# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MATTHEW RALSTON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| | : | |
| MITCHELL GARABEDIAN, ESQUIRE, et al, | : | |
| | : | NO. 2:19-cv-01539 |
| Defendants. | : | |

**APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
VOLUME I**

## TABLE OF CONTENTS

### Volume I

Exhibit "A" – July 1, 2021 deposition of Matthew Ralston ...................................................0001a

Exhibit "B" – D-31 – Matthew Ralston Resume ......................................................................0090a

Exhibit "C" – October 7, 2021 deposition transcript of Leslie Gomez ..................................0093a

Exhibit "D" – D-2 – April 23, 2016 letter to alumni and parents...........................................0288a

Exhibit "E" – November 20, 2020 deposition of Kurtis Poulos...............................................0290a

Exhibit "F" – D-1 – November 20, 2017 communication to alumni.......................................0497a

Exhibit "G" – D-33 – November 20, 2017 Hill School Communication .................................0501a

### Volume II

Exhibit "H" – November 19, 2020 deposition of Kurtis Poulos..............................................0504a

Exhibit "I" – November 24, 2020 deposition of Kurtis Poulos ...............................................0739a

Exhibit "J" – D-15 – April 11, 2018 letter from Garabedian to Lehman ...............................0845a

Exhibit "K" – D-4 – December 26, 2018 letter from Garabedian to Rees ..............................0847a

Exhibit "L" – May 27, 2021 deposition of Kurtis Poulos.......................................................0849a

### Volume III

Exhibit "M" – Poulos-4 – April 3, 2019 notes........................................................................1021a

Exhibit "N" –contingent fee agreement...................................................................................1022a

Exhibit "O" – D-3 – December 13, 2017 emails between Poulos and Mary Ellen Poulos .....1023a

Exhibit "P" – D-13 – December 13, 2017 emails between Poulos and Garabedian ...............1024a

Exhibit "Q" – D-5 – December 12, 2017 notes .......................................................................1030a

Exhibit "R" – D-9 – December 12, 2017 notes .......................................................................1037a

Exhibit "S" – D-7 – December 19, 2018 notes.........................................................................1038a

Exhibit "T" – D-6 – December 26, 2018 notes.........................................................................1039a

Exhibit "U" – D-34 – January 9, 2019 email from Rees .........................................................1041a

Exhibit "V" – D-35 – January 23, 2019 letter from Garabedian to Rees ................................1043a

Exhibit "W" – D-36 – January 30, 2019 email ........................................................................1044a

Exhibit "X" – D-37 – February 21, 2019 letter ......................................................................1046a

Exhibit "Y" – September 30, 2021 deposition transcript of Zachary Lehman .......................1047a

Exhibit "Z" – D-38 – March 26, 2019 letter ...........................................................................1216a

Exhibit "AA" – Lehman-3 – April 2019 draft email to faculty ...............................................1217a

Exhibit "BB" – July 8, 2021 deposition transcript of Nathan Gaul ........................................1218a

Exhibit "CC" – December 12, 2018 notes ...............................................................................1238a

Exhibit "DD" – December 21, 2018 notes ...............................................................................1239a

Exhibit "EE" – April 16, 2019 notes .......................................................................................1240a

Exhibit "FF" – July 8, 2021 deposition transcript of Daniel Mahoney ..................................1241a

Exhibit "GG" – December 13, 2017 notes (call with mother) .................................................1268a

Exhibit "HH" – January 29, 2018 email regarding New York statute of limitations .............1270a

Exhibit "II" – March 23, 2018 email regarding address change ..............................................1271a

Exhibit "JJ" – December 26, 2018 email from Rees .................................................................1272a

Exhibit "KK" – December 18 and 19, 2018 emails with Rees .................................................1273a

Exhibit "LL" – April 24, 2018 letter from Rees ......................................................................1277a

Exhibit "MM" – Mahoney-5 – December 13, 2017 letter from Garabedian with blank
CFA ..........................................................................................................................................1278a

Exhibit "NN" – Compilation of releases executed on December 15, 2017 ............................1280a

Exhibit "OO" – December 2017 investigative materials ..........................................................1316a

Exhibit "PP" – January 30, 2018 letter requesting records (The Hill School) .......................1324a

Exhibit "QQ" – Compilation of February 2, 2018 record requests .........................................1326a

Exhibit "RR" – Records received from University of Wisconsin-Milwaukee .......................1334a

Exhibit "SS" – December 19, 2018 emails with forwarded emails and article ......................1370a

Exhibit "TT" – May 16, 2019 email from Garabedian ...........................................................1374a

Exhibit "UU" – April 11, 2018 letter requesting records (The Hill School) ...........................1375a

Exhibit "VV" – October 11, 2021 deposition transcript of Thomas Rees..............................1376a

Exhibit "WW" – D-26 – April 18, 2019 email from Rees regarding administrative leave .....1442a

Exhibit "XX" – April 29, 2019 letter with memorandum regarding administrative leave......1443a

Exhibit "YY" – August 27, 2019 letter from James Beasley, Jr.............................................1445a

Exhibit "ZZ" – April 17, 2019 email from Philadelphia Magazine .......................................1447a

Exhibit "AAA" – October 18, 2019 email from Rees ...........................................................1448a

Exhibit "BBB" – October 14, 2019 letter from James Beasley, Jr. .......................................1449a

Exhibit "CCC" – September 23, 2019 letter from Rees ........................................................1450a

Exhibit "DDD" – December 22, 2016 letter regarding raises and bonus plan .......................1452a

Exhibit "EEE" – D-25 – June 28, 2018 job evaluation..........................................................1454a

Exhibit "FFF" – July 18, 2018 letter from Sockel regarding raise .........................................1458a

Exhibit "GGG" – July 25, 2018 email from Neese regarding bonus......................................1459a

**Volume IV**

Exhibit "HHH" – April 22, 2021 deposition of Kurtis Poulos ...............................................1460a

Exhibit "III" – September 20, 2021 deposition of Matthew Ralston....................................1571a

Exhibit "JJJ" – D-16 – Plaintiff response to interrogatories...................................................1640a

Exhibit "KKK" – June 26, 2018 email to Rees ....................................................................1651a

Exhibit "LLL" – January 2, 2019 email from Rees ..............................................................1652a

Exhibit "MMM" – March 16, 2019 email ............................................................................1653a

Exhibit "NNN" – April 29, 2018 email ...............................................................................1654a

Exhibit "OOO – D-17, D-18, D-19 – compilation of three course reviews ...........................1656a

Exhibit "PPP" – June 20, 2018 reservation of rights letter....................................................1659a

Exhibit "QQQ" – February 11, 2019 disclaimer of coverage letter .......................................1666a

Exhibit "RRR" – D-21 – April 6, 2016..................................................................................1673a

Exhibit "SSS" – D-22 – April 11, 2016 email welcoming plaintiff back ...............................1675a

Exhibit "TTT" – D-23 – July 19, 2017 letter re new salary ....................................................1676a

Exhibit "UUU" – June 24, 2021 deposition of Mitchell Garabedian .....................................1677a

Exhibit "VVV" – Gaul-5 – April 15, 2019 criminal background check ................................1739a

Exhibit "WWW" – May 10, 2019 notes ..................................................................................1751a

Exhibit "XXX" – compilation of April 2019 searches ...........................................................1752a

Exhibit "YYY" – compilation of 2019 releases ......................................................................1759a

Exhibit "ZZZ" – September 2, 2021 deposition of Christopher Hopkins .............................1762a

Exhibit "AAAA" – Subpoenas to The Hill School...................................................................1791a

**Docket Materials**

Doc. 19 – March 18, 2021 Order ............................................................................................1808a

Doc. 28 – Second Amended Complaint....................................................................................1809a

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

\*   \*   \*

JOHN DOE,                         :
            Plaintiff,            :
        - vs -                    :   NO: 2:19-CV-01539
MITCHELL GARABEDIAN, ESQUIRE,:
et al.,                           :
            Defendants.           :

\*   \*   \*

Videotape deposition of MATTHEW RALSTON,

taken at the law offices of SWARTZ CAMPBELL, LLC, One

Liberty Place, 1650 Market Street, 38th Floor,

Philadelphia, Pennsylvania, 19103, on Thursday, July 1,

2021, beginning at approximately 10:11 a.m., before

Lisa M. Cooper, Court Reporter.

\*   \*   \*

U.S. LEGAL SUPPORT
Northeast Processing Center
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania  19103
(877)  479-2484

Page 2

```
1   A P P E A R A N C E S :
2
3           THE BEASLEY FIRM, LLC
            BY:  LANE R. JUBB, JR., ESQUIRE
            1125-35 Walnut Street
4           Philadelphia, Pennsylvania  19107
            lane.jubb@beasleyfirm.com
5           -- Representing the Plaintiff
6
            SWARTZ CAMPBELL, LLC
7           BY:  CANDIDUS K. DOUGHERTY, ESQUIRE
            By:  JEFFREY B. McCARRON (VIA ZOOM)
8           One Liberty Place
            1650 Market Street, 38t Floor
9           Philadelphia, Pennsylvania  19103
            cdougherty@swartzcampbell.com
10          -- Representing the Defendant
11                  *   *   *
12
    VIDEOGRAPHER:
13          Ed Caswell, IV
14
15  ALSO PRESENT:
            Mitchell Garabedian (Via Zoom)
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                I N D E X
2
3   WITNESS                              PAGE
4
5   MATTHEW RALSTON
6
7       By:  Ms. Dougherty                5
8
9
10                  *   *   *
11          E X H I B I T S
12  NUMBER         DESCRIPTION          PAGE
13  D-15      Letter                     47
14  D-2       4/23/16 Document           98
15  D-1       E-Mails                    98
16  D-16      Interrogatories           195
17  D-4       December 26, 2018 Letter  230
18  D-17      Academic Report           329
19  D-18      Academic Report           329
20  D-19      Academic Report           329
21  D-20      Yearbook pages            337
22
23
24
25
```

Page 4

```
1           (It is hereby stipulated by and
2   among counsel for the respective parties
3   that signing, sealing, certification, and
4   filing are waived, and that all objections,
5   except as to the form of the question, are
6   reserved until the time of trial.)
7
8           MATTHEW RALSTON,
9   after having been first duly sworn, was
10  examined and testified as follows:
11                  *   *   *
12          THE VIDEOGRAPHER:  We are now on the
13  record.  My name is Ed Caswell, IV.  I'm your
14  videographer retained by U.S. Legal Support.
15  This is a video deposition for the United
16  States District Court for the Eastern
17  District of Pennsylvania.  Today's date is
18  July 1, 2021.  The time is 10:11.
19          This deposition is being held at One
20  Liberty Place, 38th floor, in Philadelphia,
21  in the matter of John Doe versus Mitchell
22  Garabedian, Esquire.  The deponent is John
23  Doe.  Counsel, if you want to introduce
24  yourselves and who you represent?
25          MS. DOUGHERTY:  Sure.  Candidus
```

Page 5

```
1   Dougherty from Swartz Campbell on behalf of
2   the defendants.
3           MR. JUBB:  Good morning.  Lane Jubb of
4   The Beasley Firm on behalf of plaintiff.  And
5   no one is appearing on behalf of Mr. Poulos
6   today.
7           THE VIDEOGRAPHER:  The witness will now
8   be sworn in.
9                   *   *   *
10          MATTHEW RALSTON,
11  after having been first duly sworn, was
12  examined and testified as follows:
13                  *   *   *
14          THE VIDEOGRAPHER:  Proceed.
15                  *   *   *
16          EXAMINATION
17                  *   *   *
18  BY MS. DOUGHERTY:
19  Q.      Can you state your full name, sir?
20  A.      Matthew, Byer, B-Y-E-R, Ralston,
21  R-A-L-S-T-O-N.
22  Q.      And what is your date of birth?
23  A.      ████████
24  Q.      Where do you live?
25  A.      5823 Parkbridge Lane, one word.  Dublin,
```

Matthew Ralston
July 01, 2021

6 to 9

Page 6

1   Ohio, 43016.
2   Q.      How long have you lived at 5823 Parkbridge
3   Lane, Dublin, Ohio, 43016?
4   A.      Five years.  Actually, technically, five
5   years about today.
6   Q.      You said to today?
7   A.      Almost.
8   Q.      So when -- so you know the date that you
9   began living at 5823 Parkbridge Lane?
10  A.      No.  Not specifically.  But it's been about
11  five years.  I converted my driver's license four years
12  ago probably.
13  Q.      Okay.  So you have a Ohio driver's license?
14  A.      I do.
15  Q.      Do you vote in Ohio?
16  A.      Yes, ma'am.
17  Q.      Do you live with someone else at 5823
18  Parkbridge Lane?
19  A.      My wife.
20  Q.      What's your wife's name?
21  A.      Mary Beth.  Two words.
22  Q.      How long have you been married to Mary Beth?
23  A.      39 years.
24  Q.      Were you married to anyone other than Mary
25  Beth?

Page 7

1   A.      No.
2   Q.      Does anyone else, other than Mary Beth, live
3   with you at 5823 Parkbridge Lane?
4   A.      No.
5   Q.      Where did you live before you lived at 5823
6   Parkbridge Lane?
7   A.      The Leelanau School.  Glen Arbor, Michigan.
8   Q.      How long -- so you lived in the residence at
9   The Leelanau School?
10  A.      Yes.
11  Q.      How long did you live in residence at The
12  Leelanau School?
13  A.      Seven years.
14  Q.      Did anyone else live with you in residence at
15  The Leelanau School?
16  A.      Mary Beth.
17  Q.      Where did you live before you lived in
18  residence at The Leelanau School?
19  A.      The Hill School.  Pottstown, Pennsylvania.
20  Q.      Just going back to The Leelanau School for a
21  minute.  So the entire time that you were employed by
22  The Leelanau School you lived in residence?
23  A.      I did.
24  Q.      You lived in residence at The Hill School in
25  Pottstown, Pennsylvania?

Page 8

1   A.      Yes.
2   Q.      How long did you live in residence at The
3   Hill School in Pottstown, Pennsylvania?
4   A.      17 years.
5   Q.      So 1992 to 2009?
6   A.      Yes.
7   Q.      The whole time you were employed by the --
8   let me start again.  You were employed by The Hill
9   School from 1992 to 2009, is that right?
10  A.      Yes.
11  Q.      The whole time you were employed by The Hill
12  School from 1992 to 2009 you lived in residence?
13  A.      Yes.
14  Q.      Did anyone else live with you in residence at
15  The Hill School when you lived in residence between
16  1992 to 2009?
17  A.      My wife.  Mary Beth.  And for part of that
18  time, our children.  Two sons.
19  Q.      What are your sons' names?
20  A.      Zachary is our oldest.  Z-A-C-H-A-R-Y.  And
21  Kyle.
22  Q.      Did Zachary attend The Hill School?
23  A.      He did.
24  Q.      Did Zachary graduate from The Hill School?
25  A.      He did.

Page 9

1   Q.      What year did Zachary graduate from The Hill
2   School?
3   A.      2005.
4   Q.      Did Kyle attend The Hill School?
5   A.      He did.
6   Q.      Did Kyle graduate from Hill School?
7   A.      Yes.  2007.
8   Q.      Did you attend The Hill School?
9   A.      No.
10  Q.      Do you have any other children, other than
11  Zachary and Kyle?
12  A.      No.
13  Q.      Do you have any grandchildren?
14  A.      No.
15  Q.      Where did you live prior to living in
16  residence at The Hill School?
17  A.      Raleigh, North Carolina.
18  Q.      How long did you live in Raleigh, North
19  Carolina?
20  A.      A little less than two years.
21  Q.      So 1990 to 1992?
22  A.      '92.  Yeah.
23  Q.      Did anyone else live with you in Raleigh,
24  North Carolina?
25  A.      Mary Beth, Zach and Kyle.

Matthew Ralston
July 01, 2021                                          10 to 13

Page 10

1  Q.      Where did you live before you lived in
2  Raleigh, North Carolina?
3  A.      At The Andrews School, Willoughby, Ohio.
4  Q.      How long did you live at The Andrews School?
5  A.      Three years.
6  Q.      So 1987 to 1990?
7  A.      Yes.
8  Q.      Did anyone live with you -- let me start
9  again.  You lived in residence at the -- at The Andrews
10 School?
11 A.      Yes.
12 Q.      Did anyone live with you in residence at the
13 The Andrews School?
14 A.      Yes.
15 Q.      Who --
16 A.      Two years Mary Beth and Zachary.  For one
17 year Mary Beth, Zachary and Kyle.
18 Q.      Where did you live before you lived in
19 residence at The Andrews School?
20 A.      Delray Beach, Florida.
21 Q.      How long did you live in Delray Beach,
22 Florida?
23 A.      15 months.
24 Q.      Just going back to Raleigh, North Carolina
25 for a moment did you live in a house or a school?

Page 11

1  A.      We had an apartment.
2  Q.      You had an apartment.
3          MR. JUBB:  Excuse me, did you say
4  Raleigh or Rawley?
5          THE WITNESS:  Raleigh.
6          MS. DOUGHERTY:  Raleigh.  Okay.  I'm
7  sorry.  I'm just saying it wrong.
8          MR. JUBB:  I just figured if you wanted
9  the correct town to look.  I figured, get the
10 names right.
11         MS. DOUGHERTY:  Sorry.  My Philly is
12 coming out.
13 BY MS. DOUGHERTY:
14 Q.      Okay.  So you lived in an apartment in North
15 Carolina?
16 A.      Yes.
17 Q.      And Delray Beach, Florida?
18 A.      Apartment.
19 Q.      So from 1995, 1996 to 1987 you were in Delray
20 Beach, Florida?
21 A.      80's.  Not 90's.
22 A.      Oh, I'm sorry.  1986.
23 A.      Yes.  Spring of '86 to the summer of '80 --
24 excuse me.  Yes, '87.  '86, '87.
25 Q.      Did anyone live with you in the apartment in

Page 12

1  Delray Beach, Florida.
2  A.      For a year of it, Mary Beth.  For the last
3  few months, Mary Beth and Zachary.
4  Q.      Where did you live before you lived in Delray
5  Beach, Florida?
6  A.      Columbus, Ohio.
7  Q.      How long did you live Columbus, Ohio?
8  A.      An apartment.
9  Q.      How long did you live in an apartment in
10 Columbus, Ohio?
11 A.      A year and a half.
12 Q.      So 1984?  1985?
13 A.      I usually go the other way.  Yeah, '80 --
14 yes.  That would be about right.
15 Q.      1984 to '86?  Or 1985 to 1986?
16 A.      Until '86, when we went to Florida.
17 Q.      You say "we", did Mary Beth live with you in
18 Columbus, Ohio?
19 A.      Yes.
20 Q.      Where did you live before you lived in
21 Columbus, Ohio?
22 A.      And, I'm sorry, I actually split residences.
23 We were still in Columbus from '82 through '86.
24 Different place, because I was doing different things.
25 So from '82 to '86 we were in Columbus.  We were

Page 13

1  married in 1982.
2  Q.      Okay.  So you were in the apartment for a
3  year and a half.  And then you were in residence for
4  the rest of the time you were in Columbus, Ohio?
5  A.      No.  We were in an apartment the whole time.
6  They were different -- they were different -- my job
7  changed in there.  That's why I separated it for you.
8  I was doing jobs where we lived.  So we were married in
9  1982 and lived in Columbus, Ohio until we left in 1986.
10 Q.      All right.  And you had one job in 1982 to
11 when?
12 A.      I did.  Yes.  So 1980 -- 1, 82, I lived in
13 Newark, Ohio.  And then we were married.  I went -- in
14 1984 I went back to graduate school.  That's why I left
15 the job.  That's when we moved.  Changed apartments.
16 And then -- so that's -- that should be -- have all of
17 those gaps filled, I think.
18 Q.      What did you do from 1982 to 1984?
19 A.      I taught at a public high school.
20 Q.      Is that different than the job in Newark,
21 Ohio?
22 A.      No.  That is the job.
23 Q.      Okay.  So you were at the job in Newark, Ohio
24 from 1980 to 1984?
25 A.      I was at the job in Newark, Ohio from the

Matthew Ralston
July 01, 2021

14 to 17

Page 14

1  spring of 1981 -- sorry, the fall of 1981, until the
2  spring -- the summer of 1984.  80 -- yes.  '83, maybe.
3  I don't know.
4  Q.      Okay.  And you went to graduate school in
5  1984?
6  A.      I did.
7  Q.      Was that in Columbus, Ohio?
8  A.      It was.
9  Q.      And you were in graduate school till 1986?
10  A.      I did.
11  Q.      Where did you live before you lived in
12  Newark, Ohio?
13  A.      I lived in South Wales, New York from 1980,
14  the fall of 1980 to the spring of 1981.  I lived in
15  residence at The Gow School.
16  Q.      Can you spell that?
17  A.      G-O-W.
18  Q.      Did anyone else live with you in residence at
19  The Gow School?
20  A.      I had a roommate who was another faculty
21  member.
22  Q.      Where did you live before you lived in
23  residence at The Gow School?
24  A.      Columbus, Ohio.
25  Q.      How long were you in Columbus, Ohio prior to

Page 15

1  living in residence in The Gow School?
2  A.      Fall of 1975 through the spring of 1980.
3  Q.      Were you working in Columbus, Ohio between
4  1975 to 1980?
5  A.      Just student jobs.  I was in college.
6  Q.      Where did you attend college?
7  A.      Ohio State.
8  Q.      Did you obtain a degree from Ohio State?
9  A.      I did.
10  Q.      What degree did you obtain from Ohio State?
11  A.      It was Elementary Education with a minor in
12  high school general science.
13  Q.      What year did you obtain -- was that a
14  Bachelor?
15  A.      It was.  1980.
16  Q.      And you said you went to graduate school.
17  Where did you go to graduate school?
18  A.      Ohio State.
19  Q.      Did you obtain a graduate degree from Ohio
20  State?
21  A.      I did.
22  Q.      What graduate degree did you obtain from Ohio
23  State?
24  A.      Master of Arts, Mathematics.
25  Q.      What year did you obtain the Master of Arts,

Page 16

1  Mathematics?
2  A.      1986.
3  Q.      Is that your highest level of education?
4  A.      It is.
5  Q.      Do you have any professional licenses?
6  A.      No.
7  Q.      Do you have a relationship with Lane Jubb
8  other than an attorney client relationship?
9  A.      Yes.
10  Q.      What is the nature of your relationship with
11  Lane Jubb, other than the attorney client relationship?
12  A.      He's an alumnus of The Hill School.
13  Q.      You were a teacher at The Hill School from
14  1992 to 2009, is that right?
15  A.      I was.
16  Q.      Was Mr. Jubb one of your students?
17  A.      He was.
18  Q.      What year was Mr. Jubb one of your students
19  at The Hill School?
20  A.      2005, 2006.
21  Q.      What course did Mr. Jubb take that you taught
22  in 2005 to 2006?
23  A.      Calculus.
24  Q.      Any other interactions with Mr. Jubb when he
25  was a student at The Hill School while you were

Page 17

1  teaching at The Hill School?
2  A.      He played on a lacrosse team for which I was
3  one of the coaches.
4  Q.      Any other contact between you and Mr. Jubb
5  while Mr. Jubb was a student at The Hill School when
6  you were a teacher at The Hill School?
7  A.      Absolutely.  And it's an in residence school,
8  so I would have seen him about campus.
9  Q.      Were you Mr. Jubb's dorm parent?
10  A.      No.
11  Q.      Were you Mr. Jubb's table head?
12  A.      Not that I recall.  But I could have been.
13  Q.      Was Mr. Jubb a classmate of your sons?
14  A.      No.
15  Q.      Mr. Jubb attended The Hill School at the same
16  time your sons attended The Hill School, is that right?
17  A.      He did.  Yep
18  Q.      Is Mr. Jubb friends with your sons?
19  A.      No.  Not that I recall.
20  Q.      Any other classes that you taught that Mr.
21  Jubb -- let me start again.  Are there any other
22  classes that you taught to Mr. Jubb while Mr. Jubb was
23  a student at The Hill School and you were a teacher at
24  The Hill School?
25  A.      No.

Page 18

1  Q.     Did you coach the lacrosse team?
2  A.     I did.
3  Q.     So you were Mr. Jubb's coach while --
4  A.     Yes.
5  Q.     -- he played on the lacrosse team while a
6  student at The Hill School?
7  A.     Yes.
8  Q.     Did you coach any other sports that Mr. Jubb
9  participated in while he was a student at The Hill
10 School?
11 A.     No.
12 Q.     Did you have any other contact with Mr. Jubb
13 when he was a student at The Hill School, other than
14 teaching the calculus class he took, coaching him in
15 lacrosse, and seeing him around campus?
16 A.     No.
17 Q.     Do you know what year Mr. Jubb -- well, let
18 me start -- let me start again.  Do you know what year
19 Mr. Jubb graduated The Hill School?
20 A.     Yes.
21 Q.     What year did Mr. Jubb graduate The Hill
22 School?
23 A.     2006.
24 Q.     Have you kept in contact with Mr. Jubb since
25 he graduated The Hill School, independent of your

Page 19

1  attorney client relationship?
2  A.     Not between 2006 and 2016.  With the possible
3  exception, and I can't tell you that I remember that,
4  could have been a class reunion in 2011.  But I don't
5  think I was in attendance.
6  Q.     Okay.  So you don't remember any contact
7  with --
8  A.     No.
9  Q.     -- Mr. Jubb between --
10 A.     No.
11 Q.     -- his graduation in 2016?
12 A.     No.
13 Q.     What prompted your contact with Mr. Jubb in
14 2016?
15 A.     I went back to work at The Hill School in
16 July of 2016.  I was on campus for class reunions in
17 June of 2016.  And Mary Beth and I ran into Lane at
18 that event.
19 Q.     You said you went back to work at The Hill
20 School in 2016, is that right?
21 A.     Correct.
22 Q.     What was your position when you went back to
23 The Hill School in 2016?
24 A.     I went back to work in the Development
25 Office.

Page 20

1  Q.     Did you have a title?
2  A.     Yes.
3  Q.     I'm sorry.  I wasn't trying to interrupt you.
4  A.     No, that's fine.  Capital Giving Officer.
5  Q.     And if I ever do that again, please just let
6  me know.  Because I'm looking down so we can move
7  quickly.  I'm not trying to interrupt you on purpose.
8  A.     Thank you.
9  Q.     Okay.  So when did you begin working at Hill
10 School again in 2016?
11 A.     July.
12 Q.     Okay.  So July 2016 you became the capital --
13 a capital --
14 A.     Capital giving officer.
15 Q.     -- giving officer?
16 A.     Yes, ma'am.
17 Q.     With the Development Office of The Hill
18 School?
19 A.     Yes.
20 Q.     Were you the only capital giving officer in
21 the development office at The Hill School?
22 A.     No.
23 Q.     How many other capital giving officers were
24 there in July of 2016?
25 A.     Four, I believe.  Five.  I'm sorry.

Page 21

1  Q.     Four or five in addition to you?
2  A.     Yes.
3  Q.     So a total of six?
4  A.     Yes.
5  Q.     Did the capital giving officers have
6  different areas in the United States that they were
7  assigned to?
8  A.     Yes.
9  Q.     What area of the United States were you
10 assigned to?
11 A.     I was assigned to the Midwest.  And then --
12 yeah.
13 Q.     So in July of 2016 you were assigned to the
14 Midwest?
15 A.     Yes.
16 Q.     Did that change?
17 A.     It did not change, per se, regionally.  It
18 changed -- I was the person assigned to some alumni
19 that I knew well that lived throughout the Country.
20 Q.     Are you still a capital giving officer at The
21 Hill School?
22 A.     I am not.
23 Q.     When did you stop working as the capital
24 giving officer at The Hill School?
25 A.     October 14th, 2019.

Matthew Ralston
July 01, 2021                                          22 to 25

Page 22

1   Q.        I forget what you called it, but I think
2   there was some kind of event that you and your wife ran
3   into Mr. Jubb at 2016?
4   A.        Yes.  Class reunions.
5   Q.        Then after the class reunion did you keep in
6   contact with Mr. Jubb?
7   A.        Yes.
8   Q.        Did you keep in contact with Mr. Jubb after
9   the class reunion in connection with your job
10  responsibilities as a capital giving officer?
11  A.        I did.
12  Q.        Did you work on any projects with Mr. Jubb in
13  -- well, let me start again.  What were your job
14  responsibilities as a capital giving officer?
15  A.        They were to engage alumni, solicit
16  involvement with the school, as well as financial
17  gifts.
18  Q.        So you were a fundraiser?
19  A.        Yes.  As well as engagement, certainly.  Yes.
20  Q.        What do you mean by engagement?
21  A.        Bringing alumni back to campus for events
22  where they interact with students.  Career days is a
23  good example.  Or to organize regional events for
24  alumni.
25  Q.        With the objective of raising money for the

Page 23

1   school, right?
2   A.        Where appropriate, yes.
3   Q.        What do you mean where appropriate?
4   A.        Some alumni are not yet in a position to
5   financially support the school.  But they are in a
6   position to stay informed and be involved in other
7   ways.  Whether that's hosting an event or meeting with
8   prospective students.
9   Q.        So when you returned to The Hill School in
10  Just 2016, you were not teaching, is that correct?
11  A.        That is correct.
12  Q.        Did you have any interaction with students at
13  The Hill School after you returned to The Hill School
14  in July 2016?
15  A.        Limited, but yes.
16  Q.        Okay.  What limited contact did you have with
17  students when you returned to The Hill School in July
18  2016?
19  A.        When I -- I worked remotely.  When I was on
20  campus I would attend meals in the dining hall.  And if
21  there were alumni activities on campus when students
22  were there, I would be present for those.
23  Q.        So your job responsibilities, when you
24  returned to The Hill School in July of 2016 didn't
25  include leading any events or teaching any classes or

Page 24

1   coaching any sports?
2   A.        No.
3   Q.        So your contact with the students of The Hill
4   School, after you returned July of 2016, was
5   incidental?  You bumped into students in the dining
6   hall --
7   A.        Yeah.
8   Q.        -- is that a fair characterization?  How many
9   times were you on campus after you returned to The Hill
10  School in July of 2016?
11  A.        Several times a year.  Some events.  Class
12  reunions, I would always be present.  Career days.  And
13  then I would visit campus periodically just so I was up
14  to speed on what was going on on campus.  As I
15  traveled, meeting with alumni.
16  Q.        I think you mentioned that you worked
17  remotely.  Was there like a set number of times you
18  needed to visit the school as part of your job
19  requirements?  Or was it fluent?  How did that work?
20  A.        They were what I would call command
21  performances.  Like alumni weekends I was expected to
22  be present.  Career days I would be present, because
23  some of the alumni there were folks I recruited to
24  join.  If I had a major donor who was visiting campus,
25  I would be present for that.  And then others, just

Page 25

1   when it seemed like a good time.  Whether it was major
2   athletic competition with a rival, or something else
3   going on on campus.
4   Q.        How many times were you on The Hill School
5   campus from July 2016 to December 31, 2016?
6   A.        July 2016 to December 2016?
7   Q.        Yeah.  Roughly the first six months of your
8   return to The Hill School.
9   A.        Wow.  I don't know.  I would have been
10  present some in the early month or two of my job, just
11  for some orientation and to meet with other giving
12  officers to -- as orientation.  I probably would have
13  been there in November.  Second week of November.  It's
14  a big rivalry week.  And I don't recall if that was on
15  Hills campus or if it was on the rival school's campus.
16  But I would have been back to that in all likelihood.
17  And that's probably it.
18  Q.        You said that was the early month of two of
19  your job.  You mean like a day or two?  Or an entire
20  month?
21  A.        No.  It would have been -- and I can't tell
22  you when, but it would have been a matter of days.  And
23  there could have been a couple times.  I don't remember
24  specifically.
25  Q.        So from July 2016 to December 2016 you were

Matthew Ralston
July 01, 2021                                    26 to 29

Page 26

1  on The Hill School campus a handful of times?
2  A.      Sure.  Yes.  I'm sorry.
3  Q.      How about in 2017, how many times were you on
4  The Hill School campus during 2017?
5  A.      Let's see.  It would -- it would be very
6  similar.  I would have been there for a reunion.  Which
7  is always in June.  I don't recall what visits I did in
8  the spring, but six months without being there would
9  have been unusual.  I would have been back again for
10 the rivalry weekend in June.
11 Q.      You mean November?
12 A.      I'm sorry, yes.  Yes.  November.
13 Q.      That's how you know I'm paying attention.
14 A.      Yes.  That was a quiz.
15 Q.      Okay.  So a handful of times on The Hill
16 School campus during 2017?
17 A.      Yes.
18 Q.      How about 2018, the same, handful of times?
19 A.      Same.  I know 2018 there was a career day I
20 was present in April.  And then beyond that, it would
21 have been very similar.  June.  Probably.  Maybe start
22 of school.  But certainly the rivalry weekend in
23 November.
24 Q.      And how about 2019 until the end of your
25 employment on October 14th, 2019?

Page 27

1  A.      I was on campus in residence for a number of
2  weeks in January and February.  I was -- I worked that
3  out.  Again just to have more presence on campus in the
4  capacity of my job.
5  Q.      Okay.  So we talked a little bit about your
6  appearance on campus in 2016.  Where did you stay?  Did
7  you stay on campus?  Or did you stay in a hotel?
8  A.      I stayed with a faculty member on campus who
9  has a house.
10 Q.      So you didn't have like a designated --
11 A.      No.
12 Q.      -- living space at The Hill School from when
13 you returned in July 2016 --
14 A.      No.
15 Q.      -- until the end of your employment in
16 October of 2019?
17 A.      I had friends who had rooms in their homes.
18 So we -- I always stayed there.
19 Q.      So each time you visited The Hill School you
20 stayed with a faculty member, friend on campus?
21 A.      With the exception of January 2019.  Just
22 because that was a longer stretch of time, I asked for
23 my own space.
24 Q.      I think you said you were in residence
25 January and February of 2019, is that right?

Page 28

1  A.      Part of -- part of it.  It was less than a
2  month in total.  But it overlapped January into
3  February.  I can't give you specific dates.
4  Q.      You said it was less than a month total?  Was
5  it a continuous --
6  A.      It was.
7  Q.      -- period of time?
8  A.      Yes.
9  Q.      Okay.  Why were you in residence in January,
10 February of 2019 for -- let me start again.  Do you
11 remember how long you were in residence in January,
12 February of 2019?
13 A.      It was -- it was three or four weeks.
14 Q.      Three or four weeks.
15 A.      Probably closer to four.
16 Q.      So why were you in residence in January,
17 February of --
18 A.      So I could --
19 Q.      -- 2019?
20 A.      I'm sorry.  I was -- I was a resident so that
21 I could do some alumni visits with other donors.  Both
22 so that I was visiting or present while they were doing
23 alumni visits, donor visits, as well as to facilitate
24 some introductions to other alumni.  People who
25 maintain those regions.  Mostly New York.

Page 29

1  Q.      Is it a fair characterization that you only
2  had incidental contact with the students of The Hill
3  School?
4  A.      Correct.
5  Q.      So similar to what you described before in
6  the dining room?
7  A.      Yes.
8  Q.      Or passing students on campus?
9  A.      And visiting classes.
10 Q.      Did something change with your job that
11 required you to be in residence as compared to working
12 remotely?
13 A.      No.  We just -- we knew there were alumni in
14 the East -- along the East Coast whom I could introduce
15 other officers to.  It gave me an opportunity to be on
16 campus again with a little more continuity than
17 previous visits.  And it also gave me an opportunity to
18 go on donor calls with other giving officers.  A little
19 deeper entrenchment in the flow of our office.
20 Q.      So did you decide to go in residence?  Or was
21 that something that your supervisor suggested that you
22 do?
23 A.      It was mutually agreed to.  I don't recall
24 which of us initiated it.  And we were both very
25 agreeable to it.  I would be surprised if I didn't

Page 30

1    initiate it, but I can't tell you for sure.
2    Q.      Who was your supervisor in 2019?
3    A.      Geoffrey Neese, with G.  Neese is N-E-E-S-E.
4    Q.      Was Geoffrey Neese your supervisor from July
5    2016 until October 2016?
6    A.      He was.
7    Q.      What was Geoffrey -- let me start again.
8    What is Geoffrey Neese's position with The Hill School?
9    A.      I believe his title was director of capital
10   giving.
11   Q.      And at least at the time when you were at The
12   Hill School, to whom did Geoffrey Neese report to?
13   A.      He reported to Christian Sockel, S-O-C-K-E-L.
14   Q.      What was -- Christian is a man?
15   A.      Yes.
16   Q.      What was Mr. Sockel's title when you were at
17   The Hill School?
18   A.      Assistant headmaster.  I think alumni
19   development.
20   Q.      Okay.  And Mr. Sockel reported to the
21   headmaster, is that right?
22   A.      He did.
23   Q.      Who was the headmaster from July 2016 to our
24   departure October 2019?
25   A.      Zach Lehman.

Page 31

1    Q.      Okay.  So the reporting structure, when you
2    returned to The Hill School in 2016, was Mr. Lehman is
3    the headmaster.  Mr. Sockel is the assistant
4    headmaster.  And Mr. Neese.  And then you and the four
5    or five other capital giving --
6    A.      Yes.
7    Q.      -- giving officers --
8    A.      Yes.
9    Q.      -- is that right?
10   A.      Correct.
11           MR. JUBB:  You're doing fine, I just
12   want to make sure you let her get her
13   question out all the way.  Because Caddie
14   does a great job of asking long concise
15   questions.
16           THE WITNESS:  Okay.
17           MR. JUBB:  She's getting the dates in
18   there, just -- you want to make sure you're
19   waiting until the end, that's all.
20           MS. DOUGHERTY:  Sometimes I'm slow too.
21           MR. JUBB:  So am I.  She'll tell you.
22   BY MS. DOUGHERTY:
23   Q.      I know that you are not purposely trying to
24   interrupt me, but, yes, it would be good so we have a
25   clean record.

Page 32

1    A.      Sure.
2    Q.      So other than the -- you and the -- well, let
3    me start again.  I think you decided that there was
4    actually five other capital giving officers other than
5    you?  Or were you --
6    A.      Yes.
7    Q.      Okay.  So there was six capital giving
8    officers in the development office for a period of time
9    after you returned to The Hill School in 2016, is that
10   right?
11   A.      Yes.
12   Q.      Were there any other individuals who worked
13   in the development office when you returned to The Hill
14   School in 2016?
15   A.      Yes.
16   Q.      Who?
17   A.      Wow.  Virginia Yinger.  Do you want the
18   capital giving officers?  Or what -- sorry.
19   Q.      Let's start -- let's do it this way.  So
20   there were the capital giving officers.  And were there
21   other positions that reported to Geoffrey Neese?
22   A.      I'm sorry?
23   Q.      So there were capital giving officers, right?
24   A.      Yes.
25   Q.      Were there other positions that also reported

Page 33

1    to Geoffrey Neese, who is the --
2    A.      I don't believe so, no.
3    Q.      So there were -- so under Geoffrey Neese
4    there were only capital giving officers, is that right?
5    A.      Yeah.  There would have -- so an
6    administrative assistant.  One for the office.  So I'm
7    not sure who she technically reports to.
8    Q.      Oh, I get it.  So the development office had
9    an administrative assistant and then six capital giving
10   officers, is that right?
11   A.      Yes.
12   Q.      Did the administrative assistant perform work
13   for everyone in the development office?
14   A.      Yes.
15   Q.      Did the administrative assistant also perform
16   work for the assistant headmaster or the headmaster?
17   A.      I believe so, yes.
18   Q.      Who was the administrative assistant during
19   the time when you returned to The Hill School in 2016
20   to 2019?
21   A.      I'm not remembering her name right now.  It
22   may come to me.
23   Q.      It was a woman?
24   A.      Her picture is clear as day.
25   Q.      So the administrative -- just so I have it

Matthew Ralston
July 01, 2021                                              34 to 37

Page 34

1  right in my head, the administrative assistant was a
2  woman who -- who provided assistance to the capital
3  giving officers, which included you, Mr. Neese, Mr.
4  Sockel and Mr. Lehman, is that right?
5  A.        Not --
6  Q.        At least at the time that you were there.
7  A.        Not to Mr. Lehman.
8  Q.        Not to Mr. Lehman? I'm sorry. I'm saying it
9  wrong. So did -- Mr. Lehman had his own administrative
10 assistant?
11 A.        Yes.
12 Q.        Who was the -- who was Mr. Lehman's
13 administrative assistance when you returned to The Hill
14 School --
15 A.        I don't recall.
16 Q.        -- in 2018 to 2019?
17 A.        I don't recall her name.
18 Q.        So Mr. Lehman had his own dedicated
19 administrative assistant, is that right?
20 A.        Yes, ma'am.
21 Q.        Okay. So the admin -- administrative
22 assistant that you had in mind that worked for the
23 development office, she only performed assistance for
24 Geoffrey Neese, Mr. Sockel, you, and the other five
25 capital giving officers, is that right?

Page 35

1  A.        No. She provided service to the other people
2  that reported to Christian.
3  Q.        Please give me the titles of the positions
4  that reported to Mr. Sockel.
5  A.        It would have -- Overarching would have been,
6  I believe, alumni relations. Annual fund. And I don't
7  know the title, but would have been the people who
8  produced the alumni magazine. Publications.
9  Q.        Did the alumni magazine have a name?
10 A.        Yes.
11 Q.        What was that?
12 A.        Hill Ties. T-I-E-S.
13 Q.        Okay. What's The Dial?
14 A.        The Dial is the school yearbook.
15 Q.        Any other publications the school publishes,
16 other than The Dial and the Hill Ties?
17 A.        Student Wiser would be a literature magazine.
18 Student newspaper. Alumni, not that I know of.
19 Q.        Okay.
20 A.        In hard copy. I mean, they maintain Twitter
21 accounts, and...
22 Q.        So Mr. Neese supervised your work when you
23 returned to The Hill School from 2019 to 2000 -- I'm
24 sorry, from 2016 to 2019?
25 A.        He did.

Page 36

1  Q.        Did Mr. Neese perform evaluations of your
2  work?
3  A.        He did.
4  Q.        How often did Mr. Neese perform evaluations
5  of your work?
6  A.        Annually.
7  Q.        Are these written evaluations?
8  A.        Yes.
9  Q.        Was there a specific time of the year when
10 the annual evaluations were performed?
11 A.        If I recall correctly, it would have been in
12 the summer months. I think it would have been prior to
13 the end of the fiscal year, so that we could set goals
14 for the ensuing year.
15 Q.        So sometime before --
16 A.        Sometime before --
17 Q.        -- June 30.
18 A.        -- June 30.
19 Q.        So in the June 2018 evaluation by Mr. Neese
20 -- let me start again. How did the evaluations work?
21 Did you fill it out and then give it to Mr. Neese and
22 he fill it out? Or how does that work?
23 A.        Yes. And then we would meet afterward.
24 Q.        Okay. So you would express your opinions in
25 a forum about --

Page 37

1  A.        Yes.
2  Q.        -- sort of self reviewing you work, right?
3  A.        Yes. There would be a self evaluation.
4  There would be a supervisor evaluation. And then we
5  would meet together.
6  Q.        So did Mr. Neese suggest, in the June 2018
7  evaluation, that you come in residence for a period of
8  time?
9  A.        I don't recall.
10 Q.        Well, how did it come about that you ended up
11 in residence in 2000 -- early 2019?
12 A.        I don't recall.
13 Q.        I think you said it was mutually agreed to,
14 or you may have suggested it. Why did you --
15 A.        I very well could have, yes.
16 Q.        Well, why do you say that?
17 A.        Because it's a place I called home for 17
18 years. And the rhythm of the days, and the changes in
19 the school since the time I left were valuable to me
20 when I was visiting with alumni.
21 Q.        Did you have any difficulty performing your
22 job remotely?
23 A.        I'm sorry?
24 Q.        Were you having difficulty performing your
25 job remotely?

Matthew Ralston
July 01, 2021                                          38 to 41

Page 38

1  A.       No.
2  Q.       So poor job performance is not the reason
3  why --
4  A.       No.
5  Q.       -- you were in residence in --
6  A.       Not at all.
7  Q.       -- early 2019?
8  A.       I'm sorry to interrupt.  That's the first
9  time I caught myself.  No.  Not at all.  The reason I
10 can't tell you specifically is that one of the other
11 purposes or things I engaged in while I was there was
12 my introduction of other alumni to other donors on the
13 East Coast.
14 Q.       Did you interact with the other capital
15 giving officers in the development office when you
16 returned to The Hill School from 2016 to 2019?
17 A.       I did.
18 Q.       You were giving me, I think, a list of the
19 capital giving officers.  We had Virginia Yinger,
20 right?
21 A.       She was not a giving officer.
22 Q.       She was not.  Okay.  Who was -- what was
23 Virginia Yinger's role?
24 A.       She had a number.  One of them was internal
25 operations of the school.  I mean not the school.  The

Page 39

1  a -- just the office.  And then also oversaw the annual
2  fund.
3  Q.       Was Virginia Yinger part of the development
4  office?
5  A.       She was.  Part of the alumni -- alumni
6  development office.  I think the school had gone away
7  from the word development at that point.
8  Q.       What was the -- I thought you told me that
9  you worked in the development office.  Was it called
10 something else?
11 A.       I did.  I think I said it was alumni and
12 development.
13 Q.       Okay.  So the full name of the department you
14 worked in was Alumni and Development Office?
15 A.       Yes.
16 Q.       The Alumni and Development Office included
17 capital giving officers, the administrative assistant,
18 Ms. Yinger.  And who else?
19 A.       It included the -- the giving officers.  It
20 included a director of alumni relations.  I think we
21 went through those.  The people that report to
22 Christian Sockel.
23 Q.       Oh, okay.  So alumni relations, the annual
24 fund, the alumni magazine, that was all part of the
25 alumni development office?

Page 40

1  A.       Yes.
2  Q.       Anyone else part of the alumni and
3  development office, other than the alumni relations,
4  annual fund, alumni magazine, the administrative
5  assistant, the capital giving officers?
6  A.       Duty wise, and I don't know to whom -- they
7  -- they were part of the office events and things.  I'm
8  guessing that's alumni relations.  But any events that
9  were planned on campus that involved alumni were --
10 came out of that office at the time as well.
11 Q.       All right.  Who were the capital giving
12 officers when you returned to The Hill School from 2016
13 to 2019?
14 A.       A woman named Emily Mimms.  Bill Randall.
15 Dave Freeman.  John Spurlock.  And then Geoff.
16 Q.       What region did Emily Mills handle?
17 A.       I'm sorry, what region?
18 Q.       Yes.  Or let's do it this way.  Were the
19 capital giving officers divided by geographic locations
20 in the United States?
21 A.       Yes.
22 Q.       You were in the Mid --
23 A.       Yes.  Generally, yes.
24 Q.       You were the Midwest, right?
25 A.       Yes.

Page 41

1  Q.       What geographic location did Emily Mimms
2  cover?
3  A.       Part of the Northeast.  I can't tell you
4  specifically the States.
5  Q.       How about Mr. Randall?
6  A.       Some of the -- what I would consider kind of
7  the northeastern, southern States.  Carolinas.  And up.
8  And then parts of Pennsylvania, West Virginia.  The
9  region -- the region -- regions are created by alumni
10 density.
11 Q.       Okay.  How about Mr. Freeman?
12 A.       I think northeast.
13 Q.       Mr. Spurlack?  Spurlock?
14 A.       South.
15 Q.       And did Mr. Neese have a geographic location?
16 Or was he just in charge?
17 A.       He did.  I can't tell you specifically,
18 although he and Christian did all international
19 fundraising.  And they probably had the more
20 established longer term major donors.
21 Q.       I saw your hesitation when we were talking
22 about geographic location.  Is it the case that the
23 individual capital giving officers focus their
24 attention to geographic locations, but if a donor or
25 alumni came about that was outside of your geographic

Matthew Ralston
July 01, 2021                                    42 to 45

Page 42

1  location and you had a relationship that you'd handle
2  it?  It wasn't like you had to -- hand off your work
3  to someone else?  Or your donor to someone else, right?
4  A.      I -- I think it depended on the relationship
5  between the donor.  If -- if -- and the officer.  If a
6  donor moved, the officer may follow.
7  Q.      Did you interact with the other capital
8  giving officers during the time when you worked at The
9  Hill School from 2016 and 2019?
10  A.      Yes.
11  Q.      How did you interact with the other capital
12  giving officers when you returned to The Hill School in
13  2016?
14  A.      Collegially.  I had -- I was in a position,
15  because of my tenure, to introduce them to alumni in
16  their regions.  I was helpful, I believe, with
17  background info -- yeah, just experience the student
18  had.  Or the alumnus had.
19  Q.      So your contact was over the phone or e-mail,
20  is that right?
21  A.      Except when I was on campus, yes.
22  Q.      So other than a handful of times each year,
23  your contact with the other capital giving officers was
24  over telephone and e-mail, is that right?
25  A.      Yes.

Page 43

1  Q.      Why did you stop working at The Hill School
2  on October 14th, 2019?
3  A.      Because of a letter that was received in
4  April '18 accusing me of molesting a student.
5  Q.      Did you resign?
6  A.      I did not.
7  Q.      Were you terminated?
8  A.      I was.
9  Q.      Who terminated your employment?
10  A.      Zach Lehman.
11  Q.      How did Zach Lehman terminate your
12  employment?
13  A.      Through a letter.
14  Q.      Did you still have that letter?
15  A.      Probably.  Actually, the letter would have
16  come from the school's attorney.  The final.
17  Q.      Who's the school's attorney that you have in
18  mind?
19  A.      Beg your pardon?
20  Q.      Who's the school's attorney?
21  A.      Tom Rees.
22  Q.      From High Swartz?
23  A.      Yes.
24  Q.      Was Mr. Rees ever your attorney?
25  A.      No.

Page 44

1  Q.      Was High Swartz ever your attorney?
2  A.      No.
3  Q.      So any time you interacted with Mr. Rees, or
4  anyone affiliated with High Swartz, it was in Mr. Rees,
5  or the attorney with High Swartz's capacity as an
6  attorney for the school, not for you, is that correct?
7  A.      Correct.
8  Q.      So you received a letter on October 14th,
9  2019?
10  A.      No.
11  Q.      When did you receive the letter terminating
12  your employment?
13  A.      It would have been before that.  It would
14  have included a Terms of Separation Agreement, with a
15  note that would have -- that -- part of the letter was
16  regardless of whether I returned the separation
17  agreement or not, the 14th was my last day of
18  employment.
19  Q.      So do you still have this letter?
20  A.      I believe that letter went to my attorney.
21  Q.      You mean Mr. Jubb, or someone else?
22  A.      Mr. Jubb.
23          MS. DOUGHERTY:  Is there a reason why
24          that letter hasn't been produced, Mr. Jubb?
25          MR. JUBB:  No.  Other than if I have it

Page 45

1  I'll give it right over to you.
2          THE WITNESS:  I think -- yeah.
3          MR. JUBB:  Can we pause for one second?
4          MS. DOUGHERTY:  Sure.
5          THE VIDEOGRAPHER:  Going off record.
6  Time is 11:09.
7                    *   *   *
8          (Whereupon, a discussion off the record
9  was held.)
10                   *   *   *
11          THE VIDEOGRAPHER:  Back on.  11:10.
12  BY MS. DOUGHERTY:
13  Q.      When did you receive the letter?
14  A.      I don't know the date.  I know the final date
15  of employment status was October 14th.
16  Q.      Did you receive the letter after you
17  commenced this action that you're testifying about
18  today?
19  A.      Yes.
20  Q.      Did you receive the letter close in time to
21  the final separation date of October 14th, 2019?
22  A.      Close in time?
23  Q.      Yeah.  Were you given two weeks, or a month,
24  or?
25  A.      The letter that said my final day was the

Matthew Ralston
July 01, 2021                                        46 to 49

Page 46

1  14th was within a couple weeks.  I can't tell you the
2  exact date I got it.  But it was a couple weeks, at the
3  most.
4      Q.      So end of September 2019, perhaps beginning
5  of October 2019, is that fair?
6      A.      That's fair.
7      Q.      And you are confident that you gave the
8  letter to your lawyer, Mr. Jubb?
9      A.      I'm pretty sure the letter went from Tom Rees
10 to Mr. Jubb.
11     Q.      How did you get the letter?
12     A.      Lane would have shared it with me.
13     Q.      When did you get the letter from Mr. Jubb?
14     A.      In all likelihood, the same day I received --
15 he received it.
16     Q.      How did you receive the letter from Mr. Jubb?
17     A.      I believe it would have been e-mail.
18     Q.      What did the letter say?
19     A.      It responded to modifications to a separation
20 agreement the school had provided saying, no, here's
21 what they would offer.  And then saying regardless of
22 whether or not I returned it, my final day of
23 employment would be October 14th.
24             MS. DOUGHERTY:  Can we mark this D-15?
25                     *   *   *

Page 47

1             (Whereupon, the above-mentioned document
2             was marked for identification as D-15.)
3                     *   *   *
4             MS. DOUGHERTY:  For the benefit of those
5             watching via Zoom, it's my document 26.
6             We're going to mark it as D-15.
7  BY MS. DOUGHERTY:
8      Q.      I'm showing you a document that I had marked
9  D-15.  It's a letter dated April 11th, 2018 from
10 Mitchell Garabedian to Zachary Lehman.  Have you seen
11 the letter that I marked as D-15 before I handed it to
12 you today?
13     A.      I have.
14     Q.      When was the first time you saw the letter
15 that has been marked as D-15?
16     A.      It was April.  I want to say April 21st,
17 1019.  I was on campus for career day.
18     Q.      I'm sorry, just to be clear, you didn't see
19 the April 11th, 2018 letter until April 21st, 2019?
20     A.      '18, sorry
21     Q.      '18, okay.
22     A.      I saw it a couple weeks after.
23     Q.      And you're certain that you first saw the
24 April 11th, 2018 letter on April 21st, 2018, because
25 you were on The Hill School campus for Career Day?

Page 48

1      A.      Yes.  And if it's not the 21st, it is
2  whatever Friday that would have been.
3      Q.      So pretty close in time to --
4      A.      Yes.
5      Q.      -- when the letter was sent, is that right?
6      A.      Within two weeks, yes.
7      Q.      Who provided you the April 11th, 2018 letter
8  that I've marked as D-5?  D-15, excuse me.
9      A.      Mr. Lehman.
10     Q.      What were the circumstances under which Mr.
11 Lehman provided you the April 11th, 2018 letter that
12 I've marked as D-15?
13     A.      Whenever I was on campus I would stop in and
14 -- his office and say hello.  And I stopped that day
15 and he asked me if I had stopped by about the letter.
16 Which I had not seen.  And at that point he pulled me
17 into his office and told me it existed and then shared
18 it with me later.
19     Q.      So Mr. --
20     A.      Later that day.
21     Q.      Okay.  So you went to Mr. Lehman's office,
22 poked your head in to say hi and then he invited you
23 into his office to talk about the letter?
24     A.      Yes.
25     Q.      What did Mr. Lehman say to you when he

Page 49

1  invited you into his office to talk about the letter?
2      A.      First it was, I think he responded to my
3  surprise that I didn't know what letter he was -- about
4  which he was speaking.  After that it was, my sense,
5  that he didn't believe the allegations.
6      Q.      By allegations you mean the allegations by
7  Mr. Kurtis Nicholas Poulos --
8      A.      I do.
9      Q.      That you sexually molested him when he was a
10 child at The Hill School?
11     A.      Yes, ma'am.
12             MR. JUBB:  Objection to the form.  You
13             can put that down until she's asked you a
14             question.
15 BY MS. DOUGHERTY:
16     Q.      So what -- so Mr. Lehman told you -- let me
17 start again.  So Mr. Lehman expressed to you that he
18 had read the April 11th, 2018 letter that I marked as
19 D-15 when he invited you into his office on April 21st,
20 2018 to talk about the letter, is that right?
21     A.      Yes.
22     Q.      And Mr. Lehman told you he didn't believe the
23 allegations in the letter?
24     A.      That was my sense.  I can't tell you his
25 exact words, but it certainly was my -- what I left

Page 50

1   feeling.
2   Q.        What did Mr. Lehman say that led you to
3   believe he didn't believe Mr. Poulos?
4              MR. JUBB:  Objection to the form.  You
5              can answer.
6   BY MS. DOUGHERTY:
7   Q.        Let me start again.  I'll ask it this way.
8   What did Mr. Lehman do or say that led you to believe
9   he did not believe Mr. Poulos's allegations expressed
10  in the April 11th, 2018 letter that I've marked as
11  D-15?
12             MR. JUBB:  Objection.
13             THE WITNESS:  I don't recall his exact
14             words, but that he knew me well enough and my
15             reputation's such that he didn't believe him.
16             And, again, I don't know his exact words.
17  BY MS. DOUGHERTY:
18  Q.        So on April 21st -- let me start again.  Is
19  it your understanding that before April 11th, 2018 that
20  Mr. Lehman thought highly of you?
21  A.        Yes.
22  Q.        And is it correct that on April 21st, 2018,
23  after Mr. Lehman expressed to you that he had already
24  read the April 11th, 2018 letter that's been marked as
25  D-15, that he still had a high opinion of you, is that

Page 51

1   right?
2              MR. JUBB:  Objection.  You can answer.
3              THE WITNESS:  To the extent I could know
4              that.  I -- I don't know how to measure that,
5              except what I would question somebody handed
6              me -- gave me a letter similar to this
7              regarding an employee.
8   BY MS. DOUGHERTY:
9   Q.        So it was your impression that on April 21st,
10  2018, that Mr. Lehman did not credit the allegations
11  contained in the April 11th, 2018 letter that's been
12  marked as D-15, because he knew your reputation, is
13  that right?
14  A.        As well as me.  That was my impression.
15  Q.        So your impression on April 21st, 2018, was
16  that nothing contained in the April 11th, 2018 letter
17  that's been marked as D-15 changed Mr. Lehman's
18  opinions of you, is that right?
19             MR. JUBB:  I'll object to the form.
20             THE WITNESS:  I guess.  I mean --
21  BY MS. DOUGHERTY:
22  Q.        What do you mean you guess?  I'm asking your
23  impression.
24  A.        -- I have no certainty about that.
25  Q.        I asked you a question.  So is it your

Page 52

1   impression, on April 21st, 2018, that Mr. Lehman, after
2   having read the April 11th, 2018 letter that's been
3   marked as D-15, Mr. Lehman's opinion of you did not
4   change?
5              MR. JUBB:  Same objection.
6              THE WITNESS:  Yes.
7   BY MS. DOUGHERTY:
8   Q.        So the content of the -- let me start again.
9   It was your impression, on April 21st, 2018, that the
10  content of the April 11th, 2018 letter that's been
11  marked as D-15 did not cause Mr. Lehman's opinion of
12  you to change, is that right?
13             MR. JUBB:  Same objection.  You can
14             answer.
15             THE WITNESS:  Correct.
16  BY MS. DOUGHERTY:
17  Q.        Did Mr. Lehman express whether -- let me
18  start again.  What else did Mr. Lehman express to you
19  when he invited you into his office on April 21st,
20  2018?
21  A.        I don't recall specifically anything else he
22  said.
23  Q.        Did he give you the letter?
24  A.        He e-mailed the letter to me.
25  Q.        So Mr. Lehman e-mailed you the April 11th,

Page 53

1   2018 letter that's been marked as D-15, on April 21st,
2   2018, like when you were still in his office?
3   A.        No.
4   Q.        When did Mr. Lehman e-mail you the April
5   11th, 2018 letter that's been marked as D-15?
6   A.        Later that day.
7   Q.        What did Mr. Lehman tell you about the letter
8   when he invited you into his office on April 21st,
9   2018?
10  A.        What did he tell me?
11  Q.        Yes.
12  A.        That it was there.  That he received it.  I
13  don't recall if he read it to me.  I don't -- I don't
14  recall.  It was a bit of a surreal moment.  Kicked in
15  the gut.
16  Q.        So, I'm sorry, Mr. Lehman read the letter to
17  you?
18  A.        I don't recall specifically.
19  Q.        Mr. Lehman did something to communicate to
20  you the content of Mr. Poulos's accusations in the
21  April 11th, 2018 letter?
22  A.        He did.
23  Q.        What did Mr. Lehman convey to you regarding
24  the content of the April 11th, 2018 letter when he
25  invited you into his office on April 21st, 2018?

Matthew Ralston
July 01, 2021

54 to 57

Page 54

1   A.        That he received a letter accusing me of
2   sexually molesting a student in the early '90s.
3   Q.        Did he tell you who the student was?
4   A.        I don't remember.
5   Q.        Did Mr. Lehman tell you anything else about
6   the letter when he invited you into his office on April
7   21st, 2018?
8   A.        I just -- what -- whatever he said left me
9   with the impression that he didn't believe it was
10  credible.
11  Q.        What did you think when you heard Mr. -- when
12  Mr. Lehman told you about the content of the letter?
13  A.        What did I think?
14  Q.        Yeah.
15  A.        I -- my world changed that instant.  I didn't
16  understand why someone would make up such a falsity
17  regarding me.  It didn't fit with the career I had.  My
18  experience at The Hill School.  And I wondered why.
19  Q.        Anything else?
20  A.        In the moments that I was in his office?
21  Q.        Yes.
22  A.        Fear, that my name was attached to what I
23  considered the most heinous crimes that can be --
24  happen to a child.  And where it was gonna -- what it
25  was going to do to me, my life, my family.  Every

Page 55

1   former student or colleague I ever had.  I can't tell
2   you that all ran through my head right there, but it
3   was all present.
4   Q.        I guess I'm confused, because the information
5   was shared with you, but Mr. Lehman's expressed to you
6   that he didn't believe it, right?  So why were you
7   afraid?
8   A.        My name is attached to the ugliest thing a
9   person can do to a child.  Why would -- I don't know
10  what else I could have felt.  Sick to my stomach and
11  afraid.  It's all false.  I have done nothing in my
12  life that would lead -- it's just changed my life.
13  That moment.  I don't --
14  Q.        Did you think that your wife would believe
15  the allegations contained in the April 11th, 2018
16  letter that's been marked as D-15?
17  A.        No.
18  Q.        Why -- what was your concern about your
19  family?  You -- I think you said you were afraid of
20  something in relation to your family.
21  A.        My children grew up on The Hill School
22  campus.  They graduated from the Hill School.  They
23  were -- childhood friends with whom they're still close
24  are Hill School students.  Every aspect of our life was
25  entrenched in the school.

Page 56

1   Q.        Did you think your children would believe the
2   allegation?
3   A.        No.
4   Q.        You said that your life was entrenched at The
5   Hill School.
6   A.        We lived on campus in dormitories.  Yes.
7   Q.        Did you think that other people at The Hill
8   School were going to believe the allegations in the
9   April 11th, 2018 letter that's been marked as D-15?
10  A.        I can't know what people will think, except
11  that I'm the only person alive that knows with absolute
12  certainty that it's all made up, with the possible
13  exception of one other person.
14  Q.        I'm sorry, who are you talking about?  Are
15  you talking about Mr. Poulos, who --
16  A.        I am.
17  Q.        -- 100 percent testified, at length, over
18  several days, that he was absolutely repeatedly
19  assaulted by you when he was a child?
20  A.        Yes.
21  Q.        Is that the person you're talking about?
22  A.        It is.
23  Q.        So am I correct that only you and Mr. Poulos
24  know what actually happened between you and Mr. Poulos,
25  is that right?

Page 57

1             MR. JUBB:  I'll object to the form.
2             THE WITNESS:  I don't -- of course.
3   BY MS. DOUGHERTY:
4   Q.        I'm just -- I'm just trying to confirm,
5   because you said possibly one other person.  So I --
6   A.        Yes.
7   Q.        -- wanted to make sure there's no other
8   witness --
9   A.        He would be the only other person that knows
10  with absolute certainty that I never abused him or
11  inappropriately touched him.
12  Q.        Have you read Mr. Poulos's testimony in this
13  action?
14  A.        No.
15  Q.        Did you observe any component of Mr. Poulos's
16  testimony?
17  A.        Observe, as in?
18  Q.        I don't think you did, but did you watch via
19  Zoom or --
20  A.        No.
21  Q.        Did you learn the content of Mr. Poulos's
22  deposition testimony?
23            MR. JUBB:  You don't have to answer that
24        question.
25            MS. DOUGHERTY:  I said did he learn the

Matthew Ralston
July 01, 2021                                                    58 to 61

Page 58

1    content of Mr. Poulos's deposition testimony.
2        MR. JUBB: Yeah, and I'm saying he
3    wouldn't have to answer that. How would he
4    learn about the contents of the deposition
5    testimony, other than through counsel?
6        MS. DOUGHERTY: I don't know. But it's
7    a -- should be a yes or no question. And
8    then if I want to ask him how he learned, if
9    that's his answer, then he can tell me that.
10       MR. JUBB: No. That's not how it works.
11   If he says, yes, he learned the content of
12   it, it came from me. If he says, no I don't
13   know the content of it, it also didn't come
14   from me. So I don't think you can get around
15   it that way.
16   BY MS. DOUGHERTY:
17   Q.      How did you learn the content of Mr. Poulos's
18   testimony?
19       MR. JUBB: I'll object to the form of
20       the question.
21       THE WITNESS: Could you just repeat it?
22       I didn't hear you.
23   BY MS. DOUGHERTY:
24   Q.      Sure. How did you learn about the content of
25   Mr. Poulos's deposition testimony?

Page 59

1        MR. JUBB: You don't have to answer that
2        question. Don't answer that question.
3        THE WITNESS: I -- I didn't say I had.
4    BY MS. DOUGHERTY:
5    Q.      So you did not learn about the content of --
6    A.      I didn't say that.
7    Q.      -- Mr. Poulos's testimony?
8        MR. JUBB: You don't have to answer it.
9        This is not a fair question.
10   BY MS. DOUGHERTY:
11   Q.      Well, how do you know if Mr. Poulos isn't
12   telling the truth, if you don't know the testimony?
13   A.      I know what I read. We were talking about
14   this letter. This is false. (Indicating.)
15   Q.      You're pointing to the April 11th, 2018
16   letter that's been marked --
17   A.      I am indeed.
18   Q.      -- D-15?
19   A.      Yes.
20   Q.      Let's look at that. The letter starts off,
21   it's addressed to Zachary G. Lehman. Headmaster of The
22   Hill School, 860 Beech Street, Pottstown, Pennsylvania,
23   19464, right?
24   A.      Yep.
25   Q.      And on April 11th, 2018, Mr. Lehman was, in

Page 60

1    fact, the headmaster of The Hill School, right?
2    A.      Yes.
3    Q.      You know that, because you were an employee
4    of The Hill School and Mr. Lehman was within your
5    reporting chain, is that right?
6    A.      Yes.
7    Q.      And it says, "Re: Sexual abuse claim of
8    Kurtis Nicholas Poulos", right?
9    A.      Yes.
10   Q.      When you were having the meeting with Mr.
11   Lehman on April 21st, 2018, did he tell you that the
12   letter was about Mr. Poulos?
13   A.      I believe so.
14   Q.      So before you left Mr. Lehman's office on
15   April 21st, 2018, you knew that Kurtis Nicholas Poulos
16   had accused you of repeatedly sexually molesting him,
17   is that right?
18   A.      Yes.
19   Q.      Now, if you look at the top, the letter's
20   from -- it says at the top, Law Office of Mitchell
21   Garabedian. And on the second page, in the middle, I
22   guess, it says, "Very truly yours, MG, Mitchell
23   Garabedian." Do you see that?
24   A.      Yes.
25   Q.      And did Mr. Lehman tell you from whom the

Page 61

1    letter came when you met with Mr. Lehman in his office
2    on April 21st, 2018, other than just identifying a
3    student?
4    A.      I don't recall.
5    Q.      Okay. So you certainly learned, later on
6    that day, when Mr. Lehman e-mailed you the April 11th,
7    2018 letter that's been marked as D-15, that the letter
8    was on a lawyer's letterhead --
9    A.      Yes.
10   Q.      -- is that right? Did you recognize Mr.
11   Garabedian when you reviewed the letter on April 21st,
12   20 --
13   A.      No.
14   Q.      Let me start again. Did you review the
15   letter, on April 21st, 2018, when Mr. Lehman e-mailed
16   it to you?
17   A.      Yes.
18   Q.      So the first time you read the letter from
19   start to finish, the letter being the April 11th, 2018
20   letter that was marked as D-15, was on April 21st,
21   2018, is that right?
22   A.      Yes.
23   Q.      And so when you read the letter on April
24   21st, 2018, did you recognize Mr. Garabedian?
25   A.      No.

Matthew Ralston
July 01, 2021                                                  62 to 65

Page 62

1   Q.      Did you Google Mr. Garabedian?
2   A.      Probably at some point I did.  I can't tell
3   you when.  It wasn't my --
4   Q.      So you Googled Mr. Garabedian sometime after
5   you read the April 11th, 2018 letter that's been marked
6   as D-15, is that right?
7   A.      Yes.
8   Q.      Did you Google Mr. Garabedian close in time
9   to when you first read the letter that's been marked as
10  D-15?
11  A.      I don't recall.
12  Q.      Did you Google Mr. Garabedian before the
13  second letter?
14  A.      Yes.  I would have known who he was by then,
15  yes.
16  Q.      What did you learn about Mr. Garabedian?
17  A.      I think the -- probably the first thing I
18  learned that stood out was that he was the attorney
19  that was highlighted in the movie Spotlight.
20  Q.      Anything else that you learned about Mr.
21  Garabedian?
22  A.      No.
23  Q.      And you learned --
24  A.      Well --
25  Q.      Go ahead.

Page 63

1   A.      That -- that his offices were in Boston.  But
2   I probably knew that once I saw it.  But beyond that,
3   no.
4   Q.      And you learned -- did you learn that Mr.
5   Garabedian represents survivors of childhood sexual
6   abuse?
7   A.      Yes.
8   Q.      And you learned that Mr. Garabedian
9   represents survivors of childhood sexual abuse by
10  Googling Mr. Garabedian?
11  A.      Yes.
12  Q.      Did you learn information about Mr.
13  Garabedian from a source other than Googling Mr.
14  Garabedian?
15  A.      Well, I had seen the movie.  So once I knew
16  the movie featured him, I would've had some
17  recollection of that.
18  Q.      So you Googled Mr. Garabedian, you realized
19  he was depicted in a movie that you saw, which informed
20  your belief about Mr. Garabedian, is that right?
21  A.      Is that how I knew him?  Who he was?
22  Q.      I'm just trying to -- you Googled Mr.
23  Garabedian.  You had independent information because
24  you watched the movie Spotlight.  Did you have any
25  other source of information about Mr. Garabedian?

Page 64

1   A.      No.
2   Q.      Basically what you're telling me is when you
3   learned that Mr. Garabedian was depicted in the movie
4   Spotlight you didn't need to look any further.  You
5   understood the nature of Mr. Garabedian's practice.  Or
6   did you do further investigation?
7   A.      I don't recall if I read more.  I probably
8   did.  But I think I -- mostly probably the movie, or
9   the reputation that the movie portrays.
10  Q.      Did you visit Mr. Garabedian's website?
11  A.      Not then.
12  Q.      Not then, you mean -- what are you talking
13  about?
14  A.      You're talking about right after I got the
15  letter?
16  Q.      Okay.  So right after you got the April 11th,
17  2018 letter that's been marked as D-15, that's when you
18  Googled Mr. Garabedian and learned he was depicted in
19  the movie Spotlight?
20  A.      Yes.  I don't know if it was that day.  It
21  was after -- after I saw the letter.  I can't -- I
22  can't tell you when.  Specifically time frame.  It
23  would have been soon after.
24  Q.      A couple days or a couple weeks?
25  A.      I'm sure.  Probably that.  Yes.

Page 65

1   Q.      So what you're telling me is when you checked
2   your e-mail and you got the letter from Mr. Lehman and
3   you read the letter, you didn't, like, immediately go
4   Google Mr. Garabedian, but sometime in the coming days
5   or perhaps weeks you Googled Mr. Garabedian to learn
6   about him?
7   A.      That would be correct, yes.
8   Q.      And are you able to tell me, without
9   completely guessing, whether it was days or weeks after
10  you reviewed the letter?
11  A.      I cannot.
12  Q.      But you're sure it wasn't longer than weeks,
13  is that right?
14  A.      I'm pretty sure.
15  Q.      So within weeks of April 21st, 2018, you
16  Googled Mr. Garabedian and learned that he was a lawyer
17  depicted in the movie Spotlight, is that right?
18  A.      Yes.
19  Q.      And within a couple weeks of April 21st,
20  2018, you knew that Mr. Garabedian represents survivors
21  of childhood sexual abuse, is that right?
22  A.      Yes.
23  Q.      Did you visit Mr. Garabedian's website when
24  you were Googling Mr. Garabedian a few weeks after
25  April 21st, or within a few weeks after April 21st,

Page 66

1   2018?
2   A.      I don't believe so.
3   Q.      You said earlier not at that time.  Was there
4   another time when you were doing research about Mr.
5   Garabedian?
6   A.      I have -- I have visited his website.  I
7   can't tell you if it was before the second letter.
8   After.  I can't tell you specifically when.
9   Q.      Okay.  So there's at least two instances
10  where you did research about Mr. Garabedian, is that
11  right?
12  A.      Yes.  I -- I don't know if visiting the
13  website was research, but yes.
14  Q.      Why did you visit the website?
15  A.      That's why I say it's probably research.
16  Q.      Okay.
17  A.      I was curious.
18  Q.      Why were you curious about Mr. Garabedian?
19  A.      Because he wrote false letters about me that
20  were written in a factual basis.  And I -- I wondered
21  why someone would do that.
22  Q.      You said letters.  So now do you remember
23  that you visited the website after the second letter?
24  Or were there more instances --
25  A.      No.

Page 67

1   Q.      -- of research?
2   A.      I -- I don't recall.  After the second
3   certainly makes sense to me.  But I -- I don't recall.
4   My -- my life changed and time changed with it.  I
5   can't -- it's -- it's a miserable blur.
6   Q.      Okay.  So other than Google Mr. Garabedian on
7   one instance, and learning he was depicted in the movie
8   Spotlight, and then later visiting Mr. Garabedian's
9   website, did you do any other research about Mr.
10  Garabedian?
11  A.      No.
12  Q.      How about did you -- when you visited -- let
13  me start again.  What did you look at when you went to
14  Mr. Garabedian's website?
15  A.      I don't recall.  I think, one, I probably
16  would have cared what he looked like.  Beyond that, I
17  -- I don't know.
18  Q.      Did you want to see if Stanley Tucci was an
19  accurate character to play him, is that right?
20  A.      (Witness laughing.)
21  Q.      So you wanted to know what Mr. Garabedian
22  looked like.  What else did you look at on Mr.
23  Garabedian's web site?
24  A.      I'm sorry.  Again?
25  Q.      Sure.  So you went to see what -- let me

Page 68

1   start again.  You were curious to see what Mr.
2   Garabedian looked like.  What else did you look at on
3   Mr. Garabedian's website?
4   A.      I don't recall.  At all.  I can't tell you
5   why I went.  Except I'm wondering what's going on in my
6   life.  It would have just probably seemed like a
7   natural place to go look.
8   Q.      Did you --
9   A.      I don't know how to explain that.
10  Q.      Did you look at information about other
11  lawyers affiliated with Mr. Garabedian's law firm?  Or
12  just for information about Mr. Garabedian?
13  A.      Other lawyers on his website, is that what
14  you're asking?
15  Q.      Sure.  Affiliated with his law firm.
16  A.      No.
17  Q.      So you were only interested in doing research
18  about Mitchell Garabedian, is that right?
19  A.      Yes.
20  Q.      Was there a reason why you were only
21  interested in doing research about Mitchell Garabedian
22  as compared to research about Mitchell Garabedian's law
23  firm, or other lawyers affiliated with Mr. Garabedian's
24  law firm?
25  A.      Yes.

Page 69

1   Q.      Why?
2   A.      Because it's his signature, or his name at
3   the end of the letter.
4   Q.      So just going back to the April 11th, 2018
5   letter that's been marked as D-15.  You said something
6   that Mr. Garabedian wrote factual letters.  Were you
7   referring to the April 11th, 2018 letter that's been
8   marked as D-15?
9           MR. JUBB:  I'll object to the form --
10          THE WITNESS:  Yes.
11          MR. JUBB:  -- of that.
12  BY MS. DOUGHERTY:
13  Q.      Well, correct me if you didn't say it.  I
14  thought you expressed the comment along the lines of he
15  wrote factual letters and that's what prompted you to
16  look at his website.
17          MR. JUBB:  That's not what he said.
18          Objection to the form.
19          THE WITNESS:  Should -- may I answer?
20          MR. JUBB:  Go ahead.
21          THE WITNESS:  The letter is written --
22          MS. DOUGHERTY:  I wrote it down.  He
23  said factual information.
24          MR. JUBB:  He said he wrote false
25  letters asserting facts.

Page 70

1          MS. DOUGHERTY:  Factual information.  I
2      thought it was curious.  So I'm not
3      mischaracterizing his testimony.
4          MR. JUBB:  You can -- you got that,
5      right?
6          THE WITNESS:  I described --
7  BY MS. DOUGHERTY:
8      Q.     Hold on.  Here's what I want to know.  I just
9  want to know what you meant when you uttered the words
10 factual information in connection with the letters
11 written by Mr. Garabedian.
12     A.     I said -- what I meant or mean is that there
13 is a letter falsely accusing me, written as though the
14 allegations are fact.
15     Q.     Okay.  So specifically, going to the April
16 11th, 2018 letter that's been marked as D-15, you think
17 that the letter is written as if it is communicating
18 facts, is that right?
19     A.     Yeah.
20     Q.     When you read the April 11th, 2018 letter
21 that has been marked as D-15, on April 21st, 2018, did
22 you have a belief about the source of the information
23 included in the letter?
24         MR. JUBB:  I'll object to the form.
25         THE WITNESS:  A belief?

Page 71

1  BY MS. DOUGHERTY:
2      Q.     Yeah.
3          MR. JUBB:  Like who the source was?
4  BY MS. DOUGHERTY:
5      Q.     Yeah.  Sure.
6      A.     I'm sorry.  I don't understand what you're
7  asking.
8      Q.     Well, do you think Mr. Garabedian came up
9  with the idea that Mr. Poulos was sexually abused by
10 you?  Or do you think that's something that Mr. Poulos
11 told Mr. Garabedian?
12         MR. JUBB:  At the time you read the
13         letter.
14 BY MS. DOUGHERTY:
15     Q.     At the time you read the letter on April
16 21st, 2018.
17     A.     I assumed that Mr. Poulos told Mr.
18 Garabedian.
19     Q.     So we were -- I think we were going line by
20 line through the letter when I got distracted about the
21 website.  So, "Dear Mr. Lehman, please be informed that
22 this office represents Kurtis Nicholas Poulos."  So you
23 read the first sentence of the April 11th, 2018 letter
24 that's been marked as D-15, on April 21st, 2018, is
25 that right?

Page 72

1      A.     Yes.
2      Q.     And so when you read the letter on April --
3  when you read -- let me start again.  When you read the
4  April 11th, 2018 letter that's been marked as D-15, on
5  April 21st, 2018, you immediately understood that Mr.
6  Garabedian was writing to Mr. Lehman on behalf of a
7  client, Kurtis Nicholas Poulos, is that right?
8      A.     Yes.
9      Q.     And then the letter continues, "This letter
10 is an attempt to settle any compromised claims
11 regarding Matthew B. Ralston, hereinafter, Mr. Ralston,
12 and Mr. Ralston's supervisors at The Hill School."  Did
13 you read that sentence on April 21st, 2018?
14     A.     Yes.
15     Q.     Matthew B. Ralston, was it your understanding
16 that referred to you?
17     A.     Yes.
18     Q.     Okay.  And then it says, "It should not be
19 used as evidence in any court hearing."  Did you read
20 that sentence --
21     A.     Yes.
22     Q.     On April 21st, 2018?  Yes?
23     A.     Yes.
24     Q.     And it continues, "Kurtis Nicholas Poulos."
25 did you recognize the name Kurtis Nicholas Poulos when

Page 73

1  you read the April 11th, 2018 letter that's been marked
2  as D-15 on April 21st, 2018?
3      A.     Yes.
4      Q.     Did you recognize Kurtis Nicholas Poulos as
5  one of your former students?
6      A.     Yes.  Yes.  I can't say in that moment I
7  recognized him as a student I taught.  As a student who
8  lived in our dormitory, yes.  As a student of the
9  school, yes.
10     Q.     Okay.  So on April 21st, 2018, when you read
11 the April 11th, 2018 letter that's been marked as D-15,
12 you recognized Mr. Poulos as a former student of The
13 Hill School who was in your dormitory, but you don't
14 remember whether you realized that Mr. Poulos had also
15 been one of your students?
16     A.     I don't think my memory went to the context
17 of our relationship, because relationships of a
18 boarding school, pretty much every aspect of not only
19 academic life, but residential life and athletic life.
20 So recognizing a student as a student of the school is
21 -- when I think of someone, is what I consider.  What I
22 think about.  Is that clear?
23     Q.     Okay.  So you recognized Mr. Poulos as --
24     A.     I don't --
25     Q.     -- a student -- a former student of The Hill

Matthew Ralston
July 01, 2021

74 to 77

Page 74

1 School on April 21st, 2018 when you read the April 11,
2 2018 letter, is that right?
3 A.       And with whom -- yes.  And with whom I would
4 have had contact in several capacities.  I probably did
5 not consider those capacities when I read the letter.
6 Q.       Do you now acknowledge that you taught
7 geometry to Mr. Poulos when he was a student at The
8 Hill School?
9 A.       Of course.
10 Q.       Was there a time when you remembered that you
11 taught Mr. Poulos geometry, after reading the April
12 21st, 2018 letter?
13 A.       A time that I recall --
14 Q.       I think you're telling me -- let me start
15 again.  Did you realize that you taught geometry to Mr.
16 Poulos on October -- excuse me, April 21st, 2018 when
17 you read the April 11th, 2018 letter?
18 A.       I could have recalled that I taught him.  I
19 don't know that I could have told you that I taught him
20 geometry.
21 Q.       Okay.  So the letter continues, "Currently 39
22 years of age.  Was repeatedly sexually molested by Mr.
23 Ralston from approximately 1993, when he was
24 approximately 15 years of age, until approximately
25 1995, when he was approximately 17 years of age."  Did

Page 75

1 you read that sentence on April 21st, 2018?
2 A.       I did.
3 Q.       Did you have contact with Mr. Poulos at The
4 Hill School between 1993 and 1995?
5 A.       Yes.
6 Q.       The third paragraph of the letter, which goes
7 on to the second page, describes Mr. Poulos's injuries.
8 Did you read the third paragraph of the April 11th,
9 2018 letter on April 21st, 2018?
10 A.       Yes.
11 Q.       What was your reaction when you read the
12 third paragraph of the April 11th, 2018 letter on April
13 21st, 2018?
14 A.       I don't know if I would have had -- my
15 reactions would have been to the first paragraph above
16 it.  Would have been my most -- my strongest reactions.
17 Anything resulting from something I knew to be false
18 would not have had the impact of what I knew to be
19 false.  Where he states that he was repeatedly is
20 false.  The results of that, I think in my --
21 Q.       You mean where he said he was repeatedly
22 sexually molested by Mr. Ralston?
23 A.       Yes.
24 Q.       So you disagree that Mr. Poul -- that you
25 repeatedly sexually molested Mr. Poulos, is that right?

Page 76

1 A.       Those are false statements.  That is a false
2 statement.
3 Q.       Okay.  So what about the paragraph about Mr.
4 Poulos's --
5 A.       So logically for me, the second -- the third
6 -- what's the third paragraph of the letter is also
7 false.  And my strongest reaction, you ask how I felt
8 about the third paragraph, I can tell you my reaction
9 would have been focused on the second paragraph, where
10 all falsity begins.  Everything that follows that is
11 just piling on false facts.  False statements.
12 Q.       Okay.  So you couldn't get past the sentence
13 that said Mr. Poulos was repeatedly sexually molested
14 by you, is that right?
15 A.       I -- I didn't say that.
16 Q.       Okay.
17 A.       You asked how I felt about the third
18 paragraph.  I'm telling you my reaction would have been
19 focused on the second paragraph.  Everything after that
20 I read.  It was false.  My focus would have been on the
21 sentence in the second paragraph that makes a false
22 statement that I repeatedly sexually molested him.
23 Q.       Okay.  Just so I understand.  So your belief
24 about Mr. Poulos is the paragraph about Mr. Poulos's
25 injuries being false is because you contend that you

Page 77

1 did not sexually molest Mr. Poulos, is that right?
2 A.       I did not molest Mr. Poulos.  That is
3 correct.
4 Q.       The fact that you say that you did not
5 sexually molest Mr. Poulos, is that the only reason why
6 you don't believe the statements about Mr. Poulos's
7 injuries?
8 A.       Yes.  Because it says as a result of my
9 molesting him.  So those can't be a result.  They can't
10 be true, because it's a result of something I didn't
11 do.
12 Q.       Why do you think Mr. Poulos accused you of
13 repeatedly sexually molesting him if you didn't
14 repeatedly sexually molest him?
15 A.       I have no idea.  I spent months trying to
16 figure that out.  And at some point it occurred to me I
17 can't figure it out.  And I just -- how was I going to
18 continue to deal with the -- the presence and the --
19 the tortuous presence, if you will, of being falsely
20 accused of such a heinous crime against a child.
21 Q.       Just sticking with April 21st, 2018.  At that
22 time only you and Mr. Lehman knew about the
23 accusations, is that right?
24 A.       I -- I don't believe that to be true.
25 Q.       Who else knew about Mr. Poul -- well, let me

Page 78

1   start again.  Other than Mr. Garabedian and Mr. Poulos,
2   who, other than you and Mr. Lehman, knew about Mr.
3   Poulos's accusations on April 21st, 2018?
4   A.        I know with certainty that Tom Rees knew.
5   Q.        So the lawyer for The Hill School?
6   A.        The lawyer -- yes.
7   Q.        Okay.
8   A.        And I assumed and I would -- as much
9   certainty as I could without asking, the board chair.
10  And, in all likelihood, the legal committee of the
11  board.
12  Q.        Okay.  So --
13  A.        Headmast -- okay.  Sorry.
14  Q.        Go ahead.  The board chair.  The legal what?
15  A.        Committee of the Board of Trustees.
16  Q.        Were you still going?
17  A.        No.
18  Q.        Okay.  So --
19  A.        Did you get -- you have Tom Rees?
20  Q.        Yeah.  I was going to go back to clarify who
21  -- what you knew with certainty the basis.  So
22  obviously Mr. Lehman had the letter, because he
23  provided it to you.  You said that you knew with
24  certainty, on April 21st, 2021, that Thomas Rees, the
25  lawyer for The Hill School, also knew about the April

Page 79

1   11th, 2018 letter that's been marked as D-15, is that
2   right?
3   A.        Yes.
4   Q.        Why do you say that you knew with certainty
5   that Thomas Rees --
6   A.        Because after speaking with my wife, he was
7   my first phone call.  I've known Tom for -- '16, so
8   probably 20 years at that point.
9   Q.        So you left Mr. Lehman's office, after he
10  invited you in on April 21st, 2018, and then you did
11  what?
12  A.        I went back to where I was staying, called my
13  wife.
14  Q.        So your wife wasn't with you?
15  A.        No.
16  Q.        So you called your wife in Ohio?
17  A.        I did.
18  Q.        And you told your wife what?
19  A.        What -- what I had received and been
20  told by Mr. Lehman.
21  Q.        Okay.  So you had received the April 11th,
22  2018 letter by e-mail from Mr. Lehman before you called
23  your wife?  Or you were just relaying what Mr. Lehman
24  told you?
25  A.        I don't recall.  Certainly what he told me.

Page 80

1   Q.        So you don't know whether you -- did you --
2   let me start again.  Did you call your wife more than
3   once, on April 21st, 2018, to talk about Mr. Poulos's
4   allegations?
5   A.        I don't remember.
6   Q.        Did you send the wife -- let me start again.
7   Did you send your wife the April 11th, 2018 letter
8   that's been marked D-15 --
9   A.        No.
10  Q.        -- after you received it from Mr. Lehman on
11  April 21st, 2018?
12  A.        No, I did not.
13  Q.        Is there a reason why you didn't share the
14  letter with your wife?
15  A.        Other than she didn't need it.  At the point
16  that I received it, and again I don't know the timing,
17  I would have read it to her.  Beyond that she didn't
18  need it.
19  Q.        I'm sorry, you don't remember whether you had
20  it before you talked to your wife?
21  A.        That's what I said --
22  Q.        Or you do remember?
23  A.        -- yes.
24  Q.        I thought you said you read it to her.
25  A.        I said I would have read it.  You asked why I

Page 81

1   didn't send it to her.
2   Q.        Oh, I get it.  Okay.  So if you had the
3   letter before you called your wife you would have read
4   it to her, right?
5   A.        Yes.
6   Q.        So then you wouldn't need to send it to her.
7   But you don't know if you had the letter before you
8   called your wife, right?
9   A.        Correct.  I know I had seen Mr. Lehman.
10  Q.        What's your explanation to not sending it to
11  your wife if you didn't have it before you spoke to
12  her?
13  A.        I'm sorry?
14  Q.        You can't tell me one way or the other
15  whether you had the letter before you spoke to your
16  wife.  You're positive that you wouldn't need to send
17  it to her if you had it before you spoke to her,
18  because you would have read it to her.  So now I'm
19  trying to find out the alternative.
20  A.        I don't --
21  Q.        Why wouldn't you send it to her?
22  A.        I don't understand the confusion.  When I
23  received the letter --
24  Q.        Yes.
25  A.        -- if I spoke -- when I spoke with my wife

Matthew Ralston
July 01, 2021                                              82 to 85

Page 82

1  after receiving it, I would have read it to her.  When
2  I called her, after leaving Mr. Lehman's office for the
3  first time, I can't tell you if I had the letter or
4  not.  I would have gone right back and called her,
5  because my world had just been shattered.
6       Q.      I'm sorry, your world was shattered even
7  though Mr. Lehman told you he didn't believe the
8  contentions?
9               MR. JUBB:  I'll object to the form.  You
10         can answer.
11              THE WITNESS:  I'm sorry?
12              MR. JUBB:  You can answer.  Go ahead.
13              THE WITNESS:  Oh.  Yeah.  There's this
14         letter that says, in a factual sentence
15         that's false, that I repeatedly molested a
16         student.
17  BY MS. DOUGHERTY:
18      Q.      Okay.  We -- we're starting to go through the
19  people who learned that accusation.  And the first one
20  is Mr. Lehman.  And he didn't believe it, right?
21              MR. JUBB:  Object to the form.
22              THE WITNESS:  That was my sense.
23  BY MS. DOUGHERTY:
24      Q.      Okay.  Then when you communicated that
25  information to your wife, did she believe it?

Page 83

1  A.      No.
2       Q.      And then you said, after speaking to your
3  wife you called Mr. Rees, is that right?
4       A.      Yes.
5       Q.      Did you call Mr. Rees after you received the
6  letter?
7       A.      I don't remember.
8       Q.      What -- you didn't call Mr. Rees for legal
9  advice, did you?
10      A.      Of course not.
11      Q.      What did you tell Mr. Rees when you called
12  him on April 21st, 2021?  I'm sorry, let me start
13  again.
14  What did you tell Mr. Rees when you called him on April
15  21st, 2018?
16      A.      I would have asked -- and I don't remember
17  our conversation verbatim -- I would have asked how
18  something like this progresses or proceeds.  I would
19  have asked -- I know I did ask him do schools ever
20  fight these things.  And then I would have listened to
21  whatever he was saying in response to those two.
22      Q.      Okay.  So on April 21st, 2018 you understood
23  that Mr. Poulos was pursuing a claim against The Hill
24  School, and you wanted to know from Mr. Rees, in words
25  or substance, whether schools ever fight allegations

Page 84

1  like communicated by Mr. Poulos in the April 11th, 2018
2  letter?
3               MR. JUBB:  Objection to the form.
4               THE WITNESS:  It's my -- so you're
5          asking if I understood that the letter was
6          seeking payment from the school?
7  BY MS. DOUGHERTY:
8       Q.      Yes.
9       A.      Yes.
10      Q.      So on April 21st, 2018 you didn't believe
11  that Mr. Poulos was asking you for money, right?
12              MR. JUBB:  I'll object to the form.
13              THE WITNESS:  No.
14  BY MS. DOUGHERTY:
15      Q.      Let me -- just to confirm, the second page of
16  the April 11th, 2018 letter that's been marked as D-15,
17  the last -- okay, third from last line, I guess, says
18  Mr. Poulos's demand from settlement is a million
19  dollars.  Is that where you got the idea that Mr.
20  Poulos was seeking money from The Hill School?
21      A.      Yes.  I'll go back and read it.  I probably
22  would have assumed that it was implied in the second
23  sentence of the letter.
24      Q.      Right.
25      A.      I mean --

Page 85

1       Q.      No, that's fair.
2       A.      -- attempt to settle and compromise claim.
3       Q.      So you didn't get to -- you didn't need to
4  get past the second sentence of the April 11th, 2018
5  letter that's been marked as D-15 to realize Mr. Poulos
6  was seeking payment from The Hill School, is that
7  right?
8               MR. JUBB:  Object to form.
9               THE WITNESS:  Knowing he was seeking
10         something.  I assumed money.  The last
11         sentence makes that clear.  Confirms what I
12         would have assumed.
13  BY MS. DOUGHERTY:
14      Q.      So you -- on April 21st, 2018, you weren't
15  concerned that Mr. Poulos wanted a million dollars from
16  you, is that right?
17      A.      That's correct.
18      Q.      But what -- and what prompted you to call Mr.
19  Rees was to learn whether, in his experience, schools
20  fight these things, I think you said?
21      A.      That was one of the -- I wanted to know -- I
22  knew Mr. Rees.  We had had -- I was in the school's
23  administration before I left, so we had worked together
24  prior.  And I wanted to ask him questions about how
25  this would proceed.  And because my name was attached,

Page 86

1   I did ask -- I asked do schools ever fight these
2   things.
3   Q.       What did Mr. Rees tell you?
4   A.       He told me how it would proceed.  And that
5   the school would be in contact, or had been, maybe.
6   Would be in contact with Mr. Garabedian.  There would
7   be a third party investigation, which would involve --
8   he told me then that I might receive a call from an
9   attorney at Cozen O'Connor.  He told me -- my
10  impression -- well -- that was also, that he didn't
11  believe these allegations.  He couldn't -- I mean, he
12  didn't tell me who all would be part of an
13  investigation with Cozen O'Connor.
14           I don't recall if he told me it would have
15  been the administrators who were part of the school at
16  the time that I was working there and these
17  allegations.  That time frame.  Or if I just was aware
18  that they would be.  So that would have included the
19  headmaster at that time, the associate headmaster at
20  that time.  And I don't know who else.
21           He said schools generally don't fight these
22  things.  That they do the investigations and act
23  according to what they learn from those investigations.
24  He suggested that I might want to seek my own counsel
25  at that time.  I asked him why.  He said that there

Page 87

1   were three reasons.  One was, what I already knew, and
2   that was that he's the school's attorney and not mine.
3   Was that if there were ever charges filed, I'd clearly
4   need defense there.  And if there was ever a lawsuit, I
5   would need -- I would need my own counsel then.  That's
6   it.  That I remember.
7            THE VIDEOGRAPHER:  Stand by.  Change
8        another chapter.
9            MR. JUBB:  We've been going for two
10       hours.  Let's take a bathroom break.
11           MS. DOUGHERTY:  Oh, yeah.
12           THE VIDEOGRAPHER:  Going off record.
13       Time is 12:05.
14                    *   *   *
15           (Whereupon, a short break was taken.)
16                    *   *   *
17           THE VIDEOGRAPHER:  Back on, 12:21.
18  BY MS. DOUGHERTY:
19  Q.       So you called Mr. Rees and he told you how it
20  would proceed.  There would be a third party
21  investigation.  You might receive a call from an
22  attorney at Cozen O'Connor.  He didn't believe the
23  allegations.  You might be part of an investigation.
24  Schools don't fight these things.  And he suggested
25  that you get a lawyer for three reasons:  Because he

Page 88

1   was the school's attorney, there could be charges filed
2   and there could be a lawsuit.  Anything else that you
3   discussed with Mr. Rees or Mr. Rees told you when you
4   called him on April 21st, 2018?
5   A.       No.
6   Q.       Why were you calling Mr. Rees to find out
7   what would happen?
8   A.       Because he's the school's attorney, and I had
9   a relationship with him, and in that capacity, it
10  seemed like kind of the obvious person to me.
11  Q.       Why didn't you ask Mr. Lehman while you were
12  meeting with him?
13  A.       Probably because I was, I don't know, in
14  shock, or numb or processing it.  And then --
15  Q.       I'm sorry, so how did the meeting with Mr.
16  Lehman end?
17  A.       How did it end?  I don't recall.
18  Q.       Just so I'm clear, you left without finding
19  out what -- what the school was going to do with the
20  letter, if anything?
21  A.       No.  I -- I don't -- I don't recall what he
22  said.  I don't -- can't imagine he would have said
23  nothing.
24  Q.       Well, didn't you want to know when he told
25  you that someone had accused you of sexual -- let me

Page 89

1   start again.  Didn't you want to know what the school
2   would do when you learned that a student had accused
3   you of sexually molesting a student?
4   A.       Of course.  And what I'm telling you is I
5   don't recall all of that conversation, because I think
6   reading or hearing it, which is -- I don't recall --
7   again, I don't think I -- I know I didn't have it.  So
8   hearing the allegations, I think, overshadowed any
9   recollection -- does overshadow any recollection of the
10  specifics of that conversation.  I can't tell you he
11  didn't mention Cozen O'Connor.  I can't tell you he
12  did.  As an example --
13  Q.       You're talking about Mr. Lehman.
14  A.       Yes.
15           MR. MCCARRON:  Can I just interrupt?  We
16       can't hear you.  It's on mute.
17           MS. DOUGHERTY:  Can you hear us now?
18           MR. MCCARRON:  Yes.  We were on mute
19       until just then.
20           MR. JUBB:  And I think we also just need
21       to clarify for the record that Jeffrey
22       McCarron and Mr. Garabedian are also present
23       for the deposition.
24           MS. DOUGHERTY:  Via Zoom.
25           MR. JUBB:  Via Zoom.

Matthew Ralston
July 01, 2021                                                      90 to 93

Page 90

1           MS. DOUGHERTY:  Can you read back my
2     question.
3                    *   *   *
4           (Whereupon, the court reporter read from
5     the record.)
6                    *   *   *
7
8   BY MS. DOUGHERTY:
9   Q.      So when you said you don't remember if Mr.
10  Lehman told you about Cozen, you're talking about Mr.
11  Lehman when you say you don't know if he told --
12  A.      Yes.
13  Q.      -- you about Cozen O'Connor, is that right?
14  A.      Right.
15  Q.      So Mr. Lehman -- it's Lehman, right?
16  A.      Lehman.
17  Q.      I keep saying --
18  A.      -- I believe.
19  Q.      -- it the wrong way.
20  A.      Yeah, I believe.
21  Q.      I'm probably going to keep saying it the
22  wrong way, because I don't learn, but.
23  A.      Just don't mispronounce mine.
24  Q.      I don't think I've done that yet.  But
25  there's still time today.  So after Mr. Lehman invited

Page 91

1   you into his office to talk about the letter, he told
2   you about the letter and then -- and the content of the
3   letter, and then you don't remember anything else about
4   the meeting?
5   A.      Not much.
6   Q.      What do you remember?
7   A.      I mean, I remember him -- I remember feeling,
8   when I left, that it was pretty clear that he didn't
9   believe the content of the letter.  And I can't, beyond
10  that, tell you much.
11  Q.      And you don't remember whether you asked Mr.
12  Lehman what the school was going to do in response to
13  the letter, if anything?
14  A.      No.  I don't recall.
15  Q.      When --
16  A.      And I'm -- because I do recall asking Mr.
17  Rees, I'm guessing I didn't.  But I don't know.
18  Q.      Didn't you care to know, as soon as you
19  learned that a student had accused you of sexual --
20  sexually molesting a student, what was going to happen?
21  A.      I don't know how to describe the change in
22  every piece of thought process when you read something
23  like this, or hear something like this attached to your
24  name.  Or your name attached to something like this.  I
25  heard him.  I left believing he didn't believe it.  And

Page 92

1   I had to go process it.  And so I don't recall the rest
2   of that conversation.  And I don't know how to -- all I
3   can do is guess, and I don't want to do that.
4   Q.      Okay.  So you don't remember how the meeting
5   ended?
6   A.      I do not.  I'm sure most of our meetings
7   ended with me -- our shaking hands, but.
8   Q.      Well, is that how this meeting ended?
9   A.      I'm sure it did.  I don't recall meeting with
10  Zach that didn't end that way.  Or a see you.  It
11  wasn't -- it wasn't adversarial.  That wasn't my sense
12  when I was there or since.  Believing that, meaning
13  that's how that meeting was.
14  Q.      No, my con --
15  A.      You're asking details and I'm telling you I
16  don't remember those details of that meeting, because I
17  had just been told I'd been accused of horrible crimes
18  against a child.
19  Q.      Okay.  You were told that and then
20  immediately told the person telling you, Mr. Lehman,
21  the headmaster of the school, didn't believe -- believe
22  it, right?
23  A.      I'm telling you --
24          MR. JUBB:  Objection to the form.
25          THE WITNESS:  -- that's the sense I left

Page 93

1   with, yes.  I don't remember his exact words.
2   BY MS. DOUGHERTY:
3   Q.      Wasn't it important to you to learn what the
4   school was going to do about the allegations by Mr.
5   Poulos, as soon as you learned that the allegations had
6   been made?
7   A.      Of course.  As soon as I -- as soon as I
8   digested the fact that the allegations had been made.  I
9   -- I -- I don't under -- I'm not sure what you're
10  asking of -- when you ask why I didn't ask him and why
11  I called the school's attorney.  I don't understand
12  what -- what you're asking me.
13  Q.      Well, I'm just trying to get my head around
14  why when somebody told you, Mr. Lehman, the headmaster,
15  someone in charge at The Hill School, told you that a
16  student accused you of sexually molesting a student,
17  you didn't immediately want to know what the school's
18  going to do to defend your honor.  What the school was
19  going to do about the letter, if you believed the
20  content to be false.  You just left?
21  A.      I don't know what I can say to help you get
22  your hands around it, then, because I've said what I
23  believed when I left.  I've said what I remember.  And
24  I can tell you what I did once -- once I processed it.
25  I can tell you my relationship with Tom Rees was longer

Matthew Ralston
July 01, 2021                                          94 to 97

Page 94

1    running than my relationship with Zach.
2            I know that Tom would have, anytime there
3    were legal proceedings claimed against the school,
4    would have been a part of it.  And so I -- when I
5    finally was ready to ask all of those questions, I
6    called Tom.  It's not an aversion to Zach Lehman.  I
7    called the guy that I knew best.
8    Q.        Okay.  So you decided not to ask Mr. Lehman
9    what the school's going to do about the April 11th,
10   2018 letter?  Instead to -- because you favored
11   contacting Mr. Rees?
12           MR. JUBB:  Objection to the form.  Asked
13           and answered.
14           THE WITNESS:  I feel like you're putting
15           words into my mouth out of context.
16   BY MS. DOUGHERTY:
17   Q.        Well, then why did you tell me you had a
18   longer relationship with Mr. Rees?
19   A.        Because I -- I did.  And what I --
20   Q.        What does that have to do with what you --
21   A.        The context --
22   Q.        -- discussed with Mr. Lehman?
23   A.        -- the context was, when I left Mr. Lehman's
24   office, I went and digested and processed what was
25   there.  And when I was ready -- what he had told me.

Page 95

1    And when I was ready to ask further questions, I called
2    Tom Rees, because I knew he would be a part of it.
3    Q.        Okay.  So you didn't ask Mr. Lehman what the
4    school was going to do about the April 11th, 2018
5    letter, because you weren't ready to ask further
6    questions?
7            MR. JUBB:  He has already answered this.
8            That he can't recall anything after that.
9            Please move on.
10           MS. DOUGHERTY:  Objection.  Move to
11           strike.
12   BY MS. DOUGHERTY:
13   Q.        IS that right?
14           MR. JUBB:  Same objection.  Asked and
15           answered.
16           THE WITNESS:  Yes.
17   BY MS. DOUGHERTY:
18   Q.        What did you think was going to happen when
19   you left Mr. Lehman's office?
20           MR. JUBB:  Same objection.
21           THE WITNESS:  I assumed, from my own
22           experience and knowledge of being around
23           schools my whole life, there would be an
24           investigation.  I assume, or assumed, that
25           investigations were participated in by both

Page 96

1            -- both parties with the idea of being --
2            getting at the truth.  And then when I got
3            more specific questions, I called Tom.  To
4            ask specifically.
5    BY MS. DOUGHERTY:
6    Q.        So when you left Mr. Lehman's office you
7    believed that there would be an investigation and then
8    called Mr. Rees to learn more detail about the
9    investigation, is that right?
10           MR. JUBB:  Objection to the form.
11           THE WITNESS:  I called Mr. Rees for more
12           information.  It was not limited to an
13           investigation into the allegations.  It was
14           the whole mess.
15   BY MS. DOUGHERTY:
16   Q.        I think you mentioned that you weren't sure,
17   or perhaps Mr. Lehman could have mentioned Cozen
18   O'Connor to you.  Was Cozen O'Connor known to you as a
19   lawyer for the school before you talked to Mr. Rees?
20   A.        I don't believe that I've ever known Cozen
21   O'Connor to be lawyers for the school.
22   Q.        Okay.  What's your understanding of Cozen
23   O'Connor's role?
24   A.        That they were -- they would -- they had
25   participated in third party investigations.  Probably

Page 97

1    fairly recently.  I can't tell you dates, of -- from
2    what I know for certain is a student allegation with
3    another student that took place off campus years
4    before.
5    Q.        So you -- your understanding is that Cozen
6    O'Connor participated in third party investigations
7    relating to -- what?
8    A.        I guess any sexual allegations that took
9    place regarding people involved at the school, whether
10   it was student/student, faculty/student.  I don't know
11   what else it would be.
12   Q.        So you were -- let me start again.  Is it
13   correct that when you talked to Mr. Rees that was the
14   first time you heard Cozen O'Connor's name, right?
15   They were already participating in third party
16   investigations?
17           MR. JUBB:  Objection.
18           THE WITNESS:  They had already done one,
19           I'm sure.
20   BY MS. DOUGHERTY:
21   Q.        Okay.  So before you spoke to Mr. Rees on
22   April 21st, 2018, you believed that Cozen O'Connor had
23   already conducted a third party investigation?
24   A.        Yes.  Because I believe the -- I can't tell
25   you a date, but I'm pretty sure it was after I went to

Page 98

1   work at the school -- back to work at the school.  He
2   sent a letter in which it was referenced that they had.
3   And maybe -- yeah, I think it was after I went back.  I
4   know it was.  I want to guess like November of '17,
5   maybe.
6               MS. DOUGHERTY:  They're already marked
7               D-1 and D-2.  I'm sorry.  They already have
8               stickers.  I'm going to use it as previously
9               marked.
10  BY MS. DOUGHERTY:
11  Q.       Let's start with D-2, if we could.
12  A.       Okay.
13  Q.       So I'm showing you a document that's been
14  previously marked as D-2.  It's dated April 23rd, 2016.
15  It says a message from the headmaster, under The Hill
16  School logo at the top of the first page.
17              MS. DOUGHERTY:  For those watching via
18              Zoom it's my document number 24.
19  BY MS. DOUGHERTY:
20  Q.       Have you seen the letter that I've marked as
21  D-2 before I just showed it to you?
22  A.       Yes.
23  Q.       When did you first see the letter that's been
24  marked as D-2?
25  A.       I can't tell you dates.  It would have been

Page 99

1   after -- after April 11th, 2018.  After April 21st,
2   2018.
3   Q.       I'm sorry, so you didn't see the April 23rd,
4   2016 letter that's been marked as D-2 until after April
5   21st, 2018?
6   A.       Yes, ma'am.  I didn't work for the school in
7   April 23rd, '16.
8   Q.       Right.  So the school -- the letter says,
9   "Dear Hill School alumni and parents", right?
10  A.       Yes.
11  Q.       So you didn't see the April 23rd, 2016 letter
12  that's been marked as D-2 after you were rehired by the
13  school in July 2016?
14  A.       Not that I recall.  No.
15  Q.       So the first time you saw the April 23rd,
16  2016 letter is -- let me start again.  Who -- how did
17  you come to review the April 23rd, 2016 letter that's
18  been marked as D-2 after April 21st, 2018?
19  A.       If I remember correctly, it's referenced in
20  the 20 -- November 20th letter, perhaps.
21  Q.       Are you talking about D-1?  Let me just
22  identify it for the record.
23  A.       Yes.
24  Q.       D-1 is a document that was previously marked
25  at another deposition.  It's a series of e-mails, but

Page 100

1   the e-mail that I want to direct your attention to
2   starts in the middle of the first page.  It says, from
3   headmaster Zachary G. Lehman.  And it's the -- this one
4   is to Kurtis Poulos.
5               THE WITNESS:  Geez.  I'm sorry.
6               MS. DOUGHERTY:  You okay?  Oh, yeah.
7   Let's go off the record for a moment.
8               THE VIDEOGRAPHER:  Going off the record.
9   Time is 12:39.
10                       *   *   *
11              (Whereupon, a short break was taken.)
12                       *   *   *
13              THE VIDEOGRAPHER:  Back on 12:44.
14  BY MS. DOUGHERTY:
15  Q.       Are you all right now?
16  A.       I hope so.
17  Q.       All right.  See we were looking at D-1.  I
18  was directing your attention to the e-mail in the
19  middle of the page.  You referenced something from
20  November 20th, 2017.  Is this what you're talking
21  about?
22  A.       Yes.
23  Q.       So the e-mail from headmaster Zachary Lehman
24  that says "Historical allegations of sexual abuse at
25  The Hill".

Page 101

1   A.       Yes.
2   Q.       When -- so you received -- I realize the
3   version you're looking at right now is an e-mail to
4   Kurtis Poulos.  But did you receive a copy of
5   headmaster Zachary G. Lehman's --
6   A.       I would have at that point, yes.
7   Q.       -- November 20th, 2017 e-mail?
8   A.       Yes.
9   Q.       Did the e-mail go to all the faculty, or the
10  students, do you know?
11  A.       I'm guessing it did.  It certainly went to
12  our office, because we worked with alumni.
13  Q.       Okay.  So --
14  A.       And I would be surprised if it didn't go to
15  Zachary as well, but.
16  Q.       Do you have a specific recollection of
17  reading this e-mail, Historical Allegations of Sexual
18  Abuse at the Hill, from Zachary Lehman on November
19  20th, 2017?
20  A.       Not reading it on that day, I don't
21  specifically remember.
22  Q.       Did you read it close in time to --
23  A.       Beg your pardon?
24  Q.       Did you -- did you read the e-mail from Mr.
25  Lehman close in time to when you received it?

Page 102

1  A.        I would've --
2  Q.        -- November 20th, 2017?
3  A.        -- definitely -- I would've definitely read
4  it when I received it.  If I recall sitting down at my
5  computer reading it, if that's what you're asking, the
6  answer is no.  I would have read it specifically,
7  because of the -- one, I was an employee of the school
8  and it came from the headmaster.  Two, it was a time
9  period where there were lots of -- not at the school,
10 but culturally, Me Too.  I was, am -- there was an
11 incident referenced between a -- two students off
12 campus at a party.  And I can't recall which one of
13 these --
14 Q.        Yeah, we'll get there.
15 A.        -- it was in.  I knew of that incident
16 because of Facebook.  And a young woman that was
17 involved in that also posted a, without naming names or
18 her school, posted it on -- on her Facebook page.  And
19 we were friends and I'd been a teacher at the school
20 when she was there, so I knew her.
21 Q.        Here's what I'm trying to learn.  That you
22 read the e-mail from Ms. Lehman --
23 A.        Yes, I did.
24 Q.        -- Historical Allegations of Sexual Abuse at
25 The Hill in November 2017?

Page 103

1  A.        Yes.
2  Q.        When you read the November 20th, 2017 e-mail
3  from Mr. Lehman, Historical Allegations of Sexual Abuse
4  at The Hill, is that the first time you learned of
5  allegations of sexual abuse at The Hill?
6  A.        No.
7  Q.        When did you first learn of allegations of
8  sexual abuse at The Hill?
9  A.        Would have been the school year of 1992, '93.
10 Q.        First year you worked at The Hill School?
11 A.        Yes.
12 Q.        What did you learn during the school year of
13 1992 to 1993 related to sexual abuse at The Hill?
14           MR. JUBB:  Just -- objection to the
15      form.  Allegations of sexual abuse at The
16      Hill.
17           MS. DOUGHERTY:  Did I say something
18      else?
19           MR. JUBB:  You forgot the allegation
20      words.
21           MS. DOUGHERTY:  Okay.  Let me ask it
22      again.
23 BY MS. DOUGHERTY:
24 Q.        What did you learn during the 1992 to 1993
25 school year regarding allegations of sexual abuse at

Page 104

1  The Hill?
2  A.        The school was involved in a lawsuit of a
3  former faculty member.  Defamation.  He had been
4  terminated for allegations of sexual abuse.  That was
5  before I was employed there.  The -- the -- his suit
6  came as a result of apparent comments that were made in
7  a faculty meeting.  I wasn't there.  It was prior to my
8  employment.  But the defamation suit went to trial in
9  Philadelphia my first year.  He was awarded a large
10 award.
11           There were mentions of it in faculty
12 meetings, people not to talk about it.  Of course I
13 didn't know what it -- I mean, what it was.  Didn't
14 know any of the parties.  And the -- the award by the
15 court was very large.  And then it was overturned in an
16 appellant court.
17 Q.        Okay.  So sometime before you worked at The
18 Hill School a teacher had sex with a student, is that
19 right?
20 A.        I didn't say that.  I said alleged.
21 Q.        Okay.
22 A.        There were allegations filed again him.  I
23 have no idea.
24 Q.        Well, he was terminated for it, right?
25 A.        He was.

Page 105

1  Q.        Okay.  So before he --
2  A.        It's my understanding.  I wasn't there.
3  Q.        I understand.  So before you -- you learned
4  -- how did you learn about -- how did you learn this
5  information that a teacher had been terminated --
6  A.        I learned --
7  Q.        Hold on.
8  A.        I'm sorry.
9  Q.        How did you learn the information that
10 a teacher had been terminated for sexual abuse?
11           MR. JUBB:  Objection to the form.
12           THE WITNESS:  It was in the context of
13      the lawsuit he had brought against the
14      school.
15 BY MS. DOUGHERTY:
16 Q.        Did you read the lawsuit?  Or did some
17 teacher tell you in the faculty room?  How -- how did
18 you learn?
19 A.        It was -- periodically the headmaster at that
20 time, or the associate headmaster at that time, would
21 remind people not to talk about it.  And maybe gave up
22 dates and who it was.
23 Q.        Who was the headmaster at the time?
24 A.        Charles Watson.
25 Q.        So you learned of the teacher involved in the

Matthew Ralston
July 01, 2021                                    106 to 109

Page 106

1   alleged sexual abuse?  Did you learn the identity of
2   the teacher who was involved in the alleged sexual
3   abuse and then sued the school?
4   A.        Yes.
5   Q.        Who was that teacher?
6   A.        His name was Wendell Chestnut.
7   Q.        And the alleged sexual abuse was between Mr.
8   Chestnut and a student?  Or Mr. Chestnut and --
9   A.        My understanding --
10  Q.        -- another faculty member?
11  A.        My understanding a student.
12  Q.        And then based on what you heard, or learned,
13  Mr. Chestnut sued The Hill School because faculty
14  members were talking about the alleged sexual abuse in
15  faculty meetings?
16  A.        I have no idea what took place in the faculty
17  meeting.  I don't know.
18  Q.        I'm just asking your understanding of what
19  you heard.
20  A.        That there was mention of it with his name in
21  a faculty meeting.  I have no idea what was said.
22  Q.        Yeah, he -- Mr. Chestnut -- your
23  understanding is that Mr. Chestnut filed a defamation
24  action against The Hill School, is that right?
25  A.        That is correct.

Page 107

1   Q.        And your -- what you heard or came to learn
2   is that Mr. Chestnut filed a defamation suit against
3   The Hill School because of comments made about his
4   termination for alleged sexual abuse, is that right?
5   A.        Yes.
6   Q.        And your understanding is it went to trial,
7   there was a large award, and then it was overturned?
8   A.        Yes.  It was front page Philadelphia Inquirer
9   news.
10  Q.        Were there -- were there other times that you
11  learned information about allegations of sexual abuse
12  at The Hill, other than the situation with Mr.
13  Chestnut?
14  A.        Not in my tenure as a teacher.
15  Q.        Okay.  How about when you returned in July of
16  2016?
17           MR. JUBB:  Objection to the form of
18           that.
19           THE WITNESS:  Prior to my return.
20  BY MS. DOUGHERTY:
21  Q.        Okay.  So you did -- so the -- when you were
22  a teacher at Hill School from 1992 to 2009, is that
23  right?
24  A.        Yes.
25  Q.        So when you were a teacher at The Hill

Page 108

1   School, the only instance -- allegation of sexual abuse
2   at The Hill that you learned information about was the
3   circumstances with Mr. Chestnut, is that right?
4   A.        Correct.
5   Q.        Sometime after you left The Hill you learned
6   additional information about allegations of sexual
7   abuse at The Hill?
8   A.        Yes.
9   Q.        Tell me about that.
10  A.        It was no physical abuse.  There was a man
11  who was a tennis coach on the girls team who had made
12  advances and sent e-mails to one of the players on his
13  team.  I was not there.  I heard.  And I know he was
14  terminated.
15  Q.        How did you hear about it?
16  A.        I don't recall.  I'm sure somebody probably
17  told me.
18  Q.        Is this when you were at the Leelanau school?
19  A.        It is.
20  Q.        When did you learn that there had been
21  inappropriate communications between a tennis coach and
22  a female student?
23  A.        I don't -- I can't tell you what year that
24  happened.  It was not long after I left.  But I can't
25  tell you whether it was school year '09, '10, I can't

Page 109

1   tell you.  I don't remember.
2   Q.        Okay.  So closer to 2009 then 2016?
3   A.        Yes.
4   Q.        Any other times that you learned about
5   allegations of sexual abuse at The Hill, other than the
6   circumstances with Mr. Chestnut and the tennis coach?
7   A.        Not involving a faculty member.
8   Q.        Okay.  How about the allegations of sexual
9   abuse not involving a faculty member?  Tell me about
10  that.
11  A.        The one that was posted on Facebook.  Young
12  woman, and, again, this was during Me Too, put up --
13  put up a large post saying she had been -- she had lied
14  about her weekend plans away from school, went to a
15  party, had got drunk.  She passed out and woke up when
16  there was another student.
17  Q.        So a female student posted on Facebook that
18  she was raped by a male student?
19  A.        Yes.  Thank you for the word.  Yes.
20  Q.        That -- was that posted on the young woman's
21  Facebook page?
22  A.        Yes.
23  Q.        And you were Facebook friends with her?
24  A.        Yes.
25  Q.        Are you Facebook friends with other students?

Matthew Ralston
July 01, 2021                                    110 to 113

Page 110

1  A.        Yes.  Form -- Yes.  Former students.
2  Q.        So the woman was a former student of yours?
3  A.        Yes.
4  Q.        And -- go ahead.
5  A.        Yes.  I didn't -- when we say student -- or
6  when I say student, I don't necessarily mean in my
7  class.  She was never a student in my class.  I was the
8  academic dean, director of studies.  Oversaw academic
9  schedules and student progress.  I knew her in that
10 capacity.  And students would often see me for math
11 extra help.  And I'd be surprised if she wasn't one of
12 those.
13 Q.        So this Facebook post, when did it happen?
14 A.        Wow.  Dates I can't tell you.  It was --
15 Q.        Were you teaching at the Leelanau School?
16 A.        It was the early Me Too period.  I was not
17 The Hill School.  I was still at Leelanau.
18 Q.        And is it correct that the woman was
19 recounting a rape that had occurred many years before
20 when she was a student at The Hill School?
21 A.        Yes.  Although she referred it to high
22 school.  But, again, she posted in general.
23 Q.        Just going back to D-1.  If you go to the
24 second page, at the bottom.  It -- there's a paragraph
25 -- looking at Garabedian 030.  The last couple

Page 111

1  sentences of the last paragraph on the second page of
2  D-1.  It says, "Recently, as part of the Me Too
3  movement, we learned of an account by an alumni who
4  shared such an incident that occurred off campus in the
5  late 1990's when she was a student and involved a male
6  student at The Hill.  "I immediately reached out to her
7  and we have carefully reviewed that situation as well."
8             So that commentary by Mr. Lehman is -- your
9  understanding, refers to the young woman who posted on
10 Facebook about it, is --
11 A.        Yes.
12 Q.        -- when she was a student at The Hill School?
13 A.        Yes.
14 Q.        Other than the situation with Mr. Chestnut,
15 the tennis coach, the female student who posted about
16 being raped on Facebook, do you have any other
17 information about allegations of sexual abuse at The
18 Hill?
19 A.        There was -- yes.
20 Q.        What other information do you have about
21 allegations of sexual abuse at The Hill, other than the
22 situation with Mr. Chestnut, the tennis coach and the
23 young woman who posted on Facebook about being raped?
24 A.        It was, again, two students.  This took place
25 in a dormitory.  A male student entered a female

Page 112

1  student's room at night.  It is not my understanding
2  that there was any rape.  My involvement was strictly
3  to provide for -- I actually don't recall if it was the
4  headmaster, it could have been Mr. Rees, the academic
5  progress of the girl.  Prior and post.  A date they
6  would have given me.  That's the information I have on
7  that.
8  Q.        So this circumstance occurred when you were a
9  teacher or when you were back after --
10 A.        No.  I was -- no, no, no, no.  When I was the
11 academic lead.  So I was still there as a teacher.  But
12 with administrative duties.  So my involvement with
13 that was as a function of my administrative duties.
14 Q.        What year was that?
15 A.        I don't know.  Early 2000's.  I can't tell
16 you specifically.
17 Q.        Okay.  So in early 2000 a male student
18 entered a female student's room and sexually assaulted
19 her, but didn't rape her?
20 A.        I -- I -- actually I don't know if there was
21 sexual assault.  School -- it's -- it's strictly
22 prohibited for him to be in the dorm.  It's strictly
23 prohibited to be outside of your own dorm after hours.
24 If he went into her room uninvited, that would have
25 been sufficient to create concern.  I'm sure it's not

Page 113

1  strong enough --
2  Q.        So the female student didn't want him in the
3  dorm room, is that right?
4  A.        Correct.
5  Q.        Whatever the --
6  A.        I can't --
7  Q.        -- details, you considered it to be related
8  to allegations of sexual abuse, is that right?
9  A.        I don't know if the technical definition is
10 sexual abuse.  If it was my daughter I would have
11 looked at that as -- probably I would have looked at
12 that as abuse.  So that's why I shared it with you.
13 Q.        Sure.  What's your definition of sexual
14 abuse?
15 A.        It would start -- well, I'd put harassment as
16 some level of abuse.  That would have -- if it's a
17 scale.  Certainly showing up in someone's room after
18 lights out time at night would be closer in my own mind
19 to abuse than harassment.
20 Q.        So you in your mind, sexual abuse includes
21 using words to harass someone, not necessarily touching
22 someone?  I'm just asking how -- how you perceive it.
23 A.        In the context of student to student, I think
24 -- if -- if -- I believe that that student, and I don't
25 recall what the outcome of that was, I would have felt

Matthew Ralston
July 01, 2021                                     114 to 117

Page 114

1  that it was warranted for him to be dismissed from
2  school, because of -- simply because of where he was.
3  If students are harassing publicly other students, I
4  think that's part of what we're teaching in school, is
5  how to -- how not to do that.  To teach the intolerance
6  for that.
7         I believe there were -- I -- the reason I
8  would say going into someone's room -- again, you ask
9  about my mind -- going into someone's room at that
10 hour, would -- the reason I would have that closer to
11 abuse than harassment is because I think it suggests at
12 least an intent of some kind.  And, again, I'm talking
13 about my interaction with students in a residential
14 school.
15 Q.       Was the male student dismissed?
16 A.       I don't recall.  Again, I was -- this -- I
17 don't -- it would have happened in the spring.  I know
18 she was a senior.  And I believe all the questions that
19 came to me were after school had been dismissed.  I
20 can't tell you who the male student -- I don't even
21 know if I was told who the male student was.  I was
22 asked specifically to provide information about the
23 female student's grades.
24 Q.       And you were asked by Mr. Rees and the
25 headmaster at the time?

Page 115

1  A.       It would have been one or the other.  And I
2  don't -- I can't tell you which one.  For some reason
3  my -- my memory is Tom, but I can't be absolutely
4  certain of that.  Rees.  I'm sorry.
5  Q.       And the headmaster in the early 2000's was
6  Dockerty, Dougherty?
7  A.       Dougherty.
8  Q.       Dougherty, okay.  So your definition of
9  sexual abuse includes harassment that doesn't involve
10 touching.  You just think that the punishment should be
11 less.
12         MR. JUBB:  Objection to the form.
13 BY MS. DOUGHERTY:
14 Q.       Is that right?  I'm just asking your
15 definition.
16 A.       I think, in dealing with adolescence, there
17 are those opportunities within that spectrum that are
18 opportunities to teach students, and there are those
19 that cross some line that is not tolerable.  That's not
20 a hard line, because the level of intimidation is
21 subjective.  And intimidation and -- is -- is on that
22 -- clearly on that spectrum.  It pushes it away from
23 just words.
24 Q.       Do you consider intimidation to be abuse?
25         MR. JUBB:  Sexual abuse?

Page 116

1  BY MS. DOUGHERTY:
2  Q.       We can do it that way.  Do you consider
3  intimidation to be sexual abuse?
4  A.       Adult to child, yes.  Child -- or adolescent
5  to adolescent, I would have to see the content.  But it
6  would be one of those that is less -- I would have less
7  tolerance for that even in children.  Adolescent to
8  adolescent.
9  Q.       Okay.  So in your view, intimidation by a
10 faculty member to a student would -- you would consider
11 that sexual abuse?
12 A.       Intimidation?
13 Q.       Yes.
14 A.       If it was sexual intimidation.  If it was
15 intimidation by authority, absolutely not.  I would
16 consider it inappropriate, but it wouldn't be sexual
17 abuse.
18 Q.       Okay.  So if it was intimidation by an
19 authority by a faculty member, to a student, that would
20 just be abuse, right?
21 A.       It would be --
22         MR. JUBB:  Objection.
23         THE WITNESS:  -- abusive treatment.
24         Certainly inappropriate.
25 BY MS. DOUGHERTY:

Page 117

1  Q.       So you agree that the faculty members -- let
2  me start again.  So you agree that if a faculty member
3  engaged in intimidating conduct to one of the students,
4  that the faculty member was committing abuse?
5         MR. JUBB:  Objection to form.
6  BY MS. DOUGHERTY:
7  Q.       I'm just asking you.
8  A.       I would -- I would have to look at the
9  specifics.
10 Q.       Is there ever a time when it's appropriate
11 for an adult to intimidate a child?
12         MR. JUBB:  Objection to the form.
13         THE WITNESS:  No.
14 BY MS. DOUGHERTY:
15 Q.       So then you agree that if a faculty member
16 was intimidating a student, that that is abuse, right?
17         MR. JUBB:  Objection to the form.
18         THE WITNESS:  I think if a student is
19         intimidated by a faculty member, that is
20         different than a student -- a faculty member
21         intimidating a student.
22 BY MS. DOUGHERTY:
23 Q.       What's the difference?
24 A.       Adults, teachers, faculty members, are
25 expected to maintain -- support the rules and values of

Page 118

1  the school.  And when students push that, those limits,
2  and however they do, if they're engaged by a faculty
3  member in the context of that, and they feel
4  intimidated because now they're going to go to the
5  dean's office, and they're intimidated by the position,
6  or the people there, that's not abusive at all.
7         If a teacher intentionally speaks down to and
8  condescends to a student and tries to manipulate their
9  behavior in a way to meet their own goals, I consider
10 that abusive.
11 Q.     You said if a teacher speaks down to a
12 student or manipulates the students for the teacher's
13 own goals, that's abuse?  In your view.
14        MR. JUBB:  Abusive.
15        THE WITNESS:  It's abusive.
16 BY MS. DOUGHERTY:
17 Q.     Abusive.  Well, what's the difference between
18 abuse and abusive?
19 A.     I mean, I can be very literal and say I think
20 it's abusive to threaten a child.  It's actually
21 physical abuse to strike them.  Or anybody, for that
22 matter.  Threatening, in my opinion, is abusive.
23 Acting on threats is abuse.
24 Q.     In your experience at The Hill School, did
25 the Hill School tolerate abusive conduct by teachers

Page 119

1  directed to students?
2  A.     I don't think so.
3  Q.     Okay.  So just because conduct is abusive, as
4  compared to abuse, involving striking a student,
5  doesn't mean it's a lesser level of offense by the
6  faculty member, right?
7  A.     The response may be different.  So if you
8  consider lesser -- lesser as a -- based on the
9  response, then I think the response could be different.
10 If you have a young teacher who's verbally abusive to a
11 student, or is trying to get them to behave in a
12 certain manner, in a way that's not acceptable,
13 conversation with the appropriate administrator is
14 a perfectly reasonable response.  If a teacher lays a
15 hand on a student, that would render a very different
16 response.
17 Q.     Okay.  So in your view it's never appropriate
18 for a teacher to touch a student uninvited, is that
19 right?
20        MR. JUBB:  I'll object to the form.
21        THE WITNESS:  No.  I don't agree with
22        that.
23 BY MS. DOUGHERTY:
24 Q.     You think it's okay for a teacher to touch a
25 student when a student doesn't agree to be touched?

Page 120

1  A.     I think a teacher can touch a student without
2  a student ask -- without asking a student.  I think if
3  the student makes it clear that they don't want to be
4  touched, and the teacher continues to do it, that
5  probably is likely to be that.  But I think a teacher
6  casually putting their arm around a student to get them
7  back in line, or touching them on a shoulder to quiet
8  them in an environment where they should be quiet,
9  whether's it's chapel or dining hall during
10 announcements, I don't think that is abusive at all.
11        I think that's being a good parent model.
12 And boarding school teachers are considered in loco
13 parentis.
14 Q.     Other than the situation with Mr. Chestnut,
15 the tennis coach, the young woman who posted on
16 Facebook about being raped, and the incident with the
17 two students in the dormitory, do you have any other
18 information about allegations of sexual abuse at The
19 Hill?
20 A.     No.  I'm sorry.  I do.  My son's sixth form
21 year.  There was a case of statutory rape.  A sixth
22 form -- a senior boy and a ninth grade girl.  Jesus.
23 Wow.  How could I forget that.
24        MR. JUBB:  He said Judas, not Jesus.
25 BY MS. DOUGHERTY:

Page 121

1  Q.     Okay.  So a senior and a freshman?
2  A.     Yes.  So she was not of age of consent, and
3  he was 18.
4  Q.     And you were a teacher at The Hill School at
5  the time, right?
6  A.     Yes.
7  Q.     And was the male student dismissed?
8  A.     He was.
9  Q.     As it relates to the young woman who posted
10 about rape on Facebook, do you know whether there were
11 any consequences for the person who raped the young
12 woman?
13 A.     I don't, officially.  I think I've heard that
14 just -- he was a pretty involved and popular kid, and
15 so just through conversation with faculty members, he
16 has been distanced from the school.  Whether he did
17 that or the school did that, I don't know.
18 Q.     What about the tennis coach?
19 A.     He was dismissed.  Terminated immediately.
20 Q.     For writing text messages with sexual
21 content?
22 A.     Beg your pardon?
23 Q.     For writing text messages --
24 A.     I don't know.
25 Q.     -- with sexual content?

Page 122

1  A.     It was certainly advancing content. I don't
2  know if they were sexual or not.
3  Q.     Okay. Other than Mr. -- the situation with
4  Mr. Chestnut, the tennis coach, the young woman who
5  posted about being raped on Facebook, the two students
6  in the dormitory, and the statutory rape in your son's
7  sixth form year, do you have any other information
8  regarding allegations of sexual abuse at The Hill?
9  A.     I don't think so.
10 Q.     So D-1. Again, back -- back to that. On the
11 first page. It's this one. It has e-mails at the top.
12 (Indicating.)
13 A.     Yeah.
14 Q.     So Mr. Lehman wrote, in the second paragraph
15 of his e-mail, which starts on the bottom of the first
16 page of D-1, "At that time with" -- you know what,
17 before we do that. Do you have a copy of the November
18 20th, 2017 e-mail that you received from Mr. Lehman?
19 A.     I don't. It would have been by e-mail. And
20 when I was terminated I lost access to all of that. So
21 I do not.
22 Q.     So you --
23 A.     Oh, wait a minute. So, yeah, yeah, yeah. So
24 it would have been in my e-mail. Sorry. I was looking
25 at dates. I said I was working there. The question is

Page 123

1  would I have a copy. It would be in my e-mail.
2  Q.     Right. Okay. So you believe you received
3  Mr. Lehman's e-mail to your work e-mail address at The
4  Hill?
5  A.     Yeah.
6  Q.     Which you no longer have access to?
7  A.     Correct.
8  Q.     And you didn't print a copy of the November
9  20th, 2017 e-mail?
10 A.     No. Not that -- I don't think so.
11 Q.     Okay. So now back to the first page, bottom.
12 A.     Okay.
13 Q.     Second paragraph. "At that time, with the
14 unanimous support of the Board of Trustees, I initiated
15 a review of historical allegations of abuse at The
16 Hill, and the school's response to those allegations.
17 This was a proactive review by the school, not
18 initiated by any complaint." Did you read that
19 paragraph when you received the November 20th, 2017
20 e-mail from Mr. Lehman?
21 A.     I'm sure I did.
22 Q.     So at least as of the time you read the
23 November 20th, 2017 e-mail from Mr. Lehman, you knew
24 that the school had already initiated its, on accord,
25 an investigation into historical allegations of abuse

Page 124

1  at The Hill, is that right?
2  A.     Yeah.
3  Q.     And the paragraph continues, "As headmaster,
4  I thought it was important to understand more about the
5  school's history. The Board and I also felt it was
6  imperative that the review be external, objective, and
7  informed by the appropriate expertise. Accordingly, we
8  engaged Leslie Gomez and Gina Smith of Cozen O'Connor,
9  child protection experts nationally recognized for
10 their experience in this area, their objectivity and
11 their candor.
12        So is it correct that as of the time you read
13 the November 20th, 2017 e-mail, is when you learned
14 that Cozen O'Connor was involved in performing third
15 party investigations?
16 A.     Yes.
17 Q.     Did you know that Cozen O'Connor was involved
18 in performing third party investigations for The Hill
19 school prior to receipt of the November 20th, 2017
20 e-mail?
21 A.     I don't believe so, no.
22 Q.     So it's your understanding that Cozen
23 O'Connor wasn't hired in reaction to Mr. Poulos's
24 allegations, is that right?
25 A.     Correct.

Page 125

1  Q.     The following paragraph is the third
2  paragraph of the e-mail, but the second -- or the first
3  full paragraph on the second page of D-1. "Through the
4  review, we learned of several troubling incidents in
5  The Hill School's history. Those incidents involve
6  conduct several decades ago by a small number of
7  faculty members, none of whom have been associated with
8  The Hill for many years, and one of whom is deceased.
9  Do you know who Mr. Lehman was referring to?
10 A.     Only the one. From 19 -- Mr. Chestnut.
11 That's the only one I would have known.
12 Q.     Is he the one who's dead?
13 A.     I don't believe so. I don't think he is.
14 But I don't know.
15 Q.     Okay. So you don't know what incidents Mr.
16 Lehman is referencing in this paragraph?
17 A.     I don't.
18 Q.     If we can go to the third page of D-1. Top
19 paragraph. Mr. Lehman wrote, "I extend an invitation
20 to any Hill School community member who wishes to share
21 his or her experiences with the school, or, if
22 appropriate, with law enforcement. I also encourage
23 any students, parents, alumni, or staff to reach out
24 directly to the school to share your observations and
25 feedback."

Page 126

1        So is it your understanding that at least as
2    of November 20th, 2017, The Hill School was inviting
3    Hill School community members to report allegations of
4    sexual abuse?
5    A.        Yes.
6    Q.        When you learned about the April 11th, 2018
7    letter detailing Mr. Poulos's allegations, did you
8    believe that Mr. Poulos's letter was sent in response
9    to the invitation by Mr. Lehman in November of 2017 to
10   report allegations of sexual abuse?
11            MR. JUBB:  Object to the form.
12            THE WITNESS:  I -- I don't think I ever
13       considered it.  I don't know.
14   BY MS. DOUGHERTY:
15   Q.        But you at least knew that the school was
16   proactively pursuing and investigating allegations of
17   sexual abuse, even if the allegations were from decades
18   in the past, is that right?
19   A.        I did understand that, yes.
20   Q.        I'm sorry if you already answered this, but
21   was it the November 20th, 2017 e-mail that prompted you
22   to look for and read the April 23rd, 2016 letter which
23   was marked as D-2?
24   A.        In all likelihood, yes.
25   Q.        Because the November 20, 2017 --

Page 127

1    A.        Right.
2    Q.        -- e-mail referenced it?
3    A.        Right.
4    Q.        So the November 20th, 2017 e-mail made you
5    curious to go look to see --
6    A.        Yes.
7    Q.        -- what would have been announced?  If you
8    can go back to D-2.  If I can just direct your
9    attention to the second paragraph in the middle of the
10   page.  Or in the middle of the paragraph.  It says,
11   "We" -- this is, again, a letter from the headmaster,
12   Mr. Lehman, April 23rd, 2016.  Mr. Lehman wrote, "We
13   also provide annual training to all employees regarding
14   our own policies on harassment and abuse, and how to
15   identify and report any issues at the earliest possible
16   stage.
17            Did you ever participate in an annual
18   training regarding the school's policy on harassment
19   and abuse and how to identify and report any issues?
20   A.        Yes.
21   Q.        Is that something that did happen annually?
22   Something that did?
23   Q.        Did happen annually?
24   A.        I believe it must have.  I don't -- I can't
25   tell you when we started doing that.  I don't know that

Page 128

1    we did it my first couple years.
2    Q.        Okay.  Let's clarify.  So in -- how about in
3    July 2000 -- after you rejoined the school, July 2016,
4    did you then participate in the annual training
5    relating to policies on harassment and abuse?
6    A.        I -- I did not.
7    Q.        Okay.  So when you say first, you're talking
8    about in 1992, 1993?
9    A.        Yes.
10   Q.        So you participated in training in 1992 or
11   1993 regarding policies on harassment and abuse?
12   A.        We had -- we didn't have -- at that point I
13   don't believe there were ever experts brought in to
14   talk about it.  It was discussed in open faculty
15   meetings.  It would have been addressed in new faculty
16   orientation.  But I don't think there were experts at
17   that point.  We did, then, start to do that.  Bring in
18   people who were trained in harassment to help -- help
19   people understand that harassment -- what it is.
20            And to keep our eyes open regarding students,
21   what it is.  And also what behavior can't be tolerated
22   in adults.  After -- after the statutory rape case, we
23   started to have -- I think there are lots of people who
24   don't really understand what that is.  And so we
25   started to have -- that became a part of protocol as

Page 129

1    well.  I don't -- I'm -- so.
2    Q.        Well, just so I understand what Mr. -- it
3    sounds to me like The Hill School had a policy about
4    harassment and abuse when you started in 1992, 1993.
5    And you learned about it, right?  I'm trying to -- what
6    Mr. Lehman described here, I'm trying to learn if you
7    ever participated in anything like he --
8    A.        And I --
9    Q.        -- that he described?
10   A.        Sorry.
11   Q.        So, yes, you have?
12   A.        I have not.
13   Q.        So it sounds like that the annual training
14   that Mr. Lehman was describing, in that sentence that I
15   read to you, something that was instituted after 2009,
16   right?
17   A.        Well, whatever Mr. Lehman instituted would
18   have started well after I left.  He started, I believe,
19   in 2014.  David Dougherty was the headmaster when I
20   left.  I can't tell you what time frame Mr. Lehman is
21   talking about in that letter.  But any -- anything he's
22   instituted did not include me.
23   Q.        Right.  He just says we.  He doesn't even --
24   A.        Right.
25   Q.        -- take credit for it.  So it's the annual

Matthew Ralston
July 01, 2021                                    130 to 133

Page 130

1  training that Mr. Lehman described in his April 23rd,
2  2016 letter is not something that existed prior to
3  2009, when you were a teacher at The Hill School,
4  right?
5  A.        No, I said it did.
6  Q.        It did.  Okay.
7  A.        I can't tell you when.  I don't believe there
8  was formal, other than headmaster or associate
9  headmaster speaking prior to David Dougherty.  David
10 Dougherty formalized a lot of things that were
11 happening at the school in his tenure.  I can't -- I
12 don't know what year we first had someone come in from
13 the outside and address us.
14 Q.        Okay.  So sometime before you stopped working
15 for The Hill School as a teacher, you did receive
16 annual training like what Mr. Lehman described in the
17 letter --
18 A.        Yes.
19 Q.        -- reflected in D-2, is that right?
20 A.        Yes.
21 Q.        You just can't remember when?
22 A.        I don't know when it started.  And I can tell
23 you when it would have happened within the course of a
24 year.
25 Q.        Okay.  After the statutory rape?

Page 131

1  A.        No.  That was -- that actually -- they
2  started very specifically including students who would
3  turn 18 during the school year.  That -- that actually
4  happened in the 2005, 2006 school year.  That I know
5  would have happened.  Just so students and even faculty
6  members would be clear what statutory rape is.  A kid
7  -- a kid -- a -- a young man who doesn't know what
8  statutory rape or age of consent is can take she said
9  okay as permission where -- and not understand that
10 she's not able to say that.
11 Q.        Right.  So --
12 A.        So that would have been when, for sure,
13 students became involved.
14 Q.        So when you say that you can say within a
15 year, do you mean like in 2004 --
16 A.        Oh.  No, no, no, no.
17 Q.        -- that's when the annual training --
18 A.        I mean within the course of a school year --
19 Q.        Okay.
20 A.        -- the time periods during that school year
21 where we -- if we -- when we were doing that, which
22 time periods it might have been during.
23 Q.        I understand.  I misunderstood.
24 A.        I'm sorry.
25 Q.        I thought -- I thought you were saying you

Page 132

1  could equate it to --
2  A.        No.
3  Q.        -- a year.  Okay.  So the next paragraph, in
4  the middle, Mr. Lehman is describing a vigorous
5  protocol.
6  A.        Where are we?
7  Q.        Still on D-2.
8  A.        Third line down?
9  Q.        Yeah.  Third line down.
10 A.        Okay.
11 Q.        Second sentence, "We want you to know that
12 The Hill School has a rigorous protocol in place",
13 right?  It continues to describe the protocol.  It says
14 "Includes promptly reporting any suspected incidents of
15 misconduct to ChildLine, Pennsylvania's investigative
16 resource concerning alleged child abuse or neglect."
17 A.        Okay.
18 Q.        Do you know if a report was made to ChildLine
19 regarding Mr. Poulos's allegations?
20 A.        I do not know.
21 Q.        So basically your testimony is you use social
22 media?
23 A.        I do.
24 Q.        When did you start using social media?
25 A.        2009.  When I left The Hill School.

Page 133

1  Q.        So you're on Facebook?
2  A.        Yes.
3  Q.        Is your Facebook page public?
4  A.        No.  I can't tell you the settings to know
5  what a nonfriend can --
6  Q.        So you're friends with former students, is
7  that right?
8  A.        I am.
9  Q.        And by former students, you're not
10 restricting your answer just to --
11 A.        Students.
12 Q.        -- former students that you taught.  You're
13 talking about former students of The Hill School, is
14 that correct?
15 A.        Yes, ma'am.
16 Q.        How many former students of The Hill School
17 are you friends with on Facebook?
18 A.        Wow.  I don't know.  But a lot.  I'm sure
19 it's in the -- it's well over a hundred.  It's probably
20 -- I don't know.
21 Q.        What name do you use on Facebook?
22 A.        Matt Ralston.  I think.
23 Q.        So if I wanted to find your Facebook page I
24 would search for Matt Ralston?
25 A.        Yes.

Matthew Ralston
July 01, 2021                                    134 to 137

Page 134

1   Q.      In Columbus, Ohio?
2   A.      It's one of those things I don't know if it's
3   in there.
4   Q.      Are you friends with Mr. -- let me start
5   again.  Are you Facebook friends with Mr. Poulos?
6   A.      No.
7   Q.      What other types of social media do you use,
8   other than Facebook, if any?
9   A.      I have an Instagram account, but I follow
10  probably four people.  My sons and their better --
11  well, their other halves.  And then I follow some --
12  actually, I don't follow -- I do follow one page on
13  there.  It's Harley Davidson.  And that's about it.  I
14  don't post on Instagram.  I don't really post on
15  Facebook.
16  Q.      Do you have a personal e-mail address?
17  A.      I do.
18  Q.      What's your personal e-mail address?
19  A.      M-A-T-T-R 557.  And that's G-mail.
20  Q.      How long have you used the mattr557@gmail.com
21  email address?
22  A.      I'm not sure, but it's probably about the
23  same time, 2009.  And it may be after that a little
24  bit.
25  Q.      Do you have any other e-mail address that you

Page 135

1   use, other than --
2   A.      I do.
3   Q.      mattr557 --
4   A.      There's a Yahoo account.  And That's R-A-L-S
5   92.  And that's why I can't -- I don't use that for
6   personal e-mail.  I use it for junk.  But it was
7   personal in -- I don't know, when I first got e-mail.
8   Q.      So that's what you used before 2009 when you
9   started using mattr557@gmail.com?
10  A.      I would have used The Hill School address.
11  Q.      Before we get there, when did you use the
12  rals92@yahoo.com address?
13  A.      Yes.
14  Q.      When?
15  A.      When did I start or stop?
16  Q.      Let's go with stop.
17  A.      It would be when I opened the gmail account.
18  And that's the influence of my sons.  And I -- I can't
19  tell you exactly.  I know Facebook was 2009.  I --
20  because it's when I left the school.  I had a friend
21  who said I'm going to want that, because it will help
22  people get a hold of me.  Gmail might have been a
23  little after that, but it's right in there somewhere.
24  Q.      Okay.  When did you start using the Yahoo
25  address?

Page 136

1   A.      I don't know.  Mid/late '90s somewhere.
2   Q.      Have you used any other e-mail address for
3   personal e-mail?
4   A.      No.
5   Q.      And so when you were at The Hill School from
6   July 2016 to October 2019 what e-mail address did you
7   use?
8   A.      For?
9   Q.      At The Hill School?
10  A.      For The Hill School?
11  Q.      Yes.
12  A.      mralsto@thehill.org.
13  Q.      Is that the same e-mail address you used when
14  you were a teacher at The Hill School?
15  A.      It is.
16  Q.      And then back to April 21st, 2018.  So you
17  spoke to Mr. Rees on the telephone.  And what did you
18  do?
19  A.      I don't know that I spoke to him on the 21st.
20  It was soon thereafter.  Very well could have been the
21  21st.  What did I do afterwards?
22  Q.      Let's just -- let me just clarify that.  I
23  thought you told me you that had your meeting with Mr.
24  Lehman?
25  A.      I did.  Called my wife.

Page 137

1   Q.      You went home.  Or went to the place where
2   you were staying on campus, you called your wife and
3   then you called Mr. Rees.
4   A.      I think what I said, my next call regarding
5   this would have been Mr. Rees.
6   Q.      Okay.
7   A.      And I -- because I -- I actually think it was
8   a Friday.  Not a Thursday.  It probably was the same --
9   if it was a Friday, it would have been the same day.  I
10  wouldn't have -- I wouldn't have -- it's not me to wait
11  through the weekend with that.
12  Q.      Okay.  So you think it's either the same day
13  or the next business day?
14  A.      Yes.  If it wasn't -- it wasn't the Friday,
15  it was the Monday.
16  Q.      Did you do anything else on April 21st, 2018
17  regarding the letter relating to Mr. Poulos's
18  allegations?
19  A.      Well, it was --
20  Q.      I'm just asking you --
21  A.      -- it --
22  Q.      Hold on a second.
23  A.      Okay.
24  Q.      I'm just asking you about the day when you
25  had the meeting with Mr. Lehman and you first learned

Matthew Ralston
July 01, 2021                                    138 to 141

---

Page 138

1  that the letter existed and you received the letter.
2  Did you do anything else, other than your meeting Mr.
3  Lehman, speak to your wife, read the letter, did you do
4  anything else on that day relating to Mr. Poulos's
5  allegations?
6  A.        Yes.
7  Q.        What?
8  A.        Chris Chirieleison.  I can spell that for
9  you.
10  Q.        Yeah.
11  A.        C-H-I-R -- I got to get the I-E.  Let's see.
12  Q.        Spoke too soon.
13  A.        E-I-S-O-N.  I don't know.
14            MR. JUBB:  It's in the disclosure.
15  BY MS. DOUGHERTY:
16  Q.        Okay.  Go ahead.
17  A.        Chris --
18  Q.        It's a he, right?
19  A.        He, I'm sorry.
20  Q.        Let's just call him Chris.
21  A.        He and I have been friends since 1992.  He
22  left the school somewhere in the late '90s.  We've been
23  in touch since.  Our relationship is deeply personal.
24  He was the sponsor of our oldest son.  He was the dean
25  of students during those years.  Or he may have been in

---

Page 139

1  the admission office then.  But he was in the
2  administration when the letter came out.  And I went
3  and shared it with him.
4  Q.        So Chris was in the administration of The
5  Hill School?
6  A.        Yes.
7  Q.        So on April 21st, 2018, the same day that you
8  met with Mr. Lehman, and you learned and read the
9  letter, you went and met with Mr. -- with Chris?
10  A.        Probably it was that day.  Or it would have
11  been the next morning.  That was -- that weekend was a
12  career day, so time was pretty structured with
13  obligations for me.
14  Q.        Did you say time was pretty structured?
15  A.        Time.  Obligations, yeah.
16  Q.        Gotcha.  So you met with Chris in person
17  about the letter?
18  A.        I did.  I went to his -- his family lived on
19  campus and I went to their home.
20  Q.        And you brought the letter with you?
21  A.        At that point I had a printed copy.
22  Q.        Where did you get the printed copy?
23  A.        I printed it somewhere.  Maybe in our office.
24  I didn't have a printer at home.  I mean at the --
25  where I stayed on campus, so it's probably in the

---

Page 140

1  office.  The development office.
2  Q.        So after you got the e-mail from Mr. Lehman
3  that included the letter, you then went to the office
4  and printed it and then went to Chris?
5  A.        I did print a copy, yes.  Yes.
6  Q.        Okay.  You gave Chris a copy of --
7  A.        I did not give him a copy.  I shared the copy
8  I had with him.
9  Q.        Okay.  So you gave your copy of the April
10  11th, 2018 letter to Chris for him to read, is that
11  right?
12  A.        Yes.
13  Q.        And this is on April 21st, 2018?
14  A.        Or the next morning.
15  Q.        Or the next morning.  Okay.  And then what
16  did Chris say?  When you shared the letter with him?
17  A.        Something -- I think I remember exactly.  He
18  said he wasn't going to give the dignity of finishing
19  it, because he knows there is no fact to it.  Not --
20  that it's -- may I use his word?
21  Q.        Sure.
22  A.        It's bullshit.
23  Q.        Just to jump back to Mr. Rees for a second so
24  I don't forget.  Did Mr. Rees already know about the
25  letter when you contacted him?

---

Page 141

1  A.        Yes.
2  Q.        Did Mr. Rees tell you how he already knew
3  about the letter when you contacted him?
4  A.        No.
5  Q.        Did you ask him?
6  A.        No.
7  Q.        Okay.  So on April 21st, 2018, or the
8  following morning, you shared the letter that you had
9  then printed, the letter being the April 11th, 2018
10  letter marked as D-15, with Chris, and he started
11  reading it and he told you it was bullshit, right?
12  A.        He said he wasn't going to give it the
13  dignity of finishing it.
14  Q.        So Chris didn't believe the accusations by
15  Mr. Poulos reflected in the April 11th, 2018 letter
16  that's been marked as D-15, is that right?
17  A.        He did not believe the content, is that what
18  you're asking?
19  Q.        Yes.
20  A.        No.  He did not.
21  Q.        Did Chris already know about the letter
22  before you showed it to him?
23  A.        Not to -- I don't think so.  No.
24  Q.        Okay.  So it's your understanding that the
25  first time Chris learned about the April 11th, 2018

---

Matthew Ralston
July 01, 2021                                    142 to 145

Page 142

1  letter that's been marked as D-15 is when you shared
2  your printed out copy with him?
3  A.      Yes.
4  Q.      And Chris said he wasn't going to give it the
5  dignity of finishing it and it was bullshit.  Anything
6  else?
7  A.      No.
8  Q.      What did you do next as it relates to the
9  April 11th, 2018 letter that's been marked as D-15?  Or
10  the accusations by Mr. Poulos?
11  A.      I can't tell you order.  I can tell you in
12  general.  And I -- I don't even know if they were that
13  visit, but certainly I shared it with my wife.  I've
14  got a brother, Mark, who is two years younger.  We
15  speak nearly daily.  I shared it with him.  Not
16  printed, but told him that it existed.  I doubt I even
17  read it.  I have another friend who is a head --
18  another headmaster at the time, with whom I've worked
19  closely and coached together at The Hill School.  We
20  speak -- we spoke often daily when I was a headmaster.
21  Our friendship's 20 years old as well.
22  Q.      What's his name?
23  A.      Chris Hopkins.
24  Q.      All right.  So you --
25  A.      And --

Page 143

1  Q.      -- contact -- we'll keep down the list, but
2  just so we don't get too far ahead.  So you contacted
3  your brother, Mark Ralston?
4  A.      Yes.
5  Q.      Told him about the letter?
6  A.      Yes.
7  Q.      And did you read the April 11th, 2018 letter
8  that's been marked as D-15 to your brother, or give him
9  a copy of it?
10  A.      I did not give him a copy.
11  Q.      Did you read it to him?
12  A.      I don't remember if I read it to him or just
13  gave him a summary.
14  Q.      What did your brother say?
15  A.      He was sorry I had to deal with that.  I --
16  and he's one who obviously knows it isn't true.  I
17  can't tell you word for word.
18  Q.      So your brother didn't believe it?
19  A.      No.
20  Q.      As it -- before we get to Chris Hopkins, as
21  it relates to Chris Chir -- how do you say it?
22  A.      Chirieleison.
23  Q.      Chirieleison.  Chris Chirieleison.  Before
24  April 2 -- let me start again.  Before April 21st,
25  2018, is it your belief that Chris Chirieleison had a

Page 144

1  high opinion of you?
2  A.      Yes.
3  Q.      Is it your understanding that as of today
4  Chris Chirieleison still has a high opinion of you?
5  A.      Yes.
6  Q.      So it's your belief that nothing that Chris
7  Chirieleison read in the April 11th, 2018 letter that's
8  been marked as D-15 affects his opinion of you, is that
9  right?
10  A.      Yes.
11  Q.      You're still friendly with Chris
12  Chirieleison?
13  A.      Yes.
14  Q.      So Mr. Chirieleison hasn't stopped
15  associating with you, based on anything that he read in
16  the April 11th, 2018 letter that's been marked as D-15,
17  is that correct?
18  A.      Correct.
19  Q.      Are you still in contact with Mr. Rees?
20  A.      No.
21  Q.      Prior to April 21st, 2018, was it your belief
22  that Mr. Rees had a high opinion of you?
23  A.      Yes.
24  Q.      Do you believe that Mr. Rees still has a high
25  opinion of you?

Page 145

1  A.      I -- yes.  I guess.  I haven't talked to him
2  in a year and a half.
3  Q.      Okay.  So as of the last -- so the last time
4  you talked to Mr. Rees was a year and a half ago, is
5  that right?
6  A.      Yes.
7  Q.      Okay.  So as of the last time you had
8  communication with Mr. Rees, is it your understanding
9  and belief that Mr. Rees still had a high opinion of
10  you?
11  A.      Yes.
12  Q.      So is it correct that nothing Mr. Rees read
13  or learned about any of the accusations by Mr. Poulos
14  changed Mr. Rees's high opinion of you, is that right?
15          MR. JUBB:  Objection to the form.
16          THE WITNESS:  As far as I know.
17  BY MS. DOUGHERTY:
18  Q.      Did you ever have contact with Mr. Rees,
19  socially or other than in his capacity as the school's
20  lawyer?
21  A.      No.
22  Q.      Nothing that your brother learned about the
23  accusations -- let me start again.  Is it your belief
24  that nothing that your brother learned about the
25  accusations by Mr. Poulos changed his high opinion of

Page 146

1  you?
2  A.       Nothing changed.
3  Q.       And your brother hasn't stopped associating
4  with you based on what he learned about Mr. Poulos's
5  accusations, is that right?
6  A.       No.  It is right.
7  Q.       Okay.  And then -- so Chris Hopkins.  You
8  were telling us about Chris Hopkins.  You shared the
9  information about --
10  A.       I did.
11  Q.       -- Poulos's accusations with Mr. Hopkins?
12  A.       I did.
13  Q.       Did you share specifically the April 11th,
14  2018 letter that's been marked as D-15 with Mr.
15  Hopkins?
16  A.       I've shared the letter with no one.  Content
17  of it.  I can't tell you if I read it to him, or if I
18  -- again, what I did with my brother was say -- and
19  that is give him a summary of it.
20  Q.       Well, you shared the letter with Chris Chir
21  -- how do you say it again?
22  A.       Hop -- oh, Chirieleison.
23  Q.       Yeah, Chirieleison.  You did share the letter
24  with Chris Chirieleison, right?
25  A.       I did.

Page 147

1  Q.       You let him look at your copy?
2  A.       Because we were visit -- yes.  He looked at
3  my copy of it.  And it left with me.
4  Q.       Did you meet -- did you meet Mr. Hopkins in
5  person, or did you talk to him on the phone?
6  A.       No, we were on the phone.
7  Q.       So you either read the letter to him or
8  communicated the content of the April 11th, 2018 letter
9  to Mr. Hopkins, is that right?
10  A.       I did.
11  Q.       And what was Mr. Hopkin's reaction?
12  A.       Very similar.  Didn't believe it.  Sorry I
13  had to deal with it.  Because he's a headmaster, also
14  knows Tom Rees, I can't tell you specifically, but we
15  would have talked about next steps for the school and
16  what's going on.  As far as process.
17  Q.       Were you making these telephone calls while
18  you were still on campus --
19  A.       No.
20  Q.       -- after the April 21st, 2018 meeting with
21  Mr. Lehman?
22  A.       No.
23  Q.       You were back in Ohio?
24  A.       Yes.
25  Q.       Do you -- can you place the time, you know,

Page 148

1  an estimate, or without completely guessing, how close
2  in time to the April 21st, 2018 meeting --
3  A.       It would have --
4  Q.       Hold on a second.
5  A.       Oh, I'm sorry.
6  Q.       -- that you contact with your brother and Mr.
7  Hopkins?
8  A.       It would have been very close in time.  It
9  would not have been weeks.  It would have been pretty
10  quickly after I was away from campus.
11  Q.       Okay.  So pretty soon after you got back
12  home --
13  A.       Yes.
14  Q.       -- you contacted your brother and Mr.
15  Hopkins.  Anyone else?  You were going through the list
16  when I stopped you at the first two.
17  A.       Yeah, I'm sorry.  I can't tell you when this
18  happened.  But I did speak with Geoff Neese.
19  Q.       That was your supervisor at The Hill School
20  at the time, right?
21  A.       Yes.
22  Q.       So you told Mr. Neese about the April 11th,
23  2018 letter that's been marked as D-15?
24  A.       I did.
25  Q.       Did Mr. Neese already know about the letter?

Page 149

1  A.       No.  Not to my knowledge.
2  Q.       So you can't place, in any way, when you told
3  Mr. Neese about the April 11, 2018 --
4  A.       It would have been --
5  Q.       -- letter?
6  A.       It would have been pretty soon.  It was in
7  person.  So I know I was on campus.  What I recognized
8  was that it was impacting my work, because it was
9  present in every conversation I had with an alumnus.
10  Or a member of the alumni.
11  Q.       I'm sorry, you talked about Mr. Poulos's
12  allegations in every conversation you had with alumni?
13  A.       That is -- no.  I said it was present in me.
14  No, I didn't talk about it with anybody.
15  Q.       Except for the people you're telling me?
16  A.       Yes.  You said when I was meeting with
17  alumni, and I'm saying, no, I didn't have that
18  conversation.
19  Q.       Here's what I'm trying to do.  I'm trying to
20  understand your comment that it was affecting your
21  work, as it was present in every conversation with
22  alumni.
23  A.       The -- I'm sorry.  Yeah.  I can explain.
24  Q.       Because that's what surprised me.
25  A.       Yeah.  It would have me too.  No, I never

Matthew Ralston
July 01, 2021                                    150 to 153

Page 150

1  mentioned it that way.  It didn't change -- it changed
2  my daily life, because it was always present in me that
3  I've been accused in this.  I was representing the
4  school and the values of the school and trying to find
5  supporters for the school.  And my constant fear was
6  that if the -- if the letter proceeded beyond that, all
7  of these people I was meeting with were going to have a
8  very different picture of me than what I was sharing
9  with them.  Which was long term faculty member, had a
10  very good career as a teacher.  Administrator.
11        I came back to The Hill after serving as a
12  headmaster similar in this capacity, because I love the
13  school.  That's where I raised my family.  And
14  represented the school.  And my fear was that that was
15  going to damage not only my relationships that I was
16  building with these people but everything I was doing
17  on behalf of the school.  So when I was saying it was
18  present, it was a fog or a shadow of every conversation
19  I had with people in regards to the school.
20  Q.      Okay.  The fog or shadow was that, like, you
21  worried that somebody was going to ask you about it?
22  A.      No.
23  Q.      Okay.
24  A.      It was that --
25  Q.      Well, why weren't you worried that somebody

Page 151

1  was going to ask you about it?
2  A.      Well, because at that point it was a letter
3  to -- to Mr. Lehman.
4  Q.      Okay.  So no --
5  A.      So the first --
6  Q.      -- so alumni didn't know about it at that
7  point in time, is that right?
8  A.      Not that I know of.
9  Q.      Okay.
10  A.      What I know is that with all the other things
11  that you -- we've discussed, once things go public,
12  than everybody knows.  So this threatened, from my
13  perspective, every relationship I had that was sourced,
14  or had its beginning at The Hill School.
15  Q.      Well, what was the basis for your belief that
16  the allegations by Mr. Poulos were public?
17  A.      That -- this says this is an attempt to
18  settle and compromise claims and with -- with Mr.
19  Ralston and should not be seen as evidence of any court
20  hearing.  That sentence doesn't matter.  But what
21  happens if an attempt to settle doesn't -- doesn't
22  happen?
23  Q.      Okay.  You acknowledge that the April 11th,
24  2018 letter that's been marked as D-15 doesn't threaten
25  to make things public, right?

Page 152

1  A.      I don't acknowledge that at all.
2  Q.      Well, what --
3  A.      You're asking how I read it.  I'm telling you
4  that if someone says to me this is an attempt to settle
5  and compromise claims, that, to me, implies that it's
6  an attempt.  What happens after that if there is not a
7  settlement?
8  Q.      Okay.  So you were concerned that if The Hill
9  School didn't settle with Mr. Poulos, that -- what?
10  A.      I -- I don't know.  My understanding --
11  Q.      How do you connect that to publicity?
12  A.      My understanding of the world is if there's
13  an attempt to settle and it doesn't happen, the next
14  step is somebody files a suit, or charges, or makes
15  some sort of public statement.
16  Q.      So was a lawsuit filed against you by Mr.
17  Poulos?
18  A.      No.
19  Q.      Were charges filed against you?
20  A.      No.  But you're asking -- you're asking
21  questions after this letter came out and about my work.
22  And how would I know if, after receiving this letter,
23  not -- not to mention later, how -- how would I know
24  that nothing was going to be filed?
25  Q.      Okay.  I'm trying to understand the fog and

Page 153

1  constant fear that you were experiencing after you went
2  back to Ohio after the career weekend, April 21st,
3  2018.
4            MR. JUBB:  That's not a question yet.
5        That's just a background.  She'll ask a
6        question.
7            THE WITNESS:  Is that a question?
8            MS. DOUGHERTY:  Well --
9            MR. JUBB:  I'm asking her to fix her
10        question.
11            MS. DOUGHERTY:  That's fine.  I'm just
12        trying to think what the problem is.
13            MR. JUBB:  It was a statement.
14            MS. DOUGHERTY:  I'm not very sure that
15        it was, but that's okay.
16  BY MS. DOUGHERTY:
17  Q.      Why were you in constant fear?  And I think
18  you described it as a fog, when you returned to Ohio
19  and were carrying out your duties as a --
20  A.      Because there's --
21  Q.      Hold on one second.  I don't remember your
22  title.  (Continued) -- as a capital giving officer.
23  Why was a constant fear and fog affecting your ability
24  to carry out your duties as a capital giving officer?
25            MR. JUBB:  Objection to the form.  Asked

Matthew Ralston
July 01, 2021                                        154 to 157

Page 154

1    and answered.  Go ahead.
2         THE WITNESS:  Because my job was
3    dependent on relationships.  And I was
4    building relationships, or maintaining
5    relationships with former students in a
6    position representing the school.  I had been
7    accused of what I consider the most heinous
8    thing that can happen to a child.  And I had
9    no way of knowing how that was going to play
10   out, because it wasn't in my hands.
11        It was out of my hands how all of this
12   was going to play out.  And I don't know how
13   to explain to you or what -- what's not
14   clear, why there would be a fear if I'm
15   sitting here asking someone to support a
16   school, that -- and then they -- it comes out
17   somewhere down the road that I was accused of
18   this, how that doesn't jeopardize everything
19   I'm doing, or make me feel like I'm being
20   somewhat -- holding back on building a
21   relationship about the values of the school.
22   BY MS. DOUGHERTY:
23   Q.      Didn't Mr. Rees already tell you that schools
24   typically resolve claims like this, when you spoke to
25   him?

Page 155

1    A.      My name's attached to all of this.
2    Q.      But your fear, as I understood it, that if
3    the school didn't settle and compromise the claims,
4    there would -- somehow the accusations by Mr. Poulos
5    would become null.  You had already spoken to Mr. Rees,
6    who told you that schools typically resolve accusations
7    like this, right?
8         MR. JUBB:  Objection to the form.
9         THE WITNESS:  No.  I don't think he told
10        me they resolved.  He told me that there
11        would be an investigation and the
12        schools act appropriately according to the
13        outcome of that.  I don't know what that
14        resolution is going to be.
15   BY MS. DOUGHERTY:
16   Q.      I think you said "Schools don't fight things
17   like this".
18   A.      Yes.  But I also said --
19   Q.      It's not fighting different than settling, in
20   your mind?
21   A.      Yeah.  In my mind.  Not fighting is hoping it
22   goes away.  I work -- I spent my -- most -- much of my
23   career at a school whose motto is whatsoever things are
24   true.  And here is a letter falsely accusing me of this
25   letter.  I don't think it's okay.

Page 156

1    Q.      Well, did any alumni -- let me start again.
2    Did any alumnus or alumni ask you about Mr. Poulos's
3    allegations?  Ever?
4    A.      No.
5    Q.      And what would you say if someone had?
6    A.      I -- I don't know.
7    Q.      You wouldn't deny it?
8    A.      Would I deny it?
9    Q.      Yeah.  You don't know what you would say if
10   somebody asked you about Mr. Poulos accusing you of
11   repeatedly sexually abusing him when he was a child?
12   A.      I have a perspective of -- I'm a former
13   headmaster and a lifelong school person.
14   Q.      No, no.  This is what I want to know.  I want
15   to know if an alumnus or alum -- we already established
16   that no alumnae or alumnus actually asked you about Mr.
17   Poulos's accusations.  So what I want to know is what
18   you would have said if you were asked about it.
19   A.      I would --
20   Q.      Are you telling me you don't know?
21   A.      No.  Well, in completion, of course part of
22   that would have been absolutely it's false.  Beyond
23   that, what I would tell them I can't tell you, because
24   I never went there with an alumnus.  I would have
25   denied it.  And here's what we're doing.  Or I would

Page 157

1    have denied it and said -- or I would have said you
2    need to reach out to Zach.  I -- I -- I would have had
3    a school perspective in my response, as well as a
4    personal one.
5         So when I say I don't know exactly what I
6    would say, it's that conflict between doing what is
7    best for the school, which I think I did in my whole
8    career, and doing what's in my own best interest.  And
9    I try to balance those.  And I would try -- I would
10   have, if somebody asked me that, tried to balance that.
11   Q.      So these alumnus and alumnae that you're
12   speaking to, these are former students that --
13   A.      Some are.
14   Q.      -- you knew, right?
15   A.      Sorry.
16   Q.      That's okay.  These are former students that
17   you knew, right?
18   A.      Some are.  Some aren't.
19   Q.      Okay.
20   A.      So -- my alumni base goes back to 1992.  Runs
21   from 1992 to about 2011.  So I knew students when I
22   left in 2009.  That's -- that is the cohort of alumni
23   that I know.
24   Q.      Okay.  So --
25   A.      Prior that, I don't --

Matthew Ralston
July 01, 2021                                    158 to 161

Page 158

1  Q.        -- the majority of the people that you were
2  speaking -- let me start again.  The majority of the
3  alumnus and alumnae that you were speaking to, at the
4  time in 2018 were people who knew you, is that right?
5  A.        No.
6  Q.        No?
7  A.        Not majority.  I can't tell you the exact
8  split.
9  Q.        I'm confused.  You were at the -- you were at
10  the school from 1992 to 2009, right?  And I think you
11  said that your time frame for your alumnus and alumnae
12  telephone calls, when you were the capital giving
13  officer, was 2011.  So I don't understand how --
14  A.        I said the people I know.  The base of people
15  I know.
16  Q.        Okay.
17  A.        My responsibility, I met with alumni back as
18  far as -- I think as far back as I go is 1951.  There
19  is an alumnus from there.
20  Q.        Oh.  Okay.
21  A.        So back that far.  Some further trustees,
22  current trustees.  Although I wasn't fundraising
23  current trustees.  I -- I don't know how -- I don't --
24  I guess I don't need to say anything else.
25  Q.        So you -- just so I'm clear -- let me --

Page 159

1  never mind.  Strike that.  So you then told Mr. Neese
2  about the letter, because you were concerned about the
3  constant fear and fog that an alumnae or alumnus might
4  ask you about the allegations?
5  A.        No.
6  Q.        Okay.  Why would you tell Mr. Neese?
7  A.        It is impacting my -- because it was
8  impacting my work.  It was a part of -- the success
9  I've had in my career is based on my ability to build
10  relationships and that, to me, feels like a piece of me
11  that impacts my daily life every day.  Since the day
12  Mr. Lehman told me, that -- that it's not -- and is --
13  at least tangentially and peripherally relative to
14  context in which I was building these -- these
15  relationships.  If it became more than tangential or it
16  became concrete, I -- I don't know what I would have
17  said or done.
18  Q.        But it didn't happen, right?
19  A.        Well, no.  But that doesn't mean it wouldn't.
20  It -- it's not fair to ask me about today how -- where
21  we are today in regards to what -- where I was in 2018.
22  Or the work I was doing there.  I haven't worked since
23  May of 2019.
24  Q.        I thought your termination date was October
25  14th --

Page 160

1  A.        It was
2  Q.        -- 2019.
3  A.        It was.  I was on leave.  Paid leave.
4  Q.        Whose idea was the paid leave?
5  A.        Mr. Lehman's, I assume.
6  Q.        Okay.
7  A.        If it wasn't his, he was the messenger.
8  Q.        So the paid leave started May 2019, did I get
9  that right?
10  A.        It did.
11  Q.        Okay.  So when did you tell Mr. Neese about
12  the April 11th, 2018 letter that has been marked as
13  D-15?
14  A.        It was probably around the opening of school
15  of that year.  And I -- because I would have probably
16  been back on campus.  Or -- I'm sorry, let's back up.
17  I was there May.  I -- I don't know specifically.  I
18  don't remember what date.  It was not -- it was not a
19  year after that.  It wasn't six months after I learned
20  of the letter.
21  Q.        The next time you went to campus after career
22  day?
23  A.        That's pro -- in all likelihood when.
24  Q.        So sometime between --
25  A.        The next time I probably was on campus would

Page 161

1  have been reunion, which is in June.
2  Q.        Okay.  So the next time you were on campus
3  after the April 2018 career day, which you think is
4  probably June 2018, you told Mr. Neese about the April
5  11th, 2018 letter that's been marked as D-15?
6  A.        I'm saying that's probably what I did.
7  Q.        Okay.
8  A.        I'm also telling you I -- I don't
9  specifically remember.
10  Q.        Okay.  So how did you tell Mr. Neese about
11  the April 11th, 2018 letter that's been marked as D-15?
12  A.        Went into his office, asked if I could close
13  the door.  I said I have something I need to share with
14  you.  And -- and I prefaced I need to share with you
15  because I know it's impacting my work.
16  Q.        Did you give Mr. Neese a copy of the letter?
17  A.        I did not.
18  Q.        Did you read it to him?
19  A.        I did not.
20  Q.        What did you tell Mr. Neese about the letter?
21  The April 11th, 2018 letter that's been marked D-15?
22  A.        I would have shared with him that there were
23  -- that there -- about the allegations.
24  Q.        So you told Mr. Neese that Mr. Poulos accused
25  you of repeatedly sexually molesting him when he was a

Matthew Ralston
July 01, 2021                                    162 to 165

Page 162

1  child?
2  A.      I think I probably told him that a former
3  student had accused me.
4  Q.      So you didn't name Mr. Poulos to Mr. Neese?
5  A.      I don't think so.  And I don't remember
6  specifically.  But I don't think so.
7  Q.      But you're confident that you communicated to
8  Mr. Neese that a former student had accused you of
9  repeatedly sexually molesting him when he was a child,
10  right?
11          MR. JUBB:  Objection to the form.
12          THE WITNESS:  Yes.
13  BY MS. DOUGHERTY:
14  Q.      And what did Mr. -- let me start again.  Did
15  you tell Mr. Neese anything else about the April 11th,
16  2018 letter that's been marked D-15, or the allegations
17  by Mr. Poulos?
18  A.      No.  I don't think so.  No.
19  Q.      What did Mr. Neese say?
20  A.      I think he just told me to do my best.  I
21  told him there are moments when I find it paralyzing.
22  He probably said he can't imagine it not doing that at
23  times.  And if I was having more -- if I had problems
24  with work to -- to let him know.
25  Q.      I'm sorry if you answered already, but I

Page 163

1  forget, did Mr. Neese already know about the letter
2  before you told him?
3  A.      I don't believe so, no.  It's not my
4  impression that he did.
5  Q.      Did Mr. Neese give you an impression about
6  whether he credited the accusations that you shared
7  with him?
8  A.      He did.  And he did not give any credibility
9  to it.
10  Q.      Okay.  So Mr. Neese didn't believe the
11  accusations that you had repeatedly sexually molested a
12  former student?
13  A.      That's true.
14  Q.      Prior to when you informed Mr. Neese about
15  Mr. Poulos's accusations, is it your understanding that
16  Mr. Neese had a high opinion of you?
17  A.      Yes.
18  Q.      Is it your understanding that as of today Mr.
19  Neese still has a high opinion of you?
20  A.      Yes.
21  Q.      So nothing that you shared with Mr. Neese
22  regarding Mr. Poulos's accusations changed Mr. Neese's
23  high opinion of you, is that right?
24  A.      It's not my impression that it did, so.
25  Q.      So did Mr. Neese stop associating with you?

Page 164

1  A.      No.  Not completely.
2  Q.      What do you mean not completely?
3  A.      We know each other's families.  I will send
4  him a happy birthday note.  There's been no
5  communications regarding this.
6  Q.      Okay.  So --
7  A.      He's certainly aware -- no, that was --
8  actually not before I was done working.
9  Q.      Is it -- let me just -- is it the case that
10  you just don't have a -- you know, you just don't have
11  the circumstance to meet up with Mr. Neese because you
12  don't work together anymore?  It's not the case that
13  Mr. Neese is avoiding you or refuses to work with you,
14  is that right?
15  A.      Yes.  As far as I know.
16  Q.      Okay.  So as far as you know, Mr. Neese is
17  not purposely not associating with you because of
18  something that learned from you about Mr. Poulos's
19  accusations, is that right?
20  A.      That's right.
21  Q.      We -- let me do it this way.  Are there more
22  people, other than Mr. Neese on your list?  Because you
23  were giving me a list of everybody you told about the
24  April 11, 2018 letter.
25  A.      There another.

Page 165

1  Q.      All right.  Why don't you tell me that
2  person?
3  A.      One other.  Bill Yinger, Y-I-N-G-E-R.
4  Q.      Is this related to the alumni relations
5  woman?
6  A.      No.
7  Q.      No?  They just have the same last name?
8  A.      Oh, oh.  Yeah.  Yeah.  I'm sorry.
9  To the woman.  Yes.  It's his -- it's his -- it's her
10  husband.
11  Q.      Virginia Yinger.
12  A.      Bill is her husband.
13  Q.      Internal Operations Annual Fund --
14  A.      Yes.
15  Q.      -- individuals.  Who you worked with, right?
16  A.      Yes, I did.
17  Q.      So you told Bill Yinger about the April 11th,
18  2018 letter that's been marked as D.15?
19  A.      I did.
20  Q.      When did you tell Bill Yinger?
21  A.      I don't remember.  It wouldn't have been a
22  long wait.
23  Q.      Who's Bill Yinger to you?  Other than the
24  husband of your former co-worker?
25  A.      Let's see.  He was a student.  His first year

Matthew Ralston
July 01, 2021                                            166 to 169

Page 166

1  as a student was the same as my first year as a faculty
2  member in 1992.  When he was a student I taught him and
3  I coached him.  He has a brother my oldest son's age,
4  and would visit our sons while he was away from home.
5  He was pretty close with our whole family.
6          He went to Lehigh.  Or not Lehigh.
7  Lafayette.  Sorry.  I don't know anybody who went to
8  Lehigh.  Would visit us sometime on the weekends while
9  he was there.  So it's a personal -- it had grown to be
10 a friendship.  He came back to work at the school.  So
11 he would have graduated college in '99.  He was at
12 Trinity College for two or three years.  So he came
13 back in '90 -- I'm sorry, '02 or '03.  Became a
14 chairman of the science department.  I was the best man
15 at his wedding.  He's attended our son's wedding.
16 We're just good family friends.
17 Q.      Did you tell Mr. Yinger about the April 11th,
18 2018 letter that's been marked D-15 after you shared
19 the content with Mr. Neese?
20 A.      I don't remember.
21 Q.      How did you -- well, let me start again.  So
22 you did share the content of the April 11th, 2018
23 letter that's been marked as D-15 with Bill Yinger, is
24 that right?
25 A.      Could you ask that again?

Page 167

1  Q.      You did share the content of the April 11th,
2  2018 letter that's been marked D-15 with Bill Yinger,
3  is that right?
4  A.      Yes.
5  Q.      How did you share the content of the April
6  11th, 2018 letter with Mr. Yinger?
7  A.      Would have been somewhere in person.  It was
8  not that he had -- I didn't share the -- hand him the
9  letter.  I don't believe.  And our -- it would have
10 been I was sharing it because we have a long personal
11 relationship and family relationships.  And part of --
12 it was becoming more part of who I was and I felt he
13 needed to know.
14 Q.      Did Mr. Yinger live in residence at The Hill
15 School?
16 A.      Did he?
17 Q.      Did he live at The Hill School?
18 A.      He does.  He did.  And does.
19 Q.      So Mr. Yinger lived at The Hill School at the
20 time when you met with him in person and shared the
21 content of the April 11th, 2018 letter that's been
22 marked D-15, is that right?
23 A.      He did.
24 Q.      So at some point when you were back on
25 campus, you went to --

Page 168

1  A.      Bill's --
2  Q.      Mr. Yinger's house on campus?
3  A.      Yes.  Yes.
4  Q.      And what did -- and you can't place that in
5  time to any extent?
6  A.      I -- I'm sorry, I -- no.
7  Q.      That's fine.
8  A.      Again, it would not have been a long -- a
9  long period of time.  I don't think it was before I
10 left.  But it could have been.  I don't -- I'm --
11 Q.      What do you mean before you left?
12 A.      Before I left in April.  I don't think it was
13 then.
14 Q.      Okay.
15 A.      But because I know I told Chris before I
16 left, Chirieleison, I might have told Bill before I
17 left.  I'm sorry.  I just don't remember.
18 Q.      Is -- and the reason why you were telling
19 Bill was because you considered him to be a close
20 friend?
21 A.      Yeah.
22 Q.      So what did you tell Bill about the April
23 11th, 2018 letter that's been marked D-15?
24 A.      I would have told him that I have been
25 accused of abusing a student.

Page 169

1  Q.      Did you tell Mr. Yinger who the student was?
2  A.      I don't know.  I don't think so.  I don't
3  know.
4  Q.      Mr. Yinger would have been a classmate of Mr.
5  Poulos, is that right?
6  A.      He would not have been a classmate.  He would
7  have been a schoolmate.
8  Q.      Schoolmate?
9  A.      Bill graduated in 1995.
10 Q.      So Mr. Poulos and Mr. Yinger are two years
11 apart in school, as that right?
12 A.      Yes.
13 Q.      What else did you tell Mr. Yinger about the
14 April 11th, 2018 letter?
15 A.      From there it would have been how it's
16 affected me personally.  What I was feeling.
17 Q.      What did Mr. Yinger say?
18 A.      Well, he didn't believe any of it.  I don't
19 know what else he said.  I know he would have done
20 nothing but stand firmly with me and tell me how he
21 would support me as we go.
22 Q.      Okay.  So Mr. Yinger didn't believe the
23 accusations as you relayed them to him, is that right?
24 A.      Correct.
25 Q.      And prior to when you relayed to Mr. Yinger

Matthew Ralston
July 01, 2021                                      170 to 173

Page 170

1  Mr. Poulos's accusations that you had repeatedly
2  sexually molested him, did Mr. Yinger have a high
3  opinion of you?
4  A.       Yes.
5  Q.       And as of today does Mr. Yinger still have a
6  high opinion of you?
7  A.       Yes.
8  Q.       So nothing that you told Mr. Yinger about Mr.
9  Poulos's accusations that you sexually -- repeatedly
10 sexually molested Mr. Poulos has changed Mr. Yinger's
11 high opinion of you, is that right?
12 A.       That's correct.
13 Q.       Has Mr. Yinger stopped associating with you?
14 A.       No.
15 Q.       Is there anyone else that you told about the
16 April 11th, 2018 letter that's been marked as D-15?
17 A.       I don't think so.
18 Q.       Okay.  So we have Mr. Yinger, Mr. Neese, Mr.
19 Hopkins, Mr. Ralston, as in your brother Mr. Ralston,
20 Mark Ralston, Chris C.
21 A.       That's what the kids call him.
22 Q.       You told Mr. Rees, but he already knew.
23 A.       I'm sorry?
24 Q.       You told Mr. Rees but he already knew.
25 A.       Yes.

Page 171

1  Q.       And your wife?
2  A.       Yes.
3  Q.       Did I leave anybody out?
4  A.       No.
5  Q.       Again, that you told about the April 11th,
6  2018 letter that we've marked as D-15?
7  A.       No.  I don't think so.
8  Q.       I'm asking about ever.  Not just limited to
9  2018, but not asking about your lawyer.
10 A.       I've spoken with a -- a doctor.  I've spoken
11 with a counselor.
12 Q.       To seek counseling therapy or medical
13 treatment, is that right?
14 A.       Well, I saw -- I spoke with a doctor because
15 of -- I didn't want to try and guess how this was
16 manifesting.  I -- I could say things that were --
17 Q.       Let's do it this way.  Why did you tell the
18 doctor about the April 11th, 2018 letter?
19 A.       Because of the constant gut-wrenching level
20 of anxiety.  I had some pretty early significant bouts
21 of diarrhea.  And I've always called them gerbils, but
22 the thought that -- that can overtake my mind at night
23 if I wake up.
24 Q.       Who is this doctor?
25 A.       Beg your pardon?

Page 172

1  Q.       Who is the doctor that you told?
2  A.       His name is Phillip Siemer.  S-I-E-M-E-R.
3  Q.       So you told Dr. Phillip Siemer about the
4  April 11th, 2018 letter.  And I think you said a
5  counselor?
6  A.       I did.  Also saw -- one of the things Dr.
7  Siemer recommended was that I see a counselor.
8  Q.       So who's the counselor that you told about
9  the April 11th, 2018 letter?
10 A.       Her name is Lisa Havens, H-A-V-E-N-S.
11 Q.       And is Dr. Siemer in Columbus, Ohio?
12 A.       No.  He's actually in Michigan.
13 Q.       Driver City?
14 A.       He's also a friend.  Suttons Bay.
15 S-U-T-T-O-N-S.
16 Q.       Is he affiliated with a medical practice?
17 A.       Yeah, he's got -- actually, he has a private
18 practice, but he also is part of MDVIP.
19 Q.       Okay.  And Lisa Havens.
20 A.       She's also --
21 Q.       She's a counselor?
22 A.       Yes, she is.
23 Q.       Is she a doctor too?
24 A.       No.
25 Q.       And where is she located?

Page 173

1  A.       She's also in Michigan.
2  Q.       In Suttons Bay?
3  A.       Yes.
4  Q.       Is she affiliated with a practice?
5  A.       Only -- not -- not on paper, technically.
6  They know each other.  Dr. Siemer recommended her.  So
7  by associated, they're not partners.  Or she's not in
8  his practice.  She's got a private practice.
9  Q.       Okay.  What's that private practice called?
10 Does she just use her name?  Or is she --
11 A.       I think she just uses her name.
12 Q.       -- affiliated -- okay.
13 A.       I think she's got a tag line now, but I don't
14 remember it.  She just uses her name.
15 Q.       All right.  Anybody else that you told about
16 the April 11th, 2018 letter that's been marked as D-15?
17 We got the doctor, the counselor, Havens, your wife,
18 your brother, Chris C., Mr. Neese, Chris Hopkins, Mr.
19 Yinger.  Anyone else?
20 A.       When I was put on leave, I shared it with my
21 sons.  The awareness.  Made them aware.
22 Q.       You mean so sometime after May 2019?
23 A.       It would have been in May.
24 Q.       In May?
25 A.       Like 2019.

Matthew Ralston
July 01, 2021                                    174 to 177

Page 174

1   Q.      Why did you tell your sons in May 2019 about
2   the April 11th, 2018 letter that's been marked as D-15?
3   A.      Because I was no longer at the school.  And
4   there was no way they weren't going to know that.
5   Q.      Well, you were just on leave.  Paid leave,
6   right?
7   A.      Correct.
8   Q.      And what did you tell your sons?
9   A.      That I have been accused of this.  And told
10  them when.  And that I was now on administrative leave.
11          THE VIDEOGRAPHER:  Stand by.  Change
12          the chapters.  Going off record, 2:22.
13                    *   *   *
14          (Whereupon, a short break was taken.)
15                    *   *   *
16          THE VIDEOGRAPHER:  We're back on, 2:40.
17  BY MS. DOUGHERTY:
18  Q.      How did you learn that you were being put on
19  leave?  Let me -- strike that.  Is it correct that the
20  leave was not voluntary?
21  A.      Correct.
22  Q.      Okay.  So what is your understanding of why
23  you were put on leave in May 2019?
24  A.      I don't even recall a phone call.  I'm sure
25  it was Zach.

Page 175

1   Q.      We're talking about Mr. Lehman?
2   A.      Mr. Lehman.  I'm sorry.  That all goes back
3   to the letters.  At that point there were two letters.
4   And -- so my -- it's where I go.  Obviously May '19 was
5   a few weeks after I filed suit.  But I -- I don't know
6   what he was thinking.  He just told me he needs to put
7   me on -- on paid administrative leave.
8   Q.      So were you put on paid administrative leave?
9   A.      You know what, I take that back.  I do know
10  how.  Tom Rees informed me.
11  Q.      It wasn't Mr. Lehman who called you?
12  A.      No.  It was Tom Rees.  What I can't -- I know
13  I had a letter confirming it, but I don't -- I have a
14  hard time believing the letter was how I found out.  So
15  maybe Zach called -- Mr. Lehman called me.  Maybe Tom
16  did.  But I'm pretty sure I got a letter.
17  Q.      Okay.  So you think that you maybe got the
18  courtesy of a telephone call first and then you have a
19  writing identifying --
20  A.      I'm sure I have a letter, because it outlined
21  what it meant.  And I -- although, you know what, a
22  phone call from Mr. Lehman -- if -- if I got a phone
23  call it would have been from Mr. Rees.  Because at that
24  time I was already engaged with Mr. Jubb.
25  Q.      Do you have allergies or are you upset?

Page 176

1   A.      No, it's allergies.
2   Q.      I just want to make sure you're not crying
3   because I'm upsetting you.
4   A.      It's not upset.
5   Q.      Okay.
6   A.      It's allergies.
7   Q.      Do you have enough tissues there for your
8   allergies?
9   A.      Yes.  I stole some more.
10  Q.      You have them stuffed in your pockets there?
11  A.      I do.
12  Q.      You're sure that you --
13          MR. MCCARRON:  Hey, could you guys --
14          could you unmute again, please?
15          MS. DOUGHERTY:  Sorry.  Can you hear us
16          now?
17          MR. MCCARRON:  Yes.
18  BY MS. DOUGHERTY:
19  Q.      Are you sure, though, that you also received
20  a letter confirming --
21  A.      I know I got -- yes.  Because it outlined
22  what it meant.
23  Q.      Okay.  And do you still have that letter?
24  A.      Probably.
25  Q.      Did you give that letter to your lawyer?

Page 177

1   A.      Probably.  But I -- I -- I know I would have
2   called and asked about it.  But I don't recall that I
3   -- if I shared it or not.
4   Q.      Because I don't have the -- a May -- I'm
5   sorry.  Let me start again.  So the letter was dated
6   May -- sometime in May 2019?
7   A.      It would have been, yes.  Yeah.
8   Q.      Okay.
9           MS. DOUGHERTY:  So sometime -- I don't
10          have a letter dated May 2019 explaining the
11          basis of the leave, or that he was going on
12          leave.
13          MR. JUBB:  Okay.
14          MS. DOUGHERTY:  Is that something that
15          you have?
16          MR. JUBB:  If I do I'll get it to you.
17          MS. DOUGHERTY:  Okay.  Will you get it
18          from your client if you don't have it?
19          MR. JUBB:  Yeah, if he has the letter.
20  BY MS. DOUGHERTY:
21  Q.      And what's your recollection of the content
22  of the May 2019 letter?
23  A.      That I was on paid administrative leave.  It
24  meant that I needed to be available for questions.  And
25  available to anybody at the school that needed me.  I

Matthew Ralston
July 01, 2021                                          178 to 181

Page 178

1    was to -- not to make contact with alumni in the
2    context of -- as an employee of the school. I believe
3    that's -- yeah. They probably said I would continue to
4    be paid while I was on leave.
5        Q.      Did the letter indicate the reason why you
6    were being put on paid leave?
7        A.      I don't think so. But I don't recall.
8        Q.      You mentioned that the letter was close in
9    time to when you commenced this lawsuit against Mr.
10   Poulos. Was the reason why you were put on leave
11   because you commenced this lawsuit against Mr. Poulos?
12       A.      Is the reason?
13       Q.      Yes.
14       A.      I don't -- I can only tell you what I felt
15   and assumed at the time. I can't tell you what went
16   into their conversations that led to it.
17       Q.      All right. Well, let's start with what you
18   felt and assumed at the time. I assume you mean when
19   you received the May 2019 letter?
20       A.      I assumed it was the next piece of the
21   continuation of the nightmare that started with the
22   letters and then was the next step after I filed suit.
23       Q.      Okay. So you did equate the paid leave to
24   your commencement of the lawsuit against Mr. Poulos?
25               MR. JUBB: Objection to the form of the

Page 179

1    question.
2    BY MS. DOUGHERTY:
3        Q.      I realize you weren't inside their head.
4        A.      The timing was not coincidence, if that's
5    what you're asking.
6        Q.      Here's what I'm getting at. You have told us
7    all these people, including Mr. Lehman and Mr. Rees,
8    who didn't credit the accusations of Mr. Poulos, right?
9    The letters were several months before your paid leave.
10   The proximity to the lawsuit and the paid leave suggest
11   that the paid leave was as a result of the lawsuit. So
12   is that your belief and assumption? I realize you
13   weren't in Mr. Lehman's head or The Hill School's head.
14               MR. JUBB: Objection to the form.
15   BY MS. DOUGHERTY:
16       Q.      What did you believe, when you learned in May
17   2019, you were being put on paid leave?
18       A.      If we can have a bit of a time line, it's
19   very short. I can tell you that I don't recall that
20   the letter said why. I can tell you that soon
21   thereafter there was an article that showed up in some
22   Philadelphia publication that mentioned it, in which
23   the director of communications of the school -- it
24   mentioned the lawsuit. Did not mention my name. That
25   there was a --

Page 180

1        Q.      Quote from your lawyer, right?
2        A.      There was a publication. And I don't recall
3    what it was, but the response to that -- in that was
4    that I had been put on paid administrative leave.
5        Q.      Okay. So your belief is you were put on paid
6    administrative leave because your lawsuit brought
7    attention to the allegations and generated press, is
8    that right?
9                MR. JUBB: Objection. Asked and
10               answered.
11               THE WITNESS: I know that's what the
12               school told the press. I don't recall if it
13               was in a letter to me.
14   BY MS. DOUGHERTY:
15       Q.      So it's your belief that the school told the
16   press that you were put on paid leave because of the
17   lawsuit?
18       A.      Yeah. I think we can confirm that.
19       Q.      And are you talking about like an article on
20   line? Or in a newspaper? Or both? Do you remember
21   the publication?
22       A.      I think there was something in Philly Mag.
23   There was another. I don't recall what it was. But I
24   think what I'm referring to where it was mentioned, the
25   school was not named. But it was described in a way

Page 181

1    that was pretty obvious.
2        Q.      You mean your complaint described the school
3    in a way that was pretty obvious.
4                MR. JUBB: Objection to the form.
5                THE WITNESS: What I'm saying is the
6                article that prompted this was described --
7                the school was described in a way.
8    BY MS. DOUGHERTY:
9        Q.      Are you talking about the article in Philly
10   Mag?
11       A.      Yeah.
12       Q.      That was an article that quoted Mr. Beasley,
13   right?
14               MR. JUBB: No, it didn't. Objection to
15               the form.
16               MS. DOUGHERTY: No?
17   BY MS. DOUGHERTY:
18       Q.      Did you read an article about your lawsuit
19   that quoted a lawyer from the Beasley Firm?
20       A.      From the --
21       Q.      The Beasley Firm. The people who represent
22   you in this lawsuit?
23       A.      I know. I didn't hear you. I don't believe
24   they were quoted. Let me rephrase that. Yes. But I
25   believe the quote was something to the effect of, we

Matthew Ralston
July 01, 2021                                    182 to 185

Page 182

1  don't have a comment about it.  That the courts will
2  decide -- it will be handled through legal channels, or
3  something.
4  Q.      Do you have any idea how the reporter
5  connected your lawsuit to The Hill School?
6  A.      Elite private boarding schools in Montgomery
7  County are pretty few.
8  Q.      An article you had in mind discussed an
9  outing of Mr. Poulos as a survivor of sexual assault,
10 right?
11          MR. JUBB:  Objection to the form.  What
12 -- what article are you talking about?
13          MS. DOUGHERTY:  The one he's talking
14 about.  Philly Mag.
15          MR. JUBB:  You're -- no.  We're not
16 doing this.  You want to ask him questions
17 about what the article said?
18          MS. DOUGHERTY:  He read it.  He said it
19 was a source of why he got put on leave.
20          MR. JUBB:  That's not what he said at
21 all.
22          MS. DOUGHERTY:  He can tell me -- he can
23 tell me -- he can --
24          MR. JUBB:  Objection to the form.
25          MS. DOUGHERTY:  He can tell me he

Page 183

1  doesn't remember.  He can tell me a lot of
2  things.
3          MR. JUBB:  Do you know what it says?
4  Because you seem to be saying a lot of things
5  that it doesn't say.  So I just want to make
6  sure we're talking about the same one.
7          MS. DOUGHERTY:  I remember the article,
8  because at the time I thought it was
9  disgusting that you took the position that
10 you would redact the school and your client's
11 name, but not the sexual assault survivor and
12 reveal personal health information about Mr.
13 Poulos in a public filing.
14          MR. JUBB:  Then you should read it
15 again.  Because you were wrong the first
16 time and you're wrong now.
17          MS. DOUGHERTY:  So is your -- does your
18 Complaint redact Mr. Poulos's name or in any
19 way protect his health information?
20          MR. JUBB:  What does that have to do
21 with an article?  Are you asking about the
22 Complaint?  Or are you asking about the
23 article?  That's what I thought.
24          MS. DOUGHERTY:  That's what you thought
25 what?

Page 184

1          MR. JUBB:  That you were talking about
2  the article.
3          MS. DOUGHERTY:  We went through this
4  before.  Being unprofessional doesn't suit
5  you.
6          MR. JUBB:  Being unprofessional does
7  suit you, and I've seen it multiple times.
8  I'm sitting here telling you, if you want to
9  ask him about an article that he says he one
10 time read and quiz him on that versus a
11 complaint --
12          MS. DOUGHERTY:  You're the only one that
13 gets upset about a compliment.  By me telling
14 you that being unprofessional doesn't suit
15 you, you don't need to make little jabby
16 comments.  I'll ask -- I'm going to proceed
17 with the question.
18 BY MS. DOUGHERTY:
19 Q.      The article that you have in mind, which I
20 think you identified as Philly Mag, is that right?
21 A.      Yes.
22 Q.      Okay.  Did that article that you have in mind
23 in Philly Mag, did that discuss Mr. Poulos?
24 A.      I don't recall.  But I know it was in the
25 Complaint.  And I know Complaints are public records.

Page 185

1  Q.      Why did you redact your name but not Mr.
2  Poulos's name?
3          MR. JUBB:  You don't have to answer that
4  question.  You don't have to answer that
5  question.
6          MS. DOUGHERTY:  Why not?
7          MR. JUBB:  Because I drafted the
8  Complaint as a lawyer, and you're not going
9  to ask him why the Complaint was drafted in a
10 particular way.
11          MS. DOUGHERTY:  Well, actually --
12          MR. JUBB:  If you want to ask him about
13 the allegations in the Complaint and, you
14 know, what he knows to support them or
15 corroborate them, et cetera, by all means.
16 But you're not going to ask him about why
17 there are certain, you know, strategy in a
18 Complaint.
19          MS. DOUGHERTY:  I didn't ask about
20 stratgy.
21          MR. JUBB:  You are asking him why he was
22 named as a Doe in a Complaint.
23          MS. DOUGHERTY:  Can you look and find
24 the place where the plaintiff says where he
25 wanted to file as a Doe.  I underlined it.  I

Page 186

1      just can't find it.  Don't want to make
2      everyone sit here and stare at me.
3  BY MS. DOUGHERTY:
4      Q.      If you had sexually molested Mr. Poulos would
5  you have admitted it?
6              MR. JUBB:  Objection to the form.
7              THE WITNESS:  I -- I can't know what it
8      would be to do that, because I didn't and --
9  BY MS. DOUGHERTY:
10     Q.      I'm asking you, if you had molested a child,
11 when you were accused of doing it would you have
12 admitted it and taken responsibility?
13             MR. JUBB:  Objection.  Just -- don't
14     answer the question.  It's harassing.
15             MS. DOUGHERTY:  Why?
16             MR. JUBB:  It's stupid.  It's quite
17     possibly the dumbest question I've ever
18     heard.  You're asking him about what he would
19     do --
20             MS. DOUGHERTY:  I'm sorry, What
21     objection is that?
22             MR. JUBB:  No, no.  It's the -- it's
23     harassing.  It's causing him to speculate.
24             MS. DOUGHERTY:  Where is stupid in the
25     Federal rules of civil procedure?

Page 187

1              MR. JUBB:  I'm explaining to you what --
2      what the rules you want to -- are you going
3      to let me finish?
4              MS. DOUGHERTY:  Are you instructing him
5      not to answer?
6              MR. JUBB:  I already did instruct him
7      not to answer, because you're trying to
8      harass him, asking him ridiculous questions.
9              MS. DOUGHERTY:  It's not ridiculous.
10             MR. JUBB:  It's harassing.  If you had
11     sexually abused someone --
12             MS. DOUGHERTY:  Yeah.
13             MR. JUBB:  -- how would you have
14     responded?  And he's like, "That's not true."
15             MS. DOUGHERTY:  He's going to lie about
16     it either way.  It really definitely --
17             MR. JUBB:  Is that your position here
18     now?
19             MS. DOUGHERTY:  -- his credibility.
20             MR. JUBB:  Okay.  Go ahead.  Ask a
21     thoughtful question.
22 BY MS. DOUGHERTY:
23     Q.      If you had sexually abused Mr. Poulos would
24 you have admitted and taken responsibility when he
25 accused you?

Page 188

1              MR. JUBB:  Don't answer that question.
2      That's ridiculous.  Even for you.  That is
3      so --
4              MS. DOUGHERTY:  Even for me?
5              MR. JUBB:  -- harassing.  Asking him to
6      answer a question like that.  He just told
7      you he's never done anything inappropriate
8      with a -- with a child.  And then you want
9      him to speculate what he would do if he did?
10             MS. DOUGHERTY:  I want to know if he
11     would take responsibility for his actions.
12             MR. JUBB:  Well, why don't you ask him
13     if -- go ahead.  No.  Ask a thoughtful
14     question.  That's ridiculous.
15             MS. DOUGHERTY:  I did ask a thoughtful
16     question.
17 BY MS. DOUGHERTY:
18     Q.      So you're not going to answer whether you
19 would take responsibility if you had engaged in
20 misconduct with Mr. Poulos?
21     A.      Am I --
22             MR. JUBB:  Answer it.  Hold on.  Hold
23     on.
24             THE WITNESS:  Okay.
25             MR. JUBB:  He is not answering any sort

Page 189

1  of questions about how he would respond if he
2  did do something with Mr. Poulos.  If you
3  want to ask him about how he's ever responded
4  to being -- of any sort of inappropriate
5  conduct as it pertains to just being a
6  teacher, whatever, that I'll allow.  But
7  you're not going to let -- you're not going
8  to ask a question about him imagining how he
9  would respond if he did do something that
10 he's very adamantly said never occurred.
11             MS. DOUGHERTY:  I'm just trying to
12     understand what kind of man he is.
13             MR. JUBB:  Why don't you ask better
14     questions.
15             MS. DOUGHERTY:  Is he somebody who takes
16     responsibility when he makes mistakes.
17             MR. JUBB:  Okay.  Ask that question.
18             MS. DOUGHERTY:  That's what I'm trying
19     to learn.  That's what I did learn.
20             MR. JUBB:  No, no.
21             MS. DOUGHERTY:  I asked him --
22 BY MS. DOUGHERTY:
23     Q.      I asked you, would you take responsibility
24 for your actions if you had engaged in misconduct with
25 a student?

Page 190

1      MR. JUBB:  Don't answer that question.
2  Why don't you ask are you the type of
3  teacher --
4      MS. DOUGHERTY:  What are you afraid of?
5      MR. JUBB:  What am I afraid of?  You're
6  asking him to speculate how he would respond
7  if he did something horrific, which he's
8  already told you he hasn't.  So why don't you
9  say have you ever had to report yourself for
10  misconduct for any reason.  Why don't you ask
11  more thoughtful questions?  And I won't
12  object to them.  Then you can figure out what
13  kind of man he is.  Asking a question like
14  that isn't going to do it.
15      MS. DOUGHERTY:  This isn't going to be
16  counted as my time, so we're going to mark
17  the time if you keep spouting off.
18  BY MS. DOUGHERTY:
19  Q.      So you're not going to answer my question,
20  Mr. Ralston?
21      MR. JUBB:  Don't answer that.  You're
22  not answering any question until she asks a
23  good one.  So that question was ridiculous
24      MS. DOUGHERTY:  Until I ask a good one?
25  Are you kidding me?  Move to strike.

Page 191

1      MR. JUBB:  Until you ask him an
2  appropriate question.
3      MS. DOUGHERTY:  Move to strike.  First
4  of all, it's 2:58.  I move to strike your
5  comments.  I don't make sport of your
6  questions.  I sat there and listened to
7  plenty that I thought were thoughtless and
8  rude and harassing.  And, you know, let you
9  victim shame.  But, you know, without
10  comment.  Because it's not appropriate to
11  make sport of someone else's questions.  So
12  what type of objection is that?
13      MR. JUBB:  Why don't you ask a question
14  again and I'll make another objection.
15  BY MS. DOUGHERTY:
16  Q.      Sir, if you had sexually molested Mr. Poulos
17  would you have admitted to your conduct when Mr. Poulos
18  accused you and taken responsibility for your actions?
19      MR. JUBB:  Don't answer that question.
20  BY MS. DOUGHERTY:
21  Q.      Have you ever reported yourself for a
22  misconduct?
23  A.      Yes.
24  Q.      When did you report yourself for a
25  misconduct?

Page 192

1  A.      When I was teaching at The Andrews School.
2  Probably 1987, '88.  It was.  Not probably.  It was.
3  So it was 1987, '88 school year.  I told a young woman
4  to shut her fucking mouth.
5  Q.      A student?
6  A.      Student.
7  Q.      A minor student?
8  A.      She was -- she was a junior in high school.
9  Q.      I just didn't know if The andrews School was
10  a college or high school.  I apologize.
11  A.      It's a college prep school.  At the time it
12  was for all girls.
13  Q.      Okay.  So the student that you told to what?
14  A.      I told her to shut her fucking mouth.
15  Q.      She was under 18, right?
16  A.      I don't know.  She was a junior in high
17  school, so probably, but maybe not.  I don't know.
18  Q.      What caused you to tell her to shut her
19  fucking mouth?
20  A.      My temper.  What provoked me was she was
21  being insubordinate in third person to me and I had
22  asked her to be quiet a few times and I lost my temper.
23  Q.      Do you have a temper?
24  A.      Well, not generally with kids.  Not generally
25  with adolescents.  Most of my intolerance is with

Page 193

1  adults.  I think I'm one of -- no.  To answer your
2  question.  When I'm working with children, no.  That
3  probably was the incident that changed my outlook on
4  things.
5  Q.      You mean your -- what do you mean your
6  outlook on things?
7  A.      I checked where my -- I left the incident, I
8  went to the headmaster and told him what I had done.  I
9  said I'm pretty sure you're going to hear about this,
10  so I want you to know what I did.  And his response to
11  me was, one, he was supportive.  Thanked me for coming.
12  Letter into my file, which I no longer have, I don't
13  think.  But he explained to me that my standards were
14  good.  That my expectations were out of line.
15      And so what I took that -- what I adjusted in
16  my career with adolescents from that point on, was I
17  made my expectations more commensurate with their age,
18  or more in line with their age.  And what was fair to
19  expect with a child.  An adolescent.  And our goal
20  became the standards.  My response to adolescents
21  became the expectation.
22  Q.      What is your definition of adolescent?
23  A.      For me it's been high school kids, because
24  that's who I taught.
25  Q.      So before the incident with the young woman,

Page 194

1   I think you said in 1987 to 1988, did you have a temper
2   with adolescents?
3   A.      No.
4   Q.      What is it that you checked or reevaluated --
5           MR. JUBB:  Objection to the form.
6   BY MS. DOUGHERTY:
7   Q.      -- as a result of the incident?
8   A.      How my expectations aligned with my
9   standards.  The headmaster, again, told me that my
10  standards were right and good, and it was my
11  expectations I needed to adjust.
12  Q.      Are you still intolerant with adults?
13          MR. JUBB:  Objection to the form.
14          THE WITNESS:  Not temper wise.  I expect
15          adults that figured some things out.  And I
16          don't -- that don't expect adolescents to
17          have figured out.  Mostly that the world
18          doesn't revolve around them.
19  BY MS. DOUGHERTY:
20  Q.      So did the student complain to the school
21  about you?
22  A.      She did.  Actually I don't know if she did.
23  Her parents did.
24  Q.      Okay.  So did you participate in responding
25  to discovery in this action?

Page 195

1   A.      I'm sorry.  I didn't hear you.
2   Q.      I'm sorry.  Did you participate in responding
3   to discovery in this action?
4   A.      In this action?
5   Q.      Yes.  The one that you filed against Mr.
6   Poulos and Mr. Garabedian?
7   A.      Can you --
8   Q.      Sure.
9   A.      I'm not sure what -- what you're -- about
10  what you're asking.
11  Q.      Sure.  That's fine.
12          MR. JUBB:  She'll show you.
13          MS. DOUGHERTY:  We're at 16, I think,
14          right?
15                        *   *   *
16          (Whereupon, the above-mentioned document
17          was marked for identification as D-16.)
18                        *   *   *
19  BY MS. DOUGHERTY:
20  Q.      Mr. Ralston, I'm showing a document that I've
21  marked D-16.  It says plaintiff's responses to the
22  first set of Interrogatories of defendants, Mr.
23  Garabedian, Esquire, and Mr. Garabedian, Esquire,
24  d/b/a, Law Offices of Mitchell Garabedian, to
25  plaintiff.  And the document is 11 pages.  Ten page

Page 196

1   document with a certificate of service.  Have you seen
2   the document that I've marked as D-16 before I just
3   handed it to you today?
4   A.      Yes.
5   Q.      Did you participate in preparing responses to
6   the questions that are identified throughout D-16?
7   A.      Yes.
8   Q.      I'm going to direct your attention to the
9   fourth page of D-16.  To number four.  It says,
10  "Identify and provide contact information for each and
11  every person who complained about you."  It says,
12  "Plaintiff objects to this request as overly broad and
13  duly burdensome, vague, confusing and without waiver,
14  none."  So that's incorrect, right?
15  A.      Um.
16  Q.      The none part.
17  A.      I'm sorry, the what part?
18  Q.      The none part.  I realize I'm not asking you
19  to comment about the objection.  Because the parents of
20  the students you just told me about did complain about
21  you, right?
22  A.      I don't see that it says none.
23  Q.      It says without waiver, none.
24  A.      Oh, without waiver.  Yeah.  I guess.  Yes.
25  Q.      So the parents --

Page 197

1   A.      There --
2   Q.      -- of the students at Saint -- I'm sorry, The
3   Andrews School.  I'm getting a little British Royals,
4   right?
5   A.      I can tell you, it's no longer just called
6   that.
7   Q.      So do you remember the student's name?
8   A.      Yeah.  Her name was --
9           MR. JUBB:  Hold on.  Just answer yes or
10          no first.
11          THE WITNESS:  Oh.  Yes.
12  BY MS. DOUGHERTY:
13  Q.      Okay.  What was the student's name?
14  A.      Her name was Rebecca Turner.
15  Q.      Is Ms. Turner deceased?  Is that why you're
16  stressing was?
17  A.      No.  I have no idea if she was married or
18  changed her name.  As a student that was her name.
19  Q.      Did anyone else, a student or a parent, ever
20  complain about you?
21  A.      When?  Otherwise?
22  Q.      Sure.  I just want to make sure that -- well,
23  do we agree, going back to number four on D-16, that
24  where it says without waiver, none, it should --
25  A.      No.

Page 198

1  Q.      -- it should say, yes, Rebecca Turner's
2  parents?
3  A.      I -- I know they did.  I don't know if she
4  went to the headmaster and then her parents.  Or if she
5  went to her parents.  My guess would be she went to her
6  parents and then her parents came to the school.
7  Q.      Okay.  But the none should at least say
8  Rebecca Turner's parents, right?  Because the parents
9  complained about you, right?
10  A.      I assume they did.  I -- I mean.  I --
11  Q.      I thought you just told me they did.
12  A.      I'm telling you I don't know who contacted
13  the headmaster.
14  Q.      Oh.  You don't know if it was Rebecca Turner
15  or her parents?
16  A.      I told you I don't know if it was Rebecca
17  Turner or her parents.
18  Q.      Okay.  So it should say, yes, Rebecca Turner
19  or Rebecca Turner's parents complained about an
20  incident with Rebecca Turner.  Right?
21          MR. JUBB:  I'll object to the form.
22          THE WITNESS:  Yes.
23  BY MS. DOUGHERTY:
24  Q.      Is there anyone else, a student or parent,
25  who's complained about you?

Page 199

1  A.      Not that I'm aware of.
2  Q.      While we're on this document, D-16, if I can
3  direct your attention to page 8, number 11.  So, again,
4  the response to number 11 says -- there's an objection.
5  Plaintiff objects, right.  And it says, "Without
6  waiver, Mr. Garabedian knows better than most people
7  the significance of abuse of a young person and
8  therefore is acutely aware of the importance of being
9  certain of allegations before spreading them.  Such
10  allegations immediately subject the accused to public
11  judgment, hatred, contempt and ridicule.  Plaintiff has
12  filed as John Doe for this reason."  Did you
13  participate in the response that I just read to you?
14  A.      Yes.
15  Q.      So you participated in the decision to hide
16  your name when you filed this lawsuit, is that right?
17  A.      Yes.
18  Q.      Is there a reason why you -- let me start
19  again.  Did you participate in the decision to not
20  obscure Mr. Poulos's name?
21  A.      I don't -- is there a reason?
22  Q.      I just want to know if you participated in
23  the decision to not also obscure Mr. Poulos's name, or
24  Mr. Poulos's health information.
25  A.      I don't recall.  I saw the complaint before

Page 200

1  it was filed.  So I was at least aware.
2  Q.      Do you agree that --
3  A.      It was filed as such.  And I would have been
4  aware that it was.  So to the extent that that implies
5  consent, yes.  Because I don't recall we argued about
6  it or anything.
7  Q.      So you weren't concerned with sharing Mr.
8  Poulos's identity and this health information?
9  A.      No.
10  Q.      Do you agree that being labeled a survivor of
11  sexual assault can subject someone to public judgment,
12  hatred, contempt and ridicule?
13  A.      Ask -- can you repeat it again?
14  Q.      Sure.  Do you agree that being labeled a sex
15  -- sexual assault survivor would subject someone to
16  public judgment, hatred, contempt and ridicule.
17          MR. JUBB:  I'll object.  Go for it.  Go
18  ahead.
19          THE WITNESS:  Being labeled as a
20  survivor would subject them to all of that?
21  BY MS. DOUGHERTY:
22  Q.      Yeah.  Do you think people think highly of
23  sex abuse victims?
24          MR. JUBB:  Objection to the form.
25          THE WITNESS:  I can't -- I don't think

Page 201

1  there's a general answer to that.  I think --
2  I don't think highly of people one way or the
3  other until I know them.  And so I wouldn't
4  judge, thinking highly of someone based on
5  that.  I would feel horrible for somebody.
6  Because I can't know what that would be, to
7  be a survivor of that.
8          As I said, I think it's the most heinous
9  thing an adult can do to a child.  And so I
10  can't imagine that it doesn't live with you
11  your whole life.
12  BY MS. DOUGHERTY:
13  Q.      Did you consider whether revealing that Mr.
14  Poulos suffers from a number of injuries, including
15  sexuality problems, self harm, suicidal ideation,
16  sharing that information publicly, associating it with
17  Mr. Poulos, would subject Mr. Poulos to public
18  judgment, hatred, contempt and ridicule?
19          MR. JUBB:  Objection to the form.
20          THE WITNESS:  I don't know that I would
21  use all those words.  I would think someone
22  that's got those would be people's
23  perspectives, when they meet them or already
24  know them, would be impacted or affected.
25  But, again, ridicule, judgment, and what

Matthew Ralston
July 01, 2021                                        202 to 205

Page 202

1          some of those other words are --
2   BY MS. DOUGHERTY:
3   Q.      Public judgment, hatred, contempt and
4   ridicule. They're part of your answer.
5   A.      Hatred, contempt and ridicule. Are we on
6   number four?
7   Q.      We were on number 11.
8   A.      Or 11, I mean?
9   Q.      Yeah. In the middle of the paragraph. It
10  says such allegations subject accused to public
11  judgment, hatred, contempt and ridicule, as it relates
12  to you being the accused of a perpetrator of sexual
13  assault. And I'm asking you, because you -- you -- you
14  didn't reveal your name, but you revealed --
15  A.      I don't --
16  Q.      -- Mr. Poulos's name. And you revealed
17  information about Mr. Poulos regarding assault and
18  injuries, some of which I just identified for you.
19  Sexual inadequacies, self harm, suicidal ideation, that
20  would expose Mr. Poulos to public judgment, hatred,
21  contempt and ridicule. Don't you agree?
22          MR. JUBB: Objection to the form.
23          THE WITNESS: I don't know why it would
24          subject a person to hatred, contempt and
25          ridicule. Public judgment. If someone

Page 203

1          suffers from those things, I don't know if
2          judgment's the right word, but I would expect
3          it to affect someone's feeling towards that
4          person. Compassionate person is probably not
5          going to be contempt -- full of contempt,
6          hatred and ridicule. So I don't know. I
7          don't -- those are not words I would use if I
8          knew that about somebody.
9   BY MR. DOUGHERTY:
10  Q.      You didn't show any compassion to Mr. Poulos,
11  though, right?
12          MR. JUBB: I'll -- objection to the
13          form. You don't have to answer that.
14  BY MS. DOUGHERTY:
15  Q.      All right. I just want to make sure we
16  closed the loop on everyone that you told about the
17  April 11th, 2018 letter that was marked as D-15. You
18  told me the doctor, the counselor, Mr. Neese, Mr.
19  Yinger, Mr. Hopkins, Mark Ralston, Chris C. Your sons.
20  Your wife. And you communicated to Mr. Rees, but you
21  said that Mr. Rees already knew about it. Did I miss
22  anybody that you told about the April 11th, 2018 letter
23  that has been marked as D-15?
24  A.      I -- I actually did not tell my sons about
25  the letter. I didn't tell my sons until I was put on

Page 204

1   paid administrative leave. And so they were aware of
2   the allegations and how I had responded. They don't --
3   they've never seen or been told about specific letters
4   or content beyond the fact that I was accused of this.
5   Q.      Okay. Did I otherwise identify everyone that
6   you told about the April 11th, 2018 letter that's been
7   marked D-15?
8   A.      Yes. That I told about the letters, yes.
9   Q.      Do you have any information about who
10  received the letter from a source other than you?
11  A.      Again? I'm sorry.
12  Q.      Yeah. Do you have any information about who
13  else received the letter?
14  A.      Yes.
15  Q.      What information do you have about who else
16  received the letter?
17  A.      I know Ms. --
18  Q.      And by the way, the letter --
19  A.      As it was mailed? Or do you mean copies
20  thereof?
21  Q.      Let's just start with the letter being -- I
22  want to know what information you have about
23  individuals who received the April 11th, 2018 letter
24  that's been marked as D-15 from a source other than
25  you.

Page 205

1   A.      I know people knew of them. I don't know
2   that he handed copies. But I assume he probably did.
3   Q.      Who is the he?
4   A.      Mr. Lehman. I'll get there. So Mr. Lehman
5   told me at one point that he had shared it with the
6   legal committee and the Board of Trustees. And he had
7   shared it with the associate headmaster of the school,
8   who, at that time, was a gentleman named Len Miller. I
9   can't tell you everybody on the legal committee. I
10  know the Chairman of the Board would be a member of
11  that. And I know two other people that I'm sure are on
12  it. Or were at the time, assuming they're still
13  trustees. Probably still are if they are.
14  Q.      Okay. So Mr. Lehman told you that he shared
15  the April 11th, 2018 that's been marked D-15 with the
16  legal committee?
17  A.      Yes.
18  Q.      Okay.
19  A.      Now, ask the time frame of your question.
20  Did he share the letter with them?
21  Q.      At the moment I'm just restricting my
22  questions to the April 11th, 2018 letter. I'm going to
23  ask about the next one next.
24  A.      Okay.
25  Q.      So did I misunderstand? I thought you were

Page 206

1 saying that he told you.
2       A.      Yeah.  I'm sorry.  I was -- I don't think Mr.
3 Lehman shared that with me until January.  When I was
4 on campus in January of 2019.
5       Q.      Okay.  So -- sorry.
6       A.      So that would have been two letters.  I
7 assume, because there's a -- it's a million dollar
8 demand, I assume that at least Tom Rees knew, which I
9 knew I was right when I asked.  And at least the board
10 chair.  And I would then have assumed, or did assume,
11 that it would go beyond the board chair and Mr. Rees,
12 based on what they -- how they decided they wanted to
13 proceed.  And I can't tell you what that is.
14      Q.      Okay.  So you assume that the April 11th,
15 2018 letter was provided to the board chair?
16      A.      I do.
17      Q.      Okay.  Do you have actual information that
18 the April 11th, 2018 letter was provided to the board
19 chair?
20      A.      Just my experience that --
21      Q.      No.  I'm asking for actual information.
22      A.      No.
23              MR. JUBB:  I'll object to the form.
24 BY MS. DOUGHERTY:
25      Q.      So Mr. Lehman didn't tell you that he

Page 207

1 provided the April 11th, 2018 letter to the board
2 chair, is that right?
3       A.      That's correct.
4       Q.      So if I wanted to know whether the board
5 chair was provided the April 11th, 2018 letter, I would
6 have to ask Mr. Lehman or the board chair, right?
7       A.      As far as I know.  Perhaps Mr. Rees.
8       Q.      You didn't ask Mr. Rees who else was
9 provided --
10      A.      I did not.
11      Q.      -- the April 11th, 2018 letter, is that
12 right?
13      A.      I did not.
14      Q.      All right.  Do you have any information about
15 anyone else who was provided the April 11th, 2018
16 letter?
17      A.      I do not.
18      Q.      Did I already give you D-4?  The December
19 26th, 2018?
20      A.      No.
21              MS. DOUGHERTY:  It was previously
22 marked.
23 BY MS. DOUGHERTY:
24      Q.      Before we get to that, before we get to D-4.
25 So was there any type of investigation, that you know

Page 208

1 of, after the April 11th, 2018 letter?  After you
2 learned about it in April 2018?
3       A.      After -- after the letter and after my first
4 conversation, I -- when Mr. Rees told me that there
5 would be, I checked in with him monthly to see if there
6 had been any progress or change.  What I was told by
7 him, each time, was that he had heard nothing back from
8 Mr. Garabedian.  I don't know if the school did any
9 part of their investigation, speaking with people they
10 would have had to speak with or not.
11      Q.      Okay.  So you don't know one way or the other
12 whether The Hill School performed an investigation into
13 the April 11th, 2018 letter, is that right?
14      A.      I know they tried to.  I don't know if they
15 spoke to anyone or not.
16      Q.      What do you mean they tried to?
17      A.      I know Mr. Rees told me that he had
18 repeatedly reached out to Mr. Garabedian and he was not
19 getting responses.  And his reaching out, as he told
20 me, was to try and get -- get Mr. Poulos to cooperate
21 in a -- in the investigation.
22      Q.      Were you ever asked questions about the April
23 11th, 2018 letter?
24      A.      No.
25      Q.      So no one at the school ever questioned you

Page 209

1 for -- about your side of the April 11th, 2018 letter,
2 or the accusations contained in the April 11th, 2018
3 letter?
4       A.      No.  But --
5       Q.      How about the police?
6       A.      No.
7       Q.      How about someone from Cozen O'Connor?
8       A.      Never contacted me.  Mr. Rees told me in the
9 first conversation that they might, but I never heard
10 from them.
11      Q.      Did Mr. Rees ask you any information about
12 the April 11th, 2018 letter?
13      A.      No.
14      Q.      Were you disciplined as a result of the April
15 11th, 2018 letter?
16      A.      I'm not working there any longer.
17      Q.      Yeah, but do you know that you're not working
18 there any longer because of the April 11th, 2018
19 letter, or because of your lawsuit?
20      A.      I don't know how to differentiate.
21      Q.      So you don't know one way or the other
22 whether you were disciplined as a result of the April
23 11th, 2018 letter?
24      A.      I don't know how to differentiate those --
25 that sequence of events.

Page 210

1   Q.       Really?  You don't know how to --
2   A.       Oh, I -- I understand how --
3   Q.       -- differentiate an April 11th, 2018 letter
4   and your lawsuit filed more than a year later?
5   A.       I understand how a person can look at a time
6   line and differentiate the steps and what the next step
7   was.  But it's all part of the same time line in my --
8   in my life and in my experience.
9   Q.       Well, the April 11th, 2018 letter wasn't made
10  public, right?  Like your lawsuit.
11  A.       I --
12  Q.       Right?
13  A.       As far as I know.  I mean, I --
14  Q.       So you didn't experience any adverse action
15  from the school until after you made public the
16  allegations in your lawsuit, is that right?
17           MR. JUBB:  Objection to the form.
18           THE WITNESS:  I can tie why I feel the
19           way I feel for you.
20  BY MS. DOUGHERTY:
21  Q.       Okay.  The school didn't --
22  A.       The specific --
23  Q.       Listen.  The school didn't lower your salary
24  when they received the April 11th, 2018 letter, did
25  they?

Page 211

1   A.       No.
2   Q.       The school didn't fire you when they received
3   the April 11th, 2018 letter, right?
4   A.       No.
5   Q.       Do you agree with me the content of the April
6   11th, 2018 letter is serious child abuse allegations?
7   Do you agree with me?
8   A.       Yes.
9   Q.       So you agree with me that if the school
10  credited the allegations in the April 11th, 2018
11  letter, you should have been immediately fired?
12  A.       Yes.
13  Q.       Right?  You agree with me?
14  A.       I do.
15  Q.       And that's not what happened, right?
16  A.       It is not.
17  Q.       You were permitted to continue with your job,
18  right?
19  A.       Yes.
20  Q.       Remotely doing your job.  And when you even
21  reported about the letter to your supervisor to express
22  you were distracted, even though nobody had asked you
23  about the allegations, but you were distracted by them,
24  the supervisor told you to continue doing your job,
25  right?

Page 212

1   A.       He did.
2   Q.       So you -- you sustained -- and even after the
3   second letter in December 2018, you weren't fired then,
4   right?
5   A.       No.
6   Q.       And you agree with me, we're going to look at
7   it in more detail, that the content of the second
8   letter, December 2018 letter, that includes serious
9   child abuse, is that right?
10  A.       Yes.  It is.
11  Q.       And if the school credited it, you should
12  have been immediately fired, correct?
13  A.       Correct.
14  Q.       In fact, you should have been hauled off in
15  handcuffs, right?  Do you agree with me?
16  A.       Right.  I do.
17  Q.       That someone who sexually assaults a child
18  belongs in jail, right?
19  A.       I agree.
20  Q.       Okay.  So that didn't happen, though, right?
21  A.       That did not.
22  Q.       Your salary wasn't lowered.  Nobody asked you
23  to leave, right?
24  A.       Correct.
25  Q.       In fact, you started working on campus in

Page 213

1   January and February of 2019, because you wanted to,
2   right?
3   A.       Correct.
4   Q.       Because you thought it would improve your
5   ability to perform your job, right?
6   A.       Yes.
7   Q.       Okay.  So the only thing that happened that
8   -- the only thing that happened is that you filed a
9   lawsuit in April 2019 and then, boom --
10  A.       No.
11  Q.       -- you're on paid leave.
12           MR. JUBB:  Objection to the form.
13           THE WITNESS:  I don't agree.
14  BY MS. DOUGHERTY:
15  Q.       You don't agree?
16  A.       No.  I received a letter in -- sometime in
17  the summer of 2018 from The Hill School's insurance
18  carrier, telling me they had been notified.  So I guess
19  that's somebody I missed being notified.  I don't know
20  who the person was.
21  Q.       Who did you think was going to pay for Mr.
22  Poulos's injuries?  Not you, right?
23  A.       May I finish?  They -- they said they were
24  going to investigate and they'd make a decision if I,
25  individually, fell under their policy or coverage.  I

Matthew Ralston
July 01, 2021                                    214 to 217

Page 214

1  received another letter in January of '19 that said I
2  would not be.  And that -- so essentially the -- that
3  was -- to me, that was the beginning of the school
4  separating themself from me.  From Matt.
5          I don't disagree with the insurance company's
6  position if the allegations are true.  But I was now on
7  my own.  And if the letters that came were not -- there
8  was no settlement, I had no idea where things were
9  going, and I was going to be on my own.
10 Q.      Do you know why the let -- the accusations by
11 Mr. Poulos were reported to The Hill School's
12 insurance?
13 A.      I received a matter of phone calls.
14 Q.      No.  I want to know if you know.  Do you
15 know?
16 A.      No.
17 Q.      Do you know why the school reported Mr.
18 Poulos's accusations to its insurance?
19 A.      I know, as a headmaster, why they --
20 Q.      No.  I want to know if you know why The Hill
21 School's --
22          MR. JUBB:  You can answer.  She's
23          just --
24          THE WITNESS:  No.  Zach didn't call and
25          say, or Mr. Rees didn't say --

Page 215

1  BY MS. DOUGHERTY:
2  Q.      Okay.
3  A.      We're sending these to the insurance company.
4  Q.      So you don't know what prompted The Hill
5  School to report Mr. Poulo's accusations to the
6  insurance company, correct?
7          MR. JUBB:  Objection to the form.
8  BY MS. DOUGHERTY:
9  Q.      Nobody told you, right?
10 A.      No.  Actually, that's not true.  Tom told me
11 that I would probably be getting a letter.  He didn't
12 tell me when they did.  He didn't tell me why they did.
13 Submitted it.  But he said I would probably be hearing.
14 Q.      Okay.  So Mr. Rees gave you an advance
15 warning about the insurance company's decision about --
16 A.      Awareness, yes.
17 Q.      -- whether it would provide separate counsel
18 for you, is that right?
19 A.      Yes.
20 Q.      And the insurance company was unwilling to
21 provide separate counsel for you, is that right?
22 A.      Yes.
23 Q.      Was there some reason you needed separate
24 counsel?
25 A.      Not at the moment, but I --

Page 216

1  Q.      Did you hire somebody?  Did you pay a lawyer?
2  A.      No.  Did I hire or pay a lawyer when?
3  Q.      When the insurance company -- okay.  The
4  insurance company sent you a letter, right?
5  A.      Yes.
6  Q.      When did that happen?
7  A.      Two letters.
8  Q.      Two letters.
9  A.      One happened in the summer.  July or August.
10 I couldn't tell you the date.  And one happened in
11 January.
12 Q.      In 2019?
13 A.      Yes.
14 Q.      Okay.
15 A.      While I was on campus.
16 Q.      All right.  So you got two letters from the
17 insurance company for The Hill School, correct?
18 A.      Yes.
19 Q.      Do you still have those letters?
20 A.      Probably.
21 Q.      Did you give them to your lawyer?
22 A.      Yes.
23          MS. DOUGHERTY:  Is there some reason why
24 we don't have them?
25          MR. JUBB:  You do have them.

Page 217

1          MS. DOUGHERTY:  I don't think I do.  I
2  think I have the results of your subpoena to
3  Mr. Poulos's insurer.
4          MR. JUBB:  No.  You have the letters.
5  They're included in The Hill School file.
6          MS. DOUGHERTY:  Okay.  Well, I have the
7  file here, so I guess I'll just have to have
8  him identify them.
9          MR. JUBB:  I'll just pull the P number
10 up for you.
11 BY MS. DOUGHERTY:
12 Q.      So you got two letters from the insurer.  And
13 the letters communicated to you that the insurer
14 wouldn't pay for you to have a lawyer of your own, is
15 that correct?
16 A.      I don't know if it said that I wouldn't have
17 a lawyer of my own.  It certainly said that -- that
18 their coverage and any -- and I don't remember details
19 of what all they cover.  But that I was outside of what
20 their relationship with The Hill would cover.  So if
21 that includes legal counsel, then yes.  I don't
22 remember the specifics of -- what -- what I know is
23 that -- I guess that's all I can tell you.
24 Q.      Look, I only -- when I ask you what you know
25 or ask you -- I really just want to know what you know.

Matthew Ralston
July 01, 2021                                          218 to 221

Page 218

1  It's not a memory test.
2  A.        I told you.  I was on my own.  You then asked
3  me if -- if the letter said the insurance company would
4  you they would not provide legal counsel for you.  I'm
5  telling you I don't know if it said I wouldn't have
6  legal counsel, per se, or if it said I wouldn't be
7  covered under their policy.  And you're -- so --
8  Q.        Okay.
9  A.        -- to ask me if I understand the specifics of
10  what their policy covered, I can't tell you that I
11  recall that right now.
12  Q.        I'm just trying to learn what the letter
13  said.  So you don't remember what the letter said?  Or
14  you do remember what the letter said?
15  A.        It was about that thick.  No, I don't
16  remember all the details of the letter.
17  Q.        Okay.  You still have D-16 there.  That's
18  this discovery.
19  A.        I do.
20  Q.        All right.  So can you please go to -- we're
21  going to look at page 6, but the answer to the question
22  is number 6, which starts on page 5.  But what I care
23  about is the top of page 6.  The sentence starts "For",
24  on page 5, and its says "Example" at the top.  I'm
25  interested in the last part, that says the

Page 219

1  school's insurance company would not pay for his legal
2  fees, because of the nature of defendant's false
3  allegations.
4  A.        Where are you?
5  Q.        Sure.  On page 6.
6  A.        Yes.
7  Q.        Are you there?  Okay.  So at the very top of
8  the page.  The "For" is on the prior page, where it
9  says "For example", it says "Plaintiff was told",
10  right?  It says, "To seek legal counsel.  Not to be
11  alone with students while on campus.  Had to have
12  permission to be on campus.  And that the school's
13  insurance company would not pay for his legal fees,
14  because of the nature of defendant's false
15  allegations."  Did you participate in preparing that
16  response?
17  A.        I certainly would have said okay to it.
18  Q.        Okay.  So the school's insurance company told
19  you that it would not pay for your legal fees.
20  A.        Okay.
21  Q.        I'm just trying to confirm.  Is that right?
22  A.        Yes.
23  Q.        Who told you to seek legal counsel?
24  A.        Tom Rees.
25  Q.        Who told you not to be alone with students

Page 220

1  while on campus?
2  A.        Mr. Lehman.
3  Q.        Who told you you needed permission to be on
4  campus?
5  A.        I asked Tom Rees when he -- so as I checked
6  in with him monthly.  I didn't check in in November.  I
7  wrote to him the week between Christmas and New Year's.
8  Q.        You're talking about 2018?
9  A.        Yes.
10  Q.        Okay.
11  A.        Tom called me the first week of January.  And
12  -- which was the response I got.  And he then informed
13  me that there had been a second letter.  And he said I
14  need to tell you now you need to seek legal counsel of
15  your own.  And then he told me --
16  Q.        I thought he told you that in April 2018.
17  A.        He told me I should consider it.  He told me
18  I should consider it.  He told me in January I needed
19  to.
20  Q.        Okay.
21  A.        There's a difference.  I spoke to an
22  attorney.
23            MR. JUBB:  Hold on.
24  BY MS. DOUGHERTY:
25  Q.        Don't tell me what you said to your attorney.

Page 221

1  A.        I'm sorry, what --
2            MR. JUBB:  She doesn't want to know
3            anything about that.
4  BY MS. DOUGHERTY:
5  Q.        It sounded like you were going to --
6            MR. JUBB:  Just focus on -- because when
7            it gets to the attorney client stuff, you
8            just got to focus on her questions.
9            THE WITNESS:  Right.  Okay.  So Tom told
10            me I needed to seek legal counsel.  I -- I
11            asked him if that second letter would result
12            in me not being able to be on camp -- campus
13            as we had scheduled for me to be.  He said
14            that's a question for the headmaster.  And so
15            I reached out to Lehman and asked him.  And
16            that's when I was told not -- yes, but don't
17            be alone with students.  And that part of it.
18  BY MS. DOUGHERTY:
19  Q.        And you were allowed to be on campus for the
20  three to four weeks, right?
21  A.        I was.
22  Q.        Did you retain counsel in response to Mr.
23  Rees's advice that you should seek legal counsel in
24  January 2019?
25  A.        I did.  Not immediately.  But, yes.

Matthew Ralston
July 01, 2021                                222 to 225

Page 222

1    Q.        Did you pay -- the lawyer you have in mind,
2    is that Mr. Jubb and The Beasley Firm?
3    A.        Yes.
4    Q.        Did you pay any legal fees as a result of
5    retaining The Beasley Firm?
6    A.        No.
7    Q.        Did you receive permission from The Hill
8    School before commencing this action?
9    A.        No.  I received discouragement.
10   Q.        So you told the school, before you filed this
11   action, that you were going to file this action?
12   A.        I didn't tell them I was going to.  They knew
13   I had en -- engaged an attorney.  And I did not tell
14   them I was going to file it.  I don't believe.
15   Q.        How do you know the school knew you had
16   engaged an attorney?
17   A.        Because -- I told them, because I'd been told
18   I should.
19   Q.        So you retained Mr. Jubb in January of 2019
20   and told the school that you had retained an attorney?
21   A.        I actually think that communication's from
22   Mr. Jubb to Mr. Rees.
23   Q.        Okay.
24   A.        So --
25   Q.        I understand.  So you communicated that you

Page 223

1    had an attorney to The Hill School through your
2    attorney?
3    A.        Yeah.
4    Q.        Now, earlier, way earlier today, we were
5    talking about how you sort of reconnected with Mr. Jubb
6    in 2016.  Is there a period of time between 2016 to
7    2019 when you had a relationship with Mr. Jubb, other
8    than an attorney client relationship?
9    A.        Yes.
10   Q.        Did you work on a project with Mr. Jubb
11   relating to capital giving?
12   A.        Yes.
13   Q.        What was that project?
14   A.        He's one of the people that was outside of my
15   region that knew me well.  And so I was asked to meet
16   with him regarding engagement with the school and
17   donations to the school.
18   Q.        You said you were asked to meet with him.
19   Who asked you to meet with him?
20   A.        Beg your pardon?
21   Q.        You said you were asked to meet with Mr.
22   Jubb.  Who asked you to meet with Mr. Jubb?
23   A.        It would have been someone in my office.
24   Q.        You mean the alumni and development office?
25   A.        It very well could have been Geoff.  Yes.

Page 224

1    Q.        Did you work on any other project with Mr.
2    Jubb?
3    A.        No.
4    Q.        Are any of the other lawyers at The Beasley
5    Firm former students of The Hill School?
6    A.        I'm sorry.
7    Q.        Are any other lawyers at The Beasley Firm
8    former students of The Hill School?
9    A.        Not to my knowledge.
10   Q.        Is The Hill School contributing to the
11   attorneys fees and costs to litigate this action?
12   A.        No.
13   Q.        Is anyone, other than you, contributing to
14   the attorneys fees and costs to litigate this action?
15   A.        No.
16   Q.        Am I correct that you have paid no fees and
17   costs in connection with this litigation, or in
18   connection with the allegations by Mr. Poulos?
19             MR. JUBB:  Don't answer that.  You don't
20        have to answer that.
21             MS. DOUGHERTY:  Why not?  You made legal
22        fees an issue.
23             MR. JUBB:  The legal fees for -- the
24        legal fees related to any -- hold on.  Can I
25        just have a clarification what you're

Page 225

1    referring to?
2             MS. DOUGHERTY:  Sure.  In -- we were on
3        page 6, right?
4             THE WITNESS:  They're not the same
5        thing.
6             MR. JUBB:  Okay.  (Reading to self) --
7        because of the nature of the defendant's
8        false allegations.  Okay.
9             MS. DOUGHERTY:  And I asked --
10            MR. JUBB:  So that would be in the
11       context of the defendant's false allegations
12       into the extent that he had legal fees that
13       -- there's never been a claim for legal fees
14       in this case.
15            MS. DOUGHERTY:  I asked him if he
16       retained an attorney in response to the legal
17       advice, and he said yes, you.  So I'm trying
18       to confirm --
19            MR. JUBB:  No.  I think you're confused.
20            MS. DOUGHERTY:  -- he's not paid any
21       legal fees.
22            MR. JUBB:  He's not -- first off, ask
23       the question if he's ever paid any legal fees
24       as it pertained to any sort of defense of
25       sexual allegation claims.  I think that's a

Matthew Ralston
July 01, 2021                                    226 to 229

Page 226

1    fair question.  But we're not going to get
2    into what the costs are in the case or fees
3    with me.
4  BY MS. DOUGHERTY:
5    Q.    Have you paid any fees and costs in
6  connection with the allegations by Mr. Poulos?
7        MR. JUBB:  Objection to the form.  You
8  can answer.
9        THE WITNESS:  You said do answer?
10       MR. JUBB:  Objection to the form.  You
11  can answer as phrased.
12       THE WITNESS:  No.
13       MS. DOUGHERTY:  What's the issue with
14  the form?
15       MR. JUBB:  Because you just said as it
16  pertains to allegations of Mr. Poulos, and so
17  technically that could involve this case.  So
18  I just want to, you know, get it down
19  perfect, okay?  If you can.
20       MS. DOUGHERTY:  There is not a problem
21  with the form of my question.  Okay.  That's
22  fine.
23       MR. JUBB:  No, there is a problem with
24  the form.  I just wanted to clarify.  So if
25  you could tighten it.

Page 227

1        MS. DOUGHERTY:  What's the form problem?
2  I said did you pay --
3        MR. JUBB:  I just told you what it was.
4        MS. DOUGHERTY:  -- fees and costs in
5  connection with the allegations by Mr.
6  Poulos.
7        MR. JUBB:  And I just said to you --
8        MS. DOUGHERTY:  And he said no.
9        MR. JUBB:  And I just said to you that
10  could be pertaining to any fees or costs
11  associated with my represent --
12  representation of him in this action.  So if
13  you want to say as it pertains to defending
14  allegations of sexual abuse, I think that's
15  a fair question.
16       MS. DOUGHERTY:  Do you stipulate that
17  Mr. Ralston is not asserting a claim for
18  damages arising from legal fees and costs?
19       MR. JUBB:  Yes.  Arising -- Mr. Ralston
20  is not seeking damages pertaining to legal
21  fees as a result of the defamatory letter.
22  That's the stipulation.
23       MS. DOUGHERTY:  And cost.
24       MR. JUBB:  And cost associated with the
25  defamatory letter.  Correct.

Page 228

1        MS. DOUGHERTY:  Okay.  And he is -- he
2    does not --
3  BY MS. DOUGHERTY:
4    Q.    Mr. Ralston, you did not incur any legal fees
5  or costs associated with defending the allegations by
6  Mr. Poulos, is that correct?
7        MR. JUBB:  You can answer that question.
8        THE WITNESS:  I need you to ask it
9        again.
10  BY MS. DOUGHERTY:
11    Q.    Sure.
12    A.    I thought you guys were talking.  Sorry.
13    Q.    It's okay.  We took the part that we were
14  fighting over out of the case, so it's not an issue.
15  But I just wanted clarification, is it correct that you
16  did not pay any legal fees and costs to defend against
17  the allegations by Mr. Poulos?
18    A.    That is correct.
19    Q.    And I apologize if you answered this already.
20  But Cozen O'Connor was never your attorney, is that
21  right?
22    A.    That is correct.
23    Q.    Did you ever have any communication with
24  anyone from Cozen O'Connor?
25    A.    I did not.

Page 229

1    Q.    Do you know who Leslie Gomez is?
2    A.    Only by name.
3    Q.    So you never had any communications with
4  Leslie Gomez?
5    A.    No.
6    Q.    And Ms. Gomez is not now and never was your
7  attorney, is that right?
8    A.    Never.  No, that is -- I'm sorry.
9    Q.    Do you know a Gina Smith?
10   A.    That is correct.
11   Q.    Do you know a Gina Smith?
12   A.    I do not.
13   Q.    Did you ever have any communications with
14  Gina Smith?
15   A.    I have not.
16   Q.    Gina Smith is not now and never has been your
17  attorney, is that right?
18   A.    She is not.  That is correct.
19   Q.    So you -- do you know whether The Hill School
20  referred Mr. Poulos's allegation to law enforcement or
21  the District Attorney?
22   A.    Do I know if they did?
23   Q.    Yeah.
24   A.    I assume not.  I don't know.
25   Q.    I think I asked you all about the lawyers and

Matthew Ralston
July 01, 2021                                    230 to 233

Page 230

1  the police.  But is it correct that no representative
2  of The Hill School ever questioned you regarding the
3  content of the April 11th, 2018 letter, is that right?
4             MR. JUBB:  I'll object to the form.
5             THE WITNESS:  Yes.  You're asking --
6        well.
7  BY MS. DOUGHERTY:
8        Q.    I want to make sure that nobody, whether it's
9  Mr. Rees, Cozen O'Connor, the police, somebody on the
10  Board, Mr. Lehman, whoever, affiliated with The Hill
11  School, or at the direction of The Hill School, ever
12  asked you to explain your side of the story or to make
13  a statement --
14        A.    No.
15        Q.    -- regarding the April 11th, 2018 letter.
16        A.    No.
17        Q.    Can we go to D-4?  So is the -- yes, D-4 was
18  previously marked.  It's the December 26th, 2018 letter
19  by Mr. Garabedian to Mr. Rees.
20             MS. DOUGHERTY:  For the people watching
21        on Zoom it's my document 25.  The stamp's
22        like in the middle of the page.
23  BY MS. DOUGHERTY:
24        Q.    As I understand your testimony, the next
25  thing that happened in the sequence of events here is

Page 231

1  that you got a telephone call from Mr. Rees in January
2  of 2019 telling you there had been a second letter, is
3  that right?
4        A.    Yes.
5        Q.    Okay.  Did Mr. Rees give you the second
6  letter?
7        A.    I'm sure he sent it to me before our
8  conversation.
9        Q.    Okay.  So before Mr. Rees called you in
10  January 2019, you didn't know that there was a second
11  letter from Mr. Garabedian, is that right?
12        A.    No.  That's correct.
13        Q.    Do you remember when you had the telephone
14  discussion with Mr. Rees, other than just January 2019?
15        A.    It was probably the first business day after
16  New Year's.  Whatever that was.  I had -- I can tell
17  you I wrote to Tom Rees on December 28th.
18        Q.    So that sticks out, because it's like Happy
19  New Year, right?
20        A.    Yeah.  They told me they decided not to ruin
21  anyone's holidays.  When he called me.
22        Q.    And then did Mr. Rees e-mail you the letter
23  after he called you?
24        A.    Yes.  That would have been what he did.
25        Q.    On the first business day after New Year's?

Page 232

1        A.    Probably.  After we spoke, he probably sent
2  it to me.
3        Q.    So it's your belief that Mr. Rees e-mailed
4  you the second letter the same day that he called you?
5        A.    I don't know if it was the same day, but I
6  know he sent it to me.
7        Q.    And then did you read the December 26th, 2018
8  letter when you received it from Mr. Rees?
9        A.    Yes.
10        Q.    Okay.  So I'm showing a document that was
11  previously marked as D-4.  Do you recognize D-4 as the
12  December 26th, 2018 letter from Mr. Garabedian to Mr.
13  Rees, that Mr. Rees sent to you at the beginning of
14  January 2019?
15        A.    Yes.
16        Q.    Did you read -- I'm sorry.  I take that back.
17  Do you see, in the second paragraph on the first page
18  of D-4, it says, "During our telephone conversation
19  regarding this matter on December 21st, 2018 you
20  requested additional information about Mr. Poulos's
21  sexual abuse claim."  Do you remember reading that
22  sentence when you read the December 26th, 2018 letter
23  that's been marked as D-4?
24        A.    Did I what?
25        Q.    Do you remember reading that sentence?

Page 233

1        A.    I remember reading the letter.  I don't know
2  if that sentence jumped out at me.
3        Q.    Did you ever ask Mr. Rees to tell you about
4  his telephone --
5        A.    That's why --
6        Q.    -- communication with Mr. Garabedian?
7        A.    I asked him monthly.  I think I said earlier
8  I don't know if I got clear through that.  I did not
9  ask him in November.  I wrote to him the week before
10  Christmas and New Year's and asked if there was any
11  update.  I said it's been a couple months.  I didn't
12  hear from him until he called me.  So I had asked.  I
13  suspect if I had -- if there had not been a second
14  letter, I would have gotten an e-mail rather than a
15  phone call.
16        Q.    These are e-mails that you were exchanging
17  with Mr. Rees from your Hill School e-mail address?
18        A.    Yes.
19        Q.    Did you print any of those e-mails?
20        A.    No.
21        Q.    Did Mr. -- when Mr. Rees called you in the
22  beginning of January 2019, did he tell you anything
23  else other than we got another letter?
24        A.    That I should seek -- he needed to tell me to
25  seek my own legal counsel.  I asked him why again.  He

Page 234

1  gave me the same reasons.
2      Q.      The same reasons you told me about earlier?
3      A.      Yeah.  We had not yet, at that point, heard
4  from an insurance company.
5      Q.      Do you need more water?
6      A.      No.  I got some.  Thanks.  I think, looking
7  back, I didn't think about it then, but he probably
8  knew what the response from the insurance company would
9  be.
10     Q.      Did you think the insurance company was going
11 to provide --
12     A.      I didn't --
13     Q.      -- coverage for the sexual assault?
14     A.      -- I -- I don't think I thought about it.
15 Until I got that second letter.
16     Q.      And the three reasons you were talking about
17 is Mr. Rees couldn't represent you, because he's the
18 school's attorney, charges could be filed, and a
19 lawsuit could be filed, right?  The reasons why Mr.
20 Rees told you --
21     A.      Say again.
22     Q.      The three reasons why Mr. Rees told you
23 needed your own lawyer was that he's the school's
24 attorney, that charges could be filed, and a lawsuit
25 could be filed?

Page 235

1      A.      No.  I knew he was the school's attorney.
2  That the three were -- that if there was a suit filed
3  against the school, that I would need counsel, which is
4  why, in retrospect, I -- I knew the answer to the
5  insurance.  If there were ever criminal charges filed,
6  I would need counsel.  And the third reason was that
7  there could be a legal case for defamation.  Is what he
8  suggested to me.
9      Q.      You mean by you?
10     A.      Yes.
11     Q.      Okay.  So when you talked to Mr. Rees in
12 January 2019 he suggested that you retain a lawyer to
13 sue Mr. Poulos for defamation?
14             MR. JUBB:  I'll object to the form of
15         that.
16             THE WITNESS:  Did Mr. Rees what?
17 BY MS. DOUGHERTY:
18     Q.      When you spoke to Mr. Rees in January of
19 2019, he suggested that you retain a lawyer to commence
20 a defamation against Mr. Poulos, is that right?
21     A.      No, he did not.
22     Q.      No?  So what was your reference to
23 defamation?
24     A.      He said there could be.  He said I'm not
25 whatever kind of attorney that would be.

Page 236

1      Q.      You mean that you could sue for defamation?
2      A.      He said it's possible there is.
3      Q.      Okay.
4      A.      He didn't encourage me to.  He didn't say do
5  it.  But he said I needed to seek independent counsel.
6      Q.      Okay.  So Mr. Rees was just giving you
7  friendly information that perhaps you could pursue a
8  defamation action against Mr. Poulos, and you should
9  check with a lawyer who could help you with that,
10 right?
11     A.      To help me decide if I could.
12     Q.      Okay.  So am I correct that Mr. Rees didn't
13 credit the content of the December 26th, 2018 letter --
14             MR. JUBB:  I'll object to the form.
15 BY MS. DOUGHERTY:
16     Q.      -- as reflected in D-4?
17     A.      His opinion of me didn't change, if that's
18 what you're asking.
19     Q.      So did Mr. Rees say something to lead you to
20 believe -- let me start again.  During your January
21 2019 telephone call with Mr. Rees, did Mr. Rees say
22 something to lead you to believe that he did not
23 believe the accusations by Mr. Poulos contained in the
24 December 26th, 2018 letter that's been marked as D-4?
25     A.      No.  But we already established he didn't

Page 237

1  believe it.
2      Q.      Okay.  So --
3      A.      So he didn't change that.
4      Q.      You didn't think the fact that he was
5  suggesting maybe you had a defamation action against
6  Mr. Poulos was commenting on his belief about the
7  accusations?
8      A.      He didn't suggest it.  He said that there
9  could be.  And I -- I guess -- I don't know that I
10 thought about what the significance of that was.  But
11 if I -- I looked at it now and say what is the
12 significance, it would be that he hadn't changed his
13 opinion any.
14     Q.      Did you have any -- okay.  So you got the
15 letter from Mr. Rees.  Then what did you do?  Did
16 you --
17     A.      What did I do?
18     Q.      Yeah.
19     A.      Walked around in a, what the hell am I going
20 to do now, kind of place.
21     Q.      Did you call your wife and tell her about the
22 letter?
23     A.      Of course.  Yeah.
24     Q.      Okay.
25     A.      I'm sorry.  Yes.  But as far as outward,

Matthew Ralston
July 01, 2021                                                      238 to 241

Page 238

1  beyond that.
2  Q.        Like we did with the April 11th, 2018 letter,
3  I want to know everybody that you told about the
4  December 26th, 2018 letter.
5  A.        Oh.  That's easy.  I'm sorry.  Yes.  I can
6  tell you that.
7  Q.        That's okay.
8  A.        My wife.  My brother, Mark.  And Chris
9  Hopkins.
10 Q.        And did you tell -- let me start again.  Did
11 you actually give a copy of the --
12 A.        No.
13 Q.        -- December 26th, 2018 letter to your wife,
14 your brother or Mr. Hopkins?
15 A.        No.
16 Q.        You just called them on the phone and
17 described the situation?
18 A.        Yes.
19 Q.        What --
20 A.        Told them there was a second letter.
21 Q.        Were you in Ohio at the time when Mr. Rees
22 called you?
23 A.        No.  I believe I had just gone back -- we
24 have a house in Michigan, as well as a condo in
25 Columbus.  And I was in Michigan.

Page 239

1  Q.        Is the condo in Traverse City?
2  A.        No.  We have a condo in Columbus.  We have a
3  house in Lake Ann, Michigan.
4  Q.        Okay.  So you didn't have to call your wife?
5  A.        I had to call my wife.
6  Q.        I apologize.
7  A.        She still works.
8  Q.        Okay.
9  A.        She was in Columbus.  She, generally, unless
10 she's taking vacation time, she's in Columbus if I go
11 up to the Michigan house.  And I was in the Michigan
12 house when Tom Rees called me.
13 Q.        You were still working in January of 2019,
14 too, right?
15 A.        I was.
16 Q.        You were working remotely?
17 A.        Um-hum.  Yes.
18 Q.        And you had permission from The Hill School
19 to work from Michigan or Columbus, right?
20 A.        Permission in the sense that they knew were
21 owned, both places, and they knew I was back and forth.
22 It's mostly done by computer, so.  I'm not --
23 Q.        Okay.  So you called your wife.  And I guess
24 you had to call Mr. Ralston.  Or, excuse me, you had to
25 call Mr. Ralston, your brother, and Mr. Hopkins,

Page 240

1  because you were in Michigan, right?
2  A.        Well, I have to call Mark, my brother Mark
3  and Mr. Hopkins regardless of where I am.
4  Q.        I'm sorry.  I thought Mr. Hopkins lived at
5  The Hill School.
6  A.        No.  He was in Maine at that time.
7  Q.        Okay.
8  A.        Mr. Chirieleison was at The Hill School.
9  Q.        Okay.  Wrong Chris.  Thank you.
10 A.        Yep.
11 Q.        Did you tell anyone else about the December
12 26th, 2018 letter, other than your wife, Mr. Ralston,
13 your brother, Mark Ralston, and Mr. Hopkins?
14 A.        No.
15 Q.        I take it that --
16 A.        I'm -- I'm --
17 Q.        I'm sorry.  Go ahead.
18 A.        Because I don't think about them.  Dr. Siemer
19 and Lisa Havens.
20 Q.        Okay.  So you told your doctor and your
21 counselor?
22 A.        Yes.
23 Q.        Okay.  Did you, like, make an appointment or
24 something?
25 A.        Yes.

Page 241

1  Q.        Do you have medical records from your
2  treatment with Dr. Siemer?
3  A.        I do not.
4  Q.        Have you been treated by Dr. Siemer?
5  A.        Yes.  Dr. Siemer is also a friend.  So, yes.
6  To answer your question, I was treated by him or
7  treated through this by him.
8  Q.        How long has Dr. Siemen (sic) been your
9  doctor?
10 A.        He's not my primary care physician.  He's
11 just someone I see annually.  And occasionally if I'm
12 sick, or have something that needs cut off.  Dr.
13 Siemer's a close friend, so I went to somebody with
14 whom it would be easier for me to share this than
15 somebody I see once a year.
16 Q.        Okay.  Who's your primary care physician?
17 A.        My family care, primary care physician, is a
18 gentleman named Nathan March.  And he is in Traverse
19 City.
20 Q.        Is he affiliated with a medical practice?
21 A.        Yes.  It's West Front Primary Care.
22 Q.        And how long has Dr. Nathan -- you said
23 March, M-A-R-C-H?
24 A.        Yes.
25 Q.        How long has Dr. Nathan March been your

Page 242

1  primary care physician?
2  A.      Will be 2009.  July.  Or whenever I first saw
3  a doctor once we moved.
4  Q.      Oh, okay.  So when you --
5  A.      When we left Hill.
6  Q.      I'm sorry.  I just had a moment right there.
7  A.      When we left Hill to go to Michigan.
8  Q.      When you went from The Hill School to --
9  right.  To Leelenau, right?
10  A.     Yes.
11  Q.     Who is your primary care physician when you
12  were in Pottstown?
13  A.     Alan, A-L-A-N.  Goldberg.
14  Q.     Read my mind.  Because I spelled it wrong.
15  Okay.  So what -- and how long was Alan Gold -- you
16  don't treat with Dr. Goldberg anymore, correct?
17  A.     Correct.
18  Q.     You haven't treated with him since before
19  2009?
20  A.     When I left.
21  Q.     2009?
22  A.     2009, yes.
23  Q.     Is Mr -- is Dr. Goldberg affiliated -- let me
24  start again.  At the time when you were treating with
25  Dr. Goldberg, was he affiliated with a medical

Page 243

1  practice?
2  A.      Yes.  I can't -- I don't remember the name of
3  the practice.  He was Potts -- maybe it's -- I -- I
4  don't know.  But he's in Pottstown.  He and his
5  partner, Paul Doghramji.  And I'm going to mess it up
6  as bad as you --
7  Q.      You're going to pass?
8  A.      -- so good luck.
9  Q.      Okay.  How long did you treat with Dr.
10  Goldberg and his partner?
11  A.      17 years.  The reason I mentioned Dr.
12  Doghramji was they were also The Hill School's doctor
13  until Dr. -- I don't know.  I know it would have been
14  early 2000s.  And I know that that changed there,
15  because the then new school doctor was the father of
16  one of my son's roommates.
17  Q.      Okay.  So when you started your employment
18  with The Hill School in 1992, do you remember that you
19  filled out some applications and paperwork for the
20  school and you had to identify your doctor?  Is that
21  how long that Dr. Goldberg has been -- was treating
22  you?  Was treating you, from when you started at The
23  Hill School?
24  A.      He would have treated me after we arrived at
25  The Hill School.  He didn't treat me before.

Page 244

1  Q.      Do you remember what paperwork I'm talking
2  about that you filled out?
3  A.      I don't.
4  Q.      I know it's a long time ago.
5  A.      I don't.
6  Q.      I was just trying to think if maybe you knew
7  then I would have his information in your documents.
8  But I'll check.
9  A.      I may still have it.
10  Q.     We'll pull it out and you can take a look at
11  it.  Okay.  So -- I'm sorry, what -- Lisa -- what was
12  the counselor's last name?
13  A.     Havens.
14  Q.     Havens.
15  A.     H-A-V-E-N-S.
16  Q.     Thank you.  And how long have you sought
17  counseling from Ms. Havens?  Does she go by Ms.?  Does
18  she have a title?
19  A.     I don't know.  I call her Lisa.
20  Q.     Okay.  I don't want to be disrespectful if
21  she's a doctor or has a different title, or prefers to
22  be Counselor.  So we'll go with Ms. Havens.  How long
23  have you been receiving counseling from Ms. Havens?
24  A.     I probably started seeing her in the fall of
25  2019.

Page 245

1  Q.      Was that the first time that you sought
2  counseling?
3  A.      Yes.
4  Q.      Ever?
5  A.      When I was leaving The Andrews School.  I
6  don't think I knew I was seeking counseling, but.  I
7  met with a gentleman in Cleveland.  I can't tell you
8  his name, but it was about career.  What I was going to
9  do.  What I wanted to do.  I wasn't sure if I wanted to
10  remain a teacher.  So I met with him.  As a more mature
11  adult I recognized that he was counseling me as well.
12  But it was almost all entirely about career and job.
13  Q.     That was the late '80s?
14  A.     Beg your pardon?
15  Q.     That was the late '80s?
16  A.     Yeah.  We left there in Eighty -- yes.
17  Q.     Okay.  So no other -- let me start again.  So
18  you've not received counseling of any kind, other than
19  the instance you just told me about in connection with
20  The Andrews School and from Ms. Havens, is that right?
21  A.     Yes.
22  Q.     And when did you start treating -- I think I
23  was saying his name wrong.  It's Dr. Siemer, right?
24  A.     Yes.
25  Q.     I think I was saying Sieman.  Sorry.  When

Matthew Ralston
July 01, 2021                                           246 to 249

Page 246

1  did you start treating with Dr. Siemer?
2  A.        That would have been probably also summer or
3  fall of '19.
4  Q.        So you didn't start treating with Dr. Siemer
5  or receive counseling from Ms. Havens until several
6  months after you commenced this lawsuit, is that right?
7  A.        Yes.  Formally, yes.  If you will.  Like I
8  said, Dr. Siemer's a friend.
9  Q.        Did you pay for the treatment by Dr. Siemer?
10 A.        No.
11 Q.        Did you pay for the treatment by -- excuse
12 me.  Did you pay for the counseling by Ms. Havens?
13 A.        Yes.
14 Q.        Do you have records reflecting how much you
15 paid for the counseling by Ms. Havens?
16 A.        No, but I could get them.
17 Q.        Are you able to estimate, without completing
18 guessing, how much you have paid Ms. Havens for
19 counseling?
20 A.        12 hundred dollars.
21 Q.        Did Dr. Siemer prescribe -- let me start
22 again.  Did Dr. Siemer diagnose you with any medical
23 condition?
24 A.        Anxiety.  Some -- the diarrhea.  Irritable
25 bowel of some kind.  I don't -- and then just

Page 247

1  disruptive sleep.
2  Q.        Do you still -- let me start again.  Did Dr.
3  Siemer prescribe any medication for anxiety?
4  A.        No.  We treated through diet and supplements
5  and exercise.
6  Q.        Do you still suffer from anxiety?
7  A.        Yes.
8  Q.        So the diet -- let me start again.  Your
9  treatment through diet, supplements and exercise, is it
10 managing the anxiety?
11 A.        Yes.
12 Q.        Do you -- let me start again.  So when were
13 you first diagnosed with anxiety by Dr. Siemer?
14 A.        It would have been when I went to see him.
15 Q.        In summer, fall of 2019?
16 A.        Yes.
17 Q.        Did Dr. Siemer diagnose the reason for the
18 anxiety?
19 A.        Wow.  I don't know how to answer that.  We
20 addressed it, because I -- I mean, I can identify the
21 anxiety.  So I don't know if there is -- if I call it a
22 diagnosis or we just --
23 Q.        I'm asking for what Dr. Siemer diagnosed, not
24 what you think.
25 A.        I beg your pardon?

Page 248

1  Q.        I'm asking what Dr. Siemer diagnosed.  If you
2  don't know, then tell me that.
3  A.        I know why I went to him.  I know what we
4  addressed.  So I guess, yes.  He diagnosed that.
5  Q.        Okay.  So Dr. Siemer's medical notes are
6  going to reflect that -- a base -- a reason why -- a
7  reason for the anxiety diagnosis, is that right?
8  A.        Yes.  I would think so.
9  Q.        How about diarrhea, irritable bowel, do you
10 still suffer from that?
11 A.        I haven't had any of that since December of
12 '20.
13 Q.        Were you prescribed any medication for the
14 diarrhea, irritable bowel?
15 A.        Some diet and then probiotics.
16 Q.        Did Dr. Siemer diagnose the reason for the
17 diarrhea or irritable bowel?
18 A.        Well, that it had -- that I had dealt with it
19 earlier.  It was just another occurrence.  So, again, I
20 don't know if he tied it to.  It was related to what I
21 was already dealing with.  So I had had some diarrhea
22 earlier in 2019.  Or in 2019.  And then we had that
23 pretty well under control and then so I had some in
24 December '20.
25 Q.        Okay.  So before or after you filed this

Page 249

1  lawsuit?  When you say earlier in 2019?
2  A.        Oh, I'm sorry.  The earlier in my mind was in
3  '20.  It was after.
4  Q.        Okay.  So after you filed this lawsuit that's
5  when you had your first bout of diarrhea and irritable
6  bowel?
7  A.        That's true.  Yes.
8  Q.        And then you had another bout in December of
9  2020?
10 A.        Yes.
11 Q.        And, I'm sorry if you answered this already,
12 but did Dr. Siemer prescribe any medication, as it
13 relates to the earlier bout in 2019?
14 A.        Again, diet and probiotics.
15 Q.        And did Dr. Siemer diagnose the reason for
16 the diarrhea and irritable bowel that you experienced
17 in 2019 after filing this lawsuit?
18 A.        Again, I can only say yes, because that's why
19 we started -- I don't know how he would word it.  But
20 it's why we were -- my situation, the accusations, not
21 working, were the reasons we were -- we attributed the
22 diarrhea to.  So in the sense that's a diagnosis, yes.
23 Q.        So not the fact that you were put on unpaid
24 leave?
25 A.        So -- I wasn't working, is what I said there.

Matthew Ralston
July 01, 2021                                    250 to 253

Page 250

1   Q.      Oh, I apologize.
2   A.      I tend to be pretty literal with these
3   questions.
4   Q.      And then I think you also said disruptive
5   sleep?
6   A.      Yep.
7   Q.      Do you still have disruptive sleep?
8   A.      Occasionally.
9   Q.      Can you describe what you mean by disruptive
10  sleep?
11  A.      Yeah.  It goes to back to the gerbil wheels.
12  Either trouble getting to sleep, or I wake up in the
13  night and my brain locks onto what I've been accused of
14  and it doesn't want to let go.
15  Q.      And that started after you filed this
16  lawsuit?
17  A.      No.
18  Q.      You didn't start treatment for disruptive
19  sleep until after you started this lawsuit, is that
20  right?
21  A.      Yes.
22  Q.      Did Dr. Siemer actually diagnose you with
23  disruptive sleep?
24  A.      I don't know if -- I actually don't know if
25  that's --

Page 251

1   Q.      Yeah, I'm just trying to learn if it's a
2   medical condition or just something you experience.
3   A.      I know when I speak with him, it's, you know,
4   do I have trouble sleeping?  Yes.  And my answer would
5   have been pretty much what I just said to you.  There
6   are nights I can't get to sleep.  There are other
7   nights that I'm wide awake.  And, you know, to me I --
8   I consider that a manifestation of anxiety.  I don't
9   know medical terms.
10  Q.      Did Dr. Siemer prescribe any medication for
11  disruptive sleep?
12  A.      Diet.  Supplements.  And exercise.
13  Q.      Okay.  So no medication.  Correct?
14  A.      Nothing I had to go to a pharmacy to get.
15  Q.      Are you an alcoholic?
16  A.      No.
17  Q.      Are you addicted to narcotics?
18  A.      No.
19  Q.      Do you gamble?
20  A.      No.
21  Q.      Do you use alcohol?
22  A.      Yes.
23  Q.      Do you use narcotics?
24  A.      No.
25  Q.      How often do you use alcohol?

Page 252

1   A.      A couple times a week.
2   Q.      Have you ever been through a detox program?
3   A.      No.
4   Q.      Have you ever received anger management
5   counseling?
6   A.      No.
7   Q.      Have you ever received therapy?
8           MR. JUBB:  Objection to the form.
9           THE WITNESS:  Beyond what I've shared,
10  no.
11  BY MS. DOUGHERTY:
12  Q.      So you never received treatment for a mental
13  health condition --
14  A.      No.
15  Q.      -- Ever?
16  A.      No.  Unless you count my father.
17  Q.      What do you mean?
18  A.      Huh?
19  Q.      What do you mean unless I count your father?
20  A.      Well --
21  Q.      Was your father a psychiatrist?
22  A.      No.  Sorry.  It's not a time for levity.
23  Just a father being a father with their teenage boys.
24  Telling me to get my head right.
25  Q.      So you've never gone to a mental health

Page 253

1   professional --
2   A.      No.
3   Q.      -- and received mental health treatment of
4   any kind?
5   A.      No.
6   Q.      So you never had any inpatient therapy?
7   A.      No.
8   Q.      Do you currently suffer from any medical
9   conditions, other than the anxiety and diarrhea that
10  you described?
11  A.      Allergies.
12  Q.      Allergies?  Okay.
13  A.      Hypertension.
14  Q.      Do you -- the allergies aren't attributable
15  to anything to do with Mr. Poulos's --
16  A.      No.
17  Q.      -- accusations, right?
18  A.      No.
19  Q.      And the hypertension is not attributable --
20  A.      No.
21  Q.      -- to anything to do with Mr. Poulos's
22  accusation?
23  A.      It's not.  Yes.  Correct.
24  Q.      And so no other medical conditions?
25  A.      No.

Matthew Ralston
July 01, 2021                                    254 to 257

Page 254

1  Q.      Other than anxiety, have you ever been
2  diagnosed with a mental health disorder?
3  A.      No.
4  Q.      Have you ever been sexually abused?
5  A.      No.
6  Q.      Have you ever been physically abused?
7  A.      No.
8  Q.      Have you ever been arrested?
9  A.      No.  Speeding ticket.  I guess that's not
10 arrested.
11         MR. JUBB:  Were you speeding that fast?
12         That's her next question.
13         MS. DOUGHERTY:  He saw my face.
14 BY MS. DOUGHERTY:
15 Q.      Okay.  So you've been pulled over speeding.
16 Have you been arrested for speeding?
17 A.      Well, I've been handed a ticket.
18 Q.      Mario Andretti over here?
19 A.      I've never been put in the back of a cruiser
20 and taken away.
21 Q.      So you've never been arrested ever for
22 anything?
23 A.      Right.  No.
24 Q.      In the United States or internationally,
25 correct?

Page 255

1  A.      Correct.
2  Q.      Have you ever been questioned by police?
3  A.      Regarding my behavior, no.
4  Q.      You've been questioned by police regarding
5  someone else's behavior?
6  A.      Yes.  In regard to students.
7  Q.      Anything relating to Mr. Poulos?
8  A.      No.
9  Q.      Anything relating to a student of The Hill
10 School between 1992 and 1997?
11 A.      Military police in reference to a security
12 check.  I was questioned about a student who was -- I'm
13 pretty sure he graduated in 1998.  So it would have
14 been after 1987, but he would have been a student in
15 1997.
16 Q.      Were you ever questioned by police relating
17 to sexual misconduct of someone other than you?
18 A.      No.
19 Q.      Have you ever spent time in custody?
20 A.      No.
21 Q.      Have you ever had a criminal complaint filed
22 against you?
23 A.      No.
24 Q.      Other than Mr. Poulos's accusations, have you
25 ever been accused of a crime?

Page 256

1  A.      No.
2  Q.      Other than Mr. Poulos's accusations, have you
3  ever been accused of misconduct with a student?
4  A.      No.  With the exception of one I shared
5  earlier.
6  Q.      Have you ever been investigated by a school
7  that employed you?
8  A.      FBI background checks.  Otherwise, no.
9  Q.      Have you ever been a party to a lawsuit,
10 other than this lawsuit?
11 A.      No.
12 Q.      Have you ever signed a confidentiality
13 agreement?
14 A.      Can I --
15 Q.      Go ahead.
16 A.      The reason I was thinking about that.  I was
17 deposed.  A student -- a student was hit in the eye
18 with a water balloon.  That's not -- and I was the dorm
19 parent.  And --
20 Q.      Were you a party?  Did you get sued?
21 A.      Beg pardon?
22 Q.      Were you like one --
23 A.      No, no, no.
24 Q.      -- of the people sued?
25 A.      No.  It was a question of did I discipline

Page 257

1  the students who hit him with the water balloon.
2  Q.      Okay.  So you gave a deposition about that?
3  A.      I did.
4  Q.      When was that?
5  A.      Over the phone.  Let's see.  I know where we
6  were living.  Probably early 2000s.
7  Q.      So that was The Hill School?
8  A.      Yes.
9  Q.      So The Hill School was a party to a lawsuit
10 arising from a kid getting hit in the eye with a water
11 balloon, and you gave a deposition about to the extent
12 in which the kid was disciplined?
13 A.      I gave a deposition.  I don't know if there
14 was a lawsuit.
15 Q.      Okay.  Was Mr. Rees the attorney for the
16 school?
17 A.      He was.
18 Q.      Have you ever signed a confidentiality
19 agreement?
20 A.      Can you tell me what that is?  No.
21 Q.      Do you know what a confidentiality agreement
22 is?
23 A.      That's what I'm asking.
24 Q.      Did you sign -- did you ever resolve a
25 dispute with someone where you signed --

Matthew Ralston
July 01, 2021                                    258 to 261

Page 258

1   A.      No.
2   Q.      -- an agreement and agreed to keep secret
3   your agreement with that other individual?
4   A.      No.
5   Q.      So you never -- okay.  Any of the -- you've
6   had a number of jobs at different academic
7   institutions, right?  We haven't --
8   A.      Yes.
9   Q.      -- gone through them, but.  Have you ever
10  signed a confidentiality agreement in connection with
11  your departure from any of the academic --
12  A.      No.
13  Q.      -- institutions that you worked at?
14  A.      No.
15  Q.      How about a nondisclosure agreement, have you
16  ever signed a nondisclosure agreement?
17  A.      If I did, it would have been as an employee
18  of -- when I finished graduate school I worked, that's
19  when we lived in Florida.  Delray.  Is that back on the
20  places I lived?
21  Q.      Yeah, you have that.  You told me about
22  that --
23  A.      I worked as an actuary.
24  Q.      -- a long time ago.
25  A.      If I ever signed a nondisclosure it would

Page 259

1   have been there.  And I don't recall ever having done
2   that.  So, no
3   Q.      Okay.  So Delray Beach, Florida, for 15
4   months you worked as an actuary?
5   A.      Yes.
6   Q.      So you may have signed a nondisclosure
7   agreement when you departed your job with the actuary?
8   A.      I may have.  I don't remember doing it.
9   Q.      Did you sign a nondisclosure agreement in
10  connection with your departure from any of the
11  financial institutions that you worked -- excuse me.
12  Let me start again.  Did you sign a nondisclosure
13  agreement with any of the academic institutions that
14  you worked for, in connection with your departure?
15  A.      No.
16  Q.      Have you ever been subject to discipline at
17  any job?
18  A.      Just the -- the one incident I shared with
19  you.
20  Q.      Have you -- other than the incident you
21  shared from The Andrews School, have you ever been
22  reprimanded at any job?
23  A.      I don't think so.
24  Q.      Can you remind me again where you completed
25  your undergraduate and graduate degree?

Page 260

1   A.      Ohio State.  Both.
2   Q.      Were you subject to discipline for any reason
3   when you were a student at Ohio State?
4   A.      No.
5   Q.      Were you reprimanded for any reason while you
6   were a student at Ohio State?
7   A.      No.
8   Q.      Were you subject -- were you subject to
9   disciplinary action when you were a student at Ohio
10  State, even if the action did not result in discipline?
11  A.      No.
12  Q.      Do you know Zachary Brusko?  B-R-U-S-K-O?
13  A.      Yes.
14  Q.      How do you know Zach Brusko?
15  A.      He was a student at The Hill School in the
16  mid/late '90s.  And then he was also -- I hired him as
17  a -- when I was working in the academic office as a
18  director of studies.  He came to work for us as
19  a registrar.  He handled the technology in our office.
20  Q.      Did you tell Zachary Brusko about the
21  allegations by Mr. Poulos?
22  A.      I did not.
23  Q.      Did you give your lawyer, Mr. Jubb,
24  permission to tell Zachary Brusko regarding the
25  allegation by Mr. Poulos?

Page 261

1           MR. JUBB:  Well, just phrase it -- it's
2           objectionable as phrased.  I think you can
3           clarify, but I think as phrased I think it's
4           asking him to talk about what he discussed
5           with me.  But I don't have a general
6           objection.
7   BY MS. DOUGHERTY:
8   Q.      Did Mr. Jubb have your authority to tell Mr.
9   Brusko about Mr. Poulos's claims against you?
10  Accusations against you?
11  A.      Yes.
12  Q.      When was the last time you spoke to Mr.
13  Brusko?
14  A.      Last time I spoke with him would have been
15  before I left The Hill School in 2009.  The last time I
16  communicated with him would have been sometime after
17  that.  He was -- I can't tell you date.  I was in
18  Michigan and he was leaving Hill and I had questions
19  about schools.  I think that was by e-mail.  I don't
20  think we spoke.
21  Q.      Have you had any contact with Mr. Brusko
22  since April 11th, 2018?
23  A.      No.
24  Q.      Do you have an understanding of what Mr.
25  Brusko's opinion of you is?

Matthew Ralston
July 01, 2021                                    262 to 265

Page 262

1   A.       Yes.  I think.
2   Q.       What is your understanding of Mr. Brusko's
3   opinion of you?
4   A.       I think it's high.  He enjoyed working with
5   me.  I know that.  Hat's all I got to base it on.
6   Q.       Has Mr. Brusko expressed to you that his
7   opinion of you has changed in any way since learning
8   the accusations by Mr. Poulos?
9   A.       No.  As I said, I haven't had any contact
10  with him since the letter.
11  Q.       Who is James Brobyn, B-R-O-B-Y-N?
12  A.       Former student.  Also from those -- the same
13  -- graduated in 1995.
14  Q.       So two years before Mr. Poulos?
15  A.       Yes.
16  Q.       Did you tell Mr. Brobyn about the accusations
17  by Mr. Poulos?
18  A.       I did not.
19  Q.       Do you know what Mr. Brobyn's opinion of you
20  is?
21  A.       I do.
22  Q.       What is Mr. Brobyn's opinion of you?
23  A.       Very high.
24  Q.       Mr. Brobyn has not stopped associating with
25  you in any way, correct?

Page 263

1   A.       Has not?
2   Q.       Has not stopped associating with you in any
3   way, correct?
4   A.       No.
5   Q.       Do you know whether Mr. Brobyn knows about
6   the accusations by Mr. Poulos, even though you did not
7   tell him?
8   A.       Yes.
9   Q.       Does Mr. Brobyn know about the accusations by
10  Mr. Poulos?
11  A.       He does.
12  Q.       Do you know how Mr. Brobyn learned about the
13  accusations by Mr. Poulos?
14  A.       I do.
15  Q.       How did Mr. Brobyn learn about the
16  accusations by Mr. Poulos?
17  A.       He spoke with Mr. Jubb.
18  Q.       Did you give Mr. Jubb authority to sell Mr.
19  Brobyn about the accusations by Mr. Poulos?
20  A.       I'm sorry, I must be getting --
21  Q.       I'm sorry.  Did you give Mr. Jubb authority
22  to tell Mr. Brobyn about the accusations by Mr. Poulos?
23  A.       Yes.
24  Q.       Do you have any information about whether the
25  information that -- let me start again.  Do you have

Page 264

1   any reason to believe that Mr. Brobyn's opinion of you
2   has changed since learning the accusations by Mr.
3   Poulos?
4   A.       No.
5   Q.       When is the time you spoke to Mr. Brobyn?
6   A.       I've not spoke with him.  He has -- we've
7   shared text messages within the last year.  He's part
8   of a business that he's trying to establish himself in
9   northern Michigan.  So when he goes out, he'll let me
10  know.  And if I'm there -- We have not gotten together.
11  It hasn't lined up.  But he wonders if I'm there and if
12  I'd be able to get together.
13  Q.       Do you know when Mr. Brobyn learned about the
14  accusations by Mr. Poulos?
15  A.       Do I know when?
16  Q.       Um-hum.
17  A.       I don't remember.
18  Q.       Here is what I really want to know.  Have you
19  spoken to Mr. -- or texted -- let me start again.  Have
20  you communicated with Mr. Brobyn since Mr. Brobyn
21  learned about the accusations by Mr. Poulos?
22  A.       Yes.
23  Q.       So Mr. Brobyn has not stopped associating
24  with you since learning the accusations by Mr. Poulos,
25  is that right?

Page 265

1   A.       That's correct.
2   Q.       The house -- let me start again.  Your
3   residence in Ohio, is that a house?
4   A.       It's a condominium.
5   Q.       It's a condominium?  So it's in a building
6   with other condominiums?
7   A.       It's not -- they're side by side.  It's not
8   an apartment building.
9   Q.       It's like a complex?
10  A.       It is a complex.
11  Q.       How many units are in the complex?
12  A.       Wow.  A bunch.  I don't know.
13  Q.       Here's what I want to know, is if you have
14  neighbors close by.
15  A.       I do.
16  Q.       Do you socialize with your neighbors?
17  A.       Yes.
18  Q.       Do any of your neighbors know about the
19  letters or the accusations by Mr. Poulos?
20  A.       No.
21  Q.       Who is in your community?
22           MR. JUBB:  Object to the form.
23           THE WITNESS:  What's your question?
24  BY MS. DOUGHERTY:
25  Q.       Who do you consider to be in your community?

Matthew Ralston
July 01, 2021                                                    266 to 269

Page 266

1  Do you have a community?
2  A.       You mean my -- I guess -- can you define what
3  you mean by community?
4  Q.       Sure.  Your -- I guess the social circle of
5  -- let me start again.  I guess the circle of people in
6  which you communicate and live and interact.
7  A.       Okay.  In Ohio, it's my wife, a neighbor.  My
8  wife's brother, with whom I lived in college.  And his
9  wife.  I have a childhood friend there.
10 Q.       Okay.  So other than your wife, do any of the
11 people in your Ohio community know about the
12 accusations by Mr. Poulos?
13 A.       They do.
14 Q.       Do all of the people you just identified to
15 me, who are your Ohio community, know about the
16 accusations by Mr. Poulos?
17 A.       No.
18 Q.       Which ones?
19 A.       The neighbor does not.
20 Q.       Oh.  I'm sorry.  The brother of -- was that
21 your brother or somebody else?
22 A.       Mary Beth's brother.  My wife's brother.
23 Q.       Your wife's brother.
24 A.       My brother-in-law.
25 Q.       Does your brother-in-law know about the

Page 267

1  accusations of Mr. Poulos?
2  A.       Yes.
3  Q.       And does your sister-in-law know about the
4  accusations by Mr. Poulos?
5  A.       Yes.
6  Q.       And your childhood friend?
7  A.       Yes.
8  Q.       How did the -- how did your brother-in-law,
9  sister-in-law and childhood friend learn about the
10 accusations by Mr. Poulos?
11 A.       Initially, I can't tell you the conversation,
12 I mean --
13 Q.       Did they learn about it from you?
14 A.       My wife.  They learned, initially, from Mary
15 Beth.  Mary Beth and her sister-in-law are pretty
16 close.
17 Q.       So did your brother-in-law -- let me start
18 again.  Do you know your brother-in-law's opinion of
19 you?
20 A.       Yes.
21 Q.       What is your brother-in-law's opinion of you?
22 A.       Very high.
23 Q.       And did your brother-in-law's opinion of you
24 change when he learned about the accusations by Mr.
25 Poulos?

Page 268

1  A.       No.
2  Q.       Did your brother-in-law stop associating with
3  you when he learned about the accusations by Mr.
4  Poulos?
5  A.       No.
6  Q.       How about your sister-in-law, do you know her
7  opinion of you?
8  A.       I assume it's high.
9  Q.       And do you know -- let me start again.  Has
10 your sister-in-law's opinion of you changed since
11 learning the accusations by Mr. Poulos?
12 A.       No.
13 Q.       So your sister-in-law's opinion of you is
14 still high, is that right?
15 A.       Yes.
16 Q.       And your sister-in-law has not stopped
17 associating with you after learning the accusations by
18 Mr. Poulos, is that right?
19 A.       That's right.
20 Q.       And your childhood friend, has your -- do you
21 -- is your childhood friend's opinion of you high?
22 A.       I don't think so.  No.
23 Q.       You think your childhood friend doesn't have
24 a high opinion of you?
25 A.       Oh, oh.

Page 269

1  Q.       I thought you were teasing me.
2  A.       I'm sorry.  No.
3  Q.       I was going to say, why did we pick that one?
4  A.       He does.
5  Q.       Okay.
6          THE VIDEOGRAPHER:  Five minutes for
7          chapter change.
8          MS. DOUGHERTY:  Okay.
9  BY MS. DOUGHERTY:
10 Q.       And so your childhood friend's opinion of you
11 is high, is that right?
12 A.       It is.
13 Q.       And has his opinion of you changed since
14 learning the accusations by Mr. Poulos?
15 A.       No.
16 Q.       And so as far as you know, your childhood
17 friend's opinion of you is still high?
18 A.       Yes.
19 Q.       And he's not stopped associating with you
20 since learning the accusations by Mr. Poulos?
21 A.       He has not.
22 Q.       As we -- have we covered everybody who you
23 consider to be in your Ohio community?
24 A.       Yes.
25 Q.       Do you have other communities?

Matthew Ralston
July 01, 2021                                          270 to 273

Page 270

1    A.        I have friends in Michigan.
2    Q.        So you consider that you have a Michigan
3    community?
4    A.        I beg your pardon?
5    Q.        Who is in your Michigan community?  And your
6    wife can just be included in all.
7    A.        Okay.  She is included in all.
8    Q.        I'll just put her down immediately.
9    A.        Yeah.  I have a friend who owns a business,
10   who I've known since he moved there in 2000 and -- I'm
11   going to say '10 or '11.  And I have a -- another
12   friend whom I met actually through the one that owns
13   the business.  And then Dr. Siemer I consider a friend
14   and part of my community.
15   Q.        Okay.  And so do the individuals in your
16   Michigan community know about the accusations by Mr.
17   Poulos?
18   A.        They do.
19   Q.        And how did the individuals in the Michigan
20   -- let me start again.  How did the individuals in your
21   Michigan community learn about the accusations by Mr.
22   Poulos?
23   A.        I shared with them when I was no longer
24   working.
25   Q.        So is it --

Page 271

1    A.        I answered the questions of why aren't you
2    working.
3    Q.        So is it correct that the individuals in your
4    Michigan community all have a high opinion of you, as
5    far as you know?
6    A.        Yes.  They do.
7    Q.        And has the opinion of anyone in your
8    Michigan community changed since they learned the
9    accusations by Mr. Poulos?
10   A.        It has not.
11   Q.        So all the individuals in your Michigan
12   community, as far as you know, still have a high
13   opinion of you, is that right?
14   A.        Yes.
15   Q.        And no one in your Michigan community has
16   stopped associating with you, is that right?
17   A.        That's right.
18   Q.        Do you have any other communities, other than
19   your Ohio community and your Michigan community?
20   A.        Wow.  My brother.  I have a second brother
21   who's ten years younger than I.  I didn't grow up with
22   him.
23   Q.        Not Mark?  Somebody else?
24   A.        Yes.  His name is John.
25   Q.        Does John know about Mr. Poulos's

Page 272

1    accusations?
2    A.        He does.
3    Q.        And did he learn about the accusations from
4    you?
5    A.        He did.
6    Q.        And I assume that John's opinion of you is
7    high?
8    A.        Yes.  I would think so.
9    Q.        And John didn't credit the accusations by Mr.
10   Poulos like Mark didn't, right?
11   A.        I'm sorry, he didn't --
12   Q.        He did not credit the allegations by Mr.
13   Poulos --
14   A.        No.
15   Q.        -- just like Mark didn't credit the
16   allegations --
17   A.        Correct.
18   Q.        -- by Mr. Poulos.
19   A.        Correct.
20   Q.        And so as far as you know, John's opinion of
21   you is still high, and he has not stopped associating
22   with you, is that right?
23   A.        Correct.  Yes.
24   Q.        Is there anyone -- can you identify anybody
25   for me whose opinion has changed since learning the

Page 273

1    accusations by Mr. Poulos?
2              MR. JUBB:  I'll objection to the form.
3              THE WITNESS:  Mr. Lehman's ultimately
4    has.  I can tell you one of my most vivid
5    bouts of anxiety was before I -- my last trip
6    as a member of the -- active member of the
7    development crew as a capital giving officer,
8    was a trip with the board chair.  And I knew
9    the board chair had to know.  And he said
10   nothing to me.  And I spent that whole trip
11   wondering.
12             So I have no idea what his opinion -- if
13   his opinion has changed.  But that felt to me
14   like it had.  Former headmaster, Mr.
15   Dougherty, I can't tell you his, except I
16   know I haven't spoken with him since the
17   letters arrived.
18   BY MS. DOUGHERTY:
19   Q.        Well, does Mr. Dougherty know about the
20   accusations by Mr. Poulos?
21   A.        Yes.
22   Q.        How do you know that?
23   A.        Because I asked him at one point if I could
24   speak with him, just get his opinion on some things.
25   And his response was, he would love to talk with me,

Matthew Ralston
July 01, 2021                                          274 to 277

Page 274

1  but if it had anything to do with legal proceedings at
2  the school he couldn't.  And that was the only legal --
3  potential legal proceedings, or legal -- I guess what I
4  would consider legal proceedings at the time.
5  Q.      When was that?
6  A.      That was in March of 2019.
7  Q.      Mr. Dougherty also knew Mr. Poulos, right?
8  A.      Yes.
9  Q.      Okay.
10         THE VIDEOGRAPHER:  Going off record.
11         4:39.
12              *   *   *
13         (Whereupon, a short break was taken.)
14              *   *   *
15         THE VIDEOGRAPHER:  Back on, 4:52.
16  BY MS. DOUGHERTY:
17  Q.      Okay.  So what is the basis for your belief
18  that Mr. Lehman's opinion of you changed because of the
19  allegation by Mr. Poulos?
20  A.      Well, I'm not working there anymore.  I guess
21  that's the basis of it.
22  Q.      Well, you're not working there anymore
23  because of Mr. Poulos's allegation or because of the
24  lawsuit that you filed?
25         MR. JUBB:  Objection to the form.  Asked

Page 275

1  and answered.
2         THE WITNESS:  I don't -- again, I don't
3         know how to separate them in a way to answer
4         that.  Can I ask -- when we left for break,
5         or changed the -- you had asked me about
6         community.
7  BY MS. DOUGHERTY:
8  Q.      Um-hum.
9  A.      We covered places we own homes.  And I had
10  asked you to define community.
11  Q.      Okay.
12  A.      My question around that is, I have -- there
13  are other people who know, but that was the result of
14  me no longer working.  I don't see them regularly.  But
15  I communicate with them.  Is that part of my
16  communicate -- part of my community?
17  Q.      Well, it's really up to you, as to what you
18  consider to be your community.  So I'll come back to
19  that.  Let's just finish up with Mr. Lehman.
20  A.      All right.
21  Q.      But I appreciate you bringing it to my
22  attention, because it's important for me to know.  So
23  did you ever discuss with Mr. Lehman his current
24  opinion of you?
25  A.      No.

Page 276

1  Q.      So you're just assuming because you no longer
2  work at The Hill School that Mr. Lehman's opinion of
3  you changed?
4  A.      Yes.
5  Q.      Because of the accusations by Mr. Poulos?
6  A.      At the core, yes.  And, yes.
7  Q.      And any -- so Mr. Lehman, the board chair,
8  Mr. Dougherty, anyone else that you can identify whose
9  opinion of you changed because of learning about the
10  allegations by Mr. Poulos?
11  A.      No.
12  Q.      Is there anyone that you can identify who
13  stopped associating with you because of the -- because
14  they learned of the allegations by Mr. Poulos?
15         MR. JUBB:  Other than what we discussed.
16  BY MS. DOUGHERTY:
17  Q.      Well, is the list the same?  I don't think it
18  is.  As the board -- did the board chair associate it
19  with you before?
20  A.      Yes.
21  Q.      Okay.  So the board chair no longer
22  associates with you?
23  A.      Correct.
24  Q.      And you're just assuming that it has
25  something to do with the allegations by Mr. Poulos, but

Page 277

1  you don't know, because you never asked, right?
2         MR. JUBB:  I'll object to the form.
3         THE WITNESS:  No.
4  BY MS. DOUGHERTY:
5  Q.      And then Mr. Lehman, Mr. Dougherty, anyone
6  else that has stopped associating with you because of
7  the allegations by Mr. Poulos?
8  A.      Any of the people I know on the board of
9  trustees.
10  Q.      Who are the people on the board of trustees
11  who stopped associating with you because of the
12  allegations by Mr. Poulos?
13  A.      I won't be able to give you an exhaustive
14  list, but I can tell you some.  Hans Maentz.
15  Q.      Well, I'm not asking for a list of everybody
16  on the board of trustees.  I want to know who stopped
17  associating with you.
18  A.      I haven't associated with any of them.
19  Q.      Did you associate with them before?
20  A.      Yes.
21  Q.      All right.  So go ahead and tell me the list
22  of people from the board of trustees who stopped
23  associating because of the allegations by Mr. Poulos.
24  A.      I know one is Hans Maentz.
25  Q.      Hans, did you say?

Matthew Ralston
July 01, 2021                                    278 to 281

Page 278

1   A.      H-A-N-S.  And Maentz is M-A-E-N-T-Z.  Another
2   is Shelly Gyves.  G-Y-E -- G-Y-V-E-S.  Doug Brody.
3   That's B-R-O-D-Y.  Doug Bouquard.  B-O-U-Q -- I don't
4   know if there's a U, but the end is A-R-D.  I'm trying
5   to think who else.  Oh, Madison Byrnes, B-Y-R-N-E-S.
6   Assuming she's still -- I don't know if any of them are
7   still on the board, but.  I know Hans is still on the
8   board.  I'm pretty sure Shelly is.  I know -- I -- I
9   know Doug Bouquard is still on the board.
10  Q.      Anybody else?
11  A.      Not that's coming to mind.  Oh, Geoff
12  Richards.  Which is J -- or G-E-O-F-F.  That's Geoff.
13  Mr. Aithe, he just retired from it, but you already got
14  him.  And, I'm sorry, I'm not thinking of who else is
15  on the board.
16  Q.      Okay.  So you were telling me about your
17  community.  You identified your Ohio community, your
18  Michigan community, and then you were telling me about
19  your family.  Are there other people in your community?
20  A.      That I consider my community, yes.
21  Q.      Who?
22  A.      Most of those people are alumni of the
23  school.
24  Q.      Do any of the people in your community that
25  are alumni of the school know of the accusations by Mr.

Page 279

1   Poulos?
2   A.      They know of accusations.  They don't know by
3   whom.  They know I'm no longer at the school, which is
4   what I shared with them.
5   Q.      So the -- can we just call them your alumni
6   community?  Is that a fair characterization?
7   A.      Yes.
8   Q.      Okay.  So the -- I'm not trying to restrict
9   you.  I'm --
10  A.      Oh, I know.
11  Q.      -- just trying to use a word we can agree on.
12  So the alumni community, they learned that there were
13  accusations against you by a student?
14  A.      Yes.
15  Q.      By who -- by you?
16  A.      Yes.  And, yes.
17  Q.      Have any of the individuals in your alumni
18  community who stopped associating with you stopped
19  since you --
20          MR. MCCARRON:  Hey, anthony -- oh,
21      sorry.
22          MS. DOUGHERTY:  Hello?
23          MR. MCCARRON:  Sorry, I didn't mean
24      to --
25          MS. DOUGHERTY:  You scared me.

Page 280

1   BY MS. DOUGHERTY:
2   Q.      I forget what I was asking.  Did anyone in
3   your -- has anyone in your alumni community stopped
4   associating with you since you told them about the
5   accusations against you?
6   A.      Yes.
7   Q.      Who in your alumni community stopped
8   associating with you since learning about the
9   accusations by Mr. -- the accusations?
10  A.      Mostly some with whom I did not have
11  continuous relationship since they graduated.
12  Q.      I need names.
13  A.      Oh.  I'll give you Faizeen, F-A-I-Z-E-E-N,
14  Khandker, K-H-A-N-D-K-E-R.
15  Q.      K-H-A-N-D-- E-R or A-R?
16  A.      I don't know.
17  Q.      All right.
18  A.      I would spell it E-R.
19  Q.      Okay.
20  A.      But I don't know if that's right.
21  Q.      Others from your alumni community who have
22  stopped associating with you after learning about
23  accusations from you?
24  A.      There are, but I can't tell you, because of
25  that.  Faizeen I know, because he called and asked me

Page 281

1   when I was coming back from where he is.  And I had to
2   tell him I was no longer there.  So there are others
3   I'm not in communication with, but I can't tell you
4   what they do or don't know.
5   Q.      Okay.  So Faizeen Khandker, did I say that
6   right?
7   A.      Khandker.
8   Q.      Khandker, okay.  He's the only person from
9   your alumni community who you informed about
10  accusations and who you know has stopped associating
11  with you since and because of learning about the
12  accusations, is that right?
13  A.      I think so.
14  Q.      What do you mean I think so?
15  A.      Well, I -- I don't communicate as much with
16  some of them, but they've got young -- I mean, it's
17  mostly life going on.  I haven't heard from Faizeen
18  since.  The reason his name comes to mind is he called
19  me and wanted to know when I would be in Chicago again
20  in the capacity of my work, and I told him I wouldn't.
21  He asked why not, and I said because I'm no longer
22  working at the school.
23  Q.      Do you have a -- how do we find out all the
24  people that you told about the accusations?
25  A.      Well, I can share the community name if we go

Matthew Ralston
July 01, 2021                                           282 to 285

Page 282

1   on.  You asked that question specifically about those
2   who had stopped communicating with me.
3   Q.      Okay.  So you have like a -- like a group in
4   Facebook or something?
5   A.      No. Heavens no, no, no.
6   Q.      Okay.  I don't understand what you mean, so
7   can you explain what you mean?
8   A.      Well, there are alumni with whom I've
9   developed friendships over the years.  There are three
10  brothers who I've known since 1992.
11  Q.      Would you have, like, a list of all the
12  people you told about the accusations?  I thought you
13  were suggesting that you had a -- like a group or
14  something.
15  A.      Oh, no, no, no.
16  Q.      Because you said community.
17  A.      When you said community, my brain is -- no, I
18  don't have a list and there's no set of people that I
19  -- those three brothers I did make a point.
20  Q.      Did they stop associating with you?
21  A.      No.
22  Q.      Anybody else who you told about the
23  accusations uh-uh stopped associating with you?
24  A.      No.
25  Q.      Anyone -- go ahead.

Page 283

1   A.      No.  That I know, no.
2   Q.      Anyone.
3   A.      That I have told, no.
4   Q.      Okay.  And is there anyone else that you've
5   informed about the accusations?  I'm saying
6   accusations, because I realize sometimes you didn't
7   attribute it to a person, you know, attribute it to Mr.
8   Poulos.  Is there anyone who you informed of the
9   accusations who you know their opinion of you changed
10  because of the accusations, other than who you told me?
11  A.      No.
12  Q.      Did we cover your community now?
13  A.      Yeah.  Yes.
14  Q.      Okay.  Back to D-4, which is the December
15  26th, 2018 letter.  We were on the second paragraph.
16  A.      I'm sorry, second paragraph?
17  Q.      I would just finish the second paragraph.
18  Let me just ask you before I -- so I don't have to come
19  back.  So you said, I think, that Faizeen has stopped
20  associating with you.  How did you previously associate
21  with Faizeen?  Like before you told him about the
22  accusations.
23  A.      In capacity of my work in the alumni office.
24  He -- he's in Chicago.  I reached out to him, because
25  he was someone in Chicago I know.  He first didn't want

Page 284

1   to meet with anyone at the school, because he said his
2   experience was not -- academically was good, but he
3   said socially it wasn't extraordinary.  I acknowledged
4   and said I'd still like to meet if he was open to it.
5           And after that he was -- would always wonder
6   when I was coming to Chicago so we could visit.  And he
7   called me sometime after I wasn't working.  I can't
8   tell you when, but it was after I wasn't working, and
9   asked me.  And that's when I shared it with him.
10  Q.      Okay.  So you have stopped associating with
11  Faizeen because you no longer work in the alumni
12  office, is that right?
13          MR. JUBB:  Objection to the form.
14  BY MS. DOUGHERTY:
15  Q.      I mean, Faizeen has no reason to associate
16  with you, because you're not part of the alumni office,
17  is that right?
18          MR. JUBB:  Objection to the form.
19          THE WITNESS:  I can't say why he doesn't
20      any longer.  I can say that would be the
21      frequency.
22  BY MS. DOUGHERTY:
23  Q.      I thought that you said that you associated
24  with him in the capacity of your work in the alumni
25  office, and he was trying to find out when you were

Page 285

1   coming to Chicago in that capacity, right?
2           MR. JUBB:  Objection to the form.
3           THE WITNESS:  I was hired because of my
4       relationship with alumni, so --
5   BY MS. DOUGHERTY:
6   Q.      Right.  But you have no reason to associate
7   with Faizeen now, because you are no longer with the
8   alumni office, is that right?
9           MR. JUBB:  Objection to the form.
10          THE WITNESS:  I -- I have no reason,
11      myself, to reach out to him.
12  BY MS. DOUGHERTY:
13  Q.      Well, the same for him, right?  Because
14  you're not able to help him with his alumni work,
15  right?
16  A.      I don't -- in a formal capacity with the
17  school, that would be true.  In a capacity of can I
18  introduce him to other alumni who are in a similar line
19  of business to him, that would not be true.
20  Q.      Were you still allowed to do stuff like that?
21  Are you still allowed to represent the school?
22  A.      I was -- I was not.  And -- I was not.  I was
23  not allowed to represent myself as an employee at the
24  school, or have an association with the school.  That
25  -- and I don't.

Page 286

1  Q.      Right.  So the reason you don't associate
2  with Faizeen is because you no longer work at The Hill
3  School, right?
4            MR. JUBB:  Objection to the form.
5            THE WITNESS:  I -- I guess you can say
6        that.  It's not complete or a completely fair
7        answer.
8  BY MS. DOUGHERTY:
9  Q.      Is that the same as it relates to the Board
10 of trustees?  Did you associate with the members of the
11 board of trustees because you were capital giving
12 officer in the development -- alumni and development
13 office?
14           MR. JUBB:  Objection to the form.
15           THE WITNESS:  Most of them.
16 BY MS. DOUGHERTY:
17 Q.      Okay.  And so now you don't associate with
18 the board of trustees, because you no longer hold that
19 position, right?
20           MR. JUBB:  Objection to the form.
21           THE WITNESS:  I -- I guess.
22 BY MS. DOUGHERTY:
23 Q.      Okay.  Which ones on the -- you said most of
24 them, I think.  So which ones on the list do you
25 associate with other than because of your position as a

Page 287

1  capital giving officer?  We had Hans, Shelly, Doug,
2  Doug, Madison and Geoff.
3  A.        It would have been -- would be Hans.
4  Although less in recent years than previously.  He was
5  once a faculty member at the school and lived in a dorm
6  when we were there and the boys were young.  And again,
7  less frequently, but Shelly Gyves, who is married to an
8  alumnus.  I take that back.  You can scratch Shelly
9  off.  I think it was Dan's brother who worked at a
10 school in North Carolina that I saw.  So you can
11 scratch her off.  It would be most -- it would be Hans.
12 Q.      Okay.  So how did you associate with Hans
13 before you -- he learned about the accusations?
14 A.        Well, in the time frame it would have been --
15 I would have seen him when we were both on campus, in
16 my role.  I would have associated with him at reunions
17 when he was back.  Even if I wasn't employed at the
18 school.  And occasionally there were life events and
19 people we both knew well that he would share with me or
20 I would share with him.
21 Q.      Are you prohibited from going to reunions?
22 A.      Yes.
23 Q.      Is that part of the October 14th, 2019
24 letter?
25 A.      That's a good question.  I'll say yes.

Page 288

1  Because it began after that.
2  Q.      So it's the case that --
3  A.      I'm sorry, it did not begin after that.  It's
4  the result of being on paid administrative leave,
5  because I was not allowed to attend the reunion that
6  June.
7  Q.      Okay.  So you're not allowed to go because
8  the school says so?  You're not not going by choice,
9  right?
10 A.      Yes.  No, I'm not.  I'm --
11 Q.      Okay.  So the reason why you can't associate
12 with Hans is because -- also because you lost your
13 position and you're not permitted to attend reunions,
14 right?
15           MR. JUBB:  Objection to the form.
16           THE WITNESS:  If I were in Los Angeles I
17       would not hesitate to call Hans.  I'm not
18       sure what his response would be.
19 BY MS. DOUGHERTY:
20 Q.      Okay.  So you haven't tried?
21 A.      No.
22 Q.      So you don't know that he actually stopped
23 associating with you?  You just haven't had occasion to
24 see him, because you're not in your position, right?
25           MR. JUBB:  Objection to the form.

Page 289

1  BY MS. DOUGHERTY:
2  Q.      You weren't permitted to go to the reunion.
3            MR. JUBB:  Objection to the form.
4            THE WITNESS:  I guess.
5  BY MS. DOUGHERTY:
6  Q.      What do you mean you guess?
7  A.      I can't --
8  Q.      You haven't --
9  A.      -- answer --
10 Q.      -- tried to associate with Hans, right?
11 A.      I can't answer what the board has been
12 directed as far as communicating with me.  I don't know
13 that.
14 Q.      Okay.
15 A.      I can only draw assumptions, so I guess.
16 Q.      So D-4 -- oh -- you know what, I almost
17 forgot.  Mr. Dougherty, how are you associated with Mr.
18 Dougherty since he stopped being the headmaster of The
19 Hill School?
20 A.      I don't know.  He and his wife retired to
21 Wilmington, North Carolina, which is where my mother
22 lived.  So I would see them when I visited my mother.
23 And we would see each other at Hill School alumni
24 weddings.  Which -- and then also he would -- they
25 would come back for reunions and things.

Page 290

1  Q.       Are you prohibited from attending alumni
2  weddings?
3  A.       Yes.
4  Q.       Is that something you agreed to in an
5  agreement with The Hill School?
6  A.       No.  Uh -- no.
7  Q.       Do you have some type of an agreement with
8  The Hill School?
9  A.       No.
10 Q.       Like a separation --
11 A.       Just --
12 Q.       -- agreement or something?
13 A.       -- just -- no.  I have the directives that
14 were in the letter.  I don't recall if that's there.  I
15 do know that in 2020, prior to the reunion not
16 happening, there were students in the Class of 1995
17 that wanted me to come back.  And one of the things the
18 school will do is speak with representatives of a class
19 and ask if there are people they want to be sure will
20 attend the reunion and then they send an invitation.  I
21 was not allowed to do that.
22 Q.       Have you gone to visit your mother since
23 March 2019?
24 A.       Yes.  But that's -- she died February of '20.
25 And in March of 2019 she was already declining.

Page 291

1  Dementia.  So, yes.  I've seen -- I saw my mother.
2  Q.       Did you try to get together with Mr.
3  Dougherty when you went to see your mother last?
4  A.       They were out of town.  They have -- they
5  have a summer home in Ireland.
6  Q.       Okay.  So Mr. Dougherty didn't say "I don't
7  want to get together with you".  He said "I'm in
8  Ireland", right?
9  A.       He did in March.  He said he wouldn't talk to
10 me.
11 Q.       He said he wouldn't -- he wouldn't talk to
12 you about legal proceedings, right?
13 A.       Yes.
14 Q.       He didn't say he wouldn't talk to you period,
15 right?
16 A.       Yes.  Correct.
17 Q.       And so when -- then when you went to get
18 together with him next, he didn't say I'm not going to
19 get together with you.  He said we're in Ireland,
20 right?
21 A.       I can't tell you that I asked again.
22 Q.       So how do you know that Mr. Dougherty is not
23 associating with you anymore?
24          MR. JUBB:  I'll object to the form.
25          THE WITNESS:  I don't know how to answer

Page 292

1  that, except we don't have any association
2  anymore.
3  BY MS. DOUGHERTY:
4  Q.       Do you have any reason to believe Mr.
5  Dougherty is refusing to associate with you?
6  A.       Any reason to believe?
7  Q.       Yeah.
8  A.       It's got to be the result of the letters and
9  where we are today.
10 Q.       No.  Just because you haven't seen somebody
11 doesn't mean the person's refusing to associate with
12 you.  I'm trying to learn who will no longer associate
13 with you or whose opinion of you changed, we went
14 through that also, because of learning about the
15 accusations by Mr. Poulos, or accusation as being
16 attributable to Mr. Poulos, and you've -- I'm trying to
17 learn why you believe that Mr. Dougherty is, like, just
18 not associating with you as compared to, like, just
19 being in Ireland.
20          MR. JUBB:  You've answered her question.
21          THE WITNESS:  I can't --
22          MR. JUBB:  You've answered her question.
23          THE WITNESS:  Oh, okay.
24          MS. DOUGHERTY:  I'm sorry, you're
25 instructing him not to answer?

Page 293

1          MR. JUBB:  I don't understand what the
2  question is, other than the last one, which
3  he already answered.  You made a legal
4  argument --
5          MS. DOUGHERTY:  So are you instructing
6  him not to --
7          MR. JUBB:  I'm instructing him not to
8  answer the statement.  I have no idea what
9  you're even asking him.  The previous
10 question.
11          MS. DOUGHERTY:  I just want an answer,
12 Lane.  I'm, like, not interested in hearing
13 about it.  So are you instructing him not to
14 answer or not?
15          MR. JUBB:  I don't even -- there's not a
16 question.
17          MS. DOUGHERTY:  He seemed to understand
18 there was a question, because -- and was able
19 to answer it.
20          MR. JUBB:  No, he was not.
21          MS. DOUGHERTY:  Yes, he was.  He was
22 answering it.
23          MR. JUBB:  You were arguing with the
24 witness, giving him a legal argument.
25          MS. DOUGHERTY:  I was not arguing with

Page 294

1 the witness, okay.  It is 5:15.  I'm not
2 wasting my time listening to this.  Are you
3 instructing him not to answer or not?
4       MR. JUBB:  Go ahead and answer.  Do you
5 even know what she asked?
6       THE WITNESS:  I think so.
7       MR. JUBB:  Go ahead.
8       THE WITNESS:  I have not been to
9 Wilmington since October of 2018.  I have not
10 been to a wedding or a reunion where he would
11 be since.  I have not reached out since he
12 told me he couldn't talk to me.
13 BY MS. DOUGHERTY:
14   Q.      About legal issues relating to the school,
15 right?
16   A.      Yes.
17   Q.      Okay.  D-4.  The third paragraph.  It says,
18 "Kurtis Nicholas Poulos, D/O/B 10/10/1978.  Met Mr.
19 Ralston during Mr. Poulos's Freshman year at The Hill
20 School in approximately 1993, or approximately 1994,
21 when Mr. Poulos was approximately 14 or approximately
22 15 years old."  Is that a true statement?
23   A.      Yes.
24   Q.      Mr. Ralston -- I'm sorry, go ahead.
25   A.      I -- I assume I met him -- I mean, it's very

Page 295

1 possible I met him his Freshman year.  So I can't
2 imagine I didn't.
3   Q.      So you don't have a reason to doubt that you
4 met Mr. Poulos Freshman year, but you're certain you
5 didn't teach him in class, right?
6   A.      No.  Correct.
7   Q.      "Mr. Ralston served as a table master in the
8 dining hall and Mr. Poulos had a rotation at Mr.
9 Ralston's table during Mr. Poulos's Freshman year."  Is
10 that a true statement?
11   A.      I don't know.  It's quite possible.
12   Q.      Okay.  So you just don't remember?
13   A.      No.  We changed tables every six months
14 weeks.  So I don't remember who all sat at my table.
15   Q.      Mr. Poulos recalls that Mr. Ralston was a
16 mathematics teacher and cross country coach at The Hill
17 School.  Is that a true statement?
18   A.      That's a true statement.  Well, those are
19 things I did.  I don't know that he recalls them.
20   Q.      Okay.  So the part, Mr. Ralston was a
21 mathematics teacher and a cross country coach at The
22 Hill School, that's true?
23   A.      Yes.
24   Q.      Okay.  And the next one says, "Mr. Poulos
25 recalls", but I'm just going to ask you about the part

Page 296

1 about you.  So, "Mr. Ralston lived in a dormitory of
2 The Hill School with Mr. Ralston's family."  Is that a
3 true statement?
4   A.      Yes.
5   Q.      Was there any inappropriate conduct -- let me
6 start again.  Was there any inappropriate contact
7 between you and Mr. Poulos during Mr. Poulos's Freshman
8 year at The Hill School?
9   A.      No.
10   Q.      You called -- I'm sorry, The Hill School
11 calls Freshman year something else, right?
12   A.      Yes.
13   Q.      Third form, is that right?
14   A.      Third form, yes.
15   Q.      And the next sentence is, "Mr. Ralston was
16 Mr. Poulos's geometry teacher during Mr. Poulos's
17 sophomore year at The Hill School in approximately 1994
18 and approximately 1995 when Mr. Poulos was
19 approximately 15 and approximately 16 years old."  Is
20 that true?
21   A.      Yes.
22   Q.      And The Hill School calls Sophomore year?
23   A.      Fourth form.
24   Q.      Fourth form.  The next sentence is, "Mr.
25 Poulos recalls", but I'm going to ask about the part

Page 297

1 that relates to you.  "Classes were held on a rotating
2 schedule at The Hill School so that classes met at
3 different times of the day."  Is that true?
4   A.      Yes.
5   Q.      That was true in 1994 and 1995 when --
6   A.      Yes.
7   Q.      -- Mr. Poulos was in your geometry class?
8   A.      Yes.
9   Q.      "On certain days when Mr. Poulos had geometry
10 as the last class of the day, Mr. Ralston made Mr.
11 Poulos stay behind in Mr. Ralston's classroom."  Is
12 that true?
13   A.      No.
14   Q.      It's all untrue?
15   A.      That I made someone stay after class?
16   Q.      Yes.
17   A.      Yes.
18   Q.      So you're certain that you never made Mr.
19 Poulos stay after class?
20   A.      Absolutely.
21   Q.      Do you remember whether geometry was ever the
22 last day -- I'm sorry, the last class of the day?
23   A.      I don't.  It's quite possible.
24   Q.      Do you have any idea why Mr. Poulos would say
25 you made him stay behind after class?

Page 298

1  A.      I don't.

2  Q.      Mr. Ralston -- do you have any recollection

3  of interacting with Mr. Poulos when he was in your

4  geometry class?

5  A.      Vaguely, but no.

6  Q.      What was your -- okay.  So you have a vague

7  recollection of interacting with Mr. Poulos?

8  A.      Yes.

9  Q.      Was -- was your interaction -- let me start

10 again.  How were your interactions with Mr. Poulos?

11 Were they cordial?  Were they combative?  Do you have

12 any sense?

13 A.      They would -- they would have been cordial.

14 Q.      So you don't remember any animosity or

15 adversity, or any --

16 A.      No.

17 Q.      -- anything like that, as it relates to Mr.

18 Poulos when he was in your geometry class, is that

19 right?

20 A.      None whatsoever.

21 Q.      Were you ever alone with Mr. Poulos?

22 A.      Probably.

23 Q.      Why do you say probably?

24 A.      Because I would often be in my classroom with

25 a student either before or after class for a brief

Page 299

1  time.  Students had about ten minutes to get from one

2  class to another.  They may ask if I was available for

3  extra help.  They may apologize for not getting their

4  homework done.  But not at any request during an

5  academic day, because they were rushed to get to their

6  next class on campus, and I had classes coming in.  And

7  so it would have been a momentary time anyway.  That a

8  class would be coming in.

9  Q.      Okay.  So is -- just -- please correct me if

10 I miss -- because I'm not trying to mischaracterize

11 your testimony.  I just want to see if I understand.

12 So are you saying that Mr. Poulos may have stayed after

13 geometry -- after class when geometry was the last day

14 of the class, but not because you made him stay, is

15 that right?

16 A.      That would be true.  And that would have been

17 a very brief meeting, because I coach.  Classes would

18 end about 3:10.  At 3:10.  Practice would begin at

19 3:20.  I would have to walk home, get my clothes

20 changed and be at practice.  And I was -- I coached

21 three seasons of the year, which is all three terms of

22 the school year.  So there's no way that happened.

23 Q.      So did Mr. Poulos ever stay after class when

24 geometry was the last day -- last class of the day?

25 A.      I don't have any idea.

Page 300

1  Q.      So you don't know one way or the other

2  whether Mr. Poulos stayed after class when geometry

3  class was the last class of the day?

4  A.      I don't.

5  Q.      You're just certain it wasn't because you

6  made him stay?

7  A.      That's true.  Yes.

8  Q.      Why are you -- so you never made a student

9  stay behind?

10 A.      I don't think so.  If there was something

11 school related, student came back from being sick or

12 something, I would ask if they are doing okay and they

13 may choose to stay then.  Most times that I would see

14 students about anything that was lengthy, it would be

15 during evening study hall.  I did not have my own

16 classroom, so meeting during the daytime during free

17 period, quote, free period, for a student, didn't

18 happen in a classroom of which I was teaching, because

19 I did not have my own classroom.  Ever.

20 Q.      So you do believe that you were alone with

21 Mr. Poulos in the geometry classroom?

22         MR. JUBB:  Objection to the form.  Are

23         you listening?

24         THE WITNESS:  I don't -- it's quite

25         possible.  I'm not saying I did or didn't.  I

Page 301

1         don't remember.

2  BY MS. DOUGHERTY:

3  Q.      I thought when I asked you if you were ever

4  alone with Mr. Poulos you said it's possible?

5  A.      I did.

6  Q.      Okay.  You just don't remember one way or the

7  other?

8  A.      It's -- it's -- it would make perfect sense

9  that I was.  I was his teacher.  And if he had a

10 question after class, could I come get extra help,

11 would be an example.  My answer would be yes or no.

12 And if it was no it would be because I had something

13 already scheduled.  If I said yes, it would be what

14 times I'm available.

15 Q.      Mr. -- next sentence, "Mr. Ralston and Mr.

16 Poulos were alone in a classroom after school on these

17 occasions."  So you don't know, one way or the other,

18 whether that's a true statement, except you're certain

19 that you -- that if Mr. Poulos was alone with you in

20 the classroom, it wasn't because you made him stay?

21 A.      I'm certain of that and I'm certain these

22 occasions are false.

23 Q.      Okay.  Well, I haven't asked you about the

24 allegations of the conduct.  I'm just talking about --

25 A.      It's what -- that's what the sentence refers

Matthew Ralston
July 01, 2021                                                    302 to 305

Page 302

1  to.
2  Q.      This says Mr. Ralston -- it says that "On
3  certain days when Mr. Poulos had geometry as the last
4  class of the day, Mr. Ralston made Mr. Poulos stay
5  behind in Mr. Ralston's classroom."
6  A.      Gotcha.
7  Q.      And you told me that it's possible that he
8  stayed after class, but not because you made him.
9  Because he needed --
10 A.      Correct.
11 Q.      -- assistance, right?  And that if that
12 occurred, then you and Mr. Poulos would be alone in the
13 classroom after school on those occasions, except it
14 wouldn't be because you made Mr. Poulos stay, is that
15 right?
16 A.      The very last part of that?
17 Q.      If you and Mr. Poulos were alone in the
18 geometry classroom, it wouldn't be because you made Mr.
19 Poulos stay?
20 A.      No.  I may ask a student a question as
21 they're leaving, but I would never make them say,
22 because I don't know their next -- I did not know their
23 next obligation and I did know mine.
24 Q.      So you never shut the door when Mr. Poulos
25 was trying to leave so he couldn't leave?

Page 303

1  A.      Never.
2  Q.      Never pulled Mr. Poulos back into the
3  classroom when he tried to leave?
4  A.      No.
5  Q.      Was the geometry classroom located at the end
6  of a hallway?
7  A.      Yes.
8  Q.      During the course of Mr. Poulos's -- what?
9  Is that --
10 A.      A geometry classroom that I taught in was
11 located at the end of the hallway.  I've got no reason
12 to believe that wasn't where I taught him.
13 Q.      "During the course of Mr. Poulos's Sophomore
14 year, Mr. Ralston sexually abused Mr. Poulos in Mr.
15 Ralston's geometry classroom between approximately 10
16 and approximately 15 times."  Is that a true statement?
17 A.      False.
18 Q.      "The sexual abuse consisted of, among other
19 things."  Did you fondle Mr. Poulos's penis --
20 A.      No.
21 Q.      -- and testicles?
22 A.      No.
23 Q.      So on no -- at no time did you fondle Mr.
24 Poulos's penis and testicles?
25 A.      At no time.

Page 304

1  Q.      So you didn't fondle Mr. Poulos's penis and
2  testicles skin on skin, or outside of the clothes in no
3  way, shape or form, that's your position?
4  A.      Ever.
5  Q.      Did you make Mr. Poulos fondle your penis and
6  testicles?
7  A.      No.
8  Q.      So never, whether skin on skin, outside of
9  clothes, no way?
10 A.      No way.
11 Q.      Did you ever have contact with Mr. Poulos's
12 penis or testicles in a way that wasn't forced?
13 A.      No.
14 Q.      Did you ever put your mouth on Mr. Poulos's
15 penis?
16 A.      No.
17 Q.      Did you ever make Mr. Poulos put his mouth on
18 your penis?
19 A.      No.
20 Q.      Do you have any idea why Mr. Poulos would
21 describe such graphic interactions with you?
22 A.      No.
23 Q.      None whatsoever?
24 A.      I think I, earlier today, said I tried to
25 figure out, I wondered why, and I quit, because I knew

Page 305

1  I'd never figure it out.
2  Q.      You weren't curious to learn more by
3  revealing Mr. Poulos's testimony in this case?
4  A.      No.  I don't figure -- I didn't -- my
5  curiosity ended when I realized I would never know.  I
6  wondered why this was happening to me.  I didn't try to
7  figure out what anyone was thinking.
8  Q.      Do you believe that Mr. Poulos was abused,
9  just not by you?
10 A.      I have no basis to make that.  I know he
11 wasn't abused by me.  And I had --
12 Q.      And -- I'm sorry.  Go ahead.
13 A.      So to answer your question, no, I have no
14 reason.
15 Q.      Do you think Mr. Poulos has identified the
16 wrong man?
17 A.      If he was abused, then yes.  But I have no
18 reason to believe that he was abused.  I -- actually, I
19 don't believe he identified the wrong man.  If he was
20 abused I know he identified the wrong man.
21 Q.      I understand you deny the abuse.  I guess --
22 let me start again.  Did you ever consider that Mr.
23 Poulos was in fact abused, just not by you, and was
24 identifying you erroneously?
25 A.      Did I -- yes.  I did consider that.

Page 306

1   Q.      And did you do anything to investigate
2   whether Mr. Poulos was abused as he described, but has
3   just misidentified you as the abuser?
4   A.      No.
5   Q.      Do you know if The Hill School ever
6   investigated whether Mr. Poulos's accusations of sexual
7   abuse were true, just that he misidentified you?
8   A.      No.
9   Q.      So the next paragraph, "The sexual abuse by
10  Mr. Ralston ended with Mr. Poulos's Sophomore year at
11  The Hill School."
12  A.      Where?
13  Q.      We're after the Mr. Ralston's penis
14  paragraph.  The next one.
15  A.      Okay.
16  Q.      "The sexual abuse by Mr. Ralston ended with
17  Mr. Poulos's Sophomore year at The Hill School."  So
18  you deny that, right?
19  A.      Yes.
20  Q.      "Mr. Poulos transferred to Marquette
21  University High School, Milwaukee, Wisconsin for his
22  Junior year of high school."  Do you have any
23  information about that, whether it's true or false?
24  A.      I believe it's true.
25  Q.      "And Mr. Poulos returned to The Hill School

Page 307

1   his Senior year, approximately 1996 to approximately
2   1997."
3   A.      Yes.
4   Q.      Is that correct?
5   A.      Yes.
6   Q.      "Mr. Poulos had limited contact with Mr.
7   Ralston during Mr. Poulos's Senior year, although Mr.
8   Poulos recalls that he and Mr. Ralston lived in the
9   same dormitory during that year."  I realize you can't
10  speak to what Mr. Poulos recalls, but is it true that
11  you had some contact with Mr. Poulos during his Senior
12  year and that you lived in the same dormitory?
13  A.      Yes.
14  Q.      Mr. -- okay.  And is it correct that there
15  was no sexual abuse during Mr. Poulos's Senior year at
16  The Hill School?  At least by you, right?
17  A.      There wasn't.  Yes.
18  Q.      "Mr. Poulos does not recall having any
19  contact with Mr. Ralston after Mr. Poulos graduated
20  from The Hill School in approximately 1997, when Mr.
21  Poulos was approximately 18 years old", is that
22  correct?
23  A.      Yes.  Well, that he recalls it, I can say
24  that I didn't have any contact with him.
25  Q.      Right.  Thank you.

Page 308

1   A.      Yes.
2   Q.      So you didn't have any contact with Mr.
3   Poulos's after he graduated --
4   A.      I did not.
5   Q.      -- in 1997, is that right?
6   A.      That's right.
7   Q.      So the first time you heard the name Poulos
8   after Mr. Poulos graduated from The Hill School was
9   when you learned about the April 11th, 2018 letter from
10  Mr. Lehman on April 21st, 2018, is that right?
11  A.      I think so.  I can't say specifically.  Or
12  for certain.  His cousin attended the school and
13  graduated a year ahead of him, and came back to
14  reunions.  And it's possible I would have asked how
15  Kurtis was doing, Mr. Poulos was doing, then.  But I
16  don't remember doing that.
17  Q.      Do you remember having -- okay.  So you may
18  have asked -- is it -- the cousin's name is Zerner?
19  A.      Yes.  Jason.
20  Q.      Did you -- so you may have asked Jason -- let
21  me start again.  You recall seeing Jason Zerner at a
22  reunion?
23  A.      Yes.
24  Q.      And you may have asked Jason how Kurt was
25  doing?

Page 309

1   A.      I may have done that, yes.
2   Q.      You don't have a recollection of seeing Mr.
3   Poulos or communicating directly with Mr. Poulos since
4   -- or after Mr. Poulos graduated in 1997?
5   A.      I know I have not.  Or I have no
6   recollection, to answer your question, of that.  I'm
7   sure I haven't.
8   Q.      Do you have a specific recollection of when
9   or how you met Mr. Poulos?
10  A.      No.
11  Q.      How was Mr. Poulos socially?
12  A.      I don't recall.  Best I can offer is after
13  this happened I looked in the yearbook to see if there
14  was anything there and I recognized that there were no
15  -- no pictures with classmates or anything.  Anything I
16  offer would be based on that.
17  Q.      Okay.  So you don't have any recollection,
18  from 1993 to 1997, of how Mr. Poulos was socially, and
19  you looked at a version of the Dial, I guess, to see if
20  you could refresh your recollection after this lawsuit
21  was underway and still have no recollection of how Mr.
22  Poulos was socially?
23  A.      When he left the school -- no.  To answer
24  your question.  When he left the school after his
25  fourth form year, was on his fifth form year, I would

Matthew Ralston
July 01, 2021                                      310 to 313

Page 310

1   have been part of conversations, not directly with him
2   as far as a conversation goes, but in his return.  So
3   all I know is I recall sending him a letter, which I
4   would outline what courses to take and encourage him to
5   reach out if he had any questions.  It would have been
6   before he arrived on campus.  No indications in any of
7   that process, that I remember, that there was social
8   issues.  As I remember his -- it was missing friends at
9   home.  Is -- is what I recall.
10  Q.       How about academically?  How was Poulos
11  academically?
12  A.       I don't recall, except what I read in my
13  academic comment, that I didn't see or -- if you want
14  to track those down.
15  Q.       I'm listening.
16  A.       Which is there.  So that's what I recall.
17  That is not all classes.  That is mine.  I don't recall
18  ever having a question of his ability.
19  Q.       Did you have any run-ins with Mr. Poulos?
20  Let me start again.  Were you on like a disciplinary
21  committee, or an honor committee or something, during
22  the time --
23  A.       I was --
24  Q.       -- when Mr. Poulos was at The Hill School?
25  A.       And there were -- there was only one at the

Page 311

1   time.  I was on the disciplinary committee.
2   Q.       Okay.  And did you have occasion to
3   discipline Mr. Poulos?
4   A.       Not that I recall through the discipline
5   committee.
6   Q.       How about not through the discipline
7   committee?
8   A.       Yes.
9   Q.       And what occasion did you have to discipline
10  Mr. Poulos outside of the discipline committee?
11  A.       His sixth form year, he had a car on campus.
12  And when students would leave campus in their car for a
13  weekend, the expectations, rules, were that they would
14  not return to campus.  They were not allowed to have
15  their cars what we call on campus.  Dormitories are
16  considered on campus.  And the confrontation, or
17  incident, would have been one where I was walking up to
18  the academic building on campus class where the -- if I
19  remember right, because I was going to photocopy
20  something.  I may have that wrong.  But his car was in
21  a loading dock by our dormitory, so I blocked it in.
22  Q.       So you have a specific recollection of this
23  sitting here today, or is this something that you
24  learned from reviewing testimony by Mr. Poulos?
25  A.       I have a recollection of it.  I have

Page 312

1   recollections of most of the encounters I have with
2   students.  Had with students as a teacher.  Because if
3   we go back to what I said I viewed teaching as, they
4   were the moments that, I believe -- I was not a teacher
5   who looked the other way.  I was a teacher who made
6   clear the lines are here and you can't violate those.
7   Cars on campus was a school rule, not a dorm rule or a
8   classroom rule.  And so they were very specific school
9   rules.
10  I -- I had no -- I never had a conversation
11  directly.  I may tell a kid they will hear from the
12  dean.  I may tell a kid to go to the dean's office and
13  I'd let the dean know they're coming.  In this case I
14  didn't want him to leave, and so I did block his car
15  in.  And I would have reported it to the dean.
16  Q.       And so blocking in Mr. Poulos's car, is that
17  the appropriate way to discipline him for returning to
18  campus when he shouldn't have?
19  A.       I decided it was at the time, because I
20  didn't want him to leave.
21  Q.       Why didn't you want him to leave?
22  A.       Because he had come back on campus when he
23  didn't have permission to.  Again, I -- my recollection
24  is that it was morning when I found it.  Early morning.
25  And -- which my interpretation was he came back late at

Page 313

1   night and stayed in the dormitory.
2   Q.       How did you know that Mr. Poulos didn't have
3   permission?
4   A.       Because we didn't give students permission to
5   have cars on campus.
6   Q.       So if Mr. Poulos said he had special
7   permission -- well, let me start again.  Was there like
8   some event or something at the school that weekend?
9   A.       I don't recall.
10  Q.       So if Mr. Poulos said that he received
11  permission, in connection with the parents weekend, or
12  family weekend, I forget what The Hill School refers to
13  it, to have his car there, does -- so he's making that
14  up?  The school never gave people permission?
15  A.       I don't know.  I don't think we gave
16  permission.  Cars were a -- a bit of a concern on
17  campus.  If it was parents weekend --
18  Q.       Is that what it's called, parents weekend?
19  A.       That's what -- yes.  If it was that, it would
20  have been easy to resolve that quickly.  And he could
21  have gone about his way.
22  Q.       So you didn't do anything to confirm whether
23  Mr. Poulos in fact had permission?  You just blocked
24  him in?
25  A.       I did.  And as -- like I said, I reported it

Page 314

1  to the dean.
2  Q.        When did you report it to the dean?
3  A.        It would have been then.  The dean at that
4  time was Chris Chirieleison.
5  Q.        Was this a weekend?
6  A.        I think so.
7  Q.        So the dean was available for you to report
8  to immediately on a weekend?
9  A.        On parents weekend everybody's available
10 immediately.  It's -- it is -- at the time it was one
11 of two -- sorry, three all hands on deck weekends.  If
12 you count opening and closing, five.  There was parents
13 weekend, where everyone was required to be there.  It
14 was the rivalry weekend in November.  And there was
15 reunion weekend, where, at that point, everybody was
16 required to be there.  Opening and closing of school
17 probably without saying.
18 Q.        Did the school have -- let me start again.
19 Was there some type of faculty handbook that described
20 the manner in which to discipline a student for car on
21 campus infraction?
22 A.        For faculty?  No, that would --
23 Q.        No, I'm trying to learn where you got the
24 idea that you should just block his car in.  And how
25 that -- and whether that's something that the school

Page 315

1  considered appropriate procedure.
2  A.        I have no reason to think it wasn't.  I don't
3  recall any conversation after the fact.  My -- my way
4  of responding was, again, I didn't want him to leave.
5  So I made it so he couldn't leave.  I knew -- if it was
6  parents weekend I knew that if he was supposed to
7  leave, that would be -- he'd be able to.
8  Q.        Why didn't you want him to leave?
9  A.        Because he was -- again, my interpretation,
10 and perception was that he'd come back at night and it
11 stayed in the dormitory.  And --
12 Q.        Why -- I don't understand.
13 A.        He wasn't allowed to do that.  Student leaves
14 off the campus, with their own car or not, they're not
15 allowed to come back to campus until they're checking
16 back in.  The boarding school, we keep track of every
17 student as best as we can for as often as we can.  And
18 so if a student checks out -- checks out to be off
19 campus and turns out they're not, then we don't know
20 where they are.  And it goes back to the we're in loco
21 parentis.
22 Q.        Okay.  So your issue was that Mr. Poulos,
23 like, checked back in and he wasn't allowed to check
24 back in?
25 A.        He did not check back in.  That's my point.

Page 316

1  Q.        But how do you know that, when you just saw
2  the car in the loading dock?  That's what I'm trying to
3  get my head around.
4  A.        But if he had checked back in he wouldn't
5  have been allowed to park there.  He would have been
6  expected to park where students park their car.
7  Q.        How did you know it was Mr. Poulos's car?
8  A.        I actually don't know that I can tell you I
9  knew that.  I don't recall that.  It was a student car.
10 I think I knew it was his.
11 Q.        You know that now, right?
12 A.        Yes.
13 Q.        So when did you learn it?
14 A.        Well, I would have, at the very latest,
15 learned it when I looked at his yearbook page.
16 Q.        Recently?
17 A.        After the letter arrived.  When I told you I
18 was trying to refamiliarize myself with interaction or
19 capacities which I would have known.
20 Q.        So there's a picture of Mr. Poulos's car in
21 the yearbook --
22 A.        There is.  Yeah.
23 Q.        -- that you looked at?  Okay.  When you
24 looked at the picture of Mr. Poulos's car in the
25 yearbook, you remembered, oh, it was that guy that I

Page 317

1  blocked in on parents weekend?
2  A.        No.  I didn't say that.  And I don't think I
3  even implied that.  I probably knew it was his car.
4  Q.        But at the time?
5  A.        At the time.
6  Q.        In 2000 -- oh, I'm sorry, 1997.
7  A.        Yeah.  See, we were --
8  Q.        But maybe not when you blocked it in?
9  A.        My guess is I did.  I don't recall saying,
10 oh, that's Kurtis's car.  But I would have -- I would
11 think I did.  Kids that had cars on campus were not
12 numerous.  Kids who lived in my dorm, I think there was
13 only one from Wisconsin.
14 Q.        Okay.  So the car had a Wisconsin plate, is
15 your recollection?
16 A.        Yes.
17 Q.        Okay.  So you were able to identify the car
18 as Mr. Poulos's because of the Wisconsin plate?
19 A.        At the very least, yes.
20 Q.        Was it a distinctive car?
21 A.        Camaro.  Distinctive to some, I guess.
22 Q.        Were there a lot of students with Camaros?
23 A.        I don't have any idea.
24 Q.        So did Mr. Poulos then -- let me start again.
25 So did you hear anything further from Mr. Poulos about

Matthew Ralston
July 01, 2021                                          318 to 321

Page 318

1   the car?
2   A.        I don't recall.  I don't think so.  But I
3   don't know.
4   Q.        So Mr. Poulos didn't go to your residence on
5   campus and interact with Mary Beth regarding the fact
6   that his car was blocked in?
7   A.        No.  And if he had gone to our apartment she
8   would not enter into a -- she'd tell a student that I
9   wasn't there, if I wasn't there.  She would get me if I
10  was there.  And she wouldn't ever enter into
11  disciplinary conversations with a student.
12  Q.        What did you do after you blocked the car in?
13  Did you go to your residence or did you go to something
14  else?
15  A.        I was on my way up to campus, so I would have
16  gone to do something else.  I can't tell you that I
17  went directly to the dean's office.  It makes sense
18  that I might've.  Again, it was -- if it was parents
19  weekend I would have.  If it wasn't, I probably would
20  have called as soon as I got to a phone.
21  Q.        So do the students that have cars on campus,
22  are they allowed to, like, keep their keys, or do they
23  have to check them out?
24  A.        They have to check them out.
25  Q.        Okay.  So how --

Page 319

1   A.        They have to check them in when they get
2   there.
3   Q.        Okay.  How would Mr. Poulos have his key if
4   he wasn't -- if he didn't have permission?
5   A.        The question isn't whether he had permission
6   to go off campus.  The question is whether he had
7   permission to come back on campus and keep his car and
8   keep his keys.  Cars were not parked at dormitories, or
9   on the internal part of campus.  They were parked at
10  the Center for the Arts parking lot, as to where it
11  was.
12  Q.        So when you blocked Mr. Poulos's car in, was
13  it your intent to prevent him from spending time with
14  his mother?
15  A.        No.  It was my intent to not allow him to
16  leave campus without permission.  Because he would not
17  have had permission to leave campus if he was back on
18  campus.  Because he didn't have permission to be there.
19  Q.        Did you know that that was the impact of you
20  blocking Mr. Poulos's car in?  That he was unable to
21  spend time with his mother on parents weekend?
22            MR. JUBB:  I'll object to the form.
23            THE WITNESS:  I don't know.  And --
24            well --
25  BY MS. DOUGHERTY:

Page 320

1   Q.        And just so I understand, you don't believe
2   that Mr. Poulos was abused at all when he was a student
3   at The Hill School?
4   A.        I think I answered that contrary to that,
5   when you asked.  You said did I ever wonder, and I said
6   yes.  I could never -- I don't believe anyone who says
7   they were abused should be ignored.  So I never said
8   that I don't think he was abused at The Hill School.
9   Or that he wasn't abused.  I said if he was abused by
10  someone, it wasn't me.  And I think you asked me
11  something about do you think it's possible that he was
12  abused at The Hill School and they've identified, or
13  he's identified the wrong person.  And I think my
14  response was something to the effect that, if he was,
15  then he does have the wrong person.
16  Q.        Okay.  So you believe that Mr. Poulos was
17  abused, just not by you?
18  A.        No.
19            MR. JUBB:  Objection to the form.
20  BY MS. DOUGHERTY:
21  Q.        How do you reconcile your statement that you
22  believe it's important for everyone who makes
23  allegations of abuse, or claims they're abused, to have
24  their allegations investigated, where you didn't do
25  that for Mr. Poulos?

Page 321

1            MR. JUBB:  I'll object to the form.
2            THE WITNESS:  May I answer?
3            MR. JUBB:  Go ahead.
4            THE WITNESS:  I reconcile it by the fact
5            that what I know is that there was no
6            cooporation from Mr. Poulos or Mr. Garabedian
7            for request to investigate the matter that
8            they had brought to the school's attention.
9   BY MS. DOUGHERTY:
10  Q.        Well, that's what Mr. Rees told you, right?
11            MR. JUBB:  I'll object to the form.
12            Finish your answer, please.
13            THE WITNESS:  Yes.
14  BY MS. DOUGHERTY:  I'm sorry.  I wasn't trying to -- I
15  thought you were done.
16  A.        That's how I reconcile it.  I assume that
17  people who make allegations are after the truth.  I
18  assume that people who are supporting those people want
19  the truth.  And the truth requires an investigation.
20  My understanding was there was no investigation, based
21  on any cooperation from Mr. Garabedian or Mr. Poulos.
22  And I don't know if the school did any without their
23  cooperation.
24  Q.        And your understanding about the lack of
25  corporation is based on what Mr. Rees told you, right?

Matthew Ralston
July 01, 2021                                      322 to 325

Page 322

1  There wasn't like anybody else communicating with you
2  about the status of the --
3  A.      No.
4  Q.      -- communications With Mr. Garabedian?
5  A.      No.  Because I checked in with Mr. Rees, as I
6  think I told you.
7  Q.      Right.  You didn't -- I'm just trying to rule
8  out like you didn't also check in with Mr. Lehman or
9  somebody else?
10 A.      No.  The only time I would have checked in
11 with Mr. Lehman regarding this is when I asked if I
12 could still be on campus.
13 Q.      Were you willing to cooperate in an
14 investigation of Mr. Poulos's allegations?
15 A.      Absolutely.
16 Q.      What did you do to cooperate with an
17 investigation into Mr. Poulos's allegations?
18 A.      Well, I certainly made myself available.  Mr.
19 Rees told me that I could likely get a phone call from
20 one of the women from Cozen O'Connor.  I would have
21 done that gladly.  Not happily, but gladly.  And beyond
22 that, I think that's as far as it ever went.  So that's
23 the extent of my cooperation.  But that was all that
24 was ever asked of me.
25 Q.      So you were able to cooperate so you could

Page 323

1  clear your name, is that right?
2  A.      Absolutely.
3  Q.      Were you willing to cooperate so you could
4  learn whether Mr. Poulos was abused by someone other
5  than you?
6  A.      I don't know, because that wasn't ever posed
7  to me.  I don't know -- if -- if someone asked me to
8  speak with them about a student making allegations, I
9  can tell you my answer would be yes.
10 Q.      Mr. Poulos has one hundred percent unshakenly
11 contended that you are the abuser.  So I'm not
12 suggesting that there is evidence that someone has said
13 otherwise.  I'm just asking you, because you denied it,
14 and express it is important for all people making
15 accusations of sexual abuse to have it investigated,
16 whether you would be willing to cooperate in order to
17 make sure that Mr. Poulos's accusations were
18 investigated and that the truth was revealed.  And, you
19 know, a responsible teacher, you claim is someone not
20 you, is punished?
21         MR. JUBB:  Objection to the form.
22 You've mischaracterized literally everything in there.
23 I don't even know how you can formulate a question like
24 that.
25         THE WITNESS:  May I answer?

Page 324

1         MR. JUBB:  If you can possibly answer
2  it, go for it.
3         THE WITNESS:  I think I've already
4  answered that.  That I would be happy -- I
5  was -- I would gladly have cooperated with
6  Cozen O'Connor if they would have called me
7  and asked me to come to Town to be part of an
8  investigation.
9  BY MS. DOUGHERTY:
10 Q.      Both to clear your name and to get justice
11 for Mr. Poulos?
12         MR. JUBB:  Objection to the form.  He's
13 never said that he believed that Mr. Poulos
14 was in any way sexually abused.
15 BY MS. DOUGHERTY:
16 Q.      I think he's corrected me on that.
17         MR. JUBB:  No.  He's --
18         THE WITNESS:  I have not.  I did not.
19 BY MS. DOUGHERTY:
20 Q.      I just -- I'm not -- I'm asking you whether
21 you'd be willing -- whether you were willing to
22 participate in the -- I'm sorry.  Whether you were
23 willing to cooperate with the investigation, both to
24 clear your name and to pursue justice for Mr. Poulos,
25 to the extent he was sexually abused.

Page 325

1         MR. JUBB:  That's a different question.
2         THE WITNESS:  Yes.
3         MS. DOUGHERTY:  You know, just so you
4  realize, which I know you do, because you
5  don't have to make snide comments, that when
6  somebody makes a proper form objection, it
7  should be the lawyer to decide whether they
8  want to reask the question.  So you don't
9  need to congratulate me because I decided to
10 reformulate a question because you assert an
11 objection, even if it was a form objection.
12 BY MS. DOUGHERTY:
13 Q.      Do you have any recollection about the
14 classroom in which you taught geometry to Mr. Poulos?
15 A.      Yes.  I have a recollection of all of them.
16 Q.      Can you describe the geometry classroom in
17 which you taught -- let me start again.  Can you
18 describe the classroom in which you taught geometry to
19 Mr. Poulos?
20 A.      Yes.  It was -- it was at the end of a hall.
21 As you walk down the hall, it was on the left-hand
22 side.  It was the end room on the hall.  It was
23 rectangular.  When you walk into the classroom,
24 teacher's desk would have been to the left.  And
25 walking in the door, if I call that the width, the room

Page 326

1   was longer.  So teacher's desk would have been at
2   a -- one of the long ends of the classroom.  And the
3   students sat opposite to the back wall.
4           There was a window opposite the teacher's
5   desk that opened on to a stairwell, that was used for
6   ascending or descending from what the school calls the
7   Quad.  And there were two windows at the back of the
8   room where back -- back wall where the students sat
9   that opened on -- that were windows to the Quad.  And
10  there was a window in the door.  And without measuring,
11  I would say the distance from -- the door set far
12  closer to the wall that would have been behind the
13  teacher than it would have been to the wall that opened
14  onto the Quad.
15  Q.      The door to the classroom, did it open in or
16  out?
17  A.      I'm guessing it opened out.
18  Q.      When you say guessing, do you remember?
19  Or --
20  A.      I don't.  At least not right now.
21  Q.      Was there a portion of the room where -- let
22  me start again.  Was there a portion of the room that
23  was not visible through the window and the door?
24  A.      Probably.  The front left corner on the door
25  on the same wall the door was in.

Page 327

1   Q.      You never spent time in that corner with Mr.
2   Poulos, is that right?
3   A.      Correct.
4   Q.      Are there any other details about the
5   geometry classroom that you taught -- I'm sorry.  Are
6   there any other details about the classroom in which
7   you taught geometry to Mr. Poulos that you recall and
8   can describe for me?
9   A.      I can tell you that that corner that would
10  have been invisible from the door was directly opposite
11  the window that opened to the stairwell.  The outside
12  stairwell.  And the periods throughout the day that
13  that stairwell would have been most heavily used would
14  have been between classes.  Right after classes and
15  before and after dinner.
16  Q.      So your belief is if there was inappropriate
17  contact going on in the corner after class, if geometry
18  was the last day of class, that someone on the stairs
19  would have seen it?  Is that why you're making that
20  point?
21  A.      I know there wasn't inappropriate content.
22  I'm suggesting that nobody can be invisibly alone with
23  a student in that room.  Or in any of the rooms.
24  Q.      For none of the time?
25          MR. JUBB:  Objection to the form.

Page 328

1           THE WITNESS:  They would not be
2           invisible.  I don't know --
3   BY MS. DOUGHERTY:
4   Q.      Any other details of the classroom in which
5   you taught geometry to Mr. Poulos that you can describe
6   to me?
7   A.      No.  I know where the chalkboard was, but
8   otherwise, no.
9   Q.      Did you make Mr. Poulos take exams at the
10  blackboard?
11  A.      No.
12  Q.      Did you make Mr. Poulos perform any work at
13  the blackboard?
14  A.      Only if there were other students working
15  problems at the board.  So I can't say he didn't work a
16  problem at the board.  I've never had a student take a
17  test or a quiz at a chalkboard.  And rarely -- and I
18  never would put -- have I ever put a student at a board
19  alone, unless they volunteered to.  So it's geometry
20  class, proofs are typically difficult.  If there's a
21  proof that somebody asked how to do it, I very well
22  could have asked does anyone want to put it on the
23  board.  I would never make anybody put it on the board.
24  Q.      Were you the -- a table master for Mr.
25  Poulos's table in the dining room?  Table head?

Page 329

1   A.      I don't remember.
2   Q.      What's the proper terminology of the --
3   A.      Table master at the time.  But probably head
4   of table today.  Master is kind of washed out.
5   Q.      Right.  Okay.  So you just don't remember one
6   way or the other?
7   A.      I don't.
8           MS. DOUGHERTY:  We're up to 17.
9                   *   *   *
10          (Whereupon, documents were marked for
11          identification as Exhibit-17 through 18.)
12                  *   *   *
13  BY MS. DOUGHERTY:
14  Q.      I'm showing you -- let's start with D-17.
15          MR. DOUGHERTY:  Which is, for the people
16          watching on Zoom, my number 11.
17  BY MS. DOUGHERTY:
18  Q.      So I'm showing you a document that I've
19  marked D-17.  It says Hill 0104 on the bottom right.
20  At the top it says Academic Report.  And on the top
21  left it says Student: Poulos, Kurtis.  Do you recognize
22  the academic report that I've marked as D-17?
23  A.      Yes.
24  Q.      How do you recognize the academic report that
25  I've marked as D-17?

Page 330

1    A.        How do I?
2    Q.        Yes.
3    A.        I recognize it as, one, the format.  Two, the
4    information at the top.  All is reasonable, as in, I
5    was a teacher.  Mr. Kreiger was certainly employed
6    there at the time, and may have been the advisor.  The
7    class and then the date fits, because it would have
8    been the end of the fall term, which is one of the
9    times we did it.  When I read the comment, it certainly
10   -- it's me.
11   Q.        Is that your signature above instructor?
12   A.        It is.
13   Q.        Okay.  And so you graded Mr. Poulos a B plus
14   for geometry for the first --
15   A.        Yes.  The fall term.
16   Q.        For the fall term.  Okay.  So there's three
17   terms, right?
18   A.        Yes.
19   Q.        In geometry.  So the first term Mr. Poulos
20   got a B plus, is that right?
21   A.        Yes.
22   Q.        And you wrote -- these are your -- did you
23   type the comments in?  Or did somebody else do it?
24   A.        No, I had to do it.
25   Q.        Okay.  So you had like a thing you had to put

Page 331

1    it in a typewriter and type on?
2    A.        You know, I don't know if we did at this
3    point.  It could have been -- probably NCR paper and a
4    typewriter at that point.
5    Q.        Yeah, it's 1994, right?  I'm having
6    flashbacks of when I was in high school.  You wrote,
7    Kurt is doing a great job in geometry.  He works hard.
8    Contributing in class and seeking extra help when he
9    needs it.  Kurt's work is always complete and
10   demonstrates a thoughtful understanding of all
11   material.  He should be encouraged to keep up the good
12   work.
13             "I enjoy having Kurt in class.  His desire to
14   learn and do well are exemplary qualities.  Kurt is an
15   integral member of his class and can be depended on to
16   start discussions even on a slow day.  Have a joyful
17   holiday season."  Those are comments that you wrote
18   about Mr. Poulos?
19   A.        Yes.
20   Q.        Is this -- do these -- where do these
21   academic reports go?
22   A.        They go to -- we turn them into what we call
23   the academic office.  A copy will then -- an NCR paper
24   copy will go into a student's file, a copy would be
25   sent to parents, and a copy would be sent to the

Page 332

1    advisor.
2    Q.        So that's why you say have a joyful holiday
3    season, because you were going to be sending the note
4    to other people?
5    A.        The comments are written to a parent.
6    Q.        Okay.
7    A.        And so I would have been wishing the family
8    there.  Students left -- it was before Thanksgiving,
9    and came back for two weeks sometime in December.  So
10   it would have been -- Thanksgiving would have been the
11   holiday to which I was referring.  And probably because
12   the next set of comments didn't go out until later in
13   the year, after Christmas or Hanukkah and New Year's, I
14   would have been referring to that as well.
15   Q.        And the comments that you wrote down there in
16   D-17, academic report for the first term of geometry,
17   they were true and accurate at the time you wrote them
18   and applied your signature, correct?
19   A.        They would have been or I wouldn't have
20   written them, yes.  And these accompanied grades.  So
21   the term grade was a weighted average.  Yeah, that was
22   a weighted average at that point of the -- they were
23   list periods, or marking periods.  So it would have
24   been the average of those two, plus the fall term exam.
25   Q.        Sound like Mr. Poulos was a pretty good

Page 333

1    geometry student?
2    A.        It does.
3    Q.        So now can you take a look at D-18?
4              MS. DOUGHERTY:  Which for people
5              watching on Zoom is my number 12.
6    BY MS. DOUGHERTY:
7    Q.        D-18 is a document that says Hill 0089 on the
8    bottom right.  It says Academic Report on the top in
9    the middle.  And the right, Student: Poulos, Kurt.  Do
10   you recognize the academic report that I've marked as
11   D-18?
12   A.        Um-hum.
13   Q.        Is this the academic report that you prepared
14   regarding Mr. Poulos for the second term, or the winter
15   term, of the geometry course that you taught to Mr.
16   Poulos?
17   A.        It would be.
18   Q.        Is that your signature there above
19   instructor?
20   A.        It is.
21   Q.        Mr. Poulos got an A?
22   A.        Yep.  Difference in the winter term is we
23   didn't have -- I don't know what grades he received
24   during marking periods and such.  Winter term is simply
25   the average between the two marking periods.  There is

Page 334

1  no exam.  I can't answer why.  It's the way it was.  So
2  my guess would be exams were typically harder for kids
3  than day-to-day work.  Because they were cumulative.
4  And they were also created departmentally.  I would not
5  have been the course head, so an exam would have been
6  problems created by the -- whoever was the head of the
7  course.
8  Q.       So you wrote, "Kurt had a strong performance
9  in geometry during the winter term.  The quality of his
10  work improved markedly over the fall.  Kurt is an
11  integral part of a dynamic class.  He is always
12  involved in class discussion and is not content with
13  answers which he finds insufficient.  Kurt seems to
14  expect everyone in the class to work hard.
15           "I really enjoyed having Kurt in class and
16  getting to know him.  He is a sharp, witty young man
17  knows when to use his wit and when to be serious.  I
18  look forward to working with Kurt during the next two
19  years."
20  A.       Okay.
21  Q.       Those are your comments regarding Kurt's
22  performance during the winter term of the geometry
23  course which you taught to Mr. Poulos?
24  A.       Certainly reads like they're mine, yes.  And
25  that is my signature.  So, yes.

Page 335

1  Q.       And those comments were true at the time when
2  you wrote them and applied your signature, is that
3  right?
4  A.       Yes.
5  Q.       You can take a look at D-19.
6           MS. DOUGHERTY:  Which is a document
7           which is number 13, for those watching on
8           Zoom.
9  BY MS. DOUGHERTY:
10  Q.       D-19 has Hill 0078 on the bottom right.
11  Academic Report on the top center.  On the left top,
12  Student: Poulos, Kurt.  Do you recognize the document
13  that I've marked as D-19?
14  A.       Yes.
15  Q.       How do you recognize the document that I've
16  marked as D-19?
17  A.       My signature.  Again, same class.  Same
18  academic year.  Same advisor.  Same student.  May I
19  read it?
20  Q.       Sure.
21  A.       If you want more.  Okay.  Very much sounds
22  like me.
23  Q.       Okay.  So Mr. Poulos got a B plus for the
24  spring term, right?
25  A.       I don't -- what I don't remember is if that's

Page 336

1  the final year inquiry, or if that's a term grade.
2  Q.       Okay.
3  A.       My -- I'm sure it's probably a final year end
4  grade.  But I don't know that.
5  Q.       You said, "Having Kurt in class this year was
6  one of the truly bright spots in a good year.  Kurt's
7  genuine concern for others, combined with his
8  tremendous sense of humor, make him a joy to work with
9  and an asset to his class and the school.  Kurt works
10  hard in class and expects everyone else to as well.
11  His work is thorough and complete, demonstrated a solid
12  understanding.  Kurt should be commended for his
13  efforts.  Kurt brings a lot to the school and I'm glad
14  that he is here.  Have a great summer."  Those are your
15  comments about Mr. Kurt -- or Mr. Poulos's
16  performance --
17  A.       Yes.
18  Q.       -- in the geometry class during the spring
19  term?  And they were true --
20  A.       Yes.
21  Q.       -- at the time when you made them and applied
22  your signature?
23  A.       Yes.  And that would have been a year end
24  comment, as well as just the term.  Although -- yes.
25           MS. DOUGHERTY:  20, right?

Page 337

1           *  *  *
2           (Whereupon, the above-mentioned document
3           was marked for identification as D-20.)
4           *  *  *
5  BY MS. DOUGHERTY:
6  Q.       I'm showing you a compilation of documents --
7  a compilation of yearbook pages which your lawyer
8  produced on your behalf.  P.6.1 through P6.29.  And
9  I've marked it as D-20.
10           MS. DOUGHERTY:  For the people watching
11           on Zoom, it's my document number 36.
12  BY MS. DOUGHERTY:
13  Q.       I just want you to go through the third page
14  in D-36.  Just to make sure.
15  A.       Okay.
16  Q.       Is that you on the top left?
17  A.       It is.
18  Q.       In 1992, right?
19  A.       Yes.
20  Q.       So in 19 -- between 1992 and 1997 can you be
21  described as tall, skinny, gangly, buzzed hair?
22  A.       Yes, I guess.
23  Q.       Did you wear glasses?
24  A.       I had glasses.  Distance was better at that
25  time.  I can't tell you if I wore them very often or

Matthew Ralston
July 01, 2021

338 to 341

Page 338

1  not.
2  Q.      Were you a clean living guy?  A runner?
3  A.      Yes.
4  Q.      And did you think that students liked you and
5  that you were perceived to be a good teacher?
6  A.      Yes.
7  Q.      Are you six feet tall?
8  A.      Not quite.
9  Q.      Not quite?  But close to it?
10  A.      Yeah.
11  Q.      Did you ever have an interaction with Mr.
12  Poulos in a study cubicle?  Or a study room?  Let me
13  start again.  Was there a study room at The Hill School
14  when -- during the period of time when Mr. Poulos was a
15  student from 1993 and 1997?
16  A.      Study room?
17  Q.      Yeah.  Something where there were cubicles
18  where people went to study?
19  A.      Yeah.  They would have been similar to --
20  Q.      In the basement.
21  A.      -- stacks in a library.  So, yes.
22  Q.      Was that in the basement?
23  A.      There probably were some there.  I didn't
24  spend much time in the basement or the library.  So I
25  don't -- I can't say for certain, but quite possibly.

Page 339

1  Q.      Did you ever go to the basement and have an
2  interaction with Mr. Poulos?
3  A.      Well, I certainly wouldn't have during the
4  day.  No.  No.  There is no time I would have.
5  Q.      I'm not -- did you ever have -- did you talk
6  to Mr. Poulos in a study room that had cubicles?  I'm
7  not suggesting any inappropriate touching.
8  A.      I have no recollection of such a thing.
9  Q.      Okay.  So you don't have any recollection of
10  an interaction with Mr. Poulos, not involving any
11  touching, in a room that had cubicles and was used to
12  provide students to study?
13  A.      No.
14  Q.      Did you ever go to Mr. Poulos's dorm room?
15  A.      I don't think so.  No recollection whatsoever
16  of doing that.
17  Q.      Did you ever invite Mr. Poulos to your
18  residence area?
19  A.      I gave extra help to all my students.  At
20  that point in our residence.  During study hall, which
21  was after dinner until, I'm going to guess 9:00
22  o'clock.  So that was generally an open invitation.  If
23  I was available.  And so quite -- I mean, I don't know
24  that I ever said Kurtis, can you come to the -- come to
25  our place after dinner.  But he certainly would have

Page 340

1  known he could come knock on the door during study
2  hall.
3  Q.      Okay.  So Mr. Poulos was invited to your
4  residence if he needed extra help, is that correct?
5          MR. JUBB:  I'll object to the form.
6          THE WITNESS:  All students were.
7  BY MS. DOUGHERTY:
8  Q.      Okay.  So it was an open invitation for any
9  student to come to your residence if they needed help
10  with class?
11  A.      Yes.
12  Q.      Okay.  And so Mr. Poulos would have known he
13  could have taken advantage of that, is that right?
14  A.      Yes.
15  Q.      Do you have a specific recollection of Mr.
16  Poulos ever taking advantage of your open offer?
17  A.      I don't.
18  Q.      You told me earlier that you did some
19  research regarding Mr. Garabedian.  Google and looked
20  on his web site.  Did you learn any information about
21  Mr. Garabedian's representation, other than what you've
22  already told me?
23  A.      No.  Most of that would have come from the
24  movie.  And then when I had seen his name since in, you
25  know, another episode with Catholic church.

Page 341

1  Q.      I'm bringing your attention back to D-16, if
2  we could.  Just on the first page.  The response to the
3  first question starts, I guess after the objection, "It
4  is without waiver, every student, colleague, parent and
5  school relationship that plaintiff has encountered."
6  Throughout your answers you reference school
7  relationships.  I just want to know if you can, like,
8  expand on what you mean by school relationships.  Did
9  you socialize with students?  Did you go to parties?
10  A.      Certainly no parties.  No -- no socializing
11  beyond supervising dances or -- certainly wasn't
12  socializing as a faculty member.  Or having what we
13  call dorm feeds.
14  Q.      A what?
15  A.      Dorm feed.  Remember, these are kids away
16  from home and each dorm would have a budget for pizza
17  or ice cream or something.  Those were generally run by
18  the faculty member.  And as close to social to get as a
19  student was enrolled.  We had, at that time, a three on
20  three basketball league.  I played in that for a number
21  of years.  Generally would have sixth formers.  Excuse
22  me, seniors, who would know me and ask me to play with
23  them on their three on three.
24  Q.      So when you say at the time, you're talking
25  about like 1993 to 1997?  Or a different time?

Matthew Ralston
July 01, 2021                                              342 to 345

Page 342

1  A.        I can't tell you when it ended.  I can tell
2  you 1990 --
3  Q.        When Mr. Poulos was there, is all I'm trying
4  to get at.
5  A.        Oh.  Yes.
6  Q.        Okay.  So everything you're describing now
7  would be the school relationships that Mr. Poulos could
8  have --
9  A.        Yes, ma'am.
10  Q.        -- experienced, is that right?
11  A.        Yes.
12  Q.        Thank you.  I didn't mean to cut you off.  I
13  just wanted to make sure that I was --
14             MR. JUBB:  I'll object to the form.
15  BY MS. DOUGHERTY:
16  Q.        So three on three basketball league with some
17  sixth formers.
18  A.        Yeah.  There was kind of a formalized created
19  social time with sixth formers after dinner, which was
20  called sixth form coffee.  In which there was coffee
21  available for stud -- sixth form students and faculty
22  members.  That would be the extent of what I would
23  consider social.  There is a -- every relationship in
24  teaching 1980 has been damaged.  Is that -- are you
25  asking what those -- am I on the right one?

Page 343

1  Q.        Yeah.  I was just -- you referenced school
2  relationships throughout.  I was just using one as an
3  example.  So -- because I wasn't sure how to direct you
4  to it.
5  A.        School relationships with faculty members.
6  Q.        Un-hum.
7  A.        Both collegial.  And pretty much because of
8  the nature of our work, most of the social life of most
9  faculty members is pretty much contained on campus.  In
10  other words, Christmas parties, most faculty -- opening
11  faculty parties.  Things like that.  Since most faculty
12  will leave campus for the breaks which are longer, to
13  go visit family and many have homes off campus they
14  would go to, because those were the opportunities they
15  have to do.
16             If you lived in a dorm in those years, you
17  were on duty always.  If I needed to be off dorm during
18  those years, it was a matter I had to walk upstairs and
19  check with another, what we called dorm masters at the
20  time, now they're called house parents, and see if he
21  could check in on my hall.  Relationships with alumni
22  over time will change in nature where they will become
23  more social.
24             Staff are there every day, so it's hard not
25  to get to know the people, to some extent, that work in

Page 344

1  the dining hall that serve the food every day, or
2  people that take care of the grounds.  All of those are
3  what I mean when I talk about every relationship.  Or
4  the school relationships.
5  Q.        Can you flip to the second page of D-16?
6  A.        Same document?
7  Q.        Yeah.  It's just next page.
8  A.        Yep.
9  Q.        And just sort of towards the bottom there's
10  the rest of a lengthy paragraph.  And then there's a
11  paragraph that says, "The way in which Mary Ellen
12  Poulos described plaintiff in her communication with
13  Zach Lehman is but one example that is named in these
14  relationships are jeopardized and ruined by such false
15  accusations."  Did you participate in preparing that --
16  that portion of the Answer to Interrogatory number one?
17  A.        I would have.
18  Q.        So who -- who's Mary Ellen Poulos?
19  A.        It's Mr. Poulos's mother.
20  Q.        And so you've seen communications by. Mrs.
21  Poulos to Mr. Lehman that cast you in a bad light?
22  A.        I believe I have seen -- yes, I have.  To
23  answer, yes.
24  Q.        And were those -- the writings that are being
25  referred to here, Mary Ellen Poulos described you,

Page 345

1  right, the plaintiff, in communications to Mr. Lehman,
2  was Mr. Garabedian part of those communications?
3  A.        With Mr. Lehman?
4  Q.        Yeah.  You say the way in which Mary Ellen
5  described plaintiff in her communications with Mr.
6  Lehman.  Was Mr. Garabedian involved in Ms. Poulos's
7  communications with Mr. Lehman?
8  A.        Not from my perspective.  I don't know.
9  Q.        Do you have any reason to believe that Mrs.
10  Poulos was communicating with Mr. Lehman because of
11  anything to do with Mr. Garabedian?
12  A.        No.
13  Q.        If you could go to the next page.  The
14  response to number two on the very bottom of page
15  three.  It says, "Additionally, Garabedian's statements
16  to Mary Ellen Poulos republishing false and defamatory
17  accusations are also at issue."  What communications
18  are you referring to Mr. Garabedian to Ms. Poulos?
19  A.        I don't recall, I was reading that.  I don't
20  recall statements by him to her.
21  Q.        So the issue -- the -- the writings that you
22  take issue with by -- let me start again.  The
23  statements by Mr. Garabedian that you contend are
24  defamatory are the -- are the two letters, right?  The
25  April 11th, 2018 letter, which was marked as D-15, and

Matthew Ralston
July 01, 2021                                    346 to 349

Page 346

1  the December 26th, 2018 letter, which was marked as
2  D-4.  I have my copies, or we can pull yours out, is
3  that right?
4  A.        Ask again.
5  Q.        Sure.  The statements that you -- let me
6  start again.  The statements by Mr. Garabedian that you
7  contend are defamatory are the two letters, right?
8  The April 11th, 2018 letter, that's been marked D-15,
9  and the December 26th, 2018 letter, which has been
10 marked D-4, is that right?
11 A.        Yes.
12 Q.        Are there other statements by Mr. Garabedian
13 that form the basis for your claim that are defamatory,
14 other than these two letters?
15 A.        I don't recall, but I don't think -- I don't
16 think I've seen any communications from him.  And
17 certainly not before this.  This is after we filed.
18 This is a Complaint, right?
19 Q.        Those are your responses to our discovery.
20 A.        Answers to Interrogatories.  Okay.
21 Q.        Um-hum.  So, you're right, it is after the
22 action.
23 A.        I don't believe.  I don't recall if I did.
24 Q.        I think we -- we were on the fourth page.
25 Let's go to the fifth page.

Page 347

1  A.        What's the number at the bottom of the page?
2  Q.        Five.
3  A.        Okay.  All right.
4  Q.        So it's the response to number 6.  In the
5  second paragraph where it's bolded, it says, "Plaintiff
6  was responsible for alumni in the Midwest.  And
7  defendant is step grandchild of a prominent Midwest
8  family and the cousin of another alumnus.  Did you
9  participate in writing that portion of the response to
10 number 6?
11 A.        Yes.
12 Q.        What prominent Midwest family are you
13 referring to?
14 A.        Proxmire.  William Proxmire was an alumnus of
15 the school.  My understanding of the relationship was
16 that, or is that Mr. Poulos is a step grandchild to Mr.
17 Proxmire.  I know Jason Zerner.
18 Q.        That's the cousin you were talking about
19 earlier?
20 A.        That's the cousin.  Um-hum.  While he doesn't
21 live in Wisconsin any longer, that's where he grew up.
22 Q.        If you can go to page 6, which is the next
23 page.  It's still part of the same answer, the same
24 question.  It's a lengthy one.  First full paragraph.
25 It's -- you know, the first one is partial, so it's the

Page 348

1  first full paragraph.  It starts, "The independent
2  school community."  What I would like to direct your
3  attention to is the last sentence.  It says, "Now
4  plaintiff cannot be the mentor, advisor, friend or
5  colleague that so many knew him to be, because of the
6  fallout from defense false and defamatory statements."
7  So did you participate in writing that portion of the
8  response to Interrogatory number 6?
9  A.        I would have, yes.
10 Q.        So why can you not be a mentor, advisor,
11 friend or colleague to so many that knew you?
12 A.        Well, I can't -- I can't represent myself as
13 a member of the school.  Or school community.  I cannot
14 attend school sponsored events.  So the only people who
15 may -- how do I say it, that I can do that with, are
16 those who -- with whom I had developed more of a
17 friendship relationship and still have my contact
18 information.  So I am no longer able to do that.  And
19 then --
20 Q.        Because you don't work at The Hill School
21 anymore and you're precluded from --
22 A.        Because I was terminated from The Hill
23 School.
24 Q.        And because of the other restrictions that
25 The Hill School placed on your ability to hold yourself

Page 349

1  out as affiliated with The Hill School, is that right?
2  A.        Yes.  I cannot respond to those phone calls
3  out of the blue in a way, except where somebody calls
4  -- has access to my contact information, which I can't
5  share.  Until they reach me.
6           MS. DOUGHERTY:  Can I have number 27?
7           MR. JUBB:  Is this the last document for
8  the day?
9           MS. DOUGHERTY:  It can be.
10          MR. JUBB:  Well, it's 6:35.  We started
11 at 10:00.
12          MS. DOUGHERTY:  Will Mr. Ralston agree
13 to return on another day?
14          MR. JUBB:  If you can tell me how much
15 longer you think we're going to be.  Because
16 we've already gone over seven hours.
17          THE VIDEOGRAPHER:  It will be eight.
18          MR. JUBB:  Eight.
19          MS. DOUGHERTY:  I think we can probably
20 narrow some down significantly with a couple
21 stipulations.  So if we could do that, then I
22 would -- I have like his -- some of his
23 history -- his employment history to go
24 through, which it's a little lengthy, because
25 there's a lot of them.  And so -- I'm getting

Matthew Ralston
July 01, 2021                                    350 to 352

Page 350

1    to the bottom of my notes.  But I have
2    probably like another three or four hours.
3         But I think we can probably stipulate
4    some of it out, because a lot of it's
5    questions about your exhibits, which I
6    would be happy to share with you.  Like, I
7    want to just rule out that people that
8    provided cards like did know about the
9    accusations.
10        MR. JUBB:  That's what I suggest.  I
11   think we should end and we should try and
12   synthesize this so we don't have to impede on
13   more time than reasonably necessary.  But
14   also providing you with a fair opportunity to
15   fully examine everything.  So I think that
16   might be the best thing to do.
17        MS. DOUGHERTY:  And if you have those
18   couple letters that you have, that might
19   also --
20        MR. JUBB:  I do have them.  They're part
21   of P-24, so.
22        MS. DOUGHERTY:  Do you know what Bates
23   number they are?
24        MR. JUBB:  Yeah.
25        MS. DOUGHERTY:  Anyway, we can go off

Page 351

1    the video, right?  Because we're going on to
2    -- he's going to agree to come back, right?
3         MR. JUBB:  I will agree to -- he will
4    reappear for the deposition so long as we can
5    sort out a couple of these issues and narrow
6    it down.
7         MS. DOUGHERTY:  Yes.
8         THE VIDEOGRAPHER:  Going off record,
9    6:37.
10        THE COURT REPORTER:  Counsel, please
11   indicate if you will be ordering the
12   transcript.
13        MS. DOUGHERTY:  Yes, please.
14        MR. JUBB:  Yes, please.
15             *   *   *
16        (Witness adjourned.)
17             *   *   *
18        (Whereupon, the videotape deposition was
19   adjourned at 6:37 p.m.)
20
21
22
23
24
25

Page 352

1              C E R T I F I C A T I O N
2
3         I, Lisa M. Cooper, a Court Reporter and
4    Notary Public, do hereby certify the foregoing to
5    be a true and accurate transcript of my original
6    stenographic notes taken at the time and place
7    hereinbefore set forth.
8         Witness my hand and official seal this
9    12th day of July A.D. 2021.
10
11
12
13
14
15                    _____
                      Lisa M. Cooper
16                    Court Reporter and Notary Public
17
18
19
20        (The foregoing certification of this
21   transcript does not apply to any reproduction of
22   the same by any names, unless under the direct
23   control and/or supervision of the certifying
24   reporter.)
25

Summary Judgment Appendix
Exhibit "B"

# Matthew B. Ralston

5823 Parkbridge Lane, Dublin, OH 43016
Phone: 610.805.6529   E-Mail: mattr557@gmail.com

**Experience**

1992–2009; 2016-2019      The Hill School   Pottstown, PA
**Capital Giving Officer**
2016-2019
Met with alumni to increase engagement and solicit support for the School.
**Dean of Faculty**
2006-2009
- Responsibilities included faculty hiring, retention, and overall evaluation.
- Worked with Assistant Headmasters of Academics and Student Life to oversee daily operation of the school.
- Planning and running faculty meetings.
- Responsibility for faculty committee assignments, work load, and duty assignments.

**Mathematics Department**                      1992-2009
- Department Chair (2001-2004).
- Courses taught include Algebra 1 through the Calculus.

**Academic Dean**                               1995-2001
- Member of two-year trustee/faculty strategic planning team resulting in introduction of coeducation.
- Member of faculty/trustee Campus Master Plan committee.  Planned campus improvements and construction with campus planners and architects.
- Chaired faculty planning committee for  50,000 sq. ft. academic center.
- Point person between school, students and parents for all academic concerns.

**Other Hill Experience**
- Head Boys' Cross Country coach (1999-2002), Head Winter Track coach (1994-1998), Junior Varsity Lacrosse coach (1999-2008).
- Adviser to the Sixth Form (senior class) (1994-95), (2002-2009).
- Head of Sixth Form dormitory(1996-2000), Head of Third/Fourth Form dorm cluster (2004-2007).
- Winner of Dorm Parenting Prize (awarded  at Commencement 2003).



EXHIBIT
D 31
9|20|21  7C

PENGAD 800-631-6989

**P7.1**
0090a

- Chair of Faculty Work Load Task Force (Dec. 2003 – Sept. 2005).
- Dorm parent for 14 years (boys' and girls' dorms and 9th – 12th grade dorms).
- Director of Financial Aid (1994-1995) Evaluated financial aid applications and recommended aid packages to the Financial Aid Committee.  Allocated and tracked distribution of $1 million in aid.

2009-2016             The Leelanau School          Glen Arbor, MI
**President and Headmaster**
- Responsible for all facets of School operations.
- Guided the School through financial stabilization including: loan forbearance, refinancing debt, fundraising ($3.1MM), budget reductions, and admissions practices.
- Led School through debt reduction of 54%, from $3.5MM to $1.6MM and sustainable annual budget reductions of 19%.
- Reallocated funds, with donor support, which were raised to build a new dormitory to complete entire campus renovations including all buildings and campus infrastructure (water and sewage).
- Instituted admission policy, practice, and staffing changes  resulting in annual student retention increase from 75+% to 90+%.
- Created a greater presence in the local community and region including sponsorship in Traverse City Film Festival, Chamber of Commerce memberships in Traverse City, Leelanau County and Glen Arbor.  We also established long term agreements with Glen Arbor Twp (public use tennis courts on campus) and Leelanau County (recycling center).
- Board of Directors, Association of Independent Michigan Schools.

**Related Experience**
**ISACS Leadership Academy with Kellogg Center for**
**Nonprofit Management**                                              2015
**NAIS Fellowship for Aspiring Heads**          2006 – 2007
Project Title: "Faculty Development Groups."
**North Carolina State University**                    1990-1992
Coordinator, Academic Support Program for Student Athletes.

**The Andrews School, Willoughby, OH**              1987-1990
Full-time teacher of mathematics for grades nine through twelve, and coach.
**National Council on Compensation Insurance**      1986-1987
Actuarial Technician.

**Lakewood Local Schools, Hebron, OH**          1981-1983
Full-time high school mathematics teacher.

**The Gow School, South Wales, NY**          1980-1981
Full-time boarding school teacher of science, dorm parent, and coach.

**Education**

1980   The Ohio State University, Columbus, OH

- Master of Arts in Mathematics.
  Graduate Teaching Assistant, Department of Mathematics.

1980   The Ohio State University, Columbus, OH

- Bachelor of Science in Education.
- Varsity Lacrosse, Dedicated Senior Award, 1980.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                        - - -

 4   JOHN DOE,                       :

          Plaintiff,                 :

 5            -vs.-                   :

     MITCHELL GARABEDIAN, ESQ.,      :

 6   LAW OFFICES OF MITCHELL         :

     GARABEDIAN AND                  :

 7   KURTIS N. POULOS,               :

          Defendants.                : NO. 2:19-CV-05139

 8                        - - -

 9                  Thursday, October 7, 2021

10                        - - -

11                  Remote Videoconference Zoom oral

12   deposition of LESLIE M. GOMEZ, ESQUIRE, taken pursuant

13   to notice, was held at the location of the witness,

14   Cozen O'Connor, 1650 Market Street, Suite 2800,

15   Philadelphia, Pennsylvania 19103, at 9:00 a.m., on the

16   above date, before Lisa DePascale, a Court Reporter

17   and Notary Public of the Commonwealth of Pennsylvania

18   and Delaware.

19

20

21

22

                 GOLKOW LITIGATION SERVICES

23         877.370.3377 ph / 917.591.5672 fax

                    deps@golkow.com

24
```

```
 1   APPEARANCES:
 2        THE BEASLEY FIRM, LLC
          BY:  LANE R. JUBB, JR., ESQUIRE
 3        (Via Zoom Videoconference)
          1125 Walnut Street
 4        Philadelphia, Pennsylvania 19107
          215.592.1000
 5        lane.jubb@beasleyfirm.com
          Representing Plaintiff
 6
 7        COZEN & O'CONNOR, P.C.
          BY:  DOUGLAS B. FOX, ESQUIRE
 8        (Via Zoom Videoconference)
          1650 Market Street
 9        One Liberty Place, Suite 2800
          Philadelphia, Pennsylvania 19103
10        215.665.2000
          dfox@cozen.com
11        Representing The Witness
12
          SWARTZ CAMPBELL, LLC
13        BY:  CANDIDUS K. DOUGHERTY, ESQUIRE
          (Via Zoom Videoconference)
14        50 South 16th Street
          Two Liberty Place, 28th Floor
15        Philadelphia, Pennsylvania 19102
          215.564.5190
16        cdougherty@swartzcampbell.com
          Representing Defendants
17
18
19   ALSO PRESENT:  Kurtis Poulos, Defendant
20
21
22
23
24
```

0094a

Leslie M. Gomez, Esquire

```
 1                       INDEX
 2   WITNESS:
 3   LESLIE M. GOMEZ, ESQUIRE
 4                                        PAGE NO.
 5        MR. JUBB ...............................6
 6        MS. DOUGHERTY .........................37
 7        MR. POULOS ...........................188
 8        MS. DOUGHERTY ........................191
 9        MR. JUBB .............................192
10
11                     EXHIBITS
12   NUMBER              DESCRIPTION         PAGE NO.
13   Gomez-1        A Message from the          14
                    Headmaster, April 23, 2016,
14                  Bates stamped Hill P16.242
                    through P16.243
15
     Gomez-2        The Hill School, Letter,    14
16                  November 20, 2017, Bates
                    stamped P16.237 through
17                  P16.239
18   Gomez-3        Law Offices of Mitchell     24
                    Garabedian, Letter, April 11,
19                  2018, Bates stamped P16.219
                    through P16.220
20
     Gomez-4        Law Offices of Mitchell     28
21                  Garabedian, Letter, December
                    26, 2018, Bates stamped
22                  P16.225 through P16.226
23   Gomez-5        High Swartz, Letter, March  34
                    26, 2019, Bates stamped
24                  P16.235
```

0095a

Leslie M. Gomez, Esquire

```
 1   D33              The Hill School, November 20,   79
                      2017, 3 pages
 2
     D34              E-mail Chain, January 9,        160
 3                    2019, Bates stamped P47.12
                      through P47.13
 4
     D35              Law Office of Mitchell          161
 5                    Garabedian, Letter, January
                      28, 2019, Bates stamped
 6                    Garabedian047
 7   D36              E-mail, January 30, 2019,       175
                      Bates stamped P47.10 through
 8                    P47.11
 9   D37              High Swartz, Letter, February  175
                      21, 2019, Bates stamped
10                    P47.27
11   D38              High Swartz, Letter, March     176
                      26, 2019, Bates stamped
12                    P47.26
13   D39              Miscellaneous letters,         186
                      e-mails, Bates stamped P47.1
14                    through P47.29
15   D40              Leslie M. Gomez, Biography,    192
                      10 pages
16
17
18
19
20
21
22
23
24
```

0096a

Leslie M. Gomez, Esquire

```
 1                       - - -

 2              DEPOSITION SUPPORT INDEX

 3                       - - -

 4

 5              REQUEST FOR INFORMATION

 6   PAGE    LINE          PAGE    LINE        PAGE    LINE

 7    41      2             56      4

 8

 9                       - - -

10           WITNESS INSTRUCTED NOT TO ANSWER

11   PAGE    LINE          PAGE    LINE        PAGE    LINE

12    81      6

13

14

15

16

17

18

19

20

21

22

23

24
```

0097a

Leslie M. Gomez, Esquire

```
 1                    (It is hereby stipulated and agreed by

 2              and among counsel for the respective parties

 3              that signing, sealing, certification, and

 4              filing are waived; and that all objections,

 5              except as to the form of the question, are

 6              reserved until the time of trial.)

 7                              -  -  -

 8                    LESLIE M. GOMEZ, ESQUIRE, after having

 9              been first duly remotely sworn, was examined

10              and testified as follows:

11                              -  -  -

12                    E X A M I N A T I O N

13                              -  -  -

14   BY MR. JUBB:

15   Q.     Ms. Gomez, good morning.  Can you hear me okay?

16   A.     I can, good morning.

17   Q.     Good morning.  My name is Lane Jubb.  I

18   represent the Plaintiff in this case.  And I'm going

19   to take your deposition.  I'm not going to take up too

20   many much of your time, I promise.  I appreciate you

21   being here with us.

22                    You and I have never met before,

23   correct?

24   A.     That's correct.
```

0098a

Leslie M. Gomez, Esquire

```
1   Q.      Do you believe we've ever spoken on the phone?

2   A.      I don't believe so.

3   Q.      In anticipation of today's deposition -- strike

4   that.

5               Can you tell us what you do for a

6   living, please.

7   A.      I am an attorney.  I work at Cozen O'Connor.

8   I'm the Vice Chair of the Institutional Response

9   Group.

10  Q.      What is institutional response in your own

11  words?

12  A.      Sure.  I am a child abuse, sex assault

13  prosecutor by training and history.  I did that work

14  at the DA's office from 1994 as an intern until 2011,

15  when I left to join a private practice.  The private

16  practice that we engage in is solely helping

17  educational institutions prevent and respond to

18  allegations of sexual and gender based harassment and

19  violence or child abuse.  So it is a practice that's

20  focused on policy development, investigations,

21  training and regulatory compliance.  We do no

22  litigation.

23  Q.      Do you consider -- I'm sorry.  I was just about

24  to ask that question.
```

0099a

Leslie M. Gomez, Esquire

```
 1              Do you consider yourself a litigator at

 2    all?

 3    A.     No.  We -- in fact, that's one of the founding

 4    principles of our practice is that we do no litigation

 5    because we want to be able to stay in the neutral

 6    subject matter expert space.

 7    Q.     At Cozen O'Connor are you the Vice Chair of the

 8    Institutional Response Group just at the Philadelphia

 9    location or at the nation wide group?

10    A.     So the group itself is based in Philadelphia.

11    It was founded be our chair Gina Smith.  And there are

12    eight attorneys in our group.  We have one attorney

13    who lives out of state but is in our group, but there

14    is no other Institutional Response Group, it's the

15    eight Philadelphia based individuals.

16    Q.     Okay.  Are you barred in Pennsylvania?

17    A.     I am.

18    Q.     Do you provide your types of advisory services

19    to other institutions outside of Pennsylvania?

20    A.     Yes.

21    Q.     Do you -- if you could approximate for us how

22    many different states do you believe that you've

23    provided advice to institutions from Philadelphia?

24    A.     40.
```

0100a

Leslie M. Gomez, Esquire

1    Q.    Do you assist institutions in designing

2    institutional responses and how they integrate Federal

3    and State laws?

4    A.    Yes.

5    Q.    Do you advise Presidents, Head of Schools,

6    Board of Trustees, senior leadership on implementing

7    these types of processes that pertain to child welfare

8    or child abuse?

9    A.    Yes.

10   Q.    Are you also involved in historical reviews of

11   any institution for allegations of sex abuse?

12   A.    Yes.

13   Q.    With respect to the -- strike that.

14             You mentioned -- I thought I heard your

15   answer that part of your background by trade was a

16   prosecutor.  Did I hear your say that correctly?

17   A.    That's correct.

18   Q.    What did you do -- strike that.

19             When did you first join Cozen O'Connor,

20   what year?

21   A.    I joined Cozen O'Connor February of 2017, I

22   believe.  It will be five years coming up this

23   February.

24   Q.    Prior to joining Cozen O'Connor in February of

Leslie M. Gomez, Esquire

```
 1   2017, what was your prior profession?

 2              MS. DOUGHERTY:  Objection.

 3              THE WITNESS:  I thought I heard

 4        somebody say something.

 5              MS. DOUGHERTY:  I did.  I said

 6        objection, just to the form.  I don't think she

 7        said she's had a profession other than as an

 8        attorney, but.

 9              MR. JUBB:  Okay.

10   BY MR. JUBB:

11   Q.    Well, prior to joining Cozen O'Connor in

12   February of 2017 where were you employed?

13   A.    I left the DA's office in around September

14   of 2011.  I spent about 18 months, maybe 15 months at

15   Ballard Spahr.  I then joined in February of '13,

16   Pepper Hamilton.  It has always been in the same

17   practice since I left the DA's office.  And it's

18   always been with my partner Gina Smith.

19   Q.    When you were at the DA's office, were you

20   prosecuting -- strike that.

21              When you were a the DA's office, what

22   type of crimes were you prosecuting?

23   A.    I focused on prosecuting child abuse, sexual

24   assault and worked in our family violence sexual
```

Leslie M. Gomez, Esquire

```
1    assault unit for a number of years.  I worked in our

2    appeals unit as well.  And then the last five years of

3    my career there I was the Chief and/or Assistant Chief

4    of our juvenile court unit.  So looking at all issues

5    that involved the juvenile population in Philadelphia,

6    whether as a victim or as a criminal defendant or a

7    delinquent defendant.

8              Some of my work may have involved other

9    cases in the appellate work or in early stages in

10   Municipal Court, felony waiver type work around other

11   crimes.  But my focus primarily has been child sexual

12   abuse, dating violence, domestic violence, sexual

13   assault.

14   Q.    And in performing these reviews and

15   evaluations, are you obligated to comply with the

16   Pennsylvania ethical standards?

17   A.    Yes.

18              MS. DOUGHERTY:  Objection.

19   BY MR. JUBB:

20   Q.    And, Ms. Gomez, I'm going to show you a

21   document here -- strike that.  I'll lay a little bit

22   more foundation.

23              At some point in time were you ever

24   contacted by an attorney from The Hill School to
```

0103a

Leslie M. Gomez, Esquire

```
 1   perform a review of their policies and procedures that
 2   were in place?
 3   A.    I don't think that I would frame it that way.
 4   Q.    Okay.  Can you tell me how you first -- strike
 5   that.
 6              Do you know what The Hill School is?
 7   A.    Yes.
 8   Q.    How do you know what The Hill School is?
 9   A.    I've grown up and raised my children in
10   Philadelphia.  My children played sports against The
11   Hill School.  They went to a local independent school.
12   But in, and I don't have the date, I want to say 2016,
13   we were contacted by The Hill School or someone on
14   behalf of The Hill School to ask us to do some work
15   for them.
16   Q.    Okay.  I'm going to show you a document here.
17   I'm just going to share my screen.  Bear with me here.
18              (Mr. Jubb is sharing his screen.)
19              Can you see that, Ms. Gomez, my screen?
20   A.    Yes.
21   Q.    I'm showing you here something that says a
22   message from the Headmaster.  It's a note dated
23   April 23, 2016.  And for record purposes, this is
24   P16.242.
```

0104a

Leslie M. Gomez, Esquire

```
 1              MS. DOUGHERTY:  It was also previously

 2         marked as D2, right?

 3              MR. JUBB:  It might be D1, Candi.  But

 4         either way, it could also be D2.  It's one --

 5         either D1 or D2.

 6              MS. DOUGHERTY:  It's D2.

 7    BY MR. JUBB:

 8    Q.    But this is P16 -- okay.  It's also marked as

 9    Hill 242.

10              Have you ever seen this message from

11    the Headmaster before, dated April 23, 2016?

12    A.    Yes.  And that's in connection with what we

13    were engaged for.

14    Q.    Do you believe that you had any involvement in

15    drafting this message from the Headmaster?

16              MS. DOUGHERTY:  Objection.

17              MR. FOX:  Objection.

18              Go ahead.

19              THE WITNESS:  Thanks, Doug.  Procedural

20         question, I've only been deposed once.  So I

21         presume I wait for you to object and then go

22         ahead anyway.

23              MR. FOX:  Yes.  Go ahead.  Unless I

24         tell you not to answer.
```

Leslie M. Gomez, Esquire

```
1              THE WITNESS:  Thank you.
2              I -- this is a document that would
3         have, based on the date, been part of our files
4         at Pepper Hamilton.  I did not review this
5         document again today, but likely I would have
6         been involved in helping to discuss the work
7         that we were going to do for The Hill School
8         and how to present that to the community.
9    BY MR. JUBB:
10   Q.    Okay.  And then here is a -- I'm going to show
11   you -- and we're going to mark that as Gomez-1 what I
12   just showed you previously.
13                      - - -
14             (Exhibit Gomez-1, A Message from the
15        Headmaster, April 23, 2016, Bates stamped Hill
16        P16.242 through P16.243, was marked for
17        identification.)
18                      - - -
19   BY MR. JUBB:
20   Q.    And now I'm going to show you what I'm going to
21   mark as Gomez-2, which is P16.237 through P16.239.
22                      - - -
23             (Exhibit Gomez-2, The Hill School,
24        Letter, November 20, 2017, Bates stamped
```

Leslie M. Gomez, Esquire

```
 1              P16.237 through P16.239, was marked for

 2              identification.)

 3                         - - -

 4    BY MR. JUBB:

 5    Q.    This is dated November 20, 2017.

 6              Have you seen this document before?

 7    A.    Yes, I have.

 8    Q.    In looking at these documents are you able to

 9    approximate for us what month and year it was that you

10    were first beginning to -- strike that.

11              In looking at these documents, are you

12    able to approximate for us what month and year it was

13    that you were first contacted by someone from The Hill

14    School?

15              MS. DOUGHERTY:  Objection.

16              THE WITNESS:  As I framed a moment ago,

17         I'm fairly confident from my recollection that

18         it was the Spring of 2016.

19              You'll laugh at the contemporaneous

20         reason that I recall that, but partially it's

21         because I was coming from a lacrosse game and

22         lacrosse season is in the spring.  And I recall

23         being in a car and speaking with whoever we

24         spoke with.  I don't recall exactly who it was,
```

Leslie M. Gomez, Esquire

```
 1          about potentially being engaged to conduct a

 2          proactive review of historical allegations of

 3          abuse.

 4    BY MR. JUBB:

 5    Q.    Okay.  And in this November 20, 2017 letter, it

 6    says, "Dear Hill School Alumni," have you ever seen

 7    this before?

 8    A.    Yes.

 9    Q.    In here, it des- -- in this paragraph, and if

10    you can't read it, I can Zoom in for you.

11    A.    I got it.

12    Q.    Great.  In this middle paragraph, it says, "You

13    may contact me directly."  You may also -- strike

14    that.

15          "You may also directly contact our

16    child protection experts, Leslie Gomez and Gina Smith

17    or provide information unanimously online."  And I'm

18    not going to read the e-mail addresses or the web

19    links.

20          But do you consider yourself a child

21    protection expert?

22    A.    Yes.

23    Q.    And by the time that this letter was sent,

24    November 20, 2017, had you already begun to conduct
```

1  your review of historical allegations of sex abuse at

2  The Hill School?

3  A.    Yes.  So as the letter says, in the second

4  paragraph.  We concluded that review in the summer of

5  2017, based on the information that was available to

6  us at that time.

7  Q.    And so would your first contact be -- I'm sorry

8  to interrupt you.

9  A.    So we also understood that in any review of

10 this nature, that there is always the potential that

11 there are other individuals who may come forward that

12 were not part of the initial review.  It's a very

13 standard thing that we see following a review or

14 attention is brought to the issue publicly.

15 Q.    And so was it part of -- strike that.

16           Am I correct then that approximately

17 the spring of 2016 through the summer of 2017 you

18 were -- had started and completed the historical

19 review at that point --

20 A.    That's correct.

21 Q.    -- or were you not considering it completed --

22 okay.  And let me rephrase that.

23           Because was it considered completed as

24 of summer of 2017, or was it here's the moment where

0109a

Leslie M. Gomez, Esquire

1    we're going to say we're at a good spot to let

2    everyone else know about it so that other allegations

3    can come forward?

4              MS. DOUGHERTY:  Objection.

5              THE WITNESS:  I think both would be the

6         answer to that.  We had concluded what we had

7         available to us, based on records and/or

8         individuals that we interviewed.  That though

9         that the scope of what we had looked at in the

10        set information we had was concluded, we

11        certainly understood that in sharing that

12        information with the community, particularly

13        with the acknowledgment that's here in this

14        letter, that you could expect that additional

15        individuals would come forward and remained

16        open to that.

17   BY MR. JUBB:

18   Q.    And as part of your investigation into

19   historical allegations of sexual abuse at The Hill

20   School, beginning in the spring of 2016 up until the

21   time of this letter, November 20, 2017, did you come

22   across any allegations of improper conduct by or

23   sexual abuse allegations made against Matthew Ralston?

24              MS. DOUGHERTY:  Objection.

Leslie M. Gomez, Esquire

```
1              MR. FOX:  Let me just assert an

2         objection.  And here's the basis for it.

3              Other than a review of an and any

4         reports of misconduct on the part of allegedly

5         on the part of Mr. Ralston that would have no

6         relevance to the current case.  And I'm going

7         to object and instruct the witness not to

8         testify or answer about any historical

9         allegations or investigation of anyone else.

10             Is that clear?

11             MS. DOUGHERTY:  I object to that

12        instruction.  If the -- the witness has to

13        answer the question that's asked.  If you have

14        an objection to the question that's asked, then

15        you should assert it.  You can't give her an

16        instruction to change her testimony without

17        alerting anyone.

18             MR. FOX:  No, I'm not asking her to

19        change her testimony.

20             MS. DOUGHERTY:  Self-edit it, I guess.

21             MR. FOX:  I'm not.  I'm simply saying

22        that on the basis of attorney/client privilege,

23        because Ms. Gomez is an attorney and also on

24        the basis of relevance, I'm not going to allow
```

0111a

Leslie M. Gomez, Esquire

```
 1          her to testify about her work on the historical

 2          allegations that have nothing to do with this

 3          case.

 4                    MS. DOUGHERTY:  Okay.  I don't agree

 5          about relevance, but my issue was with your

 6          instruction to the witness.  If you have an

 7          objection to a particular question that you

 8          think implicates what you're raising, then you

 9          should raise it.  But you can't blanketly

10          instruct the witness to edit her testimony and

11          not identify that she would give testimony

12          that's responsive to an issue that you -- you

13          can't just instruct her not to provide that

14          information.  She has to somehow indicate that

15          she would respond to the question providing

16          that information, or you have to object to the

17          question if you think it draws that

18          information.  You can't just instruct her not

19          to say that.  We need to know that she would

20          respond with something that you object to so

21          that we can raise the issue with the Court

22          because we don't agree with the position, but.

23                    So that's my issue.

24                    MR. FOX:  Sure.  Respectfully I
```

Leslie M. Gomez, Esquire

```
 1            disagree with that when it comes to a lawyer's

 2            testimony.

 3                 MR. POULOS:  Well, respectfully, you're

 4            leading your client to not answer a question.

 5                 MR. JUBB:  I got news for all of you,

 6            my question was just pertaining to Mr. Ralston,

 7            so I think we're getting ahead of ourselves.

 8                 So I'm going to go back and ask my

 9            question again.  And I think we can get through

10            this pretty quickly.  Because I know what my

11            questions are attempting to elicit.  So I'll go

12            back and rephrase my question so it's clear.

13                 MS. DOUGHERTY:  Yeah, but the

14            witness -- if the witness is going to continue

15            answering questions and self-edit her testimony

16            based on that instruction, then we need to know

17            it.

18                 MR. JUBB:  (INAUDIBLE)

19                 MS. DOUGHERTY:  I'm not suggesting that

20            you can't assert your objection, but you can't

21            tell her not to provide information without an

22            objection or alerting people that she would

23            provide information of that nature so that we

24            can bring the issue to the Court.
```

0113a

Leslie M. Gomez, Esquire

```
1              MR. FOX:  Well, I did object as well as
2         also give her an instruction.
3              Go ahead, Lane, ask your question.
4              MR. JUBB:  Thanks, Mr. Fox.
5              MS. DOUGHERTY:  You haven't answered my
6         issue.  You've given an instruction that is --
7              MR. JUBB:  There is nothing to answer
8         you.  Ms. Dougherty, there is nothing to answer
9         you.  I am asking questions.  My questions was
10        appropriate.  Whatever Mr. Fox said you can
11        take it up with him when he objects to your
12        question.  Let me ask my questions.  There is
13        nothing to go over right now.
14             MS. DOUGHERTY:  Mr. Jubb, please, you
15        don't need to get irate about it.  There is
16        something to go over.  If the witness -- my
17        issue was the instruction.  I agree that your
18        question didn't implicate the objection that
19        was posed.
20             Mr. Fox, have you withdrawn the
21        instruction?
22             MR. FOX:  No.
23             MS. DOUGHERTY:  Okay.  Then I'm going
24        to go to the Court and have her testify again
```

0114a

Leslie M. Gomez, Esquire

```
 1            if the witness is under an instruction to

 2            self-edit her testimony without informing

 3            anyone that she's doing that.

 4                    MR. FOX:  Go ahead, Lane, ask your

 5            question.

 6                    MR. JUBB:  Thank you.

 7   BY MR. JUBB:

 8   Q.    Ms. Gomez from the time you were first retained

 9   of -- strike that.

10                    Ms. Gomez, from the time you were first

11   contacted by someone from The Hill School in the

12   spring of 2016 up to until the time of November 20,

13   2017 when this letter was sent, during your historical

14   review, did you come across any allegations of child

15   sex abuse or sexual harassment or otherwise improper

16   conduct made against Matthew Ralston?

17   A.    So in preparation for today, I did not go back

18   and review all of the work that was done from 2016

19   through 2017 prior to this letter.

20                    My recollection is that the first time

21   that we became aware that there was a disclosure

22   related to Mr. Ralston was Mr. Garabedian's April 11,

23   2018 letter to Zach Lehman.

24                    I would not have identified or reviewed
```

Leslie M. Gomez, Esquire

 1    Mr. Ralston's file prior to that notification.

 2    Q.     And for all intents and purposes, if you just

 3    look at this screen, is this the letter that you're

 4    referring to --

 5    A.     Yes.

 6    Q.     -- April 11, 2018, letter to Mr. Lehman?

 7    A.     Yes.

 8                         - - -

 9                  (Exhibit Gomez-3, Law Office of

10             Mitchell Garabedian, Letter, April 11, 2018,

11             Bates stamped P16.219 through P16.220, was

12             marked for identification.)

13                         - - -

14    BY MR. JUBB:

15    Q.     We're going to call this Gomez-3, which is

16    P16.219 and P16.220.

17                  Can you tell us how you first received

18    this letter.

19    A.     I don't recall the exact.  It would have been

20    forwarded to me by the school or by counsel for the

21    school.

22    Q.     And when you reviewed these statements that

23    were being made against Mr. Ralston, at that point in

24    time did you know who Mr. Ralston was?

```
 1   A.     No.

 2   Q.     When you first saw this letter dated April 11,

 3   2018 from Mr. Garabedian, did you take the accusations

 4   and statements seriously?

 5   A.     Absolutely.

 6   Q.     Did -- strike that.

 7                 In response to receiving -- strike

 8   that.

 9                 When you first saw this letter, did you

10   know who Mr. Garabedian was?

11   A.     Yes.

12   Q.     At some point in time did you then review the

13   employment file of Mr. Ralston?

14   A.     Yes.

15   Q.     At some point in time did you then review the

16   student file of Mr. Poulos?

17   A.     Yes.

18   Q.     Was it your intention to conduct an

19   investigation into the statements that were being made

20   against Mr. Ralston?

21   A.     Yes.

22   Q.     As part of an investigation into accusations of

23   child sex abuse, especially of this nature that was

24   described by Mr. Garabedian, would you want to
```

0117a

Leslie M. Gomez, Esquire

```
 1   interview the accuser?

 2   A.    Yes.

 3              MS. DOUGHERTY:  Objection.

 4   BY MR. JUBB:

 5   Q.    Did you ever have an opportunity to interview

 6   Mr. Poulos?

 7   A.    I did not.

 8   Q.    At some point in time did you ever request to

 9   interview -- strike that.

10              MR. JUBB:  I don't want to intrude on

11         any sort of attorney/client privilege here,

12         Doug, so you might have an objections, but I'm

13         going to try best to avoid it.

14   BY MR. JUBB:

15   Q.    Ms. Gomez, at any point in time did you request

16   access to -- strike that.

17              At any point in time did you ever

18   request to interview Mr. Poulos?

19   A.    I did not specifically make the request, the

20   request was made through the School's counsel to

21   Mr. Garabedian multiple times.  It would not have been

22   ethical for me to contact Mr. Poulos directly when he

23   was represented by counsel, from what I understood.

24   Q.    And as part of your years of experience in
```

0118a

1    investigating accusations of child sex abuse, is it

2    important to personally interview the accuser?

3                    MS. DOUGHERTY:  Objection.

4                    THE WITNESS:  So I don't -- just to

5           frame that slightly.  Lane, I don't use the

6           words accuser or accused.  I use the word

7           complainant in that space.  It is important in

8           evaluating what I call a credibility case that

9           I have the opportunity to interview the

10          complainant, the respondent, any

11          contemporaneous witnesses, witnesses to the

12          disclosure, contemporaneous documentation,

13          other facts and circumstances.

14   BY MR. JUBB:

15   Q.    And at any point in time did you ever

16   personally, not through Mr. Rees, contact

17   Mr. Garabedian to request his cooperation?

18   A.    I did not.

19   Q.    At any point in time did Mr. Garabedian contact

20   you or your firm?

21   A.    Not that I'm aware of.

22   Q.    After you received the April 11, 2018 letter

23   from Mr. Garabedian, with the accusations made against

24   Mr. Ralston and you reviewed both Mr. Ralston's

Leslie M. Gomez, Esquire

```
1   employment file as well as Mr. Poulos' school file,

2   did you come across any accusations of improper

3   conduct or child sexual abuse or sexual harassment

4   that were previously made against Mr. Ralston?

5               MS. DOUGHERTY:  Objection.

6               THE WITNESS:  No.

7               MR. FOX:  Objection.

8   BY MR. JUBB:

9   Q.    I'm going to show you what has previously been

10  marked here.

11              (Mr. Jubb is sharing his screen.)

12              And can your see my screen?

13  A.    Yes.

14  Q.    Okay.  This was previously marked as P16.225

15  through P16.226, which I'm going to mark as Gomez-4.

16                    - - -

17              (Exhibit Gomez-4, Law Offices of

18        Mitchell Garabedian, Letter, December 26,

19        2018, Bates stamped P16.225 through P16.226,

20        was marked for identification.)

21                    - - -

22  BY MR. JUBB:

23  Q.    And, Ms. Gomez, this is a letter dated

24  December 26, 2018, faxed by Garabedian Law Firm to
```

0120a

Leslie M. Gomez, Esquire

1    Mr. Rees.

2              Did you ever see a copy of this letter?

3    A.    Yes.

4    Q.    Did you conduct any additional investigation

5    into the claims of Mr. Poulos and Mr. Garabedian after

6    you received this letter?

7    A.    This School gathered additional documentation

8    and records, yes.

9    Q.    And did you have an opportunity to review them?

10   A.    Yes.

11   Q.    Did you have an opportunity to conduct any

12   interviews?

13   A.    I did not conduct interviews in this matter.

14   Q.    Did ever have an opportunity to speak

15   personally with Mr. Ralston?

16   A.    The framing of your question is did I have an

17   opportunity?  I'm certain I may have had an

18   opportunity, but I did not -- I did not at any time

19   speak with Mr. Ralston.

20   Q.    Did you -- strike that.

21              After you had reviewed this letter, did

22   you have any -- strike that.

23              Would it be part of your pattern and

24   practice to advise institutions such as The Hill

Leslie M. Gomez, Esquire

```
 1    School, how to respond to receiving letters like this?
 2                 MS. DOUGHERTY:  Objection.
 3                 MR. FOX:  Object to the form.
 4                 But go ahead.
 5                 THE WITNESS:  Yes.  Not with respect
 6         to --
 7    BY MR. JUBB:
 8    Q.    Would it be --
 9    A.    I'm sorry, Lane, if I can continue.
10    Q.    Yes.
11    A.    Not with respect to the civil litigation
12    aspect, but with respect to what next steps to take to
13    continue in seeking to engage the participation of
14    Mr. Garabedian and through him Mr. Poulos, so that we
15    could begin, from my perspective, the investigation.
16    Q.    And what would those next steps be in response
17    to receiving a letter like this?
18                 MR. FOX:  You're talking about just in
19         general, not what specifically what happened
20         here?
21                 MR. JUBB:  Well, I'm just asking in
22         general because -- well, I'm happy to ask
23         specifically what was the response, but I don't
24         want to get into, you know, any discussion she
```

0122a

Leslie M. Gomez, Esquire

```
 1          may have had with her client, so I'm asking it

 2          generally.

 3                    MR. FOX:  Right.  I understand.

 4                    MR. JUBB:  And I'll rephrase that with

 5          that caveat.

 6     BY MR. JUBB:

 7     Q.    So, Ms. Gomez, generally speaking what is the

 8     standard procedure and protocol after you receive a

 9     letter such as this?

10                    MS. DOUGHERTY:  Objection.

11                    MR. FOX:  Objection.

12                    But go ahead.

13                    THE WITNESS:  So in any investigation,

14          my goal is to talk to the relevant parties to

15          the matter.  So always very important to me to

16          be able to talk to the complainant to

17          understand fully their experience, what

18          information may be able to be corroborated, who

19          they may have shared with over a period of

20          time.  We go back to look at an academic record

21          or a school file to see what information may

22          exist in that file that could be corroborative

23          in some way, even if doesn't reflect a direct

24          complaint.
```

0123a

Leslie M. Gomez, Esquire

```
 1                    In this particular case or a case like
 2          this where this information, factual
 3          information which was given to the school for
 4          the first time in December of 2018, being able
 5          to take some of the steps to verify or
 6          corroborate whether that information could be
 7          independently verified through school records,
 8          through academic calendars, through other
 9          available information.
10   BY MR. JUBB:
11   Q.     And would you have any role in advising your
12   institution how to treat the person who is complained
13   of?  I know you don't use --
14   A.       Respondent.
15   Q.     -- the accuser -- so respondent, okay.  So I'll
16   clarify that.
17                    Do you have any involvement in advising
18   the Institution the appropriate steps to take with the
19   Respondent in response to a letter such at this?
20                    MS. DOUGHERTY:  Objection.
21                    THE WITNESS:  Sometimes.
22   BY MR. JUBB:
23   Q.     And after receiving a letter such as this,
24   would it be standard practice for you to advise the
```

0124a

Leslie M. Gomez, Esquire

1    Institution to restrict the Respondent's access to the

2    facility's campus, students, et cetera?

3                    MS. DOUGHERTY:  Objection.

4                    MR. FOX:  Objection.

5                    THE WITNESS:  Yeah.  I can't speak to

6            standard practice.  Certainly one of the things

7            that we always consider is, is there a current

8            risk to minors based on the information that we

9            know.

10   BY MR. JUBB:

11   Q.    Did you ever come to any opinions that there

12   was a risk to minors -- strike that.

13                    Did you ever come to any opinions or

14   conclusions after receiving this letter that there was

15   a potential risk to minors by Mr. Ralston?

16   A.    Yes.

17   Q.    I'm going to show you a letter here that is

18   March 26, 2019, which is P16.235.  It was also

19   produced as Hill 235.  It's a March 26, 2019 letter

20   from Mr. Rees at High Swartz to Mitchell Garabedian

21   and you're CCed on that.

22                    Do you see that?

23   A.    Yes.

24   Q.    And I'm going to mark this for the record as

Leslie M. Gomez, Esquire

```
 1    Gomez-5.

 2                        - - -

 3                 (Exhibit Gomez-5, High Swartz, Letter,

 4            March 26, 2019, Bates stamped P16.235, was

 5            marked for identification.)

 6                        - - -

 7    BY MR. JUBB:

 8    Q.    After you received the December 2019 letter

 9    from Mr. Garabedian, did you still have an interest in

10    trying to interview Mr. Poulos?

11    A.    Yes.

12                 MS. DOUGHERTY:  Objection.

13    BY MR. JUBB:

14    Q.    Did you ever -- strike that.

15                 Did you ever have an opportunity to

16    interview Mr. Poulos after that?

17    A.    No.

18    Q.    Did you ever, through Mr. Rees, request

19    cooperation from Mr. Garabedian to make Mr. Poulos

20    available?

21    A.    Yes.

22                 MS. DOUGHERTY:  Objection.

23    BY MR. JUBB:

24    Q.    Did Mr. Garabedian ever -- I'm sorry to
```

0126a

Leslie M. Gomez, Esquire

1    interrupt your, please.

2    A.    My understanding is -- so the timeframe that

3    you're asking December 26, 2018 to March 26, 2019,

4    there were three written requests.  There was the

5    January 30th written request, the February 21st

6    written request and the March 26th written request.

7    I'm sorry.  And actually a January 9th written

8    request.  So four written requests.

9                 And then prior to that between April of

10   2018, there were again multiple written requests.  And

11   one time, that I understand that Mr. Rees talked to

12   Mr. Garabedian.

13   Q.    And in any of those times -- strike that.

14                 After you received the December 2019

15   letter, did you ever interview Mr. Ralston at all?

16   A.    No.

17   Q.    Did Mr. Garabedian ever provide you any

18   additional information, other than what he wrote in

19   the December 2019 letter, as it pertained to

20   Mr. Poulos' accusation?

21                 MS. DOUGHERTY:  Objection.

22                 THE WITNESS:  The December 20th letter,

23        no.

24                 MS. DOUGHERTY:  Objection.

0127a

Leslie M. Gomez, Esquire

```
 1                    MR. JUBB:  I'll rephrase.

 2   BY MR. JUBB:

 3   Q.    Did Mr. Garabedian ever provide your any more

 4   information as to Mr. Poulos' claims against

 5   Mr. Ralston other than what he wrote in the

 6   December 2018 letter?

 7                    MS. DOUGHERTY:  Objection.

 8                    THE WITNESS:  No.

 9   BY MR. JUBB:

10   Q.    At any point in time from when you first saw

11   the April 11, 2018 letter to present October 7, 2021

12   has Mr. Garabedian cooperated in way with any sort of

13   investigation pertaining to allegations that were made

14   against Mr. Ralston?

15                    MS. DOUGHERTY:  Objection.

16                    THE WITNESS:  I wouldn't classify it as

17          cooperate or not cooperate.  The School,

18          through Mr. Rees, made a request that we speak

19          with Mr. Poulos.  That did not occur.  I am

20          still very interested in speaking with

21          Mr. Poulos.

22                    MR. POULOS:  You've never called me.

23   BY MR. JUBB:

24   Q.    I will represent to you that we spoke in a
```

0128a

Leslie M. Gomez, Esquire

1    deposition with Mr. Poulos' mother, Mary Ellen Poulos,

2    who first contacted Mr. Garabedian.  And she had read

3    an article in the New York Times where you and your

4    firm were mentioned and Mr. Garabedian had made a

5    comment as well.  And in speaking with him, he had

6    told her that you're hired to help institutions "cover

7    it up."

8              Do your help institutions cover up

9    child sex abuse?

10             MS. DOUGHERTY:  Objection.

11             THE WITNESS:  I do not.  In fact, I do

12         the exact opposite.

13             MR. JUBB:  All right.  Thank you for

14         your time.  I have no further questions.

15                   -  -  -

16             E X A M I N A T I O N

17                   -  -  -

18   BY MS. DOUGHERTY:

19   Q.    Good morning, I represent Mitchell Garabedian.

20   A.    Good morning.

21   Q.    You said that you know Mr. Garabedian.  How do

22   you know Mr. Garabedian?

23   A.    I know of him.  I don't know if we've ever

24   spoken directly.  I know of him through his work in

Leslie M. Gomez, Esquire

```
 1    the Boston Dioceses.  And I just know of him through
 2    working in the independent school setting in
 3    conducting reviews of the current or historical
 4    allegations of abuse.  I honestly don't recall whether
 5    or not I've met him or spoken to him directly in the
 6    connection with any other case.
 7    Q.     And you knew of Mr. Garabedian at the time you
 8    were retained by The Hill School; is that right?
 9    A.     I think so, yes.
10    Q.     When were you first retained by The Hill
11    School?
12    A.     I believe it was around April of 2016.
13    Q.     You were at Pepper Hamilton at the time; is
14    that right?
15    A.     Yes.
16    Q.     Did The Hill School retain your specifically or
17    Pepper Hamilton or a combination of attorneys?
18    A.     They retained Gina and me, Gina Smith and me.
19    But the engagement letter is always you're engaging
20    the firm.  And we are the primary attorneys assigned
21    to the matter.
22    Q.     Okay.  So there is a written retention
23    agreement between The Hill School and Pepper Hamilton;
24    is that right?
```

Leslie M. Gomez, Esquire

```
 1   A.      There should be, yes.

 2   Q.      And you prior -- let me start again.

 3               Prior to The Hill School retaining

 4   Pepper Hamilton, had you ever represented The Hill

 5   School?

 6   A.      No.

 7   Q.      So the first request from -- for legal services

 8   by The Hill School to you occurred in April 2016 when

 9   you were with Pepper Hamilton; is that right?

10   A.      Yes, around that timeframe.

11   Q.      Do you still have the written retention

12   agreement between Pepper Hamilton and The Hill School

13   from April 2016?

14   A.      I may.  I did not look specifically today, but

15   I may have it.

16   Q.      What was the scope of your representation?

17   A.      If you'd give me a minute, I'd like to check

18   and see if I have the letter just to see.  I have a

19   recollection, but I'd like to be accurate in that.

20               (Reviewing document.)

21               I have an engagement letter dated

22   April 22, 2016.  As retained, Pepper Hamilton to serve

23   as independent counsel and provide legal advice and

24   guidance with respect to an internal review of
```

0131a

Leslie M. Gomez, Esquire

1   historical matters.

2   Q.    Okay.  So you said --

3   A.    I'm sorry.

4   Q.    Can you just say that again a little bit slower

5   because I want to write it down so I don't have to ask

6   you to keep repeating it.

7              So independent counsel...

8   A.    Independent counsel and provide legal advice

9   and guidance with respect to an internal review of

10  historical matters.  And then there is more.

11             I'm going to put this on another screen

12  so I can see your at the same time.

13  Q.    Is there any reason we cannot be provided this

14  retention agreement now?

15  A.    That's up to Chris.

16             MR. FOX:  Pepper Hamilton may have a

17        say in that.  I don't know.  We'll see.

18             THE WITNESS:  I can give you the rest

19        of the scope.

20  BY MS. DOUGHERTY:

21  Q.    Okay.  Inde -- so my question was directed to

22  Mr. Fox.  I'm sorry.  I probably should have said Mr.

23  Fox because it was a (INAUDIBLE) question.  I turned

24  my head as if we're in the same room to ask you?

0132a

Leslie M. Gomez, Esquire

```
 1                 MR. FOX:  Right.

 2                 MS. DOUGHERTY:  So can the witness

 3          provide us the retention agreement now so we

 4          can -- I can ask her questions about it?

 5                 MR. FOX:  Not now, but make your

 6          request, you have made your request and we'll

 7          consider it and figure out how to proceed.  I

 8          don't know whether Pepper Hamilton has a

 9          position on this or not.

10                 MS. DOUGHERTY:  Why is it up to Pepper

11          Hamilton at all?

12                 MR. FOX:  It's their document.

13                 MS. DOUGHERTY:  Well, it's obviously in

14          Cozen O'Connor's system because Ms. Gomez just

15          accessed it through her computer.

16                 MR. FOX:  Sure.  But that doesn't

17          change the fact that it's Pepper Hamilton's

18          document.  You should ask Pepper about that

19          one.

20  BY MS. DOUGHERTY:

21  Q.     Independent counsel and provide legal advice

22  regarding historical...?

23  A.     To provide legal advice and guidance.

24  Q.     And guidance.
```

0133a

1    A.    With respect to an internal review of

2    historical matters.  And then the scope is broken down

3    more fully.

4              I think there is about four bullet

5    points.  As part of the engagement Pepper will assist

6    The Hill School in evaluating available information

7    and current legal requirements to determine a scope

8    of -- a course of action consistent with the School's

9    mission and institutional values.

10             Second bullet, conduct an internal

11   review of a historical allegation of misconduct by a

12   former school employee who is now deceased.

13   Q.    Okay.

14   A.    Third bullet, assist the School in providing

15   open transparent and sensitive communications to

16   relevant constituencies.

17             Fourth bullet, review relevant school

18   policies, procedures and training materials.

19   Q.    Anything else regarding the scope of

20   representation by the School in April -- I'm sorry,

21   you say April 22nd --

22   A.    April -- no, the rest of the letter is what a

23   plain engagement letter rates are, which remain

24   confidential information.

Leslie M. Gomez, Esquire

1    Q.    And do a retention -- let me start again.

2              Did the Hill School specify attorneys

3    with Pepper Hamilton that it wanted to handle the

4    matter?

5    A.    Gina Smith and I, the letter is under my

6    signature, will be the attorneys responsible for your

7    representation.  From time to time they may ask other

8    Pepper attorneys and paralegals to assist me, et

9    cetera.

10   Q.    Okay.  For the moment, let's just stick with

11   the time that you represented The Hill School while

12   you were still at Pepper Hamilton before Cozen

13   O'Connor.

14             Did any attorneys, other than you or

15   Ms. Smith handle the representation of The Hill School

16   or participate in the representation of The Hill

17   School, again, while you were at Pepper Hamilton?

18   A.    I would have to look at billing records.  It's

19   entirely possible that associates worked with us in

20   the matter in reviewing documents or drafting

21   documents.  But I don't have an independent

22   recollection if they did and if so who.

23   Q.    Okay.  So you sent -- let me start again.

24             The representation of The Hill School

0135a

Leslie M. Gomez, Esquire

1    was based on hourly rate time charges?

2    A.     Yes.

3    Q.     Did you send bills to The Hill School that

4    itemized the work that was performed while you were

5    representing The Hill School while with Pepper

6    Hamilton?

7    A.     Yes.

8    Q.     Do you still have access to those invoices?

9    A.     I do not have access to Pepper Hamilton billing

10   invoices, no.

11   Q.     And it's your recollection that the detail on

12   the invoices that you sent while with Pepper Hamilton

13   to The Hill School would identify the individual

14   performing the specific work that was being charged

15   for; is that right?

16   A.     Yes.  Standard billing statements billed in .1

17   increments with a description of the work.

18   Q.     And sitting here today you don't remember any

19   other attorney with Pepper Hamilton, other than

20   Ms. Smith and yourself who performed work for The Hill

21   School?

22   A.     As I said, I don't have an independent

23   recollection.  I'm sure that there would have been an

24   associate who accompanied me to conduct interviews.  I

0136a

Leslie M. Gomez, Esquire

1    don't have any recollection of who that might have

2    been at this time.

3    Q.    Is that your standard practice to have an

4    associate accompany you when you conduct interviews?

5    A.    A second attorney, yes, sometimes a paralegal

6    but not always an associate.  Sometimes it's Gina,

7    sometimes it's someone else.

8    Q.    Do you have -- let me start again.

9               Were there any paralegals who performed

10   work for The Hill School while you were with Pepper

11   Hamilton?

12   A.    I don't recall.

13   Q.    Did the scope of your representation of The

14   Hill School change while you were at Pepper Hamilton?

15   A.    I don't know if it changed while we were at

16   Pepper Hamilton or later.  But, yes, the scope did

17   expand in some ways.

18   Q.    Okay.  When did the scope of your

19   representation expand?

20   A.    I have no recollection of when.

21   Q.    Are you able to identify an event, such as one

22   of the letters that are at issue in the case --

23   A.    Sure.  So --

24   Q.    -- or some letters that you've seen today that

0137a

Leslie M. Gomez, Esquire

1    might help you place it in a timeline.

2    A.    We also advice The Hill School in response to

3    current reports they may happen.  So additional

4    historical allegations that come forward like this one

5    that was not part of the original set of information

6    that we looked at in April.  A misconduct or a

7    complaint from one student against another student and

8    assisting and reporting to child protective services

9    or law enforcement.

10              So any number of times over the past

11   five years assisting and giving legal advice about the

12   institutional response to sexual misconduct issues

13   that may arise.

14   Q.    So the initial retention was to investigate

15   conduct by a deceased employee; is that right?

16   A.    Among the broader scope of looking at all of

17   the allegations of historical allegations of sexual

18   misconduct.

19   Q.    Okay.  Other than the investigation relating to

20   the now deceased employee of The Hill School and the

21   complaint by Mr. Poulos about Mr. Ralston, did you

22   provide advice or assistance to The Hill School

23   regarding any other complaints of child abuse or

24   sexual abuse?

0138a

Leslie M. Gomez, Esquire

1    A.      As I should, we reviewed whatever information

2    was available at that time based on school files or

3    information that had come to light involving whatever

4    the number of individuals was over a period of time.

5    Q.      Okay.  So you -- I'm just trying to understand.

6    Because you said any number of times over the past

7    five years you've given advice to The Hill School

8    regarding its institutional response to complaints of,

9    I don't remember if you said child abuse or sexual

10   abuse; is that right?

11   A.      Both or either, yes.  So whether it be a

12   historical complaint that comes in against a faculty

13   or staff member, a current complaint by a student

14   against another student.

15   Q.      I see.

16               So just limiting my question to

17   complaints about faculty conduct directed to a

18   student.  Have you investigated any complaints by

19   faculty members directed to a student, other than the

20   conduct by the now deceased employee and the claims by

21   Mr. Poulos for The Hill School?

22   A.      The original review between April of 2016 and

23   the date of that letter, November of '17, included a

24   number of historical complaints involving a number of

0139a

Leslie M. Gomez, Esquire

```
 1   individuals.

 2              Excuse me.  I just need to stand and

 3   stretch.

 4              MR. JUBB:  We can take a break at any

 5        time.

 6              THE WITNESS:  No.  I just was sitting

 7        in one position for a long time.

 8              Thank you.

 9   BY MS. DOUGHERTY:

10   Q.    How about after November 2017, have you

11   provided advice or assistance to The Hill School

12   regarding complaints by any faculty member directed to

13   a student, other than the claims by Mr. Poulos against

14   Mr. Ralston?

15   A.    I think so, yes.  I don't have a specific

16   recollection, but my recollection would be yes.

17   Q.    Do you still represent The Hill School?

18   A.    Yes.

19   Q.    Is there a written retention agreement between

20   Cozen O'Connor and The Hill School?

21   A.    There should be.

22              Give me one second, I'll check.

23              (Reviewing document.)

24              I don't have one at my finger tips,
```

0140a

Leslie M. Gomez, Esquire

1   Candi.  It's possible that there is and it's possible

2   that there is not.  When we moved from Pepper Hamilton

3   to Cozen in February of 2017, we followed the standard

4   practice of notifying our clients that we were moving,

5   giving them the opportunity to transfer files.  And

6   in -- the practice should be that in most of those

7   matters you put a new engagement letter in place.

8              I don't -- I can't say that that

9   happened every single time in the way that one might

10  expect that it would.

11  Q.    So since the time that you've represented The

12  Hill School, just so I understand your answer, you

13  haven't obtained a new retention agreement for each

14  specific complaint that you investigated or provided

15  advice or assistance about; is that your point?

16  A.    Yes.  We would not -- it would all fall within

17  the scope of the initial engagement.

18  Q.    So the scope of the services you currently

19  provide to Cozen O'Connor -- let me start again.

20  A.    The Hill School.

21  Q.    Yeah.  Hold on.

22              The scope of legal services that your

23  presently provide to The Hill School is the same as

24  the scope in the initial retention in April 2016?

0141a

Leslie M. Gomez, Esquire

```
 1   A.      I think it is to be expanded to the extent that
 2   we give advice on contemporaneous or real time
 3   incidents or allegations.  I don't like the word
 4   allegations, but real time incidents that come
 5   forward.
 6   Q.      So you completed some of the bullet points that
 7   were part of the original retention --
 8   A.      Yes.
 9   Q.      -- and you -- but you continue to provide
10   advice or assistance regarding additional complaints
11   that come in between faculty and students, students
12   and students and faculty to faculty; is that right?
13   A.      Yes.
14   Q.      Are there any lawyers, other than you, who
15   provide legal services to The Hill School at Cozen
16   O'Connor?
17   A.      So Gina and I are the primary attorneys.  In
18   our work here I know, for example, one of my counsel
19   within our group reviewed the files.  But the files,
20   meaning Mr. Ralston's personnel file, Mr. Poulos'
21   academic record.
22           And there may have been other aspects
23   of the work, legal research those sorts of thing, but
24   primarily it is Gina and me.
```

Leslie M. Gomez, Esquire

```
1    Q.      Is the retention of Cozen O'Connor also based

2    on hourly rate time charges?

3    A.      Yes.

4    Q.      Do you send bills to The Hill School on a

5    regular basis?

6    A.      Yes.

7    Q.      And the bills that you've sent while with Cozen

8    O'Connor will reflect any attorney or paralegal who

9    has --

10   A.      Yes.

11   Q.      -- performed work for The Hill school; is that

12   right?

13   A.      Yes.

14   Q.      Do you have access to the invoices that were

15   sent while you were an attorney at Cozen O'Connor?

16   A.      Yes.

17   Q.      Just while we're here, because you mentioned

18   it, you said someone other than you reviewed the

19   personnel file of Mr. Ralston and the academic record

20   of Mr. Poulos.  Did you keep like a copy of those

21   materials?  Did you go to the school and review them?

22   How did you get access?

23   A.      We have a copy.  They were sent to us.

24   Q.      Do you have a file that you maintain for the
```

0143a

Leslie M. Gomez, Esquire

1    representation of The Hill School?

2    A.    I have -- yes-ish.  I don't think I would say

3    there is a file.  There is the internal Cozen file

4    that would include documents that were gathered.  I

5    have primarily e-mail correspondence.  And as I do

6    various things, I will print out documents, make my

7    own binders for reference.  I may have handwritten or

8    typed interview notes.

9    Q.    So just so I understand correctly, there is

10   like a main file for The Hill School that's maintained

11   in the Cozen O'Connor system; is that right?

12   A.    I would say that records are kept in several

13   places.  Part of it is my own personal records and

14   notes.  For example, documents that I printed and made

15   note of today, I placed in a binder so that I had

16   documents at my fingertips.  If I were to do an

17   interview, I may print out the relevant pieces from a

18   student file or a yearbook or other information for

19   the interview.  When I go to prepare a written report,

20   I may print all of my interview memos and create a

21   binder that has all of that information.  If I do a

22   board presentation or any other presentation to a

23   school, I might have an outline.

24                    There is no one space that I would say

0144a

Leslie M. Gomez, Esquire

```
 1    if you walked into my file room, here is every Hill

 2    School document.  But every Hill School document would

 3    be maintained within my office, within Gina's office,

 4    on e-mail correspondence or within the file room or

 5    within the file management system, whatever that may

 6    be.

 7    Q.     When you refer to the file management system,

 8    are your talking about a hard copy or a system that,

 9    like an electronic system that Cozen uses?

10    A.     Doug could tell your what it's called.  But

11    like a, I think at Cozen or Ballard -- I mean, at

12    Pepper or Ballard it was DMSV or something.  So a file

13    management system where you file documents through a

14    central space.

15    Q.     And there is both hard copy materials and

16    electronic materials; is that right?

17    A.     Yes.

18    Q.     You referenced material in your office and

19    Ms. Smith's office and the file room.  I guess those

20    are hard copies, right?

21    A.     Yes.

22    Q.     Do you also have materials on your work station

23    or laptop that you use?

24    A.     Yes.
```

Leslie M. Gomez, Esquire

```
1    Q.      You said that you collected notes and materials

2    for today and put them in a binder?

3    A.      Yes.

4    Q.      What materials did you collect and put in a

5    binder?

6    A.      I went through my correspondence and I -- to

7    refresh myself on the recollection of the timeframe,

8    which --

9              (Reviewing document.)

10             -- for me started with the April 2018

11   letter.

12   Q.      Okay.  So the first item in the binder that you

13   put together is?

14   A.      The first item in the binder that I put -- in

15   my binder, for my own personal prep, is the

16   November 20, 2017 alumni letter.  The next document in

17   the binder is the April 11, 2018 letter from

18   Mr. Garabedian to Mr. Lehman.

19   Q.      Any other documents in the binder that you

20   prepared for today?

21   A.      The documents in the binder I would describe as

22   falling into two categories.  One is the

23   correspondence back and forth between Mr. Garabedian

24   and Mr. Rees.  And the second would be the
```

0146a

Leslie M. Gomez, Esquire

1    attorney/client privileged communications between

2    myself and the school or myself and Mr. Rees.  There

3    may be, I think, one or two communications that were

4    directed to me or the firm by Mr. Jubb, such as our

5    preservation notice.

6              And the Documents there were a handful

7    of actual excerpts from a student file or an employee

8    file or historical records around the timeframe that

9    were attachments to an e-mail document.

10   Q.    For a student or faculty member, other than

11   Mr. Poulos or Mr. Ralston?

12   A.    No.  In this matter.

13   Q.    All right.  So the excerpts from the student

14   matter -- or the student file, rather, relate to

15   Mr. Poulos, and the excerpts relating to the faculty

16   member relate to Mr. Ralston?

17   A.    Yes.

18   Q.    How many documents are in your binder?

19   A.    I don't know.  And part of the challenge is

20   that the e-mails are not threaded, so each time that

21   you printed one e-mail, it might be the start of

22   e-mail one and then by the time you get to the

23   response you've got eight pages that are reprinting

24   the same documents over and over again.

Leslie M. Gomez, Esquire

```
 1                    But with respect to the public, by
 2         public I mean non-privileged communications, it's
 3         probably less than ten.
 4                    MS. DOUGHERTY:  Mr. Fox, I'm just going
 5              to direct my inquiry to you.  I ask that you
 6              ask the witness to give you her binder so it's
 7              preserved.  And I request the binder.
 8                    MR. FOX:  I'll certainly make sure it's
 9              preserved.  As to the request for the binder,
10              some documents are public, and that's fine.  If
11              they're privileged, they won't be produced but
12              I can give you a log, a privilege log.
13                    MR. POULOS:  I would also like a copy.
14                    MR. FOX:  Sure.
15                    MS. DOUGHERTY:  Based on your
16              representation, I'm not going to ask the
17              witness to list them all.  So you will -- so
18              you'll at least give me a privilege log so I
19              know of everything that is in binder; is that
20              right?
21                    MR. FOX:  Sure.
22                    MS. DOUGHERTY:  And then we can argue
23              about whether we're entitled to the documents
24              at another time.
```

Leslie M. Gomez, Esquire

```
 1                MR. FOX:  Yes.
 2                MS. DOUGHERTY:  Thank you.
 3                THE WITNESS:  Yeah.  And, Candi, just
 4         so you understand this was really -- what's in
 5         the binder is what I printed from my e-mail
 6         correspondence so that I could be organized,
 7         prepared, refresh myself on date and times.
 8                MS. DOUGHERTY:  I understand.
 9    BY MS. DOUGHERTY:
10    Q.    Have you been retained to provide any other
11    legal services for The Hill School, other than what
12    you've described pursuant to the April 22, 2016
13    retention agreement and your continuing scope since
14    joining Cozen O'Connor?
15    A.    No.
16    Q.    So you've never been retained by The Hill
17    School to represent it in litigation; is that right?
18    A.    Never.  We do no litigation.
19    Q.    You were not retained by The Hill School in
20    relation to any threatened litigation by Mr. Poulos;
21    is that right?
22    A.    I can't -- so the way that you asked that
23    question, they may have retained us because of
24    threatened litigation.  I do not give litigation
```

Leslie M. Gomez, Esquire

```
 1    advise.  I do not serve in court.  I do not litigate

 2    on behalf of clients.  My advice is investigating and

 3    evaluating allegations or reports of abuse, advising

 4    on legal obligations by reporting, advising on

 5    appropriate institutional responses that are

 6    consistent with those legal obligations, consistent

 7    with the dynamics of child or educator abuse and

 8    consistent with the School's stated committment to us

 9    to respond to those in a manner that is candid and

10    transparent with their community.

11    Q.     That last part, you said the School has made a

12    committment to us.  But I -- that includes you and, I

13    assume, Ms. Smith, right?

14    A.     Yes.

15    Q.     To do what?

16    A.     As stated in the April 2016 engagement letter,

17    assist the School in providing open transparent and

18    sensitive communications to relevant constituents.

19    Q.     Oh, no.  You said the School made a committment

20    to you or you said to us, the School made a

21    committment to us.  Did the School make a committment

22    to you regarding how it would respond to any

23    investigation you performed?

24    A.     What I just read to you, that the School has
```

Leslie M. Gomez, Esquire

```
 1   communicated to us that there are values in this --

 2   any matter of child abuse is to look at that through

 3   the lense of child protection and to communicate

 4   information as appropriate and necessary to do that.

 5   Q.    So as far as you're concerned, you never

 6   provided legal advice or assistance to The Hill School

 7   relating to any litigation by Mr. Poulos; is that

 8   right?

 9   A.    The framing --

10            MR. FOX:  Object to the form.

11            Go ahead.

12            THE WITNESS:  The facts are

13       intermingled.  So do I advice the School you

14       should settle a case, not settle a case?  No.

15       Do I read a filing and adjust or revise or edit

16       a filing?  No.

17            To the extent that the issues that I'm

18       asked to investigate arise through the context

19       of a demand letter or litigation, there is

20       necessarily overlap in how the issues come to

21       light.  But I do not litigate.  I do not advise

22       on litigation.  And I do not represent the

23       School in litigation.  The School has separate

24       counsel.
```

0151a

Leslie M. Gomez, Esquire

```
 1   BY MS. DOUGHERTY:

 2   Q.    To whom do you owe allegiance in connection

 3   with the legal services you provide to The Hill

 4   School?

 5              MR. FOX:  Objection.

 6              THE WITNESS:  What do you mean by

 7        allegiance?

 8   BY MS. DOUGHERTY:

 9   Q.    Well, do you think you have any obligation to

10   act in the best interest of the complainants?

11              MR. FOX:  Objection.

12              THE WITNESS:  I think I have an ethical

13        obligation to do the engagement that I was

14        asked to do.  And that ethical obligation is to

15        gather facts in an informed and sensitive way,

16        to reach a determination and/or provide legal

17        advice based on what I know and understand the

18        law and the issues of child protection to be

19        and to provide advice.  I don't have a bias for

20        or against a complainant.  I don't have a bias

21        for or against a respondent.  And I don't have

22        a bias for or against an institution.

23   BY MS. DOUGHERTY:

24   Q.    Do you consider The Hill School your client?
```

0152a

Leslie M. Gomez, Esquire

```
 1   A.      Yes.

 2   Q.      So do you consider you have an attorney/client

 3   relationship with The Hill School?

 4   A.      Yes.

 5   Q.      So doesn't that mean that your allegiance is to

 6   The Hill School?

 7              MR. FOX:  Objection.

 8              THE WITNESS:  Candi, when you say the

 9         word allegiance, I hear bias.  I hear that the

10         very common perception of institutional bias.

11         The same that Lane referenced in the New York

12         Times article that Mr. Garabedian made some

13         comment that I don't recall in that article.  I

14         hear the idea in this field, there is a

15         perception of institutional bias that the

16         School was necessarily biased to withhold

17         information, to not do full investigations, to

18         use that very common phrase you see is sweep

19         things under the rug.  That is not the nature

20         of my practice and that is not how I view the

21         work that I do.

22              And so when you say allegiance, yes, I

23         am hired to give legal advice to my client.  My

24         client is The Hill School.  My legal advice and
```

Leslie M. Gomez, Esquire

```
 1              the reason that I am hired is to give advice

 2              about issues as it relates to child protection.

 3              And from my perspective that is the nature of

 4              the advice, what are the legal requirements,

 5              how do you comply with the law and how do you

 6              respond in a manner that's consistent with your

 7              institutional values or goals of elevating

 8              child protection.

 9   BY MS. DOUGHERTY:

10   Q.    My question about allegiance was not intended

11   to suggest that you've helped the School or your

12   clients cover things up or engage in, you know, I

13   guess that would be unlawful conduct, right?  My

14   question was more about -- well, it was.  About you as

15   an attorney providing advice and assistance to, you

16   know, The Hill School that you've identified as your

17   client.  I'm just trying to confirm that your

18   allegiance is to The Hill School, correct?

19              MR. FOX:  Objection.

20              THE WITNESS:  The Hill School is my

21       client, yes.

22   BY MS. DOUGHERTY:

23   Q.    So you're not an independent investigator?

24              MR. FOX:  Objection.
```

0154a

Leslie M. Gomez, Esquire

```
 1                  THE WITNESS:  It's really interesting,
 2         Candi, after our early conversations, I don't
 3         think it was Mr. Garabedian, I'm fairly certain
 4         it was with Mr. MacLeish in another matter.  We
 5         became aware that the term independent is a
 6         term that is viewed with great disfavor.  We no
 7         longer use the term independent.  And that was
 8         from the framing, as we understood it, of
 9         individuals, particularly plaintiff's counsel,
10         who made the assertion that because you were
11         hired by an institution that you could not
12         truly be independent.
13                  From my perspective that's a
14         hyper-technical reading of that particular
15         word.  We have shifted to the word external.  I
16         received legal fees for the work that I do.  It
17         doesn't matter who is paying those legal fees
18         if I am asked in my roll to provide candid
19         advice based on my assessment, that is what I
20         do.  And my advice does not change based on
21         whether I am -- my advice does not change
22         because I'm engaged by an institution.
23    BY MS. DOUGHERTY:
24    Q.    Okay.  You said -- I just want to be clear.
```

Leslie M. Gomez, Esquire

1   You and I have never had communications, right?

2   A.      Never.

3   Q.      All right.  So the communications you're

4   talking about are with someone other than me, in fact,

5   someone other than my partner Jeff McCarron who is

6   entered into the case or any attorney with my law

7   firm, right?

8   A.      I don't know Jeff; I don't know you.

9   Q.      Okay.  So who were you communicating with about

10  the issue presented by -- identifying yourself as an

11  independent investigator?

12  A.      I think it was probably Eric MacLeish;

13  completely unrelated, different matter, but just in

14  the context of the use of the term independent.

15  Q.      And when was that, after the letters by

16  Garabedian?

17  A.      I don't recall when.

18  Q.      So you don't know when you stopped using the

19  term independent investigator to describe yourself?

20  A.      I don't know the date, no.

21  Q.      Is there an event that you can use to place it

22  or can you estimate without completely guessing?  Like

23  this year?  Within the past two years?

24  A.      No, I would say 2016 to 2017 is the best guess.

Leslie M. Gomez, Esquire

```
 1   Q.     Do you consider yourself an auditor?

 2   A.     I don't know how you define that word.

 3   Q.     Well, how do you define it?

 4              MR. FOX:  Objection.

 5              THE WITNESS:  It depends on the scope

 6          of my engagement.  In some cases I conduct an

 7          external audit at a college or university, a K

 8          to 12 school, review policies and procedures,

 9          interview implementors, sometimes seek feedback

10          from students, faculty or staff who

11          participated as complainants and respondents

12          and provide advice about the institutional

13          response, how to change or advise policies for

14          legal compliance and/or how to change practices

15          to ensure that what that school, college or

16          university, summer camp, what have you, is

17          doing is effective -- is consistent with what

18          we believe to be effective practices.  So I do

19          conduct external audits, yes.

20   BY MS. DOUGHERTY:

21   Q.     But the scope of your legal services for The

22   Hill School didn't include an audit as you've

23   described it; is that right?

24   A.     It included that last bullet I shared, which
```

0157a

Leslie M. Gomez, Esquire

```
 1   was review relevant school policies, procedures and
 2   training materials.
 3   Q.     But not what you consider or just explained
 4   what you mean by audit, correct?
 5   A.     We were not engaged to conduct an external
 6   audit in the way that I just framed.  I would say that
 7   the review of policies, procedures and training
 8   materials would be concurrent with the review of
 9   historical work that we were doing.
10   Q.     So you consider your communications with The
11   Hill School to be protected by attorney/client
12   privilege; is that right?
13   A.     I do.  Some engagements we are hired as
14   entirely external.  The school may make a commitment
15   that we're doing an audit and/or a historical review
16   of allegations.  And that whatever report that we
17   write will be a report that is shared publicly at the
18   same time that it's shared with the institution.
19              The Curtis Institute of Music is an
20   example of a report that we recently released
21   publicly, maybe about a year ago.  There are other
22   engagements where we were hired through
23   attorney/client privilege to do similar work.  But
24   it's not necessarily -- it's sort of a broader advice
```

Leslie M. Gomez, Esquire

1  about, as I shared here, ongoing legal responses to

2  ensure that this school is meeting the legal

3  requirements as it relates to reporting to child

4  protective services or to local law enforcement and

5  taking appropriate steps with respect to supported

6  measures and protection of minors.

7  Q.    Okay.  So when you were retained April 22, 2016

8  by The Hill School, you understood that your retention

9  was as attorney/client and your findings, whatever

10  they may be, would not be made public; is that right?

11  At least not by you; is that right?

12  A.    I would clarify to say I understood that the

13  role was attorney/client privilege.  It was not

14  determined at that point what the School would choose

15  to do with that privilege, waive it or not waive it,

16  share a report or not share a report.  I'm not even

17  sure not it's determined at the beginning necessarily

18  if there will be a written report.  Sometimes there's

19  a part of the decisions you get later down the road.

20            Contrast that, Candi, with occasionally

21  there's a school as part of the engagement, we are

22  engaging you to conduct a review and we commit to the

23  public that we will share that review as written by

24  Pepper Hamilton or Cozen O'Connor.  And so there is an

0159a

1    explicit statement that that is the goal of the

2    review.

3    Q.      Okay.  So you didn't receive that committment

4    from The Hill School; is that right?

5    A.      That's right.

6    Q.      The committment that the findings would be

7    shared, right?

8    A.      I have the language in the engagement letter.

9    Assist the school in providing open, transparent and

10   sensitive communications to relevant constituencies.

11   And I have the November 2017 letter that shares,

12   through the review we learned of several troubling

13   incidents, those incidents involved, the abuse is

14   uncovered and sort of walked through.  So The Hill

15   School, in this communication, chose to share high

16   level findings, conclusions, observations and

17   apologies.

18                  (Ms. Dougherty is sharing her screen.)

19   BY MS. DOUGHERTY:

20   Q.      I'm sharing with you a document that's been

21   previously marked as D2.  I don't know because it's

22   covered, whether it has the same Bates label as what

23   was shown to you earlier as Gomez-1.  But it is the

24   April 23, 2016 letter from Mr. Lehman to Hill School

Leslie M. Gomez, Esquire

1    alumni and parents.  It's two pages long.  Well, it's

2    really one page and then there is a signature on the

3    second page.

4                   Did you participate in the preparation

5    of the April 23, 2016 letter that has been marked as

6    D2?

7    A.    I probably did.  I don't have an independent

8    recollection of that, but I probably did.  I did not,

9    as I shared earlier, review my file from 2016 through

10   2018.

11   Q.    Do have sort of a standard practice and

12   procedure as to how you provide advice to schools

13   regarding their institutional response or

14   investigation into historical sexual abuse complaints?

15   A.    Ask me that question again, Candi, I want to

16   make sure I understand it.

17   Q.    Sure.  I'm trying to use your language so you

18   don't feel like I'm putting words in your mouth.

19   A.    Go ahead.

20   Q.    I just wanted to know if you have a standard

21   practice and procedure that you follow in connection

22   with retentions like the retention by The Hill School,

23   to perform the investigation and whatnot?

24   A.    So every engagement is a different engagement.

0161a

Leslie M. Gomez, Esquire

1    And so when you say standard practice, my standard

2    practice is to gather any and all written information,

3    files, communication, documentation to -- if I'm

4    conducting an investigation, to identify who potential

5    witnesses may be, to interview those witnesses.  So

6    that's one type of an engagement.  An external audit

7    is similar but different.

8    Q.     Okay.  How about I think part of your first

9    bullet point as it related to the retention by The

10   Hill School was to conduct an internal review of

11   historical allegations of abuse.

12                Have you been engaged by -- let me

13   start again.

14                As of April 22, 2016, had you been

15   engaged by other clients and performed for other

16   clients an internal review of historical allegations

17   of abuse?

18   A.     Yes.

19   Q.     As of April 22, 2016, did you have a standard

20   practice and procedure as to how you would conduct an

21   internal review of historical allegations of sexual

22   abuse?

23   A.     Yes.

24   Q.     Did you have a standard practice and procedure

0162a

Leslie M. Gomez, Esquire

1    that was specific to schools or colleges or different

2    types of institutions or is there just one -- or was

3    there just one standard practice and procedure that

4    you had as of April 22, 2016 relating to an internal

5    review of historical allegations of sexual abuse?

6    A.    I think the standard practice and procedure is

7    to evaluate what the available information is, to

8    determine what documents may exist, to then follow

9    those leads wherever they lead you, follow the

10   information wherever it leads you, to interview

11   witnesses and to gather whatever other documentation

12   may be available, whether that be through an e-mail

13   review, a review of cell phones or text messages,

14   coordinate and contact with external law enforcement.

15            Every investigation or review, I use

16   those words interchangeably is necessarily similar and

17   necessarily different based on what information is

18   available to you.  The standard practice is to listen

19   with an earnest intent, to be open to whatever the

20   information is and to follow that information wherever

21   it leads.

22   Q.    Do you know why Mr. Lehman decided to send the

23   April 22, 2016 letter that's been marked as D2?

24            MR. FOX:  Objection.

0163a

Leslie M. Gomez, Esquire

```
 1                    THE WITNESS:  I know what was shared

 2           with me at the time, which is --

 3                    MR. FOX:  Leslie.

 4                    THE WITNESS:  Yes.

 5                    MR. FOX:  If it's an attorney/client

 6           conversation, I'd request that you not testify

 7           about that.

 8                    THE WITNESS:  I think it's what's

 9           within the letter that was shared publicly --

10                    MR. FOX:  Okay.

11                    THE WITNESS:  -- which is that the

12           School sought to conduct a proactive review.

13                    I think the November 20, 2017, second

14           paragraph, "At that time the unanimous support

15           of The Board of Trustees, I initiated a review

16           of historical allegations and abuse at The Hill

17           and the School's response to those allegations.

18           This was a proactive review by the School not

19           initiated by any complaint.  As Headmaster I

20           felt it was important to understand more about

21           the School's history.  The Board and I also

22           felt it was imperative that review be external,

23           objective and informed by the appropriate

24           expertise."
```

0164a

Leslie M. Gomez, Esquire

```
 1   BY MS. DOUGHERTY:

 2   Q.    So you're reading from the November 20, 2017

 3   letter?

 4   A.    Yes.

 5   Q.    Just to be clear, I'm asking you whether you

 6   know why Mr. Lehman sent the April 23, 2016 letter?

 7   A.    What I'm answering is that that is my

 8   understanding of the reason why.

 9   Q.    Did Mr. Lehman send the April 23, 2016 letter

10   to Hill School alumni and parents based on your

11   advice?

12              MR. FOX:  Objection.

13              THE WITNESS:  No.

14              And, in fact, I was looking back while

15         we were talking.  I don't -- I want to clarify

16         a prior answer.  I don't believe that we

17         advised on this letter.  Given the date of our

18         engagement, April 22,2016 I don't believe that

19         we advised on this letter.

20   BY MS. DOUGHERTY:

21   Q.    And at the time your retention, April 22, 2016,

22   The Hill School had received at least one complaint

23   regarding inappropriate contact or conduct by a

24   faculty member directed to a student; is that right?
```

0165a

Leslie M. Gomez, Esquire

1    A.      If I'm following your question...

2    Q.      Well, let me phrase it a different way.

3                 The scope of your retention on

4    April 22, 2016 included an investigation into conduct

5    by a now deceased Hill School employee; is that right?

6    A.      That's correct.

7    Q.      So as of your retention or Pepper Hamilton's

8    retention, April 22, 2016, The Hill School had

9    received at least one complaint regarding

10   inappropriate conduct by a faculty member directed to

11   a student; is that right?

12   A.      My recollection is that there was no current

13   complaint or historical complaint in April of 2016.

14   That it was a proactive review based on information

15   that was available and files which may have included

16   complaints that had been made in prior years.

17   Q.      Okay.

18   A.      But there was no precipitating complaint in

19   April 2016 that I'm aware of.

20   Q.      I understand.

21                So you didn't -- let me start again.

22                As far as you knew, there wasn't a

23   complainant as it related to the conduct by the

24   deceased faculty member, but the school had somehow

0166a

Leslie M. Gomez, Esquire

1    learned information that it wanted you and Ms. Smith

2    to investigate regarding the conduct of the deceased

3    faculty member; is that right?

4    A.    As far as I knew there was no contemporaneous

5    complaint in April of 2016 that caused the School to

6    initiate this.  That what was shared in that 2017

7    letter was that the school chose to do a proactive

8    review based on information that was available in

9    their files and wanting to understand their history.

10   Q.    But as of April 22, 2016, the School had some

11   information regarding misconduct, I assume, of a

12   sexual nature, I think you said by the now deceased

13   faculty member; is that right?

14   A.    Yes.

15   Q.    Because it showed up in your retention

16   agreement, right?

17   A.    Yes.

18   Q.    Okay.  So now that you've reviewed D2 and some

19   of the subsequent materials, you now believe that you

20   did not participate in the preparation of the

21   April 23, 2016 letter that has been marked as D2 and

22   was previously shown to you as Gomez-1; is that right?

23   A.    Given the date of the engagement letter and

24   given that my first contact with the School was

0167a

Leslie M. Gomez, Esquire

1    April 22nd of 2016, I do not believe that we reviewed

2    that letter.

3              I don't have access easily to the

4    Pepper Hamilton e-mail correspondence to see if there

5    would have been a draft that was shared back and

6    forth, but I do not believe that we reviewed this

7    letter.

8    Q.    When you're retained to perform an internal

9    review of historical allegations of sexual abuse do

10   you advise your client to send a letter like the one

11   reflected in the April 23, 2016 letter that's been

12   marked as D2?

13             MR. FOX:  Objection.

14             THE WITNESS:  So setting aside the like

15        that particular letter, to the extent that we

16        are doing an external review and we're seeking

17        to gather widespread historical information

18        about sexual abuse or reports that may have

19        been made, part of that process is reaching out

20        to students, faculty, staff and alumnae to

21        invite individuals to participate and share

22        information.

23   BY MS. DOUGHERTY:

24   Q.    Okay.  I'll just give you an example.  I'm a

0168a

Leslie M. Gomez, Esquire

1    litigator, not an investigator like you are.  So every
2    time I'm retained by a client, it's in connection with
3    litigation.  I enter my appearance with the Court.  So
4    every time I represent a client in litigation I enter
5    my appearance.  It's standard practice no matter who
6    or where, what you have to enter your appearance with
7    the Court.
8                  So I'm just trying to learn if you have
9    a standard practice of advising your clients to send a
10   specific type of letter when you are retained to
11   perform an internal review of historical allegations?
12   A.    It depends on the scope of the engagement.
13                  MR. FOX:  Objection.
14   BY MS. DOUGHERTY:
15   Q.    Okay.  So like in looking through the April 23,
16   2016 letter that's been marked as D2, you don't
17   recognize any language that you generated or
18   customarily advise your clients to include in letters?
19                  MR. FOX:  Objection.
20                  THE WITNESS:  Can you scroll down, I
21        want to just look at the end of it.
22   BY MS. DOUGHERTY:
23   Q.    Sure.
24                  (Ms. Dougherty is moving the screen.)

0169a

Leslie M. Gomez, Esquire

1    A.     (Reviewing document.)

2              Is there a second page?

3    Q.     There is, but it's just a signature, but I'll

4    show it to you.

5    A.     Okay.

6              (Ms. Dougherty is moving the screen.)

7              (Reviewing document.)

8              Yeah.  Candi, I don't have an

9    independent recollection.

10   Q.     Okay.

11   A.     And this is the type of information that is

12   typically included in a letter that may go out.  If

13   it's a specific invitation to participate in a review,

14   it would have language like you saw in the

15   November 2017 letter that says we encourage you to,

16   come forward.  I extend an invitation to any Hill

17   School community member who wishes to share his or her

18   experiences with the School or, if appropriate, with

19   law enforcement, encourage you to reach out directly.

20   You can contact Leslie, Gina, the School or this

21   survey.

22   Q.     Sorry.  I'm just trying to use the same version

23   that the plaintiff used.

24   A.     Take your time.

1   Q.    It's much easier to conduct a deposition when

2   you have the documents in your hand and you just hand

3   it to people.

4              There we go.

5              (Ms. Dougherty is sharing her screen.)

6              So I'm showing you the November 20,

7   2017 letter.  You previously were shown a letter.

8   It's marked as Gomez-2.  I'm going to mark it as D33.

9                        - - -

10             (Exhibit D33, The Hill School, November

11         20, 2017, 3 pages, was marked for

12         identification.)

13                       - - -

14  BY MS. DOUGHERTY:

15  Q.    Did you participate in the preparation of the

16  November 20, 2017 letter?

17  A.    I'm sure I did.

18  Q.    And I think you told Mr. Lane -- or Mr. Jubb

19  earlier that at the time that this letter was sent,

20  November 20, 2017, you had concluded your

21  investigation into historical allegations of sexual

22  abuse; is that right?

23  A.    We had concluded a review of the available

24  information at that time, yes.

Leslie M. Gomez, Esquire

1    Q.    And is it correct that you expected additional

2    individuals to come forward in response to the

3    November 20, 2017 letter?

4                   MR. FOX:  Objection to the form.

5                   THE WITNESS:  Just a small quibble on

6            the word expect.  It is correct that I

7            certainly viewed that as likely or potential.

8            Not that I necessarily expect.  I didn't have

9            any particular incident, case or file in mind.

10           But what I have seen in my experience is that

11           when a school shares information publicly and

12           is receptive to that and reflects that back to

13           their community, that if -- that sometimes is

14           an impetus for other individuals to come

15           forward and share their experience as well.

16   BY MS. DOUGHERTY:

17   Q.    Do you know why the Hill School sent the

18   November 20, 2017 letter?

19                   MR. FOX:  Objection.

20                   MR. JUBB:  Objection to form.

21                   THE WITNESS:  For the reasons that are

22           stated in the letter.  We have a history.  We

23           would have knowledge that we want to apologize

24           for.  We want to encourage anyones else to come

0172a

Leslie M. Gomez, Esquire

```
 1        forward.

 2   BY MS. DOUGHERTY:

 3   Q.    Did you advise the Hill School to send the

 4   November 20, 2017 letter?

 5              MR. FOX:  Objection.

 6              Don't respond to that, Leslie.

 7              MR. POULOS:  On what grounds?

 8              MR. FOX:  Attorney/client privilege.

 9              MS. DOUGHERTY:  Well, Mr. Fox, I guess

10        I'm just confused because I asked if she knew

11        why and she told me that the reason was as

12        expressed in the letter, which I don't think

13        the letter indicates our lawyers advised us to

14        do it, right?

15              MR. FOX:  Well, the question you asked

16        was did you advise your client to send the

17        letter.  That was the question.

18              MS. DOUGHERTY:  That wasn't exactly my

19        question, but that's fine --

20              MR. FOX:  That was your question.

21              MS. DOUGHERTY:  We'll just go to the

22        court.

23              MR. FOX:  Try to restate it then.

24              MS. DOUGHERTY:  Okay.
```

0173a

Leslie M. Gomez, Esquire

```
 1   BY MS. DOUGHERTY:

 2   Q.    I'm directing you --

 3   A.    You can frame your question this way.  Part of

 4   our engagement would include discussion as to the form

 5   of how information may be shared.  What specific

 6   advice I gave or did not give I think is what Mr. Fox

 7   is asserting privilege on, but certainly it would have

 8   been within the scope of our legal advice to discuss

 9   how best to share the information with the community.

10   And that was consistent with the scope of the

11   engagement letter.

12   Q.    Please correct me if I'm wrong, but my

13   understanding of the description of the legal services

14   that you provided to The Hill School or that are even

15   typical of your engagements, that you don't actually

16   tell the institution what to do, you advise the

17   institution how to comply with the law and report your

18   findings.  And when the institution makes a decision

19   on how it wants to respond, then you assist them in

20   that response; is that right?

21   A.    So the client makes the decision, yes.  I

22   provide the legal advice.

23   Q.    So it's not the situation that if you learn of

24   a historical allegation of sexual abuse that you
```

0174a

Leslie M. Gomez, Esquire

1    instruct your clients to send a letter to the

2    community, right.  You just report the information

3    that you learn and then respond to your client and

4    assist your client in an appropriate and legal

5    response, correct?

6    A.    I don't think I would frame it quite way.  In

7    other words, you asked me earlier about one of our

8    standard protocols.

9    Q.    Mm-hmm.

10   A.    Part of the standard protocol is, what is the

11   information that we have, what is the information that

12   we're seeking to gather, are there communications as

13   framed in this letter that support the goal of our

14   engagement or institutional mission and values at the

15   school.

16              So we do provide advice, legal advice,

17   about the form and nature of communications as it

18   relates to our work.  Ultimately our discussions with

19   any school would include what are the various ways in

20   which you can share this information with the

21   community.  And that could be any number of stops

22   along -- I'm losing my word -- but along a spectrum,

23   if you will.

24   Q.    So between your initial engagement and the

0175a

Leslie M. Gomez, Esquire

```
1    April 22, 2016 and as of the time of this November 20,

2    2017 letter, what investigation did you or the other

3    attorneys with Pepper and then Cozen O'Connor, what

4    did you do as part of the investigation?

5    A.    I would --

6    Q.    And I'm just limiting it to the investigation

7    that ended initially on November 20, 2017 as compared

8    to any investigation related to Poulos?

9    A.    Right.  I would have to go back and look.  But

10   standard practice would be, and again, I did not

11   review that portion of the engagement.  Standard

12   practice would be review the available documents,

13   review what's available in school files, personnel,

14   education records, yearbooks, review other

15   contemporaneous documentation to the extent that there

16   is any, such as a Headmaster's file or some file for

17   the year that might not be contained within any

18   particular personnel or educational file.  Interview

19   the individuals that might have relevant information,

20   which would include the complainant, the respondent if

21   available, and school administrators who would have

22   been in place at a particular time who might have

23   recollections of the context, the parties, other

24   information.
```

0176a

Leslie M. Gomez, Esquire

1                    So standard response is to gather

2       documents, gather whatever other evidence there may be

3       and interview witnesses.

4       Q.    Okay.  And just to be clear, the documents that

5       you're talking about -- well, let's just -- you know

6       what, let's just start with your standard practice, if

7       there is one.  You can tell me if there is not.

8                    As it relates to your standard

9       practice, when you talk about collecting documents, do

10      you just receive information or documents that the

11      School gives you regarding specific complainants or

12      complaints or do you go look through personnel files,

13      educational records in a more general sense?

14      A.    It depends on the engagement.

15      Q.    How about the engagement by the Hill School,

16      were you given a specific field of personnel files,

17      student files or other educational records or did you

18      perform a broader review of documents?

19      A.    There was a review of files.  I don't recall

20      the specifics of the review of the files.  But I do

21      know that we looked at a broad range of information.

22                    MR. FOX:  Can we take a break for about

23          five minutes.

24                    MS. DOUGHERTY:  Sure.

0177a

Leslie M. Gomez, Esquire

```
 1                  (A short break was taken.)

 2    BY MS. DOUGHERTY:

 3    Q.    Ms. Gomez, are you ready?

 4    A.    Yes.  Thank you.

 5    Q.    We were talking about your standard practice

 6    before the break, so just sticking with that.

 7                  Your standard practice for performing

 8    an investigation into historical allegations of abuse.

 9                  Do you have like a checklist of

10    documents that you request or that you developed over

11    time that you know to request?

12    A.    A written checklist or just sort of our

13    practice and how we do it?

14    Q.    Either.  Well, let's start -- let's do it this

15    way.  Do you have a written checklist?

16    A.    We may have had over the years.  I don't know

17    if I actually have one or could put a finger on one.

18    Q.    Okay.  How about your standard practice and

19    procedure?

20    A.    I don't think that it's written in a document

21    that you would say this is the protocol to follow, no.

22    Q.    Okay.  With that -- how about unwritten?

23    A.    Sure.

24    Q.    What's your unwritten checklist or standard
```

1    practice and procedure, whatever you want to refer to

2    it as, please use your words, of documents that you

3    request when you're starting your investigation into

4    historical allegations of abuse?

5    A.      Yeah.  Again it depends on the scope of the --

6    depends on the nature of the allegations, the scope of

7    what's been reported and where we might easily be

8    expected to find documents.

9                So you could run through in any one of

10   those circumstances.  And again, depending on the

11   context, is it a K to 12 school, is it a college and

12   university.  But I want to understand what is in

13   writing.  I want to look at individual files, student

14   files or personnel records.  I want to understand how

15   a school conducts their records management systems,

16   where in their records management systems they might

17   store information.

18               In a historical allegation of sexual

19   abuse we're primarily looking at the written documents

20   as oppose to -- or paper, hard copy documents as

21   opposed to e-mail correspondence.  So if I go back to

22   a review from a Head of School in the '80s, for

23   example, I'd want to understand how did that Head of

24   School keep their information, where might records

Leslie M. Gomez, Esquire

```
 1    have been stored, were records passed from one Head

 2    Master to the next.  So I think the best way to answer

 3    that question is that I would go through scoping

 4    interviews or custodial interviews to understand the

 5    scope of where documentation might exist.  That might

 6    include a Head of School, an Assistant Head of School.

 7    It might include, and often we see, an Administrative

 8    Assistant or a Secretary that might have access to

 9    records.

10              Some schools have very robust archives,

11    some schools do not.  Some school have digitized and

12    scanned their records some schools have not.  Some

13    schools maintain files by employee.  Some schools

14    maintain -- you could sort of go and find "the Head of

15    School file" for each year that particular Head of

16    School.

17              So when I say there is no standard

18    protocol or no standard list, the list is any and all

19    available records that might shed light on the issues

20    that we're investigating, help us to understand the

21    particular response.  It often includes -- for

22    example, one investigation that we're doing now

23    involves a church and a school.  So I go to school

24    board minutes.  I go to vestry or church board
```

0180a

Leslie M. Gomez, Esquire

```
 1    minutes.  I look at yearbooks and/or other archival

 2    materials about public communications about the

 3    employees that we might be looking at.

 4                If it's a college or university, I may

 5    seek to understand or will always seek to understand

 6    what prior reports might have been made to the police

 7    department, campus police, what prior reports may have

 8    been made to Human Resources, to Student Affairs, to

 9    students concern.  In a residence hall context, if I

10    am looking at a more recent incident, as I shared

11    earlier, it may be that the school or college or

12    university maintains a -- they provide or pay for the

13    cell phone service they're university issued or owned.

14    I may, in fact, image cell phones and/or laptops

15    and/or iPads or the like and we'll get communications

16    by text or iMessage.  I may look at social media.

17                So I'm not giving you an exhaustive

18    list of documents.  There may be -- we may obtain

19    medical records or counseling records that the

20    individual consents and gives them to us.  There may

21    be -- I'm just trying to think of all of the various

22    kinds of information that's out there.  But if there

23    is something that's available that I can reasonably

24    access, I seek to do that, including sometimes seeking
```

Leslie M. Gomez, Esquire

```
 1    to get access from local law enforcement records or
 2    other information.
 3              The goal is to be as thorough as
 4    possible in gathering information, particularly
 5    because when you are investigating sexual assault,
 6    child abuse, sexual harassment, there are often many
 7    ways to corroborate information that's brought to
 8    light, based on contemporaneous disclosures, based on
 9    contemporaneous communications, based on the history
10    and the contest of the relationship between the
11    parties or other factors that might help you to
12    evaluate the credibility of the information that's
13    being shared.
14    Q.    Am I correct that you don't remember the
15    specific materials that you had requested from The
16    Hill School in connection with the investigation into
17    historical allegations of sexual abuse?
18    A.    That's correct.
19    Q.    Did you make the request for materials in
20    writing?
21    A.    Likely.
22              May have been in writing.  May have
23    been in person during an interview.  As you're having
24    a conversation during an interview with a Head of
```

0182a

Leslie M. Gomez, Esquire

```
 1   School or a former Head of School that you're asking
 2   for information and saying, can you go back and check
 3   the record and share with me.  So sometimes it's
 4   orally, sometimes it's in writing.
 5   Q.    If your -- let me start again.
 6              If you wrote down or provided The Hill
 7   School a list of materials you wanted in writing,
 8   would you still have access to that?  Is that in your
 9   filed materials somewhere?
10   A.    Theoretically the Pepper Hamilton file would
11   have been transferred to Cozen.  I can't tell you
12   whether it was or was not, whether the transfer was
13   complete or not complete.
14   Q.    If there was a writing it would be reflected in
15   somebody's time entry on an invoice, right?
16   A.    Maybe.  In other words, the invoice might just
17   say correspondence with, you know, whoever it may be.
18   It might not say correspondence with to request X, Y,
19   Z.  They're not -- my time entries aren't always that
20   specific to say exactly what the nature of the
21   discussion and the call was or the request.
22   Q.    I think you described the interviews as
23   custodial interview or a scoping interview, is that
24   what you're talking about --
```

0183a

```
 1   A.      Right.

 2   Q.      -- where you would ask somebody orally for

 3   additional material?  So when you're interviewing

 4   somebody, if they identify a cell phone that belongs

 5   to the school or an archive that they have or

 6   something, you might ask them to provide that, right?

 7   A.      Right.  So there might be instances where all

 8   I'm doing is a custodial interview.  All right.  Maybe

 9   for an audit type purposes or responding to a Federal

10   investigation, like an office for Civil Rights or

11   Department of Education.  Other instances I'm

12   interviewing a person as a fact witness, as well as in

13   the context of that interview doing all of my

14   questions about where I might reasonably find access

15   to other information that is relevant to the scope of

16   my review.

17   Q.      I think you referenced it earlier, but you keep

18   notes when you perform an interview, whether it's --

19   A.      Absolutely.

20   Q.      -- scoping, custodial or as a fact witness; is

21   that right?

22   A.      Absolutely.

23   Q.      Do you indicate in your notes whether you asked

24   for additional materials during your interview?
```

0184a

Leslie M. Gomez, Esquire

```
 1   A.      Sometimes, yes, typically.

 2   Q.      Did you perform scoping or custodial interviews

 3   in connection with your investigation for The Hill

 4   School into historical allegations of sexual abuse?

 5   A.      I'm sure that as part of the interviews that we

 6   did, we asked questions about where documents and

 7   records might be kept and what information was

 8   available, yes.

 9   Q.      Did you interview school officials in

10   connection with your investigation into historical

11   allegations of sexual abuse at The Hill School?

12   A.      You're talking about the 2016 to 2017 time

13   period?

14   Q.      Correct.

15   A.      Yes.  I would say -- I'd have to go back and

16   double check, but primarily former school officials.

17   There may have been some who were still currently

18   employed, but primarily former.

19   Q.      Right.  Because you were looking into

20   historical allegations as compared to present

21   allegations, right?

22   A.      That's correct.

23              Although we would have done some

24   interviews of current employees to the extent that
```

0185a

Leslie M. Gomez, Esquire

1    they were employed at the time or could share insight

2    with us now as to where documentation might be, what

3    documents might still be available at the school.

4    Q.     And just as a point of reference, did you

5    conduct all the interviews?  Did Ms. Smith conduct all

6    the interviews?  Did you share them?

7    A.     I don't have a recollection.  Typically I would

8    be involved in most, if not all.

9    Q.     If you know, is it Ms. Smith's practice to also

10   keep notes during an interview like you do?

11   A.     If Ms. Smith and I do the notes, I tend to do

12   the more complete typed notes.  Ms. Smith maintains

13   notes I think as to kind of core issues or core themes

14   that come along.  But my notes would typically be the

15   more complete set of notes.

16   Q.     In connection -- again, sticking with the

17   investigation into historical allegations of sexual

18   abuse at The Hill School, did you interview any

19   alumnae or current students?

20   A.     I don't recall if we interviewed -- I'm -- I

21   don't recall if we interviewed alumnae.  I think that

22   we probably did.  I don't believe that there would

23   have been any reason to interview current students

24   based on that work that we were doing at that time.

0186a

Leslie M. Gomez, Esquire

1    Q.    Did you have any contact with law enforcement

2    regarding to --

3    A.    I don't remember.  Sometimes we do.

4    Q.    And you didn't have any complainants or

5    respondents to interview in connection with the

6    investigation of historical allegations of abuse; is

7    that right?

8    A.    So we may have.  In other words, we may have

9    and I just don't recall.  We may have reached out to

10   an individual to say we've become aware, we are

11   reviewing, we'd like to invite you to participate.  I

12   just don't recall whether we did or did not in that

13   case.

14   Q.    But it's part of your standard practice to

15   interview both the complainant and a respondent; is

16   that right?

17   A.    If available, yes.

18   Q.    By if available, you mean if the complainant or

19   the respondent agrees to submit to an interview?

20   A.    Yes.

21   Q.    And just to confirm, any contacts you had with

22   law enforcement or with former or current students or

23   a complainant or a respondent, we would find notes or

24   some type of writing in your file materials, right?

0187a

Leslie M. Gomez, Esquire

1    A.     Yes.

2                (Ms. Dougherty is sharing her screen.)

3    Q.     Okay.  We're back to the November 20, 2017

4    letter that you were shown as Gomez-2 and that I've

5    marked as D33.  We were looking at it before the

6    break, but it's hard to ask question with something in

7    your face like that.

8                So I'm going to direct your attention

9    back to the second page, the middle of the page, the

10   paragraph that starts with, "I extend an invitation to

11   any Hill School Community member."

12               Can you see that paragraph okay?

13   A.     Yes.

14   Q.     It's the only one that has color, I think, on

15   that page.

16   A.     I got it.

17   Q.     Now when this letter was sent out to The Hill

18   School alumni, were you copied on the message?

19   A.     I don't recall.  I know I would have received a

20   copy, if not contemporaneously, it would have been

21   forwarded to me.  I don't think we would have been

22   cc'd on it.  Because it would -- typical practice is

23   it goes out to the schools distribution system,

24   whatever that system might be.

Leslie M. Gomez, Esquire

```
1   Q.    Do you know how it was transmitted?

2   A.    I do not know.

3   Q.    Okay.  As you realize -- I'm sorry.  Go ahead.

4   A.    I would say that the -- this to me looks like

5   it was transmitted by e-mail.  But some schools also

6   do a hard copy mailing.  I don't know what the

7   dissemination was here.

8   Q.    And you knew before the letter -- let me start

9   again.

10            You knew before the November 20, 2017

11  letter that's been marked as D33 was sent, that you

12  were going to be identified in the letter as a source

13  of contact for, I guess, complainants that wanted to

14  come forward; is that right?

15  A.    Yes.

16  Q.    Was that the objective of including your

17  contact information in the November 20, 2017 letter to

18  invite complainants to come forward?

19  A.    Yes.

20  Q.    Did any complainants come forward?

21  A.    I don't recall.  I want to say yes, but I don't

22  recall.

23  Q.    You mean -- let me start again.

24            Did any complainants other then
```

0189a

Leslie M. Gomez, Esquire

1    Mr. Poulos come forward in response to the

2    November 20, 2017 letter?

3    A.     Again, for today, I did not review that portion

4    of my engagement.  My best recollection, without going

5    back and looking at documents is that, yes, additional

6    individuals came forward.

7    Q.     You're identified in the letter as, it says,

8    "our child protection experts," our referring to the

9    school.  I'll just -- it says, "You may also directly

10   contact our child protection experts Leslie Gomez," it

11   has your e-mail, "Gina Smith" with Ms. Smith's e-mail

12   and a phone number.

13            Do you consider yourself a child

14   protection expert?

15   A.    I guess you would have to evaluate how someone

16   defines the word expert.  I consider that since 1995 I

17   have worked in the area of investigating, evaluating

18   and assessing reports of child abuse in the criminal

19   context for 14 years and then in private practice for

20   10 years.  So it is something where I have interviewed

21   thousands of complainants, respondents.  Conducted

22   thousands of investigations and/or prosecutions.  I am

23   familiar with the dynamics of grooming, of delays in

24   reporting, of perpetration.  I am familiar with Legal

0190a

Leslie M. Gomez, Esquire

```
 1    Frameworks.  I am familiar with Child Protective

 2    Services Frameworks, Criminal Frameworks,

 3    Institutional Frameworks, with Title 9 and with

 4    clearing.  My practice is a dedicated focused practice

 5    that looks at sexual and gender based harassment and

 6    violence and child abuse.

 7                 So, yes, I do consider myself to have a

 8    higher level of experience with, a familiarity with

 9    and history with child protection issues.

10    Q.    Okay.  So do you use the title child protection

11    expert?

12    A.    Do I use it?  Like does my website say it?

13                 MR. JUBB:  Objection to form; asked and

14         answered.

15    BY MS. DOUGHERTY:

16    Q.    Yeah.  Here's what I'm trying to learn.  I'm

17    trying to learn if you know where Mr. Lehman got the

18    idea to refer to you as our child protection expert?

19    A.    I'm much more comfortable with child protection

20    professional.  I don't know whose word that was.

21                 I do consider myself a subject matter

22    expert as that term is used as a term of art.

23    Q.    Okay.

24    A.    And again, Candi, that's through my lense.
```

0191a

Leslie M. Gomez, Esquire

```
1    Right.  I'm not a psychologist, psychiatrist,

2    pediatrician.  It's through my lense of the work that

3    I've done for the past 24 years in this space.

4    Q.    Right.  I understand.  I'm just trying to learn

5    whether you used that term, child protection expert,

6    to refer to yourself.  And it sounds like you use

7    child protection professional instead of child

8    protection expert; is that right?

9    A.    I'm more comfortable with professional, yes.

10   Q.    And in your area of practice or the industry

11   of -- let me just see -- institutional response, is

12   child protection professional or child protection

13   expert like a recognized term?

14   A.    I don't -- you know, it's interesting.  I don't

15   think there is another legal practice like our

16   practice.  So it was a new and novel practice when it

17   was created.  There are a lot of attorneys who work in

18   this space, who give legal advice, some come from

19   labored employment, some come from white collar.

20   Their practice as it was founded by Gina Smith was

21   specifically designed to be working to improve

22   institutional responses.

23              So you might find other counsel who do

24   external investigations, many of them do litigation.
```

0192a

Leslie M. Gomez, Esquire

```
1    We don't.  You might find other counsel who do policy
2    review, do other aspects of it.  But it's a part of
3    their broader portfolio.  So the whole idea of the
4    institutional response group or institutional response
5    practice was something that Gina determined there was
6    a value and a service that she could provide and then
7    later I joined her.  I think it was unique and
8    different than any other legal practice that I'm aware
9    of.
10   Q.     You're talking about the institutional response
11   group that you're part of?
12   A.     Yes.
13   Q.     How about the term child protection expert or
14   child protection professional, is that something
15   that's used?
16   A.     I don't know.  I am not in the practice of
17   reviewing other firms communications or other schools
18   letters or matters that I am not involved with.
19   Q.     Well, do you think that's a term that you or
20   Ms. Smith coined similar to the institutional response
21   group concept?
22   A.     I don't recall the genesis of that term.
23   Q.     You didn't have any objection to Mr. Lehman
24   referring to you as The Hill School's child
```

0193a

Leslie M. Gomez, Esquire

1    protection -- or one of The Hill School's child

2    protection experts, right?

3    A.    I don't recall, I may have.

4    Q.    Well, did you tell Mr. Lehman that you didn't

5    want The Hill School to refer to you as a child

6    protection expert?

7    A.    Candi, I'm not saying that I had --

8              MR. FOX:  Objection.

9              MR. JUBB:  Objection to the form.

10             THE WITNESS:  I'm not saying I had an

11       objection or I didn't have an objection.  I am

12       saying I am generally more comfortable with the

13       term child protection professional.  I don't

14       know if that was an issue that we discussed

15       here, did not discuss here, who wrote that

16       term.  I also can't tell you if at that time,

17       in 2017, that was a term that I was more

18       comfortable with then than I am now.  I can't

19       answer those questions from a 2020 look-back

20       perspective.

21             I can tell you that that term, as it's

22       written in the letter, is consistent with the

23       scope of our role as I understood it with the

24       school.

0194a

Leslie M. Gomez, Esquire

1    BY MS. DOUGHERTY:

2    Q.    Does the term child protection expert or

3    professional mean that you will act in the best

4    interest of the complainant?

5              MR. FOX:  Objection.

6              THE WITNESS:  In the best interest in

7         protection of minors.

8    BY MS. DOUGHERTY:

9    Q.    So you're making -- you mean a complainant that

10   is then a minor, correct, at the time of the

11   complaint?

12   A.    And what I'm saying is I don't -- I'm not an

13   advocate for a complainant.  I'm not an attorney for a

14   complainant.  I'm not an attorney for a respondent.

15   In the context of the work that we're talking about,

16   I'm asked to either investigate a report itself as to

17   whether or not the report is credible and whatever

18   standard we apply.  Sometimes I'm asked to evaluate

19   the institutional response to a report and I presume

20   the report is credible.  And so it depends on the

21   nature and the scope of the engagement.  But I am

22   not -- I will call it as I see it in what I'm asked to

23   do with an opinion as to credibility, which in some

24   instances may be aligned with the complainant's

0195a

Leslie M. Gomez, Esquire

1    interest and in some instances may not be aligned.

2    But my lense is always through a lense of what I know

3    about child abuse, about the dynamics and about

4    decisions that are consistent with advancing

5    protection of minors.

6    Q.    Okay.  Did you do anything to protect children

7    in connection with your investigation into historical

8    allegations of sexual abuse at The Hill School?

9                    MR. FOX:  Objection.

10                   THE WITNESS:  Yeah.  So to the extent

11           that you're gathering information about

12           historical practices, you are assisting an

13           educational institution in offering apologies

14           acknowledging addressing past conduct.  Those

15           individuals may now be adults.  Then those are

16           elements that go to support and care for your

17           constituencies.

18                   When we think about the lessons that we

19           learn from past practices, those lessons we now

20           incorporate moving forward into training and

21           education programming, into policies and

22           preventions, into the recognition that we today

23           in educational institutions are creating

24           systems that are tracking grooming behaviors,

0196a

Leslie M. Gomez, Esquire

```
1          for example.  That wasn't something that was

2          done 10 years ago or 20 years ago.

3                  So could I tell you specifically what

4          the exact outcome was here or all of the ways

5          in which this review helped to protect

6          children?  I probably could go back and

7          evaluate that.  If nothing else, sharing the

8          information publicly, creating a climate of

9          openness where we encourage people to talk

10         about it gives permission to me, to current day

11         students to say, this is an institution that

12         wants to hear about your experience give us

13         permission to report.  And that ideal as

14         furthering the goal of protecting children.

15         We're educating.  We're sharing information.

16         We're creating awareness.  Those are all

17         elements that help to protect children in my

18         view.

19    BY MS. DOUGHERTY:

20    Q.    Okay.  So I'm just trying to understand the

21    child protective nature of the job.  So can you just

22    tell me, what is the child protective nature of the

23    job that you do as a child protection professional or

24    expert?
```

0197a

Leslie M. Gomez, Esquire

```
 1                    MR. FOX:  Objection.

 2                    MR. JUBB:  Objection to the form.

 3                    THE WITNESS:  So, Candi, part of the

 4           reason that the practice was developed had to

 5           do with primarily advice that colleges,

 6           universities and schools were getting was in

 7           the context of litigation or from insurance

 8           defense counsel.  And generally what we saw in

 9           the work that we did was that that advice was

10           not always aligned with how you might respond

11           openly to an allegation that comes forward.

12           And helping to educate school administrators,

13           officials, outside school counsel, whoever it

14           may be about the nature and dynamics of abuse.

15           About why reporting delays are normal and

16           should not be something that we automatically

17           use to attack the credibility.  Why changes or

18           inconsistencies that have helped over a period

19           of time.  By the way that an individual

20           responds or doesn't respond.

21                    In other words, our review was in the

22           work that we do, we help educational

23           institutions be informed, be able to gather

24           sensitive investigations to gather good
```

0198a

Leslie M. Gomez, Esquire

```
 1          information that is informed by and guided by

 2          an understanding of the dynamics of abuse and

 3          of child abuse, as opposed to discounted and/or

 4          dismissed because of misconceptions.  We had

 5          some biases out there.

 6               So it's really about educating schools,

 7          creating policies ands procedures, creating

 8          space for conversation, helping to teach about

 9          grooming, helping to build our documentation

10          and response systems.

11               And I probably violated all the

12          depositions rules that they're supposed to

13          teach is because I don't remember your

14          question.

15  BY MS. DOUGHERTY:

16  Q.   Okay.  It was, what is the child protective

17  nature of your job as a child protection professional

18  or expert?

19  A.   It's making decisions to gather and share

20  information that would help to create a climate, an

21  environment that would foster protection of minors to

22  create policies, procedures, educational programs that

23  would advance that.

24               Sometimes we meet with parents and we
```

Leslie M. Gomez, Esquire

1    share with parents information about how you talk to

2    minors.  Sometimes we teach.  I teach forensic

3    interviewing of minors to forensic interviewers, to

4    law enforcement officers, to city solicitors and to

5    assistant district attorneys.  I teach how you

6    interview a minor.  I've done trainings for police

7    departments.  I've done trainings for judges.  I've

8    done trainings in any number of contexts for colleges,

9    universities, K to 12 schools, summer camps about how

10   to prevent, identify, recognize, report child abuse.

11   Q.    Okay.  Am I understanding correctly that in

12   your view the child protective nature of your job is

13   basically educating the institution, as you said, to

14   prevent, identify and report child abuse so it's

15   prevented in the future; is that right?

16             MR. FOX:  Object to the form.

17             THE WITNESS:  All of those things plus

18        more.  All of those things plus the prior

19        answer.  For example, if there is an engagement

20        where there is an arrest of a current

21        employee --

22   BY MS. DOUGHERTY:

23   Q.    Okay.

24   A.    -- I may be brought in and my core function may

0200a

1    be help to gather any and all relevant documentation

2    and provide it to law enforcement, to facilitate the

3    sharing of information.  There have been instances

4    where I have been present at interviews by law

5    enforcement and helped direct law enforcement to

6    information that existed within an educational

7    institution to assist in an active investigation.  It

8    may be that we're looking to identify were other

9    minors harmed besides the particular minor who may

10   have come forward in that matter and connecting those

11   individuals making those reports to law enforcement.

12              So it may, in fact, be that we're

13   stopping teacher abuse by helping to get a perpetrator

14   reported to law enforcement or additional information.

15   It may be that we are helping to remedy prior abuse in

16   some way by allowing that individual to be connected

17   to resources, to counseling, to other aspects and to

18   connecting that individual even in some instances to

19   giving them a space to disclose and share information

20   with their family and other individuals.

21              That's different than this.  Hill

22   School was not arrest of a current employee.  But

23   those are sort of the broader range of work that we do

24   in this field.

Leslie M. Gomez, Esquire

1    Q.    Was part of your engagement by The Hill School

2    in connection with the investigation of the historical

3    allegations of sexual abuse to provide complainants

4    with access to -- I forget the term that you used --

5    but counseling or connect them with information to

6    improve their mental health?  Sort of the gist of what

7    I got.

8    A.    Yeah, it may have been.  I don't recall if

9    we -- I don't recall the nature of the engagement with

10   those complainants.  I don't recall if we engaged with

11   complainants and I don't recall if we did without

12   going back to look at that piece of my file.

13   Q.    Okay.  So there is nothing that you recall that

14   you specifically did for a specific complainant in

15   connection with the investigation of historical

16   allegations of sexual abuse at The Hill School; is

17   that right?

18   A.    I do not recall.  It may well have been that we

19   provided advice to the school.  It may well have been

20   in some instances at other schools that we advised the

21   school to offer supportive measures or counseling.  I

22   don't have a specific recollection of that piece of

23   The Hill School.

24   Q.    That's what I'm trying to confirm is that you

0202a

Leslie M. Gomez, Esquire

```
1    --
2    A.      I don't recall.
3    Q.      -- sitting here today, you don't recall one way
4    or the other whether you made a recommendation or did
5    something to benefit a specific complainant --
6    A.      No.
7    Q.      -- in connection with the Hill School -- the
8    investigation of The Hill School's historical
9    allegations of sexual abuse; is that right?
10   A.      I don't recall.  I do know that there is on
11   page two of that November 17, 2017 letter, there is a
12   reference about a recent account by an alumnae who
13   shared such an incident that occurred off campus in
14   the late 1990s when she was a student.  Mr. Lehman
15   says, I knew they reached out to her and we have
16   carefully reviewed that situation as well.  I don't
17   know what that outreach entailed or involved, if there
18   were other pieces that would have specifically
19   benefited, I think that was the phase you used, an
20   individual complainant.  I just don't know in this
21   case.
22   Q.      Is there a -- well, let me start again.  Let's
23   just do it sticking with the investigation into the
24   historical allegations of sexual abuse at the Hill
```

Leslie M. Gomez, Esquire

1    School.  Was there a division of labor between you and

2    Ms. Smith or did you both participate in all aspects

3    of the investigation?  How was the division of labor

4    between you and Ms. Smith?

5    A.    I don't recall.

6              Some we do together.  Some we do

7    separately.  Some we do different pieces of.  I tend

8    to do drafting of communications and investigative

9    reports.  She tends to be a more editing, although

10   drafting piece of that as well.  I don't recall the

11   particular division.

12   Q.    Did you provide any written recommendations to

13   The Hill School after your investigation into the

14   historical allegations of sexual abuse at The Hill

15   School?

16   A.    I know that we did a written deliverable.  I

17   don't recall if it included recommendations or not.

18   It may have.

19   Q.    Do you know the date of the written

20   deliverable, I think you referred to it as?

21   A.    I don't know.

22   Q.    Before the November 20, 2017 letter?

23   A.    My recollection would be yes.

24   Q.    So you called it a written deliverable, but is

0204a

Leslie M. Gomez, Esquire

```
 1    it like a report that includes recommendations and
 2    evaluation, analysis, summary of information?  Can you
 3    explain to me what you mean by written deliverable?
 4    A.    Yeah.  I don't -- so at any given time over the
 5    course of our engagement with The Hill School, we
 6    would have given lots of legal advice.  Sometimes that
 7    legal advise is in writing, sometimes it's not.  I
 8    think you're using the term recommendation in sort of
 9    a broader sense of -- I'm interpreting your use of the
10    term recommendation in a broader sense of
11    recommendations for improvement to policies, practices
12    and procedures.
13    Q.    Okay.  Let me just clarify.  And I have to
14    listen when you talk and not interrupt you, but I
15    might start waiving my hand to cut it down a little
16    bit?
17    A.    No worries.
18    Q.    So here's what I want to know.  You performed,
19    you and your colleagues, first Pepper Hamilton and
20    them rolling into Cozen O'Connor, performed an
21    investigation over a year and a half of time into
22    historical allegations of sexual abuse at The Hill
23    school.  I want to know if at the end of that you
24    initially completed the deliverables in the scope of
```

0205a

1   your retention relating to that investigation of

2   historical allegations of sexual abuse at The Hill

3   whether you prepared, you or Ms. Smith or someone

4   working on the matter, prepared like a written report

5   summarizing your findings or making any

6   recommendations anything like that?

7   A.    Yes.  I recall we prepared a written report

8   summarizing the findings of the investigation.  I do

9   not recall if it included recommendations.

10  Q.    Okay.

11  A.    We also would have provided information orally

12  and/or in e-mail.  And there likely would have been

13  recommendations of some format in an oral presentation

14  and/or e-mail correspondence or in just discussions.

15  Q.    And again, for the moment, putting aside

16  Mr. Poulos' complaints, you are -- as I understand

17  your testimony, you are unable to tell me what, if

18  anything, you did in response to any other

19  complainants that may have come forward in response to

20  the November 20, 2017 letter that has been marked as

21  D33; is that right?

22  A.    Without referring back to the file to be able

23  to give you regular detail, I don't have an

24  independent recollection as to the specific questions

Leslie M. Gomez, Esquire

1    that you have asked about individual complainants.

2    Q.    Okay.  Mr. Jubb asked you to confirm whether

3    you were aware of any complaints about Mr. Ralston

4    prior to Mr. Poulos's complaints.  And you said that

5    you would have to go back and review records or you

6    did not go back and review records.  Do you have a

7    reason to believe that there were other complaints

8    about Mr. Ralston prior to Mr. Poulos's complaints?

9    A.    I do not.  I believe that Mr. Garabedian's

10   letter in April of 2018 was the first awareness that I

11   had that there were -- that there was a report against

12   Mr. Ralston.

13   Q.    Okay.  So your point is that you can't say for

14   sure because you didn't go back and look at the

15   materials, but you don't recall sitting here today any

16   prior complaint against Mr. Ralston, right?

17   A.    That's correct.

18          And further to that, Candi, in the

19   correspondence that I reviewed from April 2018

20   forward, there was no reference that I could identify

21   or locate that said prior complaint, other evidence.

22   Q.    Okay.

23   A.    So I'm fairly confident in that, but I just I

24   know the vagaries of human memory.

0207a

Leslie M. Gomez, Esquire

```
1   Q.     I understand.  I just wanted to make sure you
2   were trying to give us a precise answer as compared to
3   you had a reason to think that something exists --
4   A.     No reason.
5   Q.     -- so you didn't independently verify before
6   testifying, so you're just trying to be accurate,
7   correct?
8   A.     That's correct.
9   Q.     When did you receive the -- let me start again.
10         Do you know whether Mr. Poulos received
11  the November 20, 2017 letter from Mr. Lehman?
12  A.     I don't know.  I thought in -- I thought I had
13  seen in some correspondence somewhere a reference to
14  that was the reason that Mr. Poulos came forward was
15  in a response to the school's outreach.  I don't know
16  when I saw that or why I have that recollection.
17  Q.     Let me make sure I'm sharing the correct thing
18  and not pictures of my cat.
19         (Ms. Dougherty is sharing her screen.)
20         I'm showing you a document that was
21  previously marked as D1.  I realize that they are some
22  e-mails at the top of the first page.  I'm going to
23  direct your attention to the middle of the page.  It
24  says, "Forwarded message from Headmaster Zachary
```

0208a

Leslie M. Gomez, Esquire

```
1    Lehman" and it's to Kurtis N. Poulos.  And you can see

2    it's an e-mail that had the November 20, 2017 letter.

3                  Have you never seen an e-mail from

4    Mr. Lehman to Mr. Poulos transmitting the

5    November 20, 2017 letter like what I'm showing you

6    now, which had been marked as part of D1?

7    A.    So as I hear your question is, did I go back to

8    look at whether or not Mr. Lehman's letter had gone

9    specifically to Mr. Poulos?  I did not.

10                 I presume a letter went to all of the

11   Hill School alumni community for whom the school had

12   contact information for.

13   Q.    Okay.  So based on your recollection when you

14   became aware of Mr. Poulos as a complainant, the

15   school didn't say, here is the e-mail from Mr. Lehman

16   to Mr. Poulos on November 20, 2017 communicating about

17   historical allegations of sexual abuse at The Hill; is

18   that right?

19   A.    Yeah.  That's right.  I presume that it went to

20   all alumni for whom they had e-mail correspondence

21   for.

22   Q.    Okay.  And if The Hill did give you an e-mail

23   like the one I have on the screen, unfortunately I

24   don't have it just as Mr. Lehman's e-mail, I have it
```

Leslie M. Gomez, Esquire

1  with -- as a forwarded message --

2  A.      Right.

3  Q.      -- but if The Hill School did provide to you or

4  another attorney participating in the representation

5  of the Hill School an e-mail by Mr. Lehman to Mr.

6  Poulos sending the historical allegations of sexual

7  abuse at The Hill letter, November 20, 2017 letter, we

8  it would find that in your file, right?

9  A.      Yeah.  And my recollection of the way that

10 those letters appear is -- are a forwarded copy, I

11 would not see the distribution list.  Just as the

12 letter that Mr. Poulos received would be addressed to

13 him specifically, he wouldn't see all of the names of

14 all of the other alumni that it went to.  So I'm not

15 sure that any copy that I -- in other words, I did not

16 receive a thousand or 3,000 or 5,000 individually

17 addressed letters.  I would have been forwarded a copy

18 of here is the communication that we sent out.

19 Q.      Okay.  And anything that you received from The

20 Hill School reflecting the communication that was sent

21 out, we could find that in your file, right?

22 A.      Say that again.  I'm sorry.  I was looking to

23 see if I actually had that communication.

24 Q.      Sure.  Sure.

Leslie M. Gomez, Esquire

1                    I'm just trying to -- I realize you

2     didn't commit to memory every single piece of paper

3     you received from The Hill School.  So I'm just trying

4     to confirm that whatever form you received a copy of

5     the November 20, 2017 letter, if you got it in letter

6     form, if you got it in e-mail, if somebody forwarded

7     you an e-mail, that we'd find that in your file,

8     correct?

9     A.     You should, yes.  If it was appropriately saved

10    and -- you should find that.

11    Q.     When did you first receive the April 11, 2018

12    letter from Mr. Garabedian to Mr. Lehman?

13    A.     Independently I don't know, but I would assume

14    it would have been relatively quickly.

15    Q.     Do you know from whom you received the

16    April 11, 2018 letter?

17    A.     Probably from Mr. Lehman.

18    Q.     Did The Hill School engage you to perform any

19    investigation into the allegations by Mr. Poulos

20    contained in the April 11, 2018 letter?

21    A.     Yes.  The Hill School asked us to review the

22    information consistent with our practice with them

23    whenever any report came in.

24    Q.     So there is not a separate retention agreement

1  between, I guess, the time would be Cozen O'Connor and

2  The Hill School relating specifically to an

3  investigation into the claims by Mr. Poulos against

4  Mr. Ralston; is that right?

5  A.    That's correct.

6  Q.    Is there a reason why you did not interview

7  Mr. Ralston?

8  A.    None that I can recall.  If there was a reason

9  I can't recall it.

10 Q.    Well, I think you told us that as part of your

11 standard procedure, you interview the complainant and

12 respondent if they're willing to speak to you; is that

13 right?

14 A.    That's right.

15 Q.    So why didn't you -- let me start again.

16       Did you try to interview Mr. Ralston

17 and did he refuse?

18 A.    No.  I don't -- I did not have any direct

19 contact with Mr. Ralston.

20 Q.    Why didn't you interview Mr. Ralston consistent

21 with your standard procedure?

22 A.    I don't recall.

23       MR. JUBB:  I'll object to the form.

24       THE WITNESS:  I don't recall what the

0212a

```
 1          decision making process was or was not.  My

 2          recollection of the timing was that we were

 3          evaluating what additional information to

 4          gather, continuing to make outreach to

 5          Mr. Garabedian to interview Mr. Poulos.

 6          Ethically, I could not contact Mr. Poulos

 7          directly, nor could Mr. Rees contact him

 8          directly given that he was, as far as we knew,

 9          represented by counsel who had contacted the

10          School and corresponded with the School and

11          spoke with Mr. Rees multiple times.

12   BY MS. DOUGHERTY:

13   Q.    Okay.  And I'm asking about Mr. Ralston though?

14   A.    I understand that.

15   Q.    But I'm going to cut you off because you're

16   going far afield my question.

17              I'm just trying to learn whey Mr.

18   Ralston wasn't interviewed consistent with your

19   standard operating procedure to interview respondents?

20   A.    Because at the time we were still seeking to

21   meet with and speak people with Mr. Poulos.  That was

22   part of our process that was happening.  We did not

23   engage or speak with Mr. Ralston prior to his filing

24   of the litigation in this matter.
```

Leslie M. Gomez, Esquire

```
 1   Q.     Were your interested to know -- let me start

 2   again.

 3                 Did you learn Mr. Ralston's response to

 4   the claims by Mr. Poulos?

 5   A.     I did.

 6   Q.     How did you learn Mr. Ralston's response to the

 7   claims by Mr. Poulos?

 8   A.     Through communications with the school.

 9   Q.     When did you learn Mr. Ralston's position about

10   the claims by Mr. Poulos?

11   A.     At various times during the course of the

12   engagement.

13   Q.     Well, you mean after April 11, 2018, correct?

14   A.     After April 11, 2018 it was my understanding

15   that at some point Mr. Ralston was informed of the

16   complaint and that Mr. Ralston spoke with one or more

17   individuals at the School or affiliated with the

18   School.  I did not speak with Mr. Ralston.  I have

19   never met Mr. Ralston.

20   Q.     What did you learn about Mr. Ralston's response

21   or position regarding Mr. Poulos's complaint or

22   claims?

23                 MR. FOX:  Object.  To the extent it

24         contains attorney/client privileged
```

0214a

Leslie M. Gomez, Esquire

```
 1          information.  If you can give nonprivileged

 2          information, Leslie, that's fine.

 3               THE WITNESS:  I don't know where the

 4          line is, but I don't think it steps into

 5          privilege to say that he denied committing

 6          abuse.

 7   BY MS. DOUGHERTY:

 8   Q.    Do you know who -- you said it was your

 9   understanding that Mr. Ralston spoke with one or more

10   people affiliated with the School.  Do you know who

11   those people were?

12   A.    I do not.  I don't know if that steps into

13   privilege or not.

14   Q.    I'm sorry.  I'm just asking about the identity

15   of the people that Mr. Ralston spoke to regarding the

16   claims by Mr. Poulos or complaints by Mr. Poulos?

17   A.    Again, I'm asking for direction from counsel.

18   I do know.  I don't know if that steps into privilege

19   or not.

20               MR. JUBB:  And you're asking, Candi,

21          you're asking?

22               MS. DOUGHERTY:  I want to know the

23          identities of the people that Mr. Ralston spoke

24          with.
```

Leslie M. Gomez, Esquire

```
 1                    MR. FOX:  (INAUDIBLE)

 2                    MS. DOUGHERTY:  Right.  She wasn't

 3          specific.  I used affiliated.  It wasn't her

 4          word.  But she said Mr. Ralston spoke to some

 5          people and communicated his position.  I just

 6          want to know who they are.

 7                    MR. FOX:  Go ahead, Leslie.

 8                    THE WITNESS:  It's my understanding

 9          that Mr. Ralston spoke with Zach Lehman and

10          that Mr. Ralston spoke with Tom Rees.

11  BY MS. DOUGHERTY:

12  Q.    I just want to make sure, and I'm not trying --

13  if you've already answered this I apologize.  I don't

14  remember your answer.

15                    Did you ever ask to interview

16  Mr. Ralston?

17  A.    At the time that we were preparing to do that,

18  we were still seeking to interview Mr. Poulos, which I

19  viewed as a critical element in being able to fully

20  understand the allegations and the information that

21  was brought to light so that I had context for the

22  information that I would then interview a respondent.

23  It would be unusual to interview a respondent before

24  you interview a complainant.
```

0216a

Leslie M. Gomez, Esquire

```
 1   Q.      So even though Mr. Poulos was not making

 2   himself available for an interview, you still did not

 3   decide to interview Mr. Ralston?

 4   A.      That's correct.

 5   Q.      So as far as you're concerned because you

 6   couldn't interview the complainant, that was the end

 7   of it?

 8               MR. FOX:  Objection.

 9               MR. JUBB:  (Laughing)

10               MS. DOUGHERTY:  I'm just trying to

11          understand.  I'm sorry.

12               THE WITNESS:  Candi --

13               MR. JUBB:  It's just (INAUDIBLE) your

14          question.

15               THE WITNESS:  -- in evaluating the

16          credibility of a report of child sexual abuse,

17          sexual assault, sexual harassment I need to

18          understand the full context of what occurred.

19          I need to understand the details, any interest,

20          motive or bio, the demeanor of the individual,

21          what corroboration may exist before I can make

22          a determination as to whether or not an

23          allegation is deemed to be credible, I have to

24          access to that information.
```

0217a

Leslie M. Gomez, Esquire

```
 1                 My goal in April of 2018 and my goal
 2          remains today to be open to hearing that
 3          information, to gather information.  And even
 4          if, as a hypothetical, I spoke to Mr. Ralston
 5          and he denied the abuse, that would not get me
 6          any further down my path of evaluating whether
 7          or not the information was credible without the
 8          opportunity to explore those issues from
 9          Mr. Poulos or any or information that he, his
10          family other information could provide.
11                 MR. POULOS:  May I make a statement?
12                 MS. DOUGHERTY:  If you have an
13          objection --
14                 MR. JUBB:  Why don't you wait for your
15          turn to question.
16                 MR. POULOS:  Then, Lane, stop laughing,
17          looking at your phone.  If you're going to take
18          this seriously, take it seriously otherwise --
19                 MR. JUBB:  Mr. Poulos, the only thing
20          that's not serious is you.  Why don't you let
21          Ms. Dougherty finish her question and if you
22          have a statement or question or you just want
23          to read anything, you can do that when it's
24          your time.  Okay?
```

Leslie M. Gomez, Esquire

```
 1              MS. DOUGHERTY:  Mr. Jubb, you don't
 2         need to be rude to Mr. Poulos.  I had the same
 3         reaction, because I didn't think it's funny
 4         when I asked questions about why the person
 5         accused of child sexual abuse wasn't
 6         interviewed.  I didn't think that was a funny
 7         question especially because your client
 8         complained --
 9              MR. JUBB:  I thought that the fact that
10         you asked it that way was comical.  Because
11         it's so inappropriate that I can't even keep a
12         straight face the way you asked that question
13         --
14              MS. DOUGHERTY:  Oh, really --
15              MR. POULOS:  None of this --
16              MR. JUBB:  None of these things --
17              MR. POULOS:  None of this is comical.
18              MS. DOUGHERTY:  That's the point.
19         Nothing about Mr. Poulos' allegation is funny,
20         so let's just...
21              MR. FOX:  Can we please proceed.
22         Leslie has got commitments later in the
23         afternoon, so.
24              MS. DOUGHERTY:  I understand that, but
```

0219a

Leslie M. Gomez, Esquire

```
1            I think I've been asking pretty specific

2            questions and getting a lot of information I

3            didn't ask for, so.  It's great contextural

4            information, so that's fine.

5                  MR. FOX:  I'm not complaining.

6                  MS. DOUGHERTY:  I understand.  I had

7            hoped to be done already.  But anyway.

8   BY MS. DOUGHERTY:

9   Q.    So you received the April 11, 2018 letter and

10  you were asked to investigate; is that right?

11  A.    That's right.

12  Q.    And what did you do to investigate in response

13  to the April 11, 2018 letter?

14  A.      Mr. Rees contacted Mr. Garabedian to ask for

15  additional information and the opportunity to

16  interview Mr. Poulos.  We reviewed that educational

17  file and records that were available as it relates to

18  Mr. Poulos.  We reviewed Mr. Ralston's file.  We

19  reviewed other information that was available after we

20  got the December 6 -- the December 26, 2018 letter

21  that would look to class schedule.

22  Q.    But for right now I'm just asking about the

23  April 11, 2018 letter.  Right.  So --

24  A.    We reviewed the available files and we sought
```

0220a

Leslie M. Gomez, Esquire

1   to speak to Mr. Poulos.

2   Q.    Did you -- again, I'm just asking in reaction

3   to the April 11, 2018 letter.  I'll ask about the

4   other one next.  But in reaction to the April 11, 2018

5   letter, did you perform any interviews of people

6   affiliated with the school, current or former

7   students, anything like that?

8   A.    I did not at that time, no.

9   Q.    Did you have any conclusions regarding -- well

10  let me start again.

11            At the time you received the April 11,

12  2018 letter did you have an understanding about

13  whether Mr. Ralston was still employed at the Hill

14  School.

15  A.    I understood that he was an employee in a

16  limited context with The Hill School.

17  Q.    I think you said earlier that you came to the

18  conclusion that Mr. Ralston posed a risk to students

19  on campus; is that right?

20            MR. FOX:  Objection.

21            THE WITNESS:  I don't think that was

22       exactly how I responded to that.  But certainly

23       an allegation involving sexual abuse of a minor

24       is something that always makes me ask the

Leslie M. Gomez, Esquire

1          question of does that individual pose a risk to

2          minors on campus.

3    BY MS. DOUGHERTY:

4    Q.    Okay.  So you didn't actually conclude that

5    Mr. Ralston posed a risk to the students at The Hill

6    School campus; is that right?

7    A.    I have not made any conclusion in this matter

8    except that I am open to investigating.

9    Q.    Okay.  Because this is why the question does

10   make sense.  Because it seemed odd to me that you came

11   to a conclusion about Mr. Ralston without even

12   speaking to him.  So I guess I wrote the question down

13   wrong.

14          So you did not come to the conclusion

15   that Mr. Ralston posed a risk to students on The Hill

16   School campus?

17          MR. FOX:  Object to the form.

18          MR. JUBB:  I'm object to the form.

19          THE WITNESS:  I did not make a

20   conclusion as to whether or not the allegation

21   by Mr. Poulos was founded or not founded.  I

22   have no basis to make that determination.  And

23   I have no basis to determine whether or not

24   Mr. Ralston engaged in conduct that posed a

0222a

Leslie M. Gomez, Esquire

```
 1          risk or did not pose a risk.  From a
 2          conservative approach when there is an
 3          allegation, the appropriate evaluation is to
 4          evaluate what information do we have.  Is there
 5          a risk to minors?  And if there is or is not,
 6          is there a risk the institution is willing to
 7          take?
 8   BY MS. DOUGHERTY:
 9   Q.    Did you evaluate whether Mr. Ralston provided
10   a risk to minors when you -- at any time after you
11   received the April 11, 2018 letter?
12   A.    I operate --
13              MR. JUBB:  Objection to the form.
14              MR. FOX:  Objection.
15              THE WITNESS:  -- on the framework that
16          an allegation is true.  And my advice in that
17          context, is to give a school advice as if the
18          allegation is true to be most protective of
19          minors and of the institution's program.
20   BY MR. JUBB:
21   Q.    So your advice to The Hill School was to treat
22   Mr. Poulos's complaint claims as true?
23              MR. FOX:  Objection.  We're not going
24          to get into privileged information.
```

Leslie M. Gomez, Esquire

```
1                    MS. DOUGHERTY:  Well, she's the one who
2          answered that she advised the school that
3          Ralston shouldn't have access to the school
4          grounds and came to the conclusion that he
5          posed a risk to students on campus.  So I mean
6          maybe she shouldn't have answered those
7          questions --
8                    MR. FOX:  No, that's not.
9                    MS. DOUGHERTY:  I wrote them down
10         because I'm surprised that she would say that
11         without even speaking to him.
12                   MR. FOX:  That's not what she said.
13                   MR. POULOS:  How was is that privileged
14         information?
15                   MR. FOX:  Her advice to her client is
16         privileged.
17                   MR. POULOS:  So she's his attorney?
18                   MR. FOX:  I don't understand.
19                   MS. DOUGHERTY:  Well, Mr. Fox is
20         referring to The Hill School, Mr. Poulos.
21                   MR. POULOS:  So she's The Hill School
22         attorney.  But whatever information that we
23         could glean from Matthew Ralston is privileged,
24         if she's not his attorney?
```

0224a

Leslie M. Gomez, Esquire

```
 1                 MR. FOX:  That's right.  All I'm

 2         saying, Kurt, is whatever advice or information

 3         Leslie gave to her client, The Hill School is

 4         privileged.

 5                 MR. POULOS:  You didn't answer my

 6         question.

 7                 MR. FOX:  Well, I don't -- I'm not sure

 8         that I have to answer questions, but I think

 9         that's what everybody was asking and that's

10         just the nature of the privilege here.

11                 MR. POULOS:  So then I want on the

12         record that you refuse to answer that question.

13                 MR. FOX:  Yeah, I don't answer

14         questions.  I'm not here to --

15                 MR. POULOS:  I'm not saying -- I'm

16         saying that Leslie Gomez refused to answer the

17         question and I want it on the record.

18                 MR. FOX:  Right.  Now, I directed the

19         witness not to answer.

20                 MR. POULOS:  No, I respect that you did

21         that.  I want it on the record.

22                 MR. FOX:  It's on the record.

23                 MS. DOUGHERTY:  Well, she can choose to

24         ignore your advice and answer anyway.
```

Leslie M. Gomez, Esquire

```
 1                    THE WITNESS:  Candi, can you repeat the
 2           question because I've lost the.
 3                    MS. DOUGHERTY:  Sure.  I mean,
 4           Mr. Poulos has a point there.
 5                    THE WITNESS:  And what is the question?
 6   BY MS. DOUGHERTY:
 7   Q.    The question was whether you advised The Hill
 8   School to treat the complaints by Mr. Poulos as true.
 9   And I said at any time after you received the April
10   11, 2018 letter.
11                    MR. FOX:  Objection, the same
12           instruction.
13                    THE WITNESS:  I am not ethically
14           permitted to share what my legal advise to a
15           client is or is not.  Why I am sharing with you
16           is my general approach is I would have no
17           reason to disbelieve a complaint that comes
18           forward that in my role with the goal of
19           protection of minors that I will presume that
20           the complaint that came forward is credible and
21           evaluate what the appropriate course of action
22           would be through the lense of the most
23           conservative approach of protecting minors.
24
```

0226a

Leslie M. Gomez, Esquire

```
 1   BY MS. DOUGHERTY:

 2   Q.    And did you advise The Hill School consistent

 3   with your standard practice?

 4               MR. FOX:  Objection.  Same instruction.

 5               THE WITNESS:  I cannot ethically share

 6        what my legal advice is or was.

 7   BY MS. DOUGHERTY:

 8   Q.    Okay.  Well, you suggest that you gave legal

 9   advice and then won't let me probe whether you

10   actually gave that advice or not.

11               MR. FOX:  That's correct.

12   BY MS. DOUGHERTY:

13   Q.    So are you withdrawing your testimony

14   suggesting that you advised the school --

15               MR. JUBB:  Objection to the form.

16               MR. FOX:  Objection to the form.

17               MS. DOUGHERTY:  Please don't interrupt

18        me.

19   BY MS. DOUGHERTY:

20   Q.    So you are not withdrawing your testimony

21   suggesting that you advised The Hill School to treat

22   Mr. Poulos's complaints as true?

23               MR. FOX:  Objection.  That's not what

24        her testimony was.  She testified about her
```

0227a

Leslie M. Gomez, Esquire

```
1          normal practice, not what -- and I disagree

2          that she was suggesting anything, she was

3          testifying about what her normal practice would

4          be.  Right?  Did you write that down?

5               THE WITNESS:  The record can stand for

6          itself.

7  BY MS. DOUGHERTY:

8  Q.   Did you provide advice to the Hill School

9  regarding whether Mr. Ralston should have access to

10 the school grounds at any time after you received the

11 April 11, 2018 letter?

12              MR. FOX:  Objection.

13              THE WITNESS:  I cannot ethically

14         provide information about legal advice.

15 BY MS. DOUGHERTY:

16 Q.   Did you reach a conclusion as to whether the

17 school should permanent Mr. Ralston access to the

18 school grounds, or The Hill School campus I think it's

19 called, at any time after you received the April 11,

20 2018 letter?  And it's a yes or no.

21              MR. FOX:  Objection.  Same instruction.

22              MS. DOUGHERTY:  I'm asking whether she

23         formed a conclusion.  I'm not asking for the

24         advice.  I specific said yes or no because she
```

Leslie M. Gomez, Esquire

```
 1          doesn't answer yes or no questions yes or no.

 2          I just want to know if she formed a conclusion.

 3          I'll ask -- if she says yes, I'll ask what it

 4          was and then it's appropriate to object.  I

 5          just want to know if she formed one.

 6                    MR. FOX:  You know what, even that in

 7          my view is privileged.

 8                    MR. POULOS:  What is the form of your

 9          objection?  What form is your objection?

10                    MR. FOX:  Attorney/client privilege.

11                    MS. DOUGHERTY:  Mr. Poulos, just so you

12          know, you're pretty close to the speaker, I

13          think, on your computer so it sort of sounds

14          like you're shouting, which I don't think is

15          your intention.

16   BY MS. DOUGHERTY:

17   Q.    Okay.  So Ms. Gomez won't tell me whether she

18   reached a conclusion regarding whether Mr. Ralston

19   should have access to the School grounds at any time

20   after she received the April 11, 2018 letter; is that

21   right?

22                    MR. JUBB:  Objection to the form.

23                    MR. FOX:  Objection.

24                    THE WITNESS:  That's right.
```

0229a

Leslie M. Gomez, Esquire

```
 1   BY MS. DOUGHERTY:

 2   Q.    And then Ms. Gomez, you're going to follow your

 3   lawyers instruction and not answer whether you reached

 4   a conclusion?

 5                   MR. JUBB:  Objection.

 6                   THE WITNESS:  Candi, I've shared with

 7           you the information that I am ethically

 8           permitted to share in this context.

 9   BY MS. DOUGHERTY:

10   Q.    Did you make a recommendation to The Hill

11   School about whether Mr. Ralston should be permitted

12   access to the School grounds, yes or no?

13                   MR. FOX:  Objection.  Same instruction.

14                   MR. POULOS:  On what grounds?

15                   MR. FOX:  Attorney/client privilege.

16                   MR. POULOS:  So is Mr. Ralston her

17           client or The Hill School her client?

18                   MR. FOX:  The Hill School.  You know,

19           if The Hill School grants permission to

20           Ms. Gomez to testify about these questions, she

21           will testify about them.  She has a client who

22           has not waived the privilege.  She cannot waive

23           the privilege.  And it's as simple as that.

24                   MS. DOUGHERTY:  I think you're jumping
```

0230a

Leslie M. Gomez, Esquire

```
1              the gun on the instruction.  Because if the

2              answer is no, then there wasn't a communication

3              to be protected.  If the answer is yes, then my

4              next question will be, what is it.  And if it's

5              in a communication that's only made to her

6              client then, that would be an appropriate time

7              to assert privilege.  I was specific because

8              the witness doesn't always answer yes or no.

9              But I asked my question that way for a reason,

10             because if the answer is no that she never did

11             that, then we have nothing to fight about.

12                  MR. FOX:  I fully understand, Candi,

13             what your position is.  I'm disagreeing with it

14             respectfully.  I'm saying even that testimony

15             about whether she formed a conclusion or did or

16             did not is protected.  We may disagree about

17             that, but that's my position.

18                  MS. DOUGHERTY:  Even though when

19             Mr. Jubb asked Ms. Gomez did she come to a

20             conclusion that Mr. Ralston posed a risk to

21             students on campus and she answered that

22             question.  I wrote it down.

23                  MR. FOX:  I don't recall the testimony

24             being that way.  If it is, that was an improper
```

0231a

1          question.  I don't recall that being asked.

2          The record will speak for itself.

3                    MS. DOUGHERTY:  Okay.  Well, then I

4          will have Ms. Gomez back to answer the

5          questions.  That's the only reason why I'm

6          asking followup questions.

7    BY MS. DOUGHERTY:

8    Q.    Okay.  We were talking about what you did in

9    response to the April 11, 2018 letter Ms. Gomez.  And

10   I think you identified that you looked at Mr. Poulos's

11   student file, whatever it's called, Mr. Ralston's

12   personnel file, you, through Mr. Rees asked to

13   interview Mr. Poulos.  Was there anything that you

14   did, again, just in response to the April 11, 2018

15   letter to investigate Mr. Poulos's claims?

16   A.    Not in response to the April 2018 letter.

17   Q.    And now turning our attention to the

18   December 26, 2018 letter.  You received the

19   December 26, 2018 letter --

20   A.    Yes.

21   Q.    -- from Mr. Garabedian to Mr. Rees; is that

22   right?

23   A.    Yes.

24   Q.    From whom did you receive the December 26, 2018

Leslie M. Gomez, Esquire

```
 1   letter?

 2   A.    I don't recall.  Likely from Mr. Rees if that's

 3   who it was sent to.  I may have been copied on it

 4   directly, I just don't recall that.

 5              (Reviewing document.)

 6              I believe from Mr. Rees.

 7   Q.    Are you looking at something that refreshed

 8   your recollection?

 9   A.    Yes.

10   Q.    I just see your touching your glasses.

11              Okay.  So what are you looking at

12   that --

13   A.    I've just started wearing glasses.  That's mean

14   though.

15   Q.    That was my hint though, you adjusting them.

16              So what were you looking at that

17   refreshed your recollection that you received the

18   December 26, 2018 letter from Mr. Garabedian to

19   Mr. Rees from Mr. Rees?

20   A.    The communication from Mr. Rees forwarding

21   Mr. Garabedian's letter.

22              MR. FOX:  Object to the extent that

23        that's that privileged.  That wasn't clear

24        until the answer.
```

0233a

Leslie M. Gomez, Esquire

```
 1              THE WITNESS:  I was just looking for

 2         the date.

 3              MR. FOX:  Yeah.

 4    BY MS. DOUGHERTY:

 5    Q.    When did you receive the December 26, 2018

 6    letter from Mr. Garabedian to Mr. Rees?

 7    A.    December 26th.

 8    Q.    Okay.  Did you do anything in response to the

 9    December 26, 2018 letter from Mr. Garabedian to

10    Mr. Rees when you received the letter?

11    A.    Based on the information provided in the letter

12    there were additional facts that could be explored

13    through school documentation.

14    Q.    Okay.  What were those additional facts -- well

15    let me start again.

16              Did you explore school records to

17    evaluate the additional facts --

18    A.    Yes.

19    Q.    -- contained in the December 26, 2018 letter?

20    A.    Yes.  With and through the School we explored

21    additional records that may exist to show, for

22    example, whether or not Mr. Ralston was a mathematics

23    teacher and a cross-country coach, whether or not

24    Mr. Ralston lived in the dormitory at that time,
```

0234a

Leslie M. Gomez, Esquire

1    whether or not Mr. Ralston was Mr. Poulos's geometry

2    teacher.  I'm just literally looking through the

3    letter to tell you the things that he corroborated.

4    Whether or not classes were held at a routine schedule

5    at that time.  Whether or not that class was held at

6    the end of the day.  Anything that you could look at

7    from records to seek to corroborate the information in

8    the letter.

9    Q.    Okay.  Just so we're clear because we have a

10   record here, because I see you're reading from it.

11   But I've put up on the screen now the December 26,

12   2018 letter that's been previously parked as D4.  It's

13   two pages.  I just wanted to make sure what you were

14   reading from when you were answering your prior

15   question is, we're talking about the same letter, D4,

16   right?

17   A.    Yes.

18   Q.    And so you were looking at the additional facts

19   regarding Mr. Poulos's, I guess, interactions and the

20   details of Mr. Poulos's interactions with Mr. Ralston

21   to confirm whether they could be corroborated; is that

22   right?

23   A.    That's correct.

24   Q.    Were you able to corroborate the facts, the

Leslie M. Gomez, Esquire

1    additional facts that you learned as a result of the

2    December 26, 2018 letter that's been marked as D4?

3                    MR. FOX:  Objection to the form.

4                    THE WITNESS:  Some of them, yes.

5    BY MS. DOUGHERTY:

6    Q.    What additional records did you review after

7    you received the December -- December 26, 2018 letter?

8    A.    Additional records that were available within

9    the School that would speak to the questions that were

10   raised.  I don't even know what to call the different

11   pieces of records, a daily class schedule, yearbook

12   photo, information as to what sports Mr. Ralston was

13   assigned to at that time.  A variety of records that

14   might speak to trying to understand the nature and the

15   scope of Mr. Ralston's role and what interactions he

16   may have had with Mr. Poulos at that time.

17   Q.    Did you go to the School to review these

18   additional records?  Were you given copies of

19   additional records?  How did that work?

20   A.    I received copies of additional records.

21   Q.    And do you still have the copies of additional

22   records that you received and reviewed in response to

23   the December 26, 2018 letter?

24   A.    Yes.

Leslie M. Gomez, Esquire

1   Q.    Are you looking at them now or are you --

2   because I see you're looking at something, so.  We

3   have to make sure that if you're using an aid to

4   answer my question that you tell me what it is.

5   A.    Yes.  The documents that I'm looking at are my

6   privileged correspondence with the School and then the

7   document that were accompanying that e-mail

8   correspondence, all of which is in the binder that has

9   been asked that Mr. Fox preserve at the -- going

10  forward.

11  Q.    Okay.  So do those communications identify the

12  additional records that the School provided and you

13  reviewed?

14  A.    Yes.

15  Q.    Can you tell -- again, I'm just asking for the

16  name of the record.  Right.  If you can tell me the

17  additional records that you reviewed in response to

18  the December 26, 2018 letter, based on you now looking

19  at your communications that have refreshed your

20  recollection or you want to read from them, I don't

21  care.  But just tell me the documents.

22  A.    I'm happy to.  I don't know that I can describe

23  each of them accurately.  I might suggest that that

24  would be part of what Mr. Fox provides when he

Leslie M. Gomez, Esquire

1    provides whatever he's willing to provide in response

2    to your request.

3    Q.    I understand.

4              Can I just ask a point of

5    clarification.

6    A.    Yes.

7    Q.    So you have the e-mail that records were

8    attached --

9    A.    Yes.

10   Q.    -- and so you have the records?  Okay.

11   A.    Yes.

12   Q.    So I think we would agree that those records

13   are not privileged, so they can be part of the

14   materials that Mr. Fox provides.  I thought perhaps

15   you had a list describing them.

16             I understand now.  Thank you.

17             Is there anything else that you did in

18   response to the December 26, 2018 letter, other than

19   request and review the additional records?

20   A.    Continue, through Mr. Rees, to request the

21   opportunity to speak with Mr. Poulos in

22   Mr. Garabedian's presence and volunteer to come to

23   Boston to meet with him in person in Mr. Garabedian's

24   office.  I believe there were four separate letters

0238a

Leslie M. Gomez, Esquire

1    after that fact, if I've looked at that correctly.

2    Q.    Okay.  Anything else that you did in response

3    to the December 26, 2018 letter, other than review the

4    additional records or request to review the additional

5    records, renew your request to interview Mr. Poulos,

6    anything else?

7    A.    No.  At that point we contemplated moving

8    forward with the interview of Mr. Ralston.  And then I

9    believe my recollection is the next step was

10   Mr. Ralston indicating or filing his complaint.  At

11   which point I took no further investigative step or

12   any further efforts to investigate.

13   Q.    Okay.  So it was your intention after receiving

14   the December 26, 2018 letter to interview Mr. Ralston

15   but you never got to it because he commenced his

16   lawsuit and then your investigation ceased; is that

17   right?

18   A.    That's correct.

19              MR. JUBB:  Objection to the form.

20   BY MS. DOUGHERTY:

21   Q.    Was there a reason why your investigation into

22   Mr. Poulos's claims ended when Mr. Ralston filed his

23   lawsuit?

24   A.    I can't speak to that.

0239a

Leslie M. Gomez, Esquire

```
1    Q.     So you don't know whether there was a reason

2    that your investigation ended when Mr. Ralston

3    commenced his lawsuit or it's something you think you

4    can't answer?

5    A.     No.  I'm saying I don't have a specific

6    recollection.

7    Q.     Okay.

8    A.     My intent was, I know I've said this, I remain

9    very open to investigating.  I remain very open to

10   hearing from Mr. Poulos.  I hold no inference in any

11   way about why between April 2018 and present day that

12   interview did not occur.  I remain very open to

13   investigating the allegations.

14   Q.     Thanks.  I was just trying to confirm that your

15   answer was you don't know as compared to you can't

16   answer on the basis of privilege.  So you just don't

17   know --

18   A.     I don't recollect the specific.

19   Q.     Did you -- okay.  So I just want to make sure

20   we covered it all.  Requesting and reviewing

21   additional records, renewing a request interview

22   Mr. Poulos.  I guess preparing to interview

23   Mr. Ralston.  Anything else that you did in response

24   to the December 26, 2018 letter?
```

0240a

Leslie M. Gomez, Esquire

```
1    A.      Nothing that I recall today.

2    Q.      So as far as you're concerned, your

3    investigation into the claims by Mr. Poulos ended when

4    Mr. Ralston commenced his lawsuit?

5    A.      Yes.

6                    MR. JUBB:  Objection to form.

7                    MR. FOX:  Object to the form.

8    BY MS. DOUGHERTY:

9    Q.      Do you know Mr. Ralston's current employment

10   status with The Hill School?

11   A.      I may have.  I don't know that I know that at

12   this moment.  I may have known that in the past.  I

13   don't believe he's still an employee, but I don't know

14   what I base that on.

15   Q.      Okay.  Do you know whether Mr. Ralston is still

16   employed by The Hill School?

17   A.      I, as I stand here today, I do not know.  I

18   know my last recollection is that at some point he was

19   placed on leave.  And I don't have updated information

20   as to what the status of that was.

21   Q.      Did you participate in the decision to place

22   Mr. Ralston on leave?

23   A.      I cannot ethically answer that question based

24   on privilege.
```

0241a

Leslie M. Gomez, Esquire

1    Q.    Do you know the reason why Mr. Ralston was

2    placed on leave, yes or no?

3    A.    No.

4              MR. FOX:  Objection.

5    BY MS. DOUGHERTY:

6    Q.    Did you provide The Hill School with a

7    recommendation about whether Mr. Ralston should be

8    placed on leave?

9              MR. FOX:  Objection.

10             THE WITNESS:  I cannot ethically answer

11        that question.

12   BY MS. DOUGHERTY:

13   Q.    Did you provide any recommendation or advice to

14   The Hill School regarding whether Mr. Ralston's

15   employment could be continued or should be terminated?

16             MR. FOX:  Objection.

17             THE WITNESS:  I did not.

18   BY MS. DOUGHERTY:

19   Q.    What was your objective in interviewing

20   Mr. Poulos?

21             MR. JUBB:  Objection to form; asked and

22        answered.

23             THE WITNESS:  I'm sorry.  I didn't hear

24        that.

0242a

Leslie M. Gomez, Esquire

```
 1              MR. JUBB:  I just objected to the form

 2        since we've already been over that.

 3              THE WITNESS:  My objective in

 4        evaluating and interviewing Mr. Poulos was to

 5        fully understand the allegations, to gather

 6        information that would allow me to investigate.

 7        Corroborate, evaluate and assess the

 8        information that was brought to light.

 9   BY MS. DOUGHERTY:

10   Q.    What information did you think you needed from

11   Mr. Poulos that was not included in the

12   December 26, 2018 letter for -- by way of example?

13   A.    There is a whole host of information that would

14   be relevant and helpful to assessing and understanding

15   the credibility of the allegations.

16   Q.    Okay.  Well, what information did you hope to

17   obtain from Mr. Poulos in addition to the content of

18   the two letters or things that Mr. Rees shared with

19   you, because I think you said he shared his

20   communications with Mr. Garabedian with you,

21   what additional information did you hope to learn or

22   learn from Mr. Poulos by interviewing him, other than

23   information available in the letters and what Mr. Rees

24   may have shared with you?
```

0243a

Leslie M. Gomez, Esquire

```
1   A.      So, Candi, I can't answer that

2   question succinctly.  I would want to understand the

3   context of the Mr. Poulos's relationship with

4   Mr. Ralston.  I would want to understand where he

5   lived, what his coping mechanisms were, who his

6   friends were.  I would want to understand how the

7   abuse occurred, in what setting, what was the

8   grooming, if any, mechanisms that were in place, what

9   may have been said by Mr. Ralston, could there be

10  other witnesses, did anybody else observe, who may

11  Mr. Poulos have told or not told contemporaneously,

12  did he document in a journal, did he experience any

13  immediate effects, did he not go to class, was his

14  leaving school his fifth form year connected to how he

15  felt about this abuse, how did -- when did the abuse

16  occur, in what context, what were the dispositions

17  that were involved, was there a potential that there

18  was any forensic evidence, was there any injury.

19             I'm respectful that you prefer short

20  answers.  And I'm really -- please know I am not

21  trying to be -- I am not adversarial to you, to

22  Mr. Poulos, to Mr. Jubb or to Mr. Ralston.  I have a

23  role as an investigator to gather the facts.  I sought

24  to do that --
```

0244a

Leslie M. Gomez, Esquire

1    Q.    Well, you warned me.  You told me it was an

2    open-ended question.  You said that it had a long

3    answer.  The length of your answer should be a

4    truthful answer.  I wasn't trying to be critical of

5    you.

6    A.    And that's a -- I don't know what I don't know

7    about what Mr. Poulos may have shared with me that

8    would allow me to identify the information.

9    Mr. Poulos may share with me I'm aware of other

10   students, somebody else that this happened to.  That

11   information in and of itself, that interview is such a

12   critical part of us understanding the context of

13   what's reported to have occurred.

14   Q.    Is there a reason that, I guess you would have

15   done it through Mr. Rees, but I guess you could have

16   done it directly too, that no request -- I'll call it

17   request for additional information was made of

18   Mr. Garabedian?  Obviously, Mr. Poulos wasn't coming

19   for an interview, did anybody -- is there a reason why

20   you didn't send a letter or have Mr. Rees send a

21   letter saying I need to know some of this additional

22   information?

23   A.    Yeah.  I just as the practice, I don't do an

24   investigation through a Q and A format.  I don't know

Leslie M. Gomez, Esquire

```
 1    the reason why Mr. Garabedian did not reply.  I don't

 2    know the reason why there were extensive delays in

 3    response from Mr. Garabedian to the School.  I mean,

 4    we -- he contacted the School April 2018.  The School

 5    responded very shortly.  And then we didn't hear again

 6    from Mr. Garabedian until September of 2018.

 7                     There were multiple opportunities that

 8    we extend an invitation to meet with, to speak with.

 9    I can surmise a whole host of reasons why Mr.

10    Garabedian may not respond.  But my job as an

11    investigator is not to surmise.  There is later

12    information that I received, vis-a-vie a letter from

13    Mr. Poulos's mother, with respect to whether or not

14    Mr. Poulos was aware or not aware of Mr. Garabedian's

15    communications.  But I don't know what the reason was.

16    And from my perspective there are very few good

17    substitutes for actually taking the time to meet with

18    an individual to understand their experience and to be

19    able to evaluate in that context whether or not there

20    is sufficient information to establish the credibility

21    of the report.

22    Q.     Okay.  So you didn't think that I think you

23    referred to it as Q and A.  You didn't think that you

24    can provide written questions and receive written
```

0246a

Leslie M. Gomez, Esquire

1   answers, you needed to speak to Mr. Poulos in person

2   to evaluate his credibility; is that correct?

3   A.      In person, by Zoom, I don't think we were in a

4   Zoom world at that point, but, yes, by telephone.

5   There's -- that's a, to me, a very critical piece of

6   being able to conduct an investigation is the

7   interview.

8   Q.      Were you provided -- let me start again.

9            Are you aware of whether Mr. Poulos

10  testified in connection with this litigation that

11  you're here testifying --

12  A.      No.

13  Q.      -- in today?

14  A.      No.

15  Q.      And I take it you have not read any testimony,

16  if it should exist, from Mr. Poulos in connection with

17  the lawsuit that you're here testifying today; is that

18  right?

19  A.      That's right.  I don't know who's being

20  deposed, who hasn't been.  I don't know who received

21  deposition notices.  I don't know any of that.

22  Q.      I just want to make sure that you've not been

23  provided testimony by Mr. Poulos relating to his

24  claims against Mr. Ralston?

```
1    A.      I have not.

2    Q.      And did you provide any recommendation

3    regarding whether The Hill School should proceed to

4    mediation with Mr. Poulos?

5                  MR. FOX:  Objection.  Same instruction

6          as to privilege.

7    BY MS. DOUGHERTY:

8    Q.      And so I don't have to ask each time.

9    Ms. Gomez, can I assume that when your lawyer

10   instructs you not to answer, you're going to follow

11   his advice?

12   A.      Yes.  I will add to that answer, that advice

13   about mediation or not would not be within the scope

14   of my role.

15   Q.      So you didn't perform an evaluation, analysis,

16   anything like that about whether the School should

17   participate in mediation because it was not part of

18   the scope of your representation of The Hill School;

19   is that right?

20   A.      That's right.

21   Q.      Media -- just so I understand it, in your mind

22   mediations is a component of litigation, right?

23   A.      That's right.

24   Q.      So mediate -- let me just make sure.
```

Leslie M. Gomez, Esquire

```
 1                 Do you ever participate in mediations
 2   with complainants?
 3   A.    I have participated in a handful of mediations
 4   as a fact witness.
 5   Q.    Okay.  But not as an advocate for the school?
 6   A.    No.  I do not represent a school in the context
 7   of civil litigation.  I have never filed a civil
 8   filing in my life.
 9   Q.    I understand.  Some people would consider
10   mediation not litigation --
11   A.    No.
12   Q.    -- so I just wanted to make sure that you don't
13   make that distinction?
14   A.    No.
15   Q.    Okay.  I understand.
16   A.    And in this case, the communication
17   specifically between Mr. Rees and Mr. Garabedian
18   discussed mediation.
19   Q.    Right.  So you're aware of the communications
20   --
21   A.    We're aware of communications, yes.
22   Q.    -- between Mr. Rees and Mr. Garabedian, but you
23   didn't participate in evaluating whether it should
24   be -- whether mediation should be pursued because it
```

0249a

Leslie M. Gomez, Esquire

1    wasn't within the scope of your representation of The

2    Hill School, correct?

3    A.    That's correct.  That's Mr. Rees's role.

4    Q.    Just to confirm, you didn't have a specific

5    retention agreement with The Hill School relating to

6    investigating Mr. Poulos's claims; is that right?

7    A.    That's correct.

8    Q.    And Cozen O'Connor doesn't have a specific

9    retention agreement to investigate the claims by

10   Mr. Poulos; is that right?

11   A.    I don't believe they do, no.  Not the claims by

12   Mr. Poulos.  There may be a Cozen O'Connor engagement

13   letter that was executed in the spring 2017 when we

14   moved to the new firm.  I don't have access to that at

15   my fingertips and I don't know if it exists or not.

16   Q.    Right.  But that couldn't have related to Mr.

17   Poulos --

18   A.    That's correct.

19   Q.    -- because the letter wasn't received until

20   April 11, 2018, right?

21   A.    That's correct.

22   Q.    I just want to make sure there isn't a separate

23   engagement agreement, a written engagement agreement

24   relating to just Mr. Poulos' complaints?

Leslie M. Gomez, Esquire

1    A.    Not that I'm aware of, no.  And I would have

2    drafted it.  So I should answer that more precisely.

3    No, there is not.

4    Q.    After you received the December 26, 2018 letter

5    did you interview any current or former students or

6    employees or faculty of The Hill School?

7    A.    No.

8              MR. JUBB:  Candi, forgive me.  Did your

9         last question involve former students?

10             MS. DOUGHERTY:  Yes.  I said current or

11        former students, employees or faculty.

12             MR. JUBB:  Thanks.

13   BY MS. DOUGHERTY:

14   Q.    Let's do it this way.

15             Ms. Gomez did you interview anyone --

16   A.    No.

17   Q.    -- in connection with Mr. Poulos' claims

18   against Mr. Ralston?

19   A.    No.

20   Q.    And just for the sake of completeness, did

21   anyone from Cozen O'Connor who participated in the

22   representation of The Hill School interview anyone in

23   connection with the claims by Mr. Poulos?

24   A.    No.

Leslie M. Gomez, Esquire

```
 1                    (Ms. Dougherty is sharing her screen.)

 2    BY MS. DOUGHERTY:

 3    Q.    I'm showing you a document that has been

 4    previously marked on the bottom, I think, here P47.12

 5    to P47.13.  I'm going to mark it as exhibit D34.

 6                         - - -

 7                    (Exhibit D34, E-mail Chain, January 9,

 8              2019, Bates stamped P47.12 through P47.13 ,

 9              was marked for identification.)

10                         - - -

11    BY MS. DOUGHERTY:

12    Q.    The document is an e-mail from Mr. Rees to Mr.

13    Garabedian, Nathan Gaul, that cc's Ms. Smith and you.

14    The subject, "Hill School-claim of Kurtis Nicholas

15    Poulos."  And it's dated January 9, 2019.

16                    Are we looking at the same document?

17    A.    I'm looking now on the screen, yes.

18    Q.    And you received the e-mail that's reflected in

19    D34; is that right?

20    A.    Yes.

21    Q.    Did you participate in the preparation of the

22    e-mail?  I realize it was sent by Mr. Rees.  But did

23    you review a draft or participate in the preparation

24    of the e-mail that was ultimately sent by Mr. Rees?
```

0252a

Leslie M. Gomez, Esquire

```
1              MR. FOX:  Objection.

2              THE WITNESS:  I really don't recall.

3   BY MS. DOUGHERTY:

4   Q.    I'm just directing your attention to the second

5   paragraph of the e-mail where Mr. Rees wrote the

6   School's outside attorneys Gina -- is it Maisto?

7   A.    Maisto.

8   Q.    Okay.  "The School's outside attorneys Gina

9   Maisto Smith, Esquire and Leslie Gomez would like to

10  meet with Mr. Poulos in your presence and in your

11  office to discuss the facts and issues presented in

12  the December 26th letter;" is that right?

13  A.    Yes.

14  Q.    So Mr. Rees communicated to Mr. Garabedian that

15  you and Ms. Smith were lawyers for The Hill School; is

16  that right?

17  A.    That's what it says.

18  Q.    I'm showing you a document that is a -- it says

19  law offices of Mitchell Garabedian at the top.  It's

20  dated January 28, 2019.  It's a letter addressed to

21  Thomas D. Rees.  At the bottom it says Garabedian047.

22              I'm going to mark this document as D35.

23                       - - -

24              (Exhibit D35, Law Office of Mitchell
```

0253a

Leslie M. Gomez, Esquire

```
 1            Garabedian, Letter, January 28, 2019, Bates

 2            stamped Garabedian047, was marked for

 3            identification.)

 4                         - - -

 5   BY MS. DOUGHERTY:

 6   Q.    Have you seen the letter reflected in D35 --

 7   A.    Yes.

 8   Q.    -- previous to me showing it to you?

 9   A.    Yes.

10   Q.    When did you receive the letter reflected in

11   D35?

12   A.    What's that date of that letter, January?

13   Q.    I'm sorry.  It's January 28, 2009.

14   A.    Just a moment.

15   Q.    Are you looking at --

16   A.    2019.

17   Q.    Yeah.  I'm sorry.  Just keep doing that.  It

18   says January 28, 2019.

19   A.    I received it on January 29, 2019.

20   Q.    From Mr. Rees?

21   A.    Yes.

22   Q.    And you're looking in your binder --

23   A.    Yes.

24   Q.    -- as a reference to answer my questions?
```

0254a

Leslie M. Gomez, Esquire

```
 1    A.     Yes.  Thank you.

 2    Q.     So as of January 29, 2019 -- well let me start

 3    again.

 4                  The second paragraph of the letter

 5    that's been marked as D35 says, "Pursuant to our

 6    telephone conversation on December 21, 2018, please

 7    advise me as to your client's position with regard to

 8    my recommendation that the parties agree to attend

 9    mediation if Mr. Poulos's claim is found credible

10    following an investigation."

11                  Did you read that portion of

12    Mr. Garabedian's letter that's been marked as D35 when

13    you received it on January 29, 2019 from Mr. Rees?

14    A.     Yes.

15    Q.     So at least as of January 29, 2019, you

16    understood that Mr. Garabedian's position was that the

17    parties would agree to attend mediation if

18    Mr. Poulos's claim was found credible following an

19    investigation; is that right?

20                  MR. JUBB:  Object to the form.

21                  THE WITNESS:  I understood

22           Mr. Garabedian wanted the school to enter into

23           mediation if the school found the accusations

24           credible after an investigation.
```

0255a

Leslie M. Gomez, Esquire

```
1    BY MS. DOUGHERTY:

2    Q.    Did the school perform an investigation and

3    make a credibility determination as a result of the

4    investigation?

5    A.    The school did not complete the investigation.

6    It took investigative steps.  It did not make a

7    credibility -- I did not make a credibility

8    determination as part of the investigation.

9    Q.    Is there a reason why you did not make a

10   credibility determination after your investigation

11   into Mr. Poulos's claim?

12   A.    I did not have sufficient information to reach

13   a credibility determination without speaking with and

14   understanding directly from Mr. Poulos the nature and

15   the extent of the conduct that would allow me to make

16   a credibility assessment.

17   Q.    Okay.  You testified a number of times that you

18   didn't know why Mr. Garabedian was not responding.

19   But he did respond, right, January 28, 2019 and

20   indicated he was looking for an investigation and a

21   determination as to whether Mr. Poulos's claim was

22   found credible?

23   A.    Between --

24              MR. JUBB:  Objection to the form.
```

0256a

```
 1              THE WITNESS:  -- April of 2018 and
 2         December -- I'm sorry, April of 2018 and
 3         September of 2018 Mr. Garabedian did not
 4         respond.  Between September of 2018 and
 5         December of 2018 there was a dialogue that had
 6         begun between Mr. Rees and Mr. Garabedian.  My
 7         understanding of that dialogue, as I just
 8         framed, was that Mr. Garabedian was asking the
 9         School to agree to mediation if the School
10         found the accusations credible after an
11         investigation.
12    Q.    And the school -- I apologize.
13    A.    Yes.  I cannot fully investigate or complete
14    that investigation without hearing directly from
15    Mr. Poulos.
16    Q.    Okay.  So the school did not complete the
17    investigation to determine whether Mr. Poulos's claim
18    was credible, which was the prerequisite for
19    Mr. Garabedian and Mr. Poulos participating in
20    mediation; is that right?
21    A.    That's my perspective.
22              MR. FOX:  Object to form.
23              THE WITNESS:  And, Candi, I just wanted
24         to finish the earlier answer.
```

0257a

Leslie M. Gomez, Esquire

```
 1              Following the December 26, 2018, there
 2         were four correspondences from Mr. Rees to
 3         Mr. Garabedian.  I believe those dates are
 4         January 9th, January 30th, February 21st and
 5         March 26th, all of which Mr. Rees reiterated a
 6         request to interview Mr. Poulos.
 7    BY MS. DOUGHERTY:
 8    Q.    Okay.  What are you reading from right now when
 9    you went through those dates?
10    A.    My notes.
11    Q.    Okay.  So you have notes in addition to a
12    binder in front of you?
13    A.    Two pages of handwritten notes that will be
14    retained in the binder.
15    Q.    Okay.  Do you have anything else in front of
16    you that you've been using as an aid to answer
17    questions?
18    A.    (Reviewing document.)
19    Q.    Other than the retention agreement that you
20    pulled up and read out loud?
21    A.    (Indicating.)  I have two pages of handwritten
22    notes, primarily listing our dates.  And I have a
23    small binder with my flags on it as to communications.
24    That's what I have in front of me.
```

0258a

1  Q.    And the notes that you held up, those are notes

2  that you made on your own; is that right?

3  A.    Those are notes that I made on my own to

4  prepare for today.

5            And if the record could reflect that my

6  video virtual background is generally blurred and that

7  I've just unblurred it to show the documents here in

8  front of me.  Ad now I'll put it back to blurred

9  because that's how I leave it.

10  Q.    So the notes that you prepared that you were

11  referencing, you prepared them on your own and not at

12  the direction of your attorney; is that correct?

13  A.    I prepared the notes on my own to refresh my

14  recollection about the chronology, the dates and

15  communications to be able to speak with you and

16  Mr. Jubb in a way that was accurate and factual based

17  on the timeline of communications, given the multiple

18  years that have passed since these events occurred.

19  Q.    Okay.  So we've already looked at the June 9,

20  2019 letter, correct.  That was D34.

21  A.    Yes.

22  Q.    Do you need me to put it up again?

23  A.    No.

24  Q.    And then we were looking at -- I put it away,

Leslie M. Gomez, Esquire

```
 1   but I'll put it back up.

 2              (Ms. Dougherty is sharing her screen.)

 3              -- D34, which was Mr. Garabedian's

 4   letter, dated January 28, 2019, right?

 5   A.    Yes.  We just looked at that together.

 6   Q.    Right.  So you acknowledged that after Mr. Rees

 7   asked about you interviewing Mr. Poulos,

 8   Mr. Garabedian did respond on January 28, 2019, right?

 9   A.    Yes.

10   Q.    And Mr. Garabedian indicated that his condition

11   was that an investigation was completed that also

12   found Mr. Poulos's claim credible; is that right:

13   A.    I've lost who your his is.  I didn't think that

14   was his condition.

15   Q.    I apologize.

16   A.    That's okay.

17   Q.    I'm just trying to confirm that as of January

18   29, 2018 when you received the letter from

19   Mr. Garabedian that's been marked as D35, that you

20   understood that Mr. Garabedian's condition was an

21   investigation that found Mr. Poulos's claim credible?

22   A.    Mr. Garabedian's --

23              MR. FOX:  Objection to the form.

24              THE WITNESS:  -- condition for what?
```

0260a

Leslie M. Gomez, Esquire

```
1           Condition for agreeing to an interview?

2           Condition for recommending mediation?  I don't

3           view these two pieces as related.

4                 If -- what I think you're asking me is

5           does this letter communicate to the School that

6           Mr. Poulos would only agree to participate in

7           an interview if the School agreed to mediate if

8           the investigation found the allegation to be

9           credible?  That is one inference.  That is

10          not -- this letter does not state that

11          explicitly.

12                And, in fact, the next communication

13          back from the School would be the January 30th

14          letter back from the School.  That says again,

15          Ms. Gomez and Ms. Smith would like to interview

16          Mr. Poulos and you in Boston.  And your

17          communication, and I don't know if you have

18          this in front of you, that Tom Rees e-mail to

19          Mitchell Garabedian of January 30, 2019.

20    BY MS. DOUGHERTY:

21    Q.    Right.  There wasn't a letter of January 30,

22    2019, right?  It was an e-mail --

23    A.    It's an e-mail.

24    Q.    -- from Mr. Rees to Mitchell Garabedian to you,
```

0261a

Leslie M. Gomez, Esquire

1    Ms. Smith and Nathan Gaul, right?

2    A.    That's right.

3    Q.    I'll pull it up a moment.  I just want to stick

4    with the January 28, 2019 communication.

5    A.    That's correct.

6    Q.    So your expectation was that Mr. Garabedian

7    needed to respond with the words, Mr. Poulos will not

8    appear for an interview, is that what you were looking

9    for?

10   A.    I don't have --

11             MR. FOX:  Objection.

12             MR. JUBB:  Objection to the form.

13             THE WITNESS:  -- have an expectation.

14        I was simply saying that we offered to

15        interview Mr. Poulos and Mr. Garabedian did not

16        respond to agree to an interview.  I don't know

17        what his reasons were.  I can't speak to that.

18        I don't hold any inference against it.

19   BY MS. DOUGHERTY:

20   Q.    Right.  In reaction to the request to interview

21   Mr. Poulos, Mr. Garabedian responded with a letter

22   that you've acknowledged that you received, confirming

23   also a telephone conversation apparently, because

24   that's what you wrote, that Mr. Poulos's position

0262a

Leslie M. Gomez, Esquire

1    through Mr. Garabedian's recommendation was that you

2    would participate in a mediation if Mr. Poulos's

3    claims were found credible following an investigation.

4              Why didn't than communicate to you --

5              MR. JUBB:  Objection to the form.

6              THE WITNESS:  I'm not sure I --

7    BY MS. DOUGHERTY:

8    Q.    -- Mr. Poulos's position?

9              MR. JUBB:  Objection to form.

10   BY MS. DOUGHERTY:

11   Q.    Well, you keep making a big deal out of Mr.

12   Garabedian didn't respond to our invitation to an

13   interview.  He did.  He responded and said, don't

14   participate in a mediation if you do an investigation

15   and you find Mr. Poulos's claims credible?

16             MR. JUBB:  Objection to the form.

17             Do you have a question?

18             MR. FOX:  That was a little bit

19        argumentative.  She's not fighting with you.

20             THE WITNESS:  Candi, what I'm saying is

21        that there was no clear communication that says

22        Mr. Poulos will not participate in an interview

23        because of whatever reason, please complete

24        your investigation without that interview and

0263a

Leslie M. Gomez, Esquire

```
 1              if found credible.

 2                   I hear what you're saying.  The

 3              inference that this will -- at least one

 4              inference of this is that his condition

 5              precedent for an interview was, please commit

 6              to me that you will agree to mediation.

 7    BY MS. DOUGHERTY:

 8    Q.   I understand.  Let me just see if I can clarify

 9    it.  Because maybe we're just talking past each other.

10                   So your point is not that

11    Mr. Garabedian didn't respond at all, it's that

12    Mr. Garabedian specifically didn't address the request

13    that you made through Mr. Rees to interview

14    Mr. Poulos; is that right?

15    A.   I'm saying after January 28th of 2019 --

16                   MR. JUBB:  Object to form.

17                   THE WITNESS:  -- when Mr. Garabedian

18              responded with the sentence that you have

19              framed that the School made three subsequent

20              outreaches to say please clarify your

21              communication.  We would remain very interested

22              in having the interview which is necessary to

23              the investigation before we even get to the

24              questioning of mediation.  And that there was
```

0264a

Leslie M. Gomez, Esquire

```
1           no response after the January 28, 2019 letter

2           of which I am aware.

3                   MS. DOUGHERTY:  Why don't we take a

4           10-minute break.

5                   THE WITNESS:  Candi, just for timing

6           purposes, I'm teaching at a conference at 1:10

7           so?

8                   MS. DOUGHERTY:  I though you were

9           available until 2:00.

10                  THE WITNESS:  No.

11                  MS. DOUGHERTY:  Okay.

12                  MR. FOX:  What time do we need to leave

13          Leslie?

14                  MS. DOUGHERTY:  Well, why don't we just

15          do five minutes then we've been going for a

16          while and I want to give the Court Reporter a

17          moment.

18                  MR. FOX:  Sure.  That's fine.

19                  MR. POULOS:  Can I put something on the

20          record before we sign off?

21                  MS. DOUGHERTY:  We're not signing off.

22          We're taking a five minute break.  And it is

23          just going to eliminate the time that we have,

24          including for you, to ask Ms. Gomez questions.
```

0265a

Leslie M. Gomez, Esquire

```
 1              MR. POULOS:  Well, I wasn't allowed to
 2         ask questions in the last deposition.  And,
 3         obviously, if we're only going to have like
 4         another 15 minutes, I'm not going to be able to
 5         ask Ms. Gomez any questions again like the last
 6         deposition.  So again, why am I a part of this
 7         if I'm not allowed to --
 8              MS. DOUGHERTY:  Mr. Poulos, Mr. Jubb
 9         and I could not control that Mr. Lehman
10         disconnected his connection and refused to
11         answer further questions literally in the
12         middle of a question by my partner.  It's a
13         separate issue.  Let's not take Ms. Gomez's
14         time or Mr. Fox's time and have a break so the
15         Court Reporter can a have a break and we'll
16         proceed.  And if Ms. Gomez has to leave before
17         you're done, then we'll address that issue.
18         I'm sure Ms. Gomez won't be rude and disconnect
19         like Mr. Lehman did.
20              MR. POULOS:  And I just want to put on
21         the record that I've not had time to ask
22         questions.
23              MS. DOUGHERTY:  Okay.  So five minutes.
24              MR. FOX:  Yes.
```

0266a

Leslie M. Gomez, Esquire

```
 1                    (A short break was taken.)

 2              MS. DOUGHERTY:  I'm going to mark a

 3         January 30, 2019 e-mail from Mr. Rees to

 4         Mr. Garabedian cc Ms. Smith, Ms. Gomez and

 5         Mr. Gaul as D36.

 6                         - - -

 7              (Exhibit D36, E-mail, January 30, 2019,

 8          Bates stamped P47.10 through P47.11, was

 9           marked for identification.)

10                         - - -

11              MS. DOUGHERTY:  I'm also going to mark

12         a February 21, 2019 letter from Mr. Rees to

13         Mr. Garabedian that's cc'd Mr. Gaul,

14         Mr. Lehman, Ms. Smith and Ms. Gomez as D37.

15                         - - -

16              (Exhibit D37, High Swartz, Letter,

17          February 21, 2019, Bates stamped P47.27, was

18           marked for identification.)

19                         - - -

20              MS. DOUGHERTY:  And I'm also going to

21         mark a March 26, 2019 letter from Mr. Rees to

22         Mr. Garabedian that cc'd Mr. Gaul, Mr. Lehman

23         Ms. Smith. Ms. Gomez as D38.

24                         - - -
```

0267a

Leslie M. Gomez, Esquire

```
 1                    (Exhibit D38, High Swartz, Letter,

 2              March 26, 2019, Bates stamped P47.26, was

 3              marked for identification.)

 4                          - - -

 5                    MS. DOUGHERTY:  It was shown to the

 6              witness earlier in a, perhaps a different form

 7              or a different Bates label, as Gomez-5.

 8                    MR. FOX:  Okay.

 9                    MS. DOUGHERTY:  I'm just going to use

10              those designations so --

11                    MR. JUBB:  Is that D38?

12                    MS. DOUGHERTY:  Yeah.  Just -- okay.

13                    THE WITNESS:  Sorry.  I was trying to

14              make arrangements to have somebody else do my

15              1:10 to 2:10 conference presentation.  I

16              certainly want to make time for Mr. Poulos to

17              ask the questions he'd like to ask.

18                    If that's your advice, counsel.

19                    (Ms. Dougherty is sharing her screen.)

20       BY MS. DOUGHERTY:

21       Q.    Okay.  Are you ready to proceed.  I thought

22       that you were available until 2:00.  I apologize.  I

23       would have suggested to start it earlier.  But it's

24       okay.
```

0268a

1          I've marked a couple documents that

2     we've been talking about them and I just want you to

3     identify them to make sure that we're talking about

4     the same things.

5          So you referenced an, I think, e-mail

6     by Mr. Rees to Mr. Garabedian on January 30, 2019.

7     I'm showing you an e-mail that I've marked as D36.  Is

8     this the e-mail you had in mind --

9     A.    Yes.

10    Q.    -- when you were talking about a January 30,

11    2019 e-mail from Mr. Rees to Mr. Garabedian?

12    A.    Yes.

13    Q.    Okay.  And you acknowledge that Mr. Rees,

14    again, referred to you and Ms. Smith as the School's

15    outside counsel, correct?

16    A.    Yes.

17    Q.    Okay.  Next I'm showing you a document that

18    I've already marked as D37.  It's a letter from

19    Mr. Rees dated February 21, 2019 to Mr. Garabedian

20    that also cc's you, among others.  You spoke earlier

21    about a letter from Mr. Rees dated February 21, 2019.

22    I just want to confirm that you're referring to D37?

23    A.    Yes.

24    Q.    You acknowledge that Mr. Rees, again, referred

1    to you and Ms. Smith as the Hill School's outside

2    attorneys, correct?

3    A.     Yes.

4    Q.     I'm showing you another letter from Mr. Rees

5    that I've marked as D38.  You looked at a -- looked at

6    it earlier as Gomez-5, but perhaps with a different

7    Bates label.  It's a March 26, 2019 letter from

8    Mr. Rees to Mr. Garabedian.  Earlier when you referred

9    to a March 26, 2019 letter by Mr. Rees to

10   Mr. Garabedian, is this what you were referring to?

11   A.     Yes.

12   Q.     And you acknowledge that, again, on March 26,

13   2019 Mr. Rees referred to you and Ms. Smith as the

14   Hill School's outside attorneys, correct?

15   A.     Yes.

16   Q.     And are there any other letters from Mr. Rees

17   requesting or expressing your request to interview

18   Mr. Poulos that you're aware of?

19   A.     Not that I'm aware of.  I think you've -- there

20   was an April 24, 2018, I believe.  I don't imagine we

21   referenced that today.  We may well have covered it

22   earlier.

23   Q.     All right.  Just so I understand how it

24   happened, the April 11, 2018 letter came in.  There

Leslie M. Gomez, Esquire

1    was some communications between Mr. Garabedian and

2    Mr. Rees.  I think you referenced the communications

3    picked up again between September 2018 to December --

4    to the December 26, 2018 letter.  And then after that

5    point in time, Mr. Rees wrote the e-mail that we

6    looked at earlier as D34, the January 9, 2019 e-mail.

7    Then Mr. Garabedian responded with a letter that we

8    were looking at before the break that was marked as

9    D37.  And then we've looked at the January 30, 2019

10   e-mail, the February 21, 2019 letter and the March 26,

11   2019 letter from Mr. Rees.

12                  Are you aware of any other

13   communications by Mr. Rees -- or I guess let me start

14   again.

15                  Are you aware of any other

16   communications where Mr. Rees communicated your

17   request to interview Mr. Poulos other than the ones

18   that I've shown to you today?

19   A.     No.

20   Q.     So your --

21   A.     Other than a telephone, like a voice mail

22   message that was referenced and/or a telephone call

23   that was referenced.

24   Q.     Okay.  I'm just making sure because I see

0271a

Leslie M. Gomez, Esquire

1    you're looking at your notes that you don't have a

2    note another written communication?

3    A.    No.

4    Q.    You wouldn't be able to tell me what happened

5    on the telephone calls between Mr. Rees and

6    Mr. Garabedian because you didn't participate in them,

7    correct?

8    A.    I would only be able to give you secondhand

9    information as to what I learned from Mr. Rees about

10   the content of that conversation.

11   Q.    Did you participate in the -- well, let me

12   start again.

13              Are you aware that first Mr. Ralston,

14   the Plaintiff, and then my office sent subpoenas for

15   documents to you and to Cozen O'Connor?

16   A.    Yes.

17   Q.    Did you participate in preparing the response

18   to any of those subpoenas?

19   A.    I don't think so, no.

20   Q.    Did you --

21   A.    I mean, other than gathering information to

22   share with Mr. Fox.  I -- or of Mr. Fox's

23   communications with Mr. Rees, but I did not, to my

24   recollection prepare any document.

Leslie M. Gomez, Esquire

```
1   Q.     Okay.  So you didn't prepare like a written

2   response to the subpoena --

3   A.     No.

4   Q.     -- is that what you mean?

5          Did you collect any documents to

6   respond to either of the subpoenas or any of the

7   subpoenas?

8   A.     Whatever documents I had were all documents

9   that I received from the School and/or copies of the

10  communications with Mr. Garabedian or that last

11  communication with Mr. Jubb with the document

12  preservation.

13         I don't remember, was there -- I don't

14  know if there was -- I just don't remember if there

15  was an affidavit not an affidavit.  I don't remember

16  any of those pieces.

17  Q.     Yeah.  I'm just trying to find the -- here with

18  go.

19         (Ms. Dougherty is sharing her screen.)

20         Okay.  I'm showing you a document --

21  I've scrolled to the middle because I just want to

22  know if you've seen a document like this.

23         It's -- but I'll represent it's the

24  notice of intent to serve a subpoena directed to Cozen
```

0273a

Leslie M. Gomez, Esquire

1    O'Connor that was sent by the Plaintiff.

2              Have you seen this document?

3    A.    Yeah.  I have not read it recently, but I would

4    have seen it around the time that it came in.

5    Q.    And you realize that there was an attachment

6    that I'm showing you now that asked for documents

7    right?

8    A.    Mm-hmm.

9    Q.    Did you do anything to collect documents to

10   respond to these requests?

11   A.    Whatever documents that existed I would have

12   provided to Mr. Fox once his -- I did not produce

13   documents.

14   Q.    Okay.  So you collected materials and you gave

15   them to Mr. Fox.  And then as far as you're concerned

16   Mr. Fox took care of the response, correct?

17   A.    That's my understanding.

18   Q.    So where did you search to collect the

19   documents?  Did you look in your e-mail?

20   A.    The same way that I prepared for today, I

21   looked in my e-mail, looked at any hard copy documents

22   that I may have had and looked at any electronic

23   documents that I may have seen.

24   Q.    You mean, on your computer and also in the

0274a

Leslie M. Gomez, Esquire

```
 1    Cozen system?

 2    A.      Yes.

 3    Q.      Did you look in any of materials maintained by

 4    Ms. Smith?  I think you mentioned that she had

 5    materials in her office?

 6    A.      I -- she would not have had materials

 7    independent of the materials that I had.  I was the

 8    lead on this matter.

 9    Q.      Do you know whether Ms. Smith participated in

10    preparing the response to Mr. Ralston's subpoena?

11    A.      Yes, I believe she did.

12    Q.      Do you know what Ms. Smith did to prepare the

13    response to Mr. Ralston's subpoena to Cozen O'Connor?

14    A.      I can't speak to her specific steps, other than

15    being involved in conversation and discussion as to

16    what documents exists where they might live?

17    Q.      I just wanted to make sure that you didn't do

18    it together or something like that.

19    A.      No.

20    Q.      So you just know from what -- you just know

21    that she did something, but you don't know the details

22    of what.  Correct?

23    A.      That's right.

24    Q.      Now I'm showing you a letter, I'm going to
```

0275a

Leslie M. Gomez, Esquire

1    scroll, that's from a lawyer with my office, dated

2    October 2, 2020.  It has a subpoena from my office to

3    Mr. Garabedian directed to you.

4              Have you seen this document before?

5    A.    I believe I have.  Again, not recently.  But

6    I'm sure if it says subpoena directed to me I would

7    have seen it.

8    Q.    You're aware that there is an addenda that has

9    document requests, right?

10   A.    Mm-hmm.

11   Q.    And you saw those around or close in time to

12   when the subpoena was served?

13   A.    Mm-hmm.

14   Q.    Did you do anything to prepare a response?  Did

15   you collect documents or anything like that in

16   response to the subpoena that I've just showed you

17   from my office?

18   A.    It would have been the same response.  I don't

19   know what the response was that went out with respect

20   to...

21   Q.    Well, let me do it this way.

22              Did you perform like a second search in

23   response to a subpoena, to a second subpoena?

24   A.    I don't have an independent recollection.  I'd

0276a

Leslie M. Gomez, Esquire

1   have to go back and look at e-mail correspondence from

2   that time frame.

3   Q.    Okay.  So you don't know what or how many

4   documents were produced in response to any of the

5   subpoenas, you just know what you collected and gave

6   to your lawyer, correct?

7   A.    Correct.

8   Q.    Okay.

9           MS. DOUGHERTY:  Mr. Fox, I was going to

10          direct this to you.  I'll go through the

11          document request and the events if I have to,

12          but I'm trying to be efficient.  It -- based on

13          the materials I received, which is 29 pages,

14          which doesn't even have like the December 2018

15          letter, I don't think we received all

16          responsive documents.  I think I've identified

17          a number of things that should have been

18          produced already.  I can go through each of the

19          requests or you and I could -- with the witness

20          to confirm it or you and I could meet and

21          confer about it offline, it's your preference.

22          MR. FOX:  Sure.  My suggestion is let's

23          you and I talk because I want to go over this.

24          It's been a while.  I don't even recall, quite

0277a

Leslie M. Gomez, Esquire

```
1              frankly, how the response was put together.  So

2              let's -- let me check my notes and you and I

3              can talk about that.

4                    MS. DOUGHERTY:  Okay.  Just for the

5              record I'll mark it, I think we're up to 39.

6              These are the -- D39, I think.

7                    MR. JUBB:  Which is also P47.

8                    MS. DOUGHERTY:  Right.

9                    MR. JUBB:  Yeah.  You're at D39.

10                              - - -

11                   (Exhibit D39, Miscellaneous letters,

12              e-mails, Bates stamped P47.1 through P47.29,

13              was marked for identification.)

14                              - - -

15                   MS. DOUGHERTY:  Yes.  D39 is 29 pages.

16             It's P47.1 through probably 29 but -- through

17             29.  These are the 29 pages we received in

18             response to Plaintiff's subpoena and I think

19             the response to our subpoena was the materials

20             have been produced.  And I'll give you this,

21             Mr. Fox, to look at, but there are obvious

22             deficiencies like the Garabedian letter that we

23             looked at that, obviously, Ms. Gomez has

24             because she put in her notes is in there, the
```

Leslie M. Gomez, Esquire

1          2018 letter that's the subject of the lawsuit

2          is in there.  So I think that either we don't

3          have all the documents or we need to do another

4          search, so.  Because I've identified things

5          that certainly should be in there and the

6          witness has identified things that I think are

7          responsive and should have been produced.

8                    So based on your representation that

9          we'll meet and confirm, are you willing to have

10         your client perform an additional search of the

11         materials.

12                   MR. FOX:  Yeah.  Absolutely.  If there

13         is something that was neglected, we'll get it

14         to you.

15                   MS. DOUGHERTY:  Right.  Because the

16         alternative would be for me to go through each

17         request and ask her what exists and what she

18         did to look for it.  And I think that's a waste

19         of time if you'll agree to work with me on it.

20                   MR. FOX:  Absolutely.

21                   THE WITNESS:  Candi, if there is

22         something that you should have and you don't

23         and you didn't, it's completely unintentional,

24         so I think the solution you proposed is

Leslie M. Gomez, Esquire

```
1           perfectly appropriate.

2                    MS. DOUGHERTY:  Those are my questions

3           with the understanding that we have to work out

4           the issue with the documents.  That's why I

5           marked the production.

6                    MR. JUBB:  So I'd also like to be a

7           part of that conversation if possible.

8                    MR. FOX:  Sure.

9                    MR. JUBB:  Thanks.

10                   MS. DOUGHERTY:  Mr. Poulos, you're up.

11                   MR. JUBB:  That's my line.

12                   MS. DOUGHERTY:  Mr. Poulos, are you

13          there?

14                   MR. POULOS:  Yeah, I'm here.

15                   MS. DOUGHERTY:  Are you ready for your

16          questions?

17                   MR. POULOS:  Yeah.  I just have a

18          couple of questions.  Nothing too long.

19                            -  -  -

20                   E X A M I N A T I O N

21                            -  -  -

22   BY MR. POULOS:

23   Q.    I understand earlier Ms. Gomez said that she

24   claims to be an expert on child or sexual abuse.
```

Leslie M. Gomez, Esquire

```
 1                Did you go to school for that?

 2   A.    Mr. Poulos, it's nice to meet you.  I'm sorry

 3   it's under these circumstances.

 4                I received on-the-job training and have

 5   attended many professional trainings or seminars.  I

 6   have read research and literature in the area and I

 7   have been engaged in the practice of it, as I said,

 8   for since 1997, I would say.  And I now teach in this

 9   area across the country.

10   Q.    But did you go to school to address

11   psychological effects of sexual abuse?

12   A.    Did I go to a college or university and receive

13   a degree in psychology?  No.

14   Q.    Okay.  That's all I wanted to know.

15                MR. POULOS:  You know, I really don't

16         have anything else at this point.

17                MR. FOX:  Okay.

18                MR. POULOS:  It seems like Candi asked

19         most of the questions I was going to ask.

20                MR. FOX:  Candi, did a very thorough

21         job.

22                MR. POULOS:  Well, she's a good

23         attorney.

24                MS. DOUGHERTY:  Sorry.  Candi is
```

0281a

Leslie M. Gomez, Esquire

```
1          dragging because Candi isn't feeling well

2          unless I talk faster.

3                  Mr. Poulos, do you have notes that you

4          want to look at because I know a couple times

5          you said you didn't have questions and then

6          realized immediately after that you did.  So do

7          you want to take a minute --

8                  MR. POULOS:  No, I've got --

9                  MS. DOUGHERTY:  If Ms. Gomez has a

10         minute.

11                 THE WITNESS:  I have time.  I have all

12         the time for Mr. Poulos to the extent that he

13         has questions.

14                 MR. POULOS:  No.  I'm good for now.  I

15         appreciate your time.

16                 THE WITNESS:  Thank you.

17                 MR. FOX:  Okay.  We'll talk.

18                 MR. JUBB:  Candi, is there anything

19         else that you have.

20                 MS. DOUGHERTY:  No.  It's just the

21         issue with the documents and, yeah, that

22         would -- actually I just have one thing that's

23         quick.

24                 MR. JUBB:  I might actually have a
```

0282a

Leslie M. Gomez, Esquire

```
 1          followup too, but if we can -- you can go

 2          first.

 3                  MS. DOUGHERTY:  It's really not a

 4          followup.  I was too fast in going through my

 5          stuff, but thank you for accommodating me.

 6                       -  -  -

 7                 E X A M I N A T I O N

 8                       -  -  -

 9   BY MS. DOUGHERTY:

10   Q.    We're up to D40.

11            I'm showing you the -- your biography

12   on the Cozen O'Connor page, which I'll represent to

13   you, it's 10 pages and I printed it this morning.  You

14   can see at the top right -- may you can't.

15   A.    I'll confirm that.  I trust that it's accurate.

16   Q.    Its October 7, '21 6:24 a.m.  That's all I want

17   to confirm is that the information contained in your

18   biography that's currently present on the Cozen

19   O'Connor website is accurate?

20   A.    I have not reviewed it recently.  I have no

21   reason to believe it's not accurate.

22   Q.    Okay.  And I don't know if I marked it but I'll

23   do D40, just so we're consistent.  Thank you.  Sorry.

24                       -  -  -
```

0283a

Leslie M. Gomez, Esquire

```
 1                    (Exhibit D40, Leslie M. Gomez,

 2              Biography, 10 pages, was marked for

 3              identification.)

 4                          -  -  -

 5                    THE WITNESS:  My hair just so the

 6         record can reflect is grayer now.

 7                    MR. JUBB:  I've just got a couple of

 8         quick questions, if that's okay.  Sorry.

 9         Mr. Poulos, did you have something else.  I

10         thought I just saw Mr. Poulos's mike light up.

11                    Kurtis, did you have something else?

12                    MR. POULOS:  No, I just don't

13         appreciate people laughing during this.

14                    THE WITNESS:  I understand and I

15         apologize for that.

16                    MR. POULOS:  Okay.

17                    THE WITNESS:  Mr. Poulos, I apologize.

18         Sometimes when moments are particularly tense

19         there is a natural relief.  I apologize and do

20         not mean to make light in any way.  I

21         understand how difficult this must be.

22                          -  -  -

23                   E X A M I N A T I O N

24                          -  -  -
```

0284a

Leslie M. Gomez, Esquire

```
 1   BY MR. JUBB:

 2   Q.     Ms. Gomez, as part of your review you had

 3   mentioned some of the things that you would ask for

 4   and look at.  Did you -- do you recall looking at the

 5   student schedule?

 6   A.     I recall that that information was provided at

 7   some point, yes, and that I reviewed that.

 8   Q.     And when you say student schedule, you mean the

 9   classes that he had taken?

10   A.     The classes that he would have been registered

11   for and taken, yes.

12              MS. DOUGHERTY:  He being Poulos?

13              MR. JUBB:  Yes, of course.  Yes I'm

14       sorry.

15   BY MR. JUBB:

16   Q.     Do you recall ever seeing something like a

17   class schedule that said what period the particular

18   class was?

19   A.     No.  My understanding as to the geometry class

20   is the geometry class, I think during the fourth form

21   year, was that geometry class was a rotating class.  I

22   don't think that there were records available that

23   would reflect what the rotation was, whether it was

24   the last class of the day or not, and I don't believe
```

Leslie M. Gomez, Esquire

1    there were records that would reflect where the class

2    occurred.  I also don't think that there --

3    Q.    Okay.

4    A.    -- are records that reflect who was in the

5    class.  I don't think records were kept in that way

6    that there was a class list of students.

7    Q.    Okay.

8                  MR. JUBB:  Thanks.

9                  MS. DOUGHERTY:  Okay.  I don't have

10         anything more.

11                 MR. FOX:  Thank you, everyone.

12                 (Deposition concluded at 1:03 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

0286a

Leslie M. Gomez, Esquire

```
 1              C E R T I F I C A T I O N

 2

 3

 4              I, Lisa DePascale, Court Reporter, certify

 5     that the foregoing is a true and accurate transcript

 6     of the foregoing deposition, that the witness was

 7     first remotely sworn by me at the time, place and on

 8     the date herein before set forth.

 9              I further certify that I am neither

10     attorney nor counsel for, not related to nor employed

11     by any of the parties to the action in which this

12     deposition was taken; further, that I am not a

13     relative or employee of any attorney or counsel

14     employed in this case, nor am I financially interested

15     in this action.

16

17

18

19     Lisa DePascale

       Court Reporter and Notary Public

20     in the Commonwealth of Pennsylvania and Delaware

21

22

23

24
```



*A Message from the Headmaster*

April 23, 2016

Dear Hill School Alumni and Parents:

You may be aware that several prominent boarding schools recently have been confronted with very troubling accusations or proven examples of sexual abuse of their students by employees. In light of this national media attention, I write to emphasize that The Hill School simply does not tolerate conduct that violates the high ethical and behavioral standards we set for all members of our community. Furthermore, our faculty and staff are committed to the family values that lie at the very foundation of The Hill.

The Hill School fosters a supportive and safe environment for our students. We do this in a myriad of ways, beginning with an intense faculty and staff hiring process requiring comprehensive background checks and references. We also provide annual training to all employees regarding our own policies on harassment and abuse, and on how to identify and report any issues at the earliest possible stage. Equally important, we facilitate proactive, awareness-raising educational programs as part of our student life co-curriculum, including speakers on sexuality issues, stress management, and substance abuse. We also routinely encourage candid, focused discussions in our adviser groups, in our dormitories, and in other forums as appropriate. I invite you to read about Hill's comprehensive resources and policies as noted on our website.

No school or organization serving young people is immune from the possibility of inappropriate conduct involving members of its community. We want you to know that The Hill School has a rigorous protocol in place that we have carefully developed to ensure the paramount safety and security of our students. This protocol includes promptly reporting any suspected incidents of misconduct to ChildLine, Pennsylvania's investigative resource concerning alleged child abuse or neglect. In addition, our policy is to cooperate fully with any investigation that may be launched. Naturally, we are guided by respect for the privacy of our students and, especially, the victims of unacceptable misconduct. Nonetheless, our policies for how we deal with behavior that violates our standards are clear, and are followed without exception. We take our responsibilities very seriously.

As always, I welcome your comments and suggestions. We have no higher priority than the health and well-being of our students as we prepare them for "college, careers, and life."

**EXHIBIT**

D-2   11/20/20



0288a

Warm regards,

Zachary G. Lehman P'16 '18
Headmaster

Email: zlehman@thehill.org
Direct Line: 1.610.705.1280

**THE HILL SCHOOL**
717 East High Street | Pottstown, PA 19464
www.thehill.org
*Please click here to change your email preferences or unsubscribe.*

1          UNITED STATES DISTRICT COURT

    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    JOHN DOE,                 : NO. 2:19-cv-01539
         Plaintiff            :

4                             :

      vs.                     :

5                             :

    MITCHELL                  :

6    GARABEDIAN, ESQ.,        :

    LAW OFFICES OF            :

7    MITCHELL GARABEDIAN      :

    and KURTIS N.             :

8    POULOS,                  :
         Defendants           :

9

                    - - -

10

              November 20, 2020

11

                    - - -

12

13       Continued remote videotaped

14   deposition of KURTIS N. POULOS, taken

15   pursuant to notice, at the location of

16   the witness, Milwaukee, Wisconsin,

17   commencing on the above date at or about

18   12:00 p.m. CT/1:00 p.m. EST, before

19   Eileen P. Barth, C.S.R., N.P.

20

21                  - - -

23       GOLKOW LITIGATION SERVICES

    Phone 877.370.3377  |  Fax 917.591.5672

24          deps@golkow.com

0290a

Kurtis N. Poulos

```
 1    APPEARANCES:
 2         THE BEASLEY FIRM, LLC
           BY:  LANE R. JUBB, JR., ESQUIRE
 3         1125 Walnut Street
           Philadelphia, PA  19107
 4         lane.jubb@beasleyfirm.com
           Attorneys for the Plaintiff
 5
 6         SWARTZ CAMPBELL, LLC
           BY:  CANDIDUS K. DOUGHERTY, ESQUIRE
 7         One Liberty Place, 38th Floor
           1650 Market Street
 8         Philadelphia, PA  19107
           cdougherty@swartzcampbell.com
 9         Attorneys for the Defendants
           Mitchell Garabedian, Esquire and Law
10         Offices of Mitchell Garabedian
11
      ALSO PRESENT:
12
           Jeff Sindiong, Videographer
13
           Karen Renee, Notary
14         (To remind witness of Oath)
15
16
17
18
19
20
21
22
23
24
```

Kurtis N.  Poulos

1           DEPOSITION SUPPORT INDEX

2

    DIRECTIONS NOT TO ANSWER:
3   PAGES:  None

4   REQUESTS FOR DOCUMENTS OR INFORMATION:
    PAGES:  None

5

    STIPULATIONS AND/OR STATEMENTS:
6   PAGES:  240

7   MARKED QUESTIONS:
    PAGES:  None

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

0292a

1                         INDEX

2

     WITNESS                           PAGE

3

4   KURTIS N. POULOS

5     By Ms. Dougherty                 242

6

7

8                      EXHIBITS

9   EXHIBIT        DESCRIPTION         PAGE

10

    D-2     4/23/2016 Letter, Bates    439

11          label P-16.242 to 16.243

12  D-3     Emails                      439

13

14

15

16

17

18

19

20

21

22

23

24

Kurtis N. Poulos

1              (It is stipulated by and

2       among Counsel for representative

3       parties that the sealing and

4       certification are waived, and that

5       all objections of any nature

6       except as to the form of the

7       question are reserved until the

8       time of trial.)

9              THE VIDEOGRAPHER:  We are

10      now on the record.  My name is

11      Jeff Sindiong.  I am the

12      videographer for Golkow Litigation

13      Services.  Today's date is

14      November 20th, 2020, and the time

15      on the screen is 12:07.

16             This is the continuation of

17      the remote deposition of Kurtis

18      Poulos, who I remind is still

19      under oath, and is being held in

20      the matter of John Doe versus

21      Garabedian, Esquire, et al.

22             Due to the nature of remote

23      reporting, please pause briefly

24      before speaking to ensure all

0294a

Kurtis N.  Poulos

1        parties are heard completely.

2            Will counsel notify --

3        please identify themselves and who

4        they represent?

5            MR. JUBB:  Good afternoon.

6        Lane Jubb of The Beasley Firm for

7        Plaintiff, and my colleague, Lou

8        Tumolo, may be joining in a few

9        moments.

10           MS. DOUGHERTY:  Candidus

11       Dougherty from Swartz Campbell,

12       LLC on behalf of Mitchell

13       Garabedian.

14           THE VIDEOGRAPHER:  Our court

15       reporter is Eileen Barth, and we

16       also have Karen Renee to make a

17       statement.

18           KAREN RENEE:  Mr. Poulos,

19       I'm a notary with the State of

20       Wisconsin.  You understand you are

21       still under oath from the

22       continuation, the oath that you

23       took yesterday.  Do you understand

24       that?

Kurtis N.  Poulos

1                    THE WITNESS:  I do

2          understand that.

3                    KAREN RENEE:  Thank you.

4                    THE VIDEOGRAPHER:  All

5          right.  You may now continue.

6    BY MS. DOUGHERTY:

7          Q.    Mr. Poulos, where are you

8    located today?

9          A.    I'm in the office of my

10   apartment.

11         Q.    Are you the only one in your

12   apartment other than Clifford, your dog?

13         A.    Yeah.  He's right here next

14   to me.  He is my service dog.

15         Q.    Okay.  One second.  All

16   right.  Have you adjusted everything to

17   your satisfaction?

18         A.    Yeah.

19         Q.    Okay.  Because you can't

20   fidget while we're asking questions

21   because it disrupts the court reporter

22   and the videographer.  Okay?

23         A.    Take the dep.  So I'm trying

24   to keep him under control.

0296a

Kurtis N. Foulos

1          Q.    Okay.  Well, if you need a

2     minute to get situated, you can have it.

3     Are you good now?

4          A.    Oh, I'm good.

5          Q.    Okay.  All right.  So only

6     you and your dog, Clifford, are in your

7     house where you are testifying from

8     today; is that right?

9          A.    Correct.

10          Q.    Yesterday, you told us about

11     a Philadelphia criminal attorney that you

12     contacted in 2014; is that right?

13               MR. JUBB:  Objection to the

14          form.

15               THE WITNESS:  To the best of

16          my knowledge, I believe he was in

17          Philadelphia, yes, correct.

18     BY MS. DOUGHERTY:

19          Q.    And since your testimony

20     yesterday, have you remembered the name

21     of the attorney that you contacted in

22     2014?

23          A.    No, because I -- the only

24     person who would probably know that would

Kurtis N.  Foulos

1    be my mother.  And you guys told me I was

2    not allowed to speak to anybody about the

3    deposition, so I did not reach out to her

4    to find out the name.

5        Q.    Your recollection is the

6    attorney you contacted in 2014 was a man?

7        A.    Correct.

8        Q.    How did you contact the

9    lawyer in 2014?

10       A.    By phone.

11       Q.    Is the only way that you

12   could refresh your recollection about the

13   identity of the lawyer you contacted in

14   2014 is to ask your mother?

15       A.    Correct.  And I don't even

16   know that she would have that information

17   readily at hand.

18       Q.    Okay.  So you didn't, like,

19   write down the attorney's name and put it

20   in that file that you talked about

21   yesterday?  You didn't send any emails to

22   the lawyer you contacted in 2014?  You

23   didn't -- you don't have any other

24   documents or anything that would reflect

0298a

Kurtis N. Foulos

1    the identity of the attorney that you

2    contacted in 2014?

3          A.    No, I do not.

4          Q.    When did you first decide

5    that you wanted The Hill School to pay

6    you back the cost of your tuition?

7          A.    When they decided that they

8    were going to use those emails in such a

9    manner to provoke people to come forward,

10   but they weren't going to use them in a

11   manner that would actually help anybody

12   out.

13         Q.    Okay.  Just so we're clear,

14   I'm just going to show you the emails

15   that I think you're talking about and you

16   can identify them and confirm whether I'm

17   right or not.

18              As I said yesterday, I'm not

19   the best with sharing the screen, so I'm

20   going to give it a whirl.

21              All right.  Can everybody

22   see a document that says The Hill School,

23   A Message From the Headmaster at the top?

24         A.    Yes.

0299a

1          Q.    Mr. Jubb showed you this
2    document that was marked P-16.242-43.
3    I'm going to mark the letter that's dated
4    April 23rd, 2016 with a Bates label of
5    P-16.242 to 43 as D-2.
6               So I'll scroll.  I'll try to
7    be slow, but stop me if you need it
8    slower for you, Mr. Poulos.
9          A.    No, I'm good.  I have read
10   that too many times.
11         Q.    Okay.  So D-2, the April
12   23rd, 2016 letter that I think you said
13   you received over email, is this one of
14   the emails you're referring to that --
15         A.    That is -
16         Q.    -- caused you -- go ahead.
17         A.    That was the first email
18   that I received from the school.  And at
19   that time, like I said yesterday, I did
20   not want to -- how can you put this?  I
21   didn't want to bring that part of my life
22   back into what was going to be my new
23   part of life.
24         Q.    Did you receive the letter

Kurtis N.   Poulos

1    reflected in D-2 in the format that you

2    see on your screen?

3            A.    Correct.

4            Q.    Was it attached to an email?

5    Was it in the body of an email?

6            A.    I believe it was the body of

7    the email.  There might have been a

8    preface saying, so, like, we're going to

9    -- but I don't believe it was an

10   attachment.

11           Q.    But your recollection is the

12   communication you received from the

13   school in April 2016 looked just like

14   D-2; is that right?

15           A.    Correct.

16           Q.    And when you received the

17   April 23rd, 2016 letter from The Hill

18   School that's now been marked as D-2,

19   that is when you decided you wanted The

20   Hill School to pay you for the tuition

21   that you had paid to the school?

22               MR. JUBB:  Objection.

23               THE WITNESS:  No.

24           Incorrect.

Kurtis N. Poulos

1    BY MS. DOUGHERTY:

2         Q.    I'm sorry.  What was your

3    answer?

4         A.    Incorrect.  In April of

5    2016, I had already decided I was going

6    to move past the situation.  It was --

7         Q.    What was -- I apologize.

8         A.    What was my initial

9    reaction?

10         Q.    No, no.  Finish your prior

11    answer first.  I wasn't intending to

12    interrupt you.  Just the Zoom -- you're

13    really tiny now because I have to share a

14    screen.

15              Are you done your prior

16    answer?

17         A.    Repeat the question, please.

18              MS. DOUGHERTY:  Ms. Barth,

19         are you able to read the question

20         back and the start of Mr. Poulos'

21         answer?

22              (Whereupon, the court

23         reporter read the referred-to

24         testimony.)

0302a

Kurtis N.  Poulos

1    BY MS. DOUGHERTY:

2         Q.    Is there more that you have

3    to add to that answer, Mr. Poulos, or is

4    that answer complete?

5         A.    That's complete.

6         Q.    When you received the April

7    23rd, 2016 letter from The Hill School

8    that's now been marked as D-2, what was

9    your reaction?

10        A.    Honestly, I probably deleted

11   it and -- you know, after I read it and

12   felt at the time that it was -- in the

13   only terms I can say -- some sort of

14   propaganda where they already knew what

15   was going on, but they offered no actual

16   support to the alumnists.

17        Q.    At the time when you

18   received the April 23rd, 2016 email --

19   I'm sorry -- letter that has been marked

20   as D-2, did you know who Zachary G.

21   Lehman -- L-E-H-M-A-N -- was?

22        A.    Yeah, we had received

23   through alumnus letterhead or emails

24   saying basically there's a new

0303a

Kurtis N.  Poulos

```
1   headmaster.  And I knew the previous

2   headmaster very well.

3           Q.    Did you ever meet Mr. Lehman

4   in person?

5           A.    No.

6           Q.    So Mr. Lehman wasn't the

7   headmaster when you attended The Hill

8   School; is that right?

9           A.    No.

10          Q.    Do you recall when you first

11  learned that Mr. Lehman was the

12  headmaster of The Hill School?

13          A.    Not to a specific date or

14  year, no.

15          Q.    Who was the headmaster of

16  The Hill School when you attended The

17  Hill School?

18          A.    Mr. Doherty and his wife Kay

19  were very close friends of the family.

20          Q.    Mr. Doherty and -- Mr.

21  Doherty was the headmaster of The Hill

22  School when you attended The Hill School?

23          A.    Correct.  He actually spoke

24  at my grandfather's memorial in
```

Kurtis N. Poulos

1   Washington, DC.

2        Q.   And Mr. Doherty was the

3   headmaster for all three years that you

4   attended The Hill School; is that right?

5        A.   He was there from -- when I

6   got, I guess, you could say permission or

7   whatever to join The Hill School

8   community, it was -- I believe Mr. Watson

9   was the headmaster.  And then my freshman

10  year was Mr. Doherty's first year, and I

11  believe he stayed on a few years after I

12  graduated; maybe one or two.

13       Q.   Did you send the April 23rd,

14  2016 letter that's been marked as D-2 to

15  your mother when you received it?

16       A.   No, I did not.

17       Q.   Did you share the April

18  23rd, 2016 letter that's been marked as

19  D-2 with anyone?

20       A.   No, I did not, not

21  intentionally.

22       Q.   So I'm showing you now the

23  document that has been previously marked

24  as D-1, which includes a series of emails

0305a

Kurtis N. Foulos

1    which starts with a November 20, 2017

2    email from Mr. Lehman to you.

3            A.    Well, it wasn't just to me.

4    It was all alumni.

5            Q.    Okay.  So it's your

6    understanding that the November 20th,

7    2017 email, the start of which I have on

8    the screen for you now that has been

9    marked as part of D-1, was sent to all

10   alumni even though the "To" line just

11   indicates you?

12           A.    Correct.  I would assume

13   they sent it to all alumni.  I could be

14   wrong, but that wouldn't be the first

15   time.

16           Q.    Did you receive periodic

17   emails from The Hill School?

18           A.    So for a period of time, I

19   had completely shut off all communication

20   with the school and I decided to rejoin

21   the community.  And I would expect this

22   to be an email that went to all

23   alumnists, not just me in particular.  I

24   think it was just -- go ahead.

0306a

Kurtis N.  Poulos

1          Q.    No.  Please finish.

2          A.    I think it was just

3    something that they sent out to everyone

4    in the school.

5          Q.    When did you rejoin The Hill

6    School community?

7          A.    2015.

8          Q.    Why did you decide to rejoin

9    The Hill School community in 2015?

10         A.    I personally thought it

11   would help me move on through what had

12   happened.

13         Q.    When you say "through what

14   had happened," you're talking about the

15   sexual abuse by Mr. Ralston; is that

16   right?

17         A.    Correct.

18         Q.    How did you think rejoining

19   The Hill School community in 2015 would

20   help you move on from the sexual abuse by

21   Mr. Ralston?

22         A.    The only way I can say this,

23   by going back to the scene of the crime

24   and knowing, like, it's over, it's --

Kurtis N.   Foulos

1    that it is what it was.  That was it.

2    There was nothing more than that.  It was

3    just simple I want to find out what, you

4    know -- because they keep sending out

5    emails, sending letters asking for money.

6    So I figured I might as well just get on

7    the alumni chain.  And I blocked them

8    from my email chain -- or from my email,

9    so I unblocked them.

10        Q.    When did you block The Hill

11   School from your email chain?

12        A.    I don't know.  Probably

13   early 20' teens, like 2012, 2013.

14        Q.    Is there something that

15   occurred that caused you to block The

16   Hill School from your email chain in, you

17   estimate, early 2012 or 2013?

18        A.    It was just a matter of

19   overwhelming amounts of emails from them

20   asking for donations and it was turning

21   into a spam situation where it was, like,

22   every month, please donate to help build

23   this or this or this; plus, I didn't

24   really want to be reminded of the fact.

0308a

Kurtis N. Poulos

1          Q.    When you say you didn't want

2     to be reminded of the fact, you're

3     talking about you didn't want to be

4     reminded of the sexual abuse by Mr.

5     Ralston?

6          A.    Correct.

7          Q.    So you mentioned a little

8     earlier today that when you received

9     emails from The Hill School, that's when

10    you decided you wanted The Hill School to

11    pay you the money you spent on tuition.

12              Is the email that I'm

13    showing you now that's reflected as part

14    of D-1 one of the emails you had in mind?

15         A.    It's the second email, the

16    one that's on the screen right now.

17         Q.    Okay.  What was the first

18    email?

19         A.    The first email was just

20    them acknowledging the fact that they

21    knew it was going on.  The second one was

22    the fact that, not only are they

23    acknowledging it, but now they're

24    offering help to those who were abused at

Kurtis N.   Poulos

1    the school.  And I find that completely

2    fraudulent because it wasn't actual help

3    they were offering.

4        Q.    So the first email was not

5    the April 23rd, 2016 letter that you

6    received via email that was marked as

7    D-2?

8            MR. JUBB:  Objection to the

9        form.

10           THE WITNESS:  That was the

11       first email that I received.  And

12       in no way do they offer any sort

13       of resources.  They say we invite

14       you or I invite you to read about

15       the resources and policies, but in

16       no way do they offer any sort of

17       resources on their behest.  It's

18       more like we know this happened

19       and we're sorry, but move on with

20       your life.

21           So I did such as that.  I --

22       I moved on.  I had forgotten about

23       it for nearly a year, or over a

24       year.

1    BY MS. DOUGHERTY:

2         Q.    So you're specifically

3    referencing the sentence here that says,

4    I invite you to read about Hill'S

5    comprehensive resources and policies as

6    noted on our website that is in the

7    second paragraph of the first page of

8    D-2; is that right?

9         A.    Correct.

10        Q.    Did you go and look at the

11   comprehensive resources and policies that

12   are referenced in the last sentence of

13   the second paragraph of D-2?

14        A.    I did not because they don't

15   have the resources and they don't really

16   care, to be honest.

17        Q.    So when you received the

18   November 20th, 2017 email that was

19   previously marked as D-1 and which I now

20   have on the screen for you, this is what

21   -- that is when you decided that you

22   wanted The Hill School to pay you your

23   tuition?

24                   (COURT REPORTER's NOTE:  Mr.

Kurtis N. Poulos

1          Jubb lost audio connection.  After

2          reading back testimony, he is

3          placing an objection to the last

4          question.)

5              THE WITNESS:  Yeah, because

6          I thought it was false

7          representation.

8    BY MS. DOUGHERTY:

9         Q.    I think you mentioned that

10   when you received the email, you sent it

11   to your mom and then called your mom.

12              Did you decide before you

13   called your mom on November 20th, 2017 in

14   relation to the November 20th, 2017 email

15   that's been marked as D-1 that you wanted

16   The Hill School to pay you back your

17   tuition?

18        A.    No.  I honestly thought the

19   people that were named in this email were

20   there to help alumnists who had been

21   abused by teachers.

22        Q.    Okay.  And you're talking

23   about Leslie Gomez and Gina Smith who are

24   identified as child protection experts in

0312a

Kurtis N.   Poulos

1    the paragraph that I've now scrolled down

2    for you which is on the first paragraph

3    on the third page of D-1; right?

4         A.    That's -- exactly.  And I

5    thought that was -- that was what made me

6    thought they were actually taking this

7    seriously and going to try to remedy the

8    situation, the systemic sexualization of

9    the students at the school.

10        Q.    Okay.  So when you first

11   received the November 20th, 2017 email

12   that's been marked as D-1 and called your

13   mom, your reaction was finally there's

14   going to be some assistance available to

15   help me with addressing the impact that

16   the sexual abuse by Mr. Ralston has had

17   on my life?

18              MR. JUBB:  Objection.

19              THE WITNESS:  It wasn't just

20        for me.  It was atonability [sic].

21        I can take my lumps.  I've taken

22        my lumps.  They don't seem to need

23        to feel the need to take their

24        lumps.  So I thought this was them

Kurtis N.   Poulos

1          standing up and being, like, we

2          recognize what happened; it's time

3          for us to listen and move forward

4          in a progressive way so that it

5          doesn't happen again.

6                  That's why I thought the

7          child protective -- or protection

8          experts were going to be

9          advocates.

10   BY MS. DOUGHERTY:

11          Q.    So your initial reaction to

12   the November 20th, 2017 email that's been

13   marked as D-1 was not that you wanted

14   money from The Hill School, but that you

15   had a belief The Hill School was offering

16   assistance through these child protection

17   experts?  Is that a fair

18   characterization?

19                MR. JUBB:  Hold on.  Can you

20          hear me?

21                MS. DOUGHERTY:  I'm sorry.

22                MR. JUBB:  I've been waving

23          my hands for two minutes.  I

24          haven't been able -- for whatever

0314a

Kurtis N. Poulos

1          reason, my phone line cut out.

2                  MS. DOUGHERTY:  I'm sorry,

3          Mr. Jubb.  I had -- you weren't on

4          my screen.

5                  MR. JUBB:  All right.  I've

6          been waving my hands because I've

7          been talking.  I haven't heard

8          anything you said.

9                  So I'm going to need to go

10         off the record and reconnect with

11         the phone, please.

12                 MS. DOUGHERTY:  Okay.

13                 THE VIDEOGRAPHER:  We are

14         now going off the record.  The

15         time is 12:32.

16                 (Mr. Jubb is reconnected to

17         Zoom.)

18                 (Whereupon, the court

19         reporter read the referred-to

20         testimony.)

21                 MR. JUBB:  Note my

22         objection.  And then we can go

23         back on the record, and Mr. Poulos

24         can answer that.

0315a

Kurtis N. Poulos

1          THE VIDEOGRAPHER:  We are

2     now back on the record.  The time

3     is 12:43.

4          You may continue.

5          MS. DOUGHERTY:  We briefly

6     just had a break off the record

7     where counsel, Mr. Poulos, Madam

8     Court Reporter, and Mr.

9     Videographer had a discussion to

10    address Plaintiff's counsel's loss

11    of sound for a number of questions

12    during the deposition.

13         The court reporter read back

14    the questions to where Mr. Jubb

15    believed he lost his audio

16    connection.  We've listened to the

17    questions and answers.  Mr. Jubb

18    has indicated where he wanted to

19    assert an objection where he

20    previously was not heard on the

21    record to assert an objection, and

22    now we're going to resume with the

23    court reporter reading back my

24    last question and Mr. Poulos

Kurtis N. Poulos

1    answering the question.

2         Is that fair a

3    characterization, and does

4    everybody agree that -- Mr. Jubb

5    in particular, do you agree that

6    you've had a fair opportunity to

7    hear the questioning that you

8    missed and assert your objections?

9         MR. JUBB:  I agree so long

10   as the next question that's

11   re-read by the court reporter is

12   the same one we left on during the

13   record.  I don't think that's

14   going to be an issue, but we're

15   ready to continue.

16         (Whereupon, the court

17   reporter read the following:

18         "Q.  So your initial

19   reaction to the November 20th,

20   2017 email that's been marked as

21   D-1 was not that you wanted money

22   from The Hill School, but that you

23   had a belief The Hill School was

24   offering assistance through these

0317a

1          child protection experts?  Is that

2          a fair characterization?")

3               THE WITNESS:  Yes.

4               MR. JUBB:  Note my

5          objection, and then answer.

6               THE WITNESS:  Okay.  Note

7          his objection, but yes.

8     BY MS. DOUGHERTY:

9          Q.    When did your -- let me

10    start again.

11               Was there a time that your

12    reaction to the November 20th, 2017 email

13    that's been marked as D-1 changed?

14          A.    Yeah.  As soon as I found

15    out that they weren't actual child

16    protection experts, they were attorneys,

17    it, frankly, pissed me off because that's

18    -- I -- without going into too much, I

19    guess I can say it, I believe it's under

20    false pretenses that they want to help

21    people and protect people and provide

22    information anonymously, but they don't

23    actually provide any of those services.

24    They're attorneys.  They're looking out

1    for their client.

2           Q.    When did you learn that --
3    I'm going to start again.

4                 The "they" in your answer is
5    referring to Leslie Gomez and Gina Smith;
6    is that right?

7           A.    Correct.  And The Hill
8    School.

9           Q.    When did your reaction
10   change to -- let me start again.

11                When did your reaction to
12   the November 20th, 2017 email that's been
13   marked as D-1 change to, I guess, being
14   pissed off?

15          A.    It changed when I found out
16   that they weren't child protection
17   experts when I received a phone call from
18   my mother saying she had, you know,
19   researched both of them and recognized
20   both of them as actual attorneys and not
21   child protection experts, so to speak.

22          Q.    When was that telephone call
23   from your mother where your mother
24   expressed to you her belief that the

Kurtis N. Poulos

1    child protection experts were attorneys?

2         A.    Twenty minutes after I sent

3    her that email.

4         Q.    So on November 20th, 2017,

5    your mother told you her belief that Ms.

6    Gomez and Ms. Smith were attorneys; is

7    that right?

8         A.    Correct.

9         Q.    And then when your mother

10   informed you that Ms. Smith and Ms.

11   Gomez -- according to, at least, her

12   research -- were attorneys, is that when

13   you decided that you wanted The Hill

14   School to pay you your tuition?

15        A.    Not initially, no.

16        Q.    When?  What do you mean,

17   "not initially"?

18        A.    Initially, I was just upset.

19        Q.    Was there a time when your

20   attitude changed from being upset to

21   something else?

22        A.    Yeah, after speaking with my

23   girlfriend at the time and thinking it

24   over and feeling that the school was

Kurtis N. Foulos

1    purposely deceiving everybody who

2    received that email.

3         Q.    Your girlfriend at the time

4    was Emily who we talked about yesterday;

5    is that right?

6         A.    Correct.

7         Q.    So when was it that your

8    attitude changed?

9         A.    Minutes.  Hours.  I don't

10   know.  It was growing.  It's so deceitful

11   in the way it's verb -- like, the

12   verbiage of that email is so deceitful,

13   that I felt insulted.

14        Q.    So close in time to --

15   within days of November 20, 2017, that's

16   when you decided that you wanted The Hill

17   School to pay your tuition; is that fair?

18             MR. JUBB:  I'll object.

19             THE WITNESS:  Are you done?

20             Yeah, that's -- within a day

21   or two, maybe a week.  I don't...

22   BY MS. DOUGHERTY:

23        Q.    So you decided that you

24   wanted The Hill School to pay you back

Kurtis N. Foulos

1   your tuition within a couple days, maybe

2   a week, of receiving the November 20th,

3   2017 email; is that correct?

4               MR. JUBB:  Objection.

5               THE WITNESS:  It wasn't so

6        much about the tuition.  It was so

7        much about them taking

8        responsibility for writing a

9        letter that tries to be, like,

10       we're being proactive, and it's

11       total BS, excuse my language.  But

12       they're trying to say they're

13       being advocates for the people

14       that were abused at that school

15       over decades.

16               It wasn't just my class.

17       This was what I said before:

18       Systemic.  And it's insulting

19       because the one thing I took away

20       was we were told to stand up --

21       sorry.  Sorry.

22               That school always told us

23       that we should stand up for what's

24       right, but they won't do the same

Kurtis N. Poulos

1              thing.  And I don't understand why

2              that's so difficult for them to

3              understand.

4                    Like, when you drive on the

5              campus, it's whatsoever things are

6              true.  They teach you to be a man;

7              stand on your own.  And then at

8              the same time, they're so willing

9              to rip the rug out from underneath

10             your feet and be, like, not our

11             fault, but thanks, take care.

12   BY MS. DOUGHERTY:

13        Q.   Was it your perception that

14   the fact that the -- well, let me start

15   again.

16             When you said -- was

17   there something -- let me start again.

18             Was there something in

19   particular about the November 20th, 2017

20   email that's been marked as D-1 that made

21   you feel as though The Hill School was

22   not taking responsibility?

23        A.   No.

24             MR. JUBB:  Objection.

Kurtis N.  Poulos

1                THE WITNESS:  Not at all.  I

2         thought they --

3                Sorry, Lane.  Do your thing.

4                MR. JUBB:  No.  That's it.

5         That's how speaking objections

6         are -- or excuse me.  That's how

7         objections are, just object to the

8         form.

9                Go ahead.

10               MS. DOUGHERTY:  Mr. Poulos,

11        just -- we can have my question

12        read back.

13               But just so we stop having

14        this problem because -- I mean, I

15        think Mr. Poulos is probably

16        pausing to make sure Lane has an

17        opportunity to speak before he

18        answers.

19   BY MS. DOUGHERTY:

20        Q.    When Mr. Jubb says the word

21   "objection," it's understood that his

22   objection is to the form of my question,

23   which means that it could be a question

24   that he thinks is leading when it

0324a

Kurtis N. Poulos

1    shouldn't be leading, that I've made a

2    mistake in my question, that I've asked a

3    confusing question, that I've asked a

4    compound question, that I'm meaning

5    multiple questions in one, that I've

6    perhaps characterized testimony, that

7    I've -- I think I already said misstated

8    a fact -- or didn't have a verb and a

9    noun, that type of thing, he's got an

10   actual problem with my question, the form

11   of it.

12              If Mr. Jubb wants to

13   complain about something else, then

14   you'll see his mouth continue to move and

15   he'll let me know what his issue is.

16              But when he says the word

17   "objection," it's understood that it's

18   form.  And unless he says more, which I

19   think you probably would know before you

20   started to speak, that's it, and you can

21   just answer.

22              I might say to him, what's

23   the problem with my question, which I

24   think you've heard me say a couple times,

Kurtis N.   Poulos

1    and he may have said it to me too when I

2    said the word "objection," and then we'll

3    discuss it.

4               But the purpose is that I

5    ask my question, Mr. Jubb takes his

6    position, as I did with some of his

7    questions, that one of us has an issue

8    with the form.  It alerts the questioner

9    that they have an opportunity to restate

10   their question to fix it or to ask the

11   other attorney what the problem is so

12   that the question can be restated.

13              So just so you understand.

14   I realize that you don't conduct

15   depositions for a living.  I don't recall

16   whether you said you ever participated in

17   a deposition before.  We probably should

18   have, as an informative matter, explained

19   that to you at the beginning of the

20   deposition I think as the court, as you

21   pointed out, suggested we do.  But we did

22   not do that.

23              So that's just information

24   for you to use and know that you can just

0326a

Kurtis N.   Poulos

```
 1    answer if, you know, nothing further

 2    occurs between Mr. Jubb and I.

 3              And I invite Mr. Jubb to add

 4    or correct anything he thinks was wrong

 5    about the information that I just

 6    provided to you, Mr. Poulos.

 7              MR. JUBB:  You can answer

 8         the question.

 9              MS. DOUGHERTY:  Madam Court

10         Reporter, can you please read back

11         the question?

12              (Whereupon, the court

13         reporter read the following:

14              "Q.   Was there something in

15         particular about the November

16         20th, 2017 email that's been

17         marked as D-1 that made you feel

18         as though The Hill School was not

19         taking responsibility?")

20              THE WITNESS:  And I can

21         answer now?

22    BY MS. DOUGHERTY:

23         Q.    Yes.

24         A.    No.  I thought it was a
```

0327a

Kurtis N. Poulos

1    moment for them to actually take

2    accountability without escalating the

3    matter.

4         Q.    I'm sorry.  So you thought

5    that The Hill School -- strike that.

6              Once you learned that Ms.

7    Gomez and Ms. Smith were lawyers for The

8    Hill School -- you know what?  Strike

9    that.

10             When did you first decide

11   that you wanted The Hill School to pay

12   you back your tuition?

13             MR. JUBB:  Objection to the

14        form.

15             THE WITNESS:  The moment I

16        found out that they had falsely

17        represented people to help people

18        when it wasn't the fact.  That's

19        never what they intended to do.

20        At least overall, it does not seem

21        like that's what they intended to

22        do, was actually help people going

23        forward or alumnists who had

24        already dealt with the situation.

Kurtis N. Poulos

1    BY MS. DOUGHERTY:

2         Q.    So you decided to come

3    forward and report the sexual abuse by

4    Mr. Ralston when you learned that Ms.

5    Gomez and Ms. Smith were not child

6    protection experts, but in fact lawyers

7    for The Hill School; is that fair?

8         A.    Correct.

9              MR. JUBB:  Objection.

10   BY MS. DOUGHERTY:

11        Q.    What did you have in mind by

12   coming forward to report the sexual abuse

13   by Mr. Ralston?

14        A.    Rephrase, please?

15        Q.    Sure.  How did you intend to

16   come forward and report the abuse by Mr.

17   Ralston?

18        A.    I intended that the school

19   starts to recognize the systemic

20   sexualization of the students even before

21   it became a co-gender boarding school.

22   We had issues when it was a single gender

23   school, and it became even worse when it

24   became a co-gender school with teachers

Kurtis N. Poulos

1   impregnating and sleeping with -- maybe

2   not impregnating -- but sleeping with

3   their female students.

4          And it's like I said before

5   yesterday.  This is a legacy for my

6   family.  So to say I went to a school

7   where this happened, it doesn't really

8   coincide with what I believe that school

9   was intentionally or initially built for.

10   It wasn't built to be this cesspool of

11   teachers taking advantage of students,

12   whether male or female now, and that's

13   what it's become.

14          And this is a precipe of

15   them knowing that it's happening and

16   acknowledging that it's happening, but

17   not fully taking responsibility for what

18   has happened.

19      Q.    Okay.  So as I understand

20   your testimony, you received the November

21   20th, 2017 email that's been marked as

22   D-1; you initially considered contacting

23   Ms. Gomez or Ms. Smith because you

24   believed them to be child protection

Kurtis N. Poulos

1    experts that could provide assistance;

2    you learned that Ms. Gomez and Ms. Smith

3    were lawyers; you then believed that the

4    school was not taking responsibility and

5    decided you were going to do something;

6    correct?

7         A.    Correct.  Correct.

8         Q.    What did you decide you were

9    going to do?

10        A.    Reach out to an attorney.

11        Q.    Why did you think you needed

12   to reach out to an attorney?

13             MR. JUBB:  Note my

14        objection.

15             THE WITNESS:  Again -- again

16        a lot of this -- putting it so

17        delicately, there are a lot of

18        families -- including the

19        president's sons who have gone to

20        this school -- there are a lot of

21        legacies.  You know, Oliver --

22        there's so many people that have

23        gone to this school where this

24        could ultimately maybe change

Kurtis N.  Poulos

1          their lives, whether they

2          experienced it or not.

3               But, you know, to have

4          generations of people who have

5          gone to this school, who felt

6          empowered by going to this school

7          and then to be abused and the

8          school is just sitting there and

9          going, well, thanks for your

10          money, we're going to build a

11          building and put your name on it,

12          maybe we'll put a plaque in the

13          chapel, it seems so disconcerting.

14     BY MS. DOUGHERTY:

15          Q.    So you wanted to do

16     something to have The Hill School change

17     its practices; is that fair?

18               MR. JUBB:  Objection to

19          form.

20               THE WITNESS:  Yeah.

21     BY MS. DOUGHERTY:

22          Q.    What did you think a lawyer

23     was going to do to assist you in your

24     objective of causing The Hill School to

Kurtis N. Poulos

1    change its conduct?

2              MR. JUBB:  Same objection.

3              THE WITNESS:  Maybe just

4         start treating your students like

5         human beings and not paychecks.

6    BY MS. DOUGHERTY:

7         Q.   You believe that a lawyer

8    would be able to do something to assist

9    you to make The Hill School treat its

10   students like human beings instead of

11   paychecks; is that right?

12        A.   Correct.

13        Q.   What did you think a lawyer

14   was going to do to help you cause The

15   Hill School to treat its students like

16   humans instead of paychecks?

17             MR. JUBB:  Note my

18        objection.

19             THE WITNESS:  It's a matter

20        of accountability.

21             And if I could be so --

22        Lane, you wanted me to be

23        accountable yesterday.  You wanted

24        to pull up all of my back history.

Kurtis N. Poulos

1          So why doesn't your client, The

2          Hill School, want to pull up their

3          accountability for the decades if

4          not nearly two centuries?

5     BY MS. DOUGHERTY:

6          Q.    Okay.  Mr. Poulos, you

7     wanted The Hill School to be held

8     accountable for its involvement in the

9     sexual abuse by Mr. Ralston against you;

10    is that fair?

11              MR. JUBB:  Note my

12         objection.

13              THE WITNESS:  That is fair.

14    BY MS. DOUGHERTY:

15         Q.    And is it also true that you

16    wanted The Hill School to be held

17    accountable for its involvement in the

18    sexual abuse of any other student that

19    has attended The Hill School?

20         A.    Yes.

21              MR. JUBB:  Same objection.

22    BY MS. DOUGHERTY:

23         Q.    And you believe that hiring

24    an attorney was the way that you could

Kurtis N.  Poulos

1    make The Hill School be held accountable

2    for its participation in the sexual abuse

3    that you sustained from Mr. Ralston?

4              MR. JUBB:  Objection.

5    BY MS. DOUGHERTY:

6         Q.    Is that right?

7         A.    I believe -- I'm sorry.

8         Q.    Go ahead.

9         A.    I honestly believed that

10   when I received this email that's on my

11   computer screen, they wanted to progress

12   to start helping people.

13             You know, making me whole is

14   never going to be about the money.

15   That's fine.  I can accept that.  The

16   issue is the systemic way they are going

17   about covering up.

18             And I could have --

19   honestly, I could have just been like,

20   you know what, I'm going to call The New

21   York Times, The Boston Globe, The

22   Washington Post.  You know, I could have

23   called any of those.  I decided that I

24   thought it would be better to speak with

Kurtis N. Poulos

1   them through an attorney without being

2   emotional.

3          Q.    So just directing your

4   attention back to D-1, the first

5   paragraph of Page 3, the first sentence

6   says, I extend an invitation to any Hill

7   School community member who wishes to

8   share his or her experiences with the

9   school or, if appropriate, with law

10  enforcement.

11             Second sentence:  I also

12  encourage any students, parents, alumni,

13  or staff to reach out directly to the

14  school to share your observations and

15  feedback.

16             Is there a reason that you

17  individually did not reach out to the

18  school directly to share your experiences

19  with Mr. Ralston?

20             MR. JUBB:  Objection to the

21       form.

22             THE WITNESS:  With Mr.

23       Ralston or Mr. Zelman [ph]?

24  BY MS. DOUGHERTY:

Kurtis N. Poulos

1          Q.    I'm sorry.  I want to

2     know --

3          A.    Or Lehman.

4          Q.    I want to know if there's a

5     reason why you, Mr. Poulos, as compared

6     to contacting a lawyer to do it for you,

7     why you, Mr. Poulos, did not reach out

8     directly to the school to share your

9     experiences or the sexual abuse or report

10    the sexual abuse by Mr. Ralston?

11              MR. JUBB:  Objection to the

12         form.  Asked and answered.

13              THE WITNESS:  It wasn't

14         asked and answered because I

15         haven't answered.

16    BY MS. DOUGHERTY:

17         Q.    It's okay.  You can just

18    ignore him.  Do you want me --

19         A.    And don't laugh.  This isn't

20    a laughing matter.

21         Q.    Oh, I'm not laughing.  I

22    think it's very serious.

23         A.    No.  He was laughing.

24              MR. JUBB:  I didn't laugh at

Kurtis N. Poulos

1              all.  And the audio should

2              absolutely reflect that, and we

3              should save it, of who apparently

4              laughed.

5       BY MS. DOUGHERTY:

6              Q.    No, Mr. Poulos.  I don't

7       think Mr. Jubb was laughing.  I think he

8       was -- he leaned down when he was

9       talking.  It may have looked like that,

10      but I don't think he was laughing, but,

11      you know, I can't speak for him.  But

12      that's -- so it's okay.

13             He's allowed to assert

14      objections.  I'm telling you to ignore it

15      because I care very deeply about what

16      your answers are and I want them to be

17      your answers that are not distracted by

18      objections.  So here's --

19             MR. JUBB:  That time I

20         laughed.

21             MS. DOUGHERTY:  Well, I

22         don't know why.  I mean, that's

23         disrespectful.

24             MR. JUBB:  No.  I laughed at

0338a

Kurtis N. Poulos

1         that comment from you considering

2         yesterday's objections.

3              THE WITNESS:  You know what?

4         Then I'm just going to end this

5         whole thing.

6              You want my answer?

7    BY MS. DOUGHERTY:

8         Q.    I want -- I want to --

9         A.    Stop talking.

10        Q.    Okay.

11        A.    You want my answer about why

12   I didn't call the school?  Because they

13   don't care.

14             Is that funny now, Lane

15   Jubb?  They don't care.

16             MR. JUBB:  Mr. Poulos,

17        please don't ask me questions.

18        I've never ever laughed at

19        anything you have said.  Please.

20        And the audio will reflect that.

21             So please make sure that

22        that's saved and we can go over

23        that again.

24   BY MS. DOUGHERTY:

0339a

Kurtis N.  Poulos

1          Q.    Yeah, Mr. Poulos.  When Mr.

2    Jubb said he was laughing, he was

3    laughing at me.  That's fine.

4               So, Mr. Poulos, you believed

5    that you needed a lawyer to assist you in

6    reporting this sexual abuse by Mr.

7    Ralston to The Hill School because you

8    believed The Hill School didn't care; is

9    that right?

10              MR. JUBB:  Objection.

11              THE WITNESS:  Correct.  They

12         didn't care about pretty much

13         anything that ever happened to any

14         student that was not reflective of

15         a Hill School student in a

16         positive way.

17   BY MS. DOUGHERTY:

18         Q.    And your objective was to

19   make The Hill School take accountability

20   for its involvement in the sexual abuse

21   that you sustained by Mr. Ralston in an

22   appropriate way, I think you expressed it

23   in a nonpublic way, by not going to the

24   press; is that right?

1          MR. JUBB:  Objection.

2          THE WITNESS:  That's

3     correct.  That's correct,

4     Candidus.

5   BY MS. DOUGHERTY:

6          Q.    When did you decide to --

7     let me start again.

8          When did you decide that you

9     should retain an attorney to assist you

10    in holding The Hill School accountable

11    for the abuse by Mr. Ralston?

12         MR. JUBB:  Same objection.

13         THE WITNESS:  There wasn't a

14    specific time.  It was more of a

15    matter of principle over a period

16    of time where I thought this can't

17    continue; I can't be proud to go

18    to a school that accepts this.

19   BY MS. DOUGHERTY:

20         Q.    I think you mentioned

21    yesterday in your testimony that you did

22    research regarding Mr. Garabedian before

23    you decided to retain Mr. Garabedian.

24         Did you research any other

Kurtis N. Foulos

1    lawyers besides Mr. Garabedian?

2         A.    Yeah, but I couldn't tell

3    you their names.

4         Q.    Did your mother suggest any

5    lawyers to you other than Mr. Garabedian?

6         A.    Yes, she did; but I, again,

7    couldn't tell you their names.

8         Q.    I'm going to take the share

9    screen down.  Sorry.

10             Well, it's better now.

11             Was there a specific

12   criteria that you had in selecting an

13   attorney to assist you in holding The

14   Hill School accountable?

15        A.    Somebody who I felt would

16   fight for the issue at hand, not just me.

17        Q.    So you wanted a lawyer that

18   would fight for sexual abuse victims?  Is

19   that what you mean by "the issue at

20   hand"?

21        A.    Yeah.  And it's not just --

22   it's not just, like, a male to male

23   thing, but it's -- it's this systemic

24   pedophilia that was going on at that

Kurtis N. Poulos

1    school where I thought, ultimately, if it

2    could be brought to light, the school

3    could ultimately just be, like, we're not

4    going to just send out random emails once

5    a year saying we know this, sorry, but

6    this shit happened, and call these random

7    women and they're going to help you, but

8    that they could actually help people.

9    That's what upsets me the most.

10          Q.    What upsets you the most?

11          A.    Because they're playing a

12    game.

13          Q.    "They," The Hill School?  Is

14    that who you're talking about?

15          A.    Correct.  It's not --

16          Q.    What game do you think The

17    Hill -- I'm sorry.

18          A.    It's not just the one

19    teacher.  It's not just me.  It's they

20    know what's going on; they turn a blind

21    eye until it gets too far.

22                And fortunately for the

23    young lady, she spoke up and told her

24    parents.  I should have done the same

Kurtis N.  Poulos

1   when I was her age.  I didn't have that

2   strength.

3                   But why would somebody want

4   to send their child to a school like that

5   knowing that there's a possibility of

6   some random teacher trying to sexually

7   abuse their students because they feel

8   ultimately in a situation of power?

9                   And for me, it pissed me off

10  even more because, yes, my mother made

11  the decision that I would go to school

12  there because it was part of a legacy.

13                  But I spent the money.  It

14  wasn't her money; it was my money.  It

15  was my life.

16       Q.   I realize that you said you

17  didn't remember the specific attorneys

18  that you were researching when you

19  decided that you wanted to retain an

20  attorney to help you hold The Hill School

21  accountable.

22                  But was there, and do you

23  remember, if there was --

24                  MR. JUBB:  Objection.

0344a

Kurtis N.  Poulos

1    BY MS. DOUGHERTY:

2          Q.    -- a reason that you

3    selected Mr. Garabedian over the other

4    attorneys?

5                MR. JUBB:  Objection.

6                THE WITNESS:  Like I said

7          yesterday, the only reason I chose

8          Mitchell was because, after

9          reading his background, it seemed

10         like he would be somebody who

11         could properly explain my case, I

12         guess, or -- this is very

13         uncomfortable for me to talk about

14         in general.  And I talked to him

15         about it, and I told him that.

16               I just wanted somebody to

17         represent me who could -- who I

18         thought could do his best to

19         properly represent me to make sure

20         that this gets rectified.

21   BY MS. DOUGHERTY:

22         Q.    Was there specific

23   information that you learned about Mr.

24   Garabedian during your research that led

0345a

Kurtis N. Poulos

1    you to believe Mr. Garabedian was the one

2    who could help you achieve your

3    objective?

4         A.    Nothing more than the cases

5    that I'd read about.

6              Sorry.  My phone is down

7    here.

8              Nothing more than I could

9    read about besides the fact that, you

10   know, he had fought a very long -- I

11   mean, that was the same sort of systemic

12   sexual abuse with the Catholic church,

13   and I felt that very much aligned with

14   what was going on with me and other

15   students at the school.

16        Q.    So you read about cases that

17   Mr. Garabedian was involved in that

18   involved the Catholic church?

19        A.    Correct.

20        Q.    Were there other types of

21   cases -- or let me start again.

22              What type of cases did you

23   read about that Mr. Garabedian was

24   involved in that caused you to believe

0346a

1    Mr. Garabedian was the lawyer that could

2    assist you in achieving your objective?

3            A.    That was pretty much the one

4    that set it up.  I don't really remember

5    anything more than that.

6               And if you're trying to

7    infer if I saw the movie where he was

8    highlighted -- I think it's called

9    Spotlight -- I've never seen that movie.

10   So that had no --

11           Q.    I'm not trying to infer

12   anything.  I'm just trying to learn all

13   of the information that you found in your

14   research that led you to believe that Mr.

15   Garabedian was the lawyer that could

16   assist you.

17              I think you mentioned that

18   you read some cases, so I just want to

19   know what those cases were.

20           A.    The only one that sticks out

21   in my mind is the one against the

22   Catholic church because that systemic

23   sexualization of minors in a situation

24   where they have no control or they feel

Kurtis N.  Poulos

1    like they have no control, and it felt

2    like he was fighting for the person or

3    the people who were affected by this the

4    most.  And I thought if anybody could

5    fight for this, it would be him.

6         Q.    Other than cases, was there

7    any other information that you learned

8    during your research about Mr.

9    Garabedian?

10        A.    I learned after that he was,

11   I guess, a character in -- or profiled in

12   the movie Spotlight.  But again, I've

13   never watched that movie.  I have no

14   desire to watch that movie because of

15   what it would -- what I'd have to relive

16   through those victims.

17             So he just felt like

18   somebody who could actually advocate for

19   people in my situation because he had

20   already done that.

21             I'm okay.

22        Q.    Just to be clear, your

23   objective in retaining Mr. Garabedian was

24   so that Mr. Garabedian would provide you

0348a

Kurtis N. Poulos

1    legal services, not counseling or

2    something of that nature; is that right?

3              MR. JUBB:  Note my

4         objection.

5              THE WITNESS:  No, not

6         counseling; just legal advice and

7         a way to -- that's it.  Just legal

8         advice and to make this

9         situation...

10   BY MS. DOUGHERTY:

11        Q.    Are you done your answer

12   there?

13        A.    Yeah.

14        Q.    I wasn't sure if you were

15   still thinking.

16        A.    No.  I'm fine.

17        Q.    I think you confirmed

18   yesterday, but just in case, what were

19   the fee terms of Mr. Garabedian's

20   retention?

21        A.    I believe it was a

22   percentage, maybe 20 percent of...

23        Q.    So you agreed to -- let me

24   start again.

0349a

Kurtis N. Poulos

1          So if you recovered money

2    from The Hill School, Mr. Garabedian

3    would receive a percentage of the amount

4    of money you recovered; is that correct?

5          A.    Yes.  That's why he was not

6    going to charge me upfront.  He didn't

7    ask for a retainer.

8          Q.    Did you pay any costs

9    associated with the representation of Mr.

10   Garabedian?

11         A.    No, I did not.

12         Q.    I'm trying to find my -- oh,

13   there it is.  Okay.

14          All right.  I'm going to

15   share my screen again, in theory.  Sorry.

16   I cannot -- all right.

17          MR. JUBB:  Can you identify

18        this one for me, Candy?

19          MS. DOUGHERTY:  I'm trying

20        to move it so I can, but my -- I'm

21        not able to move it.  Let me stop

22        the share.  When I click on it or

23        use my keyboard to move it, it

24        seems like it's opening my email.

0350a

Kurtis N.  Foulos

1              Let me try again.  Let's
2        see.
3              There we go.  Okay.  I'm not
4        really sure what's going on.
5   BY MS. DOUGHERTY:
6        Q.   Okay.  I'm showing you a
7   document that I'm going to mark as D-3.
8   The documents reflect a series of emails,
9   and I believe it came from your mother,
10  first produced to Mr. Jubb and then
11  forwarded to me.  Let's see.
12             At the top, it says -- top
13  left, 8/1/2020, and in the center, Swartz
14  Campbell, LLC, dash, Forward, colon, The
15  Interview.  I don't think that this
16  document has been produced with a Bates
17  label, so I'm just sending it in the
18  manner in which -- I'm showing it to you
19  in the manner which I received it.
20             The bottom of the first page
21  of D-3 is what looks like an email.  It
22  says, on Wednesday, December 13, 2017 at
23  11:43 a.m., Kurtis Froedtert -- and then
24  your email address -- wrote, colon.

0351a

Kurtis N.  Poulos

1                      Can you just read that

2      paragraph to yourself and let me know if

3      it reflects an email that you sent on

4      December 13, 2017, that being the

5      paragraph with the first email reflected

6      at the bottom of D-3?

7                      Just wave when you've

8      satisfied yourself that you've read it

9      and can confirm whether it's an email you

10     wrote.

11            A.    Yeah.

12            Q.    Now that you've read the

13     email at the bottom of D-3, does D-3

14     refresh your recollection regarding the

15     fee terms that you agreed to when you

16     retained Mr. Garabedian?

17            A.    Yeah.  It says 20 -- 20 to

18     30 percent.

19            Q.    And then it looks like

20     there's an email from your mother to you

21     December 13, 2017 going up from the

22     bottom of the page of D-3, and then

23     there's an email from you December 13,

24     2017 at 11:14 a.m. to your mother that

Kurtis N. Poulos

1    says, Okay.  Thanks.  My Dials, paren,

2    yearbooks, end paren, comma, diploma and

3    class jacket, comma, ring and tie were

4    all in a box that was lost in my move to

5    Maryland.  I haven't seen them since I

6    lived at the house in Shorewood.

7              So what are you referring to

8    and why were you picking out your dials,

9    diploma and class jacket, ring and tie to

10   your mom in December 13, 2017?

11         A.    I would assume it had

12   something to do with a phone call either

13   earlier that morning or the night before

14   because I have -- because I have none of

15   those -- so I have none of that.

16             And the dials, yes, the

17   yearbooks, my diploma, I don't have that,

18   my class jacket, the ring and the tie.

19   It was all marked in a box that said Hill

20   School that I kept in the basement of the

21   house in Shorewood.

22             And when I moved, I was

23   living in my childhood home that my

24   mother was no longer living in.  So I

Kurtis N. Poulos

1    moved my property out of -- out of her

2    home so that she could sell it.  That box

3    didn't show up.

4                 There was a platinum ring,

5    my school jacket -- or graduating class

6    jacket, school tie, and the diploma.

7         Q.    You moved to Connecticut in

8    2016; is that right?

9         A.    Yeah.  But this got lost

10   when I moved to Maryland.

11        Q.    Okay.  Oh, I see.  You moved

12   to Maryland in 2012; right?  Around

13   there?

14        A.    No.  I moved to Maryland in

15   2002, 2003.

16        Q.    You're right.  I apologize.

17   Okay.

18                 So you moved to Maryland in

19   2002 from your childhood home?

20        A.    Correct.  My mother had

21   moved, and I had started to rent the

22   house from her with a couple of friends.

23        Q.    And at least as of 2002

24   before you moved to Maryland, you had a

Kurtis N.  Poulos

1   box that had The Hill School written on

2   it; is that right?

3          A.    Yeah.  It had my

4   grandfather's graduation platinum -- or

5   his -- I don't know -- maybe it was

6   sterling silver -- plate.  It's a

7   graduation plate.  It had my graduation

8   jacket, my tie, my diploma.  The only

9   thing I think I took out of it was a

10  blanket, which my mother still has.

11         Q.    Was there anything else in

12  the box that you recall?

13         A.    No, because as soon as I

14  graduated, I just put it all in a box.

15         Q.    Did you have any -- it was

16  just one box; right?  There wasn't

17  multiple boxes of Hill School stuff?

18         A.    No.  It was a small box.  It

19  wasn't like a box.  It was just a

20  12-by-12-by-10 box.

21              MS. DOUGHERTY:  Could we

22         just take a five-minute comfort

23         break, if that's okay with

24         everybody?

0355a

Kurtis N. Poulos

1          MR. JUBB:  That's fine.

2          MS. DOUGHERTY:  Maybe if you

3     want to do a little bit longer --

4     oh, I'm sorry.  You're going to go

5     off the record?

6          THE VIDEOGRAPHER:  We are

7     now going off the record.  The

8     time is 1:35.

9          (Whereupon, a brief recess

10    was held.)

11         THE VIDEOGRAPHER:  We are

12    now back on the record.  The time

13    is 1:46.

14         You may continue.

15 BY MS. DOUGHERTY:

16    Q.    Mr. Poulos, what did you

17 think that Mr. Garabedian would do to

18 hold The Hill School accountable?

19         MR. JUBB:  Objection.

20         THE WITNESS:  Bring to light

21    what happened over decades.

22 BY MS. DOUGHERTY:

23    Q.    Is there something specific

24 that you wanted Mr. Garabedian to do to

Kurtis N. Poulos

1    hold the school accountable?

2         A.    Bring to light.

3              Are you objecting, Lane?

4              I just wanted it to be

5    brought to light.

6         Q.    Is it a fair

7    characterization that you left it to Mr.

8    Garabedian to decide the appropriate

9    manner to pursue holding a school

10   accountable and bringing to light the

11   circumstances of the abuse?

12             MR. JUBB:  Objection.

13             THE WITNESS:  Sure.  And I

14        thought it would go through the

15        proper channels.

16   BY MS. DOUGHERTY:

17        Q.    A few times you've

18   referenced other instances of

19   improprieties between faculty of The Hill

20   School and students.  You referred to it

21   as a systemic problem.

22             Can you please tell me all

23   the other instances of improprieties that

24   you have in mind and have been referring

Kurtis N.  Poulos

1    to?

2          A.    Do you want specific names?

3    Because I don't feel comfortable doing

4    that.  It's not my place.

5          Q.    Why don't you start with a

6    list of what you're comfortable telling

7    me, and then we can go from there?

8          A.    I know that there was or

9    there were teachers sleeping with

10   students -- male, female -- because when

11   I attended, it was all male.  I do know

12   that there were teachers who were

13   sleeping with other teachers.  I do know

14   that there were teachers abusing

15   students.

16              And for certain students --

17   and again, now being 42 years old, I

18   understand that that's not right, but

19   certain -- certain kids, I guess at the

20   time, you could say took it as a badge of

21   honor, like I'm a student and I get to

22   sleep with one of my teachers.

23              And it was well known

24   because we would watch them walk off

Kurtis N.   Poulos

1    campus.

2          Q.    Okay.  So just so I have the

3    list correct, there were instances of

4    teachers sleeping with students, teachers

5    sleeping with other teachers, and

6    teachers abusing students; is that right?

7          A.    Correct.  And teachers

8    cheating on their spouses.

9          Q.    Teachers cheating on

10   spouses, you mean with other teachers or

11   students?

12         A.    Both.

13         Q.    Both.  Okay.

14               So let's start with the

15   first on your list, teachers sleeping

16   with students.

17               While you were a student at

18   The Hill School, it's your belief that

19   teachers were having sex with students;

20   is that right?

21         A.    That's correct.

22         Q.    At the time you attended The

23   Hill School, all the students were male;

24   is that correct?

Kurtis N. Poulos

1          A.     Correct.

2          Q.     And I think you said male,

3    female in your answer.  What did you mean

4    when you said male, female?

5          A.     Well, it was female teachers

6    sleeping with male students.

7          Q.     Were male teachers also

8    sleeping with male students?

9          A.     There was rumors of abuse

10   between male teachers and male students.

11         Q.     What type of abuse did you

12   learn about -- well, let's do it this

13   way.

14                Let's put aside your

15   experience.  At the moment, I'm just

16   asking for instances of inappropriate

17   contact between teachers and students

18   other than you.  Okay?

19                So you said that there were

20   reports of abuse by male teachers on male

21   students.  Were those reports of abuse by

22   male teachers on male students abuse of

23   students other than you?

24         A.     Not at the time, no.

Kurtis N.   Poulos

1          Q.    Okay.  So when you were

2    attending The Hill School, you weren't

3    aware of abuse by a male teacher on a

4    male student other than the abuse that

5    you sustained from Mr. Ralston; is that

6    correct?

7          A.    I was waiting for an

8    objection.

9                But yes, I was aware that

10   there was improprieties by a certain

11   teacher towards certain students.  It was

12   known throughout the campus, but no one

13   in the faculty stepped forward.

14         Q.    Okay.  We'll get to that,

15   but I just want to confirm for the moment

16   that the impropriety by a male teacher --

17   let me start again.

18               The abuse by male teachers

19   to male students -- let me start again.

20               Were there abuse by male

21   teachers to male students other than the

22   abuse that you sustained from Mr.

23   Ralston?

24         A.    I believe so, yes.

Kurtis N.   Poulos

1          Q.    How many -- let me start

2   again.

3                Was the abuse by more than

4   one teacher?

5          A.    To my knowledge, yes.

6          Q.    So more than one male

7   teacher abused male students other than

8   you while you were at The Hill School; is

9   that right?

10         A.    Correct.

11         Q.    How many male students

12   abused -- let me start again.

13               How many male teachers

14   abused male students when you were at The

15   Hill School?

16         A.    I can't say for sure.

17         Q.    How many -- let me start

18   again.

19               How did you learn that there

20   was abuse by male students -- I keep

21   doing this.

22               You're uncomfortable naming

23   the parties involved; is that right?

24         A.    One of them is deceased, so

Kurtis N.   Poulos

1    I don't find it proper to talk about

2    somebody who's dead.

3              Q.    All right.  So the deceased

4    person is a male teacher; right?

5              A.    Correct.

6              Q.    What other male teachers

7    abused students while you were at The

8    Hill School?

9              A.    I don't feel comfortable

10   naming them by name in case I could be

11   called liable because, again, this is --

12   it's a small community.  And again, these

13   were at times maybe rumors, but at times

14   they were -- I should say the other

15   students were so boisterous about the

16   fact that they were sleeping with female

17   teachers, it's kind of hard to discern

18   which is fact and which is fiction, if

19   you understand that.  And --

20             Q.    I understand.  Keep going.

21             A.    No.  Go ahead.

22             Q.    All right.  How about we do

23   this?  Why don't -- at the moment, I'm

24   just asking about male teachers who

1   abused male students.  Okay?

2           I think -- hold on -- we

3   have Mr. Ralston who abused you.  Then we

4   have a deceased teacher.  And then who

5   else?  And if you would like, you can

6   call them John Doe 1, 2, like that.

7   We'll start that way.

8           So we have Mr. Ralston who

9   is a male teacher who abused a male

10  student, you; we have a deceased male

11  teacher who abused male students.  Who

12  else, if anyone?

13      A.    I can think of John Doe #1.

14  That's it.

15      Q.    And John Doe #1 is a male

16  teacher who you believe abused a male

17  student and is not Mr. Ralston or the

18  deceased male teacher; is that right?

19      A.    Correct.  And if I could

20  make a statement, I don't know that it

21  was so much physical as -- given our

22  situation with our living, you know,

23  quarters and showering quarters, it was

24  more a matter of every time kids went to

Kurtis N. Poulos

1    go and take showers, he managed to just

2    happen to pop in and be, like, oh, just

3    wanted to make sure that you guys are all

4    getting clean after sports before you go

5    to dinner.

6              And that's, pardon my

7    French, creepy as hell to just be, like,

8    oh, yeah, I'm just peeking in.  It's like

9    what the president said:  I just walked

10   through the pageant because I own it and

11   I get to look at people.  It's overall

12   creepy.

13         Q.    The "he" you're talking

14   about --

15         A.    So maybe --

16         Q.    I apologize.  Keep going.

17         A.    No.  Go ahead.

18         Q.    I just want to confirm the

19   "he" you're talking about here is John

20   Doe #1?

21         A.    Yes.

22         Q.    It is my intention to ask

23   you about each instance.  I was just

24   trying to decide a way that we could

0365a

Kurtis N.   Poulos

1    refer to the people in a way you were

2    comfortable.

3              So let's start with John Doe

4    #1.  So your belief about John Doe #1's

5    abuse towards male students is that he

6    observed male students taking showers

7    when you were a student at The Hill

8    School; is that correct?

9         A.    Correct.  Correct.

10        Q.    Did John Doe #1 ever observe

11   you when you were taking a shower while

12   you were a student at The Hill School?

13        A.    I would imagine, yes,

14   because we had communal showers in some

15   of the buildings, so we didn't have a

16   choice.

17        Q.    Well, how did you learn that

18   John Doe #1 was observing students taking

19   showers?

20        A.    Because he was just always

21   there right after we got in the showers.

22   So I stopped taking showers there.

23        Q.    So you -- when you -- so you

24   saw John Doe #1 watching the showers when

Kurtis N.   Poulos

1    you went to take a shower on at least one

2    occasion; is that right?

3          A.    On multiple occasions.

4          Q.    How many times did you

5    observe John Doe #1 watching the showers

6    when you were going to take a shower?

7          A.    Freshman year, at least a

8    dozen.  That's why I stopped showering

9    after getting ready -- you know, getting

10   ready to go back to my dorm to go to

11   dinner.

12         Q.    During what trimester did

13   these --

14         A.    That would be the first

15   trimester of my third form year.  So it

16   was -- if I could explain a little bit

17   because I don't know if any of you went

18   to a boarding school.

19               It's old.  They don't have,

20   like -- or at least when I went there,

21   they didn't have, like, separated

22   individual showers.  It was a shower

23   room.

24               So it's awkward enough that

Kurtis N.  Poulos

1    you're around your peers.  But to then

2    have a professor or your coach walk into

3    the room and just stand there and be,

4    like, shower up, guys, it's time to go,

5    that's creepy.

6              There was no separation.  It

7    was just, like I said, a community, a

8    family.  But at the end of the day, to

9    me, it felt creepy.  And it got creepier

10   the more that they just stood there and

11   watched, because you can tell your

12   lacrosse team or, you know, the kids

13   working out go and take a shower, expect

14   them to do it.

15             It was always awkward to

16   surround your peers, but then to have a

17   guy in his 30s or 40s standing there

18   making sure that you're taking a shower?

19   That doesn't make any sense to me.  And,

20   frankly, it shouldn't make sense to

21   anybody.

22        Q.   Did you report John Doe 1's

23   conduct to any other teachers or a coach?

24        A.    No, because every -- sorry.

0368a

Kurtis N.   Poulos

1    No, because everybody was, like, this is

2    normal; this is just the way it is, that

3    they're going to come in and check and

4    make sure that you're washing yourself.

5              But at the same time, they

6    completely contradict that by saying, oh,

7    we want you to be completely independent;

8    we want you to, you know, become these

9    grown individuals, yet they don't trust

10   us enough to take a shower for five

11   minutes, to put clothes on to go back to

12   our dorm?

13             None of that makes sense to

14   me.  And the more I think about it, it's

15   inexcusable.

16        Q.    So John Doe 1 made you

17   uncomfortable by watching you take a

18   shower, so you stopped taking showers

19   during the first trimester of your third

20   form year; is that correct?

21        A.    Correct.

22        Q.    Is there any other conduct

23   by John Doe 1 that was, in your opinion,

24   abuse of male students?

0369a

Kurtis N. Poulos

1        A.    To my knowledge, no.

2        Q.    Did you ever discuss John

3    Doe 1's, you called it a creepy conduct,

4    with any other student at The Hill

5    School?

6        A.    It may have just been a

7    laughing, you know -- not a laughable

8    matter, but it was kind of, like, if I

9    could go with guy speak, it was, dude,

10   why is that guy always standing there, if

11   that makes sense.  Like, why are -- why

12   does he have to come and make sure that

13   we're taking a shower.  That doesn't make

14   sense.

15        And it's -- you know, it's

16   become more, obviously, inappropriate the

17   older you get to understand, like, there

18   was possible alternative reasons why he

19   was there.

20        But having a teacher come in

21   and, like, just stand there and be, like,

22   make sure and clean yourself, it's kind

23   of creepy.

24        Q.    Do you remember any students

Kurtis N. Poulos

1    that you discussed John Doe 1's creepy

2    conduct with?

3         A.    Like I said, it was just

4    kind of a running joke, like, why is he

5    here.

6         Q.    Then the deceased male

7    teacher, what abuse do you believe that

8    the deceased male teacher engaged in,

9    again, just against male students at the

10   moment?

11        A.    Well, because there were

12   only male students.  He did have a hookah

13   party for his -- what he considered, you

14   know, his best students.  So you kind of

15   feel -- it's weird because you kind of

16   feel like, oh, I want to be invited to

17   that party if he's smoking a hookah that

18   he got in India or, you know, Azerbaijan,

19   and he's got all these Persian rugs and

20   he wants you to hang out.  You're kind

21   of, whoa, why wasn't I included.  So you

22   want to be included.

23                But I later found out that

24   he was -- and again, I don't want to

0371a

Kurtis N.   Poulos

1    speak ill of the dead.  It's not my

2    place.  But I would have to assume that

3    there was something else going on because

4    why would you invite 15- and 16-year olds

5    to smoke hookahs and hang out in your

6    apartment until 10:00, 11:00 o'clock at

7    night?

8            Q.   Did you ever attend a hookah

9    party at the deceased male teacher's

10   apartment?

11           A.    I never attended one of his

12   parties.  I had been in his apartment, so

13   I could tell you exactly what it looked

14   like.

15               But, again, he was supposed

16   to be my teacher my fifth form year, but

17   I didn't attend fifth form year.

18           Q.   Did the deceased male

19   student ever abuse you?

20           A.   Deceased male teacher?

21           Q.   Yeah.  Excuse me.  Let me

22   ask the question again.

23               Did the deceased male

24   teacher ever abuse you?

0372a

```
1              A.    No.  He was -- can I be
2    honest?
3              Q.    Well, you have to be honest.
4    You're under oath.
5                    So did the deceased male
6    teacher ever abuse you?
7              A.    No, he didn't.
8                    But, Lane, can you pull up
9    my senior page?
10                   MR. JUBB:  Ms. Dougherty,
11             I'm going to let you conduct your
12             deposition.  Would you like me to
13             pull up his senior page?
14   BY MS. DOUGHERTY:
15             Q.    Mr. Poulos, do you need the
16   senior page in order to answer my
17   question?  If you do, that's fine.
18             A.    I think it's tantamount to
19   my answer, yeah.
20                   MS. DOUGHERTY:  Okay.  Mr.
21             Jubb, if you wouldn't mind --
22             because I don't have it easily
23             accessible -- if you would pull up
24             Mr. Poulos' senior page.
```

Kurtis N. Poulos

1    BY MS. DOUGHERTY:

2          Q.    And then, Mr. Poulos, I'm

3    going to ask you to tell me first why you

4    asked Mr. Jubb to pull up your senior

5    page.

6          A.    Because the teacher's

7    name --

8          Q.    Wait.  Let him pull it up.

9    I want to see what it is first.

10         A.    Okay.

11         Q.    I, unfortunately, didn't

12   commit your senior page to memory.

13         A.    I didn't either.  Lane found

14   more pictures of me my senior year than I

15   even knew I had.

16         Q.    Oh, okay.  I remember now.

17              MS. DOUGHERTY:  Lane, could

18         you just scroll down so I can see

19         the Bates label?

20   BY MS. DOUGHERTY:

21         Q.    Okay.  So P-6.23 is your

22   senior page.

23              Okay.  Mr. Poulos, why did

24   you ask Mr. Jubb to pull up your senior

Kurtis N. Poulos

1    page to answer my question of whether the

2    deceased male teacher abused you?

3            A.    Because he didn't, but I did

4    mention him in the first line of my

5    senior page.

6            Q.    Oh.  The Zwerner?

7            A.    Yeah.

8            Q.    Is that what you're talking

9    about?

10           Oh, the line that Mr. Jubb

11   asked you about, it's a Zwerner, was

12   actually in reference to the deceased

13   male student who you believe abused

14   students during the time --

15           A.    Deceased male --

16           Q.    I keep doing that.  Okay.

17   Let me start again.

18           It's a Zwerner sentence on

19   your senior page is in reference to the

20   deceased male teacher who you believe

21   abused students while you were a student

22   at The Hill School; is that right?

23           A.    Correct.  And again, I hate

24   to speak ill of the dead, but there were

Kurtis N. Poulos

1    too many instance where it's, like --

2         Q.    Do you have information

3    about whether the deceased male teacher

4    abused other students while you were a

5    student at The Hill School?

6         A.    I do.

7         Q.    What information do you have

8    about abuse by the deceased male teacher

9    towards other students while you were a

10   student at The Hill School?

11        A.    I'm not at liberty to say

12   because it would make me have to name

13   names.  I just know --

14        Q.    All right.  Well --

15        A.    -- if that makes sense.

16        Q.    Are you able to describe

17   your information by using Student #1,

18   Student #2, rather than a student name?

19        A.    I can tell you there were a

20   few students, say 1, 2, and 3, that were

21   invited to his apartment, and it wasn't

22   for studying.  It was known that they

23   were going to go there, smoke the hookah,

24   hang out, and leave, whatever that meant.

0376a

Kurtis N.   Poulos

1          Q.    What do you mean, "leave"?

2     Is that what you said?  Leave --

3     L-E-A-V-E?

4          A.    Yeah.  Like, when it's done,

5     it's done; get out.

6               MS. DOUGHERTY:  Mr. Jubb,

7          could you end the screen sharing?

8          Thank you.

9     BY MS. DOUGHERTY:

10         Q.    Okay.  So what part of being

11    invited to the apartment smoking a hookah

12    and leaving in your view was abuse by the

13    deceased male teacher?

14         A.    Well, we pretty much always

15    knew what was going to happen when they

16    went to the apartment.

17         Q.    What do you mean, what was

18    going to happen when a student went to

19    the apartment?

20         A.    It wasn't a hookah with

21    tobacco; it was a hookah with probably

22    weed and maybe something else.  I'm only

23    conjecturing, so I cannot confirm.  And I

24    want to make that very clear.  This is

0377a

Kurtis N. Poulos

1    only conjecture.  This is only --

2          Q.    What do you mean by --

3          A.    -- what I was told.

4          Q.    So Student 1, 2, and 3 told

5    you that they smoked drugs at the

6    apartment of the deceased male teacher;

7    is that correct?

8          A.    Correct.

9          Q.    Were you told by three

10   different students that they smoked drugs

11   at the deceased male teacher's apartment?

12         A.    At least three.

13         Q.    And if you were directed by

14   a court to identify the three teachers --

15   or excuse me -- the three students that

16   you have in mind by name, you would be

17   able to identify the students by name?

18         A.    Off memory?  One.  But the

19   one means he brought somebody else with

20   him, if that makes sense.

21         Q.    Okay.  So one student who

22   you can identify by name if the court

23   were to order you to identify the student

24   by name told you that he, along with two

Kurtis N. Poulos

1    other students smoked drugs at a deceased

2    male teacher's apartment; is that right?

3         A.    Again, I'd like to preface

4    that by saying I can't confirm they were

5    smoking drugs.  I can only state that I

6    know that they would go there and smoke a

7    hookah, and what I was told was talk

8    about history.

9         Q.    I don't understand.  So did

10   a student who you can name if directed to

11   name tell you that he and other students

12   smoked drugs at the deceased male

13   teacher's apartment?  Yes or no.

14        A.    No.

15        Q.    What did the student who you

16   can identify by name tell you happened at

17   the deceased male teacher's apartment?

18        A.    He would make dinner; they

19   would hang out, smoke the hookah -- I

20   don't know what was in the hookah -- and

21   a couple hours later, they'd wander back

22   into the dormitory.

23        Q.    Just to be clear, I'm asking

24   about what the student who you could name

0379a

Kurtis N. Poulos

1    told you about what occurred at the

2    deceased male teacher's apartment.

3                So the student who you can

4    name told you that the deceased male

5    teacher made dinner, they hung out,

6    smoked a hookah, and he returned to the

7    dorm; is that right?

8          A.    Correct.

9          Q.    Is there something else that

10   the student who you can identify told you

11   about his time spent in the apartment of

12   the deceased male teacher?

13         A.    No, there is not.  There's

14   just the overall demeanor of what I

15   observed when he returned to the

16   dormitory.

17         Q.    What did you observe when

18   the student returned to the dormitory

19   after spending time in deceased male

20   teacher's apartment?

21         A.    Without -- to be so blunt,

22   he was high as hell.

23         Q.    The student who you have in

24   mind who you can name by name, how old

Kurtis N.  Poulos

1    was he when --

2           A.    It would have been my fourth

3    form year.  It was my fourth form year.

4           Q.    And the student was also a

5    fourth former?

6           A.    Correct.

7                 Can I put something on the

8    record really quickly?  I don't want to

9    put these guys in a situation where they

10   have to relive anything they had to go

11   through.  Can I just say that?

12          Q.    I mean, you can say that.

13                So the student who told you

14   -- let me start again.

15                The student who you could

16   name that you believe was high after

17   spending time in deceased male teacher's

18   apartment was not 18 at the time; is that

19   right?

20          A.    No.

21                Hey, Lane, are you awake?

22                MR. JUBB:  I'm here.  Thank

23          you.

24                THE WITNESS:  Just

Kurtis N.   Poulos

1          wondering, because you keep

2          looking down.

3                   MR. JUBB:  I've got the sun

4          in my eyes, and I'm paying

5          attention.  I know your reaction.

6          I'm just listening to her

7          questions.  But thank you.

8                   THE WITNESS:  Just didn't

9          want to make sure that you were

10          texting somebody during a

11          deposition.

12    BY MS. DOUGHERTY:

13          Q.    Are there any other

14    instances -- let me start again.

15                   Is there any other conduct

16    by deceased male teacher other than

17    inviting students to his apartment to

18    smoke a hookah that you considered abuse?

19          A.    Not to my knowledge.

20          Q.    So I could show it to you if

21    you want, but you've told me a number of

22    times you've committed the email to

23    memory.

24                   November 20th, 2017 email

Kurtis N. Poulos

1    from the school that's been marked as D-1

2    referenced on the second page conduct by

3    a deceased teacher.  When you -- the

4    teacher --

5              MR. JUBB:  Did my sound go

6         out?  Oh, sorry.

7              MS. DOUGHERTY:  You know

8         what?  I got a message that my

9         Internet was unstable when you

10        said that, so...

11             MR. JUBB:  You just paused.

12        I didn't know if I had another

13        issue.  I apologize.

14             MS. DOUGHERTY:  No.  I might

15        be having an issue.  Let me just

16        make sure.

17   BY MS. DOUGHERTY:

18        Q.    I'm just going to start

19   again.

20             Did you have an

21   understanding about what Mr. Lehman was

22   referring to in his November 20th, 2017

23   email that's been marked as D-1 when he

24   referred to incidents involving conduct

Kurtis N. Poulos

1    decades ago by faculty members including

2    one who was deceased?

3             A.    Like I spoke to yesterday,

4    yes.

5                   Excuse me.  I heard rumors

6    prior to my arrival about improprieties,

7    but at the same time, I can only address

8    what I heard while I was attending the

9    school.

10                  And I wasn't about to

11   jeopardize myself or my cousin by saying,

12   oh, well, this guy is sleeping with this

13   teacher, this teacher is doing this, or

14   this is happening to me, because there

15   are a lot of legacies.  Oliver Stone went

16   there.  The President's sons went there.

17                  Like, you don't talk about

18   it.  You know it's happening, but you

19   don't talk about it.

20            Q.    Do you have information

21   about any other deceased teacher other

22   than the deceased male teacher we talked

23   about who had hookah parties?  Do you

24   know of any conduct by any other deceased

Kurtis N. Poulos

1   teacher that you considered improper or

2   abusive directed to students?

3         A.    No, not at all.  In fact,

4   the only other teacher I can think of who

5   has passed away was my English teacher my

6   fourth form year.  And he made sure to

7   make us always feel inclusive, even to

8   the point where we got a skip Saturday

9   because it was our first class every

10  Saturday.  And he was, like, skip class;

11  we're going to have class in your room,

12  we'll bring donuts, and we'll hang out

13  and have a quasi class, I guess I could

14  say.

15        Q.    So when you identified

16  teachers sleeping with students, you

17  meant teachers having sex with students;

18  is that right?

19        A.    I would assume so, yes.

20        Q.    Do you have information

21  about any male teacher -- no.  Let me

22  start again.

23              What do you mean you assume

24  so?  I'm asking you what you meant.  You

0385a

Kurtis N. Poulos

1   said teachers sleeping with students.

2   Did you mean teachers having sex with

3   students when you said "sleeping with

4   students"?

5           A.    Can I -- the only way I

6   could verbiage -- like, put this in

7   proper verbiage is to say that maybe it

8   was boisterous high school students

9   saying, yes, I slept with so and so.

10  Could I say that I walked in on them?

11  No.  But Jeremy Eichmann --

12          Q.    Right.  At the moment, I'm

13  just asking what you meant.  You said

14  teachers sleeping with students.  You

15  meant teachers having sex with students

16  when you said "sleeping with students";

17  is that right?

18          A.    I would assume so, yes.

19          Q.    No.  There's no -- you can't

20  assume so.  You said teachers sleeping

21  with students; correct?

22          A.    I did say that because

23  that's what I was told by the student.

24          Q.    Your definition of "sleeping

Kurtis N. Poulos

1    with" is having sex with; is that right?

2         A.    Correct.

3         Q.    I'm just making sure we have

4    our terminology correct.

5         A.    Okay.

6         Q.    Do you have information

7    about any male teacher having sex with

8    students while you were a student at The

9    Hill School?

10        A.    Abusively, or just male on

11   male?

12        Q.    Well, I'm not really sure

13   that sex between an adult and a minor can

14   ever be anything other than abuse, but --

15        A.    Fair enough.

16        Q.    -- I'm not characterizing it

17   at the moment.

18             I just want to know if you

19   have information about any teacher -- I'm

20   sorry -- any male teacher having sex with

21   a student while you were at The Hill

22   School.

23        A.    Other than the deceased male

24   teacher, no.

0387a

Kurtis N.   Poulos

1          Q.    So you have information

2   about the deceased male teacher having

3   sex with a student while you were at The

4   Hill School?

5          A.    Correct.

6          Q.    Did the deceased male

7   teacher have sex with a male student?

8          A.    Correct.  We didn't have any

9   female students.

10          Q.    That's what I thought, but

11   -- how -- what is the basis for your

12   information that deceased male teacher

13   had sex with a student while you were at

14   The Hill School?

15          A.    Again, rumors and conjection

16   [sic].

17          Q.    So a student told you that

18   someone had sex with deceased --

19          A.    He had heard.

20          Q.    Okay.  Go ahead.  Tell me.

21          A.    Sorry.  He had heard that

22   the deceased teacher had had relations

23   with another student at one of the

24   parties at his apartment, which was in

0388a

Kurtis N.   Foulos

```
1    upper school on the first floor.
2         Q.    Okay.  So another student
3    told you that deceased male teacher had
4    sex with a different student during a
5    hookah party at deceased male teacher's
6    apartment; is that right?
7         A.    Correct.
8         Q.    Did more than one student
9    tell you that male -- deceased male
10   teacher had sex with a student?
11        A.    Yes.
12        Q.    How many students told you
13   that deceased male teacher had sex with a
14   student?
15        A.    Maybe two or three.
16        Q.    So maybe two or three
17   students told you that deceased male
18   teacher had sex with a student during a
19   hookah party?
20        A.    Yeah.  But as I stated
21   before, it was never my -- I'm not a
22   gossip.  I never wanted to know that.  It
23   was just something you eventually find
24   out.
```

0389a

Kurtis N. Poulos

1          Q.    Did any of the students who

2    told you deceased male teacher had sex

3    with -- let me start again.

4                Based on what you were told,

5    did the deceased male teacher have sex

6    with more than one student?

7          A.    Yes, in some form or

8    another.  I'm not sure if it was oral or

9    -- I never asked.  Like I said, I was not

10   the gossip.  I don't know the specifics,

11   so I don't know what form of.  It was

12   just a matter of, oh, did you hear that

13   this happened with him.

14         Q.    Did any of the students who

15   told you deceased male teacher had sex

16   with a student tell you that that

17   student -- the student telling you the

18   information -- had sex with deceased male

19   teacher?

20         A.    I never received it

21   directly, no.

22         Q.    Other than deceased male

23   teacher, do you have any information

24   about a male teacher having sex with a

Kurtis N. Poulos

1   student while you were at The Hill

2   School?

3         A.    No.

4         Q.    Do you have any information

5   about a female student having sex -- let

6   me start again.

7              Do you have any information

8   about a female teacher having sex with a

9   student while you were at The Hill

10  School?

11        A.    Can I interrupt for a

12  second?

13        Q.    Go ahead.  What's your

14  interruption?  Are you objecting?

15        A.    No, I'm not objecting.  I

16  said can I interject for a second?

17  Because Lane has been staring at his

18  phone for the last 20 minutes.

19              And if this is boring to

20  you, I can easily go and hang out in the

21  rest of my house and not waste everybody

22  else's time.

23              MR. JUBB:  Mr. Poulos, if

24        you could focus on her answers,

0391a

Kurtis N.  Poulos

1          that would be appreciated.

2               And just for the record --

3               THE WITNESS:  I'm focusing

4          on you because you're not --

5               MR. JUBB:  So if you could

6          get back to answering questions,

7          that would be great.

8               THE WITNESS:  So this is

9          going to end.  If you're not going

10         to take this seriously, why am I

11         going to sit here and waste my

12         time?

13    BY MS. DOUGHERTY:

14         Q.   Okay, Mr. Poulos, hold on a

15    second.  Okay?  Don't be distracted by

16    Mr. Jubb.  He has a job to do just like I

17    have a job to do, just like the

18    videographer has a job to do, the court

19    reporter has a job to do.  Okay?

20              Mr. Jubb represents the

21    person who's suing you.  I realize that

22    makes him unpopular to you; right?  I'm

23    probably not popular to you either.

24              But just hold on a second.

1  Okay?  I'm asking you questions.  I'm

2  asking you questions because your answers

3  are important to me.  You have contended

4  that you were abused by a teacher.  I

5  want you to tell me the detail of that.

6  You've contended other teachers abused

7  students.  I'm asking about the detail

8  about that.

9          It's serious content.  I'm

10  asking it for a serious reason.  And, you

11  know, that's what we're doing.

12          You can ignore Mr. Jubb

13  because he, you know, is not asking the

14  questions.  What he does is really not

15  your concern, unless the word "objection"

16  is coming out of his mouth.  Right?

17          MR. JUBB:  Ms. Dougherty, I

18      would appreciate a little bit more

19      credence than that.  I'm sitting

20      here with my notepad.

21          MS. DOUGHERTY:  I don't know

22      what you're doing.

23          MR. JUBB:  But the idea that

24      somehow I'm doing anything

Kurtis N.  Poulos

1              improper by sitting here with my

2              notepad is just outrageous.

3                      And so I could sit here and

4              look at the camera or not, but

5              I'm -- the idea that somehow he

6              should ignore me because I -- you

7              know, whatever I'm doing, it just

8              tends to -- you know, I'd

9              appreciate as a member of the bar

10             that you would at least

11             acknowledge that I'm sitting here

12             taking notes and doing nothing

13             improper about my conduct.

14                     MS. DOUGHERTY:  I'm not

15             trying to cast aspersions on you,

16             Mr. Jubb.  I'm suggesting that the

17             witness just not be distracted by

18             you.  Honestly, I wasn't looking

19             at you.

20                     MR. JUBB:  Of course not.

21                     MS. DOUGHERTY:  I've been

22             looking at Mr. Poulos the entire

23             time.  In fact, even when you

24             couldn't hear, I was looking at

Kurtis N.  Poulos

1        Mr. Poulos, so -- and I'm not very

2        good with Zoom.  So if there's --

3        that's just how I can do it.

4            So I honestly don't know

5        what you were doing.  I assume you

6        weren't doing anything untoward.

7        I'm telling the witness to just

8        not be concerned about it.  I'm

9        not suggesting that you did

10       anything inappropriate.

11           I apologize to you, Mr.

12       Jubb, to the extent you believed I

13       was suggesting that.

14           MR. JUBB:  Thank you.

15           MS. DOUGHERTY:  I only meant

16       to say I was looking at Mr. Poulos

17       and that the witness shouldn't be

18       concerned with what he thinks you

19       are or are not doing.  I'm asking

20       the questions and his answers are

21       important, and most importantly

22       that it's important they're

23       truthful and that he has not --

24           THE WITNESS:  Can I

0395a

Kurtis N.  Poulos

1           interject?  Can I interject?

2    BY MS. DOUGHERTY:

3           Q.    Go ahead.

4           A.    He made a comment yesterday

5    when I looked down to turn on the lights

6    saying that I was texting somebody.  So

7    how do I not know that he's not doing the

8    exact same thing?

9           Q.    Okay.  That's a fair

10   question.  Just to explain, when you are

11   a witness under oath, you're not -- and

12   actively testifying, which is your

13   position at the moment, you're not

14   allowed to talk to other people except if

15   you're there with a lawyer and you ask to

16   be excused to speak to your lawyer.

17   Okay?

18           You have to focus your

19   attention on the testimony.  You can't,

20   you know, speak to another person in the

21   room in the middle of testimony.  You

22   can't text message or email with

23   somebody.  Okay?

24           So I think that when you

Kurtis N. Poulos

1    looked down at your phone, Mr. Jubb asked

2    you a legitimate question just to make

3    sure you understood, because you're not

4    here with an attorney, that you can't

5    text, like when I say you can't smoke.

6    Right?

7                    So Mr. Jubb, however, is not

8    under oath and he's not testifying.  He's

9    also not asking the questions.

10                   So at the moment, what he

11   decides to do or not do, is up to him.

12   We don't really know what he is or isn't

13   doing except we see him from his

14   shoulders up and he's sitting there,

15   right, not unlike the videographer or the

16   court reporter.  Right?

17                   So that's the distinction

18   though.  That's why Mr. Jubb asked you

19   specifically because you, as a witness --

20   and it's not you personally, it's any

21   witness who's testifying -- can't have

22   communications in the middle of the

23   testimony.

24                   Does that answer your

Case 2:19-cv-01539-MAK   Document 154-3   Filed 11/15/21   Page 403 of 508
Kurtis N. Poulos

1    question or concern?

2         A.    To an extent, yes.

3         Q.    I honestly don't remember if

4    you answered or not -- I apologize if you

5    did -- so I'm just going to ask again.

6               Do you have any information

7    about a female teacher having sex with a

8    student while you were a student at The

9    Hill School?

10        A.    Yes.

11        Q.    What information do you have

12   about a female teacher having sex with a

13   student while you were a student at The

14   Hill School?

15        A.    A certain tennis player

16   bragging about the fact that he was

17   sleeping with the tennis coach who was,

18   at the time, married.

19        Q.    Was the tennis player who

20   told you he was having sex with the

21   tennis coach 18 at the time?

22        A.    He was not.

23        Q.    Do you have any other

24   information about a female teacher having

0398a

Kurtis N.  Poulos

1    sex with a student while you were a

2    student at The Hill School?

3          A.    I heard rumors, but nothing

4    specific.

5          Q.    You also, as part of your

6    list of improprieties, identified

7    teachers having sex with other teachers.

8    What information --

9          A.    Correct.

10         Q.    What information do you have

11   about teachers having sex with other

12   teachers while you were at The Hill

13   School?

14         A.    The fact that they were

15   caught off campus.

16         Q.    Did the situation you had in

17   mind relating to sex between two teachers

18   off campus then involve a student?

19         A.    Not to my knowledge, no.

20         Q.    As part of your list of

21   improprieties that occurred -- let me

22   start again.

23                Is that -- the two teachers

24   caught off campus having sex, is that the

Kurtis N. Poulos

1  only information you have about teachers

2  having sex with other teachers while you

3  were a student at The Hill School?

4       A.    I mean, there may have been

5  a few more.  Like I said, I didn't try

6  and --

7       Q.    No, no.  I'm just asking --

8  all I want to know is whether you have --

9  let me start again.

10            All I want to know is about

11  your information.  You gave me a list:

12  Teachers sleeping with students; teachers

13  sleeping with other teachers; teachers

14  abusing students; and you added as a

15  footnote teachers cheating on spouses.

16  I'm just trying to learn your information

17  and the basis for your list.

18            So you've told me you have

19  information about the two teachers who

20  were caught off campus having sex with

21  each other that did not involve a

22  student.  I want to know if you have

23  information about any other teachers

24  having sex with other teachers while you

Kurtis N.  Poulos

1    were a student at The Hill School.

2         A.    No, I do not.

3         Q.    Now, the third item on your

4    list was teachers abusing students.  And

5    I asked you to, again, for the moment,

6    leave the abuse by Mr. Ralston against

7    you out of your answer.  We'll come back

8    to that.

9              What information do you have

10   about teachers abusing students while you

11   were a student at The Hill School, again

12   excluding the abuse that you sustained

13   from Mr. Ralston?

14        A.    Can I speak in retrospect?

15        Q.    At the moment, I'm just

16   asking you about information you learned

17   when you were a student at The Hill

18   School.

19        A.    That there were teachers

20   sleeping with students who were under 18,

21   which is statutory rape.

22        Q.    Is there -- let me start

23   again.

24              Do you have information

Kurtis N. Poulos

1    about teachers abusing students while you

2    were a student at The Hill School other

3    than the abuse you've told me about

4    today?

5         A.    Male to male abuse?

6         Q.    Any type of abuse by a

7    teacher on a student other than what

8    you've told me about today.

9         A.    No.

10        Q.    You mentioned earlier in

11   your testimony there was a girl who came

12   forward about abuse.  What were you

13   referring to?

14        A.    Wait.  You broke up.  Can

15   you please restate?

16        Q.    Sure.  Earlier in your

17   testimony, you mentioned something along

18   the lines of a girl who came forward

19   about abuse.  What were you referring to?

20        A.    I believe that it was a case

21   with a female student after the school

22   went co-ed where a male teacher slept

23   with an underage female.  And the school

24   settled, to my knowledge, out of court to

Kurtis N.   Foulos

1    keep it under wraps for the, you know,

2    lack of a better term.

3              Q.    What's the basis for your

4    information?

5              A.    I'm an alumnist.  I get to

6    get that knowledge, especially when they

7    ask me for money.

8              Q.    So The Hill School reported

9    to alumnists that there had been a

10   settlement with a former student relating

11   to sex between that student and a

12   teacher?

13             A.    Correct.

14             Q.    Did the Hill School -- let

15   me start again.

16                   Did The Hill School report

17   specifics?

18             A.    Not names, but ages and the

19   fact that the faculty member had been

20   terminated.

21             Q.    How did The Hill School

22   communicate this information to you?

23             A.    Through the alumni letter.

24   We get alumni letters every month,

Kurtis N. Poulos

1    especially when you're a donator.  And my

2    family has been donating money for 70

3    years.

4         Q.    When did you start receiving

5    the monthly alumnist letters?

6         A.    A week or two after I

7    graduated and they started asking me for

8    money.

9         Q.    And did the monthly alumnist

10   letters continue continuously since a

11   month or two after you graduated to the

12   present day?

13        A.    The ones that I accepted,

14   yes.  Some of them, I, you know, like,

15   blocked them from my email account.

16              But they did admit that

17   there was impropriety between a male

18   teacher and a female student after the

19   unification to make it, you know, a

20   male-female campus, and he slept with one

21   of the girls on the school.

22        Q.    So you didn't receive the

23   alumnist -- let me start again.

24              You did not receive the

Kurtis N.  Poulos

1  monthly alumnist letters during the

2  period of time that you had the school

3  blocked?

4       A.    No.  No.

5       Q.    When did you learn from The

6  Hill School that there had been a

7  settlement relating to sex between a male

8  teacher and a female student?

9       A.    I believe it was around the

10  time that they asked for a donation from

11  my family for my grandfather's plaque to

12  be put up in -- I don't even know which

13  building -- but they asked for money from

14  all of us to put up a plaque.

15       Q.    Was that before the April

16  23rd, 2016 letter that you received in an

17  email?

18       A.    I believe so, yes.  Yeah.

19            (Court Reporter lost

20       Internet connection.)

21            THE VIDEOGRAPHER:  Hold on a

22       second.  We lost our --

23            MS. DOUGHERTY:  Who did we

24       lose?

0405a

Kurtis N.   Poulos

1              THE VIDEOGRAPHER:  It looks

2        like we lost our court reporter.

3              MS. DOUGHERTY:  We lost the

4        court reporter.

5              THE VIDEOGRAPHER:  Do you

6        want to go off the record?

7              MS. DOUGHERTY:  Yeah.  Let's

8        go off the record.  And then why

9        don't we just --

10             (Court Reporter's Internet

11        connection restored.)

12   BY MS. DOUGHERTY:

13        Q.    I'll just ask the question

14   again, or a question like it again.

15             Did you learn about the

16   settlement relating to sex between a

17   female student and a male teacher before

18   the April 23rd, 2016 letter that you

19   received via email?

20        A.    Yes, I believe so.

21        Q.    Now, again, the next set of

22   questions are directed to after you were

23   no longer a student at The Hill School,

24   after you graduated from high school.

0406a

Kurtis N.   Poulos

1          After you graduated from

2    high school, did you learn of any other

3    instances of abuse by teachers directed

4    to students of The Hill School?

5          A.    I've had nothing to do with

6    that school since the day that I left

7    other than communications that the school

8    sent out to alumnists.

9          Q.    Okay.  So you received the

10   notice from The Hill School about the

11   settlement with the female student, and

12   that is the only instance of abuse by a

13   teacher directed to a student that you

14   have information about or learned about

15   since you graduated high school; is that

16   correct?

17         A.    Correct.

18         Q.    Do you know Mary Beth

19   Ralston?

20         A.    Matt Ralston's wife.

21         Q.    Have you ever had contact

22   with Mary Beth Ralston?

23         A.    Can you rephrase that?

24   Because I had contact with her when I was

Kurtis N. Poulos

1    a student because she would come to

2    dinners.  So after graduation, no.

3           Q.    Okay.  So you had contact

4    with Ms. Ralston before you graduated

5    from The Hill School; is that right?

6           A.    Correct.  She was the one

7    who refused to move the car to let me

8    leave the property that Parents' Weekend

9    in October of 20' -- or no -- 1996.

10          Q.    What year did you graduate

11   from The Hill School again?

12          A.    May 25th, 1997.

13          Q.    So since May 25th, 1997, you

14   have had no contact whatsoever with Mary

15   Beth Ralston; is that correct?

16          A.    Not at all.

17          Q.    And prior to May 25th, 1997,

18   you had contact with Mary Beth Ralston

19   because she went to dinner at the same

20   place that you did; is that right?

21          A.    Yeah.  The families would

22   all come and have dinner at the dining

23   hall.

24          Q.    When you say "the families,"

0408a

Kurtis N.   Poulos

1    you mean the families of the teachers of

2    The Hill School?

3            A.    Of the faculty, yes.

4            Q.    And you had contact with --

5    let me start again.

6                  Before May 25th, 1997, you

7    also had contact with Mary Beth Ralston

8    in relation to Mr. Ralston's car blocking

9    you in on Parents' Weekend; is that

10   right?

11           A.    Yes, because he would not

12   answer the door.  She answered the door.

13           Q.    Other than having contact

14   with Mary Beth Ralston at dinner and the

15   event with the car, which we'll come back

16   to, did you have any other contact with

17   Mary Beth Ralston before May 25th, 1997?

18           A.    Nothing more than passing.

19           Q.    What do you mean by

20   "passing"?

21           A.    Passing, like, I greet you,

22   I'm polite to you, I wish you well, go on

23   your way.

24           Q.    So what was the date of the

Kurtis N.   Poulos

1    family weekend when your car was blocked

2    in?

3             A.    It would have been late

4    October 1996.  I don't know the exact

5    date.

6             Q.    How do you know it was late

7    October 1996?

8             A.    Because I had just sent in

9    my first vote for the President of the

10   United States absentee from Pennsylvania

11   to Wisconsin.

12                  Clifford, sit.  I'm fine.

13   I'm fine.

14            Q.    Since Clifford has made an

15   appearance, why don't you tell us who

16   Clifford is?

17            A.    He's fine.

18            Q.    Clifford is your dog?

19            A.    He's my service dog.

20                  Sit.

21            Q.    Have you ever had -- let me

22   start again.

23                  Other than the emails that

24   you received from Mr. Lehman as part of

Kurtis N. Poulos

1    your alumnist's reports, have you ever

2    had any contact with Mr. Lehman?

3         A.    No, except for them asking

4    for money.

5         Q.    Have you ever responded to

6    the emails you received from Mr. Lehman

7    asking for money?

8         A.    I think I sent them a check

9    for $.97 I believe, but I could be wrong.

10        Q.    Have you --

11        A.    It was part of a joke.

12        Q.    Oh, I understand.  Okay.  So

13   there was an instance where Mr. Lehman

14   wrote to you a letter on behalf of The

15   Hill School requesting a donation, and

16   you responded with a check for $.97; is

17   that right?

18        A.    Well, pretty much every

19   year, they send you a check -- or send

20   you an email asking for money.  And I

21   believe my family has done enough for

22   that school, so I sent them a check for

23   $.97.  But I think I sent that to

24   Headmaster Doherty.

Kurtis N. Poulos

1    Q.    So have you ever had direct

2    contact with Mr. Lehman?

3    A.    No.  I've never spoken to

4    the man.  I have no idea what he even

5    looked like.

6    Q.    Do you know Mark Ralston?

7    A.    No.

8    Q.    Do you know William Yinger

9    -- Y-I-N-G-E-R?

10   A.    Yeah, Bill Yinger, I do

11   recognize the name.  I couldn't place the

12   face, but I do know Bill Yinger.

13   Q.    How do you know the name

14   Bill Yinger?

15   A.    I think he played hockey at

16   our school.

17   Q.    When was the last time you

18   had contact with Mr. Yinger?

19   A.    I haven't had contact with

20   99.9 percent of the people there.  I

21   never spoke to him after I left campus.

22   Q.    So you've had no contact

23   with Mr. Yinger since May 25th, 1997; is

24   that right?

0412a

Kurtis N. Poulos

1        A.    I mean, that's -- to the

2    best of my knowledge, no, I've not spoken

3    to Mr. -- no, I haven't spoken to him.

4        Q.    Did you ever talk to Mr.

5    Yinger about Mr. Ralston?

6        A.    No.  He was another math

7    teacher, I believe.

8        Q.    You think Mr. Yinger was a

9    math teacher?

10        A.    I think so.

11        Q.    Was Mr. Yinger one of your

12    teachers?

13        A.    I don't believe so.

14            I've spent a -- like, a very

15    long time forgetting pretty much

16    everything I could about that school --

17    the people that went there, the teachers

18    that were there -- just to get through

19    this situation so that I could move on.

20    So I just want that to be put on the

21    record because I've done everything I

22    could possibly do, right or wrong, but I

23    did everything I could do to forget even

24    my legacy.

0413a

Kurtis N. Poulos

1          Q.     Without regard for whether

2    you identified Mr. Ralston, did you ever

3    tell Mr. Yinger that you were abused by a

4    teacher at The Hill School?

5          A.     I've never told anybody at

6    that school that I was abused.

7          Q.     Do you know who Wallace

8    Gundy is -- G-U-N-D-Y?

9          A.     Mr. Gundy?  I recognize the

10   name.  I couldn't pick him out of a

11   lineup.

12         Q.     Do you recognize the name

13   Wallace Gundy?

14         A.     I mean, it's Gundy.  It's

15   just -- I mean, I'm not trying to be a

16   smart ass, but it's Mr. Gundy, like --

17         Q.     So you recognize Mr. Gundy

18   somehow affiliated with The Hill School;

19   is that right?

20         A.     Oh, yeah, I recognize the

21   name, but I couldn't pick him out of a

22   lineup.

23         Q.     That's okay.  How do you

24   recognize the name Wallace Gundy?

Kurtis N. Poulos

1          A.    Somebody I would see in

2    passing.  Maybe I sat with him at, you

3    know, one of the tables when we were

4    assigned to different dining tables,

5    but...

6          Q.    Mr. Gundy was a student

7    while you were a student at The Hill

8    School?

9          A.    No.  I believe Mr. Gundy was

10   one of the professors.

11         Q.    Was Mr. Gundy your

12   professor?

13         A.    He may have been, but I

14   don't believe so.

15         Q.    Have you had any contact

16   with Mr. Gundy since May 25th, 1997?

17         A.    I haven't had any contact

18   with anyone from May 25th, 1997 when I

19   graduated.

20         Q.    You mean anyone from The

21   Hill School?

22         A.    Any professors.

23         Q.    Any professors from The Hill

24   School?  Okay.

0415a

Kurtis N. Poulos

1          A.     Exception.  Can I make an

2    exception?  I did send a taunting text

3    message to Mr. Drowne because he's a

4    Giants fans, and we were playing them in

5    the playoffs, the Packers.  So I had to

6    kind of mess with him, but that was in

7    2005.

8          Q.     Did you ever talk to Mr.

9    Gundy or Gundy [pronunciation] -- I don't

10   know how you say the name.  Did you ever

11   talk to Mr. Gundy about Mr. Ralston?

12         A.     I don't remember any

13   conversations with Mr. Gundy.  We didn't

14   really spend a lot of time together.

15         Q.     Do you know a Christopher

16   Hopkins?

17         A.     Not to my recollection.

18         Q.     Okay.  Mr. Doherty is David

19   Doherty; is that right?

20         A.     Yes.  Mr. Doherty spoke at

21   my grandfather's funeral or memorial at

22   the National Cathedral.

23         Q.     When was the last time you

24   had contact with Mr. Doherty?

Kurtis N. Poulos

1        A.      2005 when he spoke at my

2   grandfather's wake in -- or memorial at

3   the National Cathedral in Washington, DC.

4   He and Kay attended along with Robert

5   Kennedy and a few other members of the

6   Senate.

7        Q.      And Kay is Mr. Doherty's

8   wife; right?

9        A.      Correct.

10       Q.      Did you ever talk to Mr.

11   Doherty about Mr. Ralston?

12       A.      I never did.

13       Q.      Do you know a Jeff Neese --

14   N-E-E-S-E?

15       A.      I don't recognize the name.

16       Q.      Do you know any of the

17   members of the board of trustees for The

18   Hill School?

19       A.      I do not.

20       Q.      Have you ever known the

21   identity of anyone who was a member of

22   the board of trustees for The Hill

23   School?

24       A.      I've never inquired.  I'm

1  sure if I asked, I could find out.  But

2  I've never asked.

3      Q.    So just to put a time frame

4  on it, after you retained Mr. Garabedian

5  in 2017 and in 2018, you didn't know who

6  was a member of the board of trustees; is

7  that right?

8      A.    No.  Frankly, I don't care.

9      Q.    Was your grandfather ever on

10  the board of trustees?

11      A.    Not to my knowledge.  I know

12  he was in -- because of Lane's, you know,

13  paperwork yesterday, I know that he was

14  in communications.  I never even knew

15  that he was in communication with the

16  school about my perspective acceptance to

17  the school until yesterday.

18      Q.    You've mentioned several

19  times that there's a legacy between your

20  family and The Hill School.  Can you just

21  define that for me?

22      A.    So my grandfather or step

23  grandfather, Senator William Proxmire,

24  graduated -- graduated Class of '34.  His

Kurtis N.  Foulos

1  brother, Theodore, graduated Class of

2  '33.  I believe -- well, I know that

3  Theodore passed away in World War II.

4  Grampa went to Yale.  I mean, we've been

5  there since almost the inception of that

6  high school.

7          MS. DOUGHERTY:  Could we

8      take a five-minute break, comfort

9      break?  Could we go off the

10     record?

11         THE VIDEOGRAPHER:  All

12     right.  We're now going off the

13     record.  The time is 3:05.

14         (Whereupon, a brief recess

15     was held.)

16         THE VIDEOGRAPHER:  We are

17     now back on the record.  The time

18     is 3:19.

19         You may continue.

20  BY MS. DOUGHERTY:

21      Q.   Was there a reason that you

22  were absent from the dining hall during

23  your freshman year?

24      A.   Sorry.  It was more likely

1    that I just missed dinner.  I mean, it

2    wasn't an uncommon thing for somebody to

3    be, like, absent from dinner.  You might

4    fall asleep; you might be studying.

5          Q.    Was there a reason you

6    didn't want to go to the dining hall?

7          A.    Not until my senior year.

8          Q.    What was the reason you did

9    not want to go to the dining hall during

10   your senior year?

11         A.    As weird as it sounds, I

12   just didn't want to be around that many

13   people eating dinner.  It became, to a

14   degree, disgusting.

15         Q.    You mean because other

16   people were present eating?

17         A.    It was just the general

18   sound of people eating and being around

19   people I didn't want to be around.

20         Q.    Did Mr. Ralston have

21   anything to do with why you didn't want

22   to go to the dining hall during your

23   senior year?

24         A.    No, he did not.

Kurtis N. Poulos

1          Q.    Did you have contact with

2    Mr. Ralston in the dining hall during

3    your senior year?

4          A.    Of course.

5          Q.    What type of contact did you

6    have with Mr. Ralston when you were in

7    the dining hall during your senior year?

8          A.    Well, I had to walk into the

9    dining hall and I had to walk past his

10   table.  I had to be polite and say

11   something.  I can't just walk by.

12         Q.    In the dining hall, did

13   people have assigned tables?

14         A.    Yeah.  So what happened with

15   assigned tables is -- sorry.  Let me lift

16   this up -- every, I'd say month or so, we

17   were reassigned tables with different

18   teachers, different students, so that we

19   could meet people that we may not meet on

20   a day-to-day basis given the fact that

21   they may not be in our class work -- or

22   classes, excuse me.

23               So I'm sure I walked by him

24   and Kay, or whatever her name is, on a

0421a

Kurtis N.   Poulos

1    nearly daily basis.

2          Q.    "Her," you mean Mr.

3    Ralston's wife?

4          A.    Correct.

5                MS. DOUGHERTY:  Does anybody

6          else hear buzzing?

7                THE WITNESS:  I don't.

8                THE VIDEOGRAPHER:  Sounds

9          like a truck went by.

10               MS. DOUGHERTY:  Just making

11         sure.  Okay.

12   BY MS. DOUGHERTY:

13         Q.    Was that the -- is this how

14   the seating arrangements in the dining

15   hall worked for each year that you were

16   at The Hill School?  There was assigned

17   tables that rotated?

18         A.    Correct.  That's the only

19   reason why I had any interaction with

20   Thomas Ruth was because I got assigned to

21   his table I believe my third form year.

22         Q.    So was it the case that the

23   faculty members were assigned a table and

24   the students rotated through?  How did it

0422a

Kurtis N.   Poulos

1    work?

2           A.    The teachers were assigned a

3    table, one on either end.  And then,

4    yeah, every few weeks, maybe a month, we

5    got rotated to a different table.  So

6    you'd get that assignment in your

7    mailbox.

8           Q.    Are you doing okay there?

9    Because I want to make sure that you're

10   able to concentrate on the questions.

11          A.    No, I'm fine.  I'm fine.

12          Q.    It looks like that you

13   fidgeting with your video.

14          A.    No, I'm good.

15          Q.    Okay.  Were you ever

16   assigned -- let me start again.

17                Did Mr. Ralston have a table

18   in the dining hall?

19          A.    Every professor, yeah.

20   Every teacher had a table, one at each

21   end.  And then if they had family

22   members, they would get a few seats,

23   especially for dinner, and then the rest

24   of the students would just figure out

Kurtis N. Poulos

1    where to sit.

2          Q.    How many people were at a

3    table in the dining hall?

4          A.    Eight on each side, so 18

5    total.

6          Q.    And each table had two

7    teachers, one on each end, and the other

8    16 people were students or the families

9    of the faculty members; is that correct?

10         A.    Correct.

11         Q.    Is that the case for every

12   year that you were a student at The Hill

13   School?

14         A.    Correct.

15         Q.    Were you ever at Mr.

16   Ralston's table?

17         A.    Possibly, but not to my

18   recollection.

19         Q.    You don't -- you do not

20   remember ever being assigned to Mr.

21   Ralston's table in the dining hall for

22   any year that you attended The Hill

23   School; is that right?

24         A.    Correct.  I don't remember.

Kurtis N.  Foulos

1    I remember one table that I was situated

2    at, and that was more a matter of that it

3    was Thomas Ruth.

4         Q.    When you got your table

5    assignments in your mailbox, did the

6    assignments identify who the teacher at

7    the table would be?

8         A.    No.  It just gave you a

9    table number.  It's kind of like working

10   in a restaurant.

11        Q.    Did the teachers stay at the

12   same table number for the entire year?

13        A.    I believe so, yes.

14        Q.    So when you received your

15   dining hall assignment and saw the table

16   number, you knew which teachers would be

17   at your table; is that right?

18        A.    For the most part, yes.  I

19   mean, there was -- the headmaster's table

20   was all the way up on top, and then there

21   was lines of tables.  But pretty much

22   every professor sat at the exact same

23   seat.  But it's hard to memorize.  Like,

24   you're just given a table number; you go

Kurtis N. Poulos

1    and sit at that table number.

2         Q.    Did you ever skip your meals

3    because you were assigned to Mr.

4    Ralston's table?

5         A.    Again, I don't remember

6    being assigned to Mr. Ralston's table.  I

7    skipped meals for different reasons.

8         Q.    What were the reasons that

9    you skipped meals?

10        A.    One, the food.  Two, just I

11   guess you could say the lack of decorum.

12   I don't generally like being around a lot

13   of people that eat and speak the way they

14   were eating and presenting themselves at

15   dinner.  So I would put my plate down and

16   walk away.

17             I only had to wait for them

18   to -- so the headmaster would give us a

19   presentation.  He would talk about

20   whatever happened in the day, and then

21   you had the permission to just leave.

22        Q.    Yesterday you told me about

23   the first instance of sexual abuse by Mr.

24   Ralston.

Kurtis N.   Foulos

1                    Have you told me everything

2      that you remember about that first

3      instance of sexual abuse by Mr. Ralston?

4             A.    Other than the color of my

5      backpack, yes.

6             Q.    What was the color of your

7      backpack?

8             A.    I had a maroon JanSport

9      backpack that my mom had engraved --

10     well, embroidered my initials on the back

11     of.

12            Q.    Is there some reason why the

13     backpack sticks out in your mind as it

14     relates to the first instance of sexual

15     abuse by Mr. Ralston?

16            A.    Because on the back of the

17     backpack, there was a handle, so it was

18     like a grab bag.

19                  So if you're -- if you know

20     anything about the military, you can grab

21     the back of the bag and just walk away.

22                  So there was my initials on

23     the back right here; but in the middle of

24     it, there was also, like, a strap where

0427a

Kurtis N.   Foulos

1    you could grab it and just pull it away.

2         Q.    Did Mr. Ralston grab the

3    strap you're talking about?

4         A.    No.  It was more that he

5    grabbed me and pushed the door shut.

6         Q.    Why is the -- what was it

7    called again, the handle on the back of

8    the backpack?

9         A.    We just called it a shoe

10   strap because you could tie your shoes

11   and -- but it's a grab handle.

12        Q.    Why is the grab handle on

13   your backpack significant to you as it

14   relates to the first instance of sexual

15   abuse by Mr. Ralston?

16        A.    Because I never used the

17   backpack after that day.

18        Q.    Was there something that you

19   associated the backpack with the sexual

20   abuse by Mr. Ralston?  Let me start

21   again.

22             Why did you not use the

23   backpack again after that day?

24        A.    I just went down and ordered

0428a

Kurtis N. Poulos

1    a different one.

2         Q.    You didn't have a reason why

3    you didn't use the backpack again?

4         A.    Subconsciously, possibly.

5    But at the time, it was more a matter of

6    -- yeah, I guess it would be more

7    subconsciously that I just -- I didn't

8    want to be associated with that moment

9    with that bag, so I ordered a new

10   backpack.

11        Q.    Did the new backpack have a

12   grab handle?

13        A.    No.

14        Q.    What did you do with your

15   clothes that you were wearing on the

16   first day or the first time that you were

17   sexually abused by Mr. Ralston?

18        A.    Threw them away.

19        Q.    Is there a reason why you

20   threw away the clothes you were wearing

21   the first time Mr. Ralston abused you?

22        A.    Yeah, because I didn't want

23   -- I discarded every garment that I could

24   possibly discard that day.  Everything.

Kurtis N.   Poulos

1          Q.    Did you discard anything

2    other than your backpack and your

3    clothes?

4          A.    No.  I can tell you that I

5    did ultimately break one of or both of

6    the mirrors in my bedroom or my dorm

7    room.

8          Q.    On that day?

9          A.    Yeah.

10         Q.    Why did you break the

11   mirrors on your dorm room on the day --

12   let me start again.

13              Did you break the mirrors in

14   your dorm room after Mr. Ralston abused

15   you?

16         A.    Yeah.

17         Q.    So --

18         A.    I had to actually buy them

19   to replace them.

20         Q.    So after the first instance

21   when Mr. Ralston abused you, immediately

22   after the attack, you broke the mirrors

23   in your dorm room?

24         A.    I broke at least one.  There

0430a

Kurtis N. Poulos

1    was -- if you walked into my room, to my

2    right was my bed.  Because I had a

3    single, you could walk straight through.

4    To the left was an area for a desk.  To

5    the other area was for another desk.  But

6    in the middle, next to what I guess you

7    could consider a closet, we had a few

8    drawers and mirrors.  I guess a medicine

9    cabinet.  And, yeah, I broke at least one

10   of the mirrors.

11          Q.    And you broke at least one

12   of the mirrors immediately after the

13   first instance of abuse by Mr. Ralston;

14   is that right?

15          A.    Yeah.  But I didn't -- yeah,

16   that's right.  I just didn't tell anybody

17   until after when I actually needed to use

18   my mirror.  I actually used to have hair,

19   so...

20          Q.    So after you left the

21   classroom on the day of the first abuse

22   by Mr. Ralston, you returned to your dorm

23   room, discarded your backpack and your

24   clothes, and broke at least one mirror in

0431a

Kurtis N.   Foulos

1    your dorm room; is that right?

2          A.    Correct.

3          Q.    Did you do anything else

4    after the first instance of abuse

5    immediately after you left the classroom?

6          A.    Not to my recollection.

7          Q.    Is there anything other than

8    what you've told me already today and

9    also yesterday that you remember

10   regarding the first instance of abuse by

11   Mr. Ralston?

12         A.    No.

13         Q.    When was the second time

14   that Mr. Ralston abused you?

15         A.    I can't give you specific

16   dates or times.

17         Q.    Can you put the second time

18   in relation to the first time?

19         A.    I would have to say it was

20   probably a couple of weeks.

21         Q.    Are you settled again there

22   with the video?

23         A.    Yeah.  I'm good.

24         Q.    Okay.  Can you put the video

Kurtis N. Poulos

1    up so your whole head is in the shot?

2           A.    All right.  I'll just hold

3    it.

4           Q.    Well, is there a way that

5    you can -- how did you have it yesterday?

6           A.    Well, I was sitting in my

7    recliner, which didn't seem appropriate

8    at the time; so I moved to my office.

9           Q.    Mr. Poulos, you're allowed

10   to sit wherever you want.  So if you're

11   more comfortable sitting in your

12   recliner, that's fine, but --

13          A.    No, it's fine.  It's just --

14          Q.    Well, let me just explain to

15   you why it is important that the video be

16   focused on you and not moving and your

17   hands in the way.

18                There's a videographer here

19   who is -- you know, this is a video

20   deposition.  In addition to us being able

21   to see each other on Zoom, a video is

22   being taken which can later be shown to

23   the jury, and it is important that we are

24   able to see the video that corresponds

0433a

Kurtis N. Poulos

1    with your answers.

2              So we just want to get you

3    in a situation where you can set the

4    phone up so your whole head is on the

5    screen and you're not moving around.

6              Are you working on that now?

7         A.    Yeah.  I'm good.

8              THE VIDEOGRAPHER:  Do you

9         wish to go off the record until he

10        can get it situated again?

11             MS. DOUGHERTY:  Yeah, why

12        don't we do that?

13             THE VIDEOGRAPHER:  We are --

14        are you situated, sir?

15             THE WITNESS:  I'm good.

16             THE VIDEOGRAPHER:  All

17        right.  Should we continue on,

18        then?

19             MS. DOUGHERTY:  Yes, please.

20   BY MS. DOUGHERTY:

21        Q.    Okay.  So the second

22   instance of abuse by Mr. Ralston was

23   within a couple weeks of the first

24   instance; is that correct?

Kurtis N. Foulos

1           A.      Correct.

2           Q.      What happened during the

3    second instance of abuse by Mr. Ralston?

4           A.      Pretty much of the same from

5    the first.

6           Q.      Can you please describe the

7    second instance of abuse by Mr. Ralston?

8           A.      Can I ask you a question?

9           Q.      Okay.

10          A.      Is this going to be a

11   testimonial?

12          Q.      I'm not sure what you mean.

13          A.       I mean, do you want me to go

14   through every single instance of

15   improprieties?

16          Q.      I do.  It is important.

17   Yes, I do.  Your experience with Mr.

18   Ralston is an essential issue of this

19   case.  I know that it wasn't your choice

20   to make it that way, but it is.

21              And so we need to know

22   truthfully and in a way that you are

23   comfortable testifying about it, which is

24   why I'm concerned with the movement about

Kurtis N.   Poulos

1    the camera.  We need you to tell us, you

2    know, what happened.

3                 Does that answer your

4    question?

5         A.    And if I --

6         Q.    I'm sorry.  Go ahead.

7         A.     No.  I was just going to

8    say, I spent decades -- decades, not

9    days -- decades to block out as much

10   information -- sorry, not information,

11   but memories that I could.  Whether I did

12   it the right way -- I don't remember

13   specifics.

14        Q.    Okay.  Mr. Poulos, I'm going

15   to treat your question as an objection to

16   relevance.

17                 I'm going to tell you the

18   reason why I'm asking the questions to

19   explain to you why it is reasonably

20   calculated to lead to the discovery of

21   admissible evidence in this case.  And we

22   can -- so there are claims for a

23   defamation.  In order to prove a claim

24   for defamation, the person who is a

Kurtis N. Poulos

1    proponent of the claim for defamation

2    must prove, among other things, that the

3    statement or statements that is the basis

4    for the defamation claim was not true,

5    was false.

6              A defense -- among one

7    defense to a claim for defamation is

8    truth, so truth of the statements that

9    form the basis for the claim.

10             So again, as I said, I

11   realize it wasn't you who brought the

12   action, but your decision to come forward

13   and the letters written by Mr. Garabedian

14   on your behalf describing the abuse you

15   sustained from Mr. Ralston are now part

16   of the case.  So the truth or falsity of

17   your statements about the abuse are part

18   of the case for that reason.

19             So that is why I am asking

20   and that's why I have -- when it's come

21   up a number of times, I've expressed to

22   you it's important to me.  There's a real

23   reason that I'm asking it.  That's the

24   basis, because it relates to Plaintiff's

Kurtis N.  Poulos

1   burden to prove his claims and any

2   defense that Mr. Garabedian or you may

3   assert in response.

4            So I'm asking you to tell me

5   what you remember, and we'll just take it

6   one step at a time to the extent you are

7   comfortable now with your camera.  And if

8   at any time you want to take a break, you

9   tell me.  You're not a prisoner.  You can

10  take a break for any reason.  I just ask

11  that you finish your answer that you're

12  giving at any time, and then we can take

13  a break.

14           Does that answer your

15  question with a little bit more

16  information?

17      A.    Yeah.  I appreciate it.

18      Q.    I don't know if Mr. Jubb has

19  anything he wants to add.

20           MR. JUBB:  Nothing from me.

21      Next question.

22  BY MS. DOUGHERTY:

23      Q.    Okay.  So Mr. Poulos, can

24  you please describe for me the second

Kurtis N. Foulos

1    instance of sexual abuse by Mr. Ralston?

2         A.    It was pretty much

3    tantamount to the exact same thing that

4    happened the first time.

5         Q.    Where were you when -- let

6    me start again.

7              Where were you the second

8    time that Mr. Ralston abused you?

9         A.    So in my geometry classroom,

10   or his geometry classroom.

11        Q.    When during the day did the

12   second instance of abuse occur?

13        A.    At the end of the day.  It

14   became almost -- I wouldn't say weekly --

15   but nearly a biweekly instance, and it

16   escalated.

17             And I don't feel comfortable

18   talking more than that.  It makes me

19   hurt.  I didn't sleep at all last night.

20        Q.    Is it the case that every

21   time -- let me start again.

22             I think you described for us

23   previously that your class rotated.  So

24   you had seven classes and they rotated

Kurtis N.  Poulos

1    through the week to different times of

2    the day.  Do I understand that correctly?

3            A.    Classes, and they rotated

4    one to seven or one to five, and they

5    flipped through.

6            Q.    So do you happen to remember

7    what class in the order geometry was?

8            A.    I don't.

9            Q.    No?  Okay.

10           Is it the case that every

11   time your geometry class was the last one

12   for the day, you were inappropriately

13   touched by Mr. Ralston after the first

14   instance of abuse?

15           A.    Correct.  And it wasn't

16   every week.  It was -- it just became a

17   regular instance where, like, oh, you're

18   going to stay behind to do this.  It

19   wasn't like --

20           Q.    Go ahead.  Please finish.

21           A.    Go ahead.

22           Q.    Okay.  So the second

23   instance of abuse, were you also taking a

24   quiz on the chalkboard?

Kurtis N. Poulos

1         A.    I would assume it would have
2    been.
3         Q.    I don't want you to -- go
4    ahead.
5         A.    Can I finish?  I'm not
6    trying to say that I'm assuming, but I
7    also said yesterday I've done my best in
8    the worst ways and the most positive ways
9    to forget every moment that I was at that
10   school.
11        Q.    Why don't you tell me what
12   you've done to try to forget your time at
13   The Hill School?
14        A.    What do most people do to
15   forget things?
16        Q.    Well, I want to know what
17   you did.  You said there were some
18   positive and some negative.  So tell me
19   what you've done.
20        A.    Stay sober.
21        Q.    Did you say "sober"?
22        A.    Yeah.
23        Q.    Okay.
24        A.    Did yoga; joined groups, you

0441a

Kurtis N. Poulos

1    know, anonymously.

2              But at the end of the day, I

3    wake up having nightmares that I'm going

4    to end up back at that school being

5    terrified.

6         Q.    So it sounds like staying

7    sober, going to yoga, joining groups,

8    those are all positive things you've

9    done; right?

10        A.    Correct.

11        Q.    Are you still practicing

12   yoga and participating in groups and

13   maintaining your sobriety as of today?

14        A.    I'm maintaining my sobriety.

15   I can't go to groups.  Everything is shut

16   down.

17        Q.    That's right.

18        A.    And my sponsor -- my sponsor

19   died from COVID.

20        Q.    What other positive things

21   have you done to heal from your

22   experience at The Hill School?

23        A.    Adopt dogs; try to give

24   back; you know, give back to the

Kurtis N. Poulos

 1    military.

 2          Q.    Why is the military

 3    important to you?

 4          A.    Because we're a military

 5    family.

 6          Q.    How about retaining Mr.

 7    Garabedian?  Was retaining Mr. Garabedian

 8    to hold The Hill School accountable

 9    something that you did to heal?

10          A.    I thought it would help.

11                Did you object?

12                MR. JUBB:  I did.

13    BY MS. DOUGHERTY:

14          Q.    Was there any other positive

15    things that you've done to heal from your

16    experience at The Hill School?

17          A.    Donating my time to my

18    family's hospital.

19          Q.    When you said that you

20    joined groups, did you join groups

21    where -- let me strike that.

22                What are the negative things

23    that you've done to try to forget the

24    experience at The Hill School?

Kurtis N. Poulos

1          A.     Mostly drinking.

2          Q.     Is there anything else

3     negative?

4          A.     Drugs.

5          Q.     Have you done anything else

6     negative to try to forget your experience

7     at The Hill School besides drinking and

8     consuming drugs?

9          A.     Not being honest.

10          Q.     What do you mean by not

11     being honest?

12          A.     Just not telling people who

13     care about me the truth.

14          Q.     So you mean that you didn't

15     tell your -- well, let me start again.

16               You're talking about the

17     truth of what happened to you at The Hill

18     School, or something else?

19               MR. JUBB:  Objection.

20               THE WITNESS:  At The Hill

21          School.

22     BY MS. DOUGHERTY:

23          Q.     Did you lie to somebody that

24     you care about about what happened to you

Kurtis N.  Poulos

1    at The Hill School?

2          A.    No.  I admitted it.

3          Q.    Who do you wish you had told

4    about your time at The Hill School?

5          A.    My grandmother.

6                Is this even on anymore?

7          Q.    Yes.  I'm waiting for you to

8    finish your answer.

9          A.    I said my grandmother.

10         Q.    Okay.  Anyone other than

11   your grandmother?

12         A.    My mother.

13         Q.    Anyone --

14         A.    I just can't do this.  No.

15   I can't do this much...

16              MS. DOUGHERTY:  All right.

17         Let's go off the record.

18              THE VIDEOGRAPHER:  We're now

19         going off the record.  The time is

20         3:54.

21              (Whereupon, a brief recess

22         was held.)

23              THE VIDEOGRAPHER:  We are

24         now back on the record.  The time

Kurtis N. Poulos

1          is 4:07.

2                   You may continue.

3     BY MS. DOUGHERTY:

4          Q.    Mr. Poulos, other than

5     drinking, consuming drugs, hiding the

6     abuse from your family, are there any

7     other negative things that you've done as

8     a result of the abuse you sustained while

9     at The Hill School?

10         A.    Yeah.  I self harmed my

11    sophomore year.

12         Q.    Any other negative activity

13    as a result of the abuse besides

14    drinking, drugs, hiding the abuse from

15    your family, and self harming during your

16    sophomore year?  Is that a no?

17         A.    I mean, yeah.  I mean, it's

18    ultimately destroyed my adult life.

19         Q.    When you decided to come

20    forward after you received the November

21    20th, 2017 letter that's been marked as

22    D-1, the email from The Hill School, did

23    you understand that you would need to

24    communicate the abuse -- information

Kurtis N. Poulos

1    about the abuse that you sustained during

2    The Hill School?

3           A.    I did.   It's the hardest

4    thing I've ever had to do.

5           Q.    Yes or no.   Did you tell Mr.

6    Garabedian about your -- about the sexual

7    abuse by Mr. Ralston?

8           A.    Yes.

9                 MS. DOUGHERTY:  Did I get

10           disconnected?

11                THE VIDEOGRAPHER:  No.

12           You're still there.

13                MS. DOUGHERTY:  Yes.

14                THE WITNESS:  It jumped over

15           to the --

16    BY MS. DOUGHERTY:

17           Q.    Okay.  So the second

18    instance of abuse by Mr. Ralston, please

19    tell me what you remember from the second

20    instance of abuse.

21           A.    I don't remember any

22    specifics.

23           Q.    What do you mean you don't

24    remember specifics?

0447a

Kurtis N. Poulos

1          A.    I mean --

2                MR. JUBB:  Objection to the

3          form.

4    BY MS. DOUGHERTY:

5          Q.    You can answer.

6          A.    No.  I'm just saying I

7    don't.  I worked, whether properly,

8    improperly, I worked for decades to not

9    remember specifics of any of those

10   instances, so...

11         Q.    Mr. Poulos, a deposition

12   isn't a test.  Nobody is going to be, you

13   know, grading you on your memory or

14   otherwise.  All I want to know is what

15   you do remember.

16                So what do you remember

17   about the second time that Mr. Ralston

18   abused you?

19         A.    It started just about the

20   same way the first time started.

21         Q.    You were at the chalkboard

22   taking a quiz?

23         A.    No.  I was trying to leave

24   the -- sorry.  I was trying to leave the

0448a

Kurtis N.  Foulos

```
 1    room.

 2              I had a maroon JanSport

 3    backpack that weighed about 20 pounds

 4    probably considering all the books that

 5    we were required to bring to every single

 6    classroom.  And I remember him grabbing

 7    the back of my backpack.

 8         Q.    What happened after Mr.

 9    Ralston grabbed the back of your

10    backpack?

11         A.    He shut the door shut.

12         Q.    What happened after Mr.

13    Ralston shut the door shut?

14         A.    He made sure to know -- or

15    made sure to make me know that he was in

16    charge of that situation.

17         Q.    Mr. Ralston?

18         A.    Again -- yeah.  Again, when

19    I was a sophomore, I was 5'6", 5'7"

20    maybe.  And he used -- granted, he was a

21    lean individual, but at the same time, he

22    made sure to know -- or made sure to make

23    me know that he was the one in charge of

24    that situation.
```

Kurtis N. Poulos

1          Q.    Was Mr. Ralston bigger than

2     you?

3          A.    At that time, yes.

4          Q.    How tall was Mr. Ralston?

5          A.    I'd say 5'10".

6          Q.    Was Mr. Ralston lean, fat,

7     in between?

8          A.    Lean.  He's a runner.

9          Q.    What did Mr. Ralston do to

10    make you know that he was in charge of

11    the situation during the second time that

12    Mr. Ralston abused you?

13         A.    Slammed the door right

14    behind me the way he did -- or right in

15    front of me the way he did the first

16    time.

17         Q.    Did Mr. Ralston say

18    anything?

19         A.    No.  He didn't have to.

20         Q.    What happened after Mr.

21    Ralston slammed the door in front of you?

22         A.    Pretty much the exact same

23    thing that happened the first time.  It

24    didn't escalate past that until the

Kurtis N.   Poulos

1    fourth or fifth time that he abused me.

2          Q.    Did Mr. Ralston touch you

3    after he slammed the door in front of

4    you?

5          A.    Yes.

6          Q.    Where did Mr. Ralston touch

7    you?

8          A.    In my crotch, my groin.

9          Q.    Did Mr. Ralston touch you on

10   the outside of your pants?

11         A.    To the best of my

12   recollection, yes.  There might have been

13   him sliding his hand down.

14         Q.    Did Mr. Ralston touch you

15   anywhere else?

16         A.    No, not to my recollection.

17         Q.    Did you touch Mr. Ralston?

18         A.    Only by force; not by

19   choice.

20         Q.    Where did Mr. Ralston force

21   you to touch him?

22         A.    In his groin.

23         Q.    How long did the second

24   encounter with Mr. Ralston last?

Kurtis N. Poulos

1           A.     A few minutes.  Again, I --

2    I can't give you specific times because

3    it was, for lack of a better term, an

4    out-of-body experience.  I didn't want to

5    be there.  I wanted to flee like I fled

6    the following year when I felt that it

7    was going to happen again.

8                 So I don't -- it could have

9    been 30 seconds; it could have been five

10   minutes.  I've done my best to blank all

11   of that.

12         Q.     Did you say anything to Mr.

13   Ralston?

14         A.     No, because I was terrified.

15         Q.     How did the encounter end?

16         A.     Me basically running back up

17   to my dorm room --

18         Q.     Did you do --

19         A.     -- changing my clothes.

20                Go ahead.

21         Q.     I wasn't trying to cut you

22   off.

23                What did you do -- or let me

24   start again.

0452a

Kurtis N. Poulos

1              Did you do anything when you

2    returned to your dorm room after the

3    second instance of abuse by Mr. Ralston?

4         A.    Yeah.  I crawled into bed

5    and just cried.

6         Q.    Did you go to dinner that

7    day?

8         A.    Probably not.  That would

9    have probably been one of the nights

10   where I just ordered pizza and skipped

11   dinner because I didn't want to be around

12   people.

13        Q.    What did you do with your

14   clothes?

15        A.    Again, I threw them away.  I

16   was fortunate enough to have the ability

17   to purchase new clothes and have them

18   sent to me.

19              So I threw away too many

20   clothes, like clothes that could have

21   done something better for somebody else.

22        Q.    Did you throw anything else

23   out after the second instance of abuse

24   other than your clothes?

1          A.    Not to my recollection.

2          Q.    Is there anything else that

3    you remember about the second instance of

4    abuse by Mr. Ralston other than what

5    you've told me?

6          A.    No.  I do remember it was

7    either the third or the fourth time, and

8    he started laughing.

9          Q.    What do you remember about

10   the third time that Mr. Ralston abused

11   you?

12         A.    His giggle.

13         Q.    I'm sorry.  Did you say

14   giggle?

15         A.    Laugh or giggle, yeah.  Like

16   a...

17         Q.    Sorry about that.

18         A.    No problem.

19         Q.    So it's your recollection

20   that the third or fourth time Mr. Ralston

21   abused you, he laughed?

22         A.    I think it was a power play

23   now in retrospect.

24         Q.    Please complete your answer.

0454a

1    I wasn't trying to cut you off.  In

2    retrospect?

3              A.    I think it was a power play

4    like -- I understand, like, teachers,

5    people work very hard to get where they

6    are.  And for some of them, it may seem

7    like, oh, this kid comes in and has a

8    certain amount of whatever.

9              But it seemed like a power

10   play.  Like, it seemed like a power play

11   the weekend my mother came to visit me.

12   It was nothing more than intimidation,

13   like I can do whatever I want because,

14   ultimately, you're a student here

15   regardless.

16             And like I said before, it's

17   this systemic bullshit, sorry, where they

18   just feel like every once in a while,

19   they're going to pull somebody out of the

20   crowd and mess with them.

21             Q.    Who's "they"?  Pedophiles?

22             A.    Pedophiles primarily, but --

23   and I'm not trying to -- because right

24   now, it's not like I'm making a crap ton

0455a

Kurtis N.  Poulos

1    of money.  It just seemed like the

2    teachers at certain points were, like,

3    look at all these spoiled kids, let's

4    figure out a way to put them on our

5    level.

6         Q.    Did Mr. Ralston know about

7    your legacy with the school?

8         A.    Everybody there knew who my

9    legacy was.

10        Q.    When you were at The Hill

11   School, did you consider yourself

12   wealthy?

13        A.    No.  In fact, when I grew

14   up, we were not -- well, we weren't.  My

15   mom was a single mother.  I remember

16   being on Welfare.  It wasn't until my

17   great grandmother passed away that I even

18   realized, like, there's actual money in

19   my family.

20             I thought being a senator

21   was just a duty.  I didn't think it got

22   paid well.  It was just -- in essence, it

23   was normal to me.

24             Yes, I've got a hospital

Kurtis N. Poulos

1    named after my great grandfather and I've

2    got a grandfather on my other side who's

3    a senator and I -- I didn't equate that

4    to being abnormal.  I just thought -- you

5    know, I grew up around a lot of kids who

6    were sons and daughters of attorneys and

7    congressmen, and I thought that was just

8    the way that worked.

9              I didn't realize until I got

10   older that's not the way this works.

11   That's not a right; it's not even a

12   privilege.  It's your life, regardless if

13   you want it.

14        Q.    I realize that you've said

15   that you don't remember specific dates,

16   but can you place the third instance of

17   abuse by Mr. Ralston in time with the

18   second instance of abuse?

19        A.    I can't.

20        Q.    Was the third instance of

21   abuse during the same trimester as the

22   first and second instances of abuse?

23        A.    All these instances happened

24   after Parents' Weekend, so it would have

Kurtis N.  Poulos

1    been in the fall semester.

2         Q.    After Parents' Weekend your

3    sophomore year; right?

4         A.    Fourth form year, correct.

5         Q.    Fourth form year.

6               And when you say all the

7    instances, you're talking about the --

8         A.    First three.

9         Q.    The first three did you say?

10        A.    Correct.

11        Q.    Please tell me what you

12   remember about the third instance of

13   abuse by Mr. Ralston.

14        A.    I can't give you specifics.

15        Q.    Where were you during the

16   third instance of abuse by Mr. Ralston?

17        A.    Can I just blanket answer

18   pretty much every time or every time was

19   in his room -- or his classroom, not his

20   room.  He approached me --

21        Q.    So when -- go ahead.

22        A.    Go ahead.

23        Q.    No.  Please finish.

24        A.    No.  Go ahead.

0458a

Kurtis N.   Poulos

1          Q.    So any time that Mr. Ralston

2     touched you inappropriately was in his

3     classroom; is that right?

4          A.    Correct.

5          Q.    And is it correct -- and

6     we'll get to them -- there were other

7     instances where you had contact with Mr.

8     Ralston where he didn't touch you but

9     where you felt bullied?  Is that fair?

10         A.    More than -- more than a

11    dozen times where I felt like I was going

12    to be pressured into something up until

13    that weekend my senior year or sixth form

14    year.

15         Q.    So these other dozen times

16    that you have in mind where Mr. Ralston

17    didn't touch you, those were outside of

18    the classroom; right?

19         A.    It was more of a walking by

20    giving you a glance, grabbing you, or

21    touching you in a certain way where I --

22    I don't know.  Maybe I was obtuse to the

23    situation and I could have been more

24    aware to what was going on around me and

0459a

Kurtis N. Poulos

1    maybe I could have, if I had seen him,

2    walked away.

3              But all the sudden, you get

4    a hand on your shoulder, you get a hand

5    on your back or your -- on your butt, and

6    before you know, it's over, and then you

7    get a glare from the person who just did

8    it.

9              And that was exactly every

10   time.  That's why I stopped going to

11   dinner.  Besides the disgusting sounds, I

12   didn't want to be around him.

13             And I was so pissed off that

14   somehow I got placed in a dormitory right

15   above his apartment with his wife who was

16   going to defend him.

17        Q.    The third instance of abuse,

18   was that at the end of geometry class

19   like the first and second?

20        A.    Ninety-nine percent were.

21   There was only one time where he

22   approached me in my actual dorm.

23        Q.    Okay.  Why don't you tell me

24   about the time when Mr. Ralston

0460a

Kurtis N. Poulos

1    approached you in your dorm.

2              A.    Like I said, Mr. Drowne

3    always made sure that we had -- or were

4    made to feel like we were at home.  So,

5    as we called him, Drowne, would order

6    wings and pizza, you know, have us play

7    X-Box or whatever was out at the time,

8    and he would invite people over.  So

9    you'd grab some food, you'd go back to

10   your room or maybe hang out in the

11   apartment.

12             And I remember being in

13   Drowne's apartment and Mr. Ralston comes

14   over, which means he came from, like,

15   clear across the campus to make sure that

16   he could be on our floor party.

17             And a couple of us were

18   playing, like, NHL 95 in Mr. Drowne's

19   apartment, and he comes up and he starts

20   rubbing my shoulders.  And I fled just

21   like I fled my, you know, sophomore year

22   or junior year.  I fled.  I didn't want

23   to be there.

24             Q.    Mr. Ralston, when he rubbed

1    your shoulders, that was during your

2    senior year?

3           A.    Sophomore year.  He never

4    touched me my senior year.

5           Q.    Did Mr. Ralston ever touch

6    you on your penis inside your pants?

7           A.    Yes.

8           Q.    When -- how many -- let me

9    start again.

10          How many times did Mr.

11   Ralston touch you on your penis inside

12   your pants?

13          A.    To my recollection, it would

14   have been half a dozen.

15          Q.    When was the first time that

16   Mr. Ralston touched your penis inside

17   your pants?

18          A.    The fourth incident.

19          Clifford.

20          Q.    During the third incident of

21   abuse, did Mr. Ralston touch you?

22          A.    Yes.

23          Q.    Where did Mr. Ralston touch

24   you during the third incident of abuse?

1          A.     My buttocks and my groin.

2          Q.     Did Mr. Ralston touch you

3    anywhere other than your buttocks and

4    your groin during the third incident of

5    abuse?

6          A.     No.

7          Q.     Was the door to the

8    classroom closed during the third

9    incident of abuse?

10         A.     Yeah.  The doors were always

11    closed.

12         Q.     How did the door to the

13    classroom become closed during the third

14    incident of abuse?

15         A.     They closed automatically.

16    It's -- they're, like, fire doors.

17    They're heavy.  Well, they were heavy

18    metal doors that would basically just

19    swing shut regardless.

20         Q.     Where in the classroom did

21    the third incident of abuse by Mr.

22    Ralston occur?

23         A.     If I could draw you a

24    diagram, if you walk straight through,

0463a

1    you turn to your left.  There's nothing

2    you can see in that corner.  So the

3    door's here; everything is over here.  It

4    happened over there where there's no way

5    somebody can see anything through that

6    little window that was in the door.

7            Q.    So you were not near the

8    door during the third incident of abuse?

9            A.    No.  He had basically pulled

10   me back into the room.  And I thought

11   there was -- I can only say at this

12   point -- and maybe I should stop -- but

13   he was in a position of power that I

14   thought was -- and I didn't want to

15   question and I -- he made sure that I

16   wasn't going to leave that room.

17           Q.    How did Mr. Ralston pull you

18   back from the door during the third

19   incident of abuse?

20           A.    By my backpack.  I had a

21   maroon JanSport with my initials on the

22   back of it, but it had a pull tag.  And

23   he would -- he would grab on that.

24           Q.    You had more than one

Kurtis N. Poulos

1    backpack with your initials on it?

2          A.    I had a maroon JanSport.  I

3    had a blue JanSport that I replaced the

4    maroon one with.

5          Q.    Okay.  So you had a blue

6    JanSport backpack with your initials on

7    it during the first incident of abuse; is

8    that right?

9          A.    No.

10         Q.    No?

11         A.    No.

12         Q.    What was the backpack again?

13         A.    The first and second --

14         Q.    I apologize.  Please answer.

15         A.    The first backpack I had my

16   sophomore or fourth form year was that --

17   I had a maroon JanSport.  It was a hiking

18   bag with a -- that was the first one I

19   had.

20               After the end of my fall

21   term or my fall trimester, I had

22   discarded it and ordered a blue one to

23   replace it.

24         Q.    So which backpack did you

0465a

Kurtis N. Poulos

1    have during the first incident of abuse?

2              A.    The maroon JanSport.

3              Q.    So you did not throw the

4    maroon JanSport out immediately after the

5    first incident of abuse?

6              A.    First or second, I don't

7    remember.  I mean, it wasn't like I could

8    just go and buy a brand new backpack.

9    And it was something that my mother had

10   ordered for me, so...

11             Q.    Okay.  Which backpack did

12   you have during the first, second, and

13   third incidents of abuse?

14             A.    The maroon JanSport at least

15   the first and second.

16                   Like I said, this wasn't

17   like a weekly incident.  This happened

18   over a period of time.

19             Q.    Okay.  The third incident of

20   abuse, you had a maroon or a blue

21   JanSport backpack?

22             A.    I honestly couldn't tell you

23   which of the two I had at that time.

24             Q.    So Mr. Ralston --

Kurtis N. Poulos

1        A.    I mean, I spent -- I'm

2    sorry -- but I have spent decades, not

3    days, but decades doing my best to forget

4    everything I can.  And I'm doing my best

5    to recall everything I can about what

6    happened to me, but certain specifics

7    like what color backpack, I'm --

8        Q.    Well, you had a very --

9        A.    I'm not going to --

10       Q.    Go ahead.  Let me know when

11   you're done.

12              At the beginning of your

13   testimony today, you had a very -- or at

14   the beginning of your testimony about the

15   sexual abuse this afternoon, you had a

16   very specific recollection of a maroon

17   backpack that you threw away.  So that's

18   -- I'm just trying to get the backpack

19   straightened out.  So --

20              MR. JUBB:  I'll object to

21        the form of that question.

22              THE WITNESS:  Excuse me?

23   BY MS. DOUGHERTY:

24       Q.    He objected to the form of

1    the question.

2                So you're not certain which

3    backpack you had during the first,

4    second, and third instances of abuse, or

5    you are?  I just want to know what you

6    remember.

7           A.    I'm not.  Because at the

8    same time, like I stated before, my dorm

9    room was right there.  The classroom was

10   right there.  So there were days where I

11   didn't bring a backpack or I didn't need

12   to because why, if it's my first class,

13   why would I carry all that garbage down

14   to go to class when my room is 20 meters

15   upstairs and behind me?

16          Q.    I understand.  I just want

17   -- and I know that it is difficult and

18   uncomfortable for you, but I'm just

19   trying to focus your attention on the

20   instances of abuse by Mr. Ralston.

21               So you remember having a

22   backpack during the third incident of

23   abuse because that is how Mr. Ralston

24   pulled you back into the room; is that

0468a

1    right?

2           A.    Yeah.   It was a hiking pack.

3           Q.    What did Mr. Ralston do

4    after he pulled you back into the room

5    during the third incident of abuse?

6           A.    Honestly, I -- I can't get

7    into any more details.  Healthy,

8    unhealthy, I've done my best to forget

9    all these specific instances for nearly

10   30 years of my life.  You can take it,

11   you can leave it, but...

12          Q.    Did Mr. Ralston touch you

13   during the third incident of abuse?

14          A.    Yes.

15          Q.    Where did Mr. Ralston touch

16   you during the third incident of abuse?

17          A.    It was again -- it was again

18   right in my groin.

19                Can we --

20          Q.    Did Mr. Ralston touch you

21   anywhere else during the third incident

22   of abuse?

23          A.    No, not to my recollection.

24          Q.    Did you touch Mr. Ralston

0469a

Kurtis N. Foulos

1    during the third incident of abuse?

2           A.    Not by choice.

3           Q.    So during the third incident

4    of abuse, Mr. Ralston made you touch him?

5           A.    Correct.

6           Q.    Where did Mr. Ralston make

7    you touch him during the third incident

8    of abuse?

9           A.    On his groin.

10          Q.    And the touching, was that

11   outside of your clothing and also outside

12   of Mr. Ralston's clothing?

13          A.    I don't remember if it was

14   the third time or the fourth time --

15   hell, it could have been the fifth

16   time -- but I know eventually it became

17   something underneath the clothing.

18          Q.    Okay.  Is it a fair

19   characterization that there were a number

20   of incidents between you and Mr. Ralston

21   where Mr. Ralston touched you on your

22   penis on the outside of your clothes and

23   that you -- then made you touch him on

24   his penis on the outside of his clothes?

Kurtis N. Poulos

1    You don't remember specifically how many

2    times, but it occurred a number of times?

3    Is that what you're telling me?

4         A.    Yes, that's what I'm telling

5    you.

6         Q.    And then at some point, the

7    touching escalated beyond touching

8    outside of the clothes; is that right?

9         A.    Correct.

10        Q.    Tell me about the first time

11   you remember Mr. Ralston touching you

12   inside of your clothes.

13        A.    It was the same sort of

14   situation except it had escalated.  And

15   escalation to anybody seems sort of in a

16   way normal.  I didn't feel comfortable,

17   but at the same time, I was 16 years old.

18   I didn't know what -- I mean, I knew what

19   right and wrong was, but...

20        Q.    When was the first time you

21   remember Mr. Ralston laughing?  Was that

22   during an instance of when you were being

23   touched outside the clothes or inside the

24   clothes?

0471a

Kurtis N. Poulos

1      A.    Outside, because it was more
2  of a feeling of power for him, it felt
3  like.
4      Q.    Tell me what you remember
5  from the first instance that Mr. Ralston
6  touched you on the inside of your
7  clothes.
8      A.    Again, it was more of a
9  feeling of I can basically do whatever I
10  want and I don't -- pardon my French -- I
11  don't give a shit who your family is or
12  what your legacy is or if you're smarter
13  than I am; I have a power that I've been
14  here so many years and you haven't.
15          And again, I was 16, 15
16  years old.  I didn't -- I was terrified
17  that if I told my family, a 70-year
18  legacy, they would say, well, let's
19  figure out a way to make this go away
20  rather than remedy the situation at the
21  time.
22          In retrospect, that was
23  completely wrong of me to do because they
24  would have scorched earth.

Kurtis N.  Poulos

1          Q.    Where in the classroom were

2    you and Mr. Ralston the first time Mr.

3    Ralston touched you inside your clothes?

4          A.    It was always in the same

5    corner --

6          Q.    How did you --

7          A.    -- the corner that -- sorry.

8    Go ahead.

9          Q.    The corner that what?

10         A.    The corner that nobody could

11   see.  If I -- here.  I'll draw the

12   corridor.

13         Q.    So you're drawing the

14   corridor to the math -- the geometry

15   classroom that Mr. Ralston was in during

16   your fourth form year; is that right?

17         A.    So here's a rudimentary

18   drawing.  Do you see how the corridor

19   comes?  There's the longitude, like,

20   coming through there.

21         Q.    Yes.

22         A.    You get this way, and then

23   there's a door opening to a black wall.

24                There's no way somebody can

1    walk into that room and see -- or even

2    look through that doorway and see what's

3    going on in the far left corner, which is

4    where -- his desk was in the far right

5    corner.  What he had us do was in the far

6    left corner, which meant it was right

7    against that wall in a place that nobody

8    could see, and he knew it.

9                   And he knew what his

10   timetable was.  He knew that his wife

11   didn't care.  Strike that.  I don't want

12   to bring her into this.

13         Q.    So what you want to strike

14   is your last statement that he knew his

15   wife did not care, or are you striking

16   your entire --

17         A.    Yeah.

18         Q.    Okay.

19         A.    I don't know anything about

20   his wife other than she wouldn't move the

21   car that night.

22         Q.    No, that's fine.  I think

23   you heard me do it yesterday.  Somebody

24   can move to strike.  And I just wanted

Kurtis N.   Poulos

1    clarification about what you were moving

2    to strike.

3              So I think what you're

4    describing is there was a part in the

5    classroom, a space in the classroom, that

6    from the outside nobody could see.  So

7    you'd have to actually come in the

8    classroom to see what was going on; is

9    that right?

10         A.    Correct.

11         Q.    Okay.  And so each time that

12   Mr. Ralston abused you, he pulled you

13   into that area of the classroom that

14   couldn't be seen from the outside even

15   through the little --

16         A.    Correct.

17         Q.    -- jail-like window; right?

18   Is that right?

19         A.    Correct.

20         Q.    So every time Mr. Ralston

21   abused you in the geometry classroom was

22   in that area of the classroom that could

23   not be seen from the outside of the

24   classroom; is that right?

1         A.    Correct.

2         Q.    And I think you said that

3    Mr. Ralston knew his timetable.  What

4    were you referring to?

5         A.    We had to be at training or

6    practices at specific times.  And if

7    you're not there -- as Lane Jubb noticed

8    yesterday, if you're late for anything by

9    a minute or two, it gets marked down that

10   there's no --

11        Q.    Are you talking about the --

12   you're talking about the sports and the

13   intramural?  Is that --

14        A.    Yeah.

15        Q.    -- the period?

16        A.    But if --

17        Q.    Okay.

18        A.    So he was one of the

19   captains or one of the coaches for cross

20   country.  I think he was varsity captain.

21             But you only have so much

22   time to get so many places.  So you only

23   have so many -- so much time to do what

24   you're going to do and try and get away

Kurtis N.  Poulos

1    with it.

2              So he knew that he had a

3    timetable every time that this happened.

4    It wasn't going to be a prolonged, like,

5    rendezvous.  It was going to be like wham

6    -- sorry.  I can't think of a better term

7    than wham, bam, thank you, ma'am.  Like,

8    I'm going to do what I want do and you're

9    going to get out and I'm going to go and

10   do my thing.  It's sounds crude, but...

11         Q.    So after geometry class,

12   every time it was the last class of the

13   day, you had to be at a sports or

14   intramural afterwards within a specific

15   period of time?

16         A.    Within a certain time

17   period, yeah.

18         Q.    Were there -- did you ever

19   miss your intramural or your sports

20   practice because of an incident of abuse

21   by Mr. Ralston?

22         A.    You can ask Lane Jubb.  He

23   has my transcripts.

24         Q.    I'm asking you.  Are any of

Kurtis N. Poulos

1    those -- I mean, are any of the instances
2    -- let me start again.
3              Did you ever miss your
4    intramural or your sports class which
5    followed geometry as a last class of the
6    day because of abuse by Mr. Ralston?
7         A.    I'm sure there was a few, so
8    yes.
9         Q.    And we looked at it a bit
10   yesterday, but you got demerits when you
11   didn't go to your intramural or your
12   sports; is that right?
13        A.    So yes, I got demerits when
14   I was at school.
15        Q.    Did you get -- go ahead.
16        A.    Go ahead.
17        Q.    Right.  I want to know what
18   happened if you didn't go to your
19   intramural or your sports class.
20        A.    Nothing unless you got 12
21   demerits.  I think it was 12 demerits.
22        Q.    Okay.  So if you didn't go
23   to your -- let's just use intramural
24   class as an example.  If you didn't show

0478a

Kurtis N. Foulos

1    up for your intermural class, you would

2    get a demerit; is that right?

3         A.    Correct.

4         Q.    And then when you got 12

5    demerits, something would happen?

6         A.    Correct.

7         Q.    What would happen after you

8    got 12 demerits?

9         A.    I don't know.  I never got

10   12 demerits.

11        Q.    If you --

12        A.    I -- sorry to interrupt, but

13   I pushed everything I could to the limit.

14   I have and always will.  If there's a

15   nine, I'm going to try and get to a 10.

16              Oh, nice iced tea.

17              It's something that's borne

18   into me.  I don't know why.  But I always

19   feel like I need to push it to the limit.

20              So if they tell me I can get

21   12 demerits, I'm going to make sure that

22   I get 11 and not 12 before I get into too

23   much trouble.

24        Q.    What happened if you didn't

0479a

1   go to dinner?  Did you get a demerit for

2   that as well?

3           A.    It depended on which --

4   which form I was.  I mean, you could show

5   up for dinner and not eat and leave.  But

6   if you were an underclassman, you had to

7   stay for the entire dinner, regardless.

8           Q.    Okay.  So how about as a

9   sophomore?  What would happen if you

10  didn't show up for dinner?

11          A.    If I didn't show up, I'd get

12  a demerit.

13          Q.    And what would happen when

14  you were a sophomore if you didn't go to

15  breakfast?

16          A.    You'd get a demerit.

17          Q.    And did the meals work the

18  same way during your sophomore year as

19  sports that if you got 12 demerits, then

20  you got in trouble?

21          A.    Yeah.

22          Q.    If we showed you the records

23  that you reviewed yesterday with Mr. Jubb

24  regarding your demerits and absences,

1    would you be able to identify which ones

2    were caused because you didn't appear due

3    to abuse by Mr. Ralston?

4           A.    Honestly, no.  I couldn't --

5    I couldn't place dates.

6           Q.    It would all be during your

7    sophomore year though; is that right?

8           A.    Sophomore year abuse; my

9    junior year is why I fled; my senior

10   year, in retrospect, was him trying to

11   intimidate me because I'm pretty sure he

12   would never expect me to come back to

13   that high school.

14          Q.    The first instance that you

15   remember that Mr. Ralston touched you on

16   the inside of your clothes, where did Mr.

17   Ralston touch you?

18          A.    In my groin.

19          Q.    Did Mr. Ralston use his

20   hands?

21          A.    Yes.

22          Q.    Was there ever a time when

23   Mr. Ralston touched you on your penis

24   inside your clothes using a part of his

1    body other than his hand?

2         A.    Yes.

3         Q.    What part of Mr. Ralston's

4    body did he use to touch you on your

5    penis inside your clothes other than his

6    hand?

7         A.    Mouth.

8         Q.    The first instance when Mr.

9    Ralston touched you on your penis inside

10   your clothes, did Mr. Ralston touch you

11   anywhere else?

12        A.    Not to my recollection.

13        Q.    Did you touch Mr. Ralston

14   during the incident, the first incident

15   rather, where Mr. Ralston touched you on

16   your penis inside your clothes?

17        A.    Yes, but not by choice.

18        Q.    Did you touch Mr. Ralston on

19   the inside or the outside of his clothes

20   during the first incident where Mr.

21   Ralston touched you on your penis on the

22   inside of your clothes?

23        A.    On the inside.

24              Clifford.

Kurtis N.  Poulos

1                   On the inside.

2          Q.    Did Mr. Ralston make you

3    touch him anywhere other than on his

4    penis inside his clothes?

5          A.    No.

6          Q.    And so the first time that

7    Mr. Ralston made you touch him on his

8    penis inside his clothes was the same

9    time that he also touched you on your

10   penis inside your clothes; is that right?

11         A.    I believe so, if...

12         Q.    How many times did Mr.

13   Ralston -- let me start again.

14                How many incidents were

15   there that Mr. Ralston touched you on

16   your penis inside your clothes?

17         A.    Inside?

18         Q.    Yes.

19         A.    I don't know.  Five or six.

20   I -- I don't remember fully.  I'm sorry.

21         Q.    Do you remember the

22   trimester during which the first time Mr.

23   --

24         A.    The same every trimester.

Kurtis N. Poulos

1          Q.    Right.  I understand that.

2     I'm trying to learn from you if you

3     remember what trimester the first time

4     that Mr. Ralston touched you on your

5     penis inside your clothes occurred.

6          A.    It was after Parents'

7     Weekend.  I'm guessing winter trimester.

8     It was after Thanksgiving.

9          Q.    When was the first time that

10    Mr. Ralston touched your penis with his

11    mouth?

12         A.    Winter trimester.

13         Q.    Do you have a specific

14    recollection of the first time that Mr.

15    Ralston touched your penis with his

16    mouth?

17         A.    No.  It was he forced me to

18    start doing that to him.

19         Q.    Okay.  So --

20         A.    It wasn't me -- it wasn't

21    him doing it to me first.  It was vice

22    versa.

23         Q.    Okay.  So Mr. Ralston made

24    you use your mouth to perform oral sex?

Kurtis N.   Poulos

1          A.     Yes.

2          Q.     When was the first time that

3     Mr. Ralston made you perform oral sex on

4     him?

5          A.     After Christmas break.

6          Q.     What do you remember about

7     the first time that -- let me start

8     again.

9               Did Mr. Ralston make you

10    perform oral sex on him more than once?

11         A.     Yes.

12         Q.     What do you remember about

13    the first time that Mr. Ralston made you

14    perform oral sex on him?

15         A.     I was disgusted, but I was

16    terrified.

17         Q.     So you were in the same

18    blind spot area of the geometry classroom

19    the first time that Mr. Ralston made you

20    perform oral sex on him; is that right?

21         A.     There was -- yes.  There was

22    a corner.  There was no way that anybody

23    could see what was going on.  His special

24    corner.

0485a

Kurtis N.   Poulos

1          Q.    How did you get to the
2    special corner the first time that Mr.
3    Ralston made you perform oral sex on him?
4          A.    I didn't think it was going
5    to happen.  I thought it was just going
6    to be like --
7          Q.    Did Mr. Ralston ask you to
8    go to the corner the first time that he
9    made you perform oral sex on him?
10         A.    He didn't really have to
11   ask.  He just would like, that's -- he'd
12   point to the -- pointed to the corner.
13         Q.    Did Mr. Ralston say we're
14   going into the corner or did he move to
15   the corner?  How did Mr. Ralston express
16   that to you?
17         A.    It was implied.  It wasn't
18   -- there was no necessary movement or --
19   it was just implied.  You're here; I'm
20   here; shut the door.
21         Q.    How did you get to the
22   corner?  Did you walk there or did Mr.
23   Ralston pull you there?  Did Mr. Ralston
24   ask you to go there?

0486a

Kurtis N.   Poulos

1          A.    No.  He -- there was -- like
2    I said, it wasn't words.  It was just
3    implied.  It wasn't even -- and that's
4    the scariest thing.  It wasn't like I was
5    forced.  Eventually, I wasn't even
6    forced.  By the time this stopped, I
7    wasn't even being forced to do it.
8          Q.    Okay.  You didn't want to do
9    it; right?
10         A.    What?
11         Q.    You didn't want to do it;
12   right?
13         A.    No.
14         Q.    Okay.  Well -- okay.  Is
15   your point that you weren't physically
16   pulled to the corner?
17         A.    I was not physically pulled
18   to the corner, no.
19         Q.    Okay.  Was it the case that
20   after a number of incidences of abuse,
21   Mr. Ralston stopped pulling you over to
22   the corner at the end of class?
23         A.    It was more like -- I guess
24   the best verbiage would be

Kurtis N. Foulos

1  indoctrination.  Like, I just -- it

2  became part of that day; like, oh, this

3  is going to have to happen.

4       Q.   So you felt like there was

5  an expectation that at the end of class,

6  you and Mr. Ralston would have

7  inappropriate contact in the corner of

8  the classroom; is that right?

9       A.   Correct.  It was more

10 assumed.

11      Q.   How was the -- again, I'm

12 still talking about the first instance

13 where Mr. Ralston made you perform oral

14 sex on him.  How was that initiated?

15      A.    I don't remember specifics.

16 I'm sorry.  I -- I don't.

17      Q.   How do you know -- let me

18 start again.

19           Did Mr. Ralston tell you

20 that he wanted you to perform oral sex on

21 him the first time he made you perform

22 oral sex on him?

23      A.    I don't remember.  I --

24      Q.    How did it end?

Kurtis N. Poulos

1          A.     Excuse me?

2          Q.     How -- again, talking about

3     the first incident that Mr. Ralston made

4     you perform oral sex on him, how did the

5     encounter with Mr. Ralston end?

6          A.     Abruptly, like the first

7     time.  Anything happened with him ended

8     abruptly like -- like he knew he had done

9     something wrong and wanted to flee, but

10    he -- he kept pursuing it after -- after

11    the matter.

12         Q.     Why do you remember that the

13    first instance that Mr. Ralston made you

14    perform oral sex on him occurred after

15    Christmas break?

16         A.     Because I broke up with my

17    girlfriend shortly thereafter because I

18    thought I'd done something wrong.

19         Q.     So after the first time that

20    Mr. Ralston made you perform oral sex on

21    him, you broke up with your girlfriend?

22         A.     Correct.

23         Q.     When was the next time that

24    Mr. Ralston made you perform oral sex on

0489a

Kurtis N.  Poulos

1    him?

2         A.    I couldn't give you a

3    timeline.

4              And to be honest, I'm kind

5    of over talking about this today.  I

6    haven't slept for a week.  I honestly

7    haven't eaten for four days.  I've been

8    nothing but transparent about everything.

9              So tear my life apart, do

10   whatever you need to do, but I can't do

11   this anymore today.  I can't.  I just

12   can't.  I'm too tired.

13             MS. DOUGHERTY:  Okay.  Let's

14        go off the record.

15             THE VIDEOGRAPHER:  We are

16        now going off the record.  The

17        time is 5:11.

18             MS. DOUGHERTY:  How would

19        you like to proceed, Mr. Jubb?

20        I'm not going to make him continue

21        today if he says he's too tired to

22        continue.

23             MR. JUBB:  Since we're

24        continuing this, Mr. Poulos will

Kurtis N. Poulos

1          remain under oath.  We'll

2          coordinate a date next week.  I'll

3          make myself available whenever.

4                    MS. DOUGHERTY:  I will as

5          well.

6                    Mr. Poulos, are you still

7          there?

8                    THE WITNESS:  Yeah, I'm

9          still here.

10                   MS. DOUGHERTY:  Okay.  So

11         you've expressed that you're too

12         tired to continue testifying

13         today, so we're not going to

14         insist that you do continue if

15         you're too tired to testify.  So

16         provided you agree to return and

17         complete your testimony at a later

18         date, Mr. Jubb and I will, you

19         know -- I'll end my portion of the

20         questioning for the day and we'll

21         resume on another day.  Is that

22         how --

23                   MR. JUBB:  How about Tuesday

24         of next week?

0491a

Kurtis N.  Poulos

1          MS. DOUGHERTY:  That's fine

2     for me.  I'd, like Mr. Jubb, will

3     make myself available whenever.

4          Mr. Poulos?

5          THE WITNESS:  Yeah, I'm

6     here.

7          MS. DOUGHERTY:  Can we

8     resume on Tuesday of next week?

9          THE WITNESS:  Yeah.  Just

10     let me know what time.

11          MS. DOUGHERTY:  Hold on.

12     Why don't you tell us what time is

13     best for you?

14          THE WITNESS:  It doesn't

15     matter.  Either way, this is going

16     to eat at me for the next four

17     days.  So another four days of not

18     eating, not sleeping.  Might as

19     well make it 1:00 a.m.  It doesn't

20     really matter at this point.

21          MR. JUBB:  Let's start at

22     10:00 a.m. on Tuesday.

23          MS. DOUGHERTY:  10:00 a.m.

24     Central Time?

Kurtis N. Poulos

1           MR. JUBB:  Yeah.

2           MS. DOUGHERTY:  Okay, Mr.

3      Poulos?

4           THE WITNESS:  Yeah, that's

5      fine.

6           MS. DOUGHERTY:  Okay.  Thank

7      you.

8           We can go off the record.

9           (Whereupon, Exhibits D-2 and

10     D-3 were marked for

11     identification.)

12           (Whereupon, the deposition

13     was adjourned for the day at

14     approximately 5:14 p.m. CT/6:14

15     p.m. EST.)

16

17

18

19

20

21

22

23

24

0493a

Kurtis N.   Foulos

```
1                    CERTIFICATION

2

3

4       I, EILEEN P. BARTH, hereby certify

5   that the testimony and proceedings in the

6   foregoing matter are contained fully and

7   accurately in the stenographic notes

8   taken by me and are a true and correct

9   transcript of the same.

10

11   _____

12              EILEEN P. BARTH

             Certified Shorthand

13             Reporter

14

15

16       The foregoing certification of this

17   transcript does not apply to any

18   reproduction of the same by any means

19   unless under the direct control and/or

20   direction of the certifying shorthand

21   reporter.

22

23

24
```

Kurtis N.  Foulos

1        INSTRUCTIONS TO WITNESS

2

3        Please read your deposition over

4    carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8        After doing so, please sign the

9    errata sheet and date it.  It will be

10   attached to your deposition.

11       It is imperative that you return the

12   original errata sheet to the deposing

13   attorney within thirty (30) days of

14   receipt of the deposition transcript by

15   you.  If you fail to do so, the

16   deposition transcript may be deemed to be

17   accurate and may be used in court.

18

19

20

21

22

23

24

0495a

1          CERTIFICATE OF DEPONENT

2

3

4       I, WITNESS NAME, certify that I have

5    read the foregoing transcript of my

6    deposition and find it to be a true,

7    correct and complete transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the ERRATA.

12

13

14                 _____

15                 SIGNATURE

16                 DATE:  _____

17

18

19

20

21

22

23

24

0496a

## Fwd: Historical Allegations of Sexual Abuse at The Hill

Mary Ellen Poulos <46portia@gmail.com>
Wed 12/13/2017 12:02 PM
**To:** Mitchell Garabedian <mgarabedian@garabedianlaw.com>

Thank you! Mary Ellen Poulos
---------- Forwarded message ----------
From: **Kurtis Froedtert** <lex101078@gmail.com>
Date: Mon, Nov 20, 2017 at 1:08 PM
Subject: Fwd: Historical Allegations of Sexual Abuse at The Hill
To: Mary Ellen Poulos <46portia@gmail.com>


---------- Forwarded message ---------
From: Headmaster Zachary G. Lehman P'16 '18 <zlehman@thehill.org>
Date: Mon, Nov 20, 2017, 1:41 PM
Subject: Historical Allegations of Sexual Abuse at The Hill
To: Kurtis N. Poulos <lex101078@gmail.com>


The Hill School  |  The Family Boarding School


November 20, 2017

Dear Hill School Alumni:

At the end of the 2015-2016 academic year, I wrote to you in light of national media attention to issues of sexual abuse at boarding schools. In my April 23, 2016 *"Message from the Headmaster,"* I shared The Hill School's commitment to the safety and security of our students, and emphasized that Hill will not tolerate conduct that violates the high ethical and behavioral standards we set for all members of our community.

At that time, with the unanimous support of the Board of Trustees, I initiated a review of historical allegations of abuse at The Hill and the School's



November 19, 2020

**D-1**

Halma Reporting Group



Garabedian 029
0497a

responses to those allegations. This was a proactive review by the School, not initiated by any complaint. As Headmaster, I felt it was important to understand more about the School's history. The Board and I also felt it was imperative that the review be external, objective, and informed by the appropriate expertise. Accordingly, we engaged Leslie Gomez and Gina Smith of Cozen O'Connor, child-protection experts nationally recognized for their experience in this area, their objectivity, and their candor. That review was concluded this summer, and our board and leadership team have been processing the information gathered to make informed decisions about how best to incorporate the lessons learned to enhance our current policies and practices.

Through the review, we learned of several troubling incidents in The Hill School's history. Those incidents involved conduct several decades ago by a small number of faculty members, none of whom have been associated with The Hill for many years and one of whom is deceased.

The abuses uncovered were troubling, not only because of their nature and their impact on the students involved, but also because, in some instances, the School did not respond in a manner consistent with our institutional values, which prioritize student welfare. While some actions were taken in response, and may have been in accordance with the standards at the time, those actions would not be sufficient today.

As part of the review, I had the opportunity to speak with a number of former students and alumni to hear their experiences and offer my apologies on behalf of The Hill. Several also chose to speak with the child-protection experts we engaged to conduct this review. In addition, several former administrators candidly participated in this review, helping us understand the relevant time period and supplement existing School records.

I am grateful to all community members who participated in the review. I am sorry these incidents occurred, and that in some instances the School's response failed our students and their parents. I recognize the seeming inadequacy of an apology these many years later, but I believe acknowledgement of our history is still a valuable and tangible step that helps inform our approach to these issues as we seek to provide a safe and healthy environment for our students, faculty, and staff.

While our review was thorough, I understand there may be more alumnae/i who have similar experiences. I also expect, as part of the recent social media movement to raise awareness of sexual assault and harassment called "#MeToo," that we may continue to learn more about sexual and gender-based harassment and violence at The Hill. Recently, as part of the #MeToo movement, we learned of an account by an alumna who shared such an incident that occurred off-campus in the late 1990s when she was a student and involved a male student at The Hill. I immediately reached out to her, and we have carefully reviewed that situation as well.

I extend an invitation to any Hill School community member who wishes to share his or her experiences with the School, or, if appropriate, with law enforcement. I also encourage any students, parents, alumni, or staff to reach out directly to the School to share your observations and feedback. You may contact me directly at **zlehman@thehill.org** or 610-705-1280. You may also directly contact our child-protection experts, Leslie Gomez (**lgomez@cozen.com**) and Gina Smith (**gmsmith@cozen.com**), at 215-665-2000, or provide information anonymously online at **https://www.research.net/r/TheHillSchoolReview**. I have asked Leslie and Gina to expand their review to encompass any additional concerns that come forward.

Today, I can assure you that The Hill School has coordinated clear policies and practices that prioritize student welfare and safety and mandate careful oversight, immediate reporting, and swift responsive action. As I shared in my April 2016 email, we do this in myriad ways, beginning with a rigorous faculty and staff screening process requiring comprehensive background checks and references. We provide annual training to all employees regarding our own policies against harassment and abuse, and on how to identify and report any issues at the earliest-possible stage. Our protocol includes promptly reporting any suspected incidents of abuse and other potential sexual or physical violations to the relevant law enforcement agencies and/or ChildLine, Pennsylvania's investigative resource for suspected child abuse or neglect.

Equally important, we facilitate proactive, awareness-raising educational programs as part of our student life co-curriculum, which includes speakers on sexuality issues, stress management, and substance abuse. We encourage our students to speak up if they feel uncomfortable and we routinely encourage candid, focused discussions in our adviser groups, in our dormitories, and in other forums, as appropriate.

We routinely take steps to assess the effectiveness of our programming, our policies, and our practices. We recently received additional guidance from a report published by The Association of Boarding Schools (TABS) and the National Association of Independent Schools (NAIS), and we are creating a task force to implement the report's suggested best practices. Notably, our child-protection experts were involved in the development of this report.

Continuing this conversation with our community is an important step in assessing the efficacy of our efforts. We always welcome your feedback and stand ready to hear your perspective. As an educational institution committed to student welfare and campus safety, we learn more each day and recognize that our work is and must be ongoing.

In closing, please know that here at The Hill we have no higher priority than the health and well-being of our students as we prepare them for "college,

careers, and life."

Warm regards,

Signed, Zachary G.
Lehman


Zachary G. Lehman P'16 '18
Headmaster

860 Beech Street, Pottstown, PA 19464  |  610-326-1000  |  www.thehill.org

Email Preferences


--

Kurt Poulos

Sent using Inbox by Google on my Pixel XL



# THE HILL SCHOOL
#### THE FAMILY BOARDING SCHOOL™

November 20, 2017

Dear Hill School Alumni:

At the end of the 2015-2016 academic year, I wrote to you in light of national media attention to issues of sexual abuse at boarding schools. In my April 23, 2016 "*Message from the Headmaster*," I shared The Hill School's commitment to the safety and security of our students, and emphasized that Hill will not tolerate conduct that violates the high ethical and behavioral standards we set for all members of our community.

At that time, with the unanimous support of the Board of Trustees, I initiated a review of historical allegations of abuse at The Hill and the School's responses to those allegations. This was a proactive review by the School, not initiated by any complaint. As Headmaster, I felt it was important to understand more about the School's history. The Board and I also felt it was imperative that the review be external, objective, and informed by the appropriate expertise. Accordingly, we engaged Leslie Gomez and Gina Smith of Cozen O'Connor, child-protection experts nationally recognized for their experience in this area, their objectivity, and their candor. That review was concluded this summer, and our board and leadership team have been processing the information gathered to make informed decisions about how best to incorporate the lessons learned to enhance our current policies and practices.

Through the review, we learned of several troubling incidents in The Hill School's history. Those incidents involved conduct several decades ago by a small number of faculty members, none of whom have been associated with The Hill for many years and one of whom is deceased.

The abuses uncovered were troubling, not only because of their nature and their impact on the students involved, but also because, in some instances, the School did not respond in a manner consistent with our institutional values, which prioritize student welfare. While some actions were taken in response, and may have been in accordance with the standards at the time, those actions would not be sufficient today.

As part of the review, I had the opportunity to speak with a number of former students and alumni to hear their experiences and offer my apologies on behalf of The Hill.

EXHIBIT

D33

0501a

Several also chose to speak with the child-protection experts we engaged to conduct this review. In addition, several former administrators candidly participated in this review, helping us understand the relevant time period and supplement existing School records.

I am grateful to all community members who participated in the review. I am sorry these incidents occurred, and that in some instances the School's response failed our students and their parents. I recognize the seeming inadequacy of an apology these many years later, but I believe acknowledgement of our history is still a valuable and tangible step that helps inform our approach to these issues as we seek to provide a safe and healthy environment for our students, faculty, and staff.

While our review was thorough, I understand there may be more alumnae/i who have similar experiences. I also expect, as part of the recent social media movement to raise awareness of sexual assault and harassment called "#MeToo," that we may continue to learn more about sexual and gender-based harassment and violence at The Hill. Recently, as part of the #MeToo movement, we learned of an account by an alumna who shared such an incident that occurred off-campus in the late 1990s when she was a student and involved a male student at The Hill. I immediately reached out to her, and we have carefully reviewed that situation as well.

I extend an invitation to any Hill School community member who wishes to share his or her experiences with the School, or, if appropriate, with law enforcement. I also encourage any students, parents, alumni, or staff to reach out directly to the School to share your observations and feedback. You may contact me directly at **zlehman@thehill.org** or 610-705-1280. You may also directly contact our child-protection experts, Leslie Gomez (**lgomez@cozen.com**) and Gina Smith (**gmsmith@cozen.com**), at 215-665-2000, or provide information anonymously online at **https://www.research.net/r/TheHillSchoolReview**. I have asked Leslie and Gina to expand their review to encompass any additional concerns that come forward.

Today, I can assure you that The Hill School has coordinated clear policies and practices that prioritize student welfare and safety and mandate careful oversight, immediate reporting, and swift responsive action. As I shared in my April 2016 email, we do this in myriad ways, beginning with a rigorous faculty and staff screening process requiring comprehensive background checks and references. We provide annual training to all employees regarding our own policies against harassment and abuse, and on how to identify and report any issues at the earliest-possible stage. Our protocol includes promptly reporting any suspected incidents of abuse and other potential sexual or physical violations to the relevant law enforcement agencies and/or ChildLine, Pennsylvania's investigative resource for suspected child abuse or neglect.

Equally important, we facilitate proactive, awareness-raising educational programs as part of our student life co-curriculum, which includes speakers on sexuality issues, stress management, and substance abuse. We encourage our students to speak up if

0502a

they feel uncomfortable and we routinely encourage candid, focused discussions in our adviser groups, in our dormitories, and in other forums, as appropriate.

We routinely take steps to assess the effectiveness of our programming, our policies, and our practices. We recently received additional guidance from a report published by The Association of Boarding Schools (TABS) and the National Association of Independent Schools (NAIS), and we are creating a task force to implement the report's suggested best practices. Notably, our child-protection experts were involved in the development of this report.

Continuing this conversation with our community is an important step in assessing the efficacy of our efforts. We always welcome your feedback and stand ready to hear your perspective. As an educational institution committed to student welfare and campus safety, we learn more each day and recognize that our work is and must be ongoing.

In closing, please know that here at The Hill we have no higher priority than the health and well-being of our students as we prepare them for "college, careers, and life."

Warm regards,

Zachary G. Lehman P'16 '18
Headmaster

860 Beech Street, Pottstown, PA 19464  |  610-326-1000  |  www.thehill.org

Email Preferences

3

0503a