**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW RALSTON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| | : | |
| MITCHELL GARABEDIAN, ESQUIRE, et al, | : | |
| | : | NO. 2:19-cv-01539 |
| Defendants. | : | |

**APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
VOLUME II**

# TABLE OF CONTENTS

## Volume I

Exhibit "A" – July 1, 2021 deposition of Matthew Ralston ...................................................0001a

Exhibit "B" – D-31 – Matthew Ralston Resume ...................................................................0090a

Exhibit "C" – October 7, 2021 deposition transcript of Leslie Gomez ..................................0093a

Exhibit "D" – D-2 – April 23, 2016 letter to alumni and parents...........................................0288a

Exhibit "E" – November 20, 2020 deposition of Kurtis Poulos..............................................0290a

Exhibit "F" – D-1 – November 20, 2017 communication to alumni.......................................0497a

Exhibit "G" – D-33 – November 20, 2017 Hill School Communication ................................0501a

## Volume II

Exhibit "H" – November 19, 2020 deposition of Kurtis Poulos..............................................0504a

Exhibit "I" – November 24, 2020 deposition of Kurtis Poulos ...............................................0739a

Exhibit "J" – D-15 – April 11, 2018 letter from Garabedian to Lehman ................................0845a

Exhibit "K" – D-4 – December 26, 2018 letter from Garabedian to Rees ..............................0847a

Exhibit "L" – May 27, 2021 deposition of Kurtis Poulos.......................................................0849a

## Volume III

Exhibit "M" – Poulos-4 – April 3, 2019 notes.......................................................................1021a

Exhibit "N" –contingent fee agreement.................................................................................1022a

Exhibit "O" – D-3 – December 13, 2017 emails between Poulos and Mary Ellen Poulos .....1023a

Exhibit "P" – D-13 – December 13, 2017 emails between Poulos and Garabedian ...............1024a

Exhibit "Q" – D-5 – December 12, 2017 notes ......................................................................1030a

Exhibit "R" – D-9 – December 12, 2017 notes ......................................................................1037a

Exhibit "S" – D-7 – December 19, 2018 notes.......................................................................1038a

Exhibit "T" – D-6 – December 26, 2018 notes.......................................................................1039a

Exhibit "U" – D-34 – January 9, 2019 email from Rees ........................................................1041a

i

Exhibit "V" – D-35 – January 23, 2019 letter from Garabedian to Rees ................................1043a

Exhibit "W" – D-36 – January 30, 2019 email ........................................................................1044a

Exhibit "X" – D-37 – February 21, 2019 letter ......................................................................1046a

Exhibit "Y" – September 30, 2021 deposition transcript of Zachary Lehman ........................1047a

Exhibit "Z" – D-38 – March 26, 2019 letter ...........................................................................1216a

Exhibit "AA" – Lehman-3 – April 2019 draft email to faculty ...............................................1217a

Exhibit "BB" – July 8, 2021 deposition transcript of Nathan Gaul ........................................1218a

Exhibit "CC" – December 12, 2018 notes ...............................................................................1238a

Exhibit "DD" – December 21, 2018 notes ...............................................................................1239a

Exhibit "EE" – April 16, 2019 notes .......................................................................................1240a

Exhibit "FF" – July 8, 2021 deposition transcript of Daniel Mahoney ..................................1241a

Exhibit "GG" – December 13, 2017 notes (call with mother) ................................................1268a

Exhibit "HH" – January 29, 2018 email regarding New York statute of limitations ..............1270a

Exhibit "II" – March 23, 2018 email regarding address change ..............................................1271a

Exhibit "JJ" – December 26, 2018 email from Rees ...............................................................1272a

Exhibit "KK" – December 18 and 19, 2018 emails with Rees ................................................1273a

Exhibit "LL" – April 24, 2018 letter from Rees .....................................................................1277a

Exhibit "MM" – Mahoney-5 – December 13, 2017 letter from Garabedian with blank
CFA .........................................................................................................................................1278a

Exhibit "NN" – Compilation of releases executed on December 15, 2017 .............................1280a

Exhibit "OO" – December 2017 investigative materials .........................................................1316a

Exhibit "PP" – January 30, 2018 letter requesting records (The Hill School) ........................1324a

Exhibit "QQ" – Compilation of February 2, 2018 record requests .........................................1326a

Exhibit "RR" – Records received from University of Wisconsin-Milwaukee .........................1334a

Exhibit "SS" – December 19, 2018 emails with forwarded emails and article .......................1370a

Exhibit "TT" – May 16, 2019 email from Garabedian ...........................................................1374a

Exhibit "UU" – April 11, 2018 letter requesting records (The Hill School) ...........................1375a

Exhibit "VV" – October 11, 2021 deposition transcript of Thomas Rees ...............................1376a

Exhibit "WW" – D-26 – April 18, 2019 email from Rees regarding administrative leave .....1442a

Exhibit "XX" – April 29, 2019 letter with memorandum regarding administrative leave ......1443a

Exhibit "YY" – August 27, 2019 letter from James Beasley, Jr. ............................................1445a

Exhibit "ZZ" – April 17, 2019 email from Philadelphia Magazine ........................................1447a

Exhibit "AAA" – October 18, 2019 email from Rees ............................................................1448a

Exhibit "BBB" – October 14, 2019 letter from James Beasley, Jr. ........................................1449a

Exhibit "CCC" – September 23, 2019 letter from Rees .........................................................1450a

Exhibit "DDD" – December 22, 2016 letter regarding raises and bonus plan .......................1452a

Exhibit "EEE" – D-25 – June 28, 2018 job evaluation ..........................................................1454a

Exhibit "FFF" – July 18, 2018 letter from Sockel regarding raise ........................................1458a

Exhibit "GGG" – July 25, 2018 email from Neese regarding bonus .....................................1459a

**Volume IV**

Exhibit "HHH" – April 22, 2021 deposition of Kurtis Poulos ...............................................1460a

Exhibit "III" – September 20, 2021 deposition of Matthew Ralston ......................................1571a

Exhibit "JJJ" – D-16 – Plaintiff response to interrogatories ..................................................1640a

Exhibit "KKK" – June 26, 2018 email to Rees .....................................................................1651a

Exhibit "LLL" – January 2, 2019 email from Rees ...............................................................1652a

Exhibit "MMM" – March 16, 2019 email ............................................................................1653a

Exhibit "NNN" – April 29, 2018 email .................................................................................1654a

Exhibit "OOO – D-17, D-18, D-19 – compilation of three course reviews ...........................1656a

Exhibit "PPP" – June 20, 2018 reservation of rights letter....................................................1659a

Exhibit "QQQ" – February 11, 2019 disclaimer of coverage letter .......................................1666a

Exhibit "RRR" – D-21 – April 6, 2016.................................................................................1673a

Exhibit "SSS" – D-22 – April 11, 2016 email welcoming plaintiff back .................................1675a

Exhibit "TTT" – D-23 – July 19, 2017 letter re new salary ....................................................1676a

Exhibit "UUU" – June 24, 2021 deposition of Mitchell Garabedian .....................................1677a

Exhibit "VVV" – Gaul-5 – April 15, 2019 criminal background check ................................1739a

Exhibit "WWW" – May 10, 2019 notes .................................................................................1751a

Exhibit "XXX" – compilation of April 2019 searches ...........................................................1752a

Exhibit "YYY" – compilation of 2019 releases .....................................................................1759a

Exhibit "ZZZ" – September 2, 2021 deposition of Christopher Hopkins .............................1762a

Exhibit "AAAA" – Subpoenas to The Hill School...................................................................1791a

**Docket Materials**

Doc. 19 – March 18, 2021 Order ............................................................................................1808a

Doc. 28 – Second Amended Complaint...................................................................................1809a

```
1                  UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4    JOHN DOE,

5                          Plaintiff,

6         vs.                        Case No. 2:19-CV-01539

7    MITCHELL GARABEDIAN, ESQ., LAW

     OFFICES OF MITCHELL GARABEDIAN,

8    and KURTIS N. POULOS,

9                     Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12                    Videotaped Deposition of

13                  KURTIS N. POULOS (Volume I)

14                  (Via Zoom Videoconference)

15                  Thursday, November 19, 2020

16                    10:15 a.m. to 5:45 p.m.

17

18

19

20

21            GOLKOW LITIGATION SERVICES, INC.

22                       (215) 717-7805

23

24

25         Reported by Lynn Peppey Bayer, RPR, CM
```

0504a

```
1                    A P P E A R A N C E S

2

   FOR THE PLAINTIFF:

3

                THE BEASLEY FIRM, LLC

4               Mr. Lane Jubb, Jr., and

                    Mr. Louis F. Tumolo

5               The Beasley Building

                1125 Walnut Street

6               Philadelphia, PA 19107

                Lane.jubb@beasleyfirm.com

7               Louis.tumolo@beasleyfirm.com

                (215) 592-1000

8

9    FOR THE DEFENDANTS MITCHELL GARABEDIAN, ESQ., and LAW

10       OFFICES OF MITCHELL GARABEDIAN:

11

12                SWARTZ CAMPBELL, LLC

13              Ms. Candidus K. Dougherty

14              One Liberty Place, 38th Floor

15               1650 Market Street

16              Philadelphia, PA 19103

17              cdougherty@swartzcampbell.com

18              (215) 564-51904

19

20

21   FOR THE DEFENDANT KURTIS POULOS:

22

23              Mr. Kurtis Poulos (pro se)

24               3239 West Colony Drive

25               Greenfield, WI 53221
```

Kurtis N. Poulos

```
 1                    I N D E X
 2   WITNESS    EXAMINATION                           PAGE
 3   KURTIS N. POULOS
 4        EXAMINATION BY MR. JUBB                       6
 5        EXAMINATION BY MS. DOUGHERTY                188
 6
 7
 8                  E X H I B I T S
 9   NUMBER                          PAGE IDENTIFIED
10     Exhibit P6.23    sixth form yearbook page of K.   120
                        Poulos
11     Exhibit P6.26    Rolfe 2 dorm picture             121
       Exhibit
12     P16.164-165      Proxmire letters                 93
       Exhibit
13     P16.219-220      4/11/18 letter from Garabedian to
                        Lehman                           135
14     Exhibit
       P16.225-226      12/26/28 letter Garabedian to
15                      Rees                             138
       P16.228          1/28/19 letter Garabedian to Rees147
16     Exhibit P16.235  3/26/19 letter from Rees to
                        Garabedian                       154
17     Exhibit
       P16.237-239      11/20/17 email from Lehman to
18                      alumni                           129
       Exhibit
19     P16.242-243      4/23/16 email from Lehman to
                        alumni                           127
20     Exhibit P16.33   demerits sixth form              100
       Exhibit P16.42   12/13/96 letter from Advisor
21                      Lodish to Mary Ellen Poulos      125
       Exhibit P16.53   8/7/96 letter from Asst.
22                      Headmaster Price to Poulos       124
       Exhibit P16.62   8/8/96 letter from Poulos to
23                      Ralston                          125
       Exhibit P16.72   demerits fourth form             99
24     Exhibit P16.73   demerits third form              98
       Exhibit P16.118  dorm parent/ advisor Lodish
25                      memorandum                       94
                        (Continued)
```

0506a

Kurtis N. Poulos

```
 1                    EXHIBITS (Continued)
 2    Exhibit P100.1   sixth form yearbook photo        107
      Exhibit P100.2   sixth form yearbook photo        108
 3    Exhibit P100.3   photo - Andres                   108
      Exhibit P100.4   photo                            109
 4    Exhibit P100.5   photo                            109
      Exhibit P100.6   photo - Whitlock                 109
 5    Exhibit P100.7   photo                            109
      Exhibit P100.8   photo                            109
 6
      Exhibit
 7    Garabedian
      0240-0303        HITECH letters/authorizations    158
 8
      Exhibit D-1      Garabedian 029-032 email string
 9                     Mary Ellen Poulos/Garabedian     192
10       (Original exhibits attached to original transcript.)
         (Exhibit P16.228 was not provided and is not attached to
11                       transcript.)
         (Copies of exhibits attached to transcript copies.)
12
13
            P R E V I O U S L Y   M A R K E D   E X H I B I T S
14
15    NUMBER                                 PAGE IDENTIFIED
16
17                 (None mentioned.)
18
19
20
21                        R E Q U E S T S
22
23    REQUEST                                 PAGE   LINE
24
25       (No requests to produce documents were made.)
```

0507a

Kurtis N. Poulos

```
 1                  VIDEOGRAPHER:  We are now on the record.
 2        My name is Jeff Sindiong, and I am the videographer
 3        for Golkow Litigation Services.  Today's date is
 4        November 19th, 2020.  And the time on the screen is
 5        10:16.  This remote video deposition is being held
 6        in the matter of John Doe versus Mitchell
 7        Garabedian, Esquire, et al., for the United States
 8        District Court for the Eastern District of
 9        Pennsylvania.  Our deponent today is Kurtis Poulos.
10                  All parties to this deposition are
11        appearing remotely and have agreed to the witness
12        being sworn in remotely.  Due to the nature of
13        remote reporting, please pause briefly before
14        speaking to ensure all parties are heard completely.
15                  Will counsel please identify themselves
16        and who they represent.
17                  MR. JUBB:  Good morning.  Lane Jubb for
18        plaintiff as well as Louis Tumolo for plaintiff.
19                  MS. DOUGHERTY:  Candidus Dougherty from
20        Swartz Campbell on behalf of Mitchell Garabedian.
21                  VIDEOGRAPHER:  Our court reporter is Lynn
22        Bayer and will now swear in the witness.
23                  KURTIS N. POULOS, called as a witness
24        herein, having been first duly sworn, was examined
25        and testified as follows:
```

0508a

Rufus N. Poulos

```
 1                          EXAMINATION

 2   BY MR. JUBB:

 3   Q    Mr. Poulos, good morning.

 4   A    Good morning.

 5   Q    Because we're operating under the current

 6        circumstances using this technology, I appreciate,

 7        you know, you putting your phone right there so that

 8        we can see you.  It's not going to be the same as me

 9        sitting in the same room with you; so at any point in

10        time if you can't hear me, I just need you to tell

11        me.  Sometimes if for whatever reason maybe I can't

12        hear you and you're speaking, you can always just

13        wave your hands just to let me know.  But, otherwise,

14        I can hear you just fine right now.  Okay?

15   A    Sounds good.

16   Q    At any point in time if you want me to repeat a

17        question or you just don't understand it, just let me

18        know, I'm happy to rephrase it.  That's my job.  Fair

19        enough?

20   A    Fair enough.

21   Q    If you answer my question, though, I'm going to

22        assume that you understood it.  Is that fair?

23   A    It is.

24   Q    And I just want to make sure, no one entered during

25        your introduction for you as counsel, am I correct,
```

0509a

1        you're not represented today?

2    A   That's correct.

3    Q   And where are you physically located today?

4    A   I'm at my mother's apartment currently.

5    Q   Is she in the room with you?

6    A   She is.

7    Q   And can she hear everything we're saying?

8              THE WITNESS:  Can you hear everything?

9              MS. POULOS:  Pretty much.

10   A   For the most part.

11   BY MR. JUBB:

12   Q   And she's not your lawyer, correct?

13   A   She is not, no.

14   Q   She's actually -- I'm going to have to ask her to

15       leave, to step out, because she's potentially a

16       witness in case and so she can't sit in on it.

17             THE WITNESS:  He's saying you need to step

18       out because you're potentially a witness.

19             MS. POULOS:  I'm not gonna.

20   A   She said no.

21   BY MR. JUBB:

22   Q   Do you want to put herself on camera?

23   A   She does not want to appear on camera today, no.

24   Q   And your mom's background, she was a lawyer for about

25       40 years; is that right?

```
 1    A    Correct.

 2    Q    And how old is she now?

 3    A    74.

 4              MS. DOUGHERTY:  Mr. Jubb, could we just

 5         have Mr. Poulos' mother identify herself so we have

 6         her full name on the record.  Because we've just

 7         been referring --

 8              MR. JUBB:  Yeah.

 9              MS. DOUGHERTY:  -- to her as his mother.

10              MR. JUBB:  I'm going to get there, Candi.

11         Thank you.

12              MS. DOUGHERTY:  Okay.

13    BY MR. JUBB:

14    Q    All right.  Am I correct that within your mother's

15         apartment, is she able to communicate with you in any

16         way right now?

17    A    Yeah.

18    Q    And her full name?

19    A    Mary Ellen Poulos.

20              MR. JUBB:  Ms. Poulos, can you hear me?

21              MS. POULOS:  Yes.

22              MR. JUBB:  Great.  Do you want to be on

23         camera today?

24              MS. POULOS:  No.

25              MR. JUBB:  Do you want to be sworn in?
```

0511a

```
 1                    MS. POULOS:  No.

 2                    MR. JUBB:  Do you intend to assist your

 3          son with this?

 4                    MS. POULOS:  No.  He's in my house.

 5                    MR. JUBB:  Do you have any other rooms?

 6                    MS. POULOS:  Why do you -- why do I need

 7          to leave?  The deposition is a public event.

 8                    MR. JUBB:  No.  That's a trial.  Are you

 9          willing to --

10                    MS. POULOS:  No, a deposition is an

11          extension of the trial, so it's a public event.

12          Everything with you is an argument.  I'm sitting

13          here.

14                    MS. DOUGHERTY:  Ms. Poulos, I think if you

15          are going to be present, you probably need to be on

16          camera because there is an issue with we need to

17          make sure that Mr. Poulos is answering the questions

18          without assistance or looking at the documents that

19          Mr. Jubb or myself might show him.  So I --

20                    MS. POULOS:  Well, that's up to --

21                    (Interruption by the reporter.)

22                    MS. DOUGHERTY:  I'm sorry?  I didn't

23          either.

24                    THE WITNESS:  Then fine.  I'll just do

25          this by myself.  She was just here for moral
```

0512a

Rufus N. Poulos

```
 1              support.  She can go in her room.  I'll stay in the
 2              dining room.  Okay.  We're good.
 3                      MR. JUBB:  Thanks, Mr. Poulos.
 4   Q    And would you do me a favor and let me know if for
 5        whatever reason, she needs to come get a drink of
 6        water or just walk around her house, you know, that's
 7        fine.  You just gotta let me know.  Okay?
 8   A    That's fine.
 9   Q    Now, the house where you're currently located, what's
10        the address there?
11   A    500 Bradley Road, Apartment B104, Fox Point,
12        Wisconsin 53217.
13   Q    And do you also live there?
14   A    No.
15   Q    When was the last -- strike that.  Have you ever
16        lived there previously?
17   A    Yeah.  Up until 2016 after I got out of the hospital,
18        I lived here.
19   Q    Have you reviewed any documents in anticipation of
20        today's deposition?
21   A    Just the documents that have been emailed to me in
22        the past six months.
23   Q    Do you have any of them printed out with you?
24   A    I do not.
25   Q    Did anyone assist you in reviewing those documents?
```

Rufus N. Poulos

```
 1    A    No, they did not.

 2    Q    What's your current address?

 3    A    3239 West Colony Drive, Greenfield, Wisconsin 53221.

 4    Q    How far way is 3239 West Colony from 500 Bradley?

 5    A    About 20, 25 minutes.

 6    Q    How long have you lived on West Colony?

 7    A    Since August of 2018.

 8    Q    Do you live with anyone?

 9    A    No.  Just my dog.

10    Q    Approximately how long did you live at 500 Bradley?

11    A    Two years, and then I moved to Connecticut for two

12         years, and then I moved back to Milwaukee.

13    Q    What was your address in Connecticut?

14    A    The first one I believe was 1513 -- man, I can't

15         remember the address.  The other one was in Hamden.

16         So I lived in Orange, Connecticut, for a year; and

17         then I moved to Hamden, Connecticut.  But it's not

18         like I ever wrote my own self a letter that I needed

19         my address.

20    Q    Okay.  So, in other words, there's two addresses in

21         Connecticut where you lived, but you can't recall the

22         street address; is that right?

23    A    Correct.

24    Q    And you said approximately how long ago did you live

25         there?
```

```
 1    A    Up until March of 2018.

 2    Q    What do you do for a living?

 3    A    I work for Russ Darrow Automotive Group.

 4    Q    What do they do?

 5    A    We sell cars and buy them.

 6    Q    Are you a car salesman?

 7    A    Yes.  But I also do internet sales.  So appointment

 8         setting, stuff like that.

 9    Q    How long have you been in car sales?

10    A    Since January of 2017 when I worked in Connecticut.

11    Q    At your current address, do you have access to --

12         your current home address, not the 500 Bradley, the

13         3239, do you have access to internet there?

14    A    Yes, I do.

15    Q    Do you have a printer or a scanner access anywhere?

16    A    I have a printer and a scanner.

17    Q    Your email addresses, what email addresses do you

18         have?

19    A    LEX101078.  And I have a work email.

20    Q    What's that one?

21    A    Kurt dot Poulos at Russ Darrow dot-com.

22    Q    And I think all the correspondence that we have been

23         going back with you on has been on your LEX email

24         address; is that right?

25    A    Right.
```

Kurtis N. Poulos

```
 1    Q    And what does LEX stand for?

 2    A    Lex Luthor.  It's an inside joke from friends.

 3    Q    What's the joke?

 4    A    I shaved my head one night before a party and I had

 5         to wear a black suit, so they said I looked like Lex

 6         Luthor.  Nothing more.

 7    Q    Lex Luthor the villain to Superman?

 8    A    Yes.

 9    Q    When you send me emails, it comes up as Kurtis

10         Froedtert.  Do you know why that is?

11    A    Froedtert.  Comes up --

12    Q    Froedtert.

13    A    -- as Kurtis Froedtert, as in Froedtert Memorial

14         Hospital.  It comes up that way so that my dad

15         doesn't see my online presence.

16    Q    Is there some special name about Froedtert or is it

17         just a hospital?

18    A    Froedtert is my great grandfather.

19    Q    On your mom's side?

20    A    No.  My dad's side.  It's who I was named after.

21    Q    You said grandfather or great grandfather?

22    A    Great grandfather.

23    Q    And why is it -- strike that.  Can you explain to us

24         why you have that as your name?

25    A    Because I don't want my father tracking my online
```

0516a

Rufus N. Poulos

```
 1              social media accounts.
 2       Q     Does he do that?
 3       A     Yeah, because he -- we don't speak to each other; so
 4              the only way he can find out what's going on in our
 5              lives is to try and find us on social media.
 6       Q     When was the last time you talked with your dad?
 7       A     Face to face?  Ten years.  Maybe seven.  Only by
 8              text, and that was October of 2015.
 9       Q     Why haven't you spoken to him?
10       A     Because he's not a good human being.
11       Q     Why not?
12       A     Too many reasons to say right now.  And it's...
13       Q     What does your dad do for a living?
14       A     I have no clue.  Last I heard, he works as a grocer
15              at a grocery store.  But that was a year ago that
16              somebody told me that.
17       Q     Does he live nearby?
18       A     I believe he lives in Shorewood.
19       Q     How --
20       A     Again, I don't know.
21       Q     I'm just trying to get an understanding as to what
22              you can recall or what you do know.  Did you say
23              Charlotte?
24       A     Shorewood.
25       Q     Shorewood, okay.
```

Rufus N. Poulos

```
 1    A    Shorewood.

 2    Q    So at the time when you were younger, approximately

 3         how old were you when your parents got divorced?

 4    A    I guess two or three.

 5    Q    Did you stay in touch with your dad then?

 6    A    Up until I was about 23.  Off and on.

 7    Q    Did you ever live with him?

 8    A    Just weekends.

 9    Q    What happened when you were 23?

10    A    We had a falling out.

11    Q    Can you tell me what happened?

12    A    Not at this particular time.  Again, it was a long

13         time coming, let's just put it that way.

14    Q    A long time coming meaning there was a bunch of

15         instances that led to the falling out, right?

16    A    Correct.

17    Q    Like what?

18    A    Like a list of things that I'm not going to get into

19         at this time.

20    Q    Are they things that upset you?

21    A    Very much so.

22    Q    Would you ever describe him as a good dad prior to

23         when you were 23?

24    A    He had his moments.

25    Q    What stands out in your mind as the event when you
```

0518a

```
 1         were 23?  Because that's a long time ago, you recall

 2         that number pretty well.

 3               MS. DOUGHERTY:  Objection.  How is any of

 4         this reasonably calculated to lead to the discovery

 5         of admissible evidence regarding the defamation

 6         claim arising from the two letters?

 7               MR. JUBB:  Candi, you --

 8               MS. DOUGHERTY:  I mean, you're -- well,

 9         no --

10               MR. JUBB:  State your objection.

11               MS. DOUGHERTY:  -- I don't have to sit

12         here and listen to you ask completely irrelevant

13         questions to a witness who is pro se and doesn't

14         know better.  So I want you to just articulate to me

15         what the basis for asking the witness whether his

16         father was a good dad prior to him being 23, why

17         that has any connection to the claims.  If you're

18         not going to move on, then I guess we're going to

19         have to get the judge on the phone because we're not

20         going to sit here and all and probe the relationship

21         with Mr. Poulos and his father.  That has nothing to

22         do with the claims in the case.

23               MR. JUBB:  It does.  It has --

24               MS. DOUGHERTY:  How?

25               MR. JUBB:  -- something to do with it.
```

0519a

Rufus N. Poulos

```
 1            It's certainly discoverable.  I mean, he -- just

 2       stop, you know, let -- I'm not going to spend all

 3       day going back and forth about what is and what's

 4       not discoverable.  Your objections are limited to

 5       form.  And I'm asking him what at 23 led to him not

 6       speaking to his dad.  That's all.  So if you want to

 7       object to the way I asked the question, that's fine.

 8       I'm happy to rephrase it.  But please.

 9    Q   So I'll tidy up the question for you.  What happened

10       when you were 23 that led to this no longer

11       relationship with your dad?

12    A   I was currently moving to Maryland at the time.  We

13       got into an argument over money.  And he made a

14       comment about my mother, went to attack me.  I fought

15       back, packed up my stuff, and drove straight through

16       the night.

17    Q   Back to Wisconsin?

18    A   No.  To Maryland.

19    Q   To Maryland.  So this occurred in Wisconsin and then

20       you drove to Maryland?

21    A   No.  That happened in Detroit.

22    Q   Were you living in Michigan at any point?

23    A   No.

24    Q   Were you there visiting your dad?

25    A   I was visiting my sisters.
```

0520a

```
1    Q    Are they your full biological sisters?

2    A    No.  I have no full biological siblings.

3    Q    Were the individuals that you refer to as your

4         sisters your father's biological children?

5    A    Correct.

6    Q    Do you still keep in touch with them?

7    A    No.

8    Q    When was the last time you spoke with them?

9    A    I'm not sure how that's relevant, but 2010.

10   Q    Each of them around 2010?

11   A    All of them the same day on 2010.

12   Q    Do you have any other brothers or sisters?

13   A    I have one half brother; and I've been told I have

14        another half sister, but I've never met her.

15   Q    Your half brother, is that through your dad?

16   A    Correct.

17   Q    Is he younger or older?

18   A    Younger.

19   Q    Are your other half sisters, are they younger or

20        older?

21   A    They're all at least 20 years younger than I am.

22   Q    You mentioned that you may have another half sister

23        you've never met.  Is that also on your dad's side?

24   A    Correct.

25   Q    Would you believe she's older or younger?
```

0521a

Rufus N. Poulos

```
1   A   She's much younger.

2   Q   Have you ever gone by any other names?

3   A   No.

4   Q   Have you ever gone by any other aliases?

5   A   No.

6   Q   So your mom, who was on this deposition just a bit

7       ago, how long have you lived with her?  And I know

8       you mentioned you were there a little bit after you

9       got out of the hospital.  But are there any other

10      times that you've lived with her?

11  A   Yeah.  I lived with her after my restaurant went out

12      of business.  I was forced basically into near

13      bankruptcy.

14  Q   When was that?

15  A   2011, maybe 2012.

16  Q   Did you own a restaurant or were you a cook?

17  A   I was part owner of a restaurant.

18  Q   What was it called?

19  A   Durango Barbecue and Grill.

20  Q   Was that in Wisconsin?

21  A   It was downtown Milwaukee, correct.

22  Q   And what did you do prior to operating that

23      restaurant?

24  A   For years, nothing.  Worked odd jobs, worked for

25      J. Crew for a few years.  That was after I had moved
```

0522a

1        back from Maryland.  So nothing, nothing crazy.

2   Q    So you went from I guess working at J. Crew to then

3        owning or partly owning a restaurant; is that right?

4   A    Yeah.  I may have had a job in between there working

5        in phone sales, I think.  It's hard to remember.

6   Q    What type of ownership was it?  I mean, did you own

7        most of it, was it a bunch of people that were in,

8        was it one other person?

9   A    There were three of us total.  I had a total

10       investment of nearly $20,000.  I believe -- so I

11       would have been the minority shareholder.

12  Q    When did you start that?  You mentioned that it was

13       around 2011, 2012 when it went out of business.  But

14       when did you start that?

15  A    February of 2010.

16  Q    So from the time that we're going to talk about when

17       you were younger, do you recall officially -- when

18       your parents had officially been divorced as opposed

19       to just separated and having some issues?  Or was

20       that too young?

21  A    They were --

22            MS. DOUGHERTY:  Objection.

23  A    -- always divorced.

24            MS. DOUGHERTY:  Objection.  I think that I

25       said it when he was talking.

0523a

```
 1                    MR. JUBB:  That's okay.

 2   Q    And, Mr. Poulos, when she's objecting to the form, if

 3        you could just wait like a half a second before

 4        responding to my question just in case she has any.

 5        That way it makes it easier for the court reporter to

 6        take all that information down.  Okay?

 7   A    Okay.

 8   Q    Getting back to my last point, am I correct then that

 9        as far as your memory goes back, they have always

10        been divorced, correct?

11   A    Correct.

12   Q    When you were in the 13-, 14-year-old age, was your

13        mom practicing law then?

14   A    Yes.

15                    MS. DOUGHERTY:  Objection.

16   A    This is impossible.

17                    MR. JUBB:  Candi, did you object?

18                    MS. DOUGHERTY:  I did.

19   BY MR. JUBB:

20   Q    Okay.  So during that time frame, what did your dad

21        do?

22   A    He worked as a consultant.

23   Q    Consulting what?  You mentioned he had his own

24        business, right?

25   A    He did consulting work for multiple companies to
```

0524a

Rufus N. Poulos

```
 1          better manage them -- or better manage their
 2          employees and their payrolls.  That's --
 3     Q    Like in human resources?
 4     A    -- what -- no, no.  Like consultant.  Like, you hire
 5          him, he comes in, revamps your company, you pay him a
 6          lot of money, and he leaves.
 7     Q    Okay.  And did he do that work from the time you were
 8          around that 13 age for how long?
 9     A    I don't know.
10     Q    But now he's working at a grocery store, right?
11                    MS. DOUGHERTY:  Objection.
12     A    I don't see what any of this has to do with any of
13          this.
14     BY MR. JUBB:
15     Q    I'm just trying to get an understanding as to your
16          relationship that you had with your dad and what he
17          was doing at the time for work.  So as of -- when you
18          were around 13, he was doing consultant work where he
19          would go into companies, revamp them, he'd get paid
20          and then he would leave.  And I'm just trying to
21          understand that process of what he did next.  And we
22          can do it in the context as I go through your age if
23          that's going to be more helpful for you to recall.
24                    MS. DOUGHERTY:  Mr. Jubb, I think that
25          Mr. Poulos was asserting an objection and
```

Rufus N. Poulos

```
 1          questioning how your questions are reasonably

 2          calculated --

 3                    MR. JUBB:  Are you representing him?

 4                    MS. DOUGHERTY:  I'm not, but he's a pro se

 5          litigant.  And --

 6                    MR. JUBB:  And I just clarified my

 7          question, I said I'm happy to ask you as we go

 8          through your background.  So if you want to give

 9          legal advice to a pro se witness who you have

10          contra-interest to, feel free.  I don't think you

11          meant to do that.  But if you want to keep your

12          objections to form, I've asked Mr. Poulos

13          specifically if he prefer I ask these types of

14          questions as I go through his specific ages.  So --

15                    MS. DOUGHERTY:  Mr. Jubb, maybe if you

16          hadn't interrupted me and you let me finish my

17          sentence, you would have learned what I was going to

18          say.  Please don't do that anymore.  As you know --

19                    MR. JUBB:  This is my deposition.  I can't

20          even hear what you're saying.  Your mouth is moving.

21          We can't hear you.  Your headset is not close

22          enough.  If you have an objection, it has to be

23          objection to the form.  This is a federal court

24          deposition.

25                    MS. DOUGHERTY:  I'm sorry, is the court
```

0526a

1          reporter unable to hear me?

2                    THE REPORTER:  I can hear you.

3                    MS. DOUGHERTY:  Okay.  Raise --

4                    MR. JUBB:  You --

5                    MS. DOUGHERTY:  -- your hand if nobody --

6          you know why?  Because you're interrupting me.  I'm

7          speaking and you're trying to talk over me.

8          Mr. Poulos, can you hear me?

9                    THE WITNESS:  Loud and clear.

10                    MS. DOUGHERTY:  Mr. Jubb, can you hear me?

11                    MR. JUBB:  Yes.

12                    MS. DOUGHERTY:  Mr. -- I don't know how to

13          stay your last name, Tumolo, can you hear me?

14                    MR. TUMOLO:  Tumolo.  Now I can.  It was a

15          little jumbled before.

16                    MS. DOUGHERTY:  The court reporter can

17          hear me?

18                    THE REPORTER:  Yes.

19                    MS. DOUGHERTY:  As you know, Mr. Jubb, you

20          are not entitled to ask questions that are outside

21          the scope of discovery.  If it's going to continue

22          to be an issue, then we can get the court on the

23          phone and somebody can move for a protective order.

24          Whether it be me or Mr. Poulos.

25                    MR. JUBB:  Are you trying to instruct this

Rufus N. Poulos

```
 1         witness what to do legally?
 2              MS. DOUGHERTY:  I'm not instructing him
 3         what to do.  Should we just get the court on the
 4         phone, or are you just going to continue to abuse
 5         the pro se litigant?
 6              MR. JUBB:  I'm not abusing anyone.
 7              MS. DOUGHERTY:  Really?  How is whether he
 8         had a falling out with his father at the age of 23
 9         in any way related to the two letters that are at
10         issue in this case?  How?
11              MR. JUBB:  I think I explained --
12              MS. DOUGHERTY:  You also know that you
13         already asked background questions in written
14         discovery to Mr. Poulos to which you moved to
15         compel, and the court denied your motion and agreed
16         that they weren't.
17              MR. JUBB:  They were --
18              (Interruption by the reporter.)
19              MS. DOUGHERTY:  Right, because Mr. Jubb
20         can't -- I'm sorry, Mr. Jubb can't help himself.  He
21         just has to interrupt me.  You know that you have
22         been asking about Mr. Poulos' employment and
23         background.  We've -- I asked you, I think
24         Mr. Poulos has asked you to describe how the line of
25         questioning is related to the claims.  Are you
```

 1          refusing to do that?

 2                    MR. JUBB:  Are you finished?

 3                    MS. DOUGHERTY:  So you won't tell us how

 4          your line of questioning relates to the two letters

 5          that are at issue in the case?

 6                    MR. JUBB:  I'm just asking if you're

 7          finished with that speech, Candi.

 8                    MS. DOUGHERTY:  So you won't answer me?

 9                    MR. JUBB:  I'm going to answer you if I

10          know you're finished.  Are you finished, ma'am?

11                    MS. DOUGHERTY:  Yes.

12                    THE WITNESS:  Jesus, why am I even here?

13                    MR. JUBB:  My question to Mr. Poulos which

14          was the basis of your objection was what his dad did

15          from the time he went from a consultant for

16          companies to ultimately now working at a grocery

17          store.  They've had a falling out.  I'm asking what

18          if anything transpired in that time as to his

19          employment.  If that's the basis of your objection,

20          then say objection.  I don't understand.  If your

21          position is I'm not allowed to explore his

22          background on what was going on during this time,

23          that's wrong.  And we can address it with the court.

24          But I'm going to do that at the end.  Because I'm

25          going to get a list of all of the times that you

Rufus N. Poulos

```
 1            object, then we'll address all of them with the

 2            court separately.

 3                    MS. DOUGHERTY:  Okay.  But --

 4                    MR. JUBB:  So your objection is noted.

 5                    MS. DOUGHERTY:  I'm sorry.  Your answer is

 6            that what Mr. Poulos' father did after the time when

 7            Mr. Poulos was in high school is related to the two

 8            letters?

 9                    MR. JUBB:  Yes.  It's discoverable.  And

10            you'll see if you just let me get through this

11            deposition.  You'll have time to ask your questions

12            and try and correct anything.  Okay?  Can I proceed?

13    Q    Mr. Poulos, can you hear me?

14    A    I can hear you just fine.  I'm still wondering what

15         this has to do with anything.  I had little to no

16         relationship, so why would I know what he's been

17         doing in the interim?

18    Q    Got it.  So --

19    A    Again, I...

20    Q    Are you done?

21    A    Evidently.

22    Q    If you'd like to say anything further, please.

23    A    Nope.

24    Q    Okay.  So approximately 1992, where did you go before

25         The Hill School?
```

0530a

```
 1   A    Shorewood Intermediate School.

 2   Q    Who did you live with?

 3   A    Not sure how this is relevant at all.

 4   Q    It's relevant to test your recollection at the time,

 5        sir.  Who did you live with?

 6   A    Fine.  I lived with my mother.  I pretty much always

 7        lived with my mother.

 8   Q    Had you ever visited The Hill School before applying

 9        there?

10   A    No.

11   Q    Did you want to go there?

12   A    I applied there.  Then I went out for a visitors'

13        weekend.  I decided I liked the campus, the

14        atmosphere, the ability to learn at an accelerated

15        rate.

16   Q    And then your date of birth is what?

17   A    October 10th, 1978.

18   Q    Am I correct that the first time you attended The

19        Hill School was the fall of 1993?

20   A    Yes.  I would have been 14 years old.

21   Q    Did you know anyone at the school at the time that

22        you had gone there?

23   A    I only knew my cousin.

24   Q    What's his name?

25   A    Jason Zwerner.  Now, can I ask a question off the
```

Rufus N. Peoples

```
 1          record?

 2     Q    If there's a question that you have related to the

 3          dep -- if there's a question that you have related to

 4          one of my questions, I'm happy to clarify for you.

 5          Is it related to the deposition?

 6     A    It's related to a document that I was sent.

 7     Q    Why don't we just get through my questions, and to

 8          the extent that it's something -- here's the thing.

 9          If you want to say something about a document related

10          to this case, I think it's probably most appropriate

11          that it's on the record.  So why don't you just let

12          me get through my questions; and if it's --

13     A    Okay.

14     Q    -- relevant to your answers, that might be a good

15          time to mention it.  Was there anyone other than your

16          cousin Jason Zwerner that you knew at the school

17          prior to going there?

18     A    No.

19     Q    Were you --

20     A    Well, my grandfather went to school there.  But he

21          obviously wasn't attending there when I went.  My

22          grandpa's brother also attended.  He graduated in

23          1933 and my grandfather graduated in 1934.  They both

24          went to Yale and then fought in World War II.

25                    MR. TUMOLO:  For the record, I hate to
```

0532a

```
1         interrupt here, but I can pick up a voice whispering

2         things to Mr. Poulos.  So if there's someone in the

3         room, again, we just need to know that.

4              THE WITNESS:  There's a TV on in the other

5         room.  I mean, it's a two-bedroom apartment.

6              MS. DOUGHERTY:  Sorry, what -- can I just

7         ask a question for clarification.  When did you hear

8         whispering?  Because I didn't hear whispering.

9              MR. TUMOLO:  I heard a voice right before

10        he began that last response.

11             MS. DOUGHERTY:  Okay.

12             MR. JUBB:  Yeah.  And if it's the TV --

13        we'll try and keep going.

14    Q   But can you hear the TV right now, Mr. Poulos?

15    A   No.  She shut her door.

16    Q   Okay.  Right.  So that was going to be my next

17        question.  Obviously you didn't go to the school with

18        your grandpa or your grandpa's father, but I imagine

19        that that's how you learned of the school in the

20        first place.  Is that fair?

21    A   Yes.  We were legacies.

22    Q   And is he your biological grandfather?

23    A   No.  He is my mother's stepfather.

24    Q   Did you ever know your biological grandfather on your

25        mother's side?
```

0533a

1    A    Yes.

2    Q    How often did you see your step-grandfather at that

3         time?

4    A    Not very often.  I was living at the high school.

5    Q    I'm sorry.  I meant -- we're just focusing on the

6         time before you got there.  So I'll clarify my

7         question.  How often did you see your grandfather

8         during the time up to when you first started to live

9         at the school?

10             MS. DOUGHERTY:  Which grandfather are we

11        talking about?

12             MR. JUBB:  The one that went there.

13   A    Proxmire was a little busy in the Senate up until

14        1988, so I didn't get to see him very much because he

15        lived in D.C.  He'd come in town every once in a

16        while and do, you know, a meet-and-greet.  Otherwise,

17        maybe once a year out in D.C. if we had time to go

18        and visit.  But he was typically very busy because he

19        actually did his job when he was a senator.

20   Q    As far as you can recall, what dorm did you stay in

21        that third form year?  And when I say third form, you

22        understand that that's referring to --

23   A    I understand what -- yes.  Third form I was in the

24        upper school building.

25   Q    What floor of upper school for your third floor --

Rufus N. Poulos

```
 1          for your third form year?

 2     A    Third floor.

 3     Q    Who was your dorm parent?

 4     A    I honestly -- I think his last name started with an

 5          L.  He was not very into being part of the atmosphere

 6          of the dorm.  He just sat in his apartment on his

 7          phone.

 8     Q    What type -- he had a cellphone?

 9     A    No.  Like a home phone.  It was 1993.  Who had a

10          cellphone?

11     Q    That's why I asked it.  So you're saying that your

12          relationship with the dorm parent for your third form

13          year was essentially --

14     A    Nonexistent.

15     Q    Nonexistent.  Okay.  Did you have a roommate?

16     A    Yes.

17     Q    Who was your roommate?

18     A    John Knapp, Knaph.  It was very German.  I think it

19          was K-N-A-P-H or P-F.  He was my freshman roommate.

20     Q    Do you keep in touch with any of the -- strike that.

21          Do you keep in touch with Mr. Knaph?

22     A    No.  He was kicked out of school.

23     Q    That year?

24     A    After freshman year, correct.

25     Q    During that -- strike that.  During your third form
```

Rufus N. Poulos

```
 1          year, did you play any sports?

 2   A      I was planning on joining the ski team until I broke

 3          my arm.  So my freshman year I was training for ski,

 4          and then I broke my arm at the beginning of the ski

 5          season and couldn't perform in sports for eight

 6          weeks.

 7   Q      Was the ski team something that was part of the

 8          winter or was that something for the fall?

 9   A      That was something you trained in the fall for and

10          then you skied in the winter.

11   Q      What did you do for spring?

12   A      I honestly don't remember.

13   Q      During your freshman year, do you recall what classes

14          you took?

15   A      French, algebra, English, biology, History of Art and

16          Music.  I think that's it.  Six or seven courses is

17          all we had.

18   Q      Do you recall who your algebra teacher was?

19   A      No, I do not.  I don't remember most of my teachers,

20          to be honest.  Just the ones who had positive and

21          negative impact on me.

22   Q      During that time frame, were you going home during

23          breaks?

24   A      I would go home for Thanksgiving, Christmas and

25          spring breaks.  It wasn't realistic to go home for a
```

0536a

Rufus N. Poulos

```
 1        long weekend.  And --
 2   Q    And when you say home -- sorry to interrupt you.
 3   A    Back to Milwaukee.  And correct me if I'm wrong,
 4        don't you have my transcripts?
 5   Q    I believe I do, yeah.
 6   A    Okay.  So then you should be able to get all the
 7        teachers' names from that.
 8   Q    I appreciate that.  Am I correct that you can't
 9        recall their names that year, though?
10              MS. DOUGHERTY:  Which one are you asking
11        about?  Any of them or --
12              MR. JUBB:  Well, I think his testimony is
13        he doesn't remember most of the teachers.  So I --
14   A    I don't remember 90 percent of the people I met at
15        that school.
16   Q    Okay.  Am I correct -- let me ask it this way.  Is
17        there any teacher from any of the classes that you
18        attended that third form year that you can recall?
19   A    Yeah.  I can remember my English teacher, but I can't
20        remember her name.  I remember her because she -- I
21        can remember her because she went out of her way to
22        help me get my grades up.  But other than that, no.
23        I remember one teacher's name from my sophomore year
24        or my fourth form year, and that's because he was my
25        hall master.  I remember one teacher's name from my
```

Rufus N. Poulos

```
 1          sixth form year.  Oh, make that two.  One because he

 2          lived in --

 3   Q      I'm just -- I'm sorry, Mr. Poulos.  I'm going to go

 4          through the years chronologically just so we're all

 5          following the same page.  So we'll get there.

 6               MS. DOUGHERTY:  Objection.  You can't stop

 7          him in the middle of an answer.

 8               MR. JUBB:  I think it was because he was

 9          trying to recall off the top of his head, and I'm

10          trying to organize this deposition, Candi.  Please.

11   Q      So in the third form year, am I correct that at least

12          with respect to the -- your teachers for French,

13          algebra, English and HAM, you don't recall their

14          names?

15   A      No, I do not remember the name of the teacher who

16          taught HAM.  Interesting that you called it that

17          because only students who went to that school called

18          it HAM.

19   Q      And with respect to your third form year, do you have

20          any recollection what you did in the spring, or were

21          you just injured with that wrist problem you had?

22   A      I think I was still recovering from having a broken

23          wrist.  So I might have been playing light

24          intramurals.

25   Q      Did you have what's known as a work job?
```

```
 1   A    No.

 2   Q    At any point in time, did you ever transfer a dorm or

 3        were you on the third floor upper school the entire

 4        year?

 5   A    I was always in that room.

 6   Q    And for the entirety of your third form year, was

 7        Mr. Knaph your roommate?

 8   A    Correct.

 9   Q    Who was your advisor?

10   A    I don't remember.

11   Q    During your freshman year, did you develop any group

12        of friends at all?

13   A    Yeah.  I had a few groups of friends.

14   Q    Who were they?

15   A    Specific names?

16   Q    Yeah, that you can recall.

17   A    I can't recall any of them.

18   Q    At any point in time during your third form year, did

19        you ever require any sort of psychological treatment?

20   A    No.  I stopped eating properly, but that had nothing

21        to do with -- I don't know.  I wasn't eating full

22        meals.  But I didn't get treatment for it.

23   Q    Why weren't you eating?

24   A    Frankly, because I wanted to be in my dorm room as

25        much as possible.
```

0539a

Rufus N. Poulos

```
1    Q    Is there any particular reason?

2    A    Because it was safe there.

3    Q    What was unsafe that year?

4    A    Being approached by teachers inappropriately.

5    Q    Are there multiple teachers that you can recall that

6         you thought you were being approached by

7         inappropriately?

8    A    Nope.  Just one.

9    Q    During that year.  And am I -- at any point in time,

10        did you bring any of what you considered to be being

11        approached inappropriately by teachers to anyone's

12        attention?

13             MS. DOUGHERTY:  Objection.

14   A    No, I didn't.  I was going to object as well.  No, I

15        don't want to answer that.

16   BY MR. JUBB:

17   Q    So you're the witness, you did answer it.  And I'm

18        going to ask a follow-up question on it.  Am I

19        correct that during that year, you did not bring to

20        anyone else's attention, whether it be other

21        teachers, whether it be a supervisor, whether it be

22        your parents, whether it be a medical provider, or

23        any other student, anything that you felt was being

24        approached inappropriately by teachers?

25   A    No.
```

0540a

Rufus N. Poulos

```
 1   Q   That summer when you went home, did you work?

 2   A   So I would have been 15 years old.  No, I do not

 3       believe so.

 4   Q   Do you have any recollections about that summer after

 5       your freshman year?

 6   A   Just hanging out with friends.  Mostly --

 7   Q   Your friends at home, were they neighbors, were they

 8       kids you knew from Shorewood, family, who were they?

 9   A   Kids I knew from Shorewood.

10   Q   So when you come back for your sophomore year, the

11       fourth form year, do you recall what classes you took

12       that year?

13   A   Geometry, European history, French, English

14       literature.  For science I honestly don't remember.

15       European history, French, geometry, English lit.  You

16       can tell they obviously made a huge impact on my

17       life.  I don't remember the other three.

18   Q   Do you recall if you took -- what science you took?

19   A   No, I don't.  Because I took chemistry junior year

20       and I took physics senior year.  And I never took AP

21       bio.

22   Q   Do you recall any of the names of your teachers for

23       that year?

24   A   I recall two.  One was Mr. Drowne, he was my European

25       history teacher.  He was also my hall master my
```

0541a

Rufus N. Poulos

```
 1         fourth form year.  And I remember the name of my
 2         geometry teacher.
 3    Q    Do you recall how the scheduling of classes worked
 4         then?
 5    A    It was always a rotating class schedule.  So the
 6         class you had first on a Monday you had, what, second
 7         on Tuesday; whatever you had on your last class
 8         Monday became your first class Tuesday.  So it's just
 9         a constant round robin.  Now, I might have that
10         backwards; but I'm pretty sure one went to two, two
11         went to three, three to four.  We had --
12    Q    So --
13    A    -- a school...
14    Q    Okay.  So if I'm understanding you correctly,
15         whatever order the classes you had on Monday, let's
16         say one through five or one through seven, then on
17         Tuesday would start with two, and one would go to the
18         end of the line?  And --
19    A    Correct.
20    Q    -- then on Wednesday, you would start with three, and
21         two would go to the end of the line; is that fair?
22    A    Yeah, but Wednesday -- that's not correct.  Wednesday
23         we only had a half day of classes because teams had
24         to travel for sports.  So then we had another half
25         day of classes on Saturdays.
```

0542a

Rufus N. Poulos

```
 1                    MS. DOUGHERTY:  Is this the sophomore

 2        year?

 3                    THE WITNESS:  Yes.  Fourth form.

 4    A   Oh, I remember one other teacher's name.  Mr. Long.

 5        He was my English teacher.  He was also one of the

 6        football coaches.

 7    By MR. JUBB:

 8    Q   Do you recall the approximate -- is it fair to call

 9        them like a period or the class time?  What's the

10        appropriate terminology you want me to use?

11    A   Classes.  Our classes I guess were about 45 minutes

12        to an hour, but some of our classes were double

13        period classes.  Like History of Art and Music was an

14        extended length class because we had to travel down

15        to the Performing Arts building and sit there and she

16        had to bring up slides and music.  And so we were

17        there for quite a bit longer.

18    Q   Did you have any sort of free periods during the day?

19    A   Yes.  And then we had chapel on Thursdays.

20    Q   Was that required?

21    A   It was.  But they didn't always take up the entire

22        period of chapel.  Sometimes --

23    Q   Was there --

24    A   -- it would just be...

25                    MS. DOUGHERTY:  Yes, finish your answer.
```

0543a

1   A   Sometimes it would just be like school announcements

2       and a small speech, and sometimes it would be special

3       speakers would come in or one of the students would

4       give a speech.  So it really depended from week to

5       week what happened at chapel.

6   BY MR. JUBB:

7   Q   Was that something that was required where attendance

8       was taken?

9   A   It was required.  We had, you know, seating by your

10      peer group or your form.  So every year you moved

11      further up in the chapel towards the front.  They

12      did -- I mean, there's 90 of us in our class.  So if

13      somebody's not there, it's pretty obvious.  But it

14      was a nondenominational chapel service.  So it

15      wasn't, like, preachy or anything like that.

16  Q   So you've told us how the class schedule works, you

17      get the half day on Wednesday, half day on Saturday;

18      and then the class that started in the front on

19      Monday, that would go to the back line on Tuesday,

20      Wednesday would be a half day; and then Thursday,

21      same types of things, half day on Saturday.

22  A   Correct.

23  Q   Do you recall between your geometry, your English,

24      your French, your European history, do you recall

25      which period you had geometry?

0544a

Rufus N. Poulos

```
 1   A    Like I said, it shifted every day.  So no.  Do I
 2        remember what day of the week it was specifically
 3        which period?  No.  That's -- unless I'm -- you
 4        know -- no, I don't remember.
 5   Q    Do you remember which -- sorry.  I interrupted you.
 6        Are you finished?
 7   A    I was just saying I don't remember what order that
 8        came in in which days of the week.
 9   Q    Do you recall what class you had before it?
10   A    I don't, no, because it changed every day.
11   Q    Right.  But let's say it was class number two.  Class
12        number one would come before, class number three
13        would come after it.  So that was kind of the
14        background that I understood from your previous
15        answers.
16   A    Then yes.  I don't remember the order in which my
17        classes were of any day of the week.
18   Q    During your fourth form year, what sport if any did
19        you do during the fall period?
20   A    Honestly, I don't remember because they had gotten
21        rid of skiing that year.  So I had to have done
22        something, but I don't recall what it was.
23   Q    Do you recall what sport if any you did during the
24        winter period?
25   A    I played squash.
```

0545a

Rufus N. Poulos

```
 1    Q    At what level?  Was it varsity, junior varsity?

 2    A    JV.  I had never played squash before that year,

 3         so...

 4    Q    And what sport if any did you do during the spring

 5         period?

 6    A    I believe I played intramurals.

 7    Q    Can you explain what you mean by that, please.

 8    A    So you have a choice.  You can either join, you know,

 9         a media group where -- like the prepping the stage

10         for plays; or you can play a JV or a varsity sport.

11         Or if you don't qualify for either, you can play an

12         intramural sport.  So basically it's just a bunch of

13         students from the school playing each other every day

14         so that -- because we don't have gym class, so we

15         were required to do three sports a year.

16    Q    Okay.  So, in other words, you were required to do --

17         when you say three sports, I assume you meant one in

18         the fall, one in the winter and one in the spring; is

19         that fair?

20    A    Every trimester.

21    Q    Okay.  And so the sports, would they occur after

22         school?

23    A    Yeah.  We usually had I want to say about an hour in

24         between the end of class, maybe a little bit more, to

25         get ready.
```

```
 1   Q    Who was your roommate if any during your sophomore

 2        fourth form year?

 3   A    I did not have a roommate my sophomore year.

 4   Q    Why not?

 5   A    None was assigned to me.

 6   Q    At that point, by fourth form year, are the fourth

 7        formers allowed to pick their roommates?

 8   A    I believe so, yes.  But the roommate that I had

 9        chosen I believe did not re-attend school.

10   Q    Who's that --

11   A    Or I just decided that I didn't really care who my

12        roommate was.  I don't recall which one.

13   Q    You mentioned that year that -- you said your

14        European history teacher, Drowne, was your hall

15        master?

16   A    Correct.

17   Q    Is a hall master the same as a dorm parent?

18   A    Yeah, I guess so.  But we called them hall masters.

19   Q    Was --

20   A    It got...

21             (Interruption by the reporter.)

22   Q    I'm sorry.  Mr. Poulos, I apologize.  Sometimes

23        there's a break and then I think you're finished with

24        your answer, so I start.  But if at any point in time

25        you're not, please, you know, interrupt me, wave your
```

0547a

```
 1           hand, stop me.  I don't mean --
 2    A      Okay.  So when you're a freshman and a sophomore or a
 3           third former and a fourth former, you got a hall
 4           master who lives in an apartment at the end of each
 5           hallway.  Somewhere on that hallway are what are
 6           called prefects.  So those are seniors who live in
 7           underclassmen dorms to make sure that we act right.
 8    Q      During your fourth form year, what dorm did you live
 9           in?
10    A      I lived in the upper school first floor opposite side
11           of the third form.  So one whole side of the building
12           is stacked with third formers, besides the ones that
13           are down in Dutch Village.  The other side of the
14           building is stacked with all fourth formers besides
15           the ones who are down in Dutch Village.
16    Q      Do you recall who your prefect was?
17    A      No.  I just remember they always were watching
18           Melrose Place in their dorm room.  They were allowed
19           certain things because they were technically seniors
20           that they should have access to when the
21           underclassmen don't have access to them.  Like, say a
22           TV or a microwave or the use of a refrigerator in
23           their room I believe was part of it.  Because when
24           you're in sixth form, you don't have study hall, you
25           don't have to stay in your room from certain hours of
```

0548a

```
 1            the night until certain hours of the night.  They

 2            could come and go as they pleased throughout the

 3            night as long as one of them was there to sort of

 4            check in on us.  Or we checked out with them to, say,

 5            go to the library or go to a teacher's apartment to

 6            study.

 7    Q     Were you close with anyone that fourth form year in

 8            upper school in your dorm?  Just the floor, not the

 9            whole dorm.  I'm just talking about the floor that

10            you said.

11    A     The only one I can remember offhand is Jeremy

12            Eiserman; and that's because he was our star tennis

13            player, he lived right across the hall from me.  And

14            he would string his own rackets in his dorm room.

15    Q     Impressive.  Do you keep in touch with Jeremy at all?

16    A     I haven't spoken to anybody in that school for I

17            don't know how many years.

18    Q     Do you have a recollection, with respect to your

19            classes that year, do you remember what building

20            your -- strike that.  Do you recall what science you

21            took?

22    A     Like I stated earlier, I do not remember what science

23            I took my sophomore year.

24    Q     All right.  So for purposes of your English class,

25            where was that classroom?
```

Rufus N. Poulos

```
 1    A     That was on the third form side of upper school, at
 2          the end of the hallway down one of the small
 3          corridors.  You have to understand that the back of
 4          the building is completely flat with classrooms.  The
 5          other side of the building has small hallways that
 6          take you into the smaller classrooms, say, my English
 7          class which only had a small round table we all sat
 8          around to discuss the books we were reading.
 9    Q     So the English class would have been on the first
10          floor of upper school just opposite to where you
11          were?
12    A     Technically, it was in the basement.
13    Q     Okay.
14    A     Upper school is -- upper school is a total of six
15          stories, I believe.  The basement level which has all
16          the classrooms; then the three stories that were all
17          dormitories.  And then the two stories above that
18          were deemed unsafe to be dorms long before I was ever
19          a student there, so it was just storage.  And the
20          only way you could access that was by elevator.
21    Q     Your French class, do you recall where that was held?
22    A     That was also in upper school down the main corridor.
23    Q     Again, in that basement that you described?
24    A     Correct.  On the fourth form side of the building.
25    Q     On the fourth form side of the building.
```

1  A   Would it be easier if I just drew this for you?  I'm

2      not trying to be a smart-ass, but...

3  Q   No.  I appreciate it.  If the computer was working,

4      that might have made it easier.  But what I'm going

5      to do is I just have two more questions, and I think

6      we should just take a five-minute break and maybe

7      during that time frame you could draw it up for us.

8  A   Okay.

9  Q   So with respect to your European history class, where

10     was that?

11 A   That was in a different building altogether.  So I

12     would have exited out of my dorm on the fourth form

13     side, walked down a flight of stairs, walked about 50

14     paces, entered another building, taken I believe it

15     was one of the first rooms on the left-hand side of

16     that building, which was also a fifth form dormitory.

17 Q   And your geometry class, where was that located?

18 A   That was in upper school, basically right at the very

19     end of the fourth form dormitory area on the basement

20     level, down one of the small corridors, basically

21     mirroring my English room -- or English class,

22     basically mirroring it.  I believe they were both on

23     the same side of the small corridors, just on

24     opposite sides of the building.

25 Q   So if you had to get to geometry class from your

```
 1            room, how would that work?

 2   A    I'd walk to the end of my hallway, walk downstairs,

 3        open the door, make an immediate left down a small

 4        corridor, and go take a left and enter my geometry

 5        classroom.  At that level --

 6   Q    I -- I'm sorry.

 7   A    So on that side of the building where the small

 8        corridor classes are, there are no windows exposed to

 9        the outside world.  On the other side, on the main

10        straight of classrooms where, say, my French class

11        was, those were all facing an alleyway.  So those all

12        had natural light through windows.

13   Q    All right.  So why don't we take a five-minute break.

14        We've been going for about an hour now.  So you can

15        shut off your -- I know you're having technology

16        issues.  If it's okay, our videographer, maybe he can

17        give the best instruction.

18                  VIDEOGRAPHER:  Looks like he put it up in

19        the ceiling.

20                  MR. JUBB:  Okay.  Great.

21                  THE WITNESS:  I'm just going to shut off

22        my computer and start over.

23                  MR. JUBB:  We'll meet back here in five

24        minutes.

25                  VIDEOGRAPHER:  We are now going off the
```

0552a

```
 1          record.  The time is 11:26.
 2                     (Recess taken from 11:26 to 11:36 a.m.)
 3                     VIDEOGRAPHER:  We are now back on record.
 4          The time on the screen is 11:36.  You may continue.
 5     BY MR. JUBB:
 6     Q    Mr. Poulos, during the break, did you discuss your
 7          deposition with anyone?
 8     A    No, I did not.  I got a bottle of water.
 9     Q    So with respect to your geometry class, can you tell
10          me any of the names of any other students who were in
11          there?
12     A    No, I cannot.  I'll just preface it by saying this.
13          I'm horrible with names and faces.  I always have
14          been.  That was something that I never understood
15          about my Grandpa Proxmire, he could pull a name out
16          of nowhere even if he hadn't seen the guy for 40
17          years.  I don't have that gift.
18     Q    I take it then that none -- strike that.  Were any of
19          the students who were your -- is it dorm mates?  I
20          guess maybe that's the most appropriate.  Were any of
21          them in your geometry class?
22     A    Not to my recollection.
23     Q    You mentioned Mr. Eiserman.  Do you recall Jeremy
24          Eiserman ever being in your geometry class?
25     A    Not to my recollection.  I think I only had one class
```

0553a

Rufus N. Poulos

```
 1          with him and that was freshman year English.  I
 2          think.  I could be wrong.
 3    Q     Do you recall anyone by the name of Aaron Bluestone?
 4    A     Yes, I rec -- I recall the name.  I don't recall what
 5          he looks like or what classes I had with him.
 6    Q     As you sit here today, can you recall where you sat
 7          in your geometry class?
 8    A     I don't believe we had assigned seating.
 9    Q     Was it a class where there were desks or was it
10          similar to your English class where there was that
11          circle table?
12    A     No.  You walked into the door.  There was I believe
13          three rows of seats, maybe four in each row, maybe
14          five, and then the blackboard.
15    Q     In other words, you would enter the classroom from
16          the back?
17    A     Correct.  Towards the back of the class.  Like I
18          said, that door was at the very end of the hallway.
19    Q     On the left, correct?
20    A     Correct.
21    Q     Do you recall if there were any windows in the door?
22    A     I believe there was a small, almost like what you'd
23          see in a jail cell type window, maybe six inches wide
24          by 10 to 12 inches long.  So it's not like we had a
25          huge picture window.  It was more something where if
```

0554a

Rufus N. Poulos

```
 1          you're looking through that window, it would be
 2          almost impossible to see the entire room with the
 3          door shut.
 4    Q     During that fourth form year, who was your advisor?
 5    A     I think it was -- I think it was the teacher who
 6          ended up being my economics professor my senior year,
 7          but I could be mistaken.  And I don't remember his
 8          name.
 9    Q     Does the name Krueger ring a bell?
10    A     Mr. Krueger, yes.  I believe he taught economics
11          there.
12    Q     Is that who you believe may have been your advisor
13          that year?
14    A     I think so.  Because I think he was also Jason's
15          advisor.
16    Q     Jason being your cousin?
17    A     Correct.
18    Q     So I have that during that fourth form year you were
19          doing squash in the winter, IM sports in the spring,
20          and you don't recall what you were doing in the fall.
21          Is that fair?
22    A     That's fair.
23    Q     Do you recall what --
24    A     Oh, no.  I know what I was doing.  I was playing
25          golf.
```

0555a

Rufus N. Poulos

```
 1    Q    In the spring or the fall?

 2    A    In the spring -- no, in the fall.  Because cross

 3         country would use the country club to run their races

 4         when we had home meets, and we would be out there

 5         golfing while they would be running around.

 6    Q    And the golf in the fall, was that also junior

 7         varsity?

 8    A    No.  I think that was just intramurals.  I think it

 9         was just if you wanted to play golf, you could sign

10         up and play golf, you just had to go and play golf

11         every day.

12    Q    Would the IM sports -- strike that.  I understood

13         your prior testimony to be that you had to do a sport

14         every single semester.

15    A    Trimester.

16    Q    Right.  Excuse me, trimester.  Does that mean that

17         your attendance was required for IM sports as well?

18    A    Yes, it was.  There would be a teacher at every

19         intramural sports event who basically -- maybe he was

20         a varsity or junior varsity coach earlier in the

21         year; and that part of the season he would just go

22         in, check off that you showed up.  Sometimes they'd

23         play with you, sometimes they'd just hang out and

24         grade papers.  I mean, it was pretty nonchalant.  I

25         think one year we played kickball for intramurals or
```

0556a

```
 1            something like that.

 2    Q    Where was the golf course that you played?

 3    A    The golf course was over by the far field.  So it was

 4         I want to say about a half mile off campus the way

 5         campus was laid out when I went there.  Now, from

 6         what my understanding is, the campus has changed

 7         quite a bit since I was there.  So it's hard to say.

 8         I also know that the entrance to the school is no

 9         longer considered 616 East High Street.  I believe

10         it's now one of the back streets as opposed to off of

11         High Street by the dining hall.

12    Q    Approximately -- strike that.  Would you walk up to

13         the golf course or would you get a ride?  How did

14         that work?

15    A    No.  You walked.

16    Q    And did you have your own clubs?

17    A    I believe I brought my clubs from home.

18    Q    And during the fourth form year, did you have a work

19         job?

20    A    No.  I never had a work job when I was attending that

21         school.

22    Q    How did you consider your grades your fourth form

23         year?

24    A    Up until a certain part of the year, they were pretty

25         stellar.  And then events unfolded and my grades
```

0557a

Rufus N. Poulos

```
 1          started to deteriorate.

 2    Q     What do you mean by events?

 3    A     Improprieties by a faculty member.

 4    Q     Are you referring to improprieties that were

 5          reflected in the letters at issue in this case?

 6    A     Correct.

 7    Q     And then up -- you said stellar until that happened;

 8          is that right?

 9    A     I believe so.  I believe I was getting pretty good

10          grades that year.

11    Q     During that year, how often did you go home?

12    A     Same as my freshman year.  Only for major breaks.  I

13          think one -- it was -- there may have been one

14          weekend freshman or sophomore year where my cousin

15          and I traveled to Washington, D.C., to visit with our

16          grandparents.  But I don't recall -- I don't recall

17          which year it was.

18    Q     When you would end the school year and go home, would

19          you fly or would you drive?

20    A     I flew.

21    Q     How would you get all of your belongings back home

22          since you were living there?

23    A     You pack everything up.  If you're coming back the

24          following year, you can put it in storage for the

25          following year.  If you're not planning, you ship it
```

0558a

```
 1            back.  So, like, freshman year I had to ship
 2            everything I wanted out to The Hill School; and then
 3            at the end of freshman year third form, you pack it
 4            up and you take it down to the storage building which
 5            was by the entrance near Dutch Village which was also
 6            by where the shooting range was and next to the ice
 7            skating rink and the gymnasium.
 8      Q    And that fourth form year when you left, did you put
 9            everything in storage?
10      A    Correct.
11      Q    During the school year, were there ever opportunities
12            like a parent visitation day or a weekend, anything
13            like that, where your mom would come see you?
14      A    I believe my mom did come and visit me my fourth form
15            year.
16      Q    Did anyone come your freshman year, your third form
17            year?
18      A    My mother.
19                 MS. DOUGHERTY:  Mr. Jubb, before you go
20            on, when you talk, it sounds like there's some type
21            of noise in the background.  It's a little --
22                 MR. JUBB:  The heater just kicked on I
23            think.  It'll go off and hopefully pretty soon.  But
24            if at any point --
25                 MS. DOUGHERTY:  I only...
```

```
 1                  MR. JUBB:  Go ahead.

 2                  MS. DOUGHERTY:  I apologize.  Go ahead.

 3                  MR. JUBB:  I was going to say at any point

 4          in time if you can't hear my question, just let me

 5          know.

 6                  MS. DOUGHERTY:  I can hear your question.

 7          I didn't know if it would be a concern for you

 8          because I know you're videotaping, and you could --

 9          I'm sure you can hear it on the videotape.

10                  MR. JUBB:  Is that true, Jeff?

11                  VIDEOGRAPHER:  Yes, I can hear it.  It

12          sounds sort of like an espresso machine or something

13          going off.

14                  MR. JUBB:  We can go of the record and

15          I'll just -- I'll freeze to death up here.

16                  VIDEOGRAPHER:  Okay.  We are now going off

17          record.  The time is 11:48.

18                  (Discussion off the record.)

19                  VIDEOGRAPHER:  We are now back on the

20          record.  The time is 11:49.  You may continue.

21     BY MR. JUBB:

22     Q    Thank you.  Mr. Poulos, during that summer, did you

23          have any sort of employment?

24     A    I believe that summer I had just purchased my first

25          car over spring break.  So that summer I did have a
```

0560a

Rufeis N. Poulos

```
 1            job.  I believe I worked as a busboy at a restaurant
 2            in Bayside called Pandl's.  Oh, no, no, no.  That
 3            summer I worked at my uncle's paints and wallpaper
 4            company, JC Licht Paint & Wallpaper.  It was the
 5            winter of my junior year that I worked at the
 6            restaurant.
 7      Q     Which uncle are you referring to?
 8      A     Gregory Licht.
 9      Q     Is that on your mom's side?
10      A     Yes.  It's my aunt's ex-husband.
11      Q     And then you ultimately returned to school.  Did you
12            fly or did you drive?
13      A     My fifth form year, I flew back out.
14      Q     And your fifth form year, do you recall what classes
15            you were assigned to take?
16      A     I want to say AP English, French obviously, I think
17            trigonometry.  I honestly don't remember.  I wasn't
18            there long enough to take any of them.
19      Q     So the records reflect that around the 8th is when
20            you left.  Do you remember when school actually
21            started?
22      A     It would have started a few days later.
23      Q     You mean that you had come back to Pottstown and then
24            left before any classes started?
25      A     Right.  I never attended a class my junior year out
```

Rufus N. Foulks

```
 1              there.  You get a couple of days to settle in.  But
 2              obviously you've got to go down, get all your stuff
 3              set up, your dorm room.  If you have any, you know,
 4              pre-classroom activities like your summer reading you
 5              need to finish up, you need to get on that.  And
 6              then, you know, there's orientation stuff.  If I
 7              recall.
 8      Q       Do you recall -- sorry to interrupt you.
 9      A       No.  Go ahead.
10      Q       Do you recall specifically if you had any sort of
11              orientation that year?
12      A       I think it was more just a welcome back to the school
13              type of event.  I mean, the football team had already
14              been there for, like, almost a month by the time
15              classes started.
16      Q       In other words, some sports would come back early so
17              that they could practice; is that it?
18      A       Yeah.  I mean, football -- it's not like you go into
19              your local high school.  A lot of these kids live all
20              across the nation, so they need the weeks that a
21              local school would get where their kids can just bike
22              over to their high school and start practicing.
23      Q       So ultimately when you left, did you alert anyone
24              that you were leaving before actually leaving?
25      A       I didn't alert anybody except for a car company to
```

0562a

```
 1              come and pick me up.  I put as much of my personal

 2              belongings in the back of the limousine as I could

 3              fit.  I got to the Philadelphia airport, got a ticket

 4              with my frequent flier miles, and flew home.

 5     Q    Tell me what went into that decision.

 6     A    Again, I was approached by a teacher, made me feel

 7              uncomfortable; and I decided I was not going to put

 8              up with it that year.  And it would be easier for me

 9              to leave.

10     Q    Are you referring to the plaintiff in this case?

11     A    I am.

12     Q    You said you were approached by him that year?

13                    (Interruption by the reporter.)

14     A    I said correct.

15     Q    Tell me about that interaction.

16     A    I don't remember the specifics.  It was more a matter

17              of the way that I was approached, I didn't feel

18              comfortable.  And I decided it would be easier for

19              all parties if I just leave.

20     Q    Where were you approached?

21     A    I don't recall the exact location on the school.  I

22              just remember getting a feeling that I shouldn't be

23              there that year, and I made the necessary

24              arrangements for myself to leave, unbeknownst to my

25              own family.
```

0563a

Rufus N. Poulos

```
 1   Q   Was it that day that you left or was it a few days
 2       before?
 3   A   I believe it was the day before.  I had to arrange
 4       for a car service.  It might have been the day of.
 5   Q   What was said?
 6   A   Excuse me?
 7   Q   What was said?
 8   A   I don't remember the specifics.  I just remember
 9       being approached, being made to feel like I was being
10       targeted again.  And I figured what the hell, I paid
11       my tuition, my family didn't.  So ultimately it's my
12       money, if I didn't get it back, it's on me.  So I
13       left.  That simple.
14   Q   Approximately what time of day was this?
15   A   I believe it would have been middle of the day
16       because typically -- and I just remember this offhand
17       because I only flew one major airline for the three
18       years that I attended that school, and that was
19       Midwest Express.  And I believe they had a 3, 3:30
20       flight back from Philadelphia to Milwaukee.  So with
21       the time change I would get in, you know,
22       midafternoon.
23   Q   Is everything okay?
24   A   With what?
25   Q   No, you just turned your head like you were looking
```

Rufus N. Poulos

```
 1         at something that was catching your attention.

 2    A    Something just flew by the window.

 3    Q    Okay.  So you don't know where this occurred?

 4    A    I don't remember a specific location on campus, no.

 5    Q    And you don't recall generally what the discussion

 6         was, correct?

 7    A    No.  It was just a general tone.

 8    Q    Was there anybody else around?

 9    A    No.  I do not believe so.  Otherwise it would have

10         been brought to attention of other faculty a lot

11         earlier than it was.

12    Q    Okay.  So then you board the plane, you go home.  Did

13         you alert any of your family that you were coming in

14         prior to this or did they just get a surprise when

15         you showed up?

16    A    No.  I called my mother from the airport, said I'm at

17         home -- or I'm in Milwaukee, please come and get me.

18         And she said no, call your father, have him come and

19         get you.

20    Q    Why did she say no?

21    A    Because she was pissed that I left the school.

22    Q    Okay.  And then ultimately do you recall how you

23         ended up back there?

24    A    To be honest, my junior year was kind of a revelation

25         for me.  I spent some time in Europe going to school.
```

0565a

Rufus N. Poulos

```
 1              I went back.  I also had a huge growth spurt my
 2              junior year; so as opposed to being five-foot seven,
 3              I was now six-foot two, 185, so I was a little bit
 4              harder of a target, so I felt more confidence there.
 5              And I knew that as a senior, prior to my senior year,
 6              I would be allowed to bring my personal vehicle out
 7              to campus for personal use when it was appropriate.
 8              So not like, okay, class is over, you can get in your
 9              car and leave.  But if it's a Saturday in the past
10              and you had a car and you were a senior or six
11              former, I should say, you were allowed to take your
12              personal vehicle on your own, go grocery shopping, go
13              to the mall.  You weren't really allowed to take
14              other students with you because of the insurance
15              liability risk.  So I felt my senior year I'd have a
16              lot more freedoms.  And after visiting for my
17              cousin's graduation, which would have been May of
18              1996, I also ultimately made the decision to
19              re-enroll and go out to The Hill School and, you
20              know, try and make my family proud and get the same,
21              you know, graduation experience that three -- you
22              know, two other generations in my family had had.
23     Q    So you went to school in Europe.  Where did you go?
24     A    I attended a high school in Limoges, France, for a
25              few weeks in spring of '96, early spring, around
```

0566a

```
 1            Easter.  And then we spent a couple of weeks in
 2            Paris.
 3    Q       Going to school or as a vacation?
 4    A       More as a learning experience without the classroom.
 5    Q       Was there a teacher?
 6    A       Yeah.  We had a chaperone.  There was only eight of
 7            us from the high school that went.  Maybe nine.
 8    Q       So you were there for a couple of weeks total between
 9            the actual classroom and then Paris; is that right?
10    A       Maybe ten days, ten days to two weeks.  I can't
11            really recall.  I mean, it was Paris.
12    Q       Where --
13    A       Excuse me?
14    Q       I'm sorry.  Where did you go to school after that?
15    A       I was attending school at Marquette University High
16            School my junior year of high school.  So I
17            returned -- it was an exchange program.
18    Q       Did you have friends at Marquette High School?
19    A       I grew up with one individual in Shorewood who was
20            attending Marquette High School.
21    Q       And what was his or her name?
22    A       Steven Balistreri.
23    Q       Do you still talk with Mr. Balistreri?
24    A       No.  Last I heard, he moved to Alaska.
25    Q       During -- okay.  So you went to school at Marquette
```

0567a

Rufus N. Peoples

```
 1          for that year.  Did you have any type of employment
 2          during that time?
 3    A     Yeah.  That was my junior year.  I was working at the
 4          restaurant throughout the winter, and then early
 5          spring I went to France.  When I came back, I didn't
 6          work until I got a summer job that year.
 7    Q     And then ultimately your cousin Jason graduated, you
 8          had had your growth spurt, and that's when you
 9          decided that you would go back; is that it?
10    A     Yeah.  And I felt that with having a vehicle of my
11          own there and the certain liberties that had always
12          been extended to seniors, I would feel a lot more
13          comfortable that year.
14    Q     When you came back, what dorm were you placed in?
15    A     I think it was called Foster.  It was the first -- so
16          there's the headmaster's office, then there's the
17          Foster dormitory, and then there's another senior
18          dormitory.  And in front of the senior dorms is the
19          varsity track.  Yeah.
20    Q     Did you have a roommate?
21    A     I did not.
22    Q     Did you request one?
23    A     I actual -- well, strike that.  I had a roommate.
24          There was an opportunity for him to also have a
25          single room.  So, you know, he took the opportunity.
```

0568a

Rufus N. Poulos

```
 1         He ended up moving I think upstairs across the hall

 2         into another dorm room without a roommate.  So there

 3         was one, two, three, at least three of us on my side

 4         of the dormitory that had single dorm rooms.  So we

 5         had the room all to ourselves.  Which as an

 6         18-year-old man is kind of nice.

 7   Q     Do you recall the names of the students who were your

 8         dorm mates that year?

 9   A     Not really.  Lance Frabizio just because I ran into

10         him in D.C. a few years later when I was visiting.

11         And that's where he was from.

12   Q     Do you remember the students who had the singles?

13         You said there were three just on your side.

14   A     One of them was from Great Brittain, I believe.  I

15         don't remember his name.  I don't recall.

16   Q     Was Mr. Bluestone in your dorm that year?

17   A     I don't recall.

18   Q     Who was your dorm parent?

19   A     I believe it was Mr. Romero.  That's why I said he's

20         one of the only teachers I remember.

21   Q     What sports did you do in the fall, winter and spring

22         respectively that year?

23   A     I can't remember if it was fall.  I think it was

24         fall.  A fellow student of mine who was a close

25         friend of mine while I was there, Kent Andres, he was
```

0569a

```
 1            a local student.  He and I took weightlifting

 2            training for some reason.  Winter, I have no clue.

 3            And spring, I took an intramural which I think

 4            involved a tennis racket and a tennis ball, but it

 5            was more like baseball in the middle of the quad.  So

 6            it was, like, ridiculous.  It was just for fun.

 7      Q     And in the winter you don't remember what you did?

 8      A     I don't remember what I did in the winter, no.

 9      Q     You didn't continue with squash?

10      A     No, because I had no chance of making the varsity

11            team; and as a senior, it's varsity or nothing.

12      Q     Were you able to do any IM sport?

13      A     Yeah.  The tennis ball/tennis racket/baseball game

14            thing that we played.

15      Q     I thought you said that was in spring.

16      A     Yeah, that was in spring.  In the fall we did the

17            weightlifting.  So that would have been an intramural

18            or an elective I guess you could call it.

19      Q     Okay.  Yeah, I was just focusing on winter to see if

20            I would be able to refresh your recollection as to

21            what if anything you did for that semester.  During

22            your senior year, how would you classify your grades?

23      A     Up and down.  Senior year is a little bit different

24            for us than it is for the average student at the

25            average high school.  Once we're accepted to college,
```

0570a

```
1          as long as we stay above a D average after winter

2          break, I believe it was, for the final trimester and

3          you didn't get into any sort of trouble, you know,

4          where you got suspended, you could graduate without

5          taking final exams.  So I think for the first

6          trimester I really tried to buckle down.  Winter

7          trimester, I was already accepted into a couple of

8          schools, I believe, because I found out over

9          Christmas break where I had been accepted to school.

10         So then it's sort of just a senior slide for the rest

11         of the year.

12    Q    Where did you get accepted in the winter?

13    A    I was accepted to Penn State, one of their -- not the

14         main campus, one of their smaller, kind of like UWM

15         is to UW, satellite campuses.  But with the

16         opportunity that if you get good grades, you could go

17         to Penn State.  And University of Ithaca, I believe,

18         up in Ithaca, New York.

19    Q    During your senior year, did you have a work job at

20         all?

21    A    Like I said before, I've never had a work job while I

22         was attending that school.

23    Q    Did you have an advisor?

24    A    Yeah, but I couldn't tell you who it was.

25    Q    Who would you say would have been your closest friend
```

0571a

Rufus N. Poulos

```
 1            at the school that year?
 2    A    A kid who lived across the hall from me, but I can't
 3            remember his name.  He had long, shaggy hair.  Really
 4            nice kid.  I think he was from New Hampshire or
 5            something.  I didn't really have a lot of friends my
 6            senior year, to be honest.
 7    Q    Did you have a number of friends your sophomore year?
 8    A    Yes.  I had a lot of friends my sophomore year.
 9    Q    Who would you consider your close group of your
10            friends your sophomore year?
11    A    Jeff Glenn was probably my closest friend my
12            sophomore year.  He and I had actually attended camp
13            together when we were, like, 11.  There was two kids
14            from a small town in Maryland by where my grandmother
15            had a summer house.  So we had that in common.
16            Because it turned out they grew up right where I used
17            to spend a majority of my summers growing up.  But I
18            can't remember the two of them.  One, I think his
19            name was Will.  He played hockey.  That's what I
20            remember, because I was the equipment guy or the
21            scorekeeper when I had a broken arm freshman year.
22            But I can't remember -- his best friend's name was
23            Alec.  I remember he had a room across the hall from
24            me my freshman year in upper school, and he lived
25            with a kid from the Philippines whose parent was a
```

Rufus N. Peoples

```
1        diplomat.  So he did not come back the following

2        year.  And then -- I mean, now I'm beginning to

3        remember more of the people's names.  But I guess

4        that doesn't really matter.

5    Q   No, no, I -- so who else other than Jeff would you

6        say would be your closest friend during that fourth

7        form year?

8    A   Jeff.  I mean, we went down to Hilton Head together

9        to stay on his parents' boat for two weeks.  He,

10       unfortunately, didn't have good enough grades to ever

11       return to that school.  So I lost touch with him

12       after my sophomore year.  I mean, I stayed in

13       Milwaukee.  I really wanted nothing to do with The

14       Hill School my junior year.  So I was kind of

15       surprised he wasn't there my senior year.

16   Q   During your senior year, did you have any of those

17       weekends where your parents would come visit?

18   A   Yeah, actually, I did.  I had a parents weekend.  My

19       mom flew into town.  I was able to get access to my

20       car.  I went and picked her up in Philadelphia, drove

21       her back for, you know, the parent/teacher

22       conferences.  And then I dropped her off at the

23       Holiday Inn Express.  I had forgotten my overnight

24       bag because I was so eager to leave.  So I went back

25       to the dorm.  And next to the dormitory, there was a
```

0573a

```
 1              flight of stairs, very steep; and next to that flight
 2              of stairs there was a -- about enough room to park a
 3              single car.  To the other side of that was a big
 4              hill.  I went up to my dorm, retrieved my bag, came
 5              back downstairs, and found my car was being parked in
 6              by a blue Subaru Outback that was parked
 7              perpendicular to my vehicle, forcing me to stay on
 8              campus.  I knew whose car it was.  I went to that
 9              teacher's apartment, asked politely that they move
10              their vehicle so that I could go and spend the night
11              off campus with my mother.  I was refused, even
12              though at the time I was an 18-year-old man.  In
13              retrospect, I should have called the police that
14              night because I was detained there against my will
15              and, frankly, it made no sense that somebody would go
16              out of their way to move a car out of a parking
17              garage that has a garage door.  So it's not like they
18              parked in the parking lot, saw that I came back on
19              campus and they're like, oh, I'm just going to kind
20              of mess with him.  They physically had to go into
21              their garage, get their car, drive over, and park in
22              such a manner that I could not leave campus until the
23              following morning.  So that was fun.  That was a fun
24              weekend.
25      Q       During your sixth form year, when did you bring your
```

Rufus N. Poulos

```
 1          car to campus?

 2    A     I brought it out, my father and I drove it out, you

 3          know, a few days before classes.  There was some

 4          personal items that I wanted to bring, and I didn't

 5          feel like I would pay -- it made sense to pay a bunch

 6          of money to ship stuff when I could pack it all in my

 7          car, even though it was a Camaro, and I could just

 8          drive it out there with my father.  I thought it

 9          would be a good experience.  It was not.

10    Q     It was not a good experience driving out there with

11          your dad?

12    A     No.  Because he didn't like the car.  But it didn't

13          really matter.  It was my car.

14    Q     Did you -- strike that.  Were there any rules at the

15          school at that time as to what was considered

16          appropriate or inappropriate use of a student

17          vehicle?

18    A     Yeah, there was.  We had to have extenuating

19          circumstances, which in retrospect I would not have

20          brought my car out.  Again, I was not made aware of

21          certain rule changes that had occurred during my

22          absent year when I went to Marquette University High

23          School.  So it was no longer if you have permission

24          from your parents to use your car to go do this, this

25          and this, you can come and check out your keys.  It
```

0575a

Rufus N. Poulos

```
 1          was you can only use your car to go home.
 2    Q     And do you recall what time of that sixth form year,
 3          fall, winter, spring, where there was that incident
 4          you described where there was the blue Subaru parking
 5          you in?
 6    A     Yeah.  It was fall.  It was a couple of weeks after
 7          my 18th birthday.  Parents weekend was always in the
 8          first month and a half of the first trimester.
 9          Because the teachers wanted to let the parents know
10          what direction their students were -- their children
11          were on and what they needed to do to right the ship.
12    Q     Prior to that incident, had you ever been reprimanded
13          or receive any sort of punishment for inappropriate
14          use of your car?
15    A     No.  I was reprimanded once after.  I'll admit to
16          that.  But that was sometime in the winter trimester.
17          I went to the grocery store and bought some food.
18          Unfortunately, while I was gone, it started snowing;
19          and so it was kind of obvious when you have assigned
20          parking spots and there's tire tracks going directly
21          to my car.  I couldn't really talk my way out of that
22          one.
23    Q     At the time of this incident where you said there was
24          a blue Subaru parked behind you and you were trying
25          to leave, am I correct that, at least according to
```

Rufus N. Poulos

```
 1            the rules which you had said that you weren't aware
 2            of, you would not have been permitted to leave?
 3     A      No, I was permitted to use the car that weekend
 4            because I was going to pick up my mother from the
 5            airport.  Otherwise, she would have been forced to
 6            rent a car just to have a car still there sitting
 7            around.  So, again, being that I was 18 years old, it
 8            was my car, and my mother was flying in, I was given
 9            permission by the Dean of Discipline to use my
10            vehicle to transport my mother around the
11            Philadelphia airport -- or the Philadelphia area.  I
12            think we went to the King of Prussia mall.  And then
13            I took her back to the airport that Sunday and parked
14            my car back in the spot, turned my keys in, and that
15            was that.
16     Q      Were you supposed to pick her up from the airport?
17     A      Yes.  I was given permission by the Dean of
18            Discipline.
19     Q      Did you let him know that you were blocked in?
20     A      I let -- I mean, at that point it was Monday by the
21            time I would have even been able to let him know.  I
22            came -- okay.  So I got the car I believe that
23            Friday.  It may have been on the Saturday.  I
24            think -- no, it was Friday.  I went to the airport,
25            picked up my mother, drove back into town.  We went
```

0577a

Rufus N. Peoples

1          and had I believe her meetings with my teachers.

2          Then we went out to dinner.  I dropped her off at the

3          Holiday Inn Express.  I remember that because that's

4          where everybody's parents stayed.  And they give you

5          an option to get a cot so that as a student, we get a

6          night of freedom.  So it would have been Saturday

7          night.  But it would have been one night where I

8          don't have to be at school overnight.

9                    In my haste to go and get my mother, I

10         forgot my overnight bag.  So after dinner -- or after

11         I dropped her off, I was like, you know what, I'm

12         just going to go back to the dorm, grab my stuff.

13         I'll be back in -- I think it would have been about a

14         10- or a 15-minute drive from campus to the actual

15         hotel.  And, like I said, I ran upstairs, ran through

16         the front door of the dorm, down the hallway.  My

17         door -- my dorm room was in the very corner, the very

18         last room across the hall from the bathroom.  I ran

19         back down.  By the time I got down there, there was a

20         car parked in -- or parked behind me perpendicular.

21                    So then I went back up to that

22         individual's apartment, knocked on the door, was

23         summarily told no, I was not allowed access to my car

24         for the remainder of the night.  But I will move the

25         car so you can use it tomorrow.  Meaning he knew I

Rufus N. Poulos

```
 1        was in the right to be able to use that vehicle that
 2        night.
 3   Q    As part of the rules, were you able to use the car to
 4        drive around your mom for the weekend?
 5   A    Yes.
 6   Q    And you said parents weekend was about a month or so
 7        after school would start?
 8   A    Yeah.  Typically it was in, like, mid to late
 9        October.  So it was typically a Friday, Saturday,
10        Sunday thing.  Now, my mom having worked full time at
11        the time, she would have more than likely flown out
12        Saturday.  And that was the night of this instance.
13        Where then Sunday morning, there is a Sunday brunch,
14        like a family brunch where you bring your parents to
15        the dining hall and they make food.  We did not
16        attend that.  We just went and did our own thing.
17   Q    Did you tell your mom that you weren't able to come
18        get her?
19   A    Yeah.  I called her at the hotel, after returning my
20        stuff to my dorm room, I called the hotel, informed
21        my mother what had happened.  She said, you know
22        what, don't worry about it.  It is what it is.  I'll
23        see you in the morning.
24   Q    And did you or your mom ever talk to that
25        disciplinary dean, go, hey, you told me I could go
```

0579a

Rufus N. Poulos

```
 1          out and now I can't?
 2   A      No, because at that point there's no reason to bring
 3          it up.  What's he going to do?  Say, well -- you have
 4          to understand, half the time they just make up rules
 5          on the fly; and it's almost impossible even as an
 6          adult to be, like, well, screw you, I'm going to do
 7          my own thing.  I even at one point brought up why
 8          don't I just get my own apartment off campus being
 9          that I'm 18 years old.  I was told summarily I would
10          be kicked out of the school.  So, you know --
11   Q      Did -- I'm sorry, I interrupted you.
12   A      No.  Go ahead.
13   Q      Was the driving/car policy for students and the rules
14          applicable thereto made up on the fly, or is that
15          something that had been established in writing?
16   A      I mean, we were told in our -- you know, like I said,
17          there was some sort of orientation every year, so
18          they would bring up any sorts of rule changes.  One
19          of the rules changes was seniors, no matter if you
20          were 18 or older or -- yeah, because we had super
21          seniors, you weren't allowed to smoke on campus
22          anymore.  Prior to that, it was you could smoke on
23          campus at the age 17 and up as long as you had your
24          parents' permission or you were 18 years old.
25                 So my senior year it became no longer
```

Rufus N. Peoples

```
 1          cigarettes and coffee after dinner.  It was just

 2          coffee with teachers.  And the smoke club, there was

 3          a building down towards the end of the upper school

 4          building that had a big garage door with some lounge

 5          chairs and sofas where if you were a junior or a

 6          senior and you had permission or were 18, you could

 7          go and smoke cigarettes.  They took both of -- they

 8          took both of those away.  And then they said as far

 9          as seniors, unless you're an off-campus student and

10          you have your vehicle here, you are not allowed to

11          use your vehicle other than to go home or with

12          special permission.  So, like, if you have a doctor's

13          appointment, obviously if you have a car, rather than

14          paying for a cab, you'd go and tell the Dean of

15          Discipline I have to go here, here or here, here's a

16          letter from my parents, can I have the keys to my car

17          for that day.  He'd say yes.  So there were always

18          exceptions to be made.  It's not like I was the only

19          senior from out of state who brought a car who had to

20          get special permissions.

21     Q    And I just want to try and make sure I'm not

22          misunderstanding your testimony.  Is it your

23          testimony that prior to your mom coming in for this

24          weekend, you had gone to the dean, said I need to

25          pick her up from the airport and I want to take her
```

Rufus N. Poulos

```
 1           around town, can I do that?  And that person, whoever
 2           it was, said sure?
 3    A      Correct.
 4    Q      And who was that dean, if you can recall?
 5    A      I cannot recall, but also you have to understand I
 6           had to physically get the keys from the dean.
 7    Q      Where was his office?
 8    A      It was attached to the middle school building across
 9           the walkway from the dining hall.  But it was more
10           towards the end of the building.  So it would have
11           been the mailboxes and then you walk through, there's
12           a little shop where you can buy some school supplies
13           and stuff.  Then you'd walk out.  The college prep
14           lady, that's where her office was.  And I want to
15           say -- no, Mr. Mikaletto (phonetic), he was the
16           hockey coach.  I can't remember, but I know he had
17           something to do with hockey because he was a bigger
18           stocky guy, and I don't think he was one of the
19           football coaches.  I think he was the JV coach.
20    Q      Do you recall what classes you took that year?
21    A      Physics, French, Shakespeare, theology, I don't
22           remember what math I took that year.  Maybe that
23           was -- no, I don't remember what math I took that
24           year.
25    Q      Do you recall the names of any of those teachers?
```

0582a

Rufus N. Poulos

```
 1    A    Mr. Lahey I believe was my Shakespeare teacher.  I
 2         just remember that because it was probably the most
 3         enjoyable class that I had.  I can remember what my
 4         French teacher looks like.  She was, first off, from
 5         France and had a really short, you know, almost bowl
 6         cut.  And I remember my physics teacher's face, but I
 7         can't remember his name.  I just remember he was a
 8         really good teacher and made class a lot of fun.
 9    Q    And you mentioned theology.
10    A    Yeah.
11    Q    Who was that?
12    A    I don't remember.  I think senior year was a little
13         different in the fact that -- because I took
14         Shakespeare, but I don't think that year-long like I
15         took physics year-round and I took French year-round.
16         I think theology, Shakespeare and there was one other
17         class, and those were just trimester classes.
18    Q    You say just trimester classes, you mean they weren't
19         for the entire year; is that right?
20    A    Yeah.  You just took -- it was I think specifically
21         for seniors where you only had to take it for one
22         trimester and then you were done.  I don't remember
23         taking Shakespeare the entire year.
24    Q    Did you have any difficulty graduating?
25    A    No.  I don't -- I think --
```

0583a

Rufus N. Poulos

```
 1   Q   Did you...

 2   A   Go ahead.

 3   Q   I'm sorry.  No, go ahead.

 4   A   I almost got into a disciplinary problem right before

 5       spring break.  But the Dean of Discipline said since

 6       it happened before spring break and technically not

 7       after, that I wouldn't have to take my final exams.

 8       Just not to let it happen again.

 9   Q   And what was that disciplinary problem?

10   A   I think I was caught smoking off campus.  So, again,

11       18 years old, out walking around a town; but a

12       teacher said he saw me having a cigarette.  But I was

13       told that was a poor example of what a Hill School

14       student should represent.

15   Q   Did you have any other disciplinary issues that year?

16   A   Other than the time I took my car out without

17       permission, no.

18   Q   When was that?

19   A   Like I said, I got caught going to get groceries in

20       the winter when it snowed.

21   Q   Following your graduation -- let me ask you this.

22       Did any of your -- strike that.

23            Did any of your family members show for

24       graduation?

25   A   Everybody.
```

0584a

```
 1    Q    Mom and dad?

 2    A    Even my father and my stepmother.  My brothers, my

 3         cousins, my aunt, my grandma.  My grandpa was so

 4         excited.

 5    Q    What did you do that summer?

 6    A    I worked for -- I worked basically as a maintenance

 7         guy for the office building where my dad's company

 8         was located.  So I helped doing -- they were

 9         renovating the third floor.  So I helped doing the

10         teardown of the entire third floor of the building

11         for a summer.

12    Q    All right.  This might be a good time to take another

13         five-minute break if that's okay with you, Kurtis, or

14         would you like a little bit longer?

15    A    No.  That's fine.  I'm just curious as to how much

16         longer just this in general is going to go.

17    Q    I'm not sure yet.  But we're -- you know, I'm going

18         to show you a couple documents and then my colleague,

19         Ms. Dougherty, may have some questions too.  So let's

20         just do our five-minute break and we can look at our

21         notes, and that makes it go quicker.

22    A    Okay.

23              VIDEOGRAPHER:  We are now going off

24         record.  The time is 12:32.

25              (Recess taken from 12:32 to 12:39 p.m.)
```

Rufus N. Poulos

```
 1                    VIDEOGRAPHER:  We are now back on the

 2          record.  The time is 12:39.  You may continue.

 3                    MR. JUBB:  Thank you.

 4     Q    Mr. Poulos, have you ever been convicted of a crime?

 5     A    Yes.

 6     Q    Which crimes?

 7     A    I couldn't tell you exactly offhand.  I'm sure you

 8          have records.

 9     Q    Can you tell me what crimes you can recall being

10          convicted of?

11     A    Disorderly conduct.

12     Q    Anything else?

13     A    I believe I broke a restraining order.

14     Q    Anything else?

15     A    Not that I can recall.

16     Q    Have you ever been charged with any felonies that you

17          were not convicted of?

18     A    Not that I can recall.

19     Q    When was the disorderly conduct?

20     A    There was one in Connecticut and there was one here

21          in Milwaukee.  So 2018 and 2016.

22     Q    Have you ever served jail time for those?

23     A    Just overnighters, like waiting to be processed.

24     Q    With respect to the restraining order, when was the

25          restraining order actually in place?
```

Rufus N. Peoples

```
 1   A    I don't know.  2005.

 2   Q    When was it broken?

 3   A    Possibly somewhere around the time that it was taken

 4        out.  The problem was the location of my ex's

 5        apartment and mine at the time, I lived on a one-way

 6        street.  I had no choice but to drive past the street

 7        that she lived on to access the rest of the city.

 8        Where my parking garage exited, I had to head north

 9        in order to get to the next main street.

10        Unfortunately, I had to pass her block before I could

11        get to the next main street, and you could hear my

12        car a mile away.  So it's not like I drove by her

13        house.  I literally just was driving I think to a bar

14        to meet up with some friends.  And next thing I know,

15        I've got cops showing up at the apartment later that

16        night saying I broke my restraining order because she

17        heard my car drive by her apartment.

18   Q    Was that the extent of that?

19   A    Yeah.

20   Q    Had you ever received any sort of psychiatric

21        treatment when you were -- prior to 1997?

22   A    I think I went to see a therapist when I was, like,

23        eight or nine about whose house I wanted to live at,

24        my mom's or my dad's.  That was it.  And that wasn't

25        really therapy.  It was more I think an advocate for
```

```
 1          the court.  But it was a therapist.

 2   Q     Did you ever receive any psychological treatment from

 3          the time that you had graduated from The Hill School

 4          through 2007 being ten years later?

 5   A     No.

 6   Q     Have you ever received any --

 7   A     No.

 8   Q     I'm sorry.  Go ahead.

 9   A     I said no.

10   Q     Okay.  Have you ever received any sort of

11          psychological treatment between 2007 and 2017, which

12          would have been the next ten-year period?

13   A     I got treated when I was out in Connecticut.

14   Q     What was that related to?

15   A     I'd rather not say.

16   Q     Was this something that was mandatory?

17   A     Yes.

18   Q     As part of some sort of court order?

19   A     Not a court order, no.

20   Q     How was it mandatory?

21   A     Because I ended up in the hospital and they made me

22          stay for an evaluation.  And then they released me.

23   Q     Okay.  When did you end up in the hospital?

24   A     In 2016.

25   Q     What was that for?
```

0588a

Rufus N. Peoples

```
 1    A    I'd rather not say.

 2    Q    Unfortunately, that -- are you objecting to answering

 3         that question?

 4    A    I do object to answering that.  I don't see how

 5         something -- I don't -- well, it didn't have anything

 6         other to do than the situation that occurred there.

 7    Q    Was that in any way related to a crime?

 8    A    No.

 9    Q    It was related to you finding yourself in the

10         hospital where you were treated psychologically,

11         correct?

12    A    I had to get stitches, so they held me.

13    Q    Why did you need stitches in 2016?

14    A    They thought I was self-harming.

15    Q    Were you self-harming?

16    A    No.  That's why they released me.

17    Q    With respect to the disorderly conduct in Connecticut

18         in 2018, what were the facts surrounding that?

19    A    A drunken argument with my ex-girlfriend.

20    Q    Did you have to perform any jail time related to

21         that?  Was that the overnight situation?

22    A    Yeah.  And then I paid a fine and went home.

23    Q    What town was that in?

24    A    Orange, Connecticut.

25    Q    And in 2016 in Milwaukee, what was that related to?
```

0589a

Rufus N. Poulos

```
 1   A   I wasn't in Milwaukee in 2016.

 2   Q   I'm sorry.  I must have written it down wrong.  I

 3       thought you said that you had a disorderly in 2016

 4       and that was in Milwaukee.  Where was the disorderly

 5       in 2016?

 6   A   That was in Connecticut.  The one in Milwaukee was in

 7       2018.

 8   Q   I'm sorry.  I flipped them.  So the one in 2018 was

 9       in Milwaukee, and the one that you just described

10       pertaining to a drunken argument with your

11       ex-girlfriend was in Orange, Connecticut, in 2016.

12       So what is the incident in Milwaukee in 2018?

13   A   Same exact incident.  Argument with the girlfriend,

14       the cops get called.

15   Q   Was this the same girlfriend?

16   A   Unfortunately, yes.

17   Q   And I imagine when you say unfortunately, you two are

18       no longer together; is that fair?

19   A   Thankfully, yes.

20   Q   And was she charged with anything?

21   A   I don't know if she would have been.  It doesn't

22       matter because she left the state.

23   Q   What's her name?

24   A   Emily Peters.

25   Q   Have you had any girlfriends since Emily?
```

```
 1    A    I've dated a few women off and on since then.

 2         Nothing serious.  I'm focused on trying to stay sober

 3         and focus on work.

 4    Q    Do you ever attend any meetings related to sobriety?

 5    A    I was, yes.  Up until COVID started.

 6    Q    Can you tell me why you sought psychiatric treatment

 7         in May of 2018?

 8    A    May of 2018, I started getting treatment so that I

 9         could live a more productive life while coping with

10         what I went through in high school.

11    Q    How did you select that doctor?

12    A    Because it...  Because he's one of the best in the

13         city.

14    Q    Do you still see him?

15    A    Unfortunately, no.  He's a very busy doctor and he's

16         also $300 an hour.

17    Q    Is there any other physician that -- strike that.  Is

18         there any other mental health individual from whom

19         you sought medical treatment?

20    A    Nope.

21    Q    Was that Dr. Grade?

22    A    Grade.

23    Q    Grade?

24    A    Yes.

25    Q    G-R-A-D-E, correct?
```

0591a

```
1    A    Correct.

2    Q    At any point in time, did you relay the information

3         that you had relayed to Dr. Grade to any of your

4         girlfriends?

5    A    No.  Not with specifics.

6    Q    What do you mean by not with specifics?

7    A    Not with specific names.  I just told them that

8         there's an event that happened at my school.

9         Obviously when I received the letters from the high

10        school, I was dating somebody.  So she was kind of

11        furious as to why I was receiving letters like that.

12   Q    What did you tell her?  And was this Emily at the

13        time?

14   A    Correct.

15   Q    What did you tell Emily?

16   A    I told her what happened to me at the school.  But I

17        never used a name.

18   Q    How did it come about that Emily saw the email that

19        you received?

20             MS. DOUGHERTY:  Objection.

21   A    I was reading them on my compute -- okay.  Yeah.

22        Objection.

23             MR. JUBB:  Candi, did you object?

24             MS. DOUGHERTY:  I did.

25             MR. JUBB:  Okay.  You're just objecting to
```

0592a

```
 1          the form?
 2                    MS. DOUGHERTY:  Yeah, I think -- I don't
 3          know that he identified the communication from the
 4          school as an email.  I think he said letter.  But --
 5                    MR. JUBB:  I'll just clarify that.
 6     Q    Mr. -- strike that.  Mr. Poulos, what communication
 7          are you referring to that you had discussed with
 8          Emily?
 9     A    The two emails that contained letters from the school
10          were printed out in my office in the apartment we
11          shared.
12     Q    So you printed them out at that time?
13     A    Yeah.  I keep hard copies of important documents.
14     Q    Am I correct that you have not produced any documents
15          to me in response to any of the discovery requests?
16     A    I'm not sure as to what you're asking, referring to,
17          which specific documents you want.
18     Q    So I had issued requests for production of documents
19          to you.  Am I correct that you have not supplied me
20          with any documents?
21     A    But I'm asking what these documents would be
22          referring to.  Because you've sent me so many
23          requests for things, there have been some that I've
24          said no to, there have been some I've said yes to.
25          Plus most of these documents you can receive from the
```

Rufus N. Poulos

```
 1         school.
 2    Q    Just listen to my question.  So let's say there's one
 3         request, let's say there's 20, let's say there's a
 4         hundred.  Am I correct that you have not produced me
 5         with any documents in response to those?
 6    A    To my knowledge, no, I have not produced you any
 7         documents.
 8    Q    Have you ever had to attend any sort of anger
 9         management program?
10    A    Yes.
11    Q    When was that?
12    A    That was when I was living in Connecticut.
13    Q    Was that related to Emily?
14    A    No.  It was recommended to me and I took it.  And
15         after, I don't know, five classes, the teacher said
16         it doesn't seem like you need to be here other than
17         you need to stop drinking so that you stop having
18         outbursts.
19    Q    How often were you drinking in the 2016 time frame?
20    A    Not very much.  I had quit drinking after I got out
21         of the hospital up until basically when I met Emily.
22         Unfortunately, I slipped.
23    Q    Prior to that, did you ever consider yourself to have
24         any sort of issue with alcohol?
25    A    I mean, yeah, I drank myself into a coma trying to
```

0594a

Rufus N. Poulos

```
1          deal with the trauma of what happened at that school.
2    Q    When did you drink yourself into a coma?
3    A    Back in 2015, 2014, right when everything started to
4          come to light, I started self-medicating.
5    Q    Had you ever dranken yourself into a coma prior to
6          2014, 2015?
7    A    No.  I mean, I drank excessively, but not to the
8          point where I was putting down a handle of vodka in
9          two days, to the point where I had to be hospitalized
10         and I almost died.
11   Q    Other than you driving around your ex-girlfriend's
12         house on the way to anywhere, really, because of the
13         proximity to where you lived, was there anything else
14         about that that was related to that conviction?
15              MS. DOUGHERTY:  Objection.
16   BY MR. JUBB:
17   Q    So she's just objecting to the form.  Do you have a
18         position?
19   A    Yeah.  I object.
20   Q    Okay.  Can you tell me the basis of your objection?
21   A    I don't see how that's relevant.
22              MS. DOUGHERTY:  Are you asking me?
23              MR. JUBB:  No, no, not you.  I'm asking
24         him.
25              MS. DOUGHERTY:  Because my objection was
```

0595a

```
 1            to form.
 2                      MR. JUBB:  Of course.
 3    Q    All right.  So, Mr. Poulos, did you get a chance to
 4         look at any of your records from Hill School?
 5    A    No.  I have no, no desire to look at anything
 6         regarding that school.  They don't pertain to my life
 7         as of right now, what my records were when I was in
 8         high school.
 9    Q    I'm going to show you a couple of documents from my
10         screen.  And for the record, I'm going to be pulling
11         up here P16.164 through P16.165.
12                      MS. DOUGHERTY:  Can you say that again,
13         P16, what was that?
14                      MR. JUBB:  P16.164 through P16.165.
15    Q    Mr. Poulos, can you see that screen?  Can you see my
16         screen now, Mr. Poulos?
17    A    Now I can.
18    Q    William Proxmire, is that your step-grandfather?
19    A    It is.
20    Q    This appears to be a letter that he wrote to the then
21         headmaster in 1993, referring to him as Chuck.  And
22         he spelled your name with a C.  Have you ever spelled
23         your name with a C?
24    A    No.  In fact, he's not the only one of my
25         grandparents who every once in a while would spell my
```

0596a

```
 1          name in the English rather than in the German form.
 2    Q    In this letter that he wrote to Headmaster Watson, he
 3          said, "I said little about him at the time because,
 4          frankly, I knew little."  Can you see that?
 5    A    Yeah, I can see that.  And, like I said, I did not
 6          have very much contact with my grandfather when I was
 7          growing up.
 8    Q    Is that your grandfather's signature?
 9    A    I believe so.
10    Q    And have you ever seen these before?
11    A    I've never seen any of those before.
12    Q    Do you see this?  It's an advisor report.  The Bates
13          number is P16.118.
14    A    You just scrolled all the way to the bottom.
15    Q    I know.  I'm just trying to make sure that everybody
16          is able to take down the exhibits for us here because
17          I've got to send these to the court reporter later.
18          So it says the student is you.  The advisor is
19          Mr. Lodish, and it's dated November 1993.  Was your
20          advisor during your third form year Mr. Lodish?
21    A    Actually, I think that was my hall master, so he
22          would have probably also been my advisor.
23    Q    Is that just how it worked, your advisor is always
24          your hall master, or is that a coincidence?
25    A    No, I think as a -- I think your first year at the
```

0597a

Kurtis N. Poulos

```
 1           school, they assign you to the person that you're
 2           going to be living nearest.
 3    Q      You believe that Mr. Lodish was that individual who
 4           was your hall master who you described as in his
 5           apartment on the phone a lot --
 6    A      Correct.
 7    Q      -- is that correct?  In looking at this, which is
 8           dated November 30th, 1993, he says, "The situation
 9           with his roommate seems to be getting much better and
10           the two of them seem to be getting along.  He spends
11           a great deal of his free time on his computer which
12           tends to keep him isolated from the other boys on the
13           hall."  Do you know what he's referring to when he
14           says the situation with your roommate?
15    A      Yeah.  He was stealing from me and from other
16           students on that floor.  That's why he was not
17           recommended to come back.
18    Q      Okay.  And do you recall spending a great deal of
19           free time on your computer?
20    A      Yeah.  I was learning how to write code as an
21           extracurricular -- now it's something that they teach
22           at that school, and most high schools and
23           universities do as well.  I grew up in a home where
24           we had computers at a young age.  So I was continuing
25           my own education on how to use computers and I was
```

0598a

Kurtis N. Poulos

```
 1              using -- I had a computer that most students had the
 2              ability to use my computer to, say, look up the
 3              Encyclopedia Britannica without leaving my room and
 4              going to the library.  So why if my father had
 5              spent -- or technically my trust had spent nearly
 6              $8,000 on something so far advanced would I not use
 7              it to the fullest capabilities?  Otherwise, it's just
 8              a giant paperweight.  It's not like we had internet,
 9              you know.  It was strictly that I could use it to
10              learn programming and I could use it to advance my
11              studies on my own without having to leave.  I wasn't
12              playing games.  I mean, they didn't really even have
13              games that you could play.  I think I had a golf
14              game.
15      Q       Did you ever feel that your time with the computer
16              was ever isolating you from other classmates of
17              yours?
18      A       In fact, the complete opposite.  There was a kid that
19              lived across the hall from me who was just as
20              proficient.  He didn't have as nice of a computer.
21              But he would come and spend time.  There was another
22              gentleman or another kid that lived down the hall
23              from me.  He had his own computer.  You know, like I
24              said, back in 1993, it was rare, let alone to have a
25              machine as capable as what I had.  I had basically
```

0599a

Kurtis N. Poulos

```
1              the nicest computer that you could buy at that time.
2              So it was kind of a way to also bring them into my
3              room and hang out and be, like, look what this can
4              do, you know, look how this works.  I showed -- I
5              made a program for a kid so that he could play, like,
6              a tank-busting video came in his dorm room.
7         Q    Do you still do coding?
8         A    No.
9         Q    What did you major in college?
10        A    Business administration.
11        Q    Did you ever take any computer courses or coding
12             courses in college?
13        A    Nope.
14        Q    This is a demerit report from you dated June 1994 of
15             the school.  Down on the left-hand side there's a
16             list of dates.  I'm trying to understand this.  And
17             so what I see is F-W-S.  I assume that's fall,
18             winter, spring, and then the dates correspond along
19             the left-hand side.
20        A    Oh, by work job --
21                  MS. DOUGHERTY:  Object.
22        A    -- you meant did we have to go --
23                  MS. DOUGHERTY:  Can you identify the -- I
24             just want to know the Bates label.
25                  MR. JUBB:  Absolutely, Candi.  I
```

0600a

```
 1           apologize.  This is P16.73.
 2                   MS. DOUGHERTY:  Thank you.  I'm sorry.  I
 3           was raising my hand to try to get your attention.  I
 4           didn't want to interrupt you.
 5                   MR. JUBB:  No, I can't see you on the
 6           screen.  You know what I mean?
 7                   MS. DOUGHERTY:  Yeah.
 8                   MR. JUBB:  I apologize.  For whatever
 9           reason, the box is showing the videographer and
10           court reporter.  I can't put both of you next to
11           each other.
12                   MS. DOUGHERTY:  That's fine.
13                   MR. JUBB:  Yes.
14     Q    So, Mr. Poulos, yeah, so absent athletics, that would
15           have been that requirement that you were supposed to
16           do, correct?
17     A    Correct.
18     Q    And it shows on here warning - absent work job.  What
19           does that mean?
20     A    The only thing I can think of for work job, and I
21           could be wrong in this, but I believe as incoming --
22           or as third formers, we did have to every once in a
23           while go into the kitchen and, like, prep the cereal
24           station, I think.  I don't really consider that a job
25           because it's not like -- I'm thinking job as in it
```

Kurtis N. Poulos

```
 1           helps pay for my tuition which my tuition was paid in
 2           full.  So that's where that misunderstanding is, you
 3           know.  As far as absent breakfast, yeah, I slept in.
 4    Q      Was breakfast required?
 5    A      For underclassmen, yes.
 6    Q      I'll take that down.  And, Candi, this is P16.72.
 7           And this is the demerit list for the '94-95 school
 8           year.  And on this demerit list, it says absent
 9           special work crew, restriction one day.  Absent work
10           job, absent work job.  Again, you have no
11           recollection of what your work job was at this time?
12    A      Again, it probably would have been prepping for the
13           following day's meals.  So if I was absent a dinner
14           on 2/22 -- or 2/23 or something like that, I would
15           have missed my work job as well.  Because we did --
16           so when the meal is over, all the underclassmen are
17           supposed to stay and set up the tables for the
18           following meal.  So when you come in for breakfast,
19           the people who had dinner at that table the night
20           before would have set the places, you know, set out
21           the plates, the glasses, the silverware, the pitchers
22           for the water.  So it's possible, like, if I miss a
23           meal, I'm going to miss, you know, miss having done
24           my portion of my work job or whatever that...
25    Q      Am I correct that dinner was after sports?
```

0602a

Kurtis N. Foulos

```
 1    A    Yeah.  You had time to go and take a shower and then
 2         rush over.  But if you have a lot of homework and
 3         you're going to a school as competitive as that, am I
 4         going to go and sit at a dinner that I'm not going to
 5         eat or am I going to sit in my dorm room and do my
 6         homework?  I think one outweighs the other.
 7    Q    And you're saying during this time frame, that was
 8         what you believe was the basis for you missing
 9         dinners and the --
10    A    Correct.
11    Q    -- the responsibilities associated therewith was that
12         you were studying?
13    A    Yeah.
14    Q    This is the demerit list for the '97 school year when
15         you were a sixth former.  It looks like on here --
16         what was this about, unauthorized absence from
17         campus/dorm, detention one week?
18              MS. DOUGHERTY:  What's the Bates label?
19              MR. JUBB:  This is P16.33.
20              MS. DOUGHERTY:  Thank you.
21    A    I don't know.  I probably walked off campus and
22         bought a pack of cigarettes and got caught walking
23         back onto campus.
24    BY MR. JUBB:
25    Q    Is that something that you recall happening or was
```

0603a

Kurtis N. Foulos

```
 1          that a guess?

 2    A     That's a guess.  That's the only thing I can figure.

 3          That's the only time I left campus was to drive or

 4          walk over to Mama's which was right by the senior

 5          dorm, and she'd let us buy cigarettes even though she

 6          knew we weren't 18.

 7    Q     And it looks like this happened on October 3rd of the

 8          fall --

 9    A     Yeah, a week before my birthday.

10    Q     Did you ever have occasion to drive to get

11          cigarettes?

12    A     No.  To Mama's I would just walk.  It was literally a

13          block, a block and a half away from our school.

14    Q     And did you ever have occasion to take your car other

15          places to get cigarettes?

16    A     Just the one time where I went to get groceries

17          without permission.

18    Q     And it looks like here, February 23rd, another

19          unauthorized absence from campus/dorm, detention one

20          week.  Do you know what that one was about?

21    A     Oh, yeah.  After -- let's see, when was the Super

22          Bowl in 1997, the one that the Packers won?  After

23          that, I started leaving campus every weekend and

24          flying home almost.

25    Q     Absent evening study hall.  Is this a study hall that
```

Kurtis N. Poulos

```
 1          was required for all students or just for you?

 2    A     I couldn't tell you because typically for seniors, we

 3          do not have a mandatory study hall.  But, again, I

 4          believe I was below the threshold of demerits; so...

 5    Q     Do you know what absent athletics, which one is this

 6          referring to?  I guess this would have been the

 7          winter of your senior year.  So that would have been

 8          the -- we don't have a sport, what that was I don't

 9          think.

10    A     I have no idea what half of these are.  Except that I

11          can tell you that after the -- you know, the

12          following weeks after the Packers won the Super Bowl,

13          I tended to fly home fairly often.

14    Q     Do you know what the 1/20/97 personal conduct is,

15          what that's related to?

16    A     I think that's when I took my car without permission

17          and got caught when it was snowing.  I couldn't tell

18          you.  Some of these I know are because I flew home.

19          Again, I was 18 years old, I was pressing my luck.  I

20          never pressed it so far as to get into any major, you

21          know, trouble where I had -- you know, a week's

22          detention means you basically go to your dorm and sit

23          in your room during your off periods.  That's --

24          okay, I can deal with that.

25    Q     If you went home on the weekends after the Super
```

0605a

Kurtis N. Foulos

```
 1          Bowl, was dinner --

 2     A    They pretty --

 3     Q    -- required on Saturday?

 4                 (Interruption by the reporter.)

 5     Q    I asked if there was dinner on Saturdays.  I don't

 6          know if this is a Saturday, but my question is you

 7          said you went home on the weekends.  So I assume, you

 8          know, that is a Saturday, or I assume that any

 9          weekend is a Saturday.  So that's why I asked

10          because --

11     A    No, because --

12                 MS. DOUGHERTY:  Objection.

13     A    -- we weren't required to go to dinner.  That's why

14          I'm confused.  We weren't required to go to

15          breakfast -- oh, we were required to show up for

16          dinner.  We weren't required to stay and eat whatever

17          it was they were serving.  So I would typically on

18          those nights, if I didn't feel like putting on a

19          sport coat, a tie, dress slacks, dressing up, walking

20          over to the dining hall and sitting down for a meal I

21          had no intention on eating, I would just stay in my

22          dorm, either order a pizza or wait until the grill

23          opened and walk over there and get a burger.  I

24          basically stopped eating almost every meal my senior

25          year at that school.  That's why I started going to
```

0606a

Kurtis N. Poulos

```
 1            buy my own groceries.

 2    BY MR. JUBB:

 3    Q    And what was the reason --

 4    A    Because the idea -- yeah, the idea of sitting around

 5         500 people and listening to them scrape forks off

 6         their teeth became utterly disgusting to me.  Just so

 7         you guys know, my laptop battery is at 31 percent and

 8         I do have to go at some point and walk my dog.

 9    Q    How far away is your apartment?

10    A    30 minutes.  And I'd like to eat lunch.

11    Q    If you need a lunch break, that's a different story.

12         If we broke for an hour, it's just going to, you

13         know, drag it on a little bit.  But if you need a

14         break, I get it.  Is there anyone that can walk your

15         dog for you?

16    A    No.  I'm the only one who has a key to my apartment,

17         and the only one that Clifford will let in the

18         apartment without me there.

19    Q    And when did you leave him?

20    A    I left him at, like, 8:30 this morning.

21    Q    Okay.  Then why don't we just get through one more

22         thing and then we can break so that you can go home

23         and let your dog out.  And then we can plan to come

24         back thereafter and then I guess just take a break.

25         And, Candi, are you okay with that?
```

Kurtis N. Poulos

```
 1              MS. DOUGHERTY:  That's fine.  I just had a
 2       question for Mr. Poulos.  Do you have your charger
 3       for your -- whatever you --
 4              THE WITNESS:  It's at home.  It's at home.
 5       So I can shut down my laptop.  I can let my phone
 6       cool down because I'm getting temperature warnings
 7       on my phone.
 8              MR. JUBB:  Okay.  Then why don't we do
 9       this.  Candi, if it's okay with you, why don't we
10       break now so that the witness can go home, let his
11       dog out, grab his computer charger.  And then,
12       Mr. Poulos, I would just say that you're still under
13       oath and you're not permitted to discuss your
14       deposition with anyone.  Okay?
15              THE WITNESS:  That's fine.
16              MS. DOUGHERTY:  And how long are we
17       breaking for?
18              MR. JUBB:  I would like to -- he said it's
19       a half hour a way.  So I think, unfortunately, an
20       hour.  Mr. Poulos, can you get here within an hour
21       and ten minutes?
22              THE WITNESS:  I can get back here by 2 my
23       time.
24              MS. DOUGHERTY:  Okay.  And he wants to
25       eat.  Right?
```

0608a

Kurtis N. Poulos

```
 1                    THE WITNESS:  Well, I mean, I can --

 2                    MS. DOUGHERTY:  Can you eat at the same

 3         time?

 4                    THE WITNESS:  Yeah, I can put something to

 5         the side and take, like, small bites.

 6                    MR. JUBB:  Okay.  Then if that's okay with

 7         Jeff as well as our lovely court reporter as well as

 8         Ms. Dougherty, then why don't we break now.  And,

 9         Mr. Poulos, if you could get back as quickly as

10         possibly and just re-click that link and sign back

11         in to let us know you're available, then we could

12         start working through it.  Okay?

13                    THE WITNESS:  All right.  I appreciate it.

14         I'll take to you guys in about 45 minutes.

15                    VIDEOGRAPHER:  So we are now going off

16         record.  The time is 1:17.

17                    (Recess taken from 1:17 to 2:10 p.m.)

18                    VIDEOGRAPHER:  We are now back on the

19         record.  The time is 2:10.  You may continue.

20    BY MR. JUBB:

21    Q    Thank you.  Mr. Poulos, during the break, it's my

22         understanding that you had gone home to where you

23         currently reside.  Is that correct?

24    A    That's correct.

25    Q    And where you're currently located, is there anybody
```

0609a

Kurtis N. Poulos

```
 1         else with you there?
 2    A    Just Clifford, my dog.
 3    Q    What type of dog?
 4    A    Yeah.
 5    Q    What type of dog?
 6    A    He's half pit, half retriever, or lab.
 7    Q    Okay.  So I believe when we left off, we were
 8         discussing the few things pertaining to the latest
 9         exhibit, which I believe was your sixth -- was it
10         your sixth form demerits?  Does that sound about
11         right?
12    A    Sounds about right.
13    Q    I'm going to show you a couple of things to see if
14         they refresh your recollection.  Can you see that?
15    A    Yeah.  That's Jason Eiserman.
16              MS. DOUGHERTY:  Does this have a Bates
17         label?
18              MR. JUBB:  No.  No.  These are just --
19         let's just call this P100, I guess.
20    Q    Is Mr. Eiserman the gentleman who you just testified
21         to lived across the hall from you your sophomore
22         year?
23    A    Correct.
24    Q    And that's going to be P100.1.  Do you recognize this
25         person?
```

0610a

Kurtis N. Poulos

```
1    A    No.

2    Q    It's going to be P100.2.  Do you recognize this

3         person?

4    A    I recognize the face.  I couldn't tell you his name.

5         I didn't hang out with him.

6    Q    It's P100.3.  What about this person?

7    A    Yeah.  That's Kent Andres.

8    Q    We discussed previously --

9    A    I see --

10              (Interruption by the reporter.)

11   A    I follow him on LinkedIn.

12              MS. DOUGHERTY:  And him -- can you just

13        repeat his name.

14   A    Kent Andres.

15              MS. DOUGHERTY:  Thank you.

16   BY MR. JUBB:

17   Q    K-E-N-T is what you're saying, right, Mr. Poulos?

18   A    Correct.

19   Q    And you said you actually reached out to him

20        occasionally?

21   A    No, I've never reached out to him.  I just saw him on

22        LinkedIn.

23   Q    That's going to be P100.4.  Do you recognize this

24        person?

25   A    No.  I recognize -- I mean, there was 94 of us.  So,
```

Kurtis N. Poulos

```
 1         I mean, the face is recognizable, but I couldn't tell
 2         you his name.
 3    Q    That's P100.5.  The next is P100.6.  Do you recognize
 4         him?
 5    A    Yeah.  It's Lance Whitlock.
 6    Q    Who is Lance again?
 7    A    Lance actually was one of the kids who had a single
 8         on the same floor as I did.
 9    Q    For your senior year?
10    A    Yeah.
11    Q    P100.7, who is that?
12    A    I recognize the face.  I couldn't tell you his name.
13    Q    P100.8, do you know who this is?
14    A    No clue.
15    Q    What about him?
16    A    Recognize the face, but I couldn't tell you his name.
17         I mean, these all are senior portraits.  So everybody
18         looks somewhat familiar.
19    Q    In any of the photos that I just showed you, P100.1
20         through 100.9, the names that came up were Jason
21         Eiserman as 100.2, Kent Andres as 100.3 and Lance
22         Whitlock as 100.6, do any of these photos refresh
23         your recollection as to whether or not any of these
24         students were in your geometry class during your
25         sophomore --
```

0612a

Kurtis N. Poulos

```
1    A    I think that last --

2              MS. DOUGHERTY:  Hold -- object.  I was

3         going to object.  He wasn't done with his question,

4         though.

5    A    Yeah, finish your question.

6              MS. DOUGHERTY:  Because -- Lane, just so

7         you know my object -- I think you may have misspoken

8         that Kent Andres was a different number than what

9         you said in your question.  That was going to be my

10        objection.  So if you're going to ask the question

11        again, I just wanted to point it out to you.

12             MR. JUBB:  Okay.  I have Kent Andres as

13        100.4.  What do you have?

14             MS. DOUGHERTY:  That's what I have, but I

15        think you said 3 in your question.

16             MR. JUBB:  Thank you.  I'll correct that.

17   Q    Mr. Poulos, with respect to any of these photos that

18        I've shown you which I've marked as P100 where you

19        recognize P100.1 as Jason Eiserman, 100.4 as Kent

20        Andres, and 100.6 as Lance Whitlock, where the others

21        you could not identify by name, do any of them appear

22        to have been in your fourth form year geometry class?

23   A    No --

24   Q    I would be happy to keep scrolling through.

25   A    No.  I'm horrible with faces and names.  I stated
```

0613a

Kurtis N. Foulos

```
 1          that earlier.  I remember them because Kent was a
 2          local student, he was a star soccer player, and he
 3          and I worked out together, and his mom had me over
 4          for dinner.  I mean, it's all situational that I
 5          recognize these people.  It's not because of that
 6          class.  It's because of my proximity to them and the
 7          rest of school.
 8    Q     Had you had -- strike that.  Am I correct, though,
 9          that these were all students in your grade?
10    A     For the most part, I believe they all were.  Then
11          again, some of those -- see, the hard thing is, Lane,
12          for you to ask me a question like that because I
13          don't recognize their name, I sort of recognize their
14          face.  And they're all wearing our senior blazer and
15          our school tie.  So those pictures could have been
16          from 1990 or 1994 and I would have known them when I
17          was a freshman and they were a senior.  It's hard to
18          differentiate just given the fact that they're all
19          just senior pictures.  I mean, that's the only
20          problem I have with that lineup.
21    Q     I'm just trying to understand something.  All of
22          these photos are -- I think what you're saying is
23          they have -- everybody is kind of wearing the same
24          coat and tie; is that fair?
25    A     Oh, no, not kind of.  They're wearing our senior
```

0614a

Kurtis N. Poulos

```
 1        blazer which would have the school crest in it and a
 2        blue and silver striped tie.
 3    Q   Right.  But are you saying that you have a hard time
 4        differentiating their faces or recognizing them?
 5    A   Like, he looks like somebody -- go back one.  He
 6        looks like somebody that I thought graduated with my
 7        cousin.  But, again, I can't tell because I don't
 8        remember all of them.
 9    Q   And that's fine.  I'm just trying to understand what
10        you can recall.  So just -- we've already gone
11        through and you've identified certain folks.  I'm
12        just going to focus on the three that you could
13        recognize.  So with respect to Mr. Eiserman, did you
14        have any --
15              MS. DOUGHERTY:  Lane, before you go on,
16        just to identify for the record, when Mr. Poulos
17        said go back one, he was directing you to P100.2.
18              MR. JUBB:  That's correct.
19    Q   And, Mr. Poulos, just confirm for us, you were
20        referring to P100.2, correct?
21              MS. DOUGHERTY:  We can't hear you.
22    BY MR. JUBB:
23    Q   We can't hear you, Mr. Poulos.  Can you try talking
24        again for us, Kurtis.
25    A   I said I thought he graduated a year ahead of me, but
```

```
 1            I could be mistaken.

 2    Q    Okay.  And with respect -- and, again, Ms. Dougherty,

 3         that was 100.2 he was referring to in that regard.

 4         So focusing on those that you did recognize, 100.1

 5         being Mr. Eiserman --

 6    A    Eiserman.

 7    Q    Eiserman, did you have any friendly relationship with

 8         Mr. Eiserman during school?  Your audio is out again.

 9         Can anybody hear me?

10              MS. DOUGHERTY:  I can hear you.  I can't

11         hear him.  I'm just trying to get his attention.

12    A    -- as a hall --

13    Q    Hold on, Mr. Poulos.  You've been talking and none of

14         us can hear you.  So you're going to have to get

15         closer to the microphone.

16    A    Do you want me to use the microphone on my phone or

17         on --

18    Q    I'll tell you what.  Just bring the laptop closer to

19         you, it might pick up what you're saying.  Or you're

20         welcome to call in and we can go off the record.

21         It's up to you.

22    A    I'm just going to dial in.

23              MR. JUBB:  Okay.  We can go off the

24         record.

25              VIDEOGRAPHER:  We are now going off
```

0616a

```
1           record.  The time is 2:21.

2                   (Discussion off the record.)

3                   VIDEOGRAPHER:  We're back on record.  The

4           time is 2:23.  You may continue.

5                   MR. JUBB:  Thank you.

6    Q    Mr. Poulos, I'm going to show you Mr. Eiserman's

7           photo again just to try and refresh your recollection

8           here for the purpose of my next question.  Were you

9           friendly or in any way consider yourself friends with

10          Jason Eiserman during your sophomore year?

11   A    Jeremy Eiserman, and no, other than that he lived

12          across the hall from me.

13   Q    Have you had any discussion with Mr. Eiserman after

14          you graduated?

15   A    I haven't spoken to anyone from school since then.

16   Q    With respect to P100.4 who you identified as Kent

17          Andres, have you had any discussion with Mr. Andres

18          since you graduated from school?

19   A    Absolutely none.

20   Q    Did you consider yourself to be friends with

21          Mr. Andres at any time during your time at The Hill

22          School?

23   A    Yes, I did.

24   Q    Did you ever live with him?

25   A    No.
```

```
 1   Q   Did you -- strike that.  Now, this is P100.6 who you
 2       identified as Lance Whitlock.  Did you consider
 3       yourself --
 4   A   Yes.
 5   Q   -- to be friends with Mr. Whitlock when you were at
 6       The Hill School?
 7   A   We were friends.  I mean, he allowed me to go to his
 8       house I think on one long weekend.
 9   Q   While you were at school?
10   A   Yeah.
11   Q   Have you ever had any discussions or contact with
12       Mr. Whitlock after graduating?
13   A   About this instance, no.
14   Q   No, I'm sorry.  My question is period.  And were
15       you --
16   A   Oh, yeah.
17   Q   I'm talking -- let me back up.  When you were
18       answering my questions pertaining to Mr. Eiserman and
19       Mr. Andres, when I asked you about contact with them
20       since graduating, am I correct you haven't had any
21       contact with them whatsoever, not just as it relates
22       to this?
23   A   None whatsoever.
24   Q   Thank you.  And then with respect to Mr. Whitlock,
25       have you had any discussions with him after
```

0618a

Kurtis N. Foulos

```
 1         graduation?

 2    A    Yes.

 3    Q    Okay.  And when were you friendly with him after

 4         graduation?

 5              MS. DOUGHERTY:  Objection, form.

 6    A    Right around 9/11.  I went out to Ocean City,

 7         Maryland.  The following summer.

 8    BY MR. JUBB:

 9    Q    You say 9/11, you're referring to September 11th?

10    A    Correct.  That following summer I went out.

11    Q    You graduated in 1997, though, correct?

12    A    Correct.

13    Q    And 9/11 occurred in 2001, though, right?

14    A    Correct.

15    Q    Okay.  So the following summer would have been the

16         summer of '98 which was three years -- four years

17         before 2001.

18              MS. DOUGHERTY:  Objection.

19    A    Like I said, I didn't speak to him until after 9/11.

20         And I couldn't tell you how I ended up in contact

21         with him, but I did go out and visit Ocean City,

22         Maryland.

23    BY MR. JUBB:

24    Q    Okay.  I think I understand what you're saying.  What

25         you're saying is following graduation you didn't have
```

0619a

Kurtis N. Foulos

```
 1        any contact with Mr. Whitlock; however, around the
 2        time of 9/11 or shortly thereafter, you went to visit
 3        him; is that correct?
 4   A    Correct.
 5   Q    And you believe that's approximately 2001; is that
 6        right?
 7   A    No, it would have been the following summer.  So
 8        2002.
 9   Q    Okay.  And seeing that you hadn't had any sort of
10        contact with him following graduation, how was it
11        that you reached out to Mr. Whitlock?
12   A    Honestly, I do not remember how I got in touch with
13        him.  I mean, that was 18 years ago.
14   Q    Do you recall how long you were in contact with
15        Mr. Whitlock?
16   A    A couple of years.
17   Q    After 2002?
18   A    Yeah.
19   Q    Did he ever visit you in Wisconsin?
20   A    No.
21   Q    Did you ever visit him again after 2002?
22   A    Yeah.  I went and lived out there for a short period
23        of time.
24   Q    And when you say out there, where are you referring
25        to?
```

0620a

Kurtis N. Poulos

```
 1    A    Ocean City, Maryland.

 2    Q    So following 2002, you lived in Ocean City, Maryland?

 3    A    For less than a year.

 4    Q    Were you working at that time?

 5    A    Yeah.  I was working for Secrets Bar & Grill.

 6    Q    In 2002, had you graduated from college?

 7    A    No.  I dropped out of college.

 8    Q    And forgive me, where did you go or attend

 9         university?

10    A    Marquette University.

11    Q    And so in 2002, you had gone down to work at Secrets

12         in Ocean City, Maryland, and you were staying with

13         Mr. Whitlock?

14    A    Yeah.  He had a condominium.

15    Q    Did you maintain any sort of friendly relationship

16         with Mr. Whitlock for those, let's say, five years or

17         so between the time you graduated The Hill School and

18         the time you went down to stay with him when you were

19         working at Secrets?

20    A    Not really.  I mean, no.

21    Q    I'm sorry -- okay.  You said no?

22    A    No.

23    Q    Following 2002, am I correct that you haven't had any

24         contact with Mr. Whitlock?

25    A    It would be more like 2004.
```

Kurtis N. Poulos

```
 1    Q    Okay.  So from at least 2002 to 2004 you still had
 2         the relationship with Mr. Whitlock; is that fair?
 3    A    Yeah.  I just explained to you I was living in his
 4         condominium.
 5    Q    Mr. Poulos, were you living in his condominium
 6         between 2002 and 2004?
 7    A    Yes.
 8    Q    Okay.  So following 2004, why did you move back home?
 9    A    Because Salisbury, Maryland, and Ocean City,
10         Maryland, there's nothing to do except when you're
11         there in the summer.  There's like, 7,000 people that
12         live in that town.  It's miserable.
13    Q    Were you working at Secrets that entire time between
14         2002 and 2004?
15    A    Yes.
16    Q    And why did -- after you -- strike that.  So
17         eventually you determined that you were going to go
18         back to where, Wisconsin?
19    A    Correct.
20    Q    And you said that was because of the lack of --
21    A    I just didn't want to be out there anymore.
22    Q    Did you ever return?
23    A    No.
24    Q    Have you spoken with Mr. Whitlock since 2004?
25    A    Nope.
```

0622a

Kurtis N. Poulos

```
1    Q    Any particular reason?

2    A    No.

3    Q    Who's this guy?

4    A    That's me.

5    Q    And in this photo here, I imagine that's your car?

6    A    Correct.

7    Q    Is that the car that you brought to The Hill School?

8    A    It is.

9              MS. DOUGHERTY:  Is there a Bates number

10        for this?

11   BY MR. JUBB:

12   Q    In this photo below, are you in this photo?

13   A    No.  I took that photo when I was living in France.

14        Those were some of the students I went to France

15        with.

16             MS. DOUGHERTY:  Is there a Bates label for

17        what we're looking at?

18             MR. JUBB:  There is, Candi.  I apologize.

19        It's P6.23.

20   Q    And, Mr. Poulos, am I correct this is -- P6.23 is

21        your senior page in your yearbook?

22   A    Correct.

23   Q    As part of your page, you've included photos of

24        individuals who you met in France during your time in

25        junior year; is that right?
```

0623a

Kurtis N. Poulos

```
 1    A    Incorrect.  Those are one student from Marquette

 2         University High School and the three young ladies

 3         attended Divine Savior Holy Angels which is a private

 4         all-girls school.

 5    Q    All of those students are Americans; is that right?

 6    A    Correct.

 7    Q    Do you keep in touch with any of them?

 8    A    No.

 9    Q    With respect to the top line here where it says "It's

10         a Zwerner - T. Ruth," is that Tom Ruth?

11    A    Yeah.

12    Q    What's this Zwerner?

13    A    My cousin.

14    Q    Can you explain the context of this line and why it's

15         in your yearbook, please.

16    A    Because he had my cousin as a student; and when I was

17         sitting at Mr. Ruth's table, I did something that he

18         said reminded me of my cousin.  So he just started

19         calling me Zwerner.  Or saying you are --

20    Q    Did you -- I'm sorry if I interrupted you.

21         Mr. Poulos, was that a nickname that you held

22         throughout high school?

23    A    No, never.  It was just a joke.

24    Q    All right.  I'm showing you what's been marked

25         already as P6.26 which is the sixth form.  It says
```

Kurtis N. Poulos

| | | |
|---|---|---|
| 1 | | here -- and I will represent to you this is the |
| 2 | | senior year same book.  You said you were in Foster, |
| 3 | | correct? |
| 4 | A | I thought so.  It's the only dorm I remember.  I |
| 5 | | would have been on the first floor. |
| 6 | Q | Do you see your name in that photo for the first |
| 7 | | floor Foster? |
| 8 | A | Then Foster was the other one -- or my dorm was the |
| 9 | | other one.  Because Kent lived in first floor Foster |
| 10 | | and I just saw his name.  I didn't live in the same |
| 11 | | dorm as him.  So whatever the other senior dorm was. |
| 12 | | I honestly haven't looked or thought about this |
| 13 | | school in so long.  So, yeah, I lived in Rolfe. |
| 14 | | MS. DOUGHERTY:  I have a -- before you ask |
| 15 | | the next question.  Mr. Poulos, I don't think you |
| 16 | | can smoke during your videotaped deposition, this |
| 17 | | being a court proceeding. |
| 18 | A | Okay.  Go ahead. |
| 19 | | BY MR. JUBB: |
| 20 | Q | Mr. Poulos, are you in the photo that is on page |
| 21 | | P6.26 next to 1 Rolfe? |
| 22 | A | I think that's me standing in the back. |
| 23 | Q | This guy? |
| 24 | A | Yeah.  I think -- I can't tell.  I know I had long |
| 25 | | hair at the beginning of the year.  Nope, that's not |

0625a

Kurtis N. Foulos

```
 1        me.  Oh, there I am with the hat on.
 2   Q    Okay.  So why don't you walk me through who some of
 3        these people are, if you can.  I imagine these --
 4   A    The only one I recognize is Lance Whitlock.
 5   Q    And Lance is where?
 6   A    In the white sweatshirt with the hat on backwards.
 7   Q    That's Lance (indicating).  Is that correct?
 8   A    Yeah.
 9   Q    Thank you.  And do you recall Mr. Bluestone at all?
10   A    I don't remember anybody else in that photo.
11   Q    Do these names ever ring any bell to you, Bluestone,
12        Brady, Conole, tell me to stop if anything rings a
13        bell.  Gulbrandsen, Hatfield, Hylbert, Kang,
14        Martinez, Park, Saxl, Ward, White, and obviously you
15        know Lance Whitlock.  Any of those names ring any
16        bell to you?
17   A    I remember the last name, what was it, Gulbrandsen?
18   Q    Yeah.
19   A    I recognize the last name, but I couldn't tell you
20        who he is in that picture.
21   Q    Okay.  Did you have any memories of being friendly
22        with these guys?
23   A    I mean, Lance and I would hang out once in a while.
24        You have to remember, we didn't really address each
25        other by last name.
```

0626a

Kurtis N. Poulos

```
 1    Q    But you all lived together at night after school,
 2         right?
 3    A    Yeah, for the most part.  I mean, we were seniors; so
 4         we could leave, come and go as we pleased.
 5    Q    Did some of these kids go to school with you for four
 6         years in a class of 90?
 7    A    In the last of what?
 8    Q    You said there was a class of 90, 96 I believe.
 9    A    I would assume that some of them were in classes with
10         me in 1995 when I still was attending there.  But I
11         wasn't in attendance in 1996.
12    Q    Oh, I'm sorry, a class of 96.  I thought you were
13         referring -- when you said 96 before, I thought you
14         were referring to the class size, as to how many
15         people.
16    A    Oh, yeah.  There was only about 94 or 95 people in
17         our entire class, in our graduating class.
18    Q    Okay.  I'm showing you what is marked as P16.53,
19         which is a letter dated August 7th, 1996.  It appears
20         to be from the associate headmaster, Harry Price.
21         And in this letter directed to you, I'll read
22         portions of it for you, but it says, "To ensure a
23         good start here, you should get in touch with
24         Mr. Ralston or Mrs. Colegrove to alert him or her to
25         your return and to work out your course selections."
```

0627a

```
 1         Did you contact either one of those people?

 2    A    I think I talked to Mr. Krueger.

 3    Q    And why is that?

 4    A    Because Mr. Krueger, if I remember correctly, was the

 5         head of discipline and I wouldn't have called

 6         Mr. Ralston.  And I don't remember a Ms. Cosgrove --

 7         or Colegrove, I can't...

 8    Q    In other words, what you're saying is you -- in

 9         getting this letter, you contacted Mr. Krueger right

10         here to let him know your plans?

11    A    Correct.

12    Q    But you would not have contacted Mr. Ralston?

13    A    No.

14         (Interruption - Mr. Poulos talking to dog.)

15    Q    Mr. Poulos, I'm going to show you what's been marked

16         as P16.62.  The date on this appears to be a fax

17         dated August 8th, 1996.

18    A    Yeah.  It was faxed to my mother's office.

19    Q    Well, this is a letter that was written to

20         Mr. Ralston from you.  Fair enough?

21    A    I don't remember writing that.

22    Q    Whose signature is that at the bottom?

23    A    Mine.

24    Q    Okay.  Again, that's P16.62.  For purposes of the

25         record, I am pulling up P16.42.  Mr. Poulos -- for
```

0628a

Kurtis N. Poulos

```
 1          purposes of the record, this is P16.42.  It is a

 2          letter from Martin Lodish directed to your mom,

 3          referring to you, obviously.  And in here, Mr. Lodish

 4          in 1996 December refers to your time at The Hill

 5          School.  And specifically, he writes here in the

 6          second paragraph, "This past term was a difficult one

 7          for Kurt.  He had some significant rules violations

 8          at the beginning of the term as he readjusted the

 9          life at The Hill.  Also, the incident at home over

10          the holiday weekend upset him greatly.  He rarely was

11          smiling when I saw him about campus.  He was not

12          interacting with many of the other boys here.

13          Recently Kurt seems to be a little bit happier, and

14          Alberto Romero, his hall parent, tells me that he has

15          been hanging out with another sixth former named

16          Lance Whitlock.  Also, Kurt has begun to open up to

17          me."

18                  When he wrote this in approximately

19          December 1996 and he's referring to the incident at

20          home over the holiday weekend upset him greatly, do

21          you know what incident or have an idea as to what

22          incident he's referring to?

23     A    Holiday weekend?  No.

24     Q    Was there anything going on at home during this time

25          frame that was causing you to be upset?
```

0629a

Kurtis N. Poulos

```
 1   A    Not to my recollection.  But, again, that's 33 years
 2        ago -- or 23 years ago.
 3   Q    Was there any -- in this time frame, December of '96,
 4        did you have a relationship with your dad at this
 5        point?
 6   A    I had some sort of relationship.  Maybe that was --
 7        maybe I got into an argument with him over something.
 8        I don't know.  It might -- it could have been
 9        something really small that really upset me.  I -- I
10        have no recollection.
11   Q    When you were at Hill and these letters were getting
12        sent to your mom, did she have occasion to share them
13        with you?
14   A    No.
15   Q    Would she bring to your attention some of your
16        teachers' and advisors' concerns?
17   A    Not really.  I mean, when I was home on break, I was
18        never really home.  You know --
19   Q    What do you mean by --
20   A    You know, as soon as I got home, I got in a car and I
21        went and saw my friends from Milwaukee and hung out
22        with them.
23   Q    Okay.  I'm going to show you what's been marked as
24        P16.42 and P16.43 [sic].  Mr. Poulos, this is dated
25        April 23rd, 2016.  It says, "Dear Hill School alumni
```

0630a

```
 1          and parents."

 2                    MS. DOUGHERTY:  Lane, just -- Mr. Jubb,

 3          can you repeat the Bates label because I had the

 4          last one and P16.42.  This is 242.  Okay.  I see.

 5          So it's --

 6    BY MR. JUBB:

 7    Q     Mr. Poulos, am I correct, did you ever receive this?

 8    A     I think I received it in an email.

 9    Q     And at the time you were getting emails from the

10          school as an alumni generally; is that fair?

11    A     Correct.

12    Q     And in response to this email dated April 23rd, 2016,

13          you said that you printed this out in your apartment

14          that you lived with -- with Emily at the time, right?

15    A     Correct.

16    Q     And what did you do with it after you printed it out?

17    A     I had a file folder.

18    Q     Do you still have that file folder?

19    A     I've got a bunch of file folders in my office here at

20          my house.  Mostly with documents from you.

21    Q     But you had a file folder before I ever filed a

22          lawsuit against you, so do you still have that file

23          folder or is it the same one?

24    A     No.  That was more of, like, it wasn't necessarily a

25          file folder pertaining to the school exactly.  It was
```

0631a

Kurtis N. Poulos

```
 1        more personal items like my birth certificate,

 2        anything I might need while I'm living in Connecticut

 3        that I wouldn't have easy access to, like the deed to

 4        my car -- or the title to my car I should say.  I --

 5        you know, I needed to have a hard copy of that in

 6        case I needed to sell my Audi when I was living in

 7        Connecticut, or reinsure it, which I ended up having

 8        to do.  So I had a folder with documents pertaining

 9        to me from -- like I said, my birth certificate, any

10        lease information, stuff like that, just important

11        documents.

12   Q    Do you still maintain --

13   A    Tax returns, et cetera.

14   Q    Do you still maintain that folder?

15   A    I maintain a few folders.

16   Q    Do you maintain the folder in which you placed this

17        document?

18   A    Yeah.  It's just a lot bigger now.

19   Q    I'm showing what's been, previously marked as P16.237

20        and P16.238 and P16.239.  So a letter dated

21        November 20th, 2017, from Zachary Lehman from --

22   A    Can you stop scrolling when you get to the area with

23        the highlighted blue letters.  Yeah, that's the

24        paragraph I'm most concerned with.

25   Q    Okay.  And when did you become concerned with this
```

0632a

Kurtis N. Poulos

1       paragraph?

2   A   I received that letter.  I forwarded it -- or that

3       email.  I forwarded it to my mother and said do you

4       think I should reach out not to Zachary Lehman, but

5       to the protection experts, their child protection

6       experts, Leslie Gomez and Gina Smith.  In no way do

7       they state that they are attorneys.

8   Q   Okay.

9   A   And you know --

10  Q   Did you contact them?

11  A   No.  I contacted my mother who did some research,

12      thankfully, and found out that they were attorneys

13      for The Hill School.  So the letter to me was sent

14      under false pretenses.

15  Q   What type of lawyer is Leslie Gomez?

16  A   I have no idea.  I just know she's an attorney.

17  Q   Do you know what Gina Smith does?

18  A   No idea.  But nowhere does it say that they are

19      attorneys at law.  It says they are child protection

20      experts.

21  Q   Did you look up their bios online?

22  A   I did not.  My mother did.

23  Q   Did you see the other link where it says research dot

24      net?

25  A   I never followed -- I never went anywhere past that

Kurtis N. Foulos

```
 1        email once she said do not contact them.  I never

 2        connected -- or clicked on any of the hyperlinks, I

 3        never emailed them directly, I never emailed Zachary

 4        Lehman directly.  I had nothing to do with any of

 5        those hyperlinks.  That's why I wanted to point out

 6        that paragraph.

 7    Q   I see.  But your mom told you don't contact them?

 8    A   She -- correct.

 9    Q   Okay.  So at that point in time, by November 20th,

10        2017, what had you told your mom to be the basis for

11        asking her if you should contact any of these people?

12    A   Well, she had already had me contact an attorney

13        prior to 2014 to see if there was any legal recourse.

14        There was not.  So I had started to move on with my

15        life after I got out of my coma.  I never --

16    Q   So --

17    A   I never asked to be sent these specific emails.  I

18        was never, like, were there improprieties, please let

19        me know who I can contact.  These were emails sent to

20        me unsolicited by the school to get information from

21        previous students.  I was intending on reaching out

22        to them and seeing if they could offer some sort of

23        mental health aide.  And that's when I was informed

24        that they were not child protection adversaries or

25        experts, I should say.  They were instead attorneys
```

0634a

Kurtis N. Poulos

```
 1          representing the school; and to me and my mother, we
 2          believe under false pretenses they wanted us to call
 3          the school, tell them what happened.  And I then was
 4          like, no, I'm not going to do that.
 5    Q     So prior to 2014, your mom had told you that you
 6          should contact an attorney; is that right?
 7    A     Yes.  I had become very depressed, my drinking had
 8          gotten excessive.  And I finally confided in to
 9          her -- to her what had happened, you know.  And she
10          had me contact an attorney out in Philadelphia who
11          just said unfortunately, statute of limitations are
12          way past due; you know, I wish you the best; if
13          anything changes, please get in touch with me.  But,
14          like I said, I had moved on until the school started
15          soliciting information.
16    Q     Prior to -- and forgive me, I just want to get -- you
17          say prior to 2014.  But I understand that to mean
18          during '14, because you had mentioned that something
19          had happened in '14.  So is there any way that you
20          could try and narrow down for me an approximate time
21          frame?  Like, when you say prior to 2014, is there a
22          month, is there a date, is there something that
23          sticks out in your mind?
24                MS. DOUGHERTY:  Objection.
25    BY MR. JUBB:
```

0635a

```
 1    Q    Mr. Poulos?

 2    A    Please ask the question again.  You're fading in and

 3         out.

 4    Q    Sure.  My question was -- you mentioned that in

 5         approximately 2014 or prior to 2014 when your mom

 6         told you to contact an attorney in Philadelphia.  My

 7         question was are you able to give me a more specific

 8         time frame than simply around that 2014?  Is there a

 9         month or a date that sticks out in your mind?

10    A    It would have been sometime I believe in the spring

11         or the summer because I was sitting outside on the

12         porch.  And obviously being Wisconsin, I'm not doing

13         that in the middle of winter.

14    Q    And in this time frame, did you -- who did you tell

15         her was -- strike that.

16              When you had this conversation with your

17         mom, tell me what you told her.

18    A    I told her that there was an impropriety, that part

19         of my demeanor change that she had noticed back in

20         high school, that multiple people in my family had

21         noticed, was a result of what had happened with a

22         teacher.  And I didn't even have to tell her which

23         teacher.  She guessed it.

24    Q    How did she guess it?

25    A    Because she could tell the way I behaved around him
```

```
 1           versus other teachers.  And especially the way he
 2           intimidated me even as a senior by trying to keep me
 3           from spending time with my family which he had no
 4           right to do.  And to go back a step, I did tell one
 5           teacher that night.  I told Mr. Romero what had
 6           happened.  And he said I know you have permission to
 7           use that car.  Why did he do that?  And I said I
 8           don't know, but I'm going to be staying here.
 9           Because I had to check back into the dorm.  As far as
10           Mr. Romero knew, I wasn't going to be spending the
11           night in the dormitory that night.  I had signed off
12           campus for the rest of the weekend to stay at the
13           hotel.  So I -- remember, part of our duty or his
14           duty is to know who's in his dorm when he's on duty.
15           I had to wake him up -- or, you know, get him to come
16           up to his door and advise him that I would be
17           spending the night in the dormitory by myself, and he
18           asked why.  And I told him because the plaintiff has
19           parked me in and is refusing to move his vehicle
20           until the following morning.
21    Q      At the time of the vehicle incident, was there a rule
22           that when you leave with your car you're not allowed
23           to come back until Sunday?
24    A      Not to my recollection.  And even if that was a rule,
25           again, it was my property, I was the one paying my
```

Kurtis N. Poulos

```
 1              tuition, not my parents.  And I was 18 years old.  If

 2              I'm allowed to vote at 18, I should be able to decide

 3              if I can run into my dorm room, get my overnight bag

 4              which was already packed, and leave again without

 5              being harassed.

 6    Q    Was there any rule that precluded you from parking on

 7              campus?

 8    A    Again, no.  If I was there parking with my mother,

 9              nothing would have happened.

10    Q    Did you get in trouble for that?

11    A    Did I?

12    Q    Yes, sir.

13    A    No, I did not get in any trouble because I had

14              authority to use my vehicle to pick up my mother, use

15              it for the weekend, return it to my assigned parking

16              spot behind the Performing Arts building on Sunday

17              night, and then return my keys to the Dean of

18              Discipline I think through the mail slot in his door,

19              or maybe the following morning.

20    Q    All right.  I'm showing you what has been marked as

21              P16. -- excuse me, this has been marked as P16.219

22              and P16.220.  And this is a letter dated April 11th,

23              2018, to Zachary Lehman with the Law Offices of

24              Mitchell Garabedian at the top.  Prior to being sued,

25              had you ever seen this letter before?
```

0638a

Kurtis N. Poulos

```
 1    A    I can't read it.  All I see is his signature.

 2    Q    Okay.  April 11th, 2018, had you seen this letter

 3         prior to being named a defendant in a lawsuit?

 4    A    Not to my knowledge.

 5    Q    In here, it states that you were repeatedly sexually

 6         molested by Mr. Ralston approximately 1993, when you

 7         were 15 years of age -- years of age, until

 8         approximately 1995 when he was approximately 17 years

 9         of age.  Was this information that you had intended

10         for The Hill School to learn?

11    A    Through proper legal counsel.

12    Q    In other words, this was information you wanted to

13         relay to the school?

14    A    Candi?  I mean --

15    Q    Are you looking to Ms. Dougherty for help?

16    A    I'm just wondering if she has any objections to my

17         answering this.

18    Q    Mr. Poulos, you have a question to answer, and

19         Ms. Dougherty is well aware of what she's able to

20         object to.

21    A    Okay.

22    Q    My question was very simple.  So, Ms. Bayer, if you

23         could --

24    A    I was not aware --

25                   MS. DOUGHERTY:  Hold -- why don't -- hold
```

```
 1          on a second.  Why don't you ask the question that

 2          you want him to answer again.

 3                    MR. JUBB:  Which was my original -- if

 4          Ms. Bayer could read that back, that would be great.

 5                    MS. DOUGHERTY:  I apologize.  I didn't

 6          realize that's what you were doing.

 7                    (Question read by the reporter.)

 8                    MS. DOUGHERTY:  I thought that there was

 9          an answer.

10                    (Portion of record read.)

11     BY MR. JUBB:

12     Q    Mr. Poulos, are you going to answer that question?

13     A    Like I said before, this was information I did want

14          to be made aware to the school through proper

15          channels, meaning their legal counsel.

16     Q    Did you intend to tell Zachary Lehman of what is

17          highlighted in this document?

18     A    Not directly.  I believed that he was going to make

19          the school's legal counsel aware of the situation;

20          and then they would in turn contact the headmaster,

21          let him know that there is a student, an alumni -- or

22          alumnus that has come forward, not that he was going

23          to write a letter directly to the headmaster.

24     Q    His letter, it says Mr. Poulos's demand for

25          settlement is $1 million.
```

Kurtis N. Poulos

```
1    A    That's not true.

2    Q    Am I correct -- strike that.  Did you intend to relay

3         a demand for a million dollars to the school?

4    A    No, I did not.

5    Q    Was there ever any intention to relay a monetary

6         demand to the school?

7    A    All I initially wanted was my tuition back.  That's

8         it.  I just wanted the money that I had spent to

9         attend that school.  Nothing more, nothing less.

10   Q    I am sharing with you my screen which is a document

11        Bates stamped P16.225 through P16.226.  The date of

12        this letter is December 26, 2018.  Am I correct,

13        Mr. Poulos, that you had not seen this letter prior

14        to being named a defendant in this lawsuit?

15   A    No, I do not believe so.  If I -- the problem is at

16        that time of the year, I was preparing to move from

17        Connecticut back to Milwaukee.  So there is a chance

18        I received that in the mail, but there's a very good

19        chance I put it in my file folder to be opened at a

20        later date and never got around to it.  I never

21        imagined being named in a lawsuit.

22   Q    In this letter, there are statements in here

23        describing your relationship at the school and

24        Mr. Ralston as your geometry teacher that were

25        directed to, as you can see Mr. Rees, the school's
```

0641a

Kurtis N. Poulos

```
 1           general counsel.  And in here, when you read this

 2           letter after being named as a defendant, did you

 3           intend to relay to the school that -- on page 2 that

 4           Mr. Ralston sexually abused you in Mr. Ralston's

 5           geometry classroom?

 6      A    I figured it would come out when it needed to be.  I

 7           wasn't going to name the plaintiff by name until

 8           after things had -- I gave Mitchell his name

 9           specifically.  (To dog:)  Clifford, sit down.  Sorry.

10           I wouldn't have worded it this way if I was him.  But

11           I'm not an attorney.  So me not being an attorney.

12           Like I said, I never said his name out loud to

13           anybody except to my attorney; and then later when my

14           mother knew who it was or had a feeling she knew, I

15           just confirmed who it was.

16      Q    In here it says --

17      A    But I never reached out directly to the school at any

18           time.

19      Q    In here where the letter reads, "The sexual abuse

20           consisted of, among other things, Mr. Ralston

21           fondling Mr. Poulos' penis and testicles skin on

22           skin, Mr. Ralston making Mr. Poulos fondle

23           Mr. Ralston's penis and testicles skin on skin,

24           Mr. Ralston putting his mouth on Mr. Poulos' penis,

25           and Mr. Ralston making Poulos put his mouth on
```

0642a

```
 1          Mr. Ralston's penis."  Was that information that you

 2          intended to relay to The Hill School?

 3     A    I believe so, yes.  I mean, there's some grammatical

 4          errors, but...

 5     Q    And in here, you reference that -- it says,

 6          Mr. Ralston sexually abused Mr. Poulos in

 7          Mr. Ralston's geometry classroom between

 8          approximately 10 and approximately 15 times."  As

 9          part of the letter, it indicates that the geometry

10          classroom was located at the end of a hallway and

11          that it would occur after school when the geometry

12          class was the last day of the class.  Do you see

13          that?

14               MS. DOUGHERTY:  Objection.

15     A    Yes, I do.

16     BY MR. JUBB:

17     Q    And what day of the week was it the last day?

18     A    As I stated earlier, I don't remember what days --

19          which classes were my last class of the day.

20     Q    In each of these 10 to 15 instances, did you explain

21          the extent of -- strike that.  Is it your position

22          that what's written here, that there was fondling of

23          your genitals and Mr. Ralston's genitals as well as

24          Mr. Ralston putting his mouth on his own penis [sic]

25          and Mr. Ralston making you put your mouth on his
```

0643a

Kurtis N. Poulos

```
 1          penis, was there any other details that you provided?

 2    A     No.

 3    Q     Is it your position that that occurred between 10 and

 4          15 times?

 5    A     That would be my best guesstimate.  Like I said, I

 6          tried to blank out basically everything that ever

 7          happened to me at that school.

 8    Q     And during this time frame between April 11th of 2018

 9          through December 26th, 2018, how often were you

10          communicating with Mr. Garabedian?

11    A     Little to none.  I would call and leave messages.

12          When I would finally either get him on the phone or

13          he would call me back, he would just say to stand

14          strong --

15                 MS. DOUGHERTY:  Objection.

16    A     -- stay strong.

17                 MS. DOUGHERTY:  Mr. Poulos, just so you

18          understand, it is my -- first of all, the question

19          to you is I think a yes-or-no question.  But it is

20          my opinion that the commentary you're about to give

21          would disclose privileged information.

22                 THE WITNESS:  Okay.

23                 MS. DOUGHERTY:  It is protected.  You have

24          a choice as to whether you want to disclose the

25          information or not disclose the information.
```

0644a

Kurtis N. Poulos

```
 1    A    Can you ask the question again then, Lane.

 2                MR. JUBB:  I will -- we're going to have

 3          to address this with the court because he

 4          specifically is referring to what did and did not

 5          happen.

 6    Q    So my question was --

 7                MS. DOUGHERTY:  Well, hold on, hold on,

 8          hold on one second.  Mr. Jubb, I agree with you that

 9          your question was asking that and I didn't see a way

10          that your question was eliciting communications.

11          But the answer then went into communications.

12          Otherwise I would have made an objection and noted

13          the comments before the answer started.  So I do

14          agree with you that, yes, your question was asking

15          what did and didn't happen.

16    BY MR. JUBB:

17    Q    Mr. Poulos, my question is between April 11th, 2018,

18          and December 26, 2018, did you have any contact with

19          Mr. Garabedian?

20                MS. DOUGHERTY:  Objection.  So it's

21          clear --

22                MR. JUBB:  Hold on.  This is getting into

23          very tricky of you advising him.  And I'm asking a

24          question that's not eliciting.  Now, I do believe

25          it's already been waived by virtue of the court's
```

Kurtis N. Poulos

```
 1         previous order.  I also believe it's been waived by

 2         what's occurred thus far.  And to the extent that he

 3         has a position that's contrary to yours, that's not

 4         waiving anything.

 5               MS. DOUGHERTY:  Mr. Jubb, I'm not taking a

 6         position one way or another.  As you realize, the

 7         attorney-client privilege is important.  He is a pro

 8         se litigant.  He might not understand the ins and

 9         outs of privilege.  It is his to decide whether he

10         wants to tell you the information or not.  Your

11         question asked about what happened, and my comment

12         was going to be to clarify it so Mr. Poulos

13         understands because the comment was made previously

14         in the middle of his answer that it is -- the

15         question that you were asking him is about what did

16         and didn't happen, not about the content of

17         communications.  And it is my opinion that the

18         content of communications between Mr. Poulos and

19         Mr. Garabedian could be protected from disclosure by

20         the attorney-client privilege which is a privilege

21         owned by Mr. Poulos, and it is Mr. Poulos' choice

22         whether he wants to tell you the information or not

23         tell you the information.  And it is certainly your

24         right if he decides not to to challenge the issue

25         with the court.
```

0646a

```
 1    BY MR. JUBB:

 2    Q    Mr. Poulos, did you get all that?

 3    A    I did.

 4    Q    Okay.  So let's focus on my question very

 5         specifically, and then we'll see to what extent we

 6         need to get the court involved.  But let's just try

 7         and get through everything first since we're now

 8         getting on 4:00, and then I'll ask you a couple of

 9         questions to see if we even need to get the court

10         involved based on what you're saying.

11                   So between April 11, 2018, and

12         December 26, 2018, did you have any discussions with

13         Mr. Garabedian?

14    A    Yes.

15    Q    And approximately how many times did you have a

16         discussion with Mr. Garabedian between April 11th,

17         2018, when the first letter was written to

18         December 26th, 2018?

19    A    I have no idea.

20    Q    Did you predominantly communicate by phone or by

21         email?

22    A    By phone.

23    Q    And how would you coordinate the times to speak?

24         Would they just be calls out of the blue?

25                   MS. DOUGHERTY:  Objection.  My objection
```

0647a

Kurtis N. Poulos

```
1              is a form objection.  If you understand the

2              question, you can answer it.

3     A     I understand the question.

4     BY MR. JUBB:

5     Q     Can you answer it?

6     A     They were mostly phone calls out of the blue.

7     Q     The information that's contained in the December 26,

8              2018 letter, is that information that you intended

9              Mr. Garabedian to relay to the school?

10    A     Through proper legal counsel.

11    Q     And what do you mean by that?

12    A     Meaning he would relay to the school's attorneys, the

13             school's attorneys would work with Garabedian and

14             make the headmaster aware of the allegations.

15    Q     So you were aware that the headmaster would be made

16             aware of these allegations, correct?

17    A     Eventually, yes.

18    Q     And based on your understanding of how the school

19             worked, am I correct that you were aware that it

20             would be not only the headmaster but the people that

21             he reports to as well, correct?

22    A     The board of trustees.

23    Q     That's correct.

24    A     Yes.

25    Q     And with respect to the contact that you had with the
```

0648a

```
 1          attorney in Philadelphia in 2014 time frame who

 2          advised you that the statute of limitations had been

 3          blown, is that something that you were aware of in

 4          April of 2018?

 5                  MS. DOUGHERTY:  Objection.  My objection

 6          is a form objection because it mischaracterizes your

 7          testimony, prior testimony.

 8     A    I agree.

 9     BY MR. JUBB:

10     Q    So are you objecting to my question?

11     A    I am.

12     Q    Okay.  Prior to April of 2018, you were aware of what

13          a statute of limitations was, correct?

14     A    Correct.

15     Q    What's the statute of limitations?

16     A    It is the amount of time where a crime that has been

17          committed can be prosecuted in what I believe to only

18          be a criminal court, not a civil court.

19     Q    You spoke with a civil attorney in 2014?

20     A    No.  I spoke with a criminal attorney in 2014.

21     Q    What attorney was that?

22     A    I don't recall.

23     Q    Did you come to Philadelphia?

24     A    No.  I spoke to him over the phone.  I haven't been

25          to Philadelphia for over 20 years.
```

```
1    Q    How did you select the attorney in 2014?

2    A    I did not select the attorney in 2014.

3    Q    Did your mom?

4    A    Correct.

5    Q    And your mom was a lawyer for about 40 years?

6    A    Correct.

7    Q    Showing you what is P16.228.  It's a letter dated

8         January 28th, 2019, from Mr. Garabedian to the

9         school's counsel.  In this letter, it references a

10        telephone conversation on December 21st, 2018, and a

11        recommendation that the parties agree to attend a

12        mediation.  What's a mediation?

13   A    Mediation is basically the two parties sit down,

14        discuss the case at hand; and the mediator, you know,

15        works with them to come to amicable agreement for

16        both parties.

17   Q    Were you made aware of any mediation in this case?

18             MS. DOUGHERTY:  Objection.  It is my

19        opinion to the extent the question is eliciting

20        communications between you and an attorney --

21             MR. JUBB:  It asks --

22             MS. DOUGHERTY:  -- in particular

23        Mr. Garabedian, it could be protective on disclosure

24        by the attorney-client privilege and you can decide

25        whether or not you want to disclose that
```

0650a

Kurtis N. Poulos

```
 1        information.

 2   BY MR. JUBB:

 3   Q    Did you get that legal advice, Mr. Poulos?

 4              MS. DOUGHERTY:  Mr. Jubb, it's not legal

 5        advice.  You certainly know how important the

 6        attorney-client privilege is.  I assume that your

 7        question wasn't directed to elicit attorney-client

 8        privileged communications, that you were just asking

 9        for the information which it doesn't directly ask

10        for a communication, so I assume you were not.  But

11        I want to make sure that the witness understands --

12              MR. JUBB:  Goal here is to get through --

13              MS. DOUGHERTY:  -- and doesn't disclose

14        the protected informs because he's done it once or

15        twice when you've asked him a perfectly appropriate

16        question that I don't think would have elicited the

17        protected information.  It's not legal advice.

18        It's, again, the most important privilege I think

19        that exists in the legal system and -- you know.

20              MR. JUBB:  Again, my goal here is to ask

21        questions that are -- unquestionably do not even

22        call for it.  My position is that it's already been

23        waived, and I'm trying to wait 'til the end of my

24        questions because to the extent that there are going

25        to be objections, those are the ones that need to be
```

0651a

Kurtis N. Poulos

```
 1          addressed with the court.  So what I'm trying to do
 2          is ask those questions that you acknowledge are not
 3          calling for them.  I would just appreciate that you
 4          not try and assist the witness on every single time
 5          I ask, as you said, a perfectly appropriate question
 6          how to answer those questions because that's what's
 7          being done.  So I just --
 8                  MS. DOUGHERTY:  Mr. Jubb, I'm not
 9          assisting the witness in answering.  And if I think
10          it is -- it sounds to me like you were taking a
11          position, which perhaps is a better way to deal with
12          it, to tell Mr. Poulos that your questions at this
13          time are not designed to elicit the content of
14          communications with Mr. Garabedian.  So then he will
15          know and I won't feel a need to say anything.
16     BY MR. JUBB:
17     Q  Mr. Poulos, you have the ability as a witness to
18          answer my question at the truest and accurate extent
19          possible.  If in doing that it involves you
20          discussing conversations that may be protected by the
21          attorney-client privilege, please feel free to say
22          so.  It's my position that that's already been
23          waived.  So we're going to get to those very, very
24          clear questions towards the end.  Right now I'm just
25          asking if you could just focus on my question,
```

0652a

Kurtis N. Poulos

```
 1            that'll be good.  Then we'll get to the messier stuff

 2            towards the end.  Okay?  So for purposes of my --

 3                      MS. DOUGHERTY:  Well, Mr. Jubb, I think

 4            you might want to also let him know that he has a

 5            choice if he wants to waive the privilege because it

 6            belongs to him and answer your question even if he

 7            thinks it will involve a communication.

 8                      MR. JUBB:  He knows that based off of his

 9            answers already.

10       Q    So, Mr. Poulos, if you want to waive it and defend

11            yourself by waiving the privilege, you're more than

12            capable of doing that too if you believe that it's

13            going to help your defense.

14                      So with that as a background, my question

15            was pertaining to mediation which I think you

16            answered, I forget what my question just recently was

17            as it related to that objection.  However, following

18            in this letter, it says, "Mr. Poulos will not agree

19            to confidentiality as a condition to any settlement

20            of his sexual abuse claim."  Do you see that?  Do you

21            see that, sir?  My question is --

22       A    It says that.

23       Q    -- only if you saw it.  And my follow-up is this.

24            Did you intend to relay to the school that

25            confidentiality was not on the table?
```

0653a

Kurtis N. Poulos

```
 1    A    I don't feel comfortable answering that because I
 2         believe it's going to -- no, because that's part of
 3         my attorney-client privilege.  Whatever I discussed
 4         with my attorney is attorney-client privileged.  I'm
 5         not going to discuss any conversations I had with
 6         Mitchell Garabedian.
 7    Q    Well, there's a difference of when it's applicable
 8         and when it's not.  And so with respect to each
 9         individual question, I guess we're going to have to
10         get the court involved and get you back here for a
11         couple of things.  But the attorney-client
12         privilege --
13              MS. DOUGHERTY:  All right.  Objection,
14         don't threaten him.  Don't suggest --
15              MR. JUBB:  I'm not threatening him.
16              MS. DOUGHERTY:  -- that he's going to have
17         to come back if he invokes his privilege.
18              MR. JUBB:  I will --
19              MS. DOUGHERTY:  Why don't you just ask a
20         clarifying question.  Maybe he didn't understand.
21         Because I don't --
22              MR. JUBB:  You're just trying to help him
23         to get him -- by saying he didn't understand.
24              MS. DOUGHERTY:  I'm not trying to help
25         him.  I'm trying to help you --
```

0654a

```
 1                    MR. JUBB:  I don't --

 2                    MS. DOUGHERTY:  -- because I don't think

 3          you were intending to elicit a communication with

 4          Mr. Garabedian.

 5                    MR. JUDD:  I've already given him

 6          instructions on what it is.

 7                    MS. DOUGHERTY:  Okay.

 8   BY MR. JUBB:

 9   Q    So, Mr. Poulos, my question to you was did you intend

10        to relay to the school that you did not want

11        confidentiality as part of any settlement, intend to

12        relay to the school?

13   A    Was I going to directly ask -- tell them?

14   Q    Did you want anyone on your behalf to relay to the

15        school that you would not agree to any

16        confidentiality?

17   A    Yes.

18   Q    And why is that?

19   A    Because I'm not the only person this must have

20        happened to.

21   Q    And what's the basis for that?

22   A    I'm not going to answer that at this time.

23                    MS. DOUGHERTY:  Objection.

24   BY MR. JUBB:

25   Q    Did you have any information and do you have any
```

0655a

Kurtis N. Poulos

```
 1            information to suggest that this has happened to --

 2            what you say happened to you happened to anybody

 3            else?

 4   A    I'm not going to answer that at this time.

 5   Q    Can you tell me why not?

 6   A    A multitude of reasons which I'm not going to get

 7            into right now, but I am not going to answer that

 8            question at this time.

 9   Q    Sir, as you sit there in your recliner, do you have

10            any information to suggest that what your allegations

11            were in these letters to the school in any way

12            occurred to anybody else?

13                 MS. DOUGHERTY:  Objection, move to strike

14            the comment about the recliner.

15   BY MR. JUBB:

16   Q    You can answer.  Are you thinking or -- ?  Are you

17            still thinking?

18   A    No.  I'm trying to figure out what you are asking.

19            And to be honest, about the recliner thing, it's

20            because I have nowhere else to sit where the wires

21            reach in my apartment right now.

22   Q    Sir, do you have any information as you sit there in

23            this deposition to suggest that what you accuse this

24            person of doing in your letters ever occurred to

25            anybody else?
```

Kurtis N. Poulos

```
 1   A    Can you clarify, with that specific teacher or with
 2        any teacher?
 3   Q    With the specific teacher.
 4   A    No, I do not.
 5   Q    All right.  I'm showing you what has been marked as
 6        P16.235, which is a letter dated March 26, 2019, to
 7        Mitchell Garabedian.  And in this letter from the
 8        school's counsel, it says that, "On February 21st,
 9        2019, I sent you the attached letter reminding you
10        that Gina Smith and Leslie Gomez, The Hill School's
11        outside attorneys investigating this claim, wanted to
12        meet with you and your client, Kurtis Nicholas
13        Poulos, at your offices in Boston."  Let me stop
14        there.
15             Mr. Poulos, did you ever have any
16        intention of going to Boston to meet with either
17        Ms. Smith or Ms. Gomez or anyone as part of
18        investigating this claim in this case?
19   A    No.
20   Q    It reads further, "Since you had not responded to our
21        earlier requests, I asked you to contact either our
22        offices or Ms. Smith, Ms. Gomez, on or before
23        March 1st to set up this meeting.  Neither I nor
24        Ms. Smith or Ms. Gomez heard from you by March 1st."
25        Let me stop there.
```

0657a

Kurtis N. Poulos

```
 1                        Mr. Poulos, did you in any way ever try to
 2            contact any one of those individuals by March 1st?
 3       A    I've never -- no.
 4       Q    "On this basis, we have concluded that your client is
 5            not in a position to pursue this matter at this
 6            time."  Did you ever see this letter?
 7       A    Only afterward.
 8       Q    After you were sued?
 9       A    No, after the deadline of March 1st.  I was moving --
10            I moved into my new apartment on March 1st.  So for
11            three or four days I was in transit from Connecticut
12            to Milwaukee.
13       Q    Did you have any discussions -- I'm just asking if
14            any occurred -- with Mr. Garabedian or an attorney
15            from his law office between December 27th through
16            March 1st?
17       A    Yes.
18       Q    Okay.  And who do you believe you spoke with between
19            that time frame?
20       A    Mitchell --
21                        MS. DOUGHERTY:  I'm sorry, is the
22            question --
23       A    -- and one of his associates.
24                        (Interruption by the reporter.)
25                        MS. DOUGHERTY:  I may have misheard.  Did
```

0658a

```
 1          you say December 2017 or December 27th?  Or --

 2                    MR. JUBB:  December 27 of 2018.

 3                    MS. DOUGHERTY:  Okay.  Thank you.

 4     BY MR. JUBB:

 5     Q    And your response was -- ?

 6     A    2018?

 7     Q    Yeah, 2018.  Let me ask you again.

 8     A    Ask the question again because you keep mixing up

 9          your dates.

10     Q    I'm not sure I do.  Between December of 2018 when

11          that second letter went out through March 1st of

12          2019, so a matter of about three months, did you have

13          any contact with Mr. Garabedian or anyone from his

14          office?

15     A    I believe so.

16     Q    And who do you believe that you had spoken with?

17     A    Mitchell Garabedian.

18     Q    Do you know who Nathan Gaul is?

19     A    Nope.

20                    MS. DOUGHERTY:  Could we have a comfort

21          break when you're at a good place?

22                    MR. JUBB:  Yeah.  This might be a good

23          place.  Can we go off the record for about five

24          minutes?

25                    VIDEOGRAPHER:  We are now going off the
```

0659a

Kurtis N. Poulos

```
 1         record.  The time is 3:33.

 2                   (Recess taken from 3:33 to 3:41 p.m.)

 3                   VIDEOGRAPHER:  We are now back on the

 4         record.  The time is 3:41.  You may continue.

 5                   MR. JUBB:  Thank you.

 6    Q    Mr. Poulos, with respect to the last couple of

 7         questions, we ended off with the letter where a man

 8         by the name of Nathan was cc'd.  And you had said you

 9         had never spoken with that person before?

10    A    I believe it's one of Mr. Garabedian's assistants.  I

11         could be wrong.

12    Q    Did you ever speak to any of his associates by phone?

13    A    Only in the presence of Mitchell.

14    Q    When you say "in the presence," do you mean he was

15         also on the line?

16    A    Correct.

17    Q    And that's because it was a teleconference, if you

18         will?

19    A    Never -- it was never a teleconference.  It was the

20         two of them on speakerphone.

21    Q    At any point in time, did you ask your mom to talk

22         with you guys?

23                   MS. DOUGHERTY:  Objection.

24    A    No.

25    BY MR. JUBB:
```

0660a

1    Q    Did your mom -- strike that.  Did you ever go to

2         Mr. Garabedian's office?

3    A    No.

4    Q    Did you ever meet him personally?

5    A    No.

6    Q    Did your mom ever meet Mr. Garabedian?

7    A    No.

8    Q    How did you learn of Mr. Garabedian?

9    A    My mother.

10   Q    Do you know what type of research your mom did to

11        find Mr. Garabedian?

12   A    No.

13   Q    I'm going to show you what has been produced to us by

14        Mr. Garabedian's office as Garabedian 240 through

15        Garabedian 303.  Mr. Poulos, these have

16        Mr. Garabedian's letterhead on them.  They're what's

17        known as a HITECH letters as well as authorizations.

18        Is this your signature?

19   A    Yes.

20   Q    Do you recall signing these authorizations?

21   A    Yes.

22   Q    Did you do that by printing them out, signing them

23        and sending them back?

24   A    Yes.

25   Q    And is there any particular reason why they're not

0661a

Kurtis N. Poulos

```
 1        dated?

 2   A    No.  Oversight.

 3   Q    Okay.  So here it looks like on Garabedian 256,

 4        approximately 17 pages later from the first, it's

 5        dated December 15th, 2017.  Is that your signature?

 6   A    Yes.

 7   Q    Is that your handwriting by the date?

 8   A    Yes.

 9   Q    And was this -- strike that.  Were these documents

10        that were sent to you all at one time or were they

11        piecemeal?  In other words, did you receive all of

12        these letters for your signature in one instance or

13        was it multiple occasions that you recall signing

14        these things?

15   A    I believe it was one packet of paperwork.

16   Q    When you say packet, did you receive something else

17        in the mail?

18   A    Can you speak up.

19   Q    Sure.  When you said packet, was it something that

20        you received in the mail?

21   A    It was something I believe I received in a FedEx

22        envelope, maybe the USPS, but I think it was an

23        envelope.

24   Q    And then you sent these letters back signed; is that

25        right?
```

0662a

Kurtis N. Poulos

```
 1    A    Correct.

 2    Q    So in approximately May of 2019, I see an instance

 3         here, is that your signature?

 4    A    Yes.  So some of these -- I mean, you're scrolling so

 5         quickly.  Somebody must have --

 6    Q    No, I'm not asking questions about those, Mr. Poulos.

 7         I promise.  I'm not asking you about those.  Just

 8         bear with me.  The one that you have before you which

 9         is Garabedian 288, dated May 19th, 2019, is that your

10         signature?

11    A    Yes.

12    Q    Is that your handwriting for the date?

13    A    Yes.

14    Q    Okay.  And so do you recall in approximately May of

15         2019 signing these documents?

16    A    Yes.

17    Q    Are these documents that you printed out from an

18         email or were they documents that were sent to you by

19         hard copy?

20    A    I believe I printed them out.

21    Q    And were you still represented by Mr. Garabedian in

22         May of 2019?

23    A    Yes.

24    Q    Do you know -- do you have any understanding as to

25         where these letters were being sent to that are
```

0663a

```
 1          blacked out?

 2     A    Some of them I believe were to different doctors.

 3     Q    Okay.  Do you know which doctors that you wanted your

 4          records for to give to Mr. Garabedian?

 5     A    The only doctor would be Dr. Grade.

 6     Q    Okay.  Because on here I see you've got a couple of

 7          them.  But as far as you know, you only wanted

 8          Mr. Garabedian to get Mr. Grade's records?

 9     A    Yes.  It's the only doctor that would pertain to

10          this.

11     Q    Did you ever seek any psychological treatment from

12          anyone after Dr. Grade?

13     A    No.

14     Q    Have you ever received any of your medical records in

15          response to these requests?

16               MS. DOUGHERTY:  Objection.

17     A    Not to my knowledge.

18               MS. DOUGHERTY:  Can you identify the

19          specific requests because some of the documents I

20          don't think were for medical records.

21               MR. JUBB:  Well, my question just

22          pertained to medical records.

23               MS. DOUGHERTY:  Okay.  That's fine.

24     BY MR. JUBB:

25     Q    Yeah.  And at the top, I mean, I could go through
```

0664a

```
 1          them.  I'm trying to hurry this up.  It says

 2          attention medical records correspondence, this is

 3          Garabedian 303.  At the top it's addressed, it says

 4          pursuant to complete medical.  I mean it's over and

 5          over.  I'm only asking about medical records.  But,

 6          Mr. Poulos, as far as you know, you've never seen any

 7          of your medical records that were requested; is that

 8          fair?

 9     A    Correct.

10     Q    How is your relationship with your cousin,

11          Mr. Zwerner?

12     A    I mean, it's good.  We talk every once in a while.

13     Q    Do you see each other on holidays?

14     A    I try and send a text message to him and his brother.

15     Q    Do you know whether or not they have good things to

16          say about Mr. Ralston?

17     A    I have no idea what Jason would have to say.

18     Q    Am I correct that when you were a fourth former,

19          Jason Zwerner was at The Hill School?

20     A    He was a fifth former.

21     Q    Have you ever been charged with any crimes of fraud?

22     A    No.

23     Q    Has there ever been a warrant out for your arrest?

24     A    Yes.

25     Q    And when was that?
```

```
1   A    It was pertaining to a company credit card I used
2        that they said I improperly used.
3   Q    Did you improperly use it?
4   A    No.  I used it to take clients out to dinners.
5   Q    When was that?
6   A    When I was living in Ocean City.
7   Q    Whatever happened with that warrant?
8   A    Nothing.  It got thrown out.
9   Q    When did that get, as you said, thrown out?
10  A    Sometime when I was living in Connecticut.  So mid
11       2016.
12  Q    Who were the accusers in that case?
13  A    Lance's mother.
14  Q    That's Lance Whitlock from The Hill School?
15  A    Yes.  She had hired me to work for her part time, do
16       appraisals when I wasn't working at Secrets.
17  Q    Did you ever appear in court?
18  A    Nope.
19  Q    Did you have to hire a lawyer?
20  A    Yeah.
21  Q    Where was that case venued?
22  A    Whatever county Berlin, Maryland, is in.
23  Q    Do you know what the allegations were specifically?
24  A    Improper use of a credit card.
25  Q    Did you ever see the complaint?
```

Kurtis N. Poulos

```
 1    A    No.

 2    Q    What amount of money were you accused of improperly

 3         using, as you described?

 4    A    I don't know the specific number.

 5    Q    Was it more than a thousand dollars?

 6    A    Huh?

 7    Q    Was it more than a thousand dollars?

 8    A    I don't believe so.  Maybe 1,500, 2,000.

 9    Q    With respect to the classroom, your geometry

10         classroom, you mentioned that it was in the basement

11         of upper school and --

12    A    Correct.

13    Q    -- you would enter from the basement.  And then was

14         there a classroom on your right or a classroom on

15         your left?

16    A    I believe there was a classroom on the right because,

17         if my memory serves, when you take a left, there's

18         only room for one classroom down that small corridor.

19         And that would have been Mr. Ralston's.

20    Q    And was that -- at the time that was his classroom?

21    A    Yes.

22    Q    Was Mr. Ralston ever the sixth form advisor for you?

23    A    I don't believe so, no.  Other than that letter

24         asking me to reach out to him.

25    Q    Did you have any other interaction with Mr. Ralston
```

0667a

Kurtis N. Poulos

```
 1              during your third form year?

 2     A        With my what?

 3     Q        Third form.

 4     A        We had some small interactions third form.  I don't

 5              remember the specifics.

 6     Q        Do you remember anything general about them?

 7     A        He might have been one of my table masters.  Every

 8              once in a while you have to change tables so you get

 9              to meet teachers that you might not necessarily have

10              in your tenure at the -- you know, at your time at

11              the school.

12     Q        Walk me through how it was that you would stay after

13              class per your letter.

14     A        Well, he made an example out of me almost every class

15              he could.  He'd make me do exams on the chalkboard

16              rather than on paper because he thought I was

17              cheating.  So he would single me out and have me do

18              the problems up there in front of everybody.

19     Q        Would anybody else have to do problems on the board?

20     A        No, never.

21     Q        And in --

22     A        I mean, maybe -- maybe they'd have to do it for,

23              like, an individual question.  But he was having me

24              do ten questions during the middle of a quiz because

25              I wasn't showing my work.  So he singled me out
```

0668a

Kurtis N. Poulos

```
 1          because I was able to do the work without going

 2          through the proper A, B and C's of a geometry

 3          question.

 4     Q    I'm not sure I'm totally following.  So you mentioned

 5          that during a quiz he would have you do the quiz on

 6          the board?

 7     A    Yes.

 8     Q    And everybody else is taking the quiz at their desks?

 9     A    Correct.

10     Q    And when you were up at the board -- and how would he

11          grade it?

12     A    He would grade it in front of the class.

13     Q    And so while -- did everybody else submit their

14          quizzes on paper?

15     A    Correct.

16     Q    And then he would grade your class in front of

17          everybody -- your quiz in front of everybody?

18     A    No.  He would grade my test in front of everybody,

19          and he'd grade theirs whenever he felt like it.

20     Q    How many instances did this happen?

21     A    At least a half a dozen, if not more.

22     Q    Do you recall any other students ever having to do

23          this?

24     A    No.

25     Q    Would he criticize your work?
```

0669a

Kurtis N. Poulos

```
 1   A    He criticized the fact that I didn't show my work.  I
 2        would get a question and I would answer it.
 3   Q    But I'm talking about when he would grade your
 4        quizzes, would you just write the answer or would you
 5        show your work?
 6   A    I wouldn't show my work, no.  I didn't need to.
 7   Q    Was there a request by him to all the students to
 8        show their work?
 9   A    Probably, yes.  But why take the time?
10   Q    In other words, as far as you were concerned, an
11        answer is an answer and how you got there is
12        irrelevant.  Is that what your position was when you
13        were a sophomore?
14   A    Yeah.  If you want me to get from A to F, why am I
15        going to show you, B, C, D and E if I can just show
16        you F?
17   Q    Do you know if your other classmates were showing A,
18        B, C, D and E before they got to F?
19   A    More than likely they were all showing it.  They all
20        needed to in order to figure out the problem.  I'm
21        not saying I'm like a genius or something.  But why
22        am I going to do all these steps if I don't find them
23        necessary to get the correct answer?
24   Q    And is this something about -- you know, showing how
25        you got the answer in a geometry class, is this
```

0670a

```
 1            something that you just continued to not show your
 2            work?
 3      A     It was more like I could see the work and it would
 4            slow me down to write it all down rather than just
 5            write the answer.  I could see the process.  But
 6            having to write out every single line in the equation
 7            would take me five times longer than just writing
 8            down the answer.
 9      Q     Did he ever give you an explanation for why that was
10            important to him?
11      A     To make sure that I -- one was at first to make sure
12            I wasn't cheating, which was impossible because he
13            took our graphing calculators.  And I think it was
14            partially to respect the process.  But why can't he
15            respect my process then if I get to the same
16            conclusion?
17      Q     Did he explain to you ever a concept of if you show
18            all your work in steps A, B, C, D and E, but you get
19            the answer F wrong, then you would still be able to
20            get the vast majority of the points by doing that?
21      A     No.
22      Q     With respect to the answer that you filed in this
23            case, the motions that you filed, were all of your
24            statements in there true and accurate to the best of
25            your ability?
```

0671a

Kurtis N. Poulos

```
1    A    Yes.

2    Q    Has there ever been a statement in any of those

3         pleadings or motions that you knew was false?

4    A    No.

5              MS. DOUGHERTY:  Objection.

6    BY MR. JUBB:

7    Q    You mentioned in one of the pleadings, I believe it

8         was your -- forgive me.  It's irrelevant for the

9         purpose of this question.  But in there -- strike

10        that.

11             In one of the pleadings, I recall that you

12        said in there specifically the teacher I spoke with

13        Mr. Garabedian about was not at The Hill School, he

14        was at another school.  Do you recall saying that?

15             MS. DOUGHERTY:  Objection.

16   A    I'm not going to answer that.  That's a conversation

17        I had with my attorney.

18   BY MR. JUBB:

19   Q    Well, sir, I can show you the document.  We can go

20        that way.  It's 5:00, but I'm happy to show you what

21        you wrote.  All right.  So, Mr. Poulos, this is the

22        motion to dismiss that you filed.  It says here in

23        paragraph 6, "The confusion arises because at the

24        time of the communication with Attorney Garabedian

25        this teacher was no longer HIS school community if by
```

0672a

Kurtis N. Poulos

```
1              this reference you mean he had continuous tenure at
2              my school in Pottstown, PA --"
3                         MS. DOUGHERTY:  Objection.
4    BY MR. JUBB:
5    Q    "The teacher I talked about with Mr. Garabedian and
6              only Attorney Garabedian was at the time the head of
7              school at a different institution than the one I
8              attended."  So with respect to these two --
9                         MS. DOUGHERTY:  Object.
10   BY MR. JUBB:
11   Q    So with respect to these two paragraphs that you
12             wrote and you filed, how is it that you were aware
13             that Mr. Ralston was no longer at The Hill School but
14             was the head of school at a different institution?
15             Can you tell us about that?
16                        MS. DOUGHERTY:  Objection, I think you
17             read paragraph 6 incorrectly twice.  It's at HIS
18             school community.
19   BY MR. JUBB:
20   Q    Mr. Poulos, do you remember my question?
21   A    Can you say it again.
22   Q    All right.  I'll read this so we can go through my
23             reading abilities.  So paragraph 6, "The confusion
24             arises because at the time of the communication with
25             Attorney Garabedian, this teacher was no longer at,
```

Kurtis N. Poulos

```
 1        quote, HIS school community, closed quote, if by this
 2        reference it means he had continuous tenure at my
 3        school in Pottstown, PA."  Paragraph 7, "The teacher
 4        I talked about with Attorney Garabedian and only
 5        Attorney Garabedian was at the time the head of
 6        school at a different institution than the one I
 7        attended."
 8                So my question to you is how did you
 9        become aware that Mr. Ralston was the head of school
10        at a different institution before you told
11        Mr. Garabedian about it?
12   A    Oh, my mom.
13   Q    She looked him up?
14   A    Yes.
15   Q    When did she look him up?
16   A    I don't know what she does on a day-to-day basis.
17   Q    Okay.  But you told Mr. Garabedian, at least
18        according to what you wrote here, the teacher you
19        talked to Mr. Garabedian about was head of school at
20        a different institution.  So at least as of the first
21        time you first spoke to Mr. Garabedian, you believed
22        that Mr. Ralston was the head of school at a
23        different institution.  Fair enough?
24   A    Yeah, fair enough.
25   Q    Prior -- strike that.  At what point in time in
```

0674a

```
1          2019 -- strike that.

2                    We saw the HITECH letters dated May of

3          2019 that you had signed for Mr. Garabedian to get

4          your medical records.  After that date, when was it

5          that you were no longer represented by

6          Mr. Garabedian?

7                    MS. DOUGHERTY:  Objection.

8     A    I'm not answering that.

9     BY MR. JUBB:

10    Q    All right.  So this might be a good time to get into

11         these types of questions.  All right.  So how did you

12         learn -- strike that.  Is it your understanding that

13         Mr. Garabedian is no longer your lawyer?

14    A    No.

15    Q    You're shaking your head no.  I want to make sure you

16         understand my question.  Is Mr. Garabedian still your

17         lawyer?

18    A    To my knowledge, yes.

19    Q    When was the last time you spoke with him?

20    A    Around the time that this whole thing started.

21    Q    And have you had any conversations with

22         Mr. Garabedian's counsel, whether Ms. Dougherty or

23         someone from her firm?

24    A    Yes.

25    Q    Can you tell me what you talked about with
```

0675a

Kurtis N. Poulos

```
 1            Ms. Dougherty and someone from her firm, please?
 2     A      It was the last time that we had to do one of these
 3            with the judge and he told you both that I could call
 4            and ask for help.  I spoke with her after the judge
 5            got off the line; and I just basically said I
 6            appreciate any help I could get in the future, and
 7            that was the end of the conversation.
 8     Q      And what type of help, if any, have you gotten in the
 9            future?
10     A      On how to word certain things.  I've never had to
11            reach out to her, though.  It was more of a courtesy
12            to say I would appreciate your help and the fact that
13            you agreed to help.  But since then I've had no
14            reason to contact her.
15     Q      Did you have any conversations with anyone who was
16            acting on Mr. Garabedian's behalf, and not
17            Ms. Dougherty, but just anyone who was acting on his
18            behalf as related to this case?
19     A      I may have received emails dated -- or, you know,
20            that were composed by somebody in her firm on her
21            behalf.
22     Q      And what were those emails pertaining to?
23     A      Just to be prepared for documents that I would be
24            receiving in the mail.
25     Q      With respect to the conversations that you had with
```

0676a

Kurtis N. Poulos

```
 1        your mom, am I correct that she's the one who

 2        encouraged you to contact Mr. Garabedian?

 3   A    Correct.

 4   Q    And did she ever contact any other lawyer before

 5        contacting Mr. Garabedian?

 6   A    I have no idea.

 7   Q    Do you get legal advice from your mom?

 8   A    When it comes to certain things, yeah.  Why wouldn't

 9        I utilize somebody who's been an attorney for 40

10        years?

11   Q    Right.  And with respect to the documents that you

12        had filed, has she assisted you with drafting those?

13   A    Some of them, yes.

14   Q    With respect to some of the -- am I correct your mom

15        has actually reached out to Mr. Garabedian on your

16        behalf on occasion?

17   A    You'd have to ask her.

18   Q    Does she still work?

19   A    No.  She's been retired for a while.

20   Q    Does she know how to use the computer?

21   A    Yes.  She does legal research.

22   Q    Are there any other instances that you can recall

23        where you've received assistance from either

24        Ms. Dougherty or someone at her firm acting on behalf

25        of Mr. Garabedian?
```

0677a

Kurtis N. Poulos

```
 1                    MS. DOUGHERTY:  Objection.

 2    BY MR. JUBB:

 3    Q    Mr. Poulos?

 4    A    No.

 5                    MR. JUBB:  All right.  Just give me a few

 6          minutes, let me look over my notes.  We might be

 7          okay.

 8                    MS. DOUGHERTY:  Mr. Jubb, before you do

 9          that, you reviewed Garabedian 240 to 303 with

10          Mr. Poulos, and we had redacted them to remove the

11          provider names, health provider names, with the

12          expectation that we would come to an agreement that

13          there would be a protective order so that we could

14          provide the information unredacted.  I just wanted

15          to know if we could, the three of us, come to that

16          agreement and I can send you the unredacted versions

17          in case you wanted to ask questions of them

18          unredacted.

19                    MR. JUBB:  I would like to see the

20          unredacted versions, though it would have been nice

21          to have them before we made it through four hours or

22          five hours of the deposition.

23                    MS. DOUGHERTY:  Okay.  Sir, I asserted the

24          objections and produced a privilege log quite a long

25          time ago and specifically identified.
```

0678a

```
 1                    MR. JUBB:  If you want to send them over,

 2          yeah.

 3                    MS. DOUGHERTY:  Well, I think -- but I

 4          think that I need your agreement and Mr. Poulos'

 5          agreement that there will be a protective order in

 6          place that the protected health information, which I

 7          think includes the identity of the medical

 8          providers, won't be distributed.  That's why we

 9          redacted it.  I mean, it's Mr. Poulos' medical

10          providers names, so...

11                    MR. JUBB:  Sure.  I mean, I deal with

12          medical cases like this all the time.  There's no

13          reason for a confidentiality order other than to say

14          I'm not -- there's no reason for it; but if you're

15          comfortable in that context only with his

16          information, yeah, I agree not to produce them to

17          anyone.

18                    MS. DOUGHERTY:  Yeah.  My issue is that

19          Mr. Garabedian has them as his attorney.  So I think

20          they're Mr. Poulos' records and, you know, we

21          redacted them to be extra cautious.

22                    So, Mr. Poulos, do you understand you were

23          shown some documents, Garabedian 240 to 303, that

24          you signed that were medical --

25                    THE WITNESS:  Correct.
```

```
 1                MS. DOUGHERTY:  -- requests and there were

 2          redactions on them; and as you know, because we

 3          produced the records to you as well with the

 4          privilege log, the redactions are your social

 5          security number and the medical providers.  And we

 6          redacted the information just as a precaution until

 7          the plaintiff agreed to protect the information,

 8          meaning not distribute it to -- you know, outside of

 9          the litigation or publicly because it identified

10          your health providers.  And so Mr. Jubb is agreeing

11          that, you know, he will protect the information and

12          not share it publicly.  So with your agreement, I'd

13          like to email those records to Mr. Jubb without the

14          redactions in case he has further questions to

15          avoid, you know, later a new deposition about just

16          those records.  That's why I bring up the issue.

17                THE WITNESS:  Yeah, that's fine.

18                MS. DOUGHERTY:  Okay.  And, Mr. Jubb, what

19          I have at the moment easily accessible to send to

20          you is a version that shows where the redaction was.

21          So there's like a red box, the marking.  I can give

22          you just a clean version, but it also might point

23          you to where it was redacted.

24                MR. JUBB:  Okay.  Do you want to just go

25          off the record for two minutes?
```

```
 1                    VIDEOGRAPHER:  We can do that if you're

 2         ready.  We are now going off record.  The time is

 3         4:14.

 4                    (Recess taken from 4:14 to 4:25 p.m.)

 5                    VIDEOGRAPHER:  We are now back on the

 6         record.  The time on the screen is 4:25.  You may

 7         continue.

 8                    MR. JUBB:  Thank you.

 9    Q    Mr. Poulos, I have just received an unredacted

10         version of those HITECH letters and authorizations

11         for your medical records.  Milford Hospital, where is

12         that?

13    A    Milford, Connecticut.

14    Q    And when did you seek treatment there?

15    A    Oh, we had a small cooking accident carving pumpkins

16         and making pumpkin seeds.  So that would have been

17         October of 2016.

18    Q    And with respect to Yale New Haven hospital, how many

19         times were you there?

20    A    I believe just the once.

21    Q    What was that pertaining to?

22    A    That was pertaining to the accident with my right arm

23         where they made me stay for 72 hours or something.

24    Q    Can you describe to me further what happened with

25         your right arm, please.
```

0681a

Kurtis N. Poulos

```
 1    A    Oh, yeah.  I was cleaning -- I have a butcher block,
 2         and I went to pull a knife out and I cut my arm.  And
 3         they said it was self-harm.  And I said it wasn't.
 4         And they said, well, we have to keep you.  So they
 5         kept me.
 6    Q    Any other instance at Yale?
 7    A    No.  Unless that's where I went to see the
 8         orthopaedic specialist about the reconstructive
 9         surgery on my left arm.  But I think that was in
10         Hamden.
11    Q    What happened with your left arm?
12    A    So that was the night that we were carving pumpkins,
13         and I did something stupid and put a knife in the
14         sink; and instead of just turning off the disposal, I
15         thought it would be a brilliant idea to try and grab
16         it with my left hand.  And, yeah, that didn't work.
17         So I had to get I think five stitches.  But they had
18         to reconnect the tendons in these three fingers
19         (indicating).
20    Q    Okay.
21    A    So they had to do major reconstructive surgery to my
22         forearm.
23    Q    What was at Froedtert Hospital?
24    A    That would have been a visit for my pancreatitis.
25    Q    Approximately when was that?
```

0682a

Kurtis N. Poulos

```
 1    A     I believe that was in -- or, no, that wasn't for
 2          pancreatitis.  That was St. Luke's.  Froedtert was
 3          for exhaustion, and that was shortly after I moved
 4          back here from Connecticut in 2018.
 5    Q     So you moved from Connecticut to the Milwaukee area
 6          in around 2018, and you went to --
 7    A     March of 2018.
 8    Q     March of 2018.  And you said it was for exhaustion?
 9    A     Yeah.  So shortly after I moved back, my mom was in
10          and out of the hospital; I was still, you know,
11          trying to get the apartment set up, trying to take
12          care of her, and then she ended up back in the
13          hospital.  So I was constantly, you know, 10-,
14          12-hour days at work, plus driving out to Ozaukee
15          County, which is about a half an hour north of where
16          I worked at the time, to go visit her, make sure
17          she's okay.  And then obviously, like, it's my mom,
18          so I stay up and worry.  So I got treated for
19          dehydration and exhaustion.
20    Q     I see one in here from Pottstown Hospital.  Pottstown
21          is where The Hill School is.  Did --
22    A     Yes.
23    Q     -- you ever go to Pottstown Hospital?
24    A     Oh, I broke my arm freshman year skiing.
25    Q     And we had discussed that a little bit.  How did you
```

0683a

```
 1        break your arm freshman year skiing?

 2   A    I fell and I cracked the bone in my left wrist.

 3   Q    Was that --

 4   A    It was not a major break, but that's why I couldn't

 5        ski for the season.  But the problem was Pottstown

 6        Hospital doesn't really have a working ER, at least

 7        they didn't on a Saturday.

 8   Q    And Columbia St. Mary's Hospital in Mequon,

 9        Wisconsin, what was that about?

10   A    That was when I was there when I was in my coma, when

11        I was there for, like, 10 days or 12 days in Mequon.

12        I don't really remember how long I was there.  They

13        had sedated me.

14   Q    And that was in what time frame?

15   A    2015 I believe.  I'm kind of fuzzy.  I think it was

16        sometime in the middle of June of 2015.

17   Q    When you contacted a lawyer in Pennsylvania in the

18        2014 time frame, at that point -- and correct me if

19        I'm wrong, your mom had selected that lawyer?

20   A    Correct.

21   Q    Did you come to Philadelphia or was this a

22        conversation by phone?

23   A    Conversation by phone.  I haven't been to

24        Pennsylvania since I was 20, maybe 21.

25   Q    In 2014 when you contacted this lawyer in
```

0684a

```
 1          Philadelphia, Pennsylvania, what was the purpose of
 2          that?
 3    A     More of a fact-finding mission.
 4    Q     And did -- strike that.  What type of fact-finding
 5          mission?  Like, can you be a little bit more
 6          specific?
 7    A     Well, I knew that -- the statute of limitations for
 8          any sort of criminal case.  I just wanted to see what
 9          if any -- and this was more, just like I said, a
10          fact-finding mission of what if any -- if I decided
11          to later on in life, what sort of steps I could take.
12          Again, my mother had never practiced that kind of
13          law.  So he was kind enough to give me a half an hour
14          of his time to just go over some of my options.
15    Q     Do you recall his name?
16    A     No, I do not.  And I never gave him specifics.  I
17          didn't give him specifics about the school or the
18          teacher.
19    Q     You just told him generally when it occurred?
20    A     Correct.
21    Q     Was there ever a referral to some other lawyer to put
22          you in contact with?
23    A     I mean, my mother has received referrals to represent
24          me in this case; but I don't and she doesn't have 20
25          to $25,000 to pay for a retainer.
```

0685a

Kurtis N. Poulos

1    Q    Was Mr. Garabedian charging you for his time?

2    A    Not to my knowledge.

3    Q    What was the fee arrangement that you had with

4         Mr. Garabedian?

5    A    A percentage of if any settlement was reached.

6    Q    Do you recall what that percentage was?

7    A    I do not.

8    Q    With respect to the 2014 situation when you contacted

9         that lawyer, how did you know that the criminal

10        statute of limitations had already expired?

11   A    Because --

12             MS. DOUGHERTY:  Objection.

13   BY MR. JUBB:

14   Q    You can answer.  She's objecting to the form.

15   A    Excuse me?

16   Q    She's objecting to the form.  You can answer.

17   A    Okay.  I mean, I don't know if I had been told it by

18        my mother or if I just knew it from watching stupid

19        crime shows.  But I was, you know -- it was made -- I

20        was aware of it at the time.  It was more of, like I

21        said, a fact-finding mission to find out if any steps

22        were available in the future if I show -- so wanted

23        to pursue them.  And, like I said, I had decided I

24        was not going to.  I was going to move on with my

25        life.

0686a

Kurtis N. Poulos

```
1    Q    So when you say fact-finding process, you mean you

2         wanted to see what your options were potentially in

3         the future other than criminal; is that right?

4    A    Correct.

5              MR. JUBB:  Ms. Dougherty, I just got two

6         other emails from you.

7              MS. DOUGHERTY:  Yeah.  When you were

8         continuing your questioning, I just scrolled through

9         our privilege log to see if there were any other

10        redacted documents that were redacted --

11             MR. JUBB:  Okay.  Am I correct these are

12        records --

13             (Interruption by the reporter.)

14             MR. JUBB:  I said am I correct that these

15        are just additional school records where his social

16        security number was redacted?

17             MS. DOUGHERTY:  And -- hold on one second.

18        I'm just looking at the -- and my answer is no.  If

19        you -- just going by our privilege log, if you

20        scroll to Garabedian 346, there was a redaction

21        because of health provider information.  I think the

22        next couple pages, 346 to 348 and then 386 --

23             MS. JUBB:  Okay.  Just give me the Bates

24        numbers, please.

25             MS. DOUGHERTY:  Yeah, so I just --
```

0687a

Kurtis N. Poulos

```
 1                    MR. JUBB:  I just want the Bates numbers.

 2                    (Interruption by the reporter.)

 3                    MR. JUBB:  We can do this off the record.

 4                    MS. DOUGHERTY:  I can just tell you what I

 5           sent you and the reason why I sent it.  I just

 6           looked through our privilege log to make sure that

 7           there weren't other instances where we had redacted

 8           a health provider name.  I realize it's obvious when

 9           there is a social security number redacted, you

10           know.  So, and I see that there are other instances

11           between 304 later that had some redactions for

12           health provider names.  So I can tell you those

13           Bates labels.  I didn't -- I can't tell you that I

14           just confirmed right now that they're the same ones

15           you already looked at.  I just didn't want you to

16           get them later unredacted and have wished you had

17           them to ask.

18                    MR. JUBB:  I just --

19                    MS. DOUGHERTY:  I can tell you the Bates

20           labels if you want.

21                    MR. JUBB:  No, I have them.  They appear

22           to be just documents identifying the same records

23           that -- the same health providers I just asked

24           about.

25      Q    Mr. Poulos, we're still on the record.  Are you
```

0688a

Kurtis N. Poulos

1        texting with somebody?

2    A   No.  I was checking those emails.  This phone doesn't

3        actually call anybody.  It's just to control my

4        house.

5    Q   Okay.  So getting back, as of 2014, you were familiar

6        with the court systems, correct?

7    A   With what?

8    Q   The court systems.

9    A   To an extent, yeah.

10   Q   Approximately how many days do you believe that you

11       ever spent in jail?

12   A   I don't know.  21.

13   Q   When you had your -- I think you said one night

14       overnight around the 2016 time frame, were they

15       spread out over the course of different incidents or

16       is that all related to one incident?

17   A   It all started with one incident, with the disorderly

18       conduct.

19   Q   Okay.  So here are a couple of questions I want you

20       to think about.  Again, my position is that you have

21       waived your attorney-client privilege.  So I'm going

22       to ask these questions, you do what you like to do in

23       your own judgment.  What did you tell Mr. Garabedian

24       about Mr. Ralston?

25   A   I'm not going to answer that.

Kurtis N. Poulos

```
 1   Q    Did Mr. Garabedian give you any indication about the
 2        potential merits or lack thereof of such a claim or
 3        potential likelihood of success?
 4   A    I'm not going to answer that.
 5   Q    Do you have --
 6             MS. DOUGHERTY:  Mr. Jubb, could I just ask
 7        you a question?  Are you willing to ask that
 8        question limited with a yes or no?  Because if the
 9        answer is no, then you probably don't care, because
10        you asked it as an or.  You said whether there's a
11        likelihood of success or not success.  Right?  I
12        think whether it occurred or not, the way you asked
13        the question, is probably not a protected
14        communication.
15             MR. JUBB:  No, I think --
16             MS. DOUGHERTY:  No?  Okay.  All right.  I
17        was trying to make a suggestion to get through it.
18   BY MR. JUBB:
19   Q    Did you have any understanding of what the statute of
20        limitations was for what you had described to
21        Mr. Garabedian?
22   A    Did I have any idea?
23   Q    Yeah.
24   A    Yes.
25   Q    Did he?
```

0690a

```
1    A    I can't speak on his behalf.

2    Q    Did you ever discuss that with him?

3    A    I'm not going to answer that.

4    Q    Walk me through -- no, I think that's good for

5         purposes of the record, and then we can address those

6         later and the questions that fall from those specific

7         questions.  That's all I have for you right now.  I

8         may have some follow-up after Ms. Dougherty asks her

9         questions.

10                        EXAMINATION

11   BY MS. DOUGHERTY:

12   Q    Okay.  My question is yes or no.  Did you ever have a

13        discussion with Mr. Garabedian regarding the statute

14        of limitations about a claim against The Hill School,

15        yes or no?

16   A    Yes.  Yes.

17   Q    Again, yes or no.  Yes or no, do you recall the

18        content of the communication that you had with

19        Mr. Garabedian regarding the statute of limitations

20        for any claim against The Hill School?

21                  MR. JUBB:  Object.

22   A    No.

23                  MS. DOUGHERTY:  I'm sorry, was there an

24        objection?

25                  MR. JUBB:  Yeah, I'm just objecting to the
```

0691a

```
 1           form of these.

 2      BY MS. DOUGHERTY:

 3      Q    When did you retain Mr. Garabedian?

 4      A    I believe it would have been towards the end of 2017.

 5      Q    Why did you retain Mr. Garabedian?

 6      A    After reading reviews about his success in these sort

 7           of litigations, I felt that he would be somebody who

 8           would be able to help me.

 9      Q    What do you mean by success in these types of

10           litigations?

11      A    His litigation in Boston against the Catholic church

12           for one.

13      Q    Do you have an understanding about the nature of

14           Mr. Garabedian's law practice?

15      A    To an extent.

16      Q    What's your understanding of the nature of

17           Mr. Garabedian's law practice?

18      A    That he stands up for people who have been through

19           situations like I have to try and help them come

20           to --

21      Q    When you say...

22      A    Go ahead.

23      Q    No, please.  I wasn't trying to interrupt you.

24      A    I'm just saying it seemed like he was somebody who

25           helped people who had gone through similar situations
```

0692a

Kurtis N. Poulos

```
 1          in their past to move on with their life.
 2    Q    By similar situations, you mean the sexual abuse
 3          that --
 4    A    The sexual abuse, correct.
 5    Q    The sexual -- and just to be clear, the sexual abuse
 6          that you are referring to as sexual abuse by Matthew
 7          Ralston, right?
 8    A    Correct.
 9                    MR. JUBB:  Object.
10                    (Interruption by the reporter.)
11    BY MS. DOUGHERTY:
12    Q    So did you do research into Mr. Garabedian's
13          background before you retained Mr. Garabedian?
14    A    Only on the advice of my mother.
15    Q    Did you first learn about Mr. Garabedian from your
16          mother?
17    A    Correct.
18    Q    So your mother mentioned Mr. Garabedian to you?
19    A    Correct.
20    Q    Did your mother tell you anything else about
21          Mr. Garabedian when she first identified him to you?
22    A    Not really.  Just that she thought given his
23          background, that I should read about him and see if I
24          thought he could help me.
25    Q    By background, you mean Mr. Garabedian's background
```

0693a

Kurtis N. Poulos

```
 1          in representing sexual abuse survivors, correct?

 2    A     Correct.  Correct.

 3    Q     And then when you heard Mr. Garabedian -- let me

 4          start again.  The first time you ever heard

 5          Mr. Garabedian's name was when your mother identified

 6          Mr. Garabedian to you; is that correct?

 7    A     Correct.

 8    Q     And then what did you do?  Did you do a Google

 9          search?  What kind of research did you do?

10    A     Yeah.  I did a Google search, read on some of his

11          cases, told my mom that I thought this would work,

12          called to arrange a phone interview with him, knowing

13          it would be up to him if he wanted to take me on as a

14          client.

15    Q     Is there a specific reason why -- let me start again.

16          I think you said at the end of 2017 is when you

17          retained Mr. Garabedian; is that right?

18    A     Correct.  After I received the second letter from The

19          Hill School.

20    Q     By the second letter from The Hill School, you're

21          referring to the November 20th, 2017, letter that I

22          think you said you received through email that you

23          had looked at earlier today with Mr. Jubb, P16.237 to

24          239, that had that blue text identifying the child --

25          quote, child protection experts.  Is that the letter
```

Kurtis N. Poulos

1          you're talking about?

2    A    Correct.  I received the email with the hyperlinks

3          and made some phone calls; and then over the course

4          of the next couple of weeks, I would guess, got in

5          contact with Mitchell.  Or, sorry, Mr. Garabedian.

6    Q    I'm trying here to show you a letter, but I have the

7          wrong thing open.  Okay.  I'm not so good with

8          sharing screens.  So can everybody else see a PDF

9          called Historical Allegations of Sexual Abuse at The

10         Hill School at the top -- or at The Hill at the top?

11   A    I can.

12              MR. JUBB:  Sure.

13   BY MS. DOUGHERTY:

14   Q    Okay.  So let me just identify the document.  It's

15         four pages long.  I've shared my screen with you.  On

16         the bottom right, the first page indicates Garabedian

17         029, I'm just going to scroll to the last page just

18         to identify the document.  The last page on the

19         bottom right indicates Garabedian 032.  So I'll

20         scroll through the document a little bit by -- you

21         know what, I'm just going to mark the document as --

22         I'll just do D-1.  So D-1 is going to be Garabedian

23         029 through Garabedian 032.  I'm just going to scroll

24         through it slower, Mr. Poulos, so you can review it

25         and then I want you to identify it for me.  So tell

0695a

Kurtis N. Poulos

```
 1        me if I'm scrolling too quickly.

 2   A    There's the part -- go back up.  I could see it

 3        highlighted in black.  There.

 4   Q    Okay.  So this document which I've marked as D-1,

 5        Garabedian 029 through Garabedian 032, it looks like

 6        at the very top has an email from Mary Ellen Poulos,

 7        that's your mother, right?

 8   A    Correct.

 9   Q    Dated December 13, 2017, 12:02 p.m., to Mitchell

10        Garabedian.  Do you see that?  It says thank you,

11        Mary Ellen Poulos.  Yes?

12   A    Correct.

13   Q    Okay.  Then there's an email below that from

14        Kurtis -- how do you say that?

15   A    Poulos.

16   Q    No, F-R-O-E-D-T-E-R-T.  How do you pronounce --

17   A    Froedtert.

18   Q    -- it?  Froedtert.  Okay.

19   A    Froedtert.

20   Q    So Kurtis Froedtert dated November 20, 2017, to Mary

21        Ellen Poulos, subject line forward Historical

22        Allegations of Sexual Abuse At The Hill.  And then

23        below that, there's a forward email from Headmaster

24        Zachary G. Lehman, P1618, date November 20th, 2017,

25        to Kurtis N. Poulos, subject Historical Allegations
```

```
 1              of Sexual Abuse At The Hill.

 2                   So this third email on the first page of

 3              D-1, is this the email that you're talking about that

 4              you got from The Hill School that prompted you to

 5              react?

 6     A   Correct.  And not to go into too many fine details,

 7              the reason the email was then forwarded from my

 8              mother to Mitchell was because I no longer had a copy

 9              of it that I could locate in my email account.

10              That's why I print everything now.

11     Q   Okay.  So it looks like you got the email at your

12              LEX101078 at gmail dot-com account on November 20th,

13              2017, at 1:41 p.m., from Headmaster Zachary Lehman.

14              Did you read the email close in time to when you

15              received it?

16     A   I went outside of my place of work, had a cigarette,

17              read the entire email, called my mother, and then I

18              forwarded her the email.

19     Q   Okay.  And the email forward from you to your mother,

20              it says -- it has the same date, November 20th, 2017,

21              but it says 1:08 p.m.  Are you and your mother in a

22              different time zone?

23     A   I was in Connecticut, she was in Wisconsin.

24     Q   Okay.  And then later on --

25     A   So it would have been 2:08 for me.  So it was roughly
```

0697a

Kurtis N. Poulos

```
 1        27 minutes after I first received the email, I called
 2        her, she read it, she called me back, I forwarded her
 3        the email.
 4   Q    Okay.  And when you -- what did you discuss with your
 5        mother when you spoke to her on the phone on
 6        November 20th, 2017, about the email that has now
 7        been marked as D-1?
 8   A    I commented about the fact that they mentioned that
 9        they had hired people to help the students, and asked
10        for her advice if she thought I should contact them.
11   Q    Is there anything else that you discussed with your
12        mother when you called her on November 20th, 2017, in
13        reaction to the email that is -- I guess a series of
14        emails that's now been marked as D-1?
15   A    No.  Just strictly that I had received the email and
16        I wanted to see what she thought I should do.  So I
17        forwarded it to her, and she called me back and said
18        do not contact them.  But forward -- you know, but...
19   Q    Why did you -- I'm sorry.  Go ahead.
20   A    No.  Go ahead.
21   Q    I apologize.  I'm not trying to interrupt you.  It's
22        difficult sometimes, as Mr. Jubb expressed, to figure
23        out when you're done talking over Zoom.  So please
24        just keep talking or tell me to stop talking if
25        you're not done.  Why did you think -- or let me --
```

0698a

```
 1          strike that.  Let me start again.
 2                 What about the November 20th, 2017, email
 3          made you think you should contact Ms. Gomez or
 4          Ms. Smith?
 5    A     Because I thought the school was going to take a
 6          modicum of responsibility, having known about these
 7          situations for so long, that those were people that
 8          were actually looking to help previous students.
 9    Q     Did you -- did your mother -- I think you said you
10          asked your mother her opinion on what you should do
11          in response to the November 20th, 2017 email; is that
12          right?
13    A     Correct.  And she said let me find out who those
14          people really are.
15    Q     And then did your mother call you back or email you
16          when she learned who these people really were?
17    A     I believe she called me right back.
18    Q     So you had two telephone discussions with your mother
19          on November 20th, 2017, about the email from the
20          headmaster on November 20th, 2017?
21    A     Correct.  The first one was to tell her about the
22          email when she instructed me to forward her the
23          email.  The second phone call was then her calling me
24          back saying not to contact them or the school.
25    Q     So if you can, I've scrolled a page to the second --
```

Kurtis N. Poulos

```
 1           I've scrolled D-1 to the second page to the paragraph
 2           that says through the review.  Right?  So the letter
 3           indicates, "Through the review, we learned of several
 4           troubling incidents in The Hill School's history.
 5           Those incidents involved conduct several decades ago
 6           by a small number of faculty members, none of whom
 7           have been associated with The Hill for many years and
 8           one of whom is deceased."
 9                   Do you have any information about any of
10           the incidents referenced in the email reflected in
11           D-1?
12    A      Do I have any hard evidence?  No.  But do I know what
13           they're referring to?  Yes.
14    Q      Okay.  What is your understanding of what Mr. Lehman
15           was referring to when he wrote about several
16           troubling incidents several decades ago?
17    A      Without naming names, that students were sleeping
18           with female faculty members, that the faculty member
19           who is deceased had also abused some of the male
20           students.  And basically I guess you could include
21           the fact that we knew which faculty members were
22           cheating on their spouses with which-other -- with
23           the other faculty members or -- and/or student.
24    Q      So the situations that you're describing that you
25           have in mind right now, are those instances that
```

Kurtis N. Poulos

```
 1          occurred during the time period that you were at The

 2          Hill School?

 3     A    Yes.  Those are -- I'm not talking about anything

 4          specific other than the time that I was at that

 5          school, knowing the improprieties of those teachers,

 6          the one who is deceased, the faculty members sleeping

 7          with other students, and the faculty members cheating

 8          on their spouses with other faculty members.  I

 9          never -- that's part of the reason I just never

10          gossiped about sh -- excuse me, stuff like that.  It

11          didn't affect my life with -- in regards to what

12          those other people were doing.

13     Q    Did you know or have an understanding about the

14          purpose of the letter that Mr. Lehman sent on

15          November 20th, 2017?

16               MR. JUBB:  Note my objection.

17     A    To be blunt, it was the school trying to cover

18          themselves from getting another lawsuit like they had

19          gotten years prior when a faculty member impregnated

20          one of the new female students.

21     BY MS. DOUGHERTY:

22     Q    Is there a particular reason that you decided that

23          you should contact a lawyer when you received the

24          November 20th, 2017, letter via email?

25     A    Yeah.  Because I believed after speaking to my mom,
```

0701a

Kurtis N. Poulos

```
 1         the school was being deceitful.  (Interruption -
 2         witness talking to dog.)  I'm sorry.
 3    Q    It's okay.
 4    A    Yeah.  Because, to be honest, that letter comes off
 5         as we're going to help you get through, you know,
 6         what you went through.  And it turned out to be more
 7         of a we're going to try and do our best to cover this
 8         up so that we don't end up like one of the other, you
 9         know, boarding schools that is named in some of these
10         lawsuits.
11    Q    Did you consider the November 20th, 2017, letter that
12         you received via email that's now been marked as part
13         of D-1 an invitation to report the abuse that you
14         experienced during your time at The Hill School?
15              MR. JUBB:  Objection to the form.
16    A    100 percent.
17    BY MS. DOUGHERTY:
18    Q    Is there anything -- I can put the letter back up if
19         you would like.  In fact, why don't I just do that.
20    A    No, I don't -- I pretty much know what it says.
21    Q    Okay.  My question is, is there any particular
22         component of the November 20th, 2017, letter that you
23         received via email that's now been marked as part of
24         D-1 that led you to believe the school was inviting
25         you to report your experience of sexual abuse with
```

0702a

```
 1            Mr. Ralston during your time at The Hill School?
 2                    MR. JUBB:  Ms. Bayer, are you getting my
 3        objection?
 4    A    Not specifically by name, but --
 5                    THE REPORTER:  I didn't -- I was just
 6        going to stop -- excuse me, I was just going to stop
 7        and say did you object.
 8                    MR. JUBB:  Yeah.  That's why I said I want
 9        to make sure you hear my objections.  So please note
10        my objection on that one.  And then, Mr. Poulos, go
11        ahead.
12    A    No, that's fine.
13    BY MS. DOUGHERTY:
14    Q    Do you remember the question or do you need me to ask
15        it again?
16    A    If you could ask it again, I would prefer.
17    Q    Sure.  I just want to know if there's a particular
18        part or parts of the November 20th, 2017, letter that
19        you received via email which has now been marked as
20        part of D-1 that led you to believe the school was
21        soliciting you to report your experience of sexual
22        abuse with Mr. Ralston -- or by Mr. Ralston?
23                    MR. JUBB:  I'll object.
24    A    Again, I don't believe they were asking for specific
25        names through the email.  I think they were more
```

0703a

Kurtis N. Poulos

```
 1          asking for you to come forward and let them know what
 2          had happened.  Whether or not they were going to ask
 3          for specific names, I don't know.  I mean, I would
 4          assume eventually we would get there.  But, again, I
 5          looked at it as more of a protective, you know, type
 6          of maybe we can get you some counseling, maybe we can
 7          help you get through this so you can live a normal,
 8          productive life.  Not we're going to probably take
 9          this and shove it in a drawer somewhere and make you
10          sign an NDA or something.
11     BY MS. DOUGHERTY:
12     Q    Why did you decide that you were going to come
13          forward in 2017?
14               MR. JUBB:  Note my objection.
15     A    I guess because I thought I was in a strong enough
16          position with a good job, what I thought was a
17          healthy relationship, and have somebody by my side
18          who would help me through it, not agitate the
19          situation.
20     BY MS. DOUGHERTY:
21     Q    What did you hope to achieve by retaining
22          Mr. Garabedian?
23               MR. JUBB:  Note my objection.
24     A    That the truth comes out.  That the truth comes out
25          and this sort of stuff, these sick behaviors stop.  I
```

0704a

```
 1          know these are all small, tight-knit communities and
 2          a lot of it has to do with keeping secrets for fear
 3          of letting down your family, you know, getting in
 4          trouble with the school, being ostracized at the
 5          school.  And, you know, it should be just strictly a
 6          place of higher learning.
 7    BY MS. DOUGHERTY:
 8    Q    Did you have an objective of receiving money from The
 9          Hill School by retaining Mr. Garabedian?
10    A    No --
11                MR. JUBB:  Note my objection.  You can
12          answer.
13    A    And, as I stated, all I ever really wanted was my
14          tuition back.  That's it.
15    BY MS. DOUGHERTY:
16    Q    Okay.  So you -- I'm sorry.
17    A    Yeah.  But I did, you know, I did want my tuition
18          back.  I didn't want, you know, a crazy amount of
19          money.  You know, the fact of the matter is if I got
20          a crazy amount of money, I would probably donate it
21          either to my family's hospital or, you know -- I
22          don't know.  But I would try and make sure I could
23          provide services that were legitimate so that people
24          do not go through stuff like this in the future.  So
25          at the end of the day, yes, I wanted my tuition back.
```

0705a

Kurtis N. Poulos

```
 1    Q    Okay.  Just so I understand, you wanted The Hill
 2         School to pay you money in the amount of the tuition
 3         that you had paid for the three years you attended
 4         The Hill School; is that right?
 5              MR. JUBB:  Note my objection.
 6    A    For tuition, the cost of, you know, flying back and
 7         forth, and anything I would have -- you know, like
 8         the books were college price stupid high.  You know,
 9         you get an algebra textbook and it's $300 in high
10         school; when if you go to a public school, they just
11         give you stuff.  And we were made to buy certain
12         things.  We had to have certain clothes every year.
13         And, you know, it gets to be expensive.  Now, granted
14         I had my trust fund where I could go to them at the
15         beginning of the year and go I need $2,000 because I
16         grew four inches and I need basically all new clothes
17         to go to school.  You know, I need plane tickets so
18         that I can fly to and from Philadelphia.  I need
19         transportation money.  I need money to live for,
20         like, incidentals.  Like if something gets ruined
21         when I'm at school, I'm going to have to, you know,
22         replace a blazer or a tie or a dress shirt.  I mean,
23         it wasn't cheap to just -- even attend class was
24         expensive.  And, like I said, maybe besides a few
25         odds and ends, that all came out of my inheritance,
```

0706a

Kurtis N. Poulos

1        no one else's pocket.

2    Q   Okay.  I just want to make sure I have a complete

3        list.  So you wanted The Hill School to pay back the

4        money that you spent for tuition, the cost to travel

5        back and forth to school, the cost of books?

6    A   Sporting equipment that we had to provide for

7        ourselves.  So if you wanted to go skiing, say, they

8        weren't going to supply you with skis, you had to go

9        out and buy your own skis.  If you wanted to play

10       golf, you had to go out and buy your own golf clubs.

11       I mean, all of that stuff adds up over the years.

12   Q   Okay.  So tuition, travel, cost of books, sporting

13       equipment.  Anything else that you wanted The Hill

14       School to pay to you?

15           MR. JUBB:  Note my objection.

16   A   Not really.  I mean -- no.

17   BY MS. DOUGHERTY:

18   Q   And at the time that you retained Mr. Garabedian, you

19       had it in mind that you intended to request that The

20       Hill School pay you the cost of the tuition you paid

21       to Hill School, the travel expense, the cost of books

22       and sporting equipment; is that correct?

23   A   Correct.

24   Q   Did you -- now, my first question is I want to limit

25       it to a period of time.  At the time when you

0707a

Kurtis N. Poulos

```
 1            retained Mr. Garabedian, did you have in your mind an

 2            amount of, you know, the total amount of the tuition,

 3            travel, cost of books and the sporting equipment?

 4    A       Roughly $120,000.  I mean, to be honest, I never saw

 5            my exact bills for tuition.  I had a general idea

 6            about how expensive it was.  But they just sent the

 7            paper to the bank and the bank just sent them a

 8            check.  If I needed something, I'd just sign a piece

 9            of paper at the -- you know, at the sporting goods

10            store that we had on campus, and they would just send

11            a bill to my trust and the trust would send them a

12            check.  So there is plenty of numbers that I could be

13            way over, I could be way under.  I honestly don't

14            know.  That would be something where you'd have to

15            contact the people that used to run my trust account

16            because they would have to have I would assume

17            records of that.

18    Q       Is it a fair characterization that when you contacted

19            Mr. Garabedian, you had in your mind that you wanted

20            to recover around $120,000 from The Hill School, but

21            you intended to actually do research to determine the

22            actual amount of tuition, the actual amount of

23            travel, the cost of books, and the sporting

24            equipment?

25    A       Yes.
```

Kurtis N. Poulos

```
 1                  MR. JUBB:  Note my objection.
 2    BY MS. DOUGHERTY:
 3    Q    And so I think what you're explaining is that the
 4         $120,000 number you had in mind could be too high or
 5         could be too low, that what you wanted was
 6         essentially reimbursement from The Hill School for
 7         the tuition, travel expenses, cost of books and the
 8         sporting equipment; is that right?
 9    A    Correct.
10    Q    Did you want The Hill School to provide any mental
11         health services to you?
12    A    Yes.
13    Q    Do you have -- at the time when you retained
14         Mr. Garabedian, did you have as an objective to
15         obtain relief from The Hill School in the form of
16         mental health treatment?
17    A    Yes, that I could go and see a qualified therapist
18         and maybe for -- you know, not saying that I was
19         going to be like I'm going to go see him for 20
20         years, you can foot the bill; but that they would be
21         willing to pay for, you know, six months to a year of
22         sustained therapy where I could work through the
23         issues in a constructive way rather than drown them
24         out with liquor or drugs.
25    Q    Okay.  So your intention in -- at least in part in
```

0709a

Kurtis N. Poulos

```
 1        retaining Mr. Garabedian, in addition to receiving

 2        the reimbursement payment we've discussed, was also

 3        to have The Hill School pay for medical psychological

 4        treatment to treat the effects of the abuse you

 5        sustained; is that right?

 6               MR. JUBB:  Note my objection.

 7   A    Yes.  The depression, the way -- you know, I could

 8        work through some of the issues and understand the

 9        way -- the reasons maybe behind why I acted the way I

10        did for so many years where I chose to make every

11        healthy relationship into an unhealthy relationship;

12        and work through those issues in a positive way like

13        I'm doing now.  The only difference is now I'm doing

14        it on my own with my dog.

15   BY MS. DOUGHERTY:

16   Q    Now, again, I'm just limiting my question to at the

17        time when you retained Mr. Garabedian.  At the time

18        when you retained Mr. Garabedian, did you have in

19        mind how much the therapy that you wanted The Hill

20        School to pay for, how much that would cost?

21   A    No.

22               MR. JUBB:  I'm going to object.  I think

23        you need to be more specific.  What do you mean when

24        you say at the time you retained?

25               MS. DOUGHERTY:  I think he said that it
```

Kurtis N. Poulos

```
 1          was the December of 2017 -- well, let me ask.

 2    Q     Mr. Poulos --

 3                MR. JUBB:  No, no, we've got to be more

 4          specific.

 5                MS. DOUGHERTY:  I think he did say it --

 6          what?

 7                MR. JUBB:  Objection.  So I need you to

 8          say at the time you retained, I mean before he

 9          walked in the door, or at the time he retained which

10          is much vaguer.  So I think you need to pin that

11          down.

12                MS. DOUGHERTY:  I'm sorry, he already

13          confirmed in his testimony that he never walked in

14          the door.  And I think he already testified that he

15          retains Mr. Garabedian at the end of 2017.

16    Q     Isn't that right, Mr. Poulos?

17    A     I did.

18                MR. JUBB:  Excuse me, when I said walked

19          through the door, I'm being facetious.  I know he

20          never went there.

21                MS. DOUGHERTY:  Mr. Poulos --

22                (Interruption by the reporter.)

23                MR. JUBB:  I need to make this clear.

24          Counsel keeps saying at the time you retained

25          Garabedian.
```

0711a

Kurtis N. Poulos

```
 1              MS. DOUGHERTY:  Yeah.

 2              MR. JUBB:  And so my question is asking

 3        her to specify what she means by at the time.  Are

 4        you saying the day you saw -- the day you talked to

 5        him?  Or are you saying --

 6              MS. DOUGHERTY:  Thank you, Mr. Jubb.

 7    Q   Mr. Poulos, when did you retain Mr. Garabedian?  I

 8        think I've asked this and you answered it, but we're

 9        going to just confirm it.  When did you retain

10        Mr. Garabedian?

11    A   I believe I retained him in December of 2017.

12    Q   Okay.  And I've asked you a number of questions that

13        I specifically asked you to limit your answer to the

14        time period of when you retained Mr. Garabedian.  At

15        the time that you retained Mr. Garabedian.  And you

16        understood my question to be asking you that in

17        December 2017 when you retained Mr. Garabedian; is

18        that correct?

19    A   Correct.  I understood it.

20              MR. JUBB:  Note my objection.  If you

21        can't figure out how to make that more specific,

22        it's clearly intended to -- it's an unfair question.

23              MS. DOUGHERTY:  Mr. Jubb, it's really not

24        and you're just --

25              MR. JUBB:  No, it is.
```

0712a

Kurtis N. Poulos

```
1                    MS. DOUGHERTY:  -- being silly.

2                    MR. JUBB:  It is --

3                    MS. DOUGHERTY:  Thank you.

4                    MR. JUBB:  Why don't you -- you're trying

5            to say before you spoke with Mr. Garabedian.  Go

6            ahead.  That's how we're going to play this because

7            you've already objected to this type of stuff.

8                    MS. DOUGHERTY:  What could your objection

9            possibly be?  What?

10                   MR. JUBB:  I just told you what my --

11                   MS. DOUGHERTY:  Tell me.  Tell me right

12           now.

13                   MR. JUBB:  I just need you to --

14                   (Interruption off the record.)

15                   MS. DOUGHERTY:  You don't need me to do

16           anything.  I want you to tell me what your -- what

17           could possibly be the prejudice or the issue with my

18           question?

19                   MR. JUBB:  At the time you retained is

20           very broad.  I'm asking you to specify for us, for

21           the witness, so that I know whether or not it's a

22           fair question.  Are you referring to the time that

23           he's in the office with -- excuse me, the time he's

24           speaking with Mr. Garabedian on the phone or are you

25           referring to beforehand?  Because he said December
```

Kurtis N. Poulos

```
 1          of 2017, right?  So the whole month doesn't count as
 2          at the time.
 3                  MS. DOUGHERTY:  All right.  Let's just do
 4          it this way.
 5     Q    Mr. Poulos, have you ever had an intent other than to
 6          recover payment from The Hill School for your
 7          tuition, travel expenses, cost of books and sporting
 8          equipment?
 9     A    No, I have not.
10     Q    Have you ever had an intent other than -- I'm going
11          to start again.  Was there ever a time when you
12          didn't want The Hill School to pay for the cost of
13          therapy or treatment for the mental health issues
14          that you described?
15     A    Say that again.
16     Q    Was there ever a time, whether it's December -- was
17          there ever a time that you did not want The Hill
18          School to pay for therapy or treatment for your
19          mental health issues that were a result of the sexual
20          abuse by Mr. Ralston?
21     A    No --
22                  MR. JUBB:  Objection.
23     A    -- there was not.  Hey, Google, turn on the dining
24          room.
25     BY MS. DOUGHERTY:
```

Kurtis N. Poulos

```
 1    Q    Okay.  So you wanted The Hill School to pay you money

 2          to reimburse tuition, travel, cost of books, sporting

 3          equipment; you wanted The Hill School to pay for the

 4          cost of medical mental health treatment; is that

 5          right?

 6    A    Correct.

 7    Q    And did you want anything else from The Hill School?

 8                MR. JUBB:  Note my objection.

 9    A    Not really.

10    BY MS. DOUGHERTY:

11    Q    Now, what did you mean when you said if The Hill

12          School paid a lot of money, you would donate it to

13          the hospital?  I think you said your family's

14          hospital.

15    A    Well, my family founded a hospital.  We're pretty

16          philanthropic in the State of Wisconsin.  And I think

17          if I could donate money to them, then they could

18          start a program there with qualified people or I

19          could donate money to a program that they already are

20          working with.  Froedtert has the main hospital and

21          maybe 30 outlying properties that are owned by some

22          member of my family, I'm not sure who exactly.  I

23          have nothing to do with it, but I'd like to be part

24          of that legacy.

25    Q    Did you think that The Hill School should pay money
```

0715a

Kurtis N. Poulos

```
 1          other than to reimburse you for your tuition, travel,

 2          cost of books, sporting equipment, and to pay for

 3          your mental health treatment?

 4                  MR. JUBB:  Note my objection.

 5   A    At the beginning, no.

 6   BY MS. DOUGHERTY:

 7   Q    What do you mean by "at the beginning"?

 8   A    I think that they should legitimately hire people to

 9          help students that they -- that have come forward and

10          actually find them counseling.  Not hire attorneys

11          that pretend to be child advocates.  That is

12          something that I've never discussed with Mitchell or

13          you or anyone.  But given the amount of money that

14          that school has, I don't think that's a big ask that

15          they make sure that the students there get better

16          access than -- I believe they have one counselor for

17          500 students.  And granted that's more than most, you

18          know, that's better than most public schools get.

19          But they have so much money, it wouldn't be hard to

20          put in facilities there to make sure that students

21          who do go through similar situations don't feel

22          intimidated to stand out -- or step forward and speak

23          to somebody knowing that there will be checks in

24          place to help them.

25                  They have no problem building an entire
```

Kurtis N. Poulos

```
 1        little town for teachers and putting in ice skating
 2        rinks.  But when it comes to the overall mental
 3        health of what they put their students through, it's
 4        barbaric.  I mean, students hanging themselves?
 5        Jumping out of windows?  And they do nothing to help
 6        them afterward.
 7   Q    So was it your objection -- sorry, let me start
 8        again.  Was it your objective to pursue some type of
 9        remedy for other students who had --
10   A    Yes.
11   Q    -- experienced sexual abuse like you had?
12   A    Yes --
13               MR. JUBB:  Note my objection.
14   A    Yes.  Sorry for interrupting, but yes, 100 percent.
15   BY MS. DOUGHERTY:
16   Q    This objective of pursuing relief for other students
17        who had sustained sexual abuse, was that an objective
18        that you had on your own?
19   A    Yes.
20               MR. JUBB:  Note my objection.
21   BY MS. DOUGHERTY:
22   Q    Did you have the objective of pursuing relief for
23        other students who had been victims of sexual abuse
24        prior to ever meeting Mr. Garabedian?
25   A    No, I did not.
```

```
 1                    MR. JUBB:  Note my objection.
 2    A    This is something, like I said, is something that has
 3         only come into my forethought recently, the more I'm
 4         trying to deal with this on my own, that there should
 5         be some sort of facility in place there to help the
 6         students, whether it be the same sexual abuse that I
 7         went through or whether it be the overwhelming
 8         pressure of just attending that school.  Now,
 9         granted, I don't know what it's like now as far as
10         academic community and what sort of pressures they
11         put on their students.  But I can tell you about
12         students that tried to commit suicide when they were
13         there, but they were too ashamed to tell anybody.  So
14         they just went on going on.  Every grade you ever got
15         was posted for the entire school to ridicule.  I
16         mean, it wasn't -- kids would come back over breaks
17         and hang themselves in their dorms.  I mean, that's
18         not normal.  We had a kid jump out of a window
19         because he was so stressed out he took tabs of LSD.
20    BY MS. DOUGHERTY:
21    Q    When you contacted the lawyer in 2014, did you
22         identify Mr. Ralston to the lawyer?
23    A    I did not.  I didn't even identify the school.
24    Q    Other than your mother and Mr. Garabedian, is there
25         anyone else -- well, let me start again.  Other than
```

0718a

Kurtis N. Poulos

```
 1        your mother, Mr. Garabedian and I think your treating
 2        psychologist or psychiatrist, Mr. Grade, have you
 3        told anyone else about the abuse you sustained at the
 4        hands of Mr. Ralston?
 5              MR. JUBB:  Note my objection.
 6   A    I have told one other person about the abuse, but I
 7        never said the name.
 8   BY MS. DOUGHERTY:
 9   Q    And, I'm sorry, is that Emily, your ex-girlfriend?
10   A    Correct.
11   Q    So you told Emily that you were sexually abused when
12        you were at The Hill School, but you did not identify
13        Mr. Ralston as the perpetrator of the sexual abuse;
14        is that right?
15   A    No, I did not.
16   Q    Have you identified Mr. Ralston's -- Mr. Ralston by
17        name or the identity of The Hill School to Mr. -- or
18        Dr. Grade, your treating psychiatrist?
19   A    Yes, I have.
20   Q    Have you told anyone else that you survived sexual
21        abuse other than Emily, your mother, Dr. Grade and
22        Mr. Garabedian?
23   A    No.  I can add to that by saying I believe members of
24        my family know, but not because of me, because of my
25        mother.  So I believe she had a conversation with my
```

Kurtis N. Poulos

```
 1         aunt.

 2    Q    When was the first -- let me start again.  It's true

 3         that Mr. Ralston -- let me start again.

 4                   Matthew B. Ralston sexually abused you

 5         when you were attending The Hill School; is that

 6         right?

 7    A    Correct.

 8                   MR. JUBB:  Note my objection.

 9    BY MS. DOUGHERTY:

10    Q    When was the first time that Mr. Ralston sexually

11         abused you?

12    A    Not until my sophomore year.

13    Q    How old were you the first time that Mr. Ralston

14         sexually abused you?

15                   MR. JUBB:  Note my objection.

16                   MS. DOUGHERTY:  What's your objection?

17                   MR. JUBB:  To the nature of you saying

18         abused as opposed to -- we're not -- we're no longer

19         referring to him as an alleged victim.  You're

20         referring to him as a victim of sexual abuse by a

21         person who's very adamantly denied it.  That's -- if

22         you just want to clarify it.

23                   MS. DOUGHERTY:  That's not a valid

24         objection.  He says he --

25                   MR. JUBB:  My objection is --
```

0720a

```
 1                    MS. DOUGHERTY:  Mr. Poulos says he was
 2          abused by Mr. Ralston.  I'm asking him to provide
 3          the details of that.  There's no form issue with my
 4          question.
 5                    MR. JUBB:  No, it's the form of your
 6          question.  I'm just objecting to the form of --
 7                    MS. DOUGHERTY:  No, it's really not.
 8                    MR. JUBB:  Do you want to keep asking the
 9          question or do you want me to just tell you I'm
10          objecting to the form of your question?  I think
11          it's poorly worded.
12                    MS. DOUGHERTY:  Whatever.
13     Q    I'm sorry.  So how old were you the first time when
14          Mr. Ralston sexually abused you?
15     A    14 or 15.
16     Q    Do you remember the first time Mr. Ralston sexually
17          abused you?
18                    MR. JUBB:  Note my objection.
19     A    Not specific dates.  I remember the general feeling.
20          Like I said, I've done my best to black out a good
21          portion of my high school existence.  Not always the
22          healthiest way, but...
23     BY MS. DOUGHERTY:
24     Q    I understand that this is difficult to discuss.  But,
25          unfortunately, this is where we find ourselves.  So
```

0721a

Kurtis N. Poulos

```
1              can you please tell me what you do remember about the

2              first time you were sexually abused by Mr. Ralston?

3                        MR. JUBB:  Note my objection.

4    A    I believe it was in his classroom just making general

5         gestures towards me, and that escalated into keeping

6         me after class on certain days, and that escalated

7         further.  I mean --

8    BY MS. DOUGHERTY:

9    Q    Okay.  So -- I'm sorry.  I'm not trying to cut you

10        off.

11   A    No, that's it.

12   Q    So just focusing on the first time that Mr. Ralston

13        sexually abused you, you said that was in his

14        classroom.  Is that the geometry classroom?

15                       MR. JUBB:  Note my objection.

16   A    Correct.

17   BY MS. DOUGHERTY:

18   Q    I think you described it earlier as a classroom at

19        the end of a hallway with a prison-like window on the

20        door?

21   A    Yeah, a small window.

22   Q    And what happened the first time that Mr. Ralston

23        sexually abused you?

24   A    It was by touch only.

25   Q    Okay.  So is it the case that you and Mr. Ralston
```

0722a

```
 1            were alone in his classroom?

 2    A       Correct.

 3    Q       And how did Mr. Ralston touch you the first time that

 4            Mr. Ralston sexually abused you?

 5    A       I was walking, from the best of my recollection, I

 6            was walking out the door, which was always shut.  I

 7            mean, pretty much every classroom door was always

 8            shut.  I remember leaving and him grabbing me from

 9            behind on my crotch and pulling me back into the

10            room.  And I kind of blacked out from there.  I do

11            remember him, you know, using -- grabbing my forearm

12            to rub him.

13    Q       Okay.  Why were you and Mr. Ralston alone in his

14            classroom on the instance that you're talking about

15            now?

16    A       I don't know.  It might have been one of the days

17            where I was the last one out because I was cleaning

18            the board for him, because he had made me put up my

19            entire quiz on the board.  So when everybody else

20            hears the bell, they run; and he goes, okay, clean

21            up.  And then I've got to pack all my crap up into my

22            bag, you know, textbook, notebook, calculator,

23            anything else that I had on my desk.  While he's

24            packing up -- he had, like, a little brown satchel

25            that he always carried, if I remember correctly.
```

0723a

Kurtis N. Poulos

```
 1    Q    Was it your perception that Mr. Ralston had you
 2         perform your quizzes on the chalkboard and grade them
 3         at the time in an effort to delay your exit from the
 4         classroom?
 5    A    I believe it was that in conjunction with just
 6         overall intimidation, making sure that I knew who was
 7         in control of every situation when I was his student.
 8    Q    Okay.  So the first time that you remember
 9         Mr. Ralston sexually abusing you, you were leaving
10         the classroom and he put his hand on the -- on your
11         penis on the outside of your clothes; is that right?
12    A    Correct.
13    Q    And then he pulled you back into the classroom away
14         from the door?
15    A    Correct.  And then the doors, if I remember
16         correctly, were pretty heavy metal doors at the time.
17         And they were hinged to basically shut automatically.
18         So it's not like the last student had to make sure
19         and shut the door.  We basically had fire doors all
20         over the buildings because of how old they were.
21    Q    Were you already at the door, like, did you have your
22         hand on the doorknob?
23    A    I already had the door partially open.  That's what
24         I'm saying, it wasn't like a flimsy door where you
25         could just like flip your wrist and whip it open.
```

0724a

Kurtis N. Foulos

```
 1          You literally had to pull the door open in order to
 2          even get out.  So if something comes up from behind
 3          and pushes that door shut, it's going to shut before
 4          you have a chance to react and keep it open.
 5     Q    Okay.  And Mr. Ralston you said pulls you back from
 6          the door?
 7     A    And sort of went like this, like pushed the door and
 8          grabbed me (indicating).
 9     Q    Did you say anything?
10     A    Not really.  It was just a look and then his hand and
11          then -- and then he moved my hand.  And I don't know
12          why it stopped, but it stopped.  Eventually over
13          periods of time it progressed further and further.
14          Maybe he just felt more comfortable knowing he had a
15          specific time window where no one's going to be down
16          that corridor.  There's no other reason to go down
17          that hallway.
18     Q    Okay.  So the first -- again, just talking about the
19          first time.  Again, I know it's difficult, but this
20          is where we are.  So Mr. Ralston touched you and then
21          used your hand to touch him; is that right?
22     A    Correct.
23     Q    Was there any other contact between you and
24          Mr. Ralston, again, on the first instance?
25     A    Not to my recollection, no.
```

0725a

```
 1   Q    And you don't remember whether you said anything when

 2        Mr. Ralston first touched you?

 3   A    No.  I just sort of went into shock.

 4   Q    Did Mr. Ralston say anything to you?

 5   A    Not that I recall, no.

 6   Q    Do you remember -- I'm sorry.  And was there any

 7        other interaction between you and Mr. Ralston on that

 8        day besides Mr. Ralston touching you, pulling you

 9        back into the classroom, and then moving your hand to

10        touch him?

11   A    I mean, I would have had to have seen him that night

12        at dinner.

13   Q    Right.  Just, again, just sticking with the first,

14        you know, inappropriate contact that you remember,

15        this first instance --

16   A    After the contact was over, no, I left.

17   Q    How did it end?

18   A    It just abruptly stopped.  That was -- that's one

19        thing that sticks out is that nothing was really

20        said.  It was just a matter of -- it just sort of

21        stopped.  And I remember grabbing my stuff, opening

22        the door and just blindly walking back up to my dorm

23        room.  And I probably had to get ready for something

24        sports related around 4 or 4:15.  And then, you know,

25        it was more just a matter of shock for the rest of
```

0726a

Kurtis N. Poulos

```
 1          the day.
 2    Q     Do you remember anything else about the contact with
 3          Mr. Ralston?  Do you remember what you were wearing,
 4          what he was wearing, any other details of the room,
 5          anything like that?
 6    A     I can give you a general description.  I would have
 7          been wearing a sport coat, dress slacks --
 8    Q     Hold on --
 9    A     -- a button-down, a tie.
10    Q     Mr. Poulos, hold on one second.  I only want you to
11          answer what you actually remember.  So you said would
12          have.  I realize sometimes people speak that I way.
13          I want to make sure that you actually do remember the
14          details you're providing to me.
15    A     The specific clothing I was wearing that day?  No, I
16          do not recall.
17    Q     What about what Mr. Ralston was wearing or any
18          details of the room?
19    A     Details of the room, yeah.  I mean, like I said, I
20          believe it's three rows or it was three rows by four
21          seats, maybe five rows by four seats, but never
22          really more than 12 to -- I'd say 12 to 15 chairs max
23          in that room.  He had a desk up in the front by the
24          chalkboard.  And we were just in equal rows equally
25          spaced like your typical classroom.  I don't remember
```

Kurtis N. Poulos

```
 1            there being a window in the room other than the small
 2            window to the door.  And I believe it had two-tone
 3            paint on the wall, like at about -- from me now about
 4            hip level was one color down and then one color up to
 5            the ceiling.
 6     Q      Do you remember the assignment that you had been
 7            working on on the chalkboard on this first day?
 8     A      Yeah.  It would have been probably a weekly quiz.
 9     Q      Do you in fact --
10     A      Which was typically ten...
11     Q      Go ahead.
12     A      We typically had a quiz, like a pop quiz, on what we
13            had been learning; and it was typically ten
14            questions.  A lot of the professors there had the
15            same sort of format where you'd just get a
16            ten-question pop quiz.
17     Q      And was it the case that Mr. Ralston always had you
18            take your pop quizzes on the chalkboard?
19     A      Only after a certain point of the year when --
20     Q      When --
21     A      -- he would give -- he started doing it at a specific
22            time.  I couldn't tell you when, how long into the
23            school year it was.  I can just tell you it was after
24            I had objected to getting a failing grade on a quiz
25            for not showing my work.
```

Kurtis N. Poulos

```
1    Q    I think you said there were trimesters.  Did you call

2         the first one the fall trimester?

3    A    Yeah.  We had the fall trimester.  Then --

4    Q    A winter trimester and a spring trimester; is that

5         right?

6    A    Yeah.

7    Q    So did the first instance of inappropriate contact

8         between you and Mr. Ralston occur during the fall

9         trimester of your sophomore year?

10   A    Correct.

11              MR. JUBB:  Note my objection.

12   A    Correct.

13   BY MS. DOUGHERTY:

14   Q    Do you remember how many weeks into the fall

15        trimester the first inappropriate contact occurred?

16   A    No.

17   Q    Do you remember the season?  Was it warm or was it

18        getting colder?

19   A    It was getting cooler.

20   Q    Did you have a coat with you?

21   A    No, because I was living in the same building I had

22        that class in.  So there was no reason to have an

23        outdoor coat other than my blazer.

24   Q    Was it dark outside?

25   A    No.  It would have been early afternoon, like 3:00.
```

```
 1          So it wouldn't have been dark out, but I -- to my

 2          recollection, there wasn't even a window in that

 3          classroom anyway.  So it could have been the middle

 4          of the night, it wouldn't have made a difference.

 5          There was no exterior light coming into that room.

 6      Q   So your recollection is the first instance of

 7          inappropriate contact between you and Mr. Ralston

 8          occurred when you had geometry class as the last

 9          class of the day?

10      A   Correct.

11      Q   And what did you do after you left the classroom

12          after the first instance?

13      A   What did he do?

14      Q   What did you do?  I'm sorry.

15      A   I went straight up to my dorm room.  Like I said, it

16          was only probably 20 or 30 steps from the door of the

17          geometry class to the door to the stairway, two

18          flights of stairs and you're on the first floor.

19      Q   And how long did the contact between you and

20          Mr. Ralston last the first time?

21      A   I couldn't say.  I would be guessing.  I couldn't

22          say.

23      Q   A couple minutes?  An hour?

24      A   It's one of those you put your hand on a hot stove,

25          it feels like a minute type situations.  I honestly
```

0730a

Kurtis N. Poulos

```
 1          don't recall the length of time.  It couldn't have

 2          been more than a few minutes because, like I said,

 3          right after classes, we only have a certain amount of

 4          time to go and get ready for whatever we're doing,

 5          whether it's sports or something else

 6          extracurricular.  You have to be there by a certain

 7          time.

 8   Q      At the time when Mr. Ralston touched you the --

 9          during the first instance of inappropriate contact,

10          did you believe that the touching was wrong and

11          inappropriate?

12   A      Yeah.  That's why I froze, because I was in disbelief

13          that it was happening.

14   Q      Is there a reason why you didn't report Mr. Ralston's

15          inappropriate contact with you to an adult or another

16          teacher, another student?

17   A      Yeah, because I was a legacy at that school.  I had

18          to keep in mind, you know, the fact that not only did

19          two of my grandparents go to school there, that my

20          cousin was also currently a student enrolled there

21          and what that might do to him, how it might affect

22          our family's legacy overall at a school that we've

23          been established at going on now, you know, a little

24          under 90 years.  Okay.  I gotta take my dog out.

25          He's freaking out.
```

Kurtis N. Poulos

```
 1                   MS. DOUGHERTY:  Okay.  We have -- I mean,
 2          we can take a break for you to walk your dog; but
 3          let me find out how much longer we're going to go
 4          tonight because we're on instance one of I think 10
 5          to 15.
 6                   THE WITNESS:  I'd rather call it for the
 7          night and set something up for another day then
 8          because, like, frankly, I haven't slept in three
 9          days, I'm exhausted.  My dog is all riled up because
10          I'm all riled up.  I don't know how that works with
11          your schedule.  I've never gone through this before,
12          so I don't know how exactly this works.
13                   MS. DOUGHERTY:  Okay.  Well, you're the
14          witness, so you're in charge as far as how long the
15          questioning can go.  Because we -- and I say it in
16          the royal we, Mr. Jubb and I both, want you to have
17          enough attention to, you know, understand our
18          questions and answer them, not to be tired or, you
19          know, answer erroneously because, you know, it's not
20          a marathon basically.  So, you know --
21                   THE WITNESS:  Okay.  Then I'd rather call
22          it for the night.
23                   MS. DOUGHERTY:  -- if that's your
24          preference.  That's okay with me.  But I want to
25          just talk about when you would next be available.
```

0732a

Kurtis N. Poulos

1       Are you only available on Thursdays or can we pick

2       it up tomorrow or -- ?

3                   THE WITNESS:  Yeah.  I'm not going into

4       work tomorrow due to COVID.  But if we could make it

5       in the early afternoon, I would appreciate that.

6                   MS. DOUGHERTY:  Is that acceptable for

7       you, Mr. Jubb?

8                   MR. JUBB:  When you say early afternoon,

9       are you referring to, like, 1:00?

10                  THE WITNESS:  1:00 your time, so you guys

11      can have lunch beforehand.

12                  MR. JUBB:  That would make it 12:00 for

13      you, right?

14                  THE WITNESS:  Correct.

15                  MR. JUBB:  Yeah, if that's what you'd

16      prefer, we can pick it up then.

17                  THE WITNESS:  All right.  I'll put it in

18      my calendar.  Do I just use the same link then to

19      get in?

20                  MS. DOUGHERTY:  Well, let me ask because I

21      think we should -- if we can, Mr. Jubb, you arranged

22      for the videographer and court reporter.  But I

23      think we should stick with the same at least company

24      and setup if we can.

25                  MR. JUBB:  Yeah, of course.  Well, my

Kurtis N. Poulos

```
 1        proposal --

 2                   THE REPORTER:  Do we want this all on the

 3        record?

 4                   MR. JUBB:  We probably don't need to.

 5                   MS. DOUGHERTY:  Well, let me just -- let's

 6        just say on the record that we've discussed it and

 7        agreed that Mr. Poulos will return tomorrow at

 8        1 p.m. Eastern?  No, that's not -- 1 p.m. --

 9                   THE WITNESS:  No, that's right.  1 p.m.

10        Eastern, 12:00 Central.

11                   MS. DOUGHERTY:  Okay.  Thank you.

12                   MR. JUBB:  The specific technology

13        requirements will be forwarded to Mr. Poulos earlier

14        tomorrow, but otherwise we'll probably just stay the

15        same.  And I would only just say before we go off

16        the record that he'll remain under oath for

17        tomorrow.

18                   MS. DOUGHERTY:  Right.  Mr. Poulos, even

19        though it's going to be overnight, you can't talk

20        about your testimony with anyone because, you know,

21        your deposition hasn't concluded and --

22                   THE WITNESS:  I know.

23                   MS. DOUGHERTY:  -- and you've agreed to

24        return tomorrow to complete it so we don't have an

25        exorbitantly long day today.  So that's why Mr. Jubb
```

0734a

Kurtis N. Poulos

 1

 2

 3

 4

 5          is making that point, you're under oath and you

 6

 7          can't discuss your testimony with anyone.

 8

 9                    THE WITNESS:  I appreciate it.

10

11                    MS. DOUGHERTY:  Okay.  I think we can go

12

13          off the record now, right?  Unless, Mr. Jubb, you

14

15          had anything you wanted to add.

16

17                    MR. JUBB:  No.

18

19                    VIDEOGRAPHER:  All right.  Well, this

20

21          adjourns the deposition of Kurtis Poulos for today.

22

23          The time is 5:45.  And we are now off the record.

24

25                    (The deposition adjourned at 5:45 p.m.)

0735a

```
 1                    CERTIFICATE

 2          I, LYNN M. BAYER, Registered Professional

 3    Reporter, Certificate of Merit and Notary Public in and

 4    for the State of Wisconsin, do hereby certify that prior

 5    to the commencement of the examination, KURTIS N. POULOS,

 6    was duly remotely sworn by me to testify to the truth, the

 7    whole truth and nothing but the truth.

 8          I DO FURTHER CERTIFY that the foregoing is a

 9    verbatim transcript of the testimony as taken

10    stenographically by me at the time, place and on the date

11    hereinbefore set forth, to the best of my ability.

12          I DO FURTHER CERTIFY that I am neither a relative

13    nor employee nor attorney nor counsel of any of the

14    parties to this action, and that I am neither a relative

15    nor employee of such attorney or counsel, and that I am

16    not financially interested in the action.

17

18    _____

19    LYNN M. BAYER

20

21    Registered Professional Reporter

22    Certificate of Merit

23    Notary Public in and for the State of Wisconsin

24    Dated:  November 29, 2020

25    My Commission expires April 24, 2024
```

0736a

Kurtis N. Poulos

```
 1

 2

 3

 4

 5

 6                    CERTIFICATE OF WITNESS

 7

 8

 9

10           I have read the foregoing pages, _____ to _____,

11

12    and the same is true and correct to the best of my

13

14    knowledge and belief.  I [have/have not] noted changes on

15

16    an attached change sheet.

17

18    DATED THIS _____ DAY OF _____, 2020.

19

20

21

22    _____

23

24      KURTIS N. POULOS
```

0737a

Kurtis N. Poulos

```
1                        ERRATA SHEET

2     DO NOT WRITE ON THE TRANSCRIPT.  Change(s) should be made

3     in the spaces below.  Please sign this form and the

4     "Certificate of Witness" form when you have finished

5     reading this transcript.

6     PAGE # LINE #  CHANGE              REASON

7     _____  _____  _____     _____

8     _____  _____  _____     _____

9     _____  _____  _____     _____

10    _____  _____  _____     _____

11    _____  _____  _____     _____

12    _____  _____  _____     _____

13    _____  _____  _____     _____

14    _____  _____  _____     _____

15    _____  _____  _____     _____

16    _____  _____  _____     _____

17    _____  _____  _____     _____

18    _____  _____  _____     _____

19    _____  _____  _____     _____

20    _____  _____  _____     _____

21    _____  _____  _____     _____

22    _____  _____  _____     _____

23    SIGNATURE                         DATE

24

25    _____   _____
```

0738a

```
 1                UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3    ---------------------------------------------------------

 4    JOHN DOE,

 5               Plaintiff,

 6       -vs-                        Case No. 19 CV 1539

 7    MITCHELL GARABEDIAN, ESQ., LAW

      OFFICES OF MITCHELL GARABEDIAN,

 8    and KURTIS N. POULOS,

 9               Defendants.

10    ---------------------------------------------------------

11

12                    VOLUME III

13

14          Video deposition of KURTIS NICHOLAS POULOS,

15    taken at the instance of the Plaintiff, pursuant to the

16    Federal Rules of Civil Procedure, pursuant to notice,

17    before Debbie A. Harnen, Registered Professional

18    Reporter and Notary Public in and for the State of

19    Wisconsin, VIA ZOOM VIDEOCONFERENCE, on November 24,

20    2020, commencing at 10:00 a.m. and concluding at

21    12:35 p.m.

22

23

24

25          Reported by:  Debbie A. Harnen, RPR
```

0739a

```
 1              A P P E A R A N C E S:

 2

    FOR THE PLAINTIFF:

 3

         THE BEASLEY FIRM, LLC, by
 4            Mr. Lane R. Jubb, Jr.  (REMOTELY)
              1125 Walnut Street
 5            Philadelphia, Pennsylvania 19107
              lane.jubb@beasleyfirm.com
 6            215.592.1000

 7

    FOR DEFENDANTS MITCHELL GARABEDIAN, ESQ., and LAW
 8  OFFICES OF MITCHELL GARABEDIAN:

 9       SWARTZ CAMPBELL, LLC, by
              Ms. Candidus K. Dougherty  (REMOTELY)
10            One Liberty Place
              1650 Market Street, 38th Floor
11            Philadelphia, Pennsylvania 19103
              cdougherty@swartzcampbell.com
12            215.564.5190

13

    APPEARED PRO SE:

14

              Mr. Kurtis N. Poulos  (REMOTELY)
15            3239 West Colony Drive
              Greenfield, Wisconsin 53221

16

17

    ALSO PRESENT:  Mr. Jeff Sindiong  (REMOTELY)
18                    Video Technician

19

20

21

22

23

24

25
```

Kurtis Nicholas Poulos

1                           I N D E X

2   EXAMINATION                                          PAGE

3   KURTIS NICHOLAS POULOS

4       By Ms. Dougherty  . . . . . . . . . . . . 449

5       By Mr. Jubb . . . . . . . . . . . . . . . 491

6       By Ms. Dougherty  . . . . . . . . . . . . 541

7       By Mr. Jubb . . . . . . . . . . . . . . . 542

8

9

10

11

12                       E X H I B I T S

13  NUMBER                                 PAGE IDENTIFIED

14

    Exhibit D-4 December 2018 letter to Rees -       482

15              Bates labeled Garabedian 053-054

16

17   (Original exhibit attached to the original transcript;

        PDF provided to attorneys ordering exhibit copies.)

18

19

20

21

22

23

24

25

0741a

Kurtis Nicholas Poulos

```
 1                TRANSCRIPT OF PROCEEDINGS

 2                THE VIDEOGRAPHER:  We are now on the

 3      record.

 4                     My name is Jeff Sindiong, the

 5      videographer, for Golkow Litigation Services.

 6      Today's date is November 24th, 2020, and the time

 7      on the screen is 10:00 a.m.

 8                     This is the continuation of the

 9      deposition of Kurtis Poulos, whom I'll remind is

10      still under oath; and this is being held in the

11      matter of John Doe versus Garabedian, Esq., et al.

12      Due to the nature of remote reporting, please

13      pause briefly before speaking to ensure all

14      parties are heard completely.

15                     Will counsel please identify

16      themselves and who they represent?

17                MR. JUBB:  Good morning.  Lane Jubb of

18      The Beasley Firm for plaintiff.

19                MS. DOUGHERTY:  Candidus Dougherty from

20      Swartz Campbell, LLC, for Defendant Mitchell

21      Garabedian.

22                THE VIDEOGRAPHER:  And our court

23      reporter today is Debbie Harnen.  We may now

24      continue.

25
```

Kurtis Nicholas Poulos

```
 1                    KURTIS NICHOLAS POULOS,

 2    called as a witness herein, having been previously

 3    duly sworn and having testified, was examined and

 4    testified further as follows:

 5                    EXAMINATION (Resumed)

 6    BY MS. DOUGHERTY:

 7    Q    Mr. Poulos, do you understand that you are still

 8         under oath?

 9    A    Yes, I do.

10    Q    Where are you testifying from today?

11    A    From my apartment.

12    Q    Is anyone else in your apartment with you other

13         than Clifford --

14    A    No.

15    Q    -- your service dog?

16    A    Just my service dog.

17    Q    Did Mr. Ralston ever put his mouth on your penis?

18    A    Yes.

19    Q    How many times did Mr. Ralston put his mouth on

20         your penis?

21    A    I couldn't say.

22    Q    Did Mr. Ralston put his mouth on your penis more

23         than once?

24    A    Yes.

25    Q    Did Mr. Ralston put his mouth on your penis more
```

Kurtis Nicholas Poulos

```
 1        than five times?

 2   A    Yes.

 3   Q    Did Mr. Ralston put his mouth on your penis more

 4        than ten times?

 5   A    I don't believe so.

 6   Q    So to your best recollection, Mr. Ralston put his

 7        mouth on your penis between five and ten times?

 8   A    Correct.

 9   Q    Each time Mr. Ralston put his mouth on your penis

10        did it occur in the corner of the classroom -- the

11        geometry classroom that you described to us the

12        other -- last week?

13   A    Yes.

14   Q    So there was a corner that you believe was a blind

15        spot not visible from the outside of the classroom

16        where Mr. Ralston put his mouth on your penis; is

17        that right?

18   A    Correct.

19   Q    Other than putting his hands on your penis outside

20        your pants, making you touch Mr. Ralston on his

21        penis outside his pants, touching your penis

22        inside your pants, making you touch Mr. Ralston's

23        penis inside his pants, making you put your mouth

24        on Mr. Ralston's penis, and Mr. Ralston putting

25        his mouth on your penis, did Mr. Ralston touch you
```

Kurtis Nicholas Poulos

```
1          in any other way that you believed was

2          inappropriate?

3     A    Just awkward shoulder grabbing, shoulder rubs.

4     Q    Did the awkward shoulder grabbing and rubbing

5          occur during your sophomore year?

6     A    Correct, during class.

7     Q    So during geometry class, Mr. Ralston would touch

8          your shoulders?

9     A    He'd walk up behind, which would look innocent

10         enough to anybody else in the room.

11    Q    Mr. Ralston would walk up behind you when you were

12         sitting in your geometry class?

13    A    Correct.

14    Q    And then what did Mr. Ralston do when he walked up

15         behind you when you were sitting in your geometry

16         class?

17    A    Just randomly rub my shoulders.

18    Q    How many times did Mr. Ralston walk up behind you

19         and randomly rub your shoulders during your

20         geometry class?

21    A    I couldn't say.

22    Q    Did Mr. Ralston walk up behind you and rub your

23         shoulders during geometry class more than once?

24    A    Yes.

25    Q    Did Mr. Ralston walk up behind you and rub your
```

Kurtis Nicholas Poulos

```
 1        shoulders during geometry class more than ten
 2        times?
 3    A   Yes.
 4    Q   Did Mr. Ralston walk up behind you and rub your
 5        shoulders during geometry class more than 20
 6        times?
 7    A   I don't know.
 8    Q   So to the best of your recollection, Mr. Ralston
 9        walked up behind you and rubbed your shoulders
10        during geometry class between 10 and 20 times; is
11        that correct?
12    A   Correct.
13    Q   Did Mr. Ralston ever say anything any of the times
14        when he walked up behind you and rubbed your
15        shoulders during geometry class?
16    A   No.
17    Q   Was there a particular -- let me start again.
18                    You mentioned that your classes
19        rotated through different times on different days.
20        Was there any correlation between the day and time
21        of your geometry class and the times when
22        Mr. Ralston walked up behind you and touched your
23        shoulders?
24    A   No.
25    Q   Please tell me about the first time that
```

0746a

1        Mr. Ralston put his mouth on your penis.

2   A    I don't remember specifics.

3   Q    Can you please tell me what you remember -- let me

4        start again.

5               Can you please tell me what you do

6        remember of the first time that Mr. Ralston put

7        his mouth on your penis?

8   A    No.  I've worked very hard to forget.  I don't

9        remember specifics.

10  Q    Do you have -- let me start again.

11              Are there any writings, a journal

12       or documentation that you prepared that you could

13       review to refresh your recollection about the

14       specific facts of each instance that Mr. Ralston

15       put his mouth on your penis?

16  A    No.  I've never kept a journal.

17  Q    Have you ever written down information regarding

18       any of the incidents of abuse by Mr. Ralston?

19  A    No.  I've never written any of it down.

20  Q    Do you remember during which trimester of your

21       sophomore year Mr. Ralston put his mouth on your

22       penis for the first time?

23  A    The second trimester.

24  Q    In every instance that Mr. Ralston put his mouth

25       on your penis -- let me start again.

0747a

Kurtels Nicholas Poulos

```
 1                    Did every instance that Mr. Ralston

 2         put his mouth on your penis occur during the

 3         second trimester of your sophomore year?

 4    A    No.

 5    Q    What other trimester of your sophomore year did

 6         Mr. Ralston put his mouth on your penis?

 7    A    Third trimester.

 8    Q    Are you able to tell me any information about any

 9         instance that Mr. Ralston put his mouth on your

10         penis?

11    A    No.

12    Q    Other than touching you on your penis outside your

13         pants, making you touch Mr. Ralston on his penis

14         outside his pants, touching you on your penis

15         inside your pants, making you touch Mr. Ralston's

16         penis on the inside of his pants, making you put

17         your mouth on Mr. Ralston's penis, putting his

18         mouth on your penis, and rubbing your shoulders

19         awkwardly, are there any other times that

20         Mr. Ralston touched you that you believe was

21         inappropriate?

22    A    Not to my recollection.

23    Q    Just to confirm, all the touching that I just

24         described occurred during your sophomore year at

25         The Hill School; is that right?
```

0748a

```
 1  A    Correct.  That's why I didn't come back my junior
 2       year -- or I didn't stay, I should say.
 3  Q    I think you mentioned on one of your prior days of
 4       testimony that you did actually go to school with
 5       the intention -- let me start again.
 6            You did travel to The Hill School
 7       with the intention to start your junior year, but
 8       you had an encounter with a teacher that caused
 9       you to pack up and go home; is that fair?
10  A    That's correct.
11  Q    Who was the teacher that you had the encounter
12       with when you arrived at The Hill School for your
13       junior year of high school?
14  A    It was Mr. Ralston.
15  Q    What happened between you and Mr. Ralston during
16       this encounter?
17  A    He just made a gesture and a comment, and I knew I
18       needed to get out of there.
19  Q    What gesture did Ralston make?
20  A    I don't remember.  I just remember feeling
21       uncomfortable.
22  Q    What did -- let me start again.
23            What comment did Mr. Ralston make?
24  A    I don't remember specifics.
25  Q    Well, tell me what you do remember about the
```

0749a

Kurtis Nicholas Poulos

```
 1         comment that Mr. Ralston made.
 2   A     That I felt uncomfortable.
 3   Q     So is it correct that you don't remember the exact
 4         gesture or specifically what Mr. Ralston said to
 5         you; just that the gesture and the comment made
 6         you feel uncomfortable and that you needed to get
 7         out of there?
 8   A     Correct.
 9   Q     When did this interaction with Mr. Ralston occur?
10   A     I believe it was during or after our, you know,
11         reacclimation, our -- you know, we had those
12         meetings talking about the upcoming school year;
13         and if I remember correctly, it was at chapel or
14         after chapel outside of the building.
15   Q     How many days had you been at The Hill School
16         before the encounter with Mr. Ralston that you
17         believe was outside the chapel?
18   A     One or two, no more than four.
19   Q     What did you do immediately after the encounter
20         with Mr. Ralston outside the chapel before the
21         start of your junior year at The Hill School?
22   A     I remember calling my travel agent, and she said
23         it was too quick to rebook a flight.  I remember
24         starting to pack some of my belongings without
25         alerting my roommate at the time; and I remember
```

```
 1         hiring a car service to pick me up.

 2    Q    How long in relation to the interaction with

 3         Mr. Ralston outside the chapel did the car service

 4         arrive to pick you up?

 5    A    I couldn't tell you if it was the same day or the

 6         next day.  It all just sort of flowed together.

 7                   MS. DOUGHERTY:  Hey, Lane, are you

 8         typing?

 9                   MR. JUBB:  Yeah.

10                   MS. DOUGHERTY:  We can hear you typing.

11                   MR. JUBB:  Okay.  I'll put it on mute.

12                   MS. DOUGHERTY:  Do you mind --

13                   MR. JUBB:  I'm sorry.

14    BY MS. DOUGHERTY:

15    Q    Okay.  And I'll try to pause -- Mr. Poulos, pause

16         after my question so Lane can unmute in case he

17         wants to object.

18                      The third or fourth time that

19         Mr. Ralston touched you inappropriately, he

20         laughed; is that correct?

21    A    I think it was one of the first few times,

22         correct.

23    Q    Were there any other occasions when Mr. Ralston

24         was touching you inappropriately that he laughed?

25    A    Not to my recollection.
```

Kurtis Nicholas Poulos

```
 1   Q    During any of the times that Mr. Ralston touched

 2        you inappropriately, did he say anything to you?

 3   A    Not to my recollection.

 4   Q    During any of the times that Mr. Ralston touched

 5        you inappropriately, did he make any noises?

 6   A    Yes.

 7   Q    What noises did Mr. Ralston make when he was

 8        inappropriately touching you?

 9   A    The same sort of noises that most individuals make

10        when they're enjoying themselves, I guess.

11   Q    Did Mr. Ralston make noises every time he touched

12        you inappropriately?

13   A    I couldn't recall.

14   Q    Did you ever say anything or make any noise during

15        the time -- during any time that Mr. Ralston

16        touched you inappropriately?

17   A    No.  I stayed silent.

18   Q    Did Mr. Ralston ever say anything or make noise

19        during any of the incidents where he made you

20        touch him inappropriately?

21   A    Repeat the question.

22   Q    Sure.  Did Mr. Ralston ever say anything or make

23        any noise during any of the incidents that he made

24        you touch him inappropriately?

25   A    Yes.  I just stated that he did.
```

0752a

Kurtis Nicholas Poulos

```
 1   Q    So Mr. Ralston made noise both when he touched you
 2        or made you touch him inappropriately; is that
 3        right?
 4   A    Correct.
 5   Q    Have you told me everything that you can presently
 6        remember regarding any incident where Mr. Ralston
 7        touched you or made you touch him in a manner in
 8        which you felt was inappropriate?
 9   A    Yes.
10   Q    Did you share the same information about
11        Mr. Ralston touching you or making you touch him
12        inappropriately with Mr. Garabedian?
13   A    Yes.
14   Q    I believe you mentioned in your prior testimony
15        that there were maybe a dozen instances of contact
16        with Mr. Ralston that you considered bullying, one
17        of which was an incident involving your car and
18        being blocked in.
19              Can you tell me what you remember
20        about the other instances that you were
21        referencing that you felt Mr. Ralston was bullying
22        you?
23   A    My sixth form year he was not my teacher.  He
24        wasn't my hall master, yet he seemed to go out of
25        his way to involve himself in almost every aspect
```

0753a

Kurtis Nicholas Poulos

```
1        of my day.
2                    So I stopped attending -- again,
3        breakfast was not mandatory for sixth formers, but
4        I stopped attending all breakfasts.  Lunch was
5        mandatory, dinner was mandatory, but I left as
6        soon as I could.
7   Q    What do you mean by Mr. Ralston went out of his
8        way to involve himself?
9   A    It was like having a creepy shadow where, if I
10       misspoke or overstepped my bounds, it was like he
11       was looking for it.  So I stopped -- we had coffee
12       with the teachers after dinner, and he'd come over
13       and sit eerily close as if trying to hear what I
14       was talking about, and so I stopped attending that
15       as well.
16  Q    Did Mr. Ralston -- let me start again.
17                   How did Ralston go out of his way
18       to involve himself during breakfast?
19  A    I don't know.  I didn't really attend breakfast.
20  Q    Was there a reason related to Mr. Ralston that you
21       stopped attending breakfast during your six --
22       sixth form year?
23  A    No.  I just overall, in general, felt safer in my
24       dorm rather than -- or my dorm room rather than
25       being around him at all.
```

Kurtis Nicholas Poulos

```
 1   Q    So is it a fair characterization that during your

 2        sixth form year, you went out of your way to stay

 3        in your dorm room as much as possible?

 4   A    Correct.

 5   Q    And the reason you went out of your way to stay in

 6        your dorm room as much as possible during your

 7        sixth form year was because of Mr. Ralston; is

 8        that right?

 9   A    Correct.

10   Q    So you said that you missed coffee with the

11        teachers, breakfast, dinner.

12              Was there any other events -- were

13        there any other events that you missed because you

14        were going out of your way to stay in your dorm

15        room during your sixth form year?

16   A    I believe Lawrenceville weekend, the bonfire I did

17        not attend.  It wasn't mandatory; I wasn't going.

18   Q    Okay.  So breakfast wasn't mandatory, so you did

19        not attend breakfast during your sixth form year;

20        is that right?

21   A    Right.

22   Q    Was lunch mandatory during your sixth form year?

23   A    Yeah.  We had school announcements.

24   Q    So you attended lunch during your sixth form year?

25   A    For the most part.  I might not have eaten, but I
```

Kureis Nicholas Poulos

```
 1        would have had to show up.
 2   Q    Okay.  So is it a fair characterization that
 3        during your sixth form year, you would show up for
 4        lunch, listen to the announcements, and then
 5        return to your dorm room?
 6   A    Correct.
 7   Q    Was dinner mandatory during your sixth form year?
 8   A    I believe so, yes.
 9   Q    Did you attend dinner during your sixth form year?
10   A    Just to make sure that I got checked in and then
11        leave.
12   Q    Okay.  So you would appear for dinner, get checked
13        in and then return to your dorm room during your
14        sixth form year; is that fair?
15   A    Correct.
16   Q    You didn't attend the bonfire, you didn't attend
17        coffee with the teachers, which were both not
18        mandatory.
19                   Are there any other events,
20        mandatory or nonmandatory, that you did not attend
21        during your sixth form year because you felt safer
22        in your dorm room?
23   A    Not to my recollection.
24   Q    Are there any interactions that you recall between
25        you and Mr. Ralston that you considered to be
```

1       bullying activity by Mr. Ralston that you've not

2       told us about?

3  A   Not to my recollection.

4  Q   You mentioned previously that on the day that

5       Mr. Ralston blocked your car in over parents

6       weekend during your sixth form year, you knocked

7       on his door and had a discussion with Ms. Ralston;

8       is that right?

9  A   I believe it was Ms. Ralston.  He refused to

10      answer the door.

11  Q   Okay.  So it's your recollection that you knocked

12      on the door and asked for Mr. Ralston?

13  A   Yeah.

14  Q   And a woman answered the door?

15  A   His wife.

16  Q   What did you say to Mrs. Ralston?

17  A   I asked them to move their vehicle --

18  Q   Did Ms. --

19  A   -- so I could go and see my mom and have a normal

20      parents weekend like every other student had.

21  Q   When you parked your car, where did you park it?

22  A   I couldn't tell you the exact direction, but it

23      was paral- -- or perpendicular to the building.

24             Like I said, there was -- the

25      building goes this way, there was a staircase that

```
 1        went down right outside of my window.  Next to
 2        that was a small -- what could be considered a
 3        parking spot; and on the other side of that was a
 4        hill that led up to the headmaster's office.
 5                    So I pulled into that one area
 6        where I knew I wasn't going to block any other
 7        part of that parking structure given the fact that
 8        there was, I believe, four teachers in that
 9        building who all had vehicles parked inside of a
10        garage.  So I parked out of the way, again, just
11        to get in and get out with my belongings so I
12        could resume my parent -- you know, my time with
13        my mom for parents weekend.
14   Q    Okay.  So just to be clear, you weren't in, like,
15        your assigned parking spot?  You pulled up close
16        to the building so you could run up quickly and
17        get your stuff; is that right?
18   A    Yeah.  My assigned parking spot was a half a mile
19        away behind the history of art music building, the
20        Performing Arts building.
21   Q    What did Mrs. Ralston say when you asked that she
22        or her husband move their car?
23   A    Basically that they weren't going to move their
24        car; that I had broken some rule about coming back
25        on campus, which I find interesting because then
```

Kurtis Nicholas Poulos

1          they knew I was already signed out of campus.

2                    So if you know I broke a rule by

3          coming back to campus, you must have known that I

4          was already signed off of campus for the weekend.

5    Q    Did you say any of that to Mrs. Ralston when she

6          indicated that her and her husband were not going

7          to move their car?

8    A    I believe so, yes.

9    Q    Is there anything else that you remember

10         Mrs. Ralston saying to you or you saying to

11         Mrs. Ralston?

12   A    She was very combative.  The whole situation was

13         very combative.

14                   I mean, the fact that a grown man

15         took time to get up out of his apartment, move his

16         car out of his parking stall, put it behind my

17         car, it was infuriating because not only is he

18         trying to intimidate me; he's taking away time

19         that I could spend with my mom away from the

20         campus and feel normal for 24 hours.

21   Q    Is there anything else that you remember about the

22         exchange between you and Mrs. Ralston?

23                   Hold on.  We can't hear you.  At

24         least I can't hear you.

25                   MS. DOUGHERTY:  Can people hear me?

Kurtis Nicholas Poulos

```
 1                    THE COURT REPORTER:  I can hear you.  I
 2        can't hear the witness.
 3                    MS. DOUGHERTY:  Okay.
 4   BY THE WITNESS:
 5   A    Locking my door that night.
 6   BY MS. DOUGHERTY:
 7   Q    All right.  Mr. Poulos, I think we missed the
 8        first part of your answer.  I could see your mouth
 9        moving but couldn't hear you.
10                    So let me ask the question again,
11        and can you give your answer again, please?  I
12        believe my question was whether you remembered
13        anything else regarding the exchange between you
14        and Mrs. Ralston?
15   A    Between her and myself, no.
16   Q    The next morning, was Mr. Ralston's car still
17        blocking your car?
18   A    Nope.
19   Q    Do you know when Mr. Ralston moved his car to stop
20        blocking your car?
21   A    No idea, but it had to have been before 8:00 a.m.
22   Q    Did you get into trouble or -- of any kind, I
23        guess, from the disciplinary dean for coming back
24        to the school during parents weekend?
25   A    Absolutely not.
```

0760a

Kurtis Nicholas Poulos

```
1    Q    So -- let me start again.

2                    You returned the keys to your car

3         at some point?

4    A    After I drove my mom to the airport in

5         Philadelphia, I drove back to campus, I believe

6         probably stopped and got some food for my dorm;

7         and I think we were supposed to -- like I said, I

8         believe we put our keys -- put our keys through a

9         mail slot in the door.

10                   But it had to have been returned

11        either first thing the following morning or the

12        same day because I would have had to park all the

13        way over behind the Performing Arts building, and

14        I would have had to pass basically right by.

15                   So knowing me, I wouldn't have

16        waited.  I would have just gone, done it, and then

17        gone back to my dorm.

18   Q    Okay.  So your recollection is that when you

19        returned to the campus, whatever the procedure was

20        at the time, you -- to return your keys, you

21        followed it, right?

22   A    Correct.

23   Q    And you never heard anything further from the dean

24        of discipline or whomever that you had done

25        something wrong during the parents weekend?
```

0761a

Kareem Nicholas Pouros

```
 1   A    No, because I didn't do anything wrong.

 2   Q    As a result of being sexually molested by

 3        Mr. Ralston, have you suffered from depression?

 4   A    Yes.

 5   Q    As a result of being sexually molested by

 6        Mr. Ralston, have you suffered from sadness?

 7   A    Sadness, depression, PTSD or PTSS.

 8   Q    As a result of being sexually molested by

 9        Mr. Ralston, have you cried?

10   A    Numerous occasions.

11   Q    As a result of being sexually molested by

12        Mr. Ralston, have you experienced anxiety?

13   A    Yes.

14   Q    As a result of being sexually molested by

15        Mr. Ralston, have you experienced emotional pain?

16   A    Yes.

17   Q    As a result of being sexually molested by

18        Mr. Ralston, have you had sleep problems?

19   A    To say the least.

20   Q    What do you mean to say the least?

21   A    I mean, I don't sleep.  I sleep two hours here,

22        two hours there.  I wake up having nightmares

23        that I'm back on that campus doing it all over

24        again.

25   Q    As a result of being sexually molested by
```

0762a

```
1        Mr. Ralston, do you experience concentration

2        problems?

3   A    No.  I can concentrate just fine.

4   Q    When you were at The Hill School, did you

5        experience concentration problems because of being

6        sexually molested by Mr. Ralston?

7   A    Yeah, because I didn't know who was around me, who

8        I could trust.

9   Q    As a result of being sexually molested by

10       Mr. Ralston, do you have low self-esteem?

11  A    I believe so, yes.

12  Q    As a result of being sexually molested by

13       Mr. Ralston, do you have low self-respect?

14  A    Yes.

15  Q    As a result of being sexually molested by

16       Mr. Ralston, do you have low self-confidence?

17  A    At times.

18  Q    As a result of being sexually molested by

19       Mr. Ralston, are you apathetic and find yourself

20       not caring about things generally or caring about

21       things in your life?

22  A    I care very much about things in my life.  I care

23       about my home, my dog, you know, the people that

24       support me.  So I'm not apathetic.

25  Q    How about when you were at The Hill School?  Did
```

```
 1       you feel apathetic or find yourself not caring
 2       about your life or things?
 3   A   I still cared about my life.  That's why I spent
 4       as little time there after I was accepted to
 5       college as possible.
 6   Q   When you were at The Hill School, did you not care
 7       about your grades because you were sexually
 8       molested by Mr. Ralston?
 9   A   I stopped caring about my grades when I got
10       accepted to college.
11   Q   When you were at The Hill School, were you more
12       concerned about being safe and spending time in
13       your dorm room than your grades?
14   A   Yes.
15   Q   If I understand you correctly, you did care about
16       your future when you were at The Hill School,
17       which is why you stuck it out despite the abuse;
18       is that fair?
19   A   That, and I didn't want to let my family down.
20   Q   As a result of being sexually molested by
21       Mr. Ralston, did you self-medicate or turn to
22       drugs and alcohol to cope with the emotional
23       pain?
24   A   In general or my senior year?
25   Q   Well, let's start with generally.
```

0764a

Kurtis Nicholas Poulos

```
 1   A    Yes.

 2   Q    How about during your senior year?

 3   A    Yes.

 4   Q    So your senior year at The Hill School, is that

 5        when you started consuming drugs and alcohol to

 6        cope with the emotional pain of being sexually

 7        molested by Mr. Ralston?

 8   A    I -- I'll be honest.  I started consuming alcohol

 9        when I was living in France because it was legal.

10                     But my senior year I was drinking

11        vodka orange juice like it was water just to get

12        me through the days, and we'd smoke weed every

13        once in a while, but what high school student

14        didn't.

15   Q    So when you consumed alcohol in France, that was

16        during your junior year, right?

17   A    Correct, when I was living abroad.

18   Q    And when you consumed alcohol when you were living

19        abroad, that was for recreation; is that fair?

20   A    Yeah, and it was the first time I had ever

21        consumed alcohol.

22   Q    When you were drinking vodka orange juice like

23        water during your senior year, was that also for

24        recreation or for another reason?

25   A    For another reason.
```

0765a

Kurtis Nicholas Poulos

```
 1   Q   What was the other reason?

 2   A   To just numb the day away.

 3   Q   When you smoked marijuana during your senior year,

 4       was that for recreation or for a different reason?

 5   A   Recreation.

 6   Q   Did you continue consuming alcohol to numb the day

 7       away after your senior year?

 8   A   Off and on.

 9   Q   As a result of being sexually molested by

10       Mr. Ralston, did you self-sabotage the good things

11       in your life?

12   A   Every chance I got.

13   Q   Can you give me some examples of how you

14       self-sabotaged the good things in your life as a

15       result of being sexually molested by Mr. Ralston?

16   A   Positive relationships with my family members,

17       positive relationships with girlfriends, with

18       close friends.

19                    I don't like getting very close to

20       people anymore because I'm scared that I'm going

21       to wake up one day, and they're going to use

22       whatever I said against me in some sort of

23       fashion.

24   Q   As a result of being sexually molested by

25       Mr. Ralston, do you have trust problems?
```

0766a

Kurtis Nicholas Poulos

```
 1   A   Most undoubtedly.

 2   Q   As a result of being sexually molested by

 3       Mr. Ralston, do you have flashbacks and reminders

 4       of the sexual abuse?

 5   A   Yes.  Like I said, I'm having nightmares.  I've

 6       been having nightmares about just even being back

 7       on that campus.

 8   Q   How long have you had nightmares?

 9   A   Decades now.

10   Q   Have you had nightmares -- let me start again.

11                   When did the nightmares start?

12   A   To my recollection, over the last ten years.

13   Q   Did you have nightmares when you were attending

14       The Hill School?

15   A   Yeah.  I didn't sleep more than two or three

16       hours.

17   Q   As a result of being sexually molested by

18       Mr. Ralston, do you feel broken and unfixable?

19   A   I hope I'm fixable, but I feel like he broke a big

20       chunk of my life out of my control.

21   Q   How about when you were at The Hill School?  Did

22       you feel broken and unfixable as a result of being

23       sexually molested by Mr. Ralston?

24   A   Yes, because I felt like I should have had the

25       experience that everybody else in my family had
```

0767a

Kurtis Nicholas Poulos

```
 1            experienced over generations at that school.
 2     Q    As a result of being sexually molested by
 3            Mr. Ralston, have you ever self-harmed?
 4     A    As a result of that, no.
 5     Q    Have you self-harmed for reasons other than being
 6            sexually molested by Mr. Ralston?
 7     A    I would assume that my drinking would be
 8            considered a form of self-harm, but in a --
 9     Q    Okay.  I understand.  So let me clarify my
10            question because I didn't -- I wasn't thinking of
11            it that way, and I think you're absolutely right.
12                      So other than drinking -- let me
13            start again.
14                      When you were consuming alcohol
15            like water, did you consider that consuming
16            alcohol in excess?
17     A    In retrospect, yes.
18     Q    You considered drinking alcohol to excess to be
19            self-harm; is that right?
20     A    Absolutely.
21     Q    Other than drinking alcohol to excess, have you
22            self-harmed in other ways due to being sexually
23            molested by Mr. Ralston?
24     A    Just in my professional life.
25     Q    What do you mean by that?
```

0768a

Kurtis Nicholas Poulos

```
 1   A    Again, sabotaging things that are good in my life.

 2   Q    So you have self-harmed as a result of being

 3        sexually molested by Mr. Ralston by drinking to

 4        excess and sabotaging professional relationships

 5        in your life?

 6   A    Correct.

 7   Q    As a result of being sexually molested by

 8        Mr. Ralston, do you feel alone and isolated?

 9             THE WITNESS:  Can you stop typing?

10             MR. JUBB:  I'm back on mute.

11             THE WITNESS:  Can you repeat the

12        question?

13   BY MS. DOUGHERTY:

14   Q    Sure.  I apologize.  I didn't notice the typing

15        again.

16                  As a result of being sexually

17        molested by Mr. Ralston, do you feel alone and

18        isolated?

19   A    Yeah, but I feel safe.

20   Q    When you were at The Hill School, did you feel

21        alone and isolated because of being sexually

22        molested by Mr. Ralston?

23   A    At times.

24   Q    As a result of being sexually molested by

25        Mr. Ralston, did you feel ostracized when you were
```

0769a

Kurtis Nicholas Poulos

```
 1        at The Hill School?

 2   A    Yes.

 3   Q    As a result of being sexually molested by

 4        Mr. Ralston, do you feel shame?

 5   A    Yes.

 6   Q    As a result of being sexually molested by

 7        Mr. Ralston, do you feel embarrassment?

 8   A    For myself and my family.

 9   Q    As a result of being sexually molested by

10        Mr. Ralston, do you feel guilt?

11   A    At times.  I try not to because it's not my fault

12        that he's sick.

13   Q    As a result of being sexually molested by

14        Mr. Ralston, do you blame yourself?

15   A    No.

16   Q    When you were at The Hill School, did you blame

17        yourself because of Mr. Ralston's sexual abuse?

18   A    I honestly didn't know -- I believe I was too

19        young to actually comprehend the long-term effects

20        of what that would have -- would produce.

21   Q    Right.  But just if we could -- and I realize it's

22        difficult.  Just if you can return yourself to

23        when you were at The Hill School, did you feel

24        self-blame because of the conduct by Mr. Ralston?

25   A    I don't recall.
```

Kurtis Nicholas Poulos

```
 1   Q    As a result of being sexually molested by

 2        Mr. Ralston, do you have intimacy problems?

 3   A    Yes, because I don't trust anybody.

 4   Q    When you were at The Hill School, did you lose a

 5        dangerous amount of weight as a result of being

 6        sexually molested by Mr. Ralston?

 7   A    Yes.  I lost about 20 pounds my senior year -- or

 8        sixth form year.

 9   Q    Was that because you did not feel like eating?

10   A    I didn't -- I didn't wanna -- like I did

11        everything I could to stay in my room; and if that

12        meant I was eating cans of tuna straight out of

13        the can, that's what I was going to have to do;

14        and yes, I would go to the grill and maybe order

15        food once in a while, but I wouldn't eat most of

16        it.

17                   It got to a point where my mother

18        actually called the school to get me special

19        permission so I could go off campus using my car

20        to eat by myself at a restaurant.

21   Q    Did you get the special permission that your

22        mother requested?

23   A    I don't believe so, no.

24   Q    As a result of being sexually molested by

25        Mr. Ralston, have you ever experienced suicidal
```

0771a

Kurtis Nicholas Poulos

```
1        ideation?

2    A   Yes.

3    Q   As a result of being sexually molested by

4        Mr. Ralston, have you ever felt an emotional void?

5    A   Yes.

6    Q   As a result of being sexually molested by

7        Mr. Ralston, have you felt anger?

8    A   Very much so.

9    Q   As a result of being sexually molested by

10       Mr. Ralston, have you felt confusion?

11   A   Yes.

12   Q   As a result of being sexually molested by

13       Mr. Ralston, do you feel that Mr. Ralston ruined a

14       part of your life?

15   A   He took away my life.

16   Q   Do you feel that Mr. Ralston sent you down the

17       wrong road in life?

18                  Hold on one second.

19              THE COURT REPORTER:  We can't hear you.

20              MS. DOUGHERTY:  Can you speak again?

21       Mr. Poulos, can you hear us?  We can't hear you.

22       Can you make a sound?  Mr. Poulos?

23              THE WITNESS:  Yeah, I'm here.

24   BY MS. DOUGHERTY:

25   Q   Okay.  We lost you there I think for a minute.
```

0772a

Kurtis Nicholas Poulos

```
 1        I'm going to ask my question again.

 2                 Do you feel that Mr. Ralston sent

 3        you down the wrong road in life?

 4   A    I think it was a contributing factor.

 5   Q    Do you feel that Mr. Ralston stole your childhood

 6        innocence?

 7   A    I think he froze me in time.

 8   Q    What do you mean by that?

 9   A    I mean, I'm 42 years old, and I still feel like a

10        terrified child.

11   Q    The various impacts of the -- of being sexually

12        molested by Mr. Ralston that you just described

13        for me for the past several minutes, did you share

14        that same information with Mr. Garabedian?

15   A    To an extent.

16   Q    What do you mean "to an extent"?

17   A    I didn't -- I don't recall going into too many

18        details.  He just asked overall if it had affected

19        me, and I said yes.

20   Q    Did you describe to Mr. Garabedian how the -- how

21        being sexually molested by Mr. Ralston affected

22        you?

23   A    Yes.

24   Q    Oops.  I almost hung up on everybody.  I'm going

25        to try to share my screen.
```

0773a

Kureris Nicholas Poulos

```
1                    I'm showing you a document that was

2         previously shown to you by plaintiff's counsel as

3         P16.225 to 226.  There's a number of versions of

4         it in the record.  The particular version that I'm

5         showing you, which I think it's just an identical

6         copy, has Garabedian053 and Garabedian054 at the

7         bottom.  Actually, I have the letter twice.  So

8         it's 053 to 056.

9                    MS. DOUGHERTY:  Lane, did you use 55 to

10        56 or 5- -- did you use -- which one did you use,

11        do you know?

12                    MR. JUBB:  I used the ones that were

13        produced from the school.  So mine were P16, but I

14        have those numbers if you'd like me to reference

15        them.

16                    MS. DOUGHERTY:  Sure.  I thought they

17        were 225 and 226.

18                    MR. JUBB:  Are you trying to show him

19        the letters that are at issue in the case?

20                    MS. DOUGHERTY:  Yeah.  I just want to

21        make sure we don't have any controversy just

22        because I have one that has a different label on

23        the bottom.

24                    MR. JUBB:  No.  I think that -- as long

25        as you're going through those four pages, I think
```

0774a

```
 1        that's fine.  But why don't you just identify them

 2        for the record just in case.

 3               MS. DOUGHERTY:  Sure.  It was really

 4        only my intention to go through the first two

 5        pages because it's the same letter twice.

 6   BY MS. DOUGHERTY:

 7   Q    So I'm showing you the December 26, 2018, letter

 8        by Mitchell Garabedian to Thomas D. Rees that

 9        says, Re: Sexual Abuse Claim of Kurtis Nichols

10        Poulos.  This letter appears a number of times

11        with different Bates labels, which I don't think

12        are important.

13               I would like to direct your

14        attention to the middle of the first page, the

15        third paragraph that starts with your name,

16        Nicholas Poulos.  The sentence reads:  Kurtis

17        Nicholas Poulos (DOB █████████████) met

18        Mr. Ralston during Mr. Poulos's freshman year at

19        The Hill School in approximately 1993 or

20        approximately 1994 when Mr. Poulos was

21        approximately 14 or approximately 15 years old.

22               Is that sentence that I just read

23        to you correct?

24   A    Correct.

25               MR. JUBB:  I'm sorry.  Could -- I'm just
```

```
 1          going to have to object.  Correct as you read it?
 2                     MS. DOUGHERTY:  Okay.
 3                     MR. JUBB:  Can you clarify that for me?
 4                     MS. DOUGHERTY:  Sure.  That's fair.
 5                     I read the sentence -- the first
 6          sentence of the third paragraph -- you know what?
 7          I'm just going to mark the version I'm showing the
 8          witness, which is Garabedian 053 to 054 as D-4,
 9          just so I can reference it somehow.
10                     (Exhibit No. D-4 was marked for
11                      identification.)
12     BY MS. DOUGHERTY:
13     Q   So I just read to you, Mr. Poulos, the first
14         sentence of the third paragraph on the first page
15         of D-4.  Did I read that sentence correctly?
16     A   Yeah.
17     Q   And the first sentence of the third paragraph of
18         the first page of D-4 is factually correct; is
19         that right?
20     A   Correct.  I was sat at his table as many other
21         students were.
22     Q   The next sentence on the -- the second sentence of
23         the third paragraph on the first page of D-4
24         reads:  Mr. Ralston served as a table master in
25         the dining hall, and Mr. Poulos had a rotation at
```

0776a

Kurtis Nicholas Poulos

```
 1          Mr. Ralston's table during Mr. Poulos's freshman

 2          year.

 3                     Did I read that sentence correctly?

 4     A    Yes.

 5     Q    Is that sentence, the second sentence of the third

 6          paragraph on the first page of D-4, true?

 7     A    Yes.

 8     Q    Okay.  The third sentence of the third paragraph

 9          on the first page of D-4:  Mr. Poulos recalls that

10          Mr. Ralston was a mathematics teacher and a cross

11          country coach at The Hill School.

12                     Did I read that sentence correctly?

13     A    Yes.

14     Q    Is that sentence true?

15     A    Yes.

16     Q    Next sentence:  Mr. Poulos recalls that

17          Mr. Ralston lived in a dormitory of The Hill

18          School with Mr. Ralston's family.

19                     Did I read that sentence correctly?

20     A    Yes.

21     Q    Is that sentence true?

22     A    Yes.

23     Q    Next sentence:  Mr. Poulos does not recall that

24          anything inappropriate happened with Mr. Ralston

25          during Mr. Poulos's freshman year at The Hill
```

0777a

Kurtis Nicholas Poulos

```
1          School.

2                         Did I read that sentence correct?

3     A    Yes.

4     Q    Is that sentence true?

5     A    To my knowledge, yes.

6     Q    The next paragraph, which is the fourth paragraph

7          on the first page of D-4, which is the

8          December 26, 2018, letter by Mr. Garabedian to

9          Mr. Rees.  Sentence reads:  Mr. Ralston was

10         Mr. Poulos's geometry teacher during Mr. Poulos's

11         sophomore year at The Hill School in approximately

12         1994 and approximately 1995 when Mr. Poulos was

13         approximately 15 and approximately 16 years old.

14                        Did I read that sentence correctly?

15    A    Yes.

16    Q    Is that sentence true?

17    A    Yes.

18    Q    Next sentence:  Mr. Poulos recalls that classes

19         were held on a rotating schedule at The Hill

20         School so that classes met at different times of

21         the day.

22                        Did I read that sentence correctly?

23    A    Yes.

24    Q    Is that sentence true?

25    A    Yes.
```

```
 1   Q    Next sentence:  On certain days when Mr. Poulos

 2        had geometry as the last class of the day,

 3        Mr. Ralston made Mr. Poulos stay behind in

 4        Mr. Ralston's classroom.

 5                     Did I read that sentence correctly?

 6   A    Correct.

 7   Q    Is that sentence true?

 8   A    Yes.

 9   Q    Next sentence:  Mr. Ralston and Mr. Poulos were

10        alone in the classroom after school on these

11        occasions.

12                     Did I read that sentence correctly?

13   A    Yes.

14   Q    Is that sentence true?

15   A    Yes.

16   Q    Okay.  Now we're on the second page of D-4, next

17        sentence:  Mr. Poulos recalls that the geometry

18        classroom was located at the end of a hallway.

19                     Did I read that sentence correctly?

20   A    Yes.

21   Q    Is that sentence true?

22   A    Yes.

23   Q    Next sentence:  During the course of Mr. Poulos's

24        sophomore year, Mr. Ralston sexually abused

25        Mr. Poulos in Mr. Ralston's geometry classroom
```

Kurteis Nicholas Poulos

```
 1          between approximately 10 and approximately 15

 2          times.

 3                       Did I read that sentence correctly?

 4   A      Yes.

 5   Q      Is that sentence true?

 6   A      Yes.

 7   Q      The next sentence:  The sexual abuse consisted of,

 8          among other things, Mr. Ralston fondling

 9          Mr. Poulos's penis and testicles, skin on skin;

10          Mr. Ralston making Mr. Poulos fondle Mr. Ralston's

11          penis and testicles, skin on skin; Mr. Ralston

12          putting his mouth on Mr. Ralston's penis; and

13          Mr. Ralston making Mr. Poulos put his mouth on

14          Mr. Ralston's penis.

15                       Did I read the sentence correctly

16          as it's written in the letter that's been marked

17          as D-4?

18   A      Yes.

19   Q      Now just directing your attention to where it

20          says:  Mr. Ralston putting his mouth on

21          Mr. Ralston's penis, that didn't actually happen,

22          right?

23   A      I don't know that that's physically possible.

24   Q      Right.

25                       Is it your understanding that --
```

1        that Mr. Ralston putting his mouth on

2        Mr. Ralston's penis is referring to Mr. Ralston's

3        putting his mouth on your penis?

4    A   Correct.

5    Q   So the beginning of that sentence, The sexual

6        abuse consisted of, among other things,

7        Mr. Ralston fondling Mr. Poulos's penis and

8        testicles, skin on skin, is that true?

9    A   Yes.

10   Q   Mr. Ralston making Mr. Poulos fondle

11       Mr. Ralston's penis and testicles, skin on skin,

12       is that true?

13   A   Yes.

14   Q   And then the next part should read:  Mr. Ralston

15       putting his mouth on Mr. Poulos's penis; is that

16       right?

17   A   Correct.

18   Q   And did Mr. Ralston put his mouth on your penis?

19   A   Yes.

20   Q   And then Mr. Ralston making Mr. Poulos put his

21       mouth on Mr. Ralston's penis; is that true?

22   A   Yes.

23   Q   The next sentence, which is the first sentence of

24       the second paragraph, I guess the first full

25       paragraph, on Page 2 of D-4, which is the

Kureiis Nicholas Poulos

```
 1          December 26, 2018, letter by Mr. Garabedian to

 2          Mr. Rees, The sexual abuse by Mr. Ralston ended

 3          with Mr. Poulos's sophomore year at The Hill

 4          School.

 5                      Did I read that sentence correctly?

 6     A    Yes.

 7     Q    Is that sentence true?

 8     A    Yes.

 9     Q    Next sentence:  Mr. Poulos transferred to

10          Marquette University High School, Milwaukee,

11          Wisconsin, for his junior year of high school.

12                      Did I read that sentence correctly?

13     A    Yes.

14     Q    Is that sentence true?

15     A    Yes.

16     Q    Next sentence:  Mr. Poulos returned to The Hill

17          School for his senior year, approximately 1996 to

18          approximately 1997.

19                      Did I read that sentence correctly?

20     A    Yes.

21     Q    Is that sentence true?

22     A    Yes.

23     Q    Next sentence:  Mr. Poulos -- excuse me.  Let me

24          start again.

25                      Mr. Poulos had limited contact with
```

Kurtis Nicholas Poulos

```
 1          Mr. Ralston during Mr. Poulos's senior year,

 2          although Mr. Poulos recalls that he and

 3          Mr. Ralston lived in the same dormitory during

 4          that year.

 5                     Did I read that sentence correctly?

 6     A    Yes.

 7     Q    Is that sentence true?

 8     A    Yes.

 9     Q    Next sentence:  Mr. Poulos does not recall any

10          sexual abuse during Mr. Poulos's senior year at

11          The Hill School.

12                     Did I read that sentence correctly?

13     A    Yes.

14     Q    Is that sentence true?

15     A    Yes.

16     Q    Next sentence:  Mr. Poulos does not recall having

17          any contact with Mr. Ralston after Mr. Poulos

18          graduated from The Hill School in approximately

19          1997 when Mr. Poulos was approximately 18 years

20          old.

21                     Did I read that sentence correctly?

22     A    Yes.

23     Q    Is that sentence true?

24     A    Yes.

25     Q    And the factual information that I just read to
```

0783a

1       you is included in the third, fourth and fifth

2       paragraph of the December 26, 2008 [sic], letter

3       by Mr. Garabedian to Mr. Rees, which has been

4       marked as D4, is that information that you

5       provided to Mr. Garabedian?

6    A   Yes, it is.

7                   THE WITNESS:  Clifford...

8                   MS. DOUGHERTY:  Those are my questions.

9                   MR. JUBB:  Okay.  And the time right now

10      is 12:04 p.m. Eastern Standard Time.

11                  Why don't we do a two-minute break,

12      three-minute break since we've been going for an

13      hour.  Then I'll kick back off, and I should be

14      pretty quick.

15                  MS. DOUGHERTY:  Okay.  So five minutes?

16      12:10?

17                  MR. JUBB:  12:10, yep.

18                  MS. DOUGHERTY:  Oh, let me stop sharing.

19      There we go.

20                  THE VIDEOGRAPHER:  We are now going off

21      the record.  The time is 11:05.

22                  (Recess taken from 11:05 a.m.

23                   until 11:14 a.m.)

24                  THE VIDEOGRAPHER:  We are now back on

25      the record.  The time is 11:14, and you may

0784a

Kurtis Nicholas Poulos

```
 1        continue.
 2                   MR. JUBB:  Thank you.  Just for the
 3        record purposes, it is now 12:14 Eastern Time.
 4                   FURTHER EXAMINATION
 5   BY MR. JUBB:
 6   Q    Mr. Poulos, the weekend that you have described
 7        where your car was parked in, you had said that
 8        that was parents weekend, correct?
 9   A    Correct.
10   Q    Am I correct that parents weekend -- strike that.
11                   When would parents weekend occur?
12   A    Typically, the second or third week of October.
13        It would have been in the first trimester, roughly
14        a month after we had already started classes.
15   Q    And you would start classes in either -- end of
16        August?
17   A    No.  Early September, after Labor Day weekend.
18   Q    Okay.
19   A    Unless you were there for football, there would be
20        no other reason to be on campus that early.
21   Q    With respect to Mr. Ralston, can you describe him
22        for me?
23   A    I'd say he was five-ten, 160 pounds, short hair,
24        slight build.
25   Q    Anything else?
```

0785a

1   A   I couldn't tell you his eye color if that's what

2       you're asking for.

3   Q   With respect to the classroom in which you have

4       alleged these assaults occurred, what color were

5       the walls?

6   A   Muted tones.  Pretty much everything in that

7       building was muted tones.  My --

8   Q   And am I understanding from your testimony that

9       the door would -- coming into the room from the

10      hall, you would make a left, and that door would

11      open inward, correct?

12  A   Correct.

13  Q   And would it open inward, per your recollection,

14      from the back of the classroom or from the front?

15  A   I believe from the back of the classroom.

16  Q   And then it's your --

17  A   No.  Well --

18  Q   -- testimony that the teacher's desk --

19                  (Zoom crosstalk.)

20  BY MR. JUBB:

21  Q   I'm sorry.  You're trying to make a hand gesture.

22                  Can you --

23                  MS. DOUGHERTY:  Well, he's still

24      talking.  I don't think he was done with his

25      answer.

0786a

Kureis Nicholas Poulos

```
 1                    THE WITNESS:  I wasn't done.

 2                    MR. JUBB:  I wasn't -- I interrupted him

 3         because he was doing his hand thing as soon as I

 4         started asking a question, so...

 5                    MS. DOUGHERTY:  He was talking also,

 6         though.

 7                    MR. JUBB:  I didn't hear him talk.

 8                    But Candy, if you could just -- I

 9         know how to conduct these.  If you could just let

10         me try and get through this as quickly as

11         possible, that'd be okay.

12    BY MR. JUBB:

13    Q    So Mr. Poulos --

14                    MS. DOUGHERTY:  Okay.  Well, don't

15         interrupt his answers.  I realize it probably

16         wasn't on purpose because it seems like sometimes

17         the sound goes in and out, but that's what it

18         looked like to me.

19    BY MR. JUBB:

20    Q    Mr. Poulos, say whatever you need to say.

21    A    To my best recollection, you walk down the main

22         hallway, you take a left.  You head down to the

23         end of the corridor, and the door would have swung

24         from -- it would have been hinged on the right

25         side, if I remember correctly, meaning the rest of
```

Kurelis Nicholas Poulos

```
 1          the classroom went backwards or away from the

 2          hinges of the door.

 3    Q     Was the teacher's desk closest to the door?

 4    A     No.  It was the furthest; so was the blackboard.

 5    Q     And in the back of the classroom, what was there?

 6    A     A brick wall.

 7    Q     And for that class --

 8    A     Wait, wait.  When you speak about the back of the

 9          classroom, are you talking about the far back wall

10          when you first come in --

11    Q     Yes, sir.

12    A     -- or where his desk was situated?

13    Q     I'm referring to what you -- I was referring to

14          what you considered the back of the classroom.

15    A     I would consider the back of the classroom right

16          where the door was if I recall correctly, and then

17          it was a row of desks, and then it was the

18          blackboard; and his desk, I believe, was situated

19          in the right corner, so you would have had a

20          walkway towards the blackboard, yeah.

21    Q     And you said that this was in the basement of

22          Upper School, correct?

23    A     Basement, yeah.  I mean, first floor was

24          dormitory, so...

25    Q     And down in this area of Upper School, there were
```

```
 1        other classrooms as well as -- am I correct the

 2        language department down there, English

 3        department?

 4   A    Part of the English department was down there,

 5        yeah.  I had my English class at the far end,

 6        which later turned into where I had theology and

 7        Shakespeare.

 8                   Like I said, my French class was --

 9        or French studies were somewhere in the middle of

10        that row along the main corridor; and this --

11        again, I wish I had, like, a situation where I

12        could say east, west, north, south, but I don't.

13                   It was just if you came in from

14        this side, the main corridor is on your left.  If

15        you came in from this side, the main corridor is

16        on your right.  So if I came in my sophomore or

17        fourth form year, my French class would have been

18        on my right, my geometry class would have been on

19        my left down the corridor.

20   Q    You mentioned your French class would have been on

21        the right.  You can recall where your French class

22        occurred?

23   A    The third or fourth classroom on the right coming

24        in from the fourth form dormitory side of Upper

25        School.
```

1    Q    And were there windows in that classroom?

2    A    Yeah, because it faced the alley -- well, we

3         had -- behind Upper School, there was a driveway.

4         On the other side of Upper School was built into

5         the hill, it was built into the land.  So there

6         was nothing there.

7              Like you could walk up to the front

8         of Upper School, you'd see two doors, one to take

9         you up to the third floor, one to take you up to

10        the fourth form, but there was no exposure to what

11        was underneath it from that side of the building

12        facing the quad.  On the other side of the

13        building was a brick alleyway.

14   Q    And at any other point in time, did you have a

15        class other than geometry in this classroom that

16        you've described?

17   A    No.

18   Q    And of the students who were in there, am I

19        correct you cannot recall who anyone's -- strike

20        that.

21              Am I correct you cannot recall any

22        student who was in that class with you?

23   A    Not specifically, no.

24   Q    What about generally?

25   A    I mean, you showed me a bunch of people the other

0790a

Kurtis Nicholas Poulos

```
1        day.  There could be a possibility that one or two

2        of them were attending class with me.  But no, not

3        to my recollection.

4    Q   Did you have assigned seats?

5    A   Not to my recollection.

6    Q   Where would you usually sit?

7    A   Knowing me, probably towards the back of the

8        class.

9    Q   Was there anything on the walls?

10   A   Again, I believe it was a two-toned paint scheme.

11       Everything was so muted.  It was all tans and

12       yellows, and there wasn't, like, a bright blue

13       wall.  It was just a classroom with really crappy

14       lighting, pardon my French.

15   Q   And my question was a little bit more geared

16       toward decor.  So, for example, behind you, you

17       had something.

18                   Was there any frames on the wall or

19       photos, anything like that?

20   A   Not to my recollection.

21   Q   Was there ever an opportunity for students to

22       evaluate their teachers after the year?

23   A   Probably.

24   Q   Would you have done that?

25   A   I would have been generous.
```

0791a

Kurtis Nicholas Poulos

```
 1   Q    Why is that?

 2   A    Because I was a legacy.

 3   Q    Aren't they anonymous?

 4   A    That's like saying that if you write your name

 5        down and you hand it to somebody who already

 6        knows your handwriting, can't pick it out of a

 7        lineup.

 8                      Even a layman knows what your

 9        handwriting looks like.  It might not be

10        scientific, but if they've been teaching you for

11        months or a year, they're going to know who wrote

12        what.

13   Q    Who reviewed the evaluations --

14   A    I have no --

15   Q    -- to your recollection?

16   A    I have no idea.

17   Q    Do you know whether or not it would go to the

18        supervisors?

19   A    What supervisors?

20   Q    Well, there would be a head of the math

21        department, right?

22   A    A dean of academics?

23   Q    My question was, is there a head of the math

24        department?

25   A    I don't think there was.  I believe there was a
```

0792a

```
 1        dean of academics.

 2   Q    Who do you believe would be reviewing those

 3        evaluations?

 4   A    Whatever professor was most senior on campus, I

 5        would assume.  So at the time it would have

 6        probably been Mr. Watson.

 7   Q    And in these evaluations, do you recall the

 8        procedure for how they were completed?  In other

 9        words, was it like a survey of, you know, 1 to 5,

10        A through F?  Do you have any recollection of

11        those?

12   A    It would have probably been a numerical score with

13        the ability to write something positive or

14        negative in a bubble below, but you're 16 years

15        old.  That's the last thing you want to do when

16        you could leave by finishing it as quickly as

17        possible.

18   Q    Do you believe that you just quickly completed a

19        student evaluation for Mr. Ralston?

20   A    I quickly completed every student evaluation of my

21        teachers.  It wasn't just him.

22   Q    And in terms of the evaluation, you believe --

23        strike that.

24                  What do you believe you would put

25        for your evaluation?
```

0793a

Kurtis Nicholas Poulos

```
 1   A    8 or 9s.

 2   Q    And at least according to your testimony, that

 3        would have meant that you had been sexually

 4        assaulted by Mr. Ralston at least 10 to 15 times

 5        throughout that year and you gave him an 8 or a 9

 6        on everything?

 7   A    As a teacher or as a human being?

 8   Q    My question was related to the student

 9        evaluations.  Do you think you gave an 8 or a 9 on

10        everything?

11   A    Probably.  Again, I did not want to stand out.

12   Q    Why would you stand out if you had anything

13        negative to say about Mr. Ralston on your

14        evaluations?

15   A    Because I was a legacy.

16   Q    No, sir.  My question was, why would you stand out

17        if you had anything negative, whether it was less

18        than an 8 or a 9, for Mr. Ralston?

19   A    Asked and answered.

20   Q    Do you believe that the evaluations were not

21        anonymous?

22   A    They weren't anonymous.

23   Q    And so you have an understanding of them

24        sufficient to recall that they actually were

25        evaluations that you would write your name on; is
```

Kurtis Nicholas Poulos

```
 1        that right?
 2   A    As I stated earlier, regardless if I wrote my name
 3        on it, there was a max of 490 students at our
 4        school.  It's a small community.  People learn
 5        each other's handwriting.  There's no way any of
 6        that is anonymous.
 7   Q    Do you believe that the headmaster had your
 8        handwriting memorized if you gave Mr. Ralston poor
 9        scores on his evaluation without writing your
10        name?
11   A    I'm not going to speak about the headmaster.  The
12        headmaster spoke at my grandfather's funeral.
13        He's --
14   Q    I want to talk about who's looking at the
15        evaluations.  You said --
16   A    I have no idea.
17   Q    -- it might have been Mr. Watson.
18                   You have no idea?  Is that what you
19        just said?
20   A    Mr. Doherty was my headmaster.
21   Q    For sophomore year?
22   A    Yes, freshman --
23   Q    So who do you believe --
24   A    -- year, sophomore year.
25   Q    Who do you believe your sophomore year would have
```

0795a

Kurtis Nicholas Poulos

```
 1        been the person reviewing the student

 2        evaluations?

 3   A    The most senior member of the academic community,

 4        the most senior teacher, I would assume.

 5   Q    And do you believe that person would have your

 6        handwriting memorized to know that it was your

 7        evaluation of Mr. Ralston?

 8   A    I believe that if it got pulled out that I put him

 9        down as like a 1, it's going to go somewhere that

10        somebody else is gonna notice my handwriting.

11   Q    Did you consider giving him a 4 or a 5?

12   A    I considered getting out of that classroom.

13   Q    Did you write that anywhere, do you believe, on

14        your student evaluation?

15   A    I don't believe so.

16   Q    Would you ever recommend Mr. Ralston as a teacher

17        to anybody else?

18   A    Hell no.

19   Q    At the time --

20   A    Now?  Wait.  Strike that.

21              Are you asking if I would have

22        recommended him then or if I would recommend him

23        now?

24   Q    Then.

25   A    Then, probably.  He was a good math teacher, but
```

0796a

Kurtis Nicholas Poulos

```
 1         he was a horrible human being.

 2    Q    In other words, if you had to make a

 3         recommendation to somebody about which math

 4         teacher to take, and one of them doesn't sexually

 5         abuse kids and the other one does, you were fine

 6         recommending Mr. Ralston to your colleagues?

 7    A    I was fine --

 8                   MS. DOUGHERTY:  Objection.

 9    BY THE WITNESS:

10    A    I was fine --

11                   THE WITNESS:  What's your objection?

12                   MS. DOUGHERTY:  It's a form objection,

13         the only type of objection I can make.

14                   THE WITNESS:  Okay.

15                   MS. DOUGHERTY:  I can explain the basis

16         for it if Mr. Jubb wants to know, but I think he

17         has to ask.

18                   MR. JUBB:  I need not know.

19    BY THE WITNESS:

20    A    I'm not gonna finish answering that question.  Go

21         ahead.

22    BY MR. JUBB:

23    Q    So you're not -- you're just not going to answer

24         my question?

25    A    I answered your question.
```

Kurtis Nicholas Poulos

```
 1   Q    Mr. Poulos, if you had the option of recommending
 2        Mr. Ralston as a math teacher to one of your
 3        fellow students at the time who you are claiming
 4        sexually abused you as opposed to another math
 5        teacher, is it your testimony that you would have
 6        still recommended Mr. Ralston?
 7   A    I don't know.
 8   Q    In other words, you may recommend Mr. Ralston, who
 9        you claim sexually abused you at the time, or you
10        just may not have recommended Mr. Ralston, who
11        you're claiming abused you at the time; is that
12        right?
13   A    I don't recall.  Like I said, I probably pushed
14        through that -- that form just to get out of
15        class.  It wasn't like we got mailed them or
16        emailed them.  It was, okay, for the last five
17        minutes, fill out this form, and then you can
18        leave.  I'm going to do everything I can to leave
19        that classroom.
20   Q    And do you recall the evaluations as to whether or
21        not it even required handwriting or if you could
22        just circle a bubble or circle a number?
23   A    I do not.
24   Q    Was there anything unusual about the way you
25        circled numbers or made a checkmark that would
```

0798a

Kurdis Nicholas Poulos

```
 1        give your evaluation away?
 2   A    Again, I have no idea.
 3   Q    Were you using any special pens at the time or
 4        special pencils that your circle would look
 5        different than anybody else's?
 6   A    You want to know if I remember what pen I used?
 7   Q    I'm asking if there's any way that your student
 8        evaluation would differentiate you from anybody
 9        else.
10   A    I guess in -- in retrospect, no.
11   Q    At the time the dean of students for your sixth
12        form year during the event that you've described
13        of Mr. Ralston's car parking behind yours, was
14        that Mr. Tearalaysen [phonetic]?
15   A    I don't recall the name, but it could be.
16   Q    You don't -- you don't recall the name of Chris
17        Tearalaysen at all?
18   A    Not offhand, no.  I'd have to see a picture of
19        him, and we might have called it -- yeah, no.
20        Unless I see him, I don't know.
21   Q    During the 1996 to 1997 school year, how would it
22        occur for a student such as yourself to contact
23        the dean of students if you needed to?
24   A    I would guess we would just go to his office or
25        send a piece of mail through the school's mail
```

0799a

```
 1        system.

 2   Q    And you described the timing of this instance

 3        being a Saturday, correct?

 4   A    I believe so, yes.  It would have been parents

 5        weekend.

 6   Q    Approximately what time was it?

 7   A    After dinner.  I don't know.

 8   Q    And when you saw the car, what kind of car was it

 9        again?

10   A    I believe it was a Subaru.

11   Q    What color?

12   A    I believe it was blue or tan or both.

13   Q    Both.  And when you saw Mrs. Ralston, did she come

14        to the door?  Did she invite you in?

15   A    No.  They didn't even open the door.

16   Q    How did you talk to Mrs. Ralston?

17   A    Through the door.

18   Q    Oh, in other words -- I'm sorry.  What was the

19        door?  Was it glass?  Was it is a fully, you know,

20        wooden door at all?

21   A    I don't know if it was wood or metal.  I'm

22        guessing because it was -- I'm guessing now in the

23        experience of life it would have been a metal fire

24        door, but it was a solid door.

25   Q    Were there any windows in that door that you could
```

Kurtis Nicholas Poulos

```
 1          communicate with Mrs. Ralston?
 2   A      Just the peephole where she could see me, and I
 3          couldn't see them.
 4   Q      And when you say "them," can you tell me what
 5          evidence you have based on your recollection that
 6          suggested that Mr. Ralston was -- was inside?
 7   A      Because she said he was inside.
 8   Q      Did she -- did she try and holler for him?
 9   A      Not to my recollection.  It was more of a --
10   Q      Did she say, Let me ask him what he says?
11   A      She may have.
12   Q      You said she was confrontational.  How was she
13          confrontational?
14   A      She was confrontational because she wouldn't just
15          allow me to leave or go get him to actually
16          address the situation; more like, We're going to
17          talk about this in the morning.  For now, take
18          your ass upstairs.
19   Q      Was there ever -- again, to your recollection, was
20          there ever a rule at the time that students were
21          not allowed to park their car on campus for any
22          time?
23   A      No, and that's irregardless.
24   Q      I think you meant regardless.
25                      And in any event, am I correct that
```

0801a

Kurelis Nicholas Poulos

```
 1       at that time, it would not be the faculty's
 2       obligation to enforce discipline?  They would
 3       simply follow the rules, then report it to the
 4       dean; is that fair?
 5   A   Correct.
 6               MS. DOUGHERTY:  Objection.  Move to
 7       strike.
 8               THE WITNESS:  Okay.
 9   BY MR. JUBB:
10   Q   You said correct to that last question?
11   A   Yeah, because why would each individual teacher
12       try and -- when I got in trouble for smoking off
13       campus, I didn't get, like, grabbed by the
14       teacher.  He told somebody I was smoking off
15       campus.  So why go out of your way to become an
16       enforcer of a rule that doesn't ultimately affect
17       your life.
18   Q   Is that how you felt about most teachers at the
19       school if they had to give you a demerit or report
20       you?
21   A   No.  I have no problem getting demerits.
22   Q   You mentioned your fifth form year when you first
23       got there.  Were you going to live by yourself or
24       were you going to have a roommate?
25   A   I was going to have a roommate.
```

0802a

```
 1   Q    Do you recall his name?

 2   A    I do not.

 3   Q    Do you recall what he was known for at the school

 4        at that time?

 5   A    I believe he played hockey.

 6   Q    Was it Zach Brusko?

 7   A    There were so many hockey players.  It could have

 8        been Zach.  I don't...

 9   Q    Were you going to room with Zach your fifth form

10        year?

11   A    Again, you're throwing names at me I haven't

12        thought about in 23, 25 years.

13   Q    Okay.  Well, I'm asking you to think about it now.

14                 Were you going to room with Zach

15        Brusko your fifth form year?

16   A    Possibly.

17   Q    Are there any other people that you considered you

18        might have roomed with other than Zach Brusko to

19        say possibly as opposed to yes?

20             MS. DOUGHERTY:  Objection.

21             THE WITNESS:  Go ahead, Candy.

22             MS. DOUGHERTY:  There's no go ahead.

23             You can answer unless Mr. Jubb

24        decides he wants to rephrase his question.

25             MR. JUBB:  Yeah.  I don't.
```

Kureis Nicholas Poulos

```
 1   BY MR. JUBB:

 2   Q    Would you like me to rephrase it, Mr. Poulos?

 3   A    Did Zach Brusko play goalie for the hockey team?

 4   Q    No.  That wasn't my question.  My question was --

 5   A    Well, no.  But that --

 6   Q    -- did you room --

 7                  (Zoom crosstalk.)

 8   BY THE WITNESS:

 9   A    Can you stop talking over me for one second?

10                  You seem to know more about my high

11        school than I remember.  So I'm asking you a

12        question.  Was Zach Brusko going to play goalie

13        for the hockey team?

14   BY MR. JUBB:

15   Q    I have no idea.

16   A    Then how do you know his name?

17   Q    Mr. Poulos, you need to answer my questions.

18                  Your question was, were you going

19        to room with Zachary Brusko your fifth form year?

20        You said possibly.

21                  And I'm asking you if there was

22        anybody else that you contemplated rooming with

23        that you're not able to either say yes or no, but

24        possibly as to Zachary Brusko?

25   A    If Zachary Brusko was going to be playing goalie
```

1          for the hockey team, then that would have been my

2          roommate.  If that's his name, cool.  Do I

3          remember his specific name?  No.

4    Q    Am I correct you would have chosen your roommate?

5    A    Possibly.

6    Q    And if you had chosen your roommate, that would

7          have meant that you would have at least been

8          friends with him the year before, right?

9    A    To an extent.

10                   MS. DOUGHERTY:  Objection.

11   BY MR. JUBB:

12   Q    Did Zach also live on your dorm in Upper School

13         One East during your fourth form year?

14   A    I don't remember.

15   Q    I want to get the timeline down as to your

16         correspondence with the school after you left.

17                   Approximately what year do you

18         believe you -- you said you blocked getting emails

19         from the school.  Approximately what year was

20         that?

21   A    I have no idea.

22   Q    You mentioned that you had sent Mr. Drowne a

23         message; is that correct?

24   A    Yeah, because his Giants were playing my Packers

25         in the playoffs.  So I sent him a text message --

0805a

```
 1        no.  I called his apartment and just left a funny

 2        voice mail saying, you know, Game on, something

 3        along those lines.

 4   Q    And when you say you called his apartment, how did

 5        you get that number?

 6   A    I probably called the school switchboard.

 7   Q    When you say his Giants were playing your Packers,

 8        approximately what year was that?

 9   A    Early 2000s.

10   Q    Was it a game -- strike that.

11                  The fact that you were calling the

12        school, getting a switchboard to get his apartment

13        number, I imagine it wasn't some trivial game like

14        a Week 6 game.  It was probably -- was it a Super

15        Bowl or a playoff game?

16   A    It probably would have been a playoff game.  We

17        always had that camaraderie about sports,

18        Mr. Drowne and I.

19   Q    And Mr. Drowne was your hall master the fourth

20        form year, right?

21   A    Correct.

22   Q    Were you close with him?

23   A    Like I said, he had an open-door policy.  He

24        always was very welcoming to have us come over,

25        order food, play Sega and hang out and feel like
```

0806a

```
1        kids as opposed to science experiments.

2    Q   How often did you feel like a science experiment

3        at the school?

4    A   Every day.

5    Q   You didn't see Matt Ralston every day, though,

6        right?

7    A   Every day that I had geometry.  Every day -- you

8        see everybody every day.  You had no choice.

9    Q   Is it your testimony that you felt like a science

10       experiment every day?

11   A   Everything you do there is on exhibit.  So that's

12       pretty much the definition of a science

13       experiment.

14   Q   Can you tell me, if you can, why every day at that

15       school was a science experiment like you were on

16       exhibit as opposed to, let's say, another boarding

17       school?

18   A   I couldn't speak for other boarding schools.

19                    I can tell you that every major

20       test, every major grade was posted in the main

21       room by the mailboxes or across the hallway from

22       the mailbox in Middle School building.  So if you

23       screw up, everybody knows you screwed up.  So you

24       are on exhibit like a science experiment.

25   Q   In other words, your test at that time -- I'm
```

0807a

Kureis Nicholas Poulos

```
 1        specifically talking about the fourth form year --
 2        you would get your results by them being posted
 3        near the mailroom; is that right?
 4    A   Yeah, directly across from the mail wall.  There
 5        was a wall of mailboxes.
 6                    Then the main -- I don't know --
 7        switchboard lady, she sat in a window.  There was
 8        a row of mailboxes.  Across the way from that was
 9        a glass, you know, case that posted your grades.
10    Q   Would they just be for your fourth form year or
11        was that the same for your third, fourth and sixth
12        form year?
13    A   That was for every year.
14    Q   And would you be able to see the grades on the
15        tests for, let's say, a class you weren't even in?
16    A   Yes.
17    Q   And next to the grades, it would -- you're saying
18        that it would have the person's name who got that
19        grade?
20    A   I believe so, yes.  It's not like we had school ID
21        numbers.  It wasn't prison.
22    Q   You believe so, but do you actually recall seeing
23        that?
24    A   I -- well, yeah, because, otherwise, how am I
25        gonna look up my grades if I can't see my name?
```

0808a

Kurtis Nicholas Poulos

```
 1   Q    Was there ever indication for a Social Security
 2        number used, last four digits?
 3   A    No, not to my recollection.
 4   Q    So am I correct, then, that your testimony is that
 5        throughout the year when grades would come out for
 6        tests, every class would post every person's name
 7        on this board, and every person in the school
 8        could see who's getting what grade?
 9   A    For the most part, I remember so, yes.
10   Q    And when you contacted Mr. Drowne, did he ever get
11        back to you?
12   A    No.  I wasn't expecting him to.
13   Q    By that point in time, had you blocked the school
14        from sending you emails?
15   A    No.  I started blocking them because all they ever
16        do is ask for money.
17   Q    Okay.  And I'm just trying to figure out the
18        timing of this because you said that you couldn't
19        recall.
20                   So you said that Mr. Drowne's
21        correspondence was in early 2000s.  So following
22        that, at some point -- well, let me ask you this.
23        Did you have email as of 1997 when you were at the
24        school?
25   A    I don't believe so, no.
```

Kurtis Nicholas Poulos

```
 1    Q    Did you ever have any occasion to email Mr. Drowne
 2         or anybody else at the school?
 3    A    Did I have occasion or did I actually do it?
 4    Q    Did you ever?
 5    A    No, not to my knowledge.
 6    Q    And you referenced the emails that were asking for
 7         money.  Did you ever get emails from the school
 8         just with updates about what's going on?
 9    A    Yeah.  You get an update, like, once a month what
10         they're doing, what they're building, can you give
11         us money so we can build more, asking --
12    Q    At any point --
13    A    -- for donations.
14    Q    I'm sorry to interrupt you.  Please continue.
15    A    I'm done.
16    Q    Did you ever receive any invitation to come to any
17         reunion weekends?
18    A    Probably my 10th anniversary weekend or 10-year
19         anniversary weekend.
20    Q    Did you go to that?
21    A    No.
22    Q    Did you ever go to your 5-year anniversary
23         weekend?
24    A    Nope.
25    Q    What about your 15th?
```

0810a

```
 1    A    Nope.

 2    Q    Did you ever get invited?

 3    A    It's a general invite to all alumnus.

 4    Q    When you say "all alumnus," what do you mean by

 5         "all alumnus"?

 6    A    All alumnus for that class year are going to get

 7         invited from the alumni -- there's an actual

 8         alumni building.  That's all they do is reach out

 9         to alumnus.

10    Q    And you mentioned to Ms. Dougherty that you wrote

11         a check for 97 cents; is that right?

12    A    I believe so, back in the day.

13    Q    What year was that?

14    A    I have no idea.  It would have been a joke.

15    Q    I'm aware that it would have been a joke.

16              Did you write it from your own bank

17         account or from somebody else's?

18    A    From my own bank account.

19    Q    Was this donation solicited or was this out of the

20         kindness of your heart sua sponte?

21    A    Solicited.

22    Q    If you could approximate for me when you believe

23         this donation would have been.  Would this have

24         been in the early 2000s?  Late 2000s?

25    A    Early 2000s, maybe late '90s.
```

Kureus Nicholas Poulos

```
 1    Q    Did your family ever make any donations?

 2    A    Of course.

 3    Q    Were you privy to those?

 4    A    To the amount or the fact that we made them?

 5    Q    Both.

 6    A    Not the amount, but the fact that we made large

 7         donations.

 8    Q    How often after you graduated were there large

 9         donations that were made from your family?

10    A    I would guess my grandmother would donate at least

11         once a year.

12    Q    And did you ever have any discussions with her

13         about, you know, hey, maybe you should stop doing

14         this?

15    A    No, because I didn't want her to know.

16    Q    Could you ever think of a way to express your

17         displeasure with the school without ever

18         describing like what you've described as sexual

19         abuse?

20    A    No.

21    Q    Now, tell me when you first started talking

22         with -- with Emily, your ex-girlfriend.

23    A    I got invited to go to Lawrenceville weekend

24         through an email from the school to all alumnus,

25         and she wanted to know why I basically was not
```

0812a

1       going to participate when I lived only a few hours

2       away in Connecticut.

3   Q   And you said you got an email.  Was she over your

4       shoulder looking at your computer?

5   A   She may have been.  My -- at that point, I was

6       living in Orange, so my computer was in the living

7       room area.  So basically anything you did on the

8       computer was going to be seen by anybody in that

9       room.

10  Q   And so your then girlfriend Emily saw this email

11      and started asking you, Gee, why aren't you going

12      to go to the reunion, something to that effect?

13  A   Basically, yeah.  It was Lawrenceville --

14  Q   What had she known about this -- go ahead.

15  A   It was Lawrenceville weekend, which was a -- it

16      is, I would assume, still a giant weekend of

17      events on campus, bonfires, bussing students in so

18      that we can play sports all weekend.

19  Q   Did Ms. Peters know what Lawrenceville weekend was

20      before overseeing this email that you received?

21  A   I may have mentioned it.  I don't remember.

22  Q   In other words, Ms. Peters was aware of the

23      significance of Lawrenceville weekend in order to

24      ask you, you know, Hey, why aren't you going to go

25      to this?  Is that fair?

Kurelis Nicholas Poulos

```
 1   A    Probably.  I did speak in length with her about my

 2        experience at that school and what Lawrenceville

 3        weekend was.

 4   Q    How long were you in a relationship with

 5        Ms. Peters?

 6   A    Almost two and a half years.

 7   Q    And then at some point it's your testimony that

 8        you received one of the emails from the school,

 9        the April of 2016 email, and she oversaw that

10        too?  Is that right?

11   A    Those would have been emails I would have printed

12        out.  Whether I left them in my printer, could

13        have been.  There was a lot going on at the time.

14   Q    Like what?

15   A    Life in general.

16   Q    And what did you specifically tell Ms. Peters

17        about your time at the school?

18   A    Prior to that?

19   Q    No.  When you say that she must have seen them on

20        the printer?

21   A    I'm assuming or -- I would assume she would have

22        just asked what is this in reference to, to a

23        degree.

24   Q    And you decided to tell her the story of your

25        alleged sex abuse; is that correct?
```

0814a

```
 1   A    I had to start talking to the person that I was

 2        going to be hopefully marrying about what had

 3        happened to me, yes.

 4   Q    How did she react?

 5   A    She was mortified.

 6   Q    How was your relationship at that point?

 7   A    Fine.

 8   Q    Was there ever any domestic violence issues?

 9   A    Yeah.

10   Q    Did you have to press any charges against her?

11   A    I never would have.

12   Q    Were the domestic violence charges related to you?

13   A    Yeah.  They called -- like I said, I got a

14        disorderly conduct ticket for yelling.

15   Q    You were yelling, and that gave you a disorderly

16        conduct ticket?

17   A    The police did not like my demeanor.

18   Q    Did you try and fight a cop?

19   A    Not to my recollection.

20   Q    Approximately what time was this?  What year?

21   A    I have no idea.  What year?

22   Q    Yes, sir.

23   A    2016.

24   Q    Early 2016 or late 2016?

25   A    Middle of 2016.
```

0815a

Kurtis Nicholas Poulos

```
 1   Q    What had transpired in approximately June of 2015

 2        that you discussed your allegations of sexual

 3        abuse with your mom?

 4   A    I said June of 2014, not 2015.

 5   Q    Forgive me.

 6                        What transpired in June of 2014

 7        that made you reveal your allegations of sexual

 8        abuse to your mom?

 9   A    I was sick of living a lie.

10   Q    Did you have any run-ins with the law?

11   A    Then?

12   Q    Yes, sir.

13   A    I believe so, yes, again, for drunk and

14        disorderly.

15   Q    How did your mom react to the drunk and

16        disorderly?

17   A    She didn't want to be around me.

18   Q    After you had contact with Mr. Garabedian

19        initially, it's my understanding that there was a

20        time where you'd go outside, you have the 2017

21        letter, you forward that to your mom; your mom

22        says, Let me look into this, don't contact these

23        people, they're lawyers; and then shortly

24        thereafter, there's contact with Mr. Garabedian.

25                        With that as the background, can
```

0816a

Kurtis Nicholas Poulos

```
 1        you tell me what, if anything, was discussed with
 2        your mom as opposed to simply sending the letters
 3        to her?
 4   A    Yeah.  I called her and told her that I got the
 5        email.  I've asked and answered this same
 6        question.
 7   Q    Is there anything else you can recall about the
 8        discussions with your mom as they pertain to the
 9        April 2016 or November of 2017 letters that you
10        haven't already discussed with us in your prior
11        testimony with Ms. Dougherty questioning you?
12   A    No.
13   Q    You discussed a fee agreement with Mr. Garabedian
14        with Ms. Dougherty and your understanding of what
15        that percentage would be.
16                  Did you ever sign a fee agreement?
17   A    You have every single document that I've ever
18        signed, so...
19   Q    In other words, if I don't have a fee agreement,
20        then you didn't sign it, right?
21   A    If there was a fee agreement, I signed it.
22   Q    Well, do you recall signing a fee agreement?
23   A    I remember signing like 40 documents, which all
24        of -- all of which you have.
25   Q    Are you referring to the documents I showed you?
```

0817a

Kurtis Nicholas Poulos

```
 1   A    Yes.

 2   Q    Okay.  I'll represent to you I showed you what's

 3        known as the HITECH letters and the

 4        authorizations.  So my question is a little bit

 5        different with just respect to the contingent fee

 6        agreement.  Is it your understanding that of all

 7        the documents I showed you, that's everything you

 8        signed?

 9   A    To my recollection unless I go in my office and

10        start pulling out every single piece of paper.

11   Q    Let's not do that just yet.

12                      But as you sit there, do you recall

13        reading through a contingent fee agreement that

14        says he represents you, here's what his fee's

15        going to be, you know, if we aren't successful,

16        we'll get you -- you know, we'll eat all the

17        costs, anything like that, or was it just a verbal

18        agreement?

19   A    No.  I believe there would have been some sort of

20        payment agreement.

21   Q    And when you say you believe there would have

22        been, my question is, do you recall signing one?

23   A    No.

24   Q    Thank you.

25                      To the extent that you did and you
```

```
 1        just don't recall it, is that something you would

 2        have maintained in one of those folders that you

 3        described as important documents?

 4   A    Yes.

 5   Q    I asked you what type of dog Clifford was, and you

 6        told that to me.  When did you get him?

 7   A    January 15th, 2020.

 8   Q    You refer to him as a service dog.  Did a mental

 9        health professional prescribe to you Clifford?

10   A    No.  We went through training together to get him

11        certified.  Do you want to see his certification?

12   Q    I don't think that's necessary.

13                        And when did you go through the

14        training?

15   A    February.

16   Q    Who, if anyone, advised you to get a dog?

17   A    Me, myself and I.

18   Q    During your discussion with Ms. Dougherty, you

19        stated that going through that letter --

20   A    Which letter?

21   Q    The only document she showed you today.  With

22        respect to the December 26, 2017, letter, the

23        question was --

24                   MS. DOUGHERTY:  Objection.  I think you

25        mean 2018.
```

Kureris Nicholas Poulos

```
 1                    MR. JUBB:  Forgive me.  Strike that.

 2   BY MR. JUBB:

 3   Q    During the time that Ms. Dougherty went through

 4        the December 26, 2018, letter, she had asked you

 5        whether or not the information in the letter you

 6        provided to Mr. Garabedian, and you said yes.

 7                    Do you recall saying that?

 8   A    Yes.

 9   Q    When did you provide him that information?

10   A    I believe during our initial interview.

11   Q    Which was when?

12   A    November, December of 2017.

13   Q    And was this that conference call where there was

14        another person on the line as well?

15   A    Correct.

16   Q    Following that initial interview by phone in 2017,

17        do you recall having any discussions with

18        Mr. Garabedian after April of 2018?

19   A    Any conversations or specifics?

20   Q    Just any conversation with him.

21   A    Yeah, check-ins.

22   Q    Would he call you personally or someone from his

23        office?

24   A    He would typically call me in response to my

25        leaving a voice mail.
```

0820a

Kurtis Nicholas Poulos

```
 1    Q    In other words, you would leave a voice mail and

 2         say, Hey, what's going on?  And then he would

 3         respond back?

 4    A    Correct.

 5    Q    When he would respond back, do you recall a time

 6         where you actually spoke with him or was it just a

 7         phone tag via voice mail?

 8    A    No.  We would speak.

 9    Q    And in those discussions, did he ever have you

10         provide any sort of written statement to him?

11    A    Not to my recollection.

12    Q    Did he ever ask you for any supporting

13         documentation?

14    A    Not to my recollection.

15    Q    Did he ever ask you for any of your medical

16         records?

17    A    Possibly.

18    Q    What do you recall about that request?

19    A    That I would have allowed him to speak to or

20         receive documents from Dr. Grade.

21    Q    I'll represent to you that you didn't go to

22         Dr. Grade until approximately May of 2018.

23                   Did you provide him any sort of

24         notes for any providers before then?

25    A    No.
```

0821a

Kurtis Nicholas Poulos

```
1   Q    How did you learn of Dr. Grade?

2   A    Again, he's one of the most prominent

3        psychiatrists in the city, and my mom wanted me to

4        go see a great doctor.  So we had a family friend

5        who knew him recommend me.

6   Q    When you first spoke with Dr. Grade, did your mom

7        join you?

8   A    No.  She's never joined me in any capacity.

9   Q    When you say the family friend, was that Barry

10       Blackwell?

11  A    Yes.  It was Barry Blackwell.

12  Q    How long have you known Barry Blackwell?

13  A    Since I was in first grade.

14  Q    What does Barry Blackwell do?

15  A    He was a psychiatrist.

16  Q    Did you ever see Barry Blackwell for any

17       psychiatric treatment?

18  A    No, I did not.

19  Q    And what was it that you discussed with

20       Mr. Blackwell for him to recommend you to

21       Dr. Grade?

22  A    I just -- again, you know, the situation is these

23       people have known me since I was four, five, six

24       years old.  They've seen how it affected my life,

25       how I changed.  It's not like he didn't know.
```

Kurtis Nicholas Poulos

```
 1          That's his profession.  I wanted to --

 2   Q    Are you saying that Mr. Blackwell --

 3   A    Can I please --

 4   Q    -- determined that --

 5   A    You know what?

 6                MS. DOUGHERTY:  Objection.

 7                THE WITNESS:  If you're gonna keep

 8        interrupting me --

 9                MS. DOUGHERTY:  He needs to finish his

10        answer.

11                THE WITNESS:  -- I'm just gonna get off

12        the fuckin' thing.

13                MR. JUBB:  I'm trying to --

14                THE WITNESS:  You keep talking -- you

15        know what?  I'm done, I'm done, I'm done.

16                MR. JUBB:  Mr. Poulos, are you still

17        there?  The time is now 1:07 Eastern.

18                THE VIDEOGRAPHER:  Do you wish to go off

19        record?

20                MS. DOUGHERTY:  We can go off the video,

21        but -- why don't we take a break.  I can try to

22        call Mr. Poulos or I can try to call --

23                MR. JUBB:  No.  That's okay.  I don't

24        need you to have any contact with him.  He's -- he

25        doesn't want to come back.  It's now 1:07.  I
```

Kureris Nicholas Poulos

```
1        still have a couple of questions, so...
2                MS. DOUGHERTY:  Okay.  Well, some -- if
3        we were in -- if we were in person, as you know,
4        sometimes witnesses decide that they're going to
5        take a break and don't, you know, get in their car
6        and drive away.
7                     I'm not clear whether he's taking a
8        break and not intending to come back or what.  So
9        that was -- I can -- I think I might have a
10       telephone number for him.  I can call him on
11       speakerphone, and we can confirm whether he's
12       coming back or not.  I wasn't trying to suggest
13       anything untoward.  I just --
14               MR. JUBB:  Yeah.  Why don't you call him
15       on speaker.
16               MS. DOUGHERTY:  Okay.  Let me see if I
17       have a number for him unless you have one.
18               THE VIDEOGRAPHER:  Do you wish for me to
19       go off record or stay on?
20               MR. JUBB:  I think you should stay on.
21               MS. DOUGHERTY:  Well, do we need the
22       video for this?
23               MR. JUBB:  I think we do, yes.
24               MS. DOUGHERTY:  Whatever.  I don't care.
25       It doesn't matter.  Let me see.
```

0824a

Kurtis Nicholas Poulos

```
 1                    THE VIDEOGRAPHER:  He has logged off the

 2        meeting now.

 3                    MS. DOUGHERTY:  I thought we had to fill

 4        out a sheet for the Court for the conference call

 5        that had everybody's number on it, but I'm not

 6        finding it in my system.

 7                    MR. JUBB:  I have a number, I'm sure,

 8        somewhere.

 9                    I have a phone number.

10                    MS. DOUGHERTY:  All right.  Do you want

11        to try?

12                    MR. JUBB:  Why don't you try this.

13                    MS. DOUGHERTY:  Okay.  I can.

14                    MR. JUBB:  (262)330-4604.

15                    MS. DOUGHERTY:  (262)330-4604, right?

16                    MR. JUBB:  Yeah.

17                    MS. DOUGHERTY:  Okay.  Can you hear the

18        ringing?

19                    THE WITNESS:  Hello?

20                    MS. DOUGHERTY:  Hi, Mr. Poulos.  This is

21        Candy, and you're also on speakerphone, so

22        Mr. Jubb, the court reporter and videographer can

23        hear you.

24                    Can you please log back onto the

25        meeting?
```

0825a

Kureus Nicholas Poulos

```
 1                   MR. JUBB:  Candy, can you put him up to

 2          your microphone because I'm having a hard time

 3          hearing?

 4                   MS. DOUGHERTY:  He's not said anything.

 5          I asked my question.

 6                   MR. JUBB:  Okay.

 7                   MS. DOUGHERTY:  And I'm sorry?  Are you

 8          logging back in, Mr. Poulos?

 9                   THE WITNESS:  Yeah.

10                   MS. DOUGHERTY:  Okay.  He's -- all

11          right.  I'm going to hang up, and then we'll just

12          wait for you to join the meeting again.  Okay?

13                   THE WITNESS:  Yep.

14                   MS. DOUGHERTY:  Could you hear he said

15          yeah, yep, yep?

16                   MR. JUBB:  Yep.

17                   MS. DOUGHERTY:  Okay.  We never went off

18          the record, right?

19                   THE COURT REPORTER:  Correct.

20                   THE WITNESS:  Sorry for my outburst.

21                   MS. DOUGHERTY:  Okay.  Well, just to --

22          to be fair, it's not wrong that Mr. Jubb shouldn't

23          interrupt your answer when you're answering, just

24          like you shouldn't interrupt his question.  I

25          don't think it was intentional because, at least
```

0826a

Kurtis Nicholas Poulos

```
 1        from my perspective, sometimes the sound goes in

 2        and out.

 3                    So we'll give Mr. Jubb the benefit

 4        of the doubt that it's the technology, and he

 5        wasn't purposely trying to interrupt you.  But if

 6        it does occur, you should just alert Mr. Jubb and

 7        then finish your answer; just like if you

 8        interrupt Mr. Jubb's question, he should let you

 9        know, and he should finish his question.

10                    So I really don't remember what the

11        last question was, but I do know that you weren't

12        done with your answer, Mr. Poulos.  So maybe it

13        makes sense to read the question and answer back.

14                    MR. JUBB:  Please.

15                    (Record read as follows:

16              "QUESTION:  And what was it that you

17              discussed with Mr. Blackwell for him to

18              recommend you to Dr. Grade?

19              "ANSWER:  I just -- again, you know,

20              the situation is these people have known

21              me since I was four, five, six years

22              old.  They've seen how it affected my

23              life, how I changed.  It's not like he

24              didn't know.  That's his profession.  I

25              wanted to --"
```

0827a

Kureis Nicholas Poulos

```
 1   BY MR. JUBB:

 2   Q    Mr. Poulos, would you like to continue your

 3        answer?

 4   A    No.

 5   Q    What was it that made Mr. Blackwell refer you to

 6        Dr. Grade?

 7   A    Because Dr. Blackwell helped train Dr. Grade.

 8   Q    And what was it that you told Dr. Blackwell that

 9        would indicate to him that you should see

10        Dr. Grade, who he had trained?

11   A    The fact that he knew I went through a traumatic

12        experience.

13   Q    And tell me how he knew that.

14   A    Because he went through a similar experience.

15   Q    Did you tell him you went through a traumatic

16        experience?

17   A    Yes, without specifics.

18   Q    When did you tell him that?

19   A    At a meeting at his apartment.

20   Q    When was this?

21   A    I would say May of 2018.

22             THE WITNESS:  Sit, sit.

23   BY MR. JUBB:

24   Q    Am I correct that you had already contacted

25        Mr. Garabedian before you ever had any discussion
```

0828a

```
 1        with Mr. Blackwell?

 2   A    Correct.

 3              THE WITNESS:  It's okay.

 4   BY MR. JUBB:

 5   Q    Was there anything that occurred in the November

 6        2017 time frame as it pertained to you and any

 7        sort of criminal charges?

 8   A    No.

 9   Q    Was there anything between April of 2016 and

10        November of 2017 that pertained to you and

11        criminal charges?

12   A    Not to my recollection, no.

13   Q    When did you break up with Emily?

14   A    End of June 2018.

15   Q    And you believe --

16   A    What does this have to do with any of this?

17   Q    Bear with me.

18              You believe you broke up with Emily

19        after you had contacted Mr. Garabedian; is that

20        right?

21   A    Well after.

22   Q    Was there anything that occurred, an incident at

23        home, around the 2017 time frame?

24   A    No.

25   Q    Who is Dr. Gudeman?
```

0829a

```
 1   A     How is that relevant?

 2   Q     Is he a psychiatrist, sir?

 3   A     I believe so.  He's also a family friend.

 4   Q     Well, I had asked you previously if you had ever

 5         had any sort of psychiatric treatment, and I

 6         believe your recollection did not include any

 7         reference to Dr. Gudeman, and so I'm following up

 8         on that.

 9                    With respect to Dr. Gudeman, you

10         mentioned that he's a mental health professional

11         but also a family friend.  Do you still talk with

12         Dr. Gudeman?

13                    MS. DOUGHERTY:  Objection.

14   BY THE WITNESS:

15   A     I haven't seen Dr. -- go ahead.

16                    MS. DOUGHERTY:  I said objection.

17                    MR. JUBB:  He's waiting for you to tell

18         him he can answer, Candy.

19                    MS. DOUGHERTY:  Okay.  My objection is

20         to the commentary about prior testimony.

21                    THE WITNESS:  Clifford.

22   BY THE WITNESS:

23   A     I haven't seen the man in 20-plus years.

24   BY MR. JUBB:

25   Q     What's your last recollection of speaking with
```

0830a

Kurtis Nicholas Poulos

```
 1        Dr. Gudeman?

 2    A   I don't recall my recollection with Dr. Gudeman.

 3    Q   How long did Dr. Gudeman treat you?

 4    A   Not long.

 5    Q   Was this in the early 2000 time frame?

 6    A   It would have been before September 11th.

 7    Q   And when you say, "it would have been before

 8        September 11th," you're saying that would have

 9        been before September 11th, 2001; is that right?

10    A   Yeah, because that date doesn't stick out any

11        other year.

12    Q   And do you recall why you were receiving treatment

13        from Dr. Gudeman?

14    A   For depression.

15    Q   And do you recall approximately how many times you

16        saw him?

17    A   No.

18    Q   Where would you see him?

19    A   He had a practice at his house.

20    Q   And when you went to go see him, am I correct you

21        did not relay any allegation of sexual abuse that

22        occurred at The Hill School?

23    A   No, I did not.

24    Q   You mentioned that Mr. Ralston was one of your

25        table heads your third form year.  Who were your
```

0831a

Kurelis Nicholas Poulos

```
 1        other table heads the third form year?
 2   A    I can only remember Mr. Ruth because he wouldn't
 3        let us eat pizza with our hands.
 4              MS. DOUGHERTY:  I'm sorry.  Did you say
 5        third form year?
 6              MR. JUBB:  Yes.
 7              MS. DOUGHERTY:  Okay.  Thank you.
 8   BY MR. JUBB:
 9   Q    What about your fourth form year?
10   A    I couldn't tell you.
11   Q    Am I correct that the way it worked back then, if
12        you were on a varsity sport team, you would sit at
13        a table with the coaches?
14   A    Not to my recollection.
15   Q    Am I correct that given the rotating tables, you
16        would have had six different table heads during
17        your sophomore year?
18   A    Sounds about right.
19   Q    You would have had six different table heads for
20        your senior year?
21   A    When I attended meals, yes.
22              Again, I was never really at the
23        meals.  So it didn't matter who my head -- who the
24        table master was, I wasn't gonna stay.
25   Q    And it's your testimony that in the 1996 to 1997
```

Kurtis Nicholas Poulos

```
 1          time frame, as a senior, you could just show up,

 2          sit down, hear announcements and leave; is that

 3          right?

 4    A     Yes.

 5    Q     And of the six table heads who you were assigned

 6          to, all of them allowed that; is that right?

 7    A     Yes, to my recollection.

 8    Q     Do you recall who they were?

 9    A     No.

10    Q     Have you ever been diagnosed with any sort of

11          condition like bipolar disorder?

12    A     No.

13    Q     Has your father?

14    A     I have no idea.  I haven't spoken to the man in 20

15          years.

16    Q     Has your mom?

17    A     No.  And don't bring my mother into this.

18    Q     Have you ever relayed that to any of your medical

19          providers, that you believe any of your family

20          members may have been bipolar?

21    A     No.

22    Q     Did you ever relay that they had any sort of

23          problems with alcohol abuse or substance

24          dependency?

25    A     No.  This is slut shaming 101 basically.
```

0833a

Kurtis Nicholas Poulos

```
 1   Q    What did you refer to it as?

 2   A    Don't -- doesn't matter.

 3             MS. DOUGHERTY:  Well, I think in the

 4        legal world it's called not relevant, but...

 5   BY MR. JUBB:

 6   Q    When did you start reading emails from the school

 7        again?

 8   A    I don't know.

 9   Q    2015?

10   A    I just said I don't know.

11   Q    I'm trying to figure out if we can get a little --

12             THE WITNESS:  Whose horn is going off?

13             MS. DOUGHERTY:  It's not outside my --

14   BY MR. JUBB:

15   Q    If you were trying to talk, I couldn't hear you.

16   A    I just said I don't know, so why ask the same

17        question.

18   Q    I'm trying to figure out if we can pinpoint --

19        it's not the same question.

20             So I'm trying to figure out if we

21        can get a little closer than "I don't know," for

22        example, an approximation.  So we know you got an

23        email in April of 2016, right?

24   A    Correct.

25   Q    And we also know that you initially signed up with
```

0834a

```
 1        the school, whenever email came out, to receive

 2        email, correct?

 3   A    Correct.

 4   Q    Okay.  And so as you sit here today, the best you

 5        could do to approximate for us when you blocked

 6        the school is when email first came out when you

 7        first started getting emails from them and 2016?

 8        Somewhere in there, that's the best that you can

 9        do for your recollection; is that correct?

10   A    Correct.

11                   MR. JUBB:  That's all I have for right

12        now.

13                   FURTHER EXAMINATION

14   BY MS. DOUGHERTY:

15   Q    I just have some follow-up.

16                   Mr. Poulos, you were using the term

17        "table master," and Mr. Jubb was using the phrase

18        "table head."  Is there a difference between the

19        two?

20   A    It's the same thing.

21   Q    I think you previously mentioned that there were

22        two faculty members at your table or at the tables

23        in the dining hall.  Was one faculty member the

24        head over the other or were they both -- both

25        faculty members at a table considered the table
```

0835a

Kureris Nicholas Poulos

```
 1        master or table head?

 2   A    Each table was 16 students, one teacher on either

 3        end; each teacher took care of eight students.

 4   Q    Thanks.  Did you identify Matthew B. Ralston by

 5        name as a teacher who sexually abused you to

 6        Mr. Garabedian?

 7   A    Yes.

 8   Q    Did you identify Matthew B. Ralston by name as the

 9        teacher who sexually abused you to Mr. Garabedian

10        during the initial interview in November or

11        December 2017?

12   A    I believe so, yes.

13                 MS. DOUGHERTY:  Those are my questions.

14                 MR. JUBB:  Thank you for that follow-up.

15                 FURTHER EXAMINATION

16   BY MR. JUBB:

17   Q    So I want to talk about those discussions a bit

18        more.  In these discussions you had with

19        Mr. Garabedian where you identified Mr. Ralston,

20        did you identify him without being questioned or

21        did Mr. Garabedian ask you for the name?

22   A    He asked me for the name.

23   Q    And at that time, was it is your understanding

24        that Mr. Ralston was no longer at your school?

25   A    Correct.
```

1   Q    Did you tell Mr. Garabedian that?

2   A    I don't know.

3   Q    Did he ask?

4   A    I don't know.

5   Q    When he asked you any more details about

6        Mr. Ralston or -- strike that.

7                  In these conversations, did you

8        ever relay to Mr. Garabedian that anybody else had

9        any sort of alleged experience like you had with

10       Mr. Ralston?

11  A    I don't believe so, no.

12                 MR. JUBB:  Those are all the questions I

13       have.  Thank you.

14                 MS. DOUGHERTY:  Nothing further for me.

15                 THE VIDEOGRAPHER:  If there's nothing

16       else, this concludes the deposition of Kurtis

17       Poulos.  The time on the screen is 12:28, and we

18       are now off record.

19                 (Proceedings had off the video record:)

20                 MS. DOUGHERTY:  Can we stay on the

21       stenographic record for a moment?

22                 THE COURT REPORTER:  Yes.

23                 MS. DOUGHERTY:  Mr. Jubb, I just want to

24       address what we had discussed during a break, I

25       don't remember which day, about the handling of

0837a

```
1        the transcript, just to make sure that Mr. Poulos

2        also agrees.

3                    Mr. Poulos, the suggestion to

4        address the several days of the transcript of your

5        testimony is that if the transcript is going to be

6        publicly disseminated or filed like with the Court

7        in a motion, something like that, that any names

8        are redacted from the transcript; and the idea

9        behind that is that we can avoid sealing the

10       entire transcript, but also maintain the

11       confidentiality of people involved.

12                    Is that something that is okay with

13       you and that you will agree to, Mr. Poulos?

14                THE WITNESS:  State that again.

15                MS. DOUGHERTY:  Sure.  The suggestion on

16       addressing the -- well, let me say it this way.

17                    During the past several days of

18       your testimony, you've identified, in particular,

19       Mr. Ralston by name, who is not identified in any

20       of the pleadings by name; you've identified The

21       Hill School, which is also not identified by name

22       in any of the pleadings; and a number of other

23       teachers and classmates, none of whom are

24       identified by name in any of the pleadings.

25                    One option to address that
```

0838a

```
 1      situation to maintain the confidentiality of

 2      people's identities is to put all of the

 3      transcripts under seal, which means that anytime

 4      anyone wants to use the transcripts with a Court

 5      filing, something of that nature, a special motion

 6      needs to be filed and the material needs to be

 7      filed under seal, it's called.

 8                      An alternative short of that, short

 9      of putting all the transcripts under seal, is an

10      agreement among the parties that if at any time

11      one of the parties wants to disseminate the

12      transcript publicly or use it in a public filing,

13      if the part that is being used identifies someone

14      by name, that we agree to redact or black out the

15      person's name.

16                      You might recall the complaint in

17      this action has the two letters, the April and

18      December letter attached, but blacks out

19      Mr. Ralston's name and the school's name.  So

20      that's what we're referring to by "redacting."

21                      So just to give an example, if I

22      wanted to file a motion tomorrow that related in

23      some way to your testimony, and I wanted to attach

24      your testimony to my motion and file it with the

25      Court, which is a public filing, if part of your
```

0839a

Kurtis Nicholas Poulos

```
 1        testimony included Mr. Ralston's name, then I

 2        would black out his name, and I would do that by

 3        agreement; and then I'd probably have to also give

 4        the Court a copy that was unredacted separately

 5        just to chambers including all the parties.

 6                    So Mr. Jubb and I have agreed on

 7        behalf of our respective clients, you know,

 8        between us, subject to your agreement, that rather

 9        than putting the transcript or portions of the

10        transcript under seal, that we'll agree to redact

11        people's name from public consumption if the

12        transcript is distributed to the Court, similar to

13        the letters that were attached to the complaint by

14        Mr. Ralston.

15                    So do you understand what we're --

16        at least at the moment what I'm asking you,

17        Mr. Poulos?

18                    THE WITNESS:  Yeah.  Just redact the

19        names.

20                    MS. DOUGHERTY:  Right.  Is that

21        acceptable to you?

22                    THE WITNESS:  Yes.

23                    MS. DOUGHERTY:  Okay.  All right.

24                    Mr. Jubb, that's still your

25        agreement, right?
```

0840a

Kurtis Nicholas Poulos

```
 1                  MR. JUBB:  That's fine.
 2                  MS. DOUGHERTY:  I just don't think we
 3          actually put it on the record.  We talked about it
 4          on a break.
 5                     Okay.  So then that will save the
 6          three different court reporters from needing to go
 7          through and redact or make adjustments to the
 8          transcript since the parties have agreed to do
 9          that.
10                  MR. JUBB:  Okay.  Thank you.
11                  MS. DOUGHERTY:  Are you going to find
12          out if he wants to read and sign since he's pro
13          se?
14                  MR. JUBB:  Mr. Poulos, once these
15          transcripts come back, Ms. Dougherty and I will
16          send them to you.  You're welcome, and we
17          encourage you, for whatever it's worth, to read
18          them; and if there's any sort of names that are
19          misspelled or sometimes words, when phonetically
20          sounded out, will separate into two words, and in
21          reality they're one.
22                     I'll give you an example.  If the
23          testimony is the phrase "step on," and sometimes
24          it's actually spelled "Steffen," that would be an
25          example of you reading your testimony and saying,
```

0841a

Kureus Nicholas Poulos

```
1          you know, that's not correct; and so if -- you

2          would have the opportunity, if you want, to read

3          it.  It's called read and sign.

4                        So you can determine on your own

5          after you consult with whoever you need to consult

6          with if you want to do that.  But we'll send that

7          to you, and you're welcome to do it.  Okay?

8                        THE WITNESS:  Fair enough.

9                        MS. DOUGHERTY:  And if you -- what

10         Mr. Jubb is referring to about correcting

11         typographical or, you know, record typographical

12         errors, you would file an errata sheet that is

13         attached to the transcript.

14                        THE WITNESS:  I'll figure it out.

15                        MS. DOUGHERTY:  Okay.  Unless we need

16         anything else, I don't have anything further.

17                        MR. JUBB:  And Ms. Harnen, just etran is

18         fine with the exhibit as a PDF.

19                        THE COURT REPORTER:  Just the exhibit

20         that was shown?

21                        MR. JUBB:  Yes.

22                        MS. DOUGHERTY:  Yes.  Email PDF is fine

23         for me.  I'll send you the one that I showed on

24         the screen just because I marked it as D-4, unless

25         you have a different opinion, Mr. Jubb.
```

0842a

Kurtis Nicholas Poulos

1                    MR. JUBB:  No.  That's fine.

2                    MS. DOUGHERTY:  Thank you, Mr. Poulos,

3         for rejoining after earlier today.

4                         So now your deposition is over.

5                    THE WITNESS:  Okay.

6                    MS. DOUGHERTY:  You can leave now.

7                    (Proceedings concluded at 12:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0843a

1   STATE OF WISCONSIN   )

                         )  SS:

2   COUNTY OF MILWAUKEE  )

3              I, Debbie A. Harnen, a Registered

4   Professional Reporter and Notary Public in and for the

5   State of Wisconsin, do hereby certify that the

6   deposition of KURTIS NICHOLAS POULOS was reported by me

7   and reduced to writing under my personal direction.

8              I further certify that said deposition

9   was taken VIA ZOOM VIDEOCONFERENCE, on November 24,

10  2020, commencing at 10:00 a.m. and concluding at

11  12:35 p.m.

12             I further certify that I am not a relative

13  or employee or attorney or counsel of any of the

14  parties, or a relative or employee of such attorney or

15  counsel, or financially interested directly or

16  indirectly in this action.

17             In witness whereof, I have hereunto set my

18  hand and affixed my seal of office at Milwaukee,

19  Wisconsin, on November 30, 2020.

20                       *Debbie A. Harnen*

21

22                       Debbie A. Harnen - Notary Public

                         In and for the State of Wisconsin

23

    My Commission Expires:  July 27, 2022.

24

25

LAW OFFICES
OF
MITCHELL GARABEDIAN

MITCHELL GARABEDIAN
WILLIAM H. GORDON
NATHAN A. GAUL
SALVATORE M. CIULLA
DANIEL R. MAHONEY
LEAH BRADY
MIRRA L. CAMPBELL

100 STATE STREET, 6TH FLOOR
BOSTON, MASSACHUSETTS 02109

(617) 523-6250
FAX (617) 523-3687

April 11, 2018

Zachary G. Lehman
Headmaster
The Hill School
860 Beech St.
Pottstown, PA 19464

Re:    Sexual Abuse Claim of Kurtis Nicholas Poulos

Dear Mr. Lehman:

Please be informed that this office represents Kurtis Nicholas Poulos. This letter is an attempt to settle and compromise claims involving Matthew B. Ralston (hereinafter "Mr. Ralston") and Mr. Ralston's supervisors at The Hill School.  It should not be used as evidence in any court hearing.

Kurtis Nicholas Poulos., currently 39 years of age, was repeatedly sexually molested by Mr. Ralston from approximately 1993 when he was approximately 15 years of age years of age until approximately 1995 when he was approximately 17 years of age. During relevant times, Mr. Ralston was assigned to or affiliated with The Hill School in Pottstown, Pennsylvania while Mr. Poulos was enrolled and attended school at The Hill School.

As a result of being sexually molested by Mr. Ralston, Mr. Poulos's injuries include, but are not limited to, depression; sadness; crying; anxiety; emotional pain; sleep problems; concentration problems; low self-esteem; low self-respect; low self-confidence; apathy, finding himself not caring about things; not caring about his grades or his future while he attended The Hill School; turned to drugs and alcohol to cope with the emotional pain; self- sabotaging the good things in his life; flashbacks and reminders; feeling broken and unfixable; sexuality problems such as being oversexed at times; problems with being touched; self-harm; feeling alone and isolated; feeling ostracized while he was at school; shame; embarrassment; guilt; self-blame; trust problems; intimacy problems; losing a dangerous amount of weight while at The Hill School



November 19, 2020

P16.219-P16.220

Halma Reporting Group

EXHIBIT
D-15
LC 7|1|21

LAW OFFICES
OF
MITCHELL GARABEDIAN

Zachary G. Lehman
April 11, 2018
Page 2 of 2

because he did not feel like eating; suicidal ideation; creation of an emotional void in him; anger; confusion; feeling that Mr. Ralston ruined a part of his life; feeling that Mr. Ralston sent him down the wrong road in life; and feeling that Mr. Ralston stole his childhood innocence.

The aforementioned brief description is in no way meant to be exhaustive in its detail, but is only meant to briefly touch the surface of the relevant facts. The case is subject to substantive changes at any given time given the sensitive nature of the case.

Mr. Poulos's demand for settlement is $1,000,000.00.

I await your response.

Thank you.

Very truly yours,

*MG*

Mitchell Garabedian

LAW OFFICES
OF
MITCHELL GARABEDIAN

MITCHELL GARABEDIAN
WILLIAM H. GORDON
NATHAN A. GAUL
SALVATORE M. CIULLA
DANIEL R. MAHONEY
MIRRA L. CAMPBELL

100 STATE STREET, 6TH FLOOR
BOSTON, MASSACHUSETTS 02109
————
(617) 523-6250
FAX (617) 523-3687

December 26, 2018

VIA FAX (610-275-5290)
AND FIRST CLASS MAIL

Thomas D, Rees, Esq.
High Swartz LLP
40 East Airy Street
Norristown, PA 19404

November 24, 2020

D-4

Halma Reporting Group

Re:   Sexual Abuse Claim of Kurtis Nicholas Poulos

Dear Mr. Rees:

As you know, this office represents Kurtis Nicholas Poulos with regard to his sexual abuse claim involving Matthew B. Ralston and Mr. Ralston's supervisors at The Hill School.

During our telephone conversation regarding this matter on December 21, 2018, you requested additional information about Mr. Poulos's sexual abuse claim. Pursuant to your request, and in further support of Mr. Poulos's claim, Mr. Poulos provides the following information:

Kurtis Nicholas Poulos (DOB            met Mr. Ralston during Mr. Poulos's freshman year at The Hill School in approximately 1993 or approximately 1994 when Mr. Poulos was approximately 14 or approximately 15 years old. Mr. Ralston served as a table master in the dining hall and Mr. Poulos had a rotation at Mr. Ralston's table during Mr. Poulos's freshman year. Mr. Poulos recalls that Mr. Ralston was a mathematics teacher and a cross country coach at The Hill School. Mr. Poulos recalls that Mr. Ralston lived in a dormitory of The Hill School with Mr. Ralston's family. Mr. Poulos does not recall that anything inappropriate happened with Mr. Ralston during Mr. Poulos's freshman year at The Hill School.

Mr. Ralston was Mr. Poulos's geometry teacher during Mr. Poulos's sophomore year at The Hill School in approximately 1994 and approximately 1995 when Mr. Poulos was approximately 15 and approximately 16 years old. Mr. Poulos recalls that classes were held on a rotating schedule at The Hill School, so that classes met at different times of day. On certain days when Mr. Poulos had geometry as the last class of the day, Mr. Ralston made Mr. Poulos stay behind in Mr. Ralston's classroom. Mr. Ralston and Mr.

LAW OFFICES
OF
MITCHELL GARABEDIAN

Thomas D. Rees, Esq.
December 26, 2018
Page 2 of 2

Poulos were alone in the classroom after school on these occasions. Mr. Poulos recalls
that the geometry classroom was located at the end of a hallway. During the course of
Mr. Poulos's sophomore year, Mr. Ralston sexually abused Mr. Poulos in Mr. Ralston's
geometry classroom between approximately 10 and approximately 15 times. The sexual
abuse consisted of, among other things, Mr. Ralston fondling Mr. Poulos's penis and
testicles, skin on skin; Mr. Ralston making Mr. Poulos fondle Mr. Ralston's penis and
testicles, skin on skin; Mr. Ralston putting his mouth on Mr. Ralston's penis; and Mr.
Ralston making Mr. Poulos put his mouth on Mr. Ralston's penis.

The sexual abuse by Mr. Ralston ended with Mr. Poulos's sophomore year at The
Hill School. Mr. Poulos transferred to Marquette University High School, Milwaukee,
Wisconsin for his junior year of high school. Mr. Poulos returned to The Hill School for
his senior year, approximately 1996 to approximately 1997. Mr. Poulos had limited
contact with Mr. Ralston during Mr. Poulos's senior year, although Mr. Poulos recalls
that he and Mr. Ralston lived in the same dormitory during that year. Mr. Poulos does not
recall any sexual abuse during Mr. Poulos's senior year at The Hill School. Mr. Poulos
does not recall having any contact with Mr. Ralston after Mr. Poulos graduated from The
Hill School in approximately 1997 when Mr. Poulos was approximately 18 years old.

As I have previously advised you, Mr. Poulos has suffered numerous injuries as a
result of the sexual abuse by Mr. Ralston, including, but not limited to, problems with
depression; sadness; crying; anxiety; emotional pain; sleep; concentration; low self-
esteem; low self-respect; low self-confidence; apathy; not caring about things in his life;
self-medicating with alcohol and drugs; sabotaging himself; flashbacks and reminders of
the sexual abuse; feeling broken and unfixable; sexuality; being touched; self-harm;
feeling alone and isolated; feeling ostracized at The Hill School; shame; embarrassment;
guilt; self-blame; trust; intimacy; losing weight while at The Hill School; suicidal
ideation; feeling an emotional void; anger; confusion; feeling like Mr. Ralston ruined a
part of his life; feeling like Mr. Ralston sent him down the wrong road in life; and feeling
like Mr. Ralston stole his childhood innocence.

Please advise me as to your client's position with regard to this matter.

Thank you.

Very truly yours,

Mitchell Garabedian

Garabedian 054
0848a

```
 1                 UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 2

     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3

     JOHN DOE,

 4

                     Plaintiff,          VOLUME 5

 5

       vs.                        Case No. 2:19-cv-01539

 6

     MITCHELL GARABEDIAN, ESQ., LAW

 7   OFFICES OF MITCHELL GARABEDIAN and

     KURTIS N. POULOS,

 8

                     Defendants.

 9

     - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12

13

14             The videotaped deposition of KURTIS N.

15   POULOS was taken at the instance of the Plaintiff,

16   pursuant to the Federal Rules of Civil Procedure, taken

17   via Zoom video conferencing, on the 27th day of May,

18   2021, commencing at 11:02 a.m., before BETH ZIMMERMANN,

19   Registered Professional Reporter and Notary Public in and

20   for the State of Wisconsin.

21

22

23

24

25
```

0849a

Kurtis N. Poulos

```
 1                    REMOTE APPEARANCES

 2

 3   THE BEASLEY FIRM, LLC
         By:  Mr. Lane R. Jubb, Jr., Esq.
 4   1125 Walnut Street
         Philadelphia, Pennsylvania  19107
 5   Appearing on behalf of the Plaintiff

 6
         SWARTZ CAMPBELL, LLC
 7       By:  Ms. Candidus K. Dougherty, Esq.
         1650 Market Street, 38th Street
 8   Philadelphia, Pennsylvania  19103
         Appearing on behalf of the Defendants

 9

10

11
         ALSO PRESENT:
12
         James Vonwiegen, Videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kurtis N. Poulos

```
 1                     EXHIBIT INDEX
 2
 3   Ex. No.            Description              Page
 4      4      Bates 24, 4/3/19 Handwritten Notes    7
        5      Bates 57, 12/18/18 E-Mail to Nathan
 5             Gaul                                  16
        6      Bates 3, 5-15-19 Handwritten Notes    25
 6      7      Bates Email108, 5/6/20 E-Mail         27
        8      Bates Email0069, 5/9/19 E-Mail        29
 7      9      Cross Complaint                       32
 8      D5     Bates 33-39, 12/12/17 Handwritten Notes  71
        D6     Bates 25-26, 12/21/18 & 12/26/18 Notes  140
 9      D7     Bates 30, 12/19/18 Handwritten Notes  137
        D8     Bates 54, 1/18/18 E-Mail              132
10      D9     Bates 40, 12/12/17 Handwritten Notes   84
        D11    Bates 66-71, Historical Allegation
11             E-Mails                               63
        D12    Cross Complaint With Exhibits         55
12      D13    Bates 43-47, 1/17/18 E-Mails         131
        D14    Bates 59, 9/20/18 & 12/17/18 E-Mails  134
13
     (ORIGINAL EXHIBITS ATTACHED.  SCANNED COPIES PROVIDED
14   TO COUNSEL.)
15
16
17                  EXAMINATION INDEX
                                                    Page
18
           By Mr. Jubb                                5
19         By Ms. Dougherty                          45
           By Mr. Jubb                              144
20         By Ms. Dougherty                         169
           By Mr. Jubb                              170
21
22
23
                     REQUESTED DOCUMENTS
24
                      (NO REQUESTS MADE)
25
```

0851a

Kurtis N. Poulos

```
1                    VIDEOGRAPHER:  We are now on the

2          record.  My name is James Vonwiegen.  I'm a

3          videographer for Golkow Litigation Services.

4          Today's date is May 27, 2021, and the time is

5          11:02 a.m.

6               This remote video deposition is being

7          held in the matter of John Doe versus Mitchell

8          Garabedian, et al., for the United States

9          District Court, the Eastern District of

10         Pennsylvania.  The deponent is Kurtis Poulos.

11              All parties of the deposition are

12         appearing remotely and have agreed to the

13         witness being sworn in remotely.  Due to the

14         nature of remote reporting, please pause

15         briefly before speaking to ensure all parties

16         are heard completely.  Counsel will be noted

17         on the stenographic record.

18              The court reporter is Beth Zimmermann and

19         will now swear in the witness.

20                   KURTIS POULOS being first duly sworn

21         on oath to tell the truth, the whole truth,

22         and nothing but the truth, was examined and

23         testified as follows:

24                   THE WITNESS:  Except for the "so

25         help me God," yes.
```

0852a

```
 1          EXAMINATION BY MR. JUBB:

 2    Q     Mr. Poulos, good afternoon.  We've done this a

 3          few times, but I'll just go over the

 4          instructions anyway.  If at any point in time

 5          you don't understand my question, just let me

 6          know and I'm happy to rephrase it.

 7               Everything that we're taking down is

 8          being recorded by audio, video and

 9          stenographer, so it's important that we do our

10          best to let each other speak.  I know that can

11          be difficult in light of certain technological

12          difficulties that exist in using this

13          platform.

14               If at any point in time you want to

15          break, you just let me know.  I don't intend

16          to be too long, but you know how that works,

17          just let me know.

18               I'm going to try and pick back up -- pick

19          back up where we left off.  I might hop around

20          a little bit just because we kind of got

21          interrupted with the last situation, which was

22          no fault of anybody's; but I'd like to just

23          get back right into it if we could.

24               First off, before coming here today, did

25          you have an opportunity to review your
```

Kurtis N. Poulos

```
 1              testimony from the last time we spoke?

 2    A    No.  I have not received any copies of any

 3         testimonies.

 4    Q    And my question was a little bit different.

 5         Did you have any opportunity to review it?

 6         Whether or not you received it from somebody,

 7         did you ever review it?

 8    A    No.

 9    Q    Did you have any opportunity to -- Strike

10         that.

11              Did you review any materials in

12         anticipation of today's deposition?

13    A    No.

14    Q    Did you have any discussions with

15         Mr. Garabedian before today's deposition,

16         since your last deposition?

17    A    No.

18    Q    Did you have any discussions with

19         Ms. Dougherty or anyone from her firm since

20         your last deposition?

21    A    No.

22    Q    Am I correct that as of -- Let's see here.

23         Strike that.

24              I'm going to show you what has been

25         previously marked and produced as Garabedian
```

0854a

Kurtis N. Poulos

```
 1          File 24.  This is going to be --

 2                    MR. JUBB:  Candy, do you know where

 3          we left off at the last one?  I think I only

 4          had 3, so this would be 4.

 5                    MS. DOUGHERTY:  Yes, we were at 3.

 6                    MR. JUBB:  So we already did 3 or

 7          we're up to 3?

 8                    MS. DOUGHERTY:  Already did 3.  It

 9          was the order and then two e-mails.

10                    MR. JUBB:  Thank you.  So we're

11          going to mark this as Exhibit 4 to the

12          deposition, Volume 2.  Or I guess it would

13          be -- That was improper identification, not

14          Volume 2.  Let's just call it Exhibit 4 to the

15          May 27th deposition continuation, which is

16          Garabedian File 24.

17                    MS. DOUGHERTY:  Okay.  Mr. Jubb, I

18          think you called them "Poulos" and then a

19          number.

20                    MR. JUBB:  Call it Poulos 4, please.

21          BY MR. JUBB:

22     Q    So at the bottom you can see that, Mr. Poulos?

23     A    I can't see anything.

24     Q    Garabedian File 24, do you see that?

25     A    I just see a yellow sheet of paper.
```

```
 1    Q    Look at the bottom.  Do you see that?

 2    A    No, I cannot see that.

 3    Q    I'll represent to you that there is a video

 4         going right now so we'll see if anyone else

 5         can see Garabedian 24.  At the top it's a

 6         yellow piece of paper.  There is a date.  It

 7         looks like it says "4/3/19, Kurt Poulos, MG

 8         tells client the school was giving us the

 9         runaround."

10              Am I correct, Mr. Poulos, that as of

11         April 3, 2019, you were told by Mr. Garabedian

12         that the school was giving you the,

13         quote/unquote, runaround?

14    A    Something to that effect.

15    Q    And when he made those comments to you, that

16         the school was giving you and him the

17         runaround as of April 3, 2019, what did you

18         understand that to mean?

19    A    I guess that they were dodging questions or

20         being evasive in responding to any phone calls

21         or e-mails.

22    Q    In other words, the impression you got from

23         your discussion with Mr. Garabedian was that

24         the school was not being responsive.  Is that

25         fair?
```

0856a

```
 1    A    Correct.
 2    Q    Now, at some point in time shortly thereafter,
 3         this lawsuit was filed against you.  And am I
 4         correct that when that happened, you continued
 5         having discussions with Mr. Garabedian?
 6    A    Only in regards of how do I get representation
 7         and whether or not he would be representing
 8         me.
 9    Q    And in those discussions at any point in
10         time -- Strike that.  Let's not do it that
11         way.
12              This lawsuit was filed against you in
13         approximately April of 2019 after the 3rd, and
14         when that happened, did you have any Zoom
15         conference or any sort of personal meeting
16         with Mr. Garabedian?
17    A    I have never met Mitchell Garabedian in person
18         and I've never seen him through Zoom.
19    Q    At some point in time with this lawsuit being
20         filed, did you have a chance to speak with
21         anyone from his office about this lawsuit?
22    A    Not Mr. Garabedian.  I believe there was
23         somebody else in attendance pretty much every
24         time that I spoke with Mitchell.
25    Q    My question was a little bit different.
```

Kurtis N. Poulos

```
 1                You've already told us that you didn't speak

 2                with Mitchell in person or in Zoom, and all of

 3                the discussions that you had with Mitchell

 4                after this lawsuit was filed you have told us

 5                in your own words what they pertained to.

 6                    But have you had any discussions where

 7                Mitchell Garabedian was not present with

 8                anyone from his law firm pertaining to this

 9                case?

10      A    No.

11                    MS. DOUGHERTY:  Objection.

12                    THE WITNESS:  I don't believe so.

13                    MS. DOUGHERTY:  Were you able to

14           hear my objection?

15                    REPORTER:  (Nodding affirmatively)

16                    MS. DOUGHERTY:  I just want to make

17           sure.  Thank you.

18           BY MR. JUBB:

19      Q    After this lawsuit was filed, Mr. Garabedian

20                had some discussions with you, am I correct,

21                and at that point in time he and you went over

22                some of your criminal background?

23      A    We had already established that in the past.

24      Q    When you say "we had already established

25                that," are you referring to my previous
```

0858a

1          discussions with you or that you and

2          Mr. Garabedian had already established that?

3    A    Mr. Garabedian.

4    Q    At any point in time after you sued my client,

5          were you encouraged to contact the police?

6    A    No.

7    Q    At any point in time -- Strike that.

8              I understand your testimony to mean that

9          at no point in time after this lawsuit was

10         filed did anyone, including Mr. Garabedian or

11         any members of his office, ever encourage you

12         to contact the police.  Is that fair?

13   A    Not to my recollection, no.

14   Q    And did you -- Strike that.

15             Do you have a recollection yourself of

16         ever contacting the police?

17   A    Yes.

18   Q    And tell me everything about that, please.

19   A    I reached out to the local authorities around

20         the high school and tried to see what, if

21         any -- if they wanted me to make a statement,

22         if that would be necessary, and they basically

23         said no because of statute of limitations.

24   Q    Did Mr. Garabedian ever send anyone from

25         Wisconsin to come speak to you, from Wisconsin

Kurtis N. Poulos

```
 1            police, about this?

 2      A     No.

 3      Q     And when you contacted -- Strike that.

 4                  Am I correct to understand your testimony

 5            to be that you contacted the Pottstown Police

 6            Department?

 7      A     I believe it was the Pottstown Police

 8            Department.

 9      Q     And am I correct this is the first time you

10            contacted the Pottstown Police Department?

11      A     I believe so, yes.

12      Q     In other words, the first time you contacted

13            the Pottstown police with any allegation that

14            you were sexually abused by someone when you

15            were in high school was after you were sued as

16            a defendant in this case.  Is that correct?

17      A     No.  You totally misunderstood what I said.  I

18            did it before the lawsuit to find out if there

19            was anything that I could say to put on record

20            if it would matter, and he said "No."

21                  I did not name names when I spoke to the

22            Pottstown Police Department.  I stated I was a

23            student.  I didn't give them -- I don't

24            believe I gave them my full name -- and asked,

25            you know, if there is anything I should do to
```

Kurtis N. Poulos

```
 1              get something on the record, and he said, "No,
 2              not at this time."
 3    Q    So then tell me when approximately this
 4              occurred with respect to the Pottstown Police
 5              Department then.
 6    A    I believe it was either shortly before I moved
 7              from Connecticut in 2018 or shortly after I
 8              moved back to Milwaukee in March of 2018.
 9    Q    And tell me how you ended up contacting them.
10              Was this by phone?
11    A    Correct.
12    Q    Who did you speak with?
13    A    I don't remember.
14    Q    Was it a male or a female?
15    A    Like I said, it -- I believe it was a male,
16              and it was very informal.  It was just sort of
17              dipping my toe in the water to find out
18              what -- if there is anything I need to do as a
19              victim even though it's 20-plus years later.
20    Q    And what were you told?
21    A    That at this time there was nothing -- there
22              was no reason for them to take a statement.
23    Q    And ultimately then after you were sued in
24              this case, at any point in time did you
25              contact the Pottstown Police Department?
```

Kurtis N. Poulos

```
1     A     I don't believe so.

2     Q     Is there anything that comes to mind that

3           causes you to qualify your answer as "I don't

4           believe so" as opposed to "No"?

5     A     Okay.  No.  But I can't defin -- I don't

6           remember every single phone call I've made

7           over the last three years.  I'm sorry.  But I

8           don't think I did, so I'm going to say no.

9     Q     I certainly don't want you, nor did I ask you

10          if you recall every single phone call you

11          made.

12              So after you were named as a defendant in

13          a lawsuit accusing you of what you're being

14          accused of, did you contact any investigating

15          authority such as police or DA or anybody like

16          that?

17              MS. DOUGHERTY:  Objection.  At this

18          point I think you're past the scope of the

19          order that says Mr. Poulos shall appear for a

20          continuation of his deposition to answer

21          questions from Plaintiff's counsel limited to

22          the area of his discussions and communications

23          with Defendant Garabedian.

24              Unless I misheard, I think that

25          Mr. Poulos has indicated he didn't have
```

0862a

Kurtis N. Poulos

```
1              discussions about this with Mr. Garabedian, so
2              that's my objection.
3                       MR. JUBB:  Okay.  And I'll just move
4              all that together then.
5              BY MR. JUBB:
6       Q      Mr. Poulos, I take that to mean that to the
7              extent there is any reference in
8              Mr. Garabedian's notes of you having a
9              discussion with the police department after
10             you were sued in this lawsuit, those would be
11             incorrect.  Is that fair?
12      A      To the best of my knowledge, yes.
13      Q      At any point in time, did you ever tell
14             Mr. Garabedian that you were speaking with the
15             Pottstown Police Department?
16      A      I believe prior to this lawsuit, yes.
17      Q      And what did you tell him about that?
18      A      That I was going to reach out and speak with
19             somebody and see if there was anything I
20             needed to put on record.  Like I said, it was
21             more of a fact-finding mission than anything
22             else.
23      Q      At any point in time -- Strike that.
24                      What do you recall being told from the
25             police -- Strike that.
```

0863a

Kurtis N. Poulos

```
 1              Did you tell the police that you had a
 2         civil suit ongoing?
 3              MS. DOUGHERTY:  Objection, the same
 4         as my prior objection about the scope of the
 5         deposition.
 6              THE WITNESS:  No.
 7         BY MR. JUBB:
 8    Q    When did your discussions with Mr. Garabedian
 9         about the legal issues in this case stop?
10    A    About this case?  At least a year ago.
11         Probably a year and a half ago when I realized
12         I was not going to be represented by him.
13    Q    When had your discussions with Mr. Garabedian
14         stopped?
15    A    Again, about a year and a half ago.
16    Q    I'm going to show you what was produced to us
17         by Mr. Garabedian as Garabedian File 57.
18         We're going to mark this as Poulos 5.
19              I'm showing you what's been marked as
20         Garabedian File 57.  It appears to be an
21         e-mail from Mr. Garabedian to Mr. Nathan Gaul,
22         forwarding an e-mail from your mom.
23              First off, do you know who Mr. Gaul is?
24    A    I believe he's legal representation for The
25         Hill School.
```

0864a

Kurtis N. Poulos

```
 1     Q    To your knowledge, do you believe you've ever

 2          had any conversations with Mr. Gaul?

 3     A    I don't believe so.

 4     Q    Would it refresh your recollection in any way

 5          if I were to tell you that he is affiliated

 6          with Mr. Garabedian's law firm?  Does that

 7          refresh your recollection as to whether or not

 8          you may have spoken with him?

 9     A    No.

10     Q    In this e-mail from your mom to

11          Mr. Garabedian -- First of all, have you ever

12          seen this e-mail before?

13     A    No.

14     Q    Would you take the time to just review this

15          quickly, and then let me know when you're

16          finished, please.

17               MS. DOUGHERTY:  Could you tell me

18          the Bates label again?  I know you said it but

19          I lost it.

20               MR. JUBB:   Sure.  It's Garabedian

21          File 57.

22               THE WITNESS:  Okay.  What am I

23          supposed to do with this?  I didn't write

24          this.

25          BY MR. JUBB:
```

0865a

Kurtis N. Poulos

```
 1    Q    My question was just to review it.  Now, in

 2         here your mom wrote to Mr. Garabedian --

 3         Strike that.  Let me back up.

 4              Did you give your mother permission to

 5         communicate with Mr. Garabedian on your behalf

 6         with respect to the underlying issues as well

 7         as this lawsuit?

 8                   MS. DOUGHERTY:  Objection.

 9                   THE WITNESS:  Did I give my

10         73-year-old mother permission to do something?

11         I don't need to.  She's her own person.  She

12         can do whatever she wants.

13    BY MR. JUBB:

14    Q    Well, some might tell their mother not to

15         interfere in certain things.  At any point in

16         time did you tell your mom not to e-mail your

17         lawyers?

18                   MS. DOUGHERTY:  Objection.  My prior

19         objection regarding scope.

20                   THE WITNESS:  I am not going to try

21         to dictate to her what she can and cannot do.

22    BY MR. JUBB:

23    Q    All right.  So in this e-mail -- I'm just

24         going to lay some foundation and then ask you

25         a question about it.
```

0866a

Kurtis N. Poulos

```
 1              When she said, "In my last e-mail to you
 2         on 1/18 I expressed concern about your lack of
 3         communication about this matter.  This concern
 4         has been magnified by the mere passage of time
 5         and the unsettling request for money from
 6         Hill." Do you see where I read that correctly?
 7    A    Yes.
 8    Q    When she is referring to an "unsettling
 9         request for money from the Hill," did you have
10         an unsettling feeling about requesting money
11         from the Hill?
12                   MS. DOUGHERTY:  Objection.
13                   THE WITNESS:  I don't believe so.
14                   MS. DOUGHERTY:  Mischaracterized the
15         e-mail.
16                   THE WITNESS:  Yeah.  That's not what
17         she's saying there.  The school is requesting
18         money from us.  We received e-mails from the
19         school every few months requesting donations.
20         BY MR. JUBB:
21    Q    Forgive me.  I misspoke.  Was it unsettling to
22         you that you were receiving e-mails from The
23         Hill School that you considered to be requests
24         for donations?
25    A    At this point -- At that point I believe I
```

0867a

```
 1              blocked all communication from the alumni

 2              office in regards to monetary requests for a

 3              donation.

 4     Q    Mr. Poulos, do you recall anyone by the name

 5              of Leanne that you spoke with?

 6     A    From where?  I know a Leanne from high school.

 7     Q    No.  I'm happy to clarify.  At any point in

 8              time did you speak to -- Strike that.

 9                  It's my understanding from your testimony

10              that you did not speak with any investigating

11              authority, whether police, DA, et cetera,

12              after this lawsuit was filed.

13     A    No, I did not.

14     Q    My question would be at any point in time do

15              you recall speaking with someone by the name

16              of Leanne who was with the police or a DA or

17              anything like that?

18     A    No.

19     Q    Would I be correct in understanding your

20              testimony to be that other than the instance

21              in 2008, at no point in time were you directed

22              by Mr. Garabedian to contact the police --

23              Strike that.  Let me back up.

24                  At no point in time did Mr. Garabedian

25              ever tell you to contact the police.  Is that
```

0868a

```
 1           correct?
 2    A      I don't believe so.  And you said "2008," by
 3           the way.
 4                   MS. DOUGHERTY:  Mr. Poulos, I think
 5           he struck his question.
 6           BY MR. JUBB:
 7    Q      Focus on just being responsive to the
 8           question.
 9               So my question to you was, am I correct
10           in that at no point in time did Mr. Garabedian
11           ever direct you, instruct you or tell you to
12           contact the police?
13    A      Not to my recollection.
14    Q      Am I correct in understanding your testimony
15           that at no point did Mr. Garabedian instruct,
16           suggest or tell you to contact any sort of
17           district attorney?
18                   MS. DOUGHERTY:  Objection.
19                   THE WITNESS:  Not to my
20           recollection.
21           BY MR. JUBB:
22    Q      And I would imagine the basis for that is you
23           have no recollection of speaking with any sort
24           of DA after knowing Mr. Garabedian.  Is that
25           fair?
```

0869a

Kurtis N. Poulos

```
 1     A     I have never spoken to a DA.

 2     Q     Now, I will ask it just as broad as I can

 3           possibly be just to cross the T and dot this

 4           I.

 5                 Following your introduction to

 6           Mr. Garabedian, do you have any recollection

 7           of speaking with any sort of investigative

 8           authority, police, district attorney's office,

 9           FBI, AG, any investigative authority, any

10           recollections at all?

11                     MS. DOUGHERTY:  Objection.

12                     THE WITNESS:  As stated before, yes,

13           I spoke to somebody in the Pottstown Police

14           Department, but that was prior to this court

15           case.

16           BY MR. JUBB:

17     Q     Listen to my question.  You met -- You first

18           spoke with Mr. Garabedian in 2017, correct?

19     A     Yes.

20     Q     Now, in 2018 when you spoke to the Pottstown

21           Police Department, your testimony is that

22           Mr. Garabedian did not instruct you to do

23           that, correct?

24     A     Correct.

25     Q     All right.  Now, at any point in time --
```

0870a

```
 1           Strike that.
 2              Other than the Pottstown Police
 3           Department, is there any other investigative
 4           authority that you spoke with?
 5    A      No.
 6    Q      And have you told me everything you can about
 7           your discussions with the police department?
 8    A      Yes.
 9    Q      At any point in time did you tell
10           Mr. Garabedian that they did not want to get
11           involved because there was a civil lawsuit?
12    A      Rephrase that.  You keep saying "they" and
13           "he" and --
14    Q      At any point in time did you, Kurtis Poulos,
15           tell he, Mitchell Garabedian, that they, the
16           Pottstown Police Department, did not want to
17           investigate the case because of a civil
18           lawsuit?
19              MS. DOUGHERTY:  Objection.
20              THE WITNESS:  Not to my knowledge.
21    BY MR. JUBB:
22    Q      Did you tell Mr. Garabedian that you were
23           presently in therapy at the time you spoke
24           with him?
25              MS. DOUGHERTY:  Objection.  When are
```

Kurtis N. Poulos

```
1              you talking about?

2                     THE WITNESS:  Yeah.  I mean, you

3              keep throwing out these dangling modifiers.

4              Be more specific, because I haven't been in

5              therapy for a couple of years.  So there would

6              be a period of time when I would have spoken

7              to him and been in therapy.

8                     MS. DOUGHERTY:  My objection, Lane,

9              is just for clarification on, like, the date

10             that you were talking about when he had the

11             communication with Mr. Garabedian.

12                    MR. JUBB:  And Candy, just to be

13             clear to you, I completely understand that

14             we're on day five of this, and I am relating

15             this to conversations for -- I have a basis to

16             ask these questions.  I'm trying not to

17             constantly go through Mr. Garabedian's notes,

18             so I'm happy to pull them up to orient the

19             witness to this, to clarify that.

20             BY MR. JUBB:

21        Q    So with that as the background, Mr. Poulos,

22             after this lawsuit was filed -- Strike that.

23                 Mr. Poulos, at the time this lawsuit was

24             filed, were you in therapy?

25                    MS. DOUGHERTY:  Objection, scope.
```

```
 1                    THE WITNESS:  I don't think so.
 2                    MR. JUBB:  We're going to mark this
 3           as Poulos 6.  It's Garabedian File 3.
 4           BY MR. JUBB:
 5      Q    Mr. Poulos, I'm showing you what has
 6           previously been produced to me as Garabedian
 7           File 3.  At the top it has a date of 5/15/19,
 8           which I'll represent to you is about a month
 9           after this lawsuit was filed.  Excuse me.  A
10           little less than -- I guess a little more than
11           a month after this lawsuit was filed.
12                At the top it says, "PC Kirk Poulos," and
13           then down here it says "MG: In therapy.  KP:
14           Yes, in therapy."  Do you have any idea what
15           that is referring to?
16      A    I didn't -- I don't believe I saw my therapist
17           in May of 2019.  I was doing group therapy
18           online anonymously but not -- It was more of a
19           group therapy, exactly like you would talk
20           about PTSS.
21      Q    What program is that?
22      A    Excuse me?
23      Q    What program is that?  Does it have a name?
24      A    No, it does not.
25                    MS. DOUGHERTY:  Objection, scope.
```

0873a

```
1          BY MR. JUBB:

2     Q    Well, when you talked to Mr. Garabedian, did

3          you explain to him what type of therapy you

4          were in?

5     A    No.

6     Q    Well, how long were you in this therapy?

7                    MS. DOUGHERTY:  Objection, scope.

8                    THE WITNESS:  I probably went

9          through six or seven group sessions.  It was

10         an online chat forum.

11         BY MR. JUBB:

12    Q    Look a little lower at this "MG" -- I can't

13         read everything, but it looks like it says,

14         "Will give you AG number.  KP: I called

15         them - AG.  They, AG, said we'll get back to

16         KP in 48 hours."  Do you see that?  I'll zoom

17         in.

18    A    Yeah, I see it.

19    Q    All right.  Does that refresh your

20         recollection at all as to --

21    A    No.

22    Q    -- whether or not you contacted an AG's

23         office?

24                   MS. DOUGHERTY:  Objection.

25                   REPORTER:  Repeat your answer,
```

Kurtis N. Poulos

```
 1            please.

 2                     THE WITNESS:  No.

 3            BY MR. JUBB:

 4      Q    Do you know -- Strike that.

 5                Do you have any basis or understanding as

 6            to how Mr. Garabedian got the impression that

 7            you had contacted the AG's office?

 8                     MS. DOUGHERTY:  Objection.

 9                     THE WITNESS:  No.

10                     MR. JUBB:  I'm going to show you

11            what has previously been produced as

12            Garabedian e-mail 108.  This is going to be

13            Poulos 7.

14            BY MR. JUBB:

15      Q    Mr. Poulos, this appears to be an e-mail from

16            you to Mr. Garabedian.  5/6/20 it was sent,

17            and for the record it's Garabedian 108.  And

18            in this e-mail it says, "Subject:  May 12th

19            call.  Time is of the essence.  Please respond

20            by tomorrow on May 7th before the end of the

21            day.  I need to know if you're going to

22            represent me, Kurt Poulos."

23                Do you recall sending this?

24      A    Yes.

25      Q    And did you ever have a chance to speak with
```

Kurtis N. Poulos

```
 1            him after this e-mail?
 2    A    If I did, it was very brief and I was told
 3         that I was not going to be represented by him.
 4    Q    What else do you recall about that
 5         conversation?
 6    A    That I needed to procure my own attorney, my
 7         own representation.
 8    Q    What else?
 9    A    That because he was a co-defendant, it
10         wouldn't be possible for him to represent me.
11    Q    Is this the first time as of May 6th, 2020,
12         that you were told by Mr. Garabedian that he
13         would not be able to represent you since he
14         was a co-defendant?
15                MS. DOUGHERTY:  Objection.
16                THE WITNESS:  I don't remember if he
17         had told me before.
18         BY MR. JUBB:
19    Q    To the best of your recollection, when was the
20         first time Mr. Garabedian told you that he
21         would not be able to represent you?
22                MS. DOUGHERTY:  Objection.
23                THE WITNESS:  Shortly after this
24         whole thing started.
25                MR. JUBB:  I'm going to show you
```

0876a

Kurtis N. Poulos

```
 1            what's been marked as Garabedian e-mail 69.

 2            This is going to be Poulos 8.

 3            BY MR. JUBB:

 4       Q    Mr. Poulos, I'm showing you what's previously

 5            been produced as Garabedian e-mail 69.  We've

 6            marked it in your deposition as Poulos 8.

 7                 This is an e-mail from you to

 8            Mr. Garabedian, 5/9/19.  It says, "They called

 9            finally."  And you say, "As of now, they're

10            unwilling to take a statement at the Pottstown

11            police station."  Do you see that?

12       A    Yes.

13       Q    All right.  What did you mean by "They called

14            finally"?

15       A    Like I said in the past, I had left messages,

16            and somebody else finally called me back --

17            not the original person that I spoke to --

18            prior to this investigation or this lawsuit.

19       Q    I thought you said you called in 2018.  Wasn't

20            that your testimony?

21       A    I did.

22       Q    And no one got back to you for a year?

23                 MS. DOUGHERTY:  Objection.  He

24            wasn't done with his answer.

25                 MR. JUBB:  Ms. Zimmermann, would you
```

0877a

Kurtis N. Poulos

```
 1            mind repeating my question and whatever answer

 2            you were able to pick up?

 3            (Reporter read previous question and answer.)

 4            BY MR. JUBB:

 5       Q    I didn't hear anything after that either.  So

 6            Mr. Poulos, would you like to expand on that

 7            answer?

 8                 MS. DOUGHERTY:  He was definitely

 9            still talking.  I couldn't understand what the

10            words were.

11                 THE WITNESS:  Like I was saying --

12            (Zoom crosstalk)

13                 MS. DOUGHERTY:  I couldn't

14            understand the words because you were talking

15            over him.

16            BY MR. JUBB:

17       Q    Mr. Poulos, could you please continue your

18            answer to the extent that you have additional

19            information.

20       A    I had called in 2018.  I had left messages

21            with a couple of people I believe on different

22            occasions.  Only once did I speak to somebody,

23            and only once did somebody return my phone

24            call.  And yes, it was probably a year later.

25       Q    So 2018 you're saying that you called the
```

Kurtis N. Poulos

```
 1            Pottstown police station on multiple

 2            occasions, correct?

 3                    MS. DOUGHERTY:  Objection, scope.

 4            BY MR. JUBB:

 5    Q    Mr. Poulos?

 6    A    Correct.

 7    Q    Okay.  And in doing that, I understand your

 8            testimony to be that you were leaving a bunch

 9            of different messages.  Is that right?

10    A    I was leaving messages with multiple people.

11    Q    And when you were leaving messages with

12            multiple people, these were voicemails, right?

13    A    Correct.

14                    MS. DOUGHERTY:  Objection, scope.

15            BY MR. JUBB:

16    Q    And when you were -- Strike that.

17            Am I correct to understand your

18            testimony, at least as to what you're

19            referring to Mr. Garabedian here, "They

20            finally called" to be in reference to somebody

21            returning your call from 2018?

22                    THE WITNESS:  Clipper, go in bed.

23            (Referring to pet)

24    A    Yes.

25    Q    In other words, the impression that you wanted
```

0879a

Kurtis N. Poulos

```
 1            to give to Mr. Garabedian was that the

 2            Pottstown Police Department had not contacted

 3            you back after your voicemails to them

 4            discussing allegations of sexual abuse for

 5            almost a year.  Is that right?

 6    A       Yes.

 7                    MS. DOUGHERTY:  Objection.

 8                    MR. JUBB:  Ms. Zimmermann, did you

 9            get the "Yes"?

10                    REPORTER:  Yes, I did.

11            BY MR. JUBB:

12    Q       Mr. Poulos, I'm going to show you what I'm

13            going to be marking as Poulos 9.

14    A       Sure.

15    Q       Poulos 9 is the Cross Complaint that you filed

16            against Mr. Garabedian.  You've seen this

17            before, right?

18    A       Correct.

19    Q       And the pro se litigant at the bottom, it

20            spans five pages, that's your signature,

21            correct?

22    A       Correct.

23    Q       And it says "Dated this 21st day of December,

24            2020," correct?

25    A       Correct.
```

Kurtis N. Poulos

```
 1    Q    Now, in your -- in here in paragraph -- Strike

 2         that.

 3              When you signed this, you had an

 4         understanding that these were going to be

 5         affirmative facts to the court and you would

 6         want them to be as truthful and honest as

 7         possible, correct?

 8    A    Correct.

 9    Q    In paragraph number three you write, "For

10         approximately 20 years he told no one about

11         this abuse."  Do you see that?

12    A    Yes.

13    Q    Now, at the time that you're alleging the

14         abuse occurred, you were a sophomore in high

15         school, right?

16    A    Correct.

17    Q    And for purposes of your Cross Complaint

18         against Mr. Garabedian, you suggested in here

19         to the court that for approximately 20 years

20         you told no one about this abuse.  How old

21         were you when you were a sophomore?

22              MS. DOUGHERTY:  Objection, scope.

23              THE WITNESS:  I was 15 at the

24         beginning of the year and 16 at the end of the

25         year.
```

```
1              BY MR. JUBB:

2       Q    How am I supposed to understand for purposes

3            of your Cross Complaint against Mr. Garabedian

4            if it was approximately 20 years as in, like,

5            18 or 17 or if it's 21 or 22?  I mean, can you

6            do a better job of telling us how long it was

7            until you told someone about this?

8                    MS. DOUGHERTY:  Objection, scope.

9                    THE WITNESS:  Over 20 years.

10           Yeah, it's okay.  I'm okay. (Referring to pet)

11           BY MR. JUBB:

12      Q    And then paragraph number four you wrote,

13           "When he did confide about the abuse and

14           resulting trauma, he never identified his

15           abuser."  Do you see that?

16      A    Correct.

17                   MS. DOUGHERTY:  Objection, scope.

18           BY MR. JUBB:

19      Q    Is it your testimony that the first time that

20           you identified by name the person who you have

21           alleged to have abused you was to Mitchell

22           Garabedian?

23      A    No.

24      Q    So in this, "When he did confide about the

25           abuse and resulting trauma he never identified
```

0882a

1          the abuser," can you explain to me the

2          discrepancy there?

3                    MS. DOUGHERTY:  Objection, scope.

4                    THE WITNESS:  As I've explained in

5          the past to you, I didn't need to tell my

6          mother.  She figured it out.

7          BY MR. JUBB:

8     Q    Did you tell Mr. Garabedian that your mom knew

9          the name of the alleged abuser?

10    A    I believe so, yes.

11    Q    In paragraph 16 for your Cross Complaint

12         against Mr. Garabedian you wrote, "These very

13         explicit letters which detailed the facts of

14         the abuse and identify the abuser were never

15         discussed with or approved by client Poulos,

16         and in fact had not even been seen before the

17         receipt of the Complaint."  You wrote that

18         correct?

19    A    Correct.

20                   MS. DOUGHERTY:  Objection, scope.

21         BY MR. JUBB:

22    Q    And am I correct to understand the relevance

23         of this paragraph in your Cross Complaint to

24         mean that at no point in time did you believe

25         that Mr. Garabedian was going to be sending

Kurtis N. Poulos

```
 1              these letters to the school?
 2    A    The only thing I would have figured -- and
 3         again, this may be my naivet? about how
 4         lawyers practice law -- is that he would have
 5         told me prior the specifics of the letter.  I
 6         knew that he was going to send a letter.  I
 7         didn't know how specific it was going to be.
 8    Q    So you actually knew that Mr. Garabedian was
 9         going to send a letter to The Hill School
10         asking for a million dollars.  Is that right?
11    A    No, I did not.
12                   MS. DOUGHERTY:  Objection.
13                   THE WITNESS:  And as I stated in
14         your previous question, I did not know the
15         specifics of the letter.  I knew that he was
16         going to write a letter.
17         BY MR. JUBB:
18    Q    Did he ever give you any indication as to what
19         was going to go in this letter that you
20         believe he was eventually going to write?
21                   MS. DOUGHERTY:  Objection.
22                   THE WITNESS:  That's been answered.
23         No.
24         BY MR. JUBB:
25    Q    Did he ever -- The first letter went out in
```

0884a

Kurtis N. Poulos

```
 1              April of 2018.  Did you even know it was sent?

 2     A        Only after the fact.

 3     Q        And when you say "after the fact," you're

 4              referring to after I sued you.  Is that

 5              correct?

 6     A        No, after I reached out to Mitchell and found

 7              out that he had written letters.  I knew he

 8              had called the school, but I didn't know the

 9              specifics of the conversations or the verbiage

10              of the letters.

11     Q        When do you believe the first time that you

12              learned of the verbiage of the letters was?

13     A        After he had sent the letters.

14     Q        Okay.  Well, that's been about three years

15              now.  So can we do anything better in terms of

16              approximating when the first time that you

17              learned that Mr. Garabedian sent the April

18              letter to The Hill School?

19     A        No, I cannot.

20     Q        In other words, between April -- I guess April

21              of 2018 and May of 2021, a little over

22              36 months, trying your hardest to determine

23              for us when you first learned about it, you

24              can't do anything better other than "after he

25              sent the letter."  Is that right?
```

0885a

```
 1    A    Correct.

 2              MS. DOUGHERTY:  Objection.

 3         BY MR. JUBB:

 4    Q    When he sent the December, 2018 letter, did

 5         you know he sent that one?

 6    A    After he sent it, but I did not know the

 7         specific verbiage.

 8    Q    Well, after you learned of the December, 2018

 9         letter, do you think that you knew that he had

10         sent the April, 2018 letter by then?

11    A    No.

12    Q    Okay.  So would it be fair to say then that

13         you learned for the first time of the April

14         letter sometime after the December letter?  Is

15         that fair?

16    A    I believe so, yes.

17    Q    In April of 2019 -- April 3rd of 2019 when he

18         told you the school was giving him the

19         runaround, do you think you knew before

20         April 3, 2019, that the letters had been sent?

21    A    Yes.

22    Q    Okay.  So now we've got this smaller window of

23         sometime after the second letter and sometime

24         before April 3rd, 2019, you learned that these

25         letters were sent, correct?
```

0886a

Kurtis N. Poulos

```
1    A    Correct.

2    Q    When was the first time that you learned that

3         Mitchell Garabedian had demanded a million

4         dollars from the school?

5    A    I don't recall.

6    Q    Am I correct to understand that you never

7         approved any demand for a million dollars to

8         the school?

9              MS. DOUGHERTY:  Objection.

10             THE WITNESS:  Correct.

11   BY MR. JUBB:

12   Q    Now, at some point you withdrew your Cross

13        Complaint against Mitchell Garabedian,

14        correct?

15   A    Yes.

16             MS. DOUGHERTY:  Objection, scope.

17   BY MR. JUBB:

18   Q    Can you tell us why you withdrew that

19        complaint against Mr. Garabedian.

20             MS. DOUGHERTY:  Objection, scope.

21             THE WITNESS:  It just didn't seem

22        worth going through this a whole other time.

23   BY MR. JUBB:

24   Q    Did anyone give you any sort of legal --

25        Strike that.
```

0887a

```
 1              Did you receive any legal advice --
 2         Strike that.
 3              Did you receive advice from anyone other
 4         than your own self to withdraw that?
 5                   MS. DOUGHERTY:  Objection.
 6                   THE WITNESS:  No.
 7         BY MR. JUBB:
 8    Q    At the time you spoke with Mr. Garabedian in
 9         the 2017 time frame that one time when you
10         were doing the intake or interview process, as
11         you called it, did you have an understanding
12         then as to where Mr. Ralston was employed?
13    A    To the best of my knowledge, he had lost his
14         job at Leelanau School.
15    Q    So when you say "he lost his job," did you
16         tell Mr. Garabedian that?
17                   MS. DOUGHERTY:  Objection.
18                   THE WITNESS:  I don't think so.
19         BY MR. JUBB:
20    Q    On what basis do you -- did you conclude that
21         he lost his job?
22    A    My mother had found out.
23    Q    So your mother actually did some investigating
24         herself.  Is that your understanding?
25    A    Like I said, she's her own person.  She can do
```

0888a

```
 1              whatever she wants.

 2      Q       So she told that you Mr. Ralston had lost his

 3              job at Leelanau.  Is that right?

 4      A       That he had resigned.

 5      Q       Is there a difference in your mind between

 6              resigning from a position and losing your job?

 7                      MS. DOUGHERTY:  Objection.

 8                      THE WITNESS:  Without being a smart

 9              ass about it, a lot of people in higher

10              positions will resign rather than have --

11              being terminated as the reason that they leave

12              a position, especially something like a

13              headmaster.

14              BY MR. JUBB:

15      Q       I see.  And so do you have any factual basis

16              whatsoever to support the position that he was

17              resigning because he was going to lose his

18              job?

19                      MS. DOUGHERTY:  Objection, scope.

20                      THE WITNESS:  No.

21              BY MR. JUBB:

22      Q       A few more and I think we can move on.

23              Mr. Poulos, I believe I know the answer to

24              this question, but I just have to ask it.  So

25              at any point in time -- Strike that.
```

Kurtis N. Poulos

```
 1              How many occasions, if any, have you had
 2         discussions with Ms. Dougherty or her partners
 3         at Swartz Campbell pertaining to this lawsuit?
 4    A    Possibly a handful.  Like I was told by the
 5         judge that I could feel free to reach out to
 6         you and Candidus both and find out what was --
 7         (Zoom crosstalk)
 8    Q    Can you tell me --
 9              MS. DOUGHERTY:  Objection.  He was
10         still answering.
11              REPORTER:  I'll repeat his answer.
12              THE WITNESS:  No.  Can I go on the
13         record at this point, because this is --
14         BY MR. JUBB:
15    Q    We were always on the record.  Answer the
16         question.  My phone did not get what you were
17         saying because you're farther away from the
18         phone than I guess is necessary.  But
19         Ms. Zimmermann --
20    A    Is that better?
21    Q    -- please repeat his answer, then Mr. Poulos,
22         please continue your answer.  Then if there is
23         anything you'd like to say afterwards, feel
24         free.
25              MS. DOUGHERTY:  Objection.  Move to
```

0890a

```
 1        strike.

 2        (Reporter read previous answer.)

 3        BY MR. JUBB:

 4    Q   Anything you'd like to add?

 5    A   No.

 6    Q   Okay.  Is there anything you'd like to say?

 7    A   I would appreciate it if you would let me

 8        finish my answers.

 9    Q   That's what I just asked.  Is there anything

10        you'd like to add to your answer?

11    A   No.  I just -- I told you I finished my

12        answer.  But from now on, please stop

13        interrupting me while I'm answering.

14    Q   Mr. Poulos, talking about those handful of

15        times, could you please explain to us what you

16        can recall about those discussions, please.

17    A   Little to nothing.  They were less than five

18        minute conversations, just finding out where

19        we were in regards to certain aspects of these

20        depositions and what I should have prepared,

21        if anything, that I could recall.

22    Q   Have you finished your answer?

23    A   Yes.

24    Q   And what were the things that you were told to

25        prepare for?
```

0891a

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  I don't recall.  Just

 3         to be prepared.

 4         BY MR. JUBB:

 5    Q    There was no further guidance other than "be

 6         prepared"?

 7    A    Correct.

 8    Q    They never said, "Be prepared to be questioned

 9         about certain things"?

10                    MS. DOUGHERTY:  Objection.

11                    THE WITNESS:  No.

12         BY MR. JUBB:

13    Q    What was your response when they said "Be

14         prepared"?

15                    MS. DOUGHERTY:  Objection.

16                    THE WITNESS:  That I would do my

17         best to recall the activities of my

18         interaction with Mitchell and my interaction

19         with the plaintiff.

20         BY MR. JUBB:

21    Q    Have you ever provided them with any documents

22         at all?

23    A    No.

24    Q    Do you know whether or not your mother has had

25         any subsequent conversations with
```

Kurtis N. Poulos

```
 1              Mr. Garabedian?
 2      A    I do not.
 3      Q    At any point in time did you tell
 4              Mr. Garabedian that you didn't want him having
 5              conversations with your mom or taking
 6              instruction from your mom?
 7      A    No.
 8      Q    At any point in time did you ever relay to
 9              Mr. Garabedian that your mom was a lawyer and
10              that she represented you?
11      A    No, because she doesn't represent me.
12      Q    She never represented you, correct?
13      A    Correct.  She hasn't had her law license in
14              years.
15                    MR. JUBB:  Okay.  That's all I have.
16              Ms. Dougherty will probably have some for you.
17              And then if there is any follow-up, I might
18              have some questions, but otherwise I'm done.
19              EXAMINATION BY MS. DOUGHERTY:
20      Q    Mr. Poulos, have you ever spoken to my
21              partner, Jeff McCarron?
22      A    Perhaps.  I'm not good with names.  I'm sorry.
23              I should probably be keeping notes.
24      Q    Have you spoken to a man that's with my law
25              firm ever?
```

0893a

Kurtis N. Poulos

```
 1    A    Not to my recollection.

 2    Q    The first time you spoke to me on the

 3         telephone, just me and you, was after your

 4         deposition ended before the last session when

 5         the court ordered you to come back.  Is that

 6         right?

 7    A    Correct.  You called me and told me to get

 8         back on the computer.

 9    Q    Okay.  So -- You mean during your deposition?

10    A    Yeah.  I shut the computer, and you called me

11         and told me to get back on.

12    Q    And then so other than that telephone

13         communication to get back on during the -- get

14         back on the video during your deposition, you

15         and I hadn't spoken on the phone before that.

16         Is that correct?

17    A    Correct.  I think the only time I spoke to you

18         prior to that -- No, it was after.  I spoke to

19         you --

20    Q    With Mr. Jubb, correct?

21    A    Yes.

22    Q    With the Court?

23    A    Yes.

24    Q    Just trying to confirm that -- I'm not sure

25         you exactly said it, but I just want to make
```

0894a

Kurtis N. Poulos

```
 1            sure that your testimony is not that you
 2            talked to me before your deposition testimony
 3            and I told you to be prepared.
 4    A       I didn't know your name before the deposition,
 5            so why -- you know, I wouldn't have called
 6            you.
 7    Q       Just to confirm, when you contacted the
 8            Pottstown Police Department, you didn't tell
 9            the police Mr. Ralston's name or the school's
10            name.  Is that right?
11    A       Correct.
12    Q       Is it correct that you knew that
13            Mr. Garabedian was going to write to the
14            school and ask for money, you just didn't know
15            that it was going to be a million dollars?
16    A       Correct.
17                    MR. JUBB:  Objection to the form.
18            BY MS. DOUGHERTY:
19    Q       I think you covered this at length during a
20            prior day, but you wanted to recover your
21            tuition and get counseling paid for, stuff
22            like that.  You had things in mind that you
23            wanted monetary -- you wanted money from the
24            school to cover it.  Is that correct?
25    A       Correct.
```

0895a

Kurtis N. Foulos

```
 1                    MR. JUBB:  Same objection.

 2           BY MS. DOUGHERTY:

 3      Q    Keep going.

 4      A    As I stated before, my initial response to

 5           this was I don't want to gain financially, I

 6           just want that piece of my life back and the

 7           ability to go and get treatment for what

 8           happened.  And if -- That's it.

 9      Q    And you left it to Mr. Garabedian to decide

10           how to go about achieving your objective.  Is

11           that right?

12      A    Correct.

13                    MR. JUBB:  Same objection.

14           BY MS. DOUGHERTY:

15      Q    Did you ask Mr. -- I think you said that you

16           did learn sometime after the second letter

17           that two letters went to the school.  Did you

18           ask Mr. Garabedian for copies of the letters?

19      A    I don't believe so.

20      Q    Is there a reason why you didn't ask for

21           copies of the letters?

22      A    At the end of 2017, early 2018 I was in the

23           process of not only finding a new job, finding

24           a new house to live in a different city, this

25           was -- As much as it is important in my life,
```

0896a

Kurtis N. Poulos

```
 1              it wasn't taking precedence over what was

 2              going to be an immediate need for me and my

 3              current girlfriend -- or my previous

 4              girlfriend, I should say.

 5    Q    Did you give Mr. Garabedian permission to

 6              speak with your mother about your case?

 7    A    Possibly.  I said if she called that he's more

 8              than able or -- you know, she's more than able

 9              to receive any knowledge that I would receive.

10              Kind of like if I was in the hospital, I

11              wouldn't hide something that my doctor told me

12              from my mother, so she would sort of just have

13              to be in the room regardless.

14    Q    So it doesn't surprise you to see e-mails from

15              your mother to Mr. Garabedian or from

16              Mr. Garabedian to your mother about your case.

17              Is that right?

18    A    No, not at all.

19    Q    I'm just going to show you what was marked

20              earlier today as Poulos 4.  It's Garabedian

21              File 24.

22              Counsel asked you about the first line.

23              I want you to focus in where it says, "MG

24              tells client that we should wait to see if SOL

25              changes."
```

0897a

Kurtis N. Poulos

```
 1              Do you remember having discussion or
 2         Mr. Garabedian telling you something like "We
 3         should wait to see if SOL changes"?
 4    A    Correct.  The statute of limitations in New
 5         York, I believe, and other surrounding states
 6         had changed to allow for victims after a
 7         certain amount of time to sort of be
 8         grandfathered in and not have to report these
 9         things within a certain time period.
10    Q    So was it the situation that -- Let me look
11         here.  Let's see.  What's the date of these
12         notes?
13              So it looks like these notes are April 3,
14         2019.  At least that's what whoever took the
15         notes wrote.  In April, 2019 were you
16         considering legal action against Mr. Ralston
17         if the statue of limitations changed?
18         (Zoom crosstalk)
19                   MR. JUBB:  Objection.
20         BY MS. DOUGHERTY:
21    Q    I'm sorry?
22    A    Could you repeat the question?
23    Q    Sure.  In April were you planning to take
24         legal action against Mr. Ralston if the
25         statute of limitations of Pennsylvania
```

0898a

Kurtis N. Poulos

```
 1          changed?
 2    A     I hadn't gotten to that point.  There was no
 3          point in thinking about something that has an
 4          undetermined date.  It was going to be a
 5          threshold that if I reached it and there was
 6          an opportunity, then I had to contemplate if
 7          it's worth the time and mental energy to deal
 8          with.
 9    Q     So when you were seeing Mr. Garabedian in
10          2017, you and he had a discussion about the
11          statute of limitations and whether it had
12          passed as to a claim against Mr. Ralston.  Is
13          that right?
14    A     Correct.
15    Q     And was it the case that you in 2017 decided
16          to wait to see if the statute of limitations
17          changed as to whether you then wanted to
18          pursue legal action against Mr. Ralston?
19    A     As far as criminal procedures, correct.
20    Q     What about civil?
21    A     I believe so, yes.
22    Q     You hadn't made a decision one way or another
23          because you were waiting to see what happened
24          in Pennsylvania as it relates to the statute
25          of limitations.  Is that right?
```

0899a

Kurtis N. Poulos

```
 1     A      Correct.

 2     Q      Is it fair that you were checking in with

 3            Mr. Garabedian regularly since you were seeing

 4            him in December of 2017 to learn about the

 5            status of the statute of limitations in

 6            Pennsylvania to see if you had the option of

 7            pursuing legal action against Mr. Ralston?

 8     A      It wasn't necessary.  (Zoom crosstalk)

 9                   MR. JUBB:  Objection.

10     BY MS. DOUGHERTY:

11     Q      "It wasn't necessary," did you say?

12     A      Correct.

13     Q      Why wasn't it necessary?

14     A      Because I was getting updates every few phone

15            calls from my mother saying, "This is where

16            this is at in this state," or "This is sort of

17            on hold in this state," so -- (Zoom

18            crosstalk) -- the focus of our conversations

19            for a period of time.  And then I told her,

20            "This can't be the only thing I focus on."

21     Q      So you and your mother were actively tracking

22            whether Pennsylvania changed or was planning

23            to change the statute of limitations as it

24            relates to claims for sexual abuse.  Is that

25            right?
```

0900a

Kurtis N. Poulos

```
 1                    MR. JUBB:  Objection.

 2                    THE WITNESS:  She was more than I

 3        was.

 4        BY MS. DOUGHERTY:

 5   Q    Then the third line in the note says, "Client

 6        says okay.  We'll see.  MG says we'll give it

 7        a year."  Do you remember that discussion with

 8        Mr. Garabedian?

 9   A    Roughly.  Like I said, most of my

10        conversations with him were very short.

11        Whether I was at work and, you know, this

12        isn't exactly something I wanted to speak

13        about out loud while I'm around my coworkers

14        so --

15   Q    Sure.  If I understand correctly, in April,

16        2019 there was nothing more that could be done

17        as it relates to a claim against the school or

18        against Mr. Ralston.  Is that correct?

19   A    Correct.

20   Q    Let's see Poulos 9.  So again I'm showing you

21        Poulos 9, which is the Cross Complaint.  I was

22        going to mark it as D12, but I'll just stick

23        with Poulos 9.

24             I'm just directing your attention back to

25        paragraph 16 which is -- you were asked some
```

Kurtis N. Poulos

```
 1           questions about by Mr. Jubb.

 2                Is my understanding correct that

 3           paragraph 16 meant the first time you actually

 4           saw the letters or recollect seeing the

 5           letters was when you received the Complaint,

 6           not that you had no idea the letters had been

 7           sent.  Is that correct?

 8      A    I had not seen them.  I knew they had been

 9           sent.

10                MS. DOUGHERTY:  Actually, Lane, can

11           I ask you, did Poulos 9 have the exhibits that

12           were attached to the Cross Complaint?

13                MR. JUBB:  No.  And I don't have

14           those actually.

15                MS. DOUGHERTY:  They were sent to

16           both of us when they went to the Court.

17           That's how I got them.

18                MR. JUBB:  When they were sent to

19           the Court I looked -- I don't have those

20           attached exhibits and it's sealed right now.

21           Do you have them?

22                MS. DOUGHERTY:  I do.  And actually,

23           how about we do this?  I will mark a version

24           of the Cross Complaint as -- that has the

25           exhibits that, again, I received when we got
```

0902a

Kurtis N. Poulos

```
 1              the e-mail to the Court.  They weren't

 2              identified as exhibit numbers or anything.

 3              They were just attached as documents, so --

 4              Here, I'll just read -- I'll just mark this as

 5              D12 as I planned to.

 6                  So this is a copy of the Cross Complaint.

 7              And what I did is put the documents that were

 8              attached to the e-mail that went to the Court

 9              filed in the Cross Complaint, which were also

10              identified in the body of the Cross Complaint.

11              So I'm going to just -- The last exhibit --

12              I'll just do it this way.

13              BY MS. DOUGHERTY:

14      Q    So I'm back to the Cross Complaint, which I've

15              marked as Exhibit D12 with the attachments

16              that were sent to the Court.  I just want to

17              invite your attention to -- before we get to

18              the exhibit -- to paragraph 12 where it says,

19              "One of the attorneys was Mitchell Garabedian

20              with whom an attorney/client relationship was

21              established with Poulos on 12/18/2017."  And

22              then in parenthesis "Copy attached."

23                  And then I'm directing your attention,

24              Mr. Poulos, to what I've put as the very last

25              page of D12.  It says "Contingent Fee
```

0903a

```
 1              Agreement" at the top.  Is this what you were
 2              referring to by "Copy attached" in paragraph
 3              12 of the Cross Complaint?
 4         A    Yes.
 5         Q    And what is this page that's called Contingent
 6              Fee Agreement?
 7         A    It means he doesn't get paid unless there is a
 8              decision made in my favor.  That he takes it
 9              not pro bono, but if we lose, you know,
10              neither of us get anything.  Same as if I get
11              in a car accident and I pay for representation
12              of the person who hit me, they're going to
13              take it on contingency and then take a
14              percentage of whatever the court affords me.
15         Q    Okay.  So when -- Let's do this.  Is that your
16              signature there at the bottom --
17         A    Yes.
18         Q    -- of the Contingent Fee Agreement?  And it's
19              got a "12/15/2017" next to it?
20         A    Correct.
21         Q    So when you signed the Contingent Fee
22              Agreement, it was your understanding that
23              Mr. Garabedian was going to provide you legal
24              services?
25         A    Correct.
```

0904a

Kurtis N. Poulos

```
 1    Q    And it looks like, directing your attention up

 2         to the top again, under the point one, which

 3         is parens 1, there is a paragraph that starts

 4         with, "Injuries caused by Matthew Ralston."

 5              Is it correct as of December 15, 2017,

 6         you had told Mr. Garabedian that Matthew

 7         Ralston was the person who had abused you?

 8    A    Yes.

 9    Q    I'm directing your attention to number five,

10         it's in parens.  It says, "Client and lawyer

11         agree that a complaint or lawsuit will not be

12         filed in this matter because the statute of

13         limitations has run or expired."

14    A    Correct.

15    Q    So at the time when you signed the Contingent

16         Fee Agreement, you understood that

17         Mr. Garabedian was not going to file a lawsuit

18         for you because the statute of limitations had

19         run or expired.  Is that right?

20    A    Correct.

21    Q    Why were you retaining Mr. Garabedian if you

22         didn't -- if Mr. Garabedian wasn't going to

23         file a lawsuit for you?

24              MR. JUBB:  Note my objection.

25              THE WITNESS:  I retained legal
```

0905a

Kurtis N. Poulos

```
 1            counsel because if and when something changed

 2            out in Pennsylvania, it would be better to be

 3            prepared than not.

 4            BY MS. DOUGHERTY:

 5      Q     So is it correct that from December, 2017 you

 6            intended to file a lawsuit if the statute of

 7            limitations in Pennsylvania changed?

 8                    MR. JUBB:  Note my objection.

 9                    REPORTER:  I'm sorry.  Your answer?

10            Repeat your answer.

11                    THE WITNESS:  Yeah.  My intention

12            was to be prepared if that day were to come

13            that I could and I knew what actions could be

14            taken, and then I figured we would discuss how

15            to go about it.  As he stated multiple times,

16            some of these cases can take five or six

17            years.  It's not going to be a five-month

18            period.

19            BY MS. DOUGHERTY:

20      Q     The "he" is Mr. Garabedian?

21      A     Correct.  Sorry.

22      Q     No problem.  So Mr. Garabedian suggested to

23            you that it could take years for the statute

24            of limitations in Pennsylvania to be changed,

25            if ever.  Is that right?
```

Kurtis N. Poulos

```
 1    A    Correct.

 2    Q    So you've gone through some of your

 3         communications with Mr. Garabedian with

 4         Mr. Jubb, and there seems to be some extensive

 5         time between the communications -- months or I

 6         think in one case a year.

 7              Was it your expectation that you would

 8         have more contact with Mr. Garabedian while

 9         you were waiting to see if the statute of

10         limitations in Pennsylvania changed?

11                   MR. JUBB:  Object to the form.

12                   THE WITNESS:  To an extent I just --

13         I guess it's a matter of just checking in

14         and -- I don't know -- making sure that

15         somebody is still looking into this matter and

16         it hasn't -- And I, of course, am not

17         implicating that he would just be like, "Oh,

18         just put it in a drawer somewhere," but I

19         don't want it to be something that's just not

20         somewhere in somebody's mind, like, "This is

21         important."

22    Q    Did you ever -- Let me start again.

23              Just jumping back to the letters if we

24         could for a moment and I'll go back to the fee

25         agreement.
```

0907a

Kurtis N. Poulos

```
 1              When you learned that Mr. Garabedian sent
 2         letters, did you have an understanding of to
 3         whom he sent the letters?
 4    A    No.
 5    Q    Did you know he sent them to some
 6         representative of the school?  Like, for
 7         example, as compared to Mr. Ralston?
 8    A    That would have been my assumption, that he
 9         would have reached out directly to the
10         school's legal counsel.
11    Q    So did you ever have an expectation that
12         Mr. Garabedian would contact Mr. Ralston as
13         compared to the school?
14    A    No.
15    Q    So was it your objective from 2017 when you
16         retained Mr. Garabedian to pursue relief from
17         the school?
18    A    Correct.
19              MR. JUBB:  Note my objection.
20         BY MS. DOUGHERTY:
21    Q    Did you ever talk to Mr. Garabedian about
22         whether you could recover money from the
23         school even though you couldn't then file a
24         lawsuit?
25    A    Yes.
```

Kurtis N. Poulos

```
 1    Q    What did you discuss with Mr. Garabedian about
 2         whether you could recover money from the
 3         school even though you could not file a
 4         lawsuit?
 5    A    He stated that the first route would be to
 6         contact the school directly, and I would
 7         believe that he meant contact the school
 8         directly through their legal representation.
 9    Q    What else did you discuss with Mr. Garabedian
10         about recovering money from the school even
11         though you could not then file a lawsuit
12         against the school?
13    A    I believe there was a discussion about whether
14         or not after -- say there was a judgment or
15         whatever -- I would be willing to go public
16         with the name of my abuser, and I said "Only
17         after there was a conclusion."
18    Q    Did Mr. Garabedian share with you any
19         experience that he had in recovering money
20         from schools where a lawsuit couldn't be
21         filed?
22    A    Not to my recollection.
23    Q    Did Mr. Garabedian ever explain to you why he
24         thought you could recover money from the
25         school even though at that moment you couldn't
```

0909a

Kurtis N. Poulos

```
1           file a lawsuit?
2      A    I don't remember the exact verbiage, but we
3           did go over some options about reaching out to
4           the school, addressing the fact that the
5           school basically instigated this entire
6           situation by sending out false representation
7           letters asking for alumni to come forward,
8           telling them to talk to their counselors.
9      Q    So like the school had a moral obligation to
10          remedy the abuse you sustained?
11     A    That's what my belief was based on the
12          verbiage of the letter, until I found out that
13          the two names in -- I believe it was the
14          second letter from the school named people who
15          I later found out were attorneys and not
16          actual counselors.  I guess "counselor" is a
17          loose term, but I took that to mean
18          therapists.
19     Q    So you -- Did you discuss with Mr. Garabedian
20          pursuing money from the school because the
21          school had a moral obligation, even though you
22          could not then file a lawsuit against the
23          school?
24     A    Correct.
25     Q    I'm showing you a document which is a series
```

0910a

Kurtis N. Poulos

1          of e-mails that I've marked as D11.  It's

2          Bates labeled Garabedian_File 0066 through 71.

3          I'm just going to start on the last page.  I

4          want to scroll through it, Mr. Poulos.

5              And my question to you, if you can just

6          look as I'm scrolling, is going to be to

7          confirm whether these are the series of

8          e-mails that you had with your mother that you

9          described in your prior testimony after you

10         received the letter from The Hill School.

11             And then if you can see, we're back on

12         the first page where it looks like the chain

13         gets forwarded to Mr. Garabedian.

14             So just inviting your attention back to I

15         guess the first page to the second page -- We

16         can go in reverse order -- it looks like there

17         is an e-mail from the Headmaster Zachary

18         Lehman P'16' -- that's the second page of

19         D11 -- dated November 20, 2017, and there is

20         an e-mail indicating your e-mail address at

21         1:08 and then an e-mail from your mother,

22         "Please tell me what you think" at 3:00 p.m.

23         And then your mother again at 10:51, "Please

24         call tomorrow at your convenience, Mom."

25             Are those the e-mails between you and

```
 1           your mother after you received the letter from

 2           The Hill School that you described in your

 3           prior testimony?

 4    A      Correct.

 5    Q      And on November 20th you were in the Central

 6           Time Zone.  You were in Wisconsin.  Is that

 7           right?

 8    A      No.  I was in the Eastern Time Zone.  I was in

 9           Connecticut.

10    Q      You were in Connecticut.  So you were in

11           Eastern and your mom was in Wisconsin.  Is

12           that right?

13    A      Correct.

14    Q      And then it looks like you sent that whole

15           chain with your mom to Mr. Garabedian.  Is

16           that right?

17    A      I believe that would have been -- Yeah.  I

18           don't remember if I sent it directly after or

19           if it was a forward of our conversation.

20    Q      If we just look back at D11, you can see that

21           there is the e-mails that we just talked about

22           on the second page between you and your mother

23           on November 20th, and then there is an e-mail

24           where there is no content.  It's blank.  But

25           the header reflects your mom, to you,
```

0912a

Kurtis N. Poulos

```
 1            December 5, 2017.
 2                And then now squarely on the bottom of
 3            the first page there is an e-mail from you to
 4            Mr. Garabedian, December 13, 2017, that says
 5            "Thank you for your time and guidance through
 6            this," and it has those other e-mails that we
 7            looked through, right?
 8                So it looks like a couple weeks later you
 9            forwarded the chain that you had with your
10            mother to Mr. Garabedian.  Is that right?
11     A      Yes.  That's what I believe.
12     Q      Then Mr. Garabedian responded and said, "Be
13            proud!" Is that right?
14     A      Correct.
15     Q      Was it your impression that -- Let me start
16            again.
17                December 13, 2017, is after you had your
18            first intake interview with Mr. Garabedian.
19            Is that right?
20     A      Yes.
21     Q      And I realize you told us already that it was
22            over the phone.  Were there other people on
23            the telephone call with you and
24            Mr. Garabedian?
25     A      I believe there was somebody from Mitchell's
```

0913a

```
 1            office, but I was alone.  I had asked my

 2            girlfriend to leave the apartment while I

 3            speak to him directly.

 4     Q    So it was you and Mr. Garabedian and another

 5            lawyer from Mr. Garabedian's office.  Is that

 6            right?

 7     A    Another lawyer or legal aide.  I'm not sure if

 8            I remember exactly who.

 9     Q    Was it your impression that Mr. Garabedian

10            believed that you were telling him the truth

11            about the sexual abuse that you had sustained?

12     A    Yes.

13                  MR. JUBB:  I'll object to the form.

14            BY MS. DOUGHERTY:

15     Q    Did Mr. Garabedian say anything to you that

16            led you to believe he believed you, that you

17            had been sexually abused by Mr. Ralston?

18     A    Yes.  He asked for certain specifics if I

19            could remember them and how it's affected my

20            life throughout my relationships, my work

21            habits, my alcohol and drug abuse and any

22            other subsequent matters and how this has

23            affected my basic overall well-being.

24     Q    So Mr. Garabedian just didn't take your word

25            for it that you had been sexually abused by
```

```
 1           Mr. Ralston, he asked you questions, right?

 2    A      Correct.

 3                 MR. JUBB:  Objection.

 4                 THE WITNESS:  Correct.  I believe we

 5           were on the phone for a couple of hours.

 6           BY MS. DOUGHERTY:

 7    Q      It looks like -- We're back to D11.  It's the

 8           second e-mail on the first page.  It's from

 9           you to Mr. Garabedian December 15, 2017, 10:35

10           a.m.  In the -- Let's see here.  It's the

11           second line, so in the middle of paragraph it

12           says, "There were multiple sheets that had me

13           signing for release of medical records.  There

14           are no medical records, but I still signed

15           them.  Also, I didn't need to have this

16           notarized, did I?"

17               What were you talking about you were

18           "signing for release of medical records," if

19           you remember?

20    A      To the best of my recollection, I was

21           questioning if he was asking if there was

22           medical records pertaining to the abuse in

23           Pottstown.  I knew there was going to be other

24           medical records, but I knew there weren't

25           going to be -- The only medical record I have
```

```
 1              in Pottstown is when I broke my arm freshman

 2              year.

 3        Q     Did Mr. Garabedian want all of your medical

 4              records?

 5        A     Yes.

 6                    MR. JUBB:  I'll object.

 7              BY MS. DOUGHERTY:

 8        Q     Did Mr. Garabedian ask you to sign releases

 9              for all of your medical records?

10        A     Yes.

11        Q     Did Mr. Garabedian tell you why he asked you

12              to sign releases for all of your medical

13              records?

14        A     Not specifically.

15        Q     Did you ask?

16        A     Not to my recollection.

17        Q     So as of at least December 15, 2017,

18              Mr. Garabedian had asked you to provide

19              releases so that he could obtain all of your

20              medical records.  Is that correct?

21        A     Correct.

22        Q     Was there anything -- Let me start again.

23                    Were there any other releases or

24              documents you signed so that Mr. Garabedian

25              could get any other types of records other
```

0916a

Kurtis N. Foulos

```
 1              than just your medical records?
 2    A    There was 20 pages of releases.  There was
 3              obviously something more than just medical,
 4              but I can't recall offhand.  And we had --
 5              like I stated previously, we had already
 6              discussed any criminal background that I had,
 7              so I'm sure there was a release -- Obviously
 8              that's public record, so maybe I don't even
 9              need to release that.
10    Q    So Mr. Garabedian asked you about your medical
11              history and then asked you to sign releases so
12              that he could get the actual medical records.
13              Is that correct?
14    A    Correct.
15    Q    And you discussed with Mr. Garabedian your
16              criminal history, and then Mr. Garabedian
17              expressed that he wanted to get actual records
18              relating to the criminal history?
19                   MR. JUBB:  Note my objection.
20                   THE WITNESS:  I don't believe that
21              he stated verbatim that.  I just know that any
22              criminal records are basically public
23              knowledge, so I had been forthcoming with him
24              as far as what my criminal background was
25              and -- You know, if there was a release that I
```

0917a

Kurtis N. Poulos

```
 1              needed to sign for him to get more

 2              information, then yes.  But if not, he could

 3              easily obtain that with a credit card and a

 4              website.

 5              BY MS. DOUGHERTY:

 6    Q    So you don't have a recollection of

 7              Mr. Garabedian indicating the intent to get

 8              any criminal records.  Is that right?

 9    A    Correct.

10    Q    Did he ask you about your academic history?

11    A    I believe so.

12    Q    Did Mr. Garabedian ask you to sign any

13              releases or provide him with any records

14              relating to your academic history?

15    A    I believe that could have been one of the

16              releases that I gave him, was that he could

17              reach out to the universities to get

18              transcripts.

19    Q    I realize that you said -- and you also wrote

20              it at the time -- that there was a lot of

21              material that you were signing.  Other than

22              medical, perhaps your academic records, is

23              there any other type of records you remember

24              Mr. Garabedian expressing to you that he

25              wanted to obtain?
```

0918a

```
 1    A    Not to my recollection, no.

 2    Q    Sorry.  It takes me a minute to share the

 3         screen because I -- I use WebEx, too, and it's

 4         literally the opposite so I do it the wrong

 5         way every single time.

 6              So I'm showing you a document that I've

 7         marked D5.  It's Garabedian_File 0033 to 39.

 8         Right now I'm just on the first page of D5,

 9         which are handwritten notes.

10              Have you ever seen -- Again, I know we're

11         just looking at the first page.  Have you ever

12         seen these notes before I just showed them to

13         you?

14    A    No.

15    Q    Did you have a meeting -- Let me start again.

16              MR. JUBB:  I didn't hear the answer.

17              MS. DOUGHERTY:  He said "No."

18         BY MS. DOUGHERTY:

19    Q    Right?  Do you want to repeat it, Mr. Poulos?

20    A    No.

21    Q    I feel like by now you would tell us if you

22         meant "Yes" when I said that you said "No,"

23         but just making sure.

24    A    Yes.

25    Q    So December 12, 2017, that's when you had the
```

0919a

Kurtis N. Poulos

```
1              long telephone call with Mr. Garabedian and

2              somebody else, right?

3        A     Correct.

4        Q     And if you look over to the right -- again,

5              we're on the first page of D5 -- right at the

6              top it says, "DM."  Did you speak to somebody

7              with the initials DM?

8        A     I believe that would have been the second

9              person that was in the room with Mitchell when

10             I did my initial interview.

11       Q     And it looks like, at least as of December 12,

12             2017, you communicated during the telephone

13             call that Matthew B. Ralston was your teacher,

14             dorm master at The Hill School in Pottstown

15             Pennsylvania.  Is that right?

16       A     He was a teacher -- He was my teacher but

17             never my dorm master.

18       Q     But did you communicate that he was somebody's

19             dorm master to Mr. Garabedian and the other

20             person on the phone?

21       A     I believe so, yes.

22       Q     And you identified on December 12, 2017 that

23             Matthew B. Ralston sexually abused you when

24             you were at The Hill School.  Is that right?

25       A     Correct.
```

0920a

```
 1    Q    Did you tell Mr. Garabedian and the other
 2         person on the phone that your name was Kurtis
 3         Nicholas Poulos?
 4    A    Yes.
 5    Q    That you were born October 10, 1978?
 6    A    Yes.
 7    Q    That your address -- see next to where it says
 8         "Address:" -- did you communicate that that
 9         Connecticut address was your address to
10         Mr. Garabedian and the other person on the
11         phone on December 12, 2017?
12    A    Yes.
13    Q    Did you tell Mr. Garabedian and the other
14         person on the phone on December 12, 2017 that
15         you hadn't served in the military and that you
16         had no bankruptcies?
17    A    Yes.
18    Q    On December 12, 2017 did you tell
19         Mr. Garabedian and the other person on the
20         phone that you had been arrested in Wisconsin
21         and Connecticut for breaking and entering,
22         disorderly conduct, you had no felonies and no
23         jail time?
24    A    A couple of overnighters, no serious jail
25         time.  And I did not at that moment believe I
```

0921a

Kurtis N. Poulos

```
 1              had a felony.  I thought it had been reduced

 2              to a misdemeanor.

 3       Q      Okay.  So just to be clear, you

 4              communicated -- We're just looking at the

 5              middle of the first page of D11 (sic) where it

 6              says "Arrested," right, and it says Wisconsin,

 7              Connecticut, "WI, CT," there is, like, a

 8              little section there.

 9                   You communicated the information that's

10              written there to Mr. Garabedian and his

11              associate on December 12, 2017 and believed it

12              to be true at the time, but you since realized

13              that, you know, you were mistaken.  Is that

14              correct?

15       A      Correct.

16                        MR. JUBB:  Objection.

17              BY MS. DOUGHERTY:

18       Q      So you weren't intentionally trying to mislead

19              anyone.  You just misremembered?

20       A      Correct.

21                        MR. JUBB:  Same objection.

22              BY MS. DOUGHERTY:

23       Q      Did you tell Mr. Garabedian and the other

24              person on the phone on December 12, 2017 that

25              you weren't married, you had no children and
```

0922a

Kurtis N. Poulos

```
 1              that you were then employed as a car salesman

 2              in Milford, Connecticut?

 3    A    Yes.

 4    Q    Did you tell Mr. Garabedian and the other

 5              person on the phone on December 12, 2017 that

 6              you had one younger brother and four half

 7              sisters?

 8    A    Correct.

 9    Q    There is a notation that says, "Childhood, dad

10              violent, tough childhood."  Do you know what

11              that's about?

12    A    My dad when he was drinking and doing drugs

13              when I was younger had a tendency to get

14              violent with me and my younger half brother.

15    Q    These subject areas on the notes, are these

16              things that you were just volunteering or was

17              somebody asking you questions, like, "Are you

18              employed?"  "How was your childhood?"  How did

19              that go?

20    A    They were asking.

21    Q    Then it says, "Detox, no."  Do you know what

22              that's about?

23    A    I would assume if I've ever gone into any sort

24              of inpatient therapy for drug or alcohol

25              abuse, to go through a detox program and
```

0923a

```
 1              counseling.
 2    Q    So was it Mr. Garabedian asking the questions
 3         or was it Mr. Garabedian and the other person
 4         on the phone during the first telephone call,
 5         December 12, 2017?
 6    A    I believe it was a mix.
 7              MR. JUBB:  I'll object, but go
 8         ahead.
 9         BY MS. DOUGHERTY:
10    Q    It was a mix?
11    A    I believe so.
12    Q    So during the telephone discussion on
13         December 12th, 2017, somebody asked you
14         whether you had gone through a detox program?
15    A    I believe so.
16    Q    And you said "No," right?
17    A    Correct.
18    Q    Now, it says, "Psychology, yes.  Mom would
19         know, late '90s.  He'll send us the names."
20              Did you have a discussion about whether
21         you received psychological treatment or mental
22         health treatment during the December 12, 2017
23         telephone call with Mr. Garabedian and the
24         other person?
25    A    Yes, I had.  Well, I did speak about that with
```

Kurtis N. Poulos

1           him, and none of it was regarding the matter

2           at hand.

3      Q    Right.  So you had mental health treatment but

4           not related to the sexual abuse imposed upon

5           you by Matthew Ralston.  Is that right?

6      A    Correct.

7                    MR. JUBB:  I'll object.

8           BY MS. DOUGHERTY:

9      Q    Did you express the nature of the mental

10          health services that you received during the

11          telephone call on December 12, 2017?  You

12          don't have to tell me what they were, I just

13          want to know if you told them to

14          Mr. Garabedian and the other person.

15     A    I believe so.  I don't know if I got into too

16          many specifics.  But I did tell them that I

17          had been in therapy off and on since I was

18          seven or eight years old.

19     Q    And did you communicate that you hadn't sought

20          treatment specifically because of the sex

21          abuse?  Is that why you were making that

22          distinction to me a couple moments ago?

23     A    Yes.

24     Q    So we're on to the second page of D5.  There

25          is a heading that says, "Schools," and then

0925a

```
 1            there is some information under it.

 2                Can you just scan through it and confirm

 3            for me that this is information that you

 4            provided to Mr. Garabedian and the other

 5            person on the phone during the telephone call

 6            of December 12, 2017?

 7    A      Yes.  He just wrote down the name of -- The

 8            elementary school is wrong.  It's Lake Bluff,

 9            not Lake Russell.

10    Q      Okay.

11    A      Everything else is completely accurate.  I

12            don't know about the dates on the left,

13            because if those are supposed to match up

14            with -- because they don't, obviously.  I

15            didn't get to Marquette University until, you

16            know, fall of '97.

17    Q      So is it -- Did I understand your answer that

18            you provided information about the schools

19            that you attended, and it looks like somebody

20            broke down some of the names and dates, but

21            some of the information that was written down

22            is not necessarily correct.  Is that right?

23    A      Correct.  I went to UWM, which is

24            UW-Milwaukee, not UW-Madison.  That's just UW.

25    Q      We're going to talk a little bit more about
```

0926a

Kurtis N. Poulos

```
 1              the telephone call, but just while we're
 2              there, did anybody, like, send you, like, a
 3              summary or a type-up of what you discussed
 4              during the telephone call on December 12, 2017
 5              after the telephone call?
 6       A      Not to my recollection.
 7       Q      And were you giving this information about
 8              schools because somebody asked you questions
 9              about where you went to elementary school,
10              high school, university?
11       A      Yes.
12       Q      Then there is a section here that says,
13              "Addresses," and "Social Security number."
14              Can you just peruse that information and
15              confirm for me whether that's information that
16              you provided to Mr. Garabedian and the other
17              person on the phone on December 12, 2017
18              regarding addresses and your Social Security
19              number?
20       A      Yes.
21       Q      Somebody asked you to provide your addresses
22              and Social Security number?
23       A      To the best of my recollection.
24       Q      Do you know why?  I'm sorry.  Keep going.
25       A      I mean, like, to the best of my recollection,
```

0927a

Kurtis N. Poulos

```
 1          yes, somebody asked me for the addresses.  I
 2          didn't ask why.
 3      Q   Did anybody explain why they were asking for
 4          your addresses and Social Security number?
 5      A   No.  I just assumed it was due diligence.
 6      Q   So you had the impression that Mr. Garabedian
 7          or the other person on the phone they were
 8          going to, like, check into what you were
 9          telling them?
10      A   Exactly.
11                  MR. JUBB:  Objection to the form.
12          BY MS. DOUGHERTY:
13      Q   Is there something that gave you that
14          impression?
15      A   With my initial interview with Mitchell, it
16          wasn't so cut and dry as like, "Oh, yeah,
17          we're just going to do this."  He, I was
18          assuming, was doing his due diligence to make
19          sure I am who I am and was where I was during
20          certain dates and times.
21      Q   So as of the December 12, 2017 telephone call,
22          at the start of it had Mr. Garabedian already
23          agreed to represent you, or was it your
24          understanding he was interviewing you to
25          determine whether he would agree to represent
```

0928a

```
 1          you?
 2    A     Interviewing me to agree to represent me.
 3    Q     And at some time after the December 12, 2017
 4          telephone call, Mr. Garabedian told you that
 5          he would agree to represent you, and he signed
 6          the Contingent Fee Agreement that we looked at
 7          a few moments ago?
 8    A     (Inaudible response)
 9                   REPORTER:  What was the answer?
10                   THE WITNESS:  Correct.
11          BY MS. DOUGHERTY:
12    Q     So then it says -- again, we're on the second
13          page of D5, getting towards the bottom -- it
14          says "Hill-Perp."  Do you know what that
15          refers to?
16    A     Yeah, the perpetrator.
17    Q     Is that terminology that Mr. Garabedian and
18          the other person on the phone used, "Perp"?
19    A     I don't remember if that was their exact
20          verbiage.  They might have asked me who the
21          abuser was.  I don't recall exactly how they
22          stated it.
23    Q     Okay.  So it says "Sophomore year geometry
24          teacher, freshman year met Perp."  Is that
25          information that you provided?
```

```
 1    A    Yes.

 2    Q    Under "Perp," it says -- keep going down the

 3         second page of D5 -- there is a heading that

 4         says "Perp," and it says, "Tall, skinny,

 5         gangly, buzzed hair, no glasses, clean living

 6         guy, runner, people liked him, good teacher."

 7         Did somebody ask you to describe Mr. Ralston?

 8    A    Yes.

 9    Q    And is that a description that you provided

10         about Mr. Ralston?

11    A    Yes.

12    Q    Then we're going on to the third page of D5.

13         It says, "Senior year, Perp CLs dorm master."

14         So that's incorrect, right?  Somebody

15         misunderstood?

16    A    He was living in my dorm but he was not my

17         dorm master.

18    Q    Gotcha.  Who was the dorm master during your

19         senior year?  You might have told us.  I

20         apologize, but --

21    A    Senor Romero (Phonetic).

22    Q    So you weren't suggesting that that gentleman

23         sexually abused you, just somebody obviously

24         misunderstood your comment that Mr. Ralston

25         lived in the dorm as your dorm master, right?
```

0930a

Kurtis N. Poulos

```
 1    A      Yes.  I believe we had five teachers my senior
 2           year living in that dorm as dorm masters, one
 3           on the first floor on one side and one on the
 4           first floor on the other side and the same on
 5           the second floor.  And then Mr. Ralston's
 6           apartment entrance was by the parking lot by
 7           the garage under -- basically underneath our
 8           dorm.
 9    Q      Now, let's keep our time frame at the moment
10           limited to the December 12, 2017 telephone
11           call.  Did you tell Mr. Garabedian and the
12           other person on the phone that anyone other
13           than Matthew Ralston had sexually abused you?
14    A      No.
15    Q      Did you tell Mr. Garabedian and the other
16           person on the phone that any other teacher at
17           The Hill School had abused you but not
18           sexually?
19    A      Possibly, because there was some verbal abuse
20           by my freshman -- or my third form hall
21           master.
22    Q      Who was that again?
23    A      I don't recall his name.
24    Q      Was it Tom Ruth?
25    A      No.  Tom Ruth lived on the first floor.  I
```

0931a

```
 1              lived on the third floor.

 2    Q    Did you have any issue with Tom Ruth's

 3         behavior?

 4    A    He was just a crotchety old man.  I really

 5         didn't.  You know, he was never one of my

 6         professors when I was attending The Hill

 7         School.

 8    Q    I'm just going to -- Just while we're here,

 9         I'm showing you a document that I've marked as

10         D9.  It's Garabedian_File 0040.  Have you

11         ever -- I'm just showing you the top of the

12         page.  I can scroll down for you.

13              Have you ever seen this document before I

14         just showed it to you?

15    A    I've never seen any handwritten documents from

16         Mitchell's office.

17    Q    Okay.  So over to the top right it says under

18         "Perps," "Tom Ruth, Mr. Rolstin."  Do you have

19         any idea why somebody would identify Tom Ruth

20         as a perp?

21    A    I do believe that I was asked if I knew of any

22         other teachers, and I had heard allegations of

23         Tom Ruth with other students as I had heard

24         about numerous other female teachers with male

25         students.  I just couldn't recall all of the
```

0932a

```
 1              names.  Those -- One applied to me, one

 2              applied to, again, only rumors that I don't

 3              know were ever substantiated.

 4      Q       So you didn't tell Mr. Garabedian or the

 5              person on the phone that Mr. Ruth had acted

 6              inappropriately with you, but you told him

 7              that you had heard about situations where he

 8              had allegedly acted inappropriately with other

 9              students.  Is that right?

10      A       Yes.

11      Q       Was there some reason why you were talking

12              about other teachers other than Mr. Ralston

13              during the December 12, 2017 telephone call?

14      A       He asked if I believed this was an isolated

15              event with just this one professor at the

16              school, and I had heard rumors of -- He would

17              have the hookah tea parties in his apartment

18              and invite students over.  I was never one of

19              his students.

20                  And to the best of my knowledge, I think

21              I was in his apartment once and that was

22              because I was going to be in his AP class the

23              following year as a sophomore.

24      Q       Now that you mentioned the hookah, I think I

25              remember you told us about what you had heard
```

0933a

Kurtis N. Poulos

```
 1              about Mr. Ruth during one of your prior days

 2              of testimony.

 3                  So Mr. Garabedian or the other person on

 4              the phone asked you about other instances

 5              where teachers at The Hill School had acted

 6              inappropriately during the December 12, 2017

 7              telephone call.  Is that correct?

 8    A    Correct.  And like I stated before, there were

 9              other female teachers that were rumored to

10              have sexual relationships with male students;

11              but again, I wasn't in the room.  I can't -- I

12              think I remember what they did at the school,

13              but I can't be 100 percent certain and I

14              wouldn't want to throw somebody under the bus.

15    Q    So as of December 12, 2017 your objective was

16              to pursue some relief from The Hill School.

17              Is that right?

18    A    Correct.

19                      MR. JUBB:  Objection.

20         BY MS. DOUGHERTY:

21    Q    Is that why you were discussing with

22              Mr. Garabedian and the other person on the

23              phone other activity by people other than

24              Mr. Ralston or directed to you that occurred

25              at The Hill School?
```

```
 1    A    Correct.

 2              MR. JUBB:  Objection to the form.

 3         BY MS. DOUGHERTY:

 4    Q    So I've flipped back to D5 back to where we

 5         left off on the third page where it says,

 6         "Sexual abuse."  It says "Over twelve times."

 7         Did you tell Mr. Garabedian and the person on

 8         the telephone call that you had been sexually

 9         abused by Mr. Ralston over twelve times during

10         the December 12, 2017 telephone discussion?

11    A    I believe I said it was at least ten times, if

12         not more.

13    Q    Did you go through each instance that you

14         could then remember on December 12, 2017

15         during the telephone call with Mr. Garabedian

16         and the other person?

17    A    Not in so many specifics, because at that

18         point, if I can recall correctly, I was

19         beginning to break down and we sort of moved

20         on.

21    Q    So you told Mr. Garabedian and -- Well, it

22         says here -- Let me start again.

23              D5, third page, it says "Began freshman

24         year, 14 years old, ended sophomore year 16

25         years old, happened in PA.  CL never had perp
```

0935a

```
 1              for a coach-sports."

 2                  Is that information that you communicated

 3              to Mr. Garabedian and the other person on the

 4              phone on December 12, 2017?

 5     A    To a degree.  I don't believe that I stated

 6              the part about freshman year.  I mean, there

 7              was nothing to my recollection at this point

 8              of freshman year.  It was all sophomore year

 9              when he was my geometry teacher.

10     Q    When you started your freshman year, were you

11              14 years old?

12     A    Correct.

13     Q    And when you ended your sophomore year, you

14              were 16 years old.  Is that right?

15     A    Correct.

16     Q    It says, "Happened in study, cubicles in

17              basement of school, also CLs --" I'm sorry.

18              (Zoom crosstalk)

19     A    There was cubicles in the basement of the

20              library where there were, like, one door, no

21              windows, and basically you just went in.  You

22              had a desk and it was to do your -- We had

23              mandatory study hours every night after

24              dinner, and if you wanted some alone time, you

25              would go down into those cubicles.
```

```
 1              And rarely were they used, so it was kind

 2              of a good place to, you know, bone up before

 3              an exam or write a term paper and not be

 4              bothered by anybody.

 5      Q    Were you sexually abused by Mr. Ralston in the

 6              study room?

 7      A    I was approached by him.

 8      Q    Can you tell us about that?

 9      A    I don't know if it was supposed to intimidate

10              me, but it was one of those things where I was

11              probably one of the only, if not the only

12              student down there.

13              And I remember, like, basically being

14              written -- or read the riot act about "Why are

15              you down here?  You're a third form.  Why are

16              you down here this late?"  And it was, you

17              know, 15 or 20 minutes before dorm curfew and

18              I was in the middle of writing a term paper.

19      Q    So you thought that Mr. Ralston was

20              intimidating you?

21      A    Kind of like, "Get out of here and go back to

22              your dorm," and "I have authority and you

23              don't really have any."

24      Q    This incident in the study room, did it happen

25              before or after the first time that
```

0937a

Kurtis N. Poulos

```
1            Mr. Ralston touched you inappropriately?

2      A    Before.

3      Q    So before there was any type of physical

4            contact between you and Mr. Ralston, that's

5            when the study room incident occurred.  Is

6            that right?

7      A    Correct.

8      Q    And that was -- Let me start again.  The study

9            room incident was an interaction that you had

10           with Mr. Ralston that you thought was

11           inappropriate and made you feel uncomfortable.

12           Is that right?

13     A    Yeah.  I don't believe I ever went back down

14           there to do any extracurriculars or study

15           alone again.

16     Q    And you told Mr. Garabedian and the person on

17           the telephone on December 12, 2017 the

18           information that you just relayed about the

19           incident in the study room?

20     A    Correct.

21     Q    Then it says, "Also CLs single dorm, no

22           roommate."  Do you know what that's about?

23     A    Yeah.  My sophomore year the roommate that I

24           was supposed to have didn't end up attending

25           the school, so they moved the other bed out of
```

0938a

Kurtis N. Poulos

```
 1              the room and I had a single.
 2      Q      So it's not the case that Mr. Ralston abused
 3              you in your dorm room.  Is that right?
 4      A      Correct.
 5      Q      Did you -- You didn't tell Mr. Garabedian or
 6              the other person on the phone on December 12,
 7              2017 that you were abused in the dorm room,
 8              right?
 9      A      No.
10      Q      It says, "Never in perp's room."  You never
11              went to Mr. Ralston's room.  Is that right?
12      A      Correct.  I never entered -- I never once in
13              the three years that I attended the school
14              entered his apartment.  I didn't know until my
15              sixth form year where he even lived on campus.
16      Q      Right.  I think my question was a little
17              misleading because there was a time that you
18              actually went to his room and knocked on the
19              door and interacted with his wife over your
20              car, right?
21      A      Correct.
22      Q      But you never actually went inside.  Is that
23              correct?
24      A      No.  She wouldn't even open the door.  She
25              just said they would move the car in the
```

Kurtis N. Poulos

```
 1              morning.

 2    Q    So at no time that you were at The Hill School

 3         you never went inside Mr. Ralston's room.  Is

 4         that right?

 5    A    Other than his classroom, no.

 6    Q    All right.  It says, "Three of the four years

 7         of high school CL went junior year.  Left

 8         Hill."  And then it says, "Not weird for perp

 9         to come to room-PERS, a dorm master in another

10         dorm.  Teachers would show up and come in the

11         room."  Do you know what that was about?

12    A    Yeah.  I mean, every once in a while if you're

13         a student and you're struggling, you either go

14         to somebody's -- you know, if, like, my third

15         form year I was having trouble with English

16         composition, so I would go to my third form

17         English teacher's apartment and she would

18         tutor me during study hours.

19              I mean, there were times where my fourth

20         form English teacher would show up.  If you

21         slept in on a Saturday, she'd pound on your

22         door and bring you down to class.  I mean, it

23         just wasn't weird for teachers to be coming

24         and going during specific hours, specifically

25         our study hours, with somebody just being,
```

0940a

```
1            like, "Oh, he's either here to help him teach

2            or learn," or -- you know, "He's just making

3            sure that he's got what he needs for his

4            class."

5      Q     So Mr. Garabedian or the other person on the

6            phone asked you during the telephone call on

7            December 12, 2017 about whether teachers

8            access dorm rooms.  Is that how this came up?

9      A     Correct.  And basically, once you're in your

10           room, you are after a certain time of night

11           allowed to shut your door but you're never

12           allowed to lock it.  And the majority of the

13           students for that same reason would just leave

14           their doors wide open during study hall.

15                I mean, it's kind of like being in class.

16           You are yelling across the hallway, you know,

17           sharing notes or whatever, maybe when you

18           weren't supposed to be talking, but it is what

19           it is.

20     Q     So is it a fair characterization or an unfair

21           characterization -- I guess you can tell me if

22           it's not a fair characterization -- is it a

23           fair characterization that Mr. Garabedian and

24           the other person on the phone during the

25           December 12, 2017 telephone call were
```

Kurtis N. Foulos

```
 1            interested in how The Hill School worked in
 2            general -- general information about how the
 3            teachers interacted with students, how classes
 4            worked, where things were?
 5      A     Correct.
 6                  MR. JUBB:  I'll object.
 7            BY MS. DOUGHERTY:
 8      Q     Did you have an understanding about why
 9            Mr. Garabedian or the other person on the
10            phone were asking so many questions about The
11            Hill School during the December 12, 2017
12            telephone call?
13      A     I'll revert back to the letter --
14                  MR. JUBB:  Objection.
15                  THE WITNESS:  I'll revert back to
16            the letter that I received from the school
17            stating, "We know that this had happened."
18            And it wasn't a single individual or single
19            instance, so I'm assuming they were trying to
20            gauge the likelihood of how many teachers or
21            how likely it would be for people to come and
22            go without any sort of checks and balances
23            besides if you're an under form and you have
24            to check out with your prefect in order to go
25            to the library or go to a teacher's apartment
```

0942a

Kurtis N. Poulos

1           to get some extra tutoring for a subject.

2      Q    It says, "CLs dorm supervisor Mr." Underscore,

3           "six prefects, sophomore dorm, CL does not

4           have yearbooks."

5               Then on the bottom -- Again, we're on the

6           third page of D5, right at the bottom where it

7           says "Sexual abuse."

8      A    Yes, I'm reading it.  Okay.

9      Q    How far did you read?

10     A    I read the whole thing.

11     Q    From "Sexual abuse" down to "Mom came to town

12          at hotel CL came back to"?

13     A    Correct.

14     Q    Is that information -- that's the bottom of

15          the third page starting to the fourth page of

16          D5 -- is that information that you

17          communicated to Mr. Garabedian and the other

18          person on the phone during the December 12,

19          2017 telephone call?

20     A    To the best of my recollection, yes.

21     Q    I think you said that you didn't go into the

22          same level of detail that you went into,

23          during your testimony here, during the first

24          telephone call, the December 12, 2017

25          telephone call, because you broke down and got

Kurtis N. Poulos

```
 1          upset?

 2     A    Correct.

 3     Q    I'm just going to scroll a little bit more.

 4          So we're at the top of the fourth page of D5.

 5          It says, "Perp told CL 'our time' for us, no

 6          one else."  What's that about?

 7     A    Basically I was going to be living in the same

 8          building and I didn't know what he really

 9          meant by that.  It just -- It struck me that

10          it was odd that he went out of his way, not

11          being my dorm master, to come and approach me.

12          He wasn't going to be my professor or my dorm

13          master.  We had really no reason to interact.

14     Q    So the words in the quotes, "our time," that's

15          something that Mr. Ralston said to you?

16     A    Something to that effect.

17     Q    Was that before or after he started sexually

18          abusing you?

19     A    After.

20     Q    Then after the dashed bottom line that you

21          already confirmed, it says, "Dorm, parked car,

22          perp blocked CLs car."

23          Those two sentences there, the top of the

24          fourth page of D5, that's describing the

25          interaction you had with Mr. Ralston where
```

```
 1          your car was blocked during parents weekend,

 2          right?

 3     A    Correct.

 4     Q    And you shared information about that

 5          interaction regarding your car and Mr. Ralston

 6          during parents weekend with Mr. Garabedian and

 7          the other person on the phone during the

 8          December 12, 2017 telephone call?

 9     A    Correct.

10     Q    It says, "CL thinks perp's wife knew

11          something."  What's that about?

12     A    Just in my recollection, the way that she

13          addressed the situation where I was trying to

14          leave, and she was super defensive and being,

15          like, "My husband has every right to do what

16          he's doing," and was very -- I don't want to

17          say aggressive, but defensive of his actions.

18                   MS. DOUGHERTY:  Hold on one second.

19          Lane is waving.  I think he can't hear us.  I

20          don't want you to get too far.  Can you hear

21          us, Lane?  We can't hear you.

22                   REPORTER:  Should we go off the

23          record?

24                   MS. DOUGHERTY:  Yeah, I think so.

25                   VIDEOGRAPHER:  The time is 1:06.  We
```

0945a

Kurtis N. Poulos

```
 1          are off the record.

 2          (Off the record.  Recess taken.)

 3                    MS. DOUGHERTY:  Can we just -- We

 4          don't need video at the moment, but can we be

 5          on the stenographic record?

 6                    VIDEOGRAPHER:  The video is off.

 7          Just let me know whenever you're done and when

 8          to go back on video.

 9                    MR. JUBB:  Why are we taken off the

10          video?

11                    MS. DOUGHERTY:  We can go on video

12          for this.  I wanted to ask Mr. Poulos about

13          his comment that he has to leave and address

14          that before we got back into the testimony,

15          but we can go on video for that.

16                    MR. JUBB:  I didn't hear anything

17          along those lines.

18                    MS. DOUGHERTY:  I know you didn't.

19          That's why I wanted to go on the record and

20          address that before we got back into his

21          testimony.  Do you want that on the video?

22                    MR. JUBB:  Yes, please.

23                    MS. DOUGHERTY:  Can we go back on

24          the video, please?

25                    VIDEOGRAPHER:  Stand by.  The time
```

0946a

Kurtis N. Poulos

```
 1           is 1:19.  We are back on the record.
 2                   MS. DOUGHERTY:  Okay.  Mr. Poulos, I
 3           don't think that Mr. Jubb heard your comments
 4           that you need to leave at a certain time.  Can
 5           you repeat those?
 6                   THE WITNESS:  Yes.  I stated in the
 7           e-mail I have to do a vehicle delivery at
 8           two -- Well, around 3:00 p.m. my time, which
 9           means I need to leave here around two to get
10           to work, make sure the vehicle is prepped and
11           ready for the delivery.  This was the only day
12           that my client had available to pick up the
13           car.
14                   MS. DOUGHERTY:  Okay.  So you would
15           need to leave, just so we're clear, in
16           40 minutes?  I apologize for talking over you.
17           Did I freeze?
18                   REPORTER:  He froze.
19                   MS. DOUGHERTY:  Are you there,
20           Mr. Poulos?
21                   THE WITNESS:  I'm here.
22                   MS. DOUGHERTY:  You froze there, so
23           I wasn't trying to speak over you.  You were
24           saying something like it was the only time
25           your client could do it.  Could you just say
```

0947a

1          that again?

2                      THE WITNESS:  Yes.  It's the only

3          time that my client can take delivery of her

4          new vehicle.  And if I'm not there to do the

5          delivery, I don't get credit or commission for

6          the vehicle sale.

7                      MS. DOUGHERTY:  Okay.  So then you

8          need -- You're telling us that you need to

9          leave in 40 minutes.  Is that right?

10                     THE WITNESS:  I need to sign off of

11         here in about 40 minutes, yes.

12                     MS. DOUGHERTY:  Is there -- Are you

13         able to come back after a period of time

14         today?

15                     THE WITNESS:  Not later today --

16         (Zoom crosstalk)

17                     MS. DOUGHERTY:  That was my

18         question.  I know it was unclear.  I wasn't

19         sure how long the vehicle delivery would take.

20         I don't know that I have -- I don't know that

21         I would be done in 40 minutes.  I don't know

22         that I have much more than 40 minutes, but

23         Mr. Jubb is also permitted to ask questions

24         after me, so I'm not sure that we will be done

25         by -- in 40 minutes.

Kurtis N. Poulos

```
 1              I'm okay with stopping and resuming on

 2         another day because of your work commitment,

 3         but you need to commit to come back to let

 4         whoever is in the middle of their questioning

 5         finish their questioning.

 6              Again, I told you that I don't know that

 7         I have all that much.  40 minutes is cutting

 8         it close, but Mr. Jubb then has an opportunity

 9         to ask follow-up questions.

10              THE WITNESS:  All right.  Let's just

11         get through as much as we can as quickly as

12         possible.

13              MS. DOUGHERTY:  Okay.  So the court

14         reporter is going to read back my question.

15         It was -- Mr. Jubb stopped -- We figured this

16         out -- he was unable to hear the question

17         about -- I'll put it back up -- "CL thinks

18         perp's wife knew something," and I interrupted

19         you in the middle of your answer.

20              So the court reporter is going to read

21         the question and your answer back, and then,

22         if you could, complete your answer when she

23         lets you know it's okay for you to keep

24         talking.  Is that okay with you?

25              THE WITNESS:  Yes.  That's fine.
```

0949a

Kurtis N. Poulos

```
 1                    MS. DOUGHERTY:  So I've put D5 back
 2          up on the screen.
 3          (Reporter read previous question and answer:
 4          "Question: It says, 'CL thinks perp's wife
 5          knew something.'  What's that about?  Answer:
 6          Just in my recollection, the way that she
 7          addressed the situation where I was trying to
 8          leave, and she was super defensive and being,
 9          like, 'My husband has every right to do what
10          he's doing,' and was very -- I don't want to
11          say aggressive, but defensive of his actions."
12                    MS. DOUGHERTY:  Is it okay for
13          Mr. Poulos to finish his answer?
14                    REPORTER:  Yes.
15                    MS. DOUGHERTY:  I just wanted to
16          make sure the court reporter was back in a
17          place that she could --
18          BY MS. DOUGHERTY:
19     Q    So Mr. Poulos, I interrupted you when you were
20          giving that answer.  Would you like to finish
21          your answer?
22     A    That's the end of it.
23     Q    All right.  Then it says, "Young teacher, CL
24          told him about --" Let me start again.
25                    So you told Mr. Garabedian that you
```

0950a

Kurtis N. Poulos

```
 1            thought that Mr. Ralston's wife knew that
 2            Mr. Ralston was engaging in inappropriate
 3            contact?
 4    A       I mean, at least aggressive contact toward
 5            students (Zoom crosstalk) -- me.
 6    Q       Towards you, did you say?
 7    A       Yes.
 8    Q       So during the December 12, 2017 telephone
 9            call, do you remember what you expressed to
10            Mr. Garabedian and the other person on the
11            phone about what you thought Mr. Ralston's
12            wife knew?
13    A       Just that she knew that we had a contentious
14            relationship at this point, and obviously
15            being his wife is going to take his side of
16            whatever situation we're in, hence the whole
17            me trying to leave when I already had
18            permission to leave and she wouldn't even
19            bring him to the door.
20    Q       Okay.  So the context in which Mr. Ralston's
21            wife came up was relating to the incident with
22            the car being blocked in during parents
23            weekend, right?
24    A       Correct.
25    Q       The other person on the phone during the
```

0951a

Kurtis N. Foulos

```
 1              December 12, 2017 telephone call, was that a
 2              man or a woman, if you remember?
 3    A         I believe it was a man.
 4    Q         So Mr. Garabedian, you and a man?
 5    A         Correct.
 6    Q         We've been talking about D5, and we looked at
 7              D9 a little bit, those other notes.  Does
 8              anything during our discussion about the notes
 9              or the telephone call on December 12, 2017,
10              refresh your recollection about the identity
11              of the man on the phone in addition to you and
12              Mr. Garabedian?
13    A         Not to my recollection.
14    Q         So continuing with D5, page four.  It says,
15              "Young teacher, CL told him about car
16              incident.  Mr. Lahey --" and then it keeps
17              going, "25 years old, football, teacher, dog,
18              '82 Firebird."  What's that about?
19    A         Mr. Lahey -- I had the wrong teacher's name.
20              Mr. Lahey I believe was my Shakespeare
21              teacher.  But we did have a younger
22              football -- I think he was one of the JV
23              coaches who lived on the second floor who had
24              a dog and a Firebird, and I told him about the
25              incident and he said that it was unacceptable.
```

0952a

```
1              Mr. Romero also said it was unacceptable but
2              to just let it go.
3                Mr. Lahey was (Audio distortion) the
4              teacher than the one stated as being one of
5              the dorm master's in my six form dorm.
6      Q    So during the December 12, 2017, telephone
7              call, you identified Mr. Lahey as someone who
8              you told about the car incident.  And you
9              realize now that Mr. Lahey was the wrong name,
10             but you still -- the description and the fact
11             that you told a younger teacher about the
12             incident, that's correct, right?
13     A    Correct.
14     Q    And then it says, "No drugs --" I'm sorry.
15     A    No, that's it.
16     Q    It says, "No drugs/alcohol."  Did you tell
17             Mr. Garabedian and the other gentleman on the
18             phone during the December 12, 2017 telephone
19             call that you didn't take drugs and alcohol?
20     A    I believe it was more addressing whether or
21             not I was given drugs or alcohol.
22     Q    Did you discuss with Mr. Garabedian and the
23             other gentleman on the phone during the
24             December 12, 2017 telephone call whether you
25             consumed drugs and alcohol when you were at
```

0953a

Kurtis N. Poulos

```
 1              The Hill School?

 2    A    Probably did.  And yes, I did.

 3    Q    But you also confirmed for Mr. Garabedian and

 4         the other gentleman during the December 12,

 5         2017 telephone call that Mr. Ralston wasn't

 6         the source of the drugs and alcohol.  Is that

 7         right?

 8    A    Correct.

 9    Q    Was any other teacher at The Hill School the

10         source of the drugs and alcohol that you

11         consumed when you were at The Hill School?

12    A    No.

13    Q    Then it says, "Perp, six-foot, lanky, tall,

14         runner, short haircut, white."  Is that a

15         description that you provided to

16         Mr. Garabedian and the other gentleman on the

17         phone during the December 12, 2017 telephone

18         call relating to Mr. Ralston?

19    A    Correct.

20    Q    "No other sexual abuse."  Is that "No other

21         sexual abuse" by anyone other than

22         Mr. Ralston?

23    A    Correct.

24    Q    Then it says, "CL told," and it says "1,

25         mother, in early 30s, 4/5 years ago."
```

0954a

Kurtis N. Poulos

```
 1    A    Yes.

 2    Q    So you told your mother four or five years

 3         before the telephone call on December 12,

 4         2017, about the abuse by Mr. Ralston?

 5    A    Not his specific name; but yes, I told her

 6         there was abuse at the school.

 7    Q    That you sustained abuse at the school.  Is

 8         that right?

 9    A    Correct.

10    Q    That you sustained sexual abuse at the school?

11    A    Yes.

12    Q    And your mother guessed that it was

13         Mr. Ralston?

14    A    She deduced, not "guessed."

15              REPORTER:  I'm sorry.  What was the

16         answer?

17              THE WITNESS:  She deduced it, not

18         guessed.

19         BY MS. DOUGHERTY:

20    Q    And you told Mr. Garabedian and the other

21         gentleman who participated in the December 12,

22         2017, telephone call that you told your mother

23         about sexual abuse that you sustained at The

24         Hill School four or five years before the

25         telephone call.  Is that right?
```

0955a

```
1    A    Correct.
2    Q    And then there is some comment -- there is
3         some dashes, it says, "Everybody father,
4         Hill."  Do you see those three lines there?
5         Can you read them to yourself?
6    A    "Everybody proud the client went to The Hill
7         School, so it was hard."
8    Q    Is this information, is that something you
9         communicated to Mr. Garabedian and the
10        gentleman on the telephone call on
11        December 12, 2017?
12   A    Yes.
13   Q    Same with, "Father didn't want CL going
14        there"?
15   A    Correct.
16   Q    And "The Hill expensive school, had to wear
17        uniform."  Is that information you
18        communicated?
19   A    Yes.  I mean, it wasn't -- I think we were
20        just asking about certain specifics about what
21        life was like there.  It was, you know, if we
22        had a dress code or whatever.
23   Q    Then it says number two -- again, we're still
24        under the heading of "CL told."  We're on the
25        fourth page of D5 at the bottom.
```

0956a

Kurtis N. Poulos

```
1              It says "2, girlfriend, she used it
2         against him."  That's the girlfriend we talked
3         about before who -- (Zoom crosstalk)
4    A    The one in Connecticut.
5              REPORTER:  Go ahead.
6         BY MS. DOUGHERTY:
7    Q    And that's the one who saw the letters from
8         the school, and then you disclosed that you
9         had been abused.  Is that right?
10   A    Correct.
11   Q    And then what is "She used it against him"?
12        Did you tell Mr. Garabedian and the other
13        gentleman on the phone on December 12, 2017
14        something about your girlfriend using your
15        disclosure of sexual abuse against you?
16   A    Yes.  That she basically stated it was
17        probably something that I would have wanted to
18        happen, and she wouldn't be surprised if other
19        people had done it to me.
20             It was the middle of a fight and it was,
21        you know, the ugliest thing she could possibly
22        say to hurt me.
23   Q    Now we're on the fifth page of D5.  It says,
24        "CL had tough time fitting in school."  Is
25        that something you communicated to
```

0957a

Kurtis N. Poulos

```
 1              Mr. Garabedian and the other gentleman on the
 2              phone during the telephone call on
 3              December 12, 2017?
 4      A       Yes.
 5      Q       So I've centered the page so you can see the
 6              line, it starts "Freshman year" and it ends,
 7              "They got rid of ski team."
 8                  Can you just read that to yourself and
 9              confirm for me whether that's information you
10              shared with Mr. Garabedian and the other
11              gentleman on the phone during the December 12,
12              2017 telephone call?
13      A       Yes.
14      Q       It says, "CL knows of victims of other
15              teachers."  What's that about?
16      A       That I heard rumors that other teachers had
17              been abusing students.  Again, in retrospect,
18              I can only say, like, if you're a male student
19              sleeping with an older female teacher, it's
20              kind of like a thumbs up from all of the male
21              students.
22                  But any of the male students who were
23              being abused, it was just rumors.  The other
24              stuff was students sort of bragging, like,
25              "Oh, I'm sleeping with so and so."
```

0958a

Kurtis N. Poulos

```
1    Q    Okay.  So without regard to whether it's a
2         thumb ups, you were still describing instances
3         of child abuse.  Is that right?
4    A    Correct.  That's what I'm saying.  Like in
5         retrospect, now I know it's wrong.  Back then
6         it was sort of like, "Oh, wow.  This guy is
7         cooler than we thought."
8    Q    Did Mr. Garabedian or the other gentleman on
9         the phone during the December 12, 2017
10        telephone call ask you if you knew of other
11        victims of child abuse?
12   A    Yes.  Or who I believed, yes.
13   Q    Because you didn't have any firsthand
14        knowledge of abuse sustained by other
15        students.  It's just based on what you had
16        heard, right?
17   A    Correct.
18   Q    And it says, "Mr. Ruth abuse, Filipino kid,
19        Mr. Ruth a big teacher but abused a few
20        students, not CL."  What's that about?
21   A    There was -- Mr. Ruth was very, let's say,
22        traveled.  He loved going to the Middle East
23        and Asia, and freshman year he took a specific
24        interest in a Filipino student whose father
25        was a diplomat and -- I mean, he was in that
```

0959a

```
 1           guy's apartment almost every night.

 2               And it just -- In retrospect now, I look

 3           at it and I think that possibly could be the

 4           reason or part of the reason why he didn't

 5           return his sophomore year, just like I freaked

 6           out and left my sophomore year -- or junior

 7           year.

 8    Q    So you were, like, identifying instances that

 9           you recalled for Mr. Garabedian and the other

10           gentleman on the telephone call on

11           December 12, 2017, to, like, investigate?

12    A    No.  He just wanted to see if I had any

13           inclination of any other improprieties.

14    Q    It says "Other sexual abuse, none."  Do you

15           know what that's about?

16    A    If there was any other sexual abuse by

17           teachers or students, I'm assuming.

18    Q    And it says, "Damages."  And then under that,

19           "Ruin part of life."

20               Did you tell Mr. Garabedian and the

21           gentleman on the telephone call on December

22           12, 2017 that Mr. Ralston ruined part of your

23           life?

24    A    Yes.  He asked what the effect of the abuse

25           has had on my life since the abuse happened
```

Kurtis N. Poulos

```
 1              when I was a teenager.

 2     Q     "He" being Mr. Garabedian?

 3     A     One of the two of the gentlemen that were on

 4           the phone, Garabedian or his law associate.

 5     Q     So one of them asked you the impact that this

 6           sexual abuse by Mr. Ralston had on your life

 7           since high school.  Is that right?

 8     A     Correct.

 9     Q     And you gave this list here:  "Ruined part of

10           your life, ruined relationships with women,

11           sleep, concentration, self-esteem,

12           self-respect, you turned to drugs and alcohol,

13           six to seven days a week work in --" I don't

14           know -- "bars" and "Ruin school grades."

15              Those are things that you responded when

16           you were asked what the impact was of the

17           sexual abuse on your life after high school?

18     A     Correct.

19     Q     Did you come up with that list or did somebody

20           ask you specific questions, like if you had

21           trouble sleeping, or is this just a list you

22           had in mind?

23     A     It was just a list of what I -- That's the tip

24           of the iceberg, if you asked me honestly.

25     Q     And these effects that you experienced,
```

0961a

Kurtis N. Poulos

```
 1              your -- you know, ruin part of your life, your

 2              relationships with women, turning to drugs and

 3              alcohol, the other stuff on the list there, is

 4              that what, you know, made you want to retain

 5              Mr. Garabedian?

 6                       MR. JUBB:  Object to the form.

 7                       THE WITNESS:  It's more the reason

 8              why when I asked -- or was asked, like, how

 9              this has affected my life, and what I think

10              could be a positive outcome would be that I

11              could go and get therapy to have those things

12              addressed even at this late stage of my

13              life -- or later stage of my life.

14              BY MS. DOUGHERTY:

15       Q     So we're on to the next page of D5.  It says,

16              "More Damages," and there is two columns.  And

17              then on the left side there is like a line

18              down the center of the page.

19                  On the left side it starts with, "Ruined

20              good things and self-sabotage, trust, guilty,

21              self harm, cut himself, self blame, shame,

22              embarrassed, intimacy issues, alone, isolated,

23              ostracized, he was from Wisconsin."

24                  Are those other items that you identified

25              to Mr. Garabedian and the other gentleman on
```

0962a

Kurtis N. Poulos

```
 1            the telephone call during the December 12,
 2            2017, telephone call that were the impacts on
 3            your life since high school?
 4   A        That would be the gist of it.
 5   Q        And on the right side -- And again -- before
 6            we get to the right side -- are these things
 7            that you identified or did somebody prompt you
 8            with questions?
 9   A        Just, I guess, other issues I've had with
10            having to relive this over and over, you know,
11            since I did my best to drown it out the wrong
12            way for years, and now I'm trying to deal with
13            it head on.
14   Q        I'm sorry, because I think I misunderstood.
15            So is it the case that you gave this list or
16            did somebody prompt you?  Did somebody say,
17            "Have you ever cut yourself" or something like
18            that?
19   A        No.  He just asked me, you know, in what ways
20            do I think this has negatively affected my
21            life, and I just started speaking.  Again,
22            some of this might not be my verbiage, but
23            it's a hundred percent true.
24   Q        So it's not the case that Mr. Garabedian or
25            the other gentleman had, like, a long list
```

0963a

Kurtis N. Poulos

```
 1           that they said, you know, "Did you self
 2           sabotage" or "Did you self harm."  You came up
 3           with the list, and you identified these issues
 4           that we're looking at under the "Damages" and
 5           "More Damages" columns.  Is that right?
 6                    MR. JUBB:  Objection.
 7                    THE WITNESS:  Yes.
 8           BY MS. DOUGHERTY:
 9      Q    On the right it says, "Unfixable, crying,
10           flashbacks, reminders, won't go back to Hill
11           school campus, emotional foundation cracked,
12           suicidal ideation, ruin childhood, took away
13           parts of CLs life, wouldn't live in a dorm
14           again, senior at Hill wouldn't eat 90 percent
15           of meals -- wouldn't eat 90 percent of meals
16           in room."
17               Okay.  So those items on the right-hand
18           side of the top of the sixth page of D5, those
19           are additional impacts that you identified to
20           Mr. Garabedian and the other gentleman during
21           the telephone call on December 12, 2017?
22      A    Correct.  Even as a freshman in college I
23           refused to live in a dorm, and my senior year
24           at high school I spent maybe five minutes at
25           dinner and would leave the mess hall or the
```

0964a

```
1              dining room immediately after announcements

2              and go back to my room.

3       Q     All right.  The list over on the left

4              continues.  It says, "Self confidence,

5              oversexed, anger, sad, depression, confusion."

6              Are those more impacts that you expressed to

7              Mr. Garabedian and the other gentleman on the

8              phone on December 12, 2017?

9       A     Yes.

10      Q     And then it says, "Doesn't want unwanted

11             physical touch.  Slap hands away."  What's

12             that about?

13      A     Like if my mom comes up or my girlfriend or a

14             friend comes up behind me and, like, jokingly

15             pats me on certain parts of my body, I just --

16             I immediately freak out to the point where for

17             years my mom couldn't figure it out.  But

18             she'd come up behind me and, you know, slap me

19             on the butt jokingly after I did something

20             funny, and I'd freak out.

21                  And, you know, my friends in college, the

22             same sort of things you would expect, you

23             know, when you're living in an apartment with

24             two or three other guys and, you know -- I

25             couldn't -- I couldn't tell them why I was
```

0965a

Kurtis N. Poulos

```
 1            uncomfortable with certain subjects or certain

 2            innuendos they would make, and I would freak

 3            out and I would leave for days at a time.  And

 4            then I'd come back and pretend like nothing

 5            happened, and they would, too.

 6   Q    The examples that you just provided, did you

 7            provide those to Mr. Garabedian and the other

 8            gentleman on the phone during the December 12,

 9            2017 telephone call?

10   A    Yes.

11   Q    Were there any other examples of your reaction

12            to unwanted physical contact that you provided

13            to Mr. Garabedian and the other gentleman on

14            the telephone during the December 12, 2017

15            telephone call?

16   A    I didn't represent all of the times that I was

17            uncomfortable, but yes, that was a part of it.

18   Q    And it says, "CL lost 80 to 90 pounds."  Was

19            that in high school?

20   A    Yes.

21   Q    From the not eating?

22   A    Yes.

23   Q    And then, "Coma," and it says asterisks "from

24            drinking."  I think we talked about that

25            already, right?
```

```
 1     A    Yes.

 2     Q    And so you told Mr. Garabedian that you had --

 3          Let me start again.

 4               You told Mr. Garabedian and the other

 5          gentleman during the December 12, 2017

 6          telephone call that you had drank to excess

 7          and caused yourself to go into a coma.  Is

 8          that right?

 9     A    Correct.

10     Q    Then it says, "Apathy, not care about things,

11          will just walk away instead of working things

12          out.  Emotional void, intimacy, broken, dirty,

13          used, damaged, bad dreams-nightmares, anxiety,

14          anxiety attacks."

15               Were those other impacts that you

16          described or provided to Mr. Garabedian and

17          the other gentleman on the phone during the

18          December 12, 2017 telephone call?

19     A    Yes.

20     Q    Where it says "Bad dreams, nightmares," do you

21          have dreams regarding Mr. Ralston?

22     A    I have bad dreams regarding him.  I have bad

23          dreams that somehow I end up back at that

24          school.  For the last 20 years I wake up

25          thinking that I'm going to have to go back to
```

0967a

Kurtis N. Poulos

```
 1              that school and I'm a student again in my

 2              dream, and I wake up sweating and screaming.

 3      Q    Is that something that you described to

 4              Mr. Garabedian and the other gentleman during

 5              the December 12, 2017, telephone call?

 6      A    To some extent, yes.

 7      Q    And then on to the next page, it says -- This

 8              is actually the last page of D5.  It says,

 9              "Perp had a dog."  Mr. Ralston had a dog?

10      A    I think he had a Beagle.

11      Q    And it says, "Don, Jr., Trump, 1996 graduated

12              from The Hill School, CLs cousin graduated

13              with him."  That's information that you

14              provided to Mr. Garabedian and the other

15              gentleman during the December 12, 2017,

16              telephone call.  Is that right?

17      A    Correct.

18      Q    And it says, "Check Wikipedia, The Hill

19              School."  Do you know what that's about?

20      A    No, I don't.  Maybe he was checking to see if

21              I was being honest about the fact that Donald,

22              Jr. and Eric Trump both attended that school.

23              Eric, obviously, well after I graduated.

24      Q    So you don't remember having a discussion

25              that, like, involved Wikipedia during the
```

0968a

Kurtis N. Poulos

```
1              December 12, 2017, telephone call.  Is that
2              right?
3        A     No.
4        Q     Okay.  And then it says, "CL: Doesn't matter
5              if perp outed.  I'll think about it though."
6              Do you know what that is?
7        A     Yeah.  At the beginning -- Well, not at the
8              beginning, but I guess at the beginning of our
9              negotiation or, like, what was going to happen
10             throughout the process, I said that I wouldn't
11             have an issue if he was outed after there was
12             a resolution, and still I wasn't sure if that
13             was necessary given all of the other
14             information that they could obtain.  (Zoom
15             crosstalk)
16       Q     What do you mean by that?  I'm sorry.  I
17             didn't mean to interrupt you.
18       A     So ultimately now, yes, I want him -- if it
19             does get to that point, I want it to be
20             brought to light at the time I wasn't sure --
21             (Audio distortion)
22                      REPORTER:  He froze.
23                      MS. DOUGHERTY:  Yep.
24                      MR. JUBB:  He's not going to be too
25             happy about that.
```

0969a

 1          BY MS. DOUGHERTY:

 2     Q    Are you back?  You froze.  Can you hear us?

 3          You froze at "At the time," I think.

 4     A    I'm fine.  What did Lane mean by "He's not

 5          going to be happy about that"?

 6                    MR. JUBB:  That we didn't get your

 7          answer and you're going to have to repeat it

 8          for us.

 9                    THE WITNESS:  Then repeat the

10          question, please.

11                    MS. DOUGHERTY:  Are you able to read

12          the question back and the answer so then he

13          can pick up?

14                    REPORTER:  Sure.

15          (Reporter read previous question.)

16          BY MS. DOUGHERTY:

17     Q    Would you please finish, Mr. Poulos?  You

18          froze and we couldn't hear you.

19     A    That's it.

20     Q    You were in the middle of a sentence.

21     A    No.  I don't have anything further to say.

22     Q    Okay.  So at the beginning of your telephone

23          call with Mr. Garabedian and the other

24          gentleman on December 12, 2017, you weren't

25          sure whether you wanted to out Mr. Ralston,

0970a

Kurtis N. Poulos

```
 1              but since then you've decided that you do.

 2              Can you explain that?

 3                      MR. JUBB:  I'll object to that.

 4                      THE WITNESS:  As any abused victim,

 5              you don't want to see somebody else possibly

 6              abused.  Whether or not it's still continuing

 7              to this day, I obviously have no idea, but --

 8              BY MS. DOUGHERTY:

 9       Q      Okay.  So during the December 12, 2017,

10              telephone call, did it matter to you whether

11              Mr. Ralston was identified as someone who had

12              sexually abused you when you were a child?

13       A      Not particularly.  It was more important to me

14              that the school take accountability for the

15              people that they hired.

16       Q      Did you think that there was some way that

17              Mr. Garabedian could pursue accountability of

18              The Hill School without identifying

19              Mr. Ralston as your abuser?

20       A      Yes.  Because in their very vague letters to

21              the alumni, they stated they know of

22              improprieties.  And they didn't name teachers,

23              but if you're a student or an alumni or

24              alumnus who had experienced these traumas, to

25              "come forward and we will help you through
```

0971a

Kurtis N. Poulos

```
 1              this situation," which meant in my mind they
 2              were willing to start to take accountability,
 3              beyond the fact that they have already been
 4              sued by students' parents for one teacher
 5              impregnating a female student after the school
 6              went coed.
 7        Q    How did you think that the school would be
 8              able to investigate your claim if you didn't
 9              identify Mr. Ralston as your abuser?
10        A    I figured they would take into account time
11              and also multiple testimonies from other
12              students and work through the situation or at
13              least be able to prevent it from happening
14              again in the future.
15        Q    And since the December 12, 2017 telephone
16              call, has your attitude regarding outing
17              Mr. Ralston changed?
18        A    To be honest, yes.
19        Q    When did it change?
20        A    At the beginning of this lawsuit, frankly.
21        Q    So is it now the case that you want to pursue
22              a claim against both The Hill School and
23              Mr. Ralston if the statute of limitations in
24              Pennsylvania is extended?
25                   MR. JUBB:  Object to the form.
```

0972a

```
 1                    THE WITNESS:  At this time, yes.
 2          BY MS. DOUGHERTY:
 3     Q    Okay.  So then it says, "PA-Pennsylvania, SOL
 4          has run."
 5               So during the very first lengthy
 6          telephone call that you had with
 7          Mr. Garabedian and the other gentleman on
 8          December 12, 2017, you talked about the
 9          statute of limitations right then, right?
10     A    Correct.
11     Q    And then it says, "MG, no nondisclosure
12          agreement."  Did you have a discussion about
13          whether there should be a nondisclosure
14          agreement during the December 12, 2017
15          telephone discussion?
16     A    Vaguely.
17     Q    And then it says, "CL, I agree."  Did you
18          agree with Mr. Garabedian that there should be
19          no nondisclosure agreement?
20     A    Evidently, yes.
21     Q    What's your understanding of a nondisclosure
22          agreement?
23     A    It means it would be a matter of public
24          record.
25     Q    Did Mr. Garabedian share with you why he said
```

Kurtis N. Poulos

```
 1              "no nondisclosure agreement"?
 2      A     To the best of my knowledge or recollection,
 3              it would be a matter of -- like, if we're
 4              going to do this, we need to pursue it as, you
 5              know, to the furthest that we can.  And if it
 6              is the school that knows of these instances
 7              and is ultimately the one trying to cover it
 8              up, they need to be held accountable to their
 9              students and, you know, to their prospective
10              students and their alumni who, you know, are
11              paying for an endowment for a school that
12              harbors sexual predators.
13      Q     And you agreed with Mr. Garabedian's thoughts
14              about not having a nondisclosure agreement?
15      A     Yes.
16      Q     Was the context of the discussion relating to
17              the nondisclosure agreement during the
18              December 12, 2017, telephone call, was it
19              connected in any way to how much money you
20              could get from The Hill School?
21      A     No.  All I ever asked for was restitution of
22              my tuition and, you know, to be able to afford
23              continued therapy so that the rest of my life
24              isn't what it was for the last 25 years.
25      Q     Right.  So just so -- Please correct me if I
```

Kurtis N. Poulos

```
 1              misunderstood.  The idea behind not having a

 2              nondisclosure agreement was so that the school

 3              could be held accountable and that the abuse

 4              would be exposed and stopped, not to obtain

 5              money or additional money from the school.  Is

 6              that right?

 7     A    Correct.

 8                   MR. JUBB:  I'll object.

 9              BY MS. DOUGHERTY:

10     Q    Then it says, "No lawsuit in CFA."  Do you

11              know what that's about?

12     A    No.

13     Q    Then it says, "Would you call my Mom."  Did

14              you ask Mr. Garabedian or the other lawyer on

15              the telephone call on December 12, 2017 to

16              call your mom?

17     A    Yes, I believe so.  She would -- You know, she

18              wanted to be kept apprised of the situation

19              and also be able to give me some sort of

20              advice.

21     Q    So it was during the December 12, 2017,

22              telephone call, that's when you gave

23              Mr. Garabedian permission to talk to your mom

24              about your case?

25     A    Correct.
```

0975a

Kurtis N. Poulos

```
1    Q    And by the end of the call, did Mr. Garabedian
2         tell you that he was going to undertake to
3         represent you in a claim or a -- you know,
4         your case against The Hill School?
5    A    Yes.
6    Q    I tried to do it the right way and I did it
7         wrong.
8             I'm showing you the document that I
9         previously marked as D9.  It's Garabedian_File
10        0040.  This looks like more notes from the
11        telephone call on December 12, 2017.
12            It says, "Received letter from headmaster
13        Hill School-PA."  So during the December 12,
14        2017 telephone communication you communicated
15        to -- telephone call, you communicated to
16        Mr. Garabedian and the other gentleman on the
17        call that you received a letter from the
18        headmaster of The Hill School?
19   A    From the office of the headmaster, yes.
20   Q    And it says, "Spoke with attorney few years
21        ago."  What's that about?
22   A    When I did tell my mother finally about the
23        abuse, she recommended that I at least speak
24        to an attorney.  I do not recall his name.
25   Q    Is that the lawyer you told us about before --
```

0976a

Kurtis N. Poulos

```
 1    A    Yes.

 2    Q    -- in your testimony?  That was the criminal

 3         attorney you contacted or was it a civil

 4         attorney?

 5              MR. JUBB:  Note my objection.

 6              THE WITNESS:  I believe it was --

 7         (Audio distortion)

 8              REPORTER:  I didn't get the answer.

 9         Repeat the answer.

10         BY MS. DOUGHERTY:

11    Q    "I believe it was a criminal attorney," right?

12    A    Yes.

13              REPORTER:  I'm losing him.  I can't

14         hear him at all.

15              MS. DOUGHERTY:  Sure.

16         BY MS. DOUGHERTY:

17    Q    So Mr. Poulos, a few years before the

18         December 12, 2017 telephone call, you

19         contacted an attorney that you believe was a

20         criminal attorney.  Is that right?

21    A    I believe so.

22    Q    Did you contact any other civil attorney other

23         than Mr. Garabedian relating to the abuse you

24         sustained while at The Hill School?

25    A    I did not personally, no.
```

0977a

Kurtis N. Poulos

```
 1    Q    Is it now the time that you need to leave,
 2         Mr. Poulos?
 3    A    I can give you 15 more minutes.  I'm just
 4         going to go dressed the way I am.
 5    Q    All right.  Then it says, "MG, 100K to 500K in
 6         other school cases where it was outside SOL."
 7         Do you remember that discussion during the
 8         December 12, 2017, telephone call?
 9    A    He may have thrown it out there, that there
10         had been similar cases where this was, you
11         know, outside of the statute of limitations,
12         and these were the types of settlements I
13         should -- I could expect if this were to come,
14         you know, full circle and be closed.  But I
15         never expected $500,000, let a million
16         dollars -- you know, let alone a million
17         dollars.
18    Q    So Mr. Garabedian shared his experiences with
19         you where he pursued remedies for clients -- I
20         guess you described it earlier -- due to a
21         moral obligation by the school to compensate
22         students that were abused?
23    A    Correct.
24              MR. JUBB:  Objection.
25         BY MS. DOUGHERTY:
```

```
 1    Q    I'm showing you another series of e-mails I've

 2         marked as D13.  The Bates label on the bottom

 3         is Garabedian_ E-Mail004347.  I'm just

 4         interested at the moment at the e-mails on the

 5         top of the first page of D13.

 6              There is an e-mail from you to

 7         Mr. Garabedian, January 17, 2018.  It says,

 8         "Dear Mitchell, I just wanted to touch base

 9         with you and see if there is any progress so

10         far.  My mother did receive three yearbooks

11         from The Hill School and is willing to send

12         them to you.  I would appreciate an update

13         even if it is only minor.  I appreciate your

14         help with this matter."

15              So did your mother -- Do you know if your

16         mother ever sent the yearbooks to

17         Mr. Garabedian?

18    A    I don't know if she did.  I know she did

19         receive them.  I never opened them.  Again, I

20         was in Connecticut at this time, I believe.

21         Yeah, I was still living in Connecticut.  So

22         if she received anything, it would have been

23         when she was living in Fox Point, you know,

24         1,100 miles away from me, so --

25    Q    That's fine.  I just didn't know if she said,
```

Kurtis N. Poulos

```
 1              "Hey, I sent Mr. Garabedian the yearbooks" or

 2              anything.

 3      A       Not to my recollection.

 4      Q       Do you know why -- Or let me start again.  Was

 5              Mr. Garabedian the one who was interested in

 6              the yearbooks, or is that something your

 7              mother suggested or that you suggested?  How

 8              did that come up?

 9                      MR. JUBB:  Object.

10                      THE WITNESS:  I believe he suggested

11              it.

12              BY MS. DOUGHERTY:

13      Q       Do you know why Mr. Garabedian was interested

14              in obtaining the yearbooks?

15      A       No.

16      Q       I'm showing you a document that I've marked

17              D8.  It's Garabedian_ E-Mail0054 on the

18              bottom.  It's one page.

19      A       I'm reading.

20      Q       That's an e-mail exchange between

21              Mr. Garabedian and your mother.  So it says --

22              The e-mail at the top, Mr. Garabedian to your

23              mother, January 18, 2018, and it cc's

24              Mr. Garabedian and someone named Daniel

25              Mahoney.  Do you know who Daniel Mahoney is?
```

0980a

```
 1    A    I would assume that's the "DM" that is

 2         mentioned in the notes that you previously

 3         showed.

 4    Q    Is Daniel Mahoney somebody that you interacted

 5         with at Mr. Garabedian's office, if you

 6         remember?  If you don't, that's fine.

 7    A    I don't remember his specific name, no.

 8    Q    It says, "Mary Ellen, Attorney Dan Mahoney

 9         from my office spoke to Kurtis this morning.

10         Thank you, Mitchell."

11             Do you remember the telephone

12         conversation of July 18, 2018 with

13         Mr. Mahoney?

14                 MR. JUBB:  I'll object to the form.

15         BY MS. DOUGHERTY:

16    Q    Do you want me to make it bigger?

17    A    No.  I read it, and it's January 18th.  And

18         no, I don't recall -- I don't recall the

19         specifics.

20    Q    I apologize.  I wasn't trying to misspeak.

21         You're correct.  The e-mail is dated

22         January 18, 2018.

23             So you don't recall having a telephone

24         communication with Attorney Dan Mahoney on

25         January 18, 2018.  Is that right?
```

Kurtis N. Poulos

```
 1    A    Not specifically, no.  If I did, it would have

 2         been very brief.

 3    Q    Was there ever a time that you e-mailed

 4         Mr. Garabedian and asked for an update and you

 5         didn't receive a response, whether it be a

 6         telephone call or e-mail, from Mr. Garabedian

 7         or someone else in his office?

 8    A    I would mostly call and -- or write an e-mail.

 9         And in between I'd either call or write

10         another e-mail asking, you know, "Is there

11         anything else I can do?"  "Is there anything

12         else you need?"

13             I was trying to be as forthcoming as I

14         could, and there would be days or weeks and

15         months before I may or may not hear back.

16    Q    I'm showing you a document that I've marked

17         D14.  It's Garabedian_ E-Mail0059.  It's again

18         an e-mail exchange, this time between you and

19         Mr. Garabedian.  It looks like you wrote to

20         Mr. Garabedian on -- I'm sorry, I misspoke.

21         Two e-mails by you to Mr. Garabedian:

22         December 17, 2018, and then September 20th,

23         2018.

24             It says on the top e-mail, the

25         September 20, 2018, it says, "Hello again,
```

Kurtis N. Poulos

```
 1            Mr. Garabedian.  I spoke with my mother and
 2            she's thinking about calling the dean at The
 3            Hill to expedite the process.  (Zoom
 4            crosstalk.  Audio distortion.)
 5    A       They seem to have not been responding to any
 6            sort of outreach that Mitchell had been
 7            telling me.  Whether it be via phone call or
 8            e-mail, I don't remember the specifics, but
 9            that they had not responded to his office.
10    Q       Okay.  So just so I understand correctly.  On
11            September -- at least by September 20, 2018
12            you knew that Mr. Garabedian had contacted The
13            Hill School about the abuse you sustained
14            while at The Hill School.  Is that right?
15    A       Correct.
16    Q       And it was your understanding that The Hill
17            School wasn't responding or engaging with
18            Mr. Garabedian.  Is that right?
19    A       Correct.
20    Q       So then it sounds like your mother had the
21            idea of calling The Hill School herself?
22    A       Yes.  She was kind of fed up with the fact
23            that nothing was going on and without, you
24            know, I guess sounding pretentious about it,
25            the fact that three of my family members --
```

0983a

Kurtis N. Poulos

```
1              Well, four of my family members, one died

2              before I met him, had graduated from that

3              school, my family had donated hundreds of

4              thousands of dollars to that school and we

5              couldn't get a simple response to our attorney

6              was kind of frustrating to her.

7                   I mean, in a way our family felt it was

8              very -- or at least she felt and I felt it was

9              very disrespectful of the school that

10             continued to ask for money from us, while at

11             the same time not being able to respond to a

12             phone call or an e-mail or a letter written

13             directly to the school or their

14             representation.

15        Q    So I know you've told us that you didn't see

16             the exact letter at the time, but did you know

17             at least as of September 20, 2018 when you

18             wrote this e-mail to Mr. Garabedian that

19             Mr. Garabedian had sent a letter to The Hill

20             School?

21        A    Yes, I believe so.

22        Q    And so, I mean, there is some frustration

23             expressed here about the speed at which the

24             case is moving.  That frustration was with The

25             Hill School's reaction to Mr. Garabedian.  Is
```

Kurtis N. Poulos

```
 1          that right?  Or lack thereof, right?
 2                   MR. JUBB:  I'll object.
 3          BY MS. DOUGHERTY:
 4     Q    Yes?
 5     A    Correct.
 6     Q    Your answer is "Yes," correct?
 7     A    Yes.
 8     Q    I'm showing you a document that I marked D7.
 9          It's one page.  It's Garabedian_ File0030.
10          On the top right it has a date 12/19/18, and
11          "MG, NG" at the top.
12              Have you seen this document before I just
13          showed it to you?
14     A    No.  And I've never seen that address either.
15     Q    You mean the "Client is living at 3239 West
16          Holland Drive"?
17     A    Yes.  I live at 3239 West Colony Drive.
18     Q    Okay.  So it looks -- It looks like somebody
19          wrote down your address incorrectly.  Is that
20          right?
21     A    Yes.
22     Q    Did you have a telephone discussion with
23          Mr. Garabedian and someone else on December --
24          I'm sorry -- yes, December 19, 2018?
25     A    Yes.
```

0985a

```
1      Q    Do you know who the "NG" is?

2      A    No.

3      Q    Was it just you, Mr. Garabedian and another

4           man or woman or --

5      A    I don't recall.  I believe it was another

6           gentleman.

7      Q    Anyone else other than you three --

8      A    No.

9      Q    -- on the telephone call?

10     A    My dog Bumblebee.

11     Q    If you can just read through what I've put up

12          on the screen, which says, "Works in car

13          sales" down to "Sober a month."  Just read

14          that to yourself and confirm for me whether

15          that's information that you communicated to

16          Mr. Garabedian and the other gentleman during

17          the telephone communication on December 19,

18          2018.

19     A    Yes.

20     Q    Then it says -- I've just scrolled down --

21          "Re: Going public-feeling more confident about

22          this now that he's sober."  What's that about?

23     A    Well, that's part of the reason why I had to

24          stop drinking again, because if I was

25          drinking, all I would do is dwell on the
```

0986a

Kurtis N. Poulos

```
1            negative.
2     Q     Okay.  So you were sober on December 19th,
3            2018, right?  And you had been sober for a
4            month?
5     A     Yes.  I had -- Yeah.
6     Q     And so now that you were sober, at least as of
7            December 19th, 2018 you were feeling more
8            confident about going public about what?
9     A     I was just feeling more confident about not
10           feeling like I was a victim and more like I
11           was a survivor.
12    Q     What about the "going public"?
13    A     That when the time came, that I would be
14           willing, if need be, to make a statement.
15    Q     Identifying Mr. Ralston as your abuser?
16    A     And the school as -- I don't know -- for lack
17           of a better term, a co-conspirator, and the
18           fact that they know that this was happening
19           for decades at that school.
20    Q     So as of December 19, 2018, you were still
21           focused on pursuing relief from the school,
22           right?
23    A     Correct.
24    Q     And you were feeling more confident about
25           publicly identifying the school as a school
```

0987a

Kurtis N. Poulos

```
 1              that permits child abusers to work for it.  Is

 2              that the right concept?

 3      A       Correct.

 4                   MR. JUBB:  I'll object to the form.

 5              BY MS. DOUGHERTY:

 6      Q       And it says, "MG tells client that we're

 7              speaking to the attorney on Friday."

 8                   So did Mr. Garabedian tell you that he

 9              was going to speak to the lawyer for the

10              school during the December 19, 2018, telephone

11              call?

12      A       I don't recall if he specifically told me

13              that; but if that's what they're writing that

14              they told me, then I have no reason to doubt

15              them.

16      Q       And then it says, "We'll speak to client at 4

17              p.m. on Friday."  Do you know if you had a

18              follow-up call with Mr. Garabedian after he

19              spoke to the attorney for the school?

20      A       I can't recall any specifics, no.  I would

21              have been at work at 4 p.m. on a Friday.

22      Q       So it's 3:16.  You need to leave, correct?

23      A       I can give you 10 more minutes.

24      Q       I'm showing you a document that I've marked as

25              D6.  It's Garabedian_File0025 to 26.   You
```

0988a

Kurtis N. Poulos

1           know what?  Just to be clear, I did this by

2           accident, but I can't fix it right now.

3               On the top right of Garabedian File 25,

4           which is the first page of D6, it has a date

5           of 12/26/2018, and the second page of D6,

6           which is File 26, has a date of 12/21/2018.  I

7           inadvertently put them together.  So I just

8           want it to be clear for the record, it's notes

9           of two different dates.  I'm going to start

10          with the first page of D6.

11              There is again handwritten notes.  You

12          haven't seen those notes before I just showed

13          them to you, correct?

14     A    Correct.

15     Q    Did you have a telephone communication with

16          someone from Mr. Garabedian's office or

17          Mr. Garabedian on December 26, 2018?

18     A    I don't recall.  The conversations were so few

19          and far between, I don't remember specific

20          dates.  But this might have been one of the

21          check-ins that I did receive.

22     Q    Okay.  Just to refresh your recollection,

23          we'll go back to D7.  That's -- These are

24          notes from a discussion you had on --

25     A    Yes.

```
 1    Q    -- December 19th, 2018, right?

 2    A    Correct.

 3    Q    So now we're -- now we're on December 26,

 4         2018.  So that's like a week later, right?

 5    A    Correct.

 6    Q    All right.  And so I'll scroll to the page

 7         where it says, "Kurt had Ralston as," and then

 8         you can see down on the bottom "sophomore

 9         year, geometry."  Can you read that section to

10         yourself and then confirm for me whether

11         that's information that you provided to

12         Mr. Garabedian or someone from his office?

13    A    It is.

14    Q    Okay.  I've scrolled down to the sentence that

15         says, "Ralston made Kurt," and then it ends on

16         the bottom, "lived in the same building as

17         Ralston."

18             Can you do the same, read that and tell

19         me if that's information you provided to

20         Mr. Garabedian or someone from his office?

21    A    Yes.

22    Q    And then, "Only interaction when on one" down

23         to "No contact since high school," is that

24         information you communicated to Mr. Garabedian

25         or someone from his office?
```

0990a

Kurtis N. Poulos

```
 1     A     Correct.

 2     Q     Then we're going to the second page of D6,

 3           which again has a different date, 12/21/2018

 4           on the top right.  It says, "MG, NG." Did you

 5           have a telephone call with Mr. Garabedian and

 6           someone else on December 21, 2018?

 7     A     I believe so, briefly.

 8     Q     It says, "MG tells client that they need to

 9           speak to the client about the case.  Client

10           will call Monday."

11               Do you know what Mr. Garabedian needed to

12           speak to you about?

13     A     No, I don't recall.

14     Q     Did you learn that Mr. Garabedian was going to

15           send or did send a second letter to the school

16           around the time of these telephone

17           communications that we've been looking at,

18           middle to the end of December, 2018?

19     A     Possibly, yes.

20                     MS. DOUGHERTY:  Those are my

21           questions.

22                     MR. JUBB:  Mr. Poulos, would you

23           like to go to your appointment and schedule a

24           different time?

25                     THE WITNESS:  How much more time do
```

Kurtis N. Poulos

```
 1          you need?

 2                  MR. JUBB:  Well, I would just be

 3          limited to some of the questions that she

 4          asked you, but I don't -- I don't know.  It

 5          depends on your responses.  But probably,

 6          like, 10 to 15 minutes.  So you said you had

 7          to go at three.  Now it's 3:20.

 8                  THE WITNESS:  Let me just --

 9                  REPORTER:  Do you want to go off the

10          record?

11                  MR. JUBB:  Yes.

12                  MS. DOUGHERTY:  Mr. Poulos, we don't

13          want to inconvenience you but we also don't

14          want you to have an adverse impact at work.

15                  VIDEOGRAPHER:  The time is 2:21.

16          We're off the record.

17          (Off the record.  Recess taken.)

18                  VIDEOGRAPHER:  The time is 2:22.

19          We're back on the record.

20          EXAMINATION BY MR. JUBB:

21     Q    Mr. Poulos, I'm going to show you what was

22          produced to me as MG -- excuse me --

23          Garabedian File 33.  This was the 12/12/17

24          notes that you went over with counsel.  Do you

25          recall going over this with her?
```

0992a

Kurtis N. Poulos

```
 1     A    Yes.

 2     Q    All right.  And then she asked you about the

 3          "Arrested, Wisconsin, Connecticut, breaking

 4          and entering, disorderly conduct; felonies,

 5          no; jail time, none."  Do you recall getting

 6          asked about that?

 7     A    Yes.

 8               MS. DOUGHERTY:  This is D5, just so

 9          you know, if you wanted to use that.

10               MR. JUBB:  That's okay.  I just

11          remember it because it's Garabedian File 33.

12               MS. DOUGHERTY:  Okay.

13          BY MR. JUBB:

14     Q    And with this, Mr. Poulos, when I asked you

15          about this -- I guess it was about a month

16          ago -- you said you never had any breaking and

17          entering, correct?

18               MS. DOUGHERTY:  Objection.  I don't

19          think you asked him about the notes.

20               MR. JUBB:  I'm quite confident I

21          did.

22          BY MR. JUBB:

23     Q    Mr. Poulos, what did you tell me last time we

24          spoke about breaking and entering?

25     A    That I didn't recall that I had one, but I
```

```
 1          don't exactly have the greatest memory, so --
 2    Q    Well, I asked you whether or not you told
 3          Mr. Garabedian you had any felonies, and you
 4          said you did not have any felonies, correct?
 5    A    Yes.  I didn't believe at the time that I did.
 6    Q    Did you somehow learn from the last time we
 7          spoke and now that you actually did commit a
 8          felony?
 9    A    My mother has made me aware that there might
10          be -- or there is a felony on my record.  I
11          was not aware of that.  I thought my attorney
12          had squashed it down to a misdemeanor and
13          that's why I did not go to jail.
14    Q    Okay.  And what was it that you thought was
15          the misdemeanor that your attorney took care
16          of?
17    A    It was a violation of a restraining order.
18          Mind you, at the time that that was all
19          happening in my life, I was heavily drugged
20          and drinking, so 90 percent of what was going
21          on in my life at that time I wasn't paying
22          attention to.
23    Q    Were you paying attention when Mr. Garabedian
24          was asking you questions about your criminal
25          background?
```

0994a

Kurtis N. Poulos

```
 1    A    Yes.

 2    Q    All right.  Did you tell him that you had

 3         violated some sort of protection from abuse

 4         order then?

 5    A    Possibly.

 6    Q    He didn't write it down, though, did he?

 7    A    I don't know whose handwriting that is.

 8    Q    Well, you told him you did no jail time,

 9         right?

10    A    Correct.

11    Q    You didn't tell him a couple of overnighters,

12         right?

13    A    Yes.

14    Q    Why did you lie to him?

15    A    I didn't.

16              MS. DOUGHERTY:  Objection.

17         BY MR. JUBB:

18    Q    Okay.  So do you have any idea how

19         Mr. Garabedian or whoever was writing these

20         notes got the impression that you did no jail

21         time?

22    A    No.  I mean, I had to wait to pay bail and

23         then I went home.

24    Q    As you sit here today, are you saying that

25         you've never done any jail time?
```

0995a

```
 1    A    No.  I said I've done a couple of overnighters
 2         waiting for bail to be posted.
 3    Q    And is it your testimony that you did or did
 4         not tell Mr. Garabedian that?
 5    A    I don't recall.
 6    Q    Well, as of December of 2017, did you remember
 7         that you had done those overnighters and jail
 8         time?
 9    A    Yes.  I told him that I had done that.
10    Q    And to the extent that he wrote down in his
11         notes "None," that would be incorrect, fair?
12              MS. DOUGHERTY:  Objection.
13              THE WITNESS:  (Inaudible response)
14    BY MR. JUBB:
15    Q    You said what?
16    A    I said "I guess so."
17    Q    Now, with respect to the reference we see
18         "Psychology, Mom would know late '90s," I
19         believe you told counsel that you were on and
20         off since you were around seven or eight.  Do
21         you remember that?
22    A    Yes.
23    Q    And you told Mr. Garabedian that, correct?
24    A    Correct.
25    Q    What did you tell him about your psychological
```

```
 1            and psychology treatment on and off since you

 2            were seven or eight?

 3      A     That my early psychological treatment prior to

 4            high school mostly dealt with my mother and my

 5            father's relationship and my living situation,

 6            where the court had decided that I needed to

 7            speak with a psychiatrist and use their

 8            recommendation as to where I would have my

 9            full time residence, whether it be with my

10            mother or my father, which would be more

11            stable for me as an adolescent.

12      Q     But you said you were on and off since you

13            were seven or eight.  That would only cover

14            the seven or eight part.  Where is the other

15            ons after that?

16      A     That was still part of it.  They were still

17            fighting over custody for me up until I

18            finally told my father, like, "You just need

19            to stop with this.  I'm not going to live with

20            you."

21      Q     Okay.  And at approximately what age were you

22            at that point?

23      A     I don't know.  11 or 12, so just before high

24            school.

25      Q     All right.  And what was the therapy after
```

0997a

Kurtis N. Poulos

```
 1         that?

 2    A    The therapy after that was my freshman or

 3         sophomore year of college, I went to see a

 4         therapist about being depressed.

 5    Q    Who was that?

 6    A    I don't remember his name.  It was a family

 7         referral.

 8    Q    Where was it?

 9    A    In Milwaukee, Wisconsin.

10    Q    And you went to him because you were depressed

11         your freshman and sophomore year of college.

12         Is that right?

13    A    Yes.  My girlfriend at the time was worried

14         about me.

15    Q    And when you went to those therapy sessions,

16         did you ever tell your therapist that you were

17         in any way depressed or had anything to do

18         with being sexually abused just a couple years

19         ago?

20              MS. DOUGHERTY:  Objection.

21              THE WITNESS:  As I stated earlier,

22         no, I never previously brought up any sexual

23         abuse with my therapists before Dr. Brodick

24         (Phonetic).

25         BY MR. JUBB:
```

0998a

Kurtis N. Poulos

```
 1      Q    And did you tell the therapist that your
 2           depression-like symptoms were actually related
 3           to your family issues?
 4      A    No, I did not.
 5      Q    Did you tell them you were depressed?
 6      A    Yes.  I just was not honest with him about why
 7           I was depressed.  I was ashamed.
 8      Q    I see.  And then so when we pull up here
 9           MG35 -- Excuse me.  I keep saying "MG," but
10           it's Garabedian File 35.  On these notes you
11           were asked about the cubicles in the basement
12           of the school.  Do you remember that?
13      A    Yes.
14      Q    All right.  Describe those cubicles for me.
15      A    To the best of my recollection, they were in
16           the basement of the library.  This was a small
17           corridor with a few rooms and a built-in desk
18           so you could go down there with a couple of
19           textbooks and study or write and not be
20           disturbed.
21               There was a door that would allow no
22           access other than the one student who was
23           supposed to be in that room studying by
24           himself.
25      Q    And you said that Mr. Ralston had come down
```

Kurtis N. Poulos

```
 1           and told you to get out of there?
 2    A      Yes.
 3    Q      All right.  What were you doing down there
 4           that you were told to get out?
 5    A      Like I addressed to Candidus earlier, it was
 6           close to my curfew when I needed to be back in
 7           my under form dorm, and he was questioning if
 8           I had permission to be down there and why I
 9           was down there and why I was down there so
10           late and that I need to go back to my dorm for
11           check-in.
12    Q      But did he say that you were somehow not
13           supposed to be there?
14    A      He implied, like, "Why are you down here so
15           late?  Get out.  You're too --" You know, I
16           was a third form, so I was at best 14,
17           15 years old.  So if a teacher says "You need
18           to go back to your dorm," you go back to your
19           dorm.
20    Q      Were you the only student down there?
21    A      I believe so, yes.
22    Q      So you're a third form by yourself in the
23           basement of cubicles, and the alleged sex
24           abuser at this point just tells you to leave.
25           Is that right?
```

Kurtis N. Poulos

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  (Inaudible response)

 3                    REPORTER:  What was the answer?  I'm

 4         sorry.

 5                    THE WITNESS:  No.  It wasn't that

 6         way.  He told me -- He asked me first why I

 7         was down there.  I explained that my dorm

 8         master had given me permission to go down

 9         there and study alone, so that's what I was

10         doing.  And I was going to make it back from

11         the library to upper school with plenty of

12         time to make my curfew.  I was not in a good

13         relationship with my roommate.  He was a

14         kleptomaniac freak, so I did as much as I

15         could to not be in my dorm room.

16         BY MR. JUBB:

17    Q    Am I correct, though, that you had every right

18         to be down in this basement.  Is that right?

19    A    Correct.

20    Q    But nonetheless, Mr. Ralston kicked you out,

21         right?

22    A    Yes.  And I believe it could have been due to

23         curfew or -- I don't know what else, but it

24         was a matter of "Go back to your dorm."

25    Q    And after that, you never went back down to
```

1001a

Kurtis N. Poulos

```
 1            the cubicles in the basement again.  Is that
 2            it?
 3     A      No.  My home master allowed me to start
 4            studying in the common room on our dorm level
 5            rather than walk over to the library from the
 6            upper school building.  So --  (Zoom
 7            crosstalk)
 8     Q      Who was the home master?
 9     A      I don't remember his name.  (Audio distortion)
10                    REPORTER:  I'm sorry.  Repeat.
11                    THE WITNESS:  Who are you telling to
12            repeat?
13                    REPORTER:  The answer.  Your answer.
14                    THE WITNESS:  I remember that at the
15            end of the dorm at the far end, his apartment
16            was on one side.  Across from his apartment
17            was our common room, and I would go in there
18            and study alone rather than sit in my room
19            with a roommate that was stealing from me.
20            BY MR. JUBB:
21     Q      Okay.  You were at the school for three more
22            years after this.  Or you spent at least three
23            years at the school.  Is it your testimony you
24            never went back down to the cubicles in the
25            basement?
```

1002a

Kurtis N. Poulos

```
 1    A    Not to my recollection, no.  And if it was, it
 2         would have been because we had certain books
 3         that were not allowed to leave the library, so
 4         you had to read them on premises and then
 5         bring them back up to the librarian.  You
 6         could not check them out of the library.
 7    Q    And when this -- At the instant that you're
 8         describing happened in your third form year,
 9         this was when you were the youngest -- in your
10         freshman year.  Mr. Ralston didn't do anything
11         sexual, correct?
12    A    No.
13    Q    He wasn't creepy?
14    A    That was kind of creepy because it wasn't his
15         business.
16    Q    It wasn't his business to make sure a student
17         would be back in time for their check-in?
18    A    Well, if it was, like, five minutes after or
19         five minutes before; but it was, like, at
20         least 20 to a half -- 20 minutes to a half an
21         hour before I needed to be back in the dorm
22         that was a hundred yards away from the
23         library.
24    Q    Okay.  And then when this happened, how did
25         you respond to him?
```

1003a

Kurtis N. Poulos

```
 1     A     I just packed up my bag and whatever materials
 2           I had, and I went back to my dorm, was there
 3           for check-in.
 4     Q     I believe you told counsel that when there was
 5           reference in Mr. Garabedian's notes to "Perp
 6           told CL 'Our time for us, no one else,'" you
 7           said that had occurred when?
 8     A     I believe it was senior year when I was moving
 9           back into the dorm that he was living in but
10           not a hall master of.
11     Q     So you actually saw him your senior year in
12           this dorm, right?
13     A     No.  He didn't have a dorm.  He had an
14           apartment.  I saw him when I was moving my --
15           my -- The things that I had driven out to
16           Pennsylvania in my car with my father, we had
17           parked next to the dorm and we were emptying
18           out my Camaro, walking up the stairs to my
19           dorm, and he came outside and made that
20           comment to me.
21     Q     About your time together.  It was
22           quote/unquote "our time," correct?
23     A     Maybe not verbatim, but something to that
24           respect.
25     Q     Well, it's in quotes in Mr. Garabedian's
```

1004a

Kurtis N. Poulos

```
 1            notes, correct?

 2      A     I didn't write those quotes, so I don't know

 3            why -- I can't speak to why they're in quotes.

 4      Q     Did you tell Mr. Garabedian --

 5                       MS. DOUGHERTY:  Objection.  (Zoom

 6            crosstalk)

 7            BY MR. JUBB:

 8      Q     -- said to you during your senior year that

 9            there was going to be something that was,

10            quote/unquote, our time?

11      A     Something to that regards.  And he also made

12            other comments if you'd like to hear those.

13                       MS. DOUGHERTY:  I'm going to object.

14            Just so you're clear, I don't think anybody

15            has established whose notes they are, whether

16            they're Mr. Garabedian's or someone else's.

17            BY MR. JUBB:

18      Q     You can answer my question, Kurtis.  I'd love

19            to hear about them.  What other interactions

20            did you have?

21                       MS. DOUGHERTY:  Objection.

22                       THE WITNESS:  He confronted me on

23            multiple occasions about the fact that he knew

24            that I was smoking off campus, and he was

25            going to make sure that, you know, I was, you
```

1005a

Kurtis N. Poulos

```
 1            know, targeted and/or found out and

 2            disciplined for any improprieties the rest of

 3            the year, hence maybe why he took it upon

 4            himself to park me in when he had no authority

 5            to do so.

 6                 He wasn't the dean of discipline.  He

 7            wasn't my dorm master.  He had nothing to gain

 8            except for a feeling of power and leverage

 9            over a young man.

10       BY MR. JUBB:

11    Q   Okay.  This feeling of power and leverage,

12            when he caught you smoking, did he turn you

13            in?

14    A   No, he didn't catch me.  He just said he knew

15            I was smoking.

16    Q   And -- Any other interactions you had with

17            him?

18    A   As few as possible.

19    Q   Didn't you tell Mr. Garabedian that you never

20            had any interaction with him your senior year?

21    A   No, I did not.

22    Q   So the suggestion that you somehow had no

23            interaction with Mr. Ralston your senior year,

24            that would be false, correct?

25    A   Correct.
```

1006a

```
 1    Q    And after this interaction where you're saying
 2         Mr. Ralston said to you there was going to be
 3         something that was, quote/unquote, our time,
 4         that never happened, did it?
 5    A    That he ever said that?
 6    Q    There was never a time that you were with him,
 7         correct?
 8    A    That's not what I said.  I said I went out of
 9         my way to avoid spending time with him.
10         Obviously I'm going to have to interact with
11         almost everybody on the campus every single
12         day.  And he was in the same building that I
13         lived in.
14    Q    Right.  In the same building that you lived
15         in, and despite the fact that teachers are
16         allowed to come into rooms whenever they want
17         like was written in the notes, he never did
18         that, did he?
19    A    My senior year, no.  Because senior --
20    Q    Why not?
21    A    -- year is completely different than sophomore
22         year or freshman year.  Senior year we do not
23         have study hall times.  We're not required to
24         be in our dorms after dinner.
25              Frankly, as soon as we are through with
```

1007a

Kurtis N. Poulos

```
 1              our dinner and messages from the headmaster,
 2              all of the seniors are allowed to leave the
 3              dining hall and basically do whatever they
 4              want, to an extent.  So I would go to other
 5              dorms.  I would go to other dorm rooms.  I
 6              would go anywhere on campus to spend as little
 7              time in my actual dorm room my senior year as
 8              possible.
 9       Q    I thought that you had just told counsel that
10              you ate 90 percent of your meals in your room.
11              Is that true or false?
12                    MS. DOUGHERTY:  Objection.
13                    THE WITNESS:  That's true.
14       BY MR. JUBB:
15       Q    That's true.  Okay.  So you're eating
16              90 percent of your meals in your room, but
17              then you didn't want to be in your room every
18              other time?
19       A    I had a lockbox at the base of my bed that I
20              kept food in.  I would go and get a quick bite
21              to eat, whether it be a cup of noodles or
22              ramen.  Some nights it was just cans of raw
23              tuna.  I would scarf down whatever I could,
24              and then I would just walk.
25                    And sometimes I would break the rules and
```

1008a

Kurtis N. Poulos

```
 1              just leave campus.  There was a cemetery at
 2              the end of the campus.  I would go over there
 3              and sit down, listen to music and come back
 4              around nine-ish, watch some TV in the common
 5              room with the rest of the people in my dorm
 6              and then go to sleep.
 7     Q    Who were the people in your dorm that you were
 8              close with?
 9     A    Fabritzio (Phonetic) was one of them.  He was
10              an EMT.  He was a kid from -- (Audio
11              distortion)
12                   REPORTER:  Spell his name and where
13              he was from?  I'm sorry.
14                   THE WITNESS:  I don't recall the
15              spelling of his name.  I believe he was from
16              Washington, D.C.  There was another gentleman
17              that lived on my hallway named Clay.  I
18              believe he was from Vermont or New Hampshire,
19              so I would hang out in his room.  And he had
20              somehow gotten a TV and a PlayStation, so we
21              would sit in there and play video games with
22              the door shut and locked.
23              And like I previously stated, we were not
24              allowed to have locked doors if we were in the
25              room, so we would just stay dead silent.
```

```
1            BY MR. JUBB:

2      Q    Okay.  Anybody else you hung out with?

3      A    Lance Whitlock and Kent Andres (Phonetic).

4      Q    Who did you hang out with your sophomore year?

5      A    Mostly Jeff Glenn.

6                 REPORTER:  Say the name again?

7                 THE WITNESS:  Jeff Glenn, G-L-E-N-N,

8            as in Senator Glenn.

9            BY MR. JUBB:

10     Q    You mentioned that -- In the notes that we

11           went over, there was reference that you had

12           lost 80 to 90 pounds when you were in high

13           school from not eating?

14     A    Correct.

15     Q    So you would have been -- If you had lost 90

16           pounds, then you would have been at least

17           200 pounds freshman year, right?

18     A    I was about 140 pounds.

19     Q    By the time you graduated?

20     A    Correct.

21     Q    So then you would have been 240 pounds at the

22           time you got there?

23                MS. DOUGHERTY:  Objection.

24                THE WITNESS:  I had a growth spurt

25           when I was in France.
```

1010a

Kurtis N. Poulos

```
 1                    REPORTER:  Repeat the answer, sorry.
 2                    THE WITNESS:  I had a huge growth
 3           spurt when I was in France my junior year of
 4           high school, and I gained a lot of weight.
 5           And by the end of my senior year, I had lost
 6           at least 80 pounds, I would say.  I don't
 7           know.  I didn't weigh myself every day.
 8           BY MR. JUBB:
 9      Q    You're saying that when you were a junior in
10           high school you had a growth spurt and somehow
11           gained 80 to 90 pounds at one point.  Is that
12           right?
13      A    All I did when I was in France was eat, and I
14           grew like six inches in the couple of months
15           that I was there.
16      Q    And then you came back in your senior year and
17           you lost 80 to 90 pounds?
18      A    Probably something close to that.  I don't
19           know the exact number.  I know that I went
20           down to a size 30 pants waist and I was, like,
21           at least a 36.
22      Q    You mentioned that you told Garabedian about
23           not being able to be touched, or that if your
24           mom slapped you on your butt you would kind of
25           get uncomfortable.  Do you recall saying that?
```

1011a

Kurtis N. Poulos

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  Yes.

 3          BY MR. JUBB:

 4      Q   And that other people, you know, just like

 5          patting you on the back, that was

 6          uncomfortable.  Or slapping you on the back,

 7          that was uncomfortable, correct?

 8      A   Correct.  I didn't -- Even with my current

 9          girlfriend, if she tries to wake me up and

10          touches me in a certain place, I freak out and

11          I don't -- don't know how she just doesn't do

12          that.

13      Q   Well, what about your other girlfriends that

14          you had?  Did you have any problems with them

15          touching you?

16      A   Yes.

17                    MS. DOUGHERTY:  Objection.

18          BY MR. JUBB:

19      Q   So Emily would say that you had touching

20          problems, correct?

21      A   It got so bad that one morning she touched me

22          a certain way, and I believe I put my hands

23          around her throat.

24      Q   I guess that would lead to the other

25          protection from abuse order, correct?
```

1012a

Kurtis N. Poulos

```
 1          (Zoom crosstalk)

 2                    MS. DOUGHERTY:  Objection.

 3                    REPORTER:  Wait a minute.   Repeat

 4          the question.

 5                    MR. JUBB:  I said I guess that would

 6          lead to the other protection from abuse order,

 7          correct?

 8                    MS. DOUGHERTY:  Objection, move to

 9          strike.

10                    REPORTER:  What was the answer?

11                    THE WITNESS:  You'd be wrong.

12          BY MR. JUBB:

13     Q    What about the other girlfriend that has a

14          protection from abuse order against you?  Did

15          you have any problems touching her?

16                    MS. DOUGHERTY:  Objection.

17                    THE WITNESS:  Did I have any

18          problems touching her?

19          BY MR. JUBB:

20     Q    I'm sorry.  Did you have any problems with her

21          touching you?

22     A    Yes, the same issues.

23     Q    So both of them would say if they were under

24          oath, "He always had these issues with me

25          touching him," right?
```

1013a

Kurtis N. Poulos

```
1     A    At times, yes.  If I was unaware of what was

2          going to happen, yes.  I would feel

3          uncomfortable and threatened.

4     Q    I see.  And at any point in time did you ever

5          relay that some of your touching issues were

6          because your dad used to beat you?

7     A    No.

8               MS. DOUGHERTY:  Objection.

9               THE WITNESS:  Because it didn't

10         have anything to do with that.

11         BY MR. JUBB:

12    Q    Okay.  When you were talking about all those

13         bad dreams about going back to school, did you

14         tell your then girlfriend at the time that you

15         didn't want to drive to The Hill School that

16         she wanted to go to because you had these

17         night tremors, waking up and sweating and

18         screaming?

19              MS. DOUGHERTY:  Objection.

20              THE WITNESS:  No.

21         BY MR. JUBB:

22    Q    Ever have any of those that she would know of?

23              MS. DOUGHERTY:  Objection.

24              THE WITNESS:  I only went by that

25         school with one of my ex-girlfriends and that
```

1014a

Kurtis N. Foulos

```
 1              was when I was in my late teens, early 20s.
 2              BY MR. JUBB:
 3      Q    Closer in time to when the alleged abuse would
 4              have occurred, correct?
 5      A    Correct.  All we did was drive around the
 6              campus, and we got back on the highway and
 7              drove back to Milwaukee.
 8      Q    Would Ms. Peters or your other -- Karen --
 9              would they have any knowledge of these night
10              sweats and screams that you talk about?
11                   MS. DOUGHERTY:  You said "or your
12              other" -- What was -- I didn't hear the -- Did
13              you say "carrot"?
14                   MR. JUBB:  Other girlfriend, Karen,
15              yeah.
16                   MS. DOUGHERTY:  Okay.
17                   THE WITNESS:  Emily would realize,
18              yes.
19              BY MR. JUBB:
20      Q    Am I correct when you were describing your mom
21              being fed up that nothing was going on because
22              they couldn't get a response from the school,
23              at that point in time it was your
24              understanding and your mom's understanding
25              that the school was unresponsive, correct?
```

1015a

Kurtis N. Poulos

```
1    A    Correct.

2    Q    They weren't sending any e-mails to

3         Mr. Garabedian, right?

4    A    Not to my knowledge.

5              MS. DOUGHERTY:  Objection.

6         BY MR. JUBB:

7    Q    There was never a request to speak with you or

8         anything, correct?

9              MS. DOUGHERTY:  Objection.

10             THE WITNESS:  No.

11        BY MR. JUBB:

12   Q    You said you were sober in December of 2018,

13        correct?

14   A    Correct.

15   Q    That would be a good time to speak to somebody

16        about your allegations when you're sober,

17        correct?

18   A    As far as people, who?  Who are you referring

19        to?  "That would be a good time to speak to

20        somebody," who are you referring to?

21   Q    How about people who would be -- I don't

22        know -- examining or investigating your claims

23        of sexual abuse?

24   A    Possibly.  But maybe this isn't something I

25        want to speak about every day to people I do
```

1016a

Kurtis N. Poulos

```
 1          not know.
 2                  MR. JUBB:  I'm done.
 3          EXAMINATION BY MS. DOUGHERTY:
 4     Q    Mr. Poulos, did you speak to Mr. Garabedian
 5          in -- Well, let me start again.
 6               Mr. Poulos, did you speak to
 7          Mr. Garabedian at any time about participating
 8          in a mediation with The Hill School?
 9     A    It might have been brought up as a
10          possibility.  I don't recall the specifics of
11          the conversation.
12     Q    Do you remember when?
13     A    No, I do not.
14     Q    How about, were you sober at the time or not
15          sober at the time?
16     A    Again, if I don't know the timeline I don't
17          know -- I fell off the wagon a couple of times
18          and got back on, so -- It depends on the date.
19     Q    Was it after you learned that Mr. Garabedian
20          had sent a letter to the school?
21     A    Possibly.  Again, if I don't have a timeline,
22          I can't tell you what was going on.
23     Q    I realize you don't know the specific date.
24          I'm asking about events, so maybe you could
25          place it in time with the events without
```

1017a

Kurtis N. Poulos

```
 1              regard to whether you know the specific date.

 2                   Was it after your mom expressed

 3              frustration that the school wasn't reacting to

 4              Mr. Garabedian?

 5      A       Not to my knowledge.

 6                      MS. DOUGHERTY:  Those are my

 7              questions.

 8              EXAMINATION BY MR. JUBB:

 9      Q       Tell me when -- Currently are you sober?

10      A       Yes.  (Zoom crosstalk)

11                      REPORTER:  I'm sorry.  Repeat your

12              answer.

13                      MS. DOUGHERTY:  Objection.

14              BY MR. JUBB:

15      Q       All right.  Tell me the last time you fell off

16              the wagon.

17                      MS. DOUGHERTY:  Objection.

18                      THE WITNESS:  Over seven months ago.

19              BY MR. JUBB:

20      Q       And during the time of December of 2017 when

21              you first were contacting the Garabedian law

22              firm up until you got sued in this lawsuit,

23              were you -- what's your testimony in terms of

24              how long or approximately how many times you

25              were sober?
```

1018a

Kurtis N. Poulos

1               MS. DOUGHERTY:  Objection.

2               THE WITNESS:  I would drink

3        recreationally with -- sorry -- with Emily,

4        usually at home.

5               MR. JUBB:  Nothing further.

6               MS. DOUGHERTY:  I don't have any

7        further questions.  Thank you, Mr. Poulos.

8               VIDEOGRAPHER:  The time is 2:51.  We

9        are off the record.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1019a

Kurtis N. Poulos

1    STATE OF WISCONSIN)

2                     ) SS:

3    COUNTY OF WAUKESHA)

4       I, Beth Zimmermann, a Registered Professional

5    Reporter and Wisconsin Notary Public, certify that

6    KURTIS N. POULOS swore under oath to tell the truth,

7    the whole truth, and nothing but the truth, and that I

8    stenographically reported and reduced to typewriting

9    the deposition.

10      I certify that I am neither related to nor an

11   employee of any party or attorney to this action, and

12   I certify that I have no financial interest in the

13   matter.

14

15   Dated June 7, 2021.

16

17

18

19                    _____
                      BETH ZIMMERMANN

20

21

22

23   Court Reporter and Notary Public

24   My Commission Expires 10/21/2021.

25

1020a