**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW RALSTON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| | : | |
| MITCHELL GARABEDIAN, ESQUIRE, et al, | : | |
| | : | NO. 2:19-cv-01539 |
| Defendants. | : | |

**APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**VOLUME IV**

# TABLE OF CONTENTS

## Volume I

Exhibit "A" – July 1, 2021 deposition of Matthew Ralston ...................................................0001a

Exhibit "B" – D-31 – Matthew Ralston Resume ...................................................................0090a

Exhibit "C" – October 7, 2021 deposition transcript of Leslie Gomez ..................................0093a

Exhibit "D" – D-2 – April 23, 2016 letter to alumni and parents ...........................................0288a

Exhibit "E" – November 20, 2020 deposition of Kurtis Poulos ..............................................0290a

Exhibit "F" – D-1 – November 20, 2017 communication to alumni.......................................0497a

Exhibit "G" – D-33 – November 20, 2017 Hill School Communication ................................0501a

## Volume II

Exhibit "H" – November 19, 2020 deposition of Kurtis Poulos...............................................0504a

Exhibit "I" – November 24, 2020 deposition of Kurtis Poulos ...............................................0739a

Exhibit "J" – D-15 – April 11, 2018 letter from Garabedian to Lehman ................................0845a

Exhibit "K" – D-4 – December 26, 2018 letter from Garabedian to Rees ..............................0847a

Exhibit "L" – May 27, 2021 deposition of Kurtis Poulos.......................................................0849a

## Volume III

Exhibit "M" – Poulos-4 – April 3, 2019 notes.......................................................................1021a

Exhibit "N" –contingent fee agreement.................................................................................1022a

Exhibit "O" – D-3 – December 13, 2017 emails between Poulos and Mary Ellen Poulos .....1023a

Exhibit "P" – D-13 – December 13, 2017 emails between Poulos and Garabedian ...............1024a

Exhibit "Q" – D-5 – December 12, 2017 notes ......................................................................1030a

Exhibit "R" – D-9 – December 12, 2017 notes ......................................................................1037a

Exhibit "S" – D-7 – December 19, 2018 notes.......................................................................1038a

Exhibit "T" – D-6 – December 26, 2018 notes.......................................................................1039a

Exhibit "U" – D-34 – January 9, 2019 email from Rees ........................................................1041a

i

Exhibit "V" – D-35 – January 23, 2019 letter from Garabedian to Rees ................................1043a

Exhibit "W" – D-36 – January 30, 2019 email ...........................................................................1044a

Exhibit "X" – D-37 – February 21, 2019 letter .........................................................................1046a

Exhibit "Y" – September 30, 2021 deposition transcript of Zachary Lehman ........................1047a

Exhibit "Z" – D-38 – March 26, 2019 letter ..............................................................................1216a

Exhibit "AA" – Lehman-3 – April 2019 draft email to faculty ................................................1217a

Exhibit "BB" – July 8, 2021 deposition transcript of Nathan Gaul .........................................1218a

Exhibit "CC" – December 12, 2018 notes .................................................................................1238a

Exhibit "DD" – December 21, 2018 notes ..................................................................................1239a

Exhibit "EE" – April 16, 2019 notes .........................................................................................1240a

Exhibit "FF" – July 8, 2021 deposition transcript of Daniel Mahoney ....................................1241a

Exhibit "GG" – December 13, 2017 notes (call with mother) ..................................................1268a

Exhibit "HH" – January 29, 2018 email regarding New York statute of limitations ...............1270a

Exhibit "II" – March 23, 2018 email regarding address change ...............................................1271a

Exhibit "JJ" – December 26, 2018 email from Rees ..................................................................1272a

Exhibit "KK" – December 18 and 19, 2018 emails with Rees ..................................................1273a

Exhibit "LL" – April 24, 2018 letter from Rees ........................................................................1277a

Exhibit "MM" – Mahoney-5 – December 13, 2017 letter from Garabedian with blank
CFA ...........................................................................................................................................1278a

Exhibit "NN" – Compilation of releases executed on December 15, 2017 ..............................1280a

Exhibit "OO" – December 2017 investigative materials ...........................................................1316a

Exhibit "PP" – January 30, 2018 letter requesting records (The Hill School) .........................1324a

Exhibit "QQ" – Compilation of February 2, 2018 record requests ...........................................1326a

Exhibit "RR" – Records received from University of Wisconsin-Milwaukee ..........................1334a

Exhibit "SS" – December 19, 2018 emails with forwarded emails and article ........................1370a

Exhibit "TT" – May 16, 2019 email from Garabedian ..............................................................1374a

Exhibit "UU" – April 11, 2018 letter requesting records (The Hill School) ..........................1375a

Exhibit "VV" – October 11, 2021 deposition transcript of Thomas Rees ..............................1376a

Exhibit "WW" – D-26 – April 18, 2019 email from Rees regarding administrative leave .....1442a

Exhibit "XX" – April 29, 2019 letter with memorandum regarding administrative leave ......1443a

Exhibit "YY" – August 27, 2019 letter from James Beasley, Jr. .............................................1445a

Exhibit "ZZ" – April 17, 2019 email from Philadelphia Magazine .......................................1447a

Exhibit "AAA" – October 18, 2019 email from Rees ............................................................1448a

Exhibit "BBB" – October 14, 2019 letter from James Beasley, Jr. ......................................1449a

Exhibit "CCC" – September 23, 2019 letter from Rees ........................................................1450a

Exhibit "DDD" – December 22, 2016 letter regarding raises and bonus plan .......................1452a

Exhibit "EEE" – D-25 – June 28, 2018 job evaluation..........................................................1454a

Exhibit "FFF" – July 18, 2018 letter from Sockel regarding raise .........................................1458a

Exhibit "GGG" – July 25, 2018 email from Neese regarding bonus......................................1459a

**Volume IV**

Exhibit "HHH" – April 22, 2021 deposition of Kurtis Poulos ...............................................1460a

Exhibit "III" – September 20, 2021 deposition of Matthew Ralston.....................................1571a

Exhibit "JJJ" – D-16 – Plaintiff response to interrogatories...................................................1640a

Exhibit "KKK" – June 26, 2018 email to Rees ....................................................................1651a

Exhibit "LLL" – January 2, 2019 email from Rees ...............................................................1652a

Exhibit "MMM" – March 16, 2019 email ...........................................................................1653a

Exhibit "NNN" – April 29, 2018 email ...............................................................................1654a

Exhibit "OOO – D-17, D-18, D-19 – compilation of three course reviews ..........................1656a

Exhibit "PPP" – June 20, 2018 reservation of rights letter....................................................1659a

Exhibit "QQQ" – February 11, 2019 disclaimer of coverage letter ......................................1666a

Exhibit "RRR" – D-21 – April 6, 2016..................................................................................1673a

Exhibit "SSS" – D-22 – April 11, 2016 email welcoming plaintiff back ...............................1675a

Exhibit "TTT" – D-23 – July 19, 2017 letter re new salary ....................................................1676a

Exhibit "UUU" – June 24, 2021 deposition of Mitchell Garabedian .....................................1677a

Exhibit "VVV" – Gaul-5 – April 15, 2019 criminal background check ................................1739a

Exhibit "WWW" – May 10, 2019 notes .................................................................................1751a

Exhibit "XXX" – compilation of April 2019 searches ...........................................................1752a

Exhibit "YYY" – compilation of 2019 releases ......................................................................1759a

Exhibit "ZZZ" – September 2, 2021 deposition of Christopher Hopkins ..............................1762a

Exhibit "AAAA" – Subpoenas to The Hill School ...............................................................1791a

**Docket Materials**

Doc. 19 – March 18, 2021 Order ...........................................................................................1808a

Doc. 28 – Second Amended Complaint ..................................................................................1809a

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3    -------------------------------------------------

 4    JOHN DOE,

 5

                    Plaintiff,

 6

 7        -vs-                        Case No. 2:19-CV-01539

 8

      MITCHELL GARABEDIAN, ESQ., LAW

 9    OFFICES OF MITCHELL GARABEDIAN

      and KURTIS N. POULOS,

10

11              Defendants.

12    -------------------------------------------------

13

14

15        Videoconferencing Examination of KURTIS POULOS,

16

17    taken at the instance of the Plaintiff, under and

18

19    pursuant to Section 804.05 of the Wisconsin Statutes,

20

21    before ALI KORNBURGER, a Notary Public in and for the

22

23    State of Wisconsin, on April 22, 2021, commencing at

24

25    8:03 a.m. and concluding at 10:51 a.m.
```

Kurtis Poulos

```
 1                    A P P E A R A N C E S
 2

    THE BEASLEY FIRM, LLC, by
 3  MR. LANE R. JUBB, ESQ.

    1125 Walnut Street,
 4  Philadelphia, Pennsylvania 19107,

    appeared via Zoom on behalf of the Plaintiff.
 5

 6  SWARTZ CAMPBELL, LLC, by

    MS. CANDIDUS K. DOUGHERTY, ESQ.
 7  1650 Market Street, 38th Street,

    Philadelphia, Pennsylvania 19103,

 8  appeared via Zoom on behalf of the Defendants.

 9

10

11                   A L S O   P R E S E N T

12

    Mr. Jon Hansen, Videographer
13

14                    * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

1461a

Kurtis Poulos

```
1                    I N D E X
2
   Examination:                                    Page
3
   By Mr. Jubb....................................... 5
4
5
   Exhibits Identified:                             Page
6
   Exhibit 1 -Court Order Dated March 18, 2021,
7          Document 119.......................... 8
   Exhibit 2 -Email From Mr. Poulos to
8          Mr. Garabedian Dated 2/19/2019......... 52
   Exhibit 3 -Email From Mr. Poulos to
9          Mr. Garabedian Dated 5/15/2019......... 79
10
11                    * * * * *
12  Disposition Of Original Exhibits:
13  Attached To Original Transcript
14
                       * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

1462a

Kurtis Poulos

```
 1                TRANSCRIPT OF PROCEEDINGS

 2                    THE VIDEOGRAPHER:  Good morning.  We

 3           are now on the record.  My name is Jon Hansen,

 4           CLVS.  I'm the videographer today with Golkow

 5           Litigation Services.  Today's date is April 22,

 6           2021.  The time is 8:03.  This remote video

 7           deposition is being held in the matter of John

 8           Doe versus Mitchell Garabedian, et al., United

 9           States District Court for the Eastern District

10           of Pennsylvania, case No. 19-CV-01539.  The

11           deponent today is Kurtis Poulos.

12                    All parties to this deposition are

13           appearing remotely and have agreed to the

14           witness being sworn in remotely.  Due to the

15           nature of remote reporting, please pause

16           briefly before speaking to ensure all parties

17           are heard.  At this time if counsel could state

18           their appearance and their location after which

19           our reporter will swear in the witness and we

20           can proceed.

21                    MR. JUBB:  Good morning, Lane Jubb,

22           plaintiff.

23                    MS. DOUGHERTY:  Candidus Dougherty

24           for Mitchell Garabedian.  I'm in Philadelphia,

25           Pennsylvania.
```

1463a

```
 1                KURTIS POULOS, called as a witness

 2          herein, having been first duly sworn on oath,

 3          was examined and testified as follows:

 4                         EXAMINATION

 5     BY MR. JUBB:

 6     Q    Mr. Poulos, good morning.  We have been through

 7          this a couple times before, but I will still

 8          repeat the instructions just so there's no

 9          confusion.  We're here because the court

10          ordered you to come back for a deposition to

11          discuss your communications with

12          Mr. Garabedian.  I don't intend to go past

13          that, so if you at any point in time think I

14          am, you just have to speak up, okay?

15                I don't intend to be long.  I have no

16          desire to stay and talk with you for any more

17          time than reasonably necessary.  So I think we

18          are going to be out of here pretty quickly.  I

19          am going to bop around just a little bit

20          because it is limited in nature.  So I can't

21          pass any sort of real chronology, if you will.

22          So forgive me if I am bopping around a little

23          bit between -- between topics.

24                I want to make sure you understand my

25          question.  So just as all the other
```

1464a

Kurtis Poulos

```
 1        depositions, if you don't understand my
 2        question, if you want me to repeat it, you want
 3        me to rephrase it, whatever you need to answer
 4        that question, you tell me.  I'm happy to do
 5        that, okay?  If you answer the question, I'm
 6        going to assume you understood it, fair enough?
 7        All right.  I already can't hear you.  Would
 8        you mind speaking up?
 9   A    Fair enough.
10   Q    Okay.  Did you get a chance to look at the
11        court's order yourself?
12   A    No, I have not.
13   Q    All right.  So I sent that to you, though,
14        right?
15   A    Okay.
16   Q    But you didn't look at it?
17   A    I don't know what court order you're referring
18        to.
19   Q    I want to make sure you're aware of it, so I'm
20        going to pull it up for you so you can see it
21        and you can be well aware of the court order
22        for which you are here today, okay?  So bear
23        with me here.  Mr. Poulos, can you see that?
24   A    I don't see anything.  Now I see it.
25   Q    Okay.  Have you seen this order before?
```

1465a

Kurtis Poulos

1           MS. DOUGHERTY:  And just for the

2      record, this is March 18, 2021, document 119.

3           MR. JUBB:  Thank you.  And I'm going

4      to mark this as an exhibit as well.

5           MS. DOUGHERTY:  Okay.

6           MR. JUBB:  I believe we left off at

7      your last deposition of Mr. Poulos -- Candy,

8      maybe your notes -- if you have it handy, that

9      might be great as well.  I think we left off --

10     I'm not sure who the court reporter you used

11     was.  It looks like D4, that was your exhibit.

12     I don't think I used any that time.  I think --

13          MS. DOUGHERTY:  Yeah.  Lane, my

14     recollection is that you didn't mark them as

15     new numbers.  You used the numbers that you

16     labeled the documents with when you produced

17     them and identified them on the record that

18     way.  And I'm just looking at the index.  I

19     marked as, you know, D1, 2, 3, 4 because it was

20     easier, but -- so I think you could pick pretty

21     much -- --

22          MR. JUBB:  That's right.

23          MS. DOUGHERTY:  -- any number, P6 and

24     P16 and P100, it looks like.

25          MR. JUBB:  Thank you.  So let me go

1466a

Kurtis Poulos

```
1          back to that order.  Okay.  For the record,

2          this is a court order dated March 18, 2021,

3          document 119 on the EZ app, and I'm going to

4          mark this as Poulos 1.

5                    (Exhibit No. 1 was marked.)

6    BY MR. JUBB:

7    Q    So, Mr. Poulos, take a look at this.  I sent

8         this to you before.  Did you bother to read it?

9                    MS. DOUGHERTY:  Objection.

10   BY MR. JUBB:

11   Q    You can answer.

12   A    Again, I have been inundated.  I'm not

13        represented by anybody other than me.

14        Obviously, you have an entire legal team.  I

15        have spent ten hours in deposition with you.  I

16        will provide whatever information that just

17        lets you know that your client abused me.

18   Q    Why don't you take a look at your screen and

19        see if you saw that order before.  Did you see

20        that order before?

21   A    No.

22   Q    Okay.

23   A    I never received it by mail.

24   Q    Are you saying that you don't know how to

25        access the emails that I have been sending you?
```

Kurtis Poulos

```
 1   A    I haven't received any except for the one that

 2        I received yesterday demanding that I be on

 3        this deposition -- or two days ago.  So I don't

 4        know if you don't have my correct address, but

 5        all filing should be in paper form so I have a

 6        hard copy.  I never received that via mail.

 7   Q    I see.  So what you're saying is you've never

 8        seen this court order before; is that right?

 9   A    Not to my knowledge, no.

10   Q    Okay.  Do you open the attachments to the

11        emails when they are sent to you, sir?

12   A    Yes, I do.

13   Q    Okay.  And considering that you're a defendant

14        in this lawsuit, I imagine if I were to send

15        you something and I say, "Please see the

16        attached," you would probably want to look at

17        it, right?

18            MS. DOUGHERTY:  Objection.

19            THE WITNESS:  Asked and answered.

20   BY MR. JUBB:

21   Q    I see.  All right.  Well, why don't we read

22        this now, however long it takes you, single

23        page.  But I want to make sure you're familiar

24        with it, especially Item 3 where it says you're

25        going to appear and you're going to discuss
```

1468a

Kurtis Poulos

```
1        your discussions and communications with
2        Defendant Garabedian, okay?  And I'm going to
3        do my best to keep it to that.  Because, like I
4        said, I have no intention of being here any
5        longer than I need to.
6   A    I have no intention of being here than another
7        49 minutes.
8   Q    Well, that's interesting because the court
9        order doesn't have any limitations.  So we're
10       going to chat a little bit about your
11       discussions.
12  A    I have a schedule.  I have a meeting.
13  Q    This is a court order, so we can handle that.
14       I hope that you are wise enough to just answer
15       these questions as opposed --
16  A    Then start asking the questions.
17  Q    All right.  So did you tell Mr. Garabedian that
18       the perps were Tom Ruth and Mr. Ralston?
19  A    Thomas Ruth never touched me.
20  Q    Did you tell Mr. Garabedian that the
21       perpetrators for your alleged sexual abuse were
22       Mr. Ruth and Mr. Ralston?
23  A    Asked and answered.  I just told you I had no
24       physical contact with Mr. Ruth.
25  Q    That doesn't mean you didn't tell
```

1469a

Kurtis Poulos

```
 1         Mr. Garabedian that.  So just listen to my
 2         question.  Did you tell Mr. Garabedian that the
 3         perpetrators were Mr. Ruth and Mr. Ralston?
 4    A    Asked and answered.  He was not a perpetrator.
 5         Did I hear --
 6    Q    Do you understand the difference between what
 7         you tell someone one time versus what you're
 8         saying another time?  I'm asking you what you
 9         told Mr. Garabedian.
10    A    And I just told you, I heard of allegations
11         against Mr. Ruth.  That was it.
12    Q    My question is yes or no.  If that's the case,
13         then listen to this question very specifically.
14         Did you tell Mr. Garabedian that you were in
15         any way sexually abused or that the
16         perpetrators of your alleged sexual abuse were
17         Tom Ruth and Mr. Ralston?
18    A    I specifically said Mr. Ralston, not Thomas
19         Ruth.
20    Q    Okay.  So if Mr. Garabedian was told by you
21         that you were also sexually abused by Mr. Ruth,
22         that would not be correct; is that fair?
23              MS. DOUGHERTY:  Objection.
24    BY MR. JUBB:
25    Q    Mr. Poulos?
```

1470a

Kurtis Poulos

```
 1   A    I'm not answering that question, so you can
 2        just move on.
 3   Q    Great.  Did Mr. Ruth in any way sexually abuse
 4        you?
 5   A    Never.
 6   Q    And did you make that clear to Mr. Garabedian?
 7   A    I believe so.
 8   Q    You never gave him any impression that there
 9        was two perpetrators of sexual abuse, correct?
10                   MS. DOUGHERTY:  Objection.
11                   THE WITNESS:  No.
12   BY MR. JUBB:
13   Q    Okay.  When you had a conversation with
14        Mr. Garabedian, did you tell him that you had
15        actually contacted an attorney several years
16        prior about your claims of sexual abuse?
17   A    I believe so.
18   Q    And did he ask you who was that attorney?
19   A    He may have.
20   Q    What did you tell him?
21   A    That I don't recall his name.
22   Q    Did you tell him why the attorney rejected you?
23   A    Because the statute of limitations had run out.
24        All I was looking for was recognition of the
25        situation and my tuition back, nothing more.
```

1471a

Kurtis Poulos

```
 1   Q    Did Mr. Garabedian tell you that he could get

 2        you somewhere between 100,000 and $500,000 even

 3        though the statute of limitations had blown on

 4        your case?

 5             MS. DOUGHERTY:  Objection.

 6             THE WITNESS:  I don't recall the

 7        specific number, no.

 8   BY MR. JUBB:

 9   Q    Did he tell you that -- what a statute of

10        limitations meant?

11   A    I understood what a statute of limitation was

12        before speaking with Mitchell Garabedian.

13   Q    And what was your understanding of that?

14   A    My understanding of it is that your client, who

15        abused me over 25 years ago, can't be

16        prosecuted by the law, and that this could only

17        be a civil matter and not a criminal matter.

18   Q    And when you told Mr. -- that's what you

19        thought the statute of limitations was for your

20        alleged claims against Mr. Ralston; is that

21        right?

22   A    Correct.  And, again, this was never --

23        correct.

24   Q    Okay.  So with that being your understanding of

25        statute of limitations as it pertained to a
```

1472a

1          criminal matter, did he tell you the statute of

2          limitations for any sort of civil case was also

3          blown?

4                    MS. DOUGHERTY:  Objection.

5     BY MR. JUBB:

6     Q    You're shaking your head no?

7     A    Not to my recollection.

8     Q    In other words, at no point in time from your

9          recollection did Mr. Garabedian tell you that

10         any civil case against The Hill School or

11         Mr. Ralston is actually completely blown by the

12         statute of limitations civilly, correct?

13                   MS. DOUGHERTY:  Objection.

14                   THE WITNESS:  Asked and answered.

15    BY MR. JUBB:

16    Q    I need to make clear what I'm asking because I

17         think there's some confusion.  It's not asked

18         and answered.  Am I correct, sir, that as far

19         as you can recall at no point in time did

20         Mitchell Garabedian tell you that the statute

21         of limitations on any potential civil claim

22         against The Hill School or Mr. Ralston for

23         whatever you're saying occurred had already

24         expired?

25    A    Not to my recollection.

1473a

Kurtis Poulos

```
 1   Q    Okay.  What is your understanding today as
 2        opposed to when you spoke with -- strike that.
 3                   Where are you right now, by the way?
 4   A    I'm in my living room.
 5   Q    Okay.  Is there anybody with you?
 6   A    My dog.
 7   Q    Is there any human with you?
 8   A    No, I live alone.  You know that.
 9   Q    Well, last time your mom was with you,
10        remember?  So it's okay for me to ask those
11        questions at first, okay?  So moving on.  Did
12        Mr. Garabedian ask you about any of your prior
13        criminal conduct?
14   A    Possibly, but, again, it's not relevant to this
15        case.
16   Q    When he asked you about your criminal conduct,
17        were you trying to be honest with him?
18   A    I've never lied to him nor you nor the court.
19   Q    Okay.  Well, my question was, when he asked you
20        about your criminal conduct, were you truthful
21        to him?
22                   MS. DOUGHERTY:  Objection.
23                   THE WITNESS:  I just told you, yes, I
24        was truthful.  I never lied to any of you.
25   BY MR. JUBB:
```

Kurtis Poulos

```
 1   Q    Okay.  So if Mr. Garabedian wrote down that you

 2        did no jail time, did he write that down wrong

 3        or did you tell him you had no jail time?

 4   A    I don't know.  I told him that my life is an

 5        open book.  I know what I have done wrong in my

 6        life.

 7   Q    That's not my question.  I don't care what you

 8        have done in your life.  I'm just focused on

 9        jail time right now.  Did you tell

10        Mr. Garabedian that you have never done jail

11        time?

12   A    No.

13              MS. DOUGHERTY:  Objection.

14   BY MR. JUBB:

15   Q    Okay.  So you told Mr. Garabedian that you did

16        do jail time, correct?

17   A    I believe so.

18   Q    Because you have done jail time, correct?

19   A    Again, what -- how is this relevant to

20        anything?

21   Q    Is the answer to my question correct?

22   A    I just said --

23              MS. DOUGHERTY:  Objection.

24              THE WITNESS:  -- yes.

25   BY MR. JUBB:
```

1475a

Kurtis Poulos

```
1   Q    Okay.  Now, did he ask you if you've ever been
2        charged with any felonies?
3   A    I don't recall.
4   Q    Did he ask you if you have ever been charged
5        with any misdemeanors or anything about your
6        criminal background?
7   A    I believe so.
8   Q    And when he asked you about your criminal
9        history, to that question of, you know, have
10       you ever been convicted of a felony, what would
11       you have told him?
12  A    That I --
13            MS. DOUGHERTY:  Objection.
14            THE WITNESS:  -- don't think I have
15       been.
16  BY MR. JUBB:
17  Q    Have you ever been charged with a felony?
18  A    I believe so.
19  Q    And did he ask you that?
20  A    I don't recall.
21  Q    Did you ever tell Mr. Garabedian that you had a
22       breaking and entering?
23  A    What?
24  Q    Did you ever tell Mr. Garabedian in any phone
25       call that you were either charged or convicted
```

1476a

Kurtis Poulos

```
 1        of a breaking and entering?
 2   A    No.  Because I don't recall ever breaking or
 3        entering any property.
 4   Q    Did you ever tell Mr. Garabedian that you were
 5        charged and convicted of disorderly conduct?
 6   A    Yes.
 7   Q    Okay.  So you recall saying that; is that
 8        right?
 9   A    I believe so.
10   Q    All right.  So if Mr. Garabedian was operating
11        under the impression that you were actually
12        arrested for breaking and entering, do you have
13        any idea where that could have possibly come
14        from?
15              MS. DOUGHERTY:  Objection.
16   BY MR. JUBB:
17   Q    Mr. Poulos?
18   A    I have no idea.
19   Q    Have you ever been charged with a breaking and
20        entering?
21   A    Not to my recollection.
22   Q    Okay.  I want you to think just on what you
23        told Mr. Garabedian as of December of 2017 when
24        you first contacted him.  What crimes, either
25        misdemeanor or felony, did you tell him that
```

1477a

Kurtis Poulos

```
1        you had on your record?

2   A    I don't recall.

3   Q    Well, when he asked -- let me back up.  The

4        fact that you told him that you had a

5        disorderly conduct leads me to believe that he

6        did ask you about your criminal history.  So

7        with that being a logical conclusion, I assume

8        that when you responded to that question you

9        wanted to be as truthful and thoughtful as

10       possible, correct?

11                 MS. DOUGHERTY:  Objection.

12                 THE WITNESS:  Correct.

13  BY MR. JUBB:

14  Q    You knew he was doing an intake process to see

15       and assess if you were credible, correct?

16                 MS. DOUGHERTY:  Objection.

17                 THE WITNESS:  Correct.

18  BY MR. JUBB:

19  Q    And if you lied about your criminal conduct,

20       that's something that wouldn't be very credible

21       and honest, would it?

22                 MS. DOUGHERTY:  Objection.  What does

23       -- Lane, you're really going far abroad of the

24       order at this point.

25                 THE WITNESS:  Yeah.
```

1478a

Kurtis Poulos

```
 1                 MR. JUBB:  I'm not going abroad

 2        anything.

 3                 MS. DOUGHERTY:  Yeah, you are.

 4        You're asking him to interpret what you think

 5        Mr. Garabedian wrote in notes.  You are asking

 6        him to interpret what Mr. Garabedian's purpose

 7        was.  The order is about his communications and

 8        discussions with Mr. Garabedian.

 9                 MR. JUBB:  We will solve this.

10   BY MR. JUBB:

11   Q    Mr. Poulos, am I correct that Mr. Garabedian

12        asked you whether or not you have been charged

13        or convicted with a felony, yes or no?

14   A    Possibly.  I do not recall the specifics of the

15        conversation.

16   Q    Okay.  From the time you had that conversation

17        to present, put that aside, had you been

18        convicted of a felony at that point that you

19        would have relayed it to him that you had?

20                 MS. DOUGHERTY:  Objection.  Are you

21        asking him if he had been convicted of a felony

22        at the time of the intake?  I don't understand

23        your question.

24                 MR. JUBB:  Yeah, I am.

25                 THE WITNESS:  You obviously know the
```

1479a

```
 1       answer.
 2  BY MR. JUBB:
 3  Q    But why won't you tell me the answer?
 4            MS. DOUGHERTY:  Because whether he's
 5       been convicted of a crime, Lane, is not a
 6       discussion that he had with Mr. Garabedian.
 7            THE WITNESS:  And it's not --
 8            MR. JUBB:  Mr. Poulos --
 9            MS. DOUGHERTY:  The area -- Mr.
10       Garabedian --
11  BY MR. JUBB:
12  Q    Have that discussion with Mr. Garabedian?
13  A    I can't hear you.
14  Q    Did you have a discussion with Mr. Garabedian
15       as to whether or not you have been convicted of
16       a crime?
17            MS. DOUGHERTY:  Objection.
18            THE WITNESS:  Asked and answered,
19       Lane.
20  BY MR. JUBB:
21  Q    Did you have a conversation with Mr. Garabedian
22       about your family?
23            MS. DOUGHERTY:  Ever or during the
24       intake?
25            MR. JUBB:  Intake.  Just focused on
```

1480a

Kurtis Poulos

```
 1        the intake right now.
 2                 MS. DOUGHERTY:  Okay.  Thank you.
 3   BY MR. JUBB:
 4   Q    I'll let you know when I move on.  During the
 5        intake process, the first one, did he ask you
 6        any questions about your mom or your dad?
 7   A    I believe so.
 8   Q    Okay.  And when he asked you a question about
 9        your dad, what did you tell him?
10   A    I told him what type of human being he is.
11   Q    Did you tell him that he was violent with you?
12   A    Yes, because that's the truth.
13   Q    Did you talk to him about your mother and the
14        role that she plays in your life?
15   A    You're frozen.
16   Q    Did you talk to him about your mother and the
17        role that she plays in your life?
18   A    Yes.
19   Q    Did he ask you any questions about any sort of
20        siblings or anything like that?
21   A    I believe so.
22   Q    Tell me about the discussion that you had with
23        Mr. Garabedian in as much detail as possible
24        about the relationship or lack there of you had
25        with your father.
```

1481a

Kurtis Poulos

```
 1   A     I just explained how he treats his children.

 2   Q     But I need to know what you told him.  What did

 3         you explain?  Explain that to me.

 4   A     Not sure how that's relevant, but he treats his

 5         children like we're disposable.

 6   Q     Did he ask you any follow-up questions as to,

 7         you know, that having affected your life at

 8         all?

 9               MS. DOUGHERTY:  Objection.

10               THE WITNESS:  I don't believe so and

11         not relevant.

12   BY MR. JUBB:

13   Q     Did you tell Mr. Garabedian that you were

14         sexually abused during your freshmen year?

15   A     I don't recall.  I believe I told him it was my

16         fourth form year, which would have been my

17         sophomore year.

18   Q     Do you believe there's any chance you told him

19         that had happened freshmen year?

20   A     There's a possibility that I had the wrong year

21         as far as dates, but I don't specifically

22         remember saying freshmen year.

23   Q     Did you ever tell him that you were sexually

24         abused in a study room or cubicle?

25   A     Yes.
```

1482a

Kurtis Poulos

```
 1   Q    Okay.  Did you ever tell him that you were
 2        sexually abused in your single dorm?
 3   A    Yes.
 4   Q    Okay.  And when you and I first spoke during
 5        those ten hours that you just discussed over a
 6        period of three days, at no point in time did
 7        you ever tell us that you were sexually abused
 8        in your freshmen year, correct?
 9   A    Not to my recollection, no.
10   Q    And in those ten days (sic) spanning over three
11        days at no point in time did you ever tell us
12        that you were sexually abused in some sort of
13        cubicle, correct?
14             MS. DOUGHERTY:  Objection.
15             THE WITNESS:  Correct.
16   BY MR. JUBB:
17   Q    And during those three-days span over ten hours
18        and everybody's time at no point did you ever
19        tell us that you were abused in your dorm room,
20        correct?
21             MS. DOUGHERTY:  Objection.
22             THE WITNESS:  Correct.
23   BY MR. JUBB:
24   Q    Why did you tell Mr. Garabedian that?
25             MS. DOUGHERTY:  Objection.
```

1483a

Kurtis Poulos

```
 1                    THE WITNESS:  Why didn't you ask me?
 2   BY MR. JUBB:
 3   Q    Is it your testimony that no one asked you
 4        where all the abuse occurred?
 5   A    You asked me about specifics that I could
 6        recall.  I have spent 27 years trying to not
 7        recall every specific detail.
 8   Q    So when we asked you where everything occurred
 9        and you never told us that it occurred in your
10        room --
11   A    It was in his -- in his classroom primarily.
12        Again, I don't understand why you keep having
13        to rehash this.  He abused --
14   Q    Sir --
15                    MS. DOUGHERTY:  Objection.  He's
16        allowed to finish his answer.  Go ahead.
17   BY MR. JUBB:
18   Q    Say whatever you need to.
19   A    I'm done.
20   Q    I figured you were.
21                    MS. DOUGHERTY:  No, he wasn't.  You
22        interrupted him, Mr. Jubb.
23                    THE WITNESS:  Again, even the
24        videographer said that at least 30 seconds for
25        us to finish our questions so that we can
```

1484a

```
 1        understand and interpret what's going on.
 2        Every time I start to speak you start to speak
 3        over me.  It not only makes this pointless but
 4        infuriating.
 5               MS. DOUGHERTY:  Mr. Jubb, you have
 6        done it a couple times to me too.  I'm
 7        wondering if there's a delay because I think
 8        you're on telephone and video.  So if that's
 9        the case, we need to just be cognizant of it if
10        it's not on purpose.
11   BY MR. JUBB:
12   Q    Are you guys done?
13   A    Doesn't matter if we're done, you're going to
14        speak over us anyway.
15   Q    Let me know when you're done, and I will
16        continue.
17   A    You got 31 minutes, and then I'm done.
18   Q    All right.  We will see.  Why did you tell
19        Mr. Garabedian that you were abused in your
20        dorm room?
21   A    Because it was the truth.
22   Q    Is it your testimony now that you were abused
23        in your dorm room, because we never discussed
24        that in your prior deposition, correct?
25   A    Correct.
```

1485a

Kurtis Poulos

```
 1  Q    Okay.  And I believe it was actually
 2       Ms. Dougherty who had asked you a question
 3       about were there any other instances of sexual
 4       abuse that occurred --
 5                 MS. DOUGHERTY:  Objection.
 6  BY MR. JUBB:
 7  Q    -- outside of the classroom, and I believe your
 8       testimony was no, correct?
 9                 MS. DOUGHERTY:  Objection.
10                 THE WITNESS:  Not concerning
11       Mr. Ralston.
12  BY MR. JUBB:
13  Q    Wait a minute.  Did you get abused by somebody
14       else in your dorm room?
15                 MS. DOUGHERTY:  Objection.  Please
16       watch your tone.
17                 THE WITNESS:  Irrelevant.
18  BY MR. JUBB:
19  Q    Irrelevant?  Mr. Poulos, are you saying that
20       you were sexually abused in your dorm room?
21  A    And your client, The Hill School, knew about
22       it.
23  Q    Mr. Poulos, are you saying that somebody else
24       abused you in your dorm room when you were a
25       student at The Hill School?
```

1486a

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  Asked and answered.

 3   BY MR. JUBB:

 4   Q    No.  No.  No.  I need to know very

 5        specifically, and I imagine that Ms. Dougherty

 6        would want to know as well, did you get abused

 7        in any way, shape, or form when you were a

 8        student at The Hill School in your dorm room?

 9        Yes or no?

10   A    Yes.

11   Q    Okay.  And that person, based on your answer,

12        was not Mr. Ralston, correct?

13                    MS. DOUGHERTY:  Objection.

14                    THE WITNESS:  And, again, define

15        abuse because you're being very vague.  Did I

16        get the shit beat out of me in my dorm room?

17        Would I consider that abuse?  Yes.

18   BY MR. JUBB:

19   Q    So when you were talking to Mr. Garabedian and

20        he's asking you as a sexual abuse lawyer where

21        it occurred, did you tell him that you were

22        sexually abused in your dorm room?

23   A    I don't believe so.  I said that I was abused

24        in my dorm room.

25   Q    Who abused you in your dorm room?
```

1487a

```
 1   A     Irrelevant.

 2   Q     Who abused you in your dorm room if -- let me

 3         correct it.

 4               Did you -- did he ask you, "Did

 5         Mr. Ralston abuse you in your dorm room?"

 6   A     I don't believe so.  He asked if I was abused

 7         in my dorm room.

 8   Q     What about the cubicle that you told him you

 9         were abused in?  Who abused you there?

10   A     Irrelevant who did it.  It happened.  Abuse is

11         abuse.  Do you remember every kid that beat the

12         shit out of you in high school?

13   Q     Did he ask you about sports that you played?

14   A     Possibly.  I did not play too many sports.  I

15         was injured for a majority of my freshmen year

16         with a broken arm.

17   Q     Did you tell Mitchell Garabedian that you were

18         aware of other victims of other teachers for

19         alleged sexual abuse?

20   A     Yes.

21   Q     And did he ask you who they were?

22   A     Possibly, and I cannot recall their exact

23         names.

24   Q     But did you recall them when Mr. Garabedian

25         asked you for it?
```

1488a

1    A     Possibly.

2    Q     Did you tell Mr. Garabedian that it didn't

3          matter if the perp was outed?

4                  MS. DOUGHERTY:  Objection.

5    BY MR. JUBB:

6    Q     Do you understand my question?

7    A     I was about to and then you interrupted me.  I

8          don't believe so.

9    Q     Okay.  Did you in any way express to

10         Mr. Garabedian that it was not a concern to you

11         whether or not the alleged perpetrator of your

12         sexual abuse was outed?  Did you explain that

13         or express that to him in any words?

14                 MS. DOUGHERTY:  Objection.

15                 THE WITNESS:  My recollection of the

16         conversation was that things would be kept

17         under wraps until there was going to be a

18         conclusion and then a possible outing.  I've

19         had more than enough chance to call every

20         newspaper who's called me, and I have not

21         responded to any of them nor have I publically

22         outed anyone.

23   BY MR. JUBB:

24   Q     Have newspapers tried to contact you about this

25         case?

1489a

```
 1   A    Yes.

 2   Q    Okay.  Have you told any of them any of your

 3        claims here?

 4   A    No.

 5   Q    When you had this conversation with Mitchell

 6        Garabedian initially, did he express to you

 7        that it would be, you know, his preference if

 8        you said that you wanted to make sure that

 9        there was no nondisclosure agreement?

10             MS. DOUGHERTY:  Objection.

11             THE WITNESS:  Reask the question.

12   BY MR. JUBB:

13   Q    Sure.  Was it Mitchell Garabedian's idea that

14        you would tell the school you wanted no

15        nondisclosure agreement?

16             MS. DOUGHERTY:  Objection.

17             THE WITNESS:  It was discussed, and

18        it was not brought up by me.

19   BY MR. JUBB:

20   Q    In this initial phone call, am I correct there

21        was more than one lawyer on that or was it just

22        Mr. Garabedian?

23   A    I believe with most of my phone calls it's been

24        Mitchell Garabedian and either a legal aide or

25        another associate -- associate in his firm.
```

1490a

Kurtis Poulos

```
 1   Q    Do you remember when we first started this
 2        action and you wrote in your pleadings that you
 3        told Mr. Garabedian and only Mr. Garabedian?
 4                  MS. DOUGHERTY:  Objection.
 5                  THE WITNESS:  I may have misspoke.
 6        In recollection, yes, I possibly had said that,
 7        but majority of the time I have spoken with him
 8        there has been someone else in the room.
 9   BY MR. JUBB:
10   Q    How many other conversations can you recall
11        with his associates or his paralegals?
12                  MS. DOUGHERTY:  Objection.  Are you
13        asking with Mr. Garabedian or separate from
14        Mr. Garabedian?
15   BY MR. JUBB:
16   Q    Separate.  I will make that clear for you and
17        rephrase it, Mr. Poulos.  How many
18        conversations do you recall having with any
19        associates, paralegals or other individuals who
20        you believe to have been working for
21        Mr. Garabedian without speaking to
22        Mr. Garabedian personally?
23   A    Very few.  I was not able to get ahold of
24        Mitchell and rarely did I receive a phone call
25        back.
```

1491a

Kurtis Poulos

```
1   Q    And am I correct that from December 2017 time

2        frame until December 2018 you never heard back

3        from Mr. Garabedian at all?

4              MS. DOUGHERTY:  Objection.

5              THE WITNESS:  There may have been

6        small conversations over the phone where it was

7        sort of just checking in, me trying to find out

8        what was going on, nothing more.

9   BY MR. JUBB:

10  Q    Am I correct you were unaware that he was

11       sending a letter to The Hill School?

12             MS. DOUGHERTY:  Objection.

13             THE WITNESS:  Lane, I have answered

14       that before.  My understanding was that he was

15       going to reach out to the counsel for the

16       school.

17  BY MR. JUBB:

18  Q    Did Mr. Garabedian ever --

19             MS. DOUGHERTY:  Hold up.  He wasn't

20       -- he's not done.

21             THE WITNESS:  I'm not done speaking,

22       Lane.

23             MR. JUBB:  I'm sorry.  You have these

24       drawn-out pauses.  Forgive me.  Please

25       continue.
```

1492a

```
 1                    MS. DOUGHERTY:  There wasn't a

 2          drawn-out pause.  He was taking a breath.

 3                    THE WITNESS:  My understanding, as I

 4          have stated in the past, was that he was going

 5          to reach out to the two counselors that your

 6          client, The Hill School, hired and

 7          misrepresented themselves instead of just

 8          saying that they were lawyers for The Hill

 9          School.

10   BY MR. JUBB:

11   Q    Have you finished your answer?

12   A    Yes.

13   Q    Did Mr. Garabedian tell you he was going to

14          send a letter to the headmaster outlining what

15          you alleged to be sexual abuse?

16                    MS. DOUGHERTY:  Objection.

17                    THE WITNESS:  I don't believe so.

18   BY MR. JUBB:

19   Q    Did you tell Mr. Garabedian to call your mom?

20                    MS. DOUGHERTY:  Objection.

21                    THE WITNESS:  Possibly.

22   BY MR. JUBB:

23   Q    What did you believe your mom could provide

24          Mr. Garabedian that you couldn't at the age of

25          39?
```

1493a

Kurtis Poulos

```
 1                    MS. DOUGHERTY:  Objection.
 2                    THE WITNESS:  Possibly a view at my
 3          life and how it's been destroyed from the
 4          outside.
 5     BY MR. JUBB:
 6     Q    Did you ever have any personal -- excuse me.
 7          Strike that.
 8                    Did you ever have any face-to-face
 9          discussion with Mr. Garabedian, in person?
10     A    No.
11     Q    Did you ever have any Zoom meeting with
12          Mr. Garabedian where you could see his face and
13          he could see you?
14     A    No.
15     Q    Did you ever send him a form of photo ID to
16          show you were who you said you were?
17                    MS. DOUGHERTY:  Objection.
18                    THE WITNESS:  I don't believe so.
19     BY MR. JUBB:
20     Q    When you offered Mr. Garabedian the yearbooks,
21          did you ever send it to him?
22     A    I never received any yearbooks.  I do not have
23          any documentation from that school whatsoever.
24          Any yearbooks that were acquired were not
25          acquired by me.  They may have been acquired by
```

1494a

```
 1          request from another member of my family, but I
 2          do not possess any physical documents that have
 3          anything to do with that school.
 4    Q     So are you trying to imply -- because, you
 5          know, we both know what we know.  Did your mom
 6          request yearbooks from the school?  Is that
 7          what you are referring to?
 8    A     Correct.
 9    Q     Okay.  And then you told Mr. Garabedian, "Do
10          you want to see my yearbooks, my mom has got
11          them," correct?
12    A     I believe he requested that we get them.
13    Q     Did you ever -- strike that.
14                Did he ever, as far as you know,
15          receive those yearbooks from you or your
16          mother?
17    A     I do not know.  You have seen more of my
18          yearbooks in the last 25 years than I have.
19    Q     Did you ever tell Mr. Garabedian you had a dog?
20    A     Yes, because I've had my service dogs for the
21          last three years.
22    Q     When did you get Clifford?
23    A     January 15th of 2020.
24    Q     And what was the dog's name before that?
25    A     Clifford.
```

1495a

Kurtis Poulos

```
 1   Q    Did you ever have a dog named Bumblebee?
 2   A    Yes.  That was my first service dog.  I had her
 3        for a year.
 4   Q    And when you told -- did you tell him they were
 5        service dogs?
 6   A    It may have come up in conversation.  I had
 7        Bumblebee trained as my service animal just as
 8        I have had Clifford trained as my service
 9        animal.
10   Q    And I thought from your prior testimony you had
11        said that you had determined them to be service
12        animals.  Are you saying that you got them
13        trained for that?
14   A    I had Bumblebee trained for it in the first two
15        months.  Unfortunately, I had to wait for Big
16        Red over here because of COVID to get trained
17        as a service dog, so he recently completed his
18        training.
19             MS. DOUGHERTY:  I'm sorry.  Did you
20        say Big Red?
21             THE WITNESS:  Yeah, Clifford, Big
22        Red.
23             MS. DOUGHERTY:  Okay.
24   BY MR. JUBB:
25   Q    Mr. Poulos, did Mr. Garabedian ask you about
```

1496a

Kurtis S. Poulos

```
 1         any of your medical history?
 2    A    Yes.
 3    Q    Did he ask you about any visits to the
 4         hospital?
 5    A    Yes.  That would be part of my medical history.
 6    Q    Okay.  And when he asked you those questions,
 7         did you tell him about all of your trips to the
 8         hospital for drinking?
 9              MS. DOUGHERTY:  Objection.
10              THE WITNESS:  I recall explaining to
11         him that I have had -- Clifford, it's okay.
12         Yes.  I explained that I had been hospitalized
13         multiple times throughout my life.
14    BY MR. JUBB:
15    Q    And did you explain that that was in the
16         context for your alcohol abuse?
17    A    Yes.
18    Q    And did you explain to him that you were
19         diagnosed with hepatic encephalopathy?
20    A    Yes.
21    Q    Did you explain to him the status of your liver
22         and the cirrhosis?
23    A    My liver is fine now.  Thank you for asking.
24    Q    Did you ever have -- I'm sorry.  Is it your
25         testimony that you had a cirrhosis liver and
```

1497a

Kurtis Poulos

1      now that it's fine?

2    A    Correct.

3    Q    Am I correct the only phone interviews that you

4         had with Mr. Garabedian were in December of

5         2017?

6                  MS. DOUGHERTY:  Objection.

7                  THE WITNESS:  As far as interview,

8         yes; other phone conversations, different

9         story.

10   BY MR. JUBB:

11   Q    When you were --

12                 MS. DOUGHERTY:  Objection.  He wasn't

13        done with his answer.

14                 THE WITNESS:  Yeah.  I'm done with

15        this if you are going to keep talking over me.

16   BY MR. JUBB:

17   Q    Go ahead, please.  I'm trying to move this

18        along quickly.  Go ahead.

19   A    Doesn't matter.  Just keep going.

20   Q    Okay.  So I will ask my question again and see

21        if you want to add to your answer.  Am I

22        correct that other than the interview that was

23        done -- strike that.

24                 Am I correct the only interview with

25        you and Mr. Garabedian pertaining to your

1498a

1      allegations occurred in December of 2017?

2              MS. DOUGHERTY:  Objection.

3              THE WITNESS:  That was my first

4      formal interview.  After that I don't know that

5      I would consider it an interview.  There were

6      conversations.

7  BY MR. JUBB:

8  Q    Okay.  And in that interview process when

9      talking about what you're claiming to be

10     experiencing now, did he ask you questions that

11     were in some way leading?  In other words, did

12     he say, "Did this ruin your life?  Did it make

13     you feel guilty?  Did it give you these trust

14     issues?" or did you just voluntarily tell him

15     all those things?

16             MS. DOUGHERTY:  Objection.

17             THE WITNESS:  As I already stated

18     before, I have never withheld anything about

19     the way this has affected my life physically

20     and mentally.

21  BY MR. JUBB:

22  Q    And my question was a little bit different.

23     When he asked you about how this -- how you --

24             MS. DOUGHERTY:  Hold up.  Mr. Poulos

25     is talking.

1499a

1             MR. JUBB:  He's not talking at all.

2             MS. DOUGHERTY:  He was talking.

3             THE WITNESS:  I was talking, Lane.

4    BY MR. JUBB:

5    Q    Keep going, please.

6    A    I was forthcoming about my physical ailments

7         that have resulted in this or resulted from

8         this.  Clifford, it's okay.

9    Q    You already told me that.  Is there anything

10        else you want to add?

11   A    No.

12   Q    Okay.  So getting back to my question.  Did

13        Mr. Garabedian ask you in a leading matter

14        about your claimed injuries, or did you just

15        voluntarily list off everything?  So, for

16        example, did he say to you, "Do you have

17        depression?  Do you have crying?  Do you feel

18        that it's unfixable?  Do you feel guilty?" or

19        did you just come up with a list of everything

20        yourself?

21             MS. DOUGHERTY:  Objection.

22             THE WITNESS:  Again, I was

23        forthcoming.  I didn't need to be led by

24        Mitchell in any which way.  I just wanted to

25        tell the truth.

1    BY MR. JUBB:

2    Q    So do you believe that you told Mr. Garabedian

3         that it occurred in the classroom?

4                   MS. DOUGHERTY:  Objection.

5                   THE WITNESS:  Again, I do not

6         remember the exact specifics of our first

7         conversation.

8    BY MR. JUBB:

9    Q    Did you tell Mr. Garabedian the name of the

10        person that you are claiming sexually abused

11        you?

12                  MS. DOUGHERTY:  Objection.

13                  THE WITNESS:  If I did, it was not

14        during the first conversation.

15   BY MR. JUBB:

16   Q    Ultimately, did he ever ask you any types of

17        questions about who the alleged abuser was?

18        You know, what was the position in the school?

19        You know, was he well liked, things of that

20        type of nature?  Did he ask any further

21        questions about who the alleged abuser was?

22                  MS. DOUGHERTY:  Objection.

23                  THE WITNESS:  You mean did he ask if

24        he was popular?  I don't remember.

25   BY MR. JUBB:

Kurtis Poulos

```
 1   Q    Did he ask if Mr. Ralston was well liked?
 2   A    Pretty sure I just answered that exact
 3        question.  I don't remember if he asked if
 4        Mr. Ralston -- who we should stop calling John
 5        Doe -- was a popular teacher.  There was very
 6        few teachers and very few students.  So
 7        everybody had their groups.  Who is to say who
 8        is popular with whom.
 9   Q    I didn't say popular at all.  I never used that
10        word.  Listen to my question.
11   A    Well liked is a synonym for popular.
12   Q    Did you tell Mr. Garabedian that Mr. Ralston
13        was well liked and well respected?
14   A    Possibly.
15   Q    And you say possibly because Mr. Ralston was
16        well liked and was well respected?
17             MS. DOUGHERTY:  Objection.
18             THE WITNESS:  Again, there were very
19        few teachers.  Of course everybody was well
20        liked by at least one group in our school.  My
21        graduating class was 94 or 95 people, as I'm
22        sure you already know.  So obviously we had
23        teachers who we very much liked, other teachers
24        were not liked by that same group of students.
25        It's just the way a small community lives.
```

1502a

1    BY MR. JUBB:

2    Q    Okay.  Well, considering that small community,

3         can you think of anybody who had anything bad

4         to say about Mr. Ralston other than you?

5              MS. DOUGHERTY:  Objection.

6              THE WITNESS:  I never asked.

7    BY MR. JUBB:

8    Q    Did you tell Mr. Garabedian -- strike that.

9              From the last time we spoke I believe

10        your testimony was that upon graduation from

11        The Hill School you had never returned.  Do you

12        recall that?

13             MS. DOUGHERTY:  Objection.

14             THE WITNESS:  Yes.

15   BY MR. JUBB:

16   Q    Okay.  Did you tell Mr. Garabedian that you

17        returned after graduation?

18             MS. DOUGHERTY:  Objection.

19             THE WITNESS:  I drove by it.  I

20        didn't go on campus.  Two completely different

21        things.

22   BY MR. JUBB:

23   Q    What were you doing in Pottstown, Pennsylvania,

24        as a citizen of Wisconsin?

25             MS. DOUGHERTY:  Objection.

1503a

```
 1                  THE WITNESS:  I was visiting a friend
 2         at Cornell, and my girlfriend at the time --
 3         after we left Washington DC to visit my
 4         grandparents -- one of which was a United
 5         States senator -- we drove through
 6         Philadelphia, and she said, "I would like to
 7         see where you went to high school."  So I drove
 8         her by the campus and did not ever put my
 9         vehicle on that property.
10   BY MR. JUBB:
11   Q     Who was the girlfriend at the time?
12   A     You already know the answer.
13   Q     Okay.  So what year was this?
14   A     1999.
15   Q     So is that the story that you told
16         Mr. Garabedian?
17                  MS. DOUGHERTY:  Objection.
18                  THE WITNESS:  I don't remember the
19         specifics of what I told Mitchell Garabedian
20         about my trip passing through Pennsylvania on
21         my way back from New York, Washington DC, West
22         Virginia into Ohio and then back to Milwaukee.
23   BY MR. JUBB:
24   Q     I'm not asking for, you know, which exits you
25         took.  I'm asking whether or not you told
```

1504a

Kurtis Poulos

```
 1        Mr. Garabedian that you went back to The Hill
 2        School?
 3                  MS. DOUGHERTY:  Objection.
 4                  THE WITNESS:  I do not recall.
 5   BY MR. JUBB:
 6   Q    Okay.  Now, is it your testimony that having
 7        driven from DC through Philadelphia that you
 8        just circled -- you did a lap around The Hill
 9        School campus; is that it?
10                  MS. DOUGHERTY:  Objection.
11                  THE WITNESS:  We may have gotten
12        food, but I didn't go on the actual campus.
13   BY MR. JUBB:
14   Q    So your girlfriend wanted to see the school
15        that you went to, but when you took her there
16        -- and you took her from Philadelphia out to
17        the suburbs on 76 traffic, you just did a lap
18        around the school?
19                  MS. DOUGHERTY:  Objection.
20                  THE WITNESS:  There's nothing --
21        everything is visible from basically -- at
22        least it was, you could see Dutch Village from
23        the outside area.  You could see the dining
24        hall.  You could see the library.  You could
25        see the headmaster's home.  There was no reason
```

Kurtis Poulos

```
 1        to actually go on campus, and either which way
 2        class was not in session.  So I wouldn't feel
 3        comfortable going on that property for multiple
 4        reasons, but to just drive up, assuming I can,
 5        seems rude.  I wasn't invited.
 6   BY MR. JUBB:
 7   Q    You thought it would have been rude to drive on
 8        to your high school campus and that's why you
 9        didn't take your girlfriend on there --
10                 MS. DOUGHERTY:  Objection.
11   BY MR. JUBB:
12   Q    -- after she asked to see your school and
13        you're driving back up from DC?
14                 MS. DOUGHERTY:  Objection.
15                 THE WITNESS:  She saw my school.
16   BY MR. JUBB:
17   Q    What was the route that you were taking --
18                 MS. DOUGHERTY:  Stop.  He's still
19        talking.
20                 MR. JUBB:  I'm putting my head down
21        and he's -- I don't hear anything.
22                 MS. DOUGHERTY:  Well, I can hear him
23        and I can see him.
24                 THE WITNESS:  Lane, you have got
25        three minutes to finish.
```

1506a

```
 1   BY MR. JUBB:

 2   Q   I have as long as I need.  I have a court

 3       order, and you would be wise to open your email

 4       to see what that order says and maybe you

 5       wouldn't have this three minutes remaining.  So

 6       I'm going to continue my questions, and if you

 7       need to see the order again, I will show it to

 8       you.

 9              So my question was what route did you

10       take that you said to Mr. Garabedian "I went

11       back to The Hill School," what was that route?

12       You said you were coming from DC?

13              MS. DOUGHERTY:  Objection.  Are you

14       asking about what he told Mr. Garabedian or his

15       route?  Because you started with Mr. Garabedian

16       and then you ended with the route.

17              MR. JUBB:  I think it was perfectly

18       fine.  I will --

19              MS. DOUGHERTY:  No.  It's not because

20       he's repeatedly said he doesn't know what he

21       told Mr. Garabedian.  So it's fine.  I just

22       want to know which one you're asking.

23   BY MR. JUBB:

24   Q   When you were talking to Mr. Garabedian about

25       going back to visit the school, do you believe
```

1507a

Kurtis Poulos

```
 1        that you gave him any sort of details about

 2        that?

 3   A    No.

 4   Q    He never asked you, "Why would you go back to

 5        the school?"

 6                   MS. DOUGHERTY:  Objection.

 7                   THE WITNESS:  Not to my recollection.

 8   BY MR. JUBB:

 9   Q    All right.  And then to clarify, you were

10        living in which location as of 1999?

11   A    I was living near the UWM campus, I believe, on

12        Cramer Street, or that's where her apartment

13        was.  It was --

14   Q    And was that the trip home from Washington DC?

15   A    That was the trip home from what started in

16        Cornell, and I went to visit my grandfather who

17        was dying of Alzheimer's.

18   Q    So that was at the Cornell -- was that Ithaca

19        area?

20   A    Correct.

21   Q    And then you were coming down to DC.  What was

22        that about?

23   A    I just said to visit my dying grandfather.

24   Q    I thought that was in Cornell.

25   A    No.  My friend from my Marquette High School
```

1508a

Kurtis Poulos

```
 1        was going to Cornell.  I then went to

 2        Washington DC because my girlfriend had never

 3        been there and wanted to meet my grandparents.

 4   Q    Okay.  So you and your girlfriend were both in

 5        Cornell at the same time, correct?

 6                  MS. DOUGHERTY:  Objection.

 7                  THE WITNESS:  Yes.

 8   BY MR. JUBB:

 9   Q    All right.  Now I'm following, and then after

10        DC you guys drive back to Wisconsin, right?

11   A    Correct, and the easiest way back is through

12        Pennsylvania turnpike.

13   Q    I see your hand shaking.  Initially you had

14        said in some of your pleadings that this

15        process that you're alleging to have occurred

16        had caused you to have the tremors, correct?

17   A    Correct.  I have Parkinson's.

18   Q    Right.  Did you ever tell Mr. Garabedian that

19        doctors have actually diagnosed you have

20        shaking because of your alcohol withdrawal?

21                  MS. DOUGHERTY:  Objection.

22                  THE WITNESS:  If I had alcohol

23        withdrawal, that would mean I was drinking.  It

24        has nothing to do with that.  I have had this

25        tremor since I was in my teens before I was
```

1509a

```
 1        even drinking.

 2   BY MR. JUBB:

 3   Q    Was it as noticeable?

 4   A    No.  It gets noticeable when I have to wake up

 5        at 5:00 in the morning because I don't sleep

 6        because of bullshit like this.

 7   Q    So to the extent that Mr. Garabedian was asking

 8        you about your tremor, you said that to him?

 9   A    He never saw my tremor.

10   Q    Right.  You didn't see him.  Did you tell him

11        you had a tremor?

12   A    You have already asked if I told him about my

13        medical conditions, so, of course, I have told

14        him about my tremor.

15   Q    And when you told him about your tremor, did he

16        follow up with any questions about any medical

17        providers diagnosing you with it, when you were

18        diagnosed with it and potential causes?

19   A    I don't believe so.

20   Q    Am I correct, though, that a physician has told

21        you that your tremors are related to alcohol?

22   A    No.

23   Q    At some point in time, am I correct, that

24        Mr. Garabedian told you that the school was

25        giving him the runaround?  Do you recall that?
```

1510a

1    A    To an extent.

2    Q    I want to show you something.  I'm going to

3         mark this as Poulos 2.  It's Garabedian 67.

4         This is an email from you to Mitchell

5         Garabedian dated 2/19/2019.  Subject line, "How

6         are things going?"  Do you see that?

7    A    Yes.

8    Q    Okay.  And you said, "Hey, Mitchell.  I just

9         wanted to check in and see how things are going

10        with The Hill School.  I haven't heard anything

11        from you guys since I did that phone interview

12        with your associate a while back.  I'm hoping

13        to put this whole thing in the rear view as

14        soon as possible so I can move forward with my

15        life.  Thanks so much for everything!"  This is

16        dated February 19th, 2019.

17             Am I correct the interview to which

18        you refer in this email with his associate was

19        the one from December of 2017?

20             MS. DOUGHERTY:  Objection.

21             THE WITNESS:  Correct.

22   BY MR. JUBB:

23   Q    Now, at any point in time did Mr. Garabedian

24        tell you that school was trying to contact him?

25   A    I don't believe so.

1511a

Kurtis Poulos

```
 1   Q    Am I correct that ultimately when this lawsuit
 2        was filed against you, he told you to go to the
 3        police; is that correct?
 4   A    I don't believe so.
 5   Q    At no point in time did Mr. Garabedian ever
 6        tell you to contact the police department?
 7   A    I don't believe so.  I had already previously
 8        reached out to the Pottstown Police Department.
 9   Q    Was that in -- what time frame?
10   A    When I was living in Connecticut, so any time
11        from 2017 to 2018.
12   Q    All right.  Well, when you were communicating
13        with Mr. Garabedian, do you have any
14        recollections of you telling him that you are
15        going to reach out to the police department?
16   A    No.
17   Q    Do you have any recollection of actually
18        speaking with the Pottstown Police Department?
19   A    Yes.
20   Q    All right.  And what do you recall about that?
21   A    I gave no specific names.  I asked if there was
22        anything I could do, and I have been asked to
23        fly to Pottstown or Philadelphia and drive to
24        Pottstown and speak to them in person.  I did
25        not have the money.
```

1512a

```
1    Q    So is it your testimony that the reason you're

2         unwilling to go and speak to the Pottstown

3         police to investigate alleged sexual abuse is

4         because you don't have the money to get there?

5    A    Correct.

6    Q    And at some point, approximately 2014, 2015,

7         you had a trust fund in your name, correct?

8    A    2014, 2015, yes.  I did have the remainder of a

9         trust fund.

10   Q    And that's all gone, right?

11              MS. DOUGHERTY:  Objection.

12              THE WITNESS:  Yes, Lane.  Otherwise I

13        would have an attorney here with me.

14   BY MR. JUBB:

15   Q    And did Mr. Garabedian ever inquire into your

16        financial despair?

17              MS. DOUGHERTY:  Objection.

18              THE WITNESS:  Despair would imply

19        that I'm destined to.  No, he did not ask how

20        much money I had.

21   BY MR. JUBB:

22   Q    Do you believe you made him aware that you had

23        a trust fund, that you had blown through that?

24              MS. DOUGHERTY:  Objection.

25              THE WITNESS:  Your verbiage of saying
```

1513a

1          that I have blown through that is unequivocally

2          wrong.  The money was spent on my education,

3          and my father spent the rest of it.

4     BY MR. JUBB:

5     Q    Did you tell Mr. Garabedian that?

6     A    I told him what I spent it on, which were my

7          personal expenses, high school, which is all I

8          wanted back was my college -- high school

9          tuition.  I spent it on college.  Part of my

10         trust fund was that while attending school I

11         was not allowed to have a job because I was

12         supposed to be focused on studies.  So they

13         paid for my rent.  They paid for my car.  They

14         paid for my insurance.  That's in your mind

15         blowing through it, then fine.

16              You also have to understand that the

17         trust fund wasn't written like just give this

18         guy a check.  It was written so that every time

19         my father has a child, they just take more and

20         more of the money and it divvies up more and

21         more and more.  So what was one thing became

22         six things.

23    Q    And in your discussions with Mr. Garabedian,

24         did you tell him that your trust fund had been

25         diminished entirely because of your dad?

Kurtis Poulos

```
 1   A    It wasn't entirely diminished by my father.

 2   Q    Okay.  Was there any money left at the time you

 3        spoke with Mr. Garabedian?

 4   A    In the entire Froedtert family trust that is

 5        still around, which pays for a hospital and

 6        everything else, there's about $48 million, and

 7        I don't use any of it.  I don't --

 8   Q    I'm sorry to interrupt you.  But is this the

 9        trust to which you referred that you have no

10        more money now?

11   A    I have had three trust funds.  So one was for

12        high school, college.  The other was for living

13        expenses.  Those two are gone.  The other one

14        I've never touched, and I have no plan to.

15   Q    Do you recall making or leaving any voice mails

16        for Mr. Garabedian to call you back?

17   A    Yes.

18   Q    Do you recall him leaving you any voice mails?

19   A    No.  Because typically if he called, I picked

20        up.

21   Q    In that time frame, the 2017 and 2018, do you

22        know what your cell phone number was?  Is it

23        the same as it is now?

24   A    No, it is not.  I changed my phone number.

25   Q    When did you change your phone number?
```

1515a

```
1   A    Summer of 2019.

2   Q    Was it after I sued you?

3   A    No.

4   Q    You changed your number before I filed the

5        lawsuit?

6   A    I got on a family plan with my mother, and I

7        didn't want it -- I didn't want certain people

8        having my phone number.  So the people that

9        needed to have it, have it; the people that

10       don't, don't.

11  Q    So when you changed your phone plan in the

12       summer of 2019 -- what's your current number

13       then?

14  A    262-330-4604.

15  Q    And then what was your number at the time of

16       the 2017 to 2018, right before that?

17  A    414-704-5715.

18  Q    Did you have Mr. Garabedian's cell phone

19       number?

20  A    No, I had his office line.

21  Q    Do you recall any discussions that you had --

22       strike that.

23             We've already discussed that you had

24       some discussions with Mr. Garabedian's

25       associates or paralegals, whoever they have may
```

Kurtis Poulos

```
1        been.  Do you recall any specifics about those

2        discussions?

3   A    No.

4   Q    You're welcome to smoke, but it is a formal

5        proceeding.  So I will just ask my questions.

6                MS. DOUGHERTY:  Mr. Poulos, you can't

7        smoke.  This is like we're in court.  If we

8        need to take a break because you want to smoke,

9        that's fine.  Are we taking a break?

10               THE WITNESS:  I just assumed --

11               MR. JUBB:  I wouldn't do that, but

12       we're happy to take a break if you need to

13       smoke.

14               THE WITNESS:  Five minutes.

15               MR. JUBB:  All right.

16               THE VIDEOGRAPHER:  Going off the

17       record at 9:13.

18               (Brief recess taken.)

19               THE VIDEOGRAPHER:  We're back on the

20       record at 9:19.

21  BY MR. JUBB:

22  Q    Mr. Poulos, I want to follow up on a couple of

23       questions I had about the police, the Pottstown

24       Police Department.  Do you recall any of those

25       discussions that you had with them?
```

1517a

```
 1   A    Not specifics.

 2   Q    Did you ever communicate with them by any means

 3        other than by telephone?

 4   A    No.

 5   Q    Did you tell Mr. Garabedian about your

 6        discussions with the Pottstown Police

 7        Department?

 8   A    Possibly.

 9   Q    As you sit here today, do you have any

10        recollection of your conversation with

11        Mr. Garabedian as it pertained to you

12        purportedly contacting the Pottstown Police

13        Department?

14   A    I don't.

15   Q    Okay.  At some point in time this lawsuit gets

16        filed and you have another conversation with

17        Mr. Garabedian, and in that conversation did he

18        ever bring up to you a criminal background

19        check that revealed that you had an arrest for

20        child endangerment?

21   A    I don't recall.

22   Q    In other words, you don't recall any

23        conversation with Mitchell Garabedian where he

24        said to you in sum and substance, hey, what is

25        this charge of -- of arrest for child
```

1518a

```
 1        endangerment?
 2   A    I remember the arrest, and it was -- excuse my
 3        language, but it was bullshit.  Somebody had
 4        gotten into my American Online account and
 5        tried to entice a young lady.  And obviously
 6        the charges were dropped.
 7   Q    So did you explain that to Mr. Garabedian?
 8   A    Not in so many words.
 9   Q    What did you tell Mr. Garabedian as it pertains
10        to the arrest for child endangerment?
11   A    I don't recall.
12   Q    Tell me the details about the child
13        endangerment.
14   A    I just did.  Someone got into my AOL account,
15        and I guess tried to meet a girl for whatever,
16        and they arrested me driving to, believe it or
17        not, get a haircut because the guy knew all of
18        my personal information.
19   Q    So you're driving to get a haircut and you get
20        pulled over; is that right?
21   A    Correct.
22   Q    And why did you get pulled over?
23   A    Because he had told whoever was pretending to
24        be this girl my make and model of my car, so
25        they had -- I don't know, like, a BOLO to find
```

```
 1        my car which was pretty distinctive given where
 2        I live.
 3   Q    Did you ever see the messages that were sent to
 4        this minor -- someone who is an alleged minor?
 5   A    I believe the cop that questioned me showed me
 6        the -- or showed me the transcript of the
 7        conversations that were being held, but they
 8        weren't done by me.  They even confiscated my
 9        computer, and there was nothing on it.
10   Q    Did you spend any time in jail?
11   A    A night.
12   Q    When you were going to get your haircut --
13        forgive me, now you don't have hair, I guess is
14        the punch line -- what year was this?
15   A    It would have been 19 -- it was just before my
16        21st birthday.
17   Q    And you're on your way to get a haircut and a
18        cop pulls you over, and my question is how did
19        this particular cop know of your child
20        endangerment issue?
21   A    Again, I said they had a description of my
22        vehicle.  And my vehicle at the time was very
23        distinctive.
24   Q    What was it?
25   A    Two-door Chevy Tahoe that was supercharged,
```

1520a

Kurtsis Poulos

```
 1        black on black with silver pin striping.
 2   Q    And as part of them pulling you over, were you
 3        in the vicinity of where the person who was
 4        purportedly acting as you was going to meet
 5        this minor?
 6             MS. DOUGHERTY:  Objection.
 7             THE WITNESS:  I don't believe so.  I
 8        was driving up Capitol Drive to visit my
 9        girlfriend who was going to cut my hair.
10   BY MR. JUBB:
11   Q    And did you give a statement to the police in
12        the police department?
13   A    Yeah.  I was scared out of my mind.
14   Q    And you told them that this wasn't you and
15        someone had hacked your AOL?
16   A    Correct.
17   Q    And what happened after that?
18   A    I found out when I got home they had gone into
19        my house, seized my laptop, and three days
20        later everything was gone, and I --
21   Q    Did they ever return it?
22             MS. DOUGHERTY:  Objection.  He wasn't
23        done with his answer.
24             THE WITNESS:  Did they return it?
25        No.  I had another computer.  I didn't care.
```

1521a

Kurtis Poulos

```
 1   BY MR. JUBB:

 2   Q    Did they have a warrant to search your house?

 3   A    Evidently.

 4   Q    And after executing on this warrant they took

 5        your computer.  Anything else did they take?

 6   A    I don't believe so.

 7   Q    And did you ever try and contact the police to

 8        say, hey, I want my computer back?

 9   A    No, wasn't relevant.

10   Q    And did he -- strike that.

11             At any point in time did

12        Mr. Garabedian ever ask you about the

13        protection from abuse order that was violated?

14   A    Possibly.

15   Q    Did you tell him that -- the story that you

16        told me in your first deposition about how you

17        had to go by her house?

18   A    We lived down a one-way street.  And, again, I

19        had another very distinctive car.

20   Q    And that's what you told Mr. Garabedian?

21   A    I believe so, yes.

22   Q    And did he ask you whether or not you had to do

23        jail time for that?

24   A    I don't recall.

25   Q    At some point did Mr. Garabedian ever say to
```

1522a

Kurtis Poulos

```
 1        you, you know, "Mr. Poulos, before you told me
 2        you didn't have any jail time, but now you're
 3        telling me you did," did he ever ask you about
 4        that?
 5                  MS. DOUGHERTY:  Objection.
 6                  THE WITNESS:  I don't believe so.
 7   BY MR. JUBB:
 8   Q    Did he ever question you why you never
 9        mentioned any of this stuff in your initial
10        intake with him?
11   A    In my mind I did not see how anything that I
12        had done while I was drinking and doing drugs
13        would be relevant in regards to a criminal past
14        to what happened to me a decade prior.
15   Q    When Mr. Garabedian was doing an intake process
16        and he's asking you these questions, did he
17        ever say to you that he wanted you to be
18        truthful?
19                  MS. DOUGHERTY:  Objection.
20                  THE WITNESS:  Of course, and I was.
21   BY MR. JUBB:
22   Q    Did he explain to you in answering his
23        questions he wanted you to be as complete as
24        possible?
25   A    Yes.
```

1523a

Kurtis Poulos

```
 1   Q    And when he asked you about your criminal
 2        history, am I correct there were a number of
 3        things that you didn't inform him of?
 4   A    Possibly.
 5   Q    And despite him telling you he wanted you to
 6        have truthful and fully complete answers, did
 7        you ever explain to him why you didn't tell him
 8        about all your other criminal convictions?
 9              MS. DOUGHERTY:  Objection.
10              THE WITNESS:  No.
11   BY MR. JUBB:
12   Q    Did he seem to care about that at all?
13   A    Restate the question.
14   Q    Sure.  When Mr. Garabedian learned that you did
15        not provide him with a complete history of your
16        criminal history when he first did your
17        interview, did he express to you in any way in
18        sum and substance, you know, disappointment in
19        you for not being forthright about that?
20              MS. DOUGHERTY:  Objection.
21              THE WITNESS:  I don't believe so
22        because, again -- no.
23   BY MR. JUBB:
24   Q    Did Mr. Garabedian ever tell you or suggest to
25        you that you should contact the AG's office?
```

1524a

Kurtis Poulos

```
 1   A    The attorney general's office?

 2   Q    Which attorney general's office?

 3   A    I don't know.  You just brought up the

 4        question.  You keep asking questions and you're

 5        not very specific.  You just said the AG's

 6        office, so which AG am I supposed to reach out

 7        to?

 8   Q    That was my question.

 9   A    I don't know.

10   Q    Okay.  So let's back up.  At any point in time

11        did Mr. Garabedian tell you to contact any

12        attorney general's office?

13   A    No.

14   Q    Okay.  At any point in time did you tell

15        Mr. Garabedian that you were going to contact

16        the attorney general's office?

17   A    I believe at one point I got frustrated with

18        the lack of progress or lack of communication

19        from him and said I was going to reach out to

20        the numerous newspapers that had reached out to

21        me.  And he advised me not to, to just cool my

22        jets and hunker down, and that was it.  And

23        that was the conversation.

24   Q    At any point in time did you contact the

25        attorney general's office?
```

Kurtis Poulos

```
1   A    No.

2   Q    What were you going to contact the attorney

3        general's office about?

4   A    Again, I never planned on calling any attorney

5        general.

6   Q    I'm a little confused.  I thought you said that

7        you had mentioned to Mr. Garabedian that you

8        were getting frustrated with the lack of

9        communication and that you were going to

10       contact the AG's office or the newspapers and

11       he told you to sit tight.  So I could have

12       misinterpreted your testimony, but I want to

13       make sure I'm clear.

14              MS. DOUGHERTY:  Objection.  That's

15       also not what he said.

16              MR. JUBB:  That's what I just said.

17       Maybe I misinterpreted his testimony.  I'm

18       trying to be clear.

19  BY MR. JUBB:

20  Q    Am I correct that when you spoke with

21       Mr. Garabedian, at no point in time did you

22       ever suggest to him that you were going to

23       contact the AG's office?

24  A    No.  I suggested that I would reach out to The

25       Philadelphia Inquirer, the Pottstown magazine
```

1526a

Kurtis Poulos

1      or newspaper, and The Boston Globe and The New

2      York Times and The Washington Post.

3  Q   Okay.  At any point in time did Mr. Garabedian

4      tell you to contact the attorney general's

5      office?

6  A   Not that I believe.

7  Q   And am I correct that you never, per your

8      testimony, contacted in any way the attorney

9      general's office?

10 A   I never contacted the attorney general's office

11     nor have I contacted any newspaper or media

12     outlet.

13 Q   Okay.  And what were you going to contact the

14     newspapers about?

15 A   I was going to, without giving specific names,

16     let them know that there's systemic

17     hypersexualization at boarding schools, and The

18     Hill School is not the only one.

19 Q   So you were going to reach out to the

20     newspapers without giving any names and tell

21     them that there's hypersexualization going on

22     in boarding schools?

23 A   Yeah.

24 Q   And you told Mr. Garabedian that?

25 A   To some effect.

Kurtis Poulos

```
 1   Q    And he said sit tight?

 2   A    He said --

 3   Q    Correct?

 4   A    -- don't.

 5   Q    He said don't do that?

 6   A    Correct, so I did not.

 7   Q    You mentioned that some folks from The New York

 8        Times or other media outlets have tried to

 9        contact you and that you haven't contacted them

10        back.  Do you recall testifying to that?

11   A    Yes.

12   Q    How did they contact you?

13   A    Primarily through my mother.

14   Q    How did they know to contact your mom?

15   A    I can't speak to that.

16   Q    Is it because she was going to contact the

17        newspapers?

18   A    Again, I can't speak to that.  I don't know her

19        intentions or what she may or may not have

20        done.

21   Q    So as you sit here today, you have no knowledge

22        whatsoever of your mom ever indicating to you

23        that she was going to contact the newspapers;

24        is that correct?

25   A    Not willfully, no.
```

1528a

```
1   Q    Was she negligently going to contact the
2        newspaper by accidently dialing their number?
3        What do you mean "willfully"?
4                MS. DOUGHERTY:  Objection.
5                THE WITNESS:  I mean willfully.
6   BY MR. JUBB:
7   Q    Okay.  Well, were you willfully not answering
8        this question?  Because I'm trying to figure
9        out how your mom is going to not call the
10       newspapers willfully.
11               MS. DOUGHERTY:  Objection.  I think
12       you misunderstood his answer.
13  BY MR. JUBB:
14  Q    Mr. Poulos, did your mom contact the
15       newspapers?
16  A    Yeah.  I'm not going to reply to that.  I don't
17       know how that happened.
18  Q    Mr. Poulos, by the way, what are you drinking
19       right now?  Could you hold that up for the
20       camera?  Could you hold that up to the camera
21       for us?
22  A    No.
23  Q    Is that a Bud Light Seltzer?
24  A    No.  It's a Perrier.  Do you want one?
25  Q    Could you hold that up for us?
```

```
 1   A    No.

 2   Q    I just want to see the Perrier label.

 3   A    Don't worry about it.  It's not relevant.

 4   Q    Are you taking your deposition today under any

 5        sort of intoxication?

 6   A    No.  I'm just sleep deprived because I have

 7        been up since 5:00 in the morning.

 8   Q    Mr. Poulos, this is a video-recorded

 9        deposition.  Is that a Bud Light Seltzer?

10   A    No.

11   Q    Is it in any way a malt beverage?

12   A    No.

13   Q    Would you please hold it up to the camera for

14        us?

15   A    No.

16   Q    Any particular reason why?

17   A    Because -- no.

18   Q    So you're unwilling to tell us what you're

19        drinking right now?

20   A    Do you want me to pour it into a glass and I

21        can show you the glass?

22             MS. DOUGHERTY:  Mr. Poulos, just like

23        you can't smoke a cigarette, you can't drink

24        alcohol during a deposition.  So Mr. Jubb is

25        trying to confirm that you're not drinking
```

1530a

1        alcohol.  The easiest way to do that is to just

2        show him the can.

3    BY MR. JUBB:

4    Q    Can you show me the can, Mr. Poulos?

5    A    No.

6    Q    Okay.  Both Ms. Dougherty, who represents

7         Mr. Garabedian and his law firm, as well as me

8         who represents this plaintiff in this case

9         against you where you are alleging sexual

10        abuse, and we told you you can't smoke in the

11        deposition.

12              I'm asking you to show me what that

13        is because it's a video-recorded deposition.

14        And I think we have all seen it a number of

15        times right now.  You're refusing to show us

16        what you're drinking, correct?

17              MS. DOUGHERTY:  Objection.  Okay.  We

18        told him that he couldn't smoke and he stopped

19        smoking.  Nobody has informed him that he can't

20        drink alcohol, so to the extent he's drinking

21        alcohol, it could have been a misunderstanding,

22        but he said he's not drinking alcohol.

23    BY MR. JUBB:

24    Q    Okay.  Mr. Poulos, at any point in time during

25        your depositions spanning however long they may

1531a

Kurtis Poulos

1        have, have you been intoxicated?

2    A    No.

3    Q    All right.  Are you intoxicated now in any way?

4    A    No, I'm exhausted.

5    Q    Mr. Poulos, is there -- did you at any point in

6         time ever believe that it would be appropriate

7         to drink during a deposition?

8    A    Obviously --

9              MS. DOUGHERTY:  Objection.  Drink

10        alcohol?  Because you're certainly allowed to

11        drink during a deposition, right?  We're all

12        drinking.

13             MR. JUBB:  Ms. Dougherty, I think we

14        were pretty clear on what I meant by that.

15   BY MR. JUBB:

16   Q    But in case anybody has any confusion,

17        Mr. Poulos, at any point in time did you

18        believe it would be appropriate for you to

19        drink alcohol during a deposition?

20   A    No.

21   Q    Okay.  And as you sit here today, is it your

22        testimony that what we have just been seeing

23        you drink with two hands for the last hour or

24        so is not a Bud Light Seltzer?

25   A    Correct.

1532a

```
 1   Q    Okay.  Could you just show us to confirm,
 2        because we really would like to see it.
 3   A    No.
 4   Q    All right.  But you get thirsty again, would
 5        you just use one hand, maybe?
 6             MS. DOUGHERTY:  Objection.  It's
 7        unnecessary to make comments like that.
 8        Mr. Poulos, I think you have probably figured
 9        it out by now, but a record is being made about
10        what is occurring.  And to the extent you have
11        been drinking something other than alcohol, it
12        would be beneficial to show it to the parties
13        because plaintiff can certainly -- or
14        Mr. Garabedian, the plaintiff, can certainly
15        file a motion regarding your testimony if you
16        were drinking alcohol.
17             If you were drinking alcohol, then we
18        need to perhaps end the deposition and resume
19        on another day when you're not drinking
20        alcohol.  But to avoid future controversy in
21        motion practice, you won't be able to prove
22        what you're drinking to a court if it's not
23        reflected now in response to Mr. Jubb's
24        questions.
25             I'm just giving you that information
```

1533a

Kurtis Poulos

 1          because you're here without counsel, and if you

 2          had a lawyer, your lawyer would tell you that

 3          you could be subject to motion practice and

 4          perhaps sanction by the court if Mr. Jubb

 5          pursues the issue.

 6                    And since you have not shown the item

 7          on the record as requested, or on the video as

 8          requested, you will have no way to demonstrate

 9          to the court if there's a controversy.  It will

10          just be your word against, you know, Mr. Jubb's

11          contentions.

12                    THE WITNESS:  In regards to his

13          comment about me using two hands, it's because

14          I have a tremor.

15                    MS. DOUGHERTY:  It doesn't matter if

16          you use one or two hands.  It doesn't matter if

17          you use a straw.  It doesn't matter if you use

18          your feet, okay?  What matters is whether it's

19          an alcoholic beverage.

20                    THE WITNESS:  It's not.

21                    MS. DOUGHERTY:  Okay.  Is there a

22          reason why you won't show it on the video?  I

23          realize that it's perhaps offensive to you to

24          be accused of it, but in order to have it to

25          show the court so that you can demonstrate to

Kurtis Poulos

```
 1          the court if there's a motion later, it matters
 2          if it is shown on the video.  It's up to you
 3          whether you decide -- what you decide to do
 4          with that information, but I'm just letting you
 5          know since you don't have a lawyer, okay?
 6   BY MR. JUBB:
 7   Q    Mr. Poulos, having been advised that we would
 8        prefer that you weren't drinking or drunk
 9        during your deposition, would you like to
10        proceed on a different day or would you like to
11        continue now?
12   A    I want to get this over with.
13               MS. DOUGHERTY:  Mr. Jubb, I don't
14        mean to interrupt you either, but, Mr. Poulos,
15        I'm going to have questions as well because of
16        the items you have identified today during your
17        testimony after Mr. Jubb when his questions are
18        over.  I'm concerned that you have, a number of
19        times, indicated that you are exhausted, and at
20        the same issue that being drunk or otherwise
21        impaired through consumption of drugs or
22        alcohol would affect your ability to answer
23        questions, also not having enough rest or being
24        exhausted is a factor that would affect your
25        ability to answer questions.
```

```
 1                  So if that's an issue, then I think
 2          we perhaps need to know that, because Mr. Jubb
 3          and I both are entitled to have, you know,
 4          answers that are based on your mind in a manner
 5          in which you are able to answer the questions
 6          not impaired, whether it be alcohol, drugs,
 7          sleep, or other.  Is there an issue with that?
 8                  THE WITNESS:  The only issue I have
 9          is I have been up since 5:00 a.m., so 6:00 a.m.
10          your time.
11                  MR. JUBB:  Well, Mr. Poulos, I can
12          assure you that Ms. Dougherty and I have quite
13          some schedules, and I have a deposition to get
14          to later today.  I have been up since 4:30.  So
15          I assure you that my questions are from the
16          same level of awakeness as you.  So let's see
17          if we can proceed.
18                  THE WITNESS:  Your questions are
19          questions.  Your questions to me make me try to
20          relive and, again, live through those events
21          that traumatized me 20-some-odd years ago.
22          It's a little bit different than you waking up
23          and getting prepared to victim shame than me
24          knowing that I'm going to be victim shamed
25          again for my past discrepancies.  Like, it's
```

```
 1      just --
 2              MS. DOUGHERTY:  It's not a
 3      competition about who got up the earliest.
 4      It's an issue about whether you have an
 5      impairment, whether it be drugs, alcohol,
 6      sleep, something else, to answer questions.
 7      And so if you are confirming that you don't
 8      have an impairment, then we can proceed.  But I
 9      don't want to ask you questions if you're
10      impaired.
11              It's up to Mr. Jubb -- Jubb,
12      rather -- if he wants to ask you -- I didn't
13      mean to misstate your name.  It's up to
14      Mr. Jubb if he wants to ask questions under
15      different circumstances.  But anyway, I will
16      stop.  I apologize, Mr. Jubb.
17  BY MR. JUBB:
18  Q   Great.  Mr. Poulos, at any point in time in
19      your discussions with Mr. Garabedian, am I
20      correct that he never instructed you to contact
21      any newspapers?
22  A   Yes.
23  Q   And at some point when this lawsuit got filed
24      and he contacted you, tell me about that
25      conversation, please.
```

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  I was concerned.  I did

 3          not know how I had got in trouble for his

 4          actions.

 5     BY MR. JUBB:

 6     Q    When you say "his actions," do you mean the

 7          letters?

 8     A    Correct.

 9     Q    And I'm going to show you something here which

10          we will mark as Poulos 3.  It's an email from

11          you to Mr. Garabedian dated 5/15/2019.  "Dear

12          Mitchell, I am sorry for my tone of voice and

13          demeanor while speaking with you earlier.  It's

14          not my intention to be combative with you.  I

15          hope you can understand my feeling of

16          frustration, which is no excuse.  I will speak

17          to you soon."

18                    Do you recall having a heated

19          conversation with Mr. Garabedian?

20     A    Yes.  This has not been the most easy thing to

21          keep rehashing.

22     Q    Just for the record, this was Garabedian email

23          72, and the date is May 15, 2019.  That's

24          Poulos 3.  What do you recall --

25                    MS. DOUGHERTY:  Can you tell me the
```

1538a

```
1          Bates label again?  I apologize.  I missed it.
2                    MR. JUBB:  Garabedian email 72.
3                    MS. DOUGHERTY:  Thank you.
4    BY MR. JUBB:
5    Q    Tell me everything about that conversation that
6         you can recall.
7    A    I don't recall anything about that
8         conversation.
9    Q    Was there something traumatic about that
10        conversation that you can't recall?
11   A    No.
12   Q    Any other reasons why you can't recall this
13        conversation with Mr. Garabedian after you were
14        sued?
15   A    I just don't recall it.
16   Q    Let me ask you this, after I sued you, do you
17        have a recollection of ever speaking to
18        Mr. Garabedian, anything in your discussions?
19   A    Maybe once or twice asking if he was going to
20        help me.
21   Q    And other than just a general recollection of
22        asking him if he was going to help you, you
23        can't recall any of the discussions between you
24        and Mr. Garabedian after I sued you; is that
25        correct?
```

```
 1   A    Not offhand, except maybe he advised me to find
 2        counsel, that he would not be able to provide
 3        me with counsel during this situation.
 4   Q    Did he explain why?
 5   A    Not in so many words, no.
 6   Q    Did he ever explain to you anything about
 7        potential conflict of interest?
 8   A    I believe so.
 9   Q    Did he ever assist you in finding counsel?
10   A    I don't believe so.  Even if he did, it's not
11        like I can afford it.
12   Q    At any point in time did you, your mother and
13        Mr. Garabedian ever have a phone call, the
14        three of you?
15   A    Not to my recollection.
16   Q    Was your mom permitted to speak with
17        Mr. Garabedian on your behalf?
18   A    On my behalf, no, but she did make contact with
19        him possibly to get advice, I guess.
20        She's also been --
21   Q    Did -- I'm sorry to interrupt you.
22   A    So she thought it might just be advisable that
23        she speak with him, so that we can have an
24        educated conversation about what's going on.
25        Without being a dick, but she can dumb things
```

Kurtis Poulos

```
 1        down because I'm not an attorney.  I don't

 2        speak your language.  You guys have your own

 3        way of presenting everything, and she can give

 4        me a different perspective.

 5   Q    From the documents I reviewed, it looked like

 6        it was your mom who was really pushing you to

 7        contact Mr. Garabedian; is that correct?

 8   A    I think she was worried about me and what was

 9        going on.

10   Q    And that was because -- correct me if I'm

11        wrong -- you were in the hospital very

12        frequently, you were getting some diagnosis

13        with the liver, and then you told her that the

14        reason for your conduct was because you were

15        sexually abused as a minor at The Hill School;

16        is that correct?

17                   MS. DOUGHERTY:  Object.

18                   THE WITNESS:  She knew about that.

19        See, and that's -- you have all this

20        information and your dates are so very, very

21        wrong.  She found out about that years before I

22        ended up in the hospital due to drinking.

23   BY MR. JUBB:

24   Q    Did you tell Mr. Garabedian that you told your

25        mother about this three to four years prior?
```

1541a

Kurtis Poulos

```
 1    A     It would have been more than three or four

 2          years prior.  I was in the hospital in 2014,

 3          2015.  She found out in 2012 or 2013.

 4    Q     Did Mr. Garabedian ask you the context in which

 5          you told your mother about your allegations?

 6    A     I don't believe so.

 7    Q     In other words, he never asked you, you know,

 8          tell me more about the situation that caused

 9          you to say this to your mother; is that

10          correct?

11    A     I don't believe so.

12    Q     When you asked for your file that was

13          maintained by Mr. Garabedian to be sent to you,

14          did you actually look through it?

15    A     Not completely.

16    Q     Did you look through it and see any of

17          Mr. Garabedian's handwritten notes?

18    A     Not to my recollection, but I wouldn't know his

19          writing.

20    Q     Okay.

21    A     I'm not a stenographer.

22    Q     Well, at any point in time when Mr. Garabedian

23          asked you about who you had spoke about your

24          allegations with, did you tell him any other

25          individuals other than your mother or your
```

1542a

Kurtis Poulos

```
 1        prior girlfriend?
 2   A    No.
 3   Q    At the time you contacted Mr. Garabedian, did
 4        he ask you if you were currently in a
 5        relationship?
 6   A    Yes.
 7   Q    And at the time what did you say?
 8   A    That I was.
 9   Q    And was that with Emily?
10   A    Yes.
11   Q    Was there any contact between Mr. Garabedian
12        and Emily?
13   A    Not to my knowledge.
14   Q    Tell me the -- strike that.
15   A    Hey, Clifford.
16   Q    At any point in time did Mr. Garabedian ask you
17        about any potential witnesses who would be able
18        to corroborate your claims?
19   A    Not to my recollection.
20   Q    Did you ever tell Mr. Garabedian any of the
21        names of the students that were in your
22        geometry class?
23   A    No.  Because, again, I do not remember the
24        exact people that were in my geometry class
25        when I was 15 years old.
```

1543a

Kurtis Poulos

```
1   Q    You said you don't remember exactly.  Do you
2        remember -- can you name any individual from
3        memory that was in your geometry class?  Is
4        that a no?
5   A    Yeah, no.
6   Q    All right.  When you spoke with Mr. Garabedian,
7        did you explain to him anything about the
8        classroom and what it looked like?
9   A    I believe so.
10  Q    Did you tell him that -- if there were no
11       windows in the classroom?
12  A    No.  There was at least the window in the door.
13       Again, like I have described before, it was a
14       very small window.  I do not recall there being
15       windows facing the quad, which was where that
16       particular classroom would have been, because
17       right above them was the patio in the upper
18       school building.  So I don't really see how
19       there would have been windows out of that room.
20            Possibly when you walked in there
21       might have been windows on the left -- the
22       front-facing wall that would have looked out
23       into the parking lot.  But I do not recall
24       windows in that room.
25  Q    When you first testified, you were pretty
```

1544a

1      adamant that there were no windows in that

2      room, correct?  Are you now saying there might

3      be?

4   A  Again, 27 years have passed.  I'm doing my best

5      to recall the layout of a school that I have

6      done everything to forget.  I do remember there

7      being the one window in the door that was very

8      small but very tall.

9   Q  Did Mr. Garabedian ask you about any of the

10     charges pertaining to the Maryland incident?

11  A  I don't believe so.

12  Q  Well, when he asked you about your charges, did

13     you tell him about the Maryland incident?

14  A  Possibly.  I do not recall the specifics.

15  Q  Let's assume that Mr. Garabedian asked you

16     about your criminal background, because we have

17     seen reference to the fact that you told him

18     about your disorderly conduct.  So why don't

19     you tell us, assuming you were being truthful

20     and honest with Mr. Garabedian, all of the

21     incidents where you were arrested.

22            MS. DOUGHERTY:  Objection.  Are you

23     asking him all the incidents he told

24     Mr. Garabedian?

25            MR. JUBB:  Right.  Because

1545a

```
 1        Mr. Garabedian asked him what his criminal

 2        history was, and assuming that Mr. Poulos was

 3        going to be complete and truthful, then I would

 4        imagine what he tells us now, that's what he

 5        would have told Mr. Garabedian.

 6             MS. DOUGHERTY:  Mr. Jubb, you realize

 7        that people don't necessarily have a list with

 8        that regard for whether they intend or don't

 9        intend to be truthful.  I was just trying to

10        confirm that you were asking Mr. Poulos what he

11        told Mr. Garabedian about the arrests, as

12        compared to whether you were asking him about

13        his arrest.  That's all.

14             MR. JUBB:  I'm asking Mr. Poulos as

15        to what arrests he believed he relayed to

16        Mr. Garabedian.

17             THE WITNESS:  I don't recall.

18   BY MR. JUBB:

19   Q    Well, as you sit here today, what arrests exist

20        out there for you?

21   A    You know the answer, because you have obviously

22        done your research.  I don't have, like, an

23        Excel spreadsheet of all of my fuck-ups.

24   Q    Do you need an Excel spreadsheet to keep track

25        of all of your F-ups?
```

1546a

Kurtis Poulos

```
 1   A     No.  That was an exaggeration.  But, no, I do
 2         not have specifics about --
 3   Q     Why don't you tell us generally what you can
 4         recall about your arrests, please.
 5   A     I was never arrested for anything in Maryland.
 6         I was arrested for disorderly conducts a few
 7         times.  I was arrested for driving by an
 8         apartment because I frankly had to drive past
 9         the apartment to get to the lakefront to go to
10         work.  And I was arrested for that BS claim
11         that I tried to entice a girl on American
12         Online.
13   Q     So the arrest for the violation of the PFA,
14         that was just wrong place at the wrong time,
15         correct?
16   A     Yeah.  I'd actually gone to a movie with a
17         friend, and I was driving down from my
18         apartment after dropping him off to go down to
19         McKinley Marina.  And the only way I can get
20         there from where I was living at the time was
21         to drive down Prospect.  Well, when you drive a
22         straight-pipe Z28 Camaro, it's kind of
23         noticeable.  So she heard me.  She called me
24         in.  I went down there, picked up some stuff,
25         went back home.  By the time I was back in the
```

1547a

1          apartment, the cops were knocking on my door.

2    Q    And that's the full story on the violation of

3          the PFA; is that right?

4    A    Yeah.  I had no contact with her.  In fact,

5          there were multiple occasions where she would

6          frequent a restaurant and I would be there with

7          friends and I would leave.  And, no, I didn't

8          tell my friends why I left, but I left, and I

9          would just be like, "I will meet you at the

10         next place."

11   Q    So the violation of the PFA, that had nothing

12         to do with you trying to light her car on fire

13         and scribbling the words C-U-N-T into her door?

14              MS. DOUGHERTY:  Objection.

15              THE WITNESS:  I never --

16   BY MR. JUBB:

17   Q    That never happened?

18   A    I never did it.

19   Q    What about Maryland?  You said you weren't

20         arrested there, but you were charged with

21         something there, correct?

22              MS. DOUGHERTY:  Objection.

23              THE WITNESS:  Why is this relevant?

24         You just want to, like, drag me through the

25         mud?

```
 1   BY MR. JUBB:
 2   Q    I'm trying to understand when Mr. Garabedian
 3        asked you what your arrests were, what you were
 4        charged with, what --
 5   A    Why keep -- now you're just browbeating this.
 6   Q    Mr. Poulos, if you tell me all of these things,
 7        then I'm trying to figure out if you told
 8        Mr. Garabedian that.  So did you tell
 9        Mr. Garabedian about the violation of the PFA?
10   A    Possibly.  Again, asked and answered.  I don't
11        recall every innuendo or everything I stated in
12        that conversation.  I don't.
13   Q    Okay.  And that's why I'm having to get
14        specific, because you say you don't recall
15        everything.  So I'm trying to refresh your
16        recollection based off of --
17   A    No, you're trying to victim shame me by
18        bringing up my bad past.
19   Q    Mr. Poulos, I have no intention of victim
20        shaming anybody, because I do not consider you
21        a victim.  So why don't you focus on answering
22        my questions, okay?  We will get through this
23        together.
24              MS. DOUGHERTY:  Objection.
25   BY MR. JUBB:
```

1549a

Kurtis Poulos

```
 1   Q    So did you ever tell Mr. Garabedian that you
 2        were arrested for enticing a minor before he
 3        learned from getting a criminal background
 4        check?
 5   A    I'm just going to tell you right now, this is
 6        over.  You can file a motion or do whatever you
 7        want to do, but I'm not going to rehash every
 8        wrongdoing of my life that I may or may not
 9        have told Mitchell.  I'm just not going to.  If
10        you want the court to compel me, you have the
11        information of what I did and did not do wrong.
12   Q    I'm trying to understand whether you told
13        Mr. Garabedian and at what point.  That's my
14        only attempt here, okay?  And --
15             MS. DOUGHERTY:  Objection.  Mr. Jubb,
16        some of your questions are not about what was
17        or wasn't discussed with Mr. Garabedian.  So
18        perhaps it's part of the confusion.
19             MR. JUBB:  It's not part of the
20        confusion.
21             MS. DOUGHERTY:  You do seem to be --
22        I don't know why you're interrupting me.  I
23        don't know why you're talking over me.  You
24        really have --
25             MR. JUBB:  And what you're saying is
```

Kurtis Poulos

```
 1        just -- it doesn't make any sense at all.
 2                MS. DOUGHERTY:  Mr. Jubb, you don't
 3        get to just talk over me because you have an
 4        opinion about the substance of what I'm saying.
 5                MR. JUBB:  Please continue.
 6                MS. DOUGHERTY:  You are absolutely
 7        asking Mr. Poulos about the substance of
 8        arrest, which I think you realize are not
 9        admissible.  So I do think there is perhaps
10        some confusion, because you're saying you're
11        asking only about the stuff with
12        Mr. Garabedian, but a lot of your questions are
13        about the substance of the criminal background.
14        So I think you do need to limit your questions
15        to the discussions or reasonably therefrom.
16                MR. JUBB:  Are you done?
17                MS. DOUGHERTY:  I think you know that
18        I'm done, Mr. Jubb.  And being rude and
19        unprofessional to me doesn't suit you.
20   BY MR. JUBB:
21   Q    Okay.  So, Mr. Poulos, I want to know what you
22        told Mr. Garabedian, and you can't recall it as
23        to which arrest, convictions, charges you
24        mentioned to him.  I'm trying to get an
25        understanding as to how many there are so that
```

1551a

Kurtis Poulos

```
1        I can then say, "Did you tell Mr. Garabedian

2        that?  Did he have any follow-up questions?"

3        That's where we're going with this, okay?

4    A   You already know the answer to every arrest,

5        conviction; I don't.

6    Q   Did you tell Mr. Garabedian that you had been

7        in any sort of altercation with your domestic

8        partner at one point?

9    A   Possibly.

10   Q   When do you think that would have occurred?

11   A   I would imagine during the intake interview.

12   Q   Did you ever discuss with Mr. Garabedian the

13       charges that were filed against you in Maryland

14       at any point?

15   A   Not to my recollection.

16   Q   Is there any particular reason why you wouldn't

17       have told Mr. Garabedian that when in the

18       interview process he's asking you about

19       charges, convictions, and arrests?

20            MS. DOUGHERTY:  Objection.

21            THE WITNESS:  Again, I don't see how

22       this is relevant.  So, no.

23   BY MR. JUBB:

24   Q   So, no, you didn't tell him about it?

25   A   No, I do not believe so.  Next question.
```

1552a

Kurtis Poulos

```
 1   Q    Did Mr. Garabedian ever give you any indication

 2        about the potential merits of claims against

 3        The Hill School?

 4              MS. DOUGHERTY:  Objection.

 5              THE WITNESS:  No.  Because any of my

 6        behavior, except for what happened at that

 7        school, is irrelevant.  Your client, that's who

 8        knew about it, they did nothing.

 9   BY MR. JUBB:

10   Q    Have you finished your answer?

11   A    Yeah, go ahead.

12   Q    Did Mr. Garabedian give you any indication

13        about potential merits of your claim against

14        The Hill School?

15   A    No.  Because as your paid psychiatrist, my

16        psychiatrist have both determined I suffered

17        severe PTSD, anxiety, and trust issues due to

18        something that happened to me while I was being

19        abused by your client and your client's school.

20   Q    Perhaps you're not hearing my question

21        correctly.  My question was did Mr. Garabedian

22        ever advise you or give you any indication

23        about the potential merits of a claim against

24        The Hill School?

25   A    No --
```

1553a

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  -- because I'm telling

 3        the truth.

 4   BY MR. JUBB:

 5   Q    Okay.  I have no idea what that means.  Did

 6        Mr. Garabedian ever give you any --

 7   A    Don't know what that means?  I'm telling the

 8        truth.  The truth is the truth.

 9                    MS. DOUGHERTY:  Mr. Poulos, I don't

10        think you're listening to Mr. Jubb's question.

11   BY MR. JUBB:

12   Q    It's nonsensical.  So, Mr. Poulos, please pay

13        attention because Ms. Dougherty and I both want

14        an answer to this question, okay?

15                    Did Mr. Garabedian ever give you any

16        indication as to the potential merits of a

17        lawsuit filed by you against The Hill School?

18                    MS. DOUGHERTY:  Objection.

19                    THE WITNESS:  No.

20   BY MR. JUBB:

21   Q    No.  Okay.  Did he ever give you any indication

22        about the potential likelihood of success of a

23        lawsuit filed against The Hill School?

24                    MS. DOUGHERTY:  Objection.

25                    THE WITNESS:  Nothing in specifics.
```

1554a

Kurtis Poulos

```
 1   BY MR. JUBB:

 2   Q    Anything general?

 3   A    That this was not going to be an easy road to

 4        walk down.

 5   Q    Is that because your case was barred entirely

 6        by the statute of limitations?

 7   A    No.  Because these things do not just go away.

 8        It's a long road.  It's an arduous road, and

 9        it's taking a toll on me and my family.

10   Q    Did Mr. Garabedian ever give you any indication

11        as to the potential likelihood of success?

12                  MS. DOUGHERTY:  Objection.

13                  THE WITNESS:  Not in specifics.

14   BY MR. JUBB:

15   Q    Did he ever say to you, well, you know, I think

16        you've got a 50 percent chance or 40 percent

17        chace, anything along those lines?

18                  MS. DOUGHERTY:  Objection.

19                  THE WITNESS:  Asked and answered.

20        Not in specifics.

21   BY MR. JUBB:

22   Q    Did he say to you, "More likely than not I

23        think you're going to be successful"?

24                  MS. DOUGHERTY:  Objection.

25                  THE WITNESS:  Again, asked and
```

Kurt F. Foudos

```
 1        answered.  Not in specifics.
 2   BY MR. JUBB:
 3   Q    I'm trying to be as general as possible, okay?
 4        I don't want specifics, because you said you
 5        can't recall anything specifically.  He didn't
 6        give you anything specifically.  So I'm trying
 7        to be general.
 8                   In any way, shape, or form -- in any
 9        way, shape, or form did Mitchell Garabedian
10        provide you with any indication as to the
11        potential likelihood for success of a potential
12        case against The Hill School?
13                   MS. DOUGHERTY:  Objection.
14                   THE WITNESS:  No.
15   BY MR. JUBB:
16   Q    Okay.  Now, did Mr. Garabedian tell you whether
17        or not he was barred in Pennsylvania?
18   A    No.
19   Q    Where did he say any potential case could have
20        been brought?
21                   MS. DOUGHERTY:  Objection.
22                   THE WITNESS:  I don't recall.
23   BY MR. JUBB:
24   Q    Did he tell you that he was going to be working
25        with some attorney in Pennsylvania?
```

1556a

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  Not to my recollection.

 3   BY MR. JUBB:

 4   Q    Did you believe that Mr. Garabedian was barred

 5        in Pennsylvania?

 6                    MS. DOUGHERTY:  Objection.

 7                    THE WITNESS:  Asked and answered.  I

 8        just told you I did not that know he was barred

 9        from practicing law in the state of

10        Pennsylvania.

11   BY MR. JUBB:

12   Q    I need to clarify that.  Did you know whether

13        or not he was admitted to practice law by the

14        Supreme Court of Pennsylvania?

15   A    I did not.

16   Q    Do you have any knowledge whatsoever as to

17        whether or not Mr. Garabedian was admitted to

18        practice law in Pennsylvania?

19   A    I didn't know the specifics.  I took advice

20        from family.

21   Q    When you told Mr. Garabedian about, you know,

22        what your allegations were with respect to the

23        sexual abuse and you laid it out for him in the

24        manner in which you testified previously in

25        your deposition that Ms. Dougherty had taken
```

```
 1        you through, and when he heard all that, did he

 2        give you any indication that that made sense to

 3        him or that he found it credible at all?

 4   A    Reask the question.

 5   Q    Sure.  Am I correct that the allegations of

 6        sexual abuse that you described previously in

 7        your depositions, the manner in which they

 8        would occur according to your testimony, that

 9        that is what you told Mr. Garabedian during

10        your discussion with him?

11   A    Correct.

12   Q    Okay.  And when you told him about that, did he

13        give you any indication as to whether or not he

14        said that makes sense or this is credible,

15        anything along those lines?

16   A    He said he trusted in my truth, basically, not

17        verbatim, but --

18   Q    When you say he trusted in your truth, what do

19        you mean by your truth?

20   A    The truth of the situation, the truth of what

21        happened.

22   Q    In other words, when you told him your story

23        about how this occurred, Mr. Garabedian said to

24        you in sum and substance, yeah, I believe you

25        and this makes sense?
```

1558a

Kurtis Poulos

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  Correct.

 3   BY MR. JUBB:

 4   Q    Did you tell Mr. Garabedian that you left The

 5        Hill School for your junior year of high

 6        school?

 7   A    Yes.

 8   Q    Did you tell him that you then returned to The

 9        Hill School?

10   A    Yes.

11   Q    Did he ever ask you, hey, Kurtis, why did you

12        come back to The Hill School after you were,

13        you know, reportedly getting sexually abused?

14   A    I don't recall.

15   Q    You don't recall whether or not he asked you

16        that question?

17   A    I don't remember if he asked me specifically

18        why I went back there my senior year.

19   Q    Did he ever question, in any way that you can

20        recall, why you returned to The Hill School?

21   A    No.

22   Q    At any point in time are you aware as to

23        whether or not you or your mother provided the

24        yearbooks to Mr. Garabedian?  I know you said

25        you never maintained them -- let me back up.
```

1559a

Kurtis Poulos

```
 1          I'll just clarify.  Strike that.
 2                    Was it ever your understanding that
 3      your mom was able to obtain your yearbooks?
 4   A   I know she has obtained them.
 5   Q   Okay.  At some point did you learn that she
 6      provided them to Mr. Garabedian?
 7   A   I'm not aware of her providing them.  I am
 8      aware --
 9   Q   In other words, as far as you know,
10      Mr. Garabedian has never requested those --
11                    MS. DOUGHERTY:  You just talked over
12      the rest of his answer.
13                    MR. JUBB:  I'm sorry.  I had my head
14      down.  Go ahead.
15                    THE WITNESS:  I know that she offered
16      to provide them.  I don't know whether he
17      received them.  I don't ask questions that I
18      don't care about.
19   BY MR. JUBB:
20   Q   Okay.  You weren't concerned as to whether or
21      not the lawyer who was going to -- that you
22      contacted with a claim of sexual abuse had your
23      yearbooks?
24                    MS. DOUGHERTY:  Objection.
25                    THE WITNESS:  No.
```

1560a

Kurtis Poulos

```
 1   BY MR. JUBB:

 2   Q    As far as the statute of limitation goes, did

 3        Mr. Garabedian explain to you the difference

 4        between civil and criminal?

 5   A    I already knew the difference between civil and

 6        criminal.

 7   Q    Am I correct that at the time you contacted

 8        Mr. Garabedian you were well aware of what the

 9        difference was between criminal and civil

10        statute of limitations?

11   A    Correct.

12   Q    And at the time you contacted Mr. Garabedian,

13        you were aware that the statute of limitations

14        of any potential civil case against The Hill

15        School and/or Matt Ralston had expired,

16        correct?

17   A    Correct.  Again, I reached out because this was

18        something that the school reached out to us as

19        alumnus and they wanted a resolution.

20   Q    I see.

21   A    You have seen the letter.  It's pretty black

22        and white.  It's not like I called the school

23        and said, "Oh, this shit happened."  This

24        school kept emailing alumni saying we know this

25        happened.  Let's make some sort of restitution
```

1561a

Kurtis Poulos

```
 1         for this situation.

 2   Q     What sort of efforts did you take part in to

 3         cooperate in any sort of investigation that the

 4         school was doing?

 5   A     Initially I was going to call the counselors

 6         who turned out to be lawyers, and I was going

 7         to talk to the school.  When I found out they

 8         were attorneys, I took my family's advice and

 9         did not reach out to the school because it was

10         a manipulation by your client, The Hill School.

11   Q     Mr. Poulos, you keep saying that.  You know I

12         don't represent The Hill School, okay?  So

13         let's just be clear on that.

14   A     Who is paying your bills?

15   Q     In any event -- in any event, did -- am I

16         correct you have not cooperated in any sort of

17         investigation being conducted by The Hill

18         School?

19              MS. DOUGHERTY:  Objection.

20              THE WITNESS:  Correct.

21   BY MR. JUBB:

22   Q     At any point in time did you sit down -- strike

23         that.

24              At any point in time did

25         Mr. Garabedian, to your knowledge, ever review
```

1562a

Kurtis Poulos

```
1          your medical records?

2                    MS. DOUGHERTY:  Objection.

3                    THE WITNESS:  I have no knowledge.  I

4          would have no knowledge.

5     BY MR. JUBB:

6     Q    I don't know if maybe he had contacted you and

7          said, you know, "I got your medical records.  I

8          looked through them.  I have a couple of

9          questions," or anything like that.  As far as

10         you know you don't recall ever speaking with

11         Mr. Garabedian about what was in your medical

12         records; is that fair?

13    A    Nothing specifically.

14    Q    Is there anything general that you can recall

15         about speaking with Mr. Garabedian as it

16         pertained to your medical records?

17    A    No.  He asked for a waiver.  I gave him the

18         waiver.

19    Q    At what -- strike that.

20                   Did Mr. Garabedian ever ask you about

21         when you began heavily drinking?

22                   MS. DOUGHERTY:  Objection.

23                   THE WITNESS:  Not to my knowledge.

24    BY MR. JUBB:

25    Q    Did Mr. Garabedian ever have any knowledge of
```

1563a

Rufus Poulos

```
 1          any indication of a self-inflicted injury to
 2          you?
 3                    MS. DOUGHERTY:  Objection.  How could
 4          he know what Mr. Garabedian knew?
 5                    MR. JUBB:  If he told Mr. Garabedian.
 6                    MS. DOUGHERTY:  Yeah, that wasn't
 7          your question.
 8                    THE WITNESS:  Yeah.
 9                    MS. DOUGHERTY:  You asked whether
10          Mr. Garabedian ever had any knowledge.  Well,
11          ask him if he told him or asked or something,
12          not what Mr. Garabedian's knowledge was.
13   BY MR. JUBB:
14   Q    Mr. Poulos, at any point in time did you give
15        Mr. Garabedian any indication that there was
16        ever any issue of you self-harming yourself?
17   A    Possibly.
18   Q    Okay.  Tell me about that.
19   A    Which time do you want to know that I hurt
20        myself?
21                    MS. DOUGHERTY:  Objection.  He's
22          asking what you told Mr. Garabedian.
23                    THE WITNESS:  No, he doesn't really
24          seem to want to know that.
25                    MS. DOUGHERTY:  That was his
```

1564a

Kurtis Poulos

```
 1        question, and that's what he's allowed to ask

 2        you.

 3   BY MR. JUBB:

 4   Q    I want to know all the instances that you told

 5        Mr. Garabedian that you had a self-inflicted

 6        injury.

 7   A    I only spoke to him about it once.

 8   Q    And what did you tell him about that?

 9   A    That it was the dumbest thing I could have

10        done.

11   Q    Did it have to do with your girlfriend at the

12        time?

13   A    No.

14   Q    Did you and Mr. Garabedian ever discuss the

15        details of the relationship between you and

16        your mother?

17   A    Possibly.

18   Q    Did you ever tell Mr. Garabedian that she was a

19        former lawyer?

20   A    She was the one who found him.  So, yes, he

21        already knew that.

22   Q    Did you tell Mr. Garabedian that she was

23        providing you with any sort of financial

24        assistance?

25   A    I mean, a couple bucks here and there, but
```

1        nothing crazy.

2   Q    Did you ever give Mr. Garabedian any indication

3        that your mother was in any way oppressive to

4        you?

5   A    Oppressive?  No, not in the least.

6   Q    At some point after your conversation with

7        Mr. Garabedian -- strike that.

8               At any point in your conversation

9        with Mr. Garabedian did he ask you about

10       whether or not you had obtained any sort of

11       psychiatric or mental health therapy?

12  A    Yes.

13  Q    And what did you tell him?

14  A    That I had.

15  Q    And what mental health therapy had you received

16       prior to contacting Mr. Garabedian that you

17       told him about?

18  A    I was treated for severe anxiety, depression,

19       and PTSD when I was 21 or 22 and trying to

20       live.

21  Q    Where did that occur?

22  A    Milwaukee.

23  Q    Who is the therapist?

24  A    I honestly don't remember his name.  He was a

25       family friend.  I believe you already know who

1566a

1        he is.

2    Q   Any other therapy you told him that you had?

3    A   I had to see a shrink when my parents were

4        trying to fight over where I would live.

5    Q   Did you tell Mr. Garabedian about any therapy

6        you had to go -- undergo as part of any sort of

7        court order?

8    A   I don't believe so.

9    Q   Did you have to undergo therapy as part of a

10       court order?

11   A   Yes, and you already know that.

12   Q   Have you ever been diagnosed with any sort of

13       bipolar condition that you --

14                 MS. DOUGHERTY:  Object.

15   BY MR. JUBB:

16   Q   -- that you relayed to Mr. Garabedian?

17   A   No, I did not.

18   Q   Did he ask you whether or not you had been

19       diagnosed with any particular conditions?

20   A   I don't believe so.

21   Q   Did you tell Mr. Garabedian that he would be

22       able to speak with your mom whenever he would

23       like?

24   A   Yes.

25                 THE COURT REPORTER:  Hey, can we

1567a

1    take, like, five minutes really quick?  I just

2    spilled my coffee everywhere.

3              MR. JUBB:  Yeah, let's take five or

4    whatever you need to clean that up.

5              THE VIDEOGRAPHER:  Going off the

6    record at 10:26 a.m.

7              (Brief recess taken.)

8              THE VIDEOGRAPHER:  We're back on the

9    record at 10:49 a.m.

10             MR. JUBB:  Yes, during the break we

11   experienced a completely unforeseeable event,

12   and we are no longer able to transcribe the

13   deposition.  And so all counsel and parties

14   have agreed that this deposition will reconvene

15   on May 27th at 12:00 p.m., Eastern Time, 11:00

16   a.m. Central Time, and the parties have agreed

17   that are no conflicts on their calendar that

18   day and the deposition will reconvene then.

19   Everybody has agreed to give their best efforts

20   to extend some of the deadlines a couple of

21   weeks to make sure we can accommodate this

22   request.  Is that agreeable with you

23   Ms. Dougherty?

24             MS. DOUGHERTY:  It is.

25             MR. JUBB:  And that's agreeable with

Kurtis Poulos

1          you as well, Mr. Poulos, correct?

2                    THE WITNESS:  Yeah.

3                    MR. JUBB:  Okay.  I appreciate

4          everyone's time, and, Ali, I'm sorry this

5          happened.

6                    THE COURT REPORTER:  I'm sorry.

7                    MR. JUBB:  It's okay.  It happens.

8                    THE WITNESS:  Clifford, do you agree?

9          He doesn't agree.

10                   MS. DOUGHERTY:  He's not amused.

11                   THE VIDEOGRAPHER:  Did you want to go

12         off the record then, counsel?

13                   MS. DOUGHERTY:  Yes, I think we are

14         finished.

15                   THE VIDEOGRAPHER:  Going off the

16         record at 10:51 a.m.

17                   (Proceedings concluded at 10:51 a.m.)

18

19

20

21

22

23

24

25

1569a

Kurtis Poulos

```
1   STATE OF WISCONSIN  )

                        ) SS:

2   COUNTY OF MILWAUKEE )

3

4

5                   I, ALI KORNBURGER, Notary Public in and

6   for the State of Wisconsin, do hereby certify that

7   the above deposition of KURTIS POULOS was recorded

8   by me on April 22, 2021, and reduced to writing

9   under my personal direction.

10                  I further certify that I am not a

11  relative or employee or attorney or counsel of any

12  of the parties, or a relative or employee of such

13  attorney or counsel, or financially interested

14  directly or indirectly in this action.

15                  In witness whereof I have hereunder set

16  my hand and affixed my seal of office at Milwaukee,

17  Wisconsin, this 29th day of April, 2021.

18

19

20

21        _____

                      Notary Public

22              In and for the State of Wisconsin

23

24

    My Commission Expires:  February 22, 2024.

25
```

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT

3                   OF PENNSYLVANIA

4                * * * * * * * *

5   JOHN DOE,                *

6       Plaintiff           *   Case No.

7       vs.                 *   2:19-cv-01539

8   MITCHELL GARABEDIAN,     *

9   ESQ. d/b/a, LAW OFFICES *

10  OF MITCHELL GARABEDIAN   *

11  and KURTIS N. POULOS,    *

12      Defendants          *

13                * * * * * * * *

14

15                  DEPOSITION OF

16              MATTHEW B. RALSTON

17              September 20, 2021

18

19

20

21

22

23     Any reproduction of this transcript is prohibited

24       without authorization by the certifying agency.

25

Page 2

```
 1                    DEPOSITION
 2                       OF
 3    MATTHEW B. RALSTON, taken on behalf of the Defendant,
 4    Mitchell Garabedian, Esq. herein, pursuant to the Rules
 5    of Civil Procedure, taken before me, the undersigned,
 6    Jennifer Corb, a Court Reporter and Notary Public in
 7    and for the Commonwealth of Pennsylvania, at the law
 8    offices of Swartz Campbell, LLC, One Liberty Place,
 9    1650 Market Street, 38th Floor, Philadelphia,
10    Pennsylvania, on Monday, September 20, 2021, beginning
11    at 10:10 a.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 A P P E A R A N C E S
 2
 3    LANE R. JUBB, JR., ESQUIRE
 4    The Beasley Firm, LLC
 5    1125 Walnut Street
 6    Philadelphia, PA  19107
 7        COUNSEL FOR PLAINTIFF
 8
 9    CANDIDUS K. DOUGHERTY, ESQUIRE
10    CARYN STEIGER, ESQUIRE
11    JEFFREY B. MCCARRON, ESQUIRE
12    CHRISTOPHER YU, ESQUIRE
13    Swartz Campbell, LLC
14    One Liberty Place
15    1650 Market Place
16    38th Floor
17    Philadelphia, PA  19103
18        COUNSEL FOR DEFENDANT, MITCHELL GARABEDIAN, ESQ.
19
20    KURTIS N. POULOS, PRO SE
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2
 3    DISCUSSION AMONG PARTIES              7 - 8
 4    WITNESS: MATTHEW B. RALSTON
 5    EXAMINATION
 6      By Attorney Dougherty              9 - 248
 7    EXAMINATION
 8      By Mr. Poulos                    250 - 263
 9    RE-EXAMINATION
10      By Attorney Dougherty          263 - 270
11    DISCUSSION AMONG PARTIES         270 - 271
12    CERTIFICATE                          272
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                   EXHIBIT PAGE
 2
 3                                          PAGE
 4    NUMBER   DESCRIPTION            IDENTIFIED
 5    D-21     4/8/16 Appointment Letter     40
 6    D-22     4/11/16 Email                 49
 7    D-23     6/19/17 Appointment Letter    52
 8    D-24     Performance Evaluation
 9             '16-'17                       67
10    D-25     Performance Evaluation
11             '17-'18                       76
12    D-26     4/18/19 Email                137
13    D-27     5/6 to 5/7/19 Emails         142
14    D-28     9/4/15 Medical Office Note   230
15    D-29     2/4/16 Medical Office Note   236
16    D-30     Résumé 1                     265
17    D-31     Résumé 2                     267
18    D-32     Texts                        269
19
20
21
22
23
24
25
```

## Page 6

OBJECTION PAGE

ATTORNEY                              PAGE

Jubb  11, 18, 18, 21, 23, 23, 23, 24, 24, 25, 26, 27,
27, 28, 29, 29, 29, 32, 33, 33, 34, 34, 35, 35, 36, 38,
39, 39, 47, 48, 51, 64, 66, 69, 84, 89, 90, 91, 92, 92,
93, 93, 95, 96, 97, 97, 99, 99, 101, 101, 102, 102,
103, 104, 105, 105, 115, 116, 116, 119, 122, 127, 129,
129, 130, 131, 132, 132, 139, 139, 139, 141, 145, 150,
151, 151, 154, 157, 159, 161, 161, 162, 162, 168, 169,
169, 170, 170, 171, 177, 178, 183, 184, 188, 210, 211,
212, 212, 213, 214, 227, 251, 251, 251, 256, 257, 258,
258, 258, 259, 260, 261, 262, 262, 263

Dougherty                                      263

## Page 7

S T I P U L A T I O N
-------------------------------------------------------
(It is hereby stipulated and agreed by and between
counsel for the respective parties that reading,
signing, sealing, certification and filing are
waived.)
-------------------------------------------------------
P R O C E E D I N G S
-------------------------------------------------------
VIDEOGRAPHER:
All right.  Good morning.  We are now on
the record.  My name is Rick Christian.  I'm a
videographer retained by US Legal.  Today's date is
September 20th, 2021.  And the video time is 10:10
a.m.  This deposition is being held at Schwartz
Campbell in the matter of John Doe versus Mitchell
Garabedian, Esquire.  The deponent is John Doe.  The
court reporter is Jennifer Corbs (sic).  Sorry.  Will
counsel please introduce themselves for the record?
ATTORNEY JUBB:
Good morning.  Lane Jubb with the
Beasley Firm for Plaintiff.
ATTORNEY DOUGHERTY:
Candidus Dougherty from Schwartz
Campbell on behalf of Mitchell Garabedian.  I see that

## Page 8

Jeff McCarron also represents Mitchell Garabedian and
he is now logged in via Zoom.  Is there anybody else?
ATTORNEY JUBB:
No, that's just ---.
ATTORNEY DOUGHERTY:
Oh, okay.  I see the top is --- and
Caryn Steiger is also here in the room and represents
Mitchell Garabedian.
ATTORNEY JUBB:
Do you want to just also want to throw
something on there?  You sent Poulos the link for this
and he's not ---
ATTORNEY STEIGER:
I did send him the link, yes.
ATTORNEY JUBB:
And to be clear, Defendant Poulos was
sent a link to the Zoom conference and it's now 10:11
and he's not here nor is anyone on his behalf.
VIDEOGRAPHER:
All right.  And the court reporter is
Jennifer Corbs and will now swear in the witness.
                ----
            MATTHEW B. RALSTON,
CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

## Page 9

FOLLOWS:
                ---
            EXAMINATION
                ---
BY ATTORNEY DOUGHERTY:
Q. Are you currently working?
A. No.
Q. When was the last time you worked?
A. October --- the last time I was employed was
October of 2020 --- 2019, I'm sorry.
Q. That was with the Hill School?
A. It was.
Q. What day did your employment with the Hill School
end?
A. I was placed on leave in May of 2019.  I believe
my last pay was in early October, 2019.
Q. And how do you characterize the end of your
employment with the Hill School?
A. Can you ---?
Q. Sure.  Did you resign, were you fired, something
else?
A. I was placed on leave and then, my employment was
discontinued when that leave ended.
Q. Did you have a --- let me start again.
Did you have an employment contract with the Hill

Matthew B. Ralston
September 20, 2021                                              10 to 13

Page 10

1  School?
2  A. It was an annual appointment.
3  Q. Did your appointment end in October 2019?
4  A. Typically, my understanding of the appointments
5  is that they run July 1 through June 30.
6  Q. Okay.
7  So, you were reappointed July 1, 2019?
8  A. I did not get a new appointment letter at that
9  point.  I can only guess why so I can't answer why I
10  didn't.  I was on leave, paid administrative leave at
11  that point.
12  Q. So, when you rejoined the Hill School, you told
13  us before, in 2016.
14  Is that right?
15  A. Correct.
16  Q. So, you rejoined the Hill School in 2016.  And
17  then, did you receive an appointment letter each year?
18  A. I received a letter that confirmed what my salary
19  would be for the next year.  And I've always taken
20  that to be an appointment letter.
21  Q. And so, you received an appointment letter when
22  you were first rehired by the Hill School in 2016 and
23  then, you received another one in 2017, you said in
24  July of 2017?
25  A. Yes.

Page 11

1  Q. And in 2018 but not in 2019.
2  Is that right?
3  A. Correct.
4  Q. Was there a specific time of the year that you
5  received the appointment letters?
6  A. Generally, in July or perhaps the end of June.
7  Q. Did you have any type of evaluation of your job
8  performance?
9  A. Yes.
10  Q. When did that occur?
11  A. Prior to the letter coming out so it would have,
12  generally, been in June.
13  Q. So, in June 2017, you had an evaluation and then,
14  you received the new appointment letter for 2017 to
15  2018.
16  A. Yes.
17  Q. And then, in June 2018, you had an evaluation and
18  received a new appointment letter 2018 to --- or 2017
19  to 2018.
20  Is that right?
21  ATTORNEY JUBB:
22  Objection to form.  Sorry.  Just make
23  sure you let her finish the question, too.
24  THE WITNESS:
25  Yes.

Page 12

1  ATTORNEY DOUGHERTY:
2  Well, I think I might have confused ---.
3  ATTORNEY JUBB:
4  I got lost there, too.
5  ATTORNEY DOUGHERTY:
6  Yeah.  I think I confused myself with
7  the dates.  So, let's just do them one at a time.
8  Sorry.
9  BY ATTORNEY DOUGHERTY:
10  Q. So, you received an evaluation of your
11  performance in June 2017.
12  Is that right?
13  A. Yes.
14  Q. And then, you received a new appointment letter
15  thereafter?
16  A. Yes.
17  Q. Then, you had an evaluation in June 2018.
18  Is that right?
19  A. Yes.
20  Q. And you received a new appointment thereafter?
21  A. Yes.
22  Q. Did you have an evaluation of your job
23  performance in June 2019?
24  A. No.
25  Q. When was the last review of your job performance

Page 13

1  that you had at the Hill School?
2  A. It would have been 2018.
3  Q. How did the evaluation process work?  Again,
4  let's just stick with the second time you were
5  employed at the Hill School.
6  A. There was a self-evaluation part that was turned
7  in to my supervisor.  And then, there was the part he
8  did and then, we reviewed the two together, set goals
9  for the following year.
10  Q. So, there was a part you did and a part your
11  supervisor did.  Did you receive a copy of the part
12  that the supervisor filled in?
13  A. Yes.
14  Q. Did you have a meeting of some kind with your
15  supervisor to discuss the evaluation?
16  A. Yes.
17  Q. Who was the supervisor at the time?
18  A. Geoff Neese, G-E-O-F-F N-E-E-S-E.
19  Q. So, you had a meeting with Geoff Neese in June
20  2017 to evaluate your job performance.
21  Is that right?
22  A. Yes.
23  Q. Did you meet in person or over Zoom or telephone,
24  some other method?
25  A. I don't recall.  It could have been either.  It

Matthew B. Ralston
September 20, 2021                                    14 to 17

Page 14

1  would not have been Zoom.  It would have been either a
2  meeting with him or it would have been by phone.
3  Q.Did the meeting --- again, let's just stick with
4  June 2017.  Did the meeting with Geoff Neese to
5  evaluate your performance occur before or after you
6  and he filled out the written evaluation?
7  A.After.
8  Q.Did you have a meeting with Geoff Neese in June
9  2018 to discuss your job performance?
10 A.I did.
11 Q.Was it similar that you filled out a self-
12 evaluation, he filled out a portion of the evaluation
13 and then, you and Mr. Neese met to discuss your job
14 performance from July 1, 2017 to June 30, 2018?
15 A.Yes.
16 Q.How did you learn that you were on administrative
17 leave?
18 A.From my attorney.
19 Q.Did your attorney provide you any documentation
20 from the Hill School regarding your leave?
21 A.It would have been a description of what it meant
22 to be on paid administrative leave.
23 Q.What have you done with your time since October
24 2019?
25 A.I beg your pardon?

Page 15

1  Q.What have you done with your time since October
2  2019?
3  A.Wow.  I walk a lot.  I read a lot.  I work out a
4  lot.  And I renewed an interest in cooking.
5  Q.So, you've had no employment of any kind since
6  October 2019.
7  Correct?
8  A.Correct.
9  Q.What efforts have you made to look for employment
10 since --- well, let me start again.
11 Have you looked for employment since you stopped
12 working at the Hill School in October 2019?
13 A.I looked for work through part of the summer.
14 Prior to that, no.
15 ATTORNEY JUBB:
16 Did you say this summer or last summer?
17 THE WITNESS:
18 This summer.
19 BY ATTORNEY DOUGHERTY:
20 Q.So, 2021?
21 COURT REPORTER:
22 Is that a yes?
23 THE WITNESS:
24 Beg your pardon?
25 COURT REPORTER:

Page 16

1  Is that a yes?
2  THE WITNESS:
3  Yes.
4  BY ATTORNEY DOUGHERTY:
5  Q.I'm sorry.  So, when you learned that you were
6  being placed on administrative leave in early 2019,
7  you didn't look for other employment?
8  A.I did not.
9  Q.And when your employment with the Hill School
10 ended in October 2019, you did not look for other
11 employment until the summer of 2021?
12 A.Correct.
13 Q.Is there a reason why you didn't look for other
14 employment between October 2019 when your employment
15 with the Hill School ended and this summer 2021?
16 A.Initially, the reason would have been the onset
17 of COVID.
18 Q.But COVID didn't start until March 2020.
19 Right?
20 A.Correct.  Prior to that, I was helping my
21 brother.  My mother died in February 2020.  I helped
22 my brother close up her house and her final days.  I
23 filed for unemployment in November.  And I was
24 collecting that.  And then, COVID shut us down.
25 Q.You filed for unemployment in November 2019?

Page 17

1  A.Yes.
2  Q.So, from October 2019 when your employment with
3  the Hill School ended until February 2020, you did not
4  look for employment.
5  Is that right?
6  A.I did not.
7  Q.Is there a reason why you did not look for
8  employment between October 2019 and February 2020?
9  A.I think I was just reeling from not working at
10 the Hill anymore, not sure what I could go find a job
11 doing.  I didn't feel employable by a school because
12 of what was going on, the allegations against me.
13 Q.You said what was going on.  Are you referring to
14 your lawsuit?
15 A.I'm referring to having allegations made against
16 me of sexual abuse to a student.
17 Q.And you're referring to the two letters, right,
18 the April 2018 and December 2018 letters?
19 A.Yes.
20 Q.The letters that described accusations by Mr.
21 Poulos of sexual abuse by you of Mr. Poulos when he
22 was a child at the Hill School.
23 Is that right?
24 A.Yes.
25 Q.You were no longer employed at the Hill School.

Page 18

1  Correct?
2  A.That's correct.
3  Q.So, what were you dealing with as it relates to
4  let's just stick with the letters.  What was going on
5  about the accusations?  I want to know what that was.
6  ATTORNEY JUBB:
7  Object to the form.
8  THE WITNESS:
9  I'm not sure I understand.
10  BY ATTORNEY DOUGHERTY:
11  Q.Sure.  The ---.
12  A.Why that was in my way of looking for a job?
13  Q.Yeah.  The only thing I'm aware of that was going
14  on in October 2019 as it relates to Mr. Poulos's
15  accusations is your lawsuit.
16  A.I wasn't working any longer.  I wasn't working
17  because of the allegations made against me.  And to
18  apply for a job with a school where I'd be working
19  with students or on behalf of students, I didn't feel
20  like I could honestly go through an interview and say
21  why I wasn't working any longer.
22  Q.What's the basis for your belief that you weren't
23  working at the Hill School because of the allegations
24  that had been made against you?
25  ATTORNEY JUBB:

Page 19

1  Objection to the form.  Asked and
2  answered.
3  COURT REPORTER:
4  I'm sorry.  You said asked and answered?
5  THE WITNESS:
6  Is there something I should have heard
7  here?  I'm sorry.
8  ATTORNEY JUBB:
9  No.  Just answer the question unless I
10  tell you not to.
11  THE WITNESS:
12  Okay.
13  I go back to the allegations.  I was
14  told in January by the headmaster to not find myself
15  alone with students.  I was told by the school's
16  attorney that I should engage my own attorney because
17  of those allegations.  And that, to me, felt like a
18  part of my work world going forward.
19  BY ATTORNEY DOUGHERTY:
20  Q.And when was that?  I think you gave me --- you
21  said January.  What was the date you said?  I missed
22  it.
23  A.That the headmaster told me not to be alone with
24  students was January 2019.
25  Q.Thank you.  And the comment by Mr. Rees that you

Page 20

1  should get an attorney that was also in January 2019?
2  A.That was the second time.  He told me I should
3  consider speaking with an attorney in May of 2018.  He
4  told me after the second letter, I needed to find an
5  attorney of my own.
6  Q.So, sometime after December 2018, Mr. Rees told
7  you to get an attorney?
8  A.January of 2019.
9  Q.January of 2019, okay.  And the lawyer that you
10  retained was Mr. Jubb sitting here with you today.
11  Is that right?
12  A.It is.
13  Q.And when did you first retain Mr. Jubb?
14  A.It would have been in January of 2019.
15  Q.Why did you hire Mr. Jubb?
16  A.Why did I hire him?
17  ATTORNEY JUBB:
18  How does that have anything to do with
19  --- hold on, hold on.
20  ATTORNEY DOUGHERTY:
21  It matters whether he hired him to deal
22  with something with the school or whether he hired you
23  just to pursue this lawsuit.
24  ATTORNEY JUBB:
25  Thank you for the clarification.  You an

Page 21

1  answer.
2  THE WITNESS:
3  I hired him because of the allegations
4  against me.
5  BY ATTORNEY DOUGHERTY:
6  Q.In January 2019, were you planning to file a
7  lawsuit?
8  A.No.
9  Q.When did you first decide to file a lawsuit?
10  A.I had been made aware that there was a
11  possibility that there would be reason for a lawsuit
12  in May of 2018 by Mr. Rees.  He had said that again in
13  January.
14  Q.Of 2019?
15  A.2019.  My reason for contacting Mr. Lane was
16  because I needed an attorney and I had no idea where
17  we were --- where the allegations were leading.  And
18  that was my reason for calling him.
19  Q.Okay.
20  When did you decide you were going to file a
21  lawsuit?
22  ATTORNEY JUBB:
23  I'll object to the form of that.
24  THE WITNESS:
25  It was probably late March of 2019.

Matthew B. Ralston
September 20, 2021                                    22 to 25

Page 22

```
1   BY ATTORNEY DOUGHERTY:
2   Q.Was there a period of time that you were
3   contemplating taking legal action before you,
4   actually, decided to file a lawsuit?
5   A.Yes.
6   Q.And what was that period of time?
7   A.Probably January to March.
8   Q.And is it correct that shortly after you made the
9   decision to file a lawsuit, the lawsuit was, in fact,
10  filed.
11  Is that right?
12  A.Yes.
13  ATTORNEY DOUGHERTY:
14  What was the date of the complaint?
15  April 8.
16  ATTORNEY STEIGER:
17  I believe that's correct.
18  ATTORNEY JUBB:
19  I thought it was 6th.
20  BY ATTORNEY DOUGHERTY:
21  Q.Do you know the date that you filed the lawsuit?
22  A.Not exactly, no.
23  Q.Do you agree that you filed the lawsuit in early
24  April 2019?
25  A.Yes.
```

Page 23

```
1   Q.Prior to the filing of the lawsuit, no action had
2   been taken against you by the Hill School ---
3   ATTORNEY JUBB:
4   I'll object to the form.
5   BY ATTORNEY DOUGHERTY:
6   Q.--- as a result of the accusations by Mr. Poulos,
7   is that right?
8   ATTORNEY JUBB:
9   Objection to form.
10  THE WITNESS:
11  Action formal, no.  Being told to not be
12  alone with students is a pretty clear statement of
13  action to a person who has spent their life teaching.
14  BY ATTORNEY DOUGHERTY:
15  Q.Okay.
16  Well, did your job require you to be alone with
17  students in January of 2019?
18  ATTORNEY JUBB:
19  I'll object to that.
20  THE WITNESS:
21  I don't know how that's relevant to
22  being told not to be when I was on campus.
23  BY ATTORNEY DOUGHERTY:
24  Q.Did your job require you to be alone with
25  students in January 2019?
```

Page 24

```
1   ATTORNEY JUBB:
2   Objection to form.
3   THE WITNESS:
4   On occasion, I could have been yes.
5   BY ATTORNEY DOUGHERTY:
6   Q.What was your title again in 2019?
7   A.I was a capital giving officer.
8   Q.Okay.
9   What tasks or components of your capital --- of
10  your position as capital giving officer required you
11  to be alone with students in January 2019?
12  A.I could have found myself alone with students if
13  I was introducing them to an alumnus or alumna of the
14  school.
15  Q.But you wouldn't be alone with the student.  You
16  would have an alumni there.
17  Correct?
18  ATTORNEY JUBB:
19  I'll object to the form.
20  COURT REPORTER:
21  Can you keep your voice up when you give
22  objections?  Thank you.
23  THE WITNESS:
24  I consider being alone with students to
25  mean without other employees of the school being
```

Page 25

```
1   present is how I interpreted that.
2   BY ATTORNEY DOUGHERTY:
3   Q.Well, Mr. Lehman didn't say that, right?
4   ATTORNEY JUBB:
5   I'll object.
6   THE WITNESS:
7   No.  I just told you that's how I
8   interpreted it.
9   BY ATTORNEY DOUGHERTY:
10  Q.Okay.
11  So, in January 2019, as part of your position as
12  capital giving officer, you did have an occasion to
13  introduce students to alumni.
14  Is that right?
15  A.That is correct.
16  Q.And by students, I mean then students at the Hill
17  School in 2019.
18  Correct?
19  A.Correct.
20  Q.Okay.
21  But you didn't have to be alone with the student
22  of the Hill School in 2019 to make the introduction.
23  Is that correct?
24  A.I would have been there with a student or
25  students and the alumni.
```

Matthew B. Ralston
September 20, 2021                              26 to 29

Page 26

1  Q.And you introduced the alumni to students in
2  person or over the phone or how did that work?
3  A.No.  That would have been in person.
4  COURT REPORTER:
5  Let her finish the question fully.
6  THE WITNESS:
7  Sorry.
8  BY ATTORNEY DOUGHERTY:
9  Q.So, what other part of your job as capital giving
10 officer in 2019 required you to have contact with
11 students?
12 ATTORNEY JUBB:
13 Same objection.
14 THE WITNESS:
15 If I were on campus, I could have
16 interacted with students in the dining hall or walking
17 about campus.
18 BY ATTORNEY DOUGHERTY:
19 Q.Okay.
20 But what part of your job as capital giving
21 officer required you to have access to students or to
22 interact with students?  You told us one.  Introducing
23 students to alumni.  So, I want to know what part of
24 your job required you to have contact with students
25 alone in 2019.

Page 27

1  ATTORNEY JUBB:
2  Objection, asked and answered.
3  THE WITNESS:
4  I, actually, think I've said that.  My
5  job required selling --- presenting the school to
6  alumni.  And part of doing that would be to know
7  what's going on at campus.  So, I would be present on
8  campus.  And there really is no way to except
9  consciously say I won't be alone with students to know
10 that you're not going to have a conversation alone
11 with a student.
12 BY ATTORNEY DOUGHERTY:
13 Q.Okay.
14 You have not identified any example of being
15 alone with a student that was a requirement of your
16 job in January 2019.  Is the answer just none?  There
17 was no requirement of your job that required you to be
18 alone with a student in January 2019.
19 Correct?
20 ATTORNEY JUBB:
21 I'll object.  Asked and answered.  I
22 think you need to move on.  I don't know understand
23 what you're ---.
24 ATTORNEY DOUGHERTY:
25 No, he's not answered.

Page 28

1  ATTORNEY JUBB:
2  Yes, he has over and over.
3  ATTORNEY DOUGHERTY:
4  I want to know why it matters that
5  Lehman told him not to be alone with students in
6  January of 2019 when no part of his job required him
7  to be alone with students in January 2019.
8  ATTORNEY JUBB:
9  That's again, mischaracterization of
10 testimony and I'll object to the question.
11 ATTORNEY DOUGHERTY:
12 Okay.  That's fine.
13 BY ATTORNEY DOUGHERTY:
14 Q.Then, tell me the tasks or requirements of your
15 job in January 2019 as capital giving officer that
16 required you to be alone with a student.
17 A.Are you asking if it was in my job description?
18 Q.Yes.
19 A.No.  It's not written in my job description that
20 I should be found alone with students.
21 Q.Is there some component of --- let me start
22 again.
23 Was there some component of your job as capital
24 giving officer that required you to be alone with a
25 student of the Hill School?

Page 29

1  ATTORNEY JUBB:
2  Objection to the form.  Asked and
3  answered again.
4  THE WITNESS:
5  I don't know how to say it any clearer
6  than if what you're looking for is a no, I don't know
7  how to answer that honestly and tell you that I could
8  do my job and never run the likelihood of being alone
9  with students because my job when I was on campus was
10 to spend time on campus getting to know the school and
11 the students.  And that can very well mean I'd be
12 having a conversation with a student without others
13 present.
14 BY ATTORNEY DOUGHERTY:
15 Q.So, there was no component of your job that
16 required you to be alone with a student of Hill School
17 in 2019.
18 Is that right?
19 ATTORNEY JUBB:
20 I'll object.  You're just now harassing
21 him.
22 BY ATTORNEY DOUGHERTY:
23 Q.Is that right?
24 A.I don't know ---.
25 ATTORNEY JUBB:

Matthew B. Ralston
September 20, 2021                                    30 to 33

Page 30

1  Objection to the form.
2  THE WITNESS:
3  I don't know what else to tell you.
4  BY ATTORNEY DOUGHERTY:
5  Q.How many times --- let's start with 2016 and 2017
6  because that's how your appointments worked, right?
7  One year at a time.  So, from July 1st, 2016 to
8  January 30th, 2017, how many times were you alone with
9  a Hill School student?
10 A.I can't tell you a number.
11 Q.Can you identify any time from July 1, 2016 to
12 June 30, 2017, that you were alone, just you and the
13 student, alone with a student of the Hill School?
14 A.I can't tell you I was alone with a student.  I
15 can tell you I would have been alone with some
16 students.  That would have happened in the dining hall
17 when I would go up during seated meals.  I would sit
18 with a faculty member at their table.  The faculty
19 member left to go to a class and the students at the
20 table had some time after the meal.  We would have sat
21 and talked because I would have been introduced.
22 And the students would have known that I taught
23 there for 17 years.  And we would have talked about
24 the school.
25 Q.Students plural at the table.

Page 31

1  Correct?
2  A.Generally speaking, yes.
3  Q.And the dining hall didn't have just one table in
4  it.
5  Right?
6  A.No.
7  Q.So, do you, actually, have in mind right now an
8  example of a time when you went to the dining hall for
9  a meal and started speaking with students that were
10 seated at the table and a faculty member left and you
11 continued speaking to students?
12 A.Specific instance of that?  No.
13 Q.Yes.  Did it ever happen?
14 A.Yes.
15 Q.When did it happen?
16 A.After a meal.  I can't tell you a date.  I don't
17 know how to be more forthright than to tell you that's
18 the kind of situation where it would happen.
19 Q.Okay.
20 And there was more than one table in the dining
21 hall.
22 Right?
23 A.Lots more.
24 Q.So, were there other people in the room other
25 than you and the students at the table?

Page 32

1  A.Of course, yes.
2  Q.And other people in the dining hall besides you
3  and the students at the table, did they include a
4  faculty member or another teacher?
5  A.Probably, yes.
6  Q.So, that's not a situation that met your
7  understanding of what Mr. Lehman said about not being
8  alone with the student.
9  Is that right?
10 ATTORNEY JUBB:
11 Objection to the form.
12 THE WITNESS:
13 I can tell you only how I take not being
14 alone with students and that's in a position where you
15 can say or do things to or with a student that
16 wouldn't be acceptable.
17 BY ATTORNEY DOUGHERTY:
18 Q.Well, that couldn't happen in the middle of the
19 dining hall.
20 Right?
21 A.Certainly, a conversation could happen in the
22 dining hall.
23 Q.I'm sorry.  So, a conversation was inappropriate?
24 A.Conversations can be inappropriate I said.
25 Q.All right.

Page 33

1  So, any other instances between July 1st, 2016 to
2  June 30th, 2017 that you were alone with a Hill School
3  student?
4  A.Not that I recall.
5  Q.How about from July 1, 2017 to June 30, 2018?
6  A.Not that I recall.
7  Q.How about from July 1, 2018 to October 2019?
8  A.Not that I recall beyond the same situations.
9  Q.So, why did it matter to you that Mr. Lehman told
10 you not to be by yourself or alone with a student at
11 the Hill School?
12 ATTORNEY JUBB:
13 I'll object.  Asked and answered from
14 the prior deposition, not from this one.
15 THE WITNESS:
16 I spent my life teaching, most of it at
17 the Hill School.  And to have the headmaster say, you
18 can't be alone with students, is pretty loud statement
19 that we can't afford to have you alone with students
20 anymore.
21 BY ATTORNEY DOUGHERTY:
22 Q.Okay.
23 So, it offended you.
24 Is that right?
25 ATTORNEY JUBB:

Matthew B. Ralston
September 20, 2021                                     34 to 37

| Page 34 | Page 35 |
|---|---|
| 1   I'll object to the form. | 1   if you work for a school and you're not allowed to be |
| 2   THE WITNESS: | 2   with students without other adults around all of the |
| 3   It offended many aspects of me, yes. | 3   time how it makes it hard to work for a school |
| 4   BY ATTORNEY DOUGHERTY: | 4   regardless of your role. |
| 5   Q.But Mr. Lehman's comment didn't, actually, impact | 5   BY ATTORNEY DOUGHERTY: |
| 6   your ability to complete your job as a capital giving | 6   Q.Okay. |
| 7   officer. | 7   You've not identified a circumstance with --- as |
| 8   Is that right? | 8   part of your position as capital giving officer that, |
| 9   ATTORNEY JUBB: | 9   actually, required you to be alone with a student. |
| 10   I'll object to the form. | 10   ATTORNEY JUBB: |
| 11   THE WITNESS: | 11   Objection to the form. |
| 12   I don't know how to --- it affects | 12   BY ATTORNEY DOUGHERTY: |
| 13   everything about me, which affects my ability to do | 13   Q.That's what I'm trying to understand.  It would |
| 14   the job. | 14   make sense to me if you were a teacher or a tutor. |
| 15   ATTORNEY JUBB: | 15   You're a capital giving officer.  So, I want to know |
| 16   Next question please. | 16   what part of your job --- again, just the part of the |
| 17   BY ATTORNEY DOUGHERTY: | 17   job that you couldn't complete.  We can deal with if |
| 18   Q.Well, then tell me what part of the job of | 18   it had other impacts on you.  So, what part of your |
| 19   capital giving officer you could not complete after | 19   job as capital giving officer were you unable to |
| 20   Mr. Lehman made that comment to you in 2019. | 20   perform after Mr. Lehman made his comment to you in |
| 21   ATTORNEY JUBB: | 21   2019 that you should not be alone with a Hill School |
| 22   Objection to the form.  Asked and | 22   student. |
| 23   answered and it's harassing. | 23   ATTORNEY JUBB: |
| 24   THE WITNESS: | 24   Objection to form.  Asked and answered. |
| 25   I don't know how to make it clear that | 25   This is the last time and you're moving on. |

| Page 36 | Page 37 |
|---|---|
| 1   THE WITNESS: | 1   He's not identified any single incident |
| 2   I don't know how to answer that | 2   where he was actually alone with the student. |
| 3   differently than I have. | 3   ATTORNEY JUBB: |
| 4   BY ATTORNEY DOUGHERTY: | 4   He's told you that part of his job was |
| 5   Q.So, you can identify no component of your job as | 5   to introduce alumni to students in order to arrange |
| 6   capital giving officer that you could not perform | 6   for that ---. |
| 7   because you could not be alone with a Hill School | 7   ATTORNEY DOUGHERTY: |
| 8   student? | 8   That's not being alone. |
| 9   ATTORNEY JUBB: | 9   ATTORNEY JUBB: |
| 10   Objection.  You're now just harassing | 10   That's your impression of it. |
| 11   him.  You're just ignoring what he's ---. | 11   ATTORNEY DOUGHERTY: |
| 12   ATTORNEY DOUGHERTY: | 12   We covered that. |
| 13   He's playing games. | 13   ATTORNEY JUBB: |
| 14   ATTORNEY JUBB: | 14   So, you keep asking him the same |
| 15   He's not.  You just refuse to ask a | 15   question and he's told you that's his answer. |
| 16   different question. | 16   ATTORNEY DOUGHERTY: |
| 17   ATTORNEY DOUGHERTY: | 17   No, he's playing games. |
| 18   There is, actually, no part of his job | 18   ATTORNEY JUBB: |
| 19   as capital giving officer that he could not complete | 19   No, you just can't ---. |
| 20   because of Mr. Lehman's comment not to be alone with a | 20   ATTORNEY DOUGHERTY: |
| 21   student. | 21   No, he's playing games. |
| 22   ATTORNEY JUBB: | 22   ATTORNEY JUBB: |
| 23   He just explained to you that over and | 23   You don't like the testimony.  Move on. |
| 24   over. | 24   COURT REPORTER: |
| 25   ATTORNEY DOUGHERTY: | 25   I can only take down one person at a |

Matthew B. Ralston
September 20, 2021                    38 to 41

Page 38

1  time please.  I know that it's tense but please one
2  person.
3  BY ATTORNEY DOUGHERTY:
4  Q.So, as of January 2019, no component of your job
5  as capital giving officer required you to be alone
6  with a Hill School student.
7  Is that correct?
8  ATTORNEY JUBB:
9  Objection to the form.  Yes or no, is
10  that correct?
11  THE WITNESS:
12  After January 2019, I could not be alone
13  with students regardless.
14  BY ATTORNEY DOUGHERTY:
15  Q.That wasn't my question.  My question was ---
16  let's do --- I can clarify it so it can be extra
17  clear.  Before Mr. Lehman made his comment to you in
18  January 2019 that you should not be alone with a Hill
19  School student, there was no component of your job as
20  capital giving officer that required you to be alone
21  with a student of the Hill School.
22  Correct?
23  A.No.
24  Q.What component of your job as a capital giving
25  officer at the Hill School prior to when Mr. Lehman

Page 39

1  made his comment to you in January 2019 that you
2  shouldn't be alone with a student of the Hill School
3  required you to be alone with a student of the Hill
4  School?
5  ATTORNEY JUBB:
6  Other than what you've testified about,
7  is there anything else?
8  THE WITNESS:
9  No.
10  BY ATTORNEY DOUGHERTY:
11  Q.So, you can identify no occasion between --- let
12  me make sure I have that right.  At the time you were
13  re-employed at the Hill School as of July 1, 2016 as a
14  capital giving officer to January 2019 when Mr. Lehman
15  made his comment to you that you should not be alone
16  with a student of the Hill School that you were
17  actually alone with a student of the Hill School.
18  Is that correct?
19  ATTORNEY JUBB:
20  Objection to form.
21  BY ATTORNEY DOUGHERTY:
22  Q.If you don't understand, I'll try again.
23  A.I think I answered that when you asked me about
24  can I point to an instance at the table.  And I said
25  no, but I can tell you that those kinds of things do

Page 40

1  happen.  I'm not playing games.  This is my life.  And
2  boarding school is a fluid, constantly in motion
3  environment.  And there is not a way to be a part of
4  the community and not find yourself alone with
5  students at some point.
6  Q.Okay.
7  So, you can identify for me no time between July
8  1, 2016 and January 2019 when Mr. Lehman made his
9  comment that you should not be alone with a student of
10  the Hill School where you had, actually, been alone
11  with a student of the Hill School.
12  Is that right?
13  A.No.  I can't recall a conversation I had with a
14  student, just a student, in those two and a half
15  years.
16  ATTORNEY DOUGHERTY:
17  So, this one is --- what are we, 21?
18                    ---
19  (Whereupon, Defendant's Exhibit 21,
20  4/8/16 Appointment Letter, was marked
21  for identification.)
22                    ---
23  ATTORNEY STEIGER:
24  Yes.
25  ATTORNEY JUBB:

Page 41

1  You have the witness copy.
2  ATTORNEY DOUGHERTY:
3  Yeah.  And I don't --- before I give
4  that to him, I just want to make sure I ---.
5  BY ATTORNEY DOUGHERTY:
6  Q.I just want to confirm that you did not pay Mr.
7  Jubb or the Beasley firm any amount of money as it
8  relates to the representation of you other than in
9  connection with this lawsuit.
10  Is that correct?
11  A.That's correct.
12  Q.And there is no other attorney that you retained
13  to assist you with regard to the accusations by Mr.
14  Poulos other than Mr. Jubb and the Beasley firm.
15  Is that right?
16  A.That is correct.
17  Q.So, I'm showing you a document that's been marked
18  as D-21.  It's two pages.  On the bottom right it says
19  Hill Doe 0288 to Hill Doe 0289.  And the Hill School
20  at the top is dated on the first page April 8, 2016,
21  in the top left.  Do you know the document that I've
22  marked as D-21?
23  A.Yes.
24  Q.How do you know the document that I've marked as
25  D-21?

Matthew B. Ralston
September 20, 2021                                    42 to 45

Page 42

1   A.It's the letter that was sent to me offering me
2   --- acknowledging that I had accepted the position and
3   what my salary would be and what my expectations would
4   be.
5   Q.So, on the second page at the bottom under
6   accepted by, there is a signature.  Is that your
7   signature?
8   A.It is.
9   Q.And your name is written there.  And it has
10  P'05'07.  Do you know what that stands for?
11  A.I do.
12  Q.What does the P'05'07 stand for?
13  A.It stands for parent 2005, parent 2007.
14  Q.Okay.
15  So, '05 and '07 are --- let me start again.
16  2005, 2007 are the years that your sons graduated from
17  the Hill School.
18  Is that right?
19  A.Yes.
20  Q.And then, there's another signature on the second
21  page of D-21 towards the top above Geoffrey A. Neese.
22  Do you recognize that signature as Mr. Neese's
23  signature?
24  A.Yes.
25  Q.So, you received the letter that has been marked

Page 43

1   as D-21 on or about April 8, 2016, offering you a
2   position of capital giving officer at the Hill School.
3   And you accepted the position on April 11, 2016.
4   Is that right?
5   A.Yes.
6   Q.All right.
7   And so, the second paragraph of the letter on the
8   first page, D-21, second paragraph, first page says
9   the starting salary will be $68,000.  Did you receive
10  a salary of $68,000 for your work between July 1, 2016
11  and June 30, 2016 --- or 2017?
12  A.I'm sure I did.
13  Q.Yes?
14  A.Yes.
15  Q.Did your compensation involve any bonuses or
16  additional payment other than a salary?
17  A.No.
18  Q.And is that the case for the three years you
19  worked as a capital giving officer?  You received only
20  a salary from the Hill School?
21  A.I believe that's true.
22  Q.Okay.
23  And then it says the position is a full time
24  position with the Advancement Office and the Hill
25  School.  It is eligible for a benefits package of

Page 44

1   healthcare, retirement, vacation, and other matters
2   and dash, as will be provided to you by Heather
3   Gelting, our human resources director.  It's
4   G-E-L-T-I-N-G.  Did you receive healthcare,
5   retirement, and vacation benefits?
6   A.Yes.
7   Q.The next sentence, you will begin the capital
8   giving officer position with a start date of July 1,
9   2016.  You will work remotely from your homes in
10  Michigan and Ohio.
11  Did I read that correctly?  Did I read that
12  correctly?
13  A.Yes.
14  Q.You will work remotely from your homes in
15  Michigan and Ohio.
16  Is that right?
17  A.Yes.
18  Q.So, your job as capital giving officer at the
19  Hill School from July 1, 2016 to at least June 30,
20  2017, was a remote position.
21  Is that right?
22  A.It was.
23  Q.So, I guess it's the last paragraph if you want
24  to consider it down on the first page of D-21.  It
25  starts, included below are the stipulations for the

Page 45

1   remote work status:.  Do you see where I am?
2   A.Yes.
3   Q.It says, you will attend a previous scheduled
4   Plus Delta training in Philadelphia.  What is that?
5   A.Yes.  What is it?
6   Q.Yes.
7   A.Plus Delta is a training program for giving
8   officers.
9   Q.Did the Plus Delta training in Philadelphia
10  involve any Hill School students?
11  A.It involved visits to campus after training, it
12  did not, no.
13  Q.And then, number two, you will schedule your
14  campus visits monthly around Plus Delta sessions.  You
15  will likely stay in a guest house on campus.  I think
16  you described that to us last time that you would ---
17  that you came to campus approximately once a month.
18  Is that right?
19  A.During the Plus Delta, yes.
20  Q.You say during the Plus Delta.
21  A.I beg your pardon?
22  Q.What do you mean by --- you make it sound like it
23  was ---?
24  A.Plus Delta was a monthly meeting.
25  Q.Oh, okay.  I get you.  Okay.

Matthew B. Ralston
September 20, 2021                                    46 to 49

Page 46

1  So, there was a Plus Delta training when you
2  started and then, there was plus delta meetings every
3  month?
4  A.The training was --- I think it was 16 weeks.
5  Q.Okay.
6  A.Plus.  I can't say it was --- it sounds like too
7  many.  It was ---.
8  Q.That's what I was thinking.
9  A.It went through the fall of that year.
10 Q.Okay.
11 So, you stayed in Philadelphia for ---?
12 A.I flew to Philadelphia.
13 Q.And you stayed in Philadelphia for several weeks
14 for training?
15 A.No.  No, no, no, no, no.  It was --- the Plus
16 Delta training sessions were one day.  So, I would fly
17 in for the meeting.  Then, I would spend --- the
18 scheduling my campus visits around that would be I
19 wouldn't fly out the same day as the meeting.  I would
20 then go to campus and spend time there then.
21 Q.And so, the Plus Delta sessions were not on
22 campus.
23 Is that right?
24 A.They were not.
25 Q.And it says, you will schedule your campus

Page 47

1  visits.  What did you do during your campus visits
2  from July 1, 2016 to July 30, 2017?
3  A.As I've explained, just spent time on campus
4  getting to know the rhythm of the campus, the school
5  year, better knowledge of the students, and spent time
6  with faculty hearing what they had to say and what
7  their hopes for the future were.
8  Q.And none of those campus visits required you to
9  be alone with a Hill School student.
10 Is that right?
11 ATTORNEY JUBB:
12 Objection to form.
13 THE WITNESS:
14 No differently than I've already
15 explained.
16 BY ATTORNEY DOUGHERTY:
17 Q.Did you need more water?
18 A.That's fine.  Thank you.
19 Q.And it says, you will have a weekly call with
20 Geoff.  And that's probably Geoff Neese, right?
21 A.Correct.
22 Q.So, did a weekly call with Geoff Neese involve
23 being alone with a Hill School student?
24 A.No.  I was working remotely for those.
25 Q.And it says you'll be available by phone and

Page 48

1  email during working hours.  And then, number five,
2  you may be expected to attend key on campus events as
3  needed, Lawrenceville Weekend, Reunion Weekend,
4  dedications, et cetera.  Did you attend Lawrenceville
5  Weekend, Reunion Weekend, and dedications during the
6  July 1, 2016 to June 30, 2017 term?
7  A.Yes.
8  Q.Were you alone with a Hill School student during
9  Lawrenceville Weekend, Reunion Weekend, or dedications
10 during the July 1, 2016 to June 30, 2017, term of your
11 employment as capital giving officer?
12 ATTORNEY JUBB:
13 Objection to form.
14 THE WITNESS:
15 Certainly not during Reunion Weekend and
16 no differently than I've tried to explain with
17 Lawrenceville and dedications and the et ceteras.
18 BY ATTORNEY DOUGHERTY:
19 Q.You mean like bumping into students while walking
20 on campus or at the dining hall.
21 Right?
22 A.Yes.
23 Q.Now number sever is on the second page of D-21.
24 It says, you will be expected to complete at least 12
25 to 15 donor meetings per month.  Did you complete 12

Page 49

1  to 15 donor meetings per month?
2  A.I believe so.
3  Q.And could you just give me an example of what a
4  donor meeting would entail, a typical one if there is
5  such a thing?
6  A.I'd fly to Chicago.  I'd spend time setting up
7  meetings in different cities for locations.  I would
8  go there and meet with the donor, catch them up to
9  date on campus, learn about their experience as a
10 student and then, we would talk about ways to be
11 engaged.  And when appropriate, I'd ask them for a
12 gift.
13 Q.Did any of the donor meetings that you completed
14 during the July 1, 2016 to June 30, 2017, term of your
15 employment as capital giving officer at the Hill
16 School involve being alone with a Hill School student?
17 A.No.
18 ATTORNEY DOUGHERTY:
19 Thirty-two (32) and then, 31 please.
20 And then, 33.  Thank you.  Did I give you --- oh, we
21 got to put a sticker on it.  So, this will be D-22
22 please.
23 ---
24 (Whereupon, Defendant's Exhibit 22,
25 4/11/16 Email, was marked for

Matthew B. Ralston
September 20, 2021                                    50 to 53

Page 50

1  identification.)
2              ---
3  BY ATTORNEY DOUGHERTY:
4  Q.I'm showing you a document that is marked as D-
5  22.  It says, Hill Doe 0287, on the bottom right.  And
6  it's an email from Geoff Neese to Hill faculty, Hill
7  staff, CC Matt dated April 11, 2016.  The subject
8  line, new gift officer – Matt Ralston.  Are you
9  looking at the same document?
10  A.Yes.
11  Q.Have you seen this email that is marked as D-22
12  before I showed it to you today?
13  A.Yes.
14  Q.Did you receive the email that's been marked as
15  D-22 on April 11, 2016?
16  A.Yes.
17  Q.Did you read the email that's been marked as D-22
18  when you received it on April 11, 2016?
19  A.Yes.
20  Q.In the second paragraph, Mr. Neese wrote, Matt
21  will join a team of six gift officers and fill the
22  opening left by Jessica Moyer's departure.  I think
23  you identified the six people during your last day of
24  the deposition.  Matt's work will be critical as we
25  head into year three of the Strength of All campaign.

Page 51

1  Matt will work remotely from his homes in Michigan and
2  Ohio but will be on campus monthly to meet with the
3  Advancement Office and stay connected to campus.
4  So, did you meet with the Advancement Office
5  monthly?
6  A.Yes.
7  Q.Did you meet with the Advancement Office monthly
8  even after June 30, 2017?  Was that something that
9  continued for the whole time you were employed by the
10  Hill School a second time?
11  A.The timeframe could have been different than
12  monthly but yes.  When I was on campus, I had an
13  office in the Advancement Office.
14  Q.Okay.
15  So, the Advancement Office was on campus?
16  A.Yes.
17  Q.Was the Advancement Office near where students
18  were located on the campus?
19  ATTORNEY JUBB:
20  I'll object to the form.
21  THE WITNESS:
22  Down the hill from the dining hall and
23  across a road and behind some houses for some
24  dormitories.
25  BY ATTORNEY DOUGHERTY:

Page 52

1  Q.And was a typical format of the Advancement
2  Office meetings that you attended?
3  A.Do you mean timing or the substance of the
4  meeting?
5  Q.Either.
6  A.It would be what I would consider typical office
7  meetings.  Updates on where people are traveling and
8  things that are going on.  There could be
9  announcements of things that are happening on campus
10  and events that we ought to all try to be in
11  attendance of.
12  Q.Okay.
13  So, all of the capital giving officers got
14  together in a meeting once a month and discussed their
15  progress and status.  Is that a fair characterization?
16  A.It would have been the entire Advancement Office
17  but yes.
18  Q.Oh, okay.
19  ATTORNEY DOUGHERTY:
20  D-23.
21              ---
22  (Whereupon, Defendant's Exhibit 23,
23  6/19/17 Appointment Letter, was marked
24  for identification.)
25              ---

Page 53

1  BY ATTORNEY DOUGHERTY:
2  Q.I'm showing you a document that I've marked as D-
3  23.  It says, Hill Doe 0262, on the bottom right.  And
4  there is a Hill School logo at the top and date June
5  19, 2017, on the left at the top.  Are we looking at
6  the same document?
7  A.Yes.
8  Q.Have you seen the document that has been marked
9  as D-23 before I showed it to you today?
10  A.Have I seen it before today?
11  Q.Yeah.
12  A.Yes.
13  Q.How do you know the document that has been marked
14  as D-23?
15  A.It was sent to me and is a letter for the next
16  --- the following year, July 2017.
17  Q.So, this is your appointment letter for 2017 to
18  2018.
19  Right?
20  A.Yes.  Yes.
21  Q.And this being D-23.
22  Correct?
23  A.Yes.
24  Q.And is it fair to say the only thing that changed
25  in terms of your employment is capital giving officer

Page 54

1  between your first term, July 1, 2016 to June 30,
2  2017, as compared to your second term July 1, 2017 to
3  June 30, 2018, is the amount that you were paid?
4  A.Yes.
5  Q.So, you were still required to --- let me start
6  again.
7  So, for the 2017 to 2018 term, you were still
8  working remotely.
9  Is that correct?
10 A.Correct.
11 Q.And you were still required to attend the Plus
12 Delta sessions monthly?
13 A.No.
14 Q.No?  Okay.
15 A.That had ended.
16 Q.Okay.
17 So, for the July 1 --- when did the Delta
18 sessions end?
19 A.It would have been sometime in the fall of 2016.
20 Q.Oh, okay.
21 So, for the July 1, 2017 to June 30, 2018 term,
22 you still were required to visit the campus monthly.
23 Correct?
24 A.It would have been more periodically than set
25 monthly like it was during the Plus Delta.

Page 55

1  Q.How many times did you --- let me start again.
2  How many times were you required to visit the
3  campus during the July 1, 2017 to June 30, 2018 term?
4  A.I don't know.
5  Q.So, you don't know how many times you were
6  required to visit the campus for the July 1, 2017 to
7  June 30, 2018 term?
8  A.I can't give you a specific number of times I was
9  there.
10 ATTORNEY JUBB:
11 She asked for required first.
12 THE WITNESS:
13 Going back, they would have been the
14 same key events, on campus events as needed.  If you
15 go back to the first letter, number five at the
16 bottom.  And I would have gone I would say
17 sporadically but in between those required events in
18 order to spend time on campus.
19 BY ATTORNEY DOUGHERTY:
20 Q.Okay.
21 So, just for the record, you were pointing at D-
22 21, the April 8, 2016, appointment letter.
23 A.Yes.
24 Q.Just so we're ---.
25 A.Yes.

Page 56

1  Q.And you now have D-21 and D-23 in front of you.
2  A.Yes.
3  Q.Similar to me.  So, you're looking at number five
4  of D-21 that says you may be expected to attend key on
5  campus events as needed.  So, for July 1, 2017 to June
6  30, 2018, term as capital giving officer, you were
7  required to attend Lawrenceville Weekend, Reunion
8  Weekend, dedications.
9  Correct?
10 A.Yes.
11 Q.So, for the July 1, 2017 to June 30, 2018 term,
12 how many times were you required to visit the campus?
13 A.I don't know off the top of my head.
14 Q.Okay.
15 And just to be clear, I'm asking how many times
16 you were required.  So, we don't know how many times
17 you were required even if you did meet it.  I just
18 want to know if there was a requirement.  Let's do it
19 this way.  Was there a requirement that you attend or
20 visit the campus a specific interval during the July
21 1, 2017 to June 30, 2018 term?
22 A.No.
23 Q.So, that's something that changed between the two
24 terms.
25 A.Yes.

Page 57

1  Q.So, going back to D-21 number two, this is D-21
2  April 8, 2016, letter.  Number two it says, you will
3  schedule your campus visits monthly.  So, starting
4  July 1, 2017, you weren't required to visit the campus
5  monthly.
6  Is that right?
7  A.Correct.
8  Q.And you don't remember how many times you visited
9  the campus between July 1, 2017, and June 30, 2018.
10 Correct?
11 A.I don't.
12 Q.Are you able to estimate without guessing?
13 A.No.  Well, if you give me a minute, I could come
14 up.  But no.
15 Q.Well, if you need a minute to think about it
16 then, okay.
17 A.Probably five.
18 Q.And just to be clear, those five campus visits
19 that you have in mind, are they in addition
20 Lawrenceville Weekend, Reunion Weekend, and
21 dedications or including?
22 A.It's possible they would be included in those.
23 Q.Okay.
24 So, the total of five including the key on campus
25 events.

Matthew B. Ralston
September 20, 2021                                           58 to 61

Page 58

1  Is that right?
2  A. Yes.
3  Q. Were you still expected to attend Advancement
4  Office meetings during the July 1, 2017 to June 30,
5  2018 term of your employment as capital giving
6  officer?
7  A. But I could attend remotely.
8  Q. So, you called on the telephone?
9  A. Yes.
10  Q. Just looking at D-23, did you receive a letter
11  like D-23 for your July 1st, 2018 term?
12  A. Yes.
13  Q. Do you have your appointment letter for the July
14  1, 2018 to June 30, 2019 term?
15  A. I don't know off the top of my head.  Probably.
16  ATTORNEY DOUGHERTY:
17      I don't think that's something that we
18  have.  So, just ask if he has it, he could provide it.
19  ATTORNEY JUBB:
20      Yeah.  And I'll represent to you that
21  I've produced everything I have.  So, we'll do an
22  extra search for that.
23  BY ATTORNEY DOUGHERTY:
24  Q. Do you have in mind an appointment letter that
25  you received on --- or let me start again.  Do you

Page 59

1  have in mind an appointment letter you received for
2  the term starting July 1, 2018?
3  A. I do.
4  Q. And is the format of the letter that you have in
5  mind for the July 1, 2018, appointment the same as D-
6  23 or is it like D-21 or something different?
7  A. My recollection is it's more like D-23.  Salary I
8  know was different.
9  Q. Did your salary increase again on July 1, 2018?
10  A. Yes.  It did.
11  Q. Did anything else change with the terms of your
12  employment?
13  A. With the terms?  No.  At some point, the school
14  instituted some bonus program.  And I don't remember
15  which year that was and how it was presented to us if
16  it was part of that letter or if it was distributed in
17  a meeting.
18  Q. Okay.
19      So, sometime during the July 1, 2018 term, the
20  school implemented a bonus plan for capital giving
21  officers?
22  A. I actually think it was the previous year
23  sometime during 2017/2018 year.  But that's what I
24  don't recall specifically.
25  Q. Okay.

Page 60

1  And you don't remember if you received a separate
2  letter regarding the bonus program?
3  A. I don't.
4  Q. Did you ever receive a bonus?
5  A. I don't believe I did.
6  Q. How did the bonus program work just from what you
7  remember?
8  A. It would have been based on size of a gift if
9  there was an excess of some number.  I don't,
10  actually, recall the others.  Maybe there's a level of
11  giving called the 1851 Society, which is just a
12  recognition that people made a gift of at least
13  $1,851.  It's probably an incentive based on the
14  number of those you might have received during the
15  course of a year.  Beyond that, I can't tell you,
16  specifically.
17  Q. Was the bonus like a percentage of the gift
18  amount or that amount?
19  A. No.  It's fixed dollar amounts.
20  Q. So, it was like an incentive to get bigger gifts
21  for the capital giving officers.
22  Correct?
23  A. Yes.
24  ATTORNEY DOUGHERTY:
25      I meant to do this before and I just

Page 61

1  checked.  I don't have any messages from Mr. Poulos.
2  ATTORNEY JUBB:
3      Okay.
4  ATTORNEY DOUGHERTY:
5      Sometimes, he just emails one of us and
6  not the other.
7  ATTORNEY JUBB:
8      Most times.
9  BY ATTORNEY DOUGHERTY:
10  Q. And so, the only thing that changed with your job
11  as capital giving officer for the July 1, 2018 term
12  was an increased salary and maybe access to the bonus
13  program.
14  Is that right?
15  A. Yes.
16  Q. And if we can use D-21 again as reference, did
17  you have a specific amount of campus visits you had to
18  perform for the July 1, 2018 term?
19  A. No.
20  Q. Do you know how many times you visited campus?
21  A. No.  But it would be similar to 2018 ---
22  2017/2018 with the exception that I spent that time on
23  campus in January 2019 and early February 2019.
24  Q. So, I struggle with the July year every time I
25  ask a question.

Matthew B. Ralston
September 20, 2021                                        62 to 65

Page 62

1  A. School years.
2  Q. Yeah.  It's fine for me because I'm used to
3  January to December.  You're making my brain work
4  extra hard today.  And then, as it relates to the
5  Advancement Office meetings, you could participate via
6  telephone for the July 1, 2018 term?
7  A. Yes.
8  Q. And I don't think I asked you so let's start with
9  the July 1, 2017 to June 30, 2018.  Were you required
10 to perform a specific amount of donor meetings?
11 A. Yes.  It would have been very much like what's
12 outlined on D-21.
13 Q. Okay.
14 So, for the second term of your employment as
15 capital giving officer, you were expected to complete
16 12 to 15 donor meetings per month?
17 A. Yes.
18 Q. Did you complete 12 to 15 donor meetings per
19 month during the second term of your employment as
20 capital giving officer?
21 A. I don't recall the number I did per month.  I
22 know that scheduling of visits was one of the areas
23 that I was encouraged to improve, the number of
24 visits, which is one of the reasons I was brought
25 back.  The Midwest is an area where donors are more

Page 63

1  spread out.  And so, a trip may not yield as many
2  visits as it does on the east coast, for example.
3  Q. Were you expected to complete 12 to 15 donor
4  meetings per month during the third term of your
5  employment as capital giving officer starting at July
6  1, 2018?
7  A. Yes.
8  Q. Did you complete 12 to 15 donor meetings per
9  month during the third term of your employment as
10 capital giving officer?
11 A. I don't recall numbers.  I don't --- I'm sorry.
12 Q. When you were placed on administrative leave in
13 2019, did you stop performing donor meetings?
14 A. Yes.
15 Q. And you stopped visiting campus?
16 A. Yes.
17 Q. And you stopped participating in key on campus
18 events.
19 Is that right?
20 A. Yes.
21 Q. And you stopped participating in meetings with
22 the Advancement Office.
23 Correct?
24 A. Yes.
25 Q. As it relates to your employment during the

Page 64

1  second and third terms as a capital giving officer, am
2  I correct that your on campus visits, the key on
3  campus events, the meetings with the Advancement
4  Office, and the 12 to 15 donor meetings did not
5  involve being alone with a Hill School student?
6  ATTORNEY JUBB:
7  I'll object to the form.
8  THE WITNESS:
9  Can you ask again?
10 BY ATTORNEY DOUGHERTY:
11 Q. Sure.  We can do one at a time.  So, the 12 to 15
12 donor meetings per month you were required to perform
13 during the second and third term of your employment as
14 capital giving officer, did they involve being alone
15 with a Hill School student?
16 A. No.
17 Q. And did your meetings with the Advancement Office
18 --- let me start again.
19 Did all of your meetings with the Advancement
20 Office during the second and third term of your
21 employment occur over the telephone?
22 A. No.
23 Q. Did any of the in person meetings with the
24 Advancement Office during your second and third term
25 as capital giving officer involve being alone with a

Page 65

1  Hill School student?
2  A. The meetings did not, no.
3  Q. And your on campus visits and attendance at key
4  on campus events did not involve being alone with a
5  Hill School student.
6  Is that correct?
7  A. They could have involved being alone with
8  students.
9  Q. Okay.
10 During your second term as capital giving
11 officer, were you ever alone with a Hill School
12 student?
13 A. I haven't got a specific instance to share but
14 it's hard to imagine that I wasn't having a
15 conversation somewhere on campus with a student, be it
16 the dining hall or walking across the quad where there
17 wasn't another person present for the conversation.
18 Q. Okay.
19 So, you're describing the dining hall
20 conversations and bumping into a student on campus
21 similar to what you described during your first term.
22 Is that right?
23 A. Yes.
24 Q. And so, during your second and third term when
25 you were on campus --- let me start again.

Page 66

1  During your second and third terms, you were on
2  campus substantially less than during your first term,
3  is that right, as capital giving officer?
4  ATTORNEY JUBB:
5  I'll object to the form.
6  THE WITNESS:
7  Probably, yes.
8  BY ATTORNEY DOUGHERTY:
9  Q.And so, during your second and third term as
10  terms as capital giving officer for the Hill School,
11  you may have bumped into students on campus or had
12  conversations with students at the dining hall.
13  Is that right?
14  A.Yes.
15  Q.You can't recall a specific instance where you
16  were alone just you and the student alone with the
17  Hill School student during the second or third terms
18  of your employment at the Hill School.
19  Is that right?
20  A.That's right.
21  Q.And you can't recall an instance where you were
22  alone just you and the student during the first term
23  of your employment as capital giving officer.
24  Is that correct?
25  A.I'm sorry.  Could you repeat that?

Page 67

1  Q.Sure.  I just want to confirm and I may have
2  asked this already but I just want to confirm while
3  we're here that you cannot think of a specific
4  instance where you were alone just you and the
5  student, you were alone with a Hill School student
6  during the first term of your employment as capital
7  giving officer at the Hill School.
8  Is that right?
9  A.That's right.
10  Q.I just want to make sure that there aren't a
11  different number of pages.
12  ATTORNEY DOUGHERTY:
13  D-24.
14                    ---
15  (Whereupon, Defendant's Exhibit 24,
16  Performance Evaluation '16-'17, was
17  marked for identification.)
18                    ---
19  BY ATTORNEY DOUGHERTY:
20  Q.And just going forward, it's okay if you want to
21  --- like you said in one instance, if you need to
22  reference one of the prior letters when you're
23  answering or if you do, but can you just point out
24  what you're looking at just so we have it clear for
25  the record?

Page 68

1  A.Okay.
2  Q.I'm not suggesting that you have to.  I'm just
3  saying if you do in the future, just let me know what
4  you're looking at.  But right now, I'm showing you a
5  document that I've marked as D-24.  So, it's Hill Doe
6  0273 to 76 on the bottom right.  And it says, the Hill
7  School Advancement Office Performance Evaluation, on
8  the top of the first page.  Do you know what document
9  that I've marked as D-24?
10  A.Yes.
11  Q.How do you know the document that I've marked as
12  D-24?
13  A.It's my evaluation sheet put together by Geoff.
14  Q.Okay.
15  So, this is where you were describing earlier
16  that there was written evaluation where you filled in
17  some and then, Geoff filled in some and then, you had
18  a meeting.
19  Right?
20  A.Yes.
21  Q.So, which parts of D-24 did you fill in?
22  A.I don't know if I did all of this or ---.
23  Q.Did you actually type the comments in or did you
24  maybe hand write it and give it to somebody to type
25  up?  Is that the source of confusion?

Page 69

1  ATTORNEY JUBB:
2  I'll object to the form.
3  BY ATTORNEY DOUGHERTY:
4  Q.Okay.
5  Let's just do this.  Let's go to the first one.
6  It says, Job Knowledge, under Rating Factors.  Do you
7  see it?  It says, Job Knowledge.  And then, under
8  rating, it says, ME, which is meets expectations.
9  A.Yes.
10  Q.So, did you rate yourself for job knowledge as
11  meets expectation?
12  A.Yes.  I can see reading that that is mine.
13  Q.Okay.
14  And then, the comment says, ME for a new hire.
15  Needs improvement to be my best.  So, that's your
16  comment.
17  Right?
18  A.Yes.
19  Q.Did you get a form from the school that you had
20  to type in?  Or how did this get filled out, this
21  being D-24?
22  A.I don't know if I typed this or if I hand wrote
23  it and it got typed.  But the form would have come
24  from Geoff.  It would have gone back to Geoff.  And
25  then, Geoff and I would have met and gone over it.

Page 70

1  Q.Okay.
2  So, now that we've looked at job knowledge, the
3  first rating --- the first four rating factors under
4  number one, technical skills, we looked at that
5  comment.  Now, you recognize the content in the rating
6  column and the comments column as your comments?
7  A.Yes.
8  Q.Your ratings of yourself and your comments.
9  Right?
10 A.Yes.
11 Q.Is that the case for everything under rating and
12 comments for technical skills, number one, quality of
13 work, number two, which is --- those are on the first
14 page.  Number two falls onto the second page.  Number
15 three, interpersonal skills; four, communication
16 skills; five, approach to work; six, quality of work,
17 which goes onto the third page?
18 A.Yes.
19 Q.And there's like some type of handwriting in the
20 middle on the third page of meets expectations.  Do
21 you know what that is?  Is that your marking?
22 A.That would be Geoff's initials.
23 Q.Did you put the X there?  Did you put the X
24 there?
25 A.I'm sure.

Page 71

1  Q.Okay.
2  So, you rated yourself as meets expectations and
3  then, Geoff circled it and put his initials?
4  Is that right?
5  A.Yes.  But I can't --- yeah.
6  Q.You're just unsure whether you, actually, put a
7  handwritten X and somebody typed it.
8  Is that right?
9  A.Yes.
10 Q.I just want to make sure because you hesitated on
11 some of it that you don't think that somebody else
12 typed in the comments.
13 Right?
14 A.No.
15 Q.It would have been somebody else, actually, type
16 wrote them.
17 Correct?
18 A.I'm guessing.  I typed with the exception of
19 Geoff's comments.  What I was unsure about was if
20 Geoff's signature was regarding that he was in
21 reference to everything above it that I had done.  And
22 that was the summary or if it was just for that
23 overall rating.
24 Q.Okay.
25 And when you were pointing out Geoff's comments,

Page 72

1  and we're going to get there, you were pointing to the
2  supervisor comment section of the third page.
3  Right?
4  A.Yes.
5  Q.Okay.
6  But you rated yourself as meets expectations.
7  Is that right?
8  A.Yes.
9  Q.All right.
10 And then, the stuff under supervisor comments,
11 those are Geoff's comments about your performance.
12 Is that right?
13 A.Yes.  Yes.
14 Q.And he says --- let me start again.
15 You received these comments and were able to read
16 them and then, you met with Geoff about them.
17 Is that right?
18 A.Yes.  I don't recall if we met and then, he wrote
19 the comments or if the comments came to me and then,
20 we met.  I can't tell you the order of those.
21 Q.So, he says, Matt's first year got off to a slow
22 start as he struggled in the first six months on how
23 to get in front of people regularly and how to turn
24 off the, quote, teacher/mentor, end quote, role that
25 he knows so well and put on the CGO hat.  Do you agree

Page 73

1  with that comment?
2  A.Yes.
3  Q.And I think being remote --- and I'm still
4  reading again the next sentence.  I think being remote
5  was part of the struggle, as Matt can go months
6  without seeing the school and several days or weeks
7  without having a lengthy discussion with a colleague.
8  Do you agree with that comment?
9  A.Yes.
10 Q.So, were you at the campus at the Hill School
11 less than once a month during the 2016 to 2017 term,
12 your first term as capital giving officer?
13 A.After Plus Delta ended, I would have been, yes.
14 Q.So, you were not present on campus every month
15 after the fall of 2016.
16 Is that right?
17 A.Correct.
18 Q.How many times did you visit the Hill School
19 campus after the fall of 2016 during your first term
20 as capital giving officer?  So, I guess the winter of
21 2016 to the end of the summer as June 30th, 2017.
22 A.I don't know off the top of my head.
23 Q.Geoff wrote that you could go months without
24 seeing the school.  Is that a fair statement?
25 A.It could be, yeah.

Matthew B. Ralston
September 20, 2021                          74 to 77

Page 74

1  Q.But what's your recollection from your first term
2  as capital giving officer?
3  A.Regarding?
4  Q.Whether you could go months without seeing the
5  school.
6  A.I think that's quite possible.
7  Q.Okay.
8  On to the last page of D-24.  We're still in the
9  --- actually, the supervisory comment section ends on
10 the prior page.  So, now on the last page of D-24,
11 we're under action plan/training and development
12 goals.  And there's a box with stuff typed in it.  And
13 it says Matt and I, so these comments here on the
14 action plan/training and development goals box are
15 from Geoff.
16 Is that right?
17 A.Yes.
18 Q.So, Mr. Neese wrote, Matt and I have discussed
19 his return to campus to spend seven to ten days
20 straight in the alumni house getting accustomed to how
21 other CGO's do their work and learning more about the
22 process.  Did you spend seven to ten days straight in
23 the alumni house as suggested by Mr. Neese?
24 A.Yes.
25 Q.I was really nervous about coughing right there.

Page 75

1  Okay.
2  Mr. Neese wrote in the second paragraph, we
3  really need him to hit at least 110 visits in fiscal
4  year '18.  Did you reach 110 visits in fiscal year
5  '18?
6  A.I don't know.
7  Q.And then, on the bottom or towards the bottom of
8  the last page of D-24, there were signatures.  Is the
9  signature next to signature colon yours?  Oh, I'm
10 sorry.  Never mind.  There's a reviewer column that
11 says Matt Ralston.  Underneath, there is a signature.
12 Is that your signature?
13 A.Yes.
14 Q.And then, to the left, there's a column that says
15 supervisor and signature under that.  And that is next
16 to supervisor that says Geoff Neese and there's a
17 signature under it.  Do you recognize that as Mr.
18 Neese's signature?
19 A.Yes.
20 Q.And it looks like there's somebody else's
21 signature with June 26, 2017, date.  Do you know whose
22 signature that is?
23 A.I don't.
24 Q.Was there somebody else who participated in your
25 evaluations?

Page 76

1  A.I believe it's probably Christian Sokel.
2  Q.Okay.
3  So ---.
4  A.C and then, Sokel.
5  Q.Oh, S-O-C-L-A-L (sic)?
6  A.Yeah.  I think the C is for Christian and then,
7  there's an S and then, his last name is spelled there.
8  But I'm, actually, not certain.
9  Q.Okay.
10 Was there somebody else who participated in your
11 evaluation?
12 A.No.
13 Q.What was Mr. Sokel's position?
14 A.He is the head of advancement.  So, Geoff reports
15 to him.
16 Q.Okay.
17 ATTORNEY DOUGHERTY:
18 Do you have 16?  This will be 25.  Oh,
19 did I give you more than one?  I did.  Let me make
20 sure I gave you the right thing.
21              ---
22 (Whereupon, Defendant's Exhibit 25,
23 Performance Evaluation '17-'18, was
24 marked for identification.)
25              ---

Page 77

1  ATTORNEY JUBB:
2  This is the new one.
3  Right?
4  ATTORNEY DOUGHERTY:
5  Yeah.  I think I had --- we just had
6  three copies of that.  There's three out there.
7  BY ATTORNEY DOUGHERTY:
8  Q.Okay.
9  I'm showing you a document that I've marked as D-
10 25.  It says, Hill Doe 0627 to 270, on the bottom
11 right.  It says, The Hill Advancement Office
12 Performance Evaluation, on the top.  Do you know the
13 document that I've marked as D-25?
14 A.Yes.
15 Q.How do you know the document that I've marked as
16 D-25?
17 A.It would be my evaluation form from the next
18 year.
19 Q.For the ---?
20 A.2017 to 2018.
21 Q.Okay, right.  On the right, it says, Evaluation
22 Period, on the top left?
23 A.Yes.
24 Q.Is any portion of the first page your
25 handwriting?

Matthew B. Ralston
September 20, 2021                                    78 to 81

Page 78

1  A.No.
2  Q.Do you know whose handwriting is reflected on the
3  first page of D-25?
4  A.It must be Geoff's.
5  Q.And then, you can flip to other pages.  But I
6  want to know if you can identify any comments in the
7  evaluation reflected in D-25 that are your comments
8  about your performance.
9  ATTORNEY JUBB:
10  That he wrote in the comment section?
11  ATTORNEY DOUGHERTY:
12  Yes.  Were authored meaning he didn't
13  specifically type them.
14  THE WITNESS:
15  I'm sorry.  What writing?
16  BY ATTORNEY DOUGHERTY:
17  Q.I'm just trying to --- I want you to identify ---
18  let's do it this way.  Let's go to number one,
19  technical skills, D-25.  See those rating factors,
20  rating comments that we looked at before on the first
21  page under technical skills number one?
22  A.Okay.
23  Q.See there's rating factors, rating comments.  Did
24  you fill in the letters in the rating column like you
25  did with the last evaluation?

Page 79

1  A.Yes.
2  Q.And the comments that are reflected in the
3  comments column, well, there is only one, it says,
4  still not fluent in RE queries.  That's your comment
5  about your job performance?
6  A.Yes.
7  Q.And that's the case for the ratings and comments
8  in number two, which is quality of work.  And if you
9  go to the second page, number three, interpersonal
10  skills, rating, comments.  Number four, communication
11  skills, ratings.  There aren't any comments there.
12  Number five, approach to work, quality of work, all of
13  the letters under the rating column and the comments
14  in the comments column, those are yours about your
15  work performance?
16  A.Under ratings, anything that's handwritten in
17  ratings is not my writing.
18  Q.And number five, there are some handwritten
19  comments.  Those are not yours?
20  A.No.
21  Q.And the same with six.  There's handwritten
22  comments and those are not yours?
23  A.No.
24  Q.Okay.
25  So, only the items that are typed under the

Page 80

1  rating and comments columns on the first and second
2  page of D-25 are your comments about your work
3  performance.
4  Is that right?
5  A.I'm sorry.
6  Q.Sure.  Only the typed content under the rating
7  and comments columns on the first and second page of
8  D-25 are your comments about your work performance.
9  Is that right?
10  A.Yes.
11  Q.And then, on the third page of D-25, there is
12  another --- it says, overall performance rating.
13  There was a check next to meets expectations.  Did you
14  put that check there?
15  A.The X?
16  Q.Yeah.
17  A.Yes.
18  Q.I'm sorry.  Yes.  And then, there is typing in
19  there that says, I feel that I am still learning the
20  job.  I believe my production will continue to rise.
21  Is that a comment you wrote about your job
22  performance?
23  A.Yes.
24  Q.And then, supervisor's comments, there's
25  handwritten --- there's a box with handwriting in it.

Page 81

1  The comments in supervisor comments are Mr. Neese's
2  comments.
3  Right?
4  A.Yes.
5  Q.Okay.
6  In the middle of the handwritten comments --- let
7  me start again.  The first sentence says, Matt's
8  second year saw huge growth in how he managed
9  meetings, which led to more success, especially in the
10  second half of the fiscal year.  Matt has used the
11  Plus Delta depth techniques to transition from his
12  former teacher/mentor role into a professional
13  fundraiser.  Were you still doing Plus Delta training?
14  A.No.
15  Q.So, you were just --- so, Mr. Neese's comment was
16  that you were utilizing the techniques you learned
17  during your training at the beginning of your first
18  term as capital giving officer.
19  Correct?
20  A.Yes.
21  Q.And then, the next sentence is, Matt's work with
22  Lane Jubb of '06 was symbolic of how much he has
23  grown.  What work did you do with Lane Jubb?
24  A.I met with Lane as a potential donor and received
25  a pledge for gifts.

Matthew B. Ralston
September 20, 2021
82 to 85

Page 82

1  Q.When did you meet with Lane as it relates to the
2  work that Mr. Neese is commenting about?
3  A.I think it was January of 2018.  But I'm not
4  certain.
5  Q.Was it before you learned about the first letter
6  by Mr. Poulos or including Mr. Poulos's accusations?
7  A.Yes.
8  Q.And how often did you have contact with Mr. Jubb
9  about the work that Mr. Neese is describing in his
10  comment that is part of D-25?
11  A.One meeting, specifically, comes to mind and I
12  --- other than that, it's probably phone calls because
13  I was working remotely and he is here.
14  Q.So, you came to Pennsylvania to meet with Mr.
15  Jubb?
16  A.I did.  Actually, I probably came to Pennsylvania
17  and while I was here met with Mr. Jubb.
18  Q.It says Matt's work with Lane Jubb.  What was the
19  work?
20  A.Soliciting a gift.
21  Q.Okay.
22  So, you had a meeting with Mr. Jubb and then, you
23  had telephone contacts with Mr. Jubb about a gift?
24  A.Yes.
25  Q.And these contacts occurred prior to the first

Page 83

1  letter that included the accusations by Mr. Poulos.
2  Is that right?
3  A.Yes.
4  Q.It's somewhat close in time to the first letter.
5  Is that right?
6  A.Yes.  Months, yes.
7  Q.So, you had a meeting with Mr. Jubb in January of
8  2018 and then telephone contacts?
9  A.Yes.
10  Q.How close in time were the telephone contacts to
11  the meeting?
12  A.They would have been follow ups.  And I can't
13  tell you how much time.
14  Q.Like in January, February, did it go on for
15  weeks, days, months?
16  A.It could have gone months.  But I don't know.
17  Q.Had your contacts with Mr. Jubb regarding the
18  gift ended before you received the first letter that
19  included Mr. Poulos's accusations?
20  A.I doubt it.  I don't know but I don't think so.
21  Q.Okay.
22  So, you were still in --- let me start again.
23  You were having communications with Mr. Jubb regarding
24  a gift when you learned about the first letter that
25  included Mr. Poulos's accusations.

Page 84

1  Is that right?
2  A.Yes.
3  ATTORNEY JUBB:
4  I'll object to the form now.
5  BY ATTORNEY DOUGHERTY:
6  Q.Did you tell Mr. Jubb about the accusations by
7  Mr. Poulos before you retained Mr. Jubb as your
8  lawyer?
9  A.No.
10  Q.Did Mr. Jubb express to you in words or
11  substance, again, before he was your lawyer any
12  knowledge regarding Mr. Poulos's accusations against
13  you?
14  A.No.
15  Q.And it's your --- let me start again.  I'm
16  correct that there isn't an evaluation for 2018 to
17  2019.
18  Correct?
19  A.Correct.
20  Q.Did you have any type of exit interview or any
21  contact with the Hill School at the end of your
22  employment?
23  A.No.
24  Q.Did you have a meeting with anyone at the Hill
25  School concerning the end of your employment at the

Page 85

1  Hill School?
2  A.In what sense?  I knew that I was --- my
3  employment was going to be discontinued but that was
4  the last conversation I had with anyone.
5  Q.When did you learn your employment was going to
6  be discontinued?
7  A.Probably early August 2019.
8  Q.How did you learn in early August 2019 that your
9  employment was going to be discontinued?
10  A.A phone conversation with Mr. Lehman and Mrs.
11  Gelting.
12  Q.Mr. Lehman is the headmaster and Ms. Gelting is
13  the human resources director.
14  Right?
15  A.Yes.
16  Q.And it's Heather Gelting?
17  A.Yes.
18  Q.And Zachary Lehman.
19  Right?
20  A.Yes.
21  Q.And it's L-E-H-M-A-N, G-E-L-T-I-N-G.  Was there
22  anyone else that participated in the telephone
23  conversation between you, Mr. Lehman, and Ms. Gelting
24  regarding the termination of your employment that
25  occurred in early August 2019?

Matthew B. Ralston
September 20, 2021                    86 to 89

Page 86

1  A.No.  It was not described as a termination.
2  Q.Okay.
3    Who initiated the telephone contact?
4  A.I've got an email from Heather Gelting asking if
5  I was available to speak with her and Mr. Lehman.
6  Q.So, you got an email --- well, let me start
7  again.  Did you have access to your Hill School email
8  in August 2019?
9  A.No.
10 Q.When did you stop having access to your Hill
11 School email?
12 A.May 2019.
13 Q.When you were put on leave?
14 A.Yes.
15 Q.So, if you were put on leave prior to May 2019,
16 that's when your email access ended?
17 A.Yes.
18 Q.So, Ms. Gelting sent you an email at your
19 personal email address?
20 A.I believe so.
21 Q.Do you still have that email?
22 A.I don't know.
23 Q.Did you look for it?
24 A.I haven't looked for it.  Can I look for it?
25 Yes, I can.

Page 87

1  Q.Do you still have access to the --- I think we
2  went through your email addresses before but do you
3  still have access to the email address that Ms.
4  Gelting sent the communication to?
5  A.Yes.  What I don't know --- what I do know is
6  what I heard from her.  What I don't know is if it was
7  a phone call or if it was an email.  I was on my
8  motorcycle.  I stopped to take a break.  And when I
9  did that, there was either an email from her or a
10 phone call from her.  I can't tell you which.  And I
11 asked her --- I said of course, I can be available
12 because that was one of the criteria of my leave was
13 to be available when I was needed.
14 Q.So, how did you respond to Ms. Gelting?
15 ATTORNEY JUBB:
16   Just to be clear, you already produced
17 it.  I can show you the Bates number.
18 ATTORNEY DOUGHERTY:
19   Okay.
20   What's the Bates number?
21 ATTORNEY JUBB:
22   It's P36.6, August 12, 2019.
23 THE WITNESS:
24   So, it was an email.
25 ATTORNEY DOUGHERTY:

Page 88

1  Do you have that?
2  BY ATTORNEY DOUGHERTY:
3  Q.And how did you respond to Ms. Gelting?
4  A.I told her I was available.  I think I asked
5  about having my attorney present.  And she said she
6  didn't think we needed that.
7  Q.Did she tell you who else was going to
8  participate in the telephone call?
9  A.I believe she said Zach and I or Mr. Lehman and
10 I.
11 Q.So, the telephone call occurred sometime after
12 August 12, 2019.
13 Is that right?
14 A.Yes.
15 Q.Did the telephone discussion occur close in time
16 to the email?  Was it the next day?  Was it in a week?
17 A.It would have been relatively soon.  I don't know
18 if it was the same week or the following week but it
19 would have been very close.
20 Q.So, within a week or two of Ms. Gelting's email
21 is when you had the telephone discussion with Mr.
22 Lehman and Ms. Gelting.
23 Correct?
24 A.Yes.
25 Q.And what was discussed during the telephone

Page 89

1  conversation in August 2019 with Mr. Lehman and Ms.
2  Gelting?
3  A.Reaching an amicable, I think is the word he
4  used, separation of my employment.
5  Q.Is that it?
6  A.Pretty much.
7  Q.What did you say?
8  A.I said, if we're headed that way, I think what
9  you need to do is write up what that is and share it
10 with my attorney.
11 Q.Did Mr. Lehman tell you why, as you described ---
12 as you said amicable separation in your employment
13 needed to be reached?
14 ATTORNEY JUBB:
15   I'll object to the form.  You can
16 answer.
17 THE WITNESS:
18   My impression was because we were --- it
19 appeared that things weren't going to be resolved
20 around the accusations and the action I had taken,
21 resolved quickly.
22 BY ATTORNEY DOUGHERTY:
23 Q.When you say the action you had taken, you mean
24 the lawsuit.
25 Right?

Page 90

1   A.I do.
2   Q.Okay.
3   So, your impression of why --- let me start
4   again.  Mr. Lehman was, as far as you understood,
5   speaking on behalf of the Hill School during the
6   telephone communication in August 2019.
7   Correct?
8   A.Yes.
9   Q.So, Mr. Lehman was communicating to you that the
10  Hill School wanted to reach an amicable separation in
11  your employment?
12  A.Yes.
13  Q.And it was your impression that the reason why
14  the Hill School wanted to reach an amicable separation
15  of your employment was because your lawsuit was not
16  going to be resolved quickly?
17  ATTORNEY JUBB:
18  I'll object to the form.
19  THE WITNESS:
20  Yes.  That was my impression at the
21  time.
22  BY ATTORNEY DOUGHERTY:
23  Q.Did Mr. Lehman say anything about your lawsuit?
24  A.No.
25  Q.What gave you the impression?  Did somebody say

Page 91

1   something or do something?
2   A.Yeah.  That my situation wasn't going to be
3   resolved quickly.
4   Q.By situation, you mean the lawsuit.
5   Right?
6   ATTORNEY JUBB:
7   Objection to form.
8   THE WITNESS:
9   Yes.
10  BY ATTORNEY DOUGHERTY:
11  Q.Was there something that happened that gave you
12  the impression that there was a connection between the
13  Hill School's interest in reaching an amicable
14  separation in your employment and that the lawsuit was
15  not going to be resolved quickly?
16  A.A connection between the two?
17  Q.Yeah.  Is there something that happened that gave
18  you that impression?
19  ATTORNEY JUBB:
20  Other than what you've already told her.
21  THE WITNESS:
22  I think that's what I said.
23  BY ATTORNEY DOUGHERTY:
24  Q.But I don't think you told me the basis for your
25  impression.  Is it just something that you thought?

Page 92

1   ATTORNEY JUBB:
2   No.
3   THE WITNESS:
4   No.  I said that Mr. Lehman said it
5   looks like this isn't going to be resolved quickly.
6   BY ATTORNEY DOUGHERTY:
7   Q.Okay.
8   So, Mr. Lehman said that it looks like the
9   lawsuit, meaning your lawsuit against Mr. Poulos and
10  Mr. Garabedian was not going to be resolved quicky.
11  Is that right?
12  ATTORNEY JUBB:
13  Objection to form.
14  BY ATTORNEY DOUGHERTY:
15  Q.That was the substance, right?
16  A.Yes.  That's the context I took the comment, yes.
17  Q.I understand.  You don't remember the exact words
18  that Mr. Lehman used but he said something to the
19  effect of, it looks like the lawsuit that you've
20  commenced against Mr. Poulos and Mr. Garabedian is not
21  going to be resolved quickly or any time soon.
22  ATTORNEY JUBB:
23  Objection to form.
24  BY ATTORNEY DOUGHERTY:
25  Q.So, the Hill School wants to reach an amicable

Page 93

1   separation in your employment.
2   Is that right?
3   A.I don't think there was a so conditional in there
4   but yes that was my impression.  That's how I took our
5   conversation.
6   Q.So, it was your impression that Mr. Lehman was
7   --- or I guess Mr. Lehman on behalf of the Hill School
8   was connecting your lawsuit to the reason why your
9   employment needed to end.
10  Is that right?
11  ATTORNEY JUBB:
12  Objection to form.
13  BY ATTORNEY DOUGHERTY:
14  Q.At least it was your impression?
15  ATTORNEY JUBB:
16  Same objection.
17  THE WITNESS:
18  Yes.
19  BY ATTORNEY DOUGHERTY:
20  Q.Did Mr. Lehman express any other thoughts to you
21  or comments to you?
22  A.No.
23  Q.Did Ms. Gelling --- I'm sorry, Ms. Gelting speak
24  during the August 2019 telephone conversation?
25  A.No.  I think she was party to it because of her

Matthew B. Ralston
September 20, 2021                                    94 to 97

Page 94

1  role and to have a third party present.  Again, but
2  she didn't speak, no.
3  Q.Oh, so it was your impression that Ms. Gelting
4  was there so that Mr. Lehman had a witness?
5  A.Sure.
6  Q.And you said that you said, if we're headed that
7  way that you should write it up and share with your
8  lawyer.
9  Is that right?
10  A.Yes.
11  Q.Did you say anything else to Mr. Lehman?
12  A.No.
13  Q.So, it was a pretty short conversation.
14  A.A pretty short conversation.
15  Q.Were you surprised that Mr. Lehman --- let me
16  start again.  Were you surprised by Mr. Lehman's
17  comments?
18  A.I don't know if that's the right word.
19  Q.What is the right word?
20  A.Disappointed.
21  Q.Why were you disappointed?
22  A.Because it was, until the first nine months or
23  whatever the letter existed, it was my impression that
24  the school was making every effort to resolve the
25  situation of the allegations by engaging with Mr.

Page 95

1  Garabedian and the third party attorneys with whom the
2  school worked.  And at the point that they were not
3  getting responses or any movement there, started to
4  distance themselves from me after the second letter.
5  And aside from distancing themselves, I was
6  disappointed that I believed or had up to that point
7  that the school really did believe that the
8  allegations were lies and false.  And the decision was
9  to end my relationship with the community.
10  Q.Did Mr. Lehman say anything during the August
11  2019 telephone communication that, you know, words or
12  substance or that gave you the impression that he
13  believed Mr. Poulos's accusations?
14  A.No.
15  Q.So, you were disappointed because it was your
16  impression that the school didn't credit Mr. Poulos's
17  allegations but was still moving to amicably separate
18  or amicably end your employment.
19  Is that right?
20  A.Yes.
21  Q.Were you disappointed that the school was trying
22  to end --- let me start again.  Were you disappointed
23  that the school was interested in reaching an amicable
24  separation in your employment because of your lawsuit?
25  ATTORNEY JUBB:

Page 96

1  I'll object to the form.  You can
2  answer.
3  THE WITNESS:
4  I don't understand.
5  BY ATTORNEY DOUGHERTY:
6  Q.Sure.  Did you expect the school to be more
7  supportive of you in your lawsuit or in, I think, as
8  you expressed before clearing your name?
9  A.I don't think expectation was part of it.  I
10  think my disappointment was because I hoped that the
11  school would push harder for resolution prior to the
12  lawsuit.  And I was feeling like they had chosen not
13  to and I was kind of left on my own.
14  Q.So, you expected the school to do something to
15  disprove Mr. Poulos's accusations?
16  ATTORNEY JUBB:
17  I'll object to the form.
18  THE WITNESS:
19  I expected Mr. Garabedian and the school
20  to do what I would have considered an investigation
21  that I understood third party investigations do in
22  search of the truth and, at that point, would have
23  reached a conclusion that the letters were based on
24  lies and the allegations were false.
25  BY ATTORNEY DOUGHERTY:

Page 97

1  Q.From your perspective, the school didn't perform
2  an investigation in search of the truth?
3  ATTORNEY JUBB:
4  I'll object to the form.
5  THE WITNESS:
6  I don't know what was investigated.  My
7  understanding is that they were getting a response for
8  cooperation from Mr. Garabedian and Mr. Poulos
9  regarding the allegations.
10  BY ATTORNEY DOUGHERTY:
11  Q.Right.  I understand that you didn't --- because
12  I think you confirmed this for us already in the first
13  day of your deposition that you didn't participate in
14  any investigation.  But you said you expected Mr.
15  Garabedian and the school to do an investigation.  So,
16  I'm just --- your expectation wasn't satisfied.
17  Is that right?
18  A.No.
19  ATTORNEY JUBB:
20  Object to form.
21  BY ATTORNEY DOUGHERTY:
22  Q.So, as far as your impression and as far as you
23  knew, the school did not do an investigation in search
24  of the truth.
25  A.I don't know.  I don't know what they did.  My

Page 98

1   understanding is, and I have no experience with these
2   third party investigations, but my understanding is
3   that it involves both the accuser and the institution
4   or the accused.  And my understanding was that there
5   was not a cooperation trying to make that happen.  And
6   I was given that impression.  And the first time I
7   spoke with Mr. Rees in May of 2018 and my
8   understanding in January of 2019 is that there had
9   been no movement toward that.
10  And that's when the school started --- it's when
11  Mr. Lehman made his comment about not being alone with
12  students.  It's when I learned that the school's
13  insurance company was a part of it.  And so, it became
14  clear to me that I was being distanced.
15  Q.So, you were being distanced by the school and,
16  at the same time, you had an impression that the
17  school wasn't doing an appropriate investigation into
18  the truth.
19  A.I didn't say that.  I don't know what the school
20  is doing.  What I know is what I heard from Mr. Rees
21  was that the school wasn't getting cooperation from
22  Mr. Garabedian or a response from Mr. Garabedian.
23  Q.I understand.  I'm just trying to understand what
24  your issue was with how the --- just focusing on the
25  school for a moment with what the school did.  You

Page 99

1   said you expected the school to do an investigation in
2   search of the truth and that would reveal the letters
3   were based on lies.  And at some point, you must have
4   obtained the impression that that wasn't occurring
5   because you said your expectation of the school wasn't
6   met.  Is that right?
7   ATTORNEY JUBB:
8   I'll object.
9   BY ATTORNEY DOUGHERTY:
10  Q.I know you don't have personal knowledge of what
11  the school did but you had an impression that led you
12  to then file a lawsuit because whatever you expected
13  to happen wasn't happening, correct?
14  ATTORNEY JUBB:
15  Objection.
16  THE WITNESS:
17  What I know is what my perspective was.
18  I have no experience, as I said, in these types of
19  investigations.  And my understanding was that the
20  school didn't give the letters credibility and was
21  trying to do what I thought was the responsible thing
22  to do based on what knowledge I had of, which is
23  limited, third party investigations.  And my
24  understanding that those require both parties to
25  participate and that wasn't happening.

Page 100

1   I don't know what I think the school
2   should have done at that point.  But what it seemed to
3   me the result was that I'm the one that got left out.
4   And it's my name.  It's my career.  And I was being
5   moved away from a community where I raised my family
6   and spent 20 years of my life working and another 7
7   years being a part of.
8   BY ATTORNEY DOUGHERTY:
9   Q.Okay.
10  Was there something that you wanted the school to
11  do differently in its handling of the letters?
12  A.I don't know what --- of course, but I don't know
13  what that is.  It's what I just tried to say.
14  Q.Basically, you wanted the school to do something
15  more to defend your honor.
16  Is that right?
17  A.I don't believe it's just mine.  I believe it's
18  also the school's.  If the school thinks the letters
19  aren't credible and are lies, the school's name is
20  attached to all of that as well.  I don't know what
21  the right answer is.  What I know is I don't think
22  it's just to let it go away.  And I think when --- my
23  perspective was there were eight or nine months from
24  the time the first letter came that I thought I was
25  being --- doing the right thing and leaving the

Page 101

1   opportunity there for an investigation to happen by
2   both.
3   And when the second letter came, it was pretty
4   clear that wasn't happening and I was the one that was
5   getting distanced from my community.
6   Q.So, you had the impression that the school was
7   just letting the letters go away and then, distancing
8   itself from you?
9   ATTORNEY JUBB:
10  I'll object to the form.  You can
11  answer.
12  BY ATTORNEY DOUGHERTY:
13  Q.I'll break it up into two.  You had the
14  impression that the school was just going to --- or
15  was just letting the letters go away?
16  ATTORNEY JUBB:
17  I'll object to the form.
18  BY ATTORNEY DOUGHERTY:
19  Q.That's what you --- those are words you used, to
20  just let it go away.
21  A.Yeah.  Yes.
22  Q.You didn't think the school should just let the
23  letters go away.
24  Correct?
25  A.Of course, I don't.

Matthew B. Ralston
September 20, 2021                                   102 to 105

Page 102

1  Q.And you wanted the school to clear your name and
2  its name and not let the letters go away.
3  Is that right?
4  A.Say that again.
5  Q.Right.  You wanted the school to take some action
6  to clear your name as well as its own name, right,
7  rather than to just let the letters go away.
8  A.Yes.
9  Q.And when the school didn't do that, you then
10  decided to commence a lawsuit.  Is that right?
11  ATTORNEY JUBB:
12  Objection to the form.
13  THE WITNESS:
14  Yes.
15  BY ATTORNEY DOUGHERTY:
16  Q.So, because the school was just letting the
17  letters go away that wasn't sufficient for you.  So,
18  you decided to take legal action.  Is that right?
19  ATTORNEY JUBB:
20  Objection to the form.
21  THE WITNESS:
22  Yes.
23  BY ATTORNEY DOUGHERTY:
24  Q.I think we have to take a break now.  I'm sorry
25  if I pushed it right to the limit.

Page 103

1  VIDEOGRAPHER:
2  The time is 12:06 p.m.  Off the record.
3  OFF VIDEO
4                      ---
5  (WHEREUPON, A SHORT BREAK WAS TAKEN.)
6                      ---
7  ON VIDEO
8  VIDEOGRAPHER:
9  The time is 12:23.  Back on the record.
10  BY ATTORNEY DOUGHERTY:
11  Q.How did you know you were still employed at the
12  Hill School in August 2019 if you didn't get a new
13  appointment letter?
14  A.I was still getting paid and I hadn't been told I
15  wasn't being renewed.
16  Q.Okay.
17  So, your appointment --- we don't have it yet but
18  you're going to look for it, the 2018 to 2019 --- July
19  1, 2018 to June 30, 2019 appointment had ended.
20  Is that right?
21  A.Correct.
22  Q.And so, how did you know you were still employed
23  at the Hill School after June 30, 2019?
24  ATTORNEY JUBB:
25  Objection to form.

Page 104

1  THE WITNESS:
2  I guess I didn't think about it, except
3  that I was still getting paid and I had never been
4  through a paid leave before.  So, I didn't know how
5  the transition from one year to the next really
6  worked.  But I think mostly, I didn't think about it.
7  BY ATTORNEY DOUGHERTY:
8  Q.If the school completed an investigation in
9  search of the truth, I think that's how you described
10  it, would you not have commenced this lawsuit?
11  ATTORNEY JUBB:
12  Objection to the form.
13  THE WITNESS:
14  When I think about an investigation, it
15  wasn't just the Hill School.  It was the Hill School
16  and Mr. Garabedian because there's the accuser and
17  there is the institution.  And I expected the truth to
18  be found and them working together.
19  BY ATTORNEY DOUGHERTY:
20  Q.Okay.
21  So, if that happened, the thing you're talking
22  about, Mr. Garabedian or Mr. Poulos and the school
23  working together.
24  Is that right?
25  A.It's my understanding how those work.

Page 105

1  Q.Okay.
2  So, well, you said the accuser and institution.
3  So, I guess it's, technically, Mr. Poulos and the Hill
4  School had worked together?
5  ATTORNEY JUBB:
6  Objection to the form.
7  THE WITNESS:
8  My understanding was communications with
9  the Hill School was between Mr. Garabedian and Mr.
10  Poulos --- I mean, and the school.  And so, I would
11  have expected contact with the school to be strictly
12  through Mr. Poulos's attorney.
13  BY ATTORNEY DOUGHERTY:
14  Q.Okay.
15  And if that investigation, the accuser and the
16  institution working together, had occurred then, you
17  would not have commenced this lawsuit.
18  Is that right?
19  ATTORNEY JUBB:
20  Objection to form.
21  THE WITNESS:
22  I'm not sure how to answer that, except
23  that that would have been the step that I think I was
24  waiting for.  And for those eight months, from the
25  time the first letter came until the next letter came,

Page 106

1  I thought that would happen and it didn't.
2  BY ATTORNEY DOUGHERTY:
3  Q. What did you expect that that investigation would
4  reveal?
5  A. That I guess in the early --- in those eight
6  months, I would have, I guess, expected that either
7  the letter was made up --- not the letter. The
8  accusations were made up in a lie, therefore, the
9  letter being false or identified that Mr. Poulos had
10  the wrong person.
11  Q. Do you remember the years that Mr. Poulos --- let
12  me start again. Do you remember the year that Mr.
13  Poulos had you as his teacher?
14  ATTORNEY JUBB:
15  Could you clarify? Does he remember '94
16  to '95 or does he, actually, remember teaching Mr.
17  Poulos?
18  ATTORNEY DOUGHERTY:
19  Just what years ---.
20  BY ATTORNEY DOUGHERTY:
21  Q. Let's do it this way. Do you know what years Mr.
22  Poulos was a student at the Hill School?
23  A. Yes.
24  Q. What years was Mr. Poulos a student at the Hill
25  School?

Page 107

1  A. 1993/'94, 1994/'95, and 1996/'97.
2  Q. Do you have a specific recollection of teaching
3  Mr. Poulos or having any contact with Mr. Poulos in
4  1993 to 1995 or 1996 to 1997?
5  A. Other than what's already gone over in the last
6  deposition?
7  Q. Yes. Well, you seem to make a clarification.
8  So, I want to make sure I understand --- I'm not
9  missing something.
10  A. Other than what we've discussed, no. He was in
11  my class. I recognize that. I had contact with him
12  when he returned to the school in 1996 because I was
13  the director of studies, at that point and was
14  responsible for scheduling classes for students. That
15  would have been in the summer 1996. And he lived in
16  our dormitory in 1996/'97.
17  Q. Was there anyone else who taught geometry during
18  1993 to '94 or '94 to '95 or '96 to '97?
19  A. Yes.
20  Q. Who else taught geometry?
21  A. I don't know. I don't recall that.
22  Q. So, Mr. Poulos was in your geometry class in '93
23  to --- I'm sorry, '94 to '95.
24  Correct?
25  A. Yes.

Page 108

1  Q. Who else taught --- let me start again. Did
2  anyone other than you teach geometry in 1994 to 1995?
3  A. Yes.
4  Q. Who else taught geometry in 1994 to 1995?
5  A. I don't know.
6  Q. Do you not --- do you not remember the person's
7  name but have an image of the person in your mind or
8  just have no recollection whatsoever?
9  A. I don't know who taught the class. If I had a
10  picture of them in my mind, I could give you a name.
11  But I don't know who the other teacher was or
12  teachers.
13  Q. So, you don't know if the other geometry teacher
14  was even a man?
15  A. It would have been.
16  Q. Who were the choices?
17  A. Wow. Willis Pierre, Mike Pentz, Matt Gettings,
18  Fred Marshall, Larry Kelly, Frank DeLaurentes. How
19  many is that?
20  Q. One, two, three, four, five, six. I'll read the
21  list back to you and see if I got ---.
22  A. My name would be on there as well so that's
23  seven. I think that's it.
24  Q. Okay.
25  So, Willis Pierre, Mike Pentz, Matt Gettings,

Page 109

1  Fred Marshall, Larry Kelly, Frank DeLaurentes, you.
2  A. There is one more. Give me a second. Wayne
3  Marge.
4  Q. Did you say Marge?
5  A. Yeah, M-A-R-G-E.
6  Q. Okay.
7  A. And there was also a teacher named Rob Dougherty.
8  And Rob was not at the school very long. Wayne --- I
9  can't tell you when Rob and Wayne left the school
10  precisely. But those were the people that were
11  teaching in the Math Department around that time
12  period. I'm guessing Wayne Marge and Rob Dougherty
13  were not at the school in '97, for example, '96/'97.
14  But I can't tell you specifically.
15  Q. Okay.
16  So, it would have been one of these gentlemen who
17  was the other geometry teacher in 1994 to '95.
18  Is that right?
19  A. One of the other geometry teachers, yes.
20  Q. Oh, teachers, okay. So, it could have been more
21  than one other geometry teacher in 1994 to '95?
22  A. Yes.
23  Q. And any of the options --- let me start again.
24  The only options would be from this list. Willis
25  Pierre, Mike Pentz, Matt Gettings, Fred Marshall,

Page 110

1   Larry Kelly, Frank DeLaurentes, you, Wayne Marge, and
2   Rob Dougherty.
3   A.I'm pretty sure.
4   Q.Did any of these gentlemen look like you?
5   A.I don't think so.
6   Q.Were any of them close in age to you?
7   A.Yes.  Frank's close in age, looked nothing like
8   me.  Matt Gettings is a little younger, relatively
9   close.  Wayne Marge is probably close in age.  Who
10  else did I say?  Willis is not, Mike is not.
11  Q.Willis Pierre, Mike Pentz, Fred Marshall, Larry
12  Kelly, and Rob Dougherty.
13  A.Those would be the only ones close to me in age.
14  Q.Matt Gettings, Wayne Marge, and Frank
15  DeLaurentes.
16  A.Yes.
17  Q.And Matt Gettings, Frank DeLaurentes, Wayne Marge
18  did not look like you to any extent.  You sort of
19  laughed when I asked that question.
20  A.I think it would be hard to confuse us.
21  Q.Okay.
22  You previously described yourself, a confirmed
23  description of you as tall and lanky at the time.
24  Is that right?  And the time being '94 to '95?
25  A.Yeah.  Yes.

Page 111

1   Q.Was there another male teacher at the Hill School
2   during that time period, 1994 to 1995, who could be
3   confused with you?
4   A.Not from my perspective.  The only other person
5   I've ever been told was confused as me is a gentleman
6   named Mark Nelson.  It would be hard to describe him
7   as lanky.
8   Q.So, you can't --- you mentioned that --- or
9   testified rather that you expected that a real
10  investigation that was cooperative with the accuser
11  and the institution, the Hill School, would have
12  revealed either that the letters were lied and made up
13  or identified the wrong person.
14  Right?
15  A.Yes.
16  Q.And so, you can't think of who you would have
17  been confused with or misidentified with?
18  A.No.  Not that teaches math.
19  Q.How about any teacher?
20  A.Mark Nelson is the only one.  And he did not ---
21  and I --- again, he didn't teach math.  I don't think
22  we look alike but you're asking what others see.
23  Q.What did Mark Nelson teach?
24  A.Science.
25  Q.Is Mark Nelson still with the Hill School?

Page 112

1   A.He is.
2   Q.Does Mr. Nelson still teach science?
3   A.As far as I know.
4   Q.Has Mr. Nelson, as far as you know, ever been
5   accused of inappropriate contact with a student?
6   A.Not that I know.
7   Q.Did you ever suggest to Mr. Rees or anyone else
8   at the school that perhaps Mr. Poulos had
9   misidentified you?
10  A.I don't think so.
11  Q.Did you ever suggest to Mr. Rees or anyone at the
12  school that Mr. Poulos had misidentified you with Mr.
13  Nelson?
14  A.No.
15  Q.So, your responses or comments to Mr. Rees and
16  the Hill School about the letters were, essentially,
17  that they were lies and made up.
18  Is that right?
19  A.Yes.
20  Q.And you expected that an investigation that was
21  cooperative with Mr. Poulos and/or Mr. Garabedian on
22  the one hand and the Hill School on the other would
23  reveal that the letter --- letters rather were lies
24  and made up.
25  Is that right?

Page 113

1   A.Yes, except that what I said if --- if he had the
2   wrong person.  I don't --- in my mind, when I say the
3   wrong person, I wasn't limiting it to people that he
4   may have had a --- been abused by were necessarily at
5   Hill.  I just know it wasn't me.  And if he had made a
6   mistake, I figured --- as opposed to lying, it would
7   have come out.
8   Q.Have you read or watched any of the testimony by
9   Mr. Poulos in this action?
10  A.I have read clips.  Beyond that, no.
11  Q.What clips of Mr. Poulos's testimony have you
12  read?
13  A.I can't tell you, specifically, what I read.
14  What was shared with me by my attorney but ---.
15  Q.Did you read Mr. Poulos's description of the
16  abuse that he sustained when he was a child?
17  A.His description of the abuse?
18  Q.Yes.
19  A.In the letters.
20  Q.How about in his testimony?  Let me start again.
21  Did you read Mr. Poulos's testimony about the abuse?
22  A.I don't think so.
23  Q.Do you remember anything about the testimony by
24  Mr. Poulos that you read?  I realize you might not be
25  able to recite it.

Matthew B. Ralston
September 20, 2021                                        114 to 117

Page 114

1  A.No.  I'm sure it must have been part that was
2  about me that upset me.  As far as the nature of the
3  abuse, I immediately think of both letters.
4  Q.Okay.
5  But I'm just asking now to try to learn what
6  testimony by Mr. Poulos you read.
7  A.And I don't remember.  I don't recall.
8  Q.You don't remember anything about the testimony
9  by Mr. Poulos that you read?
10  A.I do not.
11  Q.Did you do any independent investigation to
12  determine whether Mr. Poulos was telling the truth
13  about being abused but had simply incorrectly
14  identified you?
15  A.No.
16  Q.Did it concern you when you filed this lawsuit
17  that you were identifying Mr. Poulos by name?
18  A.I'm sorry?
19  Q.Did it concern you when you filed this lawsuit
20  that you were identifying Mr. Poulos by name?
21  A.Not at that point.  I think when the second
22  letter came out, I thought I had done my --- I thought
23  there had been a long enough period of time in order
24  for him to want to participate in sorting out his
25  allegations and who had done it rather than blaming me

Page 115

1  if somebody else had done it.  And, at that point, I
2  was not concerned at all.
3  Q.Was there a point in time where you became
4  convinced that Mr. Poulos was just lying as compared
5  to misidentifying you?
6  A.I think absolutely when the second letter came.
7  It was clear to me that he was lying.  I don't know if
8  you want to consider it doubling down.  But was not
9  participating and sent a second letter.
10  Q.So, after the second letter, you reached the
11  conclusion that Mr. Poulos was lying about being
12  abused?
13  A.I reached a conclusion that Mr. Poulos was lying
14  about being abused by me.
15  Q.So, after you received the second letter, you
16  believed that it was possible that Mr. Poulos was
17  still misidentifying you, that he had in fact been
18  abused but not by you?
19  ATTORNEY JUBB:
20  Object to the form.
21  THE WITNESS:
22  I took it --- I quit thinking about
23  whether or not he had been at that point.  I knew he
24  hadn't been by me so I knew it was a lie.  And that's
25  where my attention and my concern went.

Page 116

1  BY ATTORNEY DOUGHERTY:
2  Q.So, it didn't concern you that you were
3  identifying the potential victim of sexual abuse by
4  name in a public filing?
5  ATTORNEY JUBB:
6  Objection to form.
7  THE WITNESS:
8  No.
9  BY ATTORNEY DOUGHERTY:
10  Q.Is there a reason why you didn't identify
11  yourself?
12  A.I was still an employee of the school.  And I was
13  hoping that things would resolve and I would be able
14  to maintain my relationship with the community that I
15  had spent better than 20 years building and enjoying.
16  Q.Well, you're not an employee of the school
17  anymore but you haven't identified yourself by name in
18  the lawsuit.
19  A.I can't speak to that.  That's out of my realm.
20  Q.So, you don't now have any reason not to identify
21  yourself by name in the lawsuit?
22  ATTORNEY JUBB:
23  Object to the form.  You can answer.
24  THE WITNESS:
25  I don't think so.  I'm not so naïve as

Page 117

1  to know that if --- when we go to trial in January
2  that my name won't be known.
3  BY ATTORNEY DOUGHERTY:
4  Q.Well, if you're so convinced that Mr. Poulos is a
5  liar and has falsely accused you of abuse and that
6  you're trying to clear your name then, why aren't you
7  doing it in the open?
8  A.I think I've answered that.
9  ATTORNEY JUBB:
10  He just said that.  Why don't you answer
11  again?
12  COURT REPORTER:
13  I'm sorry?
14  ATTORNEY JUBB:
15  I said he can answer again.
16  THE WITNESS:
17  I said I didn't in the beginning because
18  I was still an employee and working at the school when
19  we filed the lawsuit.  And I was trying to protect
20  that and my relationship there.  And after that, I
21  can't answer it because that's not my realm of
22  decision making.
23  BY ATTORNEY DOUGHERTY:
24  Q.Okay.
25  So, what I'm getting at is it's been almost two

Page 118

1  years, right, since the ---?
2  A.I know how long it's been.  Sorry.
3  Q.That's okay.  So, it's been almost two years
4  since your employment ended and you haven't identified
5  yourself in the lawsuit.
6  Is that right?
7  A.That's my understanding, yes.
8  Q.You said that you know how long it's been.  Is
9  the lawsuit upsetting to you?
10  A.Say again?
11  Q.You sort of looked like you had extra comments to
12  make there in reaction to how long the lawsuit has
13  been doing on.  You said, I know how long it's been.
14  Is the lawsuit upsetting to you?
15  A.The whole situation is upsetting to me.  It's
16  been three and a half years since the first letter was
17  sent.  And that's the day my world changed.  And the
18  lawsuit is, actually, the point at which I decided I
19  was going to try and put my voice out there and seek
20  the truth.
21  Q.So, you think your voice is out there by
22  identifying yourself as a John Doe?
23  A.I think my voice is out there by taking action.
24  As far as why I'm still a John Doe, I think I've said
25  this as clearly as I can say it.  I don't know why I

Page 119

1  still am.  It's not my realm.
2  Q.How did you believe the investigation that you
3  wanted to occur, again, cooperatively with the accuser
4  and institution would result in revealing that Mr.
5  Poulos was lying?
6  ATTORNEY JUBB:
7  Objection to form.
8  THE WITNESS:
9  How do I think it would have done that?
10  BY ATTORNEY DOUGHERTY:
11  Q.Yeah.
12  A.I think my record and my career and my reputation
13  within the school community speak to all of that.
14  There are no other --- ever been any concerns about
15  me.  And quite the contrary.  My career was --- my
16  career was, in many ways, charmed.
17  Q.Charmed did you say?
18  A.I found my right place to ---.
19  Q.Did you say charmed?
20  A.I did.
21  Q.Okay, thank you.
22  A.I found the right environment in which to teach
23  in a style that I wanted, in an environment that was
24  what my wife and I hoped to find for raising our
25  family.  And that was the Hill School.

Page 120

1  Q.When was the last time you taught at the Hill
2  School?
3  A. I'm sorry?
4  Q.When was the last time you taught at the Hill
5  School?
6  A.Taught?
7  Q.Uh-huh (yes).
8  A.2008/2009.
9  Q.And was that the last time you taught period?
10  A.No.  I taught some classes when I was headmaster
11  at the Leelanau School.
12  Q.Each year you were the headmaster?
13  A.Beg pardon?
14  Q.Did you teach classes each year you were the
15  headmaster at the Leelanau School?
16  A.No.
17  COURT REPORTER:
18  I'm sorry.  What's the name of that
19  school?
20  THE WITNESS:
21  L-E-E-L-A-N-A-U.
22  BY ATTORNEY DOUGHERTY:
23  Q.When did you teach classes at the Leelanau
24  School?
25  A.I can't tell you years.  I can tell you there was

Page 121

1  a teacher that left at spring break one year.  I
2  covered his classes for the remainder of that year.
3  And when teachers were out that taught math, I would
4  often fill in for them.
5  Q.So, you acted as a substitute teacher at Leelanau
6  School when you were the headmaster?
7  A.Yes.
8  Q.So, you didn't teach a regular course at the
9  Leelanau School.
10  Is that right?
11  A.The spring semester that I taught was indeed a
12  regular course.  And I was the teacher every day in
13  that year of that semester.
14  Q.You're talking about the semester when the
15  teacher left during spring break.
16  A.I am.
17  Q.What class was that?
18  A.I think it's Algebra 2.
19  Q.So, other than teaching algebra --- and you can't
20  remember the year that you taught Algebra 2 at the
21  Leelanau School.
22  Is that right?
23  A.Yes.
24  Q.So, other than teaching Algebra 2 and acting as a
25  substitute teacher when teachers who taught math were

Matthew B. Ralston
September 20, 2021                                    122 to 125

Page 122

1  out, that's the extent of your teaching at the
2  Leelanau School.
3  Is that right?
4  A.Correct.
5  Q.You described your career as charmed.  But your
6  description of charmed was an environment that ended
7  in 2008/2009.  So, I'm just trying to reconcile that
8  with the connection to the subject matter of this
9  lawsuit.
10  ATTORNEY JUBB:
11  Objection to the form.
12  THE WITNESS:
13  Can you ask it again?
14  BY ATTORNEY DOUGHERTY:
15  Q.Sure.  Was your career still charmed in 2016 to
16  2019?
17  A.Yes.
18  Q.How was your career charmed in 2016 to 2019?
19  A.Well, I'll say 2016 to the spring of 2018 when
20  the letters arrived.  It was an opportunity to end my
21  career at a place I loved working with students, many
22  of whom I built relationships with since the early and
23  mid-'90s doing work that was important to them as
24  alumni and to the school as trying to move the school
25  forward financially.

Page 123

1  Q.Was taking --- let me start again.  You took a
2  pay cut when you stepped down as the headmaster of
3  Leelanau.
4  A.I did.
5  Q.Was it a substantial pay cut?
6  A.Yeah.
7  Q.How much did you make when you left Leelanau?
8  A.I would say the year I left, I was making
9  $120,000.  The year I started at Hill, I made $68,000
10  plus benefits that exist at Hill that didn't exist at
11  Leelanau.  So, that would be retirement, for the most
12  part, which was a nine percent contribution.  So,
13  whatever 68 times 0.09.  When I left, I was making
14  $81,000 still with the benefits.  So, the first year,
15  seven-twelfths or whatever, eight-twelfths, two-thirds
16  of a pay cut or one-third pay cut.
17  Q.You were making $81,000 in 2019 when your
18  employment ended with the Hill School?
19  A.Yes.  2018/2019, my salary was $81,000.
20  Q.Can you look at D-23 again?  I guess I don't want
21  to show you my notes.  Yes.  It's the June 19, 2017,
22  appointment letter.
23  A.Yeah.
24  Q.So, we're looking at D-23 June 19, 2017
25  appointment letter.

Page 124

1  Right?
2  A.Yes.
3  Q.So, this is your appointment letter for July 1,
4  2017 to June 30, 2018.
5  Is that right?
6  A.Yes.
7  Q.And your salary from July 1, 2017 to June 30,
8  2018 is $73,100.
9  Is that right?
10  A.Yes.
11  Q.And the first letter was sent in April 2018.
12  Right?
13  A.Yes.
14  Q.So, you agree with me that the first letter that
15  included Mr. Poulos's accusations against you was sent
16  during this term, the term that is reflected in D-23.
17  Is that correct?
18  A.Yes.
19  Q.So, then you received a raise effective July 1,
20  2018 to $81,000?
21  A.Yes.
22  Q.You can go back to D-25.
23  A.Okay.
24  Q.Do you agree that this is the performance
25  evaluation for the evaluation period July 1, 2017 to

Page 125

1  July 30, 2018.
2  Correct?
3  A.Yes.
4  ATTORNEY JUBB:
5  I think you mean June 30.
6  ATTORNEY DOUGHERTY:
7  Oh, did I say it wrong?
8  BY ATTORNEY DOUGHERTY:
9  Q.So, the evaluation period is July 1, 2017 to June
10  30, 2018.
11  Is that right?
12  A.Yes.
13  Q.So, you agree with me that the evaluation period
14  reflected in the performance evaluation that has been
15  marked as D-25 included --- let me start again.
16  You agree with me that during the evaluation
17  period reflected in the performance evaluation that's
18  been marked as D-25, the first letter by Mr. Poulos
19  --- I lost my question.  Let me start again.
20  You agree with me that the first letter by Mr.
21  Poulos was sent to the school during the evaluation
22  period reflected in the performance evaluation that's
23  been marked as D-25.
24  Is that right?
25  A.The letter from Mr. Garabedian, yes.

Matthew B. Ralston
September 20, 2021                    126 to 129

Page 126

1  Q. Okay.
2  You agree with me that nowhere in this
3  performance evaluation that's been marked as D-25 is
4  there any reference to accusations of sexual abuse by
5  you against a former student.
6  Is that right?
7  A. In this?
8  Q. Yes.
9  A. No.  There is not.
10  Q. This being D-25.
11  Correct?
12  A. Correct.
13  Q. Okay.
14  So, the first letter that included Mr. Poulos's
15  accusations did not impact your performance
16  evaluation.
17  Is that correct?
18  A. That's correct.
19  Q. In fact, you received a substantial raise
20  effective July 1, 2018.
21  Is that correct?
22  A. Yes.
23  Q. In fact, the raise that you received effective
24  July 1, 2018, was more than the raise that you
25  received between your first and second term.

Page 127

1  Is that right?  And you can look at your letters
2  if you'd like.
3  A. Yes.
4  Q. So, you started the first term, July 1, 2016,
5  with a salary of $68,000 and then, received a $5,100
6  raise for your second term effective July 1, 2017.
7  Correct?
8  A. Yes.
9  Q. And then, your raise effective July 1, 2018, you
10  went from $73,100 to $81,000.
11  Right?
12  A. Yes.
13  Q. And the bonus program started sometime during the
14  second term or maybe the third term?
15  A. Yes.
16  Q. So, in addition to getting a larger raise
17  effective July 1, 2018, you also had access to the
18  bonus program.
19  Is that right?
20  A. Yes.
21  Q. And Mr. Poulos's accusations of sexual misconduct
22  by you or sexual abuse by you to him didn't affect
23  your access to the bonus program.
24  Is that right?
25  ATTORNEY JUBB:

Page 128

1  I'll object to the form.
2  THE WITNESS:
3  No.  Yes, yes.
4  BY ATTORNEY DOUGHERTY:
5  Q. Okay.
6  So, Mr. Poulos's accusations did not affect your
7  access to the bonus program?
8  A. No, it did not.
9  Q. Did you receive another increase in salary in
10  2019?
11  A. No.
12  Q. You describe your return to Hill as the place
13  where you wanted to end your career.  Were you
14  planning on retiring?
15  A. From there?
16  Q. Yes.
17  A. Yes.
18  Q. Did you have a timeframe in which you intended to
19  retire?
20  A. No.
21  Q. So, it's your belief that an investigation that
22  involved cooperation with Mr. Poulos, the accuser and
23  the institution, the Hill School would have revealed
24  that Mr. Poulos was lying because of your reputation
25  and standing at the Hill School.

Page 129

1  Is that right?
2  ATTORNEY JUBB:
3  Objection to the form.
4  THE WITNESS:
5  Yeah.  I think that's what I said, yes.
6  BY ATTORNEY DOUGHERTY:
7  Q. So, you thought that an investigation would
8  reveal that you should be believed over Mr. Poulos.
9  Is that right?
10  A. Yes.
11  Q. So, you don't believe that the investigation
12  would have revealed some type of evidence, for
13  example, a videotape or a witness.
14  Is that right?
15  A. No.
16  Q. So, as far as you know, the only way to determine
17  who is telling the truth is to just decide whether we
18  believe you or Mr. Poulos?
19  ATTORNEY JUBB:
20  Objection to the form.
21  COURT REPORTER:
22  Can you say that a little louder?
23  ATTORNEY JUBB:
24  Objection to form.
25  COURT REPORTER:

Matthew B. Ralston
September 20, 2021                                    130 to 133

Page 130

1   Thank you.
2   THE WITNESS:
3   I don't believe that's how an
4   investigation should work just he said/she said.  I
5   don't know.  I've never been involved with one so I
6   don't know the questions that are asked.  But I think,
7   in my mind if I'm thinking about people you would
8   speak with, it's more than just that.  It's
9   credibility from my supervisors, the headmaster, if
10  they talked to other faculty members, to other
11  students.  I don't know how it could have ended any
12  other way.
13  BY ATTORNEY DOUGHERTY:
14  Q.I'm sorry.  So, the only evidence that would have
15  been revealed is what you said and what Mr. Poulos
16  said.
17  Right?
18  ATTORNEY JUBB:
19  Objection to the form.
20  THE WITNESS:
21  I don't know what would have been
22  revealed.
23  BY ATTORNEY DOUGHERTY:
24  Q.Are you aware of a videotape of you and Mr.
25  Poulos interacting?

Page 131

1   A.No.
2   Q.Are you aware of any witnesses to you and Mr.
3   Poulos interacting?
4   A.No.
5   Q.So, what did you think that the investigation
6   would reveal other than who to believe?
7   ATTORNEY JUBB:
8   Objection to the form.
9   THE WITNESS:
10  I don't know how --- I don't know how to
11  answer that because I don't know what there could
12  possibly be.  There isn't anything about interactions.
13  There's probably a picture in a yearbook from a dorm.
14  There's nothing that could be revealed about me that
15  would support my abusing any student let alone --- or
16  mistreating any student let alone Mr. Poulos.
17  BY ATTORNEY DOUGHERTY:
18  Q.Is there any information that you believe the
19  school's investigation would have revealed that hasn't
20  been revealed during this litigation?
21  A.From --- what was the last part?
22  Q.During this litigation.
23  A.I don't know what they've done.
24  Q.You wanted the school to do something more,
25  right, an investigation.  So, I'm just trying to learn

Page 132

1   what you thought that would reveal.
2   ATTORNEY JUBB:
3   Objection to the form.
4   BY ATTORNEY DOUGHERTY:
5   Q.And to make sure that there's not some piece of
6   evidence we don't know about that you think the school
7   should have located.
8   A.No.
9   ATTORNEY JUBB:
10  Objection to form.
11  THE WITNESS:
12  There's no information that I believe
13  the school should have located other than my record,
14  interviews with people that would support my
15  relationship with students throughout my career if
16  that's the way it goes, as well as my relationship
17  with faculty and anybody else in the community.
18  BY ATTORNEY DOUGHERTY:
19  Q.We talked about the August 2019 telephone
20  discussion with Mr. Lehman and Ms. Gelting.  Did you
21  have any other telephone --- let me start again.  Did
22  you have any other communications with anyone from the
23  Hill School regarding the end of your employment with
24  the Hill School other than the telephone communication
25  in August 2019 with Mr. Lehman and Ms. Gelting?  Am I

Page 133

1   saying that wrong?
2   A.Gelting.
3   Q.Gelting.  Okay.
4   A.Only regarding COBRA.  I hadn't received any
5   information regarding COBRA.  And so, I sent a note, I
6   believe, asking about it.
7   Q.So, after the August 2019 telephone call with Mr.
8   Lehman and Ms. Gelting, the communications regarding
9   your separation from the Hill School were between the
10  Hill School and your lawyer?
11  A.Yes.
12  Q.How about prior to August 2019?  Did you have any
13  discussions with anyone at the Hill School regarding
14  your separation from the Hill School?
15  A.No.
16  Q.Did you have any communications with anyone from
17  the Hill School regarding your administrative leave?
18  A.No.  I received --- communications being from
19  someone to me, yes.  My understanding is that the
20  school sent out a note saying that I wasn't named but
21  there was an employee on paid administrative leave.
22  Please don't speak with them or bother them.  Respect
23  their privacy.  After the reunion, I think I heard
24  from a teacher just saying they missed me at reunion
25  and they hoped I was well but not, specifically, about

Page 134

1  my leave.
2  Q.How did you learn about the email that went out
3  saying that a teacher was on leave?
4  A.I don't know.
5  Q.You didn't receive the email, right, because your
6  email --- your Hill School email was already turned
7  off.
8  Right?
9  A.No.  It was already turned off.
10 Q.Or you didn't have access to it.
11 A.I didn't have access.
12 Q.Did you ever see the email?
13 A.No.
14 Q.So, the information you know about the email is
15 based on something that someone told you?
16 A.Yes.
17 Q.Did you learn the information about the email
18 that a teacher was on leave from someone other than
19 your lawyer?
20 A.I don't believe so.
21 Q.Did you learn --- when did you learn the
22 information about the email?
23 A.It would have been that summer somewhere soon
24 after it went out I'm sure or --- I don't know.
25 Q.So, summer, you're talking about 2019.

Page 135

1  Right?
2  A.Yes.
3  Q.And I might have misunderstood your answer.  So,
4  in the summer of 2019, you learned about the email
5  from your lawyer or from someone else?
6  A.I don't recall.
7  Q.Okay.
8  A.After the reunion, I heard from --- actually,
9  during the reunion, I heard from some alumni wondering
10 where I was.  I told them I just wasn't able to be
11 there.  I don't recall when I learned of the fact that
12 there was an email saying someone was on leave.  And I
13 don't remember how I acquired it.  And I didn't see
14 it, so heard about it.
15 Q.And when you say acquired, you mean acquired the
16 information.
17 A.Yes.
18 Q.So, that's it?  You never had any discussion with
19 the HR director about leave or anything like that?
20 You've talked about COBRA and emails from people who
21 don't sound like they are part of the school
22 administration.
23 A.I don't know how I was informed what to do with
24 my computer and any of my other school belongings.
25 That would have come from Ms. Gelting.  It must have

Page 136

1  come through Mr. Jubb but I don't recall.  And I was
2  to ship it back.  And the reason I know it came from
3  her was because one, that's who the shipping label was
4  to.  That would have been pretty quickly after my
5  leave began.
6  Q.So, somehow, you learned that you needed to ship
7  your stuff back to Ms. Gelting.
8  Right?
9  A.Yes.
10 Q.And stuff being your laptop and cell phone?
11 A.Cell phone was mine.  I was reimbursed.
12 Q.Okay.
13 So, close in time to when you learned about the
14 leave, you then shipped your laptop --- your school
15 provided laptop and anything else back to Ms. Gelting?
16 A.Anything else shipped back?
17 Q.Yeah.  Other than the laptop.
18 A.It would have been anything I had in my office.
19 So, there would have been probably Hill School thank
20 you cards.  I can't tell you what it all was.  The big
21 thing was the laptop.
22 Q.Okay.
23 So, like the laptop and any of the Hill School
24 materials you used for your job.
25 Right?

Page 137

1  A. Yes.  That could have all come in a letter from Mr.
2  Rees describing what leave was or requirements of me
3  during that.  I don't know.
4  ATTORNEY DOUGHERTY:
5  What's it now, 26?
6            ---
7  (Whereupon, Defendant's Exhibit 26,
8  4/18/19 Email, was marked for
9  identification.)
10           ---
11 ATTORNEY STEIGER:
12 Uh-huh (yes).  I'm pretty sure.  I wrote
13 down a D-25 but I didn't write down what it was.
14 ATTORNEY DOUGHERTY:
15 D-25 is the performance review.  It's
16 276 on the --- 267 on the bottom right.
17 ATTORNEY STEIGER:
18 Then, it must be 26 that we're at.
19 ATTORNEY DOUGHERTY:
20 Okay.  Cool.  I just ripped it off of a
21 big pack rather than giving you the whole pack.  If
22 it's got a better mark at the top.
23 BY ATTORNEY DOUGHERTY:
24 Q.I'm showing you a document that is marked as D-
25 26.  It says on the bottom right, P48.1.  And this is

Matthew B. Ralston
September 20, 2021

Page 138

1  an email from Mr. Rees to Lane Jubb.  And you are not
2  part of the --- you're not one of the recipients to
3  the email.  The email is dated April 18th, 2019.  I
4  just want to know if you've ever seen the email that
5  I've marked as D-26 before I showed it to you today.
6  A.I don't know.  I know I got the information.  I
7  don't recall if it was sent directly --- if it came to
8  me or if my lawyer just told me that it was there.
9  Q.Well, the email's from Mr. Rees to Mr. Jubb --- I
10 acknowledge that you're not a recipient of the email.
11 Mr. Rees wrote, Lane: I write to inform you as counsel
12 for Matt Ralston that the Hill School has placed Mr.
13 Ralston on paid administrative leave effective
14 immediately in light of recent developments.  Mr.
15 Ralston should immediately cease all work on behalf of
16 the school.  Please communicate this decision to Mr.
17 Ralston.  Any questions should be directed to me as
18 counsel for the school.
19 So, I just want to know if you received this
20 email?
21 A.I don't recall if I received it or if it was a
22 phone conversation.  I believe I've read this.  The
23 part that makes me believe I've read it is that I
24 should cease all work on behalf of the Hill School or
25 on behalf of the school.

Page 139

1  Q.So, Mr. Rees wrote, in light of recent
2  developments.  Did you know what the recent
3  developments are that he's referring to?
4  ATTORNEY JUBB:
5  Objection to form.
6  COURT REPORTER:
7  I'm sorry?
8  ATTORNEY JUBB:
9  I object to the form.
10 BY ATTORNEY DOUGHERTY:
11 Q.Or let me put it this way, were there any recent
12 developments, recent to April 18, 2019?
13 ATTORNEY JUBB:
14 Same objection.  Calls for speculation.
15 THE WITNESS:
16 We filed a lawsuit.
17 BY ATTORNEY DOUGHERTY:
18 Q.Do you know if Mr. Rees --- let me start again.
19 Do you know if the Hill School put you on
20 administrative leave because of the filing of the
21 lawsuit?
22 ATTORNEY JUBB:
23 Same objection.
24 THE WITNESS:
25 I know that may have been the catalyst.

Page 140

1  But I believe my separation from the school began back
2  when the second letter arrived when I was encouraged
3  to seek my own attorney.  And it was shared with me a
4  second time that there could be action I could take.
5  BY ATTORNEY DOUGHERTY:
6  Q.You're referring to Mr. Rees telling you that you
7  could file a lawsuit against Mr. Poulos and Mr.
8  Garabedian?
9  A.Do I recall that?
10 Q.No.  When you said that you were told a second
11 time about that there was action to be taken.
12 A.Yes.
13 Q.You're referring to Mr. Rees telling you that you
14 could file a lawsuit against Mr. Poulos and Mr.
15 Garabedian?
16 A.He didn't say I should but yes.  Yes.
17 Q.Could, could, that you could.
18 A.Possibly, yes.
19 Q.I'm just trying to make sure that that's what you
20 were referring to at the end of your answer.  Did you
21 ever go review your personnel file?
22 A.I have not.
23 Q.Did you ever request to review your personnel
24 file?
25 A.I have not.

Page 141

1  Q.Did you ever request to --- to be clear, I'm
2  talking about your personnel file at the Hill School.
3  So, you've never reviewed or requested to review your
4  personnel file at the Hill School?
5  A.I have not.
6  Q.Did you make a request to review your personnel
7  file at the Hill School through your lawyer, Mr. Jubb?
8  ATTORNEY JUBB:
9  Objection to the form.  Can you ask it a
10 different way so there is no attorney/client there?
11 ATTORNEY DOUGHERTY:
12 Do you have the other pages of P48?
13 You're right.  I do.  For some reason, I though there
14 were only four pages in it.  I'm looking for 72, P36.
15 Sure.  We can --- so, can we go off the record?
16 VIDEOGRAPHER:
17 The time is 1:12.  Off the record.
18 OFF VIDEO
19                    ---
20 (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
21                    ---
22 ON VIDEO
23 VIDEOGRAPHER:
24 The time is 1:17.  Back on the record.
25 ATTORNEY DOUGHERTY:

Matthew B. Ralston
September 20, 2021                          142 to 145

Page 142

1  The record is now going to reflect that
2  Mr. Poulos has now joined via zoom.
3  ATTORNEY JUBB:
4     Or his mom.
5  ATTORNEY DOUGHERTY:
6     Mr. Poulos, are you there?
7  MR. POULOS:
8     Yes, I'm here.
9  ATTORNEY JUBB:
10    Is your mom there?
11 MR. POULOS:
12    No.  I'm at my home.
13                ---
14 (Whereupon, Defendant's Exhibit 27, 5/6
15 to 5/7/19 Emails, was marked for
16 identification.)
17                ---
18 BY ATTORNEY DOUGHERTY:
19 Q.I'm showing you a document that I've marked as D-
20   27.  It says, P48.2, on the first page and P48.3, on
21   the second page.  It's a series of emails you, again,
22   are not a recipient of any of the emails.  I just want
23   to direct your attention to the top of the first page
24   of D-27.  It's an email from Mr. Rees to Mr. Jubb with
25   the subject line, Hill School Personnel File Review,

Page 143

1  dated May 7, 2019.  Do you see that at the top of D-
2  27?
3  A.Yes.
4  Q.And just in looking at D-27, have you ever seen
5  the series of emails between Mr. Rees and Mr. Jubb
6  before I handed D-27 to you?
7  A.I have not.
8  Q.Were you aware that there was a request to review
9  your Hill School personnel file?
10 A.Yes.  I think so.  I can't imagine there wouldn't
11 have been.
12 Q.Did you ever plan to go review your personnel
13 file?
14 A.No.
15 Q.So, you did not intend to go to the Hill School
16 to review your personnel file?
17 A.No.
18 Q.And you've never requested to review your
19 personnel file and been refused by the Hill School.
20 Is that right?
21 A.I've never requested to see my personnel file.
22 Q.Have you asked that the Hill School remove any
23 material from your personnel file?
24 A.No.
25 Q.Are you aware of whether there is any material in

Page 144

1  your personnel file regarding the accusations by Mr.
2  Poulos?
3  A.I am not.
4  Q.So, you don't know one way or the other?
5  A.I don't.
6  Q.Do you know whether your personnel file or a copy
7  of your personnel file at the Hill School was ever
8  obtained?
9  A.I don't.
10 Q.So, even if not --- let me start again.
11 I understand that you didn't go to the Hill
12 School and review your personnel file.  But have you
13 seen a copy of your personnel file from some other
14 source?
15 A.No.
16 Q.Did you participate in a conference call with
17 Geoff Richards, G-E-O-F-F, and Mr. Rees and Mr. Jubb?
18 A.I did.
19 Q.Who is Mr. Richards, Geoff Richards?
20 A.He's a member of the board of trustees.
21 Q.When did you participate in a conference call ---
22 well, let me start again.
23 Was there anyone else on the conference call
24 other than you, Mr. Richards, Mr. Rees, and Mr. Jubb?
25 A.To my understanding, it was just the four of us.

Page 145

1  Q.When was the telephone call?
2  A.Late January/early February of 2019.
3  Q.What was the purpose of the conference call?
4  A.Beg your pardon?
5  Q.What was the purpose of the conference call with
6  you, Mr. Rees, Mr. Jubb, and Mr. Richards?
7  ATTORNEY JUBB:
8     Object to the form.  You can answer.
9  THE WITNESS:
10    I had retained Mr. Jubb as my attorney,
11 at that point.  And Mr. Richards and Mr. Rees wanted
12 to check and see how I was.  Mr. Richards said he was
13 surprised to see my name attached to the letters.  We
14 had not made a decision, at that point, if I was going
15 to file a lawsuit.  We discussed some other
16 alternative or different roads we could go, one of
17 which was not filing a lawsuit.  At that point, we had
18 already received the letter from the insurance
19 company.
20 And a question we asked was if I did not
21 file a lawsuit and there was further action, would the
22 school provide me with independent counsel of my
23 choosing.
24 BY ATTORNEY DOUGHERTY:
25 Q.Just to be clear, you mean more action as it

Page 146

1  relates to the accusations of Mr. Poulos, not whether
2  the school was going to provide you independent
3  counsel for your own lawsuit.
4  A.Correct.  Yes, Yes.
5  Q.I apologize.  I just wanted to clarify that.
6  A.That's a good distinction.  The response was that
7  they would have to discuss that with the board and
8  would get back to us and we never heard back regarding
9  that question.
10 Q.And the we is you and Mr. Jubb.
11 Right?
12 A.Correct.
13 Q.So, you never got an answer from the school
14 whether the school would provide you with independent
15 --- when you say independent counsel, you mean someone
16 other than Mr. Rees.
17 Right?
18 A.Yes.
19 Q.Okay.
20 So, you wanted to know whether the school was
21 going to, basically, provide you counsel, someone
22 other than counsel for the school, if the
23 investigation into Mr. Poulos's accusations
24 progressed.
25 Is that right?

Page 147

1  A.I don't think I made the distinction of the
2  investigation.  I think what I thought was in regards
3  to if there was another step taken by Mr. Garabedian.
4  Q.Okay.
5  So, it was --- let me start again.  The idea was
6  that if Mr. Poulos commenced a lawsuit through Mr.
7  Garabedian, would the school provide you with counsel.
8  Is that right?
9  A.That would, certainly, be the main scenario in my
10 mind, yes.
11 Q.So, you weren't concerned about just having a
12 lawyer.  The concern was whether you would have a
13 lawyer provided by the school if a lawsuit was
14 commenced by Mr. Poulos.
15 Is that right?
16 A.Ask that again.
17 Q.Sure.  You weren't asking the school to just give
18 you --- retain a lawyer for you.  Your concern was
19 would the school retain counsel for you if a lawsuit
20 was commenced by Mr. Poulos.
21 Right?
22 A.Yes, yes.  That is correct.  Yes.
23 Q.And no lawsuit was ever commenced by Mr. Poulos
24 either through Mr. Garabedian or anyone else.
25 Correct?

Page 148

1  A.Not prior to our filing ours, no.
2  Q.And you never got an answer from the school about
3  whether it would provide you counsel if there was a
4  lawsuit by Mr. Poulos.
5  Is that right?
6  A.I did not.
7  Q.Was there anything else discussed during the
8  telephone call with Mr. Richards, Mr. Rees, and Mr.
9  Jubb?
10 A.I don't recall.  That's what I took from it.
11 Q.You said that you had not made a decision about
12 filing a lawsuit and had discussions about options
13 other than filing a lawsuit.  Can you provide more
14 information about that?
15 A.Had there been discussion about it you're asking?
16 Q.Yeah.  I don't know what words you used for it
17 because I didn't write the word down.  You indicated
18 that you had not made a decision regarding whether you
19 were going to file a lawsuit and alternatives --- you
20 used a different word to filing a lawsuit.  So, I want
21 to know some more information about that component of
22 your answer.  And I'm not trying to put a word in your
23 mouth.  I just don't remember what the word is.
24 A.I understand.  What I considered the alternatives
25 --- the only one I really considered was to progress

Page 149

1  how we had progressed for the last ten months, which
2  was the school continuing to try to communicate with
3  Mr. Garabedian and see if there were communications in
4  response to any of those communications.  And if the
5  existence of those allegations would resolve itself
6  without anyone taking legal action.  That was what I
7  considered the alternatives.
8  Q.And so, at some point after you said February
9  2019 telephone call with Mr. Richards, Mr. Rees, and
10 Mr. Jubb, you came to the conclusion that the school
11 was not going to take action and then, you commenced
12 your lawsuit.
13 Is that right?
14 A.Yes.
15 Q.Did you have any other discussions with the Hill
16 School regarding the accusations by Mr. Poulos after
17 the February 2019 telephone discussion that included
18 Mr. Richards, Mr. Rees, you, and Mr. Jubb?
19 A.Excuse me.  I reached out to Mr. Lehman in March.
20 My wife and I were on campus for a wedding.  And I
21 thought he might want to speak with me just regarding
22 those two avenues.  He was not on campus.  He and I
23 had a phone conversation when Mary Beth and I were
24 driving back to Columbus.  I asked him the same
25 question about whether or not the school would provide

Matthew B. Ralston
September 20, 2021                                    150 to 153

Page 150

1  me with legal counsel --- independent legal counsel if
2  there was ever further action taken by Mr. Garabedian
3  and Mr. Poulos.
4  The response was the same that I got from Mr.
5  Richards, which was I'd have to check with the board.
6  And I never got a response then either.
7  Q.Just because I forgot to ask, Mr. Richards
8  learned about Mr. Poulos's accusations from someone
9  other than you?
10 A.Oh, yeah.
11 Q.And I think that you said that Mr. Richards
12 expressed that he was surprised to see your name
13 attached to the letter.  So, Mr. Richards made
14 comments during the telephone discussion that led you
15 to believe he did not believe Mr. Poulos's accusations
16 against you.
17 Is that right?
18 ATTORNEY JUBB:
19 I'll object to the form.
20 THE WITNESS:
21 I think the use of the word surprised
22 left me --- my impression up to then was that Mr.
23 Richards thought very highly of me, surprised to see
24 my name attached, made me wonder.  However, his
25 expression of concern for me answered that.  So, he

Page 151

1  did make that comment.
2  BY ATTORNEY DOUGHERTY:
3  Q.So, Mr. Richards expressed in words or substance
4  that he did not believe Mr. Poulos's accusations
5  against you?
6  ATTORNEY JUBB:
7  Objection to the form.
8  THE WITNESS:
9  I don't remember his exact words.  But
10 it's my perception he didn't.
11 BY ATTORNEY DOUGHERTY:
12 Q.Okay.
13 So, you hung up the telephone and didn't believe
14 that --- let me start again.
15 When you ended the telephone discussion with Mr.
16 Richards, Mr. Rees, and Mr. Jubb, you had the
17 impression that Mr. Richards did not believe the
18 accusations by Mr. Poulos against you.
19 Is that right?
20 ATTORNEY JUBB:
21 Objection to the form.
22 THE WITNESS:
23 I think I had that impression before the
24 conversation and he didn't say anything to alter that
25 in the conversation.

Page 152

1  BY ATTORNEY DOUGHERTY:
2  Q.When did you first learn that Mr. Richards knew
3  about the accusations?
4  A.When did I first learn?
5  Q.That Mr. Richards knew about the accusations.
6  A.I don't know when it clicked that he was a member
7  of the legal committee of the board of trustees.  I
8  knew that Mr. Lehman, and I think we discussed this
9  last time, shared with me that he had told the legal
10 committee.  So, I don't know that it registered that
11 he was part of the legal committee.  Once I figured
12 that out, I don't know when they were informed but I
13 would assume it would have been very quickly after the
14 first letter arrived.
15 Q.When did you --- okay.  When did you first have
16 contact with Mr. Richards about Mr. Poulos's
17 accusations?
18 A.That phone call.
19 Q.Okay.
20 So, even though you didn't have any direct
21 communications with Mr. Richards about the accusations
22 by Mr. Poulos prior to the February 2019 telephone
23 discussion, you already had the impression that Mr.
24 Richards didn't credit or believe the accusations.
25 A.No.  I don't think that's what I said.  I think

Page 153

1  what I said was that I assumed he had a high opinion
2  of me.
3  Q.Well, let me just ask.  I thought you said that
4  before you were done with the telephone call in
5  February 2019, you had the impression that Mr.
6  Richards didn't believe the accusations.  Did I
7  misunderstand?
8  ATTORNEY JUBB:
9  You just interrupted his answer.
10 ATTORNEY DOUGHERTY:
11 I know because he was ---.
12 THE WITNESS:
13 If that's how you heard my answer, Mr.
14 Richards is someone I've known for many years.  He is
15 part of the board before I left the school.  I think
16 he was probably part of the board in the late '90s.
17 He was someone with whom I had contact during the
18 seven years that I was gone from the school.
19 BY ATTORNEY DOUGHERTY:
20 Q.I understand.  So, your idea was that Mr.
21 Richards knew you well enough to know and to already
22 have a belief that the accusations were not true and
23 your telephone communication in February of 2019 sort
24 of confirmed that and did nothing to disavow you of
25 your beliefs.

Page 154

1  Is that right?
2  ATTORNEY JUBB:
3  Objection to form.
4  THE WITNESS:
5  Yes.
6  BY ATTORNEY DOUGHERTY:
7  Q.Okay.
8  Any communications with anyone from the Hill
9  School regarding the accusations by Mr. Poulos after
10  the March 2019 telephone communication with Mr.
11  Lehman?
12  A.No.
13  Q.Did you ever have any in person meetings with
14  anyone at the Hill School regarding the accusations by
15  Mr. Poulos?  I realize you told us about Mr. Lehman
16  when he told you about the letters and some
17  interactions with Mr. Rees.  But did you have any
18  other type of meeting or anything like that?
19  A.Regarding?
20  Q.Yes, the accusations.
21  A.No.  Do you mean like did I sit down with Mr.
22  Rees and Mr. Lehman and talk about ---?
23  Q.Correct.
24  A.No.
25  Q.So, the equivalent of these telephone

Page 155

1  communications like the one with Mr. Lehman and Ms.
2  Gelting, did you have some type of meeting with the HR
3  director or anyone from the legal --- what do they
4  call it, the legal committee or the board of trustees
5  or anyone affiliated with the Hill School regarding
6  the accusations?
7  A.No.
8  Q.And so, between --- so, you had the March 2019
9  telephone discussion with Mr. Lehman.  And then, the
10  next contact you had with the Hill School --- with you
11  directly with the Hill School regarding your
12  employment was the August 2019 email and then,
13  telephone call with Mr. Lehman and Ms. Gelting?
14  A.I would have had the email from Ms. Gelting
15  regarding the meeting.  Prior to that, no.
16  Q.Okay.
17  So, March 2009, telephone call Mr. Lehman then,
18  the email from Ms. Gelting.
19  Correct?  In August 2019?
20  A.Yes.
21  Q.Does your wife currently work?
22  A.She does.
23  Q.Where does your wife work?
24  A.She works for Columbus Metropolitan Libraries.
25  Q.How long has your wife worked at Columbus

Page 156

1  Metropolitan Libraries?
2  A.This is '21.  Four or five years.
3  Q.I'm sorry, did you say Columbus?
4  A.Yes.
5  Q.Okay.
6  I think I might have just said Columbia by
7  mistake.  I'm sorry.  So, your wife has worked at
8  Columbus Metropolitan Libraries for four or five
9  years?
10  A.Yes.
11  Q.So, around the time when you became re-employed
12  by the Hill School, your wife started working at
13  Columbus Metropolitan Libraries?
14  A.Yes.
15  Q.Where do you primarily reside?
16  A.Columbus.
17  Q.Is that where your wife primarily resides?
18  A.Yes.
19  Q.Did you and your wife primarily reside in
20  Columbus for the entire time you were employed by the
21  Hill School the second time?
22  A.I was back and forth.  I was traveling quite a
23  bit.  But I changed my residency from Michigan --- my
24  driver's license --- probably 2017 or 2018.  I can't
25  tell you exactly when.

Page 157

1  Q.And you told us that you didn't look for other
2  employment in February 2020 because your mother died
3  and you were assisting with --- you were spending her
4  final days with her and then, assisting with her
5  estate.
6  Is that right?
7  A.From the October through then?  Yes.  When we
8  discussed that, it was October of 2019.  You asked why
9  I didn't seek employment after that.  And I think what
10  I shared was that those were the last months that she
11  was alive.  She was living with my brother.  We closed
12  up her house.  We sold it.  And I was visiting down
13  there as much as I could.
14  Q.So, your choice not to look for employment from
15  October 2019 to when your mother died was persona,
16  right, that you wanted to spend more time with your
17  mother?
18  ATTORNEY JUBB:
19  Objection to the form.
20  THE WITNESS:
21  It was that as well as what I shared
22  earlier about not feeling like I could look for work
23  in education.
24  BY ATTORNEY DOUGHERTY:
25  Q.And is there a reason why you didn't look for

Page 158

1  employment between February --- I guess, well, March
2  2020 and the summer of 2021?
3  A.That's correct.
4  Q.What was the reason why you didn't look for
5  employment between March 2020 and the summer of 2021?
6  A.COVID was a big part of that.  My concern about
7  applying to schools had not changed any.  The
8  allegations still existed.
9  Q.How did you think that the new employer would
10 learn about the accusations?
11 A.I think, for me, it was a matter of being able to
12 be honest about my situation, which stems back to the
13 letters.
14 Q.So, you felt that you would need to tell a new
15 employer that there were unsubstantiated accusations
16 made against you?
17 A.I think --- I don't think.  I know what I
18 thought.  I thought that if I don't share that in an
19 interview and then, it becomes public if you will
20 after I've been hired, I would, if I was the hiring
21 person, feel like Matt had lied to them.  And much
22 like why I'm not able to associate with Hill School
23 alumni, I can't lie to them when I meet with them.
24 Q.Well, is part of your issue that you would have
25 to tell the prospective employer about your lawsuit?

Page 159

1  A.Part of my concern.  My issue was that I would
2  end up sitting in their office explaining that I had
3  received --- the school for which I worked last had
4  received two letters from someone accusing me of that.
5   And they would wonder why I wasn't a little more open
6  with them when I interviewed with them.
7  Q.How did you think a new employer would learn
8  about the letters?
9  ATTORNEY JUBB:
10 Objection to the form.
11 THE WITNESS:
12 I don't know.
13 ATTORNEY JUBB:
14 Asked and answered twice.
15 THE WITNESS:
16  Yeah.  You asked me why I'm still a John
17 Doe and do I care if it changes and ---.
18 BY ATTORNEY DOUGHERTY:
19 Q.That's not what I asked.  I wanted to know how
20 you believe the new employer would learn about the
21 letters because you didn't even look in your personnel
22 file to see if they're there.
23 ATTORNEY JUBB:
24 He didn't tell you anything about a
25 personnel file.  He told you exactly how.  You have to

Page 160

1  listen.
2  ATTORNEY DOUGHERTY:
3  No.  Please stop.  Please stop.  Please
4  stop speaking.
5  ATTORNEY JUBB:
6  No.  You need to ask a question.
7  ATTORNEY DOUGHERTY:
8  You may say objection and that's it.
9  Please don't ---.
10 ATTORNEY JUBB:
11 You cannot harass the witness.
12 ATTORNEY DOUGHERTY:
13 I'm not harassing him.
14 ATTORNEY JUBB:
15 You keep asking things over and over.
16 ATTORNEY DOUGHERTY:
17 I'm not harassing him.  And you can't
18 coach the witness by making commentary.
19 ATTORNEY DOUGHERTY:
20 I'm not doing anything.  I'm trying to
21 coach you.
22 ATTORNEY DOUGHERTY:
23 So, I will --- okay.  Well, I don't need
24 your coaching.  Thank you.
25 ATTORNEY JUBB:

Page 161

1  Well, then ask a different question.
2  BY ATTORNEY DOUGHERTY:
3  Q.My question was how did you think the new
4  employer would learn about the letters?
5  ATTORNEY JUBB:
6  Objection to the form.  Asked and
7  answered.  You can answer one more time.
8  ATTORNEY DOUGHERTY:
9  Just strike your commentary.
10 BY ATTORNEY DOUGHERTY:
11 Q.Go ahead.
12 A.I believe from sitting in an interview talking
13 about why I'm no longer working with the school from
14 which was last on my résumé, unless I was forthright
15 with them and said, there are two letters that were
16 sent to the school accusing me of molesting a student,
17 abusing a student, and it eventually became public
18 that I didn't want to put any hiring employer in that
19 position because if roles were reversed, I would feel
20 like I was lying --- I had been lied to by that
21 employee.
22 Q.I guess what I'm trying to understand is how did
23 you think the two letters would become public.
24 ATTORNEY JUBB:
25 Objection to form.

Matthew B. Ralston
September 20, 2021                                                    162 to 165

Page 162

1  BY ATTORNEY DOUGHERTY:
2  Q.I understand what you're saying.  You felt as
3  though you had to tell a prospective employer after
4  October 2019.  You felt that you had to tell a
5  prospective employer about the two letters for fear
6  that they might become public and you didn't want the
7  hiring person to feel that they had been deceived.  I
8  think you may have used a different word.  So, how did
9  you think the two letters were going to become public?
10  ATTORNEY JUBB:
11  Objection to the form.
12  THE WITNESS:
13  I believe what I said if the allegations
14  were to become public and I believe the allegations
15  will become public and attached to my name no later
16  than when we go to trial.  So, at the very least, they
17  would have learned then.
18  BY ATTORNEY DOUGHERTY:
19  Q.Okay.
20  So, your belief is that the allegations by Mr.
21  Poulos would become public because of your lawsuit?
22  ATTORNEY JUBB:
23  Objection to the form.
24  THE WITNESS:
25  Sure.

Page 163

1  BY ATTORNEY DOUGHERTY:
2  Q.When did you start looking for other employment?
3  A.Beg your pardon?
4  Q.When did you start looking for other employment?
5  A.Looking for employment?
6  Q.Yeah.  And I said other employment.
7  A.Other employment.  I'm sorry.
8  Q.I didn't mean to put my hand in the way.  Let me
9  start again.  You are looking for employment.
10  Correct?
11  A.Softly.  I looked at public schools in Ohio.  I,
12  actually, had communications with three.  And without
13  considerably more education, I can't be certified in
14  the State of Ohio.  And so, the other avenues
15  available to me are mostly careers in which I don't
16  have much interest.  Sales or --- sales.
17  Q.So, the inability to --- let me start again.
18  You were looking for a teaching position at the
19  Ohio public schools?
20  A.Yes.
21  Q.So, your inability to get a position teaching at
22  the Ohio public schools is because of additional
23  certifications that you would need in the State of
24  Ohio.
25  Is that right?

Page 164

1  A.Yes.
2  Q.Okay.
3  So, the inability to teach at the Ohio public
4  schools is not in any way related to the accusations
5  by Mr. Poulos.
6  Right?
7  A.No.
8  Q.And you said you started softly looking for
9  employment.  When did you start that?
10  A.This summer.
11  Q.Why did you start looking for employment this
12  summer?
13  COURT REPORTER:
14  Sorry, did you say when or why?
15  ATTORNEY DOUGHERTY:
16  Why.
17  THE WITNESS:
18  Why would be two reasons.  One, I was
19  still receiving unemployment and those requirement had
20  changed.  And most importantly because I would have
21  given up the unemployment, I decided that I could take
22  short term assignments from a school and was more
23  confident in the actions I had taken and decided it
24  was worth the risk.
25  BY ATTORNEY DOUGHERTY:

Page 165

1  Q.You say you were more confident in the actions
2  you had taken.  Do you mean by filing your lawsuit?
3  A.Yes.
4  Q.And so, you can't take short term --- when you
5  say short term assignments, you mean like substitute
6  teaching?
7  A.For a year.
8  Q.Oh, I understand.  Okay.
9  A.Or two years.
10  Q.So, you can't take the short term assignments
11  from --- well, let me start again.
12  Did you apply to any other schools other than
13  Ohio public schools?
14  A.No.
15  Q.Is the issue with the certification that makes
16  you unable to teach at the public schools, does that
17  provide a problem teaching at any school in Ohio or is
18  it unique to public schools?
19  A.It would not be any school.  It would be any
20  school that is accredited or requires certification,
21  public school certification.  There are some parochial
22  schools and independent schools that also require
23  those credentials.  There are independent schools that
24  don't require those credentials.
25  Q.And we're talking about high school?

Page 166

1   A. Yes.
2   Q. So, there are schools in Ohio that don't require
3   the accreditation that the public schools require that
4   you could teach?
5   A. I believe so.
6   Q. Have you applied to any of those schools?
7   A. I have not.
8   Q. Have you applied anywhere else other than Ohio
9   public schools?
10  A. I spoke with an insurance company regarding
11  health benefits to businesses, selling.
12  Q. When was that?
13  A. Excuse me?
14  Q. When did you speak to the insurance company about
15  selling health benefits?
16  A. It would have been late July or August sometime.
17  Q. Did you send your résumé or have an interview or
18  something?
19  A. They have my résumé and I did a Zoom interview
20  and we agreed that I would follow up if I had interest
21  in joining them.
22  Q. And you didn't follow up?
23  A. I did not.
24  Q. Okay.
25  So, you didn't --- you weren't interested in the

Page 167

1   job with the insurance company.
2   Is that right?
3   A. That's correct.
4   Q. So, the reason why you aren't employed by the
5   insurance company is not because of the accusations by
6   Mr. Poulos.
7   Is that right?
8   A. That's right.
9   Q. Did you apply anywhere else other than the Ohio
10  public schools and the insurance company?
11  A. I have not.
12  Q. Do you plan to apply to other places for
13  employment?
14  A. I do not.
15  Q. Is there a reason why you do not plan to apply to
16  other places for employment?
17  A. I'm 64 and I've done the math and retirement is a
18  good option at this point.  I know I can't go back to
19  the Hill School and do what I love.  And I don't think
20  I can become a fundraiser anywhere else but the Hill
21  School.  I've been out of teaching long enough that I
22  don't think I'm a full-time teacher because of
23  technological changes since I last taught in 2009.
24  Q. I think you said that you no longer receive
25  unemployment.

Page 168

1   A. That's correct.
2   Q. And so, your only source of income is the income
3   that your wife receives from her job.
4   Is that right?
5   A. Income wise, that's the only income we have.
6   I've got my retirement funds that we're drawing on.
7   Q. Do you receive money from somewhere else to
8   support your life, living?  It's your retirement, your
9   wife's salary, what else?
10  A. I have some other money but it's inheritance that
11  I can spend some.
12  Q. Do you mean an inheritance from your mother's
13  death in February 2020?
14  A. I do.
15  Q. So, you have adequate income to support your
16  lifestyle.
17  Is that right?
18  ATTORNEY JUBB:
19  Objection to the form.
20  THE WITNESS:
21  For short term, short period of time,
22  yes.
23  BY ATTORNEY DOUGHERTY:
24  Q. You said you don't plan to work.
25  A. Correct.  I'm not yet receiving Social Security.

Page 169

1   Q. Oh, okay.  So, is it the idea that your wife's
2   salary, the retirement, Social Security, and the
3   inheritance that will be adequate so that you do not
4   need to work?
5   A. It would be adequate.
6   ATTORNEY JUBB:
7   Object to form.
8   BY ATTORNEY DOUGHERTY:
9   Q. Is there anything that you cannot do now in 2021
10  that you could do before April 2018?
11  ATTORNEY JUBB:
12  Objection to the form.  Asked and
13  answered.
14  THE WITNESS:
15  Yes.
16  BY ATTORNEY DOUGHERTY:
17  Q. What can you not do now that you could do prior
18  to April 2018?
19  A. I can't associate with any member of the Hill
20  School community who is not aware of my situation.
21  Q. Did you say who is not aware of your situation?
22  A. Yes.  Why I'm not working there or what's
23  happening regarding what they do know and that is
24  varied.  And I don't know what level it varies.
25  Q. I want to get a complete list.  But just before

Matthew B. Ralston
September 20, 2021                    170 to 173

Page 170

1  we leave that, if you are publicly identified in your
2  lawsuit then, won't everyone know?
3  A.Yeah, they would or potentially.
4  Q.So, then you would be able to associate with
5  people of the Hill School community.
6  Is that right?
7  ATTORNEY JUBB:
8  Objection to the form.
9  THE WITNESS:
10 Yes, technically.
11 BY ATTORNEY DOUGHERTY:
12 Q.Okay.  You were giving me a list.  So, you can't
13 associate with people in the Hill School community who
14 don't know about your situation.  Anything else that
15 you cannot do now that you could do prior to April
16 2018?
17 A.I feel like I can't work in a job that's as
18 rewarding as what I was doing.
19 Q.Do you mean because in your view, the job that
20 you had as a capital giving officer at the Hill School
21 was like one of a kind?
22 A.Yes.
23 ATTORNEY JUBB:
24 Object to the form.
25 BY ATTORNEY DOUGHERTY:

Page 171

1  Q.Anything else that you cannot do now that you
2  could do in April 2018?
3  A.Not that's occurring to me right now.
4  Q.Does this lawsuit, meaning your lawsuit, cause
5  any emotional distress?
6  A.I think we discussed this last time.  My
7  emotional stress sources to the April letters of 2018.
8  Anything that stems from that point forward is I can't
9  distinguish between whatever else there is and those
10 letters.
11 Q.Okay.
12 So, the lawsuit does cause you emotional distress
13 but you can't distinguish among any of the activity
14 since the first April 2018 letter.
15 Is that right?
16 ATTORNEY JUBB:
17 I'll object to the form.
18 THE WITNESS:
19 I don't understand the activity.
20 BY ATTORNEY DOUGHERTY:
21 Q.So, the lawsuit causes you distress but you can't
22 distinguish that distress from distress that you
23 believe you had sustained because of the letters?
24 A.I think they're all tied together, yes.
25 Q.Other than your employment with the Hill School,

Page 172

1  we're taking that off the table for the moment, is
2  there any other job that you applied for that you've
3  been rejected from because of the accusations by Mr.
4  Poulos?
5  A.No.
6  Q.Did you pursue a position as headmaster of a
7  school prior to your application to Leelanau?
8  A.I'm sorry.  I didn't catch the beginning.
9  Q.Did you pursue a position as a headmaster at any
10 other school prior to when you applied to Leelanau?
11 A.I did, early 2000s.  I was a finalist at West
12 Nottingham Academy.  That would have been 2004, I
13 think, which is down in Maryland.  I withdrew my name
14 from that because our sons were --- the oldest one was
15 just getting ready to --- I take that back.  It would
16 have probably have been 2000.  I'm thinking the year
17 he graduated.  In 2000, I withdrew from that because,
18 one, he was getting ready to start the Hill School
19 and, two, I wasn't ready, at that point, to move on
20 from teaching.
21 Q.Okay.
22 So, your perception is when you --- I'm sorry.
23 Let me start again.  So, is it correct that becoming a
24 headmaster, the idea is that you no longer teach?
25 A.Yes.

Page 173

1  Q.And when you applied to Leelanau, you were ready
2  to no longer teach?
3  A.Yes.  I think ready is not the right word I would
4  use there.  Willing to not teach to try something
5  else.
6  Q.Well, you didn't have to leave the Hill School
7  when you left to go to Leelanau.
8  Right?
9  A.I did not.
10 Q.So, you could have continued at the Hill School
11 and continued teaching.
12 A.I could have.
13 Q.So, you made the voluntary decision to move away
14 from teaching to become a headmaster when you left for
15 the Leelanau School.
16 Is that right?
17 A.I did.
18 Q.When you left the Leelanau School and came back
19 to the Hill School, did you consider going back to
20 teaching?
21 A.Not really.
22 Q.Did you read any of --- well, let me start again.
23 I realize you indicated you read some portions of
24 Mr. Poulos's deposition.  Did you read any other
25 testimony?

Page 174

1  A.No.
2  Q.Did you read your own testimony?
3  A.I did.
4  Q.When did you read your own testimony?
5  A.Sometime between when we had it and the last six
6  weeks.  I can't tell you exactly when.  But it was in
7  that timeframe.  I don't even know when they're
8  available.  But it was after, obviously.
9  Q.So, sometime in the past few weeks?
10 A.Yes.
11 Q.Did you read all of your testimony?
12 A.I did.
13 Q.Did you read it closely?
14 A.Most of it.
15 Q.When you were reading your prior testimony, did
16 you see any errors?
17 A.One that I think is an error and that is when I
18 described how Mr. Lehman gave me the letter.  I don't
19 actually remember if he handed me a copy or he emailed
20 it.  I don't remember.  But I know he is the person
21 who provided it to me.
22 Q.And I think your recollection at the time, and
23 let me know if it's been refreshed or if it's
24 different was that you don't remember when you,
25 actually, got the copy of the letter.

Page 175

1  A.Right.  I think ---.
2  Q.You certainly knew the content.  You talked to
3  Mr. Lehman but we couldn't recall exactly how and when
4  you got the letter, the actual letter.
5  A.Right.
6  Q.Has that changed?  Have you remembered something?
7  A.Just that --- no.  What I remember is that I'm
8  not certain he emailed it to me.  And mostly, that
9  comes from I don't know where I would have printed it.
10 Printing it in the Advancement Office, the printers
11 are not in the office.  It didn't fit.  I don't
12 remember him handing it to me.
13 Q.So, when you were reading your testimony, you
14 thought to yourself how did I get a copy.
15 A.Yeah.
16 Q.Because you, eventually, had a copy.
17 A.Yes.
18 Q.Okay.
19 Anything else that you saw when you were reading
20 your testimony that you believed was an error?
21 A.I don't think so.  I'm sorry.  I don't think so.
22 Q.And when you were reading your testimony, did you
23 remember anything that you previously did not?
24 A.No.
25 Q.The statements that form the basis for your

Page 176

1  claims against Mr. Garabedian are the two letters.
2  Is that right?
3  A.Beg your pardon.
4  Q.The statements that form the basis for --- let me
5  start that again.
6  The statements that form the basis for your claim
7  against Mr. Garabedian are the letters, right, the
8  April 2018 and December 2018 letters?
9  A.They certainly are the initial and main parts of
10 that.  My understanding that there was no
11 communications between him and the school in response
12 to the school's requests play into that as well.
13 Q.You understand that you have a defamation claim
14 against Mr. Garabedian.
15 Is that right?
16 A.I do indeed.
17 Q.And that as part of the defamation claim, you'd
18 need to prove that there was a defamatory statement
19 made by Mr. Garabedian against you --- about you.
20 Is that right?
21 A.I understand that.
22 Q.Among other things.  So, I just want to confirm
23 that the statements that form the basis for your
24 claims are the two letters, the April 2018 and the
25 December 2018 letters, not some other letter that we

Page 177

1  haven't discussed.
2  A.Correct.
3  Q.The statement by Mr. Garabedian that you believe
4  to be about you that was not true.
5  Is that right?
6  A.Yes.
7  Q.Are you aware of whether there has been any
8  publicity about the accusations by Mr. Poulos against
9  you?
10 ATTORNEY JUBB:
11 I'll object to the form.
12 BY ATTORNEY DOUGHERTY:
13 Q.I just want to know if you know of any publicity
14 about the accusations by Mr. Poulos against you.
15 A.No.
16 Q.Have you ever spoken to Mary Ellen Poulos, Mr.
17 Poulos's mother?
18 A.Not since --- I assume I spoke with her when Mr.
19 Poulos was a student.  If I did, I don't remember the
20 conversation and I've had none since.
21 Q.Did you ever touch Mr. Poulos on any part of his
22 body?
23 A.Probably.  Hand on a shoulder or something.
24 Q.As far as you're concerned, any part of Mr.
25 Poulos's body that you touched or any touching of Mr.

Page 178

1  Poulos's body, was not inappropriate.
2  A.That is my understanding.
3  Q.Well, that's your position.
4  Right?
5  A.That's my position, yes.
6  Q.Did you ever make Mr. Poulos take a quiz at the
7  chalk board?
8  A.I did not.
9  Q.Did you make any students take a quiz at the
10 chalk board?
11 A.I did not.
12 ATTORNEY DOUGHERTY:
13 I think that's your cue to fill up the
14 water cup.
15 ATTORNEY JUBB:
16 I'm trying to slow down the pace here.
17 I don't know.  I'm just warming up to a break.
18 ATTORNEY DOUGHERTY:
19 If you need a break, you can have one at
20 any time.
21 BY ATTORNEY DOUGHERTY:
22 Q.Do you have any information about to whom Mr.
23 Lehman provided the April 2018 letter?
24 ATTORNEY JUBB:
25 Objection to form.  Asked and answered.

Page 179

1  THE WITNESS:
2  Only what I shared last time.  And that
3  was that he had shared it with legal committee and the
4  board of trustees and his associate headmaster.
5  BY ATTORNEY DOUGHERTY:
6  Q.And that's information that you learned from Mr.
7  Lehman.
8  Right?
9  A.Yes.
10 Q. He told you that's to whom he provided the April
11 2018 letter?
12 A.Yes.  And I guess I should include Mr. Rees.
13 Q.Do you have any information about to whom Mr.
14 Rees provided the December 2018 letter?
15 A.I do not.
16 Q.Do you know Preston Athey, A-T-H-E-Y?
17 A.I do.
18 Q.How do you know Preston Athey?
19 A.He was chairman of the board of trustees at that
20 time.
21 Q.Do you mean in 2018?
22 A.Yes.
23 Q.Did you ever have any communications with Mr.
24 Athey regarding the accusations by Mr. Poulos?
25 A.No.

Page 180

1  Q.Do you know whether Mr. Athey received the
2  letters that included Mr. Poulos's accusations?
3  A.From Mr. Lehman?  Yes.
4  Q.Generally.
5  A.Yes.  Well, yes, he had to.
6  Q.Why do you say he had to?
7  A.Because the chairman of the board of trustees is
8  an ex officio member of legal --- of every committee.
9  So, he's a member of the legal committee.  And I know
10 that's how the school operates.
11 Q.Okay.
12 So, based on Mr. Lehman's description of giving
13 the letter, the April 2018 letter to the legal
14 committee of the board of trustees, it's your belief
15 that the former chairman of the board was a recipient
16 or member of the legal committee recipient of the
17 letter?
18 A.Yes.
19 Q.And I'm sorry.  Did you ever speak to Mr. Athey
20 about the accusations by Mr. Poulos?
21 A.No.
22 Q.Did you ever speak --- did you ever have any
23 written communications with Mr. Athey regarding the
24 accusations by Mr. Poulos?
25 A.No.

Page 181

1  Q.Did you have any contact with Mr. Athey before
2  the April 2018 letter?
3  A.Yes.
4  Q.How frequently did you have contact with Mr.
5  Athey before the April 2018 letter?
6  A.At the very least, annually.  And more likely,
7  several times a year.
8  Q.Did you have contact with Mr. Athey after the
9  April 2018 letter?
10 A.Yes.
11 Q.What was the nature of your contact with Mr.
12 Athey after the April 2018 letter?
13 A.He joined me with --- in meetings with potential
14 major donors.
15 Q.And it's your belief that Mr. Athey also received
16 the second letter, the December 2018 letter.
17 Is that right?
18 A.Yes.
19 Q.Did you have contact with Mr. Athey after the
20 December 2018 letter?
21 A.Yes.
22 Q.I'm sorry, the December 2018 letter.
23 A.After the '18 letter, yes.  That's what we did
24 before.
25 ATTORNEY JUBB:

Matthew B. Ralston
September 20, 2021                    182 to 185

Page 182

1  Hold on.  Everybody is misspeaking now
2  so why don't you correct it.
3  ATTORNEY DOUGHERTY:
4  I said 2018 so that's what I was trying
5  to do.
6  ATTORNEY JUBB:
7  Incorrect question and then, you get to
8  talk too.
9  BY ATTORNEY DOUGHERTY:
10 Q.I just want to know if you had contact with Mr.
11 Athey after the December 2018 letter.
12 A.Yes.
13 Q.And what was the nature of your contact with Mr.
14 Athey after the December 2018 letter?
15 A.We had visits in Chicago together.
16 Q.Did anything change regarding the nature of your
17 contact with Mr. Athey as it was prior to April 2018
18 to after December 2018?
19 A.From my perspective, yes, because I knew he was
20 aware of the letters.  It would have meant a lot to me
21 if he asked how I was doing, even if it wasn't
22 directly tied --- direct question regarding the
23 letters.  I spent three days with him feeling that
24 there's this elephant in the room that's just sitting
25 there.

Page 183

1  Q.Did he ever do or say anything to you to lead you
2  to believe that he credited or believed Mr. Poulos's
3  accusations?  He being Mr. Athey.
4  ATTORNEY JUBB:
5  Objection to the form.
6  THE WITNESS:
7  No.
8  BY ATTORNEY DOUGHERTY:
9  Q. Did Mr. Athey act any differently towards you?
10 A.I don't think so.  Can I --- I think not saying
11 anything to me checking how I'm doing, just even in a
12 general way, to me, felt like different --- treating
13 me differently.  We had had a good relationship.  We
14 spent time talking about lots of things prior to that.
15 It was much harder for me to initiate any conversation
16 when that was sitting in between us.  That's my
17 perspective.
18 Q.Right.  I understand.  I just want to know ---
19 so, Mr. Athey, from your perspective, didn't ask you
20 how you were doing as much and so that was different
21 in your view.
22 A.Yes.  I think we spent three days together in
23 Chicago and it didn't come up.  And I knew he knew.
24 And there was just no questioning how I'm doing or any
25 of that.  And I understand not but it was hard for me

Page 184

1  not to notice that absence of conversation.
2  Q.So, you thought Mr. Athey should address the
3  accusations with you?
4  ATTORNEY JUBB:
5  Object to the form.
6  THE WITNESS:
7  No.  I think a person could ask a
8  question in general just to see how you're doing with
9  everything.
10 BY ATTORNEY DOUGHERTY:
11 Q.Do you think that that's something that Mr. Athey
12 could do despite his position as the chairman of the
13 board of trustees and a member of the legal committee?
14 A.Probably not.
15 Q.Did you ever ask or confront Mr. Athey about it?
16 A.No.
17 Q.Did Mr. Athey ever do or say anything --- let me
18 start again.  Do you have any idea about what Mr.
19 Athey's opinion of you is?
20 A.Today?
21 Q.We can start with today.
22 A.No.
23 Q.Did you at any time know what Mr. Athey's opinion
24 of you was?
25 A.Prior to 2018?

Page 185

1  Q.Yes.
2  A.Yes.
3  Q.And what was Mr. Athey's opinion --- or your
4  understanding rather of Mr. Athey's opinion of you
5  prior to 2018?
6  A.That it was high.
7  Q.Do you believe that, at some point, Mr. Athey's
8  opinion of you changed?
9  A.I don't have anything to base that on.
10 Q.So, you don't know one way or the other what Mr.
11 Athey's opinion is now?
12 A.I don't.
13 Q.Do you know Andrew Soussloff, S-O-U-S-S-L-O-F-F?
14 A.What is it?
15 Q.I might just be saying it wrong.
16 A.I have met him I'm sure.  I can't tell you that I
17 can pick him out of a room.
18 Q.Okay.
19 So, I don't even know if that's the right --- do
20 you know the right way to say the name now that I've
21 shown it to you?
22 A.Soussloff.
23 Q.Soussloff or something like that.  Yeah.
24 S-O-U-S-S-L-O-F-F.  And so, you've met Mr. Soussloff?
25 A.I don't know that I have.  I can't imagine that I

Matthew B. Ralston
September 20, 2021                                    186 to 189

Page 186

1  haven't. But I don't remember and I couldn't identify
2  him to you.
3  Q. So, you can't remember ever having any contact
4  with him?
5  A. No.
6  Q. Do you recognize him as affiliated with the Hill
7  School?
8  A. Yes.
9  Q. Do you know anything more about Mr. Soussloff's
10 affiliation with the Hill School?
11 A. I think he was on the board, which means he's an
12 alumnus.
13 Q. Do you have any information about whether Mr.
14 Soussloff received the letters that included Mr.
15 Poulos's accusations?
16 A. I don't.
17 Q. You never associated with Mr. Soussloff.
18 Is that right?
19 A. I don't remember associating with him.
20 Q. You don't know what Mr. Soussloff's opinion of
21 you is or if he even has one.
22 Right?
23 A. I don't.
24 Q. Do you know Rick Wood?
25 A. I've met Rick Wood.

Page 187

1  Q. How do you know Rick Wood?
2  A. He works in the --- or did work, I don't know if
3  he still does, the Business Office at the Hill School.
4  Q. So, you met Rick once?
5  A. I would say at least once.
6  Q. Do you know whether Mr. Wood received the letters
7  that included Mr. Poulos's accusations?
8  A. I do not.
9  Q. Did you ever have any contact with Mr. Wood other
10 than seeing him in the Business Office?
11 A. No.
12 Q. Did you ever associate with Mr. Wood?
13 A. No.
14 Q. Do you know whether Mr. Wood has an opinion of
15 you?
16 A. I don't.
17 Q. Do you know Leslie Gomez?
18 A. I do not.
19 Q. Do you know Gina --- do you recognize the name
20 Leslie Gomez without regard of whether you'd know her?
21 A. I do recognize the name.
22 Q. How do you recognize the name Leslie Gomez?
23 A. From my understanding, she's an attorney with
24 Cozen O'Connor.
25 Q. Have you ever had contact with Ms. Gomez?

Page 188

1  A. No.
2  Q. Do you know whether Ms. Gomez has an opinion of
3  you?
4  A. I don't.
5  Q. Do you know Gina Maisto Smith, M-A-I-S-T-O?
6  A. No.
7  Q. Do you recognize the name Gina Maisto Smith?
8  A. Yes.
9  Q. How do you recognize the name Gina Maisto Smith?
10 A. She's an attorney with Cozen O'Connor.
11 Q. Have you ever met Ms. Smith?
12 A. I have not.
13 Q. Do you know whether Ms. Smith has an opinion of
14 you?
15 A. I do not.
16 Q. Do you know William Yinger?
17 A. I do.
18 Q. How do you know William Yinger?
19 ATTORNEY JUBB:
20 Objection to form. Asked and answered.
21 THE WITNESS:
22 He was a student at the school from 1992
23 to 1995. He's a current teacher at the school. He's
24 a former chair of the Science Department at the
25 school. And he's a good friend.

Page 189

1  BY ATTORNEY DOUGHERTY:
2  Q. Are you aware that Mr. Yinger provided testimony
3  in a deposition in this action?
4  A. I beg your pardon.
5  Q. Are you aware that Mr. Yinger provided testimony
6  in a deposition in this action?
7  A. I am.
8  Q. Did you read Mr. Yinger's testimony?
9  A. I have not.
10 Q. Did you speak to Mr. Yinger about his testimony?
11 A. I have not.
12 Q. Do you know whether Mr. Yinger has an opinion of
13 you?
14 A. I do.
15 Q. Do you know Mr. Yinger's opinion?
16 A. Very high.
17 Q. Mr. Yinger learned about the accusations by Mr.
18 Poulos against you from you.
19 Is that right?
20 A. That's correct.
21 Q. And learning about Mr. Poulos's accusations did
22 not change Mr. Yinger's opinion of you.
23 Is that right?
24 A. It did not.
25 Q. And Mr. Yinger has not stopped associating with

Matthew B. Ralston
September 20, 2021                    190 to 193

Page 190

1  you since learning of the accusations by Mr. Poulos.
2  Is that right?
3  A.He has not.
4  Q.Do you know Wallace Gundy, G-U-N-D-Y?
5  A.I do.
6  Q.How do you know Wallace Gundy?
7  A.She's also a former student.  She was a prefect
8  in our dormitory.  She was a faculty child.  And I
9  would consider her a friend as well.
10 Q.Do you know what Ms. Gundy's opinion of you is?
11 A.I think it's very high.
12 Q.Does Ms. Gundy know of the accusations by Mr.
13 Poulos?
14 A.I believe so.
15 Q.Do you know how Ms. Gundy learned of the
16 accusations by Mr. Poulos?
17 A.I don't.
18 Q.Why do you believe Ms. Gundy is aware of the
19 accusations by Mr. Poulos?
20 A.I beg your pardon?
21 Q.Why do you believe she's aware?  Did she say
22 something?  Did somebody else tell you something?
23 A.Let me rewind.  She knew --- she was at the
24 reunion that I didn't attend.  And I got a note from
25 her saying she missed us and knew that it wasn't

Page 191

1  anything we could talk about.  She's the president of
2  the Alumni Association I think.  And she is her class
3  secretary.  So, as far as how she found out, I can't
4  say specifically.  I have, actually, seen Wallace
5  after ---.
6  Q.I'm sorry.  It's Mr., right?
7  A.Oh, Mr.?
8  Q.Is it Wallace Gundy?
9  A.If it's Wallace, it's a she.
10 Q.It's a she, okay.
11 A.Her father was Jay.
12 Q.I apologize.  I thought I had been referring to
13 her as --- a man as a woman.  I'm sorry.  Keep going.
14 I apologize.
15 A.I saw Wallace the summer of 2019 when I was on
16 leave.  And I gave her kind of a general outline
17 without specifics.  I haven't spoken with her since.
18 I've had communications with her since.  But I have
19 not spoken with her since.
20 Q.So, do you know --- let me start again.
21 Do you have any information about whether Ms.
22 Gundy received the letters?
23 A.I don't.
24 Q.So, it's your belief that Ms. Gundy learned some
25 information about the accusations from a source other

Page 192

1  than you and that you provided Ms. Gundy information
2  about the accusations.
3  Is that right?
4  A.Yes.
5  Q.And ---.
6  A.And ---.
7  Q.Go ahead.
8  A.I don't know that she received information that
9  there were accusations.  I think she received
10 information during her reunion that I couldn't be
11 there and that it wasn't something I could talk about.
12 Q.And what did Ms. Gundy say when you gave the
13 general outline of the accusations?
14 A.She was sorry and hoped we knew how she thought
15 about us.
16 Q.And what did you tell Ms. Gundy?  You said you
17 called it a general outline but what did you tell her?
18 A.That someone had made an accusation against me.
19 I wasn't specific in what it was.
20 Q.Did you tell her it was --- oh, I'm sorry.
21 A.And that I had filed a suit.  At that point, I
22 was on paid administrative leave.  She already knew
23 that much for sure.
24 Q.Did you tell Ms. Gundy that the --- let me start
25 again.

Page 193

1  Did you tell Ms. Gundy the nature of the
2  accusation?
3  A.I don't believe so.
4  Q.Did you tell her that it was by a former student?
5  A.I don't know.
6  Q.Did you identify Mr. Poulos as the accuser?
7  A.I did not.
8  Q.Do you know whether Ms. Gundy's opinion of you
9  changed after learning the information about the
10 accusations?
11 A.I believe it did not.
12 Q.So, as far as you know, Ms. Gundy's opinion of
13 you is still high?
14 A.Yes.
15 Q.And Ms. Gundy hasn't stopped associating with you
16 after learning the accusations.
17 Is that right?
18 A.That's right.
19 Q.Do you know W. Christopher Drowne, D-R-O-W-N-E?
20 A.I do.
21 Q.How do you know W. Christopher Drowne?
22 A.Chris was a teacher at the Hill School.  He is
23 also an alumnus.  I taught his younger brother.  And
24 we were colleagues for if not every year I was
25 teaching there, all but one or two.  He was pretty

Page 194

1  young when I arrived.
2  Q.Do you know whether Mr. Drowne knows about the
3  accusations by Mr. Poulos?
4  A.I don't.
5  Q.Have you ever talked to Mr. Drowne about the
6  accusations by Mr. Poulos?
7  A.I have not.
8  Q.Do you have any information about whether Mr.
9  Drowne received the letters that included the
10  accusations by Mr. Poulos?
11  A.I do not.
12  Q.Do you know if Mr. Drowne has an opinion of you?
13  A.I do.
14  Q.Do you know what Mr. Drowne's opinion of you is?
15  A.High.
16  Q.It's your understanding that Mr. Drowne's opinion
17  of you is high presently.
18  Correct?
19  A.Yes.
20  Q.And that Mr. Drowne's opinion of you has always
21  been high.
22  Is that right?
23  A.I think so.
24  Q.And do you have any reason to believe that Mr.
25  Drowne has stopped associating with you?

Page 195

1  A.No.
2  Q.I just want to confirm.  Let me just ask the
3  question.  You told Mr. Neese about the accusations.
4  Is that right?
5  A.Mr. who/
6  Q.Neese?
7  A.Yes.
8  Q.And you don't know whether Mr. Dougherty, David
9  Dougherty, knows about the accusations.
10  Is that right?
11  A.Specifically, no but I do know, and I think I
12  shared this last time, that I asked him to speak with
13  me and he said he couldn't if it involved a legal
14  matter at the school.  So, I assume he knows.
15  Q.And that's the only information you have about
16  whether Mr. Dougherty knows about the accusations.
17  Right?
18  A.Yes.
19  Q.Do you know James Alexandre, A-L-E-X-A-N-D-R-E?
20  A.I do.
21  Q.Did I say it right, Alexandre?
22  A.I think, actually, I've always said Alexandre.
23  Q.Maybe I just have it spelled wrong.
24  A.This is the first time I saw the spelling.
25  Q.Oh, so it's spelled --- it just says it

Page 196

1  regularly.
2  A.You've got it spelled right.  He's a member of
3  the board of trustees.
4  Q.Do you know whether Mr. Alexandre has information
5  or knows about the accusations by Mr. Poulos?
6  A.No, not directly.  He was a member of the board
7  of trustees.
8  Q.Was Mr. Landy --- let me start again.  Was Mr.
9  Alexandre a member of the legal committee?
10  A.I don't know.
11  Q.So, you don't have information one way or the
12  other about whether Mr. Alexandre knows about the
13  accusations by Mr. Poulos.
14  Is that right?
15  A.No.  He may be the current chair of the board in
16  which case he would know.  But I don't remember who
17  was Preston's assistant and I know that Preston is off
18  the board or vice chair.
19  Q.So, the only basis for your --- let me start
20  again.
21  You don't have any direct information about
22  whether Mr. Alexandre received the letters or knows
23  about the accusations.
24  Is that right?
25  A.I do not.

Page 197

1  Q.You're just making an assumption because he's
2  presently on the board?
3  A.I think he is.  I'm not certain of that.
4  Q.So, if the school or the school's attorney
5  confirmed that Mr. Alexandre did not receive the
6  letters, would you accept that representation?
7  A.I'd have no reason not to.
8  Q.And then, you would have no reason to believe
9  that Mr. Alexandre received the letters or knew about
10  the accusations.
11  Is that right?
12  A.Yes.
13  Q.Do you know whether Mr. Alexandre has an opinion
14  of you?
15  A.Not directly.
16  Q.How about indirectly?
17  A.I would assume it was good.  I haven't interacted
18  with him since I left the school in 2009.
19  Q.Oh, I see.  So, the last time you had contact
20  with Mr. Alexandre was before you went to Leelanau.
21  A.Yes.
22  Q.And at that time, Mr. Alexandre had a good
23  opinion of you.
24  Is that right?
25  COURT REPORTER:

Matthew B. Ralston
September 20, 2021                                    198 to 201

Page 198

1  Is that a yes?
2  THE WITNESS:
3  Yes.  Sorry.
4  BY ATTORNEY DOUGHERTY:
5  Q.And nothing has happened since between you and
6  Mr. Alexandre to lead you to believe that Mr.
7  Alexandre's high opinion of you has changed.
8  Is that right?
9  A.Nothing.
10  Q.And do you have an --- let me start again.
11  You haven't had a reason to associate with Mr.
12  Alexandre since 2009.
13  Is that right?
14  A.I have not.
15  Q.So, there is no reason related to Mr. Poulos's
16  accusations that you haven't interacted with Mr.
17  Alexandre.
18  Is that right?
19  A.Not to my knowledge.
20  Q.Do you know Scott Wilson?
21  A.I'm sorry, Scott who?
22  Q.Wilson, W-I-L-S-O-N.
23  A.I don't think so.
24  Q.Do you know Richard --- do you recognize the name
25  Scott Wilson?

Page 199

1  A.No.
2  Q.Do you know Richard Tabarrini, T-A-B-A-R-R-I-N-I?
3  A.I recognize the name.
4  Q.How do you recognize the name Richard Tabarrini?
5  A.As a parent of a student or students but not
6  student or students I know.
7  Q.So, you recognize Mr. Tabarrini's name to have
8  some connection with the Hill School?
9  A.Just as a parent.
10  Q.As a parent?  Do you know whether Mr. Tabarrini
11  has an opinion of you?
12  A.I don't.
13  Q.Have you ever interacted with Mr. Tabarrini?
14  A.Not to my recollection, no.
15  Q.Do you know whether Mr. Tabarrini received the
16  letters or information regarding Mr. Poulos's
17  accusations?
18  A.I do not.
19  Q.Do you know James Sheward, S-H-E-W-A-R-D?
20  A.I know the name.  Don't think I could pick him
21  out.
22  Q.How do you recognize the name James Sheward?
23  A.I don't know except that it feels familiar.
24  Q.So, you don't have any information about whether
25  Mr. Sheward is even affiliated with the Hill School.

Page 200

1  Is that right?
2  A.No.  I mean, yes, that's right.
3  Q.You just recognize the name.  You have no idea
4  where.  How about Robert Oberrender,
5  O-B-E-R-R-E-N-D-E-R?
6  A.I do know him.
7  Q.How do you know Mr. Oberrender?
8  A.He's an alumnus of the school and was on the
9  board and resides in Minneapolis area, which was in my
10  territory.  And I saw him in that capacity and he also
11  met with some other donors in that area with me.
12  Q.When was the last time you interacted with Mr.
13  Oberrender?
14  A.Probably sometime in the 2018/'19 school year.
15  I'm sorry.  It could have been '17/'18.
16  Q.Do you know if Mr. Oberrender has an opinion of
17  you?
18  A.I know that he did.
19  Q.What was Mr. Oberrender's opinion of you?
20  A.I'm sorry.
21  Q.It's okay.
22  A.It was high or good, whatever, high.
23  Q.I know you're detecting the pattern.  You said
24  did.  What were you referring to?
25  A.I haven't associated with him since the last time

Page 201

1  I saw him.
2  Q.And you don't remember the last time you saw Mr.
3  Oberrender?
4  A.No.  The last time that's vivid, I can't tell you
5  when it was.  That's why it could have been '17/'18
6  was in Minneapolis.  Visited with another donor there.
7  It's quite possible we would have crossed paths during
8  a trustee weekend when we would have both likely been
9  on campus.  I'm going to need that break soon.
10  Q.Oh, sure.  Let me just finish up with Mr.
11  Oberrender if that's okay.
12  A.Of course.
13  Q.Do you know whether Mr. Oberrender has any
14  information about the accusations by Mr. Poulos?
15  A.I don't.
16  Q.Do you know whether Mr. Oberrender received the
17  letters that included the accusations by Mr. Poulos?
18  A.I don't.
19  Q.And am I correct that you don't even know if the
20  last time you saw Mr. Oberrender was before or after
21  the letters.
22  Is that right?
23  A.I think it was after the first letter but I'm not
24  absolutely certain.
25  Q.Okay.

Matthew B. Ralston
September 20, 2021                              202 to 205

---

Page 202

1  Nothing Mr. Oberrender did or said led you to
2  believe that anything about his opinion of you had
3  changed.
4  Is that right?
5  A.Correct.
6  Q.So, the last time you saw Mr. Oberrender, he had,
7  as far as you understood, a high opinion of you and
8  you have no information that there been any change
9  in his opinion of you.
10 A.That is correct.
11 Q.And you haven't crossed paths with Mr. Oberrender
12 because you're no longer affiliated with the Hill
13 School.  Is that right?
14 A.That is correct.
15 ATTORNEY DOUGHERTY:
16 Okay.  We can take a break.
17 VIDEOGRAPHER:
18 The time is 2:42.  Going off the record.
19 OFF VIDEO
20                    ---
21 (WHEREUPON, A SHORT BREAK WAS TAKEN.)
22                    ---
23 ON VIDEO
24 VIDEOGRAPHER:
25 The time is 2:54.  Back on the record.

---

Page 203

1  BY ATTORNEY DOUGHERTY:
2  Q.You indicated that you didn't know Ms. Gomez or
3  Ms. Smith.  But did you prepare a statement that was
4  for either Ms. Gomez or Ms. Smith?
5  A.I don't believe so.
6  Q.Did you prepare a statement that was intended for
7  Ms. Gomez or Ms. Smith?
8  A.I don't think so.
9  Q.Did you prepare any type of statement for the
10 school regarding your position or, you know, ---
11 A.No.
12 Q.--- explanation or response to Mr. Poulos's
13 accusations?
14 A.No.
15 Q.Do you know John Millar, Jr.?  M-I-L-L-A-R?
16 A.I don't.
17 Q.Do you recognize the name, John Millar, Jr.,
18 M-I-L-L-A-R?
19 A.I don't.
20 Q.I guess it could be Miller but with an A on it?
21 A.No.
22 Q.No.  So you don't recognize that name to any
23 extent?
24 A.No, ma'am.
25 Q.How about Jason Ingle, I-N-G-L-E?

---

Page 204

1  A.I know that name.  I believe Jason --- I'm sorry.
2  Go ahead or ask how.
3  Q.Sure.
4  How do you know --- how do you recognize the name
5  Jason Ingle?
6  A.He's, I'm pretty sure, an alumnus of the school.
7  And I think he graduated before I started, but close
8  to when I started in '92.  I'm not certain.
9  ATTORNEY DOUGHERTY:
10 And just for the record, Mr. Chris Yu is
11 now in the room.  He's another lawyer for Mr.
12 Garabedian.  Ms. Steiger has left.
13 BY ATTORNEY DOUGHERTY:
14 Q.Okay.
15 So you recognize Jason Ingle as a student in the
16 '90s?
17 A.Prior --- it would have been early '90s or late
18 '80s.  I'm pretty sure he graduated before I ---.
19 Q.Prior to when you started at the Hill School?
20 A.Before I started.  I don't know him, I don't
21 think.
22 Q.Do you recognize the name Jason Ingle as a former
23 student of the Hill School?
24 A.I do.
25 Q.Do you recognize the name Jason Ingle in any

---

Page 205

1  other context?
2  A.I don't.
3  Q.Do you have any information about whether Jason
4  Ingle received the letters or information about the
5  accusations by Mr. Poulos?
6  A.I don't.
7  Q.Do you know whether Mr. Ingle has an opinion of
8  you?
9  A.I don't.
10 Q.Do you know Peter Humphrey?
11 A.I do.
12 Q.How do you know Peter Humphrey?
13 A.First met him as a parent of a student.  He was a
14 member of the board at least when I left the Hill
15 School in 2009.
16 Q.So the first time you left the Hill School?
17 A.Uh-huh (yes.)
18 Q.I just wanted to make sure ---.
19 A.And he could still be.  I don't know.
20 Q.Okay.
21 So you recognize Mr. Humphrey as a board member
22 in 2009?
23 A.I did.  I do.
24 Q.Have you had any contact with Mr. Humphrey since
25 2009?

---

Matthew B. Ralston
September 20, 2021                                        206 to 209

Page 206

1  A.I don't know.  Maybe --- probably --- maybe on
2  campus.  I don't recall anything specific.  Oh, yes, I
3  do.  I had contact with him when I was at Leelanau.
4  He's in banking.  And we were in a financially
5  difficult place, and I called him to speak about ways
6  --- different ways banks will finance or lend to
7  institutions.
8  Q.All right.
9  So it was Leelanau School?
10 A.Yes.  Yeah, not Matt.
11 Q.So other than a contact that you had with Mr.
12 Humphrey when you were at Leelanau School, has there
13 been any other contact with Mr. Humphrey?
14 A.No.
15 Q.Since 2009?
16 A.No, unless I passed him on campus and we shook
17 hands.  But I don't remember.
18 Q.Do you know whether Mr. Humphrey has an opinion
19 of you?
20 A.I know he did.  It was high.
21 Q.And do you have any reason to believe that Mr.
22 Humphrey's high opinion of you has changed?
23 A.I don't.
24 Q.Do you have any information about whether Mr.
25 Humphrey received the letters or learned about the

Page 207

1  accusations by Mr. Poulos?
2  A.I don't.
3  Q.Do you know Michael Harris?
4  A.I've met him.
5  Q.H-A-R-R-I-S.
6  A.I think I've met him.
7  Q.How do you know or, I guess, recognize Mr.
8  Harris' name?
9  A.A board member.  I met him on one of my weeks
10 back on campus.  I believe he was a parent at the
11 time, but I'm not certain of that.
12 Q.Do you have any information about whether Mr.
13 Harris received the letters or information about Mr.
14 Poulos's accusations?
15 A.I do not.
16 Q.Do you know whether Mr. Harris has an opinion of
17 you?
18 A.I do not.
19 Q.Do you know John M. Gvodas, G-V-O-D-A-S?
20 A.I think that's pretty close.  I'm not sure if
21 I've met him, but I do know the name.
22 Q.How do you recognize the name John M. Gvodas?
23 A.He was a parent of at least two kids, maybe more.
24 Q.When you were a teacher?
25 A.No.  He was a parent of students.  No, that was

Page 208

1  --- I'm pretty sure that's after I left.  I didn't
2  know the kids so that's why I say that.  And he was on
3  the board.  And I believe he was local to Pottstown.
4  Q.Okay.
5  So you know Mr. Gvodas as a parent of students
6  and on the board at the Hill School from your time ---
7  your second time at the Hill School?
8  A.If I've met him, yes.  I may know the name, if
9  he's the person I'm thinking of, a local veterinarian.
10 Q.Oh, I got it.  You don't actually know him, but
11 you recognize the name?
12 A.No.  I don't.
13 Q.Okay.
14 So you don't even know if you've met him?
15 A.I don't.
16 Q.So you don't --- do you know whether Mr. Gvodas
17 has an opinion of you?
18 A.I don't.
19 Q.Do you have any information about whether Mr.
20 Gvodas received the letters or information about Mr.
21 Poulos's accusations?
22 A.I don't.
23 Q.Do you know Lynne Evans, L-Y-N-N-E, Evans,
24 E-V-A-N-S?
25 A.I do.

Page 209

1  Q.How do you know Lynne Evans?
2  A.She's a former student and was on the board of
3  trustees when I left in 2019.
4  Q.Do you know whether Ms. Evans received the
5  letters or has information or --- I mean let me start
6  again.
7  Do you know whether Ms. Evans received the
8  letters or information about the accusations by Mr.
9  Poulos?
10 A.I don't.
11 Q.Do you know whether Ms. Evans has an opinion of
12 you?
13 A.I do.
14 Q.What is Ms. Evans' opinion of you?
15 A.I can't speak to today, but it was high.
16 Q.When is the last time you had contact with Ms.
17 Evans?
18 A.Probably 2019.
19 Q.Before or after administrative leave?
20 A.It would have been before.
21 Q.And do you have any information that would lead
22 you to believe that Ms. Evans' high opinion of you has
23 changed since 2019?
24 A.I don't, but she would be on the list of people I
25 haven't seen if I was out here because of my not

Matthew B. Ralston
September 20, 2021                                      210 to 213

---

Page 210

1  wanting to have to lie about where I am if she doesn't
2  know.
3  Q.I don't understand.
4  A.I think I said earlier that there are --- my
5  separation from the community has resulted in my not
6  seeing alumni that I know because I would either have
7  to answer their questions with a lie or be misleading.
8  Q.Is it your belief that you're not allowed to tell
9  alumni about your lawsuit?
10  A.It's --- no.
11  Q.So why can't you tell Ms. Evans about your
12  lawsuit?
13  ATTORNEY JUBB:
14  Object to the form.
15  THE WITNESS:
16  I think it's because I can't go into
17  detail.  I don't feel that's appropriate or right to
18  do.  And so I don't --- my relationship with her,
19  while it was good and many others was good, I don't
20  think it's appropriate for me to have those
21  conversations with them or association with them in
22  that way.
23  BY ATTORNEY DOUGHERTY:
24  Q.You understand that the Complaint that you filed
25  is a public document.

---

Page 211

1  Right?
2  A.I do.
3  Q.And I think you have confirmed that you realize
4  that your identity will at least be revealed during
5  trial.
6  Right?
7  A.I have.
8  Q.So I guess I'm confused as to why you don't
9  believe you can give your Complaint or information
10  about your lawsuit to Ms. Evans or another alumni, but
11  you can make it publicly available.  What's the
12  distinction that you're making there?
13  ATTORNEY JUBB:
14  Objection to the form.
15  THE WITNESS:
16  I need to know, I think, more of what
17  you're wanting to hear from me.  Not what you want to
18  hear from me, but what you're asking of me.
19  BY ATTORNEY DOUGHERTY:
20  Q.I guess I don't understand why you can't tell Ms.
21  --- let me start again.
22  Did you consider giving Ms. Evans a copy of one
23  of your Complaints?
24  A.Heavens, no.
25  Q.Why not?

---

Page 212

1  A.Just doesn't feel right.  It is --- it involves
2  ugly allegations.  It involves putting their high
3  school --- making them question that, questions I
4  can't answer and questions they may not feel
5  comfortable asking of the school.  And I just can't
6  lie to them of questions they may ask that I don't
7  think are appropriate to answer.
8  Q.You mean, like are you talking about why you
9  decided to file your lawsuit?
10  ATTORNEY JUBB:
11  Objection to the form.
12  THE WITNESS:
13  I think I'm talking about ---.
14  BY ATTORNEY DOUGHERTY:
15  Q.Well, let me just clarify.  The stuff that you
16  say you think is inappropriate about their high
17  school, you know, to tell certain people, are you
18  talking about, you know, the school's reaction to the
19  accusations, what led you to file your lawsuit?  Is
20  that what you think is not appropriate to tell them?
21  ATTORNEY JUBB:
22  Objection to the form.
23  THE WITNESS:
24  I think it's inappropriate to say to a
25  student that --- excuse me, a member of the alumni

---

Page 213

1  who's a former student who had a good relationship
2  with me and we always enjoyed seeing each other in
3  passing, but I don't have an active and current
4  relationship with them on a regular basis.  I don't
5  feel like it's appropriate to say here's what I was
6  accused of and here's what I've done.
7  BY ATTORNEY DOUGHERTY:
8  Q.I thought you said that you filed the lawsuit
9  because you wanted to get your voice out?
10  ATTORNEY JUBB:
11  Objection to the form.  Are we still
12  doing this again, why did he file the lawsuit?
13  ATTORNEY DOUGHERTY:
14  Please stop.
15  ATTORNEY JUBB:
16  We've got 25 minutes left before this
17  deposition is over.
18  ATTORNEY DOUGHERTY:
19  Please stop.  I wasn't even done with my
20  question.
21  ATTORNEY JUBB:
22  Please note my objection.
23  ATTORNEY DOUGHERTY:
24  So please don't do that again.
25  ATTORNEY JUBB:

---

Matthew B. Ralston
September 20, 2021                          214 to 217

Page 214

1  Please note my objection.
2  BY ATTORNEY DOUGHERTY:
3  Q.I thought that you said that you filed your
4  lawsuit to get your voice out.  So why don't you want
5  to get your voice out to these alumni?  That's what
6  I'm trying to understand.  What is different about
7  these alumni than the rest of the world that you're
8  telling about your lawsuit?
9  ATTORNEY JUBB:
10  Objection to the form.
11  THE WITNESS:
12  The depth of my relationship with them.
13  BY ATTORNEY DOUGHERTY:
14  Q.So as it relates to Ms. Evans, you don't have any
15  information one way or the other about whether she
16  knows about the accusations by Mr. Poulos or the
17  letters.
18  Is that right?
19  A.I do not.
20  Q.And you don't have information one way or the
21  other about whether her high opinion of you has
22  changed.
23  Is that right?
24  A.I don't.
25  Q.Ms. Evans hasn't done or said anything to you to

Page 215

1  lead you to believe that her high opinion of you has
2  changed.
3  Is that right?
4  A.She has not.  I have not seen her.
5  Q.Ms. Evans hasn't done or said anything to you to
6  lead you to believe that she no longer wants to
7  associate with you.
8  Is that right?
9  A.She has not.
10  Q.Do you know Elizabeth Burton?
11  A.Yes.
12  Q.B-U-R-T-O-N?
13  A.I do.
14  Q.How do you know Elizabeth Burton?
15  A.She also, a former student, although I didn't
16  teach her.
17  Q.Do you have any information about whether Ms.
18  Burton received the letters or knows about the
19  accusations by Mr. Poulos?
20  A.I do not.
21  Q.Do you know whether Ms. Burton has an opinion of
22  you?
23  A.I don't.
24  Q.When was the last time you had contact with Ms.
25  Burton?

Page 216

1  A.I don't know.  It would have been on campus
2  possibly when I was back working.  Excuse me, back
3  when I was working '16 to '19.  But I don't recall
4  seeing her.
5  Q.So you have no information one way or the other
6  about Ms. Burton's opinion or whether she is or isn't
7  associating with you.
8  Is that right?
9  A.That's correct.
10  Q.Is it --- just going back to Ms. Evans for a
11  second.  I think you said that you were concerned that
12  you would have to lie or not be completely truthful if
13  you saw her.  What would you have to lie about?
14  A.I think I added or had in that answer as well is
15  the position it puts the kids in with the school.  I
16  can't be misleading in why I'm there.  They can have
17  questions about the school.  I don't think it's
18  appropriate for me to put them in that position, as
19  well as not feeling it's appropriate to talk about
20  what I've been accused of.
21  Q.So, like, a lie of omission type of thing?  Like,
22  you wouldn't be able to give them full information?
23  A.Yes.
24  Q.Full information ---?
25  A.Or misleading.

Page 217

1  Q.Both.
2  Peter Benedict, do you know Peter Benedict,
3  B-E-N-E-D-I-C-T?
4  A.We met years ago before --- while I was a
5  teacher.  He's also an alumnus.
6  Q.When was the last time you had contact with Mr.
7  Benedict?
8  A.It would have been before 2009.  He was a
9  commencement speaker one year.  I don't recall any
10  contact with him during, but that would have been
11  where I met him, if I did.
12  Q.Do you know whether Mr. Benedict received the
13  letters or any information regarding Mr. Poulos's
14  accusations?
15  A.I don't.
16  Q.Do you know whether Mr. --- do you know whether
17  Mr. Benedict has an opinion of you?
18  A.I don't.
19  Q.Do you know Matthew Bates?  B-A-T-E-S?
20  A.I do.
21  Q.How do you know Matthew Bates?
22  A.He also was a student.  I didn't teach him.  He
23  had a younger brother, sibling, who did live in our
24  dormitory.  I did not have a close relationship with
25  Matt when he was in school.  I did his brother.

Matthew B. Ralston
September 20, 2021                                    218 to 221

Page 218

1  Q.When was the last time you had contact with
2  Matthew Bates?
3  A.I don't know.  Again, if I saw him when I was
4  back between '16 and '19, it would have been in
5  passing on campus and we would have said hello and had
6  a quick conversation.  Beyond that, I don't remember.
7  Q.Do you know whether Mr. Bates has an opinion of
8  you?
9  A.I don't.
10 Q.Do you know whether Mr. Bates has any information
11 regarding the accusations by Mr. Poulos or the
12 letters?
13 A.I don't.
14 Q.You mentioned that Matthew Bates has a brother
15 that you knew better?
16 A.I did.
17 Q.What is Matthew Bates' brother's name?
18 A.Ryan.
19 Q.Are you still in contact with Ryan Bates?
20 A.No.
21 Q.When was the last time you had contact with Ryan
22 Bates?
23 A.Probably at a wedding.  And I can't even tell you
24 whose.  I can't tell you whose wedding, but I have a
25 recollection of seeing him at a wedding under a tent.

Page 219

1  But, again, that would have been well before 2019 or
2  2018.  2016, even.
3  Q.Do you know Kent Andres, A-N-D-R-E-S?
4  A.I do.
5  Q.How do you know Kent Andres?
6  A.He was a former student of mine.  I did teach
7  Kent.  He is a younger brother of a student ---
8  younger brother of a student who graduated in the
9  early '90s, and the older brother of a young woman who
10 graduated in the early 2000s.  He was a donor assigned
11 to me at his request when I returned to the school in
12 2016.
13 Q.Do you know whether Mr. Andres --- well, let me
14 start again.
15 When was the last time you had contact with Mr.
16 Andres?
17 A.Probably 2019.
18 Q.Before or after your leave?
19 A.Before.
20 Q.Do you know whether Mr. Andres has any
21 information regarding the letters or accusations by
22 Mr. Poulos?
23 A.I don't.
24 Q.Do you know whether Mr. Andres has an opinion of
25 you?

Page 220

1  A.I know he did.  Assuming he doesn't know, he
2  still would.
3  Q.Okay.
4  And so what --- what is your understanding of Mr.
5  Andre's opinion of you?
6  A.Very high.
7  Q.You just haven't had contact with Mr. Andres
8  since your leave.
9  Is that right?
10 A.That's correct.
11 Q.But you had contact with Mr. Andres after the
12 April or December 2018 letters.
13 Is that right?
14 A.I did.
15 Q.So you have no information one way or the other
16 to know whether Mr. Andres' high opinion of you has
17 changed.
18 Is that right?
19 A.Did you ask if I've had contact with him since my
20 leave?
21 Q.Yeah, and you said no.
22 A.And I need to change that.  I have.  The school
23 changed its logo and I can't tell you when but it was
24 after my leave started.  He sent me a text message
25 asking me about the change in logo because it was not

Page 221

1  a very popular change among some of the older alumni
2  that I know from my time.  And I referred him to Geoff
3  Neese, and that was the last contact we had.
4  Q.Okay.
5  So you don't have any reason to believe or
6  information that Mr. Andres' very high opinion of you
7  has changed.
8  Is that right?
9  A.I don't.
10 Q.Do you know Lance Whitlock?
11 A.Yes.
12 Q.How do you know Lance Whitlock?
13 A.He was also --- is also a former student.
14 Q.When was the last time you had contact with Lance
15 Whitlock?
16 A.Maybe when he graduated.
17 Q.In the '90s?
18 A.Yes.
19 Q.How about Ben Walborn, W-A-L-B-O-R-N?  Do you
20 know Ben Walborn?
21 A.I do.
22 Q.How do you know Ben Walborn?
23 A.He's the youngest of three brothers who attended
24 the school and part of a family that I've stayed in
25 close contact with since.

Matthew B. Ralston
September 20, 2021                                    222 to 225

---

Page 222

1  Q.When is the last time you had contact with Ben
2  Walborn?
3  A.I saw Ben --- it's been a few weeks ago.  He's a
4  Navy pilot.  And Mary Beth and I went to a show which
5  he was flying in.
6  Q.Do you know whether Mr. Walborn knows about the
7  accusations by Mr. Poulos?
8  A.I know he does.
9  Q.Do you know how Mr. Walborn learned about the
10 accusations by Mr. Poulos?
11 A.Let me rephrase that.  I know he knows that I'm
12 no longer at the school and that I'm involved in a
13 lawsuit that I filed.  I don't know beyond that.
14 Q.Is that information that you told Mr. Walborn?
15 A.It is.
16 Q.When did you tell Mr. Walborn that you were no
17 longer at the school and involved in a lawsuit that
18 you filed?
19 A.It was well after the lawsuit was filed and I was
20 no longer at the school.
21 Q.Do you know whether Mr. Walborn has an opinion of
22 you?
23 A.I do.
24 Q.Do you know what Mr. Walborn's opinion is?
25 A.It's very high.

---

Page 223

1  Q.And nothing --- Mr. Walborn's opinion of you
2  hasn't changed, as far as you know, since he learned
3  about --- learned that you're no longer at the school
4  and you're involved in a lawsuit.
5  Correct?
6  A.It has not changed.
7  Q.Did you give Mr. Walborn any information about
8  the nature of your lawsuit?
9  A.I think when I've shared it with people in that
10 way, it is some accusations were filed against me and
11 they're of the most heinous thing a teacher could do
12 with a student, and I've left it at that.
13 Q.Okay.
14 So you gave a description along those lines to
15 Mr. Walborn?
16 A.Yes.
17 Q.So he has some idea that a student accused you of
18 heinous activity or very bad activity?
19 A.That's what I shared with him, yes.
20 Q.Okay.
21 And Mr. Walborn's opinion of you hasn't changed
22 since you shared that information?
23 A.It has not.
24 Q.And Mr. Walborn hasn't stopped associating with
25 you?

---

Page 224

1  A.He has not.
2  Q.Do you know F. Christopher Chireleison?
3  A.I do.
4  Q.C-H-I-R-E-L-E-I-S-O-N.  How do you know Mr.
5  Chireleison?
6  A.He ---.
7  Q.I hope I said that right.
8  A.You did.  He's also an alumnus of the school and
9  was teaching at the school when we arrived in 1992.
10 We worked closely together.  I can't tell you exactly
11 what years he was a dean of students.  He left the
12 school in 1997 --- at the end of the 1997 school year.
13 We've remained in close contact with each other since
14 and we're very good friends.
15 Q.You told Mr. Chireleison about the accusations by
16 Mr. Poulos.
17 Is that right?
18 A.I did, yes.  Yeah, he's the one I discussed last
19 time.
20 Q.And Christopher Hopkins, he's your friend.
21 Right?
22 A.He is.
23 Q.And you told Mr. Hopkins about the accusations by
24 Mr. Poulos.
25 Is that right?

---

Page 225

1  A.I did.
2  Q.You identified a gentleman Faizeen Khandker.
3  A.Khandker (corrects pronunciation.)
4  Q.Khandker.  Okay.
5  Do you have any --- can you --- do you know how
6  to spell his last name?
7  A.K-H-A-N --- I think it's K-E-R.  Pretty sure it's
8  E, not an A at the end.
9  Q.Do you have any --- you don't have to give it to
10 me right now, but do you have contact information for
11 Mr. Khandker?
12 A.I think so.  Khandker (corrects pronunciation).
13 Q.Khandker.  Okay.
14 So is that something that you can share with your
15 lawyer?  We're trying to locate him.
16 A.If I still have it, yes.
17 Q.I know you might not know it off the top of your
18 head.
19 A.I don't.
20 Q.There were a number of board members that you
21 identified in your party of depositions.  Hans Maentz?
22 A.Maentz (corrects pronunciation).
23 Q.Maentz, M-A-E-N-T-Z.  Douglas Brody, Shelly
24 Gyves, G-Y --- G-V-Y-E-S.  I might be saying that
25 wrong.

---

Matthew B. Ralston
September 20, 2021                                    226 to 229

Page 226

1  A.I think it's G-Y-V-E-S.
2  Q.G-Y-V-E-S.  Okay.
3  And Madison Benadum.
4  A.Madison what?
5  Q.Benadum, B-E-N-A ---.
6  A.Should be B-Y-R-N-E-S.
7  Q.B-Y-R-N-E-S.
8  A.Yes, she's gotten married.
9  Q.Byrnes?
10 A.Byrnes, yes.
11 Q.Madison Byrnes, okay.  So Hans Maentz, Douglas
12 Brody, Shelly Gyves, Madison Byrnes.
13 Do I have that right now?
14 A.Yes.
15 Q.Okay.
16 And I think you --- your belief that these
17 specific --- these five board members knew about the
18 letters or the accusations by Mr. Poulos was an
19 assumption that they had received the letters from,
20 you know, Mr. Rees or someone else because they were
21 board members.
22 Is that right?
23 A.Yes.
24 Q.And if Mr. Rees or someone from the school ---
25 well, let me start again.

Page 227

1  If someone from the school or a lawyer for the
2  school confirmed for you that Mr. Maentz, Mr. Brody,
3  Ms. Gyves and Ms. Byrnes did not receive the letters
4  from Mr. Lehman or from Mr. Rees, then would you
5  accept that representation?
6  ATTORNEY JUBB:
7  I'll object to the form.  You can
8  answer.
9  THE WITNESS:
10 In all but one case.
11 BY ATTORNEY DOUGHERTY:
12 Q.Which one?
13 A.Shelly Gyves.  I don't know what the --- enough
14 to know what committees the others are on.  I know
15 she's a member of the legal committee.
16 Q.Okay.
17 So you dispute --- you think that Shelly Gyves
18 was part of --- let me start.
19 You believe that Shelly Gyves was part of a legal
20 committee in 2018?
21 A.Yes.
22 Q.Okay.
23 Thank you.
24 A.I can't tell you if she was on that committee,
25 but it's what fits.

Page 228

1  Q.Okay.
2  But you would accept it as it relates to Mr.
3  Maentz, Mr. Brody, and Ms. Byrnes.
4  Right?
5  A.Yes.  I would question if the whole board doesn't
6  know, but I would accept that Mr. Rees is being
7  honest.
8  Q.Now, you --- well, I'm going to rip this off.
9  Let me just finish this one.
10 Do you happen to know whether the independent
11 investigators from Cozen O'Connor, Ms. Gomez and Ms.
12 Smith, requested a statement from you?
13 A.I don't remember.  I don't --- if they did, I
14 don't remember.  And if I wrote one, I don't remember.
15 I just ---.
16 Q.I'm sorry.
17 A.Yeah.
18 Q.I'm just trying to ---.
19 Well, obviously, we don't need to see them.  So
20 as part of this litigation, you've produced through
21 your lawyer an exhibit that's been called P-8 that is
22 a compilation of a number of cards and letters that,
23 as I understand it, your former students have written
24 to you.
25 Do you know what I'm talking about?

Page 229

1  A.Yes.
2  Q.I want to know if any of the students who
3  authored the cards or letters that you compiled and
4  that your --- and through your attorney have now
5  produced as P-8 are former students who are aware of
6  the accusations by Mr. Poulos?
7  A.I'd have to see the list.
8  Q.Okay.
9  A.I hope it's not all the list.
10 ATTORNEY JUBB:
11 To make sure you have enough time, I
12 will off the record, not in this deposition, get him
13 to answer an Interrogatory to all those saying who was
14 or who wasn't, just to save you some time --- this
15 exercise right now.
16 ATTORNEY DOUGHERTY:
17 Okay.
18 I mean, ---.
19 ATTORNEY JUBB:
20 Because I have a belief what it is, and
21 I think he does too, but the exercise itself might
22 just take too long.  And I think you'd rather ask
23 other questions.
24 ATTORNEY DOUGHERTY:
25 That's fine.

Matthew B. Ralston
September 20, 2021                    230 to 233

Page 230

1  ATTORNEY JUBB:
2  But I can get you that information after
3  this is over.
4  ATTORNEY DOUGHERTY:
5  We were okay with, I think, the
6  stipulation but if there's anybody that the answer is
7  yes, I want to have the answers to the questions that
8  I've been asking, what their --- if they have an
9  opinion ---
10  ATTORNEY JUBB:
11  Sure.
12  ATTORNEY DOUGHERTY:
13  --- whether it's changed.
14  ATTORNEY JUBB:
15  If you make us up an interrogatory ---
16  ATTORNEY DOUGHERTY:
17  That's what I'm doing within the
18  deposition.
19  ATTORNEY JUBB:
20  --- that has the subparts to it, I'm
21  happy to do it, to answer that question pertaining to
22  P-8.
23                    ---
24  (Whereupon, Defendant's Exhibit 28,
25  9/4/15 Medical Office Note, was marked

Page 231

1  for identification.)
2                    ---
3  BY ATTORNEY DOUGHERTY:
4  Q.I'm showing you documents that are marked as D-
5  28.  They say P-40.177 to P-40.184, and also March,
6  underscore, 177, March, underscore, 184.
7  Have you ever seen the documents that I have
8  marked as part of D-28 before I handed them to you
9  today?
10  A.No.
11  Q.Is Nathan E. March a doctor who has treated you?
12  A.Yes.
13  Q.Did Doctor March treat you for mood issues in
14  2015?
15  A.No, I don't think so.
16  Q.I'll just direct your attention to the first page
17  of D-28.  Under reasons for visit, it says
18  preventative exam, skin spots, mood issues.  Do you
19  have any idea what that refers to?  I'll direct your
20  attention to higher up on the page.  It says September
21  4, 2015, if that helps.
22  I realize you didn't write that, but I didn't
23  know --- I just want to know if you know what he's
24  referring to?
25  ATTORNEY JUBB:

Page 232

1  Where's mood disorders?
2  THE WITNESS:
3  No, mood issues.  It's at the top.
4  ATTORNEY JUBB:
5  Oh, oh, oh.
6  BY ATTORNEY DOUGHERTY:
7  Q.Okay.
8  Why don't we go --- I'm just going to keep this
9  moving along.
10  A.Go ahead.
11  Q.Why don't you just go to four pages in to 180 on
12  the bottom?  It says history of present illness.  Do
13  you see that?  I'm showing it towards the top.  This
14  58-year-old man presents ---.
15  ATTORNEY JUBB:
16  Do you care if I help him?
17  ATTORNEY DOUGHERTY:
18  No.  It's okay.
19  BY ATTORNEY DOUGHERTY:
20  Q.Are you there?
21  A.Yes.
22  Q.Now, go to number three.
23  A.Okay.
24  Q.Look down, it says mood issues.  Struggling with
25  the start of school, doesn't feel prepared, wife still

Page 233

1  in Ohio, feeling lonely, lacking the satisfaction of
2  starting a new year, looking for some meaning, not
3  really engaging in the hobbies he used to, not
4  sleeping well.
5  A.Okay.
6  Q.I realize that those are not your comments, but
7  they're Doctor March's comments about preventative
8  medicine during a visit on September 4th, 2015.
9  Now that I read those notes to you, do you ---
10  does that refresh your recollection about any
11  treatment you received in September 2015 for mood
12  issues?
13  A.Certainly would have been a conversation we had.
14  I don't think I ever considered it a mood issue.
15  Do you want more?
16  Q.Well, did you discuss more with Doctor March than
17  what he wrote down there?
18  A.I'm sure I probably did.
19  Q.Did Mr. --- or excuse me.  Did Doctor March refer
20  you to another doctor for counseling or treatment or
21  prescribe any medication or did you return to see
22  Doctor March about the same issue?
23  A.He did not refer any of those or make those
24  recommendations.  We talked about it.  It was the
25  school, the Leelanau School was a piece of that

Matthew B. Ralston
September 20, 2021                          234 to 237

Page 234

1  puzzle.  It was pretty significant at that time.  And
2  the feeling lonely because Marybeth was in Ohio and
3  things were --- there were financial pressures on the
4  school at that point.  That all sounds like something
5  I would have said to him.
6  Q.I mean, I'm sorry.
7  A.Go ahead.
8  Q.What do you mean by the Leelanau School is a part
9  of that?
10  A.We were in financial forbearance.  And the
11  deadline was approaching I think in October.  School
12  starts in September.  And at that point, we had not
13  found an answer to refinance our debt that was more
14  traditional.
15  Q.So did you leave Leelanau School because of the
16  financial issues that Leelanau School was
17  experiencing?
18  A.No.  In fact, resolving those issues were one of
19  the things that made it seem like a time --- an okay
20  time for me to leave.
21  Q.So your wife lived in Ohio for the entire time
22  you were at the Leelanau School?
23  A.No.  She would --- at that point in '15, she'd
24  been there two or three years for the most part, and
25  would come to school for special occasions or if our

Page 235

1  kids were up visiting.  But she did not live on campus
2  full time.
3  Q.Is there some reason that you and your wife were
4  not living together in 2015?
5  A.We had not formally separated.  We weren't living
6  together, and I guess technically separated because
7  she's a city girl.  It's a rural school.  It was
8  isolated and unhappy, and I was pretty consumed with
9  the situation at the school.  And we decided that was
10  the best answer at the time.
11  Q.When did you separate?
12  A.Probably 2013.
13  Q.And did you reconcile?
14  A.Yes.
15  Q.When did you reconcile?
16  A.After I left the school.  So sometime after the
17  start of 2016.
18  Q.So after you were back at the Hill School or
19  before you started again at the Hill School?
20  A.I hadn't quite left Leelanau at that point, but
21  pretty close.
22  Q.Did you receive any treatment for your --- for
23  mood issues in 2015?
24  A.No.
25  Q.How about any time when you were separated from

Page 236

1  your wife, 2013 to 2016?  You receive counseling or
2  treatment?
3  A.No.
4  Q.Did any of your doctors refer you to receive
5  mental health services, counseling, treatment that you
6  did not accept during that period of time, 2013 to
7  2016?
8  A.I don't believe so, no.  Doctor March referred a
9  book to me.
10  Q.What book was that?
11  A.It's called First Things First.  The author's
12  name is Covey, I believe, C-O-V-E-Y.
13  Q.What type of book was that?
14  A.I don't know if you'd call it self-help or
15  setting priorities.  First Things First was about just
16  to get clear what I need to accomplish and accomplish
17  it.
18                      ---
19  (Whereupon, Defendant's Exhibit 29,
20  2/4/16 Medical Office Note, was marked
21  for identification.)
22                      ---
23  BY ATTORNEY DOUGHERTY:
24  Q.This is D-29.  I'm showing you documents that
25  I've marked as D-29.  On the bottom right, they say P-

Page 237

1  40.165 to P-40.172, and also March, underscore, 165
2  and March, underscore, 172.
3  A.Okay.
4  Q.Have you seen the documents that I've marked as
5  D-29 before I handed them to you today?
6  A.No.
7  Q.Again, I'll just direct your attention on the
8  first page.  See where it says patient plan for
9  February 4th, 2016.  And in the middle of the page, it
10  says reasons for visit, hypertension, comma, anxiety.
11  Do you see that?
12  A.I do.
13  Q.Did you receive treatment from Doctor March in
14  February 2016 for anxiety?
15  A.I would have seen him.  I don't believe I've ever
16  used the word anxiety.  I could have used the word
17  anxious, but to me, they're different.
18  Q.If you can go to page 168.  It's four pages in
19  again.  It's similar.  This 58-year-old male presents
20  for hypertension and anxiety.  And then underneath of
21  history of present illness, do you see, there's
22  hypertension and then number two, anxiety?
23  Do you see that?
24  A.Yes.
25  Q.Okay.

Matthew B. Ralston
September 20, 2021                                    238 to 241

Page 238

1  And so Doctor March wrote this is an initial
2  visit.  The patient reports functioning is somewhat
3  difficult.  The patient presents with anxious, slash,
4  fearful thoughts and excessive worry, but denies
5  depressed mood, difficulty concentrating, difficulty
6  falling asleep, difficulty staying asleep, diminished
7  interest or pleasure, fatigue, loss of appetite,
8  paranoia, poor judgment, racing thoughts, or
9  restlessness.
10  Patient's risk factors include financial worries
11  and unemployment.  The patient's risk factors include
12  chronic illness and relationship problems.  The
13  anxiety is aggravated by conflict or stress.  Anxiety
14  is associated with irritability.  The patient denies
15  any headache.
16  Do you recall going to see Doctor Marsh or I'm
17  sorry, March ---
18  A.March.
19  Q.--- in February of 2016, for treatment for the
20  issues that I've just read to you from Doctor March's
21  notes?
22  A.I do.
23  Q.What were the circumstances that brought you to
24  Doctor March for treatment in February of 2016?
25  A.I don't recall why I went in to see him.  It very

Page 239

1  well could have been.  I don't think I ever had ---
2  what was the phrase, a financial anxiety associated
3  with --- where's it talk about worry about money?
4  Q.Okay.
5  Well, let's start with patient reports
6  functioning is somewhat difficult.
7  Do you know what that is?  What was difficult?
8  A.Sure.
9  At that point, I had submitted my resignation
10  letter.  We had a new board of trustees, we being the
11  Leelanau School.
12  Q.Leelanau.  Okay.
13  A.It was my --- it was my view that the new board
14  was overstepping its bounds.  In March of that month
15  or of that year we were to go through an accreditation
16  screening or visit from educators from other
17  Midwestern schools, and I was concerned that the board
18  overstepping its bounds would impact that.  And I had
19  submitted my resignation primarily with the
20  understanding, belief, that we would successfully
21  complete our accreditation.  We had secured the
22  financing, and it seemed like a good, stable time for
23  me to be able to move on.
24  Q.Okay.
25  So functioning was somewhat difficult because of

Page 240

1  the situation with the board at Leelanau?
2  A.Yes.
3  Q.And it says patient presents with anxious,
4  fearful thoughts and excessive worry.  What were your
5  anxious, fearful thoughts and excessive worry about?
6  A.Being able to manage the situation at the school
7  without getting in the way.
8  Q.Okay.
9  And it says, okay, patient's risk factors include
10  financial worries and unemployment.  And you dispute
11  that?  Is that what you were talking about?
12  A.Yes, it is.  Where is --- oh, patient's risk
13  factors include financial worries and unemployment.
14  That doesn't --- I probably told him I didn't have a
15  job lined up and I knew I'd resigned.  But I'm not one
16  who's ever worried that a job would come through, so I
17  don't recall saying that.
18  Q.Okay.
19  Did you receive any treatment from Doctor March,
20  like, a referral to another doctor, counseling,
21  medication?
22  A.No.  That was a time when we talked about things
23  to do and his response to me often is you know what
24  you need to do and suggested I do that.
25  Q.What?  What is it that you know you need to do?

Page 241

1  A.Exercise more, eat better, drink less, exercise
2  judgment on things I think should be priorities and
3  not to bother myself with the other stuff.  He said
4  there are meds if you want some, and I told him I
5  didn't.  And that's what I recall from then.
6  Q.You said to drink less.  Are you talking about
7  alcohol?
8  A.Yes.
9  Q.Do you drink alcohol?
10  A.I do.
11  Q.Do you drink a lot of alcohol?
12  A.No.
13  Q.How much alcohol do you consume on a daily basis?
14  A.Less than a drink on a daily basis.  Never more
15  than two.
16  Q.Do you drink an alcoholic beverage at least once
17  a day?
18  A.No.
19  Q.No?  How much alcohol do you drink in a day?
20  A.I think I said I don't drink every day.
21  Q.You don't drink every day, okay.
22  A.I thought that's what you asked me.
23  Q.Are there particular days that you drink?
24  A.No.  If I'm out to dinner or with some friends, I
25  will.

Matthew B. Ralston
September 20, 2021
242 to 245

Page 242

1  Q.What, if you know, was the context in which the
2  doctor told you to drink less?
3  A.I think the context was I told him I was drinking
4  more, and I knew I was drinking more than I thought
5  was healthy.
6  Q.Oh, so in February 2016, you were drinking more
7  alcohol than you thought was healthy?
8  A.Yes.
9  Q.How much were you drinking in February 2016 that
10 you thought was unhealthy?
11 A.I can't answer that except that I would have
12 drinks alone.  I was living alone at that time.
13 Q.Did you drink alone every day?
14 A.Did I?
15 Q.Yeah.
16 A.I doubt it was --- no, not every day.  But I
17 would drink alone more frequently than I would
18 consider healthy.
19 Q.What --- is there a particular type of alcoholic
20 beverage that you were drinking?
21 A.No.
22 Q.Do you drink liquor, beer, ---
23 A.Both.
24 Q.--- wine?
25 A.Not wine.

Page 243

1  Q.So how much were you drinking in February 2016
2  that you thought was unhealthy, or was it the drinking
3  alone part?
4  A.Both.  Probably --- I probably had maybe three a
5  day.
6  Q.Three beers or three ---?
7  A.It would be three glasses.  Well, could be beers.
8  It would be whatever drink I was having.
9  Q.And your wife was in Ohio, so you were drinking
10 alone every time you drank.
11 Right?
12 A.Correct.
13 Q.Sometimes did you drink more than three?
14 A.I'm sure.
15 Q.What about --- I mean, we looked at the prior
16 record from the doctor, D-28.  That visit was
17 September 2015?
18 A.Yes.
19 Q.Were you drinking more than you thought was
20 healthy in September of 2015?
21 A.Not --- more than to be physically fit that I was
22 accustomed to, yes.  Not that I don't think that
23 worried me terribly.  I try to be pretty honest when
24 I'm speaking with a doctor, so, you know, if there's
25 an amount down there, that would have been pretty

Page 244

1  accurate.
2  Q.Oh, I see.  You're talking about on the bottom of
3  the first page where the doctor says limit alcohol to
4  two drinks a day?
5  A.Bottom of where?  I'm sorry.
6  Q.On the first page of D-28.  I thought you were
7  looking at that.  I'm sorry.
8  So we are looking at D-28 again.  Do you see next
9  to plan orders on the bottom of the first page?
10 A.Instructions, counseling.
11 Q.Limit alcohol to two ---
12 A.Yes.
13 Q.--- drinks a day?
14 A.I do see that.
15 Q.Okay.
16 So in September 2015, were you drinking more than
17 two drinks a day?
18 A.Yeah, I think I must have been that he wrote ---
19 well, that or I was --- I don't think I was drinking
20 more than two drinks every day.  And I suspect I told
21 him I was drinking more and, you know, some nights it
22 would have been three or so.
23 And I can't tell you what specific numbers are
24 beyond that.
25 Q.Was there some event that you noticed that caused

Page 245

1  you to start drinking more than you thought was
2  healthy, or did it just develop over time?
3  A.I think it was the --- I thought things would
4  improve at the point that I submitted my resignation.
5  And by improve, I mean I would have been stepping out
6  of what felt like a fire, which was keeping the school
7  open and afloat and that I would be able to start
8  settling down and focus on the last six months of
9  being the headmaster.  And when the board and I had
10 our --- when I felt like they were overstepping their
11 bounds and we were moving towards the accreditation
12 visit, I know that I worried about us getting through
13 that as a school and how to manage that.  So that
14 would have been the biggest cause.
15 Q.Okay.
16 So that's --- that's right around this visit,
17 September 4th, 2015.
18 Right?  You're saying the last six months, or did
19 it start sooner?
20 A.September 4th.  And I wasn't drinking nightly at
21 the start of that school year.  Anything I was feeling
22 then was mostly tied to the fact that we were in
23 forbearance which ended in, I believe, it was October.
24 Maybe it was early November, which would have
25 resulted, if we didn't resolve it, in potential

Page 246

1  foreclosure proceedings.
2  Q.Okay.
3  You said, like, it got worse at the --- I thought
4  you said six months to the end or something.  So did I
5  misunderstand?  Can you just --- can you put some
6  dates?  So you say the forbearance was November 2015
7  or October 2015?
8  A.It was longer.  That's when it ended.
9  Q.Okay.
10  A.It was '15.
11  Q.Uh-huh (yes.)
12  A.Are you asking when it started?
13  Q.Yeah.  I want to --- I'm trying to get a handle
14  with an actual, I realize it's an estimate, date of
15  what year you're talking about when you say that
16  the ---
17  A.When I arrived at the school ---.
18  Q.--- drinking became ---
19  A.Sorry.
20  Q.--- your drinking, you know, rose to a point that
21  you believed it was unhealthy?
22  A.When it rose to that level?
23  Q.Yeah.  I asked you if there was some event that
24  triggered it or if it was something that occurred
25  gradually.  And you talked a lot about the --- you

Page 247

1  thought things were going to improve, that things
2  should be settling down because you had stepped down
3  as the headmaster, but there was an issue with the
4  accreditation.  And I thought that you were talking
5  about a six-month period of time.  So I'm just trying
6  to learn, like, where --- what are you talking
7  about ---
8  A.Okay.
9  So let's back up.
10  Q.--- when your drinking got worse or got to a
11  point that you believed was unhealthy?
12  A.Forbearance was to be ended in October or
13  November of 2015.  Opening the school that's facing a
14  foreclosure before Christmas is a pretty hard or
15  pressure-filled task.  That would be what was
16  impacting me at the beginning of the school year.
17  A couple weeks before that ended, we had secured
18  a donation from a past parent that was enough of a
19  payment and a --- to the bank or a bank that we were
20  able to secure traditional financing for the debt.
21  That takes us up into November.
22  The board, part of --- the board was in pretty
23  significant transition.  That's also not necessarily
24  easy.  We got through it.  I felt that being behind
25  the school.  And the accreditation being scheduled for

Page 248

1  March of 2016, that I really had every belief that the
2  school would get through and be fully accredited for
3  another seven years.  It's why it seemed like an
4  appropriate time, stable enough time, for me to step
5  away from the school and somebody else take the helm.
6  At some point in there, I felt like the board was
7  overstepping their bounds, and that would have ---
8  that is what caused me concern going into the
9  accreditation.  And not being accredited, if you're a
10  school, is a big deal.
11  Q.Uh-huh (yes.)
12  A.People don't want to spend $60,000 for a place
13  that's not accredited.
14  Q.And so this --- these are the events that caused
15  you to drink to a point that you believe to be
16  unhealthy, the opening a ---
17  A.Yes.
18  Q.--- school that was facing, you know,
19  foreclosure?  The forbearance was an expiring
20  forbearance.  Then issues with the board and
21  potentially not being accredited.
22  Right?
23  A.Yep.  Yes.  Sorry.
24  ATTORNEY DOUGHERTY:
25  All right.

Page 249

1  I wanted to ask Mr. Ralston about his
2  prior --- about his résumé and his prior experience,
3  and I believe it will be quick questioning.  I know he
4  has to leave and I believe that Mr. Poulso wants to
5  ask a couple of questions.  So if it's okay with you,
6  I'm willing to cede to Mr. Poulos to let him ask his
7  questions and perhaps we can finish up with my past-
8  employment related questions on a different day.  And
9  then I'll be able to narrow them down because I know I
10  asked some of them before and I'm going to have to
11  compare them --- compare my notes.
12  ATTORNEY JUBB:
13  Why don't we let Poulos go, but I'm not
14  going to have him come back for another deposition.
15  ATTORNEY DOUGHERTY:
16  Well, I wasn't expecting him to come
17  back.  We could just finish up on the telephone or
18  Zoom.
19  ATTORNEY JUBB:
20  Let's see what you have because it's a
21  résumé so we've had that for quite some time.  But
22  let's see what Poulos has to say.
23  ATTORNEY DOUGHERTY:
24  Okay.
25  Mr. Poulos?

Page 250

1  MR. POULOS:
2  I'm here.
3  ATTORNEY DOUGHERTY:
4  Okay.
5  You can ask questions.
6  THE WITNESS:
7  I'm not going to be able to hear.
8  MR. POULOS:
9  I only have about 15 or 20 questions and
10 they're basically all yes and no.
11 ATTORNEY DOUGHERTY:
12 Can you hear him okay?  All right.
13 One second.  We're making it louder.
14 MR. POULOS:
15 Sorry.  I'm using a headset.
16                    ---
17 (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
18                    ---
19                 EXAMINATION
20                    ---
21 BY MR. POULOS:
22 Q.First question.  You're listed as the owner of a
23 residence located at 2000 --- or 20654 Lake Ann,
24 Michigan.
25 Is that where you reside currently?

Page 251

1  A.My current residence is in Columbus, Ohio,
2  Dublin, Ohio.  And we do own that home, yes.
3  Q.Okay.
4  And why is or who is Amy L. Powell and why is she
5  listed as a resident at these addresses?
6  ATTORNEY JUBB:
7  Objection to the form.  You can answer.
8  THE WITNESS:
9  I don't know why she's listed as a
10 resident of Nofsger Road in Lake Ann, but she was as
11 previous owner of the home.
12 BY MR. POULOS:
13 Q.Okay.
14 So current records aren't reflective of the
15 current situation?
16 ATTORNEY JUBB:
17 Objection to the form.  I think you just
18 has to establish he even knows what records you're
19 referring to.  So I'm not even sure that's a question.
20 So maybe just move on to the next one.
21 BY MR. POULOS:
22 Q.So current property records that I obtained show
23 that she is listed at both residences.  Why is that?
24 ATTORNEY JUBB:
25 I'll object to the form and as to your

Page 252

1  representation.  Go ahead.
2  THE WITNESS:
3  I have no idea what you're referring to.
4  Amy Powell has never had a stake to the Dublin, Ohio
5  address, and she was the previous owner of the Lake
6  Ann property.  And she does not reside there.
7  BY MR. POULOS:
8  Q.Are you and Mary Beth still married?
9  A.We are.
10 Q.How much money have you paid the Beasley Firm to
11 represent you in this case?
12 A.I've not paid anything.
13 Q.Is there any other person or entity contributing
14 money or resources to the prosecution of this
15 litigation?
16 A.No.
17 ATTORNEY JUBB:
18 Are you still there?
19 MR. POULOS:
20 Yeah, I'm still here.  I asked a
21 question.  I'm waiting for a response.
22 THE WITNESS:
23 I said no.
24 ATTORNEY JUBB:
25 He answered the response.  Next

Page 253

1  question.
2  BY MR. POULOS:
3  Q.So where are the funds coming from to pay for
4  your legal agreement with Lane Jubb?
5  ATTORNEY JUBB:
6  You don't have to answer that question.
7  Next question.  And I would direct your
8  attention to our previous responses to
9  Interrogatories.
10 MR. POULOS:
11 Lane, stop interrupting me.  I've asked
12 this on multiple occasions.
13 ATTORNEY JUBB:
14 You've gotten an answer.  I am
15 interrupting you because time is valuable to everybody
16 else here.  Okay.
17 We are not going to go over questions
18 that don't matter and you already have an answer to.
19 COURT REPORTER:
20 Excuse me.  This is the court reporter.
21 I can only take down one person.
22 MR. POULOS:
23 No, you have never answered that
24 question.
25 ATTORNEY DOUGHERTY:

Matthew B. Ralston
September 20, 2021                    254 to 257

Page 254

1  Mr. Poulos, hold on.  The court reporter
2  can't take down ---.
3  MR. POULOS:
4  Who is paying his attorney fees?
5  ATTORNEY JUBB:
6  Mr. Poulos, this question was already
7  answered and I can forward you the Interrogatories to
8  this already.  Move on.
9  MR. POULOS:
10 You've never answered that question.
11 ATTORNEY JUBB:
12 Your deposition questioning is about to
13 end.
14 ATTORNEY DOUGHERTY:
15 Mr. Poulos, hold on a second.
16 MR. POULOS:
17 And now you're interrupting me again.
18 ATTORNEY DOUGHERTY:
19 That was me, Mr. Poulos, Candy.
20 Mr. Ralston, have you paid any amount of
21 money to the Beasley Firm?
22 THE WITNESS:
23 No.
24 ATTORNEY DOUGHERTY:
25 Mr. Poulos, does that satisfy your

Page 255

1  question?  Did you hear his answer?
2  MR. POULOS:
3  I would agree, but I still want to see
4  the attorney/client fee agreement.
5  ATTORNEY JUBB:
6  Then you should make a request for
7  production under the rules, and I've already responded
8  to that.  Move on.
9  MR. POULOS:
10 I have and you've denied it.
11 ATTORNEY DOUGHERTY:
12 Mr. Poulos ---.
13 ATTORNEY JUBB:
14 Ms. Dougherty's time is also valuable
15 and I'm going to refer back to her if you do not have
16 another discoverable question.
17 MR. POULOS:
18 Oh, no.  I have more questions.  Don't
19 worry about it.
20 ATTORNEY JUBB:
21 Then I suggest you move along.
22 BY MR. POULOS:
23 Q.Parents weekend ---.
24 MR. POULOS:
25 And you've just interrupted me again.

Page 256

1  BY MR. POULOS:
2  Q.Parents weekend, my sixth form year, you took it
3  upon yourself to park your Subaru behind my Camaro.
4  Were you in a position of disciplinary action to do
5  such a thing?
6  A.I was in a position of maintaining discipline and
7  school rules within our dormitory.
8  Q.Were you aware that I had permission to use my
9  vehicle to take care of my mother while she was
10 visiting for parents weekend?
11 ATTORNEY JUBB:
12 I'll object to the lack of foundation in
13 the question.  You can answer if you can.
14 THE WITNESS:
15 What I know is if it was parents weekend
16 and you had permission to have a car on campus, I
17 would have known from the school, from the dean's
18 office because any permissions that were outside
19 school rules during parents weekend were clearly
20 established in the dean's office and shared with
21 appropriate dorm parents.
22 BY MR. POULOS:
23 Q.Follow-up question then.  Were you my dorm parent
24 or my hall master or was it Mr. Romero who did have a
25 copy of my permission slip?

Page 257

1  A.I don't know which hall you lived on in Rolfe
2  dormitory.  I was a house parent, dorm parent in
3  Rolfe.  And every faculty member would have had that
4  list, not just one person.
5  Q.Correct me if I'm wrong.  You weren't a dorm
6  parent my sixth form year.  You lived in the
7  subbasement apartment below the dormitory?
8  A.I will correct you because you're wrong.  We
9  lived in the apartment adjacent to the Romeros.  We
10 did not live in a subbasement apartment.
11 Q.Fair enough.
12 Why did you leave your headmaster position?
13 ATTORNEY JUBB:
14 Asked and answered.  Can you --- can we
15 just direct you to his last testimony from Ms.
16 Dougherty that we've gone over in his prior deposition
17 and this one please?  We'll copy and paste his
18 testimony into an Interrogatory for you.  Next
19 question.
20 MR. POULOS:
21  I would appreciate that.
22 BY MR. POULOS:
23 Q.I have a few more last questions.  Are you aware
24 that the Hill School asked for students to come
25 forward to counsel about past abuse and offered

Matthew B. Ralston
September 20, 2021                                    258 to 261

Page 258

1  confidentiality?
2  ATTORNEY JUBB:
3  Objection to the form.  You can answer.
4  THE WITNESS:
5  Yes.
6  BY MR. POULOS:
7  Q.Unbelievable.  Did you know that the two women
8  classified as counselors were actually attorneys in
9  those letters?
10  ATTORNEY JUBB:
11  Objection to the form.  You can answer.
12  THE WITNESS:
13  Yes.
14  BY MR. POULOS:
15  Q.Do you not find that deceiving by the Hill
16  School?
17  ATTORNEY JUBB:
18  Objection to the form.  You can answer.
19  THE WITNESS:
20  My understanding is that third party
21  investigations are typically run or handled by
22  attorneys.
23  BY MR. POULOS:
24  Q.Again, were they represented as counsel or
25  counselors to help previous students get the help they

Page 259

1  needed to get through these types of situations?
2  ATTORNEY JUBB:
3  Objection to the form.
4  THE WITNESS:
5  I have no idea how they were represented
6  to alumni.
7  ATTORNEY DOUGHERTY:
8  Mr. Poulos, would you like Mr. Ralston
9  to look at the letter?
10  BY MR. POULOS:
11  Q.Have you seen the copies of the letter that came
12  out from the school?
13  A.I'm sorry.  You have to repeat that.
14  Q.Have you seen the original copies dated from 2016
15  and 2017 that came out to previous alumni?
16  A.Yes.
17  Q.Do you remember what it said?
18  ATTORNEY JUBB:
19  Ms. Dougherty is going to show him a
20  copy of D-1, which, I believe, is the November 2017
21  email.  So why don't you --- is there something
22  specific you want to ask as opposed to do you remember
23  what it said because it's in front of him right now?
24  ATTORNEY DOUGHERTY:
25  It's the November 20, 2017 email from

Page 260

1  Mr. Lehman.  It's part of D-1.  Do you want to tell
2  him to look at a specific place?
3  MR. POULOS:
4  I believe it's the second paragraph
5  midway through when they state themselves as
6  counselors, not as counsel.
7  ATTORNEY JUBB:
8  Mr. Poulos, may I please direct the
9  witness to where I think you might be referring?
10  THE WITNESS:
11  It doesn't say counselors.
12  ATTORNEY JUBB:
13  Just answer his question then.
14  THE WITNESS:
15  Ask your question again.
16  BY MR. POULOS:
17  Q.How would you take that as an alumnus who was
18  abused that I was going to get the counsel ---?
19  ATTORNEY JUBB:
20  Objection to the form.  You don't have
21  to answer that question.
22  Next question.
23  BY MR. POULOS:
24  Q.Then let me re-ask my initial question.  Final
25  question then.  Were any of the letters that you

Page 261

1  received from the Hill School or any of the board of
2  trustee members ever signed by me?
3  ATTORNEY JUBB:
4  Are you referring to the letters that
5  were attached to our Complaint, Mr. Poulos?
6  BY MR. POULOS:
7  Q.Yeah.  Did you ever see a single letter that was
8  written to the Hill School that was signed by me?
9  A.No.
10  Q.So then why are you suing me?
11  ATTORNEY JUBB:
12  Objection to the form.  Go right ahead.
13  THE WITNESS:
14  Why am I suing you?  Because the letters
15  that did arrive to the school were written in
16  reference to conversations you had.  And the origin of
17  any of those lies had to begin with you.
18  BY MR. POULOS:
19  Q.Those letters were written by an attorney, which
20  is protected.
21  ATTORNEY JUBB:
22  Do you have a question?
23  BY MR. POULOS:
24  Q.Just like it says in --- from the school,
25  confidentiality.  Wouldn't you agree?

Page 262

1  ATTORNEY JUBB:
2  I'll object to the form.  Do you know
3  how to answer that?
4  THE WITNESS:
5  I can answer did I agree that a
6  confidential third party, however that's all worded in
7  the letter from Mr. Lehman, suggests that the
8  opportunity existed to do that, and you didn't take
9  it.
10  And, in fact, after nine months, had a
11  second letter sent that doubled down on the
12  accusations.
13  BY MR. POULOS:
14  Q.But you will agree that I never signed any letter
15  that was sent to the Hill School?  They were sent on
16  my behalf by an attorney?
17  ATTORNEY JUBB:
18  Objection to the form.  Asked and
19  answered.  Go ahead.
20  BY MR. POULOS:
21  Q.Otherwise, they would have had to have been
22  documented.
23  A.I understand that the two letters that arrived at
24  the school do not have your signature on them, yes.
25  Q.So, again, why are you suing me ---

Page 263

1  ATTORNEY JUBB:
2  Objection to the form.
3  BY MR. POULOS:
4  Q.--- if I didn't send the letter?
5  ATTORNEY JUBB:
6  Objection to form.  Asked and answered.
7  Next question.
8  ATTORNEY DOUGHERTY:
9  Objection.
10  MR. POULOS:
11  No, I'm done.
12  ATTORNEY JUBB:
13  Okay.
14  MR. POULOS:
15  He has no answers.
16  ATTORNEY JUBB:
17  Got it.
18  Ms. Dougherty, it's 4:08.  Is there any
19  chance you can get through the résumé by 4:15?
20  ATTORNEY DOUGHERTY:
21  I'll try.
22                      ---
23                 RE-EXAMINATION
24                      ---
25  BY ATTORNEY DOUGHERTY:

Page 264

1  Q.I have just a question.  Do you know James
2  Broban?
3  A.James Broban, I do.
4  Q.How do you know James Broban?
5  A.He's a former student.
6  Q.From, like, the '90s?
7  A.Graduated in '96.
8  Q.Have you had any contact with Mr. Broban since he
9  graduated?
10  A.Yes.
11  Q.When was the last time you had contact with Mr.
12  Broban?
13  A.We --- I can't give you a date, but within the
14  past year, we've had contact when he's been in
15  Michigan for meetings, and we've tried to get together
16  and it hasn't lined up.  I think it was within the
17  last year.
18  Q.Do you know whether Mr. Broban is aware of the
19  accusations by Mr. Poulos or the letters?
20  A.I think he is.
21  Q.Why do you think he is?
22  A.I believe he had a conversation with Mr. Jubb.
23  Q.Do you know whether --- do you know if Mr. Broban
24  has an opinion of you?
25  A.It's been very high.

Page 265

1  Q.And has Mr. Broban's opinion, high opinion, of
2  you changed since speaking to Mr. Jubb?
3  A.I don't believe so.
4  Q.Has Mr. Broban done or said anything to lead you
5  to believe his opinion of you has changed in any way
6  from being very high?
7  A.No.
8  ATTORNEY DOUGHERTY:
9  Mr. Jubb, I can tell you what I was
10  going to ask Mr. Ralston was to identify his
11  supervisor and salary and I think some of them we
12  needed address information.  I can do that in an
13  Interrogatory.
14  ATTORNEY JUBB:
15  That's fine.
16  ATTORNEY DOUGHERTY:
17  And if I could, I'll just --- I'll mark
18  them.
19  ATTORNEY JUBB:
20  And, I mean, just generally, obviously,
21  reserving any sort of rights to the way it's worded.
22  But I don't generally have an issue with that.
23  ATTORNEY DOUGHERTY:
24  I understand.  That's what I'm trying to
25  do.

Matthew B. Ralston
September 20, 2021                    266 to 269

---

Page 266

1  ATTORNEY JUBB:
2  Yeah.
3  ATTORNEY DOUGHERTY:
4  And what number are we up to?
5  COURT REPORTER:
6  Thirty (30).
7  ATTORNEY DOUGHERTY:
8  Okay.
9              ---
10  (Whereupon, Defendant's Exhibit 30,
11  Résumé 1, was marked for
12  identification.)
13              ---
14  BY ATTORNEY DOUGHERTY:
15  Q.I'm just going to show you a document that is
16  marked as D-30.  It says HILLDOE0237 to 238 on the
17  bottom.  It's number eight.  Can we pull it up?
18  A.I'm sorry.  Which am I looking at?
19  Q.I've handed you a document that's been marked as
20  D-30.  It looks like it's a --- well, do you know this
21  document and did you prepare it?
22  A.Yes.
23  Q.How do you know this document?
24  A.It's my résumé.
25  Q.And when --- when is this --- when did you

---

Page 267

1  prepare this résumé?
2  A.This would have been a résumé I used when I was
3  applying to the Hill School, 1992.
4  Q.Can you just look through ---?
5  A.Let me back up.  We lived there from December of
6  1990 through probably July of 1992, at that address.
7  Q.And is there anything inaccurate about the résumé
8  that's been marked as D-30?
9  A.I don't think so.  I can't imagine I would have
10  done that.  I haven't read it all recently, but ---.
11  ATTORNEY DOUGHERTY:
12  This one is going to be D-31.
13              ---
14  (Whereupon, Defendant's Exhibit 31,
15  Résumé 2, was marked for
16  identification.)
17              ---
18  BY ATTORNEY DOUGHERTY:
19  Q.I'm going to replace the D-30 with one I didn't
20  write on.
21  A.Okay.
22  Q.I've got an extra copy.
23  Okay.  I'm showing you a document that I've
24  marked as D-31.  It says P7.1 to P7.3 on the bottom.
25  Do you recognize that document I've marked as D-

---

Page 268

1  31?
2  A.Yes.
3  Q.How do you recognize the document that I've
4  marked as D-31?
5  A.It's my résumé from when I was leaving the
6  Leelanau School.
7  Q.Is there anything about the résumé that's been
8  marked as D-31 that is not accurate?
9  A.Again, I don't think so.  No.
10  Q.Did you prepare a résumé after --- so I'm sorry.
11  So D-31 is the one you prepared when you were applying
12  to the Hill School when you were leaving the Leelanau
13  School?
14  A.Yes.
15  Q.Did you prepare a new résumé since departing the
16  Hill School?
17  A.No.
18  Q.Well, let me just --- can I just direct your
19  attention to the first page.  Are you sure, because it
20  says under experience 9/2/2009 to 2016 to 2019, Hill
21  School on the top?
22  A.I see that, yes.  So then I did.
23  Q.So is the résumé that's been marked as D-31
24  something that has been prepared since you've departed
25  or since your departure from the Hill School?

---

Page 269

1  A.It must be.  It would have to be.  I didn't
2  prepare one before I was put on leave there.  Had no
3  reason to.
4  Q.Have you --- do you have any more recent résumé
5  or prepared one recently?
6  A.I do not.
7  Q.I just wanted to identify this.  Do you know this
8  document that I'm showing?
9  ATTORNEY DOUGHERTY:
10  Well, I'll mark it as D-32, a giant text
11  message.
12              ---
13  (Whereupon, Defendant's Exhibit 32,
14  Texts, was marked for identification.)
15              ---
16  THE WITNESS:
17  Right.
18  BY ATTORNEY DOUGHERTY:
19  Q.That's okay.  We're just trying to get you out of
20  here.  We'll put a sticker on it.
21  I want to know who sent you the text and why?  I
22  mean, what's it about?
23  A.That would be from Wallace Gundy, who we
24  discussed earlier.
25  Q.Okay.

---

Page 270

1    A. And that would be the note I referred to that she
2    had missed us at reunion and didn't know what was up.
3    Q. So Ms. Gundy calls you pops?
4    A. They did.
5    Q. What do you mean, they did?
6    A. There were students who viewed me as a father
7    figure and the nickname pops came in somewhere, I
8    don't know, early 2000s, 2003 or '04.
9    Q. Okay.
10   But Ms. Gundy referred to you as pops?
11   A. She did.
12   Q. I guess still does refer to you as pops?
13   A. She does, yes.
14   Q. Okay.  All right.
15   A. Yeah.  Again, she grew up with our children.
16   Lived across --- her parents lived across the street.
17   She was a prefect.  It probably started when she was a
18   prefect.
19   ATTORNEY DOUGHERTY:
20   Okay.
21   Those are my questions for now.  I'm
22   going to just make the point that we're going to send
23   some Interrogatories as identified, and we still do
24   not have a full, complete production by the Hill
25   School.  So I don't know where that will leave us.

Page 271

1    As I understand it, Mr. Ralston needs to
2    leave, so ---.
3    VIDEOGRAPHER:
4    Going off the record.  That concludes
5    this deposition today.  Time is 4:16 p.m.  Off the
6    record.
7            * * * * * * * *
8        VIDEOTAPED DEPOSITION CONCLUDED AT 4:16 P.M.
9            * * * * * * * *

Page 272

1    COMMONWEALTH OF PENNSYLVANIA  )
2    COUNTY OF PHILADELPHIA        )
3                    CERTIFICATE
4    I, Jennifer Corb, a Notary Public in and for
5    the Commonwealth of Pennsylvania, do hereby certify:
6    That the witness, Matthew B. Ralston, whose
7    testimony appears in the foregoing deposition, was
8    duly sworn by me on September 20, 2021 and that the
9    transcribed deposition of said witness is a true
10   record of the testimony given by said witness;
11   That the proceeding is herein recorded fully
12   and accurately;
13   That I am neither attorney nor counsel for,
14   nor related to any of the parties to the action in
15   which these depositions were taken, and further that
16   I am not a relative of any attorney or counsel
17   employed by the parties hereto, or financially
18   interested in this action.This notarial act involved
19   the use of communication technology.
20   Dated the 22 day of October, 2021
21
22                    *Jennifer Corb*
23
24                    Jennifer Corb,
25                    Court Reporter

EXHIBIT

Poulos 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN DOE** | : | |
| **Plaintiff** | : | |
| **v.** | : | **NO: 2:19-cv-01539-JD** |
| | : | |
| **MITCHELL GARABEDIAN, ESQ., et al.** | : | |
| **Defendants.** | : | |
| | : | |

## ORDER

AND NOW, this 18th day of March, 2021, upon consideration of the Motion by Plaintiff to Compel Miscellaneous Discovery of Defendant Poulos and any Response thereto, it is hereby ORDERED and DECREED that Plaintiff's Motion is GRANTED.

(1)     IT IS FURTHER ORDERED that Defendant Poulos shall "identify, by first and last name, any and all persons who were in his Geometry class for the 1994-1995 school year," by December 21, 2020, as previously ordered by this court. Failure to comply shall result in sanctions.

(2)"     IT IS FURTHER ORDERED that Defendant Poulos shall provide verified" responses with the production of documents responsive to Plaintiff's 28 August 2020 Discovery Requests.

(3)"     IT IS FURTHER ORDERED that Defendant Poulos shall appear for a continuation" of his deposition to answer questions from Plaintiff's Counsel, limited to the area of his discussions and communications with Defendant Garabedian.

D[ "VJ G'EQWTV⌐    "

**/s/ Hon. Jan E. DuBois**

_____
The Honorable Jan E. DuBois

"        "        "        "        "        "        "        "

1640a

1



EXHIBIT

D-16
LC 7/1/21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE** | : | |
| **Plaintiff** | : | |
| v. | : | NO: 2:19-cv-01539-JD |
| | : | |
| **MITCHELL GARABEDIAN, ESQ., et al.** | : | |
| | : | |
| **Defendants.** | : | |

### PLAINTIFF'S RESPONSES TO THE FIRST SET OF INTERROGATORIES OF DEFENDANTS, MITCHELL GARABEDIAN, ESQUIRE AND MITCHELL GARABEDIAN, ESQUIRE D/B/A LAW OFFICES OF MITCHELL GARABEDIAN, DIRECTED TO PLAINTIFF

1. Describe in detail and with particularity all damages you claim in this lawsuit, including any damage you contend that you suffered as a result of the conduct described in the second amended complaint. For each item of damage you claim, state the following:

    a. The amount of damages you claim;

    b. The factual basis supporting your claim to each item of damage; and

    c. The manner in which you calculated each item of damages.

**Response: Plaintiff objects to this request as being overly broad, vague, and prematurely seeking expert opinion.**

**Without waiver, every student, colleague, parent and school relationship that Plaintiff has encountered since he began teaching in 1980 has been damaged. Students learn best when they are in a school setting which offers them the opportunity to develop healthy relationships with other students and the adults of that school community. School communities that offer such environments are built on trust, care, vulnerability and honesty. Being accused of betraying and preying on the**

1

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**DOE V. GARABEDIAN, ESQ., ET AL.**
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1640a

trust and vulnerability of a student jeopardizes every relationship Plaintiff has ever had with a student.   Every student Plaintiff taught, parent who placed their child in his care, and colleagues with whom Plaintiff has worked would believe that there was evil working with and among them and have their experience at that school tainted with that evil because of Defendant's false and defamatory statements.   Plaintiff has successfully built thousands of healthy relationships in schools since 1980.   Plaintiff was hired as a capital giving officer at The School in 2016 because of the breadth and depth of his knowledge of and experience with the School and because of his lasting relationships with alumni.   Plaintiff was excited to return in this capacity for the same reasons.   His work as a capital giving officer was damaged directly because charitable giving is also based on donor relationships with both the institution and the fund raiser.   Plaintiff's confidence and hence, his work in representing the School was irreparably harmed the day he learned of these false allegations.   Plaintiff knew that when word of the false allegations spread to donors that he would be cut off by donors and he feared that the School would be too.   It was a dark, ugly cloud that was present in every donor meeting Plaintiff secured and the worry only increased after he secured a gift.

The way in which Mary Ellen Poulos describes Plaintiff in her communication with Zack Lehman is but one example that his name and these relationships are jeopardized and ruined by such false accusations.

Plaintiff calculated these damages the same way he taught, headed a school and worked as a capital giving officer - on an individual basis.   Plaintiff's success as a teacher was based on getting to know his students as individuals and helping them to develop their strengths, acknowledge their weaknesses and working toward their potential.

2

**The Beasley Firm, LLC**
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**DOE V. GARABEDIAN, ESQ., ET AL.**
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1641a

Plaintiff has suffered significant emotional distress and mental anguish knowing that certain members of the board of trustees, including the legal committee, comprised of alumni and parents, were all made aware of these allegations.  Worse yet, is the fear of who has subsequently learned of these heinous allegations and has either kept such information to themselves or shared them with others, out of Plaintiff's sight where he cannot correct them.

Plaintiff has sought medical care for this emotional distress, which has caused nightmares, heart palpitations, and nausea.

2.     Identify each and every statement you allege Garabedian made that you allege defamed you.

**Response: Plaintiff contends that the Defendants' statement, contained in the April 11, 2018 letter, that Defendant Poulos "was repeatedly sexually molested by [Plaintiff Doe]" is false and defamatory. Any statement or implication that Plaintiff Doe caused harm to Defendant Poulos is false and defamatory. Any inference, innuendo, or implication that Plaintiff Doe had _any_ contact with Defendant Poulos that was inappropriate or sexual in nature, at any time, is also completely false and defamatory _per se_. Each and every statement published by the Defendants pertaining to or describing inappropriate or sexual conduct by Plaintiff Doe, in either the April 11 or December 26, 2018 publications and both letters are replete with specific such statements is false and defamatory _per se_. There could be no greater charge levied against an educator who has dedicated his life to his school and his students' well-being.  Additionally, Garabedian's statements to Mary Ellen Poulos republishing the false and**

3

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**DOE V. GARABEDIAN, ESQ., ET AL.**
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1642a

defamatory accusations are also at issue. Mary Ellen Poulos then contacted the School repeating as much.

3.    Identify and provide contact information for each and every of your prior employers.

**Response: Plaintiff objects to this request as being overly broad, unduly burdensome, and not reasonably calculated to lead to admissible evidence.  Without waiver, Plaintiff's prior employers are identified on his CV previously produced.**

4.    Identify and provide contact information for each and every person who complained about you.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, vague, and confusing. Without waiver, none.**

5.    Is it your contention that the defamatory statements alleged in the second amended complaint were inaccurate or false?

If so, state:

    a.  The specific false or inaccurate statement(s);

    b.  What was specifically false or inaccurate in the statement(s);

    c.  The date(s) the false and inaccurate  statement(s) was/were made;

    d.  The identity of the person(s) to whom the false and inaccurate statement was made; and

    e.  The identify or the person(s) who made the false and inaccurate statement(s).

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Plaintiff further objects to this request as it is**

4

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**DOE V. GARABEDIAN, ESQ., ET AL.**
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1643a

**Defendant's burden to prove truth in this matter. Plaintiff has no burden to prove falsity. Without waiver, the defamatory statements at issue are false.**

6.     Is it your contention that the defamatory statements alleged in the second amended complaint caused an interruption, cancellation, or loss of your business relationships, income, or contracts?

If so, state:

  a.  The specific person(s), business(es), or contract(s) that were interrupted, cancelled, or lost as a result of the alleged defamatory statements;

  b.  What were the specific reasons given by the person(s) or business(es) for interrupting, decreasing, or canceling any business relationships or contracts;

  c.  How were these related to the alleged defamatory statements; and

  d.  The date(s) and amounts of the disrupted, cancelled, or lost business relationships income or contracts.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Without waiver, being falsely accused of the most heinous act a teacher can commit against a student impacts every relationship that teacher has.**

**Plaintiff's ability to confidently approach alumni regarding supporting the School was interrupted due to his concern that they may have heard these allegations. Plaintiff was responsible for alumni in the Midwest and defendant is Step-Grandchild of a prominent Midwest family and the cousin of another alumnus. Mary Ellen Poulos, through Kurtis Poulos, had already shared with at least one other person.**

**Plaintiffs relationship with The School, where he would have earned a living well into his 70s, is decimated as a result of Defendant's conduct. For**

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

DOE V. GARABEDIAN, ESQ., ET AL.
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1644a

example, Plaintiff was told to seek legal counsel, not to be alone with students when on campus, had to ask permission to be on campus and that the School's insurance company would not pay for his legal fees because of the nature of Defendants false allegations.

The independent school community is a small community and Plaintiff has no way of knowing who had heard rumors of Defendant's false allegations. Prior to these false statements, Plaintiff looked forward and welcomed phone correspondence from alumni that was out-of-the-blue. Now, Plaintiff cannot be the mentor, advisor, friend, or colleague that so many knew him to be because of the fallout from Defendant's false and defamatory statements.

Additionally, Plaintiff was forced to tell his two sons, both School alumni, of the false and defamatory accusations. Plaintiff's fear and anxiety caused by the defamatory statements has been detrimental to Plaintiff's state of mind as father. For example, when his son was to be married, Plaintiff spent the entire wedding wondering who, if anyone, had heard of Defendant's allegations at this wedding which was compromised of many School colleagues and former students.

Plaintiff reserves the right to supplement this response.

7.     Is it your contention that the alleged the defamatory statements harmed or lowered your reputation in your community?

If so, state: the specific person(s), business(es), or entity(ies) that plaintiff relies on to prove her reputation was harmed or lowered in the community as a result of the alleged defamatory statements.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Without waiver, Yes. See prior responses.**

6

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**DOE V. GARABEDIAN, ESQ., ET AL.**
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1645a

8.     State your contention, the factual basis for your contention and the sources of proof for the facts which support your contention that the alleged defamatory statements harmed or lowered the reputation of plaintiff's in his community.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Without waiver, Yes. See prior responses. Plaintiff is no longer affiliated with the School. During alumni reunions, he was not able to attend despite the request and questioning by former students. The Board of Trustees received the Defendant's defamatory letter, which is comprised of parents, alumni, and former students.  Many Board members are former students of Plaintiff, some of which had even written him thoughtful thank you notes and emails (already produced) upon graduation, before Defendants sent their letters.**

**Plaintiff reserves the right to supplement this response.**


9.     Is it your contention that the alleged defamatory statements deterred persons, organizations, or entities from associating with you?

If so, state: the name and address of the specific person(s), entity(ies), or organization(s) that were deterred from associating with you as a result of the alleged defamatory statements.

**Response: Plaintiff objects to this request as overly broad and unduly burdensome. Without waiver, yes. See prior responses. Plaintiff is no longer affiliated with the School.  The School's Board of Trustees are identified online on the School's website. Plaintiff already provided this information in his supplemental disclosures.**


10.     State your contention, the factual basis for your contention and the sources of proof the facts which support your contention that person(s), entity(ies), or

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

DOE V. GARABEDIAN, ESQ., ET AL.
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1646a

organization(s) that were deterred from associating with plaintiff as a result of the alleged defamatory statements.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Without waiver, see prior responses and Plaintiff's disclosures.**

11.    Is it your contention that the alleged defamatory statements exposed plaintiff to public hatred, contempt, or ridicule?

If so, identify the specific person(s), business(es), or entity(ies) that you rely on to prove you were exposed to public hatred, contempt, or ridicule as a result of the alleged defamatory statements.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Without waiver, Mr. Garabedian knows better than most people the significance of the abuse of a young person and therefore is acutely aware of the importance of being certain of allegations before spreading them. Such allegations immediately subject the accused to public judgment, hatred, contempt, and ridicule. Plaintiff has filed as John Doe for this very reason.   Again, a clear example of this hatred, judgment and contempt is Mary Ellen Poulos's communication with my employer, Zack Lehman. The Board of Trustees received the letter per School protocol and as would be expected where a demand for money is involved. Some of these individuals knew me personally, others knew of my reputation within the community – all of whom would necessarily think less of me for being the subject of such accusations.**

8

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**DOE V. GARABEDIAN, ESQ., ET AL.**
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1647a

12.   State your contention, the factual basis for your contention and the sources of proof for the facts which support your contention that the alleged defamatory statements harmed or lowered the reputation of plaintiff in the community.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Without waiver, this request seeks information that has been asked multiple times previously. See responses to prior requests and disclosures.**

13.   State: the name and address of the specific person(s) that considered the alleged statement(s) as defamatory.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Without waiver, this request seeks information that has been asked multiple times previously. See responses to prior requests and disclosures.**

14.   Identify all the electronic stored information relating to the claims and defenses of which you are aware.

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague. Plaintiff further objects to this request as not being reasonably calculated to lead to the discovery of admissible evidence. Without waiver, see Plaintiff's Production Index and Disclosures.**

15.   Was all electronically stored information and electronic documents relating to claims and defenses preserved?

**Response: Plaintiff objects to this request as overly broad, unduly burdensome, and vague.  Without waiver, Plaintiff has not destroyed or altered any electronically stored information relevant to the issues here and**

9

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

DOE V. GARABEDIAN, ESQ., ET AL.
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1648a

produced as much. See Plaintiff's Production Index.  To date, Defendants have not produced any document that was not already produced by Plaintiff or a Third Party.

/s/ Lane R. Jubb, Jr.
JAMES E. BEASLEY, JR., ESQUIRE
LANE R. JUBB, JR., ESQUIRE
LOUIS F. TUMOLO, ESQUIRE
Attorneys for Plaintiffs
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA  19107
Telephone:  (215) 592-1000
Fax:  (215) 592-8360
lane.jubb@beasleyfirm.com

November 16, 2020

10

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

DOE V. GARABEDIAN, ESQ., ET AL.
Plaintiff's Responses to the First Set of Interrogatories of Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, directed to Plaintiff

1649a

## CERTIFICATE OF SERVICE

I, Lane R. Jubb, Jr., Esquire, hereby certify that a true and correct copy of the

foregoing was served via Electronic Mail upon the following on November 16, 2020:


Jeffrey B. McCarron, Esquire
Candidus K. Dougherty, Esquire
Swartz Campbell LLC
One Liberty Place, 38th Floor
1650 Market Street
Philadelphia, PA 19103
*Attorneys for Defendants, Mitchell Garabedian, Esq. and
Law Offices of Mitchell Garabedian*


Kurtis N. Poulos
3239 W. Colony Drive
Milwaukee, WI 53221


/s/ *Lane R. Jubb, Jr.*
JAMES E. BEASLEY, JR., ESQUIRE
LANE R. JUBB, JR., ESQUIRE
LOUIS F. TUMOLO, ESQUIRE
Attorneys for Plaintiffs
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
Telephone: (215) 592-1000
Fax: (215) 592-8360
lane.jubb@beasleyfirm.com


THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

DOE V. GARABEDIAN, ESQ., ET AL.
Certificate of Service

1650a

**From:** Matt Ralston <mralston@thehill.org>
**Sent:** Tuesday, June 26, 2018 9:58 AM
**To:** Thomas Rees
**Subject:** checking in

Tom,

I have received the letter from the insurance company.  It is my understanding that it does not imply change in this matter – am I correct?  I have a couple questions.

1. Have you heard anything further regarding the allegations?
2. Assuming you haven't, can this just hang out there with no communications, movement or closure indefinitely?
3. Is there anything you (or anyone else) can do to force movement and closure?

Thanks –

Matt

**Matt Ralston P '05, '07**
**Capital Giving Officer**
Mobile: 610-805-6529
mralston@thehill.org

**THE HILL SCHOOL**
THE FAMILY BOARDING SCHOOL ™
860 Beech Street│Pottstown, PA 19464
www.alumni.thehill.org│www.thehill.org

HILLRAL 029
1651a

# Summary Judgment Appendix
## Exhibit "LLL"

**From:** Thomas Rees
**Sent:** Wednesday, January 02, 2019 3:42 PM
**To:** 'Matt Ralston'
**Subject:** Letter
**Attachments:** 1EI5542-Garabedian Ltr.PDF

Matt:  Here is the letter.  Please let me know of any further comments.  TDR



Thomas D. Rees, Esquire
**HIGH SWARTZ  LLP**
40 East Airy Street
Norristown, PA  19404
(610) 275-0700
(610) 275-0702 (direct)
(610) 275-5290 (fax)
Email: trees@highswartz.com
www.highswartz.com

The information contained in this e-mail message is attorney privileged work product and intended only for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone or e-mail reply and delete the original message from your computer.  Thank you.

1

**From:**          Matt Ralston <mralston@thehill.org>
**Sent:**          Saturday, March 16, 2019 1:12 PM
**To:**            Thomas Rees
**Cc:**            David Dougherty
**Subject:**       Question

Tom,

I would like to speak with David regarding this difficult situation and I am writing to ask if I may. I believe that his perspective and advice could be very helpful.

Thanks -

Matt

Matt Ralston P '05, '07

Capital Giving Officer

Mobile: 610-805-6529

mralston@thehill.org

THE HILL SCHOOL

THE FAMILY BOARDING SCHOOL ™

860 Beech Street|Pottstown, PA 19464

www.alumni.thehill.org|www.thehill.org

HILLRAL 058

1653a

| | |
|---|---|
| **From:** | Matt Ralston <mralston@thehill.org> |
| **Sent:** | Sunday, April 29, 2018 3:29 PM |
| **To:** | Thomas Rees |
| **Subject:** | FW: notes to School attorney for file |

Tom, I misspelled Swartz when I sent this to you last week.  It came back to me this morning.  Thanks - Matt

Tom,

Thanks for your time on Wednesday; I appreciate your support, confidence and counsel.

We arrived at Hill in the fall of 1992 (our sons were 5 and 3). We live in Upper School (2E) during our first 2 years (92-93 & 93-94 school years).   We moved to Rolfe during the summer of 1994 and lived there for 6 years.  I became the Director of Studies at the start of the 1995-96 academic year and served in that role through the 2000-01 academic year.

Here is pretty much what I can recall regarding the student who has made allegations against me.

- I remember Kurt Poulos mostly because he is the (younger) cousin of another alumnus, Jason Zwerner, whom I had more interaction at Hill and since he graduated.
- What I do remember is that he was not particularly happy at Hill and was often confrontational regarding rules.
- I can recall only one specific incident that involved him and even in that, I do remember any direct contact.  That incident involved his car and his repeated violation of School rules regarding its use and weekend privileges.  Kurt lived in Rolfe during his sixth form year (1996-97).  At that time, the School allowed boarding students to keep cars (they were parked in the CFTA lot and keys turned into the Deans' Office) which they could access on weekends if and only if they were "signed out" for the weekend.  Being signed out meant that once a student left campus they were not to return until they were returning from their weekend.  That is, a student could not come and go with their car throughout the weekend.  Kurt would sign out for the weekend and take his car.  On several occasions we would sign out for the weekend, leave in his car and, at some, point in the night return to campus, park his car at the dorm and return to his dorm room.   I don't know how many times and I don't know what he offered as his reason for doing so.  What I do remember is that on one weekend morning, I left the dorm and saw his car parked in the loading dock.  My response was to pull our car out of the garage and park it behind his, preventing him from leaving and giving the Dean an opportunity to address the issue.  I don't remember what came of the incident or any interaction between Kurt and me after that.

If you and Zack have spoken and it's appropriate for you to share some attorney's I might contact for personal counsel, I'd appreciate you sending those along at your convenience.

Thanks for your help and let me know what else I need to do.

Best –

Matt

HILLRAL 001
1654a

**Matt Ralston P '05, '07**
**Capital Giving Officer**
Mobile: 610-805-6529
mralston@thehill.org

**THE HILL SCHOOL**
THE FAMILY BOARDING SCHOOL ™
860 Beech Street|Pottstown, PA 19464
www.alumni.thehill.org|www.thehill.org

HILLRAL 002

1655a



**ACADEMIC** **REPORT**

Student: Poulos, Kurt
Subject: Geometry
Grade: *B+*

Instructor: Mr. Ralston
Adviser: Mr. Krieger
Date: 11/28/94

Kurt is doing a great job in Geometry. He works hard; contributing in class and seeking extra help when he needs it. Kurt's work is always complete and demonstrates a thoughtful understanding of all material. He should be encouraged to keep up the good work.

I enjoy having Kurt in class. His desire to learn and do well are exemplary qualities. Kurt is an integral member of his class and can be depended on to start discussions, even on a slow day. Have a joyful holiday season.

SIGNATURE *M. H. Ralston*
INSTRUCTOR



EXHIBIT
PENGAD 800-631-6989
D-17
1/24/21

**HILL0104**



**ACADEMIC REPORT**

Student: Poulos, Kurt
Subject: Geometry
Grade: A

Instructor: Mr. Ralston
Adviser: Mr. Krieger
Date: 3/6/'95

Kurt had a strong performance in geometry during the Winter Term. The quality of his work improved markedly over the fall. Kurt is an integral part of a dynamic class. He is always involved in class discussion and is not content with answers which he finds insufficient. Kurt seems to expect everyone in the class to work hard.

I have really enjoyed having Kurt in class and getting to know him. He is a sharp witty young man who knows when to use his wit and when to be serious. I look forward to working with Kurt during the next two years.

SIGNATURE_____*Matthew B Ralston*_____
INSTRUCTOR



EXHIBIT
13
LC 7.1.21
PENGAD 800-631-6989

HILL0089

1657a



**ACADEMIC REPORT**

Student: Poulos, Kurt
Subject: Geometry
Grade: B+

Instructor: Mr. Ralston
Adviser: Mr. Krieger
Date: 5/29/95

Spring term was spent doing classic constructions, finding the areas of plane figures, finding the areas and volumes of solids and introducing analytic geometry. The "flavor" of the course was considerably different than the first two terms since we did few two-column proofs and more in the way of applying theory.

Having Kurt in class this year was one of the truly bright spots in a good year. Kurt's genuine concern for others combined with his tremendous sense of humor make him a joy to work with and an asset to his class and the school. Kurt works hard in class and expects every one else to as well. His work is thorough and complete, demonstrating a solid understanding. Kurt should be commended for his efforts. Kurt brings a lot to the school and I am glad that he is here. Have a great summer.

SIGNATURE _____
INSTRUCTOR



**EXHIBIT**
PENGAD 800-631-6989
19
LC 7/2/21

**HILL0078**

1658a



**Utica National**
**Insurance Group**
Insurance that starts with you.

| | |
|---|---|
| Mark Nowak, CPCU, SCLA | Utica National Home Office Claims Department |
| Complex Liability Claims Examiner | P.O. Box 5310, Binghamton, New York 13902 |
| | Telephone: (716) 639-2335 |
| | Fax: (888) 538-2018 |
| | Mark.Nowak@uticanational.com |

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
7009 2250 0004 4404 6357

**RESERVATION OF RIGHTS**

June 20, 2018

Matthew B. Ralston
20454 Nossger Road
Lake Ann, MI 49650

RE:   Insured:      The Hill School
      Claimant:    Kurtis Nicholas Poulos
      Claim No.:   10139719
      Policy No.:  CPP-1686565, CULP-1690933

Dear Mr. Ralston:

Graphic Arts Mutual Insurance Company (Graphic Arts) received a first report of loss, on April 20, 2018, related to the above captioned claim. The report, submitted by Willis Towers Watson, included a letter of representation from the Law Offices of Mitchell Garabedian. The letter, dated April 11, 2018, is an attempt to settle and compromise claims involving Matthew B. Ralston and his supervisors at The Hill School. More specifically, the attorney claims that his client, Kurtis Nicholas Poulos, was repeatedly sexually molested by Mr. Ralston from approximately 1993 until 1995 while he attended The Hill School. The matter was reported to us to determine if any coverage is available to The Hill School under our Commercial Package Policy, CPP-1686565, and Commercial Umbrella Liability Policy, CULP-1690933. As the claim presents direct allegations against you, we are also investigating the matter and reviewing our policies to determine if any coverage is available to you.

**SUMMARY OF ALLEGATIONS**

Mr. Garabedian's letter alleges that Mr. Poulos was injured as a result of the sexual molestation and that these injuries include depression, sadness, crying, anxiety, emotional pain, sleep problems, concentration problems, low self-esteem, low self-respect, low self-confidence, apathy, finding himself not caring about things, not caring about his grades or his future while he attended The Hill School, turned to drugs and alcohol to cope with the emotional pain, self-sabotaging the good things in his life, flashbacks and reminders, feeling unbroken and unfixable, sexuality problems such as being oversexed at times, problems with being touched, self-harm, feeling alone and isolated, feeling ostracized while he was at school, shame, embarrassment, guilt, self-blame, trust problems, intimacy problems, losing a dangerous amount of weight while at The Hill School because he did not feel like eating, suicidal ideation, creation of an emotional void in him, anger, confusion, feeling that Mr. Ralston ruined a part of his life, feeling that Mr. Ralston sent him down the wrong road in life, feeling that Mr. Ralston stole his childhood innocence. The letter presents a $1,000,000 demand for settlement of the claim presented.

*Claim No.: 10139719*
*Page 2 of 7*

## POSITION ON COVERAGE

Graphic Arts Mutual Insurance Company first issued a Commercial Package Policy, Number CPP-1686565, as well as a Commercial Umbrella Liability Policy, Number CULP-1690933, to The Hill School for the policy period September 1, 1993 to September 1, 1994. The policy has been renewed on an annual basis since, with the February 1, 2018 to February 1, 2019 policy currently in effect.

In reviewing potential coverage for this case, we examined the relevant forms under the above policies. The **Commercial General Liability Coverage Form**, CG 00 01 11 88, under the Commercial Package Policy provides coverage for damages the insured becomes legally obligated to pay because of bodily injury" caused by an "occurrence" that occurs during the policy period. There is no coverage for "bodily injury" that is expected or intended from the standpoint of the insured. Further, the policy conditions require timely notification and cooperation as further explained below. Liability coverage under the Commercial Package Policy is subject to a $1,000,000 per occurrence limit.

The **Commercial Umbrella Liability Coverage Form**, 8-UMC-C (Ed. 7-89), under the Commercial Umbrella Liability Policy provides excess liability coverage subject to a $5,000,000 per occurrence and general aggregate limit. This coverage is subject to the same terms, conditions, agreements, exclusions and definitions as any insurance provided under the **Commercial General Liability Coverage Form**.

Based on the allegations that have been presented in the letter, and the provisions of our policies, there may be no coverage available to you in this matter. We are, however, proceeding under a reservation of rights and will need to investigate the matter further to determine if there is any covered claim against you for "bodily injury" caused by an "occurrence" in the policy period as those terms and provisions are defined. We will need to determine if any exclusions, including the exclusion that removes coverage for injury that is expected or intended, apply and if you qualify as an insured under our policy.   As no "suit" has been filed, as defined by the policy, Graphic Arts has no duty to provide you with a defense at this time. Lastly, it is recommended, if you have not done so, to contact your homeowner's insurance carrier during the dates alleged by the claimant, to determine if there would be any available coverage through that company.

## ANALYSIS OF COVERAGE POSITION

The **COMMERCIAL GENERAL LIABILITY COVERAGE FORM, CG 00 01 11 88,** contains the following language:

## SECTION I – COVERAGES

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1, Insuring Agreement.**

**a,**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.

*Claim No.: 10139719*
*Page 3 of 7*

**b.** This insurance applies to "bodily injury" and "property damage" only if:

　　**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

　　**(2)** The "bodily injury" or "property damage" occurs during the policy period.

Coverage is available under the policy for damages because of "bodily injury" caused by an "occurrence" that occurs during the policy period. However, there is a question as to whether there is any claim against you for "bodily injury" caused by an "occurrence" that occurred during the policy period.

The policy continues, under the **CORPORAL PUNISHMENT** form **CG 22 67 11 85,** as follows:

**2. Exclusions**

This insurance does not apply to:

**a.** "Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

This exclusion does not apply to "bodily injury" resulting from:

**(1)** The use of reasonable force to protect persons or property; or

**(2)** Corporal punishment to any student of pupil administered by or at the direction of any insured.

Based on the above exclusion, no coverage is available for "bodily injury" expected or intended from the standpoint of the insured unless such injury results from the use of reasonable force to protect persons or property or from corporal punishment to any student or pupil by or at the direction of any insured. This exclusion may also apply for any claim made against you.

FORM **CG 00 01** continues:

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

　　**c.** An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

　　**a.** Your employees, other than your executive officers, but only for acts within the scope of their employment by you.

The **COLLEGES OR SCHOOLS (LIMITED FORM)** endorsement, **CG 22 71 11 85,** adds:

**3. WHO IS AN INSURED (Section II)** is amended to include as an insured any of the following but only with respect to their duties in connection with the positions described below:

　　**a.** Any of your trustees or members of your Board of Governors if you are a private charitable or educational institution;

*Claim No.: 10139719*
*Page 4 of 7*

    **b.**    Any of your board members or commissioners if you are a public board or Commission; or

    **c.**    Any student teachers teaching as part of their educational requirements.

The above provision indicates that the executive officers and directors of The Hill School are insureds but only with respect to their duties as such. The Hill School's employees are also insureds but only for acts within the scope of their employment. As any claims against you may be related to alleged acts that fall outside the scope of your employment with The Hill School, you may not qualify as an insured under the policy.

Form **CG 00 01** contains the following conditions, which require timely reporting and cooperation, as well as policy definitions:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**2**    **Duties In The Event Of Occurrence, Claim Or Suit.**

    **a.**    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

        **(1)**    How, when and where the "occurrence" or offense took place;
        **(2)**    The names and addresses of any injured persons and witnesses; and
        **(3)**    The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.**    If a claim is made or "suit" is brought against any insured, you must:
        **(1)**    Immediately record the specifics of the claim or "suit" and the date receive; and
        **(2)**    Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

    **c.**    You and any other involved insured must.
        **(1)**    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"
        **(2)**    Authorize us to obtain records and other information;
        **(3)**    Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and
        **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.**    No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**SECTION V – DEFINITIONS**

    **4.**    "Bodily injury" means bodily injury, sickness or disease sustained by a person, Including death resulting from any of these at any time.

    **9.**    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

    **13.**    "Suit" means a civil proceeding in which damage because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this Insurance applies are alleged. "Suit" includes:

*Claim No.: 10139719*
*Page 5 of 7*

   **a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

The **COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM, 8-UMC-C (Ed. 7-89),** contains the following language:

**SECTION I - COVERAGES**
**COVERAGE A - EXCESS LIABILITY**
1. **Insuring Agreement - COVERAGE A.**
 **a.** We will pay those sums, in excess of the limits of liability under the terms of any "underlying insurance," that the insured becomes legally obligated to pay as damages because of "injury" or "wrongful act," to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable limits of insurance. If, however, the Retained Limit applies as described below in **4.** Retained Limit Each Incident - COVERAGE A, we will pay only those sums in excess of the Retained Limit.

   **This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance" except with respect to any provisions to the contrary contained in this insurance.**

 **b.** We will have the right to participate in the defense of claims or "suits" against the insured seeking damages because of "injury" or "wrongful act" to which this insurance may apply.  We will have a duty to defense such claims or "suits" when the applicable limit of insurance of the "underlying insurance" has been used up by payment of judgments or settlements. The right or duty to defend is limited as described below in **3.** Defense of Claims Or Suits - COVERAGE **A.**

 **c.** The amount we will pay for damages is limited as described in SECTION **III** - LIMITS OF INSURANCE.

 **d.** We will have no obligation under this insurance with respect to any claim or "suit" that is settled without our consent.

 **e.** This insurance applies only to "injury" or "wrongful act" which occur during the policy period except for "bodily injury" by disease to your employees. With respect to "bodily injury" by disease to your employees, such "bodily injury" must:

   **(1)** Be caused or aggravated by the conditions of your employment; and

   **(2)** Result from exposure to conditions with the last day of last exposure occurring during the policy period.

  Any "Injury" must be caused by an "incident."

2. **Exclusions - COVERAGE A.**
 **The exclusions applicable to the "underlying insurance" also apply to this insurance.**

**SECTION IV - CONDITIONS**
**A. Conditions Applicable Only to COVERAGE A.**
 If any of the following conditions are contrary to conditions contained in the "underlying insurance," the provisions contained in this policy apply.
3. **Duties In The Event Of Incident, Wrongful Act, Claim Or Suit**
 **a.** You must see to it that we are notified promptly of an "incident" or "wrongful act" which may result in a claim to which this insurance applies.  To the extent possible, notice should include:

   **(1)** How, when and where the "incident" or "wrongful act" took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

   **(3)** The nature and location of:

    **(a)** Any "injury" arising out of the "incident"; or

      **(b)** Any harm arising out of the "wrongful act."

**b.** If a claim is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the claim or "suit."

**c.** You and any other involved insured must:

      **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      **(2)** Authorize us to obtain records and other information;

      **(3)** Cooperate with us in the investigation, settlement or defense of the claim or "suit";

      **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any insured because of "injury" to which this insurance may also apply; and

      **(5)** Notify us immediately of any judgment or settlement of any claim or "suit" brought against any insured.

**d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

## SECTION V - DEFINITIONS

**Definitions Applicable Only To COVERAGE A.**

**1.** "Aggregate limit" means the maximum amount stated in the policy for which the insurer will be liable regardless of the number of covered claims.

**2.** "Underlying insurance" means the liability insurance coverage provided under policies shown in the Declarations, for the limits and periods indicated. It includes any policies issued to replace those policies during the term of this insurance that provide:

    **a.** At least the same policy limits; and

    **b.** Liability insurance coverage for the same hazards insured against, except those changes we agree to in writing.

**3.** "Underlying insurer" means any insurer who issues a policy of "underlying insurance."

**4.** "Underlying policy" means a policy providing "underlying insurance."

**5.** "Wrongful act" means any harm, except "injury," for which the "underlying insurance" provides liability insurance coverage, or would have provided such coverage except for the exhaustion of limits by payments of judgments and settlements under the terms of such "underlying insurance."

**Definitions Applicable to COVERAGES A and B.**

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**5.** "Incident" means:

    **a.** With respect to "bodily injury" to persons other than your employees and "property damage," an accident, including continuous or repeated exposure to substantially the same general harmful conditions;

    **b.** With respect to "bodily injury" to your employees arising out of and in the course of their employment by you, the accident or disease which causes the "bodily injury"; and

    **c.** With respect to offense committed by the insured resulting in "personal injury" or "advertising injury," all such injury sustained by any one person or organization.

**6.** "Injury" means "bodily injury," "property damage," "advertising injury," or "personal injury."

**13.** "Suit" means a civil proceeding in which damages to which this insurance applies are alleged. "Suit" includes:

    **a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

    **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

*Claim No.: 10139719*
*Page 7 of 7*

The **COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM** provides coverage in excess of that which may be afforded under the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**. However, as outlined above, this coverage is subject to the same terms, conditions, agreements, exclusions and definitions as the underlying insurance.

## CONCLUSION

Based on the allegations that have been presented and the provisions of our policies, we must proceed under a reservation of rights. We will investigate further to determine if any coverage is available to you in this matter. More specifically, we will need to determine if there is any claim against you for "bodily injury" caused by an "occurrence" that occurred during the policy period. We will also need to determine if any policy exclusions, including the expected or intended exclusion cited above, apply and if any policy conditions have been breached. The policy conditions, as noted above, require timely reporting and cooperation. While we will proceed with our investigation under a reservation of rights at this time, we have no duty to provide you with coverage for defense as there is no "suit" as defined by the policy.

To the extent that a particular term, condition, limitation, or exclusion has not been cited, or any issue not referenced, that was not intended, it should not be considered as a waiver of any right this company may have under the policy.  We reserve the right to amend this coverage letter, as well as disclaim coverage, should it become necessary.  Nothing this company, or its agents, do in the investigation of this case is intended as a waiver of any of our policy rights or provisions. We understand your cooperation with us in the investigation of this claim is not a waiver of any of your policy rights. We encourage you to review your policy in full so you are aware of all of your rights and responsibilities.

Please notify us immediately should you receive any additional correspondence related to this matter, including any formal legal pleadings, so that we can review to determine whether they impact our coverage position. If you have any questions on our position at this time, please direct them to the Complex Liability Claims Specialist, Karen Lind, who is assigned to the claim. Karen can be contacted at 315-734-2205 or Karen.lind@uticanational.com.

Sincerely,
UTICA NATIONAL INSURANCE GROUP

*Mark Nowak (aw)*

Mark Nowak
Complex Liability Claims Examiner

cc:   Willis Towers Watson
      26 Century Boulevard
      Nashville, TN 37214

      The Hill School
      Attn: Rick Wood, CFO & Treasurer
      717 East High Street
      Pottstown, PA 19464



**Utica National Insurance Group**
Insurance that starts with you.

Mark Nowak, CPCU, SCLA
Complex Liability Claims Examiner

Utica National Home Office Claims Department
P.O. Box 5310, Binghamton, New York 13902
Telephone: (716) 639-2335
Fax: (888) 538-2018
Mark.Nowak@uticanational.com

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 2064 7081**
**DISCLAIMER OF COVERAGE**

February 11, 2019

Matthew B. Ralston
20454 Nossger Road
Lake Ann, MI 49650

RE:   Insured:      The Hill School
        Claimant:    Kurtis Nicholas Poulos
        Claim No.:   10139719
        Policy No.:  CPP-1686565, CULP-1690933

Dear Mr. Ralston:

Graphic Arts Mutual Insurance Company, a member of the Utica National Insurance Group and hereafter referred to as "Utica", previously issued a Reservation of Rights letter to you on the above captioned matter, That letter, dated June 20, 2018, was issued in response to allegations that the Claimant was sexually abused while he attended the Hill School. This carrier has now received a supplemental letter, dated December 26, 2018, from the Law Offices of Mitchell Garabedian to Tom D. Rees, Esq. of High Swartz, LLP, who is legal counsel to The Hill School. This letter was forwarded to Utica for review and for a coverage determination under its Commercial Package Policy, CPP-1686565, and Commercial Umbrella Liability Policy, CULP-1690933. Based on the allegations of sexual abuse against you, and the provisions of our policies, *the purpose of this letter is to inform you that no coverage is available to you in this matter.*

**SUMMARY OF ALLEGATIONS**

Mr. Garabedian's December 26, 2018 letter alleges that Kurtis Nicholas Poulos was sexually abused by you at The Hill School in approximately 1994 to 1995. He alleges the abuse occurred after Geometry class when you had Mr. Poulos stay behind and were alone with him. It is alleged Mr. Poulos was abused approximately 10 to 15 times during his sophomore year. The following year Mr. Poulos transferred to another school but returned to The Hill School for his senior year. He does not recall having any contact with you during his senior year or after he graduated in 1997.

Mr. Poulos alleges he was injured as a result of the sexual molestation and that these injuries include depression; sadness; crying; anxiety; emotional pain; sleep; concentration; low self-esteem; low self-respect; low self-confidence; apathy; finding himself not caring about things; self-medicating with alcohol and drugs; sabotaging himself; flashbacks and reminders of the abuse; feeling unbroken and unfixable; sexuality; problems with being touched; self-harm; feeling alone

Utica Mutual Insurance Company and its affiliated companies • 800.274.1914 • uticanational.com

Claim No.: 10139719
Page 2 of 7

and isolated; feeling ostracized at The Hill School; shame; embarrassment; guilt; self-blame; trust; intimacy; losing weight while at The Hill School; suicidal ideation; feeling an emotional void; anger; confusion; feeling like you ruined a part of his life; feeling like you sent him down the wrong road in life; feeling like you stole his childhood innocence. The letter inquires as to what The Hill School's position is with regard to this matter.

## POSITION ON COVERAGE

Based on the allegations presented, Utica has determined there is no coverage available to defend or indemnify you under the policies this carrier provided to The Hill School. We reviewed the policies, with effective dates of September 1, 1994 to February 1, 1995, under the **Commercial General Liability Coverage Form,** with $1,000,000.00 each occurrence and $2,000,000.00 aggregate limit, as well as the **Commercial Umbrella Liability Coverage Form** subject to $5,000,000.00 per occurrence and general aggregate limit. The underlying policy has been renewed on an annual basis to the present.

In reviewing potential coverage for this case, we examined the relevant forms under the above policies. The **Commercial General Liability Coverage Form**, CG 00 01 11 88, under the Commercial Package Policy provides coverage for damages the insured becomes legally obligated to pay because of "bodily injury" caused by an "occurrence" during the policy period. There is no coverage for "bodily injury" that is expected or intended from the standpoint of the insured. Further, the policy conditions require timely notification and cooperation as further explained below.

The **Commercial Umbrella Liability Coverage Form**, 8-UMC-C (Ed. 7-89), under the Commercial Umbrella Liability Policy provides excess liability coverage, subject to the same terms, conditions, agreements, exclusions and definitions as any insurance provided under the **Commercial General Liability Coverage Form**.

## ANALYSIS OF COVERAGE POSITION

The **COMMERCIAL GENERAL LIABILITY COVERAGE FORM, CG 00 01 11 88,** contains the following language:

## SECTION I – COVERAGES

*COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY*

*1, Insuring Agreement.*

    a,    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.

    b.    This insurance applies to "bodily injury" and "property damage" only if:

        (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory;" and

        (2)    The "bodily injury" or "property damage" occurs during the policy period.

Claim No.: 10139719
Page 3 of 7

Coverage is available under the policy for damages because of "bodily injury" caused by an "occurrence" that occurs during the policy period. The allegations against you, however, do not meet the policy definition of "occurrence" that is required to trigger coverage.

The policy continues, under the **CORPORAL PUNISHMENT** form **CG 22 67 11 85,** as follows:

**2. Exclusions**

This insurance does not apply to:

a. "Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

This exclusion does not apply to "bodily injury" resulting from:

(1) The use of reasonable force to protect persons or property; or
(2) Corporal punishment to any student of pupil administered by or at the direction of any insured.

Based on the above exclusion, no coverage is available for "bodily injury" expected or intended from the standpoint of the insured unless such injury results from the use of reasonable force to protect persons or property or from corporal punishment to any student or pupil by or at the direction of any insured. This exclusion further removes coverage for the allegations presented against you.

FORM **CG 00 01** continues:

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your employees, other than your executive officers, but only for acts within the scope of their employment by you.

The **COLLEGES OR SCHOOLS (LIMITED FORM)** endorsement, **CG 22 71 11 85,** adds:

3. **WHO IS AN INSURED (Section II)** is amended to include as an insured any of the following but only with respect to their duties in connection with the positions described below:
a. Any of your trustees or members of your Board of Governors if you are a private charitable or educational institution;
b. Any of your board members or commissioners if you are a public board or Commission; or
c. Any student teachers teaching as part of their educational requirements.

The above provisions indicate that the executive officers and directors of The Hill School are insureds but only with respect to their duties as such. The Hill School's employees are also insureds but only for acts within the scope of their employment. As the allegations against you are for acts that fall outside the scope of your employment with The Hill School, you do not qualify as an insured under the policy.

Form **CG 00 01** contains the following conditions, which require timely reporting and cooperation, as well as policy definitions:

### SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

2     **Duties In The Event Of Occurrence, Claim Or Suit.**
    **a.**   *You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent* possible, notice should include:

        **(1)**   How, when and where the "occurrence" or offense took place;
        **(2)**   The names and addresses of any injured persons and witnesses; and
        **(3)**   The nature and location of any injury or damage arising out of the "occurrence" or offense.

    **b.**   If a claim is made or "suit" is brought against any insured, you must:
        **(1)**   Immediately record the specifics of the claim or "suit" and the date receive; and
        **(2)**   Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or "suit" as soon as practicable.
    **c.**   You and any other involved insured must:
        **(1)**   Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"
        **(2)**   Authorize us to obtain records and other information;
        **(3)**   Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and
        **(4)**   Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    **d.**   No insureds will, except at their own cost, voluntarily make a payment, *assume any obligation, or incur any expense, other than for first aid, without our consent.*

### SECTION V – DEFINITIONS

  **4.**  "Bodily injury" means bodily injury, sickness or disease sustained by a person, Including death resulting from any of these at any time.

  **9.**  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

 **13.**  "Suit" means a civil proceeding in which damage because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this Insurance applies are alleged. "Suit" includes:
        **a.**   An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or
        **b.**   Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our

consent.

The **COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM, 8-UMC-C (Ed. 7-89),** contains the following language:

With respect to Coverage A. the word "insured" means any person or organization qualifying as such under any "underlying insurance.

## SECTION I - COVERAGES
## COVERAGE A - EXCESS LIABILITY
1.  **Insuring Agreement - COVERAGE A.**
    a.  We will pay those sums, in excess of the limits of liability under the terms of any "underlying insurance," that the insured becomes legally obligated to pay as damages because of "injury" or "wrongful act," to which this insurance applies, provided that the "underlying insurance" also applies, or would apply but for the exhaustion of its applicable limits of insurance. If, however, the Retained Limit applies as described below in **4. Retained Limit Each Incident - COVERAGE A,** we will pay only those sums in excess of the Retained Limit.

    This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance" except with respect to any provisions to the contrary contained in this insurance.

    b.  We will have the right to participate in the defense of claims or "suits" against the insured seeking damages because of "injury" or "wrongful act" to which this insurance may apply.  We will have a duty to defense such claims or "suits" when the applicable limit of insurance of the "underlying insurance" has been used up by payment of judgments or settlements. The right or duty to defend is limited as described below in **3. Defense of Claims Or Suits - COVERAGE A.**

    c.  The amount we will pay for damages is limited as described in SECTION **III -** LIMITS OF INSURANCE.

    d.  We will have no obligation under this insurance with respect to any claim or "suit" that is settled without our consent.

    e.  This insurance applies only to "injury" or "wrongful act" which occur during the policy period except for "bodily injury" by disease to your employees. With respect to "bodily injury" by disease to your employees, such "bodily injury" must:

    **(1)** Be caused or aggravated by the conditions of your employment; and
    **(2)** Result from exposure to conditions with the last day of last exposure occurring during the policy period.
    Any "Injury" must be caused by an "incident."

2.  *Exclusions - COVERAGE A.*
    *The exclusions applicable to the "underlying insurance" also apply to this insurance.*

## SECTION IV - CONDITIONS
## A.  Conditions Applicable Only to COVERAGE A.
   If any of the following conditions are contrary to conditions contained in the "underlying insurance," the provisions contained in this policy apply.
3.  **Duties In The Event Of Incident, Wrongful Act, Claim Or Suit**
    a.  You must see to it that we are notified promptly of an "incident" or "wrongful act" which may result in a claim to which this insurance applies.  To the extent possible, notice should include:
    **(1)** How, when and where the "incident" or "wrongful act" took place;
    **(2)** The names and addresses of any injured persons and witnesses; and
    **(3)** The nature and location of:
      **(a)** Any "injury" arising out of the "incident"; or
      **(b)** Any harm arising out of the "wrongful act."

   **b.** If a claim is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the claim or "suit."

   **c.** You and any other involved insured must:

      **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      **(2)** Authorize us to obtain records and other information;

      **(3)** Cooperate with us in the investigation, settlement or defense of the claim or "suit";

      **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any insured because of "injury" to which this insurance may also apply; and

      **(5)** Notify us immediately of any judgment or settlement of any claim or "suit" brought against any insured.

   **d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

## SECTION V - DEFINITIONS

**Definitions Applicable Only To COVERAGE A.**

**1.** "Aggregate limit" means the maximum amount stated in the policy for which the insurer will be liable regardless of the number of covered claims.

**2.** "Underlying insurance" means the liability insurance coverage provided under policies shown in the Declarations, for the limits and periods indicated. It includes any policies issued to replace those policies during the term of this insurance that provide:

   **a.** At least the same policy limits; and

   **b.** Liability insurance coverage for the same hazards insured against, except those changes we agree to in writing.

**3.** "Underlying insurer" means any insurer who issues a policy of "underlying insurance."

**4.** "Underlying policy" means a policy providing "underlying insurance."

**5.** "Wrongful act" means any harm, except "injury," for which the "underlying insurance" provides liability insurance coverage, or would have provided such coverage except for the exhaustion of limits by payments of judgments and settlements under the terms of such "underlying insurance."

**Definitions Applicable to COVERAGES A and B.**

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**5.** "Incident" means:

   **a.** With respect to "bodily injury" to persons other than your employees and "property damage," an accident, including continuous or repeated exposure to substantially the same general harmful conditions;

   **b.** With respect to "bodily injury" to your employees arising out of and in the course of their employment by you, the accident or disease which causes the "bodily injury"; and

   **c.** With respect to offense committed by the insured resulting in "personal injury" or "advertising injury," all such injury sustained by any one person or organization.

**6.** "Injury" means "bodily injury," "property damage," "advertising injury," or "personal injury."

**13.** "Suit" means a civil proceeding in which damages to which this insurance applies are alleged. "Suit" includes:

   **a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

The **COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM** provides coverage in excess of that which may be afforded under the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**.



However, as outlined above, this coverage is subject to the same terms, conditions, agreements, exclusions and definitions as the underlying insurance. As no coverage is available to you under the Commercial General Liability Coverage Form, coverage is also not available under the Umbrella Form.

## CONCLUSION

Based on the allegations that have been presented against you, and the provisions of our policies, we must inform you there is no available coverage to defend or indemnify you in this matter. Your alleged acts are, again, not deemed to be an "occurrence" or "incident" as those terms and provisions are defined. Furthermore, the alleged acts, as described, are not within the scope of your employment with The Hill School. As such, you are not an insured under the policies. Utica, therefore, disclaims coverage to you under its policies.

To the extent that a particular term, condition, limitation, or exclusion has not been cited, or any issue not referenced, that was not intended, it should not be considered as a waiver of any right this company may have under the policy. We reserve the right to amend this coverage letter should it become necessary. Nothing this company, or its agents, do in the investigation of this case is intended as a waiver of any of our policy rights or provisions.

Please notify us immediately should you receive any additional correspondence related to this matter, including any formal legal pleadings, so that we can review to determine whether they impact our coverage position. If you have any questions on our position at this time, please direct them to the Complex Liability Claims Specialist, Karen Lind, who is assigned to the claim. Karen can be contacted at 315-734-2205 or Karen.lind@uticanational.com .

Sincerely,

UTICA NATIONAL INSURANCE GROUP

Mark Nowak SP

**Mark Nowak**
Complex Liability Claims Examiner

cc:

Willis Towers Watson
26 Century Boulevard
Nashville, TN 37214

The Hill School
Attn: Rick Wood, CFO & Treasurer
717 East High Street
Pottstown, PA 19464



## THE HILL SCHOOL

April 8, 2016

Matthew B. Ralston P'05'07
The Leelanau School
Glen Arbor, MI 49636

RE: Capital Giving Officer at The Hill School

Dear Matt,

It was great to speak with you this morning. Thank you for accepting the position of Capital Giving Officer at The Hill School. We are very excited for you to assume this responsibility at The Hill and within the Advancement Office. Please see our formal offer below.

The starting salary will be $68,000. This position is a full-time position with the Advancement Office and The Hill School. It is eligible for our benefits package of healthcare, retirement, vacation, and other matters – as will be provided to you by Heather Gelting, our human resources director. You will begin the Capital Giving Officer position with a start date of July 1, 2016. You will work remotely from your homes in Michigan and Ohio.

The Hill School will provide the following benefits to accommodate your remote work:
1) All travel expenses will be covered by a school-issued credit card
2) Cell phone reimbursement of $75 per month
3) School-provided laptop computer
4) Traverse City or Columbus Airport will be your hub

Included below are the stipulations for your remote status:
1) You will attend the previously scheduled Plus Delta training in Philadelphia
2) You will schedule your campus visits (monthly) around Plus Delta sessions
    a. You will likely stay in the Guest House on campus
3) You will have a weekly call with Geoff
4) You will be available by phone and email during working hours
    a. We will expect a call or email back within a reasonable amount of time (1-2 hours) that same day if someone from The Hill reaches out to you, especially from the Advancement Office
5) You may be expected to attend key on-campus events as needed
    a. Lawrenceville Weekend, Reunion Weekend, Dedications, etc.
6) You will make us aware of home/travel/meeting dates one week in advance



HILLDOE0288
1673a

7) You will be expected to complete at least 12-15 donor meetings per month
8) You will send Geoff contact reports within 72 hours of visits

This position at The Hill is critical and valued. You being a part of that important work will help us be more successful. Please sign and date below and return to us to confirm your formal acceptance.

**Congratulations!  We in the Advancement Office look forward to working with you.**

Best,

Geoffrey A. Neese '00
Director of Capital Giving

Accepted by:

Matthew B. Raltson P'05'07

4.11.2016
Date

HILLDOE0289
1674a

**Heather Gelting**

| | |
|---|---|
| **From:** | Geoff Neese |
| **Sent:** | Monday, April 11, 2016 1:33 PM |
| **To:** | Hill Faculty; Hill Staff |
| **Cc:** | Matt |
| **Subject:** | New gift officer - Matt Ralston |

Good afternoon,

I am excited to announce that **Matt Ralston** will be returning to The Hill in July as a Capital Giving Officer.

As many of you remember, Matt spent 17 years at The Hill from 1992-2009 where he served as math teacher, Academic Dean, and Dean of Faculty. Matt also spent many years coaching cross country, winter track, and JV boys' lacrosse. Matt and his wife Mary Beth raised their two sons (Zach '05, Kyle '07) here at The Hill. They lived in the dorm for 14 years in Dutch Village, Upper School, and Rolfe. Matt has spent the past seven years as Headmaster of The Leelanau School in Glen Arbor, Michigan. Matt has his undergraduate and master's degrees from Ohio State.

Matt will join a team of six gift officers and fill the opening left by Jessica Moyer's departure. Matt's work will be critical as we head into year three of *The Strength of All* Campaign. Matt will work remotely from his homes in Michigan and Ohio but will be on campus monthly to meet with the Advancement Office and stay connected to campus. He will likely cover the Midwest region in our major gifts department. Matt will officially start on July 1st but will be back on campus several times between now and then. If you see Matt, please welcome him back!

Best,
Geoff

**Geoff Neese '00**
**Director of Capital Giving**
Office: 610-705-1194 | Mobile: 484-942-7582
gneese@thehill.org

**THE HILL SCHOOL**
**THE FAMILY BOARDING SCHOOL ™**
717 East High Street | Pottstown, PA 19464
www.thehill.org | Find us on Facebook!



EXHIBIT
D 22
9/20/21

1

HILLDOE0287
1675a



# THE HILL SCHOOL
### THE FAMILY BOARDING SCHOOL™

June 19, 2017

To: Ralston, Matthew B.

Dear Matt:

As we come to the conclusion of another successful school year at Hill, it is my pleasure to inform you of your new salary for the 2017-18 fiscal year. Effective July 1, 2017 your annual salary will $73,100, paid bi-weekly, $2,811.54.

Due to your efforts, Hill continues to be one of the premier independent schools in the country. We have much to be proud of, a successful graduating class, full enrollment for the fall, an ambitious campus improvement program, and growing support from our loyal alumni. None of this would be possible without your important contributions throughout the year. On behalf of our Board of Trustees and Headmaster Lehman, I thank you for all that you do to make Hill a great place for students, staff and faculty.

As you know, I will be retiring in July 2017. It has been a pleasure working with all of you. I wish you continued success in all your endeavors.

Congratulations and thank you.

Sincerely,

Donald Silverson
CFO & Treasurer

*Matt,*
*Nice to see you at*
*Reunion. Glad to have*
*you as part of the campaign.*
*Good luck,*
*D*

EXHIBIT
D 23
9/20/21  JC

717 East High Street • Pottstown, Pennsylvania 19464-5791 • 610-326-1000 • www.thehill.org



Deposition of:
# Mitchell Garabedian

*June 24, 2021*

In the Matter of:

# Doe, John v. Garabedian, Mitchell Esq et al

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                                    NO. 2:19-cv-01539

4      - - - - - - - - - - - - - - - - - -

5      JOHN DOE

6                     Plaintiff

7        v.

8      MITCHELL GARABEDIAN, ESQ., LAW

9      OFFICES OF MITCHELL GARABEDIAN

10     and KURTIS N. POULOS

11                    Defendants

12     - - - - - - - - - - - - - - - - - -

13

14

15           AUDIOVISUAL DEPOSITION of MITCHELL GARABEDIAN,

16     a witness called by counsel for the Plaintiff, taken

17     pursuant to the Federal Rules of Civil Procedure before

18     Kristen L. Kelly, Registered Professional Reporter, CSR

19     No. 115893 and Notary Public in and for the

20     Commonwealth of Massachusetts, at REGUS BOSTON,

21     75 State Street, Boston, Massachusetts, on Thursday,

22     June 24, 2021, commencing at 10:01 a.m.

23

24

25

Page 2

1  A P P E A R A N C E S :
2
3  THE BEASLEY FIRM, LLC
4    By:  Lane R. Jubb, Jr., Esquire
5        Louis F. Tumolo, Esquire
6        The Beasley Building
7        1125 Walnut Street
8        Philadelphia, Pennsylvania 19107
9        215.592.1000
10       lane.jubb@beasleyfirm.com
11       louis.tumolo@beasleyfirm.com
12       For the Plaintiff
13
14
15  SWARTZ CAMPBELL LLC
16    By:  Jeffrey B. McCarron, Esquire
17        Candidus K. Dougherty, Esquire (Remote)
18        One Liberty Place, 38th Floor
19        1650 Market Street
20        Philadelphia, Pennsylvania 19103
21        215.299.4376
22        jmccarron@swartzcampbell.com
23        cdougherty@swartzcampbell.com
24        For Mitchell Garabedian, Esquire and
25          Law Offices of Mitchell Garabedian

Page 3

1  REMOTE APPEARANCE:
2
3  KURTIS N. POULOS, PRO SE
4        3239 West Colony Drive
5        Greenfield, Wisconsin 53221
6        262.330.4604
7        lex101078@gmail.com
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  ALSO PRESENT IN BOSTON:
25    Adam Cerro, Videographer

Page 4

1              I N D E X
2  Deponent:        Direct  Cross  Redirect  Recross
3  MITCHELL GARABEDIAN
4    By Mr. Lane        8
5    By Mr. Poulos            235
6
7
8            E X H I B I T S
9  No.                        Page
10  Exhibit 1  Email Chain, 12.13.2017;        35
11        Garabedian 029
12  Exhibit 2  12.13.2017 Letter Between Mitchell    37
13        Garabedian and Kurtis Poulos;
14        Garabedian_File0111-112
15  Exhibit 3  12.15.17 Memo; Garabedian 112 and    40
16        12.15.17 Memo; Garabedian 116
17  Exhibit 4  04.11.2018 Letter Between Mitchell    42
18        Garabedian and The Hill School;
19        Garabedian 114
20  Exhibit 5  01.30.2018 Letter Between Mitchell    43
21        Garabedian and The Hill School;
22        Garabedian 115
23  Exhibit 6  04.11.2018 Letter Between Mitchell    46
24        Garabedian and Zachary Lehman;
25        Garabedian 071-72

Page 5

1            E X H I B I T S
2  No.                        Page
3  Exhibit 7  04.11.2018 Letter Between Mitchell    49
4        Garabedian and Zachary Lehman;
5        Hill0219-0220/P16.219-220
6  Exhibit 8  09.17.2018 Email Between Kurtis    79
7        Poulos and Mitchell Garabedian;
8        Garabedian_Email 0057-58
9  Exhibit 9  09.20.2018 Email Between Kurtis    79
10        Poulos and Mitchell Garabedian;
11        Garabedian_Email 0059-60
12  Exhibit 10  04.24.2018 Letter Between Thomas    92
13        Rees and Mitchell Garabedian;
14        Garabedian 065
15  Exhibit 11  Email Chain, 12.18.2018 Between    95
16        Thomas Rees and Mitchell Garabedian;
17        Garabedian 063
18  Exhibit 12  01.28.2019 Letter Between Mitchell    104
19        Garabedian and Thomas Rees;
20        Garabedian 047
21  Exhibit 13  12.19.2018 Email Chain Between    104
22        Thomas Rees and Mitchell Garabedian;
23        Garabedian 061
24
25

Page 6

1            E X H I B I T S
2    No.                              Page
3    Exhibit 14  01.09.2019 Email Between Thomas Rees   109
4         and Mitchell Garabedian;
5         Garabedian 051
6    Exhibit 15  01.30.2019 Email Between Thomas Rees   132
7         and Mitchell Garabedian;
8         Garabedian 046
9    Exhibit 16  12.26.2018 Letter Between Mitchell     136
10        Garabedian and Thomas Rees;
11        Hill 0225-0226/P16.225-226
12   Exhibit 17  02.19.2019 Email Between Kurtis         140
13        Poulos and Mitchell Garabedian;
14        Garabedian_Email 0067
15   Exhibit 18  Handwritten Notes;                      144
16        Garabedian_File0001-40
17   Exhibit 19  Contingent Fee Agreement;               210
18        Garabedian_File 0072
19   Exhibit 20  12.13.2017 Email From Mary Ellen        219
20        Poulos to Mitchell Garabedian;
21        Garabedian_File 0047-50
22   Exhibit 21  04.23.2016 Headmaster Message;          223
23        Hill 0240
24
25        (Exhibits attached to transcript.)

Page 7

1            P R O C E E D I N G S
2
3            THE VIDEOGRAPHER:  Good morning.  We are
4    going on the record.  The time is 10:01 a.m. on
5    June 24th, 2021.  This is media unit one of the
6    video-recorded deposition of Mitchell Garabedian taken
7    by counsel for plaintiff in the matter of John Doe v.
8    Mitchell Garabedian filed in the U.S. District Court
9    for the Eastern District of Pennsylvania.  This
10   deposition is being held at 75 State Street, First
11   Floor, Boston, Massachusetts.
12           My name is Adam Cerro from the firm
13   Veritext Legal Solutions.  I am the videographer.  The
14   court reporter is Kristen Kelly.
15           Counsel will now state their appearances
16   and affiliations for the record.  If there are any
17   objections to proceeding, please state them at the time
18   of your appearance beginning with the noticing
19   attorney.
20           MR. JUBB:  Good morning.  Lane Jubb of
21   The Beasley Firm for plaintiff.
22           MR. McCARRON:  Jeffrey McCarron.  I
23   represent Mitchell Garabedian.
24           MR. JUBB:  Mr. Poulos, would you like to
25   introduce yourself for the record, please.

Page 8

1            MR. POULOS:  Yeah, Kurt Poulos here pro
2    se.
3            THE VIDEOGRAPHER:  Thank you.
4            Will the court reporter please swear in
5    the witness.
6
7            MITCHELL GARABEDIAN
8
9    having been satisfactorily identified by the production
10   of his Massachusetts driver's license and duly sworn
11   was examined and testified as follows:
12
13           DIRECT EXAMINATION
14   BY MR. JUBB:
15       Q   Mr. Garabedian, good morning.
16       A   Good morning.
17       Q   How many cases -- strike that.
18           When was the last time you successfully tried
19   a case to a verdict involving allegations of sexual
20   abuse of a minor?
21           MR. McCARRON:  Objection.
22       A   I don't recall.
23       Q   Was it more than ten years ago?
24       A   Yes.
25       Q   Was it more than 20 years ago?

Page 9

1        A   Yes.
2        Q   When was the last time that you deposed a
3    witness who was being accused of abusing a minor
4    sexually?
5            MR. McCARRON:  Objection.
6        A   I don't recall.
7        Q   Was it more than five years ago?
8            MR. POULOS:  Hey, Lane?
9            MR. JUBB:  Yeah.
10           MR. POULOS:  Sorry to interrupt.  I can
11   barely hear you guys.
12           MR. JUBB:  Okay.  I'll, I'll speak up.
13       Q   And, Mr. Garabedian, when I speak louder,
14   it's not indicative in any sort of tone.
15       A   Sure.
16       Q   It's just so he can hear.
17           THE WITNESS:  Can you repeat the last
18   question?
19           MR. JUBB:  Sure.
20       Q   Do you recall the last time that you deposed
21   a witness who was being accused of abusing a minor?
22       A   Yes.
23       Q   When was that?
24       A   About two, two months ago.
25       Q   Was that a witness who was involved in any

1    way with the church?
2       A   Yes.
3       Q   Okay.  Approximately how many depositions do
4    you take a month?
5           MR. McCARRON:  Objection.
6       A   It depends.  When we're in discovery, when
7    we're in discovery mode, it could be quite a few and
8    other times maybe not.
9       Q   Well, over the last -- I know 2020's a little
10   bit different, but in the 2019/2018/2017 timeframe,
11   approximately how many times a month were you deposing
12   witnesses?
13      A   My office or me?
14      Q   You.  You, sir.
15      A   I don't recall.  Not too many.
16      Q   More than two a month?
17      A   No.
18      Q   Approximately how many times in the last --
19   let me back up.
20          I appreciate that there might be reasons in
21   2020 where things were kind of on hold with, with
22   courts and whatnot, so I am including proceedings by
23   Zoom, okay, in, in my questioning here.
24          When was the last time that you appeared
25   before a court?

1       A   Last week.  Earlier this week.
2       Q   And did that have to do with allegations --
3    strike that.
4           Did that have to do with a case involving
5    allegations of sexual abuse of a minor?
6       A   Yes.
7       Q   Do you handle any other cases right now other
8    than sexual abuse of minor allegations?
9       A   Yes.
10      Q   Like what?
11      A   Sexual abuse of an adult.
12      Q   Do you handle any other cases involving civil
13   matters other than anything -- strike that.
14          Do you handle any other civil matters other
15   than those involving allegations of sexual abuse or
16   sexual assault?
17      A   No.
18      Q   Have you ever successfully tried a case to
19   verdict involving sexual abuse of a minor?
20          MR. McCARRON:  Objection.
21      A   No.
22      Q   Approximately how many cases do you have?
23      A   In my office right now?
24      Q   Yes, sir.
25      A   500.

1       Q   And of those 500 has that number been
2    consistent for the last five to ten years?
3       A   More or less.  It's probably a little higher
4    now.
5       Q   When was the last time that you prosecuted a
6    case against a school?
7       A   Prosecuted as in criminal?
8       Q   No.  You do civil work, right?
9       A   Yeah.
10      Q   Okay.  So when was the last time that you
11   tried a case involving allegations of sexual abuse by a
12   teacher in any of the accusers from a former student?
13      A   I never have.
14      Q   Approx --
15          MR. POULOS:  Can I interject again?  I
16   can't hear any of the answers.
17          MR. JUBB:  Okay.
18      Q   Would you mind speaking up?
19      A   Sure.
20      Q   I know that we're very close, and it's
21   uncomfortable to shout at each other.
22      A   Sure.
23          MR. JUBB:  And if there's any way that
24   you could turn up the volume too.
25          THE VIDEOGRAPHER:  There's really not,

1    actually.
2           MR. JUBB:  Okay.
3           THE VIDEOGRAPHER:  Unfortunately.
4           THE WITNESS:  Do you want to move this
5    closer to me?  Would it matter?
6           THE VIDEOGRAPHER:  If I moved it closer
7    to you, you might not be as --
8           MR. JUBB:  I think I might be able to
9    speak up a bit more, but I think he's a little bit
10   quieter.
11          THE VIDEOGRAPHER:  I can try shifting it
12   a little bit.
13          (Pause.)
14   BY MR. JUBB:
15      Q   Mr. Garabedian, of those 500 cases that you
16   currently have in your office, it's my understanding
17   that that number has been the same for approximately
18   the last five to ten years?
19      A   More or less.  It goes up and down.
20      Q   How many of them involve confidential
21   settlements?
22          MR. McCARRON:  Objection.
23      A   In the last?
24      Q   Five to ten years.
25      A   Maybe one.

Page 14

1     Q    Maybe one is confidential?
2     A    Yes.
3     Q    And when I say confidential, I'm referring to
4  the fact that -- are you just referring to the number?
5  Did you understand that when I say confidential?
6     A    I don't know what you mean.
7     Q    Sure.  So when cases resolve they can resolve
8  for --
9          MR. McCARRON:  Why don't you just do
10  this.  Just, if you would, ask a question instead of --
11  the commentary problem -- the commentary doesn't become
12  a question so that's my concern.
13         MR. JUBB:  Yeah, I'm just trying to give
14  a background and then what I'll do is tighten it up for
15  you, okay.
16         MR. McCARRON:  Well, I just think -- I
17  think you asked a question about how many involved
18  confidential -- how many of the settlements were
19  confidential.  I'm not sure why you think there's a
20  misunderstanding.  He answered maybe one.  So why don't
21  we ...
22         MR. JUBB:  Okay.  I'll, I'll -- I'm not
23  sure what the issue is.
24         MR. McCARRON:  I'm not trying to give
25  you a hard time.  I'm just saying that what's the

Page 15

1  controversy about that, if you could just -- I'm
2  just -- my issue is with the commentary, that's all.
3          MR. JUBB:  Okay.
4          MR. McCARRON:  So don't do that.
5     Q    Mr. Garabedian, when you said --
6          MR. JUBB:  Well, I'm going to ask my
7  question and then if he has -- if I'm confused, I'm
8  going to ask the --
9          MR. McCARRON:  I don't have any problem
10  with you asking questions assuming they're appropriate
11  questions or, you know, proper -- you know, proper
12  questions.  That's not what my issue is.  My issue is
13  that you were having a conversation.
14         MR. JUBB:  Involving questions.
15         MR. McCARRON:  It wasn't a question.  It
16  was -- that's, that's my only issue.
17         MR. JUBB:  All right.  We've been going
18  for, for eight minutes --
19         MR. McCARRON:  If you ask --
20         MR. JUBB:  -- so if, if -- I am going to
21  have to explain --
22         MR. McCARRON:  No.
23         MR. JUBB:  -- what I'm talking about to
24  the witness and --
25         MR. McCARRON:  No.

Page 16

1          MR. JUBB:  -- then tightening up a
2  question.
3          MR. McCARRON:  No.
4          MR. JUBB:  You're not going to allow me
5  to explain --
6          MR. McCARRON:  No.
7          MR. JUBB:  -- the basis of my question.
8          MR. McCARRON:  No.  You're only allowed
9  to ask questions.  That's all you're permitted to do.
10         MR. JUBB:  Okay.
11         MR. McCARRON:  So far you've been fine.
12  It's just that now you're about to get into this
13  dialogue or what I characterize as commentary.  We're
14  not going to do that.  Just ask a question.  So go
15  ahead.
16         MR. JUBB:  Okay.  If at any point in
17  time you think that I didn't ask a question, just tell
18  me rephrase it, okay?
19         THE WITNESS:  Thank you.
20         MR. JUBB:  All right.
21  BY MR. JUBB:
22     Q    So my understanding is that over the last
23  five to ten years the overwhelming majority of the
24  cases that you have resolved have not been
25  confidential; is that right?

Page 17

1     A    That's correct.
2     Q    And when you said not confidential, what do
3  you mean by that?
4     A    It's -- they're not confidential.
5     Q    Are the, the amount -- strike that.
6          Is the amount of the proceeds that your
7  client received confidential?
8     A    No.
9     Q    And in doing that, of those cases that have
10  resolved, approximately how many, if you can, involve
11  defendants who were former teachers?
12     A    I, I couldn't tell you.
13     Q    Do you have any right now that involve former
14  teachers?
15     A    Do I have any what?
16     Q    Do you have any cases that involve
17  allegations against former teachers?
18     A    Yes.
19     Q    Okay.  Approximately how many?
20     A    I don't know.
21         MR. McCARRON:  Objection.
22     Q    What portion of them take up your practice?
23     A    A small portion.
24     Q    And in those cases that you have
25  approximately -- strike that.

5 (Pages 14 - 17)

Page 18

1     Of the 500 or so cases that you have
2  maintained in that ballpark over the last five to ten
3  years, what portion of them would you say involve
4  allegations of sexual abuse of a then minor for
5  somebody who's over the age of 40?
6     A  I, I don't know.  Some of them.  I, I don't
7  know.
8     Q  When was the last time you filed a lawsuit
9  when the statute of limitations was blown?
10        MR. McCARRON:  Objection.
11     A  When, when it was blown?
12     Q  Yeah.  Do you know what I mean by that?
13     A  No.
14     Q  Okay.  So you've never heard the expression
15  "the statute of limitations was blown?"
16        MR. McCARRON:  Objection.
17     A  I don't know what you mean by blown.
18     Q  Okay.  So what's the statute of limitations?
19        MR. McCARRON:  Objection.
20     A  A deadline to file a lawsuit.
21     Q  And where does the statute of limitations
22  come from?
23        MR. McCARRON:  Objection.  You're not
24  going to answer that.  He's not going to answer that.
25  You're not here to conduct a legal exam -- I mean the

Page 19

1  bar exam for Mr. Garabedian.  You're here to ask
2  questions about facts.  He's not going to be your
3  source of information about the statute of limitations.
4        MR. JUBB:  All right.  Watch this.
5  Watch this, okay.
6     Q  Mr. Garabedian, before you decide to file a
7  lawsuit do you take into consideration what the statute
8  of limitation is?
9     A  Yes.
10     Q  All right.  And when you do that, where do
11  you go to determine the statute of limitations?
12     A  Don't argue with me, okay.  I mean ... don't
13  argue with me.  If you're not going to be respectful, I
14  mean I don't need you humping over here and you, know,
15  just at me and then looking at me like that and --
16     Q  I just wanted to make sure my question wasn't
17  pertaining --
18     A  Okay.
19     Q  -- to a legal conclusion, that's that.  So
20  I'm happy to, to lean back a little.
21        But when you go file these cases, --
22        MR. McCARRON:  These cases.
23     Q  -- you yourself make a determination as to
24  when the statute of limitations is, correct?
25     A  Yes.

Page 20

1     Q  All right.  And so when you're making that
2  determination, how do you make that determination?
3     A  Look at the relevant law.
4     Q  And the relevant law, that would be
5  statutory, correct?
6     A  Yes.
7     Q  And that's something that is a code created
8  by legislature, correct?
9     A  Yes.
10     Q  All right.  And of the cases that you have
11  right now, how many of them have you filed where you
12  knew the statute of limitations had expired?
13     A  None.
14     Q  As of December 2017 am I correct that you
15  first heard from Mary Ellen Poulos before Mr. Poulos?
16     A  I don't recall.
17        MR. McCARRON:  Okay.  I'm sorry.  I
18  misunderstand -- didn't hear you.  As of did you say
19  December --
20        MR. JUBB:  December of 2017.
21     Q  Do you recall how you were first contacted as
22  to any of the allegations that were going to be made by
23  Mr. Poulos?
24     A  No.
25     Q  Take me through, if you will, your practice

Page 21

1  at that timeframe.  Do you employ personally the
2  associates -- strike that.
3        As of 2017 did you personally employ all of
4  the folks that work under your law practice?
5     A  Yeah, they're my associates.
6     Q  All right.  And how many did you have at that
7  time?
8     A  I don't know.  I'd have to look.
9     Q  Was it more than five?
10     A  Probably between five and seven and eight.
11     Q  All right.  And those associates, did they
12  have any experience in trying cases at all?
13        MR. McCARRON:  Objection.
14     A  One.
15     Q  One?  And who would that be?
16     A  William Gordon.
17     Q  And does Mr. Gordon -- strike that.
18        Do you know his experience with trying cases?
19     A  Not really.
20     Q  During the December 2017 timeframe, what was
21  the process for your intakes?
22     A  I would speak to a client and gain
23  information.
24     Q  And, and what were the ways in which a
25  potential client would contact you?

6 (Pages 18 - 21)

Page 22

1     MR. McCARRON: Well, objection. I don't
2  know. You're asking him -- I just want to be clear
3  what you're asking. How a client would make contact is
4  that your question?
5     MR. JUBB: Yeah.
6  A  Call me. Send a letter. Email.
7  Q  Okay. And did you --
8  A  Various ways. I mean ...
9  Q  Sure.
10    Did you have an intake department?
11 A  No, not specifically. I mean ...
12 Q  All right. So let's take the example of a
13 phone call.
14 A  Yeah.
15 Q  If there's a phone call to the office and
16 it's from a potential client, take me through the
17 process as to how that person gets to your desk.
18 A  They'd speak to me. And I might interview
19 them. One of my associates might interview them.
20 Q  And approximately -- how many -- if you can
21 for us, do you keep statistics on your intakes?
22 A  Statistics?
23 Q  Sure. So some law firms pay attention to
24 whether or not cases are coming in by telephone, by
25 web. Maybe they're coming in by the letter that you

Page 23

1  referred. Sometimes people actually walk through the
2  door. My question was if you take or maintain
3  statistics as to how your intakes are received?
4  A  No.
5  Q  All right. As of December 2017 are you able
6  to tell me the policy that was in place as to who would
7  be the person doing the initial interviews?
8     MR. McCARRON: Objection.
9  A  No.
10 Q  Was there one in place?
11 A  Well, if a person called, I would speak to
12 them usually, and we'd do an intake. And sometimes my
13 associates would do an intake.
14 Q  Approximately how many intakes do you receive
15 a month?
16 A  I don't know.
17    MR. McCARRON: Objection.
18 Q  Does anybody in your office know?
19 A  No.
20 Q  All right. So of the intakes you receive a
21 month does every client get to speak to you?
22 A  Most of them.
23 Q  And for the ones that speak to you am I
24 correct that they speak to somebody else first before
25 they speak to you?

Page 24

1  A  Maybe. Maybe not.
2  Q  Well, in a given day do you spend the
3  majority of your time in the office?
4  A  Sometimes.
5  Q  Well, my question was the majority of the
6  time. Do you spend the majority of your time in the
7  office?
8  A  Oh, I'm sorry. Yeah.
9  Q  Okay. And in terms of client discussions,
10 are they predominantly over the phone?
11 A  Yes.
12 Q  If a potential client lives outside the, the
13 immediate, you know, driving Massachusetts area and
14 they contact you, do you have any sort of pattern of
15 requesting that they come to your office to meet
16 personally?
17 A  No.
18 Q  Do you ever question them in person to, to
19 see their eye contact or their -- any sort of
20 mannerisms in which they describe their story to you?
21 A  Sometimes.
22    MR. McCARRON: Objection.
23 Q  And in what situations would that be?
24 A  If a person walked in the door.
25 Q  And unless they walk in the door am I correct

Page 25

1  that you're not going to be meeting with them to
2  discuss or evaluate them in their potential claims?
3  A  Correct.
4  Q  And with respect to Mr. Poulos am I
5  correct that --
6  A  Well, sometimes we do. Sometimes we don't.
7  I mean there's no -- it's not an absolute.
8  Q  Okay. But the majority of the time am I
9  correct that if a client contacts you by phone that you
10 are not interviewing them in person?
11 A  Correct.
12 Q  And am I correct that at no point in time did
13 you ever meet Mr. Poulos?
14 A  Correct.
15 Q  Am I correct that at no point in time did any
16 of your associates ever meet Mr. Poulos?
17 A  Correct.
18 Q  And am I correct that at the time of
19 2017/2018 did your office have the ability to do
20 videoconference calls or Zoom?
21 A  I don't recall.
22 Q  As of 2017/2018 did you ever have an
23 opportunity to meet with Mrs. Poulos?
24 A  Did I ever have an opportunity?
25 Q  Sure. I'll rephrase that to make it easier

7 (Pages 22 - 25)

1  for you.
2      MR. McCARRON:  Do you mean just did
3  meet?  Is that what you're asking?
4      MR. JUBB:  That's what I was going to
5  do, yeah.  I got this.
6      Q   Did you ever meet Mrs. Poulos?
7      A   No.
8      Q   During the 2017/2018 timeframe had you ever
9  been involved in cases in Pennsylvania before?
10     A   I don't recall.
11     Q   At some point in time -- strike that.
12         In looking at your website just the other
13  day, I saw photos of you and Mr. Gordon; is that
14  correct?
15     A   Yes.
16     Q   And the other individuals who are listed
17  there, am I correct that none of them are barred in
18  Pennsylvania?
19     A   Correct.
20     Q   And you're not barred in Pennsylvania,
21  correct?
22     A   Correct.
23     Q   Have you ever tried a case in Connecticut?
24     A   No.
25     Q   Have you ever tried a case in New York?

1      A   No.
2      Q   Have you ever filed a lawsuit in Connecticut?
3      A   Yes.
4      Q   Are you barred in Connecticut?
5      A   No.
6      Q   Take us through the process as to how you can
7  file a lawsuit in Connecticut when you're not barred
8  there.
9      A   I use local counsel.
10     Q   Who's your local counsel in Connecticut?
11         MR. McCARRON:  Objection.
12     A   Keefe & Errante was the law firm I used in
13  the Haiti cases in Connecticut.
14     Q   Have you ever filed a lawsuit in New York?
15     A   Yes.
16     Q   Have you -- was your local counsel in
17  that case?
18     A   Simmons law firm.
19     Q   Have you ever filed a lawsuit in Pennsylvania
20  before?
21     A   No.
22     Q   Have you ever worked with a law firm in
23  Pennsylvania before?
24     A   I've spoken to Pennsylvania counsel, but I've
25  never -- if that's what you mean by worked.  I mean ...

1      Q   Sure.  And when you spoke with counsel from
2  Pennsylvania was that in regards to another case that
3  you had?
4      A   I think in regards to Pennsylvania cases,
5  yeah.
6      Q   Were you involved in any of the cases against
7  Penn State for Jerry Sandusky?
8      A   Well, I did have a client, yes.
9      Q   And did you take any depositions in that
10  case?
11     A   No.
12     Q   Did you file any lawsuit in that case?
13     A   No.
14     Q   Did you draft any discovery in that case?
15     A   No.
16     Q   But you did have a client who received a
17  settlement in that case, correct?
18     A   No.
19     Q   Okay.  Did you ever file a case in New Jersey
20  before?
21     A   Yes.
22     Q   And who's your local counsel in New Jersey?
23         MR. McCARRON:  Objection.
24     A   Attorney Dan Woodard.
25     Q   Have you ever filed a lawsuit in Wisconsin

1  before?
2      A   No.
3      Q   Have you ever filed a lawsuit in Ohio before?
4          MR. McCARRON:  Objection.
5      A   No.
6      Q   And just to clarify, I know my first question
7  had to do with cases involving sexual abuse so --
8  strike that.  I don't want there to be any commentary.
9          MR. McCARRON:  Thank you.
10     Q   When was the last time that you successfully
11  tried any case?
12         MR. McCARRON:  Objection.
13     A   It had to be years ago.
14     Q   When you say "years ago", you mean more than
15  20 years, correct?
16     A   Yes.
17     Q   Was it more than 30?
18     A   I don't know.
19     Q   Was it more than 40?
20     A   I don't know.
21     Q   Well, what comes to mind when you think of
22  the, the last time you gave a closing argument to a
23  jury?
24     A   It was quite a few years ago.  It was a car
25  accident case.

1    Q   And -- strike that.
2        Was that in Boston?
3    A   Massachusetts.
4    Q   Yes.  Okay.
5        So ultimately do you recall how you first
6    came to learn of Mr. Poulos's allegations?
7    A   No.
8    Q   In anticipation of today's deposition tell me
9    what you reviewed, please.
10       MR. McCARRON:  Objection.
11   A   I reviewed exhibits to deposition.
12   Q   Did you review Mr. Poulos's deposition?
13   A   Yes.
14   Q   Did you review the -- all the exhibits
15   attached to his deposition?
16   A   I don't know if I reviewed them all.
17   Q   Did -- other than your counsel, of course,
18   did anyone review those depositions with you?
19   A   No.
20   Q   Did you review all of them?
21       MR. McCARRON:  I think he said he didn't
22   know.
23       MR. JUBB:  No, he said that as to
24   exhibits.
25   Q   So there were multiple days of

1    Mr. Poulos's --
2    A   I'm not sure if I -- there were multiple
3    days.  I'm not sure if I read them all.
4    Q   All right.  Well, in reviewing his
5    deposition -- strike that.
6        Did you review any of the production that you
7    provided in this case as part of discovery or initial
8    disclosures?
9    A   I reviewed the exhibits.
10   Q   All right.  And in -- which exhibits?
11   A   To the deposition.
12   Q   Okay.  So does that mean that you did not
13   review any of the documents that you produced as part
14   of discovery or disclosures?
15   A   I may have reviewed some of them.  I don't
16   know.
17   Q   Well, take me through what you reviewed,
18   please.
19       MR. McCARRON:  Objection.  You can
20   answer to the extent those are documents that were --
21   that you reviewed that were not shared with you by your
22   lawyers only.
23   Q   Do you understand his caveat?
24   A   Yeah, I only reviewed what my lawyers gave me
25   to review.

1        MR. JUBB:  Okay.  But is it -- hold on,
2    Jeff.  Is it your position that I'm not allowed to know
3    what documents he looked at by himself in anticipation
4    of today?
5        MR. McCARRON:  Yes.
6        MR. JUBB:  Okay.
7    Q   So, Mr. Garabedian, who was the first person
8    to speak with Mr. Poulos?
9        MR. McCARRON:  In his office is that
10   what you're asking?
11       MR. JUBB:  No, just generally.  I mean
12   like Mr. Poulos never came to his office.
13       MR. McCARRON:  No.  No.  No.  I don't
14   mean that, sorry.  You said -- you asked who was the
15   first person to speak with Mr. Poulos.  How he would
16   ever know who the first person Mr. Poulos ever spoke
17   to?
18       MR. JUBB:  That sounds like an answer
19   that he would give me.
20       MR. McCARRON:  Concerning what?
21       MR. JUBB:  Who first spoke to
22   Mr. Poulos.
23       MR. McCARRON:  You mean when he first
24   learned how to speak?  I imagine it was his mother.
25       MR. JUBB:  You thought that that was my

1    question?
2        MR. McCARRON:  Well, you need to put a
3    subject to it.
4        MR. JUBB:  Okay.
5        MR. McCARRON:  First person.  That's why
6    I asked you the person -- are you asking about someone
7    in his -- within Mr. Garabedian's office?  What are you
8    trying to find out?
9        MR. JUBB:  Yeah, okay.
10   BY MR. JUBB:
11   Q   Mr. Garabedian, at some point Mr. Poulos or
12   his mom contacted your office, correct?
13   A   I don't recall who first contacted my office.
14   Q   Okay.
15       THE WITNESS:  Excuse me.  Can I get a
16   little glass of water, please.  I don't mean interrupt.
17   We can continue.  Just ...
18   Q   Do you have any understanding as to which one
19   of your associates first spoke with Mr. Poulos
20   initially?
21   A   No.
22   Q   Did Mr. Poulos call or did someone send an
23   email?
24   A   I don't recall.
25   Q   You have a website, and on that website

Page 34

1  there's a way for someone to contact you through the
2  website; is that correct?
3      A   Yes.
4      Q   And when someone fills out that little form
5  do you get some sort of notification or an email?
6      A   I believe so.
7      Q   Do you personally get that or does somebody
8  else in your office get that?
9      A   Everyone can access it in my office.
10     Q   And does everyone get some sort of little
11 notification or ticker flying across their screen when
12 there's an intake there?
13     A   No.
14     Q   Okay.  But there's a -- I guess like a
15 database and people can go in as they feel and see if
16 there's any potential clients that need to be
17 contacted; is that right?
18     A   Yes.
19     Q   And that's open to everybody in your office,
20 correct?
21     A   Yes.
22     Q   And so do you have any recollection of --
23 strike that.
24         When was the last time that you'd personally
25 go through this database and see potential clients?

Page 35

1      A   This morning.
2      Q   Okay.  And am I -- strike that.
3         Do you have any recollection of Mr. Poulos
4  ever sending an intake through the website to you?
5      A   No.
6      Q   Do you have any recollection of your first
7  conversation via telephone with Mr. Poulos?
8      A   No.
9          MR. JUBB:  Can we please mark this as
10 Garabedian 1.  This is going to be Garabedian 029.
11     Here's a copy for you, Jeff.
12         (Exhibit 1 marked
13          for identification)
14     Q   Here you go.
15     A   Thank you.
16     Q   Did you look at this in anticipation of
17 today?
18         MR. McCARRON:  Objection.  Don't answer.
19     Q   Have you seen this before, sir?
20     A   Yes.
21     Q   All right.  And at the top it looks like it's
22 an email from Mary Ellen Poulos dated December 13th,
23 2017 to you, and she's forwarding an email from her son
24 that he received from The Hill School.  Do you see
25 that?

Page 36

1      A   Yes.
2      Q   How did she get your email address?
3      A   I don't know.
4      Q   Is, is it a practice for your associates to
5  give out your email address?
6      A   They may.  I may.
7      Q   Did you first talk to Ms. Poulos before
8  Mr. Poulos?
9      A   I don't remember.
10     Q   Do you have any idea when you look at this as
11 to why she's saying thank you with an exclamation
12 point?
13     A   No.
14     Q   Do you -- I -- strike that.
15         Am I correct that -- strike that.
16         How often do you speak with parents of adults
17 who are claiming to be victims of sexual abuse?
18     A   I couldn't answer that.  I mean ...
19     Q   Am I correct that Ms. Poulos was not your
20 client?
21     A   Correct.
22     Q   You can put that down.
23     A   (Complies.)
24         MR. JUBB:  I'm going to mark this as
25 Garabedian 2 which is Garabedian File 111-112.

Page 37

1          (Exhibit 2 marked
2           for identification)
3          MR. POULOS:  Lane, can I interject?  I
4  can't see any of those documents that you're presenting
5  to Mitchell.
6          MR. JUBB:  Okay.  Then when I'm calling
7  out these numbers, that's referring to the documents
8  that were produced by Mr. Garabedian, okay.  So you're
9  going to need to pull those up.
10     Q   Here you go.
11     A   Thank you.
12     Q   All right.  I've handed you what I have
13 marked as Garabedian 2 which is Garabedian File 111
14 through is 112.  This appears to be the cover letter
15 that you sent to Mr. Poulos enclosing a CFA, correct?
16     A   What is a CFA?
17     Q   Contingent Fee Agreement.
18     A   Yes.
19     Q   At the bottom of this it says:  Very truly
20 yours, Mitchell Garabedian.  Are those your initials?
21     A   Probably.
22     Q   Did you write them?
23     A   I, I don't recall.
24     Q   Is that because at this time many of your
25 associates could sign your initials to the letters?

1    A   I just don't recall.

2    Q   As of December 2017 were your associates

3   permitted to put your initials on your letterhead?

4    A   At times.

5    Q   Okay.  Did it happen here?

6    A   I don't recall.

7    Q   Is that your handwriting?

8    A   I don't know.

9    Q   Well, how, how old are you, sir?

10    A   How old am I?

11    Q   Yes, sir.

12    A   I'm 69 years old.

13    Q   Okay.  And do you have any way of telling us

14   whether or not that appears to be your initials based

15   off the 69 years of looking at your handwriting?

16    A   It might be.  It might not be.  It's

17   initials.

18    Q   I see.

19        And am I correct that you sent this

20   Contingent Fee Agreement to Mr. Poulos on

21   December 13th, 2017?

22    A   I don't know.  The letter says December 13th,

23   but I don't remember mailing it.

24    Q   Okay.  But do you have folks that put your

25   letters and contingent fee agreements in the mail for

1   you or is that something you handle yourself?

2    A   Either way.

3    Q   Well, when was the last time you sealed an

4   envelope and sent it to a client?

5    A   Probably this week.

6    Q   With a Contingent Fee Agreement?

7    A   No.

8        MR. JUBB:  Could you -- we mark this.

9   This is going to be Garabedian 3.

10        MR. McCARRON:  Is this -- these are the

11   same, right?  Oh, you -- you ...

12        MR. JUBB:  Oh, I'm sorry.

13        MR. McCARRON:  That's all right.  I

14   just ...

15        MR. JUBB:  I think there's actually a

16   couple pages there.  Here you go.  This is all just

17   going to be one.  It should have been stapled so I

18   apologize.

19        I'm marking as Garabedian 3, Garabedian

20   112 and Garabedian 116.  And just for purposes of the

21   record when we read this later, Garabedian Bates is

22   different than Garabedian File and Garabedian Email.

23   Garabedian refers to those that were produced in the

24   initial disclosures, and so I -- I'm only clarifying

25   that because the last exhibit was marked as Garabedian

1   File 111 to 112.  This is Garabedian 112 and 116.  Here

2   you go.

3            (Exhibit 3 marked

4            for identification)

5   BY MR. JUBB:

6    Q   What does that appear to be?

7    A   A request for records.

8    Q   Okay.  What's a request for records?

9    A   Request to get records.

10    Q   Great.  And it looks like at the top --

11   strike that.

12        Is it your pattern and practice when you're

13   getting a potential client, do you send the Contingent

14   Fee Agreement at the same time that you send the

15   authorization to get records?

16        MR. McCARRON:  Objection.

17    A   Sometimes.

18    Q   And again, my question is just a little bit

19   different.  You know, it's -- sometimes is, is -- well,

20   I appreciate that that's your answer.  I'm just trying

21   to figure out what the policy was.  So with that as the

22   background -- and again, to avoid commentary, I'll

23   strike that.

24        Did you have a pattern and practice as of

25   December of 2017 of sending blank authorizations to

1   potential clients with the Contingent Fee Agreement?

2    A   Sometimes.

3    Q   If that were the case would you reference

4   that in the cover letter?

5    A   I don't recall.

6    Q   Well, at least as of December 15th, 2017 does

7   it appear that Mr. Poulos signed authorizations for

8   records?

9    A   Are you referring to Exhibit 3?

10    Q   I am.

11    A   Yes.

12    Q   And this was produced by you so I imagine

13   that you received this back; is that fair?

14    A   I believe so.

15    Q   Why is it that you wanted the records from

16   Shorewood School District and The Hill School as of

17   December of 2017?

18    A   To collect his records.

19    Q   Were are they important?

20    A   To review them.

21    Q   What types of things can you get from

22   reviewing the records?

23    A   Information.

24    Q   Relevant information?

25    A   Relevant, yes.

11 (Pages 38 - 41)

1688a

1    Q   Like things that could corroborate what
2  they're saying?
3    A   Relevant.  Irrelevant.
4    Q   Well, is the goal of requesting a student's
5  records to determine as to whether or not there's other
6  evidence to corroborate their claims?
7    A   The goal is to know the person.
8    Q   Okay.  Am I correct that you wrote the letter
9  to The Hill School before you received the records back
10 from The Hill School?
11   A   I don't know.
12   Q   Do you have any reason to believe that you
13 received the records back from The Hill School before
14 you wrote The Hill School?
15   A   I don't know.
16       MR. JUBB:  This is going to be marked as
17 Garabedian 4.  This was previously produced as
18 Garabedian 114.  Here you go, Jeff.
19       (Exhibit 4 marked
20        for identification)
21   Q   I've handed you what has been marked as
22 Garabedian 4 which is a letter dated April 11th, 2018
23 to The Hill School registrar requesting records; is
24 that correct?
25   A   Yes.

1    Q   Did you write this?
2    A   I don't recall.
3    Q   Are those your initials?
4    A   I don't know.
5    Q   Why would there be a request to The Hill
6  School on April 11th for records if you already had
7  them?
8    A   I don't know.
9    Q   You didn't have them, correct?
10   A   I don't recall.
11   Q   Well, in -- considering that you've been
12 practicing for quite some time and your pattern and
13 practice in doing sexual abuse cases, in looking at
14 these records seeing a request from -- you know, an
15 authorization from December 15th, 2017 and this, which
16 is Garabedian 115 which is now going to be marked as
17 Garabedian 5 ...
18       MR. JUBB:  This is my copy so I'll need
19 that back.
20       THE WITNESS:  Do you want it marked?
21       MR. JUBB:  Yeah, could you mark that as
22 an exhibit, please.
23       (Exhibit 5 marked
24        for identification)
25       MR. McCARRON:  Hang on.  Let me see it.

1        MR. JUBB:  Just check that out.  And
2  then on the back is 116 which we've already marked.
3        (Pause.)
4    Q   Am I correct that that's -- what I've handed
5  you as Garabedian 115 is identical to Garabedian 114
6  which we've marked as well, except for the dates, one
7  being January of 2018 and one being April?
8    A   No.
9    Q   Okay.  I'm not correct?
10   A   One's redacted.
11   Q   I see.
12   A   So it's not identical.
13   Q   Did you send a letter The Hill School as of
14 January 30th, 2018 requesting records?
15   A   I don't recall.
16   Q   Well, the records that you produced in this
17 case from letters that have your initials on them, are
18 those things that you sign and just put in your file
19 without going out?
20   A   I don't understand the question.
21   Q   Sure.  Can you recall an instance of you
22 drafting a letter, signing it, and then putting it into
23 the file without putting it in the mail?
24   A   I don't recall.
25   Q   In other words, you can't recall an instance

1  of doing that, correct?
2    A   I don't understand your question.  I'm sorry.
3    Q   Sure.  When you're preparing letters to go
4  out for records request or your associates are, do they
5  draft those letters up, sign them, and then not send
6  them out?  Is that the expectation?
7    A   I don't, I don't know.  I don't recall.
8    Q   Well --
9    A   I mean I imagine if they, if they -- if the
10 letter was completed and signed, it would go out, but
11 maybe for some instance, one instance or an instance it
12 didn't go out.  I don't know.
13   Q   Do you have any recollection of reviewing
14 Mr. Poulos's Hill School File before you wrote that
15 letter in April of 2018 to Mr. Lehman?
16   A   I don't recall.
17   Q   Nothing comes to mind, correct?
18   A   I don't recall.
19   Q   Okay.  Can I just have that real quick?
20   A   (Complies.)
21   Q   Are those your initials, either, on the
22 Garabedian 5?
23   A   I don't know.
24   Q   You can't tell if you wrote them or not?
25   A   No.

12 (Pages 42 - 45)

1          MR. JUBB:  Off the record.
2          (Discussion off the record)
3          MR. JUBB:  This is going to be marked as
4  Garabedian 6.  It's previously produced as Garabedian
5  71.
6          (Exhibit 6 marked
7          for identification)
8      Q   Did you write that letter?
9      A   I don't recall.
10     Q   Well, that appears to be a letter drafted
11 towards The Hill School, correct?
12     A   Correct.
13     Q   Were your associates writing those letters
14 back then?
15     A   I don't recall.
16     Q   Do you have any recollection of actually
17 writing a letter at issue in this case?
18     A   I don't recall.
19     Q   Based on your pattern and practice can you
20 even tell us whether or not you wrote that letter?
21     A   I don't know.
22     Q   Is that because your associates write letters
23 for you like this?
24     A   I don't know.
25     Q   Do your associates write letters for you like

1  this?
2      A   Sometimes.
3      Q   Did they write this one?
4      A   I don't recall.
5      Q   Well, in other words, they write letters for
6  you so often that you, you can't determine in looking
7  at this whether or not you actually wrote this; is that
8  right?
9          MR. McCARRON:  Objection.
10     A   No.  I just don't recall whether I wrote this
11 or not.
12     Q   Okay.  Look who it -- who -- look at --
13 strike that.
14         At the top it says:  Dear Attorney Soto.  Do
15 you see that?
16     A   Yes.
17     Q   There's no Soto involved here is there?
18     A   I don't know.
19     Q   Well, in looking at this file and
20 understanding how serious these allegations are against
21 you did you see anywhere where a Mr. Soto was involved
22 here?
23         MR. McCARRON:  Objection.
24     A   I don't recall.
25     Q   Okay.  Well, it's addressed to Mr. Lehman,

1  isn't it?
2      A   Yes.
3      Q   Well, when you write a letter wouldn't it be
4  Dear Mr. Lehman, not Dear Attorney Soto?
5      A   Yes.
6      Q   Okay.  And so am I correct that this letter
7  that was prepared and has your initials on it was
8  actually directed from a -- strike that.
9          Am I correct that that letter, Garabedian 71
10 and 72, has Dear Attorney Soto on there, and there's no
11 Soto that you were trying to send this letter to?
12     A   I don't know.
13     Q   Do you just have like a form letter that goes
14 out with demands?
15     A   No.
16     Q   Do your associates just copy and like do a
17 Mad Lib for demand letters?
18     A   Do a what?
19     Q   A Mad Lib.  Do you know what a Mad Lib is?
20     A   No.
21     Q   It's like a fill-in-the-blank.
22     A   No.
23     Q   So this letter "Dear Attorney Soto", somebody
24 actually wrote that in by mistake.  That wasn't already
25 there, right?

1      A   I don't know.
2      Q   How many people have the authority to draft
3  demand letters on your behalf?
4      A   I don't know.  I mean the people who work for
5  me.  So it depends how many people are working for me.
6      Q   So five to ten people can actually draft
7  demand letters on your behalf, correct?
8      A   Well ... yeah.
9      Q   And that was true as of April 2018, correct?
10     A   I don't know.
11     Q   Do you know an Attorney Soto?
12     A   Not off the top of my head.
13     Q   Do you have any recollection of actually
14 reviewing this letter?
15     A   No.
16     Q   Do you have any way of telling us, based off
17 your pattern and practice, that you actually reviewed
18 this letter?
19     A   No.
20         MR. JUBB:  Here you go, Jeff.
21         I'm marking -- Garabedian 7 is Hill 219,
22 also marked as P16.219-220.
23         (Exhibit 7 marked
24         for identification)
25     Q   Have you seen that letter before today?

13 (Pages 46 - 49)

Page 50

```
1      A   I don't recall.
2      Q   So it's dated April 2018.  Do you see that?
3      A   Dated April 11, 2018?
4      Q   Yes, sir.
5      A   Yes.
6      Q   All right.
7            MR. McCARRON:  Can I just interrupt you
8   for a second?
9            MR. JUBB:  Sure.
10           MR. McCARRON:  The last exhibit, 6, --
11           MR. JUBB:  Yes.
12           MR. McCARRON:  -- Garabedian 6, I just
13  want to make sure.  It's -- you're -- you intended to
14  make it a single page so it's one page of a longer
15  letter.  Is that the idea?  Or a longer document.
16           MR. JUBB:  It's the two -- it's just the
17  front page because we were just going over the front of
18  it.  It's 71.  And 72 is the other side of it.  I have
19  it, but for purposes of the exhibit it's -- it need not
20  have two pages, unless you want two pages which I can
21  provide.
22           MR. McCARRON:  Well, I'm just making
23  sure that the record is clear that the exhibit itself
24  is a single page, Garabedian ...
25           MR. JUBB:  71.
```

Page 51

```
1            MR. McCARRON:  ... 71 which doesn't have
2   the balance of the document.
3            MR. JUBB:  Do you want the balance of
4   the document, for the record?
5            MR. McCARRON:  Not necessarily.
6            MR. JUBB:  Okay.
7            MR. McCARRON:  I just want to make sure
8   that there's no misunderstanding that the, that the
9   exhibit that you used is a single page, and you
10  intended to do that.
11           MR. JUBB:  Here.  Let's use this as a
12  substituted Exhibit 6, so now it's 71 and 72, so it's
13  both sides, okay?
14           MR. McCARRON:  Okay.  So we're going to
15  swap that out for Exhibit 6?
16           MR. JUBB:  Yeah, just because --
17           MR. McCARRON:  Okay.
18           MR. JUBB:  -- you're saying that that
19  was just one-sided so this --
20           MR. McCARRON:  Well, it is, right?
21           MR. JUBB:  Yeah, this one is.
22           MR. McCARRON:  Okay.
23           MR. JUBB:  This one is one-sided that
24  was produced and marked as Garabedian 6.  So let's put
25  this one as Garabedian 6 just because that has two
```

Page 52

```
1   sides.
2            MR. McCARRON:  All right.  Can I just
3   have that as a placeholder?
4            MR. JUBB:  Sure.
5            MR. McCARRON:  Thank you.
6            THE WITNESS:  So do we take this out?
7            MR. JUBB:  Mm-hmm.  Thank you.
8            MR. McCARRON:  Yeah, we're going to
9   swap.  Let me just see, if I could.  I'm sorry.
10  This -- we're -- let me just see this one.  Yeah, okay.
11           THE WITNESS:  Thank you.
12           MR. McCARRON:  There you go.
13           THE WITNESS:  Thank you.
14  BY MR. JUBB:
15      Q   So, Mr. Garabedian, you have in front of you
16  Garabedian 7 which is Hill 219 and 220.  Do you see
17  that?
18      A   Yes.
19      Q   All right.  And my last question to you was
20  have you ever seen this before, and you couldn't
21  recall, correct?
22      A   Correct.
23      Q   The date is April 11th, 2018, correct?
24      A   Yes.
25      Q   And is it your testimony that from
```

Page 53

```
1   April 11th, 2018 to present you don't recall looking at
2   that letter?
3      A   I don't remember.  I'm sorry.
4      Q   Do you have any recollection of actually
5   discussing this letter with Mr. Poulos?
6      A   No.
7      Q   Did you ever provide Mr. Poulos a copy of
8   this letter?
9      A   I don't believe so.
10     Q   Did you ever tell Mr. Poulos that you were
11  going to send this letter?
12     A   But I'm not sure.
13          Excuse me?
14     Q   Did you ever tell Mr. Poulos that you were
15  going to send this letter?
16     A   I don't recall.
17     Q   Well, based on your pattern and practice of
18  how you did things would you have told Mr. Poulos that
19  you were going to send this letter?
20     A   It depends on the case.
21     Q   How so?
22          MR. McCARRON:  All right.  Why don't we
23  have a full question.
24     Q   How does it depend on the case, sir?
25     A   Well, some clients are more fragile than
```

14 (Pages 50 - 53)

1  other clients.
2      Q   Based off your recollection did you believe
3  that Mr. Poulos was more fragile than most clients?
4      A   He was extremely fragile.
5      Q   Okay.  And so your -- strike that.
6          Based off that do you believe that you wrote
7  this letter without telling him you were going to do
8  it?
9      A   I don't recall.  I mean ...
10     Q   In other words, it's possible that you wrote
11 this letter without actually informing Mr. Poulos that
12 you did, correct?
13     A   I don't know.
14     Q   Well, if you don't recall doing it am I
15 correct it's possible that you drafted this letter,
16 sent it to the school without Mr. Poulos knowing about
17 it?
18     A   Anything's possible.
19     Q   Okay.  Based off how you did things is it
20 possible?
21     A   I don't know.
22     Q   Do you -- as you sit here do you have any
23 reason to believe that you actually provided -- strike
24 that.
25         As you sit here do you have any reason to

1  believe that Mr. Poulos was aware that you were going
2  to send this letter to the school?
3      A   Well, I would notify the client that I am
4  sending a notice letter to the school.
5      Q   Okay.  And so is that based on how you did
6  things in April 2018?
7      A   Yes.
8      Q   All right.  So do you believe that you told
9  Mr. Poulos that you were going to send this letter to
10 the school?
11     A   I don't know.  I don't remember telling -- I
12 don't remember talking to him about it.
13     Q   When you speak with clients yourself do you
14 take notes?
15     A   Sometimes.
16     Q   When you have a conversation with a client
17 about taking some sort of action do you document that
18 and confirm their approval in writing?
19     A   Not necessarily.
20     Q   Do you have any recollection whatsoever of
21 speaking with Mr. Poulos that you were going to be
22 sending this letter The Hill School?
23     A   Specifically, no.
24     Q   What about generally?
25     A   Probably.

1      Q   You probably have a recollection of speaking
2  with Mr. Poulos?
3      A   No.  I, I, I probably notified him that I, I
4  was going to send the letter.
5      Q   Okay.
6      A   But I don't specifically remember.
7      Q   And did you tell him that you were going to
8  send this letter to Mr. Lehman?
9      A   I don't remember.
10     Q   Did you tell him you were going to demand a
11 million dollars?
12     A   I don't remember.
13     Q   Doesn't -- did -- at the time did you believe
14 you had an obligation to confirm with your client as to
15 what his demands would be?
16         MR. McCARRON:  Objection.
17     A   Well, I, I speak to the client about that.
18 But you're asking me if I specifically remember and
19 I -- with regard to Mr. Poulos, and I do not
20 specifically remember.
21     Q   All right.  Well, based on your pattern and
22 practice of doing things back then -- well, first of
23 all, as we sit here did you write this letter?
24     A   I don't recall.
25     Q   Is that because you write so many of these

1  letters it's tough to keep track?
2          MR. McCARRON:  Objection.
3      A   I just have -- I do a lot of work.  I have a
4  lot of clients, and I specifically don't recall.  I'm
5  sorry.
6      Q   Look at the back of this.  Is that your
7  initial, please.
8      A   I don't know.
9      Q   Is there any way for you to tell us as to
10 whether or not that's actually your handwriting?
11     A   I don't know.
12     Q   What about the language used in the, in the
13 letter, is that something that sounds like you?
14     A   I don't know.
15     Q   The letter was drafted to the headmaster,
16 correct?
17     A   Yes.
18     Q   Question for you.  When you get mail, I mean
19 with 500 cases, how much mail do you get a day?
20     A   Sometimes a little.  Sometimes a lot.
21     Q   Do you have a practice in place at the firm
22 where somebody's opening the mail for you?
23     A   It's not a practice.  Someone will just open
24 the mail.  Sometimes it's me and sometimes it's someone
25 else.

Page 58

1    Q   All right.  And you sent this to Mr. Lehman
2  as the headmaster, correct?
3    A   Apparently.
4    Q   And when you sent this to Mr. Lehman as the
5  headmaster did you consider as to whether or not a guy
6  like him who's, who's pretty busy if he's going to be
7  opening the mail himself or if maybe he has somebody in
8  his office who's going to be opening it?
9    A   No.
10    Q   You didn't give consideration to that?
11    A   No.
12    Q   That would be pretty reasonable for a
13  headmaster of a, a prominent boarding school to have
14  somebody opening his mail, correct?
15    A   I don't know.
16        MR. McCARRON:  Objection.
17    Q   You don't know?
18    A   No.
19    Q   Can you tell me whether or not as you sit
20  here today you believe that one of your associates
21  wrote this?
22    A   I don't know.
23    Q   Did you ask them?
24    A   I don't recall.
25    Q   So when you got sued, you didn't ask any of

Page 59

1  your associates who wrote this letter?
2    A   No.
3    Q   How many times have you been sued?
4        MR. McCARRON:  Objection.
5    A   One other time.
6    Q   When was that?
7        MR. McCARRON:  Objection.
8    A   Last year.
9    Q   Did you ever appear for a deposition yet?
10    A   When?
11    Q   In that case.
12    A   No.
13    Q   Am I correct -- strike that.
14    Q   Other than today, how many depositions have
15  you ever sat for?
16        MR. McCARRON:  Objection.
17    A   One.
18    Q   And when was that?
19    A   It was about 40 years ago.
20    Q   Forty?
21    A   (Nodded.)
22    Q   Did that have anything to do with you being
23  named as a defendant in a lawsuit?
24    A   No.
25    Q   So we see this one here which is Garabedian

Page 60

1  7, and I also showed you Garabedian 6 which was
2  directed to Dear Attorney Soto.  This one's to Dear
3  Mr. Lehman.  Both of them have your initials on them.
4  Can you explain that for us?
5    A   No.
6    Q   You're -- with 500 cases that you've
7  maintained for five to ten years do you have an
8  electronic document retention system?
9    A   No.
10    Q   In other --
11    A   I don't know what you mean.  I'm sorry.
12    Q   Sure.  I'm happy to clarify.
13        Do you retain documents electronically as
14  they pertain to case files?
15    A   Some.
16    Q   So, for example, you file a complaint.
17  There's proceedings.  There's motions.  There's
18  discovery requests.  There's motions to compel, the
19  jury instructions.  You name it.  Well, not jury
20  instructions.  But you maintain that in the computer,
21  correct?
22    A   Sure.
23    Q   All right.  And when you do that do you
24  create some sort of a file number?
25    A   Folders.  Excuse me.

Page 61

1    Q   Folders?
2    A   Yeah.
3    Q   Am I correct there was no folder made in this
4  case?
5    A   I don't know.
6    Q   Did you look?
7    A   No.
8    Q   Oh.  Did anyone from your office look?
9    A   I don't know.
10    Q   *Is it possible that there's a folder that
11  exists in this case with electronic documents that
12  haven't been produced?
13    A   *I don't know.
14    Q   Did you have any involvement whatsoever in --
15        THE WITNESS:  Oh, excuse me.  Can you
16  repeat that last question.
17        (*Record read)
18    A   We produced the whole file.  I mean ...
19    Q   Okay.  And how do you know that?
20    A   Because we had it copied.
21    Q   All right.  And it was electronic form; is
22  that correct?  Or was it not electronic form?
23    A   I don't know.
24    Q   Well, did you look at some of your
25  handwritten notes that were on a yellow pad?

16 (Pages 58 - 61)

1693a

Page 62

1    A   Yes.
2    Q   And were those notes something that routinely
3  are scanned into the computer system?
4    A   No.
5    Q   They're maintained in a hard copy file; is
6  that right?
7    A   Yes.
8    Q   If -- for contingent fee cases --
9    A   Pleadings are usually electronically stored.
10   Q   All right.  At any point in time did your
11 office assign a file number to Mr. Poulos?
12   A   No.
13   Q   When you're acting as a contingent fee lawyer
14 am I correct that in addition to your attorney's fees
15 which is a certain percentage, you also get
16 reimbursement for the costs that are associated with
17 the file?
18   A   Yes.
19   Q   And in order to do that you have to keep an
20 accurate accounting of things such as deposition fees,
21 court reporter's fees, printing fees, things of that
22 nature, correct?
23   A   Yes.
24   Q   Is that something that's maintained
25 electronically?

Page 63

1    A   No.
2    Q   You have an accountant break that all down by
3  hand?
4    A   Well, it's put in a folder.
5    Q   Well, what's put in folder?
6    A   The bill.
7    Q   So when a case resolves you -- at the end of
8  that case you go through all of the bills and then add
9  it up?
10   A   Yeah.  Yes.
11   Q   In other words, for the 500 cases that you
12 have, you don't believe that if I were to ask you
13 what's the cost on this case, you couldn't determine
14 that for us?
15   A   No.  But excuse me, it could be 500.  It
16 could be 400.  It varies so.  You keep saying 500.  It
17 could be more or less.
18   Q   Okay.  Well, approximately 500 --
19   A   Yeah.
20   Q   -- I think is where we landed, right.
21      So in all of those, right now if I were to
22 say what are the costs associated with this file we're
23 trying to resolve it, you would actually have to go
24 into the hard copy file, pull out all the bills and get
25 out a calculator?

Page 64

1    A   Yes.
2    Q   What were the costs associated with
3  Mr. Poulos's case?
4    A   I don't know.
5    Q   He didn't have any, did he?
6    A   Excuse me?
7    Q   He didn't have any, did he?
8    A   Well, I, I had to collect records so there,
9  there are costs associated there.
10   Q   I didn't see any bills that were produced.
11 Did you provide them to your counsel?
12   A   I don't know.
13   Q   Well, if they were in the file you would have
14 provided them to your counsel, right?
15   A   Well, they're kept in a separate file in a
16 billing folder so ...
17   Q   So there might be billing folders related to
18 Mr. Poulos's case too, right?
19   A   There could be.
20   Q   And that's maintained in hard copy form?
21   A   Yes.
22   Q   Okay.  In your office?
23   A   Yes.
24   Q   Do you have any recollection of reviewing
25 those at all?

Page 65

1    A   No.
2    Q   Did any of your -- strike that.
3      Do you have any recollection yourself of
4  personally producing the files in this case or was that
5  handled by one of your associates?
6    A   The copying, they were cop -- the files were
7  copied by I believe the copying center.
8    Q   Like a separate copying center?
9    A   Yeah.
10   Q   In other words, the hard copy file was sent
11 to a copying center, then they put everything into the
12 system and then that made it electronic; is that right?
13   A   No, they just copied it for me.
14   Q   Okay.  Well, at some point you provided that
15 to your counsel, correct?
16   A   Provided what?
17   Q   The, the documents that were responsive to
18 the discovery requests and the disclosures, correct?
19   A   Yes.
20   Q   Okay.  Did you review those documents before
21 producing them to counsel?
22   A   No.
23   Q   In other words, whatever was in Mr. Poulos's
24 file you sent to the copy center, they made copies and
25 gave the copies back to you; is that right?

17 (Pages 62 - 65)

1    A   Yeah, I believe so.

2    Q   And you still have the original file,

3  correct?

4    A   Yes.

5    Q   When was the last time you believe -- strike

6  that.

7        I understand your testimony to be that

8  between April 11th, 2018 to present you can't recall

9  actually reading this letter, correct?

10   A   Yes.

11   Q   As you sit here do you believe you reviewed

12  this letter before it was sent?

13   A   I don't recall.

14   Q   My question was a bit different.

15       As you sit here do you believe that you

16  reviewed this letter before it was sent?

17   A   I don't know.

18   Q   Do you -- strike that.

19       As of April 2018 did you believe that, that

20  you had an obligation to review letters for accuracy

21  before sending them out?

22       MR. McCARRON:  Objection.

23   A   Someone in my office read them.

24   Q   Do you believe that someone other than you

25  was the person who wrote this letter?

1    A   I have no idea.

2    Q   But as you sit here, you can't tell us one

3  way or the other if it was you or somebody else; is

4  that right?

5    A   That's right.  Yes.

6    Q   Let me back up.

7        Do you have any idea where the information

8  that was put into this letter pertaining to Mr. Poulos

9  came from?

10   A   I don't recall.

11   Q   Do you have any recollection of actually

12  speaking with Mr. Poulos?

13   A   I believe I did.

14   Q   Okay.  Tell me what you can recall about

15  speaking with Mr. Poulos before you sent this letter.

16   A   I don't recall speaking to him.  I just

17  believe I did.

18   Q   In other words, as you sit here today you

19  have no recollection of that discussion with

20  Mr. Poulos?

21   A   Correct.

22   Q   And can you tell us why you believe you did?

23   A   I, I don't know.

24   Q   Is there a chance you didn't?

25   A   I don't know.  I believe I did.

1    Q   But there's also a chance you didn't?

2    A   Well, I think I did.

3    Q   Okay.  In preparing these types of letters,

4  whether it's you or your associates, at the time would

5  you have done your best to make sure -- strike that.

6        In sending these types of letters do you

7  believe that you had any obligation to make sure that

8  the information in there was accurate?

9        MR. McCARRON:  Objection.

10   A   Yes.

11   Q   Why is that?

12   A   For the sake of accuracy.

13   Q   Why is accuracy important when it comes to

14  letters like this?

15   A   It's facts.

16   Q   And if those facts are wrong, that's going to

17  be a problem, right?

18       MR. McCARRON:  Objection.  Don't answer

19  that.

20   Q   Do you take into consideration as to whether

21  or not you put something in a letter that's untrue that

22  it could potentially cause a problem?

23       MR. McCARRON:  Objection.

24   A   We try to be accurate.

25   Q   Is that because when you're not accurate that

1  can lead to potential problems down the road?

2        MR. McCARRON:  Objection.

3    A   We just try to be accurate.

4    Q   Does your staff -- strike that.

5        Have you personally ever written a letter

6  like this --

7    A   Probably.

8    Q   -- that you can recall?

9    A   Probably but I don't recall.

10   Q   All right.  So if I said to you when was the

11  last time you personally drafted a letter making a

12  demand before a lawsuit was filed can you give me a

13  timeframe?

14   A   Before Covid.

15   Q   And when you wrote that letter did you

16  appreciate the person to which it was being directed,

17  their position?

18       MR. McCARRON:  Objection.

19   A   I don't know.  I'm sorry.  I don't understand

20  your question.

21   Q   Sure.  When you wrote that letter do you

22  recall if it was to an attorney?

23   A   I don't know.

24   Q   Was it related to something having to do with

25  the church?

18 (Pages 66 - 69)

1          MR. McCARRON:  I think I'm, I think I'm
2   confused.  Are you referring to something other than
3   Exhibit 7, right, now?  That just occurred to me.
4          MR. JUBB:  I think so.
5          MR. McCARRON:  So you're talking about
6   what the last time last that Mr. -- the last occasion
7   Mr. Garabedian recalls sending or drafting a letter?
8          MR. JUBB:  Letter like this making a
9   demand before he ever filed a suit.
10      Q    And I believe your testimony was before
11  Covid, right?
12      A    Yeah.
13      Q    How long before Covid?
14      A    I don't remember.
15      Q    Do you believe that you personally wrote a
16  letter making a demand before a lawsuit was filed
17  within the last three years?
18      A    I don't know.
19      Q    When you are -- strike that.
20          Why is it that your associates don't have
21  their own letterhead, that they can write letters by
22  themselves?
23      A    I don't know.
24      Q    Can any of them do that?
25      A    Yes.

1       Q    Okay.  So they actually have their own
2   letterhead on it, fair enough?
3       A    I don't understand you.
4       Q    Sure.  Do you allow your associates to write
5   letters signing their own name?
6       A    No.
7       Q    In other words, all of the attorneys that are
8   working for you on all these files, every letter comes
9   from your letterhead with your name at the bottom,
10  right?
11      A    I don't know.
12      Q    Well, your attorneys are not permitted to
13  draft letters on their own personal letterhead or sign
14  their own name, correct?
15      A    I don't know.
16          Are you referring to demand letters like this
17  or are you referring to letters in general?  I'm not
18  sure.
19      Q    Let's go general first because that's the way
20  my question was phrased.
21      A    Yeah, I don't know.
22      Q    As you sit here today can you recall any
23  letter in the last, I don't know, five years that you
24  recall seeing being signed off by an associate or
25  somebody not you?

1       A    No.
2       Q    Why?
3       A    I don't know.
4       Q    Is it because if the letter comes from you,
5   it might have a little bit more thrust, if you will?
6       A    No, it might be because if they're signing a
7   letter I'm not seeing it.
8       Q    I'm sorry.  I thought you said that there was
9   a, there was a policy in place that your associates
10  were not allowed to draft letters like this?
11      A    Oh, like that.  I'm sorry.  I thought you
12  were talking generally.
13      Q    Okay.
14      A    I'm, I'm a little confused.
15      Q    Let's clarify.
16          So am I correct that generally speaking, you
17  do allow associates to write letters signing their own
18  name, right?
19      A    I believe so.  I'm not sure if they do or
20  they don't.  I think they do.
21      Q    Okay.  So whatever amount of associates you
22  have, you think some of them are writing letters
23  signing their own names?
24      A    Possibly.
25      Q    Possibly, okay.

1          And have any of them ever had cases by
2   themselves?
3       A    No.
4       Q    Have any of them ever -- strike that.
5          Have any of them ever sent a demand letter of
6   any kind with their name on it instead of yours?
7       A    I don't believe so.
8       Q    As you sit here today are there instances
9   where letters are sent by your associates with your
10  name at the bottom that you haven't seen?
11      A    I don't know.
12      Q    Do you let your associates take depositions?
13      A    Bill Gordon takes a lot of depositions from
14  my office.
15      Q    Anybody else?
16      A    No.  I should say when there are depositions
17  to be taken.  Sometimes there just aren't depositions
18  to be taken so no one's taking them.
19      Q    The majority of your cases do they involve
20  depositions?
21      A    I can't answer that.  I don't know.
22      Q    In other words, you get this potential case,
23  and you're actually able to, to get settlements without
24  ever having anybody appear for a deposition?
25      A    Yes.

19 (Pages 70 - 73)

Page 74

1     Q   More often than not?
2     A   I don't know.
3     Q   Well, you know, think about it for a second.
4   More often than not can you actually just resolve a
5   case without having anybody appear for a deposition?
6     A   Yes.  Well, it's, it's a tough answer --
7   tough question to answer because you have like the
8   State of New York where they've lifted the statute of
9   limitations and you're given a window or New Jersey
10   where they have a window, a look-back window, or
11   California or many states who've amended their statute
12   of limitations.  Those cases could be in litigation,
13   and there could be depositions being taken.
14     Q   I'm not following.  What does that have
15   anything to do with whether or not you actually have
16   more cases than not that can actually come to a
17   resolution without anybody ever appearing for a
18   deposition?
19     A   Well, I guess that's why I don't know because
20   in those cases there could be a deposition.
21     Q   Okay.  Do you represent your clients in
22   depositions?
23     A   Yes.
24     Q   And does any of your associates -- strike
25   that.

Page 75

1        Do any of your associates ever represent
2   clients at depositions?
3     A   Bill Gordon.
4     Q   Bill Gordon.  Is Mr. Gordon a more senior
5   attorney?
6     A   Yes.
7     Q   How long has he been with you?
8     A   About 35 years.
9     Q   Have you discussed Mr. Poulos's case with
10   Mr. Gordon at all?
11     A   I don't recall.  I, I settle a lot of cases
12   without any depositions being taken.
13     Q   I see.  And tell me, in those cases that you
14   can resolve without having to take any depositions do
15   you file a complaint?
16     A   Sometimes.  Sometimes not.
17     Q   When was the last time that you drafted a
18   letter demanding money for potential claims where the
19   statute of limitations had been blown or expired?
20        MR. McCARRON:  Pardon me.  Can you re --
21   either re the -- could you either read that back or
22   could you -- or you can ask it again.
23        MR. JUBB:  I'll rephrase it, yeah.
24        MR. McCARRON:  It's up to you.
25        MR. JUBB:  I'll ask it again.

Page 76

1        MR. McCARRON:  There may not have been a
2   problem with the question, but I didn't follow.
3        MR. JUBB:  No problem.
4        MR. McCARRON:  Thank you.
5   BY MR. JUBB:
6     Q   Mr. Gar -- strike that.
7        Mr. Garabedian, when was the last time that
8   you can recall drafting a letter making a demand before
9   litigation had commenced where the statute of
10   limitation had already expired?
11     A   Probably this year.
12     Q   And was that to some sort of church?
13     A   School.  Church.  Institution.
14     Q   And so this year you actually wrote a letter
15   to a school demanding money for a potential claim for a
16   case that could not be brought; is that right?
17     A   I don't know.
18     Q   Well, when the statute of limitations is
19   expired am I correct that you cannot bring a claim?
20        MR. McCARRON:  Objection.
21     A   No, I --
22        MR. McCARRON:  That's not actually a
23   true statement so why would you ask that question.
24        MR. JUBB:  Well, let me, let me clarify.
25        MR. McCARRON:  Or I should say please

Page 77

1   don't ask that question.
2     Q   Have you ever had a complaint filed where the
3   statute of limitations had been expired by more than
4   five years?
5     A   No.
6     Q   And I guess the question is do you consider a
7   case to be viable so long as a court hasn't thrown it
8   out yet?
9        MR. McCARRON:  Objection.  Try again.
10     Q   So the statute of limitations is a defense,
11   correct?
12     A   Yes.
13     Q   All right.  And so that --
14        MR. McCARRON:  Objection.  Go ahead.
15     Q   -- that defense that could be raised, that's
16   raised legally after you file a complaint, correct?
17     A   Yes.
18     Q   All right.  And when that happens am I
19   correct that if the statute of limitations is expired
20   that a judge can throw it out?
21        MR. McCARRON:  Objection.
22     A   Yes.
23     Q   All right.
24        MR. McCARRON:  Well, "throw it out" is
25   not a term of art, to my knowledge, and -- rule of

20 (Pages 74 - 77)

Page 78

1 procedure so ...
2         MR. JUBB:  Sure.
3    Q    You knew what I meant when I said throw it
4 out, correct?
5    A    Well, can you repeat the question?
6    Q    Sure.  When you file a complaint -- strike
7 that.
8         Am I correct that when the statute of
9 limitations defense is raised in a case -- the statute
10 of limitations has expired on a case that a court will
11 dismiss that complaint?
12         MR. McCARRON:  Objection.
13    A    Yes.
14    Q    Can you recall the last time that you had a
15 case dismissed because a judge said the statute of
16 limitations had been expired?
17         MR. McCARRON:  Objection.
18    A    One in Connecticut about two, three years
19 ago.
20    Q    Was that against a private entity or was that
21 against a church?  What was that?
22    A    I think it was a private entity.  I forget
23 the name of it now, a school.
24    Q    Why did you file that case?  Strike that.
25         Did you know the statute of limitations had

Page 79

1 expired when you filed that case?
2         MR. McCARRON:  Objection.
3    A    It was a question of -- no.
4    Q    Am I correct that with respect to Mr. Poulos,
5 you knew that the statute of limitations had expired
6 for any of his claims, correct?
7    A    Yes.
8         MR. JUBB:  I'm going to be handing you
9 what is being marked as Garabedian 8 and 9.  Garabedian
10 8 is going to be Garabedian Email 57, and Garabedian 9
11 is going to be Garabedian Email 59.  And excuse me,
12 these are double-sided.  So Garabedian 8 is actually
13 Email 57 and 58, and Garabedian 9 is Garabedian Email
14 59 and 60.
15         (Exhibits 8 & 9 marked
16           for identification)
17    Q    Have you seen these before, Mr. Garabedian?
18    A    I don't remember.
19    Q    All right.  Well, in Garabedian 8, which is
20 Garabedian Email 57 and 58, is this an email from
21 Mr. Poulos to you?
22    A    Apparently.
23    Q    Okay.  And he's saying in here:  I haven't
24 heard from you in quite some time.  I was just
25 wondering if you have any updates concerning my case

Page 80

1 against the Hill School.  I'm sure you have more than
2 just this case going on so I understand that you are
3 busy, I'm just hoping we can put this issue to rest
4 sooner rather than later.  Do you recall reading that?
5    A    No.
6    Q    All right.  Look on 58.  You forwarded it
7 to --
8    A    Excuse me?
9    Q    Look on Garabedian Email 58.  It's on the
10 back side of that.
11    A    Oh, sorry.
12    Q    You forwarded that to your associate
13 Mr. Gaul, correct?
14    A    Yeah.
15    Q    Why did you forward it to Mr. Gaul?
16    A    I don't know.
17    Q    You did not respond to Mr. Poulos, correct?
18    A    I don't remember.
19    Q    There's -- have you seen any emails of you
20 responding to Mr. Poulos?
21    A    Have I seen?  No.  I don't recall.
22    Q    All right.  And in producing the emails that
23 were requested in this case did you do any of that
24 search yourself or is that something that somebody in
25 the office handled?

Page 81

1    A    I believe I handled it.
2    Q    And when you handled it did you produce any
3 emails that you received from Mr. Poulos?
4    A    I don't recall.  Whatever is in the file is
5 in the file.
6    Q    When you say "in the file", did you print out
7 every email in the file before you got sued?
8    A    I don't recall.
9    Q    Well, would you have a practice of printing
10 out emails and putting them in the file before you got
11 sued?
12    A    Can you rephrase that?
13    Q    Sure.
14         If -- you, you don't recall whether or not
15 you printed out these emails and put them in the file.
16 I'm asking whether or not as of this timeframe you had
17 some sort of tendency or policy, if you will, habit, of
18 printing out every email you receive and putting it in
19 the file?
20    A    I don't know.
21    Q    Did you do your search on Outlook?
22    A    I don't recall.
23    Q    What internet server do you use?
24    A    I don't know.
25    Q    Do you know if you use Microsoft Outlook?

21 (Pages 78 - 81)

1    A   We have Microsoft Outlook.
2    Q   Okay.  And in doing that did you search for
3   emails from Mr. Poulos?
4    A   I don't recall.
5    Q   Is there anything about how you practice law
6   as to why you're forwarding this to Mr. Gaul?
7    A   I don't understand your question.
8    Q   Sure.  Why are you sending this to Mr. Gaul?
9    A   I don't recall.
10    Q   Well, can you think of any reason why you
11   would be sending this to, to Mr. Gaul?
12    A   I'd only be guessing.
13    Q   Well, I certainly don't want you to guess.
14   But is there any practice that you had of forwarding
15   emails to your associates who are handling cases?
16    A   Yes.
17    Q   Was this Mr. Gaul's case?
18    A   I don't remember.
19    Q   Whose case was this?
20    A   I don't know.
21    Q   Was it yours?
22    A   Well, they're all mine.
23    Q   In other words, whatever Mr. Gaul did, that's
24   on you, right?
25    A   Yes.

1    Q   All right.  Check out Garabedian 9 which I've
2   handed you which is Garabedian Email 59 and 60 from
3   Mr. Poulos again.  Hello again Mr. Garabedian, I spoke
4   with my mother.  She's thinking about calling the dean
5   at The Hill to expedite the process.  What do you
6   think?  I'm not sure if it's a good idea though.
7   Thanks for your time, Mr. Poulos.  And then he's
8   actually cc'ing the previous email that he sent to you
9   asking for an update.  Do you see that?
10    A   Yes.
11    Q   Did you have any conversations with
12   Mr. Poulos after you received this email?
13    A   I don't recall.
14    Q   Look on the back page.
15        MR. McCARRON:  Hold it.  Can I just make
16   sure we're referring to the right one.  9, is that what
17   you're talking about?
18        MR. JUBB:  That was Garabedian 9.
19        MR. McCARRON:  When you say "this" you
20   mean 9.
21        MR. JUBB:  Garabedian 9.
22    Q   Can you turn that over, Garabedian Email 60?
23   Do you see you also forwarded this to Mr. Gaul, Mirra
24   Campbell, Salvatore Ciulla, and Daniel Mahoney?  Do you
25   see that?

1    A   Yes.
2    Q   Why did you forward them this email?
3    A   I don't recall.
4    Q   Did you ever tell Mr. Poulos it was a good
5   idea to contact the dean?
6    A   I don't recall.
7    Q   Would you have told Mr. Poulos it was a good
8   idea to contact the dean?
9    A   Excuse me for a second.
10        (Pause.)
11    A   I'm sorry.  What is your question?
12    Q   Would you have told Mr. Poulos to contact the
13   dean?
14    A   I doubt it.  But I don't specifically
15   remember.
16    Q   Did you forward this to these associates
17   because they were the ones who were suppose to be
18   communicating with Mr. Poulos?
19    A   I don't recall.
20    Q   You can't think of any reason why you're
21   forwarding this to them?
22    A   Specifically as to this email to Mr. Poulos,
23   no.
24    Q   Do you have a practice of forwarding emails
25   to your associates for cases that they're handling?

1    A   Sometimes.  Sometimes not.
2    Q   Did you have an expectation that your
3   associates would respond to Mr. Poulos?
4    A   I don't know.
5    Q   What would be the reason to send them an
6   email like this as opposed to just reaching out to
7   Mr. Poulos yourself?
8    A   Specifically I don't recall.
9    Q   Do you have a pattern and practice of after
10   you sign up a client that your associates handle them?
11    A   Sometimes.
12    Q   Did that happen here?
13    A   I don't recall.
14    Q   But it could have, right?
15    A   I don't recall.
16    Q   Let me ask you this.  Do you, do you recall
17   any conversation with Mr. Poulos?
18    A   Specifically, no.  Excuse me.
19    Q   Did you watch the videos of his deposition?
20    A   No.
21    Q   Do you even know what he looks like?
22    A   Yes.
23    Q   How do you know that?
24    A   Well, he was on the camera, for instance,
25   just a few minutes ago.

1    Q   Oh, so you're actually able to see Mr. Poulos
2  in front of you?
3    A   Not right now but earlier.
4    Q   Okay.
5        MR. McCARRON:  Could we take a brief
6  break when you have a -- when you -- when it suits you.
7        MR. JUBB:  This is fine.  Let's break.
8        THE VIDEOGRAPHER:  The time is
9  11:29 a.m.  We're off the record.
10       (Break was taken.)
11       THE VIDEOGRAPHER:  The time is
12  11:38 a.m.  We are on the record.
13       MR. JUBB:  Poulos, are you there?  Hey,
14  Kurtis?
15       MR. POULOS:  Yeah, I'm here.
16       MR. JUBB:  Okay.
17  BY MR. JUBB:
18    Q   Mr. Garabedian, in referring to Garabedian 8
19  and 9, which were Garabedian Email 57 and 58 as well as
20  59 to 60, with Mr. Poulos asking you for an update and
21  that he was thinking about or that his mom was thinking
22  about contacting the dean, do you believe anyone
23  actually contacted him?
24    A   I have, I have no knowledge of that.
25    Q   In terms of the management of these types of

1  cases is it one of your expectations that your
2  associates are going to respond to clients when they
3  have questions?
4    A   Sometimes.
5    Q   In other words, if a client is asking to
6  speak to you do you have an expectation that if you're
7  not going to speak to them one of your associates will?
8    A   It could go either way.
9    Q   How so?
10    A   I could speak to them or my associates could
11  speak to them.
12    Q   Okay.  But my question was do you have an
13  expectation that someone is going to answer the
14  client's questions?
15    A   Yes.
16    Q   All right.  Did that occur in this case?
17    A   I don't recall specifically.
18    Q   Do you have any reason to believe, as you sit
19  here right now, that someone got back to Mr. Poulos
20  with an update in September of 2018?
21    A   I don't know.
22    Q   Does Mr. Gaul have any client interactions?
23    A   Yes.
24    Q   Who's Mirra Campbell?
25    A   She's an associate that works for me.

1    Q   Who is Sal Ciulla?
2    A   Sal Ciulla.
3    Q   Ciulla, excuse me.
4    A   Ciulla.
5    Q   Spelled C-I-U-L-L-A.
6        Dan Mahoney, is he an associate?
7    A   Yes.
8    Q   Are all four of those people associates?
9    A   Sal is no longer an associate.
10    Q   When you forwarded them this email did you
11  have an expectation that one of them would contact and
12  respond to Mr. Poulos?
13    A   I don't recall.
14    Q   Well, my question, perhaps you -- strike
15  that.
16        In sending these types of emails to your
17  associates would it be your pattern and practice that
18  when you forward an email to your associates for a
19  client asking for an update or a response or anything
20  that they would respond to them?
21    A   I don't know.
22    Q   In other words, you're just sending emails to
23  your associates with no expectation that they're going
24  to do follow-up at all, right?
25    A   I don't know.

1    Q   All right.  Is that, is that good practice?
2        MR. McCARRON:  Objection.  Don't answer
3  that question.  Don't.
4        THE WITNESS:  Okay.
5    Q   Do you have any reason to believe that your
6  associates actually contacted Mr. Poulos?
7    A   I don't specifically remember.
8    Q   So as you sit here you have no reason
9  whatsoever to believe that your associates actually got
10  back to him?
11    A   I don't specifically remember.
12    Q   Do you understand the difference between my
13  question, and I don't specifically remember?
14    A   No.
15    Q   You don't appreciate that?
16    A   No.
17        MR. McCARRON:  Okay.  Just don't do
18  that.
19    Q   Okay.  So --
20        MR. McCARRON:  And, you, please don't do
21  it either.
22    Q   I'm not sure -- you know, I know you don't
23  take depositions too often, but in terms of asking a
24  question about pattern and practices, I'm not asking
25  you if you can specifically recall what occurred for a

23 (Pages 86 - 89)

1 particular instance.  I think you responded to that
2 question.  So without, you know -- I'll tighten up the
3 question for you.  So strike that.
4     A   Thank you.
5     Q   *As of September of 2018 what were the
6 reasons that you would be forwarding emails from
7 clients asking to speak to your associates?
8         THE WITNESS:  Can you repeat that,
9 please.  I'm sorry.
10        (*Record read)
11    A   It could be a variety of reasons.
12    Q   Would one of them be that you had an
13 expectation that one of your associates would contact
14 Mr. Poulos?
15    A   I don't know.
16    Q   Do you know any of your, your policies and
17 procedures at work?
18    A   Yes.
19        MR. McCARRON:  Objection.
20    Q   Okay.  And do any of them have to do with
21 client interaction?
22    A   Yes.
23    Q   Are your associates allowed to engage with
24 clients without your permission?
25    A   I don't know what you mean by that.

1     Q   Okay.  Well, are your associates -- strike
2 that.
3         As of September of 2018 would they have been
4 allowed to communicate with Mr. Poulos without your
5 knowledge?
6     A   I don't specifically remember.
7     Q   Well, as you look at this email, who were the
8 lawyers representing Mr. Poulos?
9     A   I was.  My office.
10    Q   Just you?
11    A   Well, the lawyers in my office.  I consider
12 the lawyers in my office representing each person
13 so ...
14    Q   *Okay.  And do your lawyers have an
15 understanding based off of the instruction from their
16 leader that when a client's asking for communication
17 that they're expected to respond?
18    A   From their leader?
19    Q   That would be you, correct?
20    A   I don't know what you mean.  Can you repeat
21 that, please.
22        (*Record read)
23    A   Sometimes.
24    Q   In other words, in this email, as you look at
25 it, they could very easily just not respond to it,

1 right?
2     A   I don't recall what happened in this specific
3 instance.  I'm sorry.
4         MR. JUBB:  This is going to be marked as
5 Garabedian 10.  It's Garabedian 65.
6         (Exhibit 10 marked
7          for identification)
8     Q   Do you believe you ever got that letter?
9     A   I mean if it was mailed to me.
10    Q   Okay.  Do you believe that you would have
11 reviewed the letter?
12    A   Yes.
13    Q   And in this letter that was sent to you by
14 Mr. Rees who's counsel for The Hill School, he asked
15 you to contact him by email to set up a time to call.
16 Do you see that?
17        (Pause.)
18    A   Yes.  Thank you.
19    Q   Now, when you get letters from defense
20 lawyers asking for a time to speak do you have a
21 general timeframe to which you return their, their
22 calls?
23    A   No.
24    Q   Now, when you, when you send letters asking
25 for a million dollars from, from a school and the

1 lawyer gets back to you within a couple of days would
2 you give them a call back?
3     A   Sometimes.
4     Q   Am I correct that in response to Mr. Rees's
5 April 24th, 2018 letter, you did not call him back?
6     A   I remember speaking to Mr. Rees.  When, I'm
7 not sure.  And what was said, I'm not sure.
8     Q   Well, when you receive a letter like this
9 take me through in terms of, you know, do you have a
10 paralegal look at your schedule and like here's when
11 you can call or do you look at your schedule yourself?
12        MR. McCARRON:  Objection.  That's not a
13 question so ...
14    Q   All right.  Take me through the process when
15 you get a letter like this.  What's the next step?
16    A   It -- I don't know.  It -- it varies.
17    Q   Do you ever give the letter to one of your
18 associates and have them call?
19    A   No.
20    Q   When he's asking for an email would you do
21 that yourself or would one of your associates?
22    A   I may not even send one.  I don't know.
23    Q   All right.  So there's actually occasions --
24    A   I may just pick up the phone and call him.
25    Q   Great.  Do you believe you did that in this

Page 94

1  case?
2      A   I don't recall.
3      Q   When Mr. Poulos was asking for an update as
4  of September 2018, how come no one in your office told
5  him that you actually received a response from the
6  school?
7          MR. McCARRON:  Objection.
8      A   I have -- say that again, please.  I'm sorry.
9  What was the question?
10     Q   Sure.  In looking at the emails that I
11 already provided you which are Garabedian 8 and 9 --
12     A   Yeah.
13     Q   -- from September 2018 when Mr. Poulos is
14 asking for an update, how come no one from your office
15 contacted him to let him know that the school had
16 actually responded to, to the letter that you had?
17         MR. McCARRON:  Objection.
18     A   I don't know if that happened or didn't
19 happen.
20     Q   Well, if Mr. Poulos had told you to send that
21 letter do you think it would be part of your practice
22 to let him know that the school got it?
23         MR. McCARRON:  Objection.
24     A   I don't specifically remember that.  I'm
25 sorry.

Page 95

1      Q   As you sit here today do you have any reason
2  to believe that one of your associates would have
3  gotten back to Mr. Poulos who's asking for an update?
4      A   I don't know.
5      Q   In other words, they could have ignored him,
6  correct?
7          MR. McCARRON:  Objection.
8      A   I don't -- I -- I don't know -- I don't
9  recall what happened.  I'm sorry.
10     Q   Okay.  But as you sit here today do you have
11 any reason to disagree with me when I say they ignored
12 him?
13         MR. McCARRON:  Objection.
14     A   They may have spoken to him.  I don't recall.
15     Q   And they may not have?
16     A   Correct.
17         MR. JUBB:  We can mark this as
18 Garabedian 11.
19         (Exhibit 11 marked
20          for identification)
21         MR. JUBB:  And Garabedian 11 is
22 Garabedian 63 previously produced in disclosures.  And
23 it's also 64 -- or, excuse me, it's 63.
24         MR. McCARRON:  Hmm?
25         MR. JUBB:  Do you have two pages on

Page 96

1  yours, Jeff?
2          MR. McCARRON:  No, I only have one.
3          MR. JUBB:  Okay.  So just 63.
4  BY MR. JUBB:
5      Q   Mr. Garabedian, at the bottom of this it
6  looks like there was an email from you to Tom Rees
7  cc'ing Mr. Gaul dated December 18th, 2018.  Do you see
8  that?
9      A   Yes.
10     Q   And in this email you write to Mr. Rees
11 saying:  As you know, this office represents Kurtis
12 Poulos with regard to a childhood sexual abuse claim --
13         MR. McCARRON:  You might want to go slow
14 for the court ...
15     Q   -- involving Matthew B. Ralston and The Hill
16 School.  Please contact me so that we can discuss this
17 matter.  Did you write this email or did somebody else
18 write it?
19     A   I don't recall.
20     Q   Okay.  In other words, as of December 2018
21 there were folks that could write emails on your
22 behalf?
23     A   Maybe, but I don't know.
24     Q   Do you believe you wrote this?
25     A   I don't recall.  I don't know specif -- I

Page 97

1  don't recall specifically so I can't tell you.
2      Q   Okay.  Well, when the weatherman reports that
3  it's going to be pouring rain tomorrow, absolutely
4  pouring rain --
5          MR. McCARRON:  Do you really want to do this?
6  Do you really want to do this?  You want me to --
7          MR. JUBB:  I'm just trying to
8  understand --
9          MR. McCARRON:  No.  No.  Do you want me
10 to send to the court, the way in which you think is
11 a proper -- appropriate to handle a deposition?
12         MR. JUBB:  I don't care what you send to
13 the court.
14         MR. McCARRON:  Is that right?  You
15 really don't care what I --
16         MR. JUBB:  I think when they see the way
17 he's responding to these questions --
18         MR. McCARRON:  I see.
19         MR. JUBB:  It's --
20         MR. McCARRON:  That what?
21         MR. JUBB:  It's embarrassing.
22         MR. McCARRON:  That what?  That what?
23 There's some violation of a rule that you just -- which
24 is what I'm talking about with respect to your behavior
25 now.

25 (Pages 94 - 97)

Page 98

1          MR. JUBB:  What?
2          MR. McCARRON:  I don't really want to
3   get into it, but you're not going to do what you just
4   tried to do, okay.  We're not going to do that.  We're
5   not going to deviate with some discussion or you
6   talking to yourself or whatever it may be.
7          MR. JUBB:  I'm not talking to myself.
8   I'm talking to the witness.
9          MR. McCARRON:  Well, you're not allowed
10  to do that either.  That's my point.
11         MR. JUBB:  I'm -- that's the purpose of
12  this deposition.  I'm, I'm talking to him.
13         MR. McCARRON:  No, you're asking
14  questions.
15         MR. JUBB:  I am asking questions.
16         MR. McCARRON:  You're not speaking to my
17  client.  Do not do that.
18         MR. JUBB:  Do not do speaking objections
19  either, Mr. McCarron.
20         MR. McCARRON:  I'm not doing a speaking
21  objection.  You're not going to --
22         MR. JUBB:  You've been doing it all --
23  since we started.
24         MR. McCARRON:  No, that's not true.
25  Anyway, ask --

Page 99

1          MR. JUBB:  Yeah, you have.  So if
2   you're --
3          MR. McCARRON:  Make a statement with a
4   question mark at the end.  That's the way this is going
5   to go.
6   BY MR. JUBB:
7      Q   Okay.  Pay attention to, to my question.
8   Strike that.
9          MR. McCARRON:  You don't need to do
10  that.  Please don't be rude.
11     Q   Mr. Garabedian, as of December of 2018 was
12  there anybody else that had access to your email
13  account?
14     A   Well, I imagine individuals in my office
15  could have.
16     Q   Okay.  And when you say individuals in your
17  office is that referring to your associates?
18     A   Yes.
19     Q   Okay.  And am I correct that as of December
20  of 2018 it was possible that one of your associates
21  sent this email to Mr. Rees?
22     A   I don't recall.
23     Q   Is it possible, sir?
24     A   If it happened at all.  I don't know -- I
25  don't know.

Page 100

1      Q   And if you don't know that's because you
2   can't say with any degree of certainty that your
3   associates didn't send an email, fair?
4      A   I don't know what -- I specifically don't
5   recall this.
6      Q   I know that.
7      A   Then -- well, I'm trying to answer your
8   question.  You don't have to, you don't have to like
9   yell at me, okay.
10     Q   I'm not yelling at you, sir.  I'm asking you
11  whether or not it's possible that one of your
12  associates wrote this email.  Can you answer that
13  question?
14     A   I don't know.
15     Q   But your associates did have access to your
16  email at this time, correct?
17     A   Sure.
18     Q   And there were other instances that you can
19  recall that your associates have actually written
20  emails under your email address to other folks,
21  correct?
22     A   Sure.
23     Q   Now, at the top of this Garabedian 11 which
24  is Garabedian 63, it's an email from Mr. Rees to your
25  email address, not necessarily you, saying:

Page 101

1   Mr. Garabedian:  Let us schedule a call later this
2   week.  I have no schedule conflicts tomorrow until 4,
3   no conflicts on Thursday until noon, and no conflicts
4   Friday.  Did it appear to you from this email
5   assuming -- strike that.
6          The top email is from Mr. Rees to your email
7   address, correct?
8      A   Yes.  Apparently.
9      Q   Do you believe you read this?
10     A   I don't recall reading it.
11     Q   Do you read the emails that are sent to you,
12  sir?
13     A   Yes.
14     Q   Okay.  Do you believe that you read this
15  email based on that statement?
16     A   I don't recall reading it.  That's what I --
17  I know that's ...
18     Q   When Mr. Rees says that he tried several
19  times to reach you, it will be helpful to finally have
20  a chance to speak, does that refresh your recollection
21  as to whether or not you ever spoke with Mr. Rees
22  between December of 2018 and the time you wrote that
23  letter?
24     A   I do recall speaking to Mr. Rees, but I don't
25  recall when.  And I re -- I don't recall the specific

26 (Pages 98 - 101)

Page 102

1  substance of it, the conversation.
2      Q   As you sit here do you have any reason to
3  doubt Mr. Rees's statement to you that this is going to
4  be helpful to finally have a chance to speak with you?
5      A   I have no idea what was in his mind.
6      Q   Am I correct that this email from Mr. Rees to
7  your email address -- strike that.
8          Who are all the individuals who have access
9  to your email address?
10     A   The associates in my office.
11     Q   And so if you get an email to mgarabedian@
12  mgarabedianlaw.com, that email is actually sent to
13  every associate in your office; is that correct?
14     A   No.
15     Q   Okay.  So then who are the associates that do
16  not have access to the email?
17     A   All of my associates have access.
18     Q   Well, when you receive an email at this
19  address, mgarabedian@garabedianlaw.com, who gets
20  notification of the email?
21     A   I do.
22     Q   Do any of your associates?
23     A   Well, I'm not a computer person, but they can
24  access my email address and check my emails.
25     Q   Based on how things worked in the 2018

Page 103

1  timeframe do you believe that you had received this and
2  read it?
3      A   I don't remember.
4      Q   I'm not asking if you remember reading it.
5  I'm asking if based on how you practice law, you
6  believe you actually would have read it?
7      A   I don't remember reading it.  I can't really
8  answer that.
9      Q   In other words, based on your pattern and
10  practice, you can't say one way or another whether you
11  believe you actually read this email; is that right?
12     A   I don't remember specifically reading it.
13     Q   Okay.  Do you understand the difference in my
14  question, though?
15     A   Well, I, I pr -- I read my emails, most of
16  them.
17     Q   Okay.  And so based on that practice would
18  you agree with me that you read this email?
19     A   Only if it's one that I read.
20     Q   Okay.  In other words, you're -- as you sit
21  here, based on everything you know about how you
22  practice law, you can't say one way or another whether
23  or not you would have read this email; is that right?
24     A   I specifically don't remember.
25     Q   Is it possible that you did not read this

Page 104

1  email?
2      A   You know, I, I read most of my email so I
3  really can't answer that question.
4          MR. JUBB:  Let's mark this as Garabedian
5  12.  This was previously produced as Garabedian 47.
6          (Exhibit 12 marked
7           for identification)
8      Q   And I'm going to show you Garabedian 13 which
9  is Garabedian 61.
10         (Exhibit 13 marked
11          for identification)
12     Q   Have you seen those before?
13     A   I don't know if I've seen 13 before.
14     Q   And 13 is Garabedian 61, okay.
15         In response -- if you look on 61, it's an
16  email from you to -- strike that.
17         Garabedian 61 at the bottom appears to be an
18  email from your email address to Mr. Rees, is that
19  correct?
20     A   Yes.
21  (Attorney Dougherty joined the deposition via Zoom.)
22     Q   Do you know whether or not you actually wrote
23  this?
24     A   I don't specifically recall.
25     Q   But you could have?

Page 105

1      A   Yes.
2      Q   You could have not?
3      A   Yes.
4      Q   The phone number 617.523.6250 is that your
5  office line?
6      A   Yes.
7      Q   Do you have a direct line?
8      A   No.
9      Q   In other words, no one can contact you
10  without -- strike that.
11         In other words, no one can contact your
12  office directly without going through the office line?
13     A   Yes.
14     Q   And so in this Mr. Rees --
15     A   I mean I have a cell phone, but I just don't
16  give it -- I give the number out to only a few people
17  so ...
18     Q   You don't give your cell phone out to
19  clients; is that right?
20     A   Not too many.
21     Q   Do you believe you gave your cell phone out
22  to Mr. Poulos?
23     A   I don't recall doing that.
24     Q   And in response to this two minutes later
25  Mr. Garabedian says:  Thank you.  I will call you then.

27 (Pages 102 - 105)

Page 106

1  Do you recall receiving this?
2          MR. McCARRON:  You mean Mr. Rees.
3          MR. JUBB:  Yeah, that's what I said.
4          MR. McCARRON:  No, you said
5  Mr. Garabedian.
6          MR. JUBB:  Well, that's what he said:
7  MR. Garabedian:  Thank you.  I will call you then.
8          MR. McCARRON:  Well ...
9      A  Can you repeat the question?
10     Q  Sure.  In response to this note that was sent
11  from your email address, Mr. Rees responded:
12  Mr. Garabedian:  Thank you.  I will call you then.
13     A  What is the question?
14     Q  Am I correct?
15     A  That's what it says.
16     Q  All right.  Do you recall receiving this?
17     A  Not specifically, no.
18     Q  Why is Mr. Gaul cc'd on this?
19     A  I don't know.
20     Q  Would Mr. Gaul be able to send emails from
21  your account?
22     A  Yes.
23     Q  Would Mr. Gaul be able to speak with Mr. Rees
24  on your behalf?
25     A  No.

Page 107

1      Q  Would Mr. Gaul be able to send emails from
2  your account but indicating that the email is being
3  sent from you?
4      A  I believe so.
5      Q  And then looking at Garabedian 12, this
6  appears to be a letter dated January 28th, 2019 on your
7  letterhead?
8      A  Yes.
9      Q  Who's the author of this letter?
10     A  I don't know.
11     Q  Is -- is that your handwriting for the
12  initial?
13     A  It might be.
14     Q  But it could not be?
15     A  Yes.
16     Q  And it says:  Pursuant to our telephone
17  conversation on December 21st, 2018.  Does that refresh
18  your recollection as to when you had a conversation
19  with Mr. Rees?
20     A  I mean if it's in the letter it probably was
21  then.
22     Q  Okay.  So tell me about that conversation,
23  please.
24     A  I, I don't recall the conversation.  I
25  remember speaking to Mr. Rees, but I don't recall the

Page 108

1  conversation.
2      Q  Do you recall whether or not you had spoken
3  with Mr. Rees with any of your associates in the room?
4      A  I may have.
5      Q  Do you recall discussing with Mr. Rees
6  anything whatsoever about Mr. Poulos?
7      A  I don't recall.
8      Q  As you sit here today is there anything you
9  can recall about that conversation?
10     A  No.
11     Q  Other than that it occurred?
12     A  No.
13     Q  So in this letter which may or may not have
14  been written by you, in the second paragraph it says:
15  Please advise me as to your client's position with
16  regard to my recommendation that the parties agree to
17  attend mediation if Mr. Poulos's claim is found
18  credible following an investigation.  Do you see that?
19     A  Yes.
20     Q  Did you ever say that to Mr. Rees?
21     A  I don't recall.
22     Q  As I informed you during our telephone
23  conversation on December 21, 2018, Mr. Poulos will not
24  agree to confidentiality as a condition.  Does that
25  sound like something you would say?

Page 109

1      A  Yes.
2      Q  All right.  And did Mr. Poulos tell you that?
3      A  I don't recall.
4      Q  Did Mr. Poulos tell you that he, he would not
5  agree to any sort of confidentiality?
6      A  I don't recall.
7      Q  What did you mean by attend a mediation if
8  Mr. Poulos's claim is found credible following an
9  investigation?
10     A  Just what it says.
11     Q  In other words, if they found him to be
12  incredible, mediation wouldn't be happening; is that
13  right?
14     A  That's what the le -- all I -- what the
15  letter says is attend a mediation if Mr. Poulos's claim
16  to file -- claim is found credible following an
17  investigation.
18     Q  Do you recall as to whether or not Mr. Rees
19  ever asked for your participation in any sort of
20  investigation?
21     A  I don't recall.
22         MR. JUBB:  I'm going to hand you -- or
23  mark this as Garabedian 14.  It's Garabedian 51.
24         (Exhibit 14 marked
25          for identification)

28 (Pages 106 - 109)

Page 110

1    Q   Have you seen this before?
2    A   I don't recall.
3    Q   All right.  Do you believe you received this
4 letter?  Strike that.
5        Do you believe you received this email?
6    A   Oh, if it was addressed to me, yes.
7    Q   And would you have read it?
8    A   I read most of my emails.
9    Q   Do you believe you read this one?
10   A   I specifically don't recall.
11   Q   Based on your pattern and practice do you
12 think you read this?
13   A   I read most of my emails.
14   Q   Does that mean the answer to my question is
15 yes?
16   A   I can't hear you.
17   Q   Does that mean the answer to my question is
18 yes, that you believe you read this?
19   A   I read most of my emails, but I don't
20 specifically remember reading this email.
21   Q   All right.  So in this email that was
22 directed to -- by the way -- strike that.
23       Did you ever tell Mr. Rees that your emails
24 are actually going to other folks other than you?
25   A   I don't recall.

Page 111

1    Q   Did Mr. Rees have any understanding that he
2 was getting emails from lawyers that were not actually
3 you?
4    A   You'd have to ask him.
5    Q   But, but you don't have a practice of telling
6 opposing counsel that, do you?
7    A   No.
8    Q   Do you have a practice of telling anybody
9 that your associates are actually sending emails from
10 you?
11   A   I don't know.  I mean what do you mean?
12   Q   Sure.  Do the people that you send emails to,
13 do they know that in fact it could be coming from one
14 of your associates?
15   A   Some might.
16   Q   Do, do you know if Mr. Rees knew?
17   A   I have no idea.
18   Q   So in this where it says:  The School's
19 outside attorneys, Gina Smith, Esquire and Leslie
20 Gomez, Esquire, would like to meet with Mr. Poulos in
21 your presence and in your offices to discuss the facts
22 and issues presented in the December 26th letter.  As
23 you may know, Ms. Smith and Ms. Gomez are partners at
24 Cozen O'Connor in Philadelphia, and both have extensive
25 backgrounds in investigating and prosecuting cases of

Page 112

1 child sex abuse, with a total of 34 years of experience
2 in the Philadelphia District Attorney's office before
3 entering private practice.  Do you recall reading that?
4    A   Not specifically.
5    Q   Do you know Ms. Smith and Ms. Gomez?
6    A   No.
7    Q   You've never had a case involving them in the
8 past?
9    A   Not that I remember.
10   Q   And when he follows that up by asking:
11 Please let us know if you will agree to such a meeting,
12 and if so, please provide us with a range of three or
13 four dates when a meeting could be scheduled.  I have
14 copied Ms. Smith and Ms. Gomez on this email for your
15 convenience in replying.  At any point in time did you
16 send an email to either Ms. Smith or Ms. Gomez?
17   A   I don't recall.
18   Q   Am I, am I correct -- strike that.  Am I
19 correct that as you sit here you have -- strike that.
20       Do you have any basis to believe that you
21 sent an email to Ms. Smith or Ms. Gomez?
22   A   I don't remember sending an email to them.
23   Q   Okay.  And when he's indicating to you a
24 request for three or four dates when a meeting could be
25 scheduled, did anyone from your office ever give him

Page 113

1 any dates?
2    A   I don't believe so, but I don't remember.
3    Q   Why not?
4    A   I -- it was a long time ago.
5    Q   Is there any particular reason why you
6 wouldn't give him dates as of January 9th when they're
7 asking for this?
8    A   I don't recall, but my letter of January 28th
9 is a response I believe.
10   Q   And that letter that you have of the 28th,
11 which was Garabedian 13, it mentions nothing about
12 giving them dates for Mr. Poulos to appear for any sort
13 of investigation, correct?
14   A   I don't see any.
15   Q   Is there a particular reason why you didn't
16 give them any sort of dates?
17   A   Well, it's set forth in Exhibit 12.
18       MR. McCARRON:  Did, did I mark these --
19 I'm sorry.  Can I interrupt for a moment?  Did I
20 mark -- is -- Garabedian 12 is the letter?  That's what
21 I have.
22       MR. JUBB:  Garabedian 12 is 47.
23       MR. McCARRON:  Okay.  Then I --
24       MR. JUBB:  Garabedian 13 is 61.
25       MR. McCARRON:  All right.  I think

29 (Pages 110 - 113)

1 somebody misused the -- Exhibit 13.
2        MR. JUBB:  Okay.  Let's clarify.
3        THE WITNESS:  Yeah, I got a little
4 confused there.
5 BY MR. JUBB:
6    Q    Okay.  So to clarify, in looking at
7 Garabedian 14, which is Garabedian 51, do you have that
8 in front of you, Mr. Garabedian?
9    A    Yeah.
10   Q    Okay.  And I asked you in your response to
11 this did you ever provide dates, and I believe you said
12 your response is reflected in the letter and you were
13 referring to the letter that was previously marked as
14 Garabedian 12 which is Garabedian 47, correct?
15   A    Yes.
16   Q    All right.  And in your letter am I correct
17 you did not provide them with any sort of dates?
18   A    Apparently not.
19   Q    Do you know why not?
20   A    Well, it's set forth in my letter.
21   Q    Tell me where in this letter it says why not.
22   A    Pursuant to our telephone conversation of
23 December 21, 2018, please advise me as to your client's
24 position with regard to my recommendation that the
25 parties agree to attend mediation if Mr. Poulos's claim

1 is found credible following an investigation.  That's
2 my response.
3    Q    Okay.  So you're referring to a telephone
4 conversation that had occurred the 21st of December,
5 right?
6    A    I'm also responding to any positions prior to
7 my letter.
8    Q    You don't reference the January 9th letter
9 anywhere in your letter of January 28th, correct?
10   A    That's right.
11   Q    Is there a chance that you didn't actually
12 get to see the January 9th letter?
13        MR. McCARRON:  I'm sorry.  January 9
14 letter?
15   Q    Excuse me.  The January 9 email?
16   A    I don't ... I don't recall.  I see most of
17 them so ...
18   Q    Tell us why you wouldn't provide them with
19 any sort of dates for Mr. Poulos to appear in your
20 office in Boston to answer questions with independent
21 counsel.
22        MR. McCARRON:  Objection.
23   A    I stated forth the reasons in my 20 --
24 January 28th letter.
25   Q    Okay.  So there are no other reasons, right,

1 other than what's written in this January 28th, 2019
2 letter, correct?
3    A    That I recall, yeah.
4    Q    Well, from the January 9th letter do you see
5 that the school is actually asking you for your
6 cooperation and your client's cooperation?
7    A    Yes.
8    Q    And in the January 28th letter do you believe
9 that you gave them any sort of cooperation?
10   A    Yes.
11   Q    Okay.  Tell me where you gave them the
12 cooperation.
13   A    I said:  Pursuant to our telephone
14 conversation of December 21st, 2018, please advise me
15 as to your client's position with regard to my
16 recommendation that the parties agree to attend
17 mediation if Mr. Poulos's claim is found credible
18 following an investigation.
19   Q    Okay.
20   A    That's cooperation.
21   Q    Okay.  So in your 20 -- your December 20 --
22 let's -- strike that.
23        Am I correct that December 21st, 2018 is
24 before January 9th, 2019?
25   A    I'm sorry?

1    Q    Am I correct that December 21st, 2018 is
2 before January 9th, 2019?
3    A    Yes.
4    Q    Okay.  And in that discussion that you had
5 with Mr. Rees, following that discussion he sends you
6 an email asking for you and Mr. Poulos to appear in
7 Boston to speak with their counsel pursuant to any
8 investigation, right?
9        MR. McCARRON:  You can re -- he's not
10 going to tell you what the email says.  So if that's
11 the way your question re -- as I heard it, you're
12 asking Mr. Garabedian to tell you what the email says.
13 That is Garabedian 14.
14   Q    Okay.  Mr. Garabedian, I can read myself.  So
15 why don't you tell me how you interpreted Mr. Rees
16 telling you he'd like to have independent counsel meet
17 with you and your client in your offices in Boston.
18 What did he mean by that?  How did you understand that?
19        MR. McCARRON:  Okay.  Which is it?
20   Q    How did you understand that?
21   A    Just what it says.
22   Q    That he wanted you to provide dates for
23 Mr. Poulos to appear in your office in Boston, right?
24   A    Yes.
25   Q    Okay.  And you would agree that in response

30 (Pages 114 - 117)

Page 118

1 to his January 9th letter -- excuse me, email, you
2 wrote a letter not providing dates saying advise if
3 your client is agreeable to a mediation if Mr. Poulos's
4 claim is found credible, right?
5    A  I wrote a letter saying these are the
6 conditions.
7    Q  But when you, when you wrote "if Mr. Poulos's
8 claim is found credible following an investigation,"
9 what did you mean by that?
10    A  If they found him credible in an
11 investigation, they would then attend a mediation.
12 It's an agreement.
13    Q  It's an agreement?
14    A  I would like -- I would --
15       MR. McCARRON:  No.  No.  There's no
16 question there.
17    Q  Did you interpret that as an agreement?
18    A  No, I was trying to reach an agreement.
19    Q  Did -- in, in looking at your letter, am I
20 correct that at no point in time did you ever provide
21 dates for Mr. Poulos and you to be in an office in
22 Boston to meet with independent counsel?
23       MR. McCARRON:  Objection.  He's --
24 you've already, you've already gone through this about
25 three, four times.

Page 119

1       MR. JUBB:  I haven't.
2       MR. McCARRON:  Yes, you have.  He's
3 acknowledged that the letter doesn't include any dates.
4 Do you --
5       MR. JUBB:  And my question was
6 different.
7       MR. McCARRON:  I ...
8    Q  Mr. Garabedian, I'll ask it again.
9       MR. McCARRON:  I wish it was, but it
10 wasn't.
11       MR. JUBB:  Listen closer.
12    Q  Mr. Garabedian, at any point in time --
13    A  Don't yell at me.
14    Q  At any -- I have to speak louder so
15 Mr. Poulos can hear me.
16    A  Do not yell at me, please.
17       MR. McCARRON:  No, you don't.
18 Mr. Poulos hasn't complained.
19       MR. JUBB:  I'm not yelling at anybody.
20       MR. McCARRON:  All right.  There's an
21 audio here.
22    A  You're raising your voice.  You're raising
23 your voice.  I don't -- please don't raise your voice.
24    Q  I'm not raising my voice.
25    A  Yes, you are.

Page 120

1       MR. McCARRON:  Let's hear a question if
2 you can.
3       MR. JUBB:  Okay.
4 BY MR. JUBB:
5    Q  Mr. Garabedian, at any point in time did you
6 provide dates to counsel for The Hill School that your
7 client would appear at any point for an investigation?
8    A  No.
9       MR. McCARRON:  Objection.
10    Q  Why not?
11    A  The reasons are set forth in Exhibit 12.
12    Q  No where else, right?
13    A  I don't recall.
14    Q  *At any point in time did Mr. Rees ever
15 indicate to you that part of any investigation would
16 involve actually questioning your client?
17       THE WITNESS:  Can you repeat the
18 question.  I'm sorry I didn't hear the last two words.
19       (*Record read)
20    A  I don't recall.
21    Q  Well, based on doing this, you know, 500 some
22 cases you've got for the last five years, is it
23 reasonable for a defend -- for some -- strike that.
24       Is it reasonable, sir, when a lawyer asks to
25 speak with your client in your own offices to conduct

Page 121

1 some sort of investigation to corroborate what you're
2 writing in a letter?
3       MR. McCARRON:  Objection.  I -- is it --
4 what do you -- can you ...
5       MR. JUBB:  Sure.  I'll --
6       MR. McCARRON:  My issue is with the term
7 "reasonable".  I --
8       MR. JUBB:  Okay.  Let me, let me --
9 watch this.  Strike that.
10    Q  Mr. Garabedian, when Mr. Rees is asking for
11 Mr. Poulos to appear with you in your office in Boston
12 with independent counsel did you believe that request
13 to be somehow unreasonable?
14    A  Counsel's not independent.
15    Q  I see.  So they were not independent counsel?
16    A  No.
17    Q  Okay.  And tell me how you believe that to be
18 the case.
19    A  It's been my experience that the counsel are
20 paid for by the school, and by definition they're not
21 independent.
22       MR. McCARRON:  It says right in the
23 email.  It says the -- by Mr. Rees, "the school's
24 outside attorneys" and then it identifies the two
25 lawyers that Mr. Rees then would like --

31 (Pages 118 - 121)

Page 122

1        MR. JUBB:  Would you like to testify,
2    Jeff?
3        MR. McCARRON:  No, I'm just simply
4    saying your question is not based on good faith.
5        MR. JUBB:  Yes, it is.
6        MR. McCARRON:  It can't be.  It can't
7    be.
8        MR. JUBB:  Yes, it is.
9        MR. McCARRON:  It can't be.  To call
10   Gina Maisto Smith, no way, to be independent.  No
11   chance.
12    Q   Okay.  Let me -- Mr. Garabedian --
13       MR. McCARRON:  No chance whatsoever.
14       MR. JUBB:  Do -- which, which exhibit
15   are you referring to?
16       MR. McCARRON:  Or Leslie Gomez who I do
17   not know but ...
18       MR. JUBB:  Mr. ... I'm sorry --
19       MR. McCARRON:  He identifies them as
20   outside -- he says they're the out -- the school's,
21   apostrophe S, means that they're -- the school owns
22   Maisto and Gomez, that they represent the school.
23   That's what is stated by Mr. Rees.  Your term
24   "independent"?  No.
25       MR. JUBB:  Okay.  So in the future if

Page 123

1    you have an issue --
2        MR. McCARRON:  That's bad faith to even
3    ask a question that way.
4        MR. JUBB:  It's not bad faith.
5        MR. McCARRON:  What would you call it?
6        MR. JUBB:  But your representation that
7    Gina Smith is anything but independent, I don't think
8    that has anything to do with this case.
9        MR. McCARRON:  You just said -- your
10   question presumed -- you just said she was independent.
11       MR. JUBB:  No, I just said it doesn't
12   have anything to do with being independent.
13       MR. McCARRON:  I'm confused, but I'm not
14   sure that makes a difference.  You and I can have a
15   separate discussion --
16       MR. JUBB:  Yeah.
17       MR. McCARRON:  -- about that perhaps
18   but ...
19   BY MR. JUBB:
20    Q   Mr. Garabedian, just look at the email in
21   front of you which is 51, okay.
22       MR. POULOS:  Can I speak on the fact
23   that you just brought in the Cozen firm?  They're not
24   independent.  They were named in the initial or the
25   second email that came from the headmaster's office.

Page 124

1    So I don't believe they're independent either.
2        MR. JUBB:  Anything else you want to
3    say?
4        MR. McCARRON:  Hey don't -- come on.
5    Don't be rude to him.
6        MR. JUBB:  He came to me.
7        MR. McCARRON:  To Mr. Poulos.
8        MR. JUBB:  Anything else you'd like to
9    say?
10       MR. POULOS:  No, I'm good.
11       MR. JUBB:  Okay.
12   BY MR. JUBB:
13    Q   Mr. Garabedian, please refer to Garabedian 51
14   in front of you which was marked as Garabedian 14,
15   okay?
16    A   Yes.
17    Q   I will rephrase my question without using the
18   word "independent".  Am I correct that Mr. -- strike
19   that.
20       Am I correct that Mr. Rees is asking for
21   Mr. Poulos and you to appear in your office before
22   outside counsel?
23    A   It says the school's outside the counsel.
24   The school's outside attorneys.
25    Q   Okay.

Page 125

1    A   Paragraph 2, it begins:  The school's outside
2    attorneys Gina Maistro -- Maisto Smith, Esquire and
3    Leslie Gomez, Esquire would like to meet with
4    Mr. Poulos.  It says the school's outside counsel,
5    attorneys.
6    Q   I think that's what I just said.  Okay.  So
7    when you --
8    A   No, you didn't use --
9        MR. McCARRON:  Go ahead.  What is the
10   question?
11    Q   All right.  So you actually do recall getting
12   this letter?
13    A   No.
14    Q   You're just interpreting it now, right?
15    A   Yes.
16    Q   Okay.  And so am I correct that from this
17   email that was sent to your email address, whether or
18   not you looked at it or not, Mr. Rees was indicating
19   that the school's outside attorneys, Gina Smith and
20   Leslie Gomez of Cozen O'Connor would like to meet with
21   your client and you in your offices in Boston.  Can we
22   agree on that?
23       MR. McCARRON:  That that was his
24   understanding.  Is that your question?  Because that's
25   the only one you can have that's proper.

32 (Pages 122 - 125)

1    MR. JUBB:  That he's asking, yeah.
2    MR. McCARRON:  Excuse me?
3    MR JUBB:  That's what Mr. Rees is
4  asking.
5    MR. McCARRON:  And you're asking for
6  Mr. Garabedian's understanding.
7    MR. JUBB:  Yeah.
8    MR. McCARRON:  Okay.  But he already
9  told you he doesn't remember reading this at the time.
10    MR. JUBB:  Well, he had no problem just
11  telling me what he was interpreting now.
12    MR. McCARRON:  Well, sure so you want to
13  know now whether he interprets -- understands that
14  that's what was asked by Mr. Rees?
15    MR. JUBB:  Jeff, let me do this.  You
16  know, you're interrupting like crazy.  And my questions
17  are not confusing.
18    MR. McCARRON:  No.  No.  No.  Don't --
19  I'm not.
20    MR. JUBB:  You are.
21    MR. McCARRON:  Don't characterize me as
22  crazy.
23    MR. JUBB:  Jeff, your objections are all
24  speaking objections.  You've done more talking in the
25  last -- after the break than he has.

1    MR. McCARRON:  No.  No.  No.  No.
2    MR. JUBB:  Well, you've testified more
3  for him and have more recollection than he does.
4    MR. McCARRON:  No.
5    MR. JUBB:  Okay.  Well --
6    MR. McCARRON:  I just under -- I know
7  the rules and I understand --
8    MR. JUBB:  I don't believe you do so --
9    MR. McCARRON:  Oh, seriously.
10    MR. JUBB:  I don't because --
11    MR. McCARRON:  Really.  Okay.
12    MR. JUBB:  I've never seen someone that
13  had more speaking objections than this.
14    MR. McCARRON:  Well, that's a rude
15  statement for you to make.
16    MR. JUBB:  Well, I've never seen
17  somebody have more speaking objections in a federal
18  court deposition.
19    MR. McCARRON:  Well, that's shame that
20  you haven't, but that doesn't mean that the other
21  people are doing it correctly, and I'm doing it
22  incorrectly now.
23    My issue is that you're asking -- I told
24  you -- we've been through this before.  If what you're
25  asking for is Mr. Garabedian to tell you what the

1  letter reads, that's not a proper question.  If you
2  want to know what he understood this letter to mean at
3  the time, I think you've already been through that.  If
4  you want to know if he read -- if reading this now does
5  he understand that, it's not really proper or relevant,
6  but I'm not going to interrupt the -- prevent him from
7  answering that question.  So which is it that you want
8  to know?
9  BY MR. JUBB:
10    Q   Mr. Garabedian, at any point in time did you
11  learn that The Hill School was asking for your client
12  and you to appear in Boston as part of any sort of
13  investigation?
14    A   I don't recall.
15    Q   Well, in looking at this letter and seeing
16  what it says do you believe that that's somehow
17  unreasonable?
18    MR. McCARRON:  Objection.
19    A   The letter requests that.
20    Q   Okay.  And can you tell us --
21    MR. McCARRON:  It's an email actually,
22  but yeah.
23    A   I'm sorry.  Email.
24    Q   Can you tell us why at no point in time did
25  you provide dates for Mr. Poulos to appear for any sort

1  of investigation?
2    A   The reason isn't on -- is on Exhibit 12.
3    Q   And, and I don't understand that.  Tell me
4  the reasons.  Because you just said here you'd rather
5  do a mediation if he's found credible, right?
6    A   It says:  Pursuant to our telephone
7  conversation on December 21, 2018, please advise me as
8  to your client's position with regard to my
9  recommendation that the parties agree to attend the
10  mediation if Mr. Poulos's claim is found credible
11  following an investigation.
12    Q   Where does it say anything in here about that
13  he will not appear to answer questions for an
14  investigation?
15    A   This is -- this was my response as I recall.
16    Q   Okay.  And I'm asking you where in here does
17  it say that he will not appear as part of an
18  investigation?
19    MR. McCARRON:  Just a second.  You're
20  pointing at a piece of paper.  The record doesn't take
21  down what you're pointing at.  So what is it your
22  referring to, sir?
23    Q   Okay.  Mr. Garabedian, on Garabedian 49 which
24  was marked in this deposition --
25    MR. McCARRON:  Garabedian 12?

33 (Pages 126 - 129)

1    Q   Excuse me, Garabedian ...
2         MR. McCARRON:  Exhibit 12.
3    Q   ... 47.  Strike that.
4         Mr. Garabedian, do you have Exhibit 12 in
5    front of you?
6    A   Yes.
7    Q   Okay.  It's Garabedian 47, correct?
8    A   Yes.
9    Q   Where in this letter do you say that your
10   client is not going to appear?
11   A   The letter says it.  It's preconditioned to
12   appearing is what is in here.  I also say:  As I
13   informed you during our telephone conversation on
14   December 21, 2018, Mr. Poulos will not agree to
15   confidentiality as a condition to any settlement of his
16   sexual abuse claim.
17   Q   And when you wrote "is found credible
18   following investigation", what did you mean by
19   investigation?
20   A   An investigation.
21   Q   In other words, you wanted the school to look
22   into his claims without Mr. Poulos actually appearing
23   for questioning; is that right?
24   A   I don't recall that.  I mean I -- what I
25   believe is that any questioning of Mr. Poulos is the

1    beginning of an investigation.
2    Q   I agree.
3    A   Okay.  And I wanted preconditions set before
4    the investigation began.
5         And don't point at me, please.
6    Q   And what were those preconditions?
7    A   Pursuant to our telephone conversation of
8    December 21, 2018, please advise me as to your client's
9    position with regard to my recommendation that the
10   parties agree to attend mediation if Mr. Poulos's claim
11   is found credible following an investigation.  As I
12   informed you during our telephone conversation on
13   December 21, 2018, Mr. Poulos will not agree to
14   confidentiality as a condition to any settlement of his
15   sexual abuse claim.  Those were the conditions.
16   Q   In other words, in looking at this now
17   since -- am I correct you don't actually recall
18   receiving this letter?
19   A   No.
20   Q   Okay.  And you can actually recall now what
21   your think -- thinking was at that time, correct?
22   A   I'm just reading the letter.
23   Q   Oh.  And am I correct --
24   A   Excuse me.
25   Q   I said oh.

1         Am I correct that -- strike that.
2         Did Mr. Rees ever respond to you?
3    A   I don't recall.
4    Q   Did he ever say, well, an investigation like
5    you just testified to involves him appearing for
6    questioning?
7    A   I don't recall.
8         MR. JUBB:  Garabedian 16 is a document
9    that was previously produced as Garabedian 46.  Or
10   strike that.  I believe we're at 15.
11        MR. McCARRON:  Yeah, I was going to ask
12   you.
13        MR. JUBB:  Garabedian 15 is a document
14   that was previously produced as Garabedian 46.
15        (Exhibit 15 marked
16          for identification.)
17   Q   Mr. Garabedian, I know this was an email that
18   was sent to you, but I imagine your testimony is you
19   may or may not have --
20        MR. McCARRON:  You're not going to
21   presume.  Just ask --
22        MR. JUBB:  Okay.
23   Q   Mr. Garabedian, did you read this?
24   A   Let me read it, please.
25        (Pause.)

1    A   Okay.  Thank you.
2    Q   All right.  In the second paragraph of this
3    email from Mr. Rees dated January 30, 2019 in response
4    to your January 28th letter he wrote:  In both your
5    December 21 phone call and your January 28 letter, you
6    acknowledged that the School needs to assess whether
7    Mr. Poulos' claim is credible following an
8    investigation.  We agree that an investigation is the
9    first step and meeting with Ms. Smith and Ms. Gomez is
10   an essential element of that investigation.  Did he
11   express to you that sentiment in your phone call on
12   December 21st?
13   A   I don't recall.
14   Q   In the first paragraph, last sentence where
15   he says:  Please let me know if you are agreeable to
16   this meeting and (if you agree) a range of dates when
17   you and Mr. Poulos could meet with Ms. Smith and
18   Ms. Gomez.  Did you ever provide him dates?
19   A   I don't recall.
20   Q   Do you have any understanding as to whether
21   or not -- strike that.
22        I failed to ask this question.  In Garabedian
23   12 is that your initials at the bottom?
24   A   I think so.
25   Q   All right.  So this actually may be a letter

1 that you wrote?  Is that right?
2     A   Is that a question?
3     Q   Yeah.  So this actually may be a letter that
4 you wrote, correct?
5     A   Excuse me?
6     Q   I said so this actually may be a letter that
7 you wrote, correct?
8     A   Well, I may have written the other ones too.
9     Q   Okay.  But you may also not have, right?
10    A   Right.
11    Q   Do you have any reason to believe that you
12 wrote the January 28th, 2019 letter?
13    A   I don't recall.
14    Q   All right.  Any recollection of actually
15 receiving Mr. Rees's email of January 30th, 2019?
16    A   No.
17        MR. McCARRON:  What kind of party is
18 going on out there, jeesh.
19        MR. JUBB:  Let's go off the record for a
20 second, please.
21        THE VIDEOGRAPHER:  The time is
22 12:35 p.m.  We're off the record.
23        (Break was taken.)
24        THE VIDEOGRAPHER:  The time is
25 12:37 a.m.  We're on the record.

1 BY MR. JUBB:
2     Q   Mr. Garabedian, in terms of the production of
3 emails in this case can you tell me the individuals who
4 were involved in actually searching their, their
5 Outlook folders?
6     A   No.
7     Q   You can't.
8        As the firm owner and manager do you believe
9 that any of your associates produced the emails from
10 their Outlook folders?
11    A   Prob -- yes, probably.
12    Q   Do you believe that you have produced all of
13 the emails that you had sent to Mr. Poulos in this
14 case?
15    A   I believe so.
16    Q   I just want to go through a couple of things
17 here.  The first is -- well, strike that.
18        MR. McCARRON:  Don't answer that.
19        MR. JUBB:  I said strike that.
20        MR. McCARRON:  You didn't say much
21 anyway.  I'm just teasing you.
22        MR. JUBB:  Oh.
23        All right.  This is going to be marked
24 as Garabedian 16 which is Hill School's production 225
25 and 226.

1        (Exhibit 16 marked
2        for identification)
3     Q   All right.  Mr. Garabedian, I've handed you
4 what I've marked Garabedian 16 which is The Hill
5 School's production 225, also P16.225 and 226.  Have
6 you seen this letter before?
7     A   I don't recall.  I, I believe I saw it as an
8 exhibit.
9     Q   And I imagine -- strike that.
10        Were you served with the initial complaint?
11    A   I don't remember.
12    Q   Did you ever look at the complaint?
13    A   What com -- which complaint are you talking
14 about?  I'm sorry.
15    Q   I'm sorry.  It's my understanding there was
16 never a complaint filed in this case other than the one
17 that I filed against you initially.
18    A   Okay.
19    Q   So you looked at the complaint, correct?
20    A   Briefly a long time ago.
21    Q   Well, in 2019 in April did you look at the
22 exhibits that were attached to it?
23    A   No, I don't think so.  I may have.  I don't
24 recall.  You're talking about April of 2019?
25    Q   Yeah, when you got sued and were named as a

1 defendant in this lawsuit did you read the complaint?
2     A   Probably, yeah.
3     Q   And you looked at the exhibits that were
4 attached to it?
5     A   Probably.
6     Q   All right.  When you saw -- do you believe
7 that -- strike that.
8        I'll represent to you that this letter was
9 attached as an exhibit to the complaint, all right.
10 When you reviewed that did you have any recollection of
11 actually writing this letter yourself?
12    A   No, I don't recall.
13    Q   As you sit here today do you have any reason
14 to believe -- strike that.
15        As you sit here today do you believe that you
16 wrote this letter yourself?
17    A   I don't recall.
18    Q   In other words, you can't say one way or the
19 other whether or not you wrote this letter yourself; is
20 that correct?
21    A   I don't recall specifically.
22    Q   Does that mean that I'm correct, sir?
23    A   I don't know what you mean.
24    Q   You cannot -- as you sit here today, you
25 cannot say one way or the other whether or not you

Page 138

1  wrote this letter or someone else wrote it, fair?
2      A   I don't remember specifically writing this
3  letter.
4      Q   Okay.  And if you don't remember am I correct
5  it's possible that someone else could have written this
6  letter; is that correct?
7      A   I, I -- all I can say is I don't specifically
8  remember writing this letter.
9      Q   All right.  And as of December of 2018 am I
10 correct in understanding that other associates at your
11 firm had the ability to draft letters like this on your
12 letterhead with your name at the bottom?
13     A   Yes.
14     Q   And I take that to mean that in this case
15 that could have happened, but we can't say one or the
16 other; is that fair?
17     A   Yes.
18     Q   Now, in looking at this on the second page,
19 which is Hill production 226, do those initials appear
20 to be your handwriting?
21     A   I'm not sure.
22     Q   Okay.  At the top of this production it says
23 December 26, 2018, 4:51 p.m., Mitchell Garabedian Law
24 with a number there.  Was this faxed to the school?
25     A   Apparently.

Page 139

1      Q   Strike that.
2          This was a fax to Mr. Rees, correct?
3      A   I bel -- well, apparently, based on the way
4  the letter is structured.  I mean at the top of the
5  letter on the first page it says via fax, and there's a
6  fax number.  That looks like my signature.
7      Q   All right.  Did you review this letter in
8  anticipation of today?
9      A   I believe it was an exhibit in a deposition.
10     Q   *And in going through this letter that your
11 office sent to Mr. Rees on December 26, 2018, did you
12 recall actually speaking with Mr. Poulos about some of
13 the things that are claimed in this letter?
14         THE WITNESS:  Can you repeat the
15 question, please.
16         (*Record read)
17     A   I spef -- specifically don't remember, but I
18 do -- I did speak to Mr. Poulos.
19     Q   Have you had any discussions with the
20 attorneys in your office as to who wrote this letter?
21     A   No.  Not recently.  I may have in the past,
22 but I don't recall those discussions.
23     Q   After you were sued in this matter did you
24 make any sort of efforts to determine who was the
25 attorney who actually wrote these letters on your

Page 140

1  letterhead and sent them to The Hill School?
2      A   No.  I don't recall doing that.
3      Q   When you got the complaint and looked at the
4  exhibits do you recall having any sort of recollection
5  or impression, if you will, that, oh, yeah, that's the
6  letter that I, that I wrote?
7      A   I don't recall that.
8      Q   Did you have -- strike that.
9          In reviewing the complaint and the exhibits
10 attached thereto did you have any sort of feeling or
11 reaction that in reviewing these letters you said I
12 didn't write those letters?
13     A   I don't recall that.
14     Q   When -- strike that.
15         In the 2018/2019 timeframe when clients are
16 asking you for an update via email was there a, a
17 pattern and practice of writing to them?
18     A   No, not necessarily.
19     Q   Do you have any records suggesting that you
20 were speaking with -- strike that.
21         MR. JUBB:  This is going to be
22 Garabedian 17 which is Garabedian Email 67.
23         (Exhibit 17 marked
24         for identification)
25     Q   Again, any recollection of receiving this

Page 141

1  email?
2      A   No.
3      Q   Am I correct that as of February 2019 the
4  other members of your office may have received this
5  email?
6      A   I don't know.
7      Q   Okay.  It says:  Hey Mitchell I just wanted
8  to check in and see how things are going with The Hill
9  School.  I haven't heard anything from you guys since I
10 did that phone interview with your associate a while
11 back.  I'm hoping to put this whole thing in the rear
12 view as soon as possible so I can move forward with my
13 life.  Thanks so much for everything!
14         Again, refresh your recollection as to
15 whether or not you recall receiving this from
16 Mr. Poulos?
17     A   I don't recall.  I'm sorry.
18     Q   Okay.  And does this refresh your
19 recollection at all as to whether or not it was in fact
20 your associate who did the initial phone interview?
21     A   No.
22     Q   If -- I'll, I'll represent to you -- strike
23 that.
24         I'll represent to you that -- strike that.
25         You reviewed this email that was an exhibit

36 (Pages 138 - 141)

1  to Mr. Poulos's deposition, correct?
2      A   Are you referring to Exhibit 17?
3      Q   I am, sir.
4      A   Yeah.
5      Q   Do you recall Mr. Poulos's testimony that he
6  was referring to the initial phone interview, that
7  intake process that he hasn't heard from your office
8  since then?
9      A   No.
10     Q   Do you have any reason to disagree with him
11  that he hadn't heard from your office for an update
12  after his initial interview?
13     A   No.
14         MR. JUBB:  Why don't we take a five-to-
15  ten-minute break so if anyone needs to -- I think
16  Mr. Poulos had indicated he has to take his dog out.
17         MR. McCARRON:  Mr. Poulos, this is your
18  chance to take your dog out, okay.
19         MR. POULOS:  He's fine.
20         MR. JUBB:  Okay.
21         MR. McCARRON:  I'm not telling you not
22  to -- well, do what you want.
23         MR. JUBB:  It's 12:50.  I mean let's do
24  a five-minute break.
25         THE VIDEOGRAPHER:  The time is

1  12:50 p.m.  We're off the record.
2          (Break was taken.)
3          THE VIDEOGRAPHER:  The time is
4  12:58 p.m.  We're on the record.
5          MR. McCARRON:  I have an objection to
6  your last question because I do not believe it was
7  bas -- good -- expressed on a good faith basis since
8  you are aware, Mr. Jubb, that there's substantial
9  evidence of communication that existed between the
10  Garabedian firm and Mr. Poulos in between the initial
11  intake interview and the point in time that is
12  referenced in Garabedian Exhibit 17.
13         MR. JUBB:  Okay.
14  BY MR. JUBB:
15     Q   Mr. Garabedian, after you were sued in this
16  case did you have any discussions with Mr. Poulos?
17     A   I don't recall.  I think there were some
18  discussions about my representing him.
19     Q   After you were first sued and he was also
20  named as a defendant did you provide Mr. Poulos with
21  any sort of legal advice?
22     A   I don't recall.
23     Q   So in terms of Mrs. Poulos's discussions that
24  you had with her do you have any recollection of ever
25  communicating with her by email?

1      A   I may have.
2      Q   And what do you recall about that?
3      A   I don't recall.
4      Q   So my question was if you recall anything.
5      A   I don't recall anything specific.
6      Q   All right.  Did you have any discussions with
7  her by phone?
8      A   I may have.
9      Q   Do you recall any of those discussions?
10     A   No.
11     Q   What about discussions with your associates
12  pertaining to Mr. Poulos, did you have any discussions
13  with your associates as it pertains to Mr. Poulos?
14     A   I probably did.
15     Q   Do you have any recollection of actually
16  speaking to your associates about Mr. Poulos?
17     A   Not specifically.
18         MR. JUBB:  Here's Garabedian 18 which is
19  Garabedian File 01 through 40.
20             (Exhibit 18 marked
21              for identification)
22             (Pause.)
23         MR. McCARRON:  What would you like to
24  know?
25         MR. JUBB:  I'm just waiting for him to

1  finish looking through it.
2      Q   Mr. Garabedian, does that appear to be the
3  handwritten notes that were part of Mr. Poulos's file?
4      A   I believe so.
5      Q   And am I correct that you reviewed them which
6  were attached to Mr. Poulos's deposition?
7      A   No.
8      Q   So in Mr. Poulos's deposition you never
9  reviewed these notes before today?
10     A   I may have reviewed some of them.
11     Q   All right.  Did you review -- strike that.
12         Go to the last page, Garabedian 40, for me,
13  please.
14     A   Okay.
15     Q   Are you there?  Is that your handwriting?
16     A   I don't believe so.
17     Q   At the top it says:  Perps Tom Ruth
18  Mr. Ralston.  Do you see that?
19     A   Yes.
20     Q   Did Mr. Poulos say to you that Mr. Ruth was a
21  perpetrator?
22     A   A sexual abuser?
23     Q   Yeah.
24     A   No.  Not that I recall.
25     Q   Do you know whose handwriting this is?

37 (Pages 142 - 145)

Page 146

1    A   I'm not sure. It's one of my associates.
2    Q   Now, was there a practice as of December 2017
3  where your associates would be documenting
4  conversations between you and them and clients?
5    A   Between myself and my associates?
6    Q   Yeah, and the clients.
7    A   Yes.
8    Q   All right. At the bottom where it says: MG:
9  don't talk to school "counselors", do you recall
10 telling Mr. Poulos that?
11   A   No. Specifically, no.
12   Q   In looking at this handwriting can you tell
13 us anyway -- strike that.
14       Do you have any -- strike that.
15       If you look at the top it says MG/ and then
16 some initials that are cut off there. Do you see that?
17   A   Yes.
18   Q   Do you know who wrote this?
19   A   No.
20   Q   If you go to -- a couple pages before that,
21 file 33?
22   A   Yes.
23   Q   All right. At the top of that it's now in
24 blue ink it says: DM. Is that Mr. Mahoney?
25   A   Yes. I believe so.

Page 147

1    Q   All right. The date is 12/12/17?
2    A   Yeah.
3    Q   Would it be fair to assume that this
4  discussion with Mr. Poulos occurred with Mr. Mahoney
5  and him?
6    A   I may have been involved. I don't know.
7  Along, along with Mr. Mahoney. I may have been
8  involved along with Mr. Mahoney. I ...
9    Q   In other words, at the top even though it
10 just says his initials, you're saying you could have
11 been involved?
12   A   Yes.
13   Q   Going back to that first page, Garabedian
14 File 40.
15   A   The -- excuse me. Which one?
16   Q   Garabedian File 40, the last page.
17   A   Oh, okay.
18   Q   Did you tell Mr. Poulos as of December 12th,
19 2017 that the statute of limitations on his case had
20 expired?
21   A   I don't recall specifically.
22   Q   Is that something that you would have a
23 pattern and practice of telling clients when they call?
24   A   Yes.
25   Q   Do you write your own rejection letters?

Page 148

1    A   Sometimes.
2    Q   Do you reject cases where the statute of
3  limitations has expired?
4    A   Sometimes.
5    Q   And other times you accept cases when the
6  statute of limitations has expired?
7    A   Yes.
8    Q   Does anything come to mind?
9    A   I don't understand the question. I'm sorry.
10   Q   Sure. What cases come to mind that you're
11 rejecting based off statute of limitations?
12   A   Nothing comes to mind. It could be a case
13 where I don't understand the statute of limitations or
14 it's just the statute of limitations is gone, and it's
15 another country, something like that.
16   Q   Have you ever rejected a case in the United
17 States where the statue of limitations was blown?
18   A   Yes.
19   Q   Why?
20   A   Because I may not -- not -- may not represent
21 victims in that state, for instance.
22   Q   As you sit here today do you have any
23 recollection of actually hearing Mr. Poulos's initial
24 intake statement?
25   A   No.

Page 149

1    Q   Now, if we go to Garabedian File 31, this --
2  at the top it says DM/MG. Does that indicate that you
3  were on this phone call with Mr. Mahoney?
4    A   Probably.
5    Q   And it says: Kurtis Poulos. File. Phone.
6  Mary Ellen Poulos. Does this reflect a conversation
7  that you had with Ms. Poulos?
8    A   I don't recall specifically but apparently.
9    Q   Do you recall the Pouloses ever telling you
10 that the former president Trump's children went The
11 Hill School?
12   A   I believe I saw that in the notes. They may
13 have told me.
14   Q   Look on Garabedian File 30. Whose
15 handwriting is that?
16   A   I believe that's Nathan's, Nathan Gaul's.
17   Q   How old is Mr. Gaul?
18   A   I don't know. He's been with me about 15
19 years. I don't know how old he is.
20   Q   Did he have any experience with this type of
21 work before coming to your office?
22   A   I don't, I don't know.
23   Q   In oth -- strike that.
24       Did he come to your office after law school?
25   A   Pretty close to if not right after.

38 (Pages 146 - 149)

Page 150

1    Q   And at the top of his handwritten notes it
2   says: MG, NG.  Does that mean that you were likely on
3   this phone call?
4    A   Yes.
5    Q   Can you go to Garabedian File 24, please.
6    A   Sure.  Yes.
7    Q   All right.  Whose handwriting is this?
8    A   It's not mine.  I think it's Nathan's.
9    Q   Okay.  And it says:  MG tells client the
10  school is giving us the runaround.  Have you ever told
11  a client that someone's giving them the runaround?
12   A   I don't specifically recall, but, you know,
13  it's happened.
14   Q   Is that an expression you use?
15   A   What?
16   Q   Someone's giving you the runaround?
17   A   Not commonly but ...
18   Q   As of April 3rd, 2019 -- strike that.
19       Do you have any reason to believe that
20  Mr. Gaul inaccurately documented the notes of your
21  discussion with Mr. Poulos?
22   A   No.
23   Q   Do you believe based off this that you told
24  Mr. Poulos the school was giving you the runaround?
25   A   Yes.

Page 151

1    Q   Can you tell us in your own words what, what
2   you believe the school would be doing that was giving
3   you the runaround?
4    A   I don't recall.
5    Q   So in other words, from the time that
6   Mr. Poulos contacted you to the first time you
7   contacted the school to today, you can't think of any
8   reason as you sit here as to why the school was -- or
9   strike that.
10       As you sit here today, you can't think of any
11  reason or any example of the school giving you the
12  runaround?
13       MR. McCARRON:  Objection.
14   A   Well, we had asked them for certain
15  conditions as preconditions to the investigation, and
16  they didn't agree apparently.
17   Q   *Is it your testimony that Mr. Poulos would
18  not agree to an investigation unless the school agreed
19  to mediate after the investigation?
20       THE WITNESS:  Can you repeat the
21  question?
22       (*Record read)
23   A   Well, I set it for -- set forth the position
24  in my letter and your ...
25       MR. McCARRON:  Exhibit 12.

Page 152

1    A   My January 28 letter.  I don't know if you
2   want me to read it again to you, but it's -- that's my
3   position.
4    Q   Is it your testimony that as of April 3rd,
5   2019 when you had a discussion with Mr. Poulos that you
6   would not allow him to participate in any sort of
7   investigation unless the school agreed to mediate after
8   the investigation?
9    A   Again, it's set forth in the letter.
10   Q   Okay.  So to the extent that the letter
11  doesn't say that --
12       MR. McCARRON:  I'm sorry.  Let's try
13  this again.  Can you -- the letter doesn't say what?
14   Q   So to the extent that that letter does not
15  say we will not participate in any investigation unless
16  you agree to mediate this after the investigation,
17  unless the letter says that, then that's not your
18  position here?
19       MR. McCARRON:  Objection.  That's what
20  the letter says.
21   A   You're not even -- there's no --
22       MR. JUBB:  The letter does not say that.
23       MR. McCARRON:  Yeah, it does.
24   Q   Okay.  Mr. Garabedian, --
25       MR. McCARRON:  What do you mean it

Page 153

1   doesn't?
2    Q   -- can you show me in that letter where you
3   say we're not going to have Mr. Poulos appear in any
4   sort of investigation unless you agree to mediate?
5        MR. McCARRON:  Objection.
6    Q   It doesn't say that, does it?
7    A   No, you're not reading -- asking the proper
8   question.  I'm sorry.  My position was clear, and
9   you're leaving out the word if he's found credible.
10       Pursuant to our telephone con -- this is
11  Exhibit 12, excuse me.  Pursuant to our telephone
12  conversation on December 21, 2018, please advise me as
13  to your client's position with regard to my
14  recommendation that the parties agree to attend
15  mediation if Mr. Poulos's claim is found credible
16  following an investigation.  As I informed you during
17  our telephone conversation on December 21, 2018,
18  Mr. Poulos will not agree to confidentiality as a
19  condition to any settlement of his sexual abuse claim.
20  That was my position, sir.
21   Q   Does that letter -- was that -- strike that.
22       I think we've already talked about that
23  you're unsure as to whether or not you wrote that
24  letter, correct?
25   A   But that's what the letter says.

39 (Pages 150 - 153)

Page 154

1    Q   I can read what the letter says.
2    A   Okay.
3    Q   Is it your testimony that that letter was
4    intended to express to The Hill School that Mr. Poulos
5    would not appear for an investigation unless they said
6    to you we'll agree to a mediation following the
7    investigation if he's found credible?
8    A   That's what the letter says.
9    Q   Okay.  And so did the school ever contact
10   you --
11   A   And they agree to not impose a
12   confidentiality agreement.
13   Q   And in other words, if the school did not get
14   back to you and say we'll mediate this case -- strike
15   that.
16       Is it your testimony that if the school did
17   not respond saying we'll agree to mediate this if after
18   the investigation he's found credible, that there was
19   no further discussion that was needed to be had?
20   A   And they'd have to agree to no
21   confidentiality.
22   Q   And if they did that then you would have
23   what, responded to their emails?
24   A   I would have proceeded with an
25   investigation -- in the investigation.

Page 155

1    Q   Did they ever contact you after you sent that
2    letter?
3    A   I don't recall.
4    Q   Did they ever tell you, hey, we need to hear
5    from you; we need to speak with your client?
6        MR. McCARRON:  Objection.
7    A   When?  I mean ...
8    Q   I'm asking you.
9    A   Well, you're ...
10       MR. McCARRON:  Is that what you really
11   want to know?  You've been through it.  There was an
12   answer -- I mean there was an email.  It was January
13   ... I don't know, anyway.  What -- can, can you -- you
14   keep saying they anyway.  Are you referring to the
15   school?  The school's lawyer?
16       MR. JUBB:  Sure.
17       MR. McCARRON:  Who are you thinking
18   about?
19   BY MR. JUBB:
20   Q   Okay.  Mr. Garabedian, to be extraordinarily
21   precise here, at any point in time following that
22   letter that you sent did anyone from The Hill School or
23   acting on behalf of The Hill School contact you telling
24   you they need to speak with your client?
25   A   I don't recall.

Page 156

1    Q   Now, with the expression "giving you the
2    runaround", what does that mean?
3    A   They're not being direct.  They're not
4    responding to my statement in January of -- in Exhibit
5    12.
6    Q   Can you turn to Garabedian File 16.  It's
7    right in front of you.
8    A   Yes.
9    Q   Whose handwriting is that?
10   A   That's my handwriting I believe.
11   Q   Okay.  And is that your initial at the
12   bottom, that MG?
13   A   Yes.
14   Q   Okay.  In looking at those initials can you
15   please pull back up for me Garabedian 16 which is the
16   December 18 letter and Garabedian 10 which is the
17   April 18 letter?
18   A   I'm sorry.  What, what do you want me to pull
19   up here?
20   Q   The letters that are in issue in this case.
21   A   What exhibit numbers are they?
22   Q   It's Garabedian 16.
23   A   Yeah.
24   Q   Okay.  On Garabedian 16 on the second page
25   where the initials are, in looking at both of those

Page 157

1    does that appear to be written by somebody else?
2    A   Okay.  What are we looking at now?  I'm
3    sorry.
4    Q   On P16.
5    A   Yeah.
6    Q   226.
7    A   Yeah.
8    Q   Which is the second page --
9    A   Yeah.
10   Q   -- of Garabedian 16, do those initials at the
11   bottom of that letter appear to be yours matching up
12   with the ones that you say are yours on Garabedian File
13   16 which was a part of Garabedian 18?
14   A   So you want me to compare Exhibit 16 with
15   Garabedian 16, correct?
16       MR. McCARRON:  Well, I'm not --
17   Q   No.
18       MR. McCARRON:  Now I'm not sure what
19   you're trying to find out.  Are -- what are -- are you
20   asking him --
21       MR. JUBB:  I'm trying to -- he said that
22   this is his initial.
23       MR. McCARRON:  Just if, if I could see
24   if I can clarify this.  Are you asking for -- whether
25   looking at File page 16 which is part of Garabedian 18

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1717a

1 and com -- does that refresh or give him a clue about
2 whether the initials that are on what you now
3 identified as P16.226 which is part of Garabedian 16?
4 Is that what you're asking?
5         MR. JUBB:  No, I, I like my question.  I
6 mean I'm happy to rephrase it if you just say can you
7 rephrase it.  I don't want him to --
8         MR. McCARRON:  Well, I'm not trying to
9 give you a hard time.  I'm trying to get through this.
10 I, I don't underst -- I am -- I'm not sure what you're
11 trying to find out, honestly.
12         MR. JUBB:  Okay.  Let me try again then.
13         MR. McCARRON:  Except I think you're
14 trying to figure out if, if -- if he now has a basis on
15 which to conclude that his initials appear on
16 Garabedian 16.  Is that what you're trying to figure
17 out?
18         MR. JUBB:  I'm going to get there, yeah.
19 BY MR. JUBB:
20    Q    So, Mr. Garabedian, in looking at what you
21 already told us was your initials and comparing them to
22 the initials on the December 2018 letter that went to
23 The Hill School's counsel, does this in any way give
24 you any sort of an indication that, in fact, you wrote
25 this letter and those are your initials or is that

1 somebody else's initials for you?
2    A    I'm not sure.
3    Q    Okay.  And on Garabedian File 16, what is it
4 about those initials that tell you that that's your,
5 your handwriting?
6    A    Well, it's -- I, I notice the handwriting
7 above it looks like my handwriting.  The -- I'm sorry,
8 the handwriting above my initials.
9    Q    Okay.  And so in looking at these, you can't
10 tell us one way or another as to whether or not those
11 are your handwritten initials on Hill School production
12 226 on that letter?
13    A    Yeah, it could -- they could be -- it could
14 be my initials.  I just specifically don't remember.
15    Q    Same question as to the April 11th, 2018
16 letter.
17    A    What exhibit number is that; do you know?
18    Q    I think that one is ... 7.
19    A    Oh, okay.
20    Q    Does the initials that are written on the
21 April 11th, 2018 letter look or appear to be your
22 initials that are reflected in Garabedian File 16?
23    A    I'm not sure.  It could be.
24    Q    You think they look similar?
25    A    Could.  I'm not sure.

1    Q    Do you sign your letters with your initials?
2    A    Sometimes.
3    Q    Would you do it for me?
4         MR. McCARRON:  No.
5    Q    At any point in time did you tell Mr. Poulos
6 to contact the police department?
7    A    I believe so, but I don't remember
8 specifically.
9    Q    Why did you -- why would you tell him to do
10 that?
11    A    Because he should make a record of it.
12    Q    Did he tell you that he would contact the
13 police?
14    A    I don't recall.  I believe he did, but I
15 don't recall specifically.
16    Q    Did you tell him to contact the AG's office?
17    A    I may have.
18    Q    And why would you do that?
19    A    To make a record.
20    Q    And did he represent to you that he would
21 call the AG's office?
22    A    I don't recall.
23    Q    Did -- why wouldn't you call the police
24 department and help him with that process?
25         MR. McCARRON:  Objection.

1    A    It's just my style.
2    Q    Well, if there was any difficulty or at least
3 as, as he might have said, you know, contacting the
4 police, you know, would you help your clients in those
5 situations?
6         MR. McCARRON:  Objection.
7    A    I --
8         MR. McCARRON:  This is abusive.  That's
9 an abusive question honestly, and you really --
10         MR. JUBB:  How?
11         MR. McCARRON:  I'm not going to get into
12 it with you, but it's an abusive question.  You don't
13 repre -- how can that question conceivably relate to a
14 defamation claim by your client?
15         MR. JUBB:  I'm going to as to their
16 discussions between them and Mr. Poulos --
17         MR. McCARRON:  I'm sorry.
18         MR. JUBB:  -- saying that he --
19         MR. McCARRON:  And what does that
20 have --
21         MR. JUBB:  -- contacted the -- I'm going
22 to explain.
23         MR. McCARRON:  Go ahead.  Finish.
24         MR. JUBB:  Sure.  I'm -- Mr. Poulos
25 testified as to contacting the police and what

1  Mr. Garabedian told him or did not tell him to do, and
2  I'm asking as to whether or not Mr. Garabedian would
3  assist a client in contacting the police.
4        MR. McCARRON:  What difference does it
5  make whether he would assist them?
6        MR. JUBB:  I just --
7        MR. McCARRON:  What difference does that
8  make?  Why would that make any -- why would that have
9  anything to do with -- in any regard with your client's
10 claim?  How?
11       MR. JUBB:  I don't need to express to
12 you right now the relevance of that, but it's very
13 relevant.
14       MR. McCARRON:  As to whether
15 Mr. Garabedian would assist a client making what --
16       MR. JUBB:  I can make it more specific
17 to Poulos and make it relevant for you.
18       MR. McCARRON:  That doesn't make it more
19 relevant.
20       MR. JUBB:  It does.
21       MR. McCARRON:  It just means -- no, it
22 does not.
23       MR. JUBB:  Okay.
24       MR. McCARRON:  You know what, you're
25 burning your own time, so go ahead.

1        MR. JUBB:  Sure.
2  BY MR. JUBB:
3     Q   Mr. Garabedian, when a client comes to you
4  and they're claiming that they were sexually abused as
5  a minor, that's a crime, correct?
6     A   Yes.
7     Q   All right.  And in those situations when it's
8  a crime am I correct that in the past you have actually
9  assisted your clients in speaking with the police?
10    A   By giving them information to contact the
11 police.
12    Q   And what about interviews, do you help them
13 with those?
14    A   No.
15    Q   What about contacting the AG's office, have
16 you ever helped a client with that?
17    A   I just provide them with the information.
18    Q   Okay.  And when you provide them with the
19 information is it your expectation that they're going
20 to contact the police?
21    A   Yes.
22    Q   Are there certain benefits to your civil case
23 if they file a police statement?
24    A   Maybe.
25    Q   And when that happens, the police take a

1  record, a statement from your clients, don't they?
2     A   Sometimes.  Sometimes they don't.
3     Q   Okay.  And, and is there any particular
4  reason why or why not you would not assist Mr. Poulos
5  in contacting the police in this case?
6     A   It's just my style.  I, I give the
7  information to the client, and I say contact the
8  authorities.
9     Q   There's reference in the notes that -- strike
10 that.
11        From Garabedian File 16 all the way through
12 to the end so -- strike that.
13        Garabedian File 11, am I correct that's all
14 your handwriting?
15    A   I'm sorry.  I -- what are you referring to?
16    Q   Garabedian File 16, you already said that's
17 you, right?
18    A   Let me catch up with you.  Okay.  Go ahead.
19 Thank you.
20    Q   Okay.  So keep going forward to the front,
21 Garabedian File 11, look at those pages.
22    A   Eleven?
23    Q   Yeah.  Am I correct that that's all your
24 handwriting?
25    A   Eleven I don't believe is mine.  Is this 11

1  here?  Is that what you're refer -- are you saying?
2     Q   Yeah, it's in cursive.  Is that you or is
3  that somebody else?
4     A   I'm not quite sure.  What ...
5     Q   So at the top --
6     A   Yeah.
7     Q   -- it says PC, --
8     A   Yeah.
9     Q   -- Mary Ellen Poulos and then it says MG,
10 WHG.
11    A   Yeah.
12    Q   Is that Mr. Gordon?
13    A   Yes.
14    Q   Do you think this is Mr. Gordon's
15 handwriting?
16    A   Yeah.  Yes.
17    Q   All right.  And is it Mr. Gordon's -- strike
18 that.
19        On Garabedian File 15 is that Mr. Gordon's
20 handwriting?
21    A   I believe so.
22    Q   Okay.  Fourteen, is that Mr. Gordon's
23 handwriting?
24    A   I'm not sure.  I think so.
25    Q   In here it looks like there's a note that

1 says: Client not told WHG taking notes. Do you see
2 that?
3    A   Yes.
4    Q   Whose writ -- handwriting is that?
5    A   I don't know.
6    Q   Do you know why that would be in here?
7    A   No, I don't.
8    Q   Was there any reason that Mr. Poulos was not
9 told that Mr. Gordon was taking notes?
10    A   I don't know if that's accurate. I don't
11 know.
12    Q   In other words, the note: Client not told
13 Mr. Gordon taking notes, could be written but it's
14 inaccurate?
15    A   Well, it's in the middle of the page. So
16 after that sentence he could have been told. I don't
17 know. I don't recall.
18    Q   There's also multiple pen colors on this. Do
19 you see that?
20    A   No, not really.
21    Q   Okay. Do you see any color difference on
22 Garabedian 14?
23    A   Yeah. I see a highlight in the bottom, yeah.
24    Q   Okay. There's red, isn't there?
25    A   Down the bottom.

1    Q   Yeah.
2         MR. McCARRON: You mean where it looks
3 like the black pen ran out and then red got
4 substituted?
5         MR. JUBB: That's what it looks like to
6 me.
7         MR. McCARRON: Yeah. Okay.
8    Q   Is that still Mr. Gordon's handwriting?
9    A   I, I don't know. It looks like it, but I'm
10 not sure.
11    Q   Okay. What about on the page before that,
12 Garabedian File 13, is that your handwriting or someone
13 else's?
14    A   I don't know.
15    Q   Garabedian File 12.
16         MR. McCARRON: I'm sorry. Catch -- let
17 me catch up. What, what was the page you just
18 mentioned, 13?
19         MR. JUBB: Garabedian 13 is what we just
20 discussed.
21         MR. McCARRON: Okay. All right.
22         MR. JUBB: I don't know.
23 BY MR. JUBB:
24    Q   Garabedian File 12, whose handwriting is
25 that?

1    A   That looks like mine.
2    Q   MG called Mary Ellen and told her to call
3 Vicky somebody who's an attorney?
4    A   Yes.
5    Q   And it says that you told Mary Ellen that
6 Jeff McCarron would what?
7    A   I don't know.
8    Q   Does that say refund?
9    A   I don't know. I'd be guessing.
10    Q   Is that your initials right there?
11    A   Yes. I think.
12    Q   What does that last line say? MG told Mary
13 Ellen that what?
14    A   That Jeff McCarron something Vicky.
15    Q   Garabedian File 11, is that Mr. Gordon's
16 handwriting?
17    A   Yes.
18    Q   Did Ms. Poulos ever tell you that she was
19 going to try and go to the newspapers?
20    A   I don't recall.
21    Q   Do you recall any discussions whatsoever with
22 Mr. -- with Ms. Poulos?
23    A   Not specifically.
24    Q   Anything generally?
25    A   No, not that I remember.

1    Q   How about Garabedian File 7 through
2 Garabedian File 9, whose handwriting is that?
3    A   I'm not sure.
4    Q   When you're taking notes of your discussions
5 with clients and you're saying something do you use the
6 tool or I should say just system of putting your
7 initials and then colon what you say?
8    A   Sometimes.
9    Q   Garabedian File 6, who's that?
10    A   I think that might be William Gordon.
11    Q   Garabedian File 5?
12    A   I think that's mine.
13    Q   Okay. And those are your initials at the
14 bottom?
15    A   Yes, I believe so.
16         MR. McCARRON: What page, 5?
17         THE WITNESS: 5.
18    Q   When you wrote: 2, will sign and send back
19 release, what were you referring to?
20    A   I don't remember.
21    Q   What types of releases would you be providing
22 Mr. Poulos at this point?
23    A   For medical records. For educational
24 records.
25    Q   Am I correct you didn't have his medical

Page 170

1  records before you wrote the April 2018 letter from
2  your office?
3     A   I don't recall.
4     Q   Why did you request his medical records?
5     A   To get background on him.
6     Q   Is that important to have when you're
7  bringing a case?
8     A   Excuse me?
9     Q   Is that important to have when you're
10  bringing a case?
11     A   Sometimes.
12        MR. McCARRON:  Yeah, but this -- this
13  5/19 -- I mean page 5, that's after the lawsuit, right?
14        MR. JUBB:  Yeah.
15        MR. McCARRON:  Yeah, okay.  So why are
16  we talking about medical records?
17        MR. JUBB:  He just said it might have
18  been a release for medical records.
19  BY MR. JUBB:
20     Q   Mr. Garabedian, is that what you just said?
21     A   It might have been a release for educational
22  records, medical records.  I don't know.  I don't
23  recall.
24     Q   Okay.  And you're doing that at this point to
25  get information on him, right?

Page 171

1        MR. McCARRON:  Objection.  You know
2  that's not a true statement.  I don't know why --
3        MR. JUBB:  What do you mean it's not a
4  true statement?
5        MR. McCARRON:  You know it's not a true
6  statement.  Why would you do that?
7        MR. JUBB:  I have no idea what you're
8  taking about.  His own words were --
9        MR. McCARRON:  A lawsuit had been filed
10  by this point, Mr. Jubb.
11        MR. JUBB:  I'm well aware of that.
12        MR. McCARRON:  Okay.
13        MR. JUBB:  I'm well aware of that.
14        MR. McCARRON:  And you have the file,
15  right?
16        MR. JUBB:  I don't know that.
17        MR. McCARRON:  Okay.  What do you mean
18  you don't know that?
19        MR. JUBB:  I don't know that I have the
20  entire file.
21        MR. McCARRON:  Did it have records in
22  the file?
23        MR. JUBB:  There are medical records in
24  the file.
25        MR. McCARRON:  Okay.  Then you know that

Page 172

1  as of 5/19 not 5/9/19, right.  And he already told you
2  that he didn't have any ... you know, they both have
3  been sued.  You really need to abide by the
4  responsibility that your question has to have a basis,
5  okay, and not play games.
6        MR. JUBB:  Jeff, I'm not playing games.
7        MR. McCARRON:  No.  No.  I'm sugges --
8  I'm telling you --
9        MR. JUBB:  I don't know if you're
10  familiar with this record or not, --
11        MR. McCARRON:  Yeah, I'm familiar with
12  the records.
13        MR. JUBB:  -- but he sent out the
14  releases after he was sued.
15        MR. McCARRON:  Okay.
16        MR. JUBB:  Did you know that?
17        MR. McCARRON:  -- well, all I'm saying
18  is --
19        MR. JUBB:  Did you know that?
20        MR. McCARRON:  -- just make sure that
21  you have what you need because if you don't you
22  know ...
23  BY MR. JUBB:
24     Q   Mr. Garabedian, am I correct that you had
25  Mr. Poulos sign releases, and you started obtaining

Page 173

1  records after you were sued, sir?
2     A   I don't -- I'd have to look at the file
3  dates.
4     Q   But you can't, you can't say one way or the
5  other as to whether or not you didn't do that, right?
6     A   No.
7     Q   Okay.  And after you got sued, that was the
8  first time you did a background check on Mr. Poulos,
9  correct?
10     A   Excuse me?
11     Q   After you got sued, that was the first time
12  you did a background check on Mr. Poulos, correct?
13     A   I don't know what you mean by a background
14  check.
15     Q   You've never performed a police background
16  check on somebody via rap sheet?
17        MR. McCARRON:  Why don't you ask him
18  whether -- why do you call it background check?  Just
19  ask about obtain whatever you want to call it.  Give it
20  a title.
21     Q   Do you, do you know --
22        MR. McCARRON:  What's the document --
23  what's the title on the document?
24     Q   It's called a background check.
25     A   What is?

44 (Pages 170 - 173)

Page 174

1    Q   Okay.
2        MR. McCARRON:  Why don't you show him
3    the document.
4    Q   All right.  Here we go.  Garabedian File 221
5    through 232.  All right.  At the bottom it says
6    Garabedian File 221 through 231.  At the top:  Request
7    Date, 4/15/2019.  You had been sued by then, right?
8    A   Apparently.
9    Q   Okay.  And what does it say --
10   A   Are you going to let me look at the paper or
11   are you just going to hold it up in front of --
12   Q   I'm going to actually ask questions about it.
13   Just can you see the date from here?
14   A   No.
15   Q   All right.  You can't see that?  What's the
16   date of the request?
17   A   It's 4/15/19.
18   Q   All right.  Were you sued by then?
19   A   Yes.
20   Q   Okay.  Can I have that back?
21   A   Sure.
22   Q   What is it -- what is this report called in
23   the very first sentence?
24   A   This criminal background check was performed
25   by searching the following data submitted to the crime

Page 175

1    information bureau.
2    Q   Does that refresh your recollection as to
3    what a background check is?  No.
4    A   Not really.
5    Q   Okay.
6    A   Because background check was so broad.  If
7    you asked me if I obtained his criminal record, I would
8    have just answered it.
9    Q   I see.  Because the first time you obtained
10   his criminal record was after you got sued, correct?
11   A   Apparently.
12   Q   And did you review it?
13   A   Yes.
14   Q   Did you see that he was charged with
15   enticing -- child enticement?
16   A   Where is -- there's not -- there was no
17   prosecution.
18   Q   My question was did you become aware that he
19   was charged with child enticement?
20   A   When I read the record, yes.  But it was
21   dismissed or there was no prosecution of it.
22   Q   And did you look into that through court
23   records or did you just talk with Mr. Poulos about it?
24   A   I look -- I --
25       MR. McCARRON:  Objection.

Page 176

1    A   I don't recall.
2    Q   What did Mr. Poulos say to you in, in terms
3    of that?
4    A   I don't recall.
5    Q   Well, you read his deposition, though, right?
6    A   Most of it.
7    Q   Okay.  Did, did he say that --
8    A   I --
9        MR. McCARRON:  What's the question?
10   Q   Okay.  When, when he testified that somebody
11   had used his computer to try and entice a child and
12   that he got pulled over by an unmarked car but there
13   was nothing on it, does that refresh your recollection
14   as to what he told you?
15   A   I don't recall what he told me, but I do
16   remember reading that in the deposition, though.
17   Q   And in his explanation to you did, did it
18   sound credible to you?
19   A   I don't recall.  But he was found not guilty
20   or wasn't prosecuted.  So you're asking about a crime
21   in which he wasn't found guilty of anything.
22   Q   Can you recall how many of your other clients
23   that you've represented as plaintiffs in a lawsuit
24   alleging sexual abuse have been charged with child
25   enticement?

Page 177

1    A   No.
2        MR. McCARRON:  Objection.
3    Q   This is Garabedian File 10.  Can you tell me
4    the date on that?
5    A   What did -- was your question?  I'm sorry.
6    Q   Can you tell me the date on that?
7    A   May 9th, 2019.
8    Q   And it says:  Dear Mr. Poulos, Enclosed
9    please find releases for your medical records for you
10   to sign next to both X's.  Did I read that correctly?
11   A   I don't know.
12       (Witness reviewing document.)
13   A   Yes.
14   Q   Okay.  So in my last question when I asked
15   you a couple minutes ago about did you have Mr. Poulos
16   sign releases for medical records after you were sued,
17   based on this letter is the answer yes?
18   A   Apparently.
19   Q   Was there any particular reason why you were
20   assisting Mr. Poulos getting medical records after you
21   were sued, sir?
22   A   Just collecting records.
23       MR. JUBB:  Let's just take a three-
24   minute break so I can reorganize my notes.
25       MR. McCARRON:  The time is 1:44 p.m. -

45 (Pages 174 - 177)

Page 178

1  We're off the record.
2        (Break was taken.)
3        THE VIDEOGRAPHER:  The time is 1:54 p.m.
4  We're on the record.
5  BY MR. JUBB:
6     Q   Mr. Garabedian, did you review Mr. Poulos's
7  Hill School files?
8     A   I don't recall.
9     Q   Do you know whether or not any of your
10 associates did?
11    A   I don't recall specifically.
12    Q   Would it have been your pattern to review
13 Mr. Poulos's school file since that's the entity to
14 which your letter was directed?
15    A   Well, when you say you, someone from my
16 office if not me.
17    Q   Okay.  To the extent that you had obtained
18 any records for Mr. Poulos from any sort of
19 authorization or FOIA request, whatever it may have
20 been, would those records have been included in his
21 file?
22    A   Yes.
23    Q   And those records would have been copied and
24 produced; am I correct?
25    A   Yes.

Page 179

1     Q   Thank you.
2        I imagine that based off of the work that you
3  do, you have a lot of experience in learning about
4  child predator tendencies, unfortunately.  Would you
5  consider yourself familiar with what to look for in
6  terms of assessing whether or not someone is a, is a
7  child predator?
8     A   I don't know.  I mean I'm not an expert
9  doctor.  I mean ...
10    Q   In the cases -- strike that.
11       Have you ever retained an expert in the cases
12 that you have?
13    A   What kind of expert?  I'm sorry.
14    Q   Experts.
15    A   Yes.
16    Q   Okay.  What type of experts do you retain?
17    A   Forensic psychiatrists.
18    Q   And can you tell us why you do that?
19    A   Establish damages.
20    Q   And based on your experience do most child
21 predators, are they repeat offenders?
22    A   You find that a lot.
23    Q   And based on your experience and I
24 imagine that -- strike that.  I shouldn't say that.
25 Strike that.

Page 180

1     Q   Do you personally communicate with these
2  experts, the forensic psychologist?
3     A   Sometimes.
4     Q   Are they forensic psychologists or forensic
5  psychiatrists?
6     A   They can be both.
7     Q   In communicating with them have they ever
8  expressed to you psychologically what it is about child
9  predators that causes these tendencies?
10    A   No.
11    Q   Do you know whether or not child predators
12 act as a desire for some sort of dominance or is it
13 mostly sex?
14    A   A combination probably.
15    Q   When you say "probably" are you guessing
16 or ...
17    A   Well, I mean it -- it's really a difficult
18 question to answer.
19    Q   In the situations that you are unfortunately
20 familiar with --
21    A   It's just like when you asked me about
22 whether they were one-time offenders or not.  You
23 really don't -- you can't answer that because they may
24 have offended other times you don't know about which is
25 common.

Page 181

1     Q   And am, am I correct, though, that the
2  overwhelming majority of the individuals who you have
3  accused of being involved in child abuse sexually, they
4  have been accused by multiple people?
5     A   No.
6     Q   No.  So in other words, there are individuals
7  that you're aware of who've just been accused of sexual
8  abuse by one person?
9     A   Yes.
10    Q   And what percentage of the cases that you've
11 handled would involve just that?
12       MR. McCARRON:  I'm sorry.  Just what?
13    Q   One allegation of sexual abuse.
14       MR. McCARRON:  One allegation.
15    A   I don't, I don't know.  I can't give you a
16 percentage.  I'm sorry.
17    Q   That's okay.
18       In terms of Mr. Poulos do you believe that
19 you actually discussed with him his recollection or
20 his, his narrative?
21    A   I believe I did.
22    Q   And in that discussion what do you recall him
23 saying?
24    A   Well, it's in the notes.  I, I don't remember
25 specifically now.

46 (Pages 178 - 181)

Page 182

1    Q   Well, if it's in the notes, is it your
2   testimony that that would accurately reflect what he
3   was saying?
4    A   Yeah.
5    Q   And with respect to the allegations that
6   Mr. Poulos was intending to make against Mr. Ralston --
7   strike that.
8        Did you have an opportunity to review any of
9   Mr. Poulos's filings in this case?
10   A   I don't recall.
11   Q   Do you recall --
12   A   You mean in the litigation?
13   Q   Yes, sir.
14   A   Yeah, I don't recall.
15   Q   Do you recall reviewing any documents filed
16  by Mr. Poulos where he had said at the time he
17  contacted you, plaintiff was no longer employed -- let
18  me clarify.  Strike that.
19       Do you recall reviewing any documents where
20  Mr. Poulos said that at the time he contacted you that
21  my client was no longer employed at The Hill School?
22   A   He may have said that.  I don't recall.
23   Q   Was that your understanding at the time, that
24  he was not employed at The Hill School?
25   A   I don't recall.

Page 183

1        MR. McCARRON:  At what time?  Excuse me.
2        MR. JUBB:  At the time Mr. Poulos
3   contacted him.
4        MR. McCARRON:  Initia -- oh, back in
5   2017 you're saying.
6        MR. JUBB:  Yes, sir.
7        MR. McCARRON:  Okay.
8    A   Yeah, I don't recall.
9    Q   When you wrote the letter -- strike that.
10       As of April 18 did you have any understanding
11  as to whether or not my client was employed at The Hill
12  School?
13   A   What year?
14   Q   As of -- okay.  As -- strike that.  I thought
15  I said that so forgive me.  Strike that.
16       As of April 2018 did you have an
17  understanding as to whether or not my client was
18  employed at The Hill School?
19   A   I don't recall.
20   Q   In sending these types of letters accusing
21  someone of sexual abuse of a minor, do you have an
22  understanding that that could have consequences of them
23  losing their job?
24   A   Maybe.
25   Q   And do you believe that it's important for

Page 184

1   your letters to be accurate?
2        MR. McCARRON:  Well, objection.
3    A   Yes.
4    Q   Do you believe that -- strike that.
5        Can you recall occasions where folks have
6   contacted you alleging that they were sexually abused
7   as a minor that you have subsequently found to be false
8   or untruthful?
9    A   Rarely.
10   Q   Rarely.
11       MR. POULOS:  Objection.
12   Q   Other than Mr. Poulos's statements to your
13  firm are you aware of any information that corroborates
14  his claim?
15   A   Can you repeat the question, please.
16   Q   Sure.
17       Other than Mr. Poulos's statements to your
18  firm alleging that he had been abused by my client are
19  you aware of any information, whether documents,
20  otherwise, witness statements, that would corroborate
21  his testimony?
22   A   No, I believe he told his mother four, four
23  or five years before he told me.
24   Q   Anything else?
25   A   His deposition you took.

Page 185

1    Q   So other than his statements I'm asking you.
2    A   Oh, I'm sorry.  No.
3        MR. McCARRON:  Well, I just want to make
4   sure.  You're asking just about the story of abuse
5   compared to like, for instance, whether he went to The
6   Hill School, whether he was a student of Mr. Ralston,
7   those kinds of questions?  I mean are you ...
8        MR. JUBB:  No, I mean I think my, my
9   question was clear.  I'll make sure --
10       MR. McCARRON:  Well, I just want to make
11  sure.  I mean there was ...
12       MR. JUBB:  Is there -- I'm not sure I
13  understand what's confusing about it.
14       MR. McCARRON:  Well, I think that
15  there's --
16       MR. JUBB:  I'm asking him --
17       MR. McCARRON:  The question itself is
18  not confusing.  I'm not accusing you of a, a confusing
19  question.  I'm just trying to find out the -- how
20  comprehensive we're talking about.
21       Is it just limited to the inquiry about
22  corroboration concerning the abuse as compared to other
23  features which would corroborate, for instance, contact
24  with Mr. Ralston; that he was a student at The Hill
25  School which is part of his story, as I understand it;

47 (Pages 182 - 185)

Page 186

1 that he was a student of Mr. Ralston; that he had
2 contact with him at various times during the ... I mean
3 there's certainly other information that Mr. Garabedian
4 can tell you about with respect to that issue, right.
5         MR. JUBB: Maybe. But I think he just
6 said he was unaware of anything other than Mr. Poulos's
7 statement.
8         MR. McCARRON: But the reason I ask this
9 question is because of his last answer which was
10 confined to a remark or testimony, I guess, that is --
11 that restricts it to the abuse part.
12        MR. JUBB: Yeah.
13        MR. McCARRON: That's all you're asking
14 about, right?
15        MR. JUBB: Sure. Sure. That's the only
16 issue in this case. There's nothing defamatory about
17 saying that he was a student of Mr. Ralston. I'm
18 talking about the claims that he was abused.
19        MR. McCARRON: No, I understand that,
20 but one might consider it, and I would, that it's
21 corroborative that he was a student. I mean if one
22 found out that he was never a student at The Hill
23 School, then it would be -- then the story that he had
24 been abused at The Hill School would be an issue,
25 right. Or if he was -- if the records reflected

Page 187

1 that -- or if it turned out that Mr. Ralston wasn't --
2 didn't work at the school at the time that he was a
3 student then that would be an issue.
4         MR. JUBB: Mm-hmm.
5         MR. McCARRON: If he was never in
6 Mr. Ralston -- was never a pupil of Mr. Ralston, right,
7 those are all things that would be. That's why I'm
8 asking just to make sure that we're not eliminating --
9 you don't want -- you're not expecting Mr. Garabedian
10 to tell you whether there's other evidence which would
11 corroborate, right?
12        MR. JUBB: I don't even understand --
13        MR. McCARRON: Okay. Well, --
14        MR. JUBB: -- where, where it's going,
15 but I think --
16        MR. McCARRON: -- never mind. I
17 don't -- I think I said enough --
18        MR. JUBB: Yeah.
19        MR. McCARRON: -- with respect to the
20 issue.
21 BY MR. JUBB:
22    Q   Mr. Garabedian, am I correct that other than
23 Mr. Poulos's own statements, you are unaware of any
24 evidence that would support his statement that he was
25 sexually abused?

Page 188

1    A   I don't have a photograph of it happening.
2 Of the abuse happening.
3    Q   Okay. Well, am I correct that at the time
4 you wrote the letter did you even know as to whether or
5 not he was a student at The Hill School?
6    A   Yes, I believed Mr. Poulos.
7    Q   You believed him in that, right?
8    A   Yes.
9    Q   But am I correct that you had no independent
10 corroboration that he even was a student there, right?
11   A   I don't recall.
12   Q   Am I correct that as of the time that you --
13 that the letter came from your office did you have any
14 information other than Mr. Poulos's statement that he
15 was in Mr. Ralston's geometry class that that was true?
16   A   I don't recall.
17   Q   Okay. So other than the fact that Mr. Poulos
18 went to The Hill School and was in Mr. Ralston's
19 geometry class is there any evidence that you've seen
20 that you've obtained after you sent your, your letter
21 and after you've been sued that you believe
22 corroborates Mr. Poulos's testimony or allegations
23 here?
24   A   I'd have to look at the file. I don't
25 recall. It was a deep file.

Page 189

1    Q   You, you didn't look at it?
2    A   Not recently.
3    Q   After you got sued and you were having
4 Mr. Poulos send auth -- strike that.
5         After you and Mr. Poulos were both sued and
6 you had him sign authorizations to obtain additional
7 medical records did you represent him then?
8    A   I must have.
9    Q   Do you still represent him?
10   A   No.
11        MR. McCARRON: Well, hold it. You're
12 talking about for the, the matter of representation for
13 which there was a contingent fee agreement.
14        MR. JUBB: Jeff, you can't continue to
15 interrupt like this.
16        MR. McCARRON: Hey, don't start. Don't
17 start yelling at me. Don't do that.
18        MR. JUBB: I don't understand why the
19 witness answers a question and then you chime in to
20 clarify after he gives an answer. That's just not how
21 this works. If there's something objectionable in my
22 question then just say you're objecting to the form of
23 the question. These are all speaking objections.
24        MR. McCARRON: Okay. It's not a
25 speaking objection, okay.

48 (Pages 186 - 189)

1           MR. JUBB:  Okay.
2           MR. McCARRON:  But there's a --
3           MR. JUBB:  I'm moving on.
4           MR. McCARRON:  There is an existing
5    representation agreement that's in place.
6           MR. JUBB:  That, that he just forgot
7    about in his answer?
8           MR. McCARRON:  I don't know whether he
9    forgot about it or not.  I'm just -- you know that
10   that's the case.  So when you asked the question, --
11          MR. JUBB:  I don't know --
12          MR. McCARRON:  -- I don't know what
13   you're talking about.
14          MR. JUBB:  Okay.  Let's explore this
15   then.
16          MR. McCARRON:  Here's what happened.
17   Just a second.
18          MR. JUBB:  No, I don't need you to recap
19   what happened.
20          MR. McCARRON:  You, you -- this what
21   you're asking --
22          MR. JUBB:  You're trying to help the
23   witness in response.
24          MR. McCARRON:  It's not about helping,
25   okay.

1           MR. JUBB:  You are.
2           MR. McCARRON:  All right, well, whatever
3    you want to call it.
4           MR. JUBB:  Why are you, why are you just
5    not capable --
6           MR. McCARRON:  This is what happened --
7           MR. JUBB:  -- of letting me ask the
8    question.
9           MR. McCARRON:  Just a second.  You asked
10   a question about the lawsuit then you asked about
11   representation, and you can see from -- you can -- you
12   know that he didn't represent him for this lawsuit or
13   doesn't represent him for this lawsuit?
14          MR. JUBB:  I do not know that at all.
15          MR. McCARRON:  I think we just
16   established that.
17          MR. JUBB:  And in fact the record points
18   opposite.  No.
19          MR. McCARRON:  They represent him for
20   the lawsuit?
21          MR. JUBB:  Yeah.  Okay.  Watch this.
22     Q   Mr. Garabedian, --
23          MR. McCARRON:  The litigation that you
24   brought, the lawsuit that we're here about, that's
25   distinct from the case involving your client.

1           MR. JUBB:  Jeff, stop trying to instruct
2    him.  Let me ask a question.
3           MR. McCARRON:  I'm not trying to
4    instruct anyone.
5           MR. JUBB:  Would you just let me ask a
6    question?
7           MR. McCARRON:  Go ahead.  Try to ask
8    your question.
9           MR. JUBB:  Okay.
10   BY MR. JUBB:
11     Q   Mr. Garabedian, after you were named as a
12   defendant with Mr. Poulos and you sent him
13   authorizations for medical records, I asked you did you
14   represent him then, and your response was I must have,
15   correct?
16     A   I don't represent him in this litigation, but
17   I never --
18     Q   Oh, okay.
19     A   -- really terminated him with regard to his
20   claim for abuse.
21     Q   I see.  So you still represent him.  Is that
22   your testimony?
23     A   No, I never really terminated him with regard
24   to his claim for abuse.
25     Q   Listen to my question.  Do you still

1    represent him?
2      A   I just answered it.
3      Q   Do you still represent him?
4      A   I just answered it.
5           MR. McCARRON:  If there's an existing
6    matter.  That's the issue, right?
7      Q   There's -- what existing matter, sir?
8           MR. McCARRON:  That's what I'm -- go
9    head.
10     Q   What existing matter?
11     A   His claim of abuse.
12     Q   So you still represent him in that?
13     A   Well, I never really terminated.  We never
14   terminated.
15     Q   You -- okay.  So after you were sued and he
16   was sued did you ever have a discussion with him that
17   there is a palpable conflict of interest?
18          MR. McCARRON:  Objection.  Don't answer
19   that question.
20     Q   Did you ever have a conversation with
21   Mr. Poulos that there's a conflict of interest?
22          MR. McCARRON:  Objection.  You're wrong
23   about that, by the way.
24          MR. JUBB:  I'm asking if he had a
25   discussion.

49 (Pages 190 - 193)

Page 194

1        MR. McCARRON:  See, you have to have a
2   basis for that --
3        MR. JUBB:  Did you read his deposition,
4   Jeff?
5        MR. McCARRON:  If you happen to know --
6        MR. JUBB:  You can't come in here and
7   represent him if you've never represent -- if you've
8   never read the records.  This is your second time
9   accusing me of having no good faith basis to ask this
10  question.
11       MR. McCARRON:  Okay.
12       MR. JUBB:  So let me ask my questions,
13  please.
14   Q   Mr. Garabedian, --
15       MR. McCARRON:  You don't get to intrude
16  on the representation relationship between my client
17  and Mr. Poulos so knock it off, okay.
18       MR. JUBB:  Well, unless you read --
19       MR. McCARRON:  Don't act like a jerk.
20       MR. JUBB:  I'm not acting like a jerk.
21  You're acting like a jerk.
22       MR. McCARRON:  Okay.
23       MR. JUBB:  Okay.  So maybe you didn't
24  read Mr. Poulos's deposition.
25       MR. McCARRON:  What difference does that

Page 195

1   make, by the way, as to what we're talking about?
2        MR. JUBB:  You're here telling me I'm
3   misrepresenting the record, and you don't even know it.
4        MR. McCARRON:  What Mr. Poulos said?
5        MR. JUBB:  Yeah.
6        MR. McCARRON:  What does that matter?
7        MR. JUBB:  It matters because I'm
8   asking -- that's the basis for my question, and you're
9   saying what basis do you have so you're just going in
10  circles.
11       MR. McCARRON:  I'm sorry.  I --
12       MR. JUBB:  Just let me ask a question.
13       MR. McCARRON:  You're asking about
14  conflicts of interest.  That's what you're doing.  And
15  you're, you're wrong about that.
16       MR. JUBB:  I'm asking him -- okay.
17       MR. McCARRON:  You're 100 percent wrong
18  about what you're asking.
19       MR. JUBB:  All right.  Watch.
20  BY MR. JUBB:
21   Q   Mr. Garabedian, you read his deposition,
22  correct?
23   A   Yes.
24   Q   And in there did Mr. Poulos --
25   A   Some of it.

Page 196

1    Q   -- did Mr. Poulos testify that you told him
2   there was a conflict of interest?
3    A   Yes, I believe so.
4    Q   All right.  He did.  Did he make that up?
5        MR. McCARRON:  Hold it.
6    Q   Did Mr. Poulos make that up?
7        MR. McCARRON:  You're making that up in
8   the re -- you're misleading the situation.  That
9   testimony did not -- that testimony pertained to
10  representation in this case.  That's what it pertained
11  to.  Are you telling me I'm wrong about that?
12       MR. JUBB:  I am telling you that --
13       MR. McCARRON:  Are you telling me I'm
14  wrong about that?
15       MR. JUBB:  I'm telling you that you are
16  trying to testify for this witness and --
17       MR. McCARRON:  Oh, yeah.  I want to know
18  an answer to my --
19       MR. JUBB:  -- and there's no such
20  difference.  There's no difference.
21       MR. McCARRON:  Answer my question, Jubb.
22       MR. McCARRON:  I just did.
23       MR. McCARRON:  Are you telling me that
24  I'm wrong about what I just said?  Are you telling me
25  I'm wrong?

Page 197

1        MR. JUBB:  I don't even know what you're
2   saying.
3        MR. McCARRON:  Yeah.
4        MR. JUBB:  You are trying to create an
5   issue.
6        MR. McCARRON:  You know I'm right.  No,
7   you know I'm right.
8        MR. JUBB:  You're not right on anything
9   so far.
10       MR. McCARRON:  Oh.  Good.
11       MR. JUBB:  You're not right on anything
12  so far.
13       MR. McCARRON:  Keep it up.  Keep it up.
14       MR. JUBB:  You have not reviewed his
15  deposition.  You accuse me of asking him questions
16  without a good faith basis, and you are wrong about
17  that again, okay.  So just let me ask my questions.
18       MR. McCARRON:  No.  You're not going to
19  distort the record.
20       MR. JUBB:  Okay.  It's going to speak
21  for itself, Jeff.
22       MR. McCARRON:  And you're not going to
23  act that way --
24       MR. JUBB:  Whenever you're finished.
25       MR. McCARRON:  -- and tell --

50 (Pages 194 - 197)

Page 198

1      MR. JUBB: Whenever you're finished.
2      MR. McCARRON: -- mislead the -- by
3  describing testimony that you know is out of context,
4  and that's not what the context was.
5      What is your question? And you will not
6  intrude on the attorney-client relationship.
7  BY MR. JUBB:
8   Q  Mr. Garabedian, after you got sued and
9  Mr. Poulos got sued, you had multiple conversations
10 with him, correct?
11  A  I don't recall how many conversations I had
12 with him.
13  Q  You had conversations with him, correct?
14  A  Yes.
15  Q  And in those conversations they have actually
16 been documented in notes, correct, that we just went
17 over?
18  A  I believe so, yeah.
19  Q  And those were produced to, to us pursuant --
20  A  Yeah.
21  Q  -- to a court order, correct?
22  A  Yeah.
23  Q  And in there am I correct that you were
24 trying to find him counsel, correct?
25  A  Yes.

Page 199

1   Q  And in there at any point in time did you
2  tell Mr. Poulos that you could not represent him,
3  period?
4      MR. McCARRON: In this case.
5      MR. JUBB: My question just said did you
6  tell him that you could no longer represent him,
7  period.
8      MR. McCARRON: The discussion was about
9  this case. The conversations, as you know, reflected
10 in the -- is about the representation for this case.
11     MR. JUBB: I see.
12  Q  So --
13     MR. POULOS: Asked and answered.
14  Q  Okay. So --
15     MR. POULOS: It's asked and answered.
16  Q  So when you requested his medical records and
17 those authorizations, what case did that have to do
18 with?
19  A  His claim.
20  Q  His claim. What claim?
21  A  The sexual abuse claim.
22  Q  Okay. And where are you with that?
23  A  It's dormant.
24  Q  Have you ever contacted the school again?
25  A  No.

Page 200

1   Q  You never filed anything, right?
2   A  I just told you it's dormant.
3   Q  You never reached out to local counsel,
4  right?
5   A  I just told you it's dormant.
6   Q  It's dormant. How long is it going to be
7  dormant?
8   A  I don't know.
9   Q  When are you going to file something?
10  A  I don't know.
11  Q  When was the last time you talked to
12 Mr. Poulos?
13  A  It's in the notes. I, I don't know.
14  Q  When he sued you and said that you told him
15 there was a conflict of interest and he sued you for
16 legal malpractice did you ever become aware of that?
17  A  If it's in the pleadings.
18  Q  Is that because you read the pleadings?
19  A  Please don't make faces at me.
20  Q  I'm just trying to get an under -- all this
21 would be unnecessary, but now I have to lay, you know,
22 a foundation for Fort Knox over here.
23     But at some point in time you had a
24 conversation with Mr. Poulos -- strike that.
25     Am I correct that Mr. Poulos filed a legal

Page 201

1  malpractice case against you?
2      MR. McCARRON: Objection.
3   A  It was a --
4      MR. McCARRON: Is this in some way
5  calculated to lead to the discovery of something to do
6  with a defamation claim?
7      MR. JUBB: I'm, I'm getting into this
8  because of your --
9      MR. McCARRON: I'm just asking a
10 question.
11     MR. JUBB: -- previous statements on the
12 record that there's somehow two things going on so I'm
13 just trying to --
14     MR. McCARRON: Well, there are, right?
15     MR. JUBB: -- flush all of it out.
16     MR. McCARRON: There are, right?
17     MR. JUBB: You keep say -- there's not.
18     MR. McCARRON: There's not two district
19 matters. That's your position?
20     MR. JUBB: No.
21     MR. McCARRON: Oh.
22     MR. POULOS: Lane, how is any of this
23 relevant to the defamation case?
24     MR. McCARRON: Yeah.
25     MR. JUBB: So you're going to take the

51 (Pages 198 - 201)

Page 202

1  advice from him on this one?
2           MR. McCARRON:  I just said it before
3  Mr. Poulos did.  But my point -- what I was about to
4  say is you need to educate yourself about the concepts
5  that are involved here because you -- your questions
6  are -- either it's intentional whether they reflect
7  ignorance about the concepts as they relate to
8  professional responsibility.  So I'm just making sure
9  you use the concepts correctly.
10          MR. JUBB:  Anything else?
11          MR. McCARRON:  But what you're asking
12 him has nothing to do with validity or invalidity of
13 the defamation claim.
14          MR. JUBB:  Anything else?
15          MR. McCARRON:  Well, probably but go
16 ahead and ask your question.
17          MR. JUBB:  Okay.
18 BY MR. JUBB:
19    Q    Okay.  Other than Mr. Poulos's statement to
20 you, what basis do you have to say that my client
21 sexually abused him?
22    A    Well, it's just in the file.  Whatever's in
23 the file.
24    Q    And you don't know what that is, right?
25    A    Well, I don't recall at this time.

Page 203

1     Q    And as you sit here today, you just don't
2  recall anything that's going to provide a basis for you
3  to say that my client abused Mr. Poulos other than
4  Mr. Poulos saying so; is that right?
5     A    I -- we produced the file.
6     Q    How many press conferences have you given in
7  the last five years?
8           MR. McCARRON:  Objection.  There was no
9  press conference in this case.
10    A    I don't know.
11    Q    You don't know?
12    A    No.
13          MR. POULOS:  Irrelevant.
14    Q    Have you given more -- strike that.
15         Have you given more than ten press
16 conferences?
17          MR. McCARRON:  Objection.  I want to
18 alert you that this is abusive.  It's abusive.
19          MR. POULOS:  Again, how is that
20 relevant?
21          MR. McCARRON:  It's abusive.
22          MR. JUBB:  It's, it's not abusive.
23          MR. McCARRON:  It is.
24          MR. JUBB:  No.  And you'll -- at trial
25 you will see how this all comes together.

Page 204

1           MR. McCARRON:  Press conferences?
2           MR. JUBB:  Yeah.
3           MR. McCARRON:  Is there a press
4  conference that I'm unaware of, that I'm so ignorant of
5  in this case because I don't -- you're -- is there a
6  press conference that occurred with respect to
7  Mr. Poulos?
8           MR. JUBB:  I don't know.  I'll ask that
9  question first.
10 BY MR. JUBB:
11    Q    You didn't have a press conference for this
12 one yet, did you?
13    A    Can you repeat the question?
14    Q    Did you have a press conference as it
15 pertained to Mr. Poulos?
16    A    Not that I recall.
17    Q    Okay.  Well, am I correct that over the last
18 five years you've given more press conferences than you
19 have tried cases to verdict?
20          MR. McCARRON:  Objection.
21    A    Yes.
22    Q    What's your understanding as to when
23 Mr. Poulos told his mother of these allegations?
24    A    It's in the file.  You'd have to look.
25    Q    In other words, what's written in your notes?

Page 205

1     A    Yes.
2     Q    As of the time that you sent Mr. Poulos the
3  fee agreement and he became your client -- strike that.
4           As of April of 2018 did you have -- strike
5  that.
6           Am I correct that before you can determine
7  that you have a viable claim, you actually have to know
8  what elements you need to prove?
9     A    I don't know what you mean by that.
10    Q    Sure.  Well, when I -- when you say that you
11 have a viable claim I am correct that that means that
12 you believe that you have facts to support the elements
13 of a legal claim?
14          MR. McCARRON:  Objection.
15    A    Yes.
16    Q    Okay.  And as of April 2018 were you aware of
17 the elements necessary to prove a claim against The
18 Hill School?
19          MR. McCARRON:  Objection.
20    A    I believe I had sufficient evidence.
21    Q    What were the elements to a claim to prove a
22 claim against The Hill School?
23          MR. McCARRON:  Objection.  Don't answer
24 that.
25    Q    Did you ever consider that?

52 (Pages 202 - 205)

Page 206

1          MR. McCARRON: Objection. Consider
2    what?
3      Q    Did you ever consider the elements that would
4    be necessary to prove a case against The Hill School?
5          MR. McCARRON: You can answer that
6    question. That's all. Yes or no.
7      A    Yes.
8      Q    Okay. And at the time do you know what they
9    were?
10     A    Well, --
11         MR. McCARRON: Objection.
12     A    -- liability, causation, damages.
13     Q    Did you need to prove notice?
14         MR. McCARRON: Objection. Do you
15   represent The Hill School, Mr. Jubb?
16         MR. JUBB: No, I don't rep --
17         MR. McCARRON: Okay. Then this is a
18   completely irrelevant, --
19         MR. JUBB: It's not.
20         MR. McCARRON: -- abusive question
21   because it is. It is. It is. It is.
22   BY MR. JUBB:
23     Q    Mr. Garabedian, what facts existed that were
24   known to you that would form the basis of a cause of
25   action against The Hill School?

Page 207

1          MR. McCARRON: Objection.
2      A    You'd have to -- I'd, I'd have to look at the
3    file. I don't recall. But these cases developed over
4    time also.
5      Q    Was there any indication from Mr. Poulos to
6    you, your colleagues, in your notes suggesting that the
7    school had notice of anything?
8          MR. McCARRON: Objection.
9      A    I don't recall.
10         MR. McCARRON: I'm sorry. Does, does
11   this question have anything to do with the validity of
12   the statements or the ac -- I'm sorry, the validity of
13   a defamation claim?
14         MR. JUBB: Yeah.
15         MR. McCARRON: Can you justify that to
16   me?
17         MR. JUBB: I can. Are you going to
18   continue to ask that for every single question?
19         MR. McCARRON: Well, --
20         MR. JUBB: I mean I just --
21         MR. McCARRON: Because you can inform me
22   in which case I'll stop.
23         MR. JUBB: We've only been go -- I'm
24   trying to speed this up. It's now 2:21.
25         MR. McCARRON: Go ahead. It has nothing

Page 208

1    to do with --
2          MR. JUBB: I have seven hours. I'm
3    trying to speed this up.
4          MR. McCARRON: You're not trying to
5    speed it up.
6          MR. JUBB: I'm being as efficient as
7    possible in all my questions --
8          MR. McCARRON: You're asking him abusive
9    questions. You're just trying to occupy your time is
10   all you're trying to do.
11         MR. JUBB: Okay.
12         MR. McCARRON: It's obvious because
13   you're gaining nothing. Go ahead.
14         MR. JUBB: Sure.
15         MR. McCARRON: I just want you to know I
16   consider it abusive. I'll have to decide what to do
17   about it.
18         MR. JUBB: Okay. Well ...
19   BY MR. JUBB:
20     Q    Was one of the reasons for writing a letter
21   to The Hill School to set forth a basis for a potential
22   claim?
23     A    Excuse me?
24     Q    Was one of the reasons to write a letter to
25   The Hill School to set forth a factual basis for a

Page 209

1    legal claim?
2      A    It was a notice letter to the school.
3      Q    Okay. A notice letter. And at the time were
4    you aware of what the elements were in order to prove a
5    case against The Hill School?
6          MR. McCARRON: Objection.
7      A    Liability. Causation. Damages. The Hill
8    School had sent out a letter talking about abuses in
9    their past. I mean ...
10     Q    And you reviewed that letter?
11     A    Yes.
12     Q    Okay. And when you reviewed that letter --
13   when did you review it?
14     A    I don't recall.
15     Q    And when you reviewed that letter did you
16   interpret that to mean that they were referring to
17   Mr. Ralston?
18     A    Maybe.
19     Q    Okay. And in doing that what did the letter
20   tell the students to do?
21         MR. McCARRON: Objection. He's not
22   going to be a source of information about the letter.
23     A    I don't know what you mean if it was -- I --
24   it was like a three-page letter. I don't know what
25   you ...

53 (Pages 206 - 209)

Page 210

1    Q   All right. Well, when you reviewed the
2    letter did you advise Mr. Poulos as to what it meant?
3    A   I don't recall.
4         MR. McCARRON: Objection.
5         MR. JUBB: We're up to Garabedian 19.
6         (Exhibit 19 marked
7          for identification)
8    Q   Mr. Garabedian, is this the CFA that you had
9    Mr. Poulos sign?
10   A   Yes.
11   Q   Do you have template or form document CFAs?
12   A   Yes.
13        MR. McCARRON: Objection.
14   Q   Is this a CFA that you have clients sign when
15   their case is -- strike that.
16        Is this the form that you have clients sign
17   when their potential claim has -- is expired for the
18   statute of limitations?
19   A   Yes.
20   Q   Am I correct that per the fee agreement that
21   you and Mr. Poulos wrote that you agree that a
22   complaint or lawsuit will not be filed in this matter?
23   A   Yes.
24   Q   Have you entered into any other fee
25   agreements with Mr. Poulos?

Page 211

1    A   No, I -- not that I recall.
2    Q   Do you know whether or not you can
3    represent -- strike that.
4         In Massachusetts can you represent a client
5    on a contingent basis without a Contingent Fee
6    Agreement?
7    A   I don't believe so.
8    Q   Have you reviewed any of the documents that
9    were produced by my client in this case responsive to
10   your discovery requests?
11   A   No.
12   Q   Has anyone from your office reviewed those
13   documents that you're aware of?
14   A   Not that I know of.
15   Q   After your office was sued -- strike that.
16        After you received the initial complaint did
17   you have any sort of meeting with the associates that
18   were involved in Mr. Poulos?
19   A   With regard to this matter or just meeting
20   them every day? I mean I don't know ...
21   Q   No, I don't care to know what -- you know,
22   you guys meet in the lunch room. I'm specifically
23   talking about this case so I'll clarify for you.
24        At any point in time after you were sued did
25   you have a meeting with your associates about the

Page 212

1    claims that were made against you?
2    A   There were discussions.
3    Q   Can you tell me about those discussions,
4    please.
5    A   I don't recall specifically.
6    Q   What do you -- where did it occur?
7    A   My office.
8    Q   Who, who attended?
9    A   My associates.
10   Q   Which associates?
11   A   William Gordon.
12   Q   Who else?
13   A   I'm not sure.
14   Q   Mr. Gaul?
15   A   I may have had a few brief discussions with
16   him. I'm not sure.
17   Q   What about Mr. Mahoney?
18   A   Maybe a few brief discussions.
19   Q   And that would have occurred in April of 2019
20   or at least after April 2019, correct?
21   A   Maybe.
22   Q   Did this meeting take place in a conference
23   room in your office?
24   A   Oh, it wasn't a group meeting if, if there
25   was like a meeting.

Page 213

1    Q   Were you doing any sort of independent
2    investigation into the claims that were being made
3    against you?
4    A   No.
5    Q   And in these discussions with Mr. Gordon what
6    did you talk about?
7    A   I don't recall.
8    Q   What about Mr. Gaul, what did you talk about?
9    A   I don't recall.
10   Q   Mr. Mahoney?
11   A   I don't recall.
12   Q   Did you ever ask anybody in your office who
13   wrote these letters?
14        MR. McCARRON: You already asked him
15   that.
16        MR. JUBB: I don't believe I did.
17   A   I don't recall.
18        MR. JUBB: Let's take two minutes.
19        THE VIDEOGRAPHER: The time is 2:28 p.m.
20   We're off the record.
21        (Break was taken.)
22        THE VIDEOGRAPHER: The time is 2:34 p.m.
23   We're on the record.
24   BY MR. JUBB:
25   Q   Mr. Garabedian, take us through the process

54 (Pages 210 - 213)

Page 214

1  of how you evaluate potential claims when someone comes
2  into your office claiming sexual abuse.
3      A   I ask some questions.  I collect records.  I
4  review the records.
5      Q   Do you ask for --
6      A   Excuse me.
7      Q   I'm sorry.  Did you say excuse me because I
8  interrupted you or ...
9      A   No, I was coughing.
10     Q   Okay.  Do you ask your potential clients for
11 any corroborating witnesses?
12     A   Yes.
13     Q   Do you obtain their records from the location
14 in which the abuse is alleged to have occurred?
15     A   Sometimes.
16     Q   Can you give me an example of when you
17 wouldn't need to do that?
18     A   When the institution or the entity will not
19 give me the records.
20     Q   In other words, if, if you send a record
21 request and you don't get the records then you don't
22 need them; is that it?
23     A   Well, I send the req -- request and they say
24 we're not giving you the records.
25     Q   And is that something that comes back in in

Page 215

1  writing?
2      A   Sometimes.  Sometimes I get a phone call.
3      Q   Do you do any sort of independent
4  investigation?  And that's a little too broad so I'll
5  clarify that for you.
6          Do you personally review the documents?
7      A   If I don't someone from my office would.
8      Q   Do you speak -- if the potential client is
9  telling you, you know, this person can, you know,
10 corroborate that this occurred do you speak with those
11 people?
12     A   Sometimes.
13     Q   Why would you want to do that?
14     A   Find out what they know.
15     Q   Now, with respect to Mr. Poulos's discussion
16 initially with you and the fact that you had relayed to
17 him that the statute of limitations had expired, how
18 was it that you knew the statute of limitations
19 expired?
20     A   I don't know of ... just the law.  I mean ...
21     Q   And you were referring to Pennsylvania
22 statute of limitations, correct?
23     A   Yes.
24     Q   Are you a registered lobbyist in any way?
25     A   No.

Page 216

1      Q   Have you had any discussions with any sort of
2  state representatives to try and change the statute of
3  limitations?
4      A   I don't know.  I don't know.
5          MR. McCARRON:  In any particular
6  location or are you -- just generally?
7          MR. JUBB:  Okay.  Yeah.
8      Q   So my last question, so let's just talk about
9  Massachusetts.
10         Have you had any discussions with any
11 representatives from the state to change or attempt to
12 change the statute of limitations in Massachusetts?
13     A   Oh, yes, I was very active around 2011, '12,
14 '13, '14.
15     Q   Okay.  And have you had any discussions with
16 any state representatives from Pennsylvania trying to
17 change the statute of limitations?
18     A   I don't know.  I don't remember.
19     Q   Well, as you sit here do you have any basis
20 to conclude that you did?
21     A   I may have.
22     Q   Okay.  Well, how would you go about doing
23 that?
24     A   Sometimes they call me.
25     Q   Did you ever get a phone call from a state

Page 217

1  representative here?
2      A   I don't recall.
3      Q   Well, do you, you know, keep track of these
4  types of things?
5      A   No.
6      Q   No.  So if --
7      A   I get a lot of phone calls.
8      Q   Sure.  Sure.
9          But have you ever had any discussion that you
10 can recall trying to change the statute of limitations
11 in Pennsylvania?
12     A   I don't know.  I'm not sure.
13     Q   And when you say you're not sure am I correct
14 that nothing comes to mind?
15     A   That's right.  I mean there are -- I may have
16 been interviewed by newspapers or the media in
17 Pennsylvania about the statute of limitations.  I may
18 have been contacted by groups.  I, I don't recall.
19     Q   What groups?
20     A   I don't know.
21     Q   When you say you may have been contacted,
22 when was that?
23     A   Through the years.  I mean a lot of years.
24     Q   You've never -- strike that.
25         Am I correct you've never filed a case in

55 (Pages 214 - 217)

1  Pennsylvania? I thought that's what your testimony was
2  previously.
3      A   I, I believe you're cor -- I have not. I
4  don't believe I have.
5      Q   In this instance you never contacted any
6  local counsel, correct?
7      A   No. Correct. Sorry.
8      MR. JUBB: I believe we -- this was
9  already marked unless I'm mistaken. I'm just going to
10 remark this, if it was so forgive me.
11     MR. McCARRON: Which is it?
12     MR. JUBB: Garabedian 47. Garabedian
13 File 47. Yeah, we did. It's actually 12. Oh, no,
14 that's the difference because there's Garabedian File
15 27.
16         So for the record, I'm going to mark as
17 Garabedian 20, a document that was previously produced
18 as Garabedian File 47.
19     MR. McCARRON: And is that the same as
20 Garabedian -- it is, 12. Why are you doing that?
21     MR. JUBB: It's not. That's
22 Garabedian -- see, this is the way you guys Bates it.
23     MR. McCARRON: Oh, I'm sorry. File 47,
24 sorry. Okay.
25     MR. JUBB: You can mark that for me.

1  Thank you.
2         (Exhibit 20 marked
3          for identification)
4      Q   Okay. Mr. Garabedian, this is an email from
5  Ms. Poulos to you, correct?
6      A   Yes.
7      Q   And in here there is an attachment which was
8  the email from the headmaster of The Hill School to
9  alumni dated November 20th, 2017, correct?
10     A   Yes.
11     Q   And what I've handed you is Garabedian File
12 47 through Garabedian File 50, and am I correct that
13 whether or not you've read Ms. Poulos's email, you've
14 seen this email from The Hill School before; is that
15 fair?
16     MR. McCARRON: It's a letter, isn't it?
17 Whatever it is, okay.
18     Q   Do you remember my question?
19     A   Yes.
20     Q   Okay. And in here when you read this, this
21 email, the second paragraph of this says: At that
22 time, with the unanimous support of the Board of
23 Trustees, I initiated a review of historical
24 allegations of abuse at The Hill and the School's
25 responses to those allegations. Do you believe you

1  would have read that line?
2      A   I mean if I read the letter.
3      Q   Okay. Well, based off of your experience am
4  I correct that you were aware as of this time, which is
5  December of 2017, that these schools or boarding
6  schools, that board of trustees are often involved in
7  these types of situations?
8      MR. McCARRON: Objection. I don't --
9  that questions makes no sense to me but ...
10     A   I don't know.
11     Q   Well, when -- strike that since we don't know
12 if you sent the letter personally to the school.
13         Do you have an un -- strike that.
14         Do you have an understanding as to whether or
15 not a headmaster would be reporting claims of sexual
16 abuse to boards of trustees?
17     A   I don't know the -- their process.
18     Q   But that is a possibility, right?
19     A   It's a possibility.
20     Q   And as someone involved in making claims --
21 strike that.
22         In looking at this letter, it identifies both
23 Ms. Gomez as well as Ms. Smith as individuals who can
24 be contacted or that you can email Mr. Lehman at his
25 email address. Did you read that?

1      A   Where are you -- where in the letter is that?
2      Q   I'm on Garabedian 49 at the top.
3      A   Yes.
4      Q   When you reviewed this did this appear to you
5  to be some effort of some sort of cover up?
6      A   I didn't know what it was.
7      Q   Did it appear to be something that was
8  proactive?
9      A   Yes.
10     Q   And when you read this letter had you ever
11 heard of the firm Cozen O'Connor before?
12     A   No.
13     Q   And I'll be fully candid. I'm, I'm not sure
14 if they do have a, a location in Boston.
15         But have you ever worked with any individuals
16 from Pepper Hamilton?
17     A   No. Not that I recall.
18     Q   But when you reviewed this did you have an
19 understanding that Ms. Gomez and Ms. Smith were
20 attorneys?
21     A   It didn't say they were attorneys.
22     Q   Did you make any effort to look up what Cozen
23 O'Connor was?
24     A   I don't recall.
25     Q   Was there any particular reason why you

56 (Pages 218 - 221)

Page 222

1  didn't email Mr. Lehman?
2      A   About what?
3      Q   Well, would you agree with me that your
4  letter to him went out -- is it U.S. Mail?
5      A   Yes.
6      Q   Was there any particular reason you chose to
7  send it by U.S. Mail as opposed to contacting him
8  through his email address?
9      A   No.
10     Q   Have you ever -- strike that.
11         I know this might be a difficult number to
12  calculate, but approximately how many individuals have
13  you represented who have made allegations of sexual
14  abuse as a minor?
15     A   I don't know.  I mean I -- I don't have a
16  count of that.
17     Q   It's thousands, correct?
18     A   Well, more than 2,000 probably.
19     Q   Okay.  Have you ever prior to Mr. Poulos ever
20  received any sort of complaints against The Hill
21  School?
22     A   I don't recall.
23     Q   You've never filed a lawsuit against them,
24  correct?
25     A   Correct.

Page 223

1      Q   In your review -- strike that.
2          In the documents that have been provided to
3  you that were produced from us did you review any of my
4  client's former files from The Hill School?
5      A   I don't believe so.  I don't recall.
6          MR. JUBB:  And then this is going to be
7  Garabedian 21.  And you can probably just refer to both
8  of them just because it references this.  And this is
9  going to be Hill 240.
10         (Exhibit 21 marked
11             for identification)
12     Q   Mr. Garabedian, in looking at the
13  November 2017 email that was previously marked as
14  Garabedian 20, the headmaster of the school references
15  the April 23rd, 2016 email/letter.  Do you see that?
16     A   Right.  Yes.
17     Q   Did you ever review the April 23rd, 2016
18  letter from the school?
19     A   Is that Exhibit 21 you're referring to?
20     Q   That's Exhibit 21, yes, sir.
21     A   I don't recall.
22     Q   I will represent to you that I didn't see
23  this produced as part of your file.  Am I correct that
24  if this was sent to you by email, you would have
25  produced that to me, correct?

Page 224

1      A   Yes.
2      Q   And then again, just to, to tighten this up,
3  as you sit here today have I spurred any sort of
4  independent recollections of conversations that you had
5  with Mary Ellen Poulos?
6      A   Have you spurred any?
7      Q   Yeah.  Because it's my understanding that you
8  don't recall speaking to her, so we've just spent a
9  good bit of, you know, time going over this stuff, do
10  you recall any discussions with her?
11     A   Not specifically, but I know I've spoken to
12  her in the past.
13     Q   All right.  And again with respect to
14  Mr. Poulos, other than what you have documented in the
15  records do you have any recollections of discussions
16  with him?  You're shaking your head.  I'm sorry.
17     A   I, I don't understand your question.
18     Q   Sure.  Other than what is -- strike that.
19         Other than what is reflected in the
20  handwritten notes that you've provided in this case do
21  you have any recollections of speaking with Mr. Poulos
22  outside of what is documented in those records?
23     A   Not specifically.
24     Q   And I know that you said that you don't
25  recall looking through Mr. Poulos's Hill School

Page 225

1  records, but as you sit here today do you believe that
2  you have?
3      A   I don't recall.  I'm sorry.
4      Q   All right.  And, and again, I -- I'm not
5  trying to be repetitive here, but is there anything
6  about Mr. Poulos's school records that comes to mind
7  when I say, you know, did you look at them?  I mean do
8  recall seeing any documents whatsoever from them?
9      A   I'd have to read them again.  I'm sorry.
10     Q   Well, when you say "read them again", when
11  they were produced to you after the letter do you have
12  a pattern and practice of reviewing those types of
13  things yourself?
14     A   Sometimes.
15         MR. McCARRON:  Objection.
16         MS. DOUGHERTY:  Objection.
17         MR. McCARRON:  Yeah, I just --
18         MS. DOUGHERTY:  This is Candi.
19         MR. McCARRON:  I just, I -- Candi, I
20  was --
21         MR. JUBB:  What?
22         MR. McCARRON:  I had just made the
23  objection.
24         MR. JUBB:  Jesus.
25         MR. McCARRON:  Just a second.

57 (Pages 222 - 225)

1        Mr. Jubb, your question, as I understand
2   it, is inaccurate in the sense that you suggested in
3   your question that the records showed up after the
4   letter was sent, the school records.
5        MR. JUBB:  Okay.  Let's -- we can go
6   over this again.
7     Q   Mr. Garabedian, --
8        MR. McCARRON:  No.  No.
9        MR. JUBB:  I disagree.
10        MR. McCARRON:  The records have the
11   dates on them or whatever, right.  But my objection is
12   what my objection is.  Just you don't need to include
13   those facts in your question to learn the information
14   you were trying to learn.  It's just that every once in
15   awhile you try to include a fact as I'm going to call
16   it commentary and so that was one such incident.
17        MR. JUBB:  I just want to be clear.  Are
18   you telling me that your records reflect that The Hill
19   School records were received prior -- of Mr. Poulos
20   were received prior to April 11th, 2018?
21        MR. McCARRON:  At the moment we don't
22   need to get into this debate.  But the point I'm trying
23   to make is you don't need to include in your question,
24   and I object to it, to including the -- that -- your
25   commentary, that's what I'm going to call it, about the

1   records being received after the letter.  So you don't
2   need to include it.  Just ask the question, whatever it
3   was.  I don't even remember at this point what you
4   were -- the fact you were trying to learn, but it
5   didn't relate to that.
6        MR. JUBB:  Okay.
7   BY MR. JUBB:
8     Q   Mr. Garabedian, did -- prior to writing the
9   letter am I correct that you have no knowledge, as you
10   sit here today, to suggest that you did receive
11   Mr. Poulos's records by then?
12     A   I don't recall.
13     Q   And since you don't recall receiving them,
14   you can't say one way or the other as to whether or not
15   you reviewed them prior to writing the letter; is that
16   correct?
17     A   Correct.
18     Q   And after you had writ -- strike that.
19        After the April 11th, 2018 letter am I
20   correct at some point you received Mr. Poulos's Hill
21   School records?
22     A   I don't recall.
23     Q   Do you have any recoll --
24        MS. DOUGHERTY:  Objection.
25        MR. JUBB:  Is there two --

1        MS. DOUGHERTY:  Mr. Jubb, you know that
2   your question is not on a good faith basis.
3        MR. JUBB:  Okay, guys.
4        MS. DOUGHERTY:  I direct your attention
5   to Garabedian 0235.
6        MR. POULOS:  I concur.
7        MS. JUBB:  Okay.  I have a question.
8   Who's representing Mr. Garabedian in this deposition,
9   Ms. Dougherty?  I didn't even know you showed up.  So
10   let's make sure that the record reflects she's here.
11        MR. McCARRON:  Well, it's ... whatever.
12        MS. DOUGHERTY:  Yeah, Mr. Jubb, I
13   announced to your office that I would participate via
14   Zoom.
15        MR. JUBB:  Okay.
16        MS. DOUGHERTY:  And I have been here for
17   awhile.  And I'm not going to sit --
18        MR. POULOS:  (Inaudible.)
19        MS. DOUGHERTY -- while you ask a
20   question that doesn't have a good faith basis.
21        MR. JUBB:  I have no idea what you're
22   talking about.  You guys -- okay.
23        MR. McCARRON:  Like I told you, you
24   didn't need to have this debate.  You're the one that
25   decide to have the debate so --

1        MR. JUBB:  I have no idea what the issue
2   is.
3        MR. McCARRON:  Why are you doing it?
4   Why are you doing it?
5        MR. JUBB:  Because you have your
6   associate chiming in on a phone call in a deposition
7   that I thought he was represented, but I'm asking a
8   question as to whether or not he looked at the records
9   subsequent to writing the letter.  I don't understand
10   how that's objectionable.
11        MR. McCARRON:  You've created a problem.
12   You already established, and he's already testified he
13   didn't know one way or other whether there were or
14   weren't the records present before the letter didn't or
15   didn't -- I mean before the letter went, okay.  So I
16   tried to get you past this by saying we don't need to
17   debate it now, and you don't need it for your
18   questions; but you want to do it so now you're
19   involved.
20        MR. JUBB:  Jeff, the only reason I'm
21   having to do this is because you guys are, are
22   suggesting that I'm somehow not accurately representing
23   the record.
24        MR. McCARRON:  You don't need to have
25   the information to continue with your questions.  Just

Page 230

1  continue with your questions. But the point is, is you
2  can't suggest in any question that he didn't have
3  records, that you do not have a basis to believe he did
4  not have records.
5          MR. JUBB: Okay. And this is where I
6  think we're having a problem. Do you have documents
7  suggesting that he did receive these records prior to,
8  to, right, prior to the April 11, '18 letter because I
9  don't. And that's where -- and when I said that and
10  Candi's screaming through the records -- or through the
11  microphone, that's what I'm asking about. I didn't
12  know what was wrong with that because I have -- I
13  believe the opposite.
14         MR. McCARRON: But my point -- if you
15  want to do that I guess we can --
16         MR. JUBB: It was just to --
17         MS. DOUGHERTY: Mr. Jubb, I wasn't --
18         MR. JUBB: -- it was just to clarify the
19  timeframe because I don't want to say have you ever
20  reviewed the records and his response is I don't
21  recall.
22         MR. McCARRON: I'm not --
23         MR. JUBB: I'm trying to go timeframe by
24  timeframe, guys.
25         MR. McCARRON: You can try to convince

Page 231

1  us of your innocence, but that doesn't --
2          MR. JUBB: You know, I don't need to
3  convince you of anything. This is ridiculous. You
4  don't know the records like I do, and that's been
5  reflected through these objections, so that's not fair.
6          MR. McCARRON: No, I don't think it has
7  been reflected at all.
8          MR. JUBB: Okay.
9          MR. McCARRON: In fact, I think you're
10  again misstating and overexaggerating the situation.
11  But I tried to -- I, I tried to get through this in the
12  sense that you don't necessarily need to, to do this
13  right now, but you want to insist on doing it so ...
14         MR. JUBB: Well, I, I need to -- if
15  there -- if it's going to be contested then I need to
16  explore it.
17         MR. McCARRON: You need to contest what?
18         MR. JUBB: It seems to be based off your
19  objections that it's somehow going to be contested that
20  he got the records before writing the letter.
21         MR. McCARRON: I don't know why
22  you've -- the deposition isn't now the opportunity
23  to -- I'm not sure what you're talking about contested,
24  but this isn't the opportunity for that discussion or
25  debate or whatever.

Page 232

1          MR. JUBB: I agree. That's why I don't
2  understand --
3          MR. POULOS: I don't see how that's
4  relevant as to time.
5          MR. JUBB: I don't -- that's why I'm
6  confused is if it's not an issue why is everybody
7  screaming at me that I have some bad faith for, for
8  representing it. I'm trying to get a specific
9  timeframe.
10         MR. McCARRON: Because you continue --
11         MR. POULOS: Because it's not relevant.
12         MR. McCARRON: It's also the fact -- it
13  is not relevant because there is no question that
14  Mr. Poulos was a student at the time that's -- at the
15  time Mr. Ralston was also a teacher there and it was
16  also Mr. Ralston who was a teacher of Mr. Poulos at the
17  time.
18         So for whatever reason, you know, you,
19  you can't prove that your client is not a molester just
20  because Mr. -- you know, you want to raise doubt about
21  whether Mr. Garabedian did or didn't have the records
22  at the time is completely irrelevant. It doesn't prove
23  that, that Mr. Poulos's experience didn't happen.
24         MR. JUBB: Anything else?
25         MR. McCARRON: But if that's ---

Page 233

1          MR. JUBB: That has nothing to do with
2  why I'm asking the question. I mean I literally --
3  you're right, it has nothing to do with whether or not
4  Poulos went to the school.
5          MR. McCARRON: Then I don't know why you
6  would persist. I don't think it's necessary which is
7  what I said to you earlier and then you did it again
8  which prompted Candi's objection because ...
9          MR. JUBB: Well, I'm going to ask the
10  question and you guys make your, make your objection
11  and we'll see if the court disagrees that it's
12  relevant.
13  BY MR. JUBB:
14   Q  Mr. Garabedian, as you sit here today do you
15  believe that you obtained Mr. Poulos's Hill School
16  records before that letter of April 2018 went out?
17   A  I don't recall.
18         MR. POULOS: Objection.
19   Q  Okay. And as you sit here today --
20         MR. McCARRON: Let me just say. I do
21  have an objection. As I said before, it's not just --
22  in my description, it's not relevant, it's not
23  reasonably calculated, and it is abusive, especially
24  when you've been through this a number of times.
25  Anyway, go ahead. He's already told you that.

Page 234

1          MR. JUBB: Okay. And I'm just trying
2     to -- because he doesn't recall anything so I'm just
3     trying to figure out a timeframe.
4          MR. McCARRON: Just ask your question.
5          MR. JUBB: I'm responding to you because
6     you can't just simply object.
7     BY MR. JUBB:
8     Q    So Mr. Garabedian -- strike that.
9          After April of 2018. A letter went out on
10    April 11th, 2018. Would you agree with me that there
11    is there's a letter to The Hill School from the same
12    date?
13    A    There's a letter dated April 11, 2018.
14    Q    And it's asking for Mr. Poulos's records,
15    correct?
16    A    Yes.
17    Q    Thank you.
18         And I imagine I know the answer to this
19    question, but I have to ask. Is there any way for you
20    to tell us whether or not this letter went in the same
21    envelope or if there were actually different two
22    envelopes that went out to the school?
23    A    I don't know.
24    Q    Okay. As part of file maintenance do you
25    have any pattern and practice of maintaining indexes,

Page 235

1     such as discovery indexes or document indexes, anything
2     like that?
3     A    In some cases, yes.
4     Q    Did you see anything like that for this case?
5     A    I don't recall.
6          MR. JUBB: Those are all the questions
7     that I have.
8          MR. McCARRON: Mr. Poulos?
9          MR. JUBB: Mr. Poulos, can you hear us?
10         MR. POULOS: Yes, I can hear you.
11         MR. JUBB: Okay. You're up.
12         MR. McCARRON: Do you have any
13    questions, sir?
14         MR. POULOS: I just have a couple of
15    questions regarding the Cozen firm.
16              CROSS-EXAMINATION
17    BY MR. POULOS:
18    Q    There's an article in the New York Times
19    dated back to I believe 2017 with Mitchell, and I had
20    asked Mitchell and I will repeat the question: Do you
21    believe I should get counsel before I speak to --
22    excuse me for a second while I flip the page, the
23    attorneys Leslie Gomez and Gina Smith, and in light of
24    that, I found this article where Mitchell gave an
25    interview. Mitchell, do you remember giving that

Page 236

1     interview to the New York Times?
2     A    No, I don't. Sorry.
3          MR. POULOS: Am I allowed to read off of
4     the actual article?
5          MR. McCARRON: If it involves a
6     question. Do you have a question?
7          MR. POULOS: No, if I'm not allowed to
8     read verbatim what was transcripted in the article
9     then, no, I don't have a question. I just wanted to
10    know if he remembered giving the interview about the
11    Cozen firm which was representing themself for the, The
12    Hill School.
13         MR. McCARRON: All right. Mr. Poulos, I
14    don't mean to, to tell you you can't ask a question.
15    All I'm saying to you is it's not a question just to
16    read the statement, but if you need to read the
17    statement or some portion of the article in order to --
18    as part of a question, you can certainly do that.
19         MR. POULOS: Well, no, my question was
20    if he remembered actually giving the --
21         MR. McCARRON: I understand.
22         MR. POULOS: -- interview.
23         MR. McCARRON: Okay.
24         MR. POULOS: If he doesn't --
25         MR. McCARRON: Very good.

Page 237

1          MR. POULOS: -- then there's no point in
2     me reading it out loud.
3          MR. McCARRON: Gotcha. All right. So
4     any other questions?
5          MR. POULOS: Not at this time.
6          MR. McCARRON: All right. Are we done?
7          MR. JUBB: Yes.
8          MR. McCARRON: Okay. We're going to go
9     off the record. Thank you, Mr. Poulos.
10         THE VIDEOGRAPHER: This concludes
11    today's video deposition of Mitchell Garabedian. The
12    time is 3:03 p.m. We're off the record.
13         (Whereupon the deposition was
14              concluded at 3:03 p.m.)
15
16
17
18
19
20
21
22
23
24
25

60 (Pages 234 - 237)

Page 238

1           CERTIFICATE
2  Commonwealth of Massachusetts
3  Suffolk, ss.
4
5      I, Kristen L. Kelly, Registered Professional
6  Reporter, CSR and Notary Public in and for the
7  Commonwealth of Massachusetts, do hereby certify that
8  MITCHELL GARABEDIAN, the witness whose deposition is
9  hereinbefore set forth, was duly sworn by me and that
10 such deposition is a true record of the testimony given
11 by the witness.
12     I further certify that I am neither related to or
13 employed by any of the parties in or counsel to this
14 action, nor am I financially interested in the outcome
15 of this action.
16     In witness whereof, I have hereunto set my hand
17 this 5th day of July, 2021.
18
19
20 _____
21     CSR No. 115893
22
23 My Commission Expires:
24 February 3, 2023
25

Page 239

1  Jeffrey B. McCarron, Esquire
2  jmccarron@swartzcampbell.com
3      July 6, 2021
4  RE:  Doe, John v. Garabedian, Mitchell Esq Et Al
5      6/24/2021, Mitchell Garabedian (#4638046)
6      The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 erratas-cs@veritext.com
16
17  Return completed errata within 30 days from
18 receipt of transcript.
19  If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 240

1  Doe, John v. Garabedian, Mitchell Esq Et Al
2  Mitchell Garabedian (#4638046)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Mitchell Garabedian              Date
25

Page 241

1  Doe, John v. Garabedian, Mitchell Esq Et Al
2  Mitchell Garabedian (#4638046)
3      ACKNOWLEDGEMENT OF DEPONENT
4      I, Mitchell Garabedian, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____   _____
12 Mitchell Garabedian              Date
13 *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15     _____ DAY OF _____, 20___.
16
17
18 _____
19 NOTARY PUBLIC
20
21
22
23
24
25

61 (Pages 238 - 241)



**STATE OF WISCONSIN
DEPARTMENT OF JUSTICE**



Request Date: **4/15/2019**
Report Date: **4/15/2019**

This criminal background check was performed by searching the following data submitted to the Crime Information Bureau

Name: **POULOS, KURTIS N**
Date of Birth: ████████
Alias Names: ████████

IMPORTANT EXPLANATION ABOUT HOW TO UNDERSTAND THIS RESPONSE

This response reports the results of a criminal history search conducted with the name, date of birth, and any other identifying data you provided. The identifying data you provided is printed above. If you submitted fingerprints with your search request see the statement below.

Read this entire explanation, the How to Read the Following Criminal History Report section and the Notice to Employers section. Read these sections carefully to understand how this response relates to the identifying data you provided.

Printed below these explanations is a Wisconsin criminal history record that has been identified as a possible match to the identifying data you provided.

A criminal history search based only on a name, date of birth, and other identifying data that is not unique to a particular person (like sex or race) may result in:

1. Identification of criminal history records for multiple persons as potential matches for the identifying data submitted, or

2. Identification of a criminal history record belonging to a person whose identifying information is similar in some way to the identifying data that was submitted to be searched, but is not the same person whose identifying data was submitted for searching.

The Crime Information Bureau (CIB) therefore cannot guarantee that the criminal history record below pertains to the person in whom you are interested.

You must carefully read the entire Wisconsin criminal history record below in order to determine whether the record pertains to the person in whom you are interested.

Do not just assume that the criminal history record below pertains to the person in whom you are interested.

Additional information about finger-based search submissions: Fingerprint-based background checks generally provide a more reliable result and are prone to fewer false matches due to the specific identifying features of fingerprints.

HOW TO READ THE FOLLOWING CRIMINAL HISTORY REPORT

The criminal history reported below is linked by fingerprints to the name appearing directly after these explanatory sections, following the label IDENTIFICATION. That name is the name that was provided by the fingerprinted person the first time his or her fingerprints were submitted to CIB; it may or may not be the real name of the fingerprinted person. That name is called the Master Name in these explanatory sections.

It is not uncommon for criminal offenders to use alias or fraudulent names and false dates of birth, sometimes known as identity theft. Other names used by the person identified who is the Master Name are listed in the Alias Names/Fraudulent Data section of the criminal history report below.

If the name you submitted to be searched is DIFFERENT from the Master Name below, the Wisconsin criminal history record below may belong to someone other than the person whose name and other identifying data you submitted for searching. If an alias or fraudulent name used by the person who is the Master Name is similar to the name you submitted for searching, that does not mean that the person whose name you submitted for searching has a criminal history. It means that the person associated by fingerprints with the Wisconsin criminal history below has used a name similar to the name you submitted for searching.

If the name you submitted to be searched is THE SAME as the Master Name below, the Wisconsin criminal history record below may belong to someone other than the person whose name and other identifying data you submitted for searching. That is because the Master Name is the name attached to the initial fingerprint submission to CIB that is associated with the reported criminal history, may have been an alias name or a name similar to the name you submitted for searching.

To determine whether the Wisconsin criminal history below actually belongs to the person whose name and other identifying information you submitted for searching, compare the information reported below to the other information you have obtained about that person. Inconsistencies may indicate that the criminal history reported below does not belong to the person whose name and other identifying information you submitted for searching. You may need to ask for clarification from the person whose name and other identifying information you submitted for searching.

Before you make a final decision adverse to a person based on the following criminal history record, in addition to any other opportunity you offer the applicant to explain the following criminal history record, please notify the applicant of:

1. His or her right to challenge the accuracy and completeness of any information contained in a criminal history record, and

2. The process for submitting a challenge.

The person should submit his or her challenge to CIB on Form DJ-LE-247. Form DJ-LE-247 is available free of charge on the Department of Justice website at http://www.doj.state.wi.us/dles/cib/background-check-criminal-history-information or by calling (608) 266-7314. A challenge may include a request for comparison of the fingerprints of the person submitting the challenge to the fingerprints on file that are associated with the Wisconsin criminal history record below.

The Wisconsin criminal history report below may not show all arrests for the person whose fingerprints are associated with the reported criminal history. However, the criminal history report contains all information that has been provided to the state criminal history database that may be released in response to your request.

The results of this search are effective and current for the date of this search only. A new search request should be submitted at a later time if an updated response is needed.

NOTICE TO EMPLOYERS

GARABEDIAN_FILE0222

It may be a violation of state law to discriminate against a job applicant because of an arrest or conviction record. Generally speaking, an employer may refuse to hire an applicant on the basis of a conviction record only if the circumstances of the offense for which the applicant was convicted substantially relate to the circumstances of the particular job. For more information, see Wisconsin Statute 111.335 and the Department of Workforce Development's publication, Arrest and Conviction Records Under the Law.

Before you make a final decision adverse to an applicant based on the following criminal history record, in addition to any other opportunity you offer the applicant to explain the following criminal history record, please notify the applicant of:

1. His or her right to challenge the accuracy and completeness of any information contained in a criminal history record, and

2. The process for submitting a challenge.

The applicant should submit his or her challenge to CIB on Form DJ-LE-247. Form DJ-LE-247 is available free of charge on the Department of Justice website at http://www.doj.state.wi.us/dles/cib/background-check-criminal-history-information or by calling (608) 266-7314. A challenge may include a request for comparison of the fingerprints of the person submitting the challenge to the fingerprints on file that are associated with the Wisconsin criminal history record below.

RECORD LAST UPDATED: 11/19/2018

GARABEDIAN_FILE0223

1741a

IDENTIFICATION

# KURTIS NICHOLAS POULOS

Male/White
Born in USA; Citizen of USA
█████████

Height: 6'02"  Weight: 215lbs;
Eye Color: Brown; Hair Color: Brown
2969 N FREDERICK
AVE MILWAUKEE, WI
STATE ID: WI861206
OFFENDER NOTICE:
ALIAS NAMES/FRAUDULENT DATA: Alias Names: KURT NICHOLS POULOS,
KURT POULOS,  KURTIS N POULOS,
PHOTO INFORMATION:
WI0410000 MILWAUKEE COUNTY SHERIFF
WI013035Y WI CIB IDENTIFICATION SECTION
06/30/2018 WI0410400 FOX POINT POLICE DEPARTMENT
06/30/2018 WI0410000 MILWAUKEE COUNTY SHERIFF



CRIMINAL HISTORY

CYCLE 01

  EARLIEST EVENT DATE: 10/09/1999

  DATE OF OFFENSE: 10/09/1999

  ARREST TRACKING NUMBER:

  ARREST DATA

  SUBJECT NAME: KURTIS NICHOLAS POULOS

GARABEDIAN_FILE0224

1742a

TYPE: ADULT ONLY
DATE: 10/09/1999
ARREST AGENCY: WI0415000 MILWAUKEE POLICE DEPARTMENT

## CHARGE

SEQUENCE NUMBER: 01
STATUTE NUMBER: 948.07(1) - Child Enticement-Sexual Contact
LITERAL: Child Enticement-Sexual Contact
NCIC CODE: 3699
COUNTS: 1
CLASSIFICATION:
CHARGE SEVERITY: FELONY

## PROSECUTION

CASE NUMBER:
PROSECUTOR: UNKNOWN

## CHARGE

SEQUENCE NUMBER: 01
STATUTE NUMBER: 948.07(1) - Child Enticement-Sexual Contact
LITERAL: Child Enticement-Sexual Contact
NCIC CODE: 3699
COUNTS: 1
CLASSIFICATION:
CHARGE SEVERITY: FELONY

## DISPOSITION

LITERAL: DISMISSED
DISPOSITION DATE: 10/20/1999
DISPOSITION: NO PROSECUTION

CYCLE 02

EARLIEST EVENT DATE: 03/13/2004

DATE OF OFFENSE: 03/13/2004

ARREST TRACKING NUMBER: 41004745824139

## ARREST DATA

LOCAL IDENTIFICATION NUMBER: 00000338485
SUBJECT NAME: KURTIS NICHOLAS POULOS
TYPE: ADULT ONLY
DATE: 03/13/2004

ARREST AGENCY: WI0415000 MILWAUKEE POLICE DEPARTMENT

## CHARGE

SEQUENCE NUMBER: 01
STATUTE NUMBER: 813.12(8)(A) - KNOWINGLY VIOLATE A DOMESTIC ABUSE ORDER
LITERAL: KNOWINGLY VIOLATE A DOMESTIC ABUSE ORDER
NCIC CODE: 3899
COUNTS: 1
CLASSIFICATION:
CHARGE SEVERITY: MISDEMEANOR

## CHARGE

SEQUENCE NUMBER: 02
STATUTE NUMBER: 976.03(12) - EXTRADITION-CONFINEMENT IN JAIL
LITERAL: EXTRADITION-CONFINEMENT IN JAIL
NCIC CODE: 7399
COUNTS: 1
CLASSIFICATION:
CHARGE SEVERITY: FELONY

## COURT

SUBJECT NAME: KURTIS NICHOLAS POULOS
DATE: 07/03/2018
COURT: UNKNOWN - UNKNOWN
COMMENTS: CCAP DISPOSITION

## CHARGE

LOCAL IDENTIFICATION NUMBER: 41004745824139
SEQUENCE NUMBER: 01
STATUTE NUMBER: 813.12(8)(A) - KNOWINGLY VIOLATE A DOMESTIC ABUSE ORDER
LITERAL: KNOWINGLY VIOLATE A DOMESTIC ABUSE ORDER
NCIC CODE: 3899
COUNTS: 1
CLASSIFICATION:
CHARGE SEVERITY: MISDEMEANOR

## DISPOSITION

LITERAL: OTHER
DISPOSITION DATE: 07/03/2018
DISPOSITION: DISPOSITION NOT REPORTED

GARABEDIAN_FILE0226

1744a

## CHARGE

**LOCAL IDENTIFICATION NUMBER:** 41004745824139
**SEQUENCE NUMBER:** 02
**STATUTE NUMBER:** 976.03(12) - EXTRADITION-CONFINEMENT IN JAIL
**LITERAL:** EXTRADITION-CONFINEMENT IN JAIL
**NCIC CODE:** 7399
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** FELONY
**COMMENTS:** FFJ WORCHESTER CO. MD AUTHORITIES

## DISPOSITION

**LITERAL:** OTHER
**DISPOSITION DATE:** 03/13/2004
**DISPOSITION:** HOLD FOR COURT

## CHARGE

**LOCAL IDENTIFICATION NUMBER:** 41004745824139
**SEQUENCE NUMBER:** 03
**STATUTE NUMBER:** 813.125(7) - VIOLATE/HARASSMENT RESTRAINING ORDER
**LITERAL:** VIOLATE/HARASSMENT RESTRAINING ORDER
**NCIC CODE:**
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** MISDEMEANOR

## DISPOSITION

**LITERAL:** CONVICTED
**DISPOSITION DATE:** 07/16/2004
**DISPOSITION:** CONVICTED

## SENTENCING

**DATE:** 07/16/2004
**CASE NUMBER:** 402004CM001746
**COURT:** UNKNOWN - UNKNOWN
**CONVICTED OFFENSE:**
**CHARGE SEQUENCE NUMBER:** 03
**SENTENCE:** PROBATION
**COMMENTS:**

## SENTENCING

DATE: 07/16/2004
CASE NUMBER: 402004CM001746
COURT: UNKNOWN - UNKNOWN
CONVICTED OFFENSE:
CHARGE SEQUENCE NUMBER: 03
SENTENCE: MILWAUKEE COUNTY HOUSE OF CORRECTIONS
TIME SERVED: 2 DAYS
LENGTH: 60 DAYS
COMMENTS: CONSECUTIVE TO ANY OTHER SENTENCE. STRAIGHT
TIME.

## SENTENCING

DATE: 07/16/2004
CASE NUMBER: 402004CM001746
COURT: UNKNOWN - UNKNOWN
CONVICTED OFFENSE:
CHARGE SEQUENCE NUMBER: 03
SENTENCE: PROBATION
BEGIN DATE: JULY 16, 2004
SENTENCE INDICATOR: PROBATION BY JUDGMENT
LENGTH: 18 MONTHS
COMMENTS:

## SENTENCING

DATE: 07/16/2004
CASE NUMBER: 402004CM001746
COURT: UNKNOWN - UNKNOWN
CONVICTED OFFENSE:
CHARGE SEQUENCE NUMBER: 03
SENTENCE: MILWAUKEE COUNTY HOUSE OF CORRECTIONS
TIME SERVED: 2 DAYS
LENGTH: 30 DAYS
COMMENTS: CONSECUTIVE TO ANY OTHER SENTENCE. HUBER
PRIVILEGES FOR WORK.

## SENTENCING

DATE: 07/16/2004
CASE NUMBER: 402004CM001746
COURT: UNKNOWN - UNKNOWN
CONVICTED OFFENSE:
CHARGE SEQUENCE NUMBER: 03
SENTENCE: FINE
COMMENTS:

GARABEDIAN_FILE0228

1746a

## SENTENCING

**DATE:** 07/16/2004
**CASE NUMBER:** 402004CM001746
**COURT:** UNKNOWN - UNKNOWN
**CONVICTED OFFENSE:**
**CHARGE SEQUENCE NUMBER:** 03
**SENTENCE: UNKNOWN SENTENCE CODE**
**COMMENTS:** -DEFENDANT IS TO HAVE NO CONTACT WITH THE
VICTIM. -DEFENDANT IS TO SUCCESSFULLY COMPLETE ANGER
MANAGEMENT PROGRAM.

## SENTENCING

**DATE:** 07/16/2004
**CASE NUMBER:** 402004CM001746
**COURT:** UNKNOWN - UNKNOWN
**CONVICTED OFFENSE:**
**CHARGE SEQUENCE NUMBER:** 03
**SENTENCE: RESTITUTION**
**COMMENTS:** IN AMOUNT OF $2,696.67.

**CYCLE 03**

**EARLIEST EVENT DATE:** 06/30/2018

**DATE OF OFFENSE:** 06/30/2018

**ARREST TRACKING NUMBER:** 180166126

## ARREST DATA

**SUBJECT NAME:** KURTIS NICHOLAS POULOS
**TYPE:** ADULT ONLY
**DATE:** 06/30/2018
**CASE NUMBER:** 338485
**ARREST AGENCY:** WI0410400 FOX POINT POLICE DEPARTMENT

## CHARGE

**SEQUENCE NUMBER:** 01
**STATUTE NUMBER:** 940.19(1) - BATTERY
**STATUTE NUMBER:** 973.055(1) - DOMESTIC ABUSE ASSESSMENTS
**LITERAL:** BATTERY
**NCIC CODE:** 1399
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** MISDEMEANOR

GARABEDIAN_FILE0229
1747a

## CHARGE

**SEQUENCE NUMBER:** 02
**STATUTE NUMBER:** 940.30 - False Imprisonment
**LITERAL:** False Imprisonment
**NCIC CODE:** 1099
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** FELONY

## PROSECUTION

**CASE NUMBER:**
**PROSECUTOR:** WI041013A

## CHARGE

**LOCAL IDENTIFICATION NUMBER:** 180166126
**SEQUENCE NUMBER:** 01
**STATUTE NUMBER:** 940.19(1) - BATTERY
**STATUTE NUMBER:** 968.075(1)(A)1 - "DOMESTIC ABUSE"=INFLICTION/PHY. PAIN
**LITERAL:** BATTERY
**NCIC CODE:**
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** MISDEMEANOR

## DISPOSITION

**LITERAL:** DISMISSED
**DISPOSITION DATE:** 07/03/2018
**DISPOSITION:** NO PROSECUTION

## CHARGE

**LOCAL IDENTIFICATION NUMBER:** 180166126
**SEQUENCE NUMBER:** 02
**STATUTE NUMBER:** 940.30 - False Imprisonment
**LITERAL:** False Imprisonment
**NCIC CODE:**
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** FELONY

## DISPOSITION

GARABEDIAN_FILE0230

1748a

**LITERAL:** DISMISSED
**DISPOSITION DATE:** 07/03/2018
**DISPOSITION:** NO PROSECUTION

**CYCLE 04**

**EARLIEST EVENT DATE:** 06/30/2018

**DATE OF OFFENSE:** 06/30/2018

**ARREST TRACKING NUMBER:** 41041806300013

## ARREST DATA

**LOCAL IDENTIFICATION NUMBER:** A-0000216542
**SUBJECT NAME:** KURTIS NICHOLAS POULOS
**TYPE:** ADULT ONLY
**DATE:** 06/30/2018
**CASE NUMBER:** 18003618
**ARREST AGENCY:** WI0410400 FOX POINT POLICE DEPARTMENT

## CHARGE

**SEQUENCE NUMBER:** 01
**LITERAL:** LOC ORD / DC / 670-1
**NCIC CODE:** 5311
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** NON-CRIMINAL

## CHARGE

**SEQUENCE NUMBER:** 02
**LITERAL:** LOC ORD / BATTERY / 670-14
**NCIC CODE:** 1313
**COUNTS:** 1
**CLASSIFICATION:**
**CHARGE SEVERITY:** NON-CRIMINAL

**CONTRIBUTING AGENCIES**

WI0410400-FOX POINT POLICE DEPARTMENT
WI013035Y-WI CIB IDENTIFICATION SECTION
WI0410000-MILWAUKEE COUNTY SHERIFF
WI0415000-MILWAUKEE POLICE DEPARTMENT
UNKNOWN-UNKNOWN
WI041013A-MILWAUKEE COUNTY DISTRICT ATTY
UNKNOWN-UNKNOWN

GARABEDIAN_FILE0231

1749a

End of Rapsheet

GARABEDIAN_FILE0232

MG, MMG, NG
5/10/19

Kurt Paulos

He filled out docs and mailed them today

MG asks him about the child enticement charge –
He never showed up to court for it, they said it was done
Allegation – he was on AOL and did something supposedly
Mom hired a lawyer
They checked his computer and there was nothing – it wasn't him
Pulled over by unmarked car
Not charged twice, same thing

Domestic abuse order? Drinking, something with an ex
Lived down the street, couldn't avoid her
Order on him violated, not on her
Probation, halfway house 10 days – pled out

Extradition – Maryland, when living in Connecticut
Not prosecuted

One dismissed last year

Tell of the war abused? Told her in 2015
Never told a girl before then
First told mom at 31/32
Drinking, trying to figure out why

MG may have Kurt call AG's office

Jail time? Overnight, waiting for bail, disorderly/intoxicated

GARABEDIAN_FILE0004
1751a

LAW OFFICES
OF
MITCHELL GARABEDIAN

MITCHELL GARABEDIAN
WILLIAM H. GORDON
NATHAN A. GAUL
LU XIA
SALVATORE M. CIULLA
DANIEL R. MAHONEY
MIRRA L. CAMPBELL

100 STATE STREET, 6TH FLOOR
BOSTON, MASSACHUSETTS 02109

(617) 523-6250
FAX (617) 523-3687

## AUTHORIZATION TO USE OR DISCLOSE PROTECTED HEALTH INFORMATION

Attention: Medical Records/Correspondence

RE: PATIENT: KURT POULOS

DOB:
SSN:
Date of Treatment: 10/10/1978 to PRESENT

I hereby authorize COLUMBIA-ST. MARY'S HOSPITAL MILWAUKEE to disclose to my attorney, Mitchell Garabedian, at the above address, a **certified** copy of my complete medical record including the history obtained, clinical notes, x-rays, lab reports, findings, diagnosis, prognosis and course of treatment.

The above information is disclosed for the following purpose: **Legal**.

This authorization will remain in effect until the term of its expiration on 5/20/20 or I provide written notice of revocation to your facility. I understand that **I may revoke this authorization** at any time by requesting such of the above referenced facility/physician in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law. I understand that information used or disclosed pursuant to this authorization could be subject to **redisclosure** by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

X _____    5/20/19
Signature of patient              Date

I specifically authorize disclosure of my highly confidential information relative to chemical dependency including drug and alcohol abuse, information relative to HIV/AIDS status, and information related to confidential communications with a psychotherapist, psychiatrist, psychologist, social worker, sexual assault counselor or other allied health professional.

X _____    5/20/19
Signature of patient              Date

LAW OFFICES
OF
**MITCHELL GARABEDIAN**

MITCHELL GARABEDIAN
WILLIAM H. GORDON
NATHAN A. SAUL
LU XIA
SALVATORE M. CIULLA
DANIEL R. MAHONEY
MIRRA L. CAMPBELL

100 STATE STREET, 6TH FLOOR
BOSTON, MASSACHUSETTS 02109

(617) 523-6250
FAX (617) 523-3687

## AUTHORIZATION TO USE OR DISCLOSE PROTECTED HEALTH INFORMATION

Attention: Medical Records/Correspondence

RE: PATIENT: KURT PANLOS

DOB ████████████
SSN ████████████
Date of Treatment: 10/10/1978 to PRESENT

I hereby authorize POTTSTOWN HOSPITAL to disclose to my attorney, Mitchell Garabedian, at the above address, a **certified** copy of my complete medical record including the history obtained, clinical notes, x-rays, lab reports, findings, diagnosis, prognosis and course of treatment.

The above information is disclosed for the following purpose: **Legal**.

This authorization will remain in effect until the term of its expiration on 5/20/20 or I provide written notice of revocation to your facility. I understand that **I may revoke this authorization** at any time by requesting such of the above referenced facility/physician in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law. I understand that information used or disclosed pursuant to this authorization could be subject to **redisclosure** by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

X _____      5/20/19
Signature of patient                Date

**I specifically authorize disclosure of my highly confidential information** relative to chemical dependency including drug and alcohol abuse, information relative to HIV/AIDS status, and information related to confidential communications with a psychotherapist, psychiatrist, psychologist, social worker, sexual assault counselor or other allied health professional.

X _____      5/20/19
Signature of patient                Date

LAW OFFICES
OF
MITCHELL GARABEDIAN

MITCHELL GARABEDIAN
WILLIAM H. GORDON
NATHAN A. GAUL
LU XIA
SALVATORE M. CIULLA
DANIEL R. MAHONEY
MIRRA L. CAMPBELL

100 STATE STREET, 6TH FLOOR
BOSTON, MASSACHUSETTS 02109

(617) 523-6250
FAX (617) 523-3667

## AUTHORIZATION TO USE OR DISCLOSE PROTECTED HEALTH INFORMATION

Attention: Medical Records/Correspondence

RE: PATIENT: Kurt Ponlos

DOB ▮▮▮▮▮▮▮

SSN: ▮▮▮▮▮▮▮

Date of Treatment: 10/10/1978 to PRESENT

I hereby authorize COLUMBIA St Mary's Hospital OZAUKEE to disclose to my attorney, Mitchell Garabedian, at the above address, a **certified** copy of my complete medical record including the history obtained, clinical notes, x-rays, lab reports, findings, diagnosis, prognosis and course of treatment.

The above information is disclosed for the following purpose: **Legal**.

This authorization will remain in effect until the term of its expiration on 5/20/20 or I provide written notice of revocation to your facility.  I understand that I may revoke this **authorization** at any time by requesting such of the above referenced facility/physician in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law.  I understand that information used or disclosed pursuant to this authorization could be subject to **redisclosure** by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

X _____        5/19/19
Signature of patient                  Date

I specifically authorize disclosure of my **highly confidential information** relative to chemical dependency including drug and alcohol abuse, information relative to HIV/AIDS status, and information related to confidential communications with a psychotherapist, psychiatrist, psychologist, social worker, sexual assault counselor or other allied health professional.

X _____        5/19/19
Signature of patient                  Date

**Page 1**

```
1        UNITED STATES DISTRICT COURT FOR THE
2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3        ---------------------------
         JOHN DOE              : CIVIL ACTION
4        v.                    :
5        MITCHELL GARABEDIAN, ESQ., :
         et al.                : NO. 2:19-cv-01539
6                              :
7        ---------------------------
8                     - - -
              September 2, 2021
9                     - - -
10        Zoom deposition of CHRISTOPHER HOPKINS,
11   held at the law offices of Swartz Campbell, LLC,
12   One Liberty Place, 38th Floor, 1650 Market
13   Street, Philadelphia, Pennsylvania 19103,
14   beginning at 10:00 a.m. on the above date,
15   before Harvey Krauss, a Commissioner of Deeds
16   and approved by the Federal District Court of
17   Pennsylvania.
18
19
20
21
22        ESQUIRE DEPOSITION SOLUTIONS
               1835 Market Street
23                  Suite 555
           Philadelphia, Pennsylvania 19103
24               (215) 988-9191
```

**Page 2**

```
1   APPEARANCES:
2        THE BEASLEY FIRM, LLC
         BY: LANE JUBB, ESQUIRE
3        1125 Walnut Street
         Philadelphia, Pennsylvania 19107
4        215-592-1000
         lane.jubb@beasleyfirm.com
5        Representing the Plaintiff
         Matthew Ralston
6
         SWARTZ CAMPBELL, LLC
7        BY: CANDIDUS K. DOUGHERTY, ESQUIRE
         One Liberty Place, 38th Floor
8        1650 Market Street
         Philadelphia, Pennsylvania 19103
9        215-299-4296
         cdougherty@swartzcampbell.com
10       Representing the Defendant
         Mitchell Garabedian, Esq.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1                     - - -
                    I N D E X
2                     - - -
3
      Testimony of: CHRISTOPHER HOPKINS     PAGE
4
      By Ms. Dougherty                      5/112
5
      By Mr. Jubb                           112
6
7
8
9
                      - - -
10                  EXHIBITS
                      - - -
11
12            NO.
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
1           DEPOSITION SUPPORT INDEX
2
3    Direction to Witness Not to Answer
4    Page Line          Page Line          Page
5    Line
6    (NONE)
7
8    Request for Production of Documents
9    Page Line          Page Line          Page
10   Line
11   (NONE)
12
13   Stipulations
14   Page Line          Page Line          Page
15     5   1-8
16
17   Question Marked
18   Page Line          Page Line          Page
19   Line
20   (NONE)
21
22
23
24
```



CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021

5—8

Page 5

1          (It is hereby stipulated and
2      agreed by and between counsel that
3      reading, signing, sealing, filing and
4      certification are waived; and that all
5      objections, except as to the form of
6      questions, be reserved until the time
7      of trial.)
8              - - -
9          CHRISTOPHER HOPKINS, after having
10     been duly sworn, was examined and
11     testified as follows:
12         MS. DOUGHERTY:  Mr. Jubb, are you
13     appearing as counsel for the witness?
14         MR. JUBB:  I am not.
15             - - -
16         EXAMINATION
17             - - -
18 BY MS. DOUGHERTY:
19     Q.     Mr. Hopkins, my name is Candy
20 Dougherty.  I represent Mitchell Garabedian, who
21 is a defendant in a lawsuit by Matthew Ralston.
22         MR. JUBB:  And, Candy, if we can
23     introduce ourselves on the record.
24         MS. DOUGHERTY:  Well, we're not on

Page 6

1 a video.  But, I mean --
2         MR. JUBB:  We have to introduce
3     ourselves on the record of who's
4     present and appearing for the
5     witnesses.  I don't think the court
6     reporter did that.  If counsel would
7     introduce themselves and who they
8     represent.
9         MS. DOUGHERTY:  Mr. Hopkins, where
10     are you located?  Are you in
11     Pennsylvania?
12         THE WITNESS:  No, I'm in Chicopee,
13     Massachusetts.
14         MS. DOUGHERTY:  Well, we're not on
15     video.  But, Mr. Court Reporter, do you
16     need to read a statement and have the
17     parties identify themselves?
18         COURT REPORTER:  No.  If it's not
19     a video I don't have to do that.  It's
20     up to the attorneys whether or not they
21     want to introduce themselves.
22         MR. JUBB:  Note for the record
23     that Lane Jubb of the Beasley firm is
24     appearing for plaintiff, and that Mr.

Page 7

1     Poulos, who is a defendant in this
2     matter, is not appearing today, despite
3     his request to have these depositions
4     moved to today.
5         Please proceed.
6 BY MS. DOUGHERTY:
7     Q.     So, Mr. Hopkins, you're located
8 where?
9     A.     Chicopee, Massachusetts.
10     Q.     Is there anyone else in the room
11 with you?
12     A.     No.  Just my 14-year-old dog.
13     Q.     Do you understand why you're
14 testifying here today?
15     A.     I believe so, yes.
16     Q.     What's your understanding of why
17 you're testifying here today?
18     A.     Mr. Ralston is a plaintiff in a
19 case, and I'm being deposed in regards to that
20 case.
21     Q.     Have you spoken to Mr. Ralston
22 about your testimony here today?
23     A.     No.
24     Q.     Have you talked to Mr. Ralston

Page 8

1 about his lawsuit?
2     A.     Yes.
3     Q.     Did you speak to Ralston about his
4 lawsuit?
5     A.     Today.  And frequently over the
6 years.
7     Q.     By this lawsuit I'm talking about
8 the lawsuit that you're testifying about today.
9 Do you understand that and can we agree?
10     A.     Yes.
11     Q.     What did you discuss with Mr.
12 Ralston about his lawsuit when you spoke with
13 him today?
14     A.     Simply that this was taking place
15 and he thanked me for the time.
16     Q.     By this you mean the deposition
17 was taking place?
18     A.     Correct.
19     Q.     You spoke on the telephone with
20 Mr. Ralston this morning about his lawsuit?
21     A.     Yes.
22     Q.     What else did you discuss with Mr.
23 Ralston when you spoke to him this morning about
24 his lawsuit, other than him thanking you for



CHRISTOPHER HOPKINS                                   September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                          9–12

| Page 9 | Page 11 |
|---|---|
| 1  taking the time to appear for the deposition? | 1  A.  No. |
| 2  A.  Only the fact that I was aware | 2  Q.  Prior to yesterday, when was the |
| 3  that his wife and brother were deposed | 3  last time you spoke to Mr. Ralston about his |
| 4  yesterday.  Nothing more than acknowledgement of | 4  lawsuit? |
| 5  that. | 5  A.  Yesterday. |
| 6  Q.  How did you learn that Mr. | 6  Q.  Did you speak to Mr. Ralston on |
| 7  Ralston's wife and brother were deposed | 7  the telephone the day before yesterday about his |
| 8  yesterday? | 8  lawsuit? |
| 9  A.  How? | 9  A.  Yes. |
| 10  Q.  Yes. | 10  Q.  What did you speak with Mr. |
| 11  A.  Mr. Ralston informed me some weeks | 11  Ralston regarding his lawsuit the day before |
| 12  ago. | 12  yesterday? |
| 13  Q.  Just for the moment sticking with | 13  A.  Simply his feelings and emotions |
| 14  your discussion this morning with Mr. Ralston, | 14  surrounding the upcoming depositions. |
| 15  did he provide any information about the content | 15  Q.  What did Mr. Ralston express to |
| 16  of the testimony about his wife or brother that | 16  you regarding his feelings and emotions about |
| 17  occurred yesterday? | 17  the upcoming depositions when you spoke to him |
| 18  A.  No. | 18  the day before yesterday? |
| 19  Q.  This morning when you spoke to Mr. | 19  A.  Dismay that members of his family |
| 20  Ralston about his lawsuit, did he discuss | 20  had been pulled into this lawsuit. |
| 21  anything else, other than -- well, let me start | 21  Q.  Did Mr. Ralston tell you that he |
| 22  again. | 22  identified the members of his family as |
| 23  What did you discuss with Mr. | 23  witnesses in his lawsuit? |
| 24  Ralston about the testimony by his wife and | 24  A.  No. |

| Page 10 | Page 12 |
|---|---|
| 1  brother when you spoke to Mr. Ralston this | 1  Q.  Did Mr. Ralston tell you that he |
| 2  morning? | 2  identified you as a witness in his lawsuit? |
| 3  A.  Simply that they took place. | 3  A.  I don't recall. |
| 4  Q.  Is there anything else that you | 4  Q.  Are you aware that Mr. Ralston |
| 5  discussed with Mr. Ralston this morning, other | 5  identified you as a witness in his lawsuit? |
| 6  than him thanking you for taking the time to | 6  A.  My difficulty in answering is only |
| 7  appear for a deposition and informing you that | 7  because witness versus this deposition I'm not |
| 8  the deposition of his wife and brother occurred | 8  entirely sure of the difference, whether one |
| 9  yesterday? | 9  means I'm automatically the other. |
| 10  A.  No. | 10  Q.  Are you aware that Mr. Ralston |
| 11  Q.  Prior to this morning, when was | 11  identified you as someone who has information |
| 12  the last time you spoke to Mr. Ralston? | 12  pertaining to the falsity and defamatory impact |
| 13  A.  Yesterday. | 13  of the statements at issue in this lawsuit as |
| 14  Q.  Did you speak to Mr. Ralston on | 14  well as damages slash prior reputation? |
| 15  the telephone yesterday? | 15  A.  Certainly not in that language. |
| 16  A.  Yes. | 16  Q.  Are you aware that Mr. Ralston |
| 17  Q.  What did you discuss with Mr. | 17  identified you to the defendants in his lawsuit |
| 18  Ralston when you spoke with him on the telephone | 18  as someone who has information regarding his |
| 19  yesterday? | 19  claims? |
| 20  A.  That someone had stolen his | 20  A.  Yes. |
| 21  catalytic converters from his car overnight. | 21  Q.  How did you learn that |
| 22  Q.  When you spoke to Mr. Ralston | 22  information? |
| 23  yesterday on the telephone, did you discuss | 23  A.  Mr. Ralston communicated that to |
| 24  anything regarding his lawsuit? | 24  me by phone. |



CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021

13–16

Page 13

1    Q.    When did Mr. Ralston communicate
2  that to you by phone?
3    A.    Weeks ago, and it's not possible
4  for me to be even close to specifics.
5    Q.    When you spoke to Mr. Ralston the
6  day before yesterday regarding his lawsuit, did
7  you discuss anything else other than his
8  feelings and emotions regarding the deposition
9  of his family members?
10    A.    We spoke about many other things.
11    Q.    About Mr. Ralston's lawsuit?
12    A.    No.
13    Q.    When you spoke to Mr. Ralston the
14  day before yesterday, did you discuss anything
15  about his lawsuit other than his feelings and
16  emotions regarding the depositions of his family
17  members?
18    A.    No.
19    Q.    Prior to the day before yesterday,
20  when was the last time you spoke to Mr. Ralston
21  regarding his lawsuit?
22    A.    Two days before yesterday.
23    Q.    You spoke to Mr. Ralston again on
24  the telephone two days before yesterday

Page 14

1  regarding his lawsuit?
2    A.    Yes.  To be clear, every time I
3  say I spoke with him, that would be by phone.
4    Q.    Have you ever had an e-mail
5  communication or text message, anything in
6  writing with Mr. Ralston regarding the lawsuit?
7    A.    Yes.
8    Q.    What type of written
9  communication, e-mail, text message?
10    A.    Text.
11    Q.    How many text messages have you
12  had with Mr. Ralston regarding his lawsuit?
13    A.    Many.
14    Q.    Do you still have your text
15  messages with Mr. Ralston regarding the lawsuit?
16    A.    I'm not sure.  I'm not sure how
17  far back any of my text messages go.
18    Q.    When did you first have text
19  messages with Mr. Ralston regarding his lawsuit?
20    A.    Presumably, when he initiated the
21  lawsuit.
22    Q.    Do you know when Mr. Ralston
23  initiated the lawsuit?
24    A.    I don't.

Page 15

1    Q.    When was the last time you had a
2  text message with Mr. Ralston regarding the
3  lawsuit?
4    A.    Yesterday, perhaps.  I'm not
5  positive.
6    Q.    Have you had text messages with
7  Mr. Ralston regularly between the time when he
8  commenced the lawsuit and yesterday?
9    A.    Yes.
10    Q.    Are you able to summarize,
11  generally, the type of information that you and
12  Mr. Ralston have communicated with each other
13  over text message regarding Mr. Ralston's
14  lawsuit?
15    A.    A majority have simply, directly
16  or indirectly, involved what an extraordinarily
17  difficult time this has been for him, and when
18  we would have a chance to speak again.
19    Q.    Did you ever have e-mails with Mr.
20  Ralston regarding his lawsuit?
21    A.    I don't recall.
22    Q.    Do you keep your e-mails so that
23  you would be able to look at your e-mail to tell
24  whether you had e-mails with Mr. Ralston

Page 16

1  regarding his lawsuit?
2    A.    Yes.  However, I have had at least
3  three e-mail addresses, and they were my only
4  e-mail addresses over the last ten years.
5    Q.    Do you still have access to the
6  three e-mail addresses you have in mind?
7    A.    Only one, my present.  My current
8  e-mail address.
9    Q.    When did you start using your
10  current e-mail address?
11    A.    July 1st, 2020.
12    Q.    What e-mail address is that?
13    A.    It is champlainrover@gmail.com.
14    Q.    What e-mail address did you use
15  before July 1st, 2020?
16    A.    I believe it was
17  chopkins@sca-school.org.
18    Q.    When did you start using the
19  chopkins@sca-school.org e-mail address?
20    A.    7-1-19.
21    Q.    What e-mail address did you use
22  before July 1st, 2019?
23    A.    chopkins@mci-school.org.  I need
24  to correct the second, the sca one.  I just



CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
17–20

Page 17

1  realized I had it wrong.  So, I'll need to go
2  back and correct that.
3      Q.    Okay.  Why don't you do that now.
4      A.    Okay.  I believe it was
5  chopkins@springfieldca-school.org, but I'm not
6  sure.
7      Q.    When did you start using this
8  chopkins@mci-school.org e-mail address?
9      A.    Seven -- oh, wait a minute.  Which
10  one?  I'm sorry.
11      Q.    The mci-school.org, the one prior
12  to the springfieldca-school.org.
13      A.    7-1-97.
14      Q.    Do you still have access to your
15  e-mail --
16      A.    I'm sorry.  Starting seven --
17  excuse me.  The mci one I would have started
18  July 1st, 2008.
19      Q.    Are you looking at something on
20  your screen as for reference?
21      A.    Yes.
22      Q.    What are you looking at?
23      A.    All I wrote down was the years
24  that I overlapped at the Hill School with Mr.

Page 18

1  Ralston as a colleague.
2      Q.    Okay.  So you --
3      A.    Each of these e-mail addresses are
4  attached to my employment at schools, and the
5  contracts begin on 7-1 and end 6-30.
6      Q.    All right.  Do you have notes that
7  you're looking at?
8      A.    Just that.
9      Q.    I'm sorry.  I don't understand.
10  Do you have handwritten notes that you wrote
11  your years of employment?
12      A.    Yes.  I wrote Hill School, 1997 to
13  2008.
14      Q.    Just for clarification.  Are these
15  actual notes you wrote in handwriting or did you
16  type it on a computer?
17      A.    Handwritten.
18      Q.    Okay.  So, what else did you write
19  on your notes that you're looking at?
20      A.    That's it.
21      Q.    Do you have any other notes or
22  documents --
23      A.    No.
24      Q.    -- on your computer that you're

Page 19

1  looking at?
2      A.    No.
3      Q.    Just going forward, if you feel
4  the need that you need to look at something on
5  your computer or a piece of paper on your desk
6  or something like that, can you just let me
7  know?
8          Do you still have access to your
9  chopkins@mci-school.org e-mail address?
10      A.    No.
11      Q.    Do you still have access to the
12  chopkins@springfieldca-school.org e-mail
13  address?  I realize you're not one hundred
14  percent on the e-mail address, but I just want
15  to know if you have access to that e-mail
16  address no matter what it was?
17      A.    No.
18      Q.    So, you would have no way to
19  determine whether you had e-mails with Mr.
20  Ralston regarding his lawsuit prior to July 1,
21  2020; is that right?
22      A.    Correct.
23      Q.    Do you still have access to your
24  e-mail at the champlainrover@gmail.com e-mail

Page 20

1  address?
2      A.    Yes.
3      Q.    Any other type of written
4  communications with Mr. Ralston regarding the
5  lawsuit, other than text message and e-mail?
6      A.    No.
7      Q.    Has Mr. Ralston provided you with
8  any materials from his lawsuit, like the
9  complaint or anything like that?
10      A.    No.
11      Q.    What did you discuss with Mr.
12  Ralston when you spoke to him on the telephone
13  two days before yesterday regarding his lawsuit?
14      A.    I don't recall specifically.
15      Q.    When did you first have telephone
16  contact with Mr. Ralston regarding his lawsuit?
17      A.    I don't recall.
18      Q.    Have you had regular telephone
19  contact with Mr. Ralston regarding his lawsuit?
20      A.    Yes.
21      Q.    When did you start having regular
22  telephone contact with Mr. Ralston regarding his
23  lawsuit?
24      A.    I can only presume, as I said

CHRISTOPHER HOPKINS                              September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                        21–24

Page 21

1   before, that it was when he filed the lawsuit.
2       Q.      So, you've had regular telephone
3   contact with Mr. Ralston during this year 2021,
4   regarding his lawsuit; is that correct?
5       A.      Yes.
6       Q.      And, you had regular telephone
7   contact with Mr. Ralston regarding his lawsuit
8   during 2020; is that correct?
9       A.      Yes.
10      Q.      You had regular contact with Mr.
11  Ralston regarding his lawsuit, at least for some
12  portion of 2019; is that correct?
13      A.      If you say for part of, because
14  that is the year he filed it, then, yes.
15      Q.      I realize you've given me some
16  information regarding your, at least, telephone
17  communications with Mr. Ralston, but could you,
18  otherwise, just give me a general summary of the
19  type of information that you and Mr. Ralston
20  have communicated with each other over the
21  telephone regarding his lawsuit?
22      A.      It has consisted entirely of my
23  trying to be as emotionally supportive as I can.
24      Q.      Emotionally supportive of Mr.

Page 22

1   Ralston in his pursuit of his lawsuit?
2       A.      Amongst other things, yes.
3       Q.      Well, what are the other things?
4       A.      Can you ask more specific
5   questions, please?
6       Q.      Well, you said that you are being
7   emotionally supportive as it relates to his
8   pursuit of a lawsuit, amongst other things.  I
9   just want to know what you had in mind when you
10  said amongst other things.  If I misheard or
11  misunderstood it, please just correct me, but
12  that's what I'm asking about.
13      A.      The question I find
14  oversimplified, because the discussions were
15  about the lawsuit, but they were about what the
16  original accusations have done to his name,
17  reputation and emotions.  Accusations toward
18  him, not his lawsuit, to be clear.
19      Q.      So, is it a fair characterization
20  to say that, perhaps, the lawsuit was the reason
21  for what prompted the communication, but the
22  communications also discussed the impact of the
23  accusations on him, is that where you're getting
24  at?

Page 23

1           MR. JUBB:  I would object to the
2   form.
3       Q.      So, your point is that your
4   communications just haven't been specifically
5   about the lawsuit.  They've also included
6   communications about the accusations against
7   him, or at least the impact of the accusations
8   against him; is that right?
9       A.      Yes.
10      Q.      What's your understanding of Mr.
11  Ralston's lawsuit?
12      A.      That he is suing an attorney and
13  an accuser over defamatory and grossly
14  inaccurate and unfounded claims of sexual abuse
15  by a former student, I believe, over 25 years
16  ago.
17      Q.      And, where did you get that
18  understanding of Mr. Ralston's lawsuit?  Is that
19  something he told you, someone else provided you
20  or told you?
21      A.      What understanding?
22      Q.      That Mr. Ralston is suing an
23  attorney and an accuser over defamatory and
24  grossly inaccurate and unfounded claims of

Page 24

1   sexual abuse by a former student over 25 years
2   ago.  That's your understanding, right?
3       A.      Yes.
4       Q.      I mean, I wrote it down pretty
5   much verbatim I think, right?  So, I want to
6   know where you got that understanding.
7       A.      Mr. Ralston told me.
8       Q.      Other than Mr. Ralston, have you
9   spoken to anyone regarding Mr. Ralston's
10  lawsuit?  I mean, obviously, other than today
11  during your testimony, because we're talking
12  about it.  But, outside of today and during your
13  testimony right now after you've been sworn in,
14  have you spoken to anyone else regarding Mr.
15  Ralston's lawsuit?
16      A.      Yes.
17      Q.      Who else have you spoken to
18  regarding Mr. Ralston's lawsuit?
19      A.      My parents and one of my brothers,
20  and a few friends and former colleagues.  Aside
21  from a brief conversation with Mr. Jubb
22  yesterday, no.
23      Q.      What did you discuss with Mr. Jubb
24  yesterday?

CHRISTOPHER HOPKINS                          September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                    25–28

Page 25

1    A.    The procedural nature of this
2  exercise today.
3    Q.    What did you learn regarding the
4  procedural nature of the exercise today from Mr.
5  Jubb when you spoke to him yesterday?
6    A.    I wanted to know how many people I
7  would be meeting with, and who they would be,
8  and basically what a deposition is.  I was
9  confident that I knew the answer and did not
10  learn anything that I wasn't aware of.  But,
11  that was the entirety of the conversation.
12    Q.    Did you speak with Mr. Jubb
13  regarding the substance of Mr. Ralston's claims
14  in the action or anything --
15    A.    No.
16    Q.    -- other than the procedural
17  nature of the deposition?
18    A.    No.
19    Q.    Did you have a telephone
20  communication with Mr. Jubb yesterday?
21    A.    Yes.
22    Q.    How long was your telephone
23  communication with Mr. Jubb?
24    A.    Five to ten minutes at most.  And

Page 26

1  I actually spoke to him twice, because once we
2  hung up I realized I had not -- the rescheduling
3  time had not -- I had not found out for sure
4  whether it was at 10:00 today.  So, I called him
5  back to say, "Is it on at 10 tomorrow?"  And he
6  said, "Yes."  And that was it.
7    Q.    I apologize for that.  We
8  scheduled it to accommodate someone who didn't
9  come today.  So, sorry to have to change your
10  schedule.
11          Have you had any other
12  communications with Mr. Jubb or anyone else with
13  Mr. Jubb's office or the Beasley firm regarding
14  Mr. Ralston or Mr. Ralston's lawsuit, like ever?
15    A.    Mr. Jubb and I had a conversation,
16  I believe, only one several weeks ago.  Maybe
17  not several weeks ago, but when I found out I
18  was going to be deposed, we spoke briefly and
19  the content of that was, we can speak again
20  before your deposition if you'd like to get some
21  details about what a deposition involves.
22    Q.    That was the telephone
23  communication you had with Mr. Jubb?
24    A.    Yes.

Page 27

1    Q.    How long was that telephone
2  communication with Mr. Jubb?
3    A.    Once again, five minutes.
4    Q.    What else did you discuss with Mr.
5  Jubb, other than learning that you can speak to
6  him again at a later time before your
7  deposition?
8    A.    That was it.  That was all.
9    Q.    Any other time you've spoken to or
10  communicated, even in written format, with Mr.
11  Jubb or someone from the Beasley firm regarding
12  Mr. Ralston and Mr. Ralston's lawsuit?
13    A.    Not that I recall.  I have not
14  spoken to anybody else from the Beasley firm.
15    Q.    So, Mr. Ralston, your parents, one
16  of your brothers, a few friends and former
17  colleagues and the few communications with Mr.
18  Jubb.  Is that the full list of people that
19  you've spoken to regarding Mr. Ralston's
20  lawsuit?
21    A.    Yes.
22    Q.    Did you tell your parents about
23  Mr. Ralston's lawsuit?
24    A.    Yes.

Page 28

1    Q.    Why did you tell your parents
2  about Mr. Ralston's lawsuit?
3    A.    Because they're aware of my
4  friendship with him.  They have met him once
5  before a very long time ago, and I wanted them
6  to be aware what he was going through, and that
7  it was upsetting to me as well.
8    Q.    Did your parents already know, or
9  were you the source of information?
10    A.    I was the source of information.
11    Q.    Did you communicate with your
12  parents regarding Mr. Ralston's lawsuit or the
13  accusations, both or something else?
14    A.    The first conversation would have
15  been about the accusations.
16    Q.    So, you told your parents about
17  the accusations, and then you told your parents
18  about the lawsuit; is that right?
19    A.    Correct.
20    Q.    Do your parents know Mr. Ralston?
21    A.    They've, as I said, met him once,
22  I believe.
23    Q.    Did your parents have a reaction
24  to the information that you communicated to them



CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
29–32

Page 29

1  about, let's just start with the accusations
2  against Mr. Ralston?
3      A.    Of course, yes.
4      Q.    Did your parents believe the
5  accusations that you relayed to them?
6      A.    No.
7      Q.    You identified one of your
8  brothers.  Do you want to tell me that brother's
9  name so I can use that in my questions?
10     A.    Yes.  Matthew Hopkins.
11     Q.    Did you tell Matthew Hopkins
12 regarding the accusations against Mr. Ralston?
13     A.    No.
14     Q.    Did you tell Matthew Hopkins
15 regarding the lawsuit by Mr. Ralston?
16     A.    When I finally did talk with him
17 it was about the lawsuit and the reason for it.
18     Q.    Does Matthew Hopkins know Mr.
19 Ralston?
20     A.    No.
21     Q.    Why did you discuss with your
22 brother, Matthew Hopkins, the lawsuit by Mr.
23 Ralston?
24     A.    Because my brother and I are very

Page 30

1  close and supportive of one another.
2      Q.    Did your brother already know
3  about the accusations or the lawsuit?  I'm just
4  trying to --
5      A.    No.
6      Q.    So, you told your brother about
7  the lawsuit by Mr. Ralston to be supportive of
8  you, like in your testimony of supporting Mr.
9  Ralston?
10     A.    Yes.  Supportive of me.
11     Q.    And, you may have already answered
12 this, but your brother Matthew Hopkins, he
13 doesn't know Mr. Ralston; is that right?
14     A.    Correct.
15     Q.    You said a few friends and former
16 colleagues.  So, let's start with the friends.
17 Did you tell your friends about the accusations
18 against Mr. Ralston or just the lawsuit or a
19 combination?
20     A.    A combination.
21     Q.    Do any of the friends that you
22 told about the accusations or the lawsuit by Mr.
23 Ralston know Mr. Ralston?
24     A.    No.

Page 31

1      Q.    Did you tell your friends about
2  the accusations or the lawsuit by Mr. Ralston
3  for the same reason that you told your brother
4  to be supportive of you?
5      A.    No.
6      Q.    Why did you tell your friends
7  about the accusations and/or the lawsuit by Mr.
8  Ralston?
9      A.    The topic would come up in
10 discussions about injustice and, for instance,
11 dishonesty within the government.  Some of the
12 appalling things that are happening in the
13 world.
14     Q.    So, the context in which you
15 discussed the accusations against Mr. Ralston
16 and Mr. Ralston's lawsuit with the friends was
17 to express that the accusations were false; is
18 that right?
19     A.    Partly.
20     Q.    What was the other part of it,
21 that that was an injustice?
22     A.    Yes.
23     Q.    So, it's not the case that your
24 discussions with your friends related to

Page 32

1  somebody believing that Mr. Ralston had
2  committed the acts about which he was accused.
3  It was dismay or some concern that the
4  accusations were untrue, and that was an
5  injustice; is that right?
6      A.    Discussions about how individuals
7  and groups of people can face persecution and
8  trials, but in that case I'm using the word not
9  in a legal sense, for reasons having nothing to
10 do with their own actions.
11     Q.    The discussions that you had with
12 your brother Matthew Hopkins regarding the
13 lawsuit in support of you, the context of that
14 was that the accusations were not true against
15 Mr. Ralston; is that right?
16     A.    No.  It was simply telling him
17 that it was happening.
18     Q.    Did you tell your brother that the
19 accusations were true?
20     A.    I didn't discuss that subject.  I
21 simply told him what was going on, and that's
22 life.
23     Q.    Do you believe that --
24     A.    Mr. Ralston's life.



Page 33

1    Q.    Thank you for clarifying this.  Do
2  you believe the accusations against Mr. Ralston,
3  that were made against Mr. Ralston?
4    A.    No.
5    Q.    So, you didn't tell your brother
6  that you believed the accusations against Mr.
7  Ralston; is that correct?
8    A.    No.
9    Q.    You mentioned that you spoke to
10  former colleagues.  Did you speak to your former
11  colleagues regarding the accusations, the
12  lawsuit by Mr. Ralston or a combination?
13    A.    A combination.
14    Q.    Do any of the former colleagues
15  that you spoke with know Mr. Ralston?
16    A.    No.
17    Q.    Why did you speak with your former
18  colleagues regarding the accusations and a
19  lawsuit by Mr. Ralston?
20    A.    Many of the colleagues are in
21  education, and for the same reason I spoke to --
22  it was a discussion about, as I said earlier,
23  how that individual or groups of people can find
24  themselves in some sort of peril that is

Page 34

1  unwarranted and not the result of any actions or
2  inactions on their part.
3    Q.    So, the content of your
4  communications or the purpose of your
5  communications with your former colleagues about
6  the accusations or the lawsuit by Mr. Ralston is
7  similar to the content and purpose of your
8  communication with your friends; is that right?
9    A.    Yes.
10    Q.    So, the context of the
11  communications you had with your former
12  colleagues was the accusations against Mr.
13  Ralston were not true; is that correct?
14    A.    Not explicitly, but implicitly.
15    Q.    How did you learn about the
16  accusations against Mr. Ralston?
17    A.    He informed me at some point
18  shortly after they were made.
19    Q.    How did Mr. Ralston inform you of
20  the accusations against him?
21    A.    By phone.
22    Q.    What did Mr. Ralston tell you when
23  he communicated with you by phone about the
24  accusations that were made against him?

Page 35

1    A.    He said that a letter had arrived
2  at the Hill School outlining numerous
3  allegations involving a former student.
4    Q.    Can you please tell me your
5  relationship with Mr. Ralston.
6    A.    He and I were colleagues at the
7  Hill School.  I'm going back to my notes again.
8  From 1997 to 2008.
9    Q.    Well, those notes look like they
10  have a little more than dates on them.
11    A.    Pertaining to this discussion, no.
12  It's just the Hill School, '97 to 2008.
13    Q.    Okay.  Would you mind just holding
14  the notes up to the screen.
15    A.    Okay.
16    Q.    In addition to the penguin, right?
17    A.    Yeah.  But my name is not Sidney
18  Crosby, it's Bobby Orr.  Just a joke.
19    Q.    Okay.  Thank you for pointing it
20  out that you're referencing your notes to
21  remember the date; is that right?
22    A.    There's a reason I majored in
23  English.
24    Q.    I'm the same way.  So, you were a

Page 36

1  colleague with Mr. Ralston from 1997, did you
2  say?
3    A.    To 2008.
4    Q.    So, the first time you met Mr.
5  Ralston was in 1997?
6    A.    Yes.
7    Q.    And, what was your position at the
8  Hill School in 1997, when you first met Mr.
9  Ralston?
10    A.    Dean of Students.
11    Q.    Did you hold any other position,
12  other than Dean of Students at the Hill School?
13    A.    Boys JV hockey coach, and boys JV
14  lacrosse coach.
15    Q.    Did you have any supervisory
16  authority or anything like that over Mr.
17  Ralston's work when you were colleagues at the
18  Hill School?
19    A.    For many years, no.  For some
20  years, yes.
21    Q.    And what years did you have
22  supervisory authority over Mr. Ralston's work
23  when you were at the Hill School?
24    A.    When he was not a senior

CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
37–40

Page 37

1  administrator.
2      Q.    Was that early 1997, later in the
3  range to 2008, can you place it a little bit
4  more, because I have no idea when Mr. Ralston
5  was not a senior administrator?
6      A.    Not accurately.  When I arrived he
7  was director of studies.  He happily went back
8  to being a full time teacher-coach dorm parent.
9  But, then because of the tremendous respect and
10  trust that, not only students but adults had, he
11  was named Dean of Faculty one, two or three
12  years before I moved on to my next position.  I
13  don't recall how many years.
14      Q.    Okay.  So, let me just make sure
15  if I understand this correctly.  So, when you
16  started at the Hill School in 1997, Mr. Ralston
17  was the director of studies and at some time he
18  became a full time teacher, and then at some
19  time, one, two or three years before you left
20  the Hill School in 2008, Mr. Ralston became Dean
21  of Faculty, at least as you recall it; is that
22  right?
23      A.    That is as I recall it.
24      Q.    And so, the time when Mr. Ralston

Page 38

1  was a full time teacher, that's when you had
2  supervisory authority over Mr. Ralston's work;
3  is that right?
4      A.    It was actually, hypothetically,
5  during his time as a dorm parent, and I'm now
6  realizing that he was a dorm parent up until one
7  or two years before I departed.  So,
8  specifically as a dorm parent, hypothetically, I
9  oversaw the pastoral side of the school and,
10  therefore, in that one specific area, I had
11  supervisory responsibilities over him.
12      Q.    Is there any other capacity,
13  other than Mr. Ralston's role as a dorm parent,
14  that you had supervisory capacity over Mr.
15  Ralston's work while you were at the Hill
16  School?
17      A.    He was my assistant of JV boys
18  lacrosse coach for seven years, I believe.
19      Q.    All right.  Any other capacities
20  in which you had supervisory authority over the
21  work of Mr. Ralston, other than Mr. Ralston's
22  work as assistant JV lacrosse coach as a dorm
23  parent?
24      A.    No.

Page 39

1      Q.    Did you ever have occasion to
2  observe Mr. Ralston interacting with students
3  while you were at the Hill School?
4      A.    Yes.
5      Q.    How would you characterize Mr.
6  Ralston's interactions with students that you
7  observed when you were at the Hill School?
8      A.    Caring, demanding, supportive,
9  empathetic, skilled at teaching and mentoring
10  students.
11      Q.    Did you ever receive any
12  complaints from any students about Mr. Ralston
13  during your time at the Hill School?
14      A.    No.
15      Q.    Did you ever receive any
16  complaints from anyone, if not a student,
17  regarding Mr. Ralston during your time at the
18  Hill School?
19      A.    My hesitation is not because I am
20  in a tight knit community like the Hill, it's
21  very unusual for anyone, including myself not to
22  irritate others at time.  So, while I can't
23  recall anything specific, I am sure that I heard
24  a student walking by muttering that he or she

Page 40

1  received a low grade on a math quiz.  That's the
2  best answer I can give.  There's nothing
3  concrete.  It's specific.
4      Q.    Okay.  So, you didn't receive any
5  complaints from students or otherwise, a faculty
6  member --
7      A.    No.
8      Q.    -- or a staff member, regarding
9  Mr. Ralston's conduct as a teacher or directed
10  to a student; is that right?
11      A.    No, no, absolutely not.
12      Q.    But, I think you're trying to give
13  a precise answer, making the point that at times
14  a student may have grumbled about Mr. Ralston
15  but not in the sense that it required
16  disciplinary or some type of employment review;
17  is that right?
18      A.    All in the natural flow of things
19  in a school.
20      Q.    And it seems like you maintained a
21  relationship with Mr. Ralston after you left the
22  Hill School; is that right?
23      A.    Correct.
24      Q.    Did you otherwise work, or were



CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
41–44

Page 41

1  you otherwise employed at the same place as Mr.
2  Ralston, other than at the Hill School?
3      A.    We were not.
4      Q.    So, you've just been friends with Mr.
5  Ralston since 2008?
6      A.    Yes.
7      Q.    Have you continuously been friends
8  with Mr. Ralston since 2008?
9      A.    Yes.
10     Q.    Do you know the student that
11  accused Mr. Ralston?
12     A.    I do not.
13     Q.    Do you know Curtis Poulos?
14     A.    I do not.
15     Q.    Do you know Mitchell Garabedian?
16     A.    No.
17     Q.    When did you first meet Mr. Jubb?
18     A.    He was a student at the Hill.  I
19  don't recall those years.  That's the date --
20  perhaps, the second date I should have written
21  down.  He was my advisee, and played on my JV
22  lacrosse team.
23     Q.    So, Mr. Jubb was a student at the
24  Hill School when you worked at the Hill School

Page 42

1  and was your advisee and on the JV lacrosse team
2  that you coached; is that right?
3      A.    Correct.
4      Q.    Did you keep in contact with Mr.
5  Jubb after he graduated from the Hill School?
6      A.    No.
7      Q.    So, the next time you had contact
8  with Mr. Jubb after he graduated the Hill School
9  was a few weeks ago in connection with this
10  lawsuit?
11     A.    Correct.
12     Q.    Okay.  I'm going to ask if we
13  could return to your communication on the phone
14  with Mr. Ralston when he told you about the
15  accusations that have been made against him.
16  You said that he communicated to you that a
17  letter had arrived at the Hill School outlining
18  numerous accusations by a former student; is
19  that right?
20     A.    Correct.
21     Q.    Did Mr. Ralston tell you anything
22  else over the telephone about the accusations
23  that had been made against him during your first
24  communication?

Page 43

1      A.    No.
2      Q.    Did Mr. Ralston tell you the
3  nature of the accusations?
4      A.    He was not specific.
5      Q.    What did he tell you about the
6  accusations?
7      A.    He emotionally described being
8  accused of appalling, inconceivable acts and
9  behavior.
10     Q.    Did Mr. Ralston provide to you the
11  information regarding the nature of the acts of
12  behavior?
13     A.    No, not specifically.
14     Q.    Well, what did you think the
15  accusations were, based on what Mr. Ralston told
16  you during the first telephone call?
17     A.    I didn't know what to think for
18  sure.  I hoped that what I was imagining was not
19  true, that the accusations were simply about
20  inequitable treatment and had nothing to do with
21  anything physical or sexual.  I just listened
22  and did not answer any details.
23     Q.    Okay.  So, when you were just
24  listening, your thought was that Mr. Ralston was

Page 44

1  telling you he had been accused of sexual abuse
2  of a student, a former student, but you were
3  hoping that that wasn't the case; is that right?
4      A.    No, that's not what I said.
5      Q.    Okay.
6      A.    He was not specific about what the
7  accusations were.  I hoped that they were not of
8  a physical and sexual nature.
9      Q.    When did you learn the nature of
10  the accusations?
11     A.    I don't recall.
12     Q.    Was it close in time to when you
13  learned that the accusations had, in fact, first
14  been made?
15     A.    Define close in time.
16     Q.    Well, let's do it this way.  At
17  some point in time you learned that a student
18  was accusing Mr. Ralston of sexual abuse; is
19  that right?
20     A.    Yes.
21     Q.    When did you learn that?
22     A.    I don't recall.
23     Q.    Was it close to when you had the
24  first contact with Mr. Ralston about the



CHRISTOPHER HOPKINS                                  September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                           45–48

Page 45

1  accusations, like days, weeks, months?
2       A.      Perhaps months, but not earlier
3  than that.
4       Q.      So, there was a period of time
5  when you knew that a student had accused Mr.
6  Ralston of doing something but you didn't know
7  what?
8       A.      Technically, yes.
9       Q.      Again, let's just stick with the
10  first communication by Mr. Ralston about the
11  accusations, which you say was via phone.  Did
12  Mr. Ralston give you any type of information
13  that gave you any idea about the nature of the
14  allegations?
15       A.      I don't believe he was specific.
16  I don't believe he could be specific, because he
17  was so sickened he couldn't even bring himself
18  to be specific.
19       Q.      What was your take away from your
20  friend who was very emotional and sickened about
21  what he had been accused of?
22       A.      Complete disbelief that any
23  accusation of any sort would be made.
24       Q.      Did you understand that there was

Page 46

1  an accusation of some type of abuse?
2       A.      I don't recall when Mr. Ralston
3  finally made it specific that that was the
4  nature of the accusations.
5       Q.      Okay.
6       A.      I let him decide when and what he
7  wanted to speak specifically about.
8       Q.      Okay.  So, as far as you're
9  concerned, when you were listening during the
10  first telephone call, you didn't care like what
11  the actual accusation was, you simply didn't
12  believe any accusation against Mr. Ralston from
13  a student; is that right?
14       MR. JUBB:  Objection to the form.
15       You can answer.
16       A.      Before Mr. Jubb spoke up, I was
17  going to say I don't -- I don't know how to
18  answer that question.
19       Q.      Well, I'm just trying to
20  understand.  You get a telephone call from your
21  friend who is emotional and sickened and tells
22  you that there had been a letter sent to the
23  Hill School or that arrived at the Hill School
24  outlining accusations by a former student.  And

Page 47

1  what did you understand that he was
2  communicating to you that he had been accused
3  of?  I realize you're trying to be precise and
4  explain he didn't give you the detail or you
5  don't remember getting the detail, but what did
6  he tell you?  What was your take away?
7       A.      I feel like I've already answered
8  that.  I had been an administrator for a long
9  time and have had many, many people come and
10  speak with me about tragedies and challenges in
11  their lives, and I have learned to listen and
12  not to force the person in any direction he or
13  she does not want to go, because they just need
14  your presence and your ear, and that's what I
15  gave him.
16       Q.      Did you receive enough information
17  from Mr. Ralston to form an opinion about the
18  truth or falsity of the accusations that he was
19  telling you had been made?
20       A.      At one point he said that, and
21  it's important for me to say that this was long
22  before I arrived at the Hill School, and there
23  were a lot of physical plant changes before I
24  arrived and during my time there, but I remember

Page 48

1  him saying that the specifics of many of the
2  allegations were in regards even to the physical
3  space in which they took place were completely
4  inaccurate and impossible.
5       Q.      So, you understood, based on that
6  information that some type of physical contact
7  was the accusation or included in the accusation
8  that Mr. Ralston was letting you know that the
9  physical space, the location where the physical
10  activity he was accused of occurred was
11  impossible because of the attributes of the
12  specific location, is that what you're saying?
13       A.      The details given within the
14  content of the letter, whatever those specifics
15  were about the physical space or spaces, were
16  quite literally structurally inaccurate.
17       Q.      That's the details given within
18  the content of the letter about the physical
19  space, that's information that Mr. Ralston told
20  you in your communication, correct?
21       A.      Yes.
22       Q.      Because you wouldn't know, one way
23  or another, because that was your point, right,
24  that the structures were different prior to your



Page 49

1  arrival in 1997, but Mr. Ralston was letting you
2  know that based on his reading of the content of
3  the letter and the prior physical structure of
4  the locations, it wasn't possible; is that
5  right?
6      A.    I didn't know what the letter
7  contained.  I didn't know what the particular
8  areas looked like at the time.  So, yes, he was
9  telling me -- he wasn't telling me what the
10  specifics were, but he was telling me of the
11  actions he was accused of.  He was saying the
12  space that was described in which the assaults
13  took place was inaccurate, impossible.
14      Q.    Did he tell you at the time that
15  he was accused of assaults?
16      A.    No.
17      Q.    But, you understood, based on the
18  information that Mr. Ralston was providing to
19  you that he was accused of some type of physical
20  contact with the student as compared to, for
21  example, falsifying a record or something of
22  that nature; is that correct?
23      A.    By that time I had heard enough to
24  feel as confident as I could be that the charges

Page 50

1  were specifically -- excuse me.  The letter
2  specifically outlined physical, sexual abusive
3  actions.
4      Q.    And, did you believe the
5  accusations?
6      A.    No.
7      Q.    Is there any doubt in your mind
8  about whether Mr. Ralston engaged in sexually
9  abusive actions with the former student?
10      A.    There is no doubt in my mind that
11  he did not engage in anything at all related to
12  those allegations.
13      Q.    That was your immediate and
14  consistent and has always been your view of the
15  accusations; is that correct?
16      A.    Remembering the evolution of my
17  understanding over time of what the letter
18  contained, the answer is, yes.  If you need me
19  to restate that, if that was confusing I will be
20  happy to do so, but I hope you followed what
21  I've been saying enough to understand that
22  answer.
23      Q.    Oh, I understand.  I'm just trying
24  to confirm that you never wavered in your view

Page 51

1  that the accusations were false?
2      A.    Not at all.
3      Q.    So, I think you're trying to be
4  clear about it is that you learned information a
5  little bit at a time, but every bit of
6  information you learned there was never a time
7  when you believed the accusations against Mr.
8  Ralston to be true; is that correct?
9      A.    Correct.
10      Q.    Did Mr. Ralston provide to you the
11  letter after you spoke with him on the phone?
12      A.    No.
13      Q.    Did you ever see the letter?
14      A.    Have I ever seen the letter?  He
15  has never referred to it even in a summary in
16  regards to what it contains regarding the
17  specifics.
18      Q.    Did you learn about any other
19  accusations against Mr. Ralston, other than the
20  letter outlining accusations that you told us
21  about?
22      A.    No.
23      Q.    Was there more than one letter,
24  you don't know or --

Page 52

1      A.    It was relatively recently within
2  the last four or five months where I mentioned
3  the letter and he said, "The letters plural."  I
4  said, "What?"  He said, "No, there were two."  I
5  said, "If you told me that, Matt, I completely
6  forgot there were two."  And I'm going to need a
7  brief restroom break at some point a good
8  transition time, not an emergency but fairly
9  soon.
10      Q.    Well, this is fine.  I'll just
11  pick up my questions.
12      A.    Okay.
13          MS. DOUGHERTY:  Is coming back at
14      11:30 okay, or do you need more time
15      than that?  Whatever you need?
16          THE WITNESS:  I need at the most
17      seven minutes.
18          MS. DOUGHERTY:  It's 11:19.  So,
19      why don't we plan to log back in at
20      11:30.  So, in ten minutes.
21          (Whereupon, a short recess was
22          then taken.)
23  BY MS. DOUGHERTY:
24      Q.    So, after you learned that

Page 53

1  accusations had been made against Mr. Ralston,
2  did you have regular contact with Mr. Ralston
3  thereafter about the accusations?
4      A.    Not specifically about the
5  accusations, but about the whole situation and
6  what he was going through.
7      Q.    What did Mr. Ralston communicate
8  to you about the whole situation and what he was
9  going through?
10     A.    I answered that, I believe.
11 Trying successfully to remain strong, despite
12 the sickening, slanderous accusations.
13     Q.    Did Mr. Ralston ever communicate
14 to you whether the school did anything about the
15 letter or the accusations?
16     A.    Define did anything.
17     Q.    Did Mr. Ralston ever tell you that
18 the school performed an investigation, took any
19 adverse employment action against him, anything
20 of that nature?
21     A.    Being placed on paid
22 administrative leave at a place that knows him
23 so well and that he knows so well.  I personally
24 define that as adverse and that his contract was

Page 54

1  not renewed.
2      Q.    So, you learned from Mr. Ralston
3  that at some point that he was placed on paid
4  administrative leave; is that right?
5      A.    Correct.
6      Q.    When did you learn that Mr.
7  Ralston was placed on paid administrative leave?
8      A.    I don't recall the timing of that.
9      Q.    Did you learn that Mr. Ralston was
10 placed on paid administrative leave after he
11 filed his lawsuit?
12     A.    I don't recall the timing of that.
13     Q.    Was there a period -- I'm sorry.
14 Go ahead.
15     A.    Well, I do recall he was
16 encouraged by the school attorney, Tom Reece, to
17 seek private counsel.
18     Q.    So, the first telephone discussion
19 you told us about that you had with Mr. Ralston
20 where he communicated to you accusations had
21 been made against him, he wasn't placed on
22 administrative leave then, at least as far as
23 you know; is that right?
24     A.    No, I'm sure he was not.  If you

Page 55

1  would remind me of how many years ago that first
2  letter arrived at the school.
3      Q.    Sure.  The first letter was in
4  April 2018, and Mr. Ralston's lawsuit was in
5  April 2019.  Commenced in 2019.
6      A.    So, the first letter came four or
7  plus a few months ago.  Is my math correct?
8      Q.    No, like three.
9      A.    You said April 2019?
10     Q.    April 2018, is when the first
11 letter was transmitted.
12     A.    Okay.
13     Q.    And then the lawsuit was commenced
14 in April 2019.  So, a year later.
15     A.    Got it.  That simply helps me --
16 will help me, hopefully, with some of your other
17 questions.  No, he -- repeat the question to
18 make sure I remember it correctly.
19     Q.    Sure.  I'm not sure I remember the
20 specific question, but what I wanted to know is
21 -- I'm not trying to be tricky if I ask
22 something different.
23            I want to know, or at least I
24 think you confirmed that as far as you

Page 56

1  understood it, when Mr. Ralston first
2  communicated with you about the accusations, he
3  had not been put on leave; is that right?
4      A.    To the best of my memory, no.  It
5  was some time after that.
6      Q.    Okay.  So, there was a period of
7  time, I think you said that he was encouraged by
8  the school's attorney, Tom Reece, to retain his
9  own attorney, and then after that that's when
10 you learned from Mr. Ralston he had been put on
11 paid administrative leave; is that right?
12     A.    I don't know the timing between
13 that strong encouragement from Mr. Tom Reece and
14 Matt versus the paid administrative leave
15 timing.  I don't recall.
16     Q.    But, there was at least some
17 period of time between when you learned of the
18 accusations, the letter and when you learned
19 that Mr. Ralston was placed on administrative
20 leave; is that right?
21     A.    Some period of time, yes.
22     Q.    Weeks, months, days, years?
23     A.    I don't recall.
24     Q.    And, you don't remember if you



Page 57

1  learned about the paid administrative leave
2  before or after you learned that Mr. Ralston
3  commenced a lawsuit?
4      A.    To the best of my recollection, he
5  initiated a lawsuit after he was placed on paid
6  administrative leave.
7      Q.    But, your recollection is based on
8  what Mr. Ralston told you, correct?
9      A.    Yes.
10     Q.    So, you're recalling the timeline
11 based on your communications with Mr. Ralston;
12 is that right?
13     A.    I'm doing my best to recall the
14 timeline, and all of this is based on what I was
15 hearing from Mr. Ralston, yes.
16     Q.    So, you didn't have any
17 communications with anyone at the Hill School
18 or any of, you know, your former students from
19 the Hill School or former colleagues from the
20 Hill School or anyone to learn this information,
21 like about the paid leave or the letters or
22 anything.  Everything you learned about the
23 accusations, the lawsuit and whatnot, is all
24 from what Mr. Ralston told you; is that correct?

Page 58

1      A.    Correct.
2      Q.    So, for all you know, Mr. Ralston
3  could have been on paid leave longer or shorter
4  than, you know, when he actually told you he was
5  on paid leave; is that correct?
6      A.    Repeat how you prefaced that
7  question.  For all I know...
8      Q.    Well, let's do it this way.  You
9  didn't get like a text message from Mr. Ralston
10 that said, you know, I got put on paid leave
11 today; is that right?
12     A.    No.  It was -- it would have been
13 a phone call.  A phone conversation.
14     Q.    And, how did you learn -- what was
15 the content of the phone conversation that you
16 had with Mr. Ralston where you learned that he
17 was placed on paid leave?
18     A.    I don't recall anything more than
19 that.
20     Q.    So, you don't recall whether, for
21 example, he called you and said, today I was
22 placed on paid leave or, oh, by the way, I've
23 been on paid leave.  You remember nothing about
24 the time frame that Mr. Ralston may have

Page 59

1  communicated to you about when he was placed on
2  administrative paid leave?
3      A.    I don't, no.
4      Q.    Did Mr. Ralston tell you how he
5  was placed on administrative leave as in did
6  someone tell him, did he receive a writing?  How
7  did he learn?  Did he tell you anything of that
8  nature?
9      A.    I don't know.  I don't recall
10 whether he told me the mode of communication
11 between the Hill School and Matthew Ralston
12 about the paid administrative leave.
13     Q.    And, I think you said that you
14 learned from Mr. Ralston that his contract
15 wasn't renewed; is that right?
16     A.    Yes, correct.
17     Q.    When did you learn from Mr.
18 Ralston that his contract with the Hill School
19 had not been renewed?
20     A.    I do not recall.
21     Q.    And, did you learn via telephone
22 from Mr. Ralston that his contract with the Hill
23 School had not been renewed?
24     A.    Yes.

Page 60

1      Q.    How frequently do you speak on the
2  telephone with Mr. Ralston?
3      A.    Generally, at least once a day.
4  Sometimes more than that, and then sometimes not
5  for several days if he or I are with family or
6  traveling.
7      Q.    And, that frequency of
8  communication, has that been the case for 2021,
9  2020, 2019 and 2018?
10     A.    It was certainly not as frequent
11 when he and I were both working full time at the
12 same time, but it was still fairly regularly.
13     Q.    How about after you learned about
14 the accusations against Mr. Ralston, was that
15 the same frequency?  It sounded like at least
16 once a week, even as much as every day,
17 depending on what was going on in your life and
18 Mr. Ralston's life; is that right?
19     A.    Yes.  Yes.
20     Q.    So, that's the frequency of your
21 telephone contacts with Mr. Ralston since you've
22 learned about the accusations; is that right?
23     A.    And certainly since he was placed
24 on paid administrative leave and was no longer



CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
61—64

Page 61

1 working and had -- therefore, we both had more
2 opportunity to speak rather than the two of us
3 working.
4 Q. Are you currently employed?
5 A. I am not.
6 Q. When was the last time that you
7 worked full time?
8 A. My one year interim headship, head
9 of school position ended 7-1-20. That's when
10 that sca e-mail no longer was available.
11 Q. So, based on your recollection,
12 was Mr. Ralston already on leave at the time
13 when your interim headship ended on July 1st,
14 2020?
15 A. Yes.
16 Q. And so, since July 1st, 2020,
17 you've had more time so that contact between you
18 and Mr. Ralston has been more frequent; is that
19 right?
20 A. Yes. By phone and text, yes.
21 Q. And I think throughout your
22 testimony you paused and tried to do your best
23 with some of the time frames. But, is it the
24 case that you can't place communications at a

Page 62

1 time frame just because you have so much contact
2 with Mr. Ralston and have had so much contact
3 with Mr. Ralston since learning about the
4 accusations?
5 A. No, not since learning about the
6 accusations, but we have been very close
7 friends. We were, particularly, in the last few
8 years of our overlap at the Hill School and we
9 remained in touch very closely since then,
10 though, I believe, we've only seen each other at
11 two conferences, and then one very brief hello
12 when he was driving by where I was visiting
13 family in Ohio.
14 Q. Okay. So, the frequency of your
15 contact with Mr. Ralston, I realize you've
16 explained it, it's increased more recently, but
17 the frequency of your contact has been since
18 2008, when you left the Hill School?
19 A. Yes.
20 Q. As for your difficulty in placing
21 specific communications in a specific timeline
22 or give specific dates is because you've had so
23 much contact with Mr. Ralston it's impossible to
24 do; is that right?

Page 63

1 A. And a combination would have been
2 the fact that I do not have, as some people do,
3 the time, date recall that allows me to be
4 confident in placing exactly when things
5 happened or were said. And, that's in general,
6 not just in regards to this topic.
7 Q. Yes. Some might say that's
8 something that plagues us English majors, right?
9 Anyway. Did Mr. Ralston ever
10 describe to you his relationship with the person
11 who accused him?
12 A. Very -- initially in a very, very
13 minimal way.
14 Q. Okay. You said initially. So,
15 did you receive more information from Mr.
16 Ralston over time about his relationship with
17 the accuser?
18 A. I did.
19 Q. So, what did you learn initially
20 about Mr. Ralston's relationship with his
21 accuser?
22 A. That he did not remember the
23 former student very well.
24 Q. Did he tell you the identity of

Page 64

1 the former student?
2 A. I don't recall. And, it wouldn't
3 have mattered because the student was at Hill
4 long before I was there.
5 Q. So that at some point you learned
6 the time frame in which the conduct that Mr.
7 Ralston was accused of committing occurred; is
8 that right?
9 A. Even that took me a long -- Mr.
10 Ralston has reminded me that this was, as I
11 said, I think earlier over -- I believe over 25
12 years ago. And, as I said, I -- once I hear
13 that, it's gone two days later, that he reminds
14 me that it was that long ago.
15 Q. So, it's not the case that you
16 recognize the accuser's name or anything like
17 that from, I don't know, the Hill School alumni
18 events or something of that nature?
19 A. No. No recognition.
20 Q. I think you said you learned more
21 information regarding Mr. Ralston's relationship
22 with his accuser over time from Mr. Ralston.
23 So, what else did you learn?
24 A. This individual lived in Mr.



Page 65

1  Ralston's dorm for a year.  That given the many,
2  many hundreds if not thousands of students that
3  both of us have taught or coached or been dorm
4  parents for, I believe he had to go confirm that
5  he even had this individual in a class and what
6  classes he might have taught him, but I don't
7  even -- I don't recall any of those details,
8  other than it took him some time to find out
9  that information, or confirm it.
10      Q.    So, Mr. Ralston expressed to you
11  that he didn't recognize the student and had to
12  go look through records that he can confirm
13  whether the student was a student of his; is
14  that right?
15      A.    I think you're -- I'm not sure
16  that's the right -- with all due respect, I
17  don't think that's the right question.  We --
18  teachers remember students.  But, if you were to
19  walk up and ask -- you know, a student will walk
20  up to you and say, do you remember how many
21  years you taught me or you coached me, I would
22  not remember and I wouldn't remember exactly
23  whether they graduated two years ago or eight.
24  So, he was going through the same process.  So,

Page 66

1  hundreds and hundreds and hundreds of students
2  that have come through a school that was about
3  500 students total every year, and could not
4  remember details.
5      Q.    So, Mr. Ralston did not initially
6  recognize this student's name and then --
7      A.    No.  That's not what I'm saying,
8  no.  That's what I meant by he remembered his
9  name.  He remembered what was then a student,
10  but that individual wasn't one that had stood
11  out to him as a student or in any other way
12  enough so that he remembered a great deal.
13      Q.    Okay.  So then Mr. Ralston had to
14  look through some of the school records to
15  basically refresh his recollection about his
16  contact with the accuser; is that right?
17      A.    I believe so, yeah.
18      Q.    Thank you for clarifying.  I
19  understand what you're saying now.
20          Did Mr. Ralston share with you any
21  of the information that he learned about his
22  accuser or just that his process of reviewing
23  information about the accuser?
24      A.    In the very natural human process

Page 67

1  of trying to figure out why -- how or why
2  somebody could possibly make accusations -- when
3  I say make accusations like this, it's
4  inconceivable that you can find any
5  justification for it, but he says the only thing
6  he ever remembers that was of a real contentious
7  nature is that something about the student
8  leaving in a car and coming back, and Matt
9  recognized the car.  Mr. Ralston recognized the
10  car and parked behind it so that he could notify
11  -- I don't recall whether he could talk with a
12  student or notify the dean's office that a
13  student had illegally -- illegally meaning
14  within school rules, transported a vehicle back
15  to school after being specifically told not to.
16      Q.    So, this information about the
17  car, and I'll just call it the car incident.
18  That's information that Mr. Ralston communicated
19  to you that he remembered on his own after
20  reviewing materials about his accuser?
21      A.    No. I think that -- I think he did
22  recall that.  Again, he remembered the boy, the
23  student at the time, and I think he was aware
24  that he taught him.  He wasn't sure what years

Page 68

1  or how often.  He was aware he was in the dorm,
2  but exactly when and what years, but that
3  particular event is the only one where -- that
4  he recalls where this individual -- I talked
5  earlier about individual students can, because
6  they're kids, can blame the teacher for, in this
7  case, I was the dean of students.  I was the
8  person who was in charge of discipline, and I
9  was perceived a particular way because of that.
10  And so, he thought the only negative perception
11  that this individual could have is because of
12  that one single event, because he doesn't
13  remember any other interactions of note.
14      Q.    So, Mr. Ralston couldn't come up
15  with any reason why his accuser would accuse him
16  of sexual abuse, and the only negative
17  interaction Mr. Ralston could remember of this
18  particular student was as it related to the car
19  that you've relayed; is that right?
20      A.    Correct.  Adolescent indignance at
21  being held accountable for violating a school
22  rule.
23      Q.    I think you described it as a
24  natural human process of trying to figure out



Page 69

1  why the accusations were made.  Did you and Mr.
2  Ralston discuss any other reasons the
3  accusations were made during that process of the
4  natural human process of trying to figure it
5  out, other than a car incident?
6      A.    No.  Obviously, the car incident
7  in no way makes any sense, but there's not a
8  single thing during the individual's time at the
9  school that he discussed as being memorable in
10  any significant way.
11     Q.    Okay.  So, during your
12  communications with Mr. Ralston, he expressed to
13  you that could not think of any reason or motive
14  that this student would have to accuse him of
15  sexual abuse; is that right?
16     A.    Correct.
17     Q.    Is there any other information
18  that Mr. Ralston communicated to you about his
19  relationship with his accuser, other than what
20  you've told me already?
21     A.    His relationship at the Hill
22  School, no.
23     Q.    What information has Mr. Ralston
24  told you, other than about his relationship with

Page 70

1  the accuser at the Hill School about his
2  accuser?
3          MR. JUBB:  Object to the question.
4      A.    Nothing that specifically is in
5  regards to the plaintiff.
6      Q.    I don't understand.
7      A.    I believe that Mr. Ralston heard
8  that the plaintiff has had struggles during his
9  adult life.
10     Q.    Okay.  Just to be clear.  Mr.
11  Ralston is the plaintiff, right?  That's why I
12  didn't understand.  So, in this lawsuit you're
13  here testifying about Mr. Ralston commenced the
14  lawsuit, and he's the plaintiff, and then there
15  are defendants.  One is my client, Mitchell
16  Garabedian, the other is Mr. Poulos, who, I
17  realize --
18     A.    Yes.
19     Q.    -- you don't recognize him, but
20  he's the accuser.  So --
21     A.    If I just said plaintiff, I
22  believe that was the first time that I made a
23  mistake.  I meant that Mr. Ralston has indicated
24  that the defendant has had at least emotional,

Page 71

1  if not legal difficulties during his adult life.
2      Q.    Okay.  And by defendant, you're
3  referring to Mr. Poulos, or the accuser, right,
4  not the lawyer; is that right?
5      A.    Correct.
6      Q.    Because you understand, and
7  correct me if I'm wrong -- let me do it this
8  way.  Is it your understanding that Mr. Ralston
9  has sued a lawyer and then the lawyer's client
10  who accused Mr. Ralston --
11     A.    Yes.
12     Q.    -- of sexual conduct, right?
13     A.    Let me be very clear of that, and
14  to make sure that I'm clear.  You are
15  representing only one client, and that's Mr.
16  Poulos.
17     Q.    No.  I represent Mitchell
18  Garabedian, who is the lawyer.  That's the only
19  person I represent.  I do not represent Mr.
20  Poulos, who's the accuser.
21     A.    That's fine, and I apologize for
22  that.
23     Q.    No, that's okay.
24     A.    It wouldn't have changed any of my

Page 72

1  answers, but I -- because I admit, I, at several
2  points, had wanted to ask just a procedural
3  question for confirmation that Matt Ralston is
4  the plaintiff, because this line of questioning,
5  it feels as though he's being portrayed as the
6  defendant.  So, that's been confusing to me, but
7  carry on.
8      Q.    Sure.  You don't have to
9  apologize, because I just need to make sure that
10  we're talking about the same thing, right?  And
11  so, that's why I asked the clarification.  But
12  just so you understand, Mr. Ralston, he's
13  identified in the lawsuit as John Doe, but we
14  all know who he is.  So, we've been using his
15  name, has commenced the lawsuit against a
16  lawyer, Mitchell Garabedian and, you know, his
17  law office.  That's who I represent.  I'm the
18  lawyer for Mitchell Garabedian, and Mitchell
19  Garabedian is a defendant.  And then there's
20  another defendant, Kurtis Poulos, and I do not
21  represent him.  He's not here today.  He was the
22  one who asked for us to reschedule and then
23  didn't come.  Mr. Poulos used to be my client's
24  client.  So, you have the lawyer, Mitchell



Page 73
1  Garabedian and Mr. Poulos who's not here, and
2  doesn't have a lawyer here for him today.  And
3  Mr. Jubb is Mr. Ralson's lawyer, which I think
4  you already know that.
5       A.    And I was aware of that.  This
6  line of questioning, I think, has confused me to
7  the point where I have felt as though you're the
8  Poulos defense attorney, and I think that's what
9  happened.  So, as I said, carry on.
10      Q.    Sure.  Learning what you know
11 about the falsity, or Mr. Ralston's contention
12 about the falsity of the accusations, because
13 it's information that you've been identified as
14 having.  And I just, again, want to know what
15 you heard, know and remember.  And please,
16 again, if you have any questions, feel free to
17 ask them, and I'll answer them.  If you don't
18 understand, which I think you've been doing
19 pretty well anyway, you just let me know, and if
20 you need a break again, you'll let me know.
21      A.    I've been doing pretty good not
22 understanding, is that what you --
23      Q.    No, no.  You've been doing a
24 pretty good job telling me when you don't

Page 74
1  understand when I've formed a question that
2  doesn't make sense to you, which happens.  Okay.
3  So, is it correct that you've
4  learned from Mr. Ralston that he's learned that
5  his accuser has had legal or mental health
6  issues during the course of Mr. Ralston's
7  lawsuit; is that right?
8       A.    It is not correct that I know that
9  he's had those issues during the lawsuit, no.
10      Q.    Okay.  I think you're making a
11 distinction, that Mr. Ralston learned that
12 information during the course of Mr. Ralston's
13 lawsuit as compared to learning it when he was
14 teaching the student; is that correct?
15      A.    Absolutely correct.
16      Q.    Okay.  So, Mr. Ralston has relayed
17 to you certain information that Mr. Ralston
18 learned about his accuser during the course of
19 Mr. Ralston prosecuting his lawsuit; is that
20 right?
21      A.    Correct.
22      Q.    And that particular information
23 that Mr. Ralston has relayed to you what he
24 already learned about his accuser during the

Page 75
1  lawsuit is information about legal issues and
2  mental health issues that the accuser has had;
3  is that correct?
4       A.    Allegedly had, yes.
5       Q.    Anything else that Mr. Ralston has
6  communicated to you about his accuser, whether
7  it be from his time at the Hill School or from
8  what he's learned during the prosecution of his
9  lawsuit?
10      A.    No.
11      Q.    Has Mr. Ralston communicated to
12 you about any testimony by anyone in this case?
13 His case being this lawsuit.
14      A.    Testimony.  Can you define that
15 word in the way that you're using it?
16      Q.    Sure.  Did Mr. Ralston tell you
17 whether anyone, other than his wife or brother,
18 had their deposition conducted?
19      A.    I believe he said Mr. Poulos was
20 deposed and that Mr. Garabedian was deposed.
21      Q.    And did Mr. Ralston tell you about
22 anything that Mr. Poulos said during his
23 deposition?  His being Mr. Poulos' deposition.
24      A.    No.  No.  I'm not even sure he was

Page 76
1  aware of the deposition details.
2       Q.    Okay.  And so, Mr. Ralston didn't
3  tell you anything about testimony by Mr.
4  Garabedian; is that correct, during his
5  deposition?
6       A.    He said that Garabedian has not
7  tried a case in about -- I'm not positive, but
8  he said 20 years, and he was surprised by that.
9  And that there are a number of attorneys in that
10 office who Mr. Garabedian claimed had authority
11 to send written communications with Mr.
12 Garabedian's name, signature on the bottom.
13      Q.    Is there anything else that Mr.
14 Ralston told you about Mr. Garabedian's
15 testimony during Mr. Garabedian's deposition in
16 this matter?
17      A.    Not that I recall.
18      Q.    Has Mr. Ralston told you anything
19 else about Mr. Garabedian?
20      A.    No.
21      Q.    Have you ever done any research
22 regarding Mr. Garabedian, like a Google search
23 or anything like that?
24      A.    Yes.  And, it prompted me to watch



CHRISTOPHER HOPKINS                                    September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                              77—80

Page 77

1    the Spotlight movie.
2        Q.    You say you performed a Google
3    search of Mr. Garabedian; is that right?
4        A.    Yes.
5        Q.    And you learned through the Google
6    search that Mr. Garabedian is the lawyer
7    portrayed in the movie Spotlight?
8        A.    Yes.
9        Q.    So, that's information you learned
10   from a Google search or did you learn it from a
11   different source?
12       A.    I believe that Mr. Ralston had
13   found out that connection fairly early after the
14   letters, or letter, as I said earlier, I thought
15   it was just one letter arrived at the Hill
16   School.
17       Q.    Okay.  So, it's your recollection
18   that Mr. Ralston learned that Mr. Garabedian is
19   the lawyer who was portrayed in the movie
20   Spotlight close to when he, he being Mr.
21   Ralston, learned about the first letter; is that
22   right?
23       A.    Yes.
24       Q.    And --

Page 78

1        A.    I believe so.
2        Q.    And, did Mr. Ralston tell you
3    early in the timeline while you learned about
4    the accusations that the accuser's lawyer was
5    portrayed in the movie Spotlight?
6        A.    I believe so.
7        Q.    So, you learned from Mr. Ralston
8    that Mr. Garabedian, my client, who's the lawyer
9    that's being sued --
10       A.    Yes.
11       Q.    -- was the lawyer for the accuser
12   and the lawyer portrayed in the movie Spotlight
13   for Mr. Ralston; is that right?
14       A.    Yes.
15       Q.    Did Mr. Ralston tell you how he
16   learned that information?
17       A.    He did not.
18       Q.    And, was Mr. Ralston -- did we
19   lose you there?
20       A.    I need to get my charger.
21       Q.    Sure.
22       A.    That will take 30 seconds.
23       Q.    Okay.
24       A.    It alerted me to low power mode.

Page 79

1             (Whereupon, a short recess was
2        then taken.)
3             THE WITNESS:  I'm good to go.
4    BY MS. DOUGHERTY:
5        Q.    Okay.  Thank you.  When you
6    learned from Mr. Ralston that Mr. Garabedian,
7    the lawyer for his accuser was the lawyer
8    portrayed in Spotlight, is that what prompted
9    you watch the movie?
10       A.    Two things did.  That, and the
11   fact that the Spotlight group had done a similar
12   piece on independent schools.
13       Q.    So, you watched the movie
14   Spotlight close in time to when Mr. Ralston told
15   you that the lawyer for the accuser was the
16   lawyer portrayed in the movie?
17       A.    I have no idea when I watched it,
18   and what the timing was.
19       Q.    How about the Google search, did
20   you perform a Google search of Mr. Garabedian
21   when you learned the information from Mr.
22   Ralston about Mr. Garabedian or at a later time?
23       A.    At a later time.
24       Q.    What prompted you to do the Google

Page 80

1    search of Mr. Garabedian?
2        A.    From what I consider obvious
3    reasons, I would have done a Google search on
4    any -- whoever the attorney was who had sent the
5    letter, but curiosity.  I hadn't seen the movie,
6    so I didn't know what role he had played in that
7    investigation involving the Catholic Church.   I
8    didn't know what his role was.
9        Q.    So, I guess what I'm getting at is
10   what prompted you to do the search at a later
11   time as compared to when you originally learned
12   the information?  Was there some other event
13   that occurred that caused you to want to perform
14   additional research, or I guess to perform
15   research on your own about Mr. Garabedian?
16       A.    I have no idea nor do I -- I don't
17   -- if I understood the spirit or the intent of
18   the question, maybe I can understand why you
19   were asking, but I -- initially I didn't care
20   who the attorney was.  I only cared that a
21   letter had arrived from an attorney.
22       Q.    Did you learn additional
23   information from Mr. Ralston that made you
24   conduct a Google search?  Did he communicate to

CHRISTOPHER HOPKINS                                  September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                          81–84

Page 81

1   you activity in his lawsuit or -- I mean, I just
2   want to know if there was some, you know, event
3   or communication from Mr. Ralston that made you
4   do the Google search?
5        A.    What is the significance of the
6   timing of the Google search that will help me
7   maybe understand why you're asking these things?
8        Q.    I'm not required to answer the
9   question, but I will, as a curtesy.  I think
10  that when people, witnesses are walked through a
11  timeline or asked about specific events, it
12  sometimes helps to put other events in
13  perspective.  So, if you said to me, for
14  example, I have no reason to believe this to be
15  true, but if you said Mr. Ralston called and
16  told me X about Mr. Garabedian, or that Mr.
17  Garabedian said X during his deposition, and
18  then that triggered me to do a Google search, I
19  might learn additional information that would,
20  you know, help me place things at a timeline.
21  It's not the significance of the Google search
22  as much as that you did it, what you learned and
23  when you did it and to try to place it in a
24  timeline.  So, for example, if you said that I

Page 82

1   did the Google search because Mr. Ralston told
2   me that he had been put on administrative leave
3   that made me angry.  Then, like, we might be
4   able too figure that out, right?  Do you see
5   what I'm saying?
6        A.    Yes.
7        Q.    So, I'm just trying to see if you
8   can place a time or explain to me what triggered
9   you to do the Google search, because as you've
10  explained it it was some time after you actually
11  learned that the lawyer involved was someone who
12  had been portrayed in the movie.  So, it
13  suggested to me that there was some other event
14  that made you more curious about the lawyer.
15  So, is that the case, or did you just decide one
16  day to do a Google search of the lawyer?
17       A.    I believe I just decided -- I
18  decided to find out what his -- exactly what his
19  role had been, not in the movie, but in the --
20  in the case against the Catholic Church.  Quite
21  simply, had he been the prosecuting attorney or
22  had some other role, and I discovered he had --
23  he was, I believe, if I remember correctly, was
24  representing the alleged victims.

Page 83

1        Q.    So, you wanted to learn whether
2   Mr. Garabedian was the prosecutor or a lawyer
3   for one of the victims for sexual abuse
4   perpetrated by the accused priests; is that
5   right?
6        A.    Yeah.  That was my motivation,
7   yes.  There was nothing -- there was no other
8   reason for the search.
9        Q.    And, was it triggered based on the
10  information you learned by Mr. Ralston about Mr.
11  Garabedian's testimony, like you identified that
12  Mr. Ralston relayed that Mr. Garabedian hadn't
13  tried a case in a while, something along those
14  lines, is that what triggered you?
15       A.    No.  No.  I -- it was long before
16  I heard that.
17       Q.    Sir, is there other information
18  that you learned about Mr. Garabedian through
19  your Google search or from Mr. Ralston, other
20  than what you've already told me?
21       A.    No.
22       Q.    Did you do any other type of
23  investigation?  I don't know what it would be,
24  but any other investigation, other than a Google

Page 84

1   search regarding Mr. Garabedian?
2        A.    Not that I recall.
3        Q.    Did Mr. Ralston tell you whether
4   there had been other depositions taken in his
5   lawsuit, other than his wife, brother, Mr.
6   Poulos and Mr. Garabedian?
7        A.    No.
8        Q.    Did Mr. Ralston tell you about any
9   of the court proceedings or any of the written
10  submissions, anything like that in this
11  lawsuit?
12       A.    No.
13       Q.    Did Mr. Ralston ever send you a
14  copy of any written submissions --
15       A.    No.
16       Q.    -- or anybody's deposition
17  testimony or anything like that?
18       A.    No.
19       Q.    Have you seen the letter or
20  letters, now that you know there's two?
21       A.    No.
22       Q.    Have you ever asked Mr. Ralston to
23  see the letters?
24       A.    I think at some point he and I --



CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
85–88

Page 85

1  I think I said if it would be helpful in
2  supporting you to see the letter or letters,
3  that I would be happy to do so.  I don't need
4  to, and it's up to you, and he thought about it
5  and he said, "No, I don't want to share them."
6  So, I didn't see them, and that was the extent
7  of any other conversation about the letters.
8      Q.      So, is it fair to say, Mr. Ralston
9  didn't like read them to you over the phone; is
10  that right?
11      A.      No.  No.
12      Q.      Did Mr. Ralston ever communicate
13  to you who else is aware of the accusations
14  against him?
15      A.      Yes.  But what -- well, I'll start
16  with, yes, and then you can follow up.
17      Q.      Yes.  Who did Mr. Ralston
18  communicate to you was aware of the accusations
19  against him?
20      A.      You know, aside from his wife, his
21  brother, me.  I think he talked in a very
22  general way about a few people that he was going
23  to either be seeing or dealing with whom he felt
24  he needed to, not provide details, but let them

Page 86

1  know.  And he was asked straight out by many,
2  "How come you're not at the Hill anymore?"  And
3  he, in some cases, depending on the
4  relationship, would, I believe say, "I'm not
5  interested in speaking.  Can we just talk about
6  other things."  But then there are some others
7  that he had such, either personal or
8  professional relationships where he felt that
9  they deserved to know, not the details, but
10  acted as if they knew something was up.
11      Q.      Anyone else?
12      A.      No.
13      Q.      And so, the list as you've
14  described it of people that Mr. Ralston
15  communicated to you that knew about the
16  accusations, these are people who Mr. Ralston
17  told about the accusations; is that right?
18      A.      Not about the accusations, just
19  that, "Why can't you come to the reunion?  You
20  were such an important part of the school and
21  the class."  And he doesn't lie, and prepared a
22  respectful, relatively neutral way of saying
23  that it's not best for him to be there, because,
24  and, as I said, every one of these individuals

Page 87

1  had either heard or received some sort of
2  communication from the Hill School or had an
3  inkling already, and he was aware of that.
4      Q.      Okay.  The individuals you have in
5  mind had received information that Mr. Ralston
6  was no longer affiliated with the school; is
7  that correct?
8      A.      In some fashion.  Word of mouth.
9      Q.      Right.  But, the inkling you're
10  talking about is not an inkling about
11  accusations of sexual abuse, just an inkling
12  that he wasn't affiliated with the school
13  anymore; is that correct?
14      A.      Correct.
15      Q.      Okay.  And so then Mr. Ralston, at
16  least a far as he communicated to you, told some
17  of the people, I think you described it as a
18  respectful, neutral way, about the accusations;
19  is that correct?
20      A.      I don't know that he spoke about
21  the accusations, no.  I think he simply said,
22  there's an issue that makes it best for me to
23  not to come back for your reunion, or I need it
24  make you aware of this if we're going to

Page 88

1  continue to interact in any sort of honest way
2  together, that there is an issue.  And, as I
3  said, I believe most of these people were aware
4  that there was an issue, but not the details,
5  and he did not make them aware of the details,
6  to my knowledge.
7      Q.      Okay.  So, when you say that the
8  people were aware of an issue, you mean that he
9  wasn't affiliated with the school, not that an
10  accusation had been made by a student against
11  him, correct?
12          MR. JUBB:  Object to the question.
13          THE WITNESS:  Mr. Jubb, did you
14      say something?
15          MR. JUBB:  I just objected.
16      Q.      I just want to know what you're
17  referring to when you say issue.
18      A.      And, I am doing my best, as you
19  said earlier, to try to be as accurate as I can,
20  but actually be as accurate as I can be, even if
21  I don't have a specific answer.
22      Q.      Well, here's the thing.  I
23  understand that you don't have personal
24  knowledge of the communications because you

ESQUIRE
DEPOSITION SOLUTIONS

CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
89–92

Page 89

1 weren't there, right?  So, you're telling me
2 what Mr. Ralston told you.  I'm just trying to
3 understand so I'm clear on your answer what you
4 meant when you said that they had an inkling,
5 the descriptive word you used about, quote, an
6 issue.  That's all.
7     A.     Yeah.  There were a few more
8 respected teachers, administrators, coaches,
9 dorm parents than Mr. Matt Ralston during his
10 tenure at the school, and he has a tremendous
11 number of former students and former colleagues
12 who identify with the Hill because, to a great
13 extent, one of their most powerful memories is
14 Mr. Ralston, and he knew it would not be
15 possible to simply tell every person, "I can't
16 talk about it."  Is that helpful?
17     Q.     Yes.  I'm just trying to
18 understand when you use the word issue, what you
19 were referring to.  My understanding of your use
20 of issue was that Mr. Ralston wasn't affiliated
21 with the Hill School or wasn't attending an
22 alumni event.  I just want to make sure there
23 wasn't some other issue that you were referring
24 to.

Page 90

1     A.     No.
2     Q.     And it's my understanding that
3 when asked why he wasn't at an alumni event or
4 why he wasn't somewhere, Mr. Ralston, in some
5 situations felt, based on his relationship with
6 the person, that he had to communicate some
7 information to the person about why he wasn't
8 there, and he provided more information to some
9 over others; is that right?
10     A.     That's my presumption, yes.
11     Q.     So, the people that you listed,
12 the wife, brother, you identified yourself, and
13 then some of the people you describe, which they
14 sound like colleagues from the Hill School or
15 former students, these are all people, at least,
16 based on what Mr. Ralston told you, who did not
17 know that he had been accused of sexual abuse at
18 the time when he communicated whatever he
19 decided to communicate, but when he communicated
20 with those individuals; is that right?
21     A.     No.
22     MR. JUBB:  Objection to form.
23     A.     I said I don't know what they
24 knew, but they had an inkling something was up.

Page 91

1     Q.     Did Mr. Ralston ever identify to
2 you any person who communicated to him that they
3 were aware of the accusations?
4     A.     No.
5     Q.     Do you know of anyone who learned
6 of the accusations against Mr. Ralston by
7 someone other than Mr. Ralston?
8     A.     I don't know of anyone other than
9 the list of names that I gave you who are aware
10 of the specific nature of the allegations,
11 period.  I don't know of a single other person
12 who's aware of the allegations.
13     Q.     Okay.  The list you're talking
14 about, the wife, brother, you.
15     A.     Obviously, his counsel, and
16 whoever else in the firm that was working on
17 that situation.  I am not aware of any other
18 person who is aware of the accusations.
19     Q.     Do you know anyone who believes
20 the accusations?
21     A.     No.
22     Q.     Has Mr. Ralston identified to you
23 anyone who believes the accusations?
24     A.     No.

Page 92

1     Q.     Do you think differently of Mr.
2 Ralston now that you've learned the accusations?
3     A.     Respect him more than I ever did.
4     Q.     Okay.  So, your perception of Mr.
5 Ralston has improved since you've learned of the
6 allegations or accusations against him; is that
7 right?
8     A.     I've been in awe of his strength.
9     Q.     Do you know anyone who thinks
10 differently about Mr. Ralston because of the
11 accusations?
12     A.     No.
13     Q.     Do you know anyone whose
14 relationship with Mr. Ralston has changed
15 because of the accusations?
16     A.     Only in that he is less free to
17 reach out as he might normally to former
18 students and former colleagues in a purely
19 social way.
20     Q.     Because he is no longer affiliated
21 with the Hill School?
22     MR. JUBB:  Objection to the form.
23     A.     Please, if you would be so kind as
24 to rephrase it.  I believe I understand what



Page 93

1   you're trying to ask, but the wording of your
2   question doesn't ask what I think you are trying
3   to ask.  So, please repeat the question.
4        Q.    Sir, what I want to know is, if
5   you're aware of anyone who stopped associating
6   with Mr. Ralston because they learned about the
7   accusations?
8        A.    Okay.  That wasn't your question,
9   I don't believe, and the answer is, no.  I
10  believe you had changed it.
11       Q.    Well, you asked me to rephrase it.
12  So, I was.
13       A.    Thank you.
14       Q.    So, do you know of anyone whose
15  relationship with Mr. Ralston has changed
16  because they learned about the accusations?
17       A.    No.
18       Q.    I think you've already described
19  for us how your relationship with Mr. Ralston
20  has changed since you've learned about the
21  accusations and it was to have a higher opinion
22  of him; is that right?
23       A.    Yes.  And even higher admiration
24  and opinion.

Page 94

1        Q.    So, you've not stopped associating
2   with Mr. Ralston because you learned about the
3   accusations; is that right?
4        A.    Based on an earlier question where
5   I say we sometimes speak on the phone more than
6   once a day, I believe the answer is, no, our
7   relationship has not changed.  It's been
8   strengthened and communications increased.
9        Q.    Did you discuss with Mr. Ralston
10  his plan to pursue this lawsuit before it was
11  pursued?
12       A.    Did I discuss it with him?
13       Q.    Yes.  Have a communication with
14  him, right?  Because that's the only way you
15  deal with Mr. Ralston, I think you confirmed, is
16  over the telephone.  So, during any of your
17  communications with Mr. Ralston, did you and he
18  talk about his plan to file a lawsuit before he
19  actually did it?
20       A.    Yes.
21       Q.    Well, what did you discuss with
22  Mr. Ralston about his plan to file a lawsuit
23  before he actually filed the lawsuit?
24       A.    I merely listened to him talk

Page 95

1   about the various decisions and ingredients that
2   go into making the decision and then how it
3   might progress forward.
4        Q.    Okay.  So, you talked through the
5   issue of filing a lawsuit with Mr. Ralston
6   before he made his decision; is that right?
7        A.    No, I didn't have any input.  I
8   listened to him talk about the possibility that
9   he might initiate, I would call it, a counter
10  lawsuit but, of course, remind us that there was
11  never any lawsuit against him.  Just two letters
12  that caused him to be on administrative leave
13  and then not be rehired.
14       Q.    Do you believe that the letters
15  caused Mr. Ralston to be put on administrative
16  leave and not be rehired is based on what Mr.
17  Ralston told you; is that right?
18       A.    Correct.
19       Q.    So, when you discussed the lawsuit
20  before Mr. Ralston filed the lawsuit, you didn't
21  express an opinion about whether he should or
22  shouldn't commence the lawsuit, you just
23  listened to what he had to say and was
24  supportive; is that right?

Page 96

1        A.    Correct.
2        Q.    Did Mr. Ralston tell you his
3   reason for pursuing a lawsuit when he decided to
4   pursue a lawsuit?
5        A.    Yes.
6        Q.    Well, what was the reason Mr.
7   Ralston told you that he wanted to pursue the
8   lawsuit?
9        A.    That he was doing it for himself,
10  but also on behalf of others who are falsely
11  accused and, perhaps, don't have the courage to
12  follow through and wanted to be an example of
13  seeking truth, though, that pursuit of the truth
14  might cause tremendous pain, emotional pain to
15  himself and others.
16       Q.    So, before Mr. Ralston commenced
17  his lawsuit, he communicated to you that he
18  realized that the lawsuit could cause tremendous
19  pain to himself and others; is that right?
20       A.    Oh, he didn't need to tell me
21  that.  But, over the course of our discussions
22  he continued to draw strength from what he said
23  early on, and that is, I am doing this on behalf
24  of others who, perhaps, don't have the



Page 97

1  resources, and I mean that word in its broadest
2  definition, financial, spiritual or physical or
3  emotional or mental resource in order to carry
4  out something of this magnitude.
5         And I need to apologize.  I need
6  another restroom break, if that's okay, and if
7  you all don't go anywhere I'll be back in two
8  minutes.
9         MS. DOUGHERTY:  All right.  Why
10        don't we take until 12:50, five minutes
11        so other people can have a break, and
12        I'll also look through my notes.
13        THE WITNESS:  Thank you.
14        (Whereupon, a short recess was
15        then taken.)
16  BY MS. DOUGHERTY:
17     Q.    Just so I understand, at some
18  point prior to when Mr. Ralston commenced his
19  lawsuit, he communicated to you that he
20  understood that the lawsuit would cause
21  tremendous pain for himself and others; is that
22  right?
23        MR. JUBB:  Objection to the form.
24     A.    It was all an unknown, yet he knew

Page 98

1  it would be extraordinarily challenging.  He had
2  no knowledge of what shape that difficulty might
3  take.  He knew it would be challenging.
4     Q.    And the others you're referring
5  to, is that his wife and his sons?
6     A.    I don't even recall that there
7  were any discussions that were that specific.
8     Q.    But, your take away from the
9  discussions was that Mr. Ralston realized that
10  there would be some emotional toll, and I think
11  you described it as challenges that would be
12  associated with his pursuit of the lawsuit
13  before he commenced the lawsuit; is that right?
14     A.    I think I said physical,
15  spiritual, emotional and mental challenges, yes.
16     Q.    Okay.  So, Mr. Ralston
17  communicated to you, or acknowledged to some
18  extent, in some way, that he realized he would
19  face physical, spiritual, emotional and mental
20  challenges if he pursued the lawsuit as a result
21  of the lawsuit; is that right?
22     A.    Yes.
23     Q.    And he communicated that
24  information to you before he filed the lawsuit;

Page 99

1  is that right?
2     A.    Yes.
3     Q.    I think I wrote it down, maybe I
4  misheard, but I thought you also identified
5  previously a financial challenge, a financial
6  impact.  Is that also the case that Mr. Ralston
7  communicated to you that there would be some
8  financial challenge or financial impact in
9  pursuing a lawsuit, or did I misunderstand?
10     A.    If I said that, I didn't intend
11  to.  I don't think I said that, no.
12     Q.    Okay.  So, the challenges, at
13  least your take away from the discussion, the
14  challenges that Mr. Ralston perceived are the
15  physical, spiritual, emotional and mental, as it
16  relates to his pursuit of the lawsuit; is that
17  right?
18     A.    Yes.  The financial challenges
19  were already underway when his paid leave ended.
20     Q.    Okay.  So, the financial impact
21  you have in mind relates to him being put on
22  paid leave and then the non-renewal of his
23  contract.  Not specifically, for example,
24  financial commitment for the lawsuit itself; is

Page 100

1  that right?
2     A.    I don't recall us discussing
3  finances at all.  I simply don't recall it.
4  But, yes, when he was no longer receiving his
5  salary from the Hill School, his financial
6  situation changed dramatically, of course.
7     Q.    Okay.  So, you don't have any
8  information, one way or the other, whether Mr.
9  Ralston has paid any money towards the
10  prosecution of his lawsuit; is that right?
11     A.    I am confident that he has not.
12     Q.    And you mentioned that the
13  school's lawyer, Mr. Reece, which you identified
14  him as Thomas Reece, told Mr. Ralston that he
15  should get his own counsel.
16     A.    Yes.
17     Q.    Do you know whether Mr. Ralston
18  did follow Mr. Reece's advice and retain
19  counsel?
20     A.    Yes.
21     Q.    Is that the counsel, Mr. Jubb that
22  he has in this action, as far as you understand
23  it?
24     A.    Yes.



CHRISTOPHER HOPKINS                                September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                        101–104

Page 101

1      Q.     Do you know whether Mr. Ralston
2   incurred any expense by retaining a lawyer in
3   reaction to Mr. Reece's suggestion that he
4   retain his own counsel?
5      A.     I am not aware of any expense
6   incurred in regards to legal counsel.
7      Q.     I think you've described some of
8   it already, but I'm going to ask you if you can
9   restrict your answers for me.  I want to know if
10  you have detected any emotional reaction from
11  Mr. Ralston that you attribute to the
12  accusations as distinct from the lawsuit?  If
13  you're unable to make the distinction, then
14  please tell me that.
15         MR. JUBB:  I'll just object to the
16      form.
17     Q.     Do you understand what I'm asking
18  or do you want me to try to rephrase?
19     A.     No, I do understand.  I believe I
20  understand.
21     Q.     So, I want to know what, if any,
22  emotional reaction or changes to Mr. Ralston
23  that you have detected that you attribute
24  specifically to the accusations as distinct from

Page 102

1   the lawsuit.
2      A.     I think that all of the effects
3   that he has experienced involve the intertwining
4   of the accusations and the decision to move
5   forward with a lawsuit, and then moving forward
6   with the lawsuit.  I believe they are not
7   distinguishable.
8      Q.     Have you detected any physical
9   changes or impact in Mr. Ralston that you
10  attribute to the accusations, again, as distinct
11  from the lawsuit?
12         MR. JUBB:  I'll object to the
13      form.
14     A.     Negative physical impact?
15     Q.     Well, let's just start with any.
16  How about any?  We talked about emotional.  You
17  said you can't distinguish.  So, I want to know
18  about physical.  Have you detected any physical
19  change in Mr. Ralston that you attribute to the
20  accusations as distinct from the lawsuit?
21     A.     As I've not seen him in eight
22  years, I've not seen him in person.  I believe
23  that he has used exercise as a way to take care
24  of himself physically and emotionally.  So, I

Page 103

1   think he is in better shape physically.
2      Q.     Okay.  So, you've detected a
3   physical change that you attribute to the
4   accusations, but consider the physical change a
5   positive; is that right?
6      A.     It forced him to seek out therapy
7   in the form of physical activity.
8      Q.     And, do you consider therapy in
9   the form of physical activity to be positive?
10  An improvement, I guess.
11         MR. JUBB:  I'll object to the
12      form.
13     A.     I see the motivation as being
14  damaging.  The origin of the motivation as being
15  damaging, but the end result being positive
16  physically.
17     Q.     Has Mr. Ralston told you that he
18  has suffered from any medical conditions because
19  of the accusations, again, as distinct from the
20  lawsuit?
21         MR. JUBB:  Same objection.
22     A.     I'm not aware of any, no.
23     Q.     Has Mr. Ralston told you that he
24  has suffered any medical condition as a result

Page 104

1   of the lawsuit?
2          MR. JUBB:  I'll object.
3      A.     None that I'm aware of.
4      Q.     You mentioned that Mr. Ralston
5   found a respectful and rather neutral way to
6   communicate with people who, and you described
7   it as, knew something was up, because he wasn't
8   at Hill School events.  The respectful and
9   rather neutral way you had combined was that
10  something that Mr. Ralston wrote down or that
11  you and he discussed to come up with --
12     A.     No.
13     Q.     -- like a standard response?
14     A.     That was my characterization, and
15  those were my words.
16         May I ask another procedural
17  question?
18     Q.     Sure.
19     A.     When the plaintiff's attorney
20  objects, am I supposed to respond in any way?
21     Q.     No.  Mr. Jubb's objection is to,
22  because he's not said otherwise, but his
23  objection, as I understood them, was to the form
24  of my question, which means he has, you know, a

CHRISTOPHER HOPKINS
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.

September 02, 2021
105–108

Page 105

1  quibble with how I formed my question, and it's
2  a sign to me that he has that objection, and I
3  can rephrase my question or not, but unless he
4  says something else, then you can just go ahead
5  and answer, and it's really directed to me.
6  Like if he has a position other than a form
7  objection, he'll say more information.  He
8  hasn't done that.  So --
9      A.     Okay.  But, is that --
10     Q.     The objection is directed to me.
11     A.     And, does it go on the deposition?
12     Q.     It does.  So, Mr. Jubb's
13  objections will be noted.
14     A.     I was simply curious.
15     Q.     Oh, it's fine.  And you may have
16  noticed that sometimes when he objects I ask a
17  different question or I ask a follow-up question
18  that's remarkably similar to the prior question
19  to try to fix the issue that Mr. Jubb has
20  brought to my attention by objecting.
21     A.     Understood.
22     Q.     But, it's not directed to you.
23  It's directed at me, you know.
24     A.     Yeah.

Page 106

1      Q.     And if Mr. Jubb has questions,
2  I'll have the right to do the same thing.  Does
3  that answer your question?
4      A.     Yes.  And it helps me to know that
5  I should, if I remember, at least pause for a
6  moment if you were trying to reformulate a
7  question.
8      Q.     It's no problem.  It's my job to
9  figure it out.  You're just here to do your best
10  and to tell the truth and to answer my questions
11  as best as you can, and not worry about me.
12         Just so I'm clear, there wasn't
13  like a planned response that Mr. Ralston
14  generated to give to people who inquired, you
15  know, of him as far as why he wasn't at a Hill
16  School event; is that right?
17     A.     No.  I think he had to go through
18  the agony of figuring out if and how he might
19  communicate with those whom he felt, for his own
20  reasons, needed to know what was going on in
21  some way, and it was an agonizing process,
22  because the need to do it was based on false
23  accusations that turned his life upside down and
24  required him to have to think about how he was

Page 107

1  going to talk to people with whom he used to be
2  able to talk openly and freely and warmly with.
3      Q.     Am I correct, that you listened
4  and were supportive when he communicated about
5  this issue with you; is that right?
6      A.     Yes.
7      Q.     Did you make suggestions on what
8  Mr. Ralston might tell people or did you just
9  listen?
10     A.     No, I made no suggestions.  I just
11  listened.
12         MS. DOUGHERTY:  Okay.  Those are
13  all of my questions.
14         MR. JUBB:  I just have a couple.
15             - - -
16         EXAMINATION
17             - - -
18  BY MR. JUBB:
19     Q.     Mr. Hopkins, you mentioned that
20  when you were the dean of students you had
21  discussed some sort of supervisory role when Mr.
22  Ralston was a dorm parent.  Do you recall that
23  part of your testimony?
24     A.     If I said while dean of students,

Page 108

1  then I misspoke.  I was a dean of students, and
2  I, perhaps, didn't get through my two major
3  roles, four years of dean of students, and then
4  seven years as assistant head for student life.
5  Residential life, student life.  It was in that
6  second role during my seven years that I would
7  have had supervisory responsibility for all
8  dormitory parents, and that included Mr.
9  Ralston.
10     Q.     Okay.  And, during that time
11  period, do you remember whether or not there was
12  ever a process that was in place where the
13  students who were living within the dorms had an
14  opportunity to, mid semester, mid year, whatever
15  temporal time frame you would like, had an
16  opportunity to review their dorm parents in any
17  way, or bring their evaluation of the dorm
18  parents to your attention?
19         MS. DOUGHERTY:  Objection.
20     A.     I don't -- I don't recall an
21  evaluation of that nature.
22     Q.     Okay.  In terms of your assistant
23  head master role -- was it the assistant head
24  master or assistant head for student life?



CHRISTOPHER HOPKINS                        September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                    109—112

Page 109

1      A.     Assistant head for student life.

2      Q.     Okay.  Would you in that role --

3      A.     But, technically, head master, but
4   in short, assistant head for student life.  It
5   doesn't matter, but, yes.

6      Q.     If there was any issues going on
7   in the dorms, would you be the person that,
8   whether a student or faculty would bring that to
9   your attention?

10      A.     It would all depend on the nature
11   of the issue.  If it was disciplinary, involved
12   any sort of inappropriate behavior by any of the
13   residents within the building, yes.  If it was,
14   for instance, of an emotional nature, it might
15   be referred to the counselor, and that would be
16   a confidential referral.

17      Q.     After the initial letter that was
18   sent in this matter, I'll represent to you that
19   was around April of 2018.  The lawsuit wasn't
20   filed until April of 2019.  So, prior to the
21   filing of any sort of lawsuit, when you were
22   speaking with Mr. Ralston, did he ever express
23   to you any feelings of emotional distress or
24   mental anguish?

Page 110

1            MS. DOUGHERTY:  Objection.

2      A.     Yes.

3      Q.     Can you describe for us what comes
4   to mind?

5      A.     I think my response earlier was
6   that seems obvious to me, there are few more
7   damaging, horrific accusations that can be made
8   than the abuse of a child.  I don't know if it's
9   fair to say more so within a school setting, but
10   for teachers it certainly is their greatest
11   fear, and great care is taken to make sure there
12   are no mixed signals.  So, to be accused of what
13   is at the very core of the trust that must exist
14   between adults, whether teaching, coaching, dorm
15   parenting, advising, is an absolutely crushing
16   thing to happen to an educator.

17      Q.     Do you know whether or not Mr.
18   Lehman had been the head master at the time that
19   Matt was in his first appointment with the Hill
20   School?

21      A.     His first employment?

22      Q.     Right.  So, when he was a teacher
23   on the faculty at Hill School, at some point he
24   departed and then came back to the Hill School.

Page 111

1   So, my question is, do you have any knowledge as
2   to whether or not Mr. Lehman was the head master
3   during Mr. Ralston's first time at the Hill
4   School?

5      A.     He was not the head master when
6   Matt spent all of his years as administrator,
7   teacher, coach, dorm parent.

8      Q.     Okay.  As far as you can recall,
9   within the lines of communication at the school
10   when you were there, if there was ever a
11   complaint made against a faculty member by the
12   student, another faculty member, a parent,
13   staff, whatever, would that be something that as
14   an assistant head master you would be made aware
15   of?

16      A.     Yes.  In fact, I would be the
17   point person.  I would be the point person in
18   handling them.

19            MR. JUBB:  They're all the
20        questions that I have.

21            - - -

22            EXAMINATION

23            - - -

24   BY MS. DOUGHERTY:

Page 112

1      Q.     I just want to ask a couple of
2   clarifying points about your employment at the
3   Hill School.

4            So, you were the Dean of Students
5   from 1997 to 2001; is that correct?

6      A.     If that's four school years, yes.

7      Q.     And then you were the assistant
8   head for student life from 2001 to 2008, right?

9      A.     Correct.

10      Q.     And, your tenure as Dean of
11   Students for the four years, it went from July 1
12   to June 30.

13      A.     June 30.

14      Q.     So, it was like a fiscal year?

15      A.     Yes.

16            MS. DOUGHERTY:  Okay.  Those are
17        my only follow-up questions.  Thank
18        you.

19            COURT REPORTER:  Mr. Jubb, are you
20        ordering a copy of the transcript?

21            MR. JUBB:  I am.

22            (Deposition concluded at 1:20
23        p.m.)

24



CHRISTOPHER HOPKINS                                    September 02, 2021
JOHN DOE vs MITCHELL GARABEDIAN, ESQ.                              113

Page 113

```
 1      C E R T I F I C A T I O N

 2

 3          I hereby certify that the

 4   proceedings and evidence noted are

 5   contained fully and accurately in the

 6   notes taken by me on the deposition of

 7   the above matter, and that this is a

 8   correct transcript of the same.

 9

10

11

12       _____

13              HARVEY KRAUSS

14

15          DATE:   September 17, 2021

16

17

18

19          (The foregoing certification of

20   this transcript does not apply to any

21   reproduction of the same by any means,

22   unless under the direct control and/or

23   supervision of the certifying

24   reporter.)
```



AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Pennsylvania

| | |
|---|---|
| John Doe | ) |
| *Plaintiff* | ) |
| v. | )  Civil Action No.   2:19-cv-01539-JD |
| Mitchell Garabedian, Esq., et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                    The Hill School

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  See Attachment "A".

| Place: The Hill School<br>860 Beech Street<br>Pottstown, PA  19464 | Date and Time:<br><br>06/15/2020 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    05/13/2020

|  CLERK OF COURT | OR | |
|---|---|---|
| | | /s/ Lane R. Jubb, Jr. |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Plaintiff
, who issues or requests this subpoena, are:

Lane R. Jubb, Jr., Esq., The Beasley Firm, LLC, 1125 Walnut Street, Phila., PA 19107, lane.jubb@beasleyfirm.com

 (215) 592-1000

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

1791a

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   2:19-cv-01539-JD

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____   on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____      _____
                                                              *Server's signature*

                             _____
                                                              *Printed name and title*

                             _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

1792a

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

<u>**ATTACHMENT "A"**</u>

A.   <u>**Definitions**</u>

    **"Document**" includes, but is not limited to, writings, drawings, graphs, charts, photographs, videos, sound recordings, images, and other data or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, and specifically includes electronically stored information which shall be produced in the form or forms in which it is ordinarily maintained.

    **"Kurtis Poulos"** refers to Kurtis Nicholas Poulos, DOB: xx/xx/1978, who graduated from The Hill School in 1997.

    **"Mitchell Garabedian"** refers to Mitchell Garabedian, Esquire., Law Offices of Mitchell Garabedian, and/or anyone purporting to act on his behalf.

    "**The Hill School**" refers to The Hill School, Beech Street, Pottstown, PA, as well as all current and former officers, agents, employees, and representatives thereof.

B.   <u>**Requested Materials**</u>

  **1.**   All documents in your possession, custody, or control that refer and/or related to Kurtis Poulos.

  **2.**   All documents in your possession, custody, or control that refer and/or related to Mary Ellen Poulos.

  **3.**   All documents in your possession, custody, or control that refer and/or related to any disciplinary action against Kurtis Poulos.

  **4.**   All documents in your possession, custody, or control that refer and/or related to any complaints made by Kurtis Poulos, or anyone acting on his behalf (e.g. a family member), against a current or former employee of The Hill School.

  **5.**   All documents in your possession, custody, or control that refer and/or related to any complaints made against Kurtis Poulos.

  **6.**   The entire academic file of Kurtis Poulos.

  **7.**   All student evaluations and/or reports made by The Hill School.

  **8.**   All documents in your possession, custody, or control related to Kurtis Poulos' residential assignments and residential evaluations.

1794a

**9.** All letters or correspondence written by Kurtis Poulos, or anyone acting on his behalf (e.g. a family member) to The Hill School.

**10.** All documents in your possession, custody, or control related to the alumnus file of Kurtis Poulos.

**11.** All documents in your possession, custody, or control related to any counseling or therapy sought and/or received by Kurtis Poulos while he was a student at The Hill School.

**12.** All documents in your possession, custody, or control related to any academic writings, chapel talks, and/or admissions essays of Kurtis Poulos.

**13.** All documents in your possession, custody, or control pertaining to correspondence with Mitchell Garabedian, Esquire.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Eastern District of Pennsylvania ▾

| | |
|---|---|
| John Doe | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:19-cv-01539 |
| Mitchell Garabedian, Mitchell Garabedian, Esq. d/b/a Law Offices of Mitchell Garabedian, Kurtis N. Poulos | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Custodian of Records, The Hill School
860 Beech Street, Pottstown, PA 19464

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached addendum

| Place: 860 Beech Street, Pottstown, PA 19464 | Date and Time: September 3, 2021 at 12:00 p.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  08/25/2021

*CLERK OF COURT*

OR

_____          /s/ Candidus K. Dougherty
*Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* defendants, Mitchell Garabedian and Mitchell Garabedian d/b/a Law Offices of Mitchell Garabedian , who issues or requests this subpoena, are:

Candidus K. Dougherty, Swartz Campbell LLC, 1650 Market St., Phila., 19103, cdougherty@swartzcampbell.com, 215-299-4296

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

1796a

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:19-cv-01539

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

1797a

## ADDENDUM

As used in the following requests, the term "documents" shall mean and include any and all emails, letters, correspondence, memoranda, notes, records, work papers, tapes, transcripts, and any and all other written electronic, printed, typed, recorded, transcribed, punched, taped, filmed, or graphic matter of any kind or nature, including all drafts, copies, or reproductions thereof, and including any electronically stored material in your possession or custody, including:

1. Complete personnel file for Matthew Ralston, including but not limited to applications, resumes, payroll records, disciplinary records, medical records, attendance records, memos, notes, correspondence, e-mails, including all records stored electronically and in hard copy form.

2. All documents in your possession, custody, or control that refer and /or relate to Kurtis Poulos.

3. All documents in your possession, custody, or control that refer and/or relate to any disciplinary action against Mary Ellen Poulos.

4. All documents in your possession, custody, or control that refer and/or relate to any disciplinary action against Kurtis Poulos.

5. All documents in your possession, custody, or control that refer and/or relate to any complaints made by Kurtis Poulos, or anyone acting on his behalf (e.g. a family member), against a current or former employee of The Hill School.

6. All documents in your possession, custody, or control that refer and/or relate to any complaints made against Kurtis Poulos.

7. The entire academic file of Kurtis Poulos.

8. All student evaluations and/or reports made by The Hill School.

9. All documents in your possession, custody, or control related to Kurtis Poulos' residential assignment and residential evaluations.

10. All letters or correspondence written by Kurtis Poulos, or anyone acting on his behalf (e.g. a family member) to The Hill School.

11. All documents in your possession, custody, or control related to the alumnus file of Kurtis Poulos.

12. All documents in your possession, custody, or control related to any academic writings, chapel talks, and/or admissions essays of Kurtis Poulos.

13. All documents in your possession, custody, or control pertaining to correspondence with Mitchell Garabedian, Esquire.

1798a

14. All documents requested by plaintiff or plaintiff's counsel.

15. All documents produced to plaintiff or plaintiff's counsel.

16. All correspondence with Lane Jubb regarding Matthew Ralston.

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
   **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**
   **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
   **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
   **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE, | : |
| | : CIVIL ACTION |
| Plaintiff, | : |
| v. | : |
| | : |
| MITCHELL GARABEDIAN, ESQUIRE, et al, | : NO. 2:19-cv-01539 |
| | : |
| Defendants. | : |
| | : |

**NOTICE OF INTENT TO SERVE SUBPOENA TO PRODUCE DOCUMENTS,
INFORMATION, OR OBJECTS PURSUANT TO RULE 45(a)(4)**

Defendants, Mitchell Garabedian, Esquire and Mitchell Garabedian, Esquire d/b/a Law

Offices of Mitchell Garabedian, by and through counsel, Swartz Campbell LLC, intend to serve

a subpoena directed to The Hill School identical to the subpoena attached to this notice.

Respectfully submitted,

/s/ Candidus K. Dougherty
Jeffrey B. McCarron
Candidus K. Dougherty
SWARTZ CAMPBELL LLC
One Liberty Place, 38th Floor
1650 Market Street
Philadelphia, PA  19103
Phone (215) 299-4296
Fax (215) 299-4301
cdougherty@swartzcampbell.com

Dated: August 9, 2021

1801a

## <u>CERTIFICATE OF SERVICE</u>

I, Candidus K. Dougherty, Esquire, hereby certify that a true and correct copy of the

foregoing notice of intent to serve subpoena by defendants, Mitchell Garabedian, Esquire and

Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian was served upon

counsel of record and the following parties by electronic service by email on August 9, 2021:

James E. Beasley, Jr.
Lane R. Jubb, Jr.
Louis Tumolo
The Beasley Firm, LLC
1125-35 Walnut Street
Philadelphia, PA 19107
215-592-1000
215-592-8360 (fax)
lane.jubb@beasleyfirm.com

Kurtis N. Poulos
3239 W. Colony Drive
Milwaukee, WI 53221
lex101078@gmail.com

/s/ Candidus K. Dougherty
CANDIDUS K. DOUGHERTY

1802a

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania ▼

|   |   |
|---|---|
| John Doe | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:19-cv-01539 |
| Mitchell Garabedian, Mitchell Garabedian, Esq. d/b/a Law Offices of Mitchell Garabedian, Kurtis N. Poulos | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Custodian of Records, The Hill School
             860 Beech Street, Pottstown, PA 19464

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached addendum

| Place: 860 Beech Street, Pottstown, PA 19464 | Date and Time: August 25, 2021 at 12:00 p.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  08/09/2021

| | *CLERK OF COURT* | OR | /s/ Candidus K. Dougherty |
|---|---|---|---|
| | *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* defendants, Mitchell Garabedian and Mitchell Garabedian d/b/a Law Offices of Mitchell Garabedian , who issues or requests this subpoena, are:

Candidus K. Dougherty, Swartz Campbell LLC, 1650 Market St., Phila., 19103, cdougherty@swartzcampbell.com, 215-299-4296

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

1803a

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:19-cv-01539

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                              *Server's signature*

                                          _____
                                              *Printed name and title*

                                          _____
                                              *Server's address*

Additional information regarding attempted service, etc.:

1804a

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ADDENDUM**

As used in the following requests, the term "documents" shall mean and include any and all emails, letters, correspondence, memoranda, notes, records, work papers, tapes, transcripts, and any and all other written electronic, printed, typed, recorded, transcribed, punched, taped, filmed, or graphic matter of any kind or nature, including all drafts, copies, or reproductions thereof, and including any electronically stored material in your possession or custody, including:

1. Complete personnel file for Matthew Ralston, including but not limited to applications, resumes, payroll records, disciplinary records, medical records, attendance records, memos, notes, correspondence, e-mails, including all records stored electronically and in hard copy form.

2. All documents in your possession, custody, or control that refer and /or relate to Kurtis Poulos.

3. All documents in your possession, custody, or control that refer and/or relate to any disciplinary action against Mary Ellen Poulos.

4. All documents in your possession, custody, or control that refer and/or relate to any disciplinary action against Kurtis Poulos.

5. All documents in your possession, custody, or control that refer and/or relate to any complaints made by Kurtis Poulos, or anyone acting on his behalf (e.g. a family member), against a current or former employee of The Hill School.

6. All documents in your possession, custody, or control that refer and/or relate to any complaints made against Kurtis Poulos.

7. The entire academic file of Kurtis Poulos.

8. All student evaluations and/or reports made by The Hill School.

9. All documents in your possession, custody, or control related to Kurtis Poulos' residential assignment and residential evaluations.

10. All letters or correspondence written by Kurtis Poulos, or anyone acting on his behalf (e.g. a family member) to The Hill School.

11. All documents in your possession, custody, or control related to the alumnus file of Kurtis Poulos.

12. All documents in your possession, custody, or control related to any academic writings, chapel talks, and/or admissions essays of Kurtis Poulos.

13. All documents in your possession, custody, or control pertaining to correspondence with Mitchell Garabedian, Esquire.

1806a

14. All documents requested by plaintiff or plaintiff's counsel.

15. All documents produced to plaintiff or plaintiff's counsel.

16. All correspondence with Lane Jubb regarding Matthew Ralston.

EXHIBIT

Poulos 1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE** | : | |
| **Plaintiff** | : | |
| v. | : | NO: 2:19-cv-01539-JD |
| | : | |
| **MITCHELL GARABEDIAN, ESQ., et al.** | : | |
| **Defendants.** | : | |
| | : | |

## ORDER

AND NOW, this 18th day of March, 2021, upon consideration of the Motion by Plaintiff to Compel Miscellaneous Discovery of Defendant Poulos and any Response thereto, it is hereby ORDERED and DECREED that Plaintiff's Motion is GRANTED.

(1)      IT IS FURTHER ORDERED that Defendant Poulos shall "identify, by first and last name, any and all persons who were in his Geometry class for the 1994-1995 school year," by December 21, 2020, as previously ordered by this court. Failure to comply shall result in sanctions.

(2)"      IT IS FURTHER ORDERED that Defendant Poulos shall provide verified" responses with the production of documents responsive to Plaintiff's 28 August 2020 Discovery Requests.

(3)"      IT IS FURTHER ORDERED that Defendant Poulos shall appear for a continuation" of his deposition to answer questions from Plaintiff's Counsel, limited to the area of his discussions and communications with Defendant Garabedian.

D[ "VJ G'EQWTV‹   "

**/s/ Hon. Jan E. DuBois**
_____
The Honorable Jan E. DuBois

"       "       "       "       "       "       "       "

1

1808a

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE**<br>Ohio, 43016<br>c/o 1125 Walnut Street<br>Philadelphia, PA 19107<br>**Plaintiff**<br><br>vs.<br><br>**MITCHELL GARABEDIAN, ESQ.**<br>100 State Street, 6th Floor<br>Boston, MA 02109<br><br>**And**<br><br>**MITCHELL GARABEDIAN, ESQ**<br>**d/b/a LAW OFFICES OF**<br>**MITCHELL GARABEDIAN**<br>100 State Street, 6th Floor<br>Boston, MA 02109<br><br>**and**<br><br>**KURTIS N. POULOS**<br>3239 W. Colony Drive<br>Milwaukee, WI 53221<br><br>**Defendants.** | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | **CIVIL COMPLAINT**<br><br>**NO: 2:19-cv-01539**<br><br><br>**JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

### I. INTRODUCTION

This case stems from the Defendants' outrageous scheme, where they falsely accused Plaintiff of deplorable conduct in order to extort a quick contingent fee and monetary payoff. They published these statements to Plaintiff's supervisors and peers, which caused irreparable damage to the reputation he held amongst his colleagues and the boarding school community that he has served for over twenty-five years.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

## II. PARTIES

1.  Plaintiff John Doe is an adult individual and private figure who is a citizen of, and domiciled in, Ohio, with a principal place of business in Montgomery County, Pennsylvania.[1]

2.  Defendant Mitchell Garabedian, Esquire (hereafter, "Garabedian") is an adult individual who is a citizen of, and domiciled in, Massachusetts with a principal place of business at the above captioned address.

3.  Defendant Mitchell Garabedian, Esquire d/b/a Law Offices of Mitchell Garabedian, is a sole proprietorship, domiciled in Massachusetts with a principal place of business at the above captioned address.

4.  At all times pertinent hereto, no other entity other than Defendant Garabedian employed the associates, paralegals, or legal staff at his law practice.

5.  Defendant Garabedian and his sole proprietorship, "Law Offices of Mitchell Garabedian" are collectively referred to as "The Garabedian Defendants." The "Garabedian Defendants" shall also mean and refer to their employees, including any associates, paralegals, and/or legal staff.

6.  The Garabedian Defendants are responsible for the acts and omissions of their employees, servants, and agents identified and described in this Complaint as well as those identified through discovery.

7.  Defendant Kurtis N. Poulos ("Poulos") is an adult individual who is a citizen of, and domiciled in, Wisconsin.

---

[1]  Plaintiff's identity is pled as a pseudonym due to Plaintiff's fear of severe harm, which is reasonable in light of the social climate in which this suit is brought. *Doe v. Megless*, 654 F.3d 404, 408, (3d. Cir. 2011). Plaintiff is a private figure and disclosure of Plaintiff's identity would not promote any public interest. See, *Doe v. Unum Life Ins. Co. of Am.*, 2014 U.S. Dist. LEXIS 54821 (E.D. Pa. 2014).

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1810a

8. Each and every defendant is liable for the acts of its agents, servants, and/or employees.

## III. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332. The Defendants are citizens of states other than which the Plaintiff is a citizen. The amount in controversy substantially exceeds the requirement for Federal Diversity Jurisdiction and to guarantee a jury trial, exclusive of interest and costs. The Defendants are citizens of states other than the states in which the Plaintiff resides.

10. This Court has jurisdiction over the parties because the Defendants targeted their specific statements, publications, and tortious conduct at issue in this action directly toward and in Montgomery County, Pennsylvania.

11. Venue is proper pursuant to 28 U.S.C. § 1391 because all Defendants are subject to the Court's personal jurisdiction with respect to the civil action in question. The Defendants published their defamatory statements at Plaintiff's principal place of business, a private school in Montgomery County, Pennsylvania ("Plaintiff's School" or "The School") where they targeted their unlawful scheme.

## IV. FACTS

12. Plaintiff has been an educator, coach, dorm parent, administrator, and figure within his School community in Pennsylvania for over twenty-five (25) years, where he earned and maintained the highest esteem, respect, and gratitude of his supervisors, colleagues, students, and alumni.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

3

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1811a

13.     Shortly after joining his School in 1992, Plaintiff's skill and dedication as an educator quickly elevated him through the ranks of faculty and endeared him to students and alumni.

14.     In the fall of 2009, Plaintiff accepted a head of school position at another private school in order to continue his professional endeavors in education.  During this time as headmaster at another school, Plaintiff continued to maintain his relationships with former students, faculty, and alumni from his School in Pennsylvania, even attending class reunions and graduations.

15.     In July, 2016, Plaintiff returned to his School in Pennsylvania in a role where he helped generate capital gifts through the longstanding relationships he built and maintained with School alumni over his longstanding and successful career.

16.     Sometime prior to Plaintiff Doe's return to his School (i.e. July, 2016), Defendant Poulos sought out Defendant Garabedian to assist him with a fraudulent scheme to extort money from Plaintiff's School.[2]

17.     On April 11, 2018, the Garabedian Defendants sent a letter to the headmaster of Plaintiff's school and falsely stated that Plaintiff engaged in abhorrent conduct with a minor (identified as Defendant Poulos) twenty-five (25) years ago. A redacted copy of the April 11, 2018 letter is attached hereto as Exhibit "A."

18.     The Defendants statements in the April 11, 2018 letter were published as fact – not even as allegations, let alone opinions – even going so far to claim their statements were:

---

[2]   See, ¶¶ 7-8 of Defendant Poulos' *Pro Se* Motion to Dismiss Plaintiff's Complaint ("...at the time of the communication with Attorney Garabedian this teacher was no longer at 'HIS school community'... The teacher I talked about with Attorney Garabedian *was at the time The Head of School at a different institution* than the one I attended") (Emphasis added). Dkt. at 19.

The Beasley Firm, LLC
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.8360 (fax)
www.beasleyfirm.com

4

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1812a

only meant to briefly touch the surface of the relevant facts.

19.     The Defendants demanded $1,000,000.00 "for settlement" of Defendant Poulos' purported "claim," with the intent that Plaintiff and The School would fear the mere filing of any lawsuit, despite its complete lack of merit, substantively, in addition to which it would obviously be time-barred.

20.     At no time prior to publishing this letter and making these false defamatory statements did the Garabedian Defendants perform any investigation as to Defendant Poulos' statements.

21.     In response to the Defendants April, 2018 letter, a prominent third-party law firm in Philadelphia was retained and commenced an investigation into the matter.

22.     Despite numerous requests by phone, letter, and email, for additional information about the purported claims, the Garabedian Defendants did not respond for over seven (7) months.

23.     On December 26, 2018, the Garabedian Defendants published another letter setting forth further false abhorrent statements against Plaintiff. A redacted copy of this letter is attached hereto as Exhibit "B."

24.     The December letter contained substantive and typographical errors. It also changed the timeframe the purported conduct was said to have occurred when compared to the April letter.

25.     At the same time, the Garabedian Defendants sought to obtain Defendant Poulos' school records, by written authorization.   In other words, the Garabedian Defendants made their outrageous claims without even obtaining the readily available

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

5

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1813a

school records of their own client; records that would have shown Poulos' claims to be false.

26.    Per Defendant Poulos, the Garabedian Defendants never even asked Defendant Poulos to review either the April or December, 2018 letter to confirm their accuracy.[3]

27.    The third-party investigators made numerous requests to the Garabedian Defendants – for *even just a returned phone call or acknowledgement* – in order to move their investigation forward. The Garabedian Defendants never responded.

28.    The School also made numerous requests to the Garabedian Defendants to move its own review forward. The Garabedian Defendants never responded.

29.    Finally, having not heard from the Defendants in months, the School sent the Defendants a final notice; if they did not contact the School or third-party investigators by March 1, 2019, the School would assume the Defendants were not serious about pursuing the statements of fact they made against Plaintiff in their previous publications.

30.    Once again, the Garabedian Defendants never responded.

31.    The accusations made and published by the Defendants were – and are – completely false.

32.    At no time in his career has Plaintiff Doe ever had inappropriate contact with a student.

---

[3]  See, ¶ 9 of Defendant Poulos' *Pro Se* Motion to Dismiss Plaintiff's Complaint ("Prior to the receipt of the Complaint *I had never seen the letters* on my behalf by Attorney Garabedian to my former school.") (Emphasis added). Dkt. at 19.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

6

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1814a

33.     Prior to Defendants' letters, Doe was never accused of having had inappropriate contact with a student – nor have any other claims or accusations been made since.

34.     Defendants knew that Doe had never before been accused of having had inappropriate contact with a student.

35.     The Garabedian Defendants knew or should have known that allegations of abhorrent conduct with a minor would be catastrophic to the reputation of the accused and are *per se* defamatory.

36.     At the time the Defendants made their outrageous statements against Plaintiff and their demand for money, they knew Pennsylvania's statute of limitations would apply to any claim and that it required any civil action be brought within "12 years after [Poulos] attain[ed] 18 years of age," i.e. before his thirtieth (30th) birthday. 42 Pa. C.S.A. § 5533(b)(2)(i).

37.     The Defendants stated that Poulos was "currently *39 years of age*" in their April 11, 2018 letter.

38.     Thus, the Defendants knew that any possible claim (even putting aside the complete lack of substantive merit) *was barred by Pennsylvania's statute of limitations by more than nine (9) years.* [4]

39.     Furthermore, despite demanding a million dollars *from the school*, the Garabedian Defendants made no statement of fact or allegation that would give rise to a claim against *the school* for Plaintiff's purported conducted; there were no claims of

---

[4] The Defendants also knew any lawsuit would be barred by the statute of limitations in Plaintiff's home state (Ohio) by more than nine (9) years and also barred by Defendant Poulos' home state (Wisconsin) by more than four (4) years.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

7

**SECOND AMENDED COMPLAINT**
*DOE V. GARABEDIAN, ET AL.*

1815a

notice, inadequate supervision, or that Doe was acting in the course and scope of his employment.

40. The Defendants statements were not an attempt to compromise any valid or potential legal claim.

41. The Defendants never actually intended to file suit; a suit they *knew* to be unsustainable, meritless, and fatally deficient under the law.

42. The Defendants' statements were not for purposes of "settlement" of any claims because they knew no remotely viable claims existed.

43. Rather, the Defendants' improper purpose of their publications was to cause Plaintiff maximum emotional harm – and his most respected school a potential PR nightmare – in hopes of leveraging, by false and extortionate demands, a quick payout and contingency fee.

44. The Defendants sought to obtain that $1,000,000 from the school, with the school's consent, induced by the Defendants wrongful use of actual fear and under the color of official right.

45. Plaintiff earned and maintained a reputation as a pillar of truth, honesty, justice, and good repute within his community – and he fought for whatsoever things would come from that virtuous pursuit; he taught thousands of others to do the same.

46. As a direct and proximate result of the Defendants' malicious, outrageous, intentional and otherwise reckless conduct, the Plaintiff has suffered immeasurable harm to his personal and professional reputation and name, and significant embarrassment, humiliation, emotional turmoil, distress, and physical manifestations thereof, which will continue into the foreseeable future, and which damages are well in excess of the jurisdictional requisite.

8

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1816a

## V. THEORIES OF LIABILITY AND CAUSES OF ACTION

### COUNT ONE
### PLAINTIFF v. THE GARABEDIAN DEFENDANTS
#### DEFAMATION

47.   Plaintiff incorporates the above paragraphs by reference.

48.   The Garabedian Defendants' statements and letters were publications concerning Plaintiff.

49.   The Garabedian Defendants fully anticipated, knew, or should have known that the contents of their letter would foreseeably be distributed to other individuals within the school community, more than simply the headmaster to whom it was addressed, which did in fact occur.

50.   The Garabedian Defendants fully anticipated this letter would be distributed to the School's governing bodies, including the Board of Trustees (comprised of school alumni and parents of alumni), faculty oversight groups, and human resources, which did in fact occur.

51.   The Garabedian Defendants knew or should have known that the contents of their letter would foreseeably follow the Plaintiff everywhere, to any other academic community, and that Plaintiff would have to disclose the content of those letters in countless scenarios, ensuring emotional harm through the remainder of his life.

52.   The Defendants' statement, contained in the April 11, 2018 letter, that Defendant Poulos "was repeatedly sexually molested by [Plaintiff Doe]" is false and defamatory.

53.   Any statement or implication that Plaintiff Doe caused harm to Defendant Poulos is false and defamatory including, without limitation:

a)   ¶ 3, in its entirety, of the April, 2018 letter attached as Exhibit "A;" and

9

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

b)  ¶ 6, in its entirety, of the December, 2018 letter attached as Exhibit "B."

54.     Any inference, innuendo, or implication that Plaintiff Doe had _any_ contact with Defendant Poulos that was inappropriate or sexual in nature, at any time, is also completely false and defamatory _per se_.

55.     Each and every statement published by the Defendants pertaining to or describing inappropriate or sexual conduct by Plaintiff Doe, in either the April 11 or December 26, 2018 publications, is false and defamatory _per se_.

56.     The Garabedian Defendants' statements, identified above and attached hereto, are defamatory _per se_ where there could be no greater charge levied against an educator who has dedicated his life to his school and his students' well-being.

57.     The Garabedian Defendants advertise themselves as nationally recognized advocates for victims of child abuse and are readily aware of the Statute of Limitations and _prima facie_ elements of intentional torts and vicarious liability.

58.     The Garabedian Defendants never actually intended to file a suit; they _knew_ any suit was unsustainable, meritless, and fatally deficient under the law both substantively and procedurally.

59.     The Garabedian Defendants knew Poulos had never before reported or claimed, to the School or anyone else, any sexual or otherwise improper conduct by Plaintiff.

60.     The Garabedian Defendants knew the School had never received a complaint against Plaintiff Doe by Poulos or anyone else.

61.     The Garabedian Defendants knew there was no concealment or cover-up of any prior complaints or claims against Plaintiff Doe.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

10

SECOND AMENDED COMPLAINT
_DOE V. GARABEDIAN, ET AL._

1818a

62.     The Garabedian Defendants knew there was no confidential relationship between Poulos and the School or Plaintiff Doe.

63.     Nowhere in either the April or the December, 2018 letters do the Garabedian Defendants assert (1) any prior complaint to the School; (2) any mishandling of a past claim; (3) any intentional concealment of a claim; (4) any false statement; or (5) any fact whatsoever that would give rise to a *prima facie* case against the School.

64.     The Garabedian Defendants never intended "to settle" any potential claim for fraud or fraudulent concealment. If he had, he would have asserted such facts in his letters for the School to actually consider the potential merits – albeit none existed.

65.     The Garabedian Defendants never intended to file any suit.

66.     The Garabedian Defendants had an improper motive for their publications, which were motivated by malice to leverage the fear of the statements being published for a quick extortionate payout.

67.     The Defendants published the statements without reasonable cause before doing any preliminary investigation – even so much as reviewing Polous' easily accessible school records and in the other respects as averred above – and rather deliberately chose to turn a blind eye to the truth.

68.     In fact, even a minimal investigation would have confirmed the falsity of their malicious statements.

69.     Additionally, the Garabedian Defendants knew of Poulos' criminal background, which included numerous fraudulent schemes and past victims in multiple jurisdictions.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1819a

70.     As a direct and proximate result of the Garabedian Defendants' malicious, outrageous, intentional and otherwise reckless conduct and publications, Plaintiff has suffered the harm previously set forth herein, which will continue into the future.

**WHEREFORE**, Plaintiff hereby demands damages from the Garabedian Defendants in an amount significantly in excess of the jurisdictional limit for a jury trial, plus costs, delay damages, punitive damages, and such other relief as this Honorable Court deems just and appropriate.

## COUNT TWO
## PLAINTIFF v. THE GARABEDIAN DEFENDANTS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

71.     Plaintiff incorporates the above paragraphs by reference.

72.     The Garabedian Defendants' conduct and motives were outrageous, malicious, beyond all possible bounds of decency, and intolerable in a civilized community – especially that of the legal profession in this or any Commonwealth or State.[5]

73.     The Garabedian Defendants' conduct was intended to cause and/or otherwise recklessly caused Plaintiff to suffer the severe emotional distress that he has in fact suffered.

74.     The Garabedian Defendants knew that any claim against Plaintiff was false, meritless, and woefully deficient but still sought to inflict in Plaintiff the fear and emotional distress of being accused of such conduct in a public filing.

---

[5]  Plaintiff incorporates his Certificates of Merit (Dkt. No. 5, 6) as if fully set forth at length herein. Plaintiff attaches this standard language certificate to pre-empt any such defense that one would be required to plead a claim against an attorney. Plaintiff's claim of intentional infliction of emotional distress is *not* based on any advice Defendant Garabedian gave Defendant Poulos, in good faith, but rather Garabedian's *intent* to harm Plaintiff directly.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

12

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1820a

75.     The Garabedian Defendants sought to leverage the severe emotional distress of Plaintiff (which they intended to inflict) in order to extortionately strip a quick contingency fee from a false and patently frivolous "claim" that was most egregious in nature.

76.     As a direct and proximate result of the Garabedian Defendants' outrageous, atrocious and utterly intolerable conduct, Plaintiff has and will continue to suffer those damages previously set forth as well as severe emotional distress, which has physical manifestations including, but not limited to, nausea, stomach sickness, nightmares, lethargy, and which foreseeably requires medical care.

77.     The Garabedian Defendants knew that the contents of their letter would follow the Plaintiff everywhere, to any other academic community, and that Plaintiff would have to disclose the content of those letters in countless scenarios, exacerbating his emotional distress into the future.

**WHEREFORE**, Plaintiff hereby demands damages from the Garabedian Defendants in an amount significantly in excess of the jurisdictional limit for a jury trial, plus costs, delay damages, punitive damages, and such other relief as this Honorable Court deems just and appropriate.

## COUNT THREE
## PLAINTIFF v. KURTIS N. POULOS
### DEFAMATION

78.     Plaintiff incorporates the above paragraphs by reference.

79.     Defendant Poulos' statements of and concerning Plaintiff, are entirely, wholly, and completely false.

80.     Defendant Poulos' statement, contained in the April 11, 2018 letter, that he "was repeatedly sexually molested by [Plaintiff Doe]" is false and defamatory.

13

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1821a

81.    Any statement, inference, innuendo, or implication that Plaintiff Doe had any contact with Defendant Poulos that was inappropriate or sexual in nature, is also completely false and defamatory *per se*.

82.    Each and every statement published by the Defendants pertaining to or describing inappropriate or sexual conduct by Plaintiff Doe, in either the April 11 or December 26, 2018 publications attached hereto, is false and defamatory *per se*.

83.    Any statement or implication that Plaintiff Doe caused harm to Defendant Poulos is false and defamatory including, without limitation:

   a)  ¶ 3, in its entirety, of the April, 2018 letter attached as Exhibit "A;" and

   b)  ¶ 6, in its entirety, of the December, 2018 letter attached as Exhibit "B."

84.    Defendant Poulos' statements, identified above and attached hereto, are defamatory *per se* where there could be no greater charge levied against an educator who has dedicated his life to his school and his students' well-being.

85.    Defendant Poulos knew his statements of and concerning Plaintiff were false and that any suit was unsustainable, meritless, and fatally deficient under the law.

86.    Defendant Poulos knew he had never before reported, to the School or anyone else, any sexual or otherwise improper conduct by Plaintiff.

87.    Defendant Poulos knew his former School had never received any complaint against Plaintiff Doe for improper conduct with a student.

88.    Defendant Poulos knew there was no concealment or cover-up of any prior complaint or claim against Plaintiff Doe.

89.    Defendant Poulos knew that any claim that he was harmed by Plaintiff was false.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

14

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1822a

90.     Defendant Poulos knew or should have known that the contents of the letters sent on his behalf would foreseeably follow Plaintiff everywhere, to any other academic community, and that Plaintiff would be forced to disclose the content of those letters in countless scenarios, exacerbating his emotional damages into the future.

91.     Defendant Poulos intended for his statements to be disseminated to Plaintiff's School community, which did then occur.

92.     Defendant Poulos had an improper motive for his false statements levied against Plaintiff, which were motivated by malice to leverage a quick extortionate payout.

93.     As a direct and proximate result of Defendant Poulos' malicious, outrageous, intentional and otherwise reckless conduct and publications, Plaintiff has suffered the harm previously set forth herein, which will continue into the future.

**WHEREFORE**, Plaintiff hereby demands damages from Defendant Poulos in an amount in excess of the jurisdictional limit for a jury trial, plus costs, delay damages, punitive damages, and such other relief as this Honorable Court deems just and appropriate.

## COUNT FOUR
### PLAINTIFF v. KURTIS N. POULOS
#### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94.     Plaintiff incorporates the above paragraphs by reference.

95.     Defendant Poulos used his prior experience in fraud and intentional emotional harm – readily apparent from his criminal records in several states (also disregarded by the Garabedian Defendants) – to concoct a scheme to unlawfully obtain financial gain under the guise of a victim of sexual abuse; truly repulsive.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

15

**SECOND AMENDED COMPLAINT**
*DOE V. GARABEDIAN, ET AL.*

1823a

96. Defendant Poulos' conduct and motives were outrageous, malicious, beyond all possible bounds of decency, and intolerable in a civilized community.

97. Defendant Poulos intended to cause and/or otherwise recklessly caused Plaintiff to suffer the severe emotional distress that he has in fact suffered.

98. Defendant Poulos knew any claim against Plaintiff was false, meritless, and woefully deficient but still sought to inflict in Plaintiff the fear and emotional distress of being accused of such conduct in a public filing.

99. Defendant Poulos sought to leverage the severe emotional distress of Plaintiff (which he intended to inflict) – and the potential PR nightmare from his most respected School – in order to extortionately obtain financial gain from a false and patently frivolous claim that was most egregious in nature.

100. As a direct and proximate result of Defendant Poulos' outrageous, atrocious and utterly intolerable conduct, Plaintiff has and will continue to suffer those damages previously set forth as well as severe emotional distress, which has physical manifestations including, but not limited to, nausea, stomach sickness, nightmares, lethargy, and which foreseeably requires medical care.

**WHEREFORE,** Plaintiff hereby demands damages from Defendant Poulos in an amount significantly in excess of the jurisdictional limit for a jury trial, plus costs, delay damages, punitive damages, and such other relief as this Honorable Court deems just and appropriate.

THE BEASLEY FIRM, LLC
THE BEASLEY BUILDING
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

16

SECOND AMENDED COMPLAINT
*DOE V. GARABEDIAN, ET AL.*

1824a

## NOTICE OF PRESERVATION OF EVIDENCE

PLAINTIFF HEREBY DEMANDS AND REQUESTS THAT DEFENDANTS TAKE NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, WHETHER ELECTRONIC OR OTHERWISE, ITEMS AND THINGS IN THE POSSESSION OR CONTROL OF ANY PARTY TO THIS ACTION, OR ANY ENTITY OVER WHICH ANY PARTY TO THIS ACTION HAS CONTROL, OR FROM WHOM ANY PARTY TO THIS ACTION HAS ACCESS TO, ANY DOCUMENTS, ITEMS, OR THINGS WHICH MAY IN ANY MANNER BE RELEVANT TO OR RELATE TO THE SUBJECT MATTER OF THE CAUSES OF ACTION AND/OR THE ALLEGATIONS OF THIS COMPLAINT.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

THE BEASLEY FIRM, LLC

BY: _____
JAMES E. BEASLEY, JR., ESQ.
LANE R. JUBB, JR., ESQ.
LOUIS F. TUMOLO, ESQ.
1125 Walnut Street
Philadelphia, Pa 19107
215.592.1000
215.592.8360 (fax)
*Attorneys for Plaintiff*

Date: 20 June 2019

The Beasley Firm, LLC
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.8360 (fax)
www.beasleyfirm.com

17

SECOND AMENDED COMPLAINT
*Doe v. Garabedian, et al.*

1825a

# EXHIBIT "A"

LAW OFFICES
OF
MITCHELL GARABEDIAN

MITCHELL GARABEDIAN
WILLIAM H. GORDON
NATHAN A. GAUL
SALVATORE M. CIULLA
DANIEL R. MAHONEY
LEAH BRADY
MIRRA L. CAMPBELL

100 STATE STREET, 6TH FLOOR
BOSTON, MASSACHUSETTS 02109

(617) 523-6250
FAX (617) 523-3687

April 11, 2018

Headmaster
████ School

Pottstown, PA 19464

Re:     Sexual Abuse Claim of Kurtis Nicholas Poulos

Dear Mr. ████,

        Please be informed that this office represents Kurtis Nicholas Poulos. This letter is an attempt to settle and compromise claims involving ████████ (hereinafter "████████") and ████████'s supervisors at ████ School. It should not be used as evidence in any court hearing.

        Kurtis Nicholas Poulos., currently 39 years of age, was repeatedly sexually molested by ████████ from approximately 1993 when he was approximately 15 years of age years of age until approximately 1995 when he was approximately 17 years of age. During relevant times, ████████ was assigned to or affiliated with ████ School in Pottstown, Pennsylvania while Mr. Poulos was enrolled and attended school at ████ School.

        As a result of being sexually molested by ████████, Mr. Poulos's injuries include, but are not limited to, depression; sadness; crying; anxiety; emotional pain; sleep problems; concentration problems; low self-esteem; low self-respect; low self-confidence; apathy, finding himself not caring about things; not caring about his grades or his future while he attended ████ School; turned to drugs and alcohol to cope with the emotional pain; self-sabotaging the good things in his life; flashbacks and reminders; feeling broken and unfixable; sexuality problems such as being oversexed at times; problems with being touched; self-harm; feeling alone and isolated; feeling ostracized while he was at school; shame; embarrassment; guilt; self-blame; trust problems; intimacy problems; losing a dangerous amount of weight while at ████ School

LAW OFFICES
OF
MITCHELL GARABEDIAN

April 11, 2018
Page 2 of 2

because he did not feel like eating; suicidal ideation; creation of an emotional void in him; anger; confusion; feeling that ▮▮▮▮▮ ruined a part of his life; feeling that ▮ ▮▮▮▮▮ sent him down the wrong road in life; and feeling that ▮▮▮▮▮ stole his childhood innocence.

The aforementioned brief description is in no way meant to be exhaustive in its detail, but is only meant to briefly touch the surface of the relevant facts. The case is subject to substantive changes at any given time given the sensitive nature of the case.

Mr. Poulos's demand for settlement is $1,000,000.00.

I await your response.

Thank you.

Very truly yours,

*MG*

Mitchell Garabedian

EXHIBIT "B"

LAW OFFICES
OF
MITCHELL GARABEDIAN

MITCHELL GARABEDIAN
WILLIAM H. GORDON
NATHAN A. GAUL
SALVATORE M. CIULLA
DANIEL R. MAHONEY
MIRRA L. CAMPBELL

100 STATE STREET, 6TH FLOOR
BOSTON, MASSACHUSETTS 02109

(617) 523-6250
FAX (617) 523-3687

December 26, 2018

VIA FAX (████████)
AND FIRST CLASS MAIL

████████████

Norristown, PA 19404

Re:   Sexual Abuse Claim of Kurtis Nicholas Poulos

Dear ████████

As you know, this office represents Kurtis Nicholas Poulos with regard to his sexual abuse claim involving ████████████ and ████████ supervisors at ████ ██ School.

During our telephone conversation regarding this matter on December 21, 2018, you requested additional information about Mr. Poulos's sexual abuse claim. Pursuant to your request, and in further support of Mr. Poulos's claim, Mr. Poulos provides the following information:

Kurtis Nicholas Poulos (DOB ████ met ████████ during Mr. Poulos's freshman year at ████ School in approximately 1993 or approximately 1994 when Mr. Poulos was approximately 14 or approximately 15 years old. ████████ served as a table master in the dining hall and Mr. Poulos had a rotation at ████████'s table during Mr. Poulos's freshman year. Mr. Poulos recalls that ████████ was a mathematics teacher and a cross country coach at ████ School. Mr. Poulos recalls that ████████ lived in a dormitory of ████ School with ████████'s family. Mr. Poulos does not recall that anything inappropriate happened with ████████ during Mr. Poulos's freshman year at ████ School.

████████ was Mr. Poulos's geometry teacher during Mr. Poulos's sophomore year at ████ School in approximately 1994 and approximately 1995 when Mr. Poulos was approximately 15 and approximately 16 years old. Mr. Poulos recalls that classes were held on a rotating schedule at ████ School, so that classes met at different times of day. On certain days when Mr. Poulos had geometry as the last class of the day, ███ ████████ made Mr. Poulos stay behind in ████████'s classroom. ████████ and Mr.

1830a

LAW OFFICES
OF
MITCHELL GARABEDIAN

December 26, 2018
Page 2 of 2

Poulos were alone in the classroom after school on these occasions. Mr. Poulos recalls
that the geometry classroom was located at the end of a hallway. During the course of
Mr. Poulos's sophomore year, ██████ sexually abused Mr. Poulos in ██████'s
geometry classroom between approximately 10 and approximately 15 times. The sexual
abuse consisted of, among other things, ██████ fondling Mr. Poulos's penis and
testicles, skin on skin; ██████ making Mr. Poulos fondle ██████ penis and
testicles, skin on skin; ██████ putting his mouth on ██████'s penis; and
██████ making Mr. Poulos put his mouth on ██████'s penis.

The sexual abuse by ██████ ended with Mr. Poulos's sophomore year at ██
██ School. Mr. Poulos transferred to Marquette University High School, Milwaukee,
Wisconsin for his junior year of high school. Mr. Poulos returned to ██████ School for
his senior year, approximately 1996 to approximately 1997. Mr. Poulos had limited
contact with ██████ during Mr. Poulos's senior year, although Mr. Poulos recalls
that he and ██████ lived in the same dormitory during that year. Mr. Poulos does not
recall any sexual abuse during Mr. Poulos's senior year at ██████ School. Mr. Poulos
does not recall having any contact with ██████ after Mr. Poulos graduated from
██ School in approximately 1997 when Mr. Poulos was approximately 18 years old.

As I have previously advised you, Mr. Poulos has suffered numerous injuries as a
result of the sexual abuse by ██████, including, but not limited to, problems with
depression; sadness; crying; anxiety; emotional pain; sleep; concentration; low self-
esteem; low self-respect; low self-confidence; apathy; not caring about things in his life;
self-medicating with alcohol and drugs; sabotaging himself; flashbacks and reminders of
the sexual abuse; feeling broken and unfixable; sexuality; being touched; self-harm;
feeling alone and isolated; feeling ostracized at ██████ School; shame; embarrassment;
guilt; self-blame; trust; intimacy; losing weight while at ██████ School; suicidal
ideation; feeling an emotional void; anger; confusion; feeling like ██████ ruined a
part of his life; feeling like ██████ sent him down the wrong road in life; and feeling
like ██████ stole his childhood innocence.

Please advise me as to your client's position with regard to this matter.

Thank you.

Very truly yours,

Mitchell Garabedian