**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MATTHEW RALSTON** | : | |
| | : | |
| **Plaintiff** | : | **NO: 2:19-cv-01539** |
| | : | |
| **v.** | : | |
| | : | |
| **MITCHELL GARABEDIAN, ESQ., et al.** | : | |
| | : | |
| **Defendants.** | : | |

### PLAINTIFF'S PRETRIAL CONFERENCE MEMORANDUM

**I.    NATURE OF CASE AND BASIS FOR JURISDICTION**

This case stems from the Defendants' outrageous scheme, where they falsely accused Plaintiff of deplorable conduct in order to extort a contingent fee and monetary payoff. They published these statement to Plaintiff's supervisors and peers, which caused irreparable damage to the reputation he held amongst his colleagues and the bearding school community that he has served for over twenty years.

This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332. The Defendants are citizens of states other than which the Plaintiff is a citizen. The amount in controversy substantially exceeds the requirement for Federal Diversity Jurisdiction and to guarantee a jury trial, exclusive of interest and costs. This Court has jurisdiction over the parties because the Defendants targeted their specific statements, publications, and tortious conduct at issue in this action directly toward and in Montgomery County, Pennsylvania.

**II.    BRIEF STATEMENT OF FACTS**

This a defamation action where Plaintiff has sued a former student and his lawyer for sending false and extortionate letters to Plaintiff's former employer, which accused him of

1

sexually abusing the former student. The former student is Defendant Poulos. The attorney is Defendant Mitchell Garabedian.

Defendant Poulos was born into a family of success and wealth but was unable to meet the expectations of society. Once his mom, Mary Ellen Poulos (his last resort and only true friend), threatened to cut him off after he swindled his trust fund**s**, he told her all of his problems were a result of being "assaulted" at The Hill School where she forced him to attend (where her former U.S. Senator step-father attended).

Mary Ellen then created a life for Kurtis as an alleged victim, putting his apartment next to hers, telling all her friends that all his behavior and criminal problems were because he was "sexually abused" when he was at The Hill School. Poulos went along with it. Then The Hill School sent an email to alumni informing them that they were doing a proactive review of *historical* allegations of sexual abuse because other prominent Ivy-League-feeder-boarding schools were getting hammered (rightfully) in the press during the "Me-too" movement.  Poulos saw this and forwarded it to his mom to double down on his new victim role.

Mary Ellen was searching New York Times articles against other boarding schools and stumbled upon an article where Defendant Mitchell Garabedian was quoted. She called him up and Garabedian told her that the individuals who The Hill School hired to do the proactive review (prominent Cozen O'Conner attorneys) are just there "to help them cover it all up." Mary Ellen then tells Defendant Poulos to call Garabedian and tell his story. Poulos cannot come clean so does what his mother says.

In December 2017, Poulos called Garabedian and fed him the 'who, what, where, and when." Garabedian and Poulos knew the Statute of Limitations had expired by more than 9 years

in Pennsylvania. They signed a contingent fee agreement expressly agreeing that no lawsuit would be filed but that Garabedian would represent Poulos for "claims" against the School.

Months go by and there's no communication between the Defendants. Then, out of the blue, Garabedian sends a letter to the School in April 2018 reporting Poulos' claims and demands a million ($1,000,000.00) dollars from the School accusing Plaintiff of being the abuser. Poulos had no idea the letter was going to be sent. Poulos thought Garabedian would be contacting the School and not identifying the name of the alleged abuser. He also thought he would never have to go public.

The School immediately responds to Garabedian asking for more information so they can investigate the serious charges; but 8 months go by before Garabedian ever contacts them – despite the School's repeated requests. Finally in December 2018, Poulos' mom, Mary Ellen, has had enough of Garabedian's lack of responsiveness to them as well and Ms. Poulos threatens to go to the press or contact the School herself. This gets Garabedian's attention, and he finally calls the School back. The School asks for more details of Poulos' claims. A few days later, Garabedian's associate calls Poulos and has him describe the claims in more detail. This time – the *who,*[1] *where*, and *when* all change compared to the December 2017 intake call. Garabedian's associate ignores the material issues and sends another letter with more explicit statements accusing Plaintiff of sexually abusing Poulos.

The school responds by telling Plaintiff (who had worked and lived at The Hill School for twenty years and sent his two sons to The Hill School as well), "don't find yourself alone with a student."  They restricted his access to School and told him he was on his own if a lawsuit was ever filed against them. The School investigated the records they had but they needed to

---

[1] Poulos initially reported two abusers.

interview Poulos. Garabedian refused to make Poulos available, instead taking the position "will you agree to a non-confidential mediation if after the investigation, Mr. Poulos is found credible" despite the statute of limitations having run by a decade. This was a non-starter, designed only to help Garabedian's pockets but avoid actually having any scrutiny to his clients non-existent and fabricated claims. The School pleads with Garabedian to make Poulos available, but Garabedian ignores. The School sends a final letter – "if we don't hear from you by March 1, we will assume you have no serious interest in this matter." Garabedian did nothing and still has done nothing.

Plaintiff was tortured with these accusations and the devastation that it caused to his dream job, his mental state, and his family; so he filed suit against Garabedian and Poulos in an attempt to try to repair the damage to his name.

## III.    DAMAGES

Plaintiff claims monetary damages for the following non-economic items as a result of the publications:

  i.    the harm to his reputation;

  ii.    emotional distress, mental anguish, humiliation; and

  iii.    special injuries.

Plaintiff also claims damages for the harm to his earning capacity, which is approximately $419,732 to $782,407 depending on age of retirement – absent the defamation.

Plaintiff also seeks punitive damages against all Defendants for the outrageous and reckless conduct.

IV.     **WITNESSES AND SUBSTANCE OF TESTIMONY**

***Liability Witnesses***

- James Schwartzman, Esq., c/o The Beasley Firm, LLC, to testify as an expert regarding the following opinions:

    1) Garabedian engaged in the unauthorized practice of law in Pennsylvania violation of Pa. R.P.C. 5.5, which was negligent and reckless;

    2) Garabedian is also responsible for his associates, pursuant to Pa. R. P. C. 5.1., who also engaged in the unauthorized practice under the provisions

- Shanin Specter, Esq. c/o The Beasley Firm, LLC, to testify as an expert regarding the following opinions including the basis thereof:

    1) Garabedian failed to properly investigate Poulos' claims before publishing the defamatory letters at issue in this action as a reasonably prudent attorney would be expected under the circumstances. An attorney acting reasonably would have rejected Poulos as a client.

    2) Garabedian's decision to send the April 2018 letter to the Head of School by U.S. Mail was negligent and showed a reckless indifference to and conscious disregard for the truth and Ralston.

    3) The extent of Garabedian's lack of oversight of his associates is outrageous and contributed to the publication of the defamatory letters.

    4) Neither Garabedian nor Poulos intended that these statements in their letters to the School lead to any lawsuit or further judicial or quasi-judicial proceeding. Their express written intent was to the contrary and reaffirmed by subsequent conduct.

    5) Garabedian's conduct was extreme, outrageous, and recklessly caused Ralston severe emotional injuries.

- Mitchell Garabedian, Esq., c/o Swartz Campbell, LLC; Defendants as of cross.

- Kurtis Poulos, 3239 W. Colony Drive, Milwaukee, WI 53221; Defendant as of cross.

- Nathan Gaul, Esq. c/o Swartz Campbell, LLC,; Defendant employee as of cross.

- Daniel Mahoney, Esq. c/o Swartz Campbell, LLC; Defendant employee as of cross.

### *Liability and Damages Witnesses*

- Barbara Ziv, M.D. c/o The Beasley Firm, LLC, to testify as an expert regarding the following opinions:

    1) Kurtis Poulos' accounts of sexual assault by Matt Ralston are not consistent with the literature regarding memory and trauma.

    2) The actions of Matthew Ralston described by Kurtis Poulos do not conform to the behavior of sex offenders.

    3) Kurtis Poulos' History is consistent with unspecified personality disorder with borderline, narcissistic, and antisocial traits and pseudologia fantastica.

    4) Kurtis Poulos does not meet diagnostic criteria for PTSD.

    5) Matthew Ralston's history is not consistent with literature about sex offenders or pedophiles/hebophiles.

    6) The actions of Matthew Ralston described by Kurtis Poulos do not conform to the behavior of sex offenders or pedophiles/hebophiles.

    7) The emotional, psychological, social, and occupational impact that Mr. Poulos; false allegations have had on Matthew Ralston will likely persist for the remainder of Mr. Ralston's life.

- Matthew Ralston, c/o The Beasley Firm, LLC, will testify about his reputation prior to and after the defamation at issue, the falsity of the defamatory statements, the harm to his reputation, as well as the emotional distress, mental anguish, and humiliation he has sustained.  Mr. Ralston will also testify to the intricacies of The Hill School at all pertinent times that further demonstrate the falsity of Poulos' claims. He will also testify to the future lost earnings and inability to regain meaningful employment as a result of the defamation.

- Zachary Brusko. See attached designated deposition testimony.

- Mark Ralston c/o The Beasley Firm, LLC, to testify as to falsity, the reputation of Plaintiff, and impact of the defamatory statements at issue in this lawsuit on Plaintiff.

- Christopher Chirielesion, c/o Thomas Rees, Esq., to testify to his knowledge of The Hill School disciplinary policies in the relevant time periods, the falsity of the statements at issue, Plaintiff's reputation within The Hill Community at all pertinent times, the impact of the defamatory statements on Plaintiff, and Plaintiff's reputation in The Hill School community.

- William Yinger, c/o Thomas Rees, Esq., to testify to the teaching methods of Plaintiff at all pertinent times, the falsity of the statements at issue, Plaintiff's reputation at all pertinent times within The Hill Community as an educator and faculty mentor.

- Christopher Hopkins, c/o The Beasley Firm, LLC, to testify as to the falsity of the statements and defamatory impact of the statements at issue in this lawsuit as well as Plaintiff's reputation as a Dorm Parent and Coach.  Mr. Hopkins will also testify to the economic impact of the defamatory statements on Plaintiff's ability to obtain meaningful employment.

- Zachary Lehman. See attached designated deposition testimony.

- Leslie Gomez, c/o Douglas Fox, Esquire., 1650 Market Street, Suite 2800, Philadelphia, PA 19103, to testify to the information that she has pertaining to Defendants' defamatory statements, the attempted correspondence with Defendant Garabedian, Garabedian's lack of correspondence to The Hill School, the requests to interview Poulos, her expertise as a child protection expert, her review of historical allegations of abuse only as it pertains to the lack of any complaint against Plaintiff.

- Thomas Rees, Esq., c/o Paul Troy, Esq. 860 Beech Street, Pottstown, PA 19464, attorney for The Hill School, to testify as to correspondence with, and lack of cooperation from, Defendants, the investigation in Poulos' claims, Plaintiff's reputational harm to The Hill School Community.

- U.S. Navy Cpt. Benjamin Walborn, c/o The Beasley Firm, LLC, to testify to as to Plaintiff's character and reputation in 1993-1997 as a teacher, coach, and advisor including historical circumstances that caused Cpt. Walborn to maintain a friendship with Mr. Ralston. He will also testify to the Plaintiff's reputation and character for all years subsequent to his graduation.

### ***Damages Witnesses***

- Andrew Verzilli c/o The Beasley Firm, LLC, to testify as an expert as to the economic damages sustained by Plaintiff estimated to be between $419,732 and $782,407 depending on age of retirement – absent the defamation.

V.    **EXHIBITS**

| | *Item Description* | *Bates* |
|---|---|---|
| 1. | 04/11/18 and 12/26/2018 Letters<br>from Garabedian to The Hill School | P1.1 – P1.4 |
| 2. | Expert Report and CV of Shanin Specter, Esq. | P2.1 – P2.15 |
| 3. | Expert Report and CV of James C. Schwartzman, Esq. | P3.1 – P3.15 |
| 4. | Expert Reports and CV of Barbara Ziv, M.D. | P4.1 -P4.204 |
| | Evaluation of Poulos | P4.1 – 4.46 |
| | Evaluation of Ralston | P4.47 – 4.95 |
| | Appendixes A-G | P4.107 – 4.204 |
| 5. | Expert Report and CV of Andrew Verzilli | P5.1 – P5.20 |
| 6. | Yearbook Pages<br>1994<br>1995<br>1996<br>1997<br>2009 | <br>P6.1 – P6.6<br>P6.7 – P6.13<br>P6.14 – P6.19<br>P6.20 – P6.25<br>P6.26 – P6.230 |
| 7. | Plaintiff's Resume 2020 | P7.1 – P7.3 |
| 8. | Class of '97 Yearbook Photos<br>(*formerly P100*) | P8.1 – P8.11 |
| 9. | Correspondence Re: Departure from Hill | P9.1 – P9.25 |
| 10. | Student Evals of Plaintiff | P10.1 – P10.64 |
| 11. | Note from Student at Andrews School | P11.1 |
| 12. | Letters from Administrators/Colleagues | P12.1 – P12.10 |
| 13. | Speech by Chris Howell | P13.1 – P13.2 |
| 14. | Ltr. from Zwerner (Poulos' Cousin) | P14.1 |
| 15. | Plaintiff Employment records – Leelanau School | P15.1 – 15.78 |
| 16. | Hill School Production (K. Poulos) | P16.1 – 16.253 |
| 17. | Marquette University – Kurtis Poulos | P17.1 – P17.38 |

| 18. | Kurtis Poulos Unofficial Undergraduate Transcript – Marquette University | P18 |
|-----|---------------------------------------------------------------------------|-----|
| 19. | Marquette University – Mary Ellen Poulos | P19.1 – P19.23 |
| 20. | Mary Ellen Poulos Unofficial Transcript – Marquette University | P20.1 – P20.2 |
| 21. | Records of Charles Grade (K. Poulos) | P21.1 – P21.22 |
| 22. | Plaintiff's Income Tax Returns | P22.1 – P22.88 |
| 23. | Mary Ellen Poulos Production | P23.1 – P23.5 |
| 24. | Hill School Production - Plaintiff | P24.1 – P24.325 |
| 25. | Ph.D. Dissertation Acknowledgement | P25.1 – P25.7 |
| 26. | Note from Dismissed Hill Student | P26.1 |
| 27. | The Hill School Bulletin references | P27.1 – P27.16 |
| 28. | Text Messages Re: Wallace Gundy | P28.1 – P28.2 |
| 29. | Upper School East Photo | P29.1 – P29.5 |
| 30. | '94 – '95 Geometry Materials | P30.1 – P30.19 |
| 31. | '94 – '95 Geometry Student Reviews | P31.1 – P31.49 |
| 32. | '94 – '95 Math 4 Student Reviews | P32.1 – P32.55 |
| 33. | Campus Map | P33.1 |
| 34. | Floor Plans/Permits Upper School Basement – The Hill School | P34.1 – P34.28 |
| 35. | Verizon Records, K. Poulos | P35.1 – P35.48 |
| 36. | Hill School Leave/Departure Correspondence (2019) | P36.1 – P36.18 |
| 37. | American Strategic Insurance Records (Poulos) | P37.1 – P37.226 |
| 38. | Medical Records of Lisa Havens (Plaintiff -Psych) | P38.1 – P38.36 |

| 39. | Medical Records of Phillip Seimer, M.D. | P39.1 – P39.8 |
|---|---|---|
| 40. | Medical Records of Nathan March, D.O. | P40.1 – P40.601 |
| 41. | Medical Records of Pottstown Medical Specialists (Goldberg) | P41.1 – P41.23 |
| 42. | Handwritten Notes of Plaintiff | P42.1 – P42.2 |
| 43. | State of Maryland Criminal Records – Poulos | P43.1 – P43.8 |
| 44. | Milwaukee Circuit Court Criminal Records – Poulos | P44.1 – P44.47 |
| 45. | Worchester County Criminal Records – Poulos | P45.1 – P45.95 |
| 46. | Affidavit of Kerith Iverson Brand | P46.1 -P46.9 |
| 47. | Cozen O'Conner Production | P47.1 – P47.29 |
| 48. | Correspondence w/ Hill School (Counsel) | P48.1 – P48.69 |
| 49. | Social Security Calculator | P49.1 – P49.2 |
| 50. | Andrews School Employment File | P50.1 – P50.29 |
| 51. | Cards/Notes to Plaintiff<br>     (*formerly P8*) | P51.1 – P51.224 |
| 52. | Capital Giving Office Webpage<br>     (*formerly P51*) | P52.1 – P52.3 |
| 53. | Poulos Cumulative correspondence with The Beasley Firm | P53.1 – P53.69 |
| 54. | Hill School Supplemental Production ("HILLRAL") | P54.1-P54.11 |
| 55. | Garabedian Production. November, 2020.<br>("Garabedian") | P55.1-P55.353 |
| 56. | Garabedian File Production. March, 2021.<br>     Garabedian_File 1-273 (Poulos File) | P56.1-P56.273 |
| 57. | Garabedian File Production. March, 2021.<br>     Garabedian_File 274-1244 (Poulos Medical Records) | P57.1-P57.971 |
| 58. | Garabedian File Production. March, 2021. | P58.1-P58.609 |

| | | |
|---|---|---|
| | Garabedian_File 1245-1853 (Poulos Medical Records) | |
| 59. | Garabedian File Production. March, 2021.<br>Garabedian_File 1854-1960 (Misc. Correspondence) | P59.1-P59.107 |
| 60. | Garabedian File Production. March, 2021.<br>Garabedian_Email 1-129 (Emails) | P60.1-P60.129 |
| 61. | Leslie Gomez Privilege Log and Documents | P61.1-P61.87 |
| 62. | Depositions of Kurtis Poulos (Cumulative) (Transcripts and/or video recording) | P62.1-P62.973 |
| 63. | Depositions of Matthew Ralston (Cumulative) (Transcripts and/or video recording) | P63.1-P63.715 |
| 64. | Deposition of Mitchell Garabedian, Esq. (Transcript and/or video recording) | P64.1-P64.353 |
| 65. | Deposition of Daniel Mahoney, Esq. (Transcripts and/or video recording) | P65.1-P65.174 |
| 66. | Deposition of Nathan Gaul, Esq. (Transcript and/or video recording) | P66.1-P66.72 |
| 67. | Deposition of Mary Ellen Poulos (Transcript and/or video recording) | P67.1-P67.239 |
| 68. | Deposition of Zachary Brusko (Transcript and/or video recording) | P68.1-P68.101 |
| 69. | Deposition of Charles Grade, M.D. (Transcript and/or video recording) | P69.1-P69.138 |
| 70. | Deposition of Mark Ralston (Transcript and/or video recording) | P70.1-P70.55 |
| 71. | Deposition of Mary Beth Ralston (Transcript and/or video recording) | P71.1-P71.99 |
| 72. | Deposition of Christopher Chirielesion (Transcript and/or video recording) | P72.1-P72.56 |
| 73. | Deposition of William Yinger (Transcript and/or video | P73.1-P73.101 |

| | | |
|---|---|---|
| | recording) | |
| 74. | Deposition of Christopher Hopkins (Transcript and/or video recording) | P74.1-P74.113 |
| 75. | Deposition of Zachary Lehman (Transcript and/or video recording) | P75.1-P75.178 |
| 76. | Deposition of Leslie Gomez (Transcript and/or video recording) | P76.1-P76.254 |
| 77. | Deposition of Thomas Rees (Transcript and/or video recording) | P77.1-P77.334 |
| 78. | Deposition of Andrew Verzilli (Transcript and/or video recording) | P78.1-P78.96 |
| 79. | Deposition of Shanin Specter, Esq. (Transcript and/or video recording) | P79.1-P79.361 |
| 80. | Deposition of Barbara Ziv, M.D. (Transcript and/or video recording) | P80.1-P80.660 |
| 81. | Deposition of Robert Tintner, Esq. (Transcript and/or video recording) | P81.1-P81.75 |
| 82. | Deposition of Clifford Haines, Esq. (Transcript and/or video recording) | P82.1-P82.70 |
| 83. | Deposition of Frank Fetterolf, M.D. (Transcript and/or video recording) | P83.1-P83.87 |
| 84. | Deposition of Ben Walborn (Transcript and/or video recording) | P84 |
| 85. | Expert Report and CV of Robert Tintner, Esq. | P85.1-P85.24 |
| 86. | Expert Report and CV of Clifford Haines, Esq. | P86.1-P86.13 |
| 87. | Expert Report and CV of Gladys Fenichel, M.D. | P87.1-P87.37 |
| 88. | Expert Report and CV of Frank Fetterolf, M.D. | P88.1-P88.21 |
| 89. | Expert Report and CV of Stephen Scherf, CPA | P89.1-P89.38 |
| 90. | Expert Report and CV of Michael Smychynsky, MBA | P90.1-P90.9 |

| | | |
|---|---|---|
| 91. | Plaintiff's Cumulative Responses to Discovery | P91.1-P91.44 |
| 92. | Defendants' Cumulative Responses to Discovery | P92.1-P92.356 |
| 93. | Plaintiff's Discovery Requests to Defendant Poulos | P93.1-P93.65 |
| 94. | Defendant Poulos' Answer to Second Amended Complaint | P94.1-P94.13 |
| 95. | Defendant Poulos' Motion to Dismiss SAC | P95.1-P95.5 |
| 96. | Defendant Poulos' Motion for Judgment on the Pleadings | P96.1-P96.2 |
| 97. | Defendant Poulos' Motion for Protective Order | P97.1-P97.5 |
| 98. | Defendant Poulos' Cross-Claim Against Defendant Garabedian | P98.1-P98.12 |
| 99. | Defendant Poulos' Motion for Summary Judgment | P99.1-P99.31 |
| 100. | Any Exhibits Identified by Defendants | |
| 101. | Demonstratives | |

## VI.   ESTIMATED TRIAL LENGTH

Plaintiff anticipates that trial in this matter requires 6-7 days.

## VII.   SPECIAL COMMENTS

Counsel for the parties are working to coordinate certain non-party witnesses to appear remotely to the extent necessary and possible.

## VIII.   STIPULATIONS OF COUNSEL

1.     The Garabedian Defendants published the letters/statements at issue.

2.     The letters/statements at issue are of and concerning the Plaintiff.

## IX.   DEPOSITION TESTIMONY

Zachary Brusko. See designations attached as Exhibit "A."

Zachary Lehman. See designations attached as Exhibit "B."

Mitchell Garabedian. See designations attached as Exhibit "C."

**X.**     **Plaintiff demands a jury trial.**


                              **THE BEASLEY FIRM, LLC**

                    BY:     /s/ *Lane R. Jubb, Jr.*                      

                            JAMES E. BEASLEY, JR., ESQUIRE
                            LOUIS F. TUMOLO ESQUIRE
                            LANE R. JUBB, JR., ESQUIRE
                            Attorneys for Plaintiff
                            THE BEASLEY BUILDING
                            1125 Walnut Street
                            Philadelphia, PA 19107
                            215.592.1000
                            215.592.8360 (telefax)
                            Lane.jubb@beasleyfirm.com
Dated: 21 December 2021     Pa. I.D. No. 319272

## CERTIFICATE OF SERVICE

I, Lane R. Jubb, Esquire, hereby certify that a true and correct copy of the foregoing was served, via electronic filing upon the following:

Jeffrey B. McCarron, Esquire
Candidus K. Dougherty, Esquire
Swartz Campbell LLC
One Liberty Place, 38th Floor
1650 Market Street
Philadelphia, PA  19103
*Attorneys for Defendants, Mitchell Garabedian, Esq. and*
*Law Offices of Mitchell Garabedian*

I, Lane R. Jubb, Jr., Esquire, hereby certify that a true and correct copy of the foregoing was served, via Electronic mail and U.S. Mail upon the following:

Kurtis N. Poulos
3239 W. Colony Drive
Milwaukee, WI  53221

/s/ *Lane R. Jubb, Jr.*
LANE R. JUBB, JR., ESQUIRE

Date:  21 December 2021

Exhibit "A"
Deposition Designations of
Zachary Brusko

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MATTHEW RALSTON** | : | |
| | : | |
| **Plaintiff** : | | **NO: 2:19-cv-01539** |
| **v.** | : | |
| | : | |
| **MITCHELL GARABEDIAN, ESQ., et al.** | : | |
| | : | |
| **Defendants.** : | | |

**PLAINTIFF'S DEPOSITION DESIGNATIONS OF ZACHARY BRUSKO**

1.      8:5-10:10

2.      10:22-12:16

3.      18:18-22:8

4.      22:23-24:5

5.      25:23-26:13

6.      27:7-10

7.      27:21-28:19

8.      29:13-18

9.      29:21-30:18

10.     31:7-24

11.     33:12-35:20

12.     36:5-24

13.     37:4-38:1

14.     38:18-39:4

15.     39:14-40:1

16.     48:18-23

17.     49:18-50:1

18.     50:17-23

19.     51:10-23

20.     52:1-12

21.     65:23-66:14

22.     71:12-72:4


**THE BEASLEY FIRM, LLC**

BY:      /s/ *Lane R. Jubb, Jr.*
         JAMES E. BEASLEY, JR., ESQUIRE
         LOUIS F. TUMOLO ESQUIRE
         LANE R. JUBB, JR., ESQUIRE
         Attorneys for Plaintiff
         THE BEASLEY BUILDING
         1125 Walnut Street
         Philadelphia, PA 19107
         215.592.1000
         215.592.8360 (telefax)
         Lane.jubb@beasleyfirm.com
         Pa. I.D. No. 319272

Dated: 21 December 2021

Zachary Brusko

1            UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                   No. 2:19-cv-01539

4     **********************************

5     JOHN DOE,

6               Plaintiff,

7     v.

8     MITCHELL GARABEDIAN, ESQ. LAW

9     OFFICES OF MITCHELL GARABEDIAN

10    and KURTIS N. POULOS,

11              Defendants.

12    **********************************

13

14              Remote via Zoom Videotaped

15    Deposition of ZACHARY BRUSKO, held at the

16    location of the deponent in Bethel,

17    Connecticut, commencing at 5:13 p.m., on the

18    9th of December, 2020, before Maureen

19    O'Connor Pollard, Registered Diplomate

20    Reporter, Realtime Systems Administrator,

21    Certified Shorthand Reporter.

22                   – – –

              GOLKOW LITIGATION SERVICES

23        877.370.3377 ph | 917.591.5672 fax

                   deps@golkow.com

24

Zachary Brusko

```
 1   APPEARANCES:   ALL PARTIES APPEARED REMOTELY

 2   FOR THE PLAINTIFF:

 3       LANE JUBB, ESQ.

 4         THE BEASLEY FIRM, LLC

 5         1125 Walnut Street

 6         Philadelphia, Pennsylvania 19107

 7         215-592-1000

 8         lane.jubb@beasleyfirm.com

 9

10   FOR THE GARABEDIAN DEFENDANTS:

11       CANDIDUS K. DOUGHERTY, ESQ.

12         SWARTZ CAMPBELL, LLC

13         300 Delaware Avenue

14         Washington, Delaware 19801

15         302-656-5935

16         cdougherty@swartzcampbell.com

17

18   Appearing Pro Se:

19     KURTIS POULOS

20         3239 W. Colony Drive

21         Greenfield, Wisconsin 53221

22         262-330-4604

23

24   Videographer:   James Vonwiegen
```

Zachary Brusko

```
1                     INDEX

2   EXAMINATION                      PAGE

3   ZACHARY BRUSKO

4   BY MR. JUBB                        5

5   BY MS. DOUGHERTY                  51

6   BY MR. POULOS                     77

7   BY MS. DOUGHERTY                  83

8

9

10            E X H I B I T S

11   NO.          DESCRIPTION         PAGE

12  D-1       E-mail chain.................   84

13  D-2       4/23/16 letter from The

              Hill School to Hill School

14            Alumni and Parents...........   84

15  P6.12     Page 172 of yearbook..........  19

16  P33.1     Map of The Hill School

              campus.......................   14

17

    P34.1     Hill School blank schedule

18            form.........................   47

19

20

21

22

23

24
```

Zachary Brusko

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now

 4       on the record.  My name is James

 5       Vonwiegen, I'm a videographer for

 6       Golkow Litigation Services.

 7              Today's date is December 9th,

 8       2020, and the time is 5:13 p.m.

 9              The remote video deposition is

10       being held in the matter of Doe versus

11       Garabedian, et al, for the United

12       States District Court for the Eastern

13       District of Pennsylvania.

14              The deponent is Zachary Brusko.

15              All parties to the deposition

16       are appearing remotely and have agreed

17       to the witness being sworn in

18       remotely.

19              Due to the nature of remote

20       reporting, please pause briefly before

21       speaking to ensure all parties are

22       heard completely.

23              Counsel will be noted on the

24       stenographic record.
```

Zachary Brusko

1              The court reporter is Maureen

2         Pollard, and will now swear in the

3         witness.

4

5              ZACHARY BRUSKO,

6    having been duly remotely sworn, was examined

7    and testified as follows:

8                   EXAMINATION

9    BY MR. JUBB:

10        Q.    Good evening.  Mr. Brusko, am I

11   saying your name correctly?  Is it Brusko or

12   Brusko?

13        A.    Brusko.

14        Q.    Thank you.

15             I'm going to go over a couple

16   of things instructions-wise for purposes of

17   this deposition so that you and I are both on

18   the same page.

19             My name is Lane Jubb.  I

20   represent the plaintiff in this case.  And

21   this is a deposition where you've taken an

22   oath very similar -- strike that.  It's

23   analogous to the same oath that you would

24   take in a courtroom.

Zachary Brusko

1   reporter, if you could just wait that extra

2   half a second until I'm finished before you

3   give your answer, that would be really

4   appreciated.

5                    Have you ever given a

6   deposition before?

7        A.      No, I have not.

8        Q.      Okay.  Where are you currently

9   today?

10       A.      Bethel, Connecticut.

11       Q.      How long have you been in

12   Bethel?

13       A.      Three years, three and a half

14   years, something like that.

15       Q.      What do you do for a living?

16       A.      I'm a high school teacher.

17       Q.      What high school?

18       A.      St. Luke's School in New

19   Canaan, Connecticut.

20       Q.      You said New Canaan?

21       A.      Yeah.

22       Q.      And what do you teach?

23       A.      Computer science.

24       Q.      Do you do any other coaching,

Zachary Brusko

```
 1    or have any other administrative roles at
 2    St. Luke's?
 3         A.     I coach middle school
 4    cross-country as an assistant, and I am a
 5    varsity cohead coach for ice hockey in the
 6    winter.
 7         Q.     Can you give us the CliffsNotes
 8    on your educational background, please?
 9    Where did you go to high school?
10         A.     The Hill School, Pottstown,
11    Pennsylvania.  I have a -- sorry.
12         Q.     Sorry.
13                What year did you graduate
14    middle school?
15         A.     1997.
16         Q.     Where did you go after Hill
17    School?
18         A.     Hobart College in Geneva, New
19    York.
20         Q.     When did you graduate Hobart?
21         A.     2001.
22         Q.     Following your graduation from
23    Hobart, what did you do next?
24         A.     I went to work at The Hill
```

**P68.9**

Zachary Brusko

1    School in -- I started in 2001 right after

2    graduation.

3         Q.      So immediately after college

4    you went back to The Hill School?

5         A.      Correct.

6         Q.      What did you do at The Hill

7    School in 2001, beginning?

8         A.      I started working -- my main

9    job that year was student schedules, managing

10   student records.

11        Q.      When you say "student

12   schedules," are you referring to coordinating

13   classes and -- students and what classes they

14   should take and things like that?

15        A.      Correct.  We had someone who

16   was in charge of the actual decision-making

17   process working with the kids, working with

18   the families.  I basically that first year

19   just did the software end of it of putting

20   the master schedule together based on the

21   information I was given from my bosses.

22        Q.      Okay.  How long were you at The

23   Hill School for purposes of a member of the

24   staff or faculty?

**P68.10**

Zachary Brusko

```
 1          A.      I worked there for 13 school
 2    years.
 3          Q.      So you left in approximately
 4    2014?
 5          A.      Yes.  It was June, this is --
 6    I've been gone seven -- yeah, that sounds
 7    right.
 8          Q.      And after you left The Hill
 9    School, where did you go?
10          A.      I went to a private school in
11    Alabama called Bayside Academy.
12          Q.      And what did you do there?
13          A.      I taught full-time computer
14    science -- well, it was more like computer
15    applications, or I don't really know what
16    you'd call it, but it was computer-related
17    teaching for a year.
18          Q.      So with respect to your time in
19    high school at The Hill School, in what year
20    did you begin attending The Hill School?
21          A.      Fall of 1994.
22          Q.      And did you enter as a freshman
23    or a third form?
24          A.      Sophomore.
```

Zachary Brusko

```
 1          Q.      Would that have been fourth
 2    form?
 3          A.      Yes.
 4          Q.      Where did you reside
 5    permanently at that time?
 6          A.      Like my family?
 7          Q.      Yes.
 8          A.      It was in Whitehall,
 9    Pennsylvania.
10          Q.      Were you a dorm student at that
11    time?
12          A.      I was.
13          Q.      Do you recall what dorm you
14    lived in your fourth form year?
15          A.      Yes, Upper School East, first
16    floor.
17                  MS. DOUGHERTY:  Does somebody
18          have a television or something on in
19          the background?  Am I the only one
20          that hears speaking in the background?
21                  MR. JUBB:  I hear a tiny bit of
22          something, but it's not in any way
23          impeding what I'm trying to do.
24                  ///
```

Zachary Brusko

1    roommate was?

2         A.    I had a triple.  It would have

3    been Eugene Martinsen and Kevin Sy.

4         Q.    Were those roommates that were

5    assigned to you as a first-year student, or

6    did you have an opportunity to know these

7    individuals before coming to The Hill School?

8         A.    No, we were all new.  Actually,

9    Gene and I were roommates assigned by the

10   school.  We did not know each other.  And

11   then at some point during the year Kevin, for

12   whatever reason I actually don't remember, I

13   guess he wasn't getting along with his

14   roommate, he moved in and we became a triple,

15   because we had a big room.  But I knew him

16   when he moved in, but we didn't know him

17   prior to the school year.

18        Q.    During the fourth form year, do

19   you recall whether or not an individual by

20   the name of Kurtis Poulos was on your dorm

21   floor?

22        A.    Yes.

23        Q.    I'm going to show you something

24   here.

Zachary Brusko

```
 1                      For the record, this has been
 2      marked already P6.12.
 3                      (Whereupon, Plaintiff's Exhibit
 4              Number P6.12 was marked for
 5              identification.)
 6      BY MR. JUBB:
 7              Q.      Mr. Brusko, what does this
 8      appear to be?
 9              A.      This looks like our dorm photo,
10      or yearbook photo.
11              Q.      And are you in this?
12              A.      I am.
13              Q.      Can you tell us where?
14              A.      I'm in the second row from the
15      bottom on the right sitting with a black
16      shirt, kind of hunched over a little bit.
17              Q.      When was the last time you've
18      seen this?
19              A.      Oh, I don't know.  That's a
20      good question.  Ten or more years.  It's been
21      a long time.
22              Q.      Do you stay in touch with any
23      of the guys in this photo?
24              A.      No, there's nobody in this
```

Zachary Brusko

1    photo I've spoken to in a very long time.

2          Q.    Okay.  And in this photo, do

3    you see anywhere where Mr. Poulos is

4    depicted?

5          A.    I think he's right in front of

6    me.

7          Q.    At any point in -- strike that.

8                Do you have any recollections

9    of interacting with Mr. Poulos during your

10   fourth form year?

11         A.    Yeah, I mean, we were friendly.

12   It's such a long time ago, I don't remember a

13   lot of specifics.  I feel like there were

14   times we were potentially playing video games

15   in Chris Drowne's apartment, general dorm

16   thing.  I don't know.  It's such a long time

17   ago, I don't want to -- I don't have clear

18   remembrances of specific instances, but I

19   mean, I know we were friendly.  I know he was

20   there.

21         Q.    At any point in time during

22   your fourth form year, did you come to learn

23   of a teacher named Matthew Ralston?

24         A.    Yes.

**P68.2o**

Zachary Brusko

1          Q.      Can you tell us what

2    Mr. Ralston's reputation was during your

3    fourth form year?

4          A.      I don't know.  I knew him from

5    cross-country.  I was on the lowest level

6    cross-country team, and I'm fairly certain he

7    was maybe a varsity coach of some kind.  I

8    think he was well-liked, but, you know, I was

9    new and didn't have him as a teacher.

10             But I don't -- I wouldn't say

11   anything other than he was somewhat popular,

12   I would say, well-known and well-liked.  But

13   I didn't know him well at that time.

14        Q.      Eventually during your --

15   strike that.  Let me back up.

16             At any point in time during

17   your fourth form year, did you ever notice

18   anything that in your mind suggested that

19   Mr. Poulos was in any way not okay, or that

20   anything inappropriate was going on with him

21   and a member of the faculty?

22             MS. DOUGHERTY:  Objection.

23   BY MR. JUBB:

24        Q.      Did you say no?

Zachary Brusko

1          A.        I didn't answer.   Should I
2      answer that?
3          Q.        Yes, please.
4          A.        I don't recall, no.   I don't
5      recall ever seeing that.
6          Q.        And during your fifth form
7      year, do you recall what dorm you were in?
8          A.        Middle School.
9          Q.        Was -- is Middle School on the
10     map that I had shown you?
11         A.        No.   I think that's a newer
12     map.   There's a different building in its
13     place.
14         Q.        And what building would that
15     be?
16         A.        It was directly opposite.
17     Although the academic center is the one
18     that's there now, I don't remember the
19     number, it's directly opposite Upper School
20     in the quad, with the chapel and library on
21     the sides.
22         Q.        Who was going -- strike that.
23               Who was your roommate that
24     year?

Zachary Brusko

1        A.      Well, I basically ended up

2   having a single that year, but Kurtis was my

3   roommate for the first few days of school.

4        Q.      And during the first few days

5   of school, what do you recall about your

6   interactions with Mr. Poulos then?

7        A.      I really don't remember.  It

8   was 25 years ago.  It was only a few days.

9   But I don't necessarily remember anything out

10  of the ordinary from what would have been the

11  opening of the school year.

12       Q.      It's my understanding that

13  Mr. Poulos left.  Did you have any knowledge

14  as to why Mr. Poulos left?

15       A.      Not really.  It was my

16  understanding, I think, at the time that it

17  was something back home that he needed to be

18  home for.  I don't really remember the

19  details, or I don't know if I was ever even

20  told the details.

21               I do -- I just -- it's a little

22  fuzzy, but my remembrance was basically there

23  was some reason at home, something at home,

24  family-related or something.  I'm not

Zachary Brusko

```
1    certain.
2         Q.      Did you and Mr. Poulos ever
3    discuss any of his family issues at home?
4         A.      Not with any detail, no.   Not
5    specifically, no.
6         Q.      So when you learned that he was
7    going to essentially -- strike that.
8               How did you learn, if you can
9    recall, how he was going to be leaving?
10        A.      I don't know.   I don't know if
11   he told me that he was thinking about
12   leaving.   I don't know if he told me that he
13   was leaving.   I don't remember him actually
14   leaving.   My assumption is he would have told
15   me, and there would have been a moving out
16   process.   I can't imagine I came back from
17   class one day and he was gone.
18        Q.      What do you recall, if
19   anything, about any of the discussions with
20   Mr. Poulos with respect to him leaving and
21   you having a single, if any?
22        A.      I remember he left a number of
23   things behind that I was able to use for the
24   year.   But beyond that, I was hoping to keep
```

Zachary Brusko

1    a single for the year.  I remember I didn't

2    want the school to put somebody else in

3    there.

4              But in terms of those

5    details -- obviously I must have known,

6    because it was a different time, we didn't

7    have cell phone and e-mail and things like

8    that.  So clearly he left some things behind

9    that we had spoken about me keeping for the

10   year.  But beyond that, I don't know.

11        Q.    And when you say "keeping for

12   the year," why does the year stand out in

13   your mind of just him giving you his stuff?

14        A.    You know, I don't remember.  I

15   do feel like at the time I probably thought I

16   was just keeping those, because I didn't

17   actually know if he was coming back or not.

18   So I shouldn't say for the year because at

19   that time there was no understanding that he

20   would be coming back, which he did, I

21   believe, for senior year.  So maybe I

22   shouldn't have said for the year.

23        Q.    When he came back, do you have

24   any recollection of speaking with Mr. Poulos

Zachary Brusko

 1    when he returned?

 2         A.     Yeah, okay, so this is starting

 3    to become a little clearer.

 4                Yeah, I do remember, because he

 5    did want some of his items back.  We didn't

 6    live together, he was in a different -- I was

 7    a prefect back in Upper School.  And he did

 8    take some of his items back, if I recall.

 9         Q.     In other words, he came back

10    and said, "hey, you've got my stuff, I'd like

11    it back," or something to that extent?

12         A.     That was the effect.  I don't

13    remember the conversation.

14         Q.     Did you have any friendly

15    relationship with Mr. Poulos during the sixth

16    form year?

17         A.     You know, we were in different

18    dorms with different, you know, different

19    circles there.  I would say we were friendly,

20    but I don't really recall spending much time

21    together given my prefect duties.

22                There was a bit of a separation

23    at those times between prefects who lived in

24    under-form dorms and the rest of the senior

Zachary Brusko

1    class.

2            So I don't know, I don't -- I

3    wouldn't say we were friends, but we

4    certainly weren't estranged.  I mean, we were

5    friendly, or we'd say hello or something like

6    that, if I recall.

7            Q.      During your fifth form year,

8    did you ultimately end up having a single

9    that whole year?

10           A.      I did.

11           Q.      Did you ever have any reason to

12   interact with Mr. Ralston during your fifth

13   form year?

14           A.      I don't know.  I didn't run

15   cross-country, was not in the same dorm, did

16   not have any classes with him, so I can't

17   imagine our paths crossed very often.  I

18   don't think we sat at the same table for

19   meals or anything.  I don't think we crossed

20   paths at all that year.

21           Q.      During your sixth form year,

22   where did you live?

23           A.      Upper School East, but this

24   time on the second floor.

Zachary Brusko

 1          Q.      What are the roles of a
 2     prefect?
 3          A.      Similar to what an RA would be
 4     at a university, but maybe a little more
 5     strict.  We would do nightly check-ins, make
 6     sure kids were lights out, monitor study
 7     hall, make sure they were quiet in their
 8     rooms, that kind of thing.
 9          Q.      Do you remember who your
10     prefect was the fourth form year on 1 Upper
11     School East?
12          A.      We had Eric Weston.  We had two
13     twin brothers -- no, not two twin brothers.
14     Down at the opposite end of my hall was Matt
15     Adukaitis and Colin Dougherty, he had a twin
16     brother, and I forget which was which, if
17     Colin was on our floor or a different floor.
18     And then across from me was a Jason Boyd and
19     Eric Weston.
20               MR. POULOS:  Jason was
21          Apartment, right?  That was his
22          nickname?
23               THE WITNESS:  Yes, that's
24          right.

Zachary Brusko

```
1    BY MR. JUBB:
2         Q.    And in other words, Mr. Weston
3    and Mr. Adukaitis were the prefects on 1
4    Upper School East, is that right?
5         A.    Well, there were four.
6         Q.    There were four prefects
7    actually?
8         A.    So -- yeah.  So Eric and Jason
9    were roommates, and then the other two
10   were -- I think it was Colin and Matt
11   Adukaitis, if I remember -- if I'm
12   pronouncing that the way I remember it.
13        Q.    And would the prefects have any
14   role, like you said, in enforcing, you know,
15   nightly check-ins, observing the students to
16   make sure that they're complying with room
17   checks and things and whatnot?
18        A.    Yeah, that was their main job.
19        Q.    If a student ever had any sort
20   of concerns -- let me ask you this.
21              What type of relationship would
22   prefects have with the younger formers?
23        A.    Obviously it would vary.  I
24   think the purpose was to be big brotherly,
```

Zachary Brusko

1   you know, role model, but also -- I mean, at

2   that time at an all boys boarding school, I

3   don't know what the word is, I wouldn't say

4   like -- you know, just the way a big brother

5   might -- I don't want to say intimidate, but

6   kind of -- I don't know.  I don't know what

7   I'm saying.  I think it was big brotherly,

8   some were close, some were not, some would

9   try to be intimidating in their role, some

10  would not.  It varied.

11          I found them to be not

12  particularly intimidating.  They were kind of

13  big brotherly.  Jason and Eric would let me

14  stay up late sometimes and let me watch

15  Beavis and Butt-Head with them.  So sometimes

16  they would break the rules.  I mean, they had

17  various levels of competency in their duties

18  from person to person.

19      Q.    Okay.  During your sixth form

20  year when you were a prefect, did you have

21  any recollection of having Mr. Ralston as

22  either a coach, a teacher, or a table head?

23      A.    I don't.  Well --

24      Q.    And -- sorry to interrupt you.

Zachary Brusko

1          A.      I'm just thinking.  I don't.  I

2    don't remember all of my table heads over the

3    years.  But again, I was out of

4    cross-country, I think he was also involved

5    in track which I didn't run.  I never had him

6    as a classroom teacher.

7          Q.      During your fifth form year and

8    your sixth form year, what was Mr. Ralston's

9    reputation like, if anything different from

10   what it was during your fourth form year?

11         A.      I don't think it was any

12   different.  I believe he was in one of the

13   senior dorms of Rolfe perhaps.  So, you know,

14   I know kids liked him, but, again, I didn't

15   get over there very often, so I didn't -- I

16   didn't have a personal sense other than,

17   again, just a general -- he wasn't someone I

18   heard people complain about that they didn't

19   like.

20         Q.      And ultimately when you

21   rejoined the school, did your role -- was

22   that considered faculty member, or was that

23   considered staff at the time?

24         A.      It was staff at the time.

Zachary Brusko

1    faculty position, which is why I was a table
2    head.  And also I taught -- I co-taught
3    part-time.  Like one class I co-taught, so I
4    didn't have my own class at the time.
5         Q.    Did you have any coaching
6    responsibilities?
7         A.    I had been coaching varsity
8    girls ice hockey, and that's it for coaching.
9    I did some other things in athletics.  I did
10   timing track meets and things like that, but
11   I didn't coach anything else.
12        Q.    When you rejoined The Hill
13   School following your graduation from Hobart,
14   did you have occasion to interact with
15   Matthew Ralston?
16        A.    So he was at the time, I don't
17   know the exact title, academic dean, or dean
18   of studies, dean of studies, something along
19   those lines, director of studies, and he was
20   leaving that position and was being replaced
21   by someone who didn't want to do the things
22   that I was hired for.  So he was going in,
23   but didn't have the technical background,
24   didn't want to manage the student data,

Zachary Brusko

1   didn't want to do the scheduling, didn't want

2   to do the computer side of it.

3              So when I went back, Matt was

4   one of the main people I interviewed with

5   because I was taking over, you know,

6   25 percent of his job, something like that.

7       Q.    Okay.  And did you have any

8   other interactions with him throughout your

9   time at The Hill School?

10      A.    As an employee?

11      Q.    Yes, sir.

12      A.    So early on, you know, we

13  worked a little bit together as he was

14  teaching me the ropes.  But after my first

15  year we switched software systems, and I kind

16  of took over and ran with whatever my role

17  was.  After that he was friendly with the

18  people in my office so I would see him from

19  time to time, but we didn't -- we never lived

20  in the same building, we never coached

21  together.  But obviously, you know, I got to

22  know him a little bit simply just because of

23  his connection to the office.

24      Q.    During your time coming back to

P68.34

Zachary Brusko

1    The Hill School as an employee through the

2    time of Mr. Ralston's departure in around the

3    2009-2010 time frame, did you have an

4    understanding as to what his reputation was

5    like amongst your staff and faculty

6    colleagues?

7         A.     He was well-liked and respected

8    from what I could tell.  I mean, he had an

9    administrative role, he coached, dorm.

10   You're at a school like that long enough you

11   tend to do a little bit of everything, and so

12   everybody knew him fairly well from what I

13   could tell.

14        Q.     At any point in time during

15   your time as a student as well as the time as

16   a faculty member at The Hill School, are you

17   aware of any complaint or rumor or anything

18   of the sort pertaining to Mr. Ralston in any

19   way being inappropriate with a student?

20        A.     No.

21        Q.     As part of the responsibilities

22   of the table head, it's my understanding that

23   there were three semesters that were broken

24   up into two parts, the six total grading

Zachary Brusko

1    periods if you will, and that every grading

2    period you'd rotate the tables.  Is that

3    consistent with your recollection?

4         A.    Yes.

5         Q.    When you serve as a table head,

6    do you check students in, or is there any

7    sort of attendance process?

8         A.    It's the same kids for five,

9    six weeks, so you tend to know who they are.

10   So we would take attendance and report if

11   they weren't there, but there wasn't a

12   formal -- at the time there may have been

13   little cards that were put on the tables and

14   you would write names of kids who were

15   absent.  That might have been part of it.

16   But it wasn't -- it was just you're seeing

17   who is there and you would jot down names and

18   it on the card, or you would e-mail the

19   deans.  When I was -- as a table head, by

20   then obviously we had e-mail.

21              But it was the meal would

22   start, everyone would come to the table, we'd

23   sit down together, they'd have their little

24   blessing and announcements and things, and it

Zachary Brusko

1   wasn't like a formal check in per se, but

2   attendance was taken.

3         Q.      Was -- strike that.

4                 To the extent that attendance

5   was taken and it was required, would there be

6   demerits issued if a student did not attend a

7   meal?

8         A.      Yes, I believe there was a

9   punishment.

10        Q.      During your time there as a

11  table head, was it ever a situation where a

12  student could show up and simply check in and

13  leave?

14        A.      Yes, but they would have to

15  provide a legitimate reason.  And every --

16  you know, every table head would interpret

17  the rules differently.  But if someone came

18  and said during lunch, "I've got a big test

19  next period, can I leave early," from time to

20  time I would say yes to that.

21        Q.      And when you say -- I'm sorry.

22        A.      Not every day.  The expectation

23  is they're at the meals.  So there's always

24  exceptions if you're trying to be nice to the

Zachary Brusko

1    kids.

2         Q.    To the extent that someone were

3    to, in your -- strike that.

4              Based on your experience, can

5    you ever recall a situation where a student

6    would simply show up, listen to the

7    announcements, and then be permitted to

8    leave?

9              MS. DOUGHERTY:  Objection.

10             Are you asking when he was a

11        table head, or when he was at school?

12             MR. JUBB:  Yes, I am.

13             MR. POULOS:  Which one?

14             MR. JUBB:  The former.

15    BY MR. JUBB:

16        Q.    So I'll clarify because I

17    understand the request there.

18             At the time that you were

19    personally a table head, was there ever an

20    occasion that you can recall where students

21    could simply show up for an entire list,

22    listen to the announcements, and then leave?

23        A.    If it was my table, I certainly

24    wouldn't have let that happen without -- if

Zachary Brusko

1    the student hadn't made some prior

2    arrangements.  So if it was every day, I

3    certainly would have said something to the

4    deans about it.

5          Q.    And do you believe that your

6    practices were consistent with those of your

7    colleagues and the faculty?

8          A.    I would assume.  But I can't

9    say for certain what other people did, but

10   that's what we were supposed to do, so...

11         Q.    And when you were a student in

12   your fourth form year, if in any way --

13   strike that.

14               When you were a student during

15   your time at The Hill School, were meals also

16   required?

17         A.    Yes, I think we had more

18   required meals then, more required dinners

19   then when I was a student.  And even we had

20   required breakfast for a little bit of time

21   when I was there.

22         Q.    And if you missed a breakfast,

23   lunch, or dinner, would you receive a

24   demerit?

**P68.39**

Zachary Brusko

1          A.      Yeah.

2          Q.      During your time as a student

3      at The Hill School, were you able to go to

4      the dining hall, listen to the announcements,

5      and leave?

6          A.      Not that I can recall.  I mean,

7      I would --

8          Q.      Sorry.

9          A.      I'm sure I and others had asked

10     to be let go early at times, but there would

11     be a conversation there.  If someone -- you

12     don't just get up and go.

13         Q.      Is the understanding -- strike

14     that.

15                 Was the expectation that the

16     students would be staying through the meal?

17         A.      Yes.  I think different table

18     heads had different rules.  But I think the

19     general rule for dinners -- I believe there

20     was a dessert course, I think the general

21     rule is that you would stay at least until

22     dessert was served.  But again, there's

23     always exceptions.  People would be leaving

24     at any time -- once you reached kind of a

Zachary Brusko

1     A.     I don't know.  There was a time

2  when they didn't, and I don't remember if

3  that was when I was a student, or if that was

4  when I was -- I think when I was an employee

5  they used to rotate, but as a student I'm not

6  certain they rotated every week.  I could be

7  wrong.  I just don't remember.

8     Q.     Okay.  Based off of this

9  schedule, which is a blank template for The

10 Hill School class schedule, am I correct that

11 the E period would never fall at the end of

12 the day?

13          MS. DOUGHERTY:  Objection.

14    A.     I mean, looking at that, yes.

15 But I'm not certain that that's the same as

16 it would have been back then.

17 BY MR. JUBB:

18    Q.     With respect to the athletic

19 requirements in the time when you were a

20 student, it's my understanding that all

21 students had a required athletic program to

22 attend.

23    A.     Correct.

24    Q.     Do you recall how long students

Zachary Brusko

```
1   had -- strike that.
2               What sports did you do?
3        A.      As a sophomore I ran
4   cross-country in the fall.  I was injured
5   early in the season, so then things got
6   weird.  I played hockey in the winter, ice
7   hockey in the winter.
8               In the spring I got a special
9   exemption because of my knee injury from
10  cross-country where I was allowed to use the
11  weight room.  Usually that's just for juniors
12  and seniors, but they let me as a senior as a
13  varsity hockey player and someone with a -- I
14  don't want to call it a preexisting
15  condition, but whatever.  I managed to
16  convince them not to make me do a -- play a
17  sport.
18       Q.      Would a student receive a
19  demerit if they didn't attend a sport?
20       A.      Yeah.  I mean, the varsity
21  level, it's a different conversation if a kid
22  doesn't show up to practice.  But your
23  standard JV level or activities, I would
24  think it would be somewhat common for kids to
```

Zachary Brusko

1    just skip one day and take their demerit.

2        Q.    Do you recall a time -- strike

3    that.

4            When you were a student, can

5    you recall approximately how long there was

6    between the end of class and when sports were

7    expected to kick off?

8        A.    I think it would vary by season

9    and by level.  With hockey we would practice

10   in the evenings simply because we had to get

11   multiple teams through the rink.

12           But normal after school, for

13   sports that started right after school, my

14   guess would be maybe not more than 20 minutes

15   or so.  It would end at maybe 3:10, and be at

16   practice at 3:30 or something like that.

17       Q.    Mr. Brusko, at any point in

18   time during your time as an alumnus of The

19   Hill School, as well as a faculty member,

20   have you ever heard anything in any way

21   suggesting that Mr. Ralston has ever acted

22   inappropriate with a student?

23       A.    No, I have not.

24       Q.    I appreciate your time.  That's

Zachary Brusko

1    all I have for right now.  These folks may

2    have some questions for you.

3              MS. DOUGHERTY:  Mr. Poulos, do

4         you want to ask questions first, or do

5         you want me to ask questions first?

6    Mr. Poulos?

7              MR. POULOS:  You can.

8                   EXAMINATION

9    BY MS. DOUGHERTY:

10        Q.    Mr. Brusko, do you have an

11   opinion of Matthew Ralston?

12        A.    I like Matt.  I don't -- we

13   haven't kept in touch since I left, but I

14   liked him.

15        Q.    So you liked Mr. Ralston when

16   you were a faculty member at The Hill School?

17        A.    Yeah.

18        Q.    And you still like Mr. Ralston,

19   is that right?

20        A.    Yeah.  I mean, again, I haven't

21   talked to him in quite a while.  We haven't

22   kept in touch.  I wouldn't say we're friends,

23   but I liked him as a person.

24        Q.    Have you -- let me start again.

Zachary Brusko

1            Is it fair to say your opinion
2    of Matthew Ralston is positive?
3        A.      Yes.
4        Q.      Has your opinion of Matthew
5    Ralston always been the same?
6        A.      Basically.  I mean, yes.  I
7    mean, he was instrumental in hiring me in my
8    first job, so I've always -- he's been
9    special to me for that reason.
10            But, you know, prior to that I
11   would say as a student, indifferent.  I
12   didn't know him at that time.
13       Q.      Did -- let me start again.
14            When you were a student at The
15   Hill School, did you ever have a class where
16   Matthew Ralston was a teacher?
17       A.      No.
18       Q.      When you were a student at The
19   Hill School, was Matthew Ralston ever your
20   table head?
21       A.      I don't believe so, but I had
22   18 table heads in the three years there, so I
23   don't remember.  But I don't specifically
24   remember him being my table head, no.

Zachary Brusko

1  accused of what you understood to be sexual

2  abuse?

3        A.    Well, I believed that he was

4  accused because I was told he was accused.  I

5  found it shocking that he was accused, if

6  that's what you're asking.  It seemed to me

7  to not be something I would have expected.

8        Q.    Did Mr. Jubb tell you who

9  accused Mr. Ralston of sexual abuse?

10       A.    I think he may have at the end

11  of the conversation, because he kind of held

12  that off until we talked a little bit, and

13  then when he said the name, because it was

14  someone that I had been in a dorm with.  I

15  remember thinking at the time is he even

16  going to tell me who it is, and then he later

17  did.

18       Q.    So I'm sorry, did you learn

19  during the first conversation with Mr. Jubb

20  that Mr. Poulos had accused Mr. Ralston of

21  sexual abuse?

22       A.    Yes.

23       Q.    Do you believe the accusation

24  by Mr. Poulos that Mr. Ralston sexually

Zachary Brusko

1    abused him?

2          A.     I don't know if that's -- if

3    what I believe matters.  I mean, I certainly

4    don't want to call anyone a liar, but at the

5    same time it was a shock to me to hear that,

6    that he had accused him, because that's not

7    someone I would have thought would have been

8    doing something like that.

9               So I don't want to say I don't

10   believe it, but at the same time I find it

11   hard to believe.  But I can't -- again, like

12   I said, I don't want to call anyone a liar,

13   but I find it hard to believe, in my

14   experience.

15         Q.     Okay.  So learning about the

16   accusation by Mr. Poulos that Mr. Ralston

17   sexually abused Mr. Poulos, that didn't have

18   any impact on your opinion of Mr. Ralston, is

19   that right?

20              MR. JUBB:  Objection.

21         A.     Not -- no, I mean, until I know

22   the facts, no, it hasn't.

23   BY MS. DOUGHERTY:

24         Q.     Let me start again.

Zachary Brusko

```
 1    Church scandal, but I didn't read anything.
 2    I didn't -- at that point I -- Lane told me
 3    what I needed to know.  I felt like, you
 4    know, if I'm going to be having this
 5    conversation, I don't know what's appropriate
 6    and what's not, so I didn't really do any of
 7    my own research or digging.
 8         Q.    Did you Google anything else
 9    relating to this action other than
10    Mr. Garabedian after you spoke to Mr. Jubb?
11         A.    No.
12         Q.    What's the basis for your
13    belief that Mr. Poulos left your -- I think
14    it was your fifth form year after a couple
15    days of school due to issues at home?
16         A.    The basis, I don't know.  If
17    you had asked me a month ago prior to all of
18    this why did your roommate leave junior year,
19    I would say I thought he had something at
20    home, something family-related, something
21    that he wanted to be back or needed to be
22    back for.  I thought it was more reason of
23    need to be home as opposed to not wanting to
24    be at school.
```

P68.71

Zachary Brusko

1           But I don't -- it was 25 years

2    ago.  It's not something that I had given any

3    thought since that time, so I don't really

4    remember.

5           Q.    Is your belief that Mr. Poulos

6    left after a couple days of school during

7    your fifth form year due to issues at home

8    just an assumption?

9               MR. JUBB:  Objection to the

10       form.

11          A.    I don't know why I thought that

12   way, whether something he said was in the

13   back of my head and just -- I don't know.

14   It's not something I had given thought,

15   again, in 25 years, so why I felt that way I

16   don't know.  I don't know where that came

17   from, whether it's an assumption or something

18   he said or implied, or something the school

19   said at the time, I don't remember.  I have

20   no idea.

21   BY MS. DOUGHERTY:

22          Q.    When you say "why I felt that

23   way," you mean that at the time when

24   Mr. Poulos -- let me start again.

Zachary Brusko

```
1                    CERTIFICATE
2
                    I, MAUREEN O'CONNOR
3      POLLARD, Registered Diplomate
       Reporter, Realtime Systems
4      Administrator, and Certified Shorthand
       Reporter, do hereby certify that prior
5      to the commencement of the
       examination, ZACHARY BRUSKO, was
6      remotely duly identified and sworn by
       me to testify to the truth, the whole
7      truth, and nothing but the truth.
8                    I DO FURTHER CERTIFY that
       the foregoing is a verbatim transcript
9      of the testimony as taken
       stenographically by and before me at
10     the time, place, and on the date
       hereinbefore set forth, to the best of
11     my ability.
12                   I DO FURTHER CERTIFY that
       I am neither a relative nor employee
13     nor attorney nor counsel of any of the
       parties to this action, and that I am
14     neither a relative nor employee of
       such attorney or counsel, and that I
15     am not financially interested in the
       action.
16
17         _____ Maureen O Pollard _____

18
       MAUREEN O'CONNOR POLLARD
19     NCRA Registered Diplomate Reporter
       Realtime Systems Administrator
20     Certified Shorthand Reporter
       Notary Public
21
       Dated:  December 12, 2020
22
23
24
```

Zachary Brusko

```
 1              INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8           After doing so, please sign the

 9    errata sheet and date it.  It will be

10    attached to your deposition.

11           It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt

14    of the deposition transcript by you.  If you

15    fail to do so, the deposition transcript may

16    be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

Exhibit "B"
Deposition Designations of
Zachary Lehman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW RALSTON | : | |
| | : | |
| Plaintiff | : | NO: 2:19-cv-01539 |
| v. | : | |
| | : | |
| MITCHELL GARABEDIAN, ESQ., et al. | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S DEPOSITION DESIGNATIONS OF ZACHARY LEHMAN

1.      12:4-8

2.      13:16-22

3.      18:17-20

4.      19:8-11

5.      19:12-16

6.      22:8-19

7.      22:21-23:14

8.      24:2-22

9.      25:22-26:5

10.     36:8-10

11.     36:17-24

12.     37:2-6

13.     39:4-12

14.     39:13-19

15.     45:15-46:3

16.     118:7-15

17.    128:2 – 129:6

18.    153:3-13

**THE BEASLEY FIRM, LLC**

BY:    /s/ *Lane R. Jubb, Jr.*
    JAMES E. BEASLEY, JR., ESQUIRE
    LOUIS F. TUMOLO ESQUIRE
    LANE R. JUBB, JR., ESQUIRE
    Attorneys for Plaintiff
    THE BEASLEY BUILDING
    1125 Walnut Street
    Philadelphia, PA 19107
    215.592.1000
    215.592.8360 (telefax)
    Lane.jubb@beasleyfirm.com
    Pa. I.D. No. 319272

Dated: 21 December 2021

Zachary G. Lehman

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3      JOHN DOE,                    :   Case No.
                   Plaintiff,    :   2-19-CV-01539
 4                                   :
          vs.                        :
 5                                   :
        MITCHELL GARABEDIAN,         :
 6      ESQ., LAW OFFICES OF         :
        MITCHELL GARABEDIAN and      :
 7      KURTIS N. POULOS,            :
                   Defendants.   :
 8
 9                     - - -
10           Thursday, September 30, 2021
11                     - - -
12           Remote videoconference deposition of
13      ZACHARY G. LEHMAN, conducted at the location of the
14      witness in Pottstown, Pennsylvania, commencing at
15      10:01 a.m., on the above date, before Donna A.
16      Bittner, RMR-CRR and Notary Public.
17                     - - -
18
19
20
21
22           GOLKOW LITIGATION SERVICES, INC.
             (877) 370-3377 / fax (917) 591-5672
23                   deps@golkow.com
24
25
```

**P75.1**

Zachary G. Lehman

```
 1    APPEARANCES:
 2            LANE R. JUBB, JR., ESQUIRE
               LOUIS F. TUMOLO, ESQUIRE  (AS NOTED)
 3            The Beasley Firm, LLC
               1125 Walnut Street
 4            Philadelphia, Pennsylvania  19107
               (215) 592-1000
 5            lane.jubb@beasleyfirm.com
               louis.tumolo@beasleyfirm.com
 6            Counsel for Plaintiff
 7            JEFFREY B. McCARRON, ESQUIRE
               CARYN STEIGER, ESQUIRE
 8            Swartz Campbell, LLC
               1650 Market Street, 38th Floor
 9            Philadelphia, Pennsylvania  19103
               (215) 299-4296
10            jmccarron@swartzcampbell.com
               csteiger@swartzcampbell.com
11            Counsel for Defendants
12            THOMAS D. REES, ESQUIRE
               High Swartz
13            40 East Airy Street
               P.O. Box 671
14            Norristown, Pennsylvania  19401
               (610) 275-0700
15            trees@highswartz.com
               Counsel for Deponent
16
17            KURTIS N. POULOS
               Pro Se
18
19                        - - -
20
21
22
23
24
25
```

**P75.2**

Zachary G. Lehman

```
 1                    I N D E X

    WITNESS:                              PAGE
 2

    ZACHARY G. LEHMAN
 3

         By Mr. Jubb                      4
 4

         By Mr. McCarron                  47
 5

 6                    - - -

 7  EXHIBITS          DESCRIPTION         PAGE

 8  Lehman-1     E-mail string dated Dec. 13,
                 2017 Garabedian_File1854-1857    12
 9

    Lehman-2     Letter dated April 11, 2018
10               with attachments P1.1-P1.4       13

11  Lehman-3     Document titled "Date, Dear
                 Colleagues"                      29

12

13                    - - -

14

15

16

17

18

19

20

21

22

23

24
```

Zachary G. Lehman

```
 1              COURT REPORTER:  All parties

 2         to this deposition are appearing

 3         remotely and have agreed to the

 4         witness being sworn in remotely.

 5         Due to the nature of remote

 6         reporting, please pause briefly

 7         before speaking to ensure all

 8         parties are heard completely.

 9                   - - -

10              ...ZACHARY G. LEHMAN, 860

11         Beech Street, Pottstown,

12         Pennsylvania 19464, after having

13         been duly sworn, was examined and

14         deposed as follows...

15                   - - -

16              EXAMINATION

17                   - - -

18  BY MR. JUBB:

19         Q.   Mr. Lehman, good morning.

20  My name is Lane Jubb.  I represent the

21  plaintiff in this case.  I'm going to

22  take your deposition today.

23              Can you hear me okay?

24         A.   I can.  Good morning, Lane.
```

**P75.4**

Zachary G. Lehman

```
 1    letter, I certainly had been in contact

 2    with the attorneys and reviewed findings

 3    or reports, yes.

 4              Q.    As part of your review, was

 5    there ever any accusations or findings of

 6    any sort of improper conduct by

 7    Mr. Ralston?

 8              A.    Not that I'm aware of, no.

 9              Q.    We're going to mark that as

10    Exhibit 1.

11              (Exhibit Lehman-1 was marked

12         for identification.)

13              MR. McCARRON:   This is this

14         document -- well, the equivalent

15         is already marked as a defense

16         exhibit.  You can use it if you

17         wish.

18              MR. JUBB:   Yeah, I'm

19         keeping separate exhibits, Jeff.

20         I appreciate it, though.

21              MR. McCARRON:   That's fine.

22              MR. JUBB:   So I'm going to

23         show you another document here,

24         sir.
```

Zachary G. Lehman

```
 1   BY MR. JUBB:

 2        Q.   Can you see my screen?

 3        A.   Yes.

 4        Q.   This is the April 2018

 5   letter from, on Mr. Garabedian's

 6   letterhead, and just for record purposes

 7   we're going to call this P1.1 through

 8   P1.2, and this will be Exhibit 2 to the

 9   deposition.

10             (Exhibit Lehman-2 was marked

11        for identification.)

12   BY MR. JUBB:

13        Q.   Mr. Lehman, have you seen

14   this letter before?

15        A.   Yes.

16        Q.   Other than what is relayed

17   to you in this letter, have you at any

18   point in time ever received any sort of

19   information alleging any sort of improper

20   conduct with a student against Matthew

21   Ralston?

22        A.   No.

23        Q.   Do you recall the actual

24   date that you received the letter?  I
```

Zachary G. Lehman

```
 1                    He was visibly upset and
 2      anguished by them, didn't understand
 3      where they -- seemed to not understand
 4      where they were coming from.  I don't
 5      think he had much recollection of
 6      Mr. Poulos and sort of asked me what he
 7      should do or what were we going to do.
 8              Q.    Do you recall what you told
 9      him?
10              A.    I don't.
11              Q.    During this discussion with
12      Mr. Ralston did you instruct him in sum
13      and substance to not find himself alone
14      with a student?
15              A.    Not in that conversation,
16      no.
17              Q.    Did that occur in another
18      conversation?
19              A.    Yes.
20              Q.    When was that?
21              A.    I think at some point, you
22      know, as we started to investigate it, I
23      asked Matt to restrict his, you know,
24      general access to campus, which wasn't
```

Zachary G. Lehman

1    really a big change for him.  He was

2    working remotely primarily from Michigan

3    and Ohio.  He came to campus

4    periodically.  He stayed with another

5    faculty member on campus, but, you know,

6    on the edge of campus.  He went to and

7    from the Office of Institutional Giving

8    primarily, which it has very little

9    student interaction, and I just asked him

10   to please keep his campus access limited

11   to wherever he was staying and the Office

12   of Institutional Giving out of an

13   abundance of caution while we continued

14   our investigation.

15          Q.    Okay.  You got the letter on

16   the 17th.  Do you believe you met with

17   him, you know, a few days thereafter, a

18   week after, or when was that?

19          A.    I believe I met with him on

20   April 19th, two days after receiving the

21   letter.

22          Q.    And by April 19th had you

23   already shared that with your counsel?

24          A.    Yes, I shared it on the same

Zachary G. Lehman

1    day that I received it.

2              Q.    Who else did you share it

3    with?

4              A.    I shared it with the chair

5    of our legal committee, the vice chair of

6    our legal committee, Thomas Rees, two

7    attorneys from Cozen, our CFO, Rick Wood,

8    the chairman of our board, Preston Athey,

9    and the vice chairman of our board, Andy

10   Soussloff, who is also an attorney and

11   member of our legal committee.

12             Q.    And was that part of any

13   sort of protocol that was in place at the

14   time to share it with these individuals?

15             A.    Correct.

16             Q.    Am I correct that you shared

17   the actual letter with them, not just the

18   substance of the allegations?

19             A.    I believe I scanned the

20   letter and sent it by e-mail with a short

21   note attached, but I do not remember what

22   else I said, if anything.

23             Q.    Did any of these individuals

24   ever speak to you about their concerns of

**P75.24**

Zachary G. Lehman

```
 1    the letter when they were not

 2    communicating with Mr. Rees?

 3         A.    I do not recall.

 4         Q.    Do you recall anyone who

 5    reviewed the letter expressing any

 6    concerns for the allegations?

 7         A.    Can you rephrase that

 8    question or say it a different way?  I

 9    don't understand.

10              MR. REES:   I would have

11         objected to the form, but

12         Mr. Lehman has already asked for a

13         rephrase.

14              MR. JUBB:   Sure.

15    BY MR. JUBB:

16         Q.    Did anyone who received the

17    letter that you had forwarded to them

18    respond to you with their thoughts on it?

19         A.    Any conversations that we

20    had on that nature were privileged, so I

21    can't answer your question.

22         Q.    And at the time did you

23    believe that Mr. Rees represented the

24    individuals that were on the board?
```

Zachary G. Lehman

```
1           A.    Mr. Rees is our general
2    counsel for the school and that includes
3    our board of trustees and all of our
4    employees and agents.   Certainly he
5    represented the board of trustees.
6           Q.    At the time that you
7    received the letter did you know who
8    Mitchell Garabedian was?
9           A.    Yes.
10          Q.    And just to clarify, you
11   knew independently who he was rather than
12   doing any sort of research on your own to
13   figure out who he was when you received
14   it?
15          A.    He's a well-known attorney
16   in Boston.  I practiced law in Boston.
17   There is a movie that he's featured in.
18   He had been part of, you know, the
19   spotlight investigation.
20          Q.    Sure.
21          A.    I knew who he was.
22          Q.    At the time did you believe
23   that Mr. Garabedian would ever be
24   involved in representing anybody in these
```

P75.26

Zachary G. Lehman

1    chair of the board at that time and he

2    was a member of the legal committee.

3    He's an attorney.

4              Q.    As the headmaster of The

5    Hill School, are you yourself considered

6    a member of the board of trustees?

7              A.    No.

8              Q.    Do you have any involvement

9    in board of trustees meetings?

10             A.    Yes.

11             Q.    Does the legal committee for

12   the board of trustees have to report the

13   ongoing legal issues to the board

14   generally?

15             A.    Have to or does, or do they?

16   What's your question?

17             Q.    Does the legal committee for

18   the board of trustees of The Hill School

19   report the legal situations of the school

20   as part of a routine practice to the

21   other members of the board of trustees?

22             MR. REES:   Object to the

23        form.  The witness may answer.

24             THE WITNESS:   Yes.

P75.36

Zachary G. Lehman

```
 1   BY MR. JUBB:

 2           Q.     How often does that occur?

 3           A.     Our board meets three times

 4   per year and there is a legal committee

 5   memo that accompanies the board package

 6   that goes out each time.

 7           Q.     Was there ever any legal

 8   committee memo referencing the

 9   allegations that were made by

10   Mr. Garabedian against Mr. Ralston

11   relayed to the board of trustees?

12               MR. McCARRON:   Objection.

13               THE WITNESS:  I don't

14        recall.

15   BY MR. JUBB:

16           Q.    Based off of the pattern and

17   practice of the board of trustees since

18   you've been there since 2012, is that

19   something that you would have expected to

20   be included in the memo from the legal

21   committee reporting to the other members

22   of the board?

23               MR. McCARRON:  Objection.

24        What difference does it make?  The
```

Zachary G. Lehman

```
 1          litigation since it was filed

 2          periodically.

 3   BY MR. JUBB:

 4          Q.    From the time that you

 5   received the April 2018 letter, have you

 6   ever had any faculty member or student or

 7   family member approach you with any sort

 8   of allegations whatsoever of improper

 9   conduct by Matthew Ralston?

10          A.    Beyond Mr. Poulos?

11          Q.    Of course.

12          A.    No.

13          Q.    At some point in time

14   Miss Poulos sent you an e-mail.  Do you

15   recall receiving that?

16          A.    I believe I have received

17   two e-mails from Miss Poulos, maybe a

18   third more recently ranting about this

19   case.

20          Q.    And when you received that

21   e-mail, I don't think we need to pull it

22   up or make it an exhibit, but we can if

23   you'd like to reference it, but when you

24   received that e-mail did you have any
```

Zachary G. Lehman

```
 1          allow the witness to answer again.

 2               THE WITNESS:  I did review

 3          it.  I don't remember when.

 4    BY MR. JUBB:

 5          Q.    All right.  But are you able

 6    to tell me whether or not you reviewed it

 7    after receiving Mr. Garabedian's April

 8    2018 letter?

 9               MR. REES:   Again, asked and

10          answered, but I'll allow him to

11          answer.

12               THE WITNESS:  I certainly

13          did not review it before that.

14    BY MR. JUBB:

15          Q.    Do you believe that you

16    reviewed Mr. Poulos's file before or

17    after receiving the December 2018 letter?

18    And when I say "receiving" I mean

19    reviewed.

20          A.    I believe that I reviewed

21    his file after receiving the first letter

22    from Garabedian.

23          Q.    At what point in time do you

24    believe you reviewed Mr. Ralston's
```

P75.45

Zachary G. Lehman

1    employment file?

2         A.    Probably around the same

3    time.

4         Q.    Have you personally been

5    involved in conducting any sort of

6    interviews as it relates to the

7    statements that were made about

8    Mr. Ralston in Mr. Garabedian's letter?

9         A.    Could you repeat the

10   question, please?

11        Q.    Have you personally been

12   involved in any interviews investigating

13   any of the statements that were made in

14   Mr. Garabedian's April 2018 letter that,

15   of course, did not involve your counsel

16   present?

17        A.    No.

18             MR. JUBB:   Mr. Lehman, I

19        appreciate your time.  I'm sorry

20        it's under these circumstances,

21        but those are all the questions I

22        have.

23                  - - -

24             EXAMINATION

Zachary G. Lehman

1    conclusions, findings or determinations

2    about the accusations, allegations and

3    claim of Mr. Poulos?

4          A.    It's my recollection that we

5    suspended the investigation because your

6    client would not cooperate.

7          Q.    Can you just try and -- will

8    you just answer my question? Was there

9    any findings, conclusions or

10   determinations made about the

11   accusations, allegations or claim by

12   Mr. Poulos?

13         A.    It is my understanding that

14   we suspended the investigation because

15   your client would not cooperate.

16         Q.    What do you mean by

17   "cooperate"?

18         A.    Your client would not

19   produce Mr. Poulos for an interview.

20         Q.    Produce him for an interview

21   for what purpose?

22         A.    To understand the veracity

23   of his allegations, to ask some questions

24   so that we could actually do an

Zachary G. Lehman

```
 1        A.    Yes.

 2        Q.    Did any of the troubling

 3   incidences which form the basis for your

 4   statement in D-1 involve sexual contact

 5   between student and faculty?

 6        A.    I would say I believe that

 7   there was contact.  I'm not sure it could

 8   be qualified as sexual.

 9        Q.    What kind of contact?

10        A.    Physical contact.

11        Q.    Well, why did you say it

12   wasn't sexual?

13        A.    That has a very clear

14   definition, Mr. McCarron, and --

15        Q.    What was the nature of the

16   contact between faculty and student

17   member which became part of the troubling

18   incidences you mentioned in your letter

19   which is D-1?

20        A.    You know, it was -- they

21   were the kinds of things like romantic

22   conversations, maybe passes made at

23   students, rumors of relationships, but

24   beyond that I'm not aware of, you know,
```

P75.128

Zachary G. Lehman

```
 1    extensive, the kinds of things that you

 2    would qualify as sexual like rape or

 3    physical assault.   There are some of

 4    those in the school's history that we

 5    were aware of prior to this that had been

 6    litigated or prosecuted.

 7         Q.    Prior to this, meaning prior

 8    to what?

 9         A.    Prior to this investigation

10    there were some incidents at The Hill

11    School prior to my arrival at The Hill

12    School that had been prosecuted.

13         Q.    Did those matters that were

14    prosecuted, did they involve a faculty

15    and a student?

16         A.    Yes.

17         Q.    And are those, are you able

18    to tell us those matters?

19         A.    There were -- there was one

20    just prior to my arrival, a few years

21    prior to my arrival.  It was a Spanish

22    teacher who had a, I think there were

23    some e-mail exchanges with a student for

24    which he was prosecuted, and there was
```

Exhibit "C"
Deposition Designations of
Mitchell Garabedian

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW RALSTON | : | |
| | : | |
| Plaintiff | : | NO: 2:19-cv-01539 |
| v. | : | |
| | : | |
| MITCHELL GARABEDIAN, ESQ., et al. | : | |
| | : | |
| Defendants. | : | |

### PLAINTIFF'S DEPOSITION DESIGNATIONS OF MITCHELL GARABEDIAN, ESQ.

1.     11:18-11:21

2.     20:10-20:13

3.     26:8-26:22

4.     29:10-29:20

5.     33:18-24

6.     35:6-8

7.     36:7-9

8.     37:12-38:8

9.     41:15-42:15

10.     42:21-42:25

11.     43:01-43:10

12.     45:13-45:18

13.     45:21-25

14.     46:16-47:4

15.     47:14-48:5

16.     49:02-49:19

17.    52:15-53:16

18.    54:10-21

19.    56:21-57:14

20.    58:1-3

21.    58:19-24

22.    61:3-9

23.    66:7-17

24.    66:19-67:5

25.    67:07-67:21

26.    70:20-25

27.    71:04-71:06

28.    73:08-73:11

29.    73:19-73:25

30.    77:2-5

31.    78:8-13

32.    79:04-79:07

33.    82:17-82:25

34.    93:04-93:07

35.    96:10-97:1

36.    99:11-99:25

37.    100:23-101:10

38.    109:18-109:21

39.    111:12-111:17

40.    120:05-120:08

41.    138:9-21

42.    139:10-140:07

43.    142:05-142:13

44.    143:15-143:22

45.    150:23-151:16

46.    154:16-154:25

47.    175:09-175:21

48.    178:06-178:16

49.    188:09-188:16

50.    199:16-200:13

51.    204:17-204:21

52.    211:24-212:21

53.    213:05-213:17

54.    217:25-218:7

55.    227:08-227:22

56.    235:14-236:2

**THE BEASLEY FIRM, LLC**

BY:    /s/ *Lane R. Jubb, Jr.*
       JAMES E. BEASLEY, JR., ESQUIRE
       LANE R. JUBB, JR., ESQUIRE
       Attorneys for Plaintiff
       THE BEASLEY BUILDING
       1125 Walnut Street
       Philadelphia, PA 19107

215.592.1000
215.592.8360 (telefax)
Lane.jubb@beasleyfirm.com
Pa. I.D. No. 319272

Dated: 21 December 2021



Deposition of:
# Mitchell Garabedian

*June 24, 2021*

In the Matter of:

# Doe, John v. Garabedian, Mitchell Esq et al

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com  | 215-241-1000

**P64.1**

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                                NO. 2:19-cv-01539

4     - - - - - - - - - - - - - - - - - -

5     JOHN DOE

6                    Plaintiff

7       v.

8     MITCHELL GARABEDIAN, ESQ., LAW

9     OFFICES OF MITCHELL GARABEDIAN

10    and KURTIS N. POULOS

11                   Defendants

12    - - - - - - - - - - - - - - - - - -

13

14

15           AUDIOVISUAL DEPOSITION of MITCHELL GARABEDIAN,

16    a witness called by counsel for the Plaintiff, taken

17    pursuant to the Federal Rules of Civil Procedure before

18    Kristen L. Kelly, Registered Professional Reporter, CSR

19    No. 115893 and Notary Public in and for the

20    Commonwealth of Massachusetts, at REGUS BOSTON,

21    75 State Street, Boston, Massachusetts, on Thursday,

22    June 24, 2021, commencing at 10:01 a.m.

23

24

25

**P64.2**

```
                                          Page 2
 1    A P P E A R A N C E S:

 2

 3    THE BEASLEY FIRM, LLC

 4      By:  Lane R. Jubb, Jr., Esquire

 5            Louis F. Tumolo, Esquire

 6            The Beasley Building

 7            1125 Walnut Street

 8            Philadelphia, Pennsylvania 19107

 9            215.592.1000

10            lane.jubb@beasleyfirm.com

11            louis.tumolo@beasleyfirm.com

12            For the Plaintiff

13

14

15    SWARTZ CAMPBELL LLC

16      By:  Jeffrey B. McCarron, Esquire

17            Candidus K. Dougherty, Esquire (Remote)

18            One Liberty Place, 38th Floor

19            1650 Market Street

20            Philadelphia, Pennsylvania 19103

21            215.299.4376

22            jmccarron@swartzcampbell.com

23            cdougherty@swartzcampbell.com

24            For Mitchell Garabedian, Esquire and

25                Law Offices of Mitchell Garabedian
```

Page 3

1    REMOTE APPEARANCE:

2

3    KURTIS N. POULOS, PRO SE

4           3239 West Colony Drive

5           Greenfield, Wisconsin 53221

6           262.330.4604

7           lex101078@gmail.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   ALSO PRESENT IN BOSTON:

25      Adam Cerro, Videographer

```
                                          Page 4
1                      I N D E X
2    Deponent:               Direct  Cross  Redirect  Recross
3    MITCHELL GARABEDIAN
4      By Mr. Lane            8
5      By Mr. Poulos                  235
6
7
8                    E X H I B I T S
9    No.                                        Page
10   Exhibit 1  Email Chain, 12.13.2017;        35
11              Garabedian 029
12   Exhibit 2  12.13.2017 Letter Between Mitchell  37
13              Garabedian and Kurtis Poulos;
14              Garabedian_File0111-112
15   Exhibit 3  12.15.17 Memo; Garabedian 112 and  40
16              12.15.17 Memo; Garabedian 116
17   Exhibit 4  04.11.2018 Letter Between Mitchell  42
18              Garabedian and The Hill School;
19              Garabedian 114
20   Exhibit 5  01.30.2018 Letter Between Mitchell  43
21              Garabedian and The Hill School;
22              Garabedian 115
23   Exhibit 6  04.11.2018 Letter Between Mitchell  46
24              Garabedian and Zachary Lehman;
25              Garabedian 071-72
```

Page 5

```
 1            E X H I B I T S
 2    No.                                              Page
 3    Exhibit 7   04.11.2018 Letter Between Mitchell     49
 4                Garabedian and Zachary Lehman;
 5                Hill0219-0220/P16.219-220
 6    Exhibit 8   09.17.2018 Email Between Kurtis         79
 7                Poulos and Mitchell Garabedian;
 8                Garabedian_Email 0057-58
 9    Exhibit 9   09.20.2018 Email Between Kurtis         79
10                Poulos and Mitchell Garabedian;
11                Garabedian_Email 0059-60
12    Exhibit 10  04.24.2018 Letter Between Thomas        92
13                Rees and Mitchell Garabedian;
14                Garabedian 065
15    Exhibit 11  Email Chain, 12.18.2018 Between         95
16                Thomas Rees and Mitchell Garabedian;
17                Garabedian 063
18    Exhibit 12  01.28.2019 Letter Between Mitchell     104
19                Garabedian and Thomas Rees;
20                Garabedian 047
21    Exhibit 13  12.19.2018 Email Chain Between         104
22                Thomas Rees and Mitchell Garabedian;
23                Garabedian 061
24
25
```

Page 6

1                    E X H I B I T S

2     No.                                            Page

3     Exhibit 14  01.09.2019 Email Between Thomas Rees    109

4                 and Mitchell Garabedian;

5                 Garabedian 051

6     Exhibit 15  01.30.2019 Email Between Thomas Rees    132

7                 and Mitchell Garabedian;

8                 Garabedian 046

9     Exhibit 16  12.26.2018 Letter Between Mitchell      136

10                Garabedian and Thomas Rees;

11                Hill 0225-0226/P16.225-226

12    Exhibit 17  02.19.2019 Email Between Kurtis         140

13                Poulos and Mitchell Garabedian;

14                Garabedian_Email 0067

15    Exhibit 18  Handwritten Notes;                      144

16                Garabedian_File0001-40

17    Exhibit 19  Contingent Fee Agreement;               210

18                Garabedian_File 0072

19    Exhibit 20  12.13.2017 Email From Mary Ellen        219

20                Poulos to Mitchell Garabedian;

21                Garabedian_File 0047-50

22    Exhibit 21  04.23.2016 Headmaster Message;          223

23                Hill 0240

24

25               (Exhibits attached to transcript.)

Page 7

1                    P R O C E E D I N G S

2

3                    THE VIDEOGRAPHER:  Good morning.  We are

4       going on the record.  The time is 10:01 a.m. on

5       June 24th, 2021.  This is media unit one of the

6       video-recorded deposition of Mitchell Garabedian taken

7       by counsel for plaintiff in the matter of John Doe v.

8       Mitchell Garabedian filed in the U.S. District Court

9       for the Eastern District of Pennsylvania.  This

10      deposition is being held at 75 State Street, First

11      Floor, Boston, Massachusetts.

12                   My name is Adam Cerro from the firm

13      Veritext Legal Solutions.  I am the videographer.  The

14      court reporter is Kristen Kelly.

15                   Counsel will now state their appearances

16      and affiliations for the record.  If there are any

17      objections to proceeding, please state them at the time

18      of your appearance beginning with the noticing

19      attorney.

20                   MR. JUBB:  Good morning.  Lane Jubb of

21      The Beasley Firm for plaintiff.

22                   MR. McCARRON:  Jeffrey McCarron.  I

23      represent Mitchell Garabedian.

24                   MR. JUBB:  Mr. Poulos, would you like to

25      introduce yourself for the record, please.

**P64.8**

```
 1        A    Last week.  Earlier this week.

 2        Q    And did that have to do with allegations --

 3   strike that.

 4             Did that have to do with a case involving

 5   allegations of sexual abuse of a minor?

 6        A    Yes.

 7        Q    Do you handle any other cases right now other

 8   than sexual abuse of minor allegations?

 9        A    Yes.

10        Q    Like what?

11        A    Sexual abuse of an adult.

12        Q    Do you handle any other cases involving civil

13   matters other than anything -- strike that.

14             Do you handle any other civil matters other

15   than those involving allegations of sexual abuse or

16   sexual assault?

17        A    No.

18        Q    Have you ever successfully tried a case to

19   verdict involving sexual abuse of a minor?

20             MR. McCARRON:  Objection.

21        A    No.

22        Q    Approximately how many cases do you have?

23        A    In my office right now?

24        Q    Yes, sir.

25        A    500.
```

Page 20

```
 1        Q    All right.  And so when you're making that
 2   determination, how do you make that determination?
 3        A    Look at the relevant law.
 4        Q    And the relevant law, that would be
 5   statutory, correct?
 6        A    Yes.
 7        Q    And that's something that is a code created
 8   by legislature, correct?
 9        A    Yes.
10        Q    All right.  And of the cases that you have
11   right now, how many of them have you filed where you
12   knew the statute of limitations had expired?
13        A    None.
14        Q    As of December 2017 am I correct that you
15   first heard from Mary Ellen Poulos before Mr. Poulos?
16        A    I don't recall.
17             MR. McCARRON:  Okay.  I'm sorry.  I
18   misunderstand -- didn't hear you.  As of did you say
19   December --
20             MR. JUBB:  December of 2017.
21        Q    Do you recall how you were first contacted as
22   to any of the allegations that were going to be made by
23   Mr. Poulos?
24        A    No.
25        Q    Take me through, if you will, your practice
```

1     for you.

2              MR. McCARRON:  Do you mean just did

3     meet?  Is that what you're asking?

4              MR. JUBB:  That's what I was going to

5     do, yeah.  I got this.

6        Q     Did you ever meet Mrs. Poulos?

7        A     No.

8        Q     During the 2017/2018 timeframe had you ever

9     been involved in cases in Pennsylvania before?

10       A     I don't recall.

11       Q     At some point in time -- strike that.

12              In looking at your website just the other

13    day, I saw photos of you and Mr. Gordon; is that

14    correct?

15       A     Yes.

16       Q     And the other individuals who are listed

17    there, am I correct that none of them are barred in

18    Pennsylvania?

19       A     Correct.

20       Q     And you're not barred in Pennsylvania,

21    correct?

22       A     Correct.

23       Q     Have you ever tried a case in Connecticut?

24       A     No.

25       Q     Have you ever tried a case in New York?

Page 29

```
 1    before?

 2         A    No.

 3         Q    Have you ever filed a lawsuit in Ohio before?

 4              MR. McCARRON:  Objection.

 5         A    No.

 6         Q    And just to clarify, I know my first question

 7    had to do with cases involving sexual abuse so --

 8    strike that.  I don't want there to be any commentary.

 9              MR. McCARRON:  Thank you.

10         Q    When was the last time that you successfully

11    tried any case?

12              MR. McCARRON:  Objection.

13         A    It had to be years ago.

14         Q    When you say "years ago", you mean more than

15    20 years, correct?

16         A    Yes.

17         Q    Was it more than 30?

18         A    I don't know.

19         Q    Was it more than 40?

20         A    I don't know.

21         Q    Well, what comes to mind when you think of

22    the, the last time you gave a closing argument to a

23    jury?

24         A    It was quite a few years ago.  It was a car

25    accident case.
```

Page 33

```
 1    question?
 2              MR. McCARRON:  Well, you need to put a
 3    subject to it.
 4              MR. JUBB:  Okay.
 5              MR. McCARRON:  First person.  That's why
 6    I asked you the person -- are you asking about someone
 7    in his -- within Mr. Garabedian's office?  What are you
 8    trying to find out?
 9              MR. JUBB:  Yeah, okay.
10    BY MR. JUBB:
11        Q    Mr. Garabedian, at some point Mr. Poulos or
12    his mom contacted your office, correct?
13        A    I don't recall who first contacted my office.
14        Q    Okay.
15              THE WITNESS:  Excuse me.  Can I get a
16    little glass of water, please.  I don't mean interrupt.
17    We can continue.  Just ...
18        Q    Do you have any understanding as to which one
19    of your associates first spoke with Mr. Poulos
20    initially?
21        A    No.
22        Q    Did Mr. Poulos call or did someone send an
23    email?
24        A    I don't recall.
25        Q    You have a website, and on that website
```

Page 35

```
 1        A    This morning.

 2        Q    Okay.  And am I -- strike that.

 3             Do you have any recollection of Mr. Poulos

 4   ever sending an intake through the website to you?

 5        A    No.

 6        Q    Do you have any recollection of your first

 7   conversation via telephone with Mr. Poulos?

 8        A    No.

 9             MR. JUBB:  Can we please mark this as

10   Garabedian 1.  This is going to be Garabedian 029.

11             Here's a copy for you, Jeff.

12                  (Exhibit 1 marked

13                   for identification)

14        Q    Here you go.

15        A    Thank you.

16        Q    Did you look at this in anticipation of

17   today?

18             MR. McCARRON:  Objection.  Don't answer.

19        Q    Have you seen this before, sir?

20        A    Yes.

21        Q    All right.  And at the top it looks like it's

22   an email from Mary Ellen Poulos dated December 13th,

23   2017 to you, and she's forwarding an email from her son

24   that he received from The Hill School.  Do you see

25   that?
```

Page 36

```
1          A    Yes.

2          Q    How did she get your email address?

3          A    I don't know.

4          Q    Is, is it a practice for your associates to

5     give out your email address?

6          A    They may.  I may.

7          Q    Did you first talk to Ms. Poulos before

8     Mr. Poulos?

9          A    I don't remember.

10         Q    Do you have any idea when you look at this as

11    to why she's saying thank you with an exclamation

12    point?

13         A    No.

14         Q    Do you -- I -- strike that.

15              Am I correct that -- strike that.

16              How often do you speak with parents of adults

17    who are claiming to be victims of sexual abuse?

18         A    I couldn't answer that.  I mean ...

19         Q    Am I correct that Ms. Poulos was not your

20    client?

21         A    Correct.

22         Q    You can put that down.

23         A    (Complies.)

24              MR. JUBB:  I'm going to mark this as

25    Garabedian 2 which is Garabedian File 111-112.
```

```
 1                    (Exhibit 2 marked

 2                    for identification)

 3              MR. POULOS:  Lane, can I interject?  I

 4    can't see any of those documents that you're presenting

 5    to Mitchell.

 6              MR. JUBB:  Okay.  Then when I'm calling

 7    out these numbers, that's referring to the documents

 8    that were produced by Mr. Garabedian, okay.  So you're

 9    going to need to pull those up.

10         Q    Here you go.

11         A    Thank you.

12         Q    All right.  I've handed you what I have

13    marked as Garabedian 2 which is Garabedian File 111

14    through is 112.  This appears to be the cover letter

15    that you sent to Mr. Poulos enclosing a CFA, correct?

16         A    What is a CFA?

17         Q    Contingent Fee Agreement.

18         A    Yes.

19         Q    At the bottom of this it says:  Very truly

20    yours, Mitchell Garabedian.  Are those your initials?

21         A    Probably.

22         Q    Did you write them?

23         A    I, I don't recall.

24         Q    Is that because at this time many of your

25    associates could sign your initials to the letters?
```

```
 1        A    I just don't recall.

 2        Q    As of December 2017 were your associates

 3   permitted to put your initials on your letterhead?

 4        A    At times.

 5        Q    Okay.  Did it happen here?

 6        A    I don't recall.

 7        Q    Is that your handwriting?

 8        A    I don't know.

 9        Q    Well, how, how old are you, sir?

10        A    How old am I?

11        Q    Yes, sir.

12        A    I'm 69 years old.

13        Q    Okay.  And do you have any way of telling us

14   whether or not that appears to be your initials based

15   off the 69 years of looking at your handwriting?

16        A    It might be.  It might not be.  It's

17   initials.

18        Q    I see.

19             And am I correct that you sent this

20   Contingent Fee Agreement to Mr. Poulos on

21   December 13th, 2017?

22        A    I don't know.  The letter says December 13th,

23   but I don't remember mailing it.

24        Q    Okay.  But do you have folks that put your

25   letters and contingent fee agreements in the mail for
```

```
 1     potential clients with the Contingent Fee Agreement?
 2          A     Sometimes.
 3          Q     If that were the case would you reference
 4     that in the cover letter?
 5          A     I don't recall.
 6          Q     Well, at least as of December 15th, 2017 does
 7     it appear that Mr. Poulos signed authorizations for
 8     records?
 9          A     Are you referring to Exhibit 3?
10          Q     I am.
11          A     Yes.
12          Q     And this was produced by you so I imagine
13     that you received this back; is that fair?
14          A     I believe so.
15          Q     Why is it that you wanted the records from
16     Shorewood School District and The Hill School as of
17     December of 2017?
18          A     To collect his records.
19          Q     Were are they important?
20          A     To review them.
21          Q     What types of things can you get from
22     reviewing the records?
23          A     Information.
24          Q     Relevant information?
25          A     Relevant, yes.
```

1          Q     Like things that could corroborate what

2     they're saying?

3          A     Relevant.   Irrelevant.

4          Q     Well, is the goal of requesting a student's

5     records to determine as to whether or not there's other

6     evidence to corroborate their claims?

7          A     The goal is to know the person.

8          Q     Okay.   Am I correct that you wrote the letter

9     to The Hill School before you received the records back

10    from The Hill School?

11         A     I don't know.

12         Q     Do you have any reason to believe that you

13    received the records back from The Hill School before

14    you wrote The Hill School?

15         A     I don't know.

16              MR. JUBB:  This is going to be marked as

17    Garabedian 4.  This was previously produced as

18    Garabedian 114.  Here you go, Jeff.

19                   (Exhibit 4 marked

20                   for identification)

21         Q     I've handed you what has been marked as

22    Garabedian 4 which is a letter dated April 11th, 2018

23    to The Hill School registrar requesting records; is

24    that correct?

25         A     Yes.

```
 1          Q     Did you write this?

 2          A     I don't recall.

 3          Q     Are those your initials?

 4          A     I don't know.

 5          Q     Why would there be a request to The Hill

 6     School on April 11th for records if you already had

 7     them?

 8          A     I don't know.

 9          Q     You didn't have them, correct?

10          A     I don't recall.

11          Q     Well, in -- considering that you've been

12     practicing for quite some time and your pattern and

13     practice in doing sexual abuse cases, in looking at

14     these records seeing a request from -- you know, an

15     authorization from December 15th, 2017 and this, which

16     is Garabedian 115 which is now going to be marked as

17     Garabedian 5 ...

18                 MR. JUBB:  This is my copy so I'll need

19     that back.

20                 THE WITNESS:  Do you want it marked?

21                 MR. JUBB:  Yeah, could you mark that as

22     an exhibit, please.

23                 (Exhibit 5 marked

24                 for identification)

25                 MR. McCARRON:  Hang on.  Let me see it.
```

```
 1    of doing that, correct?
 2         A    I don't understand your question.  I'm sorry.
 3         Q    Sure.  When you're preparing letters to go
 4    out for records request or your associates are, do they
 5    draft those letters up, sign them, and then not send
 6    them out?  Is that the expectation?
 7         A    I don't, I don't know.  I don't recall.
 8         Q    Well --
 9         A    I mean I imagine if they, if they -- if the
10    letter was completed and signed, it would go out, but
11    maybe for some instance, one instance or an instance it
12    didn't go out.  I don't know.
13         Q    Do you have any recollection of reviewing
14    Mr. Poulos's Hill School File before you wrote that
15    letter in April of 2018 to Mr. Lehman?
16         A    I don't recall.
17         Q    Nothing comes to mind, correct?
18         A    I don't recall.
19         Q    Okay.  Can I just have that real quick?
20         A    (Complies.)
21         Q    Are those your initials, either, on the
22    Garabedian 5?
23         A    I don't know.
24         Q    You can't tell if you wrote them or not?
25         A    No.
```

Page 46

1           MR. JUBB:  Off the record.

2           (Discussion off the record)

3           MR. JUBB:  This is going to be marked as

4    Garabedian 6.  It's previously produced as Garabedian

5    71.

6                      (Exhibit 6 marked

7                       for identification)

8    Q    Did you write that letter?

9    A    I don't recall.

10   Q    Well, that appears to be a letter drafted

11   towards The Hill School, correct?

12   A    Correct.

13   Q    Were your associates writing those letters

14   back then?

15   A    I don't recall.

16   Q    Do you have any recollection of actually

17   writing a letter at issue in this case?

18   A    I don't recall.

19   Q    Based on your pattern and practice can you

20   even tell us whether or not you wrote that letter?

21   A    I don't know.

22   Q    Is that because your associates write letters

23   for you like this?

24   A    I don't know.

25   Q    Do your associates write letters for you like

1       this?

2               A       Sometimes.

3               Q       Did they write this one?

4               A       I don't recall.

5               Q       Well, in other words, they write letters for

6       you so often that you, you can't determine in looking

7       at this whether or not you actually wrote this; is that

8       right?

9                       MR. McCARRON:  Objection.

10              A       No.  I just don't recall whether I wrote this

11      or not.

12              Q       Okay.  Look who it -- who -- look at --

13      strike that.

14                      At the top it says:  Dear Attorney Soto.  Do

15      you see that?

16              A       Yes.

17              Q       There's no Soto involved here is there?

18              A       I don't know.

19              Q       Well, in looking at this file and

20      understanding how serious these allegations are against

21      you did you see anywhere where a Mr. Soto was involved

22      here?

23                      MR. McCARRON:  Objection.

24              A       I don't recall.

25              Q       Okay.  Well, it's addressed to Mr. Lehman,

Page 48

1    isn't it?

2         A    Yes.

3         Q    Well, when you write a letter wouldn't it be

4    Dear Mr. Lehman, not Dear Attorney Soto?

5         A    Yes.

6         Q    Okay.  And so am I correct that this letter

7    that was prepared and has your initials on it was

8    actually directed from a -- strike that.

9              Am I correct that that letter, Garabedian 71

10   and 72, has Dear Attorney Soto on there, and there's no

11   Soto that you were trying to send this letter to?

12        A    I don't know.

13        Q    Do you just have like a form letter that goes

14   out with demands?

15        A    No.

16        Q    Do your associates just copy and like do a

17   Mad Lib for demand letters?

18        A    Do a what?

19        Q    A Mad Lib.  Do you know what a Mad Lib is?

20        A    No.

21        Q    It's like a fill-in-the-blank.

22        A    No.

23        Q    So this letter "Dear Attorney Soto", somebody

24   actually wrote that in by mistake.  That wasn't already

25   there, right?

1          A      I don't know.

2          Q      How many people have the authority to draft

3    demand letters on your behalf?

4          A      I don't know.  I mean the people who work for

5    me.  So it depends how many people are working for me.

6          Q      So five to ten people can actually draft

7    demand letters on your behalf, correct?

8          A      Well ... yeah.

9          Q      And that was true as of April 2018, correct?

10         A      I don't know.

11         Q      Do you know an Attorney Soto?

12         A      Not off the top of my head.

13         Q      Do you have any recollection of actually

14   reviewing this letter?

15         A      No.

16         Q      Do you have any way of telling us, based off

17   your pattern and practice, that you actually reviewed

18   this letter?

19         A      No.

20                MR. JUBB:  Here you go, Jeff.

21                I'm marking -- Garabedian 7 is Hill 219,

22   also marked as P16.219-220.

23                (Exhibit 7 marked

24                for identification)

25         Q    Have you seen that letter before today?

Page 52

```
1    sides.
2                    MR. McCARRON:  All right.  Can I just
3    have that as a placeholder?
4                    MR. JUBB:  Sure.
5                    MR. McCARRON:  Thank you.
6                    THE WITNESS:  So do we take this out?
7                    MR. JUBB:  Mm-hmm.  Thank you.
8                    MR. McCARRON:  Yeah, we're going to
9    swap.  Let me just see, if I could.  I'm sorry.
10   This -- we're -- let me just see this one.  Yeah, okay.
11                   THE WITNESS:  Thank you.
12                   MR. McCARRON:  There you go.
13                   THE WITNESS:  Thank you.
14   BY MR. JUBB:
15        Q    So, Mr. Garabedian, you have in front of you
16   Garabedian 7 which is Hill 219 and 220.  Do you see
17   that?
18        A    Yes.
19        Q    All right.  And my last question to you was
20   have you ever seen this before, and you couldn't
21   recall, correct?
22        A    Correct.
23        Q    The date is April 11th, 2018, correct?
24        A    Yes.
25        Q    And is it your testimony that from
```

1    April 11th, 2018 to present you don't recall looking at
2    that letter?
3         A    I don't remember.  I'm sorry.
4         Q    Do you have any recollection of actually
5    discussing this letter with Mr. Poulos?
6         A    No.
7         Q    Did you ever provide Mr. Poulos a copy of
8    this letter?
9         A    I don't believe so.
10        Q    Did you ever tell Mr. Poulos that you were
11   going to send this letter?
12        A    But I'm not sure.
13             Excuse me?
14        Q    Did you ever tell Mr. Poulos that you were
15   going to send this letter?
16        A    I don't recall.
17        Q    Well, based on your pattern and practice of
18   how you did things would you have told Mr. Poulos that
19   you were going to send this letter?
20        A    It depends on the case.
21        Q    How so?
22             MR. McCARRON:  All right.  Why don't we
23   have a full question.
24        Q    How does it depend on the case, sir?
25        A    Well, some clients are more fragile than

```
 1      other clients.
 2           Q    Based off your recollection did you believe
 3      that Mr. Poulos was more fragile than most clients?
 4           A    He was extremely fragile.
 5           Q    Okay.  And so your -- strike that.
 6                Based off that do you believe that you wrote
 7      this letter without telling him you were going to do
 8      it?
 9           A    I don't recall.  I mean ...
10           Q    In other words, it's possible that you wrote
11      this letter without actually informing Mr. Poulos that
12      you did, correct?
13           A    I don't know.
14           Q    Well, if you don't recall doing it am I
15      correct it's possible that you drafted this letter,
16      sent it to the school without Mr. Poulos knowing about
17      it?
18           A    Anything's possible.
19           Q    Okay.  Based off how you did things is it
20      possible?
21           A    I don't know.
22           Q    Do you -- as you sit here do you have any
23      reason to believe that you actually provided -- strike
24      that.
25                As you sit here do you have any reason to
```

1          Q     You probably have a recollection of speaking

2     with Mr. Poulos?

3          A     No.  I, I, I probably notified him that I, I

4     was going to send the letter.

5          Q     Okay.

6          A     But I don't specifically remember.

7          Q     And did you tell him that you were going to

8     send this letter to Mr. Lehman?

9          A     I don't remember.

10         Q     Did you tell him you were going to demand a

11    million dollars?

12         A     I don't remember.

13         Q     Doesn't -- did -- at the time did you believe

14    you had an obligation to confirm with your client as to

15    what his demands would be?

16                    MR. McCARRON:  Objection.

17         A     Well, I, I speak to the client about that.

18    But you're asking me if I specifically remember and

19    I -- with regard to Mr. Poulos, and I do not

20    specifically remember.

21         Q     All right.  Well, based on your pattern and

22    practice of doing things back then -- well, first of

23    all, as we sit here did you write this letter?

24         A     I don't recall.

25         Q     Is that because you write so many of these

Page 57

```
 1      letters it's tough to keep track?
 2                  MR. McCARRON:   Objection.
 3           A     I just have -- I do a lot of work.  I have a
 4      lot of clients, and I specifically don't recall.  I'm
 5      sorry.
 6           Q     Look at the back of this.  Is that your
 7      initial, please.
 8           A     I don't know.
 9           Q     Is there any way for you to tell us as to
10      whether or not that's actually your handwriting?
11           A     I don't know.
12           Q     What about the language used in the, in the
13      letter, is that something that sounds like you?
14           A     I don't know.
15           Q     The letter was drafted to the headmaster,
16      correct?
17           A     Yes.
18           Q     Question for you.  When you get mail, I mean
19      with 500 cases, how much mail do you get a day?
20           A     Sometimes a little.  Sometimes a lot.
21           Q     Do you have a practice in place at the firm
22      where somebody's opening the mail for you?
23           A     It's not a practice.  Someone will just open
24      the mail.  Sometimes it's me and sometimes it's someone
25      else.
```

1       Q   All right.  And you sent this to Mr. Lehman

2   as the headmaster, correct?

3       A   Apparently.

4       Q   And when you sent this to Mr. Lehman as the

5   headmaster did you consider as to whether or not a guy

6   like him who's, who's pretty busy if he's going to be

7   opening the mail himself or if maybe he has somebody in

8   his office who's going to be opening it?

9       A   No.

10      Q   You didn't give consideration to that?

11      A   No.

12      Q   That would be pretty reasonable for a

13   headmaster of a, a prominent boarding school to have

14   somebody opening his mail, correct?

15      A   I don't know.

16             MR. McCARRON:  Objection.

17      Q   You don't know?

18      A   No.

19      Q   Can you tell me whether or not as you sit

20   here today you believe that one of your associates

21   wrote this?

22      A   I don't know.

23      Q   Did you ask them?

24      A   I don't recall.

25      Q   So when you got sued, you didn't ask any of

Page 61

```
 1        Q    Folders?

 2        A    Yeah.

 3        Q    Am I correct there was no folder made in this

 4   case?

 5        A    I don't know.

 6        Q    Did you look?

 7        A    No.

 8        Q    Oh.  Did anyone from your office look?

 9        A    I don't know.

10        Q    *Is it possible that there's a folder that

11   exists in this case with electronic documents that

12   haven't been produced?

13        A    *I don't know.

14        Q    Did you have any involvement whatsoever in --

15             THE WITNESS:  Oh, excuse me.  Can you

16   repeat that last question.

17                  (*Record read)

18        A    We produced the whole file.  I mean ...

19        Q    Okay.  And how do you know that?

20        A    Because we had it copied.

21        Q    All right.  And it was electronic form; is

22   that correct?  Or was it not electronic form?

23        A    I don't know.

24        Q    Well, did you look at some of your

25   handwritten notes that were on a yellow pad?
```

Page 66

```
 1        A    Yeah, I believe so.

 2        Q    And you still have the original file,

 3   correct?

 4        A    Yes.

 5        Q    When was the last time you believe -- strike

 6   that.

 7             I understand your testimony to be that

 8   between April 11th, 2018 to present you can't recall

 9   actually reading this letter, correct?

10        A    Yes.

11        Q    As you sit here do you believe you reviewed

12   this letter before it was sent?

13        A    I don't recall.

14        Q    My question was a bit different.

15             As you sit here do you believe that you

16   reviewed this letter before it was sent?

17        A    I don't know.

18        Q    Do you -- strike that.

19             As of April 2018 did you believe that, that

20   you had an obligation to review letters for accuracy

21   before sending them out?

22                  MR. McCARRON:   Objection.

23        A    Someone in my office read them.

24        Q    Do you believe that someone other than you

25   was the person who wrote this letter?
```

1        A       I have no idea.

2        Q       But as you sit here, you can't tell us one

3    way or the other if it was you or somebody else; is

4    that right?

5        A       That's right.  Yes.

6        Q       Let me back up.

7                Do you have any idea where the information

8    that was put into this letter pertaining to Mr. Poulos

9    came from?

10        A       I don't recall.

11        Q       Do you have any recollection of actually

12    speaking with Mr. Poulos?

13        A       I believe I did.

14        Q       Okay.  Tell me what you can recall about

15    speaking with Mr. Poulos before you sent this letter.

16        A       I don't recall speaking to him.  I just

17    believe I did.

18        Q       In other words, as you sit here today you

19    have no recollection of that discussion with

20    Mr. Poulos?

21        A       Correct.

22        Q       And can you tell us why you believe you did?

23        A       I, I don't know.

24        Q       Is there a chance you didn't?

25        A       I don't know.  I believe I did.

Page 70

```
 1                   MR. McCARRON:  I think I'm, I think I"m
 2        confused.  Are you referring to something other than
 3        Exhibit 7, right, now?  That just occurred to me.
 4                   MR. JUBB:  I think so.
 5                   MR. McCARRON:  So you're talking about
 6        what the last time last that Mr. -- the last occasion
 7        Mr. Garabedian recalls sending or drafting a letter?
 8                   MR. JUBB:  Letter like this making a
 9        demand before he ever filed a suit.
10             Q    And I believe your testimony was before
11        Covid, right?
12             A    Yeah.
13             Q    How long before Covid?
14             A    I don't remember.
15             Q    Do you believe that you personally wrote a
16        letter making a demand before a lawsuit was filed
17        within the last three years?
18             A    I don't know.
19             Q    When you are -- strike that.
20                  Why is it that your associates don't have
21        their own letterhead, that they can write letters by
22        themselves?
23             A    I don't know.
24             Q    Can any of them do that?
25             A    Yes.
```

1          Q     Okay.  So they actually have their own

2     letterhead on it, fair enough?

3          A     I don't understand you.

4          Q     Sure.   Do you allow your associates to write

5     letters signing their own name?

6          A     No.

7          Q     In other words, all of the attorneys that are

8     working for you on all these files, every letter comes

9     from your letterhead with your name at the bottom,

10    right?

11         A     I don't know.

12         Q     Well, your attorneys are not permitted to

13    draft letters on their own personal letterhead or sign

14    their own name, correct?

15         A     I don't know.

16               Are you referring to demand letters like this

17    or are you referring to letters in general?  I'm not

18    sure.

19         Q     Let's go general first because that's the way

20    my question was phrased.

21         A     Yeah, I don't know.

22         Q     As you sit here today can you recall any

23    letter in the last, I don't know, five years that you

24    recall seeing being signed off by an associate or

25    somebody not you?

Page 73

```
 1              And have any of them ever had cases by
 2      themselves?
 3         A    No.
 4         Q    Have any of them ever -- strike that.
 5              Have any of them ever sent a demand letter of
 6      any kind with their name on it instead of yours?
 7         A    I don't believe so.
 8         Q    As you sit here today are there instances
 9      where letters are sent by your associates with your
10      name at the bottom that you haven't seen?
11         A    I don't know.
12         Q    Do you let your associates take depositions?
13         A    Bill Gordon takes a lot of depositions from
14      my office.
15         Q    Anybody else?
16         A    No.  I should say when there are depositions
17      to be taken.  Sometimes there just aren't depositions
18      to be taken so no one's taking them.
19         Q    The majority of your cases do they involve
20      depositions?
21         A    I can't answer that.  I don't know.
22         Q    In other words, you get this potential case,
23      and you're actually able to, to get settlements without
24      ever having anybody appear for a deposition?
25         A    Yes.
```

Page 77

1    don't ask that question.

2         Q    Have you ever had a complaint filed where the

3    statute of limitations had been expired by more than

4    five years?

5         A    No.

6         Q    And I guess the question is do you consider a

7    case to be viable so long as a court hasn't thrown it

8    out yet?

9              MR. McCARRON:  Objection.  Try again.

10        Q    So the statute of limitations is a defense,

11   correct?

12        A    Yes.

13        Q    All right.  And so that --

14             MR. McCARRON:  Objection.  Go ahead.

15        Q    -- that defense that could be raised, that's

16   raised legally after you file a complaint, correct?

17        A    Yes.

18        Q    All right.  And when that happens am I

19   correct that if the statute of limitations is expired

20   that a judge can throw it out?

21             MR. McCARRON:  Objection.

22        A    Yes.

23        Q    All right.

24             MR. McCARRON:  Well, "throw it out" is

25   not a term of art, to my knowledge, and -- rule of

P64.78

1    procedure so ...

2                    MR. JUBB:  Sure.

3        Q    You knew what I meant when I said throw it

4    out, correct?

5        A    Well, can you repeat the question?

6        Q    Sure.  When you file a complaint -- strike

7    that.

8                    Am I correct that when the statute of

9    limitations defense is raised in a case -- the statute

10   of limitations has expired on a case that a court will

11   dismiss that complaint?

12                   MR. McCARRON:  Objection.

13       A    Yes.

14       Q    Can you recall the last time that you had a

15   case dismissed because a judge said the statute of

16   limitations had been expired?

17                   MR. McCARRON:  Objection.

18       A    One in Connecticut about two, three years

19   ago.

20       Q    Was that against a private entity or was that

21   against a church?  What was that?

22       A    I think it was a private entity.  I forget

23   the name of it now, a school.

24       Q    Why did you file that case?  Strike that.

25                   Did you know the statute of limitations had

Page 79

```
 1   expired when you filed that case?
 2                   MR. McCARRON:  Objection.
 3        A    It was a question of -- no.
 4        Q    Am I correct that with respect to Mr. Poulos,
 5   you knew that the statute of limitations had expired
 6   for any of his claims, correct?
 7        A    Yes.
 8                   MR. JUBB:  I'm going to be handing you
 9   what is being marked as Garabedian 8 and 9.  Garabedian
10   8 is going to be Garabedian Email 57, and Garabedian 9
11   is going to be Garabedian Email 59.  And excuse me,
12   these are double-sided.  So Garabedian 8 is actually
13   Email 57 and 58, and Garabedian 9 is Garabedian Email
14   59 and 60.
15                   (Exhibits 8 & 9 marked
16                      for identification)
17        Q    Have you seen these before, Mr. Garabedian?
18        A    I don't remember.
19        Q    All right.  Well, in Garabedian 8, which is
20   Garabedian Email 57 and 58, is this an email from
21   Mr. Poulos to you?
22        A    Apparently.
23        Q    Okay.  And he's saying in here:  I haven't
24   heard from you in quite some time.  I was just
25   wondering if you have any updates concerning my case
```

Page 82

```
 1          A    We have Microsoft Outlook.

 2          Q    Okay.  And in doing that did you search for

 3      emails from Mr. Poulos?

 4          A    I don't recall.

 5          Q    Is there anything about how you practice law

 6      as to why you're forwarding this to Mr. Gaul?

 7          A    I don't understand your question.

 8          Q    Sure.  Why are you sending this to Mr. Gaul?

 9          A    I don't recall.

10          Q    Well, can you think of any reason why you

11      would be sending this to, to Mr. Gaul?

12          A    I'd only be guessing.

13          Q    Well, I certainly don't want you to guess.

14      But is there any practice that you had of forwarding

15      emails to your associates who are handling cases?

16          A    Yes.

17          Q    Was this Mr. Gaul's case?

18          A    I don't remember.

19          Q    Whose case was this?

20          A    I don't know.

21          Q    Was it yours?

22          A    Well, they're all mine.

23          Q    In other words, whatever Mr. Gaul did, that's

24      on you, right?

25          A    Yes.
```

Page 96

1    yours, Jeff?

2                    MR. McCARRON:  No, I only have one.

3                    MR. JUBB:  Okay.  So just 63.

4    BY MR. JUBB:

5         Q    Mr. Garabedian, at the bottom of this it

6    looks like there was an email from you to Tom Rees

7    cc'ing Mr. Gaul dated December 18th, 2018.  Do you see

8    that?

9         A    Yes.

10        Q    And in this email you write to Mr. Rees

11   saying:  As you know, this office represents Kurtis

12   Poulos with regard to a childhood sexual abuse claim --

13                  MR. McCARRON:  You might want to go slow

14   for the court ...

15        Q    -- involving Matthew B. Ralston and The Hill

16   School.  Please contact me so that we can discuss this

17   matter.  Did you write this email or did somebody else

18   write it?

19        A    I don't recall.

20        Q    Okay.  In other words, as of December 2018

21   there were folks that could write emails on your

22   behalf?

23        A    Maybe, but I don't know.

24        Q    Do you believe you wrote this?

25        A    I don't recall.  I don't know specif -- I

Page 97

1    don't recall specifically so I can't tell you.

2         Q    Okay.  Well, when the weatherman reports that

3    it's going to be pouring rain tomorrow, absolutely

4    pouring rain --

5              MR. McCARRON:  Do you really want to do this?

6    Do you really want to do this?  You want me to --

7                   MR. JUBB:  I'm just trying to

8    understand --

9                   MR. McCARRON:  No.  No.  Do you want me

10   to send to the court the, the way in which you think is

11   a proper -- appropriate to handle a deposition?

12                  MR. JUBB:  I don't care what you send to

13   the court.

14                  MR. McCARRON:  Is that right?  You

15   really don't care what I --

16                  MR. JUBB:  I think when they see the way

17   he's responding to these questions --

18                  MR. McCARRON:  I see.

19                  MR. JUBB:  It's --

20                  MR. McCARRON:  That what?

21                  MR. JUBB:  It's embarrassing.

22                  MR. McCARRON:  That what?  That what?

23   There's some violation of a rule that you just -- which

24   is what I'm talking about with respect to your behavior

25   now.

Page 99

```
 1                    MR. JUBB:  Yeah, you have.  So if
 2      you're --
 3                    MR. McCARRON:  Make a statement with a
 4      question mark at the end.  That's the way this is going
 5      to go.
 6      BY MR. JUBB:
 7          Q    Okay.  Pay attention to, to my question.
 8      Strike that.
 9                    MR. McCARRON:  You don't need to do
10      that.  Please don't be rude.
11          Q    Mr. Garabedian, as of December of 2018 was
12      there anybody else that had access to your email
13      account?
14          A    Well, I imagine individuals in my office
15      could have.
16          Q    Okay.  And when you say individuals in your
17      office is that referring to your associates?
18          A    Yes.
19          Q    Okay.  And am I correct that as of December
20      of 2018 it was possible that one of your associates
21      sent this email to Mr. Rees?
22          A    I don't recall.
23          Q    Is it possible, sir?
24          A    If it happened at all.  I don't know -- I
25      don't know.
```

1      Q    And if you don't know that's because you

2    can't say with any degree of certainty that your

3    associates didn't send an email, fair?

4      A    I don't know what -- I specifically don't

5    recall this.

6      Q    I know that.

7      A    Then -- well, I'm trying to answer your

8    question.  You don't have to, you don't have to like

9    yell at me, okay.

10     Q    I'm not yelling at you, sir.  I'm asking you

11   whether or not it's possible that one of your

12   associates wrote this email.  Can you answer that

13   question?

14     A    I don't know.

15     Q    But your associates did have access to your

16   email at this time, correct?

17     A    Sure.

18     Q    And there were other instances that you can

19   recall that your associates have actually written

20   emails under your email address to other folks,

21   correct?

22     A    Sure.

23     Q    Now, at the top of this Garabedian 11 which

24   is Garabedian 63, it's an email from Mr. Rees to your

25   email address, not necessarily you, saying:

1    Mr. Garabedian:   Let us schedule a call later this

2    week.   I have no schedule conflicts tomorrow until 4,

3    no conflicts on Thursday until noon, and no conflicts

4    Friday.   Did it appear to you from this email

5    assuming -- strike that.

6              The top email is from Mr. Rees to your email

7    address, correct?

8         A    Yes.   Apparently.

9         Q    Do you believe you read this?

10        A    I don't recall reading it.

11        Q    Do you read the emails that are sent to you,

12   sir?

13        A    Yes.

14        Q    Okay.   Do you believe that you read this

15   email based on that statement?

16        A    I don't recall reading it.   That's what I --

17   I know that's ...

18        Q    When Mr. Rees says that he tried several

19   times to reach you, it will be helpful to finally have

20   a chance to speak, does that refresh your recollection

21   as to whether or not you ever spoke with Mr. Rees

22   between December of 2018 and the time you wrote that

23   letter?

24        A    I do recall speaking to Mr. Rees, but I don't

25   recall when.   And I re -- I don't recall the specific

Page 109

```
 1          A    Yes.

 2          Q    All right.  And did Mr. Poulos tell you that?

 3          A    I don't recall.

 4          Q    Did Mr. Poulos tell you that he, he would not

 5     agree to any sort of confidentiality?

 6          A    I don't recall.

 7          Q    What did you mean by attend a mediation if

 8     Mr. Poulos's claim is found credible following an

 9     investigation?

10          A    Just what it says.

11          Q    In other words, if they found him to be

12     incredible, mediation wouldn't be happening; is that

13     right?

14          A    That's what the le -- all I -- what the

15     letter says is attend a mediation if Mr. Poulos's claim

16     to file -- claim is found credible following an

17     investigation.

18          Q    Do you recall as to whether or not Mr. Rees

19     ever asked for your participation in any sort of

20     investigation?

21          A    I don't recall.

22               MR. JUBB:  I'm going to hand you -- or

23     mark this as Garabedian 14.  It's Garabedian 51.

24               (Exhibit 14 marked

25                 for identification)
```

Page 111

1          Q    Did Mr. Rees have any understanding that he

2     was getting emails from lawyers that were not actually

3     you?

4          A    You'd have to ask him.

5          Q    But, but you don't have a practice of telling

6     opposing counsel that, do you?

7          A    No.

8          Q    Do you have a practice of telling anybody

9     that your associates are actually sending emails from

10    you?

11         A    I don't know.  I mean what do you mean?

12         Q    Sure.  Do the people that you send emails to,

13    do they know that in fact it could be coming from one

14    of your associates?

15         A    Some might.

16         Q    Do, do you know if Mr. Rees knew?

17         A    I have no idea.

18         Q    So in this where it says:  The School's

19    outside attorneys, Gina Smith, Esquire and Leslie

20    Gomez, Esquire, would like to meet with Mr. Poulos in

21    your presence and in your offices to discuss the facts

22    and issues presented in the December 26th letter.  As

23    you may know, Ms. Smith and Ms. Gomez are partners at

24    Cozen O'Connor in Philadelphia, and both have extensive

25    backgrounds in investigating and prosecuting cases of

1          MR. McCARRON:  Let's hear a question if

2     you can.

3          MR. JUBB:  Okay.

4     BY MR. JUBB:

5          Q    Mr. Garabedian, at any point in time did you

6     provide dates to counsel for The Hill School that your

7     client would appear at any point for an investigation?

8          A    No.

9          MR. McCARRON:  Objection.

10         Q    Why not?

11         A    The reasons are set forth in Exhibit 12.

12         Q    No where else, right?

13         A    I don't recall.

14         Q    *At any point in time did Mr. Rees ever

15    indicate to you that part of any investigation would

16    involve actually questioning your client?

17         THE WITNESS:  Can you repeat the

18    question.  I'm sorry I didn't hear the last two words.

19         (*Record read)

20         A    I don't recall.

21         Q    Well, based on doing this, you know, 500 some

22    cases you've got for the last five years, is it

23    reasonable for a defend -- for some -- strike that.

24         Is it reasonable, sir, when a lawyer asks to

25    speak with your client in your own offices to conduct

Page 138

1    wrote this letter or someone else wrote it, fair?

2         A    I don't remember specifically writing this

3    letter.

4         Q    Okay.  And if you don't remember am I correct

5    it's possible that someone else could have written this

6    letter; is that correct?

7         A    I, I -- all I can say is I don't specifically

8    remember writing this letter.

9         Q    All right.  And as of December of 2018 am I

10   correct in understanding that other associates at your

11   firm had the ability to draft letters like this on your

12   letterhead with your name at the bottom?

13        A    Yes.

14        Q    And I take that to mean that in this case

15   that could have happened, but we can't say one or the

16   other; is that fair?

17        A    Yes.

18        Q    Now, in looking at this on the second page,

19   which is Hill production 226, do those initials appear

20   to be your handwriting?

21        A    I'm not sure.

22        Q    Okay.  At the top of this production it says

23   December 26, 2018, 4:51 p.m., Mitchell Garabedian Law

24   with a number there.  Was this faxed to the school?

25        A    Apparently.

Page 139

```
1          Q    Strike that.

2               This was a fax to Mr. Rees, correct?

3          A    I bel -- well, apparently, based on the way

4     the letter is structured.  I mean at the top of the

5     letter on the first page it says via fax, and there's a

6     fax number.  That looks like my signature.

7          Q    All right.  Did you review this letter in

8     anticipation of today?

9          A    I believe it was an exhibit in a deposition.

10         Q    *And in going through this letter that your

11    office sent to Mr. Rees on December 26, 2018, did you

12    recall actually speaking with Mr. Poulos about some of

13    the things that are claimed in this letter?

14              THE WITNESS:   Can you repeat the

15    question, please.

16                   (*Record read)

17         A    I spef -- specifically don't remember, but I

18    do -- I did speak to Mr. Poulos.

19         Q    Have you had any discussions with the

20    attorneys in your office as to who wrote this letter?

21         A    No.  Not recently.  I may have in the past,

22    but I don't recall those discussions.

23         Q    After you were sued in this matter did you

24    make any sort of efforts to determine who was the

25    attorney who actually wrote these letters on your
```

Page 140

1    letterhead and sent them to The Hill School?

2         A     No.   I don't recall doing that.

3         Q     When you got the complaint and looked at the

4    exhibits do you recall having any sort of recollection

5    or impression, if you will, that, oh, yeah, that's the

6    letter that I, that I wrote?

7         A     I don't recall that.

8         Q     Did you have -- strike that.

9              In reviewing the complaint and the exhibits

10   attached thereto did you have any sort of feeling or

11   reaction that in reviewing these letters you said I

12   didn't write those letters?

13        A     I don't recall that.

14        Q     When -- strike that.

15             In the 2018/2019 timeframe when clients are

16   asking you for an update via email was there a, a

17   pattern and practice of writing to them?

18        A     No, not necessarily.

19        Q     Do you have any records suggesting that you

20   were speaking with -- strike that.

21             MR. JUBB:  This is going to be

22   Garabedian 17 which is Garabedian Email 67.

23                  (Exhibit 17 marked

24                   for identification)

25        Q     Again, any recollection of receiving this

1       to Mr. Poulos's deposition, correct?

2              A    Are you referring to Exhibit 17?

3              Q    I am, sir.

4              A    Yeah.

5              Q    Do you recall Mr. Poulos's testimony that he

6       was referring to the initial phone interview, that

7       intake process that he hasn't heard from your office

8       since then?

9              A    No.

10             Q    Do you have any reason to disagree with him

11      that he hadn't heard from your office for an update

12      after his initial interview?

13             A    No.

14                  MR. JUBB:  Why don't we take a five-to-

15      ten-minute break so if anyone needs to -- I think

16      Mr. Poulos had indicated he has to take his dog out.

17                  MR. McCARRON:  Mr. Poulos, this is your

18      chance to take your dog out, okay.

19                  MR. POULOS:  He's fine.

20                  MR. JUBB:  Okay.

21                  MR. McCARRON:  I'm not telling you not

22      to -- well, do what you want.

23                  MR. JUBB:  It's 12:50.  I mean let's do

24      a five-minute break.

25                  THE VIDEOGRAPHER:  The time is

Page 143

1    12:50 p.m.  We're off the record.

2                    (Break was taken.)

3                    THE VIDEOGRAPHER:  The time is

4    12:58 p.m.  We're on the record.

5                    MR. McCARRON:  I have an objection to

6    your last question because I do not believe it was

7    bas -- good -- expressed on a good faith basis since

8    you are aware, Mr. Jubb, that there's substantial

9    evidence of communication that existed between the

10   Garabedian firm and Mr. Poulos in between the initial

11   intake interview and the point in time that is

12   referenced in Garabedian Exhibit 17.

13                   MR. JUBB:  Okay.

14   BY MR. JUBB:

15        Q    Mr. Garabedian, after you were sued in this

16   case did you have any discussions with Mr. Poulos?

17        A    I don't recall.  I think there were some

18   discussions about my representing him.

19        Q    After you were first sued and he was also

20   named as a defendant did you provide Mr. Poulos with

21   any sort of legal advice?

22        A    I don't recall.

23        Q    So in terms of Mrs. Poulos's discussions that

24   you had with her do you have any recollection of ever

25   communicating with her by email?

1          Q    And at the top of his handwritten notes it

2     says:  MG, NG.  Does that mean that you were likely on

3     this phone call?

4          A    Yes.

5          Q    Can you go to Garabedian File 24, please.

6          A    Sure.  Yes.

7          Q    All right.  Whose handwriting is this?

8          A    It's not mine.  I think it's Nathan's.

9          Q    Okay.  And it says:  MG tells client the

10    school is giving us the runaround.  Have you ever told

11    a client that someone's giving them the runaround?

12         A    I don't specifically recall, but, you know,

13    it's happened.

14         Q    Is that an expression you use?

15         A    What?

16         Q    Someone's giving you the runaround?

17         A    Not commonly but ...

18         Q    As of April 3rd, 2019 -- strike that.

19              Do you have any reason to believe that

20    Mr. Gaul inaccurately documented the notes of your

21    discussion with Mr. Poulos?

22         A    No.

23         Q    Do you believe based off this that you told

24    Mr. Poulos the school was giving you the runaround?

25         A    Yes.

1      Q    Can you tell us in your own words what, what

2   you believe the school would be doing that was giving

3   you the runaround?

4      A    I don't recall.

5      Q    So in other words, from the time that

6   Mr. Poulos contacted you to the first time you

7   contacted the school to today, you can't think of any

8   reason as you sit here as to why the school was -- or

9   strike that.

10         As you sit here today, you can't think of any

11  reason or any example of the school giving you the

12  runaround?

13              MR. McCARRON:   Objection.

14      A    Well, we had asked them for certain

15  conditions as preconditions to the investigation, and

16  they didn't agree apparently.

17      Q    *Is it your testimony that Mr. Poulos would

18  not agree to an investigation unless the school agreed

19  to mediate after the investigation?

20              THE WITNESS:   Can you repeat the

21  question?

22                  (*Record read)

23      A    Well, I set it for -- set forth the position

24  in my letter and your ...

25              MR. McCARRON:   Exhibit 12.

Page 154

```
 1          Q    I can read what the letter says.

 2          A    Okay.

 3          Q    Is it your testimony that that letter was

 4     intended to express to The Hill School that Mr. Poulos

 5     would not appear for an investigation unless they said

 6     to you we'll agree to a mediation following the

 7     investigation if he's found credible?

 8          A    That's what the letter says.

 9          Q    Okay.  And so did the school ever contact

10     you --

11          A    And they agree to not impose a

12     confidentiality agreement.

13          Q    And in other words, if the school did not get

14     back to you and say we'll mediate this case -- strike

15     that.

16               Is it your testimony that if the school did

17     not respond saying we'll agree to mediate this if after

18     the investigation he's found credible, that there was

19     no further discussion that was needed to be had?

20          A    And they'd have to agree to no

21     confidentiality.

22          Q    And if they did that then you would have

23     what, responded to their emails?

24          A    I would have proceeded with an

25     investigation -- in the investigation.
```

```
1     information bureau.

2          Q    Does that refresh your recollection as to

3     what a background check is?  No.

4          A    Not really.

5          Q    Okay.

6          A    Because background check was so broad.  If

7     you asked me if I obtained his criminal record, I would

8     have just answered it.

9          Q    I see.  Because the first time you obtained

10    his criminal record was after you got sued, correct?

11         A    Apparently.

12         Q    And did you review it?

13         A    Yes.

14         Q    Did you see that he was charged with

15    enticing -- child enticement?

16         A    Where is -- there's not -- there was no

17    prosecution.

18         Q    My question was did you become aware that he

19    was charged with child enticement?

20         A    When I read the record, yes.  But it was

21    dismissed or there was no prosecution of it.

22         Q    And did you look into that through court

23    records or did you just talk with Mr. Poulos about it?

24         A    I look -- I --

25              MR. McCARRON:  Objection.
```

Page 178

```
1      We're off the record.
2                      (Break was taken.)
3                      THE VIDEOGRAPHER:  The time is 1:54 p.m.
4      We're on the record.
5      BY MR. JUBB:
6           Q     Mr. Garabedian, did you review Mr. Poulos's
7      Hill School files?
8           A     I don't recall.
9           Q     Do you know whether or not any of your
10     associates did?
11          A     I don't recall specifically.
12          Q     Would it have been your pattern to review
13     Mr. Poulos's school file since that's the entity to
14     which your letter was directed?
15          A     Well, when you say you, someone from my
16     office if not me.
17          Q     Okay.  To the extent that you had obtained
18     any records for Mr. Poulos from any sort of
19     authorization or FOIA request, whatever it may have
20     been, would those records have been included in his
21     file?
22          A     Yes.
23          Q     And those records would have been copied and
24     produced; am I correct?
25          A     Yes.
```

Page 188

```
 1        A    I don't have a photograph of it happening.

 2   Of the abuse happening.

 3        Q    Okay.  Well, am I correct that at the time

 4   you wrote the letter did you even know as to whether or

 5   not he was a student at The Hill School?

 6        A    Yes, I believed Mr. Poulos.

 7        Q    You believed him in that, right?

 8        A    Yes.

 9        Q    But am I correct that you had no independent

10   corroboration that he even was a student there, right?

11        A    I don't recall.

12        Q    Am I correct that as of the time that you --

13   that the letter came from your office did you have any

14   information other than Mr. Poulos's statement that he

15   was in Mr. Ralston's geometry class that that was true?

16        A    I don't recall.

17        Q    Okay.  So other than the fact that Mr. Poulos

18   went to The Hill School and was in Mr. Ralston's

19   geometry class is there any evidence that you've seen

20   that you've obtained after you sent your, your letter

21   and after you've been sued that you believe

22   corroborates Mr. Poulos's testimony or allegations

23   here?

24        A    I'd have to look at the file.  I don't

25   recall.  It was a deep file.
```

1    Q    And in there at any point in time did you

2    tell Mr. Poulos that you could not represent him,

3    period?

4                    MR. McCARRON:   In this case.

5                    MR. JUBB:   My question just said did you

6    tell him that you could no longer represent him,

7    period.

8                    MR. McCARRON:   The discussion was about

9    this case.  The conversations, as you know, reflected

10   in the -- is about the representation for this case.

11                   MR. JUBB:   I see.

12   Q    So --

13                   MR. POULOS:   Asked and answered.

14   Q    Okay.  So --

15                   MR. POULOS:   It's asked and answered.

16   Q    So when you requested his medical records and

17   those authorizations, what case did that have to do

18   with?

19   A    His claim.

20   Q    His claim.  What claim?

21   A    The sexual abuse claim.

22   Q    Okay.  And where are you with that?

23   A    It's dormant.

24   Q    Have you ever contacted the school again?

25   A    No.

Page 200

```
 1          Q    You never filed anything, right?

 2          A    I just told you it's dormant.

 3          Q    You never reached out to local counsel,

 4   right?

 5          A    I just told you it's dormant.

 6          Q    It's dormant.  How long is it going to be

 7   dormant?

 8          A    I don't know.

 9          Q    When are you going to file something?

10          A    I don't know.

11          Q    When was the last time you talked to

12   Mr. Poulos?

13          A    It's in the notes.  I, I don't know.

14          Q    When he sued you and said that you told him

15   there was a conflict of interest and he sued you for

16   legal malpractice did you ever become aware of that?

17          A    If it's in the pleadings.

18          Q    Is that because you read the pleadings?

19          A    Please don't make faces at me.

20          Q    I'm just trying to get an under -- all this

21   would be unnecessary, but now I have to lay, you know,

22   a foundation for Fort Knox over here.

23               But at some point in time you had a

24   conversation with Mr. Poulos -- strike that.

25               Am I correct that Mr. Poulos filed a legal
```

Page 204

1            MR. McCARRON:  Press conferences?

2            MR. JUBB:  Yeah.

3            MR. McCARRON:  Is there a press

4    conference that I'm unaware of, that I'm so ignorant of

5    in this case because I don't -- you're -- is there a

6    press conference that occurred with respect to

7    Mr. Poulos?

8            MR. JUBB:  I don't know.  I'll ask that

9    question first.

10   BY MR. JUBB:

11       Q    You didn't have a press conference for this

12   one yet, did you?

13       A    Can you repeat the question?

14       Q    Did you have a press conference as it

15   pertained to Mr. Poulos?

16       A    Not that I recall.

17       Q    Okay.  Well, am I correct that over the last

18   five years you've given more press conferences than you

19   have tried cases to verdict?

20            MR. McCARRON:  Objection.

21       A    Yes.

22       Q    What's your understanding as to when

23   Mr. Poulos told his mother of these allegations?

24       A    It's in the file.  You'd have to look.

25       Q    In other words, what's written in your notes?

Page 211

1         A    No, I -- not that I recall.

2         Q    Do you know whether or not you can

3    represent -- strike that.

4              In Massachusetts can you represent a client

5    on a contingent basis without a Contingent Fee

6    Agreement?

7         A    I don't believe so.

8         Q    Have you reviewed any of the documents that

9    were produced by my client in this case responsive to

10   your discovery requests?

11        A    No.

12        Q    Has anyone from your office reviewed those

13   documents that you're aware of?

14        A    Not that I know of.

15        Q    After your office was sued -- strike that.

16             After you received the initial complaint did

17   you have any sort of meeting with the associates that

18   were involved in Mr. Poulos?

19        A    With regard to this matter or just meeting

20   them every day?  I mean I don't know ...

21        Q    No, I don't care to know what -- you know,

22   you guys meet in the lunch room.  I'm specifically

23   talking about this case so I'll clarify for you.

24             At any point in time after you were sued did

25   you have a meeting with your associates about the

1    claims that were made against you?

2          A      There were discussions.

3          Q      Can you tell me about those discussions,

4    please.

5          A      I don't recall specifically.

6          Q      What do you -- where did it occur?

7          A      My office.

8          Q      Who, who attended?

9          A      My associates.

10         Q      Which associates?

11         A      William Gordon.

12         Q      Who else?

13         A      I'm not sure.

14         Q      Mr. Gaul?

15         A      I may have had a few brief discussions with

16   him.  I'm not sure.

17         Q      What about Mr. Mahoney?

18         A      Maybe a few brief discussions.

19         Q      And that would have occurred in April of 2019

20   or at least after April 2019, correct?

21         A      Maybe.

22         Q      Did this meeting take place in a conference

23   room in your office?

24         A      Oh, it wasn't a group meeting if, if there

25   was like a meeting.

Page 213

1        Q    Were you doing any sort of independent

2    investigation into the claims that were being made

3    against you?

4        A    No.

5        Q    And in these discussions with Mr. Gordon what

6    did you talk about?

7        A    I don't recall.

8        Q    What about Mr. Gaul, what did you talk about?

9        A    I don't recall.

10        Q    Mr. Mahoney?

11        A    I don't recall.

12        Q    Did you ever ask anybody in your office who

13    wrote these letters?

14                  MR. McCARRON:   You already asked him

15    that.

16                  MR. JUBB:   I don't believe I did.

17        A    I don't recall.

18                  MR. JUBB:   Let's take two minutes.

19                  THE VIDEOGRAPHER:   The time is 2:28 p.m.

20    We're off the record.

21                      (Break was taken.)

22                  THE VIDEOGRAPHER:   The time is 2:34 p.m.

23    We're on the record.

24    BY MR. JUBB:

25        Q    Mr. Garabedian, take us through the process

Page 217

1    representative here?

2         A    I don't recall.

3         Q    Well, do you, you know, keep track of these

4    types of things?

5         A    No.

6         Q    No.  So if --

7         A    I get a lot of phone calls.

8         Q    Sure.  Sure.

9              But have you ever had any discussion that you

10   can recall trying to change the statute of limitations

11   in Pennsylvania?

12        A    I don't know.  I'm not sure.

13        Q    And when you say you're not sure am I correct

14   that nothing comes to mind?

15        A    That's right.  I mean there are -- I may have

16   been interviewed by newspapers or the media in

17   Pennsylvania about the statute of limitations.  I may

18   have been contacted by groups.  I, I don't recall.

19        Q    What groups?

20        A    I don't know.

21        Q    When you say you may have been contacted,

22   when was that?

23        A    Through the years.  I mean a lot of years.

24        Q    You've never -- strike that.

25             Am I correct you've never filed a case in

Page 218

1    Pennsylvania?  I thought that's what your testimony was
2    previously.
3            A    I, I believe you're cor -- I have not.  I
4    don't believe I have.
5            Q    In this instance you never contacted any
6    local counsel, correct?
7        A    No.  Correct.  Sorry.
8                    MR. JUBB:  I believe we -- this was
9    already marked unless I'm mistaken.  I'm just going to
10   remark this, if it was so forgive me.
11                   MR. McCARRON:  Which is it?
12                   MR. JUBB:  Garabedian 47.  Garabedian
13   File 47.  Yeah, we did.  It's actually 12.  Oh, no,
14   that's the difference because there's Garabedian File
15   27.
16                   So for the record, I'm going to mark as
17   Garabedian 20, a document that was previously produced
18   as Garabedian File 47.
19                   MR. McCARRON:  And is that the same as
20   Garabedian -- it is, 12.  Why are you doing that?
21                   MR. JUBB:  It's not.  That's
22   Garabedian -- see, this is the way you guys Bates it.
23                   MR. McCARRON:  Oh, I'm sorry.  File 47,
24   sorry.  Okay.
25                   MR. JUBB:  You can mark that for me.

Page 227

1    records being received after the letter.  So you don't

2    need to include it.  Just ask the question, whatever it

3    was.  I don't even remember at this point what you

4    were -- the fact you were trying to learn, but it

5    didn't relate to that.

6              MR. JUBB:  Okay.

7    BY MR. JUBB:

8         Q    Mr. Garabedian, did -- prior to writing the

9    letter am I correct that you have no knowledge, as you

10   sit here today, to suggest that you did receive

11   Mr. Poulos's records by then?

12        A    I don't recall.

13        Q    And since you don't recall receiving them,

14   you can't say one way or the other as to whether or not

15   you reviewed them prior to writing the letter; is that

16   correct?

17        A    Correct.

18        Q    And after you had writ -- strike that.

19             After the April 11th, 2018 letter am I

20   correct at some point you received Mr. Poulos's Hill

21   School records?

22        A    I don't recall.

23        Q    Do you have any recoll --

24             MS. DOUGHERTY:  Objection.

25             MR. JUBB:  Is there two --

1    such as discovery indexes or document indexes, anything

2    like that?

3         A    In some cases, yes.

4         Q    Did you see anything like that for this case?

5         A    I don't recall.

6              MR. JUBB:  Those are all the questions

7    that I have.

8              MR. McCARRON:  Mr. Poulos?

9              MR. JUBB:  Mr. Poulos, can you hear us?

10              MR. POULOS:  Yes, I can hear you.

11              MR. JUBB:  Okay.  You're up.

12              MR. McCARRON:  Do you have any

13    questions, sir?

14              MR. POULOS:  I just have a couple of

15    questions regarding the Cozen firm.

16                   CROSS-EXAMINATION

17    BY MR. POULOS:

18         Q    There's an article in the New York Times

19    dated back to I believe 2017 with Mitchell, and I had

20    asked Mitchell and I will repeat the question:  Do you

21    believe I should get counsel before I speak to --

22    excuse me for a second while I flip the page, the

23    attorneys Leslie Gomez and Gina Smith, and in light of

24    that, I found this article where Mitchell gave an

25    interview.  Mitchell, do you remember giving that

1      interview to the New York Times?

2            A     No, I don't.  Sorry.

3                      MR. POULOS:  Am I allowed to read off of

4      the actual article?

5                      MR. McCARRON:  If it involves a

6      question.  Do you have a question?

7                      MR. POULOS:  No, if I'm not allowed to

8      read verbatim what was transcripted in the article

9      then, no, I don't have a question.  I just wanted to

10     know if he remembered giving the interview about the

11     Cozen firm which was representing themself for the, The

12     Hill School.

13                     MR. McCARRON:  All right.  Mr. Poulos, I

14     don't mean to, to tell you you can't ask a question.

15     All I'm saying to you is it's not a question just to

16     read the statement, but if you need to read the

17     statement or some portion of the article in order to --

18     as part of a question, you can certainly do that.

19                     MR. POULOS:  Well, no, my question was

20     if he remembered actually giving the --

21                     MR. McCARRON:  I understand.

22                     MR. POULOS:  -- interview.

23                     MR. McCARRON:  Okay.

24                     MR. POULOS:  If he doesn't --

25                     MR. McCARRON:  Very good.

Page 237

1                    MR. POULOS:  -- then there's no point in
2        me reading it out loud.
3                    MR. McCARRON:  Gotcha.  All right.  So
4        any other questions?
5                    MR. POULOS:  Not at this time.
6                    MR. McCARRON:  All right.  Are we done?
7                    MR. JUBB:  Yes.
8                    MR. McCARRON:  Okay.  We're going to go
9        off the record.  Thank you, Mr. Poulos.
10                   THE VIDEOGRAPHER:  This concludes
11       today's video deposition of Mitchell Garabedian.  The
12       time is 3:03 p.m.  We're off the record.
13                   (Whereupon the deposition was
14                    concluded at 3:03 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 238

1                          CERTIFICATE

2    Commonwealth of Massachusetts

3    Suffolk, ss.

4

5        I, Kristen L. Kelly, Registered Professional

6    Reporter, CSR and Notary Public in and for the

7    Commonwealth of Massachusetts, do hereby certify that

8    MITCHELL GARABEDIAN, the witness whose deposition is

9    hereinbefore set forth, was duly sworn by me and that

10   such deposition is a true record of the testimony given

11   by the witness.

12       I further certify that I am neither related to or

13   employed by any of the parties in or counsel to this

14   action, nor am I financially interested in the outcome

15   of this action.

16       In witness whereof, I have hereunto set my hand

17   this 5th day of July, 2021.

18

19

20       _____

21           CSR No. 115893

22

23   My Commission Expires:

24   February 3, 2023

25

Page 239

1    Jeffrey B. McCarron, Esquire

2    jmccarron@swartzcampbell.com

3                        July 6, 2021

4    RE:   Doe, John v. Garabedian, Mitchell Esq Et Al

5         6/24/2021, Mitchell Garabedian (#4638046)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19      If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 240

1    Doe, John v. Garabedian, Mitchell Esq Et Al

2    Mitchell Garabedian (#4638046)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____      _____

24   Mitchell Garabedian                       Date

25

P64.241

Page 241

1  Doe, John v. Garabedian, Mitchell Esq Et Al

2  Mitchell Garabedian (#4638046)

3            ACKNOWLEDGEMENT OF DEPONENT

4     I, Mitchell Garabedian, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____    _____

12  Mitchell Garabedian               Date

13  *If notary is required

14                 SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                 _____ DAY OF _____, 20___.

16

17

18                 _____

19                 NOTARY PUBLIC

20

21

22

23

24

25

Zachary G. Lehman

```
 1                    CERTIFICATE
 2
 3          I, DONNA A. BITTNER, RMR-CRR and NJ
      CSR License No. 30XI00179000, do hereby
 4    certify that prior to the commencement of the
      examination, ZACHARY G. LEHMAN, was duly
 5    remotely sworn by me to testify to the truth,
      the whole truth and nothing but the truth.
 6
            I DO FURTHER CERTIFY that the
 7    foregoing is a verbatim transcript of the
      testimony as taken stenographically by me at
 8    the time, place and on the date hereinbefore
      set forth, to the best of my ability.
 9
            I DO FURTHER CERTIFY that I am neither
10    a relative nor employee nor attorney nor
      counsel of any of the parties to this action,
11    and that I am neither a relative nor employee
      of such attorney or counsel, and that I am
12    not financially interested in this action.
13
14
15
            DONNA A. BITTNER, RMR-CRR
16          NJ CSR No. 30XI00179000
            Notary Public
17          Dated: September 30, 2021
18
19
20
21
22
23
24
```

**P75.169**