# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

\*    \*    \*

```
JOHN DOE,                    :
            Plaintiff,       :
         - vs -              :   NO: 2:19-CV-01539
MITCHELL GARABEDIAN, ESQUIRE,:
et al.,                      :
            Defendants.      :
```

\*    \*    \*

Videotape deposition of MATTHEW RALSTON,

taken at the law offices of SWARTZ CAMPBELL, LLC, One

Liberty Place, 1650 Market Street, 38th Floor,

Philadelphia, Pennsylvania, 19103, on Thursday, July 1,

2021, beginning at approximately 10:11 a.m., before

Lisa M. Cooper, Court Reporter.

\*    \*    \*

U.S. LEGAL SUPPORT
Northeast Processing Center
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania  19103
(877)  479-2484

Matthew Ralston
July 01, 2021                                    2 to 5

Page 2

```
 1  A P P E A R A N C E S :
 2
 3          THE BEASLEY FIRM, LLC
            BY:  LANE R. JUBB, JR., ESQUIRE
 4          1125-35 Walnut Street
            Philadelphia, Pennsylvania  19107
 5          lane.jubb@beasleyfirm.com
            -- Representing the Plaintiff
 6
 7          SWARTZ CAMPBELL, LLC
            BY:  CANDIDUS K. DOUGHERTY, ESQUIRE
            By:  JEFFREY B. MCCARRON (VIA ZOOM)
 8          One Liberty Place
            1650 Market Street, 38t Floor
 9          Philadelphia, Pennsylvania  19103
            cdougherty@swartzcampbell.com
10          -- Representing the Defendant
11                       *   *   *
12
    VIDEOGRAPHER:
13          Ed Caswell, IV
14
15  ALSO PRESENT:
            Mitchell Garabedian (Via Zoom)
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1               I N D E X
 2
 3  WITNESS                               PAGE
 4
 5  MATTHEW RALSTON
 6
 7       By:  Ms. Dougherty                 5
 8
 9
10                  *   *   *
11          E X H I B I T S
12  NUMBER        DESCRIPTION            PAGE
13  D-15          Letter                  47
14  D-2           4/23/16 Document        98
15  D-1           E-Mails                 98
16  D-16          Interrogatories        195
17  D-4           December 26, 2018 Letter 230
18  D-17          Academic Report        329
19  D-18          Academic Report        329
20  D-19          Academic Report        329
21  D-20          Yearbook pages         337
22
23
24
25
```

Page 4

```
 1               (It is hereby stipulated by and
 2  among counsel for the respective parties
 3  that signing, sealing, certification, and
 4  filing are waived, and that all objections,
 5  except as to the form of the question, are
 6  reserved until the time of trial.)
 7
 8               MATTHEW RALSTON,
 9  after having been first duly sworn, was
10  examined and testified as follows:
11               *   *   *
12          THE VIDEOGRAPHER:  We are now on the
13  record.  My name is Ed Caswell, IV.  I'm your
14  videographer retained by U.S. Legal Support.
15  This is a video deposition for the United
16  States District Court for the Eastern
17  District of Pennsylvania.  Today's date is
18  July 1, 2021.  The time is 10:11.
19          This deposition is being held at One
20  Liberty Place, 38th floor, in Philadelphia,
21  in the matter of John Doe versus Mitchell
22  Garabedian, Esquire.  The deponent is John
23  Doe.  Counsel, if you want to introduce
24  yourselves and who you represent?
25          MS. DOUGHERTY:  Sure.  Candidus
```

Page 5

```
 1  Dougherty from Swartz Campbell on behalf of
 2  the defendants.
 3          MR. JUBB:  Good morning.  Lane Jubb of
 4  The Beasley Firm on behalf of plaintiff.  And
 5  no one is appearing on behalf of Mr. Poulos
 6  today.
 7          THE VIDEOGRAPHER:  The witness will now
 8  be sworn in.
 9               *   *   *
10          MATTHEW RALSTON,
11  after having been first duly sworn, was
12  examined and testified as follows:
13               *   *   *
14          THE VIDEOGRAPHER:  Proceed.
15               *   *   *
16               EXAMINATION
17               *   *   *
18  BY MS. DOUGHERTY:
19  Q.     Can you state your full name, sir?
20  A.     Matthew, Byer, B-Y-E-R, Ralston,
21  R-A-L-S-T-O-N.
22  Q.     And what is your date of birth?
23  A.     5/10/1957.
24  Q.     Where do you live?
25  A.     5823 Parkbridge Lane, one word.  Dublin,
```

Matthew Ralston
July 01, 2021

6 to 9

Page 6

1  Ohio, 43016.
2  Q.      How long have you lived at 5823 Parkbridge
3  Lane, Dublin, Ohio, 43016?
4  A.      Five years.  Actually, technically, five
5  years about today.
6  Q.      You said to today?
7  A.      Almost.
8  Q.      So when -- so you know the date that you
9  began living at 5823 Parkbridge Lane?
10  A.      No.  Not specifically.  But it's been about
11  five years.  I converted my driver's license four years
12  ago probably.
13  Q.      Okay.  So you have a Ohio driver's license?
14  A.      I do.
15  Q.      Do you vote in Ohio?
16  A.      Yes, ma'am.
17  Q.      Do you live with someone else at 5823
18  Parkbridge Lane?
19  A.      My wife.
20  Q.      What's your wife's name?
21  A.      Mary Beth.  Two words.
22  Q.      How long have you been married to Mary Beth?
23  A.      39 years.
24  Q.      Were you married to anyone other than Mary
25  Beth?

Page 7

1  A.      No.
2  Q.      Does anyone else, other than Mary Beth, live
3  with you at 5823 Parkbridge Lane?
4  A.      No.
5  Q.      Where did you live before you lived at 5823
6  Parkbridge Lane?
7  A.      The Leelanau School.  Glen Arbor, Michigan.
8  Q.      How long -- so you lived in the residence at
9  The Leelanau School?
10  A.      Yes.
11  Q.      How long did you live in residence at The
12  Leelanau School?
13  A.      Seven years.
14  Q.      Did anyone else live with you in residence at
15  The Leelanau School?
16  A.      Mary Beth.
17  Q.      Where did you live before you lived in
18  residence at The Leelanau School?
19  A.      The Hill School.  Pottstown, Pennsylvania.
20  Q.      Just going back to The Leelanau School for a
21  minute.  So the entire time that you were employed by
22  The Leelanau School you lived in residence?
23  A.      I did.
24  Q.      You lived in residence at The Hill School in
25  Pottstown, Pennsylvania?

Page 8

1  A.      Yes.
2  Q.      How long did you live in residence at The
3  Hill School in Pottstown, Pennsylvania?
4  A.      17 years.
5  Q.      So 1992 to 2009?
6  A.      Yes.
7  Q.      The whole time you were employed by the --
8  let me start again.  You were employed by The Hill
9  School from 1992 to 2009, is that right?
10  A.      Yes.
11  Q.      The whole time you were employed by The Hill
12  School from 1992 to 2009 you lived in residence?
13  A.      Yes.
14  Q.      Did anyone else live with you in residence at
15  The Hill School when you lived in residence between
16  1992 to 2009?
17  A.      My wife.  Mary Beth.  And for part of that
18  time, our children.  Two sons.
19  Q.      What are your sons' names?
20  A.      Zachary is our oldest.  Z-A-C-H-A-R-Y.  And
21  Kyle.
22  Q.      Did Zachary attend The Hill School?
23  A.      He did.
24  Q.      Did Zachary graduate from The Hill School?
25  A.      He did.

Page 9

1  Q.      What year did Zachary graduate from The Hill
2  School?
3  A.      2005.
4  Q.      Did Kyle attend The Hill School?
5  A.      He did.
6  Q.      Did Kyle graduate from Hill School?
7  A.      Yes.  2007.
8  Q.      Did you attend The Hill School?
9  A.      No.
10  Q.      Do you have any other children, other than
11  Zachary and Kyle?
12  A.      No.
13  Q.      Do you have any grandchildren?
14  A.      No.
15  Q.      Where did you live prior to living in
16  residence at The Hill School?
17  A.      Raleigh, North Carolina.
18  Q.      How long did you live in Raleigh, North
19  Carolina?
20  A.      A little less than two years.
21  Q.      So 1990 to 1992?
22  A.      '92.  Yeah.
23  Q.      Did anyone else live with you in Raleigh,
24  North Carolina?
25  A.      Mary Beth, Zach and Kyle.

Page 10

1  Q.     Where did you live before you lived in
2  Raleigh, North Carolina?
3  A.     At The Andrews School, Willoughby, Ohio.
4  Q.     How long did you live at The Andrews School?
5  A.     Three years.
6  Q.     So 1987 to 1990?
7  A.     Yes.
8  Q.     Did anyone live with you -- let me start
9  again.  You lived in residence at the -- at The Andrews
10 School?
11 A.     Yes.
12 Q.     Did anyone live with you in residence at the
13 The Andrews School?
14 A.     Yes.
15 Q.     Who --
16 A.     Two years Mary Beth and Zachary.  For one
17 year Mary Beth, Zachary and Kyle.
18 Q.     Where did you live before you lived in
19 residence at The Andrews School?
20 A.     Delray Beach, Florida.
21 Q.     How long did you live in Delray Beach,
22 Florida?
23 A.     15 months.
24 Q.     Just going back to Raleigh, North Carolina
25 for a moment did you live in a house or a school?

Page 11

1  A.     We had an apartment.
2  Q.     You had an apartment.
3         MR. JUBB:  Excuse me, did you say
4  Raleigh or Rawley?
5         THE WITNESS:  Raleigh.
6         MS. DOUGHERTY:  Raleigh.  Okay.  I'm
7  sorry.  I'm just saying it wrong.
8         MR. JUBB:  I just figured if you wanted
9  the correct town to look.  I figured, get the
10 names right.
11        MS. DOUGHERTY:  Sorry.  My Philly is
12 coming out.
13 BY MS. DOUGHERTY:
14 Q.     Okay.  So you lived in an apartment in North
15 Carolina?
16 A.     Yes.
17 Q.     And Delray Beach, Florida?
18 A.     Apartment.
19 Q.     So from 1995, 1996 to 1987 you were in Delray
20 Beach, Florida?
21 A.     80's.  Not 90's.
22 Q.     Oh, I'm sorry.  1986.
23 A.     Yes.  Spring of '86 to the summer of '80 --
24 excuse me.  Yes, '87.  '86, '87.
25 Q.     Did anyone live with you in the apartment in

Page 12

1  Delray Beach, Florida?
2  A.     For a year of it, Mary Beth.  For the last
3  few months, Mary Beth and Zachary.
4  Q.     Where did you live before you lived in Delray
5  Beach, Florida?
6  A.     Columbus, Ohio.
7  Q.     How long did you live Columbus, Ohio?
8  A.     An apartment.
9  Q.     How long did you live in an apartment in
10 Columbus, Ohio?
11 A.     A year and a half.
12 Q.     So 1984?  1985?
13 A.     I usually go the other way.  Yeah, '80 --
14 yes.  That would be about right.
15 Q.     1984 to '86?  Or 1985 to 1986?
16 A.     Until '86, when we went to Florida.
17 Q.     You say "we", did Mary Beth live with you in
18 Columbus, Ohio?
19 A.     Yes.
20 Q.     Where did you live before you lived in
21 Columbus, Ohio?
22 A.     And, I'm sorry, I actually split residences.
23 We were still in Columbus from '82 through '86.
24 Different place, because I was doing different things.
25 So from '82 to '86 we were in Columbus.  We were

Page 13

1  married in 1982.
2  Q.     Okay.  So you were in the apartment for a
3  year and a half.  And then you were in residence for
4  the rest of the time you were in Columbus, Ohio?
5  A.     No.  We were in an apartment the whole time.
6  They were different -- they were different -- my job
7  changed in there.  That's why I separated it for you.
8  I was doing jobs where we lived.  So we were married in
9  1982 and lived in Columbus, Ohio until we left in 1986.
10 Q.     All right.  And you had one job in 1982 to
11 when?
12 A.     I did.  Yes.  So 1980 -- 1, 82, I lived in
13 Newark, Ohio.  And then we were married.  I went -- in
14 1984 I went back to graduate school.  That's why I left
15 the job.  That's when we moved.  Changed apartments.
16 And then -- so that's -- that should be -- have all of
17 those gaps filled, I think.
18 Q.     What did you do from 1982 to 1984?
19 A.     I taught at a public high school.
20 Q.     Is that different than the job in Newark,
21 Ohio?
22 A.     No.  That is the job.
23 Q.     Okay.  So you were at the job in Newark, Ohio
24 from 1980 to 1984?
25 A.     I was at the job in Newark, Ohio from the

Page 14

1  spring of 1981 -- sorry, the fall of 1981, until the
2  spring -- the summer of 1984.  80 -- yes.  '83, maybe.
3  I don't know.
4        Q.       Okay.  And you went to graduate school in
5  1984?
6        A.       I did.
7        Q.       Was that in Columbus, Ohio?
8        A.       It was.
9        Q.       And you were in graduate school till 1986?
10       A.       I did.
11       Q.       Where did you live before you lived in
12  Newark, Ohio?
13       A.       I lived in South Wales, New York from 1980,
14  the fall of 1980 to the spring of 1981.  I lived in
15  residence at The Gow School.
16       Q.       Can you spell that?
17       A.       G-O-W.
18       Q.       Did anyone else live with you in residence at
19  The Gow School?
20       A.       I had a roommate who was another faculty
21  member.
22       Q.       Where did you live before you lived in
23  residence at The Gow School?
24       A.       Columbus, Ohio.
25       Q.       How long were you in Columbus, Ohio prior to

Page 15

1  living in residence in The Gow School?
2        A.       Fall of 1975 through the spring of 1980.
3        Q.       Were you working in Columbus, Ohio between
4  1975 to 1980?
5        A.       Just student jobs.  I was in college.
6        Q.       Where did you attend college?
7        A.       Ohio State.
8        Q.       Did you obtain a degree from Ohio State?
9        A.       I did.
10       Q.       What degree did you obtain from Ohio State?
11       A.       It was Elementary Education with a minor in
12  high school general science.
13       Q.       What year did you obtain -- was that a
14  Bachelor?
15       A.       It was.  1980.
16       Q.       And you said you went to graduate school.
17  Where did you go to graduate school?
18       A.       Ohio State.
19       Q.       Did you obtain a graduate degree from Ohio
20  State?
21       A.       I did.
22       Q.       What graduate degree did you obtain from Ohio
23  State?
24       A.       Master of Arts, Mathematics.
25       Q.       What year did you obtain the Master of Arts,

Page 16

1  Mathematics?
2        A.       1986.
3        Q.       Is that your highest level of education?
4        A.       It is.
5        Q.       Do you have any professional licenses?
6        A.       No.
7        Q.       Do you have a relationship with Lane Jubb
8  other than an attorney client relationship?
9        A.       Yes.
10       Q.       What is the nature of your relationship with
11  Lane Jubb, other than the attorney client relationship?
12       A.       He's an alumnus of The Hill School.
13       Q.       You were a teacher at The Hill School from
14  1992 to 2009, is that right?
15       A.       I was.
16       Q.       Was Mr. Jubb one of your students?
17       A.       He was.
18       Q.       What year was Mr. Jubb one of your students
19  at The Hill School?
20       A.       2005, 2006.
21       Q.       What course did Mr. Jubb take that you taught
22  in 2005 to 2006?
23       A.       Calculus.
24       Q.       Any other interactions with Mr. Jubb when he
25  was a student at The Hill School while you were

Page 17

1  teaching at The Hill School?
2        A.       He played on a lacrosse team for which I was
3  one of the coaches.
4        Q.       Any other contact between you and Mr. Jubb
5  while Mr. Jubb was a student at The Hill School when
6  you were a teacher at The Hill School?
7        A.       Absolutely.  And it's an in residence school,
8  so I would have seen him about campus.
9        Q.       Were you Mr. Jubb's dorm parent?
10       A.       No.
11       Q.       Were you Mr. Jubb's table head?
12       A.       Not that I recall.  But I could have been.
13       Q.       Was Mr. Jubb a classmate of your sons?
14       A.       No.
15       Q.       Mr. Jubb attended The Hill School at the same
16  time your sons attended The Hill School, is that right?
17       A.       He did.  Yep
18       Q.       Is Mr. Jubb friends with your sons?
19       A.       No.  Not that I recall.
20       Q.       Any other classes that you taught that Mr.
21  Jubb -- let me start again.  Are there any other
22  classes that you taught to Mr. Jubb while Mr. Jubb was
23  a student at The Hill School and you were a teacher at
24  The Hill School?
25       A.       No.

Matthew Ralston
July 01, 2021                                                        18 to 21

Page 18

1  Q.        Did you coach the lacrosse team?
2  A.        I did.
3  Q.        So you were Mr. Jubb's coach while --
4  A.        Yes.
5  Q.        -- he played on the lacrosse team while a
6  student at The Hill School?
7  A.        Yes.
8  Q.        Did you coach any other sports that Mr. Jubb
9  participated in while he was a student at The Hill
10 School?
11 A.        No.
12 Q.        Did you have any other contact with Mr. Jubb
13 when he was a student at The Hill School, other than
14 teaching the calculus class he took, coaching him in
15 lacrosse, and seeing him around campus?
16 A.        No.
17 Q.        Do you know what year Mr. Jubb -- well, let
18 me start -- let me start again.  Do you know what year
19 Mr. Jubb graduated The Hill School?
20 A.        Yes.
21 Q.        What year did Mr. Jubb graduate The Hill
22 School?
23 A.        2006.
24 Q.        Have you kept in contact with Mr. Jubb since
25 he graduated The Hill School, independent of your

Page 19

1  attorney client relationship?
2  A.        Not between 2006 and 2016.  With the possible
3  exception, and I can't tell you that I remember that,
4  could have been a class reunion in 2011.  But I don't
5  think I was in attendance.
6  Q.        Okay.  So you don't remember any contact
7  with --
8  A.        No.
9  Q.        -- Mr. Jubb between --
10 A.        No.
11 Q.        -- his graduation in 2016?
12 A.        No.
13 Q.        What prompted your contact with Mr. Jubb in
14 2016?
15 A.        I went back to work at The Hill School in
16 July of 2016.  I was on campus for class reunions in
17 June of 2016.  And Mary Beth and I ran into Lane at
18 that event.
19 Q.        You said you went back to work at The Hill
20 School in 2016, is that right?
21 A.        Correct.
22 Q.        What was your position when you went back to
23 The Hill School in 2016?
24 A.        I went back to work in the Development
25 Office.

Page 20

1  Q.        Did you have a title?
2  A.        Yes.
3  Q.        I'm sorry.  I wasn't trying to interrupt you.
4  A.        No, that's fine.  Capital Giving Officer.
5  Q.        And if I ever do that again, please just let
6  me know.  Because I'm looking down so we can move
7  quickly.  I'm not trying to interrupt you on purpose.
8  A.        Thank you.
9  Q.        Okay.  So when did you begin working at Hill
10 School again in 2016?
11 A.        July.
12 Q.        Okay.  So July 2016 you became the capital --
13 a capital --
14 A.        Capital giving officer.
15 Q.        -- giving officer?
16 A.        Yes, ma'am.
17 Q.        With the Development Office of The Hill
18 School?
19 A.        Yes.
20 Q.        Were you the only capital giving officer in
21 the development office at The Hill School?
22 A.        No.
23 Q.        How many other capital giving officers were
24 there in July of 2016?
25 A.        Four, I believe.  Five.  I'm sorry.

Page 21

1  Q.        Four or five in addition to you?
2  A.        Yes.
3  Q.        So a total of six?
4  A.        Yes.
5  Q.        Did the capital giving officers have
6  different areas in the United States that they were
7  assigned to?
8  A.        Yes.
9  Q.        What area of the United States were you
10 assigned to?
11 A.        I was assigned to the Midwest.  And then --
12 yeah.
13 Q.        So in July of 2016 you were assigned to the
14 Midwest?
15 A.        Yes.
16 Q.        Did that change?
17 A.        It did not change, per se, regionally.  It
18 changed -- I was the person assigned to some alumni
19 that I knew well that lived throughout the Country.
20 Q.        Are you still a capital giving officer at The
21 Hill School?
22 A.        I am not.
23 Q.        When did you stop working as the capital
24 giving officer at The Hill School?
25 A.        October 14th, 2019.

Matthew Ralston
July 01, 2021

22 to 25

Page 22

1  Q.      I forget what you called it, but I think
2  there was some kind of event that you and your wife ran
3  into Mr. Jubb at 2016?
4  A.      Yes.  Class reunions.
5  Q.      Then after the class reunion did you keep in
6  contact with Mr. Jubb?
7  A.      Yes.
8  Q.      Did you keep in contact with Mr. Jubb after
9  the class reunion in connection with your job
10 responsibilities as a capital giving officer?
11 A.      I did.
12 Q.      Did you work on any projects with Mr. Jubb in
13 -- well, let me start again.  What were your job
14 responsibilities as a capital giving officer?
15 A.      They were to engage alumni, solicit
16 involvement with the school, as well as financial
17 gifts.
18 Q.      So you were a fundraiser?
19 A.      Yes.  As well as engagement, certainly.  Yes.
20 Q.      What do you mean by engagement?
21 A.      Bringing alumni back to campus for events
22 where they interact with students.  Career days is a
23 good example.  Or to organize regional events for
24 alumni.
25 Q.      With the objective of raising money for the

Page 23

1  school, right?
2  A.      Where appropriate, yes.
3  Q.      What do you mean where appropriate?
4  A.      Some alumni are not yet in a position to
5  financially support the school.  But they are in a
6  position to stay informed and be involved in other
7  ways.  Whether that's hosting an event or meeting with
8  prospective students.
9  Q.      So when you returned to The Hill School in
10 Just 2016, you were not teaching, is that correct?
11 A.      That is correct.
12 Q.      Did you have any interaction with students at
13 The Hill School after you returned to The Hill School
14 in July 2016?
15 A.      Limited, but yes.
16 Q.      Okay.  What limited contact did you have with
17 students when you returned to The Hill School in July
18 2016?
19 A.      When I -- I worked remotely.  When I was on
20 campus I would attend meals in the dining hall.  And if
21 there were alumni activities on campus when students
22 were there, I would be present for those.
23 Q.      So your job responsibilities, when you
24 returned to The Hill School in July of 2016 didn't
25 include leading any events or teaching any classes or

Page 24

1  coaching any sports?
2  A.      No.
3  Q.      So your contact with the students of The Hill
4  School, after you returned July of 2016, was
5  incidental?  You bumped into students in the dining
6  hall --
7  A.      Yeah.
8  Q.      -- is that a fair characterization?  How many
9  times were you on campus after you returned to The Hill
10 School in July of 2016?
11 A.      Several times a year.  Some events.  Class
12 reunions, I would always be present.  Career days.  And
13 then I would visit campus periodically just so I was up
14 to speed on what was going on on campus.  As I
15 traveled, meeting with alumni.
16 Q.      I think you mentioned that you worked
17 remotely.  Was there like a set number of times you
18 needed to visit the school as part of your job
19 requirements?  Or was it fluent?  How did that work?
20 A.      They were what I would call command
21 performances.  Like alumni weekends I was expected to
22 be present.  Career days I would be present, because
23 some of the alumni there were folks I recruited to
24 join.  If I had a major donor who was visiting campus,
25 I would be present for that.  And then others, just

Page 25

1  when it seemed like a good time.  Whether it was major
2  athletic competition with a rival, or something else
3  going on on campus.
4  Q.      How many times were you on The Hill School
5  campus from July 2016 to December 31, 2016?
6  A.      July 2016 to December 2016?
7  Q.      Yeah.  Roughly the first six months of your
8  return to The Hill School.
9  A.      Wow.  I don't know.  I would have been
10 present some in the early month or two of my job, just
11 for some orientation and to meet with other giving
12 officers to -- as orientation.  I probably would have
13 been there in November.  Second week of November.  It's
14 a big rivalry week.  And I don't recall if that was on
15 Hills campus or if it was on the rival school's campus.
16 But I would have been back to that in all likelihood.
17 And that's probably it.
18 Q.      You said that was the early month of two of
19 your job.  You mean like a day or two?  Or an entire
20 month?
21 A.      No.  It would have been -- and I can't tell
22 you when, but it would have been a matter of days.  And
23 there could have been a couple times.  I don't remember
24 specifically.
25 Q.      So from July 2016 to December 2016 you were

Page 26

```
 1   on The Hill School campus a handful of times?
 2   A.       Sure.  Yes.  I'm sorry.
 3   Q.       How about in 2017, how many times were you on
 4   The Hill School campus during 2017?
 5   A.       Let's see.  It would -- it would be very
 6   similar.  I would have been there for a reunion.  Which
 7   is always in June.  I don't recall what visits I did in
 8   the spring, but six months without being there would
 9   have been unusual.  I would have been back again for
10   the rivalry weekend in June.
11   Q.       You mean November?
12   A.       I'm sorry, yes.  Yes.  November.
13   Q.       That's how you know I'm paying attention.
14   A.       Yes.  That was a quiz.
15   Q.       Okay.  So a handful of times on The Hill
16   School campus during 2017?
17   A.       Yes.
18   Q.       How about 2018, the same, handful of times?
19   A.       Same.  I know 2018 there was a career day I
20   was present in April.  And then beyond that, it would
21   have been very similar.  June.  Probably.  Maybe start
22   of school.  But certainly the rivalry weekend in
23   November.
24   Q.       And how about 2019 until the end of your
25   employment on October 14th, 2019?
```

Page 27

```
 1   A.       I was on campus in residence for a number of
 2   weeks in January and February.  I was -- I worked that
 3   out.  Again just to have more presence on campus in the
 4   capacity of my job.
 5   Q.       Okay.  So we talked a little bit about your
 6   appearance on campus in 2016.  Where did you stay?  Did
 7   you stay on campus?  Or did you stay in a hotel?
 8   A.       I stayed with a faculty member on campus who
 9   has a house.
10   Q.       So you didn't have like a designated --
11   A.       No.
12   Q.       -- living space at The Hill School from when
13   you returned in July 2016 --
14   A.       No.
15   Q.       -- until the end of your employment in
16   October of 2019?
17   A.       I had friends who had rooms in their homes.
18   So we -- I always stayed there.
19   Q.       So each time you visited The Hill School you
20   stayed with a faculty member, friend on campus?
21   A.       With the exception of January 2019.  Just
22   because that was a longer stretch of time, I asked for
23   my own space.
24   Q.       I think you said you were in residence
25   January and February of 2019, is that right?
```

Page 28

```
 1   A.       Part of -- part of it.  It was less than a
 2   month in total.  But it overlapped January into
 3   February.  I can't give you specific dates.
 4   Q.       You said it was less than a month total?  Was
 5   it a continuous --
 6   A.       It was.
 7   Q.       -- period of time?
 8   A.       Yes.
 9   Q.       Okay.  Why were you in residence in January,
10   February of 2019 for -- let me start again.  Do you
11   remember how long you were in residence in January,
12   February of 2019?
13   A.       It was -- it was three or four weeks.
14   Q.       Three or four weeks.
15   A.       Probably closer to four.
16   Q.       So why were you in residence in January,
17   February of --
18   A.       So I could --
19   Q.       -- 2019?
20   A.       I'm sorry.  I was -- I was a resident so that
21   I could do some alumni visits with other donors.  Both
22   so that I was visiting or present while they were doing
23   alumni visits, donor visits, as well as to facilitate
24   some introductions to other alumni.  People who
25   maintain those regions.  Mostly New York.
```

Page 29

```
 1   Q.       Is it a fair characterization that you only
 2   had incidental contact with the students of The Hill
 3   School?
 4   A.       Correct.
 5   Q.       So similar to what you described before in
 6   the dining room?
 7   A.       Yes.
 8   Q.       Or passing students on campus?
 9   A.       And visiting classes.
10   Q.       Did something change with your job that
11   required you to be in residence as compared to working
12   remotely?
13   A.       No.  We just -- we knew there were alumni in
14   the East -- along the East Coast whom I could introduce
15   other officers to.  It gave me an opportunity to be on
16   campus again with a little more continuity than
17   previous visits.  And it also gave me an opportunity to
18   go on donor calls with other giving officers.  A little
19   deeper entrenchment in the flow of our office.
20   Q.       So did you decide to go in residence?  Or was
21   that something that your supervisor suggested that you
22   do?
23   A.       It was mutually agreed to.  I don't recall
24   which of us initiated it.  And we were both very
25   agreeable to it.  I would be surprised if I didn't
```

Matthew Ralston
July 01, 2021

30 to 33

Page 30

1   initiate it, but I can't tell you for sure.
2   Q.      Who was your supervisor in 2019?
3   A.      Geoffrey Neese, with G.  Neese is N-E-E-S-E.
4   Q.      Was Geoffrey Neese your supervisor from July
5   2016 until October 2016?
6   A.      He was.
7   Q.      What was Geoffrey -- let me start again.
8   What is Geoffrey Neese's position with The Hill School?
9   A.      I believe his title was director of capital
10  giving.
11  Q.      And at least at the time when you were at The
12  Hill School, to whom did Geoffrey Neese report to?
13  A.      He reported to Christian Sockel, S-O-C-K-E-L.
14  Q.      What was -- Christian is a man?
15  A.      Yes.
16  Q.      What was Mr. Sockel's title when you were at
17  The Hill School?
18  A.      Assistant headmaster.  I think alumni
19  development.
20  Q.      Okay.  And Mr. Sockel reported to the
21  headmaster, is that right?
22  A.      He did.
23  Q.      Who was the headmaster from July 2016 to our
24  departure October 2019?
25  A.      Zach Lehman.

Page 31

1   Q.      Okay.  So the reporting structure, when you
2   returned to The Hill School in 2016, was Mr. Lehman is
3   the headmaster.  Mr. Sockel is the assistant
4   headmaster.  And Mr. Neese.  And then you and the four
5   or five other capital giving --
6   A.      Yes.
7   Q.      -- giving officers --
8   A.      Yes.
9   Q.      -- is that right?
10  A.      Correct.
11          MR. JUBB:  You're doing fine, I just
12  want to make sure you let her get her
13  question out all the way.  Because Caddie
14  does a great job of asking long concise
15  questions.
16          THE WITNESS:  Okay.
17          MR. JUBB:  She's getting the dates in
18  there, just -- you want to make sure you're
19  waiting until the end, that's all.
20          MS. DOUGHERTY:  Sometimes I'm slow too.
21          MR. JUBB:  So am I.  She'll tell you.
22  BY MS. DOUGHERTY:
23  Q.      I know that you are not purposely trying to
24  interrupt me, but, yes, it would be good so we have a
25  clean record.

Page 32

1   A.      Sure.
2   Q.      So other than the -- you and the -- well, let
3   me start again.  I think you decided that there was
4   actually five other capital giving officers other than
5   you?  Or were you --
6   A.      Yes.
7   Q.      Okay.  So there was six capital giving
8   officers in the development office for a period of time
9   after you returned to The Hill School in 2016, is that
10  right?
11  A.      Yes.
12  Q.      Were there any other individuals who worked
13  in the development office when you returned to The Hill
14  School in 2016?
15  A.      Yes.
16  Q.      Who?
17  A.      Wow.  Virginia Yinger.  Do you want the
18  capital giving officers?  Or what -- sorry.
19  Q.      Let's start -- let's do it this way.  So
20  there were the capital giving officers.  And were there
21  other positions that reported to Geoffrey Neese?
22  A.      I'm sorry?
23  Q.      So there were capital giving officers, right?
24  A.      Yes.
25  Q.      Were there other positions that also reported

Page 33

1   to Geoffrey Neese, who is the --
2   A.      I don't believe so, no.
3   Q.      So there were -- so under Geoffrey Neese
4   there were only capital giving officers, is that right?
5   A.      Yeah.  There would have -- so an
6   administrative assistant.  One for the office.  So I'm
7   not sure who she technically reports to.
8   Q.      Oh, I get it.  So the development office had
9   an administrative assistant and then six capital giving
10  officers, is that right?
11  A.      Yes.
12  Q.      Did the administrative assistant perform work
13  for everyone in the development office?
14  A.      Yes.
15  Q.      Did the administrative assistant also perform
16  work for the assistant headmaster or the headmaster?
17  A.      I believe so, yes.
18  Q.      Who was the administrative assistant during
19  the time when you returned to The Hill School in 2016
20  to 2019?
21  A.      I'm not remembering her name right now.  It
22  may come to me.
23  Q.      It was a woman?
24  A.      Her picture is clear as day.
25  Q.      So the administrative -- just so I have it

Matthew Ralston
July 01, 2021                                    34 to 37

Page 34

1  right in my head, the administrative assistant was a
2  woman who -- who provided assistance to the capital
3  giving officers, which included you, Mr. Neese, Mr.
4  Sockel and Mr. Lehman, is that right?
5  A.       Not --
6  Q.       At least at the time that you were there.
7  A.       Not to Mr. Lehman.
8  Q.       Not to Mr. Lehman? I'm sorry. I'm saying it
9  wrong. So did -- Mr. Lehman had his own administrative
10 assistant?
11 A.       Yes.
12 Q.       Who was the -- who was Mr. Lehman's
13 administrative assistance when you returned to The Hill
14 School --
15 A.       I don't recall.
16 Q.       -- in 2018 to 2019?
17 A.       I don't recall her name.
18 Q.       So Mr. Lehman had his own dedicated
19 administrative assistant, is that right?
20 A.       Yes, ma'am.
21 Q.       Okay. So the admin -- administrative
22 assistant that you had in mind that worked for the
23 development office, she only performed assistance for
24 Geoffrey Neese, Mr. Sockel, you, and the other five
25 capital giving officers, is that right?

Page 35

1  A.       No. She provided service to the other people
2  that reported to Christian.
3  Q.       Please give me the titles of the positions
4  that reported to Mr. Sockel.
5  A.       It would have -- Overarching would have been,
6  I believe, alumni relations. Annual fund. And I don't
7  know the title, but would have been the people who
8  produced the alumni magazine. Publications.
9  Q.       Did the alumni magazine have a name?
10 A.       Yes.
11 Q.       What was that?
12 A.       Hill Ties. T-I-E-S.
13 Q.       Okay. What's The Dial?
14 A.       The Dial is the school yearbook.
15 Q.       Any other publications the school publishes,
16 other than The Dial and the Hill Ties?
17 A.       Student Wiser would be a literature magazine.
18 Student newspaper. Alumni, not that I know of.
19 Q.       Okay.
20 A.       In hard copy. I mean, they maintain Twitter
21 accounts, and...
22 Q.       So Mr. Neese supervised your work when you
23 returned to The Hill School from 2019 to 2000 -- I'm
24 sorry, from 2016 to 2019?
25 A.       He did.

Page 36

1  Q.       Did Mr. Neese perform evaluations of your
2  work?
3  A.       He did.
4  Q.       How often did Mr. Neese perform evaluations
5  of your work?
6  A.       Annually.
7  Q.       Are these written evaluations?
8  A.       Yes.
9  Q.       Was there a specific time of the year when
10 the annual evaluations were performed?
11 A.       If I recall correctly, it would have been in
12 the summer months. I think it would have been prior to
13 the end of the fiscal year, so that we could set goals
14 for the ensuing year.
15 Q.       So sometime before --
16 A.       Sometime before --
17 Q.       -- June 30.
18 A.       So -- June 30.
19 Q.       So in the June 2018 evaluation by Mr. Neese
20 -- let me start again. How did the evaluations work?
21 Did you fill it out and then give it to Mr. Neese and
22 he fill it out? Or how does that work?
23 A.       Yes. And then we would meet afterward.
24 Q.       Okay. So you would express your opinions in
25 a forum about --

Page 37

1  A.       Yes.
2  Q.       -- sort of self reviewing you work, right?
3  A.       Yes. There would be a self evaluation.
4  There would be a supervisor evaluation. And then we
5  would meet together.
6  Q.       So did Mr. Neese suggest, in the June 2018
7  evaluation, that you come in residence for a period of
8  time?
9  A.       I don't recall.
10 Q.       Well, how did it come about that you ended up
11 in residence in 2000 -- early 2019?
12 A.       I don't recall.
13 I think you said it was mutually agreed to,
14 or you may have suggested it. Why did you --
15 A.       I very well could have, yes.
16 Q.       Well, why do you say that?
17 A.       Because it's a place I called home for 17
18 years. And the rhythm of the days, and the changes in
19 the school since the time I left were valuable to me
20 when I was visiting with alumni.
21 Q.       Did you have any difficulty performing your
22 job remotely?
23 A.       I'm sorry?
24 Q.       Were you having difficulty performing your
25 job remotely?

Matthew Ralston
July 01, 2021                                    38 to 41

Page 38

1  A.      No.
2  Q.      So poor job performance is not the reason
3  why --
4  A.      No.
5  Q.      -- you were in residence in --
6  A.      Not at all.
7  Q.      -- early 2019?
8  A.      I'm sorry to interrupt.  That's the first
9  time I caught myself.  No.  Not at all.  The reason I
10 can't tell you specifically is that one of the other
11 purposes or things I engaged in while I was there was
12 my introduction of other alumni to other donors on the
13 East Coast.
14 Q.      Did you interact with the other capital
15 giving officers in the development office when you
16 returned to The Hill School from 2016 to 2019?
17 A.      I did.
18 Q.      You were giving me, I think, a list of the
19 capital giving officers.  We had Virginia Yinger,
20 right?
21 A.      She was not a giving officer.
22 Q.      She was not.  Okay.  Who was -- what was
23 Virginia Yinger's role?
24 A.      She had a number.  One of them was internal
25 operations of the school.  I mean not the school.  The

Page 39

1  a -- just the office.  And then also oversaw the annual
2  fund.
3  Q.      Was Virginia Yinger part of the development
4  office?
5  A.      She was.  Part of the alumni -- alumni
6  development office.  I think the school had gone away
7  from the word development at that point.
8  Q.      What was the -- I thought you told me that
9  you worked in the development office.  Was it called
10 something else?
11 A.      I did.  I think I said it was alumni and
12 development.
13 Q.      Okay.  So the full name of the department you
14 worked in was Alumni and Development Office?
15 A.      Yes.
16 Q.      The Alumni and Development Office included
17 capital giving officers, the administrative assistant,
18 Ms. Yinger.  And who else?
19 A.      It included the -- the giving officers.  It
20 included a director of alumni relations.  I think we
21 went through those.  The people that report to
22 Christian Sockel.
23 Q.      Oh, okay.  So alumni relations, the annual
24 fund, the alumni magazine, that was all part of the
25 alumni development office?

Page 40

1  A.      Yes.
2  Q.      Anyone else part of the alumni and
3  development office, other than the alumni relations,
4  annual fund, alumni magazine, the administrative
5  assistant, the capital giving officers?
6  A.      Duty wise, and I don't know to whom -- they
7  -- they were part of the office events and things.  I'm
8  guessing that's alumni relations.  But any events that
9  were planned on campus that involved alumni were --
10 came out of that office at the time as well.
11 Q.      All right.  Who were the capital giving
12 officers when you returned to The Hill School from 2016
13 to 2019?
14 A.      A woman named Emily Mimms.  Bill Randall.
15 Dave Freeman.  John Spurlock.  And then Geoff.
16 Q.      What region did Emily Mills handle?
17 A.      I'm sorry, what region?
18 Q.      Yes.  Or let's do it this way.  Were the
19 capital giving officers divided by geographic locations
20 in the United States?
21 A.      Yes.
22 Q.      You were in the Mid --
23 A.      Yes.  Generally, yes.
24 Q.      You were the Midwest, right?
25 A.      Yes.

Page 41

1  Q.      What geographic location did Emily Mimms
2  cover?
3  A.      Part of the Northeast.  I can't tell you
4  specifically the States.
5  Q.      How about Mr. Randall?
6  A.      Some of the -- what I would consider kind of
7  the northeastern, southern States.  Carolinas.  And up.
8  And then parts of Pennsylvania, West Virginia.  The
9  region -- the region -- regions are created by alumni
10 density.
11 Q.      Okay.  How about Mr. Freeman?
12 A.      I think northeast.
13 Q.      Mr. Spurlock?  Spurlock?
14 A.      South.
15 Q.      And did Mr. Neese have a geographic location?
16 Or was he just in charge?
17 A.      He did.  I can't tell you specifically,
18 although he and Christian did all international
19 fundraising.  And they probably had the more
20 established longer term major donors.
21 Q.      I saw your hesitation when we were talking
22 about geographic location.  Is it the case that the
23 individual capital giving officers focus their
24 attention to geographic locations, but if a donor or
25 alumni came about that was outside of your geographic

Matthew Ralston
July 01, 2021                                          42 to 45

Page 42

1  location and you had a relationship that you'd handle
2  it?  It wasn't like you had to -- hand off your work
3  to someone else?  Or your donor to someone else, right?
4  A.     I -- I think it depended on the relationship
5  between the donor.  If -- if -- and the officer.  If a
6  donor moved, the officer may follow.
7  Q.     Did you interact with the other capital
8  giving officers during the time when you worked at The
9  Hill School from 2016 and 2019?
10 A.     Yes.
11 Q.     How did you interact with the other capital
12 giving officers when you returned to The Hill School in
13 2016?
14 A.     Collegially.  I had -- I was in a position,
15 because of my tenure, to introduce them to alumni in
16 their regions.  I was helpful, I believe, with
17 background info -- yeah, just experience the student
18 had.  Or the alumnus had.
19 Q.     So your contact was over the phone or e-mail,
20 is that right?
21 A.     Except when I was on campus, yes.
22 Q.     So other than a handful of times each year,
23 your contact with the other capital giving officers was
24 over telephone and e-mail, is that right?
25 A.     Yes.

Page 43

1  Q.     Why did you stop working at The Hill School
2  on October 14th, 2019?
3  A.     Because of a letter that was received in
4  April '18 accusing me of molesting a student.
5  Q.     Did you resign?
6  A.     I did not.
7  Q.     Were you terminated?
8  A.     I was.
9  Q.     Who terminated your employment?
10 A.     Zach Lehman.
11 Q.     How did Zach Lehman terminate your
12 employment?
13 A.     Through a letter.
14 Q.     Did you still have that letter?
15 A.     Probably.  Actually, the letter would have
16 come from the school's attorney.  The final.
17 Q.     Who's the school's attorney that you have in
18 mind?
19 A.     Beg your pardon?
20 Q.     Who's the school's attorney?
21 A.     Tom Rees.
22 Q.     From High Swartz?
23 A.     Yes.
24 Q.     Was Mr. Rees ever your attorney?
25 A.     No.

Page 44

1  Q.     Was High Swartz ever your attorney?
2  A.     No.
3  Q.     So any time you interacted with Mr. Rees, or
4  anyone affiliated with High Swartz, it was in Mr. Rees,
5  or the attorney with High Swartz's capacity as an
6  attorney for the school, not for you, is that correct?
7  A.     Correct.
8  Q.     So you received a letter on October 14th,
9  2019?
10 A.     No.
11 Q.     When did you receive the letter terminating
12 your employment?
13 A.     It would have been before that.  It would
14 have included a Terms of Separation Agreement, with a
15 note that would have -- that -- part of the letter was
16 regardless of whether I returned the separation
17 agreement or not, the 14th was my last day of
18 employment.
19 Q.     So do you still have this letter?
20 A.     I believe that letter went to my attorney.
21 Q.     You mean Mr. Jubb, or someone else?
22 A.     Mr. Jubb.
23        MS. DOUGHERTY:  Is there a reason why
24        that letter hasn't been produced, Mr. Jubb?
25        MR. JUBB:  No.  Other than if I have it

Page 45

1  I'll give it right over to you.
2        THE WITNESS:  I think -- yeah.
3        MR. JUBB:  Can we pause for one second?
4        MS. DOUGHERTY:  Sure.
5        THE VIDEOGRAPHER:  Going off record.
6  Time is 11:09.
7               *   *   *
8        (Whereupon, a discussion off the record
9  was held.)
10              *   *   *
11       THE VIDEOGRAPHER:  Back on.  11:10.
12 BY MS. DOUGHERTY:
13 Q.     When did you receive the letter?
14 A.     I don't know the date.  I know the final date
15 of employment status was October 14th.
16 Q.     Did you receive the letter after you
17 commenced this action that you're testifying about
18 today?
19 A.     Yes.
20 Q.     Did you receive the letter close in time to
21 the final separation date of October 14th, 2019?
22 A.     Close in time?
23 Q.     Yeah.  Were you given two weeks, or a month,
24 or?
25 A.     The letter that said my final day was the

Matthew Ralston
July 01, 2021                                              46 to 49

Page 46

1  14th was within a couple weeks.  I can't tell you the
2  exact date I got it.  But it was a couple weeks, at the
3  most.
4      Q.      So end of September 2019, perhaps beginning
5  of October 2019, is that fair?
6      A.      That's fair.
7      Q.      And you are confident that you gave the
8  letter to your lawyer, Mr. Jubb?
9      A.      I'm pretty sure the letter went from Tom Rees
10 to Mr. Jubb.
11     Q.      How did you get the letter?
12     A.      Lane would have shared it with me.
13     Q.      When did you get the letter from Mr. Jubb?
14     A.      In all likelihood, the same day I received --
15 he received it.
16     Q.      How did you receive the letter from Mr. Jubb?
17     A.      I believe it would have been e-mail.
18     Q.      What did the letter say?
19     A.      It responded to modifications to a separation
20 agreement the school had provided saying, no, here's
21 what they would offer.  And then saying regardless of
22 whether or not I returned it, my final day of
23 employment would be October 14th.
24             MS. DOUGHERTY:  Can we mark this D-15?
25                          *  *  *

Page 47

1             (Whereupon, the above-mentioned document
2             was marked for identification as D-15.)
3                          *  *  *
4             MS. DOUGHERTY:  For the benefit of those
5         watching via Zoom, it's my document 26.
6         We're going to mark it as D-15.
7  BY MS. DOUGHERTY:
8      Q.      I'm showing you a document that I had marked
9  D-15.  It's a letter dated April 11th, 2018 from
10 Mitchell Garabedian to Zachary Lehman.  Have you seen
11 the letter that I marked as D-15 before I handed it to
12 you today?
13     A.      I have.
14     Q.      When was the first time you saw the letter
15 that has been marked as D-15?
16     A.      It was April.  I want to say April 21st,
17 1019.  I was on campus for career day.
18     Q.      I'm sorry, just to be clear, you didn't see
19 the April 11th, 2018 letter until April 21st, 2019?
20     A.      '18, sorry
21     Q.      '18, okay.
22     A.      I saw it a couple weeks after.
23     Q.      And you're certain that you first saw the
24 April 11th, 2018 letter on April 21st, 2018, because
25 you were on The Hill School campus for Career Day?

Page 48

1      A.      Yes.  And if it's not the 21st, it is
2  whatever Friday that would have been.
3      Q.      So pretty close in time to --
4      A.      Yes.
5      Q.      -- when the letter was sent, is that right?
6      A.      Within two weeks, yes.
7      Q.      Who provided you the April 11th, 2018 letter
8  that I've marked as D-5?  D-15, excuse me.
9      A.      Mr. Lehman.
10     Q.      What were the circumstances under which Mr.
11 Lehman provided you the April 11th, 2018 letter that
12 I've marked as D-15?
13     A.      Whenever I was on campus I would stop in and
14 -- his office and say hello.  And I stopped in that day
15 and he asked me if I had stopped by about the letter.
16 Which I had not seen.  And at that point he pulled me
17 into his office and told me it existed and then shared
18 it with me later.
19     Q.      So Mr. --
20     A.      Later that day.
21     Q.      Okay.  So you went to Mr. Lehman's office,
22 poked your head in to say hi and then he invited you
23 into his office to talk about the letter?
24     A.      Yes.
25     Q.      What did Mr. Lehman say to you when he

Page 49

1  invited you into his office to talk about the letter?
2      A.      First it was, I think he responded to my
3  surprise that I didn't know what letter he was -- about
4  which he was speaking.  After that it was, my sense,
5  that he didn't believe the allegations.
6      Q.      By allegations you mean the allegations by
7  Mr. Kurtis Nicholas Poulos --
8      A.      I do.
9      Q.      That you sexually molested him when he was a
10 child at The Hill School?
11     A.      Yes, ma'am.
12             MR. JUBB:  Objection to the form.  You
13         can put that down until she's asked you a
14         question.
15 BY MS. DOUGHERTY:
16     Q.      So what -- so Mr. Lehman told you -- let me
17 start again.  So Mr. Lehman expressed to you that he
18 had read the April 11th, 2018 letter that I marked as
19 D-15 when he invited you into his office on April 21st,
20 2018 to talk about the letter, is that right?
21     A.      Yes.
22     Q.      And Mr. Lehman told you he didn't believe the
23 allegations in the letter?
24     A.      That was my sense.  I can't tell you his
25 exact words, but it certainly was my -- what I left

Matthew Ralston
July 01, 2021

50 to 53

Page 50

1   feeling.
2   Q.        What did Mr. Lehman say that led you to
3   believe he didn't believe Mr. Poulos?
4               MR. JUBB:  Objection to the form.  You
5         can answer.
6   BY MS. DOUGHERTY:
7   Q.        Let me start again.  I'll ask it this way.
8   What did Mr. Lehman do or say that led you to believe
9   he did not believe Mr. Poulos's allegations expressed
10  in the April 11th, 2018 letter that I've marked as
11  D-15?
12              MR. JUBB:  Objection.
13              THE WITNESS:  I don't recall his exact
14        words, but that he knew me well enough and my
15        reputation's such that he didn't believe him.
16        And, again, I don't know his exact words.
17  BY MS. DOUGHERTY:
18  Q.        So on April 21st -- let me start again.  Is
19  it your understanding that before April 11th, 2018 that
20  Mr. Lehman thought highly of you?
21  A.        Yes.
22  Q.        And is it correct that on April 21st, 2018,
23  after Mr. Lehman expressed to you that he had already
24  read the April 11th, 2018 letter that's been marked as
25  D-15, that he still had a high opinion of you, is that

Page 51

1   right?
2               MR. JUBB:  Objection.  You can answer.
3               THE WITNESS:  To the extent I could know
4         that.  I -- I don't know how to measure that,
5         except what I would question somebody handed
6         me -- gave me a letter similar to this
7         regarding an employee.
8   BY MS. DOUGHERTY:
9   Q.        So it was your impression that on April 21st,
10  2018, that Mr. Lehman did not credit the allegations
11  contained in the April 11th, 2018 letter that's been
12  marked as D-15, because he knew your reputation, is
13  that right?
14  A.        As well as me.  That was my impression.
15  Q.        So your impression on April 21st, 2018, was
16  that nothing contained in the April 11th, 2018 letter
17  that's been marked as D-15 changed Mr. Lehman's
18  opinions of you, is that right?
19              MR. JUBB:  I'll object to the form.
20              THE WITNESS:  I guess.  I mean --
21  BY MS. DOUGHERTY:
22  Q.        What do you mean you guess?  I'm asking your
23  impression.
24  A.        -- I have no certainty about that.
25  Q.        I asked you a question.  So is it your

Page 52

1   impression, on April 21st, 2018, that Mr. Lehman, after
2   having read the April 11th, 2018 letter that's been
3   marked as D-15, Mr. Lehman's opinion of you did not
4   change?
5               MR. JUBB:  Same objection.
6               THE WITNESS:  Yes.
7   BY MS. DOUGHERTY:
8   Q.        So the content of the -- let me start again.
9   It was your impression, on April 21st, 2018, that the
10  content of the April 11th, 2018 letter that's been
11  marked as D-15 did not cause Mr. Lehman's opinion of
12  you to change, is that right?
13              MR. JUBB:  Same objection.  You can
14        answer.
15              THE WITNESS:  Correct.
16  BY MS. DOUGHERTY:
17  Q.        Did Mr. Lehman express whether -- let me
18  start again.  What else did Mr. Lehman express to you
19  when he invited you into his office on April 21st,
20  2018?
21  A.        I don't recall specifically anything else he
22  said.
23  Q.        Did he give you the letter?
24  A.        He e-mailed the letter to me.
25  Q.        So Mr. Lehman e-mailed you the April 11th,

Page 53

1   2018 letter that's been marked as D-15, on April 21st,
2   2018, like when you were still in his office?
3   A.        No.
4   Q.        When did Mr. Lehman e-mail you the April
5   11th, 2018 letter that's been marked as D-15?
6   A.        Later that day.
7   Q.        What did Mr. Lehman tell you about the letter
8   when he invited you into his office on April 21st,
9   2018?
10  A.        What did he tell me?
11  Q.        Yes.
12  A.        That it was there.  That he received it.  I
13  don't recall if he read it to me.  I don't -- I don't
14  recall.  It was a bit of a surreal moment.  Kicked in
15  the gut.
16  Q.        So, I'm sorry, Mr. Lehman read the letter to
17  you?
18  A.        I don't recall specifically.
19  Q.        Mr. Lehman did something to communicate to
20  you the content of Mr. Poulos's accusations in the
21  April 11th, 2018 letter?
22  A.        He did.
23  Q.        What did Mr. Lehman convey to you regarding
24  the content of the April 11th, 2018 letter when he
25  invited you into his office on April 21st, 2018?

Matthew Ralston
July 01, 2021                                    54 to 57

Page 54

1   A.       That he received a letter accusing me of
2   sexually molesting a student in the early '90s.
3   Q.       Did he tell you who the student was?
4   A.       I don't remember.
5   Q.       Did Mr. Lehman tell you anything else about
6   the letter when he invited you into his office on April
7   21st, 2018?
8   A.       I just -- what -- whatever he said left me
9   with the impression that he didn't believe it was
10  credible.
11  Q.       What did you think when you heard Mr. -- when
12  Mr. Lehman told you about the content of the letter?
13  A.       What did I think?
14  Q.       Yeah.
15  A.       I -- my world changed that instant.  I didn't
16  understand why someone would make up such a falsity
17  regarding me.  It didn't fit with the career I had.  My
18  experience at The Hill School.  And I wondered why.
19  Q.       Anything else?
20  A.       In the moments that I was in his office?
21  Q.       Yes.
22  A.       Fear, that my name was attached to what I
23  considered the most heinous crimes that can be --
24  happen to a child.  And where it was gonna -- what it
25  was going to do to me, my life, my family.  Every

Page 55

1   former student or colleague I ever had.  I can't tell
2   you that all ran through my head right there, but it
3   was all present.
4   Q.       I guess I'm confused, because the information
5   was shared with you, but Mr. Lehman's expressed to you
6   that he didn't believe it, right?  So why were you
7   afraid?
8   A.       My name is attached to the ugliest thing a
9   person can do to a child.  Why would -- I don't know
10  what else I could have felt.  Sick to my stomach and
11  afraid.  It's all false.  I have done nothing in my
12  life that would lead -- it's just changed my life.
13  That moment.  I don't --
14  Q.       Did you think that your wife would believe
15  the allegations contained in the April 11th, 2018
16  letter that's been marked as D-15?
17  A.       No.
18  Q.       Why -- what was your concern about your
19  family?  You -- I think you said you were afraid of
20  something in relation to your family.
21  A.       My children grew up on The Hill School
22  campus.  They graduated from the Hill School.  They
23  were -- childhood friends with whom they're still close
24  are Hill School students.  Every aspect of our life was
25  entrenched in the school.

Page 56

1   Q.       Did you think your children would believe the
2   allegation?
3   A.       No.
4   Q.       You said that your life was entrenched at The
5   Hill School.
6   A.       We lived on campus in dormitories.  Yes.
7   Q.       Did you think that other people at The Hill
8   School were going to believe the allegations in the
9   April 11th, 2018 letter that's been marked as D-15?
10  A.       I can't know what people will think, except
11  that I'm the only person alive that knows with absolute
12  certainty that it's all made up, with the possible
13  exception of one other person.
14  Q.       I'm sorry, who are you talking about?  Are
15  you talking about Mr. Poulos, who --
16  A.       I am.
17  Q.       -- 100 percent testified, at length, over
18  several days, that he was absolutely repeatedly
19  assaulted by you when he was a child?
20  A.       Yes.
21  Q.       Is that the person you're talking about?
22  A.       It is.
23  Q.       So am I correct that only you and Mr. Poulos
24  know what actually happened between you and Mr. Poulos,
25  is that right?

Page 57

1            MR. JUBB:  I'll object to the form.
2            THE WITNESS:  I don't -- of course.
3   BY MS. DOUGHERTY:
4   Q.       I'm just -- I'm just trying to confirm,
5   because you said possibly one other person.  So I --
6   A.       Yes.
7   Q.       -- wanted to make sure there's no other
8   witness --
9   A.       He would be the only other person that knows
10  with absolute certainty that I never abused him or
11  inappropriately touched him.
12  Q.       Have you read Mr. Poulos's testimony in this
13  action?
14  A.       No.
15  Q.       Did you observe any component of Mr. Poulos's
16  testimony?
17  A.       Observe, as in?
18  Q.       I don't think you did, but did you watch via
19  Zoom or --
20  A.       No.
21  Q.       Did you learn the content of Mr. Poulos's
22  deposition testimony?
23            MR. JUBB:  You don't have to answer that
24  question.
25            MS. DOUGHERTY:  I said did he learn the

Matthew Ralston
July 01, 2021                                                    58 to 61

Page 58

1    content of Mr. Poulos's deposition testimony.
2         MR. JUBB:  Yeah, and I'm saying he
3    wouldn't have to answer that.  How would he
4    learn about the contents of the deposition
5    testimony, other than through counsel?
6         MS. DOUGHERTY:  I don't know.  But it's
7    a -- should be a yes or no question.  And
8    then if I want to ask him how he learned, if
9    that's his answer, then he can tell me that.
10        MR. JUBB:  No.  That's not how it works.
11   If he says, yes, he learned the content of
12   it, it came from me.  If he says, no I don't
13   know the content of it, it also didn't come
14   from me.  So I don't think you can get around
15   it that way.
16   BY MS. DOUGHERTY:
17   Q.      How did you learn the content of Mr. Poulos's
18   testimony?
19        MR. JUBB:  I'll object to the form of
20   the question.
21        THE WITNESS:  Could you just repeat it?
22   I didn't hear you.
23   BY MS. DOUGHERTY:
24   Q.      Sure.  How did you learn about the content of
25   Mr. Poulos's deposition testimony?

Page 59

1         MR. JUBB:  You don't have to answer that
2    question.  Don't answer that question.
3         THE WITNESS:  I -- I didn't say I had.
4    BY MS. DOUGHERTY:
5    Q.      So you did not learn about the content of --
6    A.      I didn't say that.
7    Q.      -- Mr. Poulos's testimony?
8         MR. JUBB:  You don't have to answer it.
9    This is not a fair question.
10   BY MS. DOUGHERTY:
11   Q.      Well, how do you know if Mr. Poulos isn't
12   telling the truth, if you don't know the testimony?
13   A.      I know what I read.  We were talking about
14   this letter.  This is false.  (Indicating.)
15   Q.      You're pointing to the April 11th, 2018
16   letter that's been marked --
17   A.      I am indeed.
18   Q.      -- D-15?
19   A.      Yes.
20   Q.      Let's look at that.  The letter starts off,
21   it's addressed to Zachary G. Lehman.  Headmaster of The
22   Hill School, 860 Beech Street, Pottstown, Pennsylvania,
23   19464, right?
24   A.      Yep.
25   Q.      And on April 11th, 2018, Mr. Lehman was, in

Page 60

1    fact, the headmaster of The Hill School, right?
2    A.      Yes.
3    Q.      You know that, because you were an employee
4    of The Hill School and Mr. Lehman was within your
5    reporting chain, is that right?
6    A.      Yes.
7    Q.      And it says, "Re: Sexual abuse claim of
8    Kurtis Nicholas Poulos", right?
9    A.      Yes.
10   Q.      When you were having the meeting with Mr.
11   Lehman on April 21st, 2018, did he tell you that the
12   letter was about Mr. Poulos?
13   A.      I believe so.
14   Q.      So before you left Mr. Lehman's office on
15   April 21st, 2018, you knew that Kurtis Nicholas Poulos
16   had accused you of repeatedly sexually molesting him,
17   is that right?
18   A.      Yes.
19   Q.      Now, if you look at the top, the letter's
20   from -- it says at the top, Law Office of Mitchell
21   Garabedian.  And on the second page, in the middle, I
22   guess, it says, "Very truly yours, MG, Mitchell
23   Garabedian."  Do you see that?
24   A.      Yes.
25   Q.      And did Mr. Lehman tell you from whom the

Page 61

1    letter came when you met with Mr. Lehman in his office
2    on April 21st, 2018, other than just identifying a
3    student?
4    A.      I don't recall.
5    Q.      Okay.  So you certainly learned, later on
6    that day, when Mr. Lehman e-mailed you the April 11th,
7    2018 letter that's been marked as D-15, that the letter
8    was on a lawyer's letterhead --
9    A.      Yes.
10   Q.      -- is that right?  Did you recognize Mr.
11   Garabedian when you reviewed the letter on April 21st,
12   20 --
13   A.      No.
14   Q.      Let me start again.  Did you review the
15   letter, on April 21st, 2018, when Mr. Lehman e-mailed
16   it to you?
17   A.      Yes.
18   Q.      So the first time you read the letter from
19   start to finish, the letter being the April 11th, 2018
20   letter that was marked as D-15, was on April 21st,
21   2018, is that right?
22   A.      Yes.
23   Q.      And so when you read the letter on April
24   21st, 2018, did you recognize Mr. Garabedian?
25   A.      No.

Page 62

1   Q.      Did you Google Mr. Garabedian?
2   A.      Probably at some point I did.  I can't tell
3   you when.  It wasn't my --
4   Q.      So you Googled Mr. Garabedian sometime after
5   you read the April 11th, 2018 letter that's been marked
6   as D-15, is that right?
7   A.      Yes.
8   Q.      Did you Google Mr. Garabedian close in time
9   to when you first read the letter that's been marked as
10  D-15?
11  A.      I don't recall.
12  Q.      Did you Google Mr. Garabedian before the
13  second letter?
14  A.      Yes.  I would have known who he was by then,
15  yes.
16  Q.      What did you learn about Mr. Garabedian?
17  A.      I think the -- probably the first thing I
18  learned that shot out was that he was the attorney
19  that was highlighted in the movie Spotlight.
20  Q.      Anything else that you learned about Mr.
21  Garabedian?
22  A.      No.
23  Q.      And you learned --
24  A.      Well --
25  Q.      Go ahead.

Page 63

1   A.      That -- that his offices were in Boston.  But
2   I probably knew that once I saw it.  But beyond that,
3   no.
4   Q.      And you learned -- did you learn that Mr.
5   Garabedian represents survivors of childhood sexual
6   abuse?
7   A.      Yes.
8   Q.      And you learned that Mr. Garabedian
9   represents survivors of childhood sexual abuse by
10  Googling Mr. Garabedian?
11  A.      Yes.
12  Q.      Did you learn information about Mr.
13  Garabedian from a source other than Googling Mr.
14  Garabedian?
15  A.      Well, I had seen the movie.  So once I knew
16  the movie featured him, I would've had some
17  recollection of that.
18  Q.      So you Googled Mr. Garabedian, you realized
19  he was depicted in a movie that you saw, which informed
20  your belief about Mr. Garabedian, is that right?
21  A.      Is that how I knew him?  Who he was?
22  Q.      I'm just trying to -- you Googled Mr.
23  Garabedian.  You had independent information because
24  you watched the movie Spotlight.  Did you have any
25  other source of information about Mr. Garabedian?

Page 64

1   A.      No.
2   Q.      Basically what you're telling me is when you
3   learned that Mr. Garabedian was depicted in the movie
4   Spotlight you didn't need to look any further.  You
5   understood the nature of Mr. Garabedian's practice.  Or
6   did you do further investigation?
7   A.      I don't recall if I read more.  I probably
8   did.  But I think I -- mostly probably the movie, or
9   the reputation that the movie portrays.
10  Q.      Did you visit Mr. Garabedian's website?
11  A.      Not then.
12  Q.      Not then, you mean -- what are you talking
13  about?
14  A.      You're talking about right after I got the
15  letter?
16  Q.      Okay.  So right after you got the April 11th,
17  2018 letter that's been marked as D-15, that's when you
18  Googled Mr. Garabedian and learned he was depicted in
19  the movie Spotlight?
20  A.      Yes.  I don't know if it was that day.  It
21  was after -- after I saw the letter.  I can't -- I
22  can't tell you when.  Specifically time frame.  It
23  would have been soon after.
24  Q.      A couple days or a couple weeks?
25  A.      I'm sure.  Probably that.  Yes.

Page 65

1   Q.      So what you're telling me is when you checked
2   your e-mail and you got the letter from Mr. Lehman and
3   you read the letter, you didn't, like, immediately go
4   Google Mr. Garabedian, but sometime in the coming days
5   or perhaps weeks you Googled Mr. Garabedian to learn
6   about him?
7   A.      That would be correct, yes.
8   Q.      And are you able to tell me, without
9   completely guessing, whether it was days or weeks after
10  you reviewed the letter?
11  A.      I cannot.
12  Q.      But you're sure it wasn't longer than weeks,
13  is that right?
14  A.      I'm pretty sure.
15  Q.      So within weeks of April 21st, 2018, you
16  Googled Mr. Garabedian and learned that he was a lawyer
17  depicted in the movie Spotlight, is that right?
18  A.      Yes.
19  Q.      And within a couple weeks of April 21st,
20  2018, you knew that Mr. Garabedian represents survivors
21  of childhood sexual abuse, is that right?
22  A.      Yes.
23  Q.      Did you visit Mr. Garabedian's website when
24  you were Googling Mr. Garabedian a few weeks after
25  April 21st, or within a few weeks after April 21st,

Matthew Ralston
July 01, 2021                                    66 to 69

Page 66

1  2018?
2  A.      I don't believe so.
3  Q.      You said earlier not at that time.  Was there
4  another time when you were doing research about Mr.
5  Garabedian?
6  A.      I have -- I have visited his website.  I
7  can't tell you if it was before the second letter.
8  After.  I can't tell you specifically when.
9  Q.      Okay.  So there's at least two instances
10 where you did research about Mr. Garabedian, is that
11 right?
12 A.      Yes.  I -- I don't know if visiting the
13 website was research, but yes.
14 Q.      Why did you visit the website?
15 A.      That's why I say it's probably research.
16 Q.      Okay.
17 A.      I was curious.
18 Q.      Why were you curious about Mr. Garabedian?
19 A.      Because he wrote false letters about me that
20 were written in a factual basis.  And I -- I wondered
21 why someone would do that.
22 Q.      You said letters.  So now do you remember
23 that you visited the website after the second letter?
24 Or were there more instances --
25 A.      No.

Page 67

1  Q.      -- of research?
2  A.      I -- I don't recall.  After the second
3  certainly makes sense to me.  But I -- I don't recall.
4  My -- my life changed and time changed with it.  I
5  can't -- it's -- it's a miserable blur.
6  Q.      Okay.  So other than Google Mr. Garabedian on
7  one instance, and learning he was depicted in the movie
8  Spotlight, and then later visiting Mr. Garabedian's
9  website, did you do any other research about Mr.
10 Garabedian?
11 A.      No.
12 Q.      How about did you -- when you visited -- let
13 me start again.  What did you look at when you went to
14 Mr. Garabedian's website?
15 A.      I don't recall.  I think, one, I probably
16 would have cared what he looked like.  Beyond that, I
17 -- I don't know.
18 Q.      Did you want to see if Stanley Tucci was an
19 accurate character to play him, is that right?
20 A.      (Witness laughing.)
21 Q.      So you wanted to know what Mr. Garabedian
22 looked like.  What else did you look at on Mr.
23 Garabedian's web site?
24 A.      I'm sorry.  Again?
25 Q.      Sure.  So you went to see what -- let me

Page 68

1  start again.  You were curious to see what Mr.
2  Garabedian looked like.  What else did you look at on
3  Mr. Garabedian's website?
4  A.      I don't recall.  At all.  I can't tell you
5  why I went.  Except I'm wondering what's going on in my
6  life.  It would have just probably seemed like a
7  natural place to go look.
8  Q.      Did you --
9  A.      I don't know how to explain that.
10 Q.      Did you look at information about other
11 lawyers affiliated with Mr. Garabedian's law firm?  Or
12 just for information about Mr. Garabedian?
13 A.      Other lawyers on his website, is that what
14 you're asking?
15 Q.      Sure.  Affiliated with his law firm.
16 A.      No.
17 Q.      So you were only interested in doing research
18 about Mitchell Garabedian, is that right?
19 A.      Yes.
20 Q.      Was there a reason why you were only
21 interested in doing research about Mitchell Garabedian
22 as compared to research about Mitchell Garabedian's law
23 firm, or other lawyers affiliated with Mr. Garabedian's
24 law firm?
25 A.      Yes.

Page 69

1  Q.      Why?
2  A.      Because it's his signature, or his name at
3  the end of the letter.
4  Q.      So you just going back to the April 11th, 2018
5  letter that's been marked as D-15.  You said something
6  that Mr. Garabedian wrote factual letters.  Were you
7  referring to the April 11th, 2018 letter that's been
8  marked as D-15?
9          MR. JUBB:  I'll object to the form --
10         THE WITNESS:  Yes.
11         MR. JUBB:  -- of that.
12 BY MS. DOUGHERTY:
13 Q.      Well, correct me if you didn't say it.  I
14 thought you expressed the comment along the lines of he
15 wrote factual letters and that's what prompted you to
16 look at his website.
17         MR. JUBB:  That's not what he said.
18         Objection to the form.
19         THE WITNESS:  Should -- may I answer?
20         MR. JUBB:  Go ahead.
21         THE WITNESS:  The letter is written --
22         MS. DOUGHERTY:  I wrote it down.  He
23 said factual information.
24         MR. JUBB:  He said he wrote false
25 letters asserting facts.

Page 70

1          MS. DOUGHERTY:  Factual information.  I
2     thought it was curious.  So I'm not
3     mischaracterizing his testimony.
4          MR. JUBB:  You can -- you got that,
5     right?
6          THE WITNESS:  I described --
7  BY MS. DOUGHERTY:
8     Q.     Hold on.  Here's what I want to know.  I just
9  want to know what you meant when you uttered the words
10  factual information in connection with the letters
11  written by Mr. Garabedian.
12     A.     I said -- what I meant or mean is that there
13  is a letter falsely accusing me, written as though the
14  allegations are fact.
15     Q.     Okay.  So specifically, going to the April
16  11th, 2018 letter that's been marked as D-15, you think
17  that the letter is written as if it is communicating
18  facts, is that right?
19     A.     Yeah.
20     Q.     When you read the April 11th, 2018 letter
21  that has been marked as D-15, on April 21st, 2018, did
22  you have a belief about the source of the information
23  included in the letter?
24          MR. JUBB:  I'll object to the form.
25          THE WITNESS:  A belief?

Page 71

1  BY MS. DOUGHERTY:
2     Q.     Yeah.
3          MR. JUBB:  Like who the source was?
4  BY MS. DOUGHERTY:
5     Q.     Yeah.  Sure.
6     A.     I'm sorry.  I don't understand what you're
7  asking.
8     Q.     Well, do you think Mr. Garabedian came up
9  with the idea that Mr. Poulos was sexually abused by
10  you?  Or do you think that's something that Mr. Poulos
11  told Mr. Garabedian?
12          MR. JUBB:  At the time you read the
13          letter.
14  BY MS. DOUGHERTY:
15     Q.     At the time you read the letter on April
16  21st, 2018.
17     A.     I assumed that Mr. Poulos told Mr.
18  Garabedian.
19     Q.     So we were -- I think we were going line by
20  line through the letter when I got distracted about the
21  website.  So, "Dear Mr. Lehman, please be informed that
22  this office represents Kurtis Nicholas Poulos."  So you
23  read the first sentence of the April 11th, 2018 letter
24  that's been marked as D-15, on April 21st, 2018, is
25  that right?

Page 72

1     A.     Yes.
2     Q.     And so when you read the letter on April --
3  when you read -- let me start again.  When you read the
4  April 11th, 2018 letter that's been marked as D-15, on
5  April 21st, 2018, you immediately understood that Mr.
6  Garabedian was writing to Mr. Lehman on behalf of a
7  client, Kurtis Nicholas Poulos, is that right?
8     A.     Yes.
9     Q.     And then the letter continues, "This letter
10  is an attempt to settle any compromised claims
11  regarding Matthew B. Ralston, hereinafter, Mr. Ralston,
12  and Mr. Ralston's supervisors at The Hill School."  Did
13  you read that sentence on April 21st, 2018?
14     A.     Yes.
15     Q.     Matthew B. Ralston, was it your understanding
16  that referred to you?
17     A.     Yes.
18     Q.     Okay.  And then it says, "It should not be
19  used as evidence in any court hearing."  Did you read
20  that sentence --
21     A.     Yes.
22     Q.     On April 21st, 2018?  Yes?
23     A.     Yes.
24     Q.     And it continues, "Kurtis Nicholas Poulos."
25  did you recognize the name Kurtis Nicholas Poulos when

Page 73

1  you read the April 11th, 2018 letter that's been marked
2  as D-15 on April 21st, 2018?
3     A.     Yes.
4     Q.     Did you recognize Kurtis Nicholas Poulos as
5  one of your former students?
6     A.     Yes.  Yes.  I can't say in that moment I
7  recognized him as a student I taught.  As a student who
8  lived in our dormitory, yes.  As a student of the
9  school, yes.
10     Q.     Okay.  So on April 21st, 2018, when you read
11  the April 11th, 2018 letter that's been marked as D-15,
12  you recognized Mr. Poulos as a former student of The
13  Hill School who was in your dormitory, but you don't
14  remember whether you realized that Mr. Poulos had also
15  been one of your students?
16     A.     I don't think my memory went to the context
17  of our relationship, because relationships of a
18  boarding school, pretty much every aspect of not only
19  academic life, but residential life and athletic life.
20  So recognizing a student as a student of the school is
21  -- when I think of someone, is what I consider.  What I
22  think about.  Is that clear?
23     Q.     Okay.  So you recognized Mr. Poulos as --
24     A.     I don't --
25     Q.     -- a student -- a former student of The Hill

Page 74

1   School on April 21st, 2018 when you read the April 11,
2   2018 letter, is that right?
3   A.        And with whom -- yes.  And with whom I would
4   have had contact in several capacities.  I probably did
5   not consider those capacities when I read the letter.
6   Q.        Do you now acknowledge that you taught
7   geometry to Mr. Poulos when he was a student at The
8   Hill School?
9   A.        Of course.
10  Q.        Was there a time when you remembered that you
11  taught Mr. Poulos geometry, after reading the April
12  21st, 2018 letter?
13  A.        A time that I recall --
14  Q.        I think you're telling me -- let me start
15  again.  Did you realize that you taught geometry to Mr.
16  Poulos on October -- excuse me, April 21st, 2018 when
17  you read the April 11th, 2018 letter?
18  A.        I could have recalled that I taught him.  I
19  don't know that I could have told you that I taught him
20  geometry.
21  Q.        Okay.  So the letter continues, "Currently 39
22  years of age.  Was repeatedly sexually molested by Mr.
23  Ralston from approximately 1993, when he was
24  approximately 15 years of age, until approximately
25  1995, when he was approximately 17 years of age."  Did

Page 75

1   you read that sentence on April 21st, 2018?
2   A.        I did.
3   Q.        Did you have contact with Mr. Poulos at The
4   Hill School between 1993 and 1995?
5   A.        Yes.
6   Q.        The third paragraph of the letter, which goes
7   on to the second page, describes Mr. Poulos's injuries.
8   Did you read the third paragraph of the April 11th,
9   2018 letter on April 21st, 2018?
10  A.        Yes.
11  Q.        What was your reaction when you read the
12  third paragraph of the April 11th, 2018 letter on April
13  21st, 2018?
14  A.        I don't know if I would have had -- my
15  reactions would have been to the first paragraph above
16  it.  Would have been my most -- my strongest reactions.
17  Anything resulting from something I knew to be false
18  would not have had the impact of what I knew to be
19  false.  Where he states that he was repeatedly is
20  false.  The results of that, I think in my --
21  Q.        You mean where he said he was repeatedly
22  sexually molested by Mr. Ralston?
23  A.        Yes.
24  Q.        So you disagree that Mr. Poul -- that you
25  repeatedly sexually molested Mr. Poulos, is that right?

Page 76

1   A.        Those are false statements.  That is a false
2   statement.
3   Q.        Okay.  So what about the paragraph about Mr.
4   Poulos's --
5   A.        So logically for me, the second -- the third
6   -- what's the third paragraph of the letter is also
7   false.  And my strongest reaction, you ask how I felt
8   about the third paragraph, I can tell you my reaction
9   would have been focused on the second paragraph, where
10  all falsity begins.  Everything that follows that is
11  just piling on false facts.  False statements.
12  Q.        Okay.  So you couldn't get past the sentence
13  that said Mr. Poulos was repeatedly sexually molested
14  by you, is that right?
15  A.        I -- I didn't say that.
16  Q.        Okay.
17  A.        You asked how I felt about the third
18  paragraph.  I'm telling you that my reaction would have been
19  focused on the second paragraph.  Everything after that
20  I read.  It was false.  My focus would have been on the
21  sentence in the second paragraph that makes a false
22  statement that I repeatedly sexually molested him.
23  Q.        Okay.  Just so I understand.  So your belief
24  about Mr. Poulos is the paragraph about Mr. Poulos's
25  injuries being false is because you contend that you

Page 77

1   did not sexually molest Mr. Poulos, is that right?
2   A.        I did not molest Mr. Poulos.  That is
3   correct.
4   Q.        The fact that you say that you did not
5   sexually molest Mr. Poulos, is that the only reason why
6   you don't believe the statements about Mr. Poulos's
7   injuries?
8   A.        Yes.  Because it says as a result of my
9   molesting him.  So those can't be a result.  They can't
10  be true, because it's a result of something I didn't
11  do.
12  Q.        Why do you think Mr. Poulos accused you of
13  repeatedly sexually molesting him if you didn't
14  repeatedly sexually molest him?
15  A.        I have no idea.  I spent months trying to
16  figure that out.  And at some point it occurred to me I
17  can't figure it out.  And I just -- how was I going to
18  continue to deal with the -- the presence and the --
19  the tortuous presence, if you will, of being falsely
20  accused of such a heinous crime against a child.
21  Q.        Just sticking with April 21st, 2018.  At that
22  time only you and Mr. Lehman knew about the
23  accusations, is that right?
24  A.        I -- I don't believe that to be true.
25  Q.        Who else knew about Mr. Poul -- well, let me

Matthew Ralston
July 01, 2021                                                    78 to 81

Page 78

1  start again.  Other than Mr. Garabedian and Mr. Poulos,
2  who, other than you and Mr. Lehman, knew about Mr.
3  Poulos's accusations on April 21st, 2018?
4      A.      I know with certainty that Tom Rees knew.
5      Q.      So the lawyer for The Hill School?
6      A.      The lawyer -- yes.
7      Q.      Okay.
8      A.      And I assumed and I would -- as much
9  certainty as I could without asking, the board chair.
10  And, in all likelihood, the legal committee of the
11  board.
12      Q.      Okay.  So --
13      A.      Headmast -- okay.  Sorry.
14      Q.      Go ahead.  The board chair.  The legal what?
15      A.      Committee of the Board of Trustees.
16      Q.      Were you still going?
17      A.      No.
18      Q.      Okay.  So --
19      A.      Did you get -- you have Tom Rees?
20      Q.      Yeah.  I was going to go back to clarify who
21  -- what you knew with certainty the basis.  So
22  obviously Mr. Lehman had the letter, because he
23  provided it to you.  You said that you knew with
24  certainty, on April 21st, 2021, that Thomas Rees, the
25  lawyer for The Hill School, also knew about the April

Page 79

1  11th, 2018 letter that's been marked as D-15, is that
2  right?
3      A.      Yes.
4      Q.      Why do you say that you knew with certainty
5  that Thomas Rees --
6      A.      Because after speaking with my wife, he was
7  my first phone call.  I've known Tom for -- '16, so
8  probably 20 years at that point.
9      Q.      So you left Mr. Lehman's office, after he
10  invited you in on April 21st, 2018, and then you did
11  what?
12      A.      I went back to where I was staying, called my
13  wife.
14      Q.      So your wife wasn't with you?
15      A.      No.
16      Q.      So you called your wife in Ohio?
17      A.      I did.
18      Q.      And you told your wife what?
19      A.      What -- what -- what I had received and been
20  told by Mr. Lehman.
21      Q.      Okay.  So you had received the April 11th,
22  2018 letter by e-mail from Mr. Lehman before you called
23  your wife?  Or you were just relaying what Mr. Lehman
24  told you?
25      A.      I don't recall.  Certainly what he told me.

Page 80

1      Q.      So you don't know whether you -- did you --
2  let me start again.  Did you call your wife more than
3  once, on April 21st, 2018, to talk about Mr. Poulos's
4  allegations?
5      A.      I don't remember.
6      Q.      Did you send the wife -- let me start again.
7  Did you send your wife the April 11th, 2018 letter
8  that's been marked D-15 --
9      A.      No.
10      Q.      -- after you received it from Mr. Lehman on
11  April 21st, 2018?
12      A.      No, I did not.
13      Q.      Is there a reason why you didn't share the
14  letter with your wife?
15      A.      Other than she didn't need it.  At the point
16  that I received it, and again I don't know the timing,
17  I would have read it to her.  Beyond that she didn't
18  need it.
19      Q.      I'm sorry, you don't remember whether you had
20  it before you talked to your wife?
21      A.      That's what I said --
22      Q.      Or you do remember?
23      A.      -- yes.
24      Q.      I thought you said you read it to her.
25      A.      I said I would have read it.  You asked why I

Page 81

1  didn't send it to her.
2      Q.      Oh, I get it.  Okay.  So if you had the
3  letter before you called your wife you would have read
4  it to her, right?
5      A.      Yes.
6      Q.      So then you wouldn't need to send it to her.
7  But you don't know if you had the letter before you
8  called your wife, right?
9      A.      Correct.  I know I had seen Mr. Lehman.
10      Q.      What's your explanation to not sending it to
11  your wife if you didn't have it before you spoke to
12  her?
13      A.      I'm sorry?
14      Q.      You can't tell me one way or the other
15  whether you had the letter before you spoke to your
16  wife.  You're positive that you wouldn't need to send
17  it to her if you had it before you spoke to her,
18  because you would have read it to her.  So now I'm
19  trying to find out the alternative.
20      A.      I don't --
21      Q.      Why wouldn't you send it to her?
22      A.      I don't understand the confusion.  When I
23  received the letter --
24      Q.      Yes.
25      A.      -- if I spoke -- when I spoke with my wife

Matthew Ralston
July 01, 2021                                              82 to 85

Page 82

1  after receiving it, I would have read it to her.  When
2  I called her, after leaving Mr. Lehman's office for the
3  first time, I can't tell you if I had the letter or
4  not.  I would have gone right back and called her,
5  because my world had just been shattered.
6       Q.       I'm sorry, your world was shattered even
7  though Mr. Lehman told you he didn't believe the
8  contentions?
9                MR. JUBB:  I'll object to the form.  You
10        can answer.
11               THE WITNESS:  I'm sorry?
12               MR. JUBB:  You can answer.  Go ahead.
13               THE WITNESS:  Oh.  Yeah.  There's this
14        letter that says, in a factual sentence
15        that's false, that I repeatedly molested a
16        student.
17  BY MS. DOUGHERTY:
18       Q.       Okay.  We -- we're starting to go through the
19  people who learned that accusation.  And the first one
20  is Mr. Lehman.  And he didn't believe it, right?
21               MR. JUBB:  Object to the form.
22               THE WITNESS:  That was my sense.
23  BY MS. DOUGHERTY:
24       Q.       Okay.  Then when you communicated that
25  information to your wife, did she believe it?

Page 83

1       A.       No.
2       Q.       And then you said, after speaking to your
3  wife you called Mr. Rees, is that right?
4       A.       Yes.
5       Q.       Did you call Mr. Rees after you received the
6  letter?
7       A.       I don't remember.
8       Q.       What -- you didn't call Mr. Rees for legal
9  advice, did you?
10       A.       Of course not.
11       Q.       What did you tell Mr. Rees when you called
12  him on April 21st, 2021?  I'm sorry, let me start
13  again.
14       What did you tell Mr. Rees when you called him on April
15  21st, 2018?
16       A.       I would have asked -- and I don't remember
17  our conversation verbatim -- I would have asked how
18  something like this progresses or proceeds.  I would
19  have asked -- I know I did ask him do schools ever
20  fight these things.  And then I would have listened to
21  whatever he was saying in response to those two.
22       Q.       Okay.  So on April 21st, 2018 you understood
23  that Mr. Poulos was pursuing a claim against The Hill
24  School, and you wanted to know from Mr. Rees, in words
25  or substance, whether schools ever fight allegations

Page 84

1  like communicated by Mr. Poulos in the April 11th, 2018
2  letter?
3                MR. JUBB:  Objection to the form.
4                THE WITNESS:  It's my -- so you're
5        asking if I understood that the letter was
6        seeking payment from the school?
7  BY MS. DOUGHERTY:
8       Q.       Yes.
9       A.       Yes.
10       Q.       So on April 21st, 2018 you didn't believe
11  that Mr. Poulos was asking you for money, right?
12                MR. JUBB:  I'll object to the form.
13                THE WITNESS:  No.
14  BY MS. DOUGHERTY:
15       Q.       Let me -- just to confirm, the second page of
16  the April 11th, 2018 letter that's been marked as D-15,
17  the last -- okay, third from last line, I guess, says
18  Mr. Poulos's demand from settlement is a million
19  dollars.  Is that where you got the idea that Mr.
20  Poulos was seeking money from The Hill School?
21       A.       Yes.  I'll go back and read it.  I probably
22  would have assumed that it was implied in the second
23  sentence of the letter.
24       Q.       Right.
25       A.       I mean --

Page 85

1       Q.       No, that's fair.
2       A.       -- attempt to settle and compromise claim.
3       Q.       So you didn't get to -- you didn't need to
4  get past the second sentence of the April 11th, 2018
5  letter that's been marked as D-15 to realize Mr. Poulos
6  was seeking payment from The Hill School, is that
7  right?
8                MR. JUBB:  Object to form.
9                THE WITNESS:  Knowing he was seeking
10        something.  I assumed money.  The last
11        sentence makes that clear.  Confirms what I
12        would have assumed.
13  BY MS. DOUGHERTY:
14       Q.       So you -- on April 21st, 2018, you weren't
15  concerned that Mr. Poulos wanted a million dollars from
16  you, is that right?
17       A.       That's correct.
18       Q.       But what -- and what prompted you to call Mr.
19  Rees was to learn whether, in his experience, schools
20  fight these things, I think you said?
21       A.       That was one of the -- I wanted to know -- I
22  knew Mr. Rees.  We had had -- I was in the school's
23  administration before I left, so we had worked together
24  prior.  And I wanted to ask him questions about how
25  this would proceed.  And because my name was attached,

Matthew Ralston
July 01, 2021                                        86 to 89

Page 86

1   I did ask -- I asked do schools ever fight these
2   things.
3   Q.      What did Mr. Rees tell you?
4   A.          He told me how it would proceed.  And that
5   the school would be in contact, or had been, maybe.
6   Would be in contact with Mr. Garabedian.  There would
7   be a third party investigation, which would involve --
8   he told me then that I might receive a call from an
9   attorney at Cozen O'Connor.  He told me -- my
10  impression -- well -- that was also, that he didn't
11  believe these allegations.  He couldn't -- I mean, he
12  didn't tell me who all would be part of an
13  investigation with Cozen O'Connor.
14          I don't recall if he told me it would have
15  been the administrators who were part of the school at
16  the time that I was working there and these
17  allegations.  That time frame.  Or if I just was aware
18  that they would be.  So that would have included the
19  headmaster at that time, the associate headmaster at
20  that time.  And I don't know who else.
21          He said schools generally don't fight these
22  things.  That they do the investigations and act
23  according to what they learn from those investigations.
24  He suggested that I might want to seek my own counsel
25  at that time.  I asked him why.  He said that there

Page 87

1   were three reasons.  One was, what I already knew, and
2   that was that he's the school's attorney and not mine.
3   Was that if there were ever charges filed, I'd clearly
4   need defense there.  And if there was ever a lawsuit, I
5   would need -- I would need my own counsel then.  That's
6   it.  That I remember.
7           THE VIDEOGRAPHER:  Stand by.  Change
8       another chapter.
9           MR. JUBB:  We've been going for two
10      hours.  Let's take a bathroom break.
11          MS. DOUGHERTY:  Oh, yeah.
12          THE VIDEOGRAPHER:  Going off record.
13      Time is 12:05.
14              *   *   *
15          (Whereupon, a short break was taken.)
16              *   *   *
17          THE VIDEOGRAPHER:  Back on, 12:21.
18  BY MS. DOUGHERTY:
19  Q.      So you called Mr. Rees and he told you how it
20  would proceed.  There would be a third party
21  investigation.  You might receive a call from an
22  attorney at Cozen O'Connor.  He didn't believe the
23  allegations.  You might be part of an investigation.
24  Schools don't fight these things.  And he suggested
25  that you get a lawyer for three reasons:  Because he

Page 88

1   was the school's attorney, there could be charges filed
2   and there could be a lawsuit.  Anything else that you
3   discussed with Mr. Rees or Mr. Rees told you when you
4   called him on April 21st, 2018?
5   A.      No.
6   Q.      Why were you calling Mr. Rees to find out
7   what would happen?
8   A.      Because he's the school's attorney, and I had
9   a relationship with him, and in that capacity, it
10  seemed like kind of the obvious person to me.
11  Q.      Why didn't you ask Mr. Lehman while you were
12  meeting with him?
13  A.      Probably because I was, I don't know, in
14  shock, or numb or processing it.  And then --
15  Q.      I'm sorry, so how did the meeting with Mr.
16  Lehman end?
17  A.      How did it end?  I don't recall.
18  Q.      Just so I'm clear, you left without finding
19  out what -- what the school was going to do with the
20  letter, if anything?
21  A.      No.  I -- I don't -- I don't recall what he
22  said.  I don't -- can't imagine he would have said
23  nothing.
24  Q.      Well, didn't you want to know when he told
25  you that someone had accused you of sexual -- let me

Page 89

1   start again.  Didn't you want to know what the school
2   would do when you learned that a student had accused
3   you of sexually molesting a student?
4   A.      Of course.  And what I'm telling you is I
5   don't recall all of that conversation, because I think
6   reading or hearing it, which is -- I don't recall --
7   again, I don't think I -- I know I didn't have it.  So
8   hearing the allegations, I think, overshadowed any
9   recollection -- does overshadow any recollection of the
10  specifics of that conversation.  I can't tell you he
11  didn't mention Cozen O'Connor.  I can't tell you he
12  did.  As an example --
13  Q.      You're talking about Mr. Lehman.
14  A.      Yes.
15          MR. MCCARRON:  Can I just interrupt?  We
16      can't hear you.  It's on mute.
17          MS. DOUGHERTY:  Can you hear us now?
18          MR. MCCARRON:  Yes.  We were on mute
19      until just then.
20          MR. JUBB:  And I think we also just need
21      to clarify for the record that Jeffrey
22      McCarron and Mr. Garabedian are also present
23      for the deposition.
24          MS. DOUGHERTY:  Via Zoom.
25          MR. JUBB:  Via Zoom.

Page 90

1          MS. DOUGHERTY: Can you read back my
2     question.
3                    *   *   *
4          (Whereupon, the court reporter read from
5     the record.)
6                    *   *   *
7
8  BY MS. DOUGHERTY:
9  Q.     So when you said you don't remember if Mr.
10 Lehman told you about Cozen, you're talking about Mr.
11 Lehman when you say you don't know if he told --
12 A.     Yes.
13 Q.     -- you about Cozen O'Connor, is that right?
14 A.     Right.
15 Q.     So Mr. Lehman -- it's Lehman, right?
16 A.     Lehman.
17 Q.     I keep saying --
18 A.     -- I believe.
19 Q.     -- it the wrong way.
20 A.     Yeah, I believe.
21 Q.     I'm probably going to keep saying it the
22 wrong way, because I don't learn, but.
23 A.     Just don't mispronounce mine.
24 Q.     I don't think I've done that yet. But
25 there's still time today. So after Mr. Lehman invited

Page 91

1  you into his office to talk about the letter, he told
2  you about the letter and then -- and the content of the
3  letter, and then you don't remember anything else about
4  the meeting?
5  A.     Not much.
6  Q.     What do you remember?
7  A.     I mean, I remember him -- I remember feeling,
8  when I left, that it was pretty clear that he didn't
9  believe the content of the letter. And I can't, beyond
10 that, tell you much.
11 Q.     And you don't remember whether you asked Mr.
12 Lehman what the school was going to do in response to
13 the letter, if anything?
14 A.     No.  I don't recall.
15 Q.     When --
16 A.     And I'm -- because I do recall asking Mr.
17 Rees, I'm guessing I didn't. But I don't know.
18 Q.     Didn't you care to know, as soon as you
19 learned that a student had accused you of sexual --
20 sexually molesting a student, what was going to happen?
21 A.     I don't know how to describe the change in
22 every piece of thought process when you read something
23 like this, or hear something like this attached to your
24 name. Or your name attached to something like this. I
25 heard him.  I left believing he didn't believe it. And

Page 92

1  I had to go process it. And so I don't recall the rest
2  of that conversation. And I don't know how to -- all I
3  can do is guess, and I don't want to do that.
4  Q.     Okay.  So you don't remember how the meeting
5  ended?
6  A.     I do not. I'm sure most of our meetings
7  ended with me -- our shaking hands, but.
8  Q.     Well, is that how this meeting ended?
9  A.     I'm sure it did. I don't recall meeting with
10 Zach that didn't end that way. Or a see you. It
11 wasn't -- it wasn't adversarial. That wasn't my sense
12 when I was there or since. Believing that, meaning
13 that's how that meeting was.
14 Q.     No, my con --
15 A.     You're asking details and I'm telling you I
16 don't remember those details of that meeting, because I
17 had just been told I'd been accused of horrible crimes
18 against a child.
19 Q.     Okay.  You were told that and then
20 immediately told the person telling you, Mr. Lehman,
21 the headmaster of the school, didn't believe -- believe
22 it, right?
23 A.     I'm telling you --
24          MR. JUBB: Objection to the form.
25          THE WITNESS: -- that's the sense I left

Page 93

1  with, yes. I don't remember his exact words.
2  BY MS. DOUGHERTY:
3  Q.     Wasn't it important to you to learn what the
4  school was going to do about the allegations by Mr.
5  Poulos, as soon as you learned that the allegations had
6  been made?
7  A.     Of course. As soon as I -- as soon as I
8  digested the fact that the allegations had been made. I
9  -- I -- I don't under -- I'm not sure what you're
10 asking of -- when you ask why I didn't ask him and why
11 I called the school's attorney. I don't understand
12 what -- what you're asking me.
13 Q.     Well, I'm just trying to get my head around
14 why when somebody told you, Mr. Lehman, the headmaster,
15 someone in charge at The Hill School, told you that a
16 student accused you of sexually molesting a student,
17 you didn't immediately want to know what the school's
18 going to do to defend your honor. What the school was
19 going to do about the letter, if you believed the
20 content to be false. You just left?
21 A.     I don't know what I can say to help you get
22 your hands around it, then, because I've said what I
23 believed when I left. I've said what I remember. And
24 I can tell you what I did once -- once I processed it.
25 I can tell you my relationship with Tom Rees was longer

Matthew Ralston
July 01, 2021                                          94 to 97

Page 94

1   running than my relationship with Zach.
2          I know that Tom would have, anytime there
3   were legal proceedings claimed against the school,
4   would have been a part of it.  And so I -- when I
5   finally was ready to ask all of those questions, I
6   called Tom.  It's not an aversion to Zach Lehman.  I
7   called the guy that I knew best.
8   Q.        Okay.  So you decided not to ask Mr. Lehman
9   what the school's going to do about the April 11th,
10  2018 letter?  Instead to -- because you favored
11  contacting Mr. Rees?
12         MR. JUBB:  Objection to the form.  Asked
13         and answered.
14         THE WITNESS:  I feel like you're putting
15         words into my mouth out of context.
16  BY MS. DOUGHERTY:
17  Q.        Well, then why did you tell me you had a
18  longer relationship with Mr. Rees?
19  A.        Because I -- I did.  And what I --
20  Q.        What does that have to do with what you --
21  A.        The context --
22  Q.        -- discussed with Mr. Lehman?
23  A.        -- the context was, when I left Mr. Lehman's
24  office, I went and digested and processed what was
25  there.  And when I was ready -- what he had told me.

Page 95

1   And when I was ready to ask further questions, I called
2   Tom Rees, because I knew he would be a part of it.
3   Q.        Okay.  So you didn't ask Mr. Lehman what the
4   school was going to do about the April 11th, 2018
5   letter, because you weren't ready to ask further
6   questions?
7          MR. JUBB:  He has already answered this.
8          That he can't recall anything after that.
9          Please move on.
10         MS. DOUGHERTY:  Objection.  Move to
11         strike.
12  BY MS. DOUGHERTY:
13  Q.        IS that right?
14         MR. JUBB:  Same objection.  Asked and
15         answered.
16         THE WITNESS:  Yes.
17  BY MS. DOUGHERTY:
18  Q.        What did you think was going to happen when
19  you left Mr. Lehman's office?
20         MR. JUBB:  Same objection.
21         THE WITNESS:  I assumed, from my own
22         experience and knowledge of being around
23         schools my whole life, there would be an
24         investigation.  I assume, or assumed, that
25         investigations were participated in by both

Page 96

1          -- both parties with the idea of being --
2          getting at the truth.  And then when I got
3          more specific questions, I called Tom.  To
4          ask specifically.
5   BY MS. DOUGHERTY:
6   Q.        So when you left Mr. Lehman's office you
7   believed that there would be an investigation and then
8   called Mr. Rees to learn more detail about the
9   investigation, is that right?
10         MR. JUBB:  Objection to the form.
11         THE WITNESS:  I called Mr. Rees for more
12         information.  It was not limited to an
13         investigation into the allegations.  It was
14         the whole mess.
15  BY MS. DOUGHERTY:
16  Q.        I think you mentioned that you weren't sure,
17  or perhaps Mr. Lehman could have mentioned Cozen
18  O'Connor to you.  Was Cozen O'Connor known to you as a
19  lawyer for the school before you talked to Mr. Rees?
20  A.        I don't believe that I've ever known Cozen
21  O'Connor to be lawyers for the school.
22  Q.        Okay.  What's your understanding of Cozen
23  O'Connor's role?
24  A.        That they were -- they would -- they had
25  participated in third party investigations.  Probably

Page 97

1   fairly recently.  I can't tell you dates, of -- from
2   what I know for certain is a student allegation with
3   another student that took place off campus years
4   before.
5   Q.        So you -- your understanding is that Cozen
6   O'Connor participated in third party investigations
7   relating to -- what?
8   A.        I guess any sexual allegations that took
9   place regarding people involved at the school, whether
10  it was student/student, faculty/student.  I don't know
11  what else it would be.
12  Q.        So you were -- let me start again.  Is it
13  correct that when you talked to Mr. Rees that was the
14  first time you heard Cozen O'Connor's name, right?
15  They were already participating in third party
16  investigations?
17         MR. JUBB:  Objection.
18         THE WITNESS:  They had already done one,
19         I'm sure.
20  BY MS. DOUGHERTY:
21  Q.        Okay.  So before you spoke to Mr. Rees on
22  April 21st, 2018, you believed that Cozen O'Connor had
23  already conducted a third party investigation?
24  A.        Yes.  Because I believe the -- I can't tell
25  you a date, but I'm pretty sure it was after I went to

Matthew Ralston
July 01, 2021                                    98 to 101

Page 98

1   work at the school -- back to work at the school.  He
2   sent a letter in which it was referenced that they had.
3   And maybe -- yeah, I think it was after I went back.  I
4   know it was.  I want to guess like November of '17,
5   maybe.
6               MS. DOUGHERTY:  They're already marked
7               D-1 and D-2.  I'm sorry.  They already have
8               stickers.  I'm going to use it as previously
9               marked.
10  BY MS. DOUGHERTY:
11  Q.      Let's start with D-2, if we could.
12  A.      Okay.
13  Q.      So I'm showing you a document that's been
14  previously marked as D-2.  It's dated April 23rd, 2016.
15  It says a message from the headmaster, under The Hill
16  School logo at the top of the first page.
17              MS. DOUGHERTY:  For those watching via
18              Zoom it's my document number 24.
19  BY MS. DOUGHERTY:
20  Q.      Have you seen the letter that I've marked as
21  D-2 before I just showed it to you?
22  A.      Yes.
23  Q.      When did you first see the letter that's been
24  marked as D-2?
25  A.      I can't tell you dates.  It would have been

Page 99

1   after -- after April 11th, 2018.  After April 21st,
2   2018.
3   Q.      I'm sorry, so you didn't see the April 23rd,
4   2016 letter that's been marked as D-2 until after April
5   21st, 2018?
6   A.      Yes, ma'am.  I didn't work for the school in
7   April 23rd, '16.
8   Q.      Right.  So the school -- the letter says,
9   "Dear Hill School alumni and parents", right?
10  A.      Yes.
11  Q.      So you didn't see the April 23rd, 2016 letter
12  that's been marked as D-2 after you were rehired by the
13  school in July 2016?
14  A.      Not that I recall.  No.
15  Q.      So the first time you saw the April 23rd,
16  2016 letter is -- let me start again.  Who -- how did
17  you come to review the April 23rd, 2016 letter that's
18  been marked as D-2 after April 21st, 2018?
19  A.      If I remember correctly, it's referenced in
20  the 20 -- November 20th letter, perhaps.
21  Q.      Are you talking about D-1?  Let me just
22  identify it for the record.
23  A.      Yes.
24  Q.      D-1 is a document that was previously marked
25  at another deposition.  It's a series of e-mails, but

Page 100

1   the e-mail that I want to direct your attention to
2   starts in the middle of the first page.  It says, from
3   headmaster Zachary G. Lehman.  And it's the -- this one
4   is to Kurtis Poulos.
5               THE WITNESS:  Geez.  I'm sorry.
6               MS. DOUGHERTY:  You okay?  Oh, yeah.
7   Let's go off the record for a moment.
8               THE VIDEOGRAPHER:  Going off the record.
9   Time is 12:39.
10              *   *   *
11              (Whereupon, a short break was taken.)
12              *   *   *
13              THE VIDEOGRAPHER:  Back on 12:44.
14  BY MS. DOUGHERTY:
15  Q.      Are you all right now?
16  A.      I hope so.
17  Q.      All right.  See we were looking at D-1.  I
18  was directing your attention to the e-mail in the
19  middle of the page.  You referenced something from
20  November 20th, 2017.  Is this what you're talking
21  about?
22  A.      Yes.
23  Q.      So the e-mail from headmaster Zachary Lehman
24  that says "Historical allegations of sexual abuse at
25  The Hill".

Page 101

1   A.      Yes.
2   Q.      When -- so you received -- I realize the
3   version you're looking at right now is an e-mail to
4   Kurtis Poulos.  But did you receive a copy of
5   headmaster Zachary G. Lehman's --
6   A.      I would have at that point, yes.
7   Q.      -- November 20th, 2017 e-mail?
8   A.      Yes.
9   Q.      Did the e-mail go to all the faculty, or the
10  students, do you know?
11  A.      I'm guessing it did.  It certainly went to
12  our office, because we worked with alumni.
13  Q.      Okay.  So --
14  A.      And I would be surprised if it didn't go to
15  Zachary as well, but.
16  Q.      Do you have a specific recollection of
17  reading this e-mail, Historical Allegations of Sexual
18  Abuse at the Hill, from Zachary Lehman on November
19  20th, 2017?
20  A.      Not reading it on that day, I don't
21  specifically remember.
22  Q.      Did you read it close in time to --
23  A.      Beg your pardon?
24  Q.      Did you -- did you read the e-mail from Mr.
25  Lehman close in time to when you received it?

Page 102

```
1   A.        I would've --
2   Q.        -- November 20th, 2017?
3   A.        -- definitely -- I would've definitely read
4   it when I received it.  If I recall sitting down at my
5   computer reading it, if that's what you're asking, the
6   answer is no.  I would have read it specifically,
7   because of the -- one, I was an employee of the school
8   and it came from the headmaster.  Two, it was a time
9   period where there were lots of -- not at the school,
10  but culturally, Me Too.  I was, am -- there was an
11  incident referenced between a -- two students off
12  campus at a party.  And I can't recall which one of
13  these --
14  Q.        Yeah, we'll get there.
15  A.        -- it was in.  I knew of that incident
16  because of Facebook.  And a young woman that was
17  involved in that also posted a, without naming names or
18  her school, posted it on -- on her Facebook page.  And
19  we were friends and I'd been a teacher at the school
20  when she was there, so I knew her.
21  Q.        Here's what I'm trying to learn.  That you
22  read the e-mail from Ms. Lehman --
23  A.        Yes, I did.
24  Q.        -- Historical Allegations of Sexual Abuse at
25  The Hill in November 2017?
```

Page 103

```
1   A.        Yes.
2   Q.        When you read the November 20th, 2017 e-mail
3   from Mr. Lehman, Historical Allegations of Sexual Abuse
4   at The Hill, is that the first time you learned of
5   allegations of sexual abuse at The Hill?
6   A.        No.
7   Q.        When did you first learn of allegations of
8   sexual abuse at The Hill?
9   A.        Would have been the school year of 1992, '93.
10  Q.        First year you worked at The Hill School?
11  A.        Yes.
12  Q.        What did you learn during the school year of
13  1992 to 1993 related to sexual abuse at The Hill?
14            MR. JUBB:  Just -- objection to the
15        form.  Allegations of sexual abuse at The
16        Hill.
17            MS. DOUGHERTY:  Did I say something
18        else?
19            MR. JUBB:  You forgot the allegation
20        words.
21            MS. DOUGHERTY:  Okay.  Let me ask it
22        again.
23  BY MS. DOUGHERTY:
24  Q.        What did you learn during the 1992 to 1993
25  school year regarding allegations of sexual abuse at
```

Page 104

```
1   The Hill?
2   A.        The school was involved in a lawsuit of a
3   former faculty member.  Defamation.  He had been
4   terminated for allegations of sexual abuse.  That was
5   before I was employed there.  The -- the -- his suit
6   came as a result of apparent comments that were made in
7   a faculty meeting.  I wasn't there.  It was prior to my
8   employment.  But the defamation suit went to trial in
9   Philadelphia my first year.  He was awarded a large
10  award.
11            There were mentions of it in faculty
12  meetings, people not to talk about it.  Of course I
13  didn't know what it -- I mean, what it was.  Didn't
14  know any of the parties.  And the -- the award by the
15  court was very large.  And then it was overturned in an
16  appellant court.
17  Q.        Okay.  So sometime before you worked at The
18  Hill School a teacher had sex with a student, is that
19  right?
20  A.        I didn't say that.  I said alleged.
21  Q.        Okay.
22  A.        There were allegations filed again him.  I
23  have no idea.
24  Q.        Well, he was terminated for it, right?
25  A.        He was.
```

Page 105

```
1   Q.        Okay.  So before he --
2   A.        It's my understanding.  I wasn't there.
3   Q.        I understand.  So before you -- you learned
4   -- how did you learn about -- how did you learn this
5   information that a teacher had been terminated --
6   A.        I learned --
7   Q.        Hold on.
8   A.        I'm sorry.
9   Q.        How did you learn the information that
10  a teacher had been terminated for sexual abuse?
11            MR. JUBB:  Objection to the form.
12            THE WITNESS:  It was in the context of
13        the lawsuit he had brought against the
14        school.
15  BY MS. DOUGHERTY:
16  Q.        Did you read the lawsuit?  Or did some
17  teacher tell you in the faculty room?  How -- how did
18  you learn?
19  A.        It was -- periodically the headmaster at that
20  time, or the associate headmaster at that time, would
21  remind people not to talk about it.  And maybe gave up
22  dates and who it was.
23  Q.        Who was the headmaster at the time?
24  A.        Charles Watson.
25  Q.        So you learned of the teacher involved in the
```

Page 106

1   alleged sexual abuse?  Did you learn the identity of
2   the teacher who was involved in the alleged sexual
3   abuse and then sued the school?
4   A.        Yes.
5   Q.        Who was that teacher?
6   A.        His name was Wendell Chestnut.
7   Q.        And the alleged sexual abuse was between Mr.
8   Chestnut and a student?  Or Mr. Chestnut and --
9   A.        My understanding --
10  Q.        -- another faculty member?
11  A.        My understanding a student.
12  Q.        And then based on what you heard, or learned,
13  Mr. Chestnut sued The Hill School because faculty
14  members were talking about the alleged sexual abuse in
15  faculty meetings?
16  A.        I have no idea what took place in the faculty
17  meeting.  I don't know.
18  Q.        I'm just asking your understanding of what
19  you heard.
20  A.        That there was mention of it with his name in
21  a faculty meeting.  I have no idea what was said.
22  Q.        Yeah, he -- Mr. Chestnut -- your
23  understanding is that Mr. Chestnut filed a defamation
24  action against The Hill School, is that right?
25  A.        That is correct.

Page 107

1   Q.        And your -- what you heard or came to learn
2   is that Mr. Chestnut filed a defamation suit against
3   The Hill School because of comments made about his
4   termination for alleged sexual abuse, is that right?
5   A.        Yes.
6   Q.        And your understanding is it went to trial,
7   there was a large award, and then it was overturned?
8   A.        Yes.  It was front page Philadelphia Inquirer
9   news.
10  Q.        Were there -- were there other times that you
11  learned information about allegations of sexual abuse
12  at The Hill, other than the situation with Mr.
13  Chestnut?
14  A.        Not in my tenure as a teacher.
15  Q.        Okay.  How about when you returned in July of
16  2016?
17            MR. JUBB:  Objection to the form of
18            that.
19            THE WITNESS:  Prior to my return.
20  BY MS. DOUGHERTY:
21  Q.        Okay.  So you did -- so the -- when you were
22  a teacher at Hill School from 1992 to 2009, is that
23  right?
24  A.        Yes.
25  Q.        So when you were a teacher at The Hill

Page 108

1   School, the only instance -- allegation of sexual abuse
2   at The Hill that you learned information about was the
3   circumstances with Mr. Chestnut, is that right?
4   A.        Correct.
5   Q.        Sometime after you left The Hill you learned
6   additional information about allegations of sexual
7   abuse at The Hill?
8   A.        Yes.
9   Q.        Tell me about that.
10  A.        It was no physical abuse.  There was a man
11  who was a tennis coach on the girls team who had made
12  advances and sent e-mails to one of the players on his
13  team.  I was not there.  I heard.  And I know he was
14  terminated.
15  Q.        How did you hear about it?
16  A.        I don't recall.  I'm sure somebody probably
17  told me.
18  Q.        Is this when you were at the Leelanau school?
19  A.        It is.
20  Q.        When did you learn that there had been
21  inappropriate communications between a tennis coach and
22  a female student?
23  A.        I don't -- I can't tell you what year that
24  happened.  It was not long after I left.  But I can't
25  tell you whether it was school year '09, '10, I can't

Page 109

1   tell you.  I don't remember.
2   Q.        Okay.  So closer to 2009 then 2016?
3   A.        Yes.
4   Q.        Any other times that you learned about
5   allegations of sexual abuse at The Hill, other than the
6   circumstances with Mr. Chestnut and the tennis coach?
7   A.        Not involving a faculty member.
8   Q.        Okay.  How about the allegations of sexual
9   abuse not involving a faculty member?  Tell me about
10  that.
11  A.        The one that was posted on Facebook.  Young
12  woman, and, again, this was during Me Too, put up --
13  put up a large post saying she had been -- she had lied
14  about her weekend plans away from school, went to a
15  party, had got drunk.  She passed out and woke up when
16  there was another student.
17  Q.        So a female student posted on Facebook that
18  she was raped by a male student?
19  A.        Yes.  Thank you for the word.  Yes.
20  Q.        That -- was that posted on the young woman's
21  Facebook page?
22  A.        Yes.
23  Q.        And you were Facebook friends with her?
24  A.        Yes.
25  Q.        Are you Facebook friends with other students?

Matthew Ralston
July 01, 2021                                                110 to 113

Page 110

1  A.       Yes.  Form -- Yes.  Former students.
2  Q.       So the woman was a former student of yours?
3  A.       Yes.
4  Q.       And -- go ahead.
5  A.       Yes.  I didn't -- when we say student -- or
6  when I say student, I don't necessarily mean in my
7  class.  She was never a student in my class.  I was the
8  academic dean, director of studies.  Oversaw academic
9  schedules and student progress.  I knew her in that
10 capacity.  And students would often see me for math
11 extra help.  And I'd be surprised if she wasn't one of
12 those.
13 Q.       So this Facebook post, when did it happen?
14 A.       Wow.  Dates I can't tell you.  It was --
15 Q.       Were you teaching at the Leelanau School?
16 A.       It was the early Me Too period.  I was not
17 The Hill School.  I was still at Leelanau.
18 Q.       And is it correct that the woman was
19 recounting a rape that had occurred many years before
20 when she was a student at The Hill School?
21 A.       Yes.  Although she referred it to high
22 school.  But, again, she posted in general.
23 Q.       Just going back to D-1.  If you go to the
24 second page, at the bottom.  It -- there's a paragraph
25 -- looking at Garabedian 030.  The last couple

Page 111

1  sentences of the last paragraph on the second page of
2  D-1.  It says, "Recently, as part of the Me Too
3  movement, we learned of an account by an alumni who
4  shared such an incident that occurred off campus in the
5  late 1990's when she was a student and involved a male
6  student at The Hill.  "I immediately reached out to her
7  and we have carefully reviewed that situation as well."
8          So that commentary by Mr. Lehman is -- your
9  understanding, refers to the young woman who posted on
10 Facebook about it, is --
11 A.       Yes.
12 Q.       -- when she was a student at The Hill School?
13 A.       Yes.
14 Q.       Other than the situation with Mr. Chestnut,
15 the tennis coach, the female student who posted about
16 being raped on Facebook, do you have any other
17 information about allegations of sexual abuse at The
18 Hill?
19 A.       There was -- yes.
20 Q.       What other information do you have about
21 allegations of sexual abuse at The Hill, other than the
22 situation with Mr. Chestnut, the tennis coach and the
23 young woman who posted on Facebook about being raped?
24 A.       It was, again, two students.  This took place
25 in a dormitory.  A male student entered a female

Page 112

1  student's room at night.  It is not my understanding
2  that there was any rape.  My involvement was strictly
3  to provide for -- I actually don't recall if it was the
4  headmaster, it could have been Mr. Rees, the academic
5  progress of the girl.  Prior and post.  A date they
6  would have given me.  That's the information I have on
7  that.
8  Q.       So this circumstance occurred when you were a
9  teacher or when you were back after --
10 A.       No.  I was -- no, no, no, no.  When I was the
11 academic lead.  So I was still there as a teacher.  But
12 with administrative duties.  So my involvement with
13 that was as a function of my administrative duties.
14 Q.       What year was that?
15 A.       I don't know.  Early 2000's.  I can't tell
16 you specifically.
17 Q.       Okay.  So in early 2000 a male student
18 entered a female student's room and sexually assaulted
19 her, but didn't rape her?
20 A.       I -- I -- actually I don't know if there was
21 sexual assault.  School -- it's -- it's strictly
22 prohibited for him to be in the dorm.  It's strictly
23 prohibited to be outside of your own dorm after hours.
24 If he went into her room uninvited, that would have
25 been sufficient to create concern.  I'm sure it's not

Page 113

1  strong enough --
2  Q.       So the female student didn't want him in the
3  dorm room, is that right?
4  A.       Correct.
5  Q.       Whatever the --
6  A.       I can't --
7  Q.       -- details, you considered it to be related
8  to allegations of sexual abuse, is that right?
9  A.       I don't know if the technical definition is
10 sexual abuse.  If it was my daughter I would have
11 looked at that as -- probably I would have looked at
12 that as abuse.  So that's why I shared it with you.
13 Q.       Sure.  What's your definition of sexual
14 abuse?
15 A.       It would start -- well, I'd put harassment as
16 some level of abuse.  That would have -- if it's a
17 scale.  Certainly showing up in someone's room after
18 lights out time at night would be closer in my own mind
19 to abuse than harassment.
20 Q.       So you in your mind, sexual abuse includes
21 using words to harass someone, not necessarily touching
22 someone?  I'm just asking how -- how you perceive it.
23 A.       In the context of student to student, I think
24 -- if -- I believe that that student, and I don't
25 recall what the outcome of that was, I would have felt

Page 114

1  that it was warranted for him to be dismissed from
2  school, because of -- simply because of where he was.
3  If students are harassing publicly other students, I
4  think that's part of what we're teaching in school, is
5  how to -- how not to do that.  To teach the intolerance
6  for that.
7          I believe there were -- I -- the reason I
8  would say going into someone's room -- again, you ask
9  about my mind -- going into someone's room at that
10 hour, would -- the reason I would have that closer to
11 abuse than harassment is because I think it suggests at
12 least an intent of some kind.  And, again, I'm talking
13 about my interaction with students in a residential
14 school.
15 Q.       Was the male student dismissed?
16 A.       I don't recall.  Again, I was -- this -- I
17 don't -- it would have happened in the spring.  I know
18 she was a senior.  And I believe all the questions that
19 came to me were after school had been dismissed.  I
20 can't tell you who the male student -- I don't even
21 know if I was told who the male student was.  I was
22 asked specifically to provide information about the
23 female student's grades.
24 Q.       And you were asked by Mr. Rees and the
25 headmaster at the time?

Page 115

1  A.       It would have been one or the other.  And I
2  don't -- I can't tell you which one.  For some reason
3  my -- my memory is Tom, but I can't be absolutely
4  certain of that.  Rees.  I'm sorry.
5  Q.       And the headmaster in the early 2000's was
6  Dockerty, Dougherty?
7  A.       Dougherty.
8  Q.       Dougherty, okay.  So your definition of
9  sexual abuse includes harassment that doesn't involve
10 touching.  You just think that the punishment should be
11 less.
12          MR. JUBB:  Objection to the form.
13 BY MS. DOUGHERTY:
14 Q.       Is that right?  I'm just asking your
15 definition.
16 A.       I think, in dealing with adolescence, there
17 are those opportunities within that spectrum that are
18 opportunities to teach students, and there are those
19 that cross some line that is not tolerable.  That's not
20 a hard line, because the level of intimidation is
21 subjective.  And intimidation and -- is -- is on that
22 -- clearly on that spectrum.  It pushes it away from
23 just words.
24 Q.       Do you consider intimidation to be abuse?
25          MR. JUBB:  Sexual abuse?

Page 116

1  BY MS. DOUGHERTY:
2  Q.       We can do it that way.  Do you consider
3  intimidation to be sexual abuse?
4  A.       Adult to child, yes.  Child -- or adolescent
5  to adolescent, I would have to see the content.  But it
6  would be one of those that is less -- I would have less
7  tolerance for that even in children.  Adolescent to
8  adolescent.
9  Q.       Okay.  So in your view, intimidation by a
10 faculty member to a student would -- you would consider
11 that sexual abuse?
12 A.       Intimidation?
13 Q.       Yes.
14 A.       If it was sexual intimidation.  If it was
15 intimidation by authority, absolutely not.  I would
16 consider it inappropriate, but it wouldn't be sexual
17 abuse.
18 Q.       Okay.  So if it was intimidation by an
19 authority by a faculty member, to a student, that would
20 just be abuse, right?
21 A.       It would be --
22          MR. JUBB:  Objection.
23          THE WITNESS:  -- abusive treatment.
24          Certainly inappropriate.
25 BY MS. DOUGHERTY:

Page 117

1  Q.       So you agree that the faculty members -- let
2  me start again.  So you agree that if a faculty member
3  engaged in intimidating conduct to one of the students,
4  that the faculty member was committing abuse?
5          MR. JUBB:  Objection to form.
6  BY MS. DOUGHERTY:
7  Q.       I'm just asking you.
8  A.       I would -- I would have to look at the
9  specifics.
10 Q.       Is there ever a time when it's appropriate
11 for an adult to intimidate a child?
12          MR. JUBB:  Objection to the form.
13          THE WITNESS:  No.
14 BY MS. DOUGHERTY:
15 Q.       So then you agree that if a faculty member
16 was intimidating a student, that that is abuse, right?
17          MR. JUBB:  Objection to the form.
18          THE WITNESS:  I think if a student is
19          intimidated by a faculty member, that is
20          different than a student -- a faculty member
21          intimidating a student.
22 BY MS. DOUGHERTY:
23 Q.       What's the difference?
24 A.       Adults, teachers, faculty members, are
25 expected to maintain -- support the rules and values of

Page 118

1 the school. And when students push that, those limits,
2 and however they do, if they're engaged by a faculty
3 member in the context of that, and they feel
4 intimidated because now they're going to go to the
5 dean's office, and they're intimidated by the position,
6 or the people there, that's not abusive at all.
7        If a teacher intentionally speaks down to and
8 condescends to a student and tries to manipulate their
9 behavior in a way to meet their own goals, I consider
10 that abusive.
11 Q.        You said if a teacher speaks down to a
12 student or manipulates the students for the teacher's
13 own goals, that's abuse? In your view.
14        MR. JUBB:  Abusive.
15        THE WITNESS:  It's abusive.
16 BY MS. DOUGHERTY:
17 Q.        Abusive. Well, what's the difference between
18 abuse and abusive?
19 A.        I mean, I can be very literal and say I think
20 it's abusive to threaten a child. It's actually
21 physical abuse to strike them. Or anybody, for that
22 matter. Threatening, in my opinion, is abusive.
23 Acting on threats is abuse.
24 Q.        In your experience at The Hill School, did
25 the Hill School tolerate abusive conduct by teachers

Page 119

1 directed to students?
2 A.        I don't think so.
3 Q.        Okay. So just because conduct is abusive, as
4 compared to abuse, involving striking a student,
5 doesn't mean it's a lesser level of offense by the
6 faculty member, right?
7 A.        The response may be different. So if you
8 consider lesser -- lesser as a -- based on the
9 response, then I think the response could be different.
10 If you have a young teacher who's verbally abusive to a
11 student, or is trying to get them to behave in a
12 certain manner, in a way that's not acceptable,
13 conversation with the appropriate administrator is
14 a perfectly reasonable response. If a teacher lays a
15 hand on a student, that would render a very different
16 response.
17 Q.        Okay. So in your view it's never appropriate
18 for a teacher to touch a student uninvited, is that
19 right?
20        MR. JUBB:  I'll object to the form.
21        THE WITNESS:  No. I don't agree with
22 that.
23 BY MS. DOUGHERTY:
24 Q.        You think it's okay for a teacher to touch a
25 student when a student doesn't agree to be touched?

Page 120

1 A.        I think a teacher can touch a student without
2 a student ask -- without asking a student. I think if
3 the student makes it clear that they don't want to be
4 touched, and the teacher continues to do it, that
5 probably is likely to be that. But I think a teacher
6 casually putting their arm around a student to get them
7 back in line, or touching them on a shoulder to quiet
8 them in an environment where they should be quiet,
9 whether's it's chapel or dining hall during
10 announcements, I don't think that is abusive at all.
11        I think that's being a good parent model.
12 And boarding school teachers are considered in loco
13 parentis.
14 Q.        Other than the situation with Mr. Chestnut,
15 the tennis coach, the young woman who posted on
16 Facebook about being raped, and the incident with the
17 two students in the dormitory, do you have any other
18 information about allegations of sexual abuse at The
19 Hill?
20 A.        No. I'm sorry. I do. My son's sixth form
21 year. There was a case of statutory rape. A sixth
22 form -- a senior boy and a ninth grade girl. Jesus.
23 Wow. How could I forget that.
24        MR. JUBB:  He said Judas, not Jesus.
25 BY MS. DOUGHERTY:

Page 121

1 Q.        Okay. So a senior and a freshman?
2 A.        Yes. So she was not of age of consent, and
3 he was 18.
4 Q.        And you were a teacher at The Hill School at
5 the time, right?
6 A.        Yes.
7 Q.        And was the male student dismissed?
8 A.        He was.
9 Q.        As it relates to the young woman who posted
10 about rape on Facebook, do you know whether there were
11 any consequences for the person who raped the young
12 woman?
13 A.        I don't, officially. I think I've heard that
14 just -- he was a pretty involved and popular kid, and
15 so just through conversation with faculty members, he
16 has been distanced from the school. Whether he did
17 that or the school did that, I don't know.
18 Q.        What about the tennis coach?
19 A.        He was dismissed. Terminated immediately.
20 Q.        For writing text messages with sexual
21 content?
22 A.        Beg your pardon?
23 Q.        For writing text messages --
24 A.        I don't know.
25 Q.        -- with sexual content?

Page 122

1    A.        It was certainly advancing content. I don't
2    know if they were sexual or not.
3    Q.        Okay. Other than Mr. -- the situation with
4    Mr. Chestnut, the tennis coach, the young woman who
5    posted about being raped on Facebook, the two students
6    in the dormitory, and the statutory rape in your son's
7    sixth form year, do you have any other information
8    regarding allegations of sexual abuse at The Hill?
9    A.        I don't think so.
10   Q.        So D-1. Again, back -- back to that. On the
11   first page. It's this one. It has e-mails at the top.
12   (Indicating.)
13   A.        Yeah.
14   Q.        So Mr. Lehman wrote, in the second paragraph
15   of his e-mail, which starts on the bottom of the first
16   page of D-1, "At that time with" -- you know what,
17   before we do that. Do you have a copy of the November
18   20th, 2017 e-mail that you received from Mr. Lehman?
19   A.        I don't. It would have been by e-mail. And
20   when I was terminated I lost access to all of that. So
21   I do not.
22   Q.        So you --
23   A.        Oh, wait a minute. So, yeah, yeah, yeah. So
24   it would have been in my e-mail. Sorry. I was looking
25   at dates. I said I was working there. The question is

Page 123

1    would I have a copy. It would be in my e-mail.
2    Q.        Right. Okay. So you believe you received
3    Mr. Lehman's e-mail to your work e-mail address at The
4    Hill?
5    A.        Yeah.
6    Q.        Which you no longer have access to?
7    A.        Correct.
8    Q.        And you didn't print a copy of the November
9    20th, 2017 e-mail?
10   A.        No. Not that -- I don't think so.
11   Q.        Okay. So now back to the first page, bottom.
12   A.        Okay.
13   Q.        Second paragraph. "At that time, with the
14   unanimous support of the Board of Trustees, I initiated
15   a review of historical allegations of abuse at The
16   Hill, and the school's response to those allegations.
17   This was a proactive review by the school, not
18   initiated by any complaint." Did you read that
19   paragraph when you received the November 20th, 2017
20   e-mail from Mr. Lehman?
21   A.        I'm sure I did.
22   Q.        So at least as of the time you read the
23   November 20th, 2017 e-mail from Mr. Lehman, you knew
24   that the school had already initiated its, on accord,
25   an investigation into historical allegations of abuse

Page 124

1    at The Hill, is that right?
2    A.        Yeah.
3    Q.        And the paragraph continues, "As headmaster,
4    I thought it was important to understand more about the
5    school's history. The Board and I also felt it was
6    imperative that the review be external, objective, and
7    informed by the appropriate expertise. Accordingly, we
8    engaged Leslie Gomez and Gina Smith of Cozen O'Connor,
9    child protection experts nationally recognized for
10   their experience in this area, their objectivity and
11   their candor.
12        So is it correct that as of the time you read
13   the November 20th, 2017 e-mail, is when you learned
14   that Cozen O'Connor was involved in performing third
15   party investigations?
16   A.        Yes.
17   Q.        Did you know that Cozen O'Connor was involved
18   in performing third party investigations for The Hill
19   school prior to receipt of the November 20th, 2017
20   e-mail?
21   A.        I don't believe so, no.
22   Q.        So it's your understanding that Cozen
23   O'Connor wasn't hired in reaction to Mr. Poulos's
24   allegations, is that right?
25   A.        Correct.

Page 125

1    Q.        The following paragraph is the third
2    paragraph of the e-mail, but the second -- or the first
3    full paragraph on the second page of D-1. "Through the
4    review, we learned of several troubling incidents in
5    The Hill School's history. Those incidents involve
6    conduct several decades ago by a small number of
7    faculty members, none of whom have been associated with
8    The Hill for many years, and one of whom is deceased.
9    Do you know who Mr. Lehman was referring to?
10   A.        Only the one. From 19 -- Mr. Chestnut.
11   That's the only one I would have known.
12   Q.        Is he the one who's dead?
13   A.        I don't believe so. I don't think he is.
14   But I don't know.
15   Q.        Okay. So you don't know what incidents Mr.
16   Lehman is referencing in this paragraph?
17   A.        I don't.
18   Q.        If we can go to the third page of D-1. Top
19   paragraph. Mr. Lehman wrote, "I extend an invitation
20   to any Hill School community member who wishes to share
21   his or her experiences with the school, or, if
22   appropriate, with law enforcement. I also encourage
23   any students, parents, alumni, or staff to reach out
24   directly to the school to share your observations and
25   feedback."

Matthew Ralston
July 01, 2021                                    126 to 129

Page 126

1    So is it your understanding that at least as
2    of November 20th, 2017, The Hill School was inviting
3    Hill School community members to report allegations of
4    sexual abuse?
5    A.    Yes.
6    Q.    When you learned about the April 11th, 2018
7    letter detailing Mr. Poulos's allegations, did you
8    believe that Mr. Poulos's letter was sent in response
9    to the invitation by Mr. Lehman in November of 2017 to
10   report allegations of sexual abuse?
11         MR. JUBB: Object to the form.
12         THE WITNESS: I -- I don't think I ever
13            considered it. I don't know.
14   BY MS. DOUGHERTY:
15   Q.    But you at least knew that the school was
16   proactively pursuing and investigating allegations of
17   sexual abuse, even if the allegations were from decades
18   in the past, is that right?
19   A.    I did understand that, yes.
20   Q.    I'm sorry if you already answered this, but
21   was it the November 20th, 2017 e-mail that prompted you
22   to look for and read the April 23rd, 2016 letter which
23   was marked as D-2?
24   A.    In all likelihood, yes.
25   Q.    Because the November 20, 2017 --

Page 127

1    A.    Right.
2    Q.    -- e-mail referenced it?
3    A.    Right.
4    Q.    So the November 20th, 2017 e-mail made you
5    curious to go look to see --
6    A.    Yes.
7    Q.    -- what would have been announced? If you
8    can go back to D-2. If I can just direct your
9    attention to the second paragraph in the middle of the
10   page. Or in the middle of the paragraph. It says,
11   "We" -- this is, again, a letter from the headmaster,
12   Mr. Lehman, April 23rd, 2016. Mr. Lehman wrote, "We
13   also provide annual training to all employees regarding
14   our own policies on harassment and abuse, and how to
15   identify and report any issues at the earliest possible
16   stage.
17         Did you ever participate in an annual
18   training regarding the school's policy on harassment
19   and abuse and how to identify and report any issues?
20   A.    Yes.
21   Q.    Is that something that did happen annually?
22   A.    Something that did?
23   Q.    Did happen annually?
24   A.    I believe it must have. I don't -- I can't
25   tell you when we started doing that. I don't know that

Page 128

1    we did it my first couple years.
2    Q.    Okay. Let's clarify. So in -- how about in
3    July 2000 -- after you rejoined the school, July 2016,
4    did you then participate in the annual training
5    relating to policies on harassment and abuse?
6    A.    I -- I did not.
7    Q.    Okay. So when you say first, you're talking
8    about in 1992, 1993?
9    A.    Yes.
10   Q.    So you participated in training in 1992 or
11   1993 regarding policies on harassment and abuse?
12   A.    We had -- we didn't have -- at that point I
13   don't believe there were ever experts brought in to
14   talk about it. It was discussed in open faculty
15   meetings. It would have been addressed in new faculty
16   orientation. But I don't think there were experts at
17   that point. We did, then, start to do that. Bring in
18   people who were trained in harassment to help -- help
19   people understand that harassment -- what it is.
20         And to keep our eyes open regarding students,
21   what it is. And also what behavior can't be tolerated
22   in adults. After -- after the statutory rape case, we
23   started to have -- I think there are lots of people who
24   don't really understand what that is. And so we
25   started to have -- that became a part of protocol as

Page 129

1    well. I don't -- I'm -- so.
2    Q.    Well, just so I understand what Mr. -- it
3    sounds to me like The Hill School had a policy about
4    harassment and abuse when you started in 1992, 1993.
5    And you learned about it, right? I'm trying to -- what
6    Mr. Lehman described here, I'm trying to learn if you
7    ever participated in anything like he --
8    A.    And I --
9    Q.    -- that he described?
10   A.    Sorry.
11   Q.    So, yes, you have?
12   A.    I have not.
13   Q.    So it sounds like that the annual training
14   that Mr. Lehman was describing, in that sentence that I
15   read to you, something that was instituted after 2009,
16   right?
17   A.    Well, whatever Mr. Lehman instituted would
18   have started well after I left. He started, I believe,
19   in 2014. David Dougherty was the headmaster when I
20   left. I can't tell you what time frame Mr. Lehman is
21   talking about in that letter. But any -- anything he's
22   instituted did not include me.
23   Q.    Right. He just says we. He doesn't even --
24   A.    Right.
25   Q.    -- take credit for it. So it's the annual

Matthew Ralston
July 01, 2021                                         130 to 133

Page 130

1  training that Mr. Lehman described in his April 23rd,
2  2016 letter is not something that existed prior to
3  2009, when you were a teacher at The Hill School,
4  right?
5  A.      No, I said it did.
6  Q.      It did.  Okay.
7  A.      I can't tell you when.  I don't believe there
8  was formal, other than headmaster or associate
9  headmaster speaking prior to David Dougherty.  David
10 Dougherty formalized a lot of things that were
11 happening at the school in his tenure.  I can't -- I
12 don't know what year we first had someone come in from
13 the outside and address us.
14 Q.      Okay.  So sometime before you stopped working
15 for The Hill School as a teacher, you did receive
16 annual training like what Mr. Lehman described in the
17 letter --
18 A.      Yes.
19 Q.      -- reflected in D-2, is that right?
20 A.      Yes.
21 Q.      You just can't remember when?
22 A.      I don't know when it started.  And I can tell
23 you when it would have happened within the course of a
24 year.
25 Q.      Okay.  After the statutory rape?

Page 131

1  A.      No.  That was -- that actually -- they
2  started very specifically including students who would
3  turn 18 during the school year.  That -- that actually
4  happened in the 2005, 2006 school year.  That I know
5  would have happened.  Just so students and even faculty
6  members would be clear what statutory rape is.  A kid
7  -- a kid -- a -- a young man who doesn't know what
8  statutory rape or age of consent is can take she said
9  okay as permission where -- and not understand that
10 she's not able to say that.
11 Q.      Right.  So --
12 A.      So that would have been when, for sure,
13 students became involved.
14 Q.      So when you say that you can say within a
15 year, do you mean like in 2004 --
16 A.      Oh.  No, no, no, no.
17 Q.      -- that's when the annual training --
18 A.      I mean within the course of a school year --
19 Q.      Okay.
20 A.      -- the time periods during that school year
21 where we -- if we -- when we were doing that, which
22 time periods it might have been during.
23 Q.      I understand.  I misunderstood.
24 A.      I'm sorry.
25 Q.      I thought -- I thought you were saying you

Page 132

1  could equate it to --
2  A.      No.
3  Q.      -- a year.  Okay.  So the next paragraph, in
4  the middle, Mr. Lehman is describing a vigorous
5  protocol.
6  A.      Where are we?
7  Q.      Still on D-2.
8  A.      Third line down?
9  Q.      Yeah.  Third line down.
10 A.      Okay.
11 Q.      Second sentence, "We want you to know that
12 The Hill School has a rigorous protocol in place",
13 right?  It continues to describe the protocol.  It says
14 "Includes promptly reporting any suspected incidents of
15 misconduct to ChildLine, Pennsylvania's investigative
16 resource concerning alleged child abuse or neglect."
17 A.      Okay.
18 Q.      Do you know if a report was made to ChildLine
19 regarding Mr. Poulos's allegations?
20 A.      I do not know.
21 Q.      So basically your testimony is you use social
22 media?
23 A.      I do.
24 Q.      When did you start using social media?
25 A.      2009.  When I left The Hill School.

Page 133

1  Q.      So you're on Facebook?
2  A.      Yes.
3  Q.      Is your Facebook page public?
4  A.      No.  I can't tell you the settings to know
5  what a nonfriend can --
6  Q.      So you're friends with former students, is
7  that right?
8  A.      I am.
9  Q.      And by former students, you're not
10 restricting your answer just to --
11 A.      Students.
12 Q.      -- former students that you taught.  You're
13 talking about former students of The Hill School, is
14 that correct?
15 A.      Yes, ma'am.
16 Q.      How many former students of The Hill School
17 are you friends with on Facebook?
18 A.      Wow.  I don't know.  But a lot.  I'm sure
19 it's in the -- it's well over a hundred.  It's probably
20 -- I don't know.
21 Q.      What name do you use on Facebook?
22 A.      Matt Ralston.  I think.
23 Q.      So if I wanted to find your Facebook page I
24 would search for Matt Ralston?
25 A.      Yes.

Matthew Ralston
July 01, 2021                                        134 to 137

Page 134

1   Q.      In Columbus, Ohio?
2   A.      It's one of those things I don't know if it's
3   in there.
4   Q.      Are you friends with Mr. -- let me start
5   again.  Are you Facebook friends with Mr. Poulos?
6   A.      No.
7   Q.      What other types of social media do you use,
8   other than Facebook, if any?
9   A.      I have an Instagram account, but I follow
10  probably four people.  My sons and their better --
11  well, their other halves.  And then I follow some --
12  actually, I don't follow -- I do follow one page on
13  there.  It's Harley Davidson.  And that's about it.  I
14  don't post on Instagram.  I don't really post on
15  Facebook.
16  Q.      Do you have a personal e-mail address?
17  A.      I do.
18  Q.      What's your personal e-mail address?
19  A.      M-A-T-T-R 557.  And that's G-mail.
20  Q.      How long have you used the mattr557@gmail.com
21  email address?
22  A.      I'm not sure, but it's probably about the
23  same time, 2009.  And it may be after that a little
24  bit.
25  Q.      Do you have any other e-mail address that you

Page 135

1   use, other than --
2   A.      I do.
3   Q.      mattr557 --
4   A.      There's a Yahoo account.  And That's R-A-L-S
5   92.  And that's why I can't -- I don't use that for
6   personal e-mail.  I use it for junk.  But it was
7   personal in -- I don't know, when I first got e-mail.
8   Q.      So that's what you used before 2009 when you
9   started using mattr557@gmail.com?
10  A.      I would have used The Hill School address.
11  Q.      Before we get there, when did you use the
12  rals92@yahoo.com address?
13  A.      Yes.
14  Q.      When?
15  A.      When did I start or stop?
16  Q.      Let's go with stop.
17  A.      It would be when I opened the gmail account.
18  And that's the influence of my sons.  And I -- I can't
19  tell you exactly.  I know Facebook was 2009.  And I --
20  because it's when I left the school.  I had a friend
21  who said I'm going to want that, because it will help
22  people get a hold of me.  Gmail might have been a
23  little after that, but it's right in there somewhere.
24  Q.      Okay.  When did you start using the Yahoo
25  address?

Page 136

1   A.      I don't know.  Mid/late '90s somewhere.
2   Q.      Have you used any other e-mail address for
3   personal e-mail?
4   A.      No.
5   Q.      And so when you were at The Hill School from
6   July 2016 to October 2019 what e-mail address did you
7   use?
8   A.      For?
9   Q.      At The Hill School?
10  A.      For The Hill School?
11  Q.      Yes.
12  A.      mralsto@thehill.org.
13  Q.      Is that the same e-mail address you used when
14  you were a teacher at The Hill School?
15  A.      It is.
16  Q.      And then back to April 21st, 2018.  So you
17  spoke to Mr. Rees on the telephone.  And what did you
18  do?
19  A.      I don't know that I spoke to him on the 21st.
20  It was soon thereafter.  Very well could have been the
21  21st.  What did I do afterwards?
22  Q.      Let's just -- let me just clarify that.  I
23  thought you told me you that had your meeting with Mr.
24  Lehman?
25  A.      I did.  Called my wife.

Page 137

1   Q.      You went home.  Or went to the place where
2   you were staying on campus, you called your wife and
3   then you called Mr. Rees.
4   A.      I think what I said, my next call regarding
5   this would have been Mr. Rees.
6   Q.      Okay.
7   A.      And I -- because I -- I actually think it was
8   a Friday.  Not a Thursday.  It probably was the same --
9   if it was a Friday, it would have been the same day.  I
10  wouldn't have -- I wouldn't have -- it's not me to wait
11  through the weekend with that.
12  Q.      Okay.  So you think it's either the same day
13  or the next business day?
14  A.      Yes.  If it wasn't -- it wasn't the Friday,
15  it was the Monday.
16  Q.      Did you do anything else on April 21st, 2018
17  regarding the letter relating to Mr. Poulos's
18  allegations?
19  A.      Well, it was --
20  Q.      I'm just asking you --
21  A.      -- it --
22  Q.      Hold on a second.
23  A.      Okay.
24  Q.      I'm just asking you about the day when you
25  had the meeting with Mr. Lehman and you first learned

Matthew Ralston
July 01, 2021                                    138 to 141

Page 138

1    that the letter existed and you received the letter.
2    Did you do anything else, other than your meeting Mr.
3    Lehman, speak to your wife, read the letter, did you do
4    anything else on that day relating to Mr. Poulos's
5    allegations?
6    A.        Yes.
7    Q.        What?
8    A.        Chris Chirieleison.  I can spell that for
9    you.
10   Q.        Yeah.
11   A.        C-H-I-R -- I got to get the I-E.  Let's see.
12   Q.        Spoke too soon.
13   A.        E-I-S-O-N.  I don't know.
14             MR. JUBB:  It's in the disclosure.
15   BY MS. DOUGHERTY:
16   Q.        Okay.  Go ahead.
17   A.        Chris --
18   Q.        It's a he, right?
19   A.        He, I'm sorry.
20   Q.        Let's just call him Chris.
21   A.        He and I have been friends since 1992.  He
22   left the school somewhere in the late '90s.  We've been
23   in touch since.  Our relationship is deeply personal.
24   He was the sponsor of our oldest son.  He was the dean
25   of students during those years.  Or he may have been in

Page 139

1    the admission office then.  But he was in the
2    administration when the letter came out.  And I went
3    and shared it with him.
4    Q.        So Chris was in the administration of The
5    Hill School?
6    A.        Yes.
7    Q.        So on April 21st, 2018, the same day that you
8    met with Mr. Lehman, and you learned and read the
9    letter, you went and met with Mr. -- with Chris?
10   A.        Probably it was that day.  Or it would have
11   been the next morning.  That was -- that weekend was a
12   career day, so time was pretty structured with
13   obligations for me.
14   Q.        Did you say time was pretty structured?
15   A.        Time.  Obligations, yeah.
16   Q.        Gotcha.  So you met with Chris in person
17   about the letter?
18   A.        I did.  I went to his -- his family lived on
19   campus and I went to their home.
20   Q.        And you brought the letter with you?
21   A.        At that point I had a printed copy.
22   Q.        Where did you get the printed copy?
23   A.        I printed it somewhere.  Maybe in our office.
24   I didn't have a printer at home.  I mean at the --
25   where I stayed on campus, so it's probably in the

Page 140

1    office.  The development office.
2    Q.        So after you got the e-mail from Mr. Lehman
3    that included the letter, you then went to the office
4    and printed it and then went to Chris?
5    A.        I did print a copy, yes.  Yes.
6    Q.        Okay.  You gave Chris a copy of --
7    A.        I did not give him a copy.  I shared the copy
8    I had with him.
9    Q.        Okay.  So you gave your copy of the April
10   11th, 2018 letter to Chris for him to read, is that
11   right?
12   A.        Yes.
13   Q.        And this is on April 21st, 2018?
14   A.        Or the next morning.
15   Q.        Or the next morning.  Okay.  And then what
16   did Chris say?  When you shared the letter with him?
17   A.        Something -- I think I remember exactly.  He
18   said he wasn't going to give the dignity of finishing
19   it, because he knows there is no fact to it.  Not --
20   that it's -- may I use his word?
21   Q.        Sure.
22   A.        It's bullshit.
23   Q.        Just to jump back to Mr. Rees for a second so
24   I don't forget.  Did Mr. Rees already know about the
25   letter when you contacted him?

Page 141

1    A.        Yes.
2    Q.        Did Mr. Rees tell you how he already knew
3    about the letter when you contacted him?
4    A.        No.
5    Q.        Did you ask him?
6    A.        No.
7    Q.        Okay.  So on April 21st, 2018, or the
8    following morning, you shared the letter that you had
9    then printed, the letter being the April 11th, 2018
10   letter marked as D-15, with Chris, and he started
11   reading it and he told you it was bullshit, right?
12   A.        He said he wasn't going to give it the
13   dignity of finishing it.
14   Q.        So Chris didn't believe the accusations by
15   Mr. Poulos reflected in the April 11th, 2018 letter
16   that's been marked as D-15, is that right?
17   A.        He did not believe the content, is that what
18   you're asking?
19   Q.        Yes.
20   A.        No.  He did not.
21   Q.        Did Chris already know about the letter
22   before you showed it to him?
23   A.        Not to -- I don't think so.  No.
24   Q.        Okay.  So it's your understanding that the
25   first time Chris learned about the April 11th, 2018

Page 142

1  letter that's been marked as D-15 is when you shared
2  your printed out copy with him?
3  A.        Yes.
4  Q.        And Chris said he wasn't going to give it the
5  dignity of finishing it and it was bullshit.  Anything
6  else?
7  A.        No.
8  Q.        What did you do next as it relates to the
9  April 11th, 2018 letter that's been marked as D-15?  Or
10 the accusations by Mr. Poulos?
11 A.        I can't tell you order.  I can tell you in
12 general.  And I -- I don't even know if they were that
13 visit, but certainly I shared it with my wife.  I've
14 got a brother, Mark, who is two years younger.  We
15 speak nearly daily.  I shared it with him.  Not
16 printed, but told him that it existed.  I doubt I even
17 read it.  I have another friend who is a head --
18 another headmaster at the time, with whom I've worked
19 closely and coached together at The Hill School.  We
20 speak -- we spoke often daily when I was a headmaster.
21 Our friendship's 20 years old as well.
22 Q.        What's his name?
23 A.        Chris Hopkins.
24 Q.        All right.  So you --
25 A.        And --

Page 143

1  Q.        -- contact -- we'll keep down the list, but
2  just so we don't get too far ahead.  So you contacted
3  your brother, Mark Ralston?
4  A.        Yes.
5  Q.        Told him about the letter?
6  A.        Yes.
7  Q.        And did you read the April 11th, 2018 letter
8  that's been marked as D-15 to your brother, or give him
9  a copy of it?
10 A.        I did not give him a copy.
11 Q.        Did you read it to him?
12 A.        I don't remember if I read it to him or just
13 gave him a summary.
14 Q.        What did your brother say?
15 A.        He was sorry I had to deal with that.  I --
16 and he's one who obviously knows it isn't true.  I
17 can't tell you word for word.
18 Q.        So your brother didn't believe it?
19 A.        No.
20 Q.        As it -- before we get to Chris Hopkins, as
21 it relates to Chris Chir -- how do you say it?
22 A.        Chirieleison.
23 Q.        Chirieleison.  Chris Chirieleison.  Before
24 April 2 -- let me start again.  Before April 21st,
25 2018, is it your belief that Chris Chirieleison had a

Page 144

1  high opinion of you?
2  A.        Yes.
3  Q.        Is it your understanding that as of today
4  Chris Chirieleison still has a high opinion of you?
5  A.        Yes.
6  Q.        So it's your belief that nothing that Chris
7  Chirieleison read in the April 11th, 2018 letter that's
8  been marked as D-15 affects his opinion of you, is that
9  right?
10 A.        Yes.
11 Q.        You're still friendly with Chris
12 Chirieleison?
13 A.        Yes.
14 Q.        So Mr. Chirieleison hasn't stopped
15 associating with you, based on anything that he read in
16 the April 11th, 2018 letter that's been marked as D-15,
17 is that correct?
18 A.        Correct.
19 Q.        Are you still in contact with Mr. Rees?
20 A.        No.
21 Q.        Prior to April 21st, 2018, was it your belief
22 that Mr. Rees had a high opinion of you?
23 A.        Yes.
24 Q.        Do you believe that Mr. Rees still has a high
25 opinion of you?

Page 145

1  A.        I -- yes.  I guess.  I haven't talked to him
2  in a year and a half.
3  Q.        Okay.  So as of the last -- so the last time
4  you talked to Mr. Rees was a year and a half ago, is
5  that right?
6  A.        Yes.
7  Q.        Okay.  So as of the last time you had
8  communication with Mr. Rees, is it your understanding
9  and belief that Mr. Rees still had a high opinion of
10 you?
11 A.        Yes.
12 Q.        So is it correct that nothing Mr. Rees read
13 or learned about any of the accusations by Mr. Poulos
14 changed Mr. Rees's high opinion of you, is that right?
15         MR. JUBB:  Objection to the form.
16         THE WITNESS:  As far as I know.
17 BY MS. DOUGHERTY:
18 Q.        Did you ever have contact with Mr. Rees,
19 socially or other than in his capacity as the school's
20 lawyer?
21 A.        No.
22 Q.        Nothing that your brother learned about the
23 accusations -- let me start again.  Is it your belief
24 that nothing that your brother learned about the
25 accusations by Mr. Poulos changed his high opinion of

Page 146

1   you?
2   A.        Nothing changed.
3   Q.        And your brother hasn't stopped associating
4   with you based on what he learned about Mr. Poulos's
5   accusations, is that right?
6   A.        No.  It is right.
7   Q.        Okay.  And then -- so Chris Hopkins.  You
8   were telling us about Chris Hopkins.  You shared the
9   information about --
10  A.        I did.
11  Q.        -- Poulos's accusations with Mr. Hopkins?
12  A.        I did.
13  Q.        Did you share specifically the April 11th,
14  2018 letter that's been marked as D-15 with Mr.
15  Hopkins?
16  A.        I've shared the letter with no one.  Content
17  of it.  I can't tell you if I read it to him, or if I
18  -- again, what I did with my brother was say -- and
19  that is give him a summary of it.
20  Q.        Well, you shared the letter with Chris Chir
21  -- how do you say it again?
22  A.        Hop -- oh, Chirieleison.
23  Q.        Yeah, Chirieleison.  You did share the letter
24  with Chris Chirieleison, right?
25  A.        I did.

Page 147

1   Q.        You let him look at your copy?
2   A.        Because we were visit -- yes.  He looked at
3   my copy of it.  And it left with me.
4   Q.        Did you meet -- did you meet Mr. Hopkins in
5   person, or did you talk to him on the phone?
6   A.        No, we were on the phone.
7   Q.        So you either read the letter to him or
8   communicated the content of the April 11th, 2018 letter
9   to Mr. Hopkins, is that right?
10  A.        I did.
11  Q.        And what was Mr. Hopkin's reaction?
12  A.        Very similar.  Didn't believe it.  Sorry I
13  had to deal with it.  Because he's a headmaster, also
14  knows Tom Rees, I can't tell you specifically, but we
15  would have talked about next steps for the school and
16  what's going on.  As far as process.
17  Q.        Were you making these telephone calls while
18  you were still on campus --
19  A.        No.
20  Q.        -- after the April 21st, 2018 meeting with
21  Mr. Lehman?
22  A.        No.
23  Q.        You were back in Ohio?
24  A.        Yes.
25  Q.        Do you -- can you place the time, you know,

Page 148

1   an estimate, or without completely guessing, how close
2   in time to the April 21st, 2018 meeting --
3   A.        It would have --
4   Q.        Hold on a second.
5   A.        Oh, I'm sorry.
6   Q.        -- that you contact with your brother and Mr.
7   Hopkins?
8   A.        It would have been very close in time.  It
9   would not have been weeks.  It would have been pretty
10  quickly after I was away from campus.
11  Q.        Okay.  So pretty soon after you got back
12  home --
13  A.        Yes.
14  Q.        -- you contacted your brother and Mr.
15  Hopkins.  Anyone else?  You were going through the list
16  when I stopped you at the first two.
17  A.        Yeah, I'm sorry.  I can't tell you when this
18  happened.  But I did speak with Geoff Neese.
19  Q.        That was your supervisor at The Hill School
20  at the time, right?
21  A.        Yes.
22  Q.        So you told Mr. Neese about the April 11th,
23  2018 letter that's been marked as D-15?
24  A.        I did.
25  Q.        Did Mr. Neese already know about the letter?

Page 149

1   A.        No.  Not to my knowledge.
2   Q.        So you can't place, in any way, when you told
3   Mr. Neese about the April 11, 2018 --
4   A.        It would have been --
5   Q.        -- letter?
6   A.        It would have been pretty soon.  It was in
7   person.  So I know I was on campus.  What I recognized
8   was that it was impacting my work, because it was
9   present in every conversation I had with an alumnus.
10  Or a member of the alumni.
11  Q.        I'm sorry, you talked about Mr. Poulos's
12  allegations in every conversation you had with alumni?
13  A.        That is -- no.  I said it was present in me.
14  No, I didn't talk about it with anybody.
15  Q.        Except for the people you're telling me?
16  A.        Yes.  You said when I was meeting with
17  alumni, and I'm saying, no, I didn't have that
18  conversation.
19  Q.        Here's what I'm trying to do.  I'm trying to
20  understand your comment that it was affecting your
21  work, as it was present in every conversation with
22  alumni.
23  A.        The -- I'm sorry.  Yeah.  I can explain.
24  Q.        Because that's what surprised me.
25  A.        Yeah.  It would have me too.  No, I never

Matthew Ralston
July 01, 2021                                          150 to 153

Page 150

1  mentioned it that way.  It didn't change -- it changed
2  my daily life, because it was always present in me that
3  I've been accused in this.  I was representing the
4  school and the values of the school and trying to find
5  supporters for the school.  And my constant fear was
6  that if the -- if the letter proceeded beyond that, all
7  of these people I was meeting with were going to have a
8  very different picture of me than what I was sharing
9  with them.  Which was long term faculty member, had a
10  very good career as a teacher.  Administrator.
11        I came back to The Hill after serving as a
12  headmaster similar in this capacity, because I love the
13  school.  That's where I raised my family.  And
14  represented the school.  And my fear was that that was
15  going to damage not only my relationships that I was
16  building with these people but everything I was doing
17  on behalf of the school.  So when I was saying it was
18  present, it was a fog or a shadow of every conversation
19  I had with people in regards to the school.
20  Q.      Okay.  The fog or shadow was that, like, you
21  worried that somebody was going to ask you about it?
22  A.      No.
23  Q.      Okay.
24  A.      It was that --
25  Q.      Well, why weren't you worried that somebody

Page 151

1  was going to ask you about it?
2  A.      Well, because at that point it was a letter
3  to -- Mr. Lehman.
4  Q.      Okay.  So no --
5  A.      So the first --
6  Q.      -- so alumni didn't know about it at that
7  point in time, is that right?
8  A.      Not that I know of.
9  Q.      Okay.
10  A.      What I know is that with all the other things
11  that you -- we've discussed, once things go public,
12  than everybody knows.  So this threatened, from my
13  perspective, every relationship I had that was sourced,
14  or had its beginning at The Hill School.
15  Q.      Well, what was the basis for your belief that
16  the allegations by Mr. Poulos were public?
17  A.      That -- this says this is an attempt to
18  settle and compromise claims and with -- with Mr.
19  Ralston and should not be seen as evidence of any court
20  hearing.  That sentence doesn't matter.  But what
21  happens if an attempt to settle doesn't -- doesn't
22  happen?
23  Q.      Okay.  You acknowledge that the April 11th,
24  2018 letter that's been marked as D-15 doesn't threaten
25  to make things public, right?

Page 152

1  A.      I don't acknowledge that at all.
2  Q.      Well, what --
3  A.      You're asking how I read it.  I'm telling you
4  that if someone says to me this is an attempt to settle
5  and compromise claims, that, to me, implies that it's
6  an attempt.  What happens after that if there is not a
7  settlement?
8  Q.      Okay.  So you were concerned that if The Hill
9  School didn't settle with Mr. Poulos, that -- what?
10  A.      I -- I don't know.  My understanding --
11  Q.      How do you connect that to publicity?
12  A.      My understanding of the world is if there's
13  an attempt to settle and it doesn't happen, the next
14  step is somebody files a suit, or charges, or makes
15  some sort of public statement.
16  Q.      So was a lawsuit filed against you by Mr.
17  Poulos?
18  A.      No.
19  Q.      Were charges filed against you?
20  A.      No.  But you're asking -- you're asking
21  questions after this letter came out and about my work.
22  And how would I know if, after receiving this letter,
23  not -- not to mention later, how -- how would I know
24  that nothing was going to be filed?
25  Q.      Okay.  I'm trying to understand the fog and

Page 153

1  constant fear that you were experiencing after you went
2  back to Ohio after the career weekend, April 21st,
3  2018.
4        MR. JUBB:  That's not a question yet.
5        That's just a background.  She'll ask a
6        question.
7        THE WITNESS:  Is that a question?
8        MS. DOUGHERTY:  Well --
9        MR. JUBB:  I'm asking her to fix her
10        question.
11        MS. DOUGHERTY:  That's fine.  I'm just
12        trying to think what the problem is.
13        MR. JUBB:  It was a statement.
14        MS. DOUGHERTY:  I'm not very sure that
15        it was, but that's okay.
16  BY MS. DOUGHERTY:
17  Q.      Why were you in constant fear?  And I think
18  you described it as a fog, when you returned to Ohio
19  and were carrying out your duties as a --
20  A.      Because there's --
21  Q.      Hold on one second.  I don't remember your
22  title.  (Continued) -- as a capital giving officer.
23  Why was a constant fear and fog affecting your ability
24  to carry out your duties as a capital giving officer?
25        MR. JUBB:  Objection to the form.  Asked

Matthew Ralston
July 01, 2021                              154 to 157

Page 154

1   and answered.  Go ahead.
2           THE WITNESS:  Because my job was
3   dependent on relationships.  And I was
4   building relationships, or maintaining
5   relationships with former students in a
6   position representing the school.  I had been
7   accused of what I consider the most heinous
8   thing that can happen to a child.  And I had
9   no way of knowing how that was going to play
10  out, because it wasn't in my hands.
11          It was out of my hands how all of this
12  was going to play out.  And I don't know how
13  to explain to you or what -- what's not
14  clear, why there would be a fear if I'm
15  sitting here asking someone to support a
16  school, that -- and then they -- it comes out
17  somewhere down the road that I was accused of
18  this, how that doesn't jeopardize everything
19  I'm doing, or make me feel like I'm being
20  somewhat -- holding back on building a
21  relationship about the values of the school.
22  BY MS. DOUGHERTY:
23  Q.      Didn't Mr. Rees already tell you that schools
24  typically resolve claims like this, when you spoke to
25  him?

Page 155

1   A.      My name's attached to all of this.
2   Q.      But your fear, as I understood it, that if
3   the school didn't settle and compromise the claims,
4   there would -- somehow the accusations by Mr. Poulos
5   would become null.  You had already spoken to Mr. Rees,
6   who told you that schools typically resolve accusations
7   like this, right?
8           MR. JUBB:  Objection to the form.
9           THE WITNESS:  No.  I don't think he told
10  me they resolved.  He told me that there
11  would be an investigation and the
12  schools act appropriately according to the
13  outcome of that.  I don't know what that
14  resolution is going to be.
15  BY MS. DOUGHERTY:
16  Q.      I think you said "Schools don't fight things
17  like this".
18  A.      Yes.  But I also said --
19  Q.      It's not fighting different than settling, in
20  your mind?
21  A.      Yeah.  In my mind.  Not fighting is hoping it
22  goes away.  I work -- I spent my -- most -- much of my
23  career at a school whose motto is whatsoever things are
24  true.  And here is a letter falsely accusing me of this
25  letter.  I don't think it's okay.

Page 156

1   Q.      Well, did any alumni -- let me start again.
2   Did any alumnus or alumni ask you about Mr. Poulos's
3   allegations?  Ever?
4   A.      No.
5   Q.      And what would you say if someone had?
6   A.      I -- I don't know.
7   Q.      You wouldn't deny it?
8   A.      Would I deny it?
9   Q.      Yeah.  You don't know what you would say if
10  somebody asked you about Mr. Poulos accusing you of
11  repeatedly sexually abusing him when he was a child?
12  A.      I have a perspective of -- I'm a former
13  headmaster and a lifelong school person.
14  Q.      No, no.  This is what I want to know.  I want
15  to know if an alumnus or alum -- we already established
16  that no alumnee or alumnus actually asked you about Mr.
17  Poulos's accusations.  So what I want to know is what
18  you would have said if you were asked about it.
19  A.      I would --
20  Q.      Are you telling me you don't know?
21  A.      No.  Well, in completion, of course part of
22  that would have been absolutely it's false.  Beyond
23  that, what I would tell them I can't tell you, because
24  I never went there with an alumnus.  I would have
25  denied it.  And here's what we're doing.  Or I would

Page 157

1   have denied it and said -- or I would have said you
2   need to reach out to Zach.  I -- I -- I would have had
3   a school perspective in my response, as well as a
4   personal one.
5           So when I say I don't know exactly what I
6   would say, it's that conflict between doing what is
7   best for the school, which I think I did in my whole
8   career, and doing what's in my own best interest.  And
9   I try to balance those.  And I would try -- I would
10  have, if somebody asked me that, tried to balance that.
11  Q.      So these alumnus and alumnae that you're
12  speaking to, these are former students that --
13  A.      Some are.
14  Q.      -- you knew, right?
15  A.      Sorry.
16  Q.      That's okay.  These are former students that
17  you knew, right?
18  A.      Some are.  Some aren't.
19  Q.      Okay.
20  A.      So -- my alumni base goes back to 1992.  Runs
21  from 1992 to about 2011.  So I knew students when I
22  left in 2009.  That's -- that is the cohort of alumni
23  that I know.
24  Q.      Okay.  So --
25  A.      Prior that, I don't --

Matthew Ralston
July 01, 2021
158 to 161

Page 158

1  Q.      -- the majority of the people that you were
2  speaking -- let me start again.  The majority of the
3  alumnus and alumnae that you were speaking to, at the
4  time in 2018 were people who knew you, is that right?
5  A.      No.
6  Q.      No?
7  A.      Not majority.  I can't tell you the exact
8  split.
9  Q.      I'm confused.  You were at the -- you were at
10 the school from 1992 to 2009, right?  And I think you
11 said that your time frame for your alumnus and alumnae
12 telephone calls, when you were the capital giving
13 officer, was 2011.  So I don't understand how --
14 A.      I said the people I know.  The base of people
15 I know.
16 Q.      Okay.
17 A.      My responsibility, I met with alumni back as
18 far as -- I think as far back as I go is 1951.  There
19 is an alumnus from there.
20 Q.      Oh.  Okay.
21 A.      So back that far.  Some further trustees,
22 current trustees.  Although I wasn't fundraising
23 current trustees.  I -- I don't know how -- I don't --
24 I guess I don't need to say anything else.
25 Q.      So you -- just so I'm clear -- let me --

Page 159

1  never mind.  Strike that.  So you then told Mr. Neese
2  about the letter, because you were concerned about the
3  constant fear and fog that an alumnae or alumnus might
4  ask you about the allegations?
5  A.      No.
6  Q.      Okay.  Why would you tell Mr. Neese?
7  A.      It is impacting my -- because it was
8  impacting my work.  It was a part of -- the success
9  I've had in my career is based on my ability to build
10 relationships and that, to me, feels like a piece of me
11 that impacts my daily life every day.  Since the day
12 Mr. Lehman told me, that -- that it's not -- and is --
13 at least tangentially and peripherally relative to
14 context in which I was building these -- these
15 relationships.  If it became more than tangential or it
16 became concrete, I -- I don't know what I would have
17 said or done.
18 Q.      But it didn't happen, right?
19 A.      Well, no.  But that doesn't mean it wouldn't.
20 It -- it's not fair to ask me about today how -- where
21 we are today in regards to what -- where I was in 2018.
22 Or the work I was doing there.  I haven't worked since
23 May of 2019.
24 Q.      I thought your termination date was October
25 14th --

Page 160

1  A.      It was
2  Q.      -- 2019.
3  A.      It was.  I was on leave.  Paid leave.
4  Q.      Whose idea was the paid leave?
5  A.      Mr. Lehman's, I assume.
6  Q.      Okay.
7  A.      If it wasn't his, he was the messenger.
8  Q.      So the paid leave started May 2019, did I get
9  that right?
10 A.      It did.
11 Q.      Okay.  So when did you tell Mr. Neese about
12 the April 11th, 2018 letter that has been marked as
13 D-15?
14 A.      It was probably around the opening of school
15 of that year.  And I -- because I would have probably
16 been back on campus.  Or -- I'm sorry, let's back up.
17 I was there May.  I -- I don't know specifically.  I
18 don't remember what date.  It was not -- it was not a
19 year after that.  It wasn't six months after I learned
20 of the letter.
21 Q.      The next time you went to campus after career
22 day?
23 A.      That's pro -- in all likelihood when.
24 Q.      So sometime between --
25 A.      The next time I probably was on campus would

Page 161

1  have been reunion, which is in June.
2  Q.      Okay.  So the next time you were on campus
3  after the April 2018 career day, which you think is
4  probably June 2018, you told Mr. Neese about the April
5  11th, 2018 letter that's been marked as D-15?
6  A.      I'm saying that's probably what I did.
7  Q.      Okay.
8  A.      I'm also telling you I -- I don't
9  specifically remember.
10 Q.      Okay.  So how did you tell Mr. Neese about
11 the April 11th, 2018 letter that's been marked as D-15?
12 A.      Went into his office, asked if I could close
13 the door.  I said I have something I need to share with
14 you.  And -- and I prefaced I need to share with you
15 because I know it's impacting my work.
16 Q.      Did you give Mr. Neese a copy of the letter?
17 A.      I did not.
18 Q.      Did you read it to him?
19 A.      I did not.
20 Q.      What did you tell Mr. Neese about the letter?
21 The April 11th, 2018 letter that's been marked D-15?
22 A.      I would have shared with him that there were
23 -- that there -- about the allegations.
24 Q.      So you told Mr. Neese that Mr. Poulos accused
25 you of repeatedly sexually molesting him when he was a

Matthew Ralston
July 01, 2021                                  162 to 165

Page 162

1   child?
2   A.        I think I probably told him that a former
3   student had accused me.
4   Q.        So you didn't name Mr. Poulos to Mr. Neese?
5   A.        I don't think so.  And I don't remember
6   specifically.  But I don't think so.
7   Q.        But you're confident that you communicated to
8   Mr. Neese that a former student had accused you of
9   repeatedly sexually molesting him when he was a child,
10  right?
11            MR. JUBB:  Objection to the form.
12            THE WITNESS:  Yes.
13  BY MS. DOUGHERTY:
14  Q.        And what did Mr. -- let me start again.  Did
15  you tell Mr. Neese anything else about the April 11th,
16  2018 letter that's been marked D-15, or the allegations
17  by Mr. Poulos?
18  A.        No.  I don't think so.  No.
19  Q.        What did Mr. Neese say?
20  A.        I think he just told me to do my best.  I
21  told him there are moments when I find it paralyzing.
22  He probably said he can't imagine it not doing that at
23  times.  And if I was having more -- if I had problems
24  with work to -- let him know.
25  Q.        I'm sorry if you answered already, but I

Page 163

1   forget, did Mr. Neese already know about the letter
2   before you told him?
3   A.        I don't believe so, no.  It's not my
4   impression that he did.
5   Q.        Did Mr. Neese give you an impression about
6   whether he credited the accusations that you shared
7   with him?
8   A.        He did.  And he did not give any credibility
9   to it.
10  Q.        Okay.  So Mr. Neese didn't believe the
11  accusations that you had repeatedly sexually molested a
12  former student?
13  A.        That's true.
14  Q.        Prior to when you informed Mr. Neese about
15  Mr. Poulos's accusations, is it your understanding that
16  Mr. Neese had a high opinion of you?
17  A.        Yes.
18  Q.        Is it your understanding that as of today Mr.
19  Neese still has a high opinion of you?
20  A.        Yes.
21  Q.        So nothing that you shared with Mr. Neese
22  regarding Mr. Poulos's accusations changed Mr. Neese's
23  high opinion of you, is that right?
24  A.        It's not my impression that it did, so.
25  Q.        So did Mr. Neese stop associating with you?

Page 164

1   A.        No.  Not completely.
2   Q.        What do you mean not completely?
3   A.        We know each other's families.  I will send
4   him a happy birthday note.  There's been no
5   communications regarding this.
6   Q.        Okay.  So --
7   A.        He's certainly aware -- no, that was --
8   actually not before I was done working.
9   Q.        Is it -- let me just -- is it the case that
10  you just don't have a -- you know, you just don't have
11  the circumstance to meet up with Mr. Neese because you
12  don't work together anymore?  It's not the case that
13  Mr. Neese is avoiding you or refuses to work with you,
14  is that right?
15  A.        Yes.  As far as I know.
16  Q.        Okay.  So as far as you know, Mr. Neese is
17  not purposely not associating with you because of
18  something he learned from you about Mr. Poulos's
19  accusations, is that right?
20  A.        That's right.
21  Q.        We -- let me do it this way.  Are there more
22  people, other than Mr. Neese on your list?  Because you
23  were giving me a list of everybody you told about the
24  April 11, 2018 letter.
25  A.        There another.

Page 165

1   Q.        All right.  Why don't you tell me that
2   person?
3   A.        One other.  Bill Yinger, Y-I-N-G-E-R.
4   Q.        Is this related to the alumni relations
5   woman?
6   A.        No.
7   Q.        No?  They just have the same last name?
8   A.        Oh, oh.  Yeah.  Yeah.  I'm sorry.
9   To the woman.  Yes.  It's his -- it's his -- it's her
10  husband.
11  Q.        Virginia Yinger.
12  A.        Bill is her husband.
13  Q.        Internal Operations Annual Fund --
14  A.        Yes.
15  Q.        -- individuals.  Who you worked with, right?
16  A.        Yes, I did.
17  Q.        So you told Bill Yinger about the April 11th,
18  2018 letter that's been marked as D.15?
19  A.        I did.
20  Q.        When did you tell Bill Yinger?
21  A.        I don't remember.  It wouldn't have been a
22  long wait.
23  Q.        Who's Bill Yinger to you?  Other than the
24  husband of your former co-worker?
25  A.        Let's see.  He was a student.  His first year

Matthew Ralston
July 01, 2021                                          166 to 169

Page 166

1  as a student was the same as my first year as a faculty
2  member in 1992.  When he was a student I taught him and
3  I coached him.  He has a brother my oldest son's age,
4  and would visit our sons while he was away from home.
5  He was pretty close with our whole family.
6           He went to Lehigh.  Or not Lehigh.
7  Lafayette.  Sorry.  I don't know anybody who went to
8  Lehigh.  Would visit us sometime on the weekends while
9  he was there.  So it's a personal -- it had grown to be
10 a friendship.  He came back to work at the school.  So
11 he would have graduated college in '99.  He was at
12 Trinity College for two or three years.  So he came
13 back in '90 -- I'm sorry, '02 or '03.  Became a
14 chairman of the science department.  I was the best man
15 at his wedding.  He's attended our son's wedding.
16 We're just good family friends.
17 Q.      Did you tell Mr. Yinger about the April 11th,
18 2018 letter that's been marked D-15 after you shared
19 the content with Mr. Neese?
20 A.      I don't remember.
21 Q.      How did you -- well, let me start again.  So
22 you did share the content of the April 11th, 2018
23 letter that's been marked as D-15 with Bill Yinger, is
24 that right?
25 A.      Could you ask that again?

Page 167

1  Q.      You did share the content of the April 11th,
2  2018 letter that's been marked D-15 with Bill Yinger,
3  is that right?
4  A.      Yes.
5  Q.      How did you share the content of the April
6  11th, 2018 letter with Mr. Yinger?
7  A.      Would have been somewhere in person.  It was
8  not that he had -- I didn't share the -- hand him the
9  letter.  I don't believe.  And our -- it would have
10 been I was sharing it because we have a long personal
11 relationship and family relationships.  And part of --
12 it was becoming more part of who I was and I felt he
13 needed to know.
14 Q.      Did Mr. Yinger live in residence at The Hill
15 School?
16 A.      Did he?
17 Q.      Did he live at The Hill School?
18 A.      He does.  He did.  And does.
19 Q.      So Mr. Yinger lived at The Hill School at the
20 time when you met with him in person and shared the
21 content of the April 11th, 2018 letter that's been
22 marked D-15, is that right?
23 A.      He did.
24 Q.      So at some point when you were back on
25 campus, you went to --

Page 168

1  A.      Bill's --
2  Q.      Mr. Yinger's house on campus?
3  A.      Yes.  Yes.
4  Q.      And what did -- and you can't place that in
5  time to any extent?
6  A.      I -- I'm sorry, I -- no.
7  Q.      That's fine.
8  A.      Again, it would not have been a long -- a
9  long period of time.  I don't think it was before I
10 left.  But it could have been.  I don't -- I'm --
11 Q.      What do you mean before you left?
12 A.      Before I left in April.  I don't think it was
13 then.
14 Q.      Okay.
15 A.      But because I know I told Chris before I
16 left, Chirieleison, I might have told Bill before I
17 left.  I'm sorry.  I just don't remember.
18 Q.      Is -- and the reason why you were telling
19 Bill was because you considered him to be a close
20 friend?
21 A.      Yeah.
22 Q.      So what did you tell Bill about the April
23 11th, 2018 letter that's been marked D-15?
24 A.      I would have told him that I have been
25 accused of abusing a student.

Page 169

1  Q.      Did you tell Mr. Yinger who the student was?
2  A.      I don't know.  I don't think so.  I don't
3  know.
4  Q.      Mr. Yinger would have been a classmate of Mr.
5  Poulos, is that right?
6  A.      He would not have been a classmate.  He would
7  have been a schoolmate.
8  Q.      Schoolmate?
9  A.      Bill graduated in 1995.
10 Q.      So Mr. Poulos and Mr. Yinger are two years
11 apart in school, as that right?
12 A.      Yes.
13 Q.      What else did you tell Mr. Yinger about the
14 April 11th, 2018 letter?
15 A.      From there it would have been how it's
16 affected me personally.  What I was feeling.
17 Q.      What did Mr. Yinger say?
18 A.      Well, he didn't believe any of it.  I don't
19 know what else he said.  I know he would have done
20 nothing but stand firmly with me and tell me how he
21 would support me as we go.
22 Q.      Okay.  So Mr. Yinger didn't believe the
23 accusations as you relayed them to him, is that right?
24 A.      Correct.
25 Q.      And prior to when you relayed to Mr. Yinger

Matthew Ralston
July 01, 2021                                  170 to 173

Page 170

1    Mr. Poulos's accusations that you had repeatedly
2    sexually molested him, did Mr. Yinger have a high
3    opinion of you?
4    A.       Yes.
5    Q.       And as of today does Mr. Yinger still have a
6    high opinion of you?
7    A.       Yes.
8    Q.       So nothing that you told Mr. Yinger about Mr.
9    Poulos's accusations that you sexually -- repeatedly
10   sexually molested Mr. Poulos has changed Mr. Yinger's
11   high opinion of you, is that right?
12   A.       That's correct.
13   Q.       Has Mr. Yinger stopped associating with you?
14   A.       No.
15   Q.       Is there anyone else that you told about the
16   April 11th, 2018 letter that's been marked as D-15?
17   A.       I don't think so.
18   Q.       Okay.  So we have Mr. Yinger, Mr. Neese, Mr.
19   Hopkins, Mr. Ralston, as in your brother Mr. Ralston,
20   Mark Ralston, Chris C.
21   A.       That's what the kids call him.
22   Q.       You told Mr. Rees, but he already knew.
23   A.       I'm sorry?
24   Q.       You told Mr. Rees but he already knew.
25   A.       Yes.

Page 171

1    Q.       And your wife?
2    A.       Yes.
3    Q.       Did I leave anybody out?
4    A.       No.
5    Q.       Again, that you told about the April 11th,
6    2018 letter that we've marked as D-15?
7    A.       No.  I don't think so.
8    Q.       I'm asking about ever.  Not just limited to
9    2018, but not asking about your lawyer.
10   A.       I've spoken with a -- a doctor.  I've spoken
11   with a counselor.
12   Q.       To seek counseling therapy or medical
13   treatment, is that right?
14   A.       Well, I saw -- I spoke with a doctor because
15   of -- I didn't want to try and guess how this was
16   manifesting.  I -- I could say things that were --
17   Q.       Let's do it this way.  Why did you tell the
18   doctor about the April 11th, 2018 letter?
19   A.       Because of the constant gut-wrenching level
20   of anxiety.  I had some pretty early significant bouts
21   of diarrhea.  And I've always called them gerbils, but
22   the thought that -- that can overtake my mind at night
23   if I wake up.
24   Q.       Who is this doctor?
25   A.       Beg your pardon?

Page 172

1    Q.       Who is the doctor that you told?
2    A.       His name is Phillip Siemer.  S-I-E-M-E-R.
3    Q.       So you told Dr. Phillip Siemer about the
4    April 11th, 2018 letter.  And I think you said a
5    counselor?
6    A.       I did.  Also saw -- one of the things Dr.
7    Siemer recommended was that I see a counselor.
8    Q.       So who's the counselor that you told about
9    the April 11th, 2018 letter?
10   A.       Her name is Lisa Havens, H-A-V-E-N-S.
11   Q.       And is Dr. Siemer in Columbus, Ohio?
12   A.       No.  He's actually in Michigan.
13   Q.       Driver City?
14   A.       He's also a friend.  Suttons Bay.
15   S-U-T-T-O-N-S.
16   Q.       Is he affiliated with a medical practice?
17   A.       Yeah, he's got -- actually, he has a private
18   practice, but he also is part of MDVIP.
19   Q.       Okay.  And Lisa Havens.
20   A.       She's also --
21   Q.       She's a counselor?
22   A.       Yes, she is.
23   Q.       Is she a doctor too?
24   A.       No.
25   Q.       And where is she located?

Page 173

1    A.       She's also in Michigan.
2    Q.       In Suttons Bay?
3    A.       Yes.
4    Q.       Is she affiliated with a practice?
5    A.       Only -- not -- not on paper, technically.
6    They know each other.  Dr. Siemer recommended her.  So
7    by associated, they're not partners.  Or she's not in
8    his practice.  She's got a private practice.
9    Q.       Okay.  What's that private practice called?
10   Does she just use her name?  Or is she --
11   A.       I think she just uses her name.
12   Q.       -- affiliated -- okay.
13   A.       I think she's got a tag line now, but I don't
14   remember it.  She just uses her name.
15   Q.       All right.  Anybody else that you told about
16   the April 11th, 2018 letter that's been marked as D-15?
17   We got the doctor, the counselor, Havens, your wife,
18   your brother, Chris C., Mr. Neese, Chris Hopkins, Mr.
19   Yinger.  Anyone else?
20   A.       When I was put on leave, I shared it with my
21   sons.  The awareness.  Made them aware.
22   Q.       You mean so sometime after May 2019?
23   A.       It would have been in May.
24   Q.       In May?
25   A.       Like 2019.

Page 174

1  Q.        Why did you tell your sons in May 2019 about
2  the April 11th, 2018 letter that's been marked as D-15?
3  A.        Because I was no longer at the school. And
4  there was no way they weren't going to know that.
5  Q.        Well, you were just on leave. Paid leave,
6  right?
7  A.        Correct.
8  Q.        And what did you tell your sons?
9  A.        That I have been accused of this. And told
10  them when. And that I was now on administrative leave.
11              THE VIDEOGRAPHER:  Stand by.  Change
12        the chapters.  Going off record, 2:22.
13                    *   *   *
14        (Whereupon, a short break was taken.)
15                    *   *   *
16              THE VIDEOGRAPHER:  We're back on, 2:40.
17  BY MS. DOUGHERTY:
18  Q.        How did you learn that you were being put on
19  leave? Let me -- strike that. Is it correct that the
20  leave was not voluntary?
21  A.        Correct.
22  Q.        Okay. So what is your understanding of why
23  you were put on leave in May 2019?
24  A.        I don't even recall a phone call. I'm sure
25  it was Zach.

Page 175

1  Q.        We're talking about Mr. Lehman?
2  A.        Mr. Lehman. I'm sorry. That all goes back
3  to the letters. At that point there were two letters.
4  And -- so my -- it's where I go. Obviously May '19 is
5  a few weeks after I filed suit. But I -- I don't know
6  what he was thinking. He just told me he needs to put
7  me on -- on paid administrative leave.
8  Q.        So were you put on paid administrative leave?
9  A.        You know what, I take that back. I do know
10  how. Tom Rees informed me.
11  Q.        It wasn't Mr. Lehman who called you?
12  A.        No. It was Tom Rees. What I can't -- I know
13  I had a letter confirming it, but I don't -- I have a
14  hard time believing the letter was how I found out. So
15  maybe Zach called -- Mr. Lehman called me. Maybe Tom
16  did. But I'm pretty sure I got a letter.
17  Q.        Okay. So you think that you maybe got the
18  courtesy of a telephone call first and then you have a
19  writing identifying --
20  A.        I'm sure I have a letter, because it outlined
21  what it meant. And I -- although, you know what, a
22  phone call from Mr. Lehman -- if -- if I got a phone
23  call it would have been from Mr. Rees. Because at that
24  time I was already engaged with Mr. Jubb.
25  Q.        Do you have allergies or are you upset?

Page 176

1  A.        No, it's allergies.
2  Q.        I just want to make sure you're not crying
3  because I'm upsetting you.
4  A.        It's not upset.
5  Q.        Okay.
6  A.        It's allergies.
7  Q.        Do you have enough tissues there for your
8  allergies?
9  A.        Yes. I stole some more.
10  Q.        You have them stuffed in your pockets there?
11  A.        I do.
12  Q.        You're sure that you --
13              MR. MCCARRON:  Hey, could you guys --
14        could you unmute again, please?
15              MS. DOUGHERTY:  Sorry. Can you hear us
16        now?
17              MR. MCCARRON:  Yes.
18  BY MS. DOUGHERTY:
19  Q.        Are you sure, though, that you also received
20  a letter confirming --
21  A.        I know I got -- yes. Because it outlined
22  what it meant.
23  Q.        Okay. And do you still have that letter?
24  A.        Probably.
25  Q.        Did you give that letter to your lawyer?

Page 177

1  A.        Probably. But I -- I -- I know I would have
2  called and asked about it. But I don't recall that I
3  -- if I shared it or not.
4  Q.        Because I don't have the -- a May -- I'm
5  sorry. Let me start again. So the letter was dated
6  May -- sometime in May 2019?
7  A.        It would have been, yes. Yeah.
8  Q.        Okay.
9              MS. DOUGHERTY:  So sometime -- I don't
10        have a letter dated May 2019 explaining the
11        basis of the leave, or that he was going on
12        leave.
13              MR. JUBB:  Okay.
14              MS. DOUGHERTY:  Is that something that
15        you have?
16              MR. JUBB:  If I do I'll get it to you.
17              MS. DOUGHERTY:  Okay. Will you get it
18        from your client if you don't have it?
19              MR. JUBB:  Yeah, if he has the letter.
20  BY MS. DOUGHERTY:
21  Q.        And what's your recollection of the content
22  of the May 2019 letter?
23  A.        That I was on paid administrative leave. It
24  meant that I needed to be available for questions. And
25  available to anybody at the school that needed me. I

Page 178

1   was to -- not to make contact with alumni in the
2   context of -- as an employee of the school.  I believe
3   that's -- yeah.  They probably said I would continue to
4   be paid while I was on leave.
5        Q.        Did the letter indicate the reason why you
6   were being put on paid leave?
7        A.        I don't think so.  But I don't recall.
8        Q.        You mentioned that the letter was close in
9   time to when you commenced this lawsuit against Mr.
10  Poulos.  Was the reason why you were put on leave
11  because you commenced this lawsuit against Mr. Poulos?
12       A.        Is the reason?
13       Q.        Yes.
14       A.        I don't -- I can only tell you what I felt
15  and assumed at the time.  I can't tell you what went
16  into their conversations that led to it.
17       Q.        All right.  Well, let's start with what you
18  felt and assumed at the time.  I assume you mean when
19  you received the May 2019 letter?
20       A.        I assumed it was the next piece of the
21  continuation of the nightmare that started with the
22  letters and then was the next step after I filed suit.
23       Q.        Okay.  So you did equate the paid leave to
24  your commencement of the lawsuit against Mr. Poulos?
25                 MR. JUBB:  Objection to the form of the

Page 179

1   question.
2   BY MS. DOUGHERTY:
3        Q.        I realize you weren't inside their head.
4        A.        The timing was not coincidence, if that's
5   what you're asking.
6        Q.        Here's what I'm getting at.  You have told us
7   all these people, including Mr. Lehman and Mr. Rees,
8   who didn't credit the accusations of Mr. Poulos, right?
9   The letters were several months before your paid leave.
10  The proximity to the lawsuit and the paid leave suggest
11  that the paid leave was as a result of the lawsuit.  So
12  is that your belief and assumption?  I realize you
13  weren't in Mr. Lehman's head or The Hill School's head.
14                 MR. JUBB:  Objection to the form.
15  BY MS. DOUGHERTY:
16       Q.        What did you believe, when you learned in May
17  2019, you were being put on paid leave?
18       A.        If we can have a bit of a time line, it's
19  very short.  I can tell you that I don't recall that
20  the letter said why.  I can tell you that soon
21  thereafter there was an article that showed up in some
22  Philadelphia publication that mentioned it, in which
23  the director of communications of the school -- it
24  mentioned the lawsuit.  Did not mention my name.  That
25  there was a --

Page 180

1        Q.        Quote from your lawyer, right?
2        A.        There was a publication.  And I don't recall
3   what it was, but the response to that -- in that was
4   that I had been put on paid administrative leave.
5        Q.        Okay.  So your belief is you were put on paid
6   administrative leave because your lawsuit brought
7   attention to the allegations and generated press, is
8   that right?
9                 MR. JUBB:  Objection.  Asked and
10               answered.
11                 THE WITNESS:  I know that's what the
12               school told the press.  I don't recall if it
13               was in a letter to me.
14  BY MS. DOUGHERTY:
15       Q.        So it's your belief that the school told the
16  press that you were put on paid leave because of the
17  lawsuit?
18       A.        Yeah.  I think we can confirm that.
19       Q.        And are you talking about like an article on
20  line?  Or in a newspaper?  Or both?  Do you remember
21  the publication?
22       A.        I think there was something in Philly Mag.
23  There was another.  I don't recall what it was.  But I
24  think what I'm referring to where it was mentioned, the
25  school was not named.  But it was described in a way

Page 181

1   that was pretty obvious.
2        Q.        You mean your complaint described the school
3   in a way that was pretty obvious.
4                 MR. JUBB:  Objection to the form.
5                 THE WITNESS:  What I'm saying is the
6               article that prompted this was described --
7               the school was described in a way.
8   BY MS. DOUGHERTY:
9        Q.        Are you talking about the article in Philly
10  Mag?
11       A.        Yeah.
12       Q.        That was an article that quoted Mr. Beasley,
13  right?
14                 MR. JUBB:  No, it didn't.  Objection to
15               the form.
16                 MS. DOUGHERTY:  No?
17  BY MS. DOUGHERTY:
18       Q.        Did you read an article about your lawsuit
19  that quoted a lawyer from the Beasley Firm?
20       A.        From the --
21       Q.        The Beasley Firm.  The people who represent
22  you in this lawsuit?
23       A.        I know.  I didn't hear you.  I don't believe
24  they were quoted.  Let me rephrase that.  Yes.  But I
25  believe the quote was something to the effect of, we

Matthew Ralston
July 01, 2021                          182 to 185

Page 182

1  don't have a comment about it.  That the courts will
2  decide -- it will be handled through legal channels, or
3  something.
4  Q.      Do you have any idea how the reporter
5  connected your lawsuit to The Hill School?
6  A.      Elite private boarding schools in Montgomery
7  County are pretty few.
8  Q.      An article you had in mind discussed an
9  outing of Mr. Poulos as a survivor of sexual assault,
10  right?
11          MR. JUBB:  Objection to the form.  What
12  -- what article are you talking about?
13          MS. DOUGHERTY:  The one he's talking
14  about.  Philly Mag.
15          MR. JUBB:  You're -- no.  We're not
16  doing this.  You want to ask him questions
17  about what the article said?
18          MS. DOUGHERTY:  He read it.  He said it
19  was a source of why he got put on leave.
20          MR. JUBB:  That's not what he said at
21  all.
22          MS. DOUGHERTY:  He can tell me -- he can
23  tell me -- he can --
24          MR. JUBB:  Objection to the form.
25          MS. DOUGHERTY:  He can tell me he

Page 183

1  doesn't remember.  He can tell me a lot of
2  things.
3          MR. JUBB:  Do you know what it says?
4  Because you seem to be saying a lot of things
5  that it doesn't say.  So I just want to make
6  sure we're talking about the same one.
7          MS. DOUGHERTY:  I remember the article,
8  because at the time I thought it was
9  disgusting that you took the position that
10  you would redact the school and your client's
11  name, but not the sexual assault survivor and
12  reveal personal health information about Mr.
13  Poulos in a public filing.
14          MR. JUBB:  Then you should read it
15  again.  Because you were wrong the first
16  time and you're wrong now.
17          MS. DOUGHERTY:  So is your -- does your
18  Complaint redact Mr. Poulos's name or in any
19  way protect his health information?
20          MR. JUBB:  What does that have to do
21  with an article?  Are you asking about the
22  Complaint?  Or are you asking about the
23  article?  That's what I thought.
24          MS. DOUGHERTY:  That's what you thought
25  what?

Page 184

1          MR. JUBB:  That you were talking about
2  the article.
3          MS. DOUGHERTY:  We went through this
4  before.  Being unprofessional doesn't suit
5  you.
6          MR. JUBB:  Being unprofessional does
7  suit you, and I've seen it multiple times.
8  I'm sitting here telling you, if you want to
9  ask him about an article that he says he one
10  time read and quiz him on that versus a
11  complaint --
12          MS. DOUGHERTY:  You're the only one that
13  gets upset about a compliment.  By me telling
14  you that being unprofessional doesn't suit
15  you, you don't need to make little jabby
16  comments.  I'll ask -- I'm going to proceed
17  with the question.
18  BY MS. DOUGHERTY:
19  Q.      The article that you have in mind, which I
20  think you identified as Philly Mag, is that right?
21  A.      Yes.
22  Q.      Okay.  Did that article that you have in mind
23  in Philly Mag, did that discuss Mr. Poulos?
24  A.      I don't recall.  But I know it was in the
25  Complaint.  And I know Complaints are public records.

Page 185

1  Q.      Why did you redact your name but not Mr.
2  Poulos's name?
3          MR. JUBB:  You don't have to answer that
4  question.  You don't have to answer that
5  question.
6          MS. DOUGHERTY:  Why not?
7          MR. JUBB:  Because I drafted the
8  Complaint as a lawyer, and you're not going
9  to ask him why the Complaint was drafted in a
10  particular way.
11          MS. DOUGHERTY:  Well, actually --
12          MR. JUBB:  If you want to ask him about
13  the allegations in the Complaint and, you
14  know, what he knows to support them or
15  corroborate them, et cetera, by all means.
16  But you're not going to ask him about why
17  there are certain, you know, strategy in a
18  Complaint.
19          MS. DOUGHERTY:  I didn't ask about
20  stratgy.
21          MR. JUBB:  You are asking him why he was
22  named as a Doe in a Complaint.
23          MS. DOUGHERTY:  Can you look and find
24  the place where the plaintiff says where he
25  wanted to file as a Doe.  I underlined it.  I

Page 186

```
 1          just can't find it.  Don't want to make
 2      everyone sit here and stare at me.
 3   BY MS. DOUGHERTY:
 4   Q.      If you had sexually molested Mr. Poulos would
 5   you have admitted it?
 6          MR. JUBB:  Objection to the form.
 7          THE WITNESS:  I -- I can't know what it
 8      would be to do that, because I didn't and --
 9   BY MS. DOUGHERTY:
10   Q.      I'm asking you, if you had molested a child,
11   when you were accused of doing it would you have
12   admitted it and taken responsibility?
13          MR. JUBB:  Objection.  Just -- don't
14      answer the question.  It's harassing.
15          MS. DOUGHERTY:  Why?
16          MR. JUBB:  It's stupid.  It's quite
17      possibly the dumbest question I've ever
18      heard.  You're asking him about what he would
19      do --
20          MS. DOUGHERTY:  I'm sorry, What
21      objection is that?
22          MR. JUBB:  No, no.  It's the -- it's
23      harassing.  It's causing him to speculate.
24          MS. DOUGHERTY:  Where is stupid in the
25      Federal rules of civil procedure?
```

Page 187

```
 1          MR. JUBB:  I'm explaining to you what --
 2      what the rules you want to -- are you going
 3      to let me finish?
 4          MS. DOUGHERTY:  Are you instructing him
 5      not to answer?
 6          MR. JUBB:  I already did instruct him
 7      not to answer, because you're trying to
 8      harass him, asking him ridiculous questions.
 9          MS. DOUGHERTY:  It's not ridiculous.
10          MR. JUBB:  It's harassing.  If you had
11      sexually abused someone --
12          MS. DOUGHERTY:  Yeah.
13          MR. JUBB:  -- how would you have
14      responded?  And he's like, "That's not true."
15          MS. DOUGHERTY:  He's going to lie about
16      it either way.  It really definitely --
17          MR. JUBB:  Is that your position here
18      now?
19          MS. DOUGHERTY:  -- his credibility.
20          MR. JUBB:  Okay.  Go ahead.  Ask a
21      thoughtful question.
22   BY MS. DOUGHERTY:
23   Q.      If you had sexually abused Mr. Poulos would
24   you have admitted and taken responsibility when he
25   accused you?
```

Page 188

```
 1          MR. JUBB:  Don't answer that question.
 2      That's ridiculous.  Even for you.  That is
 3      so --
 4          MS. DOUGHERTY:  Even for me?
 5          MR. JUBB:  -- harassing.  Asking him to
 6      answer a question like that.  He just told
 7      you he's never done anything inappropriate
 8      with a -- with a child.  And then you want
 9      him to speculate what he would do if he did?
10          MS. DOUGHERTY:  I want to know if he
11      would take responsibility for his actions.
12          MR. JUBB:  Well, why don't you ask him
13      if -- go ahead.  No.  Ask a thoughtful
14      question.  That's ridiculous.
15          MS. DOUGHERTY:  I did ask a thoughtful
16      question.
17   BY MS. DOUGHERTY:
18   Q.      So you're not going to answer whether you
19   would take responsibility if you had engaged in
20   misconduct with Mr. Poulos?
21   A.      Am I --
22          MR. JUBB:  Answer it.  Hold on.  Hold
23      on.
24          THE WITNESS:  Okay.
25          MR. JUBB:  He is not answering any sort
```

Page 189

```
 1   of questions about how he would respond if he
 2   did do something with Mr. Poulos.  If you
 3   want to ask him about how he's ever responded
 4   to being -- of any sort of inappropriate
 5   conduct as it pertains to just being a
 6   teacher, whatever, that I'll allow.  But
 7   you're not going to let -- you're not going
 8   to ask a question about him imagining how he
 9   would respond if he did do something that
10   he's very adamantly said never occurred.
11          MS. DOUGHERTY:  I'm just trying to
12      understand what kind of man he is.
13          MR. JUBB:  Why don't you ask better
14      questions.
15          MS. DOUGHERTY:  Is he somebody who takes
16      responsibility when he makes mistakes.
17          MR. JUBB:  Okay.  Ask that question.
18          MS. DOUGHERTY:  That's what I'm trying
19      to learn.  That's what I did learn.
20          MR. JUBB:  No, no.
21          MS. DOUGHERTY:  I asked him --
22   BY MS. DOUGHERTY:
23   Q.      I asked you, would you take responsibility
24   for your actions if you had engaged in misconduct with
25   a student?
```

Matthew Ralston
July 01, 2021                                    190 to 193

Page 190

1          MR. JUBB:  Don't answer that question.
2     Why don't you ask are you the type of
3     teacher --
4          MS. DOUGHERTY:  What are you afraid of?
5          MR. JUBB:  What am I afraid of?  You're
6     asking him to speculate how he would respond
7     if he did something horrific, which he's
8     already told you he hasn't.  So why don't you
9     say have you ever had to report yourself for
10    misconduct for any reason.  Why don't you ask
11    more thoughtful questions?  And I won't
12    object to them.  Then you can figure out what
13    kind of man he is.  Asking a question like
14    that isn't going to do it.
15         MS. DOUGHERTY:  This isn't going to be
16    counted as my time, so we're going to mark
17    the time if you keep spouting off.
18 BY MS. DOUGHERTY:
19 Q.   So you're not going to answer my question,
20 Mr. Ralston?
21         MR. JUBB:  Don't answer that.  You're
22    not answering any question until she asks a
23    good one.  So that question was ridiculous
24         MS. DOUGHERTY:  Until I ask a good one?
25    Are you kidding me?  Move to strike.

Page 191

1          MR. JUBB:  Until you ask him an
2     appropriate question.
3          MS. DOUGHERTY:  Move to strike.  First
4     of all, it's 2:58.  I move to strike your
5     comments.  I don't make sport of your
6     questions.  I sat there and listened to
7     plenty that I thought were thoughtless and
8     rude and harassing.  And, you know, let you
9     victim shame.  But, you know, without
10    comment.  Because it's not appropriate to
11    make sport of someone else's questions.  So
12    what type of objection is that?
13         MR. JUBB:  Why don't you ask a question
14    again and I'll make another objection.
15 BY MS. DOUGHERTY:
16 Q.   Sir, if you had sexually molested Mr. Poulos
17 would you have admitted to your conduct when Mr. Poulos
18 accused you and taken responsibility for your actions?
19         MR. JUBB:  Don't answer that question.
20 BY MS. DOUGHERTY:
21 Q.   Have you ever reported yourself for a
22 misconduct?
23 A.        Yes.
24 Q.   When did you report yourself for a
25 misconduct?

Page 192

1 A.        When I was teaching at The Andrews School.
2 Probably 1987, '88.  It was.  Not probably.  It was.
3 So it was 1987, '88 school year.  I told a young woman
4 to shut her fucking mouth.
5 Q.        A student?
6 A.        Student.
7 Q.        A minor student?
8 A.        She was -- she was a junior in high school.
9 Q.   I just didn't know if The andrews School was
10 a college or high school.  I apologize.
11 A.        It's a college prep school.  At the time it
12 was for all girls.
13 Q.        Okay.  So the student that you told to what?
14 A.   I told her to shut her fucking mouth.
15 Q.   She was under 18, right?
16 A.   I don't know.  She was a junior in high
17 school, so probably, but maybe not.  I don't know.
18 Q.        What caused you to tell her to shut her
19 fucking mouth?
20 A.        My temper.  What provoked me was she was
21 being insubordinate in third person to me and I had
22 asked her to be quiet a few times and I lost my temper.
23 Q.        Do you have a temper?
24 A.        Well, not generally with kids.  Not generally
25 with adolescents.  Most of my intolerance is with

Page 193

1 adults.  I think I'm one of -- no.  To answer your
2 question.  When I'm working with children, no.  That
3 probably was the incident that changed my outlook on
4 things.
5 Q.   You mean your -- what do you mean your
6 outlook on things?
7 A.        I checked where my -- left the incident, I
8 went to the headmaster and told him what I had done.  I
9 said I'm pretty sure you're going to hear about this,
10 so I want you to know what I did.  And his response to
11 me was, one, he was supportive.  Thanked me for coming.
12 Letter into my file, which I no longer have, I don't
13 think.  But he explained to me that my standards were
14 good.  That my expectations were out of line.
15         And so what I took that -- what I adjusted in
16 my career with adolescents from that point on, was I
17 made my expectations more commensurate with their age,
18 or more in line with their age.  And what was fair to
19 expect with a child.  An adolescent.  And our goal
20 became the standards.  My response to adolescents
21 became the expectation.
22 Q.   What is your definition of adolescent?
23 A.   For me it's been high school kids, because
24 that's who I taught.
25 Q.   So before the incident with the young woman,

Matthew Ralston
July 01, 2021                                          194 to 197

Page 194

1  I think you said in 1987 to 1988, did you have a temper
2  with adolescents?
3  A.      No.
4  Q.      What is it that you checked or reevaluated --
5          MR. JUBB:  Objection to the form.
6  BY MS. DOUGHERTY:
7  Q.      -- as result of the incident?
8  A.      How my expectations aligned with my
9  standards.  The headmaster, again, told me that my
10 standards were right and good, and it was my
11 expectations I needed to adjust.
12 Q.      Are you still intolerant with adults?
13         MR. JUBB:  Objection to the form.
14         THE WITNESS:  Not temper wise.  I expect
15         adults that figured some things out.  And I
16         don't -- that don't expect adolescents to
17         have figured out.  Mostly that the world
18         doesn't revolve around them.
19 BY MS. DOUGHERTY:
20 Q.      So did the student complain to the school
21 about you?
22 A.      She did.  Actually I don't know if she did.
23 Her parents did.
24 Q.      Okay.  So did you participate in responding
25 to discovery in this action?

Page 195

1  A.      I'm sorry.  I didn't hear you.
2  Q.      I'm sorry.  Did you participate in responding
3  to discovery in this action?
4  A.      In this action?
5  Q.      Yes.  The one that you filed against Mr.
6  Poulos and Mr. Garabedian?
7  A.      Can you --
8  Q.      Sure.
9  A.      I'm not sure what -- what you're -- about
10 what you're asking.
11 Q.      Sure.  That's fine.
12         MR. JUBB:  She'll show you.
13         MS. DOUGHERTY:  We're at 16, I think,
14         right?
15                  *   *   *
16         (Whereupon, the above-mentioned document
17         was marked for identification as D-16.)
18                  *   *   *
19 BY MS. DOUGHERTY:
20 Q.      Mr. Ralston, I'm showing a document that I've
21 marked D-16.  It says plaintiff's responses to the
22 first set of Interrogatories of defendants, Mr.
23 Garabedian, Esquire, and Mr. Garabedian, Esquire,
24 d/b/a, Law Offices of Mitchell Garabedian, to
25 plaintiff.  And the document is 11 pages.  Ten page

Page 196

1  document with a certificate of service.  Have you seen
2  the document that I've marked as D-16 before I just
3  handed it to you today?
4  A.      Yes.
5  Q.      Did you participate in preparing responses to
6  the questions that are identified throughout D-16?
7  A.      Yes.
8  Q.      I'm going to direct your attention to the
9  fourth page of D-16.  To number four.  It says,
10 "Identify and provide contact information for each and
11 every person who complained about you."  It says,
12 "Plaintiff objects to this request as overly broad and
13 duly burdensome, vague, confusing and without waiver,
14 none."  So that's incorrect, right?
15 A.      Um.
16 Q.      The none part.
17 A.      I'm sorry, the what part?
18 Q.      The none part.  I realize I'm not asking you
19 to comment about the objection.  Because the parents of
20 the students you just told me about did complain about
21 you, right?
22 A.      I don't see that it says none.
23 Q.      It says without waiver, none.
24 A.      Oh, without waiver.  Yeah.  I guess.  Yes.
25 Q.      So the parents --

Page 197

1  A.      There --
2  Q.      -- of the students at Saint -- I'm sorry, The
3  Andrews School.  I'm getting a little British Royals,
4  right?
5  A.      I can tell you, it's no longer just called
6  that.
7  Q.      So do you remember the student's name?
8  A.      Yeah.  Her name was --
9          MR. JUBB:  Hold on.  Just answer yes or
10         no first.
11         THE WITNESS:  Oh.  Yes.
12 BY MS. DOUGHERTY:
13 Q.      Okay.  What was the student's name?
14 A.      Her name was Rebecca Turner.
15 Q.      Is Ms. Turner deceased?  Is that why you're
16 stressing was?
17 A.      No.  I have no idea if she was married or
18 changed her name.  As a student that was her name.
19 Q.      Did anyone else, a student or a parent, ever
20 complain about you?
21 A.      When?  Otherwise?
22 Q.      Sure.  I just want to make sure that -- well,
23 do we agree, going back to number four on D-16, that
24 where it says without waiver, none, it should --
25 A.      No.

Page 198

1   Q.        -- it should say, yes, Rebecca Turner's
2   parents?
3   A.        I -- I know they did.  I don't know if she
4   went to the headmaster and then her parents.  Or if she
5   went to her parents.  My guess would be she went to her
6   parents and then her parents came to the school.
7   Q.        Okay.  But the none should at least say
8   Rebecca Turner's parents, right?  Because the parents
9   complained about you, right?
10  A.        I assume they did.  I -- I mean.  I --
11  Q.        I thought you just told me they did.
12  A.        I'm telling you I don't know who contacted
13  the headmaster.
14  Q.        Oh.  You don't know if it was Rebecca Turner
15  or her parents?
16  A.        I told you I don't know if it was Rebecca
17  Turner or her parents.
18  Q.        Okay.  So it should say, yes, Rebecca Turner
19  or Rebecca Turner's parents complained about an
20  incident with Rebecca Turner.  Right?
21            MR. JUBB:  I'll object to the form.
22            THE WITNESS:  Yes.
23  BY MS. DOUGHERTY:
24  Q.        Is there anyone else, a student or parent,
25  who's complained about you?

Page 199

1   A.        Not that I'm aware of.
2   Q.        While we're on this document, D-16, if I can
3   direct your attention to page 8, number 11.  So, again,
4   the response to number 11 says -- there's an objection.
5   Plaintiff objects, right.  And it says, "Without
6   waiver, Mr. Garabedian knows better than most people
7   the significance of abuse of a young person and
8   therefore is acutely aware of the importance of being
9   certain of allegations before spreading them.  Such
10  allegations immediately subject the accused to public
11  judgment, hatred, contempt and ridicule.  Plaintiff has
12  filed as John Doe for this reason."  Did you
13  participate in the response that I just read to you?
14  A.        Yes.
15  Q.        So you participated in the decision to hide
16  your name when you filed this lawsuit, is that right?
17  A.        Yes.
18  Q.        Is there a reason why you -- let me start
19  again.  Did you participate in the decision to not
20  obscure Mr. Poulos's name?
21  A.        I don't -- is there a reason?
22  Q.        I just want to know if you participated in
23  the decision to not also obscure Mr. Poulos's name, or
24  Mr. Poulos's health information.
25  A.        I don't recall.  I saw the complaint before

Page 200

1   it was filed.  So I was at least aware.
2   Q.        Do you agree that --
3   A.        It was filed as such.  And I would have been
4   aware that it was.  So to the extent that that implies
5   consent, yes.  Because I don't recall we argued about
6   it or anything.
7   Q.        So you weren't concerned with sharing Mr.
8   Poulos's identity and this health information?
9   A.        No.
10  Q.        Do you agree that being labeled a survivor of
11  sexual assault can subject someone to public judgment,
12  hatred, contempt and ridicule?
13  A.        Ask -- can you repeat it again?
14  Q.        Sure.  Do you agree that being labeled a sex
15  -- sexual assault survivor would subject someone to
16  public judgment, hatred, contempt and ridicule.
17            MR. JUBB:  I'll object.  Go for it.  Go
18  ahead.
19            THE WITNESS:  Being labeled as a
20  survivor would subject them to all of that?
21  BY MS. DOUGHERTY:
22  Q.        Yeah.  Do you think people think highly of
23  sex abuse victims?
24            MR. JUBB:  Objection to the form.
25            THE WITNESS:  I can't -- I don't think

Page 201

1   there's a general answer to that.  I think I --
2   I don't think highly of people one way or the
3   other until I know them.  And so I wouldn't
4   judge, thinking highly of someone based on
5   that.  I would feel horrible for somebody.
6   Because I can't know what that would be, to
7   be a survivor of that.
8            As I said, I think it's the most heinous
9   thing an adult can do to a child.  And so I
10  can't imagine that it doesn't live with you
11  your whole life.
12  BY MS. DOUGHERTY:
13  Q.        Did you consider whether revealing that Mr.
14  Poulos suffers from a number of injuries, including
15  sexuality problems, self harm, suicidal ideation,
16  sharing that information publicly, associating it with
17  Mr. Poulos, would subject Mr. Poulos to public
18  judgment, hatred, contempt and ridicule?
19            MR. JUBB:  Objection to the form.
20            THE WITNESS:  I don't know that I would
21  use all those words.  I would think someone
22  that's got those would be people's
23  perspectives, when they meet them or already
24  know them, would be impacted or affected.
25  But, again, ridicule, judgment, and what

Page 202

1        some of those other words are --
2 BY MS. DOUGHERTY:
3 Q.        Public judgment, hatred, contempt and
4 ridicule.  They're part of your answer.
5 A.        Hatred, contempt and ridicule.  Are we on
6 number four?
7 Q.        We were on number 11.
8 A.        Or 11, I mean?
9 Q.        Yeah.  In the middle of the paragraph.  It
10 says such allegations subject accused to public
11 judgment, hatred, contempt and ridicule, as it relates
12 to you being the accused of a perpetrator of sexual
13 assault.  And I'm asking you, because you -- you -- you
14 didn't reveal your name, but you revealed --
15 A.        I don't --
16 Q.        -- Mr. Poulos's name.  And you revealed
17 information about Mr. Poulos regarding assault and
18 injuries, some of which I just identified for you.
19 Sexual inadequacies, self harm, suicidal ideation, that
20 would expose Mr. Poulos to public judgment, hatred,
21 contempt and ridicule.  Don't you agree?
22            MR. JUBB:  Objection to the form.
23            THE WITNESS:  I don't know why it would
24        subject a person to hatred, contempt and
25        ridicule.  Public judgment.  If someone

Page 203

1        suffers from those things, I don't know if
2        judgment's the right word, but I would expect
3        it to affect someone's feeling towards that
4        person.  Compassionate person is probably not
5        going to be contempt -- full of contempt,
6        hatred and ridicule.  So I don't know.  I
7        don't -- those are not words I would use if I
8        knew that about somebody.
9 BY MR. DOUGHERTY:
10 Q.        You didn't show any compassion to Mr. Poulos,
11 though, right?
12            MR. JUBB:  I'll -- objection to the
13        form.  You don't have to answer that.
14 BY MS. DOUGHERTY:
15 Q.        All right.  I just want to make sure we
16 closed the loop on everyone that you told about the
17 April 11th, 2018 letter that was marked as D-15.  You
18 told me the doctor, the counselor, Mr. Neese, Mr.
19 Yinger, Mr. Hopkins, Mark Ralston, Chris C.  Your sons.
20 Your wife.  And you communicated to Mr. Rees, but you
21 said that Mr. Rees already knew about it.  Did I miss
22 anybody that you told about the April 11th, 2018 letter
23 that has been marked as D-15?
24 A.        I -- I actually did not tell my sons about
25 the letter.  I didn't tell my sons until I was put on

Page 204

1 paid administrative leave.  And so they were aware of
2 the allegations and how I had responded.  They don't --
3 they've never seen or been told about specific letters
4 or content beyond the fact that I was accused of this.
5 Q.        Okay.  Did I otherwise identify everyone that
6 you told about the April 11th, 2018 letter that's been
7 marked D-15?
8 A.        Yes.  That I told about the letters, yes.
9 Q.        Do you have any information about who
10 received the letter from a source other than you?
11 A.        Again?  I'm sorry.
12 Q.        Yeah.  Do you have any information about who
13 else received the letter?
14 A.        Yes.
15 Q.        What information do you have about who else
16 received the letter?
17 A.        I know Ms.
18 Q.        And by the way, the letter --
19 A.        As it was mailed?  Or do you mean copies
20 thereof?
21 Q.        Let's just start with the letter being -- I
22 want to know what information you have about
23 individuals who received the April 11th, 2018 letter
24 that's been marked as D-15 from a source other than
25 you.

Page 205

1 A.        I know people knew of them.  I don't know
2 that he handed copies.  But I assume he probably did.
3 Q.        Who is the he?
4 A.        Mr. Lehman.  I'll get there.  So Mr. Lehman
5 told me at one point that he had shared it with the
6 legal committee and the Board of Trustees.  And he had
7 shared it with the associate headmaster of the school,
8 who, at that time, was a gentleman named Len Miller.  I
9 can't tell you everybody on the legal committee.  I
10 know the Chairman of the Board would be a member of
11 that.  And I know two other people that I'm sure are on
12 it.  Or were at the time, assuming they're still
13 trustees.  Probably still are if they are.
14 Q.        Okay.  So Mr. Lehman told you that he shared
15 the April 11th, 2018 that's been marked D-15 with the
16 legal committee?
17 A.        Yes.
18 Q.        Okay.
19 A.        Now, ask the time frame of your question.
20 Did he share the letter with them?
21 Q.        At the moment I'm just restricting my
22 questions to the April 11th, 2018 letter.  I'm going to
23 ask about the next one next.
24 A.        Okay.
25 Q.        So did I misunderstand?  I thought you were

Matthew Ralston
July 01, 2021                                    206 to 209

Page 206

1  saying that he told you.
2  A.       Yeah.  I'm sorry.  I was -- I don't think Mr.
3  Lehman shared that with me until January.  When I was
4  on campus in January of 2019.
5  Q.       Okay.  So -- sorry.
6  A.       So that would have been two letters.  I
7  assume, because there's a -- it's a million dollar
8  demand, I assume that at least Tom Rees knew, which I
9  knew I was right when I asked.  And at least the board
10 chair.  And I would then have assumed, or did assume,
11 that it would go beyond the board chair and Mr. Rees,
12 based on what they -- how they decided they wanted to
13 proceed.  And I can't tell you what that is.
14 Q.       Okay.  So you assume that the April 11th,
15 2018 letter was provided to the board chair?
16 A.       I do.
17 Q.       Okay.  Do you have actual information that
18 the April 11th, 2018 letter was provided to the board
19 chair?
20 A.       Just my experience that --
21 Q.       No.  I'm asking for actual information.
22 A.       No.
23          MR. JUBB:  I'll object to the form.
24 BY MS. DOUGHERTY:
25 Q.       So Mr. Lehman didn't tell you that he

Page 207

1  provided the April 11th, 2018 letter to the board
2  chair, is that right?
3  A.       That's correct.
4  Q.       So if I wanted to know whether the board
5  chair was provided the April 11th, 2018 letter, I would
6  have to ask Mr. Lehman or the board chair, right?
7  A.       As far as I know.  Perhaps Mr. Rees.
8  Q.       You didn't ask Mr. Rees who else was
9  provided --
10 A.       I did not.
11 Q.       -- the April 11th, 2018 letter, is that
12 right?
13 A.       I did not.
14 Q.       All right.  Do you have any information about
15 anyone else who was provided the April 11th, 2018
16 letter?
17 A.       I do not.
18 Q.       Did I already give you D-4?  The December
19 26th, 2018?
20 A.       No.
21          MS. DOUGHERTY:  It was previously
22 marked.
23 BY MS. DOUGHERTY:
24 Q.       Before we get to that, before we get to D-4.
25 So was there any type of investigation, that you know

Page 208

1  of, after the April 11th, 2018 letter?  After you
2  learned about it in April 2018?
3  A.       After -- after the letter and after my first
4  conversation, I -- when Mr. Rees told me that there
5  would be, I checked in with him monthly to see if there
6  had been any progress or change.  What I was told by
7  him, each time, was that he had heard nothing back from
8  Mr. Garabedian.  I don't know if the school did any
9  part of their investigation, speaking with people they
10 would have had to speak with or not.
11 Q.       Okay.  So you don't know one way or the other
12 whether The Hill School performed an investigation into
13 the April 11th, 2018 letter, is that right?
14 A.       I know they tried to.  I don't know if they
15 spoke to anyone or not.
16 Q.       What do you mean they tried to?
17 A.       I know Mr. Rees told me that he had
18 repeatedly reached out to Mr. Garabedian and he was not
19 getting responses.  And his reaching out, as he told
20 me, was to try and get -- get Mr. Poulos to cooperate
21 in a -- in the investigation.
22 Q.       Were you ever asked questions about the April
23 11th, 2018 letter?
24 A.       No.
25 Q.       So no one at the school ever questioned you

Page 209

1  for -- about your side of the April 11th, 2018 letter,
2  or the accusations contained in the April 11th, 2018
3  letter?
4  A.       No.  But --
5  Q.       How about the police?
6  A.       No.
7  Q.       How about someone from Cozen O'Connor?
8  A.       Never contacted me.  Mr. Rees told me in the
9  first conversation that they might, but I never heard
10 from them.
11 Q.       Did Mr. Rees ask you any information about
12 the April 11th, 2018 letter?
13 A.       No.
14 Q.       Were you disciplined as a result of the April
15 11th, 2018 letter?
16 A.       I'm not working there any longer.
17 Q.       Yeah, but do you know that you're not working
18 there any longer because of the April 11th, 2018
19 letter, or because of your lawsuit?
20 A.       I don't know how to differentiate.
21 Q.       So you don't know one way or the other
22 whether you were disciplined as a result of the April
23 11th, 2018 letter?
24 A.       I don't know how to differentiate those --
25 that sequence of events.

Matthew Ralston
July 01, 2021                                        210 to 213

Page 210

1   Q.      Really?  You don't know how to --
2   A.      Oh, I -- I understand how --
3   Q.      -- differentiate an April 11th, 2018 letter
4   and your lawsuit filed more than a year later?
5   A.      I understand how a person can look at a time
6   line and differentiate the steps and what the next step
7   was.  But it's all part of the same time line in my --
8   in my life and in my experience.
9   Q.      Well, the April 11th, 2018 letter wasn't made
10  public, right?  Like your lawsuit.
11  A.      I --
12  Q.      Right?
13  A.      As far as I know.  I mean, I --
14  Q.      So you didn't experience any adverse action
15  from the school until after you made public the
16  allegations in your lawsuit, is that right?
17              MR. JUBB:  Objection to the form.
18              THE WITNESS:  I can tie why I feel the
19          way I feel for you.
20  BY MS. DOUGHERTY:
21  Q.      Okay.  The school didn't --
22  A.      The specific --
23  Q.      Listen.  The school didn't lower your salary
24  when they received the April 11th, 2018 letter, did
25  they?

Page 211

1   A.      No.
2   Q.      The school didn't fire you when they received
3   the April 11th, 2018 letter, right?
4   A.      No.
5   Q.      Do you agree with me the content of the April
6   11th, 2018 letter is serious child abuse allegations?
7   Do you agree with me?
8   A.      Yes.
9   Q.      So you agree with me that if the school
10  credited the allegations in the April 11th, 2018
11  letter, you should have been immediately fired?
12  A.      Yes.
13  Q.      Right?  You agree with me?
14  A.      I do.
15  Q.      And that's not what happened, right?
16  A.      It is not.
17  Q.      You were permitted to continue with your job,
18  right?
19  A.      Yes.
20  Q.      Remotely doing your job.  And when you even
21  reported about the letter to your supervisor to express
22  you were distracted, even though nobody had asked you
23  about the allegations, but you were distracted by them,
24  the supervisor told you to continue doing your job,
25  right?

Page 212

1   A.      He did.
2   Q.      So you -- you sustained -- and even after the
3   second letter in December 2018, you weren't fired then,
4   right?
5   A.      No.
6   Q.      And you agree with me, we're going to look at
7   it in more detail, that the content of the second
8   letter, December 2018 letter, that includes serious
9   child abuse, is that right?
10  A.      Yes.  It is.
11  Q.      And if the school credited it, you should
12  have been immediately fired, correct?
13  A.      Correct.
14  Q.      In fact, you should have been hauled off in
15  handcuffs, right?  Do you agree with me?
16  A.      Right.  I do.
17  Q.      That someone who sexually assaults a child
18  belongs in jail, right?
19  A.      I agree.
20  Q.      Okay.  So that didn't happen, though, right?
21  A.      That did not.
22  Q.      Your salary wasn't lowered.  Nobody asked you
23  to leave, right?
24  A.      Correct.
25  Q.      In fact, you started working on campus in

Page 213

1   January and February of 2019, because you wanted to,
2   right?
3   A.      Correct.
4   Q.      Because you thought it would improve your
5   ability to perform your job, right?
6   A.      Yes.
7   Q.      Okay.  So the only thing that happened that
8   -- the only thing that happened is that you filed a
9   lawsuit in April 2019 and then, boom --
10  A.      No.
11  Q.      -- you're on paid leave.
12              MR. JUBB:  Objection to the form.
13              THE WITNESS:  I don't agree.
14  BY MS. DOUGHERTY:
15  Q.      You don't agree?
16  A.      No.  I received a letter in -- sometime in
17  the summer of 2018 from The Hill School's insurance
18  carrier, telling me they had been notified.  So I guess
19  that's somebody I missed being notified.  I don't know
20  who the person was.
21  Q.      Who did you think was going to pay for Mr.
22  Poulos's injuries?  Not you, right?
23  A.      May I finish?  They -- they said they were
24  going to investigate and they'd make a decision if I,
25  individually, fell under their policy or coverage.  I

Matthew Ralston
July 01, 2021                    214 to 217

Page 214

1  received another letter in January of '19 that said I
2  would not be.  And that -- so essentially the -- that
3  was -- to me, that was the beginning of the school
4  separating themself from me.  From Matt.
5          I don't disagree with the insurance company's
6  position if the allegations are true.  But I was now on
7  my own.  And if the letters that came were not -- there
8  was no settlement, I had no idea where things were
9  going, and I was going to be on my own.
10  Q.      Do you know why the let -- the accusations by
11  Mr. Poulos were reported to The Hill School's
12  insurance?
13  A.      I received a matter of phone calls.
14  Q.      No.  I want to know if you know.  Do you
15  know?
16  A.      No.
17  Q.      Do you know why the school reported Mr.
18  Poulos's accusations to its insurance?
19  A.      I know, as a headmaster, why they --
20  Q.      No.  I want to know if you know why The Hill
21  School's --
22          MR. JUBB:  You can answer.  She's
23          just --
24          THE WITNESS:  No.  Zach didn't call and
25          say, or Mr. Rees didn't say --

Page 215

1  BY MS. DOUGHERTY:
2  Q.      Okay.
3  A.      We're sending these to the insurance company.
4  Q.      So you don't know what prompted The Hill
5  School to report Mr. Poulo's accusations to the
6  insurance company, correct?
7          MR. JUBB:  Objection to the form.
8  BY MS. DOUGHERTY:
9  Q.      Nobody told you, right?
10  A.      No.  Actually, that's not true.  Tom told me
11  that I would probably be getting a letter.  He didn't
12  tell me when they did.  He didn't tell me why they did.
13  Submitted it.  But he said I would probably be hearing.
14  Q.      Okay.  So Mr. Rees gave you an advance
15  warning about the insurance company's decision about --
16  A.      Awareness, yes.
17  Q.      -- whether it would provide separate counsel
18  for you, is that right?
19  A.      Yes.
20  Q.      And the insurance company was unwilling to
21  provide separate counsel, is that right?
22  A.      Yes.
23  Q.      Was there some reason you needed separate
24  counsel?
25  A.      Not at the moment, but I --

Page 216

1  Q.      Did you hire somebody?  Did you pay a lawyer?
2  A.      No.  Did I hire or pay a lawyer when?
3  Q.      When the insurance company -- okay.  The
4  insurance company sent you a letter, right?
5  A.      Yes.
6  Q.      When did that happen?
7  A.      Two letters.
8  Q.      Two letters.
9  A.      One happened in the summer.  July or August.
10  I couldn't tell you the date.  And one happened in
11  January.
12  Q.      In 2019?
13  A.      Yes.
14  Q.      Okay.
15  A.      While I was on campus.
16  Q.      All right.  So you got two letters from the
17  insurance company for The Hill School, correct?
18  A.      Yes.
19  Q.      Do you still have those letters?
20  A.      Probably.
21  Q.      Did you give them to your lawyer?
22  A.      Yes.
23          MS. DOUGHERTY:  Is there some reason why
24  we don't have them?
25          MR. JUBB:  You do have them.

Page 217

1          MS. DOUGHERTY:  I don't think I do.  I
2  think I have the results of your subpoena to
3  Mr. Poulos's insurer.
4          MR. JUBB:  No.  You have the letters.
5  They're included in The Hill School file.
6          MS. DOUGHERTY:  Okay.  Well, I have the
7  file here, so I guess I'll just have to have
8  him identify them.
9          MR. JUBB:  I'll just pull the P number
10  up for you.
11  BY MS. DOUGHERTY:
12  Q.      So you got two letters from the insurer.  And
13  the letters communicated to you that the insurer
14  wouldn't pay for you to have a lawyer of your own, is
15  that correct?
16  A.      I don't know if it said that I wouldn't have
17  a lawyer of my own.  It certainly said that -- that
18  their coverage and any -- and I don't remember details
19  of what all they cover.  But that I was outside of what
20  their relationship with The Hill would cover.  So if
21  that includes legal counsel, then yes.  I don't
22  remember the specifics of -- what -- what I know is
23  that -- I guess that's all I can tell you.
24  Q.      Look, I only -- when I ask you what you know
25  or ask you -- I really just want to know what you know.

Matthew Ralston
July 01, 2021                                      218 to 221

Page 218

1  It's not a memory test.
2  A.        I told you.  I was on my own.  You then asked
3  me if -- if the letter said the insurance company told
4  you they would not provide legal counsel for you.  I'm
5  telling you I don't know if it said I wouldn't have
6  legal counsel, per se, or if it said I wouldn't be
7  covered under their policy.  And you're -- so --
8  Q.        Okay.
9  A.        -- to ask me if I understand the specifics of
10  what their policy covered, I can't tell you that I
11  recall that right now.
12  Q.        I'm just trying to learn what the letter
13  said.  So you don't remember what the letter said?  Or
14  you do remember what the letter said?
15  A.        It was about that thick.  No, I don't
16  remember all the details of the letter.
17  Q.        Okay.  You still have D-16 there.  That's
18  this discovery.
19  A.        I do.
20  Q.        All right.  So can you please go to -- we're
21  going to look at page 6, but the answer to the question
22  is number 6, which starts on page 5.  But what I care
23  about is the top of page 6.  The sentence starts "For",
24  on page 5, and its says "Example" at the top.  I'm
25  interested in the last part, that says that the

Page 219

1  school's insurance company would not pay for his legal
2  fees, because of the nature of defendant's false
3  allegations.
4  A.        Where are you?
5  Q.        Sure.  On page 6.
6  A.        Yes.
7  Q.        Are you there?  Okay.  So at the very top of
8  the page.  The "For" is on the prior page, where it
9  says "For example", it says "Plaintiff was told",
10  right?  It says, "To seek legal counsel.  Not to be
11  alone with students while on campus.  Had to have
12  permission to be on campus.  And that the school's
13  insurance company would not pay for his legal fees,
14  because of the nature of defendant's false
15  allegations."  Did you participate in preparing that
16  response?
17  A.        I certainly would have said okay to it.
18  Q.        Okay.  So the school's insurance company told
19  you that it would not pay for your legal fees.
20  A.        Okay.
21  Q.        I'm just trying to confirm.  Is that right?
22  A.        Yes.
23  Q.        Who told you to seek legal counsel?
24  A.        Tom Rees.
25  Q.        Who told you not to be alone with students

Page 220

1  while on campus?
2  A.        Mr. Lehman.
3  Q.        Who told you needed permission to be on
4  campus?
5  A.        I asked Tom Rees when he -- so as I checked
6  in with him monthly.  I didn't check in in November.  I
7  wrote to him the week between Christmas and New Year's.
8  Q.        You're talking about 2018?
9  A.        Yes.
10  Q.        Okay.
11  A.        Tom called me the first week of January.  And
12  -- which was the response I got.  And he then informed
13  me that there had been a second letter.  And he said I
14  need to tell you now you need to seek legal counsel of
15  your own.  And then he told me --
16  Q.        I thought he told you that in April 2018.
17  A.        He told me I should consider it.  He told me
18  I should consider it.  He told me in January I needed
19  to.
20  Q.        Okay.
21  A.        There's a difference.  I spoke to an
22  attorney.
23            MR. JUBB:  Hold on.
24  BY MS. DOUGHERTY:
25  Q.        Don't tell me what you said to your attorney.

Page 221

1  A.        I'm sorry, what --
2            MR. JUBB:  She doesn't want to know
3            anything about that.
4  BY MS. DOUGHERTY:
5  Q.        It sounded like you were going to --
6            MR. JUBB:  Just focus on -- because when
7            it gets to the attorney client stuff, you
8            just got to focus on her questions.
9            THE WITNESS:  Right.  Okay.  So Tom told
10  me I needed to seek legal counsel.  I -- I
11  asked him if that second letter would result
12  in me not being able to be on camp -- campus
13  as we had scheduled for me to be.  He said
14  that's a question for the headmaster.  And so
15  I reached out to Lehman and asked him.  And
16  that's when I was told not -- yes, but don't
17  be alone with students.  And that part of it.
18  BY MS. DOUGHERTY:
19  Q.        And you were allowed to be on campus for the
20  three to four weeks, right?
21  A.        I was.
22  Q.        Did you retain counsel in response to Mr.
23  Rees's advice that you should seek legal counsel in
24  January 2019?
25  A.        I did.  Not immediately.  But, yes.

Matthew Ralston
July 01, 2021                                        222 to 225

Page 222

1   Q.        Did you pay -- the lawyer you have in mind,
2   is that Mr. Jubb and The Beasley Firm?
3   A.        Yes.
4   Q.        Did you pay any legal fees as a result of
5   retaining The Beasley Firm?
6   A.        No.
7   Q.        Did you receive permission from The Hill
8   School before commencing this action?
9   A.        No.  I received discouragement.
10  Q.        So you told the school, before you filed this
11  action, that you were going to file this action?
12  A.        I didn't tell them I was going to.  They knew
13  I had en -- engaged an attorney.  And I did not tell
14  them I was going to file it.  I don't believe.
15  Q.        How do you know the school knew you had
16  engaged an attorney?
17  A.        Because -- I told them, because I'd been told
18  I should.
19  Q.        So you retained Mr. Jubb in January of 2019
20  and told the school that you had retained an attorney?
21  A.        I actually think that communication's from
22  Mr. Jubb to Mr. Rees.
23  Q.        Okay.
24  A.        So --
25  Q.        I understand.  So you communicated that you

Page 223

1   had an attorney to The Hill School through your
2   attorney?
3   A.        Yeah.
4   Q.        Now, earlier, way earlier today, we were
5   talking about how you sort of reconnected with Mr. Jubb
6   in 2016.  Is there a period of time between 2016 to
7   2019 when you had a relationship with Mr. Jubb, other
8   than an attorney client relationship?
9   A.        Yes.
10  Q.        Did you work on a project with Mr. Jubb
11  relating to capital giving?
12  A.        Yes.
13  Q.        What was that project?
14  A.        He's one of the people that was outside of my
15  region that knew me well.  And so I was asked to meet
16  with him regarding engagement with the school and
17  donations to the school.
18  Q.        You said you were asked to meet with him.
19  Who asked you to meet with him?
20  A.        Beg your pardon?
21  Q.        You said you were asked to meet with Mr.
22  Jubb.  Who asked you to meet with Mr. Jubb?
23  A.        It would have been someone in my office.
24  Q.        You mean the alumni and development office?
25  A.        It very well could have been Geoff.  Yes.

Page 224

1   Q.        Did you work on any other project with Mr.
2   Jubb?
3   A.        No.
4   Q.        Are any of the other lawyers at The Beasley
5   Firm former students of The Hill School?
6   A.        I'm sorry.
7   Q.        Are any other lawyers at The Beasley Firm
8   former students of The Hill School?
9   A.        Not to my knowledge.
10  Q.        Is The Hill School contributing to the
11  attorneys fees and costs to litigate this action?
12  A.        No.
13  Q.        Is anyone, other than you, contributing to
14  the attorneys fees and costs to litigate this action?
15  A.        No.
16  Q.        Am I correct that you have paid no fees and
17  costs in connection with this litigation, or in
18  connection with the allegations by Mr. Poulos?
19            MR. JUBB:  Don't answer that.  You don't
20  have to answer that.
21            MS. DOUGHERTY:  Why not?  You made legal
22  fees an issue.
23            MR. JUBB:  The legal fees for -- the
24  legal fees related to any -- hold on.  Can I
25  just have a clarification what you're

Page 225

1   referring to?
2             MS. DOUGHERTY:  Sure.  In -- we were on
3   page 6, right?
4             THE WITNESS:  They're not the same
5   thing.
6             MR. JUBB:  Okay.  (Reading to self) --
7   because of the nature of the defendant's
8   false allegations.  Okay.
9             MS. DOUGHERTY:  And I asked --
10            MR. JUBB:  So that would be in the
11  context of the defendant's false allegations
12  into the extent that he had legal fees that
13  -- there's never been a claim for legal fees
14  in this case.
15            MS. DOUGHERTY:  I asked him if he
16  retained an attorney in response to the legal
17  advice, and he said yes, you.  So I'm trying
18  to confirm --
19            MR. JUBB:  No.  I think you're confused.
20            MS. DOUGHERTY:  -- he's not paid any
21  legal fees.
22            MR. JUBB:  He's not -- first off, ask
23  the question if he's ever paid any legal fees
24  as it pertained to any sort of defense of
25  sexual allegation claims.  I think that's a

Matthew Ralston
July 01, 2021                                        226 to 229

Page 226

1   fair question.  But we're not going to get
2   into what the costs are in the case or fees
3   with me.
4   BY MS. DOUGHERTY:
5   Q.      Have you paid any fees and costs in
6   connection with the allegations by Mr. Poulos?
7           MR. JUBB:  Objection to the form.  You
8   can answer.
9           THE WITNESS:  You said do answer?
10          MR. JUBB:  Objection to the form.  You
11  can answer as phrased.
12          THE WITNESS:  No.
13          MS. DOUGHERTY:  What's the issue with
14  them?
15          MR. JUBB:  Because you just said as it
16  pertains to allegations of Mr. Poulos, and so
17  technically that could involve this case.  So
18  I just want to, you know, get it down
19  perfect, okay?  If you can.
20          MS. DOUGHERTY:  There is not a problem
21  with the form of my question.  Okay.  That's
22  fine.
23          MR. JUBB:  No, there is a problem with
24  the form.  I just wanted to clarify.  So if
25  you could tighten it.

Page 227

1           MS. DOUGHERTY:  What's the form problem?
2   I said did you pay --
3           MR. JUBB:  I just told you what it was.
4           MS. DOUGHERTY:  -- fees and costs in
5   connection with the allegations by Mr.
6   Poulos.
7           MR. JUBB:  And I just said to you --
8           MS. DOUGHERTY:  And he said no.
9           MR. JUBB:  And I just said to you that
10  could be pertaining to any fees or costs
11  associated with my represent --
12  representation of him in this action.  So if
13  you want to say as it pertains to defending
14  allegations of sexual abuse, I think that's
15  a fair question.
16          MS. DOUGHERTY:  Do you stipulate that
17  Mr. Ralston is not asserting a claim for
18  damages arising from legal fees and costs?
19          MR. JUBB:  Yes.  Arising -- Mr. Ralston
20  is not seeking damages pertaining to legal
21  fees as a result of the defamatory letter.
22  That's the stipulation.
23          MS. DOUGHERTY:  And cost.
24          MR. JUBB:  And cost associated with the
25  defamatory letter.  Correct.

Page 228

1           MS. DOUGHERTY:  Okay.  And he is -- he
2   does not --
3   BY MS. DOUGHERTY:
4   Q.      Mr. Ralston, you did not incur any legal fees
5   or costs associated with defending the allegations by
6   Mr. Poulos, is that correct?
7           MR. JUBB:  You can answer that question.
8           THE WITNESS:  I need you to ask it
9   again.
10  BY MS. DOUGHERTY:
11  Q.      Sure.
12  A.      I thought you guys were talking.  Sorry.
13  Q.      It's okay.  We took the part that we were
14  fighting over out of the case, so it's not an issue.
15  But I just wanted clarification, is it correct that you
16  did not pay any legal fees and costs to defend against
17  the allegations by Mr. Poulos?
18  A.      That is correct.
19  Q.      And I apologize if you answered this already.
20  But Cozen O'Connor was never your attorney, is that
21  right?
22  A.      That is correct.
23  Q.      Did you ever have any communication with
24  anyone from Cozen O'Connor?
25  A.      I did not.

Page 229

1   Q.      Do you know who Leslie Gomez is?
2   A.      Only by name.
3   Q.      So you never had any communications with
4   Leslie Gomez?
5   A.      No.
6   Q.      And Ms. Gomez is not now and never was your
7   attorney, is that right?
8   A.      Never.  No, that is -- I'm sorry.
9   Q.      Do you know a Gina Smith?
10  A.      That is correct.
11  Q.      Do you know a Gina Smith?
12  A.      I do not.
13  Q.      Did you ever have any communications with
14  Gina Smith?
15  A.      I have not.
16  Q.      Gina Smith is not now and never has been your
17  attorney, is that right?
18  A.      She is not.  That is correct.
19  Q.      So you -- do you know whether The Hill School
20  referred Mr. Poulos's allegation to law enforcement or
21  the District Attorney?
22  A.      Do I know if they did?
23  Q.      Yeah.
24  A.      I assume not.  I don't know.
25  Q.      I think I asked you all about the lawyers and

Matthew Ralston
July 01, 2021                                    230 to 233

Page 230

1  the police.  But is it correct that no representative
2  of The Hill School ever questioned you regarding the
3  content of the April 11th, 2018 letter, is that right?
4              MR. JUBB:  I'll object to the form.
5              THE WITNESS:  Yes.  You're asking --
6  well.
7  BY MS. DOUGHERTY:
8      Q.      I want to make sure that nobody, whether it's
9  Mr. Rees, Cozen O'Connor, the police, somebody on the
10  Board, Mr. Lehman, whoever, affiliated with The Hill
11  School, or at the direction of The Hill School, ever
12  asked you to explain your side of the story or to make
13  a statement --
14      A.      No.
15      Q.      -- regarding the April 11th, 2018 letter.
16      A.      No.
17      Q.      Can we go to D-4?  So is the -- yes, D-4 was
18  previously marked.  It's the December 26th, 2018 letter
19  by Mr. Garabedian to Mr. Rees.
20              MS. DOUGHERTY:  For the people watching
21              on Zoom it's my document 25.  The stamp's
22              like in the middle of the page.
23  BY MS. DOUGHERTY:
24      Q.      As I understand your testimony, the next
25  thing that happened in the sequence of events here is

Page 231

1  that you got a telephone call from Mr. Rees in January
2  of 2019 telling you there had been a second letter, is
3  that right?
4      A.      Yes.
5      Q.      Okay.  Did Mr. Rees give you the second
6  letter?
7      A.      I'm sure he sent it to me before our
8  conversation.
9      Q.      Okay.  So before Mr. Rees called you in
10  January 2019, you didn't know that there was a second
11  letter from Mr. Garabedian, is that right?
12      A.      No.  That's correct.
13      Q.      Do you remember when you had the telephone
14  discussion with Mr. Rees, other than just January 2019?
15      A.      It was probably the first business day after
16  New Year's.  Whatever that was.  I had -- I can tell
17  you I wrote to Tom Rees on December 28th.
18      Q.      So that sticks out, because it's like Happy
19  New Year, right?
20      A.      Yeah.  They told me they decided not to ruin
21  anyone's holidays.  When he called me.
22      Q.      And then did Mr. Rees e-mail you the letter
23  after he called you?
24      A.      Yes.  That would have been what he did.
25      Q.      On the first business day after New Year's?

Page 232

1      A.      Probably.  After we spoke, he probably sent
2  it to me.
3      Q.      So it's your belief that Mr. Rees e-mailed
4  you the second letter the same day that he called you?
5      A.      I don't know if it was the same day, but I
6  know he sent it to me.
7      Q.      And then did you read the December 26th, 2018
8  letter when you received it from Mr. Rees?
9      A.      Yes.
10      Q.      Okay.  So I'm showing a document that was
11  previously marked as D-4.  Do you recognize D-4 as the
12  December 26th, 2018 letter from Mr. Garabedian to Mr.
13  Rees, that Mr. Rees sent to you at the beginning of
14  January 2019?
15      A.      Yes.
16      Q.      Did you read -- I'm sorry.  I take that back.
17  Do you see, in the second paragraph on the first page
18  of D-4, it says, "During our telephone conversation
19  regarding this matter on December 21st, 2018 you
20  requested additional information about Mr. Poulos's
21  sexual abuse claim."  Do you remember reading that
22  sentence when you read the December 26th, 2018 letter
23  that's been marked as D-4?
24      A.      Did I what?
25      Q.      Do you remember reading that sentence?

Page 233

1      A.      I remember reading the letter.  I don't know
2  if that sentence jumped out at me.
3      Q.      Did you ever ask Mr. Rees to tell you about
4  his telephone --
5      A.      That's why --
6      Q.      -- communication with Mr. Garabedian?
7      A.      I asked him monthly.  I think I said earlier
8  I don't know if I got clear through that.  I did not
9  ask him in November.  I wrote to him the week before
10  Christmas and New Year's and asked if there was any
11  update.  I said it's been a couple months.  I didn't
12  hear from him until he called me.  So I had asked.  I
13  suspect if I had -- if there had not been a second
14  letter, I would have gotten an e-mail rather than a
15  phone call.
16      Q.      These are e-mails that you were exchanging
17  with Mr. Rees from your Hill School e-mail address?
18      A.      Yes.
19      Q.      Did you print any of those e-mails?
20      A.      No.
21      Q.      Did Mr. -- when Mr. Rees called you in the
22  beginning of January 2019, did he tell you anything
23  else other than we got another letter?
24      A.      That I should seek -- he needed to tell me to
25  seek my own legal counsel.  I asked him why again.  He

Matthew Ralston
July 01, 2021                                          234 to 237

Page 234

1   gave me the same reasons.
2   Q.        The same reasons you told me about earlier?
3   A.        Yeah.  We had not yet, at that point, heard
4   from an insurance company.
5   Q.        Do you need more water?
6   A.        No.  I got some.  Thanks.  I think, looking
7   back, I didn't think about it then, but he probably
8   knew what the response from the insurance company would
9   be.
10  Q.        Did you think the insurance company was going
11  to provide --
12  A.        I didn't --
13  Q.        -- coverage for the sexual assault?
14  A.        -- I -- I don't think I thought about it.
15  Until I got that second letter.
16  Q.        And the three reasons you were talking about
17  is Mr. Rees couldn't represent you, because he's the
18  school's attorney, charges could be filed, and a
19  lawsuit could be filed, right?  The reasons why Mr.
20  Rees told you --
21  A.        Say again.
22  Q.        The three reasons why Mr. Rees told you
23  needed your own lawyer was that he's the school's
24  attorney, that charges could be filed, and a lawsuit
25  could be filed?

Page 235

1   A.        No.  I knew he was the school's attorney.
2   That the three were -- that if there was a suit filed
3   against the school, that I would need counsel, which is
4   why, in retrospect, I -- I knew the answer to the
5   insurance.  If there were ever criminal charges filed,
6   I would need counsel.  And the third reason was that
7   there could be a legal case for defamation.  Is what he
8   suggested to me.
9   Q.        You mean by you?
10  A.        Yes.
11  Q.        Okay.  So when you talked to Mr. Rees in
12  January 2019 he suggested that you retain a lawyer to
13  sue Mr. Poulos for defamation?
14            MR. JUBB:  I'll object to the form of
15            that.
16            THE WITNESS:  Did Mr. Rees what?
17  BY MS. DOUGHERTY:
18  Q.        When you spoke to Mr. Rees in January of
19  2019, he suggested that you retain a lawyer to commence
20  a defamation against Mr. Poulos, is that right?
21  A.        No, he did not.
22  Q.        No?  So what was your reference to
23  defamation?
24  A.        He said there could be.  He said I'm not
25  whatever kind of attorney that would be.

Page 236

1   Q.        You mean that you could sue for defamation?
2   A.        He said it's possible there is.
3   Q.        Okay.
4   A.        He didn't encourage me to.  He didn't say do
5   it.  But he said I needed to seek independent counsel.
6   Q.        Okay.  So Mr. Rees was just giving you
7   friendly information that perhaps you could pursue a
8   defamation action against Mr. Poulos, and you should
9   check with a lawyer who could help you with that,
10  right?
11  A.        To help me decide if I could.
12  Q.        Okay.  So am I correct that Mr. Rees didn't
13  credit the content of the December 26th, 2018 letter --
14            MR. JUBB:  I'll object to the form.
15  BY MS. DOUGHERTY:
16  Q.        -- as reflected in D-4?
17  A.        His opinion of me didn't change, if that's
18  what you're asking.
19  Q.        So did Mr. Rees say something to lead you to
20  believe -- let me start again.  During your January
21  2019 telephone call with Mr. Rees, did Mr. Rees say
22  something to lead you to believe that he did not
23  believe the accusations by Mr. Poulos contained in the
24  December 26th, 2018 letter that's been marked as D-4?
25  A.        No.  But we already established he didn't

Page 237

1   believe it.
2   Q.        Okay.  So --
3   A.        So he didn't change that.
4   Q.        You didn't think the fact that he was
5   suggesting maybe you had a defamation action against
6   Mr. Poulos was commenting on his belief about the
7   accusations?
8   A.        He didn't suggest it.  He said that there
9   could be.  And I -- I guess -- I don't know that I
10  thought about what the significance of that was.  But
11  if I -- I looked at it now and say what is the
12  significance, it would be that he hadn't changed his
13  opinion any.
14  Q.        Did you have any -- okay.  So you got the
15  letter from Mr. Rees.  Then what did you do?  Did
16  you --
17  A.        What did I do?
18  Q.        Yeah.
19  A.        Walked around in a, what the hell am I going
20  to do now, kind of place.
21  Q.        Did you call your wife and tell her about the
22  letter?
23  A.        Of course.  Yeah.
24  Q.        Okay.
25  A.        I'm sorry.  Yes.  But as far as outward,

Matthew Ralston
July 01, 2021                                              238 to 241

Page 238

1   beyond that.
2   Q.      Like we did with the April 11th, 2018 letter,
3   I want to know everybody that you told about the
4   December 26th, 2018 letter.
5   A.      Oh.  That's easy.  I'm sorry.  Yes.  I can
6   tell you that.
7   Q.      That's okay.
8   A.      My wife.  My brother, Mark.  And Chris
9   Hopkins.
10  Q.      And did you tell -- let me start again.  Did
11  you actually give a copy of the --
12  A.      No.
13  Q.      -- December 26th, 2018 letter to your wife,
14  your brother or Mr. Hopkins?
15  A.      No.
16  Q.      You just called them on the phone and
17  described the situation?
18  A.      Yes.
19  Q.      What --
20  A.      Told them there was a second letter.
21  Q.      Were you in Ohio at the time when Mr. Rees
22  called you?
23  A.      No.  I believe I had just gone back -- we
24  have a house in Michigan, as well as a condo in
25  Columbus.  And I was in Michigan.

Page 239

1   Q.      Is the condo in Traverse City?
2   A.      No.  We have a condo in Columbus.  We have a
3   house in Lake Ann, Michigan.
4   Q.      Okay.  So you didn't have to call your wife?
5   A.      I had to call my wife.
6   Q.      I apologize.
7   A.      She still works.
8   Q.      Okay.
9   A.      She was in Columbus.  She, generally, unless
10  she's taking vacation time, she's in Columbus if I go
11  up to the Michigan house.  And I was in the Michigan
12  house when Tom Rees called me.
13  Q.      You were still working in January of 2019,
14  too, right?
15  A.      I was.
16  Q.      You were working remotely?
17  A.      Um-hum.  Yes.
18  Q.      And you had permission from The Hill School
19  to work from Michigan or Columbus, right?
20  A.      Permission in the sense that they knew were
21  owned, both places, and they knew I was back and forth.
22  It's mostly done by computer, so.  I'm not --
23  Q.      Okay.  So you called your wife.  And I guess
24  you had to call Mr. Ralston.  Or, excuse me, you had to
25  call Mr. Ralston, your brother, and Mr. Hopkins,

Page 240

1   because you were in Michigan, right?
2   A.      Well, I have to call Mark, my brother Mark
3   and Mr. Hopkins regardless of where I am.
4   Q.      I'm sorry.  I thought Mr. Hopkins lived at
5   The Hill School.
6   A.      No.  He was in Maine at that time.
7   Q.      Okay.
8   A.      Mr. Chirieleison was at The Hill School.
9   Q.      Okay.  Wrong Chris.  Thank you.
10  A.      Yep.
11  Q.      Did you tell anyone else about the December
12  26th, 2018 letter, other than your wife, Mr. Ralston,
13  your brother, Mark Ralston, and Mr. Hopkins?
14  A.      No.
15  Q.      I take it that --
16  A.      I'm -- I'm --
17  Q.      I'm sorry.  Go ahead.
18  A.      Because I don't think about them.  Dr. Siemer
19  and Lisa Havens.
20  Q.      Okay.  So you told your doctor and your
21  counselor?
22  A.      Yes.
23  Q.      Okay.  Did you, like, make an appointment or
24  something?
25  A.      Yes.

Page 241

1   Q.      Do you have medical records from your
2   treatment with Dr. Siemer?
3   A.      I do not.
4   Q.      Have you been treated by Dr. Siemer?
5   A.      Yes.  Dr. Siemer is also a friend.  So, yes.
6   To answer your question, I was treated by him or
7   treated through this by him.
8   Q.      How long has Dr. Siemen (sic) been your
9   doctor?
10  A.      He's not my primary care physician.  He's
11  just someone I see annually.  And occasionally if I'm
12  sick, or have something that needs cut off.  Dr.
13  Siemer's a close friend, so I went to somebody with
14  whom it would be easier for me to share this than
15  somebody I see once a year.
16  Q.      Okay.  Who's your primary care physician?
17  A.      My family care, primary care physician, is a
18  gentleman named Nathan March.  And he is in Traverse
19  City.
20  Q.      Is he affiliated with a medical practice?
21  A.      Yes.  It's West Front Primary Care.
22  Q.      And how long has Dr. Nathan -- you said
23  March, M-A-R-C-H?
24  A.      Yes.
25  Q.      How long has Dr. Nathan March been your

Page 242

1  primary care physician?
2  A.        Will be 2009.  July.  Or whenever I first saw
3  a doctor once we moved.
4  Q.        Oh, okay.  So when you --
5  A.        When we left Hill.
6  Q.        I'm sorry.  I just had a moment right there.
7  A.        When we left Hill to go to Michigan.
8  Q.        When you went from The Hill School to --
9  right.  To Leelenau, right?
10  A.       Yes.
11  Q.       Who is your primary care physician when you
12  were in Pottstown?
13  A.       Alan, A-L-A-N.  Goldberg.
14  Q.       Read my mind.  Because I spelled it wrong.
15  Okay.  So what -- and how long was Alan Gold -- you
16  don't treat with Dr. Goldberg anymore, correct?
17  A.       Correct.
18  Q.       You haven't treated with him since before
19  2009?
20  A.       When I left.
21  Q.       2009?
22  A.       2009, yes.
23  Q.       Is Mr -- is Dr. Goldberg affiliated -- let me
24  start again.  At the time when you were treating with
25  Dr. Goldberg, was he affiliated with a medical

Page 243

1  practice?
2  A.        Yes.  I can't -- I don't remember the name of
3  the practice.  He was Potts -- maybe it's -- I -- I
4  don't know.  But he's in Pottstown.  He and his
5  partner, Paul Doghramji.  And I'm going to mess it up
6  as bad as you --
7  Q.        You're going to pass?
8  A.        -- so good luck.
9  Q.        Okay.  How long did you treat with Dr.
10  Goldberg and his partner?
11  A.        17 years.  The reason I mentioned Dr.
12  Doghramji was they were also The Hill School's doctor
13  until Dr. -- I don't know.  I know it would have been
14  early 2000s.  And I know that that changed there,
15  because the then new school doctor was the father of
16  one of my son's roommates.
17  Q.        Okay.  So when you started your employment
18  with The Hill School in 1992, do you remember that you
19  filled out some applications and paperwork for the
20  school and you had to identify your doctor?  Is that
21  how long that Dr. Goldberg has been -- was treating
22  you?  Was treating you, from when you started at The
23  Hill School?
24  A.        He would have treated me after we arrived at
25  The Hill School.  He didn't treat me before.

Page 244

1  Q.        Do you remember what paperwork I'm talking
2  about that you filled out?
3  A.        I don't.
4  Q.        I know it's a long time ago.
5  A.        I don't.
6  Q.        I was just trying to think if maybe you knew
7  then I would have his information in your documents.
8  But I'll check.
9  A.        I may still have it.
10  Q.        We'll pull it out and you can take a look at
11  it.  Okay.  So -- I'm sorry, what -- Lisa -- what was
12  the counselor's last name?
13  A.        Havens.
14  Q.        Havens.
15  A.        H-A-V-E-N-S.
16  Q.        Thank you.  And how long have you sought
17  counseling from Ms. Havens?  Does she go by Ms.?  Does
18  she have a title?
19  A.        I don't know.  I call her Lisa.
20  Q.        Okay.  I don't want to be disrespectful if
21  she's a doctor or has a different title, or prefers to
22  be Counselor.  So we'll go with Ms. Havens.  How long
23  have you been receiving counseling from Ms. Havens?
24  A.        I probably started seeing her in the fall of
25  2019.

Page 245

1  Q.        Was that the first time that you sought
2  counseling?
3  A.        Yes.
4  Q.        Ever?
5  A.        When I was leaving The Andrews School.  I
6  don't think I knew I was seeking counseling, but.  I
7  met with a gentleman in Cleveland.  I can't tell you
8  his name, but it was about career.  What I was going to
9  do.  What I wanted to do.  I wasn't sure if I wanted to
10  remain a teacher.  So I met with him.  As a more mature
11  adult I recognized that he was counseling me as well.
12  But it was almost all entirely about career and job.
13  Q.        That was the late '80s?
14  A.        Beg your pardon?
15  Q.        That was the late '80s?
16  A.        Yeah.  We left there in Eighty -- yes.
17  Q.        Okay.  So no other -- let me start again.  So
18  you've not received counseling of any kind, other than
19  the instance you just told me about in connection with
20  The Andrews School and from Ms. Havens, is that right?
21  A.        Yes.
22  Q.        And when did you start treating -- I think I
23  was saying his name wrong.  It's Dr. Siemer, right?
24  A.        Yes.
25  Q.        I think I was saying Sieman.  Sorry.  When

Matthew Ralston
July 01, 2021                                246 to 249

Page 246

1  did you start treating with Dr. Siemer?
2  A.      That would have been probably also summer or
3  fall of '19.
4  Q.      So you didn't start treating with Dr. Siemer
5  or receive counseling from Ms. Havens until several
6  months after you commenced this lawsuit, is that right?
7  A.      Yes.  Formally, yes.  If you will.  Like I
8  said, Dr. Siemer's a friend.
9  Q.      Did you pay for the treatment by Dr. Siemer?
10  A.      No.
11  Q.      Did you pay for the treatment by -- excuse
12  me.  Did you pay for the counseling by Ms. Havens?
13  A.      Yes.
14  Q.      Do you have records reflecting how much you
15  paid for the counseling by Ms. Havens?
16  A.      No, but I could get them.
17  Q.      Are you able to estimate, without completing
18  guessing, how much you have paid Ms. Havens for
19  counseling?
20  A.      12 hundred dollars.
21  Q.      Did Dr. Siemer prescribe -- let me start
22  again.  Did Dr. Siemer diagnose you with any medical
23  condition?
24  A.      Anxiety.  Some -- the diarrhea.  Irritable
25  bowel of some kind.  I don't -- and then just

Page 247

1  disruptive sleep.
2  Q.      Do you still -- let me start again.  Did Dr.
3  Siemer prescribe any medication for anxiety?
4  A.      No.  We treated through diet and supplements
5  and exercise.
6  Q.      Do you still suffer from anxiety?
7  A.      Yes.
8  Q.      So the diet -- let me start again.  Your
9  treatment through diet, supplements and exercise, is it
10  managing the anxiety?
11  A.      Yes.
12  Q.      Do you -- let me start again.  So when were
13  you first diagnosed with anxiety by Dr. Siemer?
14  A.      It would have been when I went to see him.
15  Q.      In summer, fall of 2019?
16  A.      Yes.
17  Q.      Did Dr. Siemer diagnose the reason for the
18  anxiety?
19  A.      Wow.  I don't know how to answer that.  We
20  addressed it, because I -- I mean, I can identify the
21  anxiety.  So I don't know if there is -- if I call it a
22  diagnosis or we just --
23  Q.      I'm asking for what Dr. Siemer diagnosed, not
24  what you think.
25  A.      I beg your pardon?

Page 248

1  Q.      I'm asking what Dr. Siemer diagnosed.  If you
2  don't know, then tell me that.
3  A.      I know why I went to him.  I know what we
4  addressed.  So I guess, yes.  He diagnosed that.
5  Q.      Okay.  So Dr. Siemer's medical notes are
6  going to reflect that -- a base -- a reason why -- a
7  reason for the anxiety diagnosis, is that right?
8  A.      Yes.  I would think so.
9  Q.      How about diarrhea, irritable bowel, do you
10  still suffer from that?
11  A.      I haven't had any of that since December of
12  '20.
13  Q.      Were you prescribed any medication for the
14  diarrhea, irritable bowel?
15  A.      Some diet and then probiotics.
16  Q.      Did Dr. Siemer diagnose the reason for the
17  diarrhea or irritable bowel?
18  A.      Well, that it had -- that I had dealt with it
19  earlier.  It was just another occurrence.  So, again, I
20  don't know if he tied it to.  It was related to what I
21  was already dealing with.  So I had some diarrhea
22  earlier in 2019.  Or in 2019.  And then we had that
23  pretty well under control and then so I had some in
24  December '20.
25  Q.      Okay.  So before or after you filed this

Page 249

1  lawsuit?  When you say earlier in 2019?
2  A.      Oh, I'm sorry.  The earlier in my mind was in
3  '20.  It was after.
4  Q.      Okay.  So after you filed this lawsuit that's
5  when you had your first bout of diarrhea and irritable
6  bowel?
7  A.      That's true.  Yes.
8  Q.      And then you had another bout in December of
9  2020?
10  A.      Yes.
11  Q.      And, I'm sorry if you answered this already,
12  but did Dr. Siemer prescribe any medication, as it
13  relates to the earlier bout in 2019?
14  A.      Again, diet and probiotics.
15  Q.      And did Dr. Siemer diagnose the reason for
16  the diarrhea and irritable bowel that you experienced
17  in 2019 after filing this lawsuit?
18  A.      Again, I can only say yes, because that's why
19  we started -- I don't know how he would word it.  But
20  it's why we were -- my situation, the accusations, not
21  working, were the reasons we were -- we attributed the
22  diarrhea to.  So in the sense that's a diagnosis, yes.
23  Q.      So not the fact that you were put on unpaid
24  leave?
25  A.      So -- I wasn't working, is what I said there.

Matthew Ralston
July 01, 2021                                    250 to 253

Page 250

1    Q.        Oh, I apologize.
2    A.        I tend to be pretty literal with these
3    questions.
4    Q.        And then I think you also said disruptive
5    sleep?
6    A.        Yep.
7    Q.        Do you still have disruptive sleep?
8    A.        Occasionally.
9    Q.        Can you describe what you mean by disruptive
10   sleep?
11   A.        Yeah.  It goes to back to the gerbil wheels.
12   Either trouble getting to sleep, or I wake up in the
13   night and my brain locks onto what I've been accused of
14   and it doesn't want to let go.
15   Q.        And that started after you filed this
16   lawsuit?
17   A.        No.
18   Q.        You didn't start treatment for disruptive
19   sleep until after you started this lawsuit, is that
20   right?
21   A.        Yes.
22   Q.        Did Dr. Siemer actually diagnose you with
23   disruptive sleep?
24   A.        I don't know if -- I actually don't know if
25   that's --

Page 251

1    Q.        Yeah, I'm just trying to learn if it's a
2    medical condition or just something you experience.
3    A.        I know when I speak with him, it's, you know,
4    do I have trouble sleeping?  Yes.  And my answer would
5    have been pretty much what I just said to you.  There
6    are nights I can't get to sleep.  There are other
7    nights that I'm wide awake.  And, you know, to me I --
8    I consider that a manifestation of anxiety.  I don't
9    know medical terms.
10   Q.        Did Dr. Siemer prescribe any medication for
11   disruptive sleep?
12   A.        Diet.  Supplements.  And exercise.
13   Q.        Okay.  So no medication.  Correct?
14   A.        Nothing I had to go to a pharmacy to get.
15   Q.        Are you an alcoholic?
16   A.        No.
17   Q.        Are you addicted to narcotics?
18   A.        No.
19   Q.        Do you gamble?
20   A.        No.
21   Q.        Do you use alcohol?
22   A.        Yes.
23   Q.        Do you use narcotics?
24   A.        No.
25   Q.        How often do you use alcohol?

Page 252

1    A.        A couple times a week.
2    Q.        Have you ever been through a detox program?
3    A.        No.
4    Q.        Have you ever received anger management
5    counseling?
6    A.        No.
7    Q.        Have you ever received therapy?
8              MR. JUBB:  Objection to the form.
9              THE WITNESS:  Beyond what I've shared,
10   no.
11   BY MS. DOUGHERTY:
12   Q.        So you never received treatment for a mental
13   health condition --
14   A.        No.
15   Q.        -- Ever?
16   A.        No.  Unless you count my father.
17   Q.        What do you mean?
18   A.        Huh?
19   Q.        What do you mean unless I count your father?
20   A.        Well --
21   Q.        Was your father a psychiatrist?
22   A.        No.  Sorry.  It's not a time for levity.
23   Just a father being a father with their teenage boys.
24   Telling me to get my head right.
25   Q.        So you've never gone to a mental health

Page 253

1    professional --
2    A.        No.
3    Q.        -- and received mental health treatment of
4    any kind?
5    A.        No.
6    Q.        So you never had any inpatient therapy?
7    A.        No.
8    Q.        Do you currently suffer from any medical
9    conditions, other than the anxiety and diarrhea that
10   you described?
11   A.        Allergies.
12   Q.        Allergies?  Okay.
13   A.        Hypertension.
14   Q.        Do you -- the allergies aren't attributable
15   to anything to do with Mr. Poulos's --
16   A.        No.
17   Q.        -- accusations, right?
18   A.        No.
19   Q.        And the hypertension is not attributable --
20   A.        No.
21   Q.        -- to anything to do with Mr. Poulos's
22   accusation?
23   A.        It's not.  Yes.  Correct.
24   Q.        And so no other medical conditions?
25   A.        No.

Matthew Ralston
July 01, 2021                                        254 to 257

Page 254

1    Q.      Other than anxiety, have you ever been
2    diagnosed with a mental health disorder?
3    A.      No.
4    Q.      Have you ever been sexually abused?
5    A.      No.
6    Q.      Have you ever been physically abused?
7    A.      No.
8    Q.      Have you ever been arrested?
9    A.      No.  Speeding ticket.  I guess that's not
10   arrested.
11           MR. JUBB: Were you speeding that fast?
12           That's her next question.
13           MS. DOUGHERTY: He saw my face.
14   BY MS. DOUGHERTY:
15   Q.      Okay.  So you've been pulled over speeding.
16   Have you been arrested for speeding?
17   A.      Well, I've been handed a ticket.
18   Q.      Mario Andretti over here?
19   A.      I've never been put in the back of a cruiser
20   and taken away.
21   Q.      So you've never been arrested ever for
22   anything?
23   A.      Right.  No.
24   Q.      In the United States or internationally,
25   correct?

Page 255

1    A.      Correct.
2    Q.      Have you ever been questioned by police?
3    A.      Regarding my behavior, no.
4    Q.      You've been questioned by police regarding
5    someone else's behavior?
6    A.      Yes.  In regard to students.
7    Q.      Anything relating to Mr. Poulos?
8    A.      No.
9    Q.      Anything relating to a student of The Hill
10   School between 1992 and 1997?
11   A.      Military police in reference to a security
12   check.  I was questioned about a student who was -- I'm
13   pretty sure he graduated in 1998.  So it would have
14   been after 1987, but he would have been a student in
15   1997.
16   Q.      Were you ever questioned by police relating
17   to sexual misconduct of someone other than you?
18   A.      No.
19   Q.      Have you ever spent time in custody?
20   A.      No.
21   Q.      Have you ever had a criminal complaint filed
22   against you?
23   A.      No.
24   Q.      Other than Mr. Poulos's accusations, have you
25   ever been accused of a crime?

Page 256

1    A.      No.
2    Q.      Other than Mr. Poulos's accusations, have you
3    ever been accused of misconduct with a student?
4    A.      No.  With the exception of one I shared
5    earlier.
6    Q.      Have you ever been investigated by a school
7    that employed you?
8    A.      FBI background checks.  Otherwise, no.
9    Q.      Have you ever been a party to a lawsuit,
10   other than this lawsuit?
11   A.      No.
12   Q.      Have you ever signed a confidentiality
13   agreement?
14   A.      Can I --
15   Q.      Go ahead.
16   A.      The reason I was thinking about that.  I was
17   deposed.  A student -- a student was hit in the eye
18   with a water balloon.  That's not -- and I was the dorm
19   parent.  And --
20   Q.      Were you a party?  Did you get sued?
21   A.      Beg pardon?
22   Q.      Were you like one --
23   A.      No, no, no.
24   Q.      -- of the people sued?
25   A.      No.  It was a question of did I discipline

Page 257

1    the students who hit him with the water balloon.
2    Q.      Okay.  So you gave a deposition about that?
3    A.      I did.
4    Q.      When was that?
5    A.      Over the phone.  Let's see.  I know where we
6    were living.  Probably early 2000s.
7    Q.      So that was The Hill School?
8    A.      Yes.
9    Q.      So The Hill School was a party to a lawsuit
10   arising from a kid getting hit in the eye with a water
11   balloon, and you gave a deposition about to the extent
12   in which the kid was disciplined?
13   A.      I gave a deposition.  I don't know if there
14   was a lawsuit.
15   Q.      Okay.  Was Mr. Rees the attorney for the
16   school?
17   A.      He was.
18   Q.      Have you ever signed a confidentiality
19   agreement?
20   A.      Can you tell me what that is?  No.
21   Q.      Do you know what a confidentiality agreement
22   is?
23   A.      That's what I'm asking.
24   Q.      Did you sign -- did you ever resolve a
25   dispute with someone where you signed --

Matthew Ralston
July 01, 2021                              258 to 261

Page 258

1  A.        No.
2  Q.        -- an agreement and agreed to keep secret
3  your agreement with that other individual?
4  A.        No.
5  Q.        So you never -- okay.  Any of the -- you've
6  had a number of jobs at different academic
7  institutions, right?  We haven't --
8  A.        Yes.
9  Q.        -- gone through them, but.  Have you ever
10 signed a confidentiality agreement in connection with
11 your departure from any of the academic --
12 A.        No.
13 Q.        -- institutions that you worked at?
14 A.        No.
15 Q.        How about a nondisclosure agreement, have you
16 ever signed a nondisclosure agreement?
17 A.        If I did, it would have been as an employee
18 of -- when I finished graduate school I worked, that's
19 when we lived in Florida.  Delray.  Is that back on the
20 places I lived?
21 Q.        Yeah, you have that.  You told me about
22 that --
23 A.        I worked as an actuary.
24 Q.        -- a long time ago.
25 A.        If I ever signed a nondisclosure it would

Page 259

1  have been there.  And I don't recall ever having done
2  that.  So, no
3  Q.        Okay.  So Delray Beach, Florida, for 15
4  months you worked as an actuary?
5  A.        Yes.
6  Q.        So you may have signed a nondisclosure
7  agreement when you departed your job with the actuary?
8  A.        I may have.  I don't remember doing it.
9  Q.        Did you sign a nondisclosure agreement in
10 connection with your departure from any of the
11 financial institutions that you worked -- excuse me.
12 Let me start again.  Did you sign a nondisclosure
13 agreement with any of the academic institutions that
14 you worked for, in connection with your departure?
15 A.        No.
16 Q.        Have you ever been subject to discipline at
17 any job?
18 A.        Just the -- the one incident I shared with
19 you.
20 Q.        Have you -- other than the incident you
21 shared from The Andrews School, have you ever been
22 reprimanded at any job?
23 A.        I don't think so.
24 Q.        Can you remind me again where you completed
25 your undergraduate and graduate degree?

Page 260

1  A.        Ohio State.  Both.
2  Q.        Were you subject to discipline for any reason
3  when you were a student at Ohio State?
4  A.        No.
5  Q.        Were you reprimanded for any reason while you
6  were a student at Ohio State?
7  A.        No.
8  Q.        Were you subject -- were you subject to
9  disciplinary action when you were a student at Ohio
10 State, even if the action did not result in discipline?
11 A.        No.
12 Q.        Do you know Zachary Brusko?  B-R-U-S-K-O?
13 A.        Yes.
14 Q.        How do you know Zach Brusko?
15 A.        He was a student at The Hill School in the
16 mid/late '90s.  And then he was also -- I hired him as
17 a -- when I was working in the academic office as a
18 director of studies.  He came to work for us as
19 a registrar.  He handled the technology in our office.
20 Q.        Did you tell Zachary Brusko about the
21 allegations by Mr. Poulos?
22 A.        I did not.
23 Q.        Did you give your lawyer, Mr. Jubb,
24 permission to tell Zachary Brusko regarding the
25 allegation by Mr. Poulos?

Page 261

1          MR. JUBB:  Well, just phrase it -- it's
2          objectionable as phrased.  I think you can
3          clarify, but I think as phrased I think it's
4          asking him to talk about what he discussed
5          with me.  But I don't have a general
6          objection.
7  BY MS. DOUGHERTY:
8  Q.        Did Mr. Jubb have your authority to tell Mr.
9  Brusko about Mr. Poulos's claims against you?
10 Accusations against you?
11 A.        Yes.
12 Q.        When was the last time you spoke to Mr.
13 Brusko?
14 A.        Last time I spoke with him would have been
15 before I left The Hill School in 2009.  The last time I
16 communicated with him would have been sometime after
17 that.  He was -- I can't tell you date.  I was in
18 Michigan and he was leaving Hill and I had questions
19 about schools.  I think that was by e-mail.  I don't
20 think we spoke.
21 Q.        Have you had any contact with Mr. Brusko
22 since April 11th, 2018?
23 A.        No.
24 Q.        Do you have an understanding of what Mr.
25 Brusko's opinion of you is?

Page 262

1  A.      Yes.  I think.
2  Q.      What is your understanding of Mr. Brusko's
3  opinion of you?
4  A.      I think it's high.  He enjoyed working with
5  me.  I know that.  Hat's all I got to base it on.
6  Q.      Has Mr. Brusko expressed to you that his
7  opinion of you has changed in any way since learning
8  the accusations by Mr. Poulos?
9  A.      No.  As I said, I haven't had any contact
10  with him since the letter.
11  Q.      Who is James Brobyn, B-R-O-B-Y-N?
12  A.      Former student.  Also from those -- the same
13  -- graduated in 1995.
14  Q.      So two years before Mr. Poulos?
15  A.      Yes.
16  Q.      Did you tell Mr. Brobyn about the accusations
17  by Mr. Poulos?
18  A.      I did not.
19  Q.      Do you know what Mr. Brobyn's opinion of you
20  is?
21  A.      I do.
22  Q.      What is Mr. Brobyn's opinion of you?
23  A.      Very high.
24  Q.      Mr. Brobyn has not stopped associating with
25  you in any way, correct?

Page 263

1  A.      Has not?
2  Q.      Has not stopped associating with you in any
3  way, correct?
4  A.      No.
5  Q.      Do you know whether Mr. Brobyn knows about
6  the accusations by Mr. Poulos, even though you did not
7  tell him?
8  A.      Yes.
9  Q.      Does Mr. Brobyn know about the accusations by
10  Mr. Poulos?
11  A.      He does.
12  Q.      Do you know how Mr. Brobyn learned about the
13  accusations by Mr. Poulos?
14  A.      I do.
15  Q.      How did Mr. Brobyn learn about the
16  accusations by Mr. Poulos?
17  A.      He spoke with Mr. Jubb.
18  Q.      Did you give Mr. Jubb authority to sell Mr.
19  Brobyn about the accusations by Mr. Poulos?
20  A.      I'm sorry, I must be getting --
21  Q.      I'm sorry.  Did you give Mr. Jubb authority
22  to tell Mr. Brobyn about the accusations by Mr. Poulos?
23  A.      Yes.
24  Q.      Do you have any information about whether the
25  information that -- let me start again.  Do you have

Page 264

1  any reason to believe that Mr. Brobyn's opinion of you
2  has changed since learning the accusations by Mr.
3  Poulos?
4  A.      No.
5  Q.      When is the time you spoke to Mr. Brobyn?
6  A.      I've not spoke with him.  He has -- we've
7  shared text messages within the last year.  He's part
8  of a business that he's trying to establish himself in
9  northern Michigan.  So when he goes out, he'll let me
10  know.  And if I'm there -- We have not gotten together.
11  It hasn't lined up.  But he wonders if I'm there and if
12  I'd be able to get together.
13  Q.      Do you know when Mr. Brobyn learned about the
14  accusations by Mr. Poulos?
15  A.      Do I know when?
16  Q.      Um-hum.
17  A.      I don't remember.
18  Q.      Here is what I really want to know.  Have you
19  spoken to Mr. -- or texted -- let me start again.  Have
20  you communicated with Mr. Brobyn since Mr. Brobyn
21  learned about the accusations by Mr. Poulos?
22  A.      Yes.
23  Q.      So Mr. Brobyn has not stopped associating
24  with you since learning the accusations by Mr. Poulos,
25  is that right?

Page 265

1  A.      That's correct.
2  Q.      The house -- let me start again.  Your
3  residence in Ohio, is that a house?
4  A.      It's a condominium.
5  Q.      It's a condominium?  So it's in a building
6  with other condominiums?
7  A.      It's not -- they're side by side.  It's not
8  an apartment building.
9  Q.      It's like a complex?
10  A.      It is a complex.
11  Q.      How many units are in the complex?
12  A.      Wow.  A bunch.  I don't know.
13  Q.      Here's what I want to know, is if you have
14  neighbors close by.
15  A.      I do.
16  Q.      Do you socialize with your neighbors?
17  A.      Yes.
18  Q.      Do any of your neighbors know about the
19  letters or the accusations by Mr. Poulos?
20  A.      No.
21  Q.      Who is in your community?
22          MR. JUBB:  Object to the form.
23          THE WITNESS:  What's your question?
24  BY MS. DOUGHERTY:
25  Q.      Who do you consider to be in your community?

Matthew Ralston
July 01, 2021                                        266 to 269

Page 266

1   Do you have a community?
2   A.      You mean my -- I guess -- can you define what
3   you mean by community?
4   Q.      Sure.  Your -- I guess the social circle of
5   -- let me start again.  I guess the circle of people in
6   which you communicate and live and interact.
7   A.      Okay.  In Ohio, it's my wife, a neighbor.  My
8   wife's brother, with whom I lived in college.  And his
9   wife.  I have a childhood friend there.
10  Q.      Okay.  So other than your wife, do any of the
11  people in your Ohio community know about the
12  accusations by Mr. Poulos?
13  A.      They do.
14  Q.      Do all of the people you just identified to
15  me, who are your Ohio community, know about the
16  accusations by Mr. Poulos?
17  A.      No.
18  Q.      Which ones?
19  A.      The neighbor does not.
20  Q.      Oh.  I'm sorry.  The brother of -- was that
21  your brother or somebody else?
22  A.      Mary Beth's brother.  My wife's brother.
23  Q.      Your wife's brother.
24  A.      My brother-in-law.
25  Q.      Does your brother-in-law know about the

Page 267

1   accusations of Mr. Poulos?
2   A.      Yes.
3   Q.      And does your sister-in-law know about the
4   accusations by Mr. Poulos?
5   A.      Yes.
6   Q.      And your childhood friend?
7   A.      Yes.
8   Q.      How did the -- how did your brother-in-law,
9   sister-in-law and childhood friend learn about the
10  accusations by Mr. Poulos?
11  A.      Initially, I can't tell you the conversation,
12  I mean --
13  Q.      Did they learn about it from you?
14  A.      My wife.  They learned, initially, from Mary
15  Beth.  Mary Beth and her sister-in-law are pretty
16  close.
17  Q.      So did your brother-in-law -- let me start
18  again.  Do you know your brother-in-law's opinion of
19  you?
20  A.      Yes.
21  Q.      What is your brother-in-law's opinion of you?
22  A.      Very high.
23  Q.      And did your brother-in-law's opinion of you
24  change when he learned about the accusations by Mr.
25  Poulos?

Page 268

1   A.      No.
2   Q.      Did your brother-in-law stop associating with
3   you when he learned about the accusations by Mr.
4   Poulos?
5   A.      No.
6   Q.      How about your sister-in-law, do you know her
7   opinion of you?
8   A.      I assume it's high.
9   Q.      And do you know -- let me start again.  Has
10  your sister-in-law's opinion of you changed since
11  learning the accusations by Mr. Poulos?
12  A.      No.
13  Q.      So your sister-in-law's opinion of you is
14  still high, is that right?
15  A.      Yes.
16  Q.      And your sister-in-law has not stopped
17  associating with you after learning the accusations by
18  Mr. Poulos, is that right?
19  A.      That's right.
20  Q.      And your childhood friend, has your -- do you
21  -- is your childhood friend's opinion of you high?
22  A.      I don't think so.  No.
23  Q.      You think your childhood friend doesn't have
24  a high opinion of you?
25  A.      Oh, oh.

Page 269

1   Q.      I thought you were teasing me.
2   A.      I'm sorry.  No.
3   Q.      I was going to say, why did we pick that one?
4   A.      He does.
5   Q.      Okay.
6           THE VIDEOGRAPHER:  Five minutes for
7           chapter change.
8           MS. DOUGHERTY:  Okay.
9   BY MS. DOUGHERTY:
10  Q.      And so your childhood friend's opinion of you
11  is high, is that right?
12  A.      It is.
13  Q.      And has his opinion of you changed since
14  learning the accusations by Mr. Poulos?
15  A.      No.
16  Q.      And so as far as you know, your childhood
17  friend's opinion of you is still high?
18  A.      Yes.
19  Q.      And he's not stopped associating with you
20  since learning the accusations by Mr. Poulos?
21  A.      He has not.
22  Q.      As we -- have we covered everybody who you
23  consider to be in your Ohio community?
24  A.      Yes.
25  Q.      Do you have other communities?

Matthew Ralston
July 01, 2021                                    270 to 273

Page 270

1  A.      I have friends in Michigan.
2  Q.      So you consider that you have a Michigan
3  community?
4  A.      I beg your pardon?
5  Q.      Who is in your Michigan community?  And your
6  wife can just be included in all.
7  A.      Okay.  She is included in all.
8  Q.      I'll just put her down immediately.
9  A.      Yeah.  I have a friend who owns a business,
10 who I've known since he moved there in 2000 and -- I'm
11 going to say '10 or '11.  And I have a -- another
12 friend whom I met actually through the one that owns
13 the business.  And then Dr. Siemer I consider a friend
14 and part of my community.
15 Q.      Okay.  And so do the individuals in your
16 Michigan community know about the accusations by Mr.
17 Poulos?
18 A.      They do.
19 Q.      And how did the individuals in the Michigan
20 -- let me start again.  How did the individuals in your
21 Michigan community learn about the accusations by Mr.
22 Poulos?
23 A.      I shared with them when I was no longer
24 working.
25 Q.      So is it --

Page 271

1  A.      I answered the questions of why aren't you
2  working.
3  Q.      So is it correct that the individuals in your
4  Michigan community all have a high opinion of you, as
5  far as you know?
6  A.      Yes.  They do.
7  Q.      And has the opinion of anyone in your
8  Michigan community changed since they learned the
9  accusations by Mr. Poulos?
10 A.      It has not.
11 Q.      So all the individuals in your Michigan
12 community, as far as you know, still have a high
13 opinion of you, is that right?
14 A.      Yes.
15 Q.      And no one in your Michigan community has
16 stopped associating with you, is that right?
17 A.      That's right.
18 Q.      Do you have any other communities, other than
19 your Ohio community and your Michigan community?
20 A.      Wow.  My brother.  I have a second brother
21 who's ten years younger than I.  I didn't grow up with
22 him.
23 Q.      Not Mark?  Somebody else?
24 A.      Yes.  His name is John.
25 Q.      Does John know about Mr. Poulos's

Page 272

1  accusations?
2  A.      He does.
3  Q.      And did he learn about the accusations from
4  you?
5  A.      He did.
6  Q.      And I assume that John's opinion of you is
7  high?
8  A.      Yes.  I would think so.
9  Q.      And John didn't credit the accusations by Mr.
10 Poulos like Mark didn't, right?
11 A.      I'm sorry, he didn't --
12 Q.      He did not credit the allegations by Mr.
13 Poulos --
14 A.      No.
15 Q.      -- just like Mark didn't credit the
16 allegations --
17 A.      Correct.
18 Q.      -- by Mr. Poulos.
19 A.      Correct.
20 Q.      And so as far as you know, John's opinion of
21 you is still high, and he has not stopped associating
22 with you, is that right?
23 A.      Correct.  Yes.
24 Q.      Is there anyone -- can you identify anybody
25 for me whose opinion has changed since learning the

Page 273

1  accusations by Mr. Poulos?
2           MR. JUBB:  I'll objection to the form.
3           THE WITNESS:  Mr. Lehman's ultimately
4  has.  I can tell you one of my most vivid
5  bouts of anxiety was before I -- my last trip
6  as a member of the -- active member of the
7  development crew as a capital giving officer,
8  was a trip with the board chair.  And I knew
9  the board chair had to know.  And he said
10 nothing to me.  And I spent that whole trip
11 wondering.
12          So I have no idea what his opinion -- if
13 his opinion has changed.  But that felt to me
14 like it had.  Former headmaster, Mr.
15 Dougherty, I can't tell you his, except I
16 know I haven't spoken with him since the
17 letters arrived.
18 BY MS. DOUGHERTY:
19 Q.      Well, does Mr. Dougherty know about the
20 accusations by Mr. Poulos?
21 A.      Yes.
22 Q.      How do you know that?
23 A.      Because I asked him at one point if I could
24 speak with him, just get his opinion on some things.
25 And his response was, he would love to talk with me,

Page 274

1  but if it had anything to do with legal proceedings at
2  the school he couldn't.  And that was the only legal --
3  potential legal proceedings, or legal -- I guess what I
4  would consider legal proceedings at the time.
5  Q.      When was that?
6  A.      That was in March of 2019.
7  Q.      Mr. Dougherty also knew Mr. Poulos, right?
8  A.      Yes.
9  Q.      Okay.
10         THE VIDEOGRAPHER:  Going off record.
11         4:39.
12                 *   *   *
13         (Whereupon, a short break was taken.)
14                 *   *   *
15         THE VIDEOGRAPHER:  Back on, 4:52.
16  BY MS. DOUGHERTY:
17  Q.      Okay.  So what is the basis for your belief
18  that Mr. Lehman's opinion of you changed because of the
19  allegation by Mr. Poulos?
20  A.      Well, I'm not working there anymore.  I guess
21  that's the basis of it.
22  Q.      Well, you're not working there anymore
23  because of Mr. Poulos's allegation or because of the
24  lawsuit that you filed?
25         MR. JUBB:  Objection to the form.  Asked

Page 275

1  and answered.
2         THE WITNESS:  I don't -- again, I don't
3         know how to separate them in a way to answer
4         that.  Can I ask -- when we left for break,
5         or changed the -- you had asked me about
6         community.
7  BY MS. DOUGHERTY:
8  Q.      Um-hum.
9  A.      We covered places we own homes.  And I had
10  asked you to define community.
11  Q.      Okay.
12  A.      My question around that is, I have -- there
13  are other people who know, but that was the result of
14  me no longer working.  I don't see them regularly.  But
15  I communicate with them.  Is that part of my
16  communicate -- part of my community?
17  Q.      Well, it's really up to you, as to what you
18  consider to be your community.  So I'll come back to
19  that.  Let's just finish up with Mr. Lehman.
20  A.      All right.
21  Q.      But I appreciate you bringing it to my
22  attention, because it's important for me to know.  So
23  did you ever discuss with Mr. Lehman his current
24  opinion of you?
25  A.      No.

Page 276

1  Q.      So you're just assuming because you no longer
2  work at The Hill School that Mr. Lehman's opinion of
3  you changed?
4  A.      Yes.
5  Q.      Because of the accusations by Mr. Poulos?
6  A.      At the core, yes.  And, yes.
7  Q.      And any -- so Mr. Lehman, the board chair,
8  Mr. Dougherty, anyone else that you can identify whose
9  opinion of you changed because of learning about the
10  allegations by Mr. Poulos?
11  A.      No.
12  Q.      Is there anyone that you can identify who
13  stopped associating with you because of the -- because
14  they learned of the allegations by Mr. Poulos?
15         MR. JUBB:  Other than what we discussed.
16  BY MS. DOUGHERTY:
17  Q.      Well, is the list the same?  I don't think it
18  is.  As the board -- did the board chair associate it
19  with you before?
20  A.      Yes.
21  Q.      Okay.  So the board chair no longer
22  associates with you?
23  A.      Correct.
24  Q.      And you're just assuming that it has
25  something to do with the allegations by Mr. Poulos, but

Page 277

1  you don't know, because you never asked, right?
2         MR. JUBB:  I'll object to the form.
3         THE WITNESS:  No.
4  BY MS. DOUGHERTY:
5  Q.      And then Mr. Lehman, Mr. Dougherty, anyone
6  else that has stopped associating with you because of
7  the allegations by Mr. Poulos?
8  A.      Any of the people I know on the board of
9  trustees.
10  Q.      Who are the people on the board of trustees
11  who stopped associating with you because of the
12  allegations by Mr. Poulos?
13  A.      I won't be able to give you an exhaustive
14  list, but I can tell you some.  Hans Maentz.
15  Q.      Well, I'm not asking for a list of everybody
16  on the board of trustees.  I want to know who stopped
17  associating with you.
18  A.      I haven't associated with any of them.
19  Q.      Did you associate with them before?
20  A.      Yes.
21  Q.      All right.  So go ahead and tell me the list
22  of people from the board of trustees who stopped
23  associating because of the allegations by Mr. Poulos.
24  A.      I know one is Hans Maentz.
25  Q.      Hans, did you say?

Matthew Ralston
July 01, 2021                                           278 to 281

Page 278

1   A.        H-A-N-S.  And Maentz is M-A-E-N-T-Z.  Another
2   is Shelly Gyves.  G-Y-E -- G-Y-V-E-S.  Doug Brody.
3   That's B-R-O-D-Y.  Doug Bouquard.  B-O-U-Q -- I don't
4   know if there's a U, but the end is A-R-D.  I'm trying
5   to think who else.  Oh, Madison Byrnes, B-Y-R-N-E-S.
6   Assuming she's still -- I don't know if any of them are
7   still on the board, but.  I know Hans is still on the
8   board.  I'm pretty sure Shelly is.  I know -- I -- I
9   know Doug Bouquard is still on the board.
10  Q.        Anybody else?
11  A.        Not that's coming to mind.  Oh, Geoff
12  Richards.  Which is J -- or G-E-O-F-F.  That's Geoff.
13  Mr. Aithe, he just retired from it, but you already got
14  him.  And, I'm sorry, I'm not thinking of who else is
15  on the board.
16  Q.        Okay.  So you were telling me about your
17  community.  You identified your Ohio community, your
18  Michigan community, and then you were telling me about
19  your family.  Are there other people in your community?
20  A.        That I consider my community, yes.
21  Q.        Who?
22  A.        Most of those people are alumni of the
23  school.
24  Q.        Do any of the people in your community that
25  are alumni of the school know of the accusations by Mr.

Page 279

1   Poulos?
2   A.        They know of accusations.  They don't know by
3   whom.  They know I'm no longer at the school, which is
4   what I shared with them.
5   Q.        So the -- can we just call them your alumni
6   community?  Is that a fair characterization?
7   A.        Yes.
8   Q.        Okay.  So the -- I'm not trying to restrict
9   you.  I'm --
10  A.        Oh, I know.
11  Q.        -- just trying to use a word we can agree on.
12  So the alumni community, they learned that there were
13  accusations against you by a student?
14  A.        Yes.
15  Q.        By who -- by you?
16  A.        Yes.  And, yes.
17  Q.        Have any of the individuals in your alumni
18  community who stopped associating with you stopped
19  since you --
20          MR. MCCARRON:  Hey, anthony -- oh,
21        sorry.
22          MS. DOUGHERTY:  Hello?
23          MR. MCCARRON:  Sorry, I didn't mean
24        to --
25          MS. DOUGHERTY:  You scared me.

Page 280

1   BY MS. DOUGHERTY:
2   Q.        I forget what I was asking.  Did anyone in
3   your -- has anyone in your alumni community stopped
4   associating with you since you told them about the
5   accusations against you?
6   A.        Yes.
7   Q.        Who in your alumni community stopped
8   associating with you since learning about the
9   accusations by Mr. -- the accusations?
10  A.        Mostly some with whom I did not have
11  continuous relationship since they graduated.
12  Q.        I need names.
13  A.        Oh.  I'll give you Faizeen, F-A-I-Z-E-E-N,
14  Khandker, K-H-A-N-D-K-E-R.
15  Q.        K-H-A-N-D-- E-R or A-R?
16  A.        I don't know.
17  Q.        All right.
18  A.        I would spell it E-R.
19  Q.        Okay.
20  A.        But I don't know if that's right.
21  Q.        Others from your alumni community who have
22  stopped associating with you after learning about
23  accusations from you?
24  A.        There are, but I can't tell you, because of
25  that.  Faizeen I know, because he called and asked me

Page 281

1   when I was coming back from where he is.  And I had to
2   tell him I was no longer there.  So there are others
3   I'm not in communication with, but I can't tell you
4   what they do or don't know.
5   Q.        Okay.  So Faizeen Khandker, did I say that
6   right?
7   A.        Khandker.
8   Q.        Khandker, okay.  He's the only person from
9   your alumni community who you informed about
10  accusations and who you know has stopped associating
11  with you since and because of learning about the
12  accusations, is that right?
13  A.        I think so.
14  Q.        What do you mean I think so?
15  A.        Well, I -- I don't communicate as much with
16  some of them, but they've got young -- I mean, it's
17  mostly life going on.  I haven't heard from Faizeen
18  since.  The reason his name comes to mind is he called
19  me and wanted to know when I would be in Chicago again
20  in the capacity of my work, and I told him I wouldn't.
21  He asked why not, and I said because I'm no longer
22  working at the school.
23  Q.        Do you have a -- how do we find out all the
24  people that you told about the accusations?
25  A.        Well, I can share the community name if we go

Matthew Ralston
July 01, 2021                                    282 to 285

Page 282

1   on.  You asked that question specifically about those
2   who had stopped communicating with me.
3   Q.      Okay.  So you have like a -- like a group in
4   Facebook or something?
5   A.      No.  Heavens no, no, no.
6   Q.      Okay.  I don't understand what you mean, so
7   can you explain what you mean?
8   A.      Well, there are alumni with whom I've
9   developed friendships over the years.  There are three
10  brothers who I've known since 1992.
11  Q.      Would you have, like, a list of all the
12  people you told about the accusations?  I thought you
13  were suggesting that you had a -- like a group or
14  something.
15  A.      Oh, no, no, no.
16  Q.      Because you said community.
17  A.      When you said community, my brain is -- no, I
18  don't have a list and there's no set of people that I
19  -- those three brothers I did make a point.
20  Q.      Did they stop associating with you?
21  A.      No.
22  Q.      Anybody else who you told about the
23  accusations uh-uh stopped associating with you?
24  A.      No.
25  Q.      Anyone -- go ahead.

Page 283

1   A.      No.  That I know, no.
2   Q.      Anyone.
3   A.      That I have told, no.
4   Q.      Okay.  And is there anyone else that you've
5   informed about the accusations?  I'm saying
6   accusations, because I realize sometimes you didn't
7   attribute it to a person, you know, attribute it to Mr.
8   Poulos.  Is there anyone who you informed of the
9   accusations who you know their opinion of you changed
10  because of the accusations, other than who you told me?
11  A.      No.
12  Q.      Did we cover your community now?
13  A.      Yeah.  Yes.
14  Q.      Okay.  Back to D-4, which is the December
15  26th, 2018 letter.  We were on the second paragraph.
16  A.      I'm sorry, second paragraph?
17  Q.      I would just finish the second paragraph.
18  Let me just ask you before I -- so I don't have to come
19  back.  So you said, I think, that Faizeen has stopped
20  associating with you.  How did you previously associate
21  with Faizeen?  Like before you told him about the
22  accusations.
23  A.      In capacity of my work in the alumni office.
24  He -- he's in Chicago.  I reached out to him, because
25  he was someone in Chicago I know.  He first didn't want

Page 284

1   to meet with anyone at the school, because he said his
2   experience was not -- academically was good, but he
3   said socially it wasn't extraordinary.  I acknowledged
4   and said I'd still like to meet if he was open to it.
5       And after that he was -- would always wonder
6   when I was coming to Chicago so we could visit.  And he
7   called me sometime after I wasn't working.  I can't
8   tell you when, but it was after I wasn't working, and
9   asked me.  And that's when I shared it with him.
10  Q.      Okay.  So you have stopped associating with
11  Faizeen because you no longer work in the alumni
12  office, is that right?
13          MR. JUBB:  Objection to the form.
14  BY MS. DOUGHERTY:
15  Q.      I mean, Faizeen has no reason to associate
16  with you, because you're not part of the alumni office,
17  is that right?
18          MR. JUBB:  Objection to the form.
19          THE WITNESS:  I can't say why he doesn't
20          any longer.  I can say that would be the
21          frequency.
22  BY MS. DOUGHERTY:
23  Q.      I thought that you said that you associated
24  with him in the capacity of your work in the alumni
25  office, and he was trying to find out when you were

Page 285

1   coming to Chicago in that capacity, right?
2           MR. JUBB:  Objection to the form.
3           THE WITNESS:  I was hired because of my
4           relationship with alumni, so --
5   BY MS. DOUGHERTY:
6   Q.      Right.  But you have no reason to associate
7   with Faizeen now, because you are no longer with the
8   alumni office, is that right?
9           MR. JUBB:  Objection to the form.
10          THE WITNESS:  I -- I have no reason,
11          myself, to reach out to him.
12  BY MS. DOUGHERTY:
13  Q.      Well, the same for him, right?  Because
14  you're not able to help him with his alumni work,
15  right?
16  A.      I don't -- in a formal capacity with the
17  school, that would be true.  In a capacity of can I
18  introduce him to other alumni who are in a similar line
19  of business to him, that would not be true.
20  Q.      Were you still allowed to do stuff like that?
21  Are you still allowed to represent the school?
22  A.      I was -- I was not.  And -- I was not.  I was
23  not allowed to represent myself as an employee at the
24  school, or have an association with the school.  That
25  -- and I don't.

Matthew Ralston
July 01, 2021                                    286 to 289

Page 286

1  Q.      Right.  So the reason you don't associate
2  with Faizeen is because you no longer work at The Hill
3  School, right?
4          MR. JUBB:  Objection to the form.
5          THE WITNESS:  I -- I guess you can say
6          that.  It's not complete or a completely fair
7          answer.
8  BY MS. DOUGHERTY:
9  Q.      Is that the same as it relates to the Board
10 of trustees?  Did you associate with the members of the
11 board of trustees because you were capital giving
12 officer in the development -- alumni and development
13 office?
14         MR. JUBB:  Objection to the form.
15         THE WITNESS:  Most of them.
16 BY MS. DOUGHERTY:
17 Q.      Okay.  And so now you don't associate with
18 the board of trustees, because you no longer hold that
19 position, right?
20         MR. JUBB:  Objection to the form.
21         THE WITNESS:  I -- I guess.
22 BY MS. DOUGHERTY:
23 Q.      Okay.  Which ones on the -- you said most of
24 them, I think.  So which ones on the list do you
25 associate with other than because of your position as a

Page 287

1  capital giving officer?  We had Hans, Shelly, Doug,
2  Doug, Madison and Geoff.
3  A.      It would have been -- would be Hans.
4  Although less in recent years than previously.  He was
5  once a faculty member at the school and lived in a dorm
6  when we were there and the boys were young.  And again,
7  less frequently, but Shelly Gyves, who is married to an
8  alumnus.  I take that back.  You can scratch Shelly
9  off.  I think it was Dan's brother who worked at a
10 school in North Carolina that I saw.  So you can
11 scratch her off.  It would be most -- it would be Hans.
12 Q.      Okay.  So how did you associate with Hans
13 before you -- he learned about the accusations?
14 A.      Well, in the time frame it would have been --
15 I would have seen him when we were both on campus, in
16 my role.  I would have associated with him at reunions
17 when he was back.  Even if I wasn't employed at the
18 school.  And occasionally there were life events and
19 people we both knew well that he would share with me or
20 I would share with him.
21 Q.      Are you prohibited from going to reunions?
22 A.      Yes.
23 Q.      Is that part of the October 14th, 2019
24 letter?
25 A.      That's a good question.  I'll say yes.

Page 288

1  Because it began after that.
2  Q.      So it's the case that --
3  A.      I'm sorry, it did not begin after that.  It's
4  the result of being on paid administrative leave,
5  because I was not allowed to attend the reunion that
6  June.
7  Q.      Okay.  So you're not allowed to go because
8  the school says so?  You're not not going by choice,
9  right?
10 A.      Yes.  No, I'm not.  I'm --
11 Q.      Okay.  So the reason why you can't associate
12 with Hans is because -- also because you lost your
13 position and you're not permitted to attend reunions,
14 right?
15         MR. JUBB:  Objection to the form.
16         THE WITNESS:  If I were in Los Angeles I
17         would not hesitate to call Hans.  I'm not
18         sure what his response would be.
19 BY MS. DOUGHERTY:
20 Q.      Okay.  So you haven't tried?
21 A.      No.
22 Q.      So you don't know that he actually stopped
23 associating with you?  You just haven't had occasion to
24 see him, because you're not in your position, right?
25         MR. JUBB:  Objection to the form.

Page 289

1  BY MS. DOUGHERTY:
2  Q.      You weren't permitted to go to the reunion.
3          MR. JUBB:  Objection to the form.
4          THE WITNESS:  I guess.
5  BY MS. DOUGHERTY:
6  Q.      What do you mean you guess?
7  A.      I can't --
8  Q.      You haven't --
9  A.      -- answer --
10 Q.      -- tried to associate with Hans, right?
11 A.      I can't answer what the board has been
12 directed as far as communicating with me.  I don't know
13 that.
14 Q.      Okay.
15 A.      I can only draw assumptions, so I guess.
16 Q.      So D-4 -- oh -- you know what, I almost
17 forgot.  Mr. Dougherty, how are you associated with Mr.
18 Dougherty since he stopped being the headmaster of The
19 Hill School?
20 A.      I don't know.  He and his wife retired to
21 Wilmington, North Carolina, which is where my mother
22 lived.  So I would see them when I visited my mother.
23 And we would see each other at Hill School alumni
24 weddings.  Which -- and then also he would -- they
25 would come back for reunions and things.

Page 290

1   Q.        Are you prohibited from attending alumni
2   weddings?
3   A.        Yes.
4   Q.        Is that something you agreed to in an
5   agreement with The Hill School?
6   A.        No.  Uh -- no.
7   Q.        Do you have some type of an agreement with
8   The Hill School?
9   A.        No.
10  Q.        Like a separation --
11  A.        Just --
12  Q.        -- agreement or something?
13  A.        -- just -- no.  I have the directives that
14  were in the letter.  I don't recall if that's there.  I
15  do know that in 2020, prior to the reunion not
16  happening, there were students in the Class of 1995
17  that wanted me to come back.  And one of the things the
18  school will do is speak with representatives of a class
19  and ask if there are people they want to be sure will
20  attend the reunion and then they send an invitation.  I
21  was not allowed to do that.
22  Q.        Have you gone to visit your mother since
23  March 2019?
24  A.        Yes.  But that's -- she died February of '20.
25  And in March of 2019 she was already declining.

Page 291

1   Dementia.  So, yes.  I've seen -- I saw my mother.
2   Q.        Did you try to get together with Mr.
3   Dougherty when you went to see your mother last?
4   A.        They were out of town.  They have -- they
5   have a summer home in Ireland.
6   Q.        Okay.  So Mr. Dougherty didn't say "I don't
7   want to get together with you".  He said "I'm in
8   Ireland", right?
9   A.        He did in March.  He said he wouldn't talk to
10  me.
11  Q.        He said he wouldn't -- he wouldn't talk to
12  you about legal proceedings, right?
13  A.        Yes.
14  Q.        He didn't say he wouldn't talk to you period,
15  right?
16  A.        Yes.  Correct.
17  Q.        And so when -- then when you went to get
18  together with him next, he didn't say I'm not going to
19  get together with you.  He said we're in Ireland,
20  right?
21  A.        I can't tell you that I asked again.
22  Q.        So how do you know that Mr. Dougherty is not
23  associating with you anymore?
24            MR. JUBB:  I'll object to the form.
25            THE WITNESS:  I don't know how to answer

Page 292

1   that, except we don't have any association
2   anymore.
3   BY MS. DOUGHERTY:
4   Q.        Do you have any reason to believe Mr.
5   Dougherty is refusing to associate with you?
6   A.        Any reason to believe?
7   Q.        Yeah.
8   A.        It's got to be the result of the letters and
9   where we are today.
10  Q.        No.  Just because you haven't seen somebody
11  doesn't mean the person's refusing to associate with
12  you.  I'm trying to learn who will no longer associate
13  with you or whose opinion of you changed, we went
14  through that also, because of learning about the
15  accusations by Mr. Poulos, or accusation as being
16  attributable to Mr. Poulos, and you've -- I'm trying to
17  learn why you believe that Mr. Dougherty is, like, just
18  not associating with you as compared to, like, just
19  being in Ireland.
20            MR. JUBB:  You've answered her question.
21            THE WITNESS:  I can't --
22            MR. JUBB:  You've answered her question.
23            THE WITNESS:  Oh, okay.
24            MS. DOUGHERTY:  I'm sorry, you're
25  instructing him not to answer?

Page 293

1            MR. JUBB:  I don't understand what the
2   question is, other than the last one, which
3   he already answered.  You made a legal
4   argument --
5            MS. DOUGHERTY:  So are you instructing
6   him not to --
7            MR. JUBB:  I'm instructing him not to
8   answer the statement.  I have no idea what
9   you're even asking him.  The previous
10  question.
11           MS. DOUGHERTY:  I just want an answer,
12  Lane.  I'm, like, not interested in hearing
13  about it.  So are you instructing him not to
14  answer or not?
15           MR. JUBB:  I don't even -- there's not a
16  question.
17           MS. DOUGHERTY:  He seemed to understand
18  there was a question, because -- and was able
19  to answer it.
20           MR. JUBB:  No, he was not.
21           MS. DOUGHERTY:  Yes, he was.  He was
22  answering it.
23           MR. JUBB:  You were arguing with the
24  witness, giving him a legal argument.
25           MS. DOUGHERTY:  I was not arguing with

Matthew Ralston
July 01, 2021                                     294 to 297

Page 294

1    the witness, okay.  It is 5:15.  I'm not
2    wasting my time listening to this.  Are you
3    instructing him not to answer or not?
4              MR. JUBB:  Go ahead and answer.  Do you
5    even know what she asked?
6              THE WITNESS:  I think so.
7              MR. JUBB:  Go ahead.
8              THE WITNESS:  I have not been to
9    Wilmington since October of 2018.  I have not
10   been to a wedding or a reunion where he would
11   be since.  I have not reached out since he
12   told me he couldn't talk to me.
13   BY MS. DOUGHERTY:
14   Q.        About legal issues relating to the school,
15   right?
16   A.        Yes.
17   Q.        Okay.  D-4.  The third paragraph.  It says,
18   "Kurtis Nicholas Poulos, D/O/B 10/10/1978.  Met Mr.
19   Ralston during Mr. Poulos's Freshman year at The Hill
20   School in approximately 1993, or approximately 1994,
21   when Mr. Poulos was approximately 14 or approximately
22   15 years old."  Is that a true statement?
23   A.        Yes.
24   Q.        Mr. Ralston -- I'm sorry, go ahead.
25   A.        I -- I assume I met him -- I mean, it's very

Page 295

1    possible I met him his Freshman year.  So I can't
2    imagine I didn't.
3    Q.        So you don't have a reason to doubt that you
4    met Mr. Poulos Freshman year, but you're certain you
5    didn't teach him in class, right?
6    A.        No.  Correct.
7    Q.        "Mr. Ralston served as a table master in the
8    dining hall and Mr. Poulos had a rotation at Mr.
9    Ralston's table during Mr. Poulos's Freshman year."  Is
10   that a true statement?
11   A.        I don't know.  It's quite possible.
12   Q.        Okay.  So you just don't remember?
13   A.        No.  We changed tables every six months
14   weeks.  So I don't remember who all sat at my table.
15   Q.        Mr. Poulos recalls that Mr. Ralston was a
16   mathematics teacher and cross country coach at The Hill
17   School.  Is that a true statement?
18   A.        That's a true statement.  Well, those are
19   things I did.  I don't know that he recalls them.
20   Q.        Okay.  So the part, Mr. Ralston was a
21   mathematics teacher and a cross country coach at The
22   Hill School, that's true?
23   A.        Yes.
24   Q.        Okay.  And the next one says, "Mr. Poulos
25   recalls", but I'm just going to ask you about part

Page 296

1    about you.  So, "Mr. Ralston lived in a dormitory of
2    The Hill School with Mr. Ralston's family."  Is that a
3    true statement?
4    A.        Yes.
5    Q.        Was there any inappropriate conduct -- let me
6    start again.  Was there any inappropriate contact
7    between you and Mr. Poulos during Mr. Poulos's Freshman
8    year at The Hill School?
9    A.        No.
10   Q.        You called -- I'm sorry, the Hill School
11   calls Freshman year something else, right?
12   A.        Yes.
13   Q.        Third form, is that right?
14   A.        Third form, yes.
15   Q.        And the next sentence is, "Mr. Ralston was
16   Mr. Poulos's geometry teacher during Mr. Poulos's
17   sophomore year at The Hill School in approximately 1994
18   and approximately 1995 when Mr. Poulos was
19   approximately 15 and approximately 16 years old."  Is
20   that true?
21   A.        Yes.
22   Q.        And The Hill School calls Sophomore year?
23   A.        Fourth form.
24   Q.        Fourth form.  The next sentence is, "Mr.
25   Poulos recalls", but I'm going to ask about the part

Page 297

1    that relates to you.  "Classes were held on a rotating
2    schedule at The Hill School so that classes met at
3    different times of the day."  Is that true?
4    A.        Yes.
5    Q.        That was true in 1994 and 1995 when --
6    A.        Yes.
7    Q.        -- Mr. Poulos was in your geometry class?
8    A.        Yes.
9    Q.        "On certain days when Mr. Poulos had geometry
10   as the last class of the day, Mr. Ralston made Mr.
11   Poulos stay behind in Mr. Ralston's classroom."  Is
12   that true?
13   A.        No.
14   Q.        It's all untrue?
15   A.        That I made someone stay after class?
16   Q.        Yes.
17   A.        Yes.
18   Q.        So you're certain that you never made Mr.
19   Poulos stay after class?
20   A.        Absolutely.
21   Q.        Do you remember whether geometry was ever the
22   last day -- I'm sorry, the last class of the day?
23   A.        I don't.  It's quite possible.
24   Q.        Do you have any idea why Mr. Poulos would say
25   you made him stay behind after class?

Page 298

1  A.      I don't.

2  Q.      Mr. Ralston -- do you have any recollection

3  of interacting with Mr. Poulos when he was in your

4  geometry class?

5  A.      Vaguely, but no.

6  Q.      What was your -- okay.  So you have a vague

7  recollection of interacting with Mr. Poulos?

8  A.      Yes.

9  Q.      Was -- was your interaction -- let me start

10 again.  How were your interactions with Mr. Poulos?

11 Were they cordial?  Were they combative?  Do you have

12 any sense?

13 A.      They would -- they would have been cordial.

14 Q.      So you don't remember any animosity or

15 adversity, or any --

16 A.      No.

17 Q.      -- anything like that, as it relates to Mr.

18 Poulos when he was in your geometry class, is that

19 right?

20 A.      None whatsoever.

21 Q.      Were you ever alone with Mr. Poulos?

22 A.      Probably.

23 Q.      Why do you say probably?

24 A.      Because I would often be in my classroom with

25 a student either before or after class for a brief

Page 299

1  time.  Students had about ten minutes to get from one

2  class to another.  They may ask if I was available for

3  extra help.  They may apologize for not getting their

4  homework done.  But not at any request during an

5  academic day, because they were rushed to get to their

6  next class on campus, and I had classes coming in.  And

7  so it would have been a momentary time anyway.  That a

8  class would be coming in.

9  Q.      Okay.  So is -- just -- please correct me if

10 I miss -- because I'm not trying to mischaracterize

11 your testimony.  I just want to see if I understand.

12 So are you saying that Mr. Poulos may have stayed after

13 geometry -- after class when geometry was the last day

14 of the class, but not because you made him stay, is

15 that right?

16 A.      That would be true.  And that would have been

17 a very brief meeting, because I coach.  Classes would

18 end about 3:10.  At 3:10.  Practice would begin at

19 3:20.  I would have to walk home, get my clothes

20 changed and be at practice.  And I was -- I coached

21 three seasons of the year, which is all three terms of

22 the school year.  So there's no way that happened.

23 Q.      So did Mr. Poulos ever stay after class when

24 geometry was the last day -- last class of the day?

25 A.      I don't have any idea.

Page 300

1  Q.      So you don't know one way or the other

2  whether Mr. Poulos stayed after class when geometry

3  class was the last class of the day?

4  A.      I don't.

5  Q.      You're just certain it wasn't because you

6  made him stay?

7  A.      That's true.  Yes.

8  Q.      Why are you -- so you never made a student

9  stay behind?

10 A.      I don't think so.  If there was something

11 school related, student came back from being sick or

12 something, I would ask if they are doing okay and they

13 may choose to stay then.  Most times that I would see

14 students about anything that was lengthy, it would be

15 during evening study hall.  I did not have my own

16 classroom, so meeting during the daytime during free

17 period, quote, free period, for a student, didn't

18 happen in a classroom of which I was teaching, because

19 I did not have my own classroom.  Ever.

20 Q.      So you do believe that you were alone with

21 Mr. Poulos in the geometry classroom?

22         MR. JUBB:  Objection to the form.  Are

23         you listening?

24         THE WITNESS:  I don't -- it's quite

25         possible.  I'm not saying I did or didn't.  I

Page 301

1         don't remember.

2  BY MS. DOUGHERTY:

3  Q.      I thought when I asked you if you were ever

4  alone with Mr. Poulos you said it's possible?

5  A.      I did.

6  Q.      Okay.  You just don't remember one way or the

7  other?

8  A.      It's -- it's -- it would make perfect sense

9  that I was.  I was his teacher.  And if he had a

10 question after class, could I come get extra help,

11 would be an example.  My answer would be yes or no.

12 And if it was no it would be because I had something

13 already scheduled.  If I said yes, it would be what

14 times I'm available.

15 Q.      Mr. -- next sentence, "Mr. Ralston and Mr.

16 Poulos were alone in a classroom after school on these

17 occasions."  So you don't know, one way or the other,

18 whether that's a true statement, except you're certain

19 that you -- that if Mr. Poulos was alone with you in

20 the classroom, it wasn't because you made him stay?

21 A.      I'm certain of that and I'm certain these

22 occasions is false.

23 Q.      Okay.  Well, I haven't asked you about the

24 allegations of the conduct.  I'm just talking about --

25 A.      It's what -- that's what the sentence refers

Matthew Ralston
July 01, 2021                                    302 to 305

Page 302

1   to.
2   Q.      This says Mr. Ralston -- it says that "On
3   certain days when Mr. Poulos had geometry as the last
4   class of the day, Mr. Ralston made Mr. Poulos stay
5   behind in Mr. Ralston's classroom."
6   A.      Gotcha.
7   Q.      And you told me that it's possible that he
8   stayed after class, but not because you made him.
9   Because he needed --
10  A.      Correct.
11  Q.      -- assistance, right?  And that if that
12  occurred, then you and Mr. Poulos would be alone in the
13  classroom after school on those occasions, except it
14  wouldn't be because you made Mr. Poulos stay, is that
15  right?
16  A.      The very last part of that?
17  Q.      If you and Mr. Poulos were alone in the
18  geometry classroom, it wouldn't be because you made Mr.
19  Poulos stay?
20  A.      No.  I may ask a student a question as
21  they're leaving, but I would never make them say,
22  because I don't know their next -- I did not know their
23  next obligation and I did know mine.
24  Q.      So you never shut the door when Mr. Poulos
25  was trying to leave so he couldn't leave?

Page 303

1   A.      Never.
2   Q.      Never pulled Mr. Poulos back into the
3   classroom when he tried to leave?
4   A.      No.
5   Q.      Was the geometry classroom located at the end
6   of a hallway?
7   A.      Yes.
8   Q.      During the course of Mr. Poulos's -- what?
9   Is that --
10  A.      A geometry classroom that I taught in was
11  located at the end of the hallway.  I've got no reason
12  to believe that wasn't where I taught him.
13  Q.      "During the course of Mr. Poulos's Sophomore
14  year, Mr. Ralston sexually abused Mr. Poulos in Mr.
15  Ralston's geometry classroom between approximately 10
16  and approximately 15 times."  Is that a true statement?
17  A.      False.
18  Q.      "The sexual abuse consisted of, among other
19  things."  Did you fondle Mr. Poulos's penis --
20  A.      No.
21  Q.      -- and testicles?
22  A.      No.
23  Q.      So on no -- at no time did you fondle Mr.
24  Poulos's penis and testicles?
25  A.      At no time.

Page 304

1   Q.      So you didn't fondle Mr. Poulos's penis and
2   testicles skin on skin, or outside of the clothes in no
3   way, shape or form, that's your position?
4   A.      Ever.
5   Q.      Did you make Mr. Poulos fondle your penis and
6   testicles?
7   A.      No.
8   Q.      So never, whether skin on skin, outside of
9   clothes, no way?
10  A.      No way.
11  Q.      Did you ever have contact with Mr. Poulos's
12  penis or testicles in a way that wasn't forced?
13  A.      No.
14  Q.      Did you ever put your mouth on Mr. Poulos's
15  penis?
16  A.      No.
17  Q.      Did you ever make Mr. Poulos put his mouth on
18  your penis?
19  A.      No.
20  Q.      Do you have any idea why Mr. Poulos would
21  describe such graphic interactions with you?
22  A.      No.
23  Q.      None whatsoever?
24  A.      I think I, earlier today, said I tried to
25  figure out, I wondered why, and I quit, because I knew

Page 305

1   I'd never figure it out.
2   Q.      You weren't curious to learn more by
3   revealing Mr. Poulos's testimony in this case?
4   A.      No.  I don't figure -- I didn't -- my
5   curiosity ended when I realized I would never know.  I
6   wondered why this was happening to me.  I didn't try to
7   figure out what anyone was thinking.
8   Q.      Do you believe that Mr. Poulos was abused,
9   just not by you?
10  A.      I have no basis to make that.  I know he
11  wasn't abused by me.  And I had --
12  Q.      And -- I'm sorry.  Go ahead.
13  A.      So to answer your question, no, I have no
14  reason.
15  Q.      Do you think Mr. Poulos has identified the
16  wrong man?
17  A.      If he was abused, then yes.  But I have no
18  reason to believe that he was abused.  I -- actually, I
19  don't believe he identified the wrong man.  If he was
20  abused I know he identified the wrong man.
21  Q.      I understand you deny the abuse.  I guess --
22  let me start again.  Did you ever consider that Mr.
23  Poulos was in fact abused, just not by you, and was
24  identifying you erroneously?
25  A.      Did I -- yes.  I did consider that.

Matthew Ralston
July 01, 2021                                    306 to 309

Page 306

1  Q.     And did you do anything to investigate
2  whether Mr. Poulos was abused as he described, but has
3  just misidentified you as the abuser?
4  A.     No.
5  Q.     Do you know if The Hill School ever
6  investigated whether Mr. Poulos's accusations of sexual
7  abuse were true, just that he misidentified you?
8  A.     No.
9  Q.     So the next paragraph, "The sexual abuse by
10 Mr. Ralston ended with Mr. Poulos's Sophomore year at
11 The Hill School."
12 A.     Where?
13 Q.     We're after the Mr. Ralston's penis
14 paragraph.  The next one.
15 A.     Okay.
16 Q.     "The sexual abuse by Mr. Ralston ended with
17 Mr. Poulos's Sophomore year at The Hill School."  So
18 you deny that, right?
19 A.     Yes.
20 Q.     "Mr. Poulos transferred to Marquette
21 University High School, Milwaukee, Wisconsin for his
22 Junior year of high school."  Do you have any
23 information about that, whether it's true or false?
24 A.     I believe it's true.
25 Q.     "And Mr. Poulos returned to The Hill School

Page 307

1  his Senior year, approximately 1996 to approximately
2  1997."
3  A.     Yes.
4  Q.     Is that correct?
5  A.     Yes.
6  Q.     "Mr. Poulos had limited contact with Mr.
7  Ralston during Mr. Poulos's Senior year, although Mr.
8  Poulos recalls that he and Mr. Ralston lived in the
9  same dormitory during that year."  I realize you can't
10 speak to what Mr. Poulos recalls, but is it true that
11 you had some contact with Mr. Poulos during his Senior
12 year and that you lived in the same dormitory?
13 A.     Yes.
14 Q.     Mr. -- okay.  And is it correct that there
15 was no sexual abuse during Mr. Poulos's Senior year at
16 The Hill School?  At least by you, right?
17 A.     There wasn't.  Yes.
18 Q.     "Mr. Poulos does not recall having any
19 contact with Mr. Ralston after Mr. Poulos graduated
20 from The Hill School in approximately 1997, when Mr.
21 Poulos was approximately 18 years old", is that
22 correct?
23 A.     Yes.  Well, that he recalls it, I can say
24 that I didn't have any contact with him.
25 Q.     Right.  Thank you.

Page 308

1  A.     Yes.
2  Q.     So you didn't have any contact with Mr.
3  Poulos's after he graduated --
4  A.     I did not.
5  Q.     -- in 1997, is that right?
6  A.     That's right.
7  Q.     So the first time you heard the name Poulos
8  after Mr. Poulos graduated from The Hill School was
9  when you learned about the April 11th, 2018 letter from
10 Mr. Lehman on April 21st, 2018, is that right?
11 A.     I think so.  I can't say specifically.  Or
12 for certain.  His cousin attended the school and
13 graduated a year ahead of him, and came back to
14 reunions.  And it's possible I would have asked how
15 Kurtis was doing, Mr. Poulos was doing, then.  But I
16 don't remember doing that.
17 Q.     Do you remember having -- okay.  So you may
18 have asked -- is it -- the cousin's name is Zerner?
19 A.     Yes.  Jason.
20 Q.     Did you -- so you may have asked Jason -- let
21 me start again.  You recall seeing Jason Zerner at a
22 reunion?
23 A.     Yes.
24 Q.     And you may have asked Jason how Kurt was
25 doing?

Page 309

1  A.     I may have done that, yes.
2  Q.     You don't have a recollection of seeing Mr.
3  Poulos or communicating directly with Mr. Poulos since
4  -- or after Mr. Poulos graduated in 1997?
5  A.     I know I have not.  Or I have no
6  recollection, to answer your question, of that.  I'm
7  sure I haven't.
8  Q.     Do you have a specific recollection of when
9  or how you met Mr. Poulos?
10 A.     No.
11 Q.     How was Mr. Poulos socially?
12 A.     I don't recall.  Best I can offer is after
13 this happened I looked in the yearbook to see if there
14 was anything there and I recognized that there were no
15 -- no pictures with classmates or anything.  Anything I
16 offer would be based on that.
17 Q.     Okay.  So you don't have any recollection,
18 from 1993 to 1997, of how Mr. Poulos was socially, and
19 you looked at a version of the Dial, I guess, to see if
20 you could refresh your recollection after this lawsuit
21 was underway and still have no recollection of how Mr.
22 Poulos was socially?
23 A.     When he left the school -- no.  To answer
24 your question.  When he left the school after his
25 fourth form year, was on his fifth form year, I would

Matthew Ralston
July 01, 2021                                          310 to 313

Page 310

1   have been part of conversations, not directly with him
2   as far as a conversation goes, but in his return.  So
3   all I know is what sending him a letter, which I
4   would outline what courses to take and encourage him to
5   reach out if he had any questions.  It would have been
6   before he arrived on campus.  No indications in any of
7   that process, that I remember, that there was social
8   issues.  As I remember his -- it was missing friends at
9   home.  Is -- is what I recall.
10  Q.       How about academically?  How was Poulos
11  academically?
12  A.       I don't recall, except what I read in my
13  academic comment, that I didn't see or -- if you want
14  to track those down.
15  Q.       I'm listening.
16  A.       Which is there.  So that's what I recall.
17  That is not all classes.  That is mine.  I don't recall
18  ever having a question of his ability.
19  Q.       Did you have any run-ins with Mr. Poulos?
20  Let me start again.  Were you on like a disciplinary
21  committee, or an honor committee or something, during
22  the time --
23  A.       I was --
24  Q.       -- when Mr. Poulos was at The Hill School?
25  A.       And there were -- there was only one at the

Page 311

1   time.  I was on the disciplinary committee.
2   Q.       Okay.  And did you have occasion to
3   discipline Mr. Poulos?
4   A.       Not that I recall through the discipline
5   committee.
6   Q.       How about not through the discipline
7   committee?
8   A.       Yes.
9   Q.       And what occasion did you have to discipline
10  Mr. Poulos outside of the discipline committee?
11  A.       His sixth form year, he had a car on campus.
12  And when students would leave campus in their car for a
13  weekend, the expectations, rules, were that they would
14  not return to campus.  They were not allowed to have
15  their cars what we call on campus.  Dormitories are
16  considered on campus.  And the confrontation, or
17  incident, would have been one where I was walking up to
18  the academic building on campus class where the -- if I
19  remember right, because I was going to photocopy
20  something.  I may have that wrong.  But his car was in
21  a loading dock by our dormitory, so I blocked it in.
22  Q.       So you have a specific recollection of this
23  sitting here today, or is this something that you
24  learned from reviewing testimony by Mr. Poulos?
25  A.       I have a recollection of it.  I have

Page 312

1   recollections of most of the encounters I have with
2   students.  Had with students as a teacher.  Because if
3   we go back to what I said I viewed teaching as, they
4   were the moments that, I believe -- I was not a teacher
5   who looked the other way.  I was a teacher who made
6   clear the lines are here and you can't violate those.
7   Cars on campus was a school rule, not a dorm rule or a
8   classroom rule.  And so they were very specific school
9   rules.
10  I -- I had no -- I never had a conversation
11  directly.  I may tell a kid they will hear from the
12  dean.  I may tell a kid to go to the dean's office and
13  I'd let the dean know they're coming.  In this case I
14  didn't want him to leave, and so I did block his car
15  in.  And I would have reported it to the dean.
16  Q.       And so blocking in Mr. Poulos's car, is that
17  the appropriate way to discipline him for returning to
18  campus when he shouldn't have?
19  A.       I decided it was at the time, because I
20  didn't want him to leave.
21  Q.       Why didn't you want him to leave?
22  A.       Because he had come back on campus when he
23  didn't have permission to.  Again, I -- my recollection
24  is that it was morning when I found it.  Early morning.
25  And -- which my interpretation was he came back late at

Page 313

1   night and stayed in the dormitory.
2   Q.       How did you know that Mr. Poulos didn't have
3   permission?
4   A.       Because we didn't give students permission to
5   have cars on campus.
6   Q.       So if Mr. Poulos said he had special
7   permission -- well, let me start again.  Was there like
8   some event or something at the school that weekend?
9   A.       I don't recall.
10  Q.       So if Mr. Poulos said that he received
11  permission, in connection with the parents weekend, or
12  family weekend, I forget what The Hill School refers to
13  it, to have his car there, does -- so he's making that
14  up?  The school never gave people permission?
15  A.       I don't know.  I don't think we gave
16  permission.  Cars were a -- a bit of a concern on
17  campus.  If it was parents weekend --
18  Q.       Is that what it's called, parents weekend?
19  A.       That's what -- yes.  If it was that, it would
20  have been easy to resolve that quickly.  And he could
21  have gone about his way.
22  Q.       So you didn't do anything to confirm whether
23  Mr. Poulos in fact had permission?  You just blocked
24  him in?
25  A.       I did.  And as -- like I said, I reported it

Page 314

1   to the dean.
2   Q.        When did you report it to the dean?
3   A.        It would have been then.  The dean at that
4   time was Chris Chirieleison.
5   Q.        Was this a weekend?
6   A.        I think so.
7   Q.        So the dean was available for you to report
8   to immediately on a weekend?
9   A.        On parents weekend everybody's available
10  immediately.  It's -- it is -- at the time it was one
11  of two -- sorry, three all hands on deck weekends.  If
12  you count opening and closing, five.  There was parents
13  weekend, where everyone was required to be there.  It
14  was the rivalry weekend in November.  And there was
15  reunion weekend, where, at that point, everybody was
16  required to be there.  Opening and closing of school
17  probably without saying.
18  Q.        Did the school have -- let me start again.
19  Was there some type of faculty handbook that described
20  the manner in which to discipline a student for car on
21  campus infraction?
22  A.        For faculty?  No, that would --
23  Q.        No, I'm trying to learn where you got the
24  idea that you should just block his car in.  And how
25  that -- and whether that's something that the school

Page 315

1   considered appropriate procedure.
2   A.        I have no reason to think it wasn't.  I don't
3   recall any conversation after the fact.  My -- my way
4   of responding was, again, I didn't want him to leave.
5   So I made it so he couldn't leave.  I knew -- if it was
6   parents weekend I knew that if he was supposed to
7   leave, that would be -- he'd be able to.
8   Q.        Why didn't you want him to leave?
9   A.        Because he was -- again, my interpretation,
10  and perception was that he'd come back at night and it
11  stayed in the dormitory.  And --
12  Q.        Why -- I don't understand.
13  A.        He wasn't allowed to do that.  Student leaves
14  off the campus, with their own car or not, they're not
15  allowed to come back to campus until they're checking
16  back in.  The boarding school, we keep track of every
17  student as best as we can for as often as we can.  And
18  so if a student checks out -- checks out to be off
19  campus and turns out they're not, then we don't know
20  where they are.  And it goes back to the we're in loco
21  parentis.
22  Q.        Okay.  So your issue was that Mr. Poulos,
23  like, checked back in and he wasn't allowed to check
24  back in?
25  A.        He did not check back in.  That's my point.

Page 316

1   Q.        But how do you know that, when you just saw
2   the car in the loading dock?  That's what I'm trying to
3   get my head around.
4   A.        But if he had checked back in he wouldn't
5   have been allowed to park there.  He would have been
6   expected to park where students park their car.
7   Q.        How did you know it was Mr. Poulos's car?
8   A.        I actually don't know that I can tell you I
9   knew that.  I don't recall that.  It was a student car.
10  I think I knew it was his.
11  Q.        You know that now, right?
12  A.        Yes.
13  Q.        So when did you learn it?
14  A.        Well, I would have, at the very latest,
15  learned it when I looked at his yearbook page.
16  Q.        Recently?
17  A.        After the letter arrived.  When I told you I
18  was trying to refamiliarize myself with interaction or
19  capacities which I would have known.
20  Q.        So there's a picture of Mr. Poulos's car in
21  the yearbook --
22  A.        There is.  Yeah.
23  Q.        -- that you looked at?  Okay.  When you
24  looked at the picture of Mr. Poulos's car in the
25  yearbook, you remembered, oh, it was that guy that I

Page 317

1   blocked in on parents weekend?
2   A.        No.  I didn't say that.  And I don't think I
3   even implied that.  I probably knew it was his car.
4   Q.        But at the time?
5   A.        At the time.
6   Q.        In 2000 -- oh, I'm sorry, 1997.
7   A.        Yeah.  See, we were --
8   Q.        But maybe not when you blocked it in?
9   A.        My guess is I did.  I don't recall saying,
10  oh, that's Kurtis's car.  But I would have -- I would
11  think I did.  Kids that had cars on campus were not
12  numerous.  Kids who lived in my dorm, I think there was
13  only one from Wisconsin.
14  Q.        Okay.  So the car had a Wisconsin plate, is
15  your recollection?
16  A.        Yes.
17  Q.        Okay.  So you were able to identify the car
18  as Mr. Poulos's because of the Wisconsin plate?
19  A.        At the very least, yes.
20  Q.        Was it a distinctive car?
21  A.        Camaro.  Distinctive to some, I guess.
22  Q.        Were there a lot of students with Camaros?
23  A.        I don't have any idea.
24  Q.        So did Mr. Poulos then -- let me start again.
25  So did you hear anything further from Mr. Poulos about

Page 318

1  the car?
2  A.        I don't recall.  I don't think so.  But I
3  don't know.
4  Q.        So Mr. Poulos didn't go to your residence on
5  campus and interact with Mary Beth regarding the fact
6  that his car was blocked in?
7  A.        No.  And if he had gone to our apartment she
8  would not enter into a -- she'd tell a student that I
9  wasn't there, if I wasn't there.  She would get me if I
10 was there.  And she wouldn't ever enter into
11 disciplinary conversations with a student.
12 Q.        What did you do after you blocked the car in?
13 Did you go to your residence or did you go to something
14 else?
15 A.        I was on my way up to campus, so I would have
16 gone to do something else.  I can't tell you that I
17 went directly to the dean's office.  It makes sense
18 that I might've.  Again, it was -- if it was parents
19 weekend I would have.  If it wasn't, I probably would
20 have called as soon as I got to a phone.
21 Q.        So do the students that have cars on campus,
22 are they allowed to, like, keep their keys, or do they
23 have to check them out?
24 A.        They have to check them out.
25 Q.        Okay.  So how --

Page 319

1  A.        They have to check them in when they get
2  there.
3  Q.        Okay.  How would Mr. Poulos have his key if
4  he wasn't -- if he didn't have permission?
5  A.        The question isn't whether he had permission
6  to go off campus.  The question is whether he had
7  permission to come back on campus and keep his car and
8  keep his keys.  Cars were not parked at dormitories, or
9  on the internal part of campus.  They were parked at
10 the Center for the Arts parking lot, as to where it
11 was.
12 Q.        So when you blocked Mr. Poulos's car in, was
13 it your intent to prevent him from spending time with
14 his mother?
15 A.        No.  It was my intent to not allow him to
16 leave campus without permission.  Because he would not
17 have had permission to leave campus if he was back on
18 campus.  Because he didn't have permission to be there.
19 Q.        Did you know that that was the impact of you
20 blocking Mr. Poulos's car in?  That he was unable to
21 spend time with his mother on parents weekend?
22           MR. JUBB:  I'll object to the form.
23           THE WITNESS:  I don't know.  And --
24           well --
25 BY MS. DOUGHERTY:

Page 320

1  Q.        And just so I understand, you don't believe
2  that Mr. Poulos was abused at all when he was a student
3  at The Hill School?
4  A.        I think I answered that contrary to that,
5  when you asked.  You said did I ever wonder, and I said
6  yes.  I could never -- I don't believe anyone who says
7  they were abused should be ignored.  So I never said
8  that I don't think he was abused at The Hill School.
9  Or that he wasn't abused.  I said if he was abused by
10 someone, investigate it, ask me.  And I think you asked me
11 something about do you think it's possible that he was
12 abused at The Hill School and they've identified, or
13 he's identified the wrong person.  And I think my
14 response was something to the effect that, if he was,
15 then he does have the wrong person.
16 Q.        Okay.  So you believe that Mr. Poulos was
17 abused, just not by you?
18 A.        No.
19           MR. JUBB:  Objection to the form.
20 BY MS. DOUGHERTY:
21 Q.        How do you reconcile your statement that you
22 believe it's important for everyone who makes
23 allegations of abuse, or claims they're abused, to have
24 their allegations investigated, where you didn't do
25 that for Mr. Poulos?

Page 321

1           MR. JUBB:  I'll object to the form.
2           THE WITNESS:  May I answer?
3           MR. JUBB:  Go ahead.
4           THE WITNESS:  I reconcile it by the fact
5           that what I know is that there was no
6           cooporation from Mr. Poulos or Mr. Garabedian
7           for request to investigate the matter that
8           they had brought to the school's attention.
9  BY MS. DOUGHERTY:
10 Q.        Well, that's what Mr. Rees told you, right?
11           MR. JUBB:  I'll object to the form.
12           Finish your answer, please.
13           THE WITNESS:  Yes.
14 BY MS. DOUGHERTY:  I'm sorry.  I wasn't trying to -- I
15 thought you were done.
16 A.        That's how I reconcile it.  I assume that
17 people who make allegations are after the truth.  I
18 assume that people who are supporting those people want
19 the truth.  And the truth requires an investigation.
20 My understanding was there was no investigation, based
21 on any cooperation from Mr. Garabedian or Mr. Poulos.
22 And I don't know if the school did any without their
23 cooperation.
24 Q.        And your understanding about the lack of
25 corporation is based on what Mr. Rees told you, right?

Matthew Ralston
July 01, 2021                                322 to 325

Page 322

1    There wasn't like anybody else communicating with you
2    about the status of the --
3    A.       No.
4    Q.       -- communications With Mr. Garabedian?
5    A.       No.  Because I checked in with Mr. Rees, as I
6    think I told you.
7    Q.       Right.  You didn't -- I'm just trying to rule
8    out like you didn't also check in with Mr. Lehman or
9    somebody else?
10   A.       No.  The only time I would have checked in
11   with Mr. Lehman regarding this is when I asked if I
12   could still be on campus.
13   Q.       Were you willing to cooperate in an
14   investigation of Mr. Poulos's allegations?
15   A.       Absolutely.
16   Q.       What did you do to cooperate with an
17   investigation into Mr. Poulos's allegations?
18   A.       Well, I certainly made myself available.  Mr.
19   Rees told me that I could likely get a phone call from
20   one of the women from Cozen O'Connor.  I would have
21   done that gladly.  Not happily, but gladly.  And beyond
22   that, I think that's as far as it ever went.  So that's
23   the extent of my cooperation.  But that was all that
24   was ever asked of me.
25   Q.       So you were able to cooperate so you could

Page 323

1    clear your name, is that right?
2    A.       Absolutely.
3    Q.       Were you willing to cooperate so you could
4    learn whether Mr. Poulos was abused by someone other
5    than you?
6    A.       I don't know, because that wasn't ever posed
7    to me.  I don't know -- if -- if someone asked me to
8    speak with them about a student making allegations, I
9    can tell you my answer would be yes.
10   Q.       Mr. Poulos has one hundred percent unshakenly
11   contended that you are the abuser.  So I'm not
12   suggesting that there is evidence that someone has said
13   otherwise.  I'm just asking you, because you denied it,
14   and express it is important for all people making
15   accusations of sexual abuse to have it investigated,
16   whether you would be willing to cooperate in order to
17   make sure that Mr. Poulos's accusations were
18   investigated and that the truth was revealed.  And, you
19   know, a responsible teacher, you claim is someone not
20   you, is punished?
21            MR. JUBB:  Objection to the form.
22   You've mischaracterized literally everything in there.
23   I don't even know how you can formulate a question like
24   that.
25            THE WITNESS:  May I answer?

Page 324

1            MR. JUBB:  If you can possibly answer
2    it, go for it.
3            THE WITNESS:  I think I've already
4    answered that.  That I would be happy -- I
5    was -- I would gladly have cooperated with
6    Cozen O'Connor if they would have called me
7    and asked me to come to Town to be part of an
8    investigation.
9    BY MS. DOUGHERTY:
10   Q.       Both to clear your name and to get justice
11   for Mr. Poulos?
12            MR. JUBB:  Objection to the form.  He's
13   never said that he believed that Mr. Poulos
14   was in any way sexually abused.
15   BY MS. DOUGHERTY:
16   Q.       I think he's corrected me on that.
17            MR. JUBB:  No.  He's --
18            THE WITNESS:  I have not.  I did not.
19   BY MS. DOUGHERTY:
20   Q.       I just -- I'm not -- I'm asking you whether
21   you'd be willing -- whether you were willing to
22   participate in the -- I'm sorry.  Whether you were
23   willing to cooperate with the investigation, both to
24   clear your name and to pursue justice for Mr. Poulos,
25   to the extent he was sexually abused.

Page 325

1            MR. JUBB:  That's a different question.
2            THE WITNESS:  Yes.
3            MS. DOUGHERTY:  You know, just so you
4    realize, which I know you do, because you
5    don't have to make snide comments, that when
6    somebody makes a proper form objection, it
7    should be the lawyer to decide whether they
8    want to reask the question.  So you don't
9    need to congratulate me because I decided to
10   reformulate a question because you assert an
11   objection, even if it was a form objection.
12   BY MS. DOUGHERTY:
13   Q.       Do you have any recollection about the
14   classroom in which you taught geometry to Mr. Poulos?
15   A.       Yes.  I have a recollection of all of them.
16   Q.       Can you describe the geometry classroom in
17   which you taught -- let me start again.  Can you
18   describe the classroom in which you taught geometry to
19   Mr. Poulos?
20   A.       Yes.  It was -- it was at the end of a hall.
21   As you walk down the hall, it was on the left-hand
22   side.  It was the end room on the hall.  It was
23   rectangular.  When you walk into the classroom,
24   teacher's desk would have been to the left.  And
25   walking in the door, if I call that the width, the room

Page 326

1   was longer.  So teacher's desk would have been at
2   a -- one of the long ends of the classroom.  And the
3   students sat opposite to the back wall.
4           There was a window opposite the teacher's
5   desk that opened on to a stairwell, that was used for
6   ascending or descending from what the school calls the
7   Quad.  And there were two windows at the back of the
8   room where back -- back wall where the students sat
9   that opened on -- that were windows to the Quad.  And
10  there was a window in the door.  And without measuring,
11  I would say the distance from -- the door set far
12  closer to the wall that would have been behind the
13  teacher than it would have been to the wall that opened
14  onto the Quad.
15  Q.      The door to the classroom, did it open in or
16  out?
17  A.      I'm guessing it opened out.
18  Q.      When you say guessing, do you remember?
19  Or --
20  A.      I don't.  At least not right now.
21  Q.      Was there a portion of the room where -- let
22  me start again.  Was there a portion of the room that
23  was not visible through the window and the door?
24  A.      Probably.  The front left corner on the door
25  on the same wall the door was in.

Page 327

1   Q.      You never spent time in that corner with Mr.
2   Poulos, is that right?
3   A.      Correct.
4   Q.      Are there any other details about the
5   geometry classroom that you taught -- I'm sorry.  Are
6   there any other details about the classroom in which
7   you taught geometry to Mr. Poulos that you recall and
8   can describe for me?
9   A.      I can tell you that that corner that would
10  have been invisible from the door was directly opposite
11  the window that opened to the stairwell.  The outside
12  stairwell.  And the periods throughout the day that
13  that stairwell would have been most heavily used would
14  have been between classes.  Right after classes and
15  before and after dinner.
16  Q.      So your belief is if there was inappropriate
17  contact going on in the corner after class, if geometry
18  was the last day of class, that someone on the stairs
19  would have seen it?  Is that why you're making that
20  point?
21  A.      I know there wasn't inappropriate content.
22  I'm suggesting that nobody can be invisibly alone with
23  a student in that room.  Or in any of the rooms.
24  Q.      For none of the time?
25          MR. JUBB:  Objection to the form.

Page 328

1           THE WITNESS:  They would not be
2   invisible.  I don't know --
3   BY MS. DOUGHERTY:
4   Q.      Any other details of the classroom in which
5   you taught geometry to Mr. Poulos that you can describe
6   to me?
7   A.      No.  I know where the chalkboard was, but
8   otherwise, no.
9   Q.      Did you make Mr. Poulos take exams at the
10  blackboard?
11  A.      No.
12  Q.      Did you make Mr. Poulos perform any work at
13  the blackboard?
14  A.      Only if there were other students working
15  problems at the board.  So I can't say he didn't work a
16  problem at the board.  I've never had a student take a
17  test or a quiz at a chalkboard.  And rarely -- and I
18  never would put -- have I ever put a student at a board
19  alone, unless they volunteered to.  So it's geometry
20  class, proofs are typically difficult.  If there's a
21  proof that somebody asked how to do it, I very well
22  could have asked does anyone want to put it on the
23  board.  I would never make anybody put it on the board.
24  Q.      Were you the -- a table master for Mr.
25  Poulos's table in the dining room?  Table head?

Page 329

1   A.      I don't remember.
2   Q.      What's the proper terminology of the --
3   A.      Table master at the time.  But probably head
4   of table today.  Master is kind of washed out.
5   Q.      Right.  Okay.  So you just don't remember one
6   way or the other?
7   A.      I don't.
8           MS. DOUGHERTY:  We're up to 17.
9                   *  *  *
10          (Whereupon, documents were marked for
11          identification as Exhibit-17 through 18.)
12                  *  *  *
13  BY MS. DOUGHERTY:
14  Q.      I'm showing you -- let's start with D-17.
15          MR. DOUGHERTY:  Which is, for the people
16          watching on Zoom, my number 11.
17  BY MS. DOUGHERTY:
18  Q.      So I'm showing you a document that I've
19  marked D-17.  It says Hill 0104 on the bottom right.
20  At the top it says Academic Report.  And on the top
21  left it says Student: Poulos, Kurtis.  Do you recognize
22  the academic report that I've marked as D-17?
23  A.      Yes.
24  Q.      How do you recognize the academic report that
25  I've marked as D-17?

Matthew Ralston
July 01, 2021                                    330 to 333

Page 330

1    A.       How do I?
2    Q.       Yes.
3    A.       I recognize it as, one, the format.  Two, the
4    information at the top.  All is reasonable, as in, I
5    was a teacher.  Mr. Kreiger was certainly employed
6    there at the time, and may have been the advisor.  The
7    class and then the date fits, because it would have
8    been the end of the fall term, which is one of the
9    times we did it.  When I read the comment, it certainly
10   -- it's me.
11   Q.       Is that your signature above instructor?
12   A.       It is.
13   Q.       Okay.  And so you graded Mr. Poulos a B plus
14   for geometry the first --
15   A.       Yes.  The fall term.
16   Q.       For the fall term.  Okay.  So there's three
17   terms, right?
18   A.       Yes.
19   Q.       In geometry.  So the first term Mr. Poulos
20   got a B plus, is that right?
21   A.       Yes.
22   Q.       And you wrote -- these are your -- did you
23   type the comments in?  Or did somebody else do it?
24   A.       No, I had to do it.
25   Q.       Okay.  So you had like a thing you had to put

Page 331

1    it in a typewriter and type on?
2    A.       You know, I don't know if we did at this
3    point.  It could have been -- probably NCR paper and a
4    typewriter at that point.
5    Q.       Yeah, it's 1994, right?  I'm having
6    flashbacks of when I was in high school.  You wrote,
7    Kurt is doing a great job in geometry.  He works hard.
8    Contributing in class and seeking extra help when he
9    needs it.  Kurt's work is always complete and
10   demonstrates a thoughtful understanding of all
11   material.  He should be encouraged to keep up the good
12   work.
13            "I enjoy having Kurt in class.  His desire to
14   learn and do well are exemplary qualities.  Kurt is an
15   integral member of his class and can be depended on to
16   start discussions even on a slow day.  Have a joyful
17   holiday season."  Those are comments that you wrote
18   about Mr. Poulos?
19   A.       Yes.
20   Q.       Is this -- do these -- where does these
21   academic reports go?
22   A.       They go to -- we turn them into what we call
23   the academic office.  A copy will then -- an NCR paper
24   copy will go into a student's file, a copy would be
25   sent to parents, and a copy would be sent to the

Page 332

1    advisor.
2    Q.       So that's why you say have a joyful holiday
3    season, because you were going to be sending the note
4    to other people?
5    A.       The comments are written to a parent.
6    Q.       Okay.
7    A.       And so I would have been wishing the family
8    there.  Students left -- it was before Thanksgiving,
9    and came back for two weeks sometime in December.  So
10   it would have been -- Thanksgiving would have been the
11   holiday to which I was referring.  And probably because
12   the next set of comments didn't go out until later in
13   the year, after Christmas or Hanukkah and New Year's, I
14   would have been referring to that as well.
15   Q.       And the comments that you wrote down there in
16   D-17, academic report for the first term of geometry,
17   they were true and accurate at the time you wrote them
18   and applied your signature, correct?
19   A.       They would have been or I wouldn't have
20   written them, yes.  And these accompanied grades.  So
21   the term grade was a weighted average.  Yeah, that was
22   a weighted average at that point of the -- they were
23   list periods, or marking periods.  So it would have
24   been the average of those two, plus the fall term exam.
25   Q.       Sound like Mr. Poulos was a pretty good

Page 333

1    geometry student?
2    A.       It does.
3    Q.       So now can you take a look at D-18?
4            MS. DOUGHERTY:  Which for people
5            watching on Zoom is my number 12.
6    BY MS. DOUGHERTY:
7    Q.       D-18 is a document that says Hill 0089 on the
8    bottom right.  It says Academic Report on the top in
9    the middle.  And the right, Student: Poulos, Kurt.  Do
10   you recognize the academic report that I've marked as
11   D-18?
12   A.       Um-hum.
13   Q.       Is this the academic report that you prepared
14   regarding Mr. Poulos for the second term, or the winter
15   term, of the geometry course that you taught to Mr.
16   Poulos?
17   A.       It would be.
18   Q.       Is that your signature there above
19   instructor?
20   A.       It is.
21   Q.       Mr. Poulos got an A?
22   A.       Yep.  Difference in the winter term is we
23   didn't have -- I don't know what grades he received
24   during marking periods and such.  Winter term is simply
25   the average between the two marking periods.  There is

Matthew Ralston
July 01, 2021

Page 334

1    no exam. I can't answer why. It's the way it was. So
2    my guess would be exams were typically harder for kids
3    than day-to-day work. Because they were cumulative.
4    And they were also created departmentally. I would not
5    have been the course head, so an exam would have been
6    problems created by the -- whoever was the head of the
7    course.
8    Q.      So you wrote, "Kurt had a strong performance
9    in geometry during the winter term. The quality of his
10   work improved markedly over the fall. Kurt is an
11   integral part of a dynamic class. He is always
12   involved in class discussion and is not content with
13   answers which he finds insufficient. Kurt seems to
14   expect everyone in the class to work hard.
15          "I really enjoyed having Kurt in class and
16   getting to know him. He is a sharp, witty young man
17   knows when to use his wit and when to be serious. I
18   look forward to working with Kurt during the next two
19   years."
20   A.      Okay.
21   Q.      Those are your comments regarding Kurt's
22   performance during the winter term of the geometry
23   course which you taught to Mr. Poulos?
24   A.      Certainly reads like they're mine, yes. And
25   that is my signature. So, yes.

Page 335

1    Q.      And those comments were true at the time when
2    you wrote them and applied your signature, is that
3    right?
4    A.      Yes.
5    Q.      You can take a look at D-19.
6            MS. DOUGHERTY: Which is a document
7            which is number 13, for those watching on
8            Zoom.
9    BY MS. DOUGHERTY:
10   Q.      D-19 has Hill 0078 on the bottom right.
11   Academic Report on the top center. On the left top,
12   Student: Poulos, Kurt. Do you recognize the document
13   that I've marked as D-19?
14   A.      Yes.
15   Q.      How do you recognize the document that I've
16   marked as D-19?
17   A.      My signature. Again, same class. Same
18   academic year. Same advisor. Same student. May I
19   read it?
20   Q.      Sure.
21   A.      If you want more. Okay. Very much sounds
22   like me.
23   Q.      Okay. So Mr. Poulos got a B plus for the
24   spring term, right?
25   A.      I don't -- what I don't remember is if that's

Page 336

1    the final year inquiry, or if that's a term grade.
2    Q.      Okay.
3    A.      My -- I'm sure it's probably a final year end
4    grade. But I don't know that.
5    Q.      You said, "Having Kurt in class this year was
6    one of the truly bright spots in a good year. Kurt's
7    genuine concern for others, combined with his
8    tremendous sense of humor, make him a joy to work with
9    and an asset to his class and the school. Kurt works
10   hard in class and expects everyone else to as well.
11   His work is thorough and complete, demonstrated a solid
12   understanding. Kurt should be commended for his
13   efforts. Kurt brings a lot to the school and I'm glad
14   that he is here. Have a great summer." Those are your
15   comments about Mr. Kurt -- or Mr. Poulos's
16   performance --
17   A.      Yes.
18   Q.      -- in the geometry class during the spring
19   term? And they were true --
20   A.      Yes.
21   Q.      -- at the time when you made them and applied
22   your signature?
23   A.      Yes. And that would have been a year end
24   comment, as well as just the term. Although -- yes.
25           MS. DOUGHERTY: 20, right?

Page 337

1            *  *  *
2            (Whereupon, the above-mentioned document
3            was marked for identification as D-20.)
4            *  *  *
5    BY MS. DOUGHERTY:
6    Q.      I'm showing you a compilation of documents --
7    a compilation of yearbook pages which your lawyer
8    produced on your behalf. P.6.1 through P6.29. And
9    I've marked it as D-20.
10           MS. DOUGHERTY: For the people watching
11           on Zoom, it's my document number 36.
12   BY MS. DOUGHERTY:
13   Q.      I just want you to go through the third page
14   in D-36. Just to make sure.
15   A.      Okay.
16   Q.      Is that you on the top left?
17   A.      It is.
18   Q.      In 1992, right?
19   A.      Yes.
20   Q.      So in 19 -- between 1992 and 1997 can you be
21   described as tall, skinny, gangly, buzzed hair?
22   A.      Yes, I guess.
23   Q.      Did you wear glasses?
24   A.      I had glasses. Distance was better at that
25   time. I can't tell you if I wore them very often or

Page 338

1    not.
2    Q.      Were you a clean living guy?  A runner?
3    A.      Yes.
4    Q.      And did you think that students liked you and
5    that you were perceived to be a good teacher?
6    A.      Yes.
7    Q.      Are you six feet tall?
8    A.      Not quite.
9    Q.      Not quite?  But close to it?
10   A.      Yeah.
11   Q.      Did you ever have an interaction with Mr.
12   Poulos in a study cubicle?  Or a study room?  Let me
13   start again.  Was there a study room at The Hill School
14   when -- during the period of time when Mr. Poulos was a
15   student from 1993 and 1997?
16   A.      Study room?
17   Q.      Yeah.  Something where there were cubicles
18   where people went to study?
19   A.      Yeah.  They would have been similar to --
20   Q.      In the basement.
21   A.      -- stacks in a library.  So, yes.
22   Q.      Was that in the basement?
23   A.      There probably were some there.  I didn't
24   spend much time in the basement or the library.  So I
25   don't -- I can't say for certain, but quite possibly.

Page 339

1    Q.      Did you ever go to the basement and have an
2    interaction with Mr. Poulos?
3    A.      Well, I certainly wouldn't have during the
4    day.  No.  No.  There is no time I would have.
5    Q.      I'm not -- did you ever have -- did you talk
6    to Mr. Poulos in a study room that had cubicles?  I'm
7    not suggesting any inappropriate touching.
8    A.      I have no recollection of such a thing.
9    Q.      Okay.  So you don't have any recollection of
10   an interaction with Mr. Poulos, not involving any
11   touching, in a room that had cubicles and was used to
12   provide students to study?
13   A.      No.
14   Q.      Did you ever go to Mr. Poulos's dorm room?
15   A.      I don't think so.  No recollection whatsoever
16   of doing that.
17   Q.      Did you ever invite Mr. Poulos to your
18   residence area?
19   A.      I gave extra help to all my students.  At
20   that point in our residence.  During study hall, which
21   was after dinner until, I'm going to guess 9:00
22   o'clock.  So that was generally an open invitation.  If
23   I was available.  And so quite -- I mean, I don't know
24   that I ever said Kurtis, can you come to the -- come to
25   our place after dinner.  But he certainly would have

Page 340

1    known he could come knock on the door during study
2    hall.
3    Q.      Okay.  So Mr. Poulos was invited to your
4    residence if he needed extra help, is that correct?
5            MR. JUBB:  I'll object to the form.
6            THE WITNESS:  All students were.
7    BY MS. DOUGHERTY:
8    Q.      Okay.  So it was an open invitation for any
9    student to come to your residence if they needed help
10   with class?
11   A.      Yes.
12   Q.      Okay.  And so Mr. Poulos would have known he
13   could have taken advantage of that, is that right?
14   A.      Yes.
15   Q.      Do you have a specific recollection of Mr.
16   Poulos ever taking advantage of your open offer?
17   A.      I don't.
18   Q.      You told me earlier that you did some
19   research regarding Mr. Garabedian.  Google and looked
20   on his web site.  Did you learn any information about
21   Mr. Garabedian's representation, other than what you've
22   already told me?
23   A.      No.  Most of that would have come from the
24   movie.  And then when I had seen his name since in, you
25   know, another episode with Catholic church.

Page 341

1    Q.      I'm bringing your attention back to D-16, if
2    we could.  Just on the first page.  The response to the
3    first question starts, I guess after the objection, "It
4    is without waiver, every student, colleague, parent and
5    school relationship that plaintiff has encountered."
6    Throughout your answers you reference school
7    relationships.  I just want to know if you can, like,
8    expand on what you mean by school relationships.  Did
9    you socialize with students?  Did you go to parties?
10   A.      Certainly no parties.  No -- no socializing
11   beyond supervising dances or -- certainly wasn't
12   socializing as a faculty member.  Or having what we
13   call dorm feeds.
14   Q.      A what?
15   A.      Dorm feed.  Remember, these are kids away
16   from home and each dorm would have a budget for pizza
17   or ice cream or something.  Those were generally run by
18   the faculty member.  And as close to social to get as a
19   student was enrolled.  We had, at that time, a three on
20   three basketball league.  I played in that for a number
21   of years.  Generally would have sixth formers.  Excuse
22   me, seniors, who would know me and ask me to play with
23   them on their three on three.
24   Q.      So when you say at the time, you're talking
25   about like 1993 to 1997?  Or a different time?

Matthew Ralston
July 01, 2021                                   342 to 345

Page 342

1   A.      I can't tell you when it ended.  I can tell
2   you 1990 --
3   Q.      When Mr. Poulos was there, is all I'm trying
4   to get at.
5   A.      Oh.  Yes.
6   Q.      Okay.  So everything you're describing now
7   would be the school relationships that Mr. Poulos could
8   have --
9   A.      Yes, ma'am.
10  Q.      -- experienced, is that right?
11  A.      Yes.
12  Q.      Thank you.  I didn't mean to cut you off.  I
13  just wanted to make sure that I was --
14          MR. JUBB:  I'll object to the form.
15  BY MS. DOUGHERTY:
16  Q.      So three on three basketball league with some
17  sixth formers.
18  A.      Yeah.  There was kind of a formalized created
19  social time with sixth formers after dinner, which was
20  called sixth form coffee.  In which there was coffee
21  available for stud -- sixth form students and faculty
22  members.  That would be the extent of what I would
23  consider social.  There is a -- every relationship in
24  teaching 1980 has been damaged.  Is that -- are you
25  asking what those -- am I on the right one?

Page 343

1   Q.      Yeah.  I was just -- you referenced school
2   relationships throughout.  I was just using one as an
3   example.  So -- because I wasn't sure how to direct you
4   to it.
5   A.      School relationships with faculty members.
6   Q.      Uh-hum.
7   A.      Both collegial.  And pretty much because of
8   the nature of our work, most of the social life of most
9   faculty members is pretty much contained on campus.  In
10  other words, Christmas parties, most faculty -- opening
11  faculty parties.  Things like that.  Since most faculty
12  will leave campus for the breaks which are longer, to
13  go visit family and many have homes off campus they
14  would go to, because those were the opportunities they
15  have to do it.
16          If you lived in a dorm in those years, you
17  were on duty always.  If I needed to be off dorm during
18  those years, it was a matter I had to walk upstairs and
19  check with another, what we called dorm masters at the
20  time, now they're called house parents, and see if he
21  could check in on my hall.  Relationships with alumni
22  over time will change in nature where they will become
23  more social.
24          Staff are there every day, so it's hard not
25  to get to know the people, to some extent, that work in

Page 344

1   the dining hall that serve the food every day, or
2   people that take care of the grounds.  All of those are
3   what I mean when I talk about every relationship.  Or
4   the school relationships.
5   Q.      Can you flip to the second page of D-16?
6   A.      Same document?
7   Q.      Yeah.  It's just next page.
8   A.      Yep.
9   Q.      And just sort of towards the bottom there's
10  the rest of a lengthy paragraph.  And then there's a
11  paragraph that says, "The way in which Mary Ellen
12  Poulos described plaintiff in her communication with
13  Zach Lehman is but one example that is named in these
14  relationships are jeopardized and ruined by such false
15  accusations."  Did you participate in preparing that --
16  that portion of the Answer to Interrogatory number one?
17  A.      I would have.
18  Q.      So who -- who's Mary Ellen Poulos?
19  A.      It's Mr. Poulos's mother.
20  Q.      And so you've seen communications by. Mrs.
21  Poulos to Mr. Lehman that cast you in a bad light?
22  A.      I believe I have seen -- yes, I have.  To
23  answer, yes.
24  Q.      And were those -- the writings that are being
25  referred to here, Mary Ellen Poulos described you,

Page 345

1   right, the plaintiff, in communications to Mr. Lehman,
2   was Mr. Garabedian part of those communications?
3   A.      With Mr. Lehman?
4   Q.      Yeah.  You say the way in which Mary Ellen
5   described plaintiff in her communications with Mr.
6   Lehman.  Was Mr. Garabedian involved in Ms. Poulos's
7   communications with Mr. Lehman?
8   A.      Not from my perspective.  I don't know.
9   Q.      Do you have any reason to believe that Mrs.
10  Poulos was communicating with Mr. Lehman because of
11  anything to do with Mr. Garabedian?
12  A.      No.
13  Q.      If you could go to the next page.  The
14  response to number two on the very bottom of page
15  three.  It says, "Additionally, Garabedian's statements
16  to Mary Ellen Poulos republishing false and defamatory
17  accusations are also at issue."  What communications
18  are you referring to Mr. Garabedian to Ms. Poulos?
19  A.      I don't recall, just reading that.  I don't
20  recall statements by him to her.
21  Q.      So the issue -- the -- the writings that you
22  take issue with by -- let me start again.  The
23  statements by Mr. Garabedian that you contend are
24  defamatory are the -- are the two letters, right?  The
25  April 11th, 2018 letter, which was marked as D-15, and

Page 346

1  the December 26th, 2018 letter, which was marked as
2  D-4.  I have my copies, or we can pull yours out, is
3  that right?
4  A.       Ask again.
5  Q.       Sure.  The statements that you -- let me
6  start again.  The statements by Mr. Garabedian that you
7  contend are defamatory are the two letters, right?
8  The April 11th, 2018 letter, that's been marked D-15,
9  and the December 26th, 2018 letter, which has been
10  marked D-4, is that right?
11  A.       Yes.
12  Q.       Are there other statements by Mr. Garabedian
13  that form the basis for your claim that are defamatory,
14  other than these two letters?
15  A.       I don't recall, but I don't think -- I don't
16  think I've seen any communications from him.  And
17  certainly not before this.  This is after we filed.
18  This is a Complaint, right?
19  Q.       Those are your responses to our discovery.
20  A.       Answers to Interrogatories.  Okay.
21  Q.       Um-hum.  So, you're right, it is after the
22  action.
23  A.       I don't believe.  I don't recall if I did.
24  Q.       I think we -- we were on the fourth page.
25  Let's go to the fifth page.

Page 347

1  A.       What's the number at the bottom of the page?
2  Q.       Five.
3  A.       Okay.  All right.
4  Q.       So it's the response to number 6.  In the
5  second paragraph where it's bolded, it says, "Plaintiff
6  was responsible for alumni in the Midwest.  And
7  defendant is step grandchild of a prominent Midwest
8  family and the cousin of another alumnus.  Did you
9  participate in writing that portion of the response to
10  number 6?
11  A.       Yes.
12  Q.       What prominent Midwest family are you
13  referring to?
14  A.       Proxmire.  William Proxmire was an alumnus of
15  the school.  My understanding of the relationship was
16  that, or is that Mr. Poulos is a step grandchild to Mr.
17  Proxmire.  I know Jason Zerner.
18  Q.       That's the cousin you were talking about
19  earlier?
20  A.       That's the cousin.  Um-hum.  While he doesn't
21  live in Wisconsin any longer, that's where he grew up.
22  Q.       If you can go to page 6, which is the next
23  page.  It's still part of the same answer, the same
24  question.  It's a lengthy one.  First full paragraph.
25  It's -- you know, the first one is partial, so it's the

Page 348

1  first full paragraph.  It starts, "The independent
2  school community."  What I would like to direct your
3  attention to is the last sentence.  It says, "Now
4  plaintiff cannot be the mentor, advisor, friend or
5  colleague that so many knew him to be, because of the
6  fallout from defense false and defamatory statements."
7  So did you participate in writing that portion of the
8  response to Interrogatory number 6?
9  A.       I would have, yes.
10  Q.       So why can you not be a mentor, advisor,
11  friend or colleague to so many that knew you?
12  A.       Well, I can't -- I can't represent myself as
13  a member of the school.  Or school community.  I cannot
14  attend school sponsored events.  So the only people who
15  may -- how do I say it, that I can do that with, are
16  those who -- with whom I had developed more of a
17  friendship relationship and still have my contact
18  information.  So I am no longer able to do that.  And
19  then --
20  Q.       Because you don't work at The Hill School
21  anymore and you're precluded from --
22  A.       Because I was terminated from The Hill
23  School.
24  Q.       And because of the other restrictions that
25  The Hill School placed on your ability to hold yourself

Page 349

1  out as affiliated with The Hill School, is that right?
2  A.       Yes.  I cannot respond to those phone calls
3  out of the blue in a way, except where somebody calls
4  -- has access to my contact information, which I can't
5  share.  Until they reach me.
6            MS. DOUGHERTY:  Can I have number 27?
7            MR. JUBB:  Is this the last document for
8       the day?
9            MS. DOUGHERTY:  It can be.
10            MR. JUBB:  Well, it's 6:35.  We started
11       at 10:00.
12            MS. DOUGHERTY:  Will Mr. Ralston agree
13       to return on another day?
14            MR. JUBB:  If you can tell me how much
15       longer you think we're going to be.  Because
16       we've already gone over seven hours.
17            THE VIDEOGRAPHER:  It will be eight.
18            MR. JUBB:  Eight.
19            MS. DOUGHERTY:  I think we can probably
20       narrow some down significantly with a couple
21       stipulations.  So if we could do that, then I
22       would -- I have like his -- some of his
23       history -- his employment history to go
24       through, which it's a little lengthy, because
25       there's a lot of them.  And so -- I'm getting

Page 350

1    to the bottom of my notes.  But I have
2    probably like another three or four hours.
3        But I think we can probably stipulate
4    some of it out, because a lot of it's
5    questions about your exhibits, which I
6    would be happy to share with you.  Like, I
7    want to just rule out that people that
8    provided cards like did know about the
9    accusations.
10       MR. JUBB:  That's what I suggest.  I
11   think we should end and we should try and
12   synthesize this so we don't have to impede on
13   more time than reasonably necessary.  But
14   also providing you with a fair opportunity to
15   fully examine everything.  So I think that
16   might be the best thing to do.
17       MS. DOUGHERTY:  And if you have those
18   couple letters that you have, that might
19   also --
20       MR. JUBB:  I do have them.  They're part
21   of P-24, so.
22       MS. DOUGHERTY:  Do you know what Bates
23   number they are?
24       MR. JUBB:  Yeah.
25       MS. DOUGHERTY:  Anyway, we can go off

Page 351

1    the video, right?  Because we're going on to
2    -- he's going to agree to come back, right?
3        MR. JUBB:  I will agree to -- he will
4    reappear for the deposition so long as we can
5    sort out a couple of these issues and narrow
6    it down.
7        MS. DOUGHERTY:  Yes.
8        THE VIDEOGRAPHER:  Going off record,
9    6:37.
10       THE COURT REPORTER:  Counsel, please
11   indicate if you will be ordering the
12   transcript.
13       MS. DOUGHERTY:  Yes, please.
14       MR. JUBB:  Yes, please.
15            *   *   *
16       (Witness adjourned.)
17            *   *   *
18       (Whereupon, the videotape deposition was
19   adjourned at 6:37 p.m.)
20
21
22
23
24
25

Page 352

1           C E R T I F I C A T I O N
2
3        I, Lisa M. Cooper, a Court Reporter and
4    Notary Public, do hereby certify the foregoing to
5    be a true and accurate transcript of my original
6    stenographic notes taken at the time and place
7    hereinbefore set forth.
8        Witness my hand and official seal this
9    12th day of July A.D. 2021.
10
11
12
13
14
15
                                    _____
                                    Lisa M. Cooper
16                                  Court Reporter and Notary Public
17
18
19
20       (The foregoing certification of this
21   transcript does not apply to any reproduction of
22   the same by any names, unless under the direct
23   control and/or supervision of the certifying
24   reporter.)
25

# EXHIBIT "B"

```
                                                       Page 1
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT

 3                     OF PENNSYLVANIA

 4                  * * * * * * * *

 5   JOHN DOE,              *

 6       Plaintiff         *  Case No.

 7       vs.               *  2:19-cv-01539

 8   MITCHELL GARABEDIAN,   *

 9   ESQ. d/b/a, LAW OFFICES *

10   OF MITCHELL GARABEDIAN  *

11   and KURTIS N. POULOS,   *

12       Defendants         *

13                  * * * * * * * *

14

15                   DEPOSITION OF

16                 MATTHEW B. RALSTON

17                 September 20, 2021

18

19

20

21

22

23      Any reproduction of this transcript is prohibited

24       without authorization by the certifying agency.

25
```

Matthew B. Ralston
September 20, 2021                                    2 to 5

Page 2

```
1                    DEPOSITION
2                        OF
3    MATTHEW B. RALSTON, taken on behalf of the Defendant,
4    Mitchell Garabedian, Esq. herein, pursuant to the Rules
5    of Civil Procedure, taken before me, the undersigned,
6    Jennifer Corb, a Court Reporter and Notary Public in
7    and for the Commonwealth of Pennsylvania, at the law
8    offices of Swartz Campbell, LLC, One Liberty Place,
9    1650 Market Street, 38th Floor, Philadelphia,
10   Pennsylvania, on Monday, September 20, 2021, beginning
11   at 10:10 a.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                 A P P E A R A N C E S
2
3    LANE R. JUBB, JR., ESQUIRE
4    The Beasley Firm, LLC
5    1125 Walnut Street
6    Philadelphia, PA  19107
7        COUNSEL FOR PLAINTIFF
8
9    CANDIDUS K. DOUGHERTY, ESQUIRE
10   CARYN STEIGER, ESQUIRE
11   JEFFREY B. MCCARRON, ESQUIRE
12   CHRISTOPHER YU, ESQUIRE
13   Swartz Campbell, LLC
14   One Liberty Place
15   1650 Market Place
16   38th Floor
17   Philadelphia, PA  19103
18       COUNSEL FOR DEFENDANT, MITCHELL GARABEDIAN, ESQ.
19
20   KURTIS N. POULOS, PRO SE
21
22
23
24
25
```

Page 4

```
1                   I N D E X
2
3    DISCUSSION AMONG PARTIES              7 - 8
4    WITNESS: MATTHEW B. RALSTON
5    EXAMINATION
6       By Attorney Dougherty              9 - 248
7    EXAMINATION
8       By Mr. Poulos                    250 - 263
9    RE-EXAMINATION
10      By Attorney Dougherty            263 - 270
11   DISCUSSION AMONG PARTIES            270 - 271
12   CERTIFICATE                            272
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                  EXHIBIT PAGE
2
3                                          PAGE
4    NUMBER   DESCRIPTION           IDENTIFIED
5    D-21    4/8/16 Appointment Letter      40
6    D-22    4/11/16 Email                  49
7    D-23    6/19/17 Appointment Letter     52
8    D-24    Performance Evaluation
9            '16-'17                        67
10   D-25    Performance Evaluation
11           '17-'18                        76
12   D-26    4/18/19 Email                 137
13   D-27    5/6 to 5/7/19 Emails          142
14   D-28    9/4/15 Medical Office Note    230
15   D-29    2/4/16 Medical Office Note    236
16   D-30    Résumé 1                      265
17   D-31    Résumé 2                      267
18   D-32    Texts                         269
19
20
21
22
23
24
25
```

Matthew B. Ralston
September 20, 2021                                    6 to 9

---

Page 6

OBJECTION PAGE

ATTORNEY                                    PAGE
Jubb  11, 18, 18, 21, 23, 23, 23, 24, 24, 25, 26, 27,
27, 28, 29, 29, 29, 32, 33, 33, 34, 34, 35, 35, 36, 38,
39, 39, 47, 48, 51, 64, 66, 69, 84, 89, 90, 91, 92, 92,
93, 93, 95, 96, 97, 97, 99, 99, 101, 101, 102, 102,
103, 104, 105, 105, 115, 116, 116, 119, 122, 127, 129,
129, 130, 131, 132, 132, 139, 139, 139, 141, 145, 150,
151, 151, 154, 157, 159, 161, 161, 162, 162, 168, 169,
169, 170, 170, 171, 177, 178, 183, 184, 188, 210, 211,
212, 212, 213, 214, 227, 251, 251, 251, 256, 257, 258,
258, 258, 259, 260, 261, 262, 262, 263

Dougherty                                        263

---

Page 7

S T I P U L A T I O N
---------------------------------------------------
(It is hereby stipulated and agreed by and between
counsel for the respective parties that reading,
signing, sealing, certification and filing are
waived.)
---------------------------------------------------

P R O C E E D I N G S
---------------------------------------------------
VIDEOGRAPHER:
All right.  Good morning.  We are now on
the record.  My name is Rick Christian.  I'm a
videographer retained by US Legal.  Today's date is
September 20th, 2021.  And the video time is 10:10
a.m.  This deposition is being held at Schwartz
Campbell in the matter of John Doe versus Mitchell
Garabedian, Esquire.  The deponent is John Doe.  The
court reporter is Jennifer Corbs (sic).  Sorry.  Will
counsel please introduce themselves for the record?
ATTORNEY JUBB:
Good morning.  Lane Jubb with the
Beasley Firm for Plaintiff.
ATTORNEY DOUGHERTY:
Candidus Dougherty from Schwartz
Campbell on behalf of Mitchell Garabedian.  I see that

---

Page 8

Jeff McCarron also represents Mitchell Garabedian and
he is now logged in via Zoom.  Is there anybody else?
ATTORNEY JUBB:
No, that's just ---.
ATTORNEY DOUGHERTY:
Oh, okay.  I see the top is --- and
Caryn Steiger is also here in the room and represents
Mitchell Garabedian.
ATTORNEY JUBB:
Do you want to just also want to throw
something on there?  You sent Poulos the link for this
and he's not ---
ATTORNEY STEIGER:
I did send him the link, yes.
ATTORNEY JUBB:
And to be clear, Defendant Poulos was
sent a link to the Zoom conference and it's now 10:11
and he's not here nor is anyone on his behalf.
VIDEOGRAPHER:
All right.  And the court reporter is
Jennifer Corbs and will now swear in the witness.
----
MATTHEW B. RALSTON,
CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

---

Page 9

FOLLOWS:
---
EXAMINATION
---
BY ATTORNEY DOUGHERTY:
Q. Are you currently working?
A. No.
Q. When was the last time you worked?
A. October --- the last time I was employed was
October of 2020 --- 2019, I'm sorry.
Q. That was with the Hill School?
A. It was.
Q. What day did your employment with the Hill School
end?
A. I was placed on leave in May of 2019.  I believe
my last pay was in early October, 2019.
Q. And how do you characterize the end of your
employment with the Hill School?
A. Can you ---?
Q. Sure.  Did you resign, were you fired, something
else?
A. I was placed on leave and then, my employment was
discontinued when that leave ended.
Q. Did you have a --- let me start again.
Did you have an employment contract with the Hill

---

Page 10

```
 1  School?
 2  A.It was an annual appointment.
 3  Q.Did your appointment end in October 2019?
 4  A.Typically, my understanding of the appointments
 5  is that they run July 1 through June 30.
 6  Q.Okay.
 7  So, you were reappointed July 1, 2019?
 8  A.I did not get a new appointment letter at that
 9  point.  I can only guess why so I can't answer why I
10  didn't.  I was on leave, paid administrative leave at
11  that point.
12  Q.So, when you rejoined the Hill School, you told
13  us before, in 2016.
14  Is that right?
15  A.Correct.
16  Q.So, you rejoined the Hill School in 2016.  And
17  then, did you receive an appointment letter each year?
18  A.I received a letter that confirmed what my salary
19  would be for the next year.  And I've always taken
20  that to be an appointment letter.
21  Q.And so, you received an appointment letter when
22  you were first rehired by the Hill School in 2016 and
23  then, you received another one in 2017, you said in
24  July of 2017?
25  A.Yes.
```

Page 11

```
 1  Q.And in 2018 but not in 2019.
 2  Is that right?
 3  A.Correct.
 4  Q.Was there a specific time of the year that you
 5  received the appointment letters?
 6  A.Generally, in July or perhaps the end of June.
 7  Q.Did you have any type of evaluation of your job
 8  performance?
 9  A.Yes.
10  Q.When did that occur?
11  A.Prior to the letter coming out so it would have,
12  generally, been in June.
13  Q.So, in June 2017, you had an evaluation and then,
14  you received the new appointment letter for 2017 to
15  2018.
16  A.Yes.
17  Q.And then, in June 2018, you had an evaluation and
18  received a new appointment letter 2018 to --- or 2017
19  to 2018.
20  Is that right?
21  ATTORNEY JUBB:
22  Objection to form.  Sorry.  Just make
23  sure you let her finish the question, too.
24  THE WITNESS:
25  Yes.
```

Page 12

```
 1  ATTORNEY DOUGHERTY:
 2  Well, I think I might have confused ---.
 3  ATTORNEY JUBB:
 4  I got lost there, too.
 5  ATTORNEY DOUGHERTY:
 6  Yeah.  I think I confused myself with
 7  the dates.  So, let's just do them one at a time.
 8  Sorry.
 9  BY ATTORNEY DOUGHERTY:
10  Q.So, you received an evaluation of your
11  performance in June 2017.
12  Is that right?
13  A.Yes.
14  Q.And then, you received a new appointment letter
15  thereafter?
16  A.Yes.
17  Q.Then, you had an evaluation in June 2018.
18  Is that right?
19  A.Yes.
20  Q.And you received a new appointment thereafter?
21  A.Yes.
22  Q.Did you have an evaluation of your job
23  performance in June 2019?
24  A.No.
25  Q.When was the last review of your job performance
```

Page 13

```
 1  that you had at the Hill School?
 2  A.It would have been 2018.
 3  Q.How did the evaluation process work?  Again,
 4  let's just stick with the second time you were
 5  employed at the Hill School.
 6  A.There was a self-evaluation part that was turned
 7  in to my supervisor.  And then, there was the part he
 8  did and then, we reviewed the two together, set goals
 9  for the following year.
10  Q.So, there was a part you did and a part your
11  supervisor did.  Did you receive a copy of the part
12  that the supervisor filled in?
13  A.Yes.
14  Q.Did you have a meeting of some kind with your
15  supervisor to discuss the evaluation?
16  A.Yes.
17  Q.Who was the supervisor at the time?
18  A. Geoff Neese, G-E-O-F-F N-E-E-S-E.
19  Q.So, you had a meeting with Geoff Neese in June
20  2017 to evaluate your job performance.
21  Is that right?
22  A.Yes.
23  Q.Did you meet in person or over Zoom or telephone,
24  some other method?
25  A.I don't recall.  It could have been either.  It
```

Matthew B. Ralston
September 20, 2021                                        14 to 17

Page 14

1  would not have been Zoom.  It would have been either a
2  meeting with him or it would have been by phone.
3  Q.Did the meeting --- again, let's just stick with
4  June 2017.  Did the meeting with Geoff Neese to
5  evaluate your performance occur before or after you
6  and he filled out the written evaluation?
7  A.After.
8  Q.Did you have a meeting with Geoff Neese in June
9  2018 to discuss your job performance?
10 A.I did.
11 Q.Was it similar that you filled out a self-
12 evaluation, he filled out a portion of the evaluation
13 and then, you and Mr. Neese met to discuss your job
14 performance from July 1, 2017 to June 30, 2018?
15 A.Yes.
16 Q.How did you learn that you were on administrative
17 leave?
18 A.From my attorney.
19 Q.Did your attorney provide you any documentation
20 from the Hill School regarding your leave?
21 A.It would have been a description of what it meant
22 to be on paid administrative leave.
23 Q.What have you done with your time since October
24 2019?
25 A.I beg your pardon?

Page 15

1  Q.What have you done with your time since October
2  2019?
3  A.Wow.  I walk a lot.  I read a lot.  I work out a
4  lot.  And I renewed an interest in cooking.
5  Q.So, you've had no employment of any kind since
6  October 2019.
7  Correct?
8  A.Correct.
9  Q.What efforts have you made to look for employment
10 since --- well, let me start again.
11 Have you looked for employment since you stopped
12 working at the Hill School in October 2019?
13 A.I looked for work through part of the summer.
14 Prior to that, no.
15 ATTORNEY JUBB:
16 Did you say this summer or last summer?
17 THE WITNESS:
18 This summer.
19 BY ATTORNEY DOUGHERTY:
20 Q.So, 2021?
21 COURT REPORTER:
22 Is that a yes?
23 THE WITNESS:
24 Beg your pardon?
25 COURT REPORTER:

Page 16

1  Is that a yes?
2  THE WITNESS:
3  Yes.
4  BY ATTORNEY DOUGHERTY:
5  Q.I'm sorry.  So, when you learned that you were
6  being placed on administrative leave in early 2019,
7  you didn't look for other employment?
8  A.I did not.
9  Q.And when your employment with the Hill School
10 ended in October 2019, you did not look for other
11 employment until the summer of 2021?
12 A.Correct.
13 Q.Is there a reason why you didn't look for other
14 employment between October 2019 when your employment
15 with the Hill School ended and this summer 2021?
16 A.Initially, the reason would have been the onset
17 of COVID.
18 Q.But COVID didn't start until March 2020.
19 Right?
20 A.Correct.  Prior to that, I was helping my
21 brother.  My mother died in February 2020.  I helped
22 my brother close up her house and her final days.  I
23 filed for unemployment in November.  And I was
24 collecting that.  And then, COVID shut us down.
25 Q.You filed for unemployment in November 2019?

Page 17

1  A.Yes.
2  Q.So, from October 2019 when your employment with
3  the Hill School ended until February 2020, you did not
4  look for employment.
5  Is that right?
6  A.I did not.
7  Q.Is there a reason why you did not look for
8  employment between October 2019 and February 2020?
9  A.I think I was just reeling from not working at
10 the Hill anymore, not sure what I could go find a job
11 doing.  I didn't feel employable by a school because
12 of what was going on, the allegations against me.
13 Q.You said what was going on.  Are you referring to
14 your lawsuit?
15 A.I'm referring to having allegations made against
16 me of sexual abuse to a student.
17 Q.And you're referring to the two letters, right,
18 the April 2018 and December 2018 letters?
19 A.Yes.
20 Q.The letters that described accusations by Mr.
21 Poulos of sexual abuse by you of Mr. Poulos when he
22 was a child at the Hill School.
23 Is that right?
24 A.Yes.
25 Q.You were no longer employed at the Hill School.

Matthew B. Ralston
September 20, 2021                                    18 to 21

Page 18

1  Correct?
2  A.That's correct.
3  Q.So, what were you dealing with as it relates to
4  let's just stick with the letters.  What was going on
5  about the accusations?  I want to know what that was.
6  ATTORNEY JUBB:
7  Object to the form.
8  THE WITNESS:
9  I'm not sure I understand.
10 BY ATTORNEY DOUGHERTY:
11 Q.Sure.  The ---.
12 A.Why that was in my way of looking for a job?
13 Q.Yeah.  The only thing I'm aware of that was going
14 on in October 2019 as it relates to Mr. Poulos's
15 accusations is your lawsuit.
16 A.I wasn't working any longer.  I wasn't working
17 because of the allegations made against me.  And to
18 apply for a job with a school where I'd be working
19 with students or on behalf of students, I didn't feel
20 like I could honestly go through an interview and say
21 why I wasn't working any longer.
22 Q.What's the basis for your belief that you weren't
23 working at the Hill School because of the allegations
24 that had been made against you?
25 ATTORNEY JUBB:

Page 19

1  Objection to the form.  Asked and
2  answered.
3  COURT REPORTER:
4  I'm sorry.  You said asked and answered?
5  THE WITNESS:
6  Is there something I should have heard
7  here?  I'm sorry.
8  ATTORNEY JUBB:
9  No.  Just answer the question unless I
10 tell you not to.
11 THE WITNESS:
12 Okay.
13 I go back to the allegations.  I was
14 told in January by the headmaster to not find myself
15 alone with students.  I was told by the school's
16 attorney that I should engage my own attorney because
17 of those allegations.  And that, to me, felt like a
18 part of my work world going forward.
19 BY ATTORNEY DOUGHERTY:
20 Q.And when was that?  I think you gave me --- you
21 said January.  What was the date you said?  I missed
22 it.
23 A.That the headmaster told me not to be alone with
24 students was January 2019.
25 Q.Thank you.  And the comment by Mr. Rees that you

Page 20

1  should get an attorney that was also in January 2019?
2  A.That was the second time.  He told me I should
3  consider speaking with an attorney in May of 2018.  He
4  told me after the second letter, I needed to find an
5  attorney of my own.
6  Q.So, sometime after December 2018, Mr. Rees told
7  you to get an attorney?
8  A.January of 2019.
9  Q.January of 2019, okay.  And the lawyer that you
10 retained was Mr. Jubb sitting here with you today.
11 Is that right?
12 A.It is.
13 Q.And when did you first retain Mr. Jubb?
14 A.It would have been in January of 2019.
15 Q.Why did you hire Mr. Jubb?
16 A.Why did I hire him?
17 ATTORNEY JUBB:
18 How does that have anything to do with
19 --- hold on, hold on.
20 ATTORNEY DOUGHERTY:
21 It matters whether he hired him to deal
22 with something with the school or whether he hired you
23 just to pursue this lawsuit.
24 ATTORNEY JUBB:
25 Thank you for the clarification.  You an

Page 21

1  answer.
2  THE WITNESS:
3  I hired him because of the allegations
4  against me.
5  BY ATTORNEY DOUGHERTY:
6  Q.In January 2019, were you planning to file a
7  lawsuit?
8  A.No.
9  Q.When did you first decide to file a lawsuit?
10 A.I had been made aware that there was a
11 possibility that there would be reason for a lawsuit
12 in May of 2018 by Mr. Rees.  He had said that again in
13 January.
14 Q.Of 2019?
15 A.2019.  My reason for contacting Mr. Lane was
16 because I needed an attorney and I had no idea where
17 we were --- where the allegations were leading.  And
18 that was my reason for calling him.
19 Q.Okay.
20 When did you decide you were going to file a
21 lawsuit?
22 ATTORNEY JUBB:
23 I'll object to the form of that.
24 THE WITNESS:
25 It was probably late March of 2019.

Page 22

```
1   BY ATTORNEY DOUGHERTY:
2   Q.Was there a period of time that you were
3     contemplating taking legal action before you,
4     actually, decided to file a lawsuit?
5   A.Yes.
6   Q.And what was that period of time?
7   A.Probably January to March.
8   Q.And is it correct that shortly after you made the
9     decision to file a lawsuit, the lawsuit was, in fact,
10    filed.
11    Is that right?
12  A.Yes.
13  ATTORNEY DOUGHERTY:
14    What was the date of the complaint?
15    April 8.
16  ATTORNEY STEIGER:
17    I believe that's correct.
18  ATTORNEY JUBB:
19    I thought it was 6th.
20  BY ATTORNEY DOUGHERTY:
21  Q.Do you know the date that you filed the lawsuit?
22  A.Not exactly, no.
23  Q.Do you agree that you filed the lawsuit in early
24    April 2019?
25  A.Yes.
```

Page 23

```
1   Q.Prior to the filing of the lawsuit, no action had
2     been taken against you by the Hill School ---
3   ATTORNEY JUBB:
4     I'll object to the form.
5   BY ATTORNEY DOUGHERTY:
6   Q.--- as a result of the accusations by Mr. Poulos,
7     is that right?
8   ATTORNEY JUBB:
9     Objection to form.
10  THE WITNESS:
11    Action formal, no.  Being told to not be
12    alone with students is a pretty clear statement of
13    action to a person who has spent their life teaching.
14  BY ATTORNEY DOUGHERTY:
15  Q.Okay.
16    Well, did your job require you to be alone with
17    students in January of 2019?
18  ATTORNEY JUBB:
19    I'll object to that.
20  THE WITNESS:
21    I don't know how that's relevant to
22    being told not to be when I was on campus.
23  BY ATTORNEY DOUGHERTY:
24  Q.Did your job require you to be alone with
25    students in January 2019?
```

Page 24

```
1   ATTORNEY JUBB:
2     Objection to form.
3   THE WITNESS:
4     On occasion, I could have been yes.
5   BY ATTORNEY DOUGHERTY:
6   Q.What was your title again in 2019?
7   A.I was a capital giving officer.
8   Q.Okay.
9     What tasks or components of your capital --- of
10    your position as capital giving officer required you
11    to be alone with students in January 2019?
12  A.I could have found myself alone with students if
13    I was introducing them to an alumnus or alumna of the
14    school.
15  Q.But you wouldn't be alone with the student.  You
16    would have an alumni there.
17    Correct?
18  ATTORNEY JUBB:
19    I'll object to the form.
20  COURT REPORTER:
21    Can you keep your voice up when you give
22    objections?  Thank you.
23  THE WITNESS:
24    I consider being alone with students to
25    mean without other employees of the school being
```

Page 25

```
1     present is how I interpreted that.
2   BY ATTORNEY DOUGHERTY:
3   Q.Well, Mr. Lehman didn't say that, right?
4   ATTORNEY JUBB:
5     I'll object.
6   THE WITNESS:
7     No.  I just told you that's how I
8     interpreted it.
9   BY ATTORNEY DOUGHERTY:
10  Q.Okay.
11    So, in January 2019, as part of your position as
12    capital giving officer, you did have an occasion to
13    introduce students to alumni.
14    Is that right?
15  A.That is correct.
16  Q.And by students, I mean then students at the Hill
17    School in 2019.
18    Correct?
19  A.Correct.
20  Q.Okay.
21    But you didn't have to be alone with the student
22    of the Hill School in 2019 to make the introduction.
23    Is that correct?
24  A.I would have been there with a student or
25    students and the alumni.
```

Matthew B. Ralston
September 20, 2021                                    26 to 29

Page 26

```
1   Q.And you introduced the alumni to students in
2   person or over the phone or how did that work?
3   A.No.  That would have been in person.
4   COURT REPORTER:
5   Let her finish the question fully.
6   THE WITNESS:
7   Sorry.
8   BY ATTORNEY DOUGHERTY:
9   Q.So, what other part of your job as capital giving
10  officer in 2019 required you to have contact with
11  students?
12  ATTORNEY JUBB:
13  Same objection.
14  THE WITNESS:
15  If I were on campus, I could have
16  interacted with students in the dining hall or walking
17  about campus.
18  BY ATTORNEY DOUGHERTY:
19  Q.Okay.
20  But what part of your job as capital giving
21  officer required you to have access to students or to
22  interact with students?  You told us one.  Introducing
23  students to alumni.  So, I want to know what part of
24  your job required you to have contact with students
25  alone in 2019.
```

Page 27

```
1   ATTORNEY JUBB:
2   Objection, asked and answered.
3   THE WITNESS:
4   I, actually, think I've said that.  My
5   job required selling --- presenting the school to
6   alumni.  And part of doing that would be to know
7   what's going on at campus.  So, I would be present on
8   campus.  And there really is no way to except
9   consciously say I won't be alone with students to know
10  that you're not going to have a conversation alone
11  with a student.
12  BY ATTORNEY DOUGHERTY:
13  Q.Okay.
14  You have not identified any example of being
15  alone with a student that was a requirement of your
16  job in January 2019.  Is the answer just none?  There
17  was no requirement of your job that required you to be
18  alone with a student in January 2019.
19  Correct?
20  ATTORNEY JUBB:
21  I'll object.  Asked and answered.  I
22  think you need to move on.  I don't know understand
23  what you're ---.
24  ATTORNEY DOUGHERTY:
25  No, he's not answered.
```

Page 28

```
1   ATTORNEY JUBB:
2   Yes, he has over and over.
3   ATTORNEY DOUGHERTY:
4   I want to know why it matters that
5   Lehman told him not to be alone with students in
6   January of 2019 when no part of his job required him
7   to be alone with students in January 2019.
8   ATTORNEY JUBB:
9   That's again, mischaracterization of
10  testimony and I'll object to the question.
11  ATTORNEY DOUGHERTY:
12  Okay.  That's fine.
13  BY ATTORNEY DOUGHERTY:
14  Q.Then, tell me the tasks or requirements of your
15  job in January 2019 as capital giving officer that
16  required you to be alone with a student.
17  A.Are you asking if it was in my job description?
18  Q.Yes.
19  A.No.  It's not written in my job description that
20  I should be found alone with students.
21  Q.Is there some component of --- let me start
22  again.
23  Was there some component of your job as capital
24  giving officer that required you to be alone with a
25  student of the Hill School?
```

Page 29

```
1   ATTORNEY JUBB:
2   Objection to the form.  Asked and
3   answered again.
4   THE WITNESS:
5   I don't know how to say it any clearer
6   than if what you're looking for is a no, I don't know
7   how to answer that honestly and tell you that I could
8   do my job and never run the likelihood of being alone
9   with students because my job when I was on campus was
10  to spend time on campus getting to know the school and
11  the students.  And that can very well mean I'd be
12  having a conversation with a student without others
13  present.
14  BY ATTORNEY DOUGHERTY:
15  Q.So, there was no component of your job that
16  required you to be alone a student of Hill School
17  in 2019.
18  Is that right?
19  ATTORNEY JUBB:
20  I'll object.  You're just now harassing
21  him.
22  BY ATTORNEY DOUGHERTY:
23  Q.Is that right?
24  A.I don't know ---.
25  ATTORNEY JUBB:
```

Matthew B. Ralston
September 20, 2021                                30 to 33

Page 30

1  Objection to the form.
2  THE WITNESS:
3  I don't know what else to tell you.
4  BY ATTORNEY DOUGHERTY:
5  Q.How many times --- let's start with 2016 and 2017
6  because that's how your appointments worked, right?
7  One year at a time.  So, from July 1st, 2016 to
8  January 30th, 2017, how many times were you alone with
9  a Hill School student?
10  A.I can't tell you a number.
11  Q.Can you identify any time from July 1, 2016 to
12  June 30, 2017, that you were alone, just you and the
13  student, alone with a student of the Hill School?
14  A.I can't tell you I was alone with a student.  I
15  can tell you I would have been alone with some
16  students.  That would have happened in the dining hall
17  when I would go up during seated meals.  I would sit
18  with a faculty member at their table.  The faculty
19  member left to go to a class and the students at the
20  table had some time after the meal.  We would have sat
21  and talked because I would have been introduced.
22  And the students would have known that I taught
23  there for 17 years.  And we would have talked about
24  the school.
25  Q.Students plural at the table.

Page 31

1  Correct?
2  A.Generally speaking, yes.
3  Q.And the dining hall didn't have just one table in
4  it.
5  Right?
6  A.No.
7  Q.So, do you, actually, have in mind right now an
8  example of a time when you went to the dining hall for
9  a meal and started speaking with students that were
10  seated at the table and a faculty member left and you
11  continued speaking to students?
12  A.Specific instance of that?  No.
13  Q.Yes.  Did it ever happen?
14  A.Yes.
15  Q.When did it happen?
16  A.After a meal.  I can't tell you a date.  I don't
17  know how to be more forthright than to tell you that's
18  the kind of situation where it would happen.
19  Q.Okay.
20  And there was more than one table in the dining
21  hall.
22  Right?
23  A.Lots more.
24  Q.So, were there other people in the room other
25  than you and the students at the table?

Page 32

1  A.Of course, yes.
2  Q.And other people in the dining hall besides you
3  and the students at the table, did they include a
4  faculty member or another teacher?
5  A.Probably, yes.
6  Q.So, that's not a situation that met your
7  understanding of what Mr. Lehman said about not being
8  alone with the student.
9  Is that right?
10  ATTORNEY JUBB:
11  Objection to the form.
12  THE WITNESS:
13  I can tell you only how I take not being
14  alone with students and that's in a position where you
15  can say or do things to or with a student that
16  wouldn't be acceptable.
17  BY ATTORNEY DOUGHERTY:
18  Q.Well, that couldn't happen in the middle of the
19  dining hall.
20  Right?
21  A.Certainly, a conversation could happen in the
22  dining hall.
23  Q.I'm sorry.  So, a conversation was inappropriate?
24  A.Conversations can be inappropriate I said.
25  Q.All right.

Page 33

1  So, any other instances between July 1st, 2016 to
2  June 30th, 2017 that you were alone with a Hill School
3  student?
4  A.Not that I recall.
5  Q.How about from July 1, 2017 to June 30, 2018?
6  A.Not that I recall.
7  Q.How about from July 1, 2018 to October 2019?
8  A.Not that I recall beyond the same situations.
9  Q.So, why did it matter to you that Mr. Lehman told
10  you not to be by yourself or alone with a student at
11  the Hill School?
12  ATTORNEY JUBB:
13  I'll object.  Asked and answered from
14  the prior deposition, not from this one.
15  THE WITNESS:
16  I spent my life teaching, most of it at
17  the Hill School.  And to have the headmaster say, you
18  can't be alone with students, is pretty loud statement
19  that we can't afford to have you alone with students
20  anymore.
21  BY ATTORNEY DOUGHERTY:
22  Q.Okay.
23  So, it offended you.
24  Is that right?
25  ATTORNEY JUBB:

Page 34

1  I'll object to the form.
2  THE WITNESS:
3  It offended many aspects of me, yes.
4  BY ATTORNEY DOUGHERTY:
5  Q.But Mr. Lehman's comment didn't, actually, impact
6  your ability to complete your job as a capital giving
7  officer.
8  Is that right?
9  ATTORNEY JUBB:
10 I'll object to the form.
11 THE WITNESS:
12 I don't know how to --- it affects
13 everything about me, which affects my ability to do
14 the job.
15 ATTORNEY JUBB:
16 Next question please.
17 BY ATTORNEY DOUGHERTY:
18 Q.Well, then tell me what part of the job of
19 capital giving officer you could not complete after
20 Mr. Lehman made that comment to you in 2019.
21 ATTORNEY JUBB:
22 Objection to the form.  Asked and
23 answered and it's harassing.
24 THE WITNESS:
25 I don't know how to make it clear that

Page 35

1  if you work for a school and you're not allowed to be
2  with students without other adults around all of the
3  time how it makes it hard to work for a school
4  regardless of your role.
5  BY ATTORNEY DOUGHERTY:
6  Q.Okay.
7  You've not identified a circumstance with --- as
8  part of your position as capital giving officer that,
9  actually, required you to be alone with a student.
10 ATTORNEY JUBB:
11 Objection to the form.
12 BY ATTORNEY DOUGHERTY:
13 Q.That's what I'm trying to understand.  It would
14 make sense to me if you were a teacher or a tutor.
15 You're a capital giving officer.  So, I want to know
16 what part of your job --- again, just the part of the
17 job that you couldn't complete.  We can deal with if
18 it had other impacts on you.  So, what part of your
19 job as capital giving officer were you unable to
20 perform after Mr. Lehman made his comment to you in
21 2019 that you should not be alone with a Hill School
22 student.
23 ATTORNEY JUBB:
24 Objection to form.  Asked and answered.
25 This is the last time and you're moving on.

Page 36

1  THE WITNESS:
2  I don't know how to answer that
3  differently than I have.
4  BY ATTORNEY DOUGHERTY:
5  Q.So, you can identify no component of your job as
6  capital giving officer that you could not perform
7  because you could not be alone with a Hill School
8  student?
9  ATTORNEY JUBB:
10 Objection.  You're now just harassing
11 him.  You're just ignoring what he's ---.
12 ATTORNEY DOUGHERTY:
13 He's playing games.
14 ATTORNEY JUBB:
15 He's not.  You just refuse to ask a
16 different question.
17 ATTORNEY DOUGHERTY:
18 There is, actually, no part of his job
19 as capital giving officer that he could not complete
20 because of Mr. Lehman's comment not to be alone with a
21 student.
22 ATTORNEY JUBB:
23 He just explained to you that over and
24 over.
25 ATTORNEY DOUGHERTY:

Page 37

1  He's not identified any single incident
2  where he was actually alone with the student.
3  ATTORNEY JUBB:
4  He's told you that part of his job was
5  to introduce alumni to students in order to arrange
6  for that ---.
7  ATTORNEY DOUGHERTY:
8  That's not being alone.
9  ATTORNEY JUBB:
10 That's your impression of it.
11 ATTORNEY DOUGHERTY:
12 We covered that.
13 ATTORNEY JUBB:
14 So, you keep asking him the same
15 question and he's told you that's his answer.
16 ATTORNEY DOUGHERTY:
17 No, he's playing games.
18 ATTORNEY JUBB:
19 No, you just can't ---.
20 ATTORNEY DOUGHERTY:
21 No, he's playing games.
22 ATTORNEY JUBB:
23 You don't like the testimony.  Move on.
24 COURT REPORTER:
25 I can only take down one person at a

Page 38

1  time please.  I know that it's tense but please one
2  person.
3  BY ATTORNEY DOUGHERTY:
4  Q. So, as of January 2019, no component of your job
5  as capital giving officer required you to be alone
6  with a Hill School student.
7  Is that correct?
8  ATTORNEY JUBB:
9  Objection to the form.  Yes or no, is
10  that correct?
11  THE WITNESS:
12  After January 2019, I could not be alone
13  with students regardless.
14  BY ATTORNEY DOUGHERTY:
15  Q. That wasn't my question.  My question was ---
16  let's do --- I can clarify it so it can be extra
17  clear.  Before Mr. Lehman made his comment to you in
18  January 2019 that you should not be alone with a Hill
19  School student, there was no component of your job as
20  capital giving officer that required you to be alone
21  with a student of the Hill School.
22  Correct?
23  A. No.
24  Q. What component of your job as a capital giving
25  officer at the Hill School prior to when Mr. Lehman

Page 39

1  made his comment to you in January 2019 that you
2  shouldn't be alone with a student of the Hill School
3  required you to be alone with a student of the Hill
4  School?
5  ATTORNEY JUBB:
6  Other than what you've testified about,
7  is there anything else?
8  THE WITNESS:
9  No.
10  BY ATTORNEY DOUGHERTY:
11  Q. So, you can identify no occasion between --- let
12  me make sure I have that right.  At the time you were
13  re-employed at the Hill School as of July 1, 2016 as a
14  capital giving officer to January 2019 when Mr. Lehman
15  made his comment to you that you should not be alone
16  with a student of the Hill School that you were
17  actually alone with a student of the Hill School.
18  Is that correct?
19  ATTORNEY JUBB:
20  Objection to form.
21  BY ATTORNEY DOUGHERTY:
22  Q. If you don't understand, I'll try again.
23  A. I think I answered that when you asked me about
24  can I point to an instance at the table.  And I said
25  no, but I can tell you that those kinds of things do

Page 40

1  happen.  I'm not playing games.  This is my life.  And
2  boarding school is a fluid, constantly in motion
3  environment.  And there is not a way to be a part of
4  the community and not find yourself alone with
5  students at some point.
6  Q. Okay.
7  So, you can identify for me no time between July
8  1, 2016 and January 2019 when Mr. Lehman made his
9  comment that you should not be alone with a student of
10  the Hill School where you had, actually, been alone
11  with a student of the Hill School.
12  Is that right?
13  A. No.  I can't recall a conversation I had with a
14  student, just a student, in those two and a half
15  years.
16  ATTORNEY DOUGHERTY:
17  So, this one is --- what are we, 21?
18                    ---
19  (Whereupon, Defendant's Exhibit 21,
20  4/8/16 Appointment Letter, was marked
21  for identification.)
22                    ---
23  ATTORNEY STEIGER:
24  Yes.
25  ATTORNEY JUBB:

Page 41

1  You have the witness copy.
2  ATTORNEY DOUGHERTY:
3  Yeah.  And I don't --- before I give
4  that to him, I just want to make sure I ---.
5  BY ATTORNEY DOUGHERTY:
6  Q. I just want to confirm that you did not pay Mr.
7  Jubb or the Beasley firm any amount of money as it
8  relates to the representation of you other than in
9  connection with this lawsuit.
10  Is that correct?
11  A. That's correct.
12  Q. And there is no other attorney that you retained
13  to assist you with regard to the accusations by Mr.
14  Poulos other than Mr. Jubb and the Beasley firm.
15  Is that right?
16  A. That is correct.
17  Q. So, I'm showing you a document that's been marked
18  as D-21.  It's two pages.  On the bottom right it says
19  Hill Doe 0288 to Hill Doe 0289.  And the Hill School
20  at the top is dated on the first page April 8, 2016,
21  in the top left.  Do you know the document that I've
22  marked as D-21?
23  A. Yes.
24  Q. How do you know the document that I've marked as
25  D-21?

Matthew B. Ralston
September 20, 2021                                          42 to 45

Page 42

1  A. It's the letter that was sent to me offering me
2  --- acknowledging that I had accepted the position and
3  what my salary would be and what my expectations would
4  be.
5  Q. So, on the second page at the bottom under
6  accepted by, there is a signature.  Is that your
7  signature?
8  A. It is.
9  Q. And your name is written there.  And it has
10  P'05'07.  Do you know what that stands for?
11  A. I do.
12  Q. What does the P'05'07 stand for?
13  A. It stands for parent 2005, parent 2007.
14  Q. Okay.
15  So, '05 and '07 are --- let me start again.
16  2005, 2007 are the years that your sons graduated from
17  the Hill School.
18  Is that right?
19  A. Yes.
20  Q. And then, there's another signature on the second
21  page of D-21 towards the top above Geoffrey A. Neese.
22  Do you recognize that signature as Mr. Neese's
23  signature?
24  A. Yes.
25  Q. So, you received the letter that has been marked

Page 43

1  as D-21 on or about April 8, 2016, offering you a
2  position of capital giving officer at the Hill School.
3  And you accepted the position on April 11, 2016.
4  Is that right?
5  A. Yes.
6  Q. All right.
7  And so, the second paragraph of the letter on the
8  first page, D-21, second paragraph, first page says
9  the starting salary will be $68,000.  Did you receive
10  a salary of $68,000 for your work between July 1, 2016
11  and June 30, 2016 --- or 2017?
12  A. I'm sure I did.
13  Q. Yes?
14  A. Yes.
15  Q. Did your compensation involve any bonuses or
16  additional payment other than a salary?
17  A. No.
18  Q. And is that the case for the three years you
19  worked as a capital giving officer?  You received only
20  a salary from the Hill School?
21  A. I believe that's true.
22  Q. Okay.
23  And then it says the position is a full time
24  position with the Advancement Office and the Hill
25  School.  It is eligible for a benefits package of

Page 44

1  healthcare, retirement, vacation, and other matters
2  and dash, as will be provided to you by Heather
3  Gelting, our human resources director.  It's
4  G-E-L-T-I-N-G.  Did you receive healthcare,
5  retirement, and vacation benefits?
6  A. Yes.
7  Q. The next sentence, you will begin the capital
8  giving officer position with a start date of July 1,
9  2016.  You will work remotely from your homes in
10  Michigan and Ohio.
11  Did I read that correctly?  Did I read that
12  correctly?
13  A. Yes.
14  Q. You will work remotely from your homes in
15  Michigan and Ohio.
16  Is that right?
17  A. Yes.
18  Q. So, your job as capital giving officer at the
19  Hill School from July 1, 2016 to at least June 30,
20  2017, was a remote position.
21  Is that right?
22  A. It was.
23  Q. So, I guess it's the last paragraph if you want
24  to consider it down on the first page of D-21.  It
25  starts, included below are the stipulations for the

Page 45

1  remote work status:.  Do you see where I am?
2  A. Yes.
3  Q. It says, you will attend a previous scheduled
4  Plus Delta training in Philadelphia.  What is that?
5  A. Yes.  What is it?
6  Q. Yes.
7  A. Plus Delta is a training program for giving
8  officers.
9  Q. Did the Plus Delta training in Philadelphia
10  involve any Hill School students?
11  A. It involved visits to campus after training, it
12  did not, no.
13  Q. And then, number two, you will schedule your
14  campus visits monthly around Plus Delta sessions.  You
15  will likely stay in a guest house on campus.  I think
16  you described that to us last time that you would ---
17  that you came to campus approximately once a month.
18  Is that right?
19  A. During the Plus Delta, yes.
20  Q. You say during the Plus Delta.
21  A. I beg your pardon?
22  Q. What do you mean by --- you make it sound like it
23  was ---?
24  A. Plus Delta was a monthly meeting.
25  Q. Oh, okay.  I get you.  Okay.

Matthew B. Ralston
September 20, 2021                                    46 to 49

Page 46

1   So, there was a Plus Delta training when you
2   started and then, there was plus delta meetings every
3   month?
4   A.The training was --- I think it was 16 weeks.
5   Q.Okay.
6   A.Plus.  I can't say it was --- it sounds like too
7   many.  It was ---.
8   Q.That's what I was thinking.
9   A.It went through the fall of that year.
10  Q.Okay.
11  So, you stayed in Philadelphia for ---?
12  A.I flew to Philadelphia.
13  Q.And you stayed in Philadelphia for several weeks
14  for training?
15  A.No.  No, no, no, no, no.  It was --- the Plus
16  Delta training sessions were one day.  So, I would fly
17  in for the meeting.  Then, I would spend --- the
18  scheduling my campus visits around that would be I
19  wouldn't fly out the same day as the meeting.  I would
20  then go to campus and spend time there then.
21  Q.And so, the Plus Delta sessions were not on
22  campus.
23  Is that right?
24  A.They were not.
25  Q.And it says, you will schedule your campus

Page 47

1   visits.  What did you do during your campus visits
2   from July 1, 2016 to July 30, 2017?
3   A.As I've explained, just spent time on campus
4   getting to know the rhythm of the campus, the school
5   year, better knowledge of the students, and spent time
6   with faculty hearing what they had to say and what
7   their hopes for the future were.
8   Q.And none of those campus visits required you to
9   be alone with a Hill School student.
10  Is that right?
11  ATTORNEY JUBB:
12  Objection to form.
13  THE WITNESS:
14  No differently than I've already
15  explained.
16  BY ATTORNEY DOUGHERTY:
17  Q.Did you need more water?
18  A.That's fine.  Thank you.
19  Q.And it says, you will have a weekly call with
20  Geoff.  And that's probably Geoff Neese, right?
21  A.Correct.
22  Q.So, did a weekly call with Geoff Neese involve
23  being alone with a Hill School student?
24  A.No.  I was working remotely for those.
25  Q.And it says you'll be available by phone and

Page 48

1   email during working hours.  And then, number five,
2   you may be expected to attend key on campus events as
3   needed, Lawrenceville Weekend, Reunion Weekend,
4   dedications, et cetera.  Did you attend Lawrenceville
5   Weekend, Reunion Weekend, and dedications during the
6   July 1, 2016 to June 30, 2017 term?
7   A.Yes.
8   Q.Were you alone with a Hill School student during
9   Lawrenceville Weekend, Reunion Weekend, or dedications
10  during the July 1, 2016 to June 30, 2017, term of your
11  employment as capital giving officer?
12  ATTORNEY JUBB:
13  Objection to form.
14  THE WITNESS:
15  Certainly not during Reunion Weekend and
16  no differently than I've tried to explain with
17  Lawrenceville and dedications and the et ceteras.
18  BY ATTORNEY DOUGHERTY:
19  Q.You mean like bumping into students while walking
20  on campus or at the dining hall.
21  Right?
22  A.Yes.
23  Q.Now number seven is on the second page of D-21.
24  It says, you will be expected to complete at least 12
25  to 15 donor meetings per month.  Did you complete 12

Page 49

1   to 15 donor meetings per month?
2   A.I believe so.
3   Q.And could you just give me an example of what a
4   donor meeting would entail, a typical one if there is
5   such a thing?
6   A.I'd fly to Chicago.  I'd spend time setting up
7   meetings in different cities for locations.  I would
8   go there and meet with the donor, catch them up to
9   date on campus, learn about their experience as a
10  student and then, we would talk about ways to be
11  engaged.  And when appropriate, I'd ask them for a
12  gift.
13  Q.Did any of the donor meetings that you completed
14  during the July 1, 2016 to June 30, 2017, term of your
15  employment as capital giving officer at the Hill
16  School involve being alone with a Hill School student?
17  A.No.
18  ATTORNEY DOUGHERTY:
19  Thirty-two (32) and then, 31 please.
20  And then, 33.  Thank you.  Did I give you --- oh, we
21  got to put a sticker on it.  So, this will be D-22
22  please.
23                  ---
24  (Whereupon, Defendant's Exhibit 22,
25  4/11/16 Email, was marked for

Page 50

1  identification.)

2            ---

3  BY ATTORNEY DOUGHERTY:

4  Q.I'm showing you a document that is marked as D-

5  22.  It says, Hill Doe 0287, on the bottom right.  And

6  it's an email from Geoff Neese to Hill faculty, Hill

7  staff, CC Matt dated April 11, 2016.  The subject

8  line, new gift officer – Matt Ralston.  Are you

9  looking at the same document?

10 A.Yes.

11 Q.Have you seen this email that is marked as D-22

12 before I showed it to you today?

13 A.Yes.

14 Q.Did you receive the email that's been marked as

15 D-22 on April 11, 2016?

16 A.Yes.

17 Q.Did you read the email that's been marked as D-22

18 when you received it on April 11, 2016?

19 A.Yes.

20 Q.In the second paragraph, Mr. Neese wrote, Matt

21 will join a team of six gift officers and fill the

22 opening left by Jessica Moyer's departure.  I think

23 you identified the six people during your last day of

24 the deposition.  Matt's work will be critical as we

25 head into year three of the Strength of All campaign.

Page 51

1  Matt will work remotely from his homes in Michigan and

2  Ohio but will be on campus monthly to meet with the

3  Advancement Office and stay connected to campus.

4  So, did you meet with the Advancement Office

5  monthly?

6  A.Yes.

7  Q.Did you meet with the Advancement Office monthly

8  even after June 30, 2017?  Was that something that

9  continued for the whole time you were employed by the

10 Hill School a second time?

11 A.The timeframe could have been different than

12 monthly but yes.  When I was on campus, I had an

13 office in the Advancement Office.

14 Q.Okay.

15 So, the Advancement Office was on campus?

16 A.Yes.

17 Q.Was the Advancement Office near where students

18 were located on the campus?

19 ATTORNEY JUBB:

20 I'll object to the form.

21 THE WITNESS:

22 Down the hill from the dining hall and

23 across a road and behind some houses for some

24 dormitories.

25 BY ATTORNEY DOUGHERTY:

Page 52

1  Q.And was a typical format of the Advancement

2  Office meetings that you attended?

3  A.Do you mean timing or the substance of the

4  meeting?

5  Q.Either.

6  A.It would be what I would consider typical office

7  meetings.  Updates on where people are traveling and

8  things that are going on.  There could be

9  announcements of things that are happening on campus

10 and events that we ought to all try to be in

11 attendance of.

12 Q.Okay.

13 So, all of the capital giving officers got

14 together in a meeting once a month and discussed their

15 progress and status.  Is that a fair characterization?

16 A.It would have been the entire Advancement Office

17 but yes.

18 Q.Oh, okay.

19 ATTORNEY DOUGHERTY:

20 D-23.

21           ---

22 (Whereupon, Defendant's Exhibit 23,

23 6/19/17 Appointment Letter, was marked

24 for identification.)

25           ---

Page 53

1  BY ATTORNEY DOUGHERTY:

2  Q.I'm showing you a document that I've marked as D-

3  23.  It says, Hill Doe 0262, on the bottom right.  And

4  there is a Hill School logo at the top and date June

5  19, 2017, on the left at the top.  Are we looking at

6  the same document?

7  A.Yes.

8  Q.Have you seen the document that has been marked

9  as D-23 before I showed it to you today?

10 A.Have I seen it before today?

11 Q.Yeah.

12 A.Yes.

13 Q.How do you know the document that has been marked

14 as D-23?

15 A.It was sent to me and is a letter for the next

16 --- the following year, July 2017.

17 Q.So, this is your appointment letter for 2017 to

18 2018.

19 Right?

20 A.Yes.  Yes.

21 Q.And this being D-23.

22 Correct?

23 A.Yes.

24 Q.And is it fair to say the only thing that changed

25 in terms of your employment is capital giving officer

Page 54

1  between your first term, July 1, 2016 to June 30,
2  2017, as compared to your second term July 1, 2017 to
3  June 30, 2018, is the amount that you were paid?
4  A.Yes.
5  Q.So, you were still required to --- let me start
6  again.
7  So, for the 2017 to 2018 term, you were still
8  working remotely.
9  Is that correct?
10  A.Correct.
11  Q.And you were still required to attend the Plus
12  Delta sessions monthly?
13  A.No.
14  Q.No?  Okay.
15  A.That had ended.
16  Q.Okay.
17  So, for the July 1 --- when did the Delta
18  sessions end?
19  A.It would have been sometime in the fall of 2016.
20  Q.Oh, okay.
21  So, for the July 1, 2017 to June 30, 2018 term,
22  you still were required to visit the campus monthly.
23  Correct?
24  A.It would have been more periodically than set
25  monthly like it was during the Plus Delta.

Page 55

1  Q.How many times did you --- let me start again.
2  How many times were you required to visit the
3  campus during the July 1, 2017 to June 30, 2018 term?
4  A.I don't know.
5  Q.So, you don't know how many times you were
6  required to visit the campus for the July 1, 2017 to
7  June 30, 2018 term?
8  A.I can't give you a specific number of times I was
9  there.
10  ATTORNEY JUBB:
11  She asked for required first.
12  THE WITNESS:
13  Going back, they would have been the
14  same key events, on campus events as needed.  If you
15  go back to the first letter, number five at the
16  bottom.  And I would have gone I would say
17  sporadically but in between those required events in
18  order to spend time on campus.
19  BY ATTORNEY DOUGHERTY:
20  Q.Okay.
21  So, just for the record, you were pointing at D-
22  21, the April 8, 2016, appointment letter.
23  A.Yes.
24  Q.Just so we're ---.
25  A.Yes.

Page 56

1  Q.And you now have D-21 and D-23 in front of you.
2  A.Yes.
3  Q.Similar to me.  So, you're looking at number five
4  of D-21 that says you may be expected to attend key on
5  campus events as needed.  So, for July 1, 2017 to June
6  30, 2018, term as capital giving officer, you were
7  required to attend Lawrenceville Weekend, Reunion
8  Weekend, dedications.
9  Correct?
10  A.Yes.
11  Q.So, for the July 1, 2017 to June 30, 2018 term,
12  how many times were you required to visit the campus?
13  A.I don't know off the top of my head.
14  Q.Okay.
15  And just to be clear, I'm asking how many times
16  you were required.  So, we don't know how many times
17  you were required even if you did meet it.  I just
18  want to know if there was a requirement.  Let's do it
19  this way.  Was there a requirement that you attend or
20  visit the campus a specific interval during the July
21  1, 2017 to June 30, 2018 term?
22  A.No.
23  Q.So, that's something that changed between the two
24  terms.
25  A.Yes.

Page 57

1  Q.So, going back to D-21 number two, this is D-21
2  April 8, 2016, letter.  Number two it says, you will
3  schedule your campus visits monthly.  So, starting
4  July 1, 2017, you weren't required to visit the campus
5  monthly.
6  Is that right?
7  A.Correct.
8  Q.And you don't remember how many times you visited
9  the campus between July 1, 2017, and June 30, 2018.
10  Correct?
11  A.I don't.
12  Q.Are you able to estimate without guessing?
13  A.No.  Well, if you give me a minute, I could come
14  up.  But no.
15  Q.Well, if you need a minute to think about it
16  then, okay.
17  A.Probably five.
18  Q.And just to be clear, those five campus visits
19  that you have in mind, are they in addition
20  Lawrenceville Weekend, Reunion Weekend, and
21  dedications or including?
22  A.It's possible they would be included in those.
23  Q.Okay.
24  So, the total of five including the key on campus
25  events.

Matthew B. Ralston
September 20, 2021                                    58 to 61

Page 58

1  Is that right?
2  A.Yes.
3  Q. Were you still expected to attend Advancement
4  Office meetings during the July 1, 2017 to June 30,
5  2018 term of your employment as capital giving
6  officer?
7  A.But I could attend remotely.
8  Q.So, you called on the telephone?
9  A.Yes.
10 Q.Just looking at D-23, did you receive a letter
11 like D-23 for your July 1st, 2018 term?
12 A.Yes.
13 Q.Do you have your appointment letter for the July
14 1, 2018 to June 30, 2019 term?
15 A.I don't know off the top of my head.  Probably.
16 ATTORNEY DOUGHERTY:
17 I don't think that's something that we
18 have.  So, just ask if he has it, he could provide it.
19 ATTORNEY JUBB:
20 Yeah.  And I'll represent to you that
21 I've produced everything I have.  So, we'll do an
22 extra search for that.
23 BY ATTORNEY DOUGHERTY:
24 Q.Do you have in mind an appointment letter that
25 you received on --- or let me start again.  Do you

Page 59

1  have in mind an appointment letter you received for
2  the term starting July 1, 2018?
3  A.I do.
4  Q.And is the format of the letter that you have in
5  mind for the July 1, 2018, appointment the same as D-
6  23 or is it like D-21 or something different?
7  A.My recollection is it's more like D-23.  Salary I
8  know was different.
9  Q.Did your salary increase again on July 1, 2018?
10 A.Yes.  It did.
11 Q.Did anything else change with the terms of your
12 employment?
13 A.With the terms?  No.  At some point, the school
14 instituted some bonus program.  And I don't remember
15 which year that was and how it was presented to us if
16 it was part of that letter or if it was distributed in
17 a meeting.
18 Q.Okay.
19 So, sometime during the July 1, 2018 term, the
20 school implemented a bonus plan for capital giving
21 officers?
22 A.I actually think it was the previous year
23 sometime during 2017/2018 year.  But that's what I
24 don't recall specifically.
25 Q.Okay.

Page 60

1  And you don't remember if you received a separate
2  letter regarding the bonus program?
3  A.I don't.
4  Q.Did you ever receive a bonus?
5  A.I don't believe I did.
6  Q.How did the bonus program work just from what you
7  remember?
8  A.It would have been based on size of a gift if
9  there was an excess of some number.  I don't,
10 actually, recall the others.  Maybe there's a level of
11 giving called the 1851 Society, which is just a
12 recognition that people made a gift of at least
13 $1,851.  It's probably an incentive based on the
14 number of those you might have received during the
15 course of a year.  Beyond that, I can't tell you,
16 specifically.
17 Q.Was the bonus like a percentage of the gift
18 amount or that amount?
19 A.No.  It's fixed dollar amounts.
20 Q.So, it was like an incentive to get bigger gifts
21 for the capital giving officers.
22 Correct?
23 A.Yes.
24 ATTORNEY DOUGHERTY:
25 I meant to do this before and I just

Page 61

1  checked.  I don't have any messages from Mr. Poulos.
2  ATTORNEY JUBB:
3  Okay.
4  ATTORNEY DOUGHERTY:
5  Sometimes, he just emails one of us and
6  not the other.
7  ATTORNEY JUBB:
8  Most times.
9  BY ATTORNEY DOUGHERTY:
10 Q.And so, the only thing that changed with your job
11 as capital giving officer for the July 1, 2018 term
12 was an increased salary and maybe access to the bonus
13 program.
14 Is that right?
15 A.Yes.
16 Q.And if we can use D-21 again as reference, did
17 you have a specific amount of campus visits you had to
18 perform for the July 1, 2018 term?
19 A.No.
20 Q.Do you know how many times you visited campus?
21 A.No.  But it would be similar to 2018 ---
22 2017/2018 with the exception that I spent that time on
23 campus in January 2019 and early February 2019.
24 Q.So, I struggle with the July year every time I
25 ask a question.

Matthew B. Ralston
September 20, 2021                                    62 to 65

Page 62

1   A.School years.
2   Q.Yeah.  It's fine for me because I'm used to
3   January to December.  You're making my brain work
4   extra hard today.  And then, as it relates to the
5   Advancement Office meetings, you could participate via
6   telephone for the July 1, 2018 term?
7   A.Yes.
8   Q.And I don't think I asked you so let's start with
9   the July 1, 2017 to June 30, 2018.  Were you required
10  to perform a specific amount of donor meetings?
11  A.Yes.  It would have been very much like what's
12  outlined on D-21.
13  Q.Okay.
14  So, for the second term of your employment as
15  capital giving officer, you were expected to complete
16  12 to 15 donor meetings per month?
17  A.Yes.
18  Q.Did you complete 12 to 15 donor meetings per
19  month during the second term of your employment as
20  capital giving officer?
21  A.I don't recall the number I did per month.  I
22  know that scheduling of visits was one of the areas
23  that I was encouraged to improve, the number of
24  visits, which is one of the reasons I was brought
25  back.  The Midwest is an area where donors are more

Page 63

1   spread out.  And so, a trip may not yield as many
2   visits as it does on the east coast, for example.
3   Q.Were you expected to complete 12 to 15 donor
4   meetings per month during the third term of your
5   employment as capital giving officer starting at July
6   1, 2018?
7   A.Yes.
8   Q.Did you complete 12 to 15 donor meetings per
9   month during the third term of your employment as
10  capital giving officer?
11  A.I don't recall numbers.  I don't --- I'm sorry.
12  Q.When you were placed on administrative leave in
13  2019, did you stop performing donor meetings?
14  A.Yes.
15  Q.And you stopped visiting campus?
16  A.Yes.
17  Q.And you stopped participating in key on campus
18  events.
19  Is that right?
20  A.Yes.
21  Q.And you stopped participating in meetings with
22  the Advancement Office.
23  Correct?
24  A.Yes.
25  Q.As it relates to your employment during the

Page 64

1   second and third terms as a capital giving officer, am
2   I correct that your on campus visits, the key on
3   campus events, the meetings with the Advancement
4   Office, and the 12 to 15 donor meetings did not
5   involve being alone with a Hill School student?
6   ATTORNEY JUBB:
7   I'll object to the form.
8   THE WITNESS:
9   Can you ask again?
10  BY ATTORNEY DOUGHERTY:
11  Q.Sure.  We can do one at a time.  So, the 12 to 15
12  donor meetings per month you were required to perform
13  during the second and third term of your employment as
14  capital giving officer, did they involve being alone
15  with a Hill School student?
16  A.No.
17  Q.And did your meetings with the Advancement Office
18  --- let me start again.
19  Did all of your meetings with the Advancement
20  Office during the second and third term of your
21  employment occur over the telephone?
22  A.No.
23  Q.Did any of the in person meetings with the
24  Advancement Office during your second and third term
25  as capital giving officer involve being alone with a

Page 65

1   Hill School student?
2   A.The meetings did not, no.
3   Q.And your on campus visits and attendance at key
4   on campus events did not involve being alone with a
5   Hill School student.
6   Is that correct?
7   A.They could have involved being alone with
8   students.
9   Q.Okay.
10  During your second term as capital giving
11  officer, were you ever alone with a Hill School
12  student?
13  A.I haven't got a specific instance to share but
14  it's hard to imagine that I wasn't having a
15  conversation somewhere on campus with a student, be it
16  the dining hall or walking across the quad where there
17  wasn't another person present for the conversation.
18  Q.Okay.
19  So, you're describing the dining hall
20  conversations and bumping into a student on campus
21  similar to what you described during your first term.
22  Is that right?
23  A.Yes.
24  Q.And so, during your second and third term when
25  you were on campus --- let me start again.

Page 66

1  During your second and third terms, you were on
2  campus substantially less than during your first term,
3  is that right, as capital giving officer?
4  ATTORNEY JUBB:
5  I'll object to the form.
6  THE WITNESS:
7  Probably, yes.
8  BY ATTORNEY DOUGHERTY:
9  Q.And so, during your second and third term as
10  terms as capital giving officer for the Hill School,
11  you may have bumped into students on campus or had
12  conversations with students at the dining hall.
13  Is that right?
14  A.Yes.
15  Q.You can't recall a specific instance where you
16  were alone just you and the student alone with the
17  Hill School student during the second or third terms
18  of your employment at the Hill School.
19  Is that right?
20  A.That's right.
21  Q.And you can't recall an instance where you were
22  alone just you and the student during the first term
23  of your employment as capital giving officer.
24  Is that correct?
25  A.I'm sorry.  Could you repeat that?

Page 67

1  Q.Sure.  I just want to confirm and I may have
2  asked this already but I just want to confirm while
3  we're here that you cannot think of a specific
4  instance where you were alone just you and the
5  student, you were alone with a Hill School student
6  during the first term of your employment as capital
7  giving officer at the Hill School.
8  Is that right?
9  A.That's right.
10  Q.I just want to make sure that there aren't a
11  different number of pages.
12  ATTORNEY DOUGHERTY:
13  D-24.
14             ---
15  (Whereupon, Defendant's Exhibit 24,
16  Performance Evaluation '16-'17, was
17  marked for identification.)
18             ---
19  BY ATTORNEY DOUGHERTY:
20  Q.And just going forward, it's okay if you want to
21  --- like you said in one instance, if you need to
22  reference one of the prior letters when you're
23  answering or if you do, but can you just point out
24  what you're looking at just so we have it clear for
25  the record?

Page 68

1  A.Okay.
2  Q.I'm not suggesting that you have to.  I'm just
3  saying if you do in the future, just let me know what
4  you're looking at.  But right now, I'm showing you a
5  document that I've marked as D-24.  So, it's Hill Doe
6  0273 to 76 on the bottom right.  And it says, the Hill
7  School Advancement Office Performance Evaluation, on
8  the top of the first page.  Do you know what document
9  that I've marked as D-24?
10  A.Yes.
11  Q.How do you know the document that I've marked as
12  D-24?
13  A.It's my evaluation sheet put together by Geoff.
14  Q.Okay.
15  So, this is where you were describing earlier
16  that there was written evaluation where you filled in
17  some and then, Geoff filled in some and then, you had
18  a meeting.
19  Right?
20  A.Yes.
21  Q.So, which parts of D-24 did you fill in?
22  A.I don't know if I did all of this or ---.
23  Q.Did you actually type the comments in or did you
24  maybe hand write it and give it to somebody to type
25  up?  Is that the source of confusion?

Page 69

1  ATTORNEY JUBB:
2  I'll object to the form.
3  BY ATTORNEY DOUGHERTY:
4  Q.Okay.
5  Let's just do this.  Let's go to the first one.
6  It says, Job Knowledge, under Rating Factors.  Do you
7  see it?  It says, Job Knowledge.  And then, under
8  rating, it says, ME, which is meets expectations.
9  A.Yes.
10  Q.So, did you rate yourself for job knowledge as
11  meets expectation?
12  A.Yes.  I can see reading that that is mine.
13  Q.Okay.
14  And then, the comment says, ME for a new hire.
15  Needs improvement to be my best.  So, that's your
16  comment.
17  Right?
18  A.Yes.
19  Q.Did you get a form from the school that you had
20  to type in?  Or how did this get filled out, this
21  being D-24?
22  A.I don't know if I typed this or if I hand wrote
23  it and it got typed.  But the form would have come
24  from Geoff.  It would have gone back to Geoff.  And
25  then, Geoff and I would have met and gone over it.

Matthew B. Ralston
September 20, 2021                                70 to 73

Page 70

1  Q. Okay.
2     So, now that we've looked at job knowledge, the
3  first rating --- the first four rating factors under
4  number one, technical skills, we looked at that
5  comment.  Now, you recognize the content in the rating
6  column and the comments column as your comments?
7  A. Yes.
8  Q. Your ratings of yourself and your comments.
9  Right?
10  A. Yes.
11  Q. Is that the case for everything under rating and
12  comments for technical skills, number one, quality of
13  work, number two, which is --- those are on the first
14  page.  Number two falls onto the second page.  Number
15  three, interpersonal skills; four, communication
16  skills; five, approach to work; six, quality of work,
17  which goes onto the third page?
18  A. Yes.
19  Q. And there's like some type of handwriting in the
20  middle on the third page of meets expectations.  Do
21  you know what that is?  Is that your marking?
22  A. That would be Geoff's initials.
23  Q. Did you put the X there?  Did you put the X
24  there?
25  A. I'm sure.

Page 71

1  Q. Okay.
2     So, you rated yourself as meets expectations and
3  then, Geoff circled it and put his initials?
4     Is that right?
5  A. Yes.  But I can't --- yeah.
6  Q. You're just unsure whether you, actually, put a
7  handwritten X and somebody typed it.
8     Is that right?
9  A. Yes.
10  Q. I just want to make sure because you hesitated on
11  some of it that you don't think that somebody else
12  typed in the comments.
13     Right?
14  A. No.
15  Q. It would have been somebody else, actually, type
16  wrote them.
17     Correct?
18  A. I'm guessing.  I typed with the exception of
19  Geoff's comments.  What I was unsure about was if
20  Geoff's signature was regarding that he was in
21  reference to everything above it that I had done.  And
22  that was the summary or if it was just for that
23  overall rating.
24  Q. Okay.
25     And when you were pointing out Geoff's comments,

Page 72

1  and we're going to get there, you were pointing to the
2  supervisor comment section of the third page.
3     Right?
4  A. Yes.
5  Q. Okay.
6     But you rated yourself as meets expectations.
7     Is that right?
8  A. Yes.
9  Q. All right.
10     And then, the stuff under supervisor comments,
11  those are Geoff's comments about your performance.
12     Is that right?
13  A. Yes.  Yes.
14  Q. And he says --- let me start again.
15     You received these comments and were able to read
16  them and then, you met with Geoff about them.
17     Is that right?
18  A. Yes.  I don't recall if we met and then, he wrote
19  the comments or if the comments came to me and then,
20  we met.  I can't tell you the order of those.
21  Q. So, he says, Matt's first year got off to a slow
22  start as he struggled in the first six months on how
23  to get in front of people regularly and how to turn
24  off the, quote, teacher/mentor, end quote, role that
25  he knows so well and put on the CGO hat.  Do you agree

Page 73

1  with that comment?
2  A. Yes.
3  Q. And I think being remote --- and I'm still
4  reading again the next sentence.  I think being remote
5  was part of the struggle, as Matt can go months
6  without seeing the school and several days or weeks
7  without having a lengthy discussion with a colleague.
8     Do you agree with that comment?
9  A. Yes.
10  Q. So, were you at the campus at the Hill School
11  less than once a month during the 2016 to 2017 term,
12  your first term as capital giving officer?
13  A. After Plus Delta ended, I would have been, yes.
14  Q. So, you were not present on campus every month
15  after the fall of 2016.
16     Is that right?
17  A. Correct.
18  Q. How many times did you visit the Hill School
19  campus after the fall of 2016 during your first term
20  as capital giving officer?  So, I guess the winter of
21  2016 to the end of the summer as June 30th, 2017.
22  A. I don't know off the top of my head.
23  Q. Geoff wrote that you could go months without
24  seeing the school.  Is that a fair statement?
25  A. It could be, yeah.

Matthew B. Ralston
September 20, 2021                                          74 to 77

Page 74

1   Q.But what's your recollection from your first term
2   as capital giving officer?
3   A.Regarding?
4   Q.Whether you could go months without seeing the
5   school.
6   A.I think that's quite possible.
7   Q.Okay.
8   On to the last page of D-24.  We're still in the
9   --- actually, the supervisory comment section ends on
10  the prior page.  So, now on the last page of D-24,
11  we're under action plan/training and development
12  goals.  And there's a box with stuff typed in it.  And
13  it says Matt and I, so these comments here on the
14  action plan/training and development goals box are
15  from Geoff.
16  Is that right?
17  A.Yes.
18  Q.So, Mr. Neese wrote, Matt and I have discussed
19  his return to campus to spend seven to ten days
20  straight in the alumni house getting accustomed to how
21  other CGO's do their work and learning more about the
22  process.  Did you spend seven to ten days straight in
23  the alumni house as suggested by Mr. Neese?
24  A.Yes.
25  Q.I was really nervous about coughing right there.

Page 75

1   Okay.
2   Mr. Neese wrote in the second paragraph, we
3   really need him to hit at least 110 visits in fiscal
4   year '18.  Did you reach 110 visits in fiscal year
5   '18?
6   A.I don't know.
7   Q.And then, on the bottom or towards the bottom of
8   the last page of D-24, there were signatures.  Is the
9   signature next to signature colon yours?  Oh, I'm
10  sorry.  Never mind.  There's a reviewer column that
11  says Matt Ralston.  Underneath, there is a signature.
12  Is that your signature?
13  A.Yes.
14  Q.And then, to the left, there's a column that says
15  supervisor and signature under that.  And that is next
16  to supervisor that says Geoff Neese and there's a
17  signature under it.  Do you recognize that as Mr.
18  Neese's signature?
19  A.Yes.
20  Q.And it looks like there's somebody else's
21  signature with June 26, 2017, date.  Do you know whose
22  signature that is?
23  A.I don't.
24  Q.Was there somebody else who participated in your
25  evaluations?

Page 76

1   A.I believe it's probably Christian Sokel.
2   Q.Okay.
3   So ---.
4   A.C and then, Sokel.
5   Q.Oh, S-O-C-L-A-L (sic)?
6   A.Yeah.  I think the C is for Christian and then,
7   there's an S and then, his last name is spelled there.
8   But I'm, actually, not certain.
9   Q.Okay.
10  Was there somebody else who participated in your
11  evaluation?
12  A.No.
13  Q.What was Mr. Sokel's position?
14  A.He is the head of advancement.  So, Geoff reports
15  to him.
16  Q.Okay.
17  ATTORNEY DOUGHERTY:
18  Do you have 16?  This will be 25.  Oh,
19  did I give you more than one?  I did.  Let me make
20  sure I gave you the right thing.
21              ---
22  (Whereupon, Defendant's Exhibit 25,
23  Performance Evaluation '17-'18, was
24  marked for identification.)
25              ---

Page 77

1   ATTORNEY JUBB:
2   This is the new one.
3   Right?
4   ATTORNEY DOUGHERTY:
5   Yeah.  I think I had --- we just had
6   three copies of that.  There's three out there.
7   BY ATTORNEY DOUGHERTY:
8   Q.Okay.
9   I'm showing you a document that I've marked as D-
10  25.  It says, Hill Doe 0627 to 270, on the bottom
11  right.  It says, The Hill Advancement Office
12  Performance Evaluation, on the top.  Do you know the
13  document that I've marked as D-25?
14  A.Yes.
15  Q.How do you know the document that I've marked as
16  D-25?
17  A.It would be my evaluation form from the next
18  year.
19  Q.For the ---?
20  A.2017 to 2018.
21  Q.Okay, right.  On the right, it says, Evaluation
22  Period, on the top left?
23  A.Yes.
24  Q.Is any portion of the first page your
25  handwriting?

Page 78

1   A.No.
2   Q.Do you know whose handwriting is reflected on the
3   first page of D-25?
4   A.It must be Geoff's.
5   Q.And then, you can flip to other pages.  But I
6   want to know if you can identify any comments in the
7   evaluation reflected in D-25 that are your comments
8   about your performance.
9   ATTORNEY JUBB:
10  That he wrote in the comment section?
11  ATTORNEY DOUGHERTY:
12  Yes.  Were authored meaning he didn't
13  specifically type them.
14  THE WITNESS:
15  I'm sorry.  What writing?
16  BY ATTORNEY DOUGHERTY:
17  Q.I'm just trying to --- I want you to identify ---
18  let's do it this way.  Let's go to number one,
19  technical skills, D-25.  See those rating factors,
20  rating comments that we looked at before on the first
21  page under technical skills number one?
22  A.Okay.
23  Q.See there's rating factors, rating comments.  Did
24  you fill in the letters in the rating column like you
25  did with the last evaluation?

Page 79

1   A.Yes.
2   Q.And the comments that are reflected in the
3   comments column, well, there is only one, it says,
4   still not fluent in RE queries.  That's your comment
5   about your job performance?
6   A.Yes.
7   Q.And that's the case for the ratings and comments
8   in number two, which is quality of work.  And if you
9   go to the second page, number three, interpersonal
10  skills, rating, comments.  Number four, communication
11  skills, ratings.  There aren't any comments there.
12  Number five, approach to work, quality of work, all of
13  the letters under the rating column and the comments
14  in the comments column, those are yours about your
15  work performance?
16  A.Under ratings, anything that's handwritten in
17  ratings is not my writing.
18  Q.And number five, there are some handwritten
19  comments.  Those are not yours?
20  A.No.
21  Q.And the same with six.  There's handwritten
22  comments and those are not yours?
23  A.No.
24  Q.Okay.
25  So, only the items that are typed under the

Page 80

1   rating and comments columns on the first and second
2   page of D-25 are your comments about your work
3   performance.
4   Is that right?
5   A.I'm sorry.
6   Q.Sure.  Only the typed content under the rating
7   and comments columns on the first and second page of
8   D-25 are your comments about your work performance.
9   Is that right?
10  A.Yes.
11  Q.And then, on the third page of D-25, there is
12  another --- it says, overall performance rating.
13  There was a check next to meets expectations.  Did you
14  put that check there?
15  A.The X?
16  Q.Yeah.
17  A.Yes.
18  Q.I'm sorry.  Yes.  And then, there is typing in
19  there that says, I feel that I am still learning the
20  job.  I believe my production will continue to rise.
21  Is that a comment you wrote about your job
22  performance?
23  A.Yes.
24  Q.And then, supervisor's comments, there's
25  handwritten --- there's a box with handwriting in it.

Page 81

1   The comments in supervisor comments are Mr. Neese's
2   comments.
3   Right?
4   A.Yes.
5   Q.Okay.
6   In the middle of the handwritten comments --- let
7   me start again.  The first sentence says, Matt's
8   second year saw huge growth in how he managed
9   meetings, which led to more success, especially in the
10  second half of the fiscal year.  Matt has used the
11  Plus Delta depth techniques to transition from his
12  former teacher/mentor role into a professional
13  fundraiser.  Were you still doing Plus Delta training?
14  A.No.
15  Q.So, you were just --- so, Mr. Neese's comment was
16  that you were utilizing the techniques you learned
17  during your training at the beginning of your first
18  term as capital giving officer.
19  Correct?
20  A.Yes.
21  Q.And then, the next sentence is, Matt's work with
22  Lane Jubb of '06 was symbolic of how much he has
23  grown.  What work did you do with Lane Jubb?
24  A.I met with Lane as a potential donor and received
25  a pledge for gifts.

Page 82

1  Q.When did you meet with Lane as it relates to the
2  work that Mr. Neese is commenting about?
3  A.I think it was January of 2018.  But I'm not
4  certain.
5  Q.Was it before you learned about the first letter
6  by Mr. Poulos or including Mr. Poulos's accusations?
7  A.Yes.
8  Q.And how often did you have contact with Mr. Jubb
9  about the work that Mr. Neese is describing in his
10  comment that is part of D-25?
11  A.One meeting, specifically, comes to mind and I
12  --- other than that, it's probably phone calls because
13  I was working remotely and he is here.
14  Q.So, you came to Pennsylvania to meet with Mr.
15  Jubb?
16  A.I did.  Actually, I probably came to Pennsylvania
17  and while I was here met with Mr. Jubb.
18  Q.It says Matt's work with Lane Jubb.  What was the
19  work?
20  A.Soliciting a gift.
21  Q.Okay.
22  So, you had a meeting with Mr. Jubb and then, you
23  had telephone contacts with Mr. Jubb about a gift?
24  A.Yes.
25  Q.And these contacts occurred prior to the first

Page 83

1  letter that included the accusations by Mr. Poulos.
2  Is that right?
3  A.Yes.
4  Q.It's somewhat close in time to the first letter.
5  Is that right?
6  A.Yes.  Months, yes.
7  Q.So, you had a meeting with Mr. Jubb in January of
8  2018 and then telephone contacts?
9  A.Yes.
10  Q.How close in time were the telephone contacts to
11  the meeting?
12  A.They would have been follow ups.  And I can't
13  tell you how much time.
14  Q.Like in January, February, did it go on for
15  weeks, days, months?
16  A.It could have gone months.  But I don't know.
17  Q.Had your contacts with Mr. Jubb regarding the
18  gift ended before you received the first letter that
19  included Mr. Poulos's accusations?
20  A.I doubt it.  I don't know but I don't think so.
21  Q.Okay.
22  So, you were still in --- let me start again.
23  You were having communications with Mr. Jubb regarding
24  a gift when you learned about the first letter that
25  included Mr. Poulos's accusations.

Page 84

1  Is that right?
2  A.Yes.
3  ATTORNEY JUBB:
4  I'll object to the form now.
5  BY ATTORNEY DOUGHERTY:
6  Q.Did you tell Mr. Jubb about the accusations by
7  Mr. Poulos before you retained Mr. Jubb as your
8  lawyer?
9  A.No.
10  Q.Did Mr. Jubb express to you in words or
11  substance, again, before he was your lawyer any
12  knowledge regarding Mr. Poulos's accusations against
13  you?
14  A.No.
15  Q.And it's your --- let me start again.  I'm
16  correct that there isn't an evaluation for 2018 to
17  2019.
18  Correct?
19  A.Correct.
20  Q.Did you have any type of exit interview or any
21  contact with the Hill School at the end of your
22  employment?
23  A.No.
24  Q.Did you have a meeting with anyone at the Hill
25  School concerning the end of your employment at the

Page 85

1  Hill School?
2  A.In what sense?  I knew that I was --- my
3  employment was going to be discontinued but that was
4  the last conversation I had with anyone.
5  Q.When did you learn your employment was going to
6  be discontinued?
7  A.Probably early August 2019.
8  Q.How did you learn in early August 2019 that your
9  employment was going to be discontinued?
10  A.A phone conversation with Mr. Lehman and Mrs.
11  Gelting.
12  Q.Mr. Lehman is the headmaster and Ms. Gelting is
13  the human resources director.
14  Right?
15  A.Yes.
16  Q.And it's Heather Gelting?
17  A.Yes.
18  Q.And Zachary Lehman.
19  Right?
20  A.Yes.
21  Q.And it's L-E-H-M-A-N, G-E-L-T-I-N-G.  Was there
22  anyone else that participated in the telephone
23  conversation between you, Mr. Lehman, and Ms. Gelting
24  regarding the termination of your employment that
25  occurred in early August 2019?

Matthew B. Ralston
September 20, 2021                                    86 to 89

Page 86

1  A.No.  It was not described as a termination.
2  Q.Okay.
3    Who initiated the telephone contact?
4  A.I've got an email from Heather Gelting asking if
5  I was available to speak with her and Mr. Lehman.
6  Q.So, you got an email --- well, let me start
7  again.  Did you have access to your Hill School email
8  in August 2019?
9  A.No.
10  Q.When did you stop having access to your Hill
11  School email?
12  A.May 2019.
13  Q.When you were put on leave?
14  A.Yes.
15  Q.So, if you were put on leave prior to May 2019,
16  that's when your email access ended?
17  A.Yes.
18  Q.So, Ms. Gelting sent you an email at your
19  personal email address?
20  A.I believe so.
21  Q.Do you still have that email?
22  A.I don't know.
23  Q.Did you look for it?
24  A.I haven't looked for it.  Can I look for it?
25  Yes, I can.

Page 87

1  Q.Do you still have access to the --- I think we
2  went through your email addresses before but do you
3  still have access to the email address that Ms.
4  Gelting sent the communication to?
5  A.Yes.  What I don't know --- what I do know is
6  what I heard from her.  What I don't know is if it was
7  a phone call or if it was an email.  I was on my
8  motorcycle.  I stopped to take a break.  And when I
9  did that, there was either an email from her or a
10  phone call from her.  I can't tell you which.  And I
11  asked her --- I said of course, I can be available
12  because that was one of the criteria of my leave was
13  to be available when I was needed.
14  Q.So, how did you respond to Ms. Gelting?
15  ATTORNEY JUBB:
16    Just to be clear, you already produced
17  it.  I can show you the Bates number.
18  ATTORNEY DOUGHERTY:
19    Okay.
20    What's the Bates number?
21  ATTORNEY JUBB:
22    It's P36.6, August 12, 2019.
23  THE WITNESS:
24    So, it was an email.
25  ATTORNEY DOUGHERTY:

Page 88

1    Do you have that?
2  BY ATTORNEY DOUGHERTY:
3  Q.And how did you respond to Ms. Gelting?
4  A.I told her I was available.  I think I asked
5  about having my attorney present.  And she said she
6  didn't think we needed that.
7  Q.Did she tell you who else was going to
8  participate in the telephone call?
9  A.I believe she said Zach and I or Mr. Lehman and
10  I.
11  Q.So, the telephone call occurred sometime after
12  August 12, 2019.
13    Is that right?
14  A.Yes.
15  Q.Did the telephone discussion occur close in time
16  to the email?  Was it the next day?  Was it in a week?
17  A.It would have been relatively soon.  I don't know
18  if it was the same week or the following week but it
19  would have been very close.
20  Q.So, within a week or two of Ms. Gelting's email
21  is when you had the telephone discussion with Mr.
22  Lehman and Ms. Gelting.
23    Correct?
24  A.Yes.
25  Q.And what was discussed during the telephone

Page 89

1  conversation in August 2019 with Mr. Lehman and Ms.
2  Gelting?
3  A.Reaching an amicable, I think is the word he
4  used, separation of my employment.
5  Q.Is that it?
6  A.Pretty much.
7  Q.What did you say?
8  A.I said, if we're headed that way, I think what
9  you need to do is write up what that is and share it
10  with my attorney.
11  Q.Did Mr. Lehman tell you why, as you described ---
12  as you said amicable separation in your employment
13  needed to be reached?
14  ATTORNEY JUBB:
15    I'll object to the form.  You can
16  answer.
17  THE WITNESS:
18    My impression was because we were --- it
19  appeared that things weren't going to be resolved
20  around the accusations and the action I had taken,
21  resolved quickly.
22  BY ATTORNEY DOUGHERTY:
23  Q.When you say the action you had taken, you mean
24  the lawsuit.
25  Right?

Page 90

1    A.I do.
2    Q.Okay.
3    So, your impression of why --- let me start
4    again.  Mr. Lehman was, as far as you understood,
5    speaking on behalf of the Hill School during the
6    telephone communication in August 2019.
7    Correct?
8    A.Yes.
9    Q.So, Mr. Lehman was communicating to you that the
10   Hill School wanted to reach an amicable separation in
11   your employment?
12   A.Yes.
13   Q.And it was your impression that the reason why
14   the Hill School wanted to reach an amicable separation
15   of your employment was because your lawsuit was not
16   going to be resolved quickly?
17   ATTORNEY JUBB:
18   I'll object to the form.
19   THE WITNESS:
20   Yes.  That was my impression at the
21   time.
22   BY ATTORNEY DOUGHERTY:
23   Q.Did Mr. Lehman say anything about your lawsuit?
24   A.No.
25   Q.What gave you the impression?  Did somebody say

Page 91

1    something or do something?
2    A.Yeah.  That my situation wasn't going to be
3    resolved quickly.
4    Q.By situation, you mean the lawsuit.
5    Right?
6    ATTORNEY JUBB:
7    Objection to form.
8    THE WITNESS:
9    Yes.
10   BY ATTORNEY DOUGHERTY:
11   Q.Was there something that happened that gave you
12   the impression that there was a connection between the
13   Hill School's interest in reaching an amicable
14   separation in your employment and that the lawsuit was
15   not going to be resolved quickly?
16   A.A connection between the two?
17   Q.Yeah.  Is there something that happened that gave
18   you that impression?
19   ATTORNEY JUBB:
20   Other than what you've already told her.
21   THE WITNESS:
22   I think that's what I said.
23   BY ATTORNEY DOUGHERTY:
24   Q.But I don't think you told me the basis for your
25   impression.  Is it just something that you thought?

Page 92

1    ATTORNEY JUBB:
2    No.
3    THE WITNESS:
4    No.  I said that Mr. Lehman said it
5    looks like this isn't going to be resolved quickly.
6    BY ATTORNEY DOUGHERTY:
7    Q.Okay.
8    So, Mr. Lehman said that it looks like the
9    lawsuit, meaning your lawsuit against Mr. Poulos and
10   Mr. Garabedian was not going to be resolved quicky.
11   Is that right?
12   ATTORNEY JUBB:
13   Objection to form.
14   BY ATTORNEY DOUGHERTY:
15   Q.That was the substance, right?
16   A.Yes.  That's the context I took the comment, yes.
17   Q.I understand.  You don't remember the exact words
18   that Mr. Lehman used but he said something to the
19   effect of, it looks like the lawsuit that you've
20   commenced against Mr. Poulos and Mr. Garabedian is not
21   going to be resolved quickly or any time soon.
22   ATTORNEY JUBB:
23   Objection to form.
24   BY ATTORNEY DOUGHERTY:
25   Q.So, the Hill School wants to reach an amicable

Page 93

1    separation in your employment.
2    Is that right?
3    A.I don't think there was a so conditional in there
4    but yes that was my impression.  That's how I took our
5    conversation.
6    Q.So, it was your impression that Mr. Lehman was
7    --- or I guess Mr. Lehman on behalf of the Hill School
8    was connecting your lawsuit to the reason why your
9    employment needed to end.
10   Is that right?
11   ATTORNEY JUBB:
12   Objection to form.
13   BY ATTORNEY DOUGHERTY:
14   Q.At least it was your impression?
15   ATTORNEY JUBB:
16   Same objection.
17   THE WITNESS:
18   Yes.
19   BY ATTORNEY DOUGHERTY:
20   Q.Did Mr. Lehman express any other thoughts to you
21   or comments to you?
22   A.No.
23   Q.Did Ms. Gelling --- I'm sorry, Ms. Gelting speak
24   during the August 2019 telephone conversation?
25   A.No.  I think she was party to it because of her

Page 94

1  role and to have a third party present.  Again, but
2  she didn't speak, no.
3  Q.Oh, so it was your impression that Ms. Gelting
4  was there so that Mr. Lehman had a witness?
5  A.Sure.
6  Q.And you said that you said, if we're headed that
7  way that you should write it up and share with your
8  lawyer.
9  Is that right?
10 A.Yes.
11 Q.Did you say anything else to Mr. Lehman?
12 A.No.
13 Q.So, it was a pretty short conversation.
14 A.A pretty short conversation.
15 Q.Were you surprised that Mr. Lehman --- let me
16 start again.  Were you surprised by Mr. Lehman's
17 comments?
18 A.I don't know if that's the right word.
19 Q.What is the right word?
20 A.Disappointed.
21 Q.Why were you disappointed?
22 A.Because it was, until the first nine months or
23 whatever the letter existed, it was my impression that
24 the school was making every effort to resolve the
25 situation of the allegations by engaging with Mr.

Page 95

1  Garabedian and the third party attorneys with whom the
2  school worked.  And at the point that they were not
3  getting responses or any movement there, started to
4  distance themselves from me after the second letter.
5  And aside from distancing themselves, I was
6  disappointed that I believed or had up to that point
7  that the school really did believe that the
8  allegations were lies and false.  And the decision was
9  to end my relationship with the community.
10 Q.Did Mr. Lehman say anything during the August
11 2019 telephone communication that, you know, words or
12 substance or that gave you the impression that he
13 believed Mr. Poulos's accusations?
14 A.No.
15 Q.So, you were disappointed because it was your
16 impression that the school didn't credit Mr. Poulos's
17 allegations but was still moving to amicably separate
18 or amicably end your employment.
19 Is that right?
20 A.Yes.
21 Q.Were you disappointed that the school was trying
22 to end --- let me start again.  Were you disappointed
23 that the school was interested in reaching an amicable
24 separation in your employment because of your lawsuit?
25 ATTORNEY JUBB:

Page 96

1  I'll object to the form.  You can
2  answer.
3  THE WITNESS:
4  I don't understand.
5  BY ATTORNEY DOUGHERTY:
6  Q.Sure.  Did you expect the school to be more
7  supportive of you in your lawsuit or in, I think, as
8  you expressed before clearing your name?
9  A.I don't think expectation was part of it.  I
10 think my disappointment was because I hoped that the
11 school would push harder for resolution prior to the
12 lawsuit.  And I was feeling like they had chosen not
13 to and I was kind of left on my own.
14 Q.So, you expected the school to do something to
15 disprove Mr. Poulos's accusations?
16 ATTORNEY JUBB:
17 I'll object to the form.
18 THE WITNESS:
19 I expected Mr. Garabedian and the school
20 to do what I would have considered an investigation
21 that I understood third party investigations do in
22 search of the truth and, at that point, would have
23 reached a conclusion that the letters were based on
24 lies and the allegations were false.
25 BY ATTORNEY DOUGHERTY:

Page 97

1  Q.From your perspective, the school didn't perform
2  an investigation in search of the truth?
3  ATTORNEY JUBB:
4  I'll object to the form.
5  THE WITNESS:
6  I don't know what was investigated.  My
7  understanding is that they were getting a response for
8  cooperation from Mr. Garabedian and Mr. Poulos
9  regarding the allegations.
10 BY ATTORNEY DOUGHERTY:
11 Q.Right.  I understand that you didn't --- because
12 I think you confirmed this for us already in the first
13 day of your deposition that you didn't participate in
14 any investigation.  But you said you expected Mr.
15 Garabedian and the school to do an investigation.  So,
16 I'm just --- your expectation wasn't satisfied.
17 Is that right?
18 A.No.
19 ATTORNEY JUBB:
20 Object to form.
21 BY ATTORNEY DOUGHERTY:
22 Q.So, as far as your impression and as far as you
23 knew, the school did not do an investigation in search
24 of the truth.
25 A.I don't know.  I don't know what they did.  My

Matthew B. Ralston
September 20, 2021                          98 to 101

Page 98

1  understanding is, and I have no experience with these
2  third party investigations, but my understanding is
3  that it involves both the accuser and the institution
4  or the accused.  And my understanding was that there
5  was not a cooperation trying to make that happen.  And
6  I was given that impression.  And the first time I
7  spoke with Mr. Rees in May of 2018 and my
8  understanding in January of 2019 is that there had
9  been no movement toward that.
10  And that's when the school started --- it's when
11  Mr. Lehman made his comment about not being alone with
12  students.  It's when I learned that the school's
13  insurance company was a part of it.  And so, it became
14  clear to me that I was being distanced.
15  Q.So, you were being distanced by the school and,
16  at the same time, you had an impression that the
17  school wasn't doing an appropriate investigation into
18  the truth.
19  A.I didn't say that.  I don't know what the school
20  is doing.  What I know is what I heard from Mr. Rees
21  was that the school wasn't getting cooperation from
22  Mr. Garabedian or a response from Mr. Garabedian.
23  Q.I understand.  I'm just trying to understand what
24  your issue was with how the --- just focusing on the
25  school for a moment with what the school did.  You

Page 99

1  said you expected the school to do an investigation in
2  search of the truth and that would reveal the letters
3  were based on lies.  And at some point, you must have
4  obtained the impression that that wasn't occurring
5  because you said your expectation of the school wasn't
6  met.  Is that right?
7  ATTORNEY JUBB:
8  I'll object.
9  BY ATTORNEY DOUGHERTY:
10  Q.I know you don't have personal knowledge of what
11  the school did but you had an impression that led you
12  to then file a lawsuit because whatever you expected
13  to happen wasn't happening, correct?
14  ATTORNEY JUBB:
15  Objection.
16  THE WITNESS:
17  What I know is what my perspective was.
18  I have no experience, as I said, in these types of
19  investigations.  And my understanding was that the
20  school didn't give the letters credibility and was
21  trying to do what I thought was the responsible thing
22  to do based on what knowledge I had of, which is
23  limited, third party investigations.  And my
24  understanding that those require both parties to
25  participate and that wasn't happening.

Page 100

1  I don't know what I think the school
2  should have done at that point.  But what it seemed to
3  me the result was that I'm the one that got left out.
4  And it's my name.  It's my career.  And I was being
5  moved away from a community where I raised my family
6  and spent 20 years of my life working and another 7
7  years being a part of.
8  BY ATTORNEY DOUGHERTY:
9  Q.Okay.
10  Was there something that you wanted the school to
11  do differently in its handling of the letters?
12  A.I don't know what --- of course, but I don't know
13  what that is.  It's what I just tried to say.
14  Q.Basically, you wanted the school to do something
15  more to defend your honor.
16  Is that right?
17  A.I don't believe it's just mine.  I believe it's
18  also the school's.  If the school thinks the letters
19  aren't credible and are lies, the school's name is
20  attached to all of that as well.  I don't know what
21  the right answer is.  What I know is I don't think
22  it's just to let it go away.  And I think when --- my
23  perspective was there were eight or nine months from
24  the time the first letter came that I thought I was
25  being --- doing the right thing and leaving the

Page 101

1  opportunity there for an investigation to happen by
2  both.
3  And when the second letter came, it was pretty
4  clear that wasn't happening and I was the one that was
5  getting distanced from my community.
6  Q.So, you had the impression that the school was
7  just letting the letters go away and then, distancing
8  itself from you?
9  ATTORNEY JUBB:
10  I'll object to the form.  You can
11  answer.
12  BY ATTORNEY DOUGHERTY:
13  Q.I'll break it up into two.  You had the
14  impression that the school was just going to --- or
15  was just letting the letters go away?
16  ATTORNEY JUBB:
17  I'll object to the form.
18  BY ATTORNEY DOUGHERTY:
19  Q.That's what you --- those are words you used, to
20  just let it go away.
21  A.Yeah.  Yes.
22  Q.You didn't think the school should just let the
23  letters go away.
24  Correct?
25  A.Of course, I don't.

Matthew B. Ralston
September 20, 2021                                    102 to 105

Page 102

1   Q.And you wanted the school to clear your name and
2   its name and not let the letters go away.
3   Is that right?
4   A.Say that again.
5   Q.Right.  You wanted the school to take some action
6   to clear your name as well as its own name, right,
7   rather than to just let the letters go away.
8   A.Yes.
9   Q.And when the school didn't do that, you then
10  decided to commence a lawsuit.  Is that right?
11  ATTORNEY JUBB:
12  Objection to the form.
13  THE WITNESS:
14  Yes.
15  BY ATTORNEY DOUGHERTY:
16  Q.So, because the school was just letting the
17  letters go away that wasn't sufficient for you.  So,
18  you decided to take legal action.  Is that right?
19  ATTORNEY JUBB:
20  Objection to the form.
21  THE WITNESS:
22  Yes.
23  BY ATTORNEY DOUGHERTY:
24  Q.I think we have to take a break now.  I'm sorry
25  if I pushed it right to the limit.

Page 103

1   VIDEOGRAPHER:
2   The time is 12:06 p.m.  Off the record.
3   OFF VIDEO
4   ---
5   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
6   ---
7   ON VIDEO
8   VIDEOGRAPHER:
9   The time is 12:23.  Back on the record.
10  BY ATTORNEY DOUGHERTY:
11  Q.How did you know you were still employed at the
12  Hill School in August 2019 if you didn't get a new
13  appointment letter?
14  A.I was still getting paid and I hadn't been told I
15  wasn't being renewed.
16  Q.Okay.
17  So, your appointment --- we don't have it yet but
18  you're going to look for it, the 2018 to 2019 --- July
19  1, 2018 to June 30, 2019 appointment had ended.
20  Is that right?
21  A.Correct.
22  Q.And so, how did you know you were still employed
23  at the Hill School after June 30, 2019?
24  ATTORNEY JUBB:
25  Objection to form.

Page 104

1   THE WITNESS:
2   I guess I didn't think about it, except
3   that I was still getting paid and I had never been
4   through a paid leave before.  So, I didn't know how
5   the transition from one year to the next really
6   worked.  But I think mostly, I didn't think about it.
7   BY ATTORNEY DOUGHERTY:
8   Q.If the school completed an investigation in
9   search of the truth, I think that's how you described
10  it, would you not have commenced this lawsuit?
11  ATTORNEY JUBB:
12  Objection to the form.
13  THE WITNESS:
14  When I think about an investigation, it
15  wasn't just the Hill School.  It was the Hill School
16  and Mr. Garabedian because there's the accuser and
17  there is the institution.  And I expected the truth to
18  be found and them working together.
19  BY ATTORNEY DOUGHERTY:
20  Q.Okay.
21  So, if that happened, the thing you're talking
22  about, Mr. Garabedian or Mr. Poulos and the school
23  working together.
24  Is that right?
25  A.It's my understanding how those work.

Page 105

1   Q.Okay.
2   So, well, you said the accuser and institution.
3   So, I guess it's, technically, Mr. Poulos and the Hill
4   School had worked together?
5   ATTORNEY JUBB:
6   Objection to the form.
7   THE WITNESS:
8   My understanding was communications with
9   the Hill School was between Mr. Garabedian and Mr.
10  Poulos --- I mean, and the school.  And so, I would
11  have expected contact with the school to be strictly
12  through Mr. Poulos's attorney.
13  BY ATTORNEY DOUGHERTY:
14  Q.Okay.
15  And if that investigation, the accuser and the
16  institution working together, had occurred then, you
17  would not have commenced this lawsuit.
18  Is that right?
19  ATTORNEY JUBB:
20  Objection to form.
21  THE WITNESS:
22  I'm not sure how to answer that, except
23  that that would have been the step that I think I was
24  waiting for.  And for those eight months, from the
25  time the first letter came until the next letter came,

Page 106

1  I thought that would happen and it didn't.
2  BY ATTORNEY DOUGHERTY:
3  Q.What did you expect that that investigation would
4  reveal?
5  A.That I guess in the early --- in those eight
6  months, I would have, I guess, expected that either
7  the letter was made up --- not the letter.  The
8  accusations were made up in a lie, therefore, the
9  letter being false or identified that Mr. Poulos had
10  the wrong person.
11  Q.Do you remember the years that Mr. Poulos --- let
12  me start again.  Do you remember the year that Mr.
13  Poulos had you as his teacher?
14  ATTORNEY JUBB:
15  Could you clarify?  Does he remember '94
16  to '95 or does he, actually, remember teaching Mr.
17  Poulos?
18  ATTORNEY DOUGHERTY:
19  Just what years ---.
20  BY ATTORNEY DOUGHERTY:
21  Q.Let's do it this way.  Do you know what years Mr.
22  Poulos was a student at the Hill School?
23  A.Yes.
24  Q.What years was Mr. Poulos a student at the Hill
25  School?

Page 107

1  A.1993/'94, 1994/'95, and 1996/'97.
2  Q.Do you have a specific recollection of teaching
3  Mr. Poulos or having any contact with Mr. Poulos in
4  1993 to 1995 or 1996 to 1997?
5  A.Other than what's already gone over in the last
6  deposition?
7  Q.Yes.  Well, you seem to make a clarification.
8  So, I want to make sure I understand --- I'm not
9  missing something.
10  A.Other than what we've discussed, no.  He was in
11  my class.  I recognize that.  I had contact with him
12  when he returned to the school in 1996 because I was
13  the director of studies, at that point and was
14  responsible for scheduling classes for students.  That
15  would have been in the summer 1996.  And he lived in
16  our dormitory in 1996/'97.
17  Q.Was there anyone else who taught geometry during
18  1993 to '94 or '94 to '95 or '96 to '97?
19  A.Yes.
20  Q.Who else taught geometry?
21  A.I don't know.  I don't recall that.
22  Q.So, Mr. Poulos was in your geometry class in '93
23  to --- I'm sorry, '94 to '95.
24  Correct?
25  A.Yes.

Page 108

1  Q.Who else taught --- let me start again.  Did
2  anyone other than you teach geometry in 1994 to 1995?
3  A.Yes.
4  Q.Who else taught geometry in 1994 to 1995?
5  A.I don't know.
6  Q.Do you not --- do you not remember the person's
7  name but have an image of the person in your mind or
8  just have no recollection whatsoever?
9  A.I don't know who taught the class.  If I had a
10  picture of them in my mind, I could give you a name.
11  But I don't know who the other teacher was or
12  teachers.
13  Q.So, you don't know if the other geometry teacher
14  was even a man?
15  A.It would have been.
16  Q.Who were the choices?
17  A.Wow.  Willis Pierre, Mike Pentz, Matt Gettings,
18  Fred Marshall, Larry Kelly, Frank DeLaurentes.  How
19  many is that?
20  Q.One, two, three, four, five, six.  I'll read the
21  list back to you and see if I got ---.
22  A.My name would be on there as well so that's
23  seven.  I think that's it.
24  Q.Okay.
25  So, Willis Pierre, Mike Pentz, Matt Gettings,

Page 109

1  Fred Marshall, Larry Kelly, Frank DeLaurentes, you.
2  A.There is one more.  Give me a second.  Wayne
3  Marge.
4  Q.Did you say Marge?
5  A.Yeah, M-A-R-G-E.
6  Q.Okay.
7  A.And there was also a teacher named Rob Dougherty.
8  And Rob was not at the school very long.  Wayne --- I
9  can't tell you when Rob and Wayne left the school
10  precisely.  But those were the people that were
11  teaching in the Math Department around that time
12  period.  I'm guessing Wayne Marge and Rob Dougherty
13  were not at the school in '97, for example, '96/'97.
14  But I can't tell you specifically.
15  Q.Okay.
16  So, it would have been one of these gentlemen who
17  was the other geometry teacher in 1994 to '95.
18  Is that right?
19  A.One of the other geometry teachers, yes.
20  Q.Oh, teachers, okay.  So, it could have been more
21  than one other geometry teacher in 1994 to '95?
22  A.Yes.
23  Q.And any of the options --- let me start again.
24  The only options would be from this list.  Willis
25  Pierre, Mike Pentz, Matt Gettings, Fred Marshall,

Matthew B. Ralston
September 20, 2021                                110 to 113

Page 110

1  Larry Kelly, Frank DeLaurentes, you, Wayne Marge, and
2  Rob Dougherty.
3  A.I'm pretty sure.
4  Q.Did any of these gentlemen look like you?
5  A.I don't think so.
6  Q.Were any of them close in age to you?
7  A.Yes.  Frank's close in age, looked nothing like
8  me.  Matt Gettings is a little younger, relatively
9  close.  Wayne Marge is probably close in age.  Who
10  else did I say?  Willis is not, Mike is not.
11  Q.Willis Pierre, Mike Pentz, Fred Marshall, Larry
12  Kelly, and Rob Dougherty.
13  A.Those would be the only ones close to me in age.
14  Q.Matt Gettings, Wayne Marge, and Frank
15  DeLaurentes.
16  A.Yes.
17  Q.And Matt Gettings, Frank DeLaurentes, Wayne Marge
18  did not look like you to any extent.  You sort of
19  laughed when I asked that question.
20  A.I think it would be hard to confuse us.
21  Q.Okay.
22  You previously described yourself, a confirmed
23  description of you as tall and lanky at the time.
24  Is that right?  And the time being '94 to '95?
25  A.Yeah.  Yes.

Page 111

1  Q.Was there another male teacher at the Hill School
2  during that time period, 1994 to 1995, who could be
3  confused with you?
4  A.Not from my perspective.  The only other person
5  I've ever been told was confused as me is a gentleman
6  named Mark Nelson.  It would be hard to describe him
7  as lanky.
8  Q.So, you can't --- you mentioned that --- or
9  testified rather that you expected that a real
10  investigation that was cooperative with the accuser
11  and the institution, the Hill School, would have
12  revealed either that the letters were lied and made up
13  or identified the wrong person.
14  Right?
15  A.Yes.
16  Q.And so, you can't think of who you would have
17  been confused with or misidentified with?
18  A.No.  Not that teaches math.
19  Q.How about any teacher?
20  A.Mark Nelson is the only one.  And he did not ---
21  and I --- again, he didn't teach math.  I don't think
22  we look alike but you're asking what others see.
23  Q.What did Mark Nelson teach?
24  A.Science.
25  Q.Is Mark Nelson still with the Hill School?

Page 112

1  A.He is.
2  Q.Does Mr. Nelson still teach science?
3  A.As far as I know.
4  Q.Has Mr. Nelson, as far as you know, ever been
5  accused of inappropriate contact with a student?
6  A.Not that I know.
7  Q.Did you ever suggest to Mr. Rees or anyone else
8  at the school that perhaps Mr. Poulos had
9  misidentified you?
10  A.I don't think so.
11  Q.Did you ever suggest to Mr. Rees or anyone at the
12  school that Mr. Poulos had misidentified you with Mr.
13  Nelson?
14  A.No.
15  Q.So, your responses or comments to Mr. Rees and
16  the Hill School about the letters were, essentially,
17  that they were lies and made up.
18  Is that right?
19  A.Yes.
20  Q.And you expected that an investigation that was
21  cooperative with Mr. Poulos and/or Mr. Garabedian on
22  the one hand and the Hill School on the other would
23  reveal that the letter --- letters rather were lies
24  and made up.
25  Is that right?

Page 113

1  A.Yes, except that what I said if --- if he had the
2  wrong person.  I don't --- in my mind, when I say the
3  wrong person, I wasn't limiting it to people that he
4  may have had a --- been abused by were necessarily at
5  Hill.  I just know it wasn't me.  And if he had made a
6  mistake, I figured --- as opposed to lying, it would
7  have come out.
8  Q.Have you read or watched any of the testimony by
9  Mr. Poulos in this action?
10  A.I have read clips.  Beyond that, no.
11  Q.What clips of Mr. Poulos's testimony have you
12  read?
13  A.I can't tell you, specifically, what I read.
14  What was shared with me by my attorney but ---.
15  Q.Did you read Mr. Poulos's description of the
16  abuse that he sustained when he was a child?
17  A.His description of the abuse?
18  Q.Yes.
19  A.In the letters.
20  Q.How about in his testimony?  Let me start again.
21  Did you read Mr. Poulos's testimony about the abuse?
22  A.I don't think so.
23  Q.Do you remember anything about the testimony by
24  Mr. Poulos that you read?  I realize you might not be
25  able to recite it.

Page 114

1  A.No.  I'm sure it must have been part that was
2  about me that upset me.  As far as the nature of the
3  abuse, I immediately think of both letters.
4  Q.Okay.
5  But I'm just asking now to try to learn what
6  testimony by Mr. Poulos you read.
7  A.And I don't remember.  I don't recall.
8  Q.You don't remember anything about the testimony
9  by Mr. Poulos that you read?
10  A.I do not.
11  Q.Did you do any independent investigation to
12  determine whether Mr. Poulos was telling the truth
13  about being abused but had simply incorrectly
14  identified you?
15  A.No.
16  Q.Did it concern you when you filed this lawsuit
17  that you were identifying Mr. Poulos by name?
18  A.I'm sorry?
19  Q.Did it concern you when you filed this lawsuit
20  that you were identifying Mr. Poulos by name?
21  A.Not at that point.  I think when the second
22  letter came out, I thought I had done my --- I thought
23  there had been a long enough period of time in order
24  for him to want to participate in sorting out his
25  allegations and who had done it rather than blaming me

Page 115

1  if somebody else had done it.  And, at that point, I
2  was not concerned at all.
3  Q.Was there a point in time where you became
4  convinced that Mr. Poulos was just lying as compared
5  to misidentifying you?
6  A.I think absolutely when the second letter came.
7  It was clear to me that he was lying.  I don't know if
8  you want to consider it doubling down.  But was not
9  participating and sent a second letter.
10  Q.So, after the second letter, you reached the
11  conclusion that Mr. Poulos was lying about being
12  abused?
13  A.I reached a conclusion that Mr. Poulos was lying
14  about being abused by me.
15  Q.So, after you received the second letter, you
16  believed that it was possible that Mr. Poulos was
17  still misidentifying you, that he had in fact been
18  abused but not by you?
19  ATTORNEY JUBB:
20  Object to the form.
21  THE WITNESS:
22  I took it --- I quit thinking about
23  whether or not he had been at that point.  I knew he
24  hadn't been by me so I knew it was a lie.  And that's
25  where my attention and my concern went.

Page 116

1  BY ATTORNEY DOUGHERTY:
2  Q.So, it didn't concern you that you were
3  identifying the potential victim of sexual abuse by
4  name in a public filing?
5  ATTORNEY JUBB:
6  Objection to form.
7  THE WITNESS:
8  No.
9  BY ATTORNEY DOUGHERTY:
10  Q.Is there a reason why you didn't identify
11  yourself?
12  A.I was still an employee of the school.  And I was
13  hoping that things would resolve and I would be able
14  to maintain my relationship with the community that I
15  had spent better than 20 years building and enjoying.
16  Q.Well, you're not an employee of the school
17  anymore but you haven't identified yourself by name in
18  the lawsuit.
19  A.I can't speak to that.  That's out of my realm.
20  Q.So, you don't now have any reason not to identify
21  yourself by name in the lawsuit?
22  ATTORNEY JUBB:
23  Object to the form.  You can answer.
24  THE WITNESS:
25  I don't think so.  I'm not so naïve as

Page 117

1  to know that if --- when we go to trial in January
2  that my name won't be known.
3  BY ATTORNEY DOUGHERTY:
4  Q.Well, if you're so convinced that Mr. Poulos is a
5  liar and has falsely accused you of abuse and that
6  you're trying to clear your name then, why aren't you
7  doing it in the open?
8  A.I think I've answered that.
9  ATTORNEY JUBB:
10  He just said that.  Why don't you answer
11  again?
12  COURT REPORTER:
13  I'm sorry?
14  ATTORNEY JUBB:
15  I said he can answer again.
16  THE WITNESS:
17  I said I didn't in the beginning because
18  I was still an employee and working at the school when
19  we filed the lawsuit.  And I was trying to protect
20  that and my relationship there.  And after that, I
21  can't answer it because that's not my realm of
22  decision making.
23  BY ATTORNEY DOUGHERTY:
24  Q.Okay.
25  So, what I'm getting at is it's been almost two

Page 118

1  years, right, since the ---?
2  A.I know how long it's been.  Sorry.
3  Q.That's okay.  So, it's been almost two years
4  since your employment ended and you haven't identified
5  yourself in the lawsuit.
6  Is that right?
7  A.That's my understanding, yes.
8  Q.You said that you know how long it's been.  Is
9  the lawsuit upsetting to you?
10 A.Say again?
11 Q.You sort of looked like you had extra comments to
12 make there in reaction to how long the lawsuit has
13 been doing on.  You said, I know how long it's been.
14 Is the lawsuit upsetting to you?
15 A.The whole situation is upsetting to me.  It's
16 been three and a half years since the first letter was
17 sent.  And that's the day my world changed.  And the
18 lawsuit is, actually, the point at which I decided I
19 was going to try and put my voice out there and seek
20 the truth.
21 Q.So, you think your voice is out there by
22 identifying yourself as a John Doe?
23 A.I think my voice is out there by taking action.
24 As far as why I'm still a John Doe, I think I've said
25 this as clearly as I can say it.  I don't know why I

Page 119

1  still am.  It's not my realm.
2  Q.How did you believe the investigation that you
3  wanted to occur, again, cooperatively with the accuser
4  and institution would result in revealing that Mr.
5  Poulos was lying?
6  ATTORNEY JUBB:
7  Objection to form.
8  THE WITNESS:
9  How do I think it would have done that?
10 BY ATTORNEY DOUGHERTY:
11 Q.Yeah.
12 A.I think my record and my career and my reputation
13 within the school community speak to all of that.
14 There are no other --- ever been any concerns about
15 me.  And quite the contrary.  My career was --- my
16 career was, in many ways, charmed.
17 Q.Charmed did you say?
18 A.I found my right place to ---.
19 Q.Did you say charmed?
20 A.I did.
21 Q.Okay, thank you.
22 A.I found the right environment in which to teach
23 in a style that I wanted, in an environment that was
24 what my wife and I hoped to find for raising our
25 family.  And that was the Hill School.

Page 120

1  Q.When was the last time you taught at the Hill
2  School?
3  A. I'm sorry?
4  Q.When was the last time you taught at the Hill
5  School?
6  A.Taught?
7  Q.Uh-huh (yes).
8  A.2008/2009.
9  Q.And was that the last time you taught period?
10 A.No.  I taught some classes when I was headmaster
11 at the Leelanau School.
12 Q.Each year you were the headmaster?
13 A.Beg pardon?
14 Q.Did you teach classes each year you were the
15 headmaster at the Leelanau School?
16 A.No.
17 COURT REPORTER:
18 I'm sorry.  What's the name of that
19 school?
20 THE WITNESS:
21 L-E-E-L-A-N-A-U.
22 BY ATTORNEY DOUGHERTY:
23 Q.When did you teach classes at the Leelanau
24 School?
25 A.I can't tell you years.  I can tell you there was

Page 121

1  a teacher that left at spring break one year.  I
2  covered his classes for the remainder of that year.
3  And when teachers were out that taught math, I would
4  often fill in for them.
5  Q.So, you acted as a substitute teacher at Leelanau
6  School when you were the headmaster?
7  A.Yes.
8  Q.So, you didn't teach a regular course at the
9  Leelanau School.
10 Is that right?
11 A.The spring semester that I taught was indeed a
12 regular course.  And I was the teacher every day in
13 that year of that semester.
14 Q.You're talking about the semester when the
15 teacher left during spring break.
16 A.I am.
17 Q.What class was that?
18 A.I think it's Algebra 2.
19 Q.So, other than teaching algebra --- and you can't
20 remember the year that you taught Algebra 2 at the
21 Leelanau School.
22 Is that right?
23 A.Yes.
24 Q.So, other than teaching Algebra 2 and acting as a
25 substitute teacher when teachers who taught math were

Page 122

1  out, that's the extent of your teaching at the
2  Leelanau School.
3  Is that right?
4  A.Correct.
5  Q.You described your career as charmed. But your
6  description of charmed was an environment that ended
7  in 2008/2009. So, I'm just trying to reconcile that
8  with the connection to the subject matter of this
9  lawsuit.
10 ATTORNEY JUBB:
11 Objection to the form.
12 THE WITNESS:
13 Can you ask it again?
14 BY ATTORNEY DOUGHERTY:
15 Q.Sure. Was your career still charmed in 2016 to
16 2019?
17 A.Yes.
18 Q.How was your career charmed in 2016 to 2019?
19 A.Well, I'll say 2016 to the spring of 2018 when
20 the letters arrived. It was an opportunity to end my
21 career at a place I loved working with students, many
22 of whom I built relationships with since the early and
23 mid-'90s doing work that was important to them as
24 alumni and to the school as trying to move the school
25 forward financially.

Page 123

1  Q.Was taking --- let me start again. You took a
2  pay cut when you stepped down as the headmaster of
3  Leelanau?
4  A.I did.
5  Q.Was it a substantial pay cut?
6  A.Yeah.
7  Q.How much did you make when you left Leelanau?
8  A.I would say the year I left, I was making
9  $120,000. The year I started at Hill, I made $68,000
10 plus benefits that at Hill that didn't exist at
11 Leelanau. So, that would be retirement, for the most
12 part, which was a nine percent contribution. So,
13 whatever 68 times 0.09. When I left, I was making
14 $81,000 still with the benefits. So, the first year,
15 seven-twelfths or whatever, eight-twelfths, two-thirds
16 of a pay cut or one-third pay cut.
17 Q.You were making $81,000 in 2019 when your
18 employment ended with the Hill School?
19 A.Yes. 2018/2019, my salary was $81,000.
20 Q.Can you look at D-23 again? I guess I don't want
21 to show you my notes. Yes. It's the June 19, 2017,
22 appointment letter.
23 A.Yeah.
24 Q.So, we're looking at D-23 June 19, 2017
25 appointment letter.

Page 124

1  Right?
2  A.Yes.
3  Q.So, this is your appointment letter for July 1,
4  2017 to June 30, 2018.
5  Is that right?
6  A.Yes.
7  Q.And your salary from July 1, 2017 to June 30,
8  2018 is $73,100.
9  Is that right?
10 A.Yes.
11 Q.And the first letter was sent in April 2018.
12 Right?
13 A.Yes.
14 Q.So, you agree with me that the first letter that
15 included Mr. Poulos's accusations against you was sent
16 during this term, the term that is reflected in D-23.
17 Is that correct?
18 A.Yes.
19 Q.So, then you received a raise effective July 1,
20 2018 to $81,000?
21 A.Yes.
22 Q.You can go back to D-25.
23 A.Okay.
24 Q.Do you agree that this is the performance
25 evaluation for the evaluation period July 1, 2017 to

Page 125

1  July 30, 2018.
2  Correct?
3  A.Yes.
4  ATTORNEY JUBB:
5  I think you mean June 30.
6  ATTORNEY DOUGHERTY:
7  Oh, did I say it wrong?
8  BY ATTORNEY DOUGHERTY:
9  Q.So, the evaluation period is July 1, 2017 to June
10 30, 2018.
11 Is that right?
12 A.Yes.
13 Q.So, you agree with me that the evaluation period
14 reflected in the performance evaluation that has been
15 marked as D-25 included --- let me start again.
16 You agree with me that during the evaluation
17 period reflected in the performance evaluation that's
18 been marked as D-25, the first letter by Mr. Poulos
19 --- I lost my question. Let me start again.
20 You agree with me that the first letter by Mr.
21 Poulos was sent to the school during the evaluation
22 period reflected in the performance evaluation that's
23 been marked as D-25.
24 Is that right?
25 A.The letter from Mr. Garabedian, yes.

Page 126

1  Q. Okay.
2  You agree with me that nowhere in this
3  performance evaluation that's been marked as D-25 is
4  there any reference to accusations of sexual abuse by
5  you against a former student.
6  Is that right?
7  A. In this?
8  Q. Yes.
9  A. No.  There is not.
10  Q. This being D-25.
11  Correct?
12  A. Correct.
13  Q. Okay.
14  So, the first letter that included Mr. Poulos's
15  accusations did not impact your performance
16  evaluation.
17  Is that correct?
18  A. That's correct.
19  Q. In fact, you received a substantial raise
20  effective July 1, 2018.
21  Is that correct?
22  A. Yes.
23  Q. In fact, the raise that you received effective
24  July 1, 2018, was more than the raise that you
25  received between your first and second term.

Page 127

1  Is that right?  And you can look at your letters
2  if you'd like.
3  A. Yes.
4  Q. So, you started the first term, July 1, 2016,
5  with a salary of $68,000 and then, received a $5,100
6  raise for your second term effective July 1, 2017.
7  Correct?
8  A. Yes.
9  Q. And then, your raise effective July 1, 2018, you
10  went from $73,100 to $81,000.
11  Right?
12  A. Yes.
13  Q. And the bonus program started sometime during the
14  second term or maybe the third term?
15  A. Yes.
16  Q. So, in addition to getting a larger raise
17  effective July 1, 2018, you also had access to the
18  bonus program.
19  Is that right?
20  A. Yes.
21  Q. And Mr. Poulos's accusations of sexual misconduct
22  by you or sexual abuse by you to him didn't affect
23  your access to the bonus program.
24  Is that right?
25  ATTORNEY JUBB:

Page 128

1  I'll object to the form.
2  THE WITNESS:
3  No.  Yes, yes.
4  BY ATTORNEY DOUGHERTY:
5  Q. Okay.
6  So, Mr. Poulos's accusations did not affect your
7  access to the bonus program?
8  A. No, it did not.
9  Q. Did you receive another increase in salary in
10  2019?
11  A. No.
12  Q. You describe your return to Hill as the place
13  where you wanted to end your career.  Were you
14  planning on retiring?
15  A. From there?
16  Q. Yes.
17  A. Yes.
18  Q. Did you have a timeframe in which you intended to
19  retire?
20  A. No.
21  Q. So, it's your belief that an investigation that
22  involved cooperation with Mr. Poulos, the accuser and
23  the institution, the Hill School would have revealed
24  that Mr. Poulos was lying because of your reputation
25  and standing at the Hill School.

Page 129

1  Is that right?
2  ATTORNEY JUBB:
3  Objection to the form.
4  THE WITNESS:
5  Yeah.  I think that's what I said, yes.
6  BY ATTORNEY DOUGHERTY:
7  Q. So, you thought that an investigation would
8  reveal that you should be believed over Mr. Poulos.
9  Is that right?
10  A. Yes.
11  Q. So, you don't believe that the investigation
12  would have revealed some type of evidence, for
13  example, a videotape or a witness.
14  Is that right?
15  A. No.
16  Q. So, as far as you know, the only way to determine
17  who is telling the truth is to just decide whether we
18  believe you or Mr. Poulos?
19  ATTORNEY JUBB:
20  Objection to the form.
21  COURT REPORTER:
22  Can you say that a little louder?
23  ATTORNEY JUBB:
24  Objection to form.
25  COURT REPORTER:

Matthew B. Ralston
September 20, 2021                              130 to 133

Page 130

1  Thank you.
2  THE WITNESS:
3  I don't believe that's how an
4  investigation should work just he said/she said.  I
5  don't know.  I've never been involved with one so I
6  don't know the questions that are asked.  But I think,
7  in my mind if I'm thinking about people you would
8  speak with, it's more than just that.  It's
9  credibility from my supervisors, the headmaster, if
10 they talked to other faculty members, to other
11 students.  I don't know how it could have ended any
12 other way.
13 BY ATTORNEY DOUGHERTY:
14 Q.I'm sorry.  So, the only evidence that would have
15 been revealed is what you said and what Mr. Poulos
16 said.
17 Right?
18 ATTORNEY JUBB:
19 Objection to the form.
20 THE WITNESS:
21 I don't know what would have been
22 revealed.
23 BY ATTORNEY DOUGHERTY:
24 Q.Are you aware of a videotape of you and Mr.
25 Poulos interacting?

Page 131

1  A.No.
2  Q.Are you aware of any witnesses to you and Mr.
3  Poulos interacting?
4  A.No.
5  Q.So, what did you think that the investigation
6  would reveal other than who to believe?
7  ATTORNEY JUBB:
8  Objection to the form.
9  THE WITNESS:
10 I don't know how --- I don't know how to
11 answer that because I don't know what there could
12 possibly be.  There isn't anything about interactions.
13 There's probably a picture in a yearbook from a dorm.
14 There's nothing that could be revealed about me that
15 would support my abusing any student let alone --- or
16 mistreating any student let alone Mr. Poulos.
17 BY ATTORNEY DOUGHERTY:
18 Q.Is there any information that you believe the
19 school's investigation would have revealed that hasn't
20 been revealed during this litigation?
21 A.From --- what was the last part?
22 Q.During this litigation.
23 A.I don't know what they've done.
24 Q.You wanted the school to do something more,
25 right, an investigation.  So, I'm just trying to learn

Page 132

1  what you thought that would reveal.
2  ATTORNEY JUBB:
3  Objection to the form.
4  BY ATTORNEY DOUGHERTY:
5  Q.And to make sure that there's not some piece of
6  evidence we don't know about that you think the school
7  should have located.
8  A.No.
9  ATTORNEY JUBB:
10 Objection to form.
11 THE WITNESS:
12 There's no information that I believe
13 the school should have located other than my record,
14 interviews with people that would support my
15 relationship with students throughout my career if
16 that's the way it goes, as well as my relationship
17 with faculty and anybody else in the community.
18 BY ATTORNEY DOUGHERTY:
19 Q.We talked about the August 2019 telephone
20 discussion with Mr. Lehman and Ms. Gelting.  Did you
21 have any other telephone --- let me start again.  Did
22 you have any other communications with anyone from the
23 Hill School regarding the end of your employment with
24 the Hill School other than the telephone communication
25 in August 2019 with Mr. Lehman and Ms. Gelting?  Am I

Page 133

1  saying that wrong?
2  A.Gelting.
3  Q.Gelting.  Okay.
4  A.Only regarding COBRA.  I hadn't received any
5  information regarding COBRA.  And so, I sent a note, I
6  believe, asking about it.
7  Q.So, after the August 2019 telephone call with Mr.
8  Lehman and Ms. Gelting, the communications regarding
9  your separation from the Hill School were between the
10 Hill School and your lawyer?
11 A.Yes.
12 Q.How about prior to August 2019?  Did you have any
13 discussions with anyone at the Hill School regarding
14 your separation from the Hill School?
15 A.No.
16 Q.Did you have any communications with anyone from
17 the Hill School regarding your administrative leave?
18 A.No.  I received --- communications being from
19 someone to me, yes.  My understanding is that the
20 school sent out a note saying that I wasn't named but
21 there was an employee on paid administrative leave.
22 Please don't speak with them or bother them.  Respect
23 their privacy.  After the reunion, I think I heard
24 from a teacher just saying they missed me at reunion
25 and they hoped I was well but not, specifically, about

Page 134

1  my leave.
2  Q.How did you learn about the email that went out
3  saying that a teacher was on leave?
4  A.I don't know.
5  Q.You didn't receive the email, right, because your
6  email --- your Hill School email was already turned
7  off.
8  Right?
9  A.No.  It was already turned off.
10  Q.Or you didn't have access to it.
11  A.I didn't have access.
12  Q.Did you ever see the email?
13  A.No.
14  Q.So, the information you know about the email is
15  based on something that someone told you?
16  A.Yes.
17  Q.Did you learn the information about the email
18  that a teacher was on leave from someone other than
19  your lawyer?
20  A.I don't believe so.
21  Q.Did you learn --- when did you learn the
22  information about the email?
23  A.It would have been that summer somewhere soon
24  after it went out I'm sure or --- I don't know.
25  Q.So, summer, you're talking about 2019.

Page 135

1  Right?
2  A.Yes.
3  Q.And I might have misunderstood your answer.  So,
4  in the summer of 2019, you learned about the email
5  from your lawyer or from someone else?
6  A.I don't recall.
7  Q.Okay.
8  A.After the reunion, I heard from --- actually,
9  during the reunion, I heard from some alumni wondering
10  where I was.  I told them I just wasn't able to be
11  there.  I don't recall when I learned of the fact that
12  there was an email saying someone was on leave.  And I
13  don't remember how I acquired it.  And I didn't see
14  it, so heard about it.
15  Q.And when you say acquired, you mean acquired the
16  information.
17  A.Yes.
18  Q.So, that's it?  You never had any discussion with
19  the HR director about leave or anything like that?
20  You've talked about COBRA and emails from people who
21  don't sound like they are part of the school
22  administration.
23  A.I don't know how I was informed what to do with
24  my computer and any of my other school belongings.
25  That would have come from Ms. Gelting.  It must have

Page 136

1  come through Mr. Jubb but I don't recall.  And I was
2  to ship it back.  And the reason I know it came from
3  her was because one, that's who the shipping label was
4  to.  That would have been pretty quickly after my
5  leave began.
6  Q.So, somehow, you learned that you needed to ship
7  your stuff back to Ms. Gelting.
8  Right?
9  A.Yes.
10  Q.And stuff being your laptop and cell phone?
11  A.Cell phone was mine.  I was reimbursed.
12  Q.Okay.
13  So, close in time to when you learned about the
14  leave, you then shipped your laptop --- your school
15  provided laptop and anything else back to Ms. Gelting?
16  A.Anything else shipped back?
17  Q.Yeah.  Other than the laptop.
18  A.It would have been anything I had in my office.
19  So, there would have been probably Hill School thank
20  you cards.  I can't tell you what it all was.  The big
21  thing was the laptop.
22  Q.Okay.
23  So, like the laptop and any of the Hill School
24  materials you used for your job.
25  Right?

Page 137

1  A. Yes.  That could have all come in a letter from Mr.
2  Rees describing what leave was or requirements of me
3  during that.  I don't know.
4  ATTORNEY DOUGHERTY:
5  What's it now, 26?
6           ---
7  (Whereupon, Defendant's Exhibit 26,
8  4/18/19 Email, was marked for
9  identification.)
10           ---
11  ATTORNEY STEIGER:
12  Uh-huh (yes).  I'm pretty sure.  I wrote
13  down a D-25 but I didn't write down what it was.
14  ATTORNEY DOUGHERTY:
15  D-25 is the performance review.  It's
16  276 on the --- 267 on the bottom right.
17  ATTORNEY STEIGER:
18  Then, it must be 26 that we're at.
19  ATTORNEY DOUGHERTY:
20  Okay.  Cool.  I just ripped it off of a
21  big pack rather than giving you the whole pack.  If
22  it's got a better mark at the top.
23  BY ATTORNEY DOUGHERTY:
24  Q.I'm showing you a document that is marked as D-
25  26.  It says on the bottom right, P48.1.  And this is

Matthew B. Ralston
September 20, 2021                         138 to 141

Page 138

1  an email from Mr. Rees to Lane Jubb.  And you are not
2  part of the --- you're not one of the recipients to
3  the email.  The email is dated April 18th, 2019.  I
4  just want to know if you've ever seen the email that
5  I've marked as D-26 before I showed it to you today.
6  A. I don't know.  I know I got the information.  I
7  don't recall if it was sent directly --- if it came to
8  me or if my lawyer just told me that it was there.
9  Q. Well, the email's from Mr. Rees to Mr. Jubb --- I
10 acknowledge that you're not a recipient of the email.
11 Mr. Rees wrote, Lane: I write to inform you as counsel
12 for Matt Ralston that the Hill School has placed Mr.
13 Ralston on paid administrative leave effective
14 immediately in light of recent developments.  Mr.
15 Ralston should immediately cease all work on behalf of
16 the school.  Please communicate this decision to Mr.
17 Ralston.  Any questions should be directed to me as
18 counsel for the school.
19 So, I just want to know if you received this
20 email?
21 A. I don't recall if I received it or if it was a
22 phone conversation.  I believe I've read this.  The
23 part that makes me believe I've read it is that I
24 should cease all work on behalf of the Hill School or
25 on behalf of the school.

Page 139

1  Q. So, Mr. Rees wrote, in light of recent
2  developments.  Did you know what the recent
3  developments are that he's referring to?
4  ATTORNEY JUBB:
5  Objection to form.
6  COURT REPORTER:
7  I'm sorry?
8  ATTORNEY JUBB:
9  I object to the form.
10 BY ATTORNEY DOUGHERTY:
11 Q. Or let me put it this way, were there any recent
12 developments, recent to April 18, 2019?
13 ATTORNEY JUBB:
14 Same objection.  Calls for speculation.
15 THE WITNESS:
16 We filed a lawsuit.
17 BY ATTORNEY DOUGHERTY:
18 Q. Do you know if Mr. Rees --- let me start again.
19 Do you know if the Hill School put you on
20 administrative leave because of the filing of the
21 lawsuit?
22 ATTORNEY JUBB:
23 Same objection.
24 THE WITNESS:
25 I know that may have been the catalyst.

Page 140

1  But I believe my separation from the school began back
2  when the second letter arrived when I was encouraged
3  to seek my own attorney.  And it was shared with me a
4  second time that there could be action I could take.
5  BY ATTORNEY DOUGHERTY:
6  Q. You're referring to Mr. Rees telling you that you
7  could file a lawsuit against Mr. Poulos and Mr.
8  Garabedian?
9  A. Do I recall that?
10 Q. No.  When you said that you were told a second
11 time about that there was action to be taken.
12 A. Yes.
13 Q. You're referring to Mr. Rees telling you that you
14 could file a lawsuit against Mr. Poulos and Mr.
15 Garabedian?
16 A. He didn't say I should but yes.  Yes.
17 Q. Could, could, that you could.
18 A. Possibly, yes.
19 Q. I'm just trying to make sure that that's what you
20 were referring to at the end of your answer.  Did you
21 ever go review your personnel file?
22 A. I have not.
23 Q. Did you ever request to review your personnel
24 file?
25 A. I have not.

Page 141

1  Q. Did you ever request to --- to be clear, I'm
2  talking about your personnel file at the Hill School.
3  So, you've never reviewed or requested to review your
4  personnel file at the Hill School?
5  A. I have not.
6  Q. Did you make a request to review your personnel
7  file at the Hill School through your lawyer, Mr. Jubb?
8  ATTORNEY JUBB:
9  Objection to the form.  Can you ask it a
10 different way so there is no attorney/client there?
11 ATTORNEY DOUGHERTY:
12 Do you have the other pages of P48?
13 You're right.  I do.  For some reason, I though there
14 were only four pages in it.  I'm looking for 72, P36.
15 Sure.  We can --- so, can we go off the record?
16 VIDEOGRAPHER:
17 The time is 1:12.  Off the record.
18 OFF VIDEO
19                        ---
20 (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
21                        ---
22 ON VIDEO
23 VIDEOGRAPHER:
24 The time is 1:17.  Back on the record.
25 ATTORNEY DOUGHERTY:

Matthew B. Ralston
September 20, 2021                                    142 to 145

Page 142

1  The record is now going to reflect that
2  Mr. Poulos has now joined via zoom.
3  ATTORNEY JUBB:
4  Or his mom.
5  ATTORNEY DOUGHERTY:
6  Mr. Poulos, are you there?
7  MR. POULOS:
8  Yes, I'm here.
9  ATTORNEY JUBB:
10 Is your mom there?
11 MR. POULOS:
12 No.  I'm at my home.
13              ---
14 (Whereupon, Defendant's Exhibit 27, 5/6
15 to 5/7/19 Emails, was marked for
16 identification.)
17              ---
18 BY ATTORNEY DOUGHERTY:
19 Q.I'm showing you a document that I've marked as D-
20 27.  It says, P48.2, on the first page and P48.3, on
21 the second page.  It's a series of emails you, again,
22 are not a recipient of any of the emails.  I just want
23 to direct your attention to the top of the first page
24 of D-27.  It's an email from Mr. Rees to Mr. Jubb with
25 the subject line, Hill School Personnel File Review,

Page 143

1  dated May 7, 2019.  Do you see that at the top of D-
2  27?
3  A.Yes.
4  Q.And just in looking at D-27, have you ever seen
5  the series of emails between Mr. Rees and Mr. Jubb
6  before I handed D-27 to you?
7  A.I have not.
8  Q.Were you aware that there was a request to review
9  your Hill School personnel file?
10 A.Yes.  I think so.  I can't imagine there wouldn't
11 have been.
12 Q.Did you ever plan to go review your personnel
13 file?
14 A.No.
15 Q.So, you did not intend to go to the Hill School
16 to review your personnel file?
17 A.No.
18 Q.And you've never requested to review your
19 personnel file and been refused by the Hill School.
20 Is that right?
21 A.I've never requested to see my personnel file.
22 Q.Have you asked that the Hill School remove any
23 material from your personnel file?
24 A.No.
25 Q.Are you aware of whether there is any material in

Page 144

1  your personnel file regarding the accusations by Mr.
2  Poulos?
3  A.I am not.
4  Q.So, you don't know one way or the other?
5  A.I don't.
6  Q.Do you know whether your personnel file or a copy
7  of your personnel file at the Hill School was ever
8  obtained?
9  A.I don't.
10 Q.So, even if not --- let me start again.
11 I understand that you didn't go to the Hill
12 School and review your personnel file.  But have you
13 seen a copy of your personnel file from some other
14 source?
15 A.No.
16 Q.Did you participate in a conference call with
17 Geoff Richards, G-E-O-F-F, and Mr. Rees and Mr. Jubb?
18 A.I did.
19 Q.Who is Mr. Richards, Geoff Richards?
20 A.He's a member of the board of trustees.
21 Q.When did you participate in a conference call ---
22 well, let me start again.
23 Was there anyone else on the conference call
24 other than you, Mr. Richards, Mr. Rees, and Mr. Jubb?
25 A.To my understanding, it was just the four of us.

Page 145

1  Q.When was the telephone call?
2  A.Late January/early February of 2019.
3  Q.What was the purpose of the conference call?
4  A.Beg your pardon?
5  Q.What was the purpose of the conference call with
6  you, Mr. Rees, Mr. Jubb, and Mr. Richards?
7  ATTORNEY JUBB:
8  Object to the form.  You can answer.
9  THE WITNESS:
10 I had retained Mr. Jubb as my attorney,
11 at that point.  And Mr. Richards and Mr. Rees wanted
12 to check and see how I was.  Mr. Richards said he was
13 surprised to see my name attached to the letters.  We
14 had not made a decision, at that point, if I was going
15 to file a lawsuit.  We discussed some other
16 alternative or different roads we could go, one of
17 which was not filing a lawsuit.  At that point, we had
18 already received the letter from the insurance
19 company.
20 And a question we asked was if I did not
21 file a lawsuit and there was further action, would the
22 school provide me with independent counsel of my
23 choosing.
24 BY ATTORNEY DOUGHERTY:
25 Q.Just to be clear, you mean more action as it

Page 146

1  relates to the accusations of Mr. Poulos, not whether
2  the school was going to provide you independent
3  counsel for your own lawsuit.
4  A.Correct.  Yes, Yes.
5  Q.I apologize.  I just wanted to clarify that.
6  A.That's a good distinction.  The response was that
7  they would have to discuss that with the board and
8  would get back to us and we never heard back regarding
9  that question.
10 Q.And the we is you and Mr. Jubb.
11 Right?
12 A.Correct.
13 Q.So, you never got an answer from the school
14 whether the school would provide you with independent
15 --- when you say independent counsel, you mean someone
16 other than Mr. Rees.
17 Right?
18 A.Yes.
19 Q.Okay.
20 So, you wanted to know whether the school was
21 going to, basically, provide you counsel, someone
22 other than counsel for the school, if the
23 investigation into Mr. Poulos's accusations
24 progressed.
25 Is that right?

Page 147

1  A.I don't think I made the distinction of the
2  investigation.  I think what I thought was in regards
3  to if there was another step taken by Mr. Garabedian.
4  Q.Okay.
5  So, it was --- let me start again.  The idea was
6  that if Mr. Poulos commenced a lawsuit through Mr.
7  Garabedian, would the school provide you with counsel.
8  Is that right?
9  A.That would, certainly, be the main scenario in my
10 mind, yes.
11 Q.So, you weren't concerned about just having a
12 lawyer.  The concern was whether you would have a
13 lawyer provided by the school if a lawsuit was
14 commenced by Mr. Poulos.
15 Is that right?
16 A.Ask that again.
17 Q.Sure.  You weren't asking the school to just give
18 you --- retain a lawyer for you.  Your concern was
19 would the school retain counsel for you if a lawsuit
20 was commenced by Mr. Poulos.
21 Right?
22 A.Yes, yes.  That is correct.  Yes.
23 Q.And no lawsuit was ever commenced by Mr. Poulos
24 either through Mr. Garabedian or anyone else.
25 Correct?

Page 148

1  A.Not prior to our filing ours, no.
2  Q.And you never got an answer from the school about
3  whether it would provide you counsel if there was a
4  lawsuit by Mr. Poulos.
5  Is that right?
6  A.I did not.
7  Q.Was there anything else discussed during the
8  telephone call with Mr. Richards, Mr. Rees, and Mr.
9  Jubb?
10 A.I don't recall.  That's what I took from it.
11 Q.You said that you had not made a decision about
12 filing a lawsuit and had discussions about options
13 other than filing a lawsuit.  Can you provide more
14 information about that?
15 A.Had there been discussion about it you're asking?
16 Q.Yeah.  I don't know what words you used for it
17 because I didn't write the word down.  You indicated
18 that you had not made a decision regarding whether you
19 were going to file a lawsuit and alternatives --- you
20 used a different word to filing a lawsuit.  So, I want
21 to know some more information about that component of
22 your answer.  And I'm not trying to put a word in your
23 mouth.  I just don't remember what the word is.
24 A.I understand.  What I considered the alternatives
25 --- the only one I really considered was to progress

Page 149

1  how we had progressed for the last ten months, which
2  was the school continuing to try to communicate with
3  Mr. Garabedian and see if there were communications in
4  response to any of those communications.  And if the
5  existence of those allegations would resolve itself
6  without anyone taking legal action.  That was what I
7  considered the alternatives.
8  Q.And so, at some point after you said February
9  2019 telephone call with Mr. Richards, Mr. Rees, and
10 Mr. Jubb, you came to the conclusion that the school
11 was not going to take action and then, you commenced
12 your lawsuit.
13 Is that right?
14 A.Yes.
15 Q.Did you have any other discussions with the Hill
16 School regarding the accusations by Mr. Poulos after
17 the February 2019 telephone discussion that included
18 Mr. Richards, Mr. Rees, you, and Mr. Jubb?
19 A.Excuse me.  I reached out to Mr. Lehman in March.
20 My wife and I were on campus for a wedding.  And I
21 thought he might want to speak with me just regarding
22 those two avenues.  He was not on campus.  And he
23 had a phone conversation when Mary Beth and I were
24 driving back to Columbus.  I asked him the same
25 question about whether or not the school would provide

Matthew B. Ralston
September 20, 2021                                    150 to 153

Page 150

1  me with legal counsel --- independent legal counsel if
2  there was ever further action taken by Mr. Garabedian
3  and Mr. Poulos.
4  The response was the same that I got from Mr.
5  Richards, which was I'd have to check with the board.
6  And I never got a response then either.
7  Q. Just because I forgot to ask, Mr. Richards
8  learned about Mr. Poulos's accusations from someone
9  other than you?
10 A. Oh, yeah.
11 Q. And I think that you said that Mr. Richards
12 expressed that he was surprised to see your name
13 attached to the letter.  So, Mr. Richards made
14 comments during the telephone discussion that led you
15 to believe he did not believe Mr. Poulos's accusations
16 against you.
17 Is that right?
18 ATTORNEY JUBB:
19 I'll object to the form.
20 THE WITNESS:
21 I think the use of the word surprised
22 left me --- my impression up to then was that Mr.
23 Richards thought very highly of me, surprised to see
24 my name attached, made me wonder.  However, his
25 expression of concern for me answered that.  So, he

Page 151

1  did make that comment.
2  BY ATTORNEY DOUGHERTY:
3  Q. So, Mr. Richards expressed in words or substance
4  that he did not believe Mr. Poulos's accusations
5  against you?
6  ATTORNEY JUBB:
7  Objection to the form.
8  THE WITNESS:
9  I don't remember his exact words.  But
10 it's my perception he didn't.
11 BY ATTORNEY DOUGHERTY:
12 Q. Okay.
13 So, you hung up the telephone and didn't believe
14 that --- let me start again.
15 When you ended the telephone discussion with Mr.
16 Richards, Mr. Rees, and Mr. Jubb, you had the
17 impression that Mr. Richards did not believe the
18 accusations by Mr. Poulos against you.
19 Is that right?
20 ATTORNEY JUBB:
21 Objection to the form.
22 THE WITNESS:
23 I think I had that impression before the
24 conversation and he didn't say anything to alter that
25 in the conversation.

Page 152

1  BY ATTORNEY DOUGHERTY:
2  Q. When did you first learn that Mr. Richards knew
3  about the accusations?
4  A. When did I first learn?
5  Q. That Mr. Richards knew about the accusations.
6  A. I don't know when it clicked that he was a member
7  of the legal committee of the board of trustees.  I
8  knew that Mr. Lehman, and I think we discussed this
9  last time, shared with me that he had told the legal
10 committee.  So, I don't know that it registered that
11 he was part of the legal committee.  Once I figured
12 that out, I don't know when they were informed but I
13 would assume it would have been very quickly after the
14 first letter arrived.
15 Q. When did you --- okay.  When did you first have
16 contact with Mr. Richards about Mr. Poulos's
17 accusations?
18 A. That phone call.
19 Q. Okay.
20 So, even though you didn't have any direct
21 communications with Mr. Richards about the accusations
22 by Mr. Poulos prior to the February 2019 telephone
23 discussion, you already had the impression that Mr.
24 Richards didn't credit or believe the accusations.
25 A. No.  I don't think that's what I said.  I think

Page 153

1  what I said was that I assumed he had a high opinion
2  of me.
3  Q. Well, let me just ask.  I thought you said that
4  before you were done with the telephone call in
5  February 2019, you had the impression that Mr.
6  Richards didn't believe the accusations.  Did I
7  misunderstand?
8  ATTORNEY JUBB:
9  You just interrupted his answer.
10 ATTORNEY DOUGHERTY:
11 I know because he was ---.
12 THE WITNESS:
13 If that's how you heard my answer, Mr.
14 Richards is someone I've known for many years.  He is
15 part of the board before I left the school.  I think
16 he was probably part of the board in the late '90s.
17 He was someone with whom I had contact during the
18 seven years that I was gone from the school.
19 BY ATTORNEY DOUGHERTY:
20 Q. I understand.  So, your idea was that Mr.
21 Richards knew you well enough to know and to already
22 have a belief that the accusations were not true and
23 your telephone communication in February of 2019 sort
24 of confirmed that and did nothing to disavow you of
25 your beliefs.

Matthew B. Ralston
September 20, 2021                                      154 to 157

Page 154

1  Is that right?
2  ATTORNEY JUBB:
3  Objection to form.
4  THE WITNESS:
5  Yes.
6  BY ATTORNEY DOUGHERTY:
7  Q. Okay.
8  Any communications with anyone from the Hill
9  School regarding the accusations by Mr. Poulos after
10 the March 2019 telephone communication with Mr.
11 Lehman?
12 A. No.
13 Q. Did you ever have any in person meetings with
14 anyone at the Hill School regarding the accusations by
15 Mr. Poulos?  I realize you told us about Mr. Lehman
16 when he told you about the letters and some
17 interactions with Mr. Rees.  But did you have any
18 other type of meeting or anything like that?
19 A. Regarding?
20 Q. Yes, the accusations.
21 A. No.  Do you mean like did I sit down with Mr.
22 Rees and Mr. Lehman and talk about ---?
23 Q. Correct.
24 A. No.
25 Q. So, the equivalent of these telephone

Page 155

1  communications like the one with Mr. Lehman and Ms.
2  Gelting, did you have some type of meeting with the HR
3  director or anyone from the legal --- what do they
4  call it, the legal committee or the board of trustees
5  or anyone affiliated with the Hill School regarding
6  the accusations?
7  A. No.
8  Q. And so, between --- so, you had the March 2019
9  telephone discussion with Mr. Lehman.  And then, the
10 next contact you had with the Hill School --- with you
11 directly with the Hill School regarding your
12 employment was the August 2019 email and then,
13 telephone call with Mr. Lehman and Ms. Gelting?
14 A. I would have had the email from Ms. Gelting
15 regarding the meeting.  Prior to that, no.
16 Q. Okay.
17 So, March 2009, telephone call Mr. Lehman then,
18 the email from Ms. Gelting.
19 Correct?  In August 2019?
20 A. Yes.
21 Q. Does your wife currently work?
22 A. She does.
23 Q. Where does your wife work?
24 A. She works for Columbus Metropolitan Libraries.
25 Q. How long has your wife worked at Columbus

Page 156

1  Metropolitan Libraries?
2  A. This is '21.  Four or five years.
3  Q. I'm sorry, did you say Columbus?
4  A. Yes.
5  Q. Okay.
6  I think I might have just said Columbia by
7  mistake.  I'm sorry.  So, your wife has worked at
8  Columbus Metropolitan Libraries for four or five
9  years?
10 A. Yes.
11 Q. So, around the time when you became re-employed
12 by the Hill School, your wife started working at
13 Columbus Metropolitan Libraries?
14 A. Yes.
15 Q. Where do you primarily reside?
16 A. Columbus.
17 Q. Is that where your wife primarily resides?
18 A. Yes.
19 Q. Did you and your wife primarily reside in
20 Columbus for the entire time you were employed by the
21 Hill School the second time?
22 A. I was back and forth.  I was traveling quite a
23 bit.  But I changed my residency from Michigan --- my
24 driver's license --- probably 2017 or 2018.  I can't
25 tell you exactly when.

Page 157

1  Q. And you told us that you didn't look for other
2  employment in February 2020 because your mother died
3  and you were assisting with --- you were spending her
4  final days with her and then, assisting with her
5  estate.
6  Is that right?
7  A. From the October through then?  Yes.  When we
8  discussed that, it was October of 2019.  You asked why
9  I didn't seek employment after that.  And I think what
10 I shared was that those were the last months that she
11 was alive.  She was living with my brother.  We closed
12 up her house.  We sold it.  And I was visiting down
13 there as much as I could.
14 Q. So, your choice not to look for employment from
15 October 2019 to when your mother died was persona,
16 right, that you wanted to spend more time with your
17 mother?
18 ATTORNEY JUBB:
19 Objection to the form.
20 THE WITNESS:
21 It was that as well as what I shared
22 earlier about not feeling like I could look for work
23 in education.
24 BY ATTORNEY DOUGHERTY:
25 Q. And is there a reason why you didn't look for

Matthew B. Ralston
September 20, 2021                                    158 to 161

Page 158

1  employment between February --- I guess, well, March
2  2020 and the summer of 2021?
3  A. That's correct.
4  Q. What was the reason why you didn't look for
5  employment between March 2020 and the summer of 2021?
6  A. COVID was a big part of that.  My concern about
7  applying to schools had not changed any.  The
8  allegations still existed.
9  Q. How did you think that the new employer would
10 learn about the accusations?
11 A. I think, for me, it was a matter of being able to
12 be honest about my situation, which stems back to the
13 letters.
14 Q. So, you felt that you would need to tell a new
15 employer that there were unsubstantiated accusations
16 made against you?
17 A. I think --- I don't think.  I know what I
18 thought.  I thought that if I don't share that in an
19 interview and then, it becomes public if you will
20 after I've been hired, I would, if I was the hiring
21 person, feel like Matt had lied to them.  And much
22 like why I'm not able to associate with Hill School
23 alumni, I can't lie to them when I meet with them.
24 Q. Well, is part of your issue that you would have
25 to tell the prospective employer about your lawsuit?

Page 159

1  A. Part of my concern.  My issue was that I would
2  end up sitting in their office explaining that I had
3  received --- the school for which I worked last had
4  received two letters from someone accusing me of that.
5  And they would wonder why I wasn't a little more open
6  with them when I interviewed with them.
7  Q. How did you think a new employer would learn
8  about the letters?
9  ATTORNEY JUBB:
10 Objection to the form.
11 THE WITNESS:
12 I don't know.
13 ATTORNEY JUBB:
14 Asked and answered twice.
15 THE WITNESS:
16 Yeah.  You asked me why I'm still a John
17 Doe and do I care if it changes and ---.
18 BY ATTORNEY DOUGHERTY:
19 Q. That's not what I asked.  I wanted to know how
20 you believe the new employer would learn about the
21 letters because you didn't even look in your personnel
22 file to see if they're there.
23 ATTORNEY JUBB:
24 He didn't tell you anything about a
25 personnel file.  He told you exactly how.  You have to

Page 160

1  listen.
2  ATTORNEY DOUGHERTY:
3  No.  Please stop.  Please stop.  Please
4  stop speaking.
5  ATTORNEY JUBB:
6  No.  You need to ask a question.
7  ATTORNEY DOUGHERTY:
8  You may say objection and that's it.
9  Please don't ---.
10 ATTORNEY JUBB:
11 You cannot harass the witness.
12 ATTORNEY DOUGHERTY:
13 I'm not harassing him.
14 ATTORNEY JUBB:
15 You keep asking things over and over.
16 ATTORNEY DOUGHERTY:
17 I'm not harassing him.  And you can't
18 coach the witness by making commentary.
19 ATTORNEY JUBB:
20 I'm not doing anything.  I'm trying to
21 coach you.
22 ATTORNEY DOUGHERTY:
23 So, I will --- okay.  Well, I don't need
24 your coaching.  Thank you.
25 ATTORNEY JUBB:

Page 161

1  Well, then ask a different question.
2  BY ATTORNEY DOUGHERTY:
3  Q. My question was how did you think the new
4  employer would learn about the letters?
5  ATTORNEY JUBB:
6  Objection to the form.  Asked and
7  answered.  You can answer one more time.
8  ATTORNEY DOUGHERTY:
9  Just strike your commentary.
10 BY ATTORNEY DOUGHERTY:
11 Q. Go ahead.
12 A. I believe from sitting in an interview talking
13 about why I'm no longer working with the school from
14 which was last on my résumé, unless I was forthright
15 with them and said, there are two letters that were
16 sent to the school accusing me of molesting a student,
17 abusing a student, and it eventually became public
18 that I didn't want to put any hiring employer in that
19 position because if roles were reversed, I would feel
20 like I was lying --- I had been lied to by that
21 employee.
22 Q. I guess what I'm trying to understand is how did
23 you think the two letters would become public.
24 ATTORNEY JUBB:
25 Objection to form.

Matthew B. Ralston
September 20, 2021                                162 to 165

Page 162

1  BY ATTORNEY DOUGHERTY:
2  Q.I understand what you're saying.  You felt as
3  though you had to tell a prospective employer after
4  October 2019.  You felt that you had to tell a
5  prospective employer about the two letters for fear
6  that they might become public and you didn't want the
7  hiring person to feel that they had been deceived.  I
8  think you may have used a different word.  So, how did
9  you think the two letters were going to become public?
10  ATTORNEY JUBB:
11  Objection to the form.
12  THE WITNESS:
13  I believe what I said if the allegations
14  were to become public and I believe the allegations
15  will become public and attached to my name no later
16  than when we go to trial.  So, at the very least, they
17  would have learned then.
18  BY ATTORNEY DOUGHERTY:
19  Q.Okay.
20  So, your belief is that the allegations by Mr.
21  Poulos would become public because of your lawsuit?
22  ATTORNEY JUBB:
23  Objection to the form.
24  THE WITNESS:
25  Sure.

Page 163

1  BY ATTORNEY DOUGHERTY:
2  Q.When did you start looking for other employment?
3  A.Beg your pardon?
4  Q.When did you start looking for other employment?
5  A.Looking for employment?
6  Q.Yeah.  And I said other employment.
7  A.Other employment.  I'm sorry.
8  Q.I didn't mean to put my hand in the way.  Let me
9  start again.  You are looking for employment.
10  Correct?
11  A.Softly.  I looked at public schools in Ohio.  I,
12  actually, had communications with three.  And without
13  considerably more education, I can't be certified in
14  the State of Ohio.  And so, the other avenues
15  available to me are mostly careers in which I don't
16  have much interest.  Sales or --- sales.
17  Q.So, the inability to --- let me start again.
18  You were looking for a teaching position at the
19  Ohio public schools?
20  A.Yes.
21  Q.So, your inability to get a position teaching at
22  the Ohio public schools is because of additional
23  certifications that you would need in the State of
24  Ohio.
25  Is that right?

Page 164

1  A.Yes.
2  Q.Okay.
3  So, the inability to teach at the Ohio public
4  schools is not in any way related to the accusations
5  by Mr. Poulos.
6  Right?
7  A.No.
8  Q.And you said you started softly looking for
9  employment.  When did you start that?
10  A.This summer.
11  Q.Why did you start looking for employment this
12  summer?
13  COURT REPORTER:
14  Sorry, did you say when or why?
15  ATTORNEY DOUGHERTY:
16  Why.
17  THE WITNESS:
18  Why would be two reasons.  One, I was
19  still receiving unemployment and those requirement had
20  changed.  And most importantly because I would have
21  given up the unemployment, I decided that I could take
22  short term assignments from a school and was more
23  confident in the actions I had taken and decided it
24  was worth the risk.
25  BY ATTORNEY DOUGHERTY:

Page 165

1  Q.You say you were more confident in the actions
2  you had taken.  Do you mean by filing your lawsuit?
3  A.Yes.
4  Q.And so, you can't take short term --- when you
5  say short term assignments, you mean like substitute
6  teaching?
7  A.For a year.
8  Q.Oh, I understand.  Okay.
9  A.Or two years.
10  Q.So, you can't take the short term assignments
11  from --- well, let me start again.
12  Did you apply to any other schools other than
13  Ohio public schools?
14  A.No.
15  Q.Is the issue with the certification that makes
16  you unable to teach at the public schools, does that
17  provide a problem teaching at any school in Ohio or is
18  it unique to public schools?
19  A.It would not be any school.  It would be any
20  school that is accredited or requires certification,
21  public school certification.  There are some parochial
22  schools and independent schools that also require
23  those credentials.  There are independent schools that
24  don't require those credentials.
25  Q.And we're talking about high school?

Matthew B. Ralston
September 20, 2021                                166 to 169

Page 166

1    A.Yes.
2    Q.So, there are schools in Ohio that don't require
3    the accreditation that the public schools require that
4    you could teach?
5    A.I believe so.
6    Q.Have you applied to any of those schools?
7    A.I have not.
8    Q.Have you applied anywhere else other than Ohio
9    public schools?
10   A.I spoke with an insurance company regarding
11   health benefits to businesses, selling.
12   Q.When was that?
13   A.Excuse me?
14   Q.When did you speak to the insurance company about
15   selling health benefits?
16   A.It would have been late July or August sometime.
17   Q.Did you send your résumé or have an interview or
18   something?
19   A.They have my résumé and I did a Zoom interview
20   and we agreed that I would follow up if I had interest
21   in joining them.
22   Q.And you didn't follow up?
23   A.I did not.
24   Q.Okay.
25   So, you didn't --- you weren't interested in the

Page 167

1    job with the insurance company.
2    Is that right?
3    A.That's correct.
4    Q.So, the reason why you aren't employed by the
5    insurance company is not because of the accusations by
6    Mr. Poulos.
7    Is that right?
8    A.That's right.
9    Q.Did you apply anywhere else other than the Ohio
10   public schools and the insurance company?
11   A.I have not.
12   Q.Do you plan to apply to other places for
13   employment?
14   A.I do not.
15   Q.Is there a reason why you do not plan to apply to
16   other places for employment?
17   A.I'm 64 and I've done the math and retirement is a
18   good option at this point.  I know I can't go back to
19   the Hill School and do what I love.  And I don't think
20   I can become a fundraiser anywhere else but the Hill
21   School.  I've been out of teaching long enough that I
22   don't think I'm a full-time teacher because of
23   technological changes since I last taught in 2009.
24   Q.I think you said that you no longer receive
25   unemployment.

Page 168

1    A.That's correct.
2    Q.And so, your only source of income is the income
3    that your wife receives from her job.
4    Is that right?
5    A.Income wise, that's the only income we have.
6    I've got my retirement funds that we're drawing on.
7    Q.Do you receive money from somewhere else to
8    support your life, living?  It's your retirement, your
9    wife's salary, what else?
10   A.I have some other money but it's inheritance that
11   I can spend some.
12   Q.Do you mean an inheritance from your mother's
13   death in February 2020?
14   A.I do.
15   Q.So, you have adequate income to support your
16   lifestyle.
17   Is that right?
18   ATTORNEY JUBB:
19   Objection to the form.
20   THE WITNESS:
21   For short term, short period of time,
22   yes.
23   BY ATTORNEY DOUGHERTY:
24   Q.You said you don't plan to work.
25   A.Correct.  I'm not yet receiving Social Security.

Page 169

1    Q.Oh, okay.  So, is it the idea that your wife's
2    salary, the retirement, Social Security, and the
3    inheritance that will be adequate so that you do not
4    need to work?
5    A.It would be adequate.
6    ATTORNEY JUBB:
7    Object to form.
8    BY ATTORNEY DOUGHERTY:
9    Q.Is there anything that you cannot do now in 2021
10   that you could do before April 2018?
11   ATTORNEY JUBB:
12   Objection to the form.  Asked and
13   answered.
14   THE WITNESS:
15   Yes.
16   BY ATTORNEY DOUGHERTY:
17   Q.What can you not do now that you could do prior
18   to April 2018?
19   A.I can't associate with any member of the Hill
20   School community who is not aware of my situation.
21   Q.Did you say who is not aware of your situation?
22   A.Yes.  Why I'm not working there or what's
23   happening regarding what they do know and that is
24   varied.  And I don't know what level it varies.
25   Q.I want to get a complete list.  But just before

Matthew B. Ralston
September 20, 2021                          170 to 173

Page 170

1  we leave that, if you are publicly identified in your
2  lawsuit then, won't everyone know?
3  A. Yeah, they would or potentially.
4  Q. So, then you would be able to associate with
5  people of the Hill School community.
6    Is that right?
7  ATTORNEY JUBB:
8  Objection to the form.
9  THE WITNESS:
10 Yes, technically.
11 BY ATTORNEY DOUGHERTY:
12 Q. Okay.  You were giving me a list.  So, you can't
13 associate with people in the Hill School community who
14 don't know about your situation.  Anything else that
15 you cannot do now that you could do prior to April
16 2018?
17 A. I feel like I can't work in a job that's as
18 rewarding as what I was doing.
19 Q. Do you mean because in your view, the job that
20 you had as a capital giving officer at the Hill School
21 was like one of a kind?
22 A. Yes.
23 ATTORNEY JUBB:
24 Object to the form.
25 BY ATTORNEY DOUGHERTY:

Page 171

1  Q. Anything else that you cannot do now that you
2  could do in April 2018?
3  A. Not that's occurring to me right now.
4  Q. Does this lawsuit, meaning your lawsuit, cause
5  any emotional distress?
6  A. I think we discussed this last time.  My
7  emotional stress sources to the April letters of 2018.
8  Anything that stems from that point forward is I can't
9  distinguish between whatever else there is and those
10 letters.
11 Q. Okay.
12 So, the lawsuit does cause you emotional distress
13 but you can't distinguish among any of the activity
14 since the first April 2018 letter.
15 Is that right?
16 ATTORNEY JUBB:
17 I'll object to the form.
18 THE WITNESS:
19 I don't understand the activity.
20 BY ATTORNEY DOUGHERTY:
21 Q. So, the lawsuit causes you distress but you can't
22 distinguish that distress from distress that you
23 believe you had sustained because of the letters?
24 A. I think they're all tied together, yes.
25 Q. Other than your employment with the Hill School,

Page 172

1  we're taking that off the table for the moment, is
2  there any other job that you applied for that you've
3  been rejected from because of the accusations by Mr.
4  Poulos?
5  A. No.
6  Q. Did you pursue a position as headmaster of a
7  school prior to your application to Leelanau?
8  A. I'm sorry.  I didn't catch the beginning.
9  Q. Did you pursue a position as a headmaster at any
10 other school prior to when you applied to Leelanau?
11 A. I did, early 2000s.  I was a finalist at West
12 Nottingham Academy.  That would have been 2004, I
13 think, which is down in Maryland.  I withdrew my name
14 from that because our sons were --- the oldest one was
15 just getting ready to --- I take that back.  It would
16 have probably have been 2000.  I'm thinking the year
17 he graduated.  In 2000, I withdrew from that because,
18 one, he was getting ready to start the Hill School
19 and, two, I wasn't ready, at that point, to move on
20 from teaching.
21 Q. Okay.
22 So, your perception is when you --- I'm sorry.
23 Let me start again.  So, is it correct that becoming a
24 headmaster, the idea is that you no longer teach?
25 A. Yes.

Page 173

1  Q. And when you applied to Leelanau, you were ready
2  to no longer teach?
3  A. Yes.  I think ready is not the right word I would
4  use there.  Willing to not teach to try something
5  else.
6  Q. Well, you didn't have to leave the Hill School
7  when you left to go to Leelanau.
8  Right?
9  A. I did not.
10 Q. So, you could have continued at the Hill School
11 and continued teaching.
12 A. I could have.
13 Q. So, you made the voluntary decision to move away
14 from teaching to become a headmaster when you left for
15 the Leelanau School.
16 Is that right?
17 A. I did.
18 Q. When you left the Leelanau School and came back
19 to the Hill School, did you consider going back to
20 teaching?
21 A. Not really.
22 Q. Did you read any of --- well, let me start again.
23 I realize you indicated you read some portions of
24 Mr. Poulos's deposition.  Did you read any other
25 testimony?

Page 174

1  A.No.
2  Q.Did you read your own testimony?
3  A.I did.
4  Q.When did you read your own testimony?
5  A.Sometime between when we had it and the last six
6  weeks.  I can't tell you exactly when.  But it was in
7  that timeframe.  I don't even know when they're
8  available.  But it was after, obviously.
9  Q.So, sometime in the past few weeks?
10 A.Yes.
11 Q.Did you read all of your testimony?
12 A.I did.
13 Q.Did you read it closely?
14 A.Most of it.
15 Q.When you were reading your prior testimony, did
16 you see any errors?
17 A.One that I think is an error and that is when I
18 described how Mr. Lehman gave me the letter.  I don't
19 actually remember if he handed me a copy or he emailed
20 it.  I don't remember.  But I know he is the person
21 who provided it to me.
22 Q.And I think your recollection at the time, and
23 let me know if it's been refreshed or if it's
24 different was that you don't remember when you,
25 actually, got the copy of the letter.

Page 175

1  A.Right.  I think ---.
2  Q.You certainly knew the content.  You talked to
3  Mr. Lehman but we couldn't recall exactly how and when
4  you got the letter, the actual letter.
5  A.Right.
6  Q.Has that changed?  Have you remembered something?
7  A.Just that --- no.  What I remember is that I'm
8  not certain he emailed it to me.  And mostly, that
9  comes from I don't know where I would have printed it.
10 Printing it in the Advancement Office, the printers
11 are not in the office.  It didn't fit.  I don't
12 remember him handing it to me.
13 Q.So, when you were reading your testimony, you
14 thought to yourself how did I get a copy.
15 A.Yeah.
16 Q.Because you, eventually, had a copy.
17 A.Yes.
18 Q.Okay.
19 Anything else that you saw when you were reading
20 your testimony that you believed was an error?
21 A.I don't think so.  I'm sorry.  I don't think so.
22 Q.And when you were reading your testimony, did you
23 remember anything that you previously did not?
24 A.No.
25 Q.The statements that form the basis for your

Page 176

1  claims against Mr. Garabedian are the two letters.
2  Is that right?
3  A.Beg your pardon.
4  Q.The statements that form the basis for --- let me
5  start that again.
6  The statements that form the basis for your claim
7  against Mr. Garabedian are the letters, right, the
8  April 2018 and December 2018 letters?
9  A.They certainly are the initial and main parts of
10 that.  My understanding that there was no
11 communications between him and the school in response
12 to the school's requests play into that as well.
13 Q.You understand that you have a defamation claim
14 against Mr. Garabedian.
15 Is that right?
16 A.I do indeed.
17 Q.And that as part of the defamation claim, you'd
18 need to prove that there was a defamatory statement
19 made by Mr. Garabedian against you --- about you.
20 Is that right?
21 A.I understand that.
22 Q.Among other things.  So, I just want to confirm
23 that the statements that form the basis for your
24 claims are the two letters, the April 2018 and the
25 December 2018 letters, not some other letter that we

Page 177

1  haven't discussed.
2  A.Correct.
3  Q.The statement by Mr. Garabedian that you believe
4  to be about you that was not true.
5  Is that right?
6  A.Yes.
7  Q.Are you aware of whether there has been any
8  publicity about the accusations by Mr. Poulos against
9  you?
10 ATTORNEY JUBB:
11 I'll object to the form.
12 BY ATTORNEY DOUGHERTY:
13 Q.I just want to know if you know of any publicity
14 about the accusations by Mr. Poulos against you.
15 A.No.
16 Q.Have you ever spoken to Mary Ellen Poulos, Mr.
17 Poulos's mother?
18 A.Not since --- I assume I spoke with her when Mr.
19 Poulos was a student.  If I did, I don't remember the
20 conversation and I've had none since.
21 Q.Did you ever touch Mr. Poulos on any part of his
22 body?
23 A.Probably.  Hand on a shoulder or something.
24 Q.As far as you're concerned, any part of Mr.
25 Poulos's body that you touched or any touching of Mr.

Page 178

1  Poulos's body, was not inappropriate.
2  A.That is my understanding.
3  Q.Well, that's your position.
4  Right?
5  A.That's my position, yes.
6  Q.Did you ever make Mr. Poulos take a quiz at the
7  chalk board?
8  A.I did not.
9  Q.Did you make any students take a quiz at the
10 chalk board?
11 A.I did not.
12 ATTORNEY DOUGHERTY:
13 I think that's your cue to fill up the
14 water cup.
15 ATTORNEY JUBB:
16 I'm trying to slow down the pace here.
17 I don't know.  I'm just warming up to a break.
18 ATTORNEY DOUGHERTY:
19 If you need a break, you can have one at
20 any time.
21 BY ATTORNEY DOUGHERTY:
22 Q.Do you have any information about to whom Mr.
23 Lehman provided the April 2018 letter?
24 ATTORNEY JUBB:
25 Objection to form.  Asked and answered.

Page 179

1  THE WITNESS:
2  Only what I shared last time.  And that
3  was that he had shared it with legal committee and the
4  board of trustees and his associate headmaster.
5  BY ATTORNEY DOUGHERTY:
6  Q.And that's information that you learned from Mr.
7  Lehman.
8  Right?
9  A.Yes.
10 Q. He told you that's to whom he provided the April
11 2018 letter?
12 A.Yes.  And I guess I should include Mr. Rees.
13 Q.Do you have any information about to whom Mr.
14 Rees provided the December 2018 letter?
15 A.I do not.
16 Q.Do you know Preston Athey, A-T-H-E-Y?
17 A.I do.
18 Q.How do you know Preston Athey?
19 A.He was chairman of the board of trustees at that
20 time.
21 Q.Do you mean in 2018?
22 A.Yes.
23 Q.Did you ever have any communications with Mr.
24 Athey regarding the accusations by Mr. Poulos?
25 A.No.

Page 180

1  Q.Do you know whether Mr. Athey received the
2  letters that included Mr. Poulos's accusations?
3  A.From Mr. Lehman?  Yes.
4  Q.Generally.
5  A.Yes.  Well, yes, he had to.
6  Q.Why do you say he had to?
7  A.Because the chairman of the board of trustees is
8  an ex officio member of legal --- of every committee.
9  So, he's a member of the legal committee.  And I know
10 that's how the school operates.
11 Q.Okay.
12 So, based on Mr. Lehman's description of giving
13 the letter, the April 2018 letter to the legal
14 committee of the board of trustees, it's your belief
15 that the former chairman of the board was a recipient
16 or member of the legal committee recipient of the
17 letter?
18 A.Yes.
19 Q.And I'm sorry. Did you ever speak to Mr. Athey
20 about the accusations by Mr. Poulos?
21 A.No.
22 Q.Did you ever speak --- did you ever have any
23 written communications with Mr. Athey regarding the
24 accusations by Mr. Poulos?
25 A.No.

Page 181

1  Q.Did you have any contact with Mr. Athey before
2  the April 2018 letter?
3  A.Yes.
4  Q.How frequently did you have contact with Mr.
5  Athey before the April 2018 letter?
6  A.At the very least, annually.  And more likely,
7  several times a year.
8  Q.Did you have contact with Mr. Athey after the
9  April 2018 letter?
10 A.Yes.
11 Q.What was the nature of your contact with Mr.
12 Athey after the April 2018 letter?
13 A.He joined me with --- in meetings with potential
14 major donors.
15 Q.And it's your belief that Mr. Athey also received
16 the second letter, the December 2018 letter.
17 Is that right?
18 A.Yes.
19 Q.Did you have contact with Mr. Athey after the
20 December 2018 letter?
21 A.Yes.
22 Q.I'm sorry, the December 2018 letter.
23 A.After the '18 letter, yes.  That's what we did
24 before.
25 ATTORNEY JUBB:

Matthew B. Ralston
September 20, 2021                    182 to 185

Page 182

```
1   Hold on.  Everybody is misspeaking now
2   so why don't you correct it.
3   ATTORNEY DOUGHERTY:
4   I said 2018 so that's what I was trying
5   to do.
6   ATTORNEY JUBB:
7   Incorrect question and then, you get to
8   talk too.
9   BY ATTORNEY DOUGHERTY:
10  Q. I just want to know if you had contact with Mr.
11  Athey after the December 2018 letter.
12  A. Yes.
13  Q. And what was the nature of your contact with Mr.
14  Athey after the December 2018 letter?
15  A. We had visits in Chicago together.
16  Q. Did anything change regarding the nature of your
17  contact with Mr. Athey as it was prior to April 2018
18  to after December 2018?
19  A. From my perspective, yes, because I knew he was
20  aware of the letters.  It would have meant a lot to me
21  if he asked how I was doing, even if it wasn't
22  directly tied --- direct question regarding the
23  letters.  I spent three days with him feeling that
24  there's this elephant in the room that's just sitting
25  there.
```

Page 183

```
1   Q. Did he ever do or say anything to you to lead you
2   to believe that he credited or believed Mr. Poulos's
3   accusations?  He being Mr. Athey.
4   ATTORNEY JUBB:
5   Objection to the form.
6   THE WITNESS:
7   No.
8   BY ATTORNEY DOUGHERTY:
9   Q. Did Mr. Athey act any differently towards you?
10  A. I don't think so.  Can I --- I think not saying
11  anything to me checking how I'm doing, just even in a
12  general way, to me, felt like different --- treating
13  me differently.  We had had a good relationship.  We
14  spent time talking about lots of things prior to that.
15  It was much harder for me to initiate any conversation
16  when that was sitting in between us.  That's my
17  perspective.
18  Q. Right.  I understand.  I just want to know ---
19  so, Mr. Athey, from your perspective, didn't ask you
20  how you were doing as much and so that was different
21  in your view.
22  A. Yes.  I think we spent three days together in
23  Chicago and it didn't come up.  And I knew he knew.
24  And there was just no questioning how I'm doing or any
25  of that.  And I understand not but it was hard for me
```

Page 184

```
1   not to notice that absence of conversation.
2   Q. So, you thought Mr. Athey should address the
3   accusations with you?
4   ATTORNEY JUBB:
5   Object to the form.
6   THE WITNESS:
7   No.  I think a person could ask a
8   question in general just to see how you're doing with
9   everything.
10  BY ATTORNEY DOUGHERTY:
11  Q. Do you think that that's something that Mr. Athey
12  could do despite his position as the chairman of the
13  board of trustees and a member of the legal committee?
14  A. Probably not.
15  Q. Did you ever ask or confront Mr. Athey about it?
16  A. No.
17  Q. Did Mr. Athey ever do or say anything --- let me
18  start again.  Do you have any idea about what Mr.
19  Athey's opinion of you is?
20  A. Today?
21  Q. We can start with today.
22  A. No.
23  Q. Did you at any time know what Mr. Athey's opinion
24  of you was?
25  A. Prior to 2018?
```

Page 185

```
1   Q. Yes.
2   A. Yes.
3   Q. And what was Mr. Athey's opinion --- or your
4   understanding rather of Mr. Athey's opinion of you
5   prior to 2018?
6   A. That it was high.
7   Q. Do you believe that, at some point, Mr. Athey's
8   opinion of you changed?
9   A. I don't have anything to base that on.
10  Q. So, you don't know one way or the other what Mr.
11  Athey's opinion is now?
12  A. I don't.
13  Q. Do you know Andrew Soussloff, S-O-U-S-S-L-O-F-F?
14  A. What is it?
15  Q. I might just be saying it wrong.
16  A. I have met him I'm sure.  I can't tell you that I
17  can pick him out of a room.
18  Q. Okay.
19  So, I don't even know if that's the right --- do
20  you know the right way to say the name now that I've
21  shown it to you?
22  A. Soussloff.
23  Q. Soussloff or something like that.  Yeah.
24  S-O-U-S-S-L-O-F-F.  And so, you've met Mr. Soussloff?
25  A. I don't know that I have.  I can't imagine that I
```

Matthew B. Ralston
September 20, 2021                                186 to 189

Page 186

1  haven't.  But I don't remember and I couldn't identify
2  him to you.
3  Q.So, you can't remember ever having any contact
4  with him?
5  A.No.
6  Q.Do you recognize him as affiliated with the Hill
7  School?
8  A.Yes.
9  Q.Do you know anything more about Mr. Soussloff's
10  affiliation with the Hill School?
11  A.I think he was on the board, which means he's an
12  alumnus.
13  Q.Do you have any information about whether Mr.
14  Soussloff received the letters that included Mr.
15  Poulos's accusations?
16  A.I don't.
17  Q.You never associated with Mr. Soussloff.
18  Is that right?
19  A.I don't remember associating with him.
20  Q.You don't know what Mr. Soussloff's opinion of
21  you is or if he even has one.
22  Right?
23  A.I don't.
24  Q.Do you know Rick Wood?
25  A.I've met Rick Wood.

Page 187

1  Q.How do you know Rick Wood?
2  A.He works in the --- or did work, I don't know if
3  he still does, the Business Office at the Hill School.
4  Q.So, you met Rick once?
5  A.I would say at least once.
6  Q.Do you know whether Mr. Wood received the letters
7  that included Mr. Poulos's accusations?
8  A.I do not.
9  Q.Did you ever have any contact with Mr. Wood other
10  than seeing him in the Business Office?
11  A.No.
12  Q.Did you ever associate with Mr. Wood?
13  A.No.
14  Q.Do you know whether Mr. Wood has an opinion of
15  you?
16  A.I don't.
17  Q.Do you know Leslie Gomez?
18  A.I do not.
19  Q.Do you know Gina --- do you recognize the name
20  Leslie Gomez without regard of whether you'd know her?
21  A.I do recognize the name.
22  Q.How do you recognize the name Leslie Gomez?
23  A.From my understanding, she's an attorney with
24  Cozen O'Connor.
25  Q.Have you ever had contact with Ms. Gomez?

Page 188

1  A.No.
2  Q.Do you know whether Ms. Gomez has an opinion of
3  you?
4  A.I don't.
5  Q.Do you know Gina Maisto Smith, M-A-I-S-T-O?
6  A.No.
7  Q.Do you recognize the name Gina Maisto Smith?
8  A.Yes.
9  Q.How do you recognize the name Gina Maisto Smith?
10  A.She's an attorney with Cozen O'Connor.
11  Q.Have you ever met Ms. Smith?
12  A.I have not.
13  Q.Do you know whether Ms. Smith has an opinion of
14  you?
15  A.I do not.
16  Q.Do you know William Yinger?
17  A.I do.
18  Q.How do you know William Yinger?
19  ATTORNEY JUBB:
20  Objection to form.  Asked and answered.
21  THE WITNESS:
22  He was a student at the school from 1992
23  to 1995.  He's a current teacher at the school.  He's
24  a former chair of the Science Department at the
25  school.  And he's a good friend.

Page 189

1  BY ATTORNEY DOUGHERTY:
2  Q.Are you aware that Mr. Yinger provided testimony
3  in a deposition in this action?
4  A.I beg your pardon.
5  Q.Are you aware that Mr. Yinger provided testimony
6  in a deposition in this action?
7  A.I am.
8  Q.Did you read Mr. Yinger's testimony?
9  A.I have not.
10  Q.Did you speak to Mr. Yinger about his testimony?
11  A.I have not.
12  Q.Do you know whether Mr. Yinger has an opinion of
13  you?
14  A.I do.
15  Q.Do you know Mr. Yinger's opinion?
16  A.Very high.
17  Q.Mr. Yinger learned about the accusations by Mr.
18  Poulos against you from you.
19  Is that right?
20  A.That's correct.
21  Q.And learning about Mr. Poulos's accusations did
22  not change Mr. Yinger's opinion of you.
23  Is that right?
24  A.It did not.
25  Q.And Mr. Yinger has not stopped associating with

Matthew B. Ralston
September 20, 2021                                    190 to 193

Page 190

1  you since learning of the accusations by Mr. Poulos.
2  Is that right?
3  A.He has not.
4  Q.Do you know Wallace Gundy, G-U-N-D-Y?
5  A.I do.
6  Q.How do you know Wallace Gundy?
7  A.She's also a former student.  She was a prefect
8  in our dormitory.  She was a faculty child.  And I
9  would consider her a friend as well.
10 Q.Do you know what Ms. Gundy's opinion of you is?
11 A.I think it's very high.
12 Q.Does Ms. Gundy know of the accusations by Mr.
13 Poulos?
14 A.I believe so.
15 Q.Do you know how Ms. Gundy learned of the
16 accusations by Mr. Poulos?
17 A.I don't.
18 Q.Why do you believe Ms. Gundy is aware of the
19 accusations by Mr. Poulos?
20 A.I beg your pardon?
21 Q.Why do you believe she's aware?  Did she say
22 something?  Did somebody else tell you something?
23 A.Let me rewind.  She knew --- she was at the
24 reunion that I didn't attend.  And I got a note from
25 her saying she missed us and knew that it wasn't

Page 191

1  anything we could talk about.  She's the president of
2  the Alumni Association I think.  And she is her class
3  secretary.  So, as far as how she found out, I can't
4  say specifically.  I have, actually, seen Wallace
5  after ---.
6  Q.I'm sorry.  It's Mr., right?
7  A.Oh, Mr.?
8  Q.Is it Wallace Gundy?
9  A.If it's Wallace, it's a she.
10 Q.It's a she, okay.
11 A.Her father was Jay.
12 Q.I apologize.  I thought I had been referring to
13 her as --- a man as a woman.  I'm sorry.  Keep going.
14 I apologize.
15 A.I saw Wallace the summer of 2019 when I was on
16 leave.  And I gave her kind of a general outline
17 without specifics.  I haven't spoken with her since.
18 I've had communications with her since.  But I have
19 not spoken with her since.
20 Q.So, do you know --- let me start again.
21 Do you have any information about whether Ms.
22 Gundy received the letters?
23 A.I don't.
24 Q.So, it's your belief that Ms. Gundy learned some
25 information about the accusations from a source other

Page 192

1  than you and that you provided Ms. Gundy information
2  about the accusations.
3  Is that right?
4  A.Yes.
5  Q.And ---.
6  A.And ---.
7  Q.Go ahead.
8  A.I don't know that she received information that
9  there were accusations.  I think she received
10 information during her reunion that I couldn't be
11 there and that it wasn't something I could talk about.
12 Q.And what did Ms. Gundy say when you gave the
13 general outline of the accusations?
14 A.She was sorry and hoped we knew how she thought
15 about us.
16 Q.And what did you tell Ms. Gundy?  You said you
17 called it a general outline but what did you tell her?
18 A.That someone had made an accusation against me.
19 I wasn't specific in what it was.
20 Q.Did you tell her it was --- oh, I'm sorry.
21 A.And that I had filed a suit.  At that point, I
22 was on paid administrative leave.  She already knew
23 that much for sure.
24 Q.Did you tell Ms. Gundy that the --- let me start
25 again.

Page 193

1  Did you tell Ms. Gundy the nature of the
2  accusation?
3  A.I don't believe so.
4  Q.Did you tell her that it was by a former student?
5  A.I don't know.
6  Q.Did you identify Mr. Poulos as the accuser?
7  A.I did not.
8  Q.Do you know whether Ms. Gundy's opinion of you
9  changed after learning the information about the
10 accusations?
11 A.I believe it did not.
12 Q.So, as far as you know, Ms. Gundy's opinion of
13 you is still high?
14 A.Yes.
15 Q.And Ms. Gundy hasn't stopped associating with you
16 after learning the accusations.
17 Is that right?
18 A.That's right.
19 Q.Do you know W. Christopher Drowne, D-R-O-W-N-E?
20 A.I do.
21 Q.How do you know W. Christopher Drowne?
22 A.Chris was a teacher at the Hill School.  He is
23 also an alumnus.  I taught his younger brother.  And
24 we were colleagues for if not every year I was
25 teaching there, all but one or two.  He was pretty

Page 194

1  young when I arrived.
2  Q.Do you know whether Mr. Drowne knows about the
3  accusations by Mr. Poulos?
4  A.I don't.
5  Q.Have you ever talked to Mr. Drowne about the
6  accusations by Mr. Poulos?
7  A.I have not.
8  Q.Do you have any information about whether Mr.
9  Drowne received the letters that included the
10  accusations by Mr. Poulos?
11  A.I do not.
12  Q.Do you know if Mr. Drowne has an opinion of you?
13  A.I do.
14  Q.Do you know what Mr. Drowne's opinion of you is?
15  A.High.
16  Q.It's your understanding that Mr. Drowne's opinion
17  of you is high presently.
18  Correct?
19  A.Yes.
20  Q.And that Mr. Drowne's opinion of you has always
21  been high.
22  Is that right?
23  A.I think so.
24  Q.And do you have any reason to believe that Mr.
25  Drowne has stopped associating with you?

Page 195

1  A.No.
2  Q.I just want to confirm.  Let me just ask the
3  question.  You told Mr. Neese about the accusations.
4  Is that right?
5  A.Mr. who/
6  Q.Neese?
7  A.Yes.
8  Q.And you don't know whether Mr. Dougherty, David
9  Dougherty, knows about the accusations.
10  Is that right?
11  A.Specifically, no but I do know, and I think I
12  shared this last time, that I asked him to speak with
13  me and he said he couldn't if it involved a legal
14  matter at the school.  So, I assume he knows.
15  Q.And that's the only information you have about
16  whether Mr. Dougherty knows about the accusations.
17  Right?
18  A.Yes.
19  Q.Do you know James Alexandre, A-L-E-X-A-N-D-R-E?
20  A.I do.
21  Q.Did I say it right, Alexandre?
22  A.I think, actually, I've always said Alexandre.
23  Q.Maybe I just have it spelled wrong.
24  A.This is the first time I saw the spelling.
25  Q.Oh, so it's spelled --- it just says it

Page 196

1  regularly.
2  A.You've got it spelled right.  He's a member of
3  the board of trustees.
4  Q.Do you know whether Mr. Alexandre has information
5  or knows about the accusations by Mr. Poulos?
6  A.No, not directly.  He was a member of the board
7  of trustees.
8  Q.Was Mr. Landy --- let me start again.  Was Mr.
9  Alexandre a member of the legal committee?
10  A.I don't know.
11  Q.So, you don't have information one way or the
12  other about whether Mr. Alexandre knows about the
13  accusations by Mr. Poulos.
14  Is that right?
15  A.No.  He may be the current chair of the board in
16  which case he would know.  But I don't remember who
17  was Preston's assistant and I know that Preston is off
18  the board or vice chair.
19  Q.So, the only basis for your --- let me start
20  again.
21  You don't have any direct information about
22  whether Mr. Alexandre received the letters or knows
23  about the accusations.
24  Is that right?
25  A.I do not.

Page 197

1  Q.You're just making an assumption because he's
2  presently on the board?
3  A.I think he is.  I'm not certain of that.
4  Q.So, if the school or the school's attorney
5  confirmed that Mr. Alexandre did not receive the
6  letters, would you accept that representation?
7  A.I'd have no reason not to.
8  Q.And then, you would have no reason to believe
9  that Mr. Alexandre received the letters or knew about
10  the accusations.
11  Is that right?
12  A.Yes.
13  Q.Do you know whether Mr. Alexandre has an opinion
14  of you?
15  A.Not directly.
16  Q.How about indirectly?
17  A.I would assume it was good.  I haven't interacted
18  with him since I left the school in 2009.
19  Q.Oh, I see.  So, the last time you had contact
20  with Mr. Alexandre was before you went to Leelanau.
21  A.Yes.
22  Q.And at that time, Mr. Alexandre had a good
23  opinion of you.
24  Is that right?
25  COURT REPORTER:

Page 198

1  Is that a yes?
2  THE WITNESS:
3  Yes.  Sorry.
4  BY ATTORNEY DOUGHERTY:
5  Q.And nothing has happened since between you and
6  Mr. Alexandre to lead you to believe that Mr.
7  Alexandre's high opinion of you has changed.
8  Is that right?
9  A.Nothing.
10 Q.And do you have an --- let me start again.
11 You haven't had a reason to associate with Mr.
12 Alexandre since 2009.
13 Is that right?
14 A.I have not.
15 Q.So, there is no reason related to Mr. Poulos's
16 accusations that you haven't interacted with Mr.
17 Alexandre.
18 Is that right?
19 A.Not to my knowledge.
20 Q.Do you know Scott Wilson?
21 A.I'm sorry, Scott who?
22 Q.Wilson, W-I-L-S-O-N.
23 A.I don't think so.
24 Q.Do you know Richard --- do you recognize the name
25 Scott Wilson?

Page 199

1  A.No.
2  Q.Do you know Richard Tabarrini, T-A-B-A-R-R-I-N-I?
3  A.I recognize the name.
4  Q.How do you recognize the name Richard Tabarrini?
5  A.As a parent of a student or students but not
6  student or students I know.
7  Q.So, you recognize Mr. Tabarrini's name to have
8  some connection with the Hill School?
9  A.Just as a parent.
10 Q.As a parent?  Do you know whether Mr. Tabarrini
11 has an opinion of you?
12 A.I don't.
13 Q.Have you ever interacted with Mr. Tabarrini?
14 A.Not to my recollection, no.
15 Q.Do you know whether Mr. Tabarrini received the
16 letters or information regarding Mr. Poulos's
17 accusations?
18 A.I do not.
19 Q.Do you know James Sheward, S-H-E-W-A-R-D?
20 A.I know the name.  Don't think I could pick him
21 out.
22 Q.How do you recognize the name James Sheward?
23 A.I don't know except that it feels familiar.
24 Q.So, you don't have any information about whether
25 Mr. Sheward is even affiliated with the Hill School.

Page 200

1  Is that right?
2  A.No.  I mean, yes, that's right.
3  Q.You just recognize the name.  You have no idea
4  where.  How about Robert Oberrender,
5  O-B-E-R-R-E-N-D-E-R?
6  A.I do know him.
7  Q.How do you know Mr. Oberrender?
8  A.He's an alumnus of the school and was on the
9  board and resides in Minneapolis area, which was in my
10 territory.  And I saw him in that capacity and he also
11 met with some other donors in that area with me.
12 Q.When was the last time you interacted with Mr.
13 Oberrender?
14 A.Probably sometime in the 2018/'19 school year.
15 I'm sorry.  It could have been '17/'18.
16 Q.Do you know if Mr. Oberrender has an opinion of
17 you?
18 A.I know that he did.
19 Q.What was Mr. Oberrender's opinion of you?
20 A.I'm sorry.
21 Q.It's okay.
22 A.It was high or good, whatever, high.
23 Q.I know you're detecting the pattern.  You said
24 did.  What were you referring to?
25 A.I haven't associated with him since the last time

Page 201

1  I saw him.
2  Q.And you don't remember the last time you saw Mr.
3  Oberrender?
4  A.No.  The last time that's vivid, I can't tell you
5  when it was.  That's why it could have been '17/'18
6  was in Minneapolis.  Visited with another donor there.
7  It's quite possible we would have crossed paths during
8  a trustee weekend when we would have both likely been
9  on campus.  I'm going to need that break soon.
10 Q.Oh, sure.  Let me just finish up with Mr.
11 Oberrender if that's okay.
12 A.Of course.
13 Q.Do you know whether Mr. Oberrender has any
14 information about the accusations by Mr. Poulos?
15 A.I don't.
16 Q.Do you know whether Mr. Oberrender received the
17 letters that included the accusations by Mr. Poulos?
18 A.I don't.
19 Q.And am I correct that you don't even know if the
20 last time you saw Mr. Oberrender was before or after
21 the letters.
22 Is that right?
23 A.I think it was after the first letter but I'm not
24 absolutely certain.
25 Q.Okay.

Matthew B. Ralston
September 20, 2021                                    202 to 205

Page 202

1  Nothing Mr. Oberrender did or said led you to
2  believe that anything about his opinion of you had
3  changed.
4  Is that right?
5  A.Correct.
6  Q.So, the last time you saw Mr. Oberrender, he had,
7  as far as you understood, a high opinion of you and
8  you have no information that there been any change
9  in his opinion of you.
10 A.That is correct.
11 Q.And you haven't crossed paths with Mr. Oberrender
12 because you're no longer affiliated with the Hill
13 School.  Is that right?
14 A.That is correct.
15 ATTORNEY DOUGHERTY:
16 Okay.  We can take a break.
17 VIDEOGRAPHER:
18 The time is 2:42.  Going off the record.
19 OFF VIDEO
20              ---
21 (WHEREUPON, A SHORT BREAK WAS TAKEN.)
22              ---
23 ON VIDEO
24 VIDEOGRAPHER:
25 The time is 2:54.  Back on the record.

Page 203

1  BY ATTORNEY DOUGHERTY:
2  Q.You indicated that you didn't know Ms. Gomez or
3  Ms. Smith.  But did you prepare a statement that was
4  for either Ms. Gomez or Ms. Smith?
5  A.I don't believe so.
6  Q.Did you prepare a statement that was intended for
7  Ms. Gomez or Ms. Smith?
8  A.I don't think so.
9  Q.Did you prepare any type of statement for the
10 school regarding your position or, you know, ---
11 A.No.
12 Q.--- explanation or response to Mr. Poulos's
13 accusations?
14 A.No.
15 Q.Do you know John Millar, Jr.?  M-I-L-L-A-R?
16 A.I don't.
17 Q.Do you recognize the name, John Millar, Jr.,
18 M-I-L-L-A-R?
19 A.I don't.
20 Q.I guess it could be Miller but with an A on it?
21 A.No.
22 Q.No.  So you don't recognize that name to any
23 extent?
24 A.No, ma'am.
25 Q.How about Jason Ingle, I-N-G-L-E?

Page 204

1  A.I know that name.  I believe Jason --- I'm sorry.
2  Go ahead or ask how.
3  Q.Sure.
4  How do you know --- how do you recognize the name
5  Jason Ingle?
6  A.He's, I'm pretty sure, an alumnus of the school.
7  And I think he graduated before I started, but close
8  to when I started in '92.  I'm not certain.
9  ATTORNEY DOUGHERTY:
10 And just for the record, Mr. Chris Yu is
11 now in the room.  He's another lawyer for Mr.
12 Garabedian.  Ms. Steiger has left.
13 BY ATTORNEY DOUGHERTY:
14 Q.Okay.
15 So you recognize Jason Ingle as a student in the
16 '90s?
17 A.Prior --- it would have been early '90s or late
18 '80s.  I'm pretty sure he graduated before I ---.
19 Q.Prior to when you started at the Hill School?
20 A.Before I started.  I don't know him, I don't
21 think.
22 Q.Do you recognize the name Jason Ingle as a former
23 student of the Hill School?
24 A.I do.
25 Q.Do you recognize the name Jason Ingle in any

Page 205

1  other context?
2  A.I don't.
3  Q.Do you have any information about whether Jason
4  Ingle received the letters or information about the
5  accusations by Mr. Poulos?
6  A.I don't.
7  Q.Do you know whether Mr. Ingle has an opinion of
8  you?
9  A.I don't.
10 Q.Do you know Peter Humphrey?
11 A.I do.
12 Q.How do you know Peter Humphrey?
13 A.First met him as a parent of a student.  He was a
14 member of the board at least when I left the Hill
15 School in 2009.
16 Q.So the first time you left the Hill School?
17 A.Uh-huh (yes).
18 Q.I just wanted to make sure ---.
19 A.And he could still be.  I don't know.
20 Q.Okay.
21 So you recognize Mr. Humphrey as a board member
22 in 2009?
23 A.I did.  I do.
24 Q.Have you had any contact with Mr. Humphrey since
25 2009?

Page 206

1   A.I don't know.  Maybe --- probably --- maybe on
2   campus.  I don't recall anything specific.  Oh, yes, I
3   do.  I had contact with him when I was at Leelanau.
4   He's in banking.  And we were in a financially
5   difficult place, and I called him to speak about ways
6   --- different ways banks will finance or lend to
7   institutions.
8   Q.All right.
9   So it was Leelanau School?
10  A.Yes.  Yeah, not Matt.
11  Q.So other than a contact that you had with Mr.
12  Humphrey when you were at Leelanau School, has there
13  been any other contact with Mr. Humphrey?
14  A.No.
15  Q.Since 2009?
16  A.No, unless I passed him on campus and we shook
17  hands.  But I don't remember.
18  Q.Do you know whether Mr. Humphrey has an opinion
19  of you?
20  A.I know he did.  It was high.
21  Q.And do you have any reason to believe that Mr.
22  Humphrey's high opinion of you has changed?
23  A.I don't.
24  Q.Do you have any information about whether Mr.
25  Humphrey received the letters or learned about the

Page 207

1   accusations by Mr. Poulos?
2   A.I don't.
3   Q.Do you know Michael Harris?
4   A.I've met him.
5   Q.H-A-R-R-I-S.
6   A.I think I've met him.
7   Q.How do you know or, I guess, recognize Mr.
8   Harris' name?
9   A.A board member.  I met him on one of my weeks
10  back on campus.  I believe he was a parent at the
11  time, but I'm not certain of that.
12  Q.Do you have any information about whether Mr.
13  Harris received the letters or information about Mr.
14  Poulos's accusations?
15  A.I do not.
16  Q.Do you know whether Mr. Harris has an opinion of
17  you?
18  A.I do not.
19  Q.Do you know John M. Gvodas, G-V-O-D-A-S?
20  A.I think that's pretty close.  I'm not sure if
21  I've met him, but I do know the name.
22  Q.How do you recognize the name John M. Gvodas?
23  A.He was a parent of at least two kids, maybe more.
24  Q.When you were a teacher?
25  A.No.  He was a parent of students.  No, that was

Page 208

1   --- I'm pretty sure that's after I left.  I didn't
2   know the kids so that's why I say that.  And he was on
3   the board.  And I believe he was local to Pottstown.
4   Q.Okay.
5   So you know Mr. Gvodas as a parent of students
6   and on the board at the Hill School from your time ---
7   your second time at the Hill School?
8   A.If I've met him, yes.  I may know the name, if
9   he's the person I'm thinking of, a local veterinarian.
10  Q.Oh, I got it.  You don't actually know him, but
11  you recognize the name?
12  A.No.  I don't.
13  Q.Okay.
14  So you don't even know if you've met him?
15  A.I don't.
16  Q.So you don't --- do you know whether Mr. Gvodas
17  has an opinion of you?
18  A.I don't.
19  Q.Do you have any information about whether Mr.
20  Gvodas received the letters or information about Mr.
21  Poulos's accusations?
22  A.I don't.
23  Q.Do you know Lynne Evans, L-Y-N-N-E, Evans,
24  E-V-A-N-S?
25  A.I do.

Page 209

1   Q.How do you know Lynne Evans?
2   A.She's a former student and was on the board of
3   trustees when I left in 2019.
4   Q.Do you know whether Ms. Evans received the
5   letters or has information or --- I mean let me start
6   again.
7   Do you know whether Ms. Evans received the
8   letters or information about the accusations by Mr.
9   Poulos?
10  A.I don't.
11  Q.Do you know whether Ms. Evans has an opinion of
12  you?
13  A.I do.
14  Q.What is Ms. Evans' opinion of you?
15  A.I can't speak to today, but it was high.
16  Q.When is the last time you had contact with Ms.
17  Evans?
18  A.Probably 2019.
19  Q.Before or after administrative leave?
20  A.It would have been before.
21  Q.And do you have any information that would lead
22  you to believe that Ms. Evans' high opinion of you has
23  changed since 2019?
24  A.I don't, but she would be on the list of people I
25  haven't seen if I was out here because of my not

Page 210

1  wanting to have to lie about where I am if she doesn't
2  know.
3  Q.I don't understand.
4  A.I think I said earlier that there are --- my
5  separation from the community has resulted in my not
6  seeing alumni that I know because I would either have
7  to answer their questions with a lie or be misleading.
8  Q.Is it your belief that you're not allowed to tell
9  alumni about your lawsuit?
10 A.It's --- no.
11 Q.So why can't you tell Ms. Evans about your
12 lawsuit?
13 ATTORNEY JUBB:
14 Object to the form.
15 THE WITNESS:
16 I think it's because I can't go into
17 detail.  I don't feel that's appropriate or right to
18 do.  And so I don't --- my relationship with her,
19 while it was good and many others was good, I don't
20 think it's appropriate for me to have those
21 conversations with them or association with them in
22 that way.
23 BY ATTORNEY DOUGHERTY:
24 Q.You understand that the Complaint that you filed
25 is a public document.

Page 211

1  Right?
2  A.I do.
3  Q.And I think you have confirmed that you realize
4  that your identity will at least be revealed during
5  trial.
6  Right?
7  A.I have.
8  Q.So I guess I'm confused as to why you don't
9  believe you can give your Complaint or information
10 about your lawsuit to Ms. Evans or another alumni, but
11 you can make it publicly available.  What's the
12 distinction that you're making there?
13 ATTORNEY JUBB:
14 Objection to the form.
15 THE WITNESS:
16 I need to know, I think, more of what
17 you're wanting to hear from me.  Not what you want to
18 hear from me, but what you're asking of me.
19 BY ATTORNEY DOUGHERTY:
20 Q.I guess I don't understand why you can't tell Ms.
21 --- let me start again.
22 Did you consider giving Ms. Evans a copy of one
23 of your Complaints?
24 A.Heavens, no.
25 Q.Why not?

Page 212

1  A.Just doesn't feel right.  It is --- it involves
2  ugly allegations.  It involves putting their high
3  school --- making them question that, questions I
4  can't answer and questions they may not feel
5  comfortable asking of the school.  And I just can't
6  lie to them of questions they may ask that I don't
7  think are appropriate to answer.
8  Q.You mean, like are you talking about why you
9  decided to file your lawsuit?
10 ATTORNEY JUBB:
11 Objection to the form.
12 THE WITNESS:
13 I think I'm talking about ---.
14 BY ATTORNEY DOUGHERTY:
15 Q.Well, let me just clarify.  The stuff that you
16 say you think is inappropriate about their high
17 school, you know, to tell certain people, are you
18 talking about, you know, the school's reaction to the
19 accusations, what led you to file your lawsuit?  Is
20 that what you think is not appropriate to tell them?
21 ATTORNEY JUBB:
22 Objection to the form.
23 THE WITNESS:
24 I think it's inappropriate to say to a
25 student that --- excuse me, a member of the alumni

Page 213

1  who's a former student who had a good relationship
2  with me and we always enjoyed seeing each other in
3  passing, but I don't have an active and current
4  relationship with them on a regular basis.  I don't
5  feel like it's appropriate to say here's what I was
6  accused of and here's what I've done.
7  BY ATTORNEY DOUGHERTY:
8  Q.I thought you said that you filed the lawsuit
9  because you wanted to get your voice out?
10 ATTORNEY JUBB:
11 Objection to the form.  Are we still
12 doing this again, why did he file the lawsuit?
13 ATTORNEY DOUGHERTY:
14 Please stop.
15 ATTORNEY JUBB:
16 We've got 25 minutes left before this
17 deposition is over.
18 ATTORNEY DOUGHERTY:
19 Please stop.  I wasn't even done with my
20 question.
21 ATTORNEY JUBB:
22 Please note my objection.
23 ATTORNEY DOUGHERTY:
24 So please don't do that again.
25 ATTORNEY JUBB:

Page 214

1 Please note my objection.
2 BY ATTORNEY DOUGHERTY:
3 Q.I thought that you said that you filed your
4 lawsuit to get your voice out.  So why don't you want
5 to get your voice out to these alumni?  That's what
6 I'm trying to understand.  What is different about
7 these alumni that the rest of the world that you're
8 telling about your lawsuit?
9 ATTORNEY JUBB:
10 Objection to the form.
11 THE WITNESS:
12 The depth of my relationship with them.
13 BY ATTORNEY DOUGHERTY:
14 Q.So as it relates to Ms. Evans, you don't have any
15 information one way or the other about whether she
16 knows about the accusations by Mr. Poulos or the
17 letters.
18 Is that right?
19 A.I do not.
20 Q.And you don't have information one way or the
21 other about whether her high opinion of you has
22 changed.
23 Is that right?
24 A.I don't.
25 Q.Ms. Evans hasn't done or said anything to you to

Page 215

1 lead you to believe that her high opinion of you has
2 changed.
3 Is that right?
4 A.She has not.  I have not seen her.
5 Q.Ms. Evans hasn't done or said anything to you to
6 lead you to believe that she no longer wants to
7 associate with you.
8 Is that right?
9 A.She has not.
10 Q.Do you know Elizabeth Burton?
11 A.Yes.
12 Q.B-U-R-T-O-N?
13 A.I do.
14 Q.How do you know Elizabeth Burton?
15 A.She also, a former student, although I didn't
16 teach her.
17 Q.Do you have any information about whether Ms.
18 Burton received the letters or knows about the
19 accusations by Mr. Poulos?
20 A.I do not.
21 Q.Do you know whether Ms. Burton has an opinion of
22 you?
23 A.I don't.
24 Q.When was the last time you had contact with Ms.
25 Burton?

Page 216

1 A.I don't know.  It would have been on campus
2 possibly when I was back working.  Excuse me, back
3 when I was working '16 to '19.  But I don't recall
4 seeing her.
5 Q.So you have no information one way or the other
6 about Ms. Burton's opinion or whether she is or isn't
7 associating with you.
8 Is that right?
9 A.That's correct.
10 Q.Is it --- just going back to Ms. Evans for a
11 second.  I think you said that you were concerned that
12 you would have to lie or not be completely truthful if
13 you saw her.  What would you have to lie about?
14 A.I think I added or had in that answer as well is
15 the position it puts the kids in with the school.  I
16 can't be misleading in why I'm there.  They can have
17 questions about the school.  I don't think it's
18 appropriate for me to put them in that position, as
19 well as not feeling it's appropriate to talk about
20 what I've been accused of.
21 Q.So, like, a lie of omission type of thing?  Like,
22 you wouldn't be able to give them full information?
23 A.Yes.
24 Q.Full information ---?
25 A.Or misleading.

Page 217

1 Q.Both.
2 Peter Benedict, do you know Peter Benedict,
3 B-E-N-E-D-I-C-T?
4 A.We met years ago before --- while I was a
5 teacher.  He's also an alumnus.
6 Q.When was the last time you had contact with Mr.
7 Benedict?
8 A.It would have been before 2009.  He was a
9 commencement speaker one year.  I don't recall any
10 contact with him during, but that would have been
11 where I met him, if I did.
12 Q.Do you know whether Mr. Benedict received the
13 letters or any information regarding Mr. Poulos's
14 accusations?
15 A.I don't.
16 Q.Do you know whether Mr. --- do you know whether
17 Mr. Benedict has an opinion of you?
18 A.I don't.
19 Q.Do you know Matthew Bates?  B-A-T-E-S?
20 A.I do.
21 Q.How do you know Matthew Bates?
22 A.He also was a student.  I didn't teach him.  He
23 had a younger brother, sibling, who did live in our
24 dormitory.  I did not have a close relationship with
25 Matt when he was in school.  I did his brother.

Matthew B. Ralston
September 20, 2021                                    218 to 221

Page 218

1  Q.When was the last time you had contact with
2  Matthew Bates?
3  A.I don't know.  Again, if I saw him when I was
4  back between '16 and '19, it would have been in
5  passing on campus and we would have said hello and had
6  a quick conversation.  Beyond that, I don't remember.
7  Q.Do you know whether Mr. Bates has an opinion of
8  you?
9  A.I don't.
10 Q.Do you know whether Mr. Bates has any information
11 regarding the accusations by Mr. Poulos or the
12 letters?
13 A.I don't.
14 Q.You mentioned that Matthew Bates has a brother
15 that you knew better?
16 A.I did.
17 Q.What is Matthew Bates' brother's name?
18 A.Ryan.
19 Q.Are you still in contact with Ryan Bates?
20 A.No.
21 Q.When was the last time you had contact with Ryan
22 Bates?
23 A.Probably at a wedding.  And I can't even tell you
24 whose.  I can't tell you whose wedding, but I have a
25 recollection of seeing him at a wedding under a tent.

Page 219

1  But, again, that would have been well before 2019 or
2  2018.  2016, even.
3  Q.Do you know Kent Andres, A-N-D-R-E-S?
4  A.I do.
5  Q.How do you know Kent Andres?
6  A.He was a former student of mine.  I did teach
7  Kent.  He is a younger brother of a student ---
8  younger brother of a student who graduated in the
9  early '90s, and the older brother of a young woman who
10 graduated in the early 2000s.  He was a donor assigned
11 to me at his request when I returned to the school in
12 2016.
13 Q.Do you know whether Mr. Andres --- well, let me
14 start again.
15 When was the last time you had contact with Mr.
16 Andres?
17 A.Probably 2019.
18 Q.Before or after your leave?
19 A.Before.
20 Q.Do you know whether Mr. Andres has any
21 information regarding the letters or accusations by
22 Mr. Poulos?
23 A.I don't.
24 Q.Do you know whether Mr. Andres has an opinion of
25 you?

Page 220

1  A.I know he did.  Assuming he doesn't know, he
2  still would.
3  Q.Okay.
4  And so what --- what is your understanding of Mr.
5  Andre's opinion of you?
6  A.Very high.
7  Q.You just haven't had contact with Mr. Andres
8  since your leave.
9  Is that right?
10 A.That's correct.
11 Q.But you had contact with Mr. Andres after the
12 April or December 2018 letters.
13 Is that right?
14 A.I did.
15 Q.So you have no information one way or the other
16 to know whether Mr. Andres' high opinion of you has
17 changed.
18 Is that right?
19 A.Did you ask if I've had contact with him since my
20 leave?
21 Q.Yeah, and you said no.
22 A.And I need to change that.  I have.  The school
23 changed its logo and I can't tell you when but it was
24 after my leave started.  He sent me a text message
25 asking me about the change in logo because it was not

Page 221

1  a very popular change among some of the older alumni
2  that I know from my time.  And I referred him to Geoff
3  Neese, and that was the last contact we had.
4  Q.Okay.
5  So you don't have any reason to believe or
6  information that Mr. Andres' very high opinion of you
7  has changed.
8  Is that right?
9  A.I don't.
10 Q.Do you know Lance Whitlock?
11 A.Yes.
12 Q.How do you know Lance Whitlock?
13 A.He was also --- is also a former student.
14 Q.When was the last time you had contact with Lance
15 Whitlock?
16 A.Maybe when he graduated.
17 Q.In the '90s?
18 A.Yes.
19 Q.How about Ben Walborn, W-A-L-B-O-R-N?  Do you
20 know Ben Walborn?
21 A.I do.
22 Q.How do you know Ben Walborn?
23 A.He's the youngest of three brothers who attended
24 the school and part of a family that I've stayed in
25 close contact with since.

Matthew B. Ralston
September 20, 2021                    222 to 225

Page 222

1  Q.When is the last time you had contact with Ben
2  Walborn?
3  A.I saw Ben --- it's been a few weeks ago.  He's a
4  Navy pilot.  And Mary Beth and I went to a show which
5  he was flying in.
6  Q.Do you know whether Mr. Walborn knows about the
7  accusations by Mr. Poulos?
8  A.I know he does.
9  Q.Do you know how Mr. Walborn learned about the
10 accusations by Mr. Poulos?
11 A.Let me rephrase that.  I know he knows that I'm
12 no longer at the school and that I'm involved in a
13 lawsuit that I filed.  I don't know beyond that.
14 Q.Is that information that you told Mr. Walborn?
15 A.It is.
16 Q.When did you tell Mr. Walborn that you were no
17 longer at the school and involved in a lawsuit that
18 you filed?
19 A.It was well after the lawsuit was filed and I was
20 no longer at the school.
21 Q.Do you know whether Mr. Walborn has an opinion of
22 you?
23 A.I do.
24 Q.Do you know what Mr. Walborn's opinion is?
25 A.It's very high.

Page 223

1  Q.And nothing --- Mr. Walborn's opinion of you
2  hasn't changed, as far as you know, since he learned
3  about --- learned that you're no longer at the school
4  and you're involved in a lawsuit.
5  Correct?
6  A.It has not changed.
7  Q.Did you give Mr. Walborn any information about
8  the nature of your lawsuit?
9  A.I think when I've shared it with people in that
10 way, it is some accusations were filed against me and
11 they're of the most heinous thing a teacher could do
12 with a student, and I've left it at that.
13 Q.Okay.
14 So you gave a description along those lines to
15 Mr. Walborn?
16 A.Yes.
17 Q.So he has some idea that a student accused you of
18 heinous activity or very bad activity?
19 A.That's what I shared with him, yes.
20 Q.Okay.
21 And Mr. Walborn's opinion of you hasn't changed
22 since you shared that information?
23 A.It has not.
24 Q.And Mr. Walborn hasn't stopped associating with
25 you?

Page 224

1  A.He has not.
2  Q.Do you know F. Christopher Chireleison?
3  A.I do.
4  Q.C-H-I-R-E-L-E-I-S-O-N.  How do you know Mr.
5  Chireleison?
6  A.He ---.
7  Q.I hope I said that right.
8  A.You did.  He's also an alumnus of the school and
9  was teaching at the school when we arrived in 1992.
10 We worked closely together.  I can't tell you exactly
11 what years he was a dean of students.  He left the
12 school in 1997 --- at the end of the 1997 school year.
13 We've remained in close contact with each other since
14 and we're very good friends.
15 Q.You told Mr. Chireleison about the accusations by
16 Mr. Poulos.
17 Is that right?
18 A.I did, yes.  Yeah, he's the one we discussed last
19 time.
20 Q.And Christopher Hopkins, he's your friend.
21 Right?
22 A.He is.
23 Q.And you told Mr. Hopkins about the accusations by
24 Mr. Poulos.
25 Is that right?

Page 225

1  A.I did.
2  Q.You identified a gentleman Faizeen Khandker.
3  A.Khandker (corrects pronunciation.)
4  Q.Khandker.  Okay.
5  Do you have any --- can you --- do you know how
6  to spell his last name?
7  A.K-H-A-N --- I think it's K-E-R.  Pretty sure it's
8  E, not an A at the end.
9  Q.Do you have any --- you don't have to give it to
10 me right now, but do you have contact information for
11 Mr. Khandker?
12 A.I think so.  Khandker (corrects pronunciation).
13 Q.Khandker.  Okay.
14 So is that something that you can share with your
15 lawyer?  We're trying to locate him.
16 A.If I still have it, yes.
17 Q.I know you might not know it off the top of your
18 head.
19 A.I don't.
20 Q.There were a number of board members that you
21 identified in your party of depositions.  Hans Maentz?
22 A.Maentz (corrects pronunciation).
23 Q.Maentz, M-A-E-N-T-Z.  Douglas Brody, Shelly
24 Gyves, G-Y --- G-V-Y-E-S.  I might be saying that
25 wrong.

Page 226

1  A. I think it's G-Y-V-E-S.
2  Q. G-Y-V-E-S.  Okay.
3  And Madison Benadum.
4  A. Madison what?
5  Q. Benadum, B-E-N-A ---.
6  A. Should be B-Y-R-N-E-S.
7  Q. B-Y-R-N-E-S.
8  A. Yes, she's gotten married.
9  Q. Byrnes?
10  A. Byrnes, yes.
11  Q. Madison Byrnes, okay.  So Hans Maentz, Douglas
12  Brody, Shelly Gyves, Madison Byrnes.
13  Do I have that right now?
14  A. Yes.
15  Q. Okay.
16  And I think you --- your belief that these
17  specific --- these five board members knew about the
18  letters or the accusations by Mr. Poulos was an
19  assumption that they had received the letters from,
20  you know, Mr. Rees or someone else because they were
21  board members.
22  Is that right?
23  A. Yes.
24  Q. And if Mr. Rees or someone from the school ---
25  well, let me start again.

Page 227

1  If someone from the school or a lawyer for the
2  school confirmed for you that Mr. Maentz, Mr. Brody,
3  Ms. Gyves and Ms. Byrnes did not receive the letters
4  from Mr. Lehman or from Mr. Rees, then would you
5  accept that representation?
6  ATTORNEY JUBB:
7  I'll object to the form.  You can
8  answer.
9  THE WITNESS:
10  In all but one case.
11  BY ATTORNEY DOUGHERTY:
12  Q. Which one?
13  A. Shelly Gyves.  I don't know what the --- enough
14  to know what committees the others are on.  I know
15  she's a member of the legal committee.
16  Q. Okay.
17  So you dispute --- you think that Shelly Gyves
18  was part of --- let me start.
19  You believe that Shelly Gyves was part of a legal
20  committee in 2018?
21  A. Yes.
22  Q. Okay.
23  Thank you.
24  A. I can't tell you if she was on that committee,
25  but it's what fits.

Page 228

1  Q. Okay.
2  But you would accept it as it relates to Mr.
3  Maentz, Mr. Brody, and Ms. Byrnes.
4  Right?
5  A. Yes.  I would question if the whole board doesn't
6  know, but I would accept that Mr. Rees is being
7  honest.
8  Q. Now, you --- well, I'm going to rip this off.
9  Let me just finish this one.
10  Do you happen to know whether the independent
11  investigators from Cozen O'Connor, Ms. Gomez and Ms.
12  Smith, requested a statement from you?
13  A. I don't remember.  I don't --- if they did, I
14  don't remember.  And if I wrote one, I don't remember.
15  I just ---.
16  Q. I'm sorry.
17  A. Yeah.
18  Q. I'm just trying to ---.
19  Well, obviously, we don't need to see them.  So
20  as part of this litigation, you've produced through
21  your lawyer an exhibit that's been called P-8 that is
22  a compilation of a number of cards and letters that,
23  as I understand it, your former students have written
24  to you.
25  Do you know what I'm talking about?

Page 229

1  A. Yes.
2  Q. I want to know if any of the students who
3  authored the cards or letters that you compiled and
4  that your --- and through your attorney have now
5  produced as P-8 are former students who are aware of
6  the accusations by Mr. Poulos?
7  A. I'd have to see the list.
8  Q. Okay.
9  A. I hope it's not all the list.
10  ATTORNEY JUBB:
11  To make sure you have enough time, I
12  will off the record, not in this deposition, get him
13  to answer an Interrogatory to all those saying who was
14  or who wasn't, just to save you some time --- this
15  exercise right now.
16  ATTORNEY DOUGHERTY:
17  Okay.
18  I mean, ---.
19  ATTORNEY JUBB:
20  Because I have a belief what it is, and
21  I think he does too, but the exercise itself might
22  just take too long.  And I think you'd rather ask
23  other questions.
24  ATTORNEY DOUGHERTY:
25  That's fine.

Page 230

1  ATTORNEY JUBB:
2  But I can get you that information after
3  this is over.
4  ATTORNEY DOUGHERTY:
5  We were okay with, I think, the
6  stipulation but if there's anybody that the answer is
7  yes, I want to have the answers to the questions that
8  I've been asking, what their --- if they have an
9  opinion ---
10 ATTORNEY JUBB:
11 Sure.
12 ATTORNEY DOUGHERTY:
13 --- whether it's changed.
14 ATTORNEY JUBB:
15 If you make us up an interrogatory ---
16 ATTORNEY DOUGHERTY:
17 That's what I'm doing within the
18 deposition.
19 ATTORNEY JUBB:
20 --- that has the subparts to it, I'm
21 happy to do it, to answer that question pertaining to
22 P-8.
23                         ---
24 (Whereupon, Defendant's Exhibit 28,
25 9/4/15 Medical Office Note, was marked

Page 231

1  for identification.)
2                         ---
3  BY ATTORNEY DOUGHERTY:
4  Q.I'm showing you documents that are marked as D-
5  28.  They say P-40.177 to P-40.184, and also March,
6  underscore, 177, March, underscore, 184.
7  Have you ever seen the documents that I have
8  marked as part of D-28 before I handed them to you
9  today?
10 A.No.
11 Q.Is Nathan E. March a doctor who has treated you?
12 A.Yes.
13 Q.Did Doctor March treat you for mood issues in
14 2015?
15 A.No, I don't think so.
16 Q.I'll just direct your attention to the first page
17 of D-28.  Under reasons for visit, it says
18 preventative exam, skin spots, mood issues.  Do you
19 have any idea what that refers to?  I'll direct your
20 attention to higher up on the page.  It says September
21 4, 2015, if that helps.
22 I realize you didn't write that, but I didn't
23 know --- I just want to know if you know what he's
24 referring to?
25 ATTORNEY JUBB:

Page 232

1  Where's mood disorders?
2  THE WITNESS:
3  No, mood issues.  It's at the top.
4  ATTORNEY JUBB:
5  Oh, oh, oh.
6  BY ATTORNEY DOUGHERTY:
7  Q.Okay.
8  Why don't we go --- I'm just going to keep this
9  moving along.
10 A.Go ahead.
11 Q.Why don't you just go to four pages in to 180 on
12 the bottom?  It says history of present illness.  Do
13 you see that?  I'm showing it towards the top.  This
14 58-year-old man presents ---.
15 ATTORNEY JUBB:
16 Do you care if I help him?
17 ATTORNEY DOUGHERTY:
18 No.  It's okay.
19 BY ATTORNEY DOUGHERTY:
20 Q.Are you there?
21 A.Yes.
22 Q.Now, go to number three.
23 A.Okay.
24 Q.Look down, it says mood issues.  Struggling with
25 the start of school, doesn't feel prepared, wife still

Page 233

1  in Ohio, feeling lonely, lacking the satisfaction of
2  starting a new year, looking for some meaning, not
3  really engaging in the hobbies he used to, not
4  sleeping well.
5  A.Okay.
6  Q.I realize that those are not your comments, but
7  they're Doctor March's comments about preventative
8  medicine during a visit on September 4th, 2015.
9  Now that I read those notes to you, do you ---
10 does that refresh your recollection about any
11 treatment you received in September 2015 for mood
12 issues?
13 A.Certainly would have been a conversation we had.
14 I don't think I ever considered it a mood issue.
15 Do you want more?
16 Q.Well, did you discuss more with Doctor March than
17 what he wrote down there?
18 A.I'm sure I probably did.
19 Q.Did Mr. --- or excuse me.  Did Doctor March refer
20 you to another doctor for counseling or treatment or
21 prescribe any medication or did you return to see
22 Doctor March about the same issue?
23 A.He did not refer any of those or make those
24 recommendations.  We talked about it.  It was the
25 school, the Leelanau School was a piece of that

Page 234

1  puzzle.  It was pretty significant at that time.  And
2  the feeling lonely because Marybeth was in Ohio and
3  things were --- there were financial pressures on the
4  school at that point.  That all sounds like something
5  I would have said to him.
6  Q.I mean, I'm sorry.
7  A.Go ahead.
8  Q.What do you mean by the Leelanau School is a part
9  of that?
10  A.We were in financial forbearance.  And the
11  deadline was approaching I think in October.  School
12  starts in September.  And at that point, we had not
13  found an answer to refinance our debt that was more
14  traditional.
15  Q.So did you leave Leelanau School because of the
16  financial issues that Leelanau School was
17  experiencing?
18  A.No.  In fact, resolving those issues were one of
19  the things that made it seem like a time --- an okay
20  time for me to leave.
21  Q.So your wife lived in Ohio for the entire time
22  you were at the Leelanau School?
23  A.No.  She would --- at that point in '15, she'd
24  been there two or three years for the most part, and
25  would come to school for special occasions or if our

Page 235

1  kids were up visiting.  But she did not live on campus
2  full time.
3  Q.Is there some reason that you and your wife were
4  not living together in 2015?
5  A.We had not formally separated.  We weren't living
6  together, and I guess technically separated because
7  she's a city girl.  It's a rural school.  She was
8  isolated and unhappy, and I was pretty consumed with
9  the situation at the school.  And we decided that was
10  the best answer at the time.
11  Q.When did you separate?
12  A.Probably 2013.
13  Q.And did you reconcile?
14  A.Yes.
15  Q.When did you reconcile?
16  A.After I left the school.  So sometime after the
17  start of 2016.
18  Q.So after you were back at the Hill School or
19  before you started again at the Hill School?
20  A.I hadn't quite left Leelanau at that point, but
21  pretty close.
22  Q.Did you receive any treatment for your --- for your
23  mood issues in 2015?
24  A.No.
25  Q.How about any time when you were separated from

Page 236

1  your wife, 2013 to 2016?  You receive counseling or
2  treatment?
3  A.No.
4  Q.Did any of your doctors refer you to receive
5  mental health services, counseling, treatment that you
6  did not accept during that period of time, 2013 to
7  2016?
8  A.I don't believe so, no.  Doctor March referred a
9  book to me.
10  Q.What book was that?
11  A.It's called First Things First.  The author's
12  name is Covey, I believe, C-O-V-E-Y.
13  Q.What type of book was that?
14  A.I don't know if you'd call it self-help or
15  setting priorities.  First Things First was about just
16  to get clear what I need to accomplish and accomplish
17  it.
18              ---
19  (Whereupon, Defendant's Exhibit 29,
20  2/4/16 Medical Office Note, was marked
21  for identification.)
22              ---
23  BY ATTORNEY DOUGHERTY:
24  Q.This is D-29.  I'm showing you documents that
25  I've marked as D-29.  On the bottom right, they say P-

Page 237

1  40.165 to P-40.172, and also March, underscore, 165
2  and March, underscore, 172.
3  A.Okay.
4  Q.Have you seen the documents that I've marked as
5  D-29 before I handed them to you today?
6  A.No.
7  Q.Again, I'll just direct your attention on the
8  first page.  See where it says patient plan for
9  February 4th, 2016.  And in the middle of the page, it
10  says reasons for visit, hypertension, comma, anxiety.
11  Do you see that?
12  A.I do.
13  Q.Did you receive treatment from Doctor March in
14  February 2016 for anxiety?
15  A.I would have seen him.  I don't believe I've ever
16  used the word anxiety.  I could have used the word
17  anxious, but to me, they're different.
18  Q.If you can go to page 168.  It's four pages in
19  again.  It's similar.  This 58-year-old male presents
20  for hypertension and anxiety.  And then underneath of
21  history of present illness, do you see, there's
22  hypertension and then number two, anxiety?
23  Do you see that?
24  A.Yes.
25  Q.Okay.

Matthew B. Ralston
September 20, 2021                                    238 to 241

Page 238

1  And so Doctor March wrote this is an initial
2  visit.  The patient reports functioning is somewhat
3  difficult.  The patient presents with anxious, slash,
4  fearful thoughts and excessive worry, but denies
5  depressed mood, difficulty concentrating, difficulty
6  falling asleep, difficulty staying asleep, diminished
7  interest or pleasure, fatigue, loss of appetite,
8  paranoia, poor judgment, racing thoughts, or
9  restlessness.
10  Patient's risk factors include financial worries
11  and unemployment.  The patient's risk factors include
12  chronic illness and relationship problems.  The
13  anxiety is aggravated by conflict or stress.  Anxiety
14  is associated with irritability.  The patient denies
15  any headache.
16  Do you recall going to see Doctor Marsh or I'm
17  sorry, March ---
18  A.March.
19  Q.--- in February of 2016, for treatment for the
20  issues that I've just read to you from Doctor March's
21  notes?
22  A.I do.
23  Q.What were the circumstances that brought you to
24  Doctor March for treatment in February of 2016?
25  A.I don't recall why I went in to see him.  It very

Page 239

1  well could have been.  I don't think I ever had ---
2  what was the phrase, a financial anxiety associated
3  with --- where's it talk about worry about money?
4  Q.Okay.
5  Well, let's start with patient reports
6  functioning is somewhat difficult.
7  Do you know what that is?  What was difficult?
8  A.Sure.
9  At that point, I had submitted my resignation
10  letter.  We had a new board of trustees, we being the
11  Leelanau School.
12  Q.Leelanau.  Okay.
13  A.It was my --- it was my view that the new board
14  was overstepping its bounds.  In March of that month
15  or of that year we were to go through an accreditation
16  screening or visit from educators from other
17  Midwestern schools, and I was concerned that the board
18  overstepping its bounds would impact that.  And I had
19  submitted my resignation primarily with the
20  understanding, belief, that we would successfully
21  complete our accreditation.  We had secured the
22  financing, and it seemed like a good, stable time for
23  me to be able to move on.
24  Q.Okay.
25  So functioning was somewhat difficult because of

Page 240

1  the situation with the board at Leelanau?
2  A.Yes.
3  Q.And it says patient presents with anxious,
4  fearful thoughts and excessive worry.  What were your
5  anxious, fearful thoughts and excessive worry about?
6  A.Being able to manage the situation at the school
7  without getting in the way.
8  Q.Okay.
9  And it says, okay, patient's risk factors include
10  financial worries and unemployment.  And you dispute
11  that?  Is that what you were talking about?
12  A.Yes, it is.  Where is --- oh, patient's risk
13  factors include financial worries and unemployment.
14  That doesn't --- I probably told him I didn't have a
15  job lined up and I knew I'd resigned.  But I'm not one
16  who's ever worried that a job would come through, so I
17  don't recall saying that.
18  Q.Okay.
19  Did you receive any treatment from Doctor March,
20  like, a referral to another doctor, counseling,
21  medication?
22  A.No.  That was a time when we talked about things
23  to do and his response to me often is you know what
24  you need to do and suggested I do that.
25  Q.What?  What is it that you know you need to do?

Page 241

1  A.Exercise more, eat better, drink less, exercise
2  judgment on things I think should be priorities and
3  not to bother myself with the other stuff.  He said
4  there are meds if you want some, and I told him I
5  didn't.  And that's what I recall from then.
6  Q.You said to drink less.  Are you talking about
7  alcohol?
8  A.Yes.
9  Q.Do you drink alcohol?
10  A.I do.
11  Q.Do you drink a lot of alcohol?
12  A.No.
13  Q.How much alcohol do you consume on a daily basis?
14  A.Less than a drink on a daily basis.  Never more
15  than two.
16  Q.Do you drink an alcoholic beverage at least once
17  a day?
18  A.No.
19  Q.No?  How much alcohol do you drink in a day?
20  A.I think I said I don't drink every day.
21  Q.You don't drink every day, okay.
22  A.I thought that's what you asked me.
23  Q.Are there particular days that you drink?
24  A.No.  If I'm out to dinner or with some friends, I
25  will.

Page 242

1   Q.What, if you know, was the context in which the
2   doctor told you to drink less?
3   A.I think the context was I told him I was drinking
4   more, and I knew I was drinking more than I thought
5   was healthy.
6   Q.Oh, so in February 2016, you were drinking more
7   alcohol than you thought was healthy?
8   A.Yes.
9   Q.How much were you drinking in February 2016 that
10  you thought was unhealthy?
11  A.I can't answer that except that I would have
12  drinks alone.  I was living alone at that time.
13  Q.Did you drink alone every day?
14  A.Did I?
15  Q.Yeah.
16  A.I doubt it was --- no, not every day.  But I
17  would drink alone more frequently than I would
18  consider healthy.
19  Q.What --- is there a particular type of alcoholic
20  beverage that you were drinking?
21  A.No.
22  Q.Do you drink liquor, beer, ---
23  A.Both.
24  Q.--- wine?
25  A.Not wine.

Page 243

1   Q.So how much were you drinking in February 2016
2   that you thought was unhealthy, or was it the drinking
3   alone part?
4   A.Both.  Probably --- I probably had maybe three a
5   day.
6   Q.Three beers or three ---?
7   A.It would be three glasses.  Well, could be beers.
8   It would be whatever drink I was having.
9   Q.And your wife was in Ohio, so you were drinking
10  alone every time you drank.
11  Right?
12  A.Correct.
13  Q.Sometimes did you drink more than three?
14  A.I'm sure.
15  Q.What about --- I mean, we looked at the prior
16  record from the doctor, D-28.  That visit was
17  September 2015?
18  A.Yes.
19  Q.Were you drinking more than you thought was
20  healthy in September of 2015?
21  A.Not --- more than to be physically fit that I was
22  accustomed to, yes.  Not that I don't think that
23  worried me terribly.  I try to be pretty honest when
24  I'm speaking with a doctor, so, you know, if there's
25  an amount down there, that would have been pretty

Page 244

1   accurate.
2   Q.Oh, I see.  You're talking about on the bottom of
3   the first page where the doctor says limit alcohol to
4   two drinks a day?
5   A.Bottom of where?  I'm sorry.
6   Q.On the first page of D-28.  I thought you were
7   looking at that.  I'm sorry.
8   So we are looking at D-28 again.  Do you see next
9   to plan orders on the bottom of the first page?
10  A.Instructions, counseling.
11  Q.Limit alcohol to two ---
12  A.Yes.
13  Q.--- drinks a day?
14  A.I do see that.
15  Q.Okay.
16  So in September 2015, were you drinking more than
17  two drinks a day?
18  A.Yeah, I think I must have been that he wrote ---
19  well, that or I was --- I don't think I was drinking
20  more than two drinks every day.  And I suspect I told
21  him I was drinking more and, you know, some nights it
22  would have been three or so.
23  And I can't tell you what specific numbers are
24  beyond that.
25  Q.Was there some event that you noticed that caused

Page 245

1   you to start drinking more than you thought was
2   healthy, or did it just develop over time?
3   A.I think it was the --- I thought things would
4   improve at the point that I submitted my resignation.
5   And by improve, I mean I would have been stepping out
6   of what felt like a fire, which was keeping the school
7   open and afloat and that I would be able to start
8   settling down and focus on the last six months of
9   being the headmaster.  And when the board and I had
10  our --- when I felt like they were overstepping their
11  bounds and we were moving towards the accreditation
12  visit, I know that I worried about us getting through
13  that as a school and how to manage that.  So that
14  would have been the biggest cause.
15  Q.Okay.
16  So that's --- that's right around this visit,
17  September 4th, 2015.
18  Right?  You're saying the last six months, or did
19  it start sooner?
20  A.September 4th.  And I wasn't drinking nightly at
21  the start of that school year.  Anything I was feeling
22  then was mostly tied to the fact that we were in
23  forbearance which ended in, I believe, it was October.
24  Maybe it was early November, which would have
25  resulted, if we didn't resolve it, in potential

Page 246

1 foreclosure proceedings.
2 Q.Okay.
3 You said, like, it got worse at the --- I thought
4 you said six months to the end or something.  So did I
5 misunderstand?  Can you just --- can you put some
6 dates?  So you say the forbearance was November 2015
7 or October 2015?
8 A.It was longer.  That's when it ended.
9 Q.Okay.
10 A.It was '15.
11 Q.Uh-huh (yes.)
12 A.Are you asking when it started?
13 Q.Yeah.  I want to --- I'm trying to get a handle
14 with an actual, I realize it's an estimate, date of
15 what year you're talking about when you say that
16 the ---
17 A.When I arrived at the school ---.
18 Q.--- drinking became ---
19 A.Sorry.
20 Q.--- your drinking, you know, rose to a point that
21 you believed it was unhealthy?
22 A.When it rose to that level?
23 Q.Yeah.  I asked you if there was some event that
24 triggered it or if it was something that occurred
25 gradually.  And you talked a lot about the --- you

Page 247

1 thought things were going to improve, that things
2 should be settling down because you had stepped down
3 as the headmaster, but there was an issue with the
4 accreditation.  And I thought that you were talking
5 about a six-month period of time.  So I'm just trying
6 to learn, like, where --- what are you talking
7 about ---
8 A.Okay.
9 So let's back up.
10 Q.--- when your drinking got worse or got to a
11 point that you believed was unhealthy?
12 A.Forbearance was to be ended in October or
13 November of 2015.  Opening the school that's facing a
14 foreclosure before Christmas is a pretty hard or
15 pressure-filled task.  That would be what was
16 impacting me at the beginning of the school year.
17 A couple weeks before that ended, we had secured
18 a donation from a past parent that was enough of a
19 payment and a --- to the bank or a bank that we were
20 able to secure traditional financing for the debt.
21 That takes us up into November.
22 The board, part of --- the board was in pretty
23 significant transition.  That's also not necessarily
24 easy.  We got through it.  I felt that being behind
25 the school.  And the accreditation being scheduled for

Page 248

1 March of 2016, that I really had every belief that the
2 school would get through and be fully accredited for
3 another seven years.  It's why it seemed like an
4 appropriate time, stable enough time, for me to step
5 away from the school and somebody else take the helm.
6 At some point in there, I felt like the board was
7 overstepping their bounds, and that would have ---
8 that is what caused me concern going into the
9 accreditation.  And not being accredited, if you're a
10 school, is a big deal.
11 Q.Uh-huh (yes.)
12 A.People don't want to spend $60,000 for a place
13 that's not accredited.
14 Q.And so this --- these are the events that caused
15 you to drink to a point that you believe to be
16 unhealthy, the opening a ---
17 A.Yes.
18 Q.--- school that was facing, you know,
19 foreclosure?  The forbearance was an expiring
20 forbearance.  Then issues with the board and
21 potentially not being accredited.
22 Right?
23 A.Yep.  Yes.  Sorry.
24 ATTORNEY DOUGHERTY:
25 All right.

Page 249

1 I wanted to ask Mr. Ralston about his
2 prior --- about his résumé and his prior experience,
3 and I believe it will be quick questioning.  I know he
4 has to leave and I believe that Mr. Poulso wants to
5 ask a couple of questions.  So if it's okay with you,
6 I'm willing to cede to Mr. Poulos to let him ask his
7 questions and perhaps we can finish up with my past-
8 employment related questions on a different day.  And
9 then I'll be able to narrow them down because I know I
10 asked some of them before and I'm going to have to
11 compare them --- compare my notes.
12 ATTORNEY JUBB:
13 Why don't we let Poulos go, but I'm not
14 going to have him come back for another deposition.
15 ATTORNEY DOUGHERTY:
16 Well, I wasn't expecting him to come
17 back.  We could just finish up on the telephone or
18 Zoom.
19 ATTORNEY JUBB:
20 Let's see what you have because it's a
21 résumé so we've had that for quite some time.  But
22 let's see what Poulos has to say.
23 ATTORNEY DOUGHERTY:
24 Okay.
25 Mr. Poulos?

Matthew B. Ralston
September 20, 2021                              250 to 253

Page 250

1  MR. POULOS:
2  I'm here.
3  ATTORNEY DOUGHERTY:
4  Okay.
5  You can ask questions.
6  THE WITNESS:
7  I'm not going to be able to hear.
8  MR. POULOS:
9  I only have about 15 or 20 questions and
10 they're basically all yes and no.
11 ATTORNEY DOUGHERTY:
12 Can you hear him okay?  All right.
13 One second.  We're making it louder.
14 MR. POULOS:
15 Sorry.  I'm using a headset.
16                    ---
17 (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
18                    ---
19                 EXAMINATION
20                    ---
21 BY MR. POULOS:
22 Q. First question.  You're listed as the owner of a
23 residence located at 2000 --- or 20654 Lake Ann,
24 Michigan.
25 Is that where you reside currently?

Page 251

1  A. My current residence is in Columbus, Ohio,
2  Dublin, Ohio.  And we do own that home, yes.
3  Q. Okay.
4  And why is or who is Amy L. Powell and why is she
5  listed as a resident at these addresses?
6  ATTORNEY JUBB:
7  Objection to the form.  You can answer.
8  THE WITNESS:
9  I don't know why she's listed as a
10 resident of Nofsger Road in Lake Ann, but she was as
11 previous owner of the home.
12 BY MR. POULOS:
13 Q. Okay.
14 So current records aren't reflective of the
15 current situation?
16 ATTORNEY JUBB:
17 Objection to the form.  I think you just
18 has to establish he even knows what records you're
19 referring to.  So I'm not even sure that's a question.
20 So maybe just move on to the next one.
21 BY MR. POULOS:
22 Q. So current property records that I obtained show
23 that she is listed at both residences.  Why is that?
24 ATTORNEY JUBB:
25 I'll object to the form and as to your

Page 252

1  representation.  Go ahead.
2  THE WITNESS:
3  I have no idea what you're referring to.
4  Amy Powell has never had a stake to the Dublin, Ohio
5  address, and she was the previous owner of the Lake
6  Ann property.  And she does not reside there.
7  BY MR. POULOS:
8  Q. Are you and Mary Beth still married?
9  A. We are.
10 Q. How much money have you paid the Beasley Firm to
11 represent you in this case?
12 A. I've not paid anything.
13 Q. Is there any other person or entity contributing
14 money or resources to the prosecution of this
15 litigation?
16 A. No.
17 ATTORNEY JUBB:
18 Are you still there?
19 MR. POULOS:
20 Yeah, I'm still here.  I asked a
21 question.  I'm waiting for a response.
22 THE WITNESS:
23 I said no.
24 ATTORNEY JUBB:
25 He answered the response.  Next

Page 253

1  question.
2  BY MR. POULOS:
3  Q. So where are the funds coming from to pay for
4  your legal agreement with Lane Jubb?
5  ATTORNEY JUBB:
6  You don't have to answer that question.
7  Next question.  And I would direct your
8  attention to our previous responses to
9  Interrogatories.
10 MR. POULOS:
11 Lane, stop interrupting me.  I've asked
12 this on multiple occasions.
13 ATTORNEY JUBB:
14 You've gotten an answer.  I am
15 interrupting you because time is valuable to everybody
16 else here.  Okay.
17 We are not going to go over questions
18 that don't matter and you already have an answer to.
19 COURT REPORTER:
20 Excuse me.  This is the court reporter.
21 I can only take down one person.
22 MR. POULOS:
23 No, you have never answered that
24 question.
25 ATTORNEY DOUGHERTY:

Page 254

1   Mr. Poulos, hold on.  The court reporter
2   can't take down ---.
3   MR. POULOS:
4   Who is paying his attorney fees?
5   ATTORNEY JUBB:
6   Mr. Poulos, this question was already
7   answered and I can forward you the Interrogatories to
8   this already.  Move on.
9   MR. POULOS:
10  You've never answered that question.
11  ATTORNEY JUBB:
12  Your deposition questioning is about to
13  end.
14  ATTORNEY DOUGHERTY:
15  Mr. Poulos, hold on a second.
16  MR. POULOS:
17  And now you're interrupting me again.
18  ATTORNEY DOUGHERTY:
19  That was me, Mr. Poulos, Candy.
20  Mr. Ralston, have you paid any amount of
21  money to the Beasley Firm?
22  THE WITNESS:
23  No.
24  ATTORNEY DOUGHERTY:
25  Mr. Poulos, does that satisfy your

Page 255

1   question?  Did you hear his answer?
2   MR. POULOS:
3   I would agree, but I still want to see
4   the attorney/client fee agreement.
5   ATTORNEY JUBB:
6   Then you should make a request for
7   production under the rules, and I've already responded
8   to that.  Move on.
9   MR. POULOS:
10  I have and you've denied it.
11  ATTORNEY JUBB:
12  Mr. Poulos ---.
13  ATTORNEY JUBB:
14  Ms. Dougherty's time is also valuable
15  and I'm going to refer back to her if you do not have
16  another discoverable question.
17  MR. POULOS:
18  Oh, no.  I have more questions.  Don't
19  worry about it.
20  ATTORNEY JUBB:
21  Then I suggest you move along.
22  BY MR. POULOS:
23  Q.Parents weekend ---.
24  MR. POULOS:
25  And you've just interrupted me again.

Page 256

1   BY MR. POULOS:
2   Q.Parents weekend, my sixth form year, you took it
3   upon yourself to park your Subaru behind my Camaro.
4   Were you in a position of disciplinary action to do
5   such a thing?
6   A.I was in a position of maintaining discipline and
7   school rules within our dormitory.
8   Q.Were you aware that I had permission to use my
9   vehicle to take care of my mother while she was
10  visiting for parents weekend?
11  ATTORNEY JUBB:
12  I'll object to the lack of foundation in
13  the question.  You can answer if you can.
14  THE WITNESS:
15  What I know is if it was parents weekend
16  and you had permission to have a car on campus, I
17  would have known from the school, from the dean's
18  office because any permissions that were outside
19  school rules during parents weekend were clearly
20  established in the dean's office and shared with
21  appropriate dorm parents.
22  BY MR. POULOS:
23  Q.Follow-up question then.  Were you my dorm parent
24  or my hall master or was it Mr. Romero who did have a
25  copy of my permission slip?

Page 257

1   A.I don't know which hall you lived on in Rolfe
2   dormitory.  I was a house parent, dorm parent in
3   Rolfe.  And every faculty member would have had that
4   list, not just one person.
5   Q.Correct me if I'm wrong.  You weren't a dorm
6   parent my sixth form year.  You lived in the
7   subbasement apartment below the dormitory?
8   A.I will correct you because you're wrong.  We
9   lived in the apartment adjacent to the Romeros.  We
10  did not live in a subbasement apartment.
11  Q.Fair enough.
12  Why did you leave your headmaster position?
13  ATTORNEY JUBB:
14  Asked and answered.  Can you --- can we
15  just direct you to his last testimony from Ms.
16  Dougherty that we've gone over in his prior deposition
17  and this one please?  We'll copy and paste his
18  testimony into an Interrogatory for you.  Next
19  question.
20  MR. POULOS:
21  I would appreciate that.
22  BY MR. POULOS:
23  Q.I have a few more last questions.  Are you aware
24  that the Hill School asked for students to come
25  forward to counsel about past abuse and offered

Page 258

1  confidentiality?
2  ATTORNEY JUBB:
3  Objection to the form.  You can answer.
4  THE WITNESS:
5  Yes.
6  BY MR. POULOS:
7  Q.Unbelievable.  Did you know that the two women
8  classified as counselors were actually attorneys in
9  those letters?
10 ATTORNEY JUBB:
11 Objection to the form.  You can answer.
12 THE WITNESS:
13 Yes.
14 BY MR. POULOS:
15 Q.Do you not find that deceiving by the Hill
16 School?
17 ATTORNEY JUBB:
18 Objection to the form.  You can answer.
19 THE WITNESS:
20 My understanding is that third party
21 investigations are typically run or handled by
22 attorneys.
23 BY MR. POULOS:
24 Q.Again, were they represented as counsel or
25 counselors to help previous students get the help they

Page 259

1  needed to get through these types of situations?
2  ATTORNEY JUBB:
3  Objection to the form.
4  THE WITNESS:
5  I have no idea how they were represented
6  to alumni.
7  ATTORNEY DOUGHERTY:
8  Mr. Poulos, would you like Mr. Ralston
9  to look at the letter?
10 BY MR. POULOS:
11 Q.Have you seen the copies of the letter that came
12 out from the school?
13 A.I'm sorry.  You have to repeat that.
14 Q.Have you seen the original copies dated from 2016
15 and 2017 that came out to previous alumni?
16 A.Yes.
17 Q.Do you remember what it said?
18 ATTORNEY JUBB:
19 Ms. Dougherty is going to show him a
20 copy of D-1, which, I believe, is the November 2017
21 email.  So why don't you --- is there something
22 specific you want to ask as opposed to do you remember
23 what it said because it's in front of him right now?
24 ATTORNEY DOUGHERTY:
25 It's the November 20, 2017 email from

Page 260

1  Mr. Lehman.  It's part of D-1.  Do you want to tell
2  him to look at a specific place?
3  MR. POULOS:
4  I believe it's the second paragraph
5  midway through when they state themselves as
6  counselors, not as counsel.
7  ATTORNEY JUBB:
8  Mr. Poulos, may I please direct the
9  witness to where I think you might be referring?
10 THE WITNESS:
11 It doesn't say counselors.
12 ATTORNEY JUBB:
13 Just answer his question then.
14 THE WITNESS:
15 Ask your question again.
16 BY MR. POULOS:
17 Q.How would you take that as an alumnus who was
18 abused that I was going to get the counsel ---?
19 ATTORNEY JUBB:
20 Objection to the form.  You don't have
21 to answer that question.
22 Next question.
23 BY MR. POULOS:
24 Q.Then let me re-ask my initial question.  Final
25 question then.  Were any of the letters that you

Page 261

1  received from the Hill School or any of the board of
2  trustee members ever signed by me?
3  ATTORNEY JUBB:
4  Are you referring to the letters that
5  were attached to our Complaint, Mr. Poulos?
6  BY MR. POULOS:
7  Q.Yeah.  Did you ever see a single letter that was
8  written to the Hill School that was signed by me?
9  A.No.
10 Q.So then why are you suing me?
11 ATTORNEY JUBB:
12 Objection to the form.  Go right ahead.
13 THE WITNESS:
14 Why am I suing you?  Because the letters
15 that did arrive to the school were written in
16 reference to conversations you had.  And the origin of
17 any of those lies had to begin with you.
18 BY MR. POULOS:
19 Q.Those letters were written by an attorney, which
20 is protected.
21 ATTORNEY JUBB:
22 Do you have a question?
23 BY MR. POULOS:
24 Q.Just like it says in --- from the school,
25 confidentiality.  Wouldn't you agree?

Page 262

1  ATTORNEY JUBB:
2  I'll object to the form.  Do you know
3  how to answer that?
4  THE WITNESS:
5  I can answer did I agree that a
6  confidential third party, however that's all worded in
7  the letter from Mr. Lehman, suggests that the
8  opportunity existed to do that, and you didn't take
9  it.
10  And, in fact, after nine months, had a
11  second letter sent that doubled down on the
12  accusations.
13  BY MR. POULOS:
14  Q.But you will agree that I never signed any letter
15  that was sent to the Hill School?  They were sent on
16  my behalf by an attorney?
17  ATTORNEY JUBB:
18  Objection to the form.  Asked and
19  answered.  Go ahead.
20  BY MR. POULOS:
21  Q.Otherwise, they would have had to have been
22  documented.
23  A.I understand that the two letters that arrived at
24  the school do not have your signature on them, yes.
25  Q.So, again, why are you suing me ---

Page 263

1  ATTORNEY JUBB:
2  Objection to the form.
3  BY MR. POULOS:
4  Q.--- if I didn't send the letter?
5  ATTORNEY JUBB:
6  Objection to form.  Asked and answered.
7  Next question.
8  ATTORNEY DOUGHERTY:
9  Objection.
10  MR. POULOS:
11  No, I'm done.
12  ATTORNEY JUBB:
13  Okay.
14  MR. POULOS:
15  He has no answers.
16  ATTORNEY JUBB:
17  Got it.
18  Ms. Dougherty, it's 4:08.  Is there any
19  chance you can get through the résumé by 4:15?
20  ATTORNEY DOUGHERTY:
21  I'll try.
22  ---
23  RE-EXAMINATION
24  ---
25  BY ATTORNEY DOUGHERTY:

Page 264

1  Q.I have just a question.  Do you know James
2  Broban?
3  A.James Broban, I do.
4  Q.How do you know James Broban?
5  A.He's a former student.
6  Q.From, like, the '90s?
7  A.Graduated in '96.
8  Q.Have you had any contact with Mr. Broban since he
9  graduated?
10  A.Yes.
11  Q.When was the last time you had contact with Mr.
12  Broban?
13  A.We --- I can't give you a date, but within the
14  past year, we've had contact when he's been in
15  Michigan for meetings, and we've tried to get together
16  and it hasn't lined up.  I think it was within the
17  last year.
18  Q.Do you know whether Mr. Broban is aware of the
19  accusations by Mr. Poulos or the letters?
20  A.I think he is.
21  Q.Why do you think he is?
22  A.I believe he had a conversation with Mr. Jubb.
23  Q.Do you know whether --- do you know if Mr. Broban
24  has an opinion of you?
25  A.It's been very high.

Page 265

1  Q.And has Mr. Broban's opinion, high opinion, of
2  you changed since speaking to Mr. Jubb?
3  A.I don't believe so.
4  Q.Has Mr. Broban done or said anything to lead you
5  to believe his opinion of you has changed in any way
6  from being very high?
7  A.No.
8  ATTORNEY DOUGHERTY:
9  Mr. Jubb, I can tell you what I was
10  going to ask Mr. Ralston was to identify his
11  supervisor and salary and I think some of them we
12  needed address information.  I can do that in an
13  Interrogatory.
14  ATTORNEY JUBB:
15  That's fine.
16  ATTORNEY DOUGHERTY:
17  And if I could, I'll just --- I'll mark
18  them.
19  ATTORNEY JUBB:
20  And, I mean, just generally, obviously,
21  reserving any sort of rights to the way it's worded.
22  But I don't generally have an issue with that.
23  ATTORNEY DOUGHERTY:
24  I understand.  That's what I'm trying to
25  do.

Matthew B. Ralston
September 20, 2021                              266 to 269

Page 266

1  ATTORNEY JUBB:
2  Yeah.
3  ATTORNEY DOUGHERTY:
4  And what number are we up to?
5  COURT REPORTER:
6  Thirty (30).
7  ATTORNEY DOUGHERTY:
8  Okay.
9              ---
10  (Whereupon, Defendant's Exhibit 30,
11  Résumé 1, was marked for
12  identification.)
13              ---
14  BY ATTORNEY DOUGHERTY:
15  Q.I'm just going to show you a document that is
16  marked as D-30.  It says HILLDOE0237 to 238 on the
17  bottom.  It's number eight.  Can we pull it up?
18  A.I'm sorry.  Which am I looking at?
19  Q.I've handed you a document that's been marked as
20  D-30.  It looks like it's a --- well, do you know this
21  document and did you prepare it?
22  A.Yes.
23  Q.How do you know this document?
24  A.It's my résumé.
25  Q.And when --- when is this --- when did you

Page 267

1  prepare this résumé?
2  A.This would have been a résumé I used when I was
3  applying to the Hill School, 1992.
4  Q.Can you just look through ---?
5  A.Let me back up.  We lived there from December of
6  1990 through probably July of 1992, at that address.
7  Q.And is there anything inaccurate about the résumé
8  that's been marked as D-30?
9  A.I don't think so.  I can't imagine I would have
10  done that.  I haven't read it all recently, but ---.
11  ATTORNEY DOUGHERTY:
12  This one is going to be D-31.
13              ---
14  (Whereupon, Defendant's Exhibit 31,
15  Résumé 2, was marked for
16  identification.)
17              ---
18  BY ATTORNEY DOUGHERTY:
19  Q.I'm going to replace the D-30 with one I didn't
20  write on.
21  A.Okay.
22  Q.I've got an extra copy.
23  Okay.  I'm showing you a document that I've
24  marked as D-31.  It says P7.1 to P7.3 on the bottom.
25  Do you recognize that document I've marked as D-

Page 268

1  31?
2  A.Yes.
3  Q.How do you recognize the document that I've
4  marked as D-31?
5  A.It's my résumé from when I was leaving the
6  Leelanau School.
7  Q.Is there anything about the résumé that's been
8  marked as D-31 that is not accurate?
9  A.Again, I don't think so.  No.
10  Q.Did you prepare a résumé after --- so I'm sorry.
11  So D-31 is the one you prepared when you were applying
12  to the Hill School when you were leaving the Leelanau
13  School?
14  A.Yes.
15  Q.Did you prepare a new résumé since departing the
16  Hill School?
17  A.No.
18  Q.Well, let me just --- can I just direct your
19  attention to the first page.  Are you sure, because it
20  says under experience 9/2/2009 to 2016 to 2019, Hill
21  School on the top?
22  A.I see that, yes.  So then I did.
23  Q.So is the résumé that's been marked as D-31
24  something that has been prepared since you've departed
25  or since your departure from the Hill School?

Page 269

1  A.It must be.  It would have to be.  I didn't
2  prepare one before I was put on leave there.  Had no
3  reason to.
4  Q.Have you --- do you have any more recent résumé
5  or prepared one recently?
6  A.I do not.
7  Q.I just wanted to identify this.  Do you know this
8  document that I'm showing?
9  ATTORNEY DOUGHERTY:
10  Well, I'll mark it as D-32, a giant text
11  message.
12              ---
13  (Whereupon, Defendant's Exhibit 32,
14  Texts, was marked for identification.)
15              ---
16  THE WITNESS:
17  Right.
18  BY ATTORNEY DOUGHERTY:
19  Q.That's okay.  We're just trying to get you out of
20  here.  We'll put a sticker on it.
21  I want to know who sent you the text and why?  I
22  mean, what's it about?
23  A.That would be from Wallace Gundy, who we
24  discussed earlier.
25  Q.Okay.

Page 270

1  A.And that would be the note I referred to that she
2  had missed us at reunion and didn't know what was up.
3  Q.So Ms. Gundy calls you pops?
4  A.They did.
5  Q.What do you mean, they did?
6  A.There were students who viewed me as a father
7  figure and the nickname pops came in somewhere, I
8  don't know, early 2000s, 2003 or '04.
9  Q.Okay.
10  But Ms. Gundy referred to you as pops?
11  A.She did.
12  Q.I guess still does refer to you as pops?
13  A.She does, yes.
14  Q.Okay.  All right.
15  A.Yeah.  Again, she grew up with our children.
16  Lived across --- her parents lived across the street.
17  She was a prefect.  It probably started when she was a
18  prefect.
19  ATTORNEY DOUGHERTY:
20  Okay.
21  Those are my questions for now.  I'm
22  going to just make the point that we're going to send
23  some Interrogatories as identified, and we still do
24  not have a full, complete production by the Hill
25  School.  So I don't know where that will leave us.

Page 271

1  As I understand it, Mr. Ralston needs to
2  leave, so ---.
3  VIDEOGRAPHER:
4  Going off the record.  That concludes
5  this deposition today.  Time is 4:16 p.m.  Off the
6  record.
7                    * * * * * * * *
8        VIDEOTAPED DEPOSITION CONCLUDED AT 4:16 P.M.
9                    * * * * * * * *

Page 272

1  COMMONWEALTH OF PENNSYLVANIA  )
2  COUNTY OF PHILADELPHIA        )
3                    CERTIFICATE
4  I, Jennifer Corb, a Notary Public in and for
5  the Commonwealth of Pennsylvania, do hereby certify:
6  That the witness, Matthew B. Ralston, whose
7  testimony appears in the foregoing deposition, was
8  duly sworn by me on September 20, 2021 and that the
9  transcribed deposition of said witness is a true
10  record of the testimony given by said witness;
11  That the proceeding is herein recorded fully
12  and accurately;
13  That I am neither attorney nor counsel for,
14  nor related to any of the parties to the action in
15  which these depositions were taken, and further that
16  I am not a relative of any attorney or counsel
17  employed by the parties hereto, or financially
18  interested in this action.This notarial act involved
19  the use of communication technology.
20  Dated the 22 day of October, 2021
21
22                    *Jennifer Corb*
23
24                    Jennifer Corb,
25                    Court Reporter

# EXHIBIT "C"

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3   ----------------------------------------------------

 4   JOHN DOE,

 5

       Plaintiff,

 6

 7        -vs-                      Case No. 2:19-CV-01539

 8

     MITCHELL GARABEDIAN, ESQ., LAW

 9   OFFICES OF MITCHELL GARABEDIAN

     and KURTIS N. POULOS,

10

11    Defendants.

12    ------------------------------------------------

13

14                    Videoconferencing Examination of

15      CHARLES GRADE, MD, taken at the instance of the

16      Plaintiff, under and pursuant to Section 804.05

17      of the Wisconsin Statutes, before ANITA

18      KORNBURGER, a Notary Public in and for the State

19      of Wisconsin, on June 7, 2021, commencing at

20      1:06 p.m. and concluding at 3:43 p.m.

21

22

23

24

25
```

```
 1              A P P E A R A N C E S
 2   THE BEASLEY FIRM, LLC, by
     MR. LANE R. JUBB, ESQ.
 3   1125 Walnut Street
     Philadelphia, Pennsylvania 19107
 4   lane.jubb@beasleyfirm.com
     appeared via Zoom on behalf of the Plaintiff.
 5
 6   SWARTZ CAMPBELL, LLC, by
     MS. CANDIDUS K. DOUGHERTY, ESQ.
 7   1650 Market Street, 38th Street
     Philadelphia, Pennsylvania 19103
 8   cdougherty@swartzcampbell.com
     appeared via Zoom on behalf of the Defendants.
 9
         ALSO PRESENT:  Kurtis Poulos
10
11                 I N D E X
12
     Examination by                    Page
13
     Mr. Jubb. . . . . . . . . . . . . . 4
14   Mr. Poulos. . . . . . . . . . . . .67
     Ms. Dougherty. . . . . . . . . . . 70
15   Mr. Jubb. . . . . . . . . . . . . 101
     Mr. Poulos. . . . . . . . . . . . 105
16   Ms. Dougherty. . . . . . . . . . .107
17
18                E X H I B I T S
19                                     Page
     Exhibit No.  Description       Identified
20
        1         Records P21.1 through P21.25. . . . 71
21
        2         Garabedian file 1542 through 1544. .62
22
23
24
25
```

```
1                TRANSCRIPT OF PROCEEDINGS

2             THE VIDEOGRAPHER:  We are now on the

3   record.  My name is Jon Hansen, CLVS.  I'm the

4   videographer today with Golkow Litigation Services.

5   Today's date is June 7, 2021.  The time is 1:06.

6                 This remote video deposition is

7   being held in the matter of John Doe versus

8   Mitchell Garabedian, et al., United States District

9   Court for the Eastern District of Pennsylvania,

10  case number 19-CV-01539-JD.  The deponent today is

11  Charles M. Grade, M.D.  All parties to this

12  deposition are appearing remotely and have agreed

13  to the witness being sworn in remotely.  Due to the

14  nature of remote reporting, please pause briefly

15  before speaking to ensure all are heard completely.

16                 At this time if counsel could state

17  their appearances and their location, after which

18  our reporter will swear in the witness and we can

19  proceed.

20            MR. JUBB:  Good afternoon.  Lane Jubb of

21  The Beasley Firm for plaintiff.

22            MS. DOUGHERTY:  Candidus Dougherty from

23  Swartz Campbell on behalf of Mitchell Garabedian

24  and his law firm in Philadelphia, Pennsylvania.

25            MR. POULOS:  Kurt Poulos representing
```

1    myself pro se.

2              CHARLES GRADE, MD, called as a witness

3    herein, having been first duly sworn on oath, was

4    examined and testified as follows:

5                   E X A M I N A T I O N

6    BY MR. JUBB:

7        Q.   Doctor, good afternoon.  I appreciate

8    your time.  My name is Lane Jubb.  I represent the

9    plaintiff in this case, and I'm going to take your

10   deposition today, okay?

11       A.   Okay.

12       Q.   I'm unclear as to how to correctly

13   pronounce your last name, so could you just

14   introduce yourself for us, please?

15       A.   Yeah, Charles Grade.  I'm in Wauwatosa,

16   Wisconsin.

17       Q.   And Dr. Grade, what do you do for a

18   living?

19       A.   I'm a psychiatrist.

20       Q.   And do you still currently practice?

21       A.   Yes, I do.

22       Q.   And where are you currently licensed?

23       A.   In Wisconsin.

24       Q.   And Dr. Grade, have you had an

25   opportunity to review any of the medical records of

1    Mr. Poulos before coming to your deposition today?

2        A.   Yes, I reviewed the records that I have,

3    yeah.

4        Q.   Great.  Have you ever had an opportunity

5    to give a deposition before?

6        A.   I think I've done some -- I don't think

7    I've done one on Zoom, but -- but I certainly

8    haven't done a lot of them.

9        Q.   Sure.  Okay.  So what I'll do is I'm just

10   going to go over some basic instructions that we

11   lawyers typically say in every single deposition

12   just so we're all on the same page.

13            The first is that because we are doing

14   this as a Zoom deposition, there is going to be a

15   tendency for more potential, I should say, for us

16   to step over each other in terms of my question and

17   your answer.  So I'm going to do my best to -- to

18   give you like an extra half second at the end of

19   what I think your answer is before I ask my next

20   question, and if you could do the same for me, that

21   would be great.

22            In all likelihood, you're probably

23   going to know my question well before I complete

24   it, but just for purposes of the record, and

25   because there is just this delay with the

1    technology, we'll both do our best to just let the

2    question get out entirely, and I'll do my best to

3    let your answer come out entirely, okay?

4        A.   Okay.

5        Q.   I don't anticipate being long.  I

6    appreciate that you accommodated us into your

7    schedule, so -- but if at any point in time you do

8    want to take a break for whatever reason, all you

9    have to do is just let us know, okay?

10       A.   Okay.

11       Q.   I want to make sure that you understand

12   my questions, so if I use a medical term wrong or I

13   somehow ask a question that is confusing to you for

14   whatever reason, all you have to do is let me know

15   and I am happy to rephrase that or repeat it,

16   whatever you need to make sure that you understand

17   the question, okay?

18       A.   Okay.

19       Q.   So as I mentioned, I represent the

20   plaintiff in this case and your patient -- former

21   patient -- Mr. Poulos, is a defendant in this

22   action.  And I've had an opportunity to speak with

23   him on a number of occasions, and I have in front

24   of me the records that were produced from your

25   office in response to a -- to a subpoena.

```
 1              And so I just want to make sure that

 2    those records, as I have received them, are the

 3    same ones that you have.  So I'm going to show you

 4    those video -- excuse me -- those records through

 5    the video, okay?

 6         A.    Okay.

 7         Q.    And so what I have here -- can you see

 8    that, Doctor?

 9         A.    Yes, I can.

10         Q.    I have actually marked this already as

11    P21.1 through P21.22.  And these were the 22 pages

12    that I received from your office in response to a

13    subpoena I sent.

14              Do you have those records in front of

15    you right now, by chance?

16         A.    I do.

17         Q.    And are yours 22 pages as well?

18         A.    Yeah, that's what I've got too, 20 --

19         Q.    Okay, great.  Do you recall whether or

20    not you personally had any sort of involvement with

21    actually compiling the records for purposes of the

22    subpoena, or was that handled by somebody within

23    your office?

24         A.    That would be handled by my office

25    manager, Becky.
```

1    Q.   And would these records that I've showed

2  you which have been marked as P21.1 through P21.2,

3  are those kept in the ordinary course of business

4  at your office?

5    A.   Yeah.

6    Q.   Now, in terms of some of the records that

7  I have, some of them are electronic in terms of

8  being typed up, and then there are others that are

9  handwritten notes.  And I think it's probably

10  easiest if we just go through maybe

11  chronologically, and then I'm going to ask you a

12  couple of questions just about your notes and

13  handwritten notes to make sure that I'm reading

14  them correctly, and then I'll ask you some general

15  questions about what you can recall with your

16  examination, and then hopefully we can just wrap

17  that up.

18    A.   Okay.

19    Q.   So in terms of how you first met

20  Mr. Poulos, I don't see anywhere in the records

21  themselves anything about a call to schedule an

22  appointment, if it was a walk-in or anything like

23  that.

24        Do you have any understanding as to

25  how Mr. Poulos got the appointment?

```
 1              MS. DOUGHERTY:  Objection.
 2   BY MR. JUBB:
 3       Q.   I'm sorry.  Just to be clear, there may
 4   be occasions that Ms. Dougherty may object to one
 5   of my questions, there may be occasions that I
 6   object to one of her questions.  You are to answer
 7   the question.  You need not worry about those types
 8   of objections, okay?
 9       A.   Okay.
10              MS. DOUGHERTY:  Mr. Poulos can object
11   too; right?
12              MR. JUBB:  Of course, yes.  If Mr. Poulos
13   wants to object, you know, he should do that as
14   well.
15   BY MR. JUBB:
16       Q.   But again, you know, Doctor, unless --
17   you should be answering the questions.
18              So in terms of what I reviewed, like I
19   said, I didn't see anything showing how the
20   appointment was made.  Do you have a recollection
21   of that?
22       A.   Yeah, I think a colleague of mine,
23   Dr. Blackwell, had referred Kurt.  I think -- I
24   can't remember entirely, but I think they may have
25   been having dinner together and that a name was
```

Charles Grade, MD

1    mentioned, and I think that's how it went, through

2    Dr. Blackwell.

3         Q.   And is Dr. Blackwell a psychiatrist as

4    well?

5         A.   Yes, he is.

6         Q.   Was it your understanding that Mr. Poulos

7    was actually a patient of Dr. Blackwell's?

8         A.   No.  Dr. Blackwell is retired, and so he

9    was, I believe, referring Kurt to me for treatment.

10         Q.   And so do you have any understanding as

11    to how Dr. Blackwell was communicating with

12    Mr. Poulos that he got your name?

13         A.   From what I remember, they were -- I

14    don't remember this entirely, but I think they were

15    at dinner together and -- and Dr. Blackwell noticed

16    he was anxious, and they talked about where he

17    could potentially get treatment.

18              I think -- I can't recall; I think

19    there might have been a voicemail from

20    Dr. Blackwell.  But then Kurt had called and spoke

21    with Becky and set up an appointment about three

22    years ago at the end of May.

23         Q.   And is Becky your assistant?

24         A.   Yes, she's the office manager.

25         Q.   All right.  In terms of the notes, the

1    one that is from May 30th, can you take me through

2    the process of a first-time patient in terms of how

3    they are initially examined?

4         A.   You know, usually I'm going to just want

5    someone to tell me what's bringing them in; real

6    open-ended, and -- and try to understand what's

7    been happening and -- and kind of go through what's

8    been happening recently, and then talk about past

9    history and medical history and then see if there's

10   something that I can do to help by the end of the

11   interview.

12        Q.   And for first-time patients, is there an

13   intake form by any chance?

14        A.   An intake form?

15        Q.   In other words, when a patient shows up,

16   sometimes patients have insurance, that

17   information; they can fill out past medical

18   history, history of present illness, what brings

19   them in, chief complaint, things like that that

20   provide a clinician with additional information

21   prior to the interview process.  Is that something

22   that your office has for patients?

23        A.   Yeah.  I mean, usually we do have

24   something like that.  Becky jots down just their

25   information on the back of a sheet.  So I have

1   this, which is a -- it's dated May 9th and

2   it's -- to make the appointment on May 30th, that I

3   think Kurt had called, referred by Dr. Blackwell.

4            It says past sexual trauma, old high

5   school issues, and then just the insurance

6   information.

7        Q.   Okay.  And I believe this record that

8   you're holding up -- I'll just pull it up so we're

9   all following along with the same one.  Is that

10  what you're referring to, the new patient intake

11  form?

12       A.   Yeah, that's the one.

13       Q.   And in terms of a new patient intake

14  form, I understood your testimony to be that this

15  is something that's filled out by your assistant as

16  opposed to the patient themselves; is that correct?

17       A.   Yes, just by the assistant.

18       Q.   And other than the form that's filled out

19  by your assistant, is there anything else that the

20  patient themselves would complete?

21       A.   Yeah, there is another prescription copy

22  page is -- a form that just has, like, the

23  insurance information on, and address and --

24       Q.   Could you hold that up for us, please?

25       A.   Sure.  (Witness complies.)

Charles Grade, MD

```
 1        Q.   Thank you.

 2        A.   Okay.

 3        Q.   Do you have a date on that?

 4        A.   May 30th.  So it was the day of the first

 5   interview.

 6        Q.   Okay.  I don't have that record.  Would

 7   you mind being able to have -- are you in your

 8   office right now?

 9        A.   Yeah.

10        Q.   Could you do me a favor, and maybe we

11   could pause and you could have someone from your

12   staff fax that over to us?

13        A.   Sure.

14        Q.   Thank you.

15             MR. JUBB:  And we can go off the record.

16             THE VIDEOGRAPHER:  Going off the record

17   at 1:20.

18                    (Break taken.)

19             THE VIDEOGRAPHER:  We're back on the

20   record at 1:25.

21   BY MR. JUBB:

22        Q.   Great.  Doctor, so in the meantime, while

23   we're waiting for that record, we'll continue a

24   bit.

25             So with the exception of that intake
```

1    form, have you had an opportunity to review the

2    records before coming here today?

3         A.   Yes, I did.

4         Q.   Now, do you have an independent mind's

5    eye recollection of your discussion with

6    Mr. Poulos, or is it really just an understanding

7    from reading the notes?

8         A.   Most of it is from the notes.

9         Q.   Now, with respect to that first note that

10   we looked at, the one that's typed up from

11   May 30th -- let me just pull that up.

12             So in terms of your practices in this

13   timeframe, May 30, 2018, is this a note that was

14   dictated and then typed up by someone in your

15   staff, or would you be typing this note yourself?

16        A.   I believe it was through Dragon.  It was

17   voice -- voice driven.  In fact, it's a little

18   confusing on the pages, because it was originally

19   printed front and back.  And so I think I did it at

20   my other office.  So it was done by -- yeah, Dragon

21   Dictate.

22        Q.   Okay.  And would this dictation be done

23   contemporaneous with your interview, or is this

24   something that you do after the interview?

25        A.   It would be afterwards.

1      Q.   And during the interview itself are you
2  taking any handwritten notes?
3      A.   I sometimes jot some stuff down to make
4  the report from.
5      Q.   Is that something that you typically
6  maintain and put in the patient's file, or is that
7  something that's typically discarded after your
8  dictation?
9      A.   Usually I discard it.
10     Q.   All right.  I didn't see any handwritten
11 notes from the 30th interview, so is it fair for me
12 to assume that that was just your routine practice
13 of discarding them after the dictation?
14     A.   Right, right.  They usually are not in
15 the chart.
16     Q.   Now, with respect to the form that was
17 completed by your staff -- and I want to make sure
18 I identify them appropriately -- is this someone
19 who is medically trained, or is this a secretary,
20 is this a para -- excuse me -- a physician
21 assistant?
22     A.   Like a secretary, yeah.
23     Q.   And how long has she been with you?
24     A.   She's been with me since 2010.
25     Q.   And in completing the new patient intake

1   form, is that something that she's doing for

2   purposes of your review?

3        A.   Yeah, and just to kind of get the -- just

4   the information to get to the interview.

5        Q.   And the information on the form, are

6   those questions that she would be asking the

7   patient so that you have an opportunity to review

8   them ahead of time?

9        A.   Yeah.  But we usually don't go into a lot

10   of detail with the ones that are kind of like -- if

11   there's like -- I don't know where the heck that is

12   right now, but --

13        Q.   I can pull it up for you.

14        A.   Lot of times it's just mainly the

15   demographics, but we want to get -- sometimes if we

16   know that we already have something to fill in the

17   information, we got the interview coming up, we

18   don't go into much detail on that.  So --

19             MS. DOUGHERTY:  So now we're looking at

20   P21.19?

21             THE WITNESS:  Okay.

22             MR. JUBB:  Yes.

23             MS. DOUGHERTY:  Okay.

24             THE WITNESS:  Yeah.  So I think she was

25   just getting, you know, the basics.  So normally

```
 1   it's not unusual that we, you know, wait,

 2   especially with sensitive information, you know,

 3   Becky doesn't need to go into that kind of thing,

 4   that I would take it from there.  We wouldn't want

 5   to make someone uncomfortable.

 6   BY MR. JUBB:

 7        Q.   All right.  And when Becky had completed

 8   this form, it looks as though the history and

 9   current mental concerns, it says "past sexual

10   trauma, old high school issues."  Is that something

11   that would have been relayed from the patient?

12             MS. DOUGHERTY:  Objection.

13             THE WITNESS:  Yes, usually.

14   BY MR. JUBB:

15        Q.   And would Becky be the one who's asking

16   these types of questions as to whether or not

17   there's any sort of depression, anxiety, ADHD,

18   things of that nature?

19        A.   She would just ask someone what's

20   bringing them in, and then from there she'd just

21   check off one.

22        Q.   Do you know what ETOH stands for?

23        A.   That stands for alcohol.

24        Q.   And what did that mean to you when you

25   reviewed this note?
```

1      A.   That -- that it's one thing to evaluate,
2    would be is alcohol part of the presentation.
3      Q.   Now, with respect to the May 30th
4    interview, do you have a mind's eye recollection of
5    actually speaking with Mr. Poulos this day?
6      A.   I do recall speaking with him, but I
7    don't, in general, for most of my patients remember
8    details from the meetings.  I certainly remember
9    meeting with him and -- but as far as the clinical
10   details, I always go back to the record.
11     Q.   Okay.  And would it be fair for me, if we
12   pull this back up, is this particular note
13   documented in any particular fashion, or is this
14   something that is chronological in terms of your
15   discussion with the patient?
16     A.   I usually just kind of take it right from
17   where the person starts, you know, what's going on,
18   and then ask them related questions and summarize
19   it.  Then in the history of present illness would
20   be kind of like what's happening right now, and
21   then starting to connect it with other types of
22   issues that can go along with it.
23          MS. DOUGHERTY:  Just so the record
24   reflects, you're showing the doctor P21.1, right?
25          MR. JUBB:  I am, yes.

1    BY MR. JUBB:

2         Q.    And Doctor, would it be fair to say then

3    that this first part here up at the top starting

4    with "the patient" and ending with "treatment,"

5    that was something that was relayed to you by

6    Mr. Poulos; correct?

7         A.    The top -- you mean "The patient is a

8    39-year-old single" -- yeah, that's like general

9    information.  So it would be things that I would

10   know before seeing him.

11        Q.    In other words, before you saw him you

12   had been made aware that the patient was saying

13   he's having anxiety problems related to trauma; is

14   that fair?

15        A.    Yes, I think from the -- from that sheet,

16   yes, uh-huh.

17        Q.    Now, with respect to the history of

18   present illness, what types of questions would you

19   be asking to complete this section under that

20   heading?

21        A.    I would be going through things, you

22   know, that can relate to trauma and be problems,

23   post-traumatic stress disorder, depression, other

24   kinds of things that are related to it, different

25   kinds of symptoms, sleep and appetite, that kind of

1    thing.  So --
2        Q.   Okay.  And with respect to the first part
3    of this -- this record, do you have any
4    recollection about your discussion with Mr. Poulos
5    as it pertains to some of his -- strike that.
6             In terms of the questions that you're
7    asking a patient when they're reporting to you
8    initially that they're experiencing anxiety
9    problems that they're attributing to trauma, what
10   types of questions would you be asking specifically
11   if you're curious about whether or not there's some
12   sort of diagnosis of anxiety or PTSD?
13             MS. DOUGHERTY:  Objection, I don't think
14   his questions to people other than Mr. Poulos are
15   relevant.
16             MR. JUBB:  Okay.  Well, then I can do
17   even more specific.  But they would be relevant.
18   But let's see how he responds to this one.
19   BY MR. JUBB:
20       Q.   So Doctor, forgive me, I'm just trying to
21   move this along.
22             With respect to Mr. Poulos, based off
23   your note, what type of questions did you ask him
24   as it pertained to whether or not he had anxiety or
25   PTSD?

```
 1        A.   Well, questions about flashbacks,
 2   nightmares, sleeping, anxiety kinds of things.
 3   Also like a big thing would be giving permission to
 4   the patient to talk about whatever they may feel
 5   comfortable with, but not to go into things that
 6   they don't feel comfortable with.
 7             So I don't generally push for lots of
 8   detailed information.  I'm taking the lead from the
 9   patient and hoping to make them comfortable and,
10   you know, kind of realizing that this is the
11   beginning of treatment, so that the relationship
12   begins well.
13        Q.   Am I correct then to understand that you
14   would be asking Mr. Poulos "are you having any
15   nightmares," would be an example?
16        A.   Yes.
17        Q.   "Are you having any flashbacks" is
18   another example?
19        A.   Yeah.
20        Q.   Now, with respect to PTSD specifically,
21   what goes into that evaluation?  What are the
22   criteria?
23             MS. DOUGHERTY:  Objection.
24             THE WITNESS:  The criterion would be
25   someone having gone through a traumatic event,
```

1    usually that either is witnessing or having threat

2    of death, and then having a lot of reexperiencing

3    symptoms and numbing symptoms and activation

4    symptoms that last more than a month.  Lot of

5    avoidance, that type of thing.

6    BY MR. JUBB:

7         Q.   For purposes of your evaluation of

8    Mr. Poulos, did you consider whether or not the

9    traumatic event was responded to by the patient

10   with any sort of intense fear, helplessness or

11   horror?  Was that part of the criteria for that

12   part?

13              MS. DOUGHERTY:  Objection.

14              THE WITNESS:  Can you say that again?

15   BY MR. JUBB:

16        Q.   Sure.  In terms of the criteria for the

17   event itself, the exposure, if you will, was part

18   of your consideration at that time in 2018 whether

19   or not the patient had responded to the event with

20   intense fear, horror, or helplessness?

21        A.   Yes.

22        Q.   And what do you mean by that?

23        A.   Well, I'd want to get a sense for, you

24   know, what degree of trauma it was for that

25   individual, because that runs different with how

```
 1   they respond to traumas and -- so having an idea,

 2   not just my idea of what would be traumatic, but

 3   the person's own description is key.  I don't know

 4   if that answers your question.

 5        Q.   Sure.  In other words, in terms of your

 6   evaluation of Mr. Poulos at the time, would I be

 7   correct in understanding your testimony to be that

 8   you considered him to have a cognizable or

 9   relatable -- at least to you he related a sense of

10   intensity or helplessness or horror?

11        A.   Yeah.

12        Q.   And that was following the event;

13   correct?

14        A.   Yes.

15        Q.   And other than the event itself and that

16   immediate response thereto, did you also consider

17   avoidance as any part of the criteria in --

18        A.   Yes.

19        Q.   -- evaluating Mr. Poulos?

20        A.   Yes.

21        Q.   What's avoidance?

22        A.   You know, generally steering clear of

23   things that are related to the trauma itself:

24   people, places, things that bring up the same

25   emotion.
```

Charles Grade, MD

```
 1          Q.   And in the case of a patient who is
 2   saying that they were sexually abused, what types
 3   of things would you be looking for?
 4          A.   I would be looking for -- well, I mean,
 5   everyone's different with the PTSD, so I would just
 6   be looking for what is going on with them, to be
 7   honest with you.  Everyone's a little bit different
 8   with what kind of symptoms they have.  Some people
 9   might not have much avoidance.  You don't really
10   have to have all the criteria for PTSD.
11               So some people have a lot of numbing;
12   some people have a lot of reexperiencing, but they
13   may not have a lot of avoidance.  So usually I
14   just -- you know, I try to get the person's story
15   as much as possible, and then kind of ascertain
16   that based on what's going on in their life and
17   what things they're no longer involved in that
18   might relate to the trauma.
19          Q.   Is avoidance something that's not
20   required for purposes of a PTSD diagnosis?
21          A.   It doesn't have to be.  It's just one of
22   the criteria.
23          Q.   Okay.  And in terms of the duration and
24   impairment, is that something that you considered?
25          A.   Yeah.  It was kind of a timeframe.  Less
```

1    than a month is not considered PTSD.  It's gotta go

2    on for a month or longer.

3         Q.   And when would that be happening with

4    respect to the trauma itself?

5         A.   Say it again.

6         Q.   And when would that be having -- strike

7    that.

8              When would that be happening proximate

9    to the time of the alleged trauma itself?

10             MS. DOUGHERTY:  Objection.

11             THE WITNESS:  Within 30 days is just

12   called an acute stress reaction, and then if the

13   symptoms continue longer, then it's post-traumatic

14   stress disorder.

15   BY MR. JUBB:

16        Q.   Thank you.  At the time that you had

17   spoken with Mr. Poulos, it appears from your note

18   that he had relayed to you that he had recently

19   retained a lawyer.  Do you recall that discussion?

20        A.   Yeah, I recall it 'cause I -- just from

21   looking at the note, that he had an attorney.

22        Q.   And from looking at the note, did that

23   spur any sort of recollections about that

24   discussion and how that came about?

25        A.   I didn't really ask very much about that,

1    so I wasn't sure exactly what was happening from

2    the legal perspective.  And generally with PTSD,

3    especially when I'm -- the first few times when I

4    meet with someone, I'm going to be much more about

5    it, like what's happening for them and not -- I'm

6    not going to be pursuing the legal, like, parts of

7    it, just because it kind of gets complicated and

8    kind of takes away from the focus we need.

9         Q.   In other words, when you're evaluating a

10   patient for the first time, you're not really

11   taking into consideration as to whether or not that

12   particular patient is being entirely truthful or if

13   it's for purposes of litigation, you're simply

14   listening to what they're having to say; is that

15   fair?

16             MS. DOUGHERTY:  Objection.

17             MR. POULOS:  I object as well.

18   BY MR. JUBB:

19        Q.   You can answer, Doctor.

20        A.   I mean, I'm trying to just start a

21   relationship with someone and find out what kinds

22   of problems are bringing them in and taking it from

23   there, so --

24        Q.   And following -- Well, strike that.

25   Let's just look at the note real quick again.  So

1    I'll pull it up for you.  And again, I'm pulling up

2    P21.

3              MS. DOUGHERTY:  Point one, right?

4              MR. JUBB:  P21.1, yep.  It's right on the

5    screen.  This is video recorded, so it's on the

6    screen.

7              MS. DOUGHERTY:  Yeah, but I'm just trying

8    to make sure it's in the transcript.

9              MR. JUBB:  Okay.  I'm just saying we're

10   going back to the note.  You gotta give me a second

11   to get there too.  So stand by.

12   BY MR. JUBB:

13       Q.   So right now, Doctor, we have the report

14   in front of you, P21.1.  And at the bottom it says,

15   "The patient went to a boarding school at The Hill

16   School for freshman and sophomore year.  He reports

17   that his AP geometry teacher engaged in sexual

18   contact with him without his consent.  He said it

19   was also" --

20             MS. DOUGHERTY:  Objection.

21   BY MR. JUBB:

22       Q.   -- "he said there was also some hazing

23   that occurred, as well as grooming-type behaviors."

24   Let's stop there so Ms. Dougherty can get out her

25   objection.

```
1            MS. DOUGHERTY:  You read the first
2    sentence wrong.  It says freshman, sophomore and
3    senior year.
4            MR. JUBB:  I'm not sure what I said
5    wrong.
6            MS. DOUGHERTY:  You said freshman and
7    sophomore year.
8            MR. JUBB:  Okay, great.  Senior.  Is that
9    right?
10           MS. DOUGHERTY:  Yes.
11   BY MR. JUBB:
12       Q.   Okay.  So Mr. Poulos actually told you
13   that he went to The Hill School; correct?
14       A.   Yes.
15       Q.   And had you been familiar with what The
16   Hill School was before?
17       A.   No, I hadn't.
18       Q.   And he relayed to you that he had
19   attended The Hill School during his freshman,
20   sophomore and senior year; is that correct?
21       A.   Yes, in response to my question, he told
22   me where he went, yeah.
23       Q.   And in your note, when you wrote that he
24   reported his AP geometry teacher, is that AP
25   geometry, is that something that Mr. Poulos had
```

1    relayed to you?

2         A.    I think so, yes.

3         Q.    Would you be -- strike that.  In terms of

4    your dictations, was it your pattern of practice to

5    add any particular details to your notes that

6    weren't actually reflected in your notes or you

7    would be relaying accurately what you had

8    transcribed?

9              MS. DOUGHERTY:  Objection.

10             MR. POULOS:  Objection.

11             THE WITNESS:  I mean, I'm always trying

12   to be as accurate as possible.

13   BY MR. JUBB:

14        Q.    That's what I figured.  So when he said

15   there was also some hazing that occurred as well as

16   grooming-type behaviors, my first question is, when

17   Mr. Poulos is relaying to you that there was also

18   some hazing that occurred as well as some

19   grooming-type behaviors, from looking at this note,

20   is that something that it was his words saying that

21   there was grooming or hazing, or did he describe

22   actual scenarios where you yourself had put in the

23   record that that constituted hazing or that

24   constituted grooming?

25        A.    You know, I really can't recall.

Charles Grade, MD

```
1        Q.   In terms of -- I'm sorry to interrupt

2   you.  There, I already did it.

3        A.   Yeah, like I said, I can't recall if Kurt

4   said those words or not.  I think -- I think I was

5   summarizing what he had said but not using his own

6   words, but --

7        Q.   Did you have an understanding, based off

8   your experience as a psychiatrist, as to what

9   grooming meant?

10       A.   Yes.

11       Q.   What is grooming?

12       A.   In this context, it would be kind of

13  behaviors that are meant to establish a

14  relationship that then could be abusive in the

15  future.

16       Q.   Can you give me an example?

17       A.   Like -- say like an elderly gentleman is

18  befriending a child and offers them candy and, you

19  know, they become friends, and there could be

20  something that happens that's because of that trust

21  that was developed.

22       Q.   And with respect to Mr. Poulos's case, did

23  he relay to you statements that suggested that he

24  had a good relationship with his alleged abuser?

25       A.   I don't recall.  You mean a good
```

1    relationship prior to the abuse?

2        Q.   Right.   In terms of grooming, my

3    understanding of grooming is that there was a

4    relationship that was not sexually abusive in

5    nature that allowed the alleged abuser to then

6    transition from that to something more sinister and

7    illegal.

8            And so my question was:  Did

9    Mr. Poulos relay to you that he had a good

10   relationship with his alleged abuser before this

11   occurred?

12           MS. DOUGHERTY:  Objection.  Are you

13   asking him to assume your definition of grooming?

14           MR. JUBB:  No, I'm asking him to assume

15   his own definition of grooming.

16           MS. DOUGHERTY:  Well, I don't think we've

17   heard that.

18           MR. JUBB:  We have.

19   BY MR. JUBB:

20       Q.   Doctor, you can answer the question.

21       A.   I really don't recall the -- how much of

22   a discussion we had about that.  I mean, that --

23   that was my impression, but I don't recall what

24   Kurt had said about that, but -- that --

25       Q.   Well, in terms of the note that there

1    was -- he was -- strike that -- that he said there

2    was also some hazing that occurred as well as

3    grooming-type behaviors.  When you wrote that, am I

4    correct that at the time you had an understanding

5    of what grooming was, as a psychiatrist, of course?

6         A.   Yeah.

7         Q.   I'm sorry, one instruction I didn't give

8    you is that everything has to be verbal, okay?  So

9    I see your head nodding.  Did you say yes?

10        A.   Yes.

11        Q.   Okay.  In terms of that, as you sit here

12   today, am I correct that you can't recall what

13   specific things that you considered to be grooming;

14   is that fair?

15        A.   Yeah, I don't remember specific

16   discussion about -- about that in terms of specific

17   actions, just that that was happening early in the

18   relationship.

19        Q.   And in terms of the grooming early in the

20   relationship between Mr. Poulos and his alleged

21   abuser, do you recall what types of things you

22   would be looking for when it comes to allegations

23   against a former teacher?

24             MS. DOUGHERTY:  Objection.

25             THE WITNESS:  Well, I mean, you know, we

1  look at things like, you know, eating together,

2  doing things together, just kind of normal

3  activities of developing their friendship, that

4  kind of thing.

5  BY MR. JUBB:

6      Q.   If we go back to the report, you

7  mentioned that he felt -- he feels he was unable to

8  concentrate as a result.  He also feels ostracized

9  by staff and other students.  Do you recall

10  anything about those discussions or -- and I'll

11  give you a background, and then I'll make it a nice

12  tight question for you.  I wasn't -- strike that.

13          I was not clear how to interpret this

14  note to mean whether he had said to you "I felt

15  like I was unable to concentrate" and that "I felt

16  ostracized by staff and other students," or did he

17  give you specific anecdotes and then those were

18  your words that you wrote describing those events

19  to be that he was unable to concentrate or that he

20  felt ostracized?  Do you have any way of

21  determining that for us?

22          MS. DOUGHERTY:  Objection.

23          THE WITNESS:  Well I, you know,

24  just -- Kurt just told me that he was unable to

25  concentrate well at that time, and that ostracized

1    was just my word for what he was describing.

2    BY MR. JUBB:

3        Q.   Okay.  And when he told you that he had

4    initiated a lawsuit and was working with an

5    attorney named Mitchell Garabedian, had you heard

6    of Mitchell Garabedian before?

7        A.   The name was familiar, but I didn't -- I

8    don't know him.  But name is familiar.

9        Q.   All right.  And then moving on to P21.2,

10   which is the second page of your notes.  You wrote,

11   "He also reports an accident that occurred just

12   prior to Christmas in which there was interaction

13   with the police officer that escalated, and he

14   wound up in jail.  This was thrown out of court

15   after the facts were collected."

16              In this note, are you referring to the

17   most recent Christmas, that one being in 2017?

18       A.   I believe so, but I don't think I have

19   any of the details about that.  But I think just

20   prior to Christmas would be Christmas of '17, yeah.

21       Q.   And do you recall anything about that and

22   where it occurred?

23       A.   Yeah, I really don't.  I recall that it

24   was kind of complicated, and that I'm going to need

25   to come back to that, you know, after getting the

1    information we needed to get in the first

2    interview.  So I don't -- I don't think I focused

3    very much on that.

4        Q.   At any point in time did Mr. Poulos ever

5    relay to you that he had been charged with child

6    endangerment?

7             MS. DOUGHERTY:  Objection.

8             THE WITNESS:  I don't think so.

9    BY MR. JUBB:

10       Q.   Would that be information that you may,

11   given your, you know, expertise, find noteworthy?

12       A.   Yes.

13       Q.   Now, with respect to the second paragraph

14   there, "Patient reports that he told his mother

15   about the sexual abuse in 2013.  He says that

16   drinking had increased at that time, and that by

17   2014 he developed liver failure because of heavy

18   alcohol usage."

19             So let's just stop there for a second.

20   Am I correct that your notes and your discussion

21   reflect, in your conversation with Mr. Poulos, that

22   he had revealed to his mother these allegations of

23   sexual abuse at the time that his drinking was at

24   an unhealthy level?

25       A.   That's what I -- I don't remember that

1    discussion, but that's what I have in my report

2    that I'm -- that paragraph was something, you know,

3    kind of looking at the timing with alcohol and how

4    that fit in with the trauma.

5         Q.   Did Mr. Poulos ever relay to you that he

6    had been diagnosed with hepatic encephalopathy?

7         A.   I don't think he used those words, but he

8    did talk about having the liver failure.

9         Q.   As a medical doctor, I know that your

10   specialty is psychiatry, but you are medically

11   trained.  Do you know what hepatic encephalopathy

12   is?

13        A.   Yes, I -- yes.

14        Q.   What is that?

15        A.   It's like a dysfunction of the liver,

16   where ammonia levels build up and cause confusion

17   and cognitive problems, disorientation.

18        Q.   And he reported to you that he was

19   140 pounds as of 2014, and that he stopped drinking

20   entirely in January of 2014.  Did you ask him about

21   his alcohol -- I'm going to say abuse, but did you

22   ask him about the fluctuations between when he was

23   drinking and when he was not drinking?

24        A.   You mean -- no, I didn't go into detail

25   between the time he stopped and what was happening

 1    when we met that first time.  I was just getting

 2    the what-was-happening-kind-of-now picture.

 3         Q.   And you wrote that, "More recently, he

 4    has been drinking about every other day, having one

 5    half to one bottle of wine.  He does not feel that

 6    his alcohol usage is problematic.  He does

 7    understand the risk and was involved in intensive

 8    care when he had liver failure.  That was quite

 9    traumatic.  He denies the use of any drugs or abuse

10    at the present time."

11              Do you recall anything, other than

12    what's written here, about what he relayed to you

13    about the trauma he experienced in the intensive

14    care unit when they told him he was having liver

15    failure?

16              MS. DOUGHERTY:  Objection.

17              MR. POULOS:  Objection.

18              THE WITNESS:  I don't recall any other

19    discussion.

20    BY MR. JUBB:

21         Q.   At the time of your meeting with

22    Mr. Poulos, what was your understanding of his

23    alcohol intake, present when he was at your -- at

24    your --

25         A.   What was my --

1          MS. DOUGHERTY:  Are you asking about on

2    May 30, 2018?

3          MR. JUBB:  Yes, when he was at the

4    clinic.

5          THE WITNESS:  And what was the question

6    again?  I'm sorry.

7    BY MR. JUBB:

8        Q.   Sure.  At the time that Mr. Poulos was in

9    your office, did you have an understanding at that

10   time as to what his alcohol intake was?

11       A.   Yeah, I mean he -- he told me one half to

12   one bottle of wine was what was happening recently,

13   and that, you know, there was that period of

14   sobriety there, but we didn't go into it in any

15   more detail.  Obviously I'm very concerned and

16   it's -- along with the liver issue, you know, it

17   would be something that I would be very interested

18   because of the alcohol problem itself, but also

19   because of medications that I might prescribe.

20       Q.   In other words, his alcohol intake could

21   have an effect on what medications that you would

22   prescribe to your patient; is that fair?

23       A.   Right.

24       Q.   And with respect to past psychiatric

25   history, you wrote, "The patient did see

1    Dr. Gudeman in 2000."  Before I go any further, did

2    you know who Dr. Gudeman was?

3         A.   Yeah, I don't know him personally, but I

4    think he was the head of the psychiatry department

5    at Medical College.

6         Q.   He was the head of psychiatry at which

7    college?

8         A.   At the Medical College of Wisconsin.  He

9    may have been at that time.  I don't know if he

10   was.

11        Q.   And when Mr. Poulos had relayed to you

12   that he had seen Dr. Gudeman, do you recall or did

13   you ask any follow-up questions as to what he was

14   seen for?

15        A.   We were talking about past treatment with

16   medicine, so he just told me he was taking an

17   antidepressant at that time.  And we couldn't

18   figure it out -- we were trying to figure out which

19   one it might have been, and that there were side

20   effects from it, and discontinued.  So starting to

21   kind of want to find out what things may have

22   worked and what might not have worked in the past.

23        Q.   And when you say side effects, when you

24   say he reports that he had sexual dysfunction,

25   discontinued, did you understand that to mean that

1    the patient discontinued the depression medication

2    because it was affecting his ability to have sex?

3        A.   Yes.  Or at least -- I can't remember if

4    it was libido or what it was, but -- but yeah, that

5    it was unacceptable and so he stopped that

6    medicine.

7        Q.   And then you wrote, "He did see a

8    psychiatrist in Connecticut who prescribed

9    diazepam, which he reports as being helpful."

10            Now, diazepam, is that something that

11   you can take with alcohol?

12       A.   There's an interaction with alcohol.  So

13   there would be a larger effect of alcohol for most

14   people if they're taken together.

15       Q.   From a -- I don't want you to use

16   toxicology terms, but would that be something that

17   would be referred to as a synergistic effect?

18       A.   Yeah.

19            MS. DOUGHERTY:  Objection.

20            MR. POULOS:  Objection.

21   BY MR. JUBB:

22       Q.   Now, with respect to the next paragraph,

23   "He denies any hospitalizations for psychiatric

24   reasons or addiction reasons."

25            Is that a question that you would ask

Charles Grade, MD

 1   him, or is this something that a patient would be

 2   volunteering?

 3           MS. DOUGHERTY:  Objection.

 4           THE WITNESS:  Usually I'd be asking it,

 5   but I can't recall in that instance if -- if I

 6   asked or if he brought it up.

 7   BY MR. JUBB:

 8      Q.   You mentioned that there's a family

 9   history with significant AODA problems with his

10   father.  When you wrote AODA, did you mean alcohol

11   and drug addiction?

12      A.   Yes.

13      Q.   And then you wrote, "His father is -- had

14   a gambling problem and, from his description, may

15   have bipolar disorder."

16           What types of things did he relay to

17   you about his father that gave you the impression

18   that there was a gambling problem and gave you the

19   impression that there even could be a bipolar

20   disorder?

21           MR. POULOS:  Objection.

22           THE WITNESS:  You know, I don't recall.

23   It was my -- I was surmising it may have been

24   bipolar from what he had mentioned, but I don't

25   recall any specifics.

1    BY MR. JUBB:

2        Q.   When you wrote, "There's a family history

3    with significant AODA problems with his father,"

4    what did you mean by "significant"?

5        A.   Things that would cause some kind of a

6    problem with employment or family or health, you

7    know, where there's a real impact.

8        Q.   Did you get an opportunity to really

9    discuss Mr. Poulos's relationship or lack thereof

10   with his father during this first interaction you

11   had with him?

12       A.   No.

13            MR. POULOS:   Objection.

14   BY MR. JUBB:

15       Q.   And then by the way, for these first

16   examinations that you're doing, would the patient

17   who's coming in who's telling you I'm experiencing

18   some anxiety related to trauma, how long do they

19   typically last?  And if you have to refer to a

20   pattern and practice, that's okay.  If you have to

21   refer to billing purposes and how that works with

22   insurance, that's okay.  I don't want you to guess,

23   but if you're able to give us a reasonable

24   approximation, that's okay.

25            So with that as the background, do you

1    have any recollection or understanding as to the

2    approximate length of your first meeting with

3    Mr. Poulos?

4        A.   I'd say it was an hour.

5        Q.   And then from the next line where you

6    wrote, "He says his mother is 'basically a shut in'

7    and describes behavior consistent with depression."

8             MR. POULOS:   Objection.

9    BY MR. JUBB:

10       Q.   Did you get an opportunity to really get

11   into Mr. Poulos's relationship that he has with his

12   mother during this initial hour discussion you had

13   with him?

14            MS. DOUGHERTY:   Objection.

15            MR. POULOS:   Objection.

16            THE WITNESS:   No, I didn't focus on that.

17   BY MR. JUBB:

18       Q.   And with respect to the medical history,

19   you wrote, "The patient has a history of liver

20   failure that he says is apparently resolved.  He

21   also says kidney function was poor at that time but

22   has returned to normal.  He denies any other

23   medical illnesses."

24            Dr. Grade, did Mr. Poulos relay to you

25   that he has liver cirrhosis?

1        A.    Not that I recall.

2        Q.    Is his liver cirrhosis something that can

3   resolve on its own?

4        A.    Usually that's a chronic condition.

5        Q.    When you say chronic, you mean that's

6   going to be there for forever?

7        A.    Yes.

8              MS. DOUGHERTY:   Objection.

9   BY MR. JUBB:

10       Q.    At the point that you had this meeting

11   with Mr. Poulos, did you have available to you any

12   other medical records at all?

13       A.    No, I did not.

14       Q.    Did he provide you with any other medical

15   history that related to hospitalizations other than

16   what we've already described, which was -- Well,

17   strike that.  We haven't already described that.  I

18   don't want to put words in your mouth, but did he

19   describe to you in this particular visit any other

20   instances of hospitalizations?

21       A.    No, not that I recall.

22       Q.    Current medications you've listed as

23   Advil PM, three tablets each night, and he's

24   allergic to oxycodone.

25              At the time of your discussion with

Charles Grade, MD

1    Mr. Poulos, you had asked him about his

2    medications, would you have documented all of the

3    medications that he relayed to you?

4         A.   Yes.

5         Q.   In this paragraph here, he discussed that

6    the patient went away to boarding school and was

7    relatively small in stature person.  The abuse

8    started when he was a freshman.  Let me ask you

9    this:   In terms of accurately documenting your

10   records, am I correct that the timing of the abuse

11   is something that you would want to document as

12   relayed by the patient?

13        A.   Yeah, I'd like to get an idea of that.

14        Q.   And am I correct in interpreting your

15   notes to mean that Mr. Poulos had said to you that

16   the abuse began when he was a freshman?

17        A.   You know, I don't remember him saying it

18   began then.  That may have been more of the maybe

19   what we were referring to earlier, the grooming

20   kind of period.  He was kind of describing that

21   entire time that he was at that school.  So I don't

22   think he specified exactly when the abuse started.

23        Q.   In other words, your note of the abuse

24   started when he was a freshman, that could be

25   referring to the grooming process where they had

1   developed a friendly relationship, or that could

2   refer to actual sexual abuse, but you're unable to

3   tell us one way or the other; is that fair?

4        A.   I --

5             MS. DOUGHERTY:  Objection.

6   BY MR. JUBB:

7        Q.   I'm sorry, Doctor, I couldn't hear your

8   answer over that.  Would you please repeat it for

9   you us?

10       A.   I don't remember.  Yeah.

11       Q.   He did tell you -- strike that.

12            Do you recall anything about asking

13  him where the abuse occurred?

14       A.   No, I don't -- I don't recall asking him.

15       Q.   If -- I don't want you to guess in any

16  way, but I'm just seeing if there's any sort of

17  ability that I would have to potentially refresh

18  your recollection.  Do you recall whether or not

19  Mr. Poulos said that the abuse ever occurred in a

20  dorm room?

21       A.   Yeah, I don't specifically remember that,

22  but that -- I mean, you know, I don't remember

23  those words, but that -- that was the impression I

24  had, that it was the dorm, but I don't remember

25  those specific words.

1       Q.   And it looks like in your note you wrote

2   that he went to Marquette High School for junior

3   year, then returned to The Hills School for senior

4   year.  Did you ask him why he went back to the

5   school?

6       A.   I don't think I asked him that.  I think

7   I was, you know, getting his history.  And

8   returning there, I can't remember if he had

9   explained that or not.  But I don't think I asked

10  him that in relationship to abuse or anything.

11      Q.   Was there any particular reason that that

12  was something that you documented and felt to be

13  noteworthy that he returned to the school?

14      A.   Well, I mean, I just thought it

15  noteworthy just because that's his history.  You

16  know, I think in my first eval with people, I try

17  not to make a lot of conclusions, but I'm just

18  trying to understand.  So I'm not sure.  I don't

19  think I focused on that, and I can't recall Kurt

20  telling me.

21      Q.   Okay.  And when you wrote, "He said that

22  he grew seven inches between junior year and senior

23  year; that the previously inappropriate teacher was

24  somewhat intimidated by him and did not try to

25  engage in sexual activities," was that something

1    that he had said as sort of an explanation out of

2    the blue, or do you think that was in response to

3    you asking him, you know, was there any abuse that

4    occurred senior year?

5              MS. DOUGHERTY:  Objection.

6              THE WITNESS:  I think he just told me

7    about -- you know, I was asking about that whole

8    high school experience, and he told me he grew a

9    lot and returned there, so --

10   BY MR. JUBB:

11       Q.  And did he mention anything about any

12   sort of weight loss, or do you just recall him

13   saying that he grew seven inches?

14             MS. DOUGHERTY:  Objection.

15             THE WITNESS:  I just remember him saying

16   that he -- you know, he was quite different in

17   stature, and that made the relationship different.

18   BY MR. JUBB:

19       Q.  And was it his words or your words -- and

20   again, I'm only just trying to get an understanding

21   here, so I'll give a little bit of a background and

22   then tighten it up.

23             I'm just trying to understand if it

24   was your description of his words that were

25   described as the teacher was somewhat intimidated,

1    or do you believe that that was actually the words

2    that were used by Mr. Poulos?

3         A.   I don't -- I don't think he used those

4    terms.  I think it was he explained that he was

5    changed, and the behavior towards him had changed

6    too, you know.  But I don't -- I don't remember him

7    saying intimidated.  I think just being seven

8    inches bigger, you know, felt like that, in my own

9    kind of way of writing it, that it was, you know,

10   different physically.

11        Q.   Do you recall asking Mr. Poulos or having

12   it be described to you the amount or the -- strike

13   that.

14             Do you have any understanding, from

15   reviewing your notes or from your recollection of

16   what Mr. Poulos relayed to you, in terms of the

17   amount of the alleged sexual abuse?

18        A.   I never -- we never talked about those

19   kind of details or any type of length of time

20   or any -- anything like that.  I, again, wanted him

21   to tell me what he was comfortable with and

22   understand where we were together in terms of like

23   do I understand and move on to our next time, but

24   didn't go into detail, though.

25        Q.   Okay.  You then did a mental status exam,

1    and then you did a treatment plan, and you

2    prescribed certain medications; is that correct?

3         A.   Yes.

4         Q.   You wrote in your notes for the treatment

5    plan, "I discussed with the patient plan for

6    treatment.  At this time it is appropriate for

7    psychotherapy and medication management here at

8    Knapp Street."  What did you mean by psychotherapy?

9         A.   Just that, you know, for a case like this

10   and then, you know, there's similar kind of cases

11   that part of the treatment's going to be

12   psychotherapy, some kind of talk therapy.  And

13   generally I'll assess that over a period of a few

14   visits whether or not I'll do the psychotherapy

15   myself or I'll refer someone for psychotherapy and

16   do the medication and go either way.

17        Q.   And in terms of the -- strike that.  Am I

18   correct that because of the subjective nature of

19   the system's -- of the symptoms and the diagnostic

20   criteria for PTSD, that clinicians such as yourself

21   have to rely heavily on the patient's report?

22             MS. DOUGHERTY:  Objection.

23             THE WITNESS:  Yes.

24   BY MR. JUBB:

25        Q.   At any point in time did you discuss your

1    hope that Mr. Poulos would consider any sort of

2    psychological testing?

3         A.   I don't think we discussed that during

4    the course of our meeting, no.

5         Q.   All right.  And then ultimately it looks

6    like, from your handwritten notes -- we'll get

7    right to that -- and I'm going to start here on

8    P21.9 -- and it's reversed, but it looks like it

9    continues to P21.8 and P21.7.  And these are your

10   progress notes.

11              So first off, it looks like the next

12   appointment that was had, or at least was

13   scheduled, said 6/20/18.  Now, when you write C-X,

14   am I correct that means canceled?

15        A.   Yes.

16        Q.   And then in other words, there was an

17   appointment scheduled for a month later, from

18   May 30th to June 20th, and that Mr. Poulos had

19   actually canceled that appointment?

20        A.   Yes.

21        Q.   But it looks like you said "had to work.

22   Stopped" -- what's that medication?

23        A.   Prazosin and sertraline.

24        Q.   I'm sorry, because of the phone, I

25   couldn't quite make it out with all the consonants

1    in the medication.

2         A.    Yeah, prazosin and sertraline.

3         Q.    And you wrote, "Two degrees side

4    effects."  What do you mean by that?

5         A.    Secondary to side effects.  So he stopped

6    them because of side effects.

7         Q.    Are -- strike that.  Are these the types

8    of medications that could be taken in conjunction

9    with alcohol?

10             MR. POULOS:  Objection.

11             MS. DOUGHERTY:  Join.

12             THE WITNESS:  There's -- there's no real

13    interaction with them.  I mean, any medication can

14    interact to some degree, but there's not any

15    particular interaction with those.

16    BY MR. JUBB:

17         Q.    Did he relay to you what the side effects

18    were?

19         A.    I can't recall what our discussion was.

20    At that point he had already stopped them, and so I

21    think it might have even just been a message.  And

22    so I was going to talk to him about that at the

23    next appointment.

24         Q.    In other words, the 6/20/18, that

25    actually could have been a voicemail from

1    Mr. Poulos; is that right?

2        A.   Could have been, yeah.

3        Q.   And in terms of these medications that he

4    had stopped taking, are they medications that are

5    prescribed for PTSD?

6        A.   Yes.

7        Q.   And the next note looks like it's from

8    8/27/18.  And right next to it it says appointment

9    9/5 at two o'clock.  Did this appear to be your

10   handwriting or the handwriting of somebody else?

11            MS. DOUGHERTY:  Objection.

12            THE WITNESS:  It's just noting when, you

13   know, as the -- on the 27th that I made the

14   appointment for the 9th.

15   BY MR. JUBB:

16       Q.   Okay.

17       A.   It looks like --

18       Q.   And right next to it it says C-M with a

19   circle around it.  Do you know what that means?

20       A.   That's left message, L-M.  So I think I

21   would have left that message that I was -- that

22   that appointment time would work.

23       Q.   Okay.  I don't see any reference in here

24   to any discussions with Mr. Poulos or

25   correspondence with him following the 6/20

1    voicemail from him canceling his appointment.  Is

2    there anything else that you're aware of, or was

3    this message from you "LM" to him on the 27th the

4    next communication?

5         MS. DOUGHERTY:  Objection.

6         THE WITNESS:  I think that -- I think

7    that was the next communication.

8    BY MR. JUBB:

9         Q.   All right.  And then it looks like on

10   9/5/18 there's some more detailed notes.  Am I

11   correct that these would be your progress notes

12   from the actual appointment that was kept by

13   Mr. Poulos for 9/5?

14        A.   Yes.

15        Q.   And in this discussion -- there's several

16   notes here, so I just want to make sure I can

17   understand everything.  He relayed to you -- again,

18   can you just read it in your own words for us what

19   he had said?

20        A.   I think it should have been pretty

21   summed up for that one.  "June 30th the police were

22   called and I was in jail for four days."  And

23   the -- the -- what I jotted down was that there was

24   screaming for help from outside door and that

25   police appeared in SWAT gear with shields.  And I'm

1   not sure what that refers to, "cut chain open," but

2   that there was this really intense kind of police

3   action at the apartment.

4       Q.   And did he relay to you that that was

5   because of a fight he was having with his

6   girlfriend?

7       A.   That's what -- I mean, that's what I

8   understood, that his girlfriend was there and --

9   but I'm not remembering who was screaming "help,"

10  if that was the girlfriend.  But, yeah, that's what

11  I recall.

12      Q.   It looks like this was referring to

13  something that occurred on June 30th at Fox Point.

14  Did he give you any more details as to whether or

15  not if he was ever in prison for this?

16           MS. DOUGHERTY:  Objection.

17           THE WITNESS:  Well, it says "out of jail

18  July 3rd."  So I knew that -- I think I knew that

19  there was a brief stay in jail.  That's what I

20  gather from that, but --

21  BY MR. JUBB:

22      Q.   Okay.

23      A.   It was a misdemeanor I guess, but --

24      Q.   And let me be clearer.  When you wrote

25  "misdemeanor Fox Point," it looks like there's 10/2

1    below that, is that referring to something else?

2        A.    That's what I would assume, from looking

3    at something in the past, but I don't recall now.

4        Q.    Is Fox Point in Wisconsin?

5        A.    Yes.

6        Q.    In other words, you write "Fox Point

7    10/2," you're referring to something that occurred

8    in Wisconsin in October of what year?

9        A.    You know, I don't know.

10        Q.    Did he relay this to you, "if backed into

11    a corner" -- what is that word?

12        A.    "React harshly past trauma."  That's kind

13    of what I'm writing in my note based on his

14    description of how traumatic it was for this to

15    occur with the police and how, at least the way I

16    interpret it, is that he had kind of reacted in a

17    kind of exaggerated way from past trauma, perhaps.

18    You know, that's how I read it.

19        Q.    Now, with respect to the medication that

20    we had already discussed was discontinued.  And

21    correct me if I'm wrong, this symbol right here

22    means discontinued, correct D/C?

23        A.    Yes, yes.

24        Q.    And these were the medications that he

25    stopped taking.  You put in quotes, "took me" what?

1      A.   "Took me really" -- I was jotting down

2   the side effect but I didn't put in the -- the last

3   word, so -- but talking about, you know, what

4   he -- I think it took me really out of it, or

5   something like that were those side effects in the

6   past with sertraline, basically saying should we

7   try to go back to those.  And then Kurt was telling

8   me no, it really took me -- took me really out of

9   it, or something where we just decided no, we're

10  not going back to those, we're going to look at

11  something different.

12     Q.   Okay.  And then it looks like down here

13  you wrote "loss of relationship/routine"; is that

14  correct?

15     A.   Yes, uh-huh.

16     Q.   And you wrote, "No increase in alcohol."

17  Is that something that he would have relayed to

18  you -- or strike that -- is that something that you

19  would have asked him?

20     A.   That's something I would have asked him,

21  yeah.

22     Q.   And he reported to you that there was no

23  increase in alcohol as of September 5, 2018;

24  correct?

25     A.   That's what I noted, yeah.

 1      Q.   And then going -- I'm going to move back

 2  up to 21.8.  This is the next page.

 3      A.   Would you mind -- could I interrupt just

 4  for a moment and take a little bathroom break?  Is

 5  that okay?  I hate to do that, but --

 6           MR. JUBB:  Absolutely.  Let's go off the

 7  record.

 8           THE WITNESS:  Okay.  Thank you.

 9           THE VIDEOGRAPHER:  Going off the record

10  at 2:23.

11               (Break taken.)

12           THE VIDEOGRAPHER:  We're back on the

13  record at 2:34.

14  BY MR. JUBB:

15      Q.   Thank you, Doctor.  Before the break we

16  were going over some of your notes, and we had left

17  off in the middle of a meeting between you and

18  Mr. Poulos on 9/5, which was P21.9.  And then in

19  here, moving back up to the next interaction on 9/7

20  there was a call.  I assume C-X is cancel?

21      A.   Yeah.

22      Q.   It says, "cancel same day at 9:01 for

23  9/30 appointment, 150."  I assume that that was

24  because of the cancellation fee; correct?

25      A.   Yeah.  For a same-day cancel, yeah.

1      Q.   What does this mean right here?

2      A.   PDMP.   Prescription drug monitoring

3  program.  It was a requirement, I think it might

4  have started around that time, of checking a

5  website for the state of Wisconsin for controlled

6  substances.

7      Q.   And at this point in time on 9/7

8  when -- strike that.

9           It looks like the next appointment was

10  9/19/18.  Do you see that?

11     A.   Yes.

12     Q.   And I guess at some point this was set up

13  by Mr. Poulos with your office for him to come in.

14  And in here he's actually relaying to you that he

15  had to go to the hospital, and it says he was

16  throwing up blood.  Do you see that?

17     A.   Yes.

18          MS. DOUGHERTY:  Did you say 9/9 or 9/19?

19          MR. JUBB:  9/19, but --

20          MS. DOUGHERTY:  For the appointment --

21          MR. JUBB:  -- the note he put 9/9.

22  BY MR. JUBB:

23     Q.   And again, this is P21.8.  So just to

24  clarify:  Doctor, am I correct that your notes

25  reflect that you met with Mr. Poulos on

1   September 19, 2018, at which time he relayed to you

2   that he went to the hospital on September 9th?

3        A.    I think it might be 9/7, although, yeah.

4        Q.    It could be seven or nine.  But in any

5   event, that he was in the hospital either 9/7 or

6   9/9; is that fair?

7        A.    Fair, yes.

8        Q.    And at this point in time, am I correct

9   that as of your prior discussion with him, which

10  was 9/5, he had relayed to you that there was no

11  increase in alcohol; correct?

12       A.    Right.

13       Q.    And your understanding of his alcohol

14  intake was about half to maybe a bottle of wine,

15  what, every other day?

16            MR. POULOS:  Objection.

17            THE WITNESS:  I think that is what he

18  told me at our first visit.

19  BY MR. JUBB:

20       Q.    Okay.  Is that what you believe to be a

21  continuation as of 9/7/18 or 9/19/18, that his

22  alcohol intake had remained the same?

23       A.    Well, just looking at it, he had no

24  recent drinking and noticed -- or my note had said

25  that.

1      Q.   And where do you -- where is that?  Just

2    'cause it's so much difficult, sometimes, for us

3    lawyers to read the doctor's note.  Where is that?

4      A.   Sorry about that.  Just -- it says, "Dog,

5    bumblebee," and then "no recent drinking" with a

6    star after it on the --

7      Q.   Okay.

8      A.   -- 9/19 note.  Where the star is --

9      Q.   I see it.  "Dog, bumblebee, no recent

10   drinking."  Got it.  Okay.

11           Now, did you ask any additional

12   questions about that visit to the hospital?

13     A.   He basically kind of told me the problem

14   was resolved, and so we were focused on the stress

15   part of it and how it was stress related.  And

16   then, you know, I wanted to talk to him about how

17   it was going with the medication that we had just

18   done last time, and so we focused on that.  So --

19     Q.   And when you say -- when you reported

20   stress related, I believe you're referring to this

21   part of your note right here, if you look on the

22   screen.  You put that in quotes.  Does that

23   indicate that the patient said to you that it was

24   stress related?

25     A.   Yes.

1      Q.   Okay.  I'm going to show you what has

2   been marked previously as Garabedian file 1542

3   through 1544, which, for purposes of this exhibit

4   we're going to call that Grade 2.

5           And Dr. Grade, I imagine you didn't

6   have the benefit of reviewing Mr. Poulos's

7   discharge summary from that 9/7 admission; correct?

8      A.   No, I did not.

9      Q.   What -- for the discharge diagnosis, do

10  you know what ETOH withdrawal means?

11     A.   Alcohol withdrawal.

12     Q.   And what does ETOH hepatitis mean?

13     A.   Alcohol hepatitis.

14     Q.   And in terms of the hospital course, it

15  says that "reports heavy drinking twelve cans of

16  16-ounce beer a day for past two months, triggered

17  by girlfriend leaving him."

18           Did Mr. Poulos ever relay to you that

19  he was drinking twelve cans of 16-ounce beers a day

20  for the past two months?

21           MR. POULOS:  Objection.

22           MS. DOUGHERTY:  Objection.

23           THE WITNESS:  I don't recall us talking

24  about that.

25  BY MR. JUBB:

1      Q.   He reported to you that he was having,

2   like, half a bottle of wine or something every

3   other day, fair?

4           MS. DOUGHERTY:  Objection.

5           THE WITNESS:  That was from the first

6   meeting in May.

7   BY MR. JUBB:

8      Q.   I believe your note said there was no

9   increase in alcohol; correct?

10     A.   Right.

11     Q.   And that there was no recent alcohol

12  abuse; right?

13     A.   Right.

14          MS. DOUGHERTY:  Objection.

15  BY MR. JUBB:

16     Q.   And in here, for the discharge summary,

17  did he ever relay to you that -- I know your note

18  said that it was anxiety -- or excuse me -- stress

19  related.  Did he ever tell you it was because of

20  his alcohol withdrawal after his girlfriend left?

21          MS. DOUGHERTY:  Objection.

22          THE WITNESS:  No, we didn't talk about

23  that.

24  BY MR. JUBB:

25     Q.   But I imagine that was something you had

1    asked him about in terms of his alcohol use and why

2    he was in the hospital; correct?

3            MS. DOUGHERTY:  Objection.

4            MR. POULOS:  Objection.

5            THE WITNESS:  I can't recall, you know,

6    the exact discussion about alcohol at that time,

7    but I just have wrote there was no recent drinking.

8    BY MR. JUBB:

9        Q.   Would two months -- taking us back to

10   July of 2018 -- of drinking twelve 16-ounce cans of

11   beer a day, would you consider that an increase in

12   drinking?

13           MR. POULOS:  Objection.

14           THE WITNESS:  Yeah, I would consider that

15   an increase.

16   BY MR. JUBB:

17       Q.   And with respect to following the 19th,

18   it looks like Mr. Poulos had then asked you to

19   write a note to help him out in terms of his

20   sentencing; is that correct?

21       A.   Yeah, to write -- yeah, he asked for help

22   in kind of explaining why he has, you know,

23   react -- stress reactions to different kinds of

24   situations.

25       Q.   And you wrote this note, I imagine this

Charles Grade, MD

```
 1    was to explain to the charging authorities, you

 2    know, some mitigating factors to assist Kurt in

 3    this type of situation that he had found himself in

 4    with, you know, FBI storming the door; correct?

 5              MS. DOUGHERTY:  Objection.

 6              THE WITNESS:  You know, my goal was to

 7    support him by letting the court know that there is

 8    this treatment and that this phenomenon, you know,

 9    may or may not be relevant, but that that is what's

10    happened with him before.

11    BY MR. JUBB:

12         Q.   And when you wrote this note at his

13    request, am I correct that you were not under the

14    impression that the situation that occurred with

15    his girlfriend in the apartment involving the

16    authorities and breaking down the door, that that

17    was not related to drinking twelve 16-ounce beers;

18    correct?

19              MS. DOUGHERTY:  Objection.

20              MR. POULOS:  Objection.

21              THE WITNESS:  Could you say that again?

22    BY MR. JUBB:

23         Q.   Sure.  When you wrote this note to --

24    strike that.

25              Am I correct that when you wrote this
```

1    note at the request of Mr. Poulos to help him

2    with -- with the authorities, you had no idea that

3    this involvement with his girlfriend had anything

4    to do with alcohol; is that correct?

5          MS. DOUGHERTY:  Objection.

6          THE WITNESS:  I mean, I wasn't seeing it

7    as an alcohol-related incident from -- from the

8    history that I got, and more of a traumatic

9    incident that ended in him feeling agitated.

10   BY MR. JUBB:

11      Q.   Thank you.  And with respect to your next

12   appointment, it looks like after you had written

13   this note at Mr. Poulos's request, the next time

14   you see him is never.  It looks like on, if we

15   continue that note from 21.8 to 21.7 on October 19,

16   2018, he canceled the same day; correct?

17      A.   Yes, looks like same-day cancel.

18      Q.   And after you wrote the note at

19   Mr. Poulos's request to help him with the

20   authorities saying that this is related to his

21   PTSD, you had never seen him again for any sort of

22   appointment; correct?

23      A.   I don't believe we have met after that,

24   no.

25          MR. JUBB:  Doctor, I truly appreciate

```
 1   your time, especially under these circumstances, in

 2   accommodating us.  I don't have any further

 3   questions for you, but Ms. Dougherty may have, and

 4   I may have some follow-up in addition to those,

 5   okay?

 6              THE WITNESS:  Okay.

 7              MR. POULOS:  Ms. Dougherty, do you go

 8   first or can I ask first?

 9              MS. DOUGHERTY:  It's up to you.  You can

10   ask first if you want to go first.

11              MR. POULOS:  I just have a short amount

12   of questions.

13                  E X A M I N A T I O N

14   BY MR. POULOS:

15       Q.   Dr. Grade, good to see you.  I hope

16   you're doing well.

17       A.   Hi, Kurt.

18       Q.   Do you recall who was paying for my

19   treatments?

20       A.   I don't recall.  Was it your mom or --

21       Q.   Correct, yes.  Okay.  In your

22   professional experience, is it common for male

23   victims to suppress their abuse for years, if not

24   decades?

25              MR. JUBB:  I'm sorry, I couldn't hear the
```

```
 1   question.  I think you broke out.  Could you stay

 2   close to the microphone?

 3           MR. POULOS:  Yes.  I said in his

 4   professional opinion, is it common for male victims

 5   to suppress their abuse for years, if not decades?

 6           MR. JUBB:  I'll object to the form.  Feel

 7   free to answer.

 8           THE WITNESS:  Yeah, that's -- that does

 9   happen frequently.

10   BY MR. POULOS:

11       Q.   Okay.  Next question.  In your

12   professional opinion, is it common for male victims

13   to refuse to talk about the abuses?

14       A.   Yes.

15           MR. JUBB:  Same objection.

16   BY MR. POULOS:

17       Q.   Again, in your professional opinion, is

18   it common for male victims to feel shame and/or

19   embarrassment as a result of the abuse?

20       A.   Yes.

21           MR. JUBB:  Same objection.

22   BY MR. POULOS:

23       Q.   Again, in your professional opinion,

24   typically do male victims often have trouble

25   adjusting to adulthood, life in general, and
```

```
 1   establishing -- how can I put this -- good

 2   relationships or happy relationships?

 3             MR. JUBB:  Same objection as to the form

 4   of the question for a nonexpert -- nontestifying

 5   expert.

 6             MR. POULOS:  Then I have a question.

 7   Wasn't he called here as an expert witness?

 8             MS. DOUGHERTY:  Okay, Mr. Poulos, you can

 9   just ignore Mr. Jubbs' commentary and continue with

10   your questions.  He's just stating the basis for

11   objection.

12             MR. POULOS:  I just wanted it on the

13   record if he was here being called as an expert

14   witness or not.

15             MS. DOUGHERTY:  He testified as your

16   treating physician.

17             MR. POULOS:  Okay.

18   BY MR. POULOS:

19        Q.   In your professional opinion, is it often

20   common for abuse victims to cope -- use as a coping

21   mechanism alcohol and/or drugs?

22        A.   Yes, very.

23             MR. JUBB:  Same objection.

24   BY MR. POULOS:

25        Q.   And we already talked about that you did
```

```
 1    allow me to have my service animal, so I won't ask
 2    that question.
 3              MR. JUBB:  I'll move to strike that.
 4              MR. POULOS:  That's it.
 5                E X A M I N A T I O N
 6    BY MS. DOUGHERTY:
 7         Q.   Dr. Grade, you just testified regarding
 8    your professional opinions in treating adult male
 9    victims of sexual abuse.
10              Can you briefly describe your
11    professional experience and training that forms the
12    basis for your professional opinions regarding
13    adult male victims of sexual abuse?
14         A.   Well, just -- just that I've been working
15    since 1994 as a psychiatrist, so I've done a lot of
16    PTSD work with male and female patients, but most
17    of the experience with men has been through the VA
18    system.
19              But lots of my male patients have
20    trauma that I see from my addiction work as well,
21    so -- also work at the Winnebago State Hospital and
22    also Mendota State Hospital.  There's a lot of
23    trauma victims as well.
24         Q.   Okay.  I'm sharing with you what
25    the -- what Mr. Jubb previously marked as Grade 1,
```

1    which are your -- you know, before we get to

2    this --

3            MS. DOUGHERTY:  Mr. Jubb, did you receive

4    the fax from Dr. Grade?  I think there was an

5    additional page he was sending.

6            MR. JUBB:  I'm just getting it now.

7    Yeah, looks like there are three pages.  So I do

8    think that we should hit this again.  I'll ask a

9    follow-up, though, on this record.

10           MS. DOUGHERTY:  Okay.  Would you agree to

11   mark -- are you going to mark those as a separate

12   exhibit?  Just 'cause I don't want to make a

13   representation about Grade 1 if you're going to add

14   to it.  Just mark those as Grade 3, maybe.

15           MR. JUBB:  Why don't we just -- I'll add

16   this to Grade 1, and it'll be P21 point -- there's

17   three pages of it, Ms. Dougherty.  So right now my

18   records end at P21.22.  This three pages would be

19   P21.23 through .25.  And that way we don't have to

20   add a separate exhibit.  I'll just -- when I send

21   the exhibits out to the reporter, we can have just

22   one cumulative one.

23           MS. DOUGHERTY:  Okay.  Would you mind

24   e-mailing me those three pages, and then I'll look

25   at them when you're asking your questions about

1    them, and then ask whatever questions I have,

2    'cause I don't have them at the moment.

3         MR. JUBB:  Yeah, I haven't looked at them

4    yet.  I'll send these over to you right now.

5         MS. DOUGHERTY:  Great.  Thank you.

6    BY MS. DOUGHERTY:

7    Q.   So I'm showing on the screen what was

8    previously marked as Grade 1.  I'm on the first

9    page, which is P21.1.  It says May 30, 2018,

10   psychiatric evaluation at the top.

11        So Dr. Grade, can you explain to me

12   how the note that is -- let's just start with the

13   first page as an example.  How are the notes on the

14   first page here, P21.1 of the psychiatric

15   evaluation, May 30th of 2018, how is that

16   generated?

17   A.   Well, I believe that this one I did on a

18   Dragon Dictate device at my other office in Port

19   Washington, I believe.  So it's like a

20   voice-activated document -- a voice-activated

21   transaction description.

22   Q.   Do you have a specific recollection of

23   using Dragon, Dragon Dictate, it's called, or a

24   Dragon program to generate this psychiatric

25   evaluation that starts at P21.1 May 30, 2018?

1          A.    I mean, I don't have a specific.  We had

2    someone do some of our transcriptions as well.  So

3    I'm not totally sure.

4          Q.    What's the basis for your belief that you

5    used Dragon to dictate -- to generate the notes for

6    May 30, 2018 and psychiatric evaluation?

7          A.    Most of the evals at that -- at that time

8    I did on Dragon Dictate, so that's why I'm assuming

9    that that one was.  But like I said, I don't know a

10   hundred percent for sure, but --

11         Q.    Okay.  So the potential options are that

12   you used Dragon Dictate or someone else transcribed

13   the notes for the May 30, 2018 past sexual trauma;

14   is that right?

15         A.    That's right.

16               MR. JUBB:  I'll object to the form.

17   BY MS. DOUGHERTY:

18         Q.    Is there any way you would be able to

19   tell whether the notes for the May 30, 2018

20   psychiatric evaluation, which are at P21.1 through

21   P21.25, were generated through Dragon Dictate or

22   transcribed by someone else?

23         A.    The reason I think so is 'cause we --

24   originally the evaluation was front and back,

25   printed, and then when we sent it over we copied it

1   so it was on separate pages.  And that tends

2   to happen at this other office I worked at,

3   it's -- the default is front and back.  So unless

4   you change it -- so that's what leads me to believe

5   it was there.

6       Q.   And so when you use the Dragon Dictate,

7   did you read from handwritten notes or something

8   you kept during your discussion with Mr. Poulos?

9       A.   Usually what I do is I write some notes

10  on -- on a piece of paper and then we -- then I

11  shred those after I do the evaluation.

12      Q.   Okay.  So you don't have any of

13  your -- let me start again.  So did you take

14  handwritten notes during your May 30, 2018

15  evaluation of Mr. Poulos?

16      A.   Yeah.  I mean, I think I -- yep, I take

17  it for everyone.  So what I would write it on I'm

18  not sure, but -- but those generally don't go in

19  the chart.  They get shredded.

20      Q.   Okay.  How detailed are your handwritten

21  notes?

22      A.   Not detailed at all.  They just have like

23  a -- I'll have, like, a medication dosage or a date

24  of a hospitalization or, you know, that kind of

25  thing.  Something that I might not remember on my

1    own.  So dates and that type of thing.

2        Q.   How soon after your evaluation of

3    Mr. Poulos on May 30, 2018 did you use Dragon

4    Dictate to generate the notes reflected at P21.1 to

5    P21.5 of Grade 1?

6        A.   I don't know.  Couldn't tell you.

7        Q.   Are you able to estimate without

8    completely guessing?

9        A.   I mean, I usually do these pretty quickly

10   after I see someone, so I would think it would be

11   within a few days, but I'm not -- I don't know.

12   Not sure.

13       Q.   Okay.  So is it a fair characterization

14   that your practice in May 2018 was to use Dragon

15   Dictate to generate notes after an evaluation of a

16   patient within a few days of the evaluation?

17       A.   Yeah, that was common.

18       Q.   Was there, like, a particular day of the

19   week you did your dictations, or how did that work

20   in May of 2018?

21       A.   No.  I mean, it could be any day that I'm

22   there, so -- yeah, I don't know a specific day

23   or --

24       Q.   I think you said it was your practice to

25   shred your original notes.  So is it correct you

1   don't have the original handwritten notes you kept

2   during the May 30, 2018 evaluation of Mr. Poulos?

3        A.   Yeah.   I mean, I don't have anything --

4   those kind of things.   I don't keep those.   Once in

5   a while one of them is around, but those are

6   shredded after I do the dictation.

7        Q.   Now, during the questioning by other

8   counsel, we looked at -- and I'm going to ask you

9   some more questions about them -- but just

10  generally we looked at some handwritten notes that

11  you kept from other appointments.   Did you dictate

12  more lengthy notes like the May 30, 2018 note that

13  we're looking at here for your other appointments

14  with Mr. Poulos?

15       A.   No, I always -- I always hand write my

16  follow-up notes and just have my initial eval more

17  presentable.   But I just do my follow-ups by hand.

18       Q.   Okay.   So the May 30, 2018 psychiatric

19  evaluation notes we're looking at, P21.1 to P21.5,

20  that's what you call your initial eval?

21       A.   Yeah.

22       Q.   And so it's your practice to type up more

23  lengthy notes regarding your initial eval, but then

24  just maintain shorter handwritten notes for

25  follow-up appointments with patients; is that

1    correct?

2        A.   Yeah, that's right.

3        Q.   And that was your practice in May --

4    well, that was your practice in 2018?

5        A.   Yes.

6        Q.   So the material that we're looking at

7    here -- or let me start again.  The content of the

8    notes reflected in P21.1 to P21.5, those are your

9    impressions days after May 30, 2018 based on some

10   quick shorthand notes that you jotted down at the

11   time that you were evaluating Mr. Poulos; is that

12   correct?

13            MR. JUBB:  Object to the form.

14            THE WITNESS:  You know, a lot of it is

15   just my memory, but some of it is notes.

16   BY MS. DOUGHERTY:

17       Q.   Well, you didn't write down in your

18   handwritten notes all the content reflected on

19   P21.1 to P21.5 of Grade 1; correct?

20       A.   No.

21       Q.   So you wrote notes down to prompt your

22   memory so -- because you intended to later dictate

23   longer information regarding your evaluation of

24   Mr. Poulos; is that fair?

25       A.   Yeah.

1      Q.   Is it possible that some of the

2   information you dictated you misremembered?

3           MR. JUBB:  I'll object to the form.

4           THE WITNESS:  Yeah.  I mean, it's

5   possible, yeah.

6   BY MS. DOUGHERTY:

7      Q.   And just looking -- like for example, the

8   first sentence here under History of Present

9   Illness it says, "The patient is a 39-year-old

10  single white female."  That's an error; right?

11     A.   Right.

12     Q.   The middle of the paragraph here, it says

13  "He says 'I'm on edge all the time'."  And

14  then -- end quote.  And then the sentence

15  continues, "and says that he's having a hard time

16  relaxing and sleeping."

17          Now, there's two statements attributed

18  to Mr. Poulos.  I assume he's the "he"; correct?

19     A.   Yes.

20     Q.   And one is in quotes and another is not.

21  Is "I'm on edge all the time" something you wrote

22  down in your handwritten notes as a direct quote

23  from Mr. Poulos?

24     A.   I don't know.  It either could be I

25  remembered it or I wrote it down.

```
 1        Q.    Okay.  So when something's in quotes
 2   after "he says," does that mean that's a direct
 3   quote from Mr. Poulos as compared to the balance of
 4   that sentence, just as an example --
 5        A.    Yes.
 6        Q.    -- impression or your recollection of
 7   what was said?
 8        A.    Yes.
 9        Q.    So he's having flashbacks about two times
10   per month.  That's not a direct quote from
11   Mr. Poulos; is that correct?
12        A.    I don't see that right now, but I don't
13   think so.
14        Q.    Oh, here.  I'm just sticking with the
15   same sentence.  I'm just using it as an example.
16   "He says, 'I'm on edge all the time.'"  So "I'm on
17   edge all the time," that's a direct quote that you
18   either wrote down or you remembered Mr. Poulos
19   saying during the May 30, 2018 evaluation; is that
20   correct?
21        A.    That -- yes.
22        Q.    And then the second part of the sentence
23   it says, "And says that he's having a hard time
24   relaxing and sleeping."  That's not in quotes;
25   right?
```

```
 1        A.    That's not in quotes.

 2        Q.    Okay.  And so "He's having flashbacks

 3   about two times per month," that's not a quote from

 4   Mr. Poulos, that's something you wrote based on

 5   your impressions of something Mr. Poulos said; is

 6   that correct?

 7        A.    Yes, uh-huh.

 8        Q.    You were asked a number of questions

 9   about the content of notes from the May 30, 2018

10   psychiatric evaluation.  Do you have an independent

11   recollection, sitting here today, of the May 30,

12   2018 psychiatric evaluation that you performed of

13   Mr. Poulos?

14        A.    No.  I mean, I remember meeting him, but

15   I don't have a memory of any of my patients when I

16   meet them in detail.  I certainly remember the

17   visit.

18        Q.    When was the last time before -- during

19   your testimony today that you looked at the notes

20   reflected in P21.1 to P21.5 of Grade 1?  That's

21   these typed-up notes from the May 30, 2018

22   psychiatric evaluation of Mr. Poulos.

23        A.    When is the last time I looked at them?

24        Q.    Yeah, before today during your testimony.

25        A.    I think when the subpoena came
```

1    previously.  I just wanted to remind myself about

2    what it was and stuff like that.

3         Q.   Okay.  So when you received the subpoena,

4    you then read the notes reflected in P21.1 to

5    P21.5?

6         A.   I don't think I read them all, but I

7    looked at them.  You know, I just got an idea for

8    when it was and -- you know, a general idea.  How

9    long ago it was and things like that.

10        Q.   At the time when you received the

11   subpoena for the documents before you looked at the

12   materials, did you have any recollection of

13   Mr. Poulos?

14        A.   Yes.

15        Q.   What did you remember about Mr. Poulos at

16   the time you received the subpoena before you

17   looked through your records?

18        A.   I remembered that we didn't continue

19   treatment.  So my -- usually I kind of wonder, you

20   know, if something happened where that could have

21   gone better, but -- so I was just looking at the

22   timing and when it was and reminding myself of

23   that, but --

24        Q.   Right.  I'm just asking at the time you

25   received the subpoena, before you looked in your

1    file to refresh your recollection, did you

2    recognize Mr. Poulos as a former patient at the

3    time you received the subpoena, before you looked

4    at your records?

5         A.   Yeah, I do remember.  I have a couple

6    other patients by the same name, so I had to --

7    they're not related, but I had to remind myself of

8    which one --

9         Q.   So -- I'm sorry, I didn't mean to speak

10   over you.

11        A.   No, I -- you know, I remember the case.

12   I remember I enjoyed meeting with Kurt.  And he has

13   an interesting family.  And, you know, I remember

14   the -- you know, basics of it.  I remember

15   Dr. Blackwell referring him.

16        Q.   You remember Dr. Blackwell referring him.

17   And you said the basics.  What other basics did you

18   remember, again, before you looked through your

19   records when you received the subpoena?

20        A.   Just that he had anxiety issues and, you

21   know, we were looking at trying to do some kind of

22   treatment, you know, and that it didn't -- we ended

23   up not -- ended up regretting that we didn't have a

24   good enough connection or, you know, wondering, you

25   know, what could have been different, so -- but

1    nothing else really stands out too much.

2        Q.   Okay.  Is it correct that all the other

3    detail of your treatment of Mr. Poulos, your

4    discussions you had with Mr. Poulos, your treatment

5    plan, your diagnosis, that was all material you did

6    not remember at the time you received the subpoena,

7    that you refreshed your recollection by looking

8    through your file?

9        A.   I don't -- that seems complicated for me

10   to answer.  Can you say that again?

11       Q.   Sure.  I'm just trying to learn what

12   information you have an independent recollection as

13   compared to what you learned again recently from

14   reading over your file.  Are you able to make that

15   distinction for me?

16       A.   I don't think so for legal reasons.  I

17   don't think I have a sharp enough, you know,

18   memory, you know, to give an answer for a

19   deposition.

20       Q.   Okay.  I'm just going to give you a

21   couple examples.  On the second page of Grade 1 --

22   oops, I think I may have scrolled the wrong

23   way -- it says, "He also reports an accident that

24   occurred just prior to Christmas in which there was

25   interaction with the police officer that escalated

```
 1   and he wound up in jail.  This was thrown out of

 2   court after the facts were collected."

 3            I think you were asked some questions

 4   about that content by Mr. Jubb.  Do you have an

 5   independent recollection of discussing with

 6   Mr. Poulos on May 30, 2018 the content that I just

 7   read to you?

 8       A.   No.

 9       Q.   Is your answer the same for the next

10   paragraph that says, "Patient reports that he told

11   his mother about the sexual abuse in 2013," and

12   continues through the last sentence that says, "He

13   denies the use of any drugs of abuse at the present

14   time."

15       A.   No, I have no independent recollection of

16   that.

17       Q.   Is that the same as it relates to the

18   sentence that is now at the top of your screen,

19   "Patient did see Dr. Gudeman in 2000 and was

20   prescribed an unknown antidepressant that he took

21   for three weeks.  He reports that he had sexual

22   dysfunction and discontinued it."

23            You don't have an independent

24   recollection of that discussion with Mr. Poulos; is

25   that right?
```

1      A.   No.

2      Q.   I think you were asked about the last

3   several sentences on that page starting that "He

4   did see a psychiatrist," and ending with the

5   sentence, "He says his mother is" -- I'm sorry.

6   Let me start again.

7           You were asked questions about the

8   sentence starting, "He did see a psychiatrist,"

9   through the sentence, "There is a family history

10   with significant AODA problems."

11           Is your answer the same as it relates

12   to those four sentences, that you do not have an

13   independent recollection of discussing that content

14   with Mr. Poulos?

15      A.   Right.  I mean, this is bread-and-butter

16   stuff for a psychiatrist, so I go by my notes.  So

17   I don't have independent recollections of those

18   things for anyone.

19      Q.   And this is, just so we're clear the

20   content, just using those four sentences as an

21   example --

22      A.   Yeah.

23      Q.   -- from "He did see a psychiatrist," down

24   to "His father has had a gambling problem,"

25   that's -- those four sentences there, this is you

1   dictating your recollection or impressions of what

2   Mr. Poulos told you; is that correct?

3        A.   Yes.

4        Q.   Under Medical History, "The patient has a

5   liver failure that he says has apparently resolved.

6   He also says kidney function was poor at that time

7   but has returned to normal.  He denies any other

8   medical illnesses."

9             Do you have an independent

10  recollection of discussing Mr. Poulos's medical

11  history with him?

12       A.   No, I don't have a specific memory.

13       Q.   Did you ask Mr. Poulos questions

14  regarding his medical history?

15       A.   Yes.

16       Q.   What questions did you ask Mr. Poulos

17  regarding his medical history?

18       A.   I asked him --

19       Q.   Hold on a second.  I only want you to

20  tell me what you remember.  If you don't remember

21  what questions you asked Mr. Poulos about his

22  medical history, then please tell me that.  I'm

23  just reacting to your reaction to my question,

24  which was nonverbal.

25       A.   I remember that I ask everyone the same

1    thing for their medical history, so --

2        Q.   Okay.  What questions?

3        A.   I ask if they have any medical illnesses,

4    what their medications are, who their doctor is,

5    allergies.  That's -- that's what I do.

6        Q.   Any other questions that you asked

7    Mr. Poulos regarding his medical history?

8        A.   No.

9        Q.   Did you ask Mr. Poulos about any

10   hospitalizations or anything of that nature?

11       A.   Yes.

12            MR. JUBB:  Object to the --

13   BY MS. DOUGHERTY:

14       Q.   You did ask Mr. Poulos about any

15   hospitalizations during the May 30, 2018 initial

16   eval?

17       A.   Well, I'd have to look through the note

18   here and see if I said anything about

19   hospitalizations.  And if I did, then I asked him.

20   If I didn't, then I didn't, so --

21       Q.   Okay.  So if there's no reflection in

22   your notes reflected in P21.1 to P21.5 relating to

23   hospitalization, then your expectation is that you

24   didn't ask Mr. Poulos that information; is that

25   right?

1        A.    Yeah, probably not.

2        Q.    So you would have noted one way or the

3    other whether Mr. Poulos said he had been

4    hospitalized or hadn't been hospitalized if you

5    asked Mr. Poulos about his hospitalizations; is

6    that right?

7        A.    Yes.

8        Q.    You were asked some questions about the

9    paragraph -- I guess the second half of the

10   paragraph under Psychosocial History.  It starts

11   with, "The patient went away to boarding school,"

12   and ending with a paragraph "did not" -- or

13   sentence "Did not try to engage in sexual

14   activities."

15           Do you have any independent

16   recollection of discussing the content reflected in

17   the second half of the paragraph under Psychosocial

18   History?

19       A.    No.

20       Q.    Did Mr. Poulos ever tell you the name of

21   the teacher who abused him?

22       A.    I don't think so.

23       Q.    You said you thought your first meeting

24   with Mr. Poulos, which you've referred to as your

25   initial eval, was about an hour.  What's the basis

1    for your belief that it was about an hour?

2        A.   'Cause that's my general course of

3    practice.

4        Q.   You said that it was your impression that

5    the sexual abuse occurred in the dorm room.  What

6    is the basis for your impression that the sexual

7    abuse occurred in the dorm room?

8        A.   I don't specifically remember, but that

9    was my -- the imagery.  I just recall thinking it

10   was a dorm room or a residence hall, but I don't

11   remember whether he specifically said that or not.

12       Q.   Do you have any recollection of

13   discussing with Mr. Poulos where he was sexually

14   abused other than it was at school by a teacher?

15       A.   No.

16       Q.   Did you just assume because The Hill

17   School is a boarding school that the sexual abuse

18   Mr. Poulos sustained while at The Hill School by a

19   teacher occurred in his dorm room?

20       A.   No.

21            MR. JUBB:  I'll object.

22   BY MS. DOUGHERTY:

23       Q.   I think you said that the imagery you

24   called to mind was that the sexual abuse occurred

25   in the dorm room.  Can you tell me where that

1    imagery came from?  Was that something Mr. Poulos

2    said or --

3         A.   I don't know.  I don't know.

4         Q.   So I've pulled up P21.4.  The component

5    of your initial eval notes under Diagnosis is what

6    I've tried to put up in the center of your screen.

7    So under Diagnosis it says "Post-traumatic stress

8    disorder chronic with acute exacerbation."

9              Is it correct that you've diagnosed

10   that Mr. Poulos was suffering from post-traumatic

11   stress disorder chronic with acute exacerbation?

12        A.   Yes.

13        Q.   And you also diagnosed that Mr. Poulos

14   was suffering from alcohol use disorder?

15        A.   Yes.

16        Q.   What's alcohol use disorder?

17        A.   It's a pattern of use of alcohol that's

18   not -- unhealthy.

19        Q.   "A pattern of use of alcohol" and then I

20   didn't hear the last part.  I'm sorry.

21        A.   That's unhealthy.

22        Q.   Unhealthy.  Thank you.  And then you also

23   diagnosed Mr. Poulos was suffering from major

24   depressive disorder, single episode; is that right?

25        A.   Yes.

Charles Grace, MD

1      Q.   What did you -- what does a single
2   episode mean?
3      A.   It would mean that it's -- there aren't
4   previous episodes.
5      Q.   And then you wrote, "Rule out generalized
6   anxiety disorder."  So you had -- what does that
7   mean?
8      A.   The anxiety might represent generalized
9   anxiety disorder.
10     Q.   Okay.  So it was like a note that you
11  needed to rule out generalized anxiety disorder,
12  not that you already had ruled out generalized
13  anxiety disorder?
14     A.   Yeah, like keep in mind it might be
15  generalized anxiety disorder.
16     Q.   Did your PTSD diag -- let me start again.
17  Did your diagnosis of Mr. Poulos of post-traumatic
18  stress disorder, chronic with acute exacerbation,
19  ever change during the time that you were treating
20  Mr. Poulos?
21     A.   Did the diagnosis change?
22     Q.   Correct.
23     A.   No.
24     Q.   You were asked some questions about
25  information you learned about Mr. Poulos's

 1    interactions with the police.  Did the information

 2    you learned about Mr. Poulos's interactions with

 3    the police impact your di -- your PTSD diagnosis?

 4         A.   Did the --

 5         Q.   Yeah, did knowing that Mr. Poulos went to

 6    jail or had interactions with the police change

 7    your diagnosis that Mr. Poulos was suffering from

 8    post-traumatic stress disorder, chronic with acute

 9    exacerbation?

10         A.   No.

11         Q.   Did the amount of Mr. Poulos's alcohol

12    intake affect your diagnosis of post-traumatic

13    stress disorder, chronic with acute exacerbation?

14         A.   No.

15         Q.   So if Mr. Poulos drank half a bottle of

16    wine or twelve cans of 16 ounces of beer a day,

17    your diagnosis that Mr. Poulos was suffering from

18    post-traumatic stress disorder, chronic with acute

19    exacerbation, wouldn't change; is that correct?

20              MR. JUBB:  I'll object.

21              THE WITNESS:  No.  I didn't have any

22    information like that, and that wouldn't change the

23    PTSD.

24    BY MS. DOUGHERTY:

25         Q.   Am I correct that the amount of

Charles Grade, MD

```
 1    Mr. Poulos's alcohol consumption was relevant for

 2    the medications you may prescribe to Mr. Poulos?

 3    Is that why you asked about alcohol consumption?

 4         A.   Yeah, it's a common problem for our whole

 5    society.  So I ask people about alcohol and, yeah,

 6    and about medication as well.

 7         Q.   So --

 8         A.   But it wouldn't -- PTSD is almost always

 9    with addiction.

10         Q.   So alcohol abuse is something that you

11    would consider common with a PTSD diagnosis?

12         A.   I would say it's not uncommon.  I think

13    opioids are a much bigger thing with PTSD,

14    percentage-wise, but different people might use

15    different substances.

16         Q.   I am now on P21.9 of Grade 1.  Just want

17    to direct your attention back to the 8/27/18

18    entries.

19         A.   Uh-huh.

20         Q.   Can you -- what caused you to leave a

21    message for an appointment on September 5th?

22         A.   I'm not sure if he called and asked for

23    an appointment, or -- but probably that would be

24    the most common thing.

25         Q.   Just -- you were asked some questions
```

1    about the letter that you wrote dated September 20,

2    2018.  It's at P21.10 to P21.11.  Just so we're

3    clear, this is a letter that you wrote on your

4    letterhead; is that correct?

5         A.    Yeah.

6         Q.    And you signed it?

7         A.    Yep.

8         Q.    What was your understanding of what this

9    letter dated September 20, 2018 at P21.10 to P21.11

10   of Grade 1, what was your understanding of what the

11   letter was going to be used for?

12        A.    That there was some kind of a legal

13   charge of some type, and my purpose was to say that

14   he was in treatment for PTSD and that that might be

15   relevant to, you know, the case.

16        Q.    You were asked some -- I think you

17   indicated that your impression of the incident was

18   that -- or the incident with the police was a

19   traumatic incident, not an alcohol-related

20   incident; is that right?

21        A.    Yes.

22        Q.    Would knowing -- well, let's do it this

23   way.  To the extent alcohol was involved in the

24   incident with the police that precipitated you

25   writing the letter -- that's the September 20, 2018

1    letter at P21.10 to P21.11 -- to the extent alcohol

2    was involved in the incident, would that have

3    changed your willingness to write the letter or any

4    of the information you included regarding your

5    treatment and, I guess, Mr. Poulos's "startle

6    reaction"?

7         A.   Yeah, I mean, certainly if I had

8    different information, then my letter would be

9    different.

10        Q.   What impact would knowing if alcohol was

11   involved in the police incident have on the content

12   of your letter at P21.10 to 11?

13        A.   I don't know.  I'd have to get whatever

14   information it is.  I'd have to coordinate it with

15   what happened, so I don't know.

16        Q.   Well, in the second paragraph you wrote,

17   "This manifested itself in a 'startle reaction,' as

18   well as an attempt to avoid trauma or escape."

19             What are you referring to about a

20   "startle reaction"?

21        A.   That people with PTSD, a startle reaction

22   is very common, reaction to other trauma or other

23   things that remind them of the trauma.

24        Q.   Why did you think that information was

25   important to include in the September 20, 2018

1    letter at P21.10 to 11 of Grade 1?

2        A.   Because it's a component of PTSD and also

3    a component of the incident as Kurt told me.

4        Q.   Okay.  And that startle reaction issue

5    experienced by Mr. Poulos, that existed whether

6    Mr. Poulos was sober or drunk; is that right?

7            MR. JUBB:  I'll object.

8            THE WITNESS:  It could --

9            (Interruption by the reporter.)

10           THE WITNESS:  Well, for sure people get a

11   startle reaction whether they're using or not,

12   but -- yeah, so startle reaction's a classic part

13   of PTSD.  And so it's a very high percentage of

14   people that use substances that will have startle

15   reactions while they're using substances.

16   BY MS. DOUGHERTY:

17       Q.   Now that -- I don't have them to

18   show -- I'm just going to put this down for a

19   moment so we can see each other.  I don't have

20   Grade 2 to show it to you, but you probably recall

21   that you were shown some medical forms from another

22   doctor relating to treatment close in time to, I

23   think when you were treating Mr. Poulos.  Do you

24   remember that in Grade 2?

25       A.   The document from the hospitalization?

Charles Grade, MD

```
1        Q.    Correct.

2        A.    Yeah.

3        Q.    That's not information that was new to

4    you when you were treating Mr. Poulos; is that

5    right?

6        A.    Not that I recall.

7        Q.    Now that you know the information

8    reflected in the hospitalization record of alcohol

9    withdrawal, alcohol hepatitis, and the contention

10   that Mr. Poulos was drinking twelve cans of

11   16 ounces of beer a day, does that change your PTSD

12   diagnosis of Mr. Poulos?

13       A.    No.   It would just -- we'd need a

14   different kind of treatment.  We'd need a different

15   type of treatment if there's a co-occurring

16   addiction and PTSD.

17       Q.    I'm sorry, I just want to go back to

18   Grade 1 again.  Here we go.  I'm just trying to

19   direct your attention to P21.9 of Grade 1, which

20   are your notes from September 5, 2018.  And these

21   are handwritten notes in your handwriting; correct?

22       A.    Yes.

23       Q.    Did you take these notes real time when

24   you were meeting with Mr. Poulos on September 5,

25   2018?
```

Charles Grade, MD

```
 1        A.   Some of them I write while I'm with the
 2   person, and some of them I write after the person
 3   leaves.
 4        Q.   As it relates to the notes that you write
 5   after someone leaves, is that like immediately
 6   after the person leaves or --
 7        A.   Yeah.
 8        Q.   -- days or --
 9        A.   Yeah, usually it's right away.
10        Q.   In looking at your notes, is there any
11   way for you to discern which notes you wrote when
12   you were meeting with Mr. Poulos as compared to
13   notes you wrote down after he left?  And I can
14   scroll to more of them if you need to see them.
15        A.   Not really.  I mean, I think on that one,
16   just there was more -- more and more history that
17   kind of came out, and so that's why it's kind of
18   all over the place.  But usually the stuff that's
19   after is going to be the plan below the kind of
20   slash that goes across.  Like this prepare letter,
21   fluoxetine, for typing, follow up in two days, that
22   would be usually the kind of stuff.  Consider EMDI.
23   So that would be mainly afterwards.
24        Q.   Okay.  So you're talking about the sort
25   of the diagonal line with three slashes on the
```

1    bottom right of P21.9; is that right?

2         A.    Uh-huh.

3         Q.    That's sort of your plan for treatment

4    after the appointment with Mr. Poulos on

5    September 5, 2018; is that right?

6         A.    Yep.

7         Q.    And like the -- well, let me start again.

8               As it relates to the handwritten

9    notes, is it fair to say that the material that's

10   in quotes are direct quotes from Mr. Poulos, and

11   material that is not in quotes are your impressions

12   or your characterizations of something Mr. Poulos

13   said?

14        A.    Yeah.  Yes.

15        Q.    So nothing in quotes is anything that you

16   said to Mr. Poulos; right?  It's your intention to

17   quote something that Mr. Poulos said to you?

18        A.    Yeah, that's my intent.

19              MS. DOUGHERTY:  Those are my questions,

20   except I'm going to take a look at the other three

21   pages you sent while Mr. Jubb is asking any

22   follow-up questions.

23              MR. POULOS:  Can I interject and do a

24   couple of follow-ups in the meantime?  I just have

25   two questions.

Charles Grade, MD

1            MR. JUBB:  No.  But could you stop

2    smoking, please?

3            MR. POULOS:  Sure.

4            MR. JUBB:  You can ask your questions

5    after me.

6            MR. POULOS:  I just have two.  You

7    probably have 20.

8            MR. JUBB:  I don't, but we have to go in

9    order.  And I believe that both me and

10   Ms. Dougherty would request that you not smoke.  If

11   we need to break for you to do that, like she said

12   over and over, we can do that.  You can't smoke in

13   these, okay?

14           MS. DOUGHERTY:  I'm not saying that,

15   'cause he's not here as a witness.  But if you want

16   to say that, that's fine.  And if somebody needs to

17   take a break because you'd prefer that we have a

18   break for Mr. Poulos to smoke, then that's fine

19   too.  The issue with the smoking before was that he

20   was a witness, and you can't smoke as a witness in

21   court.  He's not a witness now, so I'm not saying

22   that.

23           MR. JUBB:  So you don't have an issue

24   with him smoking during the deposition?

25           MS. DOUGHERTY:  No, not when he's in his

1    house participating as a party, not as a witness.

2    I don't have that --

3              MR. JUBB:  Well, I have an issue --

4              MS. DOUGHERTY:  -- but you can object if

5    you want to, just don't join me in it is my point.

6              MR. JUBB:  Okay.  So I, unlike

7    Ms. Dougherty, do take issue with you smoking in a

8    deposition because it's a professional proceeding

9    and you're representing yourself as counsel and

10   it's distracting when there's smoke flying across

11   the screen.

12              So you can ask your questions after

13   I'm done, but if you need to break to smoke, we can

14   do that first.  I don't anticipate it being too

15   long.  So you let me know, Mr. Poulos.

16              MR. POULOS:  No, go ahead, Lane.

17              MR. JUBB:  Thank you.

18                 E X A M I N A T I O N

19   BY MR. JUBB:

20      Q.   All right.  So Dr. Grade, I'm going to

21   pull up those three pages which I've remarked as

22   P21.23 through P21.25.  And I just wanted to follow

23   up on this.  Is this your handwriting on P21.23

24   that we're looking at here?

25      A.   I just wrote that this morning when I was

Charles Grade, MD

1    going over the charts just to get the timeframe

2    down.  So that's not part of the record.

3        Q.   Okay.  I see.  And then this one does

4    appear to be --

5        A.   Yeah, that's the one, yep.

6        Q.   Okay.  And this is the form that

7    Mr. Poulos would have filled out when he comes into

8    your office; is that right?

9        A.   Yes.

10       Q.   And then this is something that would be

11   filled out by the patient too; correct?

12       A.   Yes.

13       Q.   And those are the only questions I had

14   with respect to those documents.  I do have a quick

15   couple of other questions.

16            Am I correct that your notes from your

17   discussion with Mr. Poulos on May 30th, you wrote

18   those with the intention to be as accurate as

19   possible?

20       A.   The -- the original evaluation?  Yeah.

21       Q.   Yes, sir.

22       A.   Yes.

23       Q.   And to the extent that there's something

24   that you just couldn't quite recall exactly, would

25   you be guessing in any way?

1              MS. DOUGHERTY:  Objection.

2    BY MR. JUBB:

3       Q.   You want me to --

4       A.   Yeah, I -- yeah -- yes.  Sorry, I don't

5    have a --

6       Q.   So I'm going to pull it up here.  So for

7    example, when you say like here "his anxiety level

8    went up significantly as well as memories of being

9    sexually abused in boarding school at age 14 or

10   15," are you writing that based off your

11   recollection trying your hardest to be as accurate

12   as possible?

13      A.   Yeah, I mean I -- that's my impression

14   after talking with -- as far as the age goes, not

15   that I was specifying that for sure, that's the

16   range I thought he was talking about.

17      Q.   You wrote, "His weight has gradually

18   increased from 170 pounds to 230 pounds over the

19   last two years."  Are those facts that you would

20   just make up or guess if you didn't actually recall

21   them from the conversation?

22              MS. DOUGHERTY:  Objection.

23              THE WITNESS:  That would be just

24   something that would have been told to me.

25   BY MR. JUBB:

1    Q.   Okay.  And in terms of the note that

2  you've prepared, would I be correct in

3  understanding it to be a true and accurate summary

4  of your conversation with Mr. Poulos on May 30,

5  2018?

6         MS. DOUGHERTY:  Objection.

7         THE WITNESS:  Yes.  I mean, I -- we kind

8  of looked at a couple of Dragon errors, but other

9  than that, yes.

10 BY MR. JUBB:

11   Q.   When you say Dragon errors, you're

12 referring to the actual dictation error from you

13 speaking into it; is that correct?

14   A.   Right.

15   Q.   So for example, when you're speaking into

16 the Dragon and you write in here where it writes,

17 "And gets a total of 78 hours" --

18   A.   Right.

19   Q.   -- "throughout the night."  Seven to

20 eight sounds like 78, doesn't it?

21   A.   Right.

22   Q.   Okay.  And then am I correct that your

23 diagnosis of PTSD was based upon what was reported

24 to you by Mr. Poulos; correct?

25   A.   Yes.

Charles Grade, MD

```
1        Q.   And at any point in time -- strike that.
2   Am I correct that during this initial discussion
3   you were not considering whether or not this was
4   misattributed to PTSD?
5            MS. DOUGHERTY:  Objection.
6            THE WITNESS:  No, I was simply talking
7   with the patient and trying to understand what's
8   happening from their standpoint, not -- not looking
9   into that part of it.
10  BY MR. JUBB:
11       Q.   And equally, so am I correct you were
12  just listening to the patient, not trying to
13  consider whether there was motivation behind his
14  alleged symptoms; correct?
15           MS. DOUGHERTY:  Objection.
16           THE WITNESS:  Right.  I'm thinking of it
17  from a treatment standpoint.  So I'm just trying to
18  understand, see how he's doing, and figure out what
19  we should do for treatment.
20           MR. JUBB:  Those are all the questions
21  that I have, Doctor.  Again, I appreciate your
22  time.  Mr. Poulos, you can feel free to ask any
23  questions.
24               E X A M I N A T I O N
25  BY MR. POULOS:
```

1     Q.   Thank you.  I just have two quick

2  questions, Dr. Grade, as a follow-up.  And I

3  personally don't recall, but do you recall how I

4  conveyed that I had to stop treatment due to lack

5  of funds as opposed to lack of a good rapport

6  between the both of us?

7           MR. JUBB:  I'll object to the form of

8  that.

9           THE WITNESS:  That's what I understand

10  like more recently, Kurt.  I can't remember, like,

11  before, but I know that when -- this isn't part of

12  the record, but when the subpoena came, that I

13  think there was a message -- and I can't recall if

14  your mom said it or you -- that you, you know, you

15  couldn't continue 'cause of the cost.

16           But I don't know if I -- I don't

17  know if I knew that at the time, you know, or not.

18  I mean, I can understand where it would be, for

19  sure, knowing where you were at, you know, with

20  your work history and financially.  But I

21  remembered more recently your mom or you on a

22  message, I can't remember, saying, you know, you

23  couldn't keep going 'cause of the finances.

24  BY MR. POULOS:

25     Q.   And then one final question.  And again,

1    this might have been due to Dragon.  You mentioned

2    that I possibly had said dorm room, but do you

3    recall that I mentioned that it was in a dorm

4    building that the classroom was also located in?

5            MR. JUBB:  Same objection.

6            THE WITNESS:  I mean, that does sound

7    familiar.  I can't -- you know, just -- I don't

8    know for sure, but that does sound like what you

9    had said.  I was kind of vis -- I guess it's hard

10   to visualize a school like that, what -- the

11   separation between the dorms and the classes.  But

12   that does sound familiar from what you said, Kurt.

13           MR. POULOS:  Those are the only two

14   questions I had.

15           COURT REPORTER:  Is that it, then?

16           MS. DOUGHERTY:  No, I was just thinking.

17               E X A M I N A T I O N

18   BY MS. DOUGHERTY:

19       Q.   Dr. Grade, can you describe the

20   symptoms or the basis for your diagnosis of

21   post-traumatic stress disorder, chronic with accuse

22   exacerbation?

23       A.   Having these previous trauma, and then

24   having characteristic PTSD symptoms:

25   reexperiencing and avoidance, startle reaction,

1    periods of numbness, and then having other

2    traumatic episodes bring on similar symptoms more

3    recently, is what I'd say.

4        Q.   And your diagnosis, was that based

5    exclusively what you heard from Mr. Poulos or did

6    you evaluate the matter in which he presented,

7    his -- the way he presented the information, his

8    emotional reaction, anything like that?

9            MR. JUBB:  I'll object to the form.

10           THE WITNESS:  Yeah, we generally don't,

11   you know, get information on the trauma.  You work

12   with the person who's gone through them and the

13   diagnosis is made clinically.  It wasn't a focus to

14   try to prove anything, but to try to help with how

15   Kurt was feeling.

16   BY MS. DOUGHERTY:

17       Q.   Did your diagnosis of post-traumatic

18   stress disorder --

19           MS. DOUGHERTY:  You know what, strike

20   that.  Those are my questions.

21           MR. JUBB:  I have nothing further.

22           MS. DOUGHERTY:  Mr. Poulos, do you have

23   any other questions?

24           MR. POULOS:  No, I'm fine for today.

25           MS. DOUGHERTY:  Okay.  I think we are

1    done.

2              THE VIDEOGRAPHER:   Going off the record

3    at 3:43.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        STATE OF WISCONSIN  )

                             )  ss.

 2        COUNTY OF MILWAUKEE )

 3            I, ANITA KORNBURGER, Registered

 4        Professional Reporter and Notary Public in and

 5        for the State of Wisconsin, do hereby certify

 6        that the preceding deposition was recorded by

 7        me and reduced to writing under my personal

 8        direction.

 9            I further certify that said deposition was

10        taken remotely, with all parties appearing by

11        videoconference, on June 7, 2021, commencing at

12        1:06 p.m. and concluding at 3:43 p.m.

13            I further certify that I am not a relative

14        or employee or attorney or counsel of any of

15        the parties, or a relative or employee of such

16        attorney or counsel, or financially interested

17        directly or indirectly in this action.

18            In witness whereof, I have hereunto set my

19        hand and affixed my seal of office at

20        Milwaukee, Wisconsin, this 23rd day of June,

21        2021.

22

             ANITA KORNBURGER, RPR - Notary Public

23

          My commission expires May 24, 2025.

24

25
```

# EXHIBIT "D"

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3   -------------------------------------------------------

 4   JOHN DOE,

 5

                   Plaintiff,

 6

 7      -vs-                      Case No. 2:19-CV-01539

 8

     MITCHELL GARABEDIAN, ESQ., LAW

 9   OFFICES OF MITCHELL GARABEDIAN

     and KURTIS N. POULOS,

10

11              Defendants.

12   -------------------------------------------------------

13

14

15      Videoconferencing Examination of MARY ELLEN

16

17   POULOS, taken at the instance of the Plaintiff, under

18

19   and pursuant to Section 804.05 of the Wisconsin

20

21   Statutes, before ALI KORNBURGER, a Notary Public in

22

23   and for the State of Wisconsin, on July 22, 2021,

24

25   commencing at 10:00 a.m. and concluding at 3:56 p.m.
```

Mary Ellen Poulos

```
 1                A P P E A R A N C E S
 2
     THE BEASLEY FIRM, LLC, by
 3   MR. LANE R. JUBB, Jr.,
     1125 Walnut Street,
 4   Philadelphia, Pennsylvania 19107,
     appeared on behalf of the Plaintiff.
 5
     SWARTZ CAMPBELL, LLC, by
 6   MS. CANDIDUS K. DOUGHERTY,
     1650 Market Street, 38th Floor,
 7   Philadelphia, Pennsylvania 19103,
     appeared on behalf of the Defendants.
 8
 9                A L S O   P R E S E N T
10
     Mr. Jon Hansen, Videographer
11   Mr. Kurtis Poulos, Defendant
12
                     * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2
    Examination:                              Page
 3
    By Mr. Jubb....................................   5
 4  By Mr. Poulos..................................  81
    By Ms. Dougherty...............................  86
 5  By Mr. Jubb.................................... 201
 6
    Exhibits Identified:                         Page
 7
    Exhibit P1 -  Transcript From Hill School......... 215
 8  Exhibit P2 -  Letter From William Proxmire........ 218
    Exhibit P3 -  Email Exchange...................... 177
 9  Exhibit D21 - September 11, 1995 Letter...........  99
    Exhibit D22 - Email Exchange...................... 131
10  Exhibit D23 - Email Exchange...................... 134
    Exhibit D24 - Email Exchange...................... 177
11  Exhibit D25 - Letter From Ms. Poulos.............. 183
    Exhibit D26 - Email from Mr. Lehman............... 190
12  Exhibit D27 - Email Exchange...................... 188
13
    Request By:                                  Page
14
    Ms. Dougherty -Check Sent Mail.................... 141
15
16                      * * * * *
17    Disposition Of Original Exhibits:
18    Attached To Original Transcript
19
                        * * * * *
20
21
22
23
24
25
```

Mary Ellen Poulos

```
 1                TRANSCRIPT OF PROCEEDINGS

 2                THE VIDEOGRAPHER:  We're now on the

 3      record.  My name is Jon Hansen, CLVS.  I'm the

 4      videographer today with Golkow Litigation

 5      Services.  Today's date, July 22, 2021.  The

 6      time is 10:00.  This remote video deposition is

 7      being held in the matter of John Doe versus

 8      Mitchell Garabedian, United States District

 9      Court for the Eastern District of Pennsylvania,

10      case No. 19-CV-01539-JD.  The deponent is Mary

11      Ellen Poulos.

12                All parties to this deposition are

13      appearing remotely and have agreed to the

14      witness being sworn in remotely.  Due to the

15      nature of remote reporting, please pause

16      briefly before speaking to ensure all parties

17      are heard completely.  At this time if counsel

18      could state their appearance and their

19      location, after which our reporter will swear

20      in the witness and we can proceed.

21                MR. JUBB:  Good morning.  Lane Jubb,

22      Beasley Firm, for plaintiff.

23                MS. DOUGHERTY:  Morning.  Candidus

24      Dougherty for Schwartz Campbell on behalf of

25      Mitchell Garabedian.
```

Mary Ellen Poulos

```
 1                    MR. POULOS:  Good morning, Kurt

 2          Poulos appearing from Milwaukee, Wisconsin.

 3                    MARY ELLEN POULOS, called as a witness

 4          herein, having been first duly sworn on oath,

 5          was examined and testified as follows:

 6                         EXAMINATION

 7     BY MR. JUBB:

 8     Q    Good morning, Ms. Poulos.  I appreciate you

 9          being here with us.  Have you ever given a

10          deposition before?

11     A    Once, I think.

12     Q    And you were also a lawyer for about 40 years?

13     A    Yes.

14     Q    So in addition to those experiences, I just

15          want to go over a couple things with you.  The

16          first is that if at any point in time you don't

17          understand my question or you would like me to

18          repeat it, I'm happy to do that.  You just have

19          to let me know, okay?

20     A    Got it.

21     Q    I don't anticipate taking up too much of your

22          time, but if for whatever reason you need a

23          break, could you just let us know and we will

24          make sure that we do that, okay?

25     A    Yes.
```

Mary Ellen Poulos

```
 1    Q    Have you had an opportunity to review any
 2         documents in anticipation of today's
 3         deposition?
 4    A    The last document I reviewed was your petition
 5         for phone records with the court.  And with
 6         regard to time, there's a parade at 11:00
 7         celebrating the Milwaukee Bucks that I would
 8         like to see and --
 9    Q    Ms. Dougherty and I will do our best to make
10         sure you make that.
11    A    Thank you.
12    Q    Is there anything else you reviewed?
13    A    No.
14    Q    All right.  Can you just give me the Cliff
15         notes on your legal experience, please?  What
16         type of lawyer were you?
17    A    I was a trial lawyer, basically.  I started out
18         for the City of Milwaukee in traffic court,
19         where I learned to handle about 50 cases a day,
20         boom, boom, boom.  So I learned how to do
21         things in court.  I then moved from traffic
22         court to the main office of the city attorney,
23         and I started handling civil rights litigation
24         in federal court, police brutality,
25         discrimination, stuff like that.
```

Mary Ellen Poulos

```
 1                    Then I had a child, and that
 2           complicated my legal career.  I quit the city,
 3           did private practice for a while, starved and
 4           got a job with Milwaukee County where I started
 5           out the bottom of the rung regardless of my
 6           experience and did guardianships, protective
 7           placements, whatever they wanted me to do.
 8                    Then at some point I again -- and I
 9           can't recall exactly what prompted it -- I
10           again started doing discrimination and civil
11           rights litigation, worked closely with the
12           sheriff's department and other departments of
13           the county to deal with claims of
14           discrimination, violation of civil rights
15           mainly in federal court.  We are allowed to
16           file a civil rights action in state court, so
17           in state court, and at the administrative state
18           court hearing process for discrimination cases.
19                    And I did that for almost 20 years,
20           and then I quit, retired, did private practice
21           for a while and then stopped practicing
22           about -- I don't know -- five or six years ago.
23           That's it.
24      Q    Okay.  And --
25      A    I clerked -- I clerked various places.
```

Mary Ellen Poulos

```
1    Q    Have you been able to assist your son in

2         representing himself?

3    A    I have done some work with him, yes.

4    Q    And when your son was at The Hill School, did

5         you ever visit him?

6    A    I did.

7    Q    How many times do you believe you visited him

8         when he was at The Hill School?

9    A    I visited him on parents weekend freshmen year,

10        sophomore year.  They call it differently at

11        The Hill School.  Junior year he went to

12        Marquette.  Senior year I went for parents

13        weekend and for his graduation.  I don't

14        think --

15   Q    Did you visit -- I'm sorry for interrupting.

16   A    I didn't think -- I don't think there were any

17        other instances where I went there that I can

18        think of.

19   Q    Am I correct then that to the best of your

20        recollection you visited your son on three

21        occasions while he was a student at The Hill

22        School?

23   A    Well, I would take him -- freshmen year I took

24        him to school.  Sophomore year I took him to

25        school, flew with him.  Junior year I did not.
```

Mary Ellen Poulos

```
 1              As I recall, I couldn't afford the airfare.

 2              Senior year I don't think I did.  So I don't

 3              know if you call those visits or not.  So it

 4              would be --

 5      Q       Okay.  Would be --

 6      A       -- five.

 7      Q       Five.  So you would move him in third form and

 8              fourth form year and then visit him parents

 9              weekend his third form, fourth form, and sixth

10              form year; is that correct?

11      A       Yes.

12      Q       Did you ever attend any sports game that your

13              son played?

14      A       No.

15      Q       Did you ever have any sort of parent/teacher

16              conference or advisor/parent conference?

17      A       No, they -- no.

18      Q       Did you ever have any meetings with any

19              academic advisors or the headmaster while you

20              were visiting for any of the parents weekends?

21      A       No.

22      Q       Do you know whether or not -- strike that.

23                      At the time that Kurtis was a student

24              at The Hill School, were you married to your --

25              to Kurtis's father?
```

```
1    A    No.

2    Q    Did Kurtis's father ever visit him when he was

3         a student there?

4    A    I believe he did visit once, but I'm not -- I

5         just recall something that he was in

6         Philadelphia on business, I think, and drove

7         out.  I have a vague memory of that.  And he

8         came to Kurt's graduation.  He and his family

9         came to his graduation.

10   Q    Were you at Kurtis's graduation?

11   A    Yeah, I said that already.

12   Q    Okay.

13   A    My whole family was there.  It was a big deal.

14   Q    And other than the graduation, do you have any

15        recollection of Kurtis's father ever visiting

16        him at the school?

17   A    I just answered that question.

18   Q    What other times do you believe that Kurtis's

19        father visited him at the school?

20   A    I just told you.  I believe that once he was on

21        a business trip to the east coast, maybe

22        Philadelphia, and he drove in to see him.  I

23        have a vague recollection of that.  That's it.

24   Q    At the time that your son was a student at The

25        Hill School, was there some sort of arrangement
```

Mary Ellen Poulos

```
 1              between you and his father as to visitation

 2              rights?

 3       A      No.  Not a separate one, no.

 4       Q      In other words, there was nothing precluding

 5              Kurtis's father from seeing him when he was a

 6              student at The Hill School; is that correct?

 7       A      No, I never would -- no, nothing.

 8       Q      And when -- okay.  During that time frame when

 9              Kurtis was a student at The Hill School, how

10              would he communicate with you?

11       A      Call me on the phone.

12       Q      Did he have a phone in his room?

13       A      I don't know.

14       Q      How often would you speak?

15       A      I don't know.  I don't remember.

16       Q      Did you ever have any, in your mind, difficulty

17              getting a hold of your son?

18       A      I don't know that I tried, but I don't think I

19              would have.

20       Q      So in his -- his junior year he showed up at

21              the school and then left; is that your

22              understanding?

23       A      Yeah, he showed --

24       Q      Can you -- so I know that we're starting to

25              step on each other a little bit with the
```

```
 1            question and answer proces.  So because there's

 2            a little bit of a delay, that's a lot easier to

 3            do.  So I apologize if I'm cutting you off for

 4            your answer, but if you could just give me an

 5            extra half a second to finish, that would be

 6            great too.

 7                      And while I appreciate your legal

 8            experience, my questions are -- I'm trying to

 9            be as focused as possible to get you out of

10            here in time for the parade.  So do you have an

11            understanding as to the timing in which your

12            son departed the school and the manner in which

13            he departed the school for his junior year?

14    A      I don't know what you mean by understanding.  I

15           -- I -- he flew out to the Hill.  I did not

16           accompany him.  About three or four days later

17           maybe -- within the first week of him being out

18           there, he showed up at my door of our home, and

19           he had flown back on his own, unbeknownst to

20           me.

21    Q      When you asked him when he showed up, why are

22           you here, what did he say?

23    A      I don't remember.

24    Q      Did you call the school at that point?

25    A      No.
```

Mary Ellen Poulos

```
1    Q    Did you write any letters to the school?

2    A    I guess I did write a letter because I saw it

3         in your discovery materials, but I didn't

4         remember it.

5    Q    What was your --

6    A    I didn't remember writing that letter.

7    Q    What was your understanding as to why your son

8         left the school?

9    A    I didn't have one.  I made assumptions.

10   Q    Well, why would you make -- strike that.

11             What did you use to come to the

12        assumptions that you made?

13             MS. DOUGHERTY:  Objection.

14   BY MR. JUBB:

15   Q    What facts?

16             MS. DOUGHERTY:  Objection.

17             THE WITNESS:  I wasn't very fair to

18        him.  I assumed he was being a rebellious

19        teenager.

20   BY MR. JUBB:

21   Q    Okay.  And --

22   A    Now I know I was wrong, and I feel horrible

23        about it.

24   Q    What did he tell you was the reason he didn't

25        want to go back?
```

Mary Ellen Poulos

```
 1    A    I don't think I even gave him the opportunity

 2         to give me a reason.  I was so angry.

 3    Q    Can you tell us why you were angry?

 4    A    Because I thought he was rebelling against my

 5         authority.  I thought he was thumbing his nose

 6         at me.  I didn't give him the benefit of the

 7         doubt.  I didn't inquire further.  I should

 8         have, and I regret it today.

 9    Q    So did you ever ask him, "Why did you come

10         home?"

11    A    I don't think I did.

12    Q    Does anything come to mind for his explanation

13         as to why he came home?

14    A    No.  I will tell you --

15    Q    Ultimately --

16              MS. DOUGHERTY:  Ms. Poulos, go ahead.

17              THE WITNESS:  Can I go ahead?

18    BY MR. JUBB:

19    Q    Please.

20    A    I was concerned about his education, and my

21         boss at the county was a big Marquette guy.  I

22         did not want Kurt to go to Shorewood High

23         School.  I don't know if that was right or

24         wrong.  I wanted him in a private educational

25         institution.  My snobbery, I guess.  So I went
```

Mary Ellen Poulos

```
 1              to my boss and begged him, though school had
 2              started, to see if he could get him into
 3              Marquette High, and he did.  That was my main
 4              concern, his education and what the
 5              ramifications of this would be for his future
 6              that he walked away from The Hill School.
 7              That's all I could think about.
 8      Q    Do you recall how he was doing at Marquette?
 9      A    When?
10      Q    Well, the time that he went there.
11      A    You mean after the end of the junior year?  He
12              did okay, I guess.
13      Q    I guess it wouldn't be the end of junior year
14              because he went there for his junior year,
15              right?
16      A    Yeah, but I don't know what he's doing before
17              he went there.
18      Q    Well, during that year, you know, what comes to
19              mind?  Do you recall anything?
20      A    No.
21      Q    Ultimately, when he went back, that was his
22              decision, correct?
23      A    Yes.
24      Q    And did you see any of the correspondence
25              between your son and the school and you and the
```

Mary Ellen Foulos

```
 1          school in terms of that process?
 2   A      I was thinking about that, and I really don't
 3          recall corresponding with the school about him
 4          reentering for his senior year.  I remember I
 5          was very shocked when he said he wanted to go
 6          back because he seemed to be enjoying
 7          Marquette.  He had made a lot of friends.  So I
 8          was kind of taken aback when he told me he
 9          wanted to go back.  I probably -- the first
10          thing I would have done was contact the trust.
11          I don't remember contacting the school at all,
12          but I was very proud of him for wanting to go
13          back.
14   Q      Is there any conversation that you can recall
15          that you may have had -- and, again, I'm just
16          trying to understand what you can recall --
17          with any of the administrators or headmasters
18          at the school at that time?
19   A      No, I can't recall.
20   Q      During that junior year is there anything that
21          you can recall about what Kurtis was doing as
22          far as extracurricular activities or anything
23          like that?
24   A      Yeah.
25   Q      Can you tell us, please?
```

Mary Ellen Poulos

```
 1    A    I think it was junior year that he went to

 2         France.

 3    Q    For how long was he there?

 4    A    I don't remember.  It was a pretty long trip

 5         because I think they took a class in France.

 6         There was a -- Marquette High had, sort of, a

 7         relationship with a girls Catholic high school

 8         in Milwaukee, and every summer they did a trip

 9         abroad.  And I had done the same thing when I

10         was in high school.  And I thought it was

11         fantastic.

12              And he took a trip to France and he

13         took classes in French, and he spent time in

14         Paris.  And that's one of the reasons I was so

15         shocked that he wanted to go back to the Hill,

16         because he just was really seeming to flourish

17         at Marquette High.

18    Q    And then ultimately when he did go back, did

19         you support that decision?

20    A    It was his decision.  Yes, I supported it.  I

21         was surprised, but it was his decision.

22    Q    And then during his senior year, the sixth form

23         year, you visited on parents weekend; is that

24         right?

25    A    Yes.
```

Mary Ellen Poulos

```
 1    Q    Can you tell us what you can recall about that,

 2         if anything?

 3    A    Not much.  I do remember --

 4    Q    And -- I'm sorry.  Go ahead.

 5    A    I do remember I was staying at, I think it's

 6         called the Holiday Inn Express where everybody

 7         seemed to stay, and I had gotten a cot for him

 8         to stay with me, and he didn't come back.  And

 9         he was going to stay the night with me because

10         he was old enough to leave campus.  And he

11         didn't come back, and I never really knew why.

12                  I was just happy to see him and be

13         with him when he could be with me, and I didn't

14         question a lot of things that I should have.

15         Hindsight being what it is.

16    Q    Like what?

17    A    Why he didn't come back.

18    Q    You never asked him at that time; is that

19         right?

20    A    And I don't think he volunteered, except maybe

21         to say -- I don't remember.  I really don't

22         remember, but when he told me recently, within

23         the last several years, that he didn't come

24         back because his car had been blocked in, it

25         refreshed my memory about him not coming back.
```

Mary Ellen Poulos

```
 1                      It wasn't like it was some major

 2          occurrence that I dwelled on for 20 years, but

 3          I did remember it when he told me why he didn't

 4          come back, which was within the last several

 5          years.

 6     Q    Am I correct that at no point in time did you

 7          ever observe your son interacting with Matthew

 8          Ralston?

 9     A    No, you are incorrect about that.

10     Q    Okay.  Can you tell us about that then, please?

11     A    I attended his class.  Parents weekend, I guess

12          it must have been sophomore year.  I sat -- I

13          remember the man.  I sat in on that class, and

14          he called on Kurt.

15     Q    Did he call on anybody else?

16     A    I don't remember.

17     Q    Where was that class located?

18     A    What?

19     Q    Where was that classroom located?

20     A    It was sort of like a weird -- I don't know how

21          to describe it, but it wasn't like it was a

22          separate building with classrooms.  You sort of

23          went around the side of the building where Kurt

24          lived and went down a hallway, and there was a

25          hallway of classes.  That's about all I can
```

Mary Ellen Poulos

```
 1              remember.  I just remember thinking it was

 2              pretty weird that the classrooms weren't

 3              separated more from where the kids lived.

 4    Q    In other words, there were other classrooms

 5              around that classroom?

 6    A    As I recall -- as I recall, it was kind of a --

 7              there was a doorway kind of at the end of the

 8              building on the side, and you would go in and

 9              it was a hallway.  And I don't remember how far

10              I walked or what room it was, but it was sort

11              of -- kind of like underground.  I don't know

12              how to describe it.

13    Q    Were there other parents there?

14    A    Yeah.

15    Q    Did you accompany him to his other classes that

16              day?

17    A    I was trying to recall if I did.  I must have,

18              but this one -- but I don't remember any of the

19              other classes, frankly.

20    Q    Okay.  So you attended the class on parents

21              weekend, and Kurt was called on to answer a

22              question; is that right?

23    A    Yup.

24    Q    What else do you recall about that interaction?

25    A    One of the other students stood up and started
```

```
 1              interrupting Kurt or the way that Kurt was

 2              analyzing the problem, and I remember the

 3              teacher saying, "Let Kurt do it his way," words

 4              to that effect.  "Let Kurt do it his way," and

 5              I think he did kind of like this with his hand

 6              to the other student, sort of --

 7      Q    In other words, the student was interrupting

 8              your son and Mr. Ralston had said, you know,

 9              "Let him finish and let him explain it in his

10              way"; is that right?

11      A    Words to that effect, yes.

12      Q    And did you think that that was somehow

13              inappropriate?

14      A    I didn't judge it.  I didn't --

15      Q    Was there anything unusual that you thought

16              about that?

17      A    No, I was proud of Kurt.  The teacher was sort

18              of irrelevant.  I was concentrating on my son

19              and how he was dealing with the situation.  I

20              was very proud of him and the way he had

21              handled it.  He didn't get -- you know, he

22              handled it well.  I could have cared less about

23              the teacher, really, except for his minor role

24              of calling on him.

25      Q    And Kurt was able to answer the question and do
```

```
 1              well; is that right?
 2    A    I don't know.  The rest is kind of -- I don't
 3         really remember.  I just remember him being
 4         called on, getting interrupted, and him doing a
 5         damn good job.  That's all I remember.
 6    Q    And for the rest of the sophomore year did you
 7         ever receive any notices from the school about
 8         Kurt with any disciplinary issues at all
 9         whatsoever?
10    A    I don't remember him being disciplined at all.
11    Q    And then when he returned his senior year
12         after -- strike that.
13                  How long was he in France, do you
14         recall?
15    A    No, I told you I don't.  I think maybe six
16         weeks or something.  I don't remember.
17    Q    All right.  Well, ultimately when he went back
18         to The Hill School, did you help him move in
19         then?
20    A    No.  I don't think I went back that time, but I
21         could have.  But I don't think I did.
22    Q    Did you ever meet any of his roommates?
23    A    No, I don't think so.
24    Q    Did you ever meet any of his door masters or
25         door parents?
```

Mary Ellen Poulos

```
 1     A    I don't think so, no.

 2     Q    Did you ever meet David Dougherty?

 3     A    I don't think so.

 4     Q    Okay.  Now, ultimately, at that point in time

 5          was Kurt receiving any sort of psychiatric or

 6          psychological therapy?

 7     A    No.  Well, wait, back up here.  What time?

 8     Q    While he was a student at The Hill School.

 9     A    Not that I know of.

10     Q    So after he left The Hill School, where did he

11          go to college?

12     A    He went to Marquette for a while, or UWM.  He

13          went to both, but I'm not sure in what order.

14          I think he went to Marquette first and then

15          UWM, University of Wisconsin-Milwaukee.

16     Q    Can you take us through your understanding of

17          your son's criminal history beginning after he

18          graduated -- strike that.

19               Can you take us through your

20          understanding of your son's criminal history?

21     A    My understanding of it?  What do you mean by

22          that?  I'm aware --

23     Q    Do you know whether -- if you don't understand

24          my question, you just have to tell me and I can

25          rephrase it, okay?
```

Mary Ellen Poulos

```
1    A    Well, you use weird words.  I mean, I know

2         about his various problems.  I did not

3         understand any of them.  So you use the word

4         "understanding," and I didn't have an

5         understanding, but I was aware of them.

6    Q    What were your son's -- strike that.

7                   What was your son's criminal

8         background that you were aware of?

9    A    When he left and went to live in Rehoboth.  It

10        was Ocean City or Rehoboth -- it was somewhere

11        on the eastern shore -- to work for a friend of

12        his father.  Lance Witlock was the -- Lance and

13        I had met.  They weren't roommates, but they

14        were together in the same building senior year,

15        and Lance was a sweetheart.  And his dad had a

16        company, and Kurt wanted to get away from

17        Milwaukee, went there.  He abused their credit

18        cards.

19                   He got in trouble because he was

20        using the company credit card.  And Lance's mom

21        called me and apologized to me for the fact

22        that he was being charged for abusing their

23        credit cards and said she had no control over

24        it.  That in order to get any satisfaction or

25        to be relieved of their obligation to pay for
```

1          Kurt's credit card usage, he would have to

2          be -- MasterCard insisted he be charged

3          criminally.  And I was like, this came out of

4          the clear blue.

5                    And then I think at the time when she

6          called me, Kurt was on his way back from the

7          east coast, fleeing, because he was scared

8          about these criminal charges.  I was aware of

9          that.

10                    Then he got into an altercation with

11          one of his girlfriends.  And I don't remember

12          what he was charged with, but it -- he had to

13          pay her like -- I think he damaged her car, as

14          I recall it.  He got charged with disorderly

15          conduct, I think, or maybe criminal damage to

16          property.  That might have been it.  He had to

17          make restitution to her for the damage to her

18          car, and I ended up paying that.

19                    And then there was an incident in

20          Connecticut.  I'm not very familiar with that.

21          I know he got some treatment as a result of

22          that incident.  And the most recent incident --

23          Markie, go away.  The most recent incident was

24          with his latest girlfriend, which was about

25          three years ago.  And he was arrested by the

Mary Ellen Poulos

```
 1              Fox Point police.  And I hired an attorney to
 2              represent him.  The charges for which he was
 3              arrested were dismissed, and he ended up with a
 4              municipal citation for disorderly conduct, and
 5              I think an 8- or $900 fine.
 6        Q     Did you ever visit your son in the hospital for
 7              any reason?
 8        A     Yes.
 9        Q     Can you tell us about that, please?
10        A     He was living with me.  And I don't remember
11              the exact physical problem that occurred, but
12              he was very, very sick.  I don't know -- I
13              don't recall specifically how it manifested
14              itself, but he was very, very sick.  And we had
15              to call for an ambulance.  And he was
16              transported out to St. Mary's in Ozaukee
17              County.  And I visited him there.  And he was
18              so out of it.  I have never seen anything like
19              it.
20                   I had conversations with -- I believe
21              he -- when he first was taken out to Ozaukee,
22              they were so concerned about his physical
23              well-being that they had someone actually
24              sitting in the hospital room with him all night
25              long.  They were unable to leave him alone.  I
```

Mary Ellen Poulos

```
 1            remember talking to an attendant on the phone,

 2            and I got the impression and understanding that

 3            my son was dying.  It was horrible.

 4                    And then I went to visit him.  Some

 5            friends of mine drove me because at that time I

 6            couldn't drive because of cataracts.  And as I

 7            said, he was so out of it.  I couldn't believe

 8            it.  But he survived.  And when he was

 9            discharged from the hospital, my mom hired

10            him -- because I couldn't afford it -- a nurse

11            who would come and see him and help him

12            recover.

13                    And what he had suffered from, as I

14            understand it, acute alcohol poisoning.  He was

15            drinking heavily, and he was dying from it, but

16            he survived.

17       Q    Do you recall what year that was?

18       A    It was right before he went to Connecticut.  I

19            believe it was '15.

20       Q    And you said the hospital was Ozaukee?

21       A    St. Mary's Ozaukee.  We have St. Mary's.  There

22            is St. Mary's downtown and St. Mary's Ozaukee

23            county, which is the northern -- county north

24            of Milwaukee.

25       Q    And ultimately, at that point in time in the --
```

Mary Ellen Poulos

```
 1         you think it was around 2015?

 2    A    Yeah, I believe it was.  The records -- don't

 3         you have those records?  You have all his

 4         records.

 5    Q    I'm just asking you.

 6    A    Yeah.  Well, if you know when it was, then you

 7         know when it was.  You seem to have more

 8         records and information about my son than I do.

 9         So if you're trying to, you know, take this old

10         brain and see if I remember stuff, I believe it

11         was 2015.  If you know otherwise, then you're

12         right and I'm wrong.

13    Q    And how long did it take for Kurt to recover

14         from this incident?

15              MS. DOUGHERTY:  Objection.

16    BY MR. JUBB:

17    Q    In other words, how long was he receiving this

18         private nursing care?

19    A    I don't recall.

20    Q    Ultimately, did you ever learn that he had any

21         sort of injury to his liver?

22    A    I didn't get into the specifics, no.

23    Q    In 20 -- strike that.

24              Whenever this time period was when he

25         went to St. Mary's Ozaukee for what you had
```

Mary Ellen Poulos

```
 1            described as acute alcohol poisoning, at that
 2            point in time had you ever been told by him
 3            that he was sexually abused as a minor?
 4    A       Yes.
 5    Q       When did he tell you that?
 6    A       Probably a few months before this happened.
 7            And he didn't -- well, I don't know if he used
 8            those words.  I don't remember what words he
 9            used.
10    Q       Can you tell us what you can recall about that
11            discussion, please?
12    A       He was drinking heavily.  His behavior was not
13            good, and he was yelling and he picked up
14            something and threw it.  And I said, "Kurt,
15            this has got to stop."  Maybe I yelled back,
16            and he screamed out to me, "Mom" -- and I don't
17            remember the word he used, but I got the
18            message.
19    Q       I need you to try and remember as best you can
20            what he said to you.  Do you recall generally?
21    A       Yeah.  Generally speaking, he told me that he
22            had been assaulted.  I think that's the word he
23            used, not abused.  I think he used the word
24            assaulted.  That he was assaulted when he was
25            at The Hill School.
```

Mary Ellen Poulos

```
 1     Q    And did you ask any questions about that?

 2     A    No.  He continued -- he continued yelling and

 3          crying.  He was crying, and he was very, very

 4          upset, and I listened.

 5     Q    Okay.  Did he say anything else other than that

 6          he was assaulted at The Hill School?

 7     A    No.

 8     Q    Did he say whether -- strike that.

 9               At any point in time did you ever

10          believe that he was getting picked on by other

11          boys at the school?

12     A    I didn't know anything about that.

13     Q    Whether or not you knew anything about that,

14          did you ever get that impression?

15     A    No, I don't think so.

16     Q    After he said that he was assaulted at The Hill

17          School, how did you respond?

18     A    I didn't.  I just told you that.  I let him

19          vent.  I let him vent.

20     Q    What else did he say then?

21     A    I don't remember.  Some of it was -- he was

22          crying.  He was hysterical.  He was upset.  He

23          was -- it was horrifying, frankly.

24     Q    What year was this?

25     A    I was living in apartment 101 in this building,
```

Mary Ellen Poulos

```
 1              and when apartment 104, where I now live,

 2              opened up, I moved here.  I moved here in

 3              January or February of '15.  He told me about

 4              it when I was in 101.  So it was probably

 5              within, like, late '14 or sometime in 2014 that

 6              he told me this.

 7      Q       Okay.  And what did you do in response, if

 8              anything?

 9      A       I let him vent.  And he gets exhausted then and

10              probably he would go -- if that -- in that

11              circumstance if I didn't confront him, the

12              situation would -- he would get tired, and he

13              would usually go in his room and go on his

14              computer or do something like that.  And I

15              believe that's what happened.

16      Q       Was he living with you at that time?

17      A       Yes.

18      Q       At that point in time did he have a girlfriend?

19      A       I don't think so.

20      Q       When is the next time you discussed that, what

21              he had said to you?

22                  MS. DOUGHERTY:  Objection.

23                  THE WITNESS:  Discussed what?

24      BY MR. JUBB:

25      Q       Did you -- okay.  After he had said to you that
```

Mary Ellen Poulos

```
 1          he was assaulted at The Hill School, amidst

 2          what you just described as him yelling and

 3          throwing things, when was the next time you

 4          discussed anything about The Hill School?

 5                  MS. DOUGHERTY:  Objection.

 6                  THE WITNESS:  I didn't discuss it

 7          with him anymore.  I did my own research.

 8     BY MR. JUBB:

 9     Q    What did you do?

10     A    I called --

11                  MS. DOUGHERTY:  Objection.

12                  THE WITNESS:  Do you want me to

13          answer or not?  Should I answer, Candice --

14          Candidus?

15                  MS. DOUGHERTY:  My objection was to

16          form.

17                  THE WITNESS:  Okay.

18     BY MR. JUBB:

19     Q    So what did you do?

20                  MS. DOUGHERTY:  Objection.

21                  THE WITNESS:  As I recall, I

22          called -- I checked the statutes.  I remember

23          that.  I checked the statutes in Pennsylvania,

24          and I think I called an attorney in

25          Minneapolis.  I think his name is Jeffrey
```

Mary Ellen Poulos

```
 1          Anderson who is an expert, supposedly, around

 2          the country in these kinds of cases.

 3                    And I contacted my stepsister, CiCi,

 4          because her son, Jason, also was at The Hill

 5          School a year ahead of Kurt and asked her if I

 6          could communicate with Jason about what Kurt

 7          had told me.  I didn't want to just contact

 8          Jason directly.  I wanted to go through my

 9          sister, and she said she'd contact Jason and

10          get back to me.

11     BY MR. JUBB:

12     Q    Okay.  And did she ever do that?

13     A    Yes, of course.

14     Q    And did you have a conversation with Jason?

15     A    We emailed.

16     Q    Okay.  Did you say -- strike that.

17                    When Kurtis said to you that he was,

18          quote, assaulted at The Hill School, did he

19          ever indicate to you that that was in any way

20          sexual in nature?

21               MS. DOUGHERTY:  Objection.

22               THE WITNESS:  He didn't have to.  If

23          he had been beaten up --

24     BY MR. JUBB:

25     Q    And --
```

Mary Ellen Poulos

```
 1    A    I'm not finished.  If he had been beaten up, I
 2         would have known about it because when he had
 3         medical attention, I was contacted.  He had a
 4         skiing accident when he was there, and he had
 5         medical attention, and they contact the
 6         parents.  So if he had been beaten up, the
 7         assault, I would have known about it when it
 8         happened.  It wasn't that hard.
 9    BY MR. JUBB:
10    Q    Would you have known -- go ahead.
11    A    Go ahead.
12    Q    I was going to say would you have known about
13         it if he didn't seek any sort of medical
14         attention?
15              MS. DOUGHERTY:  Objection.
16              THE WITNESS:  Yeah, I think I
17         would've.
18    BY MR. JUBB:
19    Q    Okay.  Why?
20    A    Because he would have told me, "Mom, they beat
21         me up."  I would --
22    Q    Did he --  go ahead.
23    A    No, that's all right.  He would have told me.
24    Q    Right.  And at that point in time how was
25         Kurt's relationship with his father?
```

Mary Ellen Poulos

```
 1     A    I have no idea.

 2     Q    Did Kurt's father ever get physical with him?

 3     A    Yes.

 4     Q    How many times?

 5     A    He did with me, truth be told.

 6               MS. DOUGHERTY:  Can you repeat what

 7          you said, Ms. Poulos?  I couldn't hear what you

 8          said because you and Mr. Jubb were talking at

 9          the same time.

10               THE WITNESS:  You know, his father is

11          a brute.  He asked me if his father ever got

12          physical with Kurt.  My answer was, yes, and

13          then I simply said, and with me.

14               MS. DOUGHERTY:  Thank you.

15     BY MR. JUBB:

16     Q    Ms. Poulos, if you could, how many times do you

17          believe that Kurt's father was abusive with him

18          growing up?

19               MS. DOUGHERTY:  Objection.

20               MR. POULOS:  Objection.

21               MS. DOUGHERTY:  Mr. Jubb, that wasn't

22          her testimony.

23               MR. POULOS:  And what is the scope of

24          this question regarding my father in regards to

25          the situation at The Hill School?
```

Mary Ellen Poulos

```
 1                    MR. JUBB:  I'm allowed to ask these

 2         questions.  Is someone telling her not to

 3         answer the question?

 4                    MR. POULOS:  No.  I'm just objecting

 5         to the fact that this has no relevance to this

 6         matter.

 7                    MR. JUBB:  Your objection is noted.

 8                    MS. DOUGHERTY:  My objection is that

 9         you have to have a good faith basis to ask a

10         question.  You can't misstate the testimony.

11                    MR. JUBB:  I don't know if you're

12         listening or not.  Check your headphones

13         because she just said that he was assaulted --

14         that Kurt was abused by his father.  My

15         question was if are you able to approximate for

16         me how many times that Kurt had been abused by

17         his father.

18                    MS. DOUGHERTY:  I think you need to

19         check your headphones because you asked her

20         whether his father was ever physical with him

21         and she said, yes, and that he was physical

22         with her.  I haven't heard any testimony about

23         anybody being abused by the father.

24    BY MR. JUBB:

25    Q    Okay.  Ms. Poulos, do you believe that when
```

```
 1          your -- strike that.
 2                  Ms. Poulos, do you believe that when
 3          your son was physically -- what's the term?  Is
 4          it physically abused or physically assaulted by
 5          his father?  What would you prefer I use?
 6                  MS. DOUGHERTY:  Objection.  The
 7          witness didn't use either of those terms.
 8                  MR. JUBB:  That's what I'm asking her
 9          because there's no other way to describe it.
10          He was physical.  Can you tell us what you mean
11          by that, please?
12                  MS. DOUGHERTY:  Why don't you ask
13          her?  There you go.
14                  THE WITNESS:  His father was mean.
15          His father was mean to everybody.  His father
16          is a mean person.
17     BY MR. JUBB:
18     Q   His father is also physical, correct?
19     A   He was with me.
20     Q   He was with Kurtis as well?
21     A   I believe he hit Kurtis once when it was --
22          Kurt went to Michigan to visit him, and this
23          was maybe -- I'm trying to put two and two
24          together.  I don't remember exactly when it
25          was, but I believe Kurt once went to Michigan
```

Mary Ellen Poulos

```
 1              to visit his father, and he and his father got

 2              into an argument, and I believe he told me that

 3              his father hit him.

 4     Q    Are you able to approximate for us how old your

 5              son was at that point?

 6     A    No, I can't.

 7     Q    Was he a student at The Hill School then?

 8     A    No.  No.  No, he was an adult.  He was an --

 9     Q    Was he in college or was it after that time

10              period too?

11     A    I just can't -- I can't put it together.  I

12              can't remember when it happened.

13     Q    Are there any other instances that you observed

14              Kurt's father being physical with him?

15                   MS. DOUGHERTY:  Objection.

16                   THE WITNESS:  I didn't observe that

17              one.  I was simply told about it.

18     BY MR. JUBB:

19     Q    Were there any instances that you ever observed

20              Kurt's father being physical with him?

21     A    No.

22     Q    Did Kurt ever observe his father being physical

23              with you?

24     A    I don't know.

25     Q    So then after there's this instance in
```

Mary Ellen Poulos

```
 1              approximately 2014 where your son said that he

 2              was assaulted at The Hill School, when is the

 3              next time that you spoke to him about this?

 4      A       In early 2016 I received a communication from

 5              the headmaster at The Hill School, and he was

 6              referencing articles that had appeared in the

 7              New York Times about abuse at quote/unquote

 8              elite east coast boarding schools.  And I get

 9              the New York Times every day.  So I was well

10              aware of those articles.

11                      And Kurt got that also, and my

12              sister, CiCi's son got that.  And so it sort of

13              brought things up, and I don't remember if we

14              specifically discussed that memo, but the memo

15              was so, aren't we the greatest school ever?

16              Nothing like this would ever happen here, blah,

17              blah, blah.  It was kind of laughable.  And I

18              think that maybe Kurt and I might have just

19              said, yeah, okay, so they are -- you know,

20              whatever.

21      Q       Okay.  Did you -- do you recall any of your

22              conversations with Jeff Anderson?

23      A       Yeah.  I remember telling him the facts that I

24              knew, which weren't much, and he --

25      Q       And -- please continue.
```

Mary Ellen Poulos

```
 1    A    There was a statute of limitations issue, and

 2         he said when the statute of limitation changes

 3         in Pennsylvania, call me back.

 4    Q    Did Kurt ever meet with Jeff Anderson?

 5    A    I don't think so.  You know, I have been

 6         thinking about this because I did not

 7         personally know the facts.  I knew something

 8         had happened, but I didn't know what.  So I

 9         know for a fact that with Garabedian -- but I'm

10         not sure with Jeff -- that I said, blah, blah,

11         blah, about what I knew and then they would

12         talk to Kurt.  I would get off the phone, and

13         they would -- he would tell them -- I know with

14         Garabedian this is the way it went.  He would

15         tell Garabedian the facts with me not being on

16         the phone, attorney-client privilege and all

17         that, and then I would get back on the phone.

18         And with Jeff Anderson it was a clear-cut

19         statute of limitations problem, don't bother

20         me.

21    Q    And as far as you can recall, you don't believe

22         that Mr. Anderson ever spoke with your son; is

23         that correct?

24    A    He may have.  I'm saying he may have.  I may

25         have done that -- because I didn't know the
```

Mary Ellen Poulos

```
 1           facts, you know.  And the attorney is probably

 2           not willing to give any kind of an opinion

 3           until he has some idea of what the facts are.

 4           And so if Kurt was available, then I would have

 5           them talk to Kurt, but that was very hard on

 6           Kurt.  So sometimes I wouldn't do it.

 7    Q      At some point in time did you ever ask Kurt who

 8           this person was?

 9    A      No, I never did.  It didn't matter to me.

10    Q      All right.  So then after you get the email

11           from the school in 2016, did you have any

12           discussions with your sister, CiCi?

13    A      I don't think so.

14    Q      Did you have any discussions or email

15           correspondence with her son?

16    A      I did.  You know, I did, but I don't recall --

17    Q      Did you ever -- I will ask it then.  Is there

18           anything you recall about those discussions

19           with her son Jason?

20    A      No, I don't remember.

21    Q      When you initially spoke with Jason, did you

22           tell him that Kurt was saying he was assaulted

23           at The Hill School?

24    A      I don't know what words I used.  I just said --

25           asked him if he knew who his sophomore teachers
```

```
 1              were because I had put two and two together.

 2              You know, you look back on situations and you

 3              see things that you didn't see at the time.

 4              And I recall that he did very well as a student

 5              freshmen year and that sophomore year he didn't

 6              do well and was almost flunking out.  And when

 7              he told me what had happened to him, I thought,

 8              well, the signs were there.  You just didn't

 9              see them.  And so I zeroed in on the year his

10              grades went bad and that was sophomore year.

11                      My son had always been a good

12              student, not a great student, but a very good

13              student, and that was an anomaly.  I did

14              research on this sort of abuse.  I read a lot

15              of articles, and the signs were there, and I

16              didn't see them at the time.  So I zeroed on

17              sophomore year, and I contacted Jason once CiCi

18              said it was okay and found out who his teachers

19              were that year, as I recall.  The names of the

20              teachers if Jason knew and he did.

21      Q       And then after you learned the names of Kurt's

22              teachers his sophomore year, did you then

23              approach him and say, "Is this the teacher that

24              assaulted you?"

25      A       Absolutely not.  I did --
```

Mary Ellen Foulos

```
 1    Q    Tell me what happened next then.

 2    A    I contacted the New York Times.  I contacted

 3         the reporter who was doing the articles, had an

 4         email exchange with her and asked her if The

 5         Hill School -- there was any inkling in her

 6         research in preparation for writing her

 7         articles, if there was any inkling that The

 8         Hill School had a problem with this, and she

 9         told me no and that was the end of that.

10              And Kurt is in Connecticut at this

11         time.  So I didn't have any discussions with

12         him.  My mom died in '15, and that was pretty

13         traumatic, and he went to Connecticut.  And I

14         was kind of at a dead end about figuring out

15         what happened, who did it.  And so nothing was

16         really going on until we got that second memo

17         from the headmaster at Hill in November of -- I

18         think it was November 20th, 2017.  I don't

19         think Kurt and I discussed any of this between

20         those two memos.

21    Q    Okay.  And then after you got the November 2017

22         memo, you then spoke with Kurt, correct?

23    A    He -- he emailed me.  I think he emailed me,

24         but I remember thinking -- and I don't know if

25         I expressed it to him -- well, I guess, you
```

```
 1              know, the headmaster was wrong.  And his -- he

 2              wanted to know if he should contact those two

 3              women who were, you know, with the link in the

 4              email.  He said, "Mom, should I contact them?"

 5    Q    And what did you say?

 6    A    I said, "I will get back to you.  I don't

 7              know."

 8    Q    And then ultimately you reached out to

 9              Mr. Garabedian's office?

10    A    Well, I checked up on these two women.  It

11              wasn't that hard.  They have a reputation, and

12              though the memo didn't say it, they are

13              attorneys.  And I found articles about them

14              where the bottom line in the articles was

15              basically these two women attorneys, meaning in

16              the memo it made it sound like they were, you

17              know, child psychiatrists or something.  You

18              were to call them and tell them your story, and

19              they would help you deal with it.  And I

20              thought, oh my, God, you know, what a lure.

21                   So in one of the articles I was

22              reading about these women where they were

23              characterized by Mitchell Garabedian as being

24              attorneys who are hired by institutions to

25              promote and create and do a cover up.  I
```

Mary Ellen Poulos

```
 1              decided to contact Attorney Garabedian.  I had

 2              not seen the movie Spotlight.  I did not know

 3              who he was, but his pronouncements in this

 4              article were pretty eye-opening.  And so I

 5              contacted him as a result of reading about

 6              these two women at the Cozen firm.

 7      Q       Did you contact him by telephone or by email?

 8      A       Telephone.

 9      Q       Did you speak to him directly?

10      A       Yes.

11      Q       Can you tell us what you recall about that

12              conversation, please?

13      A       I don't remember if I brought up the articles

14              in the New York Times.  I do remember telling

15              him that I believe that my son in, sort of,

16              conformance with the gist of these New York

17              Times articles had been the victim of abuse.  I

18              said I didn't know the facts, but that I had

19              gotten his name from this article about these

20              two women.  And he commented about these two

21              women and confirmed what he had said in the

22              article that they cover it up.  They help

23              institutions cover it up.

24                   And I think I asked him specifically

25              whether or not it would be a good idea.  I
```

```
 1          didn't think it would be a good idea for Kurt
 2          to contact these two women without an attorney
 3          representing him based on my research about
 4          these women and this firm, and Garabedian
 5          agreed with me.
 6                     And I don't remember exactly how he
 7          talked to Kurt because in November of 2017 Kurt
 8          was in Connecticut, and I was here, but he had
 9          a -- maybe he called Kurt.  I'm not really
10          sure, but he had a conversation with Kurt.  I
11          was not privy to that conversation and came
12          back on the phone with me and said, yes, he has
13          a case.
14                     And I remember, I asked him about the
15          statute of limitations, and then he and I had
16          an esoteric, sort of, off-the-cuff discussion
17          about what was going on with the law in
18          Pennsylvania and whether or not they were going
19          to grandfather in people like New York did, and
20          we were -- sort of went off talking about the
21          law and -- but he agreed to represent Kurt and
22          told me it might be some time because of the
23          machinations that were going on with the
24          legislature and the law in Pennsylvania.  But
25          that he was pretty certain that they were going
```

Mary Ellen Poulos

```
 1            to grandfather people in like New York did, and
 2            that was that.
 3      Q     And so at any point in time did your son ever
 4            tell you that he was sexually abused at The
 5            Hill School?
 6      A     Yes.
 7      Q     When was that?
 8      A     About 2014.
 9      Q     I'm sorry.  I thought you said he used the word
10            "assault."
11      A     I don't remember the word he used, but I knew
12            what he meant.  I will tell you that right now,
13            I knew what he meant.
14      Q     Did you ever ask your son who his alleged
15            abuser was?
16      A     Who his what?
17      Q     Who his alleged abuser was?
18      A     No.
19      Q     Did he ever tell you who his alleged abuser
20            was?
21      A     No.
22      Q     So after you initially contacted Garabedian and
23            he said your son has a case, when is the next
24            time you spoke with him?
25                  MS. DOUGHERTY:  Objection.
```

Mary Ellen Poulos

```
1                    THE WITNESS:  Spoke with whom?  My
2          son?
3     BY MR. JUBB:
4     Q    Mr. Garabedian.
5     A    Yeah.  I never really -- he called me once
6          because he couldn't find Kurt and asked me if
7          Kurt was okay, and I said as far as I knew he
8          was.  He expressed to me that, yeah, in these
9          situations sometimes people just need alone
10         time.  He seemed very sympathetic, but I said I
11         didn't think anything was going on, and I
12         hadn't talked to Kurt at that point for a
13         couple days.
14    Q    Was this early on in the process?
15    A    No.
16    Q    Like in late 2017?
17    A    No.  I didn't have much -- it wasn't my case.
18         You know, it was Kurt's case.  I tried to stay
19         out of it.  It was very, very difficult for
20         Kurt to talk about this.  I was very, very
21         proud of him for having the gumption and the
22         courage to tell Garabedian his story.
23              Garabedian needed to know his story.
24         I didn't.  I needed to be a support system for
25         him, and I was very pleased that he had a
```

Mary Ellen Poulos

```
 1          prominent attorney to help him through this,
 2          and that I could just be supportive.
 3   Q      So I'm going to show you something on your
 4          screen.  So what's going to happen is all of
 5          our photos are going to get a little bit
 6          smaller, but you're going to see a document,
 7          okay?  Let me know when you can see it, all
 8          right?  Do you see this, this email?
 9   A      Yes.
10   Q      Yes.  And it looks like it's an email from you
11          dated May 24, 2016, to somebody at The Hill
12          School.  Do you see that?
13   A      Yes, I remember the email.
14   Q      You said, "Please give me the name of my son's
15          geometry teacher when he was a student at the
16          Hill."  Do you see that?
17   A      Yes.
18   Q      Prior to May 24, 2016, did your son ever tell
19          you that his geometry teacher assaulted him or
20          sexually abused him?
21   A      He alluded to -- he told me it was a teacher.
22          That's why I tried to get information from
23          Jason.  I don't know if it was the first time
24          he told me or another situation where he was
25          triggered, but he said something about a math
```

Mary Ellen Poulos

```
 1        teacher.

 2   Q    And what do you recall about that time?

 3   A    That he said --

 4             MS. DOUGHERTY:  Objection.

 5             THE WITNESS:  -- it was a math

 6        teacher.  I answered that.

 7   BY MR. JUBB:

 8   Q    Did -- okay.  Well, Ms. Poulos, did your son

 9        ever tell you what year he was claiming that he

10        was either assaulted or sexually abused?

11   A    No.

12   Q    Okay.  And you came to the determination that

13        it must have been his fourth form year,

14        correct?

15   A    Is that sophomore year?

16   Q    Yes.

17   A    Yes.

18   Q    At some point after Mr. Poulos had initially

19        had his conversations with Mr. Garabedian, did

20        you ever have a phone call where you, your son,

21        and Mr. Garabedian were on a call at the same

22        time?

23   A    I don't think so.  I mean, Kurt may have stayed

24        on the call after he spoke with Garabedian and

25        told him the facts, but I don't know if he did
```

Mary Ellen Poulos

```
 1           or not.  I think he was in Connecticut at that
 2           time.
 3   Q   With respect to that last email I just showed
 4           you, do you recall ever getting a response to
 5           that?
 6   A   Yeah.
 7   Q   Okay.  What do you recall about that?
 8   A   They told me his name was Matthew Ralston.
 9   Q   And you sent this right after they had sent the
10           letter pertaining to -- I guess, was it the May
11           2016, that first notice they sent to all the
12           parents and alumni?
13   A   It was in April --
14               MS. DOUGHERTY:  Objection.
15               THE WITNESS:  -- of 2016.  You know,
16           don't you have these documents sitting there in
17           front of you?  You know, it was in -- I believe
18           it was April of 2016.
19   BY MR. JUBB:
20   Q   And other than receiving a response from
21           somebody at The Hill School saying that it was
22           Matt Ralston, did you receive any other
23           information from them?
24   A   No.
25               MS. DOUGHERTY:  Objection.
```

```
 1    BY MR. JUBB:

 2    Q    Do you still have that email?

 3    A    I don't think so.

 4    Q    Did you tell your son that you were going to

 5         contact Mr. Garabedian on his behalf before you

 6         did it?

 7    A    No.

 8    Q    I'm going to show you another document.  This

 9         was that initial email that you sent, "Please

10         give me the name of my son's geometry teacher

11         when he was a student at the Hill."  The

12         response from Bridget Barbieri at the Hill was

13         not that his name was Matthew Ralston.  She

14         said she sent the inquiry to the registrar's

15         office.

16    A    Well, they must have told me then.

17    Q    Okay.  So how do you recall them telling you?

18    A    I got an email.

19    Q    All right.  And when you were asked to produce

20         certain documents in this case and actually

21         ordered by the judge to produce emails in this

22         case, did you ever come across any

23         correspondence from the Hill telling you that

24         your son's geometry teacher was Matthew

25         Ralston?
```

Mary Ellen Poulos

```
1    A    No, I gave you everything I had.
2    Q    Do you recall having any sort of telephone
3         conversation with anyone at the Hill?
4    A    No, but I will tell you this; I could be
5         mistaken because at the same time that I was
6         asking the school the name of his geometry
7         teacher, I was asking Jason the name of Kurt's
8         geometry teacher.  So I may have confused who
9         actually gave me the name.  It may have
10        actually been Jason who gave me the name
11        because I was communicating with them both at
12        about the same time right after that April
13        memo.
14   Q    Do you believe that Jason would have said this
15        to you by email or was that a telephone
16        conversation you had with him?
17   A    I don't know.  I don't remember.
18   Q    Did you ask Jason anything about the geometry
19        teacher other than the name?
20   A    No.  No, absolutely not.
21   Q    At any point in time did Kurt ever tell you
22        that it was his geometry teacher that had --
23        that he was alleging to have assaulted or
24        abused him?
25   A    No, he said something about a math teacher.  I
```

```
 1            think I already said that.  Math, he used the

 2            word math.  Not geometry, math.  I'm missing my

 3            parade.

 4    Q      I thought you said it started at 1:00?

 5    A      11:00.

 6    Q      Forgive me.  That was never going to happen

 7            because we started your deposition at 10:00.  I

 8            thought you said 1:00.

 9    A      Why?

10    Q      Maybe they will win next year and you will get

11            another parade then.

12                    MS. DOUGHERTY:  Hold on a second.  Is

13            the parade short, like 15 minutes?

14                    THE WITNESS:  I have no idea.

15                    MS. DOUGHERTY:  I was going to say if

16            it's something you can watch from your window

17            on a break, we can take a short break.

18                    THE WITNESS:  Thank you.

19                    MR. JUBB:  Can you watch it from your

20            window?

21                    THE WITNESS:  No.

22    BY MR. JUBB:

23    Q      Okay.  Well, ultimately, do you recall ever

24            having to reach out to Mr. Garabedian for any

25            reason during his representation of your son?
```

Mary Ellen Poulos

```
 1    A    I think I may have felt that his
 2         representation -- he was kind of inattentive.
 3         Like what's going on?  Is anything going on?  I
 4         think I sent him an email because I think Kurt
 5         was a little agitated that he hadn't heard from
 6         him in a while, and I think I sent him an email
 7         expressing that sentiment.  And he responded
 8         back to me with, "We talked to him today," and
 9         I thought, okay, great because Kurt was upset
10         that he didn't seem to be very responsive.  And
11         so I thought maybe if I contacted him, he might
12         respond more to Kurt or keep him informed more.
13    Q    Is there any other correspondence that you can
14         recall having with Mr. Garabedian by telephone?
15    A    No.
16    Q    You mentioned that Kurt had received some sort
17         of -- whether psychiatric or psychological
18         counseling when he was in Connecticut.  What do
19         you recall about that?
20    A    I think the court ordered it.
21    Q    Did your son attend that?
22    A    Yeah.  It was inpatient, I think.
23    Q    Inpatient as in he was admitted into a
24         hospital?
25    A    As I recall.
```

Mary Ellen Poulos

```
 1    Q    Do you recall what hospital?

 2    A    No.

 3    Q    At some point after there was a lawsuit filed

 4         in this case, did you have any communication by

 5         telephone with Mr. Garabedian?

 6    A    Yes.  Well, no.  I don't think I did.  No, I

 7         talked to Jeffrey McCarron.

 8    Q    What did you talk to Mr. McCarron about?

 9    A    What a joke this was.

10    Q    What else?

11    A    Your name.

12    Q    What about me?

13    A    Just like Lane was sort of a dorky name, and I

14         mentioned that.

15    Q    What else did you talk about?

16    A    The time -- I was concerned about when the

17         answer was due and whether or not Garabedian

18         was going to represent Kurt.

19    Q    What did Mr. McCarron say?

20    A    Somebody told me -- and I don't know if it was

21         Jeffrey or I may have spoken with Garabedian or

22         one of his staff people, maybe Kurt just --

23         maybe I told Kurt to call Garabedian.  I don't

24         really specifically recall that, but that he

25         had a conflict of interest and couldn't
```

Mary Ellen Foulos

```
 1              represent Kurt.

 2    Q    Do you recall personally having any other

 3         discussions with Mr. McCarron other than that

 4         one?

 5    A    I had a lengthy phone conversation -- I have

 6         had two subsequent conversations with Jeff.

 7         One was recently.  I think right -- yeah, it

 8         was right before Garabedian's deposition, and

 9         then he and I had a long -- hour-long

10         conversation -- I don't know, maybe a couple

11         months ago.

12    Q    So with respect to that hour-long conversation

13         a couple months ago, what did you talk about

14         then?

15    A    I don't know.  I was pretty mad.

16    Q    At who?

17    A    Everybody.

18    Q    What did Mr. McCarron say to calm you down, if

19         anything?

20              MS. DOUGHERTY:  Objection.  That

21         wasn't her testimony.

22              THE WITNESS:  I'm not so sure he did

23         calm me down.

24    BY MR. JUBB:

25    Q    That's why I said "if any."  So what did you
```

```
 1          talk about for the hour-long convo when you

 2          were pretty mad?

 3                    MS. DOUGHERTY:  Objection.

 4                    THE WITNESS:  Do you really want me

 5          to go there?

 6     BY MR. JUBB:

 7     Q    I do.

 8     A    I vented a lot.  This lawsuit is frivolous.

 9          Every pleading you file is a violation of our

10          ethical code.  I practiced law for 40 years,

11          mostly in federal court.  I have never seen

12          anything as I have seen as this lawsuit.  The

13          language you use, the way you talk about

14          people, you accuse my son of being a liar and

15          an extortionist in a public document.  You

16          should go read our ethical code.

17                    That's not how you practice law, and

18          my son does not belong in this case.  He did

19          nothing.  He contacted an attorney about abuse

20          that occurred to him when he was 14 or 15 years

21          old.  He told the attorney that story.  Nobody

22          else on the face of this earth, not his mom,

23          not his grandma, not his siblings, nobody but

24          Garabedian.

25                    And now he's being raked over the
```

Mary Ellen Poulos

```
1              coals in federal court by a condescending pus.
2              I was mad and tired, exhausted by the way he's
3              being treated, and I let Jeffrey know it.  It
4              was good for the soul.
5      Q       Was there anything else you discussed in that
6              conversation?
7      A       Jeffrey was pretty aggressive, and he was
8              pretty -- it was a good talk.  It was a good
9              talk.
10     Q       What else did you discuss?
11     A       We discussed Kurt's deposition and that he was
12             very believable and that he did a really,
13             really good job and answered all your inanity
14             with dignity and respect, which I'm not doing.
15             I have tried, but you're getting on my nerves.
16             And the import of Kurt's testimony.
17                  You know, just generally talk about
18             the case.  I'm not a happy camper, and Jeff was
19             not happy with the way I was talking to him
20             about this stuff, but we talked it out, and I
21             could have talked to Jeff for five hours.  It
22             was kind of fun, and it was interesting to hear
23             his position, and I don't know.  It was
24             cathartic, I guess, and he let me do it.
25     Q       You mentioned that your son hasn't told anybody
```

```
 1              else but Garabedian.  He told his girlfriend,

 2              though, right?

 3       A      I have no idea.  I think --

 4       Q      He talked to one of Mr. Garabedian's associates

 5              too, correct?

 6       A      I have no idea.  I mean, I do know this, the

 7              few times that I talked to Garabedian on the

 8              phone he would always say to me the name -- he

 9              would give me a name of somebody who was

10              sitting in on the conversation.  He always made

11              a point of saying that somebody is here, Joe

12              Blow is sitting here with me.  So there were

13              other people always on the conversation.

14       Q      And then with respect to the other conversation

15              you had, you said there was one recently before

16              Mitchell Garabedian's deposition.  What do you

17              recall about that conversation?

18       A      Jeff contacted Kurt and wanted to talk to him

19              before Mitchell's deposition, which I believe

20              was done in person, that Jeff was on his way --

21              he was at his -- I don't know.  He has a lake

22              house or something.  Anyway, he contacted Kurt

23              and wanted to talk to Kurt before the

24              deposition took place.

25                      So I think it was the day before the
```

```
1              deposition or a couple days before or whatever.
2              And Kurt called me and asked me if he should
3              talk to Jeff, and I said, well, maybe.  Yeah, I
4              think you should, but asking if maybe I could
5              be part of that conversation too.  Kurt got
6              back to me later that day and said, yeah, Jeff
7              said that's fine, and that he would call us and
8              it was at 3:00.  I think it was the day before
9              the deposition was to take place.  We had a
10             three-way conversation, Kurt, Jeff and I.
11    Q    What did you talk about?  That was my question.
12    A    The deposition.
13    Q    What about it?
14    A    I think he wanted to reassure Kurt that
15             Garabedian -- I can't remember the exact words
16             he used, but -- words to the effect of,
17             Garabedian is on your side, kind of.
18    Q    Was this -- was the first conversation that you
19             had, the hour-long one where you talked about
20             my name, was that before or after you filed the
21             cross-claim against Mitchell Garabedian?
22    A    After.
23    Q    And whose decision was that to file a
24             cross-claim?  Was that yours or your son's?
25    A    Well, it was my decision to file it when we
```

Mary Ellen Poulos

```
 1          filed it because I'm aware of the statute of
 2          limitations problem.  Kurt -- it was more to
 3          preserve the claim than anything because the
 4          statute of limitations was right there in front
 5          of us.  And I had not been able -- and Kurt had
 6          not received a copy of his attorney file from
 7          Garabedian, and I believe it was about a week
 8          before the statute of limitations would kick in
 9          that I had expressed to somebody that we need
10          that file, and I didn't get it, didn't get it,
11          felt pressure for Kurt because of the statute
12          of limitations.  Contacted I don't know how
13          many lawyers as I did when this case was filed
14          to try and get somebody to represent Kurt out
15          there.
16                There were plenty of people who
17          wanted to represent him, but the problem was
18          they wanted $25,000, which I didn't have and
19          Kurt clearly doesn't have.  So I filed --
20          drafted and Kurt filed.  I ghostwrote a
21          complaint, and he filed it, and then I got the
22          file.
23                I think I filed it and then got the
24          file or Kurt got the file, and he sent it over
25          to me like the same day.  And I went through
```

Mary Ellen Poulos

```
 1              every document in that file, contacted a bunch

 2              of lawyers to see if somebody could represent

 3              Kurt in this cross-claim.  It was like talking

 4              to -- it was unproductive.  Let's put it that

 5              way, and I am not able to represent my son in

 6              federal court in Pennsylvania.  And I am not

 7              able to pursue a malpractice claim on his

 8              behalf.  He needed an attorney.  The issues

 9              were too complex and too subtle.  It was not

10              clear-cut once I reviewed the file.  And he and

11              I discussed it and we decided to withdraw the

12              complaint.

13    Q         Other than the cross-complaint, what other

14              documents did you ghostwrite for your son?

15    A         A motion to dismiss for non-publication, and I

16              helped with the complaint, but I had not done

17              the research on ghostwriting.  And when I

18              did -- when I had that complaint -- whether or

19              not Garabedian was going to represent him in

20              this was up in the air practically to the day

21              the answer was due.

22                        And I was contacting attorneys.  I

23              must have talked to 20 attorneys, the Legal Aid

24              Society, everybody out there trying to get

25              somebody to represent Kurt.  And then the
```

Mary Ellen Poulos

```
 1          complaint came due and I found this pro se

 2          answer online and tried to mismatch that up

 3          with Kurt, help him file that.

 4                  Then after that got done, the

 5          complaint's filed and Garabedian files the

 6          motion to dismiss and the time lapses and blah,

 7          blah, blah, I did some research on

 8          ghostwriting.  And I looked at the ADA rules,

 9          and I looked at some articles about ghost

10          writing and found out that it was perfectly

11          legal to do and that as long as Kurt didn't try

12          to deceive the court and if asked -- and I told

13          him this, you just say your mom helped you,

14          former lawyer helped you draft this stuff, then

15          it was perfectly legal.  So I started helping

16          him.  I didn't know you could do that, but I

17          did the research.

18     Q    At some point in time did you ever contact the

19          Leelanau School?

20     A    Yes.

21     Q    When was that?

22     A    I think right after -- right after I got his

23          name I started going online.  You can find out

24          so much stuff online these days it's

25          incredible.  I found out it was kind of -- it
```

Mary Ellen Poulos

```
 1              was kind of amazing.  There were some articles

 2              and some newspapers where his name was

 3              mentioned, and he was the head of school at

 4              this place called Leelanau.

 5                   So I started researching Leelanau,

 6              and I would check Leelanau, their website, once

 7              or twice a week, just go on their website and

 8              see what was going on.

 9                   And I remember one week he was there

10              and the next week -- the next time I logged on

11              he was gone, poof, up in air.  He's gone, and I

12              was kind of shocked.  I think at some point I

13              send an email to Leelanau to ask about his

14              employment status.  I can't remember exactly

15              when I said, but I never got a response.

16         Q    In other words, when you got his name, you

17              actually went on the internet and you found him

18              as the headmaster at the Leelanau school; is

19              that right?

20         A    He's called head of school there, yes.

21         Q    Tell us how you got his name.

22         A    I already did.

23         Q    Okay.  I don't believe that's the case.  Tell

24              us -- are you saying that--

25         A    I told you.  I told you I either got it in an
```

```
 1            email from Jason or I got it in an email from

 2            the school.  I don't remember which.

 3    Q    Okay.  That's why my question was that I don't

 4            believe you did because I think it was still up

 5            in the air.

 6                  MS. DOUGHERTY:  Objection.

 7    BY MR. JUBB:

 8    Q    But in any event, are you saying that at the

 9            time you first learned this name from either

10            Jason Zwerner or somebody from The Hill School,

11            then you Googled the name; is that right?

12    A    Yes.

13    Q    And then you believe you actually sent an email

14            to the Leelanau school; is that correct?

15    A    Yes.

16    Q    Did you also call them?

17    A    No.

18    Q    Do you still have that email that you sent to

19            Leelanau?

20    A    No.

21    Q    Do you delete your sent emails often?

22    A    Yes.  I think I --

23    Q    Did you make an effort -- go ahead.

24    A    I think I deleted it before the lawsuit was

25            even filed.
```

Mary Ellen Poulos

```
1    Q    Any particular reason?
2    A    I wasn't getting it.  I wouldn't -- I didn't
3         get anywhere.
4    Q    Did anyone respond to you?
5    A    No.
6    Q    What did you say in the email?
7    A    I don't remember.  His employment status.  I
8         think I asked is he still head of school
9         because one day he's there head of school,
10        proud as a peacock, and the next time I log on
11        there's an acting head of school.  I'm like,
12        what happened here?  And I was confused why he
13        left, why there was an acting head of school.
14             They were talking about -- they were
15        conducting a nationwide search to find a new
16        head of school, and the last time I logged on
17        the head of school was Ralston, and it was like
18        overnight, and I was shocked, and I wondered
19        what happened.  I wondered if that school would
20        tell us what happened and they wouldn't.  So
21        that was the end of that.
22   Q    Did you have any discussions whatsoever that
23        you can recall with anyone else from Leelanau
24        school other than that email that you sent?
25   A    No.
```

Mary Ellen Poulos

```
 1    Q    At some point --
 2               MS. DOUGHERTY:  One second.
 3         Mr. Poulos, are you there?  Mr. Poulos, are you
 4         there?  Lane, Mr. Poulos texted me and he said
 5         he didn't know what was going on, but he
 6         couldn't get back in the deposition.  That's
 7         what prompted me.  I think he's having
 8         technical issues, that's why.  I'm sorry to
 9         interrupt.  I just don't want to proceed --
10               MR. JUBB:  No, that's fine.  Let's
11         take a quick break.
12               MR. POULOS:  I'm back.
13               MS. DOUGHERTY:  You're back?  Okay.
14         Thank you.
15    BY MR. JUBB:
16    Q    Ms. Poulos, I don't have too much further.  I
17         would break, but I don't have too much further
18         and then we can break and Ms. Dougherty can ask
19         her questions, okay?
20    A    I don't need a break.  I'm doing fine.  If I
21         need a break, I will tell you I need a break.
22         I want to get this over with.
23    Q    Okay.  At some point in time you started having
24         -- reaching out to Mr. Lehman at Hill School;
25         is that correct?
```

Mary Ellen Poulos

```
1    A    I wrote him a letter.

2    Q    And did he respond?

3    A    Yes.

4    Q    And what did you say?

5    A    When this litigation was initially filed, it

6         triggered some of the anxiety, depression,

7         lashing out that Kurt had experienced and had

8         abated.  And I was convinced in my paranoid

9         attorney mind that the school was behind this

10        litigation, and I sent a letter to Lehman

11        begging him to dismiss this litigation, and he

12        responded.  Then I thought it was destroying my

13        son, doing damage, irreparable damage to my son

14        and would he please see what he could do in

15        effect to get this litigation dismissed.

16             He responded that -- I don't know --

17        that they didn't have anything to do with the

18        litigation and that it was not under their

19        control, and I don't know.  I sort of glossed

20        over it because clearly he wasn't going to do

21        what I wanted.  So I didn't really care.

22   Q    At some point did you ever learn of your son's

23        diagnosis that pertained to his liver?

24   A    No.  I -- I told you that.  I was told he had

25        suffered from acute alcohol poisoning.
```

Mary Ellen Poulos

```
 1   Q    Was there ever an understanding to any sort of
 2        chronic injury or permanent injury?
 3   A    I think he has pancreatitis.
 4   Q    Where did you get that information from?
 5   A    From him.
 6   Q    At any point in time did he ever relay to you
 7        that he suffered any sort of permanent liver
 8        damage?
 9   A    I think once he told me that -- let's see.  The
10        nurse came -- I didn't really talk to her.  I
11        didn't participate in their interactions except
12        I remember them sitting right here at this
13        table talking about what he should do, how he
14        should encourage his recovery, promote his
15        recovery.  And I believe at one point Kurt told
16        me that he had been told that amazingly enough
17        his liver was not permanently damaged and that
18        his doctor was kind of surprised that it
19        wasn't, that he had fully recovered.  And I got
20        that from Kurt.
21   Q    The latest girlfriend that your son had, was
22        that Emily Peters?
23   A    Yeah, I guess so.
24   Q    Were you involved in any incident involving
25        your son and Emily where she had to call the
```

Mary Ellen Poulos

```
 1              police and he locked himself in a bathroom?
 2                   MS. DOUGHERTY:  Objection.
 3                   MR. POULOS:  Objection.
 4     BY MR. JUBB:
 5     Q    You're smiling.  I'm not sure.  Did you
 6          understand my question?
 7     A    It's not that hard to understand your question.
 8     Q    Okay.
 9     A    No.  I wasn't really involved except in the
10          aftermath.
11     Q    What was the aftermath?
12     A    I explained to you.  I hired him an attorney
13          and bailed him out.
14     Q    At some point in time did you try and convince
15          Emily to actually come stay with you to take
16          care of Kurt?
17     A    No.  Take care of Kurt?  No.  I don't know what
18          you mean by that.
19     Q    Did you ever try to convince Emily to live with
20          you?
21     A    No.  Emily and I had an agreement that when
22          Kurt needed to be alone and was acting out,
23          which he would do, that she could come and stay
24          here with me.  We lived in the same apartment
25          complex, different building, same apartment
```

Mary Ellen Poulos

```
 1           complex.
 2                    I have two bedroom, two bathroom
 3           apartment.  I set it up so there was a bed, and
 4           I said, Emily, if Kurt needs to be alone, come
 5           over here and spend the night, no problem.  And
 6           she would do that every once in a while.  She
 7           wasn't here very long.  She did it a couple
 8           times.  She would come and we would have dinner
 9           and watch TV, and she would go in her room and
10           read, and I would go in my room and read.  I
11           told her to feel free to come over here
12           whenever she felt uncomfortable and Kurt was
13           getting anxious and needed to be alone.  As
14           Garabedian put it, sometimes these victims just
15           need to be alone.
16      Q    Would he become abusive?
17                    MS. DOUGHERTY:  Objection.
18                    THE WITNESS:  No.
19      BY MR. JUBB:
20      Q    To your knowledge, he never became abusive with
21           Emily?
22                    MS. DOUGHERTY:  Objection.
23                    THE WITNESS:  I don't know how you
24           define abusive, but my answer to that is I
25           never observed him being abusive in any way
```

Mary Ellen Poulos

```
 1          with Emily.  She was a drunk, and unfortunately
 2          that's not exactly the right kind of person to
 3          be around Kurt.  I mean, she has a right to
 4          live her life any way she chooses, and I don't
 5          mean that in a critical way.  I just mean it in
 6          the sense she was not the right person for him,
 7          in my opinion.
 8   BY MR. JUBB:
 9   Q    When you refer to Emily as a drunk, where did
10        you -- is that something that your son told
11        you?
12   A    No, I observed it.
13   Q    How so?
14   A    She would come to my door and be drunk.  I
15        didn't observe it a lot, but she wasn't here
16        very long, and we went out to dinner a couple
17        times.  She drank too much.  I observed it
18        personally.
19   Q    Do you know what led to the situation where the
20        police were called as it pertained to Emily and
21        your son?
22   A    I know what I observed in my apartment.
23   Q    What did you observe?
24   A    Emily had come as per our agreement and
25        understanding with each other; she had come to
```

Mary Ellen Poulos

```
 1          spend the night with me.  And we were talking

 2          about what we were going to do for dinner and

 3          what was on TV.  And, you know, I was in my

 4          room watching TV or doing something.  I don't

 5          remember what, and she came to door of my

 6          bedroom and she's on her phone -- on her cell

 7          phone, and she's, like, talking to somebody.

 8          And she said, "I'm going over to my apartment

 9          now."

10                  And I -- she was kind of hyper.  "I'm

11          going over there now," and I tried to talk her

12          out of it, and she wouldn't listen to me.  And

13          so she left, walked over to their apartment,

14          and the next thing I know is my son is under

15          arrest.

16     Q    Anything else that you have knowledge about

17          about that situation?

18     A    No.

19     Q    What was the incident in Connecticut?

20     A    I don't know.

21     Q    Did you hire an attorney for your son in that

22          instance?

23     A    No, Emily called me though.

24     Q    What did she say?

25     A    She called me during the incident, whatever
```

```
 1              incident occurred.  She called me on the phone
 2              from Connecticut.
 3    Q    And what did she say was occurring?
 4    A    She's, like, Kurt was -- I could hear him in
 5              the background, and she didn't know what to do.
 6              And I said, "You have to ignore him and leave,"
 7              and she didn't want to do that.
 8    Q    What was he doing?
 9    A    He was crying and shouting and emoting.  The
10              same thing I described when he finally told me
11              that something had happened to him.
12    Q    Have you ever noticed your son to have any sort
13              of drinking problem?
14    A    Yes.  He was heavily drinking in those days.
15              He suffered from alcohol poisoning, and it
16              almost killed him.
17    Q    Approximately how long, to your knowledge, was
18              your son drinking heavily?
19    A    Probably heavily drinking -- he had a bunch of
20              friends.  He had this circle of friends that
21              owned bars, and they opened a restaurant and
22              worked in bars, and they -- one guy owned a
23              hair salon.  And they were this great group of
24              guys, but they drank a lot, and I -- you know,
25              he was an adult.  I wasn't observing his
```

```
 1            behavior every day, but they all drank a lot.

 2            And that was kind of their lifestyle.  They

 3            worked hard and then in the evenings they drank

 4            a lot and went out.  And they were kind of like

 5            VIPs in the downtown bar scene in Milwaukee

 6            which is quite a scene, to be perfectly honest.

 7                    And he seemed to be having a good

 8            time.  I don't know how much he was drinking,

 9            but it certainly was brought home when he ended

10            up in the hospital.

11    Q    Did he end up in the hospital any other

12            occasions other than that one instance that you

13            were describing to me?

14                    MS. DOUGHERTY:  Objection.  Are you

15            asking because of alcohol or just generally?

16                    MR. JUBB:  Yeah.

17                    THE WITNESS:  Yeah, what?

18    BY MR. JUBB:

19    Q    Yes, as it relates to alcohol.  I will make a

20            tight question for you since that was unclear.

21                    Were there any other occasions that

22            you were aware of that your son had to be

23            admitted to the hospital for issues pertaining

24            to alcohol other than the one you just

25            described for us?
```

Mary Ellen Poulos

```
1    A    No.

2    Q    Have you told us everything that you can recall

3         about any sort of conversations that you may

4         have had with Mr. Garabedian?

5    A    Yes.

6    Q    Have you told us everything that you can recall

7         about any sort of discussions with Mr. McCarron

8         or anyone else from his firm?

9    A    I sent them emails, but most of them haven't

10        been responded to, but I think so.

11   Q    When Kurt first told you during this event

12        where you said he was angry or throwing things

13        and what have you, and he said that he was

14        assaulted at The Hill School, what led to that

15        event?

16   A    To what event?

17   Q    Well --

18   A    The explosion?

19             MS. DOUGHERTY:  Ms. Poulos, why don't

20        you let Mr. Jubb clarify for you.

21             THE WITNESS:  Sure.  Fine.

22   BY MR. JUBB:

23   Q    Yeah.  Was there more than one occasion where

24        your son at this point would become angry and

25        throw things like this?
```

1              MS. DOUGHERTY:  Objection.

2              THE WITNESS:  First of all, he didn't

3       throw things.  He threw one thing.  He threw my

4       basket.  He picked up my basket that I take my

5       groceries from the garage to my apartment.  He

6       threw that.  He bent it.  He didn't throw

7       things.  He threw one thing.  His behavior was

8       unpredictable.

9    BY MR. JUBB:

10   Q    So I'm going to refer to this -- this is just

11        the event, if you will.  What led to that

12        event?

13              MS. DOUGHERTY:  Are you -- are you

14        talking about the 2014 disclosure?

15              MR. JUBB:  I'm talking about what she

16        described as around 2014 there was an argument

17        between them where he had said he was

18        assaulted, and that's what I'm referring to as

19        the event.  So I'm asking what led to this.

20              MR. POULOS:  Can you start using

21        better modifiers because you just throw out

22        random questions?

23              MS. DOUGHERTY:  Perhaps Ms. Poulos

24        has a term that she uses to describe it.

25              THE WITNESS:  I said unpredictable.

Mary Ellen Poulos

```
 1              Unpredictable, unprovoked, inexplicable.
 2                   MS. DOUGHERTY:  Ms. Poulos, all
 3              Mr. Jubb is trying to do is find a way that you
 4              and he can agree to a term or some way to
 5              characterize the 2014 interaction with
 6              Mr. Poulos.
 7      BY MR. JUBB:
 8      Q    Incident.  Yeah, that's all I'm trying to do is
 9              to refer to it as something.  I just wanted to
10              figure out what led to that.  So with that as
11              the background, I will try and make a nice
12              tight question for you, okay?
13                   What was it, if you can tell us or if
14              you can recall, that led to this event around
15              2014 where Mr. Poulos ultimately, in what you
16              described as unpredictable, said he was
17              assaulted at The Hill School?
18      A    Nothing.
19      Q    Was he angry at you during this event?
20      A    No.
21      Q    Was there any sort of catalyst in your mind
22              that caused him to act this way?
23      A    He was lashing out.
24      Q    But did he have these events where he would
25              lash out often?
```

```
 1    A    He had them.  They were not frequent, but they

 2         were intense.

 3    Q    How often would he have them?

 4    A    I have no idea.  I wasn't around him all the

 5         time.  I only --

 6    Q    How often would it happen in your presence?

 7    A    A couple.

 8    Q    For this particular one in 2014 was there

 9         something that caused him to lash out?

10    A    I don't recall.

11    Q    Do you know whether or not he was intoxicated

12         at this time?

13    A    I don't think so.

14    Q    And what leads you to that?

15    A    I just don't think he was.  He was in my home.

16         I wasn't drinking.  It was daytime.  I don't --

17         I don't know if he ever really drank in front

18         of me at all.  Except maybe if we were out to

19         dinner he might have a beer.  I never really

20         experienced him or observed him when he had

21         been heavily drinking.

22    Q    And to your knowledge this event that

23         occurred -- you said it was at your apartment

24         in 101?

25    A    Yes.
```

Mary Ellen Poulos

```
 1    Q    To your knowledge, this event that occurred in

 2         101 in 2014 that was before the hospitalization

 3         at St. Mary's; is that correct?

 4    A    Yes.

 5              MR. JUBB:  I appreciate your time.

 6         Hopefully you can catch the end of the parade,

 7         but I'm not sure how many questions

 8         Ms. Dougherty has for you.

 9              MS. DOUGHERTY:  Sure.  Mr. Poulos, do

10         you have questions?

11              MR. POULOS:  I have a few questions

12         for Mary Ellen.

13                          EXAMINATION

14    BY MR. POULOS:

15    Q    So I will start by just saying did you

16         recognize that after I recovered from my

17         hospitalization that I had stopped drinking and

18         was in a positive space?

19              MR. JUBB:  Objection to the form.

20              THE WITNESS:  At what time?

21    BY MR. POULOS:

22    Q    After I got out of the hospital and I started

23         to recover, did you feel like I was in a

24         positive space?

25    A    Yeah, you were great.  You did -- yeah.
```

Mary Ellen Poulos

```
 1    Q    Did you see a change in my demeanor after

 2         receiving the emails while I was living in

 3         Connecticut?  Obviously, you were a thousand

 4         miles away, but overall do you think it

 5         affected the way my life from day-to-day was

 6         going?

 7              MR. JUBB:  Object to the form.

 8              THE WITNESS:  Well, I knew you were

 9         drinking again.

10    BY MR. POULOS:

11    Q    Okay.  In the past, obviously after the event

12         or alleged event at The Hill School, was it

13         brought to your attention that people who have

14         known me since I was a child noticed a major

15         change in my demeanor?

16    A    Yes.

17              MR. JUBB:  Objection to the form.

18    BY MR. POULOS:

19    Q    In your opinion do you think that my drinking

20         excessively to the point of hospitalization in

21         2014 was a result of finally letting go and

22         telling you the truth?

23              MR. JUBB:  Objection to the form.

24              THE WITNESS:  I don't know how to

25         answer that question, Kurt.
```

Mary Ellen Poulos

```
 1                    MR. POULOS:  Okay.  I can't think of

 2          anything else.  I will give up the rest of my

 3          time at the end of this.

 4                    THE WITNESS:  Can I point out

 5          something?

 6                    MR. POULOS:  Sure.

 7                    THE WITNESS:  People who notice a

 8          dramatic change in your personality and/or

 9          behavior when you are 15, 16 years old did not

10          say anything to me about it for 20 years.

11     BY MR. POULOS:

12     Q    Do you feel comfortable with telling us who

13          those people are?

14     A    A woman who I thought was my best friend at the

15          time and my own sister.

16     Q    And your best friend, what does she do for a

17          living or what did she do for a living before

18          she retired?

19     A    Right before she retired she ran St. John's,

20          which is an elderly complex for elderly living

21          and care -- you know, all different levels of

22          care plus independent living.  She was -- she

23          was the head of the mental health complex part

24          of that job.  So I met her last -- I actually

25          met her through her son.  The two of you went
```

Mary Ellen Poulos

```
 1              to kindergarten together or preschool together

 2              and that's where I met her in Shorewood.

 3    Q    And her husband who also, you know, experienced

 4              a similar traumatic experience when he was at

 5              school has also conveyed those feelings to you

 6              at some point?

 7                   MR. JUBB:  Objection to the form.

 8                   THE WITNESS:  Well, her husband is a

 9              psychiatrist, and he was a wonderful,

10              sympathetic man, and he's how we found

11              Dr. Grady.

12                   MR. POULOS:  Okay.  I'm done.

13                   MS. DOUGHERTY:  Okay.  I have a

14              number of questions.  So I would like to take a

15              comfort break so I can use the restroom and so

16              that others can as well.  So I suggest ten

17              minutes unless somebody else would like more

18              than ten minutes.

19                   THE WITNESS:  Whatever you need.  I'm

20              fine.

21                   MS. DOUGHERTY:  I understand.

22              There's just other people involved.  I'm

23              impressed, though, because I see you drinking

24              your beverage.  Okay.  So let's come back.

25                   THE WITNESS:  I didn't want you
```

Mary Ellen Poulos

```
 1           confused with what I was drinking, so I brought
 2           the can.
 3                    MS. DOUGHERTY:  No.  My comment was
 4           about the amount of liquid and not needing a
 5           break.  So 1:20, does that work?
 6                    MR. JUBB:  Sure.
 7                    THE WITNESS:  So it's 12:20 for me.
 8                    MS. DOUGHERTY:  Yes, I apologize.
 9                    THE WITNESS:  No, that's all right.
10                    THE VIDEOGRAPHER:  Going off the
11           record at 12:09.
12                    (Brief recess taken.)
13                    THE VIDEOGRAPHER:  We're back on the
14           record at 12:21.
15                    MS. DOUGHERTY:  Mr. Poulos did you
16           have further questions you wanted to ask?
17                    MR. POULOS:  I just wanted to
18           reestablish because a couple years are
19           missed --
20                    MS. DOUGHERTY:  Mr. Poulos, you don't
21           have to explain.  If you have more questions,
22           just go ahead.
23      BY MR. POULOS:
24      Q    So, Mom, did you move into the apartment at
25           104B in 2014 or 2013?
```

```
 1    A    I guess -- I thought I moved in '15, but I

 2         think I must have moved in '14 because I do

 3         recall that you worked at Pier 1 for a while

 4         after you got sick.

 5              MR. POULOS:  Okay.  I just want

 6         wanted to establish that timeline.  Go ahead,

 7         Candidus.

 8                        EXAMINATION

 9    BY MS. DOUGHERTY:

10    Q    Just staying with that so I'm clear.  Does that

11         mean that the disclosure by Mr. Poulos of

12         sexual abuse when he was at The Hill School

13         occurred earlier than 2014, 2015?

14    A    Yeah.  Yeah, it was before I moved into this

15         apartment.

16    Q    Okay.

17    A    Yeah, and I moved into this apartment in 2014.

18         My recollection has been refreshed on that, and

19         it was early in the year, end of January.  So

20         it must have been in 2013 when we were living

21         in 101 that he told me about it.

22    Q    Okay.  You said that your recollection was

23         refreshed.  What refreshed your recollection

24         regarding the date that --

25    A    I --
```

Mary Ellen Poulos

```
 1    Q    Hold on one second -- the date that you moved
 2         to 104B?
 3    A    I talked to Kurt.
 4    Q    Okay.  So you spoke to Mr. Poulos during the
 5         break?
 6    A    Yeah.
 7    Q    What did you discuss with Mr. Poulos during the
 8         break?
 9    A    When we moved.
10    Q    And did Mr. -- what did Mr. Poulos tell you
11         that refreshed your recollection that you moved
12         in a different year?
13    A    He reminded me that he worked at Pier 1 after
14         he got sick, and the time wouldn't have worked
15         out right.  I thought he got sick and then went
16         to Connecticut -- and recovered and then went
17         to Connecticut.  I forgot about the fact he got
18         sick and in, like, December of the year he got
19         sick, he went to work at Pier 1 and worked
20         there for a while.  And then at the end of --
21         and then my mom died, and right after my mom
22         died is when he went to Connecticut.  So I was
23         just missing --
24    Q    Sure.  So what's the significance of Mr. Poulos
25         working at Pier 1 as far as your recollection
```

Mary Ellen Poulos

```
 1            being refreshed?  I'm --

 2   A   It just -- it just reminded me of the events.

 3   Q   Okay.  So now you're confident that in 2013 you

 4            had a discussion with Mr. Poulos where he told

 5            you that he had been sexually abused -- let me

 6            start again.

 7                 You're now confident that it was 2013

 8            that you had a discussion with Mr. Poulos where

 9            you left with the understanding that he had

10            been sexually abused while at The Hill School;

11            is that right?

12   A   Yes.

13   Q   Prior to when Mr. Poulos left to attend The

14            Hill School, did he live with you?

15   A   Yes.

16   Q   How long had Mr. Poulos lived with you prior to

17            when he left to attend The Hill School?

18   A   His entire life.

19   Q   Did anyone else live with you and Mr. Poulos at

20            the time Mr. Poulos left to go to The Hill

21            School?

22   A   No.

23   Q   At any time did anyone ever live with you and

24            Mr. Poulos?

25   A   Well, his father lived with us until he was
```

Mary Ellen Poulos

```
 1              about two and a half, as I recall -- two and a
 2              half years old.
 3    Q    Okay.  So most of Mr. Poulos's life you and
 4         Mr. Poulos -- let me start again.
 5                   So for most Mr. Poulos's life prior
 6         to when he attended The Hill School, you and
 7         Mr. Poulos lived together alone; is that right?
 8    A    Yes.
 9    Q    What was Mr. Poulos like before he left to go
10         to The Hill School?
11    A    Typical kid, I guess.  He had a lot of friends.
12         He liked to bike ride.  He had a paper route
13         for a while.  He was kind of always active, out
14         riding his bike with his friends, or I don't
15         know, just seemed like a normal -- I don't
16         know, he was just a kid.  He played basketball
17         at his middle school.  He had some girlfriends,
18         some girls who really liked him lived right
19         down the street from us who would stop by to
20         see if he was home.
21                   He was a very handsome young man, a
22         lot of personality.  Pretty good student.  I
23         don't know how else to describe it.  He wasn't
24         perfect, obviously, but he was -- he seemed to
25         have a pretty good life.
```

Mary Ellen Poulos

```
 1    Q    Was he a positive thinker, a negative thinker?

 2    A    I don't know if we ever gotten any in-depth on

 3         things like that.

 4    Q    Well, earlier in your testimony you used some

 5         adjectives that Mr. Poulos was unpredictable

 6         and lashed out and some other adjectives like

 7         that.  Did he act like that before he went to

 8         The Hill School?

 9    A    No.  No, he was a pretty happy kid as far as I

10         knew.

11    Q    You mentioned your sister earlier in your

12         testimony.  What's your sister's name?

13    A    Her name is Jan, J-A-N, Cathy, C-A-T-H-Y,

14         Licht, L-I-C-H-T.

15    Q    Did your sister have interactions with

16         Mr. Poulos before he went to The Hill School?

17    A    Yeah, absolutely.

18    Q    How often did Mr. Poulos interact with your

19         sister before he went to The Hill School?

20    A    I'm trying to put a timeline on this.  My

21         sister lives in the Chicago area, and so we

22         would see each other quite a bit, holidays and

23         things like that.  And she got divorced, and

24         she was always kind of like Kurt's buddy.  They

25         were pretty close.  And she got divorced and
```

```
1          she has two children or they were children
2          then.  They no longer are.
3                  We used to kind of meet in the middle
4          for Easter and try to figure out Christmas.
5          Sometimes I had to meet and go down there.
6          Sometimes she would go down to DC to have
7          Christmas with my mom.  So it was catch as,
8          catch can.  During her divorce she came and
9          stayed with me in Shorewood with her kids for a
10         period of time to get away from her husband,
11         and so, you know, it was kind of like that.
12    Q    Was that period, that time you're talking about
13         when your sister stayed with you, was that when
14         Mr. Poulos also lived with you or was that
15         after he went to The Hill School?
16    A    No.  No.  No.  That was like 1985, I think is
17         the year she got divorced, and so Kurt was 7
18         years old or so, and her kids were -- Tori was
19         probably 4 and Tori's brother, Justin, was
20         probably one and a half or two.  And I was
21         living in an upper flat in Shorewood.
22    Q    With Mr. Poulos?
23    A    No.  No, I was divorced.  I got divorced --
24    Q    Hold on.  I'm sorry, Ms. Poulos.  When I say
25         "Mr. Poulos," I'm talking about your son.
```

Mary Ellen Poulos

```
 1          Should I just call him Kurt?  I don't want to
 2          be disrespectful.
 3      A   Yeah, I think you should call him Kurt.
 4      Q   Okay.  I understand how -- okay.  I apologize.
 5          Because we try to be respectful when we're on
 6          the record.  So I always refer to Kurt as
 7          Mr. Poulos even when I speak to him generally.
 8          So as Mr. Jubb refers to me as Ms. Dougherty
 9          and vice versa.  So I will call him Kurt, and
10          I'm not trying to be disrespectful, so we don't
11          have confusion.
12                  Okay.  So your sister and her
13          children lived with you for a period of time
14          when Kurt and you lived together before he went
15          to The Hill School; is that right?
16      A   They didn't live with me, but they came for
17          three or four days, I remember.
18      Q   Okay.  You said that your sister was Kurt's
19          buddy.  What do you mean by that?
20      A   They were pretty close.  I had a very difficult
21          birth, and when he was born, she came to
22          Milwaukee and Kurt -- I was in a hospital,
23          St. Mary's downtown, and my son was in the
24          neonatal intensive care unit out at the county.
25                  So he's born, and my baby is snatched
```

Mary Ellen Poulos

```
 1              away from me.  It's like 20 miles away, and my
 2              sister came in, and she spent time with me and
 3              she also was able -- she was able to go out to
 4              the neonatal intensive care unit to see him,
 5              and she also took me out there to see him once.
 6              And so she was very involved right after his
 7              birth with the two of us, and they just kind of
 8              established a bond.  It was a little baby and a
 9              little boy.
10    Q    You also mentioned a woman who was your best
11              friend who was affiliated with St. John's
12              Hospital.  Who is that person?
13    A    It's not St. John's Hospital.
14    Q    I'm sorry.
15    A    St. John's Hospital is different.  Her name is
16              Kathie, K-A-T-H-I-E, Eilers, E-I-L-E-R-S.
17    Q    Okay.  Can you tell me the entity that she's
18              affiliated with since I had it wrong?
19    A    Well, she's retired now.
20    Q    Okay.  But what was the reference to St. John's
21              that I misunderstood?
22    A    I think they call it St. John's adult living
23              society or some mouthful like that, and it's --
24              it's a nursing home, hospice.  It's a community
25              on the lakefront in Milwaukee where elderly
```

Mary Ellen Poulos

```
 1              people can go and have independent living and
 2              care when they can no longer -- it has a broad
 3              range of services for adults, elderly adults.
 4              And when she retired from Milwaukee County, she
 5              retired to take the job at St. John's to run
 6              the place.
 7    Q    Was -- did Ms. Eilers have contact with Kurt
 8              before Kurt went to The Hill School?
 9    A    Absolutely.
10    Q    What type of contact did Ms. Eilers have with
11              Kurt before he went to The Hill School?
12    A    We shared -- her son, Adam, is two months
13              younger than Kurt, and I met Adam at
14              four-year-old Kindergarten in Shorewood at
15              Shorewood Elementary School when I took Kurt
16              there for his first day.  Adam came up to
17              introduce himself to us, and one time after
18              that incident Kurt and I were at a restaurant
19              eating dinner and Adam walked up to our table
20              and said, "Hi, remember me?  I'm Adam," and
21              introduced me to his parents, Barry and Kathie.
22              And we established a friendship and a
23              relationship basically through our sons in
24              four-year-old kindergarten at Shorewood.
25    Q    So Ms. Eilers and her husband, Barry, had
```

Mary Ellen Poulos

```
 1           regular contact with Mr. Poulos before he went

 2           to The Hill School?

 3    A      Yes, very regular.

 4    Q      Was there a time that you noticed a change in

 5           Mr. Poulos's personality or demeanor from a,

 6           quote, happy kid, pretty happy kid?

 7    A      Yes.

 8    Q      When was that?

 9    A      When he fled The Hill School.

10    Q      So you're talking about Mr. Poulos's junior

11           year?

12    A      Yes.

13    Q      Tell us about what you observed regarding a

14           change in Mr. Poulos's demeanor when he

15           returned from The Hill School, I guess, without

16           starting his junior year.

17    A      Well, I didn't explore his personality in depth

18           when he came home.  I think I've already

19           testified that I --

20    Q      No.  Just to be clear because I think you

21           misunderstand.  I just want to stick to my

22           question so we can get done.  I just want to

23           know what you observed in -- because you think

24           -- you confirmed that saw a change in his

25           demeanor.  So I just want to know what you
```

Mary Ellen Poulos

```
 1          observed that leads you to believe or forms the

 2          basis of your testimony that his demeanor

 3          changed when he returned from The Hill School

 4          his junior year.

 5     A    The mere act of him coming home in that fashion

 6          to me was uncharacteristic.

 7     Q    Okay.  Was he still a pretty happy kid when he

 8          returned from The Hill School his junior year?

 9     A    Well, as I stated earlier, I was concerned

10          about his education.  So I spent the first

11          several days that he was back in town trying to

12          get him into a school.  I also had a full-time

13          job, and I got him into Marquette.

14                   And my observation of him while he

15          was at Marquette was he seemed okay, and he

16          made a lot of friends.  He had a good social

17          group.  He went to Europe.  He seemed to

18          thoroughly enjoy that.  He made one really

19          close friend whose name escapes me at the

20          moment, but he seemed to be adjusting well to

21          this new school.  And I thought, okay, I guess

22          he just didn't like The Hill School or I didn't

23          have any lengthy discussions with him about his

24          motivations or anything else.

25                   I simply observed that he seemed to
```

Mary Ellen Poulos

```
 1          be happy at Marquette High, which I heaved a

 2          sigh of relief, and he went about his business

 3          and I went about mine.

 4    Q     I understand, Ms. Poulos, and just so we're

 5          clear, my questions are not designed to be

 6          critical of you for --

 7    A     I know.

 8    Q     I'm just asking about your observations because

 9          you said that you observed a change in

10          Mr. Poulos's demeanor when he returns from The

11          Hill School.

12                 So what did you observe, is what I

13          want to know?  It's not a judgment of you or

14          anything.  I just want to know what you

15          observed.

16    A     Oh, my God.  I didn't really observe that much

17          of a change in his demeanor.  I think I should

18          clarify and simply say that the mere act of

19          coming home so abruptly, not talking to me, not

20          calling me, not telling me he was coming

21          shocked me, surprised me.  That behavior in and

22          of itself I found disconcerting.

23                 So then I decided what am I going to

24          do about this?  Well, my first thought was get

25          him into another school.  School had already
```

1          started.

2    Q     Hold on, Ms. Poulos.  Mr. Jubb like --

3    A     Is he bored?  Is he bored?

4    Q     Ms. Poulos, I'm just going to cut you off

5          because I think I understand your testimony

6          better now.  So the mere act of Mr. Poulos

7          coming back from The Hill School you said

8          shocked and surprised you and then you were

9          sort of in a panic to get him enrolled in

10         school; is that right?

11   A     Yes.

12   Q     And then Mr. Poulos was enrolled in Marquette

13         and seemed to, I guess, rebound and start to do

14         better at Marquette; is that right?

15   A     He adjusted.

16              MR. JUBB:  Objection to the form.

17   BY MS. DOUGHERTY:

18   Q     And then there was time when Mr. Poulos

19         returned to The Hill School; is that right?

20   A     Yes, he --

21   Q     So Mr. Poulos requested to transfer back to The

22         Hill School?

23   A     Yes.  I just assumed he would go to Marquette

24         High for senior year.

25   Q     Did Mr. Poulos tell you why he wanted to return

Mary Ellen Poulos

```
1          to The Hill School rather than continue with

2          Marquette?

3     A    No, not really.

4     Q    I'm showing you a document that I'm going to

5          mark as D21, which is Bates labeled on the

6          bottom Hill 0003 to Hill 004.

7                So, Ms. Poulos, can you see the

8          document that I have up on your screen now?

9     A    Yes.

10    Q    I'm just going to scroll through it and tell me

11         if I need to go faster or slower.  My question

12         is going to be, do you recognize the document

13         that I marked as D21?

14    A    Well, I don't remember writing it, but I have

15         seen it before in some discovery materials that

16         I reviewed.

17    Q    Okay.  So just for the record this is a

18         September 11, 1995, letter that you wrote to

19         David R. Dougherty headmaster of The Hill

20         School; is that right?

21    A    Yes.

22    Q    And is that your signature on the second page?

23    A    Yes, it is.

24    Q    Now, you wrote on the first paragraph, second

25         sentence -- or let's just go with the first
```

Mary Ellen Poulos

| | | |
|---|---|---|
| 1 | | sentence, "As you are certainly aware, my son |
| 2 | | Kurt boarded a plane on Friday, September 8, |
| 3 | | 1995, and returned to his home in Milwaukee," |
| 4 | | right?  That's what you wrote to Mr. Dougherty? |
| 5 | A | Yeah, it's right there. |
| 6 | Q | "This decision was motivated in large part by |
| 7 | | his inability to cope with the living situation |
| 8 | | at the Hill."  Is that what you wrote to |
| 9 | | Mr. Dougherty? |
| 10 | A | There it is, yes. |
| 11 | Q | What do you mean by that sentence that I just |
| 12 | | read to you, Mr. Poulos's inability -- I'm |
| 13 | | sorry, Kurt's inability to cope with the living |
| 14 | | situation at the Hill? |
| 15 | A | I have no idea what I meant.  I can only |
| 16 | | surmise he must have told me that he didn't |
| 17 | | like it there anymore. |
| 18 | Q | Then you say, "I hesitate to characterize the |
| 19 | | events since I have no firsthand knowledge, but |
| 20 | | it is my observation that Kurt felt his |
| 21 | | physical being had been violated by a couple of |
| 22 | | the boys in his form."  Is that what you wrote? |
| 23 | A | Yup. |
| 24 | Q | What was the basis for your observation that |
| 25 | | Kurt felt his physical being had been violated |

```
 1          by a couple of the boys in his form?
 2    A     I can only assume he told me that, but I don't
 3          independently remember it.
 4    Q     I'm sorry.  So your -- you do not remember why
 5          you wrote -- let me start again.
 6                You do not remember the basis for
 7          your observation that Kurt felt his physical
 8          being had been violated by a couple of the boys
 9          in his form?
10    A     No, I don't remember that.  Can you make it
11          bigger again?
12    Q     Sure.  I'm sorry.  I had to make it smaller to
13          read.
14    A     Yeah, I got it.
15    Q     Well, let's start with this.  How about the
16          observation that Kurt felt his physical being
17          had been violated, did Mr. Poulos say something
18          to you?
19    A     I'm trying to be --
20    Q     Ms. Poulos --
21    A     I don't remember.
22    Q     Ms. Poulos, if at any time you do not know or
23          do not recall, that's a perfectly acceptable
24          answer.
25    A     That's what I just said.
```

Mary Ellen Poulos

```
 1    Q    Hold on one second.  If the answer is true, if
 2         you truly do not know or do not recall, then
 3         that should be your answer, and I'm just
 4         exploring information with you.
 5              So you do not recall the observation
 6         that you had that led you to write, "Kurt felt
 7         his physical being had been violated by a
 8         couple of the boys in his form"; is that right?
 9    A    Right.  I don't remember.
10    Q    I think in response to Mr. Poulos's question --
11         Kurt's questioning of you you indicated that
12         your sister and Ms. Eilers noticed a change in
13         Mr. Poulos and communicated that information to
14         you; is that right?
15    A    Many years later.
16    Q    Okay.  When did Ms. Eilers communicate to you
17         that she noticed a change in Kurt?
18    A    When he told me in, now we determined to be,
19         2013 what had happened to him, I talked to her
20         because the night that happened when he showed
21         up at my door, I called her, and she came over
22         to my house and so --
23    Q    Let me stop you there so we can lock this down.
24    A    You asked me a specific question, and I'm
25         getting to the answer.  In 2013 when I told her
```

Mary Ellen Poulos

```
 1            what Kurt had told me, she said to me I knew

 2            something was wrong; I knew something had

 3            happened.  And I lost it.

 4    Q     You got upset with Ms. Eilers?

 5    A     Yes.

 6    Q     Did Ms. Eilers give more information to you

 7            about what she meant by "I knew something was

 8            wrong"?

 9    A     I didn't let her.

10    Q     So just taking a step back to the -- so at the

11            time when you had the interaction with

12            Mr. Poulos -- I'm sorry.  Let me start again.

13                   In 2013 when you had the interaction

14            with Kurt where he told you he had been abused

15            while at The Hill School, Mr. -- Kurt did not

16            live with you at that time; is that correct?

17                   MR. JUBB:  Objection to the form.

18                   THE WITNESS:  No.  He did live with

19            me in apartment 101.

20    BY MS. DOUGHERTY:

21    Q     Okay.  How did the interaction begin?

22    A     With Kurt?

23    Q     Yes.

24    A     I don't remember.

25    Q     I thought you just said he came up to you or
```

Mary Ellen Poulos

```
 1          something when you were describing your

 2          conversation with Ms. Eilers.  Was Kurt not

 3          home?  Did he come home and did you two then

 4          start the discussion?

 5                    MR. JUBB:  Objection.

 6                    THE WITNESS:  At some point in 2013 I

 7          think we've established Kurt told me that

 8          something happened to him at The Hill School.

 9     BY MS. DOUGHERTY:

10     Q    Yes.  And I want to know how that

11          conversation --

12     A    Let me finish.

13     Q    Ms. Poulos, I'm really just trying to focus you

14          because --

15     A    I guess we're talking across verboses is the

16          only way I can look at it, and maybe I can

17          clarify, maybe I can't, if you would like.

18     Q    That's fine.  I just want to know how the

19          communication with Mr. Poulos started or with

20          Kurt started.  I can't break that habit because

21          I just want to call him Mr. Poulos.

22     A    I can't recall.

23     Q    Okay.  And it was an interaction that you and

24          Kurt had in person; is that right?

25     A    Yes.
```

Mary Ellen Foulos

1   Q   And is it during this 2013 discussion that Kurt

2       referred to the perpetrator as a math teacher?

3   A   I don't remember.

4   Q   Did you believe Kurt?

5   A   Absolutely I believed him.

6   Q   And just so I'm clear, during this 2013

7       communication with Kurt where he revealed he

8       had been sexually abused while at The Hill

9       School, he communicated information to you so

10      that you understood that a teacher had abused

11      him; is that correct?

12  A   Yes, but he never --

13              MR. JUBB:  Objection to the form.

14              THE WITNESS:  -- used the word

15      sexual.

16  BY MS. DOUGHERTY:

17  Q   Okay.  What was it about the description by

18      Kurt that led you to understand he was

19      referring to sexual abuse as compared to some

20      other type of abuse?

21  A   I don't know.  I just put two and two together

22      and came up with four.

23  Q   And -- I apologize.

24  A   I believe, and I tried to express this, that if

25      it had been a physical punching assault of some

```
 1           kind, then I would have heard about it from the
 2           school because he would have had injuries.  He
 3           was assaulted in a way that was not physically
 4           observable to the naked eye was my impression
 5           of what had happened to him.
 6      Q    I understand.  So is it -- so was your belief
 7           that if Kurt had been physically assaulted in a
 8           observable way, the school would have reported
 9           it to you even if he hadn't obtained medical
10           assistance; is that right?
11      A    Absolutely.
12      Q    And so your takeaway from the description by
13           Mr. -- by Kurt was that he had to have been
14           abused physically -- let me start again.
15                Your understanding of what Kurt told
16           you during this 2013 exchange was that the
17           abuse was physical; is that right?
18                     MR. JUBB:  Objection to the form.
19                     THE WITNESS:  I didn't know.  The one
20           thing I knew and could glean from what he said
21           was that it was private, that nobody knew about
22           it.
23      BY MS. DOUGHERTY:
24      Q    Okay.
25      A    Nobody observed it.
```

1    Q    Okay.  So Kurt told you that something had

2         happened with a teacher that was private and no

3         one observed?

4              MR. JUBB:  Objection to form.

5              THE COURT REPORTER:  I didn't get

6         that answer.

7              THE WITNESS:  Whose turn is it to

8         talk?  Mine?

9              MR. JUBB:  Yours.

10             MS. DOUGHERTY:  It's your turn.

11   BY MS. DOUGHERTY:

12   Q    Is that right or wrong?

13   A    Let me --

14   Q    Okay.  I'm just making sure you understand the

15        question.

16   A    You guys, your questions aren't that

17        complicated.  The issue is what I perceived

18        when my son exploded when he exploded.

19   Q    Ms. Poulos, we can read it back, but you

20        actually said he said it was private.  So

21        that's why I'm asking for clarification.

22   A    I gleaned.  I said I gleaned that it was

23        private.  I gleaned.  It appeared to me that

24        whatever happened to him nobody else knew

25        about.  That's what I gleaned.  I used that

Mary Ellen Poulos

```
 1              word.  And I figured if he -- and that it
 2              involved a teacher.  That's all I knew.
 3     Q    You don't remember if it was during this 2013
 4              communication that Kurt described a teacher as
 5              a math teacher; is that right?
 6     A    Right.  I don't remember that.
 7     Q    Well, do you remember when Kurt told you that
 8              his abuser at The Hill School was a math
 9              teacher?
10     A    No.
11     Q    And then -- so then -- so after this exchange
12              with Kurt, you said that you then did your own
13              research; is that right?
14     A    Yes.
15     Q    You checked -- you say you checked the statutes
16              in Pennsylvania.  What statutes did you check
17              in Pennsylvania?
18     A    Sexual abuse of a minor.
19     Q    What information did you learn when you checked
20              the statutes in Pennsylvania regarding sexual
21              abuse of a minor?
22     A    That the statute of limitations had run, I
23              think, at age 30 or something.
24     Q    Any other statutes that you checked in
25              Pennsylvania?
```

Mary Ellen Poulos

```
 1    A    No.

 2    Q    As part of your research?

 3    A    No.

 4    Q    Then you said you contacted Joffrey (sic)

 5         Anderson a lawyer; is that right?

 6    A    I think his name is Jeffrey.

 7    Q    Jeffrey?

 8    A    I think it's Jeffrey.  I'm not sure.  I just --

 9         I don't know if I spoke with -- I knew an

10         attorney in Milwaukee who had been very -- who

11         was with a firm -- a prominent attorney, very

12         political attorney who had defended the

13         Catholic church and the accusations, and I may

14         have contacted him to find out -- I'm pretty

15         sure he's the one that gave me Anderson's name

16         as one of the attorneys that he had run up

17         against on the other side and that he was in

18         Minneapolis.

19    Q    Okay.  So as part of your research after your

20         2013 communication with Kurt where he told you

21         he had been abused while at The Hill School,

22         you checked the statutes in Pennsylvania, you

23         had contact with a lawyer who gave you

24         Mr. Anderson's name and you spoke to

25         Mr. Anderson; is that right?
```

Mary Ellen Foulos

```
 1    A    As I recall, yes.

 2                MR. JUBB:  Objection to the form.

 3    BY MS. DOUGHERTY:

 4    Q    And then you also spoke to your stepsister; is

 5         that right?

 6    A    Yes.  Because her son attended The Hill School.

 7         He was a year ahead of Kurt.

 8    Q    And what did you -- I'm sorry.  Just to be

 9         clear, the stepsister's name is CiCi; is that

10         right?

11    A    Her is name Elsie, E-L-S-I-E, but we all call

12         her C-I-C-I, CiCi.

13    Q    Okay.  What did you tell CiCi when you spoke to

14         her after your 2013 communication with Kurt

15         where he told you he had been abused while at

16         The Hill School?

17                MR. JUBB:  Objection to the form.

18                THE WITNESS:  I don't recall how open

19         I was with her about what Kurt had told me

20         because it really wasn't my story to tell, but

21         I asked CiCi if she thought -- if it was okay

22         with her if I contacted Jason about his time at

23         The Hill School with Kurt because Jason had

24         been very protective of Kurt.

25                And I thought that maybe Jason would
```

Mary Ellen Poulos

```
 1          have information that I was unwilling to try

 2          and get from Kurt because it was too

 3          provacative to try and talk to Kurt.  It wasn't

 4          fair of me to cross-examine him about this

 5          trauma, so I thought I would see if I could get

 6          any information without involving Kurt, and she

 7          said she would contact Jason and ask him if it

 8          was okay if I contacted him to talk about his

 9          time at The Hill School.

10    BY MS. DOUGHERTY:

11    Q    Did you tell CiCi the nature of your

12          communication with Kurt?

13    A    That's what I can't -- I can't recall how

14          specific I was when I contacted CiCi.

15    Q    So you don't recall whether you expressed your

16          takeaway or the fact that you gleaned from the

17          comments by Kurt that he had been sexually

18          abused?

19    A    Yeah.  I knew I didn't say that Kurt told me he

20          was sexually abused.  I may have said something

21          to CiCi to indicate to her that I had a great

22          deal of concern about how he was treated while

23          he was a student.  And then I wanted to see if

24          Jason had any information about that.

25    Q    And CiCi then told you what?
```

Mary Ellen Poulos

```
 1    A    She said she would contact Jason and get back

 2         to me.

 3    Q    Did that happen?

 4    A    Yes.

 5    Q    Did you speak to Jason about your 2013

 6         communication with Mr. Poulos -- with Kurt?

 7    A    CiCi got back to me and said Jason told me that

 8         if he had any information about Kurt being hurt

 9         or in any way -- Jason is kind of excitable

10         type, and he said he would have killed the son

11         of a bitch if he knew anything had happened to

12         Kurt while he was at The Hill School.  And,

13         yes, he would be more than happy to talk to me.

14         So I sent Jason an email and simply asked him

15         if he knew who Kurt's teachers were second

16         year.

17    Q    Okay.  And then you also spoke to Ms. Eilers,

18         right, after the communication with Kurt?

19    A    Yes.

20    Q    So is there anything else that you did in

21         response to the 2013 communication with Kurt

22         where you learned he had been abused while at

23         The Hill School other than checking the

24         statutes in Pennsylvania, speaking to two

25         attorneys, speaking to your stepsister and
```

Mary Ellen Poulos

```
 1              Jason and Ms. Eilers, anything else?

 2                      MR. JUBB:  Objection.

 3                      THE WITNESS:  At some point -- at

 4              some point I contacted The Hill School.

 5     BY MS. DOUGHERTY:

 6     Q    In 2013?

 7     A    Well, you saw the email.  It was 2014.

 8     Q    So you contacted The Hill School in 2014?

 9     A    Yeah.

10     Q    Is this the email you're talking about when you

11          say, "I saw the email"?

12     A    Yeah.

13     Q    This is 2016; is that correct?

14     A    2016?  I'm totally confused.

15     Q    All right.  So I will go back to this email.

16              So did you have any contact with The Hill

17          School in response to your 2013 communication

18          with Kurt?

19     A    No.

20     Q    Okay.

21     A    Except for that.  I'm sorry.  Except for that.

22     Q    I apologize if you already told us, but what

23          time of year did your communication with Kurt

24          occur in 2013?

25     A    I don't recall.
```

```
 1    Q    Was it the beginning of the year, the end of

 2         the year, hot, cold?

 3    A    I would say it was probably summertime.  I

 4         don't recall.

 5    Q    Okay.  So is there anything else you did as

 6         part of your own research in response to Kurt's

 7         communication with you in 2013?

 8              On my list I have checked the

 9         statutes of Pennsylvania, contacting two

10         attorneys, talking to your stepsister, to

11         Jason, Ms. Eilers, and then a couple years

12         later emailing The Hill School.  Anything else

13         that you did as part of your research?

14    A    I don't think so.  Well, I read a lot.  I don't

15         know if you want another human being involved,

16         but I did do a lot of reading on this topic.

17    Q    "This topic" being sexual abuse of children?

18    A    Yes.

19    Q    Just to be clear, I think you referred -- you

20         said, "I did my own research."  So I'm just

21         trying to learn everything you did as part of

22         that.  So if you consider reading articles

23         about child sex abuse as part of your research,

24         then -- so is there anything else that was part

25         of your research that you did in response to
```

Mary Ellen Poulos

```
 1          your 2013 communication with Kurt?

 2     A    I don't think so.

 3     Q    You said your sister also expressed to you she

 4          observed a change to you in Kurt.  When did

 5          your sister express to you that she observed a

 6          change in Kurt?

 7     A    Well, the most specific time was when he was

 8          living with me in 2013.

 9     Q    Did you also tell your sister about the

10          communication with Kurt where you left

11          believing he had been sexually abused while at

12          The Hill School?

13     A    I did.

14     Q    And is that when your sister told you she

15          observed a change in Kurt or was it before

16          that?

17     A    She said to me in 2013, I know something

18          happened to him.  I don't know what it was, but

19          I know something happened to him.  He changed.

20     Q    Did your sister tell you that she knew

21          something happened to Kurt before or after your

22          communication with Kurt where you left with the

23          understanding Kurt had been sexually abused

24          while at The Hill School?

25     A    What?  Can you repeat that, please?
```

Mary Ellen Poulos

```
 1    Q    Sure.  Did your sister tell you that she knew
 2         something happened to Kurt before or after your
 3         2013 communication with Kurt where you left
 4         with the understanding Kurt had been sexually
 5         abused while at The Hill School?
 6    A    I don't know how to answer that question.
 7    Q    You don't know whether your sister --
 8    A    No, I know.
 9    Q    -- said something before or after --
10    A    I know --
11    Q    -- that Kurt told you he had been abused?
12    A    Prior to him telling me about the abuse there
13         had been observations of behavior exhibited by
14         Kurt that none of us understood.
15    Q    Okay.
16    A    For several years we had observed behavior that
17         was inconsistent with the Kurt we knew.  None
18         of us could explain it.  After he told me what
19         happened to him in 2013 we now understood or
20         had an understanding of what might explain his
21         behavior.  Does that answer your question?  I
22         hope.
23    Q    Well, that clarifies things for me.  Thank you
24         very much.  So when you said "we" in your
25         answer, are you referring to just you and your
```

```
 1              sister or are there other people in the "we"

 2              that observed behavior from Kurt that, you

 3              know, was very out of the ordinary for the Kurt

 4              you knew?

 5    A    Family members.

 6    Q    What family members other than your sister?

 7    A    Her children.

 8    Q    So your sister's children, Tori and Justin?

 9    A    Tori.  It's T-O-R-I, short for Victoria, and

10              Justin.

11    Q    So Tori and Justin commented to you that

12              Kurt --

13    A    No.

14    Q    No?  Okay.

15    A    Tori and Justin would comment to her.  Justin

16              and Kurt hung out together, unbeknownst to me,

17              probably a lot of it.  They were pretty close.

18              Kurt was always very protective of Tori.  Our

19              children were close.  My sister and I were

20              close.  We observed behaviors, anger in Kurt

21              that we couldn't explain.  All of us observed

22              it.  We just didn't know why.  We couldn't

23              explain why he was so angry.

24    Q    And then when you had your communication with

25              Kurt in 2013, it made sense; is that right?
```

Mary Ellen Poulos

```
 1    A    Absolutely.

 2    Q    And so I just want to make sure I have a full

 3         list of who "all of us" is.  You mentioned that

 4         Tori and Justin expressed to your sister that

 5         they were observing conduct by Kurt that was

 6         out of the ordinary for him and your sister

 7         expressed that to you.  Was there anyone else

 8         that's part of the "all of us"?

 9    A    Not really that I can think of off the top of

10         my head.

11    Q    And you said it had been going on for years.

12         Can you indicate to me a start time?

13    A    I -- I can't.  I can't pinpoint it.  I would

14         say it was a progression.

15    Q    Did it start when Mr. Poulos -- I'm sorry --

16         when Kurt returned to The Hill School as a

17         senior?

18    A    Well, the one thing we all observed when we

19         went to his graduation was he probably -- he

20         was like six two or six three and he probably

21         weighed 100 pounds, and we all noticed that.

22         He was skinny as a rail, and my stepfather, the

23         senator, was there because this was his school.

24         My mom was there and CiCi, Jason, the whole

25         family was there, and my ex-husband was there.
```

Mary Ellen Poulos

```
 1              And it wasn't a situation where we could, you
 2              know, delve into our observations, but he was
 3              skinny as a rail.  And we all noticed that and
 4              commented on it.  So if that maybe is the
 5              beginning, I don't know.
 6       Q      Okay.  And that was the graduation from The
 7              Hill School, right?
 8       A      Yes.
 9       Q      That Kurt was skinny as a rail, right?
10       A      Yes.  Yes.
11       Q      When is the first time you remember that Kurt
12              was acting, you described it, angry and not the
13              Kurt that you knew?
14       A      It didn't start out as anger.  I think it was
15              the alcohol, the drinking that brought out the
16              anger.  It started out as going to Marquette,
17              going UWM, not sticking with anything.  He was
18              always a pretty good student, interested in
19              education.
20       Q      And that changed?
21       A      Yeah, because -- I mean, my desire obviously
22              was for him to go to college and graduate and
23              get a degree, and he couldn't seem to stick to
24              it.  And then he started drinking, and I don't
25              know exactly when he started drinking because
```

Mary Ellen Poulos

```
1          he never really drank that much in front of me,

2          but he started drinking.  And instead of being

3          in school and going to college, he was working

4          in a bar and hanging out with guys who owned

5          bars and owned -- it was no lifestyle that I

6          would put my imprimatur on.  Let's put it that

7          way, and it was a gradual process.  That's the

8          only way I can put it.  It didn't happen

9          overnight.

10    Q    Okay.  So he started drinking, hanging out at

11         the bars, working at bars.  What was the next

12         step in the gradual progression?

13    A    The anger.

14    Q    And can you give me some examples of the anger

15         that you experienced from Kurt that was not the

16         Kurt you knew?

17    A    Lashing out, not able to talk to him, crying,

18         pleading, not knowing what he's pleading for,

19         but he's pleading for something.  For help, I

20         guess.

21    Q    Anything else that you observed as part of the

22         progression that was not the Kurt you knew?

23    A    Well, the anger was the foremost problem, and

24         when he had the incident that I described with

25         one of his girlfriends, I sent him to -- I
```

Mary Ellen Poulos

```
 1              imposed upon an associate of mine, a doctor,

 2              who was the head of the mental health complex

 3              when I was their attorney and sent Kurt to see

 4              him to try and get him to deal with whatever

 5              was going on with him, which I was unable to

 6              do.

 7                      And so Kurt started seeing

 8              Dr. Gudeman.  He obviously didn't tell me

 9              anything about what they discussed, but it was

10              mainly the anger that got worse.  As the

11              drinking got worse, the anger got worse.

12     Q     Can you just remind me, when you say that you

13           sent Kurt to the doctor, when was that?

14     A     Well, I was living over on the east side, and I

15           moved here in 2005.  And I was still working at

16           the county.  So it was probably 2003 or '04.  I

17           don't know, somewhere early 2000s.

18     Q     Okay.  So Kurt was having anger problems that

19           you remember even in 2003, 2004?

20     A     Yeah.

21     Q     And that persisted until -- for another ten

22           years to 2013 when you then had the

23           communication where you learned that he had

24           been abused?

25                      MR. JUBB:  Objection to form.
```

Mary Ellen Poulos

```
 1                      THE WITNESS:  On and off, I guess,

 2           yeah.

 3      BY MS. DOUGHERTY:

 4      Q    Are there other examples that you can provide

 5           to me where -- that you remember where Kurt

 6           exhibited anger that was not like Kurt?

 7      A    Not really.  He wasn't -- I mean, he wasn't

 8           around me all the time, so.

 9      Q    Did you have less communication with Kurt

10           during this period of time?

11      A    Well, at some point he went out east.  He went

12           out to live with his friend, Lance.

13                      We're getting feedback here on these

14           speakers.

15                      MS. DOUGHERTY:  Yeah, I'm noticing

16           that.  Is anyone else noticing an echo?

17                      MR. POULOS:  Yeah, I am.

18                      MR. JUBB:  It's because my headphones

19           died, so you guys are probably picking up every

20           single time I type or the air conditioner,

21           things like that.  They are charging for a

22           little bit.  It will go away.

23                      MS. DOUGHERTY:  Okay.

24      BY MS. DOUGHERTY:

25      Q    So did the -- tell me about your -- the
```

Mary Ellen Poulos

```
 1              frequency of your communications with Kurt.
 2              Did that change at all during this gradual
 3              process leading to anger?
 4       A      I don't know what you mean by that.  I mean, he
 5              and I talk.  It's not like we talk every day or
 6              anything like that.
 7       Q      Okay.  So part of the change wasn't a change in
 8              the amount of communication you had with Kurt;
 9              is that right?
10       A      No, not really.
11       Q      Was there anything else that you noticed that
12              changed with Kurt other than what you already
13              told us about?
14       A      Not really.
15       Q      Just so I don't forget, was there anyone other
16              than Ms. Eilers or your sister and I guess
17              Barry Eilers, Ms. Eilers's husband --
18       A      Barry Blackwell.
19       Q      Barry Blackwell.  Let me start again then.  Was
20              there anyone other than Barry Blackwell,
21              Ms. Eilers and your sister who identified to
22              you that they noticed a change in Kurt?
23       A      I don't think so.  Those are the people who
24              knew him since he was a little baby, little
25              boy.
```

Mary Ellen Poulos

```
 1    Q    Was there a point in time when Kurt stopped

 2         drinking?

 3    A    Yeah, after his hospitalization.

 4    Q    That was after 2015?

 5    A    His hospitalization was in 2014.  I had that

 6         wrong.

 7    Q    Okay.  So do you know -- so sometime after the

 8         2014 hospitalization Kurt stopped drinking; is

 9         that right?

10    A    Yes.

11    Q    How did you learn that Kurt stopped drinking?

12    A    He was living with me.

13    Q    When did Kurt start living with you in

14         proximity to his hospitalization?

15    A    I think he started living with me in 2013.

16    Q    So close in time to when Kurt told you about

17         the abuse, that's when he started living with

18         you again; is that right?

19    A    Yeah, it could have been --

20              MR. JUBB:  Objection to the form.

21    BY MS. DOUGHERTY:

22    Q    So your best estimate is around 2013; is that

23         right?

24    A    Yes.

25    Q    And then you learned that Kurt stopped drinking
```

Mary Ellen Poulos

```
 1        after his hospitalization because he was living

 2        with you?

 3   A    I observed that he wasn't drinking.

 4   Q    I'm showing you a document that's been

 5        previously marked as D2.  It's April 23, 2016,

 6        letter from The Hill School.

 7   A    Yes.

 8   Q    Have you seen this letter before?

 9   A    Yes.

10   Q    When was the -- did you receive this letter,

11        this April 23, 2016, letter that I have marked

12        as D2?

13   A    I did.  I'm a parent.

14   Q    And did you discuss the April 23, 2016, letter

15        that I marked as D2 with Kurt?  I can scroll

16        down if there's --

17   A    No, I know what this is.  You know, I -- I

18        remember discussing it with CiCi.

19   Q    Let's do it this way.  What was your -- let me

20        start again.

21            How did you receive the letter that's

22        been marked as D2?  Did you get that in email

23        or mail?

24   A    I'm pretty sure I got it via email.

25   Q    And when you received the April 23, 2016,
```

Mary Ellen Poulos

```
 1              letter that's been marked as D2, what was your

 2              reaction?

 3     A        Do you really want to know?

 4     Q        I do want to know.

 5     A        That the headmaster was being naive and

 6              glossing over, at least in my opinion,

 7              something that should be more thoroughly

 8              investigated.  It was pap.

 9     Q        It was what?

10     A        Pap.  It was, aren't we great, aren't we --

11              because this letter was directly in response to

12              the series of articles that had been published

13              in the New York Times exposing abuse going back

14              30, 40 years and, quote/unquote, in elite east

15              coast boarding schools.  This letter mentions

16              those articles, and I thought to myself I have

17              a feeling, Mr. Lehman, that you are naive.  And

18              I personally know of one instance where it did

19              happen.

20     Q        You're referring to Kurt, right?

21     A        Yes.

22     Q        Any other reaction to the April 23, 2016,

23              letter that's been marked as D2?

24     A        I decided to -- I guess I decided at some point

25              to try and figure out who had done this to my
```

Mary Ellen Poulos

```
 1              son and report it to the school if I could.

 2       Q   So this April 23, 2016, letter that's been

 3              marked as D2 prompted you to want to learn who

 4              had abused Kurt; is that right?

 5       A   I wanted to learn from the minute he told me

 6              about it in 2013, but I was up against a brick

 7              wall, stone wall.  I couldn't get anywhere.

 8              Now -- and then I start reading these articles

 9              in the New York Times, and as I stated earlier,

10              I contacted the reporter.  She was very

11              gracious.  To see if there was any inkling in

12              her research about The Hill School, and she

13              said no.

14       Q   Did the letter that's been marked as D2, that's

15              the April 23, 2016, letter, impact your

16              interest in learning who had or discovering who

17              had abused your son?

18       A   It sure did.

19       Q   How?

20       A   I became more tenacious, I guess you would say.

21       Q   Did you share D2 with your sister?

22       A   No.

23       Q   I'm sorry.  You said you shared the letter with

24              CiCi; is that right?

25       A   Well, she got it too.
```

```
 1    Q    Okay.

 2    A    I didn't have to share it with her.  I

 3         contacted her, and she got too, and I asked her

 4         if Jason got it.  And she said, "Yeah, Jason

 5         got it and he ripped it up and threw it away."

 6    Q    Do you know why Jason ripped it up and threw it

 7         away?

 8    A    Because that's Jason.

 9    Q    Did it have anything to do with Kurt being

10         abused?

11              MR. JUBB:  Object to the form.

12              THE WITNESS:  He didn't know that,

13         technically speaking.

14    BY MS. DOUGHERTY:

15    Q    Okay.

16    A    I was not very open with my opinions of what

17         had happened to Kurt.  I was not very open with

18         what he had told me.  I tried to gloss over it.

19         It wasn't my story to tell.  It was his story

20         to tell.

21    Q    I understand.  So as far as you know, you

22         didn't tell Jason; is that right?

23    A    Right.

24    Q    So as far as you knew Jason didn't know in

25         April 2016; is that right?
```

Mary Ellen Poulos

```
 1    A    I asked Jason if he was aware of any abuse of

 2         my son of any kind or CiCi asked him that.  And

 3         he said -- his answer was, if I had known that

 4         anybody had hurt Kurt when he was at The Hill

 5         School, I would have had killed the son of a

 6         bitch.  I think that's a direct quote.

 7    Q    And that was the 2013 discussion, right?

 8              MR. POULOS:  2016.

 9              THE WITNESS:  It was 2016.

10    BY MS. DOUGHERTY:

11    Q    Okay.  So in 2016 you had a communication with

12         CiCi where she relayed that Jason said that if

13         he had learned anybody hurt Kurt that he would

14         have killed him?

15    A    Words to that effect, yes.

16    Q    That's 2016?

17    A    Yeah.

18    Q    Is that before or after the April 23, 2016,

19         letter that was marked as D2, if you know?

20    A    It was a result of the 2016 letter.

21    Q    Okay.

22    A    Now I felt more -- now I felt more comfortable

23         talking to my stepsister about this because the

24         school acknowledged that they were perfect.

25         The school is telling everybody that nothing
```

Mary Ellen Poulos

```
 1              ever happened here.  So I just contacted CiCi

 2              and said, "Did you get this?  Did Jason get

 3              this?  What do you guys think about this?"

 4    Q    Did the April 23, 2016, letter that's been

 5              marked as D2 make you angry?

 6    A    It made me laugh, not because it was funny,

 7              because it was pathetic.

 8    Q    Did you discuss the April 23, 2016, letter

 9              that's been marked as D2 with Kurt?

10    A    I'm sure we had some conversation about it, but

11              I don't recall it though.

12    Q    Do you recall what Kurt's reaction was to the

13              April 23, 2016, letter that's been marked as

14              D2?

15    A    No, he was in Connecticut then.

16    Q    So you just -- you don't have any recollection

17              of a discussion, like, over the telephone,

18              email, in person, communication of any kind

19              with Kurt regarding the April 23, 2016, letter

20              that's been marked as D2; is that right?

21    A    Right.

22    Q    Now, do you know the time when -- at the time

23              of the April 23, 2016, letter that's been

24              marked as D2, was Kurt drinking or was he

25              sober?
```

Mary Ellen Poulos

```
1    A    When he went to Connecticut, which I believe
2         was January or so of 2016, he moved to
3         Connecticut sort of for a new start.  He
4         started drinking again.  I don't know how
5         quickly.  I don't know how much.  I just know
6         that his girlfriend, who he met, and he would
7         do a lot of drinking.
8              I know for sure she would, and I was
9         very concerned about it, but I don't know how
10        much she was drinking or anything.  I just --
11        I'm pretty sure he started drinking again.
12   Q    So you don't know if he started drinking again
13        in reaction to the April 23, 2016, letter
14        that's been marked as D2; is that right?
15   A    Yeah.  I don't know what evolved it, prompted
16        it.
17   Q    All right.  So I'm showing you a document that
18        I've marked as D22.  On the bottom right it
19        says -- and I will make it bigger in a second
20        for you -- says Garabedian_Email0016, and it's
21        an exchange of emails.
22   A    Okay.
23   Q    Now, you mentioned a couple times that you
24        contacted a reporter.  So I want to direct your
25        attention to the middle of the document that I
```

Mary Ellen Poulos

```
 1            have marked as D22 where there are emails from

 2            May 2016.  Do you see that?

 3    A       Yeah, I can -- yeah, May 6, 2016.  Yeah.

 4    Q       Yeah.  So there's at the very bottom of the

 5            page, it's D22, it says that there is a May 6,

 6            2016, email from you --

 7    A       Yes.

 8    Q       -- it says, "For some reason"; is that right?

 9    A       Yeah.

10    Q       That's your email?  You recognize that as your

11            email?

12    A       Yeah, absolutely.

13    Q       And did you write that to Katharine Seelye,

14            S-E-E-L-Y-E?

15    A       Yeah.

16    Q       Is that the New York Times reporter that you

17            have been referencing?

18    A       Yes.

19    Q       And so just as an example, there's a link here

20            in the email that -- let me start again.

21                   So Ms. Seelye responded to your email

22            on May 6th, right?

23    A       Yes, she was very gracious.

24    Q       And then she gave you a link to an article,

25            right?
```

Mary Ellen Poulos

```
 1    A    Yes.

 2    Q    And then is this article here an example of the

 3         type of article you read during your research

 4         about sexual abuse of children?

 5    A    No.  The New York Times series -- I didn't keep

 6         the articles, and when I got the memo from

 7         Lehman, the April memo, it piqued my interest

 8         in those articles I had read, and I hadn't kept

 9         them.

10              I mean, I get the actual newspaper

11         every day.  It's a bad habit, but I can't break

12         it, and I didn't -- hadn't saved those

13         articles, and I couldn't find them.  So I

14         somehow got her name.  I can't remember exactly

15         the process I went through.  I wanted to

16         refresh my recollection about those articles

17         that I read in the New York Times series, and I

18         wanted to ask her if she had any contact at all

19         with The Hill School.  That was the purpose of

20         my communication with her.

21    Q    What did she tell you?  Did she have

22         communication or contact with The Hill School?

23    A    No, she said -- she said The Hill School never

24         came up at all in her investigation.

25    Q    Okay.  And just -- the email going back to the
```

Mary Ellen Poulos

1          top of the page.  The email above Ms. Seelye's

2          email in May 2016, the next one up is an email

3          from you to Mr. Garabedian dated December 18,

4          2018.  It says, "This is the reporter.  Thanks,

5          Mary Ellen."

6     A    Yeah, I guess.  Yeah.

7     Q    Why did you send the information about

8          Ms. Seelye to Mr. Garabedian?

9     A    I don't remember.  I don't remember.  Can you

10         tell me again the date on that email to

11         Garabedian, just for my information?

12    Q    Sure.  I will put it back up on the screen for

13         you.  I'm sorry if I took it down too soon.

14    A    No, that's okay.  I just wanted the date.

15    Q    Okay.  It is December 18, 2018.

16    A    Okay.  Thank you.

17    Q    Does that refresh your recollection to any

18         extent as to why you sent the email to

19         Mr. Garabedian?

20    A    Not really.

21    Q    So we looked at these emails earlier today.

22         I'm showing you a document that I marked as

23         D23, which doesn't have a Bates label.  It

24         starts -- we will start at the top.  It says,

25         "Applegate, Amanda, Subject, Forward Kurtis N.

Mary Ellen Poulos

```
 1            Poulos Hill student, graduated in 1997."  It
 2            looks like you forwarded an email to
 3            Mr. Jubb -- is that right -- on July 30, 2020?
 4     A      Yup.
 5     Q      We're going to mark these series of emails as
 6            D23.  So you forwarded -- and I have scrolled
 7            down to make it bigger and focused.  You
 8            forwarded an email originally from you dated
 9            May 24, 2016, to bbarbieri@thehill.org; is that
10            right?
11     A      I guess.
12     Q      So as of at least May 24, 2016, you had the
13            communication with Kurt where he expressed that
14            a math teacher had been his abuser; is that
15            right?
16     A      At some point I figured that out.
17     Q      Well, did you figure it out or is it something
18            that Kurt told you?
19     A      I know he said it was a teacher.  I went back,
20            thought about his time at Hill, noticed the
21            precipitous drop in his grades sophomore year,
22            second year or I guess that's fourth term or
23            whatever they call it.
24     Q      I can't keep track.
25     A      Yeah, but anyway, I started looking at his life
```

```
 1              and trying to put two and two together, and I
 2              came up with whatever happened to him -- what
 3              happened to him his second year at The Hill
 4              School.  And I tried to figure it out, and I
 5              don't know if -- I'm not sure where I got all
 6              my information, but I know he told me it was a
 7              teacher.
 8    Q    So you don't know what led you to ask The Hill
 9              School to identify Kurt's geometry teacher in
10              May 2016; is that right?
11    A    Yeah.  I'm not sure if it's information I got
12              from Jason or if it's information I got from
13              Kurt.
14    Q    That led you to ask The Hill School
15              specifically to identify Kurt's geometry
16              teacher; is that right?
17    A    Right.
18    Q    You say that you're not sure if it's
19              information that you got from Kurt or Jason.
20              Why do you say Jason?
21    A    Because I thought -- I had always thought in
22              trying to rehash this, up until this point,
23              that Jason was the one that had told me who his
24              geometry teacher was, but then when I was going
25              through my old emails to send to Jubb, I found
```

```
 1              this email.
 2                   And I was trying to put two and two
 3              together and figure out why I sent that email
 4              when I thought I had gotten the name from Jason
 5              of who Kurt's geometry teacher was.  And so I
 6              tried to figure out where I even was -- my
 7              interest was piqued, and I can't remember.
 8    Q    For the moment let's just start with now.  I'm
 9              going to ask you about a different time period,
10              but currently -- well, let me do it this way.
11              Do you still use the email address
12              46portia@gmail.com?
13    A    Yes.
14    Q    How long have you used the email address
15              46portia@gmail.com?
16    A    I don't know.  Kurt set it up for me because I
17              had AOL.  I'm not very computer sophisticated,
18              and I think Gmail is Google, and at one point
19              when -- at one point Kurt set up a Google email
20              account for me, and I used Portia for the
21              female attorney in Shakespeare.  I used it for
22              a long time, and he set that up for me, but I
23              don't know when.  I'm not sure when.  It's a
24              long time, though.
25    Q    Just asking about now.  Do you have a custom or
```

| | | |
|---|---|---|
| 1 | | practice to how you handle your email in your |
| 2 | | 46portia@gmail.com account? |
| 3 | A | I get so many emails.  I pay a lot of my bills |
| 4 | | over email, contact with my friends and family. |
| 5 | Q | Are there certain emails that you keep?  Do you |
| 6 | | delete your emails?  Do you keep them all?  Can |
| 7 | | you tell me about that process? |
| 8 | A | I delete every day probably 100 emails, junk. |
| 9 | | I have kept some emails about my stepdad and |
| 10 | | some communications with family and some of the |
| 11 | | emails from The Hill School, but mostly I |
| 12 | | discard them every day. |
| 13 | Q | And has been how you handle your emails since |
| 14 | | at least 2016? |
| 15 | A | Yeah, forever. |
| 16 | Q | So you said you kept some emails from The Hill |
| 17 | | School.  What emails from The Hill School have |
| 18 | | you kept? |
| 19 | A | Well, you get emails from The Hill School about |
| 20 | | fundraising and as an alumnus or parent |
| 21 | | sometimes I keep them because I think it's so |
| 22 | | funny that they send me emails asking for money |
| 23 | | but -- or ironic or whatever, cruel maybe.  And |
| 24 | | I kept the email communications I had with |
| 25 | | Mr. Lehman about Kurt that we referenced in my |

Mary Ellen Poulos

```
 1            testimony earlier.  Other than that, I'm not

 2            very -- I don't know.  I don't keep a lot of

 3            stuff.

 4     Q     Okay.  So just again focusing on the emails, I

 5            think you said from The Hill School.  Do you

 6            have like a folder or something in your emails

 7            --

 8     A     No.  I don't know.  I wish I did.

 9     Q     You said -- I think you said you kept them.

10            Right, you kept some emails from --

11     A     Yeah.

12     Q     -- from The Hill School?  How did you keep

13            them?  Did you print them?

14     A     No, just in my -- if I log onto my email

15            account, when I go to my email account every

16            day, those emails are there.

17     Q     So they are just right there in your inbox?

18     A     Yes.  My inbox.  In my inbox, exactly, yes.

19     Q     And I think that Mr. Jubb sent you a subpoena

20            and you sent us some emails, but I just want to

21            make sure all The Hill School emails that you

22            have in mind that you kept, that are in your

23            inbox, right, that you have now sent them to

24            Mr. Jubb and I; is that right or do you have

25            other ones?
```

Mary Ellen Poulos

```
 1    A    No.  No, I don't have any others.

 2    Q    So all of The Hill School emails that you have

 3         in your inbox, you sent those to Mr. Jubb and

 4         I; is that right?

 5    A    Yes.

 6    Q    And any emails that you had with Mr. Lehman,

 7         did you send those to Mr. Jubb and I?

 8    A    I sent you anything that I had sent to The Hill

 9         School in any way, shape, or form.

10    Q    Okay.  That you still have, right?

11    A    That I still have.

12    Q    Okay.  And did you -- how did you do that?  Did

13         you just look through your inbox?

14    A    Yes.

15    Q    Did you look -- do you know how to go to your

16         sent email box?

17    A    Yes.

18    Q    Did you look in your sent email box to make

19         sure that there weren't any emails about The

20         Hill School or Mr. Lehman in there?

21    A    No, I didn't.  I didn't think of that.

22    Q    Is that something you would be willing to do?

23    A    Absolutely.

24    Q    Not this instant.  So and how about your trash?

25         Did you look in there?
```

Mary Ellen Poulos

```
 1     A     I delete my trash every day.

 2     Q     Okay.  Would you mind when you look in your

 3           sent folder, would you just check?  Sometimes

 4           things don't always get deleted.

 5     A     Sure.

 6     Q     Do you have any other folders in your email?  I

 7           think you said you don't know how to do it.

 8     A     No, I don't.

 9     Q     All right.  So you're going to check your sent

10           mail and then forward any emails about The Hill

11           School or with Mr. Lehman or I suppose with

12           Mr. Garabedian, whatever Mr. Jubb can confirm,

13           but --

14     A     Yes.

15     Q     Yeah.  You're going to check your sent mail and

16           send all those emails to Mr. Jubb and I if

17           there are any; is that right?

18     A     Correct.

19     Q     You mentioned in your earlier testimony that

20           you -- well, let me start -- that you contacted

21           the Leelanau school; is that right?

22     A     Yes.  I recall sending an email at some point

23           to see if they would tell me anything about why

24           their head of school left so abruptly.  I don't

25           remember how I put it.
```

Mary Ellen Poulos

```
 1   Q   Okay.  So you didn't call them on the phone,

 2       you sent them an email, right?

 3   A   Right.

 4   Q   Will you look in your sent mail to see if you

 5       still have that email, and if you do, send that

 6       Mr. Jubb and I?

 7   A   Sure.

 8   Q   Thank you.  And I think you said that you did

 9       that right after you got Mr. Ralston's name; is

10       that right?

11   A   No.  No.  No.

12   Q   When did you do it?  When did you write the

13       email to the Leelanau school?

14   A   I'm not sure.

15   Q   How did you first learn that Mr. Ralston was

16       the teacher who sexually abused Kurt when he

17       was a student at The Hill School?

18   A   I didn't know he was.

19   Q   When did you first get Mr. Ralston's name?

20   A   Somewhere in '16, I believe.

21   Q   So sometime close in time to that May 2016

22       email?

23   A   Do you want me to explain it to you or do you

24       just -- we will just fumble around.  I will

25       explain it to you.
```

Mary Ellen Poulos

```
 1    Q    Okay.  But, well, I appreciate that you're
 2         getting frustrated with me, but the -- I'm
 3         sorry for that because I'm not trying to do it
 4         to you, but the way it's supposed to work in a
 5         deposition, you know, that I have to ask a
 6         question and you provide an answer.  So it does
 7         feel like fumbling, but that's how the rules
 8         work.
 9              So close in time to the May 2016 is
10         when you learned Mr. Ralston's name; is that
11         right?
12    A    Yes.
13    Q    And did you then contact the Leelanau school in
14         2016?
15    A    No.
16    Q    When did you contact the Leelanau school?
17    A    I don't recall.
18    Q    What did you do when you learned Mr. Ralston's
19         name?
20    A    Tried to find out if he was the one, tried to
21         figure it out.  I knew his name as being Kurt's
22         geometry teacher.  I suspected that if I could
23         ask Kurt if this was the person who did it, he
24         would say yes.  I never asked him that.  I just
25         wanted to see what I could find out about this
```

1          man.  I didn't know for sure that he was the

2          one.

3     Q    When did you learn for sure?

4                    MR. JUBB:  Objection to the form.

5                    THE WITNESS:  When -- when -- when

6          Jubb sent the name.

7     BY MS. DOUGHERTY:

8     Q    Okay.  So even at the time when you were

9          dealing with Mr. Garabedian you didn't know

10         that Mr. Ralston was the teacher?

11    A    No, not for sure.  Not from Kurt's mouth,

12         absolutely not.  You know, I was not willing to

13         confront Kurt with anything I knew because it

14         was a trigger for him.  So I was trying to

15         figure stuff out on my own and see where it

16         went.  And when he was forced to disclose John

17         Doe, I went, okay, that's what I -- that's what

18         I thought, but I never knew who the plaintiff

19         was or who the perpetrator was or who Kurt had

20         alleged the perpetrator was for sure until the

21         disclosure was made in this litigation.

22    Q    Okay.  So you mean when Mr. Jubb identified

23         John Doe as Matthew Ralston; is that right?

24    A    Yes.

25    Q    So you had your suspicions, but Kurt never had

```
 1            confirmed it to you; is that right?
 2    A     I was not in a position where I felt
 3            comfortable even telling him I knew of this
 4            man.
 5    Q     Did you ever have a discussion with
 6            Mr. Garabedian where you used Mr. Ralston's
 7            name with Mr. Garabedian?
 8    A     Absolutely not.  Never.  No, he didn't tell me
 9            who it was.  I didn't ask.
10    Q     So you never told Mr. Garabedian your suspicion
11            and the results of your research or anything
12            like that?
13    A     Absolutely not.  Well, he's your client, maybe
14            you know this better than I do, but
15            conversations with Mr. Garabedian are very
16            brief and not very productive.  And throughout
17            this whole process I tried to be hands-off as
18            much as I could.
19                  Once I found out who he was and his
20            reputation and the things that he had done for
21            young men like my son, I was on cloud nine
22            because I thought, oh, my God, we finally got
23            an advocate for Kurt, finally somebody who he
24            can talk to.  And -- but that didn't stop me
25            from trying to find out stuff on my own.
```

Mary Ellen Poulos

```
1    Q    Okay.  So even after Mr. Garabedian was

2         retained by Kurt, you continued to do your own

3         research and you wanted to assist in any way

4         possible; is that right?

5    A    Yup.

6    Q    But you tried to not interfere with the

7         attorney/client relationship between Kurt and

8         Mr. Garabedian; is that right?

9    A    Absolutely.  I thought Mr. Garabedian was the

10        cream of the crop when it came to this kind

11        of -- I was not going to piss him off or

12        interfere with what he felt he had to do to

13        handle this situation.

14   Q    And you never identified Matthew Ralston by

15        name to Mr. Garabedian; is that right?

16   A    Absolutely not.

17   Q    Mr. Garabedian -- I'm sorry.  Go ahead.

18   A    No, you go ahead.

19   Q    No.  Ms. Poulos, I'm honestly not trying to

20        interrupt you.

21   A    No, I know.

22   Q    I 100 percent apologize --

23   A    No.

24   Q    -- to infinity.  So please complete your answer

25        because that's not my intention to interrupt
```

```
 1         you.

 2    A    I know.  No, I know.  I'm not upset.  I just --

 3         as far as Kurt and Garabedian went, I wanted to

 4         be hands-off.  As far as finding out as much as

 5         I could on my own, I wanted to be hands-on.

 6    Q    And Mr. Garabedian never used the name Matthew

 7         Ralston to you; is that right?

 8    A    That's absolutely right.

 9    Q    How did Mr. Garabedian refer to Kurt's abuser

10         in your discussions?

11    A    We never had any discussions.

12    Q    So you never had any telephone or email

13         communications with Mr. Garabedian about Kurt's

14         abuser?

15    A    Not about the substance of the abuse or the

16         substance of the case.  We had discussions

17         about -- he's very curt over the phone, and he

18         will say -- he will send an email to me, "We

19         contacted him today."  Fine.  He would call me

20         because he couldn't get a hold of Kurt.  He --

21         you know, it was that -- we never had any

22         substantive discussions about my son's case or

23         the posture of the case or how he was going to

24         handle it or who did it or what happened.  I

25         got -- found out what happened to my son when I
```

Mary Ellen Poulos

```
1          got the complaint with the facts in the

2          complaint.

3      Q   Okay.

4      A   Yeah.

5      Q   Okay.  So before you received the complaint in

6          this action by Matthew Ralston, who is

7          identified as John Doe in the complaint, you

8          didn't know the factual information relating to

9          the abuse; is that right?

10     A   Absolutely.  I knew nothing.

11     Q   So reading the letters that were attached to

12         the complaint in this action, that was the

13         first time that you -- let me start again.

14             When did you -- you read the

15         complaint in this action, obviously, right?

16     A   Yes.

17     Q   Do you know when you first read it?

18     A   Shortly after Kurt got it.  I guess he can

19         serve by mail now.  I didn't even know that.

20         He brought it to me or I was at his apartment

21         and he gave it to me, one or the other, and I

22         read the complaint.

23     Q   And you read the letters that were attached to

24         the complaint?

25     A   No, I couldn't handle it.  I glossed over them.
```

Mary Ellen Poulos

```
 1    Q    So Kurt brought you the complaint in April or

 2         May 2019?

 3    A    Well, I think it was filed April 17th or

 4         something of 2019.  It was right before the

 5         statute of limitations would have run.  I think

 6         on -- I think it's a one-year statute of

 7         limitations, and I think the last letter that

 8         Garabedian wrote was in April of 2018, I

 9         believe, if my brain is working.

10              And so I believe the lawsuit was

11         filed -- I don't have it in front of me, but I

12         believe it was filed in April of 2019 within

13         the one-year statute of limitations for

14         defamation, right?

15    Q    Right, from the first letter.  So Kurt -- you

16         read the complaint sometime in April or May

17         2019, right?

18    A    And that's when I talked to Jeff, right after I

19         got it.

20    Q    But you didn't read the letters that were

21         attached at that time, right?

22    A    (Shakes head. )

23    Q    So, no?  You're shaking your head.

24    A    Yeah.  No, I didn't read them.

25    Q    I'm only confirming because we have to have
```

Mary Ellen Poulos

```
 1        your actual no on the record.

 2   A    I'm sorry, yes.

 3   Q    I'm not trying to be a jerk.

 4   A    Good luck with that.

 5   Q    Got to acknowledge every time we're not trying

 6        to do it, okay?

 7             So -- and then when did you learn

 8        that it -- that Matthew Ralston was John Doe?

 9   A    Jubb was forced to disclose.

10   Q    To tell you?

11   A    Not to me.  He sent a letter to everybody where

12        the court had forced him to disclose the name.

13        I mean, you can't defend yourself if you don't

14        know who the plaintiff is, and he sent a

15        confident -- I remember reading a confidential

16        letter -- I don't know the date -- where he

17        disclosed the name of John Doe as required by

18        the rules that he identified John Doe to the

19        parties so he can prepare a defense.

20   Q    Okay so that was -- okay.  And then when was

21        the first time you read the letters attached --

22        let me start again.

23             Have you read the letters attached to

24        the complaint?

25   A    I glossed over them.  I -- I just feel like I'm
```

Mary Ellen Poulos

```
 1              going to throw up.  I have a very hard time

 2              reading those letters, and I'm not a very

 3              emotional person, frankly, but they make me

 4              sick to my stomach, what is described in those

 5              letters.  The complaint makes me sick to my

 6              stomach, but I'm getting kind of used to it.

 7                      So I finally read them -- after

 8              Garabedian was dismissed there was a period of

 9              time where not much was going on, and then

10              Garabedian was reinstated.  And when Garabedian

11              was dismissed, I thought, well, it's going to

12              file that Kurt will be dismissed because Kurt

13              didn't do a God damn thing.  And so we were

14              kind of breathing a sigh of relief, but then

15              Garabedian was reinstated as a defendant.

16                      So the reality set in that this was

17              not going to go away, except I kept hearing

18              from my son that the judge, Dubois, kept

19              saying, "Why is Kurt in this lawsuit?  Why is

20              Kurt in this lawsuit?"  He would tell me that

21              after telephone conferences the judge would

22              raise that, that he raised it more than once.

23              So we had hope that Kurt was going to be

24              dismissed.  Then he wasn't dismissed.  So I

25              said to myself, well, you better get serious
```

Mary Ellen Poulos

```
 1          about this.  So I went back and got all the
 2          stuff that had been -- that I had in my
 3          possession that had been filed to that point,
 4          and I read it all.  I reread the complaint, the
 5          amended complaint.  I didn't read the 50-,
 6          60-page briefs that were supplied by the
 7          parties because I just didn't have the
 8          wherewithal, but I did read the court
 9          documents.
10              And I finally read those two letters
11          when the lawsuit against Garabedian was
12          reinstated.  And after Kurt was -- I think it
13          was like June, maybe, of last year where
14          finally the judge said, no, Kurt stays in.  For
15          what reason, I do not know, but I decided I
16          better read those letters, and I did.
17     Q    And when you read the letters attached to the
18          complaint, that was the first time you learned
19          the detail about Kurt's abuse; is that correct?
20     A    Yes.
21              MR. JUBB:  Objection to the form.
22     BY MS. DOUGHERTY:
23     Q    Just so I'm clear, you didn't learn any
24          information from Mr. Garabedian about Kurt's
25          sexual abuse; is that right?
```

Mary Ellen Poulos

```
1    A    No.  No.

2    Q    And you didn't -- did you talk to Kurt about

3         the letters after you read them?

4    A    No.

5    Q    Have you talked to anyone about the letters

6         after you read them?

7    A    No.  Well, let me -- I don't know what you guys

8         mean by this, that and the other thing, but I

9         had dinner with Kathie Eilers and Barry

10        Blackwell about a month ago.  And they asked me

11        how the -- you know, what was going on with

12        Kurt and what the litigation was, and I told

13        them that I finally read the letters that

14        described the abuse and that it was horrific.

15        And we just sort of, yeah -- yeah, I bet, kind

16        of, you know.

17             So I did -- I didn't get specific

18        about the facts, but I did say that it was

19        horrific to read, hard to read, hard to accept.

20        And I think they are the only two people that I

21        even mentioned that I read them to.

22   Q    So you didn't tell Barry or Ms. Eilers --

23   A    Eilers.

24   Q    I'm sorry.  I apologize.  Let me start again.

25        You didn't tell Mr. Blackwell or Ms. Eilers the
```

Mary Ellen Poulos

```
 1            content of the letters, just that you had read

 2            them; is that right?

 3     A      And it's Eilers and Dr. Blackwell.

 4            Dr. Blackwell and I -- I said it was horrible.

 5            I did not say he did this, he did that, this

 6            happened, that happened.  I didn't give any of

 7            the specifics.  I just said it was horrible and

 8            hard to read, and they both said, "Yeah, I

 9            bet," or words to that effect.

10     Q      Did you tell them the identity of the

11            plaintiff, the abuser?

12     A      No.

13     Q      Have you told anyone the identity of

14            Mr. Ralston as Kurt's abuser?

15     A      No, I don't -- no.  No.

16     Q      Did you ever ask Kurt whether the content about

17            the abuse in the letters was true?

18     A      No, I don't have to.

19     Q      With that regard -- what do you mean you don't

20            have to?

21     A      Because I believe him.

22     Q      Has Kurt ever told you information about his

23            abuse other than what you have told us?

24     A      No.

25     Q      All right.  Hold on one second.  Daisy, my cat,
```

Mary Ellen Poulos

```
 1          is not cooperating at the moment.  So I'm
 2          showing you a document that's been marked as
 3          D1.  It's a series of emails.  I'm going to
 4          start on the bottom of the first page, which is
 5          an email dated November 20, 2017, from
 6          headmaster Zachary Lehman to Kurtis N. Poulos.
 7          Do you know this email?
 8   A      Yes.
 9   Q      Did you receive this email from your son on
10          November 20, 2018 -- or 2017?
11   A      Yes, I guess.
12   Q      Did you read the November 20, 2017, email from
13          Mr. Lehman when you received it from Kurt?
14   A      Absolutely, yes.
15   Q      What was your reaction to the November 20,
16          2017, email that's been marked as D1?
17   A      My initial reaction was, I guess, your April
18          2016 email and communication to friends -- to
19          alumni and parents was a crock.  Apparently The
20          Hill School does have a problem, did have a
21          problem.  I was kind of, I guess, not surprised
22          that they had received responses to the 2016
23          email even though they are a such a wonderful
24          institution.  Pardon my sarcasm, but that was
25          my reaction.
```

Mary Ellen Poulos

```
 1    Q    And then this letter that we've have marked as
 2         -- the November 20, 2017, email that's been
 3         marked as D1 or part of D1, that's the email
 4         that prompted you to contact Mr. Garabedian; is
 5         that right?
 6    A    Well, it wasn't -- I didn't go from that email
 7         to Garabedian.  I did some research in between.
 8    Q    Right.  You went from the email to researching
 9         the ladies from Cozen O'Connor identified in
10         the email to Mr. Garabedian; is that right?
11    A    Yes.  Because Kurt wanted to know if he should
12         contact those two women.
13    Q    I understand.  I'm just trying to connect your
14         earlier testimony to D1.  So I just want to
15         confirm that the November 20, 2017, from
16         Mr. Lehman to Kurtis Poulos that's been marked
17         as D1 is the email that prompted you to do
18         research that ultimately led to you contacting
19         Mr. Garabedian; is that right?
20    A    Yes.
21    Q    We have some emails that -- involving you and
22         Mr. Garabedian or Kurt and Mr. Garabedian
23         regarding yearbooks.  Did you undertake to
24         obtain copies of yearbooks for when Kurt was in
25         high school?
```

Mary Ellen Poulos

```
1    A    I did.

2    Q    Were you successful?  Did you over get any

3         yearbooks?

4    A    I got three yearbooks.

5    Q    Do you still have them?

6    A    Yes, I do.

7    Q    And if we wanted to have access to those

8         yearbooks, would we be able to get access?  You

9         can't email those, but we would have to make

10        other arrangements.

11   A    I had anticipated after Mr. Garabedian asked me

12        to get them that he would want them, but he

13        never asked for them.

14             MR. POULOS:  Also, Lane already has

15        copies of them and he presented them during my

16        deposition.

17             MS. DOUGHERTY:  Right, but I don't

18        have copies of them.  I just want to know,

19        Ms. Poulos, if you still have them.

20             THE WITNESS:  Yes, I do.

21             MS. DOUGHERTY:  If I make appropriate

22        arrangements or Mr. Jubb and I make appropriate

23        arrangements, we can have access to those

24        yearbooks, right?

25             THE WITNESS:  Absolutely.  They are
```

Mary Ellen Poulos

```
 1              gorgeous, but they weigh a ton.

 2     BY MS. DOUGHERTY:

 3     Q    We will make sure we include extra postage,

 4          right?

 5     A    Yeah.

 6     Q    Okay.  So when you read the two letters that

 7          were attached in the complaint, did you read

 8          the section of the letters that described the

 9          injuries that Kurt sustained as a result of the

10          abuse?

11     A    I read that entire letter, so, yeah.

12     Q    I'm showing you -- I'm going to scroll just to

13          the bottom so you don't have to look at the

14          description of abuse, but I'm showing you the

15          April 2018 letter that's been previously marked

16          as D4.

17     A    Okay.

18     Q    Let me make sure I have the right one.  No, I'm

19          sorry.  I misspoke.  I'm showing you the

20          December 26th, 2018, letter that's been

21          previously marked as D4.

22     A    Okay.

23     Q    I have scrolled to the very last page, to the

24          last paragraph, and I want to ask you about the

25          description of injuries.  So the letter says
```

Mary Ellen Poulos

```
 1          that Kurt has problems with depression.  Do you
 2          have any information regarding whether Kurt has
 3          problems with depression?
 4    A     Well, I'm not a diagnostician and I'm not a
 5          psychiatrist or a psychologist, but --
 6    Q     Just in lay mom terms.
 7    A     I would say, yes.  I mean --
 8    Q     Has Kurt ever expressed to you that he's been
 9          diagnosed with depression?
10    A     Well, I know when he -- he saw Gudeman that
11          Gudeman expressed to me in very general terms
12          that he has some serious issues.  I think those
13          were his exact words, but he wasn't specific
14          about any diagnoses of any kind, so.
15    Q     Okay.  And then it says -- I will make it
16          bigger because I'm trying to read it with you
17          at the same time -- sadness, crying.  Is that
18          something you observed?
19    A     Absolutely.  The crying -- crying is just --
20          yes.
21    Q     So Mr. Poulos -- let me start -- when was the
22          first time you observed inappropriate crying
23          from Kurt?
24    A     I guess I can't pinpoint it with any
25          specificity.  I can only say that he would get
```

Mary Ellen Poulos

 1              very, very angry and kind of moan and cry.

 2     Q      Does it stick out -- did you -- was the crying

 3              for a specific reason or an unexplained reason?

 4              Why does it stick out to you?

 5                        MR. JUBB:  Objection to the form.

 6     BY MS. DOUGHERTY:

 7     Q      I just want to know, Ms. Poulos, because the

 8              way you're describing it is that there was

 9              something different about the crying that

10              struck you; is that correct?

11     A      That I didn't know the reason for it.  I

12              couldn't understand it.  I couldn't get a

13              handle on what it was that was making him so

14              sad.

15     Q      Until you had the discussion in 2013, right?

16     A      Absolutely.

17     Q      And Kurt didn't act like this before he went to

18              The Hill School, right?

19     A      No.

20     Q      And then it says, "Anxiety."  Did you ever --

21              did Mr. -- did Kurt ever communicate to you

22              that he had been diagnosed with anxiety?

23     A      Yes, he told me that.  You know, I don't know

24              how anxiety manifests itself.  I'm anxious

25              right now, but I'm in a deposition, so I should

Mary Ellen Poulos

```
 1          be.

 2    Q     But Kurt told you he had been diagnosed with

 3          anxiety; is that right?

 4    A     Yes.

 5    Q     By a medical professional, correct?

 6    A     Yes.  Yes.

 7    Q     And then it says, "Emotional pain."  Is that

 8          something you observed?

 9    A     Yes.  That was obvious.  When he would have one

10          of his -- when something -- something would

11          trigger him.  His emotional pain, you could see

12          it on his face.

13    Q     What type of things would trigger him?

14    A     I don't know.  You -- you can't explain it.

15          Maybe it would be drinking.  Maybe it would be

16          he got up on the wrong side of the bed.  I

17          don't know what would trigger it.  He was dying

18          inside, I guess, is the only way you can look

19          at it.

20    Q     So as a mother you could tell that he was in

21          pain; is that right?

22    A     Absolutely.

23                MR. JUBB:  I'll object to the form.

24    BY MS. DOUGHERTY:

25    Q     And so it says, "Sleep, concentration."  Did
```

Mary Ellen Poulos

```
 1              you observe Kurt having sleep problems because

 2              he lived with you for some of the time, right?

 3      A       He has tried -- most of his adult life he's not

 4              been a good sleeper, and he's tried everything

 5              under the sun.

 6      Q       Was he --

 7      A       To this day he wakes up at 5:00 in the morning

 8              and can't get back to sleep or 2:00 in the

 9              morning.  He's most his adult life expressed

10              problems with sleeping and tried to deal with

11              it.

12      Q       Was he a good sleeper before he went to The

13              Hill School?

14      A       Yes.

15      Q       How about concentration?  Does Kurt -- have you

16              ever observed Kurt having trouble with

17              concentration?

18      A       Well, in the macro sense of when he has a job

19              and he sticks to it, no, but -- or in the micro

20              sense, but in the macro sense, in the big

21              aspects of his life, stick to it, having a

22              goal, like staying in college and getting a

23              degree, I have seen that as a problem.  And I

24              would call that concentration.

25      Q       Okay.  You described that a little bit earlier
```

Mary Ellen Poulos

```
 1         about changing colleges, changing job choices,

 2         right?  So not sticking with it, okay?  So

 3         that's something that you pretty continuously

 4         observed since Kurt left The Hill School; is

 5         that right?

 6    A    Right.

 7    Q    Graduated from The Hill School, rather?

 8    A    Right.

 9    Q    How about low self-esteem, low self-respect,

10         low self-confidence, apathy, not caring about

11         things in his life.  Are those things you have

12         observed from Kurt since he left The Hill

13         School?

14    A    Well, I think it's all part of --

15              MR. JUBB:  I'll object to the form.

16    BY MS. DOUGHERTY:

17    Q    "I think it's all part of the"?

18    A    Part and parcel of his life.  It's part of not

19         being able to concentrate, not being able to

20         set goals.

21    Q    Did Kurt have low self-esteem, low

22         self-respect, low self-confidence, apathy and

23         didn't care about things in his life before he

24         went to The Hill School?

25    A    No.  No.
```

Mary Ellen Poulos

1    Q    He was a happy kid, right, before he went to

2         The Hill School?

3    A    And a very confident kid.  He was very

4         confident in himself and his abilities.  It was

5         pretty funny, actually.  It was very enjoyable

6         to be around his attitude.

7    Q    So Kurt was outgoing before he went to The Hill

8         School?

9                   MR. JUBB:  I'll object to the form.

10                  THE WITNESS:  Yes.  He had a lot of

11        friends, and he was a pretty good student, and

12        he was confident in himself.

13   BY MS. DOUGHERTY:

14   Q    Okay.  We talked about alcohol, and do you know

15        if -- has Kurt -- let me start again.

16                  Have you ever observed Kurt taking

17        drugs that were not prescribed by a doctor?

18   A    No.

19   Q    Do you have any information about Kurt taking

20        drugs that were not prescribed by a doctor?

21   A    No.

22   Q    How about sabotaging himself, flashbacks,

23        feeling broken and unfixable?  Are those

24        symptoms that you have observed in Kurt or Kurt

25        has expressed to you that he has sustained?

Mary Ellen Poulos

```
 1    A    I wouldn't say he's ever used those words, but
           in my observations of him, I would say that he
 3         felt that way.  It was apparent.
 4    Q    How about being touched?  Does Kurt like to be
 5         touched in an appropriate way?
 6    A    I don't know.  We're not very touching people
 7         in my family.  So we don't do a lot of hugging,
 8         and I don't know.  Some people do, some people
 9         don't.
10    Q    So that's not something that you would really
11         notice, right?
12    A    No.
13    Q    Okay.
14    A    It was my birthday Monday; he gave me a hug.
15    Q    How about self-harm?  Do you know if Kurt has
16         ever harmed himself?
17    A    I'm not -- not really.  I mean, I -- he has a
18         huge gash on his arm that he has -- I don't
19         know.  I think it happened when he was drunk
20         and claimed he broke a glass or something, but
21         I think Emily told me that he did that to
22         himself, but I did not know that.
23    Q    Have you ever been concerned that Kurt would
24         hurt himself?
25    A    Absolutely, yes.
```

Mary Ellen Poulos

```
 1    Q    When was the first time that you remember being
 2         concerned that Kurt would hurt himself?
 3    A    I don't know.
 4    Q    Did you have that concern before Kurt went to
 5         The Hill School?
 6    A    No.
 7    Q    So sometime after -- let me start again.
 8               How about when Kurt was at The Hill
 9         School?  Was there ever a time when you were
10         concerned that he would hurt himself?
11    A    No, not -- no.
12    Q    So how about -- so sometime after Kurt left The
13         Hill School you became concerned that he might
14         hurt himself?
15    A    Yes, it was a progression.
16    Q    So part of the gradual progression that started
17         from observing him being very skinny to having
18         anger outbursts; is that right?
19    A    And drinking a lot.
20               MR. JUBB:  Object to the form.
21               THE WITNESS:  And not able to keep a
22         job and keep an apartment and have a life.
23    BY MS. DOUGHERTY:
24    Q    Let's see.  So I just want to clarify one
25         thing.  You testified earlier about a situation
```

```
 1            where Kurt's father hit hurt when Kurt was an

 2            adult.  I just want to confirm that that is the

 3            first and only time you are aware that Kurt's

 4            father was physical with Kurt?

 5     A      Yes.

 6     Q      And as an adult you mean -- can you quantify

 7            that a little bit?  I realize it's more than

 8            18, but can you give us a better estimate on

 9            the age?

10     A      If I could remember -- he and a girlfriend were

11            traveling somewhere, I think, and stopped --

12            going from Milwaukee or Chicago to the east

13            coast for some reason, I think.  And they

14            stopped in Detroit on the way, so.  It seems

15            like it was yesterday, but it must have been

16            early 2000s, maybe.  I'm not sure.  How do you

17            pronounce your last name, Dougherty or

18            Dougherty?

19     Q      Dougherty.

20     A      Okay.  Thank you.

21     Q      So when you first contacted Mr. Garabedian you

22            realized that the statute of limitations for

23            Kurt to file a lawsuit against -- let me start

24            again.

25                   When you contacted -- let me start
```

```
 1          again.

 2                    What was the objective of why you

 3          contacted Mr. Garabedian?

 4     A    I wanted him to assist Kurt in responding to

 5          those two women in the November 20, 2017, memo

 6          of Lehman's.  I didn't want him to respond

 7          alone.

 8     Q    The "he" being Kurt, right?

 9     A    Yes.

10     Q    Okay.  At the time you contacted Mr. Garabedian

11          you realized that the statute of limitations

12          for Kurt to file a lawsuit against the school

13          or Mr. Ralston had passed; is that right?

14     A    Yes.

15     Q    Was it the case that -- let me start again.

16                    Was it Kurt's intention to file a

17          lawsuit against The Hill School or Mr. Ralston

18          if the statute of limitations was extended in

19          Pennsylvania, if you know?

20                    MR. JUBB:  Objection to the form.

21                    THE WITNESS:  A lawsuit didn't have

22          anything to do with it.  The purpose of

23          contacting Mr. Garabedian was to contact The

24          Hill School.  The Hill School was -- was

25          requesting and giving students the opportunity
```

Mary Ellen Poulos

1          to come forward.  I did not want Kurt to do

2          that without representation once I found out

3          these two women were attorneys.  I mean, the

4          deception was right there -- the deception of

5          what The Hill School was doing was right there

6          in the communication in 2017.  They were not

7          identified as attorneys.  They were identified

8          as child specialists or something.  So I was

9          suspicious of what the motivation was of The

10         Hill School.  So I said, "Kurt, I think you

11         should have an attorney before you contact

12         them."  We weren't even thinking of a lawsuit.

13               But contemporaneous with this letter

14         from Lehman asking people to come forward were

15         changes that were going on in Pennsylvania over

16         this type of claim.  New York had grandfathered

17         people in, and Pennsylvania was considering

18         grandfathering people in also.  So the

19         potential for a lawsuit clearly existed, but

20         that was not the reason for the initial contact

21         with Garabedian.  Lawsuits were out the window

22         at that point.

23    BY MS. DOUGHERTY:

24    Q    At the time of the initial contact; is that

25         correct?

Mary Ellen Poulos

```
1     A    Yes, absolutely.

2     Q    And then what about after Kurt retained

3          Mr. Garabedian?

4     A    That's what I'm talking about.  At the time

5          that he was contacted by us and signed up Kurt

6          as a client, the purpose was to contact The

7          Hill School.  If a lawsuit matured because

8          Pennsylvania changed their law, obviously we

9          would have hoped that Garabedian would file a

10         lawsuit once it became viable.

11    Q    Okay.  So the purpose -- so it was always --

12         let me start again.

13              So the purpose of obtaining

14         Mr. Garabedian was for Mr. Garabedian to tell

15         The Hill School about the abuse that Kurt

16         sustained while a student at The Hill School;

17         is that right?

18              MR. JUBB:  Objection to the form.

19              THE WITNESS:  Yeah, I guess.  I don't

20         know if I would go that far, but --

21    BY MS. DOUGHERTY:

22    Q    Let me just do it -- let me confirm.  You and

23         Kurt received -- well, I'm sorry.  Kurt

24         received the November 20, 2017, email that he

25         shared with you, and then he wanted to report
```

Mary Ellen Poulos

```
 1            to The Hill School what had happened to him; is
 2            that right?
 3    A    Right.
 4    Q    And you said, hold on, before you write to
 5            these ladies that are identified here that are
 6            actually attorneys, you should have your own
 7            attorney; is that right?
 8    A    Yes.  I didn't feel comfortable advising Kurt
 9            to contact these two women unrepresented.  If I
10            could get him an attorney to help him, that's
11            what I wanted to do.  I did not want him to
12            email them and tell them his story once I found
13            out they were attorneys.
14    Q    Okay.
15    A    Had I researched them and determined that they
16            were child abuse counselors, I probably would
17            have said, "Yeah, go ahead, contact them."  But
18            I found out they were attorneys.  It didn't say
19            in that memo that these were attorneys.  So
20            then I got suspicious, and I said, let's see if
21            we can get you some help.  And I contacted
22            Garabedian, and he agreed to help.
23    Q    Right.  So the objective in retaining
24            Garabedian or contacting Garabedian was always
25            for Kurt to tell The Hill School what had
```

```
1         happened to him; is that right?

2    A    No.  It was to tell these two women what had

3         happened to him.

4    Q    Would you think the women are someone other

5         than The Hill School?

6    A    Apparently.

7    Q    What do you mean by that?

8    A    Because he gave you a choice of contacting The

9         Hill School or contacting these women, and Kurt

10        and I were talking about contacting these

11        women.  I felt he shouldn't contact the women

12        without an attorney.  I never even discussed

13        with him contacting The Hill School itself.

14             When I went back and reread that, I

15        realized that Lehman had given you a number of

16        opportunities and people to contact or ways to

17        contact, do it anonymously, send him an email,

18        but in blue what stood out was contacting these

19        child psychologist -- child abuse specialists,

20        I think he called them.  Child abuse

21        specialists, and I thought, okay, maybe he can

22        get some help through these people, get some

23        counseling, get some help.

24             So I researched these women.  I found

25        out they were attorneys.  I said to the hell
```

```
 1              with that.  I'm not going to have Kurt contact

 2              these two women without some representation if

 3              I can get it.  I didn't think I would be able

 4              to get it because of the statute of limitations

 5              problem that no attorney would take it on, but

 6              Garabedian agreed to.  But maybe, you know, I

 7              agree.  There were -- the memo says send me an

 8              email, do a -- you know, gave you a number of

 9              options.

10    Q   Yeah, that's not really what I'm getting at.

11              I'm just trying to confirm that the purpose --

12              let me start again.

13                   I'm just trying to confirm Kurt, he

14              wanted to report the abuse, that was his

15              purpose in retaining Mr. Garabedian at least as

16              you understood it; is that right?

17    A   Yeah.  Yeah.

18                   MR. JUBB:  Object to form.

19                   THE WITNESS:  But there's a huge

20              distinction between publishing an article in a

21              newspaper or contacting The Hill School and

22              writing them a letter and contacting these two

23              attorneys.  There's a huge distinction in what

24              the impact of supplying that information is.

25    BY MS. DOUGHERTY:
```

Mary Ellen Poulos

```
 1    Q    Okay.  Let -- Mr. Garabedian didn't write an
 2         article, right?
 3    A    No.
 4    Q    Did you write an article about Kurt's abuse?
 5    A    No.
 6    Q    And Kurt didn't write an article about the
 7         abuse?
 8    A    No.
 9    Q    So did you think if the abuse was communicated
10         to the two women at Cozen O'Connor that The
11         Hill School wasn't going to learn of the
12         report?
13    A    I don't know.  I didn't know how it was going
14         to operate.  I had no idea.
15    Q    When was the first time that you became aware
16         that Kurt wanted to get his tuition refunded or
17         reimbursed from The Hill School?
18              MR. JUBB:  Objection to the form.
19              THE WITNESS:  He told me, that I
20         think.
21    BY MS. DOUGHERTY:
22    Q    When did he tell you that?
23    A    I think after he had established an attorney --
24         a relationship with Mr. Garabedian -- Attorney
25         Garabedian.
```

1    Q    So you never -- okay.  Did you ever communicate

2         to Mr. Garabedian that Kurt wanted to get his

3         tuition reimbursed?

4    A    Yeah, I did.  I remember in reviewing my emails

5         -- I didn't recall it independently, but in

6         reviewing my emails before I sent them to you

7         guys, I saw an email where I said, you know,

8         all Kurt ever wanted was his tuition

9         reimbursed.  I remember reading that when I

10        sent you guys the emails.

11   Q    Okay.  So when Kurt contacted Mr. Poulos -- I'm

12        sorry.  Let me start again.

13             So when Kurt contacted Mr. Garabedian

14        he also wanted to get his tuition reimbursed?

15   A    I don't know.

16             MR. JUBB:  Objection to the form.

17             THE WITNESS:  He told me that's all

18        he wanted.

19   BY MS. DOUGHERTY:

20   Q    Okay.

21   A    I don't know what he told Garabedian.  Kurt

22        told me, "All I want, Mom, is my tuition

23        reimbursed."  I said, "Okay."  You know, I

24        didn't have any control over what was going to

25        be asked for or what he wanted or what anybody

Mary Ellen Poulos

```
 1          wanted.  He just told me what he wanted.
 2          That's all.  He would be satisfied if he got
 3          his tuition reimbursed, and if The Hill School
 4          would pay for some counseling of some kind,
 5          some treatment because he's been very, very --
 6          he's had a very good response to seeing
 7          Dr. Grady, and he's been involved in some
 8          meetings.
 9               He has a group that when he gets
10          really tense and upset, he tells me anyway that
11          he's going -- "I'm going to go to a meeting
12          tonight," and it seems to help him.  And I
13          think that if I could afford it, if he could
14          afford it, he would try to have regular
15          sessions with a psychologist or a psychiatrist.
16          And he would like The Hill School to pay for
17          that, but I did not hear that from Garabedian.
18          We never discussed anything about the case in
19          depth.
20     Q    Okay.  So you don't know one way or the other
21          whether that was Kurt's objective when he
22          retained Mr. Garabedian.  It's something you
23          learned about after Mr. Garabedian was retained
24          from Kurt; is that right?
25     A    Yes.  And I also saw that in the notes that
```

```
1          were submitted when Kurt's file with Garabedian

2          was sent to us.  I saw that notation, I think,

3          somewhere in there.

4                    THE COURT REPORTER:  Do you think we

5          could take like a couple minutes really quick?

6                    MS. DOUGHERTY:  Sure.

7                    MR. JUBB:  Of course.

8                    THE VIDEOGRAPHER:  Going off the

9          record at 2:41.

10                   (Discussion off the record.)

11                   THE VIDEOGRAPHER:  We're back on the

12         record at 2:50.

13    BY MS. DOUGHERTY:

14    Q    Can everybody hear me okay?  Yeah.  I just want

15         to make sure.  I'm showing you a document that

16         I marked as D24.  It doesn't have a Bates

17         label.  At the top it says, "Applegate, Amanda,

18         Subject: Forward, the Hill."

19                   It looks like another series of

20         emails that you, Ms. Poulos, forwarded to

21         Mr. Jubb on July 29, 2020.  I just want to

22         direct your attention to the middle of the

23         page.  Let's start at the bottom.  There's an

24         email, December 12, 2017, from Kurt to you.  It

25         says, "Hey, I was just wondering if you would
```

Mary Ellen Poulos

```
 1              emailed those lawyers or the headmaster on my

 2              behalf or if you wanted me to do that today?"

 3              Do you remember receiving that email from Kurt?

 4    A    Sure.  Maybe.

 5    Q    So is it your understanding that Kurt is

 6              talking about the November 20, 2017, email from

 7              the headmaster, right?

 8    A    Yes.

 9    Q    And so does this email from Kurt refresh your

10              recollection that he was considering contacting

11              the lawyers or Mr. Lehman, the headmaster?

12    A    Yes.  Hi, Kurt.

13              MR. POULOS:  Hi, Mom.  Great day off.

14              THE WITNESS:  Yeah.

15    BY MS. DOUGHERTY:

16    Q    So I'm sharing with you, Ms. Poulos, a document

17              that's been previously marked as D10.  It says

18              Garabedian_file0041 on the bottom right.  It's

19              an email from you to Mr. Garabedian dated

20              January 29, 2019, Subject: New York Law.  Do

21              you remember sending the email that I marked as

22              D10 to Mr. Garabedian?

23    A    I don't specifically remember it, but it

24              doesn't surprise me that I sent it.  You know,

25              this is part and parcel of some of the issues
```

Mary Ellen Poulos

```
1              we're trying to deal with here.
2    Q    So you wrote, "New York just passed the law
3         extending statute of limitations for sex abuse.
4         I think Hill School should be worried.  New
5         York Times today's issue!  Mary Ellen Poulos,"
6         right?
7    A    Right.
8    Q    Why did you write in this email to
9         Mr. Garabedian about the New York statute of
10        limitations?
11             MR. POULOS:  Became aware.
12             THE WITNESS:  Because I knew either
13        from him or from my research that Pennsylvania
14        was thinking of doing the same thing.
15   BY MS. DOUGHERTY:
16   Q    So why did you write, "I think Hill School
17        should be worried"?
18   A    Because I -- I felt pretty confident that
19        Pennsylvania was going to do the same thing and
20        grandfather in some of these older cases.
21   Q    Was Kurt waiting for the Pennsylvania statute
22        of limitations to change to assert a lawsuit
23        against The Hill School?
24   A    Well, there were two aspects to this.  I think
25        he and I both hoped and prayed that we would
```

Mary Ellen Poulos

```
 1              never have to sue and that this new venue that

 2              opened up through the November -- November 20,

 3              2017, email from the school, the school

 4              reaching out to grieved students might be a

 5              substitute for litigation of any kind.

 6                     I did not -- I was not looking

 7              forward to the thought of Kurt having to become

 8              a plaintiff.  I was hopeful, though I don't

 9              pray much, prayful for the fact that maybe this

10              could be resolved and that New York passing the

11              law would be an impetus for schools to avoid

12              waiting for the Pennsylvania law to change and

13              be sued.  Because Pennsylvania had a similar

14              provision, but as I understand it, they did

15              change the age and gave -- raised the age that

16              a lawsuit to be commenced but did not

17              grandfather in, and they did a grandfathering

18              in section of that law, but they -- the

19              secretary of state, I think, screwed up some

20              sort of publication.  And therefore, they had

21              to go back to square one with the

22              grandfather -- grandfathering in portion of

23              that law and, you know, hope springs eternal.

24      Q      So you said that it was twofold.  So number

25              one, that you and Kurt were hopeful and you
```

Mary Ellen Poulos

```
 1              maybe prayed, even though you're not a praying
 2              woman, that the November 20, 2017, email would
 3              open up a line of communication that would
 4              permit Kurt to get some sort of remedy or
 5              relief for the abuse he sustained; is that
 6              right?
 7      A    Especially --
 8                   MR. JUBB:  Objection to the form.
 9                   THE WITNESS:  Especially since he had
10              someone as prominent as Mitchell Garabedian
11              representing him.  I thought, come on, Kurt
12              isn't asking for much.
13      BY MS. DOUGHERTY:
14      Q    And so -- and you thought that the change in
15              New York law might impact the school in
16              Pennsylvania so that they would stop waiting to
17              see if the statute of limitations changed and
18              respond to Kurt's inquiries, right?
19      A    Yeah.  I mean, sometimes -- sometimes the
20              handwriting is on the law and maybe should --
21              you know --
22      Q    Are those the two points or is that just point
23              number one?
24      A    My cat has been locked up for four hours, so
25              now she's out here trying to get attention.  So
```

Mary Ellen Poulos

```
 1        pardon me.

 2   Q    That's okay.  Daisy, my cat, is doing the same

 3        thing to me.  We're in the same boat.

 4             So you mentioned that the strategy or

 5        the plan was twofold.  So have you told us

 6        about number one?  What's number two?

 7   A    Well, Kurt has -- you know, with the statute of

 8        limitations at that point --

 9             Minnie, get down.

10             With the statute of limitations at

11        that point being against him, he can't file a

12        lawsuit, but with the school soliciting

13        students to come forward, with Garabedian in

14        his corner, I was hopeful that the school would

15        handle this, would help my son, would give him

16        back his wasted $100,000 in tuition.  I was

17        hopeful that they would act like adults, and

18        that didn't happen.  But I was also cognizant

19        of the fact that there was a chance that

20        Pennsylvania was changing its law and that

21        their new law would be similar to New York's.

22   Q    Okay.

23   A    So there are two dynamics here.

24   Q    Right.  I understand.  So dynamic number one is

25        to try to resolve the issue and have Kurt made
```

Mary Ellen Poulos

```
 1          whole without litigation, and then if that
 2          doesn't work, then if the statute of
 3          limitations has changed in Pennsylvania, then
 4          to pursue litigation; is that right, the two
 5          dynamics?
 6     A    Yeah.
 7               MR. JUBB:  Objection to the form.
 8     BY MS. DOUGHERTY:
 9     Q    All right.  I'm showing you a document that I
10          marked as D25.  It's a May 16, 2019 letter.  It
11          says on the bottom right "Hill0213," and it
12          looks like it's a letter by you to Mr. Lehman.
13          Did you write the letter that's been marked as
14          D25?
15     A    I did.
16     Q    What prompted you to -- let me start again.
17               You actually sent this letter to
18          Mr. Lehman, right?
19     A    I did.
20     Q    Did you email it to him, mail it to him, fax it
21          to him?
22     A    I think I emailed it because nobody sends mail
23          anymore.  I'm pretty sure I did it as an
24          attachment though.  I'm not very good at that,
25          but I think I did it as an attachment.
```

Mary Ellen Poulos

```
 1   Q   Right.  So that's why you did on the bottom

 2       under regards /s/?

 3   A   Yeah.  Yeah.  Yeah, exactly.  I didn't print it

 4       out, obviously.  Okay.

 5   Q   What prompted you to send this May 16, 2019,

 6       letter to Mr. Lehman?

 7   A   The lawsuit.  It had -- Kurt had been doing so

 8       well, and then out of the clear blue sky he's

 9       served with this God damn lawsuit, and it was

10       such a setback.  It was so hard to watch.  And

11       I did not understand -- I felt powerless, and I

12       thought maybe, maybe, maybe the school can

13       influence this litigation either through

14       contact -- and I didn't know who the plaintiff

15       was.  I didn't know where he was working.  I

16       knew he was no longer at Leelanau.  I

17       subsequently determined somehow that he was

18       working again, I guess, for the Hill.  I don't

19       know.

20            It's kind of sketchy, but it didn't

21       appear to me that he would have the resources

22       to handle litigation of this ilk, and I'm still

23       mystified by that.  So I was appealing to the

24       school as Kurt's mom, him as an alumnus, to

25       please can you do what you can do to end this.
```

Mary Ellen Poulos

```
 1            And I kind of -- you know, as I said before, my

 2            paranoid lawyer brain thought they might be

 3            behind it because I couldn't figure out where

 4            the money was coming.  To handle litigation

 5            like this is expensive.  It's not like a slip

 6            and fall case, defamation.

 7      Q     So you mentioned -- you referenced earlier in

 8            your testimony that you wrote Lehman, quote,

 9            begging him to dismiss this litigation, is this

10            the letter you were talking about?  This letter

11            being D25?

12      A     Yes, please, help him.  Help my son.

13      Q     Now, at the time when you wrote the May 16,

14            2019, letter, did you know that John Doe was

15            Matthew Ralston?

16      A     No.

17      Q     Okay.  So you had your suspicions which is why

18            you were looking Mr. Ralston up and everything,

19            but you did not at this time, being May 16,

20            2019, know that John Doe was, in fact, Matthew

21            Ralston; is that right?

22      A     I don't think so.  I mean, as I explained, I

23            found out for sure when I found out and it was

24            disclosed who John Doe was.  I don't know what

25            the date of that was.  You guys probably know
```

```
 1          that better than I do or have it in your file
 2          or however you do it.  I don't think I knew for
 3          sure, no.
 4     Q    So this May 16, 2019, letter that's been marked
 5          as D25, is this your first contact with
 6          Mr. Lehman about this lawsuit being the John
 7          Doe versus Garabedian, et al, lawsuit?
 8     A    I think so.
 9     Q    So you didn't call Mr. Lehman on the phone
10          before writing him a letter?
11     A    No.
12     Q    Have you had any contact with Mr. Lehman other
13          than -- let me start again.
14                   Have you had any contact with
15          Mr. Lehman on the telephone about this lawsuit
16          or Mr. Ralston?
17     A    I've never spoken to him on the phone.
18     Q    Did you write Mr. Lehman any letters other than
19          this May 16, 2019, letter that's been marked as
20          D25 regarding this lawsuit, meaning John Doe
21          versus Garabedian, or about Mr. Ralston?
22     A    I have no other letters, no.  Well --
23     Q    I will -- I'm sorry.  Go ahead.
24     A    I sent, I think, an email.  I couldn't find --
25          I'm not very computer savvy, and I couldn't
```

```
 1          find the April 2016 and the November 2017

 2          communications from the school.  So at some

 3          point -- and I think it was within the last few

 4          months or so -- I sent an email to Lehman

 5          requesting copies of those prior memos.  And I

 6          got a snotty letter back from Rees, R-E-E-S,

 7          however you pronounce that, saying that in the

 8          future when I wanted to talk to Lehman I should

 9          go through him, and he attached -- it was kind

10          of condescending.

11                 I'm getting use to that in this case,

12          but it was sort of a nonsensical letter because

13          I'm a parent.  I mean, I was entitled to those

14          whether or not this litigation ever happened,

15          but he told me from here on in if I wanted to

16          contact the school to go through him.  So that

17          was another time I did contact Lehman I can

18          think of.

19     Q    So I put up on your screen for you -- we will

20          go back to D25 in a moment, but I've put

21          Garabedian_email0117 to 18, and I'm going to

22          mark this as D27.  I haven't marked it at the

23          moment.  Are these the emails that you're

24          talking about?  Here, I will make it bigger.

25     A    I can't read it.  Can you make it bigger?
```

```
 1   Q   Yeah.  So let's just start.  I guess I -- there
 2       we go.  For some reason I wasn't able to scroll
 3       down.  So it looks like the second page is just
 4       blank.  So on the bottom of the first page of
 5       D27, which is Garabedian_email0117, there's an
 6       email from Mr. Rees to, it says, Mr. Poulos and
 7       Mr. Garabedian.
 8   A   Well, is it Mr. Poulos, so it's to Kurt?
 9   Q   Yeah.  It looks like -- and then there's an
10       email from Kurt, and then it looks like there's
11       an email from you to Kurt and Mr. Rees and
12       Mr. Garabedian and Mr. Lehman that you wrote,
13       "Dear Attorney Rees," and I was just putting
14       these up to see if these are the email
15       exchanges you are talking about because you are
16       100 percent accurate that Mr. Lehman is a
17       recipient.  Is that big enough now?
18   A   Is this where I ask for copies?
19   Q   Yeah.  You say, "Kurt has forwarded this email
20       to me, so I will introduce myself to you.  My
21       name is Mary Ellen Poulos, and I'm his mother.
22       As the parent of a Hill student, I reviewed two
23       emails in 2016 sent by the Headmaster Zachary
24       Lehman to 'Alumni and Parents.'  The first
25       email was dated April 23, 2016, and was
```

```
 1              prompted by a series of articles in the New

 2              York Times" -- let's make it smaller to keep

 3              reading -- "concerning serious abuse problems

 4              at elite boarding schools.  This first rather

 5              generic communication was followed up by a much

 6              more specific email sent, I believe, at the end

 7              of 2016.  The purpose of my email is to request

 8              hard copies of these two communications.  This

 9              request has nothing to do with Attorney

10              Garabedian.  I was a practicing attorney for

11              over 40 years, and in that guise I find your

12              response to Kurt's request for copies confusing

13              at best."  That's the email you wrote, right?

14      A      Yup.

15      Q      So it looks like Kurt asked for the emails and

16              then got a response from Mr. Rees that he sent

17              to you, and then you responded to Mr. Rees,

18              Mr. Garabedian, Kurt, and then also Mr. Lehman;

19              is that right?

20      A      Just know they were being weird about it.

21      Q      Yeah.  So when you were talking about a

22              communication that you recollected, perhaps an

23              email with Mr. Lehman, this is what you were

24              talking about?

25      A      Yeah, I know I needed copies.  I like to have
```

Mary Ellen Poulos

```
 1          pieces of paper, not have to go to my computer

 2          every time I want to look at something.  So I

 3          wanted hard copies, which I never got.

 4     Q    Any other communications with Mr. Lehman

 5          regarding this action or Mr. Ralston?

 6     A    I don't think so.

 7                    MR. POULOS:  Can I interject for a

 8          second?

 9                    MS. DOUGHERTY:  Do you have an

10          objection?

11                    MR. POULOS:  It doesn't seem like

12          Lane is paying attention to what's going on.

13                    MR. JUBB:  I can hear everything

14          that's being said, Kurtis.  You should pay

15          attention too.

16                    MR. POULOS:  I have been paying

17          attention since 10:00 this morning.  You're

18          staring down at a desk right now.

19                    MR. JUBB:  Please continue,

20          Ms. Dougherty.

21                    MS. DOUGHERTY:  Mr. Poulos, are you

22          done with your objection?  Yes, okay.

23                    MR. POULOS:  Yeah.  I just wish he

24          would give my mother the respect she deserves.

25     BY MS. DOUGHERTY:
```

```
 1    Q    I understand.  Just for your benefit,

 2         Ms. Poulos, I'm looking down sometimes because

 3         I'm reading while asking you questions, not

 4         intending to be rude.  I just can't do them

 5         both at the same time.

 6                   So I'm showing you a document that I

 7         marked as D26.  It is -- it says on the bottom

 8         Hill0250 to Hill0251, and it looks like on the

 9         second page starts with an email by you to

10         Mr. Lehman, which it looks like perhaps where

11         you sent your letter that was marked as D25?

12    A    I have no idea.  I can't see the top.  I don't

13         know.

14    Q    There's no indication of a -- okay.  I will

15         just scroll up.  And then there's an email from

16         Mr. Lehman to you.  This is all it is.  It

17         doesn't have any other --

18    A    Yeah, I don't -- okay, May 17, 2019.  So that's

19         in response, I suppose, to my letter.

20    Q    Yeah, so the bottom -- the first email in the

21         chain, which starts at the bottom of the first

22         page of D26, is an email from you by you --

23    A    With my letter.

24    Q    Right, which probably had your letter attached;

25         is that right?
```

Mary Ellen Poulos

```
 1    A    Yes.  Okay.  Right.

 2    Q    But it doesn't show an attachment; the page is

 3         just blank.

 4    A    I see.  Okay.  Got it.

 5    Q    That's what I just wanted to confirm.  And then

 6         Mr. Lehman, looks like, wrote you back on May

 7         27, 2019; is that right?

 8    A    Yes.

 9    Q    Do you remember receiving this email from

10         Mr. Lehman?

11    A    I do.

12    Q    And Mr. Lehman wrote that, "As has been

13         publicly reported" -- and let me just

14         reference, I'm in the second paragraph of

15         Mr. Lehman's email last -- I guess it's the

16         second sentence, but it's the last sentence of

17         the second paragraph.  It says, "As has been

18         publicly reported, the employee that filed the

19         lawsuit and was accused of sexual misconduct in

20         the letters sent to us by Mr. Garabedian is on

21         leave."

22              So Mr. Lehman told you in -- on May

23         17, 2019, that at least that Mr. Ralston was on

24         leave?

25    A    That's what it says.
```

Mary Ellen Poulos

```
 1    Q    Is that the first time that you learned that
 2         information about Mr. Ralston?
 3    A    Absolutely, but let me just preface this by
 4         saying that Mr. Lehman's credibility is about
 5         zero with me when he spells my son's name with
 6         a C.  I mean, his name is spelled with a K.
 7         So, you know, the minute I saw that, I was
 8         like, okay, here we go, more of his bullshit.
 9         But I was -- I do admit, when he said Mr. --
10         the employee is on leave, I was like, I didn't
11         know he was even working for you.  That was
12         news to me.
13    Q    Did that prompt you to go look up Mr. Ralston
14         to see his employment status?
15    A    No.  I already knew he had left Leelanau, and
16         they in 2016 were conducting a nationwide
17         search and had an acting head of school.  So I
18         already was aware of that.  By telling me in
19         this letter that he was on leave, on leave from
20         what?  On leave from working for The Hill
21         School, so they hired him back.  I thought,
22         these guys are really idiots, you know.  And
23         then I subsequently learned, I guess, that --
24         and I don't remember how, but I learned that he
25         had been hired by them to do fundraising or
```

Mary Ellen Poulos

```
1              something.

2                      I don't know.  Maybe that was --

3              something I read somewhere that he had an

4              address sometime -- some kind of an address in

5              Philadelphia, but that he could be contacted

6              through Jubb's office and that he was doing

7              fundraising for The Hill School.

8    Q   So did you have any other communication with

9              Mr. Lehman about your original letter, your May

10             16th letter that we just looked at that was

11             marked as D25, other than this response?

12   A   No.  None.

13   Q   Did you write back to Mr. Lehman?

14   A   No.

15   Q   Do you know if Kurt has -- let me start again.

16                     So in the first paragraph, right,

17             Mr. Lehman writes a bunch of stuff, and then he

18             says, "We would still very much welcome the

19             opportunity to speak with Curtis to further

20             understand the concerns he has brought forward

21             and we would also appreciate the opportunity to

22             speak with you."  So that's the last sentence

23             of the paragraph by Mr. Lehman on the May 17,

24             2019, email that's been marked as D26.

25   A   Okay.
```

Mary Ellen Poulos

```
 1    Q    So did you ever talk to Mr. Lehman in response

 2         to his invitation that I just read to you?

 3    A    My trust level is going down every time

 4         anything -- no, I did not.

 5    Q    Do you know if Kurt ever spoke to Mr. Lehman in

 6         response to the invitation that Mr. Lehman

 7         extended to you to speak to Kurt further about

 8         his allegations?

 9    A    Yes, we did discuss it.

10    Q    Okay.  So you discussed with Kurt whether he

11         should speak with Mr. Lehman; is that right?

12    A    No.

13    Q    No?

14    A    I discussed with him maybe he should -- I

15         suggested or we were spitballing because this

16         lawsuit was kind of new and Garabedian had

17         pretty much abandoned him.  And I suggested

18         that maybe we should do -- now with more

19         knowledge, maybe he should consider contacting

20         those two women and see what they had to say.

21         We spitballed that a couple times.

22               In my opinion he was just getting

23         crushed here.  I couldn't get a lawyer to

24         represent him, and so we did discuss possibly

25         doing what the November 20, 2017, memo had
```

Mary Ellen Poulos

1          suggested to begin with and calling those child

2          experts -- child abuse experts, quote/unquote,

3          attorneys, and see what happened, but he didn't

4          do it.

5     Q    How about did you talk to -- let me start

6          again.

7               Did you share with Kurt that

8          Mr. Lehman wrote you an email on May 17, 2019,

9          suggesting that Mr. Lehman welcome the

10         opportunity to speak to Kurt about his

11         allegations?

12    A    I don't know if I specifically told him or gave

13         him a copy of the letter.  I'm not really sure

14         about that at all.

15    Q    Did you talk to Kurt about whether he should

16         contact Mr. Lehman, again, after you received

17         the May 17, 2019, email from Mr. Lehman, the

18         one that we're look at now, D26?

19    A    I never from the beginning of this thought he

20         should contact Mr. Lehman.  The only issue I

21         had or thought -- the only viable option I

22         thought was contacting the Cozen law firm.  I

23         never would have suggested to him that he

24         contact Lehman.  He's a putz, I think.  He has

25         not handled this well, in my opinion.

```
 1    Q    And Mr. Lehman's May 2019 email where it didn't
 2         even spell your son's name wrong name -- name
 3         correctly didn't give you any more confidence,
 4         right?
 5    A    No.  No, certainly did not.
 6    Q    So I'm showing you a document that's been
 7         previously marked as D14.  I'm going to make it
 8         bigger.  It's a series of emails.  I'm going to
 9         read it to you because I realize it's small,
10         and you're not included in the email.  This is
11         a series of two emails -- email exchange
12         rather -- between Mr. Garabedian -- no, I
13         apologize.
14              These are two emails by Kurt to
15         Mr. Garabedian.  What I want to focus the
16         attention is to the September 20, 2018, 5:42
17         p.m. email from Kurt to Mr. Garabedian where he
18         says, "I spoke with my mother, and she's
19         thinking about calling the dean at the Hill to
20         expedite the process."
21              So my question is whether you
22         actually did call the Hill in September of
23         2018?
24    A    September of 2018, I'm not sure what Kurt is
25         talking about.
```

Mary Ellen Poulos

```
 1    Q    Okay.  But you didn't call The Hill School
 2         regarding Kurt's complaint about Mr. Ralston's
 3         conduct; is that right?
 4    A    No.  I sent that one letter after the
 5         litigation was filed against Kurt.  And I sent
 6         emails asking for yearbooks and the name of a
 7         teacher, but other than that I had no interest
 8         in talking to the headmaster at all.
 9    Q    Okay.  I'm just checking because Kurt said
10         "Calling the dean."  So I just wanted to make
11         sure that wasn't referring to somebody other
12         than the people we have talked about.  Because
13         we have gone through Mr. Lehman.  We have gone
14         through Mr. Rees, right?  So you didn't contact
15         anybody in 2018 about Kurt's complaints about
16         Ralston's conduct or to quote, "Expedite the
17         process"?
18    A    Anybody at The Hill School?
19    Q    Yeah.
20    A    I mean, the lawsuit hasn't even been filed at
21         this point, so.
22    Q    Correct.  I'm just trying to confirm whether --
23         how about this, have you called anybody at The
24         Hill School regarding Mr. Ralston?
25    A    No.  I've never had a phone conversation with
```

Mary Ellen Poulos

```
1              anybody from The Hill School.  I think they did
2              call me back when I asked for the yearbooks.
3              Yeah, they called me when I asked for the
4              yearbooks because they wanted to say that it
5              might take a little time to find them because
6              they were pretty old.  You know, it was like 30
7              years ago.  Well, no, 23 years ago, 24 years
8              ago, and she didn't want me to -- you know, she
9              wanted me to be patient.
10                  MR. POULOS:  Can I make a statement
11             really quickly?  As far as the verbiage of
12             "expedite," it wasn't, like, to push it
13             through, it was just to get a response.
14                  MS. DOUGHERTY:  I understand.
15      BY MS. DOUGHERTY:
16      Q    I'm just trying to confirm that, Ms. Poulos,
17             that you actually didn't call anybody?
18      A    No.
19      Q    That's all.  Because if you said, yes, then I
20             would have asked you about what you talked
21             about, but your answer is very informative.
22             Thank you.
23                  I shared the wrong thing.  I'm not so
24             good with this myself.  Okay.
25      A    That's me.
```

Mary Ellen Poulos

```
 1    Q    You know what, never mind.  I'm not going to
 2         use that one.  I just want to confirm -- I
 3         misread your email that the only two emails
 4         that you received from The Hill School relating
 5         in any way to issues of sexual abuse were the
 6         April 23, 2016, letter, which was basically to
 7         say we don't have this problem, and then the
 8         November 20, 2017, email which reported that an
 9         investigation had revealed problems; is that
10         right?
11    A    Yes.
12    Q    Have you received any other communications from
13         The Hill School since the November 20, 2017,
14         email soliciting money or fundraising?
15    A    I get emails periodically.  I don't even read
16         them.
17    Q    You just delete those, so those wouldn't be in
18         your inbox or sent mail?
19    A    They are form emails sent to everybody.  You
20         know what I mean?  Fundraising, talking about a
21         new building or some other such crap.
22    Q    But you don't -- you don't have them, right,
23         you deleted them?
24    A    I don't think I do, no, but I will look.  I
25         will look.
```

Mary Ellen Poulos

```
 1                    MR. POULOS:  There will be one

 2          showing up in the next month before they start

 3          going back to class.

 4                    THE WITNESS:  Yeah.

 5                    MS. DOUGHERTY:  I believe those are

 6          my questions.  If I missed something, I will

 7          ask a follow up after everyone else is done,

 8          but I believe I'm done.

 9                    MR. POULOS:  I just have a couple

10          questions before this ends.

11                    MS. DOUGHERTY:  Well, Mr. Jubb gets

12          an opportunity --

13                    MR. POULOS:  Do you want to wait --

14          go ahead, Lane.

15                    MR. JUBB:  Well, it's not a matter of

16          going ahead.  I think it's just proper

17          ordering, and quite frankly you might have

18          additional questions after mine, so it just

19          makes more sense.  Is that okay?

20                    MR. POULOS:  Do whatever you need to

21          do.

22                         EXAMINATION

23     BY MR. JUBB:

24     Q    Ms. Poulos, I asked you about how often you

25          would visit your son during school, and we went
```

Mary Ellen Poulos

```
 1           over that.  How often would he come home?

 2      A    Holidays.

 3      Q    Which would include Christmas, Thanksgiving,

 4           anything else?

 5      A    I think there was spring break.  I'm not sure.

 6      Q    Did he come home for spring break his senior

 7           year?

 8      A    I don't remember.

 9      Q    Did he come home for Christmas his senior year?

10      A    I'm sure he did, but I don't have a specific

11           memory of it.

12      Q    Do you think he came home for Thanksgiving his

13           senior year as well?

14      A    I don't know.  One year I know he went -- I

15           think it was Hilton Head -- it might have been

16           senior year -- with John Glen's son.  I don't

17           know what year that was though, and I think

18           that might have been a spring break or I don't

19           know.

20               MR. POULOS:  Can I interrupt because

21           I do have those specific dates?

22               THE WITNESS:  You can ask me about

23           them, Honey, when it's your turn.

24               MR. POULOS:  Okay.

25      BY MR. JUBB:
```

```
 1    Q    So while I appreciate that your son might be

 2         able to get different answers out of you than I

 3         may be able to, I can issue my own request to

 4         him.  Do you have any recollection at all as to

 5         whether or not your son came home his senior

 6         year for Christmas or Thanksgiving or spring

 7         break?  Do you actually recall that happening?

 8    A    Are you talking to me?

 9    Q    Yes, ma'am.

10    A    No, I frankly don't.  Christmas -- well, I mean

11         I'm sure he did, but I don't have any

12         independent recollection of it.

13    Q    All right.  And you mentioned -- so you said

14         that Kurt started to see Dr. Gudeman.  Do you

15         recall saying that?

16    A    Yes.

17    Q    Approximately what year was that?

18    A    I was living on Prospect in a high-rise, and he

19         was staying with me.  And I was still working

20         at the county, so it was before 2005, and

21         that's about as precise as I can be.

22    Q    Do you recall how long that treatment was for?

23    A    No.  I introduced the two of them in the sense

24         of talking to Dr. Gudeman when I was at work

25         where I would see him periodically and asking
```

Mary Ellen Poulos

```
 1          him if he had the time to sit down with Kurt
 2          and figure out why he was so angry at the
 3          world, so to speak.
 4                    I was pretty vague and general about
 5          it, and he was very gracious and said
 6          absolutely he would talk to my son and help out
 7          in any way that he could and that we didn't
 8          have to pay him.  And then I left it up to the
 9          two of them from there on.  I had no more to do
10          with it.
11     Q    Okay.  What's his first name?
12     A    Jon, J-O-N.
13     Q    Do you remember his practice's name?
14     A    What?
15     Q    Do you remember the name of his practice?
16     A    He worked for Milwaukee County.  He was the
17          head of the mental health complex, our
18          psychiatric inpatient facility.
19     Q    Thank you.
20     A    I knew him because I was their attorney for a
21          couple lawsuits in federal court.
22     Q    Okay.  And then during the discussion that we
23          talked about, where you and I were speaking it
24          was 2014, then it went to 2013.  In that 2013
25          discussion where there was the instance where
```

Mary Ellen Foulos

```
 1            Kurt had said that he was assaulted in high
 2            school.  Can we understand that all my prior
 3            questions where I was referring to the incident
 4            and we were discussing 2014, is it fair for all
 5            of us to understand that my questions were
 6            actually dealing with 2013?
 7    A       I don't know.  I was incorrect about the year,
 8            and that's all I'm willing to conceive,
 9            whatever other --
10    Q       I get that.
11    A       Yeah.
12    Q       I get that, but I don't want to have to ask you
13            a whole other hour of questions pertaining to a
14            2013 incident if you can just agree with me
15            that all of my questions that pertain to the
16            2014 incident are actually related to 2013.
17    A       I'm very hesitant to --
18    Q       Okay.  In what year did you first learn of any
19            accusations that your son was assaulted at The
20            Hill School?
21    A       Apparently 2013.
22    Q       Okay.  In that discussion would you agree with
23            me that he never used the word "sexual"?
24    A       Yes.
25    Q       Would you agree with me that he never referred
```

Mary Ellen Poulos

```
 1           to it as abuse, he referred to it as assault?
 2    A      No, I would not agree with you.
 3    Q      Okay.  You're saying you actually recall him
 4           referring to it as abuse?
 5    A      The man was hysterical, and he was yelling and
 6           he was beside himself with pain.  If you were a
 7           human being and you observed this, you could
 8           see that something horrible had happened to
 9           him.  And the exact words he used, I don't
10           know.  I bet he doesn't know, but I will tell
11           you I got the message.
12    Q      But I believe last time I was asking you
13           questions you had said that he had said
14           assault, correct?
15    A      I think, but I don't ever remember him saying
16           the word "sexual."  I intuited that, and I
17           don't think to this day he's ever said that
18           anyway.
19    Q      And with respect to some of the -- I recall
20           there was questioning about when your son had
21           started drinking again after the 2014
22           hospitalization, and your testimony was 2016,
23           around the time he moved to Connecticut; is
24           that correct?
25    A      Yes.
```

Mary Ellen Poulos

```
 1    Q    And then I heard you mention something, whether

 2         it was mumbling or not, you said something

 3         about a car accident.  What car accident are

 4         you referring to?

 5    A    A car accident?

 6    Q    Did you say car accident?

 7    A    I don't know.

 8    Q    Was your son ever in a car accident?

 9    A    Yeah --

10              MR. POULOS:  How is this --

11              THE WITNESS:  He had a car accident

12         in Connecticut where the car that I had bought

13         him was totaled.

14    BY MR. JUBB:

15    Q    Was that in 2016?

16    A    No, that was 2018.

17    Q    Okay.  And do you know what that car accident

18         was pertaining to -- did that have anything to

19         do with alcohol as far as you know?

20    A    I don't know.

21    Q    I believe your testimony initially was that the

22         anger issues that you noticed started after you

23         noticed the drinking; is that correct?

24              MS. DOUGHERTY:  Objection.

25              THE WITNESS:  I would say --
```

Mary Ellen Poulos

```
 1     BY MR. JUBB:

 2     Q    Ms. Poulos?

 3                MS. DOUGHERTY:  She was thinking.

 4                THE WITNESS:  Sometimes I like to

 5          think before I answer, okay?  If you don't like

 6          it, I don't care.  I'm trying to be as precise

 7          as I can.  I don't know what came first, but I

 8          do know that alcohol exacerbated whatever hurt

 9          he was feeling, and he expressed it more -- he

10          expressed it when he was drinking.  That

11          happens, people drink and they say stuff.  It's

12          not an uncommon human happenstance.  Say stuff

13          they wouldn't say when they were sober.  Yeah,

14          roll your eyes.

15     BY MR. JUBB:

16     Q    And I believe that you said the heavy drinking

17          that you notice started in the 2004, 2005 time

18          frame?

19     A    No.

20                MR. POULOS:  No, she said 2014.

21                THE WITNESS:  Kurt --

22                MS. DOUGHERTY:  Objection.

23                THE WITNESS:  Yeah.  Object or

24          whatever, you don't have to speak for me,

25          Honey.
```

```
 1                   MR. POULOS:  Okay.

 2      BY MR. JUBB:

 3      Q   Ms. Poulos, when did you first notice your son

 4          was starting to heavily drink?

 5      A   I didn't ever really notice that.  His friends

 6          noticed it.  His behavior -- some of his

 7          behavior was chalked up to heavy drinking.  I

 8          never saw him drunk, I don't think.  I don't

 9          think I ever saw my son drunk in his life, but

10          I knew he hung out with a bunch of people that

11          drank a lot.  He had some great party friends,

12          and they drank a lot.  It was a part of their

13          thing, and so I knew that he was a drinker.

14                   He didn't really ever drink around

15          me.  I mean, when we went out to dinner, he

16          usually had iced tea.  So I can't put two and

17          two together for you.  I don't know when his

18          drinking became a real problem.  I just

19          observed the results of that fact.

20      Q   You said that his friends noticed he was

21          heavily drinking.  When did you learn from them

22          about that?

23      A   I never said that.  I said he drank with his

24          friends.  I didn't say they noticed it was

25          heavy drinking.  He hung out with a group of
```

```
 1              people who loved to party.  They were fun guys.

 2              I used to talk to him --

 3    Q    At any point in time did you ever believe that

 4              your son was heavily drinking prior to 2014

 5              hospitalization at St. Mary's?

 6                   MR. POULOS:  Objection.  Relevance.

 7                   THE WITNESS:  I just told you I knew

 8              that he liked to go out with his friends and

 9              drink a lot.  I don't know how to characterize

10              it because I never personally observed it.  So

11              I can't really answer your question with any

12              specificity.

13    BY MR. JUBB:

14    Q    All right.  When did you first notice that he

15              was very angry and had these stents of anger?

16    A    When he would yell and cry.

17    Q    And when did that start?

18    A    It was gradual.

19    Q    What comes to mind as when it first started in

20              your mind?

21    A    I don't know.  I don't recall a specific

22              incident.  I recall the incident in 2013.  I

23              now know in 2013.  I recall that vividly.

24    Q    When he was coming up from Maryland with the

25              issues about the credit card, do you recall him
```

Mary Ellen Poulos

```
 1            having any sort of anger issues at that point?
 2    A     Well, to be perfectly honest with you, I equate
 3            the drinking and the behavior that caused him
 4            to leave Maryland and the argument with his
 5            girlfriend and that, kind of, erratic,
 6            irresponsible behavior, to me they are all
 7            equal and detrimental to him and making a life
 8            for himself.
 9                 They are all equal, and they started
10            when he graduated from high school, problems
11            with school, problems with concentrating,
12            self-esteem, getting his act together.  It
13            started when he left -- when he graduated from
14            high school, and it manifested itself in many
15            ways, and it culminated in him almost dying
16            from acute alcohol poisoning.  That's the only
17            way I can explain it to you.
18    Q     When was the first time that you can recall
19            having experience with him having the anger
20            issues with you?
21    A     He was never angry at me.  You --
22    Q     Okay.
23    A     I don't know what you're -- he was not angry
24            with me.  He was angry at the world.  He was
25            angry at himself.  Don't interrupt me.  He was
```

1           angry at himself.  He was angry at the wall.

2           He was angry at a piece of furniture in front

3           of him.  He was not angry at me.

4                    MS. DOUGHERTY:  Ms. Poulos, I think

5           you misheard Mr. Jubb's question.  It was --

6                    MR. POULOS:  No, I don't think she

7           did.

8                    MS. DOUGHERTY:  -- when was the first

9           time you recognized --

10                   THE WITNESS:  Noticed him being angry

11          at you, he said.  Being angry at you.

12                   MS. DOUGHERTY:  Okay.

13                   THE WITNESS:  Yeah, he was never

14          angry at me.

15   BY MR. JUBB:

16   Q    Got it.  So why don't you tell me the first

17        time you observed him being angry just

18        generally at a wall or a piece of furniture.

19   A    The first time that really stands out is 2013

20        where it was in my presence.  I saw it.  I

21        observed it, the hurt, the pain.

22   Q    All right.  So at some point you reached out to

23        the school and said who is -- I need the name

24        of my son's geometry teacher.  Did you ask them

25        at any point in time before that the names of

Mary Ellen Poulos

```
 1           the other teachers that he had?

 2    A      No.

 3    Q      At any point in time did your son ever tell you

 4           that the alleged assault or abuse occurred his

 5           freshmen year?

 6    A      He --

 7                    MR. POULOS:  Object.

 8                    THE WITNESS:  -- never told me

 9           anything about when, where, how, who, about the

10           incident.

11    BY MR. JUBB:

12    Q      Then take me through -- Ms. Poulos, all of

13           Ms. Dougherty's questions and my questions,

14           we're the ones asking them.  They are supposed

15           to be narrow.  If you could just focus on our

16           questions, we could have ended this stuff three

17           hours ago.  All right?  So I've been pretty

18           patient.  I swear if you just let me ask the

19           question, you will get out of here.

20                    With respect to -- with respect to

21           your son's teachers, take us through why it was

22           that you were asking about his geometry teacher

23           as opposed to anybody else?

24    A      Because his geometry teacher singled him out in

25           my presence, and I remembered it vividly.  And
```

Mary Ellen Poulos

```
 1              I also noticed that his second year, his grades
 2              dropped significantly.  I remember that.  I
 3              refreshed my memory about his experience at The
 4              Hill School, and I saw a good student first
 5              year and somebody who was almost flunking out
 6              his second year and who escaped the institution
 7              his third year.  And I started putting it
 8              together and thinking about it and trying to
 9              get an idea of what happened to my little boy
10              when he was at The Hill School.
11    Q    When Kurtis was at the --
12    A    I could have been wrong -- I could have been
13         wrong, but I was going to do what I could to
14         find out what I could on my own without
15         involving him because it was too hard on him to
16         talk about it.
17    Q    When you said you were recalling that his
18         grades had dropped his fourth form year, his
19         sophomore year, did you have his grades in
20         front of you or is that just something you
21         recalled off the top of your head?
22    A    I started thinking about it.
23    Q    Had you starting --
24    A    I just started thinking about.
25    Q    In other words, you didn't have anything to
```

Mary Ellen Poulos

```
 1              review in front of you, you just recalled that
 2              being the case, correct?
 3       A      No.  And, in fact, I remember at some point I
 4              did ask Kurt if he still had his records from
 5              The Hill School because I couldn't find them.
 6              I went through every piece of paper I had, and
 7              I thought that I -- I have moved three times
 8              since then.  And I couldn't find any records of
 9              grades from The Hill School, and I asked him --
10       Q      Okay.
11       A      -- had it, and he said he didn't.
12       Q      As far as you know, your son's grades went down
13              his sophomore year; is that right?
14       A      Well, I saw it, yes.  I saw his transcript
15              recently, so I was right.
16       Q      Can you see this?
17       A      Yes.
18       Q      Okay.  In his English class is a C better than
19              a C minus?
20       A      What?
21       Q      Is a C better than a C minus?
22                      MR. POULOS:  How is this relevant?
23                      THE WITNESS:  Yes.
24       BY MR. JUBB:
25       Q      Ms. Poulos, you said you looked at his
```

Mary Ellen Poulos

1           transcript.  Okay.  So he did better in English

2           his sophomore year, correct?

3                     MR. POULOS:  Can I interrupt for a

4           second?

5                     MR. JUBB:  No.

6                     MR. POULOS:  I already testified to

7           the fact that I got tutoring for English to go

8           into my second year at The Hill School.

9                     MR. JUBB:  Great.  Why don't you let

10          me ask the questions.

11      BY MR. JUBB:

12      Q   Ms. Poulos, you would agree with me that he did

13          worse in French, agreed?

14      A   When?

15      Q   His tenth grade year he got a D plus in French

16          2 and he took an honors course, correct?

17      A   Yes, I see that.

18      Q   All right.  In Algebra 1, that's a math class,

19          correct?  You see he got a B minus his freshmen

20          year?

21      A   Yes.

22      Q   Geometry was the math he took his sophomore

23          year.  He did better then, correct?  B plus is

24          better than a B minus?

25      A   Yeah, but this isn't at the end of the year.

Mary Ellen Poulos

```
 1          He almost flunked all of his exams at the end

 2          of the year.  You're taking a snapshot of

 3          whatever this is, but this isn't the end of the

 4          year.

 5   Q   I see.  So this official secondary record form

 6          from The Hill School, that's not the end of the

 7          year; is that right?

 8   A   Right.

 9   Q   Okay.  And when you said -- let me ask you

10          this, how was your son's relationship with your

11          stepfather, Mr. Proxmire?

12                  MR. POULOS:  Objection.  Irrelevant.

13   BY MR. JUBB:

14   Q   Ms. Poulos?

15   A   How was his relationship?  They saw each other

16          very infrequently.  My stepfather was very

17          gregarious because he was a politician and a

18          campaigner.  So he was always happy to see us.

19          He was very pleased and proud that Kurt went to

20          The Hill School, but he had already left the

21          Senate by the time Kurt went to The Hill

22          School.

23                  And my stepfather suffered from

24          Alzheimer's, and so he was always very, very --

25          when he went to Kurt's graduation, he -- he was
```

Mary Ellen Poulos

```
 1          so pleased to be there and to see him and --
 2    Q    When did he get diagnosed with Alzheimer's?
 3    A    Huh?
 4    Q    When did he get diagnosed with Alzheimer's?
 5    A    Early '90s.
 6               MR. POULOS:  Objection.  Irrelevant.
 7               THE WITNESS:  Yeah, well.  He died in
 8          a nursing home in Baltimore if you want the
 9          facts.  It's in -- if you did any research,
10          it's in his --
11               MR. POULOS:  I'm sure he has it.
12               THE WITNESS:  Yeah.
13               MR. POULOS:  I can --
14    BY MR. JUBB:
15    Q    Do you see what I'm showing you?  Is this his
16          letterhead?  You were criticizing Mr. Lehman
17          for using a C --
18    A    I know.  I knew you were going to bring this
19          up.  He spelled it with a C.
20    Q    Okay.
21    A    Yeah.
22    Q    He says in this letter he knew little about him
23          as of January 23rd, 1993; is that true?  "You
24          mentioned Curtis Poulos, my stepgrandson.  I
25          said little about him at the time because
```

Mary Ellen Poulos

```
 1          frankly I knew little"; is that true?

 2   A      Yeah.

 3   Q      With respect to -- did you ever do any

 4          investigation into other teachers that your son

 5          would have had when he was a student at The

 6          Hill School?

 7   A      Nope.  I didn't know any other teachers.

 8   Q      Okay.  And when -- you had asked both the

 9          school if they had any yearbooks, and I recall

10          and I think you referenced it too, the email to

11          your son about having any yearbooks.  Who

12          ultimately gave you the yearbooks that you now

13          have that you are going to be able to show Ms.

14          Dougherty as well as me?

15   A      The school.

16   Q      So the school actually gave you all of your

17          son's yearbooks; is that correct?

18   A      Yes.

19   Q      At any point in time -- strike that.

20                 Am I correct that at no point in time

21          did your son ever tell you that the alleged

22          abuse he suffered occurred during his sophomore

23          year?

24   A      No, he was never that specific.

25   Q      Am I correct that at no point in time did your
```

Mary Ellen Poulos

```
 1           son ever say that the assault or abuse at The

 2           Hill School occurred as a result of a math

 3           teacher?

 4      A    I'm not sure where I got that information, if

 5           it was from Jason.  I'm not sure how I came to

 6           that conclusion to be perfectly honest.

 7      Q    Am I correct --

 8      A    I'm pretty good --

 9      Q    Okay.  Am I correct that you first contacted

10           and spoke with Mr. Garabedian and relayed to

11           him the situation with your son before he had

12           an opportunity to speak with Kurtis directly?

13      A    I believe I was on the phone alone with

14           Mr. Garabedian, yes, first.

15      Q    And for that first call, doing your best, could

16           you tell us approximately how long that call

17           was?

18      A    Not very long.  He talked to Kurt much longer

19           than he spoke with me.

20                    MR. JUBB:  Those are all the

21           follow-up questions I have at this time.  Thank

22           you.

23                    MS. DOUGHERTY:  Mr. Poulos, do you

24           have questions?

25                    THE WITNESS:  Kurt?  Maybe he left.
```

Mary Ellen Poulos

```
 1                    MR. POULOS:  I'm here.

 2                    MS. DOUGHERTY:  Do you have

 3          additional questions?

 4                    MR. POULOS:  No, I think I'm good for

 5          now.  I just want this over with because this

 6          was --

 7                    MS. DOUGHERTY:  Okay.  So that's a

 8          no, no further questions?

 9                    MR. POULOS:  Not right now.

10                    MS. DOUGHERTY:  I don't have any

11          other questions, so I think we're done unless

12          you have more questions, Mr. Poulos.

13                    MR. JUBB:  And, Ali, could I get a

14          copy of this expedited, please?

15                    MS. DOUGHERTY:  Are we going off the

16          video?

17                    THE VIDEOGRAPHER:  Off the record at

18          3:56.

19                    (Proceedings concluded at 3:56 p.m.)

20

21

22

23

24

25
```

Mary Ellen Poulos

```
1    STATE OF WISCONSIN  )

                         ) SS:

2    COUNTY OF MILWAUKEE )

3

4

5                 I, ALI KORNBURGER, Notary Public in and

6    for the State of Wisconsin, do hereby certify that

7    the above deposition of MARY ELLEN POULOS was

8    recorded by me on July 22, 2021, and reduced to

9    writing under my personal direction.

10                I further certify that I am not a

11   relative or employee or attorney or counsel of any

12   of the parties, or a relative or employee of such

13   attorney or counsel, or financially interested

14   directly or indirectly in this action.

15                In witness whereof I have hereunder set

16   my hand and affixed my seal of office at Milwaukee,

17   Wisconsin, this 2nd day of August, 2021.

18

19

20

21   _____

                 Notary Public

22           In and for the State of Wisconsin

23

24

     My Commission Expires:  February 22, 2024.

25
```

# EXHIBIT "E"

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 4  JOHN DOE,

 5                      Plaintiff,

 6      vs.                   Case No. 2:19-CV-01539

 7  MITCHELL GARABEDIAN, ESQ., LAW

    OFFICES OF MITCHELL GARABEDIAN,

 8  and KURTIS N. POULOS,

 9                  Defendants.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12                  Videotaped Deposition of

13                  KURTIS N. POULOS (Volume I)

14                  (Via Zoom Videoconference)

15                  Thursday, November 19, 2020

16                  10:15 a.m. to 5:45 p.m.

17

18

19

20

21          GOLKOW LITIGATION SERVICES, INC.

22                  (215) 717-7805

23

24

25          Reported by Lynn Peppey Bayer, RPR, CM
```

```
1                    A P P E A R A N C E S

2

    FOR THE PLAINTIFF:

3

                THE BEASLEY FIRM, LLC
4               Mr. Lane Jubb, Jr., and
                    Mr. Louis F. Tumolo
5               The Beasley Building
                1125 Walnut Street
6               Philadelphia, PA 19107
                Lane.jubb@beasleyfirm.com
7               Louis.tumolo@beasleyfirm.com
                (215) 592-1000

8

9    FOR THE DEFENDANTS MITCHELL GARABEDIAN, ESQ., and LAW
10       OFFICES OF MITCHELL GARABEDIAN:

11

12              SWARTZ CAMPBELL, LLC
13              Ms. Candidus K. Dougherty
14              One Liberty Place, 38th Floor
15               1650 Market Street
16              Philadelphia, PA 19103
17              cdougherty@swartzcampbell.com
18              (215) 564-51904

19

20

21   FOR THE DEFENDANT KURTIS POULOS:

22

23              Mr. Kurtis Poulos (pro se)
24               3239 West Colony Drive
25               Greenfield, WI 53221
```

```
 1                        I N D E X
 2    WITNESS     EXAMINATION                            PAGE
 3    KURTIS N. POULOS
 4        EXAMINATION BY MR. JUBB                         6
 5        EXAMINATION BY MS. DOUGHERTY                  188
 6
 7
 8                      E X H I B I T S
 9    NUMBER                          PAGE IDENTIFIED
10    Exhibit P6.23    sixth form yearbook page of K.   120
                       Poulos
11    Exhibit P6.26    Rolfe 2 dorm picture             121
      Exhibit
12    P16.164-165      Proxmire letters                 93
      Exhibit
13    P16.219-220      4/11/18 letter from Garabedian to
                       Lehman                           135
14    Exhibit
      P16.225-226      12/26/28 letter Garabedian to
15                     Rees                             138
      P16.228          1/28/19 letter Garabedian to Rees147
16    Exhibit P16.235  3/26/19 letter from Rees to
                       Garabedian                       154
17    Exhibit
      P16.237-239      11/20/17 email from Lehman to
18                     alumni                           129
      Exhibit
19    P16.242-243      4/23/16 email from Lehman to
                       alumni                           127
20    Exhibit P16.33   demerits sixth form              100
      Exhibit P16.42   12/13/96 letter from Advisor
21                     Lodish to Mary Ellen Poulos      125
      Exhibit P16.53   8/7/96 letter from Asst.
22                     Headmaster Price to Poulos       124
      Exhibit P16.62   8/8/96 letter from Poulos to
23                     Ralston                          125
      Exhibit P16.72   demerits fourth form             99
24    Exhibit P16.73   demerits third form              98
      Exhibit P16.118  dorm parent/ advisor Lodish
25                     memorandum                       94
                       (Continued)
```

```
 1                   EXHIBITS (Continued)
 2    Exhibit P100.1   sixth form yearbook photo      107
      Exhibit P100.2   sixth form yearbook photo      108
 3    Exhibit P100.3   photo - Andres                 108
      Exhibit P100.4   photo                          109
 4    Exhibit P100.5   photo                          109
      Exhibit P100.6   photo - Whitlock               109
 5    Exhibit P100.7   photo                          109
      Exhibit P100.8   photo                          109
 6
      Exhibit
 7    Garabedian
      0240-0303        HITECH letters/authorizations  158
 8
      Exhibit D-1      Garabedian 029-032 email string
 9                     Mary Ellen Poulos/Garabedian      192
10       (Original exhibits attached to original transcript.)
         (Exhibit P16.228 was not provided and is not attached to
11                        transcript.)
         (Copies of exhibits attached to transcript copies.)
12
13
          P R E V I O U S L Y   M A R K E D   E X H I B I T S
14
15    NUMBER                              PAGE IDENTIFIED
16
17                   (None mentioned.)
18
19
20
21                       R E Q U E S T S
22
23    REQUEST                              PAGE   LINE
24
25       (No requests to produce documents were made.)
```

Kurtis N. Poulos

```
 1              VIDEOGRAPHER:  We are now on the record.

 2      My name is Jeff Sindiong, and I am the videographer

 3      for Golkow Litigation Services.  Today's date is

 4      November 19th, 2020.  And the time on the screen is

 5      10:16.  This remote video deposition is being held

 6      in the matter of John Doe versus Mitchell

 7      Garabedian, Esquire, et al., for the United States

 8      District Court for the Eastern District of

 9      Pennsylvania.  Our deponent today is Kurtis Poulos.

10              All parties to this deposition are

11      appearing remotely and have agreed to the witness

12      being sworn in remotely.  Due to the nature of

13      remote reporting, please pause briefly before

14      speaking to ensure all parties are heard completely.

15              Will counsel please identify themselves

16      and who they represent.

17              MR. JUBB:  Good morning.  Lane Jubb for

18      plaintiff as well as Louis Tumolo for plaintiff.

19              MS. DOUGHERTY:  Candidus Dougherty from

20      Swartz Campbell on behalf of Mitchell Garabedian.

21              VIDEOGRAPHER:  Our court reporter is Lynn

22      Bayer and will now swear in the witness.

23              KURTIS N. POULOS, called as a witness

24      herein, having been first duly sworn, was examined

25      and testified as follows:
```

```
 1                    EXAMINATION

 2   BY MR. JUBB:

 3   Q    Mr. Poulos, good morning.

 4   A    Good morning.

 5   Q    Because we're operating under the current

 6        circumstances using this technology, I appreciate,

 7        you know, you putting your phone right there so that

 8        we can see you.  It's not going to be the same as me

 9        sitting in the same room with you; so at any point in

10        time if you can't hear me, I just need you to tell

11        me.  Sometimes if for whatever reason maybe I can't

12        hear you and you're speaking, you can always just

13        wave your hands just to let me know.  But, otherwise,

14        I can hear you just fine right now.  Okay?

15   A    Sounds good.

16   Q    At any point in time if you want me to repeat a

17        question or you just don't understand it, just let me

18        know, I'm happy to rephrase it.  That's my job.  Fair

19        enough?

20   A    Fair enough.

21   Q    If you answer my question, though, I'm going to

22        assume that you understood it.  Is that fair?

23   A    It is.

24   Q    And I just want to make sure, no one entered during

25        your introduction for you as counsel, am I correct,
```

```
 1        you're not represented today?

 2   A    That's correct.

 3   Q    And where are you physically located today?

 4   A    I'm at my mother's apartment currently.

 5   Q    Is she in the room with you?

 6   A    She is.

 7   Q    And can she hear everything we're saying?

 8             THE WITNESS:  Can you hear everything?

 9             MS. POULOS:  Pretty much.

10   A    For the most part.

11   BY MR. JUBB:

12   Q    And she's not your lawyer, correct?

13   A    She is not, no.

14   Q    She's actually -- I'm going to have to ask her to

15        leave, to step out, because she's potentially a

16        witness in case and so she can't sit in on it.

17             THE WITNESS:  He's saying you need to step

18        out because you're potentially a witness.

19             MS. POULOS:  I'm not gonna.

20   A    She said no.

21   BY MR. JUBB:

22   Q    Do you want to put herself on camera?

23   A    She does not want to appear on camera today, no.

24   Q    And your mom's background, she was a lawyer for about

25        40 years; is that right?
```

```
 1    A    Correct.

 2    Q    And how old is she now?

 3    A    74.

 4              MS. DOUGHERTY:  Mr. Jubb, could we just

 5         have Mr. Poulos' mother identify herself so we have

 6         her full name on the record.  Because we've just

 7         been referring --

 8              MR. JUBB:  Yeah.

 9              MS. DOUGHERTY:  -- to her as his mother.

10              MR. JUBB:  I'm going to get there, Candi.

11         Thank you.

12              MS. DOUGHERTY:  Okay.

13    BY MR. JUBB:

14    Q    All right.  Am I correct that within your mother's

15         apartment, is she able to communicate with you in any

16         way right now?

17    A    Yeah.

18    Q    And her full name?

19    A    Mary Ellen Poulos.

20              MR. JUBB:  Ms. Poulos, can you hear me?

21              MS. POULOS:  Yes.

22              MR. JUBB:  Great.  Do you want to be on

23         camera today?

24              MS. POULOS:  No.

25              MR. JUBB:  Do you want to be sworn in?
```

```
 1                    MS. POULOS:  No.

 2                    MR. JUBB:  Do you intend to assist your

 3          son with this?

 4                    MS. POULOS:  No.  He's in my house.

 5                    MR. JUBB:  Do you have any other rooms?

 6                    MS. POULOS:  Why do you -- why do I need

 7          to leave?  The deposition is a public event.

 8                    MR. JUBB:  No.  That's a trial.  Are you

 9          willing to --

10                    MS. POULOS:  No, a deposition is an

11          extension of the trial, so it's a public event.

12          Everything with you is an argument.  I'm sitting

13          here.

14                    MS. DOUGHERTY:  Ms. Poulos, I think if you

15          are going to be present, you probably need to be on

16          camera because there is an issue with we need to

17          make sure that Mr. Poulos is answering the questions

18          without assistance or looking at the documents that

19          Mr. Jubb or myself might show him.  So I --

20                    MS. POULOS:  Well, that's up to --

21                    (Interruption by the reporter.)

22                    MS. DOUGHERTY:  I'm sorry?  I didn't

23          either.

24                    THE WITNESS:  Then fine.  I'll just do

25          this by myself.  She was just here for moral
```

Kurtis N. Poulos

```
 1            support.  She can go in her room.  I'll stay in the
 2            dining room.  Okay.  We're good.
 3                    MR. JUBB:  Thanks, Mr. Poulos.
 4     Q    And would you do me a favor and let me know if for
 5            whatever reason, she needs to come get a drink of
 6            water or just walk around her house, you know, that's
 7            fine.  You just gotta let me know.  Okay?
 8     A    That's fine.
 9     Q    Now, the house where you're currently located, what's
10            the address there?
11     A    500 Bradley Road, Apartment B104, Fox Point,
12            Wisconsin 53217.
13     Q    And do you also live there?
14     A    No.
15     Q    When was the last -- strike that.  Have you ever
16            lived there previously?
17     A    Yeah.  Up until 2016 after I got out of the hospital,
18            I lived here.
19     Q    Have you reviewed any documents in anticipation of
20            today's deposition?
21     A    Just the documents that have been emailed to me in
22            the past six months.
23     Q    Do you have any of them printed out with you?
24     A    I do not.
25     Q    Did anyone assist you in reviewing those documents?
```

Kurtis N. Poulos

```
1   A    No, they did not.

2   Q    What's your current address?

3   A    3239 West Colony Drive, Greenfield, Wisconsin 53221.

4   Q    How far way is 3239 West Colony from 500 Bradley?

5   A    About 20, 25 minutes.

6   Q    How long have you lived on West Colony?

7   A    Since August of 2018.

8   Q    Do you live with anyone?

9   A    No.  Just my dog.

10  Q    Approximately how long did you live at 500 Bradley?

11  A    Two years, and then I moved to Connecticut for two

12       years, and then I moved back to Milwaukee.

13  Q    What was your address in Connecticut?

14  A    The first one I believe was 1513 -- man, I can't

15       remember the address.  The other one was in Hamden.

16       So I lived in Orange, Connecticut, for a year; and

17       then I moved to Hamden, Connecticut.  But it's not

18       like I ever wrote my own self a letter that I needed

19       my address.

20  Q    Okay.  So, in other words, there's two addresses in

21       Connecticut where you lived, but you can't recall the

22       street address; is that right?

23  A    Correct.

24  Q    And you said approximately how long ago did you live

25       there?
```

Kurtis N. Poulos

```
 1    A    Up until March of 2018.

 2    Q    What do you do for a living?

 3    A    I work for Russ Darrow Automotive Group.

 4    Q    What do they do?

 5    A    We sell cars and buy them.

 6    Q    Are you a car salesman?

 7    A    Yes.  But I also do internet sales.  So appointment

 8         setting, stuff like that.

 9    Q    How long have you been in car sales?

10    A    Since January of 2017 when I worked in Connecticut.

11    Q    At your current address, do you have access to --

12         your current home address, not the 500 Bradley, the

13         3239, do you have access to internet there?

14    A    Yes, I do.

15    Q    Do you have a printer or a scanner access anywhere?

16    A    I have a printer and a scanner.

17    Q    Your email addresses, what email addresses do you

18         have?

19    A    LEX101078.  And I have a work email.

20    Q    What's that one?

21    A    Kurt dot Poulos at Russ Darrow dot-com.

22    Q    And I think all the correspondence that we have been

23         going back with you on has been on your LEX email

24         address; is that right?

25    A    Right.
```

```
 1    Q    And what does LEX stand for?

 2    A    Lex Luthor.  It's an inside joke from friends.

 3    Q    What's the joke?

 4    A    I shaved my head one night before a party and I had

 5         to wear a black suit, so they said I looked like Lex

 6         Luthor.  Nothing more.

 7    Q    Lex Luthor the villain to Superman?

 8    A    Yes.

 9    Q    When you send me emails, it comes up as Kurtis

10         Froedtert.  Do you know why that is?

11    A    Froedtert.  Comes up --

12    Q    Froedtert.

13    A    -- as Kurtis Froedtert, as in Froedtert Memorial

14         Hospital.  It comes up that way so that my dad

15         doesn't see my online presence.

16    Q    Is there some special name about Froedtert or is it

17         just a hospital?

18    A    Froedtert is my great grandfather.

19    Q    On your mom's side?

20    A    No.  My dad's side.  It's who I was named after.

21    Q    You said grandfather or great grandfather?

22    A    Great grandfather.

23    Q    And why is it -- strike that.  Can you explain to us

24         why you have that as your name?

25    A    Because I don't want my father tracking my online
```

```
 1          social media accounts.
 2   Q    Does he do that?
 3   A    Yeah, because he -- we don't speak to each other; so
 4          the only way he can find out what's going on in our
 5          lives is to try and find us on social media.
 6   Q    When was the last time you talked with your dad?
 7   A    Face to face?  Ten years.  Maybe seven.  Only by
 8          text, and that was October of 2015.
 9   Q    Why haven't you spoken to him?
10   A    Because he's not a good human being.
11   Q    Why not?
12   A    Too many reasons to say right now.  And it's...
13   Q    What does your dad do for a living?
14   A    I have no clue.  Last I heard, he works as a grocer
15          at a grocery store.  But that was a year ago that
16          somebody told me that.
17   Q    Does he live nearby?
18   A    I believe he lives in Shorewood.
19   Q    How --
20   A    Again, I don't know.
21   Q    I'm just trying to get an understanding as to what
22          you can recall or what you do know.  Did you say
23          Charlotte?
24   A    Shorewood.
25   Q    Shorewood, okay.
```

Kurtis N. Poulos

1   A    Shorewood.

2   Q    So at the time when you were younger, approximately

3        how old were you when your parents got divorced?

4   A    I guess two or three.

5   Q    Did you stay in touch with your dad then?

6   A    Up until I was about 23.  Off and on.

7   Q    Did you ever live with him?

8   A    Just weekends.

9   Q    What happened when you were 23?

10  A    We had a falling out.

11  Q    Can you tell me what happened?

12  A    Not at this particular time.  Again, it was a long

13       time coming, let's just put it that way.

14  Q    A long time coming meaning there was a bunch of

15       instances that led to the falling out, right?

16  A    Correct.

17  Q    Like what?

18  A    Like a list of things that I'm not going to get into

19       at this time.

20  Q    Are they things that upset you?

21  A    Very much so.

22  Q    Would you ever describe him as a good dad prior to

23       when you were 23?

24  A    He had his moments.

25  Q    What stands out in your mind as the event when you

```
 1        were 23?  Because that's a long time ago, you recall

 2        that number pretty well.

 3                  MS. DOUGHERTY:  Objection.  How is any of

 4        this reasonably calculated to lead to the discovery

 5        of admissible evidence regarding the defamation

 6        claim arising from the two letters?

 7                  MR. JUBB:  Candi, you --

 8                  MS. DOUGHERTY:  I mean, you're -- well,

 9        no --

10                  MR. JUBB:  State your objection.

11                  MS. DOUGHERTY:  -- I don't have to sit

12        here and listen to you ask completely irrelevant

13        questions to a witness who is pro se and doesn't

14        know better.  So I want you to just articulate to me

15        what the basis for asking the witness whether his

16        father was a good dad prior to him being 23, why

17        that has any connection to the claims.  If you're

18        not going to move on, then I guess we're going to

19        have to get the judge on the phone because we're not

20        going to sit here and all and probe the relationship

21        with Mr. Poulos and his father.  That has nothing to

22        do with the claims in the case.

23                  MR. JUBB:  It does.  It has --

24                  MS. DOUGHERTY:  How?

25                  MR. JUBB:  -- something to do with it.
```

```
 1              It's certainly discoverable.  I mean, he -- just
 2         stop, you know, let -- I'm not going to spend all
 3         day going back and forth about what is and what's
 4         not discoverable.  Your objections are limited to
 5         form.  And I'm asking him what at 23 led to him not
 6         speaking to his dad.  That's all.  So if you want to
 7         object to the way I asked the question, that's fine.
 8         I'm happy to rephrase it.  But please.
 9    Q    So I'll tidy up the question for you.  What happened
10         when you were 23 that led to this no longer
11         relationship with your dad?
12    A    I was currently moving to Maryland at the time.  We
13         got into an argument over money.  And he made a
14         comment about my mother, went to attack me.  I fought
15         back, packed up my stuff, and drove straight through
16         the night.
17    Q    Back to Wisconsin?
18    A    No.  To Maryland.
19    Q    To Maryland.  So this occurred in Wisconsin and then
20         you drove to Maryland?
21    A    No.  That happened in Detroit.
22    Q    Were you living in Michigan at any point?
23    A    No.
24    Q    Were you there visiting your dad?
25    A    I was visiting my sisters.
```

Kurtis N. Poulos

```
 1    Q    Are they your full biological sisters?

 2    A    No.  I have no full biological siblings.

 3    Q    Were the individuals that you refer to as your

 4         sisters your father's biological children?

 5    A    Correct.

 6    Q    Do you still keep in touch with them?

 7    A    No.

 8    Q    When was the last time you spoke with them?

 9    A    I'm not sure how that's relevant, but 2010.

10    Q    Each of them around 2010?

11    A    All of them the same day on 2010.

12    Q    Do you have any other brothers or sisters?

13    A    I have one half brother; and I've been told I have

14         another half sister, but I've never met her.

15    Q    Your half brother, is that through your dad?

16    A    Correct.

17    Q    Is he younger or older?

18    A    Younger.

19    Q    Are your other half sisters, are they younger or

20         older?

21    A    They're all at least 20 years younger than I am.

22    Q    You mentioned that you may have another half sister

23         you've never met.  Is that also on your dad's side?

24    A    Correct.

25    Q    Would you believe she's older or younger?
```

Kurtis N. Poulos

```
 1    A    She's much younger.

 2    Q    Have you ever gone by any other names?

 3    A    No.

 4    Q    Have you ever gone by any other aliases?

 5    A    No.

 6    Q    So your mom, who was on this deposition just a bit

 7         ago, how long have you lived with her?  And I know

 8         you mentioned you were there a little bit after you

 9         got out of the hospital.  But are there any other

10         times that you've lived with her?

11    A    Yeah.  I lived with her after my restaurant went out

12         of business.  I was forced basically into near

13         bankruptcy.

14    Q    When was that?

15    A    2011, maybe 2012.

16    Q    Did you own a restaurant or were you a cook?

17    A    I was part owner of a restaurant.

18    Q    What was it called?

19    A    Durango Barbecue and Grill.

20    Q    Was that in Wisconsin?

21    A    It was downtown Milwaukee, correct.

22    Q    And what did you do prior to operating that

23         restaurant?

24    A    For years, nothing.  Worked odd jobs, worked for

25         J. Crew for a few years.  That was after I had moved
```

```
 1          back from Maryland.  So nothing, nothing crazy.
 2    Q     So you went from I guess working at J. Crew to then
 3          owning or partly owning a restaurant; is that right?
 4    A     Yeah.  I may have had a job in between there working
 5          in phone sales, I think.  It's hard to remember.
 6    Q     What type of ownership was it?  I mean, did you own
 7          most of it, was it a bunch of people that were in,
 8          was it one other person?
 9    A     There were three of us total.  I had a total
10          investment of nearly $20,000.  I believe -- so I
11          would have been the minority shareholder.
12    Q     When did you start that?  You mentioned that it was
13          around 2011, 2012 when it went out of business.  But
14          when did you start that?
15    A     February of 2010.
16    Q     So from the time that we're going to talk about when
17          you were younger, do you recall officially -- when
18          your parents had officially been divorced as opposed
19          to just separated and having some issues?  Or was
20          that too young?
21    A     They were --
22                MS. DOUGHERTY:  Objection.
23    A     -- always divorced.
24                MS. DOUGHERTY:  Objection.  I think that I
25          said it when he was talking.
```

```
 1                    MR. JUBB:  That's okay.

 2   Q    And, Mr. Poulos, when she's objecting to the form, if

 3        you could just wait like a half a second before

 4        responding to my question just in case she has any.

 5        That way it makes it easier for the court reporter to

 6        take all that information down.  Okay?

 7   A    Okay.

 8   Q    Getting back to my last point, am I correct then that

 9        as far as your memory goes back, they have always

10        been divorced, correct?

11   A    Correct.

12   Q    When you were in the 13-, 14-year-old age, was your

13        mom practicing law then?

14   A    Yes.

15                    MS. DOUGHERTY:  Objection.

16   A    This is impossible.

17                    MR. JUBB:  Candi, did you object?

18                    MS. DOUGHERTY:  I did.

19   BY MR. JUBB:

20   Q    Okay.  So during that time frame, what did your dad

21        do?

22   A    He worked as a consultant.

23   Q    Consulting what?  You mentioned he had his own

24        business, right?

25   A    He did consulting work for multiple companies to
```

```
 1        better manage them -- or better manage their

 2        employees and their payrolls.  That's --

 3   Q    Like in human resources?

 4   A    -- what -- no, no.  Like consultant.  Like, you hire

 5        him, he comes in, revamps your company, you pay him a

 6        lot of money, and he leaves.

 7   Q    Okay.  And did he do that work from the time you were

 8        around that 13 age for how long?

 9   A    I don't know.

10   Q    But now he's working at a grocery store, right?

11               MS. DOUGHERTY:  Objection.

12   A    I don't see what any of this has to do with any of

13        this.

14   BY MR. JUBB:

15   Q    I'm just trying to get an understanding as to your

16        relationship that you had with your dad and what he

17        was doing at the time for work.  So as of -- when you

18        were around 13, he was doing consultant work where he

19        would go into companies, revamp them, he'd get paid

20        and then he would leave.  And I'm just trying to

21        understand that process of what he did next.  And we

22        can do it in the context as I go through your age if

23        that's going to be more helpful for you to recall.

24               MS. DOUGHERTY:  Mr. Jubb, I think that

25        Mr. Poulos was asserting an objection and
```

```
 1        questioning how your questions are reasonably

 2        calculated --

 3                MR. JUBB:  Are you representing him?

 4                MS. DOUGHERTY:  I'm not, but he's a pro se

 5        litigant.  And --

 6                MR. JUBB:  And I just clarified my

 7        question, I said I'm happy to ask you as we go

 8        through your background.  So if you want to give

 9        legal advice to a pro se witness who you have

10        contra-interest to, feel free.  I don't think you

11        meant to do that.  But if you want to keep your

12        objections to form, I've asked Mr. Poulos

13        specifically if he prefer I ask these types of

14        questions as I go through his specific ages.  So --

15                MS. DOUGHERTY:  Mr. Jubb, maybe if you

16        hadn't interrupted me and you let me finish my

17        sentence, you would have learned what I was going to

18        say.  Please don't do that anymore.  As you know --

19                MR. JUBB:  This is my deposition.  I can't

20        even hear what you're saying.  Your mouth is moving.

21        We can't hear you.  Your headset is not close

22        enough.  If you have an objection, it has to be

23        objection to the form.  This is a federal court

24        deposition.

25                MS. DOUGHERTY:  I'm sorry, is the court
```

```
1           reporter unable to hear me?

2                   THE REPORTER:  I can hear you.

3                   MS. DOUGHERTY:  Okay.  Raise --

4                   MR. JUBB:  You --

5                   MS. DOUGHERTY:  -- your hand if nobody --

6           you know why?  Because you're interrupting me.  I'm

7           speaking and you're trying to talk over me.

8           Mr. Poulos, can you hear me?

9                   THE WITNESS:  Loud and clear.

10                  MS. DOUGHERTY:  Mr. Jubb, can you hear me?

11                  MR. JUBB:  Yes.

12                  MS. DOUGHERTY:  Mr. -- I don't know how to

13          stay your last name, Tumolo, can you hear me?

14                  MR. TUMOLO:  Tumolo.  Now I can.  It was a

15          little jumbled before.

16                  MS. DOUGHERTY:  The court reporter can

17          hear me?

18                  THE REPORTER:  Yes.

19                  MS. DOUGHERTY:  As you know, Mr. Jubb, you

20          are not entitled to ask questions that are outside

21          the scope of discovery.  If it's going to continue

22          to be an issue, then we can get the court on the

23          phone and somebody can move for a protective order.

24          Whether it be me or Mr. Poulos.

25                  MR. JUBB:  Are you trying to instruct this
```

Kurtis N. Poulos

```
 1          witness what to do legally?
 2                   MS. DOUGHERTY:  I'm not instructing him
 3          what to do.  Should we just get the court on the
 4          phone, or are you just going to continue to abuse
 5          the pro se litigant?
 6                   MR. JUBB:  I'm not abusing anyone.
 7                   MS. DOUGHERTY:  Really?  How is whether he
 8          had a falling out with his father at the age of 23
 9          in any way related to the two letters that are at
10          issue in this case?  How?
11                   MR. JUBB:  I think I explained --
12                   MS. DOUGHERTY:  You also know that you
13          already asked background questions in written
14          discovery to Mr. Poulos to which you moved to
15          compel, and the court denied your motion and agreed
16          that they weren't.
17                   MR. JUBB:  They were --
18                   (Interruption by the reporter.)
19                   MS. DOUGHERTY:  Right, because Mr. Jubb
20          can't -- I'm sorry, Mr. Jubb can't help himself.  He
21          just has to interrupt me.  You know that you have
22          been asking about Mr. Poulos' employment and
23          background.  We've -- I asked you, I think
24          Mr. Poulos has asked you to describe how the line of
25          questioning is related to the claims.  Are you
```

Kurtis N. Poulos

1       refusing to do that?

2                    MR. JUBB:  Are you finished?

3                    MS. DOUGHERTY:  So you won't tell us how

4       your line of questioning relates to the two letters

5       that are at issue in the case?

6                    MR. JUBB:  I'm just asking if you're

7       finished with that speech, Candi.

8                    MS. DOUGHERTY:  So you won't answer me?

9                    MR. JUBB:  I'm going to answer you if I

10      know you're finished.  Are you finished, ma'am?

11                   MS. DOUGHERTY:  Yes.

12                   THE WITNESS:  Jesus, why am I even here?

13                   MR. JUBB:  My question to Mr. Poulos which

14      was the basis of your objection was what his dad did

15      from the time he went from a consultant for

16      companies to ultimately now working at a grocery

17      store.  They've had a falling out.  I'm asking what

18      if anything transpired in that time as to his

19      employment.  If that's the basis of your objection,

20      then say objection.  I don't understand.  If your

21      position is I'm not allowed to explore his

22      background on what was going on during this time,

23      that's wrong.  And we can address it with the court.

24      But I'm going to do that at the end.  Because I'm

25      going to get a list of all of the times that you

```
 1           object, then we'll address all of them with the
 2           court separately.
 3                     MS. DOUGHERTY:  Okay.  But --
 4                     MR. JUBB:  So your objection is noted.
 5                     MS. DOUGHERTY:  I'm sorry.  Your answer is
 6           that what Mr. Poulos' father did after the time when
 7           Mr. Poulos was in high school is related to the two
 8           letters?
 9                     MR. JUBB:  Yes.  It's discoverable.  And
10           you'll see if you just let me get through this
11           deposition.  You'll have time to ask your questions
12           and try and correct anything.  Okay?  Can I proceed?
13      Q    Mr. Poulos, can you hear me?
14      A    I can hear you just fine.  I'm still wondering what
15           this has to do with anything.  I had little to no
16           relationship, so why would I know what he's been
17           doing in the interim?
18      Q    Got it.  So --
19      A    Again, I...
20      Q    Are you done?
21      A    Evidently.
22      Q    If you'd like to say anything further, please.
23      A    Nope.
24      Q    Okay.  So approximately 1992, where did you go before
25           The Hill School?
```

```
 1   A    Shorewood Intermediate School.

 2   Q    Who did you live with?

 3   A    Not sure how this is relevant at all.

 4   Q    It's relevant to test your recollection at the time,

 5        sir.  Who did you live with?

 6   A    Fine.  I lived with my mother.  I pretty much always

 7        lived with my mother.

 8   Q    Had you ever visited The Hill School before applying

 9        there?

10   A    No.

11   Q    Did you want to go there?

12   A    I applied there.  Then I went out for a visitors'

13        weekend.  I decided I liked the campus, the

14        atmosphere, the ability to learn at an accelerated

15        rate.

16   Q    And then your date of birth is what?

17   A    October 10th, 1978.

18   Q    Am I correct that the first time you attended The

19        Hill School was the fall of 1993?

20   A    Yes.  I would have been 14 years old.

21   Q    Did you know anyone at the school at the time that

22        you had gone there?

23   A    I only knew my cousin.

24   Q    What's his name?

25   A    Jason Zwerner.  Now, can I ask a question off the
```

```
 1          record?

 2    Q     If there's a question that you have related to the

 3          dep -- if there's a question that you have related to

 4          one of my questions, I'm happy to clarify for you.

 5          Is it related to the deposition?

 6    A     It's related to a document that I was sent.

 7    Q     Why don't we just get through my questions, and to

 8          the extent that it's something -- here's the thing.

 9          If you want to say something about a document related

10          to this case, I think it's probably most appropriate

11          that it's on the record.  So why don't you just let

12          me get through my questions; and if it's --

13    A     Okay.

14    Q     -- relevant to your answers, that might be a good

15          time to mention it.  Was there anyone other than your

16          cousin Jason Zwerner that you knew at the school

17          prior to going there?

18    A     No.

19    Q     Were you --

20    A     Well, my grandfather went to school there.  But he

21          obviously wasn't attending there when I went.  My

22          grandpa's brother also attended.  He graduated in

23          1933 and my grandfather graduated in 1934.  They both

24          went to Yale and then fought in World War II.

25                    MR. TUMOLO:  For the record, I hate to
```

```
 1          interrupt here, but I can pick up a voice whispering

 2          things to Mr. Poulos.  So if there's someone in the

 3          room, again, we just need to know that.

 4                    THE WITNESS:  There's a TV on in the other

 5          room.  I mean, it's a two-bedroom apartment.

 6                    MS. DOUGHERTY:  Sorry, what -- can I just

 7          ask a question for clarification.  When did you hear

 8          whispering?  Because I didn't hear whispering.

 9                    MR. TUMOLO:  I heard a voice right before

10          he began that last response.

11                    MS. DOUGHERTY:  Okay.

12                    MR. JUBB:  Yeah.  And if it's the TV --

13          we'll try and keep going.

14     Q    But can you hear the TV right now, Mr. Poulos?

15     A    No.  She shut her door.

16     Q    Okay.  Right.  So that was going to be my next

17          question.  Obviously you didn't go to the school with

18          your grandpa or your grandpa's father, but I imagine

19          that that's how you learned of the school in the

20          first place.  Is that fair?

21     A    Yes.  We were legacies.

22     Q    And is he your biological grandfather?

23     A    No.  He is my mother's stepfather.

24     Q    Did you ever know your biological grandfather on your

25          mother's side?
```

```
1   A   Yes.

2   Q   How often did you see your step-grandfather at that

3       time?

4   A   Not very often.  I was living at the high school.

5   Q   I'm sorry.  I meant -- we're just focusing on the

6       time before you got there.  So I'll clarify my

7       question.  How often did you see your grandfather

8       during the time up to when you first started to live

9       at the school?

10          MS. DOUGHERTY:  Which grandfather are we

11       talking about?

12          MR. JUBB:  The one that went there.

13  A   Proxmire was a little busy in the Senate up until

14      1988, so I didn't get to see him very much because he

15      lived in D.C.  He'd come in town every once in a

16      while and do, you know, a meet-and-greet.  Otherwise,

17      maybe once a year out in D.C. if we had time to go

18      and visit.  But he was typically very busy because he

19      actually did his job when he was a senator.

20  Q   As far as you can recall, what dorm did you stay in

21      that third form year?  And when I say third form, you

22      understand that that's referring to --

23  A   I understand what -- yes.  Third form I was in the

24      upper school building.

25  Q   What floor of upper school for your third floor --
```

```
1          for your third form year?

2    A     Third floor.

3    Q     Who was your dorm parent?

4    A     I honestly -- I think his last name started with an

5          L.  He was not very into being part of the atmosphere

6          of the dorm.  He just sat in his apartment on his

7          phone.

8    Q     What type -- he had a cellphone?

9    A     No.  Like a home phone.  It was 1993.  Who had a

10         cellphone?

11   Q     That's why I asked it.  So you're saying that your

12         relationship with the dorm parent for your third form

13         year was essentially --

14   A     Nonexistent.

15   Q     Nonexistent.  Okay.  Did you have a roommate?

16   A     Yes.

17   Q     Who was your roommate?

18   A     John Knapp, Knaph.  It was very German.  I think it

19         was K-N-A-P-H or P-F.  He was my freshman roommate.

20   Q     Do you keep in touch with any of the -- strike that.

21         Do you keep in touch with Mr. Knaph?

22   A     No.  He was kicked out of school.

23   Q     That year?

24   A     After freshman year, correct.

25   Q     During that -- strike that.  During your third form
```

```
 1          year, did you play any sports?

 2    A     I was planning on joining the ski team until I broke

 3          my arm.  So my freshman year I was training for ski,

 4          and then I broke my arm at the beginning of the ski

 5          season and couldn't perform in sports for eight

 6          weeks.

 7    Q     Was the ski team something that was part of the

 8          winter or was that something for the fall?

 9    A     That was something you trained in the fall for and

10          then you skied in the winter.

11    Q     What did you do for spring?

12    A     I honestly don't remember.

13    Q     During your freshman year, do you recall what classes

14          you took?

15    A     French, algebra, English, biology, History of Art and

16          Music.  I think that's it.  Six or seven courses is

17          all we had.

18    Q     Do you recall who your algebra teacher was?

19    A     No, I do not.  I don't remember most of my teachers,

20          to be honest.  Just the ones who had positive and

21          negative impact on me.

22    Q     During that time frame, were you going home during

23          breaks?

24    A     I would go home for Thanksgiving, Christmas and

25          spring breaks.  It wasn't realistic to go home for a
```

```
 1         long weekend.  And --

 2    Q    And when you say home -- sorry to interrupt you.

 3    A    Back to Milwaukee.  And correct me if I'm wrong,

 4         don't you have my transcripts?

 5    Q    I believe I do, yeah.

 6    A    Okay.  So then you should be able to get all the

 7         teachers' names from that.

 8    Q    I appreciate that.  Am I correct that you can't

 9         recall their names that year, though?

10              MS. DOUGHERTY:  Which one are you asking

11         about?  Any of them or --

12              MR. JUBB:  Well, I think his testimony is

13         he doesn't remember most of the teachers.  So I --

14    A    I don't remember 90 percent of the people I met at

15         that school.

16    Q    Okay.  Am I correct -- let me ask it this way.  Is

17         there any teacher from any of the classes that you

18         attended that third form year that you can recall?

19    A    Yeah.  I can remember my English teacher, but I can't

20         remember her name.  I remember her because she -- I

21         can remember her because she went out of her way to

22         help me get my grades up.  But other than that, no.

23         I remember one teacher's name from my sophomore year

24         or my fourth form year, and that's because he was my

25         hall master.  I remember one teacher's name from my
```

Kurtis N. Poulos

```
 1         sixth form year.  Oh, make that two.  One because he

 2         lived in --

 3    Q    I'm just -- I'm sorry, Mr. Poulos.  I'm going to go

 4         through the years chronologically just so we're all

 5         following the same page.  So we'll get there.

 6              MS. DOUGHERTY:  Objection.  You can't stop

 7         him in the middle of an answer.

 8              MR. JUBB:  I think it was because he was

 9         trying to recall off the top of his head, and I'm

10         trying to organize this deposition, Candi.  Please.

11    Q    So in the third form year, am I correct that at least

12         with respect to the -- your teachers for French,

13         algebra, English and HAM, you don't recall their

14         names?

15    A    No, I do not remember the name of the teacher who

16         taught HAM.  Interesting that you called it that

17         because only students who went to that school called

18         it HAM.

19    Q    And with respect to your third form year, do you have

20         any recollection what you did in the spring, or were

21         you just injured with that wrist problem you had?

22    A    I think I was still recovering from having a broken

23         wrist.  So I might have been playing light

24         intramurals.

25    Q    Did you have what's known as a work job?
```

```
 1    A    No.

 2    Q    At any point in time, did you ever transfer a dorm or

 3         were you on the third floor upper school the entire

 4         year?

 5    A    I was always in that room.

 6    Q    And for the entirety of your third form year, was

 7         Mr. Knaph your roommate?

 8    A    Correct.

 9    Q    Who was your advisor?

10    A    I don't remember.

11    Q    During your freshman year, did you develop any group

12         of friends at all?

13    A    Yeah.  I had a few groups of friends.

14    Q    Who were they?

15    A    Specific names?

16    Q    Yeah, that you can recall.

17    A    I can't recall any of them.

18    Q    At any point in time during your third form year, did

19         you ever require any sort of psychological treatment?

20    A    No.  I stopped eating properly, but that had nothing

21         to do with -- I don't know.  I wasn't eating full

22         meals.  But I didn't get treatment for it.

23    Q    Why weren't you eating?

24    A    Frankly, because I wanted to be in my dorm room as

25         much as possible.
```

```
1    Q    Is there any particular reason?

2    A    Because it was safe there.

3    Q    What was unsafe that year?

4    A    Being approached by teachers inappropriately.

5    Q    Are there multiple teachers that you can recall that

6         you thought you were being approached by

7         inappropriately?

8    A    Nope.  Just one.

9    Q    During that year.  And am I -- at any point in time,

10        did you bring any of what you considered to be being

11        approached inappropriately by teachers to anyone's

12        attention?

13             MS. DOUGHERTY:  Objection.

14   A    No, I didn't.  I was going to object as well.  No, I

15        don't want to answer that.

16   BY MR. JUBB:

17   Q    So you're the witness, you did answer it.  And I'm

18        going to ask a follow-up question on it.  Am I

19        correct that during that year, you did not bring to

20        anyone else's attention, whether it be other

21        teachers, whether it be a supervisor, whether it be

22        your parents, whether it be a medical provider, or

23        any other student, anything that you felt was being

24        approached inappropriately by teachers?

25   A    No.
```

```
 1   Q   That summer when you went home, did you work?
 2   A   So I would have been 15 years old.  No, I do not
 3       believe so.
 4   Q   Do you have any recollections about that summer after
 5       your freshman year?
 6   A   Just hanging out with friends.  Mostly --
 7   Q   Your friends at home, were they neighbors, were they
 8       kids you knew from Shorewood, family, who were they?
 9   A   Kids I knew from Shorewood.
10   Q   So when you come back for your sophomore year, the
11       fourth form year, do you recall what classes you took
12       that year?
13   A   Geometry, European history, French, English
14       literature.  For science I honestly don't remember.
15       European history, French, geometry, English lit.  You
16       can tell they obviously made a huge impact on my
17       life.  I don't remember the other three.
18   Q   Do you recall if you took -- what science you took?
19   A   No, I don't.  Because I took chemistry junior year
20       and I took physics senior year.  And I never took AP
21       bio.
22   Q   Do you recall any of the names of your teachers for
23       that year?
24   A   I recall two.  One was Mr. Drowne, he was my European
25       history teacher.  He was also my hall master my
```

```
 1            fourth form year.  And I remember the name of my

 2            geometry teacher.

 3     Q     Do you recall how the scheduling of classes worked

 4            then?

 5     A     It was always a rotating class schedule.  So the

 6            class you had first on a Monday you had, what, second

 7            on Tuesday; whatever you had on your last class

 8            Monday became your first class Tuesday.  So it's just

 9            a constant round robin.  Now, I might have that

10            backwards; but I'm pretty sure one went to two, two

11            went to three, three to four.  We had --

12     Q     So --

13     A     -- a school...

14     Q     Okay.  So if I'm understanding you correctly,

15            whatever order the classes you had on Monday, let's

16            say one through five or one through seven, then on

17            Tuesday would start with two, and one would go to the

18            end of the line?  And --

19     A     Correct.

20     Q     -- then on Wednesday, you would start with three, and

21            two would go to the end of the line; is that fair?

22     A     Yeah, but Wednesday -- that's not correct.  Wednesday

23            we only had a half day of classes because teams had

24            to travel for sports.  So then we had another half

25            day of classes on Saturdays.
```

Kurtis N. Poulos

```
 1                    MS. DOUGHERTY:  Is this the sophomore
 2        year?
 3                    THE WITNESS:  Yes.  Fourth form.
 4    A    Oh, I remember one other teacher's name.  Mr. Long.
 5         He was my English teacher.  He was also one of the
 6         football coaches.
 7    By MR. JUBB:
 8    Q    Do you recall the approximate -- is it fair to call
 9         them like a period or the class time?  What's the
10         appropriate terminology you want me to use?
11    A    Classes.  Our classes I guess were about 45 minutes
12         to an hour, but some of our classes were double
13         period classes.  Like History of Art and Music was an
14         extended length class because we had to travel down
15         to the Performing Arts building and sit there and she
16         had to bring up slides and music.  And so we were
17         there for quite a bit longer.
18    Q    Did you have any sort of free periods during the day?
19    A    Yes.  And then we had chapel on Thursdays.
20    Q    Was that required?
21    A    It was.  But they didn't always take up the entire
22         period of chapel.  Sometimes --
23    Q    Was there --
24    A    -- it would just be...
25                    MS. DOUGHERTY:  Yes, finish your answer.
```

```
 1    A    Sometimes it would just be like school announcements
 2         and a small speech, and sometimes it would be special
 3         speakers would come in or one of the students would
 4         give a speech.  So it really depended from week to
 5         week what happened at chapel.
 6    BY MR. JUBB:
 7    Q    Was that something that was required where attendance
 8         was taken?
 9    A    It was required.  We had, you know, seating by your
10         peer group or your form.  So every year you moved
11         further up in the chapel towards the front.  They
12         did -- I mean, there's 90 of us in our class.  So if
13         somebody's not there, it's pretty obvious.  But it
14         was a nondenominational chapel service.  So it
15         wasn't, like, preachy or anything like that.
16    Q    So you've told us how the class schedule works, you
17         get the half day on Wednesday, half day on Saturday;
18         and then the class that started in the front on
19         Monday, that would go to the back line on Tuesday,
20         Wednesday would be a half day; and then Thursday,
21         same types of things, half day on Saturday.
22    A    Correct.
23    Q    Do you recall between your geometry, your English,
24         your French, your European history, do you recall
25         which period you had geometry?
```

Kurtis N. Poulos

```
 1   A   Like I said, it shifted every day.  So no.  Do I
 2       remember what day of the week it was specifically
 3       which period?  No.  That's -- unless I'm -- you
 4       know -- no, I don't remember.
 5   Q   Do you remember which -- sorry.  I interrupted you.
 6       Are you finished?
 7   A   I was just saying I don't remember what order that
 8       came in in which days of the week.
 9   Q   Do you recall what class you had before it?
10   A   I don't, no, because it changed every day.
11   Q   Right.  But let's say it was class number two.  Class
12       number one would come before, class number three
13       would come after it.  So that was kind of the
14       background that I understood from your previous
15       answers.
16   A   Then yes.  I don't remember the order in which my
17       classes were of any day of the week.
18   Q   During your fourth form year, what sport if any did
19       you do during the fall period?
20   A   Honestly, I don't remember because they had gotten
21       rid of skiing that year.  So I had to have done
22       something, but I don't recall what it was.
23   Q   Do you recall what sport if any you did during the
24       winter period?
25   A   I played squash.
```

```
 1   Q    At what level?  Was it varsity, junior varsity?

 2   A    JV.  I had never played squash before that year,

 3        so...

 4   Q    And what sport if any did you do during the spring

 5        period?

 6   A    I believe I played intramurals.

 7   Q    Can you explain what you mean by that, please.

 8   A    So you have a choice.  You can either join, you know,

 9        a media group where -- like the prepping the stage

10        for plays; or you can play a JV or a varsity sport.

11        Or if you don't qualify for either, you can play an

12        intramural sport.  So basically it's just a bunch of

13        students from the school playing each other every day

14        so that -- because we don't have gym class, so we

15        were required to do three sports a year.

16   Q    Okay.  So, in other words, you were required to do --

17        when you say three sports, I assume you meant one in

18        the fall, one in the winter and one in the spring; is

19        that fair?

20   A    Every trimester.

21   Q    Okay.  And so the sports, would they occur after

22        school?

23   A    Yeah.  We usually had I want to say about an hour in

24        between the end of class, maybe a little bit more, to

25        get ready.
```

```
 1   Q   Who was your roommate if any during your sophomore

 2       fourth form year?

 3   A   I did not have a roommate my sophomore year.

 4   Q   Why not?

 5   A   None was assigned to me.

 6   Q   At that point, by fourth form year, are the fourth

 7       formers allowed to pick their roommates?

 8   A   I believe so, yes.  But the roommate that I had

 9       chosen I believe did not re-attend school.

10   Q   Who's that --

11   A   Or I just decided that I didn't really care who my

12       roommate was.  I don't recall which one.

13   Q   You mentioned that year that -- you said your

14       European history teacher, Drowne, was your hall

15       master?

16   A   Correct.

17   Q   Is a hall master the same as a dorm parent?

18   A   Yeah, I guess so.  But we called them hall masters.

19   Q   Was --

20   A   It got...

21               (Interruption by the reporter.)

22   Q   I'm sorry.  Mr. Poulos, I apologize.  Sometimes

23       there's a break and then I think you're finished with

24       your answer, so I start.  But if at any point in time

25       you're not, please, you know, interrupt me, wave your
```

```
 1        hand, stop me.  I don't mean --
 2   A    Okay.  So when you're a freshman and a sophomore or a
 3        third former and a fourth former, you got a hall
 4        master who lives in an apartment at the end of each
 5        hallway.  Somewhere on that hallway are what are
 6        called prefects.  So those are seniors who live in
 7        underclassmen dorms to make sure that we act right.
 8   Q    During your fourth form year, what dorm did you live
 9        in?
10   A    I lived in the upper school first floor opposite side
11        of the third form.  So one whole side of the building
12        is stacked with third formers, besides the ones that
13        are down in Dutch Village.  The other side of the
14        building is stacked with all fourth formers besides
15        the ones who are down in Dutch Village.
16   Q    Do you recall who your prefect was?
17   A    No.  I just remember they always were watching
18        Melrose Place in their dorm room.  They were allowed
19        certain things because they were technically seniors
20        that they should have access to when the
21        underclassmen don't have access to them.  Like, say a
22        TV or a microwave or the use of a refrigerator in
23        their room I believe was part of it.  Because when
24        you're in sixth form, you don't have study hall, you
25        don't have to stay in your room from certain hours of
```

```
 1          the night until certain hours of the night.  They

 2          could come and go as they pleased throughout the

 3          night as long as one of them was there to sort of

 4          check in on us.  Or we checked out with them to, say,

 5          go to the library or go to a teacher's apartment to

 6          study.

 7     Q    Were you close with anyone that fourth form year in

 8          upper school in your dorm?  Just the floor, not the

 9          whole dorm.  I'm just talking about the floor that

10          you said.

11     A    The only one I can remember offhand is Jeremy

12          Eiserman; and that's because he was our star tennis

13          player, he lived right across the hall from me.  And

14          he would string his own rackets in his dorm room.

15     Q    Impressive.  Do you keep in touch with Jeremy at all?

16     A    I haven't spoken to anybody in that school for I

17          don't know how many years.

18     Q    Do you have a recollection, with respect to your

19          classes that year, do you remember what building

20          your -- strike that.  Do you recall what science you

21          took?

22     A    Like I stated earlier, I do not remember what science

23          I took my sophomore year.

24     Q    All right.  So for purposes of your English class,

25          where was that classroom?
```

Kurtis N. Poulos

```
 1   A   That was on the third form side of upper school, at

 2       the end of the hallway down one of the small

 3       corridors.  You have to understand that the back of

 4       the building is completely flat with classrooms.  The

 5       other side of the building has small hallways that

 6       take you into the smaller classrooms, say, my English

 7       class which only had a small round table we all sat

 8       around to discuss the books we were reading.

 9   Q   So the English class would have been on the first

10       floor of upper school just opposite to where you

11       were?

12   A   Technically, it was in the basement.

13   Q   Okay.

14   A   Upper school is -- upper school is a total of six

15       stories, I believe.  The basement level which has all

16       the classrooms; then the three stories that were all

17       dormitories.  And then the two stories above that

18       were deemed unsafe to be dorms long before I was ever

19       a student there, so it was just storage.  And the

20       only way you could access that was by elevator.

21   Q   Your French class, do you recall where that was held?

22   A   That was also in upper school down the main corridor.

23   Q   Again, in that basement that you described?

24   A   Correct.  On the fourth form side of the building.

25   Q   On the fourth form side of the building.
```

```
 1   A    Would it be easier if I just drew this for you?  I'm

 2        not trying to be a smart-ass, but...

 3   Q    No.  I appreciate it.  If the computer was working,

 4        that might have made it easier.  But what I'm going

 5        to do is I just have two more questions, and I think

 6        we should just take a five-minute break and maybe

 7        during that time frame you could draw it up for us.

 8   A    Okay.

 9   Q    So with respect to your European history class, where

10        was that?

11   A    That was in a different building altogether.  So I

12        would have exited out of my dorm on the fourth form

13        side, walked down a flight of stairs, walked about 50

14        paces, entered another building, taken I believe it

15        was one of the first rooms on the left-hand side of

16        that building, which was also a fifth form dormitory.

17   Q    And your geometry class, where was that located?

18   A    That was in upper school, basically right at the very

19        end of the fourth form dormitory area on the basement

20        level, down one of the small corridors, basically

21        mirroring my English room -- or English class,

22        basically mirroring it.  I believe they were both on

23        the same side of the small corridors, just on

24        opposite sides of the building.

25   Q    So if you had to get to geometry class from your
```

```
 1        room, how would that work?
 2   A    I'd walk to the end of my hallway, walk downstairs,
 3        open the door, make an immediate left down a small
 4        corridor, and go take a left and enter my geometry
 5        classroom.  At that level --
 6   Q    I -- I'm sorry.
 7   A    So on that side of the building where the small
 8        corridor classes are, there are no windows exposed to
 9        the outside world.  On the other side, on the main
10        straight of classrooms where, say, my French class
11        was, those were all facing an alleyway.  So those all
12        had natural light through windows.
13   Q    All right.  So why don't we take a five-minute break.
14        We've been going for about an hour now.  So you can
15        shut off your -- I know you're having technology
16        issues.  If it's okay, our videographer, maybe he can
17        give the best instruction.
18            VIDEOGRAPHER:  Looks like he put it up in
19        the ceiling.
20            MR. JUBB:  Okay.  Great.
21            THE WITNESS:  I'm just going to shut off
22        my computer and start over.
23            MR. JUBB:  We'll meet back here in five
24        minutes.
25            VIDEOGRAPHER:  We are now going off the
```

```
 1          record.  The time is 11:26.

 2                     (Recess taken from 11:26 to 11:36 a.m.)

 3                     VIDEOGRAPHER:  We are now back on record.

 4          The time on the screen is 11:36.  You may continue.

 5     BY MR. JUBB:

 6     Q    Mr. Poulos, during the break, did you discuss your

 7          deposition with anyone?

 8     A    No, I did not.  I got a bottle of water.

 9     Q    So with respect to your geometry class, can you tell

10          me any of the names of any other students who were in

11          there?

12     A    No, I cannot.  I'll just preface it by saying this.

13          I'm horrible with names and faces.  I always have

14          been.  That was something that I never understood

15          about my Grandpa Proxmire, he could pull a name out

16          of nowhere even if he hadn't seen the guy for 40

17          years.  I don't have that gift.

18     Q    I take it then that none -- strike that.  Were any of

19          the students who were your -- is it dorm mates?  I

20          guess maybe that's the most appropriate.  Were any of

21          them in your geometry class?

22     A    Not to my recollection.

23     Q    You mentioned Mr. Eiserman.  Do you recall Jeremy

24          Eiserman ever being in your geometry class?

25     A    Not to my recollection.  I think I only had one class
```

```
 1         with him and that was freshman year English.  I
 2         think.  I could be wrong.
 3     Q   Do you recall anyone by the name of Aaron Bluestone?
 4     A   Yes, I rec -- I recall the name.  I don't recall what
 5         he looks like or what classes I had with him.
 6     Q   As you sit here today, can you recall where you sat
 7         in your geometry class?
 8     A   I don't believe we had assigned seating.
 9     Q   Was it a class where there were desks or was it
10         similar to your English class where there was that
11         circle table?
12     A   No.  You walked into the door.  There was I believe
13         three rows of seats, maybe four in each row, maybe
14         five, and then the blackboard.
15     Q   In other words, you would enter the classroom from
16         the back?
17     A   Correct.  Towards the back of the class.  Like I
18         said, that door was at the very end of the hallway.
19     Q   On the left, correct?
20     A   Correct.
21     Q   Do you recall if there were any windows in the door?
22     A   I believe there was a small, almost like what you'd
23         see in a jail cell type window, maybe six inches wide
24         by 10 to 12 inches long.  So it's not like we had a
25         huge picture window.  It was more something where if
```

Kurtis N. Poulos

```
 1        you're looking through that window, it would be
 2        almost impossible to see the entire room with the
 3        door shut.
 4    Q   During that fourth form year, who was your advisor?
 5    A   I think it was -- I think it was the teacher who
 6        ended up being my economics professor my senior year,
 7        but I could be mistaken.  And I don't remember his
 8        name.
 9    Q   Does the name Krueger ring a bell?
10    A   Mr. Krueger, yes.  I believe he taught economics
11        there.
12    Q   Is that who you believe may have been your advisor
13        that year?
14    A   I think so.  Because I think he was also Jason's
15        advisor.
16    Q   Jason being your cousin?
17    A   Correct.
18    Q   So I have that during that fourth form year you were
19        doing squash in the winter, IM sports in the spring,
20        and you don't recall what you were doing in the fall.
21        Is that fair?
22    A   That's fair.
23    Q   Do you recall what --
24    A   Oh, no.  I know what I was doing.  I was playing
25        golf.
```

```
1    Q    In the spring or the fall?

2    A    In the spring -- no, in the fall.  Because cross

3         country would use the country club to run their races

4         when we had home meets, and we would be out there

5         golfing while they would be running around.

6    Q    And the golf in the fall, was that also junior

7         varsity?

8    A    No.  I think that was just intramurals.  I think it

9         was just if you wanted to play golf, you could sign

10        up and play golf, you just had to go and play golf

11        every day.

12   Q    Would the IM sports -- strike that.  I understood

13        your prior testimony to be that you had to do a sport

14        every single semester.

15   A    Trimester.

16   Q    Right.  Excuse me, trimester.  Does that mean that

17        your attendance was required for IM sports as well?

18   A    Yes, it was.  There would be a teacher at every

19        intramural sports event who basically -- maybe he was

20        a varsity or junior varsity coach earlier in the

21        year; and that part of the season he would just go

22        in, check off that you showed up.  Sometimes they'd

23        play with you, sometimes they'd just hang out and

24        grade papers.  I mean, it was pretty nonchalant.  I

25        think one year we played kickball for intramurals or
```

1     something like that.

2   Q   Where was the golf course that you played?

3   A   The golf course was over by the far field.  So it was

4       I want to say about a half mile off campus the way

5       campus was laid out when I went there.  Now, from

6       what my understanding is, the campus has changed

7       quite a bit since I was there.  So it's hard to say.

8       I also know that the entrance to the school is no

9       longer considered 616 East High Street.  I believe

10      it's now one of the back streets as opposed to off of

11      High Street by the dining hall.

12  Q   Approximately -- strike that.  Would you walk up to

13      the golf course or would you get a ride?  How did

14      that work?

15  A   No.  You walked.

16  Q   And did you have your own clubs?

17  A   I believe I brought my clubs from home.

18  Q   And during the fourth form year, did you have a work

19      job?

20  A   No.  I never had a work job when I was attending that

21      school.

22  Q   How did you consider your grades your fourth form

23      year?

24  A   Up until a certain part of the year, they were pretty

25      stellar.  And then events unfolded and my grades

```
 1         started to deteriorate.

 2   Q     What do you mean by events?

 3   A     Improprieties by a faculty member.

 4   Q     Are you referring to improprieties that were

 5         reflected in the letters at issue in this case?

 6   A     Correct.

 7   Q     And then up -- you said stellar until that happened;

 8         is that right?

 9   A     I believe so.  I believe I was getting pretty good

10         grades that year.

11   Q     During that year, how often did you go home?

12   A     Same as my freshman year.  Only for major breaks.  I

13         think one -- it was -- there may have been one

14         weekend freshman or sophomore year where my cousin

15         and I traveled to Washington, D.C., to visit with our

16         grandparents.  But I don't recall -- I don't recall

17         which year it was.

18   Q     When you would end the school year and go home, would

19         you fly or would you drive?

20   A     I flew.

21   Q     How would you get all of your belongings back home

22         since you were living there?

23   A     You pack everything up.  If you're coming back the

24         following year, you can put it in storage for the

25         following year.  If you're not planning, you ship it
```

```
 1           back.  So, like, freshman year I had to ship
 2           everything I wanted out to The Hill School; and then
 3           at the end of freshman year third form, you pack it
 4           up and you take it down to the storage building which
 5           was by the entrance near Dutch Village which was also
 6           by where the shooting range was and next to the ice
 7           skating rink and the gymnasium.
 8      Q    And that fourth form year when you left, did you put
 9           everything in storage?
10      A    Correct.
11      Q    During the school year, were there ever opportunities
12           like a parent visitation day or a weekend, anything
13           like that, where your mom would come see you?
14      A    I believe my mom did come and visit me my fourth form
15           year.
16      Q    Did anyone come your freshman year, your third form
17           year?
18      A    My mother.
19                 MS. DOUGHERTY:  Mr. Jubb, before you go
20           on, when you talk, it sounds like there's some type
21           of noise in the background.  It's a little --
22                 MR. JUBB:  The heater just kicked on I
23           think.  It'll go off and hopefully pretty soon.  But
24           if at any point --
25                 MS. DOUGHERTY:  I only...
```

Kurtis N. Poulos

```
 1                    MR. JUBB:  Go ahead.

 2                    MS. DOUGHERTY:  I apologize.  Go ahead.

 3                    MR. JUBB:  I was going to say at any point

 4        in time if you can't hear my question, just let me

 5        know.

 6                    MS. DOUGHERTY:  I can hear your question.

 7        I didn't know if it would be a concern for you

 8        because I know you're videotaping, and you could --

 9        I'm sure you can hear it on the videotape.

10                    MR. JUBB:  Is that true, Jeff?

11                    VIDEOGRAPHER:  Yes, I can hear it.  It

12        sounds sort of like an espresso machine or something

13        going off.

14                    MR. JUBB:  We can go of the record and

15        I'll just -- I'll freeze to death up here.

16                    VIDEOGRAPHER:  Okay.  We are now going off

17        record.  The time is 11:48.

18                    (Discussion off the record.)

19                    VIDEOGRAPHER:  We are now back on the

20        record.  The time is 11:49.  You may continue.

21   BY MR. JUBB:

22   Q    Thank you.  Mr. Poulos, during that summer, did you

23        have any sort of employment?

24   A    I believe that summer I had just purchased my first

25        car over spring break.  So that summer I did have a
```

Kurtis N. Poulos

```
1          job.  I believe I worked as a busboy at a restaurant
2          in Bayside called Pandl's.  Oh, no, no, no.  That
3          summer I worked at my uncle's paints and wallpaper
4          company, JC Licht Paint & Wallpaper.  It was the
5          winter of my junior year that I worked at the
6          restaurant.
7     Q    Which uncle are you referring to?
8     A    Gregory Licht.
9     Q    Is that on your mom's side?
10    A    Yes.  It's my aunt's ex-husband.
11    Q    And then you ultimately returned to school.  Did you
12         fly or did you drive?
13    A    My fifth form year, I flew back out.
14    Q    And your fifth form year, do you recall what classes
15         you were assigned to take?
16    A    I want to say AP English, French obviously, I think
17         trigonometry.  I honestly don't remember.  I wasn't
18         there long enough to take any of them.
19    Q    So the records reflect that around the 8th is when
20         you left.  Do you remember when school actually
21         started?
22    A    It would have started a few days later.
23    Q    You mean that you had come back to Pottstown and then
24         left before any classes started?
25    A    Right.  I never attended a class my junior year out
```

Kurtis N. Poulos

```
 1        there.  You get a couple of days to settle in.  But
 2        obviously you've got to go down, get all your stuff
 3        set up, your dorm room.  If you have any, you know,
 4        pre-classroom activities like your summer reading you
 5        need to finish up, you need to get on that.  And
 6        then, you know, there's orientation stuff.  If I
 7        recall.
 8    Q   Do you recall -- sorry to interrupt you.
 9    A   No.  Go ahead.
10    Q   Do you recall specifically if you had any sort of
11        orientation that year?
12    A   I think it was more just a welcome back to the school
13        type of event.  I mean, the football team had already
14        been there for, like, almost a month by the time
15        classes started.
16    Q   In other words, some sports would come back early so
17        that they could practice; is that it?
18    A   Yeah.  I mean, football -- it's not like you go into
19        your local high school.  A lot of these kids live all
20        across the nation, so they need the weeks that a
21        local school would get where their kids can just bike
22        over to their high school and start practicing.
23    Q   So ultimately when you left, did you alert anyone
24        that you were leaving before actually leaving?
25    A   I didn't alert anybody except for a car company to
```

```
 1        come and pick me up.  I put as much of my personal
 2        belongings in the back of the limousine as I could
 3        fit.  I got to the Philadelphia airport, got a ticket
 4        with my frequent flier miles, and flew home.
 5     Q  Tell me what went into that decision.
 6     A  Again, I was approached by a teacher, made me feel
 7        uncomfortable; and I decided I was not going to put
 8        up with it that year.  And it would be easier for me
 9        to leave.
10     Q  Are you referring to the plaintiff in this case?
11     A  I am.
12     Q  You said you were approached by him that year?
13               (Interruption by the reporter.)
14     A  I said correct.
15     Q  Tell me about that interaction.
16     A  I don't remember the specifics.  It was more a matter
17        of the way that I was approached, I didn't feel
18        comfortable.  And I decided it would be easier for
19        all parties if I just leave.
20     Q  Where were you approached?
21     A  I don't recall the exact location on the school.  I
22        just remember getting a feeling that I shouldn't be
23        there that year, and I made the necessary
24        arrangements for myself to leave, unbeknownst to my
25        own family.
```

Kurtis N. Poulos

```
 1    Q    Was it that day that you left or was it a few days

 2         before?

 3    A    I believe it was the day before.  I had to arrange

 4         for a car service.  It might have been the day of.

 5    Q    What was said?

 6    A    Excuse me?

 7    Q    What was said?

 8    A    I don't remember the specifics.  I just remember

 9         being approached, being made to feel like I was being

10         targeted again.  And I figured what the hell, I paid

11         my tuition, my family didn't.  So ultimately it's my

12         money, if I didn't get it back, it's on me.  So I

13         left.  That simple.

14    Q    Approximately what time of day was this?

15    A    I believe it would have been middle of the day

16         because typically -- and I just remember this offhand

17         because I only flew one major airline for the three

18         years that I attended that school, and that was

19         Midwest Express.  And I believe they had a 3, 3:30

20         flight back from Philadelphia to Milwaukee.  So with

21         the time change I would get in, you know,

22         midafternoon.

23    Q    Is everything okay?

24    A    With what?

25    Q    No, you just turned your head like you were looking
```

Kurtis N. Poulos

```
 1              at something that was catching your attention.

 2    A    Something just flew by the window.

 3    Q    Okay.  So you don't know where this occurred?

 4    A    I don't remember a specific location on campus, no.

 5    Q    And you don't recall generally what the discussion

 6              was, correct?

 7    A    No.  It was just a general tone.

 8    Q    Was there anybody else around?

 9    A    No.  I do not believe so.  Otherwise it would have

10              been brought to attention of other faculty a lot

11              earlier than it was.

12    Q    Okay.  So then you board the plane, you go home.  Did

13              you alert any of your family that you were coming in

14              prior to this or did they just get a surprise when

15              you showed up?

16    A    No.  I called my mother from the airport, said I'm at

17              home -- or I'm in Milwaukee, please come and get me.

18              And she said no, call your father, have him come and

19              get you.

20    Q    Why did she say no?

21    A    Because she was pissed that I left the school.

22    Q    Okay.  And then ultimately do you recall how you

23              ended up back there?

24    A    To be honest, my junior year was kind of a revelation

25              for me.  I spent some time in Europe going to school.
```

Kurtis N. Poulos

```
 1       I went back.  I also had a huge growth spurt my
 2       junior year; so as opposed to being five-foot seven,
 3       I was now six-foot two, 185, so I was a little bit
 4       harder of a target, so I felt more confidence there.
 5       And I knew that as a senior, prior to my senior year,
 6       I would be allowed to bring my personal vehicle out
 7       to campus for personal use when it was appropriate.
 8       So not like, okay, class is over, you can get in your
 9       car and leave.  But if it's a Saturday in the past
10       and you had a car and you were a senior or six
11       former, I should say, you were allowed to take your
12       personal vehicle on your own, go grocery shopping, go
13       to the mall.  You weren't really allowed to take
14       other students with you because of the insurance
15       liability risk.  So I felt my senior year I'd have a
16       lot more freedoms.  And after visiting for my
17       cousin's graduation, which would have been May of
18       1996, I also ultimately made the decision to
19       re-enroll and go out to The Hill School and, you
20       know, try and make my family proud and get the same,
21       you know, graduation experience that three -- you
22       know, two other generations in my family had had.
23   Q   So you went to school in Europe.  Where did you go?
24   A   I attended a high school in Limoges, France, for a
25       few weeks in spring of '96, early spring, around
```

```
 1          Easter.  And then we spent a couple of weeks in
 2          Paris.
 3     Q    Going to school or as a vacation?
 4     A    More as a learning experience without the classroom.
 5     Q    Was there a teacher?
 6     A    Yeah.  We had a chaperone.  There was only eight of
 7          us from the high school that went.  Maybe nine.
 8     Q    So you were there for a couple of weeks total between
 9          the actual classroom and then Paris; is that right?
10     A    Maybe ten days, ten days to two weeks.  I can't
11          really recall.  I mean, it was Paris.
12     Q    Where --
13     A    Excuse me?
14     Q    I'm sorry.  Where did you go to school after that?
15     A    I was attending school at Marquette University High
16          School my junior year of high school.  So I
17          returned -- it was an exchange program.
18     Q    Did you have friends at Marquette High School?
19     A    I grew up with one individual in Shorewood who was
20          attending Marquette High School.
21     Q    And what was his or her name?
22     A    Steven Balistreri.
23     Q    Do you still talk with Mr. Balistreri?
24     A    No.  Last I heard, he moved to Alaska.
25     Q    During -- okay.  So you went to school at Marquette
```

```
 1          for that year.  Did you have any type of employment

 2          during that time?

 3     A    Yeah.  That was my junior year.  I was working at the

 4          restaurant throughout the winter, and then early

 5          spring I went to France.  When I came back, I didn't

 6          work until I got a summer job that year.

 7     Q    And then ultimately your cousin Jason graduated, you

 8          had had your growth spurt, and that's when you

 9          decided that you would go back; is that it?

10     A    Yeah.  And I felt that with having a vehicle of my

11          own there and the certain liberties that had always

12          been extended to seniors, I would feel a lot more

13          comfortable that year.

14     Q    When you came back, what dorm were you placed in?

15     A    I think it was called Foster.  It was the first -- so

16          there's the headmaster's office, then there's the

17          Foster dormitory, and then there's another senior

18          dormitory.  And in front of the senior dorms is the

19          varsity track.  Yeah.

20     Q    Did you have a roommate?

21     A    I did not.

22     Q    Did you request one?

23     A    I actual -- well, strike that.  I had a roommate.

24          There was an opportunity for him to also have a

25          single room.  So, you know, he took the opportunity.
```

```
 1        He ended up moving I think upstairs across the hall
 2        into another dorm room without a roommate.  So there
 3        was one, two, three, at least three of us on my side
 4        of the dormitory that had single dorm rooms.  So we
 5        had the room all to ourselves.  Which as an
 6        18-year-old man is kind of nice.
 7   Q    Do you recall the names of the students who were your
 8        dorm mates that year?
 9   A    Not really.  Lance Frabizio just because I ran into
10        him in D.C. a few years later when I was visiting.
11        And that's where he was from.
12   Q    Do you remember the students who had the singles?
13        You said there were three just on your side.
14   A    One of them was from Great Brittain, I believe.  I
15        don't remember his name.  I don't recall.
16   Q    Was Mr. Bluestone in your dorm that year?
17   A    I don't recall.
18   Q    Who was your dorm parent?
19   A    I believe it was Mr. Romero.  That's why I said he's
20        one of the only teachers I remember.
21   Q    What sports did you do in the fall, winter and spring
22        respectively that year?
23   A    I can't remember if it was fall.  I think it was
24        fall.  A fellow student of mine who was a close
25        friend of mine while I was there, Kent Andres, he was
```

```
 1           a local student.  He and I took weightlifting
 2           training for some reason.  Winter, I have no clue.
 3           And spring, I took an intramural which I think
 4           involved a tennis racket and a tennis ball, but it
 5           was more like baseball in the middle of the quad.  So
 6           it was, like, ridiculous.  It was just for fun.
 7    Q   And in the winter you don't remember what you did?
 8    A   I don't remember what I did in the winter, no.
 9    Q   You didn't continue with squash?
10    A   No, because I had no chance of making the varsity
11           team; and as a senior, it's varsity or nothing.
12    Q   Were you able to do any IM sport?
13    A   Yeah.  The tennis ball/tennis racket/baseball game
14           thing that we played.
15    Q   I thought you said that was in spring.
16    A   Yeah, that was in spring.  In the fall we did the
17           weightlifting.  So that would have been an intramural
18           or an elective I guess you could call it.
19    Q   Okay.  Yeah, I was just focusing on winter to see if
20           I would be able to refresh your recollection as to
21           what if anything you did for that semester.  During
22           your senior year, how would you classify your grades?
23    A   Up and down.  Senior year is a little bit different
24           for us than it is for the average student at the
25           average high school.  Once we're accepted to college,
```

```
 1           as long as we stay above a D average after winter
 2           break, I believe it was, for the final trimester and
 3           you didn't get into any sort of trouble, you know,
 4           where you got suspended, you could graduate without
 5           taking final exams.  So I think for the first
 6           trimester I really tried to buckle down.  Winter
 7           trimester, I was already accepted into a couple of
 8           schools, I believe, because I found out over
 9           Christmas break where I had been accepted to school.
10           So then it's sort of just a senior slide for the rest
11           of the year.
12    Q      Where did you get accepted in the winter?
13    A      I was accepted to Penn State, one of their -- not the
14           main campus, one of their smaller, kind of like UWM
15           is to UW, satellite campuses.  But with the
16           opportunity that if you get good grades, you could go
17           to Penn State.  And University of Ithaca, I believe,
18           up in Ithaca, New York.
19    Q      During your senior year, did you have a work job at
20           all?
21    A      Like I said before, I've never had a work job while I
22           was attending that school.
23    Q      Did you have an advisor?
24    A      Yeah, but I couldn't tell you who it was.
25    Q      Who would you say would have been your closest friend
```

```
1         at the school that year?

2    A    A kid who lived across the hall from me, but I can't

3         remember his name.  He had long, shaggy hair.  Really

4         nice kid.  I think he was from New Hampshire or

5         something.  I didn't really have a lot of friends my

6         senior year, to be honest.

7    Q    Did you have a number of friends your sophomore year?

8    A    Yes.  I had a lot of friends my sophomore year.

9    Q    Who would you consider your close group of your

10        friends your sophomore year?

11   A    Jeff Glenn was probably my closest friend my

12        sophomore year.  He and I had actually attended camp

13        together when we were, like, 11.  There was two kids

14        from a small town in Maryland by where my grandmother

15        had a summer house.  So we had that in common.

16        Because it turned out they grew up right where I used

17        to spend a majority of my summers growing up.  But I

18        can't remember the two of them.  One, I think his

19        name was Will.  He played hockey.  That's what I

20        remember, because I was the equipment guy or the

21        scorekeeper when I had a broken arm freshman year.

22        But I can't remember -- his best friend's name was

23        Alec.  I remember he had a room across the hall from

24        me my freshman year in upper school, and he lived

25        with a kid from the Philippines whose parent was a
```

```
 1          diplomat.  So he did not come back the following

 2          year.  And then -- I mean, now I'm beginning to

 3          remember more of the people's names.  But I guess

 4          that doesn't really matter.

 5     Q    No, no, I -- so who else other than Jeff would you

 6          say would be your closest friend during that fourth

 7          form year?

 8     A    Jeff.  I mean, we went down to Hilton Head together

 9          to stay on his parents' boat for two weeks.  He,

10          unfortunately, didn't have good enough grades to ever

11          return to that school.  So I lost touch with him

12          after my sophomore year.  I mean, I stayed in

13          Milwaukee.  I really wanted nothing to do with The

14          Hill School my junior year.  So I was kind of

15          surprised he wasn't there my senior year.

16     Q    During your senior year, did you have any of those

17          weekends where your parents would come visit?

18     A    Yeah, actually, I did.  I had a parents weekend.  My

19          mom flew into town.  I was able to get access to my

20          car.  I went and picked her up in Philadelphia, drove

21          her back for, you know, the parent/teacher

22          conferences.  And then I dropped her off at the

23          Holiday Inn Express.  I had forgotten my overnight

24          bag because I was so eager to leave.  So I went back

25          to the dorm.  And next to the dormitory, there was a
```

Kurtis N. Poulos

```
 1        flight of stairs, very steep; and next to that flight
 2        of stairs there was a -- about enough room to park a
 3        single car.  To the other side of that was a big
 4        hill.  I went up to my dorm, retrieved my bag, came
 5        back downstairs, and found my car was being parked in
 6        by a blue Subaru Outback that was parked
 7        perpendicular to my vehicle, forcing me to stay on
 8        campus.  I knew whose car it was.  I went to that
 9        teacher's apartment, asked politely that they move
10        their vehicle so that I could go and spend the night
11        off campus with my mother.  I was refused, even
12        though at the time I was an 18-year-old man.  In
13        retrospect, I should have called the police that
14        night because I was detained there against my will
15        and, frankly, it made no sense that somebody would go
16        out of their way to move a car out of a parking
17        garage that has a garage door.  So it's not like they
18        parked in the parking lot, saw that I came back on
19        campus and they're like, oh, I'm just going to kind
20        of mess with him.  They physically had to go into
21        their garage, get their car, drive over, and park in
22        such a manner that I could not leave campus until the
23        following morning.  So that was fun.  That was a fun
24        weekend.
25    Q   During your sixth form year, when did you bring your
```

Kurtis N. Poulos

```
1          car to campus?

2     A    I brought it out, my father and I drove it out, you

3          know, a few days before classes.  There was some

4          personal items that I wanted to bring, and I didn't

5          feel like I would pay -- it made sense to pay a bunch

6          of money to ship stuff when I could pack it all in my

7          car, even though it was a Camaro, and I could just

8          drive it out there with my father.  I thought it

9          would be a good experience.  It was not.

10    Q    It was not a good experience driving out there with

11         your dad?

12    A    No.  Because he didn't like the car.  But it didn't

13         really matter.  It was my car.

14    Q    Did you -- strike that.  Were there any rules at the

15         school at that time as to what was considered

16         appropriate or inappropriate use of a student

17         vehicle?

18    A    Yeah, there was.  We had to have extenuating

19         circumstances, which in retrospect I would not have

20         brought my car out.  Again, I was not made aware of

21         certain rule changes that had occurred during my

22         absent year when I went to Marquette University High

23         School.  So it was no longer if you have permission

24         from your parents to use your car to go do this, this

25         and this, you can come and check out your keys.  It
```

```
 1         was you can only use your car to go home.
 2   Q     And do you recall what time of that sixth form year,
 3         fall, winter, spring, where there was that incident
 4         you described where there was the blue Subaru parking
 5         you in?
 6   A     Yeah.  It was fall.  It was a couple of weeks after
 7         my 18th birthday.  Parents weekend was always in the
 8         first month and a half of the first trimester.
 9         Because the teachers wanted to let the parents know
10         what direction their students were -- their children
11         were on and what they needed to do to right the ship.
12   Q     Prior to that incident, had you ever been reprimanded
13         or receive any sort of punishment for inappropriate
14         use of your car?
15   A     No.  I was reprimanded once after.  I'll admit to
16         that.  But that was sometime in the winter trimester.
17         I went to the grocery store and bought some food.
18         Unfortunately, while I was gone, it started snowing;
19         and so it was kind of obvious when you have assigned
20         parking spots and there's tire tracks going directly
21         to my car.  I couldn't really talk my way out of that
22         one.
23   Q     At the time of this incident where you said there was
24         a blue Subaru parked behind you and you were trying
25         to leave, am I correct that, at least according to
```

```
 1          the rules which you had said that you weren't aware

 2          of, you would not have been permitted to leave?

 3     A    No, I was permitted to use the car that weekend

 4          because I was going to pick up my mother from the

 5          airport.  Otherwise, she would have been forced to

 6          rent a car just to have a car still there sitting

 7          around.  So, again, being that I was 18 years old, it

 8          was my car, and my mother was flying in, I was given

 9          permission by the Dean of Discipline to use my

10          vehicle to transport my mother around the

11          Philadelphia airport -- or the Philadelphia area.  I

12          think we went to the King of Prussia mall.  And then

13          I took her back to the airport that Sunday and parked

14          my car back in the spot, turned my keys in, and that

15          was that.

16     Q    Were you supposed to pick her up from the airport?

17     A    Yes.  I was given permission by the Dean of

18          Discipline.

19     Q    Did you let him know that you were blocked in?

20     A    I let -- I mean, at that point it was Monday by the

21          time I would have even been able to let him know.  I

22          came -- okay.  So I got the car I believe that

23          Friday.  It may have been on the Saturday.  I

24          think -- no, it was Friday.  I went to the airport,

25          picked up my mother, drove back into town.  We went
```

```
 1        and had I believe her meetings with my teachers.

 2        Then we went out to dinner.  I dropped her off at the

 3        Holiday Inn Express.  I remember that because that's

 4        where everybody's parents stayed.  And they give you

 5        an option to get a cot so that as a student, we get a

 6        night of freedom.  So it would have been Saturday

 7        night.  But it would have been one night where I

 8        don't have to be at school overnight.

 9               In my haste to go and get my mother, I

10        forgot my overnight bag.  So after dinner -- or after

11        I dropped her off, I was like, you know what, I'm

12        just going to go back to the dorm, grab my stuff.

13        I'll be back in -- I think it would have been about a

14        10- or a 15-minute drive from campus to the actual

15        hotel.  And, like I said, I ran upstairs, ran through

16        the front door of the dorm, down the hallway.  My

17        door -- my dorm room was in the very corner, the very

18        last room across the hall from the bathroom.  I ran

19        back down.  By the time I got down there, there was a

20        car parked in -- or parked behind me perpendicular.

21               So then I went back up to that

22        individual's apartment, knocked on the door, was

23        summarily told no, I was not allowed access to my car

24        for the remainder of the night.  But I will move the

25        car so you can use it tomorrow.  Meaning he knew I
```

Kurtis N. Poulos

```
 1        was in the right to be able to use that vehicle that
 2        night.
 3    Q   As part of the rules, were you able to use the car to
 4        drive around your mom for the weekend?
 5    A   Yes.
 6    Q   And you said parents weekend was about a month or so
 7        after school would start?
 8    A   Yeah.  Typically it was in, like, mid to late
 9        October.  So it was typically a Friday, Saturday,
10        Sunday thing.  Now, my mom having worked full time at
11        the time, she would have more than likely flown out
12        Saturday.  And that was the night of this instance.
13        Where then Sunday morning, there is a Sunday brunch,
14        like a family brunch where you bring your parents to
15        the dining hall and they make food.  We did not
16        attend that.  We just went and did our own thing.
17    Q   Did you tell your mom that you weren't able to come
18        get her?
19    A   Yeah.  I called her at the hotel, after returning my
20        stuff to my dorm room, I called the hotel, informed
21        my mother what had happened.  She said, you know
22        what, don't worry about it.  It is what it is.  I'll
23        see you in the morning.
24    Q   And did you or your mom ever talk to that
25        disciplinary dean, go, hey, you told me I could go
```

```
 1           out and now I can't?
 2    A      No, because at that point there's no reason to bring
 3           it up.  What's he going to do?  Say, well -- you have
 4           to understand, half the time they just make up rules
 5           on the fly; and it's almost impossible even as an
 6           adult to be, like, well, screw you, I'm going to do
 7           my own thing.  I even at one point brought up why
 8           don't I just get my own apartment off campus being
 9           that I'm 18 years old.  I was told summarily I would
10           be kicked out of the school.  So, you know --
11    Q      Did -- I'm sorry, I interrupted you.
12    A      No.  Go ahead.
13    Q      Was the driving/car policy for students and the rules
14           applicable thereto made up on the fly, or is that
15           something that had been established in writing?
16    A      I mean, we were told in our -- you know, like I said,
17           there was some sort of orientation every year, so
18           they would bring up any sorts of rule changes.  One
19           of the rules changes was seniors, no matter if you
20           were 18 or older or -- yeah, because we had super
21           seniors, you weren't allowed to smoke on campus
22           anymore.  Prior to that, it was you could smoke on
23           campus at the age 17 and up as long as you had your
24           parents' permission or you were 18 years old.
25                    So my senior year it became no longer
```

Kurtis N. Poulos

```
 1            cigarettes and coffee after dinner.  It was just
 2            coffee with teachers.  And the smoke club, there was
 3            a building down towards the end of the upper school
 4            building that had a big garage door with some lounge
 5            chairs and sofas where if you were a junior or a
 6            senior and you had permission or were 18, you could
 7            go and smoke cigarettes.  They took both of -- they
 8            took both of those away.  And then they said as far
 9            as seniors, unless you're an off-campus student and
10            you have your vehicle here, you are not allowed to
11            use your vehicle other than to go home or with
12            special permission.  So, like, if you have a doctor's
13            appointment, obviously if you have a car, rather than
14            paying for a cab, you'd go and tell the Dean of
15            Discipline I have to go here, here or here, here's a
16            letter from my parents, can I have the keys to my car
17            for that day.  He'd say yes.  So there were always
18            exceptions to be made.  It's not like I was the only
19            senior from out of state who brought a car who had to
20            get special permissions.
21   Q   And I just want to try and make sure I'm not
22            misunderstanding your testimony.  Is it your
23            testimony that prior to your mom coming in for this
24            weekend, you had gone to the dean, said I need to
25            pick her up from the airport and I want to take her
```

```
 1          around town, can I do that?  And that person, whoever
 2          it was, said sure?
 3     A    Correct.
 4     Q    And who was that dean, if you can recall?
 5     A    I cannot recall, but also you have to understand I
 6          had to physically get the keys from the dean.
 7     Q    Where was his office?
 8     A    It was attached to the middle school building across
 9          the walkway from the dining hall.  But it was more
10          towards the end of the building.  So it would have
11          been the mailboxes and then you walk through, there's
12          a little shop where you can buy some school supplies
13          and stuff.  Then you'd walk out.  The college prep
14          lady, that's where her office was.  And I want to
15          say -- no, Mr. Mikaletto (phonetic), he was the
16          hockey coach.  I can't remember, but I know he had
17          something to do with hockey because he was a bigger
18          stocky guy, and I don't think he was one of the
19          football coaches.  I think he was the JV coach.
20     Q    Do you recall what classes you took that year?
21     A    Physics, French, Shakespeare, theology, I don't
22          remember what math I took that year.  Maybe that
23          was -- no, I don't remember what math I took that
24          year.
25     Q    Do you recall the names of any of those teachers?
```

```
 1    A    Mr. Lahey I believe was my Shakespeare teacher.  I
 2         just remember that because it was probably the most
 3         enjoyable class that I had.  I can remember what my
 4         French teacher looks like.  She was, first off, from
 5         France and had a really short, you know, almost bowl
 6         cut.  And I remember my physics teacher's face, but I
 7         can't remember his name.  I just remember he was a
 8         really good teacher and made class a lot of fun.
 9    Q    And you mentioned theology.
10    A    Yeah.
11    Q    Who was that?
12    A    I don't remember.  I think senior year was a little
13         different in the fact that -- because I took
14         Shakespeare, but I don't think that year-long like I
15         took physics year-round and I took French year-round.
16         I think theology, Shakespeare and there was one other
17         class, and those were just trimester classes.
18    Q    You say just trimester classes, you mean they weren't
19         for the entire year; is that right?
20    A    Yeah.  You just took -- it was I think specifically
21         for seniors where you only had to take it for one
22         trimester and then you were done.  I don't remember
23         taking Shakespeare the entire year.
24    Q    Did you have any difficulty graduating?
25    A    No.  I don't -- I think --
```

Kurtis N. Poulos

```
1    Q    Did you...

2    A    Go ahead.

3    Q    I'm sorry.  No, go ahead.

4    A    I almost got into a disciplinary problem right before

5         spring break.  But the Dean of Discipline said since

6         it happened before spring break and technically not

7         after, that I wouldn't have to take my final exams.

8         Just not to let it happen again.

9    Q    And what was that disciplinary problem?

10   A    I think I was caught smoking off campus.  So, again,

11        18 years old, out walking around a town; but a

12        teacher said he saw me having a cigarette.  But I was

13        told that was a poor example of what a Hill School

14        student should represent.

15   Q    Did you have any other disciplinary issues that year?

16   A    Other than the time I took my car out without

17        permission, no.

18   Q    When was that?

19   A    Like I said, I got caught going to get groceries in

20        the winter when it snowed.

21   Q    Following your graduation -- let me ask you this.

22        Did any of your -- strike that.

23               Did any of your family members show for

24        graduation?

25   A    Everybody.
```

```
 1    Q    Mom and dad?

 2    A    Even my father and my stepmother.  My brothers, my

 3         cousins, my aunt, my grandma.  My grandpa was so

 4         excited.

 5    Q    What did you do that summer?

 6    A    I worked for -- I worked basically as a maintenance

 7         guy for the office building where my dad's company

 8         was located.  So I helped doing -- they were

 9         renovating the third floor.  So I helped doing the

10         teardown of the entire third floor of the building

11         for a summer.

12    Q    All right.  This might be a good time to take another

13         five-minute break if that's okay with you, Kurtis, or

14         would you like a little bit longer?

15    A    No.  That's fine.  I'm just curious as to how much

16         longer just this in general is going to go.

17    Q    I'm not sure yet.  But we're -- you know, I'm going

18         to show you a couple documents and then my colleague,

19         Ms. Dougherty, may have some questions too.  So let's

20         just do our five-minute break and we can look at our

21         notes, and that makes it go quicker.

22    A    Okay.

23              VIDEOGRAPHER:  We are now going off

24         record.  The time is 12:32.

25              (Recess taken from 12:32 to 12:39 p.m.)
```

Kurtis N. Poulos

```
 1                    VIDEOGRAPHER:  We are now back on the
 2          record.  The time is 12:39.  You may continue.
 3                    MR. JUBB:  Thank you.
 4     Q    Mr. Poulos, have you ever been convicted of a crime?
 5     A    Yes.
 6     Q    Which crimes?
 7     A    I couldn't tell you exactly offhand.  I'm sure you
 8          have records.
 9     Q    Can you tell me what crimes you can recall being
10          convicted of?
11     A    Disorderly conduct.
12     Q    Anything else?
13     A    I believe I broke a restraining order.
14     Q    Anything else?
15     A    Not that I can recall.
16     Q    Have you ever been charged with any felonies that you
17          were not convicted of?
18     A    Not that I can recall.
19     Q    When was the disorderly conduct?
20     A    There was one in Connecticut and there was one here
21          in Milwaukee.  So 2018 and 2016.
22     Q    Have you ever served jail time for those?
23     A    Just overnighters, like waiting to be processed.
24     Q    With respect to the restraining order, when was the
25          restraining order actually in place?
```

```
 1    A    I don't know.  2005.

 2    Q    When was it broken?

 3    A    Possibly somewhere around the time that it was taken

 4         out.  The problem was the location of my ex's

 5         apartment and mine at the time, I lived on a one-way

 6         street.  I had no choice but to drive past the street

 7         that she lived on to access the rest of the city.

 8         Where my parking garage exited, I had to head north

 9         in order to get to the next main street.

10         Unfortunately, I had to pass her block before I could

11         get to the next main street, and you could hear my

12         car a mile away.  So it's not like I drove by her

13         house.  I literally just was driving I think to a bar

14         to meet up with some friends.  And next thing I know,

15         I've got cops showing up at the apartment later that

16         night saying I broke my restraining order because she

17         heard my car drive by her apartment.

18    Q    Was that the extent of that?

19    A    Yeah.

20    Q    Had you ever received any sort of psychiatric

21         treatment when you were -- prior to 1997?

22    A    I think I went to see a therapist when I was, like,

23         eight or nine about whose house I wanted to live at,

24         my mom's or my dad's.  That was it.  And that wasn't

25         really therapy.  It was more I think an advocate for
```

```
1              the court.  But it was a therapist.

2    Q    Did you ever receive any psychological treatment from

3         the time that you had graduated from The Hill School

4         through 2007 being ten years later?

5    A    No.

6    Q    Have you ever received any --

7    A    No.

8    Q    I'm sorry.  Go ahead.

9    A    I said no.

10   Q    Okay.  Have you ever received any sort of

11        psychological treatment between 2007 and 2017, which

12        would have been the next ten-year period?

13   A    I got treated when I was out in Connecticut.

14   Q    What was that related to?

15   A    I'd rather not say.

16   Q    Was this something that was mandatory?

17   A    Yes.

18   Q    As part of some sort of court order?

19   A    Not a court order, no.

20   Q    How was it mandatory?

21   A    Because I ended up in the hospital and they made me

22        stay for an evaluation.  And then they released me.

23   Q    Okay.  When did you end up in the hospital?

24   A    In 2016.

25   Q    What was that for?
```

```
 1    A    I'd rather not say.

 2    Q    Unfortunately, that -- are you objecting to answering

 3         that question?

 4    A    I do object to answering that.  I don't see how

 5         something -- I don't -- well, it didn't have anything

 6         other to do than the situation that occurred there.

 7    Q    Was that in any way related to a crime?

 8    A    No.

 9    Q    It was related to you finding yourself in the

10         hospital where you were treated psychologically,

11         correct?

12    A    I had to get stitches, so they held me.

13    Q    Why did you need stitches in 2016?

14    A    They thought I was self-harming.

15    Q    Were you self-harming?

16    A    No.  That's why they released me.

17    Q    With respect to the disorderly conduct in Connecticut

18         in 2018, what were the facts surrounding that?

19    A    A drunken argument with my ex-girlfriend.

20    Q    Did you have to perform any jail time related to

21         that?  Was that the overnight situation?

22    A    Yeah.  And then I paid a fine and went home.

23    Q    What town was that in?

24    A    Orange, Connecticut.

25    Q    And in 2016 in Milwaukee, what was that related to?
```

```
 1    A    I wasn't in Milwaukee in 2016.

 2    Q    I'm sorry.  I must have written it down wrong.  I

 3         thought you said that you had a disorderly in 2016

 4         and that was in Milwaukee.  Where was the disorderly

 5         in 2016?

 6    A    That was in Connecticut.  The one in Milwaukee was in

 7         2018.

 8    Q    I'm sorry.  I flipped them.  So the one in 2018 was

 9         in Milwaukee, and the one that you just described

10         pertaining to a drunken argument with your

11         ex-girlfriend was in Orange, Connecticut, in 2016.

12         So what is the incident in Milwaukee in 2018?

13    A    Same exact incident.  Argument with the girlfriend,

14         the cops get called.

15    Q    Was this the same girlfriend?

16    A    Unfortunately, yes.

17    Q    And I imagine when you say unfortunately, you two are

18         no longer together; is that fair?

19    A    Thankfully, yes.

20    Q    And was she charged with anything?

21    A    I don't know if she would have been.  It doesn't

22         matter because she left the state.

23    Q    What's her name?

24    A    Emily Peters.

25    Q    Have you had any girlfriends since Emily?
```

Kurtis N. Poulos

```
 1    A    I've dated a few women off and on since then.

 2         Nothing serious.  I'm focused on trying to stay sober

 3         and focus on work.

 4    Q    Do you ever attend any meetings related to sobriety?

 5    A    I was, yes.  Up until COVID started.

 6    Q    Can you tell me why you sought psychiatric treatment

 7         in May of 2018?

 8    A    May of 2018, I started getting treatment so that I

 9         could live a more productive life while coping with

10         what I went through in high school.

11    Q    How did you select that doctor?

12    A    Because it...  Because he's one of the best in the

13         city.

14    Q    Do you still see him?

15    A    Unfortunately, no.  He's a very busy doctor and he's

16         also $300 an hour.

17    Q    Is there any other physician that -- strike that.  Is

18         there any other mental health individual from whom

19         you sought medical treatment?

20    A    Nope.

21    Q    Was that Dr. Grade?

22    A    Grade.

23    Q    Grade?

24    A    Yes.

25    Q    G-R-A-D-E, correct?
```

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | At any point in time, did you relay the information |
| 3 | | that you had relayed to Dr. Grade to any of your |
| 4 | | girlfriends? |
| 5 | A | No.  Not with specifics. |
| 6 | Q | What do you mean by not with specifics? |
| 7 | A | Not with specific names.  I just told them that |
| 8 | | there's an event that happened at my school. |
| 9 | | Obviously when I received the letters from the high |
| 10 | | school, I was dating somebody.  So she was kind of |
| 11 | | furious as to why I was receiving letters like that. |
| 12 | Q | What did you tell her?  And was this Emily at the |
| 13 | | time? |
| 14 | A | Correct. |
| 15 | Q | What did you tell Emily? |
| 16 | A | I told her what happened to me at the school.  But I |
| 17 | | never used a name. |
| 18 | Q | How did it come about that Emily saw the email that |
| 19 | | you received? |
| 20 | | MS. DOUGHERTY:  Objection. |
| 21 | A | I was reading them on my compute -- okay.  Yeah. |
| 22 | | Objection. |
| 23 | | MR. JUBB:  Candi, did you object? |
| 24 | | MS. DOUGHERTY:  I did. |
| 25 | | MR. JUBB:  Okay.  You're just objecting to |

```
1          the form?
2                    MS. DOUGHERTY:  Yeah, I think -- I don't
3          know that he identified the communication from the
4          school as an email.  I think he said letter.  But --
5                    MR. JUBB:  I'll just clarify that.
6     Q    Mr. -- strike that.  Mr. Poulos, what communication
7          are you referring to that you had discussed with
8          Emily?
9     A    The two emails that contained letters from the school
10         were printed out in my office in the apartment we
11         shared.
12    Q    So you printed them out at that time?
13    A    Yeah.  I keep hard copies of important documents.
14    Q    Am I correct that you have not produced any documents
15         to me in response to any of the discovery requests?
16    A    I'm not sure as to what you're asking, referring to,
17         which specific documents you want.
18    Q    So I had issued requests for production of documents
19         to you.  Am I correct that you have not supplied me
20         with any documents?
21    A    But I'm asking what these documents would be
22         referring to.  Because you've sent me so many
23         requests for things, there have been some that I've
24         said no to, there have been some I've said yes to.
25         Plus most of these documents you can receive from the
```

Kurtis N. Poulos

```
 1          school.

 2     Q    Just listen to my question.  So let's say there's one

 3          request, let's say there's 20, let's say there's a

 4          hundred.  Am I correct that you have not produced me

 5          with any documents in response to those?

 6     A    To my knowledge, no, I have not produced you any

 7          documents.

 8     Q    Have you ever had to attend any sort of anger

 9          management program?

10     A    Yes.

11     Q    When was that?

12     A    That was when I was living in Connecticut.

13     Q    Was that related to Emily?

14     A    No.  It was recommended to me and I took it.  And

15          after, I don't know, five classes, the teacher said

16          it doesn't seem like you need to be here other than

17          you need to stop drinking so that you stop having

18          outbursts.

19     Q    How often were you drinking in the 2016 time frame?

20     A    Not very much.  I had quit drinking after I got out

21          of the hospital up until basically when I met Emily.

22          Unfortunately, I slipped.

23     Q    Prior to that, did you ever consider yourself to have

24          any sort of issue with alcohol?

25     A    I mean, yeah, I drank myself into a coma trying to
```

Kurtis N. Poulos

```
 1        deal with the trauma of what happened at that school.

 2   Q    When did you drink yourself into a coma?

 3   A    Back in 2015, 2014, right when everything started to

 4        come to light, I started self-medicating.

 5   Q    Had you ever dranken yourself into a coma prior to

 6        2014, 2015?

 7   A    No.  I mean, I drank excessively, but not to the

 8        point where I was putting down a handle of vodka in

 9        two days, to the point where I had to be hospitalized

10        and I almost died.

11   Q    Other than you driving around your ex-girlfriend's

12        house on the way to anywhere, really, because of the

13        proximity to where you lived, was there anything else

14        about that that was related to that conviction?

15              MS. DOUGHERTY:  Objection.

16   BY MR. JUBB:

17   Q    So she's just objecting to the form.  Do you have a

18        position?

19   A    Yeah.  I object.

20   Q    Okay.  Can you tell me the basis of your objection?

21   A    I don't see how that's relevant.

22              MS. DOUGHERTY:  Are you asking me?

23              MR. JUBB:  No, no, not you.  I'm asking

24        him.

25              MS. DOUGHERTY:  Because my objection was
```

```
 1            to form.
 2                     MR. JUBB:  Of course.
 3    Q     All right.  So, Mr. Poulos, did you get a chance to
 4            look at any of your records from Hill School?
 5    A     No.  I have no, no desire to look at anything
 6            regarding that school.  They don't pertain to my life
 7            as of right now, what my records were when I was in
 8            high school.
 9    Q     I'm going to show you a couple of documents from my
10            screen.  And for the record, I'm going to be pulling
11            up here P16.164 through P16.165.
12                     MS. DOUGHERTY:  Can you say that again,
13            P16, what was that?
14                     MR. JUBB:  P16.164 through P16.165.
15    Q     Mr. Poulos, can you see that screen?  Can you see my
16            screen now, Mr. Poulos?
17    A     Now I can.
18    Q     William Proxmire, is that your step-grandfather?
19    A     It is.
20    Q     This appears to be a letter that he wrote to the then
21            headmaster in 1993, referring to him as Chuck.  And
22            he spelled your name with a C.  Have you ever spelled
23            your name with a C?
24    A     No.  In fact, he's not the only one of my
25            grandparents who every once in a while would spell my
```

Kurtis N. Poulos

```
1              name in the English rather than in the German form.

2    Q    In this letter that he wrote to Headmaster Watson, he

3         said, "I said little about him at the time because,

4         frankly, I knew little."  Can you see that?

5    A    Yeah, I can see that.  And, like I said, I did not

6         have very much contact with my grandfather when I was

7         growing up.

8    Q    Is that your grandfather's signature?

9    A    I believe so.

10   Q    And have you ever seen these before?

11   A    I've never seen any of those before.

12   Q    Do you see this?  It's an advisor report.  The Bates

13        number is P16.118.

14   A    You just scrolled all the way to the bottom.

15   Q    I know.  I'm just trying to make sure that everybody

16        is able to take down the exhibits for us here because

17        I've got to send these to the court reporter later.

18        So it says the student is you.  The advisor is

19        Mr. Lodish, and it's dated November 1993.  Was your

20        advisor during your third form year Mr. Lodish?

21   A    Actually, I think that was my hall master, so he

22        would have probably also been my advisor.

23   Q    Is that just how it worked, your advisor is always

24        your hall master, or is that a coincidence?

25   A    No, I think as a -- I think your first year at the
```

```
 1          school, they assign you to the person that you're

 2          going to be living nearest.

 3    Q     You believe that Mr. Lodish was that individual who

 4          was your hall master who you described as in his

 5          apartment on the phone a lot --

 6    A     Correct.

 7    Q     -- is that correct?  In looking at this, which is

 8          dated November 30th, 1993, he says, "The situation

 9          with his roommate seems to be getting much better and

10          the two of them seem to be getting along.  He spends

11          a great deal of his free time on his computer which

12          tends to keep him isolated from the other boys on the

13          hall."  Do you know what he's referring to when he

14          says the situation with your roommate?

15    A     Yeah.  He was stealing from me and from other

16          students on that floor.  That's why he was not

17          recommended to come back.

18    Q     Okay.  And do you recall spending a great deal of

19          free time on your computer?

20    A     Yeah.  I was learning how to write code as an

21          extracurricular -- now it's something that they teach

22          at that school, and most high schools and

23          universities do as well.  I grew up in a home where

24          we had computers at a young age.  So I was continuing

25          my own education on how to use computers and I was
```

Kurtis N. Poulos

```
 1            using -- I had a computer that most students had the
 2            ability to use my computer to, say, look up the
 3            Encyclopedia Britannica without leaving my room and
 4            going to the library.  So why if my father had
 5            spent -- or technically my trust had spent nearly
 6            $8,000 on something so far advanced would I not use
 7            it to the fullest capabilities?  Otherwise, it's just
 8            a giant paperweight.  It's not like we had internet,
 9            you know.  It was strictly that I could use it to
10            learn programming and I could use it to advance my
11            studies on my own without having to leave.  I wasn't
12            playing games.  I mean, they didn't really even have
13            games that you could play.  I think I had a golf
14            game.
15     Q      Did you ever feel that your time with the computer
16            was ever isolating you from other classmates of
17            yours?
18     A      In fact, the complete opposite.  There was a kid that
19            lived across the hall from me who was just as
20            proficient.  He didn't have as nice of a computer.
21            But he would come and spend time.  There was another
22            gentleman or another kid that lived down the hall
23            from me.  He had his own computer.  You know, like I
24            said, back in 1993, it was rare, let alone to have a
25            machine as capable as what I had.  I had basically
```

1       the nicest computer that you could buy at that time.

2       So it was kind of a way to also bring them into my

3       room and hang out and be, like, look what this can

4       do, you know, look how this works.  I showed -- I

5       made a program for a kid so that he could play, like,

6       a tank-busting video came in his dorm room.

7   Q   Do you still do coding?

8   A   No.

9   Q   What did you major in college?

10  A   Business administration.

11  Q   Did you ever take any computer courses or coding

12      courses in college?

13  A   Nope.

14  Q   This is a demerit report from you dated June 1994 of

15      the school.  Down on the left-hand side there's a

16      list of dates.  I'm trying to understand this.  And

17      so what I see is F-W-S.  I assume that's fall,

18      winter, spring, and then the dates correspond along

19      the left-hand side.

20  A   Oh, by work job --

21          MS. DOUGHERTY:  Object.

22  A   -- you meant did we have to go --

23          MS. DOUGHERTY:  Can you identify the -- I

24      just want to know the Bates label.

25          MR. JUBB:  Absolutely, Candi.  I

```
 1          apologize.  This is P16.73.
 2                    MS. DOUGHERTY:  Thank you.  I'm sorry.  I
 3          was raising my hand to try to get your attention.  I
 4          didn't want to interrupt you.
 5                    MR. JUBB:  No, I can't see you on the
 6          screen.  You know what I mean?
 7                    MS. DOUGHERTY:  Yeah.
 8                    MR. JUBB:  I apologize.  For whatever
 9          reason, the box is showing the videographer and
10          court reporter.  I can't put both of you next to
11          each other.
12                    MS. DOUGHERTY:  That's fine.
13                    MR. JUBB:  Yes.
14     Q    So, Mr. Poulos, yeah, so absent athletics, that would
15          have been that requirement that you were supposed to
16          do, correct?
17     A    Correct.
18     Q    And it shows on here warning - absent work job.  What
19          does that mean?
20     A    The only thing I can think of for work job, and I
21          could be wrong in this, but I believe as incoming --
22          or as third formers, we did have to every once in a
23          while go into the kitchen and, like, prep the cereal
24          station, I think.  I don't really consider that a job
25          because it's not like -- I'm thinking job as in it
```

```
 1          helps pay for my tuition which my tuition was paid in

 2          full.  So that's where that misunderstanding is, you

 3          know.  As far as absent breakfast, yeah, I slept in.

 4    Q     Was breakfast required?

 5    A     For underclassmen, yes.

 6    Q     I'll take that down.  And, Candi, this is P16.72.

 7          And this is the demerit list for the '94-95 school

 8          year.  And on this demerit list, it says absent

 9          special work crew, restriction one day.  Absent work

10          job, absent work job.  Again, you have no

11          recollection of what your work job was at this time?

12    A     Again, it probably would have been prepping for the

13          following day's meals.  So if I was absent a dinner

14          on 2/22 -- or 2/23 or something like that, I would

15          have missed my work job as well.  Because we did --

16          so when the meal is over, all the underclassmen are

17          supposed to stay and set up the tables for the

18          following meal.  So when you come in for breakfast,

19          the people who had dinner at that table the night

20          before would have set the places, you know, set out

21          the plates, the glasses, the silverware, the pitchers

22          for the water.  So it's possible, like, if I miss a

23          meal, I'm going to miss, you know, miss having done

24          my portion of my work job or whatever that...

25    Q     Am I correct that dinner was after sports?
```

Kurtis N. Poulos

```
 1   A    Yeah.  You had time to go and take a shower and then
 2        rush over.  But if you have a lot of homework and
 3        you're going to a school as competitive as that, am I
 4        going to go and sit at a dinner that I'm not going to
 5        eat or am I going to sit in my dorm room and do my
 6        homework?  I think one outweighs the other.
 7   Q    And you're saying during this time frame, that was
 8        what you believe was the basis for you missing
 9        dinners and the --
10   A    Correct.
11   Q    -- the responsibilities associated therewith was that
12        you were studying?
13   A    Yeah.
14   Q    This is the demerit list for the '97 school year when
15        you were a sixth former.  It looks like on here --
16        what was this about, unauthorized absence from
17        campus/dorm, detention one week?
18             MS. DOUGHERTY:  What's the Bates label?
19             MR. JUBB:  This is P16.33.
20             MS. DOUGHERTY:  Thank you.
21   A    I don't know.  I probably walked off campus and
22        bought a pack of cigarettes and got caught walking
23        back onto campus.
24   BY MR. JUBB:
25   Q    Is that something that you recall happening or was
```

Kurtis N. Poulos

```
 1         that a guess?

 2    A    That's a guess.  That's the only thing I can figure.

 3         That's the only time I left campus was to drive or

 4         walk over to Mama's which was right by the senior

 5         dorm, and she'd let us buy cigarettes even though she

 6         knew we weren't 18.

 7    Q    And it looks like this happened on October 3rd of the

 8         fall --

 9    A    Yeah, a week before my birthday.

10    Q    Did you ever have occasion to drive to get

11         cigarettes?

12    A    No.  To Mama's I would just walk.  It was literally a

13         block, a block and a half away from our school.

14    Q    And did you ever have occasion to take your car other

15         places to get cigarettes?

16    A    Just the one time where I went to get groceries

17         without permission.

18    Q    And it looks like here, February 23rd, another

19         unauthorized absence from campus/dorm, detention one

20         week.  Do you know what that one was about?

21    A    Oh, yeah.  After -- let's see, when was the Super

22         Bowl in 1997, the one that the Packers won?  After

23         that, I started leaving campus every weekend and

24         flying home almost.

25    Q    Absent evening study hall.  Is this a study hall that
```

Kurtis N. Poulos

```
 1            was required for all students or just for you?

 2    A       I couldn't tell you because typically for seniors, we

 3            do not have a mandatory study hall.  But, again, I

 4            believe I was below the threshold of demerits; so...

 5    Q       Do you know what absent athletics, which one is this

 6            referring to?  I guess this would have been the

 7            winter of your senior year.  So that would have been

 8            the -- we don't have a sport, what that was I don't

 9            think.

10    A       I have no idea what half of these are.  Except that I

11            can tell you that after the -- you know, the

12            following weeks after the Packers won the Super Bowl,

13            I tended to fly home fairly often.

14    Q       Do you know what the 1/20/97 personal conduct is,

15            what that's related to?

16    A       I think that's when I took my car without permission

17            and got caught when it was snowing.  I couldn't tell

18            you.  Some of these I know are because I flew home.

19            Again, I was 18 years old, I was pressing my luck.  I

20            never pressed it so far as to get into any major, you

21            know, trouble where I had -- you know, a week's

22            detention means you basically go to your dorm and sit

23            in your room during your off periods.  That's --

24            okay, I can deal with that.

25    Q       If you went home on the weekends after the Super
```

Kurtis N. Poulos

1      Bowl, was dinner --

2   A   They pretty --

3   Q   -- required on Saturday?

4             (Interruption by the reporter.)

5   Q   I asked if there was dinner on Saturdays.  I don't

6       know if this is a Saturday, but my question is you

7       said you went home on the weekends.  So I assume, you

8       know, that is a Saturday, or I assume that any

9       weekend is a Saturday.  So that's why I asked

10      because --

11  A   No, because --

12            MS. DOUGHERTY:  Objection.

13  A   -- we weren't required to go to dinner.  That's why

14      I'm confused.  We weren't required to go to

15      breakfast -- oh, we were required to show up for

16      dinner.  We weren't required to stay and eat whatever

17      it was they were serving.  So I would typically on

18      those nights, if I didn't feel like putting on a

19      sport coat, a tie, dress slacks, dressing up, walking

20      over to the dining hall and sitting down for a meal I

21      had no intention on eating, I would just stay in my

22      dorm, either order a pizza or wait until the grill

23      opened and walk over there and get a burger.  I

24      basically stopped eating almost every meal my senior

25      year at that school.  That's why I started going to

```
 1          buy my own groceries.

 2   BY MR. JUBB:

 3   Q    And what was the reason --

 4   A    Because the idea -- yeah, the idea of sitting around

 5        500 people and listening to them scrape forks off

 6        their teeth became utterly disgusting to me.  Just so

 7        you guys know, my laptop battery is at 31 percent and

 8        I do have to go at some point and walk my dog.

 9   Q    How far away is your apartment?

10   A    30 minutes.  And I'd like to eat lunch.

11   Q    If you need a lunch break, that's a different story.

12        If we broke for an hour, it's just going to, you

13        know, drag it on a little bit.  But if you need a

14        break, I get it.  Is there anyone that can walk your

15        dog for you?

16   A    No.  I'm the only one who has a key to my apartment,

17        and the only one that Clifford will let in the

18        apartment without me there.

19   Q    And when did you leave him?

20   A    I left him at, like, 8:30 this morning.

21   Q    Okay.  Then why don't we just get through one more

22        thing and then we can break so that you can go home

23        and let your dog out.  And then we can plan to come

24        back thereafter and then I guess just take a break.

25        And, Candi, are you okay with that?
```

```
 1                    MS. DOUGHERTY:  That's fine.  I just had a

 2          question for Mr. Poulos.  Do you have your charger

 3          for your -- whatever you --

 4                    THE WITNESS:  It's at home.  It's at home.

 5          So I can shut down my laptop.  I can let my phone

 6          cool down because I'm getting temperature warnings

 7          on my phone.

 8                    MR. JUBB:  Okay.  Then why don't we do

 9          this.  Candi, if it's okay with you, why don't we

10          break now so that the witness can go home, let his

11          dog out, grab his computer charger.  And then,

12          Mr. Poulos, I would just say that you're still under

13          oath and you're not permitted to discuss your

14          deposition with anyone.  Okay?

15                    THE WITNESS:  That's fine.

16                    MS. DOUGHERTY:  And how long are we

17          breaking for?

18                    MR. JUBB:  I would like to -- he said it's

19          a half hour a way.  So I think, unfortunately, an

20          hour.  Mr. Poulos, can you get here within an hour

21          and ten minutes?

22                    THE WITNESS:  I can get back here by 2 my

23          time.

24                    MS. DOUGHERTY:  Okay.  And he wants to

25          eat.  Right?
```

Kurtis N. Poulos

```
 1                    THE WITNESS:  Well, I mean, I can --

 2                    MS. DOUGHERTY:  Can you eat at the same

 3          time?

 4                    THE WITNESS:  Yeah, I can put something to

 5          the side and take, like, small bites.

 6                    MR. JUBB:  Okay.  Then if that's okay with

 7          Jeff as well as our lovely court reporter as well as

 8          Ms. Dougherty, then why don't we break now.  And,

 9          Mr. Poulos, if you could get back as quickly as

10          possibly and just re-click that link and sign back

11          in to let us know you're available, then we could

12          start working through it.  Okay?

13                    THE WITNESS:  All right.  I appreciate it.

14          I'll take to you guys in about 45 minutes.

15                    VIDEOGRAPHER:  So we are now going off

16          record.  The time is 1:17.

17                    (Recess taken from 1:17 to 2:10 p.m.)

18                    VIDEOGRAPHER:  We are now back on the

19          record.  The time is 2:10.  You may continue.

20     BY MR. JUBB:

21     Q    Thank you.  Mr. Poulos, during the break, it's my

22          understanding that you had gone home to where you

23          currently reside.  Is that correct?

24     A    That's correct.

25     Q    And where you're currently located, is there anybody
```

```
 1        else with you there?

 2   A    Just Clifford, my dog.

 3   Q    What type of dog?

 4   A    Yeah.

 5   Q    What type of dog?

 6   A    He's half pit, half retriever, or lab.

 7   Q    Okay.  So I believe when we left off, we were

 8        discussing the few things pertaining to the latest

 9        exhibit, which I believe was your sixth -- was it

10        your sixth form demerits?  Does that sound about

11        right?

12   A    Sounds about right.

13   Q    I'm going to show you a couple of things to see if

14        they refresh your recollection.  Can you see that?

15   A    Yeah.  That's Jason Eiserman.

16             MS. DOUGHERTY:  Does this have a Bates

17        label?

18             MR. JUBB:  No.  No.  These are just --

19        let's just call this P100, I guess.

20   Q    Is Mr. Eiserman the gentleman who you just testified

21        to lived across the hall from you your sophomore

22        year?

23   A    Correct.

24   Q    And that's going to be P100.1.  Do you recognize this

25        person?
```

Kurtis N. Poulos

```
 1    A    No.

 2    Q    It's going to be P100.2.  Do you recognize this

 3         person?

 4    A    I recognize the face.  I couldn't tell you his name.

 5         I didn't hang out with him.

 6    Q    It's P100.3.  What about this person?

 7    A    Yeah.  That's Kent Andres.

 8    Q    We discussed previously --

 9    A    I see --

10              (Interruption by the reporter.)

11    A    I follow him on LinkedIn.

12              MS. DOUGHERTY:  And him -- can you just

13         repeat his name.

14    A    Kent Andres.

15              MS. DOUGHERTY:  Thank you.

16    BY MR. JUBB:

17    Q    K-E-N-T is what you're saying, right, Mr. Poulos?

18    A    Correct.

19    Q    And you said you actually reached out to him

20         occasionally?

21    A    No, I've never reached out to him.  I just saw him on

22         LinkedIn.

23    Q    That's going to be P100.4.  Do you recognize this

24         person?

25    A    No.  I recognize -- I mean, there was 94 of us.  So,
```

Kurtis N. Poulos

```
 1        I mean, the face is recognizable, but I couldn't tell
 2        you his name.
 3   Q    That's P100.5.  The next is P100.6.  Do you recognize
 4        him?
 5   A    Yeah.  It's Lance Whitlock.
 6   Q    Who is Lance again?
 7   A    Lance actually was one of the kids who had a single
 8        on the same floor as I did.
 9   Q    For your senior year?
10   A    Yeah.
11   Q    P100.7, who is that?
12   A    I recognize the face.  I couldn't tell you his name.
13   Q    P100.8, do you know who this is?
14   A    No clue.
15   Q    What about him?
16   A    Recognize the face, but I couldn't tell you his name.
17        I mean, these all are senior portraits.  So everybody
18        looks somewhat familiar.
19   Q    In any of the photos that I just showed you, P100.1
20        through 100.9, the names that came up were Jason
21        Eiserman as 100.2, Kent Andres as 100.3 and Lance
22        Whitlock as 100.6, do any of these photos refresh
23        your recollection as to whether or not any of these
24        students were in your geometry class during your
25        sophomore --
```

```
 1    A    I think that last --

 2              MS. DOUGHERTY:  Hold -- object.  I was

 3         going to object.  He wasn't done with his question,

 4         though.

 5    A    Yeah, finish your question.

 6              MS. DOUGHERTY:  Because -- Lane, just so

 7         you know my object -- I think you may have misspoken

 8         that Kent Andres was a different number than what

 9         you said in your question.  That was going to be my

10         objection.  So if you're going to ask the question

11         again, I just wanted to point it out to you.

12              MR. JUBB:  Okay.  I have Kent Andres as

13         100.4.  What do you have?

14              MS. DOUGHERTY:  That's what I have, but I

15         think you said 3 in your question.

16              MR. JUBB:  Thank you.  I'll correct that.

17    Q    Mr. Poulos, with respect to any of these photos that

18         I've shown you which I've marked as P100 where you

19         recognize P100.1 as Jason Eiserman, 100.4 as Kent

20         Andres, and 100.6 as Lance Whitlock, where the others

21         you could not identify by name, do any of them appear

22         to have been in your fourth form year geometry class?

23    A    No --

24    Q    I would be happy to keep scrolling through.

25    A    No.  I'm horrible with faces and names.  I stated
```

```
 1            that earlier.  I remember them because Kent was a
 2            local student, he was a star soccer player, and he
 3            and I worked out together, and his mom had me over
 4            for dinner.  I mean, it's all situational that I
 5            recognize these people.  It's not because of that
 6            class.  It's because of my proximity to them and the
 7            rest of school.
 8    Q     Had you had -- strike that.  Am I correct, though,
 9            that these were all students in your grade?
10    A     For the most part, I believe they all were.  Then
11            again, some of those -- see, the hard thing is, Lane,
12            for you to ask me a question like that because I
13            don't recognize their name, I sort of recognize their
14            face.  And they're all wearing our senior blazer and
15            our school tie.  So those pictures could have been
16            from 1990 or 1994 and I would have known them when I
17            was a freshman and they were a senior.  It's hard to
18            differentiate just given the fact that they're all
19            just senior pictures.  I mean, that's the only
20            problem I have with that lineup.
21    Q     I'm just trying to understand something.  All of
22            these photos are -- I think what you're saying is
23            they have -- everybody is kind of wearing the same
24            coat and tie; is that fair?
25    A     Oh, no, not kind of.  They're wearing our senior
```

Kurtis N. Poulos

```
 1        blazer which would have the school crest in it and a

 2        blue and silver striped tie.

 3   Q    Right.  But are you saying that you have a hard time

 4        differentiating their faces or recognizing them?

 5   A    Like, he looks like somebody -- go back one.  He

 6        looks like somebody that I thought graduated with my

 7        cousin.  But, again, I can't tell because I don't

 8        remember all of them.

 9   Q    And that's fine.  I'm just trying to understand what

10        you can recall.  So just -- we've already gone

11        through and you've identified certain folks.  I'm

12        just going to focus on the three that you could

13        recognize.  So with respect to Mr. Eiserman, did you

14        have any --

15              MS. DOUGHERTY:  Lane, before you go on,

16        just to identify for the record, when Mr. Poulos

17        said go back one, he was directing you to P100.2.

18              MR. JUBB:  That's correct.

19   Q    And, Mr. Poulos, just confirm for us, you were

20        referring to P100.2, correct?

21              MS. DOUGHERTY:  We can't hear you.

22   BY MR. JUBB:

23   Q    We can't hear you, Mr. Poulos.  Can you try talking

24        again for us, Kurtis.

25   A    I said I thought he graduated a year ahead of me, but
```

```
 1            I could be mistaken.

 2    Q    Okay.  And with respect -- and, again, Ms. Dougherty,

 3         that was 100.2 he was referring to in that regard.

 4         So focusing on those that you did recognize, 100.1

 5         being Mr. Eiserman --

 6    A    Eiserman.

 7    Q    Eiserman, did you have any friendly relationship with

 8         Mr. Eiserman during school?  Your audio is out again.

 9         Can anybody hear me?

10              MS. DOUGHERTY:  I can hear you.  I can't

11         hear him.  I'm just trying to get his attention.

12    A    -- as a hall --

13    Q    Hold on, Mr. Poulos.  You've been talking and none of

14         us can hear you.  So you're going to have to get

15         closer to the microphone.

16    A    Do you want me to use the microphone on my phone or

17         on --

18    Q    I'll tell you what.  Just bring the laptop closer to

19         you, it might pick up what you're saying.  Or you're

20         welcome to call in and we can go off the record.

21         It's up to you.

22    A    I'm just going to dial in.

23              MR. JUBB:  Okay.  We can go off the

24         record.

25              VIDEOGRAPHER:  We are now going off
```

```
 1            record.  The time is 2:21.
 2                      (Discussion off the record.)
 3                      VIDEOGRAPHER:  We're back on record.  The
 4            time is 2:23.  You may continue.
 5                      MR. JUBB:  Thank you.
 6    Q    Mr. Poulos, I'm going to show you Mr. Eiserman's
 7            photo again just to try and refresh your recollection
 8            here for the purpose of my next question.  Were you
 9            friendly or in any way consider yourself friends with
10            Jason Eiserman during your sophomore year?
11    A    Jeremy Eiserman, and no, other than that he lived
12            across the hall from me.
13    Q    Have you had any discussion with Mr. Eiserman after
14            you graduated?
15    A    I haven't spoken to anyone from school since then.
16    Q    With respect to P100.4 who you identified as Kent
17            Andres, have you had any discussion with Mr. Andres
18            since you graduated from school?
19    A    Absolutely none.
20    Q    Did you consider yourself to be friends with
21            Mr. Andres at any time during your time at The Hill
22            School?
23    A    Yes, I did.
24    Q    Did you ever live with him?
25    A    No.
```

```
 1    Q    Did you -- strike that.  Now, this is P100.6 who you
 2         identified as Lance Whitlock.  Did you consider
 3         yourself --
 4    A    Yes.
 5    Q    -- to be friends with Mr. Whitlock when you were at
 6         The Hill School?
 7    A    We were friends.  I mean, he allowed me to go to his
 8         house I think on one long weekend.
 9    Q    While you were at school?
10    A    Yeah.
11    Q    Have you ever had any discussions or contact with
12         Mr. Whitlock after graduating?
13    A    About this instance, no.
14    Q    No, I'm sorry.  My question is period.  And were
15         you --
16    A    Oh, yeah.
17    Q    I'm talking -- let me back up.  When you were
18         answering my questions pertaining to Mr. Eiserman and
19         Mr. Andres, when I asked you about contact with them
20         since graduating, am I correct you haven't had any
21         contact with them whatsoever, not just as it relates
22         to this?
23    A    None whatsoever.
24    Q    Thank you.  And then with respect to Mr. Whitlock,
25         have you had any discussions with him after
```

```
 1       graduation?

 2   A   Yes.

 3   Q   Okay.  And when were you friendly with him after

 4       graduation?

 5              MS. DOUGHERTY:  Objection, form.

 6   A   Right around 9/11.  I went out to Ocean City,

 7       Maryland.  The following summer.

 8   BY MR. JUBB:

 9   Q   You say 9/11, you're referring to September 11th?

10   A   Correct.  That following summer I went out.

11   Q   You graduated in 1997, though, correct?

12   A   Correct.

13   Q   And 9/11 occurred in 2001, though, right?

14   A   Correct.

15   Q   Okay.  So the following summer would have been the

16       summer of '98 which was three years -- four years

17       before 2001.

18              MS. DOUGHERTY:  Objection.

19   A   Like I said, I didn't speak to him until after 9/11.

20       And I couldn't tell you how I ended up in contact

21       with him, but I did go out and visit Ocean City,

22       Maryland.

23   BY MR. JUBB:

24   Q   Okay.  I think I understand what you're saying.  What

25       you're saying is following graduation you didn't have
```

```
 1           any contact with Mr. Whitlock; however, around the

 2           time of 9/11 or shortly thereafter, you went to visit

 3           him; is that correct?

 4    A      Correct.

 5    Q      And you believe that's approximately 2001; is that

 6           right?

 7    A      No, it would have been the following summer.  So

 8           2002.

 9    Q      Okay.  And seeing that you hadn't had any sort of

10           contact with him following graduation, how was it

11           that you reached out to Mr. Whitlock?

12    A      Honestly, I do not remember how I got in touch with

13           him.  I mean, that was 18 years ago.

14    Q      Do you recall how long you were in contact with

15           Mr. Whitlock?

16    A      A couple of years.

17    Q      After 2002?

18    A      Yeah.

19    Q      Did he ever visit you in Wisconsin?

20    A      No.

21    Q      Did you ever visit him again after 2002?

22    A      Yeah.  I went and lived out there for a short period

23           of time.

24    Q      And when you say out there, where are you referring

25           to?
```

```
 1    A    Ocean City, Maryland.

 2    Q    So following 2002, you lived in Ocean City, Maryland?

 3    A    For less than a year.

 4    Q    Were you working at that time?

 5    A    Yeah.  I was working for Secrets Bar & Grill.

 6    Q    In 2002, had you graduated from college?

 7    A    No.  I dropped out of college.

 8    Q    And forgive me, where did you go or attend

 9         university?

10    A    Marquette University.

11    Q    And so in 2002, you had gone down to work at Secrets

12         in Ocean City, Maryland, and you were staying with

13         Mr. Whitlock?

14    A    Yeah.  He had a condominium.

15    Q    Did you maintain any sort of friendly relationship

16         with Mr. Whitlock for those, let's say, five years or

17         so between the time you graduated The Hill School and

18         the time you went down to stay with him when you were

19         working at Secrets?

20    A    Not really.  I mean, no.

21    Q    I'm sorry -- okay.  You said no?

22    A    No.

23    Q    Following 2002, am I correct that you haven't had any

24         contact with Mr. Whitlock?

25    A    It would be more like 2004.
```

Kurtis N. Poulos

```
 1   Q    Okay.  So from at least 2002 to 2004 you still had
 2        the relationship with Mr. Whitlock; is that fair?
 3   A    Yeah.  I just explained to you I was living in his
 4        condominium.
 5   Q    Mr. Poulos, were you living in his condominium
 6        between 2002 and 2004?
 7   A    Yes.
 8   Q    Okay.  So following 2004, why did you move back home?
 9   A    Because Salisbury, Maryland, and Ocean City,
10        Maryland, there's nothing to do except when you're
11        there in the summer.  There's like, 7,000 people that
12        live in that town.  It's miserable.
13   Q    Were you working at Secrets that entire time between
14        2002 and 2004?
15   A    Yes.
16   Q    And why did -- after you -- strike that.  So
17        eventually you determined that you were going to go
18        back to where, Wisconsin?
19   A    Correct.
20   Q    And you said that was because of the lack of --
21   A    I just didn't want to be out there anymore.
22   Q    Did you ever return?
23   A    No.
24   Q    Have you spoken with Mr. Whitlock since 2004?
25   A    Nope.
```

```
1    Q    Any particular reason?

2    A    No.

3    Q    Who's this guy?

4    A    That's me.

5    Q    And in this photo here, I imagine that's your car?

6    A    Correct.

7    Q    Is that the car that you brought to The Hill School?

8    A    It is.

9              MS. DOUGHERTY:  Is there a Bates number

10        for this?

11   BY MR. JUBB:

12   Q    In this photo below, are you in this photo?

13   A    No.  I took that photo when I was living in France.

14        Those were some of the students I went to France

15        with.

16             MS. DOUGHERTY:  Is there a Bates label for

17        what we're looking at?

18             MR. JUBB:  There is, Candi.  I apologize.

19        It's P6.23.

20   Q    And, Mr. Poulos, am I correct this is -- P6.23 is

21        your senior page in your yearbook?

22   A    Correct.

23   Q    As part of your page, you've included photos of

24        individuals who you met in France during your time in

25        junior year; is that right?
```

```
 1   A    Incorrect.  Those are one student from Marquette
 2        University High School and the three young ladies
 3        attended Divine Savior Holy Angels which is a private
 4        all-girls school.
 5   Q    All of those students are Americans; is that right?
 6   A    Correct.
 7   Q    Do you keep in touch with any of them?
 8   A    No.
 9   Q    With respect to the top line here where it says "It's
10        a Zwerner - T. Ruth," is that Tom Ruth?
11   A    Yeah.
12   Q    What's this Zwerner?
13   A    My cousin.
14   Q    Can you explain the context of this line and why it's
15        in your yearbook, please.
16   A    Because he had my cousin as a student; and when I was
17        sitting at Mr. Ruth's table, I did something that he
18        said reminded me of my cousin.  So he just started
19        calling me Zwerner.  Or saying you are --
20   Q    Did you -- I'm sorry if I interrupted you.
21        Mr. Poulos, was that a nickname that you held
22        throughout high school?
23   A    No, never.  It was just a joke.
24   Q    All right.  I'm showing you what's been marked
25        already as P6.26 which is the sixth form.  It says
```

```
1          here -- and I will represent to you this is the
2          senior year same book.  You said you were in Foster,
3          correct?
4     A    I thought so.  It's the only dorm I remember.  I
5          would have been on the first floor.
6     Q    Do you see your name in that photo for the first
7          floor Foster?
8     A    Then Foster was the other one -- or my dorm was the
9          other one.  Because Kent lived in first floor Foster
10         and I just saw his name.  I didn't live in the same
11         dorm as him.  So whatever the other senior dorm was.
12         I honestly haven't looked or thought about this
13         school in so long.  So, yeah, I lived in Rolfe.
14              MS. DOUGHERTY:  I have a -- before you ask
15         the next question.  Mr. Poulos, I don't think you
16         can smoke during your videotaped deposition, this
17         being a court proceeding.
18    A    Okay.  Go ahead.
19    BY MR. JUBB:
20    Q    Mr. Poulos, are you in the photo that is on page
21         P6.26 next to 1 Rolfe?
22    A    I think that's me standing in the back.
23    Q    This guy?
24    A    Yeah.  I think -- I can't tell.  I know I had long
25         hair at the beginning of the year.  Nope, that's not
```

```
1         me.  Oh, there I am with the hat on.

2    Q    Okay.  So why don't you walk me through who some of

3         these people are, if you can.  I imagine these --

4    A    The only one I recognize is Lance Whitlock.

5    Q    And Lance is where?

6    A    In the white sweatshirt with the hat on backwards.

7    Q    That's Lance (indicating).  Is that correct?

8    A    Yeah.

9    Q    Thank you.  And do you recall Mr. Bluestone at all?

10   A    I don't remember anybody else in that photo.

11   Q    Do these names ever ring any bell to you, Bluestone,

12        Brady, Conole, tell me to stop if anything rings a

13        bell.  Gulbrandsen, Hatfield, Hylbert, Kang,

14        Martinez, Park, Saxl, Ward, White, and obviously you

15        know Lance Whitlock.  Any of those names ring any

16        bell to you?

17   A    I remember the last name, what was it, Gulbrandsen?

18   Q    Yeah.

19   A    I recognize the last name, but I couldn't tell you

20        who he is in that picture.

21   Q    Okay.  Did you have any memories of being friendly

22        with these guys?

23   A    I mean, Lance and I would hang out once in a while.

24        You have to remember, we didn't really address each

25        other by last name.
```

Kurtis N. Poulos

```
 1   Q   But you all lived together at night after school,

 2       right?

 3   A   Yeah, for the most part.  I mean, we were seniors; so

 4       we could leave, come and go as we pleased.

 5   Q   Did some of these kids go to school with you for four

 6       years in a class of 90?

 7   A   In the last of what?

 8   Q   You said there was a class of 90, 96 I believe.

 9   A   I would assume that some of them were in classes with

10       me in 1995 when I still was attending there.  But I

11       wasn't in attendance in 1996.

12   Q   Oh, I'm sorry, a class of 96.  I thought you were

13       referring -- when you said 96 before, I thought you

14       were referring to the class size, as to how many

15       people.

16   A   Oh, yeah.  There was only about 94 or 95 people in

17       our entire class, in our graduating class.

18   Q   Okay.  I'm showing you what is marked as P16.53,

19       which is a letter dated August 7th, 1996.  It appears

20       to be from the associate headmaster, Harry Price.

21       And in this letter directed to you, I'll read

22       portions of it for you, but it says, "To ensure a

23       good start here, you should get in touch with

24       Mr. Ralston or Mrs. Colegrove to alert him or her to

25       your return and to work out your course selections."
```

1      Did you contact either one of those people?

2   A  I think I talked to Mr. Krueger.

3   Q  And why is that?

4   A  Because Mr. Krueger, if I remember correctly, was the

5      head of discipline and I wouldn't have called

6      Mr. Ralston.  And I don't remember a Ms. Cosgrove --

7      or Colegrove, I can't...

8   Q  In other words, what you're saying is you -- in

9      getting this letter, you contacted Mr. Krueger right

10     here to let him know your plans?

11  A  Correct.

12  Q  But you would not have contacted Mr. Ralston?

13  A  No.

14        (Interruption - Mr. Poulos talking to dog.)

15  Q  Mr. Poulos, I'm going to show you what's been marked

16     as P16.62.  The date on this appears to be a fax

17     dated August 8th, 1996.

18  A  Yeah.  It was faxed to my mother's office.

19  Q  Well, this is a letter that was written to

20     Mr. Ralston from you.  Fair enough?

21  A  I don't remember writing that.

22  Q  Whose signature is that at the bottom?

23  A  Mine.

24  Q  Okay.  Again, that's P16.62.  For purposes of the

25     record, I am pulling up P16.42.  Mr. Poulos -- for

```
 1          purposes of the record, this is P16.42.  It is a

 2          letter from Martin Lodish directed to your mom,

 3          referring to you, obviously.  And in here, Mr. Lodish

 4          in 1996 December refers to your time at The Hill

 5          School.  And specifically, he writes here in the

 6          second paragraph, "This past term was a difficult one

 7          for Kurt.  He had some significant rules violations

 8          at the beginning of the term as he readjusted the

 9          life at The Hill.  Also, the incident at home over

10          the holiday weekend upset him greatly.  He rarely was

11          smiling when I saw him about campus.  He was not

12          interacting with many of the other boys here.

13          Recently Kurt seems to be a little bit happier, and

14          Alberto Romero, his hall parent, tells me that he has

15          been hanging out with another sixth former named

16          Lance Whitlock.  Also, Kurt has begun to open up to

17          me."

18                   When he wrote this in approximately

19          December 1996 and he's referring to the incident at

20          home over the holiday weekend upset him greatly, do

21          you know what incident or have an idea as to what

22          incident he's referring to?

23     A    Holiday weekend?  No.

24     Q    Was there anything going on at home during this time

25          frame that was causing you to be upset?
```

```
 1   A    Not to my recollection.  But, again, that's 33 years

 2        ago -- or 23 years ago.

 3   Q    Was there any -- in this time frame, December of '96,

 4        did you have a relationship with your dad at this

 5        point?

 6   A    I had some sort of relationship.  Maybe that was --

 7        maybe I got into an argument with him over something.

 8        I don't know.  It might -- it could have been

 9        something really small that really upset me.  I -- I

10        have no recollection.

11   Q    When you were at Hill and these letters were getting

12        sent to your mom, did she have occasion to share them

13        with you?

14   A    No.

15   Q    Would she bring to your attention some of your

16        teachers' and advisors' concerns?

17   A    Not really.  I mean, when I was home on break, I was

18        never really home.  You know --

19   Q    What do you mean by --

20   A    You know, as soon as I got home, I got in a car and I

21        went and saw my friends from Milwaukee and hung out

22        with them.

23   Q    Okay.  I'm going to show you what's been marked as

24        P16.42 and P16.43 [sic].  Mr. Poulos, this is dated

25        April 23rd, 2016.  It says, "Dear Hill School alumni
```

```
 1          and parents."

 2                  MS. DOUGHERTY:  Lane, just -- Mr. Jubb,

 3          can you repeat the Bates label because I had the

 4          last one and P16.42.  This is 242.  Okay.  I see.

 5          So it's --

 6   BY MR. JUBB:

 7   Q      Mr. Poulos, am I correct, did you ever receive this?

 8   A      I think I received it in an email.

 9   Q      And at the time you were getting emails from the

10          school as an alumni generally; is that fair?

11   A      Correct.

12   Q      And in response to this email dated April 23rd, 2016,

13          you said that you printed this out in your apartment

14          that you lived with -- with Emily at the time, right?

15   A      Correct.

16   Q      And what did you do with it after you printed it out?

17   A      I had a file folder.

18   Q      Do you still have that file folder?

19   A      I've got a bunch of file folders in my office here at

20          my house.  Mostly with documents from you.

21   Q      But you had a file folder before I ever filed a

22          lawsuit against you, so do you still have that file

23          folder or is it the same one?

24   A      No.  That was more of, like, it wasn't necessarily a

25          file folder pertaining to the school exactly.  It was
```

```
 1          more personal items like my birth certificate,
 2          anything I might need while I'm living in Connecticut
 3          that I wouldn't have easy access to, like the deed to
 4          my car -- or the title to my car I should say.  I --
 5          you know, I needed to have a hard copy of that in
 6          case I needed to sell my Audi when I was living in
 7          Connecticut, or reinsure it, which I ended up having
 8          to do.  So I had a folder with documents pertaining
 9          to me from -- like I said, my birth certificate, any
10          lease information, stuff like that, just important
11          documents.
12    Q     Do you still maintain --
13    A     Tax returns, et cetera.
14    Q     Do you still maintain that folder?
15    A     I maintain a few folders.
16    Q     Do you maintain the folder in which you placed this
17          document?
18    A     Yeah.  It's just a lot bigger now.
19    Q     I'm showing what's been, previously marked as P16.237
20          and P16.238 and P16.239.  So a letter dated
21          November 20th, 2017, from Zachary Lehman from --
22    A     Can you stop scrolling when you get to the area with
23          the highlighted blue letters.  Yeah, that's the
24          paragraph I'm most concerned with.
25    Q     Okay.  And when did you become concerned with this
```

```
 1        paragraph?
 2   A    I received that letter.  I forwarded it -- or that
 3        email.  I forwarded it to my mother and said do you
 4        think I should reach out not to Zachary Lehman, but
 5        to the protection experts, their child protection
 6        experts, Leslie Gomez and Gina Smith.  In no way do
 7        they state that they are attorneys.
 8   Q    Okay.
 9   A    And you know --
10   Q    Did you contact them?
11   A    No.  I contacted my mother who did some research,
12        thankfully, and found out that they were attorneys
13        for The Hill School.  So the letter to me was sent
14        under false pretenses.
15   Q    What type of lawyer is Leslie Gomez?
16   A    I have no idea.  I just know she's an attorney.
17   Q    Do you know what Gina Smith does?
18   A    No idea.  But nowhere does it say that they are
19        attorneys at law.  It says they are child protection
20        experts.
21   Q    Did you look up their bios online?
22   A    I did not.  My mother did.
23   Q    Did you see the other link where it says research dot
24        net?
25   A    I never followed -- I never went anywhere past that
```

```
 1        email once she said do not contact them.  I never

 2        connected -- or clicked on any of the hyperlinks, I

 3        never emailed them directly, I never emailed Zachary

 4        Lehman directly.  I had nothing to do with any of

 5        those hyperlinks.  That's why I wanted to point out

 6        that paragraph.

 7   Q    I see.  But your mom told you don't contact them?

 8   A    She -- correct.

 9   Q    Okay.  So at that point in time, by November 20th,

10        2017, what had you told your mom to be the basis for

11        asking her if you should contact any of these people?

12   A    Well, she had already had me contact an attorney

13        prior to 2014 to see if there was any legal recourse.

14        There was not.  So I had started to move on with my

15        life after I got out of my coma.  I never --

16   Q    So --

17   A    I never asked to be sent these specific emails.  I

18        was never, like, were there improprieties, please let

19        me know who I can contact.  These were emails sent to

20        me unsolicited by the school to get information from

21        previous students.  I was intending on reaching out

22        to them and seeing if they could offer some sort of

23        mental health aide.  And that's when I was informed

24        that they were not child protection adversaries or

25        experts, I should say.  They were instead attorneys
```

```
 1        representing the school; and to me and my mother, we
 2        believe under false pretenses they wanted us to call
 3        the school, tell them what happened.  And I then was
 4        like, no, I'm not going to do that.
 5   Q    So prior to 2014, your mom had told you that you
 6        should contact an attorney; is that right?
 7   A    Yes.  I had become very depressed, my drinking had
 8        gotten excessive.  And I finally confided in to
 9        her -- to her what had happened, you know.  And she
10        had me contact an attorney out in Philadelphia who
11        just said unfortunately, statute of limitations are
12        way past due; you know, I wish you the best; if
13        anything changes, please get in touch with me.  But,
14        like I said, I had moved on until the school started
15        soliciting information.
16   Q    Prior to -- and forgive me, I just want to get -- you
17        say prior to 2014.  But I understand that to mean
18        during '14, because you had mentioned that something
19        had happened in '14.  So is there any way that you
20        could try and narrow down for me an approximate time
21        frame?  Like, when you say prior to 2014, is there a
22        month, is there a date, is there something that
23        sticks out in your mind?
24                 MS. DOUGHERTY:  Objection.
25   BY MR. JUBB:
```

```
 1   Q   Mr. Poulos?

 2   A   Please ask the question again.  You're fading in and

 3       out.

 4   Q   Sure.  My question was -- you mentioned that in

 5       approximately 2014 or prior to 2014 when your mom

 6       told you to contact an attorney in Philadelphia.  My

 7       question was are you able to give me a more specific

 8       time frame than simply around that 2014?  Is there a

 9       month or a date that sticks out in your mind?

10   A   It would have been sometime I believe in the spring

11       or the summer because I was sitting outside on the

12       porch.  And obviously being Wisconsin, I'm not doing

13       that in the middle of winter.

14   Q   And in this time frame, did you -- who did you tell

15       her was -- strike that.

16               When you had this conversation with your

17       mom, tell me what you told her.

18   A   I told her that there was an impropriety, that part

19       of my demeanor change that she had noticed back in

20       high school, that multiple people in my family had

21       noticed, was a result of what had happened with a

22       teacher.  And I didn't even have to tell her which

23       teacher.  She guessed it.

24   Q   How did she guess it?

25   A   Because she could tell the way I behaved around him
```

Kurtis N. Poulos

```
 1        versus other teachers.  And especially the way he
 2        intimidated me even as a senior by trying to keep me
 3        from spending time with my family which he had no
 4        right to do.  And to go back a step, I did tell one
 5        teacher that night.  I told Mr. Romero what had
 6        happened.  And he said I know you have permission to
 7        use that car.  Why did he do that?  And I said I
 8        don't know, but I'm going to be staying here.
 9        Because I had to check back into the dorm.  As far as
10        Mr. Romero knew, I wasn't going to be spending the
11        night in the dormitory that night.  I had signed off
12        campus for the rest of the weekend to stay at the
13        hotel.  So I -- remember, part of our duty or his
14        duty is to know who's in his dorm when he's on duty.
15        I had to wake him up -- or, you know, get him to come
16        up to his door and advise him that I would be
17        spending the night in the dormitory by myself, and he
18        asked why.  And I told him because the plaintiff has
19        parked me in and is refusing to move his vehicle
20        until the following morning.
21   Q    At the time of the vehicle incident, was there a rule
22        that when you leave with your car you're not allowed
23        to come back until Sunday?
24   A    Not to my recollection.  And even if that was a rule,
25        again, it was my property, I was the one paying my
```

```
 1          tuition, not my parents.  And I was 18 years old.  If
 2          I'm allowed to vote at 18, I should be able to decide
 3          if I can run into my dorm room, get my overnight bag
 4          which was already packed, and leave again without
 5          being harassed.
 6     Q    Was there any rule that precluded you from parking on
 7          campus?
 8     A    Again, no.  If I was there parking with my mother,
 9          nothing would have happened.
10     Q    Did you get in trouble for that?
11     A    Did I?
12     Q    Yes, sir.
13     A    No, I did not get in any trouble because I had
14          authority to use my vehicle to pick up my mother, use
15          it for the weekend, return it to my assigned parking
16          spot behind the Performing Arts building on Sunday
17          night, and then return my keys to the Dean of
18          Discipline I think through the mail slot in his door,
19          or maybe the following morning.
20     Q    All right.  I'm showing you what has been marked as
21          P16. -- excuse me, this has been marked as P16.219
22          and P16.220.  And this is a letter dated April 11th,
23          2018, to Zachary Lehman with the Law Offices of
24          Mitchell Garabedian at the top.  Prior to being sued,
25          had you ever seen this letter before?
```

Kurtis N. Poulos

```
 1    A    I can't read it.  All I see is his signature.

 2    Q    Okay.  April 11th, 2018, had you seen this letter

 3         prior to being named a defendant in a lawsuit?

 4    A    Not to my knowledge.

 5    Q    In here, it states that you were repeatedly sexually

 6         molested by Mr. Ralston approximately 1993, when you

 7         were 15 years of age -- years of age, until

 8         approximately 1995 when he was approximately 17 years

 9         of age.  Was this information that you had intended

10         for The Hill School to learn?

11    A    Through proper legal counsel.

12    Q    In other words, this was information you wanted to

13         relay to the school?

14    A    Candi?  I mean --

15    Q    Are you looking to Ms. Dougherty for help?

16    A    I'm just wondering if she has any objections to my

17         answering this.

18    Q    Mr. Poulos, you have a question to answer, and

19         Ms. Dougherty is well aware of what she's able to

20         object to.

21    A    Okay.

22    Q    My question was very simple.  So, Ms. Bayer, if you

23         could --

24    A    I was not aware --

25                   MS. DOUGHERTY:  Hold -- why don't -- hold
```

```
 1          on a second.  Why don't you ask the question that
 2          you want him to answer again.
 3                    MR. JUBB:  Which was my original -- if
 4          Ms. Bayer could read that back, that would be great.
 5                    MS. DOUGHERTY:  I apologize.  I didn't
 6          realize that's what you were doing.
 7                    (Question read by the reporter.)
 8                    MS. DOUGHERTY:  I thought that there was
 9          an answer.
10                    (Portion of record read.)
11   BY MR. JUBB:
12    Q     Mr. Poulos, are you going to answer that question?
13    A     Like I said before, this was information I did want
14          to be made aware to the school through proper
15          channels, meaning their legal counsel.
16    Q     Did you intend to tell Zachary Lehman of what is
17          highlighted in this document?
18    A     Not directly.  I believed that he was going to make
19          the school's legal counsel aware of the situation;
20          and then they would in turn contact the headmaster,
21          let him know that there is a student, an alumni -- or
22          alumnus that has come forward, not that he was going
23          to write a letter directly to the headmaster.
24    Q     His letter, it says Mr. Poulos's demand for
25          settlement is $1 million.
```

```
1    A    That's not true.

2    Q    Am I correct -- strike that.  Did you intend to relay

3         a demand for a million dollars to the school?

4    A    No, I did not.

5    Q    Was there ever any intention to relay a monetary

6         demand to the school?

7    A    All I initially wanted was my tuition back.  That's

8         it.  I just wanted the money that I had spent to

9         attend that school.  Nothing more, nothing less.

10   Q    I am sharing with you my screen which is a document

11        Bates stamped P16.225 through P16.226.  The date of

12        this letter is December 26, 2018.  Am I correct,

13        Mr. Poulos, that you had not seen this letter prior

14        to being named a defendant in this lawsuit?

15   A    No, I do not believe so.  If I -- the problem is at

16        that time of the year, I was preparing to move from

17        Connecticut back to Milwaukee.  So there is a chance

18        I received that in the mail, but there's a very good

19        chance I put it in my file folder to be opened at a

20        later date and never got around to it.  I never

21        imagined being named in a lawsuit.

22   Q    In this letter, there are statements in here

23        describing your relationship at the school and

24        Mr. Ralston as your geometry teacher that were

25        directed to, as you can see Mr. Rees, the school's
```

```
1        general counsel.  And in here, when you read this

2        letter after being named as a defendant, did you

3        intend to relay to the school that -- on page 2 that

4        Mr. Ralston sexually abused you in Mr. Ralston's

5        geometry classroom?

6    A   I figured it would come out when it needed to be.  I

7        wasn't going to name the plaintiff by name until

8        after things had -- I gave Mitchell his name

9        specifically.  (To dog:)  Clifford, sit down.  Sorry.

10       I wouldn't have worded it this way if I was him.  But

11       I'm not an attorney.  So me not being an attorney.

12       Like I said, I never said his name out loud to

13       anybody except to my attorney; and then later when my

14       mother knew who it was or had a feeling she knew, I

15       just confirmed who it was.

16   Q   In here it says --

17   A   But I never reached out directly to the school at any

18       time.

19   Q   In here where the letter reads, "The sexual abuse

20       consisted of, among other things, Mr. Ralston

21       fondling Mr. Poulos' penis and testicles skin on

22       skin, Mr. Ralston making Mr. Poulos fondle

23       Mr. Ralston's penis and testicles skin on skin,

24       Mr. Ralston putting his mouth on Mr. Poulos' penis,

25       and Mr. Ralston making Poulos put his mouth on
```

```
 1          Mr. Ralston's penis."  Was that information that you

 2          intended to relay to The Hill School?

 3     A    I believe so, yes.  I mean, there's some grammatical

 4          errors, but...

 5     Q    And in here, you reference that -- it says,

 6          Mr. Ralston sexually abused Mr. Poulos in

 7          Mr. Ralston's geometry classroom between

 8          approximately 10 and approximately 15 times."  As

 9          part of the letter, it indicates that the geometry

10          classroom was located at the end of a hallway and

11          that it would occur after school when the geometry

12          class was the last day of the class.  Do you see

13          that?

14               MS. DOUGHERTY:  Objection.

15     A    Yes, I do.

16     BY MR. JUBB:

17     Q    And what day of the week was it the last day?

18     A    As I stated earlier, I don't remember what days --

19          which classes were my last class of the day.

20     Q    In each of these 10 to 15 instances, did you explain

21          the extent of -- strike that.  Is it your position

22          that what's written here, that there was fondling of

23          your genitals and Mr. Ralston's genitals as well as

24          Mr. Ralston putting his mouth on his own penis [sic]

25          and Mr. Ralston making you put your mouth on his
```

```
 1        penis, was there any other details that you provided?
 2   A    No.
 3   Q    Is it your position that that occurred between 10 and
 4        15 times?
 5   A    That would be my best guesstimate.  Like I said, I
 6        tried to blank out basically everything that ever
 7        happened to me at that school.
 8   Q    And during this time frame between April 11th of 2018
 9        through December 26th, 2018, how often were you
10        communicating with Mr. Garabedian?
11   A    Little to none.  I would call and leave messages.
12        When I would finally either get him on the phone or
13        he would call me back, he would just say to stand
14        strong --
15              MS. DOUGHERTY:  Objection.
16   A    -- stay strong.
17              MS. DOUGHERTY:  Mr. Poulos, just so you
18        understand, it is my -- first of all, the question
19        to you is I think a yes-or-no question.  But it is
20        my opinion that the commentary you're about to give
21        would disclose privileged information.
22              THE WITNESS:  Okay.
23              MS. DOUGHERTY:  It is protected.  You have
24        a choice as to whether you want to disclose the
25        information or not disclose the information.
```

 1    A    Can you ask the question again then, Lane.

 2               MR. JUBB:  I will -- we're going to have

 3          to address this with the court because he

 4          specifically is referring to what did and did not

 5          happen.

 6    Q    So my question was --

 7               MS. DOUGHERTY:  Well, hold on, hold on,

 8          hold on one second.  Mr. Jubb, I agree with you that

 9          your question was asking that and I didn't see a way

10          that your question was eliciting communications.

11          But the answer then went into communications.

12          Otherwise I would have made an objection and noted

13          the comments before the answer started.  So I do

14          agree with you that, yes, your question was asking

15          what did and didn't happen.

16    BY MR. JUBB:

17    Q    Mr. Poulos, my question is between April 11th, 2018,

18          and December 26, 2018, did you have any contact with

19          Mr. Garabedian?

20               MS. DOUGHERTY:  Objection.  So it's

21          clear --

22               MR. JUBB:  Hold on.  This is getting into

23          very tricky of you advising him.  And I'm asking a

24          question that's not eliciting.  Now, I do believe

25          it's already been waived by virtue of the court's

```
 1          previous order.  I also believe it's been waived by
 2          what's occurred thus far.  And to the extent that he
 3          has a position that's contrary to yours, that's not
 4          waiving anything.
 5                    MS. DOUGHERTY:  Mr. Jubb, I'm not taking a
 6          position one way or another.  As you realize, the
 7          attorney-client privilege is important.  He is a pro
 8          se litigant.  He might not understand the ins and
 9          outs of privilege.  It is his to decide whether he
10          wants to tell you the information or not.  Your
11          question asked about what happened, and my comment
12          was going to be to clarify it so Mr. Poulos
13          understands because the comment was made previously
14          in the middle of his answer that it is -- the
15          question that you were asking him is about what did
16          and didn't happen, not about the content of
17          communications.  And it is my opinion that the
18          content of communications between Mr. Poulos and
19          Mr. Garabedian could be protected from disclosure by
20          the attorney-client privilege which is a privilege
21          owned by Mr. Poulos, and it is Mr. Poulos' choice
22          whether he wants to tell you the information or not
23          tell you the information.  And it is certainly your
24          right if he decides not to to challenge the issue
25          with the court.
```

```
1    BY MR. JUBB:

2    Q    Mr. Poulos, did you get all that?

3    A    I did.

4    Q    Okay.  So let's focus on my question very

5         specifically, and then we'll see to what extent we

6         need to get the court involved.  But let's just try

7         and get through everything first since we're now

8         getting on 4:00, and then I'll ask you a couple of

9         questions to see if we even need to get the court

10        involved based on what you're saying.

11                   So between April 11, 2018, and

12        December 26, 2018, did you have any discussions with

13        Mr. Garabedian?

14   A    Yes.

15   Q    And approximately how many times did you have a

16        discussion with Mr. Garabedian between April 11th,

17        2018, when the first letter was written to

18        December 26th, 2018?

19   A    I have no idea.

20   Q    Did you predominantly communicate by phone or by

21        email?

22   A    By phone.

23   Q    And how would you coordinate the times to speak?

24        Would they just be calls out of the blue?

25                   MS. DOUGHERTY:  Objection.  My objection
```

```
 1              is a form objection.  If you understand the

 2              question, you can answer it.

 3    A    I understand the question.

 4    BY MR. JUBB:

 5    Q    Can you answer it?

 6    A    They were mostly phone calls out of the blue.

 7    Q    The information that's contained in the December 26,

 8              2018 letter, is that information that you intended

 9              Mr. Garabedian to relay to the school?

10    A    Through proper legal counsel.

11    Q    And what do you mean by that?

12    A    Meaning he would relay to the school's attorneys, the

13              school's attorneys would work with Garabedian and

14              make the headmaster aware of the allegations.

15    Q    So you were aware that the headmaster would be made

16              aware of these allegations, correct?

17    A    Eventually, yes.

18    Q    And based on your understanding of how the school

19              worked, am I correct that you were aware that it

20              would be not only the headmaster but the people that

21              he reports to as well, correct?

22    A    The board of trustees.

23    Q    That's correct.

24    A    Yes.

25    Q    And with respect to the contact that you had with the
```

```
 1          attorney in Philadelphia in 2014 time frame who
 2          advised you that the statute of limitations had been
 3          blown, is that something that you were aware of in
 4          April of 2018?
 5                MS. DOUGHERTY:  Objection.  My objection
 6          is a form objection because it mischaracterizes your
 7          testimony, prior testimony.
 8     A    I agree.
 9   BY MR. JUBB:
10     Q    So are you objecting to my question?
11     A    I am.
12     Q    Okay.  Prior to April of 2018, you were aware of what
13          a statute of limitations was, correct?
14     A    Correct.
15     Q    What's the statute of limitations?
16     A    It is the amount of time where a crime that has been
17          committed can be prosecuted in what I believe to only
18          be a criminal court, not a civil court.
19     Q    You spoke with a civil attorney in 2014?
20     A    No.  I spoke with a criminal attorney in 2014.
21     Q    What attorney was that?
22     A    I don't recall.
23     Q    Did you come to Philadelphia?
24     A    No.  I spoke to him over the phone.  I haven't been
25          to Philadelphia for over 20 years.
```

Kurtis N. Poulos

```
1    Q    How did you select the attorney in 2014?

2    A    I did not select the attorney in 2014.

3    Q    Did your mom?

4    A    Correct.

5    Q    And your mom was a lawyer for about 40 years?

6    A    Correct.

7    Q    Showing you what is P16.228.  It's a letter dated

8         January 28th, 2019, from Mr. Garabedian to the

9         school's counsel.  In this letter, it references a

10        telephone conversation on December 21st, 2018, and a

11        recommendation that the parties agree to attend a

12        mediation.  What's a mediation?

13   A    Mediation is basically the two parties sit down,

14        discuss the case at hand; and the mediator, you know,

15        works with them to come to amicable agreement for

16        both parties.

17   Q    Were you made aware of any mediation in this case?

18             MS. DOUGHERTY:  Objection.  It is my

19        opinion to the extent the question is eliciting

20        communications between you and an attorney --

21             MR. JUBB:  It asks --

22             MS. DOUGHERTY:  -- in particular

23        Mr. Garabedian, it could be protective on disclosure

24        by the attorney-client privilege and you can decide

25        whether or not you want to disclose that
```

```
 1        information.

 2   BY MR. JUBB:

 3   Q    Did you get that legal advice, Mr. Poulos?

 4              MS. DOUGHERTY:  Mr. Jubb, it's not legal

 5        advice.  You certainly know how important the

 6        attorney-client privilege is.  I assume that your

 7        question wasn't directed to elicit attorney-client

 8        privileged communications, that you were just asking

 9        for the information which it doesn't directly ask

10        for a communication, so I assume you were not.  But

11        I want to make sure that the witness understands --

12              MR. JUBB:  Goal here is to get through --

13              MS. DOUGHERTY:  -- and doesn't disclose

14        the protected informs because he's done it once or

15        twice when you've asked him a perfectly appropriate

16        question that I don't think would have elicited the

17        protected information.  It's not legal advice.

18        It's, again, the most important privilege I think

19        that exists in the legal system and -- you know.

20              MR. JUBB:  Again, my goal here is to ask

21        questions that are -- unquestionably do not even

22        call for it.  My position is that it's already been

23        waived, and I'm trying to wait 'til the end of my

24        questions because to the extent that there are going

25        to be objections, those are the ones that need to be
```

```
 1            addressed with the court.  So what I'm trying to do
 2            is ask those questions that you acknowledge are not
 3            calling for them.  I would just appreciate that you
 4            not try and assist the witness on every single time
 5            I ask, as you said, a perfectly appropriate question
 6            how to answer those questions because that's what's
 7            being done.  So I just --
 8                 MS. DOUGHERTY:  Mr. Jubb, I'm not
 9            assisting the witness in answering.  And if I think
10            it is -- it sounds to me like you were taking a
11            position, which perhaps is a better way to deal with
12            it, to tell Mr. Poulos that your questions at this
13            time are not designed to elicit the content of
14            communications with Mr. Garabedian.  So then he will
15            know and I won't feel a need to say anything.
16       BY MR. JUBB:
17       Q   Mr. Poulos, you have the ability as a witness to
18            answer my question at the truest and accurate extent
19            possible.  If in doing that it involves you
20            discussing conversations that may be protected by the
21            attorney-client privilege, please feel free to say
22            so.  It's my position that that's already been
23            waived.  So we're going to get to those very, very
24            clear questions towards the end.  Right now I'm just
25            asking if you could just focus on my question,
```

```
 1          that'll be good.  Then we'll get to the messier stuff

 2          towards the end.  Okay?  So for purposes of my --

 3                    MS. DOUGHERTY:  Well, Mr. Jubb, I think

 4          you might want to also let him know that he has a

 5          choice if he wants to waive the privilege because it

 6          belongs to him and answer your question even if he

 7          thinks it will involve a communication.

 8                    MR. JUBB:  He knows that based off of his

 9          answers already.

10    Q     So, Mr. Poulos, if you want to waive it and defend

11          yourself by waiving the privilege, you're more than

12          capable of doing that too if you believe that it's

13          going to help your defense.

14                    So with that as a background, my question

15          was pertaining to mediation which I think you

16          answered, I forget what my question just recently was

17          as it related to that objection.  However, following

18          in this letter, it says, "Mr. Poulos will not agree

19          to confidentiality as a condition to any settlement

20          of his sexual abuse claim."  Do you see that?  Do you

21          see that, sir?  My question is --

22    A     It says that.

23    Q     -- only if you saw it.  And my follow-up is this.

24          Did you intend to relay to the school that

25          confidentiality was not on the table?
```

```
 1    A    I don't feel comfortable answering that because I

 2         believe it's going to -- no, because that's part of

 3         my attorney-client privilege.  Whatever I discussed

 4         with my attorney is attorney-client privileged.  I'm

 5         not going to discuss any conversations I had with

 6         Mitchell Garabedian.

 7    Q    Well, there's a difference of when it's applicable

 8         and when it's not.  And so with respect to each

 9         individual question, I guess we're going to have to

10         get the court involved and get you back here for a

11         couple of things.  But the attorney-client

12         privilege --

13              MS. DOUGHERTY:  All right.  Objection,

14         don't threaten him.  Don't suggest --

15              MR. JUBB:  I'm not threatening him.

16              MS. DOUGHERTY:  -- that he's going to have

17         to come back if he invokes his privilege.

18              MR. JUBB:  I will --

19              MS. DOUGHERTY:  Why don't you just ask a

20         clarifying question.  Maybe he didn't understand.

21         Because I don't --

22              MR. JUBB:  You're just trying to help him

23         to get him -- by saying he didn't understand.

24              MS. DOUGHERTY:  I'm not trying to help

25         him.  I'm trying to help you --
```

```
 1                    MR. JUBB:  I don't --

 2                    MS. DOUGHERTY:  -- because I don't think

 3          you were intending to elicit a communication with

 4          Mr. Garabedian.

 5                    MR. JUDD:  I've already given him

 6          instructions on what it is.

 7                    MS. DOUGHERTY:  Okay.

 8   BY MR. JUBB:

 9   Q    So, Mr. Poulos, my question to you was did you intend

10          to relay to the school that you did not want

11          confidentiality as part of any settlement, intend to

12          relay to the school?

13   A    Was I going to directly ask -- tell them?

14   Q    Did you want anyone on your behalf to relay to the

15          school that you would not agree to any

16          confidentiality?

17   A    Yes.

18   Q    And why is that?

19   A    Because I'm not the only person this must have

20          happened to.

21   Q    And what's the basis for that?

22   A    I'm not going to answer that at this time.

23                    MS. DOUGHERTY:  Objection.

24   BY MR. JUBB:

25   Q    Did you have any information and do you have any
```

```
 1          information to suggest that this has happened to --

 2          what you say happened to you happened to anybody

 3          else?

 4    A     I'm not going to answer that at this time.

 5    Q     Can you tell me why not?

 6    A     A multitude of reasons which I'm not going to get

 7          into right now, but I am not going to answer that

 8          question at this time.

 9    Q     Sir, as you sit there in your recliner, do you have

10          any information to suggest that what your allegations

11          were in these letters to the school in any way

12          occurred to anybody else?

13              MS. DOUGHERTY:  Objection, move to strike

14          the comment about the recliner.

15    BY MR. JUBB:

16    Q     You can answer.  Are you thinking or -- ?  Are you

17          still thinking?

18    A     No.  I'm trying to figure out what you are asking.

19          And to be honest, about the recliner thing, it's

20          because I have nowhere else to sit where the wires

21          reach in my apartment right now.

22    Q     Sir, do you have any information as you sit there in

23          this deposition to suggest that what you accuse this

24          person of doing in your letters ever occurred to

25          anybody else?
```

Kurtis N. Poulos

```
 1   A    Can you clarify, with that specific teacher or with

 2        any teacher?

 3   Q    With the specific teacher.

 4   A    No, I do not.

 5   Q    All right.  I'm showing you what has been marked as

 6        P16.235, which is a letter dated March 26, 2019, to

 7        Mitchell Garabedian.  And in this letter from the

 8        school's counsel, it says that, "On February 21st,

 9        2019, I sent you the attached letter reminding you

10        that Gina Smith and Leslie Gomez, The Hill School's

11        outside attorneys investigating this claim, wanted to

12        meet with you and your client, Kurtis Nicholas

13        Poulos, at your offices in Boston."  Let me stop

14        there.

15             Mr. Poulos, did you ever have any

16        intention of going to Boston to meet with either

17        Ms. Smith or Ms. Gomez or anyone as part of

18        investigating this claim in this case?

19   A    No.

20   Q    It reads further, "Since you had not responded to our

21        earlier requests, I asked you to contact either our

22        offices or Ms. Smith, Ms. Gomez, on or before

23        March 1st to set up this meeting.  Neither I nor

24        Ms. Smith or Ms. Gomez heard from you by March 1st."

25        Let me stop there.
```

```
 1                      Mr. Poulos, did you in any way ever try to
 2            contact any one of those individuals by March 1st?
 3     A      I've never -- no.
 4     Q      "On this basis, we have concluded that your client is
 5            not in a position to pursue this matter at this
 6            time."  Did you ever see this letter?
 7     A      Only afterward.
 8     Q      After you were sued?
 9     A      No, after the deadline of March 1st.  I was moving --
10            I moved into my new apartment on March 1st.  So for
11            three or four days I was in transit from Connecticut
12            to Milwaukee.
13     Q      Did you have any discussions -- I'm just asking if
14            any occurred -- with Mr. Garabedian or an attorney
15            from his law office between December 27th through
16            March 1st?
17     A      Yes.
18     Q      Okay.  And who do you believe you spoke with between
19            that time frame?
20     A      Mitchell --
21                   MS. DOUGHERTY:  I'm sorry, is the
22            question --
23     A      -- and one of his associates.
24                   (Interruption by the reporter.)
25                   MS. DOUGHERTY:  I may have misheard.  Did
```

Kurtis N. Poulos

```
 1          you say December 2017 or December 27th?  Or --
 2                    MR. JUBB:  December 27 of 2018.
 3                    MS. DOUGHERTY:  Okay.  Thank you.
 4     BY MR. JUBB:
 5     Q    And your response was -- ?
 6     A    2018?
 7     Q    Yeah, 2018.  Let me ask you again.
 8     A    Ask the question again because you keep mixing up
 9          your dates.
10     Q    I'm not sure I do.  Between December of 2018 when
11          that second letter went out through March 1st of
12          2019, so a matter of about three months, did you have
13          any contact with Mr. Garabedian or anyone from his
14          office?
15     A    I believe so.
16     Q    And who do you believe that you had spoken with?
17     A    Mitchell Garabedian.
18     Q    Do you know who Nathan Gaul is?
19     A    Nope.
20                    MS. DOUGHERTY:  Could we have a comfort
21          break when you're at a good place?
22                    MR. JUBB:  Yeah.  This might be a good
23          place.  Can we go off the record for about five
24          minutes?
25                    VIDEOGRAPHER:  We are now going off the
```

Kurtis N. Poulos

```
 1          record.  The time is 3:33.

 2                    (Recess taken from 3:33 to 3:41 p.m.)

 3                    VIDEOGRAPHER:  We are now back on the

 4          record.  The time is 3:41.  You may continue.

 5                    MR. JUBB:  Thank you.

 6     Q    Mr. Poulos, with respect to the last couple of

 7          questions, we ended off with the letter where a man

 8          by the name of Nathan was cc'd.  And you had said you

 9          had never spoken with that person before?

10     A    I believe it's one of Mr. Garabedian's assistants.  I

11          could be wrong.

12     Q    Did you ever speak to any of his associates by phone?

13     A    Only in the presence of Mitchell.

14     Q    When you say "in the presence," do you mean he was

15          also on the line?

16     A    Correct.

17     Q    And that's because it was a teleconference, if you

18          will?

19     A    Never -- it was never a teleconference.  It was the

20          two of them on speakerphone.

21     Q    At any point in time, did you ask your mom to talk

22          with you guys?

23                    MS. DOUGHERTY:  Objection.

24     A    No.

25     BY MR. JUBB:
```

```
 1    Q    Did your mom -- strike that.  Did you ever go to

 2         Mr. Garabedian's office?

 3    A    No.

 4    Q    Did you ever meet him personally?

 5    A    No.

 6    Q    Did your mom ever meet Mr. Garabedian?

 7    A    No.

 8    Q    How did you learn of Mr. Garabedian?

 9    A    My mother.

10    Q    Do you know what type of research your mom did to

11         find Mr. Garabedian?

12    A    No.

13    Q    I'm going to show you what has been produced to us by

14         Mr. Garabedian's office as Garabedian 240 through

15         Garabedian 303.  Mr. Poulos, these have

16         Mr. Garabedian's letterhead on them.  They're what's

17         known as a HITECH letters as well as authorizations.

18         Is this your signature?

19    A    Yes.

20    Q    Do you recall signing these authorizations?

21    A    Yes.

22    Q    Did you do that by printing them out, signing them

23         and sending them back?

24    A    Yes.

25    Q    And is there any particular reason why they're not
```

```
 1        dated?

 2   A    No.  Oversight.

 3   Q    Okay.  So here it looks like on Garabedian 256,

 4        approximately 17 pages later from the first, it's

 5        dated December 15th, 2017.  Is that your signature?

 6   A    Yes.

 7   Q    Is that your handwriting by the date?

 8   A    Yes.

 9   Q    And was this -- strike that.  Were these documents

10        that were sent to you all at one time or were they

11        piecemeal?  In other words, did you receive all of

12        these letters for your signature in one instance or

13        was it multiple occasions that you recall signing

14        these things?

15   A    I believe it was one packet of paperwork.

16   Q    When you say packet, did you receive something else

17        in the mail?

18   A    Can you speak up.

19   Q    Sure.  When you said packet, was it something that

20        you received in the mail?

21   A    It was something I believe I received in a FedEx

22        envelope, maybe the USPS, but I think it was an

23        envelope.

24   Q    And then you sent these letters back signed; is that

25        right?
```

```
 1    A    Correct.

 2    Q    So in approximately May of 2019, I see an instance

 3         here, is that your signature?

 4    A    Yes.  So some of these -- I mean, you're scrolling so

 5         quickly.  Somebody must have --

 6    Q    No, I'm not asking questions about those, Mr. Poulos.

 7         I promise.  I'm not asking you about those.  Just

 8         bear with me.  The one that you have before you which

 9         is Garabedian 288, dated May 19th, 2019, is that your

10         signature?

11    A    Yes.

12    Q    Is that your handwriting for the date?

13    A    Yes.

14    Q    Okay.  And so do you recall in approximately May of

15         2019 signing these documents?

16    A    Yes.

17    Q    Are these documents that you printed out from an

18         email or were they documents that were sent to you by

19         hard copy?

20    A    I believe I printed them out.

21    Q    And were you still represented by Mr. Garabedian in

22         May of 2019?

23    A    Yes.

24    Q    Do you know -- do you have any understanding as to

25         where these letters were being sent to that are
```

Kurtis N. Poulos

```
 1        blacked out?

 2   A    Some of them I believe were to different doctors.

 3   Q    Okay.  Do you know which doctors that you wanted your

 4        records for to give to Mr. Garabedian?

 5   A    The only doctor would be Dr. Grade.

 6   Q    Okay.  Because on here I see you've got a couple of

 7        them.  But as far as you know, you only wanted

 8        Mr. Garabedian to get Mr. Grade's records?

 9   A    Yes.  It's the only doctor that would pertain to

10        this.

11   Q    Did you ever seek any psychological treatment from

12        anyone after Dr. Grade?

13   A    No.

14   Q    Have you ever received any of your medical records in

15        response to these requests?

16              MS. DOUGHERTY:  Objection.

17   A    Not to my knowledge.

18              MS. DOUGHERTY:  Can you identify the

19        specific requests because some of the documents I

20        don't think were for medical records.

21              MR. JUBB:  Well, my question just

22        pertained to medical records.

23              MS. DOUGHERTY:  Okay.  That's fine.

24   BY MR. JUBB:

25   Q    Yeah.  And at the top, I mean, I could go through
```

```
 1          them.  I'm trying to hurry this up.  It says

 2          attention medical records correspondence, this is

 3          Garabedian 303.  At the top it's addressed, it says

 4          pursuant to complete medical.  I mean it's over and

 5          over.  I'm only asking about medical records.  But,

 6          Mr. Poulos, as far as you know, you've never seen any

 7          of your medical records that were requested; is that

 8          fair?

 9     A    Correct.

10     Q    How is your relationship with your cousin,

11          Mr. Zwerner?

12     A    I mean, it's good.  We talk every once in a while.

13     Q    Do you see each other on holidays?

14     A    I try and send a text message to him and his brother.

15     Q    Do you know whether or not they have good things to

16          say about Mr. Ralston?

17     A    I have no idea what Jason would have to say.

18     Q    Am I correct that when you were a fourth former,

19          Jason Zwerner was at The Hill School?

20     A    He was a fifth former.

21     Q    Have you ever been charged with any crimes of fraud?

22     A    No.

23     Q    Has there ever been a warrant out for your arrest?

24     A    Yes.

25     Q    And when was that?
```

```
 1   A    It was pertaining to a company credit card I used

 2        that they said I improperly used.

 3   Q    Did you improperly use it?

 4   A    No.  I used it to take clients out to dinners.

 5   Q    When was that?

 6   A    When I was living in Ocean City.

 7   Q    Whatever happened with that warrant?

 8   A    Nothing.  It got thrown out.

 9   Q    When did that get, as you said, thrown out?

10   A    Sometime when I was living in Connecticut.  So mid

11        2016.

12   Q    Who were the accusers in that case?

13   A    Lance's mother.

14   Q    That's Lance Whitlock from The Hill School?

15   A    Yes.  She had hired me to work for her part time, do

16        appraisals when I wasn't working at Secrets.

17   Q    Did you ever appear in court?

18   A    Nope.

19   Q    Did you have to hire a lawyer?

20   A    Yeah.

21   Q    Where was that case venued?

22   A    Whatever county Berlin, Maryland, is in.

23   Q    Do you know what the allegations were specifically?

24   A    Improper use of a credit card.

25   Q    Did you ever see the complaint?
```

```
 1   A    No.

 2   Q    What amount of money were you accused of improperly

 3        using, as you described?

 4   A    I don't know the specific number.

 5   Q    Was it more than a thousand dollars?

 6   A    Huh?

 7   Q    Was it more than a thousand dollars?

 8   A    I don't believe so.  Maybe 1,500, 2,000.

 9   Q    With respect to the classroom, your geometry

10        classroom, you mentioned that it was in the basement

11        of upper school and --

12   A    Correct.

13   Q    -- you would enter from the basement.  And then was

14        there a classroom on your right or a classroom on

15        your left?

16   A    I believe there was a classroom on the right because,

17        if my memory serves, when you take a left, there's

18        only room for one classroom down that small corridor.

19        And that would have been Mr. Ralston's.

20   Q    And was that -- at the time that was his classroom?

21   A    Yes.

22   Q    Was Mr. Ralston ever the sixth form advisor for you?

23   A    I don't believe so, no.  Other than that letter

24        asking me to reach out to him.

25   Q    Did you have any other interaction with Mr. Ralston
```

```
 1          during your third form year?

 2    A     With my what?

 3    Q     Third form.

 4    A     We had some small interactions third form.  I don't

 5          remember the specifics.

 6    Q     Do you remember anything general about them?

 7    A     He might have been one of my table masters.  Every

 8          once in a while you have to change tables so you get

 9          to meet teachers that you might not necessarily have

10          in your tenure at the -- you know, at your time at

11          the school.

12    Q     Walk me through how it was that you would stay after

13          class per your letter.

14    A     Well, he made an example out of me almost every class

15          he could.  He'd make me do exams on the chalkboard

16          rather than on paper because he thought I was

17          cheating.  So he would single me out and have me do

18          the problems up there in front of everybody.

19    Q     Would anybody else have to do problems on the board?

20    A     No, never.

21    Q     And in --

22    A     I mean, maybe -- maybe they'd have to do it for,

23          like, an individual question.  But he was having me

24          do ten questions during the middle of a quiz because

25          I wasn't showing my work.  So he singled me out
```

Kurtis N. Poulos

```
 1         because I was able to do the work without going

 2         through the proper A, B and C's of a geometry

 3         question.

 4    Q    I'm not sure I'm totally following.  So you mentioned

 5         that during a quiz he would have you do the quiz on

 6         the board?

 7    A    Yes.

 8    Q    And everybody else is taking the quiz at their desks?

 9    A    Correct.

10    Q    And when you were up at the board -- and how would he

11         grade it?

12    A    He would grade it in front of the class.

13    Q    And so while -- did everybody else submit their

14         quizzes on paper?

15    A    Correct.

16    Q    And then he would grade your class in front of

17         everybody -- your quiz in front of everybody?

18    A    No.  He would grade my test in front of everybody,

19         and he'd grade theirs whenever he felt like it.

20    Q    How many instances did this happen?

21    A    At least a half a dozen, if not more.

22    Q    Do you recall any other students ever having to do

23         this?

24    A    No.

25    Q    Would he criticize your work?
```

```
 1    A    He criticized the fact that I didn't show my work.  I
 2         would get a question and I would answer it.
 3    Q    But I'm talking about when he would grade your
 4         quizzes, would you just write the answer or would you
 5         show your work?
 6    A    I wouldn't show my work, no.  I didn't need to.
 7    Q    Was there a request by him to all the students to
 8         show their work?
 9    A    Probably, yes.  But why take the time?
10    Q    In other words, as far as you were concerned, an
11         answer is an answer and how you got there is
12         irrelevant.  Is that what your position was when you
13         were a sophomore?
14    A    Yeah.  If you want me to get from A to F, why am I
15         going to show you, B, C, D and E if I can just show
16         you F?
17    Q    Do you know if your other classmates were showing A,
18         B, C, D and E before they got to F?
19    A    More than likely they were all showing it.  They all
20         needed to in order to figure out the problem.  I'm
21         not saying I'm like a genius or something.  But why
22         am I going to do all these steps if I don't find them
23         necessary to get the correct answer?
24    Q    And is this something about -- you know, showing how
25         you got the answer in a geometry class, is this
```

```
 1        something that you just continued to not show your
 2        work?
 3    A   It was more like I could see the work and it would
 4        slow me down to write it all down rather than just
 5        write the answer.  I could see the process.  But
 6        having to write out every single line in the equation
 7        would take me five times longer than just writing
 8        down the answer.
 9    Q   Did he ever give you an explanation for why that was
10        important to him?
11    A   To make sure that I -- one was at first to make sure
12        I wasn't cheating, which was impossible because he
13        took our graphing calculators.  And I think it was
14        partially to respect the process.  But why can't he
15        respect my process then if I get to the same
16        conclusion?
17    Q   Did he explain to you ever a concept of if you show
18        all your work in steps A, B, C, D and E, but you get
19        the answer F wrong, then you would still be able to
20        get the vast majority of the points by doing that?
21    A   No.
22    Q   With respect to the answer that you filed in this
23        case, the motions that you filed, were all of your
24        statements in there true and accurate to the best of
25        your ability?
```

Kurtis N. Poulos

```
1    A    Yes.

2    Q    Has there ever been a statement in any of those

3         pleadings or motions that you knew was false?

4    A    No.

5                   MS. DOUGHERTY:  Objection.

6    BY MR. JUBB:

7    Q    You mentioned in one of the pleadings, I believe it

8         was your -- forgive me.  It's irrelevant for the

9         purpose of this question.  But in there -- strike

10        that.

11                  In one of the pleadings, I recall that you

12        said in there specifically the teacher I spoke with

13        Mr. Garabedian about was not at The Hill School, he

14        was at another school.  Do you recall saying that?

15                  MS. DOUGHERTY:  Objection.

16   A    I'm not going to answer that.  That's a conversation

17        I had with my attorney.

18   BY MR. JUBB:

19   Q    Well, sir, I can show you the document.  We can go

20        that way.  It's 5:00, but I'm happy to show you what

21        you wrote.  All right.  So, Mr. Poulos, this is the

22        motion to dismiss that you filed.  It says here in

23        paragraph 6, "The confusion arises because at the

24        time of the communication with Attorney Garabedian

25        this teacher was no longer HIS school community if by
```

```
 1            this reference you mean he had continuous tenure at
 2            my school in Pottstown, PA --"
 3                      MS. DOUGHERTY:  Objection.
 4    BY MR. JUBB:
 5    Q    "The teacher I talked about with Mr. Garabedian and
 6            only Attorney Garabedian was at the time the head of
 7            school at a different institution than the one I
 8            attended."  So with respect to these two --
 9                      MS. DOUGHERTY:  Object.
10    BY MR. JUBB:
11    Q    So with respect to these two paragraphs that you
12            wrote and you filed, how is it that you were aware
13            that Mr. Ralston was no longer at The Hill School but
14            was the head of school at a different institution?
15            Can you tell us about that?
16                      MS. DOUGHERTY:  Objection, I think you
17            read paragraph 6 incorrectly twice.  It's at HIS
18            school community.
19    BY MR. JUBB:
20    Q    Mr. Poulos, do you remember my question?
21    A    Can you say it again.
22    Q    All right.  I'll read this so we can go through my
23            reading abilities.  So paragraph 6, "The confusion
24            arises because at the time of the communication with
25            Attorney Garabedian, this teacher was no longer at,
```

```
 1        quote, HIS school community, closed quote, if by this
 2        reference it means he had continuous tenure at my
 3        school in Pottstown, PA."  Paragraph 7, "The teacher
 4        I talked about with Attorney Garabedian and only
 5        Attorney Garabedian was at the time the head of
 6        school at a different institution than the one I
 7        attended."
 8              So my question to you is how did you
 9        become aware that Mr. Ralston was the head of school
10        at a different institution before you told
11        Mr. Garabedian about it?
12   A    Oh, my mom.
13   Q    She looked him up?
14   A    Yes.
15   Q    When did she look him up?
16   A    I don't know what she does on a day-to-day basis.
17   Q    Okay.  But you told Mr. Garabedian, at least
18        according to what you wrote here, the teacher you
19        talked to Mr. Garabedian about was head of school at
20        a different institution.  So at least as of the first
21        time you first spoke to Mr. Garabedian, you believed
22        that Mr. Ralston was the head of school at a
23        different institution.  Fair enough?
24   A    Yeah, fair enough.
25   Q    Prior -- strike that.  At what point in time in
```

```
 1          2019 -- strike that.

 2                    We saw the HITECH letters dated May of

 3          2019 that you had signed for Mr. Garabedian to get

 4          your medical records.  After that date, when was it

 5          that you were no longer represented by

 6          Mr. Garabedian?

 7                    MS. DOUGHERTY:  Objection.

 8     A    I'm not answering that.

 9     BY MR. JUBB:

10     Q    All right.  So this might be a good time to get into

11          these types of questions.  All right.  So how did you

12          learn -- strike that.  Is it your understanding that

13          Mr. Garabedian is no longer your lawyer?

14     A    No.

15     Q    You're shaking your head no.  I want to make sure you

16          understand my question.  Is Mr. Garabedian still your

17          lawyer?

18     A    To my knowledge, yes.

19     Q    When was the last time you spoke with him?

20     A    Around the time that this whole thing started.

21     Q    And have you had any conversations with

22          Mr. Garabedian's counsel, whether Ms. Dougherty or

23          someone from her firm?

24     A    Yes.

25     Q    Can you tell me what you talked about with
```

```
1          Ms. Dougherty and someone from her firm, please?
2     A    It was the last time that we had to do one of these
3          with the judge and he told you both that I could call
4          and ask for help.  I spoke with her after the judge
5          got off the line; and I just basically said I
6          appreciate any help I could get in the future, and
7          that was the end of the conversation.
8     Q    And what type of help, if any, have you gotten in the
9          future?
10    A    On how to word certain things.  I've never had to
11         reach out to her, though.  It was more of a courtesy
12         to say I would appreciate your help and the fact that
13         you agreed to help.  But since then I've had no
14         reason to contact her.
15    Q    Did you have any conversations with anyone who was
16         acting on Mr. Garabedian's behalf, and not
17         Ms. Dougherty, but just anyone who was acting on his
18         behalf as related to this case?
19    A    I may have received emails dated -- or, you know,
20         that were composed by somebody in her firm on her
21         behalf.
22    Q    And what were those emails pertaining to?
23    A    Just to be prepared for documents that I would be
24         receiving in the mail.
25    Q    With respect to the conversations that you had with
```

```
 1          your mom, am I correct that she's the one who

 2          encouraged you to contact Mr. Garabedian?

 3     A    Correct.

 4     Q    And did she ever contact any other lawyer before

 5          contacting Mr. Garabedian?

 6     A    I have no idea.

 7     Q    Do you get legal advice from your mom?

 8     A    When it comes to certain things, yeah.  Why wouldn't

 9          I utilize somebody who's been an attorney for 40

10          years?

11     Q    Right.  And with respect to the documents that you

12          had filed, has she assisted you with drafting those?

13     A    Some of them, yes.

14     Q    With respect to some of the -- am I correct your mom

15          has actually reached out to Mr. Garabedian on your

16          behalf on occasion?

17     A    You'd have to ask her.

18     Q    Does she still work?

19     A    No.  She's been retired for a while.

20     Q    Does she know how to use the computer?

21     A    Yes.  She does legal research.

22     Q    Are there any other instances that you can recall

23          where you've received assistance from either

24          Ms. Dougherty or someone at her firm acting on behalf

25          of Mr. Garabedian?
```

```
 1                    MS. DOUGHERTY:  Objection.

 2      BY MR. JUBB:

 3      Q    Mr. Poulos?

 4      A    No.

 5                    MR. JUBB:  All right.  Just give me a few

 6           minutes, let me look over my notes.  We might be

 7           okay.

 8                    MS. DOUGHERTY:  Mr. Jubb, before you do

 9           that, you reviewed Garabedian 240 to 303 with

10           Mr. Poulos, and we had redacted them to remove the

11           provider names, health provider names, with the

12           expectation that we would come to an agreement that

13           there would be a protective order so that we could

14           provide the information unredacted.  I just wanted

15           to know if we could, the three of us, come to that

16           agreement and I can send you the unredacted versions

17           in case you wanted to ask questions of them

18           unredacted.

19                    MR. JUBB:  I would like to see the

20           unredacted versions, though it would have been nice

21           to have them before we made it through four hours or

22           five hours of the deposition.

23                    MS. DOUGHERTY:  Okay.  Sir, I asserted the

24           objections and produced a privilege log quite a long

25           time ago and specifically identified.
```

Kurtis N. Poulos

```
 1                    MR. JUBB:  If you want to send them over,
 2         yeah.
 3                    MS. DOUGHERTY:  Well, I think -- but I
 4         think that I need your agreement and Mr. Poulos'
 5         agreement that there will be a protective order in
 6         place that the protected health information, which I
 7         think includes the identity of the medical
 8         providers, won't be distributed.  That's why we
 9         redacted it.  I mean, it's Mr. Poulos' medical
10         providers names, so...
11                    MR. JUBB:  Sure.  I mean, I deal with
12         medical cases like this all the time.  There's no
13         reason for a confidentiality order other than to say
14         I'm not -- there's no reason for it; but if you're
15         comfortable in that context only with his
16         information, yeah, I agree not to produce them to
17         anyone.
18                    MS. DOUGHERTY:  Yeah.  My issue is that
19         Mr. Garabedian has them as his attorney.  So I think
20         they're Mr. Poulos' records and, you know, we
21         redacted them to be extra cautious.
22                    So, Mr. Poulos, do you understand you were
23         shown some documents, Garabedian 240 to 303, that
24         you signed that were medical --
25                    THE WITNESS:  Correct.
```

```
1                    MS. DOUGHERTY:  -- requests and there were

2          redactions on them; and as you know, because we

3          produced the records to you as well with the

4          privilege log, the redactions are your social

5          security number and the medical providers.  And we

6          redacted the information just as a precaution until

7          the plaintiff agreed to protect the information,

8          meaning not distribute it to -- you know, outside of

9          the litigation or publicly because it identified

10         your health providers.  And so Mr. Jubb is agreeing

11         that, you know, he will protect the information and

12         not share it publicly.  So with your agreement, I'd

13         like to email those records to Mr. Jubb without the

14         redactions in case he has further questions to

15         avoid, you know, later a new deposition about just

16         those records.  That's why I bring up the issue.

17                    THE WITNESS:  Yeah, that's fine.

18                    MS. DOUGHERTY:  Okay.  And, Mr. Jubb, what

19         I have at the moment easily accessible to send to

20         you is a version that shows where the redaction was.

21         So there's like a red box, the marking.  I can give

22         you just a clean version, but it also might point

23         you to where it was redacted.

24                    MR. JUBB:  Okay.  Do you want to just go

25         off the record for two minutes?
```

```
 1                    VIDEOGRAPHER:  We can do that if you're

 2         ready.  We are now going off record.  The time is

 3         4:14.

 4                    (Recess taken from 4:14 to 4:25 p.m.)

 5                    VIDEOGRAPHER:  We are now back on the

 6         record.  The time on the screen is 4:25.  You may

 7         continue.

 8                    MR. JUBB:  Thank you.

 9    Q    Mr. Poulos, I have just received an unredacted

10         version of those HITECH letters and authorizations

11         for your medical records.  Milford Hospital, where is

12         that?

13    A    Milford, Connecticut.

14    Q    And when did you seek treatment there?

15    A    Oh, we had a small cooking accident carving pumpkins

16         and making pumpkin seeds.  So that would have been

17         October of 2016.

18    Q    And with respect to Yale New Haven hospital, how many

19         times were you there?

20    A    I believe just the once.

21    Q    What was that pertaining to?

22    A    That was pertaining to the accident with my right arm

23         where they made me stay for 72 hours or something.

24    Q    Can you describe to me further what happened with

25         your right arm, please.
```

```
 1   A    Oh, yeah.  I was cleaning -- I have a butcher block,
 2        and I went to pull a knife out and I cut my arm.  And
 3        they said it was self-harm.  And I said it wasn't.
 4        And they said, well, we have to keep you.  So they
 5        kept me.
 6   Q    Any other instance at Yale?
 7   A    No.  Unless that's where I went to see the
 8        orthopaedic specialist about the reconstructive
 9        surgery on my left arm.  But I think that was in
10        Hamden.
11   Q    What happened with your left arm?
12   A    So that was the night that we were carving pumpkins,
13        and I did something stupid and put a knife in the
14        sink; and instead of just turning off the disposal, I
15        thought it would be a brilliant idea to try and grab
16        it with my left hand.  And, yeah, that didn't work.
17        So I had to get I think five stitches.  But they had
18        to reconnect the tendons in these three fingers
19        (indicating).
20   Q    Okay.
21   A    So they had to do major reconstructive surgery to my
22        forearm.
23   Q    What was at Froedtert Hospital?
24   A    That would have been a visit for my pancreatitis.
25   Q    Approximately when was that?
```

Kurtis N. Poulos

```
 1    A    I believe that was in -- or, no, that wasn't for
 2         pancreatitis.  That was St. Luke's.  Froedtert was
 3         for exhaustion, and that was shortly after I moved
 4         back here from Connecticut in 2018.
 5    Q    So you moved from Connecticut to the Milwaukee area
 6         in around 2018, and you went to --
 7    A    March of 2018.
 8    Q    March of 2018.  And you said it was for exhaustion?
 9    A    Yeah.  So shortly after I moved back, my mom was in
10         and out of the hospital; I was still, you know,
11         trying to get the apartment set up, trying to take
12         care of her, and then she ended up back in the
13         hospital.  So I was constantly, you know, 10-,
14         12-hour days at work, plus driving out to Ozaukee
15         County, which is about a half an hour north of where
16         I worked at the time, to go visit her, make sure
17         she's okay.  And then obviously, like, it's my mom,
18         so I stay up and worry.  So I got treated for
19         dehydration and exhaustion.
20    Q    I see one in here from Pottstown Hospital.  Pottstown
21         is where The Hill School is.  Did --
22    A    Yes.
23    Q    -- you ever go to Pottstown Hospital?
24    A    Oh, I broke my arm freshman year skiing.
25    Q    And we had discussed that a little bit.  How did you
```

```
 1        break your arm freshman year skiing?

 2   A    I fell and I cracked the bone in my left wrist.

 3   Q    Was that --

 4   A    It was not a major break, but that's why I couldn't

 5        ski for the season.  But the problem was Pottstown

 6        Hospital doesn't really have a working ER, at least

 7        they didn't on a Saturday.

 8   Q    And Columbia St. Mary's Hospital in Mequon,

 9        Wisconsin, what was that about?

10   A    That was when I was there when I was in my coma, when

11        I was there for, like, 10 days or 12 days in Mequon.

12        I don't really remember how long I was there.  They

13        had sedated me.

14   Q    And that was in what time frame?

15   A    2015 I believe.  I'm kind of fuzzy.  I think it was

16        sometime in the middle of June of 2015.

17   Q    When you contacted a lawyer in Pennsylvania in the

18        2014 time frame, at that point -- and correct me if

19        I'm wrong, your mom had selected that lawyer?

20   A    Correct.

21   Q    Did you come to Philadelphia or was this a

22        conversation by phone?

23   A    Conversation by phone.  I haven't been to

24        Pennsylvania since I was 20, maybe 21.

25   Q    In 2014 when you contacted this lawyer in
```

```
 1          Philadelphia, Pennsylvania, what was the purpose of
 2          that?
 3   A      More of a fact-finding mission.
 4   Q      And did -- strike that.  What type of fact-finding
 5          mission?  Like, can you be a little bit more
 6          specific?
 7   A      Well, I knew that -- the statute of limitations for
 8          any sort of criminal case.  I just wanted to see what
 9          if any -- and this was more, just like I said, a
10          fact-finding mission of what if any -- if I decided
11          to later on in life, what sort of steps I could take.
12          Again, my mother had never practiced that kind of
13          law.  So he was kind enough to give me a half an hour
14          of his time to just go over some of my options.
15   Q      Do you recall his name?
16   A      No, I do not.  And I never gave him specifics.  I
17          didn't give him specifics about the school or the
18          teacher.
19   Q      You just told him generally when it occurred?
20   A      Correct.
21   Q      Was there ever a referral to some other lawyer to put
22          you in contact with?
23   A      I mean, my mother has received referrals to represent
24          me in this case; but I don't and she doesn't have 20
25          to $25,000 to pay for a retainer.
```

Kurtis N. Poulos

```
 1    Q    Was Mr. Garabedian charging you for his time?

 2    A    Not to my knowledge.

 3    Q    What was the fee arrangement that you had with

 4         Mr. Garabedian?

 5    A    A percentage of if any settlement was reached.

 6    Q    Do you recall what that percentage was?

 7    A    I do not.

 8    Q    With respect to the 2014 situation when you contacted

 9         that lawyer, how did you know that the criminal

10         statute of limitations had already expired?

11    A    Because --

12              MS. DOUGHERTY:  Objection.

13    BY MR. JUBB:

14    Q    You can answer.  She's objecting to the form.

15    A    Excuse me?

16    Q    She's objecting to the form.  You can answer.

17    A    Okay.  I mean, I don't know if I had been told it by

18         my mother or if I just knew it from watching stupid

19         crime shows.  But I was, you know -- it was made -- I

20         was aware of it at the time.  It was more of, like I

21         said, a fact-finding mission to find out if any steps

22         were available in the future if I show -- so wanted

23         to pursue them.  And, like I said, I had decided I

24         was not going to.  I was going to move on with my

25         life.
```

Kurtis N. Poulos

```
1    Q    So when you say fact-finding process, you mean you
2         wanted to see what your options were potentially in
3         the future other than criminal; is that right?
4    A    Correct.
5              MR. JUBB:  Ms. Dougherty, I just got two
6         other emails from you.
7              MS. DOUGHERTY:  Yeah.  When you were
8         continuing your questioning, I just scrolled through
9         our privilege log to see if there were any other
10        redacted documents that were redacted --
11             MR. JUBB:  Okay.  Am I correct these are
12        records --
13             (Interruption by the reporter.)
14             MR. JUBB:  I said am I correct that these
15        are just additional school records where his social
16        security number was redacted?
17             MS. DOUGHERTY:  And -- hold on one second.
18        I'm just looking at the -- and my answer is no.  If
19        you -- just going by our privilege log, if you
20        scroll to Garabedian 346, there was a redaction
21        because of health provider information.  I think the
22        next couple pages, 346 to 348 and then 386 --
23             MS. JUBB:  Okay.  Just give me the Bates
24        numbers, please.
25             MS. DOUGHERTY:  Yeah, so I just --
```

Kurtis N. Poulos

```
 1                    MR. JUBB:  I just want the Bates numbers.
 2                    (Interruption by the reporter.)
 3                    MR. JUBB:  We can do this off the record.
 4                    MS. DOUGHERTY:  I can just tell you what I
 5          sent you and the reason why I sent it.  I just
 6          looked through our privilege log to make sure that
 7          there weren't other instances where we had redacted
 8          a health provider name.  I realize it's obvious when
 9          there is a social security number redacted, you
10          know.  So, and I see that there are other instances
11          between 304 later that had some redactions for
12          health provider names.  So I can tell you those
13          Bates labels.  I didn't -- I can't tell you that I
14          just confirmed right now that they're the same ones
15          you already looked at.  I just didn't want you to
16          get them later unredacted and have wished you had
17          them to ask.
18                    MR. JUBB:  I just --
19                    MS. DOUGHERTY:  I can tell you the Bates
20          labels if you want.
21                    MR. JUBB:  No, I have them.  They appear
22          to be just documents identifying the same records
23          that -- the same health providers I just asked
24          about.
25     Q    Mr. Poulos, we're still on the record.  Are you
```

Kurtis N. Poulos

```
 1          texting with somebody?

 2    A     No.  I was checking those emails.  This phone doesn't

 3          actually call anybody.  It's just to control my

 4          house.

 5    Q     Okay.  So getting back, as of 2014, you were familiar

 6          with the court systems, correct?

 7    A     With what?

 8    Q     The court systems.

 9    A     To an extent, yeah.

10    Q     Approximately how many days do you believe that you

11          ever spent in jail?

12    A     I don't know.  21.

13    Q     When you had your -- I think you said one night

14          overnight around the 2016 time frame, were they

15          spread out over the course of different incidents or

16          is that all related to one incident?

17    A     It all started with one incident, with the disorderly

18          conduct.

19    Q     Okay.  So here are a couple of questions I want you

20          to think about.  Again, my position is that you have

21          waived your attorney-client privilege.  So I'm going

22          to ask these questions, you do what you like to do in

23          your own judgment.  What did you tell Mr. Garabedian

24          about Mr. Ralston?

25    A     I'm not going to answer that.
```

1    Q    Did Mr. Garabedian give you any indication about the

2         potential merits or lack thereof of such a claim or

3         potential likelihood of success?

4    A    I'm not going to answer that.

5    Q    Do you have --

6              MS. DOUGHERTY:  Mr. Jubb, could I just ask

7         you a question?  Are you willing to ask that

8         question limited with a yes or no?  Because if the

9         answer is no, then you probably don't care, because

10        you asked it as an or.  You said whether there's a

11        likelihood of success or not success.  Right?  I

12        think whether it occurred or not, the way you asked

13        the question, is probably not a protected

14        communication.

15             MR. JUBB:  No, I think --

16             MS. DOUGHERTY:  No?  Okay.  All right.  I

17        was trying to make a suggestion to get through it.

18   BY MR. JUBB:

19   Q    Did you have any understanding of what the statute of

20        limitations was for what you had described to

21        Mr. Garabedian?

22   A    Did I have any idea?

23   Q    Yeah.

24   A    Yes.

25   Q    Did he?

```
 1    A    I can't speak on his behalf.

 2    Q    Did you ever discuss that with him?

 3    A    I'm not going to answer that.

 4    Q    Walk me through -- no, I think that's good for

 5         purposes of the record, and then we can address those

 6         later and the questions that fall from those specific

 7         questions.  That's all I have for you right now.  I

 8         may have some follow-up after Ms. Dougherty asks her

 9         questions.

10                         EXAMINATION

11    BY MS. DOUGHERTY:

12    Q    Okay.  My question is yes or no.  Did you ever have a

13         discussion with Mr. Garabedian regarding the statute

14         of limitations about a claim against The Hill School,

15         yes or no?

16    A    Yes.  Yes.

17    Q    Again, yes or no.  Yes or no, do you recall the

18         content of the communication that you had with

19         Mr. Garabedian regarding the statute of limitations

20         for any claim against The Hill School?

21                    MR. JUBB:  Object.

22    A    No.

23                    MS. DOUGHERTY:  I'm sorry, was there an

24         objection?

25                    MR. JUBB:  Yeah, I'm just objecting to the
```

```
 1        form of these.

 2   BY MS. DOUGHERTY:

 3   Q    When did you retain Mr. Garabedian?

 4   A    I believe it would have been towards the end of 2017.

 5   Q    Why did you retain Mr. Garabedian?

 6   A    After reading reviews about his success in these sort

 7        of litigations, I felt that he would be somebody who

 8        would be able to help me.

 9   Q    What do you mean by success in these types of

10        litigations?

11   A    His litigation in Boston against the Catholic church

12        for one.

13   Q    Do you have an understanding about the nature of

14        Mr. Garabedian's law practice?

15   A    To an extent.

16   Q    What's your understanding of the nature of

17        Mr. Garabedian's law practice?

18   A    That he stands up for people who have been through

19        situations like I have to try and help them come

20        to --

21   Q    When you say...

22   A    Go ahead.

23   Q    No, please.  I wasn't trying to interrupt you.

24   A    I'm just saying it seemed like he was somebody who

25        helped people who had gone through similar situations
```

```
 1            in their past to move on with their life.

 2    Q    By similar situations, you mean the sexual abuse

 3            that --

 4    A    The sexual abuse, correct.

 5    Q    The sexual -- and just to be clear, the sexual abuse

 6            that you are referring to as sexual abuse by Matthew

 7            Ralston, right?

 8    A    Correct.

 9                    MR. JUBB:  Object.

10                    (Interruption by the reporter.)

11  BY MS. DOUGHERTY:

12    Q    So did you do research into Mr. Garabedian's

13            background before you retained Mr. Garabedian?

14    A    Only on the advice of my mother.

15    Q    Did you first learn about Mr. Garabedian from your

16            mother?

17    A    Correct.

18    Q    So your mother mentioned Mr. Garabedian to you?

19    A    Correct.

20    Q    Did your mother tell you anything else about

21            Mr. Garabedian when she first identified him to you?

22    A    Not really.  Just that she thought given his

23            background, that I should read about him and see if I

24            thought he could help me.

25    Q    By background, you mean Mr. Garabedian's background
```

Kurtis N. Poulos

```
 1           in representing sexual abuse survivors, correct?

 2    A      Correct.  Correct.

 3    Q      And then when you heard Mr. Garabedian -- let me

 4           start again.  The first time you ever heard

 5           Mr. Garabedian's name was when your mother identified

 6           Mr. Garabedian to you; is that correct?

 7    A      Correct.

 8    Q      And then what did you do?  Did you do a Google

 9           search?  What kind of research did you do?

10    A      Yeah.  I did a Google search, read on some of his

11           cases, told my mom that I thought this would work,

12           called to arrange a phone interview with him, knowing

13           it would be up to him if he wanted to take me on as a

14           client.

15    Q      Is there a specific reason why -- let me start again.

16           I think you said at the end of 2017 is when you

17           retained Mr. Garabedian; is that right?

18    A      Correct.  After I received the second letter from The

19           Hill School.

20    Q      By the second letter from The Hill School, you're

21           referring to the November 20th, 2017, letter that I

22           think you said you received through email that you

23           had looked at earlier today with Mr. Jubb, P16.237 to

24           239, that had that blue text identifying the child --

25           quote, child protection experts.  Is that the letter
```

1          you're talking about?

2    A     Correct.  I received the email with the hyperlinks

3          and made some phone calls; and then over the course

4          of the next couple of weeks, I would guess, got in

5          contact with Mitchell.  Or, sorry, Mr. Garabedian.

6    Q     I'm trying here to show you a letter, but I have the

7          wrong thing open.  Okay.  I'm not so good with

8          sharing screens.  So can everybody else see a PDF

9          called Historical Allegations of Sexual Abuse at The

10         Hill School at the top -- or at The Hill at the top?

11   A     I can.

12                 MR. JUBB:  Sure.

13   BY MS. DOUGHERTY:

14   Q     Okay.  So let me just identify the document.  It's

15         four pages long.  I've shared my screen with you.  On

16         the bottom right, the first page indicates Garabedian

17         029, I'm just going to scroll to the last page just

18         to identify the document.  The last page on the

19         bottom right indicates Garabedian 032.  So I'll

20         scroll through the document a little bit by -- you

21         know what, I'm just going to mark the document as --

22         I'll just do D-1.  So D-1 is going to be Garabedian

23         029 through Garabedian 032.  I'm just going to scroll

24         through it slower, Mr. Poulos, so you can review it

25         and then I want you to identify it for me.  So tell

Kurtis N. Poulos

```
 1          me if I'm scrolling too quickly.

 2    A     There's the part -- go back up.  I could see it

 3          highlighted in black.  There.

 4    Q     Okay.  So this document which I've marked as D-1,

 5          Garabedian 029 through Garabedian 032, it looks like

 6          at the very top has an email from Mary Ellen Poulos,

 7          that's your mother, right?

 8    A     Correct.

 9    Q     Dated December 13, 2017, 12:02 p.m., to Mitchell

10          Garabedian.  Do you see that?  It says thank you,

11          Mary Ellen Poulos.  Yes?

12    A     Correct.

13    Q     Okay.  Then there's an email below that from

14          Kurtis -- how do you say that?

15    A     Poulos.

16    Q     No, F-R-O-E-D-T-E-R-T.  How do you pronounce --

17    A     Froedtert.

18    Q     -- it?  Froedtert.  Okay.

19    A     Froedtert.

20    Q     So Kurtis Froedtert dated November 20, 2017, to Mary

21          Ellen Poulos, subject line forward Historical

22          Allegations of Sexual Abuse At The Hill.  And then

23          below that, there's a forward email from Headmaster

24          Zachary G. Lehman, P1618, date November 20th, 2017,

25          to Kurtis N. Poulos, subject Historical Allegations
```

```
 1          of Sexual Abuse At The Hill.
 2                   So this third email on the first page of
 3          D-1, is this the email that you're talking about that
 4          you got from The Hill School that prompted you to
 5          react?
 6   A     Correct.  And not to go into too many fine details,
 7          the reason the email was then forwarded from my
 8          mother to Mitchell was because I no longer had a copy
 9          of it that I could locate in my email account.
10          That's why I print everything now.
11   Q     Okay.  So it looks like you got the email at your
12          LEX101078 at gmail dot-com account on November 20th,
13          2017, at 1:41 p.m., from Headmaster Zachary Lehman.
14          Did you read the email close in time to when you
15          received it?
16   A     I went outside of my place of work, had a cigarette,
17          read the entire email, called my mother, and then I
18          forwarded her the email.
19   Q     Okay.  And the email forward from you to your mother,
20          it says -- it has the same date, November 20th, 2017,
21          but it says 1:08 p.m.  Are you and your mother in a
22          different time zone?
23   A     I was in Connecticut, she was in Wisconsin.
24   Q     Okay.  And then later on --
25   A     So it would have been 2:08 for me.  So it was roughly
```

```
 1          27 minutes after I first received the email, I called
 2          her, she read it, she called me back, I forwarded her
 3          the email.
 4     Q    Okay.  And when you -- what did you discuss with your
 5          mother when you spoke to her on the phone on
 6          November 20th, 2017, about the email that has now
 7          been marked as D-1?
 8     A    I commented about the fact that they mentioned that
 9          they had hired people to help the students, and asked
10          for her advice if she thought I should contact them.
11     Q    Is there anything else that you discussed with your
12          mother when you called her on November 20th, 2017, in
13          reaction to the email that is -- I guess a series of
14          emails that's now been marked as D-1?
15     A    No.  Just strictly that I had received the email and
16          I wanted to see what she thought I should do.  So I
17          forwarded it to her, and she called me back and said
18          do not contact them.  But forward -- you know, but...
19     Q    Why did you -- I'm sorry.  Go ahead.
20     A    No.  Go ahead.
21     Q    I apologize.  I'm not trying to interrupt you.  It's
22          difficult sometimes, as Mr. Jubb expressed, to figure
23          out when you're done talking over Zoom.  So please
24          just keep talking or tell me to stop talking if
25          you're not done.  Why did you think -- or let me --
```

```
 1        strike that.  Let me start again.
 2                   What about the November 20th, 2017, email
 3        made you think you should contact Ms. Gomez or
 4        Ms. Smith?
 5   A    Because I thought the school was going to take a
 6        modicum of responsibility, having known about these
 7        situations for so long, that those were people that
 8        were actually looking to help previous students.
 9   Q    Did you -- did your mother -- I think you said you
10        asked your mother her opinion on what you should do
11        in response to the November 20th, 2017 email; is that
12        right?
13   A    Correct.  And she said let me find out who those
14        people really are.
15   Q    And then did your mother call you back or email you
16        when she learned who these people really were?
17   A    I believe she called me right back.
18   Q    So you had two telephone discussions with your mother
19        on November 20th, 2017, about the email from the
20        headmaster on November 20th, 2017?
21   A    Correct.  The first one was to tell her about the
22        email when she instructed me to forward her the
23        email.  The second phone call was then her calling me
24        back saying not to contact them or the school.
25   Q    So if you can, I've scrolled a page to the second --
```

```
 1        I've scrolled D-1 to the second page to the paragraph
 2        that says through the review.  Right?  So the letter
 3        indicates, "Through the review, we learned of several
 4        troubling incidents in The Hill School's history.
 5        Those incidents involved conduct several decades ago
 6        by a small number of faculty members, none of whom
 7        have been associated with The Hill for many years and
 8        one of whom is deceased."
 9                Do you have any information about any of
10        the incidents referenced in the email reflected in
11        D-1?
12    A   Do I have any hard evidence?  No.  But do I know what
13        they're referring to?  Yes.
14    Q   Okay.  What is your understanding of what Mr. Lehman
15        was referring to when he wrote about several
16        troubling incidents several decades ago?
17    A   Without naming names, that students were sleeping
18        with female faculty members, that the faculty member
19        who is deceased had also abused some of the male
20        students.  And basically I guess you could include
21        the fact that we knew which faculty members were
22        cheating on their spouses with which-other -- with
23        the other faculty members or -- and/or student.
24    Q   So the situations that you're describing that you
25        have in mind right now, are those instances that
```

     1          occurred during the time period that you were at The

     2          Hill School?

     3     A    Yes.  Those are -- I'm not talking about anything

     4          specific other than the time that I was at that

     5          school, knowing the improprieties of those teachers,

     6          the one who is deceased, the faculty members sleeping

     7          with other students, and the faculty members cheating

     8          on their spouses with other faculty members.  I

     9          never -- that's part of the reason I just never

    10          gossiped about sh -- excuse me, stuff like that.  It

    11          didn't affect my life with -- in regards to what

    12          those other people were doing.

    13     Q    Did you know or have an understanding about the

    14          purpose of the letter that Mr. Lehman sent on

    15          November 20th, 2017?

    16               MR. JUBB:  Note my objection.

    17     A    To be blunt, it was the school trying to cover

    18          themselves from getting another lawsuit like they had

    19          gotten years prior when a faculty member impregnated

    20          one of the new female students.

    21     BY MS. DOUGHERTY:

    22     Q    Is there a particular reason that you decided that

    23          you should contact a lawyer when you received the

    24          November 20th, 2017, letter via email?

    25     A    Yeah.  Because I believed after speaking to my mom,

```
 1        the school was being deceitful.  (Interruption -

 2        witness talking to dog.)  I'm sorry.

 3   Q    It's okay.

 4   A    Yeah.  Because, to be honest, that letter comes off

 5        as we're going to help you get through, you know,

 6        what you went through.  And it turned out to be more

 7        of a we're going to try and do our best to cover this

 8        up so that we don't end up like one of the other, you

 9        know, boarding schools that is named in some of these

10        lawsuits.

11   Q    Did you consider the November 20th, 2017, letter that

12        you received via email that's now been marked as part

13        of D-1 an invitation to report the abuse that you

14        experienced during your time at The Hill School?

15             MR. JUBB:  Objection to the form.

16   A    100 percent.

17   BY MS. DOUGHERTY:

18   Q    Is there anything -- I can put the letter back up if

19        you would like.  In fact, why don't I just do that.

20   A    No, I don't -- I pretty much know what it says.

21   Q    Okay.  My question is, is there any particular

22        component of the November 20th, 2017, letter that you

23        received via email that's now been marked as part of

24        D-1 that led you to believe the school was inviting

25        you to report your experience of sexual abuse with
```

```
 1        Mr. Ralston during your time at The Hill School?

 2                  MR. JUBB:  Ms. Bayer, are you getting my

 3        objection?

 4   A    Not specifically by name, but --

 5                  THE REPORTER:  I didn't -- I was just

 6        going to stop -- excuse me, I was just going to stop

 7        and say did you object.

 8                  MR. JUBB:  Yeah.  That's why I said I want

 9        to make sure you hear my objections.  So please note

10        my objection on that one.  And then, Mr. Poulos, go

11        ahead.

12   A    No, that's fine.

13   BY MS. DOUGHERTY:

14   Q    Do you remember the question or do you need me to ask

15        it again?

16   A    If you could ask it again, I would prefer.

17   Q    Sure.  I just want to know if there's a particular

18        part or parts of the November 20th, 2017, letter that

19        you received via email which has now been marked as

20        part of D-1 that led you to believe the school was

21        soliciting you to report your experience of sexual

22        abuse with Mr. Ralston -- or by Mr. Ralston?

23                  MR. JUBB:  I'll object.

24   A    Again, I don't believe they were asking for specific

25        names through the email.  I think they were more
```

1          asking for you to come forward and let them know what

2          had happened.  Whether or not they were going to ask

3          for specific names, I don't know.  I mean, I would

4          assume eventually we would get there.  But, again, I

5          looked at it as more of a protective, you know, type

6          of maybe we can get you some counseling, maybe we can

7          help you get through this so you can live a normal,

8          productive life.  Not we're going to probably take

9          this and shove it in a drawer somewhere and make you

10         sign an NDA or something.

11    BY MS. DOUGHERTY:

12    Q    Why did you decide that you were going to come

13         forward in 2017?

14              MR. JUBB:  Note my objection.

15    A    I guess because I thought I was in a strong enough

16         position with a good job, what I thought was a

17         healthy relationship, and have somebody by my side

18         who would help me through it, not agitate the

19         situation.

20    BY MS. DOUGHERTY:

21    Q    What did you hope to achieve by retaining

22         Mr. Garabedian?

23              MR. JUBB:  Note my objection.

24    A    That the truth comes out.  That the truth comes out

25         and this sort of stuff, these sick behaviors stop.  I

```
 1        know these are all small, tight-knit communities and
 2        a lot of it has to do with keeping secrets for fear
 3        of letting down your family, you know, getting in
 4        trouble with the school, being ostracized at the
 5        school.  And, you know, it should be just strictly a
 6        place of higher learning.
 7   BY MS. DOUGHERTY:
 8   Q    Did you have an objective of receiving money from The
 9        Hill School by retaining Mr. Garabedian?
10   A    No --
11             MR. JUBB:  Note my objection.  You can
12        answer.
13   A    And, as I stated, all I ever really wanted was my
14        tuition back.  That's it.
15   BY MS. DOUGHERTY:
16   Q    Okay.  So you -- I'm sorry.
17   A    Yeah.  But I did, you know, I did want my tuition
18        back.  I didn't want, you know, a crazy amount of
19        money.  You know, the fact of the matter is if I got
20        a crazy amount of money, I would probably donate it
21        either to my family's hospital or, you know -- I
22        don't know.  But I would try and make sure I could
23        provide services that were legitimate so that people
24        do not go through stuff like this in the future.  So
25        at the end of the day, yes, I wanted my tuition back.
```

Kurtis N. Poulos

```
1   Q    Okay.  Just so I understand, you wanted The Hill
2        School to pay you money in the amount of the tuition
3        that you had paid for the three years you attended
4        The Hill School; is that right?
5             MR. JUBB:  Note my objection.
6   A    For tuition, the cost of, you know, flying back and
7        forth, and anything I would have -- you know, like
8        the books were college price stupid high.  You know,
9        you get an algebra textbook and it's $300 in high
10       school; when if you go to a public school, they just
11       give you stuff.  And we were made to buy certain
12       things.  We had to have certain clothes every year.
13       And, you know, it gets to be expensive.  Now, granted
14       I had my trust fund where I could go to them at the
15       beginning of the year and go I need $2,000 because I
16       grew four inches and I need basically all new clothes
17       to go to school.  You know, I need plane tickets so
18       that I can fly to and from Philadelphia.  I need
19       transportation money.  I need money to live for,
20       like, incidentals.  Like if something gets ruined
21       when I'm at school, I'm going to have to, you know,
22       replace a blazer or a tie or a dress shirt.  I mean,
23       it wasn't cheap to just -- even attend class was
24       expensive.  And, like I said, maybe besides a few
25       odds and ends, that all came out of my inheritance,
```

```
 1              no one else's pocket.

 2    Q    Okay.  I just want to make sure I have a complete

 3         list.  So you wanted The Hill School to pay back the

 4         money that you spent for tuition, the cost to travel

 5         back and forth to school, the cost of books?

 6    A    Sporting equipment that we had to provide for

 7         ourselves.  So if you wanted to go skiing, say, they

 8         weren't going to supply you with skis, you had to go

 9         out and buy your own skis.  If you wanted to play

10         golf, you had to go out and buy your own golf clubs.

11         I mean, all of that stuff adds up over the years.

12    Q    Okay.  So tuition, travel, cost of books, sporting

13         equipment.  Anything else that you wanted The Hill

14         School to pay to you?

15              MR. JUBB:  Note my objection.

16    A    Not really.  I mean -- no.

17    BY MS. DOUGHERTY:

18    Q    And at the time that you retained Mr. Garabedian, you

19         had it in mind that you intended to request that The

20         Hill School pay you the cost of the tuition you paid

21         to Hill School, the travel expense, the cost of books

22         and sporting equipment; is that correct?

23    A    Correct.

24    Q    Did you -- now, my first question is I want to limit

25         it to a period of time.  At the time when you
```

Kurtis N. Poulos

```
 1              retained Mr. Garabedian, did you have in your mind an
 2              amount of, you know, the total amount of the tuition,
 3              travel, cost of books and the sporting equipment?
 4    A    Roughly $120,000.  I mean, to be honest, I never saw
 5              my exact bills for tuition.  I had a general idea
 6              about how expensive it was.  But they just sent the
 7              paper to the bank and the bank just sent them a
 8              check.  If I needed something, I'd just sign a piece
 9              of paper at the -- you know, at the sporting goods
10              store that we had on campus, and they would just send
11              a bill to my trust and the trust would send them a
12              check.  So there is plenty of numbers that I could be
13              way over, I could be way under.  I honestly don't
14              know.  That would be something where you'd have to
15              contact the people that used to run my trust account
16              because they would have to have I would assume
17              records of that.
18    Q    Is it a fair characterization that when you contacted
19              Mr. Garabedian, you had in your mind that you wanted
20              to recover around $120,000 from The Hill School, but
21              you intended to actually do research to determine the
22              actual amount of tuition, the actual amount of
23              travel, the cost of books, and the sporting
24              equipment?
25    A    Yes.
```

Kurtis N. Poulos

```
 1                    MR. JUBB:  Note my objection.

 2    BY MS. DOUGHERTY:

 3    Q    And so I think what you're explaining is that the

 4         $120,000 number you had in mind could be too high or

 5         could be too low, that what you wanted was

 6         essentially reimbursement from The Hill School for

 7         the tuition, travel expenses, cost of books and the

 8         sporting equipment; is that right?

 9    A    Correct.

10    Q    Did you want The Hill School to provide any mental

11         health services to you?

12    A    Yes.

13    Q    Do you have -- at the time when you retained

14         Mr. Garabedian, did you have as an objective to

15         obtain relief from The Hill School in the form of

16         mental health treatment?

17    A    Yes, that I could go and see a qualified therapist

18         and maybe for -- you know, not saying that I was

19         going to be like I'm going to go see him for 20

20         years, you can foot the bill; but that they would be

21         willing to pay for, you know, six months to a year of

22         sustained therapy where I could work through the

23         issues in a constructive way rather than drown them

24         out with liquor or drugs.

25    Q    Okay.  So your intention in -- at least in part in
```

Kurtis N. Poulos

```
 1        retaining Mr. Garabedian, in addition to receiving
 2        the reimbursement payment we've discussed, was also
 3        to have The Hill School pay for medical psychological
 4        treatment to treat the effects of the abuse you
 5        sustained; is that right?
 6             MR. JUBB:  Note my objection.
 7   A    Yes.  The depression, the way -- you know, I could
 8        work through some of the issues and understand the
 9        way -- the reasons maybe behind why I acted the way I
10        did for so many years where I chose to make every
11        healthy relationship into an unhealthy relationship;
12        and work through those issues in a positive way like
13        I'm doing now.  The only difference is now I'm doing
14        it on my own with my dog.
15   BY MS. DOUGHERTY:
16   Q    Now, again, I'm just limiting my question to at the
17        time when you retained Mr. Garabedian.  At the time
18        when you retained Mr. Garabedian, did you have in
19        mind how much the therapy that you wanted The Hill
20        School to pay for, how much that would cost?
21   A    No.
22             MR. JUBB:  I'm going to object.  I think
23        you need to be more specific.  What do you mean when
24        you say at the time you retained?
25             MS. DOUGHERTY:  I think he said that it
```

```
 1        was the December of 2017 -- well, let me ask.

 2   Q    Mr. Poulos --

 3               MR. JUBB:  No, no, we've got to be more

 4        specific.

 5               MS. DOUGHERTY:  I think he did say it --

 6        what?

 7               MR. JUBB:  Objection.  So I need you to

 8        say at the time you retained, I mean before he

 9        walked in the door, or at the time he retained which

10        is much vaguer.  So I think you need to pin that

11        down.

12               MS. DOUGHERTY:  I'm sorry, he already

13        confirmed in his testimony that he never walked in

14        the door.  And I think he already testified that he

15        retains Mr. Garabedian at the end of 2017.

16   Q    Isn't that right, Mr. Poulos?

17   A    I did.

18               MR. JUBB:  Excuse me, when I said walked

19        through the door, I'm being facetious.  I know he

20        never went there.

21               MS. DOUGHERTY:  Mr. Poulos --

22               (Interruption by the reporter.)

23               MR. JUBB:  I need to make this clear.

24        Counsel keeps saying at the time you retained

25        Garabedian.
```

Kurtis N. Poulos

 1                    MS. DOUGHERTY:  Yeah.

 2                    MR. JUBB:  And so my question is asking

 3          her to specify what she means by at the time.  Are

 4          you saying the day you saw -- the day you talked to

 5          him?  Or are you saying --

 6                    MS. DOUGHERTY:  Thank you, Mr. Jubb.

 7    Q    Mr. Poulos, when did you retain Mr. Garabedian?  I

 8          think I've asked this and you answered it, but we're

 9          going to just confirm it.  When did you retain

10          Mr. Garabedian?

11    A    I believe I retained him in December of 2017.

12    Q    Okay.  And I've asked you a number of questions that

13          I specifically asked you to limit your answer to the

14          time period of when you retained Mr. Garabedian.  At

15          the time that you retained Mr. Garabedian.  And you

16          understood my question to be asking you that in

17          December 2017 when you retained Mr. Garabedian; is

18          that correct?

19    A    Correct.  I understood it.

20                    MR. JUBB:  Note my objection.  If you

21          can't figure out how to make that more specific,

22          it's clearly intended to -- it's an unfair question.

23                    MS. DOUGHERTY:  Mr. Jubb, it's really not

24          and you're just --

25                    MR. JUBB:  No, it is.

Kurtis N. Poulos

```
 1                    MS. DOUGHERTY:  -- being silly.

 2                    MR. JUBB:  It is --

 3                    MS. DOUGHERTY:  Thank you.

 4                    MR. JUBB:  Why don't you -- you're trying

 5          to say before you spoke with Mr. Garabedian.  Go

 6          ahead.  That's how we're going to play this because

 7          you've already objected to this type of stuff.

 8                    MS. DOUGHERTY:  What could your objection

 9          possibly be?  What?

10                    MR. JUBB:  I just told you what my --

11                    MS. DOUGHERTY:  Tell me.  Tell me right

12          now.

13                    MR. JUBB:  I just need you to --

14                    (Interruption off the record.)

15                    MS. DOUGHERTY:  You don't need me to do

16          anything.  I want you to tell me what your -- what

17          could possibly be the prejudice or the issue with my

18          question?

19                    MR. JUBB:  At the time you retained is

20          very broad.  I'm asking you to specify for us, for

21          the witness, so that I know whether or not it's a

22          fair question.  Are you referring to the time that

23          he's in the office with -- excuse me, the time he's

24          speaking with Mr. Garabedian on the phone or are you

25          referring to beforehand?  Because he said December
```

```
 1          of 2017, right?  So the whole month doesn't count as
 2          at the time.
 3                 MS. DOUGHERTY:  All right.  Let's just do
 4          it this way.
 5     Q    Mr. Poulos, have you ever had an intent other than to
 6          recover payment from The Hill School for your
 7          tuition, travel expenses, cost of books and sporting
 8          equipment?
 9     A    No, I have not.
10     Q    Have you ever had an intent other than -- I'm going
11          to start again.  Was there ever a time when you
12          didn't want The Hill School to pay for the cost of
13          therapy or treatment for the mental health issues
14          that you described?
15     A    Say that again.
16     Q    Was there ever a time, whether it's December -- was
17          there ever a time that you did not want The Hill
18          School to pay for therapy or treatment for your
19          mental health issues that were a result of the sexual
20          abuse by Mr. Ralston?
21     A    No --
22                 MR. JUBB:  Objection.
23     A    -- there was not.  Hey, Google, turn on the dining
24          room.
25     BY MS. DOUGHERTY:
```

```
 1   Q    Okay.  So you wanted The Hill School to pay you money

 2        to reimburse tuition, travel, cost of books, sporting

 3        equipment; you wanted The Hill School to pay for the

 4        cost of medical mental health treatment; is that

 5        right?

 6   A    Correct.

 7   Q    And did you want anything else from The Hill School?

 8             MR. JUBB:  Note my objection.

 9   A    Not really.

10   BY MS. DOUGHERTY:

11   Q    Now, what did you mean when you said if The Hill

12        School paid a lot of money, you would donate it to

13        the hospital?  I think you said your family's

14        hospital.

15   A    Well, my family founded a hospital.  We're pretty

16        philanthropic in the State of Wisconsin.  And I think

17        if I could donate money to them, then they could

18        start a program there with qualified people or I

19        could donate money to a program that they already are

20        working with.  Froedtert has the main hospital and

21        maybe 30 outlying properties that are owned by some

22        member of my family, I'm not sure who exactly.  I

23        have nothing to do with it, but I'd like to be part

24        of that legacy.

25   Q    Did you think that The Hill School should pay money
```

```
 1            other than to reimburse you for your tuition, travel,

 2            cost of books, sporting equipment, and to pay for

 3            your mental health treatment?

 4                     MR. JUBB:  Note my objection.

 5    A     At the beginning, no.

 6    BY MS. DOUGHERTY:

 7    Q     What do you mean by "at the beginning"?

 8    A     I think that they should legitimately hire people to

 9            help students that they -- that have come forward and

10            actually find them counseling.  Not hire attorneys

11            that pretend to be child advocates.  That is

12            something that I've never discussed with Mitchell or

13            you or anyone.  But given the amount of money that

14            that school has, I don't think that's a big ask that

15            they make sure that the students there get better

16            access than -- I believe they have one counselor for

17            500 students.  And granted that's more than most, you

18            know, that's better than most public schools get.

19            But they have so much money, it wouldn't be hard to

20            put in facilities there to make sure that students

21            who do go through similar situations don't feel

22            intimidated to stand out -- or step forward and speak

23            to somebody knowing that there will be checks in

24            place to help them.

25                     They have no problem building an entire
```

Kurtis N. Poulos

```
 1            little town for teachers and putting in ice skating

 2            rinks.  But when it comes to the overall mental

 3            health of what they put their students through, it's

 4            barbaric.  I mean, students hanging themselves?

 5            Jumping out of windows?  And they do nothing to help

 6            them afterward.

 7   Q    So was it your objection -- sorry, let me start

 8            again.  Was it your objective to pursue some type of

 9            remedy for other students who had --

10   A    Yes.

11   Q    -- experienced sexual abuse like you had?

12   A    Yes --

13                 MR. JUBB:  Note my objection.

14   A    Yes.  Sorry for interrupting, but yes, 100 percent.

15   BY MS. DOUGHERTY:

16   Q    This objective of pursuing relief for other students

17            who had sustained sexual abuse, was that an objective

18            that you had on your own?

19   A    Yes.

20                 MR. JUBB:  Note my objection.

21   BY MS. DOUGHERTY:

22   Q    Did you have the objective of pursuing relief for

23            other students who had been victims of sexual abuse

24            prior to ever meeting Mr. Garabedian?

25   A    No, I did not.
```

1                    MR. JUBB:  Note my objection.

2    A    This is something, like I said, is something that has

3         only come into my forethought recently, the more I'm

4         trying to deal with this on my own, that there should

5         be some sort of facility in place there to help the

6         students, whether it be the same sexual abuse that I

7         went through or whether it be the overwhelming

8         pressure of just attending that school.  Now,

9         granted, I don't know what it's like now as far as

10        academic community and what sort of pressures they

11        put on their students.  But I can tell you about

12        students that tried to commit suicide when they were

13        there, but they were too ashamed to tell anybody.  So

14        they just went on going on.  Every grade you ever got

15        was posted for the entire school to ridicule.  I

16        mean, it wasn't -- kids would come back over breaks

17        and hang themselves in their dorms.  I mean, that's

18        not normal.  We had a kid jump out of a window

19        because he was so stressed out he took tabs of LSD.

20   BY MS. DOUGHERTY:

21   Q    When you contacted the lawyer in 2014, did you

22        identify Mr. Ralston to the lawyer?

23   A    I did not.  I didn't even identify the school.

24   Q    Other than your mother and Mr. Garabedian, is there

25        anyone else -- well, let me start again.  Other than

Kurtis N. Poulos

```
 1              your mother, Mr. Garabedian and I think your treating

 2              psychologist or psychiatrist, Mr. Grade, have you

 3              told anyone else about the abuse you sustained at the

 4              hands of Mr. Ralston?

 5                      MR. JUBB:  Note my objection.

 6    A    I have told one other person about the abuse, but I

 7         never said the name.

 8    BY MS. DOUGHERTY:

 9    Q    And, I'm sorry, is that Emily, your ex-girlfriend?

10    A    Correct.

11    Q    So you told Emily that you were sexually abused when

12         you were at The Hill School, but you did not identify

13         Mr. Ralston as the perpetrator of the sexual abuse;

14         is that right?

15    A    No, I did not.

16    Q    Have you identified Mr. Ralston's -- Mr. Ralston by

17         name or the identity of The Hill School to Mr. -- or

18         Dr. Grade, your treating psychiatrist?

19    A    Yes, I have.

20    Q    Have you told anyone else that you survived sexual

21         abuse other than Emily, your mother, Dr. Grade and

22         Mr. Garabedian?

23    A    No.  I can add to that by saying I believe members of

24         my family know, but not because of me, because of my

25         mother.  So I believe she had a conversation with my
```

Kurtis N. Poulos

```
 1        aunt.

 2   Q    When was the first -- let me start again.  It's true

 3        that Mr. Ralston -- let me start again.

 4                 Matthew B. Ralston sexually abused you

 5        when you were attending The Hill School; is that

 6        right?

 7   A    Correct.

 8                 MR. JUBB:  Note my objection.

 9   BY MS. DOUGHERTY:

10   Q    When was the first time that Mr. Ralston sexually

11        abused you?

12   A    Not until my sophomore year.

13   Q    How old were you the first time that Mr. Ralston

14        sexually abused you?

15                 MR. JUBB:  Note my objection.

16                 MS. DOUGHERTY:  What's your objection?

17                 MR. JUBB:  To the nature of you saying

18        abused as opposed to -- we're not -- we're no longer

19        referring to him as an alleged victim.  You're

20        referring to him as a victim of sexual abuse by a

21        person who's very adamantly denied it.  That's -- if

22        you just want to clarify it.

23                 MS. DOUGHERTY:  That's not a valid

24        objection.  He says he --

25                 MR. JUBB:  My objection is --
```

```
 1                    MS. DOUGHERTY:  Mr. Poulos says he was
 2          abused by Mr. Ralston.  I'm asking him to provide
 3          the details of that.  There's no form issue with my
 4          question.
 5                    MR. JUBB:  No, it's the form of your
 6          question.  I'm just objecting to the form of --
 7                    MS. DOUGHERTY:  No, it's really not.
 8                    MR. JUBB:  Do you want to keep asking the
 9          question or do you want me to just tell you I'm
10          objecting to the form of your question?  I think
11          it's poorly worded.
12                    MS. DOUGHERTY:  Whatever.
13     Q    I'm sorry.  So how old were you the first time when
14          Mr. Ralston sexually abused you?
15     A    14 or 15.
16     Q    Do you remember the first time Mr. Ralston sexually
17          abused you?
18                    MR. JUBB:  Note my objection.
19     A    Not specific dates.  I remember the general feeling.
20          Like I said, I've done my best to black out a good
21          portion of my high school existence.  Not always the
22          healthiest way, but...
23     BY MS. DOUGHERTY:
24     Q    I understand that this is difficult to discuss.  But,
25          unfortunately, this is where we find ourselves.  So
```

Kurtis N. Poulos

```
 1          can you please tell me what you do remember about the
 2          first time you were sexually abused by Mr. Ralston?
 3               MR. JUBB:  Note my objection.
 4   A     I believe it was in his classroom just making general
 5          gestures towards me, and that escalated into keeping
 6          me after class on certain days, and that escalated
 7          further.  I mean --
 8   BY MS. DOUGHERTY:
 9   Q     Okay.  So -- I'm sorry.  I'm not trying to cut you
10          off.
11   A     No, that's it.
12   Q     So just focusing on the first time that Mr. Ralston
13          sexually abused you, you said that was in his
14          classroom.  Is that the geometry classroom?
15               MR. JUBB:  Note my objection.
16   A     Correct.
17   BY MS. DOUGHERTY:
18   Q     I think you described it earlier as a classroom at
19          the end of a hallway with a prison-like window on the
20          door?
21   A     Yeah, a small window.
22   Q     And what happened the first time that Mr. Ralston
23          sexually abused you?
24   A     It was by touch only.
25   Q     Okay.  So is it the case that you and Mr. Ralston
```

Kurtis N. Poulos

```
 1        were alone in his classroom?

 2   A    Correct.

 3   Q    And how did Mr. Ralston touch you the first time that

 4        Mr. Ralston sexually abused you?

 5   A    I was walking, from the best of my recollection, I

 6        was walking out the door, which was always shut.  I

 7        mean, pretty much every classroom door was always

 8        shut.  I remember leaving and him grabbing me from

 9        behind on my crotch and pulling me back into the

10        room.  And I kind of blacked out from there.  I do

11        remember him, you know, using -- grabbing my forearm

12        to rub him.

13   Q    Okay.  Why were you and Mr. Ralston alone in his

14        classroom on the instance that you're talking about

15        now?

16   A    I don't know.  It might have been one of the days

17        where I was the last one out because I was cleaning

18        the board for him, because he had made me put up my

19        entire quiz on the board.  So when everybody else

20        hears the bell, they run; and he goes, okay, clean

21        up.  And then I've got to pack all my crap up into my

22        bag, you know, textbook, notebook, calculator,

23        anything else that I had on my desk.  While he's

24        packing up -- he had, like, a little brown satchel

25        that he always carried, if I remember correctly.
```

Kurtis N. Poulos

```
 1   Q   Was it your perception that Mr. Ralston had you
 2       perform your quizzes on the chalkboard and grade them
 3       at the time in an effort to delay your exit from the
 4       classroom?
 5   A   I believe it was that in conjunction with just
 6       overall intimidation, making sure that I knew who was
 7       in control of every situation when I was his student.
 8   Q   Okay.  So the first time that you remember
 9       Mr. Ralston sexually abusing you, you were leaving
10       the classroom and he put his hand on the -- on your
11       penis on the outside of your clothes; is that right?
12   A   Correct.
13   Q   And then he pulled you back into the classroom away
14       from the door?
15   A   Correct.  And then the doors, if I remember
16       correctly, were pretty heavy metal doors at the time.
17       And they were hinged to basically shut automatically.
18       So it's not like the last student had to make sure
19       and shut the door.  We basically had fire doors all
20       over the buildings because of how old they were.
21   Q   Were you already at the door, like, did you have your
22       hand on the doorknob?
23   A   I already had the door partially open.  That's what
24       I'm saying, it wasn't like a flimsy door where you
25       could just like flip your wrist and whip it open.
```

Kurtis N. Poulos

```
 1        You literally had to pull the door open in order to
 2        even get out.  So if something comes up from behind
 3        and pushes that door shut, it's going to shut before
 4        you have a chance to react and keep it open.
 5    Q   Okay.  And Mr. Ralston you said pulls you back from
 6        the door?
 7    A   And sort of went like this, like pushed the door and
 8        grabbed me (indicating).
 9    Q   Did you say anything?
10    A   Not really.  It was just a look and then his hand and
11        then -- and then he moved my hand.  And I don't know
12        why it stopped, but it stopped.  Eventually over
13        periods of time it progressed further and further.
14        Maybe he just felt more comfortable knowing he had a
15        specific time window where no one's going to be down
16        that corridor.  There's no other reason to go down
17        that hallway.
18    Q   Okay.  So the first -- again, just talking about the
19        first time.  Again, I know it's difficult, but this
20        is where we are.  So Mr. Ralston touched you and then
21        used your hand to touch him; is that right?
22    A   Correct.
23    Q   Was there any other contact between you and
24        Mr. Ralston, again, on the first instance?
25    A   Not to my recollection, no.
```

Kurtis N. Poulos

```
 1   Q   And you don't remember whether you said anything when
 2       Mr. Ralston first touched you?
 3   A   No.  I just sort of went into shock.
 4   Q   Did Mr. Ralston say anything to you?
 5   A   Not that I recall, no.
 6   Q   Do you remember -- I'm sorry.  And was there any
 7       other interaction between you and Mr. Ralston on that
 8       day besides Mr. Ralston touching you, pulling you
 9       back into the classroom, and then moving your hand to
10       touch him?
11   A   I mean, I would have had to have seen him that night
12       at dinner.
13   Q   Right.  Just, again, just sticking with the first,
14       you know, inappropriate contact that you remember,
15       this first instance --
16   A   After the contact was over, no, I left.
17   Q   How did it end?
18   A   It just abruptly stopped.  That was -- that's one
19       thing that sticks out is that nothing was really
20       said.  It was just a matter of -- it just sort of
21       stopped.  And I remember grabbing my stuff, opening
22       the door and just blindly walking back up to my dorm
23       room.  And I probably had to get ready for something
24       sports related around 4 or 4:15.  And then, you know,
25       it was more just a matter of shock for the rest of
```

```
1       the day.

2   Q   Do you remember anything else about the contact with

3       Mr. Ralston?  Do you remember what you were wearing,

4       what he was wearing, any other details of the room,

5       anything like that?

6   A   I can give you a general description.  I would have

7       been wearing a sport coat, dress slacks --

8   Q   Hold on --

9   A   -- a button-down, a tie.

10  Q   Mr. Poulos, hold on one second.  I only want you to

11      answer what you actually remember.  So you said would

12      have.  I realize sometimes people speak that I way.

13      I want to make sure that you actually do remember the

14      details you're providing to me.

15  A   The specific clothing I was wearing that day?  No, I

16      do not recall.

17  Q   What about what Mr. Ralston was wearing or any

18      details of the room?

19  A   Details of the room, yeah.  I mean, like I said, I

20      believe it's three rows or it was three rows by four

21      seats, maybe five rows by four seats, but never

22      really more than 12 to -- I'd say 12 to 15 chairs max

23      in that room.  He had a desk up in the front by the

24      chalkboard.  And we were just in equal rows equally

25      spaced like your typical classroom.  I don't remember
```

Kurtis N. Poulos

```
1          there being a window in the room other than the small

2          window to the door.  And I believe it had two-tone

3          paint on the wall, like at about -- from me now about

4          hip level was one color down and then one color up to

5          the ceiling.

6     Q    Do you remember the assignment that you had been

7          working on on the chalkboard on this first day?

8     A    Yeah.  It would have been probably a weekly quiz.

9     Q    Do you in fact --

10    A    Which was typically ten...

11    Q    Go ahead.

12    A    We typically had a quiz, like a pop quiz, on what we

13         had been learning; and it was typically ten

14         questions.  A lot of the professors there had the

15         same sort of format where you'd just get a

16         ten-question pop quiz.

17    Q    And was it the case that Mr. Ralston always had you

18         take your pop quizzes on the chalkboard?

19    A    Only after a certain point of the year when --

20    Q    When --

21    A    -- he would give -- he started doing it at a specific

22         time.  I couldn't tell you when, how long into the

23         school year it was.  I can just tell you it was after

24         I had objected to getting a failing grade on a quiz

25         for not showing my work.
```

```
 1   Q    I think you said there were trimesters.  Did you call

 2        the first one the fall trimester?

 3   A    Yeah.  We had the fall trimester.  Then --

 4   Q    A winter trimester and a spring trimester; is that

 5        right?

 6   A    Yeah.

 7   Q    So did the first instance of inappropriate contact

 8        between you and Mr. Ralston occur during the fall

 9        trimester of your sophomore year?

10   A    Correct.

11             MR. JUBB:  Note my objection.

12   A    Correct.

13   BY MS. DOUGHERTY:

14   Q    Do you remember how many weeks into the fall

15        trimester the first inappropriate contact occurred?

16   A    No.

17   Q    Do you remember the season?  Was it warm or was it

18        getting colder?

19   A    It was getting cooler.

20   Q    Did you have a coat with you?

21   A    No, because I was living in the same building I had

22        that class in.  So there was no reason to have an

23        outdoor coat other than my blazer.

24   Q    Was it dark outside?

25   A    No.  It would have been early afternoon, like 3:00.
```

Kurtis N. Poulos

```
 1          So it wouldn't have been dark out, but I -- to my

 2          recollection, there wasn't even a window in that

 3          classroom anyway.  So it could have been the middle

 4          of the night, it wouldn't have made a difference.

 5          There was no exterior light coming into that room.

 6    Q     So your recollection is the first instance of

 7          inappropriate contact between you and Mr. Ralston

 8          occurred when you had geometry class as the last

 9          class of the day?

10    A     Correct.

11    Q     And what did you do after you left the classroom

12          after the first instance?

13    A     What did he do?

14    Q     What did you do?  I'm sorry.

15    A     I went straight up to my dorm room.  Like I said, it

16          was only probably 20 or 30 steps from the door of the

17          geometry class to the door to the stairway, two

18          flights of stairs and you're on the first floor.

19    Q     And how long did the contact between you and

20          Mr. Ralston last the first time?

21    A     I couldn't say.  I would be guessing.  I couldn't

22          say.

23    Q     A couple minutes?  An hour?

24    A     It's one of those you put your hand on a hot stove,

25          it feels like a minute type situations.  I honestly
```

```
 1      don't recall the length of time.  It couldn't have

 2      been more than a few minutes because, like I said,

 3      right after classes, we only have a certain amount of

 4      time to go and get ready for whatever we're doing,

 5      whether it's sports or something else

 6      extracurricular.  You have to be there by a certain

 7      time.

 8   Q  At the time when Mr. Ralston touched you the --

 9      during the first instance of inappropriate contact,

10      did you believe that the touching was wrong and

11      inappropriate?

12   A  Yeah.  That's why I froze, because I was in disbelief

13      that it was happening.

14   Q  Is there a reason why you didn't report Mr. Ralston's

15      inappropriate contact with you to an adult or another

16      teacher, another student?

17   A  Yeah, because I was a legacy at that school.  I had

18      to keep in mind, you know, the fact that not only did

19      two of my grandparents go to school there, that my

20      cousin was also currently a student enrolled there

21      and what that might do to him, how it might affect

22      our family's legacy overall at a school that we've

23      been established at going on now, you know, a little

24      under 90 years.  Okay.  I gotta take my dog out.

25      He's freaking out.
```

Kurtis N. Poulos

```
 1                MS. DOUGHERTY:  Okay.  We have -- I mean,
 2        we can take a break for you to walk your dog; but
 3        let me find out how much longer we're going to go
 4        tonight because we're on instance one of I think 10
 5        to 15.
 6                THE WITNESS:  I'd rather call it for the
 7        night and set something up for another day then
 8        because, like, frankly, I haven't slept in three
 9        days, I'm exhausted.  My dog is all riled up because
10        I'm all riled up.  I don't know how that works with
11        your schedule.  I've never gone through this before,
12        so I don't know how exactly this works.
13                MS. DOUGHERTY:  Okay.  Well, you're the
14        witness, so you're in charge as far as how long the
15        questioning can go.  Because we -- and I say it in
16        the royal we, Mr. Jubb and I both, want you to have
17        enough attention to, you know, understand our
18        questions and answer them, not to be tired or, you
19        know, answer erroneously because, you know, it's not
20        a marathon basically.  So, you know --
21                THE WITNESS:  Okay.  Then I'd rather call
22        it for the night.
23                MS. DOUGHERTY:  -- if that's your
24        preference.  That's okay with me.  But I want to
25        just talk about when you would next be available.
```

```
 1        Are you only available on Thursdays or can we pick

 2        it up tomorrow or -- ?

 3                  THE WITNESS:  Yeah.  I'm not going into

 4        work tomorrow due to COVID.  But if we could make it

 5        in the early afternoon, I would appreciate that.

 6                  MS. DOUGHERTY:  Is that acceptable for

 7        you, Mr. Jubb?

 8                  MR. JUBB:  When you say early afternoon,

 9        are you referring to, like, 1:00?

10                  THE WITNESS:  1:00 your time, so you guys

11        can have lunch beforehand.

12                  MR. JUBB:  That would make it 12:00 for

13        you, right?

14                  THE WITNESS:  Correct.

15                  MR. JUBB:  Yeah, if that's what you'd

16        prefer, we can pick it up then.

17                  THE WITNESS:  All right.  I'll put it in

18        my calendar.  Do I just use the same link then to

19        get in?

20                  MS. DOUGHERTY:  Well, let me ask because I

21        think we should -- if we can, Mr. Jubb, you arranged

22        for the videographer and court reporter.  But I

23        think we should stick with the same at least company

24        and setup if we can.

25                  MR. JUBB:  Yeah, of course.  Well, my
```

```
1        proposal --
2                    THE REPORTER:  Do we want this all on the
3        record?
4                    MR. JUBB:  We probably don't need to.
5                    MS. DOUGHERTY:  Well, let me just -- let's
6        just say on the record that we've discussed it and
7        agreed that Mr. Poulos will return tomorrow at
8        1 p.m. Eastern?  No, that's not -- 1 p.m. --
9                    THE WITNESS:  No, that's right.  1 p.m.
10       Eastern, 12:00 Central.
11                   MS. DOUGHERTY:  Okay.  Thank you.
12                   MR. JUBB:  The specific technology
13       requirements will be forwarded to Mr. Poulos earlier
14       tomorrow, but otherwise we'll probably just stay the
15       same.  And I would only just say before we go off
16       the record that he'll remain under oath for
17       tomorrow.
18                   MS. DOUGHERTY:  Right.  Mr. Poulos, even
19       though it's going to be overnight, you can't talk
20       about your testimony with anyone because, you know,
21       your deposition hasn't concluded and --
22                   THE WITNESS:  I know.
23                   MS. DOUGHERTY:  -- and you've agreed to
24       return tomorrow to complete it so we don't have an
25       exorbitantly long day today.  So that's why Mr. Jubb
```

 1

 2

 3

 4

 5          is making that point, you're under oath and you

 6

 7          can't discuss your testimony with anyone.

 8

 9                    THE WITNESS:  I appreciate it.

10

11                    MS. DOUGHERTY:  Okay.  I think we can go

12

13          off the record now, right?  Unless, Mr. Jubb, you

14

15          had anything you wanted to add.

16

17                    MR. JUBB:  No.

18

19                    VIDEOGRAPHER:  All right.  Well, this

20

21          adjourns the deposition of Kurtis Poulos for today.

22

23          The time is 5:45.  And we are now off the record.

24

25                    (The deposition adjourned at 5:45 p.m.)

Kurtis N. Poulos

```
 1                    CERTIFICATE

 2            I, LYNN M. BAYER, Registered Professional

 3    Reporter, Certificate of Merit and Notary Public in and

 4    for the State of Wisconsin, do hereby certify that prior

 5    to the commencement of the examination, KURTIS N. POULOS,

 6    was duly remotely sworn by me to testify to the truth, the

 7    whole truth and nothing but the truth.

 8            I DO FURTHER CERTIFY that the foregoing is a

 9    verbatim transcript of the testimony as taken

10    stenographically by me at the time, place and on the date

11    hereinbefore set forth, to the best of my ability.

12            I DO FURTHER CERTIFY that I am neither a relative

13    nor employee nor attorney nor counsel of any of the

14    parties to this action, and that I am neither a relative

15    nor employee of such attorney or counsel, and that I am

16    not financially interested in the action.

17

18    _____

19    LYNN M. BAYER

20

21    Registered Professional Reporter

22    Certificate of Merit

23    Notary Public in and for the State of Wisconsin

24    Dated:  November 29, 2020

25    My Commission expires April 24, 2024
```

Kurtis N. Poulos

1

2

3

4

5

6                    CERTIFICATE OF WITNESS

7

8

9

10          I have read the foregoing pages, _____ to _____,

11

12   and the same is true and correct to the best of my

13

14   knowledge and belief.  I [have/have not] noted changes on

15

16   an attached change sheet.

17

18   DATED THIS _____ DAY OF _____, 2020.

19

20

21

22   _____

23

24     KURTIS N. POULOS

# EXHIBIT "F"

1          UNITED STATES DISTRICT COURT

     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    JOHN DOE,              : NO. 2:19-cv-01539
          Plaintiff        :

4                          :

       vs.                 :

5                          :

     MITCHELL              :

6    GARABEDIAN, ESQ.,     :

     LAW OFFICES OF        :

7    MITCHELL GARABEDIAN   :

     and KURTIS N.         :

8    POULOS,               :
          Defendants       :

9

                    - - -

10

              November 20, 2020

11

                    - - -

12

13       Continued remote videotaped

14   deposition of KURTIS N. POULOS, taken

15   pursuant to notice, at the location of

16   the witness, Milwaukee, Wisconsin,

17   commencing on the above date at or about

18   12:00 p.m. CT/1:00 p.m. EST, before

19   Eileen P. Barth, C.S.R., N.P.

20

21                  - - -

23       GOLKOW LITIGATION SERVICES

     Phone 877.370.3377  |  Fax 917.591.5672

24          deps@golkow.com

Kurtis N. Poulos

```
 1    APPEARANCES:
 2           THE BEASLEY FIRM, LLC
             BY:  LANE R. JUBB, JR., ESQUIRE
 3           1125 Walnut Street
             Philadelphia, PA  19107
 4           lane.jubb@beasleyfirm.com
             Attorneys for the Plaintiff
 5
 6           SWARTZ CAMPBELL, LLC
             BY:  CANDIDUS K. DOUGHERTY, ESQUIRE
 7           One Liberty Place, 38th Floor
             1650 Market Street
 8           Philadelphia, PA  19107
             cdougherty@swartzcampbell.com
 9           Attorneys for the Defendants
             Mitchell Garabedian, Esquire and Law
10           Offices of Mitchell Garabedian
11
      ALSO PRESENT:
12
             Jeff Sindiong, Videographer
13
             Karen Renee, Notary
14           (To remind witness of Oath)
15
16
17
18
19
20
21
22
23
24
```

1          DEPOSITION SUPPORT INDEX

2

     DIRECTIONS NOT TO ANSWER:

3    PAGES:   None

4    REQUESTS FOR DOCUMENTS OR INFORMATION:

     PAGES:   None

5

     STIPULATIONS AND/OR STATEMENTS:

6    PAGES:   240

7    MARKED QUESTIONS:

     PAGES:   None

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    INDEX

 2

      WITNESS                      PAGE

 3

 4   KURTIS N. POULOS

 5     By Ms. Dougherty                242

 6

 7

 8                  EXHIBITS

 9    EXHIBIT       DESCRIPTION        PAGE

10

     D-2      4/23/2016 Letter, Bates    439

11            label P-16.242 to 16.243

12   D-3      Emails                     439

13

14

15

16

17

18

19

20

21

22

23

24
```

Kurtis N.  Poulos

1              (It is stipulated by and

2         among Counsel for representative

3         parties that the sealing and

4         certification are waived, and that

5         all objections of any nature

6         except as to the form of the

7         question are reserved until the

8         time of trial.)

9              THE VIDEOGRAPHER:  We are

10        now on the record.  My name is

11        Jeff Sindiong.  I am the

12        videographer for Golkow Litigation

13        Services.  Today's date is

14        November 20th, 2020, and the time

15        on the screen is 12:07.

16             This is the continuation of

17        the remote deposition of Kurtis

18        Poulos, who I remind is still

19        under oath, and is being held in

20        the matter of John Doe versus

21        Garabedian, Esquire, et al.

22             Due to the nature of remote

23        reporting, please pause briefly

24        before speaking to ensure all

1        parties are heard completely.

2             Will counsel notify --

3        please identify themselves and who

4        they represent?

5             MR. JUBB:  Good afternoon.

6        Lane Jubb of The Beasley Firm for

7        Plaintiff, and my colleague, Lou

8        Tumolo, may be joining in a few

9        moments.

10            MS. DOUGHERTY:  Candidus

11       Dougherty from Swartz Campbell,

12       LLC on behalf of Mitchell

13       Garabedian.

14            THE VIDEOGRAPHER:  Our court

15       reporter is Eileen Barth, and we

16       also have Karen Renee to make a

17       statement.

18            KAREN RENEE:  Mr. Poulos,

19       I'm a notary with the State of

20       Wisconsin.  You understand you are

21       still under oath from the

22       continuation, the oath that you

23       took yesterday.  Do you understand

24       that?

Kurtis N.   Poulos

 1                    THE WITNESS:   I do

 2          understand that.

 3                    KAREN RENEE:  Thank you.

 4                    THE VIDEOGRAPHER:  All

 5          right.  You may now continue.

 6     BY MS. DOUGHERTY:

 7               Q.    Mr. Poulos, where are you

 8          located today?

 9               A.    I'm in the office of my

10          apartment.

11               Q.    Are you the only one in your

12          apartment other than Clifford, your dog?

13               A.    Yeah.  He's right here next

14          to me.  He is my service dog.

15               Q.    Okay.  One second.  All

16          right.  Have you adjusted everything to

17          your satisfaction?

18               A.    Yeah.

19               Q.    Okay.  Because you can't

20          fidget while we're asking questions

21          because it disrupts the court reporter

22          and the videographer.  Okay?

23               A.    Take the dep.  So I'm trying

24          to keep him under control.

Kurtis N. Poulos

```
1            Q.    Okay.  Well, if you need a
2    minute to get situated, you can have it.
3    Are you good now?
4            A.    Oh, I'm good.
5            Q.    Okay.  All right.  So only
6    you and your dog, Clifford, are in your
7    house where you are testifying from
8    today; is that right?
9            A.    Correct.
10           Q.    Yesterday, you told us about
11   a Philadelphia criminal attorney that you
12   contacted in 2014; is that right?
13                 MR. JUBB:  Objection to the
14           form.
15                 THE WITNESS:  To the best of
16           my knowledge, I believe he was in
17           Philadelphia, yes, correct.
18   BY MS. DOUGHERTY:
19           Q.    And since your testimony
20   yesterday, have you remembered the name
21   of the attorney that you contacted in
22   2014?
23           A.    No, because I -- the only
24   person who would probably know that would
```

1    be my mother.  And you guys told me I was

2    not allowed to speak to anybody about the

3    deposition, so I did not reach out to her

4    to find out the name.

5         Q.    Your recollection is the

6    attorney you contacted in 2014 was a man?

7         A.    Correct.

8         Q.    How did you contact the

9    lawyer in 2014?

10        A.    By phone.

11        Q.    Is the only way that you

12   could refresh your recollection about the

13   identity of the lawyer you contacted in

14   2014 is to ask your mother?

15        A.    Correct.  And I don't even

16   know that she would have that information

17   readily at hand.

18        Q.    Okay.  So you didn't, like,

19   write down the attorney's name and put it

20   in that file that you talked about

21   yesterday?  You didn't send any emails to

22   the lawyer you contacted in 2014?  You

23   didn't -- you don't have any other

24   documents or anything that would reflect

1    the identity of the attorney that you

2    contacted in 2014?

3          A.    No, I do not.

4          Q.    When did you first decide

5    that you wanted The Hill School to pay

6    you back the cost of your tuition?

7          A.    When they decided that they

8    were going to use those emails in such a

9    manner to provoke people to come forward,

10   but they weren't going to use them in a

11   manner that would actually help anybody

12   out.

13         Q.    Okay.  Just so we're clear,

14   I'm just going to show you the emails

15   that I think you're talking about and you

16   can identify them and confirm whether I'm

17   right or not.

18              As I said yesterday, I'm not

19   the best with sharing the screen, so I'm

20   going to give it a whirl.

21              All right.  Can everybody

22   see a document that says The Hill School,

23   A Message From the Headmaster at the top?

24         A.    Yes.

1        Q.    Mr. Jubb showed you this

2    document that was marked P-16.242-43.

3    I'm going to mark the letter that's dated

4    April 23rd, 2016 with a Bates label of

5    P-16.242 to 43 as D-2.

6              So I'll scroll.  I'll try to

7    be slow, but stop me if you need it

8    slower for you, Mr. Poulos.

9        A.    No, I'm good.  I have read

10   that too many times.

11       Q.    Okay.  So D-2, the April

12   23rd, 2016 letter that I think you said

13   you received over email, is this one of

14   the emails you're referring to that --

15       A.    That is -

16       Q.    -- caused you -- go ahead.

17       A.    That was the first email

18   that I received from the school.  And at

19   that time, like I said yesterday, I did

20   not want to -- how can you put this?  I

21   didn't want to bring that part of my life

22   back into what was going to be my new

23   part of life.

24       Q.    Did you receive the letter

1    reflected in D-2 in the format that you

2    see on your screen?

3          A.    Correct.

4          Q.    Was it attached to an email?

5    Was it in the body of an email?

6          A.    I believe it was the body of

7    the email.  There might have been a

8    preface saying, so, like, we're going to

9    -- but I don't believe it was an

10   attachment.

11         Q.    But your recollection is the

12   communication you received from the

13   school in April 2016 looked just like

14   D-2; is that right?

15         A.    Correct.

16         Q.    And when you received the

17   April 23rd, 2016 letter from The Hill

18   School that's now been marked as D-2,

19   that is when you decided you wanted The

20   Hill School to pay you for the tuition

21   that you had paid to the school?

22              MR. JUBB:  Objection.

23              THE WITNESS:  No.

24         Incorrect.

1    BY MS. DOUGHERTY:

2         Q.    I'm sorry.  What was your

3    answer?

4         A.    Incorrect.  In April of

5    2016, I had already decided I was going

6    to move past the situation.  It was --

7         Q.    What was -- I apologize.

8         A.    What was my initial

9    reaction?

10         Q.    No, no.  Finish your prior

11    answer first.  I wasn't intending to

12    interrupt you.  Just the Zoom -- you're

13    really tiny now because I have to share a

14    screen.

15              Are you done your prior

16    answer?

17         A.    Repeat the question, please.

18              MS. DOUGHERTY:  Ms. Barth,

19         are you able to read the question

20         back and the start of Mr. Poulos'

21         answer?

22              (Whereupon, the court

23         reporter read the referred-to

24         testimony.)

```
1    BY MS. DOUGHERTY:
2         Q.    Is there more that you have
3    to add to that answer, Mr. Poulos, or is
4    that answer complete?
5         A.    That's complete.
6         Q.    When you received the April
7    23rd, 2016 letter from The Hill School
8    that's now been marked as D-2, what was
9    your reaction?
10        A.    Honestly, I probably deleted
11   it and -- you know, after I read it and
12   felt at the time that it was -- in the
13   only terms I can say -- some sort of
14   propaganda where they already knew what
15   was going on, but they offered no actual
16   support to the alumnists.
17        Q.    At the time when you
18   received the April 23rd, 2016 email --
19   I'm sorry -- letter that has been marked
20   as D-2, did you know who Zachary G.
21   Lehman -- L-E-H-M-A-N -- was?
22        A.    Yeah, we had received
23   through alumnus letterhead or emails
24   saying basically there's a new
```

Kurtis N. Pozzi 04

1  headmaster.  And I knew the previous

2  headmaster very well.

3       Q.    Did you ever meet Mr. Lehman

4  in person?

5       A.    No.

6       Q.    So Mr. Lehman wasn't the

7  headmaster when you attended The Hill

8  School; is that right?

9       A.    No.

10       Q.    Do you recall when you first

11  learned that Mr. Lehman was the

12  headmaster of The Hill School?

13       A.    Not to a specific date or

14  year, no.

15       Q.    Who was the headmaster of

16  The Hill School when you attended The

17  Hill School?

18       A.    Mr. Doherty and his wife Kay

19  were very close friends of the family.

20       Q.    Mr. Doherty and -- Mr.

21  Doherty was the headmaster of The Hill

22  School when you attended The Hill School?

23       A.    Correct.  He actually spoke

24  at my grandfather's memorial in

Kurtis N. Poulos

1   Washington, DC.

2        Q.    And Mr. Doherty was the

3   headmaster for all three years that you

4   attended The Hill School; is that right?

5        A.    He was there from -- when I

6   got, I guess, you could say permission or

7   whatever to join The Hill School

8   community, it was -- I believe Mr. Watson

9   was the headmaster.  And then my freshman

10  year was Mr. Doherty's first year, and I

11  believe he stayed on a few years after I

12  graduated; maybe one or two.

13       Q.    Did you send the April 23rd,

14  2016 letter that's been marked as D-2 to

15  your mother when you received it?

16       A.    No, I did not.

17       Q.    Did you share the April

18  23rd, 2016 letter that's been marked as

19  D-2 with anyone?

20       A.    No, I did not, not

21  intentionally.

22       Q.    So I'm showing you now the

23  document that has been previously marked

24  as D-1, which includes a series of emails

1    which starts with a November 20, 2017

2    email from Mr. Lehman to you.

3         A.    Well, it wasn't just to me.

4    It was all alumni.

5         Q.    Okay.  So it's your

6    understanding that the November 20th,

7    2017 email, the start of which I have on

8    the screen for you now that has been

9    marked as part of D-1, was sent to all

10   alumni even though the "To" line just

11   indicates you?

12        A.    Correct.  I would assume

13   they sent it to all alumni.  I could be

14   wrong, but that wouldn't be the first

15   time.

16        Q.    Did you receive periodic

17   emails from The Hill School?

18        A.    So for a period of time, I

19   had completely shut off all communication

20   with the school and I decided to rejoin

21   the community.  And I would expect this

22   to be an email that went to all

23   alumnists, not just me in particular.  I

24   think it was just -- go ahead.

Kurtis N. Poulos

1    Q.    No.  Please finish.

2    A.    I think it was just

3    something that they sent out to everyone

4    in the school.

5    Q.    When did you rejoin The Hill

6    School community?

7    A.    2015.

8    Q.    Why did you decide to rejoin

9    The Hill School community in 2015?

10    A.    I personally thought it

11    would help me move on through what had

12    happened.

13    Q.    When you say "through what

14    had happened," you're talking about the

15    sexual abuse by Mr. Ralston; is that

16    right?

17    A.    Correct.

18    Q.    How did you think rejoining

19    The Hill School community in 2015 would

20    help you move on from the sexual abuse by

21    Mr. Ralston?

22    A.    The only way I can say this,

23    by going back to the scene of the crime

24    and knowing, like, it's over, it's --

Kurtis N.  Poulos

1    that it is what it was.  That was it.

2    There was nothing more than that.  It was

3    just simple I want to find out what, you

4    know -- because they keep sending out

5    emails, sending letters asking for money.

6    So I figured I might as well just get on

7    the alumni chain.  And I blocked them

8    from my email chain -- or from my email,

9    so I unblocked them.

10        Q.    When did you block The Hill

11   School from your email chain?

12        A.    I don't know.  Probably

13   early 20' teens, like 2012, 2013.

14        Q.    Is there something that

15   occurred that caused you to block The

16   Hill School from your email chain in, you

17   estimate, early 2012 or 2013?

18        A.    It was just a matter of

19   overwhelming amounts of emails from them

20   asking for donations and it was turning

21   into a spam situation where it was, like,

22   every month, please donate to help build

23   this or this or this; plus, I didn't

24   really want to be reminded of the fact.

1    Q.    When you say you didn't want

2    to be reminded of the fact, you're

3    talking about you didn't want to be

4    reminded of the sexual abuse by Mr.

5    Ralston?

6    A.    Correct.

7    Q.    So you mentioned a little

8    earlier today that when you received

9    emails from The Hill School, that's when

10   you decided you wanted The Hill School to

11   pay you the money you spent on tuition.

12        Is the email that I'm

13   showing you now that's reflected as part

14   of D-1 one of the emails you had in mind?

15   A.    It's the second email, the

16   one that's on the screen right now.

17   Q.    Okay.  What was the first

18   email?

19   A.    The first email was just

20   them acknowledging the fact that they

21   knew it was going on.  The second one was

22   the fact that, not only are they

23   acknowledging it, but now they're

24   offering help to those who were abused at

1    the school.  And I find that completely

2    fraudulent because it wasn't actual help

3    they were offering.

4         Q.    So the first email was not

5    the April 23rd, 2016 letter that you

6    received via email that was marked as

7    D-2?

8              MR. JUBB:  Objection to the

9         form.

10             THE WITNESS:  That was the

11        first email that I received.  And

12        in no way do they offer any sort

13        of resources.  They say we invite

14        you or I invite you to read about

15        the resources and policies, but in

16        no way do they offer any sort of

17        resources on their behest.  It's

18        more like we know this happened

19        and we're sorry, but move on with

20        your life.

21             So I did such as that.  I --

22        I moved on.  I had forgotten about

23        it for nearly a year, or over a

24        year.

```
1    BY MS. DOUGHERTY:

2         Q.     So you're specifically

3    referencing the sentence here that says,

4    I invite you to read about Hill'S

5    comprehensive resources and policies as

6    noted on our website that is in the

7    second paragraph of the first page of

8    D-2; is that right?

9         A.     Correct.

10        Q.     Did you go and look at the

11   comprehensive resources and policies that

12   are referenced in the last sentence of

13   the second paragraph of D-2?

14        A.     I did not because they don't

15   have the resources and they don't really

16   care, to be honest.

17        Q.     So when you received the

18   November 20th, 2017 email that was

19   previously marked as D-1 and which I now

20   have on the screen for you, this is what

21   -- that is when you decided that you

22   wanted The Hill School to pay you your

23   tuition?

24             (COURT REPORTER's NOTE:  Mr.
```

1          Jubb lost audio connection.  After

2          reading back testimony, he is

3          placing an objection to the last

4          question.)

5               THE WITNESS:  Yeah, because

6          I thought it was false

7          representation.

8     BY MS. DOUGHERTY:

9          Q.    I think you mentioned that

10    when you received the email, you sent it

11    to your mom and then called your mom.

12               Did you decide before you

13    called your mom on November 20th, 2017 in

14    relation to the November 20th, 2017 email

15    that's been marked as D-1 that you wanted

16    The Hill School to pay you back your

17    tuition?

18         A.    No.  I honestly thought the

19    people that were named in this email were

20    there to help alumnists who had been

21    abused by teachers.

22         Q.    Okay.  And you're talking

23    about Leslie Gomez and Gina Smith who are

24    identified as child protection experts in

Kurtis N. Poulos

1   the paragraph that I've now scrolled down

2   for you which is on the first paragraph

3   on the third page of D-1; right?

4        A.    That's -- exactly.  And I

5   thought that was -- that was what made me

6   thought they were actually taking this

7   seriously and going to try to remedy the

8   situation, the systemic sexualization of

9   the students at the school.

10       Q.    Okay.  So when you first

11  received the November 20th, 2017 email

12  that's been marked as D-1 and called your

13  mom, your reaction was finally there's

14  going to be some assistance available to

15  help me with addressing the impact that

16  the sexual abuse by Mr. Ralston has had

17  on my life?

18            MR. JUBB:  Objection.

19            THE WITNESS:  It wasn't just

20       for me.  It was atonability [sic].

21       I can take my lumps.  I've taken

22       my lumps.  They don't seem to need

23       to feel the need to take their

24       lumps.  So I thought this was them

 1          standing up and being, like, we

 2          recognize what happened; it's time

 3          for us to listen and move forward

 4          in a progressive way so that it

 5          doesn't happen again.

 6               That's why I thought the

 7          child protective -- or protection

 8          experts were going to be

 9          advocates.

10     BY MS. DOUGHERTY:

11          Q.    So your initial reaction to

12     the November 20th, 2017 email that's been

13     marked as D-1 was not that you wanted

14     money from The Hill School, but that you

15     had a belief The Hill School was offering

16     assistance through these child protection

17     experts?  Is that a fair

18     characterization?

19               MR. JUBB:  Hold on.  Can you

20          hear me?

21               MS. DOUGHERTY:  I'm sorry.

22               MR. JUBB:  I've been waving

23          my hands for two minutes.  I

24          haven't been able -- for whatever

1    reason, my phone line cut out.

2         MS. DOUGHERTY:  I'm sorry,

3    Mr. Jubb.  I had -- you weren't on

4    my screen.

5         MR. JUBB:  All right.  I've

6    been waving my hands because I've

7    been talking.  I haven't heard

8    anything you said.

9         So I'm going to need to go

10   off the record and reconnect with

11   the phone, please.

12        MS. DOUGHERTY:  Okay.

13        THE VIDEOGRAPHER:  We are

14   now going off the record.  The

15   time is 12:32.

16        (Mr. Jubb is reconnected to

17   Zoom.)

18        (Whereupon, the court

19   reporter read the referred-to

20   testimony.)

21        MR. JUBB:  Note my

22   objection.  And then we can go

23   back on the record, and Mr. Poulos

24   can answer that.

Kurtis N. Poulos

1           THE VIDEOGRAPHER:  We are

2     now back on the record.  The time

3     is 12:43.

4           You may continue.

5           MS. DOUGHERTY:  We briefly

6     just had a break off the record

7     where counsel, Mr. Poulos, Madam

8     Court Reporter, and Mr.

9     Videographer had a discussion to

10    address Plaintiff's counsel's loss

11    of sound for a number of questions

12    during the deposition.

13          The court reporter read back

14    the questions to where Mr. Jubb

15    believed he lost his audio

16    connection.  We've listened to the

17    questions and answers.  Mr. Jubb

18    has indicated where he wanted to

19    assert an objection where he

20    previously was not heard on the

21    record to assert an objection, and

22    now we're going to resume with the

23    court reporter reading back my

24    last question and Mr. Poulos

1          answering the question.

2                  Is that fair a

3          characterization, and does

4          everybody agree that -- Mr. Jubb

5          in particular, do you agree that

6          you've had a fair opportunity to

7          hear the questioning that you

8          missed and assert your objections?

9                  MR. JUBB:  I agree so long

10         as the next question that's

11         re-read by the court reporter is

12         the same one we left on during the

13         record.  I don't think that's

14         going to be an issue, but we're

15         ready to continue.

16                 (Whereupon, the court

17         reporter read the following:

18                 "Q.  So your initial

19         reaction to the November 20th,

20         2017 email that's been marked as

21         D-1 was not that you wanted money

22         from The Hill School, but that you

23         had a belief The Hill School was

24         offering assistance through these

1          child protection experts?  Is that

2          a fair characterization?")

3                THE WITNESS:  Yes.

4                MR. JUBB:  Note my

5          objection, and then answer.

6                THE WITNESS:  Okay.  Note

7          his objection, but yes.

8    BY MS. DOUGHERTY:

9          Q.   When did your -- let me

10   start again.

11                Was there a time that your

12   reaction to the November 20th, 2017 email

13   that's been marked as D-1 changed?

14          A.   Yeah.  As soon as I found

15   out that they weren't actual child

16   protection experts, they were attorneys,

17   it, frankly, pissed me off because that's

18   -- I -- without going into too much, I

19   guess I can say it, I believe it's under

20   false pretenses that they want to help

21   people and protect people and provide

22   information anonymously, but they don't

23   actually provide any of those services.

24   They're attorneys.  They're looking out

1    for their client.

2         Q.    When did you learn that --

3    I'm going to start again.

4              The "they" in your answer is

5    referring to Leslie Gomez and Gina Smith;

6    is that right?

7         A.    Correct.  And The Hill

8    School.

9         Q.    When did your reaction

10   change to -- let me start again.

11             When did your reaction to

12   the November 20th, 2017 email that's been

13   marked as D-1 change to, I guess, being

14   pissed off?

15        A.    It changed when I found out

16   that they weren't child protection

17   experts when I received a phone call from

18   my mother saying she had, you know,

19   researched both of them and recognized

20   both of them as actual attorneys and not

21   child protection experts, so to speak.

22        Q.    When was that telephone call

23   from your mother where your mother

24   expressed to you her belief that the

Kurtis N. Poulos

```
1    child protection experts were attorneys?

2         A.    Twenty minutes after I sent

3    her that email.

4         Q.    So on November 20th, 2017,

5    your mother told you her belief that Ms.

6    Gomez and Ms. Smith were attorneys; is

7    that right?

8         A.    Correct.

9         Q.    And then when your mother

10   informed you that Ms. Smith and Ms.

11   Gomez -- according to, at least, her

12   research -- were attorneys, is that when

13   you decided that you wanted The Hill

14   School to pay you your tuition?

15        A.    Not initially, no.

16        Q.    When?  What do you mean,

17   "not initially"?

18        A.    Initially, I was just upset.

19        Q.    Was there a time when your

20   attitude changed from being upset to

21   something else?

22        A.    Yeah, after speaking with my

23   girlfriend at the time and thinking it

24   over and feeling that the school was
```

Kurtis N. Poulos

1    purposely deceiving everybody who

2    received that email.

3         Q.    Your girlfriend at the time

4    was Emily who we talked about yesterday;

5    is that right?

6         A.    Correct.

7         Q.    So when was it that your

8    attitude changed?

9         A.    Minutes.  Hours.  I don't

10   know.  It was growing.  It's so deceitful

11   in the way it's verb -- like, the

12   verbiage of that email is so deceitful,

13   that I felt insulted.

14        Q.    So close in time to --

15   within days of November 20, 2017, that's

16   when you decided that you wanted The Hill

17   School to pay your tuition; is that fair?

18             MR. JUBB:  I'll object.

19             THE WITNESS:  Are you done?

20             Yeah, that's -- within a day

21        or two, maybe a week.  I don't...

22   BY MS. DOUGHERTY:

23        Q.    So you decided that you

24   wanted The Hill School to pay you back

1    your tuition within a couple days, maybe

2    a week, of receiving the November 20th,

3    2017 email; is that correct?

4              MR. JUBB:  Objection.

5              THE WITNESS:  It wasn't so

6         much about the tuition.  It was so

7         much about them taking

8         responsibility for writing a

9         letter that tries to be, like,

10        we're being proactive, and it's

11        total BS, excuse my language.  But

12        they're trying to say they're

13        being advocates for the people

14        that were abused at that school

15        over decades.

16              It wasn't just my class.

17        This was what I said before:

18        Systemic.  And it's insulting

19        because the one thing I took away

20        was we were told to stand up --

21        sorry.  Sorry.

22              That school always told us

23        that we should stand up for what's

24        right, but they won't do the same

1        thing.  And I don't understand why

2        that's so difficult for them to

3        understand.

4            Like, when you drive on the

5        campus, it's whatsoever things are

6        true.  They teach you to be a man;

7        stand on your own.  And then at

8        the same time, they're so willing

9        to rip the rug out from underneath

10       your feet and be, like, not our

11       fault, but thanks, take care.

12  BY MS. DOUGHERTY:

13       Q.   Was it your perception that

14  the fact that the -- well, let me start

15  again.

16            When you said -- was

17  there something -- let me start again.

18            Was there something in

19  particular about the November 20th, 2017

20  email that's been marked as D-1 that made

21  you feel as though The Hill School was

22  not taking responsibility?

23       A.   No.

24            MR. JUBB:  Objection.

```
1              THE WITNESS:  Not at all.  I
2         thought they --
3              Sorry, Lane.  Do your thing.
4              MR. JUBB:  No.  That's it.
5         That's how speaking objections
6         are -- or excuse me.  That's how
7         objections are, just object to the
8         form.
9              Go ahead.
10              MS. DOUGHERTY:  Mr. Poulos,
11         just -- we can have my question
12         read back.
13              But just so we stop having
14         this problem because -- I mean, I
15         think Mr. Poulos is probably
16         pausing to make sure Lane has an
17         opportunity to speak before he
18         answers.
19    BY MS. DOUGHERTY:
20         Q.   When Mr. Jubb says the word
21    "objection," it's understood that his
22    objection is to the form of my question,
23    which means that it could be a question
24    that he thinks is leading when it
```

Kurtis N. Poulos

1    shouldn't be leading, that I've made a

2    mistake in my question, that I've asked a

3    confusing question, that I've asked a

4    compound question, that I'm meaning

5    multiple questions in one, that I've

6    perhaps characterized testimony, that

7    I've -- I think I already said misstated

8    a fact -- or didn't have a verb and a

9    noun, that type of thing, he's got an

10   actual problem with my question, the form

11   of it.

12              If Mr. Jubb wants to

13   complain about something else, then

14   you'll see his mouth continue to move and

15   he'll let me know what his issue is.

16              But when he says the word

17   "objection," it's understood that it's

18   form.  And unless he says more, which I

19   think you probably would know before you

20   started to speak, that's it, and you can

21   just answer.

22              I might say to him, what's

23   the problem with my question, which I

24   think you've heard me say a couple times,

Kurtis N. Poulos

1 and he may have said it to me too when I

2 said the word "objection," and then we'll

3 discuss it.

4          But the purpose is that I

5 ask my question, Mr. Jubb takes his

6 position, as I did with some of his

7 questions, that one of us has an issue

8 with the form.  It alerts the questioner

9 that they have an opportunity to restate

10 their question to fix it or to ask the

11 other attorney what the problem is so

12 that the question can be restated.

13          So just so you understand.

14 I realize that you don't conduct

15 depositions for a living.  I don't recall

16 whether you said you ever participated in

17 a deposition before.  We probably should

18 have, as an informative matter, explained

19 that to you at the beginning of the

20 deposition I think as the court, as you

21 pointed out, suggested we do.  But we did

22 not do that.

23          So that's just information

24 for you to use and know that you can just

```
1    answer if, you know, nothing further

2    occurs between Mr. Jubb and I.

3               And I invite Mr. Jubb to add

4    or correct anything he thinks was wrong

5    about the information that I just

6    provided to you, Mr. Poulos.

7               MR. JUBB:  You can answer

8         the question.

9               MS. DOUGHERTY:  Madam Court

10        Reporter, can you please read back

11        the question?

12              (Whereupon, the court

13        reporter read the following:

14              "Q.   Was there something in

15        particular about the November

16        20th, 2017 email that's been

17        marked as D-1 that made you feel

18        as though The Hill School was not

19        taking responsibility?")

20              THE WITNESS:  And I can

21        answer now?

22   BY MS. DOUGHERTY:

23        Q.    Yes.

24        A.    No.  I thought it was a
```

1   moment for them to actually take

2   accountability without escalating the

3   matter.

4         Q.    I'm sorry.  So you thought

5   that The Hill School -- strike that.

6               Once you learned that Ms.

7   Gomez and Ms. Smith were lawyers for The

8   Hill School -- you know what?  Strike

9   that.

10              When did you first decide

11  that you wanted The Hill School to pay

12  you back your tuition?

13              MR. JUBB:  Objection to the

14        form.

15              THE WITNESS:  The moment I

16        found out that they had falsely

17        represented people to help people

18        when it wasn't the fact.  That's

19        never what they intended to do.

20        At least overall, it does not seem

21        like that's what they intended to

22        do, was actually help people going

23        forward or alumnists who had

24        already dealt with the situation.

1    BY MS. DOUGHERTY:

2          Q.     So you decided to come

3    forward and report the sexual abuse by

4    Mr. Ralston when you learned that Ms.

5    Gomez and Ms. Smith were not child

6    protection experts, but in fact lawyers

7    for The Hill School; is that fair?

8          A.     Correct.

9                 MR. JUBB:  Objection.

10   BY MS. DOUGHERTY:

11         Q.     What did you have in mind by

12   coming forward to report the sexual abuse

13   by Mr. Ralston?

14         A.     Rephrase, please?

15         Q.     Sure.  How did you intend to

16   come forward and report the abuse by Mr.

17   Ralston?

18         A.     I intended that the school

19   starts to recognize the systemic

20   sexualization of the students even before

21   it became a co-gender boarding school.

22   We had issues when it was a single gender

23   school, and it became even worse when it

24   became a co-gender school with teachers

Kurtis N. Pouncy

1    impregnating and sleeping with -- maybe

2    not impregnating -- but sleeping with

3    their female students.

4              And it's like I said before

5    yesterday.  This is a legacy for my

6    family.  So to say I went to a school

7    where this happened, it doesn't really

8    coincide with what I believe that school

9    was intentionally or initially built for.

10   It wasn't built to be this cesspool of

11   teachers taking advantage of students,

12   whether male or female now, and that's

13   what it's become.

14             And this is a precipe of

15   them knowing that it's happening and

16   acknowledging that it's happening, but

17   not fully taking responsibility for what

18   has happened.

19        Q.    Okay.  So as I understand

20   your testimony, you received the November

21   20th, 2017 email that's been marked as

22   D-1; you initially considered contacting

23   Ms. Gomez or Ms. Smith because you

24   believed them to be child protection

Kurtis N. Poulos

1    experts that could provide assistance;

2    you learned that Ms. Gomez and Ms. Smith

3    were lawyers; you then believed that the

4    school was not taking responsibility and

5    decided you were going to do something;

6    correct?

7         A.    Correct.   Correct.

8         Q.    What did you decide you were

9    going to do?

10         A.    Reach out to an attorney.

11         Q.    Why did you think you needed

12    to reach out to an attorney?

13              MR. JUBB:  Note my

14         objection.

15              THE WITNESS:  Again -- again

16         a lot of this -- putting it so

17         delicately, there are a lot of

18         families -- including the

19         president's sons who have gone to

20         this school -- there are a lot of

21         legacies.  You know, Oliver --

22         there's so many people that have

23         gone to this school where this

24         could ultimately maybe change

Kurtis N. Poulos

1      their lives, whether they

2      experienced it or not.

3              But, you know, to have

4      generations of people who have

5      gone to this school, who felt

6      empowered by going to this school

7      and then to be abused and the

8      school is just sitting there and

9      going, well, thanks for your

10     money, we're going to build a

11     building and put your name on it,

12     maybe we'll put a plaque in the

13     chapel, it seems so disconcerting.

14  BY MS. DOUGHERTY:

15     Q.     So you wanted to do

16  something to have The Hill School change

17  its practices; is that fair?

18              MR. JUBB:  Objection to

19     form.

20              THE WITNESS:  Yeah.

21  BY MS. DOUGHERTY:

22     Q.     What did you think a lawyer

23  was going to do to assist you in your

24  objective of causing The Hill School to

Kurtis N.   Poulos

```
 1     change its conduct?

 2               MR. JUBB:  Same objection.

 3               THE WITNESS:  Maybe just

 4          start treating your students like

 5          human beings and not paychecks.

 6     BY MS. DOUGHERTY:

 7          Q.    You believe that a lawyer

 8     would be able to do something to assist

 9     you to make The Hill School treat its

10     students like human beings instead of

11     paychecks; is that right?

12          A.    Correct.

13          Q.    What did you think a lawyer

14     was going to do to help you cause The

15     Hill School to treat its students like

16     humans instead of paychecks?

17               MR. JUBB:  Note my

18          objection.

19               THE WITNESS:  It's a matter

20          of accountability.

21               And if I could be so --

22          Lane, you wanted me to be

23          accountable yesterday.  You wanted

24          to pull up all of my back history.
```

1          So why doesn't your client, The

2          Hill School, want to pull up their

3          accountability for the decades if

4          not nearly two centuries?

5   BY MS. DOUGHERTY:

6          Q.    Okay.  Mr. Poulos, you

7   wanted The Hill School to be held

8   accountable for its involvement in the

9   sexual abuse by Mr. Ralston against you;

10  is that fair?

11          MR. JUBB:  Note my

12          objection.

13          THE WITNESS:  That is fair.

14  BY MS. DOUGHERTY:

15          Q.    And is it also true that you

16  wanted The Hill School to be held

17  accountable for its involvement in the

18  sexual abuse of any other student that

19  has attended The Hill School?

20          A.    Yes.

21          MR. JUBB:  Same objection.

22  BY MS. DOUGHERTY:

23          Q.    And you believe that hiring

24  an attorney was the way that you could

1    make The Hill School be held accountable

2    for its participation in the sexual abuse

3    that you sustained from Mr. Ralston?

4              MR. JUBB:  Objection.

5    BY MS. DOUGHERTY:

6         Q.    Is that right?

7         A.    I believe -- I'm sorry.

8         Q.    Go ahead.

9         A.    I honestly believed that

10   when I received this email that's on my

11   computer screen, they wanted to progress

12   to start helping people.

13             You know, making me whole is

14   never going to be about the money.

15   That's fine.  I can accept that.  The

16   issue is the systemic way they are going

17   about covering up.

18             And I could have --

19   honestly, I could have just been like,

20   you know what, I'm going to call The New

21   York Times, The Boston Globe, The

22   Washington Post.  You know, I could have

23   called any of those.  I decided that I

24   thought it would be better to speak with

1    them through an attorney without being

2    emotional.

3             Q.    So just directing your

4    attention back to D-1, the first

5    paragraph of Page 3, the first sentence

6    says, I extend an invitation to any Hill

7    School community member who wishes to

8    share his or her experiences with the

9    school or, if appropriate, with law

10   enforcement.

11             Second sentence:  I also

12   encourage any students, parents, alumni,

13   or staff to reach out directly to the

14   school to share your observations and

15   feedback.

16             Is there a reason that you

17   individually did not reach out to the

18   school directly to share your experiences

19   with Mr. Ralston?

20             MR. JUBB:  Objection to the

21       form.

22             THE WITNESS:  With Mr.

23       Ralston or Mr. Zelman [ph]?

24   BY MS. DOUGHERTY:

Kurtis N.   Poulos

1          Q.    I'm sorry.  I want to

2    know --

3          A.    Or Lehman.

4          Q.    I want to know if there's a

5    reason why you, Mr. Poulos, as compared

6    to contacting a lawyer to do it for you,

7    why you, Mr. Poulos, did not reach out

8    directly to the school to share your

9    experiences or the sexual abuse or report

10   the sexual abuse by Mr. Ralston?

11             MR. JUBB:  Objection to the

12        form.  Asked and answered.

13             THE WITNESS:  It wasn't

14        asked and answered because I

15        haven't answered.

16   BY MS. DOUGHERTY:

17        Q.    It's okay.  You can just

18   ignore him.  Do you want me --

19        A.    And don't laugh.  This isn't

20   a laughing matter.

21        Q.    Oh, I'm not laughing.  I

22   think it's very serious.

23        A.    No.  He was laughing.

24             MR. JUBB:  I didn't laugh at

Kurtis N. Poulos

1          all.  And the audio should

2          absolutely reflect that, and we

3          should save it, of who apparently

4          laughed.

5     BY MS. DOUGHERTY:

6          Q.    No, Mr. Poulos.  I don't

7     think Mr. Jubb was laughing.  I think he

8     was -- he leaned down when he was

9     talking.  It may have looked like that,

10    but I don't think he was laughing, but,

11    you know, I can't speak for him.  But

12    that's -- so it's okay.

13              He's allowed to assert

14    objections.  I'm telling you to ignore it

15    because I care very deeply about what

16    your answers are and I want them to be

17    your answers that are not distracted by

18    objections.  So here's --

19              MR. JUBB:  That time I

20         laughed.

21              MS. DOUGHERTY:  Well, I

22         don't know why.  I mean, that's

23         disrespectful.

24              MR. JUBB:  No.  I laughed at

Kurtis N.   Poulos

1           that comment from you considering

2           yesterday's objections.

3                    THE WITNESS:  You know what?

4           Then I'm just going to end this

5           whole thing.

6                    You want my answer?

7    BY MS. DOUGHERTY:

8           Q.    I want -- I want to --

9           A.    Stop talking.

10          Q.    Okay.

11          A.    You want my answer about why

12   I didn't call the school?  Because they

13   don't care.

14                   Is that funny now, Lane

15   Jubb?  They don't care.

16                   MR. JUBB:  Mr. Poulos,

17          please don't ask me questions.

18          I've never ever laughed at

19          anything you have said.  Please.

20          And the audio will reflect that.

21                   So please make sure that

22          that's saved and we can go over

23          that again.

24   BY MS. DOUGHERTY:

Kurtis N.   Poulos

1              Q.   Yeah, Mr. Poulos.  When Mr.

2    Jubb said he was laughing, he was

3    laughing at me.  That's fine.

4              So, Mr. Poulos, you believed

5    that you needed a lawyer to assist you in

6    reporting this sexual abuse by Mr.

7    Ralston to The Hill School because you

8    believed The Hill School didn't care; is

9    that right?

10             MR. JUBB:  Objection.

11             THE WITNESS:  Correct.  They

12        didn't care about pretty much

13        anything that ever happened to any

14        student that was not reflective of

15        a Hill School student in a

16        positive way.

17   BY MS. DOUGHERTY:

18             Q.   And your objective was to

19   make The Hill School take accountability

20   for its involvement in the sexual abuse

21   that you sustained by Mr. Ralston in an

22   appropriate way, I think you expressed it

23   in a nonpublic way, by not going to the

24   press; is that right?

1          MR. JUBB:  Objection.

2          THE WITNESS:  That's

3     correct.  That's correct,

4     Candidus.

5   BY MS. DOUGHERTY:

6          Q.    When did you decide to --

7     let me start again.

8               When did you decide that you

9     should retain an attorney to assist you

10    in holding The Hill School accountable

11    for the abuse by Mr. Ralston?

12          MR. JUBB:  Same objection.

13          THE WITNESS:  There wasn't a

14    specific time.  It was more of a

15    matter of principle over a period

16    of time where I thought this can't

17    continue; I can't be proud to go

18    to a school that accepts this.

19   BY MS. DOUGHERTY:

20          Q.    I think you mentioned

21    yesterday in your testimony that you did

22    research regarding Mr. Garabedian before

23    you decided to retain Mr. Garabedian.

24               Did you research any other

Kurtis N. Poulos

1    lawyers besides Mr. Garabedian?

2         A.    Yeah, but I couldn't tell

3    you their names.

4         Q.    Did your mother suggest any

5    lawyers to you other than Mr. Garabedian?

6         A.    Yes, she did; but I, again,

7    couldn't tell you their names.

8         Q.    I'm going to take the share

9    screen down.  Sorry.

10             Well, it's better now.

11             Was there a specific

12    criteria that you had in selecting an

13    attorney to assist you in holding The

14    Hill School accountable?

15        A.    Somebody who I felt would

16    fight for the issue at hand, not just me.

17        Q.    So you wanted a lawyer that

18    would fight for sexual abuse victims?  Is

19    that what you mean by "the issue at

20    hand"?

21        A.    Yeah.  And it's not just --

22    it's not just, like, a male to male

23    thing, but it's -- it's this systemic

24    pedophilia that was going on at that

Kurtis N. Poulos

1    school where I thought, ultimately, if it

2    could be brought to light, the school

3    could ultimately just be, like, we're not

4    going to just send out random emails once

5    a year saying we know this, sorry, but

6    this shit happened, and call these random

7    women and they're going to help you, but

8    that they could actually help people.

9    That's what upsets me the most.

10         Q.    What upsets you the most?

11         A.    Because they're playing a

12    game.

13         Q.    "They," The Hill School?  Is

14    that who you're talking about?

15         A.    Correct.  It's not --

16         Q.    What game do you think The

17    Hill -- I'm sorry.

18         A.     It's not just the one

19    teacher.  It's not just me.  It's they

20    know what's going on; they turn a blind

21    eye until it gets too far.

22              And fortunately for the

23    young lady, she spoke up and told her

24    parents.  I should have done the same

Kurtis N. Poulos

1    when I was her age.  I didn't have that

2    strength.

3              But why would somebody want

4    to send their child to a school like that

5    knowing that there's a possibility of

6    some random teacher trying to sexually

7    abuse their students because they feel

8    ultimately in a situation of power?

9              And for me, it pissed me off

10   even more because, yes, my mother made

11   the decision that I would go to school

12   there because it was part of a legacy.

13             But I spent the money.  It

14   wasn't her money; it was my money.  It

15   was my life.

16        Q.    I realize that you said you

17   didn't remember the specific attorneys

18   that you were researching when you

19   decided that you wanted to retain an

20   attorney to help you hold The Hill School

21   accountable.

22             But was there, and do you

23   remember, if there was --

24             MR. JUBB:  Objection.

Kurtis N. Poulos

```
1    BY MS. DOUGHERTY:
2          Q.    -- a reason that you
3    selected Mr. Garabedian over the other
4    attorneys?
5                MR. JUBB:  Objection.
6                THE WITNESS:  Like I said
7          yesterday, the only reason I chose
8          Mitchell was because, after
9          reading his background, it seemed
10         like he would be somebody who
11         could properly explain my case, I
12         guess, or -- this is very
13         uncomfortable for me to talk about
14         in general.  And I talked to him
15         about it, and I told him that.
16                I just wanted somebody to
17         represent me who could -- who I
18         thought could do his best to
19         properly represent me to make sure
20         that this gets rectified.
21   BY MS. DOUGHERTY:
22         Q.    Was there specific
23   information that you learned about Mr.
24   Garabedian during your research that led
```

Kurtis N. Poulos

1  you to believe Mr. Garabedian was the one

2  who could help you achieve your

3  objective?

4       A.    Nothing more than the cases

5  that I'd read about.

6            Sorry.  My phone is down

7  here.

8            Nothing more than I could

9  read about besides the fact that, you

10  know, he had fought a very long -- I

11  mean, that was the same sort of systemic

12  sexual abuse with the Catholic church,

13  and I felt that very much aligned with

14  what was going on with me and other

15  students at the school.

16       Q.    So you read about cases that

17  Mr. Garabedian was involved in that

18  involved the Catholic church?

19       A.    Correct.

20       Q.    Were there other types of

21  cases -- or let me start again.

22            What type of cases did you

23  read about that Mr. Garabedian was

24  involved in that caused you to believe

Kurtis N. Poulos

```
1    Mr. Garabedian was the lawyer that could
2    assist you in achieving your objective?
3         A.    That was pretty much the one
4    that set it up.  I don't really remember
5    anything more than that.
6              And if you're trying to
7    infer if I saw the movie where he was
8    highlighted -- I think it's called
9    Spotlight -- I've never seen that movie.
10   So that had no --
11        Q.    I'm not trying to infer
12   anything.  I'm just trying to learn all
13   of the information that you found in your
14   research that led you to believe that Mr.
15   Garabedian was the lawyer that could
16   assist you.
17             I think you mentioned that
18   you read some cases, so I just want to
19   know what those cases were.
20        A.    The only one that sticks out
21   in my mind is the one against the
22   Catholic church because that systemic
23   sexualization of minors in a situation
24   where they have no control or they feel
```

Kurtis N. Poulos

1  like they have no control, and it felt

2  like he was fighting for the person or

3  the people who were affected by this the

4  most.  And I thought if anybody could

5  fight for this, it would be him.

6          Q.    Other than cases, was there

7  any other information that you learned

8  during your research about Mr.

9  Garabedian?

10          A.    I learned after that he was,

11  I guess, a character in -- or profiled in

12  the movie Spotlight.  But again, I've

13  never watched that movie.  I have no

14  desire to watch that movie because of

15  what it would -- what I'd have to relive

16  through those victims.

17              So he just felt like

18  somebody who could actually advocate for

19  people in my situation because he had

20  already done that.

21              I'm okay.

22          Q.    Just to be clear, your

23  objective in retaining Mr. Garabedian was

24  so that Mr. Garabedian would provide you

1    legal services, not counseling or

2    something of that nature; is that right?

3              MR. JUBB:  Note my

4         objection.

5              THE WITNESS:  No, not

6         counseling; just legal advice and

7         a way to -- that's it.  Just legal

8         advice and to make this

9         situation...

10   BY MS. DOUGHERTY:

11        Q.    Are you done your answer

12   there?

13        A.    Yeah.

14        Q.    I wasn't sure if you were

15   still thinking.

16        A.    No.  I'm fine.

17        Q.    I think you confirmed

18   yesterday, but just in case, what were

19   the fee terms of Mr. Garabedian's

20   retention?

21        A.    I believe it was a

22   percentage, maybe 20 percent of...

23        Q.    So you agreed to -- let me

24   start again.

1              So if you recovered money
2    from The Hill School, Mr. Garabedian
3    would receive a percentage of the amount
4    of money you recovered; is that correct?
5         A.    Yes.  That's why he was not
6    going to charge me upfront.  He didn't
7    ask for a retainer.
8         Q.    Did you pay any costs
9    associated with the representation of Mr.
10   Garabedian?
11        A.    No, I did not.
12        Q.    I'm trying to find my -- oh,
13   there it is.  Okay.
14              All right.  I'm going to
15   share my screen again, in theory.  Sorry.
16   I cannot -- all right.
17              MR. JUBB:  Can you identify
18         this one for me, Candy?
19              MS. DOUGHERTY:  I'm trying
20         to move it so I can, but my -- I'm
21         not able to move it.  Let me stop
22         the share.  When I click on it or
23         use my keyboard to move it, it
24         seems like it's opening my email.

Kurtis N. Froedtert

1          Let me try again.  Let's
2      see.
3          There we go.  Okay.  I'm not
4      really sure what's going on.
5  BY MS. DOUGHERTY:
6          Q.   Okay.  I'm showing you a
7  document that I'm going to mark as D-3.
8  The documents reflect a series of emails,
9  and I believe it came from your mother,
10 first produced to Mr. Jubb and then
11 forwarded to me.  Let's see.
12          At the top, it says -- top
13 left, 8/1/2020, and in the center, Swartz
14 Campbell, LLC, dash, Forward, colon, The
15 Interview.  I don't think that this
16 document has been produced with a Bates
17 label, so I'm just sending it in the
18 manner in which -- I'm showing it to you
19 in the manner which I received it.
20          The bottom of the first page
21 of D-3 is what looks like an email.  It
22 says, on Wednesday, December 13, 2017 at
23 11:43 a.m., Kurtis Froedtert -- and then
24 your email address -- wrote, colon.

1          Can you just read that
2   paragraph to yourself and let me know if
3   it reflects an email that you sent on
4   December 13, 2017, that being the
5   paragraph with the first email reflected
6   at the bottom of D-3?
7          Just wave when you've
8   satisfied yourself that you've read it
9   and can confirm whether it's an email you
10  wrote.
11       A.    Yeah.
12       Q.    Now that you've read the
13  email at the bottom of D-3, does D-3
14  refresh your recollection regarding the
15  fee terms that you agreed to when you
16  retained Mr. Garabedian?
17       A.    Yeah.  It says 20 -- 20 to
18  30 percent.
19       Q.    And then it looks like
20  there's an email from your mother to you
21  December 13, 2017 going up from the
22  bottom of the page of D-3, and then
23  there's an email from you December 13,
24  2017 at 11:14 a.m. to your mother that

1    says, Okay.  Thanks.  My Dials, paren,

2    yearbooks, end paren, comma, diploma and

3    class jacket, comma, ring and tie were

4    all in a box that was lost in my move to

5    Maryland.  I haven't seen them since I

6    lived at the house in Shorewood.

7                So what are you referring to

8    and why were you picking out your dials,

9    diploma and class jacket, ring and tie to

10   your mom in December 13, 2017?

11        A.     I would assume it had

12   something to do with a phone call either

13   earlier that morning or the night before

14   because I have -- because I have none of

15   those -- so I have none of that.

16                And the dials, yes, the

17   yearbooks, my diploma, I don't have that,

18   my class jacket, the ring and the tie.

19   It was all marked in a box that said Hill

20   School that I kept in the basement of the

21   house in Shorewood.

22                And when I moved, I was

23   living in my childhood home that my

24   mother was no longer living in.  So I

Kurtis N. Poulos

1  moved my property out of -- out of her

2  home so that she could sell it.  That box

3  didn't show up.

4              There was a platinum ring,

5  my school jacket -- or graduating class

6  jacket, school tie, and the diploma.

7        Q.    You moved to Connecticut in

8  2016; is that right?

9        A.    Yeah.  But this got lost

10  when I moved to Maryland.

11        Q.    Okay.  Oh, I see.  You moved

12  to Maryland in 2012; right?  Around

13  there?

14        A.    No.  I moved to Maryland in

15  2002, 2003.

16        Q.    You're right.  I apologize.

17  Okay.

18              So you moved to Maryland in

19  2002 from your childhood home?

20        A.    Correct.  My mother had

21  moved, and I had started to rent the

22  house from her with a couple of friends.

23        Q.    And at least as of 2002

24  before you moved to Maryland, you had a

1    box that had The Hill School written on

2    it; is that right?

3          A.    Yeah.  It had my

4    grandfather's graduation platinum -- or

5    his -- I don't know -- maybe it was

6    sterling silver -- plate.  It's a

7    graduation plate.  It had my graduation

8    jacket, my tie, my diploma.  The only

9    thing I think I took out of it was a

10   blanket, which my mother still has.

11         Q.    Was there anything else in

12   the box that you recall?

13         A.    No, because as soon as I

14   graduated, I just put it all in a box.

15         Q.    Did you have any -- it was

16   just one box; right?  There wasn't

17   multiple boxes of Hill School stuff?

18         A.    No.  It was a small box.  It

19   wasn't like a box.  It was just a

20   12-by-12-by-10 box.

21              MS. DOUGHERTY:  Could we

22         just take a five-minute comfort

23         break, if that's okay with

24         everybody?

Kurtis N.   Poulos

 1                    MR. JUBB:  That's fine.

 2                    MS. DOUGHERTY:  Maybe if you

 3            want to do a little bit longer --

 4            oh, I'm sorry.  You're going to go

 5            off the record?

 6                    THE VIDEOGRAPHER:  We are

 7            now going off the record.  The

 8            time is 1:35.

 9                    (Whereupon, a brief recess

10            was held.)

11                    THE VIDEOGRAPHER:  We are

12            now back on the record.  The time

13            is 1:46.

14                    You may continue.

15    BY MS. DOUGHERTY:

16            Q.    Mr. Poulos, what did you

17    think that Mr. Garabedian would do to

18    hold The Hill School accountable?

19                    MR. JUBB:  Objection.

20                    THE WITNESS:  Bring to light

21    what happened over decades.

22    BY MS. DOUGHERTY:

23            Q.    Is there something specific

24    that you wanted Mr. Garabedian to do to

Kurtis N. Poulos

1    hold the school accountable?

2           A.    Bring to light.

3                 Are you objecting, Lane?

4                 I just wanted it to be

5    brought to light.

6           Q.    Is it a fair

7    characterization that you left it to Mr.

8    Garabedian to decide the appropriate

9    manner to pursue holding a school

10   accountable and bringing to light the

11   circumstances of the abuse?

12                MR. JUBB:  Objection.

13                THE WITNESS:  Sure.  And I

14          thought it would go through the

15          proper channels.

16   BY MS. DOUGHERTY:

17          Q.    A few times you've

18   referenced other instances of

19   improprieties between faculty of The Hill

20   School and students.  You referred to it

21   as a systemic problem.

22                Can you please tell me all

23   the other instances of improprieties that

24   you have in mind and have been referring

1    to?

2         A.    Do you want specific names?

3    Because I don't feel comfortable doing

4    that.  It's not my place.

5         Q.    Why don't you start with a

6    list of what you're comfortable telling

7    me, and then we can go from there?

8         A.    I know that there was or

9    there were teachers sleeping with

10   students -- male, female -- because when

11   I attended, it was all male.  I do know

12   that there were teachers who were

13   sleeping with other teachers.  I do know

14   that there were teachers abusing

15   students.

16              And for certain students --

17   and again, now being 42 years old, I

18   understand that that's not right, but

19   certain -- certain kids, I guess at the

20   time, you could say took it as a badge of

21   honor, like I'm a student and I get to

22   sleep with one of my teachers.

23              And it was well known

24   because we would watch them walk off

1    campus.

2           Q.    Okay.  So just so I have the

3    list correct, there were instances of

4    teachers sleeping with students, teachers

5    sleeping with other teachers, and

6    teachers abusing students; is that right?

7           A.    Correct.  And teachers

8    cheating on their spouses.

9           Q.    Teachers cheating on

10   spouses, you mean with other teachers or

11   students?

12          A.    Both.

13          Q.    Both.  Okay.

14                So let's start with the

15   first on your list, teachers sleeping

16   with students.

17                While you were a student at

18   The Hill School, it's your belief that

19   teachers were having sex with students;

20   is that right?

21          A.    That's correct.

22          Q.    At the time you attended The

23   Hill School, all the students were male;

24   is that correct?

1      A.      Correct.

2      Q.      And I think you said male,

3  female in your answer.  What did you mean

4  when you said male, female?

5      A.      Well, it was female teachers

6  sleeping with male students.

7      Q.      Were male teachers also

8  sleeping with male students?

9      A.      There was rumors of abuse

10  between male teachers and male students.

11      Q.      What type of abuse did you

12  learn about -- well, let's do it this

13  way.

14          Let's put aside your

15  experience.  At the moment, I'm just

16  asking for instances of inappropriate

17  contact between teachers and students

18  other than you.  Okay?

19          So you said that there were

20  reports of abuse by male teachers on male

21  students.  Were those reports of abuse by

22  male teachers on male students abuse of

23  students other than you?

24      A.      Not at the time, no.

1          Q.    Okay.  So when you were

2    attending The Hill School, you weren't

3    aware of abuse by a male teacher on a

4    male student other than the abuse that

5    you sustained from Mr. Ralston; is that

6    correct?

7          A.    I was waiting for an

8    objection.

9                But yes, I was aware that

10   there was improprieties by a certain

11   teacher towards certain students.  It was

12   known throughout the campus, but no one

13   in the faculty stepped forward.

14         Q.    Okay.  We'll get to that,

15   but I just want to confirm for the moment

16   that the impropriety by a male teacher --

17   let me start again.

18                The abuse by male teachers

19   to male students -- let me start again.

20                Were there abuse by male

21   teachers to male students other than the

22   abuse that you sustained from Mr.

23   Ralston?

24         A.    I believe so, yes.

1          Q.    How many -- let me start

2    again.

3                Was the abuse by more than

4    one teacher?

5          A.    To my knowledge, yes.

6          Q.    So more than one male

7    teacher abused male students other than

8    you while you were at The Hill School; is

9    that right?

10         A.    Correct.

11         Q.    How many male students

12   abused -- let me start again.

13               How many male teachers

14   abused male students when you were at The

15   Hill School?

16         A.    I can't say for sure.

17         Q.    How many -- let me start

18   again.

19               How did you learn that there

20   was abuse by male students -- I keep

21   doing this.

22               You're uncomfortable naming

23   the parties involved; is that right?

24         A.    One of them is deceased, so

1    I don't find it proper to talk about

2    somebody who's dead.

3           Q.    All right.  So the deceased

4    person is a male teacher; right?

5           A.    Correct.

6           Q.    What other male teachers

7    abused students while you were at The

8    Hill School?

9           A.    I don't feel comfortable

10   naming them by name in case I could be

11   called liable because, again, this is --

12   it's a small community.  And again, these

13   were at times maybe rumors, but at times

14   they were -- I should say the other

15   students were so boisterous about the

16   fact that they were sleeping with female

17   teachers, it's kind of hard to discern

18   which is fact and which is fiction, if

19   you understand that.  And --

20          Q.    I understand.  Keep going.

21          A.    No.  Go ahead.

22          Q.    All right.  How about we do

23   this?  Why don't -- at the moment, I'm

24   just asking about male teachers who

Kurtis N. Poulos

1   abused male students.  Okay?

2           I think -- hold on -- we

3   have Mr. Ralston who abused you.  Then we

4   have a deceased teacher.  And then who

5   else?  And if you would like, you can

6   call them John Doe 1, 2, like that.

7   We'll start that way.

8           So we have Mr. Ralston who

9   is a male teacher who abused a male

10  student, you; we have a deceased male

11  teacher who abused male students.  Who

12  else, if anyone?

13      A.    I can think of John Doe #1.

14  That's it.

15      Q.    And John Doe #1 is a male

16  teacher who you believe abused a male

17  student and is not Mr. Ralston or the

18  deceased male teacher; is that right?

19      A.    Correct.  And if I could

20  make a statement, I don't know that it

21  was so much physical as -- given our

22  situation with our living, you know,

23  quarters and showering quarters, it was

24  more a matter of every time kids went to

1    go and take showers, he managed to just

2    happen to pop in and be, like, oh, just

3    wanted to make sure that you guys are all

4    getting clean after sports before you go

5    to dinner.

6              And that's, pardon my

7    French, creepy as hell to just be, like,

8    oh, yeah, I'm just peeking in.  It's like

9    what the president said:  I just walked

10   through the pageant because I own it and

11   I get to look at people.  It's overall

12   creepy.

13        Q.   The "he" you're talking

14   about --

15        A.   So maybe --

16        Q.   I apologize.  Keep going.

17        A.   No.  Go ahead.

18        Q.   I just want to confirm the

19   "he" you're talking about here is John

20   Doe #1?

21        A.   Yes.

22        Q.   It is my intention to ask

23   you about each instance.  I was just

24   trying to decide a way that we could

Kurtis N. Poulos

```
1    refer to the people in a way you were

2    comfortable.

3              So let's start with John Doe

4    #1.  So your belief about John Doe #1's

5    abuse towards male students is that he

6    observed male students taking showers

7    when you were a student at The Hill

8    School; is that correct?

9         A.    Correct.  Correct.

10        Q.    Did John Doe #1 ever observe

11   you when you were taking a shower while

12   you were a student at The Hill School?

13        A.    I would imagine, yes,

14   because we had communal showers in some

15   of the buildings, so we didn't have a

16   choice.

17        Q.    Well, how did you learn that

18   John Doe #1 was observing students taking

19   showers?

20        A.    Because he was just always

21   there right after we got in the showers.

22   So I stopped taking showers there.

23        Q.    So you -- when you -- so you

24   saw John Doe #1 watching the showers when
```

1    you went to take a shower on at least one

2    occasion; is that right?

3        A.    On multiple occasions.

4        Q.    How many times did you

5    observe John Doe #1 watching the showers

6    when you were going to take a shower?

7        A.    Freshman year, at least a

8    dozen.  That's why I stopped showering

9    after getting ready -- you know, getting

10   ready to go back to my dorm to go to

11   dinner.

12       Q.    During what trimester did

13   these --

14       A.    That would be the first

15   trimester of my third form year.  So it

16   was -- if I could explain a little bit

17   because I don't know if any of you went

18   to a boarding school.

19            It's old.  They don't have,

20   like -- or at least when I went there,

21   they didn't have, like, separated

22   individual showers.  It was a shower

23   room.

24            So it's awkward enough that

1    you're around your peers.  But to then

2    have a professor or your coach walk into

3    the room and just stand there and be,

4    like, shower up, guys, it's time to go,

5    that's creepy.

6              There was no separation.  It

7    was just, like I said, a community, a

8    family.  But at the end of the day, to

9    me, it felt creepy.  And it got creepier

10   the more that they just stood there and

11   watched, because you can tell your

12   lacrosse team or, you know, the kids

13   working out go and take a shower, expect

14   them to do it.

15             It was always awkward to

16   surround your peers, but then to have a

17   guy in his 30s or 40s standing there

18   making sure that you're taking a shower?

19   That doesn't make any sense to me.  And,

20   frankly, it shouldn't make sense to

21   anybody.

22        Q.    Did you report John Doe 1's

23   conduct to any other teachers or a coach?

24        A.    No, because every -- sorry.

Kurtis N.   Poulos

1    No, because everybody was, like, this is

2    normal; this is just the way it is, that

3    they're going to come in and check and

4    make sure that you're washing yourself.

5             But at the same time, they

6    completely contradict that by saying, oh,

7    we want you to be completely independent;

8    we want you to, you know, become these

9    grown individuals, yet they don't trust

10   us enough to take a shower for five

11   minutes, to put clothes on to go back to

12   our dorm?

13            None of that makes sense to

14   me.  And the more I think about it, it's

15   inexcusable.

16        Q.   So John Doe 1 made you

17   uncomfortable by watching you take a

18   shower, so you stopped taking showers

19   during the first trimester of your third

20   form year; is that correct?

21        A.   Correct.

22        Q.   Is there any other conduct

23   by John Doe 1 that was, in your opinion,

24   abuse of male students?

1          A.     To my knowledge, no.

2          Q.     Did you ever discuss John
3    Doe 1's, you called it a creepy conduct,
4    with any other student at The Hill
5    School?

6          A.     It may have just been a
7    laughing, you know -- not a laughable
8    matter, but it was kind of, like, if I
9    could go with guy speak, it was, dude,
10   why is that guy always standing there, if
11   that makes sense.  Like, why are -- why
12   does he have to come and make sure that
13   we're taking a shower.  That doesn't make
14   sense.

15          And it's -- you know, it's
16   become more, obviously, inappropriate the
17   older you get to understand, like, there
18   was possible alternative reasons why he
19   was there.

20          But having a teacher come in
21   and, like, just stand there and be, like,
22   make sure and clean yourself, it's kind
23   of creepy.

24          Q.     Do you remember any students

1    that you discussed John Doe 1's creepy

2    conduct with?

3        A.    Like I said, it was just

4    kind of a running joke, like, why is he

5    here.

6        Q.    Then the deceased male

7    teacher, what abuse do you believe that

8    the deceased male teacher engaged in,

9    again, just against male students at the

10   moment?

11       A.    Well, because there were

12   only male students.  He did have a hookah

13   party for his -- what he considered, you

14   know, his best students.  So you kind of

15   feel -- it's weird because you kind of

16   feel like, oh, I want to be invited to

17   that party if he's smoking a hookah that

18   he got in India or, you know, Azerbaijan,

19   and he's got all these Persian rugs and

20   he wants you to hang out.  You're kind

21   of, whoa, why wasn't I included.  So you

22   want to be included.

23             But I later found out that

24   he was -- and again, I don't want to

Kurtis N. Poulos

1   speak ill of the dead.  It's not my

2   place.  But I would have to assume that

3   there was something else going on because

4   why would you invite 15- and 16-year olds

5   to smoke hookahs and hang out in your

6   apartment until 10:00, 11:00 o'clock at

7   night?

8          Q.    Did you ever attend a hookah

9   party at the deceased male teacher's

10  apartment?

11         A.    I never attended one of his

12  parties.  I had been in his apartment, so

13  I could tell you exactly what it looked

14  like.

15              But, again, he was supposed

16  to be my teacher my fifth form year, but

17  I didn't attend fifth form year.

18         Q.    Did the deceased male

19  student ever abuse you?

20         A.    Deceased male teacher?

21         Q.    Yeah.  Excuse me.  Let me

22  ask the question again.

23              Did the deceased male

24  teacher ever abuse you?

Kurtis N. Poulos

```
1            A.    No.  He was -- can I be
2    honest?
3            Q.    Well, you have to be honest.
4    You're under oath.
5                  So did the deceased male
6    teacher ever abuse you?
7            A.    No, he didn't.
8                  But, Lane, can you pull up
9    my senior page?
10                 MR. JUBB:  Ms. Dougherty,
11           I'm going to let you conduct your
12           deposition.  Would you like me to
13           pull up his senior page?
14   BY MS. DOUGHERTY:
15           Q.    Mr. Poulos, do you need the
16   senior page in order to answer my
17   question?  If you do, that's fine.
18           A.    I think it's tantamount to
19   my answer, yeah.
20                 MS. DOUGHERTY:  Okay.  Mr.
21           Jubb, if you wouldn't mind --
22           because I don't have it easily
23           accessible -- if you would pull up
24           Mr. Poulos' senior page.
```

1    BY MS. DOUGHERTY:

2          Q.    And then, Mr. Poulos, I'm

3    going to ask you to tell me first why you

4    asked Mr. Jubb to pull up your senior

5    page.

6          A.    Because the teacher's

7    name --

8          Q.    Wait.  Let him pull it up.

9    I want to see what it is first.

10         A.    Okay.

11         Q.    I, unfortunately, didn't

12   commit your senior page to memory.

13         A.     I didn't either.  Lane found

14   more pictures of me my senior year than I

15   even knew I had.

16         Q.    Oh, okay.  I remember now.

17              MS. DOUGHERTY:  Lane, could

18         you just scroll down so I can see

19         the Bates label?

20   BY MS. DOUGHERTY:

21         Q.    Okay.  So P-6.23 is your

22   senior page.

23              Okay.  Mr. Poulos, why did

24   you ask Mr. Jubb to pull up your senior

1    page to answer my question of whether the

2    deceased male teacher abused you?

3         A.    Because he didn't, but I did

4    mention him in the first line of my

5    senior page.

6         Q.    Oh.  The Zwerner?

7         A.    Yeah.

8         Q.    Is that what you're talking

9    about?

10         Oh, the line that Mr. Jubb

11   asked you about, it's a Zwerner, was

12   actually in reference to the deceased

13   male student who you believe abused

14   students during the time --

15        A.    Deceased male --

16        Q.    I keep doing that.  Okay.

17   Let me start again.

18         It's a Zwerner sentence on

19   your senior page is in reference to the

20   deceased male teacher who you believe

21   abused students while you were a student

22   at The Hill School; is that right?

23        A.    Correct.  And again, I hate

24   to speak ill of the dead, but there were

1    too many instance where it's, like --

2         Q.    Do you have information

3    about whether the deceased male teacher

4    abused other students while you were a

5    student at The Hill School?

6         A.    I do.

7         Q.    What information do you have

8    about abuse by the deceased male teacher

9    towards other students while you were a

10   student at The Hill School?

11        A.    I'm not at liberty to say

12   because it would make me have to name

13   names.  I just know --

14        Q.    All right.  Well --

15        A.    -- if that makes sense.

16        Q.    Are you able to describe

17   your information by using Student #1,

18   Student #2, rather than a student name?

19        A.    I can tell you there were a

20   few students, say 1, 2, and 3, that were

21   invited to his apartment, and it wasn't

22   for studying.  It was known that they

23   were going to go there, smoke the hookah,

24   hang out, and leave, whatever that meant.

1      Q.    What do you mean, "leave"?

2   Is that what you said?  Leave --

3   L-E-A-V-E?

4      A.    Yeah.  Like, when it's done,

5   it's done; get out.

6           MS. DOUGHERTY:  Mr. Jubb,

7      could you end the screen sharing?

8      Thank you.

9   BY MS. DOUGHERTY:

10     Q.    Okay.  So what part of being

11  invited to the apartment smoking a hookah

12  and leaving in your view was abuse by the

13  deceased male teacher?

14     A.    Well, we pretty much always

15  knew what was going to happen when they

16  went to the apartment.

17     Q.    What do you mean, what was

18  going to happen when a student went to

19  the apartment?

20     A.    It wasn't a hookah with

21  tobacco; it was a hookah with probably

22  weed and maybe something else.  I'm only

23  conjecturing, so I cannot confirm.  And I

24  want to make that very clear.  This is

1    only conjecture.  This is only --

2         Q.    What do you mean by --

3         A.    -- what I was told.

4         Q.    So Student 1, 2, and 3 told

5    you that they smoked drugs at the

6    apartment of the deceased male teacher;

7    is that correct?

8         A.    Correct.

9         Q.    Were you told by three

10   different students that they smoked drugs

11   at the deceased male teacher's apartment?

12        A.    At least three.

13        Q.    And if you were directed by

14   a court to identify the three teachers --

15   or excuse me -- the three students that

16   you have in mind by name, you would be

17   able to identify the students by name?

18        A.    Off memory?  One.  But the

19   one means he brought somebody else with

20   him, if that makes sense.

21        Q.    Okay.  So one student who

22   you can identify by name if the court

23   were to order you to identify the student

24   by name told you that he, along with two

1   other students smoked drugs at a deceased

2   male teacher's apartment; is that right?

3         A.    Again, I'd like to preface

4   that by saying I can't confirm they were

5   smoking drugs.  I can only state that I

6   know that they would go there and smoke a

7   hookah, and what I was told was talk

8   about history.

9         Q.    I don't understand.  So did

10   a student who you can name if directed to

11   name tell you that he and other students

12   smoked drugs at the deceased male

13   teacher's apartment?  Yes or no.

14         A.    No.

15         Q.    What did the student who you

16   can identify by name tell you happened at

17   the deceased male teacher's apartment?

18         A.    He would make dinner; they

19   would hang out, smoke the hookah -- I

20   don't know what was in the hookah -- and

21   a couple hours later, they'd wander back

22   into the dormitory.

23         Q.    Just to be clear, I'm asking

24   about what the student who you could name

Kurtis N. Poulos

1    told you about what occurred at the

2    deceased male teacher's apartment.

3              So the student who you can

4    name told you that the deceased male

5    teacher made dinner, they hung out,

6    smoked a hookah, and he returned to the

7    dorm; is that right?

8         A.    Correct.

9         Q.    Is there something else that

10   the student who you can identify told you

11   about his time spent in the apartment of

12   the deceased male teacher?

13        A.    No, there is not.  There's

14   just the overall demeanor of what I

15   observed when he returned to the

16   dormitory.

17        Q.    What did you observe when

18   the student returned to the dormitory

19   after spending time in deceased male

20   teacher's apartment?

21        A.    Without -- to be so blunt,

22   he was high as hell.

23        Q.    The student who you have in

24   mind who you can name by name, how old

1    was he when --

2          A.    It would have been my fourth

3    form year.  It was my fourth form year.

4          Q.    And the student was also a

5    fourth former?

6          A.    Correct.

7                Can I put something on the

8    record really quickly?  I don't want to

9    put these guys in a situation where they

10   have to relive anything they had to go

11   through.  Can I just say that?

12         Q.    I mean, you can say that.

13               So the student who told you

14   -- let me start again.

15               The student who you could

16   name that you believe was high after

17   spending time in deceased male teacher's

18   apartment was not 18 at the time; is that

19   right?

20         A.    No.

21               Hey, Lane, are you awake?

22               MR. JUBB:  I'm here.  Thank

23         you.

24               THE WITNESS:  Just

1          wondering, because you keep

2          looking down.

3                  MR. JUBB:  I've got the sun

4          in my eyes, and I'm paying

5          attention.  I know your reaction.

6          I'm just listening to her

7          questions.  But thank you.

8                  THE WITNESS:  Just didn't

9          want to make sure that you were

10          texting somebody during a

11          deposition.

12      BY MS. DOUGHERTY:

13          Q.    Are there any other

14      instances -- let me start again.

15                  Is there any other conduct

16      by deceased male teacher other than

17      inviting students to his apartment to

18      smoke a hookah that you considered abuse?

19          A.    Not to my knowledge.

20          Q.    So I could show it to you if

21      you want, but you've told me a number of

22      times you've committed the email to

23      memory.

24                  November 20th, 2017 email

Kurtis N. Poulos

1    from the school that's been marked as D-1

2    referenced on the second page conduct by

3    a deceased teacher.  When you -- the

4    teacher --

5                MR. JUBB:  Did my sound go

6         out?  Oh, sorry.

7                MS. DOUGHERTY:  You know

8         what?  I got a message that my

9         Internet was unstable when you

10        said that, so...

11               MR. JUBB:  You just paused.

12        I didn't know if I had another

13        issue.  I apologize.

14               MS. DOUGHERTY:  No.  I might

15        be having an issue.  Let me just

16        make sure.

17   BY MS. DOUGHERTY:

18        Q.    I'm just going to start

19   again.

20               Did you have an

21   understanding about what Mr. Lehman was

22   referring to in his November 20th, 2017

23   email that's been marked as D-1 when he

24   referred to incidents involving conduct

Kurtis N. Poulos

1  decades ago by faculty members including

2  one who was deceased?

3          A.     Like I spoke to yesterday,

4  yes.

5                 Excuse me.  I heard rumors

6  prior to my arrival about improprieties,

7  but at the same time, I can only address

8  what I heard while I was attending the

9  school.

10                And I wasn't about to

11  jeopardize myself or my cousin by saying,

12  oh, well, this guy is sleeping with this

13  teacher, this teacher is doing this, or

14  this is happening to me, because there

15  are a lot of legacies.  Oliver Stone went

16  there.  The President's sons went there.

17                Like, you don't talk about

18  it.  You know it's happening, but you

19  don't talk about it.

20          Q.     Do you have information

21  about any other deceased teacher other

22  than the deceased male teacher we talked

23  about who had hookah parties?  Do you

24  know of any conduct by any other deceased

Kurtis N. Poulos

1    teacher that you considered improper or

2    abusive directed to students?

3         A.    No, not at all.  In fact,

4    the only other teacher I can think of who

5    has passed away was my English teacher my

6    fourth form year.  And he made sure to

7    make us always feel inclusive, even to

8    the point where we got a skip Saturday

9    because it was our first class every

10   Saturday.  And he was, like, skip class;

11   we're going to have class in your room,

12   we'll bring donuts, and we'll hang out

13   and have a quasi class, I guess I could

14   say.

15        Q.    So when you identified

16   teachers sleeping with students, you

17   meant teachers having sex with students;

18   is that right?

19        A.    I would assume so, yes.

20        Q.    Do you have information

21   about any male teacher -- no.  Let me

22   start again.

23             What do you mean you assume

24   so?  I'm asking you what you meant.  You

1    said teachers sleeping with students.

2    Did you mean teachers having sex with

3    students when you said "sleeping with

4    students"?

5         A.    Can I -- the only way I

6    could verbiage -- like, put this in

7    proper verbiage is to say that maybe it

8    was boisterous high school students

9    saying, yes, I slept with so and so.

10   Could I say that I walked in on them?

11   No.  But Jeremy Eichmann --

12        Q.    Right.  At the moment, I'm

13   just asking what you meant.  You said

14   teachers sleeping with students.  You

15   meant teachers having sex with students

16   when you said "sleeping with students";

17   is that right?

18        A.    I would assume so, yes.

19        Q.    No.  There's no -- you can't

20   assume so.  You said teachers sleeping

21   with students; correct?

22        A.    I did say that because

23   that's what I was told by the student.

24        Q.    Your definition of "sleeping

Kurtis N. Poulos

1    with" is having sex with; is that right?

2         A.    Correct.

3         Q.    I'm just making sure we have

4    our terminology correct.

5         A.    Okay.

6         Q.    Do you have information

7    about any male teacher having sex with

8    students while you were a student at The

9    Hill School?

10        A.    Abusively, or just male on

11   male?

12        Q.    Well, I'm not really sure

13   that sex between an adult and a minor can

14   ever be anything other than abuse, but --

15        A.    Fair enough.

16        Q.    -- I'm not characterizing it

17   at the moment.

18             I just want to know if you

19   have information about any teacher -- I'm

20   sorry -- any male teacher having sex with

21   a student while you were at The Hill

22   School.

23        A.    Other than the deceased male

24   teacher, no.

Kurtis N. Poulos

1      Q.    So you have information

2    about the deceased male teacher having

3    sex with a student while you were at The

4    Hill School?

5      A.    Correct.

6      Q.    Did the deceased male

7    teacher have sex with a male student?

8      A.    Correct.  We didn't have any

9    female students.

10     Q.    That's what I thought, but

11   -- how -- what is the basis for your

12   information that deceased male teacher

13   had sex with a student while you were at

14   The Hill School?

15     A.    Again, rumors and conjection

16   [sic].

17     Q.    So a student told you that

18   someone had sex with deceased --

19     A.    He had heard.

20     Q.    Okay.  Go ahead.  Tell me.

21     A.    Sorry.  He had heard that

22   the deceased teacher had had relations

23   with another student at one of the

24   parties at his apartment, which was in

1    upper school on the first floor.

2          Q.    Okay.  So another student

3    told you that deceased male teacher had

4    sex with a different student during a

5    hookah party at deceased male teacher's

6    apartment; is that right?

7          A.    Correct.

8          Q.    Did more than one student

9    tell you that male -- deceased male

10   teacher had sex with a student?

11         A.    Yes.

12         Q.    How many students told you

13   that deceased male teacher had sex with a

14   student?

15         A.    Maybe two or three.

16         Q.    So maybe two or three

17   students told you that deceased male

18   teacher had sex with a student during a

19   hookah party?

20         A.    Yeah.  But as I stated

21   before, it was never my -- I'm not a

22   gossip.  I never wanted to know that.  It

23   was just something you eventually find

24   out.

1        Q.    Did any of the students who

2   told you deceased male teacher had sex

3   with -- let me start again.

4              Based on what you were told,

5   did the deceased male teacher have sex

6   with more than one student?

7        A.    Yes, in some form or

8   another.  I'm not sure if it was oral or

9   -- I never asked.  Like I said, I was not

10  the gossip.  I don't know the specifics,

11  so I don't know what form of.  It was

12  just a matter of, oh, did you hear that

13  this happened with him.

14       Q.    Did any of the students who

15  told you deceased male teacher had sex

16  with a student tell you that that

17  student -- the student telling you the

18  information -- had sex with deceased male

19  teacher?

20       A.    I never received it

21  directly, no.

22       Q.    Other than deceased male

23  teacher, do you have any information

24  about a male teacher having sex with a

1   student while you were at The Hill

2   School?

3           A.    No.

4           Q.    Do you have any information

5   about a female student having sex -- let

6   me start again.

7                 Do you have any information

8   about a female teacher having sex with a

9   student while you were at The Hill

10  School?

11          A.    Can I interrupt for a

12  second?

13          Q.    Go ahead.  What's your

14  interruption?  Are you objecting?

15          A.    No, I'm not objecting.  I

16  said can I interject for a second?

17  Because Lane has been staring at his

18  phone for the last 20 minutes.

19                And if this is boring to

20  you, I can easily go and hang out in the

21  rest of my house and not waste everybody

22  else's time.

23                MR. JUBB:  Mr. Poulos, if

24          you could focus on her answers,

1          that would be appreciated.

2                And just for the record --

3                THE WITNESS:  I'm focusing

4          on you because you're not --

5                MR. JUBB:  So if you could

6          get back to answering questions,

7          that would be great.

8                THE WITNESS:  So this is

9          going to end.  If you're not going

10          to take this seriously, why am I

11          going to sit here and waste my

12          time?

13   BY MS. DOUGHERTY:

14          Q.    Okay, Mr. Poulos, hold on a

15   second.  Okay?  Don't be distracted by

16   Mr. Jubb.  He has a job to do just like I

17   have a job to do, just like the

18   videographer has a job to do, the court

19   reporter has a job to do.  Okay?

20                Mr. Jubb represents the

21   person who's suing you.  I realize that

22   makes him unpopular to you; right?  I'm

23   probably not popular to you either.

24                But just hold on a second.

1    Okay?  I'm asking you questions.  I'm

2    asking you questions because your answers

3    are important to me.  You have contended

4    that you were abused by a teacher.  I

5    want you to tell me the detail of that.

6    You've contended other teachers abused

7    students.  I'm asking about the detail

8    about that.

9                   It's serious content.  I'm

10   asking it for a serious reason.  And, you

11   know, that's what we're doing.

12                  You can ignore Mr. Jubb

13   because he, you know, is not asking the

14   questions.  What he does is really not

15   your concern, unless the word "objection"

16   is coming out of his mouth.  Right?

17              MR. JUBB:  Ms. Dougherty, I

18          would appreciate a little bit more

19          credence than that.  I'm sitting

20          here with my notepad.

21              MS. DOUGHERTY:  I don't know

22          what you're doing.

23              MR. JUBB:  But the idea that

24          somehow I'm doing anything

Kurtis N. Poulos

1      improper by sitting here with my

2      notepad is just outrageous.

3              And so I could sit here and

4      look at the camera or not, but

5      I'm -- the idea that somehow he

6      should ignore me because I -- you

7      know, whatever I'm doing, it just

8      tends to -- you know, I'd

9      appreciate as a member of the bar

10     that you would at least

11     acknowledge that I'm sitting here

12     taking notes and doing nothing

13     improper about my conduct.

14              MS. DOUGHERTY:  I'm not

15     trying to cast aspersions on you,

16     Mr. Jubb.  I'm suggesting that the

17     witness just not be distracted by

18     you.  Honestly, I wasn't looking

19     at you.

20              MR. JUBB:  Of course not.

21              MS. DOUGHERTY:  I've been

22     looking at Mr. Poulos the entire

23     time.  In fact, even when you

24     couldn't hear, I was looking at

1    Mr. Poulos, so -- and I'm not very
2    good with Zoom.  So if there's --
3    that's just how I can do it.
4        So I honestly don't know
5    what you were doing.  I assume you
6    weren't doing anything untoward.
7    I'm telling the witness to just
8    not be concerned about it.  I'm
9    not suggesting that you did
10   anything inappropriate.
11       I apologize to you, Mr.
12   Jubb, to the extent you believed I
13   was suggesting that.
14       MR. JUBB:  Thank you.
15       MS. DOUGHERTY:  I only meant
16   to say I was looking at Mr. Poulos
17   and that the witness shouldn't be
18   concerned with what he thinks you
19   are or are not doing.  I'm asking
20   the questions and his answers are
21   important, and most importantly
22   that it's important they're
23   truthful and that he has not --
24       THE WITNESS:  Can I

1          interject?  Can I interject?

2    BY MS. DOUGHERTY:

3          Q.    Go ahead.

4          A.    He made a comment yesterday

5    when I looked down to turn on the lights

6    saying that I was texting somebody.  So

7    how do I not know that he's not doing the

8    exact same thing?

9          Q.    Okay.  That's a fair

10   question.  Just to explain, when you are

11   a witness under oath, you're not -- and

12   actively testifying, which is your

13   position at the moment, you're not

14   allowed to talk to other people except if

15   you're there with a lawyer and you ask to

16   be excused to speak to your lawyer.

17   Okay?

18              You have to focus your

19   attention on the testimony.  You can't,

20   you know, speak to another person in the

21   room in the middle of testimony.  You

22   can't text message or email with

23   somebody.  Okay?

24              So I think that when you

Kurtis N. Poulos

1    looked down at your phone, Mr. Jubb asked

2    you a legitimate question just to make

3    sure you understood, because you're not

4    here with an attorney, that you can't

5    text, like when I say you can't smoke.

6    Right?

7                    So Mr. Jubb, however, is not

8    under oath and he's not testifying.  He's

9    also not asking the questions.

10                   So at the moment, what he

11   decides to do or not do, is up to him.

12   We don't really know what he is or isn't

13   doing except we see him from his

14   shoulders up and he's sitting there,

15   right, not unlike the videographer or the

16   court reporter.  Right?

17                   So that's the distinction

18   though.  That's why Mr. Jubb asked you

19   specifically because you, as a witness --

20   and it's not you personally, it's any

21   witness who's testifying -- can't have

22   communications in the middle of the

23   testimony.

24                   Does that answer your

1    question or concern?

2         A.    To an extent, yes.

3         Q.    I honestly don't remember if

4    you answered or not -- I apologize if you

5    did -- so I'm just going to ask again.

6              Do you have any information

7    about a female teacher having sex with a

8    student while you were a student at The

9    Hill School?

10        A.    Yes.

11        Q.    What information do you have

12   about a female teacher having sex with a

13   student while you were a student at The

14   Hill School?

15        A.    A certain tennis player

16   bragging about the fact that he was

17   sleeping with the tennis coach who was,

18   at the time, married.

19        Q.    Was the tennis player who

20   told you he was having sex with the

21   tennis coach 18 at the time?

22        A.    He was not.

23        Q.    Do you have any other

24   information about a female teacher having

Kurtis N. Poulos

1    sex with a student while you were a

2    student at The Hill School?

3        A.    I heard rumors, but nothing

4    specific.

5        Q.    You also, as part of your

6    list of improprieties, identified

7    teachers having sex with other teachers.

8    What information --

9        A.    Correct.

10       Q.    What information do you have

11   about teachers having sex with other

12   teachers while you were at The Hill

13   School?

14       A.    The fact that they were

15   caught off campus.

16       Q.    Did the situation you had in

17   mind relating to sex between two teachers

18   off campus then involve a student?

19       A.    Not to my knowledge, no.

20       Q.    As part of your list of

21   improprieties that occurred -- let me

22   start again.

23              Is that -- the two teachers

24   caught off campus having sex, is that the

Kurtis N. Poulos

1   only information you have about teachers

2   having sex with other teachers while you

3   were a student at The Hill School?

4        A.    I mean, there may have been

5   a few more.  Like I said, I didn't try

6   and --

7        Q.    No, no.  I'm just asking --

8   all I want to know is whether you have --

9   let me start again.

10            All I want to know is about

11  your information.  You gave me a list:

12  Teachers sleeping with students; teachers

13  sleeping with other teachers; teachers

14  abusing students; and you added as a

15  footnote teachers cheating on spouses.

16  I'm just trying to learn your information

17  and the basis for your list.

18            So you've told me you have

19  information about the two teachers who

20  were caught off campus having sex with

21  each other that did not involve a

22  student.  I want to know if you have

23  information about any other teachers

24  having sex with other teachers while you

1    were a student at The Hill School.

2           A.    No, I do not.

3           Q.    Now, the third item on your

4    list was teachers abusing students.  And

5    I asked you to, again, for the moment,

6    leave the abuse by Mr. Ralston against

7    you out of your answer.  We'll come back

8    to that.

9                 What information do you have

10   about teachers abusing students while you

11   were a student at The Hill School, again

12   excluding the abuse that you sustained

13   from Mr. Ralston?

14          A.    Can I speak in retrospect?

15          Q.    At the moment, I'm just

16   asking you about information you learned

17   when you were a student at The Hill

18   School.

19          A.    That there were teachers

20   sleeping with students who were under 18,

21   which is statutory rape.

22          Q.    Is there -- let me start

23   again.

24                Do you have information

1   about teachers abusing students while you

2   were a student at The Hill School other

3   than the abuse you've told me about

4   today?

5         A.     Male to male abuse?

6         Q.     Any type of abuse by a

7   teacher on a student other than what

8   you've told me about today.

9         A.     No.

10         Q.     You mentioned earlier in

11   your testimony there was a girl who came

12   forward about abuse.  What were you

13   referring to?

14         A.     Wait.  You broke up.  Can

15   you please restate?

16         Q.     Sure.  Earlier in your

17   testimony, you mentioned something along

18   the lines of a girl who came forward

19   about abuse.  What were you referring to?

20         A.     I believe that it was a case

21   with a female student after the school

22   went co-ed where a male teacher slept

23   with an underage female.  And the school

24   settled, to my knowledge, out of court to

1    keep it under wraps for the, you know,

2    lack of a better term.

3            Q.    What's the basis for your

4    information?

5            A.    I'm an alumnist.  I get to

6    get that knowledge, especially when they

7    ask me for money.

8            Q.    So The Hill School reported

9    to alumnists that there had been a

10   settlement with a former student relating

11   to sex between that student and a

12   teacher?

13           A.    Correct.

14           Q.    Did the Hill School -- let

15   me start again.

16                 Did The Hill School report

17   specifics?

18           A.    Not names, but ages and the

19   fact that the faculty member had been

20   terminated.

21           Q.    How did The Hill School

22   communicate this information to you?

23           A.    Through the alumni letter.

24   We get alumni letters every month,

1   especially when you're a donator.  And my

2   family has been donating money for 70

3   years.

4        Q.   When did you start receiving

5   the monthly alumnist letters?

6        A.   A week or two after I

7   graduated and they started asking me for

8   money.

9        Q.   And did the monthly alumnist

10  letters continue continuously since a

11  month or two after you graduated to the

12  present day?

13       A.   The ones that I accepted,

14  yes.  Some of them, I, you know, like,

15  blocked them from my email account.

16            But they did admit that

17  there was impropriety between a male

18  teacher and a female student after the

19  unification to make it, you know, a

20  male-female campus, and he slept with one

21  of the girls on the school.

22       Q.   So you didn't receive the

23  alumnist -- let me start again.

24            You did not receive the

1    monthly alumnist letters during the

2    period of time that you had the school

3    blocked?

4              A.    No.   No.

5              Q.    When did you learn from The

6    Hill School that there had been a

7    settlement relating to sex between a male

8    teacher and a female student?

9              A.    I believe it was around the

10   time that they asked for a donation from

11   my family for my grandfather's plaque to

12   be put up in -- I don't even know which

13   building -- but they asked for money from

14   all of us to put up a plaque.

15             Q.    Was that before the April

16   23rd, 2016 letter that you received in an

17   email?

18             A.    I believe so, yes.  Yeah.

19                   (Court Reporter lost

20             Internet connection.)

21                   THE VIDEOGRAPHER:  Hold on a

22             second.  We lost our --

23                   MS. DOUGHERTY:  Who did we

24             lose?

Kurtis N. Poulos

1          THE VIDEOGRAPHER:  It looks

2      like we lost our court reporter.

3          MS. DOUGHERTY:  We lost the

4      court reporter.

5          THE VIDEOGRAPHER:  Do you

6      want to go off the record?

7          MS. DOUGHERTY:  Yeah.  Let's

8      go off the record.  And then why

9      don't we just --

10          (Court Reporter's Internet

11      connection restored.)

12  BY MS. DOUGHERTY:

13      Q.    I'll just ask the question

14  again, or a question like it again.

15          Did you learn about the

16  settlement relating to sex between a

17  female student and a male teacher before

18  the April 23rd, 2016 letter that you

19  received via email?

20      A.    Yes, I believe so.

21      Q.    Now, again, the next set of

22  questions are directed to after you were

23  no longer a student at The Hill School,

24  after you graduated from high school.

1          After you graduated from
2     high school, did you learn of any other
3     instances of abuse by teachers directed
4     to students of The Hill School?
5          A.    I've had nothing to do with
6     that school since the day that I left
7     other than communications that the school
8     sent out to alumnists.
9          Q.    Okay.  So you received the
10    notice from The Hill School about the
11    settlement with the female student, and
12    that is the only instance of abuse by a
13    teacher directed to a student that you
14    have information about or learned about
15    since you graduated high school; is that
16    correct?
17         A.    Correct.
18         Q.    Do you know Mary Beth
19    Ralston?
20         A.    Matt Ralston's wife.
21         Q.    Have you ever had contact
22    with Mary Beth Ralston?
23         A.    Can you rephrase that?
24    Because I had contact with her when I was

1    a student because she would come to

2    dinners.  So after graduation, no.

3          Q.    Okay.  So you had contact

4    with Ms. Ralston before you graduated

5    from The Hill School; is that right?

6          A.    Correct.  She was the one

7    who refused to move the car to let me

8    leave the property that Parents' Weekend

9    in October of 20' -- or no -- 1996.

10         Q.    What year did you graduate

11   from The Hill School again?

12         A.    May 25th, 1997.

13         Q.    So since May 25th, 1997, you

14   have had no contact whatsoever with Mary

15   Beth Ralston; is that correct?

16         A.    Not at all.

17         Q.    And prior to May 25th, 1997,

18   you had contact with Mary Beth Ralston

19   because she went to dinner at the same

20   place that you did; is that right?

21         A.    Yeah.  The families would

22   all come and have dinner at the dining

23   hall.

24         Q.    When you say "the families,"

Kurtis N. Poulos

1  you mean the families of the teachers of

2  The Hill School?

3       A.    Of the faculty, yes.

4       Q.    And you had contact with --

5  let me start again.

6            Before May 25th, 1997, you

7  also had contact with Mary Beth Ralston

8  in relation to Mr. Ralston's car blocking

9  you in on Parents' Weekend; is that

10 right?

11      A.    Yes, because he would not

12 answer the door.  She answered the door.

13      Q.    Other than having contact

14 with Mary Beth Ralston at dinner and the

15 event with the car, which we'll come back

16 to, did you have any other contact with

17 Mary Beth Ralston before May 25th, 1997?

18      A.    Nothing more than passing.

19      Q.    What do you mean by

20 "passing"?

21      A.    Passing, like, I greet you,

22 I'm polite to you, I wish you well, go on

23 your way.

24           Q.    So what was the date of the

1    family weekend when your car was blocked

2    in?

3         A.    It would have been late

4    October 1996.  I don't know the exact

5    date.

6         Q.    How do you know it was late

7    October 1996?

8         A.    Because I had just sent in

9    my first vote for the President of the

10   United States absentee from Pennsylvania

11   to Wisconsin.

12              Clifford, sit.  I'm fine.

13   I'm fine.

14        Q.    Since Clifford has made an

15   appearance, why don't you tell us who

16   Clifford is?

17        A.    He's fine.

18        Q.    Clifford is your dog?

19        A.    He's my service dog.

20              Sit.

21        Q.    Have you ever had -- let me

22   start again.

23              Other than the emails that

24   you received from Mr. Lehman as part of

1    your alumnist's reports, have you ever

2    had any contact with Mr. Lehman?

3         A.    No, except for them asking

4    for money.

5         Q.    Have you ever responded to

6    the emails you received from Mr. Lehman

7    asking for money?

8         A.    I think I sent them a check

9    for $.97 I believe, but I could be wrong.

10        Q.    Have you --

11        A.    It was part of a joke.

12        Q.    Oh, I understand.  Okay.  So

13   there was an instance where Mr. Lehman

14   wrote to you a letter on behalf of The

15   Hill School requesting a donation, and

16   you responded with a check for $.97; is

17   that right?

18        A.    Well, pretty much every

19   year, they send you a check -- or send

20   you an email asking for money.  And I

21   believe my family has done enough for

22   that school, so I sent them a check for

23   $.97.  But I think I sent that to

24   Headmaster Doherty.

1       Q.    So have you ever had direct
2   contact with Mr. Lehman?
3       A.    No.  I've never spoken to
4   the man.  I have no idea what he even
5   looked like.
6       Q.    Do you know Mark Ralston?
7       A.    No.
8       Q.    Do you know William Yinger
9   -- Y-I-N-G-E-R?
10      A.    Yeah, Bill Yinger, I do
11  recognize the name.  I couldn't place the
12  face, but I do know Bill Yinger.
13      Q.    How do you know the name
14  Bill Yinger?
15      A.    I think he played hockey at
16  our school.
17      Q.    When was the last time you
18  had contact with Mr. Yinger?
19      A.    I haven't had contact with
20  99.9 percent of the people there.  I
21  never spoke to him after I left campus.
22      Q.    So you've had no contact
23  with Mr. Yinger since May 25th, 1997; is
24  that right?

1        A.    I mean, that's -- to the

2   best of my knowledge, no, I've not spoken

3   to Mr. -- no, I haven't spoken to him.

4        Q.    Did you ever talk to Mr.

5   Yinger about Mr. Ralston?

6        A.    No.   He was another math

7   teacher, I believe.

8        Q.    You think Mr. Yinger was a

9   math teacher?

10        A.    I think so.

11        Q.    Was Mr. Yinger one of your

12   teachers?

13        A.    I don't believe so.

14              I've spent a -- like, a very

15   long time forgetting pretty much

16   everything I could about that school --

17   the people that went there, the teachers

18   that were there -- just to get through

19   this situation so that I could move on.

20   So I just want that to be put on the

21   record because I've done everything I

22   could possibly do, right or wrong, but I

23   did everything I could do to forget even

24   my legacy.

1          Q.     Without regard for whether
2    you identified Mr. Ralston, did you ever
3    tell Mr. Yinger that you were abused by a
4    teacher at The Hill School?
5          A.     I've never told anybody at
6    that school that I was abused.
7          Q.     Do you know who Wallace
8    Gundy is -- G-U-N-D-Y?
9          A.     Mr. Gundy?  I recognize the
10   name.  I couldn't pick him out of a
11   lineup.
12         Q.     Do you recognize the name
13   Wallace Gundy?
14         A.     I mean, it's Gundy.  It's
15   just -- I mean, I'm not trying to be a
16   smart ass, but it's Mr. Gundy, like --
17         Q.     So you recognize Mr. Gundy
18   somehow affiliated with The Hill School;
19   is that right?
20         A.     Oh, yeah, I recognize the
21   name, but I couldn't pick him out of a
22   lineup.
23         Q.     That's okay.  How do you
24   recognize the name Wallace Gundy?

Kurtis N. Poulos

```
1          A.    Somebody I would see in

2    passing.  Maybe I sat with him at, you

3    know, one of the tables when we were

4    assigned to different dining tables,

5    but...

6          Q.    Mr. Gundy was a student

7    while you were a student at The Hill

8    School?

9          A.    No.  I believe Mr. Gundy was

10   one of the professors.

11         Q.    Was Mr. Gundy your

12   professor?

13         A.    He may have been, but I

14   don't believe so.

15         Q.    Have you had any contact

16   with Mr. Gundy since May 25th, 1997?

17         A.    I haven't had any contact

18   with anyone from May 25th, 1997 when I

19   graduated.

20         Q.    You mean anyone from The

21   Hill School?

22         A.    Any professors.

23         Q.    Any professors from The Hill

24   School?  Okay.
```

1        A.    Exception.  Can I make an

2    exception?  I did send a taunting text

3    message to Mr. Drowne because he's a

4    Giants fans, and we were playing them in

5    the playoffs, the Packers.  So I had to

6    kind of mess with him, but that was in

7    2005.

8        Q.    Did you ever talk to Mr.

9    Gundy or Gundy [pronunciation] -- I don't

10   know how you say the name.  Did you ever

11   talk to Mr. Gundy about Mr. Ralston?

12       A.    I don't remember any

13   conversations with Mr. Gundy.  We didn't

14   really spend a lot of time together.

15       Q.    Do you know a Christopher

16   Hopkins?

17       A.    Not to my recollection.

18       Q.    Okay.  Mr. Doherty is David

19   Doherty; is that right?

20       A.    Yes.  Mr. Doherty spoke at

21   my grandfather's funeral or memorial at

22   the National Cathedral.

23       Q.    When was the last time you

24   had contact with Mr. Doherty?

Kurtis N.    Poulos

1          A.    2005 when he spoke at my

2    grandfather's wake in -- or memorial at

3    the National Cathedral in Washington, DC.

4    He and Kay attended along with Robert

5    Kennedy and a few other members of the

6    Senate.

7          Q.    And Kay is Mr. Doherty's

8    wife; right?

9          A.    Correct.

10         Q.    Did you ever talk to Mr.

11   Doherty about Mr. Ralston?

12         A.    I never did.

13         Q.    Do you know a Jeff Neese --

14   N-E-E-S-E?

15         A.    I don't recognize the name.

16         Q.    Do you know any of the

17   members of the board of trustees for The

18   Hill School?

19         A.    I do not.

20         Q.    Have you ever known the

21   identity of anyone who was a member of

22   the board of trustees for The Hill

23   School?

24         A.    I've never inquired.  I'm

Kurtis N. Poulos

1    sure if I asked, I could find out.  But

2    I've never asked.

3          Q.    So just to put a time frame

4    on it, after you retained Mr. Garabedian

5    in 2017 and in 2018, you didn't know who

6    was a member of the board of trustees; is

7    that right?

8          A.    No.  Frankly, I don't care.

9          Q.    Was your grandfather ever on

10   the board of trustees?

11         A.    Not to my knowledge.  I know

12   he was in -- because of Lane's, you know,

13   paperwork yesterday, I know that he was

14   in communications.  I never even knew

15   that he was in communication with the

16   school about my perspective acceptance to

17   the school until yesterday.

18         Q.    You've mentioned several

19   times that there's a legacy between your

20   family and The Hill School.  Can you just

21   define that for me?

22         A.    So my grandfather or step

23   grandfather, Senator William Proxmire,

24   graduated -- graduated Class of '34.  His

Kurtis N.  Poulos

1   brother, Theodore, graduated Class of

2   '33.  I believe -- well, I know that

3   Theodore passed away in World War II.

4   Grampa went to Yale.  I mean, we've been

5   there since almost the inception of that

6   high school.

7             MS. DOUGHERTY:  Could we

8        take a five-minute break, comfort

9        break?  Could we go off the

10       record?

11            THE VIDEOGRAPHER:  All

12       right.  We're now going off the

13       record.  The time is 3:05.

14            (Whereupon, a brief recess

15       was held.)

16            THE VIDEOGRAPHER:  We are

17       now back on the record.  The time

18       is 3:19.

19            You may continue.

20   BY MS. DOUGHERTY:

21       Q.    Was there a reason that you

22   were absent from the dining hall during

23   your freshman year?

24       A.    Sorry.  It was more likely

1    that I just missed dinner.  I mean, it

2    wasn't an uncommon thing for somebody to

3    be, like, absent from dinner.  You might

4    fall asleep; you might be studying.

5         Q.    Was there a reason you

6    didn't want to go to the dining hall?

7         A.    Not until my senior year.

8         Q.    What was the reason you did

9    not want to go to the dining hall during

10   your senior year?

11        A.    As weird as it sounds, I

12   just didn't want to be around that many

13   people eating dinner.  It became, to a

14   degree, disgusting.

15        Q.    You mean because other

16   people were present eating?

17        A.    It was just the general

18   sound of people eating and being around

19   people I didn't want to be around.

20        Q.    Did Mr. Ralston have

21   anything to do with why you didn't want

22   to go to the dining hall during your

23   senior year?

24        A.    No, he did not.

1      Q.    Did you have contact with

2  Mr. Ralston in the dining hall during

3  your senior year?

4      A.    Of course.

5      Q.    What type of contact did you

6  have with Mr. Ralston when you were in

7  the dining hall during your senior year?

8      A.    Well, I had to walk into the

9  dining hall and I had to walk past his

10  table.  I had to be polite and say

11  something.  I can't just walk by.

12      Q.    In the dining hall, did

13  people have assigned tables?

14      A.    Yeah.  So what happened with

15  assigned tables is -- sorry.  Let me lift

16  this up -- every, I'd say month or so, we

17  were reassigned tables with different

18  teachers, different students, so that we

19  could meet people that we may not meet on

20  a day-to-day basis given the fact that

21  they may not be in our class work -- or

22  classes, excuse me.

23             So I'm sure I walked by him

24  and Kay, or whatever her name is, on a

Kurtis N. Poulos

1    nearly daily basis.

2          Q.    "Her," you mean Mr.

3    Ralston's wife?

4          A.    Correct.

5                MS. DOUGHERTY:  Does anybody

6          else hear buzzing?

7                THE WITNESS:  I don't.

8                THE VIDEOGRAPHER:  Sounds

9          like a truck went by.

10               MS. DOUGHERTY:  Just making

11         sure.  Okay.

12   BY MS. DOUGHERTY:

13         Q.    Was that the -- is this how

14   the seating arrangements in the dining

15   hall worked for each year that you were

16   at The Hill School?  There was assigned

17   tables that rotated?

18         A.    Correct.  That's the only

19   reason why I had any interaction with

20   Thomas Ruth was because I got assigned to

21   his table I believe my third form year.

22         Q.    So was it the case that the

23   faculty members were assigned a table and

24   the students rotated through?  How did it

1    work?

2         A.    The teachers were assigned a

3    table, one on either end.  And then,

4    yeah, every few weeks, maybe a month, we

5    got rotated to a different table.  So

6    you'd get that assignment in your

7    mailbox.

8         Q.    Are you doing okay there?

9    Because I want to make sure that you're

10   able to concentrate on the questions.

11        A.    No, I'm fine.  I'm fine.

12        Q.    It looks like that you

13   fidgeting with your video.

14        A.    No, I'm good.

15        Q.    Okay.  Were you ever

16   assigned -- let me start again.

17             Did Mr. Ralston have a table

18   in the dining hall?

19        A.    Every professor, yeah.

20   Every teacher had a table, one at each

21   end.  And then if they had family

22   members, they would get a few seats,

23   especially for dinner, and then the rest

24   of the students would just figure out

1   where to sit.

2        Q.    How many people were at a

3   table in the dining hall?

4        A.    Eight on each side, so 18

5   total.

6        Q.    And each table had two

7   teachers, one on each end, and the other

8   16 people were students or the families

9   of the faculty members; is that correct?

10       A.    Correct.

11       Q.    Is that the case for every

12  year that you were a student at The Hill

13  School?

14       A.    Correct.

15       Q.    Were you ever at Mr.

16  Ralston's table?

17       A.    Possibly, but not to my

18  recollection.

19       Q.    You don't -- you do not

20  remember ever being assigned to Mr.

21  Ralston's table in the dining hall for

22  any year that you attended The Hill

23  School; is that right?

24       A.    Correct.  I don't remember.

1    I remember one table that I was situated

2    at, and that was more a matter of that it

3    was Thomas Ruth.

4         Q.    When you got your table

5    assignments in your mailbox, did the

6    assignments identify who the teacher at

7    the table would be?

8         A.    No.  It just gave you a

9    table number.  It's kind of like working

10   in a restaurant.

11        Q.    Did the teachers stay at the

12   same table number for the entire year?

13        A.    I believe so, yes.

14        Q.    So when you received your

15   dining hall assignment and saw the table

16   number, you knew which teachers would be

17   at your table; is that right?

18        A.    For the most part, yes.  I

19   mean, there was -- the headmaster's table

20   was all the way up on top, and then there

21   was lines of tables.  But pretty much

22   every professor sat at the exact same

23   seat.  But it's hard to memorize.  Like,

24   you're just given a table number; you go

1    and sit at that table number.

2          Q.    Did you ever skip your meals

3    because you were assigned to Mr.

4    Ralston's table?

5          A.    Again, I don't remember

6    being assigned to Mr. Ralston's table.  I

7    skipped meals for different reasons.

8          Q.    What were the reasons that

9    you skipped meals?

10          A.    One, the food.  Two, just I

11   guess you could say the lack of decorum.

12   I don't generally like being around a lot

13   of people that eat and speak the way they

14   were eating and presenting themselves at

15   dinner.  So I would put my plate down and

16   walk away.

17                I only had to wait for them

18   to -- so the headmaster would give us a

19   presentation.  He would talk about

20   whatever happened in the day, and then

21   you had the permission to just leave.

22          Q.    Yesterday you told me about

23   the first instance of sexual abuse by Mr.

24   Ralston.

Kurtis N. Poulos

 1                    Have you told me everything
 2      that you remember about that first
 3      instance of sexual abuse by Mr. Ralston?
 4           A.    Other than the color of my
 5      backpack, yes.
 6           Q.    What was the color of your
 7      backpack?
 8           A.    I had a maroon JanSport
 9      backpack that my mom had engraved --
10      well, embroidered my initials on the back
11      of.
12           Q.    Is there some reason why the
13      backpack sticks out in your mind as it
14      relates to the first instance of sexual
15      abuse by Mr. Ralston?
16           A.    Because on the back of the
17      backpack, there was a handle, so it was
18      like a grab bag.
19                 So if you're -- if you know
20      anything about the military, you can grab
21      the back of the bag and just walk away.
22                 So there was my initials on
23      the back right here; but in the middle of
24      it, there was also, like, a strap where

Kurtis N. Pozios

1    you could grab it and just pull it away.

2         Q.    Did Mr. Ralston grab the

3    strap you're talking about?

4         A.    No.  It was more that he

5    grabbed me and pushed the door shut.

6         Q.    Why is the -- what was it

7    called again, the handle on the back of

8    the backpack?

9         A.    We just called it a shoe

10   strap because you could tie your shoes

11   and -- but it's a grab handle.

12        Q.    Why is the grab handle on

13   your backpack significant to you as it

14   relates to the first instance of sexual

15   abuse by Mr. Ralston?

16        A.    Because I never used the

17   backpack after that day.

18        Q.    Was there something that you

19   associated the backpack with the sexual

20   abuse by Mr. Ralston?  Let me start

21   again.

22             Why did you not use the

23   backpack again after that day?

24        A.    I just went down and ordered

1    a different one.

2          Q.    You didn't have a reason why

3    you didn't use the backpack again?

4          A.    Subconsciously, possibly.

5    But at the time, it was more a matter of

6    -- yeah, I guess it would be more

7    subconsciously that I just -- I didn't

8    want to be associated with that moment

9    with that bag, so I ordered a new

10   backpack.

11         Q.    Did the new backpack have a

12   grab handle?

13         A.    No.

14         Q.    What did you do with your

15   clothes that you were wearing on the

16   first day or the first time that you were

17   sexually abused by Mr. Ralston?

18         A.    Threw them away.

19         Q.    Is there a reason why you

20   threw away the clothes you were wearing

21   the first time Mr. Ralston abused you?

22         A.    Yeah, because I didn't want

23   -- I discarded every garment that I could

24   possibly discard that day.  Everything.

Kurtis N. Poulos

1    Q.    Did you discard anything

2    other than your backpack and your

3    clothes?

4    A.    No.  I can tell you that I

5    did ultimately break one of or both of

6    the mirrors in my bedroom or my dorm

7    room.

8    Q.    On that day?

9    A.    Yeah.

10   Q.    Why did you break the

11   mirrors on your dorm room on the day --

12   let me start again.

13   Did you break the mirrors in

14   your dorm room after Mr. Ralston abused

15   you?

16   A.    Yeah.

17   Q.    So --

18   A.    I had to actually buy them

19   to replace them.

20   Q.    So after the first instance

21   when Mr. Ralston abused you, immediately

22   after the attack, you broke the mirrors

23   in your dorm room?

24   A.    I broke at least one.  There

1    was -- if you walked into my room, to my

2    right was my bed.  Because I had a

3    single, you could walk straight through.

4    To the left was an area for a desk.  To

5    the other area was for another desk.  But

6    in the middle, next to what I guess you

7    could consider a closet, we had a few

8    drawers and mirrors.  I guess a medicine

9    cabinet.  And, yeah, I broke at least one

10   of the mirrors.

11        Q.    And you broke at least one

12   of the mirrors immediately after the

13   first instance of abuse by Mr. Ralston;

14   is that right?

15        A.    Yeah.  But I didn't -- yeah,

16   that's right.  I just didn't tell anybody

17   until after when I actually needed to use

18   my mirror.  I actually used to have hair,

19   so...

20        Q.    So after you left the

21   classroom on the day of the first abuse

22   by Mr. Ralston, you returned to your dorm

23   room, discarded your backpack and your

24   clothes, and broke at least one mirror in

Kurtis N.    Poulos

1    your dorm room; is that right?

2         A.    Correct.

3         Q.    Did you do anything else

4    after the first instance of abuse

5    immediately after you left the classroom?

6         A.    Not to my recollection.

7         Q.    Is there anything other than

8    what you've told me already today and

9    also yesterday that you remember

10   regarding the first instance of abuse by

11   Mr. Ralston?

12        A.    No.

13        Q.    When was the second time

14   that Mr. Ralston abused you?

15        A.    I can't give you specific

16   dates or times.

17        Q.    Can you put the second time

18   in relation to the first time?

19        A.    I would have to say it was

20   probably a couple of weeks.

21        Q.    Are you settled again there

22   with the video?

23        A.    Yeah.  I'm good.

24        Q.    Okay.  Can you put the video

1    up so your whole head is in the shot?

2            A.    All right.   I'll just hold

3    it.

4            Q.    Well, is there a way that

5    you can -- how did you have it yesterday?

6            A.    Well, I was sitting in my

7    recliner, which didn't seem appropriate

8    at the time; so I moved to my office.

9            Q.    Mr. Poulos, you're allowed

10   to sit wherever you want.   So if you're

11   more comfortable sitting in your

12   recliner, that's fine, but --

13           A.    No, it's fine.   It's just --

14           Q.    Well, let me just explain to

15   you why it is important that the video be

16   focused on you and not moving and your

17   hands in the way.

18               There's a videographer here

19   who is -- you know, this is a video

20   deposition.   In addition to us being able

21   to see each other on Zoom, a video is

22   being taken which can later be shown to

23   the jury, and it is important that we are

24   able to see the video that corresponds

```
1    with your answers.
2              So we just want to get you
3    in a situation where you can set the
4    phone up so your whole head is on the
5    screen and you're not moving around.
6              Are you working on that now?
7         A.   Yeah.  I'm good.
8              THE VIDEOGRAPHER:  Do you
9         wish to go off the record until he
10        can get it situated again?
11             MS. DOUGHERTY:  Yeah, why
12        don't we do that?
13             THE VIDEOGRAPHER:  We are --
14        are you situated, sir?
15             THE WITNESS:  I'm good.
16             THE VIDEOGRAPHER:  All
17        right.  Should we continue on,
18        then?
19             MS. DOUGHERTY:  Yes, please.
20   BY MS. DOUGHERTY:
21        Q.   Okay.  So the second
22   instance of abuse by Mr. Ralston was
23   within a couple weeks of the first
24   instance; is that correct?
```

Kurtis N. Poulos

1          A.      Correct.

2          Q.      What happened during the

3    second instance of abuse by Mr. Ralston?

4          A.      Pretty much of the same from

5    the first.

6          Q.      Can you please describe the

7    second instance of abuse by Mr. Ralston?

8          A.      Can I ask you a question?

9          Q.      Okay.

10         A.      Is this going to be a

11   testimonial?

12         Q.      I'm not sure what you mean.

13         A.      I mean, do you want me to go

14   through every single instance of

15   improprieties?

16         Q.      I do.  It is important.

17   Yes, I do.  Your experience with Mr.

18   Ralston is an essential issue of this

19   case.  I know that it wasn't your choice

20   to make it that way, but it is.

21              And so we need to know

22   truthfully and in a way that you are

23   comfortable testifying about it, which is

24   why I'm concerned with the movement about

Kurtis N.   Poulos

1    the camera.  We need you to tell us, you

2    know, what happened.

3              Does that answer your

4    question?

5         A.    And if I --

6         Q.    I'm sorry.  Go ahead.

7         A.    No.  I was just going to

8    say, I spent decades -- decades, not

9    days -- decades to block out as much

10   information -- sorry, not information,

11   but memories that I could.  Whether I did

12   it the right way -- I don't remember

13   specifics.

14        Q.    Okay.  Mr. Poulos, I'm going

15   to treat your question as an objection to

16   relevance.

17             I'm going to tell you the

18   reason why I'm asking the questions to

19   explain to you why it is reasonably

20   calculated to lead to the discovery of

21   admissible evidence in this case.  And we

22   can -- so there are claims for a

23   defamation.  In order to prove a claim

24   for defamation, the person who is a

1   proponent of the claim for defamation

2   must prove, among other things, that the

3   statement or statements that is the basis

4   for the defamation claim was not true,

5   was false.

6            A defense -- among one

7   defense to a claim for defamation is

8   truth, so truth of the statements that

9   form the basis for the claim.

10            So again, as I said, I

11   realize it wasn't you who brought the

12   action, but your decision to come forward

13   and the letters written by Mr. Garabedian

14   on your behalf describing the abuse you

15   sustained from Mr. Ralston are now part

16   of the case.  So the truth or falsity of

17   your statements about the abuse are part

18   of the case for that reason.

19            So that is why I am asking

20   and that's why I have -- when it's come

21   up a number of times, I've expressed to

22   you it's important to me.  There's a real

23   reason that I'm asking it.  That's the

24   basis, because it relates to Plaintiff's

1    burden to prove his claims and any

2    defense that Mr. Garabedian or you may

3    assert in response.

4              So I'm asking you to tell me

5    what you remember, and we'll just take it

6    one step at a time to the extent you are

7    comfortable now with your camera.  And if

8    at any time you want to take a break, you

9    tell me.  You're not a prisoner.  You can

10   take a break for any reason.  I just ask

11   that you finish your answer that you're

12   giving at any time, and then we can take

13   a break.

14              Does that answer your

15   question with a little bit more

16   information?

17        A.    Yeah.  I appreciate it.

18        Q.    I don't know if Mr. Jubb has

19   anything he wants to add.

20              MR. JUBB:  Nothing from me.

21        Next question.

22   BY MS. DOUGHERTY:

23        Q.    Okay.  So Mr. Poulos, can

24   you please describe for me the second

Kurtis N. Poulos

1    instance of sexual abuse by Mr. Ralston?

2          A.    It was pretty much

3    tantamount to the exact same thing that

4    happened the first time.

5          Q.    Where were you when -- let

6    me start again.

7                Where were you the second

8    time that Mr. Ralston abused you?

9          A.    So in my geometry classroom,

10   or his geometry classroom.

11         Q.    When during the day did the

12   second instance of abuse occur?

13         A.    At the end of the day.  It

14   became almost -- I wouldn't say weekly --

15   but nearly a biweekly instance, and it

16   escalated.

17               And I don't feel comfortable

18   talking more than that.  It makes me

19   hurt.  I didn't sleep at all last night.

20         Q.    Is it the case that every

21   time -- let me start again.

22               I think you described for us

23   previously that your class rotated.  So

24   you had seven classes and they rotated

1    through the week to different times of

2    the day.   Do I understand that correctly?

3         A.    Classes, and they rotated

4    one to seven or one to five, and they

5    flipped through.

6         Q.    So do you happen to remember

7    what class in the order geometry was?

8         A.    I don't.

9         Q.    No?   Okay.

10         Is it the case that every

11    time your geometry class was the last one

12    for the day, you were inappropriately

13    touched by Mr. Ralston after the first

14    instance of abuse?

15         A.    Correct.   And it wasn't

16    every week.   It was -- it just became a

17    regular instance where, like, oh, you're

18    going to stay behind to do this.   It

19    wasn't like --

20         Q.    Go ahead.   Please finish.

21         A.    Go ahead.

22         Q.    Okay.   So the second

23    instance of abuse, were you also taking a

24    quiz on the chalkboard?

Kurtis N.   Poulos

1        A.     I would assume it would have

2   been.

3        Q.     I don't want you to -- go

4   ahead.

5        A.     Can I finish?  I'm not

6   trying to say that I'm assuming, but I

7   also said yesterday I've done my best in

8   the worst ways and the most positive ways

9   to forget every moment that I was at that

10   school.

11        Q.     Why don't you tell me what

12   you've done to try to forget your time at

13   The Hill School?

14        A.     What do most people do to

15   forget things?

16        Q.     Well, I want to know what

17   you did.  You said there were some

18   positive and some negative.  So tell me

19   what you've done.

20        A.     Stay sober.

21        Q.     Did you say "sober"?

22        A.     Yeah.

23        Q.     Okay.

24        A.     Did yoga; joined groups, you

1     know, anonymously.

2                But at the end of the day, I

3     wake up having nightmares that I'm going

4     to end up back at that school being

5     terrified.

6          Q.     So it sounds like staying

7     sober, going to yoga, joining groups,

8     those are all positive things you've

9     done; right?

10         A.     Correct.

11         Q.     Are you still practicing

12    yoga and participating in groups and

13    maintaining your sobriety as of today?

14         A.     I'm maintaining my sobriety.

15    I can't go to groups.  Everything is shut

16    down.

17         Q.     That's right.

18         A.     And my sponsor -- my sponsor

19    died from COVID.

20         Q.     What other positive things

21    have you done to heal from your

22    experience at The Hill School?

23         A.     Adopt dogs; try to give

24    back; you know, give back to the

1    military.

2           Q.      Why is the military

3    important to you?

4           A.      Because we're a military

5    family.

6           Q.      How about retaining Mr.

7    Garabedian?  Was retaining Mr. Garabedian

8    to hold The Hill School accountable

9    something that you did to heal?

10          A.      I thought it would help.

11                  Did you object?

12                  MR. JUBB:  I did.

13   BY MS. DOUGHERTY:

14          Q.      Was there any other positive

15   things that you've done to heal from your

16   experience at The Hill School?

17          A.      Donating my time to my

18   family's hospital.

19          Q.      When you said that you

20   joined groups, did you join groups

21   where -- let me strike that.

22                  What are the negative things

23   that you've done to try to forget the

24   experience at The Hill School?

1       A.      Mostly drinking.

2       Q.      Is there anything else

3    negative?

4       A.      Drugs.

5       Q.      Have you done anything else

6    negative to try to forget your experience

7    at The Hill School besides drinking and

8    consuming drugs?

9       A.      Not being honest.

10      Q.      What do you mean by not

11   being honest?

12      A.      Just not telling people who

13   care about me the truth.

14      Q.      So you mean that you didn't

15   tell your -- well, let me start again.

16              You're talking about the

17   truth of what happened to you at The Hill

18   School, or something else?

19              MR. JUBB:  Objection.

20              THE WITNESS:  At The Hill

21      School.

22   BY MS. DOUGHERTY:

23      Q.      Did you lie to somebody that

24   you care about about what happened to you

1     at The Hill School?

2            A.     No.   I admitted it.

3            Q.     Who do you wish you had told

4     about your time at The Hill School?

5            A.     My grandmother.

6                   Is this even on anymore?

7            Q.     Yes.   I'm waiting for you to

8     finish your answer.

9            A.     I said my grandmother.

10           Q.     Okay.  Anyone other than

11    your grandmother?

12           A.     My mother.

13           Q.     Anyone --

14           A.     I just can't do this.   No.

15    I can't do this much...

16                  MS. DOUGHERTY:   All right.

17           Let's go off the record.

18                  THE VIDEOGRAPHER:   We're now

19           going off the record.   The time is

20           3:54.

21                  (Whereupon, a brief recess

22           was held.)

23                  THE VIDEOGRAPHER:   We are

24           now back on the record.   The time

1          is 4:07.

2                You may continue.

3     BY MS. DOUGHERTY:

4          Q.    Mr. Poulos, other than

5     drinking, consuming drugs, hiding the

6     abuse from your family, are there any

7     other negative things that you've done as

8     a result of the abuse you sustained while

9     at The Hill School?

10         A.    Yeah.  I self harmed my

11    sophomore year.

12         Q.    Any other negative activity

13    as a result of the abuse besides

14    drinking, drugs, hiding the abuse from

15    your family, and self harming during your

16    sophomore year?  Is that a no?

17         A.    I mean, yeah.  I mean, it's

18    ultimately destroyed my adult life.

19         Q.    When you decided to come

20    forward after you received the November

21    20th, 2017 letter that's been marked as

22    D-1, the email from The Hill School, did

23    you understand that you would need to

24    communicate the abuse -- information

1    about the abuse that you sustained during

2    The Hill School?

3           A.    I did.  It's the hardest

4    thing I've ever had to do.

5           Q.    Yes or no.  Did you tell Mr.

6    Garabedian about your -- about the sexual

7    abuse by Mr. Ralston?

8           A.    Yes.

9                 MS. DOUGHERTY:  Did I get

10   disconnected?

11                THE VIDEOGRAPHER:  No.

12   You're still there.

13                MS. DOUGHERTY:  Yes.

14                THE WITNESS:  It jumped over

15   to the --

16   BY MS. DOUGHERTY:

17          Q.    Okay.  So the second

18   instance of abuse by Mr. Ralston, please

19   tell me what you remember from the second

20   instance of abuse.

21          A.    I don't remember any

22   specifics.

23          Q.    What do you mean you don't

24   remember specifics?

1          A.    I mean --

2                MR. JUBB:  Objection to the

3          form.

4    BY MS. DOUGHERTY:

5          Q.    You can answer.

6          A.    No.  I'm just saying I

7    don't.  I worked, whether properly,

8    improperly, I worked for decades to not

9    remember specifics of any of those

10   instances, so...

11         Q.    Mr. Poulos, a deposition

12   isn't a test.  Nobody is going to be, you

13   know, grading you on your memory or

14   otherwise.  All I want to know is what

15   you do remember.

16               So what do you remember

17   about the second time that Mr. Ralston

18   abused you?

19         A.    It started just about the

20   same way the first time started.

21         Q.    You were at the chalkboard

22   taking a quiz?

23         A.    No.  I was trying to leave

24   the -- sorry.  I was trying to leave the

1    room.

2              I had a maroon JanSport

3    backpack that weighed about 20 pounds

4    probably considering all the books that

5    we were required to bring to every single

6    classroom.  And I remember him grabbing

7    the back of my backpack.

8         Q.    What happened after Mr.

9    Ralston grabbed the back of your

10   backpack?

11        A.    He shut the door shut.

12        Q.    What happened after Mr.

13   Ralston shut the door shut?

14        A.    He made sure to know -- or

15   made sure to make me know that he was in

16   charge of that situation.

17        Q.    Mr. Ralston?

18        A.    Again -- yeah.  Again, when

19   I was a sophomore, I was 5'6", 5'7"

20   maybe.  And he used -- granted, he was a

21   lean individual, but at the same time, he

22   made sure to know -- or made sure to make

23   me know that he was the one in charge of

24   that situation.

Kurtis N. Poulos

1      Q.      Was Mr. Ralston bigger than

2  you?

3      A.      At that time, yes.

4      Q.      How tall was Mr. Ralston?

5      A.      I'd say 5'10".

6      Q.      Was Mr. Ralston lean, fat,

7  in between?

8      A.      Lean.  He's a runner.

9      Q.      What did Mr. Ralston do to

10 make you know that he was in charge of

11 the situation during the second time that

12 Mr. Ralston abused you?

13     A.      Slammed the door right

14 behind me the way he did -- or right in

15 front of me the way he did the first

16 time.

17     Q.      Did Mr. Ralston say

18 anything?

19     A.      No.  He didn't have to.

20     Q.      What happened after Mr.

21 Ralston slammed the door in front of you?

22     A.      Pretty much the exact same

23 thing that happened the first time.  It

24 didn't escalate past that until the

1    fourth or fifth time that he abused me.

2           Q.    Did Mr. Ralston touch you

3    after he slammed the door in front of

4    you?

5           A.    Yes.

6           Q.    Where did Mr. Ralston touch

7    you?

8           A.    In my crotch, my groin.

9           Q.    Did Mr. Ralston touch you on

10   the outside of your pants?

11          A.    To the best of my

12   recollection, yes.  There might have been

13   him sliding his hand down.

14          Q.    Did Mr. Ralston touch you

15   anywhere else?

16          A.    No, not to my recollection.

17          Q.    Did you touch Mr. Ralston?

18          A.    Only by force; not by

19   choice.

20          Q.    Where did Mr. Ralston force

21   you to touch him?

22          A.    In his groin.

23          Q.    How long did the second

24   encounter with Mr. Ralston last?

1      A.      A few minutes.  Again, I --
2   I can't give you specific times because
3   it was, for lack of a better term, an
4   out-of-body experience.  I didn't want to
5   be there.  I wanted to flee like I fled
6   the following year when I felt that it
7   was going to happen again.
8           So I don't -- it could have
9   been 30 seconds; it could have been five
10  minutes.  I've done my best to blank all
11  of that.
12      Q.      Did you say anything to Mr.
13  Ralston?
14      A.      No, because I was terrified.
15      Q.      How did the encounter end?
16      A.      Me basically running back up
17  to my dorm room --
18      Q.      Did you do --
19      A.      -- changing my clothes.
20          Go ahead.
21      Q.      I wasn't trying to cut you
22  off.
23          What did you do -- or let me
24  start again.

1          Did you do anything when you
2  returned to your dorm room after the
3  second instance of abuse by Mr. Ralston?
4          A.    Yeah.  I crawled into bed
5  and just cried.
6          Q.    Did you go to dinner that
7  day?
8          A.    Probably not.  That would
9  have probably been one of the nights
10  where I just ordered pizza and skipped
11  dinner because I didn't want to be around
12  people.
13          Q.    What did you do with your
14  clothes?
15          A.    Again, I threw them away.  I
16  was fortunate enough to have the ability
17  to purchase new clothes and have them
18  sent to me.
19          So I threw away too many
20  clothes, like clothes that could have
21  done something better for somebody else.
22          Q.    Did you throw anything else
23  out after the second instance of abuse
24  other than your clothes?

1       A.    Not to my recollection.

2       Q.    Is there anything else that
3   you remember about the second instance of
4   abuse by Mr. Ralston other than what
5   you've told me?

6       A.    No.  I do remember it was
7   either the third or the fourth time, and
8   he started laughing.

9       Q.    What do you remember about
10  the third time that Mr. Ralston abused
11  you?

12      A.    His giggle.

13      Q.    I'm sorry.  Did you say
14  giggle?

15      A.    Laugh or giggle, yeah.  Like
16  a...

17      Q.    Sorry about that.

18      A.    No problem.

19      Q.    So it's your recollection
20  that the third or fourth time Mr. Ralston
21  abused you, he laughed?

22      A.    I think it was a power play
23  now in retrospect.

24      Q.    Please complete your answer.

Kurtis N.  Poulos

1    I wasn't trying to cut you off.  In

2    retrospect?

3            A.    I think it was a power play

4    like -- I understand, like, teachers,

5    people work very hard to get where they

6    are.  And for some of them, it may seem

7    like, oh, this kid comes in and has a

8    certain amount of whatever.

9                 But it seemed like a power

10   play.  Like, it seemed like a power play

11   the weekend my mother came to visit me.

12   It was nothing more than intimidation,

13   like I can do whatever I want because,

14   ultimately, you're a student here

15   regardless.

16                And like I said before, it's

17   this systemic bullshit, sorry, where they

18   just feel like every once in a while,

19   they're going to pull somebody out of the

20   crowd and mess with them.

21           Q.    Who's "they"?  Pedophiles?

22           A.    Pedophiles primarily, but --

23   and I'm not trying to -- because right

24   now, it's not like I'm making a crap ton

Kurtis N. Poulos

1    of money.  It just seemed like the

2    teachers at certain points were, like,

3    look at all these spoiled kids, let's

4    figure out a way to put them on our

5    level.

6         Q.    Did Mr. Ralston know about

7    your legacy with the school?

8         A.    Everybody there knew who my

9    legacy was.

10        Q.    When you were at The Hill

11   School, did you consider yourself

12   wealthy?

13        A.    No.  In fact, when I grew

14   up, we were not -- well, we weren't.  My

15   mom was a single mother.  I remember

16   being on Welfare.  It wasn't until my

17   great grandmother passed away that I even

18   realized, like, there's actual money in

19   my family.

20             I thought being a senator

21   was just a duty.  I didn't think it got

22   paid well.  It was just -- in essence, it

23   was normal to me.

24             Yes, I've got a hospital

1    named after my great grandfather and I've

2    got a grandfather on my other side who's

3    a senator and I -- I didn't equate that

4    to being abnormal.  I just thought -- you

5    know, I grew up around a lot of kids who

6    were sons and daughters of attorneys and

7    congressmen, and I thought that was just

8    the way that worked.

9            I didn't realize until I got

10   older that's not the way this works.

11   That's not a right; it's not even a

12   privilege.  It's your life, regardless if

13   you want it.

14       Q.    I realize that you've said

15   that you don't remember specific dates,

16   but can you place the third instance of

17   abuse by Mr. Ralston in time with the

18   second instance of abuse?

19       A.    I can't.

20       Q.    Was the third instance of

21   abuse during the same trimester as the

22   first and second instances of abuse?

23       A.    All these instances happened

24   after Parents' Weekend, so it would have

1    been in the fall semester.

2         Q.    After Parents' Weekend your

3    sophomore year; right?

4         A.    Fourth form year, correct.

5         Q.    Fourth form year.

6               And when you say all the

7    instances, you're talking about the --

8         A.    First three.

9         Q.    The first three did you say?

10        A.    Correct.

11        Q.    Please tell me what you

12   remember about the third instance of

13   abuse by Mr. Ralston.

14        A.    I can't give you specifics.

15        Q.    Where were you during the

16   third instance of abuse by Mr. Ralston?

17        A.    Can I just blanket answer

18   pretty much every time or every time was

19   in his room -- or his classroom, not his

20   room.  He approached me --

21        Q.    So when -- go ahead.

22        A.    Go ahead.

23        Q.    No.  Please finish.

24        A.    No.  Go ahead.

1      Q.    So any time that Mr. Ralston

2  touched you inappropriately was in his

3  classroom; is that right?

4      A.    Correct.

5      Q.    And is it correct -- and

6  we'll get to them -- there were other

7  instances where you had contact with Mr.

8  Ralston where he didn't touch you but

9  where you felt bullied?  Is that fair?

10      A.    More than -- more than a

11  dozen times where I felt like I was going

12  to be pressured into something up until

13  that weekend my senior year or sixth form

14  year.

15      Q.    So these other dozen times

16  that you have in mind where Mr. Ralston

17  didn't touch you, those were outside of

18  the classroom; right?

19      A.    It was more of a walking by

20  giving you a glance, grabbing you, or

21  touching you in a certain way where I --

22  I don't know.  Maybe I was obtuse to the

23  situation and I could have been more

24  aware to what was going on around me and

Kurtis N.   Pouliot

1    maybe I could have, if I had seen him,

2    walked away.

3              But all the sudden, you get

4    a hand on your shoulder, you get a hand

5    on your back or your -- on your butt, and

6    before you know, it's over, and then you

7    get a glare from the person who just did

8    it.

9              And that was exactly every

10   time.  That's why I stopped going to

11   dinner.  Besides the disgusting sounds, I

12   didn't want to be around him.

13             And I was so pissed off that

14   somehow I got placed in a dormitory right

15   above his apartment with his wife who was

16   going to defend him.

17        Q.    The third instance of abuse,

18   was that at the end of geometry class

19   like the first and second?

20        A.    Ninety-nine percent were.

21   There was only one time where he

22   approached me in my actual dorm.

23        Q.    Okay.  Why don't you tell me

24   about the time when Mr. Ralston

1    approached you in your dorm.

2              A.    Like I said, Mr. Drowne

3    always made sure that we had -- or were

4    made to feel like we were at home.  So,

5    as we called him, Drowne, would order

6    wings and pizza, you know, have us play

7    X-Box or whatever was out at the time,

8    and he would invite people over.  So

9    you'd grab some food, you'd go back to

10   your room or maybe hang out in the

11   apartment.

12              And I remember being in

13   Drowne's apartment and Mr. Ralston comes

14   over, which means he came from, like,

15   clear across the campus to make sure that

16   he could be on our floor party.

17              And a couple of us were

18   playing, like, NHL 95 in Mr. Drowne's

19   apartment, and he comes up and he starts

20   rubbing my shoulders.  And I fled just

21   like I fled my, you know, sophomore year

22   or junior year.  I fled.  I didn't want

23   to be there.

24              Q.    Mr. Ralston, when he rubbed

Kurtis N. Poulos

```
1    your shoulders, that was during your
2    senior year?
3         A.    Sophomore year.  He never
4    touched me my senior year.
5         Q.    Did Mr. Ralston ever touch
6    you on your penis inside your pants?
7         A.    Yes.
8         Q.    When -- how many -- let me
9    start again.
10        How many times did Mr.
11   Ralston touch you on your penis inside
12   your pants?
13        A.    To my recollection, it would
14   have been half a dozen.
15        Q.    When was the first time that
16   Mr. Ralston touched your penis inside
17   your pants?
18        A.    The fourth incident.
19        Clifford.
20        Q.    During the third incident of
21   abuse, did Mr. Ralston touch you?
22        A.    Yes.
23        Q.    Where did Mr. Ralston touch
24   you during the third incident of abuse?
```

1          A.     My buttocks and my groin.

2          Q.     Did Mr. Ralston touch you

3    anywhere other than your buttocks and

4    your groin during the third incident of

5    abuse?

6          A.     No.

7          Q.     Was the door to the

8    classroom closed during the third

9    incident of abuse?

10         A.     Yeah.  The doors were always

11   closed.

12         Q.     How did the door to the

13   classroom become closed during the third

14   incident of abuse?

15         A.     They closed automatically.

16   It's -- they're, like, fire doors.

17   They're heavy.  Well, they were heavy

18   metal doors that would basically just

19   swing shut regardless.

20         Q.     Where in the classroom did

21   the third incident of abuse by Mr.

22   Ralston occur?

23         A.     If I could draw you a

24   diagram, if you walk straight through,

1    you turn to your left.  There's nothing

2    you can see in that corner.  So the

3    door's here; everything is over here.  It

4    happened over there where there's no way

5    somebody can see anything through that

6    little window that was in the door.

7            Q.    So you were not near the

8    door during the third incident of abuse?

9            A.    No.  He had basically pulled

10   me back into the room.  And I thought

11   there was -- I can only say at this

12   point -- and maybe I should stop -- but

13   he was in a position of power that I

14   thought was -- and I didn't want to

15   question and I -- he made sure that I

16   wasn't going to leave that room.

17           Q.    How did Mr. Ralston pull you

18   back from the door during the third

19   incident of abuse?

20           A.    By my backpack.  I had a

21   maroon JanSport with my initials on the

22   back of it, but it had a pull tag.  And

23   he would -- he would grab on that.

24           Q.    You had more than one

1    backpack with your initials on it?

2         A.    I had a maroon JanSport.  I

3    had a blue JanSport that I replaced the

4    maroon one with.

5         Q.    Okay.  So you had a blue

6    JanSport backpack with your initials on

7    it during the first incident of abuse; is

8    that right?

9         A.    No.

10        Q.    No?

11        A.    No.

12        Q.    What was the backpack again?

13        A.    The first and second --

14        Q.    I apologize.  Please answer.

15        A.    The first backpack I had my

16   sophomore or fourth form year was that --

17   I had a maroon JanSport.  It was a hiking

18   bag with a -- that was the first one I

19   had.

20             After the end of my fall

21   term or my fall trimester, I had

22   discarded it and ordered a blue one to

23   replace it.

24        Q.    So which backpack did you

Kurtis N. Poulos

1    have during the first incident of abuse?

2           A.    The maroon JanSport.

3           Q.    So you did not throw the

4    maroon JanSport out immediately after the

5    first incident of abuse?

6           A.    First or second, I don't

7    remember.  I mean, it wasn't like I could

8    just go and buy a brand new backpack.

9    And it was something that my mother had

10   ordered for me, so...

11          Q.    Okay.  Which backpack did

12   you have during the first, second, and

13   third incidents of abuse?

14          A.    The maroon JanSport at least

15   the first and second.

16                Like I said, this wasn't

17   like a weekly incident.  This happened

18   over a period of time.

19          Q.    Okay.  The third incident of

20   abuse, you had a maroon or a blue

21   JanSport backpack?

22          A.    I honestly couldn't tell you

23   which of the two I had at that time.

24          Q.    So Mr. Ralston --

Kurtis N. Poulos

1          A.     I mean, I spent -- I'm

2     sorry -- but I have spent decades, not

3     days, but decades doing my best to forget

4     everything I can.  And I'm doing my best

5     to recall everything I can about what

6     happened to me, but certain specifics

7     like what color backpack, I'm --

8          Q.     Well, you had a very --

9          A.     I'm not going to --

10          Q.     Go ahead.  Let me know when

11     you're done.

12               At the beginning of your

13     testimony today, you had a very -- or at

14     the beginning of your testimony about the

15     sexual abuse this afternoon, you had a

16     very specific recollection of a maroon

17     backpack that you threw away.  So that's

18     -- I'm just trying to get the backpack

19     straightened out.  So --

20               MR. JUBB:  I'll object to

21          the form of that question.

22               THE WITNESS:  Excuse me?

23     BY MS. DOUGHERTY:

24          Q.     He objected to the form of

1  the question.

2           So you're not certain which

3  backpack you had during the first,

4  second, and third instances of abuse, or

5  you are?  I just want to know what you

6  remember.

7           A.    I'm not.  Because at the

8  same time, like I stated before, my dorm

9  room was right there.  The classroom was

10  right there.  So there were days where I

11  didn't bring a backpack or I didn't need

12  to because why, if it's my first class,

13  why would I carry all that garbage down

14  to go to class when my room is 20 meters

15  upstairs and behind me?

16           Q.    I understand.  I just want

17  -- and I know that it is difficult and

18  uncomfortable for you, but I'm just

19  trying to focus your attention on the

20  instances of abuse by Mr. Ralston.

21           So you remember having a

22  backpack during the third incident of

23  abuse because that is how Mr. Ralston

24  pulled you back into the room; is that

1    right?

2          A.    Yeah.  It was a hiking pack.

3          Q.    What did Mr. Ralston do

4    after he pulled you back into the room

5    during the third incident of abuse?

6          A.    Honestly, I -- I can't get

7    into any more details.  Healthy,

8    unhealthy, I've done my best to forget

9    all these specific instances for nearly

10   30 years of my life.  You can take it,

11   you can leave it, but...

12         Q.    Did Mr. Ralston touch you

13   during the third incident of abuse?

14         A.    Yes.

15         Q.    Where did Mr. Ralston touch

16   you during the third incident of abuse?

17         A.    It was again -- it was again

18   right in my groin.

19               Can we --

20         Q.    Did Mr. Ralston touch you

21   anywhere else during the third incident

22   of abuse?

23         A.    No, not to my recollection.

24         Q.    Did you touch Mr. Ralston

1    during the third incident of abuse?

2           A.    Not by choice.

3           Q.    So during the third incident

4    of abuse, Mr. Ralston made you touch him?

5           A.    Correct.

6           Q.    Where did Mr. Ralston make

7    you touch him during the third incident

8    of abuse?

9           A.    On his groin.

10          Q.    And the touching, was that

11   outside of your clothing and also outside

12   of Mr. Ralston's clothing?

13          A.    I don't remember if it was

14   the third time or the fourth time --

15   hell, it could have been the fifth

16   time -- but I know eventually it became

17   something underneath the clothing.

18          Q.    Okay.  Is it a fair

19   characterization that there were a number

20   of incidents between you and Mr. Ralston

21   where Mr. Ralston touched you on your

22   penis on the outside of your clothes and

23   that you -- then made you touch him on

24   his penis on the outside of his clothes?

Kurtis N. Poulos

1    You don't remember specifically how many

2    times, but it occurred a number of times?

3    Is that what you're telling me?

4            A.    Yes, that's what I'm telling

5    you.

6            Q.    And then at some point, the

7    touching escalated beyond touching

8    outside of the clothes; is that right?

9            A.    Correct.

10           Q.    Tell me about the first time

11   you remember Mr. Ralston touching you

12   inside of your clothes.

13           A.    It was the same sort of

14   situation except it had escalated.  And

15   escalation to anybody seems sort of in a

16   way normal.  I didn't feel comfortable,

17   but at the same time, I was 16 years old.

18   I didn't know what -- I mean, I knew what

19   right and wrong was, but...

20           Q.    When was the first time you

21   remember Mr. Ralston laughing?  Was that

22   during an instance of when you were being

23   touched outside the clothes or inside the

24   clothes?

Kurtis N. Pozios

1    A.    Outside, because it was more

2  of a feeling of power for him, it felt

3  like.

4    Q.    Tell me what you remember

5  from the first instance that Mr. Ralston

6  touched you on the inside of your

7  clothes.

8    A.    Again, it was more of a

9  feeling of I can basically do whatever I

10  want and I don't -- pardon my French -- I

11  don't give a shit who your family is or

12  what your legacy is or if you're smarter

13  than I am; I have a power that I've been

14  here so many years and you haven't.

15         And again, I was 16, 15

16  years old.  I didn't -- I was terrified

17  that if I told my family, a 70-year

18  legacy, they would say, well, let's

19  figure out a way to make this go away

20  rather than remedy the situation at the

21  time.

22         In retrospect, that was

23  completely wrong of me to do because they

24  would have scorched earth.

1    Q.    Where in the classroom were
2 you and Mr. Ralston the first time Mr.
3 Ralston touched you inside your clothes?
4    A.    It was always in the same
5 corner --
6    Q.    How did you --
7    A.    -- the corner that -- sorry.
8 Go ahead.
9    Q.    The corner that what?
10    A.    The corner that nobody could
11 see.  If I -- here.  I'll draw the
12 corridor.
13    Q.    So you're drawing the
14 corridor to the math -- the geometry
15 classroom that Mr. Ralston was in during
16 your fourth form year; is that right?
17    A.    So here's a rudimentary
18 drawing.  Do you see how the corridor
19 comes?  There's the longitude, like,
20 coming through there.
21    Q.    Yes.
22    A.    You get this way, and then
23 there's a door opening to a black wall.
24        There's no way somebody can

1    walk into that room and see -- or even
2    look through that doorway and see what's
3    going on in the far left corner, which is
4    where -- his desk was in the far right
5    corner.  What he had us do was in the far
6    left corner, which meant it was right
7    against that wall in a place that nobody
8    could see, and he knew it.
9              And he knew what his
10   timetable was.  He knew that his wife
11   didn't care.  Strike that.  I don't want
12   to bring her into this.
13        Q.    So what you want to strike
14   is your last statement that he knew his
15   wife did not care, or are you striking
16   your entire --
17        A.    Yeah.
18        Q.    Okay.
19        A.    I don't know anything about
20   his wife other than she wouldn't move the
21   car that night.
22        Q.    No, that's fine.  I think
23   you heard me do it yesterday.  Somebody
24   can move to strike.  And I just wanted

1    clarification about what you were moving

2    to strike.

3                    So I think what you're

4    describing is there was a part in the

5    classroom, a space in the classroom, that

6    from the outside nobody could see.  So

7    you'd have to actually come in the

8    classroom to see what was going on; is

9    that right?

10          A.     Correct.

11          Q.     Okay.  And so each time that

12   Mr. Ralston abused you, he pulled you

13   into that area of the classroom that

14   couldn't be seen from the outside even

15   through the little --

16          A.     Correct.

17          Q.     -- jail-like window; right?

18   Is that right?

19          A.     Correct.

20          Q.     So every time Mr. Ralston

21   abused you in the geometry classroom was

22   in that area of the classroom that could

23   not be seen from the outside of the

24   classroom; is that right?

1    A.    Correct.

2    Q.    And I think you said that

3 Mr. Ralston knew his timetable.  What

4 were you referring to?

5    A.    We had to be at training or

6 practices at specific times.  And if

7 you're not there -- as Lane Jubb noticed

8 yesterday, if you're late for anything by

9 a minute or two, it gets marked down that

10 there's no --

11    Q.    Are you talking about the --

12 you're talking about the sports and the

13 intramural?  Is that --

14    A.    Yeah.

15    Q.    -- the period?

16    A.    But if --

17    Q.    Okay.

18    A.    So he was one of the

19 captains or one of the coaches for cross

20 country.  I think he was varsity captain.

21         But you only have so much

22 time to get so many places.  So you only

23 have so many -- so much time to do what

24 you're going to do and try and get away

Kurtis N.   Poulos

1    with it.

2              So he knew that he had a

3    timetable every time that this happened.

4    It wasn't going to be a prolonged, like,

5    rendezvous.  It was going to be like wham

6    -- sorry.  I can't think of a better term

7    than wham, bam, thank you, ma'am.  Like,

8    I'm going to do what I want do and you're

9    going to get out and I'm going to go and

10   do my thing.  It's sounds crude, but...

11        Q.    So after geometry class,

12   every time it was the last class of the

13   day, you had to be at a sports or

14   intramural afterwards within a specific

15   period of time?

16        A.    Within a certain time

17   period, yeah.

18        Q.    Were there -- did you ever

19   miss your intramural or your sports

20   practice because of an incident of abuse

21   by Mr. Ralston?

22        A.    You can ask Lane Jubb.  He

23   has my transcripts.

24        Q.    I'm asking you.  Are any of

Kurtis N.  Pouros

1   those -- I mean, are any of the instances

2   -- let me start again.

3                  Did you ever miss your

4   intramural or your sports class which

5   followed geometry as a last class of the

6   day because of abuse by Mr. Ralston?

7        A.    I'm sure there was a few, so

8   yes.

9        Q.    And we looked at it a bit

10  yesterday, but you got demerits when you

11  didn't go to your intramural or your

12  sports; is that right?

13       A.    So yes, I got demerits when

14  I was at school.

15       Q.    Did you get -- go ahead.

16       A.    Go ahead.

17       Q.    Right.  I want to know what

18  happened if you didn't go to your

19  intramural or your sports class.

20       A.    Nothing unless you got 12

21  demerits.  I think it was 12 demerits.

22       Q.    Okay.  So if you didn't go

23  to your -- let's just use intramural

24  class as an example.  If you didn't show

Kurtis N. Poulos

1   up for your intermural class, you would

2   get a demerit; is that right?

3        A.    Correct.

4        Q.    And then when you got 12

5   demerits, something would happen?

6        A.    Correct.

7        Q.    What would happen after you

8   got 12 demerits?

9        A.    I don't know.  I never got

10  12 demerits.

11       Q.    If you --

12       A.    I -- sorry to interrupt, but

13  I pushed everything I could to the limit.

14  I have and always will.  If there's a

15  nine, I'm going to try and get to a 10.

16            Oh, nice iced tea.

17            It's something that's borne

18  into me.  I don't know why.  But I always

19  feel like I need to push it to the limit.

20            So if they tell me I can get

21  12 demerits, I'm going to make sure that

22  I get 11 and not 12 before I get into too

23  much trouble.

24       Q.    What happened if you didn't

1    go to dinner?   Did you get a demerit for

2    that as well?

3         A.    It depended on which --

4    which form I was.   I mean, you could show

5    up for dinner and not eat and leave.   But

6    if you were an underclassman, you had to

7    stay for the entire dinner, regardless.

8         Q.    Okay.   So how about as a

9    sophomore?   What would happen if you

10   didn't show up for dinner?

11        A.    If I didn't show up, I'd get

12   a demerit.

13        Q.    And what would happen when

14   you were a sophomore if you didn't go to

15   breakfast?

16        A.    You'd get a demerit.

17        Q.    And did the meals work the

18   same way during your sophomore year as

19   sports that if you got 12 demerits, then

20   you got in trouble?

21        A.    Yeah.

22        Q.    If we showed you the records

23   that you reviewed yesterday with Mr. Jubb

24   regarding your demerits and absences,

1    would you be able to identify which ones

2    were caused because you didn't appear due

3    to abuse by Mr. Ralston?

4           A.    Honestly, no.  I couldn't --

5    I couldn't place dates.

6           Q.    It would all be during your

7    sophomore year though; is that right?

8           A.    Sophomore year abuse; my

9    junior year is why I fled; my senior

10   year, in retrospect, was him trying to

11   intimidate me because I'm pretty sure he

12   would never expect me to come back to

13   that high school.

14          Q.    The first instance that you

15   remember that Mr. Ralston touched you on

16   the inside of your clothes, where did Mr.

17   Ralston touch you?

18          A.    In my groin.

19          Q.    Did Mr. Ralston use his

20   hands?

21          A.    Yes.

22          Q.    Was there ever a time when

23   Mr. Ralston touched you on your penis

24   inside your clothes using a part of his

Kurtis N. Poulos

1    body other than his hand?

2          A.     Yes.

3          Q.     What part of Mr. Ralston's

4    body did he use to touch you on your

5    penis inside your clothes other than his

6    hand?

7          A.     Mouth.

8          Q.     The first instance when Mr.

9    Ralston touched you on your penis inside

10   your clothes, did Mr. Ralston touch you

11   anywhere else?

12         A.     Not to my recollection.

13         Q.     Did you touch Mr. Ralston

14   during the incident, the first incident

15   rather, where Mr. Ralston touched you on

16   your penis inside your clothes?

17         A.     Yes, but not by choice.

18         Q.     Did you touch Mr. Ralston on

19   the inside or the outside of his clothes

20   during the first incident where Mr.

21   Ralston touched you on your penis on the

22   inside of your clothes?

23         A.     On the inside.

24                Clifford.

1          On the inside.

2          Q.    Did Mr. Ralston make you

3    touch him anywhere other than on his

4    penis inside his clothes?

5          A.    No.

6          Q.    And so the first time that

7    Mr. Ralston made you touch him on his

8    penis inside his clothes was the same

9    time that he also touched you on your

10   penis inside your clothes; is that right?

11         A.    I believe so, if...

12         Q.    How many times did Mr.

13   Ralston -- let me start again.

14               How many incidents were

15   there that Mr. Ralston touched you on

16   your penis inside your clothes?

17         A.    Inside?

18         Q.    Yes.

19         A.    I don't know.  Five or six.

20   I -- I don't remember fully.  I'm sorry.

21         Q.    Do you remember the

22   trimester during which the first time Mr.

23   --

24         A.    The same every trimester.

1    Q.    Right.  I understand that.

2  I'm trying to learn from you if you

3  remember what trimester the first time

4  that Mr. Ralston touched you on your

5  penis inside your clothes occurred.

6    A.    It was after Parents'

7  Weekend.  I'm guessing winter trimester.

8  It was after Thanksgiving.

9    Q.    When was the first time that

10  Mr. Ralston touched your penis with his

11  mouth?

12    A.    Winter trimester.

13    Q.    Do you have a specific

14  recollection of the first time that Mr.

15  Ralston touched your penis with his

16  mouth?

17    A.    No.  It was he forced me to

18  start doing that to him.

19    Q.    Okay.  So --

20    A.    It wasn't me -- it wasn't

21  him doing it to me first.  It was vice

22  versa.

23    Q.    Okay.  So Mr. Ralston made

24  you use your mouth to perform oral sex?

1          A.      Yes.

2          Q.      When was the first time that

3     Mr. Ralston made you perform oral sex on

4     him?

5          A.      After Christmas break.

6          Q.      What do you remember about

7     the first time that -- let me start

8     again.

9               Did Mr. Ralston make you

10     perform oral sex on him more than once?

11          A.      Yes.

12          Q.      What do you remember about

13     the first time that Mr. Ralston made you

14     perform oral sex on him?

15          A.      I was disgusted, but I was

16     terrified.

17          Q.      So you were in the same

18     blind spot area of the geometry classroom

19     the first time that Mr. Ralston made you

20     perform oral sex on him; is that right?

21          A.      There was -- yes.  There was

22     a corner.  There was no way that anybody

23     could see what was going on.  His special

24     corner.

1    Q.    How did you get to the

2  special corner the first time that Mr.

3  Ralston made you perform oral sex on him?

4    A.    I didn't think it was going

5  to happen.  I thought it was just going

6  to be like --

7    Q.    Did Mr. Ralston ask you to

8  go to the corner the first time that he

9  made you perform oral sex on him?

10    A.    He didn't really have to

11  ask.  He just would like, that's -- he'd

12  point to the -- pointed to the corner.

13    Q.    Did Mr. Ralston say we're

14  going into the corner or did he move to

15  the corner?  How did Mr. Ralston express

16  that to you?

17    A.    It was implied.  It wasn't

18  -- there was no necessary movement or --

19  it was just implied.  You're here; I'm

20  here; shut the door.

21    Q.    How did you get to the

22  corner?  Did you walk there or did Mr.

23  Ralston pull you there?  Did Mr. Ralston

24  ask you to go there?

Kurtis N. Poulos

1    A.    No.  He -- there was -- like
2  I said, it wasn't words.  It was just
3  implied.  It wasn't even -- and that's
4  the scariest thing.  It wasn't like I was
5  forced.  Eventually, I wasn't even
6  forced.  By the time this stopped, I
7  wasn't even being forced to do it.
8    Q.    Okay.  You didn't want to do
9  it; right?
10   A.    What?
11   Q.    You didn't want to do it;
12  right?
13   A.    No.
14   Q.    Okay.  Well -- okay.  Is
15  your point that you weren't physically
16  pulled to the corner?
17   A.    I was not physically pulled
18  to the corner, no.
19   Q.    Okay.  Was it the case that
20  after a number of incidences of abuse,
21  Mr. Ralston stopped pulling you over to
22  the corner at the end of class?
23   A.    It was more like -- I guess
24  the best verbiage would be

1    indoctrination.  Like, I just -- it

2    became part of that day; like, oh, this

3    is going to have to happen.

4           Q.    So you felt like there was

5    an expectation that at the end of class,

6    you and Mr. Ralston would have

7    inappropriate contact in the corner of

8    the classroom; is that right?

9           A.    Correct.  It was more

10   assumed.

11          Q.    How was the -- again, I'm

12   still talking about the first instance

13   where Mr. Ralston made you perform oral

14   sex on him.  How was that initiated?

15          A.    I don't remember specifics.

16   I'm sorry.  I -- I don't.

17          Q.    How do you know -- let me

18   start again.

19          Did Mr. Ralston tell you

20   that he wanted you to perform oral sex on

21   him the first time he made you perform

22   oral sex on him?

23          A.    I don't remember.  I --

24          Q.    How did it end?

1        A.      Excuse me?

2        Q.      How -- again, talking about

3   the first incident that Mr. Ralston made

4   you perform oral sex on him, how did the

5   encounter with Mr. Ralston end?

6        A.      Abruptly, like the first

7   time.  Anything happened with him ended

8   abruptly like -- like he knew he had done

9   something wrong and wanted to flee, but

10  he -- he kept pursuing it after -- after

11  the matter.

12       Q.      Why do you remember that the

13  first instance that Mr. Ralston made you

14  perform oral sex on him occurred after

15  Christmas break?

16       A.      Because I broke up with my

17  girlfriend shortly thereafter because I

18  thought I'd done something wrong.

19       Q.      So after the first time that

20  Mr. Ralston made you perform oral sex on

21  him, you broke up with your girlfriend?

22       A.      Correct.

23       Q.      When was the next time that

24  Mr. Ralston made you perform oral sex on

Kurtis N.  Poulos

1    him?
2         A.    I couldn't give you a
3    timeline.
4              And to be honest, I'm kind
5    of over talking about this today.  I
6    haven't slept for a week.  I honestly
7    haven't eaten for four days.  I've been
8    nothing but transparent about everything.
9              So tear my life apart, do
10   whatever you need to do, but I can't do
11   this anymore today.  I can't.  I just
12   can't.  I'm too tired.
13             MS. DOUGHERTY:  Okay.  Let's
14        go off the record.
15             THE VIDEOGRAPHER:  We are
16        now going off the record.  The
17        time is 5:11.
18             MS. DOUGHERTY:  How would
19        you like to proceed, Mr. Jubb?
20        I'm not going to make him continue
21        today if he says he's too tired to
22        continue.
23             MR. JUBB:  Since we're
24        continuing this, Mr. Poulos will

Kurtis N. Poulos

```
 1           remain under oath.  We'll
 2           coordinate a date next week.  I'll
 3           make myself available whenever.
 4                MS. DOUGHERTY:  I will as
 5           well.
 6                Mr. Poulos, are you still
 7           there?
 8                THE WITNESS:  Yeah, I'm
 9           still here.
10                MS. DOUGHERTY:  Okay.  So
11           you've expressed that you're too
12           tired to continue testifying
13           today, so we're not going to
14           insist that you do continue if
15           you're too tired to testify.  So
16           provided you agree to return and
17           complete your testimony at a later
18           date, Mr. Jubb and I will, you
19           know -- I'll end my portion of the
20           questioning for the day and we'll
21           resume on another day.  Is that
22           how --
23                MR. JUBB:  How about Tuesday
24           of next week?
```

```
 1              MS. DOUGHERTY:  That's fine
 2         for me.  I'd, like Mr. Jubb, will
 3         make myself available whenever.
 4              Mr. Poulos?
 5              THE WITNESS:  Yeah, I'm
 6         here.
 7              MS. DOUGHERTY:  Can we
 8         resume on Tuesday of next week?
 9              THE WITNESS:  Yeah.  Just
10         let me know what time.
11              MS. DOUGHERTY:  Hold on.
12         Why don't you tell us what time is
13         best for you?
14              THE WITNESS:  It doesn't
15         matter.  Either way, this is going
16         to eat at me for the next four
17         days.  So another four days of not
18         eating, not sleeping.  Might as
19         well make it 1:00 a.m.  It doesn't
20         really matter at this point.
21              MR. JUBB:  Let's start at
22         10:00 a.m. on Tuesday.
23              MS. DOUGHERTY:  10:00 a.m.
24         Central Time?
```

Kurtis N.  Poulos

```
 1              MR. JUBB:  Yeah.
 2              MS. DOUGHERTY:  Okay, Mr.
 3       Poulos?
 4              THE WITNESS:  Yeah, that's
 5       fine.
 6              MS. DOUGHERTY:  Okay.  Thank
 7       you.
 8              We can go off the record.
 9              (Whereupon, Exhibits D-2 and
10       D-3 were marked for
11       identification.)
12              (Whereupon, the deposition
13       was adjourned for the day at
14       approximately 5:14 p.m. CT/6:14
15       p.m. EST.)
16
17
18
19
20
21
22
23
24
```

1              CERTIFICATION

2

3

4        I, EILEEN P. BARTH, hereby certify

5    that the testimony and proceedings in the

6    foregoing matter are contained fully and

7    accurately in the stenographic notes

8    taken by me and are a true and correct

9    transcript of the same.

10

11    _____

12                    EILEEN P. BARTH

                    Certified Shorthand

13                    Reporter

14

15

16        The foregoing certification of this

17    transcript does not apply to any

18    reproduction of the same by any means

19    unless under the direct control and/or

20    direction of the certifying shorthand

21    reporter.

22

23

24

Kurtis N.  Poulos

```
1              INSTRUCTIONS TO WITNESS

2

3       Please read your deposition over

4    carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8        After doing so, please sign the

9    errata sheet and date it.  It will be

10   attached to your deposition.

11       It is imperative that you return the

12   original errata sheet to the deposing

13   attorney within thirty (30) days of

14   receipt of the deposition transcript by

15   you.  If you fail to do so, the

16   deposition transcript may be deemed to be

17   accurate and may be used in court.

18

19

20

21

22

23

24
```

Kurtis N. Poulos

```
1              CERTIFICATE OF DEPONENT

2

3

4        I, WITNESS NAME, certify that I have

5    read the foregoing transcript of my

6    deposition and find it to be a true,

7    correct and complete transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the ERRATA.

12

13

14                _____

15                SIGNATURE

16                DATE:  _____

17

18

19

20

21

22

23

24
```

Kurtis N. Poulos

1                    — — — — — — —

                         ERRATA

2                    — — — — — — —

3      PAGE    LINE    CHANGE

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

Kurtis N. Poulos

1

— — — — — — —

LAWYER'S NOTES

2

— — — — — — —

3  PAGE  LINE

4   _____  _____   _____

5   _____  _____   _____

6   _____  _____   _____

7   _____  _____   _____

8   _____  _____   _____

9   _____  _____   _____

10  _____  _____   _____

11  _____  _____   _____

12  _____  _____   _____

13  _____  _____   _____

14  _____  _____   _____

15  _____  _____   _____

16  _____  _____   _____

17  _____  _____   _____

18  _____  _____   _____

19  _____  _____   _____

20  _____  _____   _____

21  _____  _____   _____

22  _____  _____   _____

23  _____  _____   _____

24  _____  _____   _____

# EXHIBIT "G"

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3  ----------------------------------------------------------

 4  JOHN DOE,

 5              Plaintiff,

 6     -vs-                       Case No. 19 CV 1539

 7  MITCHELL GARABEDIAN, ESQ., LAW

    OFFICES OF MITCHELL GARABEDIAN,

 8  and KURTIS N. POULOS,

 9              Defendants.

10  ----------------------------------------------------------

11

12                   VOLUME III

13

14          Video deposition of KURTIS NICHOLAS POULOS,

15  taken at the instance of the Plaintiff, pursuant to the

16  Federal Rules of Civil Procedure, pursuant to notice,

17  before Debbie A. Harnen, Registered Professional

18  Reporter and Notary Public in and for the State of

19  Wisconsin, VIA ZOOM VIDEOCONFERENCE, on November 24,

20  2020, commencing at 10:00 a.m. and concluding at

21  12:35 p.m.

22

23

24

25          Reported by:  Debbie A. Harnen, RPR
```

```
 1                A P P E A R A N C E S:
 2

    FOR THE PLAINTIFF:
 3

         THE BEASLEY FIRM, LLC, by
 4           Mr. Lane R. Jubb, Jr.  (REMOTELY)
             1125 Walnut Street
 5           Philadelphia, Pennsylvania 19107
             lane.jubb@beasleyfirm.com
 6           215.592.1000
 7

    FOR DEFENDANTS MITCHELL GARABEDIAN, ESQ., and LAW
 8  OFFICES OF MITCHELL GARABEDIAN:
 9       SWARTZ CAMPBELL, LLC, by
             Ms. Candidus K. Dougherty  (REMOTELY)
10           One Liberty Place
             1650 Market Street, 38th Floor
11           Philadelphia, Pennsylvania 19103
             cdougherty@swartzcampbell.com
12           215.564.5190
13

    APPEARED PRO SE:
14
             Mr. Kurtis N. Poulos  (REMOTELY)
15           3239 West Colony Drive
             Greenfield, Wisconsin 53221
16
17
    ALSO PRESENT:  Mr. Jeff Sindiong  (REMOTELY)
18                    Video Technician
19
20
21
22
23
24
25
```

1                    I N D E X

2   EXAMINATION                                    PAGE

3   KURTIS NICHOLAS POULOS

4        By Ms. Dougherty  . . . . . . . . . . . 449

5        By Mr. Jubb . . . . . . . . . . . . . . 491

6        By Ms. Dougherty  . . . . . . . . . . . 541

7        By Mr. Jubb . . . . . . . . . . . . . . 542

8

9

10

11

12                  E X H I B I T S

13  NUMBER                              PAGE IDENTIFIED

14

    Exhibit D-4 December 2018 letter to Rees -      482

15                Bates labeled Garabedian 053-054

16

17    (Original exhibit attached to the original transcript;

       PDF provided to attorneys ordering exhibit copies.)

18

19

20

21

22

23

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2                    THE VIDEOGRAPHER:  We are now on the

 3        record.

 4                    My name is Jeff Sindiong, the

 5        videographer, for Golkow Litigation Services.

 6        Today's date is November 24th, 2020, and the time

 7        on the screen is 10:00 a.m.

 8                    This is the continuation of the

 9        deposition of Kurtis Poulos, whom I'll remind is

10        still under oath; and this is being held in the

11        matter of John Doe versus Garabedian, Esq., et al.

12        Due to the nature of remote reporting, please

13        pause briefly before speaking to ensure all

14        parties are heard completely.

15                    Will counsel please identify

16        themselves and who they represent?

17                    MR. JUBB:  Good morning.  Lane Jubb of

18        The Beasley Firm for plaintiff.

19                    MS. DOUGHERTY:  Candidus Dougherty from

20        Swartz Campbell, LLC, for Defendant Mitchell

21        Garabedian.

22                    THE VIDEOGRAPHER:  And our court

23        reporter today is Debbie Harnen.  We may now

24        continue.

25
```

```
 1                    KURTIS NICHOLAS POULOS,

 2    called as a witness herein, having been previously

 3    duly sworn and having testified, was examined and

 4    testified further as follows:

 5                    EXAMINATION (Resumed)

 6    BY MS. DOUGHERTY:

 7    Q    Mr. Poulos, do you understand that you are still

 8         under oath?

 9    A    Yes, I do.

10    Q    Where are you testifying from today?

11    A    From my apartment.

12    Q    Is anyone else in your apartment with you other

13         than Clifford --

14    A    No.

15    Q    -- your service dog?

16    A    Just my service dog.

17    Q    Did Mr. Ralston ever put his mouth on your penis?

18    A    Yes.

19    Q    How many times did Mr. Ralston put his mouth on

20         your penis?

21    A    I couldn't say.

22    Q    Did Mr. Ralston put his mouth on your penis more

23         than once?

24    A    Yes.

25    Q    Did Mr. Ralston put his mouth on your penis more
```

Kurtis Nicholas Poulos

```
1           than five times?

2   A       Yes.

3   Q       Did Mr. Ralston put his mouth on your penis more

4           than ten times?

5   A       I don't believe so.

6   Q       So to your best recollection, Mr. Ralston put his

7           mouth on your penis between five and ten times?

8   A       Correct.

9   Q       Each time Mr. Ralston put his mouth on your penis

10          did it occur in the corner of the classroom -- the

11          geometry classroom that you described to us the

12          other -- last week?

13  A       Yes.

14  Q       So there was a corner that you believe was a blind

15          spot not visible from the outside of the classroom

16          where Mr. Ralston put his mouth on your penis; is

17          that right?

18  A       Correct.

19  Q       Other than putting his hands on your penis outside

20          your pants, making you touch Mr. Ralston on his

21          penis outside his pants, touching your penis

22          inside your pants, making you touch Mr. Ralston's

23          penis inside his pants, making you put your mouth

24          on Mr. Ralston's penis, and Mr. Ralston putting

25          his mouth on your penis, did Mr. Ralston touch you
```

Kurtis Nicholas Poulos

```
1     in any other way that you believed was

2     inappropriate?

3   A   Just awkward shoulder grabbing, shoulder rubs.

4   Q   Did the awkward shoulder grabbing and rubbing

5       occur during your sophomore year?

6   A   Correct, during class.

7   Q   So during geometry class, Mr. Ralston would touch

8       your shoulders?

9   A   He'd walk up behind, which would look innocent

10      enough to anybody else in the room.

11  Q   Mr. Ralston would walk up behind you when you were

12      sitting in your geometry class?

13  A   Correct.

14  Q   And then what did Mr. Ralston do when he walked up

15      behind you when you were sitting in your geometry

16      class?

17  A   Just randomly rub my shoulders.

18  Q   How many times did Mr. Ralston walk up behind you

19      and randomly rub your shoulders during your

20      geometry class?

21  A   I couldn't say.

22  Q   Did Mr. Ralston walk up behind you and rub your

23      shoulders during geometry class more than once?

24  A   Yes.

25  Q   Did Mr. Ralston walk up behind you and rub your
```

Kurtis Nicholas Poulos

```
 1            shoulders during geometry class more than ten
 2            times?
 3    A       Yes.
 4    Q       Did Mr. Ralston walk up behind you and rub your
 5            shoulders during geometry class more than 20
 6            times?
 7    A       I don't know.
 8    Q       So to the best of your recollection, Mr. Ralston
 9            walked up behind you and rubbed your shoulders
10            during geometry class between 10 and 20 times; is
11            that correct?
12    A       Correct.
13    Q       Did Mr. Ralston ever say anything any of the times
14            when he walked up behind you and rubbed your
15            shoulders during geometry class?
16    A       No.
17    Q       Was there a particular -- let me start again.
18                        You mentioned that your classes
19            rotated through different times on different days.
20            Was there any correlation between the day and time
21            of your geometry class and the times when
22            Mr. Ralston walked up behind you and touched your
23            shoulders?
24    A       No.
25    Q       Please tell me about the first time that
```

1          Mr. Ralston put his mouth on your penis.

2    A     I don't remember specifics.

3    Q     Can you please tell me what you remember -- let me

4          start again.

5                          Can you please tell me what you do

6          remember of the first time that Mr. Ralston put

7          his mouth on your penis?

8    A     No.  I've worked very hard to forget.  I don't

9          remember specifics.

10   Q     Do you have -- let me start again.

11                         Are there any writings, a journal

12         or documentation that you prepared that you could

13         review to refresh your recollection about the

14         specific facts of each instance that Mr. Ralston

15         put his mouth on your penis?

16   A     No.  I've never kept a journal.

17   Q     Have you ever written down information regarding

18         any of the incidents of abuse by Mr. Ralston?

19   A     No.  I've never written any of it down.

20   Q     Do you remember during which trimester of your

21         sophomore year Mr. Ralston put his mouth on your

22         penis for the first time?

23   A     The second trimester.

24   Q     In every instance that Mr. Ralston put his mouth

25         on your penis -- let me start again.

Rufus Nicholas Poulos

```
 1                          Did every instance that Mr. Ralston
 2          put his mouth on your penis occur during the
 3          second trimester of your sophomore year?
 4     A    No.
 5     Q    What other trimester of your sophomore year did
 6          Mr. Ralston put his mouth on your penis?
 7     A    Third trimester.
 8     Q    Are you able to tell me any information about any
 9          instance that Mr. Ralston put his mouth on your
10          penis?
11     A    No.
12     Q    Other than touching you on your penis outside your
13          pants, making you touch Mr. Ralston on his penis
14          outside his pants, touching you on your penis
15          inside your pants, making you touch Mr. Ralston's
16          penis on the inside of his pants, making you put
17          your mouth on Mr. Ralston's penis, putting his
18          mouth on your penis, and rubbing your shoulders
19          awkwardly, are there any other times that
20          Mr. Ralston touched you that you believe was
21          inappropriate?
22     A    Not to my recollection.
23     Q    Just to confirm, all the touching that I just
24          described occurred during your sophomore year at
25          The Hill School; is that right?
```

Kurelis Nicholas Poulos

```
 1   A    Correct.  That's why I didn't come back my junior
 2        year -- or I didn't stay, I should say.
 3   Q    I think you mentioned on one of your prior days of
 4        testimony that you did actually go to school with
 5        the intention -- let me start again.
 6                   You did travel to The Hill School
 7        with the intention to start your junior year, but
 8        you had an encounter with a teacher that caused
 9        you to pack up and go home; is that fair?
10   A    That's correct.
11   Q    Who was the teacher that you had the encounter
12        with when you arrived at The Hill School for your
13        junior year of high school?
14   A    It was Mr. Ralston.
15   Q    What happened between you and Mr. Ralston during
16        this encounter?
17   A    He just made a gesture and a comment, and I knew I
18        needed to get out of there.
19   Q    What gesture did Ralston make?
20   A    I don't remember.  I just remember feeling
21        uncomfortable.
22   Q    What did -- let me start again.
23                   What comment did Mr. Ralston make?
24   A    I don't remember specifics.
25   Q    Well, tell me what you do remember about the
```

Rufeis Nicholas Poulos

```
 1         comment that Mr. Ralston made.

 2   A     That I felt uncomfortable.

 3   Q     So is it correct that you don't remember the exact

 4         gesture or specifically what Mr. Ralston said to

 5         you; just that the gesture and the comment made

 6         you feel uncomfortable and that you needed to get

 7         out of there?

 8   A     Correct.

 9   Q     When did this interaction with Mr. Ralston occur?

10   A     I believe it was during or after our, you know,

11         reacclimation, our -- you know, we had those

12         meetings talking about the upcoming school year;

13         and if I remember correctly, it was at chapel or

14         after chapel outside of the building.

15   Q     How many days had you been at The Hill School

16         before the encounter with Mr. Ralston that you

17         believe was outside the chapel?

18   A     One or two, no more than four.

19   Q     What did you do immediately after the encounter

20         with Mr. Ralston outside the chapel before the

21         start of your junior year at The Hill School?

22   A     I remember calling my travel agent, and she said

23         it was too quick to rebook a flight.  I remember

24         starting to pack some of my belongings without

25         alerting my roommate at the time; and I remember
```

Kufels Nicholas Poulos

```
 1        hiring a car service to pick me up.
 2   Q    How long in relation to the interaction with
 3        Mr. Ralston outside the chapel did the car service
 4        arrive to pick you up?
 5   A    I couldn't tell you if it was the same day or the
 6        next day.  It all just sort of flowed together.
 7                 MS. DOUGHERTY:  Hey, Lane, are you
 8        typing?
 9                 MR. JUBB:  Yeah.
10                 MS. DOUGHERTY:  We can hear you typing.
11                 MR. JUBB:  Okay.  I'll put it on mute.
12                 MS. DOUGHERTY:  Do you mind --
13                 MR. JUBB:  I'm sorry.
14   BY MS. DOUGHERTY:
15   Q    Okay.  And I'll try to pause -- Mr. Poulos, pause
16        after my question so Lane can unmute in case he
17        wants to object.
18                      The third or fourth time that
19        Mr. Ralston touched you inappropriately, he
20        laughed; is that correct?
21   A    I think it was one of the first few times,
22        correct.
23   Q    Were there any other occasions when Mr. Ralston
24        was touching you inappropriately that he laughed?
25   A    Not to my recollection.
```

```
 1   Q    During any of the times that Mr. Ralston touched

 2        you inappropriately, did he say anything to you?

 3   A    Not to my recollection.

 4   Q    During any of the times that Mr. Ralston touched

 5        you inappropriately, did he make any noises?

 6   A    Yes.

 7   Q    What noises did Mr. Ralston make when he was

 8        inappropriately touching you?

 9   A    The same sort of noises that most individuals make

10        when they're enjoying themselves, I guess.

11   Q    Did Mr. Ralston make noises every time he touched

12        you inappropriately?

13   A    I couldn't recall.

14   Q    Did you ever say anything or make any noise during

15        the time -- during any time that Mr. Ralston

16        touched you inappropriately?

17   A    No.  I stayed silent.

18   Q    Did Mr. Ralston ever say anything or make noise

19        during any of the incidents where he made you

20        touch him inappropriately?

21   A    Repeat the question.

22   Q    Sure.  Did Mr. Ralston ever say anything or make

23        any noise during any of the incidents that he made

24        you touch him inappropriately?

25   A    Yes.  I just stated that he did.
```

Kurtis Nicholas Poulos

1    Q    So Mr. Ralston made noise both when he touched you

2         or made you touch him inappropriately; is that

3         right?

4    A    Correct.

5    Q    Have you told me everything that you can presently

6         remember regarding any incident where Mr. Ralston

7         touched you or made you touch him in a manner in

8         which you felt was inappropriate?

9    A    Yes.

10   Q    Did you share the same information about

11        Mr. Ralston touching you or making you touch him

12        inappropriately with Mr. Garabedian?

13   A    Yes.

14   Q    I believe you mentioned in your prior testimony

15        that there were maybe a dozen instances of contact

16        with Mr. Ralston that you considered bullying, one

17        of which was an incident involving your car and

18        being blocked in.

19                  Can you tell me what you remember

20        about the other instances that you were

21        referencing that you felt Mr. Ralston was bullying

22        you?

23   A    My sixth form year he was not my teacher.  He

24        wasn't my hall master, yet he seemed to go out of

25        his way to involve himself in almost every aspect

```
1      of my day.
2                        So I stopped attending -- again,
3      breakfast was not mandatory for sixth formers, but
4      I stopped attending all breakfasts.  Lunch was
5      mandatory, dinner was mandatory, but I left as
6      soon as I could.
7   Q  What do you mean by Mr. Ralston went out of his
8      way to involve himself?
9   A  It was like having a creepy shadow where, if I
10     misspoke or overstepped my bounds, it was like he
11     was looking for it.  So I stopped -- we had coffee
12     with the teachers after dinner, and he'd come over
13     and sit eerily close as if trying to hear what I
14     was talking about, and so I stopped attending that
15     as well.
16  Q  Did Mr. Ralston -- let me start again.
17                        How did Ralston go out of his way
18     to involve himself during breakfast?
19  A  I don't know.  I didn't really attend breakfast.
20  Q  Was there a reason related to Mr. Ralston that you
21     stopped attending breakfast during your six --
22     sixth form year?
23  A  No.  I just overall, in general, felt safer in my
24     dorm rather than -- or my dorm room rather than
25     being around him at all.
```

Kurelis Nicholas Poulos

1   Q   So is it a fair characterization that during your
2       sixth form year, you went out of your way to stay
3       in your dorm room as much as possible?

4   A   Correct.

5   Q   And the reason you went out of your way to stay in
6       your dorm room as much as possible during your
7       sixth form year was because of Mr. Ralston; is
8       that right?

9   A   Correct.

10  Q   So you said that you missed coffee with the
11      teachers, breakfast, dinner.

12              Was there any other events -- were
13      there any other events that you missed because you
14      were going out of your way to stay in your dorm
15      room during your sixth form year?

16  A   I believe Lawrenceville weekend, the bonfire I did
17      not attend.  It wasn't mandatory; I wasn't going.

18  Q   Okay.  So breakfast wasn't mandatory, so you did
19      not attend breakfast during your sixth form year;
20      is that right?

21  A   Right.

22  Q   Was lunch mandatory during your sixth form year?

23  A   Yeah.  We had school announcements.

24  Q   So you attended lunch during your sixth form year?

25  A   For the most part.  I might not have eaten, but I

Kurtis Nicholas Poulos

```
 1        would have had to show up.
 2   Q    Okay.  So is it a fair characterization that
 3        during your sixth form year, you would show up for
 4        lunch, listen to the announcements, and then
 5        return to your dorm room?
 6   A    Correct.
 7   Q    Was dinner mandatory during your sixth form year?
 8   A    I believe so, yes.
 9   Q    Did you attend dinner during your sixth form year?
10   A    Just to make sure that I got checked in and then
11        leave.
12   Q    Okay.  So you would appear for dinner, get checked
13        in and then return to your dorm room during your
14        sixth form year; is that fair?
15   A    Correct.
16   Q    You didn't attend the bonfire, you didn't attend
17        coffee with the teachers, which were both not
18        mandatory.
19                  Are there any other events,
20        mandatory or nonmandatory, that you did not attend
21        during your sixth form year because you felt safer
22        in your dorm room?
23   A    Not to my recollection.
24   Q    Are there any interactions that you recall between
25        you and Mr. Ralston that you considered to be
```

```
 1         bullying activity by Mr. Ralston that you've not
 2         told us about?
 3    A    Not to my recollection.
 4    Q    You mentioned previously that on the day that
 5         Mr. Ralston blocked your car in over parents
 6         weekend during your sixth form year, you knocked
 7         on his door and had a discussion with Ms. Ralston;
 8         is that right?
 9    A    I believe it was Ms. Ralston.  He refused to
10         answer the door.
11    Q    Okay.  So it's your recollection that you knocked
12         on the door and asked for Mr. Ralston?
13    A    Yeah.
14    Q    And a woman answered the door?
15    A    His wife.
16    Q    What did you say to Mrs. Ralston?
17    A    I asked them to move their vehicle --
18    Q    Did Ms. --
19    A    -- so I could go and see my mom and have a normal
20         parents weekend like every other student had.
21    Q    When you parked your car, where did you park it?
22    A    I couldn't tell you the exact direction, but it
23         was paral- -- or perpendicular to the building.
24                   Like I said, there was -- the
25         building goes this way, there was a staircase that
```

Kurtis Nicholas Poulos

```
 1          went down right outside of my window.  Next to

 2          that was a small -- what could be considered a

 3          parking spot; and on the other side of that was a

 4          hill that led up to the headmaster's office.

 5                    So I pulled into that one area

 6          where I knew I wasn't going to block any other

 7          part of that parking structure given the fact that

 8          there was, I believe, four teachers in that

 9          building who all had vehicles parked inside of a

10          garage.  So I parked out of the way, again, just

11          to get in and get out with my belongings so I

12          could resume my parent -- you know, my time with

13          my mom for parents weekend.

14     Q    Okay.  So just to be clear, you weren't in, like,

15          your assigned parking spot?  You pulled up close

16          to the building so you could run up quickly and

17          get your stuff; is that right?

18     A    Yeah.  My assigned parking spot was a half a mile

19          away behind the history of art music building, the

20          Performing Arts building.

21     Q    What did Mrs. Ralston say when you asked that she

22          or her husband move their car?

23     A    Basically that they weren't going to move their

24          car; that I had broken some rule about coming back

25          on campus, which I find interesting because then
```

1        they knew I was already signed out of campus.

2                    So if you know I broke a rule by

3        coming back to campus, you must have known that I

4        was already signed off of campus for the weekend.

5   Q    Did you say any of that to Mrs. Ralston when she

6        indicated that her and her husband were not going

7        to move their car?

8   A    I believe so, yes.

9   Q    Is there anything else that you remember

10       Mrs. Ralston saying to you or you saying to

11       Mrs. Ralston?

12  A    She was very combative.  The whole situation was

13       very combative.

14                   I mean, the fact that a grown man

15       took time to get up out of his apartment, move his

16       car out of his parking stall, put it behind my

17       car, it was infuriating because not only is he

18       trying to intimidate me; he's taking away time

19       that I could spend with my mom away from the

20       campus and feel normal for 24 hours.

21  Q    Is there anything else that you remember about the

22       exchange between you and Mrs. Ralston?

23                   Hold on.  We can't hear you.  At

24       least I can't hear you.

25                   MS. DOUGHERTY:  Can people hear me?

```
 1                    THE COURT REPORTER:  I can hear you.  I
 2        can't hear the witness.
 3                    MS. DOUGHERTY:  Okay.
 4    BY THE WITNESS:
 5    A    Locking my door that night.
 6    BY MS. DOUGHERTY:
 7    Q    All right.  Mr. Poulos, I think we missed the
 8        first part of your answer.  I could see your mouth
 9        moving but couldn't hear you.
10                    So let me ask the question again,
11        and can you give your answer again, please?  I
12        believe my question was whether you remembered
13        anything else regarding the exchange between you
14        and Mrs. Ralston?
15    A    Between her and myself, no.
16    Q    The next morning, was Mr. Ralston's car still
17        blocking your car?
18    A    Nope.
19    Q    Do you know when Mr. Ralston moved his car to stop
20        blocking your car?
21    A    No idea, but it had to have been before 8:00 a.m.
22    Q    Did you get into trouble or -- of any kind, I
23        guess, from the disciplinary dean for coming back
24        to the school during parents weekend?
25    A    Absolutely not.
```

1    Q    So -- let me start again.

2              You returned the keys to your car

3         at some point?

4    A    After I drove my mom to the airport in

5         Philadelphia, I drove back to campus, I believe

6         probably stopped and got some food for my dorm;

7         and I think we were supposed to -- like I said, I

8         believe we put our keys -- put our keys through a

9         mail slot in the door.

10             But it had to have been returned

11        either first thing the following morning or the

12        same day because I would have had to park all the

13        way over behind the Performing Arts building, and

14        I would have had to pass basically right by.

15             So knowing me, I wouldn't have

16        waited.  I would have just gone, done it, and then

17        gone back to my dorm.

18   Q    Okay.  So your recollection is that when you

19        returned to the campus, whatever the procedure was

20        at the time, you -- to return your keys, you

21        followed it, right?

22   A    Correct.

23   Q    And you never heard anything further from the dean

24        of discipline or whomever that you had done

25        something wrong during the parents weekend?

Kurtis Nicholas Poulos

```
 1    A    No, because I didn't do anything wrong.

 2    Q    As a result of being sexually molested by

 3         Mr. Ralston, have you suffered from depression?

 4    A    Yes.

 5    Q    As a result of being sexually molested by

 6         Mr. Ralston, have you suffered from sadness?

 7    A    Sadness, depression, PTSD or PTSS.

 8    Q    As a result of being sexually molested by

 9         Mr. Ralston, have you cried?

10    A    Numerous occasions.

11    Q    As a result of being sexually molested by

12         Mr. Ralston, have you experienced anxiety?

13    A    Yes.

14    Q    As a result of being sexually molested by

15         Mr. Ralston, have you experienced emotional pain?

16    A    Yes.

17    Q    As a result of being sexually molested by

18         Mr. Ralston, have you had sleep problems?

19    A    To say the least.

20    Q    What do you mean to say the least?

21    A    I mean, I don't sleep.  I sleep two hours here,

22         two hours there.  I wake up having nightmares

23         that I'm back on that campus doing it all over

24         again.

25    Q    As a result of being sexually molested by
```

Kurtis Nicholas Poulos

```
 1        Mr. Ralston, do you experience concentration
 2        problems?
 3   A    No.  I can concentrate just fine.
 4   Q    When you were at The Hill School, did you
 5        experience concentration problems because of being
 6        sexually molested by Mr. Ralston?
 7   A    Yeah, because I didn't know who was around me, who
 8        I could trust.
 9   Q    As a result of being sexually molested by
10        Mr. Ralston, do you have low self-esteem?
11   A    I believe so, yes.
12   Q    As a result of being sexually molested by
13        Mr. Ralston, do you have low self-respect?
14   A    Yes.
15   Q    As a result of being sexually molested by
16        Mr. Ralston, do you have low self-confidence?
17   A    At times.
18   Q    As a result of being sexually molested by
19        Mr. Ralston, are you apathetic and find yourself
20        not caring about things generally or caring about
21        things in your life?
22   A    I care very much about things in my life.  I care
23        about my home, my dog, you know, the people that
24        support me.  So I'm not apathetic.
25   Q    How about when you were at The Hill School?  Did
```

```
 1        you feel apathetic or find yourself not caring

 2        about your life or things?

 3   A    I still cared about my life.  That's why I spent

 4        as little time there after I was accepted to

 5        college as possible.

 6   Q    When you were at The Hill School, did you not care

 7        about your grades because you were sexually

 8        molested by Mr. Ralston?

 9   A    I stopped caring about my grades when I got

10        accepted to college.

11   Q    When you were at The Hill School, were you more

12        concerned about being safe and spending time in

13        your dorm room than your grades?

14   A    Yes.

15   Q    If I understand you correctly, you did care about

16        your future when you were at The Hill School,

17        which is why you stuck it out despite the abuse;

18        is that fair?

19   A    That, and I didn't want to let my family down.

20   Q    As a result of being sexually molested by

21        Mr. Ralston, did you self-medicate or turn to

22        drugs and alcohol to cope with the emotional

23        pain?

24   A    In general or my senior year?

25   Q    Well, let's start with generally.
```

```
 1   A    Yes.

 2   Q    How about during your senior year?

 3   A    Yes.

 4   Q    So your senior year at The Hill School, is that

 5        when you started consuming drugs and alcohol to

 6        cope with the emotional pain of being sexually

 7        molested by Mr. Ralston?

 8   A    I -- I'll be honest.  I started consuming alcohol

 9        when I was living in France because it was legal.

10                   But my senior year I was drinking

11        vodka orange juice like it was water just to get

12        me through the days, and we'd smoke weed every

13        once in a while, but what high school student

14        didn't.

15   Q    So when you consumed alcohol in France, that was

16        during your junior year, right?

17   A    Correct, when I was living abroad.

18   Q    And when you consumed alcohol when you were living

19        abroad, that was for recreation; is that fair?

20   A    Yeah, and it was the first time I had ever

21        consumed alcohol.

22   Q    When you were drinking vodka orange juice like

23        water during your senior year, was that also for

24        recreation or for another reason?

25   A    For another reason.
```

Rufus Nicholas Poulos

```
 1   Q    What was the other reason?

 2   A    To just numb the day away.

 3   Q    When you smoked marijuana during your senior year,

 4        was that for recreation or for a different reason?

 5   A    Recreation.

 6   Q    Did you continue consuming alcohol to numb the day

 7        away after your senior year?

 8   A    Off and on.

 9   Q    As a result of being sexually molested by

10        Mr. Ralston, did you self-sabotage the good things

11        in your life?

12   A    Every chance I got.

13   Q    Can you give me some examples of how you

14        self-sabotaged the good things in your life as a

15        result of being sexually molested by Mr. Ralston?

16   A    Positive relationships with my family members,

17        positive relationships with girlfriends, with

18        close friends.

19             I don't like getting very close to

20        people anymore because I'm scared that I'm going

21        to wake up one day, and they're going to use

22        whatever I said against me in some sort of

23        fashion.

24   Q    As a result of being sexually molested by

25        Mr. Ralston, do you have trust problems?
```

Rufus Nicholas Poulos

```
1   A   Most undoubtedly.

2   Q   As a result of being sexually molested by

3       Mr. Ralston, do you have flashbacks and reminders

4       of the sexual abuse?

5   A   Yes.  Like I said, I'm having nightmares.  I've

6       been having nightmares about just even being back

7       on that campus.

8   Q   How long have you had nightmares?

9   A   Decades now.

10  Q   Have you had nightmares -- let me start again.

11                  When did the nightmares start?

12  A   To my recollection, over the last ten years.

13  Q   Did you have nightmares when you were attending

14      The Hill School?

15  A   Yeah.  I didn't sleep more than two or three

16      hours.

17  Q   As a result of being sexually molested by

18      Mr. Ralston, do you feel broken and unfixable?

19  A   I hope I'm fixable, but I feel like he broke a big

20      chunk of my life out of my control.

21  Q   How about when you were at The Hill School?  Did

22      you feel broken and unfixable as a result of being

23      sexually molested by Mr. Ralston?

24  A   Yes, because I felt like I should have had the

25      experience that everybody else in my family had
```

Kurtis Nicholas Poulos

```
 1        experienced over generations at that school.
 2   Q    As a result of being sexually molested by
 3        Mr. Ralston, have you ever self-harmed?
 4   A    As a result of that, no.
 5   Q    Have you self-harmed for reasons other than being
 6        sexually molested by Mr. Ralston?
 7   A    I would assume that my drinking would be
 8        considered a form of self-harm, but in a --
 9   Q    Okay.  I understand.  So let me clarify my
10        question because I didn't -- I wasn't thinking of
11        it that way, and I think you're absolutely right.
12                 So other than drinking -- let me
13        start again.
14                 When you were consuming alcohol
15        like water, did you consider that consuming
16        alcohol in excess?
17   A    In retrospect, yes.
18   Q    You considered drinking alcohol to excess to be
19        self-harm; is that right?
20   A    Absolutely.
21   Q    Other than drinking alcohol to excess, have you
22        self-harmed in other ways due to being sexually
23        molested by Mr. Ralston?
24   A    Just in my professional life.
25   Q    What do you mean by that?
```

```
 1   A     Again, sabotaging things that are good in my life.

 2   Q     So you have self-harmed as a result of being

 3         sexually molested by Mr. Ralston by drinking to

 4         excess and sabotaging professional relationships

 5         in your life?

 6   A     Correct.

 7   Q     As a result of being sexually molested by

 8         Mr. Ralston, do you feel alone and isolated?

 9                   THE WITNESS:  Can you stop typing?

10                   MR. JUBB:  I'm back on mute.

11                   THE WITNESS:  Can you repeat the

12         question?

13   BY MS. DOUGHERTY:

14   Q     Sure.  I apologize.  I didn't notice the typing

15         again.

16                        As a result of being sexually

17         molested by Mr. Ralston, do you feel alone and

18         isolated?

19   A     Yeah, but I feel safe.

20   Q     When you were at The Hill School, did you feel

21         alone and isolated because of being sexually

22         molested by Mr. Ralston?

23   A     At times.

24   Q     As a result of being sexually molested by

25         Mr. Ralston, did you feel ostracized when you were
```

```
 1        at The Hill School?

 2   A    Yes.

 3   Q    As a result of being sexually molested by

 4        Mr. Ralston, do you feel shame?

 5   A    Yes.

 6   Q    As a result of being sexually molested by

 7        Mr. Ralston, do you feel embarrassment?

 8   A    For myself and my family.

 9   Q    As a result of being sexually molested by

10        Mr. Ralston, do you feel guilt?

11   A    At times.  I try not to because it's not my fault

12        that he's sick.

13   Q    As a result of being sexually molested by

14        Mr. Ralston, do you blame yourself?

15   A    No.

16   Q    When you were at The Hill School, did you blame

17        yourself because of Mr. Ralston's sexual abuse?

18   A    I honestly didn't know -- I believe I was too

19        young to actually comprehend the long-term effects

20        of what that would have -- would produce.

21   Q    Right.  But just if we could -- and I realize it's

22        difficult.  Just if you can return yourself to

23        when you were at The Hill School, did you feel

24        self-blame because of the conduct by Mr. Ralston?

25   A    I don't recall.
```

Kurtis Nicholas Poulos

```
 1   Q   As a result of being sexually molested by

 2       Mr. Ralston, do you have intimacy problems?

 3   A   Yes, because I don't trust anybody.

 4   Q   When you were at The Hill School, did you lose a

 5       dangerous amount of weight as a result of being

 6       sexually molested by Mr. Ralston?

 7   A   Yes.  I lost about 20 pounds my senior year -- or

 8       sixth form year.

 9   Q   Was that because you did not feel like eating?

10   A   I didn't -- I didn't wanna -- like I did

11       everything I could to stay in my room; and if that

12       meant I was eating cans of tuna straight out of

13       the can, that's what I was going to have to do;

14       and yes, I would go to the grill and maybe order

15       food once in a while, but I wouldn't eat most of

16       it.

17                   It got to a point where my mother

18       actually called the school to get me special

19       permission so I could go off campus using my car

20       to eat by myself at a restaurant.

21   Q   Did you get the special permission that your

22       mother requested?

23   A   I don't believe so, no.

24   Q   As a result of being sexually molested by

25       Mr. Ralston, have you ever experienced suicidal
```

Rufus Nicholas Poulos

```
 1        ideation?

 2   A    Yes.

 3   Q    As a result of being sexually molested by

 4        Mr. Ralston, have you ever felt an emotional void?

 5   A    Yes.

 6   Q    As a result of being sexually molested by

 7        Mr. Ralston, have you felt anger?

 8   A    Very much so.

 9   Q    As a result of being sexually molested by

10        Mr. Ralston, have you felt confusion?

11   A    Yes.

12   Q    As a result of being sexually molested by

13        Mr. Ralston, do you feel that Mr. Ralston ruined a

14        part of your life?

15   A    He took away my life.

16   Q    Do you feel that Mr. Ralston sent you down the

17        wrong road in life?

18                    Hold on one second.

19               THE COURT REPORTER:  We can't hear you.

20               MS. DOUGHERTY:  Can you speak again?

21        Mr. Poulos, can you hear us?  We can't hear you.

22        Can you make a sound?  Mr. Poulos?

23               THE WITNESS:  Yeah, I'm here.

24   BY MS. DOUGHERTY:

25   Q    Okay.  We lost you there I think for a minute.
```

```
 1        I'm going to ask my question again.
 2                        Do you feel that Mr. Ralston sent
 3        you down the wrong road in life?
 4   A    I think it was a contributing factor.
 5   Q    Do you feel that Mr. Ralston stole your childhood
 6        innocence?
 7   A    I think he froze me in time.
 8   Q    What do you mean by that?
 9   A    I mean, I'm 42 years old, and I still feel like a
10        terrified child.
11   Q    The various impacts of the -- of being sexually
12        molested by Mr. Ralston that you just described
13        for me for the past several minutes, did you share
14        that same information with Mr. Garabedian?
15   A    To an extent.
16   Q    What do you mean "to an extent"?
17   A    I didn't -- I don't recall going into too many
18        details.  He just asked overall if it had affected
19        me, and I said yes.
20   Q    Did you describe to Mr. Garabedian how the -- how
21        being sexually molested by Mr. Ralston affected
22        you?
23   A    Yes.
24   Q    Oops.  I almost hung up on everybody.  I'm going
25        to try to share my screen.
```

```
 1                          I'm showing you a document that was
 2            previously shown to you by plaintiff's counsel as
 3            P16.225 to 226.  There's a number of versions of
 4            it in the record.  The particular version that I'm
 5            showing you, which I think it's just an identical
 6            copy, has Garabedian053 and Garabedian054 at the
 7            bottom.  Actually, I have the letter twice.  So
 8            it's 053 to 056.
 9                          MS. DOUGHERTY:  Lane, did you use 55 to
10            56 or 5- -- did you use -- which one did you use,
11            do you know?
12                          MR. JUBB:  I used the ones that were
13            produced from the school.  So mine were P16, but I
14            have those numbers if you'd like me to reference
15            them.
16                          MS. DOUGHERTY:  Sure.  I thought they
17            were 225 and 226.
18                          MR. JUBB:  Are you trying to show him
19            the letters that are at issue in the case?
20                          MS. DOUGHERTY:  Yeah.  I just want to
21            make sure we don't have any controversy just
22            because I have one that has a different label on
23            the bottom.
24                          MR. JUBB:  No.  I think that -- as long
25            as you're going through those four pages, I think
```

Kurtis Nicholas Poulos

```
 1        that's fine.  But why don't you just identify them
 2        for the record just in case.
 3                  MS. DOUGHERTY:  Sure.  It was really
 4        only my intention to go through the first two
 5        pages because it's the same letter twice.
 6   BY MS. DOUGHERTY:
 7   Q    So I'm showing you the December 26, 2018, letter
 8        by Mitchell Garabedian to Thomas D. Rees that
 9        says, Re: Sexual Abuse Claim of Kurtis Nichols
10        Poulos.  This letter appears a number of times
11        with different Bates labels, which I don't think
12        are important.
13                  I would like to direct your
14        attention to the middle of the first page, the
15        third paragraph that starts with your name,
16        Nicholas Poulos.  The sentence reads:  Kurtis
17        Nicholas Poulos (DOB October 10, 1978) met
18        Mr. Ralston during Mr. Poulos's freshman year at
19        The Hill School in approximately 1993 or
20        approximately 1994 when Mr. Poulos was
21        approximately 14 or approximately 15 years old.
22                  Is that sentence that I just read
23        to you correct?
24   A    Correct.
25                  MR. JUBB:  I'm sorry.  Could -- I'm just
```

```
 1          going to have to object.  Correct as you read it?

 2                    MS. DOUGHERTY:  Okay.

 3                    MR. JUBB:  Can you clarify that for me?

 4                    MS. DOUGHERTY:  Sure.  That's fair.

 5                    I read the sentence -- the first

 6          sentence of the third paragraph -- you know what?

 7          I'm just going to mark the version I'm showing the

 8          witness, which is Garabedian 053 to 054 as D-4,

 9          just so I can reference it somehow.

10                    (Exhibit No. D-4 was marked for

11                     identification.)

12   BY MS. DOUGHERTY:

13   Q    So I just read to you, Mr. Poulos, the first

14        sentence of the third paragraph on the first page

15        of D-4.  Did I read that sentence correctly?

16   A    Yeah.

17   Q    And the first sentence of the third paragraph of

18        the first page of D-4 is factually correct; is

19        that right?

20   A    Correct.  I was sat at his table as many other

21        students were.

22   Q    The next sentence on the -- the second sentence of

23        the third paragraph on the first page of D-4

24        reads:  Mr. Ralston served as a table master in

25        the dining hall, and Mr. Poulos had a rotation at
```

1          Mr. Ralston's table during Mr. Poulos's freshman

2          year.

3                          Did I read that sentence correctly?

4     A    Yes.

5     Q    Is that sentence, the second sentence of the third

6          paragraph on the first page of D-4, true?

7     A    Yes.

8     Q    Okay.  The third sentence of the third paragraph

9          on the first page of D-4:  Mr. Poulos recalls that

10         Mr. Ralston was a mathematics teacher and a cross

11         country coach at The Hill School.

12                         Did I read that sentence correctly?

13    A    Yes.

14    Q    Is that sentence true?

15    A    Yes.

16    Q    Next sentence:  Mr. Poulos recalls that

17         Mr. Ralston lived in a dormitory of The Hill

18         School with Mr. Ralston's family.

19                         Did I read that sentence correctly?

20    A    Yes.

21    Q    Is that sentence true?

22    A    Yes.

23    Q    Next sentence:  Mr. Poulos does not recall that

24         anything inappropriate happened with Mr. Ralston

25         during Mr. Poulos's freshman year at The Hill

```
 1        School.
 2                        Did I read that sentence correct?
 3    A   Yes.
 4    Q   Is that sentence true?
 5    A   To my knowledge, yes.
 6    Q   The next paragraph, which is the fourth paragraph
 7        on the first page of D-4, which is the
 8        December 26, 2018, letter by Mr. Garabedian to
 9        Mr. Rees.  Sentence reads:  Mr. Ralston was
10        Mr. Poulos's geometry teacher during Mr. Poulos's
11        sophomore year at The Hill School in approximately
12        1994 and approximately 1995 when Mr. Poulos was
13        approximately 15 and approximately 16 years old.
14                        Did I read that sentence correctly?
15    A   Yes.
16    Q   Is that sentence true?
17    A   Yes.
18    Q   Next sentence:  Mr. Poulos recalls that classes
19        were held on a rotating schedule at The Hill
20        School so that classes met at different times of
21        the day.
22                        Did I read that sentence correctly?
23    A   Yes.
24    Q   Is that sentence true?
25    A   Yes.
```

| 1 | Q | Next sentence:  On certain days when Mr. Poulos |
|---|---|---|
| 2 | | had geometry as the last class of the day, |
| 3 | | Mr. Ralston made Mr. Poulos stay behind in |
| 4 | | Mr. Ralston's classroom. |
| 5 | | Did I read that sentence correctly? |
| 6 | A | Correct. |
| 7 | Q | Is that sentence true? |
| 8 | A | Yes. |
| 9 | Q | Next sentence:  Mr. Ralston and Mr. Poulos were |
| 10 | | alone in the classroom after school on these |
| 11 | | occasions. |
| 12 | | Did I read that sentence correctly? |
| 13 | A | Yes. |
| 14 | Q | Is that sentence true? |
| 15 | A | Yes. |
| 16 | Q | Okay.  Now we're on the second page of D-4, next |
| 17 | | sentence:  Mr. Poulos recalls that the geometry |
| 18 | | classroom was located at the end of a hallway. |
| 19 | | Did I read that sentence correctly? |
| 20 | A | Yes. |
| 21 | Q | Is that sentence true? |
| 22 | A | Yes. |
| 23 | Q | Next sentence:  During the course of Mr. Poulos's |
| 24 | | sophomore year, Mr. Ralston sexually abused |
| 25 | | Mr. Poulos in Mr. Ralston's geometry classroom |

```
 1          between approximately 10 and approximately 15

 2          times.

 3                      Did I read that sentence correctly?

 4    A     Yes.

 5    Q     Is that sentence true?

 6    A     Yes.

 7    Q     The next sentence:  The sexual abuse consisted of,

 8          among other things, Mr. Ralston fondling

 9          Mr. Poulos's penis and testicles, skin on skin;

10          Mr. Ralston making Mr. Poulos fondle Mr. Ralston's

11          penis and testicles, skin on skin; Mr. Ralston

12          putting his mouth on Mr. Ralston's penis; and

13          Mr. Ralston making Mr. Poulos put his mouth on

14          Mr. Ralston's penis.

15                      Did I read the sentence correctly

16          as it's written in the letter that's been marked

17          as D-4?

18    A     Yes.

19    Q     Now just directing your attention to where it

20          says:  Mr. Ralston putting his mouth on

21          Mr. Ralston's penis, that didn't actually happen,

22          right?

23    A     I don't know that that's physically possible.

24    Q     Right.

25                      Is it your understanding that --
```

Rufers Nicholas Poulos

```
 1        that Mr. Ralston putting his mouth on
 2        Mr. Ralston's penis is referring to Mr. Ralston's
 3        putting his mouth on your penis?
 4   A    Correct.
 5   Q    So the beginning of that sentence, The sexual
 6        abuse consisted of, among other things,
 7        Mr. Ralston fondling Mr. Poulos's penis and
 8        testicles, skin on skin, is that true?
 9   A    Yes.
10   Q    Mr. Ralston making Mr. Poulos fondle
11        Mr. Ralston's penis and testicles, skin on skin,
12        is that true?
13   A    Yes.
14   Q    And then the next part should read:  Mr. Ralston
15        putting his mouth on Mr. Poulos's penis; is that
16        right?
17   A    Correct.
18   Q    And did Mr. Ralston put his mouth on your penis?
19   A    Yes.
20   Q    And then Mr. Ralston making Mr. Poulos put his
21        mouth on Mr. Ralston's penis; is that true?
22   A    Yes.
23   Q    The next sentence, which is the first sentence of
24        the second paragraph, I guess the first full
25        paragraph, on Page 2 of D-4, which is the
```

```
 1              December 26, 2018, letter by Mr. Garabedian to

 2              Mr. Rees, The sexual abuse by Mr. Ralston ended

 3              with Mr. Poulos's sophomore year at The Hill

 4              School.

 5                          Did I read that sentence correctly?

 6    A         Yes.

 7    Q         Is that sentence true?

 8    A         Yes.

 9    Q         Next sentence:  Mr. Poulos transferred to

10              Marquette University High School, Milwaukee,

11              Wisconsin, for his junior year of high school.

12                          Did I read that sentence correctly?

13    A         Yes.

14    Q         Is that sentence true?

15    A         Yes.

16    Q         Next sentence:  Mr. Poulos returned to The Hill

17              School for his senior year, approximately 1996 to

18              approximately 1997.

19                          Did I read that sentence correctly?

20    A         Yes.

21    Q         Is that sentence true?

22    A         Yes.

23    Q         Next sentence:  Mr. Poulos -- excuse me.  Let me

24              start again.

25                          Mr. Poulos had limited contact with
```

```
 1            Mr. Ralston during Mr. Poulos's senior year,

 2            although Mr. Poulos recalls that he and

 3            Mr. Ralston lived in the same dormitory during

 4            that year.

 5                      Did I read that sentence correctly?

 6    A       Yes.

 7    Q       Is that sentence true?

 8    A       Yes.

 9    Q       Next sentence:  Mr. Poulos does not recall any

10            sexual abuse during Mr. Poulos's senior year at

11            The Hill School.

12                      Did I read that sentence correctly?

13    A       Yes.

14    Q       Is that sentence true?

15    A       Yes.

16    Q       Next sentence:  Mr. Poulos does not recall having

17            any contact with Mr. Ralston after Mr. Poulos

18            graduated from The Hill School in approximately

19            1997 when Mr. Poulos was approximately 18 years

20            old.

21                      Did I read that sentence correctly?

22    A       Yes.

23    Q       Is that sentence true?

24    A       Yes.

25    Q       And the factual information that I just read to
```

```
 1        you is included in the third, fourth and fifth

 2        paragraph of the December 26, 2008 [sic], letter

 3        by Mr. Garabedian to Mr. Rees, which has been

 4        marked as D4, is that information that you

 5        provided to Mr. Garabedian?

 6    A   Yes, it is.

 7                    THE WITNESS:  Clifford...

 8                    MS. DOUGHERTY:  Those are my questions.

 9                    MR. JUBB:  Okay.  And the time right now

10        is 12:04 p.m. Eastern Standard Time.

11                       Why don't we do a two-minute break,

12        three-minute break since we've been going for an

13        hour.  Then I'll kick back off, and I should be

14        pretty quick.

15                    MS. DOUGHERTY:  Okay.  So five minutes?

16        12:10?

17                    MR. JUBB:  12:10, yep.

18                    MS. DOUGHERTY:  Oh, let me stop sharing.

19        There we go.

20                    THE VIDEOGRAPHER:  We are now going off

21        the record.  The time is 11:05.

22                       (Recess taken from 11:05 a.m.

23                        until 11:14 a.m.)

24                    THE VIDEOGRAPHER:  We are now back on

25        the record.  The time is 11:14, and you may
```

```
 1        continue.
 2                MR. JUBB:  Thank you.  Just for the
 3        record purposes, it is now 12:14 Eastern Time.
 4                   FURTHER EXAMINATION
 5   BY MR. JUBB:
 6   Q    Mr. Poulos, the weekend that you have described
 7        where your car was parked in, you had said that
 8        that was parents weekend, correct?
 9   A    Correct.
10   Q    Am I correct that parents weekend -- strike that.
11                When would parents weekend occur?
12   A    Typically, the second or third week of October.
13        It would have been in the first trimester, roughly
14        a month after we had already started classes.
15   Q    And you would start classes in either -- end of
16        August?
17   A    No.  Early September, after Labor Day weekend.
18   Q    Okay.
19   A    Unless you were there for football, there would be
20        no other reason to be on campus that early.
21   Q    With respect to Mr. Ralston, can you describe him
22        for me?
23   A    I'd say he was five-ten, 160 pounds, short hair,
24        slight build.
25   Q    Anything else?
```

Kurtis Nicholas Poulos

```
 1   A    I couldn't tell you his eye color if that's what
 2        you're asking for.
 3   Q    With respect to the classroom in which you have
 4        alleged these assaults occurred, what color were
 5        the walls?
 6   A    Muted tones.  Pretty much everything in that
 7        building was muted tones.  My --
 8   Q    And am I understanding from your testimony that
 9        the door would -- coming into the room from the
10        hall, you would make a left, and that door would
11        open inward, correct?
12   A    Correct.
13   Q    And would it open inward, per your recollection,
14        from the back of the classroom or from the front?
15   A    I believe from the back of the classroom.
16   Q    And then it's your --
17   A    No.  Well --
18   Q    -- testimony that the teacher's desk --
19                  (Zoom crosstalk.)
20   BY MR. JUBB:
21   Q    I'm sorry.  You're trying to make a hand gesture.
22                  Can you --
23                  MS. DOUGHERTY:  Well, he's still
24        talking.  I don't think he was done with his
25        answer.
```

Kurtis Nicholas Poulos

```
 1                    THE WITNESS:  I wasn't done.

 2                    MR. JUBB:  I wasn't -- I interrupted him

 3        because he was doing his hand thing as soon as I

 4        started asking a question, so...

 5                    MS. DOUGHERTY:  He was talking also,

 6        though.

 7                    MR. JUBB:  I didn't hear him talk.

 8                    But Candy, if you could just -- I

 9        know how to conduct these.  If you could just let

10        me try and get through this as quickly as

11        possible, that'd be okay.

12   BY MR. JUBB:

13   Q    So Mr. Poulos --

14                    MS. DOUGHERTY:  Okay.  Well, don't

15        interrupt his answers.  I realize it probably

16        wasn't on purpose because it seems like sometimes

17        the sound goes in and out, but that's what it

18        looked like to me.

19   BY MR. JUBB:

20   Q    Mr. Poulos, say whatever you need to say.

21   A    To my best recollection, you walk down the main

22        hallway, you take a left.  You head down to the

23        end of the corridor, and the door would have swung

24        from -- it would have been hinged on the right

25        side, if I remember correctly, meaning the rest of
```

Kurtis Nicholas Poulos

```
 1            the classroom went backwards or away from the
 2            hinges of the door.
 3    Q     Was the teacher's desk closest to the door?
 4    A     No.  It was the furthest; so was the blackboard.
 5    Q     And in the back of the classroom, what was there?
 6    A     A brick wall.
 7    Q     And for that class --
 8    A     Wait, wait.  When you speak about the back of the
 9            classroom, are you talking about the far back wall
10            when you first come in --
11    Q     Yes, sir.
12    A     -- or where his desk was situated?
13    Q     I'm referring to what you -- I was referring to
14            what you considered the back of the classroom.
15    A     I would consider the back of the classroom right
16            where the door was if I recall correctly, and then
17            it was a row of desks, and then it was the
18            blackboard; and his desk, I believe, was situated
19            in the right corner, so you would have had a
20            walkway towards the blackboard, yeah.
21    Q     And you said that this was in the basement of
22            Upper School, correct?
23    A     Basement, yeah.  I mean, first floor was
24            dormitory, so...
25    Q     And down in this area of Upper School, there were
```

```
 1        other classrooms as well as -- am I correct the

 2        language department down there, English

 3        department?

 4    A   Part of the English department was down there,

 5        yeah.  I had my English class at the far end,

 6        which later turned into where I had theology and

 7        Shakespeare.

 8                    Like I said, my French class was --

 9        or French studies were somewhere in the middle of

10        that row along the main corridor; and this --

11        again, I wish I had, like, a situation where I

12        could say east, west, north, south, but I don't.

13                    It was just if you came in from

14        this side, the main corridor is on your left.  If

15        you came in from this side, the main corridor is

16        on your right.  So if I came in my sophomore or

17        fourth form year, my French class would have been

18        on my right, my geometry class would have been on

19        my left down the corridor.

20    Q   You mentioned your French class would have been on

21        the right.  You can recall where your French class

22        occurred?

23    A   The third or fourth classroom on the right coming

24        in from the fourth form dormitory side of Upper

25        School.
```

Kurtis Nicholas Poulos

```
1   Q    And were there windows in that classroom?

2   A    Yeah, because it faced the alley -- well, we

3        had -- behind Upper School, there was a driveway.

4        On the other side of Upper School was built into

5        the hill, it was built into the land.  So there

6        was nothing there.

7                    Like you could walk up to the front

8        of Upper School, you'd see two doors, one to take

9        you up to the third floor, one to take you up to

10       the fourth form, but there was no exposure to what

11       was underneath it from that side of the building

12       facing the quad.  On the other side of the

13       building was a brick alleyway.

14  Q    And at any other point in time, did you have a

15       class other than geometry in this classroom that

16       you've described?

17  A    No.

18  Q    And of the students who were in there, am I

19       correct you cannot recall who anyone's -- strike

20       that.

21                    Am I correct you cannot recall any

22       student who was in that class with you?

23  A    Not specifically, no.

24  Q    What about generally?

25  A    I mean, you showed me a bunch of people the other
```

Kurtis Nicholas Poulos

```
 1        day.  There could be a possibility that one or two

 2        of them were attending class with me.  But no, not

 3        to my recollection.

 4   Q    Did you have assigned seats?

 5   A    Not to my recollection.

 6   Q    Where would you usually sit?

 7   A    Knowing me, probably towards the back of the

 8        class.

 9   Q    Was there anything on the walls?

10   A    Again, I believe it was a two-toned paint scheme.

11        Everything was so muted.  It was all tans and

12        yellows, and there wasn't, like, a bright blue

13        wall.  It was just a classroom with really crappy

14        lighting, pardon my French.

15   Q    And my question was a little bit more geared

16        toward decor.  So, for example, behind you, you

17        had something.

18                    Was there any frames on the wall or

19        photos, anything like that?

20   A    Not to my recollection.

21   Q    Was there ever an opportunity for students to

22        evaluate their teachers after the year?

23   A    Probably.

24   Q    Would you have done that?

25   A    I would have been generous.
```

Kurtis Nicholas Poulos

```
 1   Q   Why is that?

 2   A   Because I was a legacy.

 3   Q   Aren't they anonymous?

 4   A   That's like saying that if you write your name

 5       down and you hand it to somebody who already

 6       knows your handwriting, can't pick it out of a

 7       lineup.

 8                        Even a layman knows what your

 9       handwriting looks like.  It might not be

10       scientific, but if they've been teaching you for

11       months or a year, they're going to know who wrote

12       what.

13   Q   Who reviewed the evaluations --

14   A   I have no --

15   Q   -- to your recollection?

16   A   I have no idea.

17   Q   Do you know whether or not it would go to the

18       supervisors?

19   A   What supervisors?

20   Q   Well, there would be a head of the math

21       department, right?

22   A   A dean of academics?

23   Q   My question was, is there a head of the math

24       department?

25   A   I don't think there was.  I believe there was a
```

```
 1        dean of academics.

 2   Q    Who do you believe would be reviewing those

 3        evaluations?

 4   A    Whatever professor was most senior on campus, I

 5        would assume.  So at the time it would have

 6        probably been Mr. Watson.

 7   Q    And in these evaluations, do you recall the

 8        procedure for how they were completed?  In other

 9        words, was it like a survey of, you know, 1 to 5,

10        A through F?  Do you have any recollection of

11        those?

12   A    It would have probably been a numerical score with

13        the ability to write something positive or

14        negative in a bubble below, but you're 16 years

15        old.  That's the last thing you want to do when

16        you could leave by finishing it as quickly as

17        possible.

18   Q    Do you believe that you just quickly completed a

19        student evaluation for Mr. Ralston?

20   A    I quickly completed every student evaluation of my

21        teachers.  It wasn't just him.

22   Q    And in terms of the evaluation, you believe --

23        strike that.

24                 What do you believe you would put

25        for your evaluation?
```

```
 1   A   8 or 9s.

 2   Q   And at least according to your testimony, that

 3       would have meant that you had been sexually

 4       assaulted by Mr. Ralston at least 10 to 15 times

 5       throughout that year and you gave him an 8 or a 9

 6       on everything?

 7   A   As a teacher or as a human being?

 8   Q   My question was related to the student

 9       evaluations.  Do you think you gave an 8 or a 9 on

10       everything?

11   A   Probably.  Again, I did not want to stand out.

12   Q   Why would you stand out if you had anything

13       negative to say about Mr. Ralston on your

14       evaluations?

15   A   Because I was a legacy.

16   Q   No, sir.  My question was, why would you stand out

17       if you had anything negative, whether it was less

18       than an 8 or a 9, for Mr. Ralston?

19   A   Asked and answered.

20   Q   Do you believe that the evaluations were not

21       anonymous?

22   A   They weren't anonymous.

23   Q   And so you have an understanding of them

24       sufficient to recall that they actually were

25       evaluations that you would write your name on; is
```

Kureis Nicholas Poulos

```
 1       that right?
 2   A   As I stated earlier, regardless if I wrote my name
 3       on it, there was a max of 490 students at our
 4       school.  It's a small community.  People learn
 5       each other's handwriting.  There's no way any of
 6       that is anonymous.
 7   Q   Do you believe that the headmaster had your
 8       handwriting memorized if you gave Mr. Ralston poor
 9       scores on his evaluation without writing your
10       name?
11   A   I'm not going to speak about the headmaster.  The
12       headmaster spoke at my grandfather's funeral.
13       He's --
14   Q   I want to talk about who's looking at the
15       evaluations.  You said --
16   A   I have no idea.
17   Q   -- it might have been Mr. Watson.
18                 You have no idea?  Is that what you
19       just said?
20   A   Mr. Doherty was my headmaster.
21   Q   For sophomore year?
22   A   Yes, freshman --
23   Q   So who do you believe --
24   A   -- year, sophomore year.
25   Q   Who do you believe your sophomore year would have
```

Rufels Nicholas Poulos

```
 1        been the person reviewing the student

 2        evaluations?

 3   A    The most senior member of the academic community,

 4        the most senior teacher, I would assume.

 5   Q    And do you believe that person would have your

 6        handwriting memorized to know that it was your

 7        evaluation of Mr. Ralston?

 8   A    I believe that if it got pulled out that I put him

 9        down as like a 1, it's going to go somewhere that

10        somebody else is gonna notice my handwriting.

11   Q    Did you consider giving him a 4 or a 5?

12   A    I considered getting out of that classroom.

13   Q    Did you write that anywhere, do you believe, on

14        your student evaluation?

15   A    I don't believe so.

16   Q    Would you ever recommend Mr. Ralston as a teacher

17        to anybody else?

18   A    Hell no.

19   Q    At the time --

20   A    Now?  Wait.  Strike that.

21                  Are you asking if I would have

22        recommended him then or if I would recommend him

23        now?

24   Q    Then.

25   A    Then, probably.  He was a good math teacher, but
```

Rufels Nicholas Poulos

```
 1        he was a horrible human being.

 2   Q    In other words, if you had to make a

 3        recommendation to somebody about which math

 4        teacher to take, and one of them doesn't sexually

 5        abuse kids and the other one does, you were fine

 6        recommending Mr. Ralston to your colleagues?

 7   A    I was fine --

 8                   MS. DOUGHERTY:  Objection.

 9   BY THE WITNESS:

10   A    I was fine --

11                   THE WITNESS:  What's your objection?

12                   MS. DOUGHERTY:  It's a form objection,

13        the only type of objection I can make.

14                   THE WITNESS:  Okay.

15                   MS. DOUGHERTY:  I can explain the basis

16        for it if Mr. Jubb wants to know, but I think he

17        has to ask.

18                   MR. JUBB:  I need not know.

19   BY THE WITNESS:

20   A    I'm not gonna finish answering that question.  Go

21        ahead.

22   BY MR. JUBB:

23   Q    So you're not -- you're just not going to answer

24        my question?

25   A    I answered your question.
```

Kurtis Nicholas Poulos

1    Q    Mr. Poulos, if you had the option of recommending

2         Mr. Ralston as a math teacher to one of your

3         fellow students at the time who you are claiming

4         sexually abused you as opposed to another math

5         teacher, is it your testimony that you would have

6         still recommended Mr. Ralston?

7    A    I don't know.

8    Q    In other words, you may recommend Mr. Ralston, who

9         you claim sexually abused you at the time, or you

10        just may not have recommended Mr. Ralston, who

11        you're claiming abused you at the time; is that

12        right?

13   A    I don't recall.  Like I said, I probably pushed

14        through that -- that form just to get out of

15        class.  It wasn't like we got mailed them or

16        emailed them.  It was, okay, for the last five

17        minutes, fill out this form, and then you can

18        leave.  I'm going to do everything I can to leave

19        that classroom.

20   Q    And do you recall the evaluations as to whether or

21        not it even required handwriting or if you could

22        just circle a bubble or circle a number?

23   A    I do not.

24   Q    Was there anything unusual about the way you

25        circled numbers or made a checkmark that would

```
 1        give your evaluation away?
 2   A    Again, I have no idea.
 3   Q    Were you using any special pens at the time or
 4        special pencils that your circle would look
 5        different than anybody else's?
 6   A    You want to know if I remember what pen I used?
 7   Q    I'm asking if there's any way that your student
 8        evaluation would differentiate you from anybody
 9        else.
10   A    I guess in -- in retrospect, no.
11   Q    At the time the dean of students for your sixth
12        form year during the event that you've described
13        of Mr. Ralston's car parking behind yours, was
14        that Mr. Tearalaysen [phonetic]?
15   A    I don't recall the name, but it could be.
16   Q    You don't -- you don't recall the name of Chris
17        Tearalaysen at all?
18   A    Not offhand, no.  I'd have to see a picture of
19        him, and we might have called it -- yeah, no.
20        Unless I see him, I don't know.
21   Q    During the 1996 to 1997 school year, how would it
22        occur for a student such as yourself to contact
23        the dean of students if you needed to?
24   A    I would guess we would just go to his office or
25        send a piece of mail through the school's mail
```

Kurtis Nicholas Poulos

```
1        system.

2   Q    And you described the timing of this instance

3        being a Saturday, correct?

4   A    I believe so, yes.  It would have been parents

5        weekend.

6   Q    Approximately what time was it?

7   A    After dinner.  I don't know.

8   Q    And when you saw the car, what kind of car was it

9        again?

10  A    I believe it was a Subaru.

11  Q    What color?

12  A    I believe it was blue or tan or both.

13  Q    Both.  And when you saw Mrs. Ralston, did she come

14       to the door?  Did she invite you in?

15  A    No.  They didn't even open the door.

16  Q    How did you talk to Mrs. Ralston?

17  A    Through the door.

18  Q    Oh, in other words -- I'm sorry.  What was the

19       door?  Was it glass?  Was it is a fully, you know,

20       wooden door at all?

21  A    I don't know if it was wood or metal.  I'm

22       guessing because it was -- I'm guessing now in the

23       experience of life it would have been a metal fire

24       door, but it was a solid door.

25  Q    Were there any windows in that door that you could
```

1        communicate with Mrs. Ralston?

2    A   Just the peephole where she could see me, and I

3        couldn't see them.

4    Q   And when you say "them," can you tell me what

5        evidence you have based on your recollection that

6        suggested that Mr. Ralston was -- was inside?

7    A   Because she said he was inside.

8    Q   Did she -- did she try and holler for him?

9    A   Not to my recollection.  It was more of a --

10   Q   Did she say, Let me ask him what he says?

11   A   She may have.

12   Q   You said she was confrontational.  How was she

13       confrontational?

14   A   She was confrontational because she wouldn't just

15       allow me to leave or go get him to actually

16       address the situation; more like, We're going to

17       talk about this in the morning.  For now, take

18       your ass upstairs.

19   Q   Was there ever -- again, to your recollection, was

20       there ever a rule at the time that students were

21       not allowed to park their car on campus for any

22       time?

23   A   No, and that's irregardless.

24   Q   I think you meant regardless.

25                   And in any event, am I correct that

1      at that time, it would not be the faculty's

2      obligation to enforce discipline?  They would

3      simply follow the rules, then report it to the

4      dean; is that fair?

5   A   Correct.

6              MS. DOUGHERTY:  Objection.  Move to

7      strike.

8              THE WITNESS:  Okay.

9   BY MR. JUBB:

10  Q   You said correct to that last question?

11  A   Yeah, because why would each individual teacher

12     try and -- when I got in trouble for smoking off

13     campus, I didn't get, like, grabbed by the

14     teacher.  He told somebody I was smoking off

15     campus.  So why go out of your way to become an

16     enforcer of a rule that doesn't ultimately affect

17     your life.

18  Q   Is that how you felt about most teachers at the

19     school if they had to give you a demerit or report

20     you?

21  A   No.  I have no problem getting demerits.

22  Q   You mentioned your fifth form year when you first

23     got there.  Were you going to live by yourself or

24     were you going to have a roommate?

25  A   I was going to have a roommate.

Kurtis Nicholas Poulos

```
 1   Q    Do you recall his name?

 2   A    I do not.

 3   Q    Do you recall what he was known for at the school

 4        at that time?

 5   A    I believe he played hockey.

 6   Q    Was it Zach Brusko?

 7   A    There were so many hockey players.  It could have

 8        been Zach.  I don't...

 9   Q    Were you going to room with Zach your fifth form

10        year?

11   A    Again, you're throwing names at me I haven't

12        thought about in 23, 25 years.

13   Q    Okay.  Well, I'm asking you to think about it now.

14                  Were you going to room with Zach

15        Brusko your fifth form year?

16   A    Possibly.

17   Q    Are there any other people that you considered you

18        might have roomed with other than Zach Brusko to

19        say possibly as opposed to yes?

20              MS. DOUGHERTY:  Objection.

21              THE WITNESS:  Go ahead, Candy.

22              MS. DOUGHERTY:  There's no go ahead.

23              You can answer unless Mr. Jubb

24        decides he wants to rephrase his question.

25              MR. JUBB:  Yeah.  I don't.
```

1    BY MR. JUBB:

2    Q    Would you like me to rephrase it, Mr. Poulos?

3    A    Did Zach Brusko play goalie for the hockey team?

4    Q    No.  That wasn't my question.  My question was --

5    A    Well, no.  But that --

6    Q    -- did you room --

7                   (Zoom crosstalk.)

8    BY THE WITNESS:

9    A    Can you stop talking over me for one second?

10                  You seem to know more about my high

11        school than I remember.  So I'm asking you a

12        question.  Was Zach Brusko going to play goalie

13        for the hockey team?

14   BY MR. JUBB:

15   Q    I have no idea.

16   A    Then how do you know his name?

17   Q    Mr. Poulos, you need to answer my questions.

18                  Your question was, were you going

19        to room with Zachary Brusko your fifth form year?

20        You said possibly.

21                  And I'm asking you if there was

22        anybody else that you contemplated rooming with

23        that you're not able to either say yes or no, but

24        possibly as to Zachary Brusko?

25   A    If Zachary Brusko was going to be playing goalie

Kurtis Nicholas Poulos

```
 1        for the hockey team, then that would have been my
 2        roommate.  If that's his name, cool.  Do I
 3        remember his specific name?  No.
 4    Q   Am I correct you would have chosen your roommate?
 5    A   Possibly.
 6    Q   And if you had chosen your roommate, that would
 7        have meant that you would have at least been
 8        friends with him the year before, right?
 9    A   To an extent.
10             MS. DOUGHERTY:  Objection.
11    BY MR. JUBB:
12    Q   Did Zach also live on your dorm in Upper School
13        One East during your fourth form year?
14    A   I don't remember.
15    Q   I want to get the timeline down as to your
16        correspondence with the school after you left.
17                 Approximately what year do you
18        believe you -- you said you blocked getting emails
19        from the school.  Approximately what year was
20        that?
21    A   I have no idea.
22    Q   You mentioned that you had sent Mr. Drowne a
23        message; is that correct?
24    A   Yeah, because his Giants were playing my Packers
25        in the playoffs.  So I sent him a text message --
```

Kurtis Nicholas Poulos

```
 1        no.  I called his apartment and just left a funny

 2        voice mail saying, you know, Game on, something

 3        along those lines.

 4   Q    And when you say you called his apartment, how did

 5        you get that number?

 6   A    I probably called the school switchboard.

 7   Q    When you say his Giants were playing your Packers,

 8        approximately what year was that?

 9   A    Early 2000s.

10   Q    Was it a game -- strike that.

11             The fact that you were calling the

12        school, getting a switchboard to get his apartment

13        number, I imagine it wasn't some trivial game like

14        a Week 6 game.  It was probably -- was it a Super

15        Bowl or a playoff game?

16   A    It probably would have been a playoff game.  We

17        always had that camaraderie about sports,

18        Mr. Drowne and I.

19   Q    And Mr. Drowne was your hall master the fourth

20        form year, right?

21   A    Correct.

22   Q    Were you close with him?

23   A    Like I said, he had an open-door policy.  He

24        always was very welcoming to have us come over,

25        order food, play Sega and hang out and feel like
```

Kurtis Nicholas Poulos

```
 1          kids as opposed to science experiments.

 2   Q      How often did you feel like a science experiment

 3          at the school?

 4   A      Every day.

 5   Q      You didn't see Matt Ralston every day, though,

 6          right?

 7   A      Every day that I had geometry.  Every day -- you

 8          see everybody every day.  You had no choice.

 9   Q      Is it your testimony that you felt like a science

10          experiment every day?

11   A      Everything you do there is on exhibit.  So that's

12          pretty much the definition of a science

13          experiment.

14   Q      Can you tell me, if you can, why every day at that

15          school was a science experiment like you were on

16          exhibit as opposed to, let's say, another boarding

17          school?

18   A      I couldn't speak for other boarding schools.

19                      I can tell you that every major

20          test, every major grade was posted in the main

21          room by the mailboxes or across the hallway from

22          the mailbox in Middle School building.  So if you

23          screw up, everybody knows you screwed up.  So you

24          are on exhibit like a science experiment.

25   Q      In other words, your test at that time -- I'm
```

Kurtis Nicholas Poulos

```
 1        specifically talking about the fourth form year --
 2        you would get your results by them being posted
 3        near the mailroom; is that right?
 4   A    Yeah, directly across from the mail wall.  There
 5        was a wall of mailboxes.
 6              Then the main -- I don't know --
 7        switchboard lady, she sat in a window.  There was
 8        a row of mailboxes.  Across the way from that was
 9        a glass, you know, case that posted your grades.
10   Q    Would they just be for your fourth form year or
11        was that the same for your third, fourth and sixth
12        form year?
13   A    That was for every year.
14   Q    And would you be able to see the grades on the
15        tests for, let's say, a class you weren't even in?
16   A    Yes.
17   Q    And next to the grades, it would -- you're saying
18        that it would have the person's name who got that
19        grade?
20   A    I believe so, yes.  It's not like we had school ID
21        numbers.  It wasn't prison.
22   Q    You believe so, but do you actually recall seeing
23        that?
24   A    I -- well, yeah, because, otherwise, how am I
25        gonna look up my grades if I can't see my name?
```

Kurtis Nicholas Poulos

```
1   Q    Was there ever indication for a Social Security
2        number used, last four digits?
3   A    No, not to my recollection.
4   Q    So am I correct, then, that your testimony is that
5        throughout the year when grades would come out for
6        tests, every class would post every person's name
7        on this board, and every person in the school
8        could see who's getting what grade?
9   A    For the most part, I remember so, yes.
10  Q    And when you contacted Mr. Drowne, did he ever get
11       back to you?
12  A    No.  I wasn't expecting him to.
13  Q    By that point in time, had you blocked the school
14       from sending you emails?
15  A    No.  I started blocking them because all they ever
16       do is ask for money.
17  Q    Okay.  And I'm just trying to figure out the
18       timing of this because you said that you couldn't
19       recall.
20                    So you said that Mr. Drowne's
21       correspondence was in early 2000s.  So following
22       that, at some point -- well, let me ask you this.
23       Did you have email as of 1997 when you were at the
24       school?
25  A    I don't believe so, no.
```

Kurtis Nicholas Poulos

```
 1   Q    Did you ever have any occasion to email Mr. Drowne

 2        or anybody else at the school?

 3   A    Did I have occasion or did I actually do it?

 4   Q    Did you ever?

 5   A    No, not to my knowledge.

 6   Q    And you referenced the emails that were asking for

 7        money.  Did you ever get emails from the school

 8        just with updates about what's going on?

 9   A    Yeah.  You get an update, like, once a month what

10        they're doing, what they're building, can you give

11        us money so we can build more, asking --

12   Q    At any point --

13   A    -- for donations.

14   Q    I'm sorry to interrupt you.  Please continue.

15   A    I'm done.

16   Q    Did you ever receive any invitation to come to any

17        reunion weekends?

18   A    Probably my 10th anniversary weekend or 10-year

19        anniversary weekend.

20   Q    Did you go to that?

21   A    No.

22   Q    Did you ever go to your 5-year anniversary

23        weekend?

24   A    Nope.

25   Q    What about your 15th?
```

```
 1   A    Nope.

 2   Q    Did you ever get invited?

 3   A    It's a general invite to all alumnus.

 4   Q    When you say "all alumnus," what do you mean by

 5        "all alumnus"?

 6   A    All alumnus for that class year are going to get

 7        invited from the alumni -- there's an actual

 8        alumni building.  That's all they do is reach out

 9        to alumnus.

10   Q    And you mentioned to Ms. Dougherty that you wrote

11        a check for 97 cents; is that right?

12   A    I believe so, back in the day.

13   Q    What year was that?

14   A    I have no idea.  It would have been a joke.

15   Q    I'm aware that it would have been a joke.

16                  Did you write it from your own bank

17        account or from somebody else's?

18   A    From my own bank account.

19   Q    Was this donation solicited or was this out of the

20        kindness of your heart sua sponte?

21   A    Solicited.

22   Q    If you could approximate for me when you believe

23        this donation would have been.  Would this have

24        been in the early 2000s?  Late 2000s?

25   A    Early 2000s, maybe late '90s.
```

1    Q    Did your family ever make any donations?

2    A    Of course.

3    Q    Were you privy to those?

4    A    To the amount or the fact that we made them?

5    Q    Both.

6    A    Not the amount, but the fact that we made large

7         donations.

8    Q    How often after you graduated were there large

9         donations that were made from your family?

10   A    I would guess my grandmother would donate at least

11        once a year.

12   Q    And did you ever have any discussions with her

13        about, you know, hey, maybe you should stop doing

14        this?

15   A    No, because I didn't want her to know.

16   Q    Could you ever think of a way to express your

17        displeasure with the school without ever

18        describing like what you've described as sexual

19        abuse?

20   A    No.

21   Q    Now, tell me when you first started talking

22        with -- with Emily, your ex-girlfriend.

23   A    I got invited to go to Lawrenceville weekend

24        through an email from the school to all alumnus,

25        and she wanted to know why I basically was not

1       going to participate when I lived only a few hours

2       away in Connecticut.

3    Q  And you said you got an email.  Was she over your

4       shoulder looking at your computer?

5    A  She may have been.  My -- at that point, I was

6       living in Orange, so my computer was in the living

7       room area.  So basically anything you did on the

8       computer was going to be seen by anybody in that

9       room.

10   Q  And so your then girlfriend Emily saw this email

11      and started asking you, Gee, why aren't you going

12      to go to the reunion, something to that effect?

13   A  Basically, yeah.  It was Lawrenceville --

14   Q  What had she known about this -- go ahead.

15   A  It was Lawrenceville weekend, which was a -- it

16      is, I would assume, still a giant weekend of

17      events on campus, bonfires, bussing students in so

18      that we can play sports all weekend.

19   Q  Did Ms. Peters know what Lawrenceville weekend was

20      before overseeing this email that you received?

21   A  I may have mentioned it.  I don't remember.

22   Q  In other words, Ms. Peters was aware of the

23      significance of Lawrenceville weekend in order to

24      ask you, you know, Hey, why aren't you going to go

25      to this?  Is that fair?

1   A      Probably.  I did speak in length with her about my

2          experience at that school and what Lawrenceville

3          weekend was.

4   Q      How long were you in a relationship with

5          Ms. Peters?

6   A      Almost two and a half years.

7   Q      And then at some point it's your testimony that

8          you received one of the emails from the school,

9          the April of 2016 email, and she oversaw that

10         too?  Is that right?

11  A      Those would have been emails I would have printed

12         out.  Whether I left them in my printer, could

13         have been.  There was a lot going on at the time.

14  Q      Like what?

15  A      Life in general.

16  Q      And what did you specifically tell Ms. Peters

17         about your time at the school?

18  A      Prior to that?

19  Q      No.  When you say that she must have seen them on

20         the printer?

21  A      I'm assuming or -- I would assume she would have

22         just asked what is this in reference to, to a

23         degree.

24  Q      And you decided to tell her the story of your

25         alleged sex abuse; is that correct?

```
1   A    I had to start talking to the person that I was

2        going to be hopefully marrying about what had

3        happened to me, yes.

4   Q    How did she react?

5   A    She was mortified.

6   Q    How was your relationship at that point?

7   A    Fine.

8   Q    Was there ever any domestic violence issues?

9   A    Yeah.

10  Q    Did you have to press any charges against her?

11  A    I never would have.

12  Q    Were the domestic violence charges related to you?

13  A    Yeah.  They called -- like I said, I got a

14       disorderly conduct ticket for yelling.

15  Q    You were yelling, and that gave you a disorderly

16       conduct ticket?

17  A    The police did not like my demeanor.

18  Q    Did you try and fight a cop?

19  A    Not to my recollection.

20  Q    Approximately what time was this?  What year?

21  A    I have no idea.  What year?

22  Q    Yes, sir.

23  A    2016.

24  Q    Early 2016 or late 2016?

25  A    Middle of 2016.
```

1    Q    What had transpired in approximately June of 2015

2         that you discussed your allegations of sexual

3         abuse with your mom?

4    A    I said June of 2014, not 2015.

5    Q    Forgive me.

6                        What transpired in June of 2014

7         that made you reveal your allegations of sexual

8         abuse to your mom?

9    A    I was sick of living a lie.

10   Q    Did you have any run-ins with the law?

11   A    Then?

12   Q    Yes, sir.

13   A    I believe so, yes, again, for drunk and

14        disorderly.

15   Q    How did your mom react to the drunk and

16        disorderly?

17   A    She didn't want to be around me.

18   Q    After you had contact with Mr. Garabedian

19        initially, it's my understanding that there was a

20        time where you'd go outside, you have the 2017

21        letter, you forward that to your mom; your mom

22        says, Let me look into this, don't contact these

23        people, they're lawyers; and then shortly

24        thereafter, there's contact with Mr. Garabedian.

25                        With that as the background, can

Kurtis Nicholas Poulos

```
 1        you tell me what, if anything, was discussed with
 2        your mom as opposed to simply sending the letters
 3        to her?
 4    A   Yeah.  I called her and told her that I got the
 5        email.  I've asked and answered this same
 6        question.
 7    Q   Is there anything else you can recall about the
 8        discussions with your mom as they pertain to the
 9        April 2016 or November of 2017 letters that you
10        haven't already discussed with us in your prior
11        testimony with Ms. Dougherty questioning you?
12    A   No.
13    Q   You discussed a fee agreement with Mr. Garabedian
14        with Ms. Dougherty and your understanding of what
15        that percentage would be.
16                  Did you ever sign a fee agreement?
17    A   You have every single document that I've ever
18        signed, so...
19    Q   In other words, if I don't have a fee agreement,
20        then you didn't sign it, right?
21    A   If there was a fee agreement, I signed it.
22    Q   Well, do you recall signing a fee agreement?
23    A   I remember signing like 40 documents, which all
24        of -- all of which you have.
25    Q   Are you referring to the documents I showed you?
```

Kurtis Nicholas Poulos

```
 1   A     Yes.

 2   Q     Okay.  I'll represent to you I showed you what's

 3         known as the HITECH letters and the

 4         authorizations.  So my question is a little bit

 5         different with just respect to the contingent fee

 6         agreement.  Is it your understanding that of all

 7         the documents I showed you, that's everything you

 8         signed?

 9   A     To my recollection unless I go in my office and

10         start pulling out every single piece of paper.

11   Q     Let's not do that just yet.

12               But as you sit there, do you recall

13         reading through a contingent fee agreement that

14         says he represents you, here's what his fee's

15         going to be, you know, if we aren't successful,

16         we'll get you -- you know, we'll eat all the

17         costs, anything like that, or was it just a verbal

18         agreement?

19   A     No.  I believe there would have been some sort of

20         payment agreement.

21   Q     And when you say you believe there would have

22         been, my question is, do you recall signing one?

23   A     No.

24   Q     Thank you.

25               To the extent that you did and you
```

```
 1          just don't recall it, is that something you would

 2          have maintained in one of those folders that you

 3          described as important documents?

 4    A     Yes.

 5    Q     I asked you what type of dog Clifford was, and you

 6          told that to me.  When did you get him?

 7    A     January 15th, 2020.

 8    Q     You refer to him as a service dog.  Did a mental

 9          health professional prescribe to you Clifford?

10    A     No.  We went through training together to get him

11          certified.  Do you want to see his certification?

12    Q     I don't think that's necessary.

13                      And when did you go through the

14          training?

15    A     February.

16    Q     Who, if anyone, advised you to get a dog?

17    A     Me, myself and I.

18    Q     During your discussion with Ms. Dougherty, you

19          stated that going through that letter --

20    A     Which letter?

21    Q     The only document she showed you today.  With

22          respect to the December 26, 2017, letter, the

23          question was --

24                MS. DOUGHERTY:  Objection.  I think you

25          mean 2018.
```

Kurtis Nicholas Poulos

```
 1                  MR. JUBB:  Forgive me.  Strike that.

 2   BY MR. JUBB:

 3   Q    During the time that Ms. Dougherty went through

 4        the December 26, 2018, letter, she had asked you

 5        whether or not the information in the letter you

 6        provided to Mr. Garabedian, and you said yes.

 7                  Do you recall saying that?

 8   A    Yes.

 9   Q    When did you provide him that information?

10   A    I believe during our initial interview.

11   Q    Which was when?

12   A    November, December of 2017.

13   Q    And was this that conference call where there was

14        another person on the line as well?

15   A    Correct.

16   Q    Following that initial interview by phone in 2017,

17        do you recall having any discussions with

18        Mr. Garabedian after April of 2018?

19   A    Any conversations or specifics?

20   Q    Just any conversation with him.

21   A    Yeah, check-ins.

22   Q    Would he call you personally or someone from his

23        office?

24   A    He would typically call me in response to my

25        leaving a voice mail.
```

Kurtis Nicholas Poulos

```
 1   Q    In other words, you would leave a voice mail and
 2        say, Hey, what's going on?  And then he would
 3        respond back?
 4   A    Correct.
 5   Q    When he would respond back, do you recall a time
 6        where you actually spoke with him or was it just a
 7        phone tag via voice mail?
 8   A    No.  We would speak.
 9   Q    And in those discussions, did he ever have you
10        provide any sort of written statement to him?
11   A    Not to my recollection.
12   Q    Did he ever ask you for any supporting
13        documentation?
14   A    Not to my recollection.
15   Q    Did he ever ask you for any of your medical
16        records?
17   A    Possibly.
18   Q    What do you recall about that request?
19   A    That I would have allowed him to speak to or
20        receive documents from Dr. Grade.
21   Q    I'll represent to you that you didn't go to
22        Dr. Grade until approximately May of 2018.
23             Did you provide him any sort of
24        notes for any providers before then?
25   A    No.
```

```
1    Q    How did you learn of Dr. Grade?

2    A    Again, he's one of the most prominent

3         psychiatrists in the city, and my mom wanted me to

4         go see a great doctor.  So we had a family friend

5         who knew him recommend me.

6    Q    When you first spoke with Dr. Grade, did your mom

7         join you?

8    A    No.  She's never joined me in any capacity.

9    Q    When you say the family friend, was that Barry

10        Blackwell?

11   A    Yes.  It was Barry Blackwell.

12   Q    How long have you known Barry Blackwell?

13   A    Since I was in first grade.

14   Q    What does Barry Blackwell do?

15   A    He was a psychiatrist.

16   Q    Did you ever see Barry Blackwell for any

17        psychiatric treatment?

18   A    No, I did not.

19   Q    And what was it that you discussed with

20        Mr. Blackwell for him to recommend you to

21        Dr. Grade?

22   A    I just -- again, you know, the situation is these

23        people have known me since I was four, five, six

24        years old.  They've seen how it affected my life,

25        how I changed.  It's not like he didn't know.
```

Kurtis Nicholas Poulos

```
 1          That's his profession.  I wanted to --

 2   Q   Are you saying that Mr. Blackwell --

 3   A   Can I please --

 4   Q   -- determined that --

 5   A   You know what?

 6                MS. DOUGHERTY:  Objection.

 7                THE WITNESS:  If you're gonna keep

 8        interrupting me --

 9                MS. DOUGHERTY:  He needs to finish his

10        answer.

11                THE WITNESS:  -- I'm just gonna get off

12        the fuckin' thing.

13                MR. JUBB:  I'm trying to --

14                THE WITNESS:  You keep talking -- you

15        know what?  I'm done, I'm done, I'm done.

16                MR. JUBB:  Mr. Poulos, are you still

17        there?  The time is now 1:07 Eastern.

18                THE VIDEOGRAPHER:  Do you wish to go off

19        record?

20                MS. DOUGHERTY:  We can go off the video,

21        but -- why don't we take a break.  I can try to

22        call Mr. Poulos or I can try to call --

23                MR. JUBB:  No.  That's okay.  I don't

24        need you to have any contact with him.  He's -- he

25        doesn't want to come back.  It's now 1:07.  I
```

Kurtis Nicholas Poulos

```
1          still have a couple of questions, so...
2                    MS. DOUGHERTY:  Okay.  Well, some -- if
3          we were in -- if we were in person, as you know,
4          sometimes witnesses decide that they're going to
5          take a break and don't, you know, get in their car
6          and drive away.
7                         I'm not clear whether he's taking a
8          break and not intending to come back or what.  So
9          that was -- I can -- I think I might have a
10         telephone number for him.  I can call him on
11         speakerphone, and we can confirm whether he's
12         coming back or not.  I wasn't trying to suggest
13         anything untoward.  I just --
14                   MR. JUBB:  Yeah.  Why don't you call him
15         on speaker.
16                   MS. DOUGHERTY:  Okay.  Let me see if I
17         have a number for him unless you have one.
18                   THE VIDEOGRAPHER:  Do you wish for me to
19         go off record or stay on?
20                   MR. JUBB:  I think you should stay on.
21                   MS. DOUGHERTY:  Well, do we need the
22         video for this?
23                   MR. JUBB:  I think we do, yes.
24                   MS. DOUGHERTY:  Whatever.  I don't care.
25         It doesn't matter.  Let me see.
```

Kurtis Nicholas Poulos

```
 1                    THE VIDEOGRAPHER:  He has logged off the
 2        meeting now.
 3                    MS. DOUGHERTY:  I thought we had to fill
 4        out a sheet for the Court for the conference call
 5        that had everybody's number on it, but I'm not
 6        finding it in my system.
 7                    MR. JUBB:  I have a number, I'm sure,
 8        somewhere.
 9                         I have a phone number.
10                    MS. DOUGHERTY:  All right.  Do you want
11        to try?
12                    MR. JUBB:  Why don't you try this.
13                    MS. DOUGHERTY:  Okay.  I can.
14                    MR. JUBB:  (262)330-4604.
15                    MS. DOUGHERTY:  (262)330-4604, right?
16                    MR. JUBB:  Yeah.
17                    MS. DOUGHERTY:  Okay.  Can you hear the
18        ringing?
19                    THE WITNESS:  Hello?
20                    MS. DOUGHERTY:  Hi, Mr. Poulos.  This is
21        Candy, and you're also on speakerphone, so
22        Mr. Jubb, the court reporter and videographer can
23        hear you.
24                         Can you please log back onto the
25        meeting?
```

```
 1                    MR. JUBB:  Candy, can you put him up to
 2          your microphone because I'm having a hard time
 3          hearing?
 4                    MS. DOUGHERTY:  He's not said anything.
 5          I asked my question.
 6                    MR. JUBB:  Okay.
 7                    MS. DOUGHERTY:  And I'm sorry?  Are you
 8          logging back in, Mr. Poulos?
 9                    THE WITNESS:  Yeah.
10                    MS. DOUGHERTY:  Okay.  He's -- all
11          right.  I'm going to hang up, and then we'll just
12          wait for you to join the meeting again.  Okay?
13                    THE WITNESS:  Yep.
14                    MS. DOUGHERTY:  Could you hear he said
15          yeah, yep, yep?
16                    MR. JUBB:  Yep.
17                    MS. DOUGHERTY:  Okay.  We never went off
18          the record, right?
19                    THE COURT REPORTER:  Correct.
20                    THE WITNESS:  Sorry for my outburst.
21                    MS. DOUGHERTY:  Okay.  Well, just to --
22          to be fair, it's not wrong that Mr. Jubb shouldn't
23          interrupt your answer when you're answering, just
24          like you shouldn't interrupt his question.  I
25          don't think it was intentional because, at least
```

```
 1        from my perspective, sometimes the sound goes in
 2        and out.
 3                    So we'll give Mr. Jubb the benefit
 4        of the doubt that it's the technology, and he
 5        wasn't purposely trying to interrupt you.  But if
 6        it does occur, you should just alert Mr. Jubb and
 7        then finish your answer; just like if you
 8        interrupt Mr. Jubb's question, he should let you
 9        know, and he should finish his question.
10                    So I really don't remember what the
11        last question was, but I do know that you weren't
12        done with your answer, Mr. Poulos.  So maybe it
13        makes sense to read the question and answer back.
14                    MR. JUBB:  Please.
15                    (Record read as follows:
16                "QUESTION:  And what was it that you
17                discussed with Mr. Blackwell for him to
18                recommend you to Dr. Grade?
19                "ANSWER:  I just -- again, you know,
20                the situation is these people have known
21                me since I was four, five, six years
22                old.  They've seen how it affected my
23                life, how I changed.  It's not like he
24                didn't know.  That's his profession.  I
25                wanted to --"
```

```
 1   BY MR. JUBB:

 2   Q    Mr. Poulos, would you like to continue your

 3        answer?

 4   A    No.

 5   Q    What was it that made Mr. Blackwell refer you to

 6        Dr. Grade?

 7   A    Because Dr. Blackwell helped train Dr. Grade.

 8   Q    And what was it that you told Dr. Blackwell that

 9        would indicate to him that you should see

10        Dr. Grade, who he had trained?

11   A    The fact that he knew I went through a traumatic

12        experience.

13   Q    And tell me how he knew that.

14   A    Because he went through a similar experience.

15   Q    Did you tell him you went through a traumatic

16        experience?

17   A    Yes, without specifics.

18   Q    When did you tell him that?

19   A    At a meeting at his apartment.

20   Q    When was this?

21   A    I would say May of 2018.

22              THE WITNESS:  Sit, sit.

23   BY MR. JUBB:

24   Q    Am I correct that you had already contacted

25        Mr. Garabedian before you ever had any discussion
```

Kurtis Nicholas Poulos

```
 1        with Mr. Blackwell?

 2   A    Correct.

 3             THE WITNESS:  It's okay.

 4   BY MR. JUBB:

 5   Q    Was there anything that occurred in the November

 6        2017 time frame as it pertained to you and any

 7        sort of criminal charges?

 8   A    No.

 9   Q    Was there anything between April of 2016 and

10        November of 2017 that pertained to you and

11        criminal charges?

12   A    Not to my recollection, no.

13   Q    When did you break up with Emily?

14   A    End of June 2018.

15   Q    And you believe --

16   A    What does this have to do with any of this?

17   Q    Bear with me.

18             You believe you broke up with Emily

19        after you had contacted Mr. Garabedian; is that

20        right?

21   A    Well after.

22   Q    Was there anything that occurred, an incident at

23        home, around the 2017 time frame?

24   A    No.

25   Q    Who is Dr. Gudeman?
```

1   A    How is that relevant?

2   Q    Is he a psychiatrist, sir?

3   A    I believe so.  He's also a family friend.

4   Q    Well, I had asked you previously if you had ever

5        had any sort of psychiatric treatment, and I

6        believe your recollection did not include any

7        reference to Dr. Gudeman, and so I'm following up

8        on that.

9                    With respect to Dr. Gudeman, you

10       mentioned that he's a mental health professional

11       but also a family friend.  Do you still talk with

12       Dr. Gudeman?

13                MS. DOUGHERTY:  Objection.

14   BY THE WITNESS:

15   A    I haven't seen Dr. -- go ahead.

16                MS. DOUGHERTY:  I said objection.

17                MR. JUBB:  He's waiting for you to tell

18       him he can answer, Candy.

19                MS. DOUGHERTY:  Okay.  My objection is

20       to the commentary about prior testimony.

21                THE WITNESS:  Clifford.

22   BY THE WITNESS:

23   A    I haven't seen the man in 20-plus years.

24   BY MR. JUBB:

25   Q    What's your last recollection of speaking with

```
 1         Dr. Gudeman?
 2    A    I don't recall my recollection with Dr. Gudeman.
 3    Q    How long did Dr. Gudeman treat you?
 4    A    Not long.
 5    Q    Was this in the early 2000 time frame?
 6    A    It would have been before September 11th.
 7    Q    And when you say, "it would have been before
 8         September 11th," you're saying that would have
 9         been before September 11th, 2001; is that right?
10    A    Yeah, because that date doesn't stick out any
11         other year.
12    Q    And do you recall why you were receiving treatment
13         from Dr. Gudeman?
14    A    For depression.
15    Q    And do you recall approximately how many times you
16         saw him?
17    A    No.
18    Q    Where would you see him?
19    A    He had a practice at his house.
20    Q    And when you went to go see him, am I correct you
21         did not relay any allegation of sexual abuse that
22         occurred at The Hill School?
23    A    No, I did not.
24    Q    You mentioned that Mr. Ralston was one of your
25         table heads your third form year.  Who were your
```

```
 1         other table heads the third form year?

 2    A    I can only remember Mr. Ruth because he wouldn't

 3         let us eat pizza with our hands.

 4              MS. DOUGHERTY:  I'm sorry.  Did you say

 5         third form year?

 6              MR. JUBB:  Yes.

 7              MS. DOUGHERTY:  Okay.  Thank you.

 8    BY MR. JUBB:

 9    Q    What about your fourth form year?

10    A    I couldn't tell you.

11    Q    Am I correct that the way it worked back then, if

12         you were on a varsity sport team, you would sit at

13         a table with the coaches?

14    A    Not to my recollection.

15    Q    Am I correct that given the rotating tables, you

16         would have had six different table heads during

17         your sophomore year?

18    A    Sounds about right.

19    Q    You would have had six different table heads for

20         your senior year?

21    A    When I attended meals, yes.

22                   Again, I was never really at the

23         meals.  So it didn't matter who my head -- who the

24         table master was, I wasn't gonna stay.

25    Q    And it's your testimony that in the 1996 to 1997
```

```
 1          time frame, as a senior, you could just show up,

 2          sit down, hear announcements and leave; is that

 3          right?

 4    A     Yes.

 5    Q     And of the six table heads who you were assigned

 6          to, all of them allowed that; is that right?

 7    A     Yes, to my recollection.

 8    Q     Do you recall who they were?

 9    A     No.

10    Q     Have you ever been diagnosed with any sort of

11          condition like bipolar disorder?

12    A     No.

13    Q     Has your father?

14    A     I have no idea.  I haven't spoken to the man in 20

15          years.

16    Q     Has your mom?

17    A     No.  And don't bring my mother into this.

18    Q     Have you ever relayed that to any of your medical

19          providers, that you believe any of your family

20          members may have been bipolar?

21    A     No.

22    Q     Did you ever relay that they had any sort of

23          problems with alcohol abuse or substance

24          dependency?

25    A     No.  This is slut shaming 101 basically.
```

```
 1   Q    What did you refer to it as?

 2   A    Don't -- doesn't matter.

 3              MS. DOUGHERTY:  Well, I think in the

 4        legal world it's called not relevant, but...

 5   BY MR. JUBB:

 6   Q    When did you start reading emails from the school

 7        again?

 8   A    I don't know.

 9   Q    2015?

10   A    I just said I don't know.

11   Q    I'm trying to figure out if we can get a little --

12              THE WITNESS:  Whose horn is going off?

13              MS. DOUGHERTY:  It's not outside my --

14   BY MR. JUBB:

15   Q    If you were trying to talk, I couldn't hear you.

16   A    I just said I don't know, so why ask the same

17        question.

18   Q    I'm trying to figure out if we can pinpoint --

19        it's not the same question.

20              So I'm trying to figure out if we

21        can get a little closer than "I don't know," for

22        example, an approximation.  So we know you got an

23        email in April of 2016, right?

24   A    Correct.

25   Q    And we also know that you initially signed up with
```

```
 1        the school, whenever email came out, to receive

 2        email, correct?

 3   A    Correct.

 4   Q    Okay.  And so as you sit here today, the best you

 5        could do to approximate for us when you blocked

 6        the school is when email first came out when you

 7        first started getting emails from them and 2016?

 8        Somewhere in there, that's the best that you can

 9        do for your recollection; is that correct?

10   A    Correct.

11               MR. JUBB:  That's all I have for right

12        now.

13                    FURTHER EXAMINATION

14   BY MS. DOUGHERTY:

15   Q    I just have some follow-up.

16               Mr. Poulos, you were using the term

17        "table master," and Mr. Jubb was using the phrase

18        "table head."  Is there a difference between the

19        two?

20   A    It's the same thing.

21   Q    I think you previously mentioned that there were

22        two faculty members at your table or at the tables

23        in the dining hall.  Was one faculty member the

24        head over the other or were they both -- both

25        faculty members at a table considered the table
```

```
 1        master or table head?

 2    A   Each table was 16 students, one teacher on either

 3        end; each teacher took care of eight students.

 4    Q   Thanks.  Did you identify Matthew B. Ralston by

 5        name as a teacher who sexually abused you to

 6        Mr. Garabedian?

 7    A   Yes.

 8    Q   Did you identify Matthew B. Ralston by name as the

 9        teacher who sexually abused you to Mr. Garabedian

10        during the initial interview in November or

11        December 2017?

12    A   I believe so, yes.

13                 MS. DOUGHERTY:  Those are my questions.

14                 MR. JUBB:  Thank you for that follow-up.

15                     FURTHER EXAMINATION

16    BY MR. JUBB:

17    Q   So I want to talk about those discussions a bit

18        more.  In these discussions you had with

19        Mr. Garabedian where you identified Mr. Ralston,

20        did you identify him without being questioned or

21        did Mr. Garabedian ask you for the name?

22    A   He asked me for the name.

23    Q   And at that time, was it is your understanding

24        that Mr. Ralston was no longer at your school?

25    A   Correct.
```

1   Q    Did you tell Mr. Garabedian that?

2   A    I don't know.

3   Q    Did he ask?

4   A    I don't know.

5   Q    When he asked you any more details about

6        Mr. Ralston or -- strike that.

7                    In these conversations, did you

8        ever relay to Mr. Garabedian that anybody else had

9        any sort of alleged experience like you had with

10       Mr. Ralston?

11  A    I don't believe so, no.

12                   MR. JUBB:  Those are all the questions I

13       have.  Thank you.

14                   MS. DOUGHERTY:  Nothing further for me.

15                   THE VIDEOGRAPHER:  If there's nothing

16       else, this concludes the deposition of Kurtis

17       Poulos.  The time on the screen is 12:28, and we

18       are now off record.

19                   (Proceedings had off the video record:)

20                   MS. DOUGHERTY:  Can we stay on the

21       stenographic record for a moment?

22                   THE COURT REPORTER:  Yes.

23                   MS. DOUGHERTY:  Mr. Jubb, I just want to

24       address what we had discussed during a break, I

25       don't remember which day, about the handling of

Kurtis Nicholas Poulos

```
 1        the transcript, just to make sure that Mr. Poulos
 2        also agrees.
 3                   Mr. Poulos, the suggestion to
 4        address the several days of the transcript of your
 5        testimony is that if the transcript is going to be
 6        publicly disseminated or filed like with the Court
 7        in a motion, something like that, that any names
 8        are redacted from the transcript; and the idea
 9        behind that is that we can avoid sealing the
10        entire transcript, but also maintain the
11        confidentiality of people involved.
12                   Is that something that is okay with
13        you and that you will agree to, Mr. Poulos?
14                   THE WITNESS:  State that again.
15                   MS. DOUGHERTY:  Sure.  The suggestion on
16        addressing the -- well, let me say it this way.
17                   During the past several days of
18        your testimony, you've identified, in particular,
19        Mr. Ralston by name, who is not identified in any
20        of the pleadings by name; you've identified The
21        Hill School, which is also not identified by name
22        in any of the pleadings; and a number of other
23        teachers and classmates, none of whom are
24        identified by name in any of the pleadings.
25                   One option to address that
```

Kurtis Nicholas Psutos

1     situation to maintain the confidentiality of

2     people's identities is to put all of the

3     transcripts under seal, which means that anytime

4     anyone wants to use the transcripts with a Court

5     filing, something of that nature, a special motion

6     needs to be filed and the material needs to be

7     filed under seal, it's called.

8                   An alternative short of that, short

9     of putting all the transcripts under seal, is an

10    agreement among the parties that if at any time

11    one of the parties wants to disseminate the

12    transcript publicly or use it in a public filing,

13    if the part that is being used identifies someone

14    by name, that we agree to redact or black out the

15    person's name.

16                  You might recall the complaint in

17    this action has the two letters, the April and

18    December letter attached, but blacks out

19    Mr. Ralston's name and the school's name.  So

20    that's what we're referring to by "redacting."

21                  So just to give an example, if I

22    wanted to file a motion tomorrow that related in

23    some way to your testimony, and I wanted to attach

24    your testimony to my motion and file it with the

25    Court, which is a public filing, if part of your

Kurtis Nicholas Poulos

```
 1        testimony included Mr. Ralston's name, then I

 2        would black out his name, and I would do that by

 3        agreement; and then I'd probably have to also give

 4        the Court a copy that was unredacted separately

 5        just to chambers including all the parties.

 6                      So Mr. Jubb and I have agreed on

 7        behalf of our respective clients, you know,

 8        between us, subject to your agreement, that rather

 9        than putting the transcript or portions of the

10        transcript under seal, that we'll agree to redact

11        people's name from public consumption if the

12        transcript is distributed to the Court, similar to

13        the letters that were attached to the complaint by

14        Mr. Ralston.

15                      So do you understand what we're --

16        at least at the moment what I'm asking you,

17        Mr. Poulos?

18                      THE WITNESS:  Yeah.  Just redact the

19        names.

20                      MS. DOUGHERTY:  Right.  Is that

21        acceptable to you?

22                      THE WITNESS:  Yes.

23                      MS. DOUGHERTY:  Okay.  All right.

24                      Mr. Jubb, that's still your

25        agreement, right?
```

```
 1                    MR. JUBB:  That's fine.

 2                    MS. DOUGHERTY:  I just don't think we

 3          actually put it on the record.  We talked about it

 4          on a break.

 5                         Okay.  So then that will save the

 6          three different court reporters from needing to go

 7          through and redact or make adjustments to the

 8          transcript since the parties have agreed to do

 9          that.

10                    MR. JUBB:  Okay.  Thank you.

11                    MS. DOUGHERTY:  Are you going to find

12          out if he wants to read and sign since he's pro

13          se?

14                    MR. JUBB:  Mr. Poulos, once these

15          transcripts come back, Ms. Dougherty and I will

16          send them to you.  You're welcome, and we

17          encourage you, for whatever it's worth, to read

18          them; and if there's any sort of names that are

19          misspelled or sometimes words, when phonetically

20          sounded out, will separate into two words, and in

21          reality they're one.

22                         I'll give you an example.  If the

23          testimony is the phrase "step on," and sometimes

24          it's actually spelled "Steffen," that would be an

25          example of you reading your testimony and saying,
```

```
 1          you know, that's not correct; and so if -- you
 2          would have the opportunity, if you want, to read
 3          it.  It's called read and sign.
 4                    So you can determine on your own
 5          after you consult with whoever you need to consult
 6          with if you want to do that.  But we'll send that
 7          to you, and you're welcome to do it.  Okay?
 8                    THE WITNESS:  Fair enough.
 9                    MS. DOUGHERTY:  And if you -- what
10          Mr. Jubb is referring to about correcting
11          typographical or, you know, record typographical
12          errors, you would file an errata sheet that is
13          attached to the transcript.
14                    THE WITNESS:  I'll figure it out.
15                    MS. DOUGHERTY:  Okay.  Unless we need
16          anything else, I don't have anything further.
17                    MR. JUBB:  And Ms. Harnen, just etran is
18          fine with the exhibit as a PDF.
19                    THE COURT REPORTER:  Just the exhibit
20          that was shown?
21                    MR. JUBB:  Yes.
22                    MS. DOUGHERTY:  Yes.  Email PDF is fine
23          for me.  I'll send you the one that I showed on
24          the screen just because I marked it as D-4, unless
25          you have a different opinion, Mr. Jubb.
```

 1               MR. JUBB:  No.  That's fine.

 2               MS. DOUGHERTY:  Thank you, Mr. Poulos,

 3        for rejoining after earlier today.

 4                   So now your deposition is over.

 5               THE WITNESS:  Okay.

 6               MS. DOUGHERTY:  You can leave now.

 7            (Proceedings concluded at 12:35 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kurtis Nicholas Poulos

```
 1   STATE OF WISCONSIN   )

                          )  SS:

 2   COUNTY OF MILWAUKEE  )

 3              I, Debbie A. Harnen, a Registered

 4   Professional Reporter and Notary Public in and for the

 5   State of Wisconsin, do hereby certify that the

 6   deposition of KURTIS NICHOLAS POULOS was reported by me

 7   and reduced to writing under my personal direction.

 8              I further certify that said deposition

 9   was taken VIA ZOOM VIDEOCONFERENCE, on November 24,

10   2020, commencing at 10:00 a.m. and concluding at

11   12:35 p.m.

12              I further certify that I am not a relative

13   or employee or attorney or counsel of any of the

14   parties, or a relative or employee of such attorney or

15   counsel, or financially interested directly or

16   indirectly in this action.

17              In witness whereof, I have hereunto set my

18   hand and affixed my seal of office at Milwaukee,

19   Wisconsin, on November 30, 2020.

20
                    Debbie A. Harnen
21

22              Debbie A. Harnen - Notary Public

                In and for the State of Wisconsin

23

     My Commission Expires:  July 27, 2022.

24

25
```

```
1    STATE OF WISCONSIN    )

                           ) SS:

2    COUNTY OF MILWAUKEE   )

3

4              I, KURTIS NICHOLAS POULOS, do hereby

5    certify that I have read the foregoing transcript of

6    proceedings, taken November 24, 2020, at VIA ZOOM

7    VIDEOCONFERENCE, and the same is true and correct

8    except for the list of corrections noted on the annexed

9    page.

10

11             Dated at _____

12   this _____ day of _____, 20_____.

13

14                         _____

                           KURTIS NICHOLAS POULOS

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT "H"

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3    ------------------------------------------------------

 4    JOHN DOE,

 5

                   Plaintiff,

 6

 7      -vs-                       Case No. 2:19-CV-01539

 8

      MITCHELL GARABEDIAN, ESQ., LAW

 9    OFFICES OF MITCHELL GARABEDIAN

      and KURTIS N. POULOS,

10

11                 Defendants.

12    ------------------------------------------------------

13

14

15      Videoconferencing Examination of KURTIS POULOS,

16

17    taken at the instance of the Plaintiff, under and

18

19    pursuant to Section 804.05 of the Wisconsin Statutes,

20

21    before ALI KORNBURGER, a Notary Public in and for the

22

23    State of Wisconsin, on April 22, 2021, commencing at

24

25    8:03 a.m. and concluding at 10:51 a.m.
```

Kurtis  Poulos

```
 1                    A P P E A R A N C E S

 2

     THE BEASLEY FIRM, LLC, by

 3   MR. LANE R. JUBB, ESQ.

     1125 Walnut Street,

 4   Philadelphia, Pennsylvania 19107,

     appeared via Zoom on behalf of the Plaintiff.

 5

 6   SWARTZ CAMPBELL, LLC, by

     MS. CANDIDUS K. DOUGHERTY, ESQ.

 7   1650 Market Street, 38th Street,

     Philadelphia, Pennsylvania 19103,

 8   appeared via Zoom on behalf of the Defendants.

 9

10

11                    A L S O   P R E S E N T

12

     Mr. Jon Hansen, Videographer

13

14                      *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X
 2
     Examination:                              Page
 3
     By Mr. Jubb....................................   5
 4
 5
     Exhibits Identified:                       Page
 6
     Exhibit 1 -Court Order Dated March 18, 2021,
 7           Document 119..........................   8
     Exhibit 2 -Email From Mr. Poulos to
 8           Mr. Garabedian Dated 2/19/2019.........  52
     Exhibit 3 -Email From Mr. Poulos to
 9           Mr. Garabedian Dated 5/15/2019.........  79
10
11                    * * * * *
12   Disposition Of Original Exhibits:
13   Attached To Original Transcript
14
                          * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

Kurtis Poulos

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2                    THE VIDEOGRAPHER:  Good morning.  We

 3          are now on the record.  My name is Jon Hansen,

 4          CLVS.  I'm the videographer today with Golkow

 5          Litigation Services.  Today's date is April 22,

 6          2021.  The time is 8:03.  This remote video

 7          deposition is being held in the matter of John

 8          Doe versus Mitchell Garabedian, et al., United

 9          States District Court for the Eastern District

10          of Pennsylvania, case No. 19-CV-01539.  The

11          deponent today is Kurtis Poulos.

12                    All parties to this deposition are

13          appearing remotely and have agreed to the

14          witness being sworn in remotely.  Due to the

15          nature of remote reporting, please pause

16          briefly before speaking to ensure all parties

17          are heard.  At this time if counsel could state

18          their appearance and their location after which

19          our reporter will swear in the witness and we

20          can proceed.

21                    MR. JUBB:  Good morning, Lane Jubb,

22          plaintiff.

23                    MS. DOUGHERTY:  Candidus Dougherty

24          for Mitchell Garabedian.  I'm in Philadelphia,

25          Pennsylvania.
```

Kurtis Poulos

```
 1                  KURTIS POULOS, called as a witness
 2         herein, having been first duly sworn on oath,
 3         was examined and testified as follows:
 4                         EXAMINATION
 5    BY MR. JUBB:
 6    Q    Mr. Poulos, good morning.  We have been through
 7         this a couple times before, but I will still
 8         repeat the instructions just so there's no
 9         confusion.  We're here because the court
10         ordered you to come back for a deposition to
11         discuss your communications with
12         Mr. Garabedian.  I don't intend to go past
13         that, so if you at any point in time think I
14         am, you just have to speak up, okay?
15                  I don't intend to be long.  I have no
16         desire to stay and talk with you for any more
17         time than reasonably necessary.  So I think we
18         are going to be out of here pretty quickly.  I
19         am going to bop around just a little bit
20         because it is limited in nature.  So I can't
21         pass any sort of real chronology, if you will.
22         So forgive me if I am bopping around a little
23         bit between -- between topics.
24                  I want to make sure you understand my
25         question.  So just as all the other
```

Kurtis  Poulos

```
 1        depositions, if you don't understand my

 2        question, if you want me to repeat it, you want

 3        me to rephrase it, whatever you need to answer

 4        that question, you tell me.  I'm happy to do

 5        that, okay?  If you answer the question, I'm

 6        going to assume you understood it, fair enough?

 7        All right.  I already can't hear you.  Would

 8        you mind speaking up?

 9    A   Fair enough.

10    Q   Okay.  Did you get a chance to look at the

11        court's order yourself?

12    A   No, I have not.

13    Q   All right.  So I sent that to you, though,

14        right?

15    A   Okay.

16    Q   But you didn't look at it?

17    A   I don't know what court order you're referring

18        to.

19    Q   I want to make sure you're aware of it, so I'm

20        going to pull it up for you so you can see it

21        and you can be well aware of the court order

22        for which you are here today, okay?  So bear

23        with me here.  Mr. Poulos, can you see that?

24    A   I don't see anything.  Now I see it.

25    Q   Okay.  Have you seen this order before?
```

Kurtis  Poulos

```
 1                    MS. DOUGHERTY:  And just for the

 2          record, this is March 18, 2021, document 119.

 3                    MR. JUBB:  Thank you.  And I'm going

 4          to mark this as an exhibit as well.

 5                    MS. DOUGHERTY:  Okay.

 6                    MR. JUBB:  I believe we left off at

 7          your last deposition of Mr. Poulos -- Candy,

 8          maybe your notes -- if you have it handy, that

 9          might be great as well.  I think we left off --

10          I'm not sure who the court reporter you used

11          was.  It looks like D4, that was your exhibit.

12          I don't think I used any that time.  I think --

13                    MS. DOUGHERTY:  Yeah.  Lane, my

14          recollection is that you didn't mark them as

15          new numbers.  You used the numbers that you

16          labeled the documents with when you produced

17          them and identified them on the record that

18          way.  And I'm just looking at the index.  I

19          marked as, you know, D1, 2, 3, 4 because it was

20          easier, but -- so I think you could pick pretty

21          much -- --

22                    MR. JUBB:  That's right.

23                    MS. DOUGHERTY:  -- any number, P6 and

24          P16 and P100, it looks like.

25                    MR. JUBB:  Thank you.  So let me go
```

Kurtis Poulos

```
 1          back to that order.  Okay.  For the record,

 2          this is a court order dated March 18, 2021,

 3          document 119 on the EZ app, and I'm going to

 4          mark this as Poulos 1.

 5                    (Exhibit No. 1 was marked.)

 6   BY MR. JUBB:

 7   Q    So, Mr. Poulos, take a look at this.  I sent

 8        this to you before.  Did you bother to read it?

 9                    MS. DOUGHERTY:  Objection.

10   BY MR. JUBB:

11   Q    You can answer.

12   A    Again, I have been inundated.  I'm not

13        represented by anybody other than me.

14        Obviously, you have an entire legal team.  I

15        have spent ten hours in deposition with you.  I

16        will provide whatever information that just

17        lets you know that your client abused me.

18   Q    Why don't you take a look at your screen and

19        see if you saw that order before.  Did you see

20        that order before?

21   A    No.

22   Q    Okay.

23   A    I never received it by mail.

24   Q    Are you saying that you don't know how to

25        access the emails that I have been sending you?
```

```
 1   A    I haven't received any except for the one that

 2        I received yesterday demanding that I be on

 3        this deposition -- or two days ago.  So I don't

 4        know if you don't have my correct address, but

 5        all filing should be in paper form so I have a

 6        hard copy.  I never received that via mail.

 7   Q    I see.  So what you're saying is you've never

 8        seen this court order before; is that right?

 9   A    Not to my knowledge, no.

10   Q    Okay.  Do you open the attachments to the

11        emails when they are sent to you, sir?

12   A    Yes, I do.

13   Q    Okay.  And considering that you're a defendant

14        in this lawsuit, I imagine if I were to send

15        you something and I say, "Please see the

16        attached," you would probably want to look at

17        it, right?

18                   MS. DOUGHERTY:  Objection.

19                   THE WITNESS:  Asked and answered.

20   BY MR. JUBB:

21   Q    I see.  All right.  Well, why don't we read

22        this now, however long it takes you, single

23        page.  But I want to make sure you're familiar

24        with it, especially Item 3 where it says you're

25        going to appear and you're going to discuss
```

Kurtis Poulos

```
1        your discussions and communications with

2        Defendant Garabedian, okay?  And I'm going to

3        do my best to keep it to that.  Because, like I

4        said, I have no intention of being here any

5        longer than I need to.

6    A   I have no intention of being here than another

7        49 minutes.

8    Q   Well, that's interesting because the court

9        order doesn't have any limitations.  So we're

10       going to chat a little bit about your

11       discussions.

12   A   I have a schedule.  I have a meeting.

13   Q   This is a court order, so we can handle that.

14       I hope that you are wise enough to just answer

15       these questions as opposed --

16   A   Then start asking the questions.

17   Q   All right.  So did you tell Mr. Garabedian that

18       the perps were Tom Ruth and Mr. Ralston?

19   A   Thomas Ruth never touched me.

20   Q   Did you tell Mr. Garabedian that the

21       perpetrators for your alleged sexual abuse were

22       Mr. Ruth and Mr. Ralston?

23   A   Asked and answered.  I just told you I had no

24       physical contact with Mr. Ruth.

25   Q   That doesn't mean you didn't tell
```

Kurtis Poulos

```
 1        Mr. Garabedian that.  So just listen to my
 2        question.  Did you tell Mr. Garabedian that the
 3        perpetrators were Mr. Ruth and Mr. Ralston?
 4   A    Asked and answered.  He was not a perpetrator.
 5        Did I hear --
 6   Q    Do you understand the difference between what
 7        you tell someone one time versus what you're
 8        saying another time?  I'm asking you what you
 9        told Mr. Garabedian.
10   A    And I just told you, I heard of allegations
11        against Mr. Ruth.  That was it.
12   Q    My question is yes or no.  If that's the case,
13        then listen to this question very specifically.
14        Did you tell Mr. Garabedian that you were in
15        any way sexually abused or that the
16        perpetrators of your alleged sexual abuse were
17        Tom Ruth and Mr. Ralston?
18   A    I specifically said Mr. Ralston, not Thomas
19        Ruth.
20   Q    Okay.  So if Mr. Garabedian was told by you
21        that you were also sexually abused by Mr. Ruth,
22        that would not be correct; is that fair?
23             MS. DOUGHERTY:  Objection.
24   BY MR. JUBB:
25   Q    Mr. Poulos?
```

Kurtis Poulos

```
 1   A    I'm not answering that question, so you can
 2        just move on.
 3   Q    Great.  Did Mr. Ruth in any way sexually abuse
 4        you?
 5   A    Never.
 6   Q    And did you make that clear to Mr. Garabedian?
 7   A    I believe so.
 8   Q    You never gave him any impression that there
 9        was two perpetrators of sexual abuse, correct?
10             MS. DOUGHERTY:  Objection.
11             THE WITNESS:  No.
12   BY MR. JUBB:
13   Q    Okay.  When you had a conversation with
14        Mr. Garabedian, did you tell him that you had
15        actually contacted an attorney several years
16        prior about your claims of sexual abuse?
17   A    I believe so.
18   Q    And did he ask you who was that attorney?
19   A    He may have.
20   Q    What did you tell him?
21   A    That I don't recall his name.
22   Q    Did you tell him why the attorney rejected you?
23   A    Because the statute of limitations had run out.
24        All I was looking for was recognition of the
25        situation and my tuition back, nothing more.
```

Kurtis  Poulos

```
 1   Q    Did Mr. Garabedian tell you that he could get

 2        you somewhere between 100,000 and $500,000 even

 3        though the statute of limitations had blown on

 4        your case?

 5             MS. DOUGHERTY:  Objection.

 6             THE WITNESS:  I don't recall the

 7        specific number, no.

 8   BY MR. JUBB:

 9   Q    Did he tell you that -- what a statute of

10        limitations meant?

11   A    I understood what a statute of limitation was

12        before speaking with Mitchell Garabedian.

13   Q    And what was your understanding of that?

14   A    My understanding of it is that your client, who

15        abused me over 25 years ago, can't be

16        prosecuted by the law, and that this could only

17        be a civil matter and not a criminal matter.

18   Q    And when you told Mr. -- that's what you

19        thought the statute of limitations was for your

20        alleged claims against Mr. Ralston; is that

21        right?

22   A    Correct.  And, again, this was never --

23        correct.

24   Q    Okay.  So with that being your understanding of

25        statute of limitations as it pertained to a
```

```
 1        criminal matter, did he tell you the statute of
 2        limitations for any sort of civil case was also
 3        blown?
 4                   MS. DOUGHERTY:  Objection.
 5   BY MR. JUBB:
 6   Q    You're shaking your head no?
 7   A    Not to my recollection.
 8   Q    In other words, at no point in time from your
 9        recollection did Mr. Garabedian tell you that
10        any civil case against The Hill School or
11        Mr. Ralston is actually completely blown by the
12        statute of limitations civilly, correct?
13                   MS. DOUGHERTY:  Objection.
14                   THE WITNESS:  Asked and answered.
15   BY MR. JUBB:
16   Q    I need to make clear what I'm asking because I
17        think there's some confusion.  It's not asked
18        and answered.  Am I correct, sir, that as far
19        as you can recall at no point in time did
20        Mitchell Garabedian tell you that the statute
21        of limitations on any potential civil claim
22        against The Hill School or Mr. Ralston for
23        whatever you're saying occurred had already
24        expired?
25   A    Not to my recollection.
```

Kurtis Poulos

```
 1   Q    Okay.  What is your understanding today as
 2        opposed to when you spoke with -- strike that.
 3                  Where are you right now, by the way?
 4   A    I'm in my living room.
 5   Q    Okay.  Is there anybody with you?
 6   A    My dog.
 7   Q    Is there any human with you?
 8   A    No, I live alone.  You know that.
 9   Q    Well, last time your mom was with you,
10        remember?  So it's okay for me to ask those
11        questions at first, okay?  So moving on.  Did
12        Mr. Garabedian ask you about any of your prior
13        criminal conduct?
14   A    Possibly, but, again, it's not relevant to this
15        case.
16   Q    When he asked you about your criminal conduct,
17        were you trying to be honest with him?
18   A    I've never lied to him nor you nor the court.
19   Q    Okay.  Well, my question was, when he asked you
20        about your criminal conduct, were you truthful
21        to him?
22                  MS. DOUGHERTY:  Objection.
23                  THE WITNESS:  I just told you, yes, I
24        was truthful.  I never lied to any of you.
25   BY MR. JUBB:
```

Kurtis  Poulos

```
 1   Q    Okay.  So if Mr. Garabedian wrote down that you

 2        did no jail time, did he write that down wrong

 3        or did you tell him you had no jail time?

 4   A    I don't know.  I told him that my life is an

 5        open book.  I know what I have done wrong in my

 6        life.

 7   Q    That's not my question.  I don't care what you

 8        have done in your life.  I'm just focused on

 9        jail time right now.  Did you tell

10        Mr. Garabedian that you have never done jail

11        time?

12   A    No.

13               MS. DOUGHERTY:  Objection.

14   BY MR. JUBB:

15   Q    Okay.  So you told Mr. Garabedian that you did

16        do jail time, correct?

17   A    I believe so.

18   Q    Because you have done jail time, correct?

19   A    Again, what -- how is this relevant to

20        anything?

21   Q    Is the answer to my question correct?

22   A    I just said --

23               MS. DOUGHERTY:  Objection.

24               THE WITNESS:  -- yes.

25   BY MR. JUBB:
```

Kurtis  Poulos

```
 1   Q    Okay.  Now, did he ask you if you've ever been
 2        charged with any felonies?
 3   A    I don't recall.
 4   Q    Did he ask you if you have ever been charged
 5        with any misdemeanors or anything about your
 6        criminal background?
 7   A    I believe so.
 8   Q    And when he asked you about your criminal
 9        history, to that question of, you know, have
10        you ever been convicted of a felony, what would
11        you have told him?
12   A    That I --
13              MS. DOUGHERTY:  Objection.
14              THE WITNESS:  -- don't think I have
15        been.
16   BY MR. JUBB:
17   Q    Have you ever been charged with a felony?
18   A    I believe so.
19   Q    And did he ask you that?
20   A    I don't recall.
21   Q    Did you ever tell Mr. Garabedian that you had a
22        breaking and entering?
23   A    What?
24   Q    Did you ever tell Mr. Garabedian in any phone
25        call that you were either charged or convicted
```

```
 1        of a breaking and entering?

 2   A    No.  Because I don't recall ever breaking or

 3        entering any property.

 4   Q    Did you ever tell Mr. Garabedian that you were

 5        charged and convicted of disorderly conduct?

 6   A    Yes.

 7   Q    Okay.  So you recall saying that; is that

 8        right?

 9   A    I believe so.

10   Q    All right.  So if Mr. Garabedian was operating

11        under the impression that you were actually

12        arrested for breaking and entering, do you have

13        any idea where that could have possibly come

14        from?

15             MS. DOUGHERTY:  Objection.

16   BY MR. JUBB:

17   Q    Mr. Poulos?

18   A    I have no idea.

19   Q    Have you ever been charged with a breaking and

20        entering?

21   A    Not to my recollection.

22   Q    Okay.  I want you to think just on what you

23        told Mr. Garabedian as of December of 2017 when

24        you first contacted him.  What crimes, either

25        misdemeanor or felony, did you tell him that
```

Kurtis  Poulos

```
 1       you had on your record?

 2   A   I don't recall.

 3   Q   Well, when he asked -- let me back up.  The

 4       fact that you told him that you had a

 5       disorderly conduct leads me to believe that he

 6       did ask you about your criminal history.  So

 7       with that being a logical conclusion, I assume

 8       that when you responded to that question you

 9       wanted to be as truthful and thoughtful as

10       possible, correct?

11                 MS. DOUGHERTY:  Objection.

12                 THE WITNESS:  Correct.

13   BY MR. JUBB:

14   Q   You knew he was doing an intake process to see

15       and assess if you were credible, correct?

16                 MS. DOUGHERTY:  Objection.

17                 THE WITNESS:  Correct.

18   BY MR. JUBB:

19   Q   And if you lied about your criminal conduct,

20       that's something that wouldn't be very credible

21       and honest, would it?

22                 MS. DOUGHERTY:  Objection.  What does

23       -- Lane, you're really going far abroad of the

24       order at this point.

25                 THE WITNESS:  Yeah.
```

```
 1                  MR. JUBB:  I'm not going abroad
 2        anything.
 3                  MS. DOUGHERTY:  Yeah, you are.
 4        You're asking him to interpret what you think
 5        Mr. Garabedian wrote in notes.  You are asking
 6        him to interpret what Mr. Garabedian's purpose
 7        was.  The order is about his communications and
 8        discussions with Mr. Garabedian.
 9                  MR. JUBB:  We will solve this.
10   BY MR. JUBB:
11   Q    Mr. Poulos, am I correct that Mr. Garabedian
12        asked you whether or not you have been charged
13        or convicted with a felony, yes or no?
14   A    Possibly.  I do not recall the specifics of the
15        conversation.
16   Q    Okay.  From the time you had that conversation
17        to present, put that aside, had you been
18        convicted of a felony at that point that you
19        would have relayed it to him that you had?
20                  MS. DOUGHERTY:  Objection.  Are you
21        asking him if he had been convicted of a felony
22        at the time of the intake?  I don't understand
23        your question.
24                  MR. JUBB:  Yeah, I am.
25                  THE WITNESS:  You obviously know the
```

 1      answer.

 2  BY MR. JUBB:

 3  Q    But why won't you tell me the answer?

 4              MS. DOUGHERTY:  Because whether he's

 5       been convicted of a crime, Lane, is not a

 6       discussion that he had with Mr. Garabedian.

 7              THE WITNESS:  And it's not --

 8              MR. JUBB:  Mr. Poulos --

 9              MS. DOUGHERTY:  The area -- Mr.

10       Garabedian --

11  BY MR. JUBB:

12  Q    Have that discussion with Mr. Garabedian?

13  A    I can't hear you.

14  Q    Did you have a discussion with Mr. Garabedian

15       as to whether or not you have been convicted of

16       a crime?

17              MS. DOUGHERTY:  Objection.

18              THE WITNESS:  Asked and answered,

19       Lane.

20  BY MR. JUBB:

21  Q    Did you have a conversation with Mr. Garabedian

22       about your family?

23              MS. DOUGHERTY:  Ever or during the

24       intake?

25              MR. JUBB:  Intake.  Just focused on

```
 1        the intake right now.

 2              MS. DOUGHERTY:  Okay.  Thank you.

 3   BY MR. JUBB:

 4   Q    I'll let you know when I move on.  During the

 5        intake process, the first one, did he ask you

 6        any questions about your mom or your dad?

 7   A    I believe so.

 8   Q    Okay.  And when he asked you a question about

 9        your dad, what did you tell him?

10   A    I told him what type of human being he is.

11   Q    Did you tell him that he was violent with you?

12   A    Yes, because that's the truth.

13   Q    Did you talk to him about your mother and the

14        role that she plays in your life?

15   A    You're frozen.

16   Q    Did you talk to him about your mother and the

17        role that she plays in your life?

18   A    Yes.

19   Q    Did he ask you any questions about any sort of

20        siblings or anything like that?

21   A    I believe so.

22   Q    Tell me about the discussion that you had with

23        Mr. Garabedian in as much detail as possible

24        about the relationship or lack there of you had

25        with your father.
```

Kurtis Poulos

```
 1   A    I just explained how he treats his children.

 2   Q    But I need to know what you told him.  What did

 3        you explain?  Explain that to me.

 4   A    Not sure how that's relevant, but he treats his

 5        children like we're disposable.

 6   Q    Did he ask you any follow-up questions as to,

 7        you know, that having affected your life at

 8        all?

 9             MS. DOUGHERTY:  Objection.

10             THE WITNESS:  I don't believe so and

11        not relevant.

12   BY MR. JUBB:

13   Q    Did you tell Mr. Garabedian that you were

14        sexually abused during your freshmen year?

15   A    I don't recall.  I believe I told him it was my

16        fourth form year, which would have been my

17        sophomore year.

18   Q    Do you believe there's any chance you told him

19        that had happened freshmen year?

20   A    There's a possibility that I had the wrong year

21        as far as dates, but I don't specifically

22        remember saying freshmen year.

23   Q    Did you ever tell him that you were sexually

24        abused in a study room or cubicle?

25   A    Yes.
```

```
 1   Q    Okay.  Did you ever tell him that you were
 2        sexually abused in your single dorm?
 3   A    Yes.
 4   Q    Okay.  And when you and I first spoke during
 5        those ten hours that you just discussed over a
 6        period of three days, at no point in time did
 7        you ever tell us that you were sexually abused
 8        in your freshmen year, correct?
 9   A    Not to my recollection, no.
10   Q    And in those ten days (sic) spanning over three
11        days at no point in time did you ever tell us
12        that you were sexually abused in some sort of
13        cubicle, correct?
14              MS. DOUGHERTY:  Objection.
15              THE WITNESS:  Correct.
16   BY MR. JUBB:
17   Q    And during those three-days span over ten hours
18        and everybody's time at no point did you ever
19        tell us that you were abused in your dorm room,
20        correct?
21              MS. DOUGHERTY:  Objection.
22              THE WITNESS:  Correct.
23   BY MR. JUBB:
24   Q    Why did you tell Mr. Garabedian that?
25              MS. DOUGHERTY:  Objection.
```

Kurtis Poulos

```
 1                    THE WITNESS:  Why didn't you ask me?
 2   BY MR. JUBB:
 3   Q    Is it your testimony that no one asked you
 4        where all the abuse occurred?
 5   A    You asked me about specifics that I could
 6        recall.  I have spent 27 years trying to not
 7        recall every specific detail.
 8   Q    So when we asked you where everything occurred
 9        and you never told us that it occurred in your
10        room --
11   A    It was in his -- in his classroom primarily.
12        Again, I don't understand why you keep having
13        to rehash this.  He abused --
14   Q    Sir --
15                    MS. DOUGHERTY:  Objection.  He's
16        allowed to finish his answer.  Go ahead.
17   BY MR. JUBB:
18   Q    Say whatever you need to.
19   A    I'm done.
20   Q    I figured you were.
21                    MS. DOUGHERTY:  No, he wasn't.  You
22        interrupted him, Mr. Jubb.
23                    THE WITNESS:  Again, even the
24        videographer said that at least 30 seconds for
25        us to finish our questions so that we can
```

Kurtis Poulos

```
 1          understand and interpret what's going on.

 2          Every time I start to speak you start to speak

 3          over me.  It not only makes this pointless but

 4          infuriating.

 5                    MS. DOUGHERTY:  Mr. Jubb, you have

 6          done it a couple times to me too.  I'm

 7          wondering if there's a delay because I think

 8          you're on telephone and video.  So if that's

 9          the case, we need to just be cognizant of it if

10          it's not on purpose.

11   BY MR. JUBB:

12   Q    Are you guys done?

13   A    Doesn't matter if we're done, you're going to

14        speak over us anyway.

15   Q    Let me know when you're done, and I will

16        continue.

17   A    You got 31 minutes, and then I'm done.

18   Q    All right.  We will see.  Why did you tell

19        Mr. Garabedian that you were abused in your

20        dorm room?

21   A    Because it was the truth.

22   Q    Is it your testimony now that you were abused

23        in your dorm room, because we never discussed

24        that in your prior deposition, correct?

25   A    Correct.
```

Kurtis Poulos

```
 1   Q    Okay.  And I believe it was actually

 2        Ms. Dougherty who had asked you a question

 3        about were there any other instances of sexual

 4        abuse that occurred --

 5                  MS. DOUGHERTY:  Objection.

 6   BY MR. JUBB:

 7   Q    -- outside of the classroom, and I believe your

 8        testimony was no, correct?

 9                  MS. DOUGHERTY:  Objection.

10                  THE WITNESS:  Not concerning

11        Mr. Ralston.

12   BY MR. JUBB:

13   Q    Wait a minute.  Did you get abused by somebody

14        else in your dorm room?

15                  MS. DOUGHERTY:  Objection.  Please

16        watch your tone.

17                  THE WITNESS:  Irrelevant.

18   BY MR. JUBB:

19   Q    Irrelevant?  Mr. Poulos, are you saying that

20        you were sexually abused in your dorm room?

21   A    And your client, The Hill School, knew about

22        it.

23   Q    Mr. Poulos, are you saying that somebody else

24        abused you in your dorm room when you were a

25        student at The Hill School?
```

Kurtis Poulos

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  Asked and answered.

 3   BY MR. JUBB:

 4   Q    No.  No.  No.  I need to know very

 5        specifically, and I imagine that Ms. Dougherty

 6        would want to know as well, did you get abused

 7        in any way, shape, or form when you were a

 8        student at The Hill School in your dorm room?

 9        Yes or no?

10   A    Yes.

11   Q    Okay.  And that person, based on your answer,

12        was not Mr. Ralston, correct?

13                    MS. DOUGHERTY:  Objection.

14                    THE WITNESS:  And, again, define

15        abuse because you're being very vague.  Did I

16        get the shit beat out of me in my dorm room?

17        Would I consider that abuse?  Yes.

18   BY MR. JUBB:

19   Q    So when you were talking to Mr. Garabedian and

20        he's asking you as a sexual abuse lawyer where

21        it occurred, did you tell him that you were

22        sexually abused in your dorm room?

23   A    I don't believe so.  I said that I was abused

24        in my dorm room.

25   Q    Who abused you in your dorm room?
```

Kurtis Poulos

```
 1   A    Irrelevant.

 2   Q    Who abused you in your dorm room if -- let me

 3        correct it.

 4             Did you -- did he ask you, "Did

 5        Mr. Ralston abuse you in your dorm room?"

 6   A    I don't believe so.  He asked if I was abused

 7        in my dorm room.

 8   Q    What about the cubicle that you told him you

 9        were abused in?  Who abused you there?

10   A    Irrelevant who did it.  It happened.  Abuse is

11        abuse.  Do you remember every kid that beat the

12        shit out of you in high school?

13   Q    Did he ask you about sports that you played?

14   A    Possibly.  I did not play too many sports.  I

15        was injured for a majority of my freshmen year

16        with a broken arm.

17   Q    Did you tell Mitchell Garabedian that you were

18        aware of other victims of other teachers for

19        alleged sexual abuse?

20   A    Yes.

21   Q    And did he ask you who they were?

22   A    Possibly, and I cannot recall their exact

23        names.

24   Q    But did you recall them when Mr. Garabedian

25        asked you for it?
```

Kurtis  Poulos

```
 1   A     Possibly.

 2   Q     Did you tell Mr. Garabedian that it didn't

 3         matter if the perp was outed?

 4                   MS. DOUGHERTY:  Objection.

 5   BY MR. JUBB:

 6   Q     Do you understand my question?

 7   A     I was about to and then you interrupted me.  I

 8         don't believe so.

 9   Q     Okay.  Did you in any way express to

10         Mr. Garabedian that it was not a concern to you

11         whether or not the alleged perpetrator of your

12         sexual abuse was outed?  Did you explain that

13         or express that to him in any words?

14                   MS. DOUGHERTY:  Objection.

15                   THE WITNESS:  My recollection of the

16         conversation was that things would be kept

17         under wraps until there was going to be a

18         conclusion and then a possible outing.  I've

19         had more than enough chance to call every

20         newspaper who's called me, and I have not

21         responded to any of them nor have I publically

22         outed anyone.

23   BY MR. JUBB:

24   Q     Have newspapers tried to contact you about this

25         case?
```

```
 1   A    Yes.

 2   Q    Okay.  Have you told any of them any of your

 3        claims here?

 4   A    No.

 5   Q    When you had this conversation with Mitchell

 6        Garabedian initially, did he express to you

 7        that it would be, you know, his preference if

 8        you said that you wanted to make sure that

 9        there was no nondisclosure agreement?

10             MS. DOUGHERTY:  Objection.

11             THE WITNESS:  Reask the question.

12   BY MR. JUBB:

13   Q    Sure.  Was it Mitchell Garabedian's idea that

14        you would tell the school you wanted no

15        nondisclosure agreement?

16             MS. DOUGHERTY:  Objection.

17             THE WITNESS:  It was discussed, and

18        it was not brought up by me.

19   BY MR. JUBB:

20   Q    In this initial phone call, am I correct there

21        was more than one lawyer on that or was it just

22        Mr. Garabedian?

23   A    I believe with most of my phone calls it's been

24        Mitchell Garabedian and either a legal aide or

25        another associate -- associate in his firm.
```

```
 1   Q    Do you remember when we first started this
 2        action and you wrote in your pleadings that you
 3        told Mr. Garabedian and only Mr. Garabedian?
 4                 MS. DOUGHERTY:  Objection.
 5                 THE WITNESS:  I may have misspoke.
 6        In recollection, yes, I possibly had said that,
 7        but majority of the time I have spoken with him
 8        there has been someone else in the room.
 9   BY MR. JUBB:
10   Q    How many other conversations can you recall
11        with his associates or his paralegals?
12                 MS. DOUGHERTY:  Objection.  Are you
13        asking with Mr. Garabedian or separate from
14        Mr. Garabedian?
15   BY MR. JUBB:
16   Q    Separate.  I will make that clear for you and
17        rephrase it, Mr. Poulos.  How many
18        conversations do you recall having with any
19        associates, paralegals or other individuals who
20        you believe to have been working for
21        Mr. Garabedian without speaking to
22        Mr. Garabedian personally?
23   A    Very few.  I was not able to get ahold of
24        Mitchell and rarely did I receive a phone call
25        back.
```

Kurtis Poulos

```
 1   Q      And am I correct that from December 2017 time

 2          frame until December 2018 you never heard back

 3          from Mr. Garabedian at all?

 4                  MS. DOUGHERTY:  Objection.

 5                  THE WITNESS:  There may have been

 6          small conversations over the phone where it was

 7          sort of just checking in, me trying to find out

 8          what was going on, nothing more.

 9   BY MR. JUBB:

10   Q      Am I correct you were unaware that he was

11          sending a letter to The Hill School?

12                  MS. DOUGHERTY:  Objection.

13                  THE WITNESS:  Lane, I have answered

14          that before.  My understanding was that he was

15          going to reach out to the counsel for the

16          school.

17   BY MR. JUBB:

18   Q      Did Mr. Garabedian ever --

19                  MS. DOUGHERTY:  Hold up.  He wasn't

20          -- he's not done.

21                  THE WITNESS:  I'm not done speaking,

22          Lane.

23                  MR. JUBB:  I'm sorry.  You have these

24          drawn-out pauses.  Forgive me.  Please

25          continue.
```

```
 1                  MS. DOUGHERTY:  There wasn't a
 2        drawn-out pause.  He was taking a breath.
 3                  THE WITNESS:  My understanding, as I
 4        have stated in the past, was that he was going
 5        to reach out to the two counselors that your
 6        client, The Hill School, hired and
 7        misrepresented themselves instead of just
 8        saying that they were lawyers for The Hill
 9        School.
10   BY MR. JUBB:
11   Q    Have you finished your answer?
12   A    Yes.
13   Q    Did Mr. Garabedian tell you he was going to
14        send a letter to the headmaster outlining what
15        you alleged to be sexual abuse?
16                  MS. DOUGHERTY:  Objection.
17                  THE WITNESS:  I don't believe so.
18   BY MR. JUBB:
19   Q    Did you tell Mr. Garabedian to call your mom?
20                  MS. DOUGHERTY:  Objection.
21                  THE WITNESS:  Possibly.
22   BY MR. JUBB:
23   Q    What did you believe your mom could provide
24        Mr. Garabedian that you couldn't at the age of
25        39?
```

Kurtis  Poulos

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  Possibly a view at my

 3           life and how it's been destroyed from the

 4           outside.

 5   BY MR. JUBB:

 6   Q      Did you ever have any personal -- excuse me.

 7           Strike that.

 8                    Did you ever have any face-to-face

 9           discussion with Mr. Garabedian, in person?

10   A      No.

11   Q      Did you ever have any Zoom meeting with

12           Mr. Garabedian where you could see his face and

13           he could see you?

14   A      No.

15   Q      Did you ever send him a form of photo ID to

16           show you were who you said you were?

17                    MS. DOUGHERTY:  Objection.

18                    THE WITNESS:  I don't believe so.

19   BY MR. JUBB:

20   Q      When you offered Mr. Garabedian the yearbooks,

21           did you ever send it to him?

22   A      I never received any yearbooks.  I do not have

23           any documentation from that school whatsoever.

24           Any yearbooks that were acquired were not

25           acquired by me.  They may have been acquired by
```

Kurtis Foulds

```
 1        request from another member of my family, but I

 2        do not possess any physical documents that have

 3        anything to do with that school.

 4   Q    So are you trying to imply -- because, you

 5        know, we both know what we know.  Did your mom

 6        request yearbooks from the school?  Is that

 7        what you are referring to?

 8   A    Correct.

 9   Q    Okay.  And then you told Mr. Garabedian, "Do

10        you want to see my yearbooks, my mom has got

11        them," correct?

12   A    I believe he requested that we get them.

13   Q    Did you ever -- strike that.

14             Did he ever, as far as you know,

15        receive those yearbooks from you or your

16        mother?

17   A    I do not know.  You have seen more of my

18        yearbooks in the last 25 years than I have.

19   Q    Did you ever tell Mr. Garabedian you had a dog?

20   A    Yes, because I've had my service dogs for the

21        last three years.

22   Q    When did you get Clifford?

23   A    January 15th of 2020.

24   Q    And what was the dog's name before that?

25   A    Clifford.
```

Kurtis Poulos

```
 1   Q    Did you ever have a dog named Bumblebee?

 2   A    Yes.   That was my first service dog.   I had her

 3        for a year.

 4   Q    And when you told -- did you tell him they were

 5        service dogs?

 6   A    It may have come up in conversation.   I had

 7        Bumblebee trained as my service animal just as

 8        I have had Clifford trained as my service

 9        animal.

10   Q    And I thought from your prior testimony you had

11        said that you had determined them to be service

12        animals.   Are you saying that you got them

13        trained for that?

14   A    I had Bumblebee trained for it in the first two

15        months.   Unfortunately, I had to wait for Big

16        Red over here because of COVID to get trained

17        as a service dog, so he recently completed his

18        training.

19             MS. DOUGHERTY:   I'm sorry.   Did you

20        say Big Red?

21             THE WITNESS:   Yeah, Clifford, Big

22        Red.

23             MS. DOUGHERTY:   Okay.

24   BY MR. JUBB:

25   Q    Mr. Poulos, did Mr. Garabedian ask you about
```

Kurtis Foulds

```
 1        any of your medical history?
 2   A    Yes.
 3   Q    Did he ask you about any visits to the
 4        hospital?
 5   A    Yes.  That would be part of my medical history.
 6   Q    Okay.  And when he asked you those questions,
 7        did you tell him about all of your trips to the
 8        hospital for drinking?
 9             MS. DOUGHERTY:  Objection.
10             THE WITNESS:  I recall explaining to
11        him that I have had -- Clifford, it's okay.
12        Yes.  I explained that I had been hospitalized
13        multiple times throughout my life.
14   BY MR. JUBB:
15   Q    And did you explain that that was in the
16        context for your alcohol abuse?
17   A    Yes.
18   Q    And did you explain to him that you were
19        diagnosed with hepatic encephalopathy?
20   A    Yes.
21   Q    Did you explain to him the status of your liver
22        and the cirrhosis?
23   A    My liver is fine now.  Thank you for asking.
24   Q    Did you ever have -- I'm sorry.  Is it your
25        testimony that you had a cirrhosis liver and
```

```
 1          now that it's fine?

 2   A      Correct.

 3   Q      Am I correct the only phone interviews that you

 4          had with Mr. Garabedian were in December of

 5          2017?

 6                    MS. DOUGHERTY:  Objection.

 7                    THE WITNESS:  As far as interview,

 8          yes; other phone conversations, different

 9          story.

10   BY MR. JUBB:

11   Q      When you were --

12                    MS. DOUGHERTY:  Objection.  He wasn't

13          done with his answer.

14                    THE WITNESS:  Yeah.  I'm done with

15          this if you are going to keep talking over me.

16   BY MR. JUBB:

17   Q      Go ahead, please.  I'm trying to move this

18          along quickly.  Go ahead.

19   A      Doesn't matter.  Just keep going.

20   Q      Okay.  So I will ask my question again and see

21          if you want to add to your answer.  Am I

22          correct that other than the interview that was

23          done -- strike that.

24                    Am I correct the only interview with

25          you and Mr. Garabedian pertaining to your
```

Kurtis Poulos

```
 1          allegations occurred in December of 2017?
 2                    MS. DOUGHERTY:  Objection.
 3                    THE WITNESS:  That was my first
 4          formal interview.  After that I don't know that
 5          I would consider it an interview.  There were
 6          conversations.
 7     BY MR. JUBB:
 8     Q    Okay.  And in that interview process when
 9          talking about what you're claiming to be
10          experiencing now, did he ask you questions that
11          were in some way leading?  In other words, did
12          he say, "Did this ruin your life?  Did it make
13          you feel guilty?  Did it give you these trust
14          issues?" or did you just voluntarily tell him
15          all those things?
16                    MS. DOUGHERTY:  Objection.
17                    THE WITNESS:  As I already stated
18          before, I have never withheld anything about
19          the way this has affected my life physically
20          and mentally.
21     BY MR. JUBB:
22     Q    And my question was a little bit different.
23          When he asked you about how this -- how you --
24                    MS. DOUGHERTY:  Hold up.  Mr. Poulos
25          is talking.
```

Kurtis  Poulos

```
 1                    MR. JUBB:  He's not talking at all.

 2                    MS. DOUGHERTY:  He was talking.

 3                    THE WITNESS:  I was talking, Lane.

 4   BY MR. JUBB:

 5   Q    Keep going, please.

 6   A    I was forthcoming about my physical ailments

 7        that have resulted in this or resulted from

 8        this.  Clifford, it's okay.

 9   Q    You already told me that.  Is there anything

10        else you want to add?

11   A    No.

12   Q    Okay.  So getting back to my question.  Did

13        Mr. Garabedian ask you in a leading matter

14        about your claimed injuries, or did you just

15        voluntarily list off everything?  So, for

16        example, did he say to you, "Do you have

17        depression?  Do you have crying?  Do you feel

18        that it's unfixable?  Do you feel guilty?" or

19        did you just come up with a list of everything

20        yourself?

21                    MS. DOUGHERTY:  Objection.

22                    THE WITNESS:  Again, I was

23        forthcoming.  I didn't need to be led by

24        Mitchell in any which way.  I just wanted to

25        tell the truth.
```

```
 1   BY MR. JUBB:

 2   Q    So do you believe that you told Mr. Garabedian

 3        that it occurred in the classroom?

 4                  MS. DOUGHERTY:  Objection.

 5                  THE WITNESS:  Again, I do not

 6        remember the exact specifics of our first

 7        conversation.

 8   BY MR. JUBB:

 9   Q    Did you tell Mr. Garabedian the name of the

10        person that you are claiming sexually abused

11        you?

12                  MS. DOUGHERTY:  Objection.

13                  THE WITNESS:  If I did, it was not

14        during the first conversation.

15   BY MR. JUBB:

16   Q    Ultimately, did he ever ask you any types of

17        questions about who the alleged abuser was?

18        You know, what was the position in the school?

19        You know, was he well liked, things of that

20        type of nature?  Did he ask any further

21        questions about who the alleged abuser was?

22                  MS. DOUGHERTY:  Objection.

23                  THE WITNESS:  You mean did he ask if

24        he was popular?  I don't remember.

25   BY MR. JUBB:
```

```
 1   Q    Did he ask if Mr. Ralston was well liked?

 2   A    Pretty sure I just answered that exact

 3        question.  I don't remember if he asked if

 4        Mr. Ralston -- who we should stop calling John

 5        Doe -- was a popular teacher.  There was very

 6        few teachers and very few students.  So

 7        everybody had their groups.  Who is to say who

 8        is popular with whom.

 9   Q    I didn't say popular at all.  I never used that

10        word.  Listen to my question.

11   A    Well liked is a synonym for popular.

12   Q    Did you tell Mr. Garabedian that Mr. Ralston

13        was well liked and well respected?

14   A    Possibly.

15   Q    And you say possibly because Mr. Ralston was

16        well liked and was well respected?

17              MS. DOUGHERTY:  Objection.

18              THE WITNESS:  Again, there were very

19        few teachers.  Of course everybody was well

20        liked by at least one group in our school.  My

21        graduating class was 94 or 95 people, as I'm

22        sure you already know.  So obviously we had

23        teachers who we very much liked, other teachers

24        were not liked by that same group of students.

25        It's just the way a small community lives.
```

```
 1   BY MR. JUBB:

 2   Q    Okay.  Well, considering that small community,

 3        can you think of anybody who had anything bad

 4        to say about Mr. Ralston other than you?

 5                  MS. DOUGHERTY:  Objection.

 6                  THE WITNESS:  I never asked.

 7   BY MR. JUBB:

 8   Q    Did you tell Mr. Garabedian -- strike that.

 9                  From the last time we spoke I believe

10        your testimony was that upon graduation from

11        The Hill School you had never returned.  Do you

12        recall that?

13                  MS. DOUGHERTY:  Objection.

14                  THE WITNESS:  Yes.

15   BY MR. JUBB:

16   Q    Okay.  Did you tell Mr. Garabedian that you

17        returned after graduation?

18                  MS. DOUGHERTY:  Objection.

19                  THE WITNESS:  I drove by it.  I

20        didn't go on campus.  Two completely different

21        things.

22   BY MR. JUBB:

23   Q    What were you doing in Pottstown, Pennsylvania,

24        as a citizen of Wisconsin?

25                  MS. DOUGHERTY:  Objection.
```

Kurtis  Poulos

```
 1                    THE WITNESS:  I was visiting a friend
 2         at Cornell, and my girlfriend at the time --
 3         after we left Washington DC to visit my
 4         grandparents -- one of which was a United
 5         States senator -- we drove through
 6         Philadelphia, and she said, "I would like to
 7         see where you went to high school."  So I drove
 8         her by the campus and did not ever put my
 9         vehicle on that property.
10    BY MR. JUBB:
11    Q    Who was the girlfriend at the time?
12    A    You already know the answer.
13    Q    Okay.  So what year was this?
14    A    1999.
15    Q    So is that the story that you told
16         Mr. Garabedian?
17                    MS. DOUGHERTY:  Objection.
18                    THE WITNESS:  I don't remember the
19         specifics of what I told Mitchell Garabedian
20         about my trip passing through Pennsylvania on
21         my way back from New York, Washington DC, West
22         Virginia into Ohio and then back to Milwaukee.
23    BY MR. JUBB:
24    Q    I'm not asking for, you know, which exits you
25         took.  I'm asking whether or not you told
```

Kurtis Poulos

```
 1        Mr. Garabedian that you went back to The Hill
 2        School?
 3                 MS. DOUGHERTY:  Objection.
 4                 THE WITNESS:  I do not recall.
 5   BY MR. JUBB:
 6   Q    Okay.  Now, is it your testimony that having
 7        driven from DC through Philadelphia that you
 8        just circled -- you did a lap around The Hill
 9        School campus; is that it?
10                 MS. DOUGHERTY:  Objection.
11                 THE WITNESS:  We may have gotten
12        food, but I didn't go on the actual campus.
13   BY MR. JUBB:
14   Q    So your girlfriend wanted to see the school
15        that you went to, but when you took her there
16        -- and you took her from Philadelphia out to
17        the suburbs on 76 traffic, you just did a lap
18        around the school?
19                 MS. DOUGHERTY:  Objection.
20                 THE WITNESS:  There's nothing --
21        everything is visible from basically -- at
22        least it was, you could see Dutch Village from
23        the outside area.  You could see the dining
24        hall.  You could see the library.  You could
25        see the headmaster's home.  There was no reason
```

Kurtis Poulos

```
 1          to actually go on campus, and either which way

 2          class was not in session.  So I wouldn't feel

 3          comfortable going on that property for multiple

 4          reasons, but to just drive up, assuming I can,

 5          seems rude.  I wasn't invited.

 6    BY MR. JUBB:

 7    Q    You thought it would have been rude to drive on

 8          to your high school campus and that's why you

 9          didn't take your girlfriend on there --

10               MS. DOUGHERTY:  Objection.

11    BY MR. JUBB:

12    Q    -- after she asked to see your school and

13          you're driving back up from DC?

14               MS. DOUGHERTY:  Objection.

15               THE WITNESS:  She saw my school.

16    BY MR. JUBB:

17    Q    What was the route that you were taking --

18               MS. DOUGHERTY:  Stop.  He's still

19          talking.

20               MR. JUBB:  I'm putting my head down

21          and he's -- I don't hear anything.

22               MS. DOUGHERTY:  Well, I can hear him

23          and I can see him.

24               THE WITNESS:  Lane, you have got

25          three minutes to finish.
```

Kurtis  Poulos

```
 1    BY MR. JUBB:
 2    Q    I have as long as I need.  I have a court
 3         order, and you would be wise to open your email
 4         to see what that order says and maybe you
 5         wouldn't have this three minutes remaining.  So
 6         I'm going to continue my questions, and if you
 7         need to see the order again, I will show it to
 8         you.
 9              So my question was what route did you
10         take that you said to Mr. Garabedian "I went
11         back to The Hill School," what was that route?
12         You said you were coming from DC?
13              MS. DOUGHERTY:  Objection.  Are you
14         asking about what he told Mr. Garabedian or his
15         route?  Because you started with Mr. Garabedian
16         and then you ended with the route.
17              MR. JUBB:  I think it was perfectly
18         fine.  I will --
19              MS. DOUGHERTY:  No.  It's not because
20         he's repeatedly said he doesn't know what he
21         told Mr. Garabedian.  So it's fine.  I just
22         want to know which one you're asking.
23    BY MR. JUBB:
24    Q    When you were talking to Mr. Garabedian about
25         going back to visit the school, do you believe
```

1        that you gave him any sort of details about

2        that?

3   A    No.

4   Q    He never asked you, "Why would you go back to

5        the school?"

6                MS. DOUGHERTY:  Objection.

7                THE WITNESS:  Not to my recollection.

8   BY MR. JUBB:

9   Q    All right.  And then to clarify, you were

10       living in which location as of 1999?

11  A    I was living near the UWM campus, I believe, on

12       Cramer Street, or that's where her apartment

13       was.  It was --

14  Q    And was that the trip home from Washington DC?

15  A    That was the trip home from what started in

16       Cornell, and I went to visit my grandfather who

17       was dying of Alzheimer's.

18  Q    So that was at the Cornell -- was that Ithaca

19       area?

20  A    Correct.

21  Q    And then you were coming down to DC.  What was

22       that about?

23  A    I just said to visit my dying grandfather.

24  Q    I thought that was in Cornell.

25  A    No.  My friend from my Marquette High School

Kurtis  Poulos

```
 1        was going to Cornell.  I then went to

 2        Washington DC because my girlfriend had never

 3        been there and wanted to meet my grandparents.

 4   Q    Okay.  So you and your girlfriend were both in

 5        Cornell at the same time, correct?

 6             MS. DOUGHERTY:  Objection.

 7             THE WITNESS:  Yes.

 8   BY MR. JUBB:

 9   Q    All right.  Now I'm following, and then after

10        DC you guys drive back to Wisconsin, right?

11   A    Correct, and the easiest way back is through

12        Pennsylvania turnpike.

13   Q    I see your hand shaking.  Initially you had

14        said in some of your pleadings that this

15        process that you're alleging to have occurred

16        had caused you to have the tremors, correct?

17   A    Correct.  I have Parkinson's.

18   Q    Right.  Did you ever tell Mr. Garabedian that

19        doctors have actually diagnosed you have

20        shaking because of your alcohol withdrawal?

21             MS. DOUGHERTY:  Objection.

22             THE WITNESS:  If I had alcohol

23        withdrawal, that would mean I was drinking.  It

24        has nothing to do with that.  I have had this

25        tremor since I was in my teens before I was
```

Kurtis  Poulos

 1        even drinking.

 2   BY MR. JUBB:

 3   Q    Was it as noticeable?

 4   A    No.  It gets noticeable when I have to wake up

 5        at 5:00 in the morning because I don't sleep

 6        because of bullshit like this.

 7   Q    So to the extent that Mr. Garabedian was asking

 8        you about your tremor, you said that to him?

 9   A    He never saw my tremor.

10   Q    Right.  You didn't see him.  Did you tell him

11        you had a tremor?

12   A    You have already asked if I told him about my

13        medical conditions, so, of course, I have told

14        him about my tremor.

15   Q    And when you told him about your tremor, did he

16        follow up with any questions about any medical

17        providers diagnosing you with it, when you were

18        diagnosed with it and potential causes?

19   A    I don't believe so.

20   Q    Am I correct, though, that a physician has told

21        you that your tremors are related to alcohol?

22   A    No.

23   Q    At some point in time, am I correct, that

24        Mr. Garabedian told you that the school was

25        giving him the runaround?  Do you recall that?

```
 1   A    To an extent.

 2   Q    I want to show you something.  I'm going to

 3        mark this as Poulos 2.  It's Garabedian 67.

 4        This is an email from you to Mitchell

 5        Garabedian dated 2/19/2019.  Subject line, "How

 6        are things going?"  Do you see that?

 7   A    Yes.

 8   Q    Okay.  And you said, "Hey, Mitchell.  I just

 9        wanted to check in and see how things are going

10        with The Hill School.  I haven't heard anything

11        from you guys since I did that phone interview

12        with your associate a while back.  I'm hoping

13        to put this whole thing in the rear view as

14        soon as possible so I can move forward with my

15        life.  Thanks so much for everything!"  This is

16        dated February 19th, 2019.

17                 Am I correct the interview to which

18        you refer in this email with his associate was

19        the one from December of 2017?

20                 MS. DOUGHERTY:  Objection.

21                 THE WITNESS:  Correct.

22   BY MR. JUBB:

23   Q    Now, at any point in time did Mr. Garabedian

24        tell you that school was trying to contact him?

25   A    I don't believe so.
```

1    Q    Am I correct that ultimately when this lawsuit
2         was filed against you, he told you to go to the
3         police; is that correct?
4    A    I don't believe so.
5    Q    At no point in time did Mr. Garabedian ever
6         tell you to contact the police department?
7    A    I don't believe so.  I had already previously
8         reached out to the Pottstown Police Department.
9    Q    Was that in -- what time frame?
10   A    When I was living in Connecticut, so any time
11        from 2017 to 2018.
12   Q    All right.  Well, when you were communicating
13        with Mr. Garabedian, do you have any
14        recollections of you telling him that you are
15        going to reach out to the police department?
16   A    No.
17   Q    Do you have any recollection of actually
18        speaking with the Pottstown Police Department?
19   A    Yes.
20   Q    All right.  And what do you recall about that?
21   A    I gave no specific names.  I asked if there was
22        anything I could do, and I have been asked to
23        fly to Pottstown or Philadelphia and drive to
24        Pottstown and speak to them in person.  I did
25        not have the money.

```
 1   Q    So is it your testimony that the reason you're

 2        unwilling to go and speak to the Pottstown

 3        police to investigate alleged sexual abuse is

 4        because you don't have the money to get there?

 5   A    Correct.

 6   Q    And at some point, approximately 2014, 2015,

 7        you had a trust fund in your name, correct?

 8   A    2014, 2015, yes.  I did have the remainder of a

 9        trust fund.

10   Q    And that's all gone, right?

11              MS. DOUGHERTY:  Objection.

12              THE WITNESS:  Yes, Lane.  Otherwise I

13        would have an attorney here with me.

14   BY MR. JUBB:

15   Q    And did Mr. Garabedian ever inquire into your

16        financial despair?

17              MS. DOUGHERTY:  Objection.

18              THE WITNESS:  Despair would imply

19        that I'm destined to.  No, he did not ask how

20        much money I had.

21   BY MR. JUBB:

22   Q    Do you believe you made him aware that you had

23        a trust fund, that you had blown through that?

24              MS. DOUGHERTY:  Objection.

25              THE WITNESS:  Your verbiage of saying
```

```
 1        that I have blown through that is unequivocally

 2        wrong.  The money was spent on my education,

 3        and my father spent the rest of it.

 4   BY MR. JUBB:

 5   Q    Did you tell Mr. Garabedian that?

 6   A    I told him what I spent it on, which were my

 7        personal expenses, high school, which is all I

 8        wanted back was my college -- high school

 9        tuition.  I spent it on college.  Part of my

10        trust fund was that while attending school I

11        was not allowed to have a job because I was

12        supposed to be focused on studies.  So they

13        paid for my rent.  They paid for my car.  They

14        paid for my insurance.  That's in your mind

15        blowing through it, then fine.

16             You also have to understand that the

17        trust fund wasn't written like just give this

18        guy a check.  It was written so that every time

19        my father has a child, they just take more and

20        more of the money and it divvies up more and

21        more and more.  So what was one thing became

22        six things.

23   Q    And in your discussions with Mr. Garabedian,

24        did you tell him that your trust fund had been

25        diminished entirely because of your dad?
```

```
 1  A    It wasn't entirely diminished by my father.

 2  Q    Okay.  Was there any money left at the time you

 3       spoke with Mr. Garabedian?

 4  A    In the entire Froedtert family trust that is

 5       still around, which pays for a hospital and

 6       everything else, there's about $48 million, and

 7       I don't use any of it.  I don't --

 8  Q    I'm sorry to interrupt you.  But is this the

 9       trust to which you referred that you have no

10       more money now?

11  A    I have had three trust funds.  So one was for

12       high school, college.  The other was for living

13       expenses.  Those two are gone.  The other one

14       I've never touched, and I have no plan to.

15  Q    Do you recall making or leaving any voice mails

16       for Mr. Garabedian to call you back?

17  A    Yes.

18  Q    Do you recall him leaving you any voice mails?

19  A    No.  Because typically if he called, I picked

20       up.

21  Q    In that time frame, the 2017 and 2018, do you

22       know what your cell phone number was?  Is it

23       the same as it is now?

24  A    No, it is not.  I changed my phone number.

25  Q    When did you change your phone number?
```

```
 1   A    Summer of 2019.

 2   Q    Was it after I sued you?

 3   A    No.

 4   Q    You changed your number before I filed the

 5        lawsuit?

 6   A    I got on a family plan with my mother, and I

 7        didn't want it -- I didn't want certain people

 8        having my phone number.  So the people that

 9        needed to have it, have it; the people that

10        don't, don't.

11   Q    So when you changed your phone plan in the

12        summer of 2019 -- what's your current number

13        then?

14   A    262-330-4604.

15   Q    And then what was your number at the time of

16        the 2017 to 2018, right before that?

17   A    414-704-5715.

18   Q    Did you have Mr. Garabedian's cell phone

19        number?

20   A    No, I had his office line.

21   Q    Do you recall any discussions that you had --

22        strike that.

23              We've already discussed that you had

24        some discussions with Mr. Garabedian's

25        associates or paralegals, whoever they have may
```

Kurtis  Poulos

```
 1          been.  Do you recall any specifics about those

 2          discussions?

 3    A     No.

 4    Q     You're welcome to smoke, but it is a formal

 5          proceeding.  So I will just ask my questions.

 6                    MS. DOUGHERTY:  Mr. Poulos, you can't

 7          smoke.  This is like we're in court.  If we

 8          need to take a break because you want to smoke,

 9          that's fine.  Are we taking a break?

10                    THE WITNESS:  I just assumed --

11                    MR. JUBB:  I wouldn't do that, but

12          we're happy to take a break if you need to

13          smoke.

14                    THE WITNESS:  Five minutes.

15                    MR. JUBB:  All right.

16                    THE VIDEOGRAPHER:  Going off the

17          record at 9:13.

18                    (Brief recess taken.)

19                    THE VIDEOGRAPHER:  We're back on the

20          record at 9:19.

21    BY MR. JUBB:

22    Q     Mr. Poulos, I want to follow up on a couple of

23          questions I had about the police, the Pottstown

24          Police Department.  Do you recall any of those

25          discussions that you had with them?
```

Kurtis  Poulos

```
 1   A     Not specifics.

 2   Q     Did you ever communicate with them by any means

 3         other than by telephone?

 4   A     No.

 5   Q     Did you tell Mr. Garabedian about your

 6         discussions with the Pottstown Police

 7         Department?

 8   A     Possibly.

 9   Q     As you sit here today, do you have any

10         recollection of your conversation with

11         Mr. Garabedian as it pertained to you

12         purportedly contacting the Pottstown Police

13         Department?

14   A     I don't.

15   Q     Okay.  At some point in time this lawsuit gets

16         filed and you have another conversation with

17         Mr. Garabedian, and in that conversation did he

18         ever bring up to you a criminal background

19         check that revealed that you had an arrest for

20         child endangerment?

21   A     I don't recall.

22   Q     In other words, you don't recall any

23         conversation with Mitchell Garabedian where he

24         said to you in sum and substance, hey, what is

25         this charge of -- of arrest for child
```

Kurtis Poulos

```
 1          endangerment?
 2   A    I remember the arrest, and it was -- excuse my
 3          language, but it was bullshit.  Somebody had
 4          gotten into my American Online account and
 5          tried to entice a young lady.  And obviously
 6          the charges were dropped.
 7   Q    So did you explain that to Mr. Garabedian?
 8   A    Not in so many words.
 9   Q    What did you tell Mr. Garabedian as it pertains
10          to the arrest for child endangerment?
11   A    I don't recall.
12   Q    Tell me the details about the child
13          endangerment.
14   A    I just did.  Someone got into my AOL account,
15          and I guess tried to meet a girl for whatever,
16          and they arrested me driving to, believe it or
17          not, get a haircut because the guy knew all of
18          my personal information.
19   Q    So you're driving to get a haircut and you get
20          pulled over; is that right?
21   A    Correct.
22   Q    And why did you get pulled over?
23   A    Because he had told whoever was pretending to
24          be this girl my make and model of my car, so
25          they had -- I don't know, like, a BOLO to find
```

```
 1        my car which was pretty distinctive given where
 2        I live.
 3   Q    Did you ever see the messages that were sent to
 4        this minor -- someone who is an alleged minor?
 5   A    I believe the cop that questioned me showed me
 6        the -- or showed me the transcript of the
 7        conversations that were being held, but they
 8        weren't done by me.  They even confiscated my
 9        computer, and there was nothing on it.
10   Q    Did you spend any time in jail?
11   A    A night.
12   Q    When you were going to get your haircut --
13        forgive me, now you don't have hair, I guess is
14        the punch line -- what year was this?
15   A    It would have been 19 -- it was just before my
16        21st birthday.
17   Q    And you're on your way to get a haircut and a
18        cop pulls you over, and my question is how did
19        this particular cop know of your child
20        endangerment issue?
21   A    Again, I said they had a description of my
22        vehicle.  And my vehicle at the time was very
23        distinctive.
24   Q    What was it?
25   A    Two-door Chevy Tahoe that was supercharged,
```

Kurtis Psellos

```
 1        black on black with silver pin striping.

 2   Q    And as part of them pulling you over, were you

 3        in the vicinity of where the person who was

 4        purportedly acting as you was going to meet

 5        this minor?

 6              MS. DOUGHERTY:  Objection.

 7              THE WITNESS:  I don't believe so.  I

 8        was driving up Capitol Drive to visit my

 9        girlfriend who was going to cut my hair.

10   BY MR. JUBB:

11   Q    And did you give a statement to the police in

12        the police department?

13   A    Yeah.  I was scared out of my mind.

14   Q    And you told them that this wasn't you and

15        someone had hacked your AOL?

16   A    Correct.

17   Q    And what happened after that?

18   A    I found out when I got home they had gone into

19        my house, seized my laptop, and three days

20        later everything was gone, and I --

21   Q    Did they ever return it?

22              MS. DOUGHERTY:  Objection.  He wasn't

23        done with his answer.

24              THE WITNESS:  Did they return it?

25        No.  I had another computer.  I didn't care.
```

```
 1   BY MR. JUBB:

 2   Q    Did they have a warrant to search your house?

 3   A    Evidently.

 4   Q    And after executing on this warrant they took

 5        your computer.  Anything else did they take?

 6   A    I don't believe so.

 7   Q    And did you ever try and contact the police to

 8        say, hey, I want my computer back?

 9   A    No, wasn't relevant.

10   Q    And did he -- strike that.

11             At any point in time did

12        Mr. Garabedian ever ask you about the

13        protection from abuse order that was violated?

14   A    Possibly.

15   Q    Did you tell him that -- the story that you

16        told me in your first deposition about how you

17        had to go by her house?

18   A    We lived down a one-way street.  And, again, I

19        had another very distinctive car.

20   Q    And that's what you told Mr. Garabedian?

21   A    I believe so, yes.

22   Q    And did he ask you whether or not you had to do

23        jail time for that?

24   A    I don't recall.

25   Q    At some point did Mr. Garabedian ever say to
```

```
 1        you, you know, "Mr. Poulos, before you told me
 2        you didn't have any jail time, but now you're
 3        telling me you did," did he ever ask you about
 4        that?
 5                  MS. DOUGHERTY:  Objection.
 6                  THE WITNESS:  I don't believe so.
 7   BY MR. JUBB:
 8   Q    Did he ever question you why you never
 9        mentioned any of this stuff in your initial
10        intake with him?
11   A    In my mind I did not see how anything that I
12        had done while I was drinking and doing drugs
13        would be relevant in regards to a criminal past
14        to what happened to me a decade prior.
15   Q    When Mr. Garabedian was doing an intake process
16        and he's asking you these questions, did he
17        ever say to you that he wanted you to be
18        truthful?
19                  MS. DOUGHERTY:  Objection.
20                  THE WITNESS:  Of course, and I was.
21   BY MR. JUBB:
22   Q    Did he explain to you in answering his
23        questions he wanted you to be as complete as
24        possible?
25   A    Yes.
```

Kurtis Poulos

```
 1   Q    And when he asked you about your criminal

 2        history, am I correct there were a number of

 3        things that you didn't inform him of?

 4   A    Possibly.

 5   Q    And despite him telling you he wanted you to

 6        have truthful and fully complete answers, did

 7        you ever explain to him why you didn't tell him

 8        about all your other criminal convictions?

 9             MS. DOUGHERTY:  Objection.

10             THE WITNESS:  No.

11   BY MR. JUBB:

12   Q    Did he seem to care about that at all?

13   A    Restate the question.

14   Q    Sure.  When Mr. Garabedian learned that you did

15        not provide him with a complete history of your

16        criminal history when he first did your

17        interview, did he express to you in any way in

18        sum and substance, you know, disappointment in

19        you for not being forthright about that?

20             MS. DOUGHERTY:  Objection.

21             THE WITNESS:  I don't believe so

22        because, again -- no.

23   BY MR. JUBB:

24   Q    Did Mr. Garabedian ever tell you or suggest to

25        you that you should contact the AG's office?
```

```
 1   A    The attorney general's office?

 2   Q    Which attorney general's office?

 3   A    I don't know.  You just brought up the

 4        question.  You keep asking questions and you're

 5        not very specific.  You just said the AG's

 6        office, so which AG am I supposed to reach out

 7        to?

 8   Q    That was my question.

 9   A    I don't know.

10   Q    Okay.  So let's back up.  At any point in time

11        did Mr. Garabedian tell you to contact any

12        attorney general's office?

13   A    No.

14   Q    Okay.  At any point in time did you tell

15        Mr. Garabedian that you were going to contact

16        the attorney general's office?

17   A    I believe at one point I got frustrated with

18        the lack of progress or lack of communication

19        from him and said I was going to reach out to

20        the numerous newspapers that had reached out to

21        me.  And he advised me not to, to just cool my

22        jets and hunker down, and that was it.  And

23        that was the conversation.

24   Q    At any point in time did you contact the

25        attorney general's office?
```

1   A    No.

2   Q    What were you going to contact the attorney

3        general's office about?

4   A    Again, I never planned on calling any attorney

5        general.

6   Q    I'm a little confused.  I thought you said that

7        you had mentioned to Mr. Garabedian that you

8        were getting frustrated with the lack of

9        communication and that you were going to

10       contact the AG's office or the newspapers and

11       he told you to sit tight.  So I could have

12       misinterpreted your testimony, but I want to

13       make sure I'm clear.

14              MS. DOUGHERTY:  Objection.  That's

15       also not what he said.

16              MR. JUBB:  That's what I just said.

17       Maybe I misinterpreted his testimony.  I'm

18       trying to be clear.

19   BY MR. JUBB:

20   Q    Am I correct that when you spoke with

21       Mr. Garabedian, at no point in time did you

22       ever suggest to him that you were going to

23       contact the AG's office?

24   A    No.  I suggested that I would reach out to The

25       Philadelphia Inquirer, the Pottstown magazine

```
 1        or newspaper, and The Boston Globe and The New

 2        York Times and The Washington Post.

 3   Q    Okay.  At any point in time did Mr. Garabedian

 4        tell you to contact the attorney general's

 5        office?

 6   A    Not that I believe.

 7   Q    And am I correct that you never, per your

 8        testimony, contacted in any way the attorney

 9        general's office?

10   A    I never contacted the attorney general's office

11        nor have I contacted any newspaper or media

12        outlet.

13   Q    Okay.  And what were you going to contact the

14        newspapers about?

15   A    I was going to, without giving specific names,

16        let them know that there's systemic

17        hypersexualization at boarding schools, and The

18        Hill School is not the only one.

19   Q    So you were going to reach out to the

20        newspapers without giving any names and tell

21        them that there's hypersexualization going on

22        in boarding schools?

23   A    Yeah.

24   Q    And you told Mr. Garabedian that?

25   A    To some effect.
```

Kurtis   Poulos

```
 1   Q    And he said sit tight?

 2   A    He said --

 3   Q    Correct?

 4   A    -- don't.

 5   Q    He said don't do that?

 6   A    Correct, so I did not.

 7   Q    You mentioned that some folks from The New York

 8        Times or other media outlets have tried to

 9        contact you and that you haven't contacted them

10        back.  Do you recall testifying to that?

11   A    Yes.

12   Q    How did they contact you?

13   A    Primarily through my mother.

14   Q    How did they know to contact your mom?

15   A    I can't speak to that.

16   Q    Is it because she was going to contact the

17        newspapers?

18   A    Again, I can't speak to that.  I don't know her

19        intentions or what she may or may not have

20        done.

21   Q    So as you sit here today, you have no knowledge

22        whatsoever of your mom ever indicating to you

23        that she was going to contact the newspapers;

24        is that correct?

25   A    Not willfully, no.
```

Kurtis Poulos

```
 1   Q    Was she negligently going to contact the
 2        newspaper by accidently dialing their number?
 3        What do you mean "willfully"?
 4              MS. DOUGHERTY:  Objection.
 5              THE WITNESS:  I mean willfully.
 6   BY MR. JUBB:
 7   Q    Okay.  Well, were you willfully not answering
 8        this question?  Because I'm trying to figure
 9        out how your mom is going to not call the
10        newspapers willfully.
11              MS. DOUGHERTY:  Objection.  I think
12        you misunderstood his answer.
13   BY MR. JUBB:
14   Q    Mr. Poulos, did your mom contact the
15        newspapers?
16   A    Yeah.  I'm not going to reply to that.  I don't
17        know how that happened.
18   Q    Mr. Poulos, by the way, what are you drinking
19        right now?  Could you hold that up for the
20        camera?  Could you hold that up to the camera
21        for us?
22   A    No.
23   Q    Is that a Bud Light Seltzer?
24   A    No.  It's a Perrier.  Do you want one?
25   Q    Could you hold that up for us?
```

 1   A    No.

 2   Q    I just want to see the Perrier label.

 3   A    Don't worry about it.  It's not relevant.

 4   Q    Are you taking your deposition today under any

 5        sort of intoxication?

 6   A    No.  I'm just sleep deprived because I have

 7        been up since 5:00 in the morning.

 8   Q    Mr. Poulos, this is a video-recorded

 9        deposition.  Is that a Bud Light Seltzer?

10   A    No.

11   Q    Is it in any way a malt beverage?

12   A    No.

13   Q    Would you please hold it up to the camera for

14        us?

15   A    No.

16   Q    Any particular reason why?

17   A    Because -- no.

18   Q    So you're unwilling to tell us what you're

19        drinking right now?

20   A    Do you want me to pour it into a glass and I

21        can show you the glass?

22             MS. DOUGHERTY:  Mr. Poulos, just like

23        you can't smoke a cigarette, you can't drink

24        alcohol during a deposition.  So Mr. Jubb is

25        trying to confirm that you're not drinking

```
 1        alcohol.  The easiest way to do that is to just

 2        show him the can.

 3   BY MR. JUBB:

 4   Q    Can you show me the can, Mr. Poulos?

 5   A    No.

 6   Q    Okay.  Both Ms. Dougherty, who represents

 7        Mr. Garabedian and his law firm, as well as me

 8        who represents this plaintiff in this case

 9        against you where you are alleging sexual

10        abuse, and we told you you can't smoke in the

11        deposition.

12             I'm asking you to show me what that

13        is because it's a video-recorded deposition.

14        And I think we have all seen it a number of

15        times right now.  You're refusing to show us

16        what you're drinking, correct?

17             MS. DOUGHERTY:  Objection.  Okay.  We

18        told him that he couldn't smoke and he stopped

19        smoking.  Nobody has informed him that he can't

20        drink alcohol, so to the extent he's drinking

21        alcohol, it could have been a misunderstanding,

22        but he said he's not drinking alcohol.

23   BY MR. JUBB:

24   Q    Okay.  Mr. Poulos, at any point in time during

25        your depositions spanning however long they may
```

Kurtis Poulos

```
 1        have, have you been intoxicated?
 2   A    No.
 3   Q    All right.  Are you intoxicated now in any way?
 4   A    No, I'm exhausted.
 5   Q    Mr. Poulos, is there -- did you at any point in
 6        time ever believe that it would be appropriate
 7        to drink during a deposition?
 8   A    Obviously --
 9              MS. DOUGHERTY:  Objection.  Drink
10        alcohol?  Because you're certainly allowed to
11        drink during a deposition, right?  We're all
12        drinking.
13              MR. JUBB:  Ms. Dougherty, I think we
14        were pretty clear on what I meant by that.
15   BY MR. JUBB:
16   Q    But in case anybody has any confusion,
17        Mr. Poulos, at any point in time did you
18        believe it would be appropriate for you to
19        drink alcohol during a deposition?
20   A    No.
21   Q    Okay.  And as you sit here today, is it your
22        testimony that what we have just been seeing
23        you drink with two hands for the last hour or
24        so is not a Bud Light Seltzer?
25   A    Correct.
```

Kurtis Poulos

```
 1   Q    Okay.  Could you just show us to confirm,

 2        because we really would like to see it.

 3   A    No.

 4   Q    All right.  But you get thirsty again, would

 5        you just use one hand, maybe?

 6             MS. DOUGHERTY:  Objection.  It's

 7        unnecessary to make comments like that.

 8        Mr. Poulos, I think you have probably figured

 9        it out by now, but a record is being made about

10        what is occurring.  And to the extent you have

11        been drinking something other than alcohol, it

12        would be beneficial to show it to the parties

13        because plaintiff can certainly -- or

14        Mr. Garabedian, the plaintiff, can certainly

15        file a motion regarding your testimony if you

16        were drinking alcohol.

17             If you were drinking alcohol, then we

18        need to perhaps end the deposition and resume

19        on another day when you're not drinking

20        alcohol.  But to avoid future controversy in

21        motion practice, you won't be able to prove

22        what you're drinking to a court if it's not

23        reflected now in response to Mr. Jubb's

24        questions.

25             I'm just giving you that information
```

1        because you're here without counsel, and if you

2        had a lawyer, your lawyer would tell you that

3        you could be subject to motion practice and

4        perhaps sanction by the court if Mr. Jubb

5        pursues the issue.

6                    And since you have not shown the item

7        on the record as requested, or on the video as

8        requested, you will have no way to demonstrate

9        to the court if there's a controversy.  It will

10       just be your word against, you know, Mr. Jubb's

11       contentions.

12                    THE WITNESS:  In regards to his

13       comment about me using two hands, it's because

14       I have a tremor.

15                    MS. DOUGHERTY:  It doesn't matter if

16       you use one or two hands.  It doesn't matter if

17       you use a straw.  It doesn't matter if you use

18       your feet, okay?  What matters is whether it's

19       an alcoholic beverage.

20                    THE WITNESS:  It's not.

21                    MS. DOUGHERTY:  Okay.  Is there a

22       reason why you won't show it on the video?  I

23       realize that it's perhaps offensive to you to

24       be accused of it, but in order to have it to

25       show the court so that you can demonstrate to

Kurtis  Poulos

```
 1          the court if there's a motion later, it matters

 2          if it is shown on the video.  It's up to you

 3          whether you decide -- what you decide to do

 4          with that information, but I'm just letting you

 5          know since you don't have a lawyer, okay?

 6   BY MR. JUBB:

 7   Q    Mr. Poulos, having been advised that we would

 8          prefer that you weren't drinking or drunk

 9          during your deposition, would you like to

10          proceed on a different day or would you like to

11          continue now?

12   A    I want to get this over with.

13               MS. DOUGHERTY:  Mr. Jubb, I don't

14          mean to interrupt you either, but, Mr. Poulos,

15          I'm going to have questions as well because of

16          the items you have identified today during your

17          testimony after Mr. Jubb when his questions are

18          over.  I'm concerned that you have, a number of

19          times, indicated that you are exhausted, and at

20          the same issue that being drunk or otherwise

21          impaired through consumption of drugs or

22          alcohol would affect your ability to answer

23          questions, also not having enough rest or being

24          exhausted is a factor that would affect your

25          ability to answer questions.
```

 1                So if that's an issue, then I think

 2         we perhaps need to know that, because Mr. Jubb

 3         and I both are entitled to have, you know,

 4         answers that are based on your mind in a manner

 5         in which you are able to answer the questions

 6         not impaired, whether it be alcohol, drugs,

 7         sleep, or other.  Is there an issue with that?

 8                THE WITNESS:  The only issue I have

 9         is I have been up since 5:00 a.m., so 6:00 a.m.

10         your time.

11                MR. JUBB:  Well, Mr. Poulos, I can

12         assure you that Ms. Dougherty and I have quite

13         some schedules, and I have a deposition to get

14         to later today.  I have been up since 4:30.  So

15         I assure you that my questions are from the

16         same level of awakeness as you.  So let's see

17         if we can proceed.

18                THE WITNESS:  Your questions are

19         questions.  Your questions to me make me try to

20         relive and, again, live through those events

21         that traumatized me 20-some-odd years ago.

22         It's a little bit different than you waking up

23         and getting prepared to victim shame than me

24         knowing that I'm going to be victim shamed

25         again for my past discrepancies.  Like, it's

```
 1       just --
 2                MS. DOUGHERTY:  It's not a
 3       competition about who got up the earliest.
 4       It's an issue about whether you have an
 5       impairment, whether it be drugs, alcohol,
 6       sleep, something else, to answer questions.
 7       And so if you are confirming that you don't
 8       have an impairment, then we can proceed.  But I
 9       don't want to ask you questions if you're
10       impaired.
11                It's up to Mr. Jubb -- Jubb,
12       rather -- if he wants to ask you -- I didn't
13       mean to misstate your name.  It's up to
14       Mr. Jubb if he wants to ask questions under
15       different circumstances.  But anyway, I will
16       stop.  I apologize, Mr. Jubb.
17   BY MR. JUBB:
18   Q   Great.  Mr. Poulos, at any point in time in
19       your discussions with Mr. Garabedian, am I
20       correct that he never instructed you to contact
21       any newspapers?
22   A   Yes.
23   Q   And at some point when this lawsuit got filed
24       and he contacted you, tell me about that
25       conversation, please.
```

```
 1                MS. DOUGHERTY:  Objection.

 2                THE WITNESS:  I was concerned.  I did

 3         not know how I had got in trouble for his

 4         actions.

 5    BY MR. JUBB:

 6    Q    When you say "his actions," do you mean the

 7         letters?

 8    A    Correct.

 9    Q    And I'm going to show you something here which

10         we will mark as Poulos 3.  It's an email from

11         you to Mr. Garabedian dated 5/15/2019.  "Dear

12         Mitchell, I am sorry for my tone of voice and

13         demeanor while speaking with you earlier.  It's

14         not my intention to be combative with you.  I

15         hope you can understand my feeling of

16         frustration, which is no excuse.  I will speak

17         to you soon."

18                Do you recall having a heated

19         conversation with Mr. Garabedian?

20    A    Yes.  This has not been the most easy thing to

21         keep rehashing.

22    Q    Just for the record, this was Garabedian email

23         72, and the date is May 15, 2019.  That's

24         Poulos 3.  What do you recall --

25                MS. DOUGHERTY:  Can you tell me the
```

1        Bates label again?  I apologize.  I missed it.

2                    MR. JUBB:  Garabedian email 72.

3                    MS. DOUGHERTY:  Thank you.

4   BY MR. JUBB:

5   Q    Tell me everything about that conversation that

6        you can recall.

7   A    I don't recall anything about that

8        conversation.

9   Q    Was there something traumatic about that

10       conversation that you can't recall?

11  A    No.

12  Q    Any other reasons why you can't recall this

13       conversation with Mr. Garabedian after you were

14       sued?

15  A    I just don't recall it.

16  Q    Let me ask you this, after I sued you, do you

17       have a recollection of ever speaking to

18       Mr. Garabedian, anything in your discussions?

19  A    Maybe once or twice asking if he was going to

20       help me.

21  Q    And other than just a general recollection of

22       asking him if he was going to help you, you

23       can't recall any of the discussions between you

24       and Mr. Garabedian after I sued you; is that

25       correct?

Kurtis  Poulos

```
 1   A    Not offhand, except maybe he advised me to find
 2        counsel, that he would not be able to provide
 3        me with counsel during this situation.
 4   Q    Did he explain why?
 5   A    Not in so many words, no.
 6   Q    Did he ever explain to you anything about
 7        potential conflict of interest?
 8   A    I believe so.
 9   Q    Did he ever assist you in finding counsel?
10   A    I don't believe so.  Even if he did, it's not
11        like I can afford it.
12   Q    At any point in time did you, your mother and
13        Mr. Garabedian ever have a phone call, the
14        three of you?
15   A    Not to my recollection.
16   Q    Was your mom permitted to speak with
17        Mr. Garabedian on your behalf?
18   A    On my behalf, no, but she did make contact with
19        him possibly to get advice, I guess.
20        She's also been --
21   Q    Did -- I'm sorry to interrupt you.
22   A    So she thought it might just be advisable that
23        she speak with him, so that we can have an
24        educated conversation about what's going on.
25        Without being a dick, but she can dumb things
```

```
 1        down because I'm not an attorney.  I don't
 2        speak your language.  You guys have your own
 3        way of presenting everything, and she can give
 4        me a different perspective.
 5   Q    From the documents I reviewed, it looked like
 6        it was your mom who was really pushing you to
 7        contact Mr. Garabedian; is that correct?
 8   A    I think she was worried about me and what was
 9        going on.
10   Q    And that was because -- correct me if I'm
11        wrong -- you were in the hospital very
12        frequently, you were getting some diagnosis
13        with the liver, and then you told her that the
14        reason for your conduct was because you were
15        sexually abused as a minor at The Hill School;
16        is that correct?
17             MS. DOUGHERTY:  Object.
18             THE WITNESS:  She knew about that.
19        See, and that's -- you have all this
20        information and your dates are so very, very
21        wrong.  She found out about that years before I
22        ended up in the hospital due to drinking.
23   BY MR. JUBB:
24   Q    Did you tell Mr. Garabedian that you told your
25        mother about this three to four years prior?
```

```
 1   A    It would have been more than three or four

 2        years prior.  I was in the hospital in 2014,

 3        2015.  She found out in 2012 or 2013.

 4   Q    Did Mr. Garabedian ask you the context in which

 5        you told your mother about your allegations?

 6   A    I don't believe so.

 7   Q    In other words, he never asked you, you know,

 8        tell me more about the situation that caused

 9        you to say this to your mother; is that

10        correct?

11   A    I don't believe so.

12   Q    When you asked for your file that was

13        maintained by Mr. Garabedian to be sent to you,

14        did you actually look through it?

15   A    Not completely.

16   Q    Did you look through it and see any of

17        Mr. Garabedian's handwritten notes?

18   A    Not to my recollection, but I wouldn't know his

19        writing.

20   Q    Okay.

21   A    I'm not a stenographer.

22   Q    Well, at any point in time when Mr. Garabedian

23        asked you about who you had spoke about your

24        allegations with, did you tell him any other

25        individuals other than your mother or your
```

Kurtis  Poulos

```
 1        prior girlfriend?

 2   A    No.

 3   Q    At the time you contacted Mr. Garabedian, did

 4        he ask you if you were currently in a

 5        relationship?

 6   A    Yes.

 7   Q    And at the time what did you say?

 8   A    That I was.

 9   Q    And was that with Emily?

10   A    Yes.

11   Q    Was there any contact between Mr. Garabedian

12        and Emily?

13   A    Not to my knowledge.

14   Q    Tell me the -- strike that.

15   A    Hey, Clifford.

16   Q    At any point in time did Mr. Garabedian ask you

17        about any potential witnesses who would be able

18        to corroborate your claims?

19   A    Not to my recollection.

20   Q    Did you ever tell Mr. Garabedian any of the

21        names of the students that were in your

22        geometry class?

23   A    No.  Because, again, I do not remember the

24        exact people that were in my geometry class

25        when I was 15 years old.
```

1    Q    You said you don't remember exactly.  Do you
2         remember -- can you name any individual from
3         memory that was in your geometry class?  Is
4         that a no?
5    A    Yeah, no.
6    Q    All right.  When you spoke with Mr. Garabedian,
7         did you explain to him anything about the
8         classroom and what it looked like?
9    A    I believe so.
10   Q    Did you tell him that -- if there were no
11        windows in the classroom?
12   A    No.  There was at least the window in the door.
13        Again, like I have described before, it was a
14        very small window.  I do not recall there being
15        windows facing the quad, which was where that
16        particular classroom would have been, because
17        right above them was the patio in the upper
18        school building.  So I don't really see how
19        there would have been windows out of that room.
20             Possibly when you walked in there
21        might have been windows on the left -- the
22        front-facing wall that would have looked out
23        into the parking lot.  But I do not recall
24        windows in that room.
25   Q    When you first testified, you were pretty

Kurtis   Poulos

```
 1         adamant that there were no windows in that
 2         room, correct?  Are you now saying there might
 3         be?
 4    A    Again, 27 years have passed.  I'm doing my best
 5         to recall the layout of a school that I have
 6         done everything to forget.  I do remember there
 7         being the one window in the door that was very
 8         small but very tall.
 9    Q    Did Mr. Garabedian ask you about any of the
10         charges pertaining to the Maryland incident?
11    A    I don't believe so.
12    Q    Well, when he asked you about your charges, did
13         you tell him about the Maryland incident?
14    A    Possibly.  I do not recall the specifics.
15    Q    Let's assume that Mr. Garabedian asked you
16         about your criminal background, because we have
17         seen reference to the fact that you told him
18         about your disorderly conduct.  So why don't
19         you tell us, assuming you were being truthful
20         and honest with Mr. Garabedian, all of the
21         incidents where you were arrested.
22                   MS. DOUGHERTY:  Objection.  Are you
23         asking him all the incidents he told
24         Mr. Garabedian?
25                   MR. JUBB:  Right.  Because
```

Kurtis Poulos

```
1        Mr. Garabedian asked him what his criminal

2        history was, and assuming that Mr. Poulos was

3        going to be complete and truthful, then I would

4        imagine what he tells us now, that's what he

5        would have told Mr. Garabedian.

6              MS. DOUGHERTY:  Mr. Jubb, you realize

7        that people don't necessarily have a list with

8        that regard for whether they intend or don't

9        intend to be truthful.  I was just trying to

10       confirm that you were asking Mr. Poulos what he

11       told Mr. Garabedian about the arrests, as

12       compared to whether you were asking him about

13       his arrest.  That's all.

14             MR. JUBB:  I'm asking Mr. Poulos as

15       to what arrests he believed he relayed to

16       Mr. Garabedian.

17             THE WITNESS:  I don't recall.

18  BY MR. JUBB:

19  Q    Well, as you sit here today, what arrests exist

20       out there for you?

21  A    You know the answer, because you have obviously

22       done your research.  I don't have, like, an

23       Excel spreadsheet of all of my fuck-ups.

24  Q    Do you need an Excel spreadsheet to keep track

25       of all of your F-ups?
```

Kurtis  Poulos

```
 1   A    No.  That was an exaggeration.  But, no, I do
 2        not have specifics about --
 3   Q    Why don't you tell us generally what you can
 4        recall about your arrests, please.
 5   A    I was never arrested for anything in Maryland.
 6        I was arrested for disorderly conducts a few
 7        times.  I was arrested for driving by an
 8        apartment because I frankly had to drive past
 9        the apartment to get to the lakefront to go to
10        work.  And I was arrested for that BS claim
11        that I tried to entice a girl on American
12        Online.
13   Q    So the arrest for the violation of the PFA,
14        that was just wrong place at the wrong time,
15        correct?
16   A    Yeah.  I'd actually gone to a movie with a
17        friend, and I was driving down from my
18        apartment after dropping him off to go down to
19        McKinley Marina.  And the only way I can get
20        there from where I was living at the time was
21        to drive down Prospect.  Well, when you drive a
22        straight-pipe Z28 Camaro, it's kind of
23        noticeable.  So she heard me.  She called me
24        in.  I went down there, picked up some stuff,
25        went back home.  By the time I was back in the
```

Kurtis  Poulos

```
 1        apartment, the cops were knocking on my door.
 2   Q    And that's the full story on the violation of
 3        the PFA; is that right?
 4   A    Yeah.  I had no contact with her.  In fact,
 5        there were multiple occasions where she would
 6        frequent a restaurant and I would be there with
 7        friends and I would leave.  And, no, I didn't
 8        tell my friends why I left, but I left, and I
 9        would just be like, "I will meet you at the
10        next place."
11   Q    So the violation of the PFA, that had nothing
12        to do with you trying to light her car on fire
13        and scribbling the words C-U-N-T into her door?
14              MS. DOUGHERTY:  Objection.
15              THE WITNESS:  I never --
16   BY MR. JUBB:
17   Q    That never happened?
18   A    I never did it.
19   Q    What about Maryland?  You said you weren't
20        arrested there, but you were charged with
21        something there, correct?
22              MS. DOUGHERTY:  Objection.
23              THE WITNESS:  Why is this relevant?
24        You just want to, like, drag me through the
25        mud?
```

```
 1   BY MR. JUBB:

 2   Q    I'm trying to understand when Mr. Garabedian

 3        asked you what your arrests were, what you were

 4        charged with, what --

 5   A    Why keep -- now you're just browbeating this.

 6   Q    Mr. Poulos, if you tell me all of these things,

 7        then I'm trying to figure out if you told

 8        Mr. Garabedian that.  So did you tell

 9        Mr. Garabedian about the violation of the PFA?

10   A    Possibly.  Again, asked and answered.  I don't

11        recall every innuendo or everything I stated in

12        that conversation.  I don't.

13   Q    Okay.  And that's why I'm having to get

14        specific, because you say you don't recall

15        everything.  So I'm trying to refresh your

16        recollection based off of --

17   A    No, you're trying to victim shame me by

18        bringing up my bad past.

19   Q    Mr. Poulos, I have no intention of victim

20        shaming anybody, because I do not consider you

21        a victim.  So why don't you focus on answering

22        my questions, okay?  We will get through this

23        together.

24             MS. DOUGHERTY:  Objection.

25   BY MR. JUBB:
```

```
 1   Q    So did you ever tell Mr. Garabedian that you

 2        were arrested for enticing a minor before he

 3        learned from getting a criminal background

 4        check?

 5   A    I'm just going to tell you right now, this is

 6        over.  You can file a motion or do whatever you

 7        want to do, but I'm not going to rehash every

 8        wrongdoing of my life that I may or may not

 9        have told Mitchell.  I'm just not going to.  If

10        you want the court to compel me, you have the

11        information of what I did and did not do wrong.

12   Q    I'm trying to understand whether you told

13        Mr. Garabedian and at what point.  That's my

14        only attempt here, okay?  And --

15              MS. DOUGHERTY:  Objection.  Mr. Jubb,

16        some of your questions are not about what was

17        or wasn't discussed with Mr. Garabedian.  So

18        perhaps it's part of the confusion.

19              MR. JUBB:  It's not part of the

20        confusion.

21              MS. DOUGHERTY:  You do seem to be --

22        I don't know why you're interrupting me.  I

23        don't know why you're talking over me.  You

24        really have --

25              MR. JUBB:  And what you're saying is
```

Kurtis  Poulos

```
 1          just -- it doesn't make any sense at all.

 2                    MS. DOUGHERTY:  Mr. Jubb, you don't

 3          get to just talk over me because you have an

 4          opinion about the substance of what I'm saying.

 5                    MR. JUBB:  Please continue.

 6                    MS. DOUGHERTY:  You are absolutely

 7          asking Mr. Poulos about the substance of

 8          arrest, which I think you realize are not

 9          admissible.  So I do think there is perhaps

10          some confusion, because you're saying you're

11          asking only about the stuff with

12          Mr. Garabedian, but a lot of your questions are

13          about the substance of the criminal background.

14          So I think you do need to limit your questions

15          to the discussions or reasonably therefrom.

16                    MR. JUBB:  Are you done?

17                    MS. DOUGHERTY:  I think you know that

18          I'm done, Mr. Jubb.  And being rude and

19          unprofessional to me doesn't suit you.

20     BY MR. JUBB:

21     Q    Okay.  So, Mr. Poulos, I want to know what you

22          told Mr. Garabedian, and you can't recall it as

23          to which arrest, convictions, charges you

24          mentioned to him.  I'm trying to get an

25          understanding as to how many there are so that
```

Kurtis   Poulos

```
 1        I can then say, "Did you tell Mr. Garabedian
 2        that?  Did he have any follow-up questions?"
 3        That's where we're going with this, okay?
 4    A   You already know the answer to every arrest,
 5        conviction; I don't.
 6    Q   Did you tell Mr. Garabedian that you had been
 7        in any sort of altercation with your domestic
 8        partner at one point?
 9    A   Possibly.
10    Q   When do you think that would have occurred?
11    A   I would imagine during the intake interview.
12    Q   Did you ever discuss with Mr. Garabedian the
13        charges that were filed against you in Maryland
14        at any point?
15    A   Not to my recollection.
16    Q   Is there any particular reason why you wouldn't
17        have told Mr. Garabedian that when in the
18        interview process he's asking you about
19        charges, convictions, and arrests?
20            MS. DOUGHERTY:  Objection.
21            THE WITNESS:  Again, I don't see how
22        this is relevant.  So, no.
23   BY MR. JUBB:
24    Q   So, no, you didn't tell him about it?
25    A   No, I do not believe so.  Next question.
```

Kurtis  Poulos

```
 1   Q    Did Mr. Garabedian ever give you any indication

 2        about the potential merits of claims against

 3        The Hill School?

 4                   MS. DOUGHERTY:  Objection.

 5                   THE WITNESS:  No.  Because any of my

 6        behavior, except for what happened at that

 7        school, is irrelevant.  Your client, that's who

 8        knew about it, they did nothing.

 9   BY MR. JUBB:

10   Q    Have you finished your answer?

11   A    Yeah, go ahead.

12   Q    Did Mr. Garabedian give you any indication

13        about potential merits of your claim against

14        The Hill School?

15   A    No.  Because as your paid psychiatrist, my

16        psychiatrist have both determined I suffered

17        severe PTSD, anxiety, and trust issues due to

18        something that happened to me while I was being

19        abused by your client and your client's school.

20   Q    Perhaps you're not hearing my question

21        correctly.  My question was did Mr. Garabedian

22        ever advise you or give you any indication

23        about the potential merits of a claim against

24        The Hill School?

25   A    No --
```

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  -- because I'm telling

 3        the truth.

 4   BY MR. JUBB:

 5   Q    Okay.  I have no idea what that means.  Did

 6        Mr. Garabedian ever give you any --

 7   A    Don't know what that means?  I'm telling the

 8        truth.  The truth is the truth.

 9                    MS. DOUGHERTY:  Mr. Poulos, I don't

10        think you're listening to Mr. Jubb's question.

11   BY MR. JUBB:

12   Q    It's nonsensical.  So, Mr. Poulos, please pay

13        attention because Ms. Dougherty and I both want

14        an answer to this question, okay?

15                    Did Mr. Garabedian ever give you any

16        indication as to the potential merits of a

17        lawsuit filed by you against The Hill School?

18                    MS. DOUGHERTY:  Objection.

19                    THE WITNESS:  No.

20   BY MR. JUBB:

21   Q    No.  Okay.  Did he ever give you any indication

22        about the potential likelihood of success of a

23        lawsuit filed against The Hill School?

24                    MS. DOUGHERTY:  Objection.

25                    THE WITNESS:  Nothing in specifics.
```

Kurtis Poulos

1    BY MR. JUBB:

2    Q    Anything general?

3    A    That this was not going to be an easy road to

4         walk down.

5    Q    Is that because your case was barred entirely

6         by the statute of limitations?

7    A    No.  Because these things do not just go away.

8         It's a long road.  It's an arduous road, and

9         it's taking a toll on me and my family.

10   Q    Did Mr. Garabedian ever give you any indication

11        as to the potential likelihood of success?

12                 MS. DOUGHERTY:  Objection.

13                 THE WITNESS:  Not in specifics.

14   BY MR. JUBB:

15   Q    Did he ever say to you, well, you know, I think

16        you've got a 50 percent chance or 40 percent

17        chace, anything along those lines?

18                 MS. DOUGHERTY:  Objection.

19                 THE WITNESS:  Asked and answered.

20        Not in specifics.

21   BY MR. JUBB:

22   Q    Did he say to you, "More likely than not I

23        think you're going to be successful"?

24                 MS. DOUGHERTY:  Objection.

25                 THE WITNESS:  Again, asked and

Kurtis Poulos

```
 1          answered.  Not in specifics.
 2  BY MR. JUBB:
 3  Q    I'm trying to be as general as possible, okay?
 4       I don't want specifics, because you said you
 5       can't recall anything specifically.  He didn't
 6       give you anything specifically.  So I'm trying
 7       to be general.
 8                In any way, shape, or form -- in any
 9       way, shape, or form did Mitchell Garabedian
10       provide you with any indication as to the
11       potential likelihood for success of a potential
12       case against The Hill School?
13                MS. DOUGHERTY:  Objection.
14                THE WITNESS:  No.
15  BY MR. JUBB:
16  Q    Okay.  Now, did Mr. Garabedian tell you whether
17       or not he was barred in Pennsylvania?
18  A    No.
19  Q    Where did he say any potential case could have
20       been brought?
21                MS. DOUGHERTY:  Objection.
22                THE WITNESS:  I don't recall.
23  BY MR. JUBB:
24  Q    Did he tell you that he was going to be working
25       with some attorney in Pennsylvania?
```

```
 1                    MS. DOUGHERTY:  Objection.
 2                    THE WITNESS:  Not to my recollection.
 3   BY MR. JUBB:
 4   Q    Did you believe that Mr. Garabedian was barred
 5        in Pennsylvania?
 6                    MS. DOUGHERTY:  Objection.
 7                    THE WITNESS:  Asked and answered.  I
 8        just told you I did not that know he was barred
 9        from practicing law in the state of
10        Pennsylvania.
11   BY MR. JUBB:
12   Q    I need to clarify that.  Did you know whether
13        or not he was admitted to practice law by the
14        Supreme Court of Pennsylvania?
15   A    I did not.
16   Q    Do you have any knowledge whatsoever as to
17        whether or not Mr. Garabedian was admitted to
18        practice law in Pennsylvania?
19   A    I didn't know the specifics.  I took advice
20        from family.
21   Q    When you told Mr. Garabedian about, you know,
22        what your allegations were with respect to the
23        sexual abuse and you laid it out for him in the
24        manner in which you testified previously in
25        your deposition that Ms. Dougherty had taken
```

Kurtis Poulos

```
 1          you through, and when he heard all that, did he
 2          give you any indication that that made sense to
 3          him or that he found it credible at all?
 4   A      Reask the question.
 5   Q      Sure.  Am I correct that the allegations of
 6          sexual abuse that you described previously in
 7          your depositions, the manner in which they
 8          would occur according to your testimony, that
 9          that is what you told Mr. Garabedian during
10          your discussion with him?
11   A      Correct.
12   Q      Okay.  And when you told him about that, did he
13          give you any indication as to whether or not he
14          said that makes sense or this is credible,
15          anything along those lines?
16   A      He said he trusted in my truth, basically, not
17          verbatim, but --
18   Q      When you say he trusted in your truth, what do
19          you mean by your truth?
20   A      The truth of the situation, the truth of what
21          happened.
22   Q      In other words, when you told him your story
23          about how this occurred, Mr. Garabedian said to
24          you in sum and substance, yeah, I believe you
25          and this makes sense?
```

Kurtis Poulos

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:   Correct.

 3   BY MR. JUBB:

 4   Q    Did you tell Mr. Garabedian that you left The

 5        Hill School for your junior year of high

 6        school?

 7   A    Yes.

 8   Q    Did you tell him that you then returned to The

 9        Hill School?

10   A    Yes.

11   Q    Did he ever ask you, hey, Kurtis, why did you

12        come back to The Hill School after you were,

13        you know, reportedly getting sexually abused?

14   A    I don't recall.

15   Q    You don't recall whether or not he asked you

16        that question?

17   A    I don't remember if he asked me specifically

18        why I went back there my senior year.

19   Q    Did he ever question, in any way that you can

20        recall, why you returned to The Hill School?

21   A    No.

22   Q    At any point in time are you aware as to

23        whether or not you or your mother provided the

24        yearbooks to Mr. Garabedian?  I know you said

25        you never maintained them -- let me back up.
```

Kurtis  Poulos

```
 1          I'll just clarify.  Strike that.
 2                Was it ever your understanding that
 3      your mom was able to obtain your yearbooks?
 4   A   I know she has obtained them.
 5   Q   Okay.  At some point did you learn that she
 6      provided them to Mr. Garabedian?
 7   A   I'm not aware of her providing them.  I am
 8      aware --
 9   Q   In other words, as far as you know,
10      Mr. Garabedian has never requested those --
11                MS. DOUGHERTY:  You just talked over
12      the rest of his answer.
13                MR. JUBB:  I'm sorry.  I had my head
14      down.  Go ahead.
15                THE WITNESS:  I know that she offered
16      to provide them.  I don't know whether he
17      received them.  I don't ask questions that I
18      don't care about.
19   BY MR. JUBB:
20   Q   Okay.  You weren't concerned as to whether or
21      not the lawyer who was going to -- that you
22      contacted with a claim of sexual abuse had your
23      yearbooks?
24                MS. DOUGHERTY:  Objection.
25                THE WITNESS:  No.
```

Kurtis Poulos

```
 1   BY MR. JUBB:

 2   Q    As far as the statute of limitation goes, did

 3        Mr. Garabedian explain to you the difference

 4        between civil and criminal?

 5   A    I already knew the difference between civil and

 6        criminal.

 7   Q    Am I correct that at the time you contacted

 8        Mr. Garabedian you were well aware of what the

 9        difference was between criminal and civil

10        statute of limitations?

11   A    Correct.

12   Q    And at the time you contacted Mr. Garabedian,

13        you were aware that the statute of limitations

14        of any potential civil case against The Hill

15        School and/or Matt Ralston had expired,

16        correct?

17   A    Correct.  Again, I reached out because this was

18        something that the school reached out to us as

19        alumnus and they wanted a resolution.

20   Q    I see.

21   A    You have seen the letter.  It's pretty black

22        and white.  It's not like I called the school

23        and said, "Oh, this shit happened."  This

24        school kept emailing alumni saying we know this

25        happened.  Let's make some sort of restitution
```

1        for this situation.

2    Q   What sort of efforts did you take part in to

3        cooperate in any sort of investigation that the

4        school was doing?

5    A   Initially I was going to call the counselors

6        who turned out to be lawyers, and I was going

7        to talk to the school.  When I found out they

8        were attorneys, I took my family's advice and

9        did not reach out to the school because it was

10       a manipulation by your client, The Hill School.

11   Q   Mr. Poulos, you keep saying that.  You know I

12       don't represent The Hill School, okay?  So

13       let's just be clear on that.

14   A   Who is paying your bills?

15   Q   In any event -- in any event, did -- am I

16       correct you have not cooperated in any sort of

17       investigation being conducted by The Hill

18       School?

19                 MS. DOUGHERTY:  Objection.

20                 THE WITNESS:  Correct.

21   BY MR. JUBB:

22   Q   At any point in time did you sit down -- strike

23       that.

24                 At any point in time did

25       Mr. Garabedian, to your knowledge, ever review

1        your medical records?

2                    MS. DOUGHERTY:  Objection.

3                    THE WITNESS:  I have no knowledge.  I

4        would have no knowledge.

5   BY MR. JUBB:

6   Q    I don't know if maybe he had contacted you and

7        said, you know, "I got your medical records.  I

8        looked through them.  I have a couple of

9        questions," or anything like that.  As far as

10       you know you don't recall ever speaking with

11       Mr. Garabedian about what was in your medical

12       records; is that fair?

13  A    Nothing specifically.

14  Q    Is there anything general that you can recall

15       about speaking with Mr. Garabedian as it

16       pertained to your medical records?

17  A    No.  He asked for a waiver.  I gave him the

18       waiver.

19  Q    At what -- strike that.

20                   Did Mr. Garabedian ever ask you about

21       when you began heavily drinking?

22                   MS. DOUGHERTY:  Objection.

23                   THE WITNESS:  Not to my knowledge.

24  BY MR. JUBB:

25  Q    Did Mr. Garabedian ever have any knowledge of

Kurtis Poulos

```
 1       any indication of a self-inflicted injury to

 2       you?

 3              MS. DOUGHERTY:  Objection.  How could

 4       he know what Mr. Garabedian knew?

 5              MR. JUBB:  If he told Mr. Garabedian.

 6              MS. DOUGHERTY:  Yeah, that wasn't

 7       your question.

 8              THE WITNESS:  Yeah.

 9              MS. DOUGHERTY:  You asked whether

10       Mr. Garabedian ever had any knowledge.  Well,

11       ask him if he told him or asked or something,

12       not what Mr. Garabedian's knowledge was.

13  BY MR. JUBB:

14  Q   Mr. Poulos, at any point in time did you give

15      Mr. Garabedian any indication that there was

16      ever any issue of you self-harming yourself?

17  A   Possibly.

18  Q   Okay.  Tell me about that.

19  A   Which time do you want to know that I hurt

20      myself?

21              MS. DOUGHERTY:  Objection.  He's

22       asking what you told Mr. Garabedian.

23              THE WITNESS:  No, he doesn't really

24       seem to want to know that.

25              MS. DOUGHERTY:  That was his
```

```
 1        question, and that's what he's allowed to ask

 2        you.

 3   BY MR. JUBB:

 4   Q    I want to know all the instances that you told

 5        Mr. Garabedian that you had a self-inflicted

 6        injury.

 7   A    I only spoke to him about it once.

 8   Q    And what did you tell him about that?

 9   A    That it was the dumbest thing I could have

10        done.

11   Q    Did it have to do with your girlfriend at the

12        time?

13   A    No.

14   Q    Did you and Mr. Garabedian ever discuss the

15        details of the relationship between you and

16        your mother?

17   A    Possibly.

18   Q    Did you ever tell Mr. Garabedian that she was a

19        former lawyer?

20   A    She was the one who found him.  So, yes, he

21        already knew that.

22   Q    Did you tell Mr. Garabedian that she was

23        providing you with any sort of financial

24        assistance?

25   A    I mean, a couple bucks here and there, but
```

Kurtis  Poulos

```
 1        nothing crazy.

 2   Q    Did you ever give Mr. Garabedian any indication

 3        that your mother was in any way oppressive to

 4        you?

 5   A    Oppressive?  No, not in the least.

 6   Q    At some point after your conversation with

 7        Mr. Garabedian -- strike that.

 8             At any point in your conversation

 9        with Mr. Garabedian did he ask you about

10        whether or not you had obtained any sort of

11        psychiatric or mental health therapy?

12   A    Yes.

13   Q    And what did you tell him?

14   A    That I had.

15   Q    And what mental health therapy had you received

16        prior to contacting Mr. Garabedian that you

17        told him about?

18   A    I was treated for severe anxiety, depression,

19        and PTSD when I was 21 or 22 and trying to

20        live.

21   Q    Where did that occur?

22   A    Milwaukee.

23   Q    Who is the therapist?

24   A    I honestly don't remember his name.  He was a

25        family friend.  I believe you already know who
```

Kurtis Poulos

```
 1        he is.

 2   Q    Any other therapy you told him that you had?

 3   A    I had to see a shrink when my parents were

 4        trying to fight over where I would live.

 5   Q    Did you tell Mr. Garabedian about any therapy

 6        you had to go -- undergo as part of any sort of

 7        court order?

 8   A    I don't believe so.

 9   Q    Did you have to undergo therapy as part of a

10        court order?

11   A    Yes, and you already know that.

12   Q    Have you ever been diagnosed with any sort of

13        bipolar condition that you --

14             MS. DOUGHERTY:  Object.

15   BY MR. JUBB:

16   Q    -- that you relayed to Mr. Garabedian?

17   A    No, I did not.

18   Q    Did he ask you whether or not you had been

19        diagnosed with any particular conditions?

20   A    I don't believe so.

21   Q    Did you tell Mr. Garabedian that he would be

22        able to speak with your mom whenever he would

23        like?

24   A    Yes.

25             THE COURT REPORTER:  Hey, can we
```

Kurtis Podios

```
 1        take, like, five minutes really quick?  I just

 2        spilled my coffee everywhere.

 3                MR. JUBB:  Yeah, let's take five or

 4        whatever you need to clean that up.

 5                THE VIDEOGRAPHER:  Going off the

 6        record at 10:26 a.m.

 7                (Brief recess taken.)

 8                THE VIDEOGRAPHER:  We're back on the

 9        record at 10:49 a.m.

10                MR. JUBB:  Yes, during the break we

11        experienced a completely unforeseeable event,

12        and we are no longer able to transcribe the

13        deposition.  And so all counsel and parties

14        have agreed that this deposition will reconvene

15        on May 27th at 12:00 p.m., Eastern Time, 11:00

16        a.m. Central Time, and the parties have agreed

17        that are no conflicts on their calendar that

18        day and the deposition will reconvene then.

19        Everybody has agreed to give their best efforts

20        to extend some of the deadlines a couple of

21        weeks to make sure we can accommodate this

22        request.  Is that agreeable with you

23        Ms. Dougherty?

24                MS. DOUGHERTY:  It is.

25                MR. JUBB:  And that's agreeable with
```

Kurtis Poulos

```
 1       you as well, Mr. Poulos, correct?

 2              THE WITNESS:  Yeah.

 3              MR. JUBB:  Okay.  I appreciate

 4       everyone's time, and, Ali, I'm sorry this

 5       happened.

 6              THE COURT REPORTER:  I'm sorry.

 7              MR. JUBB:  It's okay.  It happens.

 8              THE WITNESS:  Clifford, do you agree?

 9       He doesn't agree.

10              MS. DOUGHERTY:  He's not amused.

11              THE VIDEOGRAPHER:  Did you want to go

12       off the record then, counsel?

13              MS. DOUGHERTY:  Yes, I think we are

14       finished.

15              THE VIDEOGRAPHER:  Going off the

16       record at 10:51 a.m.

17              (Proceedings concluded at 10:51 a.m.)

18

19

20

21

22

23

24

25
```

Kurtis Poulos

1    STATE OF WISCONSIN   )

                         ) SS:

2    COUNTY OF MILWAUKEE )

3

4

5                I, ALI KORNBURGER, Notary Public in and

6    for the State of Wisconsin, do hereby certify that

7    the above deposition of KURTIS POULOS was recorded

8    by me on April 22, 2021, and reduced to writing

9    under my personal direction.

10               I further certify that I am not a

11   relative or employee or attorney or counsel of any

12   of the parties, or a relative or employee of such

13   attorney or counsel, or financially interested

14   directly or indirectly in this action.

15               In witness whereof I have hereunder set

16   my hand and affixed my seal of office at Milwaukee,

17   Wisconsin, this 29th day of April, 2021.

18

19

20

21   _____

                    Notary Public

22          In and for the State of Wisconsin

23

24

     My Commission Expires:  February 22, 2024.

25

# EXHIBIT "I"

1                  UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

    - - - - - - - - - - - - - - - - - - - - - - - - - - -

3

    JOHN DOE,

4

                    Plaintiff,          VOLUME 5

5

       vs.                     Case No. 2:19-cv-01539

6

    MITCHELL GARABEDIAN, ESQ., LAW

7   OFFICES OF MITCHELL GARABEDIAN and

    KURTIS N. POULOS,

8

                    Defendants.

9

    - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12

13

14              The videotaped deposition of KURTIS N.

15   POULOS was taken at the instance of the Plaintiff,

16   pursuant to the Federal Rules of Civil Procedure, taken

17   via Zoom video conferencing, on the 27th day of May,

18   2021, commencing at 11:02 a.m., before BETH ZIMMERMANN,

19   Registered Professional Reporter and Notary Public in and

20   for the State of Wisconsin.

21

22

23

24

25

```
 1                    REMOTE APPEARANCES

 2

 3   THE BEASLEY FIRM, LLC
     By:  Mr. Lane R. Jubb, Jr., Esq.
 4   1125 Walnut Street
     Philadelphia, Pennsylvania  19107
 5   Appearing on behalf of the Plaintiff

 6

     SWARTZ CAMPBELL, LLC
 7   By:  Ms. Candidus K. Dougherty, Esq.
     1650 Market Street, 38th Street
 8   Philadelphia, Pennsylvania  19103
     Appearing on behalf of the Defendants

 9

10

11

     ALSO PRESENT:

12

     James Vonwiegen, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kurtis N. Poulos

```
 1                    EXHIBIT INDEX
 2
 3   Ex. No.          Description              Page
 4     4      Bates 24, 4/3/19 Handwritten Notes    7
       5      Bates 57, 12/18/18 E-Mail to Nathan
 5            Gaul                                  16
       6      Bates 3, 5-15-19 Handwritten Notes    25
 6     7      Bates Email108, 5/6/20 E-Mail         27
       8      Bates Email0069, 5/9/19 E-Mail        29
 7     9      Cross Complaint                       32
 8     D5     Bates 33-39, 12/12/17 Handwritten Notes  71
       D6     Bates 25-26, 12/21/18 & 12/26/18 Notes  140
 9     D7     Bates 30, 12/19/18 Handwritten Notes  137
       D8     Bates 54, 1/18/18 E-Mail              132
10     D9     Bates 40, 12/12/17 Handwritten Notes   84
       D11    Bates 66-71, Historical Allegation
11            E-Mails                               63
       D12    Cross Complaint With Exhibits         55
12     D13    Bates 43-47, 1/17/18 E-Mails         131
       D14    Bates 59, 9/20/18 & 12/17/18 E-Mails 134
13
     (ORIGINAL EXHIBITS ATTACHED.  SCANNED COPIES PROVIDED
14   TO COUNSEL.)
15
16
17                  EXAMINATION INDEX
                                              Page
18
            By Mr. Jubb                          5
19          By Ms. Dougherty                    45
            By Mr. Jubb                        144
20          By Ms. Dougherty                   169
            By Mr. Jubb                        170
21
22
23
                  REQUESTED DOCUMENTS
24
25              (NO REQUESTS MADE)
```

Kurtis N. Poulos

```
 1              VIDEOGRAPHER:  We are now on the

 2        record.  My name is James Vonwiegen.  I'm a

 3        videographer for Golkow Litigation Services.

 4        Today's date is May 27, 2021, and the time is

 5        11:02 a.m.

 6             This remote video deposition is being

 7        held in the matter of John Doe versus Mitchell

 8        Garabedian, et al., for the United States

 9        District Court, the Eastern District of

10        Pennsylvania.  The deponent is Kurtis Poulos.

11             All parties of the deposition are

12        appearing remotely and have agreed to the

13        witness being sworn in remotely.  Due to the

14        nature of remote reporting, please pause

15        briefly before speaking to ensure all parties

16        are heard completely.  Counsel will be noted

17        on the stenographic record.

18             The court reporter is Beth Zimmermann and

19        will now swear in the witness.

20                  KURTIS POULOS being first duly sworn

21        on oath to tell the truth, the whole truth,

22        and nothing but the truth, was examined and

23        testified as follows:

24                  THE WITNESS:  Except for the "so

25        help me God," yes.
```

Kurtis N. Poulos

```
 1              EXAMINATION BY MR. JUBB:

 2      Q    Mr. Poulos, good afternoon.  We've done this a

 3           few times, but I'll just go over the

 4           instructions anyway.  If at any point in time

 5           you don't understand my question, just let me

 6           know and I'm happy to rephrase it.

 7                 Everything that we're taking down is

 8           being recorded by audio, video and

 9           stenographer, so it's important that we do our

10           best to let each other speak.  I know that can

11           be difficult in light of certain technological

12           difficulties that exist in using this

13           platform.

14                 If at any point in time you want to

15           break, you just let me know.  I don't intend

16           to be too long, but you know how that works,

17           just let me know.

18                 I'm going to try and pick back up -- pick

19           back up where we left off.  I might hop around

20           a little bit just because we kind of got

21           interrupted with the last situation, which was

22           no fault of anybody's; but I'd like to just

23           get back right into it if we could.

24                 First off, before coming here today, did

25           you have an opportunity to review your
```

```
 1              testimony from the last time we spoke?

 2     A    No.  I have not received any copies of any

 3          testimonies.

 4     Q    And my question was a little bit different.

 5          Did you have any opportunity to review it?

 6          Whether or not you received it from somebody,

 7          did you ever review it?

 8     A    No.

 9     Q    Did you have any opportunity to -- Strike

10          that.

11              Did you review any materials in

12          anticipation of today's deposition?

13     A    No.

14     Q    Did you have any discussions with

15          Mr. Garabedian before today's deposition,

16          since your last deposition?

17     A    No.

18     Q    Did you have any discussions with

19          Ms. Dougherty or anyone from her firm since

20          your last deposition?

21     A    No.

22     Q    Am I correct that as of -- Let's see here.

23          Strike that.

24              I'm going to show you what has been

25          previously marked and produced as Garabedian
```

Kurtis N. Poulos

```
 1              File 24.  This is going to be --

 2                   MR. JUBB:  Candy, do you know where

 3         we left off at the last one?  I think I only

 4         had 3, so this would be 4.

 5                   MS. DOUGHERTY:  Yes, we were at 3.

 6                   MR. JUBB:  So we already did 3 or

 7         we're up to 3?

 8                   MS. DOUGHERTY:  Already did 3.  It

 9         was the order and then two e-mails.

10                   MR. JUBB:  Thank you.  So we're

11         going to mark this as Exhibit 4 to the

12         deposition, Volume 2.  Or I guess it would

13         be -- That was improper identification, not

14         Volume 2.  Let's just call it Exhibit 4 to the

15         May 27th deposition continuation, which is

16         Garabedian File 24.

17                   MS. DOUGHERTY:  Okay.  Mr. Jubb, I

18         think you called them "Poulos" and then a

19         number.

20                   MR. JUBB:  Call it Poulos 4, please.

21         BY MR. JUBB:

22    Q    So at the bottom you can see that, Mr. Poulos?

23    A    I can't see anything.

24    Q    Garabedian File 24, do you see that?

25    A    I just see a yellow sheet of paper.
```

```
 1     Q     Look at the bottom.  Do you see that?

 2     A     No, I cannot see that.

 3     Q     I'll represent to you that there is a video

 4           going right now so we'll see if anyone else

 5           can see Garabedian 24.  At the top it's a

 6           yellow piece of paper.  There is a date.  It

 7           looks like it says "4/3/19, Kurt Poulos, MG

 8           tells client the school was giving us the

 9           runaround."

10               Am I correct, Mr. Poulos, that as of

11           April 3, 2019, you were told by Mr. Garabedian

12           that the school was giving you the,

13           quote/unquote, runaround?

14     A     Something to that effect.

15     Q     And when he made those comments to you, that

16           the school was giving you and him the

17           runaround as of April 3, 2019, what did you

18           understand that to mean?

19     A     I guess that they were dodging questions or

20           being evasive in responding to any phone calls

21           or e-mails.

22     Q     In other words, the impression you got from

23           your discussion with Mr. Garabedian was that

24           the school was not being responsive.  Is that

25           fair?
```

```
 1    A    Correct.

 2    Q    Now, at some point in time shortly thereafter,

 3         this lawsuit was filed against you.  And am I

 4         correct that when that happened, you continued

 5         having discussions with Mr. Garabedian?

 6    A    Only in regards of how do I get representation

 7         and whether or not he would be representing

 8         me.

 9    Q    And in those discussions at any point in

10         time -- Strike that.  Let's not do it that

11         way.

12              This lawsuit was filed against you in

13         approximately April of 2019 after the 3rd, and

14         when that happened, did you have any Zoom

15         conference or any sort of personal meeting

16         with Mr. Garabedian?

17    A    I have never met Mitchell Garabedian in person

18         and I've never seen him through Zoom.

19    Q    At some point in time with this lawsuit being

20         filed, did you have a chance to speak with

21         anyone from his office about this lawsuit?

22    A    Not Mr. Garabedian.  I believe there was

23         somebody else in attendance pretty much every

24         time that I spoke with Mitchell.

25    Q    My question was a little bit different.
```

Kurtis N. Poulos

```
 1            You've already told us that you didn't speak

 2            with Mitchell in person or in Zoom, and all of

 3            the discussions that you had with Mitchell

 4            after this lawsuit was filed you have told us

 5            in your own words what they pertained to.

 6                But have you had any discussions where

 7            Mitchell Garabedian was not present with

 8            anyone from his law firm pertaining to this

 9            case?

10      A     No.

11                    MS. DOUGHERTY:  Objection.

12                    THE WITNESS:  I don't believe so.

13                    MS. DOUGHERTY:  Were you able to

14            hear my objection?

15                    REPORTER:  (Nodding affirmatively)

16                    MS. DOUGHERTY:  I just want to make

17            sure.  Thank you.

18            BY MR. JUBB:

19      Q     After this lawsuit was filed, Mr. Garabedian

20            had some discussions with you, am I correct,

21            and at that point in time he and you went over

22            some of your criminal background?

23      A     We had already established that in the past.

24      Q     When you say "we had already established

25            that," are you referring to my previous
```

```
 1              discussions with you or that you and

 2              Mr. Garabedian had already established that?

 3     A       Mr. Garabedian.

 4     Q       At any point in time after you sued my client,

 5              were you encouraged to contact the police?

 6     A       No.

 7     Q       At any point in time -- Strike that.

 8                  I understand your testimony to mean that

 9              at no point in time after this lawsuit was

10              filed did anyone, including Mr. Garabedian or

11              any members of his office, ever encourage you

12              to contact the police.  Is that fair?

13     A       Not to my recollection, no.

14     Q       And did you -- Strike that.

15                  Do you have a recollection yourself of

16              ever contacting the police?

17     A       Yes.

18     Q       And tell me everything about that, please.

19     A       I reached out to the local authorities around

20              the high school and tried to see what, if

21              any -- if they wanted me to make a statement,

22              if that would be necessary, and they basically

23              said no because of statute of limitations.

24     Q       Did Mr. Garabedian ever send anyone from

25              Wisconsin to come speak to you, from Wisconsin
```

Kurtis N. Poulos

```
1            police, about this?

2    A    No.

3    Q    And when you contacted -- Strike that.

4            Am I correct to understand your testimony

5        to be that you contacted the Pottstown Police

6        Department?

7    A    I believe it was the Pottstown Police

8        Department.

9    Q    And am I correct this is the first time you

10        contacted the Pottstown Police Department?

11    A    I believe so, yes.

12    Q    In other words, the first time you contacted

13        the Pottstown police with any allegation that

14        you were sexually abused by someone when you

15        were in high school was after you were sued as

16        a defendant in this case.  Is that correct?

17    A    No.  You totally misunderstood what I said.  I

18        did it before the lawsuit to find out if there

19        was anything that I could say to put on record

20        if it would matter, and he said "No."

21            I did not name names when I spoke to the

22        Pottstown Police Department.  I stated I was a

23        student.  I didn't give them -- I don't

24        believe I gave them my full name -- and asked,

25        you know, if there is anything I should do to
```

```
 1              get something on the record, and he said, "No,

 2              not at this time."

 3       Q      So then tell me when approximately this

 4              occurred with respect to the Pottstown Police

 5              Department then.

 6       A      I believe it was either shortly before I moved

 7              from Connecticut in 2018 or shortly after I

 8              moved back to Milwaukee in March of 2018.

 9       Q      And tell me how you ended up contacting them.

10              Was this by phone?

11       A      Correct.

12       Q      Who did you speak with?

13       A      I don't remember.

14       Q      Was it a male or a female?

15       A      Like I said, it -- I believe it was a male,

16              and it was very informal.  It was just sort of

17              dipping my toe in the water to find out

18              what -- if there is anything I need to do as a

19              victim even though it's 20-plus years later.

20       Q      And what were you told?

21       A      That at this time there was nothing -- there

22              was no reason for them to take a statement.

23       Q      And ultimately then after you were sued in

24              this case, at any point in time did you

25              contact the Pottstown Police Department?
```

Kurtis N. Poulos

```
 1     A     I don't believe so.

 2     Q     Is there anything that comes to mind that

 3           causes you to qualify your answer as "I don't

 4           believe so" as opposed to "No"?

 5     A     Okay.  No.  But I can't defin -- I don't

 6           remember every single phone call I've made

 7           over the last three years.  I'm sorry.  But I

 8           don't think I did, so I'm going to say no.

 9     Q     I certainly don't want you, nor did I ask you

10           if you recall every single phone call you

11           made.

12                 So after you were named as a defendant in

13           a lawsuit accusing you of what you're being

14           accused of, did you contact any investigating

15           authority such as police or DA or anybody like

16           that?

17                       MS. DOUGHERTY:  Objection.  At this

18           point I think you're past the scope of the

19           order that says Mr. Poulos shall appear for a

20           continuation of his deposition to answer

21           questions from Plaintiff's counsel limited to

22           the area of his discussions and communications

23           with Defendant Garabedian.

24                 Unless I misheard, I think that

25           Mr. Poulos has indicated he didn't have
```

```
 1              discussions about this with Mr. Garabedian, so
 2              that's my objection.
 3                       MR. JUBB:  Okay.  And I'll just move
 4              all that together then.
 5              BY MR. JUBB:
 6    Q    Mr. Poulos, I take that to mean that to the
 7              extent there is any reference in
 8              Mr. Garabedian's notes of you having a
 9              discussion with the police department after
10              you were sued in this lawsuit, those would be
11              incorrect.  Is that fair?
12    A    To the best of my knowledge, yes.
13    Q    At any point in time, did you ever tell
14              Mr. Garabedian that you were speaking with the
15              Pottstown Police Department?
16    A    I believe prior to this lawsuit, yes.
17    Q    And what did you tell him about that?
18    A    That I was going to reach out and speak with
19              somebody and see if there was anything I
20              needed to put on record.  Like I said, it was
21              more of a fact-finding mission than anything
22              else.
23    Q    At any point in time -- Strike that.
24              What do you recall being told from the
25              police -- Strike that.
```

Kurtis N. Poulos

```
 1              Did you tell the police that you had a
 2         civil suit ongoing?
 3              MS. DOUGHERTY:  Objection, the same
 4         as my prior objection about the scope of the
 5         deposition.
 6              THE WITNESS:  No.
 7    BY MR. JUBB:
 8    Q    When did your discussions with Mr. Garabedian
 9         about the legal issues in this case stop?
10    A    About this case?  At least a year ago.
11         Probably a year and a half ago when I realized
12         I was not going to be represented by him.
13    Q    When had your discussions with Mr. Garabedian
14         stopped?
15    A    Again, about a year and a half ago.
16    Q    I'm going to show you what was produced to us
17         by Mr. Garabedian as Garabedian File 57.
18         We're going to mark this as Poulos 5.
19              I'm showing you what's been marked as
20         Garabedian File 57.  It appears to be an
21         e-mail from Mr. Garabedian to Mr. Nathan Gaul,
22         forwarding an e-mail from your mom.
23              First off, do you know who Mr. Gaul is?
24    A    I believe he's legal representation for The
25         Hill School.
```

```
 1     Q    To your knowledge, do you believe you've ever

 2          had any conversations with Mr. Gaul?

 3     A    I don't believe so.

 4     Q    Would it refresh your recollection in any way

 5          if I were to tell you that he is affiliated

 6          with Mr. Garabedian's law firm?  Does that

 7          refresh your recollection as to whether or not

 8          you may have spoken with him?

 9     A    No.

10     Q    In this e-mail from your mom to

11          Mr. Garabedian -- First of all, have you ever

12          seen this e-mail before?

13     A    No.

14     Q    Would you take the time to just review this

15          quickly, and then let me know when you're

16          finished, please.

17               MS. DOUGHERTY:  Could you tell me

18          the Bates label again?  I know you said it but

19          I lost it.

20               MR. JUBB:   Sure.  It's Garabedian

21          File 57.

22               THE WITNESS:  Okay.  What am I

23          supposed to do with this?  I didn't write

24          this.

25          BY MR. JUBB:
```

Kurtis N. Poulos

```
 1      Q      My question was just to review it.  Now, in

 2             here your mom wrote to Mr. Garabedian --

 3             Strike that.  Let me back up.

 4                 Did you give your mother permission to

 5             communicate with Mr. Garabedian on your behalf

 6             with respect to the underlying issues as well

 7             as this lawsuit?

 8                      MS. DOUGHERTY:  Objection.

 9                      THE WITNESS:  Did I give my

10             73-year-old mother permission to do something?

11             I don't need to.  She's her own person.  She

12             can do whatever she wants.

13      BY MR. JUBB:

14      Q      Well, some might tell their mother not to

15             interfere in certain things.  At any point in

16             time did you tell your mom not to e-mail your

17             lawyers?

18                      MS. DOUGHERTY:  Objection.  My prior

19             objection regarding scope.

20                      THE WITNESS:  I am not going to try

21             to dictate to her what she can and cannot do.

22      BY MR. JUBB:

23      Q      All right.  So in this e-mail -- I'm just

24             going to lay some foundation and then ask you

25             a question about it.
```

```
 1              When she said, "In my last e-mail to you
 2         on 1/18 I expressed concern about your lack of
 3         communication about this matter.  This concern
 4         has been magnified by the mere passage of time
 5         and the unsettling request for money from
 6         Hill." Do you see where I read that correctly?
 7    A    Yes.
 8    Q    When she is referring to an "unsettling
 9         request for money from the Hill," did you have
10         an unsettling feeling about requesting money
11         from the Hill?
12              MS. DOUGHERTY:  Objection.
13              THE WITNESS:  I don't believe so.
14              MS. DOUGHERTY:  Mischaracterized the
15         e-mail.
16              THE WITNESS:  Yeah.  That's not what
17         she's saying there.  The school is requesting
18         money from us.  We received e-mails from the
19         school every few months requesting donations.
20         BY MR. JUBB:
21    Q    Forgive me.  I misspoke.  Was it unsettling to
22         you that you were receiving e-mails from The
23         Hill School that you considered to be requests
24         for donations?
25    A    At this point -- At that point I believe I
```

Kurtis N. Poulos

```
 1              blocked all communication from the alumni

 2              office in regards to monetary requests for a

 3              donation.

 4      Q    Mr. Poulos, do you recall anyone by the name

 5              of Leanne that you spoke with?

 6      A    From where?  I know a Leanne from high school.

 7      Q    No.  I'm happy to clarify.  At any point in

 8              time did you speak to -- Strike that.

 9                 It's my understanding from your testimony

10              that you did not speak with any investigating

11              authority, whether police, DA, et cetera,

12              after this lawsuit was filed.

13      A    No, I did not.

14      Q    My question would be at any point in time do

15              you recall speaking with someone by the name

16              of Leanne who was with the police or a DA or

17              anything like that?

18      A    No.

19      Q    Would I be correct in understanding your

20              testimony to be that other than the instance

21              in 2008, at no point in time were you directed

22              by Mr. Garabedian to contact the police --

23              Strike that.  Let me back up.

24                 At no point in time did Mr. Garabedian

25              ever tell you to contact the police.  Is that
```

```
 1            correct?

 2     A      I don't believe so.  And you said "2008," by

 3            the way.

 4                  MS. DOUGHERTY:  Mr. Poulos, I think

 5            he struck his question.

 6            BY MR. JUBB:

 7     Q      Focus on just being responsive to the

 8            question.

 9               So my question to you was, am I correct

10            in that at no point in time did Mr. Garabedian

11            ever direct you, instruct you or tell you to

12            contact the police?

13     A      Not to my recollection.

14     Q      Am I correct in understanding your testimony

15            that at no point did Mr. Garabedian instruct,

16            suggest or tell you to contact any sort of

17            district attorney?

18                  MS. DOUGHERTY:  Objection.

19                  THE WITNESS:  Not to my

20            recollection.

21            BY MR. JUBB:

22     Q      And I would imagine the basis for that is you

23            have no recollection of speaking with any sort

24            of DA after knowing Mr. Garabedian.  Is that

25            fair?
```

```
 1    A    I have never spoken to a DA.

 2    Q    Now, I will ask it just as broad as I can

 3         possibly be just to cross the T and dot this

 4         I.

 5              Following your introduction to

 6         Mr. Garabedian, do you have any recollection

 7         of speaking with any sort of investigative

 8         authority, police, district attorney's office,

 9         FBI, AG, any investigative authority, any

10         recollections at all?

11              MS. DOUGHERTY:  Objection.

12              THE WITNESS:  As stated before, yes,

13         I spoke to somebody in the Pottstown Police

14         Department, but that was prior to this court

15         case.

16         BY MR. JUBB:

17    Q    Listen to my question.  You met -- You first

18         spoke with Mr. Garabedian in 2017, correct?

19    A    Yes.

20    Q    Now, in 2018 when you spoke to the Pottstown

21         Police Department, your testimony is that

22         Mr. Garabedian did not instruct you to do

23         that, correct?

24    A    Correct.

25    Q    All right.  Now, at any point in time --
```

```
 1              Strike that.

 2                   Other than the Pottstown Police

 3              Department, is there any other investigative

 4              authority that you spoke with?

 5     A   No.

 6     Q   And have you told me everything you can about

 7              your discussions with the police department?

 8     A   Yes.

 9     Q   At any point in time did you tell

10              Mr. Garabedian that they did not want to get

11              involved because there was a civil lawsuit?

12     A   Rephrase that.  You keep saying "they" and

13              "he" and --

14     Q   At any point in time did you, Kurtis Poulos,

15              tell he, Mitchell Garabedian, that they, the

16              Pottstown Police Department, did not want to

17              investigate the case because of a civil

18              lawsuit?

19                   MS. DOUGHERTY:  Objection.

20                   THE WITNESS:  Not to my knowledge.

21     BY MR. JUBB:

22     Q   Did you tell Mr. Garabedian that you were

23              presently in therapy at the time you spoke

24              with him?

25                   MS. DOUGHERTY:  Objection.  When are
```

Kurtis N. Poulos

```
 1            you talking about?
 2                      THE WITNESS:  Yeah.  I mean, you
 3            keep throwing out these dangling modifiers.
 4            Be more specific, because I haven't been in
 5            therapy for a couple of years.  So there would
 6            be a period of time when I would have spoken
 7            to him and been in therapy.
 8                      MS. DOUGHERTY:  My objection, Lane,
 9            is just for clarification on, like, the date
10            that you were talking about when he had the
11            communication with Mr. Garabedian.
12                      MR. JUBB:  And Candy, just to be
13            clear to you, I completely understand that
14            we're on day five of this, and I am relating
15            this to conversations for -- I have a basis to
16            ask these questions.  I'm trying not to
17            constantly go through Mr. Garabedian's notes,
18            so I'm happy to pull them up to orient the
19            witness to this, to clarify that.
20            BY MR. JUBB:
21       Q    So with that as the background, Mr. Poulos,
22            after this lawsuit was filed -- Strike that.
23                 Mr. Poulos, at the time this lawsuit was
24            filed, were you in therapy?
25                      MS. DOUGHERTY:  Objection, scope.
```

Kurtis N. Poulos

```
 1                    THE WITNESS:  I don't think so.

 2                    MR. JUBB:  We're going to mark this

 3          as Poulos 6.  It's Garabedian File 3.

 4          BY MR. JUBB:

 5      Q   Mr. Poulos, I'm showing you what has

 6          previously been produced to me as Garabedian

 7          File 3.  At the top it has a date of 5/15/19,

 8          which I'll represent to you is about a month

 9          after this lawsuit was filed.  Excuse me.  A

10          little less than -- I guess a little more than

11          a month after this lawsuit was filed.

12              At the top it says, "PC Kirk Poulos," and

13          then down here it says "MG: In therapy.  KP:

14          Yes, in therapy."  Do you have any idea what

15          that is referring to?

16      A   I didn't -- I don't believe I saw my therapist

17          in May of 2019.  I was doing group therapy

18          online anonymously but not -- It was more of a

19          group therapy, exactly like you would talk

20          about PTSS.

21      Q   What program is that?

22      A   Excuse me?

23      Q   What program is that?  Does it have a name?

24      A   No, it does not.

25                    MS. DOUGHERTY:  Objection, scope.
```

```
 1          BY MR. JUBB:

 2     Q    Well, when you talked to Mr. Garabedian, did

 3          you explain to him what type of therapy you

 4          were in?

 5     A    No.

 6     Q    Well, how long were you in this therapy?

 7               MS. DOUGHERTY:  Objection, scope.

 8               THE WITNESS:  I probably went

 9          through six or seven group sessions.  It was

10          an online chat forum.

11          BY MR. JUBB:

12     Q    Look a little lower at this "MG" -- I can't

13          read everything, but it looks like it says,

14          "Will give you AG number.  KP: I called

15          them - AG.  They, AG, said we'll get back to

16          KP in 48 hours."  Do you see that?  I'll zoom

17          in.

18     A    Yeah, I see it.

19     Q    All right.  Does that refresh your

20          recollection at all as to --

21     A    No.

22     Q    -- whether or not you contacted an AG's

23          office?

24               MS. DOUGHERTY:  Objection.

25               REPORTER:  Repeat your answer,
```

Kurtis N. Poulos

```
 1          please.
 2                    THE WITNESS:  No.
 3          BY MR. JUBB:
 4     Q    Do you know -- Strike that.
 5              Do you have any basis or understanding as
 6          to how Mr. Garabedian got the impression that
 7          you had contacted the AG's office?
 8                    MS. DOUGHERTY:  Objection.
 9                    THE WITNESS:  No.
10                    MR. JUBB:  I'm going to show you
11          what has previously been produced as
12          Garabedian e-mail 108.  This is going to be
13          Poulos 7.
14          BY MR. JUBB:
15     Q    Mr. Poulos, this appears to be an e-mail from
16          you to Mr. Garabedian.  5/6/20 it was sent,
17          and for the record it's Garabedian 108.  And
18          in this e-mail it says, "Subject:  May 12th
19          call.  Time is of the essence.  Please respond
20          by tomorrow on May 7th before the end of the
21          day.  I need to know if you're going to
22          represent me, Kurt Poulos."
23              Do you recall sending this?
24     A    Yes.
25     Q    And did you ever have a chance to speak with
```

```
 1            him after this e-mail?
 2    A    If I did, it was very brief and I was told
 3            that I was not going to be represented by him.
 4    Q    What else do you recall about that
 5            conversation?
 6    A    That I needed to procure my own attorney, my
 7            own representation.
 8    Q    What else?
 9    A    That because he was a co-defendant, it
10            wouldn't be possible for him to represent me.
11    Q    Is this the first time as of May 6th, 2020,
12            that you were told by Mr. Garabedian that he
13            would not be able to represent you since he
14            was a co-defendant?
15                    MS. DOUGHERTY:  Objection.
16                    THE WITNESS:  I don't remember if he
17            had told me before.
18            BY MR. JUBB:
19    Q    To the best of your recollection, when was the
20            first time Mr. Garabedian told you that he
21            would not be able to represent you?
22                    MS. DOUGHERTY:  Objection.
23                    THE WITNESS:  Shortly after this
24            whole thing started.
25                    MR. JUBB:  I'm going to show you
```

Kurtis N. Poulos

```
 1              what's been marked as Garabedian e-mail 69.
 2              This is going to be Poulos 8.
 3              BY MR. JUBB:
 4    Q    Mr. Poulos, I'm showing you what's previously
 5         been produced as Garabedian e-mail 69.  We've
 6         marked it in your deposition as Poulos 8.
 7              This is an e-mail from you to
 8         Mr. Garabedian, 5/9/19.  It says, "They called
 9         finally."  And you say, "As of now, they're
10         unwilling to take a statement at the Pottstown
11         police station."  Do you see that?
12    A    Yes.
13    Q    All right.  What did you mean by "They called
14         finally"?
15    A    Like I said in the past, I had left messages,
16         and somebody else finally called me back --
17         not the original person that I spoke to --
18         prior to this investigation or this lawsuit.
19    Q    I thought you said you called in 2018.  Wasn't
20         that your testimony?
21    A    I did.
22    Q    And no one got back to you for a year?
23              MS. DOUGHERTY:  Objection.  He
24         wasn't done with his answer.
25              MR. JUBB:  Ms. Zimmermann, would you
```

```
 1          mind repeating my question and whatever answer

 2          you were able to pick up?

 3          (Reporter read previous question and answer.)

 4          BY MR. JUBB:

 5     Q    I didn't hear anything after that either.  So

 6          Mr. Poulos, would you like to expand on that

 7          answer?

 8               MS. DOUGHERTY:  He was definitely

 9          still talking.  I couldn't understand what the

10          words were.

11               THE WITNESS:  Like I was saying --

12          (Zoom crosstalk)

13               MS. DOUGHERTY:  I couldn't

14          understand the words because you were talking

15          over him.

16          BY MR. JUBB:

17     Q    Mr. Poulos, could you please continue your

18          answer to the extent that you have additional

19          information.

20     A    I had called in 2018.  I had left messages

21          with a couple of people I believe on different

22          occasions.  Only once did I speak to somebody,

23          and only once did somebody return my phone

24          call.  And yes, it was probably a year later.

25     Q    So 2018 you're saying that you called the
```

```
 1           Pottstown police station on multiple

 2           occasions, correct?

 3                    MS. DOUGHERTY:  Objection, scope.

 4           BY MR. JUBB:

 5     Q     Mr. Poulos?

 6     A     Correct.

 7     Q     Okay.  And in doing that, I understand your

 8           testimony to be that you were leaving a bunch

 9           of different messages.  Is that right?

10     A     I was leaving messages with multiple people.

11     Q     And when you were leaving messages with

12           multiple people, these were voicemails, right?

13     A     Correct.

14                    MS. DOUGHERTY:  Objection, scope.

15           BY MR. JUBB:

16     Q     And when you were -- Strike that.

17               Am I correct to understand your

18           testimony, at least as to what you're

19           referring to Mr. Garabedian here, "They

20           finally called" to be in reference to somebody

21           returning your call from 2018?

22                    THE WITNESS:  Clipper, go in bed.

23           (Referring to pet)

24     A     Yes.

25     Q     In other words, the impression that you wanted
```

```
 1              to give to Mr. Garabedian was that the

 2              Pottstown Police Department had not contacted

 3              you back after your voicemails to them

 4              discussing allegations of sexual abuse for

 5              almost a year.  Is that right?

 6      A      Yes.

 7                      MS. DOUGHERTY:  Objection.

 8                      MR. JUBB:  Ms. Zimmermann, did you

 9              get the "Yes"?

10                      REPORTER:  Yes, I did.

11              BY MR. JUBB:

12      Q      Mr. Poulos, I'm going to show you what I'm

13              going to be marking as Poulos 9.

14      A      Sure.

15      Q      Poulos 9 is the Cross Complaint that you filed

16              against Mr. Garabedian.  You've seen this

17              before, right?

18      A      Correct.

19      Q      And the pro se litigant at the bottom, it

20              spans five pages, that's your signature,

21              correct?

22      A      Correct.

23      Q      And it says "Dated this 21st day of December,

24              2020," correct?

25      A      Correct.
```

```
 1    Q    Now, in your -- in here in paragraph -- Strike
 2         that.
 3              When you signed this, you had an
 4         understanding that these were going to be
 5         affirmative facts to the court and you would
 6         want them to be as truthful and honest as
 7         possible, correct?
 8    A    Correct.
 9    Q    In paragraph number three you write, "For
10         approximately 20 years he told no one about
11         this abuse."  Do you see that?
12    A    Yes.
13    Q    Now, at the time that you're alleging the
14         abuse occurred, you were a sophomore in high
15         school, right?
16    A    Correct.
17    Q    And for purposes of your Cross Complaint
18         against Mr. Garabedian, you suggested in here
19         to the court that for approximately 20 years
20         you told no one about this abuse.  How old
21         were you when you were a sophomore?
22              MS. DOUGHERTY:  Objection, scope.
23              THE WITNESS:  I was 15 at the
24         beginning of the year and 16 at the end of the
25         year.
```

```
 1              BY MR. JUBB:

 2      Q       How am I supposed to understand for purposes

 3              of your Cross Complaint against Mr. Garabedian

 4              if it was approximately 20 years as in, like,

 5              18 or 17 or if it's 21 or 22?  I mean, can you

 6              do a better job of telling us how long it was

 7              until you told someone about this?

 8                      MS. DOUGHERTY:  Objection, scope.

 9                      THE WITNESS:  Over 20 years.

10              Yeah, it's okay.  I'm okay. (Referring to pet)

11              BY MR. JUBB:

12      Q       And then paragraph number four you wrote,

13              "When he did confide about the abuse and

14              resulting trauma, he never identified his

15              abuser."  Do you see that?

16      A       Correct.

17                      MS. DOUGHERTY:  Objection, scope.

18              BY MR. JUBB:

19      Q       Is it your testimony that the first time that

20              you identified by name the person who you have

21              alleged to have abused you was to Mitchell

22              Garabedian?

23      A       No.

24      Q       So in this, "When he did confide about the

25              abuse and resulting trauma he never identified
```

```
 1            the abuser," can you explain to me the

 2            discrepancy there?

 3                    MS. DOUGHERTY:  Objection, scope.

 4                    THE WITNESS:  As I've explained in

 5            the past to you, I didn't need to tell my

 6            mother.  She figured it out.

 7            BY MR. JUBB:

 8       Q    Did you tell Mr. Garabedian that your mom knew

 9            the name of the alleged abuser?

10       A    I believe so, yes.

11       Q    In paragraph 16 for your Cross Complaint

12            against Mr. Garabedian you wrote, "These very

13            explicit letters which detailed the facts of

14            the abuse and identify the abuser were never

15            discussed with or approved by client Poulos,

16            and in fact had not even been seen before the

17            receipt of the Complaint."  You wrote that

18            correct?

19       A    Correct.

20                    MS. DOUGHERTY:  Objection, scope.

21            BY MR. JUBB:

22       Q    And am I correct to understand the relevance

23            of this paragraph in your Cross Complaint to

24            mean that at no point in time did you believe

25            that Mr. Garabedian was going to be sending
```

```
 1            these letters to the school?

 2   A    The only thing I would have figured -- and

 3        again, this may be my naivet? about how

 4        lawyers practice law -- is that he would have

 5        told me prior the specifics of the letter.  I

 6        knew that he was going to send a letter.  I

 7        didn't know how specific it was going to be.

 8   Q    So you actually knew that Mr. Garabedian was

 9        going to send a letter to The Hill School

10        asking for a million dollars.  Is that right?

11   A    No, I did not.

12                MS. DOUGHERTY:  Objection.

13                THE WITNESS:  And as I stated in

14        your previous question, I did not know the

15        specifics of the letter.  I knew that he was

16        going to write a letter.

17        BY MR. JUBB:

18   Q    Did he ever give you any indication as to what

19        was going to go in this letter that you

20        believe he was eventually going to write?

21                MS. DOUGHERTY:  Objection.

22                THE WITNESS:  That's been answered.

23        No.

24        BY MR. JUBB:

25   Q    Did he ever -- The first letter went out in
```

Kurtis N. Poulos

```
 1            April of 2018.  Did you even know it was sent?
 2    A       Only after the fact.
 3    Q       And when you say "after the fact," you're
 4            referring to after I sued you.  Is that
 5            correct?
 6    A       No, after I reached out to Mitchell and found
 7            out that he had written letters.  I knew he
 8            had called the school, but I didn't know the
 9            specifics of the conversations or the verbiage
10            of the letters.
11    Q       When do you believe the first time that you
12            learned of the verbiage of the letters was?
13    A       After he had sent the letters.
14    Q       Okay.  Well, that's been about three years
15            now.  So can we do anything better in terms of
16            approximating when the first time that you
17            learned that Mr. Garabedian sent the April
18            letter to The Hill School?
19    A       No, I cannot.
20    Q       In other words, between April -- I guess April
21            of 2018 and May of 2021, a little over
22            36 months, trying your hardest to determine
23            for us when you first learned about it, you
24            can't do anything better other than "after he
25            sent the letter."  Is that right?
```

Kurtis N. Poulos

```
1    A    Correct.

2              MS. DOUGHERTY:  Objection.

3         BY MR. JUBB:

4    Q    When he sent the December, 2018 letter, did

5         you know he sent that one?

6    A    After he sent it, but I did not know the

7         specific verbiage.

8    Q    Well, after you learned of the December, 2018

9         letter, do you think that you knew that he had

10        sent the April, 2018 letter by then?

11   A    No.

12   Q    Okay.  So would it be fair to say then that

13        you learned for the first time of the April

14        letter sometime after the December letter?  Is

15        that fair?

16   A    I believe so, yes.

17   Q    In April of 2019 -- April 3rd of 2019 when he

18        told you the school was giving him the

19        runaround, do you think you knew before

20        April 3, 2019, that the letters had been sent?

21   A    Yes.

22   Q    Okay.  So now we've got this smaller window of

23        sometime after the second letter and sometime

24        before April 3rd, 2019, you learned that these

25        letters were sent, correct?
```

```
 1    A    Correct.
 2    Q    When was the first time that you learned that
 3         Mitchell Garabedian had demanded a million
 4         dollars from the school?
 5    A    I don't recall.
 6    Q    Am I correct to understand that you never
 7         approved any demand for a million dollars to
 8         the school?
 9              MS. DOUGHERTY:  Objection.
10              THE WITNESS:  Correct.
11    BY MR. JUBB:
12    Q    Now, at some point you withdrew your Cross
13         Complaint against Mitchell Garabedian,
14         correct?
15    A    Yes.
16              MS. DOUGHERTY:  Objection, scope.
17    BY MR. JUBB:
18    Q    Can you tell us why you withdrew that
19         complaint against Mr. Garabedian.
20              MS. DOUGHERTY:  Objection, scope.
21              THE WITNESS:  It just didn't seem
22         worth going through this a whole other time.
23    BY MR. JUBB:
24    Q    Did anyone give you any sort of legal --
25         Strike that.
```

```
 1              Did you receive any legal advice --
 2         Strike that.
 3              Did you receive advice from anyone other
 4         than your own self to withdraw that?
 5                   MS. DOUGHERTY:  Objection.
 6                   THE WITNESS:  No.
 7         BY MR. JUBB:
 8    Q    At the time you spoke with Mr. Garabedian in
 9         the 2017 time frame that one time when you
10         were doing the intake or interview process, as
11         you called it, did you have an understanding
12         then as to where Mr. Ralston was employed?
13    A    To the best of my knowledge, he had lost his
14         job at Leelanau School.
15    Q    So when you say "he lost his job," did you
16         tell Mr. Garabedian that?
17                   MS. DOUGHERTY:  Objection.
18                   THE WITNESS:  I don't think so.
19         BY MR. JUBB:
20    Q    On what basis do you -- did you conclude that
21         he lost his job?
22    A    My mother had found out.
23    Q    So your mother actually did some investigating
24         herself.  Is that your understanding?
25    A    Like I said, she's her own person.  She can do
```

```
 1            whatever she wants.

 2     Q     So she told that you Mr. Ralston had lost his

 3            job at Leelanau.  Is that right?

 4     A     That he had resigned.

 5     Q     Is there a difference in your mind between

 6            resigning from a position and losing your job?

 7                    MS. DOUGHERTY:  Objection.

 8                    THE WITNESS:  Without being a smart

 9            ass about it, a lot of people in higher

10            positions will resign rather than have --

11            being terminated as the reason that they leave

12            a position, especially something like a

13            headmaster.

14            BY MR. JUBB:

15     Q     I see.  And so do you have any factual basis

16            whatsoever to support the position that he was

17            resigning because he was going to lose his

18            job?

19                    MS. DOUGHERTY:  Objection, scope.

20                    THE WITNESS:  No.

21            BY MR. JUBB:

22     Q     A few more and I think we can move on.

23            Mr. Poulos, I believe I know the answer to

24            this question, but I just have to ask it.  So

25            at any point in time -- Strike that.
```

Kurtis N. Poulos

```
 1                How many occasions, if any, have you had
 2        discussions with Ms. Dougherty or her partners
 3        at Swartz Campbell pertaining to this lawsuit?
 4    A   Possibly a handful.  Like I was told by the
 5        judge that I could feel free to reach out to
 6        you and Candidus both and find out what was --
 7        (Zoom crosstalk)
 8    Q   Can you tell me --
 9                MS. DOUGHERTY:  Objection.  He was
10        still answering.
11                REPORTER:  I'll repeat his answer.
12                THE WITNESS:  No.  Can I go on the
13        record at this point, because this is --
14        BY MR. JUBB:
15    Q   We were always on the record.  Answer the
16        question.  My phone did not get what you were
17        saying because you're farther away from the
18        phone than I guess is necessary.  But
19        Ms. Zimmermann --
20    A   Is that better?
21    Q   -- please repeat his answer, then Mr. Poulos,
22        please continue your answer.  Then if there is
23        anything you'd like to say afterwards, feel
24        free.
25                MS. DOUGHERTY:  Objection.  Move to
```

```
 1          strike.

 2          (Reporter read previous answer.)

 3          BY MR. JUBB:

 4    Q     Anything you'd like to add?

 5    A     No.

 6    Q     Okay.  Is there anything you'd like to say?

 7    A     I would appreciate it if you would let me

 8          finish my answers.

 9    Q     That's what I just asked.  Is there anything

10          you'd like to add to your answer?

11    A     No.  I just -- I told you I finished my

12          answer.  But from now on, please stop

13          interrupting me while I'm answering.

14    Q     Mr. Poulos, talking about those handful of

15          times, could you please explain to us what you

16          can recall about those discussions, please.

17    A     Little to nothing.  They were less than five

18          minute conversations, just finding out where

19          we were in regards to certain aspects of these

20          depositions and what I should have prepared,

21          if anything, that I could recall.

22    Q     Have you finished your answer?

23    A     Yes.

24    Q     And what were the things that you were told to

25          prepare for?
```

```
 1                      MS. DOUGHERTY:  Objection.
 2                      THE WITNESS:  I don't recall.  Just
 3           to be prepared.
 4           BY MR. JUBB:
 5     Q     There was no further guidance other than "be
 6           prepared"?
 7     A     Correct.
 8     Q     They never said, "Be prepared to be questioned
 9           about certain things"?
10                      MS. DOUGHERTY:  Objection.
11                      THE WITNESS:  No.
12           BY MR. JUBB:
13     Q     What was your response when they said "Be
14           prepared"?
15                      MS. DOUGHERTY:  Objection.
16                      THE WITNESS:  That I would do my
17           best to recall the activities of my
18           interaction with Mitchell and my interaction
19           with the plaintiff.
20           BY MR. JUBB:
21     Q     Have you ever provided them with any documents
22           at all?
23     A     No.
24     Q     Do you know whether or not your mother has had
25           any subsequent conversations with
```

```
 1             Mr. Garabedian?

 2   A    I do not.

 3   Q    At any point in time did you tell

 4        Mr. Garabedian that you didn't want him having

 5        conversations with your mom or taking

 6        instruction from your mom?

 7   A    No.

 8   Q    At any point in time did you ever relay to

 9        Mr. Garabedian that your mom was a lawyer and

10        that she represented you?

11   A    No, because she doesn't represent me.

12   Q    She never represented you, correct?

13   A    Correct.  She hasn't had her law license in

14        years.

15             MR. JUBB:  Okay.  That's all I have.

16        Ms. Dougherty will probably have some for you.

17        And then if there is any follow-up, I might

18        have some questions, but otherwise I'm done.

19        EXAMINATION BY MS. DOUGHERTY:

20   Q    Mr. Poulos, have you ever spoken to my

21        partner, Jeff McCarron?

22   A    Perhaps.  I'm not good with names.  I'm sorry.

23        I should probably be keeping notes.

24   Q    Have you spoken to a man that's with my law

25        firm ever?
```

Kurtis N. Poulos

```
 1    A    Not to my recollection.

 2    Q    The first time you spoke to me on the

 3         telephone, just me and you, was after your

 4         deposition ended before the last session when

 5         the court ordered you to come back.  Is that

 6         right?

 7    A    Correct.  You called me and told me to get

 8         back on the computer.

 9    Q    Okay.  So -- You mean during your deposition?

10    A    Yeah.  I shut the computer, and you called me

11         and told me to get back on.

12    Q    And then so other than that telephone

13         communication to get back on during the -- get

14         back on the video during your deposition, you

15         and I hadn't spoken on the phone before that.

16         Is that correct?

17    A    Correct.  I think the only time I spoke to you

18         prior to that -- No, it was after.  I spoke to

19         you --

20    Q    With Mr. Jubb, correct?

21    A    Yes.

22    Q    With the Court?

23    A    Yes.

24    Q    Just trying to confirm that -- I'm not sure

25         you exactly said it, but I just want to make
```

```
 1            sure that your testimony is not that you

 2            talked to me before your deposition testimony

 3            and I told you to be prepared.

 4     A      I didn't know your name before the deposition,

 5            so why -- you know, I wouldn't have called

 6            you.

 7     Q      Just to confirm, when you contacted the

 8            Pottstown Police Department, you didn't tell

 9            the police Mr. Ralston's name or the school's

10            name.  Is that right?

11     A      Correct.

12     Q      Is it correct that you knew that

13            Mr. Garabedian was going to write to the

14            school and ask for money, you just didn't know

15            that it was going to be a million dollars?

16     A      Correct.

17                    MR. JUBB:  Objection to the form.

18            BY MS. DOUGHERTY:

19     Q      I think you covered this at length during a

20            prior day, but you wanted to recover your

21            tuition and get counseling paid for, stuff

22            like that.  You had things in mind that you

23            wanted monetary -- you wanted money from the

24            school to cover it.  Is that correct?

25     A      Correct.
```

Kurtis N. Poulos

```
 1                    MR. JUBB:  Same objection.

 2           BY MS. DOUGHERTY:

 3      Q    Keep going.

 4      A    As I stated before, my initial response to

 5           this was I don't want to gain financially, I

 6           just want that piece of my life back and the

 7           ability to go and get treatment for what

 8           happened.  And if -- That's it.

 9      Q    And you left it to Mr. Garabedian to decide

10           how to go about achieving your objective.  Is

11           that right?

12      A    Correct.

13                    MR. JUBB:  Same objection.

14           BY MS. DOUGHERTY:

15      Q    Did you ask Mr. -- I think you said that you

16           did learn sometime after the second letter

17           that two letters went to the school.  Did you

18           ask Mr. Garabedian for copies of the letters?

19      A    I don't believe so.

20      Q    Is there a reason why you didn't ask for

21           copies of the letters?

22      A    At the end of 2017, early 2018 I was in the

23           process of not only finding a new job, finding

24           a new house to live in a different city, this

25           was -- As much as it is important in my life,
```

Kurtis N. Poulos

```
1          it wasn't taking precedence over what was
2          going to be an immediate need for me and my
3          current girlfriend -- or my previous
4          girlfriend, I should say.
5     Q    Did you give Mr. Garabedian permission to
6          speak with your mother about your case?
7     A    Possibly.  I said if she called that he's more
8          than able or -- you know, she's more than able
9          to receive any knowledge that I would receive.
10         Kind of like if I was in the hospital, I
11         wouldn't hide something that my doctor told me
12         from my mother, so she would sort of just have
13         to be in the room regardless.
14    Q    So it doesn't surprise you to see e-mails from
15         your mother to Mr. Garabedian or from
16         Mr. Garabedian to your mother about your case.
17         Is that right?
18    A    No, not at all.
19    Q    I'm just going to show you what was marked
20         earlier today as Poulos 4.  It's Garabedian
21         File 24.
22             Counsel asked you about the first line.
23         I want you to focus in where it says, "MG
24         tells client that we should wait to see if SOL
25         changes."
```

Kurtis N. Poulos

```
 1                    Do you remember having discussion or

 2            Mr. Garabedian telling you something like "We

 3            should wait to see if SOL changes"?

 4     A      Correct.  The statute of limitations in New

 5            York, I believe, and other surrounding states

 6            had changed to allow for victims after a

 7            certain amount of time to sort of be

 8            grandfathered in and not have to report these

 9            things within a certain time period.

10     Q      So was it the situation that -- Let me look

11            here.  Let's see.  What's the date of these

12            notes?

13                    So it looks like these notes are April 3,

14            2019.  At least that's what whoever took the

15            notes wrote.  In April, 2019 were you

16            considering legal action against Mr. Ralston

17            if the statue of limitations changed?

18            (Zoom crosstalk)

19                        MR. JUBB:  Objection.

20            BY MS. DOUGHERTY:

21     Q      I'm sorry?

22     A      Could you repeat the question?

23     Q      Sure.  In April were you planning to take

24            legal action against Mr. Ralston if the

25            statute of limitations of Pennsylvania
```

Kurtis N. Poulos

```
1              changed?

2    A    I hadn't gotten to that point.  There was no

3         point in thinking about something that has an

4         undetermined date.  It was going to be a

5         threshold that if I reached it and there was

6         an opportunity, then I had to contemplate if

7         it's worth the time and mental energy to deal

8         with.

9    Q    So when you were seeing Mr. Garabedian in

10        2017, you and he had a discussion about the

11        statute of limitations and whether it had

12        passed as to a claim against Mr. Ralston.  Is

13        that right?

14   A    Correct.

15   Q    And was it the case that you in 2017 decided

16        to wait to see if the statute of limitations

17        changed as to whether you then wanted to

18        pursue legal action against Mr. Ralston?

19   A    As far as criminal procedures, correct.

20   Q    What about civil?

21   A    I believe so, yes.

22   Q    You hadn't made a decision one way or another

23        because you were waiting to see what happened

24        in Pennsylvania as it relates to the statute

25        of limitations.  Is that right?
```

```
 1    A    Correct.

 2    Q    Is it fair that you were checking in with

 3         Mr. Garabedian regularly since you were seeing

 4         him in December of 2017 to learn about the

 5         status of the statute of limitations in

 6         Pennsylvania to see if you had the option of

 7         pursuing legal action against Mr. Ralston?

 8    A    It wasn't necessary.  (Zoom crosstalk)

 9                   MR. JUBB:  Objection.

10    BY MS. DOUGHERTY:

11    Q    "It wasn't necessary," did you say?

12    A    Correct.

13    Q    Why wasn't it necessary?

14    A    Because I was getting updates every few phone

15         calls from my mother saying, "This is where

16         this is at in this state," or "This is sort of

17         on hold in this state," so -- (Zoom

18         crosstalk) -- the focus of our conversations

19         for a period of time.  And then I told her,

20         "This can't be the only thing I focus on."

21    Q    So you and your mother were actively tracking

22         whether Pennsylvania changed or was planning

23         to change the statute of limitations as it

24         relates to claims for sexual abuse.  Is that

25         right?
```

```
 1                    MR. JUBB:  Objection.

 2                    THE WITNESS:  She was more than I

 3          was.

 4          BY MS. DOUGHERTY:

 5    Q     Then the third line in the note says, "Client

 6          says okay.  We'll see.  MG says we'll give it

 7          a year."  Do you remember that discussion with

 8          Mr. Garabedian?

 9    A     Roughly.  Like I said, most of my

10          conversations with him were very short.

11          Whether I was at work and, you know, this

12          isn't exactly something I wanted to speak

13          about out loud while I'm around my coworkers

14          so --

15    Q     Sure.  If I understand correctly, in April,

16          2019 there was nothing more that could be done

17          as it relates to a claim against the school or

18          against Mr. Ralston.  Is that correct?

19    A     Correct.

20    Q     Let's see Poulos 9.  So again I'm showing you

21          Poulos 9, which is the Cross Complaint.  I was

22          going to mark it as D12, but I'll just stick

23          with Poulos 9.

24                    I'm just directing your attention back to

25          paragraph 16 which is -- you were asked some
```

```
 1          questions about by Mr. Jubb.

 2               Is my understanding correct that

 3          paragraph 16 meant the first time you actually

 4          saw the letters or recollect seeing the

 5          letters was when you received the Complaint,

 6          not that you had no idea the letters had been

 7          sent.  Is that correct?

 8     A    I had not seen them.  I knew they had been

 9          sent.

10               MS. DOUGHERTY:  Actually, Lane, can

11          I ask you, did Poulos 9 have the exhibits that

12          were attached to the Cross Complaint?

13               MR. JUBB:  No.  And I don't have

14          those actually.

15               MS. DOUGHERTY:  They were sent to

16          both of us when they went to the Court.

17          That's how I got them.

18               MR. JUBB:  When they were sent to

19          the Court I looked -- I don't have those

20          attached exhibits and it's sealed right now.

21          Do you have them?

22               MS. DOUGHERTY:  I do.  And actually,

23          how about we do this?  I will mark a version

24          of the Cross Complaint as -- that has the

25          exhibits that, again, I received when we got
```

```
 1              the e-mail to the Court.  They weren't

 2              identified as exhibit numbers or anything.

 3              They were just attached as documents, so --

 4              Here, I'll just read -- I'll just mark this as

 5              D12 as I planned to.

 6                   So this is a copy of the Cross Complaint.

 7              And what I did is put the documents that were

 8              attached to the e-mail that went to the Court

 9              filed in the Cross Complaint, which were also

10              identified in the body of the Cross Complaint.

11              So I'm going to just -- The last exhibit --

12              I'll just do it this way.

13              BY MS. DOUGHERTY:

14    Q    So I'm back to the Cross Complaint, which I've

15              marked as Exhibit D12 with the attachments

16              that were sent to the Court.  I just want to

17              invite your attention to -- before we get to

18              the exhibit -- to paragraph 12 where it says,

19              "One of the attorneys was Mitchell Garabedian

20              with whom an attorney/client relationship was

21              established with Poulos on 12/18/2017."  And

22              then in parenthesis "Copy attached."

23                   And then I'm directing your attention,

24              Mr. Poulos, to what I've put as the very last

25              page of D12.  It says "Contingent Fee
```

```
 1              Agreement" at the top.  Is this what you were

 2              referring to by "Copy attached" in paragraph

 3              12 of the Cross Complaint?

 4     A        Yes.

 5     Q        And what is this page that's called Contingent

 6              Fee Agreement?

 7     A        It means he doesn't get paid unless there is a

 8              decision made in my favor.  That he takes it

 9              not pro bono, but if we lose, you know,

10              neither of us get anything.  Same as if I get

11              in a car accident and I pay for representation

12              of the person who hit me, they're going to

13              take it on contingency and then take a

14              percentage of whatever the court affords me.

15     Q        Okay.  So when -- Let's do this.  Is that your

16              signature there at the bottom --

17     A        Yes.

18     Q        -- of the Contingent Fee Agreement?  And it's

19              got a "12/15/2017" next to it?

20     A        Correct.

21     Q        So when you signed the Contingent Fee

22              Agreement, it was your understanding that

23              Mr. Garabedian was going to provide you legal

24              services?

25     A        Correct.
```

```
 1    Q    And it looks like, directing your attention up
 2         to the top again, under the point one, which
 3         is parens 1, there is a paragraph that starts
 4         with, "Injuries caused by Matthew Ralston."
 5              Is it correct as of December 15, 2017,
 6         you had told Mr. Garabedian that Matthew
 7         Ralston was the person who had abused you?
 8    A    Yes.
 9    Q    I'm directing your attention to number five,
10         it's in parens.  It says, "Client and lawyer
11         agree that a complaint or lawsuit will not be
12         filed in this matter because the statute of
13         limitations has run or expired."
14    A    Correct.
15    Q    So at the time when you signed the Contingent
16         Fee Agreement, you understood that
17         Mr. Garabedian was not going to file a lawsuit
18         for you because the statute of limitations had
19         run or expired.  Is that right?
20    A    Correct.
21    Q    Why were you retaining Mr. Garabedian if you
22         didn't -- if Mr. Garabedian wasn't going to
23         file a lawsuit for you?
24              MR. JUBB:  Note my objection.
25              THE WITNESS:  I retained legal
```

```
 1        counsel because if and when something changed

 2        out in Pennsylvania, it would be better to be

 3        prepared than not.

 4        BY MS. DOUGHERTY:

 5   Q    So is it correct that from December, 2017 you

 6        intended to file a lawsuit if the statute of

 7        limitations in Pennsylvania changed?

 8                 MR. JUBB:  Note my objection.

 9                 REPORTER:  I'm sorry.  Your answer?

10        Repeat your answer.

11                 THE WITNESS:  Yeah.  My intention

12        was to be prepared if that day were to come

13        that I could and I knew what actions could be

14        taken, and then I figured we would discuss how

15        to go about it.  As he stated multiple times,

16        some of these cases can take five or six

17        years.  It's not going to be a five-month

18        period.

19        BY MS. DOUGHERTY:

20   Q    The "he" is Mr. Garabedian?

21   A    Correct.  Sorry.

22   Q    No problem.  So Mr. Garabedian suggested to

23        you that it could take years for the statute

24        of limitations in Pennsylvania to be changed,

25        if ever.  Is that right?
```

Kurtis N. Poulos

```
 1    A    Correct.

 2    Q    So you've gone through some of your

 3         communications with Mr. Garabedian with

 4         Mr. Jubb, and there seems to be some extensive

 5         time between the communications -- months or I

 6         think in one case a year.

 7              Was it your expectation that you would

 8         have more contact with Mr. Garabedian while

 9         you were waiting to see if the statute of

10         limitations in Pennsylvania changed?

11              MR. JUBB:  Object to the form.

12              THE WITNESS:  To an extent I just --

13         I guess it's a matter of just checking in

14         and -- I don't know -- making sure that

15         somebody is still looking into this matter and

16         it hasn't -- And I, of course, am not

17         implicating that he would just be like, "Oh,

18         just put it in a drawer somewhere," but I

19         don't want it to be something that's just not

20         somewhere in somebody's mind, like, "This is

21         important."

22    Q    Did you ever -- Let me start again.

23              Just jumping back to the letters if we

24         could for a moment and I'll go back to the fee

25         agreement.
```

Kurtis N. Poulos

```
 1                    When you learned that Mr. Garabedian sent

 2            letters, did you have an understanding of to

 3            whom he sent the letters?

 4    A       No.

 5    Q       Did you know he sent them to some

 6            representative of the school?  Like, for

 7            example, as compared to Mr. Ralston?

 8    A       That would have been my assumption, that he

 9            would have reached out directly to the

10            school's legal counsel.

11    Q       So did you ever have an expectation that

12            Mr. Garabedian would contact Mr. Ralston as

13            compared to the school?

14    A       No.

15    Q       So was it your objective from 2017 when you

16            retained Mr. Garabedian to pursue relief from

17            the school?

18    A       Correct.

19                    MR. JUBB:  Note my objection.

20            BY MS. DOUGHERTY:

21    Q       Did you ever talk to Mr. Garabedian about

22            whether you could recover money from the

23            school even though you couldn't then file a

24            lawsuit?

25    A       Yes.
```

Kurtis N. Poulos

```
1     Q      What did you discuss with Mr. Garabedian about
2            whether you could recover money from the
3            school even though you could not file a
4            lawsuit?
5     A      He stated that the first route would be to
6            contact the school directly, and I would
7            believe that he meant contact the school
8            directly through their legal representation.
9     Q      What else did you discuss with Mr. Garabedian
10           about recovering money from the school even
11           though you could not then file a lawsuit
12           against the school?
13    A      I believe there was a discussion about whether
14           or not after -- say there was a judgment or
15           whatever -- I would be willing to go public
16           with the name of my abuser, and I said "Only
17           after there was a conclusion."
18    Q      Did Mr. Garabedian share with you any
19           experience that he had in recovering money
20           from schools where a lawsuit couldn't be
21           filed?
22    A      Not to my recollection.
23    Q      Did Mr. Garabedian ever explain to you why he
24           thought you could recover money from the
25           school even though at that moment you couldn't
```

Kurtis N. Poulos

```
 1              file a lawsuit?

 2    A    I don't remember the exact verbiage, but we

 3              did go over some options about reaching out to

 4              the school, addressing the fact that the

 5              school basically instigated this entire

 6              situation by sending out false representation

 7              letters asking for alumni to come forward,

 8              telling them to talk to their counselors.

 9    Q    So like the school had a moral obligation to

10              remedy the abuse you sustained?

11    A    That's what my belief was based on the

12              verbiage of the letter, until I found out that

13              the two names in -- I believe it was the

14              second letter from the school named people who

15              I later found out were attorneys and not

16              actual counselors.  I guess "counselor" is a

17              loose term, but I took that to mean

18              therapists.

19    Q    So you -- Did you discuss with Mr. Garabedian

20              pursuing money from the school because the

21              school had a moral obligation, even though you

22              could not then file a lawsuit against the

23              school?

24    A    Correct.

25    Q    I'm showing you a document which is a series
```

1          of e-mails that I've marked as D11.  It's

2          Bates labeled Garabedian_File 0066 through 71.

3          I'm just going to start on the last page.  I

4          want to scroll through it, Mr. Poulos.

5               And my question to you, if you can just

6          look as I'm scrolling, is going to be to

7          confirm whether these are the series of

8          e-mails that you had with your mother that you

9          described in your prior testimony after you

10         received the letter from The Hill School.

11              And then if you can see, we're back on

12         the first page where it looks like the chain

13         gets forwarded to Mr. Garabedian.

14              So just inviting your attention back to I

15         guess the first page to the second page -- We

16         can go in reverse order -- it looks like there

17         is an e-mail from the Headmaster Zachary

18         Lehman P'16' -- that's the second page of

19         D11 -- dated November 20, 2017, and there is

20         an e-mail indicating your e-mail address at

21         1:08 and then an e-mail from your mother,

22         "Please tell me what you think" at 3:00 p.m.

23         And then your mother again at 10:51, "Please

24         call tomorrow at your convenience, Mom."

25              Are those the e-mails between you and

```
1         your mother after you received the letter from

2         The Hill School that you described in your

3         prior testimony?

4    A    Correct.

5    Q    And on November 20th you were in the Central

6         Time Zone.  You were in Wisconsin.  Is that

7         right?

8    A    No.  I was in the Eastern Time Zone.  I was in

9         Connecticut.

10   Q    You were in Connecticut.  So you were in

11        Eastern and your mom was in Wisconsin.  Is

12        that right?

13   A    Correct.

14   Q    And then it looks like you sent that whole

15        chain with your mom to Mr. Garabedian.  Is

16        that right?

17   A    I believe that would have been -- Yeah.  I

18        don't remember if I sent it directly after or

19        if it was a forward of our conversation.

20   Q    If we just look back at D11, you can see that

21        there is the e-mails that we just talked about

22        on the second page between you and your mother

23        on November 20th, and then there is an e-mail

24        where there is no content.  It's blank.  But

25        the header reflects your mom, to you,
```

Kurtis N. Poulos

```
 1              December 5, 2017.
 2                   And then now squarely on the bottom of
 3              the first page there is an e-mail from you to
 4              Mr. Garabedian, December 13, 2017, that says
 5              "Thank you for your time and guidance through
 6              this," and it has those other e-mails that we
 7              looked through, right?
 8                   So it looks like a couple weeks later you
 9              forwarded the chain that you had with your
10              mother to Mr. Garabedian.  Is that right?
11        A     Yes.  That's what I believe.
12        Q     Then Mr. Garabedian responded and said, "Be
13              proud!" Is that right?
14        A     Correct.
15        Q     Was it your impression that -- Let me start
16              again.
17                   December 13, 2017, is after you had your
18              first intake interview with Mr. Garabedian.
19              Is that right?
20        A     Yes.
21        Q     And I realize you told us already that it was
22              over the phone.  Were there other people on
23              the telephone call with you and
24              Mr. Garabedian?
25        A     I believe there was somebody from Mitchell's
```

Kurtis N. Poulos

```
 1              office, but I was alone.  I had asked my
 2              girlfriend to leave the apartment while I
 3              speak to him directly.
 4    Q    So it was you and Mr. Garabedian and another
 5              lawyer from Mr. Garabedian's office.  Is that
 6              right?
 7    A    Another lawyer or legal aide.  I'm not sure if
 8              I remember exactly who.
 9    Q    Was it your impression that Mr. Garabedian
10              believed that you were telling him the truth
11              about the sexual abuse that you had sustained?
12    A    Yes.
13                   MR. JUBB:  I'll object to the form.
14         BY MS. DOUGHERTY:
15    Q    Did Mr. Garabedian say anything to you that
16              led you to believe he believed you, that you
17              had been sexually abused by Mr. Ralston?
18    A    Yes.  He asked for certain specifics if I
19              could remember them and how it's affected my
20              life throughout my relationships, my work
21              habits, my alcohol and drug abuse and any
22              other subsequent matters and how this has
23              affected my basic overall well-being.
24    Q    So Mr. Garabedian just didn't take your word
25              for it that you had been sexually abused by
```

Kurtis N. Poulos

```
 1             Mr. Ralston, he asked you questions, right?
 2     A     Correct.
 3                   MR. JUBB:  Objection.
 4                   THE WITNESS:  Correct.  I believe we
 5           were on the phone for a couple of hours.
 6           BY MS. DOUGHERTY:
 7     Q     It looks like -- We're back to D11.  It's the
 8           second e-mail on the first page.  It's from
 9           you to Mr. Garabedian December 15, 2017, 10:35
10           a.m.  In the -- Let's see here.  It's the
11           second line, so in the middle of paragraph it
12           says, "There were multiple sheets that had me
13           signing for release of medical records.  There
14           are no medical records, but I still signed
15           them.  Also, I didn't need to have this
16           notarized, did I?"
17                What were you talking about you were
18           "signing for release of medical records," if
19           you remember?
20     A     To the best of my recollection, I was
21           questioning if he was asking if there was
22           medical records pertaining to the abuse in
23           Pottstown.  I knew there was going to be other
24           medical records, but I knew there weren't
25           going to be -- The only medical record I have
```

Kurtis N. Poulos

```
 1        in Pottstown is when I broke my arm freshman
 2        year.
 3    Q   Did Mr. Garabedian want all of your medical
 4        records?
 5    A   Yes.
 6             MR. JUBB:  I'll object.
 7        BY MS. DOUGHERTY:
 8    Q   Did Mr. Garabedian ask you to sign releases
 9        for all of your medical records?
10    A   Yes.
11    Q   Did Mr. Garabedian tell you why he asked you
12        to sign releases for all of your medical
13        records?
14    A   Not specifically.
15    Q   Did you ask?
16    A   Not to my recollection.
17    Q   So as of at least December 15, 2017,
18        Mr. Garabedian had asked you to provide
19        releases so that he could obtain all of your
20        medical records.  Is that correct?
21    A   Correct.
22    Q   Was there anything -- Let me start again.
23             Were there any other releases or
24        documents you signed so that Mr. Garabedian
25        could get any other types of records other
```

Kurtis N. Poulos

```
 1                than just your medical records?
 2     A    There was 20 pages of releases.  There was
 3                obviously something more than just medical,
 4                but I can't recall offhand.  And we had --
 5                like I stated previously, we had already
 6                discussed any criminal background that I had,
 7                so I'm sure there was a release -- Obviously
 8                that's public record, so maybe I don't even
 9                need to release that.
10     Q    So Mr. Garabedian asked you about your medical
11                history and then asked you to sign releases so
12                that he could get the actual medical records.
13                Is that correct?
14     A    Correct.
15     Q    And you discussed with Mr. Garabedian your
16                criminal history, and then Mr. Garabedian
17                expressed that he wanted to get actual records
18                relating to the criminal history?
19                     MR. JUBB:  Note my objection.
20                     THE WITNESS:  I don't believe that
21                he stated verbatim that.  I just know that any
22                criminal records are basically public
23                knowledge, so I had been forthcoming with him
24                as far as what my criminal background was
25                and -- You know, if there was a release that I
```

```
 1            needed to sign for him to get more

 2            information, then yes.  But if not, he could

 3            easily obtain that with a credit card and a

 4            website.

 5            BY MS. DOUGHERTY:

 6      Q    So you don't have a recollection of

 7            Mr. Garabedian indicating the intent to get

 8            any criminal records.  Is that right?

 9      A    Correct.

10      Q    Did he ask you about your academic history?

11      A    I believe so.

12      Q    Did Mr. Garabedian ask you to sign any

13            releases or provide him with any records

14            relating to your academic history?

15      A    I believe that could have been one of the

16            releases that I gave him, was that he could

17            reach out to the universities to get

18            transcripts.

19      Q    I realize that you said -- and you also wrote

20            it at the time -- that there was a lot of

21            material that you were signing.  Other than

22            medical, perhaps your academic records, is

23            there any other type of records you remember

24            Mr. Garabedian expressing to you that he

25            wanted to obtain?
```

```
 1    A    Not to my recollection, no.

 2    Q    Sorry.  It takes me a minute to share the

 3         screen because I -- I use WebEx, too, and it's

 4         literally the opposite so I do it the wrong

 5         way every single time.

 6              So I'm showing you a document that I've

 7         marked D5.  It's Garabedian_File 0033 to 39.

 8         Right now I'm just on the first page of D5,

 9         which are handwritten notes.

10              Have you ever seen -- Again, I know we're

11         just looking at the first page.  Have you ever

12         seen these notes before I just showed them to

13         you?

14    A    No.

15    Q    Did you have a meeting -- Let me start again.

16                   MR. JUBB:  I didn't hear the answer.

17                   MS. DOUGHERTY:  He said "No."

18         BY MS. DOUGHERTY:

19    Q    Right?  Do you want to repeat it, Mr. Poulos?

20    A    No.

21    Q    I feel like by now you would tell us if you

22         meant "Yes" when I said that you said "No,"

23         but just making sure.

24    A    Yes.

25    Q    So December 12, 2017, that's when you had the
```

1       long telephone call with Mr. Garabedian and

2       somebody else, right?

3    A  Correct.

4    Q  And if you look over to the right -- again,

5       we're on the first page of D5 -- right at the

6       top it says, "DM."  Did you speak to somebody

7       with the initials DM?

8    A  I believe that would have been the second

9       person that was in the room with Mitchell when

10      I did my initial interview.

11   Q  And it looks like, at least as of December 12,

12      2017, you communicated during the telephone

13      call that Matthew B. Ralston was your teacher,

14      dorm master at The Hill School in Pottstown

15      Pennsylvania.  Is that right?

16   A  He was a teacher -- He was my teacher but

17      never my dorm master.

18   Q  But did you communicate that he was somebody's

19      dorm master to Mr. Garabedian and the other

20      person on the phone?

21   A  I believe so, yes.

22   Q  And you identified on December 12, 2017 that

23      Matthew B. Ralston sexually abused you when

24      you were at The Hill School.  Is that right?

25   A  Correct.

1    Q    Did you tell Mr. Garabedian and the other

2         person on the phone that your name was Kurtis

3         Nicholas Poulos?

4    A    Yes.

5    Q    That you were born October 10, 1978?

6    A    Yes.

7    Q    That your address -- see next to where it says

8         "Address:" -- did you communicate that that

9         Connecticut address was your address to

10        Mr. Garabedian and the other person on the

11        phone on December 12, 2017?

12   A    Yes.

13   Q    Did you tell Mr. Garabedian and the other

14        person on the phone on December 12, 2017 that

15        you hadn't served in the military and that you

16        had no bankruptcies?

17   A    Yes.

18   Q    On December 12, 2017 did you tell

19        Mr. Garabedian and the other person on the

20        phone that you had been arrested in Wisconsin

21        and Connecticut for breaking and entering,

22        disorderly conduct, you had no felonies and no

23        jail time?

24   A    A couple of overnighters, no serious jail

25        time.  And I did not at that moment believe I

Kurtis N. Poulos

```
 1              had a felony.  I thought it had been reduced

 2              to a misdemeanor.

 3       Q      Okay.  So just to be clear, you

 4              communicated -- We're just looking at the

 5              middle of the first page of D11 (sic) where it

 6              says "Arrested," right, and it says Wisconsin,

 7              Connecticut, "WI, CT," there is, like, a

 8              little section there.

 9                   You communicated the information that's

10              written there to Mr. Garabedian and his

11              associate on December 12, 2017 and believed it

12              to be true at the time, but you since realized

13              that, you know, you were mistaken.  Is that

14              correct?

15       A      Correct.

16                        MR. JUBB:  Objection.

17              BY MS. DOUGHERTY:

18       Q      So you weren't intentionally trying to mislead

19              anyone.  You just misremembered?

20       A      Correct.

21                        MR. JUBB:  Same objection.

22              BY MS. DOUGHERTY:

23       Q      Did you tell Mr. Garabedian and the other

24              person on the phone on December 12, 2017 that

25              you weren't married, you had no children and
```

```
 1              that you were then employed as a car salesman
 2              in Milford, Connecticut?
 3      A       Yes.
 4      Q       Did you tell Mr. Garabedian and the other
 5              person on the phone on December 12, 2017 that
 6              you had one younger brother and four half
 7              sisters?
 8      A       Correct.
 9      Q       There is a notation that says, "Childhood, dad
10              violent, tough childhood."  Do you know what
11              that's about?
12      A       My dad when he was drinking and doing drugs
13              when I was younger had a tendency to get
14              violent with me and my younger half brother.
15      Q       These subject areas on the notes, are these
16              things that you were just volunteering or was
17              somebody asking you questions, like, "Are you
18              employed?"  "How was your childhood?"  How did
19              that go?
20      A       They were asking.
21      Q       Then it says, "Detox, no."  Do you know what
22              that's about?
23      A       I would assume if I've ever gone into any sort
24              of inpatient therapy for drug or alcohol
25              abuse, to go through a detox program and
```

```
 1            counseling.
 2    Q       So was it Mr. Garabedian asking the questions
 3            or was it Mr. Garabedian and the other person
 4            on the phone during the first telephone call,
 5            December 12, 2017?
 6    A       I believe it was a mix.
 7                    MR. JUBB:  I'll object, but go
 8            ahead.
 9            BY MS. DOUGHERTY:
10    Q       It was a mix?
11    A       I believe so.
12    Q       So during the telephone discussion on
13            December 12th, 2017, somebody asked you
14            whether you had gone through a detox program?
15    A       I believe so.
16    Q       And you said "No," right?
17    A       Correct.
18    Q       Now, it says, "Psychology, yes.  Mom would
19            know, late '90s.  He'll send us the names."
20            Did you have a discussion about whether
21            you received psychological treatment or mental
22            health treatment during the December 12, 2017
23            telephone call with Mr. Garabedian and the
24            other person?
25    A       Yes, I had.  Well, I did speak about that with
```

Kurtis N. Poulos

```
 1              him, and none of it was regarding the matter

 2              at hand.

 3       Q      Right.  So you had mental health treatment but

 4              not related to the sexual abuse imposed upon

 5              you by Matthew Ralston.  Is that right?

 6       A      Correct.

 7                      MR. JUBB:  I'll object.

 8       BY MS. DOUGHERTY:

 9       Q      Did you express the nature of the mental

10              health services that you received during the

11              telephone call on December 12, 2017?  You

12              don't have to tell me what they were, I just

13              want to know if you told them to

14              Mr. Garabedian and the other person.

15       A      I believe so.  I don't know if I got into too

16              many specifics.  But I did tell them that I

17              had been in therapy off and on since I was

18              seven or eight years old.

19       Q      And did you communicate that you hadn't sought

20              treatment specifically because of the sex

21              abuse?  Is that why you were making that

22              distinction to me a couple moments ago?

23       A      Yes.

24       Q      So we're on to the second page of D5.  There

25              is a heading that says, "Schools," and then
```

Kurtis N. Foulos

```
 1              there is some information under it.

 2                  Can you just scan through it and confirm

 3              for me that this is information that you

 4              provided to Mr. Garabedian and the other

 5              person on the phone during the telephone call

 6              of December 12, 2017?

 7        A     Yes.  He just wrote down the name of -- The

 8              elementary school is wrong.  It's Lake Bluff,

 9              not Lake Russell.

10        Q     Okay.

11        A     Everything else is completely accurate.  I

12              don't know about the dates on the left,

13              because if those are supposed to match up

14              with -- because they don't, obviously.  I

15              didn't get to Marquette University until, you

16              know, fall of '97.

17        Q     So is it -- Did I understand your answer that

18              you provided information about the schools

19              that you attended, and it looks like somebody

20              broke down some of the names and dates, but

21              some of the information that was written down

22              is not necessarily correct.  Is that right?

23        A     Correct.  I went to UWM, which is

24              UW-Milwaukee, not UW-Madison.  That's just UW.

25        Q     We're going to talk a little bit more about
```

```
 1              the telephone call, but just while we're
 2              there, did anybody, like, send you, like, a
 3              summary or a type-up of what you discussed
 4              during the telephone call on December 12, 2017
 5              after the telephone call?
 6    A         Not to my recollection.
 7    Q         And were you giving this information about
 8              schools because somebody asked you questions
 9              about where you went to elementary school,
10              high school, university?
11    A         Yes.
12    Q         Then there is a section here that says,
13              "Addresses," and "Social Security number."
14              Can you just peruse that information and
15              confirm for me whether that's information that
16              you provided to Mr. Garabedian and the other
17              person on the phone on December 12, 2017
18              regarding addresses and your Social Security
19              number?
20    A         Yes.
21    Q         Somebody asked you to provide your addresses
22              and Social Security number?
23    A         To the best of my recollection.
24    Q         Do you know why?  I'm sorry.  Keep going.
25    A         I mean, like, to the best of my recollection,
```

Kurtis N. Poulos

```
 1          yes, somebody asked me for the addresses.  I
 2          didn't ask why.
 3   Q      Did anybody explain why they were asking for
 4          your addresses and Social Security number?
 5   A      No.  I just assumed it was due diligence.
 6   Q      So you had the impression that Mr. Garabedian
 7          or the other person on the phone they were
 8          going to, like, check into what you were
 9          telling them?
10   A      Exactly.
11               MR. JUBB:  Objection to the form.
12          BY MS. DOUGHERTY:
13   Q      Is there something that gave you that
14          impression?
15   A      With my initial interview with Mitchell, it
16          wasn't so cut and dry as like, "Oh, yeah,
17          we're just going to do this."  He, I was
18          assuming, was doing his due diligence to make
19          sure I am who I am and was where I was during
20          certain dates and times.
21   Q      So as of the December 12, 2017 telephone call,
22          at the start of it had Mr. Garabedian already
23          agreed to represent you, or was it your
24          understanding he was interviewing you to
25          determine whether he would agree to represent
```

```
 1              you?

 2    A    Interviewing me to agree to represent me.

 3    Q    And at some time after the December 12, 2017

 4         telephone call, Mr. Garabedian told you that

 5         he would agree to represent you, and he signed

 6         the Contingent Fee Agreement that we looked at

 7         a few moments ago?

 8    A    (Inaudible response)

 9                   REPORTER:  What was the answer?

10                   THE WITNESS:  Correct.

11         BY MS. DOUGHERTY:

12    Q    So then it says -- again, we're on the second

13         page of D5, getting towards the bottom -- it

14         says "Hill-Perp."  Do you know what that

15         refers to?

16    A    Yeah, the perpetrator.

17    Q    Is that terminology that Mr. Garabedian and

18         the other person on the phone used, "Perp"?

19    A    I don't remember if that was their exact

20         verbiage.  They might have asked me who the

21         abuser was.  I don't recall exactly how they

22         stated it.

23    Q    Okay.  So it says "Sophomore year geometry

24         teacher, freshman year met Perp."  Is that

25         information that you provided?
```

Kurtis N. Poulos

```
 1    A    Yes.

 2    Q    Under "Perp," it says -- keep going down the

 3         second page of D5 -- there is a heading that

 4         says "Perp," and it says, "Tall, skinny,

 5         gangly, buzzed hair, no glasses, clean living

 6         guy, runner, people liked him, good teacher."

 7         Did somebody ask you to describe Mr. Ralston?

 8    A    Yes.

 9    Q    And is that a description that you provided

10         about Mr. Ralston?

11    A    Yes.

12    Q    Then we're going on to the third page of D5.

13         It says, "Senior year, Perp CLs dorm master."

14         So that's incorrect, right?  Somebody

15         misunderstood?

16    A    He was living in my dorm but he was not my

17         dorm master.

18    Q    Gotcha.  Who was the dorm master during your

19         senior year?  You might have told us.  I

20         apologize, but --

21    A    Senor Romero (Phonetic).

22    Q    So you weren't suggesting that that gentleman

23         sexually abused you, just somebody obviously

24         misunderstood your comment that Mr. Ralston

25         lived in the dorm as your dorm master, right?
```

```
 1    A      Yes.  I believe we had five teachers my senior
 2           year living in that dorm as dorm masters, one
 3           on the first floor on one side and one on the
 4           first floor on the other side and the same on
 5           the second floor.  And then Mr. Ralston's
 6           apartment entrance was by the parking lot by
 7           the garage under -- basically underneath our
 8           dorm.
 9    Q      Now, let's keep our time frame at the moment
10           limited to the December 12, 2017 telephone
11           call.  Did you tell Mr. Garabedian and the
12           other person on the phone that anyone other
13           than Matthew Ralston had sexually abused you?
14    A      No.
15    Q      Did you tell Mr. Garabedian and the other
16           person on the phone that any other teacher at
17           The Hill School had abused you but not
18           sexually?
19    A      Possibly, because there was some verbal abuse
20           by my freshman -- or my third form hall
21           master.
22    Q      Who was that again?
23    A      I don't recall his name.
24    Q      Was it Tom Ruth?
25    A      No.  Tom Ruth lived on the first floor.  I
```

```
 1          lived on the third floor.
 2    Q     Did you have any issue with Tom Ruth's
 3          behavior?
 4    A     He was just a crotchety old man.  I really
 5          didn't.  You know, he was never one of my
 6          professors when I was attending The Hill
 7          School.
 8    Q     I'm just going to -- Just while we're here,
 9          I'm showing you a document that I've marked as
10          D9.  It's Garabedian_File 0040.  Have you
11          ever -- I'm just showing you the top of the
12          page.  I can scroll down for you.
13              Have you ever seen this document before I
14          just showed it to you?
15    A     I've never seen any handwritten documents from
16          Mitchell's office.
17    Q     Okay.  So over to the top right it says under
18          "Perps," "Tom Ruth, Mr. Rolstin."  Do you have
19          any idea why somebody would identify Tom Ruth
20          as a perp?
21    A     I do believe that I was asked if I knew of any
22          other teachers, and I had heard allegations of
23          Tom Ruth with other students as I had heard
24          about numerous other female teachers with male
25          students.  I just couldn't recall all of the
```

```
 1            names.  Those -- One applied to me, one

 2            applied to, again, only rumors that I don't

 3            know were ever substantiated.

 4    Q   So you didn't tell Mr. Garabedian or the

 5            person on the phone that Mr. Ruth had acted

 6            inappropriately with you, but you told him

 7            that you had heard about situations where he

 8            had allegedly acted inappropriately with other

 9            students.  Is that right?

10    A   Yes.

11    Q   Was there some reason why you were talking

12            about other teachers other than Mr. Ralston

13            during the December 12, 2017 telephone call?

14    A   He asked if I believed this was an isolated

15            event with just this one professor at the

16            school, and I had heard rumors of -- He would

17            have the hookah tea parties in his apartment

18            and invite students over.  I was never one of

19            his students.

20                And to the best of my knowledge, I think

21            I was in his apartment once and that was

22            because I was going to be in his AP class the

23            following year as a sophomore.

24    Q   Now that you mentioned the hookah, I think I

25            remember you told us about what you had heard
```

```
 1          about Mr. Ruth during one of your prior days
 2          of testimony.
 3              So Mr. Garabedian or the other person on
 4          the phone asked you about other instances
 5          where teachers at The Hill School had acted
 6          inappropriately during the December 12, 2017
 7          telephone call.  Is that correct?
 8    A     Correct.  And like I stated before, there were
 9          other female teachers that were rumored to
10          have sexual relationships with male students;
11          but again, I wasn't in the room.  I can't -- I
12          think I remember what they did at the school,
13          but I can't be 100 percent certain and I
14          wouldn't want to throw somebody under the bus.
15    Q     So as of December 12, 2017 your objective was
16          to pursue some relief from The Hill School.
17          Is that right?
18    A     Correct.
19                   MR. JUBB:  Objection.
20          BY MS. DOUGHERTY:
21    Q     Is that why you were discussing with
22          Mr. Garabedian and the other person on the
23          phone other activity by people other than
24          Mr. Ralston or directed to you that occurred
25          at The Hill School?
```

Kurtis N. Poulos

```
 1    A    Correct.

 2               MR. JUBB:  Objection to the form.

 3         BY MS. DOUGHERTY:

 4    Q    So I've flipped back to D5 back to where we

 5         left off on the third page where it says,

 6         "Sexual abuse."  It says "Over twelve times."

 7         Did you tell Mr. Garabedian and the person on

 8         the telephone call that you had been sexually

 9         abused by Mr. Ralston over twelve times during

10         the December 12, 2017 telephone discussion?

11    A    I believe I said it was at least ten times, if

12         not more.

13    Q    Did you go through each instance that you

14         could then remember on December 12, 2017

15         during the telephone call with Mr. Garabedian

16         and the other person?

17    A    Not in so many specifics, because at that

18         point, if I can recall correctly, I was

19         beginning to break down and we sort of moved

20         on.

21    Q    So you told Mr. Garabedian and -- Well, it

22         says here -- Let me start again.

23            D5, third page, it says "Began freshman

24         year, 14 years old, ended sophomore year 16

25         years old, happened in PA.  CL never had perp
```

```
 1              for a coach-sports."
 2                  Is that information that you communicated
 3              to Mr. Garabedian and the other person on the
 4              phone on December 12, 2017?
 5     A        To a degree.  I don't believe that I stated
 6              the part about freshman year.  I mean, there
 7              was nothing to my recollection at this point
 8              of freshman year.  It was all sophomore year
 9              when he was my geometry teacher.
10     Q        When you started your freshman year, were you
11              14 years old?
12     A        Correct.
13     Q        And when you ended your sophomore year, you
14              were 16 years old.  Is that right?
15     A        Correct.
16     Q        It says, "Happened in study, cubicles in
17              basement of school, also CLs --" I'm sorry.
18              (Zoom crosstalk)
19     A        There was cubicles in the basement of the
20              library where there were, like, one door, no
21              windows, and basically you just went in.  You
22              had a desk and it was to do your -- We had
23              mandatory study hours every night after
24              dinner, and if you wanted some alone time, you
25              would go down into those cubicles.
```

```
 1                    And rarely were they used, so it was kind
 2           of a good place to, you know, bone up before
 3           an exam or write a term paper and not be
 4           bothered by anybody.
 5      Q    Were you sexually abused by Mr. Ralston in the
 6           study room?
 7      A    I was approached by him.
 8      Q    Can you tell us about that?
 9      A    I don't know if it was supposed to intimidate
10           me, but it was one of those things where I was
11           probably one of the only, if not the only
12           student down there.
13                   And I remember, like, basically being
14           written -- or read the riot act about "Why are
15           you down here?  You're a third form.  Why are
16           you down here this late?"  And it was, you
17           know, 15 or 20 minutes before dorm curfew and
18           I was in the middle of writing a term paper.
19      Q    So you thought that Mr. Ralston was
20           intimidating you?
21      A    Kind of like, "Get out of here and go back to
22           your dorm," and "I have authority and you
23           don't really have any."
24      Q    This incident in the study room, did it happen
25           before or after the first time that
```

Kurtis N. Poulos

```
 1              Mr. Ralston touched you inappropriately?

 2      A       Before.

 3      Q       So before there was any type of physical

 4              contact between you and Mr. Ralston, that's

 5              when the study room incident occurred.  Is

 6              that right?

 7      A       Correct.

 8      Q       And that was -- Let me start again.  The study

 9              room incident was an interaction that you had

10              with Mr. Ralston that you thought was

11              inappropriate and made you feel uncomfortable.

12              Is that right?

13      A       Yeah.  I don't believe I ever went back down

14              there to do any extracurriculars or study

15              alone again.

16      Q       And you told Mr. Garabedian and the person on

17              the telephone on December 12, 2017 the

18              information that you just relayed about the

19              incident in the study room?

20      A       Correct.

21      Q       Then it says, "Also CLs single dorm, no

22              roommate."  Do you know what that's about?

23      A       Yeah.  My sophomore year the roommate that I

24              was supposed to have didn't end up attending

25              the school, so they moved the other bed out of
```

Kurtis N. Poulos

```
 1            the room and I had a single.

 2      Q     So it's not the case that Mr. Ralston abused

 3            you in your dorm room.  Is that right?

 4      A     Correct.

 5      Q     Did you -- You didn't tell Mr. Garabedian or

 6            the other person on the phone on December 12,

 7            2017 that you were abused in the dorm room,

 8            right?

 9      A     No.

10      Q     It says, "Never in perp's room."  You never

11            went to Mr. Ralston's room.  Is that right?

12      A     Correct.  I never entered -- I never once in

13            the three years that I attended the school

14            entered his apartment.  I didn't know until my

15            sixth form year where he even lived on campus.

16      Q     Right.  I think my question was a little

17            misleading because there was a time that you

18            actually went to his room and knocked on the

19            door and interacted with his wife over your

20            car, right?

21      A     Correct.

22      Q     But you never actually went inside.  Is that

23            correct?

24      A     No.  She wouldn't even open the door.  She

25            just said they would move the car in the
```

Kurtis N. Poulos

```
 1          morning.
 2     Q    So at no time that you were at The Hill School
 3          you never went inside Mr. Ralston's room.  Is
 4          that right?
 5     A    Other than his classroom, no.
 6     Q    All right.  It says, "Three of the four years
 7          of high school CL went junior year.  Left
 8          Hill."  And then it says, "Not weird for perp
 9          to come to room-PERS, a dorm master in another
10          dorm.  Teachers would show up and come in the
11          room."  Do you know what that was about?
12     A    Yeah.  I mean, every once in a while if you're
13          a student and you're struggling, you either go
14          to somebody's -- you know, if, like, my third
15          form year I was having trouble with English
16          composition, so I would go to my third form
17          English teacher's apartment and she would
18          tutor me during study hours.
19               I mean, there were times where my fourth
20          form English teacher would show up.  If you
21          slept in on a Saturday, she'd pound on your
22          door and bring you down to class.  I mean, it
23          just wasn't weird for teachers to be coming
24          and going during specific hours, specifically
25          our study hours, with somebody just being,
```

Kurtis N. Poulos

```
 1              like, "Oh, he's either here to help him teach
 2              or learn," or -- you know, "He's just making
 3              sure that he's got what he needs for his
 4              class."
 5      Q     So Mr. Garabedian or the other person on the
 6              phone asked you during the telephone call on
 7              December 12, 2017 about whether teachers
 8              access dorm rooms.  Is that how this came up?
 9      A     Correct.  And basically, once you're in your
10              room, you are after a certain time of night
11              allowed to shut your door but you're never
12              allowed to lock it.  And the majority of the
13              students for that same reason would just leave
14              their doors wide open during study hall.
15                  I mean, it's kind of like being in class.
16              You are yelling across the hallway, you know,
17              sharing notes or whatever, maybe when you
18              weren't supposed to be talking, but it is what
19              it is.
20      Q     So is it a fair characterization or an unfair
21              characterization -- I guess you can tell me if
22              it's not a fair characterization -- is it a
23              fair characterization that Mr. Garabedian and
24              the other person on the phone during the
25              December 12, 2017 telephone call were
```

Kurtis N. Poulos

```
 1            interested in how The Hill School worked in

 2            general -- general information about how the

 3            teachers interacted with students, how classes

 4            worked, where things were?

 5     A      Correct.

 6                  MR. JUBB:  I'll object.

 7            BY MS. DOUGHERTY:

 8     Q      Did you have an understanding about why

 9            Mr. Garabedian or the other person on the

10            phone were asking so many questions about The

11            Hill School during the December 12, 2017

12            telephone call?

13     A      I'll revert back to the letter --

14                  MR. JUBB:  Objection.

15                  THE WITNESS:  I'll revert back to

16            the letter that I received from the school

17            stating, "We know that this had happened."

18            And it wasn't a single individual or single

19            instance, so I'm assuming they were trying to

20            gauge the likelihood of how many teachers or

21            how likely it would be for people to come and

22            go without any sort of checks and balances

23            besides if you're an under form and you have

24            to check out with your prefect in order to go

25            to the library or go to a teacher's apartment
```

Kurtis N. Poulos

```
 1            to get some extra tutoring for a subject.

 2    Q    It says, "CLs dorm supervisor Mr." Underscore,

 3            "six prefects, sophomore dorm, CL does not

 4            have yearbooks."

 5                Then on the bottom -- Again, we're on the

 6            third page of D5, right at the bottom where it

 7            says "Sexual abuse."

 8    A    Yes, I'm reading it.  Okay.

 9    Q    How far did you read?

10    A    I read the whole thing.

11    Q    From "Sexual abuse" down to "Mom came to town

12            at hotel CL came back to"?

13    A    Correct.

14    Q    Is that information -- that's the bottom of

15            the third page starting to the fourth page of

16            D5 -- is that information that you

17            communicated to Mr. Garabedian and the other

18            person on the phone during the December 12,

19            2017 telephone call?

20    A    To the best of my recollection, yes.

21    Q    I think you said that you didn't go into the

22            same level of detail that you went into,

23            during your testimony here, during the first

24            telephone call, the December 12, 2017

25            telephone call, because you broke down and got
```

Kurtis N. Poulos

```
 1              upset?

 2      A       Correct.

 3      Q       I'm just going to scroll a little bit more.

 4              So we're at the top of the fourth page of D5.

 5              It says, "Perp told CL 'our time' for us, no

 6              one else."  What's that about?

 7      A       Basically I was going to be living in the same

 8              building and I didn't know what he really

 9              meant by that.  It just -- It struck me that

10              it was odd that he went out of his way, not

11              being my dorm master, to come and approach me.

12              He wasn't going to be my professor or my dorm

13              master.  We had really no reason to interact.

14      Q       So the words in the quotes, "our time," that's

15              something that Mr. Ralston said to you?

16      A       Something to that effect.

17      Q       Was that before or after he started sexually

18              abusing you?

19      A       After.

20      Q       Then after the dashed bottom line that you

21              already confirmed, it says, "Dorm, parked car,

22              perp blocked CLs car."

23                  Those two sentences there, the top of the

24              fourth page of D5, that's describing the

25              interaction you had with Mr. Ralston where
```

Kurtis N. Poulos

```
 1          your car was blocked during parents weekend,
 2          right?
 3    A     Correct.
 4    Q     And you shared information about that
 5          interaction regarding your car and Mr. Ralston
 6          during parents weekend with Mr. Garabedian and
 7          the other person on the phone during the
 8          December 12, 2017 telephone call?
 9    A     Correct.
10    Q     It says, "CL thinks perp's wife knew
11          something."  What's that about?
12    A     Just in my recollection, the way that she
13          addressed the situation where I was trying to
14          leave, and she was super defensive and being,
15          like, "My husband has every right to do what
16          he's doing," and was very -- I don't want to
17          say aggressive, but defensive of his actions.
18                    MS. DOUGHERTY:  Hold on one second.
19          Lane is waving.  I think he can't hear us.  I
20          don't want you to get too far.  Can you hear
21          us, Lane?  We can't hear you.
22                    REPORTER:  Should we go off the
23          record?
24                    MS. DOUGHERTY:  Yeah, I think so.
25                    VIDEOGRAPHER:  The time is 1:06.  We
```

Kurtis N. Poulos

```
1          are off the record.

2          (Off the record.  Recess taken.)

3                    MS. DOUGHERTY:  Can we just -- We

4          don't need video at the moment, but can we be

5          on the stenographic record?

6                    VIDEOGRAPHER:  The video is off.

7          Just let me know whenever you're done and when

8          to go back on video.

9                    MR. JUBB:  Why are we taken off the

10         video?

11                   MS. DOUGHERTY:  We can go on video

12         for this.  I wanted to ask Mr. Poulos about

13         his comment that he has to leave and address

14         that before we got back into the testimony,

15         but we can go on video for that.

16                   MR. JUBB:  I didn't hear anything

17         along those lines.

18                   MS. DOUGHERTY:  I know you didn't.

19         That's why I wanted to go on the record and

20         address that before we got back into his

21         testimony.  Do you want that on the video?

22                   MR. JUBB:  Yes, please.

23                   MS. DOUGHERTY:  Can we go back on

24         the video, please?

25                   VIDEOGRAPHER:  Stand by.  The time
```

Kurtis N. Poulos

```
 1            is 1:19.  We are back on the record.
 2                 MS. DOUGHERTY:  Okay.  Mr. Poulos, I
 3            don't think that Mr. Jubb heard your comments
 4            that you need to leave at a certain time.  Can
 5            you repeat those?
 6                 THE WITNESS:  Yes.  I stated in the
 7            e-mail I have to do a vehicle delivery at
 8            two -- Well, around 3:00 p.m. my time, which
 9            means I need to leave here around two to get
10            to work, make sure the vehicle is prepped and
11            ready for the delivery.  This was the only day
12            that my client had available to pick up the
13            car.
14                 MS. DOUGHERTY:  Okay.  So you would
15            need to leave, just so we're clear, in
16            40 minutes?  I apologize for talking over you.
17            Did I freeze?
18                 REPORTER:  He froze.
19                 MS. DOUGHERTY:  Are you there,
20            Mr. Poulos?
21                 THE WITNESS:  I'm here.
22                 MS. DOUGHERTY:  You froze there, so
23            I wasn't trying to speak over you.  You were
24            saying something like it was the only time
25            your client could do it.  Could you just say
```

Kurtis N. Poulos

1    that again?

2              THE WITNESS:  Yes.  It's the only

3    time that my client can take delivery of her

4    new vehicle.  And if I'm not there to do the

5    delivery, I don't get credit or commission for

6    the vehicle sale.

7              MS. DOUGHERTY:  Okay.  So then you

8    need -- You're telling us that you need to

9    leave in 40 minutes.  Is that right?

10             THE WITNESS:  I need to sign off of

11   here in about 40 minutes, yes.

12             MS. DOUGHERTY:  Is there -- Are you

13   able to come back after a period of time

14   today?

15             THE WITNESS:  Not later today --

16   (Zoom crosstalk)

17             MS. DOUGHERTY:  That was my

18   question.  I know it was unclear.  I wasn't

19   sure how long the vehicle delivery would take.

20   I don't know that I have -- I don't know that

21   I would be done in 40 minutes.  I don't know

22   that I have much more than 40 minutes, but

23   Mr. Jubb is also permitted to ask questions

24   after me, so I'm not sure that we will be done

25   by -- in 40 minutes.

Kurtis N. Poulos

```
 1              I'm okay with stopping and resuming on

 2         another day because of your work commitment,

 3         but you need to commit to come back to let

 4         whoever is in the middle of their questioning

 5         finish their questioning.

 6              Again, I told you that I don't know that

 7         I have all that much.  40 minutes is cutting

 8         it close, but Mr. Jubb then has an opportunity

 9         to ask follow-up questions.

10                   THE WITNESS:  All right.  Let's just

11         get through as much as we can as quickly as

12         possible.

13                   MS. DOUGHERTY:  Okay.  So the court

14         reporter is going to read back my question.

15         It was -- Mr. Jubb stopped -- We figured this

16         out -- he was unable to hear the question

17         about -- I'll put it back up -- "CL thinks

18         perp's wife knew something," and I interrupted

19         you in the middle of your answer.

20              So the court reporter is going to read

21         the question and your answer back, and then,

22         if you could, complete your answer when she

23         lets you know it's okay for you to keep

24         talking.  Is that okay with you?

25                   THE WITNESS:  Yes.  That's fine.
```

Kurtis N. Poulos

```
 1                      MS. DOUGHERTY:  So I've put D5 back

 2            up on the screen.

 3            (Reporter read previous question and answer:

 4            "Question: It says, 'CL thinks perp's wife

 5            knew something.'  What's that about?  Answer:

 6            Just in my recollection, the way that she

 7            addressed the situation where I was trying to

 8            leave, and she was super defensive and being,

 9            like, 'My husband has every right to do what

10            he's doing,' and was very -- I don't want to

11            say aggressive, but defensive of his actions."

12                      MS. DOUGHERTY:  Is it okay for

13            Mr. Poulos to finish his answer?

14                      REPORTER:  Yes.

15                      MS. DOUGHERTY:  I just wanted to

16            make sure the court reporter was back in a

17            place that she could --

18            BY MS. DOUGHERTY:

19      Q     So Mr. Poulos, I interrupted you when you were

20            giving that answer.  Would you like to finish

21            your answer?

22      A     That's the end of it.

23      Q     All right.  Then it says, "Young teacher, CL

24            told him about --" Let me start again.

25                      So you told Mr. Garabedian that you
```

Kurtis N. Poulos

```
 1              thought that Mr. Ralston's wife knew that

 2              Mr. Ralston was engaging in inappropriate

 3              contact?

 4     A        I mean, at least aggressive contact toward

 5              students (Zoom crosstalk) -- me.

 6     Q        Towards you, did you say?

 7     A        Yes.

 8     Q        So during the December 12, 2017 telephone

 9              call, do you remember what you expressed to

10              Mr. Garabedian and the other person on the

11              phone about what you thought Mr. Ralston's

12              wife knew?

13     A        Just that she knew that we had a contentious

14              relationship at this point, and obviously

15              being his wife is going to take his side of

16              whatever situation we're in, hence the whole

17              me trying to leave when I already had

18              permission to leave and she wouldn't even

19              bring him to the door.

20     Q        Okay.  So the context in which Mr. Ralston's

21              wife came up was relating to the incident with

22              the car being blocked in during parents

23              weekend, right?

24     A        Correct.

25     Q        The other person on the phone during the
```

```
 1          December 12, 2017 telephone call, was that a
 2          man or a woman, if you remember?
 3     A    I believe it was a man.
 4     Q    So Mr. Garabedian, you and a man?
 5     A    Correct.
 6     Q    We've been talking about D5, and we looked at
 7          D9 a little bit, those other notes.  Does
 8          anything during our discussion about the notes
 9          or the telephone call on December 12, 2017,
10          refresh your recollection about the identity
11          of the man on the phone in addition to you and
12          Mr. Garabedian?
13     A    Not to my recollection.
14     Q    So continuing with D5, page four.  It says,
15          "Young teacher, CL told him about car
16          incident.  Mr. Lahey --" and then it keeps
17          going, "25 years old, football, teacher, dog,
18          '82 Firebird."  What's that about?
19     A    Mr. Lahey -- I had the wrong teacher's name.
20          Mr. Lahey I believe was my Shakespeare
21          teacher.  But we did have a younger
22          football -- I think he was one of the JV
23          coaches who lived on the second floor who had
24          a dog and a Firebird, and I told him about the
25          incident and he said that it was unacceptable.
```

```
 1              Mr. Romero also said it was unacceptable but
 2              to just let it go.
 3                  Mr. Lahey was (Audio distortion) the
 4              teacher than the one stated as being one of
 5              the dorm master's in my six form dorm.
 6     Q   So during the December 12, 2017, telephone
 7              call, you identified Mr. Lahey as someone who
 8              you told about the car incident.  And you
 9              realize now that Mr. Lahey was the wrong name,
10              but you still -- the description and the fact
11              that you told a younger teacher about the
12              incident, that's correct, right?
13     A   Correct.
14     Q   And then it says, "No drugs --" I'm sorry.
15     A   No, that's it.
16     Q   It says, "No drugs/alcohol."  Did you tell
17              Mr. Garabedian and the other gentleman on the
18              phone during the December 12, 2017 telephone
19              call that you didn't take drugs and alcohol?
20     A   I believe it was more addressing whether or
21              not I was given drugs or alcohol.
22     Q   Did you discuss with Mr. Garabedian and the
23              other gentleman on the phone during the
24              December 12, 2017 telephone call whether you
25              consumed drugs and alcohol when you were at
```

```
 1         The Hill School?

 2    A    Probably did.  And yes, I did.

 3    Q    But you also confirmed for Mr. Garabedian and

 4         the other gentleman during the December 12,

 5         2017 telephone call that Mr. Ralston wasn't

 6         the source of the drugs and alcohol.  Is that

 7         right?

 8    A    Correct.

 9    Q    Was any other teacher at The Hill School the

10         source of the drugs and alcohol that you

11         consumed when you were at The Hill School?

12    A    No.

13    Q    Then it says, "Perp, six-foot, lanky, tall,

14         runner, short haircut, white."  Is that a

15         description that you provided to

16         Mr. Garabedian and the other gentleman on the

17         phone during the December 12, 2017 telephone

18         call relating to Mr. Ralston?

19    A    Correct.

20    Q    "No other sexual abuse."  Is that "No other

21         sexual abuse" by anyone other than

22         Mr. Ralston?

23    A    Correct.

24    Q    Then it says, "CL told," and it says "1,

25         mother, in early 30s, 4/5 years ago."
```

Kurtis N. Poulos

```
 1    A    Yes.

 2    Q    So you told your mother four or five years

 3         before the telephone call on December 12,

 4         2017, about the abuse by Mr. Ralston?

 5    A    Not his specific name; but yes, I told her

 6         there was abuse at the school.

 7    Q    That you sustained abuse at the school.  Is

 8         that right?

 9    A    Correct.

10    Q    That you sustained sexual abuse at the school?

11    A    Yes.

12    Q    And your mother guessed that it was

13         Mr. Ralston?

14    A    She deduced, not "guessed."

15              REPORTER:  I'm sorry.  What was the

16         answer?

17              THE WITNESS:  She deduced it, not

18         guessed.

19         BY MS. DOUGHERTY:

20    Q    And you told Mr. Garabedian and the other

21         gentleman who participated in the December 12,

22         2017, telephone call that you told your mother

23         about sexual abuse that you sustained at The

24         Hill School four or five years before the

25         telephone call.  Is that right?
```

```
 1    A    Correct.

 2    Q    And then there is some comment -- there is

 3         some dashes, it says, "Everybody father,

 4         Hill."  Do you see those three lines there?

 5         Can you read them to yourself?

 6    A    "Everybody proud the client went to The Hill

 7         School, so it was hard."

 8    Q    Is this information, is that something you

 9         communicated to Mr. Garabedian and the

10         gentleman on the telephone call on

11         December 12, 2017?

12    A    Yes.

13    Q    Same with, "Father didn't want CL going

14         there"?

15    A    Correct.

16    Q    And "The Hill expensive school, had to wear

17         uniform."  Is that information you

18         communicated?

19    A    Yes.  I mean, it wasn't -- I think we were

20         just asking about certain specifics about what

21         life was like there.  It was, you know, if we

22         had a dress code or whatever.

23    Q    Then it says number two -- again, we're still

24         under the heading of "CL told."  We're on the

25         fourth page of D5 at the bottom.
```

Kurtis N. Poulos

```
 1              It says "2, girlfriend, she used it
 2         against him."  That's the girlfriend we talked
 3         about before who -- (Zoom crosstalk)
 4    A    The one in Connecticut.
 5              REPORTER:  Go ahead.
 6    BY MS. DOUGHERTY:
 7    Q    And that's the one who saw the letters from
 8         the school, and then you disclosed that you
 9         had been abused.  Is that right?
10    A    Correct.
11    Q    And then what is "She used it against him"?
12         Did you tell Mr. Garabedian and the other
13         gentleman on the phone on December 12, 2017
14         something about your girlfriend using your
15         disclosure of sexual abuse against you?
16    A    Yes.  That she basically stated it was
17         probably something that I would have wanted to
18         happen, and she wouldn't be surprised if other
19         people had done it to me.
20              It was the middle of a fight and it was,
21         you know, the ugliest thing she could possibly
22         say to hurt me.
23    Q    Now we're on the fifth page of D5.  It says,
24         "CL had tough time fitting in school."  Is
25         that something you communicated to
```

```
 1              Mr. Garabedian and the other gentleman on the
 2              phone during the telephone call on
 3              December 12, 2017?
 4    A         Yes.
 5    Q         So I've centered the page so you can see the
 6              line, it starts "Freshman year" and it ends,
 7              "They got rid of ski team."
 8                   Can you just read that to yourself and
 9              confirm for me whether that's information you
10              shared with Mr. Garabedian and the other
11              gentleman on the phone during the December 12,
12              2017 telephone call?
13    A         Yes.
14    Q         It says, "CL knows of victims of other
15              teachers."  What's that about?
16    A         That I heard rumors that other teachers had
17              been abusing students.  Again, in retrospect,
18              I can only say, like, if you're a male student
19              sleeping with an older female teacher, it's
20              kind of like a thumbs up from all of the male
21              students.
22                   But any of the male students who were
23              being abused, it was just rumors.  The other
24              stuff was students sort of bragging, like,
25              "Oh, I'm sleeping with so and so."
```

Kurtis N. Poulos

```
 1    Q    Okay.  So without regard to whether it's a

 2         thumb ups, you were still describing instances

 3         of child abuse.  Is that right?

 4    A    Correct.  That's what I'm saying.  Like in

 5         retrospect, now I know it's wrong.  Back then

 6         it was sort of like, "Oh, wow.  This guy is

 7         cooler than we thought."

 8    Q    Did Mr. Garabedian or the other gentleman on

 9         the phone during the December 12, 2017

10         telephone call ask you if you knew of other

11         victims of child abuse?

12    A    Yes.  Or who I believed, yes.

13    Q    Because you didn't have any firsthand

14         knowledge of abuse sustained by other

15         students.  It's just based on what you had

16         heard, right?

17    A    Correct.

18    Q    And it says, "Mr. Ruth abuse, Filipino kid,

19         Mr. Ruth a big teacher but abused a few

20         students, not CL."  What's that about?

21    A    There was -- Mr. Ruth was very, let's say,

22         traveled.  He loved going to the Middle East

23         and Asia, and freshman year he took a specific

24         interest in a Filipino student whose father

25         was a diplomat and -- I mean, he was in that
```

Kurtis N. Poulos

```
 1              guy's apartment almost every night.
 2                   And it just -- In retrospect now, I look
 3              at it and I think that possibly could be the
 4              reason or part of the reason why he didn't
 5              return his sophomore year, just like I freaked
 6              out and left my sophomore year -- or junior
 7              year.
 8    Q    So you were, like, identifying instances that
 9              you recalled for Mr. Garabedian and the other
10              gentleman on the telephone call on
11              December 12, 2017, to, like, investigate?
12    A    No.  He just wanted to see if I had any
13              inclination of any other improprieties.
14    Q    It says "Other sexual abuse, none."  Do you
15              know what that's about?
16    A    If there was any other sexual abuse by
17              teachers or students, I'm assuming.
18    Q    And it says, "Damages."  And then under that,
19              "Ruin part of life."
20                   Did you tell Mr. Garabedian and the
21              gentleman on the telephone call on December
22              12, 2017 that Mr. Ralston ruined part of your
23              life?
24    A    Yes.  He asked what the effect of the abuse
25              has had on my life since the abuse happened
```

```
1              when I was a teenager.

2      Q      "He" being Mr. Garabedian?

3      A      One of the two of the gentlemen that were on

4              the phone, Garabedian or his law associate.

5      Q      So one of them asked you the impact that this

6              sexual abuse by Mr. Ralston had on your life

7              since high school.  Is that right?

8      A      Correct.

9      Q      And you gave this list here:  "Ruined part of

10             your life, ruined relationships with women,

11             sleep, concentration, self-esteem,

12             self-respect, you turned to drugs and alcohol,

13             six to seven days a week work in --" I don't

14             know -- "bars" and "Ruin school grades."

15                 Those are things that you responded when

16             you were asked what the impact was of the

17             sexual abuse on your life after high school?

18     A      Correct.

19     Q      Did you come up with that list or did somebody

20             ask you specific questions, like if you had

21             trouble sleeping, or is this just a list you

22             had in mind?

23     A      It was just a list of what I -- That's the tip

24             of the iceberg, if you asked me honestly.

25     Q      And these effects that you experienced,
```

Kurtis N. Poulos

```
 1            your -- you know, ruin part of your life, your
 2            relationships with women, turning to drugs and
 3            alcohol, the other stuff on the list there, is
 4            that what, you know, made you want to retain
 5            Mr. Garabedian?
 6                      MR. JUBB:  Object to the form.
 7                      THE WITNESS:  It's more the reason
 8            why when I asked -- or was asked, like, how
 9            this has affected my life, and what I think
10            could be a positive outcome would be that I
11            could go and get therapy to have those things
12            addressed even at this late stage of my
13            life -- or later stage of my life.
14            BY MS. DOUGHERTY:
15       Q    So we're on to the next page of D5.  It says,
16            "More Damages," and there is two columns.  And
17            then on the left side there is like a line
18            down the center of the page.
19                 On the left side it starts with, "Ruined
20            good things and self-sabotage, trust, guilty,
21            self harm, cut himself, self blame, shame,
22            embarrassed, intimacy issues, alone, isolated,
23            ostracized, he was from Wisconsin."
24                 Are those other items that you identified
25            to Mr. Garabedian and the other gentleman on
```

Kurtis N. Poulos

```
 1              the telephone call during the December 12,

 2              2017, telephone call that were the impacts on

 3              your life since high school?

 4     A        That would be the gist of it.

 5     Q        And on the right side -- And again -- before

 6              we get to the right side -- are these things

 7              that you identified or did somebody prompt you

 8              with questions?

 9     A        Just, I guess, other issues I've had with

10              having to relive this over and over, you know,

11              since I did my best to drown it out the wrong

12              way for years, and now I'm trying to deal with

13              it head on.

14     Q        I'm sorry, because I think I misunderstood.

15              So is it the case that you gave this list or

16              did somebody prompt you?  Did somebody say,

17              "Have you ever cut yourself" or something like

18              that?

19     A        No.  He just asked me, you know, in what ways

20              do I think this has negatively affected my

21              life, and I just started speaking.  Again,

22              some of this might not be my verbiage, but

23              it's a hundred percent true.

24     Q        So it's not the case that Mr. Garabedian or

25              the other gentleman had, like, a long list
```

```
 1        that they said, you know, "Did you self

 2        sabotage" or "Did you self harm."  You came up

 3        with the list, and you identified these issues

 4        that we're looking at under the "Damages" and

 5        "More Damages" columns.  Is that right?

 6                   MR. JUBB:  Objection.

 7                   THE WITNESS:  Yes.

 8        BY MS. DOUGHERTY:

 9    Q   On the right it says, "Unfixable, crying,

10        flashbacks, reminders, won't go back to Hill

11        school campus, emotional foundation cracked,

12        suicidal ideation, ruin childhood, took away

13        parts of CLs life, wouldn't live in a dorm

14        again, senior at Hill wouldn't eat 90 percent

15        of meals -- wouldn't eat 90 percent of meals

16        in room."

17             Okay.  So those items on the right-hand

18        side of the top of the sixth page of D5, those

19        are additional impacts that you identified to

20        Mr. Garabedian and the other gentleman during

21        the telephone call on December 12, 2017?

22    A   Correct.  Even as a freshman in college I

23        refused to live in a dorm, and my senior year

24        at high school I spent maybe five minutes at

25        dinner and would leave the mess hall or the
```

```
 1            dining room immediately after announcements

 2            and go back to my room.

 3     Q      All right.  The list over on the left

 4            continues.  It says, "Self confidence,

 5            oversexed, anger, sad, depression, confusion."

 6            Are those more impacts that you expressed to

 7            Mr. Garabedian and the other gentleman on the

 8            phone on December 12, 2017?

 9     A      Yes.

10     Q      And then it says, "Doesn't want unwanted

11            physical touch.  Slap hands away."  What's

12            that about?

13     A      Like if my mom comes up or my girlfriend or a

14            friend comes up behind me and, like, jokingly

15            pats me on certain parts of my body, I just --

16            I immediately freak out to the point where for

17            years my mom couldn't figure it out.  But

18            she'd come up behind me and, you know, slap me

19            on the butt jokingly after I did something

20            funny, and I'd freak out.

21                 And, you know, my friends in college, the

22            same sort of things you would expect, you

23            know, when you're living in an apartment with

24            two or three other guys and, you know -- I

25            couldn't -- I couldn't tell them why I was
```

Kurtis N. Poulos

```
 1              uncomfortable with certain subjects or certain
 2              innuendos they would make, and I would freak
 3              out and I would leave for days at a time.  And
 4              then I'd come back and pretend like nothing
 5              happened, and they would, too.
 6      Q    The examples that you just provided, did you
 7              provide those to Mr. Garabedian and the other
 8              gentleman on the phone during the December 12,
 9              2017 telephone call?
10      A    Yes.
11      Q    Were there any other examples of your reaction
12              to unwanted physical contact that you provided
13              to Mr. Garabedian and the other gentleman on
14              the telephone during the December 12, 2017
15              telephone call?
16      A    I didn't represent all of the times that I was
17              uncomfortable, but yes, that was a part of it.
18      Q    And it says, "CL lost 80 to 90 pounds."  Was
19              that in high school?
20      A    Yes.
21      Q    From the not eating?
22      A    Yes.
23      Q    And then, "Coma," and it says asterisks "from
24              drinking."  I think we talked about that
25              already, right?
```

```
 1    A    Yes.

 2    Q    And so you told Mr. Garabedian that you had --

 3         Let me start again.

 4              You told Mr. Garabedian and the other

 5         gentleman during the December 12, 2017

 6         telephone call that you had drank to excess

 7         and caused yourself to go into a coma.  Is

 8         that right?

 9    A    Correct.

10    Q    Then it says, "Apathy, not care about things,

11         will just walk away instead of working things

12         out.  Emotional void, intimacy, broken, dirty,

13         used, damaged, bad dreams-nightmares, anxiety,

14         anxiety attacks."

15              Were those other impacts that you

16         described or provided to Mr. Garabedian and

17         the other gentleman on the phone during the

18         December 12, 2017 telephone call?

19    A    Yes.

20    Q    Where it says "Bad dreams, nightmares," do you

21         have dreams regarding Mr. Ralston?

22    A    I have bad dreams regarding him.  I have bad

23         dreams that somehow I end up back at that

24         school.  For the last 20 years I wake up

25         thinking that I'm going to have to go back to
```

Kurtis N. Poulos

```
 1              that school and I'm a student again in my

 2              dream, and I wake up sweating and screaming.

 3         Q    Is that something that you described to

 4              Mr. Garabedian and the other gentleman during

 5              the December 12, 2017, telephone call?

 6         A    To some extent, yes.

 7         Q    And then on to the next page, it says -- This

 8              is actually the last page of D5.  It says,

 9              "Perp had a dog."  Mr. Ralston had a dog?

10         A    I think he had a Beagle.

11         Q    And it says, "Don, Jr., Trump, 1996 graduated

12              from The Hill School, CLs cousin graduated

13              with him."  That's information that you

14              provided to Mr. Garabedian and the other

15              gentleman during the December 12, 2017,

16              telephone call.  Is that right?

17         A    Correct.

18         Q    And it says, "Check Wikipedia, The Hill

19              School."  Do you know what that's about?

20         A    No, I don't.  Maybe he was checking to see if

21              I was being honest about the fact that Donald,

22              Jr. and Eric Trump both attended that school.

23              Eric, obviously, well after I graduated.

24         Q    So you don't remember having a discussion

25              that, like, involved Wikipedia during the
```

Kurtis N. Poulos

```
 1              December 12, 2017, telephone call.  Is that
 2              right?
 3      A       No.
 4      Q       Okay.  And then it says, "CL: Doesn't matter
 5              if perp outed.  I'll think about it though."
 6              Do you know what that is?
 7      A       Yeah.  At the beginning -- Well, not at the
 8              beginning, but I guess at the beginning of our
 9              negotiation or, like, what was going to happen
10              throughout the process, I said that I wouldn't
11              have an issue if he was outed after there was
12              a resolution, and still I wasn't sure if that
13              was necessary given all of the other
14              information that they could obtain.  (Zoom
15              crosstalk)
16      Q       What do you mean by that?  I'm sorry.  I
17              didn't mean to interrupt you.
18      A       So ultimately now, yes, I want him -- if it
19              does get to that point, I want it to be
20              brought to light at the time I wasn't sure --
21              (Audio distortion)
22                      REPORTER:  He froze.
23                      MS. DOUGHERTY:  Yep.
24                      MR. JUBB:  He's not going to be too
25              happy about that.
```

```
1          BY MS. DOUGHERTY:

2     Q    Are you back?  You froze.  Can you hear us?

3          You froze at "At the time," I think.

4     A    I'm fine.  What did Lane mean by "He's not

5          going to be happy about that"?

6                    MR. JUBB:  That we didn't get your

7          answer and you're going to have to repeat it

8          for us.

9                    THE WITNESS:  Then repeat the

10         question, please.

11                   MS. DOUGHERTY:  Are you able to read

12         the question back and the answer so then he

13         can pick up?

14                   REPORTER:  Sure.

15         (Reporter read previous question.)

16         BY MS. DOUGHERTY:

17    Q    Would you please finish, Mr. Poulos?  You

18         froze and we couldn't hear you.

19    A    That's it.

20    Q    You were in the middle of a sentence.

21    A    No.  I don't have anything further to say.

22    Q    Okay.  So at the beginning of your telephone

23         call with Mr. Garabedian and the other

24         gentleman on December 12, 2017, you weren't

25         sure whether you wanted to out Mr. Ralston,
```

Kurtis N. Poulos

```
 1              but since then you've decided that you do.
 2              Can you explain that?
 3                      MR. JUBB:  I'll object to that.
 4                      THE WITNESS:  As any abused victim,
 5              you don't want to see somebody else possibly
 6              abused.  Whether or not it's still continuing
 7              to this day, I obviously have no idea, but --
 8              BY MS. DOUGHERTY:
 9      Q       Okay.  So during the December 12, 2017,
10              telephone call, did it matter to you whether
11              Mr. Ralston was identified as someone who had
12              sexually abused you when you were a child?
13      A       Not particularly.  It was more important to me
14              that the school take accountability for the
15              people that they hired.
16      Q       Did you think that there was some way that
17              Mr. Garabedian could pursue accountability of
18              The Hill School without identifying
19              Mr. Ralston as your abuser?
20      A       Yes.  Because in their very vague letters to
21              the alumni, they stated they know of
22              improprieties.  And they didn't name teachers,
23              but if you're a student or an alumni or
24              alumnus who had experienced these traumas, to
25              "come forward and we will help you through
```

```
 1              this situation," which meant in my mind they
 2              were willing to start to take accountability,
 3              beyond the fact that they have already been
 4              sued by students' parents for one teacher
 5              impregnating a female student after the school
 6              went coed.
 7    Q    How did you think that the school would be
 8         able to investigate your claim if you didn't
 9         identify Mr. Ralston as your abuser?
10    A    I figured they would take into account time
11         and also multiple testimonies from other
12         students and work through the situation or at
13         least be able to prevent it from happening
14         again in the future.
15    Q    And since the December 12, 2017 telephone
16         call, has your attitude regarding outing
17         Mr. Ralston changed?
18    A    To be honest, yes.
19    Q    When did it change?
20    A    At the beginning of this lawsuit, frankly.
21    Q    So is it now the case that you want to pursue
22         a claim against both The Hill School and
23         Mr. Ralston if the statute of limitations in
24         Pennsylvania is extended?
25              MR. JUBB:  Object to the form.
```

```
 1                    THE WITNESS:  At this time, yes.

 2          BY MS. DOUGHERTY:

 3      Q   Okay.  So then it says, "PA-Pennsylvania, SOL

 4          has run."

 5              So during the very first lengthy

 6          telephone call that you had with

 7          Mr. Garabedian and the other gentleman on

 8          December 12, 2017, you talked about the

 9          statute of limitations right then, right?

10      A   Correct.

11      Q   And then it says, "MG, no nondisclosure

12          agreement."  Did you have a discussion about

13          whether there should be a nondisclosure

14          agreement during the December 12, 2017

15          telephone discussion?

16      A   Vaguely.

17      Q   And then it says, "CL, I agree."  Did you

18          agree with Mr. Garabedian that there should be

19          no nondisclosure agreement?

20      A   Evidently, yes.

21      Q   What's your understanding of a nondisclosure

22          agreement?

23      A   It means it would be a matter of public

24          record.

25      Q   Did Mr. Garabedian share with you why he said
```

Kurtis N. Poulos

```
 1              "no nondisclosure agreement"?

 2    A    To the best of my knowledge or recollection,

 3         it would be a matter of -- like, if we're

 4         going to do this, we need to pursue it as, you

 5         know, to the furthest that we can.  And if it

 6         is the school that knows of these instances

 7         and is ultimately the one trying to cover it

 8         up, they need to be held accountable to their

 9         students and, you know, to their prospective

10         students and their alumni who, you know, are

11         paying for an endowment for a school that

12         harbors sexual predators.

13    Q    And you agreed with Mr. Garabedian's thoughts

14         about not having a nondisclosure agreement?

15    A    Yes.

16    Q    Was the context of the discussion relating to

17         the nondisclosure agreement during the

18         December 12, 2017, telephone call, was it

19         connected in any way to how much money you

20         could get from The Hill School?

21    A    No.  All I ever asked for was restitution of

22         my tuition and, you know, to be able to afford

23         continued therapy so that the rest of my life

24         isn't what it was for the last 25 years.

25    Q    Right.  So just so -- Please correct me if I
```

```
 1            misunderstood.  The idea behind not having a

 2            nondisclosure agreement was so that the school

 3            could be held accountable and that the abuse

 4            would be exposed and stopped, not to obtain

 5            money or additional money from the school.  Is

 6            that right?

 7     A      Correct.

 8                   MR. JUBB:  I'll object.

 9     BY MS. DOUGHERTY:

10     Q      Then it says, "No lawsuit in CFA."  Do you

11            know what that's about?

12     A      No.

13     Q      Then it says, "Would you call my Mom."  Did

14            you ask Mr. Garabedian or the other lawyer on

15            the telephone call on December 12, 2017 to

16            call your mom?

17     A      Yes, I believe so.  She would -- You know, she

18            wanted to be kept apprised of the situation

19            and also be able to give me some sort of

20            advice.

21     Q      So it was during the December 12, 2017,

22            telephone call, that's when you gave

23            Mr. Garabedian permission to talk to your mom

24            about your case?

25     A      Correct.
```

```
 1    Q    And by the end of the call, did Mr. Garabedian

 2         tell you that he was going to undertake to

 3         represent you in a claim or a -- you know,

 4         your case against The Hill School?

 5    A    Yes.

 6    Q    I tried to do it the right way and I did it

 7         wrong.

 8              I'm showing you the document that I

 9         previously marked as D9.  It's Garabedian_File

10         0040.  This looks like more notes from the

11         telephone call on December 12, 2017.

12              It says, "Received letter from headmaster

13         Hill School-PA."  So during the December 12,

14         2017 telephone communication you communicated

15         to -- telephone call, you communicated to

16         Mr. Garabedian and the other gentleman on the

17         call that you received a letter from the

18         headmaster of The Hill School?

19    A    From the office of the headmaster, yes.

20    Q    And it says, "Spoke with attorney few years

21         ago."  What's that about?

22    A    When I did tell my mother finally about the

23         abuse, she recommended that I at least speak

24         to an attorney.  I do not recall his name.

25    Q    Is that the lawyer you told us about before --
```

```
 1    A    Yes.

 2    Q    -- in your testimony?  That was the criminal

 3         attorney you contacted or was it a civil

 4         attorney?

 5              MR. JUBB:  Note my objection.

 6              THE WITNESS:  I believe it was --

 7         (Audio distortion)

 8              REPORTER:  I didn't get the answer.

 9         Repeat the answer.

10         BY MS. DOUGHERTY:

11    Q    "I believe it was a criminal attorney," right?

12    A    Yes.

13              REPORTER:  I'm losing him.  I can't

14         hear him at all.

15              MS. DOUGHERTY:  Sure.

16         BY MS. DOUGHERTY:

17    Q    So Mr. Poulos, a few years before the

18         December 12, 2017 telephone call, you

19         contacted an attorney that you believe was a

20         criminal attorney.  Is that right?

21    A    I believe so.

22    Q    Did you contact any other civil attorney other

23         than Mr. Garabedian relating to the abuse you

24         sustained while at The Hill School?

25    A    I did not personally, no.
```

```
 1    Q    Is it now the time that you need to leave,

 2         Mr. Poulos?

 3    A    I can give you 15 more minutes.  I'm just

 4         going to go dressed the way I am.

 5    Q    All right.  Then it says, "MG, 100K to 500K in

 6         other school cases where it was outside SOL."

 7         Do you remember that discussion during the

 8         December 12, 2017, telephone call?

 9    A    He may have thrown it out there, that there

10         had been similar cases where this was, you

11         know, outside of the statute of limitations,

12         and these were the types of settlements I

13         should -- I could expect if this were to come,

14         you know, full circle and be closed.  But I

15         never expected $500,000, let a million

16         dollars -- you know, let alone a million

17         dollars.

18    Q    So Mr. Garabedian shared his experiences with

19         you where he pursued remedies for clients -- I

20         guess you described it earlier -- due to a

21         moral obligation by the school to compensate

22         students that were abused?

23    A    Correct.

24              MR. JUBB:  Objection.

25         BY MS. DOUGHERTY:
```

Kurtis N. Poulos

```
 1    Q    I'm showing you another series of e-mails I've
 2         marked as D13.  The Bates label on the bottom
 3         is Garabedian_ E-Mail004347.  I'm just
 4         interested at the moment at the e-mails on the
 5         top of the first page of D13.
 6              There is an e-mail from you to
 7         Mr. Garabedian, January 17, 2018.  It says,
 8         "Dear Mitchell, I just wanted to touch base
 9         with you and see if there is any progress so
10         far.  My mother did receive three yearbooks
11         from The Hill School and is willing to send
12         them to you.  I would appreciate an update
13         even if it is only minor.  I appreciate your
14         help with this matter."
15              So did your mother -- Do you know if your
16         mother ever sent the yearbooks to
17         Mr. Garabedian?
18    A    I don't know if she did.  I know she did
19         receive them.  I never opened them.  Again, I
20         was in Connecticut at this time, I believe.
21         Yeah, I was still living in Connecticut.  So
22         if she received anything, it would have been
23         when she was living in Fox Point, you know,
24         1,100 miles away from me, so --
25    Q    That's fine.  I just didn't know if she said,
```

Kurtis N. Poulos

```
 1              "Hey, I sent Mr. Garabedian the yearbooks" or
 2              anything.
 3       A      Not to my recollection.
 4       Q      Do you know why -- Or let me start again.  Was
 5              Mr. Garabedian the one who was interested in
 6              the yearbooks, or is that something your
 7              mother suggested or that you suggested?  How
 8              did that come up?
 9                     MR. JUBB:  Object.
10                     THE WITNESS:  I believe he suggested
11              it.
12              BY MS. DOUGHERTY:
13       Q      Do you know why Mr. Garabedian was interested
14              in obtaining the yearbooks?
15       A      No.
16       Q      I'm showing you a document that I've marked
17              D8.  It's Garabedian_ E-Mail0054 on the
18              bottom.  It's one page.
19       A      I'm reading.
20       Q      That's an e-mail exchange between
21              Mr. Garabedian and your mother.  So it says --
22              The e-mail at the top, Mr. Garabedian to your
23              mother, January 18, 2018, and it cc's
24              Mr. Garabedian and someone named Daniel
25              Mahoney.  Do you know who Daniel Mahoney is?
```

```
1    A    I would assume that's the "DM" that is

2         mentioned in the notes that you previously

3         showed.

4    Q    Is Daniel Mahoney somebody that you interacted

5         with at Mr. Garabedian's office, if you

6         remember?  If you don't, that's fine.

7    A    I don't remember his specific name, no.

8    Q    It says, "Mary Ellen, Attorney Dan Mahoney

9         from my office spoke to Kurtis this morning.

10        Thank you, Mitchell."

11            Do you remember the telephone

12        conversation of July 18, 2018 with

13        Mr. Mahoney?

14                MR. JUBB:  I'll object to the form.

15        BY MS. DOUGHERTY:

16    Q    Do you want me to make it bigger?

17    A    No.  I read it, and it's January 18th.  And

18        no, I don't recall -- I don't recall the

19        specifics.

20    Q    I apologize.  I wasn't trying to misspeak.

21        You're correct.  The e-mail is dated

22        January 18, 2018.

23            So you don't recall having a telephone

24        communication with Attorney Dan Mahoney on

25        January 18, 2018.  Is that right?
```

```
 1    A    Not specifically, no.  If I did, it would have
 2         been very brief.
 3    Q    Was there ever a time that you e-mailed
 4         Mr. Garabedian and asked for an update and you
 5         didn't receive a response, whether it be a
 6         telephone call or e-mail, from Mr. Garabedian
 7         or someone else in his office?
 8    A    I would mostly call and -- or write an e-mail.
 9         And in between I'd either call or write
10         another e-mail asking, you know, "Is there
11         anything else I can do?"  "Is there anything
12         else you need?"
13             I was trying to be as forthcoming as I
14         could, and there would be days or weeks and
15         months before I may or may not hear back.
16    Q    I'm showing you a document that I've marked
17         D14.  It's Garabedian_ E-Mail0059.  It's again
18         an e-mail exchange, this time between you and
19         Mr. Garabedian.  It looks like you wrote to
20         Mr. Garabedian on -- I'm sorry, I misspoke.
21         Two e-mails by you to Mr. Garabedian:
22         December 17, 2018, and then September 20th,
23         2018.
24             It says on the top e-mail, the
25         September 20, 2018, it says, "Hello again,
```

Kurtis N. Poulos

```
 1         Mr. Garabedian.  I spoke with my mother and
 2         she's thinking about calling the dean at The
 3         Hill to expedite the process.  (Zoom
 4         crosstalk.  Audio distortion.)
 5    A    They seem to have not been responding to any
 6         sort of outreach that Mitchell had been
 7         telling me.  Whether it be via phone call or
 8         e-mail, I don't remember the specifics, but
 9         that they had not responded to his office.
10    Q    Okay.  So just so I understand correctly.  On
11         September -- at least by September 20, 2018
12         you knew that Mr. Garabedian had contacted The
13         Hill School about the abuse you sustained
14         while at The Hill School.  Is that right?
15    A    Correct.
16    Q    And it was your understanding that The Hill
17         School wasn't responding or engaging with
18         Mr. Garabedian.  Is that right?
19    A    Correct.
20    Q    So then it sounds like your mother had the
21         idea of calling The Hill School herself?
22    A    Yes.  She was kind of fed up with the fact
23         that nothing was going on and without, you
24         know, I guess sounding pretentious about it,
25         the fact that three of my family members --
```

```
 1              Well, four of my family members, one died

 2              before I met him, had graduated from that

 3              school, my family had donated hundreds of

 4              thousands of dollars to that school and we

 5              couldn't get a simple response to our attorney

 6              was kind of frustrating to her.

 7                  I mean, in a way our family felt it was

 8              very -- or at least she felt and I felt it was

 9              very disrespectful of the school that

10              continued to ask for money from us, while at

11              the same time not being able to respond to a

12              phone call or an e-mail or a letter written

13              directly to the school or their

14              representation.

15      Q       So I know you've told us that you didn't see

16              the exact letter at the time, but did you know

17              at least as of September 20, 2018 when you

18              wrote this e-mail to Mr. Garabedian that

19              Mr. Garabedian had sent a letter to The Hill

20              School?

21      A       Yes, I believe so.

22      Q       And so, I mean, there is some frustration

23              expressed here about the speed at which the

24              case is moving.  That frustration was with The

25              Hill School's reaction to Mr. Garabedian.  Is
```

Kurtis N. Poulos

```
 1          that right?  Or lack thereof, right?

 2                  MR. JUBB:  I'll object.

 3          BY MS. DOUGHERTY:

 4     Q    Yes?

 5     A    Correct.

 6     Q    Your answer is "Yes," correct?

 7     A    Yes.

 8     Q    I'm showing you a document that I marked D7.

 9          It's one page.  It's Garabedian_ File0030.

10          On the top right it has a date 12/19/18, and

11          "MG, NG" at the top.

12              Have you seen this document before I just

13          showed it to you?

14     A    No.  And I've never seen that address either.

15     Q    You mean the "Client is living at 3239 West

16          Holland Drive"?

17     A    Yes.  I live at 3239 West Colony Drive.

18     Q    Okay.  So it looks -- It looks like somebody

19          wrote down your address incorrectly.  Is that

20          right?

21     A    Yes.

22     Q    Did you have a telephone discussion with

23          Mr. Garabedian and someone else on December --

24          I'm sorry -- yes, December 19, 2018?

25     A    Yes.
```

Kurtis N. Poulos

```
1    Q    Do you know who the "NG" is?

2    A    No.

3    Q    Was it just you, Mr. Garabedian and another

4         man or woman or --

5    A    I don't recall.  I believe it was another

6         gentleman.

7    Q    Anyone else other than you three --

8    A    No.

9    Q    -- on the telephone call?

10   A    My dog Bumblebee.

11   Q    If you can just read through what I've put up

12        on the screen, which says, "Works in car

13        sales" down to "Sober a month."  Just read

14        that to yourself and confirm for me whether

15        that's information that you communicated to

16        Mr. Garabedian and the other gentleman during

17        the telephone communication on December 19,

18        2018.

19   A    Yes.

20   Q    Then it says -- I've just scrolled down --

21        "Re: Going public-feeling more confident about

22        this now that he's sober."  What's that about?

23   A    Well, that's part of the reason why I had to

24        stop drinking again, because if I was

25        drinking, all I would do is dwell on the
```

Kurtis N. Poulos

```
 1              negative.
 2    Q    Okay.  So you were sober on December 19th,
 3         2018, right?  And you had been sober for a
 4         month?
 5    A    Yes.  I had -- Yeah.
 6    Q    And so now that you were sober, at least as of
 7         December 19th, 2018 you were feeling more
 8         confident about going public about what?
 9    A    I was just feeling more confident about not
10         feeling like I was a victim and more like I
11         was a survivor.
12    Q    What about the "going public"?
13    A    That when the time came, that I would be
14         willing, if need be, to make a statement.
15    Q    Identifying Mr. Ralston as your abuser?
16    A    And the school as -- I don't know -- for lack
17         of a better term, a co-conspirator, and the
18         fact that they know that this was happening
19         for decades at that school.
20    Q    So as of December 19, 2018, you were still
21         focused on pursuing relief from the school,
22         right?
23    A    Correct.
24    Q    And you were feeling more confident about
25         publicly identifying the school as a school
```

1          that permits child abusers to work for it.  Is

2          that the right concept?

3     A    Correct.

4               MR. JUBB:  I'll object to the form.

5          BY MS. DOUGHERTY:

6     Q    And it says, "MG tells client that we're

7          speaking to the attorney on Friday."

8               So did Mr. Garabedian tell you that he

9          was going to speak to the lawyer for the

10         school during the December 19, 2018, telephone

11         call?

12    A    I don't recall if he specifically told me

13         that; but if that's what they're writing that

14         they told me, then I have no reason to doubt

15         them.

16    Q    And then it says, "We'll speak to client at 4

17         p.m. on Friday."  Do you know if you had a

18         follow-up call with Mr. Garabedian after he

19         spoke to the attorney for the school?

20    A    I can't recall any specifics, no.  I would

21         have been at work at 4 p.m. on a Friday.

22    Q    So it's 3:16.  You need to leave, correct?

23    A    I can give you 10 more minutes.

24    Q    I'm showing you a document that I've marked as

25         D6.  It's Garabedian_File0025 to 26.  You

```
 1              know what?  Just to be clear, I did this by

 2              accident, but I can't fix it right now.

 3                   On the top right of Garabedian File 25,

 4              which is the first page of D6, it has a date

 5              of 12/26/2018, and the second page of D6,

 6              which is File 26, has a date of 12/21/2018.  I

 7              inadvertently put them together.  So I just

 8              want it to be clear for the record, it's notes

 9              of two different dates.  I'm going to start

10              with the first page of D6.

11                   There is again handwritten notes.  You

12              haven't seen those notes before I just showed

13              them to you, correct?

14     A        Correct.

15     Q        Did you have a telephone communication with

16              someone from Mr. Garabedian's office or

17              Mr. Garabedian on December 26, 2018?

18     A        I don't recall.  The conversations were so few

19              and far between, I don't remember specific

20              dates.  But this might have been one of the

21              check-ins that I did receive.

22     Q        Okay.  Just to refresh your recollection,

23              we'll go back to D7.  That's -- These are

24              notes from a discussion you had on --

25     A        Yes.
```

Kurtis N. Poulos

```
 1    Q    -- December 19th, 2018, right?

 2    A    Correct.

 3    Q    So now we're -- now we're on December 26,

 4         2018.  So that's like a week later, right?

 5    A    Correct.

 6    Q    All right.  And so I'll scroll to the page

 7         where it says, "Kurt had Ralston as," and then

 8         you can see down on the bottom "sophomore

 9         year, geometry."  Can you read that section to

10         yourself and then confirm for me whether

11         that's information that you provided to

12         Mr. Garabedian or someone from his office?

13    A    It is.

14    Q    Okay.  I've scrolled down to the sentence that

15         says, "Ralston made Kurt," and then it ends on

16         the bottom, "lived in the same building as

17         Ralston."

18             Can you do the same, read that and tell

19         me if that's information you provided to

20         Mr. Garabedian or someone from his office?

21    A    Yes.

22    Q    And then, "Only interaction when on one" down

23         to "No contact since high school," is that

24         information you communicated to Mr. Garabedian

25         or someone from his office?
```

```
 1    A    Correct.

 2    Q    Then we're going to the second page of D6,

 3         which again has a different date, 12/21/2018

 4         on the top right.  It says, "MG, NG." Did you

 5         have a telephone call with Mr. Garabedian and

 6         someone else on December 21, 2018?

 7    A    I believe so, briefly.

 8    Q    It says, "MG tells client that they need to

 9         speak to the client about the case.  Client

10         will call Monday."

11             Do you know what Mr. Garabedian needed to

12         speak to you about?

13    A    No, I don't recall.

14    Q    Did you learn that Mr. Garabedian was going to

15         send or did send a second letter to the school

16         around the time of these telephone

17         communications that we've been looking at,

18         middle to the end of December, 2018?

19    A    Possibly, yes.

20                 MS. DOUGHERTY:  Those are my

21         questions.

22                 MR. JUBB:  Mr. Poulos, would you

23         like to go to your appointment and schedule a

24         different time?

25                 THE WITNESS:  How much more time do
```

Kurtis N. Poulos

```
 1          you need?

 2                    MR. JUBB:  Well, I would just be

 3          limited to some of the questions that she

 4          asked you, but I don't -- I don't know.  It

 5          depends on your responses.  But probably,

 6          like, 10 to 15 minutes.  So you said you had

 7          to go at three.  Now it's 3:20.

 8                    THE WITNESS:  Let me just --

 9                    REPORTER:  Do you want to go off the

10          record?

11                    MR. JUBB:  Yes.

12                    MS. DOUGHERTY:  Mr. Poulos, we don't

13          want to inconvenience you but we also don't

14          want you to have an adverse impact at work.

15                    VIDEOGRAPHER:  The time is 2:21.

16          We're off the record.

17          (Off the record.  Recess taken.)

18                    VIDEOGRAPHER:  The time is 2:22.

19          We're back on the record.

20          EXAMINATION BY MR. JUBB:

21     Q    Mr. Poulos, I'm going to show you what was

22          produced to me as MG -- excuse me --

23          Garabedian File 33.  This was the 12/12/17

24          notes that you went over with counsel.  Do you

25          recall going over this with her?
```

Kurtis N. Poulos

```
 1    A    Yes.

 2    Q    All right.  And then she asked you about the

 3         "Arrested, Wisconsin, Connecticut, breaking

 4         and entering, disorderly conduct; felonies,

 5         no; jail time, none."  Do you recall getting

 6         asked about that?

 7    A    Yes.

 8              MS. DOUGHERTY:  This is D5, just so

 9         you know, if you wanted to use that.

10              MR. JUBB:  That's okay.  I just

11         remember it because it's Garabedian File 33.

12              MS. DOUGHERTY:  Okay.

13         BY MR. JUBB:

14    Q    And with this, Mr. Poulos, when I asked you

15         about this -- I guess it was about a month

16         ago -- you said you never had any breaking and

17         entering, correct?

18              MS. DOUGHERTY:  Objection.  I don't

19         think you asked him about the notes.

20              MR. JUBB:  I'm quite confident I

21         did.

22         BY MR. JUBB:

23    Q    Mr. Poulos, what did you tell me last time we

24         spoke about breaking and entering?

25    A    That I didn't recall that I had one, but I
```

Kurtis N. Poulos

```
 1            don't exactly have the greatest memory, so --
 2   Q    Well, I asked you whether or not you told
 3        Mr. Garabedian you had any felonies, and you
 4        said you did not have any felonies, correct?
 5   A    Yes.  I didn't believe at the time that I did.
 6   Q    Did you somehow learn from the last time we
 7        spoke and now that you actually did commit a
 8        felony?
 9   A    My mother has made me aware that there might
10        be -- or there is a felony on my record.  I
11        was not aware of that.  I thought my attorney
12        had squashed it down to a misdemeanor and
13        that's why I did not go to jail.
14   Q    Okay.  And what was it that you thought was
15        the misdemeanor that your attorney took care
16        of?
17   A    It was a violation of a restraining order.
18        Mind you, at the time that that was all
19        happening in my life, I was heavily drugged
20        and drinking, so 90 percent of what was going
21        on in my life at that time I wasn't paying
22        attention to.
23   Q    Were you paying attention when Mr. Garabedian
24        was asking you questions about your criminal
25        background?
```

Kurtis N. Poulos

```
 1    A    Yes.

 2    Q    All right.  Did you tell him that you had

 3         violated some sort of protection from abuse

 4         order then?

 5    A    Possibly.

 6    Q    He didn't write it down, though, did he?

 7    A    I don't know whose handwriting that is.

 8    Q    Well, you told him you did no jail time,

 9         right?

10    A    Correct.

11    Q    You didn't tell him a couple of overnighters,

12         right?

13    A    Yes.

14    Q    Why did you lie to him?

15    A    I didn't.

16              MS. DOUGHERTY:  Objection.

17         BY MR. JUBB:

18    Q    Okay.  So do you have any idea how

19         Mr. Garabedian or whoever was writing these

20         notes got the impression that you did no jail

21         time?

22    A    No.  I mean, I had to wait to pay bail and

23         then I went home.

24    Q    As you sit here today, are you saying that

25         you've never done any jail time?
```

```
 1    A    No.  I said I've done a couple of overnighters
 2         waiting for bail to be posted.
 3    Q    And is it your testimony that you did or did
 4         not tell Mr. Garabedian that?
 5    A    I don't recall.
 6    Q    Well, as of December of 2017, did you remember
 7         that you had done those overnighters and jail
 8         time?
 9    A    Yes.  I told him that I had done that.
10    Q    And to the extent that he wrote down in his
11         notes "None," that would be incorrect, fair?
12              MS. DOUGHERTY:  Objection.
13              THE WITNESS:  (Inaudible response)
14         BY MR. JUBB:
15    Q    You said what?
16    A    I said "I guess so."
17    Q    Now, with respect to the reference we see
18         "Psychology, Mom would know late '90s," I
19         believe you told counsel that you were on and
20         off since you were around seven or eight.  Do
21         you remember that?
22    A    Yes.
23    Q    And you told Mr. Garabedian that, correct?
24    A    Correct.
25    Q    What did you tell him about your psychological
```

```
 1           and psychology treatment on and off since you
 2           were seven or eight?
 3    A      That my early psychological treatment prior to
 4           high school mostly dealt with my mother and my
 5           father's relationship and my living situation,
 6           where the court had decided that I needed to
 7           speak with a psychiatrist and use their
 8           recommendation as to where I would have my
 9           full time residence, whether it be with my
10           mother or my father, which would be more
11           stable for me as an adolescent.
12    Q      But you said you were on and off since you
13           were seven or eight.  That would only cover
14           the seven or eight part.  Where is the other
15           ons after that?
16    A      That was still part of it.  They were still
17           fighting over custody for me up until I
18           finally told my father, like, "You just need
19           to stop with this.  I'm not going to live with
20           you."
21    Q      Okay.  And at approximately what age were you
22           at that point?
23    A      I don't know.  11 or 12, so just before high
24           school.
25    Q      All right.  And what was the therapy after
```

```
 1          that?
 2     A    The therapy after that was my freshman or
 3          sophomore year of college, I went to see a
 4          therapist about being depressed.
 5     Q    Who was that?
 6     A    I don't remember his name.  It was a family
 7          referral.
 8     Q    Where was it?
 9     A    In Milwaukee, Wisconsin.
10     Q    And you went to him because you were depressed
11          your freshman and sophomore year of college.
12          Is that right?
13     A    Yes.  My girlfriend at the time was worried
14          about me.
15     Q    And when you went to those therapy sessions,
16          did you ever tell your therapist that you were
17          in any way depressed or had anything to do
18          with being sexually abused just a couple years
19          ago?
20               MS. DOUGHERTY:  Objection.
21               THE WITNESS:  As I stated earlier,
22          no, I never previously brought up any sexual
23          abuse with my therapists before Dr. Brodick
24          (Phonetic).
25          BY MR. JUBB:
```

Kurtis N. Poulos

```
1    Q    And did you tell the therapist that your
2         depression-like symptoms were actually related
3         to your family issues?
4    A    No, I did not.
5    Q    Did you tell them you were depressed?
6    A    Yes.  I just was not honest with him about why
7         I was depressed.  I was ashamed.
8    Q    I see.  And then so when we pull up here
9         MG35 -- Excuse me.  I keep saying "MG," but
10        it's Garabedian File 35.  On these notes you
11        were asked about the cubicles in the basement
12        of the school.  Do you remember that?
13   A    Yes.
14   Q    All right.  Describe those cubicles for me.
15   A    To the best of my recollection, they were in
16        the basement of the library.  This was a small
17        corridor with a few rooms and a built-in desk
18        so you could go down there with a couple of
19        textbooks and study or write and not be
20        disturbed.
21            There was a door that would allow no
22        access other than the one student who was
23        supposed to be in that room studying by
24        himself.
25   Q    And you said that Mr. Ralston had come down
```

```
 1          and told you to get out of there?
 2     A    Yes.
 3     Q    All right.  What were you doing down there
 4          that you were told to get out?
 5     A    Like I addressed to Candidus earlier, it was
 6          close to my curfew when I needed to be back in
 7          my under form dorm, and he was questioning if
 8          I had permission to be down there and why I
 9          was down there and why I was down there so
10          late and that I need to go back to my dorm for
11          check-in.
12     Q    But did he say that you were somehow not
13          supposed to be there?
14     A    He implied, like, "Why are you down here so
15          late?  Get out.  You're too --" You know, I
16          was a third form, so I was at best 14,
17          15 years old.  So if a teacher says "You need
18          to go back to your dorm," you go back to your
19          dorm.
20     Q    Were you the only student down there?
21     A    I believe so, yes.
22     Q    So you're a third form by yourself in the
23          basement of cubicles, and the alleged sex
24          abuser at this point just tells you to leave.
25          Is that right?
```

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  (Inaudible response)

 3                    REPORTER:  What was the answer?  I'm

 4          sorry.

 5                    THE WITNESS:  No.  It wasn't that

 6          way.  He told me -- He asked me first why I

 7          was down there.  I explained that my dorm

 8          master had given me permission to go down

 9          there and study alone, so that's what I was

10          doing.  And I was going to make it back from

11          the library to upper school with plenty of

12          time to make my curfew.  I was not in a good

13          relationship with my roommate.  He was a

14          kleptomaniac freak, so I did as much as I

15          could to not be in my dorm room.

16          BY MR. JUBB:

17     Q    Am I correct, though, that you had every right

18          to be down in this basement.  Is that right?

19     A    Correct.

20     Q    But nonetheless, Mr. Ralston kicked you out,

21          right?

22     A    Yes.  And I believe it could have been due to

23          curfew or -- I don't know what else, but it

24          was a matter of "Go back to your dorm."

25     Q    And after that, you never went back down to
```

Kurtis N. Poulos

```
 1           the cubicles in the basement again.  Is that
 2           it?
 3    A      No.  My home master allowed me to start
 4           studying in the common room on our dorm level
 5           rather than walk over to the library from the
 6           upper school building.  So -- (Zoom
 7           crosstalk)
 8    Q      Who was the home master?
 9    A      I don't remember his name.  (Audio distortion)
10                  REPORTER:  I'm sorry.  Repeat.
11                  THE WITNESS:  Who are you telling to
12           repeat?
13                  REPORTER:  The answer.  Your answer.
14                  THE WITNESS:  I remember that at the
15           end of the dorm at the far end, his apartment
16           was on one side.  Across from his apartment
17           was our common room, and I would go in there
18           and study alone rather than sit in my room
19           with a roommate that was stealing from me.
20           BY MR. JUBB:
21    Q      Okay.  You were at the school for three more
22           years after this.  Or you spent at least three
23           years at the school.  Is it your testimony you
24           never went back down to the cubicles in the
25           basement?
```

```
 1    A    Not to my recollection, no.  And if it was, it
 2         would have been because we had certain books
 3         that were not allowed to leave the library, so
 4         you had to read them on premises and then
 5         bring them back up to the librarian.  You
 6         could not check them out of the library.
 7    Q    And when this -- At the instant that you're
 8         describing happened in your third form year,
 9         this was when you were the youngest -- in your
10         freshman year.  Mr. Ralston didn't do anything
11         sexual, correct?
12    A    No.
13    Q    He wasn't creepy?
14    A    That was kind of creepy because it wasn't his
15         business.
16    Q    It wasn't his business to make sure a student
17         would be back in time for their check-in?
18    A    Well, if it was, like, five minutes after or
19         five minutes before; but it was, like, at
20         least 20 to a half -- 20 minutes to a half an
21         hour before I needed to be back in the dorm
22         that was a hundred yards away from the
23         library.
24    Q    Okay.  And then when this happened, how did
25         you respond to him?
```

Kurtis N. Poulos

```
 1      A     I just packed up my bag and whatever materials

 2            I had, and I went back to my dorm, was there

 3            for check-in.

 4      Q     I believe you told counsel that when there was

 5            reference in Mr. Garabedian's notes to "Perp

 6            told CL 'Our time for us, no one else,'" you

 7            said that had occurred when?

 8      A     I believe it was senior year when I was moving

 9            back into the dorm that he was living in but

10            not a hall master of.

11      Q     So you actually saw him your senior year in

12            this dorm, right?

13      A     No.  He didn't have a dorm.  He had an

14            apartment.  I saw him when I was moving my --

15            my -- The things that I had driven out to

16            Pennsylvania in my car with my father, we had

17            parked next to the dorm and we were emptying

18            out my Camaro, walking up the stairs to my

19            dorm, and he came outside and made that

20            comment to me.

21      Q     About your time together.  It was

22            quote/unquote "our time," correct?

23      A     Maybe not verbatim, but something to that

24            respect.

25      Q     Well, it's in quotes in Mr. Garabedian's
```

```
 1            notes, correct?

 2     A      I didn't write those quotes, so I don't know

 3            why -- I can't speak to why they're in quotes.

 4     Q      Did you tell Mr. Garabedian --

 5                    MS. DOUGHERTY:  Objection.  (Zoom

 6            crosstalk)

 7            BY MR. JUBB:

 8     Q      -- said to you during your senior year that

 9            there was going to be something that was,

10            quote/unquote, our time?

11     A      Something to that regards.  And he also made

12            other comments if you'd like to hear those.

13                    MS. DOUGHERTY:  I'm going to object.

14            Just so you're clear, I don't think anybody

15            has established whose notes they are, whether

16            they're Mr. Garabedian's or someone else's.

17            BY MR. JUBB:

18     Q      You can answer my question, Kurtis.  I'd love

19            to hear about them.  What other interactions

20            did you have?

21                    MS. DOUGHERTY:  Objection.

22                    THE WITNESS:  He confronted me on

23            multiple occasions about the fact that he knew

24            that I was smoking off campus, and he was

25            going to make sure that, you know, I was, you
```

Kurtis N. Poulos

```
 1            know, targeted and/or found out and

 2            disciplined for any improprieties the rest of

 3            the year, hence maybe why he took it upon

 4            himself to park me in when he had no authority

 5            to do so.

 6                He wasn't the dean of discipline.  He

 7            wasn't my dorm master.  He had nothing to gain

 8            except for a feeling of power and leverage

 9            over a young man.

10       BY MR. JUBB:

11    Q    Okay.  This feeling of power and leverage,

12            when he caught you smoking, did he turn you

13            in?

14    A    No, he didn't catch me.  He just said he knew

15            I was smoking.

16    Q    And -- Any other interactions you had with

17            him?

18    A    As few as possible.

19    Q    Didn't you tell Mr. Garabedian that you never

20            had any interaction with him your senior year?

21    A    No, I did not.

22    Q    So the suggestion that you somehow had no

23            interaction with Mr. Ralston your senior year,

24            that would be false, correct?

25    A    Correct.
```

```
 1    Q    And after this interaction where you're saying
 2         Mr. Ralston said to you there was going to be
 3         something that was, quote/unquote, our time,
 4         that never happened, did it?
 5    A    That he ever said that?
 6    Q    There was never a time that you were with him,
 7         correct?
 8    A    That's not what I said.  I said I went out of
 9         my way to avoid spending time with him.
10         Obviously I'm going to have to interact with
11         almost everybody on the campus every single
12         day.  And he was in the same building that I
13         lived in.
14    Q    Right.  In the same building that you lived
15         in, and despite the fact that teachers are
16         allowed to come into rooms whenever they want
17         like was written in the notes, he never did
18         that, did he?
19    A    My senior year, no.  Because senior --
20    Q    Why not?
21    A    -- year is completely different than sophomore
22         year or freshman year.  Senior year we do not
23         have study hall times.  We're not required to
24         be in our dorms after dinner.
25              Frankly, as soon as we are through with
```

Kurtis N. Poulos

```
 1             our dinner and messages from the headmaster,

 2             all of the seniors are allowed to leave the

 3             dining hall and basically do whatever they

 4             want, to an extent.  So I would go to other

 5             dorms.  I would go to other dorm rooms.  I

 6             would go anywhere on campus to spend as little

 7             time in my actual dorm room my senior year as

 8             possible.

 9   Q    I thought that you had just told counsel that

10        you ate 90 percent of your meals in your room.

11        Is that true or false?

12             MS. DOUGHERTY:  Objection.

13             THE WITNESS:  That's true.

14   BY MR. JUBB:

15   Q    That's true.  Okay.  So you're eating

16        90 percent of your meals in your room, but

17        then you didn't want to be in your room every

18        other time?

19   A    I had a lockbox at the base of my bed that I

20        kept food in.  I would go and get a quick bite

21        to eat, whether it be a cup of noodles or

22        ramen.  Some nights it was just cans of raw

23        tuna.  I would scarf down whatever I could,

24        and then I would just walk.

25             And sometimes I would break the rules and
```

Kurtis N. Poulos

```
 1              just leave campus.  There was a cemetery at

 2              the end of the campus.  I would go over there

 3              and sit down, listen to music and come back

 4              around nine-ish, watch some TV in the common

 5              room with the rest of the people in my dorm

 6              and then go to sleep.

 7     Q    Who were the people in your dorm that you were

 8              close with?

 9     A    Fabritzio (Phonetic) was one of them.  He was

10              an EMT.  He was a kid from -- (Audio

11              distortion)

12                   REPORTER:  Spell his name and where

13              he was from?  I'm sorry.

14                   THE WITNESS:  I don't recall the

15              spelling of his name.  I believe he was from

16              Washington, D.C.  There was another gentleman

17              that lived on my hallway named Clay.  I

18              believe he was from Vermont or New Hampshire,

19              so I would hang out in his room.  And he had

20              somehow gotten a TV and a PlayStation, so we

21              would sit in there and play video games with

22              the door shut and locked.

23          And like I previously stated, we were not

24              allowed to have locked doors if we were in the

25              room, so we would just stay dead silent.
```

Kurtis N. Poulos

```
 1              BY MR. JUBB:

 2     Q    Okay.  Anybody else you hung out with?

 3     A    Lance Whitlock and Kent Andres (Phonetic).

 4     Q    Who did you hang out with your sophomore year?

 5     A    Mostly Jeff Glenn.

 6                  REPORTER:  Say the name again?

 7                  THE WITNESS:  Jeff Glenn, G-L-E-N-N,

 8          as in Senator Glenn.

 9              BY MR. JUBB:

10     Q    You mentioned that -- In the notes that we

11          went over, there was reference that you had

12          lost 80 to 90 pounds when you were in high

13          school from not eating?

14     A    Correct.

15     Q    So you would have been -- If you had lost 90

16          pounds, then you would have been at least

17          200 pounds freshman year, right?

18     A    I was about 140 pounds.

19     Q    By the time you graduated?

20     A    Correct.

21     Q    So then you would have been 240 pounds at the

22          time you got there?

23                  MS. DOUGHERTY:  Objection.

24                  THE WITNESS:  I had a growth spurt

25          when I was in France.
```

```
 1                    REPORTER:  Repeat the answer, sorry.

 2                    THE WITNESS:  I had a huge growth

 3          spurt when I was in France my junior year of

 4          high school, and I gained a lot of weight.

 5          And by the end of my senior year, I had lost

 6          at least 80 pounds, I would say.  I don't

 7          know.  I didn't weigh myself every day.

 8          BY MR. JUBB:

 9     Q    You're saying that when you were a junior in

10          high school you had a growth spurt and somehow

11          gained 80 to 90 pounds at one point.  Is that

12          right?

13     A    All I did when I was in France was eat, and I

14          grew like six inches in the couple of months

15          that I was there.

16     Q    And then you came back in your senior year and

17          you lost 80 to 90 pounds?

18     A    Probably something close to that.  I don't

19          know the exact number.  I know that I went

20          down to a size 30 pants waist and I was, like,

21          at least a 36.

22     Q    You mentioned that you told Garabedian about

23          not being able to be touched, or that if your

24          mom slapped you on your butt you would kind of

25          get uncomfortable.  Do you recall saying that?
```

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  Yes.

 3          BY MR. JUBB:

 4      Q   And that other people, you know, just like

 5          patting you on the back, that was

 6          uncomfortable.  Or slapping you on the back,

 7          that was uncomfortable, correct?

 8      A   Correct.  I didn't -- Even with my current

 9          girlfriend, if she tries to wake me up and

10          touches me in a certain place, I freak out and

11          I don't -- don't know how she just doesn't do

12          that.

13      Q   Well, what about your other girlfriends that

14          you had?  Did you have any problems with them

15          touching you?

16      A   Yes.

17                    MS. DOUGHERTY:  Objection.

18          BY MR. JUBB:

19      Q   So Emily would say that you had touching

20          problems, correct?

21      A   It got so bad that one morning she touched me

22          a certain way, and I believe I put my hands

23          around her throat.

24      Q   I guess that would lead to the other

25          protection from abuse order, correct?
```

```
 1           (Zoom crosstalk)

 2                   MS. DOUGHERTY:  Objection.

 3                   REPORTER:  Wait a minute.   Repeat

 4           the question.

 5                   MR. JUBB:  I said I guess that would

 6           lead to the other protection from abuse order,

 7           correct?

 8                   MS. DOUGHERTY:  Objection, move to

 9           strike.

10                   REPORTER:  What was the answer?

11                   THE WITNESS:  You'd be wrong.

12           BY MR. JUBB:

13      Q    What about the other girlfriend that has a

14           protection from abuse order against you?  Did

15           you have any problems touching her?

16                   MS. DOUGHERTY:  Objection.

17                   THE WITNESS:  Did I have any

18           problems touching her?

19           BY MR. JUBB:

20      Q    I'm sorry.  Did you have any problems with her

21           touching you?

22      A    Yes, the same issues.

23      Q    So both of them would say if they were under

24           oath, "He always had these issues with me

25           touching him," right?
```

```
 1     A    At times, yes.  If I was unaware of what was

 2          going to happen, yes.  I would feel

 3          uncomfortable and threatened.

 4     Q    I see.  And at any point in time did you ever

 5          relay that some of your touching issues were

 6          because your dad used to beat you?

 7     A    No.

 8                    MS. DOUGHERTY:  Objection.

 9                    THE WITNESS:  Because it didn't

10          have anything to do with that.

11          BY MR. JUBB:

12     Q    Okay.  When you were talking about all those

13          bad dreams about going back to school, did you

14          tell your then girlfriend at the time that you

15          didn't want to drive to The Hill School that

16          she wanted to go to because you had these

17          night tremors, waking up and sweating and

18          screaming?

19                    MS. DOUGHERTY:  Objection.

20                    THE WITNESS:  No.

21          BY MR. JUBB:

22     Q    Ever have any of those that she would know of?

23                    MS. DOUGHERTY:  Objection.

24                    THE WITNESS:  I only went by that

25          school with one of my ex-girlfriends and that
```

```
 1              was when I was in my late teens, early 20s.
 2              BY MR. JUBB:
 3     Q    Closer in time to when the alleged abuse would
 4              have occurred, correct?
 5     A    Correct.  All we did was drive around the
 6              campus, and we got back on the highway and
 7              drove back to Milwaukee.
 8     Q    Would Ms. Peters or your other -- Karen --
 9              would they have any knowledge of these night
10              sweats and screams that you talk about?
11                   MS. DOUGHERTY:  You said "or your
12              other" -- What was -- I didn't hear the -- Did
13              you say "carrot"?
14                   MR. JUBB:  Other girlfriend, Karen,
15              yeah.
16                   MS. DOUGHERTY:  Okay.
17                   THE WITNESS:  Emily would realize,
18              yes.
19              BY MR. JUBB:
20     Q    Am I correct when you were describing your mom
21              being fed up that nothing was going on because
22              they couldn't get a response from the school,
23              at that point in time it was your
24              understanding and your mom's understanding
25              that the school was unresponsive, correct?
```

```
 1    A    Correct.

 2    Q    They weren't sending any e-mails to

 3         Mr. Garabedian, right?

 4    A    Not to my knowledge.

 5              MS. DOUGHERTY:  Objection.

 6         BY MR. JUBB:

 7    Q    There was never a request to speak with you or

 8         anything, correct?

 9              MS. DOUGHERTY:  Objection.

10              THE WITNESS:  No.

11         BY MR. JUBB:

12    Q    You said you were sober in December of 2018,

13         correct?

14    A    Correct.

15    Q    That would be a good time to speak to somebody

16         about your allegations when you're sober,

17         correct?

18    A    As far as people, who?  Who are you referring

19         to?  "That would be a good time to speak to

20         somebody," who are you referring to?

21    Q    How about people who would be -- I don't

22         know -- examining or investigating your claims

23         of sexual abuse?

24    A    Possibly.  But maybe this isn't something I

25         want to speak about every day to people I do
```

```
 1            not know.
 2                   MR. JUBB:  I'm done.
 3            EXAMINATION BY MS. DOUGHERTY:
 4    Q    Mr. Poulos, did you speak to Mr. Garabedian
 5         in -- Well, let me start again.
 6              Mr. Poulos, did you speak to
 7         Mr. Garabedian at any time about participating
 8         in a mediation with The Hill School?
 9    A    It might have been brought up as a
10         possibility.  I don't recall the specifics of
11         the conversation.
12    Q    Do you remember when?
13    A    No, I do not.
14    Q    How about, were you sober at the time or not
15         sober at the time?
16    A    Again, if I don't know the timeline I don't
17         know -- I fell off the wagon a couple of times
18         and got back on, so -- It depends on the date.
19    Q    Was it after you learned that Mr. Garabedian
20         had sent a letter to the school?
21    A    Possibly.  Again, if I don't have a timeline,
22         I can't tell you what was going on.
23    Q    I realize you don't know the specific date.
24         I'm asking about events, so maybe you could
25         place it in time with the events without
```

Kurtis N. Poulos

```
 1              regard to whether you know the specific date.

 2                   Was it after your mom expressed

 3              frustration that the school wasn't reacting to

 4              Mr. Garabedian?

 5       A      Not to my knowledge.

 6                        MS. DOUGHERTY:  Those are my

 7              questions.

 8              EXAMINATION BY MR. JUBB:

 9       Q      Tell me when -- Currently are you sober?

10       A      Yes.  (Zoom crosstalk)

11                        REPORTER:  I'm sorry.  Repeat your

12              answer.

13                        MS. DOUGHERTY:  Objection.

14              BY MR. JUBB:

15       Q      All right.  Tell me the last time you fell off

16              the wagon.

17                        MS. DOUGHERTY:  Objection.

18                        THE WITNESS:  Over seven months ago.

19              BY MR. JUBB:

20       Q      And during the time of December of 2017 when

21              you first were contacting the Garabedian law

22              firm up until you got sued in this lawsuit,

23              were you -- what's your testimony in terms of

24              how long or approximately how many times you

25              were sober?
```

```
 1                    MS. DOUGHERTY:  Objection.

 2                    THE WITNESS:  I would drink

 3          recreationally with -- sorry -- with Emily,

 4          usually at home.

 5                    MR. JUBB:  Nothing further.

 6                    MS. DOUGHERTY:  I don't have any

 7          further questions.  Thank you, Mr. Poulos.

 8                    VIDEOGRAPHER:  The time is 2:51.  We

 9          are off the record.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STATE OF WISCONSIN)

 2                    ) SS:

 3   COUNTY OF WAUKESHA)

 4      I, Beth Zimmermann, a Registered Professional

 5   Reporter and Wisconsin Notary Public, certify that

 6   KURTIS N. POULOS swore under oath to tell the truth,

 7   the whole truth, and nothing but the truth, and that I

 8   stenographically reported and reduced to typewriting

 9   the deposition.

10      I certify that I am neither related to nor an

11   employee of any party or attorney to this action, and

12   I certify that I have no financial interest in the

13   matter.

14

15   Dated June 7, 2021.

16

17

18

19                    _____
                                BETH ZIMMERMANN

                      BETH ZIMMERMANN

20

21

22

23   Court Reporter and Notary Public

24   My Commission Expires 10/21/2021.

25
```