## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MATTHEW RALSTON** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO.  19-1539** |
| | **:** | |
| **MITCHELL GARABEDIAN, ESQ.,** *et* | **:** | |
| *al.* | **:** | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                    December 23, 2021

A lawyer representing a former student may notify a school of a former teacher allegedly sexually abusing his client twenty-plus years earlier. The lawyer may privately do so with no court or media involvement when the former student does not want public review of the sexual abuse claim. But assertions of student sexual abuse may harm a teacher's reputation. And valid policy reasons protecting lawyers' advocacy fade when the lawyer does not seriously contemplate litigation. We today address whether a lawyer's two letters to a private school headmaster in 2018 containing allegations of sexual abuse against a former teacher from 1993 to 1995 and demanding a million dollars in compensation even though his claims are barred by the statute of limitations may be defamatory. The lawyer and his client seek summary judgment. They argue, among other things, the private letters are privileged and the former teacher accused in the letter cannot show the lawyer possessed actual malice necessary to proceed on the defamation claim. We balance the right to fully report sexual abuse with the teacher's rights to protect his reputation from false statements. The lawyer and his client have not shown they are entitled to summary judgment dismissing the former teacher's defamation claim. They have not shown us a basis for a privilege or an actual malice standard applying to the statements made about the former teacher in the private letters. We deny the lawyer's and his client's motions for summary judgment.

I.    **Facts adduced in discovery.**[1]

Matthew Ralston taught math at the Hill School from 1992 to 2009.[2] He became Academic Dean in 1995.[3] As Academic Dean, he served as the "[p]oint person between school, students[,] and parents for all academic concerns."[4] He became the Dean of Faculty in 2006.[5] He oversaw "faculty hiring, retention, and overall education," including "daily operation of the school."[6] He also coached cross country, track, and lacrosse; served as a "dorm parent" and won a "Dorm Parenting Prize" in 2003; chaired the mathematics department; and served as director of financial aid, among other positions.[7]

Mr. Ralston left the Hill School in 2009 to become headmaster of a Michigan school.[8] He returned to the Hill School in 2016 as a "Capital Giving Officer."[9] Mr. Ralston's role after 2016 required him to meet "with alumni to increase engagement and solicit support for the School."[10] The Hill School hired Mr. Ralston as a capital giving officer because he "had a lot of experience with the school, [and] he knew a range of alumni given his years of service as a faculty member."[11] Mr. Ralston claims he developed "thousands of healthy relationships in schools" during his career.[12]

### The Hill School sends letters to alumni regarding sexual abuse.

Hill School Headmaster Zachary Lehman sent two letters to Hill School alumni regarding sexual abuse in boarding schools.[13] He sent the first letter in April 2016.[14] Headmaster Lehman acknowledged allegations of sexual abuse against employees of boarding schools nationally.[15] He assured alumni and parents the Hill School does not tolerate sexual abuse and outlined the Hill School's "rigorous protocol" for ensuring sexual abuse does not occur at the Hill School.[16]

Headmaster Lehman sent his second letter in November 2017.[17] Unlike his April 2016 letter which addressed sexual abuse nationally, the November 2017 letter addressed abuse at the

Hill School. Headmaster Lehman explained the Hill School reviewed "historical allegations of abuse at The Hill and the School's responses to those allegations."[18] He advised alumni the Hill School hired Attorneys Leslie Gomez and Gina Smith—"nationally recognized" experts in the field—to review the allegations of past abuse at the Hill School and the Hill School's responses to the allegations.[19] Their review revealed "several troubling incidents in The Hill School's history."[20] Headmaster Lehman apologized for the past misconduct, assured the Hill School community of its procedures preventing abuse, and invited the community to contact Headmaster Lehman, Attorney Smith, or Attorney Gomez with "observations and feedback."[21]

### *Mr. Poulos retains Attorney Garabedian but they agree to not sue for the sexual abuse.*

Hill School alumnus Kurtis Poulos contacted Attorney Mitchell Garabedian in December 2017 after he received Headmaster Lehman's letters.[22] Mr. Poulos informed Attorney Garabedian Mr. Ralston sexually abused him while he attended the Hill School from 1993 to 1995.[23] Mr. Poulos provided information about his academic history, family history, the details of the sexual abuse, details of bullying by Mr. Ralston, and the description of Mr. Ralston.[24]

Mr. Poulos and Attorney Garabedian signed a contingent fee agreement dated December 18, 2017.[25] They agreed the "claim, controversy, and other matters with reference to which the services are to be performed are: Injuries caused by Matthew Ralston . . .; and The Hill School."[26] They confirmed: "Client and Lawyer agree that a complaint or lawsuit will not be filed in this matter because the Statute of Limitations has run or expired."[27] Mr. Poulos swears "at the time" he signed the agreement, he understood Attorney Garabedian would not "file a lawsuit . . . because the statute of limitations had run or expired."[28] He swears he retained Attorney Garabedian because he wanted to "be prepared" to file a lawsuit if Pennsylvania's statute of limitations for his claims changed.[29] He believed other states had changed their statutes of limitations for similar claims and

Pennsylvania might change its statute of limitations as well.[30] Two of Attorney Garabedian's associates who assisted Attorney Garabedian on Mr. Poulos's matter—Nathan Gaul and Daniel Mahoney—testified they understood the statute of limitations for Mr. Poulos's potential claims against Mr. Ralston or the Hill School had expired.[31] Attorney Garabedian also swore he knew the statute of limitations expired.[32]

### Attorney Garabedian sends April 2018 letter accusing Mr. Ralston of sexual abuse.

Attorney Garabedian sent a letter to Headmaster Lehman on April 11, 2018.[33] Attorney Garabedian informed the Hill School his firm represented Mr. Poulos.[34] He wrote, "[t]his letter is an attempt to settle and compromise claims involving Matthew B. Ralston."[35] He accused Mr. Ralston of "repeatedly sexually molest[ing]" Mr. Poulos while he attended the Hill School from 1993 to 1995, when Mr. Poulos was fifteen to seventeen years old.[36] Attorney Garabedian alleged numerous injuries Mr. Poulos suffered from the alleged abuse.[37] He wrote: "Mr. Poulos's demand for settlement is $1,000,000.00."[38]

The Hill School's attorney, Thomas Rees, wrote to Attorney Garabedian on April 24, 2018.[39] Attorney Rees notified Attorney Garabedian his law firm represented the Hill School and asked Attorney Garabedian to communicate with him regarding the matter.[40] There is no record of Attorney Garabedian then responding to Attorney Rees.[41] Mr. Poulos emailed Attorney Garabedian in September 2018: "I haven't heard from you in quite some time. I am just wondering if you have any updates concerning my case against the Hill School."[42] The day after Mr. Poulos sent the email, Attorney Garabedian called Attorney Rees and left him a voicemail.[43] The record contains attorney notes suggesting Attorney Garabedian spoke with Mr. Poulos's mother, an attorney, on December 12, 2018, and told her "there's a movement to amend" the Pennsylvania statute of limitations which is "projected to take about 9–12 months, but no guarantees."[44]

Attorneys Garabedian and Gaul spoke with Attorney Rees on December 21, 2018.[45] Attorney Rees requested more information about Mr. Poulos's claims, and Attorney Garabedian agreed to provide it.[46] Attorney Rees asked to interview Mr. Poulos.[47] Attorney Garabedian countered with a proposal of mediation.[48]

### Attorney Garabedian sends December 2018 letter accusing Mr. Ralston of sexual abuse.

Attorney Garabedian sent a second letter to the Hill School on December 26, 2018.[49] He addressed this letter to Attorney Rees.[50] Attorney Garabedian wrote Mr. Poulos met Mr. Ralston during Mr. Poulos's freshman year at the Hill School in 1993 or 1994.[51] Mr. Ralston taught Mr. Poulos Geometry during Mr. Poulos's sophomore year when Mr. Poulos was fifteen or sixteen years old.[52] Mr. Ralston allegedly made Mr. Poulos stay behind after class on certain days, leaving the two alone in the classroom.[53] Mr. Ralston allegedly "sexually abused" Mr. Poulos in the classroom ten to fifteen times.[54] He alleged Mr. Ralston "fondl[ed] Mr. Poulos's penis and testicles, skin on skin; Mr. Ralston ma[de] Mr. Poulos fondl[e] Mr. Ralston's penis and testicles, skin on skin; Mr. Ralston put[] his mouth on Mr. [Poulos's] penis; and Mr. Ralston ma[de] Mr. Poulos put his mouth on Mr. Ralston's penis."[55] Mr. Poulos transferred to a school in Wisconsin for his junior year, then returned to the Hill School for his senior year.[56] Mr. Ralston did not abuse Mr. Poulos when he returned to the Hill School.[57] Attorney Garabedian's December 26 letter did not include a settlement demand.[58] He instead concluded: "Please advise me as to your client's position with regard to this matter."[59]

Headmaster Lehman read the December 26 letter.[60] He asked Mr. Ralston to "please keep his campus access limited to wherever he was staying and the Office of Institutional Giving" when he made campus visits.[61] Headmaster Lehman also instructed Mr. Ralston "not to be alone with students."[62]

Attorney Rees responded to the December 26 letter on January 9, 2019, informing Attorney Garabedian the Hill School began an investigation of Mr. Poulos's allegations.[63] Attorney Rees proposed the Hill School's outside attorneys meet with Mr. Poulos to investigate the allegations.[64] We have no evidence Attorney Garabedian responded to Attorney Rees's proposal of a meeting. Attorney Garabedian instead wrote to Attorney Rees on January 28, 2019 and again asked about mediation.[65] Attorney Rees emailed Attorney Garabedian on January 30, February 21, and March 26 inquiring about Mr. Poulos meeting the Hill School's outside attorneys.[66] Attorney Garabedian again did not respond to Attorney Rees.[67] The parties do not adduce evidence of any further communications between them regarding the meeting with the Hill School's attorneys or mediation.

Attorneys Garabedian and Gaul spoke with Mr. Poulos in April 2019.[68] Notes from Attorney Garabedian's office dated April 3, 2019 show Attorney Garabedian told Mr. Poulos "we should wait to see if SOL changes" and said, "we'll give it a year."[69] Attorney Garabedian never sued on Mr. Poulos's behalf.

### Mr. Ralston sues Mr. Poulos and Attorney Garabedian.

Mr. Ralston sued Attorney Garabedian, his law firm, and Mr. Poulos.[70] He alleged claims of defamation and intentional infliction of emotional distress against both Attorney Garabedian and Mr. Poulos.[71] Mr. Ralston alleges Attorney Garabedian and Mr. Poulos defamed him by publishing false allegations of sexual abuse in the 2018 letters.[72]

### The Hill School fires Mr. Ralston.

The Hill School placed Mr. Ralston on administrative leave after he filed this lawsuit.[73] Attorney Rees wrote to Mr. Ralston he placed him on leave because suing an alumnus is

incompatible with his duties as a capital giving officer.[74] The Hill School terminated Mr. Ralston in October 2019.[75]

Headmaster Lehman swore he did not know of "any accusations or findings of any sort of improper conduct by Mr. Ralston" at the time he sent his April 2016 and November 2017 letters.[76] And Headmaster Lehman had not received allegations of misconduct by Mr. Ralston except for the allegations contained in Attorney Garabedian's 2018 letters.[77] Attorneys Smith and Gomez did not investigate Mr. Ralston as part of their review of historical allegations of sexual abuse at the Hill School.[78] Mr. Ralston swore he did not see Headmaster Lehman's April 2016 letter until after he returned to the Hill School as a capital giving officer.[79]

## II.    Analysis

Attorney Garabedian moves for summary judgment on Mr. Ralston's remaining defamation claim.[80] He argues: (1) judicial privilege protects his two 2018 letters; (2) Mr. Ralston cannot prove "actual malice," which is required because he is a limited-purpose public figure; (3) Attorney Garabedian did not abuse a conditional privilege; (4) Attorney Garabedian did not publish the 2018 letters in Ohio where Mr. Ralston lives; and (5) Mr. Ralston suffered no "special harm" from Attorney Garabedian's publication.[81] Mr. Ralston responds: (1) the judicial privilege does not apply because Attorney Garabedian never seriously contemplated litigation; (2) Mr. Ralston need not prove actual malice but even if he did, Attorney Garabedian acted with actual malice; (3) no conditional privilege applies; (4) the place where Attorney Garabedian published the letter is irrelevant because Mr. Ralston suffered reputational harm; and (5) Mr. Ralston need not prove "special harm" as Attorney Garabedian defines it.

Mr. Poulos also *pro se* moves for summary judgment on Mr. Ralston's defamation claim.[82] He argues he did not publish the letters and they are otherwise conditionally privileged. Mr.

Ralston responds Mr. Poulos published the letters because his attorney sent them and to the extent a conditional privilege applies, Mr. Poulos abused it by publishing the letters with malice or negligence.[83]

The Pennsylvania General Assembly requires Mr. Ralston must adduce evidence proving seven elements to proceed on his defamation claim under Pennsylvania law:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.[84]

We deny Attorney Garabedian's and Mr. Poulos's Motions for summary judgment.

**A.  We deny Attorney Garabedian's Motion for summary judgment.**

We deny Attorney Garabedian's Motion for summary judgment because: (1) judicial privilege does not apply because Attorney Garabedian did not seriously contemplate judicial or quasi-judicial proceedings when he sent the 2018 letters; (2) Mr. Ralston need not show Attorney Garabedian published with actual malice because Mr. Ralston is not a limited-purpose public figure; (3) genuine disputes of material fact as to Attorney Garabedian's negligence preclude application of a conditional privilege; (4) Attorney Garabedian did not need to publish the 2018 letters in Ohio where Mr. Ralston lived; and (5) Mr. Ralston need not show "special harm" as Attorney Garabedian defines it to succeed on a defamation claim.

### 1.   The judicial privilege does not protect the 2018 letters.

Attorney Garabedian argues judicial privilege bars Mr. Ralston's defamation claims. He argues he sent the 2018 letters while serving a client—Mr. Poulos—who contemplated filing a lawsuit when the letters were sent. Mr. Ralston responds judicial privilege does not apply because Attorney Garabedian agreed he would not file suit and did not seriously contemplate judicial or quasi-judicial proceedings. We find the judicial privilege does not apply because Attorney Garabedian does not show he seriously contemplated instituting judicial or quasi-judicial proceedings when he sent the 2018 letters.

"[A] publisher of defamatory material is not liable if the publication was made subject to a privilege and the privilege was not abused."[85] "The defendant bears the burden of showing the privileged nature of the communication."[86] "Whether a privilege exists [or] applies in a given context is a question of law for the court."[87]

One such privilege is the "judicial privilege."[88] The judicial privilege entitles a person "to absolute immunity for 'communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought.'"[89] "[T]he judicial privilege is not limited to statements made in open court."[90] It also covers "less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest."[91] "The contours of the privilege . . . have been shaped by a case-by-case evaluation of whether its application in specific circumstances is needed to advance its underlying policy objectives."[92]

The judicial privilege's policy objectives include the "fundamental societal need for justice to be administered freely and efficiently through the eliciting of speech from parties and witnesses that may be accusatory or otherwise reflect negatively upon another's character."[93] The privilege

encourages "[a]ll persons involved in a judicial proceeding . . . to speak frankly and argue freely without danger or concern that they may be required to defend their statements in a later defamation action."[94] It "is an integral part of a public policy which permits all suitors, however bold and wicked, however virtuous and timid, to secure access to the courts of justice to present whatever claims, true or false, real or fictitious, they seek to adjudicate."[95]

"The essential realm of protected communication is not, however, without bounds."[96] Pennsylvania courts limit the privilege's application where the "policy considerations" animating the privilege "would not be implicated."[97] The privilege applies to "communications preliminary to a proposed judicial proceeding . . . only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding."[98] "The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."[99] "Where a declarant has no intention of initiating proceedings or otherwise obtaining a remedy, clothing his or her statement with immunity cannot serve" its "goal" of "incentivizing individuals to . . . speak freely in *seeking to initiate* judicial or quasi-judicial proceedings."[100]

The issue is whether Attorney Garabedian contemplated in good faith and seriously considered initiating a judicial or quasi-judicial proceeding when he wrote the 2018 letters accusing Mr. Ralston of sexually abusing Mr. Poulos. We find he offers no evidence of doing so.

The Pennsylvania Supreme Court's examination of intent to initiate proceedings in *Schanne v. Addis* guides our analysis today.[101] In *Schanne*, adult woman Jenna Addis told high school teacher Susan O'Bannon about another teacher, Robert Schanne, maintaining an inappropriate romantic relationship with Ms. Addis while she attended the school.[102] Teacher

O'Bannon reported Ms. Addis's allegation against fellow Teacher Schanne to her high school.[103] Teacher Schanne sued Ms. Addis for defamation in our District; Ms. Addis sought summary judgment invoking the judicial privilege.[104] Judge Brody granted summary judgment to Ms. Addis based on the privilege.[105] Our Court of Appeals then certified the central issue to the Pennsylvania Supreme Court:

> Does the absolute judicial privilege apply to an allegation of sexual misconduct against a teacher by a former student, which allegation was made prior to the commencement of any quasi-judicial proceeding and without an intent that the allegation lead to a quasi-judicial proceeding?[106]

The Pennsylvania Supreme Court answered "no."[107] It found Ms. Addis's allegations did not implicate the "policy concerns which underlie the judicial privilege" because "the judicial privilege operates by incentivizing individuals to speak freely within a judicial (or quasi-judicial) context—or more to the point here, to speak freely in *seeking to initiate* judicial or quasi-judicial proceedings."[108] Ms. Addis admittedly did not intend to initiate proceedings. She spoke to Teacher O'Bannon "only as a friend and with no desire or expectation that the allegation she made against [Teacher] Schanne would result in proceedings of any type."[109] The court distinguished several courts applying the privilege where the communications "were made in a directed effort to initiate proceedings or otherwise obtain relief from school officials."[110] It found "[t]he bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."[111]

The Pennsylvania Supreme Court's direction as to Pennsylvania law in *Schanne* requires we reject Attorney Garabedian's attempt to invoke the judicial privilege today. Attorney Garabedian does not carry his burden to show he seriously contemplated initiating judicial or quasi-judicial proceedings when he sent the 2018 letters. We also reject Attorney Garabedian's argument his intent to "obtain a remedy" for Mr. Poulos suffices to invoke the privilege.

### a. Attorney Garabedian did not seriously contemplate initiating judicial proceedings when he sent the 2018 letters.

We first find Attorney Garabedian did not seriously contemplate initiating judicial proceedings when he published the 2018 letters. Attorney Garabedian and Mr. Poulos swear they knew the statute of limitations had expired for Mr. Poulos's potential claims when Attorney Garabedian sent the 2018 letters. Attorney Garabedian and Mr. Poulos memorialized this understanding in their contingent fee agreement signed before Attorney Garabedian sent the 2018 letters. They agreed "a complaint or lawsuit *will not be filed* in this matter because the Statute of Limitations has run or expired."[112] This agreement governed the scope of Attorney Garabedian's representation of Mr. Poulos. Attorney Garabedian sought to obtain a remedy for Mr. Poulos—but not through a judicial proceeding. The April 2018 letter described itself as "an attempt to settle and compromise claims," but our determination of the privilege's application necessitates "an inquiry into the factual issue of the speaker's intent."[113] The letter's self-serving characterization does not create a genuine dispute of material fact regarding Attorney Garabedian's actual intent, which his contingent fee agreement reveals. The parties' written agreement forecloses Attorney Garabedian's serious contemplation of judicial proceedings when he published the 2018 letters.

We assume Attorney Garabedian seriously contemplated a judicial proceeding before he signed the contingent fee agreement. Attorney Garabedian and his associates needed to research Mr. Poulos's legal remedies to discover the statute of limitations expired. But this research evidently led the attorneys to conclude a lawsuit was not feasible by 2018 or until the General Assembly amended the statute of limitations. Once Attorney Garabedian and Mr. Poulos signed the contingent fee agreement, they eliminated serious contemplation of a judicial proceeding they might have previously entertained given the present state of the law.

12

The adduced evidence of Attorney Garabedian's conduct after sending the 2018 letters is not what we would expect of an attorney "seriously" contemplating litigation. Attorney Rees promptly responded to Attorney Garabedian's April 2018 letter. Attorney Garabedian does not adduce evidence he responded to Attorney Rees. Mr. Poulos emailed Attorney Garabedian in September 2018 noting he had not heard from Attorney Garabedian "in quite some time."[114] Attorney Garabedian evidently did not speak with Attorney Rees until December 21, 2018. He then repeatedly did not address Attorney Rees's requests for Attorneys Smith and Gomez to meet with Mr. Poulos. He instead repeatedly proposed mediation. We think an attorney seriously contemplating judicial proceedings would do more to advocate his client's allegations of abhorrent sexual abuse after seeking a million dollars to resolve his allegations.

We recognize the Pennsylvania Supreme Court in *Schanne* addressed a non-attorney's allegation and we are reviewing Attorney Garabedian's allegations. We do not view this difference as material because the Restatement advises similar application of the judicial privilege to attorney and non-attorney conduct. The Pennsylvania Supreme Court in *Schanne* applied section 588 of the Restatement, which governs the judicial privilege's application to "witnesses in judicial proceedings."[115] The Pennsylvania Supreme Court has also applied section 586 of the Restatement, which governs the judicial privilege's application to "attorneys at law."[116] Each section's comments regarding communications preliminary to judicial proceedings are materially similar.[117] An attorney or his client must seriously contemplate judicial or quasi-judicial proceedings for the judicial privilege to apply to pre-litigation communications.

A judicial proceeding remained *possible* after Attorney Garabedian signed the contingent fee agreement. If Pennsylvania changed its statute of limitations, Attorney Garabedian and Mr. Poulos may have modified their contingent fee agreement and filed suit. But mere possibility of a

lawsuit does not warrant the judicial privilege. The California Court of Appeal rejected the judicial privilege's application to pre-litigation settlement communications where a judicial proceeding constituted "a mere possibility on the horizon" in *Edwards v. Centex Real Estate Corp.*[118] In *Edwards*, homeowners sued a construction company alleging fraudulent inducement into releases of damages for faulty construction.[119] The construction company, its insurer, and its consultants allegedly sent the homeowners pre-litigation communications which induced them to sign the releases.[120] The Court of Appeal concluded the judicial privilege did not apply to the pre-litigation communications because "the mere potential or 'bare possibility' that judicial proceedings 'might be instituted' in the future is insufficient to invoke the litigation privilege."[121] The court explained the communication "must have some relation to an imminent lawsuit or judicial proceeding which is *actually* contemplated seriously and in good faith to resolve a dispute, and not simply as a tactical ploy to negotiate a bargain"; the privilege does not apply "when a threat of litigation is made merely as a means of obtaining a settlement."[122] The court reasoned extending California's litigation privilege to pre-litigation settlement negotiations when proceedings are not seriously contemplated "would effectively condone fraud and deceit once any tort has been committed or claim has been made, on the theory that litigation 'might' result."[123] The privilege could apply only when litigation "ripened into a *proposed proceeding* that is actually contemplated in good faith and under serious consideration as a means of obtaining access to the courts for the purpose of resolving the dispute."[124]

We are persuaded by the California Court of Appeal's reasoning, which is consistent with Pennsylvania law. Attorney Garabedian argues he intended to institute judicial proceedings once Pennsylvania changed its statute of limitations for sexual abuse claims. But this evidence merely shows litigation constituted a "mere possibility on the horizon" as in *Edwards*.[125] A hope of future

litigation based on an uncontrollable contingency does not suffice to show "serious" contemplation of litigation. If it did, the privilege could apply to any pre-litigation communication, no matter how attenuated from a judicial proceeding and no matter how frivolous the pre-litigation communication is, merely because the law might someday change. This untenable application of the privilege extends it beyond its underlying policy aim of ensuring access to the courts. And it would animate the very policy concern the California Court of Appeal recognized in *Edwards*: Protecting "a threat of litigation . . . made merely as a means of obtaining a settlement." [126]

We are mindful the Pennsylvania courts developed the judicial privilege on a case-by-case basis, evaluating "whether its application in specific circumstances is needed to advance its underlying policy objectives." [127] The specific circumstances here do not advance the privilege's paramount policy objective: "[G]uaranteeing ***access to the courts*** and permitting the free articulation and resolution of ***legal claims***." [128] Attorney Garabedian and Mr. Poulos agreed they would not access the courts to resolve a legal claim. Litigation never ensued after Attorney Garabedian sent the 2018 letters—just as he and Mr. Poulos agreed. [129]

We find Attorney Garabedian did not today adduce evidence of seriously contemplating a judicial proceeding when he sent the 2018 letters. Attorney Garabedian does not adduce evidence of his serious contemplation of judicial proceedings beyond showing the proceeding constituted a "mere possibility on the horizon." We will, however, permit Attorney Garabedian to adduce evidence at trial regarding his perception of the likelihood the statute of limitations might change. We recognize neither party adduces evidence regarding the likelihood of the statute of limitations changing. If Attorney Garabedian in good faith believed an imminent change to the statute of limitations would permit him to file suit on Mr. Poulos's behalf when he published his letters, his belief may suffice to show he seriously contemplated judicial proceedings despite his contingent

fee agreement and his behavior consistent with the agreement. But Attorney Garabedian does not make the required showing today. We may revisit this issue after the close of evidence.

### b. Attorney Garabedian did not seriously contemplate a quasi-judicial proceeding.

Attorney Garabedian argues he seriously contemplated quasi-judicial proceedings because he intended to mediate his dispute and intended to instigate an investigation into Mr. Ralston. We disagree these proceedings are quasi-judicial.

The Pennsylvania Supreme Court applies the judicial privilege to communications made in anticipation of a quasi-judicial proceeding. Quasi-judicial proceedings are those in which "tribunals . . . perform judicial functions, such as proceedings by administrative officers, boards, and commissions."[130] A proceeding is "quasi-judicial" if "it involves the exercise of discretion and requires notice and a hearing."[131] Pennsylvania courts "look to the presence and exercise of discretionary decision-making authority (*i.e.*, applying the law, rules and regulations to the factual matrix of a given case) as well as the existence of procedural safeguards in the administrative proceeding similar to the safeguards afforded at a judicial proceeding (*e.g.*, notice, hearing, right to cross-examine witnesses, etc.)."[132] Our Court of Appeals held "government involvement" is "a necessary condition for according quasi-judicial status to grievance procedures" under Pennsylvania law.[133]

Attorney Garabedian argues he intended to initiate proceedings because he repeatedly suggested mediation to Attorney Rees. Mediation is not a quasi-judicial proceeding. A mediator does not possess "discretionary decision-making authority"; rather, she intervenes "between two contending parties with a view to ***reconcile them or persuade them*** to adjust or settle their dispute."[134] Mediation is a private form of dispute resolution which does not involve

administrative functions or government bodies. The parties may take or leave the mediator's suggestions.

Attorney Garabedian argues he intended to "instigate an investigation" of Mr. Ralston.[135] But Attorney Garabedian identifies no "government involvement" or "administrative or executive" body which would conduct this possible investigation. He identifies no process he intended to initiate which included a notice, hearing, or opportunity to present evidence. The Hill School is a private school which retained private counsel to conduct investigations into allegations of sexual abuse.[136] Attorney Garabedian offers no evidence of quasi-judicial proceedings.

Mr. Ralston correctly argues the adduced facts today contrast with our 2019 findings in *Fogel v. University of the Arts*, where we applied the judicial privilege to a defamation claim against a university professor who reported sexual misconduct to the university's Title IX officer.[137] We found the professor's allegations privileged because she intended to "initiate . . . quasi-judicial proceedings" by reporting misconduct to the university's Title IX officer.[138] Unlike the Hill School's private investigation, a Title IX investigation is quasi-judicial by involving an administrative body with discretionary decision-making authority.[139] Judges in our District reject application of the judicial privilege to "entirely private grievance procedure[s]."[140]

We must determine whether applying the privilege here furthers its underlying aims. Applying the privilege to the entirely private avenues of redress Attorney Garabedian used would not promote the privilege's policy aim of upholding "the good of the ***general public***" by ensuring candor in quasi-judicial proceedings.[141] We find Attorney Garabedian does not adduce evidence of seriously contemplating a quasi-judicial proceeding when he sent the 2018 letters.

> c. **Intending to "obtain a remedy" outside of a judicial or quasi-judicial proceeding does not warrant application of judicial privilege under Pennsylvania law.**

Attorney Garabedian argues the judicial privilege should apply because he intended to "obtain a remedy" for Mr. Poulos by sending the 2018 letters.[142] He argues his intent to obtain a remedy warrants the judicial privilege because the Pennsylvania Supreme Court used the "obtain a remedy" phrase while discussing the privilege's bounds in *Schanne*. We do not think the Pennsylvania Supreme Court would extend the judicial privilege as far as Attorney Garabedian suggests.

In *Schanne*, the Pennsylvania Supreme Court distinguished its facts from cases where courts applied the privilege to communications "made in a directed effort to initiate proceedings or ***otherwise obtain relief*** from school officials."[143] Attorney Garabedian suggests the Pennsylvania Supreme Court's distinguishment means it would have applied the judicial privilege to directed efforts to obtain relief from school officials, regardless of whether those efforts involved a judicial or quasi-judicial proceeding. We disagree. The Pennsylvania Supreme Court did not hold the privilege *does* apply to communications seeking to obtain relief from school officials regardless of their intent to initiate judicial or quasi-judicial proceedings; it simply found the facts of *Schanne* distinguishable from cases handling mere intent to obtain a remedy. The Pennsylvania Supreme Court explicitly deferred deciding "whether the privilege would attach in Pennsylvania in the circumstances which arose in those extra-jurisdictional cases."[144]

We need not guess whether the Pennsylvania Supreme Court would extend the privilege to those extra-jurisdictional circumstances because those circumstances are not present here. The four extra-jurisdictional cases the Pennsylvania Supreme Court distinguished contrast with the facts we handle today because they either (1) applied the privilege to complaints made *by current students* against their educators or (2) involved quasi-judicial proceedings.[145] As to the first category, the

Indiana Supreme Court in *Hartman v. Keri* privileged complaints of sexual harassment against a professor made by current students of a public university to the university's affirmative action office.[146] The court reasoned an absolute judicial privilege attached because "a current student" could face "academic discipline for abuse of the process," creating a "substantial deterrent" for false reports.[147] It further reasoned the professor "is in a position of authority over the student," necessitating a greater "need for protection."[148] Judges have since distinguished *Hartman* from situations where non-current students report misconduct.[149] As to the second category, the courts applied the privilege where the communications were made to initiate proceedings before an administrative body which involved, for example, a right to appeal, right to a hearing, and a right to judicial review of an administration's decision—in other words, paradigmatic quasi-judicial proceedings.[150]

We have no basis to find the Pennsylvania Supreme Court would extend the judicial privilege to the adduced facts. The facts before us today are unlike the extra-jurisdictional cases the Pennsylvania Supreme Court distinguished in *Schanne* because they do not involve allegations made by a current student or allegations made to initiate quasi-judicial proceedings before a school board or other agency. Attorney Garabedian intended to obtain a remedy for Mr. Poulos by sending the 2018 letters. But he did not intend to do so through avenues the privilege protects.

Our findings today should not be read to discourage abuse victims from reporting abuse, especially in schools. The law must encourage abuse victims to hold malfeasant educators accountable. And it does so. We affirm the judicial privilege usually *does* protect those reporting educators' misconduct—but only when those allegations are *made to hold the educators accountable*. Allegations for this proper purpose are usually made to those with the judicial or quasi-judicial authority to police the abusers.[151] Even if the allegations are made simply to start

the process of holding educators accountable, the judicial privilege protects the accuser from defamation liability.[152] Here, though, Attorney Garabedian did not intend to begin a proceeding which would hold Mr. Ralston accountable. To the contrary, Attorney Garabedian's April 2018 letter offered to "***settle and compromise***" claims arising out of Mr. Ralston's purported abuse.[153] Attorney Garabedian did not seek to hold anyone accountable—he sought a million dollars. The judicial privilege does not protect this behavior which admittedly never sought a judicial remedy.

We stress the narrowness of our finding today. We recognize the vital policy aims the judicial privilege serves—especially as applied to attorneys. The privilege lets attorneys zealously advocate their clients' interests without fearing lawsuits.[154] The privilege also serves vital aims in the pre-litigation context by promoting early resolution of disputes which could go to suit.[155] But the privilege applies only where attorneys seek to use the courts or something similar to obtain remedies. Like Justice Todd concurred in *Schanne*: "[M]y position is firmly tied to the peculiar factual circumstances of the instant case."[156] We do the same. On these "peculiar" facts—where Attorney Garabedian agreed in writing he would not file suit, he did not intend to begin a quasi-judicial process, and the accuser is not a current student—applying the privilege does not promote its policy aims. We reject Attorney Garabedian's judicial privilege defense.

### 2.  Mr. Ralston is not a limited-purpose public figure.

Attorney Garabedian also seeks summary judgment arguing Mr. Ralston cannot prove Attorney Garabedian published the 2018 letters with "actual malice" because Mr. Ralston is a limited-purpose public figure. Mr. Ralston responds he is not a limited-purpose public figure because he did not voluntarily inject himself into a public controversy.

We find the 2018 letters concerned a public controversy: the extent of the "historical allegations of sexual abuse" at the Hill School as described by its headmaster in his letter to the

alumni. But Mr. Ralston is not a limited-purpose public figure regarding this controversy because he did not voluntarily inject himself into it.

First Amendment protections require defamation plaintiffs to meet a higher standard of proof if they are public figures.[157] A defamation plaintiff who is a "public figure" must prove by clear and convincing evidence the defendant defamed him with "actual malice."[158] The higher standard of proof applicable to public figures recognizes society's interest in "uninhibited, robust, and wide-open" debate "on public issues."[159] Two justifications support the higher standard of proof applicable to public figures.[160] First, public figures enjoy a "more realistic opportunity to counteract false statements than private individuals normally enjoy" via media access.[161] Second—and "more importantly"—public figures "assume[] the risk of attracting public attention."[162] "The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court."[163]

A person "may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes."[164] Many politicians, for example, are all-purpose public figures.[165] "More commonly," however, a person "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."[166] These limited-purpose public figures assume public figure status "only in the context of a particular public controversy."[167] To determine if one is a limited-purpose public figure, we must examine: "(1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of plaintiff's involvement in that controversy."[168]

### a. The extent of the "historical allegations of sexual abuse" at the Hill School constituted a public controversy.

Our Court of Appeals "has not adopted an explicit definition of what constitutes a public controversy."[169] It has found "a public controversy 'must be a real dispute, the outcome of which

affects the general public or some segment of it.'"[170] "To be 'public,' the dispute must affect more than its immediate participants."[171] Mere "disputes of interest to the public" are not necessarily public controversies.[172] "The proper dimensions of the public controversy requirement have proved difficult to diagram."[173]

It is not difficult today to determine Attorney Garabedian's 2018 letters involved a public controversy: the extent of the "historical allegations of sexual abuse" at the Hill School. Headmaster Lehman brought the controversy to the public's view with two letters sent to alumni and parents. Headmaster Lehman sent a letter to Hill School parents and alumni in April 2016, noting "national media attention" paid to accusations of abuse against faculty members of "several prominent boarding schools."[174] He wrote again in November 2017, informing the community the Hill School "initiated a review of historical allegations of abuse at The Hill."[175] The Hill School hired Attorneys Smith and Gomez—"nationally recognized" for their experience in child protection—to oversee the review.[176] The review uncovered "troubling incidents" in the Hill School's history including conduct "several decades ago by a small number of faculty members."[177] Headmaster Lehman invited commentary from the letter's recipients.[178]

Headmaster Lehman's letters did not create a public controversy to the "general public," but certainly created a public controversy to "some segment of it": the Hill School community.[179] This is the same community in which Mr. Ralston alleges he suffered his reputational and professional harm due to Attorney Garabedian's letters. Judges have found public controversies even when the controversy is relevant to only "residents of the local community."[180] The Hill School recognized the importance of the issue to its community. A reporter from Philadelphia Magazine emailed the Hill School seeking comment on Mr. Ralston's lawsuit in 2019.[181] This further suggests the public's interest in the allegations of sexual misconduct.

We are persuaded by Judge Robreno's exhaustive analysis of when school officials' misconduct constitutes a "public controversy" in *Mzamane v. Winfrey*.[182] Mzamane became the headmistress of a South African school for disadvantaged girls called the Oprah Winfrey Leadership Academy for Girls.[183] Oprah Winfrey, a television personality and media executive of international celebrity, opened the Academy.[184] The opening "attracted media attention."[185] A South African newspaper published an article reporting on a student who left the Academy.[186] The student described her time at the Academy as a "nightmare."[187] A group of students later met with an Academy staffer and reported they saw a Dorm Parent sleeping in the same bed with another student.[188] Ms. Winfrey issued a statement expressing personal devastation about the allegations, which "generated significant attention from the international media."[189] During the ensuing press attention, Ms. Winfrey made many statements about Headmistress Mzamane's handling of the situation which Mzamane alleged constituted defamation.[190]

Judge Robreno found a public controversy in whether the Academy's "administration failed to protect students from abusive treatment by the Dorm Parents."[191] Judge Robreno found "[t]he safety and well-being of seventh and eighth grade students in receiving a quality education without being subjected to mistreatment is a matter of legitimate public concern."[192] He found— even if "a celebrity such as [Ms.] Winfrey" were not involved with the Academy—whether the Academy officials "would succeed in their educational mission, including safeguarding against verbal, physical, and sexual abuse of seventh and eighth grade students is a topic that would concern the community and trigger public discussion."[193]

We find Judge Robreno's analysis persuasive on this point. The extent of the historical sexual abuse at the Hill School is a public controversy because the Hill School community cares about the "safety and well-being" of the Hill School students. The Hill School is not a public-

facing enterprise like the Winfrey Academy, but such notoriety is not needed to generate public interest in educators' misconduct. As Headmaster Lehman's letters to the Hill School community suggest, the historical sexual abuse at the Hill School would surely "concern the community and trigger public discussion." We find a public controversy existed as to the extent of the "historical allegations of sexual abuse" at the Hill School.[194]

### b. Mr. Ralston did not constitute a limited-purpose public figure regarding the extent of historical sexual abuse at the Hill School.

We next must determine whether Mr. Ralston "voluntarily injected himself into the public controversy concerning" the extent of abuse at the Hill School.[195] A defamation plaintiff who voluntarily injects himself into a controversy "assume[s] . . . the risk and the consequent fairness" of public figure status.[196] An individual may voluntarily become a limited-purpose public figure by "actively participat[ing] in the public issue in a manner intended to obtain attention."[197] An individual may also become a limited-purpose public figure "even though an individual does not intend to attract attention by his actions."[198] "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure."[199] An individual's "status, position[,] or associations," for example, may make him a limited-purpose public figure. This transition to limited-purpose public figure may occur if the individual engages "in a profession which draws him regularly into regional and national view and leads to 'fame and notoriety in the community.'"[200] "If a position itself is so prominent that its occupant unavoidably enters the limelight, then a person who voluntarily assumes such a position may be presumed to have accepted public figure status."[201]

"[D]etermining the proper scope of the public figure doctrine" creates "considerable difficulty."[202] "One district court opined that the task of demarcating between public and private figures 'is much like trying to nail a [jellyfish] to the wall.'"[203] Public figure status warrants a

"case-by-case determination, [involving] scrutinizing the nature and scope of the plaintiffs' involvement in the controversy."[204]

We must today balance two critical interests: the public's interest in knowing the extent of sexual abuse at a school versus educators' interests in safeguarding their reputations against abhorrent allegations of sexual abuse. A careful review of our Court of Appeals's public figure jurisprudence is warranted to resolve this tension. Our Court of Appeals has analyzed the Supreme Court's limited-purpose public figure doctrine from *Gertz* in six cases which guide us today.

In *Chuy v. Philadelphia Eagles Football Club*, our Court of Appeals held a starting player for the Eagles constituted a limited-purpose public figure regarding his public contractual dispute with the Eagles following a career-ending injury.[205] Another team traded the player to the Eagles in a well-publicized deal.[206] The player suffered a career-ending injury during a game.[207] The Eagles' team physician told a newspaper reporter the player had a potentially fatal condition.[208] The player sued the paper and physician for defamation.[209] Our Court of Appeals reasoned the player constituted a limited-purpose public figure because professional athletes "assume a position of public prominence," so their "contractual disputes . . . command the attention of sports fans."[210] The player "had been thrust into public prominence long before [the physician's] statements appeared" in the paper.[211] The Court concluded the player constituted a limited-purpose public figure for the purposes of his "physical condition, his contractual dispute, and his retirement," because they concerned his "ability to play football."[212]

In *Steaks Unlimited, Inc. v. Deaner*, our Court of Appeals found a meat producer constituted a limited-purpose public figure regarding the quality of its highly advertised product.[213] The meat producer held an "intensive" advertising and sales campaign promoting its sales of meat.[214] A television reporter began investigating the quality of the meat after receiving complaints

from purchasers.[215] The reporter ran a negative story on the meat producer's product, and the meat producer sued for defamation.[216] Our Court of Appeals found the meat producer constituted a limited-purpose public figure "for the purposes of the controversy giving rise to this litigation."[217] It found the meat producer created a public controversy through its "intensive" advertising campaign of its meat.[218] The meat producer "voluntarily injected itself" into the question of its meat's quality by "creat[ing] a controversy for the purpose of influencing the consuming public."[219]

In *Avins v. White*, our Court of Appeals found a law school founder who spearheaded a public push for accreditation constituted a limited-purpose public figure regarding the accreditation process.[220] The founder created the Delaware Law School and sought its accreditation from the American Bar Association.[221] The Association repeatedly denied accreditation to the School, attracting media attention and causing "panic" among the School's graduates and students.[222] The founder sued a consultant of the Association who handled accreditation for defaming him with negative comments about the accreditation process made during an event in front of a judge.[223] Our Court of Appeals held the founder constituted a limited-purpose public figure for the purpose of the School's "accreditation struggle."[224] The founder voluntarily injected himself into the accreditation controversy as "creator, chief architect, and the first dean" of the School.[225] The court held the founder "actively involved in every facet of the accreditation struggle"; he "played an affirmative and aggressive role in the accreditation process."[226]

In *Marcone v. Penthouse International Magazine for Men*, our Court of Appeals found an attorney who fraternized with gangsters and whom the United States charged with drug-related offenses constituted a limited-purpose public figure regarding his alleged involvement in

purchasing drugs.[227] A Philadelphia attorney represented gangs.[228] Penthouse Magazine reported the attorney contributed $25,000 to marijuana transactions.[229] It further reported the United States criminally charged the attorney, but the charges were dropped because he cooperated with investigators.[230] The attorney sued Penthouse for libel.[231] Our Court of Appeals found the attorney constituted a limited-purpose public figure regarding his "alleged involvement in the purchase and sale of illicit drugs."[232] It reasoned the news media "widely reprinted" his indictment.[233] His representation of the "notorious" gangs invited attention.[234] The attorney invited public comment on his involvement with the gangs by meeting at their headquarters with gang leaders and by going on weekend trips with them.[235] The Court of Appeals concluded the attorney's voluntary association with the gangs coupled with the "intense media attention he engendered" sufficed to establish his public figure status for his connection with illicit drug trafficking.[236]

In *McDowell v. Paiewonsky*, our Court of Appeals found an architect who worked on public projects constituted a limited-purpose public figure regarding a port authority director's conflict of interest in granting the architect public grants.[237] An architect serviced numerous public building projects, including a high school.[238] A senator with a talk radio show reported the director of the Port Authority had a conflict of interest in awarding construction projects to the architect because of their friendship.[239] The senator criticized the director's hiring of the architect for public projects, claiming the architect poorly constructed various other projects.[240] The architect sued the senator for defamation.[241] Our Court of Appeals found the architect constituted a public figure regarding the public controversy of the director's conflict of interest, the awarding of government contracts, and the expenditure of funds on the high school project.[242] The architect's construction projects "had been the subject of considerable media attention" for years before they began.[243] The architect's high school project had underwent two official investigations, causing "highly critical

reports by the Attorney General and the United States Comptroller for the Virgin Islands."[244] The Court of Appeals found the architect's acceptance of a high school project the media reported as "impossible" "almost inevitably put him into the vortex of a public controversy."[245]

In *Schiavone Construction Co. v. Time, Inc.*, our Court of Appeals found a construction company owner who sought public attention constituted a limited-purpose public figure regarding his role in a criminal investigation of a corrupt labor secretary.[246] Time Magazine reported a special prosecutor reopened an investigation into a former United States labor secretary.[247] The special prosecutor's report "center[ed] on the charge" the secretary met with well-known mobsters to set up no-show jobs for mobsters outside the construction company owner's sites.[248] The owner sued for defamation, alleging the Time report contained innuendo of criminality.[249] Our Court of Appeals found the owner constituted a limited-purpose public figure because he campaigned for President Reagan, investigated the special prosecutor, wrote numerous letters to local publications complaining about the secretary's treatment, bragged about his association with the secretary in promotional materials, and his company worked exclusively on public projects.[250] The owner's letter campaigns and investigation into the special prosecutor meant he "thrust himself into the controversy" surrounding the secretary.[251] Our Court of Appeals concluded, "questions concerning Schiavone. . . were in the public eye long before Time's challenged article appeared."[252]

We face a different fact pattern from our Court of Appeals's six cases. Attorney Garabedian offers no evidence Mr. Ralston "actively participated in" the public controversy of the extent of the Hill School's historical allegations of sexual abuse. Mr. Ralston did not manage—or appear to have any involvement in—the Hill School's response to the sexual abuse allegations. Mr. Ralston did not work at the Hill School when Headmaster Lehman sent his first letter regarding the historical allegations of abuse in April 2016. Headmaster Lehman's November 2017 letter

announcing the historical allegations of abuse do not mention Mr. Ralston. Mr. Ralston took no action related to the controversy which itself invited public comment. We have no evidence he communicated with alumni or publicly opined about the controversy. Of course, the alleged action of sexually abusing Mr. Poulos would invite public comment. But a defamation plaintiff cannot transform into a public figure simply because of the alleged defamation.[253]

Attorney Garabedian argues, relying on the analysis applied to the Eagles' injured player in *Chuy*, we may find Mr. Ralston a limited-purpose public figure because he obtained significant notoriety in the Hill School community through his later leadership positions.[254] We recognize this argument's appeal. Like the professional football player in *Chuy* obtained notoriety to sports fans, Mr. Ralston obtained notoriety in the Hill School community by teaching for decades, and later serving as the Academic Dean, Dean of Faculty, chair of mathematics, coaching various sports, and developing thousands of alumni relationships from the mid-1990's through 2009. Mr. Ralston does not contest he obtained notoriety in the Hill School community; indeed, he argues the Hill School hired him in 2016 for the alumni position because "of the breadth and depth of his knowledge of and experience with the [Hill] School and because of his lasting relationships with alumni."[255] The Hill School community would certainly want to know if one of its leaders sexually abused children.

But Attorney Garabedian's argument unravels upon considering our Court of Appeals's sextet of limited-purpose public figure cases. The precedent from those six cases contain a common theme: the plaintiffs voluntarily involved themselves in an *active* public controversy *before* the defendant defamed them. In *Chuy*, the professional football player was part of widely publicized trade to Philadelphia, then became injured during a game; the player thus became a limited-purpose public figure regarding his "ability to play football" before the physician's

comments ran in the paper.[256] In *Steaks Unlimited*, the meat producer widely advertised its meat as part of a major campaign and invited "public attention, comment, and criticism"; the meat producer thus became a limited-purpose public figure regarding the quality of its meat before the critical news report aired.[257] In *Akins*, the law school founder spearheaded the school's drive toward accreditation by officially requesting, inviting, and invoking the accreditation process; the founder thus became a public figure regarding the "accreditation process" before the consultant criticized him in front of a judge.[258] In *Marcone*, the attorney voluntarily associated and vacationed with notorious gangs, had been indicted for buying marijuana, and attracted widespread media attention; the attorney thus became a limited-purpose public figure regarding his "connection with illicit drug trafficking" before Penthouse published a story about him.[259] In *McDowell*, the architect engaged in several public construction projects attracting media attention, undertook a high school construction project which received media attention, and had received public criticism of his construction work from the Attorney General; the architect thus became a limited-purpose public figure regarding whether he obtained his projects through a senator's conflict of interest before the radio show aired.[260] And in *Schiavone*, the construction owner publicly complained about the corrupt labor secretary's treatment, bragged about his association with the secretary publicly, and worked on public construction constructs; the owner thus became a limited-purpose public figure regarding his role in the labor secretary's corruption before Time published its story.

Each of these persons became limited public figures by stepping into the public light for purposes of the controversy. They assumed the risk of publicity in their communities when they did so. Mr. Ralston, by contrast, did nothing to voluntarily inject himself into *this* public controversy *before* it arose. The public controversy arose in November 2017 when Headmaster Lehman notified the public about historical allegations of sexual abuse at the Hill School. At the

time, Mr. Ralston served as a capital giving officer. His role had nothing to do with the Hill School's review of sexual abuse allegations. Headmaster Lehman had never received allegations of misconduct about Mr. Ralston before sending the November 2017 letter. Attorneys Gomez and Smith did not investigate Mr. Ralston in their review of historical allegations of sexual abuse. Attorney Garabedian offers no evidence Mr. Ralston had any reason to foresee a public controversy arising regarding sexual abuse at the Hill School when he obtained his leadership positions.

Limited-purpose public figures must "assume[] the risk" of public attention.[261] We cannot find Mr. Ralston assumed the risk of allegations of abhorrent sexual abuse simply because he obtained positions of leadership within the Hill School decades before sexual abuse became a controversy at the Hill School. An educator does not assume the risk of such allegations simply because they implicate his ability to educate. Such a finding would surely disincentivize educators from leading in their communities. Risks of reputation-ruining allegations are not assumed by educators like risks of inquiry into health are assumed by professional football players.[262] This case is like the Supreme Court's rejections of limited-purpose public figure status to individuals who did nothing to draw attention to themselves.[263]

We remain mindful of the two justifications supporting the higher standard of proof for limited-purpose public figures: (1) access to the media, and, more importantly, (2) "the manner in which the risk of defamation came upon" Mr. Ralston.[264] Both factors suggest Mr. Ralston is a private figure. The only media involvement in the record is the Philadelphia Magazine reporter's outreach to the Hill School following Mr. Ralston's lawsuit. But this outreach came after Attorney Garabedian's allegations brought Mr. Ralston into the limelight. One cannot become a public figure by virtue of being defamed.[265] And as we discussed at length above, Mr. Ralston did nothing

to involve himself in the Hill School's historical review of sexual abuse. We may have a different case if Attorney Garabedian's letter followed media attention or if Mr. Ralston made statements about his virtuous nature or publicly condemning child abuse in schools.[266] But Attorney Garabedian does not adduce this evidence.

This case does not implicate the primary policy aim undergirding the Supreme Court's *Sullivan* analysis: Our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[267] We must weigh this interest against an "individual's right to the protection of his own good name," which is "a concept at the root of any decent system of ordered liberty."[268] On the facts adduced by Attorney Garabedian, Mr. Ralston's right to protect his good name outweighs Attorney Garabedian's right to discuss public issues. Our public certainly has a strong interest in uninhibited discussions of students' safety. But our educators have an immense interest in defending their reputation against allegations of abhorrent conduct involving minors. Attorney Garabedian's 2018 letters did not seek to discuss students' safety. Rather, he sent the 2018 letters to privately accuse Mr. Ralston of abuse and get paid a million dollars. Attorney Garabedian does not offer evidence he or Mr. Poulos would have continued their discussion if the Hill School paid them one million dollars. We note our Court of Appeals's sextet of limited-purpose public figure cases all handled allegations made in a public setting—unlike Attorney Garabedian's allegations.[269] As the Supreme Court disclaimed in *Gertz*, "it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority."[270] This is such a case. The considerations supporting First Amendment protections for uninhibited public disputes are not implicated here. Mr. Ralston is a private figure.

### 3. Genuine disputes of material fact as to Attorney Garabedian's negligence preclude a finding of conditional privilege.

Attorney Garabedian next seeks summary judgment arguing a conditional privilege applies to his 2018 letters. He argues his 2018 letters enjoyed conditional privilege because they "relate[d] to an issue of public concern."[271] Mr. Ralston responds Attorney Garabedian's 2018 letters did not relate to an issue of public concern, and even if they did, Attorney Garabedian's negligence defeats the conditional privilege. We find genuine disputes of material fact preclude application of a conditional privilege.

Pennsylvania courts recognize at least three occasions in which a conditional privilege may protect otherwise defamatory statements: "when (1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved."[272] "Communications which are made on a proper occasion, from a proper motive, in a proper manner, and which are based upon reasonable cause are privileged."[273]

Attorney Garabedian "carries [the] burden to show that a communication is conditionally privileged."[274] If he shows a conditional privilege applies, "the burden shifts to the plaintiff to establish that the defendant abused its conditional privilege."[275] A defendant abuses a conditional privilege when: "the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose."[276]

The 2018 letters are possibly conditionally privileged because the person to whom they were published, Headmaster Lehman, maintained an "interest" in the subject matter of the 2018 letters and they related to a matter of public concern. Headmaster Lehman sent a letter regarding

historical allegations of sexual abuse at the Hill School before Attorney Garabedian sent his letters. Headmaster Lehman's letter invited alumni to contact him with concerns about the historical allegations of abuse, showing Headmaster Lehman's interest in the subject matter.[277] Attorney Garabedian published the letters regarding purported sexual abuse to Headmaster Lehman.[278] And as we discussed above, Attorney Garabedian's 2018 letters related to a public concern.

But the letters' possible conditional privilege can be destroyed if Attorney Garabedian published them negligently.[279] "Negligence in this context is the publication of information with a want of reasonable care to ascertain the truth."[280] Genuine disputes of material fact as to Attorney Garabedian's negligence include whether he and his firm conducted an adequate investigation to ascertain the truth of Mr. Poulos's claims before publishing them, including but not limited to the thoroughness of Attorney Garabedian's interviews of Mr. Poulos, whether Attorney Garabedian should have met with Mr. Poulos in person before publishing his claims, whether Attorney Garabedian adequately investigated arguable inconsistencies in Mr. Poulos's claims, and whether Attorney Garabedian should have obtained Mr. Poulos's Hill School transcript and files before sending the 2018 letters.

Attorney Garabedian argues a conditional privilege for an attorney's advocacy protects communications made by lawyers during the scope of their representation. But he cites no Pennsylvania law supporting an "advocacy privilege." Attorney Garabedian cites many inapposite cases which handle the general scope of an attorney's liability to third parties in non-defamation contexts.[281] The only cited cases which mention defamation do not support a special conditional privilege applicable to attorneys. In *Smith v. Griffiths*, for example, plaintiff-attorney sued a third party's attorney for defamation and negligence.[282] The Pennsylvania Superior Court simply applied the judicial privilege to the defamation claim.[283] And in *Hefferman v. Hunter*, our Court

of Appeals dismissed a section 1985 conspiracy claim against an attorney and his client, reasoning no conspiracy can exist based on an attorney's advice to his client.[284] But our Court of Appeals noted an attorney could be liable in "a defamation suit" for disseminating defamatory information to the media in the scope of his representation.[285]

We have no basis to find the Pennsylvania courts would recognize a special "advocacy privilege" for attorneys. The Pennsylvania courts already recognize a privilege broader than the privilege for which Attorney Garabedian advocates: the *absolute* judicial privilege discussed above. The same policy reasons Attorney Garabedian suggests support an advocacy privilege have already been applied by the Pennsylvania Supreme Court to create a judicial privilege for attorneys.[286] Even if we thought the Pennsylvania Supreme Court might recognize an "advocacy privilege," we expect it would still allow negligence to defeat the conditional privilege as it does for other conditional privileges. We deny summary judgment on this basis.

### 4. Attorney Garabedian's non-publication in Ohio does not defeat the defamation claim.

Attorney Garabedian seeks summary judgment arguing Mr. Ralston's defamation claim fails because Attorney Garabedian did not publish the 2018 letters in Mr. Ralston's Ohio domicile. Mr. Ralston argues reputational harm need not be contained to one's domicile. Mr. Ralston is correct.

The first element of defamation is the "defamatory nature of the communication."[287] "A statement is deemed to be defamatory 'if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession.'"[288] "When communications tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness for the proper conduct of his lawful business or profession, they are deemed defamatory."[289]

Attorney Garabedian offers no authority showing publication must occur within the state of a defamation plaintiff's domicile to state a claim for defamation. He cites only cases discussing how defamation plaintiffs generally have most of their reputational contacts within their home states for choice-of-law purposes.[290] Attorney Garabedian published the 2018 letters to Mr. Ralston's Pennsylvania employer. The letters contained allegations Mr. Ralston sexually abused his student, which obviously "blacken[s]" Mr. Ralston's reputation "in his business or profession" in Pennsylvania.[291] Mr. Ralston travelled to the Hill School's campus in Pennsylvania for work. An email announcing his hiring sent to Hill School faculty and staff noted he would work remotely but his work would be "critical" to the Hill School's development.[292]

Attorney Garabedian's non-publication in Ohio does not warrant summary judgment in his favor.

### 5.  Mr. Ralston need not prove economic damages or pecuniary loss.

Attorney Garabedian seeks summary judgment arguing Mr. Ralston does not prove "special harm," which he alleges is required for defamation claims. Mr. Ralston argues "special harm" is the same thing as general damages in Pennsylvania. Mr. Ralston is correct.

The General Assembly includes "[s]pecial harm resulting to the plaintiff" as an element of defamation.[293] But Pennsylvania has also adopted section 569 of the Restatement, which does not require "special harm."[294] "This apparent contradiction is resolved by understanding that the term 'special harm' has different meanings in the statute and Restatement.[295] "The term 'special harm' as used in the statute has been interpreted to mean 'general damages' which are proven upon a showing of 'actual harm.'"[296] "Actual harm includes impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."[297] "As used in section 569 of the Restatement, the 'special harm' that a libel plaintiff *need not show* is actually 'special damages.'"[298] "'Special damages' are 'economic harm' or 'pecuniary loss.'"[299]

Without explaining what "special harm" is, Attorney Garabedian concludes Mr. Ralston fails to show it. We reject this reach. Pennsylvania law does not require "special harm"—defined as economic harm or pecuniary loss—as an element of a defamation claim. Pennsylvania merely requires actual harm, which includes reputational damage. The record contains ample evidence of Mr. Ralston's reputational harm, including Headmaster Lehman asking Mr. Ralston to limit his campus access and not to be alone with students after Attorney Garabedian's publication of the 2018 letters.

We deny Attorney Garabedian's arguments for summary judgment based on the alleged harm.

### B.  We deny Mr. Poulos's Motion for summary judgment.

Mr. Poulos *pro se* moves for summary judgment on Mr. Ralston's defamation claim against him. He argues: (1) Attorney Garabedian, not him, published the 2018 letters, and (2) conditional privilege bars Mr. Ralston's negligence claims because Headmaster Lehman shared an interest in the subject matter of the 2018 letters. We deny Mr. Poulos's Motion.

We reject Mr. Poulos's argument he did not publish the 2018 letters. Attorney Garabedian served as Mr. Poulos's attorney acting as Mr. Poulos's agent without notice of an abandoned agency relationship.[300] Mr. Poulos and Attorney Garabedian spoke about how Attorney Garabedian could obtain a remedy before Attorney Garabedian sent the 2018 letters, suggesting Mr. Poulos knew Attorney Garabedian would contact the Hill School. Mr. Poulos cites no fact rebutting the presumption Attorney Garabedian worked at his direction. We reject his argument he did not publish the letters.

We reject Mr. Poulos's argument a conditional privilege bars Mr. Ralston's defamation claim because genuine disputes of material fact as to Mr. Ralston's negligence in publishing the

2018 letters exist. As we explained above, negligence or actual malice defeats conditional privileges under Pennsylvania law.[301] Mr. Ralston does not address the issue of his negligence or actual malice in his Motion. Mr. Ralston cites evidence suggesting Mr. Poulos's claims may be false. This evidence alone creates genuine disputes of material fact as to Mr. Poulos's negligence in seeking a remedy from the Hill School. We reject Mr. Poulos's argument conditional privilege bars Mr. Ralston's claims.

## III.    Conclusion

Kurtis Poulos claimed Matthew Ralston, a former teacher of his at the Hill School, sexually abused him while he attended The Hill School from 1993 to 1995. Mr. Poulos reported these allegations to Attorney Mitchell Garabedian in December 2017. Attorney Garabedian signed and sent an April 11, 2018 letter to the Hill School. Attorney Garabedian reported Mr. Ralston sexually abused Mr. Poulos and demanded $1,000,000 to "settle" Mr. Poulos's claims against the Hill School. The Hill School's attorney responded to Attorney Garabedian in April 2018. Attorney Garabedian did not respond until five months later in September 2018.

Months also evidently passed without contact between Attorney Garabedian and Mr. Poulos. Attorney Garabedian and Mr. Poulos finally discussed the allegations again in December 2018. Attorney Garabedian then sent a December 26, 2018 letter to the Hill School again accusing Mr. Ralston of sexually abusing Mr. Poulos over twenty years earlier. The Hill School responded by having its investigators repeatedly ask Attorney Garabedian if they could interview Mr. Poulos about his claims, but Attorney Garabedian never responded to their demand. Attorney Garabedian instead fruitlessly offered to mediate Mr. Poulos's purported claims against the Hill School. He never filed suit. He knew he could not sue under the statute of limitations. Mr. Ralston now sues

Mr. Poulos, Attorney Garabedian, and Attorney Garabedian's law firm for defamation arising out of the 2018 letters sent by Attorney Garabedian.

We address difficult questions regarding whether the judicial privilege protects an attorney's advocacy where judicial proceedings are not seriously contemplated, and whether a school official is a limited-purpose public figure regarding a controversy of historical allegations of abuse. We find the judicial privilege does not protect the attorney's advocacy where he explicitly agreed he would not file suit and offers no evidence he seriously contemplated a judicial or quasi-judicial proceeding for his client. We find the former teacher accused of sexual assault is not a limited-purpose public figure necessary to apply an actual malice standard because he did not voluntarily thrust himself into the public controversy of the extent of historical allegations of abuse at the Hill School. We reject the attorney's arguments a conditional privilege bars the former teacher's defamation claim, non-publication in the former teacher's domicile bars his claims, and the former teacher must show special harm to obtain damages.

We deny the former student's Motion for summary judgment because he fails to show there are no genuine disputes of material fact precluding Mr. Ralston's claim against him. The jury must determine these issues including the affirmative defense of truth.

---

[1] Attorney Garabedian submitted a statement of undisputed material facts. ECF Doc. No. 154-2 ("Garabedian SUMF"). He appended exhibits. *See* ECF Doc. Nos. 154-3 to 154-6 ("Garabedian App'x"). Mr. Ralston responded and submitted a counterstatement of undisputed material facts. ECF Doc. No. 165 ("Ralston Resp. to Garabedian SUMF" and "Ralston SUMF"). He appended exhibits. ECF Doc. Nos. 165-1 to 165-5 ("Ralston App'x"). Attorney Garabedian responded to Mr. Ralston's counterstatement. ECF Doc. No. 169 ("Garabedian Resp. to Ralston SUMF").

[2] Garabedian App'x at 90a.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] Garabedian App'x at 90a–91a.

[8] Garabedian App'x at 91a.

[9] Garabedian App'x at 90a.

[10] *Id.*

[11] Garabedian App'x at 1079a (Lehman Dep. at 32:7–19).

[12] Garabedian App'x at 1641a.

[13] Garabedian's SUMF ¶ 17. Our citations to the parties' SUMFs reference facts the parties do not genuinely dispute unless we note otherwise.

[14] Garabedian App'x at 288a–89a.

[15] Garabedian App'x at 288a.

[16] Garabedian App'x at 288a.

[17] *Id.* ¶ 25.

[18] Garabedian App'x at 501a.

[19] *Id.*

[20] *Id.*

[21] Garabedian App'x at 502a.

[22] Garabedian SUMF ¶ 61; Ralston Resp. to Garabedian SUMF ¶ 61 (agreeing first conversation between Mr. Poulos and Attorney Garabedian occurred in December 2017).

[23] Garabedian SUMF ¶ 77.

[24] Garabedian SUMF ¶ 80. Mr. Ralston denied this statement of fact, but only denied whether the substance of what Mr. Poulos said to Attorney Garabedian is true. He did not deny the fact Mr. Poulos and Attorney Garabedian discussed the claim.

[25] Ralston App'x at 2568a.

---

[26] *Id.*

[27] *Id.*

[28] Ralston App'x at 905a (Poulos Dep. at 56:15–20).

[29] Ralston App'x at 906a (Poulos Dep. at 57:5–18).

[30] Ralston App'x at 899a–901a.

[31] Garabedian App'x at 1229a–30a (Gaul Dep. at 41:24–42:2); Garabedian App'x at 1254a (Mahoney Dep. at 48:23–25).

[32] Garabedian App'x at 1698a (Garabedian Dep. 79:3–7).

[33] Garabedian App'x at 845a–46a. The parties dispute whether Attorney Garabedian himself signed the letter or if Attorney Mahoney signed the letter. *See* Ralston SUMF ¶¶ 36–39; Garabedian Resp. to Ralston SUMF ¶¶ 36–39. The letter ends with "Very truly yours, Mitchell Garabedian." *See* Garabedian App'x 846a. A signed "MG" appears in the signature block. Attorney Garabedian's  SUMF asserts he sent the letter. *See* Garabedian SUMF ¶ 116. We will treat the letter as being sent by Attorney Garabedian.

[34] Garabedian App'x at 845a.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] Garabedian App'x at 846a.

[39] Garabedian SUMF ¶ 183.

[40] Garabedian SUMF ¶ 184; Ralston SUMF ¶ 48; Garabedian App'x at 1277a.

[41] *See* Ralston SUMF ¶ 49; Garabedian Resp. to Ralston SUMF ¶ 49 (denying the allegation Attorney Garabedian "never responded" to Attorney Rees, but only because Attorney Garabedian "called" Attorney Rees on September 18, 2018).

[42] Ralston App'x at 2784a.

[43] Ralston SUMF ¶ 51.

[44] Garabedian App'x at 1238a.

[45] Garabedian SUMF ¶ 205.

[46] Garabedian SUMF ¶ 207.

[47] Garabedian SUMF ¶ 208.

[48] Garabedian SUMF ¶ 209.

[49] Garabedian SUMF ¶ 217; Garabedian App'x at 847a–48a.

[50] Garabedian App'x at 847a.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] Garabedian App'x at 848a.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] Garabedian SUMF ¶ 258; Ralston Resp. to Garabedian SUMF ¶ 258 (not denying Headmaster Lehman read the letter).

[61] Garabedian SUMF ¶ 259.

[62] Garabedian SUMF ¶ 260.

[63] Garabedian SUMF ¶¶ 267–68.

[64] Garabedian App'x at 1041a.

[65] Garabedian App'x at 1043a.

[66] Garabedian App'x 1044a–1046a; 1216a.

[67] Ralston SUMF ¶ 85; Garabedian Resp. to Ralston SUMF ¶ 85.

[68] Ralston SUMF ¶ 86.

[69] Garabedian App'x at 1021a.

[70] ECF Doc. No. 1.

[71] *Id.* Judge DuBois dismissed Mr. Ralston's intentional infliction of emotional distress claims. ECF Doc. No. 39. The Clerk of Court later transferred this case to us. ECF Doc. No. 140.

[72] ECF Doc. No. 28.

[73] Garabedian SUMF ¶ 301; Ralston Resp. to Garabedian SUMF ¶ 301 (admitting fact of administrative leave).

[74] Garabedian SUMF ¶ 314; Ralston Resp. to Garabedian SUMF ¶ 314 (admitting fact Attorney Rees wrote to Mr. Ralston suing an alumnus is incompatible with his duties as a capital giving officer).

[75] Garabedian SUMF ¶ 318.

[76] Garabedian App'x at 1058a (Lehman Dep. at 9:4–8).

[77] Garabedian App'x at 1085a (Lehman Dep. at 38:4–12).

[78] Garabedian App'x at 115a (Gomez Dep. at 22:20–23) ("My recollection is that the first time that we became aware that there was a disclosure related to Mr. Ralston was Mr. Garabedian's April 11, 2018 letter."); Garabedian App'x at 119a (Gomez Dep. at 26:22–27:6) (Attorney Gomez testifying she had not "come across any accusations of improper conduct or child sexual abuse or sexual harassment that were previously made against Mr. Ralston").

[79] Garabedian App'x at 26a (Ralston Dep. at 98:11–99:14).

[80] ECF Doc. No. 154. Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.,* 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322–23).

[81] *See* ECF Doc. No. 154-7. Attorney Garabedian argues we should apply Ohio law. *See* ECF Doc. No. 154-7 at 11–14. He argues Ohio law "likely" applies "because [Ohio] is plaintiff's domicile." *Id.* at 14. But Attorney Garabedian then applies Pennsylvania law throughout his brief. *See id.* It is Attorney Garabedian's burden to show he is entitled to judgment as a matter of law. We question how he could succeed if we found Ohio law applied since he cites no Ohio law. In any event, Judge DuBois already determined Pennsylvania law applies. *See* ECF Doc. No. 38 at 7–8. We agree with his reasoning. We should apply the "law of the state where the publication occurred unless, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 149(b) (1971). The publication occurred in Pennsylvania. Mr. Ralston lives in Ohio, which provides Ohio an interest in this matter. *See, e.g.*, *Franklin Prescriptions, Inc. v. The New York Times Co.*, 267 F. Supp. 2d 425, 432 (E.D. Pa. 2003) (the plaintiff's domicile maintains a concern with "vindicating plaintiff's good name" (internal quotations omitted)). But Pennsylvania also maintains a significant interest because, as Judge DuBois found: "(1) it is the place where the publication occurred, (2) it is the place where [Mr. Ralston] has had his professional and business contacts as a teacher for over 25 years and the alleged defamatory letters related to [Mr. Ralston's] professional reputation as a teacher, and (3) [Mr. Ralston] was working in Pennsylvania when the alleged defamatory letters were sent." ECF Doc. No. 38 at 8. Attorney Garabedian presents no reason why we should suddenly change the law Judge DuBois applied to this case. We apply Pennsylvania law to Mr. Ralston's claims.

[82] ECF Doc. No. 155.

[83] ECF Doc. No. 167.

[84] 42 Pa. Stat. and Cons. Stat. Ann. § 8343(a).

[85] *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 476 (E.D. Pa. 2010).

[86] *Id.*; *see also Weinik v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. 20-2525, 2021 WL 5882039, at *2 (3d Cir. Dec. 13, 2021) (defendant "bears the burden of proving" judicial privilege).

[87] *Doe v. Wyo. Valley Health Care Sys., Inc.*, 987 A.2d 758, 767 (Pa. Super. Ct. 2009).

[88] *See Bochetto v. Gibson*, 860 A.2d 67, 71 (Pa. 2004).

[89] *Id.* (emphases removed) (quoting *Post v. Mendel*, 507 A.2d 351, 355 (Pa. 1986)).

[90] *Schanne v. Addis*, 121 A.3d 942, 947 (Pa. 2015).

[91] *Id.* (quoting *Pawlowski v. Smorto*, 588 A.2d 36, 41 (Pa. Super. Ct. 1991)).

[92] *Id.* at 948.

[93] *Id.* at 947.

[94] *Smith v. Griffiths*, 476 A.2d 22, 24 (Pa. Super. Ct. 1984).

[95] *Post*, 507 A.2d at 355.

[96] *Id.*

[97] *Schanne*, 121 A.3d at 948.

[98] *Id.* at 950 (emphasis removed) (quoting Restatement (Second) of Torts § 588 cmt. e (1977)).

[99] *Id.* (quoting Restatement (Second) of Torts § 588 cmt. e (1977)).

[100] *Id.* at 949 (emphasis in original).

[101] 121 A.3d 942. We recently examined *Schanne* in *Fogel v. Univ. of the Arts*, No. 18-5137, 2019 WL 1384577, at *9–10 (E.D. Pa. Mar. 27, 2019).

[102] *Schanne*, 121 A.3d at 943–44.

[103] *Id.*

[104] *Id.* at 944–45.

[105] *Id.* at 945.

[106] *Id.*

[107] *Id.* at 952.

[108] *Id.* at 949 (emphasis in original).

[109] *Id.*

[110] *Id.* at 950.

[111] *Id.* (quoting Restatement (Second) of Torts § 588 cmt. e (1977)).

---

[112] Ralston App'x at 2568a (emphasis added).

[113] *Weinik v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. 19-3503, 2020 WL 3892963, at *9 (E.D. Pa. July 10, 2020) (emphasis removed) (citing *Schanne*, 121 A.3d at 951).

[114] Ralston App'x at 2784a.

[115] Restatement (Second) of Torts § 588 (1977).

[116] *See Post*, 507 A.2d at 356 (quoting Restatement (Second) of Torts § 586 (1977)).

[117] *Compare* Restatement (Second) of Torts § 588 cmt. e (1977) ("As to communications preliminary to a proposed judicial proceeding, the rule stated in this Section applies only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."), *with* Restatement (Second) of Torts § 586 cmt. e (1977) ("As to communications preliminary to a proposed judicial proceeding the rule stated in this Section applies only when the communication has some relation to a proceeding that is contemplated in good faith and under serious consideration. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered.").

[118] 61 Cal. Rptr. 2d 518, 532 (Cal. Ct. App. 1997). We of course apply Pennsylvania law today, not California law. But the Pennsylvania Supreme Court approvingly cited a decision of the California Court of Appeal in *Schanne* while discussing the intent requirement of the judicial privilege. *See Schanne*, 121 A.3d at 951 (citing *Brody v. Montalbano*, 151 Cal. Rptr. 206 (Cal. Ct. App. 1978)). And the California Court of Appeal in *Edwards* discussed the same provisions of the Restatement the Pennsylvania Supreme Court analyzed in *Schanne* and other cases. *Compare Edwards*, 61 Cal. Rptr. 2d at 533 (citing Restatement (Second) of Torts §§ 586–88), *with Schanne*, 121 A.3d 950 (quoting Restatement (Second) of Torts § 588), *and Post*, 507 A.2d at 356 (quoting Restatement (Second) of Torts § 586).

[119] *Edwards*, 61 Cal. Rptr. 2d at 522.

[120] *Id.* at 523–24.

[121] *Id.* at 531 (citing Restatement (Second) of Torts §§ 586–88 cmts. e).

[122] *Id.* (emphasis in original).

[123] *Id.* at 532.

[124] *Id.* at 533 (emphasis in original).

[125] *Id.* at 532.

[126] *Id.* at 531. Judges interpreting states' judicial privileges reject the privileges' application "when the statements are made in furtherance of a frivolous lawsuit and outside the context of a judicial proceeding." *McNamee v. Clemens*, 762 F. Supp. 2d 584, 608 (E.D.N.Y. 2011); *see also Begley v. Ireson*, 399 P.3d 777, 781 (Col. Ct. App. 2017) (a blanket privilege for attorneys' pre-litigation statements "could condone improper behavior while doing nothing to advance the goals of the litigation privilege (ensuring access to the courts and protection of attorneys during the course of client representation)").

[127] *Schanne*, 121 A.3d at 948.

[128] *Id.* at 947 (emphases added).

[129] We recognize just because the lawyer do not file suit does not alone show he did not intend to file suit when he wrote the challenged statements. But the litigation's non-materialization supports an inference the parties did not seriously contemplate litigation. *See, e.g.*, *Meltzer v. Grant*, 193 F. Supp. 2d 373, 381 (D. Mass. 2002) (finding plaintiffs stated a claim for defamation not barred by the judicial privilege because no litigation ever materialized, which "is a basis for challenging whether the other threatened action, civil litigation, was contemplated in good faith and/or was seriously considered").

[130] *Schanne v. Addis*, 898 F. Supp. 2d 751, 755 (E.D. Pa. 2012), *vacated and remanded on other grounds*, 615 F. App'x 759 (3d Cir. 2015).

[131] *Greenberg v. McGraw*, 161 A.3d 976, 983–84 (Pa. Super. Ct. 2017) (quoting *Urbano v. Meneses*, 431 A.2d 308, 311 (Pa. Super. Ct. 1981)).

[132] *Pollina v. Dishong*, 98 A.3d 613, 620–21 (Pa. Super. Ct. 2014).

[133] *Overall v. Univ. of Pa.*, 412 F.3d 492, 497 (3d Cir. 2005); *see also* Douglas R. Richmond, *The Lawyer's Litigation Privilege*, 31 Am. J. Trial Advoc. 281, 303 (2007) (explaining "quasi-judicial proceedings involve adjudications by administrative or executive bodies" and compiling cases from other jurisdictions).

[134] *See Mediation*, Black's Law Dictionary (online 2nd ed.) (emphasis added).

[135] ECF Doc. No. 154-7 at 19.

[136] *See, e.g.*, Garabedian App'x at 1166a (Lehman Dep. at 119:2–22).

[137] 2019 WL 1384577, at *9–10.

[138] *Id.* at *10.

[139] *See, e.g.*, *Khan v. Yale Univ.*, 511 F. Supp. 3d 213, 221–25 (D. Conn. 2021) (finding hearings conducted by Yale's "University-Wide Committee on Sexual Misconduct"—which are required by Title IX—quasi-judicial).

[140] *Harris v. Saint Joseph's Univ.*, No. 13-3937, 2014 WL 1910242, at *9 (E.D. Pa. May 13, 2014).

[141] *Post*, 507 A.2d at 355 (emphasis added) (quoting *Greenberg*, 235 A.2d at 578).

[142] ECF Doc. No. 154-7 at 18.

[143] *Schanne*, 121 A.3d at 950 (emphasis added).

[144] *Id.* at 951 n.7.

[145] *See id.* at 950 n.6 (citing *Hartman v. Keri*, 883 N.E.2d 774 (Ind. 2008); *Reichardt v. Flynn*, 823 A.2d 566 (Md. 2003); *Brody*, 151 Cal. Rptr. 206; and *Weissman v. Mogol*, 462 N.Y.S.2d 383 (Sup. Ct. 1983)).

[146] *Hartman*, 883 N.E.2d at 775.

[147] *Id.* at 778.

[148] *Id.*

[149] *See, e.g.*, *Mauvais-Jarvis v. Wong*, 987 N.E.2d 864, 888 (Ill. App. Ct. 2013) (refusing to apply privilege to defamation claim against a researcher who falsely reported scientific misconduct).

[150] *Reichardt*, 823 A.2d at 574; *Brody*, 151 Cal. Rptr. at 211 (applying privilege to letter sent by parents of high school students to the Los Angeles City Board of Education because they "were intended to prompt official action on the part of the Board"); *Weissman*, 462 N.Y.S.2d at 386 (applying privilege to petition submitted by group of high school parents to board of education regarding alleged misconduct of a tenured teacher).

[151] *See, e.g.*, *Pawlowski*, 588 A.2d at 41 (protecting allegations made to police to initiate criminal proceedings); *Brody*, 151 Cal. Rptr. at 211 (protecting allegations made to city school board); *Fogel*, 2019 WL 1384577, at *9–10 (protecting allegations made to Title IX officer).

[152] *See, e.g.*, *Hartman*, 883 N.E.2d at 775; *Schanne*, 121 A.3d at 953 (Todd, J., concurring) (noting "I might very well have" not applied the judicial privilege had "Addis been a student at the time she confided in O'Bannon").

[153] Garabedian App'x at 845a (emphasis added).

[154] *See* Douglas R. Richmond, *The Lawyer's Litigation Privilege*, 31 Am. J. Trial Advoc. 281, 306 (2007).

[155] *Id.* at 307.

[156] *Schanne*, 121 A.3d at 952 (Todd, J., concurring).

[157] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Pennsylvania law does not govern our determination whether Mr. Ralston is a limited-purpose public figure. Defamation claims involve "inquiries under both state and federal law." *McDowell v. Paiewonsky*, 769 F.2d 942, 945 (3d Cir. 1985). "In the first instance, the Court must determine whether the defendant has injured the plaintiff's reputation under the applicable state law." *Id.* "If so, then the Court must ascertain whether the [federal Constitution's] First Amendment nevertheless prohibits the imposition of liability." *Id.* The Supreme Court created the public figure doctrine as a First Amendment protection. *See Gertz*, 418 U.S. at 342. Our Court of Appeals's interpretations of *Sullivan* and its progeny bind us for this portion of our analysis. *See, e.g.*, *McDowell*, 769 F.2d at 947; *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 272 (3d Cir. 1980) ("In cases dealing with plaintiffs who are 'public officials' or 'public figures,' states may not authorize recovery unless the plaintiff proves, 'with convincing clarity,' that the defendants published false material, knowing of its falsity or with reckless disregard of the truth.").

[158] *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 497 (E.D. Pa. 2010) (citing *Sullivan*, 376 U.S. at 279–80). "Actual malice exists where a statement was made with either: (1) knowledge of its falsity; or (2) reckless disregard to its truth or falsity." *Id.* at 506 (citing *Sullivan*, 376 U.S. at 506). We need not determine whether the record contains evidence Attorney Garabedian acted with actual malice because we find Mr. Ralston is not a limited-purpose public figure.

[159] *Sullivan*, 376 U.S. at 270.

[160] *Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072, 1081 (3d Cir. 1985).

[161] *Id.* (internal quotations omitted).

[162] *Mzamane*, 693 F. Supp. 2d at 502 (citing *Gertz*, 418 U.S. at 345).

[163] *Marcone*, 754 F.2d at 1081 n.4.

[164] *Gertz*, 418 U.S. at 351.

[165] *See, e.g.*, *Medure v. Vindicator Printing Co.*, 273 F. Supp. 2d 588, 609 (W.D. Pa. 2002). Attorney Garabedian does not argue Mr. Ralston is an all-purpose public figure.

[166] *Gertz*, 418 U.S. at 351.

[167] *Avins v. White*, 627 F.2d 637, 647 (3d Cir. 1980).

[168] *Mzamane*, 693 F. Supp. 2d at 499 (citing *McDowell*, 769 F.2d at 948).

[169] *Id.*

[170] *Marcone*, 754 F.2d at 1083 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)).

[171] *Id.*

[172] *Id.*

[173] *Id.* at 1083 n.7.

[174] Garabedian App'x at 288a.

[175] Garabedian App'x at 501a.

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Marcone*, 754 F.2d at 1083 (quoting *Waldbaum*, 627 F.2d at 1296).

[180] *Smith v. A Pocono Country Place Prop. Owners Ass'n, Inc.*, 686 F. Supp. 1053, 1058 (M.D. Pa. 1987).

[181] Garabedian App'x at 1447a.

[182] 693 F. Supp. 2d 442.

[183] *Id.* at 461.

[184] *Id.* at 462.

[185] *Id.* at 463.

[186] *Id.*

[187] *Id.*

[188] *Id.* at 464.

[189] *Id.* at 465.

[190] *Id.* at 480–497.

[191] *Id.* at 500.

[192] *Id.*

[193] *Id.*

---

[194] *See Avins*, 627 F.2d at 647 (accreditation struggle of Delaware Law School constituted a public controversy because "its success or failure was of importance to the Delaware State Bar as well as to any individual interested in attending an accredited law school in Delaware" and the struggle attracted media attention).

[195] *Id.* at 648.

[196] *Marcone*, 754 F.2d at 1083.

[197] *Id.*

[198] *McDowell*, 769 F.2d at 949.

[199] *Id.*

[200] *Marcone*, 754 F.2d at 1083.

[201] *Id.* Attorney Garabedian does not argue Mr. Ralston is a "public official" because the Hill School is a private school.  *See, e.g.*, *Byers v. Se. Newspaper Corp. Inc.*, 288 S.E.2d 698, 700–01 (Ga. 1982) (compiling cases finding officials of public schools are public officials).

[202] *Marcone*, 754 F.2d at 1082.

[203] *Id.* (quoting *Rosanova v. Playboy Enters., Inc.*, 411 F. Supp. 440, 443 (S.D. Ga. 1976)).

[204] *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1078 (3d Cir. 1988).

[205] 595 F.2d 1265, 1280 (3d Cir. 1979).

[206] *Id.* at 1269.

[207] *Id.*

[208] *Id.* at 1270.

[209] *Id.*

[210] *Id.* at 1280.

[211] *Id.*

[212] *Id.*

[213] 623 F.2d 264, 276 (3d Cir. 1980).

[214] *Id.* at 266.

[215] *Id.* at 267.

[216] *Id.* at 268–70.

[217] *Id.* at 273.

[218] *Id.* at 273.

[219] *Id.* at 274.

[220] 627 F.2d 637, 648 (3d Cir. 1980).

[221] *Id.* at 640.

[222] *Id.* at 641.

[223] *Id.*

[224] *Id.* at 647.

[225] *Id.* at 648.

[226] *Id.*

[227] 754 F.2d 1072, 1083–84 (3d Cir. 1985).

[228] *Id.* at 1076.

[229] *Id.* at 1077.

[230] *Id.*

[231] *Id.*

[232] *Id.* at 1082.

[233] *Id.* at 1085.

[234] *Id.*

[235] *Id.* at 1086.

[236] *Id.*

[237] 769 F.2d 942, 950–51 (3d Cir. 1985).

[238] *Id.* at 944.

[239] *Id.*

[240] *Id.* at 945.

[241] *Id.*

[242] *Id.* at 949.

[243] *Id.*

[244] *Id.*

[245] *Id.* at 950.

[246] 847 F.2d 1069, 1078–79 (3d Cir. 1988).

[247] *Id.* at 1073–74.

[248] *Id.* at 1074.

[249] *Id.* at 1076.

[250] *Id.* at 1078.

[251] *Id.* at 1079.

[252] *Id.* Our Court of Appeals analyzed *Gertz*'s public figure rule at least two other times but neither is particularly helpful to today's analysis. In *McCafferty v. Newsweek Media Group, Ltd.*, our Court of Appeals found a child voluntarily injected himself into political controversies involving President Trump by producing videos watched hundreds of thousands of times and receiving widespread media coverage. 955 F.3d 352, 359 (3d Cir. 2020). Our Court of Appeals did not provide much analysis of the issue because the child creating the videos readily constituted a limited purpose public figure. *Id.* In *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, our Court of Appeals found two companies involved in an "advertising war" were not limited purpose public figures for the purpose of "commenting on health care" and noted the *Gertz* framework was "not helpful" in deciding public figure status of companies warring through advertising. 898 F.2d 914, 938–39 (3d Cir. 1990).

[253] *Mzamane*, 693 F. Supp. 2d at 503–04 (noting Supreme Court's rejection of "bootstrapping"— wherein one becomes a public figure by virtue of the defamatory action—in *Hutchinson v. Proxmire*, 443 U.S. 111, 135–36 (1979)).

[254] ECF Doc. No. 170 at 13 (quoting *Chuy v. Phila. Eagles Football Club*, 431 F. Supp. 254, 267 (E.D. Pa. 1977)).

[255] Garabedian App'x at 1641a.

[256] *Chuy*, 595 F.2d at 1280.

[257] *Steaks Unlimited*, 623 F.2d at 274.

[258] *Avins*, 627 F.3d at 648.

[259] *Marcone*, 754 F.2d at 1072.

[260] *McDowell*, 769 F.2d at 948.

[261] *Mzamane*, 693 F. Supp. 2d at 502.

[262] *See Chuy*, 595 F.2d at 1280.

[263] *See, e.g.*, *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) (woman who divorced her wealthy husband but did not seek out any public attention related to the divorce was not a public figure because she did not "freely choose to publicize issues as to the propriety of her married life").

[264] *U.S. Healthcare, Inc.*, 898 F.2d at 938.

[265] *See Proxmire*, 443 U.S. at 135–36.

[266] *See, e.g.*, *Mzamane*, 693 F. Supp. 2d at 505 (finding headmistress of "a novel and innovative educational institution which was bound to attract public attention, in conjunction with a figure [Orpah Winfrey] of worldwide renown, in a leadership position," constituted a limited-purpose public figure regarding a controversy arising at the school after the headmistress assumed her role).

[267] *Sullivan*, 376 U.S. at 270; *see also Gertz*, 418 U.S. at 340 (citing same provision of *Sullivan*). We are also mindful of Justice Gorsuch's dissent from the Supreme Court's denial of certiorari in *Berisha v. Lawson*. 141 S. Ct. 2424 (2021). Justice Gorsuch invited the Court to re-examine the extent of the *Sullivan* "actual malice" doctrine because "our Nation's media landscape has shifted in ways few could have foreseen." *Id.* at 2427 (Gorsuch, J., dissenting). He reasoned the Court decided *Sullivan* "to ensure that dissenting or critical voices are not crowded out of public debate." *Id.* "But if that justification had force in a world with comparatively few platforms for speech, it's less obvious what force it has in a world in which everyone carries a soapbox in their hands." *Id.*

[268] *Gertz*, 418 U.S. at 341 (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966)).

[269] *Chuy*, *Steaks Unlimited*, *Marcone*, *McDowell*, and *Schiavone* all involved statements made by or in the media. *Avins* involved a public statement made during the public process of accrediting a new law school.

[270] *Id.* at 344.

[271] ECF Doc. No. 170 at 10.

[272] *Miketic v. Baron*, 675 A.2d 324, 329 (Pa. Super. Ct. 1996) (quoting *Beckman v. Dunn*, 419 A.2d 583, 588 (Pa. Super. Ct. 1980)). Because Mr. Ralston is a private figure, we now return to application of Pennsylvania law. "States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Gertz*, 418 U.S. at 345–46. "[S]tates are free to allow a private-figure plaintiff to recover by establishing that the defendant acted negligently rather than maliciously." *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007).

[273] *Thompson v. Wagner*, 631 F. Supp. 2d 664, 686 (W.D. Pa. 2008) (quoting *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1268 (Pa. Super. Ct. 2005)).

[274] *Wilson v. Am. Gen. Fin. Inc.*, 807 F. Supp. 2d 291, 299 (W.D. Pa. 2011) (citing *Miketic*, 675 A.2d at 329).

[275] *Id.* (citing *Miketic*, 675 A.2d at 329).

[276] *Beckman*, 419 A.2d at 588 (internal citations and footnote omitted); *see also Baker v. Benton Area Sch. Dist.*, 418 F. Supp. 3d 17, 60 (M.D. Pa. 2019) (quoting *Beckman*); *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 428 n.9 (Pa. 2015) (negligence defeats conditional privilege for a "matter of public concern").

[277] *See* Garabedian App'x at 502a.

[278] *See, e.g.*, *Baker*, 418 F. Supp. 3d at 60; *Chicarella v. Passant*, 494 A.2d 1109, 1113 (Pa. Super. Ct. 1985).

[279] *Am. Future Sys., Inc.*, 923 A.2d at 398; *see also Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009).

[280] *Pacitti*, 310 F. App'x at 528 (citing *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 342 (Pa. Super. Ct. 2008)).

[281] ECF Doc. No. 154-7 at 20–26 (citing, for example, *Austin J. Richards, Inc. v. McClafferty*, 538 A.2d 11, 15 (Pa. Super. Ct. 1988) ("[A]n attorney cannot be held liable ***for negligence*** to a third person with whom he has no contract of employment." (emphasis added)), *Smith*, 476 A.2d at 26 (attorneys owe no duty of care in the negligence context to third parties), and *Perelman v. Perelman*, 125 A.3d 1259, 1264 (Pa. Super. Ct. 2015) (an attorney is not liable for wrongful use of civil proceedings if he acted in good faith in bringing the suit)).

[282] 476 A.2d at 24, 26.

[283] *Id.* at 24–25.

[284] 189 F.3d 405, 413 (3d Cir. 1999).

[285] *Id.* at 414.

[286] *See Bochetto*, 860 A.2d at 71–72; *Post*, 507 A.2d at 355; *Smith*, 476 A.2d at 24.

[287] 42 Pa. Stat. and Cons. Stat. Ann. § 8343(a).

[288] *Mzamane*, 693 F. Supp. 2d at 477 (quoting *Joseph*, 959 A.2d at 334).

[289] *Id.* (quoting *Joseph*, 959 A.2d at 334).

[290] *See, e.g.*, *Fitzpatrick v. Milky Way Prods., Inc.*, 537 F. Supp. 165, 171 (E.D. Pa. 1982).

[291] *Mzamane*, 693 F. Supp. 2d at 477.

[292] Garabedian App'x at 1675a.

[293] 42 Pa. Stat. and Cons. Stat. Ann. § 8343(a).

[294] *Joseph v. Scranton Times, L.P.*, 89 A.3d 251, 261 (Pa. Super. Ct. 2014), *aff'd in part, rev'd in part on other grounds*, 129 A.3d 404 (Pa. 2015); *see also LabMD, Inc. v. Tiversa Holding Corp.*, No. 15-92, 2020 WL 1441641, at *9 n.12 (W.D. Pa. Mar. 24, 2020) (noting the Superior Court's *Joseph* opinion was reversed on grounds not related to its discussion of special harm).

[295] *Joseph*, 89 A.3d at 261.

[296] *Id.*

[297] *Id.* (cleaned up).

[298] *Id.* (emphasis added).

[299] *Id.* (quoting *Pilchesky v. Gatelli*, 12 A.3d 430, 444 (Pa. Super. Ct. 2011)); *see also Joseph*, 129 A.3d at 429 n.10 ("Consistent with Restatement (Second) of Torts § 569, Pennsylvania case law holds that proof of special harm, *i.e.*, monetary damages, is not a prerequisite to recovery in a defamation libel matter.").

[300] *See, e.g.*, *Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962) (a client who voluntarily hires an attorney "as his representative in the action" cannot "avoid the consequences of the acts or omissions of this freely selected agent" because "each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney" (internal quotations omitted)); *see also Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 807 (3d Cir. 1986) (noting the "*Link* principle remains valid"); *Rhoden v. Childrens Hosp. of Pittsburgh of UPMC Health Sys.*, 749 F. App'x 86, 90 n.4 (3d Cir. 2018).

[301] *See supra* Part II.A.3.