**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MATTHEW RALSTON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 19-1539** |
| | : | |
| **MITCHELL GARABEDIAN, ESQ.,** *et* | : | |
| *al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                    January 3, 2022

 We instruct juries to reach a unanimous verdict by focusing on facts generally provided by witnesses with firsthand knowledge, apply their common sense, and follow the law as instructed. We also allow persons without firsthand knowledge but qualified by experience or expertise to provide the jury with a qualified opinion if it will assist the jury in understanding an issue in the case outside our common understanding. We must ensure these expert opinions expressed to the jury are offered by persons qualified to provide relevant opinions after they demonstrate reliance on credible experience or data. We avoid mini-trials and unfair prejudice caused by opinions on marginally relevant issues. Experts cannot function as the trial lawyers from the witness stand. Experts must focus on data fitting the dispute.

 We today review challenges to a variety of opinions offered by former Hill School teacher Matthew Ralston claiming his former student Kurtis Poulos and Mr. Poulos's Massachusetts lawyer Mitchell Garabedian and his law firm defamed him through sexual abuse allegations in letters sent to school administration. Attorney Garabedian sent two letters in 2018 describing Mr. Ralston's alleged sexual abuse of Mr. Poulos in the mid-1990s knowing Pennsylvania's statute of limitations barred recovery but still seeking a million dollars in compensation. The jury will focus on whether the lawyers and Mr. Poulos defamed Mr. Ralston to the Hill School knowing they

could not recover in court. The lawyers and Mr. Poulos argue, among other things, the lawyers' statements of sexual abuse are true, they are entitled to a judicial privilege based on the lawyers' understanding Pennsylvania would amend the statute of limitations so they could sue, and the lawyers' statements are conditionally privileged as responses to the Hill School raising the issue of sexual abuse of students.

Mr. Ralston hopes to persuade the jury with opinions from two lawyers challenging the pleaded defenses of judicial or conditional privilege. He also adduced an economist's opinion of his lost earnings after the school fired him. He also adduced a series of psychiatric evaluations of himself and Mr. Poulos to presumably persuade the jury to believe him and not Mr. Poulos's sex abuse claims in the 2018 letters.

Expert opinions, regardless of the quality of the expertise, must fit the facts and not constitute attacks on witness credibility or proffer legal conclusions. We preclude Mr. Ralston from introducing opinions from an expert in legal ethics whose opinions are marginally probative but substantially outweighed by the confusion and sideshow to the jury on the issues before it. We also preclude Mr. Ralston from introducing opinions from a tort trial attorney which go beyond the standard of care applicable to a lawyer investigating a client's claim and sending a letter seeking recovery; the trial attorney expert cannot opine as to legal conclusions or witness state of mind. We further preclude Mr. Ralston from introducing testimony of a forensic psychiatrist to the extent her opinions do not use specialized knowledge, invade the jury's fact-finding function by telling the jury whom to believe through the guise of medical opinions, and unduly prejudice Mr. Poulos. We also preclude Mr. Ralston from introducing an economist's opinion on his lost earnings until after he adduces evidence the Garabedian lawyers' letters caused the lost earnings. Mr. Ralston may adduce an expert opinion from the trial attorney on the standard of care applied to the

Garabedian lawyers sending these letters and how the lawyers may have deviated from the suggested standard. We may allow the forensic psychiatrist to opine on permissible conclusions after we better understand her reasons explained to us during a Rule 104 evidentiary hearing.

## I.    Analysis

We must ensure a witness offering an expert opinion possesses adequate "knowledge, skill, experience, training, or education" to support the opinion.

[1] We act "as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'"[2] Congress, through Rule of Evidence 702, "usually favors admissibility."[3] Rule 702 embodies a "trilogy of restrictions on expert testimony: qualification, reliability[,] and fit."[4]

The first category of restrictions—qualification—requires "that the witness possess specialized expertise."[5] Our Court of Appeals interprets this requirement "liberally."[6] "[A] broad range of knowledge, skills, and training qualify an expert."[7] We should not "impos[e] overly rigorous requirements of expertise"; "more generalized qualifications" suffice.[8]

The second category—reliability—requires us to examine "the process or technique the expert used in formulating the opinion."[9] The opinion must be based on "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[10] "In other words, the expert must have 'good grounds' for his belief."[11] In cases not involving scientific testimony, "the relevant reliability concerns may focus upon personal knowledge or experience."[12]

The third category—fit—requires we ask "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[13] "Put another way, this is a question of relevance, and Rule 702, which governs the admissibility

of expert testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of fact."[14] "The standard is not that high, but is higher than bare relevance."[15]

Rule 702's trilogy of restrictions "incorporates to some extent a consideration of the dangers, particularly the danger of unfair prejudice, enumerated in" Rule 403.[16] But Rule 403 still independently applies to expert testimony.[17] We should exclude evidence under Rule 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[18]

### A.  We exclude James Schwartzman, Esq.'s proffered opinion testimony.

James Schwartzman, Esq. opines Attorney Garabedian of the Massachusetts Bar violated the Pennsylvania Rules of Professional Conduct through the unauthorized practice of law in Pennsylvania.[19] Attorney Schwartzman is undoubtedly qualified to offer expert opinions on attorney ethics issues; he served on the Disciplinary Board of the Supreme Court of Pennsylvania for six years, including two years as chairman and vice chairman, among other positions in which he oversaw attorneys' conduct.[20] He is among the most highly regarded attorney ethics lawyers in our District. He opines: (1) Attorney Garabedian "engaged in the unauthorized practice of law in violation of [Pennsylvania Rule of Professional Conduct] 5.5" and (2) Attorney Garabedian "also violated [Rule] 5.1 in failing to supervise and in permitting the violation of [Rule] 5.5 by his associates Nathan Gaul and Daniel Mahoney, in connection with their services on behalf of" Mr. Poulos.[21]

Attorney Garabedian argues we should preclude Attorney Schwartzman's expert testimony because "it does not satisfy the 'fit' requirement, improperly purports to instruct the jury regarding the governing law and will create unfair prejudice and mislead the jury by suggesting the Rules of Professional Conduct can be a basis for civil liability when they cannot."[22] Mr. Ralston responds

Attorney Schwartzman's testimony is relevant to Attorney Garabedian's serious contemplation of litigation in Pennsylvania necessary for the application of the judicial privilege to protect his letters and whether Attorney Garabedian acted with negligence or recklessness in publishing the letters.

Attorney Schwartzman's opinions are inadmissible under Rule 403 because they create a significant risk of confusing the issues, misleading the jury, and unfair prejudice which substantially outweighs the limited probative value of the issues before the jury on whether Attorney Garabedian seriously contemplated judicial proceedings and whether he acted negligently or recklessly and thus cannot invoke a conditional privilege.

### 1. Attorney Schwartzman's testimony is inadmissible to prove Attorney Garabedian's serious contemplation of judicial proceedings.

Mr. Ralston argues Attorney Schwartzman's opinions are admissible to prove whether Attorney Garabedian seriously contemplated judicial proceedings as required for the judicial privilege to apply. Mr. Ralston argues Attorney Schwartzman's opinions as to Attorney Garabedian's compliance with the Rules are relevant because if Attorney Garabedian did not obtain authorization to practice in Pennsylvania, it shows he did not seriously contemplate initiating a lawsuit in Pennsylvania. We find Attorney Schwartzman's evidence inadmissible under Rule 403.

Attorney Garabedian did not show a judicial privilege applied to his 2018 letters before trial.[23] Attorney Garabedian did not adduce evidence he or Mr. Poulos seriously contemplated judicial proceedings because they agreed not to file suit and their conduct did not suggest they seriously considered a lawsuit.[24] But Attorney Garabedian may raise the issue at trial on a limited theory: "If Attorney Garabedian in good faith believed an imminent change to the statute of limitations would permit him to file suit on Mr. Poulos's behalf when he published his letters, his belief may suffice to show he seriously contemplated judicial proceedings."[25]

Mr. Ralston argues Attorney Schwartzman's testimony is relevant to Attorney Garabedian's serious contemplation of judicial proceedings.[26] But Mr. Ralston's arguments for relevance are largely foreclosed by our findings in denying Attorney Garabedian's motion for summary judgment. Mr. Ralston argues, for example, Attorney Schwartzman's testimony rebuts Attorney Garabedian's arguments the judicial privilege applies because Attorney Garabedian wrote the 2018 letters in his capacity as Mr. Poulos's lawyer, he acted in service of a client when he wrote the letters, and he demanded money for the injuries.[27] But we already rejected these arguments by Attorney Garabedian. We rejected the notion the letters were written in a judicial context by finding the privilege could only apply if "Attorney Garabedian contemplated in good faith and seriously considered initiating a judicial or quasi-judicial proceeding when he wrote the 2018 letters."[28] We also found Attorney Garabedian's mere intent to recover money for Mr. Poulos's alleged injuries insufficient to invoke the privilege.[29]

Mr. Ralston does not show how Attorney Schwartzman's testimony is relevant to the one theory Attorney Garabedian may be able to present at trial: the extent of his study and basis to believe the statute of limitations might change. Attorney Schwartzman's testimony bears only tangential (at best) relevance to this theory. If Attorney Garabedian failed to abide the professional obligations necessary to practice law in Pennsylvania, it may slightly tend to show he did not ultimately intend to file suit law in Pennsylvania. But this theory of relevance is internally inconsistent because Attorney Schwartzman opines Attorney Garabedian **did** practice law in Pennsylvania by sending the 2018 letters. He simply practiced in an unauthorized manner. The manner Attorney Garabedian practiced while the statute of limitations barred Mr. Poulos's claims is barely relevant to whether Attorney Garabedian intended to file a lawsuit if the statute of limitations changed. Attorney Schwartzman's testimony amounts to a criticism of Attorney

Garabedian's compliance with his professional and ethical obligations. But Attorney Garabedian is not on trial for professional misconduct.[30]

Whatever scant probative value Attorney Schwartzman's testimony contains is substantially outweighed by the risk of confusing the issues, misleading the jury, and causing Attorney Garabedian unfair prejudice.[31] First, the testimony regarding professional violations will confuse the issues and mislead the jury. To explain his conclusion Attorney Garabedian committed the unauthorized practice of law, Attorney Schwartzman will need to explain his former role on the Disciplinary Board of the Supreme Court of Pennsylvania, a lawyer's professional and ethical obligations under the Pennsylvania Rules of Professional Conduct, the avenues through which an attorney obtains authorization to practice law, and how Attorney Garabedian ignored those avenues. Attorney Garabedian will then present rebuttal experts explaining the same concepts but reaching different conclusions. These are complicated concepts which attorneys must study to obtain their law licenses. Adducing this evidence would take several hours. The presentation of this evidence will create an unnecessary and confusing sideshow or mini-trial about whether Attorney Garabedian complied with his professional obligations in sending letters requested by the Hill School.[32] Second, Attorney Schwartzman's testimony is unfairly prejudicial to Attorney Garabedian. Its admission allows the jury to hear an expert who sat on the Pennsylvania Supreme Court's Disciplinary Board conclude Attorney Garabedian is an unethical or unprofessional attorney. The jury should not consider this evidence in determining whether Attorney Garabedian defamed Mr. Ralston, but it very well might after hearing Attorney Schwartzman's testimony.

Judge Caproni excluded similar opinions regarding the Rules of Professional Conduct even where the evidence related more closely to the issues than it does here.[33] In *Joffe v. King & Spalding LLP*, a law firm fired one of its lawyers after the lawyer reported suspected ethical

violations of the firm's senior lawyers to other senior lawyers at the firm.[34] The primary issue for trial was whether plaintiff suffered an adverse employment action after reporting "suspected unethical behavior," and, if so, whether plaintiff's report "was not in good faith."[35] The behavior would be "unethical" if it violated the Rules of Professional Conduct, and plaintiff's reporting was protected if he made "good-faith and reasonable efforts to comply with" the Rules, which require reporting in certain circumstances.[36] The law firm proffered an expert to opine the law firm's partners did not violate the Rules, the Rules did not obligate the fired lawyer to report the partners' conduct, and the fired lawyer could not have reasonably believed he had a reporting obligation under the Rules.[37] Judge Caproni found the expert's testimony relevant because the obviousness of the partners' misconduct affected whether the fired lawyer reported in good faith and whether he reasonably perceived an obligation to report the conduct.[38] But Judge Caproni excluded the expert's testimony under Rule 403 because the risk of confusing the issues, misleading the jury, and causing undue delay substantially outweighed its probative value.[39] She reasoned the Rules of Professional Conduct did not impose a "clear-cut" obligation upon the fired lawyer to report misconduct; thus, the expert's interpretation of the Rules was "only marginally probative" to whether the fired lawyer reasonably and in good faith thought he had to report the misconduct.[40] Judge Caproni concluded the expert's testimony risked "creating a mini-trial on the minutia of bar association ethics opinions and the [expert's] theories of legal ethics"; similarly, "[t]he ethics minitrial is also likely to create a sideshow that distracts the jury from the main question" of plaintiff's good-faith and reasonable belief he had to report misconduct.[41]

We are persuaded by Judge Caproni's reasoning when the relevance is even more marginal. Attorney Schwartzman's ethics opinions—and the ensuing rebuttal testimony—will distract the jury from whether Attorney Garabedian seriously contemplated a lawsuit based on a possible

change of the statute of limitations. Judge Caproni reviewed and precluded more relevant ethics testimony where the reasonableness of plaintiff's understanding of the Rules constituted the "main question."[42] We do not face the same issue; the Rules regarding unauthorized practice do not control Attorney Garabedian's serious contemplation of judicial proceedings.[43] Attorney Garabedian could have fully intended to obtain authorization to practice in Pennsylvania once the statute of limitations for Mr. Poulos's claims changed.[44] He may not have. Either way, he still may have seriously contemplated judicial proceedings. The risk of unfair prejudice and an unnecessary mini-trial as to Attorney Garabedian's Rules violations outweighs the limited probative value of Attorney Schwartzman's opinions.

### 2. Attorney Schwartzman's testimony is inadmissible to prove Attorney Garabedian's negligence or recklessness.

Mr. Ralston argues Attorney Schwartzman's evidence is relevant to another issue: whether Attorney Garabedian abused a conditional privilege by acting negligently or with actual malice in sending the 2018 letters. We find Attorney Schwartzman's evidence inadmissible for this purpose for similar reasons as to why it is inadmissible to prove judicial privilege.

A conditional privilege applies to Attorney Garabedian's 2018 letters but Mr. Ralston may introduce evidence of Attorney Garabedian's negligence or actual malice to show he abused the conditional privilege.[45] We found "[n]egligence in this context is the publication of information with a want of reasonable care to ascertain the truth."[46] Mr. Ralston also may introduce evidence of actual malice to show abuse of the privilege. Actual malice in this context is "reckless disregard" as to the truth of the statements.[47]

Attorney Garabedian's failure to obtain authorization to practice law in Pennsylvania is marginally relevant to his reasonable care "to ascertain the truth" or whether he acted with "reckless disregard" of the truth. It is relevant in the sense ignorance of one professional obligation

may be some indicia (if admitted) to show lack of care as to the entire representation of Mr. Poulos. The representation includes investigating Mr. Poulos's claims. But—as with Attorney Schwartzman's testimony vis-à-vis judicial privilege—this relevance is slight at best. An attorney may thoroughly investigate a client's claim before, or without ever, obtaining authorization to practice law in a certain jurisdiction. Other provisions of the Pennsylvania Rules of Professional Conduct govern the lawyer's obligations to speak truthfully.[48] Rules 5.1 and 5.5—which Attorney Schwartzman cites—have little bearing on whether Attorney Garabedian acted negligently or recklessly in investigating Mr. Poulos's claims.

The slight probative value of Attorney Schwartzman's testimony is substantially outweighed by the risk of confusing the jury, misleading the issues, and unfair prejudice. Judge Caproni's reasoning in *Joffe* applies in equal measure to this portion of our analysis. The jury should not hear a mini-trial about whether Attorney Garabedian violated a Rule having nothing to do with investigating a client's claims. And admission of Attorney Schwartzman's testimony unfairly prejudices Attorney Garabedian by suggesting he is an unethical or unprofessional attorney when those issues are only tangential to his negligence or recklessness. We preclude Attorney Schwartzman's proffered opinions as they do not fit the issues.

**B. We admit Shanin Specter, Esq.'s proffered opinion testimony only to the extent it regards the standard of care applicable to Attorney Garabedian's conduct; it is inadmissible to the extent it provides legal conclusions or addresses a witness's mental state.**

Shanin Specter, Esquire opines Attorney Garabedian did not comply with the standard of care required of attorneys.[49] Attorney Specter is a co-founding partner of the law firm Kline & Specter, P.C., and "ha[s] been involved in and/or overseen thousands of potential client interviews as part of the case intake process."[50] He is an accomplished and highly regarded advocate for

persons seeking recovery due to injuries. He is qualified to offer expert opinion evidence on lawyers' obligations in tort cases. But he cannot offer jury instructions or legal conclusions.

Mr. Ralston proffers five opinions from Attorney Specter:

(1) "Garabedian failed to properly investigate Poulos' claims before publishing the defamatory letters at issue in this action as a reasonably prudent attorney would be expected under the circumstances. An attorney acting reasonably would have rejected Poulos as a client.

(2) Garabedian's decision to send the April 2018 letter to the Head of School by U.S. Mail was negligent and showed a reckless indifference to and conscious disregard for the truth and Ralston.

(3) The extent of Garabedian's lack of oversight of his associates is outrageous and contributed to the publication of the defamatory letters.

(4) Neither Garabedian nor Poulos intended that the statements in their letters to the School lead to any lawsuit or further judicial or quasi-judicial proceeding. Their express written intent was to the contrary and reaffirmed by subsequent conduct.

(5) Garabedian's conduct was extreme, outrageous, and recklessly caused Ralston severe emotional injuries."[51]

Attorney Garabedian argues we should preclude Attorney Specter from testifying because "the opinions do not involve the application of specialized skill, are impermissible credibility opinions and unreliable, do not satisfy the 'fit' requirement and create unfair prejudice, confuse the issues[,] and will mislead the jury."[52] Mr. Ralston responds Attorney Specter is qualified, his methods are reliable, and his opinions relate to Attorney Garabedian's negligence and/or recklessness.

We find Attorney Specter's first and third opinion—except as to the third opinion's legal conclusion Attorney Garabedian acted outrageously—admissible to the extent they regard whether Attorney Garabedian acted in accordance with the standard of care expected of attorneys. Attorney

Specter's remaining opinions are inadmissible because they constitute legal conclusions which do not require the application of specialized knowledge.

### 1. Attorney Specter's first and third opinions are admissible only to the extent they regard the standard of care applicable to Attorney Garabedian and whether he met the standard.

Attorney Specter's first opinion—"[Attorney] Garabedian failed to properly investigate [Mr.] Poulos' claims before publishing the defamatory letters at issue in this action as a reasonably prudent attorney would be expected under the circumstances. An attorney acting reasonably would have rejected Poulos as a client"—is admissible.

Attorney Specter is qualified to opine as to whether Attorney Garabedian's conduct complied with the professional standard of care. Because Attorney Garabedian is a professional, Mr. Ralston must show Attorney Garabedian failed "to exercise ordinary skill and knowledge" of a reasonable professional.[53] In cases not involving scientific testimony, "the relevant reliability concerns may focus upon personal knowledge or experience."[54] Attorney Specter's "personal knowledge or experience" qualify him as an expert as to whether Attorney Garabedian acted as a reasonable attorney would act in Pennsylvania. Attorney Specter possesses ample knowledge and experience regarding how tort attorneys should practice. Attorney Specter has practiced tort law in Pennsylvania for decades, co-founded a prominent firm in Philadelphia, oversaw thousands of potential client interviews, and served as counsel in hundreds of cases involving allegations against allege child sexual abusers. Judges find such qualifications suffice for attorneys providing expert testimony about other attorneys' conduct.[55] And judges in our Circuit regularly permit experts to testify based upon personal knowledge and experience, especially when the subject matter of their testimony relates to their professional practice.[56]

Attorney Garabedian argues Attorney Specter is unqualified to testify as to the applicable standard of care because he has only litigated one defamation case. We reject this argument. The

standard of care is whether Attorney Garabedian acted with ordinary skill and knowledge expected of an attorney to ascertain the truth of Mr. Poulos's allegations. Reasonably investigating a client's allegations is part of an attorney's duty in *all* cases.[57] Attorney Specter's experience litigating tort actions qualifies him to testify as to the standard of care to ascertain the truth of Mr. Poulos's claims.

Attorney Garabedian argues Attorney Specter's opinions are unreliable. We generally evaluate at least four factors in determining the "reliability of attorney expert testimony": "(1) whether the expert identified the materials relied upon and personally examined the file underlying the case; (2) whether the expert sufficiently explained why he or she reached an opinion; (3) whether the expert cited other sources relied upon by attorneys such as applicable statutes, treatises, or publications by professional organizations; or (4) whether the expert demonstrated that his opinion is accepted by his peers."[58] We find Attorney Specter's opinions comply with these elements, but only as they relate to testimony about "the standard of care amongst" tort law practitioners in Pennsylvania.[59]

Attorney Specter's first opinion is admissible to the extent it concerns the "standards of ordinary practice in the [tort law] industry"[60] and whether he thinks Attorney Garabedian breached those standards.[61] Attorney Specter formed the opinion after reviewing the file, detailing a fact chronology, and applying his specialized expertise to determine whether Attorney Garabedian acted as a reasonable attorney would have. His opinion is one typical of expert witnesses testifying based on experience.[62]

Attorney Garabedian argues Attorney Specter's first opinion is unreliable because he relied upon his incorrect credibility determinations. We disagree; Attorney Specter testified what he thinks Attorney Garabedian should have done under the standard of care applicable to attorneys

considering his *perceived* credibility issues. Attorney Garabedian argues Attorney Specter should be precluded because he misstated the standard of care, testified it is not negligent to send a pre-suit letter, it is acceptable to engage a client with a time-barred claim, and no caselaw or court opinion prevents him from sending a pre-suit letter. But these are criticisms appropriate for cross-examination or rebuttal expert testimony, not grounds to exclude Attorney Specter from applying his experience to these facts.[63]

Attorney Specter's third opinion—whether Mr. Garabedian acted unreasonably by failing to oversee his associates—is admissible but only to the extent it relates to the standard of care applicable to Attorney Garabedian. Attorney Specter phrased this conclusion as finding an "outrageous" lack of oversight, but his reasoning for this opinion concerns whether Attorney Garabedian acted reasonably.[64] Attorney Specter may testify as to how a reasonable attorney would oversee his associates to ascertain the truth of the allegations made. He may not reach a legal conclusion the lack of oversight is outrageous; the jury will determine whether the proffered breach reaches the level of outrageous.[65]

## 2. Attorney Specter's remaining opinions are inadmissible.

Attorney Specter's remaining three opinions (his second, fourth, and fifth opinions from his expert report) are not admissible because they are legal conclusions usurping the jury's fact-finding role. Attorney Specter is qualified as a skilled tort trial lawyer; he is not qualified to issue legal conclusions.

"An opinion is not objectionable just because it embraces an ultimate issue."[66] But "when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed."[67] An expert's testimony cannot constitute "legal conclusions."[68] And expert witnesses cannot "appl[y] the law to the facts, as this usurps the role of the jury."[69] It is the "court's duty to instruct the jury on the law and the jury's

role of determining credibility of witnesses and applying the law to the evidence."[70] Judges exclude expert testimony which, for example, defines legal obligations under a contract[71] or makes conclusions based on credibility determinations.[72] In sum, an expert witness's testimony is inadmissible if it "consists of nothing more than drawing inferences from the evidence that [the expert is] no more qualified than the jury to draw."[73]

Attorney Specter's remaining opinions simply apply the facts of this case to the law without applying specialized knowledge. Attorney Specter's second opinion concludes Attorney Garabedian was "negligent" and showed "reckless indifference to and conscious disregard for the truth and Ralston."[74] But these are the exact issues the jury must determine. Attorney Specter opines—without explanation—"Garabedian knew there was no legally cognizable claim," "[t]here were also obvious reasons to doubt the veracity of Poulos," and "Garabedian knew that disclosure of the identity of the alleged perpetrator was likely to cause great harm."[75] But these are facts to which the jury, not Attorney Specter, must assign weight. Attorney Specter does not apply any specialized knowledge to reach this conclusion. Nor is this conclusion helpful to the jury; rather, it risks the "jury simply adopt[ing] the expert's conclusions rather than making its own decision."[76] This conclusion contrasts with Attorney Specter's opinion as to the standard of care, which is helpful to the jury by instructing it as to how attorneys should act to ascertain the truth of their clients' claims.

Attorney Specter's fourth opinion—neither Attorney Garabedian nor Mr. Poulos intended to institute judicial or quasi-judicial proceedings—suffers from the same defects. Attorney Specter does not explain how he is qualified to opine as to Attorney Garabedian's or Mr. Poulos's mental state. Attorney Specter's conclusion merely recites facts of record, then concludes Attorney Garabedian and Mr. Poulos cannot have intended to file a lawsuit based on those facts. Attorney

Specter applies no specialized knowledge to reach these conclusions; he simply concludes "there is no credible evidence" Attorney Garabedian or Mr. Poulos intended to sue. But inferring mental states from adduced testimony is the jury's sworn role, and it does not need expert testimony.

Attorney Specter's fifth opinion is also inadmissible. He opines Attorney Garabedian's conduct was extreme, outrageous, and recklessly caused Mr. Ralston severe emotional injuries. It is unclear how Attorney Specter is qualified to testify as to the existence and cause of Mr. Ralston's emotional injuries as a non-medical expert who has not examined Mr. Ralston. Attorney Specter's decades of practicing law do not make him qualified to render quasi-medical opinions regarding the emotional injuries Mr. Ralston allegedly suffered.

### C.  We admit Andrew Verzilli, Jr.'s proposed expert testimony subject to Mr. Ralston establishing a foundation for its relevance at trial.

Economist Andrew Verzilli, Jr. opines as to Mr. Ralston's lost earning capacity because the Hill School fired him from his job after it received Attorney Garabedian's 2018 letters.[77] Mr. Verzilli opines Mr. Ralston lost $782,407 in earnings based on his earning capacity and loss in benefits.[78]

Attorney Garabedian argues Mr. Verzilli's opinion is inadmissible because (1) Mr. Verzilli does not use specialized knowledge to perform basic mathematical calculations and (2) does not meet the "fit" requirement because Mr. Verzilli bases his opinion on the incorrect fact the Hill School terminated Mr. Ralston because of the 2018 letters, when in fact it terminated him because he sued Mr. Poulos. Mr. Ralston responds Mr. Verzilli's calculations include specialized knowledge helpful to the jury and his assumptions are reasonable. We agree with Mr. Ralston on the calculations but need a foundation as to the reason Hill School fired Mr. Ralston before Mr. Verzilli can offer these calculations.

We reject Attorney Garabedian's argument Mr. Verzilli's calculations are not based on specialized knowledge. Attorney Garabedian argues Mr. Verzilli's "opinion is a mere mathematical calculation," and "[e]xpert testimony is unnecessary and improper merely to perform math."[79] This argument ignores Mr. Verzilli's sworn testimony regarding the economic methods he applied to reach his conclusions.[80] Attorney Garabedian cites no case in which a judge excluded expert testimony as to lost damages, let alone a case excluding such testimony because it is not based on specialized knowledge. We might preclude mere calculations, but Mr. Verzilli offers opinions based on future earnings and benefits outside a jury's common knowledge.

We reject Attorney Garabedian's argument Mr. Verzilli's testimony does not "fit" without prejudice subject to hearing evidence for why the Hill School fired Mr. Ralston. Mr. Verzilli opines as to lost earnings caused by the defamation. His testimony is relevant only if Mr. Ralston adduces sufficient evidence from which the jury could find the defamation caused his firing. If the evidence is undisputed defamation did not cause Mr. Ralston's termination, Mr. Verzilli's testimony is irrelevant because Mr. Ralston's lost earnings are not appropriate damages.[81] The parties presently dispute whether the defamation caused Mr. Ralston's termination. We must hear evidence regarding the cause of Mr. Ralston's firing to determine whether lost earning capacity is properly before the jury.

We also reject Attorney Garabedian's argument Mr. Verzilli's opinion is unreliable because he based it on the flawed assumption the defamation caused Mr. Ralston's firing.[82] An expert's opinion must be "based on sufficient facts or data."[83] "An expert's empirical assumptions must be supported by the factual record."[84] Expert testimony regarding future earnings loss "must be accompanied by a sufficient factual foundation before it can be submitted to the jury."[85] Speculative assessments of future earnings—such as assessments based "solely on the plaintiff's

17

personal assessment of his ability to re-enter the work force"—do not suffice.[86] The assumptions on which an expert bases his testimony must include "foundation in the record."[87] Mr. Verzilli conducted economic calculations independent of the reason for which the Hill School terminated Mr. Ralston. He based these economic calculations on his review of the record and economic principles which would not change based on the reason why the Hill School terminated Mr. Ralston.[88] The reason for Mr. Ralston's firing goes to the *relevance* of Mr. Verzilli's testimony, not its *reliability*.[89] We will conditionally admit Mr. Verzilli's testimony subject to Mr. Ralston adducing sufficient evidence the defamation caused his firing.

### D. We exclude Barbara Ziv, M.D.'s proposed testimony to the extent it does not involve specialized knowledge, invades the jury's fact-finding function, or is unduly prejudicial.

Attorney Garabedian moves to preclude Barbara Ziv, M.D. from offering a variety of conclusions focusing on the defense of truth. Attorney Garabedian hopes to defend the case by persuading the jury, among other things, the statements in the letters are not defamatory because they are true: Mr. Ralston sexually abused Mr. Poulos as a student at the Hill School. Mr. Ralston apparently hopes Dr. Ziv can tell the jury to believe Mr. Ralston and not Mr. Poulos based on her medical diagnoses of Mr. Poulos's credibility. Dr. Ziv can testify as to certain conclusions based on her specialized knowledge which we define after a Rule 104 evidentiary hearing outside the jury's presence during trial.

Dr. Ziv is a psychiatrist who conducted more than 2,000 "forensic assessments and independent medical examinations" in her career.[90] She sits on Pennsylvania's Medical/Legal Advisory Board on Child Abuse and the Pennsylvania Sexual Offenders Assessment Board.[91]

Dr. Ziv issued two reports. She issued a narrative entitled "Evaluation of Matt Ralston."[92] Dr. Ziv noted "at the core of this assessment is the question of the reliability of Mr. Poulos'[s] account of abuse by Mr. Ralston."[93] She concluded, "The allegations levied against Matt Ralston

by Kurtis Poulos are so preposterous, it is difficult to know where to begin."[94] She evidently based her conclusion regarding Mr. Poulos's credibility on three grounds: Mr. Ralston's behaviors with Mr. Poulos contrast with "known patterns of behavior of men who abuse children/teenagers"; Mr. Poulos's accounts of the abuse are "inconsistent and contain improbable information"; and "the manner by which Mr. Poulos came to make allegations against Mr. Ralston strongly points to secondary gain."[95] Dr. Ziv concluded her report with opinions without tying reasons to each opinion.[96]

Dr. Ziv reached six conclusions in her evaluation of Mr. Ralston:

(1) Matt Ralston's history is not consistent with literature about sex offenders or pedophiles/hebephiles.

(2) The actions of Matt Ralston described by Kurtis Poulos do not conform to the behavior of sex offenders or pedophiles/hebephiles.

(3) It is virtually unheard of for an offender to commit sex offenses in a semi-public area when the chances of detection are extremely high.

(4) The allegations made by Kurtis Poulos contain factually inaccurate elements and/or inconsistencies and implausibilities.

(5) All objective information, supported by voluminous literature, indicates that Kurtis Poulos has fabricated the allegations against Matt Ralston.

(6) The devastating emotional, psychological, social, and occupational impact that Mr. Poulos'[s] false allegations have had on Matt Ralston will likely persist for the remainder of Mr. Ralston's life.[97]

Dr. Ziv's second report is an "Evaluation of Kurtis Poulos."[98] She wrote "it is essential to obtain independent, objective information about all aspects of the events involved in the individual being assessed" because "of the possibility of secondary gain."[99] She wrote her evaluation "necessarily include[d] an evaluation of the individual's overall credibility."[100] She included an "assess[ment of] the honesty and reliability of the individual being evaluated."[101] Dr. Ziv concluded "Kurtis Poulos is not a reliable historian" based on her identified inconsistencies

between her interview and his deposition testimony, and previous bad acts.[102] She diagnosed Mr. Poulos's "inability to tell the truth" as "pathological," a condition known as "pseudologia fantastica."[103] Dr. Ziv found Mr. Poulos "is a classic pseudologue; his stories are dramatic and fantastical."[104] Dr. Ziv opined Mr. Poulos "derives narcissistic satisfaction from exaggerating his stature."[105] She also diagnosed Mr. Poulos with "borderline personality disorder" due to his "long history of affective instability, unstable interpersonal relationships, self-destructive behavior, problems with anger, and mood reactivity."[106] She similarly diagnosed him with "narcissistic personality disorder."[107] Dr. Ziv cited Mr. Poulos's "grandiose sense of self-importance," "sense of entitlement," and "criminal behaviors . . . based on interpersonal exploitation" for which he "demonstrated limited empathy."[108] Dr. Ziv diagnosed Mr. Poulos with a third personality disorder: "antisocial personality disorder."[109] She cited his "history of multiple arrests, deceitfulness, and impulsivity"; his failure to honor financial obligations as ordered by a court; his lack of remorse for his behaviors; and "myriad infractions incurred at The Hill School during his senior year."[110] Dr. Ziv concluded Mr. Poulos's allegations "do not stand up to scrutiny when viewed though [*sic*] any practical, scientific, or sociologic lens."[111] She found Mr. Poulos does not suffer from post-traumatic stress disorder because "Mr. Poulos'[s] purported problems remembering large periods of time and specific details of the alleged assaults are not consistent with research on trauma and memory."[112] She found Mr. Poulos malingered post-traumatic stress disorder because "[i]t is difficult to reconcile the alleged severity of Mr. Poulos'[s] symptoms with the near total absence of any meaningful psychotherapy," and he has "never *demonstrated* any symptoms of PTSD."[113]

Dr. Ziv concluded with seven opinions as to Mr. Poulos:

(1) Kurtis Poulos'[s] accounts of sexual assault by Matt Ralston are not consistent with the literature regarding memory and trauma.

(2) The actions of Matt Ralston described by the [*sic*] Kurtis Poulos do not conform to the behavior of sex offenders.

(3) It is virtually unheard of for an offender to commit sex offenses in a semi-public area when the chances of detection are extremely high.

(4) All objective information, supported by voluminous literature, indicates that Kurtis Poulos fabricated the allegations against Matt Ralston.

(5) Kurtis Poulos'[s] history is consistent with unspecified personality disorder with borderline, narcissistic, and antisocial traits.

(6) Kurtis Poulos does not meet diagnostic criteria for PTSD.

(7) Kurtis Poulos meets DSM criteria for malingering.[114]

Attorney Garabedian argues Dr. Ziv's reports are inadmissible for four reasons: (1) her opinions did not involve the application of specialized skill or knowledge; (2) she relied upon credibility determinations and Mr. Poulos's previous bad acts to reach her conclusions; (3) her opinions are unreliable because she did not apply her stated methodologies; and (4) her opinions do not "fit" the case because they do not make any fact more or less likely.[115] Mr. Ralston counters Attorney Garabedian cites only snippets of Dr. Ziv's testimony and misapplies case law and then argues Dr. Ziv did not rely upon Mr. Poulos's previous bad acts.[116]

We cannot allow Dr. Ziv to offer conclusions to the extent they do not apply specialized skill or knowledge, invade the jury's function as fact-finder, and rely upon Mr. Poulos's previous bad acts. We detail some of those conclusions to provide counsel with advance notice of conclusions which will not be presented to the jury. But Dr. Ziv's inartful reports require we hold a Rule 104 evidentiary hearing during trial outside the jury's presence so we can question her and understand her basis for conclusions which may constitute permissible expert testimony.

1. **Dr. Ziv may not testify as to her opinions which do not involve specialized knowledge, which invade the jury's fact-finding function, and which are unduly prejudicial**.

The "credibility of witnesses is generally not an appropriate subject for expert testimony."[117] At least three rationales support the exclusion of such evidence.[118] "First, 'expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702.'"[119] Our Court of Appeals instructs "[a] doctor . . . cannot pass judgment on [an] alleged victim's truthfulness in the guise of a medical opinion, because it is the jury's function to decide credibility."[120] Second, courts exclude expert opinions regarding credibility because they might "exceed[] the scope of the expert's specialized knowledge and therefore merely inform[] the jury that it should reach a particular conclusion."[121] Expert testimony "divorced from the scientific, medical, or other expert basis that qualified the witness in the first place" is inadmissible.[122] Third, courts exclude such evidence under Rule 403 because "the testimony of impressively qualified experts on the credibility of other witnesses is prejudicial [and] unduly influences the jury."[123]

These three bases apply to much of Dr. Ziv's proposed testimony. Dr. Ziv may not testify regarding her opinions which did not use specialized knowledge; her credibility determinations, including her disbelief of Mr. Poulos, because they invade the province of the jury; and her diagnoses of Mr. Poulos with pseudologia fantastica and personality disorders because they rely upon highly prejudicial inadmissible evidence of past bad acts.

a. **Dr. Ziv may not testify as to her opinions which do not require specialized knowledge**.

Dr. Ziv's opinions exceed the scope of her expertise in several regards. Dr. Ziv's expertise is in evaluating sex offenders and their patterns of behavior. Yet Dr. Ziv repeatedly failed to apply

this expertise. She instead resorted to buzzwords confirming she is not using specialized expertise. For example, Dr. Ziv opined it "requires only common sense"—and "does not require specialized training and experience"—to disbelieve Mr. Poulos's account Mr. Ralston sexually abused him in public during the middle of the day.[124] She also opined it requires "an abandonment of both science and common sense" to believe Mr. Poulos cannot recall specific details of the alleged sexual assaults but can recall a detailed narrative about Mr. Ralston blocking Mr. Poulos's car.[125] Experts should not base their opinions on mere "common sense." An expert's opinion must be based on "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[126] It is the jury's function—not Dr. Ziv's—to employ its "common sense in weighing the evidence."[127] Dr. Ziv's testimony failing to use specialized expertise is inadmissible.

### b. Dr. Ziv's credibility determinations are inadmissible because they invade the jury's fact-finding role.

Dr. Ziv's testimony is also inadmissible to the extent it contains her opinions regarding Mr. Poulos's or Mr. Ralston's credibility. Dr. Ziv repeatedly expresses her complete disbelief of Mr. Poulos's allegations of Mr. Ralston's sexual abuse of him as a student.[128] Her opinions are unprofessional based on slang not referenced in the record and hyperbolic at times.[129] These determinations require no specialized knowledge. Determining whether a person lied is a fundamental jury function. Courts routinely exclude expert testimony amounting to mere belief or disbelief of a witness.[130] Whether Dr. Ziv believes Mr. Poulos exceeds the bounds of her specialized knowledge and risks the jury siding with Dr. Ziv simply because she is an "impressively qualified expert[]."[131]

Dr. Ziv also diagnosed Mr. Poulos with pseudologia fantastica—*i.e.*, pathological lying. She reasoned she needed to examine his credibility because Mr. Poulos stood to obtain "secondary gain" from fabricating the allegations against Mr. Ralston.[132] She reached the diagnosis after eight

pages of comparing Mr. Poulos's deposition testimony to his interview statements, his deposition testimony against extrinsic evidence, and his interview statements against extrinsic evidence. She then applied the inconsistencies and inaccuracies in Mr. Poulos's statements to the criteria for pseudologia fantastica.

This diagnosis is inadmissible because it necessarily constitutes an inadmissible attack on Mr. Poulos's credibility through the "guise of a medical opinion."[133] Dr. Ziv reached her diagnosis by performing the same credibility analysis reserved for the jury: examining the witness, evaluating inconsistencies in his statements, and considering acts which may bear on his truthfulness.[134] Dr. Ziv explicitly relied upon Mr. Poulos's lack of credibility in reaching her pseudologia fantastica diagnosis.[135] We do not doubt a forensic psychiatrist like Dr. Ziv must compare her evaluation of a patient to other evidence to reach diagnoses like pseudologia fantastica. But this process still invades the jury's role as fact-finder.

Judge Rufe recently excluded similar testimony from Dr. Ziv. In *Bistrian v. Levi*, Dr. Ziv proffered testimony regarding the plaintiff's "honestly and reliability," just as here.[136] Judge Rufe excluded the testimony because, through "valid consideration of a patient's subjective complaints," Dr. Ziv testified "more broadly as to [her] opinion concerning the truthfulness and reliability of [a plaintiff's] complaints."[137] Judge Rufe persuasively reasoned this testimony "invades the role of the fact-finder."[138]

We agree with Judge Rufe when she faced the same attempt from Dr. Ziv. Mr. Ralston may attempt to cross-examine Mr. Poulos with previous instances of conduct for the purpose of attacking his character for truthfulness. This cross-examination is not substantive evidence. An expert witness cannot introduce these specific instances of conduct as substantive evidence and

then draw conclusions and offer diagnoses which do "nothing but vouch for the credibility of another witness."[139]

      **c.  Dr. Ziv impermissibly references Mr. Poulos's previous bad acts to reach medical diagnoses which she apparently did not reach absent those alleged bad acts.**

Even if we could ignore Dr. Ziv's admitted failure to use specialized knowledge and her invasion of the jury's function, we still must exclude much of her diagnostic testimony under Rule 403 because it considers highly prejudicial instances of Mr. Poulos's previous bad acts.

A witness generally cannot attack another witness's character through "specific instances of conduct."[140] Such evidence is generally only admissible through cross-examination of a witness who has testified about a witness's pertinent character trait.[141]

Admitting much of Dr. Ziv's testimony would include admission of numerous previous bad acts. Dr. Ziv invested eight pages of her report in detailing Mr. Poulos's alleged lies, inconsistencies, and poor conduct. For example, Dr. Ziv includes a lengthy discussion of Mr. Poulos's criminal history, including charges of credit card fraud and violating a restraining order. She details his statements related to the charges of credit card theft. She details an affidavit signed by someone whom Mr. Poulos allegedly threatened and harassed.

Dr. Ziv's lengthy discussion of Mr. Poulos's previous acts is the kind of character assassination precluded by the Rules of Evidence as substantive evidence. Mr. Ralston cannot admit this evidence through the back door with a doctor who claims to know whom to believe. A witness may not introduce specific instances of Mr. Poulos's bad character on direct examination—especially an expert witness whom a jury is more likely to believe because of their "expert" moniker. Dr. Ziv relies on eight pages of previous bad acts to diagnose Mr. Poulos with pseudologia fantastica, borderline personality disorder, narcissistic personality disorder, and antisocial personality disorder. Because Dr. Ziv must show her method of diagnosis is reliable, we

cannot allow the jury to hear these diagnoses without also allowing the jury to hear the evidence Dr. Ziv relied upon to reach them. Admitting this evidence causes a severe risk the jury will indict Mr. Poulos's character or find him incredible simply based on an expert's say-so without heeding its fact-finding function. As a result, it is highly prejudicial to Mr. Poulos.

Judge Rufe's analysis in *Bistrian* again aids us. Judge Rufe excluded Dr. Ziv's testimony not just because it invaded the jury's fact-finding role, but because it relied on a litany of previous bad acts.[142] Dr. Ziv in *Bistrian* cited, among other things, the opposing party's previous convictions, "engagement in deceitful behaviors for much of his adult life," and "lack of remorse for his past actions."[143] Judge Rufe excluded Dr. Ziv's testimony because the evidence was "extraordinarily prejudicial."[144] Rule 403 counseled exclusion because the evidence's "probative value is undermined by the fact that the ultimate conclusion [the evidence] supports—that [the opposing party] is a malingerer and is thus not credible—is improper expert testimony."[145]

Judge Rufe's reasoning is applicable to Dr. Ziv's most recent attempt to be the oracle of credibility to the jury. Dr. Ziv cited similar types of bad acts in her reports submitted today as in her reports submitted before Judge Rufe. Dr. Ziv's testimony as to Mr. Poulos's diagnoses must include testimony as to his previous bad acts because Dr. Ziv must explain her reasoning to the jury. These facts are highly prejudicial to Mr. Poulos. Dr. Ziv may not testify to the evidence including the diagnoses she reached by considering the evidence.

### 2. We will hold an evidentiary hearing outside the jury's presence during trial to confirm admissible testimony.

Dr. Ziv also offers conclusions based on her specialized knowledge which do not include credibility determinations and do not rely on inadmissible previous bad acts to reach medical diagnoses. It is difficult for us to parse through her evaluations for every example of an admissible statement given its inartful presentation. We will hold an evidentiary hearing outside the presence

of the jury under Federal Rule of Evidence 104 to hear how Dr. Ziv will tie competent expert reasoning into opinions demonstrating specialized knowledge without determining credibility and not relying on inadmissible earlier bad acts.

For example, Dr. Ziv may testify as to how her evaluation of Mr. Poulos affects her conclusion of whether Mr. Poulos acted consistently with a sexual abuse victim. Dr. Ziv is qualified to testify on behaviors of abuse victims, and reliably contrast those behaviors with the behavior of Mr. Poulos.[146] This testimony constitutes appropriate expert opinion because it applies Dr. Ziv's specialized knowledge to explain behaviors without infringing on the jury's fact-finding role. Dr. Ziv may also testify as to whether Mr. Ralston behaves consistently with the behavior of a child sex abuser. Her report on Mr. Ralston contains an evaluation of Mr. Ralston's behavior which permissibly compares Mr. Ralston's behaviors to those of sexual abusers as Dr. Ziv has studied.[147] And Dr. Ziv may testify as to her independent evaluation of Mr. Ralston's mental health after review of Mr. Poulos's allegations.[148] But she must not characterize Mr. Poulos's allegations as "false." And she must not offer conclusions regarding credibility during this testimony as she does throughout her report.[149]

Dr. Ziv may also be able to testify as to whether Mr. Poulos is "malingering" symptoms of post-traumatic stress disorder to the extent she did not rely on credibility determinations or previous bad acts.[150] Dr. Ziv's diagnosis in this regard responds to a post-traumatic stress disorder diagnosis from another doctor.[151] Dr. Ziv's report suggests she reached this conclusion by comparing her evaluation of Mr. Poulos to the studied symptoms of post-traumatic stress disorder.[152] Dr. Ziv's diagnosis of malingering references Mr. Poulos's "history of antisocial behavior," but this reference does not necessarily include previous bad acts.[153] Attorney Garabedian argues Dr. Ziv's "malingering" diagnosis is irrelevant, but he asserts truth as a defense

to Mr. Ralston's defamation claim. Whether Mr. Poulos developed post-traumatic stress disorder bears on the truth of his allegations. We permit Dr. Ziv to testify as to this diagnosis to the extent compliant with the guidelines provided to her today and after hearing her testimony outside the jury's presence.

## II.    Conclusion

After examining Mr. Ralston's proffered expert testimony, we: (a) exclude James Schwartzman, Esquire's testimony under Rule 403 because its limited probative value is substantially outweighed by the risk of confusing the issues, misleading the jury, and unfair prejudice; (b) admit Shanin Specter, Esquire's testimony to the extent it regards the standard of care applicable to Attorney Garabedian's conduct but exclude it to the extent it contains conclusions of law, including his conclusions as to whether Attorney Garabedian acted with actual malice or acted outrageously, whether Attorney Garabedian or Mr. Poulos intended to initiate judicial proceedings, and whether Attorney Garabedian caused Mr. Ralston harm; (c) conditionally admit economist Andrew Verzilli's testimony subject to Mr. Ralston adducing a foundation for its relevance at trial; and (d) exclude Barbara Ziv, M.D.'s testimony to the extent her opinions do not use specialized knowledge, invade the jury's fact-finding function, and unduly prejudice Mr. Poulos. Dr. Ziv may be able to present testimony consistent with an admissible expert opinion based on our findings after a Rule 104 evidentiary hearing during trial.

---

[1] Fed. R. Evid. 702.

[2] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

[3] *Honeywell, Inc. v. Am. Standards Testing Bureau, Inc.*, 851 F.2d 652, 656 (3d Cir. 1988).

[4] *Calhoun v. Yahama Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

[5] *Pineda*, 520 F.3d at 244.

[6] *Id.*

[7] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

[8] *Id.*

[9] *Id.* at 742.

[10] *Walker v. Gordon*, 46 F. App'x 691, 694 (3d Cir. 2002) (quoting *In re Paoli*, 35 F.3d at 742).

[11] *Id.* (quoting *In re Paoli*, 35 F.3d at 741–42).

[12] *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

[13] *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (cleaned up).

[14] *Id.* (internal quotations omitted).

[15] *Id.* (internal quotations omitted).

[16] *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985).

[17] *See id.*

[18] Fed. R. Evid. 403.

[19] *See* ECF Doc. No. 175-4 at 536–50.

[20] *Id.* at 536–37.

[21] *Id.* at 547–48.

[22] ECF Doc. No. 175-2 at 7 (emphasis removed).

[23] ECF Doc. No. 190 at 9–20.

[24] *See id.* at 12–16.

[25] *Id.* at 15–16.

[26] "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401.

[27] ECF Doc. No. 183-1 at 8.

[28] ECF Doc. No. 190 at 10.

[29] *Id.* at 18–20.

[30] ECF Doc. No. 183-1 at 9 (Mr. Ralston arguing, "This is an action for defamation, not an action for violation of the Rules [of Professional Conduct.]").

[31] Fed. R. Evid. 403.

[32] *See, e.g.*, *United States v. Moore*, No. 14-110, 2014 WL 7344093, at *2 (W.D. Pa. Dec. 23, 2014) (excluding evidence under Rule 403 where its admission "would merely create a sideshow" of unrelated issues); *Sarin v. Poojan, Inc.*, No. 08-1077, 2010 WL 5463250, at *6 (M.D. Pa. Dec. 29, 2010) (excluding evidence constituting a "sideshow that distracts the jury and lengthens the trial").

[33] *Joffe v. King & Spalding LLP*, No. 17-3392, 2019 WL 4673554, at *17–18 (S.D.N.Y. Sept. 24, 2019).

[34] *Id.* at *1.

[35] *Id.* at *14.

[36] *Id.* at *15 n.14.

[37] *Id.* at *14.

[38] *Id.* at *15.

[39] *Id.* at *17.

[40] *Id.*

[41] *Id.*

[42] *Id.* at *17.

[43] Mr. Ralston does not adduce an opinion as to whether Attorney Garabedian breached another ethical obligation under the Rules such as duties of diligence or communication.

[44] We express no view as to whether Attorney Garabedian committed the unauthorized practice of law in Pennsylvania by sending the 2018 letters or whether he could have retained Pennsylvania counsel to bring suit and thereafter sought special admission to practice.

[45] ECF Doc. No. 190 at 33–35.

[46] *Id.* at 34 (quoting *Pacitti v. Durr*, 310 F. App'x 526,  528 (3d Cir. 2009)).

[47] *Id.* at 49 n.158 (quoting *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 497 (E.D. Pa. 2010)).

[48] *See, e.g.*, Pa. R. Prof.'l Conduct 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law ***and fact*** for doing so that is not frivolous" (emphasis added)); *id.* 4.1 ("[A] lawyer shall not knowingly . . . make a false statement of material fact or law to a third person.").

[49] ECF Doc. No. 175-4 at 1038–52.

[50] *Id.* at 1038.

[51] *Id.* at 1039.

[52] ECF Doc. No. 175-2 at 20.

[53] *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 400 (E.D. Pa. 2009).

[54] *Betterbox*, 300 F.3d at 329 (quoting *Kumho Tire*, 526 U.S. at 150.

[55] *See, e.g.*, *McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1291 (D. Haw. 2007) (attorney is qualified "in the area of family law" because, among other reasons, he "has been a managing partner of a family law practice for twenty-five years").

[56] *See, e.g.*, *Krock v. United States*, No. 14-3683, 2015 WL 4601130, at *7 (E.D. Pa. July 31, 2015) (permitting doctor to testify as to professional standard of care in medical malpractice action based on his practice of medicine for more than thirty years); *Qeisi v. Patel*, No. 02-8211, 2007 WL 527445, at *7 (E.D. Pa. Feb. 9, 2007) (permitting medical expert to testify as to diagnoses where "the expert's opinions are not supported by medical research" because diagnosing symptoms "is precisely the type of 'opinion' that doctors make in every day practice").

[57] *See, e.g.*, Pa. R. Prof.'l Conduct. 3.1 cmt. 2 ("The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. What is required of lawyers, however, is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions.").

[58] *McDevitt*, 522 F. Supp. 2d at 1291–92 (internal citations omitted).

[59] *Id.* at 1294.

[60] *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977).

[61] *See, e.g.*, *Storm v. Golden*, 538 A.2d 61, 64 (Pa. Super. Ct. 1988) (expert testimony required to establish negligent performance of attorney in legal malpractice action).

[62] ECF Doc. No. 175-4 at 1044–45 ("Garabedian failed to reasonably investigate Poulos' claims. . . . The Garabedian attorneys had an obligation to meet and observe him to assess his credibility as a witness . . . [the allegations] were criminal in their gist and required a heightened degree of investigation.").

[63] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[64] *See, e.g.*, ECF Doc. No. 175-4 at 1048 ("Attorneys have a responsibility to take reasonable steps to ensure that clients or potential clients are not using legal services to commit a fraud.").

[65] *See, e.g.*, *Nale v. Finley*, 505 F. Supp. 3d 635, 640 (W.D. La. 2020) (precluding expert testimony as to whether defendants acted with "reckless disregard" because it is a "legal conclusion[] as to the conduct at issue"); *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1268–69 (D. Kan. 2003) (precluding expert testimony as to whether Black individuals would consider a certain phrase "outrageous" because the "opinion on this question is essentially a legal conclusion" and a "jury would be well qualified to evaluate" the phrase's outrageousness).

[66] Fed. R. Evid. 704(a).

[67] *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988).

[68] *McDevitt*, 522 F. Supp. 2d at 1292.

[69] *Id.*

[70] *FedEx Ground Package Sys., Inc. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 222 (W.D. Pa. 2010).

[71] *Marx & Co.*, 550 F.2d at 508.

[72] *FedEx Ground Package Sys., Inc.*, 695 F. Supp. 2d at 222.

[73] *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991).

[74] ECF Doc. No. 175-4 at 1045–46.

[75] *Id.* at 1046.

[76] *Specht*, 853 F.2d at 809.

[77] ECF Doc. No. 175-4 at 581–600.

[78] *Id.* at 586.

[79] ECF Doc. No. 175-2 at 9.

[80] *See* ECF Doc. No. 175-4 at 630–94 (Mr. Verzilli's deposition testimony explaining the bases for his economic opinions).

[81] *See* 42 Pa. Stat. and Cons. Stat. Ann. § 8343(a)(6) (plaintiff must prove special harm "resulting" from publication of defamatory communication).

[82] ECF Doc. No. 175-2 at 10.

[83] Fed. R. Evid. 702(b).

[84] *In re: Chocolate Confectionary Antitrust Litig.*, No. 08–MDL–1935, 2013 WL 11305184, at *5 (M.D. Pa. May 10, 2013).

[85] *Elcock v. Kmart Corp.*, 233 F.3d 734, 754 (3d Cir. 2000).

[86] *Id.* at 755.

[87] *Id.*

[88] *See, e.g.*, ECF Doc. No. 175-4 at 630–94.

[89] *See, e.g.*, *Dougherty v. School District of Phila.*, No. 12-1001, 2015 WL 2365600, at *9 n.1 (E.D. Pa. May 18, 2015) (rejecting challenge to Mr. Verzilli's testimony based on his assumption the tort caused plaintiff's firing because the reason for plaintiff's firing "does not make [Mr.] Verzilli's calculations themselves unreliable or speculative"; "[i]f the Court were to discount [Mr.] Verzilli's opinions, it would solely be ***due to their lack of relevance***" (emphasis added)).

[90] ECF Doc. No. 175-4 at 203.

[91] *Id.* at 202–04.

[92] *Id.* at 5–53; 102–99.

[93] *Id.* at 29.

[94] *Id.* at 30.

[95] *Id.* at 29–30.

[96] Dr. Ziv's freeform opinions contrast with the organized conclusions of Attorney Schwartzman, Attorney Specter, and Mr. Verzilli. Dr. Ziv's narrative reports are confusing and deprive us of an ability to understand the reasons for her conclusions. She provides long narratives of facts and medical literature with no nexus to her conclusions. She then reaches conclusions without tying

reasons to her opinions. We worked our way through the thicket of Dr. Ziv's two reports. We will not permit Dr. Ziv to establish post hoc rationales for her conclusions unsupported by her reports.

[97] *Id.* at 41.

[98] *Id.* at 55–100; 102–99.

[99] *Id.* at 74.

[100] *Id.*

[101] *Id.*

[102] *Id.* at 75–83.

[103] *Id.* at 83.

[104] *Id.* at 84.

[105] *Id.*

[106] *Id.* at 86.

[107] *Id.*

[108] *Id.* at 87.

[109] *Id.*

[110] *Id.* at 88 (internal citations omitted).

[111] *Id.*

[112] *Id.* at 93.

[113] *Id.* at 96 (emphasis in original).

[114] *Id.* at 97.

[115] ECF Doc. No. 175-2 at 10–20.

[116] ECF Doc. No. 183 at 14–19.

[117] *Coney v. NPR, Inc.*, 312 F. App'x 469, 474 (3d Cir. 2009) (quoting *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001)).

[118] *See Adams*, 271 F.3d at 1245.

[119] *Id.* (quoting *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999)).

[120] *Coney*, 312 F. App'x at 474 (omission in original) (quoting *United States v. Whitted*, 11 F.3d 782, 785–86 (8th Cir. 1993)).

[121] *Adams*, 271 F.3d at 1245 (quoting *United States v. Shay*, 57 F.3d 126, 131 (3d Cir. 1995)).

[122] *United States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996).

[123] *Adams*, 271 F.3d at 1245.

[124] ECF Doc. No. 175-4 at 37–38.

[125] *Id.* at 93.

[126] *Walker*, 46 F. App'x at 694 (quoting *In re Paoli*, 35 F.3d at 742).

[127] 3d Cir. Model Civil Jury Instruction 1.5.

[128] *See, e.g.*, ECF Doc. No. 175-4 at 97 ("All objective information, supported by voluminous literature, indicates that Kurtis Poulos fabricated the allegations against Matt Ralston.").

[129] Dr. Ziv repeatedly used the slang term "blow job" to refer to the alleged sexual abuse when there is no evidence Mr. Poulos used this slang. *See* ECF Doc. No. 175-4 at 64 (noting Mr. Poulos "was allegedly giving and getting blow jobs from Mr. Poulos"); *id.* at 466 (Ziv Dep. at 254:18–23) (testifying at deposition, "There may be a gradual opening up and revealing slightly more information, but it doesn't change from 'I was at the door' to 'I was behind the desk' to 'he touched me' to 'he gave me—made me give him a blow job.'"). Merriam-Webster defines "blow job" as "vulgar slang" meaning "an act of fellatio." *See Blow job*, Merriam-Webster, https://www.merriam-webster.com/dictionary/blow%20job. We find it bizarre for Dr. Ziv to employ such flippant terminology when referring to allegations of serious sexual abuse. She also overstates her "opinion" to the level of hyperbole at times. *See, e.g.*, ECF Doc. No. 175-4 at 38 (calling Mr. Poulos's allegations "almost farcical"); *id.* at 30 ("The allegations levied against Matt Ralston by Kurtis Poulos are so preposterous, it is difficult to know where to begin.").

[130] *See, e.g.*, *United States v. Benally*, 541 F.3d 990, 995 (10th Cir. 2008) (excluding testimony which simply invited the jury to "disregard the confession and credit the defendant's testimony that his confession was a lie"); *Whitted*, 11 F.3d at 786 (excluding diagnosis of "repeated child sexual abuse" because the witness based the "diagnosis solely on [the victim's] allegations of abuse"); *Adams*, 271 F.3d at 1246 (excluding report which "was little more than a professionally-trained witness testifying that, based upon his history, 'Mr. Adams is the type of person who would have lied about his involvement to the police'").

[131] *Adams*, 271 F.3d at 1245.

35

---

[132] ECF Doc. No. 175-4 at 74.

[133] *Coney*, 312 F. App'x at 474.

[134] *See* 3d Cir. Model Civil Jury Instructions 1.7 (describing how a jury may determine credibility).

[135] *See* ECF Doc. No. 175-4 at 83 ("Mr. Poulos'[s] inability to tell the truth is so pervasive, that it can be characterized as pathological," and diagnosing pseudologia fantastica).

[136] 443 F. Supp. 3d 576, 577 (E.D. Pa. 2019).

[137] *Id.* at 579 (quoting *Coney*, F. App'x at 474).

[138] *Id.* at 577.

[139] *Adams*, 271 F.3d at 1245; *see also Butt v. United Bhd. of Carpenters & Joiners of Am.*, No. 09-4285, 2016 WL 3362014, at *3 (E.D. Pa. June 16, 2016) (excluding expert testimony regarding individuals' credibility based on comparisons of their interviews with their deposition testimony because the evidence would usurp the jury's fact-finding function).

[140] Fed. R. Evid. 405(b).

[141] Fed. R. Evid. 405(a). We recognize Rule 405(b) permits introduction of specific acts bearing on reputation when "a person's character or character trait is an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b). Mr. Poulos's affirmative defense of truth does not make his *character* for truthfulness an essential element of his defense; his defense simply turns on whether the allegation was true. Conversely, Mr. Ralston subjected his good reputation to attack through specific acts because his "character is substantively at issue" in a defamation case. *Schafer v. Time, Inc.*, 142 F.3d 1361, 1372 (11th Cir. 1998). But Dr. Ziv's testimony does not relate to Mr. Ralston's *good* character, it relates to Mr. Poulos's *bad* character.

[142] 443 F. Supp. 3d at 578.

[143] *Id.*

[144] *Id.*

[145] *Id.*

[146] *See, e.g.*, ECF Doc. No. 175-4 at 93 (noting Mr. Poulos's memory problems are "not consistent with research on trauma and memory"); *id.* at 34 ("Mr. Poulos'[s] explanations for his lack of recall do not conform to research about trauma and memory.").

[147] *Id.* at 39–40.

[148] *Id.* at 40–41.

[149] *Id.* at 40 ("[T]he literature about sex offenders and victims of sexual abuse/assault make it virtually impossible to view the allegations of Kurtis Poulos as credible.").

[150] "Malingering" is "to pretend or exaggerate incapacity of illness (as to avoid duty or work)." *Malinger*, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/malinger.

[151] ECF Doc. No. 175-4 at 91.

[152] *Id.* at 90–96.

[153] *Id.* at 96.