**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MATTHEW RALSTON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  19-1539** |
| | : | |
| **MITCHELL GARABEDIAN, ESQ.,** | : | |
| **KURTIS N. POULOS, MITCHELL** | : | |
| **GARABEDIAN LAW OFFICE** | : | |

## MEMORANDUM
## <u>with Findings of Fact & Conclusions of Law</u>

**KEARNEY, J.**                                                                        **August 26, 2022**

We presided over an extended bench trial addressing whether a former student and his attorney defamed a teacher at a boarding school by accusing the teacher of sexual abuse from 1993 to 1995 in two 2018 letters demanding a million dollars in compensation when the former student and his attorney agreed they would not sue. But no one believed the sexual abuse claims. The teacher suffered no reputational harm. The central issues today are whether the former student fabricated the allegations and, if so, whether the teacher can recover damages from the attorney and former student by adducing clear and convincing evidence of their actual malice.

We find the former student defamed the teacher with actual malice as the sexual abuse accusations are demonstrably false and the former student should be liable for causing emotional distress damages to the teacher. We also find the former student's attorney is not entitled to the judicial privilege. The attorney wrote the most heinous of allegations towards the teacher without the expected care particularly when he sent a second demand letter after learning of material inconsistencies in the former student's story after his first demand letter. But the teacher does not prove reputational injury necessary for compensatory damages. And the teacher does not adduce

evidence of the attorney's actual malice by clear and convincing evidence as necessary for presumed and punitive damages.

## I.    Background

We provide a synopsis of our lengthy Findings of Fact and Conclusions of Law. A Wisconsin lawyer trying to help her adult son struggling with alcohol-related health problems added "two and two" to infer a boarding school teacher sexually abused her adult son as a student at the boarding school twenty-five years earlier. The former student first mentioned being "assaulted" at the boarding school approximately ten years ago to his mother but did not mention sexual abuse nor identify a teacher as the abuser. But the mother began investigating potential claims against the boarding school before he mentioned sexual abuse after the boarding school's headmaster generally advised its alumni of sexual abuse at boarding schools across the country in April 2016.

The headmaster sent another letter in November 2017 confirming historical allegations of sexual abuse at the boarding school. The headmaster hired experienced attorneys to vet and investigate reports from alumni. The mother remembered a geometry teacher chose her son to answer questions during a class she visited in the 1990s. The mother "put two and two together" and somehow concluded the teacher sexually abused her son as a student. A Minneapolis lawyer told the mother a claim for redress for the teacher's mid-1990s conduct is barred by the Pennsylvania statute of limitations. The mother continued. She identified a well-known child victim advocate and attorney in Massachusetts. The mother called the attorney seeking his advice about notifying the boarding school of the purported assault by the teacher she remembered from decades earlier who she now inferred sexually abused her son.

The Massachusetts attorney spoke to the mother and her son. The attorney also knew Pennsylvania's statute of limitations barred the former student's claim. He agreed to represent the former student in contacting the boarding school but both agreed in their retainer agreement to not sue the boarding school since the statute of limitations barred the claim. The former student never authorized or wanted to sue the boarding school. The attorney never met the former student in person or over a video feed but spoke to him twice on the phone before sending an April 11, 2018 letter to the boarding school's headmaster seeking $1,000,000 from the school based on the teacher's alleged sexual abuse of the former student from 1993 to 1995. The attorney based his letter on telephone representations made to him by the former student who accused the teacher of sexual abuse. The attorney then largely ignored the former student's inquiries on the status of his claim for months after sending the April 11, 2018 letter.

The boarding school and the former teacher (now working at the boarding school as a capital giving officer) could not so easily ignore the attorney's words. The teacher learned of the April 11, 2018 letter and experienced deep personal distress. Several members of the boarding school's executive community learned of the letter. But no one believed the allegations. No one thought any less of the teacher. The boarding school increased the teacher's compensation after positive performance reviews.

Despite the boarding school's belief in the teacher, the boarding school immediately attempted to uncover the facts and invited an investigation into the alleged abuse. The former student's attorney remained unresponsive even when the former student contacted him checking on his progress after not hearing from him for months. The attorney finally contacted the former student in December 2018. The former student changed his story as to where the abuse occurred and his age during the abuse. But these material changes did not stop the attorney from sending a

second letter to the school on December 26, 2018 with more lurid allegations even though the attorney and former student agreed they would not sue. No one believed this second letter either and the school did not alter the teacher's role with its alumni nor reduce his compensation.

The boarding school repeatedly asked the Massachusetts attorney to cooperate in an investigation, but the attorney would not cooperate unless the boarding school agreed to non-confidential mediation. The attorney hoped the threat of reputational harm would result in a million-dollar payday his client never sought without facing judicial scrutiny.

The boarding school repeatedly contacted the attorney in early 2019 to further its investigation. The attorney did not respond. The attorney instead reminded the mother and the former student he could not proceed given the Pennsylvania statute of limitations, but they should reassess after one year in case Pennsylvania changed its statute of limitations. Hearing nothing from the attorney, the boarding school dropped its investigation in April 2019.

The teacher, still fraught over the allegations, considered a lawsuit to clear his name. The boarding school's lawyer told him not to sue as it would force the school to place him on leave and litigation would harm everyone. The teacher sued anyway seeking to clear his name. He sued the attorney and the former student in April 2019 knowing suing a former student could result in losing his position working with the school's alumni.

Throwing lurid accusations into demand letters when you will not sue differs from the civil discovery process leading to the crucible of trial. We held a trial hoping to discover the truth based on testimony including from the teacher and the student. The former student's mother did not appear or testify over a virtual platform afforded to all witnesses. We evaluated the credibility of several fact and expert trial witnesses surrounding this most serious claim of teacher sexual abuse.

We are ever mindful of the need to bring predators of our students to trial and potential justice either through the criminal system or through civil remedies based on investigated facts.

The trial evidence amply demonstrated the former student's sexual abuse story is not credible. We find the former student, for whatever reason, concocted the sexual abuse claims as shown by several determinative facts.

The attorney's words in two demand letters sent knowing he would not file a lawsuit are not entitled to judicial privilege. The attorney and the former student agreed to not sue. But we cannot award damages to the teacher from the attorney. The attorney's statements did not injure the teacher's reputation. The teacher created and maintained such a reputation of renown that no one believed the former student or the well-known attorney. The teacher lost his job in mid-2019 because he decided to sue a former student but he maintained his reputation after allegations no one believed. And the teacher did not adduce clear and convincing evidence the attorney acted with actual malice as required by decades of defamation law largely based on sustaining freedom of the press but now extended to require the same heightened standard of proof for statements by non-media speakers about private persons if the private persons do not establish reputational injury. We do not condone the attorney's conduct after a limited investigation. We are offended by his cavalier approach to facts which could destroy a teacher's career particularly when his client starts to change material facts. But failure to investigate to the level we expect is not clear and convincing evidence of actual malice. We cannot find by clear and convincing evidence the attorney subjectively disbelieved the former student's story or entertained serious doubts as to its truth as required by long-established law. The evidence instead shows the attorney refused to doubt the core of the former student's claim. We cannot award the teacher damages from the attorney based on the evidence.

The scrutiny afforded by direct and cross-examination allows us to find the former student fabricated his story and, even absent reputational harm, is liable for the emotional distress caused to the teacher based on the former student's actual malice. We calculate those damages at $50,000. We cannot enter judgment for this amount as there is no personal representative under Pennsylvania law for the former student who passed away after our trial and before we could issue our analysis.

## II.    FINDINGS OF FACT AFTER BENCH TRIAL[1]

1.      The Hill School is a private college preparatory boarding school located in Pottstown, Pennsylvania.[2]

2.      Matthew Ralston taught math classes, coached sports, and held various leadership positions at The Hill School from 1992 to 2009.[3]

3.      Mr. Ralston enjoyed a sterling reputation at The Hill School. He received excellent evaluations from his students;[4] many grateful messages from students and parents he had helped during his career;[5] and a dedication of the 2009 Hill School yearbook.[6]

4.      Students at The Hill School displayed "extraordinary" respect for Mr. Ralston, "treat[ing] him like a member of the[ir] family."[7]

5.      Mr. Ralston's colleagues also "highly respected" him.[8] Mr. Ralston's colleagues viewed him as "[a] champion for the weak," "somebody who supports and lifts students who are struggling," somebody who "has no patience for bullies and will stand up to them," and "[s]omebody who was always seeing the good and trying to draw it out of his students and his colleagues."[9]

6.      Mr. Ralston kept a box called "Why I Teach" in his home where he stored notes and other mementos he received from students over the years.[10] He emotionally testified about some memories he kept in his "Why I Teach" box.

7.      The Hill School was "so important" to Mr. Ralston. He worked there for decades, enjoying a "career . . . as fulfilling as [he] could have ever dreamed a job would be."[11] His two sons attended The Hill School and "were surrounded by some of the best examples of young men that [Mr. Ralston] could have ever imagined."[12] The Hill School was Mr. Ralston's "whole life."[13]

8.      Mr. Ralston left The Hill School to serve as headmaster of the Leelanau School in Michigan from 2009 to 2016.[14]

9.      Mr. Ralston returned to The Hill School in 2016 to work as a capital giving officer. His job responsibilities entailed soliciting donations from The Hill School alumni.[15] He lived in Ohio and travelled throughout the Midwest to engage alumni.[16] He visited The Hill School occasionally.[17]

10.      Kurtis Poulos attended The Hill School for his freshman and sophomore years of high school from 1993 to 1995.[18] He was the fourth member of his family to attend The Hill School.[19]

11.      Mr. Ralston taught Mr. Poulos geometry when Mr. Poulos was in tenth grade and aged between fourteen and fifteen at The Hill School in 1994 and 1995.[20]

12.      Mr. Poulos wrote a positive anonymous review of Mr. Ralston after his sophomore year.[21] Mr. Poulos wrote he "would recommend" Mr. Ralston to other students.[22]

13.      Mr. Poulos attended Marquette University High School for his junior year from 1995 to 1996.[23] He voluntarily returned to The Hill School for his senior year from 1996 to 1997.[24]

7

*Mr. Poulos discloses alleged assault to his mother.*

14.     In 2012 or 2013, Mr. Poulos lived with his mother, Mary Ellen Poulos.[25] Mrs. Poulos is a licensed attorney.[26] She practiced for about forty years focusing on civil rights litigation.[27]

15.     In 2012 or 2013, Mr. Poulos told his mother he had been "assaulted."[28] He "mentioned no names."[29] Mr. Poulos did not mention when or where the assault occurred.[30] Mr. Poulos simply told Mrs. Poulos the person who assaulted him "was a teacher."[31]

16.     Mrs. Poulos recalled Mr. Poulos had "said something about a math teacher."[32] He did not "indicate . . . in any way" he had suffered sexual assault.[33]

17.     When Mr. Poulos told Mrs. Poulos about the assault, he "was lashing out."[34] He "was hysterical," "yelling," and "beside himself with pain."[35] He "was drinking heavily" around the time he disclosed the assault to Mrs. Poulos.[36] His behavior was "unpredictable."[37] He "picked up something and threw it" during the conversation.[38]

18.     Mrs. Poulos inferred her son had suffered sexual abuse from what he told her.[39] She "just put two and two together and came up with four."[40] She reasoned she "would have known about it when it happened" if the abuse had been non-sexual.[41]

19.     Mrs. Poulos also inferred the abuse occurred during Mr. Poulos's sophomore year at The Hill School because she "had put two and two together."[42] She made this inference by thinking about Mr. Poulos's "time at Hill" and "notic[ing] the precipitous drop in his grades sophomore year."[43]

20.     Mrs. Poulos never asked Mr. Poulos who abused him.[44]

21.     Mr. Poulos "never told" Mrs. Poulos "anything about when, where, how, who, about the incident."[45]

22.     A few months after[46] Mr. Poulos told Mrs. Poulos about the assault, Mr. Poulos suffered "acute alcohol poisoning"[47] after drinking "[him]self into a coma."[48] He became "very, very sick" and required a hospital stay.[49]

### *The Hill School addresses national allegations of sexual abuse at boarding schools as Mrs. Poulos investigates Mr. Ralston.*

23.     Hill School Headmaster Zachary Lehman wrote to the Hill School community on April 23, 2016 acknowledging allegations of sexual abuse against employees of boarding schools nationally.[50] He assured alumni and parents The Hill School does not tolerate sexual abuse and outlined its "rigorous protocol" for ensuring sexual abuse does not occur at The Hill School.[51]

24.     Mrs. Poulos received Headmaster Lehman's April 23, 2016 letter.[52] She does not recall whether she discussed it with Mr. Poulos.[53] She does not recall how Mr. Poulos reacted to the letter.[54]

25.     Headmaster Lehman's April 23, 2016 letter motivated Mrs. Poulos "to try and figure out who had done this to my son and report it to the school."[55] It made her "tenacious."[56]

26.     Mrs. Poulos then emailed The Hill School asking for the name of Mr. Poulos's sophomore year geometry teacher.[57] Mrs. Poulos asked for the name of the geometry teacher because she remembered a time visiting her son's geometry class when Mr. Poulos answered a question. Another student interrupted Mr. Poulos while he answered. The teacher stopped the other student, saying, "Let Kurt do it his way."[58]

27.     Mrs. Poulos discovered Mr. Ralston taught Mr. Poulos geometry.[59]

28.     Mrs. Poulos endeavored to discover if Mr. Ralston "was the one" who abused Mr. Poulos.[60] She did so without asking Mr. Poulos about Mr. Ralston.[61] She thought "it was too hard on" Mr. Poulos "to talk about it."[62] Mrs. Poulos "suspected" Mr. Poulos would tell her Mr. Ralston abused him if she asked Mr. Poulos.[63]

29.    Mrs. Poulos then contacted a journalist with *The New York Times* who reported on sexual abuse at boarding schools to "see if there was any inkling in her research" about The Hill School.[64] The reporter "said no."[65]

30.    Mrs. Poulos contacted Minneapolis lawyer Jeffrey Anderson. Attorney Anderson told Mrs. Poulos the statute of limitations governing potential claims by Mr. Poulos for the alleged assault had expired.[66]

31.    Mrs. Poulos obtained copies of Mr. Poulos's Hill School yearbooks.[67]

32.    Mrs. Poulos located Mr. Ralston online. At the time, Mr. Ralston served as head of school at The Leelanau School in Wisconsin. She contacted The Leelanau School to query Mr. Ralston's "employment status."[68]

***Headmaster Lehman notifies The Hill School community of sexual abuse allegations.***

33.    Headmaster Lehman wrote to The Hill School alumni on November 20, 2017 notifying them of "historical allegations" of sexual abuse at The Hill School.[69]

34.    Headmaster Lehman disclosed The Hill School began a review of the allegations led by attorneys Gina Smith and Leslie Gomez.[70] The review uncovered "several troubling incidents" which occurred "several decades ago" by former Hill School faculty.[71]

35.    The Hill School's investigation did not uncover allegations against or wrongdoing by Mr. Ralston.[72] The investigation also did not involve Mr. Poulos.

36.    Headmaster Lehman acknowledged: "I understand there may be more alumnae/i who have similar experiences. . . . I also expect . . . that we may continue to learn more about sexual and gender-based harassment and violence at The Hill."[73]

37.    Headmaster Lehman invited "any Hill School community member who wishes to share his or her experiences with the School, or, if appropriate, with law enforcement" to come forward. He encouraged "any students, parents, alumni, or staff to reach out directly to the School

to share your observations and feedback."[74] Headmaster Lehman invited students to contact him directly.[75]

### *Mrs. Poulos contacts Attorney Garabedian about Mr. Poulos's claims.*

38.   Mr. Poulos interpreted Headmaster Lehman's November 20, 2017 letter as an "invitation" to contact the school.[76]

39.   But Mrs. Poulos told Mr. Poulos not to contact The Hill School or Attorneys Gomez and Smith because she thought Attorneys Gomez and Smith helped institutions cover up sexual abuse.[77]

40.   Mrs. Poulos told Mr. Poulos he should not contact Attorneys Gomez and Smith "unrepresented."[78]

41.   Mrs. Poulos instead contacted attorney Mitchell Garabedian, a Massachusetts attorney with well-known experience representing victims of sexual abuse, in December 2017.[79] Attorney Garabedian gained notoriety after being favorably portrayed in the award-winning movie *Spotlight* for his work uncovering abuse of children in Boston.[80] Attorney Garabedian's law firm touts his representing "thousands" of alleged sexual abuse victims.[81]

42.   Mrs. Poulos contacted Attorney Garabedian to obtain his thoughts on whether "it would be a good idea" for Mr. Poulos to contact Attorneys Gomez and Smith.[82] Attorney Garabedian advised against it.[83]

43.   Mrs. Poulos did not tell Mr. Poulos she planned to contact Attorney Garabedian before she contacted him.[84]

44.   Mrs. Poulos never identified Mr. Ralston as her son's abuser to Attorney Garabedian.[85]

45.   Mrs. Poulos knew a "lawsuit didn't have anything to do with" contacting Attorney Garabedian because "[w]e weren't even thinking of a lawsuit."[86]

46.     Mrs. Poulos knew the statute of limitations governing potential claims against Mr. Ralston or The Hill School had expired from her conversations with Minneapolis Attorney Anderson.

47.     Mrs. Poulos only would have considered a lawsuit once it "became viable"—*i.e.*, once the statute of limitations governing her son's claims changed.[87]

### *Mr. Poulos tells Attorney Garabedian Mr. Ralston sexually abused him.*

48.     Mr. Poulos contacted Attorney Garabedian after speaking to his mother about her interaction with Attorney Garabedian.

49.     Mr. Poulos wanted Attorney Garabedian to obtain "relief" from The Hill School for the purported abuse he suffered there.[88] He sought recoupment of his Hill School tuition and counseling.[89]

50.     Attorney Garabedian and his associate, Attorney Salvatore Ciulla, first spoke with Mr. Poulos on December 12, 2017 by telephone.[90]

51.     Mr. Poulos told Attorney Garabedian he contacted him because of Headmaster Lehman's 2017 email.[91] Mr. Poulos told Attorney Garabedian he called him because he did not know whether he should contact Attorneys Gomez and Smith or Headmaster Lehman in response to the November 2017 letter.[92]

52.     Mr. Poulos told Attorney Garabedian Mr. Ralston sexually abused him.[93]

53.     There is no credible evidence Mr. Poulos accused Mr. Ralston of sexually abusing him until this call.

54.     Attorney Garabedian told Mr. Poulos Pennsylvania's statute of limitations barred his potential claims against The Hill School or Mr. Ralston.[94] Attorney Garabedian also told Mr. Poulos he had obtained between $100,000 and $500,000 for other alleged abuse victims through "settlement" despite their claims being outside the statute of limitations.[95]

55.     Attorney Garabedian's associate, Attorney Daniel Mahoney, conducted an intake interview with Mr. Poulos by telephone on December 13, 2017.[96] Attorney Garabedian participated in about thirty percent of this call.[97] He trusted Attorney Mahoney to conduct the call because he had trained Attorney Mahoney for about one year on client intake interviews.[98]

56.     Attorney Garabedian designed his firm's standard intake interview to probe the accuser's name, address, criminal history, childhood, family history, marital status, relationship to his parents, where they lived, educational history, and damages.[99] The interview also probed the accuser's name, physical appearance, actions, and position of authority.[100] And the interview probed the location, time, and description of the abuse.[101]

57.     Mr. Poulos told Attorneys Garabedian and Mahoney how Mr. Ralston sexually abused him while he attended The Hill School during his freshman and sophomore year.[102]

58.     Mr. Poulos said the abuse started when he was fourteen and ended when he was sixteen.[103]

59.     Mr. Poulos said the abuse occurred in a study room, cubicles in the basement of The Hill School, and in his dorm room.[104]

60.     Mr. Poulos said Mr. Ralston fondled him in class, rubbed his back, fellated him, and made him fellate Mr. Ralston.[105]

61.     Mr. Poulos described Mr. Ralston's physical appearance.[106]

62.     Mr. Poulos said he suffered guilt, lack of sleep, shame, and embarrassment.[107]

63.     Mr. Poulos provided his health, residential, academic, financial, familial, and criminal history.[108]

64.     Mr. Poulos said he transferred to Marquette in Wisconsin after his sophomore year at The Hill School.[109] He said he then transferred back to The Hill School for his senior year.[110]

65.     Attorney Garabedian insisted he would not sign a non-disclosure agreement with The Hill School as part of his representation of Mr. Poulos.[111] Mr. Poulos agreed and told Attorney Mahoney it did not matter whether he "outed" Mr. Ralston.[112]

### *Attorney Garabedian credits Mr. Poulos's allegations.*

66.     Attorney Garabedian believed Mr. Poulos's allegations.[113]

67.     Headmaster Lehman's 2017 letter made Attorney Garabedian think "red flags" existed at The Hill School.[114]

68.     Attorney Garabedian perceived Mr. Poulos to be "in pain," "anguish," and "misery" while Mr. Poulos accused Mr. Ralston of sexual abuse over the phone.[115] Attorney Garabedian found this behavior consistent with abuse victims' behavior because they typically act nervously and anxiously while reporting abuse.[116]

69.     Mr. Poulos disclosed his arrest history to Attorney Garabedian.[117] Attorney Garabedian found his criminal history consistent with sexual abuse victims' because abuse victims "act[] out" following the abuse.[118] He also thought this made Mr. Poulos credible because he "was open and up front" about his criminal history.[119]

70.     Mr. Poulos told Attorney Garabedian he had received psychological treatment for the abuse.[120] Attorney Garabedian found this consistent with other abuse victims because many receive psychological treatment.[121]

71.     Attorney Garabedian did not think Mr. Poulos returning to The Hill School his senior year belied his abuse claims. He thought returning constituted Mr. Poulos's way of saying "F you'" to The Hill School.[122]

72.     Attorney Garabedian thought Mr. Ralston "groom[ed]" Mr. Poulos—for example, rubbing his back to "test[] the waters."[123] Attorney Garabedian found this conduct consistent with the behaviors of sexual abusers.[124]

***Attorney Garabedian and Mr. Poulos agree they will not file a lawsuit.***

73.     Attorney Garabedian told Mr. Poulos the statute of limitations barred any lawsuit against The Hill School or Mr. Ralston during the intake interview.[125]

74.     Attorney Garabedian did not tell Mr. Poulos the statute of limitations might change, nor did he tell Mr. Poulos he hoped to help change the statute of limitations in Pennsylvania.[126]

75.     Attorney Garabedian did not tell Mr. Poulos he had contacted legislators about the statute of limitations or had lobbied to change the statute of limitations.[127]

76.     Mr. Poulos understood the statute of limitations for a potential lawsuit had expired.[128] He had previously asked an unidentified attorney in 2013 or 2014 and the attorney told him the statute of limitations had expired for criminal charges against Mr. Ralston.[129]

77.     Mr. Poulos did not intend to file a lawsuit against The Hill School or Mr. Ralston. He instead hired Attorney Garabedian only to "be prepared" if the Pennsylvania General Assembly and Governor someday amended Pennsylvania's statute of limitations.[130]

78.     Mr. Poulos never planned to "take legal action" against Mr. Ralston because "[t]here was no point in thinking about something that has an undetermined date."[131]

79.     Mr. Poulos would only have considered a lawsuit if the statute of limitations changed.[132] If the statute changed, "then" he would "contemplate if" a lawsuit would be "worth the time and mental energy to deal with."[133]

80.     But Mr. Poulos still wanted Attorney Garabedian to relay his allegations to The Hill School.[134]

81.     Mr. Poulos hoped Attorney Garabedian would relay his allegations to Headmaster Lehman and The Hill School board of trustees.[135]

82.     Mr. Poulos and Attorney Garabedian signed a contingent fee agreement governing Attorney Garabedian's representation of Mr. Poulos.[136] They agreed Attorney Garabedian would

perform services regarding: "Injuries caused by Matthew Ralston . . . and The Hill School."[137] They agreed Attorney Garabedian would receive 33.3% of the damages he recovered for Mr. Poulos.[138]

83.    Consistent with Mr. Poulos's purposes for contacting Attorney Garabedian, Mr. Poulos and Attorney Garabedian further agreed: "Client and Lawyer agree that a complaint or lawsuit will not be filed in this matter because the Statute of Limitations has run or expired."[139]

84.    Attorney Garabedian did not include language in the contingency fee agreement about modifying the agreement should the statute of limitations governing Mr. Poulos's claims change.[140]

***Attorney Mahoney obtains background information about Mr. Poulos's claims.***

85.    Attorney Mahoney then investigated Mr. Ralston's background following the intake call. He located online posts from The Hill School about Mr. Ralston's career and Mr. Ralston's LinkedIn page.[141]

86.    Attorney Mahoney also endeavored to obtain Mr. Poulos's records containing "background information."[142]

87.    Attorney Garabedian requested Mr. Poulos's records with Mr. Poulos's release from The Hill School almost six weeks after their intake call.[143] The Hill School did not respond.

88.    Attorney Garabedian obtained Mr. Poulos's academic files from Marquette, which included Mr. Poulos's Hill School transcript.[144]

89.    The transcript showed Mr. Poulos attended a geometry class at The Hill School from 1994 to 1995.[145] Mr. Ralston signed the transcript.[146]

90.    Attorney Garabedian did not obtain Mr. Poulos's criminal records until this lawsuit even though Mr. Poulos disclosed arrests to Attorney Garabedian during the intake interview.[147]

16

91.     Attorney Garabedian did not obtain Mr. Poulos's medical records even though Mr. Poulos disclosed psychological treatment for the abuse to Attorney Garabedian.[148]

92.     Attorney Garabedian did not obtain Mr. Poulos's Hill School file until this lawsuit.[149]

***Attorney Garabedian sends an April 11, 2018 letter accusing Mr. Ralston of sexual abuse.***

93.     Attorney Garabedian sent an April 11, 2018 letter to Headmaster Lehman (the "April 11 Letter").[150]

94.     Attorney Garabedian wrote in the April 11 Letter: "This letter is an attempt to settle and compromise claims involving Matthew B. Ralston . . . and Mr. Ralston's supervisors at The Hill School."[151]

95.     Attorney Garabedian accused Mr. Ralston in the April 11 Letter of "repeatedly sexually molest[ing]" Mr. Poulos when Mr. Poulos was between fifteen and seventeen years old.[152] Attorney Garabedian claimed the "brief description" of the sexual abuse was "meant to briefly touch the surface of the relevant facts."[153]

96.     Attorney Garabedian claimed the sexual abuse caused Mr. Poulos extensive emotional and psychological damages.[154]

97.     Attorney Garabedian concluded: "Mr. Poulos's demand for settlement is $1,000,000.00. I await your response. Thank you."[155]

98.     Mr. Poulos did not ask Attorney Garabedian to send the April 11 Letter.[156]

99.     Attorney Garabedian did not show Mr. Poulos the April 11 Letter before he sent it.[157]

100.    Mr. Poulos never intended to demand one million dollars from The Hill School.[158]

101.    Mr. Poulos "had no discussions" with Attorney Garabedian between December 2017, when he signed the contingency fee agreement, and April 2018.[159]

***The Hill School officials respond to the April 11 Letter, but Attorney Garabedian ignores them.***

102.    Headmaster Lehman received Attorney Garabedian's April 11, 2018 Letter.[160]

103.    Headmaster Lehman shared the April 11 Letter with The Hill School's attorney, Thomas Rees, and with members of The Hill School's board: Board Chairman Preston Athey, Board Vice Chairman Andrew Soussloff, Legal Committee Chairman Geoffrey Richards, Legal Committee Vice Chairwoman Michelle Gyves, and Chief Financial Officer Richard Wood.[161]

104.    Attorney Rees reviewed the April 11 Letter and determined it made "very serious allegations."[162]

105.    He called Attorney Garabedian's offices "within one day or two" of receiving the letter and left a voicemail about the allegations.[163]

106.    Attorney Garabedian did not return Attorney Rees's message.[164]

107.    Attorney Rees faxed Attorney Garabedian a letter asking to discuss "the charges in the letter."[165]

108.    Attorney Garabedian did not respond to Attorney Rees's fax.[166]

***Mr. Ralston discovers Attorney Garabedian's allegations.***

109.    Mr. Ralston, working for The Hill School as a capital giving officer in the Midwest, visited The Hill School for its "Career Day" in late April 2018.[167] He stopped into Headmaster Lehman's office, as he often did when he returned to The Hill School.[168]

110.    Headmaster Lehman asked Mr. Ralston, "Are you here about the letter?"[169]

111.    Mr. Ralston did not know about the April 11 Letter until Headmaster Lehman asked him about it.[170]

112.    Headmaster Lehman explained the contents of the April 11 Letter to Mr. Ralston and later sent him a copy of the letter.[171]

113.    Mr. Ralston found the allegations "sickening" and "surreal."[172] As Mr. Ralston read the April 11 Letter, he thought, "Why? Why is this here? No way," and, "It's all lies."[173]

114.    Attorney Rees discussed the allegations with Mr. Ralston on three telephone calls and through email in April 2018.[174] Attorney Rees sought to discover Mr. Ralston's "dealings with Mr. Poulos" and discuss "the nature of the charges."[175]

115.    Mr. Ralston emailed Attorney Rees about his alleged encounters with Mr. Poulos when Mr. Poulos attended The Hill School.[176] Mr. Ralston could recall only one incident involving Mr. Poulos. He recalled an incident in which Mr. Poulos violated school rules by parking his car in a restricted campus lot on a weekend during the 1996–97 school year.[177] Mr. Ralston used his own car to block Mr. Poulos's car into its parking spot so Mr. Poulos could not drive off before the dean could discipline Mr. Poulos.[178]

### Attorney Garabedian ignores Mr. Poulos's matter for months.

116.    There is no evidence Attorney Garabedian worked on Mr. Poulos's matter between April 2018 and September 2018.

117.    Mr. Poulos emailed Attorney Garabedian on September 17, 2018.[179] Mr. Poulos wrote: "I haven't heard from you in quite some time. I was just wondering if you have any updates concerning my case against the Hill School."[180]

118.    Attorney Garabedian did not respond.[181]

119.    Attorney Garabedian instead called Attorney Rees the day after receiving Mr. Poulos's email.[182]

120.    Attorney Rees missed the call, but promptly returned it.[183]

121.    Attorney Garabedian did not return Attorney Rees's call.[184] Attorney Garabedian resumed inactivity on Mr. Poulos's matter.

***Attorney Garabedian resumes working on Mr. Poulos's matter.***

122.    Attorney Garabedian resumed work on Mr. Poulos's matter after Mrs. Poulos angrily emailed Attorney Garabedian on December 18, 2018: "It has been almost a year since there has been any communication from you as far as I know. Yet, on 12/16 I hear from [The Hill School.] The email from Hill was a solicitation for MONEY!'"[185]

123.    Mrs. Poulos continued: "In my last email to you on 1/18[[186]] I expressed concern about your lack of communication about this matter. This concern has been magnified by the mere passage of time and the unsettling request for money from Hill."[187]

124.    Mrs. Poulos concluded: "Can you please tell us something—anything—about this case?! All we want is a refund of his tuition."[188]

125.    Mr. Poulos also sent Attorney Garabedian an email complaining he had not heard from Attorney Garabedian for a year.[189]

126.    These emails prompted Attorney Garabedian to revisit Mr. Poulos's matter.

127.    On December 18, 2018—the same day Mrs. Poulos emailed Attorney Garabedian—Attorney Garabedian and his associate Nathan Gaul called Mrs. Poulos.[190]

128.    The attorneys' notes reflect Attorney Garabedian discussed with Mrs. Poulos the possible changing of Pennsylvania's statute of limitations governing Mr. Poulos's claim.[191] The notes read: "MG [Attorney Garabedian] tells Mary Ellen [Mrs. Poulos] there's movement to amend SOL [statute of limitations], projected to take at least 9–12 months, but no guarantees."[192]

129.    Attorney Garabedian emailed Attorney Rees on December 18, asking Attorney Rees to "[p]lease contact me so we can discuss this matter."[193]

130.    Attorney Rees responded within an hour, writing: "Let us schedule a call this week . . . I have tried several times to reach you and it will be helpful to finally have the chance to speak."[194]

131.    Attorneys Garabedian and Gaul spoke with Mr. Poulos by phone on December 19, 2018 before their call with Attorney Rees.[195] Mr. Poulos updated the attorneys about his life. Attorney Garabedian informed Mr. Poulos he would speak to Attorney Rees in the coming days.[196]

132.    There is no credible evidence Attorneys Garabedian and Gaul discussed a lawsuit or a change in the statute of limitations during this December 19, 2018 call with Mr. Poulos.[197]

133.    Attorneys Garabedian and Gaul spoke to Attorney Rees by phone for the first time on December 21, 2018.[198]

134.    Attorney Garabedian told Attorney Rees he would still pursue Mr. Poulos's claims and his $1 million demand still stood.[199]

135.    Attorney Garabedian proposed mediation.[200] He said he would not agree to a confidential mediation.[201]

136.    Attorney Rees said The Hill School could not agree to mediate Mr. Poulos's claims without "an investigation."[202]

137.    Attorney Rees asked Attorney Garabedian for "more specific allegations," which Attorney Garabedian said he would provide.[203]

***Attorneys Garabedian and Gaul speak with Mr. Poulos, who provides different details about the abuse.***

138.    Attorneys Garabedian and Gaul spoke with Mr. Poulos again on December 26, 2018 to "get information" to tell Attorney Rees so he could "begin his investigation."[204]

139.    Mr. Poulos told the attorneys Mr. Ralston would make him stay after class when geometry fell as the last class of the day.[205]

140.    Mr. Poulos said Mr. Ralston "fondled" his penis and testicles, "skin on skin; put mouth on penis," and made Mr. Poulos do the same thing.[206]

141.    Mr. Poulos claimed Mr. Ralston sexually abused him ten to fifteen times over the year, always in his geometry classroom during his sophomore year.[207]

142.    This allegation differed from Mr. Poulos's initial allegations to Attorneys Garabedian and Mahoney in 2017. Mr. Poulos initially reported the abuse occurred during his freshman and sophomore year, not just his sophomore year. He also initially reported the abuse occurred in study cubicles and his dorm room, not just the geometry classroom.

143.    Mr. Poulos further claimed Mr. Ralston tried to get Mr. Poulos to "come to [his] dorm room for tutoring," but Mr. Poulos refused.[208]

144.    Mr. Poulos discussed the same incident Mr. Ralston had told Attorney Rees about his car.[209] Mr. Poulos considered this incident an act of abuse.[210]

145.    Mr. Poulos said he left The Hill School for his junior year then returned his senior year.[211] Mr. Poulos said Mr. Ralston did not abuse him his senior year.[212]

146.    Inconsistencies in Mr. Poulos's stories from December 2017 and December 2018, including his age at the time of the abuse and the location of the abuse, did not make Attorney Garabedian doubt his story. Attorney Garabedian reasoned someone aged fifteen during the abuse "is not going to have every detail bound in his mind."[213] Attorney Garabedian believed victims try to "suppress" the memories but they "come forward" eventually.[214] He thought when victims do come forward, they will not have "a photograph of the abuse" memorized but can provide "enough general details" making them credible.[215]

***Attorney Garabedian sends second letter to Attorney Rees on December 26, 2018.***

147.    Attorney Gaul drafted a letter to Attorney Rees based on his conversation with Mr. Poulos the same day (the "December 26 Letter").[216] Attorney Garabedian signed the letter and sent it to Attorney Rees.[217]

148.    In the December 26 Letter, Attorney Garabedian said Mr. Ralston taught Mr. Poulos geometry and sexually abused Mr. Poulos when geometry fell as the last class of the day.[218] Attorney Garabedian accused Mr. Ralston of "sexually abus[ing]" Mr. Poulos while he attended The Hill School by "among other things, Mr. Ralston fondling Mr. Poulos's penis and testicles, skin on skin; Mr. Ralston making Mr. Poulos fondle Mr. Ralston's penis and testicles, skin on skin; Mr. Ralston putting his mouth on Mr. [Poulos's] penis; and Mr. Ralston making Mr. Poulos put his mouth on Mr. Ralston's penis."[219] He wrote the sexual abuse ended when Mr. Poulos left The Hill School to transfer to Marquette in Wisconsin.[220] Attorney Garabedian concluded by listing Mr. Poulos's alleged damages.[221]

149.    Unlike the April 11 Letter, Attorney Garabedian did not make a settlement demand in the December 26 Letter. He instead concluded: "Please advise me as to your client's position with regard to this matter."[222]

**Attorney Rees repeatedly seeks to investigate claims; Attorney Garabedian ignores him.**

150.    Attorney Rees shared the December 26 Letter with Headmaster Lehman and the same board members with whom Headmaster Lehman shared the April 11 Letter: Chairman Athey, Vice Chairman Soussloff, Legal Committee Chairman Richards, Legal Committee Vice Chairwoman Gyves, and Chief Financial Officer Wood.[223]

151.    Attorney Rees responded to the December 26 Letter on January 9, 2019 by email.[224]

152.    Attorney Rees invited Attorney Garabedian and Mr. Poulos to meet with The Hill School's outside counsel, Attorneys Smith and Gomez, so they could begin to investigate the claim.[225]

153.    Attorney Garabedian did not respond to Attorney Rees's request to begin an investigation.

154.    Attorney Garabedian instead wrote to Attorney Rees on January 28, 2019 asking Attorney Rees to advise him as to whether The Hill School would "agree to attend mediation if Mr. Poulos's claim is found credible following an investigation."[226]

155.    Mrs. Poulos emailed Attorney Garabedian on January 29, notifying him: "New York just passed a law extending statute of limitations for sex abuse. I think Hill School should be worried."[227] Attorney Garabedian did not respond to the email.

156.    Attorney Rees emailed back on January 30 telling Attorney Garabedian his January 28 letter "appear[ed] to overlook" Attorney Rees's January 9 email which invited Mr. Poulos and Attorney Garabedian to begin an investigation.[228]

157.    Attorney Rees also told Attorney Garabedian in the same email Attorneys Gomez and Smith could travel to Attorney Garabedian's Boston offices to interview Mr. Poulos.[229]

158.    Attorney Rees reminded Attorney Garabedian it was Attorney Garabedian who proposed an investigation.[230]

159.    But Attorney Garabedian did not respond to Attorney Rees's January 30 email.

160.    Attorney Rees again wrote to Attorney Garabedian on February 21, 2019.[231] Attorney Rees referenced his earlier communications: "Mr. Poulos made very serious charges against the School and a faculty member. You have agreed that it is important for the School to investigate these charges, yet we remain unable to promptly investigate these charges."[232]

161.    Attorney Rees asked Attorney Garabedian to respond by March 1, 2019.[233] Attorney Rees said The Hill School "will conclude that Mr. Poulos does not wish to pursue this matter" if Attorney Garabedian did not respond by March 1.[234]

162.    Attorney Garabedian did not respond by March 1—or at all, for that matter.

163.    Attorney Rees wrote to Attorney Garabedian again on March 26, 2019.[235]

164.     Attorney Rees notified Attorney Garabedian he had not heard from Attorney Garabedian by the March 1 deadline.[236] "On this basis," Attorney Rees wrote, "we have concluded that your client is not in a position to pursue this matter at this time."[237]

165.     Attorney Garabedian ignored Attorney Rees's March 26 letter.

166.     Attorney Garabedian instead called Mr. Poulos on April 3, 2019.[238]

167.     Attorney Garabedian told Mr. Poulos the Hill School "is giving us the runaround."[239]

168.     Attorney Garabedian told Mr. Poulos "there was a movement to amend the statute of limitations in Pennsylvania."[240]

169.     Attorney Garabedian proposed he and Mr. Poulos wait one year to see if the statute of limitations would change, then reassess.[241]

170.     This April 3, 2019 discussion is the first time Attorney Garabedian discussed the statute of limitations changing with Mr. Poulos.

### The accusations affect Mr. Ralston.

171.     Mr. Ralston labored under the weight of Mr. Poulos's accusations.

172.     Mr. Ralston considered the allegations "the most heinous offense that could be done against a child by anybody, let alone a teacher."[242]

173.     Mr. Ralston thought about Attorney Garabedian's April 11 Letter "[e]very day" between April and October 2018.[243]

174.     Mr. Ralston wondered who had seen the letter and what they would think of him.[244]

175.     Mr. Ralston felt even worse when he discovered Attorney Garabedian was favorably portrayed in *Spotlight*.[245] Mr. Ralston thought Attorney Garabedian "probably had a lot of credibility in the world of dealing with sex abuse cases," and began to worry "how this was going to get unraveled because of that reputation."[246]

176.    Attorney Rees later sent Mr. Ralston Attorney Garabedian's December 26 Letter.[247]

177.    After reading it, Mr. Ralston "stopped thinking this was going to resolve itself through . . . the prescribed process of investigations and cooperation from both sides."[248]

178.    Mr. Ralston shared the letters' allegations with his friends, family, and colleagues, seeking solace they disbelieved the allegations.[249]

179.    For example, Mr. Ralston called his brother Mark Ralston to share the allegations.[250] Mark Ralston perceived Mr. Ralston as "[a]nxious," in "[d]isbelief," and in "[s]hock" as he shared the allegations.[251]

180.    Mr. Ralston also shared the letter with friend Christopher Hopkins, the former Dean of Students at The Hill School.[252] Mr. Ralston sounded "extremely emotional in a desperate[,] shaken way" and told Mr. Hopkins "a letter arrived that accused him of horrific[,] unspeakable things."[253]

181.    Mr. Hopkins, who serves as dean of a Maine boarding school, disbelieved the allegations. They did not change his opinion of Mr. Ralston. Mr. Hopkins opined the allegations made Mr. Ralston "unemployable" because Mr. Hopkins "would not be able to employ" Mr. Ralston if he came to Mr. Hopkins's school "even given" Mr. Hopkins's "knowledge of" Mr. Ralston.[254]

182.    Mr. Ralston asked Headmaster Lehman in January 2019 if he would allow him on campus.[255] Headmaster Lehman said, "Yes, but try to keep a low profile, and don't find yourself alone with students."[256]

183.    No one had previously told Mr. Ralston to avoid finding himself alone with students.[257] Headmaster Lehman's statement made Mr. Ralston feel "[a]wful."[258] He "couldn't imagine that being said" to him after thirty years working with students.[259]

184.    Mr. Ralston stopped attending funerals and weddings of certain Hill School families he would have otherwise attended because of Attorney Garabedian's 2018 Letters.[260]

185.    Mr. Ralston found it difficult to perform his duties as a capital giving officer because he "was afraid" alumni could discover the allegations, making both Mr. Ralston and The Hill School "look horrible."[261]

186.    But Mr. Ralston continued to satisfy his job obligations.[262] The Hill School gave him a positive performance review in June 2018 after the April 11 Letter.[263] The Hill School raised his salary and paid him a bonus in July 2018.[264]  And The Hill School again raised his salary after Attorney Garabedian's December 26 Letter.[265]

187.    To manage emotional distress, Mr. Ralston improved his diet, exercised regularly, obtained good sleep, and began mediating.[266] He also met with a counselor several times.[267] He did not receive medical treatment or medication.[268]

*No one believes the allegations.*

188.    Despite the anguish the 2018 Letters caused Mr. Ralston, Mr. Ralston's family, friends, and colleagues did not believe the allegations in the 2018 Letters. Everyone Mr. Ralston identified who read the 2018 Letters either disbelieved the letters or formed no opinion about them.

189.    Headmaster Lehman told Mr. Ralston he "didn't believe the allegations in the letter."[269] He told Mr. Ralston the allegations were "bullshit, and that it was an attempt to extract a million dollars from the school."[270]

190.    Headmaster Lehman did not change his opinion of Mr. Ralston based on the 2018 Letters.[271]

191.    Mr. Ralston visited The Hill School in January 2019, and Headmaster Lehman permitted him to reside on campus for three to four weeks.[272]

192.    Mr. Ralston's wife, Mary Beth Ralston, disbelieved the allegations.[273]

193.    Mark Ralston disbelieved the allegations.[274]

194.    Mr. Ralston's friend, Bill Yinger, disbelieved the allegations.[275]

195.    Mr. Ralston's direct supervisors in his role as capital giving officer, Jeffrey Neese and Virginia Yinger, disbelieved the allegations.[276] When Mr. Ralston told Mr. Neese and Ms. Yinger about the letters, they told him to keep doing his job.[277]

196.    Mr. Ralston's friend and former Hill School colleague Christopher Chirieleison disbelieved the allegations.[278]

197.    Benjamin Walborn, a former student of Mr. Ralston's, "didn't believe" the allegations because he considered Mr. Ralston "someone of high character."[279]

198.    Zachary Brusko roomed with Mr. Poulos when Mr. Poulos attended The Hill School.[280] Mr. Brusko later worked at The Hill School managing student records while Mr. Ralston also worked at The Hill School.[281] Mr. Brusko holds a positive opinion of Mr. Ralston.[282] Mr. Brusko did not hear about Attorney Garabedian's allegations until Mr. Ralston's counsel contacted Mr. Brusko regarding his deposition.[283] Mr. Brusko found the allegations "hard to believe."[284] And the allegations did not change Mr. Brusko's opinion of Mr. Ralston.[285]

199.    Attorney Rees had "no opinion" of Mr. Ralston.[286] Attorney Rees and Mr. Ralston did not have a personal relationship.[287] The 2018 Letters did not change Attorney Rees's non-existent opinion of Mr. Ralston.[288] Attorney Rees evaluated the 2018 Letters professionally as The Hill School's counsel; he did not form personal opinions about them.[289]

200.    Mr. Ralston knew Chairman Athey before Chairman Athey read the 2018 Letters. Mr. Ralston occasionally travelled with Chairman Athey to visit alumni.[290] Chairman Athey disbelieved the allegations.[291] Chairman Athey did not change his opinion of Mr. Ralston after reading the 2018 Letters.[292]

201.    Mr. Ralston also shared a "personal relationship" with Legal Committee Chairman Richards. Chairman Richards disbelieved the allegations.[293]

202.    Mr. Ralston did not know the other members of The Hill School board.[294] There is no evidence these people believed the allegations.

203.    Mr. Ralston taught Mr. Poulos's cousin, Jason Zwerner. Mr. Ralston developed a "very good" relationship with Mr. Zwerner.[295] Mr. Poulos told Mr. Zwerner about the allegations. Mr. Ralston's relationship with Mr. Zwerner remains "very good."[296] Mr. Ralston asked Mr. Zwerner to attend the bench trial, but Mr. Zwerner could not attend.[297] There is no evidence Mr. Zwerner believed the allegations. There is also no evidence Mr. Zwerner read the 2018 Letters.

204.    Mr. Ralston called David Dougherty, a Hill School employee who served as headmaster of The Hill School for sixteen of Mr. Ralston's seventeen years teaching there, to seek his advice.[298] Mr. Dougherty told Mr. Ralston he could not speak to him about legal matters without Attorney Rees present.[299] But there is no evidence Mr. Dougherty believed the allegations.

205.    No Hill School representative except Attorney Rees ever asked Mr. Ralston if he abused Mr. Poulos after Attorney Garabedian sent the 2018 Letters.[300]

206.    "[D]ozens of people" attended the first week of our bench trial to support Mr. Ralston.[301] Mr. Ralston told "every one of" them about the allegations.[302] They still came to trial despite risks posed by the Omicron variant of COVID-19 to support Mr. Ralston.

***Mr. Ralston sues Attorney Garabedian and Mr. Poulos, and The Hill School does not renew Mr. Ralston's employment agreement.***

207.    Mr. Ralston considered suing Mr. Poulos. He and his lawyer met with Attorney Rees and Chairman Richards in February 2019 about whether he could sue Mr. Poulos and keep his job.[303]

208.    Attorney Rees "discourage[d]" Mr. Ralston from suing Mr. Poulos.[304] Attorney Rees told Mr. Ralston he would have to "take a leave from employment" if he sued Mr. Poulos because "it would be an attempt or perceived as an attempt to silence someone who had alleged to be a victim of sexual abuse."[305] Attorney Rees told Mr. Ralston "litigation would be harmful to all those involved."[306]

209.    Mr. Ralston sued Mr. Poulos despite Attorney Rees's warnings.[307] He sued Attorney Garabedian and his law firm and Mr. Poulos for defamation.[308] Mr. Ralston named Mr. Poulos in the lawsuit, but initially used a pseudonym for his own name.[309]

210.    Mr. Ralston sued because he perceived a "hostile environment" at The Hill School, and he "didn't want to put [himself] or [his] family at risk for false statements of abusing a student."[310] He thought the lawsuit "seemed like a good answer" while he attempted to "figure out how [he] was going to move forward in [his] job with this going on."[311]

211.    Mr. Ralston sued for damages; he did not seek declaratory relief.[312]

212.    The Hill School responded to Mr. Ralston's lawsuit by placing Mr. Ralston on leave.[313]

213.    The Hill School placed Mr. Ralston on leave because Mr. Ralston "sued an alumnus of the school who had made a claim to be a victim of sexual misconduct"[314] and named the alleged victim publicly.[315] Those actions were "incompatible with the duties of a Capital Giving Officer."[316]

214.    The Hill School did not renew Mr. Ralston's employment agreement following the 2019–20 fiscal year.[317] The Hill School "separated from" Mr. Ralston.[318]

215.    Mr. Ralston understood The Hill School did not renew his employment because he sued Mr. Poulos, not because of the allegations Mr. Poulos made.[319]

*Mr. Ralston did not abuse Mr. Poulos.*

216.    We find Mr. Poulos's testimony Mr. Ralston abused him highly incredible because his story offends our common sense; his story contradicts itself, his previous statements, and his conduct; Mr. Poulos possessed incentives to lie; Mr. Poulos possessed bias against Mr. Ralston because of the car incident; Mr. Poulos possessed poor memory of the abuse; and Mr. Poulos's demeanor made him incredible.

217.    We find Mr. Ralston's testimony he did not abuse Mr. Poulos highly credible because he forcefully swore he did not abuse Mr. Poulos, he suffered mental anguish from the false allegations, and he acted how we would expect someone falsely accused of sexual abuse to act.

218.    Mr. Ralston taught Mr. Poulos geometry on the first floor of a building called "Upper School" located in the middle of The Hill School campus.[320] Several other classrooms were in the basement of Upper School.[321]

219.    The Hill School used a rotating class schedule with eight classes.[322] The classes were denoted "A" through "H."[323] The classes rotated daily—if a student's "A" class began his Monday and his "H" class ended his Monday, then "B" would begin Tuesday and "A" would end Tuesday, "C" would begin Wednesday and "B" would end Wednesday, and so forth.[324] Classes ended most days at 3:10 before students began their sports practices at 3:30.[325]

220.    Mr. Poulos claims Mr. Ralston only abused him when geometry fell as the last class of the day.[326]

221.    Mr. Poulos golfed as an extra-curricular activity his sophomore year.[327] Mr. Poulos never showed up late for golf or missed a single golf practice during his sophomore year.[328] Golf practice occurred about twenty minutes after class.[329] This means Mr. Ralston only had twenty

minutes to abuse Mr. Poulos after class before he timely arrived at golf practice on the other side of campus.

222.    Mr. Ralston possesses a distinctive birthmark, a patch of differently colored hair on the top of his head.[330] Mr. Poulos never mentioned this birthmark when he described Mr. Ralston to Attorney Garabedian.[331]

223.    Mr. Poulos acts inconsistently with the studied behaviors of teenage sexual abuse survivors according to the highly credible testimony of Barbara Ziv, M.D.

224.    Mr. Poulos does not remember details central to the abuse. He repeatedly testified he could not remember "specifics" about the abuse.[332] He does not remember the size and shape of Mr. Ralston's genitals, whether Mr. Ralston had an erection, how it felt to fellate Mr. Ralston, whether Mr. Ralston ejaculated, and whether Mr. Ralston locked the door before abusing him.[333]

225.    Mr. Poulos did not avoid The Hill School campus following the abuse. Mr. Poulos lived on the same floor in the same building as Mr. Ralston when he returned to The Hill School for his senior year.[334] Mr. Poulos voluntarily visited The Hill School with a girlfriend after he graduated because he wanted to "show her where he went to school."[335]

226.    Mr. Poulos wrote Mr. Ralston an anonymous positive review after his sophomore year. Mr. Poulos defended the review by testifying Mr. Ralston was a "good teacher," but this did not mean he was a "good person."[336]

227.    Mr. Ralston acts inconsistently with the studied behaviors of sexual abusers of teenagers.

228.    Mr. Ralston did not "groom" Mr. Poulos. Mr. Ralston never gave Mr. Poulos gifts.[337] Mr. Ralston never saw Mr. Poulos off-campus.[338] Mr. Ralston never contacted Mr. Poulos

after he transferred schools.[339] Mr. Ralston instead antagonized Mr. Poulos through the car incident.

## III.    CONCLUSIONS OF LAW

**A. Conclusions of law applicable to Mr. Ralston's claims against Attorney Garabedian and Mr. Poulos.**

1.      The 2018 Letters are defamatory *per se*.

2.      The 2018 Letters applied to Mr. Ralston.

3.      The recipients of the 2018 Letters understood the 2018 Letters' defamatory meaning.

4.      The recipients of the 2018 Letters understood they applied to Mr. Ralston.

5.      The allegations contained in the 2018 Letters are false.

**B. Conclusions of law applicable to Mr. Ralston's claim against Attorney Garabedian.**

6.      Attorney Garabedian and the Law Offices of Attorney Garabedian (collectively, "Attorney Garabedian"[340]) published the 2018 Letters.

7.      The judicial privilege does not protect Attorney Garabedian's publication.

8.      Mr. Ralston is not entitled to a damages judgment against Attorney Garabedian because Attorney Garabedian did not publish the 2018 Letters with actual malice and the publication did not cause Mr. Ralston actual reputational injury.

**C. Conclusions of law applicable to Mr. Ralston's claim against Mr. Poulos.**

9.      Mr. Poulos published false allegations to Attorney Garabedian and authorized Attorney Garabedian's republications of the allegations in the 2018 Letters.

10.     Mr. Poulos's publication caused Mr. Ralston special harm.

11.     The judicial privilege does not protect Mr. Poulos's publication to Attorney Garabedian.

12.     Mr. Poulos abused any conditional privileges which might attach to his publication because he spoke with actual malice.

13.     Mr. Ralston demonstrated $50,000 in presumed damages but no basis to award punitive damages against Mr. Poulos.

## IV.   ANALYSIS

Mr. Ralston alleges Attorney Garabedian and Mr. Poulos defamed him by falsely accusing him of sexual abuse in the April 11 and December 26, 2018 Letters.[341]

Attorney Garabedian challenges several elements of Mr. Ralston's claim. He argues the 2018 Letters did not harm Mr. Ralston's reputation, the judicial privilege protects him, conditional privileges protect him, he did not publish the letters with actual malice, and the allegations contained in the 2018 Letters are true.[342] Mr. Poulos pro se argues he cannot be liable for Attorney Garabedian's publication of the 2018 Letters.[343] He also invokes the conditional privilege and argues his allegations are true.[344]

Defamation "is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation" by publishing false words.[345] "In order to be actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another."[346]

A defamation claim contains seven elements:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.[347]

Defendants generally bear the burden to prove three defenses to defamation, should they assert them:

(1) The truth of the defamatory communication.

(2) The privileged character of the occasion on which it was published.

(3) The character of the subject matter of defamatory comment as of public concern.[348]

We cannot award Mr. Ralston the damages he seeks against Attorney Garabedian because Mr. Ralston does not prove by clear and convincing evidence Attorney Garabedian published the 2018 Letters with actual malice and does not prove Attorney Garabedian's publication caused him actual reputational injury. We find Mr. Ralston proves his defamation claim against Mr. Poulos. Mr. Ralston demonstrated $50,000 in presumed damages against Mr. Poulos.

We begin by explaining our five conclusions of law which apply to Mr. Ralston's claims against both Attorney Garabedian and Mr. Poulos because the conclusions regard the 2018 Letters: (1) the 2018 Letters are defamatory *per se*; (2) the 2018 Letters applied to Mr. Ralston; (3) the recipients of the 2018 Letters understood the 2018 Letters' defamatory meaning; (4) the recipients of the 2018 Letters understood they applied to Mr. Ralston; and (5) the allegations contained in the 2018 Letters are false.

We next explain our three conclusions of law applicable only to Mr. Ralston's claim against Attorney Garabedian: (1) Attorney Garabedian published the 2018 Letters, (2) the judicial privilege does not protect Attorney Garabedian's publication, and (3) Mr. Ralston is not entitled to a damages judgment against Attorney Garabedian because Attorney Garabedian did not publish the 2018 Letters with actual malice and the publication did not cause Mr. Ralston actual reputational injury.

We then explain our five conclusions of law applicable only to Mr. Ralston's claim against Mr. Poulos: (1) Mr. Poulos published false allegations to Attorney Garabedian and authorized Attorney Garabedian's republications of the allegations in the 2018 Letters; (2) Mr. Poulos's publication caused Mr. Ralston special harm; (3) the judicial privilege does not protect Mr. Poulos's publication to Attorney Garabedian; (4) Mr. Poulos abused any conditional privileges which might attach to his publication because he spoke with actual malice; and (5) Mr. Ralston demonstrates $50,000 in presumed damages but no punitive damages against Mr. Poulos.

### A. Mr. Ralston established the 2018 letters contained defamatory statements.

Mr. Ralston claims Attorney Garabedian and Mr. Poulos defamed him by publishing the 2018 Letters.[349] So we begin by analyzing the content contained in the 2018 Letters. We find: (1) the 2018 Letters are defamatory *per se*; (2) the 2018 Letters applied to Mr. Ralston; (3) the recipients of the 2018 Letters understood the 2018 Letters' defamatory meaning; (4) the recipients of the 2018 Letters understood they applied to Mr. Ralston; and (5) the allegations contained in the 2018 Letters are false.

#### 1. The 2018 Letters are defamatory *per se*.

We first examine whether the 2018 Letters are defamatory. A communication is defamatory if it "tends to harm an individual's reputation so as to lower him in the estimation of the community or [to] deter third persons from associating or dealing with him."[350] Some communications are so obviously defamatory Pennsylvania courts consider them "defamation *per se*."[351] A communication is defamatory *per se* if it imputes "(1) [a] criminal offense, (2) [a] loathsome disease, (3) business misconduct, or (4) serious sexual misconduct."[352]

The 2018 Letters are defamatory *per se* by accusing Mr. Ralston of criminal offenses and serious sexual misconduct. Mr. Poulos and Attorney Garabedian in the April 11 Letter accused Mr. Ralston of "repeatedly sexually molest[ing]" Mr. Poulos when he was between fifteen and

seventeen years old. And Mr. Poulos and Attorney Garabedian in the December 26 Letter accused Mr. Ralston of "sexually abus[ing]" Mr. Poulos while he attended The Hill School by "among other things, fondling Mr. Poulos's penis and testicles, skin on skin; Mr. Ralston making Mr. Poulos fondle Mr. Ralston's penis and testicles, skin on skin; Mr. Ralston putting his mouth on Mr. [Poulos's] penis; and Mr. Ralston making Mr. Poulos put his mouth on Mr. Ralston's penis." These accusations comprise both criminal conduct and serious sexual misconduct.[353] They are defamatory *per se*.[354]

### 2. The 2018 Letters applied to Mr. Ralston.

Mr. Ralston must show the 2018 Letters applied to him. He does so. The 2018 Letters clearly applied to Mr. Ralston because they contained accusations Mr. Ralston sexually abused Mr. Poulos.

### 3. The recipients of the 2018 Letters understood their defamatory meaning.

Mr. Ralston must show the recipients of the 2018 Letters understood their defamatory meaning. Again, he does so. The 2018 Letters contain allegations Mr. Ralston sexually abused Mr. Poulos. Anyone who read the 2018 Letters would understand they accused Mr. Ralston of sexually abusing Mr. Poulos. And those who read the 2018 Letters would understand this meaning to be defamatory because accusations of criminal conduct and serious sexual misconduct are defamatory *per se*. Everyone who read the 2018 Letters understood their defamatory meaning.

### 4. The recipients of the 2018 Letters understood they applied to Mr. Ralston.

Mr. Ralston must show the recipients of the 2018 Letters understood their defamatory content applied to Mr. Ralston. He does so. The 2018 Letters contained allegations Mr. Ralston sexually abused a minor. Anyone who read the letters would understand they applied to Mr. Ralston because they named him.

**5.   The allegations contained in the 2018 Letters are false.**

We next must decide whether the allegations in the 2018 Letters are false.[355] Truth is an "absolute defense" to defamation.[356] Attorney Garabedian and Mr. Poulos must show "substantial, rather than complete, truth."[357] "[T]he falsity of an allegedly defamatory statement must go to the gist or sting of the defamation."[358] "The test is whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced."[359]

The adduced evidence requires we find the allegations contained in the 2018 Letters are false. We so determine after carefully evaluating Mr. Poulos's credibility during our bench trial. We first detail Mr. Poulos's testimony. We then explain we disbelieve him for three reasons: (1) Mr. Poulos is incredible; (2) the unrebutted, credible expert testimony of Barbara Ziv, M.D. shows Mr. Poulos acts inconsistently with studied behaviors of teenage sexual abuse survivors; and (3) Dr. Ziv's testimony shows Mr. Ralston acts inconsistently with studied behaviors of men who sexually abuse teenagers.

**a.   Mr. Poulos's testimony.**

We describe Mr. Poulos's testimony to describe background and not to suggest its truth. We begin noting Mr. Poulos undisputedly suffered under substantial pressure and anxiety in testifying and suffered in overcoming addictions and adjusting to adult life. We, like any independent person, could not help but be affected by Mr. Poulos's difficulties. But our question is whether he credibly accused Mr. Ralston of sexually abusing him. We find he did not.

Mr. Poulos grew up in Milwaukee.[360] He became the fourth member of his family to attend The Hill School beginning in 1993.[361] He met Mr. Ralston during his freshman year at The Hill School through Mr. Zwerner.[362] Mr. Poulos did not interact with Mr. Ralston his freshman year.[363]

Mr. Ralston allegedly began abusing Mr. Poulos during his sophomore year. Mr. Ralston taught Mr. Poulos geometry in the first floor of a building called "Upper School" near the middle of The Hill School's campus.[364] Mr. Ralston made Mr. Poulos "feel uncomfortable" around October of Mr. Poulos's sophomore year by making Mr. Poulos stay behind after class "for no apparent reason."[365] Mr. Ralston picked on Mr. Poulos by making him take geometry quizzes on the blackboard while Mr. Poulos's classmates took quizzes sitting down.[366] Mr. Ralston also rubbed Mr. Poulos's shoulders during class.[367]

During the first instance of sexual abuse, Mr. Ralston walked up behind Mr. Poulos, shut the door, grabbed him by the arm, put Mr. Poulos in the back corner of the classroom, "and made advances toward[]" Mr. Poulos.[368] Mr. Poulos "froze."[369] Mr. Ralston "groped" Mr. Poulos's genitalia, made him "perform fellatio," and performed "fellatio" on Mr. Poulos.[370] Mr. Ralston repeated this process "on multiple occasions."[371]

Mr. Ralston allegedly sexually abused Mr. Poulos "over ten times."[372] It always occurred in the corner of the geometry classroom where passersby could not see.[373] The abuse only occurred when geometry fell as the last day of class once a week on The Hill School's rotating class schedule.[374] Mr. Ralston either "groped" Mr. Poulos "or forced [him] to perform fellatio."[375] Mr. Ralston allegedly ejaculated in Mr. Poulos's mouth during one occasion.[376] Mr. Ralston then "acted like nothing happened."[377]

Mr. Poulos testified he could only recall "general events, not specifics" about the abuse because he has tried to "bla[c]k out everything that happened" to him for the past twenty-five years.[378] He could not recall which day of the week the abuse occurred because he has "done [his] best for the past [twenty-seven] years to black out the entire fact" he attended The Hill School.[379] He "hadn't thought about this situation for over [twenty] years" before receiving Headmaster

Lehman's 2016 letter.[380] Mr. Poulos could not describe Mr. Ralston's penis because the abuse occurred so long ago.[381] He could not recall whether Mr. Ralston had an erection during the incidents of abuse because "it was too surreal" it "was actually happening."[382] He also felt uncomfortable testifying about the abuse to a room full of strangers.[383]

Mr. Poulos left The Hill School after his sophomore year to attend Marquette in Wisconsin for his junior year. Mr. Poulos returned to The Hill School for his senior year. Mr. Ralston did not abuse Mr. Poulos when he returned to The Hill School for his senior year.[384] Mr. Ralston only "intimidate[d]" him.[385]

But there is one incident everyone seems to remember. Mr. Poulos vividly described a "car incident" in which Mr. Ralston blocked Mr. Poulos's car one weekend during his senior year when his mother Mrs. Poulos happened to be in town. Mr. Poulos owned a Chevrolet Camaro.[386] He obtained permission to drive it on campus.[387] The facts about the car incident are then disputed. According to Mr. Ralston, Mr. Ralston saw Mr. Poulos's car parked where he did not have permission to park on a weekend.[388] Mr. Ralston then used his own car to block Mr. Poulos's car so Mr. Poulos could not remove his car before the dean addressed discipline for Mr. Poulos's violations.[389] Mr. Poulos told a different story. He testified he obtained permission from the dean of students to park the car on campus overnight and planned to drive it off-campus so he could see his mother, who visited from Wisconsin for the weekend.[390] Mr. Poulos said Mr. Ralston said, "'Screw it. I'm going to park my shitty Subaru behind his car and keep him here,' even though he knew my mother was there only for one night and kept me away from her."[391]

Everyone agrees Mr. Poulos received psychological treatment. He met with therapists to "progress as a person," "not be so angry," and remove the memories from "the back of my mind where it[] fester[ed] like a cancer."[392] Mr. Poulos testified he first reported the abuse to Mrs. Poulos

around 2012 or 2013.[393] But Mr. Poulos did not specify who abused him and did not specify sexual abuse; he simply told his mother he had been "assaulted."[394] Mr. Poulos tearfully testified he did not tell anyone about the abuse when it occurred because he feared disappointing people.[395] Mr. Poulos understood his family's pride in attending The Hill School.[396] Mr. Poulos felt he would "let them down" if he disclosed the abuse.[397] Telling his family members "face-to-face wasn't something" Mr. Poulos "was strong enough to do."[398]

Having described Mr. Poulos's testimony, we now explain why we disbelieve it.

### b.  Mr. Poulos's testimony regarding the alleged abuse is not credible.

We determine Mr. Poulos's credibility by considering five factors in order of their present importance: (1) how reasonable the witness's testimony is when considered in the light of other evidence we believe; (2) whether the witness is contradicted by anything the witness said or wrote before trial or other evidence; (3) whether the witness has an interest in the outcome of the case or any motive, bias or prejudice; (4) the quality of the witness's understanding and memory; and (5) the witness's manner while testifying.[399]

All five of these factors lead us to conclude Mr. Poulos fabricated the allegations concerning Mr. Ralston.

### i.  Mr. Poulos's story offends our common sense.

We first must determine whether Mr. Poulos's testimony about sexual abuse in the geometry classroom is reasonable after comparing it to other evidence we believe. We apply our common sense to make this determination.[400] We weigh evidence by comparing it to our "everyday experience with people and events."[401]

Our common sense and everyday experience strongly tell us Mr. Poulos fabricated the sexual abuse allegations against Mr. Ralston. Mr. Poulos's recitation is inherently absurd. He claimed Mr. Ralston sexually assaulted him ten times after geometry class shortly after the

41

remainder of his class exited the classroom. The abuse occurred in broad daylight. It occurred while Upper School bustled with students preparing for sports. Mr. Poulos claimed Mr. Ralston locked the door to the geometry classroom, and then abused him in a corner of the room where no one could see through the window. Mr. Ralston presented as a calm, risk-averse, and cautious teacher, husband, and father. But believing Mr. Poulos's story requires us to believe Mr. Ralston took the biggest risk imaginable for a teacher and father. Mr. Poulos claimed Mr. Ralston brazenly abused him when anyone could have knocked on the door, heard the abuse, or unlocked the door. Common sense and Dr. Ziv's compelling opinion tell us those who commit abhorrent sex crimes wish to avoid getting caught.[402] And The Hill School's thorough investigation into historical allegations of sexual abuse at The Hill School uncovered nothing about Mr. Ralston.

Mr. Poulos's story also appears impossible. Mr. Poulos golfed as an extra-curricular activity his sophomore year. Mr. Poulos never showed up late to golf practice or missed a single golf practice during his sophomore year. Golf practice occurred about twenty minutes after class. Mr. Poulos told us Mr. Ralston abused him only when geometry fell as the last class period of the day. This means the abuse could only occur within a twenty-minute window between the end of geometry class and Mr. Poulos's timely arrival to golf practice. Mr. Poulos attended geometry class in a building on the middle of campus, but the golf practice occurred on the far north side of campus. So, to believe Mr. Poulos, we would need to believe Mr. Ralston could wait until students left the geometry classroom, pull Mr. Poulos to the corner of the classroom, fellate Mr. Poulos, and make Mr. Poulos fellate him; then Mr. Poulos could return to his dorm room, change for golf practice, and trek to the far north side of campus—all in fewer than twenty minutes, every time. Counsel repeatedly asked us to review the campus map when evaluating testimony regarding

distances between the buildings.[403] After doing so, we find this conduct is extremely unlikely to have happened.

The circumstances giving rise to Mr. Poulos's allegations almost twenty-five years later are also extremely suspect. It seems experienced litigation attorney Mrs. Poulos provoked her son to accuse Mr. Ralston despite having no evidence Mr. Ralston abused him. When Mr. Poulos first mentioned he suffered an "assault" to his mother, he was "hysterical," "lashing out," and "beside himself with pain." He was drinking heavily and acting unpredictably. Mr. Poulos fell into a coma from alcohol poisoning a few months later. Mrs. Poulos reasonably worried about her son. But this worry generated unreasonable inferences. Mrs. Poulos somehow leaped to infer her son had not only suffered sexual abuse, but also suffered sexual abuse at The Hill School. She so inferred even though Mr. Poulos never told her "anything about when, where, how, [and] who." After Mrs. Poulos received Headmaster Lehman's 2016 letter, she "tenacious[ly]" endeavored to find out "who had done this to [her] son"—even though her son never said what "this" was. And she did so without consulting Mr. Poulos, fearing "it was too hard on" him to discuss it. Mrs. Poulos emailed a reporter for *The New York Times*, contacted a lawyer, and obtained Mr. Poulos's Hill School yearbooks to uncover what happened. She remembered a vague incident in which she watched a teacher stop another student from interrupting Mr. Poulos as he answered a question in geometry class. This memory, coupled with Mr. Poulos's declining grades his sophomore year, triggered Mrs. Poulos to ask The Hill School who taught geometry to her son. Mrs. Poulos "suspected" Mr. Ralston "was the one" who abused Mr. Poulos. It seems Mrs. Poulos confirmed her theory Mr. Poulos suffered sexual abuse at The Hill School when Headmaster Lehman sent his 2017 letter about historical allegations of abuse. Mrs. Poulos contacted Attorney Garabedian without telling her son. Her inferences triggered the events bringing us here.

Mrs. Poulos catalyzed Mr. Poulos's allegations against Mr. Ralston with no evidence—not even her son's say-so. She simply put "two and two together." We heard no credible evidence Mr. Poulos told anyone Mr. Ralston abused him until speaking to Attorney Garabedian. There is no evidence Mr. Poulos knew of Attorney Garabedian or ever considered contacting him but for his mother's encouragement. We cannot judge Mrs. Poulos's credibility because we only possess her deposition transcript. And we cannot speculate as to how she persuaded herself Mr. Poulos suffered sexual assault by putting "two and two together." But her incessant acts based on tenuous (at best) inferences at least form another entry in the long list of reasons we disbelieve Mr. Poulos.

### ii.    Mr. Poulos's testimony contradicted itself, his previous statements, and his conduct.

We next determine whether Mr. Poulos's testimony contradicts his other actions. It does.

Mr. Poulos could not maintain a consistent story regarding the alleged abuse during his testimony. He first testified Mr. Ralston groped him, fellated him, and made him fellate Mr. Ralston during the first instance of abuse. But Mr. Poulos later testified the first instance of abuse "was by touch only."[404] Then he testified he did not "recall exactly everything that happened on the first occasion" and could only "remember certain parts of it."[405] Mr. Poulos first testified Mr. Ralston abused him at least ten times, but later testified the abuse occurred between five to ten times. Yet he told Attorney Gaul in December 2018 the abuse occurred between ten to fifteen times. Mr. Poulos claims the sexual abuse "destroyed [his] entire life,"[406] but could not testify as to any specifics about the abuse. He offered only vague and inconsistent details. Mr. Poulos testified the abuse made him miss sports during his sophomore year, but he had perfect attendance at sports practices.[407]

Mr. Poulos's testimony contradicted details he told Attorney Garabedian and swore to at his deposition. He told Attorney Garabedian in December 2017 the abuse occurred during his

freshman and sophomore year in a "study room," "cubicles," and in his dorm room.[408] But Mr. Poulos testified at trial the abuse only occurred during his sophomore year. And it only occurred in the geometry classroom after class. During his deposition, he swore Mr. Ralston once abused him in a Hill School dorm room by coming to the dorm and rubbing his shoulders.[409] Yet we heard nothing about this alleged incident during trial; Mr. Poulos instead testified the abuse only occurred in the geometry classroom.

Mr. Poulos's testimony also contradicted his conduct. Mr. Poulos did things we would never expect of someone who suffered abuse from Mr. Ralston. For example, Mr. Poulos wrote a positive anonymous review of Mr. Ralston after his sophomore year (but before the car incident).[410] Mr. Poulos wrote he "would recommend" Mr. Ralston to other students.[411] Mr. Poulos provided an absurd explanation for this during trial: Mr. Ralston was a "good teacher," but this did not mean he was a "good person."[412] It is inconceivable a student would anonymously recommend Mr. Ralston to others after suffering serial sexual abuse at Mr. Ralston's hands, then defend the recommendation twenty-five years later by arguing a serial child abuser can be a "good teacher" but not a "good person."[413] Mr. Ralston also visited The Hill School with a girlfriend after he graduated because he wanted to "show her where [he] went to school."[414] Mr. Ralston voluntarily gave his girlfriend a tour of the campus.[415] Yet Mr. Poulos testified during trial he has done "everything in [his] possible power to forget every instance of [him] even being on that school campus."[416] Voluntarily returning to campus to provide a tour belies Mr. Poulos's apparent attempts to black out every instance of attending The Hill School.

Mr. Ralston's credibility undermines Mr. Poulos's credibility. Mr. Ralston testified forcefully he never abused Mr. Poulos. Mr. Ralston's memories of discovering the abuse are vivid, showing they pained him. He reacted to the allegations like we would expect someone falsely

accused to react: by seeking solace from family, friends, and colleagues. Had Mr. Ralston committed the abuse, we expect he would not broadcast them, fearing others would discover the allegations' truth. The Hill School's investigation into historical allegations of child sexual abuse never implicated Mr. Ralston at any time. We believe his testimony.

We do not suggest everything Mr. Poulos said was unbelievable. We found Mr. Poulos credible when he testified he failed to meet the high expectations of his family members. He displayed genuine emotion during this testimony. This testimony, however, extrapolated a dishonest conclusion (Mr. Ralston abused Mr. Poulos) from an honest premise (Mr. Poulos's feelings of inadequacy regarding his Hill School experience). We believe Mr. Poulos feared disappointing his family by failing to succeed at The Hill School, which triggered his genuine emotion. But we disbelieve sexual abuse generated this fear.

### iii.   Mr. Poulos had an interest in the outcome of the case and possessed bias against Mr. Ralston because of the car incident.

We next consider Mr. Poulos's biases, motives, and prejudices influencing his testimony. We find Mr. Poulos possessed abundant reasons to lie about the abuse.

For starters, truth is an absolute defense to Mr. Ralston's defamation claim against him. If we believe Mr. Poulos, Mr. Ralston loses his case. Mr. Poulos had incentive to lie to win this case.

Mr. Poulos also had incentive to repeat the story. Mr. Poulos had claimed Mr. Ralston abused him for over four years before our trial in January 2022. Mr. Poulos repeated the claim many times: to Attorney Garabedian, Attorney Garabedian's associates, counsel during depositions, to the Court and the gallery during his testimony, and throughout his public filings in this case. Mr. Poulos possessed a strong incentive to continue the fiction lest he be branded a liar.

Mr. Poulos also possessed a fundamental prejudice against Mr. Ralston: retribution for the "car incident." Mr. Poulos loved his Camaro and the freedom and status it provided him as a high

school student. Mr. Poulos testified his mother promised him a car if he returned to The Hill School after transferring.[417] He called receiving a car "a mighty proposition" for a 17-year-old boy.[418] Mr. Ralston's act of blocking Mr. Poulos's car, making Mr. Poulos unable to use it, infuriated Mr. Poulos—especially on the only night he could see his visiting mother.

The car incident still upset Mr. Poulos twenty-five years later. The car incident assumed a prominent role in this case; Dr. Ziv aptly called it "that infamous car parking incident."[419] Mr. Poulos reported the incident to Attorneys Garabedian and Mahoney during his intake interview, then reported it again one year later to Attorney Gaul.[420] Mr. Poulos and Mr. Ralston described the car incident during their depositions and trial testimony. When Attorney Rees asked Mr. Ralston about Mr. Poulos, Mr. Ralston remembered almost nothing about him except the car incident. Mr. Poulos reported the car incident to Dr. Ziv when she evaluated him. While testifying about the details of the purported sexual abuse, Mr. Poulos, when asked why he did not tell Mr. Ralston to stop, said: "I honestly don't know why I didn't just leave. I honestly don't know why I didn't call the police when [Mr. Ralston] entrapped my vehicle when I was [eighteen]. I don't know a lot of reasons why I didn't do a lot things twenty-five years ago."[421] Twenty-five years passed since the car incident, but it remained so crucial to Mr. Poulos's memories of Mr. Ralston he mentioned it—unprompted—in the middle of recounting purported sexual abuse.

Mr. Poulos considered the car incident itself an act of abuse. Counsel asked Mr. Poulos if he endured "any other types of abuse that are not sexual" from Mr. Ralston.[422] Mr. Poulos answered by describing the car incident in detail.[423] Mr. Poulos's demeanor when describing the car incident changed dramatically from his demeanor while describing the purported sexual abuse. When describing the sexual abuse, Mr. Poulos appeared unsure and could not remember specific details about it—even though he claimed it "destroyed [his] entire life." But Mr. Poulos vividly

remembered the car incident. He recalled specific details about it, testifying how the dean permitted Mr. Poulos to drive a car on campus, Mr. Ralston parked his "shitty Subaru" to "entrap" Mr. Poulos's car, and Mr. Ralston knew he would keep Mr. Poulos away from his visiting mother by doing so.[424] Mr. Poulos considered this "abuse."

The car incident seemed to motivate Mr. Poulos to accuse Mr. Ralston of sexual abuse. We, of course, recognize how ridiculous it is to accuse someone of sexual assault because of such a minor incident some twenty-five years earlier. Other motives also likely influenced Mr. Poulos's false allegations against Mr. Ralston. But the prominence of the car incident during this litigation, Mr. Poulos's vivid memories of it, and Mr. Poulos's anger while testifying about it at least show Mr. Poulos possessed animus toward Mr. Ralston.

### iv.   Mr. Poulos possessed poor memory of the alleged abuse.

We next examine the quality of Mr. Poulos's memory. We find it poor. Mr. Poulos often testified he could not recall specifics of the abuse. Mr. Poulos barely even provided generalities about the abuse. For example, Mr. Ralston possesses a distinctive birthmark, a patch of differently colored hair on the top of his head. This is something one would see if the top of someone's head was positioned at or near one's waist. Mr. Poulos never mentioned this birthmark when he described Mr. Ralston to Attorney Garabedian. If Mr. Poulos's abuse stories are true, Mr. Poulos would likely have mentioned the birthmark when describing the appearance of Mr. Ralston.

Mr. Poulos also could not provide specificity when testifying about the abuse. He frequently appeared unsure of critical details. We readily recognize the difficulty abuse victims face in testifying about their trauma. We are not suggesting abuse victims who cannot recall details necessarily fabricate their harm. We also do not suggest Mr. Poulos's delayed reporting of the incident makes him incredible; "[d]elayed reporting is very common"[425] and our common sense tells us disclosing an extremely traumatic incident may take time or never happen at all. But false

allegations against persons demonstrably not abusing students harm not only the accused but also victims who courageously step forward and credibly identify those who harm them. Mr. Poulos could not provide facts substantiating his allegations. We cannot credit them.

### v.   Mr. Poulos presented as defensive and pugnacious.

We must examine Mr. Poulos's manner while testifying. His manner rendered him unbelievable because he presented as knowing he was lying. He acted defensively from the moment he started testifying. He made insolent or sarcastic remarks. He bickered with Mr. Ralston's counsel about insignificant matters.[426] Were Mr. Poulos speaking honestly, we expect he would eschew trivialities and testify directly about the incident which he claimed ruined his life. For example, Mr. Poulos testified forthrightly about the car incident, his work obligations which forced him to testify virtually, and his difficult experiences after graduating college. But Mr. Poulos could not testify forthrightly about conduct in his geometry classroom. We find Mr. Poulos incredible as to his claim Mr. Ralston sexually abused him.

### c.   Dr. Ziv's unrebutted, credible expert testimony shows Mr. Poulos acted inconsistently with studied behaviors of teenage sexual abuse survivors.

Barbara Ziv, M.D. is a forensic psychiatrist. She teaches forensic psychiatry to residents at Temple University, specifically about the behaviors of sex offenders and victims of sexual assault.[427] She specializes in treating and evaluating both victims and perpetrators of sexual abuse.[428] She has evaluated more than one thousand convicted sex offenders and thousands of victims of sexual abuse.[429] Dr. Ziv possesses sterling qualifications in her field.[430] We qualified Dr. Ziv before trial as an expert in "behaviors of abuse victims" and "child sex abuser[s]."[431]

Dr. Ziv examined Mr. Poulos and opined his "behaviors are not consistent with an individual who has been sexually assaulted."[432] We find Dr. Ziv's opinion highly credible.

Dr. Ziv testified about well-studied behaviors of teenage boys who survive teenage sexual abuse. Survivors often delay reporting the abuse.[433] But delayed reporting "should not be confused" with faulty memory.[434] An abuse victim would recall the abuse as a "[t]raumatic memory," which differs from ordinary memories.[435] When trauma is occurring, the brain narrows its focus on "survival" and ignores peripheral matters.[436] If someone threatens another with a knife, for example, the person being threatened will focus on the knife and ignore the paintings on the wall and the color of the rug.[437] The brain then stores these vivid survival-related memories "robustly" and "accurately . . . maybe forever."[438] Repressing these traumatic memories is difficult.[439] The "central elements" of the traumatic memory do not change.[440] A teenage abuse victim, for example, will often register at least the first instance of abuse as traumatic and forever recall events "central" to the abuse.[441] For example, abuse victims recall the abuser's genitals and whether he ejaculated because these details are "central" to the traumatic event.[442] Abuse victims often avoid the place where the abuse occurred to avoid triggering the memory.[443]

Mr. Poulos's behaviors contrast with the studied behaviors Dr. Ziv described. Mr. Poulos testified the abuse traumatized him. If this is true, Mr. Poulos would have at least registered the first act of abuse as a traumatic memory. This means Mr. Poulos would "robustly" and "accurately" remember central elements of the trauma. But Mr. Poulos remembered little about the abuse. Mr. Poulos repeatedly testified he cannot recall specifics about the abuse, only generalities.[444] Counsel asked Mr. Poulos about events which would be "central" to the abuse. For example, counsel asked Mr. Poulos about whether Mr. Poulos unbuttoned Mr. Ralston's pants, the size and shape of Mr. Ralston's genitals, whether Mr. Ralston had an erection, how it felt to fellate Mr. Ralston, whether Mr. Ralston ejaculated, and whether Mr. Ralston locked the door before abusing him. In response to almost all these questions, Mr. Poulos responded he did not remember.[445] An abuse victim

registering the abuse as traumatic—which Mr. Poulos claims he did—would likely remember these central details. Mr. Poulos testified he cannot remember specifics because he tried to black out the abuse. But Dr. Ziv testified it is "very difficult" for abusers to successfully "repress" memories of trauma.[446]

Mr. Poulos also did not avoid the place of abuse to avoid triggering traumatic memories as abuse survivors do. Mr. Poulos instead transferred back to The Hill School from Wisconsin for his senior year so his mother would buy him a car—the same Camaro from the car incident. He not only returned to The Hill School but lived on the same floor in the same building as Mr. Ralston during his entire senior year. Mr. Poulos did nothing to avoid this arrangement. And Mr. Poulos voluntarily returned to The Hill School after graduating because he wanted to give his girlfriend a tour.

We heard no evidence rebutting Dr. Ziv's opinion. Attorney Garabedian presented the expert testimony of psychiatrist Frank Fetterolf, M.D., who examined Mr. Poulos and opined Mr. Poulos suffers from post-traumatic stress disorder and borderline personality disorder.[447] Dr. Fetterolf testified both disorders can develop after trauma occurs.[448] Dr. Fetterolf opined "childhood sexual abuse" best "explains" Mr. Poulos's psychiatric diagnoses.[449] But, with due respect to Dr. Fetterolf's ample psychiatric qualifications, his qualifications regarding study of sexual abuse survivors and offenders are incomparable to Dr. Ziv's.[450] Dr. Fetterolf did not rebut Dr. Ziv's findings regarding the studied behaviors of sexual abuse victims. Dr. Fetterolf simply opined childhood sexual abuse could have caused Mr. Poulos's symptoms. We assign this opinion little weight given the lack of detail compared to Dr. Ziv's compelling testimony. Dr. Fetterolf is undoubtedly qualified but could not rebut Dr. Ziv's opinions.

### d. Dr. Ziv persuades us Mr. Ralston acts inconsistently with the studied behaviors of sexual abusers of teenagers.

Dr. Ziv examined Mr. Ralston and opined he does not behave "consistent[ly] with a sex offender or a man who sex offends against a child or a teenager."[451] We again find Dr. Ziv's opinion highly credible.

Dr. Ziv explained "by far and away" the "most common" method adults use to sexually abuse teenage boys is "the process of grooming behaviors."[452] An adult grooms a victim by assuming a role of "mentor . . . of guidance, of friend, counselor."[453] The adult makes the child feel "special" by providing a "shoulder to cry on" and being the child's "biggest fan."[454] Adults treat the victim specially by, for example, buying them lunch or providing extra tutoring.[455] The adult does this to establish a "connection and a trusting relationship."[456] This trust permits a "cognitive distortion" within the abuser, allowing him to think he is in a "relationship" with his victim.[457] The trust allows the abuser to "break down those barriers that naturally exist" by developing "growing intimacy" with the victim.[458] For example, an abuser might go camping with his victim, develop a ruse to get naked with the victim like jumping into a pond, and ultimately assault the victim.[459] The grooming prevents the victim from fighting the eventual abuse because it entails a "step-wise" process through which the victim becomes "comfortable with being touched."[460] After the abuse, the groomed victim "feels that they [had] some agency in [the abuse] and some degree of responsibility for it because they liked" the abuser and "let it happen."[461]

We heard no evidence Mr. Ralston groomed Mr. Poulos. Mr. Poulos described none of the grooming behaviors Dr. Ziv described. Mr. Ralston never gave Mr. Poulos gifts.[462] Mr. Ralston never saw Mr. Poulos off-campus.[463] Mr. Ralston never contacted Mr. Poulos after he transferred schools.[464] Mr. Poulos and Mr. Ralston shared no "relationship," let alone the intimate relationship abusers typically groom. Mr. Ralston treated Mr. Poulos like he treated any other student.

And Mr. Poulos's theory leads us to find Mr. Ralston acted opposite how a child abuser would act by antagonizing—rather than grooming—Mr. Poulos. Dr. Ziv testified "antagonistic" behaviors are "not expected" from abusers because they inhibit grooming and increase the likelihood of getting caught.[465] Abusers do not "go out of [their] way to do something that may increase the likelihood that [they] would be caught."[466] But Mr. Ralston did just this if we credit Mr. Poulos's testimony. Mr. Poulos argued in his post-trial briefing Mr. Ralston "would humiliate" and "intimidate[]" him.[467] For example, according to Mr. Poulos, Mr. Ralston forced him to take geometry quizzes on the blackboard while his classmates took quizzes in their seats. Mr. Ralston regularly made Mr. Poulos stay after class. And the car incident so antagonized Mr. Poulos it still bothered him twenty-five years later. Mr. Ralston would not "go out of [his] way" to alienate Mr. Poulos if Mr. Ralston truly abused him because it would draw The Hill School's attention to Mr. Ralston's relationship with Mr. Poulos and make him more likely to get caught.

Dr. Ziv also credibly opined grooming is not the only way abusers victimize children. Some abuse occurs abruptly without grooming.[468] But the victims of such abuse are more likely to exhibit the "natural response . . . to recoil" upon suffering abuse.[469] These victims are "absolutely," "without question" more likely to report the abuse because the abuser never developed trust with the victim by grooming.[470] But this type of abuse is also unlikely because Mr. Poulos did not report the abuse for over twenty years. Mr. Poulos claimed he did not report the abuse because he feared disappointing his family. But this explanation comports with victims who have been groomed, not victims who suddenly suffer assault.[471]

Mr. Ralston abusing Mr. Poulos so recklessly further contradicts studied behaviors of abusers. Dr. Ziv testified abusers assault children "in places where they are unlikely to be discovered," like "a hotel room," "car," or "early in the morning" at a remote campus location.[472]

Abusers do this to avoid getting caught and to ensure enough time to derive "pleasure from these sexual acts" by allowing the sexual act to "come to completion."[473] Yet Mr. Ralston apparently abused Mr. Poulos in a public classroom, in broad daylight, in a bustling building at the heart of campus filled with students and teachers. Dr. Ziv's testimony confirms our common-sense findings it is unlikely Mr. Ralston would abuse Mr. Poulos in this way.

We can never know exactly what, if anything, happened on The Hill School campus between Mr. Poulos and Mr. Ralston besides the car incident. We do not suggest Mr. Poulos fabricated his pain. He appeared to our untrained eye to be suffering. The crucible of depositions and trial could not have helped. But we have no basis to find Mr. Ralston caused Mr. Poulos's suffering. We reach this conclusion following months of reading and re-reading the admitted testimony and carefully evaluating the credibility of Mr. Poulos, Mr. Ralston, the undisputed expert opinions of Dr. Ziv, and dozens of exhibits during trial.

Our findings today should not be read in any way as dissuading persons from reporting abuse. If anything, our findings should do the opposite by confirming trials exist to discover the truth. Overwhelming evidence confirms the truth is Mr. Ralston did not sexually abuse Mr. Poulos.

**B. Attorney Garabedian is not entitled to the judicial privilege for the 2018 letters but Mr. Ralston is not entitled to damages from Attorney Garabedian.**

We now examine Mr. Ralston's defamation claim against Attorney Garabedian. We reach three conclusions confirming Attorney Garabedian does not owe damages to Mr. Ralston: (1) Attorney Garabedian published the 2018 Letters; (2) the judicial privilege does not protect Attorney Garabedian's publication, and (3) Mr. Ralston is not entitled to a damages judgment against Attorney Garabedian because Attorney Garabedian did not publish with actual malice and the publication did not cause Mr. Ralston actual reputational injury.

**1. Attorney Garabedian published the 2018 Letters.**

"Publication of defamatory matter is the intentional or negligent communication of such matter to one other than the person defamed."[474] "Any act by which the defamatory matter is intentionally or negligently communicated to a third person is a publication."[475]

Attorney Garabedian published the 2018 Letters because he intentionally communicated them to Headmaster Lehman and Attorney Rees. Attorney Garabedian published the April 11 Letter to Headmaster Lehman by sending the April 11 Letter to Headmaster Lehman. And Attorney Garabedian published the December 26 Letter to Attorney Rees by sending the December 26 Letter to Attorney Rees. These acts constitute publication.

**2. The judicial privilege does not protect Attorney Garabedian's publication.**

Attorney Garabedian argues the judicial privilege protects his publication of the 2018 Letters because he and Mr. Poulos seriously considered litigation before Attorney Garabedian sent the 2018 Letters. Attorney Garabedian argues he told Mr. Poulos Pennsylvania's statute of limitations governing Mr. Poulos's potential claims had expired when Mr. Poulos retained him, but a movement to amend the statute had developed great momentum and he would sue as soon as the statute changed. Mr. Ralston responds Attorney Garabedian's testimony about the statute of limitations changing is not credible, and even if it were, it does not warrant the judicial privilege as a matter of law. We agree with Mr. Ralston.

The judicial privilege entitles a person "to absolute immunity for 'communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought.'"[476] "[T]he judicial privilege is not limited to statements made in open court."[477] It also covers "less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest."[478] "The contours of the

privilege . . . have been shaped by a case-by-case evaluation of whether its application in specific circumstances is needed to advance its underlying policy objectives."[479]

The judicial privilege's policy objectives include the "fundamental societal need for justice to be administered freely and efficiently through the eliciting of speech from parties and witnesses that may be accusatory or otherwise reflect negatively upon another's character."[480] It "is an integral part of a public policy which permits all suitors, however bold and wicked, however virtuous and timid, to secure access to the courts of justice to present whatever claims, true or false, real or fictitious, they seek to adjudicate."[481]

"The essential realm of protected communication is not, however, without bounds."[482] Pennsylvania courts limit the privilege's application where the "policy considerations" animating the privilege "would not be implicated."[483] The privilege applies to "communications preliminary to a proposed judicial proceeding . . . only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding."[484] "The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."[485] "Where a declarant has no intention of initiating proceedings or otherwise obtaining a remedy, clothing his or her statement with immunity cannot serve" the judicial privilege's "goal" of "incentivizing individuals to . . . speak freely in seeking to initiate judicial or quasi-judicial proceedings."[486]

We found Attorney Garabedian did not carry his burden to show the judicial privilege applied before trial.[487] We found the contingent fee agreement signed by Attorney Garabedian and Mr. Poulos, in which they explicitly agreed they would not file a lawsuit, showed they did not

seriously consider judicial proceedings. We also found they did not seriously consider quasi-judicial proceedings because they at most sought to mediate Mr. Poulos's claims.

But we were mindful the judicial privilege "depends on the speaker's subjective intent," so "a factual inquiry into that intent may be necessary to apply the privilege."[488] We were also mindful the record contained little evidence regarding the reason why Attorney Garabedian and Mr. Poulos agreed not to sue: the expiration of the statute of limitations governing Mr. Poulos's potential claims.[489] So we permitted Attorney Garabedian to adduce evidence at trial regarding "his perception of the likelihood the statute of limitations might change."[490]

We now affirm our December 23, 2021 findings the judicial privilege does not protect Attorney Garabedian's publication of the 2018 Letters because neither Attorney Garabedian nor Mr. Poulos seriously considered judicial or quasi-judicial proceedings before Attorney Garabedian sent the 2018 Letters.

The evidence adduced at trial only strengthened our previous findings the judicial privilege does not apply. In our December 23, 2021 findings, we assumed Attorney Garabedian and Mr. Poulos seriously considered litigation at some point, but their serious consideration waned once they discovered the statute of limitations expired.[491] But the trial evidence revealed the two *never* seriously considered litigation. Mr. Poulos and Mrs. Poulos both testified they never intended to file a lawsuit. Mrs. Poulos, who contacted Attorney Garabedian first, thought a "lawsuit didn't have anything to do with" contacting Attorney Garabedian because "[w]e weren't even thinking of a lawsuit." Mrs. Poulos only would have considered a lawsuit once it "became viable"—*i.e.*, once the statute of limitations governing Mr. Poulos's claims changed. Mr. Poulos knew the statute of limitations for claims against Mr. Ralston expired before he contacted Attorney Garabedian. He contacted Attorney Garabedian so Attorney Garabedian could report his claims to The Hill

School—not to file a lawsuit. Mr. Poulos wanted to "be prepared" if the Pennsylvania General Assembly and Governor someday amended the statute of limitations, but he had no reason to believe they would do so when he contacted Attorney Garabedian. Mr. Poulos did not plan to "take legal action" against Mr. Ralston because "[t]here was no point in thinking about something that has an undetermined date." Mr. Poulos testified he "knew that no lawsuit would be filed." During Attorney Garabedian's initial discussions with Mr. Poulos in late 2017, they barely discussed a lawsuit—the attorneys simply informed Mr. Poulos the statute of limitations had expired, then moved forward.

Attorney Garabedian testified he told Mr. Poulos before he sent the April 2018 Letters a movement to change the statute of limitations governing his claims had gained "great momentum."[492] We find this testimony highly incredible for at least four reasons.

First, Mr. Poulos, who possessed a much better memory of the relevant conversations with his lawyer (as opposed to his recall of the claimed events in the geometry classroom), testified Attorney Garabedian and his associates never told him the statute of limitations would change. Mr. Poulos did not remember Attorney Garabedian telling him he contacted legislators or lobbyists about changing the Pennsylvania statute of limitations. Mr. Poulos testified Attorney Garabedian did not "directly" tell him "there was going to be a change" to the statute of limitations.[493] Although Mr. Poulos lacked credibility in other respects, we find his memory of his few interactions with Attorney Garabedian more credible than Attorney Garabedian's memory of one client amid thousands of clients claiming abuse across the country under differing statutes of limitations.

Second, Attorney Garabedian's memory of these discussions appeared non-existent. Attorney Garabedian frequently did not remember details during our bench trial. Counsel used

Attorney Garabedian's notes of his conversations with Mr. Poulos to refresh his recollection—but Attorney Garabedian, who testified virtually, would simply parrot the notes almost verbatim during his "refreshed" testimony.[494] Attorney Garabedian also testified to some non-existent facts, such as his belief Mr. Poulos's father had sexually abused him. Attorney Garabedian was also full of "I don't know"s and "I don't remembers" when asked about his discussions with Mr. Poulos during his depositions. Attorney Garabedian has represented thousands of alleged sexual abuse victims. He does not appear to remember the discussions with this alleged victim.

Third, Attorney Garabedian's notes are silent regarding discussions between Attorney Garabedian and Mr. Poulos about the statute of limitations changing before Attorney Garabedian sent the 2018 Letters. The notes are otherwise fulsome. But as to the statute of limitations, the notes merely show Attorney Garabedian told Mr. Poulos the statute of limitations had expired, so they would not sue. Attorney Garabedian's file on Mr. Poulos's matter contains no evidence he or his associates researched a change to the statute of limitations. The first time the notes show Attorney Garabedian discussing a change to the statute of limitations with Mr. Poulos is in April 2019. This is after Attorney Garabedian sent the 2018 Letters, after Attorney Rees told them The Hill School considered the matter closed, and is too little, too late.

Fourth, the expansive summary judgment record contained no evidence of Attorney Garabedian's understanding "great momentum" developed to change the statute of limitations. It is remarkably convenient Attorney Garabedian suddenly found his purported discussions about the statute of limitations relevant only after we "permit[ted] Attorney Garabedian to adduce evidence at trial regarding his perception of the likelihood the statute of limitations might change."[495] We expect we would have seen *something* about Attorney Garabedian's discussions with Mr. Poulos regarding this momentum had the discussions occurred.[496] We do not doubt a movement to change

the statute of limitations developed momentum.[497] But we deeply doubt Attorney Garabedian discussed this movement with Mr. Poulos. He is not credible on this issue. We do not credit Attorney Garabedian's eleventh-hour attempts to manufacture serious consideration of litigation.

Even if we believed Attorney Garabedian's testimony about his discussions with Mr. Poulos, however, our belief would not warrant the judicial privilege. As we found in our December 23, 2021 Memorandum, we cannot apply the judicial privilege based on "the mere potential or 'bare possibility' that judicial proceedings 'might be instituted' in the future."[498] The privilege does not protect communications made "simply as a tactical ploy to negotiate a bargain" or "as a means of obtaining a settlement."[499] But this is exactly why Attorney Garabedian sent the 2018 Letters.

Attorney Garabedian sent the 2018 Letters hoping to obtain a quick settlement of "claims" Attorney Garabedian and Mr. Poulos agreed they would not file. Attorney Garabedian told Mr. Poulos the statute of limitations prevented them from suing before he sent the April 11 Letter. Attorney Garabedian agreed he would not sue in the fee agreement governing his representation of Mr. Poulos. But Attorney Garabedian still boasted to Mr. Poulos about obtaining $500,000 for other alleged abuse victims through "settlement" despite their claims being time-barred. Attorney Garabedian tried to do the same here by bluffing about having "claims" worth $1,000,000 in the April 11 Letter. Attorney Garabedian possessed "claims" in only an abstract sense: Attorney Garabedian *could* have sued The Hill School or Mr. Ralston; the statute of limitations is an affirmative defense, and The Hill School or Mr. Ralston might not have invoked it. But Attorney Garabedian foreclosed the possibility of suing by agreeing with Mr. Poulos he would not sue. Then he threatened "claims" anyway which he would only release for one million dollars.

Attorney Garabedian's inactivity on Mr. Poulos's matter after sending the 2018 Letters confirms he sent the letters only hoping to obtain a quick settlement. Attorney Garabedian ignored Attorney Rees's outreach in April 2018 shortly after sending the April 11 Letter. Attorney Garabedian and his associates performed no work on Mr. Poulos's matter from April 2018 to September 2018. Attorney Garabedian ignored Mr. Poulos's September 2018 outreach seeking updates on his case. Attorney Garabedian provided a bizarre explanation for his ignorance of Mr. Poulos at trial: "In my area of the law, sometimes you don't speak to clients because you trigger them. . . . Sometimes you just leave the client alone, in my area of the law."[500] It seems to us ignoring a client desperate for updates about his case would be the event triggering the client.

Attorney Garabedian finally called Attorney Rees in September 2018, but the two could not connect and Attorney Garabedian resumed doing nothing on the matter. In December 2018, after receiving an angry email from Mrs. Poulos fairly asking for updates, Attorney Garabedian and his associates resumed working on Mr. Poulos's matter. But Attorney Garabedian barely did anything. He simply re-interviewed Mr. Poulos, sent the December 2018 Letter to Attorney Rees, and asked Attorney Rees to mediate the case after an investigation. Then, yet again, Attorney Garabedian resumed ignoring Mr. Poulos's matter by disregarding three emails over three months from Attorney Rees asking to begin an investigation—even though Attorney Garabedian first proposed the investigation. After ignoring Attorney Rees, Attorney Garabedian told Mr. Poulos The Hill School was "giving us the runaround." Attorney Garabedian's conclusion is curious. Attorney Garabedian proposed an investigation, yet Attorney Garabedian somehow concluded Attorney Rees's messages seeking to start the very investigation Attorney Garabedian proposed constituted "the runaround." Attorney Garabedian's pattern of inactivity and ignorance confirms

his purpose for sending 2018 Letters: obtain a quick settlement without the fact-finding process applied in trial courts.

Still more reasons to reject the judicial privilege exist. Even accepting all of Attorney Garabedian's testimony as credible—which it is not by a long shot—still does not show Attorney Garabedian or Mr. Poulos "seriously" considered judicial or quasi-judicial proceedings. At most, the evidence shows they hoped the statute of limitations might change so they could ***then*** someday seriously consider litigation. In April 2019, Attorney Garabedian told Mr. Poulos they should wait one year to see if the statute of limitations changed, then reassess. Mr. Poulos swore at his deposition he would not begin to consider a lawsuit until the statute of limitations changed. Only then would Mr. Poulos "contemplate if it's worth the time and mental energy to deal with." Applying the judicial privilege to these contingency-laden circumstances stretches the privilege too far.

Nor does Attorney Garabedian show either he or Mr. Poulos seriously considered a quasi-judicial proceeding. We earlier found no evidence Attorney Garabedian considered a quasi-judicial proceeding in our December 23, 2021 Memorandum. He considered mediation, but we found mediation is not a quasi-judicial proceeding.[501] Attorney Garabedian presented no evidence persuading us to change our view. Attorney Garabedian proposed an investigation of Mr. Poulos's claims, but this proposed investigation does not warrant the judicial privilege for two reasons. First, an investigation is not quasi-judicial unless it at least "involves the exercise of discretion and requires notice and a hearing."[502] Private procedures do not suffice.[503] Attorney Garabedian only considered a private investigation conducted by The Hill School through Attorneys Gomez and Smith. This process does not qualify as quasi-judicial. Second, even if the investigation did qualify as quasi-judicial, Attorney Garabedian did not "seriously" consider it. Attorney Garabedian

ignored Attorney Rees's invitations to begin the investigation for months. Attorney Garabedian's ignorance made Attorney Rees close Mr. Poulos's matter with no objection from Attorney Garabedian. This is not serious consideration.

As we reasoned in our December 23, 2021 Memorandum, the judicial privilege serves important policy aims. The judicial privilege likely protects most pre-suit demand letters because the attorney intends to sue. The judicial privilege might also protect pre-suit demand letters sent by attorneys threatening claims barred by the statute of limitations—if the attorney or his client seriously considered bringing the litigation in good faith. But we face different facts. Our evaluation of witness credibility confirms Attorney Garabedian and Mr. Poulos did not seriously consider judicial or quasi-judicial proceedings. We cannot infer they must have considered such proceedings simply because Attorney Garabedian happens to be an attorney. We heard no evidence Attorney Garabedian or Mr. Poulos seriously considered the procedures the judicial privilege protects. The judicial privilege does not protect the 2018 Letters.

### 3. Mr. Ralston is not entitled to a damages judgment against Attorney Garabedian because Attorney Garabedian did not publish the 2018 Letters with actual malice and the publication did not cause Mr. Ralston actual reputational injury.

Mr. Ralston seeks a damages judgment against Attorney Garabedian.[504] Private figures like Mr. Ralston may recover damages through two avenues depending on the level of fault they prove.[505] First, if the plaintiff proves the defendant published with actual malice, he may recover "presumed and punitive damages."[506] Actual malice obviates the need to prove actual reputational injury.[507] Second, if the plaintiff fails to prove actual malice, he may only recover damages by proving the defendant's publication caused "actual injury" to the plaintiff's "reputation."[508] Sans actual malice, proof of reputational injury "is a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries."[509]

Mr. Ralston proves neither actual malice nor actual injury to his reputation. We explain this finding in three parts. First, the Pennsylvania Supreme Court's decision in *Joseph v. Scranton Times L.P*[510] requires Mr. Ralston to prove either actual malice or actual reputational injury to recover damages. Second, Attorney Garabedian did not act with actual malice. Third, Attorney Garabedian did not cause Mr. Ralston actual reputational injury.

### a.   The Pennsylvania Supreme Court requires Mr. Ralston to prove either actual malice or actual reputational injury to recover damages.

We first clarify why Mr. Ralston's failure to prove actual malice or actual reputational injury dooms his claim for defamation damages.

The Pennsylvania Supreme Court exhaustively analyzed permissible damages in defamation suits approximately seven years ago in *Joseph*. The Pennsylvania Court examined the United States Supreme Court's directive "only the State's interest in protecting an individual's reputation can justify the intrusion into otherwise constitutionally protected free speech."[511] The Pennsylvania Supreme Court concluded a private-figure defamation plaintiff who does not prove actual malice must prove "actual injury" to his "reputation" as "a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries."[512] This conclusion comported with the "historical framework of defamation" and "the manner in which the law of defamation has generally been understood within [Pennsylvania's] appellate case law."[513] "[P]ermitting the recovery of damages for injuries such as mental anguish without a showing of injury to reputation subverts" the United States Supreme Court's defamation framework because "protection of an individual's reputation is the very essence of a claim for defamation."[514] These findings abrogated the Pennsylvania Superior Court's previous findings in the same case a defamation plaintiff only needed to prove reputational harm *or* personal humiliation to recover damages.[515]

Attorney Garabedian argues the Pennsylvania Supreme Court's reasoning in *Joseph* is unconstitutional under the First Amendment. Attorney Garabedian argues the First Amendment requires Mr. Ralston to prove Attorney Garabedian acted with actual malice—not merely to prove he suffered actual reputational injury—because his speech related to a matter of public concern under *Philadelphia Newspapers, Inc. v. Hepps*.[516] We disagree.

The United States Supreme Court in *Hepps* did not interpret the First Amendment to always require actual malice in defamation actions regarding matters of public concern. The Court held as a matter of First Amendment law, private-figure plaintiffs suing media defendants on matters of public concern "bear the burden of showing falsity, as well as fault, before recovering damages."[517] But the Supreme Court did not define "fault" to mean "actual malice."[518] The Court left untouched its precedents permitting states to "define for themselves the appropriate standard of liability" in defamation cases where private figures sue for defamation regarding matters of public concern.[519] And the Court strongly suggested negligence sufficed to recover damages when private figures sue on matters on public concern.[520]

The Pennsylvania Supreme Court defines the standard of liability as requiring negligence when private figures sue on matters of public concern. In *American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania*,[521] the Pennsylvania Supreme Court rejected the argument private figures must show actual malice to prove defamation when the speech "pertained to a matter of public concern."[522] The Pennsylvania Supreme Court accurately described United States Supreme Court law: "[P]ublic figures or officials . . .  must show that such statements were made with . . . actual malice, whereas states may impose liability on a lesser basis as to statements about a private figure on a matter of public concern, so long as they require some showing of

fault."[523] This "showing of fault" under Pennsylvania law is negligence.[524] This is constitutional.[525]

### b. Mr. Ralston does not meet his burden to prove Attorney Garabedian acted with actual malice.

The first way Mr. Ralston can recover damages from Attorney Garabedian is adducing clear and convincing evidence Attorney Garabedian defamed him with actual malice. The Pennsylvania Supreme Court follows the United States Supreme Court's definition of actual malice.[526] "'Actual malice' is a term of art that does not connote ill will or improper motivation."[527] "Actual malice exists where a statement [is] made with either: (1) knowledge of its falsity; or (2) reckless disregard to its truth or falsity."[528] "[T]he question of actual malice is a subjective inquiry as to the defendant's belief to be made by the finder of fact."[529] Mr. Ralston must prove actual malice by "clear and convincing evidence."[530] "This standard requires evidence 'so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy of the truth of the precise facts in issue.'"[531] "This is a difficult burden to meet, and . . . it is not met by a showing of mere carelessness or negligence."[532]

Mr. Ralston did not adduce clear and convincing evidence Attorney Garabedian published the 2018 Letters with actual malice. Mr. Ralston does not prove (1) Attorney Garabedian either knew Mr. Poulos's allegations were false or (2) acted with reckless disregard as to the statements' falsity.

### i. Attorney Garabedian believed Mr. Poulos.

Attorney Garabedian believed Mr. Poulos's allegations because we credit Attorney Garabedian's testimony he believed Mr. Poulos. Attorney Garabedian has represented thousands of abuse victims. He found Mr. Poulos's story consistent with other victims' stories. Attorney Garabedian judged Mr. Poulos's tone of voice during his interviews, finding him anxious and in

pain. Headmaster Lehman's 2017 letter lent an air of credibility to Mr. Poulos's allegations. Mr. Poulos told Attorney Garabedian he contacted him because Headmaster Lehman solicited comments about sexual abuse. Attorney Garabedian concluded Mr. Poulos reported a truthful story responding to Headmaster Lehman's 2017 letter. Simply put, we believe Attorney Garabedian's testimony he believed Mr. Poulos. We find no clear and convincing evidence suggesting otherwise.

   ii.  **Attorney Garabedian did not act with reckless disregard to the falsity of the allegations because he did not have serious doubts as to the truth of his publication or subjective awareness of probable falsity.**

   Whether Attorney Garabedian acted with reckless disregard to the allegations' falsity is a tougher question. "The term 'reckless disregard' is not amenable to one infallible definition."[533] "It is a term which is understood by considering a variety of factors in the context of an actual case."[534] These factors include "whether the author published a statement in the face of verifiable denials . . . without further investigation or corroboration, where allegations were clearly serious enough to warrant some attempt at substantiation" and "evidence of unexplained distortion or the absence of any factual basis to support an accusation."[535] "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[536] We may "use circumstantial evidence" to ascertain Attorney Garabedian's reckless disregard.[537]

   Critically, "[a]ctual malice focuses on [the speaker's] attitude towards the *truth*."[538] Mr. Ralston must at least prove Attorney Garabedian published the statements with "serious doubts as to the truth of his publication" or "subjective awareness of probable falsity."[539]

   After evaluating the credibility of the testimony, we find Attorney Garabedian did not act with reckless disregard because he neither harbored serious doubts as to the truth of Mr. Poulos's allegations nor had subjective awareness of their probable falsity.

   We begin by acknowledging a reasonable person would have had serious doubts about Mr. Poulos's story by December 2018. Mr. Poulos told the Garabedian attorneys materially different

stories in December 2017 and in December 2018. In December 2017, Mr. Poulos said Mr. Ralston abused him in a study room, cubicles in the basement of The Hill School, and in his dorm room. But in December 2018, Mr. Poulos said the abuse occurred only in geometry classroom. In 2017, Mr. Poulos said the abuse occurred during his freshman and sophomore years; in 2018, he said it only occurred during his sophomore year. A reasonable person hearing these inconsistencies in allegations so damning would stop and think before republishing them. A reasonable person would inquire why Mr. Poulos changed material details like the location of the abuse and his age when it occurred.

But we are not examining what a "reasonably prudent person" would think about the truth of the allegations—we are examining what Attorney Garabedian thought.[540] Attorney Garabedian did not doubt Mr. Poulos's statements. It seems decades of representing abuse victims have made Attorney Garabedian default to believing victims irrespective of inconsistencies in their stories. Attorney Garabedian provided credible—if unreasonable—reasons he did not doubt Mr. Poulos's story despite its inconsistences. Attorney Garabedian thought someone aged fifteen during abuse "is not going to have every detail bound in his mind." Attorney Garabedian believed victims try to "suppress" the memories but they "come forward" eventually. He thought when victims do come forward, they will not have "a photograph of the abuse" memorized, but can provide "enough general details" making them credible. We now know Attorney Garabedian's justifications for disregarding the inconsistencies in Mr. Poulos's story lack merit based on Dr. Ziv's credible expert testimony. But Attorney Garabedian believed what he believed.

Attorney Garabedian found Mr. Poulos's story consistent with other victims' stories. Attorney Garabedian thought Mr. Poulos felt "pain," "anguish," and "misery" when recounting the abuse like most victims. Mr. Poulos committed crimes and received psychological treatment,

which many victims do. Mr. Poulos recounted how Mr. Ralston purportedly "groom[ed]" him, which Attorney Garabedian found frequently occurred.

Attorney Garabedian's belief of Mr. Poulos was not *so* unreasonable as to compel a finding Attorney Garabedian lied about believing Mr. Poulos. Mr. Poulos initially presented to Attorney Garabedian as a victim seeking to hold his abuser accountable. Mr. Poulos disclosed Headmaster Lehman's 2017 letter, which confirmed abuse at The Hill School "decades" ago and lent an air of credibility to Mr. Poulos's story. Attorney Garabedian thought "red flags" existed at The Hill School because of the 2017 letter. Mr. Poulos asked Attorney Garabedian whether he should contact Attorneys Smith and Gomez, suggesting Mr. Poulos was serious about his allegations. It is understandable a sexual abuse victim would seek legal counsel in responding to a communication like the 2017 letter. Mr. Poulos then disclosed a straightforward story of abuse in December 2017. He described Mr. Ralston's physical appearance, the harms he suffered, and provided background information. Mrs. Poulos had previously contacted Attorney Garabedian about The Hill School, giving him further reason to believe Mr. Poulos. Attorney Mahoney's minimal investigation confirmed some basic elements of Mr. Poulos's story—Mr. Poulos attended The Hill School when he said he did, Mr. Ralston signed Mr. Poulos's transcript (confirming some relationship between the two), and Mr. Poulos transferred from The Hill School after the abuse allegedly occurred.

We recognize the Garabedian attorneys performed a minimal investigation of Mr. Poulos's claims. Mr. Poulos informed the Garabedian attorneys he had received psychological treatment and had been arrested, yet the attorneys made no effort to obtain Mr. Poulos's criminal records or medical records. Attorney Garabedian also published the 2018 Letters before obtaining his Hill School file. Worse, Attorney Garabedian never met Mr. Poulos in person or even through video

conference to assess his credibility. Attorney Garabedian simply spoke to Mr. Poulos by phone before sending the 2018 Letters. A reasonable person would certainly meet someone making allegations of abhorrent sexual abuse before republishing them to the accused's employer. Attorney Garabedian's sloppiness is not the standard we expect of counsel.[541] Alas, "failure to investigate before publishing"[542] or "failure to verify . . . facts"[543] does not establish actual malice. Attorney Garabedian did not maintain serious doubts before publishing, so he did not act with actual malice.

Our finding Attorney Garabedian did not act with actual malice may appear inconsistent with our unequivocal disapproval of Attorney Garabedian's practices when rejecting the judicial privilege above. We emphasize our disapproval of Attorney Garabedian's settlement-seeking practice as to The Hill School based on minimal investigation. But Attorney Garabedian's sloppiness is the very thing protecting him from an actual malice judgment. Actual malice focuses on Attorney Garabedian's "attitude towards the *truth*."[544] By never stopping to question the truth of Mr. Poulos's allegations, Attorney Garabedian never formed serious doubts about them. Our Court of Appeals recently directed us "an extreme departure from professional standards" is not enough for actual malice.[545] Nor is "ill will" or "desire to increase profits."[546] Attorney Garabedian departed from the standard we expect of attorneys bringing such damning accusations to increase profits through settlement. While this "circumstantial evidence" is relevant to Attorney Garabedian's "state of mind," it does not excuse the requirement he harbored serious doubts as to the truth of the statements he published.[547] This, he did not do.

Our findings here might also seem inconsistent with our finding Mr. Poulos lied about the abuse. But we focus our actual malice inquiry on Attorney Garabedian's state of mind at the time he published the statements on April 11 and December 26, 2018. When he published the

statements, he did not have the benefit of a two-week trial with comprehensive expert testimony, powerful cross-examination, and dozens of exhibits. We have far more reasons to doubt Mr. Poulos than Attorney Garabedian had when evaluating Mr. Poulos's claims in 2017 and 2018.

Mr. Ralston argues Attorney Garabedian "buried his own head in the sand" to avoid obtaining contradictory information.[548] Maybe so, but this still does not establish actual malice. The "purposeful avoidance theory" only supports a finding of actual malice "where there is sufficient evidence from which a reasonable jury could infer that the publisher of the statement subjectively doubted the truth of the underlying information."[549] We may only find actual malice based on a defendant's purposeful avoidance of truth if the defendant "avoided contradictory information *due to the publisher's doubts* as to the truth of his own statements."[550] As we explained, Attorney Garabedian did not entertain doubts as to the truth of his statements. Attorney Garabedian presents as a man with unparalleled confidence in his ability to detect truth in a sexual abuse claim. He relied on his touted experience in representing thousands of alleged abuse victims to self-assure his credibility finding. Mr. Ralston adduced no evidence Attorney Garabedian or his associates doubted their credibility judgment.

These facts exemplify why we join several jurists in questioning the continued viability of the actual malice doctrine requiring private persons to adduce clear and convincing evidence of actual malice by a non-media speaker to recover damages absent reputational harm.[551] The United States Supreme Court created the actual malice doctrine in the context of a defamation suit against *The New York Times* after it ran an inaccurate ad seeking donations for the civil rights movement.[552] The Court reasoned we should "tolerate the occasional falsehood to ensure robust reporting" by media outlets regarding public figures.[553] But as Justice Gorsuch notes, the doctrine has evolved into "an ironclad subsidy for the publication of falsehoods by means and on a scale

previously unimaginable."[554] To avoid actual malice, the "optimal legal strategy" might be to publish "*without* investigation" or "fact-checking," as here.[555] The Supreme Court has acknowledged the actual malice doctrine arguably "puts a premium on ignorance" or "encourages the irresponsible publisher not to inquire."[556] We are skeptical the Court in *Sullivan* intended the actual malice doctrine to protect Attorney Garabedian, a non-media defendant who issued abhorrent allegations about a private figure while never intending to allow his allegations to be tested in court. Yet the actual malice doctrine protects Attorney Garabedian because he ***avoided*** knowing too much about Mr. Poulos's story by conducting a minimal investigation which did not reveal the facts' falsity and instead relied on his self-confidence in detecting credibility when seeking a million-dollar payday. Negligence counterintuitively protects Attorney Garabedian. Mr. Ralston cleared his name through our defamation trial, but still cannot recover from Attorney Garabedian because he could not adduce clear and convincing evidence of Attorney Garabedian's disbelief. Attorney Garabedian's conduct is a long reach from the concern with a robust press reporting on public figures in *Sullivan* and its progeny. But this is the law on reckless disregard we must follow today.[557] Attorney Garabedian's ignorance of Mr. Poulos's incredibility tells us quite a bit about Attorney Garabedian's practice—but it does not constitute actual malice through reckless disregard under the governing law.

We are not alone in finding a minimal investigation before issuing defamatory accusations is not actual malice under the clear and convincing standard. Judge Spector also found no clear and convincing evidence of actual malice when reviewing sexual assault allegations after a bench trial. In *Powell v. Jones-Soderman*, a mother attempting to gain custody of her two minor daughters from their father hired an investigator to examine the father's parenting.[558] The daughters told the investigator the father sexually and physically abused them, which they had previously alleged.[559]

One daughter produced her diary which detailed the purported abuse.[560] The investigator knew the daughters suffered from mental conditions making them feign illnesses.[561] The investigator also knew a judge ordered the daughters to the father's custody after police and a child welfare agency found the daughters' previous allegations of abuse "unfounded."[562] Nonetheless, the investigator repeatedly posted on a public website detailed allegations the father sexually and physically abused the daughters.[563] The father sued the investigator for defamation. Judge Spector found actual malice by a preponderance of the evidence because the investigator kept up her allegations for more than one year in a public forum despite knowing objective evidence the allegations were false.[564] But Judge Spector did not find clear and convincing evidence of actual malice.[565] Judge Spector recognized the investigator had subjective reasons to believe the daughters' allegations.[566] The investigator interviewed the daughters for three hours, conducted many phone calls with them, and reviewed one daughter's diary.[567] Judge Spector found insufficient evidence meeting the "heightened standard of clear and convincing evidence."[568]

We, like Judge Spector, cannot find Mr. Ralston established recklessness by clear and convincing evidence. Judge Spector considered similar facts to ours: A person hired someone who became incentivized to accuse another of sexually abusing a minor. But the investigator in *Powell* acted more culpably than Attorney Garabedian by publishing false allegations of sexual abuse despite knowing a judge, the police, and a child welfare agency found "absolutely no support" for the allegations and despite knowing the children feigned illnesses.[569] Attorney Garabedian did not have such evidence. The investigator also published the allegations on a public forum. Attorney Garabedian, meanwhile, published the 2018 Letters privately to The Hill School. The facts of *Powell* still did not persuade Judge Spector to find clear and convincing evidence of actual malice because the investigator had reasons to believe the allegations. Like the investigator, Attorney

Garabedian had subjective reasons to believe Mr. Poulos. We cannot find "without hesitancy" Attorney Garabedian acted with actual malice.[570] This ends the actual malice inquiry.

### c. Mr. Ralston does not meet his burden to prove Attorney Garabedian caused him actual reputational injury.

Because Mr. Ralston does not prove Attorney Garabedian's actual malice, he must prove Attorney Garabedian's publication caused him actual reputational injury. Mr. Ralston does not meet his burden to show actual reputational injury.

"[R]eputation is the estimation in which one's character is held by his neighbors or associates."[571] Pennsylvania courts broadly define actual reputational harm as "any injury done to [plaintiff's] reputation."[572]

Defamation plaintiffs must present "competent evidence" of actual reputational injury.[573] Mr. Ralston may adduce "evidence concerning the circulation and contents of the defamatory publication."[574] This evidence "may support an inference that it was read by its intended recipients and caused damage to the plaintiff's reputation."[575] "[T]he plaintiff in a defamation action may also present testimony concerning his loss of reputation."[576] The plaintiff's testimony may alone show reputational harm; "evidence of others in the community" is not required.[577] Still, the plaintiff's testimony regarding reputational harm must bear on "the perception of others, rather than that of the plaintiff."[578] Mr. Ralston need only show "just one person's opinion of him was negatively affected."[579]

Mr. Ralston does not make this showing. Mr. Ralston adduced no competent evidence he suffered reputational harm from the 2018 Letters because he adduced no evidence anyone believed the content in the 2018 Letters. Every person Mr. Ralston identified who read or heard about the 2018 Letters either disbelieved them or formed no opinion about them. Headmaster Zachary Lehman, Mary Beth Ralston, Mark Ralston, Benjamin Walborn, Christopher Hopkins, Bill Yinger,

Virginia Yinger, Christopher Chirieleison, Jeffrey Neese, Chairman Preston Athey, and Chief Financial Officer Richard Wood disbelieved the allegations. Dozens of supporters attended Mr. Ralston's trial. We infer these supporters disbelieved the allegations because Mr. Ralston told them the allegations, yet they still came to support him. We heard no testimony a single person believed the allegations. Mr. Ralston identified no one whose "estimation" of his "character" changed because of the 2018 Letters.[580]

The facts adduced during trial resemble *Joseph*, the very decision requiring Mr. Ralston to prove actual reputational harm. In *Joseph*, the Pennsylvania Supreme Court held the trial judge properly found newspaper articles implicating plaintiffs in criminal conduct did not harm plaintiffs' reputations.[581] The trial judge heard "unequivocal[]" testimony during a bench trial from plaintiffs' "friends and employees" the newspaper articles did not change their opinions of plaintiffs.[582] As to one plaintiff, the trial judge heard no "testimony of any member of his community who had a lesser or diminished view" of his reputation."[583] The trial judge properly concluded the plaintiffs failed to prove "any actual reputational injury."[584]

The same applies today. Like *Joseph*, we heard no evidence from Mr. Ralston or his friends, colleagues, or community members the 2018 Letters affected their opinions of him. Mr. Ralston identified no one who believed the allegations, let alone a person in his "community." Mr. Ralston instead testified about person after person who disbelieved the allegations and did not change their opinion of him.

Mr. Ralston argues he must have suffered reputational harm because The Hill School did not renew his employment following the 2018 Letters. But we heard convincing evidence Mr. Ralston's decision to sue Mr. Poulos—not the 2018 Letters—caused The Hill School's decision. Mr. Ralston adduced no evidence The Hill School had even considered adverse employment action

because of the 2018 Letters. Mr. Ralston told his direct supervisors, Mr. Neese and Ms. Yinger, about the letters; they told him he should keep doing his job. Mr. Ralston then received positive performance reviews, raises, and bonuses following The Hill School's receipt of the 2018 Letters. No Hill School representative asked Mr. Ralston if the allegations were true except Attorney Rees acting as The Hill School's attorney required to ask these questions. The Hill School never contemplated adverse employment action against Mr. Ralston until February 2019, when Attorney Rees spoke to Mr. Ralston and his lawyers about the consequences of suing Mr. Poulos. Attorney Rees explained The Hill School would place Mr. Ralston on administrative leave if he sued an alumnus because suing an alumnus is incompatible with his job duties. Mr. Ralston sued Mr. Poulos anyway knowing of this likely result. Mr. Ralston's decision, not reputational harm caused by the 2018 Letters, provoked the Hill School to decline renewing Mr. Ralston's employment agreement.

Ignoring his sworn testimony, Mr. Ralston argues many people changed their opinions of him because of the 2018 Letters: (1) Christopher Hopkins; (2) Headmaster Zachary Lehman; (3) Attorney Thomas Rees; (4) Jason Zwerner; (5) David Dougherty; (6) Chairman Preston Athey and Chairman Geoffrey Richards; and (7) the three Hill School board members who did not previously know Mr. Ralston—Vice Chairwoman Michelle Gyves, Vice Chairman Andrew Soussloff, and Chief Financial Officer Richard Wood. But we heard no evidence allowing us to infer these people changed their opinions of Mr. Ralston.

### i.    Christopher Hopkins.

Mr. Hopkins, Mr. Ralston's friend, forcefully testified he disbelieved the allegations. Mr. Hopkins held Mr. Ralston's reputation in high regard before hearing about the 2018 Letters. The 2018 Letters did not change Mr. Hopkins's opinion.

Mr. Ralston argues Mr. Hopkins's opinion must have changed because Mr. Hopkins commented the 2018 Letters made Mr. Ralston "unemployable." But Mr. Hopkins did not testify *he* thought the 2018 Letters made Mr. Ralston unemployable; rather, he testified: "I would not *be able* to employ [Mr. Ralston] if [Mr. Ralston] came to my school *even given my knowledge of [him]* and the circumstances."[585] The 2018 Letters did not change Mr. Hopkins's opinion of Mr. Ralston—they simply made him un*able* to employ Mr. Ralston because Mr. Hopkins feared others might disapprove of a school hiring someone accused of sexual abuse. Mr. Hopkins still held Mr. Ralston's reputation in the highest esteem after reading the 2018 Letters. Mr. Hopkins simply speculated, in a hypothetical situation in which Mr. Ralston sought employment from Mr. Hopkins, Mr. Hopkins could not employ him—despite his excellent opinion of Mr. Ralston—for reasons beyond his control.

Mr. Hopkins's speculation as to what others might think about him hiring Mr. Ralston is irrelevant to what Mr. Hopkins himself thinks about Mr. Ralston. Mr. Hopkins's speculation about what others might think is also inadmissible for the purpose of Mr. Ralston's reputational harm for two reasons. First, Mr. Hopkins lacks personal knowledge about what others would think about him hiring Mr. Ralston.[586] Second, the evidence is irrelevant to Mr. Hopkins's opinion of Mr. Ralston. The evidence proves only what Mr. Hopkins feared others would think of *Mr. Hopkins* hiring Mr. Ralston. Mr. Hopkins's concern about others' perceptions is "not evidence of reputational harm"; at most, it is evidence of "any other injury of which [defamation] is the legal cause."[587] Mr. Hopkins's testimony does not show reputational harm.

### ii.   Headmaster Zachary Lehman.

Similar reasoning applies to Headmaster Lehman. Headmaster Lehman did not testify, but Mr. Ralston repeatedly testified Headmaster Lehman disbelieved the allegations. Headmaster

Lehman told Mr. Ralston he "didn't believe the allegations." He told Mr. Ralston the allegations were "bullshit, and that it was an attempt to extract a million dollars from the school."

Mr. Ralston still argues Headmaster Lehman must have changed his opinion of Mr. Ralston because Headmaster Lehman told him to keep a low profile on campus and to avoid time alone with students. This isolated comment does not show Headmaster Lehman changed his opinion of Mr. Ralston.  Headmaster Lehman did not believe the allegations, so they cannot have changed his estimation of Mr. Ralston's character and motivated his comment.[588] Headmaster Lehman likely told Mr. Ralston not to be alone with students out of concern for what others might think about him or The Hill School if The Hill School permitted someone accused of sexual abuse to be alone with students. Headmaster Lehman's *own* opinion of Mr. Ralston did not change; he simply speculated others might change their opinion of him or The Hill School if he permitted Mr. Ralston to spend time alone with students.[589] Like Mr. Hopkins, Headmaster Lehman's speculation about what others might think of The Hill School lacks personal knowledge regarding what others would think about Mr. Ralston and is irrelevant to Mr. Ralston's reputational harms. Headmaster Lehman's opinion of Mr. Ralston did not change, so it does not prove reputational harm.

### iii.    Attorney Thomas Rees.

Attorney Rees testified he had "no opinion" of Mr. Ralston because the two did not share a personal relationship. The 2018 Letters did not change Attorney Rees's opinion of Mr. Ralston.

Mr. Ralston argues the 2018 Letters must have changed Attorney Rees's view of Mr. Ralston because Attorney Rees "asked Mr. Ralston if the information in the letter was true."[590] We reject this argument for two reasons. First, irrespective of whether Attorney Rees believed the allegations, he testified they did not affect his opinion of Mr. Ralston. Second, Attorney Rees asking Mr. Ralston about the allegations' truth does not bear on Attorney Rees's opinion of the allegations. Attorney Rees simply performed his professional obligation as The Hill School's

lawyer to investigate claims made against a Hill School employee. He expressed no view as to the allegations' truth. The 2018 Letters did not change Attorney Rees's opinion of Mr. Ralston.

### iv.    Jason Zwerner.

We heard no evidence Mr. Zwerner, Mr. Poulos's cousin and Mr. Ralston's former student, changed his opinion of Mr. Ralston. Mr. Zwerner did not testify. We simply heard Mr. Zwerner could not attend our trial. While Mr. Poulos testified Mr. Zwerner believes Mr. Poulos's allegations, we assign this testimony little weight given Mr. Poulos's credibility problems.[591] Mr. Ralston still views his relationship with Mr. Zwerner as "very good." If Mr. Zwerner believed the allegations Mr. Ralston assaulted his cousin, we cannot imagine Mr. Ralston would maintain a "very good" relationship with him. We cannot find Mr. Zwerner changed his opinion of Mr. Ralston.

Even if we assumed Mr. Zwerner's opinion of Mr. Ralston changed, Mr. Ralston does not meet his burden to show Attorney Garabedian caused this harm because Mr. Zwerner heard the allegations from Mr. Poulos, not Attorney Garabedian. Attorney Garabedian is liable only for the reputational harms caused by his "negligently published falsehood."[592] Attorney Garabedian is also liable for harms caused by "republication" of the falsehood if "the recipient was privileged to repeat it, or if the repetition was authorized or intended by the original defamer, or if the repetition was reasonably to be expected."[593] But we heard no evidence Attorney Garabedian published the 2018 Letters to Mr. Zwerner either directly or foreseeably. The testimony suggests Mr. Zwerner heard the allegations directly from Mr. Poulos, his cousin.[594] We find no nexus between Attorney Garabedian sending the 2018 Letters to The Hill School and Mr. Zwerner hearing the allegations from Mr. Poulos. Attorney Garabedian did not cause Mr. Zwerner's opinion to change even assuming his opinion did change.[595]

### v.     David Dougherty.

We heard little evidence about Mr. Dougherty's opinion of Mr. Ralston. We simply heard Mr. Ralston called Mr. Dougherty, his former colleague, asking for advice. But Mr. Dougherty could not speak to Mr. Ralston about the 2018 Letters because he could not discuss The Hill School legal matters without Attorney Rees present. This evidence reveals nothing about Mr. Dougherty's views of Mr. Ralston; it simply shows Mr. Dougherty's job obligations prevented him from speaking to Mr. Ralston. We cannot infer reputational harm from Mr. Dougherty's isolated comment to Mr. Ralston.

### vi.     Chairman Preston Athey and Chairman Geoffrey Richards.

Chairman Athey and Chairman Richards did not testify at trial. Mr. Ralston also did not testify about their opinions at trial. Mr. Ralston cites his own deposition testimony in which Mr. Ralston opined Chairman Athey and Chairman Richards acted differently toward Mr. Ralston following the 2018 Letters. But this does not prove reputational harm for two reasons. First, Mr. Ralston cannot designate his own deposition testimony as substantive evidence because it is inadmissible hearsay subject to no exception for using depositions in court proceedings under Rule 32(a).[596] Second, even assuming Mr. Ralston could offer the deposition testimony, it does not show Chairman Athey or Chairman Richards changed their views of Mr. Ralston because—once again—Mr. Ralston swore these men disbelieved the allegations.[597]

### vii.     Vice Chairwoman Michelle Gyves, Vice Chairman Andrew Soussloff, and Chief Financial Officer Richard Wood.

Perhaps recognizing the absence of evidence showing reputational harm, Mr. Ralston asks us to infer reputational harm. He argues three Hill School board members—Vice Chairwoman Gyves, Vice Chairman Andrew Soussloff, and Chief Financial Officer Wood—must have changed their opinions of Mr. Ralston. Mr. Ralston argues we should infer these board members' opinions

of Mr. Ralston changed because the board members had no "reason to disbelieve" the 2018 Letters.[598] We disagree.

Mr. Ralston asks us to infer reputational harm based on Judge Yohn's well-reasoned but distinguishable analysis in *Sprague v. American Bar Ass'n*.[599] In *Sprague*, a "prominent Philadelphia attorney" sued the American Bar Association Journal—a periodical—and a Journal reporter after they reported the attorney achieved legal success by "fix[ing]" cases.[600] The periodical and reporter sought summary judgment arguing the attorney failed to adduce evidence of reputational harm because "numerous witnesses presented by plaintiff concede[d] that their estimations of plaintiff did not falter as a result of the article."[601] Judge Yohn denied summary judgment because the evidence of disbelief permitted "highly contested inferences."[602] Judge Yohn reasoned the witnesses only disbelieved the defamation because they personally knew plaintiff and knew he would not fix cases.[603] But others having "no reason to disbelieve" the article might have believed it, causing plaintiff reputational harm.[604] And because the defamation appeared in a journal which circulated to 400,000 readers, Judge Yohn found the jury could infer at least one person who read the defamation had no reason to disbelieve it.[605]

Judge Yohn's reasoning does not apply today because Vice Chairwoman Gyves, Vice Chairman Andrew Soussloff, and Chief Financial Officer Wood had ample "reason to disbelieve" the 2018 Letters. The three board members owed a fiduciary obligation to inform themselves about the merits of the 2018 Letters. These three board members worked in The Hill School community where no one appeared to believe the allegations. Their other three board colleagues—Headmaster Lehman, Chairman Athey, and Chairman Richards—disbelieved the allegations. Attorney Garabedian ignored Attorney Rees's invitations to investigate the claim, giving the three board members nothing to substantiate Attorney Garabedian's allegations. Mr. Ralston's sterling

reputation in The Hill School community makes it more likely the three board members disbelieved the allegations like their colleagues.

Had the board members believed the claims, we expect we would have heard some evidence about it. The board members' fiduciary obligation to The Hill School would have motivated some action had they believed the allegations. But we heard no evidence they took such action, which is telling. The board members never asked Mr. Ralston about the allegations. The Hill School—through its board—took no adverse employment actions against Mr. Ralston because of the 2018 Letters. The Hill School, presumably with Board approval, instead raised Mr. Ralston's salary and issued positive performance reviews. We cannot infer The Hill School board members believed the allegations when the evidence suggests only otherwise.

This case is also distinguishable from Judge Yohn's analysis in *Sprague* because Attorney Garabedian published the allegations to a far lesser number of persons. In *Sprague*, Judge Yohn identified a compelling inference of reputational harm because the defendants published the defamation in a journal with 400,000 readers. Many of these readers likely knew nothing about the attorney before reading the article, giving them no reason to disbelieve it. But here, we know exactly who read the 2018 Letters. Attorney Garabedian privately published the 2018 Letters. He published the letters only to Headmaster Lehman and Attorney Rees, who then shared the letters only with those people necessary to investigate the claims. Those people did not believe the allegations. Nor did Mr. Ralston's friends, family, and colleagues. Mr. Ralston identified no one else who read the 2018 Letters. We cannot infer someone who did not know Mr. Ralston came upon the allegations because they were not published to a wide audience (at least until Mr. Ralston chose to bring these allegations into a public forum).

We do not mean to belittle Mr. Ralston's mental anguish. But Mr. Ralston's emotional harms are not compensable without reputational injury or actual malice. Defamation is "the tort of detracting from a person's ***reputation***."[606] The "primary purpose" of an action for defamation is to "vindicat[e]" a plaintiff's "good name" and "to restore [the plaintiff's] unjustly tarnished reputation."[607] Mr. Ralston does not show a tarnished reputation, which is the "prerequisite to the recovery of damages for other actual injuries."[608] The evidence persuades us Mr. Ralston enjoyed ***such*** sterling character in The Hill School community that the allegations did not dent his reputation. We cannot award Mr. Ralston damages from Attorney Garabedian.

### C.  Mr. Ralston has shown a basis for presumed damages from Mr. Poulos.

We now turn to our conclusions of law particular to Mr. Ralston's defamation claim against the pro se Mr. Poulos. We reach five conclusions: (1) Mr. Poulos published false allegations to Attorney Garabedian and authorized Attorney Garabedian's republications of the allegations in the 2018 Letters; (2) Mr. Poulos's publication caused Mr. Ralston special harm; (3) the judicial privilege does not protect Mr. Poulos's publication to Attorney Garabedian; (4) Mr. Poulos abused any conditional privileges which might attach to his publication because he spoke with actual malice; and (5) Mr. Ralston demonstrates $50,000 in presumed damages but no punitive damages against Mr. Poulos.

### 1.  Mr. Poulos published false allegations to Attorney Garabedian and authorized Attorney Garabedian's republications of the allegations in the 2018 Letters.

Mr. Poulos argues he cannot be liable because he did not publish the 2018 Letters, Attorney Garabedian did.[609] We disagree because Mr. Poulos published the defamatory words forming the 2018 Letters to Attorney Garabedian and authorized Attorney Garabedian's republication of the words to The Hill School.

As we described above, "[p]ublication of defamatory matter is the intentional or negligent communication of such matter to one other than the person defamed."[610] Mr. Poulos is liable for harms caused by republication of the falsehood he published if "the recipient was privileged to repeat it, or if the repetition was authorized or intended by the original defamer, or if the repetition was reasonably to be expected."[611] A defamer who "sets in motion" foreseeable harms cannot "claim lack of causality because, after initiating the harm, he/she stands back and watches the results of their duplicity."[612]

Mr. Poulos published the 2018 Letters because he published false allegations of sexual assault to Attorney Garabedian, then authorized Attorney Garabedian to republish those allegations to The Hill School. Mr. Poulos retained Attorney Garabedian for the specific purpose of Attorney Garabedian publishing his allegations to The Hill School. Mr. Poulos contacted Attorney Garabedian in response to Headmaster Lehman's 2017 letter soliciting feedback from the Hill School community about sexual assault. Mr. Poulos hoped Attorney Garabedian would respond to the 2017 letter by republishing his allegations of assault. Mr. Poulos contacted Attorney Garabedian hoping he could recover his tuition from The Hill School and receive counseling. His conduct required Attorney Garabedian to republish Mr. Poulos's allegations.

Mr. Poulos argues he never intended to demand $1,000,000 from The Hill School and never read the 2018 Letters before their publication. But this simply shows Mr. Poulos quibbled with the way Attorney Garabedian republished his allegations; it does not change the fact Mr. Poulos authorized Attorney Garabedian to republish his defamatory allegations. Mr. Poulos retained Attorney Garabedian to remedy "[i]njuries caused by Matthew Ralston . . . and the Hill School."[613] Mr. Poulos agreed Attorney Garabedian would recover a contingency fee upon "the recovery of damages" for Mr. Ralston's and The Hill School's actions.[614] Mr. Poulos swore he retained

Attorney Garabedian for the specific purpose of publishing allegations Mr. Ralston abused him to The Hill School. Mr. Poulos authorized Attorney Garabedian's republication of his allegations through the 2018 Letters, making Mr. Poulos liable for harms caused by the 2018 Letters.

### 2. Mr. Poulos's publication caused Mr. Ralston special harm.

Mr. Ralston must show Mr. Poulos's publication caused him "special harm." Special harm simply means "general damages," which are proven upon a showing of "actual harm."[615] "Actual harm includes impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."[616]

Mr. Poulos's publication of the 2018 Letters caused Mr. Ralston mental anguish and humiliation. Mr. Ralston dedicated his life to education. He taught, coached, and led thousands of students. He convincingly testified about the satisfaction he received from his fulfilling accomplishments working with students and their families. So Mr. Ralston credibly viewed the 2018 Letters' allegations as the most "heinous offense" of which anyone could accuse him. Mr. Ralston thought about the letters every day, wondering who might have seen them. He struggled to perform his duties as a capital giving officer because he worried the alumni with whom he spoke had seen the letters. He regularly checked with Attorney Rees for updates on the case. He contacted family and friends, hoping to obtain their validation they did not believe the allegations. Mr. Ralston felt humiliated when Headmaster Lehman told him not to find himself alone with children. Mr. Poulos caused Mr. Ralston actual harm.

### 3. The judicial privilege does not protect Mr. Poulos's publication to Attorney Garabedian.

Mr. Poulos does not invoke the judicial privilege. This alone suffices to find the judicial privilege does not apply because it is it the defendant's burden to prove privilege.[617]

Given the importance of the judicial privilege to this litigation, however, we note Mr. Poulos would not enjoy the judicial privilege even had he invoked it. As we found in our December 23, 2021 Memorandum, the judicial privilege operates similarly for both attorneys and their clients;[618] Mr. Poulos needed to seriously consider a judicial or quasi-judicial proceeding for the privilege to apply.

Mr. Poulos never considered a judicial or quasi-judicial proceeding. When Mr. Poulos contacted Attorney Garabedian, he did not plan to "take legal action" against Mr. Ralston because "[t]here was no point in thinking about something that has an undetermined date." Mr. Poulos knew the statute of limitations had expired when he contacted Attorney Garabedian. He contacted Attorney Garabedian simply to "be prepared" if the Pennsylvania legislature changed its statute of limitations. The two did not discuss a lawsuit beyond affirming their knowledge the statute of limitations had expired. Mr. Poulos agreed in writing with Attorney Garabedian no lawsuit would be filed. Mr. Poulos identified no quasi-judicial proceeding he hoped to initiate; at most, he hoped for a private investigation of Mr. Ralston. The judicial privilege does not protect Mr. Poulos's publications to Attorney Garabedian and his authorized republications.

### 4. Mr. Poulos abused any conditional privileges which might attach to his publication because he spoke with actual malice.

We liberally construe Mr. Poulos's pro se arguments.[619] He appears to invoke a conditional privilege based on good-faith reporting of abuse. We find several conditional privileges attach to Mr. Poulos's publication to Attorney Garabedian. But we find clear and convincing evidence Mr. Poulos abused the conditional privileges by speaking with actual malice.

"[A] publisher of defamatory matter is not liable if the publication was made subject to a privilege, and the privilege was not abused."[620] One such privilege is the conditional privilege. "A conditional privilege is one of the methods utilized by the common law for balancing the interest

of the defamed person in the protection of his reputation against the interests of the publisher, of third persons and of the public in having the publication take place."[621] The conditional privilege protects statements "made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause."[622] Some examples are: "(1) when some interest of the publisher of the defamatory matter is involved; (2) when some interest of the recipient of the matter, or a third party is involved; or (3) when a recognized interest of the public is involved."[623] It is the defendant's burden to show a conditional privilege attaches.[624]

If the defendant shows conditional privilege, the plaintiff "must establish that the defendant abused that conditional privilege."[625] A defendant abuses a conditional privilege when the publication:

(1) is actuated by malice or negligence;

(2) is made for a purpose other than that for which the privilege is given;

(3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or

(4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.[626]

We identify at least two conditional privileges attaching to Mr. Poulos's publication. First, the 2018 Letters related to a public concern: sexual abuse at The Hill School. The public maintains a strong interest in allowing abuse victims to report their allegations of abuse. The public's interest in knowing whether educators sexually abuse children is weighty. Second, the recipients of the 2018 Letters had interests in the 2018 Letters' subject matter. Headmaster Lehman notified The Hill School community of historical allegations of sexual abuse at The Hill School and invited comments from the community. Mr. Poulos responded by authorizing Attorney Garabedian to send

the April 11 Letter. Attorney Rees later requested Attorney Garabedian provide more details about the alleged abuse. Mr. Poulos authorized the December 26 Letter to provide these details.

But Mr. Poulos abused any conditional privileges attaching to his conduct by speaking with actual malice. As we discussed, "[a]ctual malice exists where a statement [is] made with either: (1) knowledge of its falsity; or (2) reckless disregard to its truth or falsity."[627] The plaintiff must prove actual malice by "clear and convincing evidence."[628]

We find clear and convincing evidence Mr. Poulos spoke with actual malice because he knew the falsity of his allegations. This finding of falsity flows from our findings Mr. Poulos fabricated the abuse allegations. We heard overwhelmingly clear and convincing evidence Mr. Ralston did not abuse Mr. Poulos. Mr. Poulos maintained his lies throughout the litigation. We heard no evidence permitting us to find Mr. Poulos somehow did not know he fabricated the allegations despite speaking them. The clear falsity of Mr. Poulos's allegations compels a finding Mr. Poulos knew the falsity of his allegations. Mr. Poulos acted with actual malice and his conduct is unprivileged.

### 5. Mr. Ralston demonstrates $50,000 in presumed damages but no basis to award punitive damages against Mr. Poulos.

Our finding Mr. Poulos acted with actual malice entitles Mr. Ralston to punitive and presumed damages from Mr. Poulos. Mr. Ralston demonstrates $50,000 in presumed damages. We decline to award Mr. Ralston punitive damages.

#### a. Mr. Ralston demonstrates $50,000 in presumed damages from Mr. Poulos.

Presumed damages are a form of compensatory damages in defamation actions.[629] Presumed damages are the damages we "expect[]" the defamation would cause.[630] "Presumed damages allow a defamation plaintiff to recover compensatory damages without proving the defamatory statement caused actual harm."[631]

Because presumed damages do not require proof of harm, they are notoriously difficult to measure.[632] Presumed damages are an "oddity of tort law" permitting "recovery of purportedly compensatory damages without evidence of actual loss."[633] The proper damages amount is simply "referred to the sound discretion of the" factfinder.[634] The factfinder assumes "the awkward position of awarding damages without any criteria with which to measure harm."[635]

Applying our discretion in this "awkward position," we will award Mr. Ralston presumed damages reflecting harms he suffered for the mental anguish and humiliation the 2018 Letters caused. Presumed damages permit awards of damages one might expect the defamation would cause. We could expect the 2018 Letters to cause Mr. Ralston reputational harm, mental anguish, and job loss. But as we described above, the 2018 Letters only caused Mr. Ralston's mental anguish; they caused no reputational harm or job loss. We are uncomfortable awarding compensatory damages to compensate Mr. Ralston for harms we know he did not suffer. "Juries usually are instructed that their awards of presumed damages must be commensurate with the actual injuries sustained."[636] So we exercise discretion to limit Mr. Ralston's presumed damages to the mental anguish and humiliation he suffered.[637]

But "putting a price tag on" Mr. Ralston's "pain and suffering is challenging."[638] Emotional injury "does not readily translate into dollar amounts."[639] And "few truly comparable cases can be found" given the uniqueness of each plaintiff's emotional harms.[640]

Mr. Ralston undoubtedly suffered mental anguish as a teacher, mentor, father, and husband as we detailed in describing Mr. Ralston's special harm. But he did not require medical treatment. He did not receive medications. He received some counseling. The mental anguish also led to an improved diet, regular exercise, better sleep habits, and beginning a meditating practice.

We are again partially guided by Judge Spector's analysis of similar facts in *Powell* as to damages. Judge Spector awarded $40,000 in emotional distress to the father based on the investigator's public allegations he physically and sexually abused his daughters.[641] The father testified he experienced "headaches, sleeplessness[,] and loss of appetite."[642] He felt "sick to his stomach," he "gain[ed] and los[t] weight," and lost "memory and cognitive functioning."[643] The allegations "impacted his social relationships" and caused him "social anxiety."[644] Judge Spector characterized the father's emotional distress as "garden variety" because he did not present medical evidence establishing the distress.[645] Judge Spector awarded $40,000 to compensate the father for his mental anguish.

Judge Spector's $40,000 award comports with our instincts regarding Mr. Ralston's presumed damages. We exercise our discretion to increase the figure to $50,000. Our evaluation of Mr. Ralston's demeanor and credibility, plus the present value of damages,[646] persuades us the higher figure is necessary. We find $50,000 in presumed damages is warranted.

**b. Mr. Ralston did not demonstrate a basis for punitive damages.**

Punitive damages in defamation cases "are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."[647] Punitive damages exist "not to compensate the plaintiff, but rather to impress upon the defendant the gravity of the wrong committed."[648] Punitive damages "serv[e] the dual function of penalizing past conduct constituting an aggravated violation of another's interests, and of deterring such behavior in the future."[649] "Punitive damages are not a matter of right, but may be granted in the sound discretion of the court."[650]

We decline to award Mr. Ralston punitive damages against Mr. Poulos because Mr. Poulos suffered enough punishment. Mr. Poulos suffered trauma in his life as abundantly evident to us and confirmed by Dr. Fetterolf's evaluation. We believed Mr. Poulos when he testified how

uncomfortable he felt testifying in front of "a bunch of strangers" about the purported sexual abuse. He cried twice during his testimony. He endured a pointed interrogation from Attorney Garabedian's counsel about the specifics of the abuse; he could not answer counsel's questions. Our extensive findings today about Mr. Poulos's incredibility and our award of presumed damages suffice to deter lying about abuse; anything more would be gratuitous and there is no further need to deter Mr. Poulos from continuing this accusation.

## V.    CONCLUSION

Matthew Ralston adduced evidence through the crucible of trial demonstrating Kurtis Poulos defamed him by lying about sexual abuse in the geometry classroom from 1993 to 1995. Mr. Poulos's statements to Attorney Garabedian, given their manifest falsity, are a result of actual malice. Mr. Ralston is entitled to a measure of considered damages based on his emotional distress from Mr. Poulos's estate should one ever be formed.

But Mr. Ralston is not entitled to damages from Attorney Garabedian because no one believed Attorney Garabedian and there is no clear and convincing evidence Attorney Garabedian published Mr. Poulos's lies with actual malice.

The late Mr. Poulos published these lies to Attorney Garabedian and his law firm. Attorney Garabedian and his associates engaged in marginal investigation and relied upon Attorney Garabedian's touted experience in representing victims of sexual abuse to justify their financial reasons to believe Mr. Poulos even though they never met Mr. Poulos or engaged in the level of diligence we expect from counsel accusing a teacher of the most heinous of conduct towards their students. Attorney Garabedian published defamatory statements in letters written to Mr. Ralston's employer knowing he already agreed with Mr. Poulos and his mother not to bring a lawsuit against

anyone given the statute of limitations barred such claims. Attorney Garabedian's demand letter seeking $1,000,000 including these defamatory statements do not warrant a judicial privilege.

But no one believed Attorney Garabedian. Mr. Ralston did not suffer a loss in reputation or income. Mr. Ralston could not show reputational harm. And Mr. Ralston also could not adduce clear and convincing evidence Attorney Garabedian, while not protected by the judicial privilege, published his letter with actual malice as today required by the Supreme Court consistent with the present interpretation of the First Amendment. Mr. Ralston is not entitled to damages from Attorney Garabedian.

---

[1] Former Hill School teacher and administrator Matthew Ralston sued his former mid-1990's geometry student Kurtis N. Poulos and Mr. Poulos's lawyer Mitchell Garabedian in April 2019 shortly after The Hill School told Mr. Ralston the suit would result in the loss of his job with alumni at The Hill School. Then in his early forties, Mr. Poulos of Wisconsin chose to defend Mr. Ralston's claims without counsel explaining he could not afford representation.

Judge DuBois ably managed the litigation until his retirement last fall. The Clerk of Court randomly reassigned the case to our docket. We conferred with Mr. Poulos and counsel to promptly conclude discovery, set dispositive motion deadlines, and schedule the jury trial to begin January 10, 2022. ECF Doc. No. 143. But the spread of the Omicron variant of COVID-19 caused our Court to suspend jury trials in January 2022. The parties consented to a bench trial. *See* ECF Doc. Nos. 251–52.

We held a bench trial from January 11, 2022 through January 20, 2022. The parties agreed to present certain witnesses in-person and others by video live feed. Plaintiff Matthew Ralston and witnesses Barbara Ziv, M.D.; Mark Ralston; Christopher Hopkins; Andrew Verzilli; and Clifford Haines, Esquire testified in-person. Defendants Mitchell Garabedian and Kurtis Poulos, and witnesses Thomas Rees, Esquire; Frank Chirieleison; Leslie Gomez, Esquire; Daniel Mahoney, Esquire; Nathan Gaul, Esquire; Frank Fettorolf M.D.; Mary Eilers; and Robert Tintner, Esquire testified through video conference. The parties also designated extensive deposition testimony from Mr. Poulos; Mr. Poulos's mother Mary Ellen Poulos; Shanin Specter, Esquire; Charles Grade, M.D.; Attorney Garabedian; Mr. Ralston; Zachary Brusko; and Benjamin Walborn.

The video conferencing worked seamlessly. The parties' technology professionals allowed us to view and hear the witnesses and judge witness credibility as though they sat in our courtroom. We commend those handling technology for operating our unique Omicron trial. And we thank counsel for their flexibility.

Counsel informed us Mr. Poulos passed in April 2022 after the parties filed extensive proposed findings of fact and conclusions of law and a couple days before we intended to issue findings and

conclusions. *See* ECF Doc. No. 407. We first elected to defer issuing today's Memorandum with Findings of Fact and Conclusions of Law until Mr. Ralston either dismissed his claims against the late Mr. Poulos or someone substituted for Mr. Poulos acting pro se. *See Ralston v. Garabedian*, No. 19-1539, --- F. Supp. 3d ----, 2022 WL 1524108, at *3 (May 13, 2022). We twice denied Mr. Ralston's motions to substitute; first because he did not adduce evidence supporting his proposed substitute, then because he did not propose a proper substitute under Pennsylvania law. *See* ECF Doc. Nos. 419, 434–35. We then decided to issue our findings of fact and conclusions of law to end further delay for Mr. Ralston and Attorney Garabedian. ECF Doc. No. 434. We will continue staying judgment relating to Mr. Ralston's claims against Mr. Poulos until Mr. Ralston either dismisses this claim or timely moves to substitute a personal representative for the deceased Kurtis Poulos. We did not let Mr. Poulos's regrettable passing after our trial affect our reasoning. We judge the facts solely based on the evidence adduced at trial.

[2] Notes of Testimony ("N.T.") Jan. 11, 2022 Bench Trial at 33:24–34:5; *id.* at 49:20–21.

[3] *Id.* at 33:7–10 (started in 1992); *id.* at 119:11–13 (left in 2009).

[4] *See* Ex. J-36.

[5] *See* Exs. J-51, 52, 54, 61, 62.

[6] *See* Ex. J-63.

[7] N.T. Jan. 12, 2022 Bench Trial at 193:20–194:6.

[8] N.T. Jan. 13, 2022 Bench Trial at 59:4–7.

[9] N.T. Jan. 12, 2022 Bench Trial at 217:3–10.

[10] N.T. Jan. 11, 2022 Bench Trial at 83:6–84:3.

[11] *Id.* at 164:15; *id.* at 165:1–3.

[12] *Id.* at 164:23–165:4.

[13] *Id.* at 165:13–14.

[14] *Id.* at 119:11–17.

[15] *Id.* at 128–33.

[16] *Id.* at 130:1–7.

[17] *Id.* at 133:16–19.

[18] Ex. J-161 at 1903.

[19] N.T. Jan. 13, 2022 Bench Trial at 278:8–14.

[20] Ex. J-161 at 1903; N.T. Jan. 11, 2022 Bench Trial at 47:12–15.

[21] N.T. Jan. 13, 2022 Bench Trial at 215:19–25.

[22] *Id.* at 215:19–25.

[23] Ex. J-161 at 1903.

[24] *Id.*; *see* Ex. J-320 (Mary Ellen Poulos Dep.) at 98:21–99:3 (Mr. Poulos requested to transfer back to The Hill School). We cite deposition transcripts by citing the page number of the transcript itself, not the pagination assigned by CM/ECF.

[25] N.T. Jan. 13, 2022 Bench Trial at 229:12–13.

[26] Ex. J-320 at 5:12–13.

[27] *Id.* at 6:14–7:23.

[28] N.T. Jan. 13, 2022 Bench Trial at 230:19–23; *see also* Ex. J-320 at 105:2–12.

[29] N.T. Jan. 13, 2022 Bench Trial at 230:19–23.

[30] Ex. J-320 at 30:1–7; N.T. Jan. 13, 2022 Bench Trial at 230:20–231:8.

[31] Ex. J-320 at 49:21–50:1.

[32] *Id.* at 49:21–50:1.

[33] *Id.* at 33:17–34:8; *id.* at 105:6–15.

[34] *Id.* at 79:23.

[35] *Id.* at 206:3–11.

[36] *Id.* at 29:12.

[37] *Id.* at 78:2–8.

[38] *Id.* at 29:12–18.

[39] *Id.* at 33:17–34:23.

[40] *Id.* at 105:17–22.

[41] *Id.* at 33:17–34:23.

[42] *Id.* at 41:24–42:3.

[43] *Id.* at 135:17–23.

---

[44] *Id.* at 47:14–20.

[45] *Id.* at 213:6–10.

[46] *Id.* at 29:5–9 (Mrs. Poulos swearing Mr. Poulos told her about the assault "a few months before" his alcohol poisoning).

[47] *Id.* at 27:13–16 (Mrs. Poulos swearing her son suffered from "acute alcohol poisoning").

[48] Ex. J-321-A at 91:25–92:4 (Mr. Poulos swearing he "drank [him]self into a coma trying to deal with the trauma of what happened at that school" around "2015, 2014").

[49] Ex. J-320 at 26:6–27:19 (Mrs. Poulos's deposition testimony regarding Mr. Poulos's hospital stay).

[50] Ex. J-71.

[51] *Id.*.

[52] Ex. J-320 at 39:4–10.

[53] *Id.* at 130:8–21.

[54] *Id.*

[55] *Id.* at 126:24–127:1.

[56] *Id.* at 127:14–20.

[57] *Id.* at 20:25–21:11 (details of interaction); *id.* at 213:24–25 (recalling why she queried Mr. Poulos's geometry teacher).

[58] *Id.* at 21:3–6.

[59] *Id.* at 51:3–8.

[60] *Id.* at 143:20–21.

[61] *Id.* at 143:20–144:2.

[62] *Id.* at 214:12–16.

[63] *Id.* at 143:20–144:2.

[64] *Id.* at 43:2–9.

[65] *Id.* at 43:9.

[66] *Id.* at 39:21–40:3; *id.* at 109:4–6.

[67] *Id.* at 156:21–157:13.

[68] *Id.* at 66:13–20; *id.* at 67:6–13.

[69] Ex. J-74.

[70] *Id.*

[71] *Id.*

[72] N.T. Jan. 13, 2022 Bench Trial at 135:19–25.

[73] Ex. J-74.

[74] *Id.*

[75] *Id.*

[76] N.T. Jan. 13, 2022 Bench Trial at 308:1–12.

[77] *Id.* at 308:23–309:4; Ex. J-320 at 45:20–23.

[78] Ex. J-320 at 171:8–13.

[79] *Id.* at 44:25–45:6; N.T. Jan. 18, 2022 Bench Trial at 198:2–14.

[80] *See, e.g.*, N.T. Jan. 11, 2022 Bench Trial at 282:22–283:5.

[81] N.T. Jan. 18, 2022 Bench Trial at 208:3–11.

[82] Ex. J-320 at 45:24–46:5.

[83] *Id.*

[84] *Id.* at 52:4–7.

[85] *Id.* at 146:14–16.

[86] *Id.* at 168:21–170:10.

[87] *Id.*

[88] Ex. J-321-E (Kurtis Poulos May 27, 2021 Dep.) at 86:15–18.

[89] N.T. Jan. 13, 2022 Bench Trial at 199:7–9; N.T. Jan. 18, 2022 Bench Trial at 263:2–24.

[90] Ex. J-86; N.T. Jan. 18, 2022 Bench Trial at 225:21–23.

[91] N.T. Jan. 18, 2022 Bench Trial at 228:20–229:10.

[92] *Id.*

[93] *See id.* at 223:21–24; *id.* at 231:22–232:1.

[94] *Id.* at 229:1–3.

[95] *Id.* at 232:12–19.

[96] Ex. J-87; N.T. Jan. 14, 2022 Bench Trial at 84:18–25.

[97] N.T. Jan. 18, 2022 Bench Trial at 239:5–23.

[98] *Id.* at 239:15–240:3.

[99] *Id.* at 240:25–241:20.

[100] *Id.* at 241:12–16.

[101] *Id.* at 241:5–8.

[102] Ex. J-87. Attorney Mahoney testified and confirmed Ex. J-87 reflects the contents of the intake interview. *See* N.T. Jan. 14, 2022 Bench Trial at 90:22–123:17.

[103] Ex. J-87 at 35; N.T. Jan. 14, 2022 Bench Trial at 97:8–12.

[104] Ex. J-87 at 35; N.T. Jan. 14, 2022 Bench Trial at 98:17–99:4.

[105] Ex. J-87 at 35.

[106] *Id.* at 36.

[107] *Id.* at 37–38.

[108] *See generally id.* (corroborated during testimony of Attorney Mahoney).

[109] *Id.* at 34.

[110] *Id.*

[111] *Id.* at 39.

[112] *Id.*

[113] *See, e.g.*, N.T. Jan. 18, 2022 Bench Trial at 213:24–214:1.

[114] N.T. Jan. 19, 2022 Bench Trial at 57:19–22.

[115] N.T. Jan. 18, 2022 Bench Trial at 215:1–2.

[116] *Id.* at 247:11–19.

[117] Ex. J-87 at 33.

[118] N.T. Jan. 18, 2022 Bench Trial at 219:17–24 (call occurred on December 13, 2017 despite date of Ex. J-87 reading "12/12/17").

[119] *Id.* at 220:6–15.

[120] N.T. Jan. 14, 2022 Bench Trial at 92:1–9.

[121] N.T. Jan. 18, 2022 Bench Trial at 243:17–244:1.

[122] *Id.* at 221:1–3.

[123] *Id.* at 248:16–21.

[124] *Id.*

[125] *Id.* at 229:1–3; N.T. Jan. 13, 2022 Bench Trial at 198:16–18.

[126] N.T. Jan. 13, 2022 Bench Trial at 252:20–254:9.

[127] *Id.*

[128] *Id.* at 252:17–20.

[129] *Id.* at 268:2–13. It is possible Mr. Poulos spoke to Attorney Anderson with Mrs. Poulos, but the testimony on this point is unclear.

[130] *See, e.g.*, Ex. J-321-E at 58:5–18.

[131] *Id.* at 50:20–51:8.

[132] *Id.* at 51:2–8.

[133] *Id.*

[134] Ex. J-321-A at 136:5–13 (asking Mr. Poulos whether he wanted "The Hill School to learn" Mr. Ralston abused him; Mr. Poulos answering, "Through proper legal counsel."); *id.* at 137:12–15 (Mr. Poulos swearing he wanted The Hill School to learn his allegations through Attorney Garabedian); *id.* at 139:19–140:4 (Mr. Poulos testifying he wished to inform The Hill School about the specific details of how Mr. Ralston abused him).

[135] ECF Doc. No. 388 at 145:18–24.

[136] Ex. J-103.

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] *See* N.T. Jan. 18, 2022 Bench Trial at 73:13–18; Ex. J-166 (Garabedian file containing materials about Mr. Ralston).

[142] N.T. Jan. 18, 2022 Bench Trial at 27:13–19.

[143] Ex. J-93.

[144] Ex. J-161 at 1903.

[145] *Id.*

[146] *Id.*

[147] Ex. J-87 (disclosing arrests); Ex. J-318 (Mitchell Garabedian June 24, 2021 Dep.) at 175:9–13 (Attorney Garabedian swearing at deposition he did not obtain Mr. Poulos's criminal records until this lawsuit); Ex. J-166 (absence of criminal records from Attorney Garabedian's file on Mr. Poulos's matter).

[148] Ex. J-87 at 33 (disclosing psychological treatment); Ex. J-318 at 177:14–22 (Attorney Garabedian swearing at deposition he did not ask for Mr. Poulos's release for his medical records until May 2019); Ex. J-166 (absence of medical records from Attorney Garabedian's file on Mr. Poulos's matter).

[149] *See* Ex. J-166 (absence of The Hill School file from Attorney Garabedian's file on Mr. Poulos's matter).

[150] Ex. J-81.

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *See* N.T. Jan. 13, 2022 Bench Trial at 234:2–13.

[157] Ex. J-318 at 53:7–16.

[158] N.T. Jan. 13, 2022 Bench Trial at 234:6–9.

[159] *Id.* at 234:2–5.

[160] N.T. Jan. 11, 2022 Bench Trial at 134:9–18 (Mr. Ralston describing Headmaster Lehman reading the letter).

[161] N.T. Jan. 13, 2022 Bench Trial at 16:22–25:5; *id.* at 99:14–100:10.

[162] *Id.* at 19:11–20; 20:10–14.

[163] *Id.* at 19:11–20.

[164] *Id.* at 22:15–19.

[165] *Id.* at 19:21–20:1.

[166] *Id.* at 22:15–19.

[167] N.T. Jan. 11, 2022 Bench Trial at 133:25–134:8.

[168] *Id.* at 134:9–14.

[169] *Id.* at 134:15–18.

[170] *Id.* at 134:15–135:1.

[171] *Id.* at 135:11–15.

[172] *Id.* at 134:21–135:1.

[173] *Id.* at 135:16–25.

[174] *Id.* at 33:2–9.

[175] *Id.*

[176] *See* Ex. J-96.

[177] *Id.*

[178] *Id.*

[179] *See* Ex. J-102.

[180] *Id.*

[181] N.T. Jan. 19, 2022 Bench Trial at 65:15–24.

[182] N.T. Jan. 13, 2022 Bench Trial at 80:15–24.

[183] *Id.*

[184] *Id.* at 80:18–24.

[185] Ex. J-106.

[186] The record does not contain an email dated January 18 from Mrs. Poulos.

[187] Ex. J-106.

[188] *Id.*

[189] N.T. Jan. 13, 2022 Bench Trial at 233:9–12.

[190] *See* Ex. J-104. The date in the top-right corner of the notes reads "12/12/18," but the phone call occurred on December 18, 2018. *See* N.T. Jan. 18, 2022 Bench Trial at 158:5–14.

[191] *See* Ex. J-104.

[192] *Id.*

[193] Ex. J-107.

[194] Ex. J-108.

[195] Ex. J-109; N.T. Jan. 18, 2022 Bench Trial at 131:19–132:6.

[196] *See* Ex. J-109.

[197] *See id.*

[198] *See* Ex. J-110.

[199] *See* N.T. Jan. 13, 2022 Bench Trial at 23:5–14.

[200] *See id.*

[201] *See id.*

[202] *Id.* at 86:3–5.

[203] *Id.* at 23:18–24:1.

[204] N.T. Jan. 18, 2022 Bench Trial at 142:4–10; N.T. Jan. 19, 2022 Bench Trial at 75:9–13; Ex. J-112.

[205] Ex. J-112.

[206] *Id.*

[207] *Id.*; N.T. Jan. 18, 2022 Bench Trial at 145:10–146:14.

[208] Ex. J-112.

[209] *Id.*

[210] N.T. Jan. 13, 2022 Bench Trial at 335:3–22.

[211] Ex. J-112.

[212] *Id.*

[213] N.T. Jan. 18, 2022 Bench Trial at 218:3–16.

[214] *Id.*

[215] *Id.*

[216] Ex. J-85; N.T. Jan. 18, 2022 Bench Trial at 149:1–9.

[217] *See* N.T. Jan. 18, 2022 Bench Trial at 150:10–16.

[218] Ex. J-85.

[219] *Id.*

[220] *Id.*

[221] *Id.*

[222] *Id.*

[223] N.T. Jan. 13, 2022 Bench Trial at 99:18–100:10.

[224] *See* Ex. J-128.

[225] N.T. Jan. 13, 2022 Bench Trial at 25:22–26:2; Ex. J-128.

[226] N.T. Jan. 18, 2022 Bench Trial at 150:18–151:5; Ex. J-118; Ex. 128.

[227] Ex. J-127.

[228] Ex. J-128.

[229] *Id.*

[230] *Id.*

[231] *See* Ex. J-130.

[232] *Id.*

[233] *Id.*

[234] *Id.*

[235] Ex. J-132.

[236] *Id.*

[237] *Id.*

[238] Ex. J-133.

[239] *Id.*

[240] *See* N.T. Jan. 18, 2022 Bench Trial at 192:12–21; Ex. J-133.

[241] Ex. J-133; N.T. Jan. 18, 2022 Bench Trial at 192:12–21.

[242] N.T. Jan. 11, 2022 Bench Trial at 144:17–22.

[243] *Id.* at 147:8–10.

[244] *Id.* at 147:13–149:8.

[245] *Id.* at 282:22–283:5.

[246] *Id.* at 192:17–193:15; *id.* at 282:22–283:5.

[247] *Id.* at 152:4–6

[248] *Id.* at 152:9–15.

[249] *Id.* at 278:13–279:8.

[250] N.T. Jan. 12, 2022 Bench Trial at 196:16–18.

[251] *Id.*

[252] *Id.* at 219:19–23.

[253] *Id.*

[254] *Id.* at 225:22–226:1.

[255] N.T. Jan. 11, 2022 Bench Trial at 153:8–9.

[256] *Id.* at 153:11–12.

[257] *Id.* at 153:20–23.

[258] *Id.* at 155:11–14.

259 *Id.*

260 *Id.* at 161:1–164:14.

261 *Id.* at 145:23–147:6.

262 *Id.* at 146:9–12.

263 *See* Ex. J-84.

264 N.T. Jan. 11, 2022 Bench Trial at 224:24–225:6.

265 *Id.* at 225:7–16.

266 *Id.* at 172:14–173:4.

267 *Id.* at 172:23–24.

268 *Id.* at 172:18–20.

269 *Id.* at 189:5–7.

270 *Id.* at 189:11–15.

271 *Id.* at 191:5–9.

272 *Id.* at 225:13–20.

273 *Id.* at 196:14–197:4.

274 N.T. Jan. 12, 2022 Bench Trial at 208:5–7.

275 N.T. Jan. 11, 2022 Bench Trial at 213:6–14.

276 *Id.* at 214:6–215:3.

277 *Id.* at 223:10–13.

278 N.T. Jan. 13, 2022 Bench Trial at 60:25–61:7.

279 Ex. J-317 (Benjamin Walborn Dep.) at 18:10–12.

280 ECF Doc. No. 290 (Zachary Brusko Dep.) at 23:1–3. The parties moved in designations and counter-designations of Mr. Brusko at the close of Mr. Ralston's case-in-chief. *See* N.T. Jan. 18, 2022 Bench Trial at 11–15.

281 ECF Doc. No. 290 at 10:6–10.

282 *Id.* at 51:10–23; 54:14–19.

[283] *Id.* at 56:2–20; 63:3–64:13.

[284] *Id.* at 58:2–14.

[285] *Id.* at 15–22.

[286] N.T. Jan. 13, 2022 Bench Trial at 74:10–13.

[287] N.T. Jan. 11, 2022 Bench Trial at 210:14–20.

[288] N.T. Jan. 13, 2022 Bench Trial at 74:21–24.

[289] *Id.*

[290] N.T. Jan. 11, 2022 Bench Trial at 149:19–23.

[291] ECF Doc. No. 372 (Matthew Ralston Sept. 20, 2021 Dep.) at 183:1–7.

[292] *Id.* at 185:3–12.

[293] *Id.* at 151:3–10.

[294] N.T. Jan. 11, 2022 Bench Trial at 150:7–151:6 (only disclosing Chairman Richards in response to question whether Mr. Ralston knew any board members beside Chairman Athey).

[295] *Id.* at 167:4–5.

[296] *Id.* at 167:6–7.

[297] *Id.* at 228:1–11.

[298] *Id.* at 157:14–21.

[299] *Id.* at 158:17–20.

[300] *Id.* at 221:15–20; N.T. Jan. 13, 2022 Bench Trial at 91:25–92:2 (Attorney Rees asked Mr. Ralston about the allegations' truth).

[301] N.T. Jan. 11, 2022 Bench Trial at 278:13–279:3.

[302] *Id.*

[303] *Id.* at 155:24–156:6 (describing Mr. Richards's role); N.T. Jan. 13, 2022 Bench Trial at 96:9–13 (describing call).

[304] N.T. Jan. 13, 2022 Bench Trial at 96:14–95:1.

[305] *Id.* at 97:2–98:3.

[306] *Id.* at 98:19–22.

[307] ECF Doc. No. 1.

[308] *Id.*

[309] *Id.* at 1.

[310] N.T. Jan. 11, 2022 Bench Trial at 216:14–23.

[311] *Id.*

[312] *See* ECF Doc. No. 28.

[313] N.T. Jan. 13, 2022 Bench Trial at 102:1–3.

[314] *Id.*

[315] *See* Ex. J-145.

[316] *See id.*

[317] N.T. Jan. 11, 2022 Bench Trial at 285:7–11.

[318] *Id.*

[319] *See* N.T. Jan. 11, 2022 Bench Trial at 223:20–23 ("Q: [Y]ou weren't fired in reaction to the December 26, 2018 letter, right? A: I was not fired then because of the letter, no.").

[320] *Id.* at 51:7–15 (denoting building No. 20 on exhibit J-57 as Upper School East); Ex. J-57 (building No. 20 is Upper School East).

[321] *Id.* at 53:13–18.

[322] *Id.* at 54:25–55:18.

[323] *Id.*

[324] *Id.*

[325] *Id.* at 56:2–5.

[326] N.T. Jan. 13, 2022 Bench Trial at 184:7–13.

[327] *Id.* at 185:7–10.

[328] *See id.* at 190:6–9; *see* Ex. P16.72; Ex. J-171 at P16.72 (listing demerits from Mr. Poulos's sophomore year, but none listed about sports); Ex. J-171 at P16.93 (perfect score in attendance on Mr. Poulos's "Athletic Report").

[329] *See* N.T. Jan. 11, 2022 Bench Trial at 246:9–16 (twenty minutes between end of geometry class and the beginning of sports).

[330] N.T. Jan. 13, 2022 Bench Trial at 240:13–15.

[331] *Id.*

[332] *Id.* at 294:1–3; *id.* at 295:6–7.

[333] *Id.* at 302:10–13; *id.* at 316:9–15; *id.* at 318:24–25; *id.* at 321:14–20; *id.* at 321:24–322:11.

[334] N.T. Jan. 11, 2022 Bench Trial at 251:12–252:21.

[335] N.T. Jan. 13, 2022 Bench Trial at 249:2–9.

[336] *Id.* at 215:23–25.

[337] *Id.* at 244:13–15.

[338] *Id.* at 244:16–21.

[339] *Id.* at 244:22–245:1.

[340] Mr. Ralston sued Attorney Garabedian and The Law Offices Attorney Garabedian as separate entities. *See* ECF Doc. No. 28 at 1. The parties do not dispute the Law Offices are liable for the conduct of Attorney Garabedian. We refer to both defendants collectively as "Attorney Garabedian."

[341] ECF Doc. No. 28; ECF Doc. Nos. 402–03.

[342] ECF Doc. Nos. 401, 404.

[343] ECF Doc. No. 400.

[344] *Id.* ¶ 27 (arguing Mr. Poulos accused Mr. Ralston "in good faith").

[345] *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008).

[346] *Id.*

[347] 42 Pa. Stat. and Cons. Stat. Ann. § 8343(a).

[348] *Id.* § 8343(b).

[349] *See* ECF Doc. No. 28 at 1 (introducing claims by arguing Attorney Garabedian and Mr. Poulos published defamatory allegations "to Plaintiff's supervisors and peers"); *id.* ¶¶ 47–70 (claiming defamation against Attorney Garabedian for publishing the 2018 Letters); *id.* ¶¶ 78–93 (focusing defamation claim against Mr. Poulos on statements in the 2018 Letters).

[350] *Emekekwue v. Offor*, 26 F. Supp. 3d 348, 359 (M.D. Pa. 2014) (alteration in original) (quoting *U.S. Healthcare v. Blue Cross of Greater Phila.*, 898 F.2d 914, 923 (3d Cir. 1990)).

[351] *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 500 F. Supp. 3d 380, 424 (E.D. Pa. 2020).

[352] *Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 465 (E.D. Pa. 2017), *aff'd sub nom. Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132 (3d Cir. 2018).

[353] *See* 18 Pa. Stat. and Cons. Stat. Ann. § 6318(a) (prohibiting sexual abuse of minors).

[354] *See, e.g.*, *Thompson v. Wagner*, 631 F. Supp. 2d 664, 686 n.15 (W.D. Pa. 2008) (a communication is "easily" defamatory when it "implicates the plaintiff in criminal activity").

[355] It is unclear whether Attorney Garabedian and Mr. Poulos bear the burden to prove the allegations' truth or if Mr. Ralston bears the burden to prove the allegations' falsity. The defamer usually bears the burden to prove truth as an affirmative defense. *See Emekekwue*, 26 F. Supp. 3d at 362 (citing 42 Pa. Con. Stat. § 8343(b)(1)) ("The burden is on the defendant to prove the truth of the defamatory communication."). The First Amendment requires the plaintiff to prove falsity when the defamation relates to a matter of public concern and the plaintiff sues a media defendant. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("[T]he common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages ***against a media defendant*** for speech of public concern." (emphasis added)).

The speech here about child sexual abuse at a boarding school relates to a matter of public concern. But Attorney Garabedian and Mr. Poulos are not media defendants. So the burden of proof is unclear. *See id.* at 780 (Brennan, J., concurring) (noting the Court "reserve[d] the question whether the rule it announce[d] [in *Hepps*] applies to nonmedia defendants"); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 n.6 (1990) ("In *Hepps* the Court reserved judgment on cases involving nonmedia defendants, and accordingly we do the same." (internal citations omitted)). The Pennsylvania Superior Court required the plaintiff to prove falsity in a case against a nonmedia defendant, but the court did not acknowledge *Hepps* limited its holding to media defendants. *See Kuwait & Gulf Link Transp. Co. v. Doe*, 216 A.3d 1074, 1089 n.4 (Pa. Super. Ct. 2019) ("Under the First Amendment to the United States Constitution, a plaintiff asserting defamation concerning a publication of a matter of 'public concern' bears the burden of proving that the publication was false." (citing *Hepps*, 475 U.S. at 776)). We need not resolve this question today because even assuming Mr. Ralston must prove falsity, he overwhelmingly does so.

[356] *Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009) (citing *Bobb v. Kraybill*, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986)).

[357] *Id.*

[358] *Wallace v. Media News Grp., Inc.*, 568 F. App'x 121, 125 (3d Cir. 2014) (internal quotations omitted).

[359] *Emekekwue*, 26 F. Supp. 3d at 362 (alteration in original).

[360] N.T. Jan. 13, 2022 Bench Trial at 292:13.

108

361 *Id.* at 278:8–15; *see also* Ex. J-171 at P16.10.

362 N.T. Jan. 13, 2022 Bench Trial at 164:15–17; *id.* at 288:2–4.

363 *Id.* at 289:1–5.

364 *Id.* at 168:2–5.

365 *Id.* at 291:10–25.

366 *Id.* at 297:5–12.

367 *Id.* at 301:24–302:3.

368 *Id.* at 292:4–6.

369 *Id.* at 292:15–16.

370 *Id.* at 294:1–6.

371 *Id.*

372 *Id.* at 294:23–25.

373 *Id.* at 295:6–13.

374 *Id.* at 184:7–13.

375 *Id.* at 301:9–11.

376 *Id.* at 323:18–22.

377 *Id.* at 323:24–25.

378 *Id.* at 294:1–3; *id.* at 295:6–7.

379 *Id.* at 221:3–5.

380 *Id.* at 240:18–25.

381 *Id.* at 302:11–13.

382 *Id.* at 318:24–319:6.

383 *Id.* at 293:18–21.

384 *Id.* at 245:2–14.

385 *Id.* at 245:2–14

[386] *Id.* at 250:10.

[387] *Id.* at 335:13–22.

[388] Ex. J-96.

[389] *Id.*

[390] N.T. Jan. 13, 2022 Bench Trial at 335:13–22.

[391] *Id.*

[392] *Id.* at 271:3–13.

[393] *Id.* at 227:3–14.

[394] *Id.* at 230:20–23.

[395] *Id.* at 277:16–278:7.

[396] *Id.*

[397] *Id.* at 278:6.

[398] *Id.* at 278:8–14.

[399] 3d Cir. Model Civ. Jury Instructions § 1.7. This model instruction contains two factors we need not consider today. First, it directs juries to consider "the opportunity and ability of the witness to see or hear or know the things the witness testifies to." *Id.* This is the only factor which does not harm Mr. Poulos's credibility, as he possessed an excellent opportunity to "see or hear or know" his story. His story, however, is false, so this factor is irrelevant. Second, the instruction allows juries to consider "any other factors that bear on believability." *Id.* We need not consider this catch-all factor because the other five factors are sufficient to find Mr. Poulos unbelievable.

[400] *See id.* § 1.5.

[401] *Id.*

[402] *See, e.g.*, N.T. Jan. 12, 2022 Bench Trial at 30:25–31:19 (Dr. Ziv testifying child abusers are "worried" about getting caught, so abusers often "go out of their way to meet at times where detection is likely not to occur").

[403] *See* Ex. J-57.

[404] N.T. Jan. 13, 2022 Bench Trial at 312:21–24.

[405] *Id.* at 315:20–25.

[406] *Id.* at 333:7–9.

---

[407] *Id.* at 186:3–9; Ex. J-171 at P16.93 (perfect score in attendance on Mr. Poulos's "Athletic Report").

[408] Ex. J-87.

[409] Ex. J-321-B (Kurtis Poulos Nov. 20, 2020 Dep.) at 406:23–408:4.

[410] N.T. Jan. 13, 2022 Bench Trial at 215:19–25.

[411] *Id.*

[412] *Id.* at 215:23–25.

[413] *Id.*

[414] *Id.* at 249:2–9.

[415] *Id.*

[416] *Id.* at 302:11–13.

[417] *Id.* at 213:12–16.

[418] *Id.*

[419] N.T. Jan. 12, 2022 Bench Trial at 40:19.

[420] *See* Ex. J-87, Ex. J-112.

[421] N.T. Jan. 13, 2022 Bench Trial at 292:25–293:4.

[422] *Id.* at 335:3–4.

[423] *Id.* at 335:13–22.

[424] *Id.*

[425] N.T. Jan. 12, 2022 Bench Trial at 47:2–4.

[426] *See, e.g.*, N.T. Jan. 13, 2022 Bench Trial at 177:10–16 ("Q: And then did you black out then? A: No. I didn't know what was going on. Q: Well, what went on? A: I know that after that, that he started to sexually abuse me, Lane. Q: I'm asking about the first instance, Mr. Poulos. Okay? A: And I just explained that to you."); *id.* at 184:1–6 ("Q: Did you tell Mr. Garabedian anything else other than [the abuse] all occurred in the geometry classroom when it was the last period of the day? A: I can only tell you what I can recall. I can't be specific about certain things I do not recall. You asked me to be falsely testifying."); *id.* at 191:10–14 ("Q: Well, what type of lawyer do you think Mr. Garabedian is? A: Lane, you have to be more succinct with your verbiage. When you speak about abuse, there's two types of abuse."); *id.* at 246:10–14 ("Q: Forgive me, Mr. Poulos, I didn't mean to interrupt you . . . Would you like to complete your answer? A: No. You never let

me do, so just go ahead."); *id.* at 259:15–16 ("Q: Did he ask you whether or not—strike that. A: Are you prepared for this?" By this, Mr. Poulos meant to ask Mr. Ralston's counsel whether he had prepared to examine Mr. Poulos.).

[427] N.T. Jan. 12, 2022 Bench Trial at 3:4–19.

[428] *Id.* at 4:9–25.

[429] *Id.* at 8:12–23.

[430] *Id.* at 2:20–10:13 (Dr. Ziv testifying to her qualifications).

[431] *Ralston v. Garabedian*, No. 19-1539, 2022 WL 19273, at *17 (E.D. Pa. Jan. 3, 2022). We granted in part Attorney Garabedian's *Daubert* Motion to exclude portions of Dr. Ziv's testimony in our January 3, 2022 Order. *See id.* at *11–17. We excluded portions of Dr. Ziv's opinion in which she simply opined as to whether Mr. Poulos lied because those opinions did not require specialized knowledge, invaded the jury's fact-finding role, and relied on inadmissible previous bad acts. *Id.* at *14–16. We permitted Dr. Ziv to testify only as to those opinions requiring specialized knowledge, like whether Mr. Poulos displayed studied behaviors of sexual abuse survivors and whether Mr. Ralston displayed studied behaviors of sexual abuse perpetrators. *Id.* at *16–17. We planned to hold a *Daubert* hearing to determine the scope of admissible opinions but no longer needed a hearing after the parties consented to a bench trial.

Dr. Ziv complied with our January 3 Order at our bench trial. She provided competent opinions based on her specialized knowledge and did not invade our fact-finding role. We found her testimony helpful and credible. Litigants should not cite our January 3 findings concerning opinions outside of her expertise as somehow impugning Dr. Ziv's qualifications, which are abundant.

[432] N.T. Jan. 12, 2022 Bench Trial at 23:16–17.

[433] *Id.* at 46:23–47:8.

[434] *Id.* at 47:6–8.

[435] *Id.* at 48:8–51:3.

[436] *Id.*

[437] *Id.*

[438] *Id.*

[439] *Id.* at 53:9–10.

[440] *Id.* at 51:6–14.

[441] *Id.* at 52:22–23; *id.* at 57:12–13.

---

[442] *Id.* at 61:18–25.

[443] *Id.* at 63:10–18.

[444] *See, e.g.*, N.T. Jan. 13, 2022 Bench Trial at 316:11–15 ("Q: Tell me about the first time you performed fellatio on Mr. Ralston. How did you get access to Mr. Ralston's penis? A: I don't remember the specifics."); *id.* at 326:8–10 ("Q: I want to know about a time when Mr. Ralston sexually abused you. A: I don't recall specifics."); *id.* at 326:21–24 ("Q: So did you perform oral sex on Mr. Ralston in both corners of the classroom? A: I don't remember the specifics of what I did or didn't do.").

[445] *Id.* at 302:10–13; *id.* at 316:9–15; *id.* at 318:24–25; *id.* at 321:14–20; *id.* at 321:24–322:11. Mr. Poulos did claim Mr. Ralston ejaculated. *See id.* at 323:18–22.

[446] N.T. Jan. 12, 2022 Bench Trial at 53:9–10.

[447] N.T. Jan. 19, 2022 Bench Trial at 167:17–25.

[448] *Id.* at 173:4–8.

[449] *Id.* at 176:4–11.

[450] *Id.* at 209:1–3 ("I don't have a lot of experience with nonpatient populations who experience sexual assault and report it in their experience.").

[451] N.T. Jan. 12, 2022 Bench Trial at 22:10–16.

[452] *Id.* at 26:8–11.

[453] *Id.* at 26:16–18.

[454] *Id.* at 28:6–14.

[455] *Id.* at 31:18–32:17.

[456] *Id.* at 26:20–21.

[457] *Id.* at 26:22–27:3.

[458] *Id.* at 27:4–28:14.

[459] *Id.* at 33:13–17.

[460] *Id.* at 27:4–28:14.

[461] *Id.* at 33:3–12.

[462] N.T. Jan. 13, 2022 Bench Trial at 244:13–15.

[463] *Id.* at 244:16–21.

[464] *Id.* at 244:22–245:1.

[465] N.T. Jan. 12, 2022 Bench Trial at 40:23–41:6; *id.* at 44:11–14.

[466] *Id.* at 41:2–4.

[467] ECF Doc. No. 400 ¶¶ 37, 42.

[468] N.T. Jan. 12, 2022 Bench Trial at 26:1 (describing "stranger assault").

[469] *Id.* at 27:6–7.

[470] *Id.* at 44:17–45:8; *see also id.* at 33:1–2.

[471] *See id.* at 33:3–12 (explaining how groomed victims feel "responsibility" for their own assault).

[472] *Id.* at 45:20–46:8.

[473] *Id.* at 46:4–8.

[474] *Chicarella v. Passant*, 494 A.2d 1109, 1112 (Pa. Super. Ct. 1985)

[475] Restatement (Second) of Torts § 577 (1977).

[476] *Bochetto v. Gibson*, 860 A.2d 67, 71 (Pa. 2004) (emphases removed) (quoting *Post v. Mendel*, 507 A.2d 351, 355 (Pa. 1986)).

[477] *Schanne v. Addis*, 121 A.3d 942, 947 (Pa. 2015).

[478] *Id.* (quoting *Pawlowski v. Smorto*, 588 A.2d 36, 41 (Pa. Super. Ct. 1991)).

[479] *Id.* at 948.

[480] *Id.* at 947.

[481] *Post*, 507 A.2d at 355.

[482] *Id.*

[483] *Schanne*, 121 A.3d at 948.

[484] *Id.* at 950 (emphasis removed) (quoting Restatement (Second) of Torts § 588 cmt. e (1977)).

[485] *Id.* (quoting Restatement (Second) of Torts § 588 cmt. e (1977)).

[486] *Id.* at 949 (emphasis removed).

[487] *Ralston v. Garabedian*, --- F. Supp. 3d. ----, No. 19-1539, 2021 WL 6072881, at *7–13 (E.D. Pa. Dec. 23, 2021) [hereinafter "*Ralston I*"].

[488] *Weinik v. Temple Univ. of Commonwealth Sys. of Higher Educ.*, No. 20-2525, 2021 WL 5882039, at *1 (3d Cir. Dec. 13, 2021) (citing *Schanne*, 121 A.3d at 951).

[489] The statute of limitations effective during Attorney Garabedian and Mr. Poulos's discussions required Mr. Poulos to sue within twelve years of turning eighteen. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 5533(b)(2)(i) (effective through Nov. 25, 2019).

[490] *Ralston I*, 2021 WL 6072881, at *10.

[491] *See id.* at *8 (assuming Attorney Garabedian seriously considered litigation because he "needed to research Mr. Poulos's legal remedies to discover the statute of limitations expired").

[492] *See, e.g.*, N.T. Jan. 18, 2022 Bench Trial at 254:16–255:3.

[493] N.T. Jan. 13, 2022 Bench Trial at 254:4–7.

[494] *See, e.g.*, N.T. Jan. 18, 2022 Bench Trial at 283:21–284:5; *compare also* 284:18–285:7 (Attorney Garabedian testifying after refreshing recollection), *with* Ex. J-109 (showing Attorney Garabedian parroted his law firm's notes).

[495] *Ralston I*, 2021 WL 6072881, at *10.

[496] We judicially noticed the existence of certain documents Attorney Garabedian submitted before trial purporting to show his efforts to change the statute of limitations. *See* ECF Doc. No. 289 at 5–6. But we conditioned our consideration of the documents' contents—as opposed to their mere existence—on Attorney Garabedian establishing a foundation for the documents' relevance at trial. *Id.* at 8. But Attorney Garabedian made no effort to establish the documents' relevance. His counsel never presented him the documents and he never testified about them, let alone testified about his purported discussions with Mr. Poulos related to the documents. We now discount as irrelevant the documents which Attorney Garabedian asked us to judicially notice.

[497] Indeed, Pennsylvania's statute of limitations governing sexual abuse claims now reads: "If an individual entitled to bring a civil action arising from sexual abuse is under 18 years of age at the time the cause of action accrues, the individual shall have a period of 37 years after attaining 18 years of age in which to commence an action for damages regardless of whether the individual files a criminal complaint regarding the sexual abuse." 42 Pa. Stat. and Cons. Stat. Ann. § 5533(b)(2)(i).

[498] *Ralston I*, 2021 WL 6072881, at *9 (quoting *Edwards v. Centex Real Est. Corp.*, 61 Cal. Rptr. 2d 518, 531 (Cal. Ct. App. 1997)).

[499] *Id.*

[500] N.T. Jan. 19, 2022 Bench Trial at 65:21–66:4.

[501] *See Ralston I*, 2021 WL 6072881, at *11 (mediation is not a quasi-judicial proceeding because it is a "private form of dispute resolution which does not involve administrative functions or government bodies").

[502] *Greenberg v. McGraw*, 161 A.3d 976, 983–84 (Pa. Super. Ct. 2017) (quoting *Urbano v. Meneses*, 431 A.2d 308, 311 (Pa. Super. Ct. 1981)).

[503] *See, e.g.*, *Harris v. Saint Joseph's Univ.*, No. 13-3937, 2014 WL 1910242, at *9 (E.D. Pa. May 13, 2014).

[504] *See* ECF Doc. No. 28 at 12 ("WHEREFORE, Plaintiff hereby demands damages from the Garabedian Defendants.").

[505] We found Mr. Ralston is a private figure in our December 23, 2021 Memorandum. *See Ralston I*, 2021 WL 6072881, at *13–20. We found the subject matter of the 2018 Letters regarded a public controversy of the extent of sexual abuse at The Hill School, but Mr. Ralston did not constitute a limited-purpose public figure vis-à-vis the public controversy. *Id.* We heard no evidence persuading us to change our view during trial.

[506] *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 432 (Pa. 2015).

[507] *Id.* at 431–32 (rejecting argument presumed and punitive damages "should be limited to those for proven actual injury").

[508] *Id.* at 429 ("[F]or purposes of a Pennsylvania defamation case, proof of actual injury to a private plaintiff's reputation is a prerequisite to the recovery of damages for other actual injuries, including mental and emotional injuries.").

[509] *Id.*

[510] 129 A.3d 404.

[511] *Id.* at 426 (emphasis removed) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

[512] *Id.* at 429.

[513] *Id.* at 429–30.

[514] *Id.* at 430 (citing *Time, Inc. v. Firestone*, 424 U.S. 448, 475 n.3 (1976) (Brennan, J., dissenting)).

[515] *See Joseph*, 959 A.2d at 344 ("With words that are actionable *per se,* only general damages, *i.e.*, proof that one's reputation was actually affected by defamation or that one suffered personal humiliation, or both, must be proven."). The Pennsylvania Supreme Court in *Joseph* did not specify whether its analysis pertained to one of the seven statutory elements of defamation or whether it analyzed constitutional protections. But we need not decide the analytical underpinnings of the *Joseph* analysis because the court made its holding clear: Private figure plaintiffs cannot obtain damages judgments without proving actual malice or actual reputational injury.

---

[516] 475 U.S. 767 (1986); ECF Doc. No. 404 at 6–7, 13–15.

[517] *Hepps*, 475 U.S. at 776.

[518] *See generally id.*

[519] *Id.* at 774 (quoting *Gertz*, 418 U.S. at 347).

[520] *See, e.g., id.* at 774 (noting *Gertz* required a "showing of simple fault . . . to allow recovery for actual damages"); *id.* at 780 (Stevens, J., dissenting) ("The issue the Court resolves today will make a difference in only one category of cases—those in which a private individual can prove that he was libeled by a defendant who ***was at least negligent***. . . . [T]he only litigants—and the only publishers—who will benefit from today's decision are those who act ***negligently*** or maliciously. (emphases added)); *see also Milkovich*, 497 U.S. at 20–21 (requiring actual malice when public figures sue on matters of public concern, but requiring only "some level of fault" when private figures sue on matters of public concern).

[521] 923 A.2d 389 (Pa. 2007).

[522] *Id.* at 399.

[523] *Id.* at 399 n.12.

[524] *Id.* at 400 ("[S]tates are free to allow a private-figure plaintiff to recover by establishing that the defendant acted negligently rather than maliciously . . . Indeed, we do find this to be the appropriate standard relative to a private-figure plaintiff.").

[525] Attorney Garabedian argues our Court of Appeals's nonprecedential decision fifteen years ago in *Moore v. Vislosky* requires Mr. Ralston to prove actual malice, not just reputational injury. 240 F. App'x 457 (3d Cir. 2007). We disagree. In *Moore*, our Court of Appeals predicted the Pennsylvania Supreme Court would require actual malice to defeat a conditional privilege arising from speech related to public concern. *Id.* at 464. This prediction turned out to be incorrect; the Pennsylvania Supreme Court addressed the issue after *Moore* and found negligence suffices to defeat conditional privileges. *See Am. Future*, 923 A.2d at 400. Our Court of Appeals returned to applying a negligence standard to defeat conditional privileges under Pennsylvania law following *Moore. See, e.g., Wallace v. Media News Grp., Inc.*, 568 F. App'x 121, 125 n.4 (3d Cir. 2014) ("Actual malice is required for liability only when the plaintiff is a public figure and the speech relates to matters of public concern, and private figures may seek compensatory damages for defamation under Pennsylvania law and the First Amendment on the basis of mere negligence."); *Manning v. Flannery*, 528 F. App'x 141, 143 (3d Cir. 2013) (quoting negligence standard to defeat conditional privilege). In any event, the *Moore* decision does not bind us because our Court of Appeals's non-published opinions are "not precedents for the district courts of this circuit." *In re Grand Jury Investigation*, 445 F.3d 266, 276 (3d Cir. 2006).

[526] *See Joseph*, 129 A.3d at 436–37 (discussing actual malice based on what "the federal High Court has held" and citing United States Supreme Court law in defining actual malice).

[527] *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020).

[528] *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 506 (E.D. Pa. 2010).

[529] *Id.*

[530] *Joseph*, 129 A.3d at 436.

[531] *Manning v. WPXI, Inc.*, 886 A.2d 1137, 1144 (Pa. Super. Ct. 2005) (quoting *Matter of Braig*, 554 A.2d 493, 495 (Pa. 1989)).

[532] *Medure v. New York Times Co.*, 60 F. Supp. 2d 477, 487 (W.D. Pa. 1999).

[533] *Curran v. Phila. Newspapers, Inc.*, 546 A.2d 639, 642 (Pa. Super. Ct. 1988).

[534] *Id.*

[535] *Id.*

[536] *Medure*, 60 F. Supp. 2d at 487 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

[537] *McCafferty*, 955 F.3d at 359 (citing *Joseph*, 129 A.3d at 437).

[538] *Id.* at 360 (first alteration and emphasis in original).

[539] *Mzamane*, 693 F. Supp. 2d at 506 (first quoting *St. Amant*, 390 U.S. at 731, then quoting *McDowell v. Paiewonsky*, 769 F.2d 942, 951 (3d Cir. 1985)).

[540] *Joseph*, 129 A.3d at 437.

[541] *See, e.g.*, ECF Doc. No. 369 (Shanin Specter Dep.) at 96:13–23 (Mr. Ralston's expert witness, Shanin Specter, Esquire, opining a lawyer "must exercise exquisite care in the investigatory and evaluative process before making" claims of sexual abuse).

[542] *Joseph*, 129 A.3d at 437.

[543] *Medure*, 60 F. Supp. 2d at 487 (quoting *McDowell*, 769 F.2d at 951).

[544] *McCafferty*, 955 F.3d at 360 (emphasis in original).

[545] *Id.* at 359.

[546] *Medure*, 60 F. Supp. 2d at 487.

[547] *Joseph*, 129 A.3d at 437.

[548] ECF Doc. No. 403 at 24.

[549] *Mzamane*, 693 F. Supp. 2d at 507.

[550] *Id.* (emphasis added).

---

[551] *See, e.g.*, *Berisha v. Lawson*, 141 S. Ct. 2424, 2425 (2021) (Thomas, J., dissenting) (urging Supreme Court to reconsider actual malice doctrine because "of the doctrine's real-world effects," as "lies impose real harm"); *id.* at 2429 (Gorsuch, J., dissenting) (noting the actual malice doctrine has "evolved into a subsidy for published falsehoods on a scale no one could have foreseen [and] it has come to leave far more people without redress than anyone could have predicted"); *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 251 (D.C. Cir. 2021) (Silberman, J., dissenting) (urging the Supreme Court to overrule actual malice doctrine considering "doubt[s] the Court would invent the same rule" today), *cert. denied*, 142 S. Ct. 427, 211 L. Ed. 2d 252 (2021).

[552] *See New York Times Co. v. Sullivan*, 376 U.S. 254, 256–57 (1964).

[553] *Berisha*, 141 S. Ct. at 2428 (Gorsuch, J., dissenting).

[554] *Id.* (Gorsuch, J., dissenting). Because the Pennsylvania Supreme Court has adopted the federal actual malice doctrine, criticisms of the federal doctrine apply all the same to the Pennsylvania doctrine.

[555] *Id.* at 2428 (Gorsuch, J., dissenting) (emphasis in original).

[556] *St. Amant*, 390 U.S. at 731; *see also Berisha*, 141 S. Ct. at 2428 (Gorsuch, J., dissenting) ("Under the actual malice regime as it has evolved, ignorance is bliss." (internal quotations omitted)).

[557] *See, e.g.*, *Blankenship v. Fox News Network, LLC*, No. 19-236, 2022 WL 321023, at *15 n.24 (S.D. W. Va. Feb. 2, 2022) (compiling criticisms of actual malice doctrine but concluding "it remains binding precedent that the court is obligated to follow").

[558] 433 F. Supp. 3d 353, 362 (D. Conn. 2020).

[559] *Id.* at 363.

[560] *Id.* at 366.

[561] *Id.* at 372.

[562] *Id.*

[563] *Id.* at 368–69.

[564] *Id.* at 376–77, 380.

[565] *Id.* at 380.

[566] *Id.*

[567] *Id.*

[568] *Id.*

---

[569] *Id.* at 376.

[570] *Manning*, 886 A.2d at 1144.

[571] *Sprague v. Am. Bar Ass'n*, 276 F. Supp. 2d 365, 370 (E.D. Pa. 2003) (internal quotations omitted).

[572] *Agriss v. Roadway Exp., Inc.*, 483 A.2d 456, 474 (Pa. Super. Ct. 1984).

[573] *Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072, 1080 (3d Cir. 1985).

[574] *Joseph*, 959 A.2d at 344 (Pa. Super. Ct. 2008).

[575] *Id.*

[576] *Id.*

[577] *Joseph*, 959 A.2d at 345.

[578] *Sprague*, 276 F. Supp. 2d at 370.

[579] *Id.* at 370 n.6.

[580] *Id.* at 370.

[581] *Joseph*, 129 A.3d at 409–10 (newspaper article suggesting plaintiff committed money laundering and organized crime); *id.* at 434 (affirming trial judge's findings).

[582] *Id.*

[583] *Id.*

[584] *Id.* at 435.

[585] N.T. Jan. 12, 2022 Bench Trial at 225:24–226:1 (emphases added).

[586] *See* Fed. R. Evid. 602.

[587] *Sprague*, 276 F. Supp. 2d at 371 (finding judge's fear of associating with defamed person did not constitute evidence of reputational harm because the judge's own opinion of the defamed person did not change).

[588] *Cf. id.* at 370 (defamation plaintiff suffers reputational harm if the evidence allows an inference those with "no reason to disbelieve the alleged defamation" read the defamation and believed it).

[589] Indeed, Mr. Ralston lived on The Hill School campus for four weeks unsupervised after Headmaster Lehman made this comment.

[590] ECF Doc. No. 402 ¶ 118.

---

[591] N.T. Jan. 13, 2022 Bench Trial at 165:7–13.

[592] *Menkowitz v. Peerless Publ'ns, Inc.*, 211 A.3d 797, 806 (Pa. 2019).

[593] *Reed v. Brown*, 166 A.3d 570, 575 (Pa. Commw. Ct. 2017) (citing Restatement (Second) of Torts § 576, cmts. b & c (1977)).

[594] *See* N.T. Jan. 13, 2022 Bench Trial at 165:7–13.

[595] Mr. Ralston does not argue Zachary Brusko's opinion of him changed. The argument would fail had Mr. Ralston made it for the same reasons relevant to Mr. Zwerner. Mr. Brusko testified he holds a positive view of Mr. Ralston. The allegations did not change Mr. Brusko's view of Mr. Ralston. And even if they did, Mr. Brusko heard the allegations from Mr. Ralston's counsel for purposes of this litigation, not from Attorney Garabedian.

[596] *See* Fed. R. Civ. P. 32(a).

[597] *See* ECF Doc. No. 372 at 70 (using the pagination assigned by the CM/ECF system) (Ralston Dep. at 151:2–2), 77 (Ralston Dep. at 183:1–7).

[598] ECF Doc. No. 403 at 17.

[599] 276 F. Supp. 2d 365.

[600] *Id.* at 367.

[601] *Id.* at 370.

[602] *Id.*

[603] *Id.*

[604] *Id.*

[605] *Id.*

[606] *Joseph*, 959 A.2d at 334 (emphasis added).

[607] *Agriss*, 483 A.2d at 473.

[608] *Joseph*, 129 A.3d at 429.

[609] ECF Doc. No. 400.

[610] *Chicarella*, 494 A.2d at 1112.

[611] *Reed*, 166 A.3d at 575.

[612] *Stine v. Walter*, 29 Pa. D. & C.4th 193, 201–02 (Com. Pl. 1996).

[613] Ex. J-103.

[614] *Id.*

[615] *Joseph v. Scranton Times, L.P.*, 89 A.3d 251, 261 (Pa. Super. Ct. 2014), *aff'd in part, rev'd in part on other grounds*, 129 A.3d 404. As we previously explained in our December 23, 2021 Memorandum, the term "special harm" as used by the General Assembly is not to be confused with the term "special harm" as used in the Restatement, which means economic harm or pecuniary loss. *See Ralston I*, 2021 WL 6072881, at *23.

[616] *Joseph*, 89 A.3d at 261 (cleaned up).

[617] 42 Pa. Stat. and Cons. Stat. Ann. § 8343(b)(2).

[618] *See Ralston I*, 2021 WL 6072881, at *9 ("[T]he Restatement advises similar application of the judicial privilege to attorney and non-attorney conduct.").

[619] *See Higgs v. Atty. Gen. of the U.S.*, 655 F.3d 333, 339 (3d Cir. 2011), *as amended* (Sept. 19, 2011).

[620] *Elia v. Erie Ins. Exch.*, 634 A.2d 657, 660 (Pa. Super. Ct. 1993).

[621] Restatement (Second) of Torts § 593 cmt. c (1977).

[622] *Martin v. Finley*, 349 F. Supp. 3d 391, 428 (M.D. Pa. 2018) (internal quotations omitted).

[623] *Elia*, 634 A.2d at 660.

[624] 42 Pa. Stat. and Cons. Stat. Ann. § 8343(b) (requiring defendant to prove privileged occasion).

[625] *Elia*, 634 A.2d at 661.

[626] *Id.* (footnote omitted).

[627] *Mzamane*, 693 F. Supp. 2d at 506.

[628] *Joseph*, 129 A.3d at 436.

[629] *See Sprague*, 276 F. Supp. 2d at 368 (categorizing presumed damages as compensatory damages).

[630] *Id.*

[631] *Franklin Prescriptions*, 424 F.3d at 341 (internal quotations omitted).

[632] *See Gertz*, 418 U.S. at 349 ("The largely uncontrolled discretion of juries to award [presumed] damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms.

Additionally, the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact.").

[633] *Id.*

[634] David A. Anderson, *Reputation, Compensation and Proof*, 25 Wm. & Mary L. Rev. 747, 749 (1984) (cited in *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 581 (E.D. Pa. 1999), *aff'd*, 229 F.3d 1139 (3d Cir. 2000)).

[635] *Synygy*, 51 F. Supp. 2d at 581.

[636] Anderson, *Reputation*, *supra*, at 749 (citing *Sullivan*, 376 U.S. 254).

[637] Pennsylvania courts "generally" require medical evidence to establish emotional distress damages in defamation and false light cases. *See Taha v. Bucks Cnty.*, No. 12-6867, 2021 WL 534464, at *2 (E.D. Pa. Feb. 12, 2021). But presumed damages allow us to award damages without evidence the damages were suffered. *See Synygy*, 51 F. Supp. 2d at 581 n.10. We need not follow the general rule requiring medical testimony.

[638] *Synygy*, 51 F. Supp. 2d at 581 n.10.

[639] *Doe v. Whitebread*, No. 15-1165, 2017 WL 590272, at *4 (M.D. Pa. Feb. 14, 2017).

[640] *Id.*

[641] 433 F. Supp. 3d at 379.

[642] *Id.* at 378.

[643] *Id.* at 367.

[644] *Id.*

[645] *Id.* at 379.

[646] According to the United States Bureau of Labor Statistics, $40,000 in January 2020 is worth about $46,000 in July 2022. *See* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*, available at https://www.bls.gov/data/inflation_calculator.htm.

[647] *Gertz*, 418 U.S. at 350.

[648] *Clemente v. Espinosa*, 749 F. Supp. 672, 681–82 (E.D. Pa. 1990) (citing *Rhoads v. Heberling*, 451 A.2d 1378 (Pa. Super. Ct. 1982)).

[649] *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1277 (3d Cir. 1979) (quoting *Medvecz v. Choi*, 569 F.2d 1221, 1227 (3d Cir. 1977)).

[650] *Clemente*, 749 F. Supp. at 681.